IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |
| | ) | Filed electronically: January 20, 2006 |

CORRECTED JOINT PRELIMINARY STATUS REPORT

Pursuant to the RCFC, Appendix A, and this Court's Special Procedures Order and Order of October 13, 2005, Plaintiff, Dairyland Power Cooperative ("Dairyland"), and defendant, the United States ("Defendant" or "the Government"), respectfully submit their Joint Preliminary Status Report.

This action involves a contract for acceptance, removal and disposal of spent nuclear fuel and/or high level waste (collectively, "spent fuel" or "SNF") (sometimes called a "Standard Contract") executed on June 15, 1983, between Dairyland and the United States, acting through the Department of Energy ("DOE"). A copy of the Dairyland contract is attached to Dairyland's Complaint. Approximately 59 cases involving the Government's actions in connection with similar contracts are currently pending in this Court.

**(a) Does the Court have jurisdiction over the action?**

Dairyland's claim is based upon a partial breach of the contract between Dairyland and the Government. The parties agree that this Court possesses jurisdiction to entertain this claim

pursuant to 28 U.S.C. § 1491(a)(1). Dairyland states that the Federal Circuit has concluded that this Court possesses jurisdiction to entertain such claims. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000); Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000). Defendant states that, although the appellate court did not consider any challenge to jurisdiction in Maine Yankee or Northern States, the jurisdiction of this Court to entertain the spent nuclear fuel cases is currently pending on interlocutory appeal in PSEG Nuclear, L.L.C. v. United States, No. 05-5162 (Fed. Cir.).

**(b) Should the case be consolidated with any other case and, if so, why?**

**Dairyland's Position**

This case should not be consolidated with any other spent nuclear fuel case or cases. Various Judges on the Court have already properly rejected the Government's request for consolidation on a number of separate occasions.

**Defendant's Position**

Defendant has previously requested that the Court reassign all of the spent nuclear fuel cases to a single judge, followed by consolidation for the limited purpose of resolving issues surrounding the spent nuclear fuel acceptance schedule terms of the Standard Contract. The Court has not granted the Government's request. Nevertheless, defendant continues to believe that reassignment and consolidation of the spent nuclear fuel cases, which would permit resolution of issues surrounding the schedule terms that appear in every Standard Contract, is appropriate.

**(c) Should trial of liability and damages be bifurcated and the reasons therefore?**

**Dairyland's Position**

Trial of liability and damages should not be bifurcated in this action. The Federal Circuit and this Court have already determined that, as a matter of law, the Government has breached the Standard Contracts by failing to begin accepting SNF by the January 31, 1998 contractual deadline. Maine Yankee Atomic Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000); Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000); Consumers Energy Co. v. United States, 65 Fed. Cl. 364 (2005) (Damich, C.J.). Therefore, the only remaining issue in this case is Dairyland's damages for the Government's partial breach of contract.

Dairyland disputes virtually everything the Government says below about Greater Than Class C ("GTCC") waste, and notes that the Government's position has been rejected -- at the pre-trial stage -- by every Judge who has considered it substantively in a spent fuel case in this Court. Dairyland also objects to the Government's inappropriate posturing about this issue in the JPSR. The Government can bring issues to the Court by motion if it wishes, but should not clutter the JPSR by selectively arguing particular substantive issues. Dairyland reserves the right to respond fully at an appropriate time.

More fundamentally, the Government is making factual assumptions about the presence and effect of GTCC waste that appear to be both untrue and premature. The Government's statement that "Dairyland undoubtedly possesses" GTCC is incorrect. As Dairyland's counsel has informed the Government, the best information available to Dairyland indicates that, at present, Dairyland's does not possess any material that will need to be disposed of as GTCC waste. Dairyland has a very small, demonstration reactor that was permanently shut down in

1987. Radioactivity decays over time, and Dairyland currently believes that any material in the reactor or in Dairyland's spent fuel pool that may once have been radioactive to GTCC levels has decayed to levels that will allow it to be disposed of as class B or class C waste, as defined by the Nuclear Regulatory Commission. Most importantly for present purposes, based on the best information currently available, Dairyland likely will not need to spend any significant amount of money to store GTCC waste for an extended period. In short, at present Dairyland does not believe it has any damages attributable to GTCC waste. Dairyland is therefore similarly situated to plaintiffs in other spent fuel cases where this Court has recognized that the GTCC waste issues the government seeks to raise are not properly presented, or "ripe," for decision. See Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 659 (2003); Tenn. Valley Auth. v. United States, 60 Fed. Cl. 665, 673-74 (2004).

