No. 04-106C
Chief Judge Damich
Filed Electronically on December 28, 2006

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DAIRYLAND'S MOTION TO COMPEL DISCOVERY RESPONSES

---

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173
(202) 261-4751
Counsel for Plaintiff
Dairyland Power Cooperative

Of Counsel:

ROBERT L. SHAPIRO
KEVIN STERN
Greenberg Traurig, LLP

# TABLE OF CONTENTS

**Page**


I. The Government's Interrogatory Responses Are Inadequate And the Court Should Compel Proper Responses. .... 3

A. Improper Refusal to Respond to Interrogatories .... 3

B. Improper Refusal to Respond to Certain Interrogatories .... 6

C. Improper Reliance on RCFC33(d) and References to Individuals Who "May" Have Information .... 9

II. The Government's Responses To Dairyland's Document Requests Are Inadequate And The Court Should Compel Proper Responses .... 16

A. The Government Should Be Required To Produce Documents Promptly Where It Says Documents Will Be Produced .... 17

B. The Government Should Be Required To Respond To Requests Even If They Are Contrary To The Government's Theory of the Case .... 18

C. The Government Should Be Required To Produce Documents Regarding Dairyland's Spent Fuel .... 19

D. The Government Should Be Required To Update Document Production To Include Recent Documents .... 19

E. The Government Should Be Required To Produce NRC Documents .... 20

III. Sanctions .... 21

# TABLE OF AUTHORITIES

**Federal Cases** **Page**

*American Rockwool v. Owens-Corning Fiberglass Corp.*, 109 F.R.D. 263 (E.D.N.C. 1985) .......... 13, 14

*Bonds v. District of Columbia*, 93 F.3d 801 (D.C. Cir. 1996) .......... 13

*Cable & Computer Tech., Inc. v. Lockheed Saunders, Inc.*, 175 F.R.D. 646 (C.D. Cal. 1997) .......... 7

*Daiflon, Inc. v. Allied Chemical Corp.*, 534 F.2d 221 (10th Cir.), *cert. denied*, 429 U.S. 886 (1976) .......... 12

*Govas v. Chalmers*, 965 F.2d 298 (7th Cir. 1992) .......... 14, 15, 16

*In re One Bancorp Secs. Litig.*, 134 F.R.D. 4 (D. Me. 1991) .......... 8

*In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 320 (N.D. Ill. 2005) .......... 12, 13

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) .......... 4, 5

*Leksi, Inc. v. Fed. Ins. Co.*, 129 F.R.D. 99 (D.N.J. 1989) .......... 7

*Lexington Ins. Co. v. Commonwealth Ins. Co.*, No. C983477CRBJCS, 1999 WL 33292943 (N.D. Cal. 1999) .......... 7

*Pacific Gas & Electric Co. v. United States*, No. 04-074C & 075C, (Fed. Cl. filed Jan. 22, 2004) .......... 4

*Pascale v. G.D. Searle & Co.*, 90 F.R.D. 55 (D.R.I. 1981) .......... 14

*Precision Pine & Timber, Inc. v. United States*, WL 1819224 (Fed. Cl.) .......... 22

*Sabel v. Mead Johnson & Co.*, 110 F.R.D. 553 (D. Mass. 1986) .......... 12

*T.N. Taube Corp. v. Marine Midland Mortgage Corp.*, 136 F.R.D. 449 (W.D.N.C. 1991) .......... 13, 14

*United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 230 F.R.D. 538 (N.D. Ill. 2005) .......... 7

*United States v. Dist. Council of New York City*, No. 90CIV5722CSH, 1992 WL 188379 (S.D.N.Y. July 30, 1992)........................................ 13

*Yankee Atomic Elec. Co. v. United States*, 72 Fed. Cl. 249 (2006) ........................................ 5, 11

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl. filed Feb. 18, 1998)........................................................................................................ 9

**<u>Federal Rules</u>**

FRCP 33(c) ........................................................................................................ 12

RCFC 37(a)........................................................................................................ 22

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04-106C |
| | ) | (Chief Judge Damich) |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

DAIRYLAND'S MOTION TO COMPEL DISCOVERY RESPONSES

The government, after obtaining enlargements of time totaling 29 days (in addition to the 30 days provided by the Rules), has served "responses" to Dairyland's first set of interrogatories and first set of document requests that are wholly inadequate. *See* attachment 1 (interrogatory responses); attachment 2 (document request responses). Dairyland therefore moves to compel proper responses, and requests that the Court sanction the government for its dilatory conduct and improper responses.

