No. 04-106C
Chief Judge Damich

Electronically filed on January 18, 2007

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DAIRYLAND'S MOTION TO COMPEL OF DOCUMENTS WITHHELD UNDER THE "DELIBERATIVE PROCESS" AND ATTORNEY-CLIENT PRIVILEGES

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
202.331.3173 phone
202.261.4751 fax

*Counsel for Dairyland Power Cooperative*

Of Counsel:

ROBERT L. SHAPIRO
KEVIN STERN
Greenberg Traurig, LLP

TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 3

I. THE COURT'S ORIGINAL RULING IN *PG&E* ....................................................... 3

II. THE COURT'S RECONSIDERATION OPINION IN *PG&E*. .................................. 5

ARGUMENT ............................................................................................................. 8

III. THE COURT SHOULD ENFORCE THE COURT'S ORIGINAL RULINGS IN *PG&E*, AS CORRECTLY AFFIRMED ON RECONSIDERATION IN THAT CASE, AND REJECT THE *PG&E* COURT'S UNSUPPORTED AND INAPPROPRIATE DISREGARD OF THOSE RULINGS. .................................... 8

IV. AT A MINIMUM, THE COURT SHOULD ORDER PRODUCTION OF ALL THE DELIBERATIVE PROCESS DOCUMENTS PRODUCED IN *PG&E* THAT ARE RELEVANT TO DAIRYLAND'S CLAIMS. ...................................................... 16

V. THIS COURT ALSO SHOULD REVISIT JUDGE HEWITT'S ULTIMATE RULINGS ON A FEW CATEGORIES OF DOCUMENTS. ................................ 19

VI. THIS COURT SHOULD REJECT THE GOVERNMENT'S PLAINLY UNFOUNDED CLAIMS OF ATTORNEY-CLIENT PRIVILEGE ...................... 26

CONCLUSION ........................................................................................................ 27

APPENDIX

Pac. Gas & Elec. Co. v. United States, Order Of May 14, 2006 .......................................... A1

Declaration of Ronald A. Milner dated March 31, 2006 ..................................................... A8

Pac. Gas & Elec. Co. v. United States, Table of Challenges ............................................. A85

Milner Affidavit Table of Exhibits ...................................................................................... A125

Pac. Gas & Elec. Co. v. United States, Order Of April 14, 2006 .................................... A131

# TABLE OF AUTHORITIES

Federal Cases

PAGE

*Consumers Power Co. v. United States* 65 Fed. Cl. 364 (2005) .......... 21

*Energy Northwest v. United States* 69 Fed. Cl. 500 (2006) .......... 21

*Judicial Watch v. U.S. Postal Serv.*, 297 F. Supp. 2d 252 (D.D.C. 2004) .......... 27

*Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302 (Fed. Cir. 2006) .......... 3

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) .......... 27

*Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128 (2006) .......... passim

*Pac. Gas & Elec. Co. v. United States*, 71 Fed. CL. 205 (2006) .......... passim

*Simon & Searle*, 816 F.2d 397 (C.A. 8th Cir. 1987) .......... 26

*Sun Oil Co. v. United States*, 514 F.2d 1020 (1975) .......... 11

*Walsky Contr. Co. v. United States*, 20 Cl. Ct. 317 (1990) .......... 4

*Wilderness Soc. v. U.S. Dept. of Interior*, 344 F. Supp. 2d 1 (D.D.C. 2004) .......... 26

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Filed Electronically filed on January 18, 2007

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-106C<br>(Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DAIRYLAND'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD UNDER THE "DELIBERATIVE PROCESS" AND ATTORNEY-CLIENT PRIVILEGES**

Plaintiff Dairyland Power Cooperative ("Dairyland") moves the Court pursuant to RCFC 37(a)(2) to compel the government to produce 281 responsive documents that the government improperly is withholding from Dairyland on claims of "deliberative process," and in some cases attorney-client, privilege.

INTRODUCTION

As discussed in Dairyland's motion to compel discovery responses filed December 28, 2006, the government has never produced any privilege log to Dairyland, and indeed has not produced a single document in response to Dairyland's document requests either. Nonetheless, Dairyland is aware that the government is improperly withholding relevant documents based on litigation in Pacific Gas and Electric's spent fuel case. As recounted in Judge Hewitt's three pertinent opinions there, the government asserted deliberative process privilege claims over more than 450 documents, *see Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128, 129 n.1 (2006); Judge Hewitt initially rejected all of those claims, *see id.* at 136-137*;* and after reconsideration

and further proceedings, the government ultimately produced either voluntarily or pursuant to Court Order approximately 310 of those documents, *see Pac. Gas & Elec. Co. v. United States*, 71 Fed. Cl. 205 (2006) (reconsideration opinion); Order of May 14, 2006 (Order on second motion to compel) (copy attached at A1). However, for reasons explained by Judge Hewitt and discussed below, all but 29 of those documents were produced under a modified protective order that at least arguably limited disclosure of the produced documents to PG&E's attorneys for use only in the PG&E case. *See* Order of May 14, 2006, at 2-3 n.3, A2-A3. By the present motion, Dairyland seeks production for use in this case of all of the deliberative process documents produced in *PG&E* that are relevant to Dairyland's claims.

In addition, Judge Hewitt's ultimate rulings in her reconsideration opinion, 71 Fed. Cl. 205, have no merit. Those rulings are not only irreconcilable with Judge Hewitt's original rulings, which correctly rejected all the government's deliberative process claims on several independent grounds, *see* 70 Fed. Cl. at 136-37, but also are not even supported by the "rationale" Judge Hewitt offers in her reconsideration opinion. Accordingly, Dairyland respectfully requests this Court to adopt the careful reasoning of Judge Hewitt's original opinion (and that of the longstanding precedent she follows there), and direct the government to produce all the documents covered by that original opinion. In the alternative, should this Court to decline to reject Judge Hewitt's reconsideration opinion in its entirety, Dairyland requests the Court to compel production of additional documents in a few categories as to which Judge Hewitt's ultimate rulings refusing production are clearly both wrong and prejudicial to Dairyland (and spent fuel plaintiffs generally).

