# APPENDIX

# In the United States Court of Federal Claims

No. 04-74C
(into which has been consolidated No. 04-75C)

(E-Filed: May 14, 2006)

PACIFIC GAS AND ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

## ORDER

Before the court is Pacific Gas & Electric's Second Motion to Compel the Production of Documents Withheld Under the "Deliberative Process" Privilege (Pl.'s Mot. or Motion). Pursuant to Rule 37(a)(2) of the Rules of the Court of Federal Claims (RCFC), plaintiff moves the court "to compel the government to produce 209 responsive documents that the government continues to withhold from disclosure due to its 'deliberative process' privilege claims." Pl.'s Mot. at 2. For the foregoing reasons, plaintiff's Motion is GRANTED-IN-PART and DENIED-IN-PART.

In the court's Order of April 27, 2006, the court provided brief analyses of various descriptions of documents provided in the ex parte affidavits submitted to the court on April 11, 2006 for the purpose of permitting the parties to analogize the examples to disputed documents not mentioned in the court's April 27, 2006 Order and thereby to resolve any further discovery disputes involving the deliberative process privilege that may have arisen. 4/27/06 Order at 8. The parties were also ordered to confer in an effort to resolve any such disputes using the guidance provided by the court's April 27, 2006 Order. Id. Nevertheless, despite the court's guidance, the parties were unable to come to an agreement with respect to 209 documents that plaintiff now seeks to be produced. The court now proceeds to address each of these documents as categorized in plaintiff's

Motion to determine whether plaintiff has made "'a showing of evidentiary need . . . that outweighs the harm that disclosure of such information may cause to the defendant.'"[1] Pac. Gas & Elec. Co. v. United States (PG&E), No. 04-74C, 2006 U.S. Claims LEXIS 63, at *17 (Fed. Cl. Mar. 14, 2006) (quoting Alaska v. United States, 16 Cl. Ct. 5, 11 (1988)); see also Marriott Int'l Resorts, L.P. v. United States, 437 F.3d 1302, 1304, 1307 (Fed. Cir. 2006) ("[A] showing of compelling need can overcome the qualified deliberative process privilege.").

## I. Documents Which the Government has Agreed to Produce Based on the Court's April 27, 2006 Order

In a letter written to plaintiff on May 10, 2006, defendant states that it "will not contest" the production of a number of documents that it believes to "have a similar subject matter to those that the [c]ourt ordered [defendant] to produce in its April 27, 2006 [O]rder." Pl.'s Mot. Ex. D at 2. Defendant states that, "[b]ecause [it] do[es] not want to create any opportunity for any SNF plaintiff, or any plaintiff in other current or future litigation with [the Department of Energy (DOE)], to have any grounds for arguing that the [g]overnment somehow waived any privilege claims relating to the rate of acceptance, we request that [plaintiff] ask the [c]ourt for an order compelling the production of these documents." Id. at 2-3. Accordingly, plaintiff has requested the court to enter an order compelling the production of these documents. Pl.'s Mot. at 3. The court agrees to this request. Defendant is hereby ORDERED to PRODUCE to plaintiff Document Nos.[2] 118, 119, 122, 124, 125, 127, 135, 138, 140, 143, 145, 146, 188-89, 190-96, 202-03, 205, 207-08, 212-16, 220, 224, 226, 233, 236, 238, 240-46, 248-49, 54, 256, 262, 264, 266-70, 272, 274-84, 287, 290, 311, 313, 319, 322, 333-36, 341, 346, 348, 350, 361, 363–66 and 378.[3]

---

[1]The court has reviewed in camera the following documents and also has the government's responses to plaintiff's requests to produce the following documents in the form of letters written to plaintiff that post-date the court's April 27, 2006 Order. See Pl.'s Mot. Exhibit (Ex.) B, C, and D. Accordingly, the court does not require a response to plaintiff's Motion in order to make its final determinations with respect to the deliberative process privilege.

[2]All document numbers refer to those from the Table of Challenges in the Appendix to PG&E's Motion.

[3]Every document ordered to be produced by this Order shall be subject to the Protective Order issued by the court on April 21, 2005. However, for the purposes of this Order, the court AMENDS the Protective Order to limit the disclosure and/or use of all documents mentioned in this Order to the attorneys for the plaintiffs in this litigation only, rather than, as stated in the (continued...)

II. Documents Related to GTCC Waste

In the court's April 27, 2006 Order, the court stated that it agreed that:

> if defendant takes a "litigation position" in this case that the continued storage of GTCC waste at PG&E's storage facilities after January 31, 1998 "would obviate or reduce damages" claimed by plaintiff, then plaintiff's evidentiary need for production of documents related to GTCC waste and described in the Virgilio Declaration, the Marcinowski Declaration, or any other declaration before the court, see, e.g., Milner Decl. at 29, would potentially outweigh defendant's interest in maintaining the confidentiality of these documents. However, as of the date of this Order, the court is not aware that defendant has indicated such a "litigation position" in this case.

