**No. 04-0106C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**DAIRYLAND POWER COOPERATIVE,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY AND MOTION FOR A PROTECTIVE ORDER

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**RUSSELL A. SHULTIS**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 353-0897**
**Fax: (202) 307-2503**

**OF COUNSEL:**

**JANE K. TAYLOR**
**Office of General Counsel**
**U.S. Department of Energy**
**1000 Independence Avenue, S.W.**
**Washington, D.C. 20585**

**PATRICK B. BRYAN**
**JOHN C. EKMAN**
**SONIA M. ORFIELD**
**MARIAN E. SULLIVAN**
**Department of Justice**
**Washington, D.C. 20530**

**January 18, 2007**

**Attorneys for Defendant**

TABLE OF CONTENTS

PAGE

SUMMARY OF ARGUMENT . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 4

I. DAIRYLAND DID NOT MAKE ANY EFFORT TO MEET AND CONFER, AS REQUIRED BY RCFC 37(a)(2) AND APPENDIX A . . . . . . . . . . 4

II. DAIRYLAND IS NOT ENTITLED TO DEMAND RESPONSES TO INTERPOSE OVERBROAD WRITTEN DISCOVERY REQUESTS . . . . . . . . 5

A. A Party Is Not Entitled To Sweeping Discovery Of Information That Is Not Relevant To The Subject Matter Of The Issues In The Case . . . . . . . . . . 5

B. Even When Information Sought Is Relevant, The Court Will Preclude Discovery That Is Unduly Burdensome Or Expensive . . . . . . . . 7

III. WITH REGARD TO THE INTERROGATORIES FOR WHICH DAIRYLAND IS SEEKING SUPPLEMENTAL RESPONSES, THEY EITHER ARE OVERBROAD OR HAVE BEEN FULLY ANSWERED . . . . . . 9

A. Contrary To Dairyland's Suggestion, We Did Not Assert That The Information Sought In Interrogatory No.5 Was Irrelevant To This Litigation, And We Responded To That Interrogatory . . . . . . . . . . . 9

B. Interrogatory Nos. 6, 7, 8, and 12 Seek Extensive Discovery Regarding DOE's Prediction Of Future Events, Which Are Irrelevant To The Development Of A "But For" World Against Which To Establish Causation And Measure Damages . . . . . . . . . . . . . 11

C. Dairyland's Contention Interrogatories, Set Forth In Interrogatory Nos. 9, 13, 14, 15, and 16, Seek The Government's Litigation Positions That Are Still Being Developed Through Continuing Discovery . . . . . . . . . . 17

TABLE OF CONTENTS (cont'd)

PAGE

D. The Government Has Appropriately Responded To Dairyland's Demands For Information Regarding Identification Of Individuals . . . . 25

1. Dairyland's Interrogatory No. 17 Does Not Request Identification Of Individuals, And Its Inclusion Of This Contention Interrogatory Here Appears To Be In Error . . . . . . . 25

2. With Regard To Dairyland's Demand In Interrogatory No. 18 For Identification Of Individuals With The "Most Knowledge" Regarding Certain Topics, Counsel For Plaintiff's Past Use Of Sanctions Motions To Punish The Government For Witnesses' Lack Of Memory Regarding Matters In Which They Were Once Involved, As Well As The Work Product Doctrine, Precludes Us From Providing Such Attestations . . . . . . . . . . . . . . . . . . . . . . . . 26

3. Dairyland's Requests For Identities Of Individuals In Interrogatory Nos. 1, 2, And 11 Are Overbroad . . . . . . . . . . . . . 29

4. With Regard To Interrogatory Nos. 4, 10, And 18, The Government Has Properly Identified Percipient Witnesses . . . . 31

IV. WITH REGARD TO ITS PRODUCTION REQUESTS, DAIRYLAND SEEKS THE PRODUCTION OF DOCUMENTS THAT HAVE ALREADY BEEN PRODUCED, ARE NOT RELEVANT TO THE COURT'S CONSIDERATION OF DAMAGES IN THIS CASE, OR HAVE BEEN DENIED IN OTHER CASES . . . . . . . . . . . . . . . . . . . . . . . . . . 33

A. The Bulk Of The Documents That Dairyland Requested Have Already Been Produced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B. Without Any Prior Notice, Dairyland Seeks The Production Of Documents That Are Irrelevant To The Matters To Be Decided Here . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

TABLE OF AUTHORITIES

CASES PAGE(S)

Alexander v. Federal Bureau of Investigation,
186 F.R.D. 197 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 38

Ballou v. University of Kansas Medical Center,
159 F.R.D. 558 (D. Kan. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Broadway & 96th Street Realty Co. v. Loew's, Inc.,
21 F.R.D. 347 (S.D.N.Y. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Capacchione v. Charlotte-Mecklenburg Schools,
182 F.R.D. 486 (W.D.N.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Carpenter Tech. Corp. v. Armco, Inc.,
Civ. No. 90-0740, 1999 WL 61180 (E.D. Pa. May 8, 1990) . . . . . . . . . . . . . . . . . . . . . . . 6

Catellus Development Corp. v. United States,
26 Fed. Cl. 210 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re Convergent Technologies Secs. Litigation,
108 F.R.D. 328 (N.D. Cal. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Doe v. Lepley,
185 F.R.D. 605 (D. Nev. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 38

Fisher & Porter Co. v. Tolson,
143 F.R.D. 93 (E.D. Pa. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Flynn v. Church of Scientology,
116 F.R.D. 1 (D. Mass. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

In re Fontaine,
402 F. Supp. 1219 (S.D.N.Y. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Food Lion, Inc. v. United Food & Commercial Workers International Union,
103 F.3d 1007 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Hasbro, Inc. v. Serafino,
168 F.R.D. 99 (D. Mass. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Herbert v. Lando,
441 U.S. 153 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Independent Petrochemical Corp. v. Aetna Casulty & Surety Co.,
117 F.R.D. 283 (D.D.C. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . 23

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11, 12, 13

International Graphics, Division of Moore Business Forms, Inc. v. United States,
3 Cl. Ct. 715 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

International Paper Co. v. United States,
36 Fed. Cl. 313 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

McClain v. Mack Trucks, Inc.,
85 F.R.D. 53 (E.D. Pa. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Micro Motion, Inc. v. Kane Steel Co.,
894 F.2d 1318 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Nestle Foods Corp. v. Aetna Casulty & Surety Co.,
135 F.R.D. 101 (D.N.J. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

In re One Bancorp Securities Litigation,
134 F.R.D. 4 (D. Me. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Pacific Gas & Electric Co. v. United States,
70 Fed. Cl. 758 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 16, 22, 23, 39

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Powers v. CSX Transportation, Inc.,
No. 99-0326, 2001 WL 1190243 (S.D. Ala. July 16, 2001) . . . . . . . . . . . . . . . . . . . . . . . 4

Precision Pine & Timber, Inc. v. United States,
No. 98-720C, 2001 WL 1819224 (Fed. Cl. March 6, 2001) . . . . . . . . . . . . . . . . . . . . . . 40

Renda Marine, Inc. v. United States,
58 Fed. Cl. 57 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Roth v. Bank of the Commonwealth,
No. CIV-79-36E, 1988 WL 43963 (W.D.N.Y. May 4, 1988) . . . . . . . . . . . . . . . . . . . 17, 18

Sattar v. Motorola, Inc.,
138 F.3d 1164 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Shuttle Master, Inc. v. Progressive Games, Inc.,
170 F.R.D. 166 (D. Nev. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

In re Surety Association of America,
388 F.2d 412 (2d Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Soto v. City of Concord,
162 F.R.D. 603 (N.D. Cal. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Tri-Star Pictures, Inc. v. Unger,
171 F.R.D. 94 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Upsher-Smith Labs., Inc. v. Mylan Labs., Inc.,
944 F. Supp. 1411 (D. Minn. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Yankee Atomic Electric Co. v. United States,
73 Fed. Cl. 249 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 32

Zoltec Corp. v. United States,
71 Fed. Cl. 160 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

TABLE OF AUTHORITIES (cont'd)

RULES AND TREATISES PAGE(S)

RCFC 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

RCFC 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

RCFC 37(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 40

RCFC, Appendix A, ¶ 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9 A. Corbin, Corbin on Contracts § 956 (Interim ed. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

4 J. Moore, Moore's Federal Practice 26-431 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

4A J. Moore, Moore's Federal Practice ¶ 33.17[2] (2d ed. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 17

8 C. Wright, A. Miller, & R. Marcus, Federal Practice & Procedure § 2008 (2d ed. 1994) . . . . . 6

8 C. Wright, A. Miller, & R. Marcus, Federal Practice & Procedure § 2008.1 (2d ed. 1994) . . . 8

22 Am. Jur. 2d Damages § 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Restatement (Second) of Judgments § 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

