OBJECTIONS

Dairyland objects that the phrases "describe in detail," "spent fuel acceptance schedules or acceptance scenarios," "used by" and "decommissioning studies" are vague. Dairyland objects that the term "assumed" is also vague. Dairyland further objects to identifying and describing "all" schedules or scenarios "used," and each person who has knowledge regarding each schedule or scenario.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Pursuant to RCFC 33(d), Dairyland refers the government to its 1994 LACBWR Decommissioning Cost Study prepared by Sargent & Lundy and its 1998, 2000, and 2003 Decommissioning Cost Study Updates prepared by Dairyland, which have already been produced.

In addition, Dairyland used acceptance scenarios in order to fill out delivery commitment schedule correspondence pursuant to the government's instructions and, pursuant to RCFC 33(d), the government is referred to those instructions to determine the schedules used.

INTERROGATORY NO. 7

Describe in detail all modifications that were made, or that will be made, to Dairyland's spent fuel pool buildings, making sure to identify any modifications relating to the removal of SNF from the pool or to move SNF from the pool into casks of any kind, and identify all documents related to your response.

OBJECTIONS

Dairyland objects that the phrases "describe in detail" and "all documents related to your response" and the term "modifications" are vague. Dairyland further objects that this interrogatory is overbroad, unduly burdensome and neither relevant nor reasonably calculated to

lead to the discovery of admissible evidence, particularly where it seeks information relating to "all modifications" to Dairyland's spent fuel buildings and requires Dairyland to identify "all documents related to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland's spent fuel wet pool is located within the LACBWR reactor containment building, which also contains the reactor pressure vessel ("RPV") and a variety of other systems for the power plant. Since the plant was shut down in 1987, Dairyland has made several modifications to the reactor containment building as part of decommissioning. In addition, pursuant to RCFC 33(d), Dairyland refers the government to its contract with Duratek, Inc., dated August 11, 2005, for the removal and disposal of the RPV, which has already been produced and sets forth the modifications that will be made to the reactor containment building in order to remove the RPV.

Furthermore, once the RPV is removed from the containment building, Dairyland anticipates fabricating and installing a transfer tank where the RPV once was that will serve the purpose of providing a site for the loading of spent fuel into canisters for dry storage.

INTERROGATORY NO. 8

Describe in detail Dairyland's current and projected SNF, HLW, and GTCC waste, making sure to identify where each type of waste is being stored, quantify the amount in each waste category, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrase "describe in detail" is vague. Dairyland objects further to this interrogatory's implied distinction between HLW and GTCC waste. Dairyland also

objects that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to "identify all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows:

SNF (current and projected): 37.959 MTU stored in the LACBWR spent fuel pool

HLW/GTCC waste (current and projected): none

Dairyland has already produced numerous documents pertaining to the amount of SNF it is storing, including, but not limited to, its RW-859 Nuclear Fuel Data Surveys, and directs the government to a May 23, 2006 letter from the South Carolina Department of Health and Environmental Control (PLAC0046023), which shows that Dairyland's recent waste shipment containing its fuel shrouds, control blades and start-up sources to the Barnwell facility met the requirements for Class C waste.

INTERROGATORY NO. 9

Describe in detail each of Dairyland's decommissioning cost studies, making sure to identify each individual who worked upon those studies, identify the source of knowledge and area of expertise for each of the individuals identified, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "describe in detail," "worked upon," "area of expertise" and "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to identify each and every individual who worked on each and every decommissioning

cost study, the source of knowledge and area of expertise of each individual and to identify "all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Pursuant to RCFC 33(d), Dairyland refers the government to its decommissioning cost studies and decommissioning cost study updates described in response to Interrogatory No. 7, which have already been produced.

The principal persons at Dairyland who have worked on decommissioning cost studies and cost study updates include Larry L. Nelson, Health and Safety Supervisor - LACBWR, Roger E. Christians, Plant Manager - LACBWR, and Mike Johnsen, a Technical Support Engineer who is no longer employed at Dairyland.

INTERROGATORY NO. 10

Identify all documents relating to the costs of spent fuel storage at LACBWR including any estimates prepared on Dairyland's behalf.

OBJECTIONS

Dairyland objects that the phrase "that in any way address the cost of spent fuel storage" and the term "estimates" are vague. Dairyland further objects that this interrogatory is overbroad and unduly burdensome, particularly where the interrogatory seeks information about "all" documents.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Pursuant to RCFC 33(d), Dairyland refers the government to its RCFC 26(a)(1) Disclosures.

