# Appendix

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

COPY

vs. Case No. 04-0106 C

THE UNITED STATES,

Defendant.

---

* * * * * *

DEPOSITION OF JOHN PARKYN

TAKEN ON THE 12TH DAY OF DECEMBER, 2006

AT THE RADISSON HOTEL LA CROSSE

LA CROSSE, WISCONSIN

9:45 A.M.

* * * * * *

Taken before Lynn M. Ettl, RPR, CRR

www.nwcourtreporters.com

nwcr@nwcourtreporters.com

1-800-628-7551

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 9

MR. SHULTIS: Okay. Well, with regard to the -- the questions and your preparation with Counsel, just -- just so you know, Robert, with that in mind, we will keep this deposition open to further explore that.

**Q (By Mr. Shultis, continuing) And did you review any documents that were not provided by Counsel?**

MR. SHAPIRO: I'm going to again object, instruct the witness not to answer.

**Q (By Mr. Shultis, continuing) Well, I asked you, and you answered that you didn't do any preparation on your own, is that correct?**

A That's correct, I answered that.

**Q Okay. And you -- and the answer was that you did not review any documents outside of those that you might have reviewed with Counsel, is that correct?**

A It wasn't -- the question -- if I did any preparation without Counsel?

**Q Right.**

A It was a general question, and I said no, I didn't.

**Q Okay. And would that include any review of any documents?**

THE WITNESS: Is that all right to answer?

MR. SHAPIRO: You may answer.

A Yeah, yes, it includes --

**Q (By Mr. Shultis, continuing) Okay.**

A -- just as it was asked. No preparation outside of Counsel.

**Q Okay. Can you generally describe your understanding of the litigation for which your deposition is being given today?**

A Basically Dairyland Power, for whom I worked, has a nuclear power plant that was built by the Atomic Energy Commission in conjunction with Dairyland. Each of them built a portion of it. They took ownership of it. They were intending to reprocess fuel. And the American President issued an Executive Order, so the processing was stopped. Subsequent Congress and President passed the High Level Waste Act of '82, and standard contracts were issued, I believe it was, June of '83, were to be executed by that time, and Dairyland executed one. The date listed in there was January 31, 1998 for the beginning of the movement of fuel. The date has passed.

There is no federal repository operating, no federal repository with a license application in.

Page 10 / Page 11

And at the time that was appropriate, Dairyland filed a damage claim for failure to perform under that contract.

**Q Did you -- what was your involvement and preparation of Dairyland's damages claim in this case?**

MR. SHAPIRO: Objection. Again instruct the witness not to -- to answer that question.

MR. SHULTIS: On what basis?

MR. SHAPIRO: Work product.

MR. SHULTIS: So -- just so I understand your objection, my asking Mr. Parkyn about his participation in the preparation of a damages claim, you're -- you're saying is attorney work product?

MR. SHAPIRO: Yes. You may ask him any number of questions about the damages Dairyland suffered, including specific questions that use the initial disclosure as a jumping off point, but Mr. Parkyn's particular involvement in that process is -- is privileged.

**Q (By Mr. Shultis, continuing) Did Mr. Parkyn have any role in the preparation of the damages claim?**

Page 12

MR. SHAPIRO: You're asking me a question?

MR. SHULTIS: Actually, well, I'm asking Mr. Parkyn.

**Q (By Mr. Shultis, continuing) Did you have any role in the preparation of the damages claim in this case?**

A I'm not sure what the question means. Do you -- do you mean the numbers that are used in the damage claim?

**Q Yes, and the -- the factual basis for that.**

MR. SHAPIRO: Objection, vague. You may answer.

A Okay. Certainly the numbers are a matter of record, so. You know, I was involved in operation of the plant, transferring to a shutdown condition, and private fuel storage. And those are all numbers that are in the damage claim.

**Q (By Mr. Shultis, continuing) Okay. And so you have seen the damages claim in this case?**

A I've seen -- yeah, yes, I have, the -- the claim.

**Q Yes.**

A Of course I saw the numbers that went into it. Yeah, I saw it.

Page 13

**Q Okay. And so then getting back to my question, what was your role in putting those numbers together? What did you do for that?**
MR. SHAPIRO: Again, I'm going to object, instruct the witness not to answer that question. It's protected by the work product doctrine.
MR. SHULTIS: Okay. And just so you know, Robert, we intend to keep this deposition open for purposes of pursuing those questions.
MR. SHAPIRO: (Nods head.)
(Discussion held off the record.)
MR. SHULTIS: And just so that you know, Robert, there was a decision in the Pacific Gas & Electric case that bears directly on this issue, and we intend to get a copy of that decision. It -- the judge in that case allowed us to pursue this whole line of questioning. We did -- it's my understanding we did go back and redepose witnesses for that purpose in that case. I just thought I'd let you know.
MR. SHAPIRO: All right.
**Q (By Mr. Shultis, continuing) Moving on.**

Page 14

**Mr. Parkyn, could you describe your post high school education, please?**
A Well, I went to the University of Wisconsin in La Crosse. When I was in the Army, I took a course at the University of New Mexico, at Los Cruces. And then I went to the University of Wisconsin at Madison and received my nuclear engineering and physics degree there.
**Q And -- and when was that, sir?**
A '72.
**Q Any education after that, formal education?**
A Well, I -- I have a diploma from the Railroad Educational Bureau in Omaha. That was about the -- I got that last year.
**Q What was that?**
A Rail operation, things you need for operating a -- a rail network for transportation. Of course, we're working on transporting spent fuel, so.
**Q So could you explain what the relationship is between that degree and what you're currently doing?**
A Well, part of the license application for Private Fuel Storage indicates that we're -- we're transporting fuel from reactors to the site in

