IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Electronically filed: January 23, 2007

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S REPLY ON ITS MOTION TO COMPEL DEPOSITIONS

The government's response to Dairyland's motion to compel depositions reflects a pattern of government efforts to deprive Dairyland of any meaningful discovery. The government's focus on burden of proof – that Dairyland must establish its need for the depositions as opposed to the government establishing a need to avoid them – is both wrong and wrongheaded. The government is wrong on the procedural issue. It is the government's burden to show why the depositions should not be had. More fundamentally, however, the government fails to offer any reason why it would be burdened by the few depositions Dairyland seeks. Conversely, Dairyland has legitimate issues to address in these depositions; accordingly, the Court should permit Dairyland to take the depositions.

1. The government is wrong on the burden of proof issue

The government spends the first third of its response to Dairyland's motion arguing that Dairyland must establish a need to "re-open" the depositions of Messrs. Kouts, Pollog and Zabransky because Dairyland may use prior depositions of these individuals taken in other spent fuel cases as if they were taken in Dairyland's spent fuel case. The government's argument is

wrong from the get go. The Court's rules provide parties with flexibility to obtain discovery by any of the means provided in the Rules. *See* RCFC 26(a)(5). Regarding depositions, the Court's Rules generally provide for ten depositions per side. RCFC 30(a)(2). This Court's Standard Special Procedures (entered in this case by Order of March 4, 2004) generally permit 5 depositions per side and more if the parties agree. ¶ 9.d.ii. Dairyland has not objected to the government taking seven depositions of current and former Dairyland employees.

The depositions of Messrs. Kouts, Pollog and Zabransky (and others) taken in other spent fuel cases neither count against Dairyland's allotment of depositions in this case nor do they count as Dairyland's opportunity to depose those individuals. The wording of the Court's Rules limiting depositions are clearly focused on depositions that are actually taken by the parties in the case at hand. RCFC 30(a)(2)(A) ("a proposed deposition would result in more than ten depositions taken . . . by *the plaintiffs, or by the defendants, or by the third-party defendants*."); RCFC 30(a)(2)(B) ("the person to be examined already has been deposed *in this case*") (emphases added). None of the various cases cited by the government stands for the proposition that depositions in another case may count as a party's opportunity to depose a person consistent with RCFC 30(a)(2)(B), and we are aware of no such authority.

The government's opposition totally confuses the issue of the *use* of depositions in other cases in this case. First, contrary to the government's assertion, *see* Govt. Resp. at 7, RCFC 32(a) does not specify circumstances in which depositions taken in prior proceedings may be "treated as if they have been taken in a subsequent proceeding." Rather, the Rule explicitly is limited to addressing the *use* of depositions (both those taken in other cases and those taken here) in this case. Second, RCFC 32(a) makes clear that "[a] deposition previously taken may also be used as permitted by the Federal Rules of Evidence." Prior depositions of Messrs. Kouts, Pollog

and Zabransky (and other government personnel) are admissible as admissions of the government pursuant to RCFC 801(d)(2)(D). *See, e.g.*, *Globe Savings Bank. v. United States*, 61 Fed. Cl. 91, 95 (2004). Given the admissibility of those depositions pursuant to that Rule of Evidence, Dairyland need not establish that it may also use the depositions pursuant to RCFC 32(a). *Id.* Third, the government's focus on the fact that Dairyland's counsel represents other spent fuel plaintiffs, Govt. Resp. at 8, has no appropriate place in the analysis. Under RCFC 32(a), the identity of counsel of the party seeking to use the deposition is irrelevant.

2. <u>Dairyland's need for the depositions outweighs their burden to the government</u>

Remarkably, the government's response to Dairyland's motion makes almost no attempt to demonstrate any burden from providing the depositions sought by Dairyland. In fact, the government acknowledges that a deposition of seven hours is not burdensome. Govt. Resp. at 13. The government notes that the individuals would have to "prepare" for the deposition, *id.*, but given that Messrs. Kouts, Pollog and Zabransky have been deposed before in the spent fuel cases (numerous times as emphasized by the government) and have testified at multiple trials, they should not need much preparation. Lacking from the government's response is any assertion, much less an affidavit, declaration or other evidence, that Messrs. Kouts, Pollog and Zabransky have anything more important to do. Indeed, the only demand on these officials' time noted by the government is their testimony on behalf of the government in other spent fuel cases. *Id.* at 13-14. This absence of other work should not be surprising since these officials' assignments at the Department of Energy concern waste acceptance, and DOE is not realistically expected to start accepting waste from utilities until at least 2020. *See* Report by National Conference of State Legislatures of presentation of Edward Sproat (Director, Office of Civilian Radioactive Waste Management, DOE) before The National Academy of Sciences, Nuclear and

Radiation Studies Board, November 29, 2006, available at https://www.ncsl.org/orgrams/environ/cleanup/NAS1106.htm, A1-6.

Conversely, Dairyland has substantial need for these depositions notwithstanding these officials' testimony in other spent fuel cases. First, there are a number of Dairyland-specific issues to be covered. For example, Dairyland personnel held discussions with DOE officials in 2002-04 regarding Dairyland's efforts to mitigate its damages caused by the government's breach of contract. *See* Documents produced in discovery referencing discussions. A7-18. Dairyland should be entitled to discover the government's recollections and understanding of what transpired in those discussions. Other Dairyland-specific interactions with DOE include analysis of options for delivering spent fuel from the Dairyland site to the government, treatment of Dairyland's delivery commitment schedule ("DCS") correspondence, and work on the Private Fuel Storage effort.

Second, there are new subjects to be addressed that post-date the depositions of the DOE officials in other spent fuel cases. For example, the government has a new plan to use transport, aging and disposal canisters in conjunction with its Yucca Mountain. *See, e.g.*, 71 Fed. Reg. 60490 (October 13, 2006). Dairyland seeks to discover the government's plans on this issue to help bolster Dairyland's claim that its similar efforts to use multi-purpose dry storage canisters for its spent fuel in the face of DOE's failure to open Yucca Mountain on time have been reasonable. Elsewhere, the government has suggested that the use of multi-purpose dry storage canisters by utilities is problematic. *See, e.g., Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 285-86 (2006). And thus far, the government has declined the opportunity to take this issue off the table in response to Dairyland's contention interrogatories. Thus, Dairyland should be permitted to take discovery which may be helpful on this issue.

