3/17/03
ComEd
ic

No. 98-621C
(Judge Hewitt)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COMMONWEALTH EDISON COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE RATE OF SPENT NUCLEAR FUEL ACCEPTANCE

ROBERT D. McCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-6288
Fax: (202) 514-8640

OF COUNSEL:

FRANKLIN E. WHITE, JR.
Assistant Director
KEVIN B. CRAWFORD
HEIDE L. HERRMANN
TIMOTHY P. McILMAIL
R. ALAN MILLER
RUSSELL A. SHULTIS
VICTORIA STROHMEYER
MARIAN E. SULLIVAN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

JANE K. TAYLOR
MARTHA S. CROSLAND
L. DOW DAVIS, IV
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

March 17, 2003

Attorneys for Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| COMMONWEALTH EDISON COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 98-621C<br>(Judge Hewitt) |

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE RATE OF SPENT NUCLEAR FUEL ACCEPTANCE

Defendant, the United States, respectfully submits this reply to plaintiff's response to the Government's motion for partial summary judgment regarding the schedule for acceptance of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") to apply for the purpose of assessing damages in this case.

SUMMARY OF ARGUMENT

Following more than a year of discovery, during which time the plaintiff, Commonwealth Edison Company ("ComEd"), was largely focused upon its response to the Government's motion for partial summary judgment, plaintiff has now identified the extensive evidence and deposition testimony that it believes is critical to its case. Unbelievably, the bulk of that evidence – consisting of individuals' testimony regarding the "intent" of Congress in passing the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101-10270, and hopes and goals of DOE program employees that were never incorporated as commitments into the Standard Contract – is either inadmissible and/or irrelevant to the issues presented in the Government's motion. Although ComEd has presented this Court with a massive number of proposed findings of fact, the bulk of them relates to legal interpretations of the NWPA, defining Congress' intent by reference to

## II. TO THE EXTENT THAT PARTIES TO THE STANDARD CONTRACT WERE UNABLE TO REACH AN AGREEMENT WITH DOE REGARDING A SPECIFIC ACCEPTANCE SCHEDULE, THE STANDARD CONTRACT'S SCHEDULE TERMS GRANT DOE THE DISCRETION TO SELECT THE APPROPRIATE ACCEPTANCE SCHEDULE

### A. Under The Standard Contract's Schedule Terms, The Parties Are First Required To Attempt To Agree Upon A Specific Acceptance Schedule, Through The Submission And Consideration Of Delivery Commitment Schedules

Plaintiff bases the arguments in its response brief upon two main assumptions. First, plaintiff claims that, because the Standard Contract does not contain the specific schedule or rate for accepting the contract holders' SNF and HLW, it is an "open" or "missing" term that requires the Court to "look to the intent of the parties, as well as the intent of the underlying statute, the NWPA, in determining how to apply the contract." Pl. Br. 17. Second, plaintiff argues, by reference in large part to the deposition testimony of various individuals, that "the NWPA and the Standard Contract were intended to achieve two fundamental objectives: (1) to prevent the nuclear utilities from having to build at-reactor storage after DOE began performance in 1998; and (2) to accept SNF at a rate that permitted the DOE to keep up with the rate of production of SNF and eventually reduce the existing SNF backlog." Pl. Br. 28. Both of plaintiff's basic assumptions are wholly in error and unsupported by either the Standard Contract or the NWPA.

With regard to plaintiff's assertion that the absence of a specific acceptance schedule or rate in the Standard Contract itself creates an "open" or "missing" term, plaintiff's argument completely ignores the actual language of the Standard Contract. In appropriate circumstances, if a term of a contract "which is essential to a determination of [the parties'] rights and duties" has been omitted from a contract, "a term which is reasonable in the circumstances [may be] supplied

by the court." Restatement (Second) of Contracts § 204 (1981).[6] However, an "omission" occurs where "[t]he parties to an agreement . . . entirely fail to foresee the situation which later arises and gives rise to a dispute" or where "they . . . have expectations but fail to manifest them either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse." Id. § 204 cmt. b. "Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention" when negotiating the contract. Id. § 204 cmt. d.

