No. 98-621C
(Judge Hewitt)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COMMONWEALTH EDISON COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE RATE OF SPENT NUCLEAR FUEL ACCEPTANCE


ROBERT D. McCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington D.C. 20530
Tele: (202) 307-6289

OF COUNSEL:
L. DOW DAVIS, IV
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
Washington, D.C. 20585

HAROLD D. LESTER, JR.
Assistant Director
MARIAN E. SULLIVAN
R. ALAN MILLER
BRYANT S. BANES
ERIN E. POWELL
RUSSELL A. SHULTIS
WILLIAM L. OLSEN
HEIDE L. HERRMANN
KEVIN B. CRAWFORD
Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

Attorneys for Defendant


November 28, 2001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| COMMONWEALTH EDISON COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 98-621C<br>(Judge Hewitt) |

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE RATE OF SPENT NUCLEAR FUEL ACCEPTANCE

Pursuant to Rule 56(b) of the Rules of this Court ("RCFC"), defendant respectfully requests that this Court grant partial summary judgment in defendant's favor upon the issue of the rate and order of acceptance of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") for purposes of assessing damages for the Department of Energy's breach of the Standard Contract at issue in this case. There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In support of our motion, we rely upon the following brief and appendix, the accompanying proposed findings of uncontroverted fact, and the pleadings filed by the parties in this case.

DEFENDANT'S BRIEF

STATEMENT OF ISSUES

1. Whether the Delivery Commitment Schedules ("DCSs") that the nuclear utility plaintiffs submitted to the Department of Energy ("DOE") pursuant to Article IV.B of the "Standard Contract For The Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" ("Standard Contract"), published at 10 C.F.R. § 961.11, constitute binding commitments that establish the rate and order of SNF and/or HLW acceptance for purposes of assessing

accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

b. The Standard Contract Defines A Framework For Definitizing A Specific Rate Of SNF Acceptance, Through Contract Holders' Submission Of, And DOE's Approval Of, Delivery Commitment Schedules

The Standard Contract itself does not expressly identify a required rate by which DOE had to accept contract holders' SNF and/or HLW under the contract. Instead, the Standard Contract merely provides a start date for SNF acceptance, stating that "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 . . . ." 10 C.F.R. § 961.11, Art. II. The Standard Contract left the determination of the rate at which SNF and/or HLW would be accepted under the Standard Contract to future development of the annual capacity reports and, beginning January 1, 1992, the contract holders' submission, and DOE's approval, of delivery commitment schedules.

Specifically, pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See id. Further, beginning on April 1, 1991, DOE was to "issue an

annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based on "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Nothing in the Standard Contract or the NWPA identified any particular rate of SNF acceptance that DOE was obligated to satisfy. To the contrary, although (as described above) the Standard Contract provided for DOE's periodic issuance of annual capacity reports ("ACRs") and acceptance priority rankings ("APRs"), nothing in either the Standard Contract or the NWPA precluded DOE from changing the proposed rates of SNF acceptance in the publication of subsequent ACRs and APRs. However, beginning January 1, 1992, following DOE's issuance of the 1991 ACR and APR, the contract holders were required to submit delivery commitment schedules ("DCSs") to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1. Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; A. 145-52 ("Instructions For Completing The Appendix C Delivery Commitment Schedule").[1]

DOE was to "approve or disapprove such schedules within three (3) months after receipt." Id. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for

[1] "A. __" refers to the appendix to this motion. "DPFUF ¶ ___" refers to Defendant's Proposed Findings of Uncontroverted Fact Regarding The Rate Of Spent Nuclear Fuel Acceptance, which are being filed concurrently with this motion.

disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in writing of the reasons for such disapproval and [to] submit [DOE's] proposed schedule." Id. If the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

Upon approval by DOE, the DCS defined, among other things, the amount of SNF and/or HLW that DOE was to take from a particular contract holder in a given year, including the metric tons uranium (initial and discharged) and the number of assemblies; the type of cask required; and the proposed shipping mode. 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF and/or HLW that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." Id., Art. II. Absent a DCS, DOE had no basis for identifying any SNF and/or HLW that a contract holder intended to deliver to DOE within a given year. Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year.

Although the DCS defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, it did not define the month or day of that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules ("FDSs"). Specifically, not less than 12 months

before the delivery date "for delivery of SNF and/or HLW covered by an approved [DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . .," which DOE would review and either approve or disapprove. 10 C.F.R. § 961.11, Art. V.C. The FDS required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW acceptance during the assigned year. As with the DCS submittal and approval process, if the parties could not agree upon the FDS, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

If the parties could not agree upon a disapproved DCS or a FDS after negotiation, the Standard Contract's "Disputes" clause would apply. See id., Art. XVI.A; see also A. 26-27 (Edison Electric Institute's comments from administrative rulemaking on proposed Standard Contract, recognizing that claims under Disputes clause "are more likely to be . . . regarding delivery commitments rather than claims for money"). Pursuant to that clause, "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." 10 C.F.R. § 961.11, Art. XVI.A. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in writing to the Department of Energy Board of Contract Appeals. Id.; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1 BCA ¶ 16,377, at 81,421 (1983) (boards of contract appeals "[h]istorically and traditionally" assumed jurisdiction over non-monetary "disputes as to the interpretation of contract provisions and determination of the rights and obligations of the parties under the provisions of the contract"); see also Alliant Techsystems, Inc. v. United States, 186 F.3d 1379, 1380 (Fed. Cir. 1999) (same).

