# Appendix

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 04-106C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Courtroom 5, Room 505
National Courts Building
717 Madison Street, N.W.
Washington, D.C.

Thursday,
January 25, 2007

The parties met, pursuant to notice of the Court, at 10:07 a.m.

BEFORE: HONORABLE EDWARD J. DAMICH
Chief Judge

APPEARANCES:

<u>For the Plaintiff</u>:

ROBERT L. SHAPIRO, Esquire
JERRY STOUCK, Esquire
TODD W. MONROE, Esquire
KEVIN E. STERN, Esquire
ROBERT A. CAPLEN, Esquire
Greenberg Traurig
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3174
(202) 331-3173
(202) 530-8561
(202) 452-4878
(202) 530-8597

inclination is, I believe that Mr. Stern's summary was actually quite accurate. The difficulty that a judge has at this particular point is that the rule, which he correctly stated, doesn't really give the Court the task of deciding, sort of fine tuning, the relevance issue, but really discovery is different from saying, This is admissible in court because it's relevant or not admissible because it's irrelevant. So I have that problem.

The second problem I have is that, as sympathetic as I am to the Defendant on the burden of having these individuals constantly being deposed in other cases, is the fact that, again, that issue was a coordination issue, and I believe that I have to make a decision with regard to Dairyland in this particular case.

I know that Mr. Stouck has represented other plaintiffs and that there is an acquaintance here, but I think Mr. Stern is correct that what I really have to do is recognize that Mr. Stouck now is representing Dairyland, and whoever conducts the depositions is going to ask questions regarding Dairyland and its particular interests.

So my inclination is to favor the Plaintiff's position, but I want to read these

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DAIRYLAND POWER COOPERATIVE, )
)
Plaintiff, )
)
v. ) Docket No.: 04-106C
)
UNITED STATES, )
)
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place N.W.
Washington, D.C.

Wednesday,
February 8, 2006

The parties met, pursuant to notice of the Court, at 2:05 p.m.

BEFORE: HONORABLE EDWARD J. DAMICH
Chief Judge

APPEARANCES:

For the Plaintiff:

JERRY STOUCK, Esquire
KEVIN E. STERN, Esquire
ROBERT L. SHAPIRO, Esquire
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3100

Defendant.

MR. STOUCK: That's our intention. We did that in PG&E. We gave them detailed cost schedules in the initial disclosures.

I'll do one better. We gave them accounting data out the wazoo during the course of discovery to back up the numbers that were in the initial disclosures, and detailed, detailed, detailed cost data and backup was provided during fact discovery and inquired about at fact deposition, and that would be I would assume and I believe we intend to proceed in a similar manner in this case.

THE COURT: What the Defendant has to know is your particular theory, the specific theory of damages. We're asking for recovery on this for this reason, and then of course the facts back that up. Knowing that, they test the facts through the discovery process

If there's suddenly something pops up in the expert report like an additional theory based on certain facts that they didn't depose anybody on because of the fact that it wasn't there in the Rule 26 disclosures then I would of course be very open to saying yes, we'll allow extra fact discovery and then you'll end up with a discovery dispute possibly, which

will delay things even more.

If everything worked well in the best of all possible worlds, I'm very much attracted to the traditional view. However, it depends upon cooperation, your cooperation on the Plaintiff's side of course and on the Defendant's side.

I'm inclined to go in that direction with the exhortation that I have made, but insofar as the actual dates I'm still a little conflicted with regard to the GTCC stuff so I want to take that issue under advisement before I actually come up with a date and also I guess the contractual liability.

If you wanted to file a motion for contractual liability and rate of acceptance when do you think you would want to file that?

MR. SHULTIS: We didn't propose filing a motion on contractual liability, Your Honor. It was just rate of acceptance.

THE COURT: So the Court is supposed to award damages without finding that there's liability?

MR. SHULTIS: We don't assume that there are damages at all, Your Honor.

MR. STOUCK: I guess our position is the Court has already found damages.

THE COURT: I know that, but are you willing

to concede that the government is liable on the contract then?

MR. SHULTIS: No, I'm not conceding that, Your Honor. In the other cases I've been involved with the Plaintiffs have filed that motion.

THE COURT: Okay. Mr. Stouck?

MR. STOUCK: Your Honor, I meant to come back with this before. Energy Northwest decides that issue. There is liability here.

We're not particularly concerned with getting a formal finding of liability because we're really not going to get anything that we can take to the store until the damages ruling. That's where we want to get.

We would strenuously, strenuously urge the Court -- object to and urge the Court -- to dispense with any briefing of liability issues on the basis that it's not consistent with Rule 1 under your ruling that came out 10 days after our JPSR was filed or else we would have put it in there.

THE COURT: Call me old fashioned. I just find it strange to say to proceed with damages without a determination by the Court that there are damages.

MR. STOUCK: I move the Court to enter judgment on liability then on the basis of your Energy

IN THE UNITED STATES COURT OF
FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE, COPY

Plaintiff,

-vs- Case No. 04-01-06 C

THE UNITED STATES,

Defendant.