In the course of preparing its Rule 26(a) initial disclosures, and otherwise preparing for discovery and other pretrial proceedings, Dairyland will continue to investigate these matters and will advise the government if such investigation reveals that Dairyland does (or may) have GTCC material at its reactor and/or that Dairyland's damages claim in this case will include costs associated with GTCC material. In that event, and at that time, the parties can (and should) discuss how best to present to the Court for resolution any legal issues associated with GTCC material that Dairyland may possess. But until then, the GTCC waste-related matters discussed by the Government below are at best premature and appear irrelevant in this case.

**Defendant's Position**

Although the Government does not seek bifurcation of the trial in this matter, the Government believes that the Court should decide the GTTC issue before the parties proceed to

discovery on damages.

Dairyland, which ceased operating its nuclear power plant in 1987, undoubtedly possesses GTCC, as we had previously understood that fact to be true through prior communications with counsel for Dairyland.[1] While the utility plaintiffs maintain that DOE is obligated to accept its GTCC pursuant to the Standard Contract, the Government has always contended that GTCC is not covered by the Standard Contract and that, in fact, GTCC is covered by another statute altogether, the Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPA"), Pub. L. No. 99-240 (codified at 42 U.S.C. §§ 2021b-2021i). Thus, the Government believes that any claim by Dairyland for the storage costs of its GTCC should not be allowed in this case. Furthermore, resolution of this issue is critical. Most, if not all, of the SNF storage costs claimed by Dairyland would likely be necessary for the storage of its GTCC as well. Thus, resolution of this issue has profound implications regarding the effect of DOE's delay upon Dairyland's claimed costs. Furthermore, the GTCC issue is a purely legal question. Consequently, the Government believes this issue should be decided before the Government begins fact discovery.

If Dairyland were willing to agree to forgo any claim for storage costs associated with GTCC, and to agree that it is responsible for any costs associated with the storage of GTCC waste at its facility for the indefinite future, the Court need not address the issue. However,

---

[1] GTCC waste is a form of low-level radioactive waste that contains concentrations of certain radioactive nuclides, such as Cesium-137 or Carbon-14, that exceed the concentration limits established by the Nuclear Regulatory Commission ("NRC") for Class C waste. See 10 C.F.R. § 61.55; see also 10 C.F.R. § 61.2 (definition of "waste"). Specifically, low-level radioactive waste is classified as GTCC waste if it exceeds the Class C concentration limits for either the long-lived radionuclides contained in Table 1 of 10 C.F.R. § 61.55 or the Class C limits for the short-lived radionuclides contained in Table 2 of 10 C.F.R. § 61.55. GTCC waste from nuclear reactors comes from metal components in the reactor that absorb neutrons during the reactor's operation and become irradiated. Examples include the inside of the core shroud that surrounds the nuclear core, control rods, and the support plates that hold the reactor core in place. 66 Fed. Reg. 51,823, 51,824 (Oct. 11, 2001).

rather than simply removing the issue from the case, Dairyland tries to have it both ways by stating that it "does not believe it has any damages attributable to GTCC waste," while leaving opening the possibility that it may make such a claim in this matter in the future. Because Dairyland has left before the Court the specter of a claim for the storage of GTCC waste, it is appropriate for the Court to address the issue of whether such a claim should be precluded as a matter of law. Accordingly, the Government plans to file a dispositive motion explaining that, despite Dairyland's suggestion that DOE is obligated to accept GTCC pursuant to the Standard Contract, in fact, the removal of GTCC is covered by another statute altogether, the Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPA"), Pub. L. No. 99-240 (codified at 42 U.S.C. §§ 2021b-2021i). The Court should address this matter now so that the parties may avoid engage in any discovery regarding GTCC waste.