INTRODUCTION

The government has explicitly refused to respond at all to five of Dairyland's interrogatories (nos. 5, 6, 7, 8 and 12), has explicitly refused to respond until later (after discovery) to five more interrogatories (nos. 9, 13, 14, 15 and 16), and has effectively refused to respond to all but one (no. 3) of the remaining eight interrogatories by either simply referring in general terms to prior document productions and/or indicating that certain named individuals "may" have had some involvement in the matters addressed by the particular interrogatory. Although in some instances the government purports to invoke Rule 33(d), which allows a party in certain circumstances to refer to documents in response to interrogatories, the government's reliance on that procedure is improper for reasons discussed below. Further, the government has

also neglected to comply with the requirement of Rule 33(b) that interrogatory responses "shall be answered . . . under oath . . . [and] are to be signed by the person making them;" the "responses" thus do not actually constitute responses at all, and the government therefore has also violated the Court's December 4 Order, which directed the government to provide responses by December 8.

The government's "responses" to Dairyland's document requests are similarly deficient. Even though the government states in response to 17 of Dairyland's 42 document requests that it will be producing additional documents, to date the government has not produced a single document and has not responded to Dairyland's inquiry as to when those documents will be produced. *See* Letter Stouck to Shultis dated December 12, 2006, attachment 3. Most of the government's responses to Dairyland's remaining document requests refer in vague terms to prior document productions and refuse to produce any additional documents unless Dairyland "narrows" its requests in unspecified ways. Nor has the government served or identified any log of privileged documents, or indicated when it will serve such a privilege log. See attachment 5, Declaration of Todd Moore, ¶9. More fundamentally, in addition to these specific deficiencies with the government's responses to specific document requests, the government has not produced, and has made clear it does not intend to produce, any actual documents in response to Dairyland's requests. Rather, the government has directed Dairyland to search for documents responsive to its requests on a document production website the government has set up for all SNF cases. *Id.* at ¶4. This website consists of posting of various large "containers" of documents that the government has produced over time in response to various document requests and disclosure requirements in the various SNF cases. These document containers are only labeled generically, apparently based upon the source of the documents. *Id.* at ¶6. *The*

government's website does not disclose what types of documents are contained in the containers and the containers do not reference any particular document requests or disclose whether the documents contained therein are being produced as they are kept in the ordinary course of business. The government's chosen method of document production, to which Dairyland never consented, does not comply with the government's obligations under Rule 34.

## DISCUSSION

I. The Government's Interrogatory Responses Are Inadequate And the Court Should Compel Proper Responses.

A. Improper Refusal to Respond to Interrogatories on Relevance Grounds. The government has explicitly refused to respond, at all, to the following five interrogatories, numbered 5, 6, 7, 8, and 12:

> 5. On what schedule (measured in Metric Tons Uranium) does DOE contend it is obligated to remove DAIRYLAND's SPENT FUEL pursuant to DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? State all factual and legal grounds for this contention.
>
> 6. On what schedule (measured in Metric Tons Uranium) does DOE plan to remove DAIRYLAND's SPENT FUEL pursuant to DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? DESCRIBE if, how, and when this plan has changed since the execution of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT; IDENTIFY all documents and evidence RELATED TO this plan; IDENTIFY the five people with the most knowledge of this plan and the nature of such knowledge.
>
> 7. IDENTIFY the earliest date on which DOE reasonably believes it will begin to take delivery of SPENT FUEL from PURCHASERS under their STANDARD CONTRACTS and/or DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT.
>
> 8. On what date does DOE currently plan to complete picking up SPENT FUEL from LACBWR? DESCRIBE how this plan has changed since the execution of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT; IDENTIFY all evidence RELATED TO this plan; IDENTIFY the five people with the most knowledge of this plan and the nature of such knowledge.
>
> 12. Does DOE plan to accept delivery of FAILED FUEL from DAIRYLAND on a different schedule than the rest of DAIRYLAND's SPENT FUEL before it completes taking

delivery of other SPENT FUEL from DAIRYLAND? If so, DESCRIBE the schedule DOE is planning to use for picking up DAIRYLAND's FAILED FUEL.

The government's stated reason for refusing to respond to interrogatories 6, 7, 8 and 12 is identical: they "seek[] information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998." *See, e.g.*, attachment 1, Response No. 6. Specifically, the government notes that *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005), held that future damages are not recoverable in a partial breach of contract case, and asserts that that ruling "render[s] the information sought through this interrogatory irrelevant to this litigation." *See, e.g., id.*

The government is wrong. Simply because damages after 2006 are not recoverable in this action does not mean that future *facts*, including the government's plans for future performance, are not relevant to issues bearing on the determination of pre-2006 damages. Indeed, the government has already litigated this very issue and lost it, in *Pacific Gas & Electric Co. v. United States*, No. 04-074C & -075C, Order of December 21, 2005 at 2-3 (Fed. Cl. filed Jan. 22, 2004), attachment 4. As the Court explained there, in rejecting a cut-off date barring discovery of future documents:

> [P]laintiff states, that, under its theory of the case, 'because the contract is silent on acceptance rate and other 'schedule' issues, the court must supply a 'reasonable' rate and schedule . . . , and what the Department of Energy (DOE) is doing now, or plans to do in the future, is plainly evidence of what a 'reasonable schedule would be.' . . . Thus, plaintiff concludes that it 'should be able to obtain discovery without any cut-off date restriction and later the parties can argue (and the court can decide) what is relevant and/or should be admitted into the trial record.'
>
> The court agrees with plaintiff. The Rules of [this Court] call for a 'broad scope of discovery in this court.' . . . [A]s plaintiff states, the relevance of such documents can be ruled upon 'through motions *in limine*,' during trial, or even after trial, rather than 'on the basis of an artificial discovery cut-off that actually *prevents* the

> court from addressing these substantive issues on a full factual record.' . . . Indeed, as plaintiff states, 'it cannot be said at this time that *nothing* about DOE's current and future plans is relevant.'