Finally, in addition to claiming deliberative process privilege, the government asserted attorney-client and/or other privilege claims over 92 of the more than 450 documents involved in

the privilege dispute in *PG&E*. Because PG&E had not initially challenged those other privilege claims, Judge Hewitt declined to address them. *See* Order of May 14, 2006 at 5-6, A5-A6. Rather, Judge Hewitt directed that documents she ordered produced (upon rejection of the government's deliberative process claims) could be produced with material subject to those other privileges redacted. By the present motion, Dairyland seeks production of unredacted copies of a small number of those 92 documents as to which the government has failed to substantiate its claim of attorney-client privilege.

BACKGROUND

## I. THE COURT'S ORIGINAL RULING IN *PG&E*

In a careful and thorough opinion, the Court in *PG&E* originally rejected the government's deliberative process claims for three separate and independent reasons. *See id*. at 136-37 ("the court agrees . . . that the 458 documents over which defendant claims deliberative process privilege should be produced"). The Court first found that the government had "failed to demonstrate that the privilege was invoked by an appropriate official." *Id.* at 137. Recognizing that in *Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302 (Fed. Cir. 2006), the Federal Circuit allowed agency heads to delegate authority to invoke the deliberative process privilege, so long as the government displayed adequate "'care in the delegation process,'" 70 Fed. Cl. at 137-38 (quoting *Marriott*, 437 F.3d at 1308), the Court in *PG&E* found such care lacking in for several different reasons. "Contrary to [*Marriott*]," 70 Fed. Cl. at 138, the various delegations and redelegations before the Court in *PG&E* "were extremely broad in scope," "provided little, if any, 'criteria for invoking the privilege,'" and in some cases redelegations of authority to assert the privilege were provided "on the very same day that the delegatee executed his affidavit asserting the privilege." *Id.* (quoting *Marriott*, 437 F.3d at 1308). As the Court explained, the latter practice "does not appear . . . to be consistent with delegation that was 'carefully

undertaken.'" *Id.* (quoting *Marriott*, 437 F.3d at 1308). *See generally* Part II.B. 1 of the Court's opinion, 70 Fed. Cl. at 137-38.

To underscore the separate and independent grounds for its ruling, the Court in *PG&E* then noted that "even if the government's various delegations of authority . . . could be viewed as proper – *and the court does not so view these delegations* – the government's invocation of privilege contains two further procedural deficiencies." *Id.* (emphasis added) The first of those was the government's failure to supply the Court with "precise and certain" reasons for maintaining the confidentiality of the subject documents. *See id.* (quoting *Walsky Contr. Co. v. United States*, 20 Cl. Ct. 317, 320 (1990). Each of the eight affidavits the government had submitted included only "a very vague, general and conclusory statement" as to why confidentiality should be maintained – statements "all purporting to apply to many documents but unconnected to any particular document." *Id.* (quoting vague and conclusory statements from the affidavits). The Court found such statements inadequate to sustain the privilege, citing precedent that similarly had ruled that "the bare assertion that internal agency discussions will be 'chilled' is nothing but a legal platitude." *Id.* at 141; *see id.* at 140 ("Blanket assertions of the privilege are insufficient."). *See generally* Part II. B. 2 of the Court's opinion, 70 Fed. Cl. at 138-42.

Finally – and most importantly in terms of the interests that the deliberative process privilege should and should not serve – the Court recognized in *PG&E* that the government's affidavits supporting its assertions of this privilege were "belatedly executed." *Id.* at 137. As the Court explained, because each of the eight affidavits had only been executed by government delegates *after* and in response to PG&E's motion to compel:

> It logically follows . . . that the government's counsel had already made a determination to claim the deliberative process privilege with respect to these documents without an affidavit from a government official to support or validate such a claim. In fact, several of the affidavits upon which defendant relies state exactly that.

*Id.* at 143. The Court found this practice not only "procedurally deficient," *id.*, but fundamentally at odds with the purpose of the deliberative process privilege, which the Court described as enhancing the quality of agency decision-making, "not to further the litigation strategy of counsel who apparently, as in this case, decide when it will be asserted." *Id. See generally* Part II. B. 3 of the Court's opinion, 70 Fed. Cl. at 142-44.

## II. THE COURT'S RECONSIDERATION OPINION IN *PG&E.*

Rather than comply with Judge Hewitt's emphatic opinion, the government moved for reconsideration. After full briefing of that motion, Judge Hewitt expressly refused to reconsider her conclusions as to *all three* of the separate grounds for her original ruling. *See Pac. Gas & Elec. Co.*, 73 Fed. Cl. at 208-09. First, "the court disagree[d] that, at the time the deliberative process privilege is asserted by the government, it need not obtain affidavits from appropriate government officials in support of its assertion. . . . Accordingly, the court decline[d] to reconsider Part II.B.3 of its Order to Compel" *Id.* at 208-09. As the Court noted, the government's insistence that affidavits from agency personnel could properly be supplied later "belies the notion that government officials, rather than government counsel, made the decision to assert the deliberative process privilege." *Id.* at 208.

Second, "the court disagree[d] with defendant that all of the delegations of authority to assert the deliberative process privilege were 'carefully undertaken' . . . . Accordingly, the court decline[d] to reconsider Part II.B. 1 of its Order to Compel." *Id.* at 209. Third, quoting its prior

ruling that "'the deliberative process privilege can be invoked only if the proponent of the privilege explains *with particularity* how or why disclosures of the substance of the documents would harm an identified deliberative function,'" *id.* at 209 (emphasis added by Court) (quoting 70 Fed. Cl. at 138 n.11), the Court reiterated that "[d]efendant failed to meet this requirement. . . . Accordingly, the court decline[d] to reconsider Part II.B.2 of its Order to Compel." *Id.* at 209-10.

Dairyland submits that the Court's analysis and conclusions in its original deliberative process opinion in *PG&E* were correct, *and the Court in PG&E plainly agreed*, because the Court there *refused* to disturb those conclusions on reconsideration. *See id.* at 208 ("[T]he court disagrees with arguments advanced by defendant for reconsideration of the court's Order to Compel."). Nonetheless, contrary to its twice affirmed rulings, the Court in *PG&E* wnet on to consider new, supplemental affidavits from government delegatees that had been submitted to the Court *ex parte* during the course of briefing on PG&E's motion to compel. *See id.* at 210. Purportedly in reliance on those *ex parte* affidavits – and thus without any argument or other input from PG&E – the Court then in effect *presumed* that all 458 documents in issue were subject to the deliberative process privilege, explaining that it was "exercis[ing] its discretion in the circumstances of this case." *PG&E*, 71 Fed. Cl. at 210.