4/27/06 Order at 13. Defendant has since taken such a "litigation position." See Defendant's Memorandum of Contentions of Fact and Law at 66-67. Accordingly, and for the reasons stated in plaintiff's Motion, see Pl.'s Mot. at 7-14, the court agrees that plaintiff's evidentiary need for the production of documents related to GTCC waste outweighs defendant's interest in maintaining their confidentiality.[4] The court's examination in camera of these documents supports this finding. Defendant is hereby ORDERED to PRODUCE to plaintiff Document Nos. 2, 12-13, 16-18, 51-53, 55-59, 62-68, 71-77, 80-103, 186-187, 289, 300-301, 384-386, 391-392, 396, 400-434, 436-459, 462 and 464. Accord Order of August 25, 2003 in Yankee Atomic Electric Co. v. United States, No. 98-126C ("Thus, the Government's plans with respect to its obligation . . . to dispose of GTCC, must be fully disclosed to enable the court to make a finding(s) on the

---

[3](...continued)
Protective Order, the "attorneys for plaintiffs in the spent nuclear fuel cases," 4/21/05 Order ¶ 5.

[4]The court has noted defendant's letter to plaintiff that refers to these documents, see Pl.'s Mot. Ex. B at 2-4, and the court disagrees with the defendant's assessment of the potential relevance of the documents listed to this litigation. Although many of the documents are "deliberative" and "predecisional," almost all of them address various aspects of the government's plans for the handling of GTCC waste, information that is vital to making "an evidentiary finding as to whether GTCC material will be left on a reactor site after [SNF] and/or [HLW] is removed," Order of August 25, 2003 in Yankee Atomic Electric Co. v. United States, No. 98-126C, as well as making an evidentiary finding as to whether the Standard Contract covers GTCC waste, see Pl.'s Mot. at 7.

validity of this defense defendant asserts. It appears there may only be inchoate plans, or recommended plans, but it is concluded that unless defendant abandons its GTCC defense against monetary claims in this matter, there exists a compelling necessity for the production of all documentation which can contribute to an evidentiary finding as to whether GTCC material will be left on a reactor site after [SNF] and/or [HLW] is removed.") (emphasis added).

III. Documents Related to the Government's Rate of Acceptance

In the court's April 27, 2006 Order, the court stated that

> documents regarding the potential rate of acceptance by the government of SNF from nuclear utilities – which could be helpful in determining the rate of acceptance the government would have used had it began to perform the Standard Contract on January 31, 2006 – are highly relevant to this litigation and . . . there may be no other way for plaintiff to obtain evidence that serves the same purpose as these documents.

4/27/06 Order at 15. Accordingly, and for the reasons stated in plaintiff's Motion, see Pl.'s Mot. at 14-17, the court finds that all documents which relate to the potential rate of acceptance by the government of SNF from nuclear utilities should be produced. After examining in camera the 20 documents that plaintiff identifies as "clearly involv[ing] what the [c]ourt has termed the 'highly relevant' rate of acceptance issue," Pl.'s Mot. at 17, the court agrees that the plaintiff's evidentiary need for these documents, listed in footnote three of plaintiff's Motion, outweighs defendant's interest in maintaining their confidentiality. However, after examining in camera the 54 documents that plaintiff identifies as being potentially "'helpful in determining the rate of acceptance the government would have used had it began to perform,'" Pl.'s Mot. at 20 (quoting 4/27/06 Order at 14-15), the court does not find that plaintiff's evidentiary need for these documents, listed in footnote 4 of plaintiff's Motion, outweighs defendant's interest in maintaining their confidentiality. For the foregoing reasons, defendant is hereby ORDERED to PRODUCE to plaintiff Document Nos. 132, 167, 170, 223, 255, 285, 286, 320, 323-327, 330, 340, 347, 349, 362, 381 and 260.

IV. Documents Related to the DOE's Annual Capacity Report/Annual Priority Report and the Delivery Commitment Schedules Related Thereto

After examining in camera Document Nos. 387-390 and 368, which plaintiff describes as "highly relevant," Pl.'s Mot. at 22, the court finds that plaintiff's evidentiary need for these documents does not outweigh defendant's interest in maintaining the

Case 1:04-cv-00106-EJD Document 60-2 Filed 01/18/2007 Page 6 of 30

confidentiality. The court agrees with defendant that "[t]hese documents are not relevant to this litigation." Pl.'s Mot. Ex. D at 9.

V. Documents Related to the DOE's Adoption of a "Market-Driven Acquisition Approach" for the Office of Civilian Radioactive Waste Management

After examining in camera Document Nos. 108 and 109, which plaintiff describes as "highly relevant to the rate and schedule issue," Pl.'s Mot. at 23, the court finds that plaintiff's evidentiary need for these documents does not outweigh defendant's interest in maintaining their confidentiality. The court agrees with defendant that these documents are not relevant to this litigation. See Pl.'s Mot. Ex. D at 6.

VI. Document Related to Spent Fuel Storage Costs

After examining in camera Document No. 123, which plaintiff describes as "address[ing] a key disputed issue in this case," Pl.'s Mot. at 24, the court agrees and finds that plaintiff's evidentiary need for this document outweighs defendant's interest in maintaining its confidentiality. Accordingly, defendant is hereby ORDERED to produce to plaintiff Document No. 123.

VII. Documents Related to DOE Proposals to Modify or Amend the Spent Fuel Contracts

After examining in camera Document Nos. 367 and 369, which plaintiff describes as highly relevant, see Pl.'s Mot. at 24, the court finds that plaintiff's evidentiary need for these documents does not outweigh defendant's interest in maintaining their confidentiality. The court agrees with defendant that these documents are "irrelevant to this litigation." Pl.'s Mot. Ex. D at 5.