INDEX TO THE APPENDIX


| DOCUMENT | PAGE |
| --- | --- |
| Comparison of Dairyland's Requests for Production to Requests Propounded in Coordinated Discovery, Yankee Atomic and PG&E | 1 |
| Utility Plaintiffs' Joint First Set Of Requests For Production Of Documents, served during Coordinated Discovery Proceedings, dated Sept. 4, 2001 | 3 |
| Plaintiff's First Request For Production of Documents, served in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), dated March 30, 1998 | 22 |
| Plaintiff's Second Request For Production of Documents, served in Yankee Atomic, dated April 19, 2002 | 36 |
| PG&E's First Request for the Production of Documents, served in Pacific Gas & Electric Co. v. United States, Nos. 04-74C & 04-75C (Fed. Cl.), dated June 3, 2005 | 46 |
| Plaintiff's First Set of Requests for Production of Documents, served in South Carolina Electric & Gas Co. v. United States, No. 04-0101C (Fed. Cl.), dated Oct. 15, 2004 | 57 |
| Plaintiff's First Individual Set of Requests For Production of Documents and First Set of Interrogatories Relating To Damages, served in Northern States Power Co. v. United States, No. 98-484C (Fed. Cl.), dated July 17, 2006 | 76 |
| Dairyland's Objections and Response To Defendant's First Set of Requests for Production of Documents, dated Aug. 28, 2006 | 90 |
| Dairyland's Objections And Response To Defendant's First Set of Interrogatories, dated Aug. 28, 2006 | 113 |
| Letter from Mr. Jerry Stouck, Spriggs & Hollingsworth, to Mr. Harold D. Lester, Jr., Department of Justice, with attached Rule 30(b)(6) deposition notice, dated Feb. 18, 1999 | 140 |
| Letter from Mr. Lester to Mr. Stouck, dated Mar. 1, 1999 | 149 |
| Excerpt of Deposition of Mr. Thomas Pollog, Department of Energy, Pursuant to RCFC 30(b)(6) Notice Regarding Document Production Matters, dated Feb. 19, 2002 | 164 |
| Order in Pacific Gas & Electric Co. v. United States, Nos. 04-74C & -075C (Fed. Cl.), issued Oct. 18, 2005 | 174 |

INDEX TO THE APPENDIX (cont'd)

DOCUMENTS PAGE

Index of Government's Production of Documents, found on Government's Production Website . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Electronic Mail Notifications To Dairyland's Counsel Regarding Documents Made Available On Government's Production Website, dated Dec. 23, 2005 - Dec. 5, 2006 . . . . . . 204

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0106C |
| | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY AND MOTION FOR A PROTECTIVE ORDER

Defendant, the United States, respectfully responds to "Dairyland's Motion To Compel Discovery Responses," which plaintiff, Dairyland Power Cooperative ("Dairyland"), filed on December 28, 2006. Further, defendant respectfully requests that the Court issue a protective order (1) to limit Dairyland's discovery in the manner described below and (2) to relieve the Government of any obligation to respond to Dairyland's oppressive discovery demands. In support of this motion, we rely upon the following memorandum and attached exhibits.

## SUMMARY OF ARGUMENT

The discovery motion that Dairyland filed here is nothing new. For the most part, it simply duplicates similar discovery motions that counsel for Dairyland has filed but upon which it has not prevailed in other spent nuclear fuel ("SNF") cases previously pending in this Court. Like other SNF plaintiffs, when one judge of this Court refuses to grant certain discovery in a particular SNF case, counsel for the SNF plaintiffs will then ask a different judge in a different SNF case for the same discovery, which, if granted, can be shared among all of the SNF cases. This type of repetitive judge-shopping should not be encouraged, and Dairyland's motion should be denied.

Over the past nine years in the SNF cases pending before this Court, the Government, in response to numerous requests for document production both in coordinated discovery proceedings and from individual SNF plaintiffs, has produced more than one million images to the various SNF plaintiffs, including Dairyland. In general, we have attempted to produce all documents that we have been able to locate that relate to the scheduling, pace, capacity, acceptance, and removal of SNF acceptance from the nuclear utilities under the "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" ("Standard Contract"), 10 C.F.R. § 961.11, as it related to the plans by the Department of Energy ("DOE") for SNF acceptance leading up to the 1998 date for the commencement of SNF acceptance from the nuclear utility contract holders; contract formation issues; documents relating to whether Greater-Than-Class-C radioactive waste ("GTCC waste") is covered by the Standard Contract; and other related matters. Our production has been extensive and thorough.

Recently, counsel for Dairyland, who was also counsel for the plaintiffs in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), and its two companion cases, and in Pacific Gas & Electric Co. v. United States, Nos. 04-0074C & -0075C (Fed. Cl.), served the Government with a set of broad document production requests and interrogatories, many of which were virtually identical copies of document production requests that the Yankee and PG&E plaintiffs had previously served. In response to those earlier production requests and motions to compel that the plaintiffs in those cases filed, the Court in Yankee Atomic and PG&E rejected the plaintiffs' broad requests and required a much narrower production focused on the issues in the SNF cases. In the same manner, the Court should not revisit those rulings and should similarly find that the document searches which the Government has agreed to undertake

are sufficient and that Dairyland's broader requests are irrelevant and too burdensome to require the Government to satisfy.

Further, many of Dairyland's requests seek far-reaching discovery into the Department of Energy's current thoughts, activities, and hopes for opening a repository and beginning SNF acceptance in the future. However, in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), the United States Court of Appeals for the Federal Circuit held that plaintiffs in the SNF cases pursuing claims only for partial, not total, breach of contract may not recover future damages in these cases, but, instead, should return to court in the future if and when they incur damages from the Department of Energy's delay. Accordingly, although Dairyland apparently intended in this litigation to ask the Court to speculate about future events and to create an anticipated future world for the purpose of awarding future damages in this case, the Court, in light of Indiana Michigan, will not need to engage in that effort. Instead, it will award costs already incurred in the past, without the need to speculate here about the future. Further, in determining whether particular activities and costs were "caused" by and were an incremental result of DOE's delay, the Court will need to construct a "but for" world against which it can measure which of those claimed costs, absent any delay, Dairyland would still have incurred – an effort necessary to ensure that Dairyland is not placed in a better position as a result of the delay than it would have been absent any delay. Yet, information about DOE's current projections about the future is unrelated to the development of that "but for" world as it existed in 1998 or before. As a result, all of Dairyland's broad requests for continual discovery about the Department of Energy's thoughts about the future, through and including 2017, the date by which DOE currently anticipates it will begin SNF acceptance, are now irrelevant to this

litigation. Further, the effort necessary to gather all such documents would be extremely burdensome. Like the Court in PG&E, which did not require the Government to respond to such discovery requests, this Court similarly should deny those requests.

ARGUMENT

I. DAIRYLAND DID NOT MAKE ANY EFFORT TO MEET AND CONFER, AS REQUIRED BY RCFC 37(a)(2) AND APPENDIX A

Appendix A to the Court's rules requires a party moving to compel discovery to state that "the movant has in good faith conferred or attempted to confer to resolve the matters in dispute." RCFC, Appendix A, ¶ 10; see RCFC 37(a)(2). "The entire purpose of the meet-and-confer rule is to force litigants to attempt to resolve, or [at] least narrow, the disputed issues to prevent the unnecessary waste of time and effort on any given motion." Alexander v. Federal Bureau of Investigation, 186 F.R.D. 197, 199 (D.D.C. 1999) (interpreting local district court rule); see Hasbro, Inc. v. Serafino, 168 F.R.D. 99, 101 (D. Mass. 1996) (construing analogous Fed. R. Civ. P. 37(a)(2)(A)). To this end, courts require a party moving to compel to conduct "a personal or telephonic consultation during which the parties engage in meaningful negotiations" in a "genuine effort to avoid judicial intervention." Shuttle Master, Inc. v. Progressive Games, Inc., 170 F.R.D. 166, 171, 172 (D. Nev. 1996); see Powers v. CSX Transportation, Inc., No. 99-0326, 2001 WL 1190243, at *4 (S.D. Ala. July 16, 2001); Soto v. City of Concord, 162 F.R.D. 603, 623 (N.D. Cal. 1995). Moreover, courts "will not condone a violation [of the meet-and-confer requirement] simply because the potential for compromise appears bleak," because "[d]isagreement . . . is an obvious precursor to negotiated compromise, and thus, is a necessary component of the meet-and-confer prerequisite to bringing a motion to compel." Tri-Star Pictures, Inc. v. Unger, 171 F.R.D. 94, 99, 100 (S.D.N.Y. 1997). These requirements exist

because, as the one district court stated, "[i]t is not up to the Court to expend its energies when the parties have not sufficiently expended their own." Hasbro, 168 F.R.D. at 101.

Therefore, when a party moving to compel does not attempt to resolve the disputes short of judicial intervention, courts do not hesitate to deny the motion upon this ground. E.g., Sattar v. Motorola, Inc., 138 F.3d 1164, 1171-72 (7th Cir. 1998) (affirming denial of motion to compel for failure to confer); Alexander, 186 F.R.D. at 199 (denying motion to compel for failure to confer); Doe v. Lepley, 185 F.R.D. 605, 606 (D. Nev. 1999) (failure to "make a sincere effort to personally consult" with opposing counsel constitutes grounds for denying motion); Tri-Star Pictures, 171 F.R.D. at 99-100 (denying motion to compel for failure to confer in good faith); Shuffle Master, 170 F.R.D. at 171-72 (same); Hasbro, 168 F.R.D. at 101-02 (same); Ballou v. University of Kansas Med. Ctr., 159 F.R.D. 558, 560 (D. Kan. 1994). Here, Dairyland's only effort to "confer" was a December 12, 2006 letter, see Pl. Att. 3,[1] that lacked any specificity regarding the matters now detained in its motion, and we have not located in its motion any representation of its good faith in conferring prior to filing its motion. The Court should summarily deny Dairyland's motion upon this basis.