INTERROGATORY NO. 11

Describe in detail Dairyland's decision to shut down the LACBWR making sure to explain when Dairyland first considered closing LACBWR, when Dairyland finally decided to shut down LACBWR, identify the individuals most knowledgeable about the decision to shut down LACBWR, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "describe in detail," "most knowledgeable" and "all documents relating to your response" are vague. Dairyland also objects that this interrogatory is overbroad and unduly burdensome, particularly where the interrogatory seeks information about "all documents relating to [its] response" and is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: The decision to permanently shut down LACBWR was made in April 1987 based on the conclusion of Dairyland senior management at that time that Dairyland would not need the power output from LACBWR until after the anticipated LACBWR retirement date and that the operating costs for LACBWR, compared to the operating costs for Dairyland's other generating units, made it uneconomical for Dairyland to continue operating LACBWR. The individual most knowledgeable about the decision to shut down LACBWR is Jack Leifer, Dairyland's former Assistant General Manager, Operations.

Dairyland has already produced numerous documents pertaining to the decision to permanently shut down LACBWR, including, but not limited to, Dairyland's Board Minutes dated April 24, 1987.

INTERROGATORY NO. 12

Identify all actions taken by Dairyland to mitigate the damages allegedly incurred as a result of the Government's delay in acceptance of SNF from the LACBWR and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "all actions" and "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to "identify all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland has attempted to mitigate its damages resulting from the government's breach of its spent fuel removal contract through its membership in PFS, a limited liability company founded to develop a private offsite dry storage facility that would temporarily store Dairyland's and other civilian reactors' spent fuel pending the delayed opening of the permanent federal repository, and also through its current efforts to develop an onsite dry storage facility. Dairyland has also mitigated its damages by proceeding with and completing several decommissioning activities despite the continued presence of spent fuel in its wet pool, such as removal and disposal of its RPV. Dairyland has already produced numerous documents pertaining to PFS, its offsite and onsite dry storage plans, and its decommissioning activities.

Dairyland has also made numerous attempts to achieve a legislative solution to the government's breach, including legislation included in the proposed Nuclear Waste Policy Amendments Act of 1999, S.1287 in the First Session of the 106th Congress, which would have

authorized the Department of Energy to take title to Dairyland's spent fuel as part of a settlement of Dairyland's contract claim. That bill was approved by the Congress but vetoed by President Clinton. Dairyland has already produced numerous documents pertaining to its efforts to achieve a legislative solution to the government's breach.

INTERROGATORY NO. 13

Identify all "non-standard fuel," "failed fuel," and "nonfuel components," as those terms are defined by the Standard Contract, that is in the possession of Dairyland making sure to identify where the non-standard, failed fuel and non-fuel components are currently stored, quantify the amounts in each category, identify all persons with knowledge of those subjects, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrase "all documents relating to your response" is vague. Dairyland further objects that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to identify "all persons with knowledge" and "all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland has no non-standard fuel and no non-fuel components except in the RPV, and those components are scheduled to be removed and disposed of by no later than 2007. With regard to identification of Dairyland's failed fuel, pursuant to RCFC 33(d), Dairyland refers the government to the LaCrosse Boiling Water Reactor Fuel Condition Report (LAC-TR-140) dated December 16, 2002, the Summary Report entitled "Research of Material Displaced From LACBWR Spent Fuel Assemblies" (LAC-TR-141) dated February 21, 2003, and the RW-859 Nuclear Fuel Data

Surveys, which have already been produced. In addition, Dairyland has recently discovered that LACBWR Fuel Assembly Number 2-07 is failed. The person at Dairyland with the most knowledge of its non-standard fuel, failed fuel and non-fuel components (or lack thereof) is Seymour Raffety.

INTERROGATORY NO. 14

Describe in detail the organizational structure of Dairyland, making sure to identify senior management, including name and position title, from 1983 to the present and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "describe in detail," "organizational structure" and "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to "identify all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Pursuant to RCFC 33(d), Dairyland refers the government to the Dairyland management organization charts from 1983 to the present (PDPC0000001-27), which have been produced.

INTERROGATORY NO. 15

Identify all owners and their respective ownership interests (as a percentage) in both Dairyland and LACBWR.