Page 15

Utah that's now licensed. To -- the options to the site were all rail. That involved construction and operation of a railroad that we would have to use to get spent fuel to the site.
**Q Are you a licensed Professional Engineer?**
A In Wisconsin and a licensed professional -- Nuclear Engineer in California.
**Q Are you a certified cost estimate engineer?**
A No.
**Q When did you -- when -- you said you went to the University of Wisconsin-La Crosse. What degree did you receive, or did you receive a degree?**
A No, the degree was from Madison.
**Q Okay.**
A So basically, classes from La Crosse, thermal from Los Cruces all is part of the Madison degree.
**Q Okay. After you got out of school, after you got out of the University of Wisconsin-Madison, where did you go to work?**
A Wisconsin Electric Power Company.
**Q And when was that?**
A '72 to, I think, '74.
**Q And what did you do at Wisconsin Electric?**
A I was at the Point Beach Nuclear Power Plant. I

Page 16

was the -- one of the operations engineers, and I was a licensed senior reactor operator on the two units under the Atomic Energy Commission.
**Q And who did you work with at WEPCO? Who was your immediate supervisor?**
A Oh, there were several. Forrest Rhodes and Tom Rogers are the two that I remember.
**Q Okay.**
A Tom would have been first and Forrest second.
**Q Okay, thank you. What did you do after that?**
A Came to La Crosse, Dairyland Power Cooperative, La Crosse boiling water reactor.
**Q So that would have been in 1974?**
A I believe it was '74, yeah.
**Q Okay. And what did -- what did -- what was your first job at Dairyland?**
A I was the operations engineer.
**Q And what did you do as an operations engineer?**
A Oversaw reactor operations. I also had a -- by then it was a Nuclear Regulatory Commission senior reactor operator license in La Crosse.
**Q And how long did you do that?**
A I'm not sure when I took over that -- my next job was assistant superintendent, so that was operations maintenance and a couple of other



"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 217

**instructs you not to answer, are you going to accept that advice?**
A Yes, he's my attorney.
**Q Okay. Did you speak with Dairyland personnel outside of counsel being present concerning the damages?**
MR. SHAPIRO: You may answer that question.
A Not that I'm aware of. I don't remember any.
**Q (By Mr. Shultis, continuing) Did you assemble documents in support of the claim?**
A No.
**Q Did you assist in determining what activities were caused by the breach?**
MR. SHAPIRO: You may answer.
A No.
**Q (By Mr. Shultis, continuing) Did you assist in determining what costs should be claimed as damages?**
MR. SHAPIRO: Objection, vague, but you may answer.
A No.
**Q (By Mr. Shultis, continuing) Did you participate in any meetings with experts that you understood were testifying in this matter?**

Page 218

A No.
**Q Did you speak with Dairyland personnel with counsel present regarding damages?**
MR. SHAPIRO: You may answer that.
A I -- I don't -- I'm trying to recall if there was specific -- we talked about where we spent money. I don't know that we talked about things in light of there being damages. They're a matter of accounting records.
**Q (By Mr. Shultis, continuing) Who was responsible for determining what costs would be claimed as damages?**
MR. SHAPIRO: Objection, vague.
A I -- I didn't make that determination.
**Q (By Mr. Shultis, continuing) But do you know who did?**
A You mean within Dairyland?
**Q Yes.**
A I don't.
**Q So did you have any involvement in the preparation of Dairyland's damages claim?**
MR. SHAPIRO: Objection, vague.
A I guess in light of the other -- I don't understand what you're asking.
**Q (By Mr. Shultis, continuing) Did -- did you**

Page 219

**participate in the compilation of Dairyland's damages claim?**
A You're talking about the collection of records of what we spent? No.
**Q Computation of numbers, that sort of thing too?**
A No, the numbers are just from our accounting records, so.
MR. SHULTIS: And with -- with -- Robert, I just wanted you to know we're holding this deposition open for the purpose of pursuing the questions that you did not allow us to ask Mr. Parkyn.
MR. SHAPIRO: I understand your position.
MR. SHULTIS: Okay. Thank you. We have no further questions, unless you do.
MR. SHAPIRO: I have no questions for the witness.
(Whereupon, the Deposition was concluded at approximately 5:27 p.m.)

Page 220

STATE OF MINNESOTA )
COUNTY OF WASHINGTON)

Be it known that I took the Deposition of JOHN PARKYN, on the 12th day of December, 2006, at La Crosse, Wisconsin;

that I was then and there a Notary Public in and for the County of Washington, State of Minnesota, and that by virtue thereof I was authorized to administer an oath;

that the witness, before testifying, was by me first duly sworn to testify to the whole truth and nothing but the truth relative to said cause;

that the testimony of said witness was recorded in stenotype by myself and reduced to print by means of Computer-Assisted Transcription under my direction, and that the deposition is a true record of the testimony given by the witness to the best of my ability;

that I am not related to any parties hereto nor interested in the outcome of the action.

Dated this 19th day of December, 2006.

Lynn M. Ettl, RPR, CRR
Washington County, Minnesota
My Commission Expires 1-31-2010



"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

COPY

vs. Case No. 04-0106 C

THE UNITED STATES,

Defendant.

---

* * * * * *

DEPOSITION OF MICHAEL A. BRASEL

TAKEN ON THE 13TH DAY OF DECEMBER, 2006

AT THE RADISSON HOTEL LA CROSSE

LA CROSSE, WISCONSIN

9:15 A.M.

* * * * * *

Taken before Lynn M. Ettl, RPR, CRR

www.nwcourtreporters.com

nwcr@nwcourtreporters.com

1-800-628-7551

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 5

MICHAEL A. BRASEL,
after having been first duly sworn on oath by Lynn M. Ettl, was examined and testified as follows:

EXAMINATION

BY MR. EKMAN:

**Q Good morning, Mr. Brasel. Could you state your full name and address for the record, please?**
A Michael Allen Brasel. My address is 2898 Kelly Road, La Crescent, Minnesota.
MR. STERN: John, before we go further, I just want to make sure that we designate this transcript as confidential pursuant to the terms of the protective order. And after we get the full transcript, we'll review and make less designations on confidentiality.
MR. EKMAN: Good.
**Q (By Mr. Ekman, continuing) Mr. Brasel, good morning. My name is John Ekman. I'm an attorney with the Department of Justice. To make introductions, with me today are John Couchman, and Emily Flinn, Rob Sweeney, all of whom are consultants for the government. At the end of the table is Russ Shultis, who is also an**