Testimony on other issues warrants updating since prior depositions given by the DOE officials on issues that are relevant to Dairyland's current claim for damages. As noted in the motion, Mr. Kouts has apparently obtained new and different knowledge since his prior depositions. In another example, Dairyland needs to update testimony on when DOE expects to remove Dairyland's spent fuel. Dairyland is seeking recovery of costs for the initial planning for an at-reactor dry storage facility that is expected to become operational in 2009. In prior testimony, Mr. Kouts and other DOE officials testified that DOE expected to start removing utility spent fuel in 2010. *See, e.g.*, *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 643-45 (2004), *aff'd*, 422 F.3d (2005). If DOE were truly expected to begin removing Dairyland's spent fuel in 2010, the reasonableness of current expenditures for a dry storage facility that would only become available a year before might be questioned. As noted above, however, current expectations are that DOE will not perform for a significant period of time. Dairyland should be permitted to take discovery on this issue from the relevant DOE officials to help bolster Dairyland's arguments that the mitigation expenditures it has made have been reasonable.

In addition, the government's arguments on the issues have changed in ways that warrant additional discovery. At the time many of the depositions of these DOE officials were taken, the government's primary argument regarding the rate of spent fuel acceptance was that its obligation was limited by the extent to which it had approved DCSs for a utility, and that such approved DCSs are binding. *See Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 666 (2003). More recently, the government has argued that the Standard Contracts create a "mechanism" for the development of a spent fuel acceptance schedule. *See, e.g.*, Defendant's Memorandum in Support of Its Rule 52(c) Motion in *Systems Fuels, Inc. v. United States*, No.

03-2624 (Fed. Cl. filed Dec. 20, 2006) at 7, excerpt at A19. Dairyland should be permitted to take discovery that focuses on the government's current theory on this issue.

Dairyland should also be permitted to confirm that key portions of the DOE's officials' testimony has not changed with the passage of time. The government asserts that any such changes "are best addressed at trial through the traditional avenues of impeachment." Govt. Resp. at 12. But the government does not attempt to explain why its witnesses should be permitted to surprise Dairyland at trial. Indeed, a substantial reason for the provision of discovery in this Court is the avoidance of surprise at trial.

Contrary to the government's assertion, Govt. Resp. at 14, Dairyland does not contend that its counsel should not be required to review the existing depositions. Indeed, Dairyland intends to not only review but also to make full use of the body of existing discovery. Indeed, the use of such depositions is how Dairyland believes it can limit the number and length of depositions that it needs to take. But as Dairyland explained in its motion, valuable deposition time would be wasted if the government were permitted to argue in the course of the few depositions that Dairyland seeks to take that individual questions should have, or could have, or in some form may have, been asked at a prior time.

Relatedly, the government's two requests for relief if Dairyland is permitted to take depositions of Messrs. Kouts, Pollog and Zabransky, that Dairyland be barred from using past depositions of these officials and that the depositions not be distributed to other spent fuel plaintiffs, Govt. Resp. at 15, are utterly without merit. The government offers no grounds for these requests, and there can be none. Although Dairyland needs to supplement the prior depositions of these DOE officials, that is no reason for Dairyland and the Court to not make use

of these witnesses' prior statements.[1] Likewise, there can be no proper reason for hiding any new testimony from these DOE officials from other spent fuel plaintiffs. These government requests indicate most clearly that the government's true goal is to hide the truth, even when it is in the form of sworn statements from its own officials.

3. <u>Dairyland should be permitted to take a RCFC 30(b)(6) deposition</u>

The government's arguments against Dairyland's proposed RCFC 30(b)(6) deposition suffer from the same flaws as its arguments against the other depositions. Indeed, Dairyland does not anticipate that its RCFC 30(b)(6) deposition would require the government to proffer a witness in addition to the three sought by Dairyland for individual depositions. Since Dairyland seeks to depose the three officials who the government has been using as its primary witnesses in recent spent fuel cases, Dairyland expects the government to use some combination of those same witnesses to address the 30(b)(6) topics. Thus, there should be very little burden to the government of providing Dairyland with this discovery.

The government argues vaguely that Dairyland should be able to find all of the information sought in the deposition it seeks through the existing record of depositions. Govt. Resp. at 17. Importantly, the government ignores the fact, explained in Dairyland's motion at 7, that the Rule 30(b)(6) deposition permitted in 2002 during "common discovery" was quite limited.

There are at least four additional flaws with the government's argument that the existing deposition record should suffice. First, a number of the topics are Dairyland-specific. *E.g.*

[1] Dicta in *Pesterfield v. Sunbeam Corp.*, 2005 WL 1076293 at *3 (E.D. Tenn. May 6, 2005), suggests an inclination to provide a choice between using new or prior depositions in that case. There, however, the relevant testimony in the depositions was on a relatively narrow, single incident (alleged injuries resulting from use of a product) rather than the very substantial work over many years (and ongoing) that characterizes the involvement of the government deponents in the spent fuel litigation.

topics 14-20. The government argues that topic 14 has been addressed previously. Govt. Resp. at 18, 22. This assertion is clearly wrong. Dairyland has described this topic explicitly as including plans for handling of Dairyland's failed fuel, a topic that has not been addressed previously in any deposition of government personnel. Second, as explained above, some of the issues to be addressed post-date the RCFC 30(b)(6) depositions taken in other spent fuel cases. *E.g.* topics 3, 21. Third, as explained above, Dairyland should be permitted to update the government's testimony on key issues to avoid surprises at trial. The Rule 30(b)(6) depositions to which the government seeks to limit Dairyland are now five years old. Fourth, some of the prior testimony upon which the government argues Dairyland should rely is not testimony of a government designee; thus, the government does not even contend that it has provided the government's definitive view on these issues (topics 2, 6, 7, 8 and 14). *See* Govt. Resp. at 18-19.

The government argues that some of the topics listed by Dairyland are duplicative of some of the issues covered by Dairyland's contention interrogatories. Govt. Resp. at 20. The government's contention is remarkable because the government has refused to answer those interrogatories. Moreover, there is nothing wrong with some overlap in the discovery Dairyland seeks. Dairyland has sought the contention interrogatories to obtain the government's initial statement on these issues. Dairyland would then use the interrogatory responses to help narrow its exploration of these issues in the Rule 30(b)(6) depositions. Given the government's evasiveness in its responses to Dairyland's interrogatories, it is important that Dairyland have the opportunity to follow-up on government's statements as provided for in a deposition. And there should be no extra burden to the government of providing the interrogatory responses in addition to the depositions since the government has to develop its positions on these issues in order to prepare for the depositions.

The government's reliance on *Exxon Research and Eng'g Co. v. United States*, 44 Fed. Cl. 597 (1999) and *McCormick-Morgan, Inc. v. Teledyne Indus, Inc.*, 134 F.R.D. 275 (N.D. Cal.), *rev'd in part*, 765 F. Supp. 611 (N.D. Cal. 1991), for the proposition that contention interrogatories are preferred over RCFC 30(b)(6) depositions, Govt. Resp. at 20, is misplaced. Those cases addressed the use of corporate designees to address specialized and legal-oriented issues of patent claim construction. Here, Dairyland seeks factual testimony from the government regarding the reasonableness of some of Dairyland's mitigation efforts.