Here, however, the schedule terms of the Standard Contract are not "missing." As we explained in our motion for partial summary judgment, the Standard Contract contained terms that expressly identified, in great detail, the manner in which specific acceptance schedules would be developed under the contract, through the submission and approval of delivery commitment schedules ("DCSs") and final delivery schedules ("FDSs"). Def. Br. 10-14. Further, the record of the administrative rulemaking supporting the promulgation of the Standard

[6] At a certain point, a term of a contract may be so essential to the parties' respective rights that its absence may preclude enforcement of the contract. Restatement (Second) of Contracts § 33 cmt. f, at 95 (1981) ("[e]ven when the parties intend to enter into a contract, uncertainty may be so great as to frustrate their intention"); see also Standard Federal Bank v. United States, No. 95-478C, 2002 WL 31947572, at *13 (Fed. Cl. Dec. 30, 2002) ("[t]o be valid and enforceable, a contract must have sufficient definiteness to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy'"). "Thus a promise by A to give B employment, even though consideration is paid for it, does not provide a basis for any remedy if neither the character of the employment nor the compensation therefor is stated." Id. Nevertheless, the Court need not consider that issue in this case, given that the parties have already defined the first several years of the schedule for DOE's acceptance of ComEd's and other contract holders' SNF. See Restatement (Second) of Contracts § 34 cmt. c, at 98-99 (1981) ("[s]ubsequent conduct of one or both parties may remove either obstacle [to definiteness] or both," as "part performance may give meaning to indefinite terms of an agreement, or may have the effect of eliminating indefinite alternatives by waiver or modification").

Contract in the Federal Register, coupled with DOE's comments and representations contained in the proposed and final rules, plainly refutes any argument that the parties simply overlooked, forgot to include, or accidentally "omitted" a specific acceptance schedule or rate in the Standard Contract. DPFUF ¶¶ 15-18, 20-35, 37-46. To the contrary, the proposed and final rules and the record of the administrative rulemaking clearly evidence that the importance of the schedule terms of the Standard Contract were well-known and that the terms were extensively evaluated and developed. Id.

Even ComEd itself recognizes that the schedule terms are not "missing" from the Standard Contract. As ComEd represents in its response brief, "[t]he contract did not specify a specific rate in order to provide sufficient flexibility to achieve [the goals of avoiding additional at-reactor storage and reduction of backlog]." Pl. Br. 34. It further recognizes that the parties could not include a specific acceptance schedule or rate in the Standard Contract, but that the issue of the acceptance schedule was well-considered:

> In order to achieve the contractual intent on a consistent basis in 1998, the parties could not include a specific acceptance rate in the standard contract at the time it was executed. The necessary acceptance rate could increase or decrease as a result of many variables, including changes in the annual SNF and HLW output. Maintaining some flexibility in the acceptance rate was necessary . . . .

Pl. Br. 34. n.19. Accordingly, plaintiff's argument that the schedule terms of the Standard Contract are "missing" or "open," and that the Court should therefore supply them, is unsupported by the language of the Standard Contract itself.

Instead of creating a "missing" or "open" term, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a

two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a). The contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V(B)(1). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the contract holder's first DCS submission, in which the contract holder identifies the SNF that it would like DOE to take in a given year, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id.

This portion of the schedule terms in the Standard Contract is comparable to an "agreement to agree," with DOE identifying the amounts of SNF that it anticipates being able to accept, the contract holder's identification of the SNF that it wants to deliver, and DOE's evaluation of the contract holder's request. "[I]f an essential element is reserved for the future agreement of both parties, as a general rule it can give rise to no legal obligation until such future agreement." 1 R. Lord, Williston on Contracts § 4:26, at 585 (4th ed. 1990). "[W]hile some courts have invalidated so-called 'agreements to agree,' the emerging view is that an agreement which specifies certain terms will be agreed on by future negotiation is sufficiently definite, because it impliedly places an obligation on the parties to negotiate *in good faith*." Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991) (italics in original). As a result, in the Standard Contract, that portion of the schedule terms through which the parties agreed to attempt to agree to specific acceptance schedule amounts and dates creates an obligation, upon both parties, to attempt to agree in good faith upon specific delivery and acceptance commitments.[7]

[7] Here, and as discussed in detail in our motion for partial summary judgment, many of the parties, including ComEd, followed the mechanism in the Standard Contract for several years, beginning in 1992, and "agreed" upon various SNF acceptance dates and acceptance amounts. Def. Br. 18-20. Specifically, plaintiff submitted several DCSs, and DOE approved many of those DCSs. Based upon the provisions of the Standard Contract, those approved DCSs become commitments that define the parties' schedule obligations for those years of SNF acceptance to which the approved DCSs apply.