Further, the Standard Contract also contains the following language: "Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the [SNF] or [HLW] involved as expeditiously as practicable upon the request of the generator or owner of such waste or [SNF]." 10 C.F.R. § 961.11 (emphasis added). To the extent that a "Whereas" clause creates any obligations upon a party, see Florida Power & Light Co. v. United States, 49 Fed. Cl. 656, 667 (2001), appeal pending, No. 02-5012 (Fed. Cir.), this language mirrors the requirements specified in the NWPA, requiring DOE to take title to commercial SNF "as expeditiously as practicable" after a permanent repository is operational. Given the express obligation contained in the Standard Contract applicable only after a permanent repository is operational, the absence of any such express obligation in either the NWPA or the Standard Contract applicable before repository operation makes clear that, prior to the existence of an operational repository, no such obligation exists.

### C. The Record Of The Administrative Rulemaking For The Standard Contract Establishes That DOE Did Not Obligate Itself To Continue Acceptance Of SNF And/Or HLW At Any Particular Rate

When the meaning of a regulation is clear on its face, it is unnecessary to consider the history that led to its development. Honeywell, 661 F.2d at 185. However, to the extent that the Court believes it necessary, the record of the development of the Standard Contract through rulemaking plainly evidences that DOE intentionally excluded from the Standard Contract any obligation, after it had begin SNF and/or HLW acceptance, to continue that acceptance at any minimum rate.

After the Standard Contract was published in the Federal Register as a proposed rule, DOE received numerous comments from interested parties. One commenter, Tennessee Valley

Authority ("TVA"), recognized that the draft contract placed no performance obligations upon DOE to accept SNF other than a start date of January 31, 1998. DPFUF ¶ 20. TVA stated that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." Id. TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision requiring DOE to "start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id.[9]

Similarly, Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management, expressly recognized that "the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate." DPFUF ¶ 2; A. 4. However, EEI and UNWMG, like several individual utilities, stated that the Standard Contract should contain a requirement that "DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW." Id. EEI and UNWMG

[9] TVA also proposed that the contract provide that, "[a]fter January 31, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to said date on a schedule sufficient to provide for delivery consistent with decommissioning plans for Purchaser's nuclear power plants specified in Appendix A." A. 105.

suggested the inclusion in the Standard Contract of the following language, intended to add an additional obligation upon DOE beyond that imposed by the proposed rule:

> WHEREAS, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

DPFUF ¶ 21. EEI and UNWMG also requested that DOE add a contract provision reading that "[t]he services to be provided by DOE under this contract shall commence on a schedule consistent with the commencement of disposal services [i.e., in a permanent repository] not later than January 31, 1998." DPFUF ¶ 24.

Another commenter, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation requiring DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress:

> The [NWPA] specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the [NWPA]), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:
>
> > "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the [NWPA], as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

DPFUF ¶ 22.

In the final rule promulgated by DOE, the Department did not adopt any of these requested revisions. Instead, the Standard Contract, as finally promulgated, contains the same basic requirement as the proposed rule: that DOE will begin SNF and/or HLW acceptance by January 31, 1998. The fact that DOE specifically declined to add provisions obligating DOE, after beginning SNF and/or HLW acceptance, to continue that acceptance at a specific rate is strong evidence that, in fact, the Standard Contract contains no such obligation.

D. Because The Amount Of SNF And/Or HLW Identified In The Approved DCSs Would More Than Satisfy DOE's Obligation To "Begin" SNF And/Or HLW Acceptance Under The NWPA, The Court Need Not Identify Any Additional Acceptance Obligations Prior To Repository Operation

Because the amount of SNF and/or HLW identified in the DCSs that the utilities submitted and that DOE approved more than satisfy DOE's obligation to "begin" SNF and/or HLW acceptance, the Court need not identify the precise scope of DOE's obligation to "begin" acceptance. Through the DCSs that DOE approved for the contract holders, DOE committed itself to accept several hundred MTU of SNF, beginning by January 31, 1998. As previously discussed, those approved DCSs constitute a binding commitment upon DOE, developed through the mechanisms established in the Standard Contract, that define a specific amount of SNF and/or HLW that DOE committed to accepting. Until a permanent repository is operational, DOE is not contractually or statutorily obligated to accept any additional amounts of SNF and/or HLW. As a result, the damages that the plaintiff utilities seek should be limited to those damages associated with DOE's failure to accept the SNF and/or HLW identified in the approved DCSs. Once a permanent repository becomes operational, the contract holders can pursue any additional claims if DOE does not meet any obligations that arise after repository operation.

CONCLUSION

For the foregoing reasons, the Court should hold that the DCSs submitted by the nuclear utility plaintiffs and approved by DOE define DOE's obligations to accept SNF and/or HLW pursuant to the Standard Contract and provide the basis for assessing damages in these cases. Alternatively, the Court should accept the rates of SNF and/or HLW acceptance set forth in the 1995 ACR/APR as a rational basis for the assessment of damages.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-6289

OF COUNSEL:

L. DOW DAVIS, IV
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

HAROLD D. LESTER, JR.
Assistant Director
BRYANT S. BANES
ERIN E. POWELL
RUSSELL A. SHULTIS
WILLIAM L. OLSEN
HEIDE L. HERRMANN
KEVIN B. CRAWFORD
MARIAN E. SULLIVAN
R. ALAN MILLER
Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

November 28, 2001

Attorneys for Defendant