---

* * * * * *

DEPOSITION OF KEITH STUBBENDICK
TAKEN ON THE 1ST DAY OF FEBRUARY 2007
AT RADISSON HARBORVIEW
LA CROSSE, WISCONSIN
9:15 A.M.

* * * * * *

Taken before Pauline Hanson, RPR

www.nwcourtreporters.com
nwcr@nwcourtreporters.com
1-800-628-7551

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

manager?
A I was general accounting manager until January of 1992, when I became director of accounting.
Q And you've held that position then ever since?
A Since that time, yes.
Q How did your role at Dairyland change going from the general accounting manager to director of accounting?
A Under -- with the director of accounting under that, there was also the responsibility for the property accounting and fixed asset management, payroll, the accounts payable. And at the time we actually had an information systems group that was within the accounting area that acted as the intermediary for the old mainframe financial systems and all the report writing and everything that way.
Q And how many folks were under you at that time?
A At the time I took over there were 23 of us in that department, 22 or 23.
Q How many today?
A There are 11 counting myself.
Q So it's a pretty sizeable decrease. What happened, was it a change in responsibilities?
A No. It was the 1990s downsizing and everything else that went on. But at the same time, when I first

P7949 relates to other B&C Waste?
A It would seem, yes, it does.
Q I would assume the DTK that appears there as well would relate to Duratek, is that right?
A I'm not sure what it would be, but I would conclude probably, yes, it would.
Q Okay. All right. Thank you. All right.
(Deposition Exhibit Number 2 was marked for identification.)
Q (Mr. Ekman, continuing) Mr. Stubbendick, you've been handed what's been marked as Exhibit 2, which is a document prepared in connection with this case entitled SAFSTOR Cost by Project and Account. Have you seen this document before?
A I've seen some form of this before, yes.
Q And what form of this have you seen?
A Well, it was the same spreadsheet, but it was just ones that were internal documents.
Q And I'll represent to you this is a document that was provided to us by Dairyland's attorneys in connection with this case. It purports to detail the SAFSTOR costs that are flowing through to damages. Mr. Stubbendick, did you have any role in preparing Exhibit 2?
MR. STERN: I'm going to object and

instruct the witness not to answer on work product grounds.

MR. EKMAN: It's the initial disclosures.

MR. STERN: I understand. You can ask him all the questions you want on the initial disclosure, but not asking about his involvement in putting it together or -- we've been through this, John, with every witness other than the fact that you put this piece of paper in front of them.

MR. EKMAN: We have not been through with every witness. This is initial disclosures. And Mr. Sans Crainte was allowed to answer questions about who participated in this.

MR. STERN: I was not at Mr. Sans Crainte's deposition, so I don't know what you're saying is accurate. The question is what involvement he had in putting this together. I'm going to object and instruct him not to answer on work product grounds.

Q (Mr. Ekman, continuing) Did you have any involvement in putting this together?

MR. STERN: I'm going to object and instruct the witness not to answer.

MR. EKMAN: Obviously this will be subject

to a motion. These are the initial disclosures. I'm entitled to know who put together the initial disclosures. There's absolutely nothing work product in that Mr. Sans Crainte was unable to answer questions about it and said Mr. Stubbendick would have knowledge about it. I think I'm entitled to know whether it's even worthwhile asking this witness any questions about this particular document.

MR. STERN: And you have a motion to compel on that. And I'm sure -- you know, we've been through this song and dance already.

MR. EKMAN: We have not been through the song and dance.

MR. STERN: You can ask him plenty of questions about -- you have all the information in front of you, all the underlying data. Feel free to ask questions about it, but not about his involvement in helping to put together this document.

Q (Mr. Ekman, continuing) Are you going to follow your counsel's instruction not to answer?

A I am.

Q I assume going forward, if your counsel instructs

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Q Have you spoken with Mr. Brasel about this case?
A Yes.
Q And have you spoken to Mr. Brasel about the SAFSTOR costs that are included in Exhibit 2?
A Not about those specific costs.
Q What costs have you talked to Mr. Brasel about?
A He was working with Todd Smith's group, the chemical --

MR. STERN: I'm going to instruct the witness not to answer. It deals with discussions with consulting experts at this time.

Q (Mr. Ekman, continuing) Outside of that, did you have any -- did you have any communications with Mr. Brasel concerning the damages in this case?
A The project numbers that are used for SAFSTOR are ones that Roger Christians and Mike Brasel both have input in as far as how they're used that way. So I had worked with him on that aspect of it.
Q So, in other words, Mr. Christians and Mr. Brasel gave you input into what activity codes should be -- what activity codes should have accounting information collected, is that right, for what account codes that accounting information be collected? Let me rephrase the question.

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

A I'm not following your question.

Q Mr. Christians and Mr. Brasel provided some input into which activity numbers should be included on this SAFSTOR sheet?

A There were a number of P numbers that are used by LACBWR personnel. And I did have the opportunity to work with Mike on identifying them as they applied to the SAFSTOR projects and which ones are not applicable.

Q Do you know which activity codes were kept -- were not included in this?