**(d) Should further proceedings in this case be deferred pending consideration of another case before this court or any other tribunal and the reasons therefore? Is there any basis for transferring or remanding the case to another tribunal?**

**<u>Dairyland's Position</u>**

Dairyland, an electric cooperative based in Wisconsin, is a relatively small commercial entity that has a relatively substantial claim for significant damages arising from DOE's partial breach of Dairyland's spent fuel contract. Dairyland desires to move forward toward resolution of that claim. Nevertheless, because this case shares common legal and factual issues with other spent fuel cases that are much further advanced procedurally, Dairyland believes that discovery and trial in this case are likely to be more efficient and effective for the parties and the Court if the parties have the benefit of decisions that are currently pending, following damages trials, in three other spent fuel cases pending in the Court: (i) the consolidated Yankee Utilities' trial

(Yankee Atomic Elec. Co. v. United States, No. 98-126C; Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C; Maine Yankee Atomic Power Co. v. United States, No. 98-474C), ("Yankee" cases), (ii) Sacramento Municipal Utility District v. United States, No. 98-488C ("SMUD"), and (iii) Tennessee Valley Authority v. United States, No. 01-249C ("TVA"). Trials in those cases were all completed several months ago, or more, and decisions in each of them are expected in early to mid-2006.

Accordingly, Dairyland respectfully requests that this case be set now for trial in the Fall of 2007 (specifically, the September-November 2007 time frame). By that time, the parties and the Court will likely have significant additional guidance on the key factual and legal issues in this case from decisions in the cases noted and, possibly, other spent fuel cases. Those decisions, therefore, appear likely to facilitate the "just, speedy and inexpensive resolution" of Dairyland's claims here. See RCFC 1. Provided the Court agrees and sets a Fall 2007 trial date, Dairyland respectfully requests that discovery in this case not commence until July 28, 2006, and that further proceedings in this case be stayed until then to best conserve party and Court resources. A detailed proposed discovery and scheduling plan based upon a Fall 2007 trial date is set forth in response to question (j) below.

Dairyland strongly opposes commencing discovery until the Court sets a firm trial date. Experience in the spent fuel cases and other cases teaches that commencing discovery before the end-date for discovery is established can promote unfocused and inefficient discovery efforts that increase the cost and burden of discovery for both parties and the Court. Should the Court for any reason schedule trial of this case after the Fall of 2007, Dairyland respectfully requests the opportunity to revise the proposed discovery and pretrial scheduling plan set forth below to push

back the commencement of discovery and key discovery deadlines by a corresponding period.

As explained in Dairyland's January 6, 2006 Unopposed Motion for Enlargement of Time to Submit Joint Preliminary Status Report, the Government previously had agreed with Dairyland to a proposed pretrial schedule whereby a trial date would be set for mid to late 2007, and a discovery and pretrial schedule would be set in accordance with this trial date. This agreement was set forth in the parties' September 30, 2005 Joint Status Report. However, the Government apparently has now altered its position, at least to some degree, and states that it prefers an indefinite stay of proceedings pending decisions in no less than six other spent fuel cases. The Government's position is untenable for several reasons.

First, continuing the stay over Dairyland's objection would be fundamentally unfair and likely an abuse of discretion. See Landis v. North Am. Co., 299 U.S. 248, 258 (1936); Cherokee Nation of Okla. v. United States, 124 F.3d 1413, 1418 (Fed. Cir. 1997).

Second, Dairyland objects to the Government's mischaracterization of the six "lead" cases described below. These six cases were designated by this Court as lead cases only for purposes of resolving the Government's motions for summary judgment on rate of acceptance. The Government's contention that these cases were designated as lead cases for all purposes, including trial, is simply wrong. Moreover, the Government's summary judgment motions on rate of acceptance were denied in every one of these cases where they were ruled on. See, e.g., Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003); Commonwealth Edison, 56 Fed. Cl. 652; the Yankee cases, Nos. 98-126C, 98-154C, 98- 474, Order of June 26, 2003; see also Consumers Energy, 65 Fed. Cl. at 375; Power Auth. of N.Y. v. United States, 2004 WL 3461071 at *1 (Fed. Cl. Sept. 30, 2004) (Damich, C.J.). Moreover, in Indiana Michigan, the

Court granted a cross-motion for summary judgment on the rate of acceptance, holding that 3,000 MTU is the contractual rate as a matter of law.

Third, the Government is wrong in its suggestion that the rate of acceptance issue needs to be resolved prior to resolution of damages issues. This is exactly the same argument that various Judges of the Court have rejected in refusing the Government's request on numerous occasions to consolidate the spent fuel issues.