*Id.* That persuasive reasoning disposes of the government's refusal to respond to Dairyland interrogatory nos. 6, 7 and 12, which request information about DOE's plans for pickup of spent fuel.

Interrogatory 7 asks when DOE "expects" to begin picking up spent fuel under the Standard Contracts with utilities. This goes to another material issue in this case, namely the reasonableness of Dairyland's efforts to mitigate the effect of DOE's breach. *See Indiana Michigan,* 422 F.3d at 1375 (quoting Restatement (Second) of Contracts § 350(2)) (a spent fuel plaintiff "is 'not precluded from recovery . . . to the extent that it has made reasonable but unsuccessful efforts to avoid loss.'"); *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 264 (2006) ("Defendant has the burden of showing that plaintiffs' mitigation efforts were unreasonable"). When DOE expects to begin performance is relevant to the reasonableness of Dairyland's mitigation because what might be reasonable on Dairyland's part if DOE planned to perform in 2010, as it had previously announced, could be different from what might be reasonable if DOE does not perform until 2020 – its current projection. And Dairyland's confidence in the timing of DOE's performance could affect the reasonableness of its mitigation efforts. These factors also provide additional reason why the government must answer interrogatory 8, which asks for evidence about when DOE plans to complete picking up Dairyland's spent fuel. Until the spent fuel is completely removed, it is reasonable for Dairyland to implement measures to mitigate the impact of the government's breach.

Interrogatory no. 5 asks for the government's "contention" regarding the schedule on which DOE is obligated to remove Dairyland's spent fuel pursuant to the parties contract. The

government's objection to this interrogatory is frivolous, for reasons discussed below in connection with the government's objections to Dairyland's other "contention" interrogatories. Apparently recognizing that its objection lacks merit, the government purports to answer interrogatory no. 5 by "incorporat[ing] by reference its response to Interrogatory no. 3." *See* attachment 1, Response No. 5. The problem with that "response" is that interrogatory no. 3 asks an entirely different question, and the government's response to that interrogatory thus does provide what interrogatory no. 5 requests.

Accordingly, the Court should compel the government to provide complete and proper responses to these interrogatories – nos. 5, 6, 7, 8, and 12.

B. Improper Refusal to Respond to Certain Interrogatories. With respect to the following five interrogatories (nos. 9 13, 14, 15, and 16), which inquire about the government's positions or "contentions" in this case on various issues, the government asserts the interrogatories are improper and also contends, in any event, that responses are "premature" pending further discovery:

9. Do you contend that it is or would be unreasonable for DAIRYLAND to study, analyze, investigate and/or implement dry storage of its SPENT FUEL subsequent to DOE's partial breach of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, explain all bases for this contention.

13. Do you contend that DOE would have picked up DAIRYLAND's FAILED FUEL later than the rest of its SPENT FUEL had the government begun SPENT FUEL acceptance from utilities starting not later than January 31, 1998? If so, state all bases for this contention.

14. Do you contend that DAIRYLAND's expenditures supporting PFS were unreasonable expenditures toward mitigation of DAIRYLAND's damages due to DOE's partial breach of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, state all bases for this contention.

15. Do you contend that it was unreasonable for DAIRYLAND to store its SPENT FUEL in the LACBWR wet fuel storage pool after DOE partially breached DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, DESCRIBE when you contend it became unreasonable for DAIRYLAND to continue to store its SPENT FUEL in the LACBWR wet fuel

storage pool and DESCRIBE the specific alternative storage options you believe would have been reasonable for DAIRYLAND to employ to store its SPENT FUEL from that point onward.

16. DESCRIBE all options that you contend DAIRYLAND should have explored or implemented for the storage of its SPENT FUEL.