The Court then directed the government to provide the *ex parte* affidavits to PG&E, and, in recognition of the qualified nature of the deliberative process privilege, invited PG&E to file a further motion to compel based on "a showing of evidentiary need . . . that outweighs the harm that disclosure of such information may cause to the defendant." *Id.* (quoting *PG&E,* 70 Fed. Cl. at 134). Then, before waiting to get that motion or any input from PG&E, the Court proceeded in its reconsideration opinion to offer its views on sample documents as to which it believed

PG&E's evidentiary need would, and would not, "outweigh" the government's interest in confidentiality. *See id.* at 210-215. In doing so, however, the Court wrongly articulated a standard of "compelling need" – a standard that is far stricter than the simple balancing test that is prescribed by the applicable case law and that Judge Hewitt herself had correctly articulated in her original opinion (as quoted above in the first sentence of this paragraph). *See, e.g., PG&E*, 71 Fed. Cl. at 211 (it is not readily apparent to the court why plaintiff has a 'compelling need' for the document . . . .").

The Court stated that it was providing its "brief analyses" of the sample documents so the parties could "analogize these examples to disputed documents not mentioned in this Order and thereby [attempt to] resolve any further discovery disputes involving the deliberative process privilege." *Id.* at 210. After the government refused to produce virtually any additional documents "by analogy" to the Court's samples, PG&E filed a second motion to compel and, as noted above, the government ultimately produced more than 310 of the originally-withheld documents either voluntarily or pursuant to the Court's May 14, 2006 Order resolving PG&E's second motion to compel. As to the documents the government produced pursuant to that latter Order, the Court in *PG&E* modified the protective order in that case "to limit disclosure and/or use of all documents mentioned in this Order to the attorneys for the plaintiffs *in this litigation only*, rather than, as stated in the [original] Protective Order, the 'attorneys for plaintiffs in the spent nuclear fuel cases.'" Order of May 14, 2006, at 2-3 n.3, A2-A3. Although Dairyland views this provision as ambiguous, and fully consistent with use here "in this litigation" by the undersigned attorneys (who also were "attorneys for plaintiffs" in *PG&E*), the government interprets this provision as limiting disclosure of the documents for use solely in the *PG&E* case and has affixed a special legend so stating to each disclosed document.

ARGUMENT

III. THE COURT SHOULD ENFORCE THE COURT'S ORIGINAL RULINGS IN *PG&E*, AS CORRECTLY AFFIRMED ON RECONSIDERATION IN THAT CASE, AND REJECT THE *PG&E* COURT'S UNSUPPORTED AND INAPPROPRIATE DISREGARD OF THOSE RULINGS.

This Court should enforce the Court's original rulings in *PG&E* rejecting the government's deliberative process claims. Those rulings, which the Court correctly reaffirmed in *PG&E* on reconsideration, are faithful to longstanding precedent recognizing the narrow scope of the deliberative process privilege. In particular, as precedent instructs and Judge Hewitt stressed in her original opinion in *PG&E*, *see* 70 Fed. Cl. at 139-42, the heart of the deliberative process privilege is the potential for harm to government decision-making that may arise from disclosure of internal documents. Thus, as Judge Hewitt also stressed, in order to properly assert this privilege (which remains qualified), the government must "explain[] *with particularity* how or why disclosures of the substance of the documents would harm an identified deliberative function," *id.* at 209 (emphasis added by Court) (quoting 70 Fed. Cl. at 138 n.11). Because the government's eight original affidavits did not make that showing as to *any* of the documents in question, and because those affidavits also both came too late and were the product of delegations and redelegations lacking requisite "care," the Court in *PG&E* correctly rejected the government's privilege claims. Ultimately, Judge Hewitt recognized that the privilege had been invoked by the government's litigation counsel – before any agency affidavits were prepared and before any delegations and redelegations of authority were made. The Court thus recognized that the government's subsequent affidavits (also prepared by government counsel) and delegations of authority merely rubber-stamped the strategic withholding of documents by government counsel, and the Court quite rightly rejected that blatant misuse of the privilege. *See* *PG&E*, 70 Fed. Cl. at 144 (criticizing "[t]he submission of post hoc determinations by

government officials in response to plaintiff's motion to compel which invoke the privilege while stating that documents that have already been withheld by government counsel are indeed subject to the privilege").

By enforcing the original rulings in *PG&E*, this Court would confine the deliberative process privilege to its proper narrow scope, and appropriately would require the government to produce all the documents it is withholding from Dairyland on deliberative process grounds that are relevant to the issues in this case. The Court should do so for the sound reasons articulated by Judge Hewitt in her original and reconsideration opinions in *PG&E*. (As discussed further below, 124 of the 458 documents addressed by Judge Hewitt concerned GTCC waste issues, and the government has not yet made GTCC waste an issue in this case. This motion thus does not yet seek those GTCC waste documents, which the government at present may properly withhold from Dairyland on relevance grounds even if not on deliberative process grounds. But as also noted below, if the government makes GTCC waste an issue in this case those 124 GTCC waste-related documents also should be produced here).

As to all the non-GTCC waste documents addressed in *PG&E*, this Court should reject the *PG&E* Court's subsequent disregard of its original rulings for a number independent reasons. Most fundamentally, although the *PG&E* reconsideration opinion offers only one vague reason for disregarding the Court's emphatic rejection (twice) of the government's deliberative process privilege arguments, that reason is not supported by the Court's discussion and indeed is contrary not only to the Court's original rulings but to applicable precedent that the Court had cited and relied upon in rendering its original opinion. The one vague reason the Court in *PG&E* offered for disregarding its original rulings was that for "**many** of the documents . . . withheld defendant," the belated *ex parte* affidavits "make clear . . . that harm *particular* to the substance

and contents of each document **may** be caused by disclosure of the document to plaintiff." *PG&E*, 71 Fed. Cl. at 210 (bold added).

This ground for disregarding the Court's original rulings is deficient in numerous ways. First, even assuming *arguendo* that the assertion in government's *ex parte* affidavits that disclosure "may" cause harm to "many" documents satisfies the "particular-harm-from-disclosure" element of the deliberative process privilege as to all the pertinent documents – and it does not, as discussed below – these affidavits do not and cannot satisfy the other, separate elements that the Court in *PG&E* cited as grounds for rejecting the privilege, namely the government's deficient delegations of authority and the government's failure to obtain proper affidavits from agency officials at the time the privilege is first invoked. The *PG&E* Court in its reconsideration opinion did not even attempt to explain why it completely disregarded these two additional elements.