VIII. Documents Over Which Defendant Asserts Attorney-Client Privilege Because They are "Under Legal Review"

Plaintiff requests the court to reject defendant's assertion of attorney-client privilege over documents not authored by a lawyer that defendant claims merely to be "under legal review." Pl.'s Mot. at 25. Plaintiff has previously chosen not to contest defendant's assertion of attorney-client privilege or work product protection over the 92 documents over which defendant has also claimed the deliberative process privilege. See PG&E's Opposition to Motion for Reconsideration at 13. Accordingly, the court has ruled that:

> defendant shall not be required to produce any portion of the 92 documents as to which a privilege in addition to the deliberative process privilege, i.e., attorney-client privilege or work product protection, was asserted and not challenged. However, to the extent that this Order – either directly or through its guidance – resolves in plaintiff's favor the question of whether defendant may continue to protect any of these 92 documents under the deliberative process privilege, defendant shall PRODUCE to plaintiff the documents with the attorney-client or work product material redacted.

4/27/06 Order (citations omitted). That Order remains in full force and effect. To the extent that the court has ordered any of these 92 documents to be produced in this Order, see supra Parts I-VI, defendant is entitled to produce these documents with the attorney-client or work product material redacted. The court declines to review in camera each and every document that defendant describes as "under legal review" to determine if it should be protected by the attorney-client privilege. Indeed, defendant has redacted small portions of some of the documents which plaintiff now challenges in its submission to the court for in camera review, see, e.g., Document No. 202, and therefore the court cannot ascertain whether the small amount of material redacted should in fact be privileged. When making these submissions, defendant stated that:

> because PG&E has represented that it does not intend to challenge the Government's assertions of [attorney-client] privilege, we have begun, but not completed, the process of attempting to redact privileged information from those 92 documents. To the extent that we have been able to redact particular documents from the list of 92 identified in our motion for reconsideration, we have done so before submitting the documents to the [c]ourt, both to minimize the time that the [c]ourt needs to expend reviewing particular documents and to reduce the amount of privileged material that we are presenting to the [c]ourt.

Attachment to Court Document No. 190, at 2. The court declines to revisit defendant's unchallenged assertions of the attorney-client privilege at this late date.

## IX. Conclusion

For the foregoing reasons, plaintiff's Motion is GRANTED-IN-PART and DENIED-IN-PART. Defendant is hereby ORDERED to produce to plaintiff, on or before Wednesday, May 17, Document Nos. 118, 119, 122, 124, 125, 127, 135, 138, 140, 143, 145, 146, 188-89, 190-96, 202-03, 205, 207-08, 212-16, 220, 224, 226, 233, 236, 238, 240-46, 248-49, 54, 256, 262, 264, 266-70, 272, 274-84, 287, 290, 311, 313, 319, 322,

333-36, 341, 346, 348, 350, 361, 363–66, 378, 2, 12-13, 16-18, 51-53, 55-59, 62-68, 71-77, 80-103, 186-187, 289, 300-301, 384-386, 391-392, 396, 400-434, 436-459, 462, 464, 132, 167, 170, 223, 255, 285, 286, 320, 323-327, 330, 340, 347, 349, 362, 381, 260 and 123.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

**DECLARATION OF RONALD A. MILNER**

RONALD A. MILNER declares as follows:

1. I am the Chief Operating Officer for the Office of Civilian Radioactive Waste Management ("OCRWM"), Department of Energy ("DOE"). As Chief Operating Officer, I report directly to the Director and Deputy Director of OCRWM. I am involved with and familiar with all aspects of DOE's civilian radioactive waste management program, and am personally responsible for the day-to-day operations of OCRWM.

2. I have worked for DOE since 1977, and I have worked for OCRWM continuously since 1984. I have been a member of the Senior Executive Service since 1992. I have served as OCRWM's Chief Operating Officer since 2000, and immediately prior to my current position, I served as the Acting Deputy Director of OCRWM for approximately three years.

3. OCRWM was established in 1983 following passage of the Nuclear Waste Policy Act. ("NWPA") 42 U.S.C. § 10224. OCRWM currently employs approximately 150 federal employees, and also oversees the activities of numerous contractor employees. OCRWM personnel work under my supervision. The OCRWM Program is currently organized into the following components: (1) Program Management -- Program management activities are managed from Washington, D.C. Responsibilities include oversight of quality assurance, program

Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal Claims

planning and administration, program management and integration, external interactions, human resources, and the OCRWM budget; (2) Yucca Mountain Project -- The Yucca Mountain site is located in Nye County, Nevada, approximately 100 miles northwest of Las Vegas. For two decades, OCRWM has conducted scientific and engineering investigations at Yucca Mountain to determine its suitability as a nuclear waste repository; (3) Science and Technology Program -- The program explores technological improvements that could enhance the performance, safety, and efficiency of the repository at Yucca Mountain, and/or reduce the costs of the civilian radioactive waste management system; and (4) Waste Acceptance and Transportation Project -- Headquartered in Washington, DC., responsibilities include development of waste acceptance, storage and transportation systems. Activities also include interactions with other waste owners, generators and international waste management programs.

4. During my tenure at DOE, OCRWM has been subject to constant scrutiny by many different parties – Congress, other Executive Branch agencies, the DOE Inspector General's office, the states affected by OCRWM's plans for siting of disposal and storage facilities, the commercial nuclear utilities with which we hold Standard Contracts, and others. As part of this scrutiny, DOE policy makers and OCRWM personnel are constantly called to explain decisions and actions taken by the Department in the implementation of the Nuclear Waste Policy Act. OCRWM's plans, decisions and actions also have been the subject of numerous lawsuits. In addition to the suits pending before the Court of Federal Claims, the State of Nevada and others have filed suits seeking review of actions taken to site the repository. In the upcoming license application proceeding before the NRC, OCRWM will have to defend its plans for the design and operation of the repository, with an expected review of all the studies



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

and analysis that DOE has undertaken to date. While under this scrutiny, OCRWM personnel are trying to fulfill their mission, which is to site, build and open a facility at which they can accept spent nuclear fuel ("SNF") from Standard Contract holders and the DOE weapons complex for eventual long-term disposal.