## II. DAIRYLAND IS NOT ENTITLED TO DEMAND RESPONSES TO INTERPOSE OVERBROAD WRITTEN DISCOVERY REQUESTS

### A. A Party Is Not Entitled To Sweeping Discovery Of Information That Is Not Relevant To The Subject Matter Of The Issues In The Case

RCFC 26 allows for discovery of "any matter, not privileged, which is relevant to the claim or defense of any party . . . ." RCFC 26(b)(1) (emphasis added). "While the scope of

[1] "Pl. Att. __, at __" refers to the attachments to plaintiff's December 28, 2006 motion to compel and the page numbers within that attachment. "Pl. Mtn. __" refers to plaintiff's December 28, 2006 motion to compel." "A.__" refers to the appendix to this response.

discovery is generally broad, it is not without its bounds." Carpenter Tech. Corp. v. Armco, Inc., Civ. No. 90-0740, 1990 WL 61180, at *3 (E.D. Pa. May 8, 1990) (citing McClain v. Mack Trucks, Inc., 85 F.R.D. 53, 57 (E.D. Pa. 1979)). "Perhaps the single most important word in Rule 26(b)(1) is 'relevant' because it is only relevant matter than may be the subject of discovery." 8 C. Wright, A. Miller, & R. Marcus, Federal Practice & Procedure § 2008, at 99 (2d ed. 1994). Although the discovery rules are generally to be accorded a broad and liberal treatment, courts are required to strictly and firmly apply limitations to require that information sought be "relevant" to the subject matter of the case at hand:

> But the discovery provisions, like all of the Federal Rules of Civil Procedure, are subject to the injunction of Rule 1 that they "be construed to secure the just, speedy, and inexpensive determination of every action." To this end, the requirement of Rule 26(b)(1) that the material sought in discovery be "relevant" should be firmly applied, and the district courts should not neglect their power to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Rule 26(c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process.

Herbert v. Lando, 441 U.S. 153, 177 (1979) (emphasis added).

Particularly in cases involving broad sweeping discovery requests that would impose incredible time, resource, and cost commitments upon the party from which discovery is sought, "practical considerations dictate that the parties should not be permitted to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might become so." In re Surety Ass'n of Am., 388 F.2d 412, 414 (2d Cir. 1967) (quoting Broadway & 96th St. Realty Co. v. Loew's Inc., 21 F.R.D. 347, 352 (S.D.N.Y. 1958)); see Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, 103 F.3d 1007, 1012 (D.C. Cir.

1997) (discovery of "information that has no bearing on the case" should be disallowed); Upsher-Smith Labs., Inc. v. Mylan Labs., Inc., 944 F. Supp. 1411, 1444 (D. Minn. 1996) (precluding search into "shadow zones of relevancy" in complex litigation); In re Fontaine, 402 F. Supp. 1219, 1221 (S.D.N.Y. 1975) (same). A party asserting that it is entitled to sweeping discovery should be required to show reasonable grounds for belief that all of the records sought are relevant to the subject matter involved in the pending action. See, e.g., International Graphics, Div. of Moore Bus. Forms, Inc. v. United States, 3 Cl. Ct. 715, 718-19 (1983); McClain v. Mack Trucks, Inc., 85 F.R.D. 53, 57 (E.D. Pa. 1979). "[W]here the relevance of information sought in discovery proceedings is questionable . . . discovery of the requested information will be denied." Flynn v. Church of Scientology, 116 F.R.D. 1, 3 (D. Mass. 1986) (quoting 4 J. Moore, Moore's Federal Practice 26-431).

B. Even When Information Sought Is Relevant, The Court Will Preclude Discovery That Is Unduly Burdensome Or Expensive

Even when discovery requests are designed to seek relevant information, RCFC 26(b)(2) contemplates limitations upon discovery when it is "unreasonably cumulative or duplicative," is obtainable from a less burdensome source, seeks information that the party has already had ample opportunity to obtain, or is unduly burdensome or expensive. As the United States Court of Appeals for the Federal Circuit has succinctly explained, discovery of relevant information may be curtailed in various circumstances:

> Discovery may not be had regarding a matter which is "not relevant to the subject matter involved in the pending action." Fed. R. Civ. P. 26(b)(1). Even if relevant, discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information.

Micro Motion, Inc. v. Kane Steel Co., 894 F.2d 1318, 1323 (Fed. Cir. 1990) (emphasis in original); see Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co., 117 F.R.D. 283, 286 (D.D.C. 1986) (denying motion to compel production of categories of information "as imposing an inordinate and expensive burden for information marginally relevant at most"). These criteria call "for a recognition that in many cases where the sole object is to recover money the cost of discovery is something the court should have in mind when contemplating limitations on the amount of discovery activity that is appropriate." 8 C. Wright, A. Miller, & R. Marcus, supra, § 2008.1, at 120. This rule affirms "the already-emerging change in orientation of judges to emphasize management of litigation, specifically curtailing overuse, whether intentional or thoughtless, of broad discovery." Id. § 2008.1, at 121.

Finally, RCFC 26(c) provides that the Court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden and expense, including . . . (1) that the discovery not be had; . . . (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; [or] (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters . . . ." Although "mindful" that the moving party for a protective order "bears the burden of showing 'good cause,'" this Court has stated that it "will not allow discovery that is 'unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, the limitations on the parties' resources, and the importance of the issues at stake in the litigation.'" International Paper Co. v. United States, 36 Fed. Cl. 313, 317 (1996) (quoting RCFC 26(b)); see Catellus Dev. Corp. v. United States, 26 Cl. Ct. 210, 214 (1992) ("the [Court] has broad discretion to limit and restrict discovery when justice so requires").

## III. WITH REGARD TO THE INTERROGATORIES FOR WHICH DAIRYLAND IS SEEKING SUPPLEMENTAL RESPONSES, THEY EITHER ARE OVERBROAD OR HAVE BEEN FULLY ANSWERED

### A. Contrary To Dairyland's Suggestion, We Did Not Assert That The Information Sought In Interrogatory No.5 Was Irrelevant To This Litigation, And We Responded To That Interrogatory

In its motion, Dairyland first focuses upon five particular interrogatories: Nos. 5, 6, 7, 8, and 12. Because Interrogatory Nos. 6, 7, 8, and 12 differ from Interrogatory No. 5, we will address them in two groups.

We are confused by Dairyland's assertion that we have "refused" to answer Interrogatory No. 5, which asks the following: "On what schedule (measured in Metric Tons Uranium) does DOE contend it is obligated to remove DAIRYLAND'S SPENT FUEL pursuant to DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT?" See Pl. Att. 1, at 9. Contrary to Dairyland's suggestion in the heading to the section of its motion dealing with this interrogatory, see Pl. Mtn. 3, we did not assert that the information sought by this interrogatory was "irrelevant" to this case. See Pl. Att. 1, at 9. Instead, we incorporated by reference our response to Interrogatory No. 3, in which we detailed our reference to the Annual Capacity Reports ("ACRs"), Acceptance Priority Rankings ("APRs"), and Delivery Commitment Schedule ("DCS") contract provisions as forming the basis of the relevant acceptance rate in the "but for" world for purposes of measuring any damages in this (or any) SNF case. Pl. Att. 1, at 9. Although Dairyland complains that Interrogatory No. 3 "asks an entirely different question" than Interrogatory No. 5, Pl. Mtn. 9, we attempted to write our response to Interrogatory No. 3, which is directly relevant to the information sought in Interrogatory No. 5, in a manner that would apply to both interrogatories, explaining that, "[a]s set forth in the Standard Contract, the 1991

[ACR], in conjunction with the 1991 [APR], was the document by which DOE began making firm acceptance commitments to individual utilities based upon the [DCSs] submitted by [contract holders] that DOE approved." Pl. Att. 1, at 7.

Moreover, even if Dairyland were somehow confused by our written response here, counsel for Dairyland is well aware of our position in the SNF cases regarding this issue. These issues have been thoroughly briefed, argued, and decided in other SNF cases in which counsel for Dairyland represented the plaintiff. Most recently, the parties engaged in a two-week trial before Judge Hewitt in which the acceptance rate to be applied in formulating the "but for" world – for the purposes of assessing causation in determining damages – was one of the most significant issues, and the Court extensively discussed the parties' positions upon the issue. See Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 375-400 (2006). Further, these issues have been extensively briefed not only in the PG&E case, but in numerous motions for summary judgment that were filed in multiple SNF cases in late 2001 and early 2002. Through his extensive involvement in these cases, counsel for Dairyland is certainly well-familiar with these numerous statements of the Government's position upon these issues. Accordingly, Dairyland's demand for further supplementation to our response to Interrogatory No. 5 here can be nothing more than an effort to keep the Government busy on irrelevant but time-consuming matters that will provide counsel for Dairyland with no greater understanding of the Government's positions than the complete understanding that he already has. To the extent that Dairyland is truly confused by the Government's response to Interrogatory No. 5, we would simply refer Dairyland to the extensive briefing upon these issues in the other SNF cases, copies of which counsel for

Dairyland already possesses. Beyond that clarification, Dairyland's motion to compel further supplementation should be denied.

B. Interrogatory Nos. 6, 7, 8, and 12 Seek Extensive Discovery Regarding DOE's Prediction Of Future Events, Which Are Irrelevant To The Development Of A "But For" World Against Which To Establish Causation And Measure Damages

In Interrogatory Nos. 6, 7, 8, and 12, Dairyland seeks information relating not to the "but for" world against which causation will have to be established, but to DOE's current 2007 plans and goals with regard to the future opening of a repository and the acceptance of SNF from nuclear utilities. Because of the nature of these suits, which seek damages for a partial rather than a total breach of contract, discovery into DOE's current projections about the future are irrelevant to any analysis of causation or damages.

In Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), the Federal Circuit rejected the SNF plaintiff's argument that, in response to the plaintiff's election to treat DOE's delay in beginning SNF acceptance as a partial breach of contract, the trial court should have allowed the plaintiff to recover not only its actual incurred costs arising from the partial breach, but also costs that it currently anticipates it will incur in the future because of the delay. The appellate court found that, "[b]ecause of its highly speculative nature, a claimant may not recover, at the time of the first suit for partial breach, prospective damages for anticipated future nonperformance resulting from the same partial breach." Id. at 1376. Instead, the appellate court agreed that, "[i]f the breach of an entire contract is only partial, the plaintiff can recover only such damages as he or she has sustained, *leaving prospective damages to a later suit in the event of future breaches*." Id. at 1377 (quoting 22 Am. Jur. 2d Damages § 488 (2003)) (italics supplied by appellate court). It specifically agreed with the principles of section 26(1)(e)

of the Restatement (Second) of Judgments, which provides that, in a partial breach case, the plaintiff may only "sue from time to time for the damages incurred to the date of suit . . .," and found that it applied to the SNF partial breach claim.[2] Id.

This Court, in Pacific Gas & Electric Co. v. United States, 70 Fed. Cl. 758 (2006), has recently interpreted the Indiana Michigan to preclude SNF plaintiffs in a partial breach of contract suit to recover damages that post-date the filing of their complaints:

> None of these statements made by the Federal Circuit in *Indiana Michigan II* is consistent with allowing plaintiff to seek damages through 2005. Rather, the court views *Indiana Michigan II* as clearly directing trial courts to allow plaintiffs suing for partial breach in spent nuclear fuel litigations to seek damages only through "the date of ... suit," *Indiana Michigan II,* 422 F.3d at 1376-77, or "'up to the time of the institution of the action,'" *id.* at 1377 (quoting *Restatement (Second) of Judgments* § 26 cmt. g (1982)); *see also* 9 Arthur L. Corbin, *Corbin on Contracts* § 956 (Interim ed. 1993) ("It has been thought that where there has been no repudiation [e.g., no total breach], the plaintiff can recover damages for his injury *only to the date of the writ*-that he must treat the breach as only 'partial'[.]"), *cited in Indiana Michigan II,* 422 F.3d at 1376 (emphasis and alterations in *Indiana Michigan II*). The court interprets these directives to mean that plaintiff may seek damages only through the date of an amended complaint.

Id. at 763 (emphasis added; italics in original).

The precedent of the Indiana Michigan and PG&E decisions is directly applicable here. Dairyland is asserting a partial, rather than total, breach claim in this case. Accordingly, pursuant to Indiana Michigan and PG&E, Dairyland's damages in this case are limited to those

---

[2] The appellate court also quoted from comment g to section 26 of the Restatement (Second) of Judgments, which provides that, in a partial breach case, the plaintiff "is entitled to maintain an action for damages sustained from breaches up to the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date." Indiana Michigan, 422 F.3d at 1377 (emphasis added).

that it has incurred as a result of DOE's delay "to the date of suit." Indiana Michigan, 422 F.3d at 1377 (quoting Restatement (Second) of Judgments § 26(1)(e)). Yet, Interrogatory Nos. 6, 7, 8, and 12 are unrelated to those previously incurred costs. In this litigation, to establish that costs actually incurred were caused by DOE's delay and would not have been incurred absent that delay, Dairyland will need to establish what DOE's obligations to Dairyland under the Standard Contract were – specifically, the amount of SNF that DOE was obligated to accept from Dairyland at specific points in time in the "but for" world in which no breach occurred – and then establish that, had DOE satisfied those obligations, Dairyland would not have to have incurred the costs that it is claiming in this litigation. To satisfy that obligation, Dairyland will need to define DOE's obligations under the Standard Contract – specifically, the schedule upon which DOE was obligated to accept Dairyland's SNF in the "but for" world. Discovery regarding that topic would involve information about the "but for" world under which DOE was obligated to perform under the Standard Contract. To establish causation, Dairyland will need to compare the "but for" world with the actual events that have occurred up until the date that it is entitled to recover costs: the date of suit.

However, much of the discovery that Dairyland has identified in its motion to compel relates not to the "but for" world or events that occurred up to the date of suit, but instead relates to possible future events in the actual world that have no relation to the development of a "but for" world beginning in 1998. For example, in Interrogatory No. 7, Dairyland requests that the Government identify "the earliest date on which DOE reasonably believes that it will," sometime in the future, "begin to taken delivery of" the nuclear utilities' SNF under the Standard Contract. Pl. Att. 1, at page 10. Similarly, in Interrogatory No. 6, Dairyland requests that the Government

identify the schedule upon which, sometime in the future, DOE anticipates it will accept Dairyland's SNF. The only explanation that Dairyland provides regarding the relevance of this information about DOE's predictions of the future in the actual world is that Dairyland needs the information to determine the "reasonableness of Dairyland's efforts to mitigate the effect of DOE's breach." Pl. Mtn. 5. Yet, the reasonableness of those efforts and of Dairyland's mitigation decisions, if any, will be based upon an analysis of the information that Dairyland had before it when it was making those decisions. See Old Stone Corp. v. United States, 450 F.3d 1360, 1368 (Fed. Cir. 2006) ("non-breaching party may generally recover its mitigation costs incurred in a reasonable effort to avoid loss caused by a breach" (emphasis added)). We are aware of no court precedent that evaluates the reasonableness of a non-breaching party's mitigation efforts by reference to non-public information of which it was not aware. Accordingly, we cannot understand the basis of Dairyland's assertion that it needs DOE's current internal non-public future planning information to establish whether Dairyland made reasonable mitigation decisions in the past based upon information of which it could not have known. Quite simply, Dairyland has not identified any relevance of this information to its present damages claims. Accordingly, its demands for such information should be denied.

In its motion, Dairyland states that, with regard to these documents relating to future events and, in particular, the date by which DOE currently anticipates that it will actually begin SNF acceptance in the future in the "actual" world, "the government has already litigated this very issue and lost it, in *Pacific Gas & Electric Co. v. United States*, No. 04-074C & -075C." Pl. Mtn. 4. Astoundingly, it was the SNF plaintiff there, not the Government, that "lost" on this issue, and Dairyland's misrepresentation of this fact is outrageous. Dairyland's interrogatories

about future possible events seek exactly the same information as document production requests that the plaintiff in PG&E served. A1-2, 51-54 (Request Nos. 15, 29, 31, 32, & 36). Counsel for PG&E, who is now counsel for Dairyland, filed a motion to compel production of all documents relating to DOE's current projections about future possible events, including the date by which DOE will begin SNF acceptance from nuclear utilities and the schedule upon which it currently plans to accept SNF in the future. In its October 18, 2005 order, this Court granted those requests in part, but with a significant limitation: "that the documents requested are limited to those created up to and including January 22, 2004." A.175 (Order, PG&E v. United States, Nos. 04-0074C & -0075C, at 2 (Fed. Cl. Oct. 18, 2005) (addressing Request Nos. 15, 29, 31, 32, and 36)). This Court further stated in its order dated October 18, 2005, that, "[t]o the extent the Requests ask for documents created after January 22, 2004, the Requests are DENIED." Id. (emphasis added). In a footnote to the subsequent December 21, 2005 order from which Dairyland extensively quotes, the PG&E Court held that "the specific limitations on document discovery ordered by the court in its October 18, 2005 Order shall remain in place, as these limitations were ordered after hearing the parties' oral arguments during two telephonic conferences held on October 14 and 17, 2005, and after careful attention by the court to extended arguments." Order, PG&E v. United States, Nos. 04-0074C & -0075C, at 3 n.3 (Fed. Cl. Dec. 21, 2005). Dairyland's failure to identify this ruling while, at the same time, using the PG&E orders to suggest that these same documents must be produced here is inappropriate.

Further, the extensive quotation from PG&E that Dairyland has provided was from an order issued before the Court had fully studied the effect of the Federal Circuit's ruling in Indiana Michigan on this litigation. The order to which Dairyland cites was issued on December

21, 2005. However, on March 30, 2006, after complete briefing on the issue of future damages, the Court issued an order agreeing with the Government that the plaintiff in PG&E could not recover damages beyond the date of its amended complaint in that case, based upon the Federal Circuit's decision in Indiana Michigan. PG&E, 70 Fed. Cl. at 763. Even later, the Court fully analyzed the issue of the "but for" world against which to evaluate causation and measure damages, identifying that "but for" world by events that occurred in the 1990s, not by predictions of possible future events in the actual world that post-date 1998. PG&E, 73 Fed. Cl. at 375-400. Again, Dairyland has not identified any valid rationale through which information or documents relating to predictions of future operating dates and SNF acceptance would be relevant to the creation of a "but for" world or the recovery of damages in the actual world to the date of the filing of Dairyland's complaint.

Finally, the discovery that Dairyland has requested regarding future planning – not simply through its interrogatories, but also through its extensive document production requests – is overwhelmingly burdensome. The SNF cases involve a continuing program at DOE that continues to work towards developing, locating, constructing, and operating a spent nuclear fuel disposal repository. The work involved in this effort is enormous, and the number of documents that is generated in numerous offices is voluminous. Despite the lack of relevance of these continuing efforts to open a repository to the issue of the costs that the SNF plaintiffs have incurred to date as a result of DOE's delay, Dairyland apparently believes that, every time any individual within DOE thinks about or consults with another individual regarding matters that might affect the date by which a repository may open in the future or the schedule upon which that repository may open, that individual must immediately make certain to provide all such

documents to Dairyland so that Dairyland can micromanage and evaluate the program. In such an environment, the program simply cannot function. Although, once a repository opens, DOE likely will be able to begin accepting SNF from the contract holders, that has no bearing on whether costs currently being incurred are the result of the current delay. Even though utilities are certainly interested in the decisions that DOE is making, that does not render them relevant to the narrow issues in this case: those related to the determination of causation, reasonableness, foreseeability, and reasonable certainty in proof for those costs that Dairyland has already incurred. Dairyland should not be able to impose an impossible burden on the Government that will only further distract OCRWM employees from their efforts to develop a repository.