OBJECTIONS

Dairyland objects that this interrogatory is overbroad and unduly burdensome, particularly where the interrogatory seeks information about "all" owners.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland is a not-for-profit, non-stock cooperative association incorporated under the laws of the states of Wisconsin and Minnesota that provides wholesale electric generation and transmission service to 25 Class A distribution cooperative members under long-term all-requirements contracts. As a cooperative, Dairyland is owned and controlled by its members, which are distribution cooperatives that provide electric service at retail to their members in rural areas of the states of Wisconsin, Minnesota, Iowa and Illinois. Dairyland also provides wholesale electric service to 14 municipal utility members. Dairyland's board of directors is composed of one representative of each of the 25 Class A distribution cooperative members and one representative of four Class B cooperative members as a group. Dairyland is the sole owner of LACBWR.

INTERROGATORY NO. 16

Describe in detail when Dairyland would have lost its full core offload capability if it had continued to operate the LACBWR, making sure to specify the amount of space that was available in the spent fuel pool in terms of the number of assemblies that the pool can accommodate prior to the last discharge from the reactor, the number of assemblies that were typically discharged from the reactor during each fuel cycle, the number of spaces that are currently available in the spent fuel pool, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "full core offload capability," "typically discharged" and "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to

"identify all documents relating to [its] response." Dairyland also objects that this interrogatory is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland likely would never have lost full core offload capability because it would have increased its spent fuel storage capacity in the pool or through dry storage as necessary. At the time of its shutdown in 1987, LACBWR's spent fuel pool capacity was 440 fuel assemblies, and it held (and continues to hold) 333 fuel assemblies. Prior to shutdown, LACBWR would typically discharge 24 assemblies during each fuel cycle, which typically lasted about 18 months toward the end of the plant's operating life. This information can be found in RW-859 Nuclear Fuel Data Surveys submitted by Dairyland, which have already been produced.

INTERROGATORY NO. 17

Describe in detail all analyses by, or on behalf of, Dairyland relating to the exchange of delivery commitment schedules pursuant to the Standard Contract making sure to identify each person with knowledge regarding this topic and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the term "analyses" and the phrase "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to identify "each person with knowledge regarding this topic" and "all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Due to the government's breach of its spent fuel removal contract, Dairyland never did any analyses or had any analyses performed on its behalf relating to the exchange of delivery commitment schedules.

INTERROGATORY NO. 18

Identify all persons with knowledge concerning DOE's obligations to accept GTCC waste or failed fuel, including persons with knowledge of the timing of such acceptance, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "with knowledge concerning," "obligations," and "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to identify "all persons with knowledge" and "all documents relating to [its] response." Dairyland objects further that this interrogatory cannot be answered as posed, as DOE's obligations regarding GTCC waste and failed fuel are legal, not factual, matters.

INTERROGATORY NO. 19

Describe in detail Dairyland's relationship with PFS making sure to describe the history of this relationship, identify all persons with knowledge of this relationship, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "describe in detail," "relationship with" and "all documents relating to your response" and the term "history" are vague. Dairyland further objects that this interrogatory is overbroad and unduly burdensome, particularly with regard to

"describing the history" of Dairyland's relationship with PFS, identifying "all persons with knowledge" of this relationship and "all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland has been a member of PFS through Dairyland's wholly-owned subsidiary, Genoa FuelTech, Inc., since PFS's founding as Mescalero Fuel Storage, LLC in September, 1995. Dairyland joined with a number of other nuclear utilities to serve on a steering committee and then to create PFS as an organization to license and operate a temporary, away-from-reactor spent fuel storage facility until their spent fuel could be taken by the DOE for placement in the much-delayed permanent federal repository. John Parkyn, Dairyland's Nuclear and Special Projects Manager, is the Chairman of the PFS Board of Managers and has served as its Chairman since shortly after its founding. Dairyland has invested several millions of dollars as member equity in PFS. Dairyland has also loaned staff members from time to time to work on elements of the PFS project, including negotiations with the initial host organization, the Mescalero Apache Tribe, in New Mexico, and later with the Skull Valley Band of Goshute Indians, in Utah, and the development and support of the NRC license application. Persons at Dairyland with the most knowledge of Dairyland's relationship with PFS are John Parkyn and Charles Sans Crainte.

Dairyland has already produced numerous documents pertaining to relationship with PFS, including, but not limited to, the original LLC agreement and subsequent subscription agreements which show the extent of Dairyland's participation.

Respectfully submitted,

August 28, 2006

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

*As to the Answers*:

The preceding interrogatory answers are based on a review of business records and the personal recollections of a number of employees. Dairyland has made a good faith effort to supply true and correct responses to the interrogatories. I have reviewed each response and believe each to be true and correct.