Page 6

**attorney with the Department of Justice. Have you ever had your deposition taken before?**
A No.
**Q All right. And I'm sure your lawyers talked to you about this before, but just to go over some of the ground rules. Obviously, a transcript is being made of our discussion here today, so it's important that you answer audibly, yes, no. Uh-huhs, uh-uhs, those kinds of things don't come out very well on the record. Okay?**
A Yes.
**Q All right. That was the first test. From time to time your attorney may interpose an objection. Unless you're instructed not to answer, you do need to answer the question. If you need a question clarified, just ask me. I'm -- I'll be happy to clarify that question. Okay?**
A Yes.
**Q And I will take breaks every hour and 15 minutes, or thereabouts, but if you do need a break, just let me know. Okay?**
A Yes.
**Q Mr. Brasel, what did you do to prepare for your deposition here today?**
MR. STERN: I'm going to instruct the

Page 7

witness not to answer that question. The question calls for attorney-client privileged communications and also work product.
**Q (By Mr. Ekman, continuing) And you're take -- you'll accept your attorney's instruction?**
A Yes.
**Q All right. Is it fair to say to the extent that instruction comes up again in the deposition, that you will again take your attorney's instruction?**
A Yes.
**Q All right. Did you do anything to prepare for your deposition here today?**
A No. I mean, outside of just reading some documents and familiarizing myself with --
**Q All right. What -- what documents did you review?**
MR. STERN: I'm going to instruct the witness not to answer the question. Calls for privileged information.
**Q (By Mr. Ekman, continuing) Did you personally select documents for review in preparation for the deposition here today?**
A Say that again.

Page 8

**Q Did you -- did you personally, in other words outside of your attorneys, did you personally select documents to review in preparation for your deposition here today?**
A Say that again one more time. Sorry.
**Q No. Did you -- in advance of your deposition, you said you read some documents. Did you pick the documents? Did you pick any documents yourself independently to review in preparation for your deposition here today?**
A Yes.
**Q What documents did you personally select to review?**
A Just general documents that would -- you want me to name particular documents?
**Q Sure. If you have some idea, just --**
A None in particular. I mean it was just perusing some documents to refresh my memory, is all.
**Q About any particular topics?**
A Not necessarily, no.
**Q How about the reactor pressure vessel, did you look at documents about that?**
A Well, that's my job every day, so, no, not for this case. No, I didn't.
**Q Okay. Do you recall any topics of documents that**



"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 9

**you selected that you reviewed personally?**
A Maybe some WPI documents from the -- the work that we did back then. That was just to familiarize myself with them.
**Q Okay. Let's talk about your employment history. What's your current position?**
A Project engineer, Dairyland Power Cooperative.
**Q And how long have you had that position?**
A Since February 6, 2002.
**Q Who do you report to?**
A Greg Lobner.
**Q Could you spell that?**
A L-O-B-N-E-R. He's the Generation Engineering project manager.
**Q And do you know who Mr. Lobner, up the chain, reports to?**
A Mr. Lobner reports to Rob Palmberg.
**Q Okay. What are your duties as project engineer?**
A I am assigned to projects to oversee, manage the projects to completion.
**Q What projects?**
A Currently I'm working on the reactor vessel removal project.
**Q Have you done work on other projects?**
A In the past, yes.

Page 10

**Q Okay. What other projects have you been involved in?**
A Mostly coal plant stuff. If you want me to name all those?
**Q How about stick to nuclear.**
A Nuclear? I -- I've assisted LACBWR on various projects as project engineer.
**Q Can you give me a flavor for projects that you've done outside of an RPV?**
A The WPI project in 2002 into 2003. Let me think. Otherwise, it was just -- I think it was the only project. Otherwise it was just general engineering.
**Q What is the WPI project?**
A It was an undertaking by Dairyland Power and LACBWR to investigate removal of the fuel from the reactor building.
**Q Remove the spent fuel?**
A Spent.
**Q Is this a dry storage related project?**
A It -- it involved that. It wasn't the only focus, but, yes.
**Q And what was your role in that project?**
A Project engineer, meaning I would review documents, comment on them as a program, from a

Page 11

technical standpoint.
**Q And as project engineer, what's your -- what's your role in the RPV? Can I call it the RPV project?**
A Yes.
**Q Okay. What's your role on that project?**
A I'm the project manager.
**Q You are the project manager?**
A Yes.
**Q Do you supervise folks in that capacity?**
A I don't have any direct -- anyone reporting to me, direct reports, but, yes, I -- I -- I guess I give instructions in regards to the project to the LACBWR staff.
**Q All right. Could you tell, just in your own words, differentiate for me what your responsibilities are when you're a project engineer versus a project manager?**
A Well, a project manager is -- generally directs, coordinates the efforts for the project, is the main point of contact with any contractors. And a project engineer is more of hands-on with the technical information, structural mechanical electrical, those type of things.
**Q All right. When you were talking about LACBWR,**

Page 12

**you mentioned that you do do some general engineering work?**
A Yes.
**Q What -- what kind of general engineering work do you have?**
A For example, decommissioning. They needed an analysis of, a structural analysis, a simple structural analysis to support the reheater before -- if they need to reboot the moisture separator underneath it, I would do some quick calculations to show that, yes, we can do that and what the supports would be.
**Q Any other examples?**
A I coordinated the hiring of a contractor to inspect the LACBWR chimney or stack. And, yeah, that's about it. Those types of miscellaneous work, which has nothing to do with any specific project.
**Q What -- where are you based out of?**
A My location is the La Crosse office, the main office.
**Q Is that here in town?**
A Yes.
**Q And what percentage of your work today relates to the RPV project as opposed to, say, the other**



"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 13

**projects you work on?**
A Eighty percent.
**Q How long has it been a significant component of your job?**
A Since January of 2006.
**Q And before that, what was the, again roughly, the mix of your responsibilities between nuclear and coal?**
A I spent about 40 percent of my time nuclear and about 60 percent at the coal plant next door.
**Q And is that a rough average, a rough percentage from the beginning of your -- of your job as project engineer?**
A It -- it came and went. I mean, it -- sometimes I'd spend all my time on nuclear. Sometimes I'd spend all my time on coal. But if you had to look at the five years that I've spent here, it's been -- I'd say that's accurate.
**Q All right. Now you mentioned five years, which leaves me, I think, one year short. What was your first job at Dairyland?**
A I'm sorry?
**Q What was your first job?**
A Project engineer.
**Q At February 6, 2002 --**