The government's arguments concerning current expectations regarding future DOE performance, Govt. Resp. at 21, ignore the relevance of those expectations to the reasonableness of Dairyland's current mitigation efforts as explained above. Further, the government should not be permitted to avoid this discovery by making vague references to information that may be available from other sources such as unspecified statements "to Congress and others." *Id.* The government knows well that Dairyland is entitled to obtain discovery that it can use as evidence at trial.

4. Reinstitution of "Coordinated Discovery" is not appropriate

The government's request, Govt. Resp. at 23-24, that coordinated discovery be instituted if Dairyland is permitted to take the depositions it seeks is without merit. Dairyland seeks to take three depositions, plus a Rule 30(b)(6) deposition (which can hopefully be combined with the other three). Those depositions, which may not even each require a full day, could easily be scheduled and completed in a manner that does not waste the parties' time or resources and would not delay litigation of this matter.

In contrast, the government's vaguely-defined request for "coordinated" discovery would result in a mess. As the government notes, Govt. Resp. at 1, there are more than 50 pending

spent fuel cases before most of the judges of the Court. These cases are in widely varying postures. In the great majority, now is not the appropriate time for the plaintiffs to be taking depositions of government officials. Indeed, many judges, at the joint requests of both plaintiffs and the government, have stayed spent fuel cases pending developments in other cases. There is no means to get all of these cases on the same schedule, certainly not without grossly delaying Dairyland's case. Moreover, as reflected in the government's chart of prior depositions, Govt. Resp. at A1-4, the depositions taken during coordinated discovery tended to be extended, multi-day affairs. Accordingly, the Court should see the government's request for coordinated discovery for what it is – an effort, contrary to RCFC 1, to make this litigation more expensive and time consuming for plaintiffs and the Court.

For these reasons, the Court should compel the government to cooperate in the scheduling of the depositions of Messrs. Kouts, Pollog and Zabransky and a Rule 30(b)(6) deposition on the topics noted in Dairyland's motion.

Respectfully submitted,

January 23, 2007

s/ Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

# APPENDIX

# Index to Appendix

Report by National Conference of State Legislatures of Presentation of Edward Sproat before the National Academy of Sciences, Nuclear and Radiation Studies Board, November 29, 2006 .......... A1

Documents Produced in Discovery Referencing Discussions .......... A7

Defendant's Memorandum in Support of Its Rule 52(c) Motion, *Systems Fuels, Inc. v. United States*, No. 03-2624 (Fed. Cl. filed Dec. 20, 2006) .......... A19

NATIONAL CONFERENCE of STATE LEGISLATURES

## The National Academies, Nuclear and Radiation Studies Board

Fifth Meeting November 29, 2006
in Washington, D.C.

---

**New Developments in the Yucca Mountain Program (YMP)**
***Edward (Ward) Sproat, Director; DOE-Office of Civilian Radioactive Waste Management (OCRWM)***
(PowerPoint available upon request)

NAS key reports:
Times report - 1995
Adaptive Staging Report - One step at a time (love idea). Regulatory regime not adaptive though.
Going the Distance (good report)

Milestones
Focus on License Application (LA) submittal no later than June 2008.
Best achievable opening of Yucca, March 2017. Not most probable.

3 components:
1) Between today and LA - 18 mo. Will meet that. -4 mos., plus 0.
2) LA and Construction authorization. Three years of litigation may occur. -0, plus 4 years.
3) Construction auth and opening repository. -0, plus 1½ years.
Total = -0, plus 3½ years most likely realistic schedule.

Program Strategic Objectives
1) LA different approach this time that will allow quick process, docketing and turnaround.
2) Just as important, train competent OCRWM office to progress YMP and run it.
3) Spent Fuel Contracts, address federal govt. mounting liability - ½ billion per year.
4) Develop and begin implementation of transportation plan. Has been under-funded since focus on future importance, but should be doing now. Get states and locals involved in all aspects. Fully behind NAS study recommendations. Currently looking into how to meet those recommendations.

Key Issues Update:
Legislative, S.2589:
Land Withdrawal
Capacity Limit
Waste Fund Receipts Reclassification - access to NWF receipts, $750 million/year, without it counting against the Federal Budget Deficit.

FY2007:
House passed budget, Senate did not. Probably won't in lame duck. May go on continuing resolution (CR) until next Feb., March. Don't know how it will end up.

Revision to EPA Standard 40 CFR 197:
Post closure performance standards at Yucca Mountain (NAS report)
Being released end of year, maybe January. Now in interagency review, including EPA. DOE doesn't need it to submit their LA, but NRC
will need it to give the license.

A1

Thoughts on Adaptive Staging:

Turn science into engineering design

i.e. - magma intrudence, how to design to avoid it

Theory versus practice

See conversation on NAS books above. Regulatory regime - should design facilities to maximize retention and capture of fission products for maximum period of time.

Operation - putting waste in, maybe allow for retrieve-ability if something comes up, or for recycling. But at some point must make decision to close repository and leave it there. Should do this 100 years or so into the future. Part 63 requires this now though, before construction license can be granted. This is backward. 100 years from now, NRC will not require any further studies before it is permanently closed. This is too front-loaded.

Regulatory compliance - up to a million years. Only attorneys for state of NV think this is a good idea.

One Step at a Time report - Cannot do with the current regulatory regime. Next book should be called - "....for a million years."

Q - How can we make adaptive staging doable?
A - Change Part 63. May be too late to change though - not helpful in short term since submitting LA soon.
When standard (peak dose year) comes out, will be litigated. Uncertainty bands will bring out dueling PhDs - for at least 8 years. If this group can clarify meaning of word versus how enacted, that would help in anticipation of litigation.

C - Committee persuaded that part 63 could be applied flexibly. Then current design was for un-failed fuel in a single package - hypothetical reservoir. Booklet cautious. Committee said this is not fitting with their thinking.
A - Phased adaptive approach allowed in some instances.
Licensing process (part 63), is very heavily front-end loaded. Long-term analysis prior to construction authorization. Counter to intent of report.
C - Meant to recognize possible litigation and dispute it.

Kevin Crowley -
2 reports - not just technical, but to bring public along. Societal consensus a big reason for adaptive staging recommendation.
10CFR63 - Could you not propose something slightly different than in regulations if say you will meet them and how/when appropriate?
A - Yes, I did so with licensing a reactor. But there are specific factors within the law that the Commission must find to grant construction. Post closure performance criteria very specific, set by EPA.

C - Experience with reactor LA may be a detriment.
A - Reasonable assurance and reasonable expectation a nuanced difference.