the regulation's promulgation." Id. (quoting Gardebring v. Jenkins, 485 U.S. 415, 430 (1988)).[10] Importantly, "[t]his broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" Id. (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991)); see Stuart-James Co. v. SEC, 857 F.2d 796, 800 (D.C. Cir. 1988) ("[a]gency interpretations are to be given particular deference when they rest upon matters peculiarly within the administrator's field of expertise"). Here, long before this litigation began, DOE had issued documents evidencing that the DCSs, once approved, would constitute a commitment by the contract holder to deliver, and by DOE to accept, a specific amount of the contract holder's SNF in a specific year. See, e.g., GA 145-52 (DCS Instructions).[11] Deference to that interpretation of the Standard Contract's schedule terms is warranted.

Further, the language of the Standard Contract's schedule terms is clear. Although the Standard Contract does not specify an acceptance schedule or rate, it sets forth, in detail, the complete understanding of the parties regarding the manner in which the acceptance schedule would be determined. It provides that the issuance of ACRs, followed by the submission and

---

[10] See Barnhart v. Walton, 535 U.S. 212, 217 (2002) ("[c]ourts grant an agency's interpretation of its own regulations considerable legal leeway"); Auer v. Robbins, 519 U.S. 452, 461 (1997) (agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation"); Sprague v. United States, 230 Ct. Cl. 492, 498, 667 F.2d 865, 868 (1982) ("considerable deference should be accorded to an agency's interpretation of regulations it has promulgated").

[11] Although the DCS Instructions were not issued pursuant to notice-and-comment rulemaking, they were issued to all Standard Contract holders and represented the agency's official "instructions" to the Standard Contract holders. Accordingly, given their status as the official position of the agency, deference to those instructions is warranted.

review of DCSs, would be the mechanism by which the parties would create that schedule. Interestingly, although plaintiff complains repeatedly that the Court should not accept the Government's interpretation of the Standard Contract's schedule provisions, plaintiff never explains any other manner in which the Standard Contract could work. That is, although plaintiff argues that the Court should adopt other rates of SNF acceptance and another SNF acceptance schedule than that established by DOE, any discussion or explanation of the manner in which that proposed schedule could actually have worked in the "real world" in light of the Standard Contract's acceptance schedule terms is completely absent. Plaintiff has failed to tie its proposed schedule or rates to the Standard Contract terms. It is clear that any methodology other than that discussed by the Government would write the agreed-upon process out of the Standard Contract and render the schedule terms meaningless, in violation of both standard contract interpretation and regulatory interpretation principles. See, e.g., Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (contract interpretation should not render portion of contract meaningless).

Further, because the Standard Contract includes the parties' agreement regarding the manner in which specific acceptance schedules would be defined, the acceptance schedule or rate is not a "missing" or "open" term. In this respect, this case is very different from cases such as David Nassif Associates v. United States, 226 Ct. Cl. 372, 644 F.2d 4 (1981), and Essex Electro Engineers, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000), which plaintiff cites in its response brief. See Pl. Br. 19-20. In David Nassif, a contract for the construction of a cafeteria failed to specify the size of a contractually-required cafeteria, or even the manner in which the size would be determined. See David Nassif, 226 Ct. Cl. at 373-74, 644 F.2d at 5. In fact, the Court determined that, during contract negotiations, "the parties never discussed the matter of the

cafeteria's *size*" and that, "[e]ven more than that, it was quite literally an issue to which neither party ever gave any thought." David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 422 n.5, 557 F.2d 249, 258 n.5 (1977) (italics in original). The Court observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." David Nassif, 214 Ct. Cl. at 423, 557 F.2d at 258. That, however, was because, "by mutual oversight, the matter of the cafeteria size was never focused upon, either in the negotiations or in the subsequent lease agreement itself." David Nassif, 226 Ct. Cl. at 373-74, 644 F.2d at 5. Accordingly, the Court assumed the task of determining the size of the cafeteria "that the parties would have agreed upon at the time of their initial lease negotiations . . . ." Id. at 376, 644 F.2d at 7.[12]