A For example, LACBWR had time charged to the project number that was involved with the implementation of our loss and financial systems in 1999. Had nothing to do with SAFSTOR. But people all across the company were using that to track their time spent on financial system implementation. There are projects that are used all the time that could be that type of activity.

Q Any other -- any others that you can think of?

A There was some kind of a specific, it was a -- not a training -- well, if there's time spent on annual meeting costs or those type of one-time shot project costs, I mean, again, we use them all across the company. At any given time we've got three to 500

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

COPY

vs. Case No. 04-0106 C

THE UNITED STATES,

Defendant.

---

* * * * * *

DEPOSITION OF CHARLES V. SANS CRAINTE

TAKEN ON THE 30TH DAY OF JANUARY, 2007

AT THE RADISSON HOTEL LA CROSSE

LA CROSSE, WISCONSIN

9:45 A.M.

* * * * * *

Taken before Lynn M. Ettl, RPR, CRR

www.nwcourtreporters.com

nwcr@nwcourtreporters.com

1-800-628-7551

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

the instruction.
Q (By Mr. Ekman, continuing) All right. And you'll accept your attorney's instruction, I assume?
A Yes.
Q And so I don't have to keep asking that question, to the extent Mr. Stouck instructs you not to answer, I will assume you will follow that instruction going forward?
A That is correct.
Q Did any of the documents you reviewed refresh your recollection about events you may be asked to testify about today?
A Yes.
Q What documents did you review that refreshed your recollection of events?
MR. STOUCK: I'll object to that and instruct him not to answer on the same grounds.
Q (By Mr. Ekman, continuing) As I think as we said just a few moments ago, you were present for at least parts of some of the depositions that we took back in December. And I'm -- my first question is, I'm wondering if there's anything that you heard while you were sitting here that

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

sort of has been bothering or eating at you that you would like to correct on the record, a misstatement for example that you think you -- you need to correct?

MR. STOUCK: Of one of the other witnesses?

MR. EKMAN: Yes.

A I have not given that any thought, but I know that Mike Brasel in his deposition was agitated, and -- and in the course of responding he made some factual misstatements, and I think that was -- that's been since discussed in correspondence.

Q (By Mr. Ekman, continuing) Do you know what those factual misstatements were?

A Simply that he didn't participate in a meeting, at least he didn't recall. Perhaps they weren't misstatements, they were just --

Q And --

A -- failure to recall.

Q When you say in correspondence, are you perhaps referring to the Government's motion to compel?

A Yes.

Q Okay. And you reviewed that motion?

A Well, only in cursory fashion.

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

interface with the market for buying energy when there is a need and for selling excess energy when it's available to sell, and GEN~SYS Energy fills that need.

Q All right. Now at some point, you became vice president of Generation for Dairyland, is that right?

A That's right. It was in early 1999, I believe.

Q And what were your -- and you're currently the vice president of Generation?

A That's correct.

Q What are your -- what -- have your duties changed since 1999 in that role?

A Only in limited degrees, yeah.

Q So what are your general responsibilities as vice president of Generation?

A I'm responsible for the -- all of our power generation equipment, the staffing, the training, the maintenance, the performance. We also have our environmental area that reports to me, and they serve the entire system not just the Generation area, the entire system. John Parkyn, our representative on Private Fuel, is part of my staff as well.

Q How many folks report directly to you currently?

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

nuclear business, we have to get rid of our B and C waste too, and the reactor pressure vessel falls into that category.

It was further suggested that Barnwell is going to close and they've announced that in 2008 to parties outside their contract. That's us. So I think we -- we held out that option as long as we reasonably could and we're essentially coming in just under the wire. We have the option now -- when we secured a position, we paid for our reservation at Barnwell and we hope to ship that. Unfortunately now, the fuel has to follow it, and removal of the fuel is going to be made more difficult as a result of the RPV being removed first.

Q And that's because you were initially planning on loading it in the RPV?

A That was a -- one of the available opportunities and that seemed the most straightforward, yes.

Q All right. Is it -- do you know if Mr. Brasel is involved in determining the -- the incremental costs associated with the RPV removal that has resulted from the presence of spent fuel?

MR. STOUCK: Objection, form. It's vague.

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

A We have a -- we have a consultant hired to assist us in determining what the difference is, and I'm sure Mr. Brasel is -- is working with him.

Q (By Mr. Ekman, continuing) Just so that I can make sure, because I know there's certainly your -- Mr. Stouck and I have a fairly strong disagreement about the work product and attorney-client privilege in some respects, but on some things we agree. So I want to make sure I understand. You use the word consultant. This consultant, is this the expert --

A Yes.

Q -- that you referenced earlier in the -- in the deposition?

A In what context did I reference it?

MR. STOUCK: Yes, yes.

Q (By Mr. Ekman, continuing) All right. Let me -- let me ask a further -- let me ask a further question. Is it your understanding -- I'm not going to ask who it is. But is it your understanding that this individual is intended to be a testifying expert in this case as opposed to simply a consulting expert in this case?

MR. STOUCK: Don't answer that. That's work product and we don't have to disclose

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"