The Government's "fallback" position that Dairyland should be ordered to participate in coordinated discovery proceedings if a stay is not granted is similarly untenable. In 2001-02, plaintiffs in the then-pending spent fuel cases agreed to a brief period of coordinated discovery, which became a way for those plaintiffs to obtain discovery necessary to respond to the government's summary judgment motions on rate of acceptance and GTCC waste issues. Since that coordinated discovery concluded (in 2002), other than the Government's web-based document production database, there has not been coordinated discovery in any of the other spent fuel cases. There have been no common depositions. Indeed, the Government's key witnesses have already testified extensively in depositions and at trial, so not much additional testimony is needed from those witnesses and Dairyland does not expect to take many depositions. There is simply no need, or occasion, for further coordinated discovery with other spent fuel cases, and any such coordination would be oppressive, unduly burdensome and expensive.

Finally, for the reasons stated above, Dairyland disagrees with the Government's position that the GTCC issue needs to be resolved before the commencement of fact discovery.

**<u>Defendant's Position</u>**

As defendant explained in its status report dated April 23, 2004, proceedings in this case

should be stayed pending the conclusion of trial proceedings in the "lead" cases currently scheduled for trial. The Chief Judge has identified six "lead" or "accelerated" cases (out of the original 65 spent nuclear fuel cases) in which the spent nuclear fuel acceptance schedule issues are to be decided. These acceptance schedule issues, which should resolve the rate at which DOE is obligated to accept spent nuclear fuel from the nuclear utility contract holders under the terms of the Standard Contract, must be decided before the Court can evaluate specific damages causation issues. Without resolution of the issues surrounding the acceptance schedule by which DOE was obligated to accept plaintiff's spent nuclear fuel under the terms of the Standard Contract, the Court cannot identify whether specific damages that plaintiff alleges it has incurred or will incur were "caused" by DOE's delay in beginning spent nuclear fuel acceptance or whether those costs would have been incurred regardless of the delay.

Dairyland asserts that the Government previously "agreed" not to ask for a continued stay in this case and to proceed to trial in 2007. This assertion is incorrect. Both counsel for plaintiff and the Court have been well aware for many months of our position in this regard. Indeed, in a motion filed on March 29, 2004, we informed the Court and plaintiff that, given the common issues that run through all of the SNF cases pending before the Court of Federal Claims, such as the scope of the Department of Energy's ("DOE's") contractual obligations under the Standard Contract between DOE and the nuclear utilities, we believed it would be best to wait for the resolution the six lead cases before this case proceeded. See Defendant's Motion to Stay All Proceedings Or, In The Alternative, For Coordinated Discovery Regarding Rate and Acceptance Issue, at 8-12. Although the Court stayed this case until the United States Court of Appeals for the Federal Circuit issued its decision in Indiana Michigan Power Co. v. United States, 422 F.3d

1369 (Fed. Cir. 2005), we understood that the Court desired for this case to proceed. Notwithstanding the Court's apparent disagreement with our position, we respectfully believed, and continue to believe, that the best course of action for all of the spent nuclear fuel cases is to wait until the resolution of the six lead SNF cases before litigating the remaining SNF cases. It was against this backdrop that, in September 2005, we agreed with plaintiff that, as plaintiff states in its motion, it would be reasonable to request a trial of Dairyland's claims in mid to late 2007. Despite plaintiff's assertions to the contrary, our position regarding a potential trial date for this matter has not changed since those discussions.

Defendant further believes that, to the extent that the Court declines to stay proceedings in this case, the Court should order the plaintiff to participate in coordinated discovery with the other spent nuclear fuel plaintiffs, for the reasons explained in defendant's April 23, 2004 report. Further, to the extent that the Court does not stay this case, the Government believes that the most efficient use of time would require resolution of the GTCC issue before any damages discovery begins. However, should the Court choose not to stay the case and proceed to trial, the Government generally agrees with Dairyland's proposal for a trial scheduled for Fall 2007 as well as the discovery and pretrial schedule set forth in response to question (j) below would be established in accordance with this trial date.[2]

Neither party believes there is any basis for transferring or remanding this case to another tribunal.

---

[2] We do not agree with Dairyland's representation that a schedule for discovery, without first identifying a trial date, is not workable. To the contrary, we see no need to schedule a trial date at this time, but are willing to work through discovery prior to defining a trial date. Nevertheless, absent a stay of proceedings, we will not object to Dairyland's proposed trial date at this time. Of course, to the extent that problems arise during discovery, we reserve the right to revisit that non-opposition.