The government first asserts these "contention" interrogatories are improper "upon the grounds that plaintiff seeks to have defendant make certain legal conclusions." *See, e.g.*, attachment 1, Response No. 6. As noted above, the government makes the same objection to interrogatory no. 5. This objection is frivolous. It is well-settled that interrogatories "seeking to elicit what a party's contentions will be at the time of trial are not objectionable." *Leksi, Inc. v. Fed. Ins. Co.*, 129 F.R.D. 99, 107 (D.N.J. 1989). Indeed, contention interrogatories "may . . . be the most reliable and cost-effective discovery device," *Cable & Computer Tech., Inc. v. Lockheed Saunders, Inc.*, 175 F.R.D. 646, 652 (C.D. Cal. 1997), because they are designed to learn what the opposing party will argue at trial. *Lexington Ins. Co. v. Commonwealth Ins. Co.*, No. C983477CRBJCS, 1999 WL 33292943, at *8 (N.D. Cal. 1999). *See United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 230 F.R.D. 538, 544 (N.D. Ill. 2005) ("Contention interrogatories that seek damage theory and methodology information from a plaintiff almost invariably will comport with the requirements of Rules 26(b)(1) and 33(c) . . . seeking as they do, information about an inherent element of the claim.").

The government's suggestion that it cannot state its position on these important issues – principally, the reasonableness of Dairyland's mitigation actions and expenditures – pending further discovery or even "prior to the completion of discovery," *see* attachment 1, Response No. 14, is simply not credible. Considering the elaborate initial disclosures provided by Dairyland, which describe all aspects of the mitigation it has undertaken, as well as the tens of thousand of documents that Dairyland provide the government several months ago, the government surely

knows by now its position on the "reasonableness" of Dairyland's mitigation efforts. The implicit suggestion that the government will develop its position on the reasonableness of Dairyland's mitigation through depositions of Dairyland's witnesses is ludicrous. Dairyland's position, of course, is that its mitigation has been reasonable. We doubt that will be the government's position – no matter how many depositions it takes of Dairyland witnesses.

In short, the Court should reject the government's unreasonable and dilatory effort to "hide the ball" by refusing to state its position on key issues until after discovery is completed. Not only do the reasons the government advances in support of that ploy lack credibility, but to allow the government to delay stating its contentions on key issues would deny Dairyland the opportunity to obtain the basis for the government's positions prior to when Dairyland deposes the government's witnesses. The government knows it positions on these key issues and should be required to state them. *See In re One Bancorp Secs. Litig.*, 134 F.R.D. 4, 7-8 (D. Me. 1991) (rejecting plaintiff's argument that adequate discovery should be completed before it is required to answer contention interrogatories, finding no sufficient justification for granting a delay, and noting that counsel "expended more time in arguing this motion than would have been necessary to answer the interrogatories in the first instance").[1]

The government's response to interrogatory 13 makes one additional point. That interrogatory asks whether the government contends that DOE would have picked up Dairyland's "failed fuel" later than the rest of its spent fuel if DOE had commenced performance as required by January 31, 1998. In response, the government, alluding vaguely to "technical impediments" that might affect pickup of failed fuel, states "[g]iven that the design parameters

[1] The one interrogatory the government does answer is no. 3, but before doing so the government offers a discourse on pre-1998 matters not embraced within the interrogatory, and also lodges an objection "upon the grounds that plaintiff seeks to have defendant make certain legal conclusions." That objection is meritless for reasons discussed in the text.

for any storage facility that DOE might operate have not yet been defined, it is impossible to identify every technical impediment that *could occur* in the acceptance of failed fuel form Dairyland's nuclear reactor." *See* attachment 1, Response No. 13 (emphasis added). The government then refers to trial testimony from the *Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl. filed Feb. 18, 1998), where it states the DOE contracting officer Mr. Zabransky "explained the issues that *might arise* relating to the acceptance of failed fuel at any repository." *Id.* (emphasis added).

This response is improper and inadequate. The interrogatory calls for a "yes" or "no" answer, and if "yes," for an explanation of why. If for whatever reasons the government has no position on the issue, which its cryptic response seems to imply, then the government should be required to say that. What "could occur" or "might arise" regarding failed fuel at a DOE spent fuel facility in the future is not responsive to Dairyland's straightforward question about the government's position on when it would have picked up Dairyland's failed fuel.

Accordingly, the Court should compel the government to provide complete and proper responses to these interrogatories – nos. 9, 13, 14, 15, 16 and 17 (and 5, for the additional reasons stated here).

C. Improper Reliance on RCFC33(d) and References to Individuals Who "May" Have Information. The government's responses to seven of Dairyland's eight remaining interrogatories (nos. 1, 2, 4, 10, 11, 17 and 18), which are set out below, either improperly rely on Rule 33(d) by referring in vague terms to prior document productions from which answers "may" be available and/or indicate that certain named individuals "may" have had some involvement in the matters addressed by the particular interrogatory.

1. IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or preparation of any COMMUNICATIONS between DOE and/or NRC on the one hand and

DAIRYLAND on the other hand RELATING TO SPENT FUEL. For each PERSON identified, DESCRIBE in detail all aspects of that PERSON's involvement.

2. IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or of any DOCUMENTS or COMMUNICATIONS RELATED TO the decommissioning of LACBWR. For each PERSON identified, describe in detail all aspects of that PERSON's involvement.

4. IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or preparation of responses to the delivery commitment schedules DAIRYLAND submitted to DOE. For each PERSON identified, DESCRIBE in detail the activities in which they engaged RELATED TO these activities.

10. IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or preparation of any DOCUMENT or COMMUNICATIONS RELATED TO the removal, transport, storage and disposal of the reactor pressure vessel from LACBWR. For each PERSON identified, DESCRIBE in detail all aspects of that PERSON's involvement.

11. Has DOE given any consideration or undertaken any study, analysis, or investigation of the manner in which DOE will or could dispose of FAILED FUEL? If not, explain why DOE has not considered or studied this topic. If so, also IDENTIFY:

a. The nature of such consideration, study, analysis or investigation.
b. The timeframe of such consideration, study, analysis or investigation.
c. All individuals who participated in such consideration, study, analysis or investigation.
d. The results and/or conclusions of such consideration, study, analysis or investigation.
e. Whether such consideration, study, analysis or investigation included the possibility of storing or disposing of FAILED FUEL in a facility or location other than the deep geologic repository.

17. DESCRIBE all options that you contend DAIRYLAND should have explored or implemented for the storage of its FAILED FUEL. If you contend that DAIRYLAND should have explored or implemented options for storage of its FAILED FUEL that are different from those options explored or implemented to store DAIRYLAND'S other SPENT FUEL, DESCRIBE how and why they should have been different.

18. DESCRIBE all efforts undertaken by or on behalf of DOE to examine the manner or process by which DOE would remove SPENT FUEL from LACBWR. IDENTIFY the five people with the most knowledge of these efforts and the nature of such knowledge.

The government's responses to these interrogatories are deficient in several ways. First, to the extent these interrogatories ask for identification of individuals involved in certain activities or issues, the government for the most part has not provided an answer. Instead, the

government lists various individuals whom it states "*may* have had some involvement relating to . . ." the specified activity. *See, e.g.*, attachment 1, Response No. 4 (emphasis added) (listing seven individuals who "may" have been involved); *see also id.*, Response No. 1 (listing six individuals "who *may* have had *some* involvement relating to . . ." the specified activity). These are not answers to the question asked. Dairyland knows the universe of individuals who "may" have been involved; it seeks to learn through these interrogatories who *was* involved. The government knows, or has the means to determine, the answer to that question and should be directed to do so. The vague responses the government has provided amount to nothing more than guesses, which may or may not be correct. They are thus akin to the discovery response discussed in footnote 75 of *Yankee Atomic*, 73 Fed. Cl. at 326, n.75. That response led the Court to sanction the government because at deposition an individual it had named "declined to recall any involvement in the events for which defendant had listed him as knowledgeable." *Id.* Dairyland should not have to conduct depositions here of the numerous "may be knowledgeable" individuals the government has listed, only to find – as occurred in *Yankee Atomic* – that they in fact have no knowledge.

Second, the government's responses to these interrogatories misuse Rule 33(d) in multiple ways. In proper circumstances, that Rule provides:

> Where the answer to an interrogatory may be derived or ascertained from business records of the party upon whom the interrogatory has been served, . . . and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served, it is a sufficient answer to specify the records . . . A specification shall be In sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.

The government's repeated invocations of this Rule satisfy none of its explicit requirements. To properly invoke Rule 33(d), the government first must determine and state that an answer to the interrogatory can in fact be derived from its business records. It is not enough to say, as the government does, that answers "may" be derived from business records. *See, e.g.,* attachment 1, Response No. 11 ("[T]here are large quantities of documents available on the Record Information System website ("RIS-Web") that are *potentially responsive* to this request.") (emphasis added); *id.*, Response No. 4 ("[A]nswer(s) to this interrogatory *may* be obtained from the database of document previously made available.") (emphasis added).

Courts have determined, in the context of this Rule, that the term "may" is not equivalent to the word "might." *See Sabel v. Mead Johnson & Co.*, 110 F.R.D. 553, 555 (D. Mass. 1986) (quoting *Daiflon, Inc. v. Allied Chemical Corp.*, 534 F.2d 221, 226 (10th Cir.), *cert. denied*, 429 U.S. 886 (1976)) ("The party served must specify the records and cannot merely indicate that the information sought may or may not be found in the records made available."). Thus, the *Sabel* court determined that former FRCP 33(c) (equivalent to the current Rule 33(d)) required a reference to "specific documents and [a] state[ment] that the information sought can be found therein" rather than a response that "'information, *if any*, responsive to this interrogatory is contained in the materials.'" *Id.* at 555-56 (citation omitted). In effect, the government's responses merely inform Dairyland that if it searches long enough in the huge electronic database of documents the government has made available, *it might find something* responsive to certain interrogatories.