The timing of the *ex parte* affidavits is particularly troubling. A crucial part of the Court's original ruling in *PG&E* was rejection of the practice of government counsel in asserting this privilege first, and then obtaining affidavits to rubber stamp counsel's privilege assertion later. Whatever may have been Judge Hewitt's reason for "exercis[ing] discretion in the circumstances of th[e *PG&E*] case" to excuse that abusive practice after she had criticized it so harshly – Judge Hewitt did not offer any reason for doing so – this Court should not excuse the abuse here. If Judge Hewitt's emphatic rulings rejecting the government's privilege claims and confirming those rulings on reconsideration are to mean anything, they must be enforced at least in subsequent cases.

Third, that the affidavits the Court relied upon were submitted *ex parte* provides an additional reason for rejecting reliance on them here. Those affidavits were ultimately released

to PG&E, but not until *after* the Court had already relied upon them to reach its conclusions about which government documents would be produced. *See PG&E*, 71 Fed. Cl. at 210 (directing production of *ex parte* affidavits to PG&E in the future); *id.* at 211-15 (setting forth rulings based on *ex parte* affidavits). To endorse that practice of the *PG&E* Court as a precedent here would affirmatively *invite* the government to ignore the requirements of the law – as those requirements were announced in the original *PG&E* opinion, and confirmed on reconsideration – in every future case.

Fourth, again assuming *arguendo* that the government has shown sufficient harm from disclosure to invoke the deliberative process privilege, thus triggering the balancing test required by the qualified nature of this privilege, the standard of "compelling need" applied by the *PG&E* Court is an improperly strict standard in that balancing process. Governing precedent dictates that the executive privilege, of which the deliberative process is a part, can be overcome simply by showing that a party's evidentiary need of the documents "outweighs" the government's interest in confidentiality – as Judge Hewitt correctly recognized in her original opinion. *See* 70 Fed. Cl. at 134; *Sun Oil Co. v. United States*, 514 F.2d 1020, 1026 (1975) ("Defendant admits that it would not be against the public interest to disclose the documents if plaintiffs can how to the court's satisfaction that they are needed to establish facts relevant to the litigation"); *id.* at 1024 ("[T]he rule has long been established that were a demonstrated need for documents sought is clearly sufficient, on balance, to override a claim of privilege, the documents must be produced.").

Fifth, even with respect to the harm-from-disclosure element of the deliberative process privilege, it is not enough for the government to show, in Judge Hewitt's words quoted above, that harm "may" be caused by disclosure, *see* 71 Fed. Cl. at 210, nor is such potential harm to

"many" of the documents, as Judge Hewitt put it, *see id.*, sufficient to invoke the privilege as to *all* the withheld documents – as Judge Hewitt ultimately presumed in her reconsideration opinion. To the contrary, as Judge Hewitt explained in her original opinion, citing precedent, the government's affidavits must "'explain why, particularly, the documents in question here are so sensitive that disclosure *would* compromise the agency decision-making process to such a degree that the public interest in full disclosure is outweighed.'" *PG&E*, 70 Fed. Cl. at 142 (citation omitted) (emphasis added).

Sixth and very importantly, under either standard – "may" harm or "would" harm – the government's supplemental *ex parte* affidavits are ultimately no more detailed, in terms of showing "particular" harm from disclosure, than were the government's original affidavits. Instead, the *ex parte* affidavits contain the same kinds of "blanket" assertions that the Court in *PG&E* correctly found inadequate in its original opinion. Thus, even the one vague reason that Judge Hewitt offers for disregarding her substantive rulings is not supported by the belated, *ex parte* affidavits upon which she purports to rely.

For example, in her reconsideration opinion Judge Hewitt found that documents with reference numbers 228, 231 and 257 from PG&E's "Table of Challenges" accompanying its motion to compel "are the type of documents that the deliberative process privilege is designed to protect." *PG&E*, 71 Fed. Cl. at 212. (A copy of that Table of Challenges, which lists all documents involved in this motion and also incorporates the government's privilege log, is included in the appendix to this motion at A85). Yet the description of the purported harm from disclosure of those three documents in the government's *ex parte* affidavit is no more specific, as to "particularized" harm, than was the description in the affidavit the government offered originally in *PG&E* (albeit also only *after* PG&E's motion to compel) – a description the Court

there properly rejected as "vague, general and conclusory." *See PG&E*, 70 Fed. Cl. at 140. The entire description of these three documents and the purported harm from their disclosure set forth in the supplemental *ex parte* declaration of Mr. Milner is as follows:

> The[se] documents . . . are spreadsheets presenting possible activities that could be undertaken to reduce the cost and schedule for the construction of the repository and opinions as to the likelihood of successfully implementing each of the ideas. This document [sic] was generated by OCRWM personnel in the process of creating a budget request for the program. The thoughtful preparation of documents such as these for decision makers is vital to the proper management of the program because decision-makers need good ideas as to how to reduce cost. If OCRWM personnel know that documents containing such ideas will be released and that they will be questioned about why certain cost reduction activities could or could not be undertaken, they will be unwilling to think creatively about how program costs can be reduced in the future.

Declaration of Ronald A. Milner, dated March 31, 2006, at 46, A53 at ¶45. The only part of this description that addresses potential harm from disclosure is the last sentence. Yet that sentence describes the potential harm from disclosure of *any* government document; it does not describe "particularized" harm from disclosures of these specific three documents. As Judge Hewitt explained, "the bare assertion that internal agency discussion will be 'chilled' is nothing but a legal platitude." 70 Fed. Cl. at 141. The last sentence quoted above is nothing but such a bare assertion.

In fact, the last sentence quoted above from Mr. Milner's supplemental *ex parte* declaration is in substance *identical* to the language contained in Mr. Milner's original declaration (also submitted only after PG&E's motion to compel), which Judge Hewitt correctly found insufficient. That declaration described the purported harm from disclosure as follows:

> I have determined that disclosure of any deliberative process contents of the documents disclosed in the following list would be injurious to the Federal Government's decision-making functions because such disclosure would tend to inhibit the frank and candid discussion necessary to effective government. Indeed, disclosure would have a chilling effect on any future budget discussions as well as several related and continuing policy issues.