5. OCRWM personnel are aware of this constant scrutiny of their actions and the potential for further scrutiny if preliminary drafts or opinion papers are released based upon the experience of the program. [redacted]

PRIVILEGED INFORMATION UNRELATED TO THIS LITIGATIO[N]

DESCRIBES EFFECT OF INADVERTENT RELEASE OF DELIBERATIVE PROCESS DOCUMENT ON EMPLOYEES' WILLINGNESS TO PROVIDE CANDID ADVICE IN ANOTHER CIRCUMSTANCE

6. OCRWM personnel are also very aware of the litigation brought by Standard Contract holders in the United States Court of Federal Claims. In the litigation numerous OCRWM personnel have been deposed about their involvement in the program. Several people have been deposed repeatedly -- Mr. Pollog has sat for 11 days of deposition and Mr. Zabransky has sat for 16 days of deposition. While Messrs. Pollog and Zabransky have played a crucial role in supporting the Office of General Counsel and assisting the Department of Justice in defending



Protected Material To Be Disclosed Only In Accordance With Protective Order Entered By U.S. Court Of Federal Claims

the Department in the spent nuclear fuel litigation, I have had comparatively little involvement in the litigation and have not routinely provided assistance to the Office of General Counsel regarding it;[1] despite my relative lack of involvement in this matter, I, myself, sat through six days of deposition, during which I was asked about drafts of documents, my comments on potential policies, and my participation in decisions regarding actions taken or not taken by the program. Mr. Lake Barrett, the former deputy director of the program, sat through seven days of deposition. It is common knowledge throughout the program that the litigation continues and that personnel may be subject to further depositions.

7. As a result of this scrutiny, individuals under my general supervision are very reticent to provide recommendations or opinions about courses of action that may become the subject of questioning by Congress, the Government Accountability Office, the DOE Inspector General, in the litigation, or in the license application proceedings. While employees are required to generate or provide review of documents necessary to the program, employees are increasingly reluctant to express a novel idea or voice a potential criticism to their superiors for concern they will be called to defend their thoughts in a deposition or another forum. Yet, as we finalize the license application, it is critical to decision-making in the best interest of American citizens that OCRWM employees feel free to state their opinions and make sure that the license application is robust and beyond reproach.

8. It is my understanding that, in response to discovery requests from the utility plaintiffs in the spent nuclear fuel cases filed in the Court of Federal Claims, DOE has reviewed

---

[1] Given the scope and import of the spent nuclear fuel litigation, there is no individual within OCRWM who has not become somewhat informed about the litigation.



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

and produced hundreds of thousands of documents referring or relating to DOE's delay in beginning acceptance of spent nuclear fuel or high-level radioactive waste by January 31, 1998 and the schedule by which DOE should have begun acceptance. In that process, DOE has identified and withheld a small number of documents that involve and/or reflect the Department's deliberative processes. DOE has a policy of protecting its deliberative processes in order to assure the free flow of ideas and candid discussion of alternatives, which are essential to its efficient operation.

9. Congress established OCRWM to carry out the functions of the Secretary of Energy pursuant to the NWPA. Pursuant to a formal delegation by the Secretary of Energy to the Under Secretary of Energy, Science and Environment, and a subsequent formal redelegation from the Under Secretary to the Director, Office of Civilian Radioactive Waste Management, the Director or her delegate has responsibility for asserting the Government's deliberative process privilege within the cognizance of OCRWM.

10. In connection with my responsibilities as Chief Operating Officer for OCRWM and my prior positions within OCRWM since 1984, I am generally familiar with the spent nuclear fuel litigation. Based upon the thorough review of the documents at issue by counsel with DOE's Office of General Counsel, my own personal detailed review of these documents, and my experience as an official within OCRWM for 22 years, I have determined that the Department can and should assert the claim of deliberative process privilege with respect to certain documents more thoroughly described in this declaration. As part of the spent nuclear fuel litigation, I previously executed declarations asserting deliberative process privilege over numerous DOE documents. It is my understanding that the Court has been provided with my



Protected Material To Be Disclosed Only In Accordance With Protective Order Entered By U.S. Court Of Federal Claims

prior declarations, dated May 13, 2002, June 13, 2003 (two declarations), and November 10, 2005, respectively. This declaration includes, and I continue to assert a claim of deliberative process privilege over, most of the documents that were included in my prior declarations.

11. Because the controversy regarding the delay in spent nuclear fuel acceptance is within the cognizance of OCRWM, I, Ronald A. Milner, Chief Operating Office of OCRWM and delegate of the Director of OCRWM, hereby assert the deliberative process privilege upon behalf of DOE for the documents listed below. Most of the documents I discuss below reflect our standard practice of soliciting input from knowledgeable individuals to ensure that policy makers have the best information and recommendations upon which to base their decisions. If these documents are released and staff members are called upon to testify about their stated opinions and recommendations that are reflected in these documents, the environment in which OCRWM personnel operate will become further degraded in that employees will be reluctant to provide their frank advice and opinions. I have determined that disclosure of any of the deliberative contents of the documents identified in the following list would be injurious to the Federal Government's decision-making functions because such disclosure would tend to inhibit the frank and candid discussion necessary to effective government. Indeed, disclosure would have a chilling effect upon many future discussions at DOE.