C. Dairyland's Contention Interrogatories, Set Forth In Interrogatory Nos. 9, 13, 14, 15, and 16, Seek The Government's Litigation Positions That Are Still Being Developed Through Continuing Discovery

Dairyland complains that the Government deferred a substantive response to Dairyland's contention interrogatories in Interrogatory Nos. 9, 13, 14, 15, and 16. See Pl. Mtn. 6-9. We do not dispute that Rule 33(c) "allows interrogatories requesting factual opinions or contentions, [although] it does not allow those which seek strictly legal conclusions or opinions not related to the facts of the case." Roth v. Bank of the Commonwealth, No. CIV-79-36E, 1988 WL 43963, at *4 (W.D.N.Y. May 4, 1988) (citing 4A J. Moore, Moore's Federal Practice ¶ 33.17[2], at 33-91 (2d ed. 1987)).[3] However, even where a contention interrogatory does not seek a purely legal

[3] "Examples of contention interrogatories are: (1) those that ask a party *what* he contends; (2) those that ask *whether* he makes a specified contention; (3) those that ask the adverse party to state all the *facts* or all the *evidence* upon which he *bases* some specific contention; and (4) those that ask the answering party to take a position, and to explain that position by explaining *how the law applies to the facts.*" Roth, 1988 WL 43963, at *4 (italics in original).

conclusion, RCFC 33(c) permits the Court to "order that such an interrogatory need not be answered until after designated discovery has been completed or until a pretrial conference or other later time." This provision in Rule 33(c) "allows courts to postpone answers to contention interrogatories protects the responding party from being hemmed into fixing his position without adequate information." Roth, 1988 WL 43963, at *4. "The interests of judicial economy and efficiency for the litigants dictate that 'contention interrogatories are more appropriate after a substantial amount of discovery has been conducted.'" Fisher & Porter Co. v. Tolson, 143 F.R.D. 93, 95 (E.D. Pa. 1992) (quoting Nestle Foods Corp. v. Aetna Casualty & Surety Co., 135 F.R.D. 101, 110-11 (D.N.J. 1990)); see Capacchione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 489 (W.D.N.C. 1998) ("[d]ue to the nature of contention interrogatories, they are more appropriately used as a substantial amount of discovery has been conducted – typically, at the end of the discovery period").

Importantly, "[a] party filing contention interrogatories early in the pretrial period, before substantial discovery or testimonial discovery has been completed, has the burden of justification." Fisher & Porter, 143 F.R.D. at 96; see In re Convergent Technologies Secs. Litig., 108 F.R.D. 328, 338 (N.D. Cal. 1985) (placing "burden of justification on a party who seeks answers to to these kinds of questions before substantial discovery or testimonial discovery has been completed"). "A party seeking early answers to contention interrogatories cannot meet its burden of justification by vague or speculative statements about what might happen if the interrogatories were answered." Convergent Technologies, 108 F.R.D. at 339. "Rather, the propounding party must present specific, plausible grounds for believing that securing early

answers to its contention questions will material advance the goals of the Federal Rules of Civil Procedure." Id.

In this case, Dairyland has made no effort to establish the reasons that answers to its contention interrogatories now, as opposed to after the Government has been able to complete discovery into Dairyland's damages claims, are necessary or helpful. Further, other than pure speculation, it has not established how the Government can take reasoned and well-supported litigation positions regarding causation and reasonableness associated with Dairyland's claimed damages before it has had an opportunity to complete discovery, analyze the activities that Dairyland would have needed to take in an appropriate "but for" world where no breach had occurred, and consult with appropriate expert witnesses regarding Dairyland's activities. Moreover, where we were able to provide a partial response to these interrogatories, we did, as evidenced by our responses to Interrogatory Nos. 13 and 14. Below, we individually address each of the contention interrogatories about which Dairyland complains.

Interrogatory No. 9: Dairyland promulgated the following contention interrogatory as Interrogatory No. 9:

> Do you contend that it was or would have been unreasonable for DAIRYLAND to study, analyze, investigate and/or implement dry storage of its SPENT FUEL at any time subsequent to DOE's partial breach of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, explain all bases for this contention.

Pl. Att. 1, at 11. In response, we objected, in part "because it is premature," but stated that, "[t]hrough discovery, defendant anticipates that it may analyze Dairyland's SNF storage decisions and make determinations, for purposes of this litigation, regarding the appropriateness of those decisions." Pl. Att. 1, at 12.

The interrogatory is compound, because, even if it is reasonable to study alternative methods of storage, it may be unreasonable to implement dry storage. In any event, any answer requires discovery into a variety of facts. To respond properly to this interrogatory, we need to know, among other things: (i) the cost of Dairyland's wet storage; (ii) the anticipated cost to Dairyland of implementing dry storage, including the design, licensing, and construction of its dry storage facility; (iii) the expected costs for casks; (iv) the necessary facility modifications; (v) Dairyland's cask loading costs; and (vi) anticipated operations and maintenance costs for the dry storage facility. To date, none of the individuals whom we have deposed have been knowledgeable about Dairyland's costs. Individuals who may have knowledge of the costs are scheduled to be deposed in the near future.

Further, there are significant questions as to why, even if dry storage is reasonable and cost-effective, Dairyland did not begin to implement dry storage in the late 1990s. As of today, nine years after DOE's partial breach, Dairyland continues to store its SNF in its wet pool – a mode of storage that Dairyland appears now to assert is more expensive than dry storage. If that is the case, there is a potentially significant failure to mitigate by Dairyland. None of the witnesses questioned in the first round of depositions, including the dry storage project manager, Michael Brasel, could answer these questions. Additionally, to understand whether there is a failure to mitigate, we need additional discovery concerning the cost components of the two options, as well as the technology that would have been available to the plaintiff in the late 1990s. Although individuals deposed to date have not possessed that information, we have upcoming depositions of Dairyland's plant manager and vice president of generation.

Interrogatory No. 13. In this contention interrogatory, Dairyland propounded the following question:

> Do you contend that DOE would have picked up DAIRYLAND's FAILED FUEL later than the rest of its SPENT FUEL had the government begun SPENT FUEL acceptance from utilities starting not later than January 31, 1998? If so, state all bases for this contention.

Pl. Att. 1, at 15. As with Interrogatory No. 9, we objected to this interrogatory in part because "because it is premature prior to the completion of fact discovery, given that defendant does not have adequate information regarding plaintiff's failed fuel to respond appropriately to this interrogatory."[4] Pl. Att. 1, at 16. Nevertheless, we explained that, "during his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository" and "referred plaintiff to that testimony for a response to this interrogatory." Pl. Att. 1, at 16. We also stated that, "although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates," citing 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

Since this response, we have learned additional information concerning the condition of Dairyland's particular SNF, such as that Dairyland possesses seriously failed fuel including significant amounts of fuel that are not intact. Indeed, some of Dairyland's spent fuel is so

---

[4] We further objected "to this interrogatory as vague, overly broad, and unduly burdensome. Given that the design parameters for any storage facility that DOE might operate have not yet been defined, it is impossible to identify every technical impediment that could occur in the acceptance of failed fuel from Dairyland's nuclear reactor." Pl. Att. 1, at 16.

degraded that more than 250 grams of spent fuel was embedded in the resins used in the pool and was shipped to a private waste burial site, approximately six grams were contained in dry active waste and was shipped to a private waste burial site, and more than 42 grams of spent fuel were discharged through Dairyland's filtration system into the Mississippi River. Deposition of Seymour Raffety, dated December 14, 2006, at 151:17-154:5.

The poor condition of significant amounts of SNF may affect our response to this interrogatory depending upon the date by which Dairyland asserts its standard spent fuel assemblies would have been removed in the non-breach world, a litigation position that Dairyland has not yet disclosed. The rate of acceptance that is assumed in Dairyland's claim also could have an effect upon DOE's ability to accept seriously degraded spent fuel. Finally, we need to know whether Dairyland will be arguing the exchanges theory pursued by counsel for Dairyland in Yankee Atomic and Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 333 (2006), and the effect of that argument upon Dairyland's place in the acceptance queue – that is, whether Dairyland allegedly have traded up or down in the queue. If Dairyland takes the position that all of its SNF would have been accepted in the first year (or years) of DOE performance, there likely will be significant questions raised as to whether SNF that is among the most damaged in the United States would have been taken in the nascent program. None of these questions can be answered without Dairyland's articulation of its litigation position concerning the date by which Dairyland's SNF would have been removed in the "but for" world.

Interrogatory No. 14: Here, Dairyland promulgated the following contention interrogatory:

> Do you contend that DAIRYLAND's expenditures supporting [Private Fuel Storage ("PFS")] were unreasonable expenditures

> toward mitigation of DAIRYLAND's damages due to DOE's partial breach of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, state all bases for this contention.

Pl. Att. 1, at 16. We objected to this response, in part, as premature, given that "any determination of whether, from a business or profit-making standpoint upon Dairyland's part, it was 'unreasonable' for Dairyland to invest in Private Fuel Storage ('PFS') cannot be made prior to the completion of discovery." Pl. Att. 1, at 17. Nevertheless, we stated that, "as we have explained in prior briefing in several of the SNF cases pending before this Court, any investment in PFS was not foreseeable at the time of contract formation and, further, was wholly speculative. Any such investment could not be considered proper 'mitigation' of DOE's delay in beginning SNF acceptance." Id.