I declare under penalty of perjury that the foregoing statement is true and correct.

Date: 8/28/06

C V Sans Crainte
Charles V. Sans Crainte
Vice President, Generation

CERTIFICATE OF SERVICE

I certify that I caused a copy of the foregoing Dairyland's Objections and Responses to Defendant's First Set of Interrogatories be served by hand this 28th day of August 2006 on:

Russell Shultis
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Classification Unit, Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530

Todd W. Monroe

SPRIGGS & HOLLINGSWORTH
ATTORNEYS AND COUNSELORS
1350 I STREET, N.W.
NINTH FLOOR
WASHINGTON, D.C. 20005-3305

TELEPHONE:(202) 898-5800
TELECOPIER:(202) 682-1639
CABLE: SHWSH

WRITER'S DIRECT DIAL NO.
898- 5839

JERRY STOUCK

February 18, 1999

**VIA TELECOPY AND U.S. MAIL**

Harold D. Lester, Jr.
Assistant Director
Commercial Litigation Branch, Civil Division
United States Department of Justice
Eighth Floor Mailroom
1100 L. Street, N.W.
Washington, DC 20530

Re: *Yankee Atomic v. U.S., Connecticut Yankee v. U.S., Maine Yankee v. U.S.*

Dear Harold:

The enclosed Rule 30(b)(6) deposition notice is necessitated by your refusal to provide adequate responses to our interrogatories seeking the identification of key government and contractor personnel. We need this information to make intelligent and efficient choices concerning who to depose. The government can eliminate the need for this deposition by responding more appropriately to our interrogatories. Absent such response, however, we will proceed with the deposition.

Please let us know if the date and time set forth in the notice are acceptable. Thank you for your attention to this matter.

Sincerely,

Jerry Stouck

Enclosure

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA<br>Defendant. | No. 98-126C<br>(Senior Judge Merow) |

**NOTICE OF DEPOSITION**

Plaintiff[1] hereby gives notice pursuant to RCFC 30(b)(1) and 30(b)(6) of its intent to take the deposition upon oral examination of one or more designees of the defendant to testify on the matters set out in exhibit 1 hereto. The deposition shall commence on March 1, 1999 at 10:00 a.m. and shall continue day to day until completed. The deposition shall be conducted at the offices of Spriggs & Hollingsworth,

[1] Although this deposition is being noticed under Case No. 98-126C, consistent with the admonition in the Court's Pretrial Order of November 4, 1998 that duplicative discovery be avoided, this deposition is also intended for use in *Connecticut Yankee v. United States*, No. 98-154C and *Maine Yankee v. United States*, No. 98-474C.

1350 I Street, N.W., Ninth Floor, Washington, D.C. 20005.

Respectfully submitted,

Date: February 18, 1999

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W, Ninth Floor
Washington, D.C. 20005
(202) 898-5800
COUNSEL FOR PLAINTIFF
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

David J. Taylor
Robert L. Shapiro
Glenn S. Greene
Peter J. Skalaban, Jr.
SPRIGGS & HOLLINGSWORTH

# EXHIBIT 1

**Instructions and Definitions:**

1. With respect to the identification of PERSONS called for in the following schedule, the identification to be provided shall include (for each such PERSON):

   (a) his or her full name;

   (b) the nature of his or her involvement with and knowledge of the subject matter in question;

   (c) the name and address of the company (including any agency or department of the United States) by which he or she was employed at any time relevant to the subject matter in question;

   (d) his or her position or status of employment with that company at any time relevant to the subject matter;

   (e) the offices, divisions, and/or departments where he or she worked, his or her supervisors, and his or her periods of employment with DOE or a DOE contractor;

   (f) his or her current or last known business and home addresses and telephone numbers; and

   (g) for PERSONS whose addresses are known to be inaccurate at this time, the most reliable address and telephone number in your possession.

2. The term "PERSONS," as used in this Exhibit, means any OFFICAL, DIRECTOR, EMPLOYEE, REPRESENTATIVE, or AGENT of (1) DOE or any other agency or branch of the United States with involvement with the passage or implementation of the Nuclear Waste Policy Act of 1982 ("NWPA"), and (2) any contractor or agent, working on behalf of DOE or any other branch or agency of the United States, with involvement with the implementation of the NWPA.