Page 14

A Yes. I guess --
**Q It is 2007, isn't it?**
A I apologize. It's -- February is coming up really soon. Almost five years.
**Q My daughter's birthday. I should have remembered that. Okay. Before that, before February 6, 2002, now that my math is right, what did you do?**
A I was an engineer for Centra Technology in Arlington, Virginia.
**Q Spell that.**
A Centra?
**Q Yeah.**
A C-E-N-T-R-A.
**Q And what does Centra do?**
A They're a contractor to government agencies. Specifically the one I worked for was DARPA, Defense Advanced Research Projects Agency.
**Q How long were you there?**
A Approximately a year.
**Q So February 2001 to February 2002, January?**
A January, I left in January 2002. I started in -- approximately in March, so just short of a year.
**Q And very generally what kind of work were you doing there?**
A I worked on two projects. The primary one was a

Page 15

counter underground facilities program, and the other one was unmanned aircraft.
**Q All right. Prior to that, what was your job?**
A I was a full-time student.
**Q Okay, great. Where were you a student?**
A Old Dominion University.
**Q And when did you graduate?**
A 2001.
**Q Spring of 2001?**
A May of 2001.
**Q What's your degree?**
A Mechanical engineering.
**Q You're going to business school at -- currently?**
A Yes.
**Q Where are you at in that process?**
A I'm anticipated to graduate in 2008, summer 2008.
**Q And what -- what school are you -- are you going to?**
A University of Wisconsin-La Crosse.
**Q And is it a three-year program? Are you -- you're going full-time or part-time?**
A Part-time.
**Q When did you start that degree?**
A Fall of 2004 I started undergraduate prerequisites.

Page 16

**Q You have a degree in mechanical engineering. Are you a licensed engineer?**
A No, I'm not.
**Q Do you have any professional licenses?**
A No.
**Q All right. Let's start with this case. Did you have any involvement in the preparation of Dairyland's damages claim?**
MR. STERN: I'm going to instruct the witness not to answer. It calls for work product and privileged information.
MR. EKMAN: It's a yes or no question. I said, Did you have any involvement in the preparation of Dairyland's damages claim --
MR. STERN: Again --
MR. EKMAN: -- not what he did.
MR. STERN: I'm going to instruct the witness not to answer.
MR. EKMAN: Great. And the basis for that? What's the basis of that instruction?
MR. STERN: It's privileged information, work product.
MR. EKMAN: Whether he participated, whether he had involvement is work product?
MR. STERN: Whether he did or did not,

(Pages 13 to 16)

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 17

yes.
Q (By Mr. Ekman, continuing) Did you speak with Dairyland personnel outside of counsel being present concerning Dairyland's damages claim?
A No.
Q Did you -- you didn't --
A I'm sorry.
Q You haven't -- have you had correspondence with Dairyland personnel concerning the damages claim outside of counsel?
A No.
Q Did you assemble documents in support of the damages claim?
A Outside of counsel, no.
Q Did you assist in determining what activities undertaken by Dairyland were caused by the breach?
A No.
Q Did you assist in determining what costs should be claimed as damages?
A No.
Q Did you have any meetings with experts, you understand to be testifying experts in this case?
A No.
Q Okay.

Page 18

(Discussion held off the record.)
(Michael A. Brasel Deposition Exhibit Number 1 was marked for identification.)
Q (By Mr. Ekman, continuing) Mr. Brasel, I've handed you what's been marked as Exhibit 1 to your deposition, which is a string of emails, beginning with an email from Sandy Fancher to you. And then if you go down, there's an email from a Dan Fruehling to you, as well as to a couple other recipients. And then the first email in this chain is an email from you to Dan Fruehling with a Dairyland address. Is this an email string -- let's talk about that first email, the bottom one. Is this an email that you sent to Mr. Fruehling on June 1, 2004?
A Yes, that's what it says.
Q Okay. Do you see, are there any attorneys present or identified in any of the two lines or cc lines in these -- this string of emails?
A No.
Q Your email references someone named Mike Johnsen. Do you see that?
A Yes.
Q Who is Mr. Johnsen?
A He is a retired Dairyland employee.

Page 19

Q When did he retire?
A January 2006.
Q And so at this current time, he was an employee at Dairyland?
A Yes.
Q And what was his job, do you know, at this time?
A He was a technical support engineer, LACBWR.
Q And where in the scheme of Dairyland does that put him relative to what you were, which was a project engineer?
A Well, he worked directly for Roger Christians, plant manager at LACBWR, and him and I worked together on tasks assigned by Roger and-or my boss.
Q The first sentence of this email says, Mike Johnsen and I are tasked with compiling the LACBWR damages incurred by DPC for the DOE not taking the spent fuel in January 1998 as per the NWPA standard contract. Do you see that?
A Yes.
Q Then you go on to where you I think request some insurance information from Mr. Fruehling, is that right?
A Yes.
Q My first question is, what's Mr. Fruehling's job

Page 20

at this time, do you know?
A He's the risk manager for Dairyland Power.
Q So if one wanted to get insurance information, he'd be the guy to talk to?
A The first contact, yes.
Q All right. Now, who tasked you with compiling LACBWR damages as referenced in that first line?
A I believe it was -- at the time I believe it was Dave Rybarik, my boss, who was instructed by Tom Zaremba and Chuck Sans Crainte to do that.
Q And Mr. Zaremba is counsel for Dairyland, is that right?
A That's correct.
Q And Mr. Sans Crainte is?
A Vice president of Generation.
Q And he's here today?
A Yes.
Q All right. So -- and I understand we all -- this is a couple years ago. We do forget things. But let me just reask my question and see if maybe we can narrow down exactly what your responsibilities are. Earlier I asked you if you had had any communications with Dairyland personnel outside of counsel concerning the damages claim. Do you recall that question?