Q - Supplemental EIS?
A - Just starting. Look at differences in repository now from original site characterization.

Differences include:
Surface facility - dry to wet for fuel canisters that come in and need to be repackaged in a TAD.
Surface layout changed.

Q - Legislation. Going to Congress to require NRC to determine capacity for NRC. What if don't get answer back in time for Yucca?
A - EIS assumed about double capacity - approx. 125,000. Can argue in front of NRC with LA.

Kevin Crowley, NAS - Interim Storage on Senate side. Are you thinking of centralized interim storage at Yucca?
A - Under existing law, can't do interim storage anywhere except Yucca and only after licensed.
Accumulation of government liability - alternative to reduce taxpayer burden? Maybe interim storage a solution, but depends on many aspects. Interim Storage only makes sense for two reasons - waste confidence, reduce govt. liability.
Doesn't fix waste confidence though, can be done through legislation or NRC changes. Second reason depends on many factors such as when, where, etc.

**New Developments in the Global Nuclear Energy Partnership (GNEP)**
***Dr. Paul Lisowski, Deputy Program Manager; DOE, Global Nuclear Energy Partnership***
(PowerPoint available upon request)

Office of NE reorganized.

GNEP basics:
A national strategy based on presidential initiative. Lots of plans, not much funding yet.
Need because of rising energy demand.
World electricity demand to increase by 200% in 25 years
US by 65% in 25 years
Environmental concerns, proliferation concerns

Goals:
Reducing burden of geologic disposal. Waste volume, heat load, toxicity - extend use of repository through 21st century. Have to change legislation though.
Recover energy value in SNF
Reduce proliferation risks

US Program Elements:
Expand nuclear power
Minimize burden from SNF
Develop advanced recycle technology
Develop advanced burner reactors
Enhance nuclear safeguards technology
Establish reliable fuel services
Promote exportable reactor

Once-through fuel cycle - instead transuranics into fuel to burn in advanced burner reactor. Transmutation fuel separation, transuranics, with uranium, back to fuel, fission products process losses.

Developing a reliable international fuel service is an essential part of reducing proliferation risk.

Technology base:
40-year base of experience with liquid metal fast reactors and test reactors in US.
Foreign reprocessing
Major technical risk area for GNEP is transuranic recycle
GNEP will have an R&D program element to address technology risk.

Deployment plan for GNEP now to include industry and R&D activities.
Operate commercial-scale advanced recycling and burner reactor in US as early as 2020-2025.
Store
Close technology gaps.

Supporting this approach requires both R&D and technology development components.
Long-term

Reprocessing and fast reactor - industry side
Transmutation on federal facilities (AFCF), because of materials handled

Domestically:
18 expressions of interest (EOIs)
Grants for detailed study of potential host sites - 14 applicants. Announcement today for 11 site grants.
Programmatic EIS in Summer 2008
June 2008, Secretarial decision on GNEP going forward. His office to inform.

At a minimum, should restore intellectual faith in nuclear power. This is up to full GNEP program.

International partnerships:
Supply reliable fuel service that cannot be resolved in commercial market.
Reduce need for countries to enrich themselves.
Intl R&D partnerships

Q - Ambitious undertaking. In part to address carbon cycle. How many reactors would be required?
A - Want to close the fuel cycle over 100 years. Fleet of reactors a mix of light water and fast reactors (1/3). Grow as fast as industry will grow it - by 2030 may be expedited (one reactor every five years?). Impact on carbon cycle long term, not short.
Q - But 2050 is tipping point. Wouldn't address that.

Q - DOE roadmap on recycling buried in past because it was deemed too expensive.
A - Do have an economic model. Cost of implementing once-through versus closed. Closed a bit higher, but govt. responsibility to handle waste and need innovation. So maybe cost-sharing.

Q - What is spurring this? Are foreign partners putting money into this?
A - Proliferation issue overrides many other issues. Foreign countries are putting in money. Our transuranic fuel in a French reactor now. Talking with Russian federation. Some work will be underwritten by Russian research.

C - Member of NAS panel worked in closed fuel cycle. EBR2 system. Fuel went for 5 cycles. Reactor design changes to handle re-fabricated fuel. Program you've laid out - going to industry for some parts, going to govt. for others - not going to work.
No interchange between reprocessing people and fuel people.
A - Requirement for integration may come out of thinking.
C - No need to consider reprocessing fast reactor fuel.

Q - China? etc., any conversations with them using it?
A - He hasn't spoken with China. Japan and France important too. Intl program not formed yet. Details not worked out.

Q - Commercial scale facilities don't make sense now?
A - Commercial scale encompass big range. Long start up period.

Q - System as a whole. If priority was to avoid proliferation, then could do so with no nuclear energy. If intent to reduce waste - different set of priorities. Needs systems analysis. Set of building blocks have not been sized to build a total structure. Must do early before apportion money.
A - Fuel supplier states can take back fuel. If US not part of that, can't establish rules for non-proliferation.
C - If no Yucca Mountain problem, and can store cheaply, would have to justify fast reactor expense. Internationally - priorities may be different. Do you have a shared intl systems model?
A - Systems analysis in 2007 budget. Have only looked at the US so far.

Kevin Crowley, NAS - AFCF?
Prototype of a world class research facility to discover how to burn transuranics. This happens before industry side. Research scale before commercial scale.

***Outgoing Majority Chief of Staff for the House***
Comment - Don't see reduction in House in support for Yucca. Think Sproat doing excellent job and giving realistic schedule. Questions about timing, but useful.
GNEP - agencies often defend president's budget request to the death. But this agency being flexible. Congress trying to understand changes. Several big challenges:

- FY 2007 appropriations (House passed, Senate didn't, likely to pass CR til next Congress. May turn into a year-long CR). Could tighten GNEP funding more than Yucca.
- Change in political landscape. NV holds stronger hand now with Reid. May change Sproat's schedule. Don't think House will change, Senate not certain yet.

- GNEP - not much difference between Dems and Reps. Interest groups on some sides not as comfortable about nuclear energy and waste. Not dead necessarily, but raises bar on need to persuade Congress. Worthwhile to at least explore process, but can't get funded at full level for exploring. That is why House passed half as much funding as budget request. Not enough meat on bone. Need to link R&D and commercial reactors, those producing with those selling.
- Timing issue. Safety and Security. Financial Liability. NRC waste confidence if Yucca full, yet not built. Need some interim solution: interim storage, fast-track Yucca, early implementation of off-the-shelf commercial reprocessing? Sproat/Yucca - slow and steady and get it right. GNEP/Industry - working with industry, but not putting hands on fuel until 2020 or 2025. This is why interim storage necessary. Senate has version too. Since Yucca and/or reprocessing far out, need to move now with what can do.