Here, by contrast, the Standard Contract does not overlook the question of acceptance schedules, and the manner in which acceptance schedules would be developed was not a question about which "neither party gave any thought." Instead, the Standard Contract specifies, in great detail, the precise manner in which the parties would determine those schedules. Unlike some contracts, which provide for the actual physical delivery of a specified amount of an item during a specified period of time, see, e.g., Oeltjenbrun v. CSA Investors, Inc., 3 F. Supp. 2d 1024, 1039 (N.D. Iowa 1998) (concerning contract for delivery of grain), the Standard Contract expressly reserves those questions for future determination. See 10 C.F.R. § 961.11, Art. V. Because the

---

[12] Further, in Essex Electro, because a contract did not "specify the period in which the government must respond" to a contractor's formal engineering change proposal, and instead contained contract terms that were completely silent regarding that time period, the court held that "the law impose[d] an obligation to act within a reasonable period of time." Essex, 224 F.3d at 1291 (quoting Specialty Assembling & Packing Co. v. United States, 174 Ct. Cl. 153, 355 F.2d 554, 565 (1966)).

after 1998. Id. "The implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties." State of Alaska v. United States, 35 Fed. Cl. 685, 704 (1996), aff'd, 119 F.3d 16 (Fed. Cir. 1997), cert. denied, 522 U.S. 1108 (1998). As discussed below, the congressional "intent" that plaintiff proposes does not exist in the NWPA and was not incorporated into the Standard Contract. Accordingly, plaintiff has no basis upon which to support its claim that the acceptance rates contained in the 1991 through 1995 ACRs and the acceptance schedules based upon those rates conflict with DOE's good faith obligations.

## IV. PLAINTIFF'S ASSERTION THAT THE INTENT OF THE NWPA AND THE STANDARD CONTRACT WAS TO ENSURE THAT PLAINTIFF NEVER HAD TO BUILD ANY ADDITIONAL AT-REACTOR STORAGE SPACE AFTER 1998 IS WHOLLY INSUPPORTABLE

### A. The NWPA Was Not Intended To Prevent Commercial Nuclear Utilities From Having To Build At-Reactor Storage After 1998 Or To Require DOE To Accept SNF At A Rate Sufficient To "Keep Up" With The Rate Of SNF Production

Ignoring that the process for defining the schedule of SNF acceptance has already defined a large part of the schedule against which damages may be measured, plaintiff argues that "the NWPA and the Standard Contract were intended to achieve two fundamental objectives: (1) to prevent the nuclear utilities from having to build at-reactor storage after DOE began performance in 1998; and (2) to accept SNF at a rate that permitted the DOE to keep up with the rate of production of SNF and eventually reduce the existing SNF backlog." Pl. Br. 28. Plaintiff then argues that an annual acceptance rate of 3,000 MTUs of SNF would have been necessary to achieve this objective. Astoundingly, although plaintiff cites to deposition testimony of various individuals, a declaration of its own witness, and some vague statements in the legislative history

of the NWPA to support its contention regarding the "intent" of the NWPA, plaintiff fails to cite any "evidence" from the most important means of determining this intent: the language of the NWPA itself.

In fact, the NWPA itself not only is devoid of any support for plaintiff's far-fetched argument, but actually conflicts with it. Unlike many statutes, the NWPA expressly identifies, in the statute itself, the purposes of the Act, as well as the congressional findings supporting the Act. Nowhere in those express findings or purposes is the "intent" that plaintiff proposes identified. See 42 U.S.C. § 10131. In fact, the identified purposes of the NWPA relate to protecting "the public and the environment . . . from the hazards posed" by SNF and HLW and in "ensur[ing] that the costs of carrying out activities relating to the disposal of [SNF and HLW] will be borne by the persons responsible for generating" it. Id. § 10131(b)(1) & (4). The NWPA not only says absolutely nothing about ensuring that private commercial nuclear utilities are protected against expenditures, but it affirmatively seeks to ensure that those utilities, rather than taxpayers, pay all incurred storage and disposal costs. Id. Further, the language of the Act that authorizes the Secretary of Energy to develop and enter into contracts with the owners and generators of SNF and/or HLW, 42 U.S.C. § 10222, makes no reference to the "intent" that plaintiff proposes. In short, the NWPA itself is devoid of any support for plaintiff's alleged intent. Statutory interpretation begins with "the plain words of the law," Turtle Island Restoration Network v. Evans, 284 F.3d 1282, 1291 (Fed. Cir. 2002), petition for certiorari filed, 71 U.S.L.W. 3353 (Nov. 6, 2002), and the words of statutes are to be given their ordinary meaning. Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108

(1980). Here, the words of the actual statute do not create the obligations, or "intent," that plaintiff alleges.