**(e) In cases other than tax refund actions, will a remand or suspension be sought and, if so, why and for how long?**

The parties do not intend to seek a remand. Assuming a Fall 2007 trial date, Dairyland requests a suspension or stay of the case until July 2006 for the reasons stated in response to question (d) above.

**(f) Will additional parties be joined and, if so, a statement describing such parties, their relationship to the case, and the efforts to effect joinder and the schedule proposed to effect joinder?**

The parties do not believe that additional parties will be joined.

**(g) Does either party intend to file a motion pursuant to RCFC 12(b) or 56 and, if so, a schedule for the intended filing?**

**Dairyland's Position**

At this time, Dairyland does not intend to file any motions pursuant to RCFC 12(b) or 56. Government counsel had previously agreed with Dairyland counsel that Dairyland would not have to respond to any GTCC summary judgment motion brought by the Government until August 2006 at the earliest -- after the commencement of discovery under Dairyland's proposed schedule. Regardless of any agreement, in view of the fact that Dairyland's counsel is scheduled to try the Pacific Gas & Elec. ("PG&E") spent fuel case in June 2006, and will be engaged in extensive post-trial briefing in that case during the following month, Dairyland respectfully requests that its response to any GTCC motion brought by the Government be deferred until at least August 28, 2006.

As discussed above, the Government's arguments regarding its anticipated summary judgment motion regarding the rate of acceptance are precisely the same ones that have been rejected by three Judges in five cases who denied the Government's motions for summary

judgment on the rate of acceptance issue. No Judge in this Court has accepted the Government's arguments.

In particular, all the Judges who have addressed the issue have rejected the Government's argument here that the Standard Contract contains a "mechanism" to set the schedule. <u>See</u> decisions and Orders cited above on p. 8. Rather, the Contract is silent on the schedule which requires the Court to enforce a reasonable schedule. Under any reasonable schedule, DOE would have removed Dairyland's very small amount of spent soon after commencing performance in January 1998. Therefore, the Government's argument here that DOE would have delayed removing Dairyland's very small amount of spent fuel for twelve years or more, thus imposing on Dairyland tens of millions of dollars of avoidable costs, is completely untenable -- and certainly not "reasonable" even when measured by the DOE's own recent planning documents. Moreover, the Government' suggestion that Dairyland has no damages even under its own damages theory is wrong (and absurd). But these issues need not be debated in the JPSR. They can and doubtless will be explored thoroughly during discovery and at trial.

**<u>Defendant's Position</u>**

As discussed previously, the Government believes that resolution of the GTCC issue prior to fact discovery would be the most efficient course. Consequently, the Government intends to file a motion for summary judgment regarding the GTCC issue on or before March 15, 2006. Although Dairyland asserts that the Government had somehow previously agreed that Dairyland would not have to file any response to our GTCC waste motion until after discovery commences, Dairyland has a different understanding of past conversations than the Government. Dairyland appears to be mistaken regarding the timing of our GTCC motion. Rather than

agreeing to delay the time for Dairyland to respond to our motion, as Dairyland suggests, the Government has consistently believed that, to save the parties the expense and burden of discovery regarding the issue of GTCC waste, the Court should proceed with the resolution of our motion sooner, rather than later.[3]

Additionally, the Government may elect to file a motion for summary judgment regarding the rate of SNF acceptance following fact discovery. The Standard Contract does not specify a rate at which DOE was obligated to accept SNF. Instead, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes a process for determining when DOE would accept SNF from each utility.[4] The appropriate rate of acceptance is the one that was published in the 1991 ACR. Although there has been some deviation among the utility plaintiffs regarding ramp-up rates, the utilities have uniformly argued that DOE was obligated to accept SNF at an annual rate of 3,000 Metric Tons Uranium ("MTU").

Dairyland presents a case that is particularly sensitive to the rate issue. Dairyland has been shut down since 1987 and is presently storing its SNF in a spent fuel pool. To date, Dairyland has not begun construction of an Independent Spent Fuel Storage Installation

---

[3] In response to plaintiff's request that it be permitted to defer any response to the Government's GTCC motion because it is involved in another spent nuclear fuel trial, we believe it more appropriate for the Court to follow the Court's rules regarding responses to motions and to consider any requests for enlargements of time as they are submitted.

[4] Briefly, the process provided that DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a). After DOE had issued its proposed acceptance priority ranking on April 1, 1991, and no earlier than January 1, 1992, utilities were required to submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1. If DOE approved the DCS, the parties effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id.