Such responses are improper because Rule 33(d) "requires substantially more than making available a documents repository." *See In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 320, 326 (N.D. Ill. 2005) (stating that party impermissibly "produced a massive amount

of documents and has left the plaintiffs to sift through them to find the answers to Interrogatory 11" under the Rule). In *In re Sulfuric Acid*, the court recognized that reference "to business records en mass, without specifying particular documents is 'an abuse of the option.'" *Id.* (quoting *Bonds v. District of Columbia*, 93 F.3d 801, 811 (D.C. Cir. 1996)). The *Sulfuric Acid* court explained that "plaintiffs are entitled to complete disclosure, which cannot be obtained by pouring through a mountain of material." *Id.* Thus, the party relying upon the Rule must make specifications "in sufficient detail" that enable the interrogating party "to locate and to identify the records from which the answer may be ascertained." *Id.*; *c.f. United States v. Dist. Council of New York City*, No. 90CIV5722CSH, 1992 WL 188379, at *5-*6 (S.D.N.Y. July 30, 1992) (allowing the government to invoke Rule 33(c) because it "identified *discrete groups* of documents" and that the interrogating party "can read them and determine which documents pertain to an allegation, and to what degree, directly or indirectly") (emphasis added).

Here, the government has referred Dairyland to the entirety of huge collections of documents: the government's million-plus page production web site for the spent fuel litigation (Responses to Requests 1, 2, 4 and 18), the NRC's huge ADAMS database (Response to Request 10), and the enormous RIS-Web with its millions of pages (Response to Request 11). By simply directing Dairyland to the entirety of these databases, the government has failed to comply with the Rule. *See In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. at 366 (stating that defendants improperly employed Rule 33(d) by producing "perhaps a million pages of documents and merely referr[ing] plaintiffs, generally, to them for the answers to their interrogatory"); *see also T.N. Taube Corp. v. Marine Midland Mortgage Corp.*, 136 F.R.D. 449, 455 (W.D.N.C. 1991) ("[D]irecting the opposing party to an undifferentiated mass of records is not a suitable response to a legitimate request for discovery.") (quoting *American Rockwool v. Owens-Corning*

*Fiberglas Corp.*, 109 F.R.D. 263, 266 (E.D.N.C. 1985)). For this reason alone, the Court should reject the government's reliance on Rule 33(d) and direct the government to provide specific answers to Dairyland's interrogatories.

In addition, Rule 33(d) by its terms is not even available unless there is some requisite "burden" on the responding party. *See Pascale v. G.D. Searle & Co.*, 90 F.R.D. 55, 60 (D.R.I. 1981). In *T.N. Taube, supra*, the court noted three factors that contribute to the calculus: (1) cost of the necessary research; (2) nature of the relevant records; (3) the interrogated party's familiarity with its own records. 136 F.R.D. at 444. As an initial matter, the notion that the government needs to conduct some massive document review in order to answer Dairyland's interrogatories is fallacious – the government knows the answer to most of the questions Dairyland has asked, and can readily determine the remaining answers from DOE personnel or from a modest review of selected documents. As courts have recognized, a party who "knows or has access to an interrogatory answer may not use Rule 33(c) to avoid furnishing" responses to the interrogatory. *Govas v. Chalmers*, 965 F.2d 298, 302 (7th Cir. 1992).

And to whatever extent review of documents may be necessary to respond to Dairyland's interrogatories, such review "involves more than mere technical knowledge; it also requires knowledge regarding the organization of Defendant's records and the location, within those records, of relevant documents." *T.N. Taube*, 136 F.R.D. at 444. That fact is directly relevant here. The government maintains the RIS-Web database and it is certainly familiar with the documents produced as part of, and DOE, in particular, possesses far greater knowledge than Dairyland of both the organization of that database and the underlying technical and scientific documentation it contains. Indeed, Dairyland has essentially no knowledge of how the database is organized. The same is also true, indeed more so, for the database of discovery documents the

government has created for this spent fuel litigation. *See* Declaration of Todd Monroe, ¶¶4-8. The government plainly has greater knowledge of that database and its contents than Dairyland, which again has essentially no knowledge. In fact, the government almost certainly has obtained from its document contractor "bibliographic" coding of the documents on the database, which allows the government to search the database readily – and easily – for documents addressing specified topics or having specified dates, authors, recipients, or other characteristics. *Id.* at ¶6. The government, particularly the NRC, is also much more familiar with the contents and organization of the ADAMS database than Dairyland.

In effect, the government "ha[s] exclusive access to this information, and, as such, Rule 33(c) does not excuse [its] failure to provide this requested information." *Govas*, 965 F.2d at 302. Rather, given its superior knowledge, through DOE and NRC, of both the relevant documents databases and the underlying substance, the government is in a far better position to determine which documents are responsive to Dairyland's interrogatories. In this case there is simply no requisite "burden" on the government to providing answers to Dairyland's interrogatories, and the government therefore may not rely on Rule 33(d).