*See id.* at 140. Judge Hewitt was correct in holding that such platitudes about the "chilling effect" of disclosure are insufficient to sustain this privilege, *id.* at 140-42, and that ruling should be enforced here – not ignored. And as this Court can see by perusing Mr. Milner's attached *ex parte* declaration, A8-A77, the descriptions there of purported harm from disclosure of other withheld documents are no more "particularized," and no less mere platitudes, than the descriptions quoted above. For example:

– as to fifteen documents collectively (Ref Nos. 197, 204, 209, 222, 225, 227, 229, 230, 235, 237, 255, 258, 260, 271, 273), which Judge Hewitt ultimately refused to order the government to produce, the *ex parte* Milner declaration describes the purported harm from disclosure as follows: "Under Secretary Card was asking program personnel to think creatively about how to reduce costs. If these documents are released and program personnel are questioned about this work, it will affect the ability of DOE policy makers to have program personnel think creatively in the future." *See* Milner Decl. at 62-63, A69-A70.

– as to three documents (Ref. Nos. 105, 106, 107) dealing specifically with "the request from Dairyland Power Cooperative . . . to DOE seeking assistance in the disposal of its SNF for its shutdown facility," Milner Decl. at 30, A37, the Milner declaration describes the harm from disclosure as follows: "Decision makers need to be aware of the implications of requests. Release of this document would impinge upon the willingness of Mr. Zabransky [the contracting

officer for all the DOE spent fuel contracts] and others within OCRWM to offer constructive advice regarding how to proceed in the face of requests like this one."

– as to five documents (Ref. Nos. 136, 141, 263, 261, 137) that "reveal options for the [Yucca Mountain repository] design that were considered, but are not currently being pursued, as a way to meet the budgetary restrictions facing the program," Milner Decl. at 34, A41, the Milner declaration describes the harm from disclosure as follows: "For reasons explained above, releasing these documents now will chill employees' willingness to provide such advice and will hamper the ability of the program to choose the best final design for the repository." *Id.*

Although Judge Hewitt ultimately refused to compel production of all the documents discussed above, the above-quoted "blanket" assertions of the deliberative process privilege, which amount to nothing more than "legal platitude[s]," *see PG&E*, 70 Fed. Cl. at 141, are insufficient to sustain the privilege – as Judge Hewitt correctly explained in her original and reconideration opinions.

A final reason for this Court to reject Judge Hewitt's improper disregard of her sound original rulings is that any release of documents there (or here) would – as Judge Hewitt also noted but ultimately also ignored – be subject to the existing protective order, which limits dissemination and use of the documents to attorneys and plaintiff personnel involved in the spent fuel litigation. *See id.* at 139-40. Both from the government's privilege log and from the hundreds of documents originally withheld but ultimately released in *PG&E*, we know that almost all those documents deal with one of two topics – either DOE's plans for implementing the spent fuel program generally, or specifically DOE's plans for disposition of GTCC waste. (As noted above Dairyland doe s not in this motion seek GTCC waste-related documents). *Not only have hundreds of DOE and other government documents addressing topics already been*

*produced to spent fuel plaintiffs, but those topics have been, and continue to be, the subject of extensive testimony in many spent fuel cases.* Therefore, attorneys and plaintiff personnel involved in the spent fuel litigation and subject to a protective order in one of the spent fuel cases have already seen hundreds of government documents addressing DOE's plans for the spent fuel program (including plans for GTCC waste disposition), and have already heard and will continue to hear much testimony about these topics. Any suggestion that release of *additional* documents addressing these same topics would "chill" internal deliberations at DOE or other government agencies is completely fallacious.

In truth, the government is not concerned about chilling internal deliberations. For reasons just discussed, no such chilling could possibly occur given the enormous quantity of documents on similar topics already produced to spent fuel plaintiffs by the government and discussed in testimony in this litigation. Rather, the government simply wants to keep these additional documents from Dairyland and the other spent fuel plaintiffs in order to advance the government's litigation interests. That is why government *lawyers* selected these particular documents for withholding on deliberative process grounds, and that is also why Judge Hewitt correctly rejected the privilege claims that the government's lawyers had made – and its declarants subsequently had merely rubber-stamped – for the three separate and independent reasons set out in her original opinion and reaffirmed in her reconsideration opinion.

## IV. AT A MINIMUM, THE COURT SHOULD ORDER PRODUCTION OF ALL THE DELIBERATIVE PROCESS DOCUMENTS PRODUCED IN *PG&E* THAT ARE RELEVANT TO DAIRYLAND'S CLAIMS.

Even if this Court accepts Judge Hewitt's disregard of her original rulings and her ultimate disposition of the government's privilege claims in *PG&E* – and for the reasons set out above, this Court should not do so – there is no basis for withholding from Dairyland the 259

deliberative process documents the Court ordered the government to produce to *PG&E,* to the extent such documents are relevant in this case. To the contrary, under the *PG&E* reconsideration opinion, and the subsequent May 14, 2006 Order in *PG&E*, the reason the Court ordered the documents produced to PG&E was a finding that the "documents are highly relevant to this litigation and that there may be no other way for plaintiff to obtain evidence that serves the same purpose as these documents." *PG&E*, 71 Fed. Cl. at 215. In other words, the Court found that PG&E had more than met the requisite standard of showing that its evidentiary need "outweighed" any harm that disclosure may cause the government. *Id.*; *see* 70 Fed. Cl. at 134.

The documents the Court ordered released in *PG&E* in fall into two general categories. First are documents related to DOE's plans for disposition of GTCC waste. Following Judge Merow's ruling on the issue in the *Yankee* spent fuel cases, Judge Hewitt in *PG&E* concluded that if the government took the position that PG&E's GTCC waste reduced or eliminated its damages, then PG&E's evidentiary need for GTCC waste related documents being withheld by the government on deliberative process grounds would outweigh the government's interesting confidentiality. *See PG&E*, 71 Fed. Cl. at 213-14. The same ruling should be applicable in Dairyland's case. The government has not yet taken the position here that GTCC waste affects Dairyland's damages claims. But early on the government made a big fuss about GTCC waste, and if in the future the government should take the position here that such waste affects Dairyland's damages, then the Court should direct the government to produce to Dairyland the same GTCC waste-related documents as were produced in *PG&E.*

All but one of the remaining documents that the *PG&E* Court directed the government to produce were "documents regarding the potential rate of acceptance by the government of SNF from nuclear utilities – which could be helpful in determining the rate of acceptance the

government would have used had it began [sic] to perform the Standard Contract on January 31, 1998." *Id.* at 215; *see* Order of May 14, 2006 at 4, A4 ("[A]ll documents which relate to the potential rate of acceptance by the government of SNF from nuclear utilities should be produced."). Because the rate of acceptance and other DOE pickup "schedule" issues are substantially the same in all these spent fuel cases, Dairyland's "evidentiary need" for the rate of acceptance documents the Court ordered produced in *PG&E* is identical to PG&E's need for them (and every other spent fuel plaintiff's need for them). Thus, to the extent the Court in *PG&E* intended to limit disclosure of these documents for use only in the *PG&E* case, that limitation was unwarranted, improper and should be eliminated. The one other document the Court directed the government to produce in *PG&E* concerned spent fuel storage costs, *see PG&E* Order of May 14, 2006, at 5, A5, which is a key disputed issue in this case as well.