12. When the Department asserts a formal claim of deliberative process privilege with respect to predecisional/deliberative documents, the privilege is claimed only to protect those intragovernmental documents reflecting advisory opinions, recommendations and deliberations which comprise part of the process by which agency decisions and policies are formulated. The Department does not seek to protect documents containing factual matters unless such factual



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

matters are so intertwined with advisory opinions, recommendations, conclusions, or reasoning by Government officials that the factual material cannot be excised from the privileged material or unless the factual matter itself, through its selection and distillation by the author, would reveal the author's mental process or the agency's deliberations. The privilege is not claimed to protect all opinions, conclusions, mental impressions, and thought processes of Government officials, but only those the disclosure of which would interfere with vital Government functions or would cause injury to and negatively impact the quality of agency decisions.

13. When the Department asserts a formal claim of deliberative process privilege with respect to predecisional/deliberative documents, the Department first considers whether the document falls within the scope of the deliberative process privilege; that is, whether the document was generated before the adoption of a department policy or position, or whether the document reflects the give-and-take of the consultation process leading up to the formulation of an agency policy, position or decision. The Department also considers whether the document is recommendatory in nature or is a draft rather than a final document; whether the document weighs the pros and cons as to the agency's ultimate adoption of one viewpoint or another; and whether the material is so candid or personal in nature that public disclosure is likely to stifle honest and frank communication within the Department in the future.

14. Consequently, the Department considers protecting recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy or position of the Department. These types of documents inaccurately reflect or prematurely disclose the views of Government officials, suggesting an agency position which is, as yet, only a personal position. Disclosure of



Protected Material To Be Disclosed Only In Accordance With Protective Order Entered By U.S. Court Of Federal Claims

documents containing reasons and rationales that were not ultimately relied upon by the department in reaching its decisions could create public confusion and not accurately reflect the Department's decision on a particular matter or issue.

15. I understand that the process of reviewing and producing documents as part of this SNF litigation began in 1998, and continues to this day. This review and production has encompassed literally hundreds of thousands of documents related to OCRWM's civilian radioactive waste management program.

16. Obviously, this quantity of documents, reviewed and produced over a number of years, cannot be reviewed and considered by a single individual. As a result, a number of DOE employees, including attorneys from the Office of General Counsel, have been involved with and responsible for collecting documents responsive to the plaintiff's discovery requests, reviewing all of those documents, and then producing the responsive, non-privileged documents to plaintiffs. During this same review process, both DOE staff employees and DOE attorneys also identified a small number of documents that those individuals believed might involve or reflect DOE's predecisional, deliberative review and assessment of the Department's policies, decisions, strategies and/or positions.

17. As a result of this internal document review, and my understanding that the Government must identify documents during discovery that it intends to withhold from production to plaintiffs on the basis of privilege, I conducted my own personal review of the documents that were initially identified or considered by other individuals within the Department to be predecisional and deliberative. As the Secretary's delegee to assert deliberative process privilege over matters under the cognizance of OCRWM, I executed my first "deliberative



Protected Material To Be Disclosed Only In Accordance With Protective Order Entered By U.S. Court Of Federal Claims

process" declaration in May 2002, as part of what was described to me as the coordinated discovery phase of the SNF litigation. However, the same process of initial identification of potential documents protected by the deliberative process privilege, and then individual, detailed review of each identified document by myself, applies to all of the declarations that I executed during this litigation.

18. Recently, I was informed by counsel at DOE and the Department of Justice that, in response to the Court's order in the above-captioned case, which resulted from the plaintiff's motion to compel the production of numerous documents withheld from production on the basis of deliberative process privilege, the Government was directed to provide the Court with *ex parte* declarations covering all of the documents over which the Government continued to assert a claim of deliberative process privilege. Over a period of three days, I spent approximately ten hours reviewing each of the 281 documents that were included in my prior declarations submitted as part of the spent nuclear fuel litigation. As a result of this review, I have determined that the Department will waive its claim of deliberative process over 14 documents, either in whole or in part. However, based upon my detailed review of the documents, I hereby reassert the deliberative process privilege upon behalf of DOE for the following documents which are potentially responsive to plaintiff's requests for production of documents:

1. The document Bates-Stamped HQR0380108 - HQR0380111 (E174)[2] is a draft document that includes the Department's considerations and recommendations regarding how DOE should improve its interaction with the State of Nevada. The

---

[2] "E___" refers to the number that plaintiff has assigned to the document at issue in its motion to compel.



Protected Material To Be Disclosed Only In Accordance With Protective Order Entered By U.S. Court Of Federal Claims

document is part of an ongoing policy deliberation within the DOE regarding its continuing interaction with Nevada as it relates to the storage of spent nuclear fuel at Yucca Mountain. [redacted] If confidential suggestions such as this one were released, and individuals questioned regarding the potential policies presented, Department employees would be reluctant to make such suggestions in the future.