The plaintiff, and its attorneys, are well aware of the Government's position upon the issue of PFS, and, significantly, the Government's position that costs related to PFS are not recoverable has been adopted by this Court in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), and in Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 333 (2006). However, there still remains significant analysis of the Dairyland-specific facts to determine whether additional grounds for contesting PFS in this case exist, beyond the grounds previously accepted by this Court and affirmed by the United States Court of Appeals for the Federal Circuit. In Indiana Michigan, some of the evidence upon which the Court relied in finding PFS speculative was internal documents from the plaintiff in which its own employees expressed their belief, at the time of the investment, that the investment was unlikely to result in success. Here, we should be entitled to take discovery into those issues before we have to identify all of our contentions regarding PFS.

Interrogatory No. 15. In this contention interrogatory, Dairyland asked the following question:

> Do you contend that it was unreasonable for DAIRYLAND to store its SPENT FUEL in the LACBWR wet fuel storage pool at any time after DOE partially breached DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, DESCRIBE when you contend it became unreasonable for DAIRYLAND to continue to store its SPENT FUEL in the LACBWR wet fuel storage pool and DESCRIBE the specific alternative storage options you believe would have been reasonable for DAIRYLAND to employ to store its SPENT FUEL from that point onward.

Pl. Att. 1, at 17.

Again, Dairyland is asking us to state all of our contentions regarding its on-site activities and its internal decision-making processes before we have had complete discovery regarding those activities and processes and before we have had an opportunity to analyze them. This interrogatory essentially mirrors Interrogatory No. 9 and requires all of the same information identified above to respond. To date, we have not deposed any individual with knowledge of Dairyland's decision-making nor have we deposed individuals knowledgeable about Dairyland's costs. Once those depositions are complete, we will be able to provide a response.

Dairyland cites to the district court's decision in In re One Bancorp Securities. Litigation, 134 F.R.D. 4 (D. Me. 1991), to support its position that the Government should be required, now and before it has completed substantial discovery, to develop and convey to Dairyland all of its not-yet-formulated contentions regarding the appropriateness of actions that Dairyland took and about which we are still learning. Yet, in One Bancorp, it was the plaintiffs that sought to defer until after the close of discovery their obligation to disclose their contentions underlying the lawsuit that they had filed. As the district court there determined, "[p]laintiffs must have some

factual basis for the allegations in their complaint" and ordered the plaintiffs to disclose them. Id. at 8. Here, Dairyland, not the Government, filed the complaint, and, long before Dairyland filed that complaint, counsel for Dairyland had access to the bulk of the discovery, including over a million pages of documents produced following document production requests, that the Government has produced in the SNF litigation. In contrast, until very recently, the Government had no discovery from Dairyland, and the contentions to which Dairyland demands responses relate to aspects of Dairyland's decision-making about which the Department of Energy had no involvement. Dairyland's insistence that, prior to substantial discovery, we state whether Dairyland's on-site actions with regard to its SNF storage were "reasonable" – before we have taken discovery to understand the contents of Dairyland's fuel pool, the level of damage to Dairyland's SNF or the degree to which it requires special handling, and the circumstances that caused Dairyland to decide to construct a dry storage facility – is unreasonable.

### D. The Government Has Appropriately Responded To Dairyland's Demands For Information Regarding Identification Of Individuals

#### 1. Dairyland's Interrogatory No. 17 Does Not Request Identification Of Individuals, And Its Inclusion Of This Contention Interrogatory Here Appears To Be In Error

Dairyland complains that the Government has improperly relied upon RCFC 33(d) "in vague terms" to reference prior document productions and the identifies of individuals who may have knowledge of certain matters. Pl. Mtn. 9. In its list of challenged responses, Dairyland includes Interrogatory No. 17. Id. at 9-10. However, Interrogatory No. 17 does not include a request for the identities of individuals, instead asking us to "DESCRIBE all options that [we] contend DAIRYLAND should have explored and/or implemented for the storage of its FAILED FUEL after DOE partially breached" the Standard Contract, along with an explanation of "how

and why" Dairyland should have explored or implemented different storage options. Pl. Att. 1, at 18. The interrogatory itself is a contention interrogatory to which we responded by stating that it is premature. Pl. Att. 1, at 18. For the reasons explained above, we should not be required to develop our contentions regarding Dairyland's storage of its failed fuel until we have had a complete opportunity to discovery appropriate information regarding Dairyland's failed fuel, the level of its failure, and the manner in which Dairyland has and might have stored it. However, Dairyland's inclusion of this interrogatory in its challenge to the Government's reference to past document and discovery productions appears to be in error.

2. With Regard To Dairyland's Demand In Interrogatory No. 18 For Identification Of Individuals With The "Most Knowledge" Regarding Certain Topics, Counsel For Plaintiff's Past Use Of Sanctions Motions To Punish The Government For Witnesses' Lack Of Memory Regarding Matters In Which They Were Once Involved, As Well As The Work Product Doctrine, Precludes Us From Providing Such Attestations

Although it does not mention this specific request in detail, Dairyland's motion requests that the Court compel us to respond to its inquiry in Interrogatory No. 18 to identify the "five people with the most knowledge" regarding certain efforts. In our response to that interrogatory, as well as other interrogatories, we attempted to identify those persons who, to the best of our knowledge after a reasonable inquiry, either were involved or were most likely to be involved (where we could not ascertain with certainty that anyone from the Government was involved) in the matters identified in the interrogatory and/or who we believed were likely to have relevant knowledge, based upon what appeared to be their past involvement with various activities. However, we cannot attest to the current "knowledge" or recollection of every

individual who was involved in various activities, as Interrogatory No. 18, and the discovery rules do not require us to undertake such an effort.

Further, counsel for Dairyland's past efforts successfully to sanction us for identifying an individual as one of the "most knowledgeable" – an individual who later, during a deposition, was unable to recall many specifics about matters about which he had once been involved – counsels against the requirement that Dairyland now seeks to impose. As part of its motion to compel, Dairyland refers to that sanctions effort and award in Yankee Atomic Electric Co. v. United States, 73 Fed. Cl. 249 (2006), but it misrepresents the facts that lead to it. Specifically, Dairyland misdescribes that sanction as apparently relating to "vague responses" that the Government had provided in response to discovery requests in that case. Contrary to Dairyland's statements here, the sanction in Yankee was based upon counsel for Dairyland's insistence there that the Government identify the "most knowledgeable" individuals on 27 broad categories, the Government's effort there to comply with that demand, and counsel's insistence that the Government be held accountable when one of the 39 individuals identified as "most knowledgeable" could not recall much about the specific facts of his involvement.

In mid-February 1999, very early in the SNF litigation, current counsel for Dairyland, who was then counsel for the plaintiffs in the three Yankee Atomic cases, issued a RCFC 30(b)(6) deposition notice demanding that the Government identify the "eight (8) PERSONS with the most personal knowledge" in 27 broad categories and provided the Government with 11 days within which to respond. See A.140-48. In an attempt to reduce the number of voluminous discovery disputes that the Yankees were taking to the Court and to attempt to eliminate some of the Yankees' incredible discovery demands, we agreed to provide a letter, in lieu of a RCFC

30(b)(6) deposition, within the time frame demanded by the deposition notice. We developed that list of "most knowledgeable individuals" in the 11 days that we were provided by reference to the knowledge of then-current DOE employees within the relevant DOE office, the Office of Civilian Radioactive Waste Management ("OCRWM"), and from DOE records identifying individuals who appeared, based on the documentation, to have the most involvement in 27 categories identified in the deposition notice. One of the 39 individuals who we identified from agency records and OCRWM employee recollection was Richard Leotta, a former contracting officer for the Standard Contract, who the Yankees then deposed. During his deposition, Mr. Leotta was unable to recall much, if any, information about his time as the contracting officer, even though his name was on numerous documents. Almost three years later, in February 2002, the Yankees filed a motion, without prior notice to the Government, seeking sanctions based upon our identification of Mr. Leotta as an individual with the "most knowledge," essentially holding us responsible for Mr. Leotta's lack of memory. Three-and-a-half years after that motion was filed, this Court granted it, although only after noting that the Government had a "reasonable position[] with respect to this controversy," and awarded the Yankees the cost of the deposition. Yankee Atomic Elec. Co. v. United States, 73 Fed. Cl. 326 n.75 (2006).

Dairyland appears to be seeking to repeat that situation. Apparently, counsel for Dairyland believes that it is the Government's obligation not only to identify every individual who was involved in matters at issue in this litigation, but to conduct thorough interviews of every such individual to ascertain and develop a full and complete understanding of the scope of their current recollection of those matters and the activities associated with them and, then, to determine which witnesses have the best memories and attest to the scope of their memories. In

light of counsel for Dairyland's past efforts to obtain sanctions against the Government when an individual, reasonably identified through agency records when there was no time provided to conduct the type of extensive interview process that counsel for Dairyland apparently expects, could not remember the specifics of his involvement associated with the Standard Contract, we are unwilling to make such representations again, and the Court should not place us in such a position. In addition, the information that Dairyland seeks – requesting that counsel interview individuals, identify their current level of knowledge, and make judgment calls regarding which individuals have the "most knowledge" responsive to a particular request – implicates the attorney work product doctrine. See Zoltek Corp. v. United States, 71 Fed. Cl. 160, 166 (2006) (work product doctrine protects against disclosure of "mental impressions, conclusions, opinions, or legal theories"). In this case, we have reasonably identified, from the recollections of current agency employees and from agency records, those individuals most likely to have discoverable knowledge, and we identified those individuals in extensive prior written discovery responses that we have made available to Dairyland, coupled with supplemental information in our written responses to Dairyland's newest requests. Counsel for Dairyland's efforts to demand more in Interrogatory No. 18 should not be required.