3. The term "OFFICAL", "DIRECTOR", "EMPLOYEE", "REPRESENTATIVE", or "AGENT" shall include any natural person serving or acting, or being in such capacity (by contract or otherwise), at any relevant time even though such person no longer serves, acts, or is in such a capacity, or is otherwise no longer employed by DOE or the United States, or their contractors or agents.

4. In order to prevent duplicative discovery, the term "PLAINTIFFS," as used in this exhibit, means Yankee Atomic Electric Co., Maine Yankee Atomic Power Co., and Connecticut Yankee Atomic Power Co.

5. The term "CONTRACT HOLDER" shall mean any party with a contract with DOE for the disposal of SPENT FUEL.

6. The terms "DOE" and "SPENT FUEL" as used in this exhibit, are defined in Yankee Atomic's Second Set of Interrogatories, at pp. 3, 5.

7. The identities of the eight (8) PERSONS called for by each topic must include, wherever possible:

- five (5) PERSONS with the most knowledge concerning the topic selected from among the former or present employees of DOE or the United States, and

- three (3) PERSONS with the most knowledge concerning the topic selected from among the former or present employees of agents or contractors of DOE or the United States.

If three former or present employees of the contractors or agents do not have substantive knowledge of a topic, the balance of the eight PERSONS shall be selected from among former or present employees of DOE or the United States.

**Schedule:**

1. The identities of the eight (8) PERSONS with the most personal knowledge concerning the schedule (measured in terms of metric tons of uranium or assemblies per year or by some other measure) by which DOE is obligated to remove SPENT FUEL from the site of PLAINTIFFS' reactors pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts.

2. The identities of the eight (8) PERSONS with the most personal knowledge concerning the date by which DOE is obligated to finish removing all of the SPENT FUEL from PLAINTIFFS' reactors pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts.

3. The identities of the eight (8) PERSONS with the most personal knowledge concerning the effect that the permanently shut down status of PLAINTIFFS' reactors has on the timing of the removal of SPENT FUEL from the site of PLAINTIFFS' reactors pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts.

4. The identities of the eight (8) PERSONS with the most personal knowledge concerning DOE's role, pursuant to PLAINTIFFS' spent fuel disposal contracts, with respect to

agreements -- between a PLAINTIFF and any other CONTRACT HOLDER -- that concern exchanges of approved delivery commitment schedules.

5. The identities of the eight (8) PERSONS with the most personal knowledge concerning the treatment or handling of Greater Than Class C Waste pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts.

6. The identities of the eight (8) PERSONS with the most personal knowledge concerning DOE's interpretation of PLAINTIFFS' obligations under Article IV.A.2(a) of PLAINTIFFS' Spent Fuel Disposal Contracts to prepare its SPENT FUEL for transport and/or storage.

7. The identities of the eight (8) PERSONS with the most personal knowledge concerning the effect of the annual capacity reports issued by DOE and mentioned in Article IV.B.5(b) of PLAINTIFFS' Spent Fuel Disposal Contracts on the schedule by which DOE is obligated to remove SPENT FUEL from the site of PLAINTIFFS' reactors.

8. The identities of the eight (8) PERSONS with the most personal knowledge concerning DOE's plans, projections and/or objectives, as of June 30, 1983, with respect to the annual acceptance rate of SPENT FUEL at the DOE facility(ies) to which PLAINTIFFS' SPENT FUEL would be removed pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts.

9. The identities of the eight (8) PERSONS with the most personal knowledge concerning the creation of or amendments to DOE's plans, projections and/or objectives with respect to the annual acceptance rate of SPENT FUEL at the DOE facility(ies) to which PLAINTIFFS' SPENT FUEL would be removed pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts.

10. The identities of the eight (8) PERSONS with the most personal knowledge concerning the creation of or amendments to the annual acceptance priority rankings issued by DOE and mentioned in Article IV.B.5.(a) of PLAINTIFFS' Spent Fuel Disposal Contract.

11. The identities of the eight (8) PERSONS with the most personal knowledge concerning the effect of the annual acceptance priority rankings issued by DOE and mentioned in Article IV.B.5(a) of PLAINTIFFS' Spent Fuel Disposal Contract on the schedule by which DOE is obligated to remove SPENT FUEL from the site of PLAINTIFFS' reactors.

12. The identities of the eight (8) PERSONS with the most personal knowledge concerning DOE's rights and obligations, pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts, with respect to the approval or disapproval of delivery commitment schedules furnished by PLAINTIFFS' pursuant to Article V.B.1. of PLAINTIFFS' Spent Fuel Disposal Contracts.