"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 21

A Yes.
**Q And you thought you had not?**
A Yes.
**Q Obviously this is a situation where you did, true?**
MR. STERN: Object to the form of the question. Mischaracterizes his testimony.
A Yes, it appears I did.
**Q (By Mr. Ekman, continuing) And another question I asked was, did you assemble documents in support of the claim. Maybe I should have asked you, did you assemble information in support of the claim?**
MR. STERN: Object to the form.
A Yes, I put together documents that were marked attorney-client privilege from the beginning. And I'll leave it at that.
**Q (By Mr. Ekman, continuing) I want to know -- I don't want to know what those documents were, okay? I'm not asking you to identify the documents. When you say you assembled documents that were marked attorney-client privilege, were these company records that you were collecting or were these something else? In other words --**
A Rephrase --

Page 22

**Q -- company record could be a Nukem invoice, for example.**
A No, I did not collect any company records.
**Q Can you, without describing the content of the information -- without describing the content of the documents, again, I don't want to know the content, what type of documents were these?**
MR. STERN: Again, I'm going to instruct the witness not to answer. It calls for attorney-client work product.
**Q (By Mr. Ekman, continuing) The next line of this email says, "We need to know how DPC handles insurance for LACBWR, in order to capture these expenses in DPC's claim." Do you see that?**
A Yes.
**Q And then you ask a variety of questions in terms of how to get that information, including how the charge numbers are handled, right?**
A Yes, it appears so.
**Q Did -- and Mr. Fruehling responded and gave you that information, right?**
A Yes.
MR. SHAPIRO: I'm sorry. Do you want to take a quick break and have a colloquy with the witness. It will only take a

Page 23

minute.
MR. EKMAN: It's fine.
(A short recess was taken.)
MR. STERN: Based on our discussions and what's come out here, we believe this document is a work product or privileged document and we're -- we'll be calling this back pursuant to the terms of the protective order subsequent to this deposition.
MR. EKMAN: Let's set up my motion, then.
**Q (By Mr. Ekman, continuing) Mr. Brasel, did you prepare any analyses in connection with the damages claim?**
MR. STERN: Counsel will instruct the witness not to answer the question.
MR. EKMAN: On what grounds? It's a yes or no question.
MR. STERN: Did you prepare -- did you prepare any analyses in connection with the damages claim? Again, that calls for attorney-client work product.
MR. EKMAN: Is it attorney-client privilege or work product or is it both?
MR. STERN: I think it comes as both.

Page 24

**Q (By Mr. Ekman, continuing) If you had conversations with -- you personally had conversations outside of your preparation for this deposition with counsel in connection with this claim?**
A Restate the question.
**Q Outside of any conversations you may have had in connection with this deposition, in connection with the -- your work that you did --**
A Preparation?
**Q -- outside of the preparation that you may have done for this deposition?**
A (Nods head.)
**Q In connection with this damages claim, did you personally speak with any attorneys for LACBWR?**
MR. STERN: Again, I counsel the witness not to reveal any communications with counsel regarding this client in this case.
MR. EKMAN: Is that instruction not to answer that question?
MR. STERN: Well, if the answer is no, then he can answer it. But if the answer is yes, yes.
MR. EKMAN: Well, he can answer it if



"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 25

the answer is no, but if the answer is yes, he can't answer it?

MR. STERN: He can answer the question, but I'm counseling the witness not to reveal any attorney-client communications.

(A short recess was taken beginning at 9:45 a.m. and ending at 9:50 a.m.)

MR. STERN: Let me object to that question. Vague in terms of damages claim.

**Q (By Mr. Ekman, continuing) You can answer.**

A No.

**Q Did you send out -- did you solicit other information from other individuals other than Mr. Fruehling relative to this claim?**

MR. STERN: I'm going to instruct the witness not to answer. Calls for work product.

MR. EKMAN: Whether the yes or no calls for work product?

MR. STERN: Yes.

**Q (By Mr. Ekman, continuing) Did you speak -- did you have meetings with Mike Johnsen concerning the damages claim, just the two of you, to discuss how you were going to go about this process?**

Page 26

A I don't recall.

**Q How did you know that Mr. Johnsen had been tasked with you to compile the LACBWR damages?**

MR. STERN: I'm going to instruct the witness not to answer to the extent it calls for attorney-client communications. If you can answer the question without revealing attorney-client communication, feel free to do so.

THE WITNESS: Repeat the question.

(Whereupon, the court reporter read back as requested.)

A Well, Mr. Johnsen works for plant manager at LACBWR.

**Q (By Mr. Ekman, continuing) Mr. -- and was that Mr. Rybarik?**

A No, Roger Christians, and when we were instructed by Mr. -- when I was instructed by Mr. Rybarik, Mr. Johnsen was instructed at the same time by Mr. Christians.

**Q And you don't recall if the two of you had any meetings concerning this project?**

A I don't remember them.

**Q Do you -- when you have -- when you're assigned a task, do you typically meet with other folks on**

Page 27

**the projects to discuss how you're going to go about doing the task?**

A On a typical task, yes.

**Q Would you have expected that you and Mr. Johnsen may have met on this particular task to discuss how you were going to go about soliciting information?**

A We may have. I don't recall.

**Q For example, let me just give an example since I have one in front of me. For instance, you and Mr. Johnsen would have wanted to know who is going to talk to Mr. Fruehling so that you both don't send emails obviously seeking the same information, true?**

MR. STERN: Object to the form.

A I'm sorry. Are you waiting on me?

**Q (By Mr. Ekman, continuing) Yes.**

A Oh, what was the question?

MR. EKMAN: Read it back.

(Whereupon, the court reporter read back as requested.)

MR. STERN: Objection.

A I don't -- I don't know. I just don't recall any conversations with Mike Johnsen on this subject.

**Q (By Mr. Ekman, continuing) Did you guys work**

Page 28

**independent of each other or did you work together?**

MR. STERN: Object to the form, vague.

A I just don't recall Mike Johnsen having a big role in this effort.

**Q (By Mr. Ekman, continuing) You were the person who had the role in this effort?**

A (Nods head.)

**Q Yes?**

A Yes.

**Q Anyone other than you and Mr. Johnsen on a more limited role involved in this project?**

A I don't recall.