Opportunity and challenge for board. Recycling needs to be fleshed out to determine development, costs, waste streams. Congress may need NAS to independently assess technology.

Kevin Crowley, NAS - GNEP and global warming. Something has happened in last 6 mos. to give this issue (GW) more weight.
A - Yes, he has observed shift on both sides. May result in investing money more into Office of Science for carbon sequestration, etc. Sierra Club, nuclear best solution in near term. Much of environmental community hasn't bought in yet though. Probably more debate in the future, may have to make case stronger to pass.

Kevin Crowley, NAS - Interim Storage, not a partisan issue.
A - Golden opportunity - take closed reactor fuel first. Start moving as sign of good faith to ratepayers and utilities. This will help waste confidence. His subcommittee doesn't think legislating it away is an honest step.

**New Developments in Environmental Management (EM), including technology road mapping**
***Mark Gilbertson, Deputy Assistant Secretary for Engineering and Technology; DOE-EM***

House Appropriations committee requested a technology roadmap in FY07, due in January. But because of CR and uncertainty in request, went to Hill to seek guidance. Schedule not due til end of March. That is when Congress will generally pass judgment on new budget.

Potential for committee to do workshop. Scientific and technical needs assessment have been done by NAS for EM in past. EM currently restructuring. Funding changes last few years - external technical reviews, however, show implementation of big projects require more funds for technical risk. Helped with a roadmap. Initial one will be a letter report, not as robust as future ones, because of time constraints. Roadmap includes funding increases. Troubled with CR.

Asked NAS to gather info from labs on their concerns regarding technical risks. Hope for more honest feedback.

Second piece - asked for a phase two study. Support from National Labs, but subcontracted out. Do that on an annual basis. Are investments in labs based on history? What about WTP? What kind of assistance will EM need from labs in future?

What critical infrastructure do you need from universities? Why not focus on those. We do fund them at a lower rate than labs, but business decision. May warrant phase 3 study.

Q - Boundaries of Science and Technology programs. You are with EM, but what about related parts of DOE - those other offices in charge of cleanup (NNSA), and OLM.
A - That is small in overall size, but agrees there is synergy there. They do invite other groups to workshops, etc., but don't have mandate across other offices.

Kevin Crowley, NAS - October workshop useful.
This study might end up addressing a look at intellectual resources not only at labs, but within offices. This could be phase two.
A - Outside group can help restore our credibility, make right investments in future.

Kevin Crowley, NAS - Stay connected to Office of Science in doing this study.

*(Rest of presentation)*

Tank waste:

Workshop in December on cementatious materials for low-level D&D? Supported by Vanderbilt and SRS. Bringing in NRC and EPA. Modeling timeframes.

Press release for Waste Determination for closure of Idaho tanks. Started to grout smaller tanks. Major milestone. That activity informed by NAS and NRC work.

Sequencing of work - taking to heart issue of potential new technologies for removing waste from tanks (additional materials from tanks 18 and 19).

EM being more open with technical issues. Bulk vitrification technical review available. Report states that technology in beginning stages. Team didn't see fatal flaws that couldn't be addressed with a concerted effort, but need that effort.

Dec., early January - external technical review will be available for external salt reprocessing facility. QA and ability of engineering firms. Need to pay attention to them.

Then hold a root cause analysis session to address things in a proactive way.

Overall Program Goals for 07:

Rispoli's utmost priority is safety performance.
Project mgmt. Now at 50-60% of performance acceptance. Want to be 90%.
Designing, constructing, managing waste mgmt. infrastructure to reduce health and environmental risks.
Reduce technical uncertainty - NAS can help.
Better with stakeholder, more transparent. External reviews. National meeting going on now.
NAPA review of their program in terms of human capital.

Q - 10 million R&D program recommendation?
A - Can't talk about '08 budget formulation. Committees heard though and are plus upping it. If done with assessment by March, can use in '08 budget, if not, in '09.

Q - Still supporting graduate programs to mold future EM employees?
A - No, but new intern program. Establish pipeline. May include fellowships at national labs.

Environmental Management of Federal Facilities Web Page

© 2007 National Conference of State Legislatures, All Rights Reserved

**Denver Office:** Tel: 303-364-7700 | Fax: 303-364-7800 | 7700 East First Place | Denver, CO 80230 | Map
**Washington Office:** Tel: 202-624-5400 | Fax: 202-737-1069 | 444 North Capitol Street, N.W., Suite 515 | Washington, D.C. 20001



"Lake Barrett"
<lake@lbarrett.com>

01/18/2004 08:56 PM

To: "Brian Rude" <bdr@dairynet.com>, "Chuck Sans Crainte" <cvs@dairynet.com>
cc: <rec@dairynet.com>, "Ernie Tremmel" <Trem62004@yahoo.com>, "Tom Zaremba" <tzaremba@wheelerlaw.com>
Subject: Notes from January 16th DOE/Dairyland Spent Fuel Meeting

Hi Brian & Chuck,

Here is my draft summary of the meeting and some background on settlements

On January 16th Chuck Sans Crainte, Brian Rude, Roger Christians, and Lake Barrett met with DOE/RW to discuss possible joint LACBWR spent fuel demonstration projects. This was follow-on to our November 20, 2003 introductory meeting on the same subject. We met with Margaret Chu, Director of the Office of Civilian Waste Management, Paul Dickman, Policy Advisor, and Dave Zabransky, lead staffer responsible for utility waste acceptance issues and the DOE/utility contract. The meeting started at 10:00am and Ms. Chu stayed until 10:45, Paul Dickman until 11:00am, and Dave Zabransky until 11:45. Ted Garrish, Deputy Director of OCRWM, greeted us, but did not stay for the meeting. Ted did not want to attend the meeting because he has separated himself from DOE/utility contract matters because of his pervious Nuclear Energy Institute employment.

In our November 20th meeting we told DOE that we would have to file a 1998 waste acceptance date lawsuit before January 31, 2004 because of the statue of limitations, but that we desired to enter into a mutually beneficial LACBWR joint demonstration project independent of the lawsuit. DOE had said that they were interested in discussing a joint project, but that the Department of Justice may not allow independent discussions and may only allow settlement discussions once the lawsuits are filed. It was the desire of Dairyland and DOE/RW staff to try to keep these matters independent and to have the January 16th meeting to try to identify a specific joint LACBWR spent fuel project that both parties could support in the Congressional FY 2005 DOE Budget appropriations actions this year.

Roger Christians prepared a one page summary of possible LACBWR projects that was distributed for discussion, but the DOE attendees informed us that they thought that specific project discussions would have to be performed as lawsuit settlement discussions under DOJ jurisdiction. It was fairly obvious from the discussion that this was not what Ms Chu, nor any of the DOE/RW staff wanted, but they seemed to think that was the only realistic path forward once the suit was filed.