To the extent that plaintiff relies upon self-serving references to snippets of legislative history, those snippets cannot create a statutory obligation that does not exist in the NWPA. "[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point." Shannon v. United States, 512 U.S. 573, 583-84 (1994) (quoting International Brotherhood of Elec. Workers, Local Union No. 474, AFL-CIO v. NLRB, 814 F.2d 697, 712 (D.C. Cir. 1987)); see Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 26 (1977) (reliance upon legislative history in divining the intent of Congress is "a step to be taken cautiously"). That is, absent an obligation created by the language of a statute itself, legislative history cannot, in and of itself, create statutory obligations. "To give effect to th[e] snippet[s] of legislative history" that plaintiff cites, the Court "would have to abandon altogether the text of the statute as a guide in the interpretative process." Shannon, 512 U.S. at 583. "[I]t is the text of the [statute] that governs this issue, for what matters is not what Congress meant to say in passing the [statute] but what it in fact said." In re MicroStrategy, Inc. Securities Litigation, 115 F. Supp. 2d 620, 630 n.16 (E.D. Va. 2000). That is particularly important in this case, where the expressly identified findings and purposes of the NWPA fail to mention, and conflict with, the "intent" that plaintiff here seeks to create.

Further, the "evidence" upon which plaintiff relies to support its "legislative intent" is, for the most part, not even admissible. Plaintiff's reliance upon deposition testimony of individuals as evidence of the "intent" of Congress in the NWPA is ludicrous, see, e.g., Pl. Br. 33-34 (citing testimony of Lake Barrett, a former DOE employee, that "Congress did not intend utilities to pay

. . .")[15] & 29-31, since even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); accord Honeywell, 228 Ct. Cl. at 595, 661 F.2d at 185; Department of Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F.Supp. 496, 500 n.5 (CIT 1985). Here, plaintiff relies upon various individuals' beliefs who began working with the NWPA long after Congress enacted it as to the meaning that Congress presumably intended when it passed the Act.

Similarly, plaintiff's reliance upon individual statements of legislators about drafts of the Nuclear Waste Policy Act to define the intent of "Congress" in enacting the NWPA is equally irrelevant. See Pl. Br. 31-32. Legislative history is easily "created by advocates of one position or the other during the legislative process who did not get their views into the statutory language, and also is why it is so frequently a waste of time to use it to construe the statute," and "[b]etter guidance is available from the words of the law duly passed and signed." Hoonah Indian Ass'n v. Morrison, 170 F.3d 1223, 1228 (9th Cir. 1999); see id. ("[t]he remarks of an individual legislator on the floor are not part of the statute passed by both houses and signed by the President, so they lack the force of law"). Further, the legislative history that plaintiff cites simply does not support

---

[15] In quoting Mr. Barrett's deposition testimony in its response brief, ComEd omitted the objection in the transcription of that testimony. See CA 492. For the reasons explained in the objection, that testimony is inadmissible. See Carmen v. San Fancisco Unified School Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001) ("[t]he requirement of Rule 56(e) that affidavit testimony be competent and admissible evidence applies with equal force to deposition testimony").

Accordingly, based upon data provided by the utilities themselves, ComEd's argument that the 1991 ACR rates have no factual support is completely without merit. Moreover, the data clearly demonstrate, if the Court somehow were to determine that the intent of the NWPA and the parties was that DOE's acceptance schedule had to prevent the need for additional at-reactor storage after 1998, that the 1991 ACR rates accomplish that purpose. As we explain fully elsewhere, due to Congress' imposition of a statutory limit upon DOE's ability to accept SNF at any facility prior to the operation of a repository, DOE cannot begin to reduce the SNF backlog until a repository begins operation.

CONCLUSION

For the foregoing reasons, and those discussed in our motion for partial summary judgment, we respectfully request that the Court grant our motion.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

David M. Cohen/by HD Fe Ye

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-6288
FAX: (202) 514-8640

OF COUNSEL:

FRANKLIN E. WHITE, JR.
Assistant Director
KEVIN B. CRAWFORD
HEIDE L. HERRMANN
TIMOTHY P. McILMAIL
R. ALAN MILLER
RUSSELL A. SHULTIS
VICTORIA STROHMEYER
MARIAN E. SULLIVAN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

JANE K. TAYLOR
MARTHA S. CROSLAND
L. DOW DAVIS, IV
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

March 17, 2003

Attorneys for Defendant