("ISFSI"), which has given rise to the majority of the damages claimed in Yankee, SMUD, and TVA. Because Dairyland has not incurred those capital costs, Dairyland's damages claim likely arise from the alleged cost of operating its spent fuel pool longer than it would have if DOE had begun accepting Dairyland's SNF in 1998. Applying the same model that has been used in each of the spent nuclear fuel trials, DOE had determined that, if the Court were to accept the Government's position regarding the rate of acceptance, DOE would not have accepted all of Dairyland's SNF until sometime after 2010 even if DOE had begun accepting SNF in 1998. Applying the utility position regarding the rate of SNF acceptance to the model shows that Dairyland's SNF would still not have been removed by DOE by the date that Dairyland filed its complaint with this Court. Because the cost of maintaining a spent fuel pool is the same whether the pool is completely full or not, Dairyland would not have incurred any additional operations and maintenance costs if the Government position regarding rate is correct and, potentially, even under Dairyland's likely rate theory. Thus, the rate issue also has a profound effect upon Dairyland's damages. Consequently, the Government may file a motion for summary judgment regarding the rate of SNF acceptance during or following the close of discovery.

**(h) What are the relevant factual and legal issues?**

**Dairyland's Position**

The material issues of fact and law in this case are the following:

1. The damages Dairyland has incurred and is incurring as a result of DOE's partial breach of Dairyland's contract, arising from Dairyland's costs to store, monitor and secure spent fuel for an extended period and for its actions to mitigate its losses from the DOE's partial breach, including pursuit of alternative, off-site, interim storage of spent fuel.

2. DOE's obligations and/or likely actions regarding acceptance of GTCC absent breach of the parties' contract (in the event Dairyland discovers, contrary to its current best information, that it actually has some GTCC waste and discovers that it will incur GTCC-related damages).

**<u>Defendant's Position</u>**

The main issues in this case are:

1. Whether DOE was required to accept SNF pursuant to the process provided in the Standard Contract.

2. Whether DOE is obligated to accept GTCC pursuant to the Standard Contract.

3. Whether DOE's partial breach of the Standard Contract caused Dairyland to incur the claimed damages.

4. The extent to which Dairyland can recover post-complaint damages in this case.

**(i) What is the likelihood of settlement? Is alternative dispute resolution contemplated?**

**<u>Dairyland's Position</u>**

Dairyland has a strong interest in exploring settlement. However, at present there is no possibility of settlement because the Government has made clear it is only willing to discuss settlement on terms that are unacceptable to Dairyland. For the same reason Dairyland does not contemplate pursuing ADR at the present time.

**<u>Defendant's Position</u>**

The Government is willing to discuss settlement and will continue to explore reasonable settlement options as this case progresses.

**(j) Proposed Scheduling Plans**

**<u>Dairyland's Position</u>**

As discussed above, Dairyland believes that decisions in the spent fuel cases that have already been tried will likely narrow, if not resolve, some of the key factual and legal issues in this case. Dairyland proposes that a trial date be set for the Fall of 2007 (September-November 2007) and, in accordance with a Fall 2007 trial, that discovery in this case commence on July 28, 2006. Further proceedings in this case would be stayed until then. In accordance with a Fall 2007 trial date, Dairyland proposes the following scheduling plan:

1. <u>Dates for joinder of additional parties</u>: The parties do not believe that additional parties will be joined.

2. <u>Discovery Plan</u>:

| Event | Date |
|---|---|
| Commencement of Discovery; RCFC 26(a)(1) Initial Disclosures (including exchange of documents) | July 28, 2006[5] |
| Complete Fact Discovery | January 12, 2007 |
| Three Alternative Dates for Status Conference | January 22, 2007 at 10:00 a.m.<br>January 23, 2007 at 10:00 a.m.<br>January 24, 2007 at 10:00 a.m. |
| Plaintiff's Expert Report(s) | January 19, 2007 |
| Defendant's Expert Report(s) | March 23, 2007 |
| Rebuttal Expert Report(s) | April 27, 2007 |
| Deadline to File Dispositive Motions | May 4, 2007 |

---

[5] Assuming the Government submits its request to Dairyland by June 28, 2006, Dairyland has agreed to respond to the Government's request for production of documents on July 28, 2006 as well.

| | |
|---|---|
| Complete Expert Discovery | May 11, 2007 |

Dairyland strongly opposes commencing discovery until a reasonable time before the Court sets a firm trial date. As mentioned above, Dairyland is a small company with limited resources, and commencing discovery far in advance of trial or before an end-date for discovery is established can promote unfocused and inefficient discovery, efforts that increase the cost and burden of discovery for both parties and the Court. Therefore, should the Court for any reason schedule trial of this case after the Fall of 2007, Dairyland would respectfully request that it be allowed to make appropriate adjustments to the proposed schedule to push back the commencement of discovery and key discovery deadlines by a corresponding period.