Finally, to the extent (if any) the government needs to resort to documents to answer Dairyland's interrogatories and to the extent (if any) that such document review works a "burden," the government's reliance on Rule 33(d) is still misplaced because the Rule is only available if "the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served." *See* Rule 33(d). Given the government's superior knowledge of its databases, as discussed above, as well as the government's superior knowledge of the substance of the information involved, the burden on Dairyland of deriving answers from the government' massive document databases is not only far greater than any

burden on the government – it is virtually prohibitive, and extremely unfair. Rather than allowing the government to require Dairyland to search for needles that "may" be in the document database haystack, the Court should direct the government to provide the answers Dairyland has requested. And if the government can establish that one or more interrogatories does require a review of documents in the government's database, then the government should be required to specify those documents in the manner that Rule 33(d) explicitly requires: "A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained."

Accordingly, the Court should compel the government to provide complete and proper responses to interrogatory nos. 1, 2, 4, 10, 11, 17, and 18.

II. The Government's Responses To Dairyland's Document Requests Are Inadequate And The Court Should Compel Proper Responses.

As noted at the outset, the government has not "produced" a single document in response to Dairyland's document requests, not even by posting any requested document on the government's document discovery database (a production method that itself is improper). The only documents posted on the government's database since May 2006, before Dairyland's document requests were served, were posted on December 4, 2006 and relate to another spent fuel case, that of Northern States Power Co. *See* Declaration of Todd Monroe, ¶5.

Instead, the government's document request "responses" refer in vague terms to prior voluminous productions of documents in other spent fuel cases. *See, e.g.,* attachment 2, Response No. 6 (objecting "to the extent that it seeks documents that . . . the Government provided in response to Request No. 3 in the Utility Plaintiffs' Joint First Set of Requests for

Production."); *id.*, Response No. 8 (same). Such "responses" are inadequate for two distinct reasons. First, instruction no. 2 to Dairyland's document requests explicitly limit the requests to "documents that have not been produced previously." Dairyland is not asking the government to re-produce previously produced documents. Nonetheless, it is important for purposes of keeping the record in this case clear that the government *identify* in its responses here the documents responsive to Dairyland's requests, even if they have been previously produced, by referring as specifically as possible (e.g., by date of production and bates number ranges) to prior productions. Absent a response that is at least that detailed, Dairyland literally cannot know what documents the government believes are responsive to Dairyland's documents requests in this case. *See* Declaration of Todd Monroe, ¶¶4-8.

A. The Government Should Be Required To Produce Documents Promptly Where It Says Documents Will Be Produced. The government should be require to provide Dairyland with documents responsive to the request for which the government has already agreed to provide responsive documents by a date certain in the very near future. The government states in response to the following 17 requests that it will be producing additional documents, but to date his produced no such documents to Dairyland: Requests 3, 5, 6-9, 11, 14-18, 34, 36-39. Dairyland served its requests for documents on October 10, yet as of this date, it has received neither documents from the government nor any estimate, much less a commitment, as to when the government will produce responsive documents despite a December 12 letter requesting such a commitment. The government should not be permitted to delay production of responsive documents while the period for fact discovery runs. Instead, the Court should require the government to produce documents responsive to requests 3, 5, 6-9, 11, 14-18, 34, 36-39 by January 15. Alternatively, provision should be made for Dairyland to complete its depositions of

government personnel after the scheduled close of fact discovery (February 16) so that it may make use of the responsive documents in the course of those depositions.

B. The Government Should Be Required To Respond To Requests Even If They Are Contrary To The Government's Theory of the Case. The government has refused entirely to respond to 10 of Dairyland's requests for the production of documents on the grounds that "the matters at issue in this case involve the schedule against which the Court will assess damages pursuant to the terms of the Standard Contract," *see, e.g.*, attachment 2, Response No. 2, and the requests at issue address matters such as legislative proposals for implementing the NWPA (Requests 1 and 2), development of contracts for new nuclear reactors (Request 4), the timing of eventual DOE performance of the its fuel removal obligations (Requests 19-23, 32 and 35), or the relationship between the civilian radioactive waste management system and DOE's consideration of or planning for the Global Nuclear Energy Partnership (Request 42). The government is wrong. Because the parties' contract does not set out clear performance standards for the government, the Court must supply reasonable terms. Dairyland's requests go directly to the issue of what would have been reasonable DOE performance absent the breach. Dairyland is aware that the government's legal position in other spent fuel cases is that the Court does not need to supply a reasonable term. But Dairyland should not be denied the opportunity to inquire into matters that support both parties' theories of the case at the discovery stage of proceeding. In addition, as explained above, the timing and manner of DOE's future performance, also goes to the issue of the reasonableness of Dairyland's efforts to mitigate its damages. Therefore, the government should be required to provide by January 15 documents responsive to Requests 1, 2, 4, 19-23, 32, 35, and 42.