Accordingly, even if this Court does not entirely reject Judge Hewitt's disregard of her original rulings, at a minimum this Court should direct the government to produce here all the rate of acceptance and pickup schedule documents and the one storage costs document that the Court directed the government to produce in *PG&E.* Specifically, this Court should now direct the government to produce for Dairyland's use all the "deliberative process" documents the Court in *PG&E* directed the government to produce in *PG&E* except those relating to GTCC waste. As listed at the end of the May 14, 2006 Order in *PG&E*, these documents are Ref Nos. 118, 119, 122, 124, 125, 127, 135, 138, 140, 143, 145, 146, 188-89, 190-96, 202-03, 205, 207-08, 212-16, 220,224,226, 233, 236, 238, 240-46, 248-49, 254, 256, 262, 264, 266-70, 272, 274-84, 287, 290, 311, 313, 319, 322, 333-36, 341, 346, 348, 350, 361, 363-66, 378, 132, 167, 170, 223, 255, 285, 286, 320, 323-327, 330, 340, 347, 349, 362, 381, 260 and 123.

Importantly, because all spent fuel plaintiffs have essentially the same "evidentiary need" for these documents, and given both the enormous burden and cost of litigating these privilege issues separately in each case and the protective orders that exist in all the spent fuel cases, this Court should direct the government to produce the above documents for use by all spent fuel plaintiffs.

## V. THIS COURT ALSO SHOULD REVISIT JUDGE HEWITT'S ULTIMATE RULINGS ON A FEW CATEGORIES OF DOCUMENTS.

In addition, if this Court does not entirely reject Judge Hewitt's disregard of her original rulings – and thus direct the government to produce here *all* the documents it has withheld on deliberative process grounds – then in addition to directing production of the same documents produced in *PG&E*, this Court also should revisit Judge Hewitt's ultimate rulings as to a few categories of documents where her assessment of plaintiffs' evidentiary need versus the government's confidentiality interests is simply wrong.

1. Two documents withheld by the government (Ref Nos. 367 and 369) discuss a proposed approach for initiating modifications to DOE's Standard Contracts with utilities. *See* Milner Decl. at 37-38, A44-A45. Mr. Milner's supplemental Declaration describes these documents and the purported harm from their disclosure as follows:

> The[se] documents . . . contain [DOE Contracting Officer] Mr. Zabransky's recommendations and opinions regarding the terms to be modified if modifications are undertaken. . . . . Mr. Zabransky would certainly expect to be questioned in further depositions about his opinions about these possible contract modifications . . . if this document is released, even though no decision as to whether the Standard Contract should be modified has been made. Such questioning will quell Mr. Zabransky's willingness and the willingness of others to make similar recommendations in the future or participate further in the deliberations regarding whether and how the Standard Contract should be modified.

*Id*., A44-A45. Putting aside (as Judge Hewitt did) that this passage expresses mere platitudes rather than any *particularized* harm from disclosure, Judge Hewitt eventually found that PG&E's "evidentiary need for these documents does not outweigh defendant's interest in maintaining their confidentiality," and, indeed, that "these documents are 'irrelevant to this litigation.'" *PG&E*, Order of May 14, 2006 at 5, A5 (citation omitted).

Those conclusions are plainly wrong. By definition a document discussing "possible contract modifications" to be proposed by DOE's Contracting Officer will discuss his interpretation and understanding of the *current* contract terms and perceived deficiencies in those terms. Dairyland submits that there could hardly be anything more relevant in a contract case, particularly where contract terms are disputed, than an opposing parties' expressed understanding of the current contract terms and possible deficiencies in those terms. It is no wonder the government wants to conceal DOE's own understanding of the spent fuel contract and its deficiencies from utility plaintiffs, but it also seems clear the government has no significant interest in keeping such contract interpretations confidential – apart from its litigation interest, which should not and cannot be credited it his context.

The description quoted above of purported harm from disclosure of these two documents is too vague and conclusory to invoke the deliberative process privilege. But even if this Court accepts Judge Hewitt's presumption that such harm is sufficient, this Court should reject her conclusion that PG&E's (and Dairyland's) evidentiary need for these documents does not outweigh the government's interest in confidentiality. It plainly does.

2. Five documents (Ref. Nos. 387-90 and 368) pertain to DOE's 2004 Annual Capacity Report/Annual Priority Ranking ("ACR/APR"), issued in July 2004, and DOE's related initiation of a new Delivery Commitment Schedule ("DCS") process. As the Court is aware, the

government's position on contract liability in these cases rests largely on ACR/APR documents and the associated DCS process from the 1990's, *see Consumers Power Co. v. United States* 65 Fed. Cl. 364, 369-70 (2005); *Energy Northwest v. United States*, 69 Fed. Cl. 500, 503 (2006) – a process DOE abandoned before 1998, *see Consumers Power,* 65 Fed. Cl. at 370. The Court may also be aware that DOE resumed the DCS process based on a new ACR/APR issued in July 2004, and then abandoned the process again. The July 2004 ACR/APR and various related correspondence and other documents have been produced by the government to plaintiffs in this litigation. However, on deliberative process grounds the government has withheld five documents pertaining to the 2004 ACR/APR and DCS process. Mr. Milner's supplemental Declaration describes those documents and the purported harm from their disclosure as follows:

> These documents were prepared by [DOE Contracting Officer] David Zabransky and [his Technical Representative] Thomas Pollog, and provide their recommendations and opinions regarding the issues that should be addressed when DOE resumed the delivery commitment schedule process. . . . The resumption of the Delivery Commitment Schedule process was of interest to every Standard Contract holder and Mr. Zabransky and Mr. Pollog have already been questioned about the resumption of the DCS process in depositions and during trial. Further, Mr. Zabransky and Mr. Pollog are currently the individuals who will be responsible for the issuance of the next ACR and the resumption of the DCS process in the future. If these documents are released, Mr. Zabransky and Mr. Pollog will be required to provide advice to the Director and the Secretary, knowing that they can be questioned about that advice later. Having already experienced the deposition process, Mr. Zabransky and Mr. Pollog would be understandably wary of providing completely candid advice under such circumstances.