SENSITIVE INFORMATION REGARDING DOE'S RELATIONSHIP W/ NEVADA; DOES NOT PROVIDE GREATER INSIGHT TO CONTENTS OF DOCUMENT THAN DESCRIBED ABOVE; INFORMATION NOT RELEVANT TO ISSUES IN THIS LITIGATION

2. The document Bates-Stamped HQR0390447 - HQR0390454 (E176) is a legal memorandum from DOE's General Counsel to the Executive Assistant to the Deputy Secretary of Energy regarding options for the receipt of Cintichem fuel. The specific decision at issue was how DOE would accept Cintichem fuel, and this document reflects DOE's deliberations regarding different methods for accepting the fuel, and provides options, discusses advantages and disadvantages of the options, and makes recommendations regarding the acceptance of Cintichem fuel. The release of this document would cause second-guessing by multiple parties of the method of acceptance ultimately chosen by DOE, and therefore would inhibit DOE's willingness and ability to respond to future requests for acceptance such as this one.



Protected Material To Be Disclosed Only In Accordance With Protective Order Entered By U.S. Court Of Federal Claims

**Advice Concerning Possible Settlements:**

The following four documents all address the issue of whether DOE could settle the utilities' lawsuits, and the sensitivities involved in such a decision. Each of the documents contains analysis of various options that DOE could pursue, and their effect upon the program and the potential for settlement.

3. The document Bates-Stamped HQR0510001 - HQR0510007 (E180) is a briefing memorandum to the Secretary of Energy from Mary Louise Wagner, special assistant to the Secretary of Energy, regarding a meeting with utility executives that provides recommendations and analysis of issues prior to a meeting with executives of PECO and ComEd. The specific decision at issue in this document was whether DOE could settle the utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document reflects part of the Department's deliberations that led to its decision, and also includes materials prepared at the direction of counsel and attorney-client communications. The document identifies for the Secretary various "sensitivities" that must be contemplated. The release of this information would discourage employees from identifying such sensitivities for the Secretary in the future, which would lead to less well-informed decision-making by the Secretary. Because the Department is still engaged in continuing settlement negotiations with numerous Standard Contract holders, it is particularly important that individuals feel free to provide input and make suggestions regarding potentially creative means of settlement without fear that their suggestions (intended only for internal use) would be obtained by the utilities and,



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

depending upon the context of the suggestion, used against the Department in settlement negotiations. Knowing that their preliminary ideas and concerns might be disclosed to the utilities, potentially to the Department's detriment, has already chilled Department employees from becoming involved in these activities. To the extent that additional settlements are to occur, the free flow of ideas within the Department must be encouraged and not chilled. Further, the one-sided disclosure of information about the Department's internal settlement positions would seem inherently unfair and counterproductive to the idea that parties negotiate settlements on a level playing field.

4. The document Bates-Stamped HQR0510008 - HQR0510011 (E181) is a briefing memorandum for the Secretary of Energy from Mary Louise Wagner and Mary Anne Sullivan, General Counsel of the Department of Energy, regarding a meeting with Northern States Utility. The specific decision at issue in this document was whether DOE could settle the utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document reflects part of the Department's deliberations that led to its decision, and also includes materials prepared at the direction of counsel and attorney-client communications. The document identifies for the Secretary various "sensitivities" that must be contemplated. The release of this information would discourage employees from identifying such sensitivities for the Secretary in the future, which would lead to less well-informed decision-making by the Secretary.



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

5. The document Bates-Stamped HQR0510018 (E183) is a summary regarding spent fuel storage costs. The document is part of DOE's ongoing deliberations that involve the possibility of settling the nuclear utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document includes materials prepared at the direction of counsel and attorney-client communications, and provides the estimated costs associated with pursuing a number of options and scenarios regarding DOE's delay in SNF acceptance. If outside parties gained access to this information, they would second-guess the decision ultimately made by DOE, questioning DOE officials about each and every option considered. This would prompt DOE decision-makers to stop seeking creative suggestions that may ultimately be rejected, and consider markedly fewer options in the future.

6. The document Bates-Stamped HQR0292342-HQR0292353 (E160) is a memorandum from Lake Barrett, former Acting Deputy Director, OCRWM, to Under Secretary of Energy Thomas Grumbly regarding the advantages and disadvantages of several litigation options as they relate to the Department's acceptance of spent nuclear fuel. The specific decision at issue in this document was whether DOE could settle the utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document reflects part of the Department's deliberations that led to its decision, and also includes materials prepared at the direction of counsel and attorney-client communications. This document contains analyses of options that may have later been proven impractical or impossible. Outside parties with access to this information would question DOE's decision to



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

reject such options, suppressing the willingness of DOE officials to suggest a variety of options in the future. DOE decision-makers would be left without the w materials necessary to make a comprehensive and well-considered decision.

7. The document Bates-Stamped CTR191370 - CTR191383 (E110) is addressed to the Office of the Secretary from an individual in DOE's office of Fissile Materials Assurance Working Group ("FMAWG"). The specific policy decision at issue was the methods through which the Department would safeguard irradiated nuclear materials. The document seeks Secretary-level approval of the attached Program Directions for Safeguarding Irradiated Nuclear Materials. The document also includes a communication from the Acting Deputy Assistant Secretary for Nuclear Material and Facility Stabilization to AMEM field managers regarding the FMAWG drafted program direction, and seeks comments and estimated costs to implement the proposed Program Directions. The document was part of DOE's policy deliberations that led to the Department's decision, and includes a recommendation from FMAWG to the Office of the Secretary relating to that decision. Here, Mr. Chris Einberg of the Office of Civilian Radioactive Waste Management was specifically asking Mr. Scott Vance for input regarding the proposed program direction, which had not yet been adopted. If this pre-decisional document were released, and Mr. Einberg and Mr. Vance subject to deposition regarding their input, Mr. Einberg and other individuals[3] would be less likely to provide frank input in the future. It is critical that decision-makers

[3] Mr. Vance is no longer with the program.