3. Dairyland's Requests For Identities Of Individuals In Interrogatory Nos. 1, 2, And 11 Are Overbroad

Dairyland seeks the identifies of every single person ever involved in (1) the "review, approval, disapproval, drafting and/or preparation of any COMMUNICATIONS between DOE and/or NRC on the one hand and DAIRYLAND on the other hand RELATING TO SPENT FUEL," and (2) "the review, approval, disapproval, drafting and/or [sic] of any DOCUMENTS or COMMUNICATIONS RELATED TO the decommissioning of" Dairyland's nuclear reactor,

and to describe "in detail all aspects of that PERSON's involvement." Pl. Att. 1, at 4 & 5 (emphasis added). Yet, every possible communication with Dairyland that somehow relates to "spent fuel" is not relevant to this litigation, and the only component of Dairyland's efforts in decommissioning its nuclear reactor in its damages claims is some presently undisclosed percentage of the costs of its reactor pressure vessel removal project. Dairyland's demand that we search the entirety of DOE's and the NRC's files to locate every single document relating to the decommissioning of Dairyland's reactor and every single document to or from Dairyland "relating to" SNF, and then to identify every single individual with any tangential involvement or knowledge or those documents, is hugely overbroad. To the extent that Dairyland identifies particular documents or categories of documents (that is, a certain dispute during a particular time frame about which communications can be more readily identified and studied) that are relevant to its damages claims and about which we can focus a search for information, we can review those and respond in an appropriate manner. However, Dairyland's demands for extensive research and investigation into every single communication and document about SNF and decommissioning seems simply an effort to create unnecessary and unlimited work for the Government. Despite this overbreadth, we attempted to identify those individuals most likely to have some knowledge and/or involvement in such matters. See Pl. Att. 1, at 4-6. Nevertheless, Dairyland's current requests are simply too broad to allow for a literal response.

Dairyland also requests identification of broad categories of individuals over extremely broad topics that are, in reality, not limited to communications to or about Dairyland. In Interrogatory No. 11, Dairyland asks for identification of all individuals who have ever "given any consideration or undertaken any study, analysis, or investigation of the manner in which

DOE will or could dispose of FAILED FUEL" at a permanent repository or otherwise. Pl. Att. 1, at 13-14. Yet, the scope of Dairyland's request is potentially far-ranging, relating not only to Dairyland but to every single nuclear utility, as well as to every aspect of "failed fuel." Again, Dairyland's request is not tailored to the aspect of its damages claims related to failed fuel, and there are potentially a multitude of "studies" or "investigations" that somehow tangentially relate to failed fuel in some way. A detailed listing of all such individuals is simply impossible to generate, absent some specific guidance tailoring this request to Dairyland's damages claims.

4. With Regard To Interrogatory Nos. 4, 10, And 18, The Government Has Properly Identified Percipient Witnesses

The remaining interrogatories about which Dairyland complains – Interrogatory Nos. 4, 10, and 18 – relate to requests for identification of individuals involved in or with knowledge of matters particular to Dairyland. We have appropriately responded to these interrogatories, although they all implicate the Government's work relating to all of the Standard Contract holders. It is the nature of Dairyland's requests for information about individuals' Dairyland-specific involvement, when work was being performed on an industry-wide basis, that has generated the issue about which Dairyland complains.

Dairyland apparently assumes that the Government has a list of all individuals who were "involved" with every aspect of the topics that it has identified. For example, Dairyland requests identification of all individuals "involved in the review, approval, disapproval, drafting and/or preparation of responses to the delivery commitment schedules DAIRYLAND submitted to DOE." Pl. Mtn. 10. In response to that inquiry, we stated that individuals "who may have had some involvement relating to DCSs that Dairyland submitted . . . may include" seven named individuals. One reason that we used the word "may" is because we do not have solid records

that, other than for individuals who actually signed the Dairyland DCSs, indicate who was involved specifically with Dairyland's DCSs. Many utilities submitted DCSs, and we can generally identify individuals who were involved with dealing with them. However, we cannot be as accurate in identifying every individual who was "involved" in dealing specifically with Dairyland's DCSs. Similarly, in Interrogatory No. 18, Dairyland has asked for the identities of individuals knowledgeable about "all efforts undertaken by or on behalf of DOE to examine the manner or process by which DOE would remove SPENT FUEL from" Dairyland's reactor. Pl. Att. 1, at 19. We responded by identifying the Facility Interface Data Study (Document No. MOL.20060121.0173 in the Record Information System database) and similar studies and by identifying individuals who were involved in preparing them. Pl. Att. 1, at 20. In addition, we referred counsel to Dairyland to the Government's prior responses, which included a substantially similar question: "The identities of the eight (8) PERSONS with the most personal knowledge concerning any effort undertaken by or on behalf of DOE to examine the manner in which DOE would remove [SNF] from PLAINTIFFS' reactors," which we had previously provided to counsel for Dairyland on March 1, 1999. A.162-63. However, the studies responsive to the inquiry in Interrogatory No. 18 do not deal only with Dairyland, but involve all utilities. Accordingly, within that group of named individuals, we cannot presently identify which individuals worked specifically on any analysis of Dairyland's site. The answer that we provided is the best that we can given the level of information that we have.[5]

---

[5] Dairyland has misrepresented the Yankee Atomic decision in insinuating that the Government was previously sanctioned for providing the "vague responses" that Dairyland alleges were provided here. See Pl. Mtn. 11. As previously discussed, that decision related to the Government's identification of an individual as one of the "most knowledgeable" and that witness' inability to recall details of his involvement in matters during his deposition. It has

In any event, we cannot understand how counsel for Dairyland does not already have a strong knowledge of the information that Dairyland seeks. Counsel for Dairyland has been involved in these cases since at least 1998. He has taken extensive discovery in Yankee Atomic, Connecticut Yankee, Maine Yankee, and Pacific Gas & Electric, and he participated in the coordinated discovery proceedings that involved all SNF plaintiffs that had cases pending in 2001. Counsel for Dairyland's suggestion that he does not know the identities of those individuals who appear to have the "most knowledge" regarding the topics identified in Dairyland's interrogatories defies belief. This individual case cannot be considered in a vacuum and outside the context of counsel's past involvement in the other related SNF cases. Because counsel for Dairyland has an extensive knowledge of these cases and the documents underlying the various theories that he wishes to present, his efforts to attempt to require us to undertake an extensive and continuing "interview" process, constantly updating our records regarding each individual's current "knowledge" and memory, are wholly inappropriate.

## IV. WITH REGARD TO ITS PRODUCTION REQUESTS, DAIRYLAND SEEKS THE PRODUCTION OF DOCUMENTS THAT HAVE ALREADY BEEN PRODUCED, ARE NOT RELEVANT TO THE COURT'S CONSIDERATION OF DAMAGES IN THIS CASE, OR HAVE BEEN DENIED IN OTHER CASES

### A. The Bulk Of The Documents That Dairyland Requested Have Already Been Produced

Through its motion to compel, Dairyland seeks to compel production of documents in response to 41 of 42 of its requests for production,[6] although the Government has already

nothing to do with any "vague responses" that the Government provided to written discovery requests.

[6] The only production request upon which Dairyland does not move to compel is Request No. 27, which requested, "DOCUMENTS RELATED TO DOE's acceptance,

produced most, if not all, of the relevant documents responsive to Dairyland's requests. Dairyland's requests largely duplicate requests that have been propounded in other SNF cases pending before the Court. See A.1-2. For example, Dairyland, in Request For Production No. 8, seeks production of the following category of documents:

> 8. DOCUMENTS RELATED TO the according of priority to SPENT FUEL removed from a CIVILIAN NUCLEAR POWER REACTOR that has reached the end of its useful life or has been shut down permanently.

Pl. Att. 2, at 10. Yet, in the Yankee Atomic and PG&E cases, counsel for Dairyland sought production of the same documents through substantially similar production requests. A.1, 17, 30, 51. In fact, 25 of Dairyland's 42 production requests seek the production of documents that have been sought by plaintiffs in the coordinated discovery proceedings, in Yankee Atomic, and/or in PG&E. See A.1-2. The Government produced the bulk of these documents prior to 2002 in response to the production requests propounded in the coordinated discovery proceedings or in Yankee Atomic. Counsel for Dairyland received these documents when they were originally produced. More recently, the Government has also made all of these documents

---

ownership, storage or plans for disposal of HIGH LEVEL WASTE from CIVILIAN NUCLEAR POWER REACTORS other than those obligations arising under the STANDARD CONTRACTS." Pl. Att. 2, at 24. The Government objected to this request, in part, as vague because plaintiff's definition of "high level waste" was different from the definition set forth in the Standard Contract and included "irradiated reactor fuel," with is defined as "spent nuclear fuel" in the Standard Contract. Dairyland's definition of "high level waste" potentially would require the Government to produce every document ever generated by the Office of Civilian Radioactive Waste Management. Apparently, Dairyland has recognized the overbreadth of this request and has not moved to compel the production of any documents.

available upon the Government's document production website, to which counsel for Dairyland has had access since May 6, 2005.[7]

In addition, the Government recently produced documents responsive to Request Nos. 40 and 41 in response to a very similar request from the plaintiff in Northern States Power Co. v. United States, No. 98-484C (Fed. Cl). Compare Pl. Att. 2, at 32 (Request Nos. 40 and 41, documents "related to PFS, except any already publicly available documents related to PFS's license application with the NRC," and "related to PFS's offer or proposal to allow government use of its temporary spent fuel storage site located in Skull Valley, Utah.") with A.85 (Northern States' Request No. 9, "All documents submitted to or produced for or by the Government that analyze, review, assess, comment upon, or relate to Private Fuel Storage, LLC (or any predecessor)."). We posted these documents to our production website in December 2006. Dairyland notes this production of documents upon our document production website in its motion to compel, but apparently has not reviewed the documents that we made available. See

[7] Robert L. Shapiro is the counsel for Dairyland that applied for and was granted access to the Government's production website, and Mr. Shapiro receives the notifications when new material has been posted. Mr. Monroe, in his declaration in support of Dairyland's motion to compel, asserts that Dairyland's counsel never received notification of the last five additions to the production website. Monroe Decl. ¶ 8. However, the Government notified Mr. Shapiro that new material had been added to the website on the following dates: December 23, 2005, February 15, 2006, February 17, 2006, April 21, 2006, May 2, 2006, and December 5, 2006. A.204-09. Prior to reading Mr. Monroe's declaration, neither Government counsel or our litigation support contractor, which provides technical support for the production website, received any notice from Mr. Shapiro or anyone else at Greenburg Traurig that they were not receiving timely notifications or experiencing any other difficulties with the production website. To the contrary, after we responded to a complaint regarding the production website on August 30, 2005, see Pl. Att. 5 (containing a copy of our August 30, 2005 response), in which we invited counsel for Dairyland to contact us with any further questions regarding the production website, we have heard nothing from Dairyland regarding any alleged difficulties.

Pl. Mtn. 16. Such review would show that these documents are responsive to Dairyland's requests and do not, as Dairyland claims, "relate [only] to another spent fuel case." Id.

Dairyland asserts, in its motion to compel, that it is not asking the Government to "re-produce previously produced documents," but, in the very next sentence, states that the Government should be required to "identify in its responses here the documents responsive to Dairyland's requests." Pl. Mtn. at 17. Astonishingly, Dairyland then asserts that, without such identification, "Dairyland literally cannot know what documents the Government believes are responsive to Dairyland's documents requests in this case." Id. Given that counsel for Dairyland has propounded the same requests counsel propounded in Yankee Atomic and PG&E, and that counsel has had access to the bulk of these documents for several years, Dairyland's assertion that it does not already know what documents are responsive to Dairyland's requests is astounding. Instead, Dairyland's motion represents an effort to require the Government unnecessarily to undertake efforts that go beyond the requirements of RCFC 34.

RCFC 34 requires that the Government produce documents "as they are kept in the usual course of business or shall organize and label them to correspond to the categories of the request." RCFC 34(b). "It appears that the pivotal consideration in deciding discovery challenges under Rule 34(b), . . . where a large number of documents have been produced based upon an 'as they are kept in the usual course of business' election is whether the filing system for the produced documents 'is so disorganized that it is unreasonable for the [party to whom the documents have been produced] to make [its] own review." Renda Marine Inc. v. United States, 58 Fed. Cl. 57, 64 (2003) (citations omitted). In Renda Marine, the Court determined that the "gravamen" of the moving party's complaint about the production was tied to the large volume

of the documents, rather than any claims that the documents "were 'so disorganized' that defendant is unable to review the documents." Id. The Court stated that a party's "objection to the production of requested documents based upon volume alone is insufficient to trigger relief from the Court." The Court further noted that the defendant in that case could avail itself of "additional discovery methods to assist in its review of the produced documents, including a Rule 30(b)(6) deposition of those individuals having knowledge about the document production." Id.[8]

The gravamen of Dairyland's apparent complaint also appears to be the volume of the Government's production of documents to date and counsel's alleged inability to organize them. Monroe Decl. ¶¶ 5-6. However, for the documents that were loaded to the production website in 2004, which had previously been produced in the coordinated discovery proceedings or in Yankee Atomic, counsel for Dairyland should be well aware of when those documents were produced because counsel for Dairyland received the original productions of those documents. Since the production website has been available, the Government provides notification to Dairyland when new material has been loaded and identifies its source.

Further, although it challenges the Government's method of production, Dairyland, in response to the Government's production requests, has not made any effort to undertake the identification work that it seeks to impose upon the Government. Instead, Dairyland's uniform response to the Government's requests is that "Dairyland will produce all responsive,

---

[8] Counsel for Dairyland has already availed itself of this discovery tool. In February 2002, counsel for Yankee Atomic's then-associate participated in a Rule 30(b)(6) deposition of Mr. Thomas Pollog regarding the documents produced by the Government to date, which at that point totaled approximately 800,000 pages. A.164-67. Dairyland already has access to that information in the form of a Rule 30(b)(6) deposition to aid it in the review of these documents.

non-privileged documents it can identify as coming within the reasonable scope of this request and to the extent they can be located after a reasonable search." In its responses to some of the Government's interrogatories, Dairyland has identified a few specific documents, but not a wholesale identification of all documents responsive to each request. A.90-110, 121-36. Dairyland's manner of production is precisely the same as the Government's. See Pl. Att. 1, at 7 & 20. We do not understand Dairyland's basis for imposing differing obligations upon the parties.[9]

### B. Without Any Prior Notice, Dairyland Seeks The Production Of Documents That Are Irrelevant To The Matters To Be Decided Here

Dairyland seeks the production of documents that are irrelevant to the matters to be decided by the Court, contending that we should be required to produce documents in response to Request Nos. 1, 2, 4, 19 to 23, 32, 35, and 42, "although they are contrary to the Government's theory of the case." Pl. Mtn. 18. As an initial matter, the first time that we were notified of this dispute was when we read Dairyland's motion to compel. In its letter dated December 12, 2006 – the only attempt by Dairyland to "meet-and-confer" in advance of a motion to compel, as required by RCFC 37(a)(2) – Dairyland said nothing about any deficiency in these responses. See Pl. Att. 3. For this reason alone, this request should be denied. Alexander, 186 F.R.D. at 199; Doe, 185 F.R.D. at 606.

---

[9] Dairyland also argues that the Government should be required to "update" its production to include recent documents. Pl. Mtn. 19-20. As shown on the chart comparing Dairyland's requests to those propounded in the coordinated discovery proceedings, Yankee Atomic, and PG&E, the Government has previously been asked by counsel for Dairyland to produce documents responsive to these requests. The Government cannot understand what requires "updating" when we have produced the documents responsive to these requests in the past. However, we are endeavoring to ensure that there is no additional material that is responsive to these requests that still needs to be produced.

Request Nos. 19-23, 32, 35, & 42. Ignoring the "meet and confer" requirement, Dairyland misapprehends the nature of the Government's objection to these production requests. As previously explained in our discussion of the Federal Circuit's decision in Indiana Michigan, these requests seek irrelevant and speculative information about predictions of future events that have not happened. Even accepting Dairyland's formulation regarding the proper nature of the Court's inquiry, see Pl. Mtn. 18, which the Court in PG&E, 73 Fed. Cl. 333, rejected, the documents that Dairyland seeks through these requests cannot inform the Court in conducting that inquiry. Further, as previously discussed, the Court in PG&E denied counsel for Dairyland's request for the bulk of this type of future information, A.175, and counsel has not identified any basis for revisiting that ruling here.

Request Nos. 10, 14, 15, 17, and 18. Request No. 10 seeks "DOCUMENTS RELATED TO any DOE or NRC meetings concerning the acceptance and/or disposal of DAIRYLAND'S SPENT FUEL or amending DAIRYLAND'S spent fuel contract." In our response, we objected to this request as overly broad and burdensome because of Dairyland's very broad definition of "related to" and request for "any meeting," which could include all meetings conducted at either agency regarding any aspect of the acceptance or disposal of spent fuel from the nuclear industry since the Standard Contract was promulgated. Pl. Att. 2. We suggested that Dairyland narrow its request by identifying specific topics or specific time periods for which it would like the Government to search for documents, but advised that the request as currently written was too broad to allow the Government to conduct a meaningful search. Dairyland did not address the Government's concern in its letter, dated December 12, 2006, and, instead, now simply insists that the Government produce documents responsive to this request. Pl. Mtn. 19. Contrary to

Dairyland's assertion, the Government does not object to this request on the grounds of relevance, but, instead, seek a narrowing of the request to permit a proper search. Our objection to Request Nos. 14, 15, 17, and 18 was similar, as these requests could require the production of a large volume of documents wholly unrelated to the matters in this case. Without further narrowing, we are unable to ask the NRC to devote significant resources to respond.

Request Nos. 1 & 2. Dairyland seeks production of all documents related to "any federal legislative proposal for federal storage or disposal of [SNF]" and "any efforts or proposals to amend the NWPA." Pl. Att. 6. Counsel for Dairyland submitted the same requests in both Yankee Atomic and PG&E, and, in both cases, the requests were denied. Legislative proposals, both recent and past, that have never been enacted are irrelevant to the existing duties under the NWPA or the Standard Contract. Dairyland has identified no relevance to them and, prior to its motion, did not seek to confer about our response. Its requests should be denied.

CONCLUSION

For the foregoing reasons, Dairyland's motion to compel should be denied, and the Government's request for a protective order should be granted.[10]

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

---

[10] Dairyland requests that the Court, pursuant to RCFC 37(a) and its "inherent authority," sanction the Government. However, we have not abused the discovery process or otherwise acted in bad faith, so that reliance upon the Court's "inherent authority" to sanction is not warranted. See Precision Pine & Timber, Inc. v. United States, No. 98-720C, 2001 WL 1819224 (Fed. Cl. March 6, 2001). Further, because Dairyland failed to comply with its obligation to meet and confer, sanctions are inappropriate under RCFC 37(a). See RCFC 37(a)(4).

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
JOHN C. EKMAN
SONIA M. ORFIELD
MARIAN E. SULLIVAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

January 18, 2007

s/Russell A. Shultis
RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

Attorneys for Defendant