13. The identities of the eight (8) PERSONS with the most personal knowledge concerning the factual grounds upon which you base your denial of paragraph 16 of Yankee Atomic's Complaint.

14. The identities of the eight (8) PERSONS with the most personal knowledge concerning the factual grounds upon which you base your denial of paragraph 17 of Yankee Atomic's Complaint

15. The identities of the eight (8) PERSONS with the most personal knowledge concerning the factual grounds upon which you base your denial of paragraph 23 of Yankee Atomic's Complaint.

16. The identities of the eight (8) PERSONS with the most personal knowledge concerning the factual grounds upon which you base your denial of paragraph 24 of Yankee Atomic's Complaint

17. The identities of the eight (8) PERSONS with the most personal knowledge concerning the factual grounds upon which you base your denial of paragraph 25 of Yankee Atomic's Complaint.

18. The identities of the eight (8) PERSONS with the most personal knowledge concerning the factual grounds upon which you base your denial of paragraph 27 of Yankee Atomic's Complaint.

19. The identities of the eight (8) PERSONS with the most personal knowledge concerning the factual grounds upon which you base your denial of paragraph 39 of Yankee Atomic's Complaint.

20. The identities of the eight (8) PERSONS with the most personal knowledge concerning the factual grounds upon which you base the contention in paragraph 21 of your Answer to Yankee Atomic's Complaint that "plaintiff would have been required to incur substantially all of its claimed additional costs even had the Department of Energy commenced disposal operations in 1998."

21. The identities of the eight (8) PERSONS with the most personal knowledge concerning the extent and manner of the government's current storage of SPENT FUEL originating from commercial nuclear power reactors.

22. The identities of the eight (8) PERSONS with the most personal knowledge concerning movements of SPENT FUEL into or within the United States by or on behalf of the United States since January 1, 1990.

23. The identities of the eight (8) PERSONS with the most personal knowledge concerning

places in the United States in which SPENT FUEL has been stored since January 1, 1983 at a site other than at a commercial nuclear power reactor.

24. The identities of the eight (8) PERSONS with the most personal knowledge concerning DOE's rights and obligations, pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts, with respect to the timely provision of casks necessary for the removal of SPENT FUEL from the site of PLAINTIFFS' reactors.

25. The identities of the eight (8) PERSONS with the most personal knowledge concerning DOE's physical capability to transport SPENT FUEL from PLAINTIFFS' reactors.

26. The identities of the eight (8) PERSONS with the most personal knowledge concerning DOE's physical capability to store SPENT FUEL removed from PLAINTIFFS' reactors.

27. The identities of the eight (8) PERSONS with the most personal knowledge concerning any effort undertaken by or on behalf of DOE to examine the manner in which DOE would remove SPENT FUEL from PLAINTIFFS' reactors.

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing Notice of Deposition was served by telecopy and U.S. Mail to the following on February 18, 1999:

Harold D. Lester, Jr., Esq.
Assistant Director
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
Attn: Classification Unit, 8th Floor

Peter J. Skalaban, Jr.

U.S. Department of Justice

FWH:DMC:HDLester
154-98-126

Telephone:
(202) 307-6288

*Washington, D.C. 20530*

March 1, 1999

VIA TELECOPY AND FIRST CLASS MAIL

Jerry Stouck
Robert L. Shapiro
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D.C. 20005-3305

Re: Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.); Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Fed. Cl.); Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Fed. Cl.)

Dear Messrs. Stouck and Shapiro:

This letter is in response to your letter dated February 18, 1999, and its accompanying notice of deposition. As I agreed with Mr. Shapiro on February 26, 1999, we are providing you with this letter in lieu of the Rule 30(b)(6) deposition, which you had noticed for this morning.[1]

---

[1] In a letter dated February 26, 1999, Mr. Shapiro confirmed our agreement that we would provide this letter in lieu of the deposition noticed for today. He also asserted in his letter that we "agreed that if we did need to proceed with the deposition that it would take place by the end of the week of March 1st." I have no recollection of any representation or discussion that any deposition would take place "by the end of the week of March 1st." If, after reviewing this letter, plaintiffs continue to seek a deposition upon the matters identified in the notice of deposition, we are willing to discuss the scope of that deposition and a date for such a deposition with you. However, we made no agreement regarding a specific date for that deposition.