**Q I asked you -- one of my questions was I asked if you had spoken with Dairyland personnel outside of counsel being present concerning the damages claim, and you said you had not. Is that a true statement? Do you not remember if you spoke with somebody, or did you speak with Dairyland personnel concerning the damages claim?**

MR. STERN: Object to the form, damages claim, vague.

A No.

**Q (By Mr. Ekman, continuing) Which -- no, no, to what?**



"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 29

A I did not speak to anyone outside of counsel, within Dairyland about the damages claim.
Q What about Mike Johnsen?
A Not about the damages claim.
Q How about damages, did you speak with Dairyland personnel outside of counsel being present concerning damages incurred by DPC for the DOE not taking the spent fuel in January 1998 as per the NWPA standard contract?
MR. STERN: Object to the form. If you can answer.
A Re -- I'm sorry. Rephrase it again. I --
Q (By Mr. Ekman, continuing) The question is -- question I asked was, did you speak with Dairyland personnel outside of counsel being present concerning damages?
A Yes, it appears I did.
Q And you mentioned you and -- you and Mike Johnsen were tasked. You obviously sent an email to Mr. Fruehling to which he responded. And then my next question was, did you talk with anybody else other than Mr. -- Mr. Johnsen about DPC's damages?
A I seriously don't recall. It was a long time ago.

Page 30

Q Did you attend any meetings to discuss the damages in this case?
A No.
Q Okay.
(Michael A. Brasel Deposition Exhibit Number 2 was marked for identification.)
Q (By Mr. Ekman, continuing) I have a feeling I know where we're going to go with this, but I'll ask my questions. This is an email from Roger Christians to a variety of recipients, including you, Subject: Talking points for Duratek discussion. Do you see that?
A Yes.
Q Who is Duratek?
A A waste disposal company.
Q And what -- what is -- what were they doing in the 2004 time period, or proposed to be doing in the 2004 time period for LACBWR?
A I don't recall because September of 2004 I was involved in project manager of replacing two boiler tube sections in our coal facility. I don't recall these conversations.
Q All right. You see there's an email. It begins, Gentlemen, For our meeting tomorrow regarding the Duratek proposal. Do you see that?

Page 31

A Yes.
Q The last issue down there are damages claim against DOE. Do you see that?
A Yes.
Q And the second bullet under that says Brasel presentation of damages estimate and methodology. Do you see that? Did you attend this meeting, Mr. Brasel?
A No, I did not.
Q You did not. So you did not make a presentation of the damages estimate?
A No.
Q And you did not make a presentation concerning the methodology?
A No.
Q Do you know what method -- what methodology is this referring to?
MR. STERN: Object to the form.
A I don't know what you're talking about here, because I never -- again, I was full-time on the coal plant here, so I don't know what they were -- what this is all about.
Q (By Mr. Ekman, continuing) Okay. You're copied on this email, correct?
A Yes, yes.

Page 32

Q Did you respond to this email? Mr. Christians is who, the plant manager?
A Plant manager.
Q Did you take communications from the plant manager seriously?
MR. STERN: Object to the form.
A Of course.
Q (By Mr. Ekman, continuing) Of course.
A (Nods head.)
Q When you received this email, do you know if you sent a response that asked Mr. Christians what he was talking about?
A I don't recall.
Q Have you had any conversations with Mr. Christians concerning the damages estimate and methodology?
A No.
Q Do you know why Mr. Christians believed on September 1st, 2004 that you were an individual who would be able to present the damages estimate and methodology?
MR. STERN: Counsel the witness not to answer. The question calls for attorney-client communications or work product.



"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 33

MR. EKMAN: That's a yes or no question.
MR. STERN: I've counseled the witness. If you can answer without revealing attorney-client communications or work product, you can answer the question. But if you can't, then I'm instructing you not to answer. She can read the question back.
A Not without attorney-client privilege, I can't. No, I can't answer the question without violating the attorney-client privilege.
**Q (By Mr. Ekman, continuing) You've never had any conversations with any attorneys? You testified earlier that in this time period you never had conversations with attorneys directly?**
MR. STERN: Object to the form.
**Q (By Mr. Ekman, continuing) Is that true?**
MR. STERN: Mischaracterizes his testimony.
A We were instructed by an attorney to put this together.
**Q (By Mr. Ekman, continuing) So you are familiar with the damages estimate and methodology?**
MR. STERN: Object to the form.
A No, I'm not.

Page 34

**Q (By Mr. Ekman, continuing) When you say you're instructed by an attorney to put this together, what's the this refer to?**
MR. STERN: Object to the form. I mean, objection, instruct the witness not to answer.
**Q (By Mr. Ekman, continuing) Does the this refer to the damages claim?**
MR. STERN: Instruct the witness not to answer.
**Q (By Mr. Ekman, continuing) What methodology did you employ in assembling the damages claim?**
MR. STERN: Object to the form. Instruct the witness not to answer.
MR. EKMAN: On what grounds?
MR. STERN: You're asking him to reveal if -- if he put together a damages estimate and what methodology he used, and that calls for attorney-client privileged information and work product.
**Q (By Mr. Ekman, continuing) In connection with this case, did you turn over all your emails?**
A Yes.
**Q So to the extent that --**
A I turned them over to him.