They understood that we desired to remove the spent fuel from the pool and place the fuel into a fuel storage/transport system that would facilitate early removal from the LACBWR site as soon as possible. We also wanted the joint project to provide Dairyland better assurance that the LACBWR storage/transport SNF system would be acceptable to DOE under the spent fuel contract so that Dairyland would not become embroiled in a conflict over the acceptability of the fuel form similar to the present conflict between DOE and the Yankee utilities. Unfortunately, a major issue in the Yankee litigation is the subject of the acceptability of fuel placed in transportable storage canisters. The Yankees have already placed their fuel in transportable storage canisters that DOE has not legally determined to be "standard spent fuel" by a modification to the DOE/Yankee contract. The Yankee's, in their lawsuits, are claiming damages for DOE not removing their fuel on time, but the DOJ lawyers are claiming in court that there are no damages because their contract had never been modified to specifically allow transportable canister systems and that the canister systems are not acceptable under the existing contract language. If DOJ can sustain their position that the Yankee fuel was not in an acceptable form, it would never have been moved by DOE if DOE had met the 1998 date, so there are no damages due to the Yankee's caused by the lack of DOE's performance in 1998. Given the significance of this issue (most likely hundreds of millions of dollars); it is doubtful that DOJ would allow any DOE/utility (Dairyland or any other utility) discussions that involved this subject outside of lawsuit settlement discussions.

There was very limited discussion of what would be involved with settlement negotiations. If a settlement could be reached with a contract modification, then in addition to any DOJ settlement payments, DOE



Confidential -- To Be Used Only In Litigating Case No. 04-106C, Dairyland Power Cooperative v. US, And In Accordance With U.S. Court of Federal Claims Protective Order Entered August 17, 2006

would then be free to discuss joint demonstration projects.

The January 16th meeting did not get into any dialog on specifics of settlements.

[redacted]

Hope you trip back was uneventful and that you had a good weekend.

Lake

----- Message from "Lake Barrett" <lake@lbarrett.com> on Wed, 17 Dec 2003 16:10:47 -0500 -----

**To:** "Brian Rude" <bdr@dairynet.com>

**cc:** "Tom Zaremba" <tzaremba@wheelerlaw.com>, "Chuck Sans Crainte" <cvs@dairynet.com>, "Erni <trem6@comcast.net>, <rec@dairynet.com>

**Subject:** Lawsuit settlement options

Hi Brian,

[redacted]

[redacted]



Confidential -- To Be Used Only In Litigating Case No. 04-106C, Dairyland
Power Cooperative v. US, And In Accordance With U.S. Court of Federal Claims
Protective Order Entered August 17, 2006

[redacted]



Confidential -- To Be Used Only In Litigating Case No. 04-106C, Dairyland Power Cooperative v. US, And In Accordance With U.S. Court of Federal Claims Protective Order Entered August 17, 2006

[redacted]

Merry Christmas and Happy New Year
Lake

P.S. What have you decided about meeting with DOE on the 16th? If that works I need to let them know. I will be away with Grandchildren until January 6th. I will check emails every day and we can communicate that way and through the telephone. My cell phone (240-426-3754) sometimes works there and sometimes does not. If you would like to talk by phone that is OK with me if I know when.



Confidential -- To Be Used Only In Litigating Case No. 04-106C, Dairyland Power Cooperative v. US, And In Accordance With U.S. Court of Federal Claims Protective Order Entered August 17, 2006

L. Barrett 11/20 Draft

# Dairyland Spent Fuel DOE Program

Nov 20, 2003 Chu Meeting Notes

We held a meeting with Dr. Chu and her staff ( Paul Dickman, Chris Kouts, Dave Zabransky) on November 20, 2003 to discuss the LACBWR spent fuel situation, elicit their interest in a mutual joint spent fuel demonstration project, and alert them of our need to file a contact breach lawsuit next January.

Chuck presented our information and received the following comments from DOE:

General: There was an understanding of the uniqueness of the Dairyland situation and there seemed to be a genuine willingness to enter into a dialog to explore mutually beneficial joint spent fuel projects with LACBWR. They understood that the lawsuit had to be filed.

Dr Chu: The RW program is very complicated with often conflicting constraints that makes implementation of tasks like these difficult. Politics is important. When a lawsuit is filed, the DOJ may prevent future DOE/RW and Dairyland discussions unless the lawyers are present. This would greatly hinder progress.

Paul Dickman: Legislative authority may be a problem. It would be good if the Energy Bill had specifically authorized an R&D project.

Idaho politics will be difficult. Importation of spent fuel will require a change to the Batt Agreement. It would be unlikely that fuel importation would be allowed by Idaho until an NRC approval (CA or maybe staff SER) is provided (~2007/8/9). There would also need to be a pathway for the fuel to be removed within a five year period. Senator Craig is an important person to involve. Senator Crapo and Governor Kempthorne will also need to be involved.

The Office of Nuclear Energy (NE, Bill Magwood) plays an important role in Idaho and that the Advanced Fuel Cycle Initiative (AFCI) plans to do demonstration spent fuel separation work there. It might be possible to tie in with that Program. (It was not clear if Paul was suggesting that NE should pay for this or that RW would pay for it.)

DOE had taken the TMI fuel to Idaho for R&D purposes. Maybe a similar argument could be made for the uniqueness of the LACBWR stainless steel fuel? Maybe it could be part of a demonstration facility that could be used to

support the Yucca Mountain surface facility design, licensing, construction, and crew training similar to the Nuclear Navy's prototypes at NRF in Idaho.

DOE is going to have to purchase a substantial transportation cask fleet. Possibly DOE could provide canisters or casks to Dairyland? Maybe these could be rented by Dairyland. This could provide some assurance that the packaged fuel would be accepted by DOE without additional repackaging by Dairyland in the future.

Dave Zabransky: Be careful that Dairyland does not do what Consumers did at BRP with the West-flex canisters. It would be hard to justify a DOE supplied cask for just a few canisters (8 at BRP).

If Waste Fund money is used to finance anything at Dairyland, it would have to have merit under the NWPA. The Waste Fund can not be used to finance lawsuit settlements per the Alabama Appeals Court ruling.

Bechtel has just completed a study that indicates that existing vendor MPCs (canisters that can be used for storage, transportation, and the inner part of the Yucca Mountain disposal waste package) are not suitable in the Yucca Mountain License Application design because of criticality concerns. If so then all canisters would have to be cut open at Yucca Mountain.

DOJ has a lot of influence over the interpretation (backsliding) on the acceptability of NRC certified storage/transportation canister/cask systems.

December is going to be a busy time for DOE staff having to do additional depositions for 1998 lawsuits.