Dairyland disagrees with the Government's proposal that fact discovery remain open until May 11, 2007. It is not appropriate for expert reports to be due until after fact discovery has closed. That is the practice that (to Dairyland's knowledge) has been followed in all spent fuel cases to date, and the practice routinely followed in this Court and others under the Federal Rules of Civil Procedure. Furthermore, there is no requirement under the RCFC that a party submit a damages "claim" to the Government beyond what is required by RCFC 26(a). Dairyland anticipates providing, pursuant to its obligations under RCFC 26(a), a similar level of detail about its damages to what was provided by the plaintiff in the PG&E case, which has been satisfactory to the Government and which the Government has used to conduct discovery in that case without difficulty.

**Defendant's Position**

Although the Government believes that the GTCC issues should be decided before the parties begin discovery in this matter, to the extent that the Court does not stay proceedings in

this case, the Government, to the extent that this case is not stayed, generally will not disagree with Dairyland's proposed schedule. However, the Government does not agree that there be a separate closing date for fact discovery versus another for expert discovery. Although Dairyland asserts that bifurcated deadlines for the conclusion of fact discovery and expert discovery are supported by the practice of both this Court and other courts that follow the Federal Rules of Civil Procedure, we are aware of no provision in this Court's rules that encourages or requires such bifurcation. Further, Dairyland's apparent desire that the Government complete the entirety of its fact discovery before Dairyland discloses to the Government the entirety of its damages claims and their bases, which we presume from our experience in other spent nuclear fuel cases will not be provided to us until we receive Dairyland's expert reports, would be inherently unfair and prejudicial to the Government.[6] If defendant is required to complete its fact discovery before it is made fully aware of Dairyland's damages claims and the support for those claims, defendant will be required to engage in broad and potentially unfocused discovery about Dairyland's possible damages that will not only be wasteful, but will not allow us to focus upon and develop detailed analyses of those costs that Dairyland will later tell us it is claiming in this litigation. Contrary to Dairyland's representation, several judges, including Senior Judge Merow in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), and two other spent nuclear fuel cases and Judge Wiese in the two spent nuclear fuel cases assigned to him, have required the plaintiff, before requiring the Government to take any discovery, to provide the Government with a detailed claim supported by actual cost data. To the extent that the Court does not require such

[6] Although Dairyland asserts that it will identify its damages in its initial disclosures, the Government's past experience in the spent nuclear fuel cases is that the level of detail contained in the initial disclosures is insufficient to preclude the need for extensive discovery to attempt to define the scope of and support for the plaintiff's claimed

a detailed claim at the outset of the Government's discovery in this case, the Government requests that discovery – both fact and expert – remain open until May 11, 2007, to eliminate any concern that the Government might fail to identify some aspects of Dairyland's eventual damages claim during the fact discovery portion of proceedings. Similarly, the deadline for filing dispositive motions should be extended until May 25, 2007.

Dairyland's request that fact discovery conclude at an earlier date than expert discovery further prejudices the Government in this case in light of the significant differences in discovery already available to each party. As the Court is aware, the Government has previously made extensive discovery from its files available to all spent nuclear fuel plaintiffs, and counsel for Dairyland has had, and continues to have, access to that extensive discovery that the Government began producing in 1999, including access to the dozens of depositions of Government witnesses previously taken in these cases. Conversely, the Government has not obtained any discovery from Dairyland regarding the damages that it will be claiming in this litigation. Given that Dairyland should need little, if any, additional discovery from the Government about what Dairyland's damages are, a shortened time period for the Government's fact discovery – completed before Dairyland provides the Government with any detailed definitization of the damages that it will claim in this litigation – would be unfair. Further, a bifurcated deadline is simply unnecessary.