C. The Government Should Be Required To Produce Documents Regarding Dairyland's Spent Fuel. In response to Request No. 10, which seeks documents relating to any DOE or NRC meetings concerning acceptance and/or disposal of Dairyland's spent fuel or amending Dairyland's spent fuel disposal contract, the government refuses to provide any documents unless Dairyland narrows its request to meetings concerning specific topics. The government's objection is without merit. Contrary to the government's objection, this request does not seek all documents concerning "meetings conducted at either agency regarding any aspect of the acceptance or disposal of spent fuel from the nuclear industry since the Standard Contract was promulgated." Rather, Dairyland's request is explicitly limited to meetings concerning acceptance and/or disposal of *Dairyland's spent fuel*. It is difficult to imagine why such documents would not be relevant to this litigation. Therefore, the government should be required to produce by January 15, 2007 documents responsive to Request No. 10.

D. The Government Should Be Required To Update Document Production To Include Recent Documents. In response to 13 requests, the government acknowledges that it has previously produced responsive documents but now refuses to produce any additional documents unless Dairyland narrows its request: Requests 12, 13, 24, 25, 26, 28, 29, 30, 31, 33, 34, 40, and 41. The government's position is untenable. Having previously provided responsive documents to these (or similarly worded) requests in the course of the spent fuel litigation before the Court, the government cannot contend that the requests seek irrelevant information or are overbroad. Instead, the government seems to take the position that having previously produced responsive documents in other cases, the government should not required to search for more recent documents for use in Dairyland's spent fuel trial. *See, e.g.,* Response to Request 24 (seeking documents relating to any mission plan, program plan or program reassessment for DOE's

activities pursuant to the NWPA), noting that the government has previously produced documents responsive to the request through at least July 2005. The government offers no reason why it should be absolved from producing more recent documents, and there is no such reason. Therefore, the government should be required to produce by January 15, 2007 documents responsive to Requests 12, 13, 24, 25, 26, 28, 29, 30, 31, 33, 34, 40, and 41.

E. The Government Should Be Required To Produce NRC Documents. In response to four requests, the government agrees to produce responsive documents from DOE but refuses to produce responsive documents from the NRC: Requests 14, 15, 17, 18. In response to Requests 14 and 15 (which seek documents related to the development and location of an ISFSI at Dairyland's site), the government asserts that all responsive documents either would be available on the NRC's ADAMS database or were previously submitted to the NRC by Dairyland. Yet the government notes in response to Request Nos. 17 and 18 that the NRC maintains "non-public files." The government does not explain why it should not be required to produce documents responsive to Requests 14 and 15 from NRC's non-public files. Moreover, even if many responsive documents are possibly located in the ADAMS database, that is not a proper ground for the government to refuse to produce those documents to Dairyland. ADAMS is a huge, cumbersome, database, and there is every reason to expect that the NRC is in a far better position than Dairyland to find documents either in NRC's regular files or within the ADAMS database.

In response to Request 17 (which seeks documents relating to actual or potential past removals of spent fuel from Dairyland's plant), the government asserts that many such documents are wholly unrelated to matters to be decided in this case. In its recent depositions of Dairyland personnel, however, the government has asked a number of questions about how

Dairyland has or might have removed spent fuel from its plant absent the breach. The government appears to be attempting to develop an argument that even if the government had performed, removal of spent fuel from Dairyland's site may have been delayed due to logistical difficulties presented by Dairyland's site. Dairyland should be permitted to discover government documents that might relate to this issue.

In response to Request 18 (which seeks documents related to the removal and disposal of the reactor pressure vessel of Dairyland's shut down nuclear reactor), the government argues that Dairyland should be required to narrow its request to the extent it wants documents from the NRC beyond those available on the ADAMS database. Given that Dairyland is seeking as damages the additional costs it is incurring to remove its reactor pressure in the presence of spent fuel over those costs that Dairyland would have incurred if DOE had timely removed its spent fuel, the government's claim that this request seeks documents that are wholly unrelated to matters to be decided by the Court in this case is without merit. In addition, as with its responses to Requests 14 and 15, the government should not be permitted to point to the ADAMS database to avoid its obligation to produce documents responsive to Requests 17 and 18.

Therefore, the government should be required to produce by January 15, 2007 documents responsive to requests 14, 15, 17, and 18.

III. Sanctions.

The government has flouted its discovery obligations. Thus far, the government has not produced a single document and has failed to provide meaningful interrogatory responses. And as set out in Dairyland's other discovery motion, the government has refused to make any witnesses available for deposition. This pattern of discovery abuse is prejudicial to Dairyland and is frustrating Dairyland's ability to complete fact discovery in a timely manner. Pursuant to

RCFC 37(a) and the Court's inherent authority, the Court should sanction the government and award Dairyland its costs, including attorneys fees, for prosecuting these motions to compel. *See Precision Pine & Timber, Inc. v. United States*, WL 1819224 (Fed. Cl.).

Respectfully submitted,

Dated: December 28, 2006

s/ Jerry Stouck
Jerry Stouck
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173
(202) 261-4751
Counsel for Plaintiff
Dairyland Power Cooperative

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
Greenberg Traurig, LLP