Milner Decl. at 32-33, A39-A40. Judge Hewitt found that PG&E's "evidentiary need for these documents does not outweigh defendant's interest in maintaining their confidentiality," and, indeed, that these documents are 'not relevant' to litigation.'" *PG&E,* Order of May 14, 2006 at 5, A5 (citation omitted).

These conclusions are also plainly wrong. Initially, despite its wordiness, the passage quoted above does not describe any *particular* harm from disclosure of these documents. In substance, this passage simply states that internal discussions will be "chilled" if the documents are released. That kind of blanket assertion is insufficient to invoke the deliberative process privilege. But accepting Judge Hewitt's ultimate presumption that the privilege is applicable to these five documents, such that a balancing of interests is appropriate given the qualified nature of the privilege, the above passage clearly shows that the evidentiary need of Dairyland and other spent fuel plaintiffs outweighs any government interest in confidentiality.

Under the government's theory, the ACR/APR documents and the DCS process are crucial. Here again, there could hardly be any documents more relevant to the government's theory in this case than "draft action memoranda" like these "regarding DOE's issuance of the 2004 [ACR/APR] and the initiation of the [DCS] process." Milner Decl. at 32, A39. On the other hand, as the passage above acknowledges, Mr. Zabransky and Mr. Pollog have *already* been questioned about these matters extensively, and likely will be further questioned in future discovery and trials. It is simply too late in the day for the government to complain about "chilling" their candor. These men know they will be questioned about these matters in the future. The upshot of the government's "position" is simply to deny Dairyland (and other spent fuel plaintiffs) palpably relevant documents regarding matters crucial to the government's case.

3. Finally, as noted above Judge Hewitt confirmed in her May 14, 2006 Order that "all documents which relate to the potential rate of acceptance by the government of SNF from nuclear utilities should be produced." Order of May 14, 2006, at 4, A4. But the Court in that Order then went on to distinguish, without any explanation why, two groups of documents pertaining to rate of acceptance and related DOE pickup schedule issues, directing the

government to produce the twenty documents in one group and allowing the government to continue withholding the fifty-four documents in the other group. *See* Order of May 14, 2006 at 4, A4.[1] Dairyland respectfully submits that even if this Court accepts the *PG&E* Court's presumption that the deliberative process privilege applies to that second group of documents, then applying the balancing of interests that the qualified nature of this privilege requires, there is no basis for distinguishing that second group of documents from the first group that Judge Hewitt ordered the government to produce – both groups of documents pertain to the rate of acceptance and DOE pickup schedule issues that are significant in all these cases.

As the Court recognized in its *PG&E* reconsideration opinion, "documents regarding the potential rate of acceptance by the government of SNF from nuclear utilities . . . are highly relevant to this litigation and [] there may be no other way for plaintiff to obtain evidence that serves the same purpose as these documents." *PG&E,* 71 Fed. Cl. at 215. The twenty documents addressing these issues that the Court in *PG&E* ultimately directed the government to produce include documents described as follows in the supplemental Milner Declaration:

> – 17 documents "are copies of slides addressing the impact of high receipt rates on waste site inventories that were used for a graphic presentation for a group discussion of options regarding the design and operation of the repository at Yucca Mountain and the effect of those options upon SNF inventories. Milner Decl. at 53, A60.
>
> – 9 documents "are presentations titled 'Impacts of Accelerated Waste Acceptance' and similar documents provided [sic] information requested by Under Secretary Card in connection with policy decisions to be made within DOE regarding waste acceptance." Milner Decl. at 54-55, A61-A62.
>
> – 1 document "discuss[es] the Administration's policy and guidance to DOE regarding the interim storage of SNF. . . . The

[1] Of those fifty-four documents, Judge Hewitt did for other reasons direct the government to produce six (Ref Nos. 125, 260, 320, 323, 324 and 340), but for sake of clarity here, Dairyland refers to all fifty-four documents as the Court did on p. 4 of its May 14, 2006 order.

> document . . . discusses options available to DOE regarding interim storage, a cost analysis involving paying utilities that experience delays from scheduled shipment dates under various assumptions, and a list of principles to consider for interim storage." Milner Decl. at 21, A28.
>
> – 1 document "is an e-mail suggesting language for an internal memorandum regarding an option for accelerated SNF acceptance and the possible effects of such an option upon the obligations under the Standard Contract." Milner Decl. at 65, A72.

The fifty-four documents (*see* fn. 1 above) that also address rate of acceptance and related issues but which Judge Hewitt refused to direct the government to produce address the same subjects as the above documents, and indeed are described in the supplemental Milner Declaration the same or substantially similar terms. Subjects addressed by these fifty-four still-withheld documents include, for example, "documents [containing] assessments and recommendations by DOE personnel regarding the potential impact of schedules for repository construction and SNF acceptance resulting from potential budget reductions" (Ref. Nos. 129, 198-201, 210-11, 219, 232; *see* Milner Decl. at 44, A51); "versions of a graphic depiction showing the effect of several budgetary options upon the construction of a repository at Yucca Mountain and SNF acceptance at the repository" (Ref Nos. 129, 198-201, 210-11, 219, 232; *see* Milner Decl. at 44, A51); "emails forwarding two drafts of . . . presentation discuss[ing] . . . possible options to 'accelerate waste acceptance' from utilities" (Ref. Nos. 291, 295; *See* Milner Decl. at 69, A76); "an e-mail suggesting language for an internal memorandum regarding an option for accelerated SNF acceptance and the possible effects of such an option upon the obligations under the Standard Contract" (Ref. No 320; *see* Milner Decl. at 65, A72); and documents concerning "the amount of SNF to be generated and stored by commercial nuclear utilities and the time period required to collect the SNF, assuming our current acceptance rates for the repository" and "the dates by which SNF could be accepted from all shutdown reactors

and from dry storage facilities at all commercial utility sites if such priorities in acceptance became a 'matter of national priority.'" (Ref No. 324; *see* Milner Decl. at 73-74, A80-A81).