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

receive unfettered advice from qualified individuals before finalizing this kind of policy decision.

8. The document Bates-Stamped HQR0510020 - HQR0510024 (E184) is a memorandum prepared by Mary Louise Wagner, Senior Policy Advisor to the Secretary, at the direction of Mary Anne Sullivan, then-DOE General Counsel, for the Secretary of Energy containing legal advice and mental impressions regarding DOE's request to the President for approval to begin negotiations with the United States Senate for nuclear waste legislation, following the decision of the United States Court of Appeals for the District of Columbia in Northern States Power Co. v. U.S. Dep't of Energy, 128 F.3d 754 (D.C.Cir. 1997). In addition to the attorney client privilege and attorney work product protection asserted for this document, the document reveals the deliberations within DOE regarding its response to the spent nuclear fuel lawsuits and forms part of the deliberative process. The document Bates-Stamped HQR0510012 (E182) is a memorandum detailing points to be made concerning a proposal for on-site storage of nuclear utilities' spent nuclear fuel. The memorandum was prepared by Mary Louise Wagner (DOE) at the direction of Mary Anne Sullivan (DOE General Counsel) for the Secretary of Energy and reveals the legal advice and mental impressions of DOE legal counsel regarding DOE's position for on-site storage of spent nuclear fuel and DOE's position regarding proposed congressional legislation regarding interim storage of spent nuclear fuel. Document contains analysis and recommendations from the Secretary of Energy to the President regarding the administration of NWPA,



Protected Material To Be Disclosed Only In Accordance With Protective Order Entered By U.S. Court Of Federal Claims

including analysis of then-pending legislation and possible litigation. The release of this document will have a chilling effect upon the ability of the Secretary and OCRWM to provide similar recommendations and advice to the President on matters regarding the administration of the NWPA in the future.

9. The documents numbered HQR0283563-HQR0283588 (E151) and HQR290966-HQR290970 (E158) are duplicate memoranda to TJ Glauthier, Associate Director Natural Resources, OMB, from Elgie Holstein, Chief of Staff, and Mary Anne Sullivan, Deputy General Counsel, regarding the Department's response to Indiana Michigan Power Co. v. DOE. The document provides recommendations that the DOE take certain actions in response to the court decision, and requests concurrence with the proposed approach. The document also attaches a draft of a sample letter to contract holders, and includes a draft attachment of the contracting officer's preliminary determination. The document reflects part of the Department's deliberations that led to its decision, and also includes materials prepared at the direction of counsel and attorney-client communications. DOE is continually faced with new legal decisions that affect its programs. It is critical for the Department to be able to examine the effects of such decisions, seek advice upon how to respond, and thoughtfully determine the appropriate course of action. Only with the free and unencumbered exchange of ideas can DOE decision-makers make such a determination. The release of this kind of advice would discourage such an exchange.



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

**Advice Concerning Possible Interim Storage:**

The following five documents all address the issue of whether DOE could or would elect to store spent nuclear fuel in an interim storage facility, and if so, the possible ways in which interim storage could be accomplished. This issue has been repeatedly revisited by DOE, the Executive Branch and Legislative Branch, and to date no final decision has been made. DOE decision-makers must be allowed to gather information and determine the viability of all options presented before choosing and presenting their recommendation to the Office of Management and Budget and the President.

10. The documents Bates-Stamped CTR0400568-CTR0400583 (E112) and HQR0320182-HQR0320197 (E166) are duplicates or different versions of an OMB memorandum from TJ Glauthier, Associate Director Natural Resources, and Charles Curtis, Under Secretary of Energy, requesting comments from various offices, including the Department of Justice, regarding an options paper upon the question of interim storage of high-level radioactive waste. The specific decision at issue was whether DOE would elect to store spent nuclear fuel in an interim storage facility, and this document reflects DOE's considerations and deliberations that relate to that decision. The document discusses issues and options relating to that decision, and the advantages and disadvantages of each option. It is critical to the proper functioning of the Executive Branch that the OMB be allowed to examine all options before presenting its recommendation. Release of the options being considered as part of this process would cause a barrage of criticism from outside parties, before the OMB has even had the chance



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

to analyze the suggestions. Such a reaction would overwhelm decision-makers and bring the process to a virtual halt. Further, DOE personnel would be less likely to offer the kind of creative ideas necessary to an informed decision if they are aware of the potential publication of their comments, and the ensuing difficulties.

11. The documents Bates-Stamped HQR0290177-HQR0290190 (E154), HQR04214.52-HQR04214.64 (E178), and HQR0320231-HQR0320245 (E171) are different versions or duplicates of a draft memorandum regarding DOE's policy options for the interim storage of nuclear waste. The documents outline DOE's options for interim storage, and DOE's perceived advantages and disadvantages of each option. The specific decision at issue was whether DOE would accept spent nuclear fuel at an interim storage facility, and these documents reflect DOE's policy deliberations as they related to DOE's decision. DOE is continually faced with Congressional inquiries regarding this issue, and it is important that the Department speak with one voice in response to Congress' questions. While we consider many ideas in formulating policy, the ideas that we consider are merely the opinions of individuals, and not the Department's policy. It would be detrimental to the process if Congress and other parties could delve into all of suggestions considered. These suggestions, while essential to the decision-making process, could be misconstrued by other parties, or could be erroneously attributed to the Department or the Executive Branch. If employees see that their individual opinions are publicized and ultimately have a detrimental



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

effect upon the decision-making process, they will be less likely to offer creative opinions in the future.