Prior to responding to the information requested in your Rule 30(b)(6) deposition notice, we note that a Rule 30(b)(6) deposition is not an appropriate vehicle for the discovery that you seek. First, there is no central record keeping system for all of the information that you seek, particularly with regard to your request for "the nature of [each individual's] involvement with and knowledge of the subject matter in question." In fact, to respond completely to your requests for information about the "nature" of each individual's "involvement and knowledge of the subject matter in question," you would presumably have to depose each and every individual identified, as it would be impossible for us to extract all such information regarding each person and provide it either in written form or in a Rule 30(b)(6) deposition.

Further, in light of the documents that have already been produced to you (including the contract files for the plaintiffs in these three cases), the documents that you presumably already have in light of your clients' contemporaneous involvement in the matters at issue in this case, and the access that you will have to the electronic database of documents maintained by the Department of Energy, you should be able to identify the contracting officers assigned to these contracts and the individuals with knowledge of the matters about which you seek information. Further, the documentation produced to you should provide you with adequate means to identify the "nature of [each individual's] involvement and knowledge" of the identified topics. The Advisory Committee Notes to Rule 30(b)(6) of the Federal Rules of Civil Procedure indicate that the rule was intended to assist parties otherwise unable to identify who within the organization has knowledge of particular facts. Fed. R. Civ. Pro. Rule 30(b)(6), Notes of Advisory Committee on 1970 Amendment. We have identified below the individuals who have knowledge of the "particular facts" that you have identified. Your request that we go beyond that task and identify "all" facts known on every topic identified is beyond any reasonable interpretation of Rule 30(b)(6). Given that some of the information that you currently seek is similar in nature to information that you sought in your second set of interrogatories, it also conflicts with the purposes of Rule 33(c) of the Rules of the Court of Federal Claims, which allows us to produce business records through which you can obtain the information that you seek.

Without waiving these objections, we have attempted to identify eight or more individuals for the categories that you have identified, with the exception of clearly irrelevant categories of information that are not designed to lead to the discovery of admissible evidence in the proceedings before the Court of Federal Claims. We specifically object to your request for all information regarding "the nature of [each individual's] involvement with and knowledge of the subject matter in

question," as vague, ambiguous, and unduly burdensome, as well as for the reasons set forth above. Each individual listed under each topic has knowledge of the topic at issue, with the individuals listed in descending order of involvement in the particular matter (with the exception of contracting officers, who are listed after other Federal employees).

Unless otherwise indicated below, the business address for all listed Federal employees is the Department of Energy, 1000 Independence Avenue, S.W., Washington, D.C. 20585, (202) 586-5000. Further, unless otherwise indicated below, the business address for all contractor personnel is TRW Environmental Safety Systems, Inc., 2650 Park Tower Drive, Suite 800, Vienna, Virginia 22180. We are precluded from providing home addresses for individuals, pursuant to the Privacy Act, 5 U.S.C. § 552a (1994).

**QUESTION 1: The identities of the eight (8) PERSONS with the most personal knowledge concerning the schedule (measured in terms of metric tons of uranium or assemblies per year or by some other measure) by which DOE is obligated to remove SPENT FUEL from the site of PLAINTIFFS' reactors pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts.**

Federal

Alan Brownstein (1985-91, Nuclear Industry Specialist, Management & Support Division; 1991-94, Supervisory Industry Specialist, Logistics & Utility Interface Branch, 1994-95, Supervisory Industry Specialist, Waste Acceptance Division; 1995-present, Supervisory Program Analyst, Regulatory Integration Division)
Nancy Slater (1991-95, Industry Specialist, Logistics & Utility Interface Branch; March 1995 to August 1995, Supervisory Industry Specialist, Waste Acceptance Division; August 1995 to present, Industry Specialist, Regulatory Coordination Division)
Dave Zabransky (1991-95, General Engineer, Logistics & Utility Interface Branch; 1995 to 1997, General Engineer, Waste Acceptance Division; 1997 to present, Industry Specialist, Regulatory Coordination Division)
Beth Tomasoni, Contracting Officer
Chris Jedrey, Former Contracting Officer (address unknown)
Rich Leotta, Former Contracting Officer

Contractor

Billy Cole, Manager, TESS Waste Acceptance
Scott Vance (1988-93, Research Engineer, Battelle PNL, Waste Management Department; 1993-94, Consultant CH2MHill; Senior Consultant, JAI, Inc., TESS Waste Acceptance),

current address: JAI, Inc., 1210 Virginia Circle, Nampa, Idaho 83687

Ed Benz (1979-81, Project Manager, Battelle, Columbus; 1983-88, Jacobs Engineering (Weston Teammate), Waste Package Program Manager; 1988-91, Jacobs Engineering, Waste Acceptance Task Leader; 1994-96, Jacobs Engineering, Waste Acceptance Task Leader; 1997 to present, JAI, Inc. (TESS Teammate), Senior Consultant, Waste Acceptance)

**QUESTION 2: The identities of the eight (8) PERSONS with the most personal knowledge concerning the date by which DOE is obligated to finish removing all of the SPENT FUEL from PLAINTIFFS' reactors pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts.**

<u>Federal</u>

Alan Brownstein
Nancy Slater
Dave Zabransky
Beth Tomasoni
Chris Jedrey
Rich Leotta

<u>Contractor</u>

Billy Cole
Scott Vance
Ed Benz

**QUESTION 3: The identities of the eight (8) PERSONS with the most personal knowledge concerning the effect that the permanently shut down status of PLAINTIFFS' reactors has on the timing of the removal of SPENT FUEL from the site of PLAINTIFFS' reactors pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts.**

<u>Federal</u>

Alan Brownstein
Nancy Slater
Lake Barrett (1985-89, Director, Transportation & Waste Systems Division; 1989-91, Deputy Associate Director for External Relations & Policy; 1993-97, Deputy Director of OCRWM; 1997 to present, Acting Director, OCRWM)

Ronald P. Milner (April 1984 to March 1985, Supervisory Program Analyst, Operations Division; March 1985 to May 1986, Supervisory General Engineer, Finance & Cost Analysis Division; May 1986 to September 1986, Supervisory General Engineer, Analytical Services Branch; September 1986 to July 1988, Supervisory General Engineer, Financial Management Analysis Division; July 1988 to June 1991, Supervisory General Engineer, Program Control Division; June 1991 to January 1995, Associate Director for Office of Storage and Transportation; January 1995 to May 1997, Director, Office of Program Management & Transportation; May 1997 to June 1997, Director, Office of Waste Acceptance & Transportation; June 1997 to present, Acting Deputy Director, OCRWM)
Dave Zabransky
Beth Tomasoni
Chris Jedrey
Rich Leotta

Contractor

Billy Cole
Scott Vance
Ed Benz

**QUESTION 4: The identities of the eight (8) PERSONS with the most personal knowledge concerning DOE's role, pursuant to PLAINTIFFS' spent fuel disposal contracts, with respect to agreements — between a PLAINTIFF and any other CONTRACT HOLDER — that concern exchanges of approved delivery commitment schedules.**

Federal

Alan Brownstein
Nancy Slater
Dave Zabransky
Ronald P. Milner
Lake Barrett
Beth Tomasoni
Chris Jedrey
Rich Leotta

Contractor

Billy Cole
Scott Vance
Pat MacDuffee, Retired Principal Investigator PNL (address unknown)

**QUESTION 5: The identities of the eight (8) PERSONS with the most personal knowledge concerning the treatment or handling of Greater Than Class C Waste pursuant to PLAINTIFFS' Spent Fuel Disposal Contracts.**

Federal

Alan Brownstein
Nancy Slater
Dave Zabransky
Ronald P. Milner
Lake Barrett
Beth Tomasoni
Chris Jedrey
Rich Leotta

Contractor

Billy Cole
Scott Vance
Pat MacDuffee

**QUESTION 6: The identities of the eight (8) PERSONS with the most personal knowledge concerning DOE's interpretation of PLAINTIFFS' obligations under Article IV.A.2(a) of PLAINTIFFS' Spent Fuel Disposal Contracts to prepare its SPENT FUEL for transport and/or storage.**

Federal

Alan Brownstein
Nancy Slater
James Carlson (1983-84, Nuclear Engineer, Office of Systems & Storage Development; 1984-88, Supervisory General Engineer, Storage & Engineering Division; 1988-91, Supervisory General Engineer, Program Relations Branch; 1991-94, Supervisory General Engineer, Transportation & Logistics Division; 1994-97, Supervisory General Engineer, Systems Engineering Division; 1997 to present, Supervisory General Engineer, Waste Acceptance and Transportation Division)
Dwight Shelor, Acting Director, Office of Acceptance, Transportation and Integration
Beth Tomasoni
Chris Jedrey
Rich Leotta

Contractor

Billy Cole