Page 35

**Q I understand. Not directly to me. To the extent that you had an email saved responding to Mr. Christians, that would have been turned over, correct?**
A Yes.
**Q In other words, if there's an email that said, What the heck are you talking about, that would be saved somewhere or would have been turned over had it been saved?**
A Had it been saved, yes.
**Q And you don't know if you sent such an email to Mr. Christians?**
A I don't recall.
**Q You don't know if you -- did you, again outside of an email, did you go to Mr. Christians and say, Presentation of damages estimate and methodology, what?**
A Again, I don't recall. I was working at the coal plant full-time.
MR. STERN: For the record, we will be partially calling back this document which is PDPC0021072 for Item C, which is a privileged work product information.
MR. EKMAN: Well, and for the record, you're certainly aware, Mr. Stern, that in a

Page 36

published opinion Judge Hewitt found that Plaintiff's Counsel's assertion, that responses of PG&E employees to deposition questions regarding the preparation of Plaintiff's damages claim are, quote, covered by the work product doctrine, close quote. Attempts to stretch the doctrine beyond its recognized boundaries, that's a published opinion. Counsel for PG&E was -- was Greenberg Traurig in that particular case. Obviously we agree with Judge Hewitt. We will be filing a motion concerning this information. We do not believe it's work product. Certainly isn't attorney-client, not based on the answer he's given. We will leave this deposition open and we will be talking to Mr. Brasel again provided the Court allows us to. I'd also add, of course, to the extent he's relied upon by testifying experts, we certainly would be entitled to speak with him again to the extent that an expert identifies Mr. Brasel as someone from whom he received information. And even if it was information collected by Mr. Brasel, I believe we would

(Pages 33 to 36)

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 37

be entitled to talk to him. But we are going to leave this deposition open. These are the exact same objections that Judge Hewitt found again in a published order that were not supported by the work product doctrine, and she even noted that they were unlikely to be supported by attorney-client privilege. So I will be filing a motion.

MR. STERN: Let the record reflect that we respectfully disagree with Judge Hewitt's opinion.

MR. EKMAN: We have a new judge.

MR. STERN: Yes, we do.

**Q (By Mr. Ekman, continuing) Mr. Brasel, assuming that DOE did come on time -- let me ask you this. Are you familiar with the standard contract?**

A I know it exists.

**Q And you know when I say standard contract, you know what I'm talking about?**

A Yes.

**Q What's your understanding of that contract broadly?**

A That the Department of Energy is contracted to take our fuel by 1998. That's really the extent of it, my knowledge.

Page 38

**Q And when you say by, is it required to take all of it by 1998; is that your understanding?**

A I'm not familiar with it that --

**Q How do you have that understanding?**

A Just in discussions with plant staff at LACBWR.

**Q Okay. Why would you have had those kinds of discussions?**

A Because of the current involvement in LACBWR and the projects that are undergoing.

**Q All right. Assuming that the Department of Energy had come and begun removing spent fuel from Dairyland, would Dairyland have -- have been required to consider and evaluate how casks provided by DOE would be handled inside and outside the containment building?**

MR. STERN: Object to the form.

A I'm not that familiar with the standard contract to know.

**Q (By Mr. Ekman, continuing) This is outside the standard contract. I'm asking from a technical perspective. If you are going to handle a cask, do you need to evaluate how the cask will be handled inside and outside a containment building?**

A Somebody would, yes.

Page 39

**Q Okay. In advance of DOE removing fuel, would Dairyland also have had to evaluate the capacity of its facilities, its cranes, those kinds of things, to handle the DOE casks?**

MR. STERN: Object to the form, vague.

A Restate the question again.

**Q (By Mr. Ekman, continuing) Well, before you handle a cask, do you need to know that your lifting equipment can handle it, handle the weight of a loaded cask?**

A Per our license, yes, we do.

**Q All right. And do you need to know that the cask is going to fit through the right doors or --**

A Yes.

**Q Okay. What -- do you know what the crane capabilities were at LACBWR in 1998 in terms of the amount of weight that it was licensed to -- the crane was licensed to handle?**

A I wasn't here in 1998, so I don't know that.

**Q I understand that.**

A I can only speak to right now.

**Q Okay. What is it right now?**

A It is a 50-ton capacity crane.

**Q Single failure proof?**

A No.

Page 40

**Q And you said you can speak to it now. Do you know if there had been any modifications between 1998 and 2006 that have increased the amount of weight that that particular crane can hold?**

A No, there haven't been no modifications to increase the capacity of the crane (sic).

**Q All right. So if -- so that means then it would have been 50 tons back in 1998, as well, is that right?**

A I can't say that, but I mean, I guess -- I wasn't there in 1998, so I don't know what happened in 1998.

**Q Wouldn't have been more than 50 tons?**

A I doubt it.

**Q Okay. Do you know if LACBWR's loaded fuel, spent fuel from its fuel pool, is transported off site?**

A I know we have, yes.

**Q Before your time obviously?**

A Yes.

**Q Do you know the size of the casks that were used?**

A No, I don't.

**Q Do you know the weight of the cask that was used?**

A No, I don't.

**Q Do you know if there are any modifications that would be required to load fuel from Dairyland's**



"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 61

A I can look up the numbers, yes.
**Q And we know at least today the static dry storage is cheaper from an O&M perspective than the wet --**
A Yes.
**Q -- correct? And all I'm asking you is, you're an engineer, can you think of any situation in which that would be flipped, where dry storage O&M would be more expensive at a standalone ISFSI than just -- than having the fuel in the wet pool?**
MR. STERN: Object to the form, vague.
A Yeah, I guess I don't understand the question.
**Q (By Mr. Ekman, continuing) Is it more expensive to run active systems or passive systems?**
MR. STERN: Object to the form, vague.
A I don't know because I haven't run a passive system. I mean, I haven't -- we haven't run an on-site ISFSI, so I don't know.
**Q (By Mr. Ekman, continuing) But you make an educated guess that the O&M is less at a standalone ISFSI, right?**
A That's my educated guess. I'm not saying --
**Q Could you explain for me a situation where a passive technology would cost more than an active**

Page 62

**technology?**
MR. STERN: Objection to the form, vague.
A No, I can't, because it's vague. I mean, I don't -- I don't know enough about the passive systems yet. We're getting into that right now.
**Q (By Mr. Ekman, continuing) Do you believe that management should rely upon your estimates as to what you believe these systems are going to cost?**
A That's management's decision, not mine. I -- I can't tell them how to make -- how to make their decision. I can give them information to make their decision.
**Q I appreciate that. And they are going to make the decision on who to listen to. But do you believe that your information is reliable?**
MR. STERN: Object to the form, vague.
A I mean as far as I know at the moment.
**Q (By Mr. Ekman, continuing) Okay. So if Mr. Christians or Mr. Sans Crainte came to you and said, You know, Mike, we looked at your estimates, we're going to go with them; you wouldn't stop them and say, Wait, those are just guesses, Man, don't look at me?**
MR. STERN: Objection.

Page 63

**Q (By Mr. Ekman, continuing) You'd say, Okay, that's fine?**
MR. STERN: Objection.
A I wouldn't say that, but I would warn them that I -- I mean, I would talk to them about the basis for my educated guess, and that is just what it is, is an educated guess.
**Q (By Mr. Ekman, continuing) And you did provide an educated guess on the dry storage O&M costs, correct?**
MR. STERN: Objection to the form, mischaracterizes his testimony.
A Yes, I did, but I don't recall what they are.
**Q (By Mr. Ekman, continuing) And making -- yeah, and in making that estimated or educated guess, you certainly want to provide the most accurate information that you can to management, true?**
A Yes.
MR. EKMAN: All right. Let's take a break.
(A short recess was taken beginning at 10:35 a.m. and ending at 10:50 a.m.)
**Q (By Mr. Ekman, continuing) What is your position on the dry storage project team?**
A I'm the project manager.

Page 64

**Q And in that capacity, what's your role?**
A I'm responsible for completing the project and all planning efforts at this point.
**Q All planning efforts, is that right?**
A And I assign tasks, too, to staff, certain staff in their expertise.
**Q How long have you had a role in connection with looking at dry storage?**
A My first interaction was with the WPI project in the summer of 2002.
**Q And have you worked on the project at least intermittently since?**
A Intermittently I'd say, yes.
**Q What percentage of your work today is dry storage related?**
A Twenty percent.
**Q All right.**
**(Michael A. Brasel Deposition Exhibit Number 3 was marked for identification.)**
**Q (By Mr. Ekman, continuing) Mr. Brasel, unfortunately I only have one copy, additional copy. Handing you what's been marked Exhibit 3 to your deposition, it's an email. It's printed by Mr. Sans Crainte, but it's from you to a variety of individuals, including**



"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Page 161

**Q And you don't know why the DOE litigation is referenced in this document?**
A I do not.
**Q Do you know who wrote this report for Duratek?**
A I do not -- I don't know the exact author.
**Q You were not involved at this time in --**
A Partially. Not to the extent I am now.
**Q Mr. Johnsen would have been more involved than you?**
A Yes.
**Q Do you know how the $4 million figure was calculated?**
A No, I do not.
**Q Do you know if that's an accurate figure for the difference between the cost with fuel versus the cost without fuel?**
A No, I do not.
**Q Have you been asked -- have you been asked to look at that?**
MR. STERN: Objection to the extent it calls for attorney-client communications. Instruct the witness not to reveal any attorney-client communications. If you can answer the question --
A I'll say to that, no.

Page 162

**Q (By Mr. Ekman, continuing) Is that -- is that, no, you haven't been asked to look at it, or, no, you can't answer because it reveals attorney-client privilege?**
A No, I can't answer because it reveals attorney-client privilege.
**Q Well -- oh, man. You don't know how they came up -- how this estimate of $4 million was calculated, right?**
A No, I do not.
**Q There's a reference to an $830,000 FTL, Fuel Transfer Liner. Is that what that means?**
A Yes.
**Q What is the Fuel Transfer Liner?**
A It's a concept that we came up with, together with Duratek, once we were exploring options to remove the reactor pressure vessel since we had planned on using the reactor vessel as a means to load casks and then subsequent work on dry cask storage. We needed to know whether -- what were the feasible options of -- of being able to load fuel and remove it from the building. And this was the concept we came up with.
**Q Is it what you're doing?**
A We haven't got that far. We're -- we're taking

Page 163

it to the next step right now.
**Q Now, there's a mention in this paragraph about the segmentation option. Again, segmentation option is not the preferred option?**
A No, it is not.
**Q And it's probably not one you would have done even if fuel hadn't been in the pool?**
A Probably not.
**Q Who at Dairyland would know about the $4 million estimate in this document, if anyone?**
A Nobody.
**Q Do you know if Dairyland -- Dairyland has not installed any portion of the FTL, right?**
A No.
**Q Do you know if they've paid for any portion of the FTL yet?**
A No.
**Q You don't know or they have not?**
A We have not.
**Q Paid?**
A We have not paid.
**Q Would a Fuel Transfer Liner have been necessary if the fuel had been removed from the plant?**
A Restate your question again.
**Q Yeah. Would the fuel -- would a Fuel Transfer**

Page 164

**Liner be necessary if -- if the fuel was gone?**
A No.
**Q The only purpose it serves is to facilitate loading, cask loading?**
A That's correct.
**Q Did Dairyland get an estimate from more than one company or did Dairyland just go with Duratek?**
A For what project, the RPV removal?
**Q Yeah.**
A I wasn't involved in the early decision-making. I was next-door at the coal plant, so I don't know.
**Q Why is it that -- why is it that Dairyland went, decided to proceed, with the RPV removal?**
A The primary --
**Q Now.**
A The primary reason is the closure of Barnwell to out-of-compact states.
**Q And that's slated to occur in 2008, is that right?**
A It's slated to occur June 30 of 2008.
**Q Do you know when that announcement was made, that --**
A I do not.
**Q Who would know about the historic status of**

(Pages 161 to 164)

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

7/28/06
DPC
18

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S RCFC 26(a)(1) DISCLOSURES

Pursuant to RCFC 26(a)(1) and the Court's Orders of May 1, 2006 and May 23, 2006, Dairyland Power Cooperative ("Dairyland") provides the following disclosures:

A. Witnesses

The individuals listed below are likely to have discoverable information on the noted subjects that Dairyland may use to support its claims. These individuals are represented by counsel, and the government should only contact the witnesses through counsel.

Michael A. Brasel, LACBWR,[1] (608) 689-4220. Spent nuclear fuel and high-level radioactive waste (together, "spent fuel") management issues at LACBWR. Removal of the reactor pressure vessel ("RPV") from the LACBWR containment building. Dairyland's consideration of alternatives to on-site wet pool storage.

Roger E. Christians, LACBWR, (608) 689-4216. Spent fuel management issues at LACBWR.

[1] This abbreviation is being used to note individuals located at the La Crosse Boiling Water Reactor ("LACBWR") plant. The address for LACBWR is S4601 State Hwy 35, Genoa, WI 54632.