Chris Kouts: DOJ may require that any DOE/Dairyland dialog be done under a potential settlement discussion. Could/would Dairyland settle for a dollar figure that DOJ might want?

Could any technical dialog that resulted in a possible project be documented as a contract modification?

Could this be a full or partial settlement?

What does Dairyland really want? Can it be quantified in money?

Dairyland Next Steps

Dairyland Objective: Obtain as much of the following as possible:

- DOE financial assistance to offset spent fuel management costs
- DOE assurance that future LACBWR spent fuel storage configurations are considered "standard fuel" per the NWPA contract
- Removal of the spent fuel ASAP
  - Including Dairyland's support to RW to build the Yucca Mountain facility and transportation system.
- Facilitate PFS endeavor (or at least not adversely impact PFS)
- Keep contract lawsuit issue separate

Action Plan:

To achieve the above objectives in 2004, Dairyland will need a coordinated program along three main areas: technical/financial, legal, and political. We should engage DOE mainly in the technical/financial area to try to establish a mutually beneficial demonstration at LACBWR that will achieve as much of the objectives as possible. The legal area needs to be thought through carefully ahead of time, on a contingency basis, so that when the DOJ/DOE lawyers adversely affect the demonstration project, we are ready to make the best possible decisions. The political area needs to take the steps necessary to apply political and intuitional pressures to support progress toward our objectives and to eliminate or mitigate obstacles to achieving our objectives.

These three areas are highly interrelated and will require careful coordination and integration to achieve success. What we are trying to achieve is complicated by significant uncertainties that are constantly evolving and changing while we are working this task. Actions will need to be taken in a time frame that is often dictated by external events, e.g. federal budget cycle events and court decisions. We must be prepared to take the appropriate action at the right time; however the timing of actions may not be those of our choosing. Therefore we should think through likely scenarios and be prepared to do the best thing when decisions have to be made.

The primary line of DOE engagement will be a dialog with DOE/RW to create a demonstration project that meets our objectives and is one that can be successfully implemented within DOE. This "technical team" should be lead by the plant staff. This team needs to be prepared for a complex iterative process that will need considerable dialog with DOE to help DOE deal with the many constraints that they have. The legal and political teams will have to provide considerable support to this front line technical team.

The "legal team" needs to anticipate the legal obstacles that the technical team will surely encounter. They need do what they have to do in the contact lawsuit area, but do so in a manner that minimizes potential adverse Federal actions, e.g. DOJ gag order on DOE program people. They also need to be prepared for a possible order from DOJ to DOE that dialogs can only be conducted under a DOJ settlement discussion umbrella. Also an appropriate Dairyland response to a monetary settlement amount request needs to be thought through ahead of time.

The "political/intuitional" team needs to lay out a master calendar with groups or individuals that need to be contacted and customized messages for each. These need to be focused on pushing and pulling DOE into a project and eliminating or mitigating any constituency that might object to such a project. Influence needs to be exerted both directly and indirectly on DOE, potential allies, and potential enemies. Communication channels must be constantly kept open so that action can be taken on short notice. I expect that there will need to be a considerable use of political "carrots and sticks" to support this initiative.

Action Time Table

Immediate:

Send a thank you letter to Chu for the Nov 20 meeting and request to continue the dialog at the staff level.

Nov/Dec

Technical: Develop candidate demonstration projects to present to DOE in a nominal Jan 15 technical meeting. The desired outcome of the meeting would be to create a DOE desire to work toward consummating the demonstration project and defend a continued dialog despite a likely direction from DOJ to terminate such dialogs. The DOE January meeting date should be scheduled no later than mid December. Several internal meetings will likely be needed to develop this proposal.

Legal: Prepare overall litigation strategy (with contingencies) and implementation plan to support a nominal Jan 15 DOJ/DOE-GC meeting to explain the lawsuit. This should include logic why the demonstration dialog is independent of the lawsuit and should continue. Outside litigation counsel should be selected with consideration to DOJ reaction.

Political: Prepare a "contact" and "message" action plan that will touch Congressional and other intuitions (e.g. NEI, NRC, DPC, NRECA,



PDPC0022342

NARUC, and other utilities) to advance our technical dialog and prevent or minimize objectionable behavior. Letters to, or meetings with, the Secretary and FY 2005 E&W appropriations language support are important to plan out in advance. The Decommissioned Plant Coalition (Tim Smith) will be an important future player in this process.

Jan:

Execute nominal January 15 meetings. Try to schedule multiple meetings on the same DC trip. Chuck should plan to come.

Perform follow-up actions from the meetings.

Feb/Mar/Apr/May:

Negotiate demonstration project.

Bring political/institutional pressure to bear for House and Senate Energy and Water Appropriations markups that should occur in May or June

Jun/Jul/Aug

Finalize demonstration project and complete paper work.

Sep/Oct

Start work on October 1, 2004 with FY 05 Appropriation Act

*Notes*
# Meeting with Dr. Margaret Chu, DOE
May 31, 2002
DOE Headquarters
Washington, DC

Attendees: Dr. Margaret Chu, Lake Barrett (former interim Director), David Zabransky, Jeff ?, Sue ?(counsel), Linda Desell (counsel), David Blee (~~NEI~~, NAC Chuck Sans Crainte (Dairyland Power Cooperative)

Introductions: In response to several questions, I was able to recite some DPC history.

David Blee walked through the presentation and I contributed, as ~~it seemed~~ appropriate. In response to key issues and/or questions, I was able to elaborate on Dairyland and/or PFS concerns & issues. We reviewed photos of the PFS site and railcar.

Observations:

- DOE is more than a little upset. They are livid with regard to the "junkyard dog lawyers" that some of our associates in the Decommissioning Plant Coalition (Maine Yankee) and others sicked on them.
- They can not enter discussions with litigants on some of our key issues (early acceptance, GTCC). They have gotten permission from DOJ to enter limited discussions on issues related to waste form (?).
- Re: Acceptable Waste Form – Lake repeated, several times, that he believes that the fuel in MPCs (such as Maine Yankee) will eventually be accepted by the DOE. There was very little risk that it would not. All of the documentation bears a caveat, no guarantees. Lake rues the day that he made the statement that it would….be accepted (because of the badgering of the lawyers?)
- Re: GTCC – This is another technical problem that could probably have been very easily resolved, but it can not and will not be, in light of the pending lawsuits. I asked if there was anyone in the room that didn't believe that the GTCC should be shipped to Yucca right along with the fuel. Lake responded that the answer was probably "no", but in light of the litigation, they couldn't say that. Technically, this isn't the responsibility of the Yucca project (by standard contract) and it isn't the responsibility of the States (low level waste). Margaret Chu asked if this was an "orphan". I think the response was that, No, the DOE has the responsibility and technically it has been handed to the Environmental Dept., they will design another repository for it. This is absurd, and everyone knew it, but it remains part of their defense and they're not budging while the lawsuits are unsettled. (I may have misunderstood this, as Dave Z. said a case could also be made that it belongs with low level waste as it was there when they did initial studies (or reports) years ago). ?
- Early acceptance – Another area that they can't work with the litigants on, can't even discuss. If I wasn't there they wouldn't have this meeting!

- Note: Lake Barrett, on a couple of occasions, expressed empathy for Dairyland and our inability to make a decision and risk associated with moving forward. He viewed Dairyland as an "ideal" party to work with to resolve these issues going forward.
- I, on two occasions, discussed my observations that we must find a way to initiate discussions with the litigants as it is in the DOE's best interest to. They could end up with a Yucca Mountain and none of the other issues resolved to enable parties to use it. There was no optimism that DOJ would allow ~~this~~ discussions to ~~happen~~ begin. (Again, I think working these issues out with Dairyland Power may be an answer?)
- As an aside – as we were leaving, Dave Z. suggested that I call him, we will talk about a path(s) to get resolution to some of these issues (202-586-9198).
- PFS – I mentioned it several times. They were aware of, and sensitive to, the "AD-HOC" and ~~HAPHAZARD~~" "UNCOORDINATED" comments of Secretary Abraham and have been talking to Scott Northard. I paraphrased the value PFS has brought to the DOE and distributed copies of Scott's work for their review, offering to answer questions. I didn't get a read as to their position, if any, on PFS.
- We also discussed the Yucca Senate vote, strategies and concerns.

*Charles V. Sans Crainte*

CVS:css

No. 03-2624C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SYSTEM FUELS, INC., on its own behalf and as agent for
SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI
ELECTRIC POWER ASSOCIATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS RULE 52(c) MOTION

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 514-4325
Facsimile: (202) 514-7969

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

December 20, 2006

Attorneys for Defendant

rate of acceptance. At trial, Frank Rives, the Director of Nuclear Fuels for Entergy, testified that there was no provision of the NWPA that obligated DOE to begin acceptance of SNF in January 1998 at a rate that met any qualitative two-part obligation. Tr.1185: 15-17 (Rives). Simply stated, the NWPA is devoid of any requirement that DOE begin acceptance at any particular level, let alone a level that would obligate DOE to meet any qualitative obligation that SFI espoused at trial. See Pacific Gas & Electric, 73 Fed. Cl. at 388-91 (finding that NWPA does not contain the two-art qualitiative test or rate requirement that plaintiff promoted).

C. The Standard Contract Did Not Require Acceptance Of SNF At Any Particular Rate Or Pursuant To Any Particular Test

Mr. Rives also testified that he knew of no obligation in the Standard Contract requiring DOE to accept SNF at a rate of 3,000 MTUs per year. Tr. 1185:18-25 (Rives). Mr. Rives also testified that there was no obligation set forth in the Standard Contract requiring DOE to accept SNF to meet any qualitiative test. Tr. 1186:10-22 (Rives).

The evidence is completely contrary to SFI's assertions that DOE was required to create an acceptance rate that satisfied any two-part "test." Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. 10 C.F.R. § 961.11, Art. IV.B.5. (DX 1). First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Id., Art. IV.B.5.(a). Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance

ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." Id., Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a); accord Pacific Gas & Electric, 73 Fed. Cl. 398 ("The court is able to approximate with reasonable certainty the rate at which DOE would have accepted the utilities' spent fuel had it begun performance of the Standard Contract on January 31, 1998, by using the 1991 ACR and APR.")

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1. (DX 1). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE, with a right to appeal to the Energy Board of Contract Appeals if the disagreement cannot be resolved through negotiation. Id., Art. V.B.2 & XVI.A; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1

BCA ¶ 16,377, at 81,421 (1983) (boards of contract appeals "[h]istorically and traditionally" assumed jurisdiction over non-monetary "disputes as to the interpretation of contract provisions and determination of the rights and obligations of the parties under the provisions of the contract").

Nothing in the terms of the Standard Contract creates an obligation upon DOE's part to accept SNF at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the "backlog" of SNF. In fact, SFI can identify absolutely no contractual language in the Standard Contract creating any such obligation. Further, the integration clause in the Standard Contract, Article XXII.A, expressly precludes reading any unwritten "agreement" into the contract: "Any representation, promise, or condition not incorporated in this contract shall not be binding on either party," and "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in the contract." 10 C.F.R. § 961.11, Art. XXII.A. (DX 1). SFI's proposed requirement for a rate that precludes additional at-reactor storage and reduces the "backlog" of SNF violates standard rules of contract interpretation. As this Court recently recognized in the PG&E case, in response to the same argument that SFI is raising, "DOE never . . . engaged in a rulemaking establishing a minimum spent fuel acceptance rate under the Standard Contract." Pacific Gas & Electric, 73 Fed. Cl. at 358; see also Florida Power & Light Co. v. United States, 64 Fed. Cl. 37, 48 n. 12 (2005) ("[n]one of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations"), vacated on other grounds, 66 Fed. Cl. 93

(2005). SFI's "understanding" that DOE had some minimum acceptance rate obligation is a post-litigation theory, created after disputes about timely SNF acceptance began.[3]

D. SFI's Reliance Upon DOE Planning Documents To Support Its Assertion That DOE Was Obligated To Accept SNF At A Rate Of 3,000 MTUs Is Misplaced As A Matter Of Law And Fact

1. SFI's Reliance Upon Program Documents Fails As A Matter Of Law

While arguing that determining what would have happened in the "but for" world is too speculative, SFI also proposes an alternative view of the world where the rate of acceptance is not so speculative after all. In attempting to define the rate of acceptance that Entergy expected DOE would implement, plaintiff relied predominately upon the testimony of Mr. Frank Rives. While completely ignoring the Standard Contract, which clearly defines the process whereby the rate of acceptance will be developed beginning in 1991, Mr. Rives preferred to rely almost exclusively upon draft Mission Plans, planning documents, and other parol evidence to support his testimony that he "expected" DOE to use a 3,000 MTU rate of acceptance to implement its program beginning in January 1998.

For example, Mr. Rives relied upon the 1983 Draft Mission Plan to support his alleged "expectations." Tr. 1134: 6-9 (Rives); PX 275. However, this Court, in SMUD, already found

---

[3] And the PG&E Court also concluded that any judicial imposition of such an obligation on DOE would be clearly improper:

> The court concludes that for it to impose on the government an obligation to accept the utilities' spent fuel in accordance with the alleged two-part obligation or at a rate of 3,000 MTU/year would be tantamount to its enacting either legislation or regulation for the nuclear fuel industry that did not exist before this litigation.

Pacific Gas & Electric, 73 Fed. Cl. at 391.