Finally, regardless of the Court's decision upon a bifurcated discovery deadline, Dairyland's proposed schedule does not appear to require Dairyland to provide the Government with a detailed damages claim prior to the delivery of expert reports. However, a detailed claim

---

damages. Further, the Government has found that claimed damages about which the Government was previously unaware are often contained in the expert reports.

is a useful prerequisite to efficient discovery because it permits the Government to know the quantity and basis for Dairyland's damages and allows the Government effectively to explore the factual predicate of those damages during fact discovery. Dairyland's proposed schedule contemplates providing the Government with that information on January 19, 2007, a week after the close of fact discovery. As previously discussed, the Government would not be able to explore the basis of Dairyland's claim, but would be forced to anticipate every possible factual predicate which might support a claim before receiving the claim itself. To make discovery significantly more efficient and less costly, Dairyland, like the plaintiffs in the cases before Senior Judge Merow and Judge Wiese, should be required to submit its detailed damages claim to the Government on or before May 26, 2006, at the outset of discovery.

3. Additional information

(i) Dairyland does not at present intend to file any dispositive motions after conducting limited discovery on particular issues. The Government wishes to file a motion for summary judgment regarding the GTCC issue and may file a motion for summary judgment regarding the rate of acceptance during or following the close of fact discovery.

(ii) Dairyland does not believe that discovery should be conducted in phases, except that fact discovery should be completed prior to commencement of expert discovery.

(iii) Dairyland believes that the presumptive limit of 25 interrogatories per individual party is adequate. The parties believe that the parties should be permitted to negotiate a variance from the presumptive limit of ten depositions per party if they deem

it necessary and appropriate.

(iv) The parties do not anticipate any physical or mental examination of any parties pursuant to RCFC 35.

(v) Assuming that paragraph 13 of Appendix A, which requires the meeting of counsel no later than 63 days before the pretrial conference, is applied, the earliest date by which the case reasonably should be expected to be ready for trial is October 2007. If, however, the Court allows the parties to apply 14 or more of these 63 days to the period following the close of discovery and preceding the meeting of counsel -- during which the parties are required under the Court's standard Trial Preparation Order to exchange preliminary proposed findings of fact, witness and exhibit lists, and objections -- then the parties anticipate being ready for trial in September 2007.

(vi) The length of time expected to try this case to judgment is approximately two weeks.

(vii) The parties request that the trial take place in the Court of Federal Claims in Washington, D.C.

**(k) Are there any special issues regarding electronic case management needs?**

**Dairyland's position**

There are no special issues regarding electronic case management needs at this time. Based upon Dairyland counsel's experience in the PG&E case, at some point issues and objections may arise concerning the Government's use of its electronic document production website to respond to Dairyland's document requests.

**Defendant's position**

The Government agrees that there are no special needs that the Court need be aware of at this time. However, the Government would like to advise the Court that, to date, much of the document production in this case and the other cases involving an alleged breach of the Standard Contract has been handled electronically, through a secured website upon which the Government has produced documents to all of the various spent nuclear fuel plaintiffs. Further, this case may lend itself to electronic trial presentation, when trial is necessary.

**(l) Is there other information of which the court should be aware at this time?**

The parties held several telephonic meetings of counsel as required in Appendix A ¶ 3 in December 2005 and January 2006, and, prior to those meetings, exchanged the information needed for the JPSR. However, consistent with their respective positions regarding the proposed trial and discovery schedule, the parties have agreed and stipulated that their RCFC 26(a)(1) initial disclosures will be exchanged on July 28, 2006, provided that a Fall 2007 trial date is set and the proposed discovery schedule is adopted.

Dairyland respectfully objects to publicly disclosing specific estimates of its litigation costs, as such disclosure would disclose information protected by the work product doctrine. Dairyland understands, through discussions with its counsel, that its litigation costs in this matter will be substantial. Dairyland's counsel hereby certifies that these estimates have been provided to Dairyland.

The Government is currently not in a position to estimate its litigation costs.

**Proposed Dates and Times for Preliminary Status Conference**

By minute entry Order of January 12, 2006, the Court has scheduled a status conference

for February 8 at 2 p.m. The parties therefore respectfully omit the otherwise-required suggestion of dates and times for the preliminary status conference.

Respectfully submitted,

Dated: January 20, 2006

s/Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

s/Russell A. Shultis
RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
U. S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, DC 20530
Telephone: (202) 305-7561
Facsimile: (202) 305-2503
Attorney for Defendant

Dated: January 20, 2006