These same words or concepts are used in the supplemental Milner Declaration for a number of the documents that the Court ordered released, as shown by the passage quoted on the preceding page. Indeed, that Judge Hewitt drew a false and arbitrary line between the twenty acceptance rate related documents she ordered the government to produce and the fifty-four such documents she allowed the government to continue withholding is shown starkly by the fact that the same paragraph and same language in the supplemental Milner Declaration describes both a document Judge Hewitt ordered released, Ref. No. 319 and one she refused to order released, Ref. No. 324. *See* Milner Decl. at 72-73, A79-A80 (pertinent language quoted above at end of paragraph preceding this one).

In summary, there is no difference in substance between the these two groups of documents. This Court can see that from the descriptions in the supplemental Milner Declaration. (Attached at A125is a chart showing the withheld documents by Ref. No. and which page of the Milner Declaration, A8, each document is described on). Therefore, even if this Court declines to reject Judge Hewitt's disregard of her original rulings, then for at least the reasons Judge Hewittt ordered the government to produce the twenty acceptance rate documents, this Court should direct the government to produce the other fifty-four acceptance rate documents identified above for Dairyland's use in this case.[2]

---

[2] Dairyland is mindful that a small number of the fifty-four documents discussed here, for example Ref. Nos. 228, 231, 258, were mentioned by the *PG&E* Court in its reconsideration opinion as documents for which "it is not readily apparent to the court" why PG&E's evidentiary need outweighs the government's confidentiality interest. *See PG&E*, 71 Fed. Cl. at 211. However, descriptions in the government's privilege log, *see* A103, A104, A107, do indicate that these documents address the "highly relevant" rate of acceptance issue, and indeed,

VI. THIS COURT SHOULD REJECT THE GOVERNMENT'S PLAINLY UNFOUNDED CLAIMS OF ATTORNEY-CLIENT PRIVILEGE

As noted above, the government also claimed other privileges. *i.e.*, attorney-client and work product, over 92 of the 458 documents it withheld on deliberative process grounds in *PG&E*. Because PG&E did not initially challenge those other privilege claims, the Court in *PG&E* declined to rule on them. Instead, to the extent the Court in *PG&E* overruled the government's deliberative process claims, it allowed the government to produce those documents with attorney-client or work product material redacted. *See* Order of May 14, 2006 at 5-6, A5-A6.

Dairyland does challenge those other privilege claims here– not in every case, but as to those documents where according to the government's privilege log the sole basis for the claim of attorney-client privilege is that the document is or has been "under legal review." Over and over the government's privilege log reflects a claim of attorney-client privilege merely because an otherwise ordinary document, not authored by a lawyer, is "under legal review." *See* Ref. Nos. 196, 202, 212, 220, 233, 251, 254, 268 287, 290, 402 and 403. But passing a document before a lawyer's eyes does not make it privileged. *See Simon v. Searle,* 816 F.2d 397, 403 (C.A. 8th Cir. 1987) ("Just as the minutes of business meetings attended by attorneys are not automatically privileged, *(citations omitted)*, business documents sent to . . . the corporation's attorneys, do not become privileged automatically."); *Wilderness Soc. v. U.S. Dept. of Interior,* 344 F. Supp. 2d 1, 16 (D.D.C. 2004) ("[T]he attorney-client privilege does not give . . . the ability 'to withhold a document merely because it is a communication between the agency and its lawyers.'" (citing *Judicial Watch, Inc. v. U.S. Postal Serv.,* 297 F.Supp. 2d 252, 267 (D.D.C. 2004) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 252 (D.C. Cir. 1977))). Indeed, in

as discussed in the text, the Court in *PG&E* "determined" that PG&E's evidentiary need was overriding with respect to numerous others documents addressing exactly these same subjects.

*PG&E* the Court rejected PG&E's claims of privilege where lawyer's "review" or other involvement in a document did not satisfy the elements of the narrow attorney-client privilege, *see PG&E,* Order of April 14, 2006 at 4, A134. This Court should similarly reject the government's similarly unfounded claims based solely on "legal review" of otherwise discoverable documents.

That Dairyland is not challenging any of the government's other claims of attorney-client or work product privilege here should not be understood as agreement that those claims are proper. Rather, except for the deliberative process privilege documents where attorney-client privilege is also claimed only because they are "under legal review," Dairyland is willing to accept in this case production of such documents with attorney-client or work product material redacted, as in *PG&E*.

CONCLUSION

For the reasons set forth above, this Court should:

1. Direct the government to produce to Dairyland, subject only to the existing protective order, all documents the government withheld in *PG&E* on deliberative process grounds except for those pertaining to GTCC waste.

(Except as stated in paragraph 3 below, as to all documents that the Court directs the government to produce as a result of this motion, portions of such documents subject to claims of attorney-client or work product privilege may be redacted).

2. In the alternative, direct the government to produce to Dairyland –

(a) all documents that the Court in *PG&E* ordered the government to produce to PG&E, subject only to the existing protective order, except that the government need only so produce to Dairyland the GTCC waste related documents that the Court in *PG&E*

ordered the government to produce if the government takes the position in this case that Dairyland's damages should be reduced or eliminated due to the presence of GTCC waste, and

(b) all 55 documents in the three categories discussed in this motion at pp. 19-25 (*i.e.*, Ref Nos. 367-369, 387-390, 129, 198-201. . . ), subject only to the existing protective order.

3. To the extent the Court directs the government to produce to Dairyland documents identified as Ref Nos. 196, 202, 212, 220, 233, 251, 254, 268 287, 290, 402 and 403), direct that such documents be produced in unredacted form.

Dated: January 18, 2007

Respectfully submitted,

s/ Jerry Stouck

Jerry Stouck
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax

Counsel for Plaintiff
Dairyland Power Cooperative

Of Counsel:

Robert L. Shapiro
Kevin Stern
Greenberg Traurig, LLP

## CERTIFICATE OF SERVICE

The undersigned certifies that the accompanying Motion to Compel and Appendix was served by hand on January 18, 2006 upon:

Russell A. Shultis
U.S. Department of Justice, Civil Division
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, DC 20530

s/ Jerry Stouck