12. The documents numbered HQR0290044-HQR0290051 (E153), HQR0292365-HQR0292368 (E161) and HQR0292428-HQRH292434 (E162) are different versions or duplicates of a memorandum dated January 31, 1997 from Charles Curtis, Acting Secretary of Energy, and Thomas Grumbly, Under Secretary, regarding DOE's proposed position on interim storage written in preparation for the Senate Energy Committee's February 5, 1997 hearing on interim storage. The specific decisions at issue were whether DOE would accept spent nuclear fuel at an interim storage facility, and whether DOE could offer relief to the utilities involved in the lawsuits. The memorandum discusses whether DOE can offer relief to the utilities involved in lawsuits, and outlines DOE's perceived advantages and disadvantages for this proposed relief. The documents reflect DOE's policy deliberations as they related to these decisions. Again, the proposal considered in this document is merely an option being considered by the Executive Branch. It would be impossible for the Department to field all of the questions that would result if each of the options considered were released, regardless of whether they ultimately become the policy of the DOE. Further, the difficulties caused by the release of this information would cause a chilling effect upon employees' future willingness to provide the suggestions that decision-makers require to make informed decisions.



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

13. The documents Bates-Stamped HQR0320151-HQR0320156 (E163), HQR0320213-HQR0320220 (E169), HQR0320221-HQR0320227 (E170), HQR0320176-HQR0320181 (E165), and HQR0320207-HQR0320212 (E168) are different versions or drafts of a memorandum entitled "Proposed Presidential Position Regarding Interim Storage of Spent Nuclear Fuel" that discuss the Administration's current position regarding interim storage, and proposed recommendations for the Administration's position. The specific decision at issue was whether DOE would accept spent nuclear fuel at an interim storage facility. The document reflects DOE's policy deliberations as they relate to DOE's position, and provides analysis supporting the proposed recommendations, including the possibility of expedited acceptance of SNF, legislative implications, costs, and various options regarding interim storage and options for compensating utilities for Federal delays in waste acceptance. Based upon the legislative and cost obstacles alone, it is possible that one or more of the options presented would be rejected, and would never become DOE policy, or the position of the President. Disclosure of options considered would impede the ability of the Executive Branch to speak with one voice with regard to policy decisions. In addition, the difficulties brought about when this kind of analysis and advice is released will cause a chilling effect upon employees' future willingness to provide analysis and advice when it would be beneficial to the Administration.

14. The document Bates-Stamped HQR0320199-HQR0320206 (E167) is a May 13, 1995 draft memorandum from TJ Glauthier of OMB to Kathleen Peroff, Gary L.



Protected Material To Be Disclosed Only In Accordance With Protective Order Entered By U.S. Court Of Federal Claims

Bennethum and Robert L. Civiak discussing the Administration's policy and guidance to DOE regarding the interim storage of SNF. The specific decision at issue was whether DOE would accept spent nuclear fuel at an interim storage facility. The document reflects DOE's policy deliberations as they relate to this decision, and discusses options available to DOE regarding interim storage, a cost analysis involving paying utilities that experience delays from scheduled shipment dates under various assumptions, and a list of principles to consider for interim storage. Memoranda such as this one represent the free flow of ideas with regard to the interim storage issue, and must be encouraged so that an effective policy decision can be reached. If we believed that discussions such as this one were to be released, we would be reluctant to engage in such candid discussion of the various options, and an effective and well-reasoned decision could not be reached.

15. The document Bates-Stamped HQR0381321(E175) is a March 23, 2000 e-mail message from D. Kim to Mary Louise Wagner at DOE that contains draft language for the President regarding the President's intent to veto S. 1287, the Nuclear Waste Policy Act ("NWPA") of 2000. The specific decision at issue was the Department's recommendation to the Administration concerning S. 1287, and the document reflects DOE's policy considerations that relate to that decision, including proposed reasons for vetoing the 2000 NWPA. This document is example of the fact that the Executive Branch must consider the opinions of many individuals, none of whom are the ultimate decision-makers, regarding important policy decisions, like the language that should be used by the President if and



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

when he decides to veto pending legislation. Individuals within the Department must feel comfortable voicing such opinions, without fear that their superiors may later be embarrassed or inconvenienced if their opinions are disclosed.

16. The document Bates-Stamped HQR0240155-HQR0240182 (E150) is a set of presentations and cost estimates created in approximately March 2000 that discuss the rate at which DOE considered the pick-up of spent nuclear fuel, and the cost estimates to DOE if Congress passed S.1287.. The specific policy deliberation at issue is DOE's ongoing deliberation regarding the rate at which it will accept spent nuclear fuel. This document reflects some of DOE's policy considerations as it relates to this deliberation. The presentations include cost estimates and cost assumptions if DOE were to take title of the SNF, and discuss various proposals for the President's budget for a site characterization program, repository development, and waste acceptance. Presentations such as these represent the opinions of many individuals within the Department as to how the program should be run, and have not been determined to be practical or even technically feasible courses of action. If these unexamined opinions were disclosed, DOE would be subject to countless inquiries as to why it chose to manage its program one way as opposed to another, and whether the rejected options could have been viable. When DOE employees are put through the inconvenience and discomfort of several days of deposition based upon the ideas they put forth, the are likely to avoid putting forth ideas in the future.



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims