No. 04-106C
Chief Judge Damich

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO COMPEL DEPOSITION TESTIMONY IMPROPERLY WITHHELD UPON THE BASIS OF PRIVILEGE OR UPON DOCTRINAL GROUNDS

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, .D.C. 20530
Tele: (202) 305-7571
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

March 19, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**


BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. FACTS RELATING TO THE DEPOSITION OF CHARLES SANS CRAINTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. FACTS RELATING TO THE DEPOSITION OF KEITH STUBBENDICK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I. DAIRYLAND COUNSEL IMPROPERLY INSTRUCTED WITNESSES NOT TO RESPOND TO QUESTIONS DURING THEIR DEPOSITIONS . . . . 21

A. The Questions That The Government Posed Do Not Seek Information Covered By The Work Product Doctrine . . . . . . . . . . . . . . . . 21

B. The Questions That The Government Posed Do Not Seek Information Covered By The Attorney-Client Privilege . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## TABLE OF AUTHORITIES

### CASES

**PAGE(S)**

Afro-Lecon, Inc. v. United States,
820 F.2d 1198 (Fed. Cir. 1987) . . . . . 26

Audiotext Comm. Network, Inc. v. U.S. Telecom, Inc.,
1995 WL 625962 (D. Kan. Oct. 5, 1995) . . . . . 23

Binks Mfg. Co. v. National Presto Indus., Inc.,
709 F.2d 1109 (7th Cir. 1983) . . . . . 22

Carter v. Gibbs,
909 F.2d 1450 (Fed. Cir. 1990) . . . . . 22

Diversified Industries, Inc. v. Meredith,
572 F.2d 596 (8th Cir. 1978) . . . . . 25

First Fed.. Sav. Bank of Hegewisch v. United States,
55 Fed. Cl. 263 (2003) . . . . . 25

Genentech, Inc. v. U.S. Int'l Trade Comm'n,
122 F.3d 1409 (Fed. Cir. 1997) . . . . . 22

Hearn v. Rhay,
68 F.R.D. 574 (E.D. Wash, 1975) . . . . . 26, 27

Hickman v. Taylor,
329 U.S. 495 (1947) . . . . . 21

Hoffman v. United Telecomm., Inc.,
117 F.R.D. 436 (D. Kan. 1987) . . . . . 24

Onwuka v. Federal Express Corp.,
178 F.R.D. 508 (D. Minn. 1997) . . . . . 22

Pacific Gas & Electric Co. v. United States,
69 Fed. Cl. 784 (2006) . . . . . passim

Papadakis v. CSX Transp., Inc.,
233 F.R.D. 227 (D. Mass. 2006) . . . . . . . . . . 22

Philadelphia v. Westinghouse Electric Corp.,
205 F. Supp. 830 (D. Pa. 1962) . . . . . . . . . . 25

RTC v. Dabney,
73 F.3d 262 (10th Cir. 1995) . . . . . . . . . . 22

United States v. Nobles,
422 U.S. 225 (1975) . . . . . . . . . . 21, 26

Upjohn Co. v. United States,
449 U.S. 383 (1981) . . . . . . . . . . 25

Yankee Atomic Electric Co. v. United States,
No. 98-126C (Fed. Cl.) . . . . . . . . . . 19

Zenith Radio Corp. v. United States,
764 F.2d 1577 (Fed. Cir. 1985) . . . . . . . . . . 26

# INDEX

Document Page

Dairyland Power Cooperative v. United States, No. 04-0106C, Deposition of Charles V. Sans Crainte (January 30, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Dairyland Power Cooperative v. United States, No. 04-0106C, Deposition of Keith Stubbendick (February 1, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Letter from Kevin Stern (Greenberg Traurig) to Russell A. Shultis, (Department of Justice) transmitting updated damages claim for Dairyland Power Cooperative v. United States, No. 04-0106C (February 13, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Summary of Damages for Dairyland Power Cooperative v. United States, No. 04-0106C, (July 28, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

Revised Summary of Damages for Dairyland Power Cooperative v. United States, No. 04-0106C (February 12, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | |
| v. | ) | No. 04-106C (Chief Judge Damich) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S MOTION TO COMPEL DEPOSITION TESTIMONY IMPROPERLY WITHHELD UPON THE BASIS OF PRIVILEGE OR UPON DOCTRINAL GROUNDS

Pursuant to Rule 37 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully moves to compel additional deposition testimony that plaintiff, Dairyland Power Cooperative ("Dairlyand"), improperly withheld upon the basis of the attorney-client privilege and/or the work product doctrine.

BACKGROUND

This supplemental motion to compel is related to the motion to compel that we filed on January 23, 2007, and is based upon Dairyland's objections to questions posed during depositions based upon the work product doctrine and/or attorney-client privilege. As in the deposition of Michael Brasel, which we described in the first motion to compel, counsel for Dairyland repeatedly, and improperly, instructed witnesses not to answer questions concerning the damages claim or even questions dealing with the preparation of Dairyland's initial disclosures in depositions that took place on January 30, 2007 and February 1, 2007. As with the questions and objections that are the subject of the Government first motion to compel, the

questions that Government counsel posed do not seek privileged information or information protected by the work product doctrine. Based upon the case law that we cited in our January 23, 2007 motion to compel – including the decision in Pacific Gas & Electric Co. v. United States, 69 Fed. Cl. 784 (2006), which is on point and against the plaintiff's doctrinal and privilege assertions – we ask that the Court order Dairyland to produce Charles Sans Crainte and Keith Stubbendick for additional depositions and that these witnesses be ordered to respond to the legitimate questions posed by counsel for the Government.

## STATEMENT OF FACTS

### I. FACTS RELATING TO THE DEPOSITION OF CHARLES SANS CRAINTE

On January 30, 2007, the Government deposed Charles Sans Crainte, Dairyland's Vice President of Generation. Deposition of Charles Sans Crainte, taken January 31, 2007 ("Sans Crainte Dep.") (A. 1).[1] Mr. Sans Crainte has been employed by Dairyland since 1971 and has served as Vice President of Generation since 1999. Sans Crainte Dep., 10:4-12; 14:5-8 (A. 2-3). Mr. Sans Crainte is the immediate supervisor of Roger Christians, the plant superintendent at LACBWR,[2] and Mr. Sans Crainte has oversight authority over the project to remove LACBWR's reactor pressure vessel. Sans Crainte Dep., 19:7-20:10 (A. 4-5).

At his deposition, Mr. Sans Crainte was precluded from answering questions regarding communications that he may have had with LACBWR personnel or Dairyland's experts

---

1 "A.___" refers to the appendix attached to this motion.

2 "LACBWR" is an acronym for La Crosse Boiling Water Reactor and was used during depositions interchangeably with Dairyland and plaintiff.

concerning damages, including questions that sought simply the existence (or lack thereof) of any communications:

> Q. * * * Do you know -- do you know from a dollar amount what that -- what that amount is that Dairyland's claiming?
>
> A. I know that we have a -- an expert hired to help us ascertain what that figure is.
>
> Q. * * * Have you spoken with this expert?
>
> MR. STOUCK: I'm going to object that I think, Counsel, he doesn't have to answer that. Another reason for that, it's our position it's work product. You can ask the expert that.
>
> MR. EKMAN: Technically, I think I can ask them both. That's a yes or no question.

Sans Crainte Dep., 21:7-21 (A. 6).

* * *

> Q. Have you ever had any conversation with Mr. Brasel concerning this litigation?
>
> MR. STOUCK: Objection, form. It's vague.
>
> A. That is a very vague question, John. I'm certain that we've discussed the litigation in some respect.
>
> Q. I'll ask a more specific one. Did you instruct Mr. Brasel at any time to do any work on that damages claim?

MR. STOUCK: Objection to that and I'll instruct him not to answer that. It's within our work product.

Sans Crainte Dep., 30:11-23 (A. 7).

* * *

Q. Do you know if you attended any meetings with Mr. Brasel concerning -- that involved the damages claim?

MR. STOUCK: You know, same instruction not to answer, but it's also -- can you tell us what you mean by the damages claim? I mean, that's just inherently vague. Are you talking about the Rule 26 Disclosures?

MR. EKMAN: Yeah.

MR. STOUCK: Okay. Then my instruction stands.

MR. EKMAN: The initial disclosures.

MR. STOUCK: Yeah, yeah.

MR. EKMAN: Okay. Your instruction is not to answer?

MR. STOUCK: Yeah.

MR. EKMAN: All right.

MR. STOUCK: Except to what's written on the pieces of paper, that's work product.

Sans Crainte Dep., 31:2-20 (A. 8).

* * *

Q. When -- when I talk about the damages claim, obviously I'm talking about costs that Dairyland either believed they would seek or are seeking in connection with this case. Same thing for damages. I'm talking about in connection with this case, just as you did, as you used it in your response.

MR. STOUCK: Okay. I'm going to object to that deposition -- that definition as just inherently vague, so, but you may answer the next question if it's posed.

Q. The question was, was that a fair definition?

MR. STOUCK: Regardless of what he says, I object on vagueness grounds.

A. I think -- I -- I view damages as -- as those things that we would be seeking from the Government that -- expenses that have been incurred as a result of the Government's . . . failure to remove the fuel beginning January 1998.

Q. Okay. I think we --

A. Expenses that otherwise would not exist.

Q All right. I think we've reached some consensus on that. You don't recall, then, what the damage -- what the discussion was in this particular meeting?

A. Well --

Q. Is that fair?

MR. STOUCK: Well, about what?

MR. EKMAN: About the damages claim.

MR. STOUCK: Okay. Well, I'm going to object and instruct him not to answer that question on work product grounds.

Q. Have you had conversations with your attorneys concerning the damage -- the description of the damages claim?

MR. STOUCK: I object to that question on attorney-client privilege grounds and instruct him not to answer.

MR. EKMAN: It's a predicate answer. How am I going to know -- if he hasn't talked to you, how does he have work product?

MR. STOUCK: The whole subject matter is -- you know, you're not entitled to ask about what he discussed with us, period. That's our position.

MR. EKMAN: Well, that's our motion. We'll have him back.

Sans Crainte Dep., 36:17-38:16 (A. 9-11).

* * *

Later, counsel for Dairyland seemed to invite questions regarding Dairyland's intial disclosures while preventing Mr. Sans Crainte from answering questions regarding Dairyland's damages:

Q. Do you recall when the first time was that you asked folks to prepare estimates on -- on damages?

MR. STOUCK: I'm going to object and instruct him not to answer. I'll let him answer the one question, but that's -- those damage claims, at least as I'm understanding it, are work product that we maintain you are not entitled to ask him about.

Q (By Mr. Ekman, continuing) Did -- when you asked --

MR. STOUCK: But if you want to ask him about the Rule 26 Disclosures, that would be --

MR. EKMAN: I'm going to.

MR. STOUCK: That's probably what the case is about.

MR. EKMAN: I'm going to.

MR. STOUCK: I'll just make a little suggestion.

Q . When you -- when you asked folks to prepare damages estimates or look at estimates that may ultimately flow through to damages, did you -- did you do so independent of counsel or did -- in other words, it was your idea to do this as a business person as opposed to having been instructed by a lawyer that you needed to start assembling the damages estimate?

MR. STOUCK: Objection, instruct you not to answer for work product grounds, on work product grounds.

MR. EKMAN: That's fine. I'm making a record.

Sans Crainte Dep., 42:2-43:9 (A. 12-13).

* * *

However, when questioned about the preparation of Dairyland's initial disclosures, Mr. Sans Crainte was instructed not to respond:

Q (By Mr. Ekman, continuing) You've been handed what's been marked as Exhibit 4, which is entitled Dairyland Power Cooperative v. The United States, Summary of Damages. And I'll represent to you that this was provided to us in connection with initial disclosures that were provided to us by counsel in this case, counsel to Dairyland in this case. Have you seen this document before?

A Yes.

Q Okay. When did you see it?

A I don't know specifically.

Q Were you involved in the preparation of this document?

A Not directly.

Q How about indirectly?

A I was -- yeah, I'm sure I reviewed it upon its completion.

Q All right. Did you provide any information that went into this document?

A Not specifically that I can recall.

Q Any generally?

A No.

Q. Do you know who prepared this document?

A. I believe this was prepared by our accounting department, [Keith] Stubbendick and his staff, with the involvement of staff at LACBWR.

Q. All right. And do you know who at LACBWR was involved?

MR. STOUCK: Let's just stop there. This is -- you're getting into material that we consider to be work product.

MR. EKMAN: Now I'm asking about the initial disclosures.

MR. STOUCK: Ask him about the facts that are on this page. That's what's at issue in this lawsuit, not how it was put together, who put it together, what the strategies for putting it together were. Ask the people who know what these costs are. Those are fair questions. Our problem is with when you get into who pulled the stuff together and how and why they did it. That's just -- that's second order information. Ask him about the numbers. Ask him about who knows about the numbers. Ask him about where the numbers come from. Ask him about what they reflect. Not who put them together. That's our position. I'm not going to let him answer those questions.

MR. EKMAN: Under what assertion?

MR. STOUCK: It's work product.

Sans Crainte Dep., 70:22-73:2 (A. 14-17).

II. FACTS RELATING TO THE DEPOSITION OF KEITH STUBBENDICK

On February 1, 2007, the Government deposed Keith Stubbendick, Dairyland's Director of Accounting. Keith Stubbendick Deposition, taken on February 1, 2007 ("Stubbendick Dep."). Mr. Stubbendick has worked for Dairyland since 1986 and has been Director of Accounting since 1992. Stubbendick Dep., 6:25-7:2; 7:2-5 (A. 19-20). Mr. Stubbendick is responsible for the property accounting and fixed asset management, payroll, and accounts payable at Dairyland. Stubbendick Dep., 8:6-16 (A. 21).

Counsel for Dairyland repeatedly prevented Mr. Stubbendick from discussing his role in assembling Dairyland's initial disclosures:

> Q (Mr. Ekman, continuing) Mr. Stubbendick, you've been handed what's been marked as Exhibit 2, which is a document prepared in connection with this case entitled SAFSTOR Cost by Project and Account. Have you seen this document before?
>
> A I've seen some form of this before, yes.
>
> Q And what form of this have you seen?
>
> A Well, it was the same spreadsheet, but it was just ones that were internal documents.
>
> Q And I'll represent to you this is a document that was provided to us by Dairyland's attorneys in connection with this case. It purports to detail the SAFSTOR costs that are

flowing through to damages. Mr. Stubbendick, did you have any role in preparing Exhibit 2?

MR. STERN: I'm going to object and instruct the witness not to answer on work product grounds.

MR. EKMAN: It's the initial disclosures.

MR. STERN: I understand. You can ask him all the questions you want on the initial disclosure, but not asking about his involvement in putting it together or -- we've been through this, John, with every witness other than the fact that you put this piece of paper in front of them.

MR. EKMAN: We have not been through with every witness. This is initial disclosures. And Mr. Sans Crainte was allowed to answer questions about who participated in this.

MR. STERN: I was not at Mr. Sans Crainte's deposition, so I don't know what you're saying is accurate. The question is what involvement he had in putting this together. I'm going to object and instruct him not to answer on work product grounds.

Q (Mr. Ekman, continuing) Did you have any involvement in putting this together?

MR. STERN: I'm going to object and instruct the witness not to answer.

MR. EKMAN: Obviously this will be subject to a motion. These are the initial disclosures. I'm entitled to know who put together the initial disclosures. There's absolutely nothing work product in that Mr. Sans Crainte was unable to answer questions about it and said Mr. Stubbendick would have knowledge about it. I think I'm entitled to know whether it's even worthwhile asking this witness any questions about this particular document.

MR. STERN: And you have a motion to compel on that. And I'm sure -- you know, we've been through this song and dance already.

MR. EKMAN: We have not been through the song and dance.

MR. STERN: You can ask him plenty of questions about -- you have all the information in front of you, all the underlying data. Feel free to ask questions about it, but not about his involvement in helping to put together this document.

Q (Mr. Ekman, continuing) Are you going to follow your counsel's instruction not to answer?

A I am.

Q I assume going forward, if your counsel instructs you not to answer, you'll continue to follow that instruction, correct?

A I will.

Q What personnel were involved in preparing this document?

MR. STERN: Objection, instruct the witness not to answer –

Q (Mr. Ekman, continuing) Who --

MR. STERN: -- work product grounds.

Q (Mr. Ekman, continuing) Who requested you prepare this document?

MR. STERN: Objection, instruct the witness not to answer --

Q (Mr. Ekman, continuing) What guide --

MR. STERN: -- on work -- let me finish my objection -- on work product and attorney-client privilege.

Q (Mr. Ekman, continuing) What guidance were you provided in preparing this document?

MR. STERN: Objection, instruct the witness not to answer on attorney-client privilege grounds.

Q (Mr. Ekman, continuing) Were you provided any guidance in preparing this document?

MR. STERN: Objection, instruct the witness not to answer under attorney-client privilege grounds.

Q (Mr. Ekman, continuing) Have you spoken with any Dairyland employees concerning this document?

MR. STERN: Objection, instruct the witness not to answer on work product grounds.

Q (Mr. Ekman, continuing) Have you spoken with any attorneys concerning this document?

MR. STERN: Objection, instruct the witness not to answer on work product and privilege grounds.

Q (Mr. Ekman, continuing) How is this document prepared?

MR. STERN: Objection, instruct the witness not to answer on work product and privilege grounds.

Q (Mr. Ekman, continuing) How is the information collected that went into this document?

MR. STERN: Objection, instruct the witness not to answer, work product privilege grounds.

Stubbendick Dep., 26:10-30:21 (A. 22-26).

* * *

Q Do you know where RAD plant dismantlement is listed on this initial disclosure?

A The 52008 would be an account number that had expenses charged to it, and it's part of that P4042.

Q So all P4042 activities are flow through to SAFSTOR?

A Yes.

Q And flow through, therefore, to damages to the government, true?

A This was included in that damages claim, yes.

Q Was there -- in determining what account numbers and account descriptions would flow through, was there any

discussion concerning whether particular line items should not be included on the initial disclosures?

MR. STERN: Object, instruct the witness not to answer on attorney-client privilege grounds.

Q (Mr. Ekman, continuing) Let me ask, to the extent there were discussions, were those discussions with attorneys?

A There would have been attorneys involved with some discussions.

Q All discussions?

A No.

Q Have you seen this document before?

A Yes.

Q When did you see it?

A Well, this specific one that I was handed, a while ago, 20 minutes or whatever; but the -- what it represents, last July.

Q So you saw a version of this document last July?

A Yes.

Q Is that right?

A Yes.

Q And is -- there is -- there is a July date down on the bottom, is that right?

A Yes.

Q Did you see it before July 28, 2006?

A I don't recall specifically.

Q I'm going to ask again, did you prepare -- did you assemble the information here?

MR. STERN: Object, instruct the witness not to answer.

MR. EKMAN: In -- I mean, that's just -- there's just a factual predicate. Whether he did or didn't, that cannot be privileged. It cannot be work product. How am I to get at how particular decisions were made to include or not include things?

MR. STERN: Why don't you ask about the factual basis underlying the inclusion of these numbers in here? You were on that line of questioning just a moment ago, but you seem to have gone back to your original line of questioning.

Q (Mr. Ekman, continuing) Why is -- well, I think the answer was because it was part of the code. And my question where there was objection to is were there discussions about eliminating particular account numbers that may flow through to activity numbers but in fact may be related to something other than SAFSTOR, for instance, limited dismantlement?

MR. STERN: Is that a question?

MR. EKMAN: That is a question.

MR. STERN: Could you read the question back, please?

(The court reporter read back as requested.)

MR. STERN: Again, I'm going to object and instruct the witness not to answer, attorney-client privilege.

Q (Mr. Ekman, continuing) Did you discuss the inclusion of RAD plant dismantlement in this document as part of the damages?

A I do not recall discussing including that or not including that.

Q How about including or not including any specific account numbers?

MR. STERN: Objection, instruct the witness not to answer, privileged.

Q (Mr. Ekman, continuing) Do you know who prepared this document?

A Ultimately it was prepared by Greenberg Traurig in the form that you are seeing here.

Q Is there a prior version that was prepared by somebody at Dairyland?

A Yes.

Q Do you know who prepared the prior version?

A It was a group effort by a staff member of mine and myself and trying to think of the -- there were LACBWR personnel involved as we were compiling it and reviewing it.

Q Did Greenberg Traurig have access to your account system or would you have to provide them with that accounting information?

A You mean would they actually be able to access? No.

Q So they have to rely on you to get the information?

A Yes.

Q Were you given any direction in terms of what activities to include in this particular document?

MR. STERN: Objection, instruct the witness not to answer, privileged work product.

Q (Mr. Ekman, continuing) Were you given any instructions by anyone as to what activities not to include?

MR. STERN: Objection, instruct the witness not to answer, attorney-client work product.

Stubbendick Dep., 32:5-36:12 (A 27-31).

* * *

Q How did you know what activity numbers to include in -- on this spreadsheet?

A On the P4045?

Q No. Just in general.

MR. STERN: Object, instruct the witness not to answer, work product.

Stubbendick Dep., 41:7-12 (A. 32).

Dairyland's counsel also prevented Mr. Stubbendick from testifying about the information he provided to Dairyland's experts:

Q Have you spoken with Mr. Brasel about this case?

A Yes.

Q And have you spoken to Mr. Brasel about the SAFSTOR costs that are included in Exhibit 2?

A Not about those specific costs.

Q What costs have you talked to Mr. Brasel about?

A He was working with Todd Smith's group,[3] the chemical --

MR. STERN: I'm going to instruct the witness not to answer. It deals with discussions with consulting experts at this time.

Stubbendick Dep., 58:7-12 (A. 33).

* * *

Q And let me just ask, because I think I can eliminate a whole lot of questions. With respect to the total O&M, is there any cost category that was included in the -- in your

---

[3] Todd Smith testified in the trial of Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), in which counsel for Dairyland represented the plaintiff.

analysis that flowed through to the damages claim where you did drill down and make an attempt to decide or determine, okay, these costs were really related to coal, so we're not going to put those in; conversely, these costs were related to nuclear and they are appropriately in?

A The values that are on these two lines is what you're asking for clarification on?

Q Yes.

A That would have flowed through the normal Core Business Model practice. There was not anything supplemental done than what was done as part of the typical Core Business Model result.

Q Have you spoken with the individual who is looking at this -- these costs from an expert perspective?

A I have.

Q And what information have you provided him?

MR. STERN: I'm going to instruct the witness not to answer on the work product grounds.

Stubbendick Dep., 111:23-112:20 (A. 83-84).

On February 13, 2007, Dairyland submitted several compact discs which contained "Dairyland's revised and updated damages claim," including "updated damages summary spreadsheets." February 13, 2007 letter from Kevin Stern (A 136). Unlike the summary

spreadsheets that accompanied the initial disclosures, all references to Dairyland's "Core Business Model" were removed and replaced with figures that were to be submitted later "subject to expert analysis." (A. 137-138).

## DISCUSSION

### I. DAIRYLAND COUNSEL IMPROPERLY INSTRUCTED WITNESSES NOT TO RESPOND TO QUESTIONS DURING THEIR DEPOSITIONS

#### A. The Questions That The Government Posed Do Not Seek Information Covered By The Work Product Doctrine

Just as they had in connection with the deposition of Mr. Brasel, Dairyland's counsel repeatedly prevented the Government from fully deposing Mr. Sans Crainte and Mr. Stubbendick by tactics that this Court previously rejected in Pacific Gas & Electric Co. v. United States, 69 Fed. Cl. 784, 813-17 (2006). Counsel instructed the witnesses not to answer questions regarding their involvement in the preparation of the damages claim provided to the Government, including predicate questions that simply sought "yes" or "no" responses. Counsel's instructions in this case are identical to the assertions of privilege that counsel made in the Pacific Gas litigation, which this Court ultimately rejected. Upon analysis, the questions that the Government posed do not seek "documents and tangible things" potentially subject to the work product doctrine.

The work product doctrine, first recognized by the Supreme Court in Hickman v. Taylor, 329 U.S. 495 (1947), provides "a qualified privilege for certain materials prepared by an attorney acting for his client in anticipation of litigation." United States v. Nobles, 422 U.S. 225, 237-38 (1975) (internal quotations and citations omitted). The work product doctrine "provides protection only for *documents and tangible things* and . . . not for facts a party may have learned, even if they were learned from work product documents that are not themselves discoverable."

Pacific Gas, 69 Fed. Cl. at 816 (citing RCFC 26(b)(3)) (emphasis in original) (additional citations omitted). Although the work product doctrine also "furnishes protection for some forms of work product not in tangible form, . . . these are limited to the mental impressions, conclusions, opinions, legal theories, thought processes and recollections *of an attorney or other representative of a party* concerning the litigation." Id. (emphasis in original) (citations omitted). The purpose of the work product doctrine is to prevent the disclosure of an attorney's mental impressions and thought processes to an opposing party. Carter v. Gibbs, 909 F.2d 1450, 1451 (Fed. Cir. 1990). To this end, the doctrine protects the attorney's "thought processes and legal recommendations." Genentech, Inc. v. U.S. Int'l Trade Comm'n, 122 F.3d 1409, 1415 (Fed. Cir. 1997); see Onwuka v. Federal Express Corp., 178 F.R.D. 508, 512 (D. Minn. 1997). The work product doctrine does not protect facts concerning the creation of work product or facts contained within the work product. Pacific Gas, 69 Fed. Cl. at 816; RTC v. Dabney, 73 F.3d 262, 266 (10th Cir. 1995); see Papadakis v. CSX Transp., Inc., 233 F.R.D. 227, 229 (D. Mass. 2006) (work product doctrine "does not prohibit the discovery of underlying facts"). Further, "[l]ike all privileges, the work product doctrine must be strictly construed," and the burden is upon the party asserting the protection to show that the materials or information sought were prepared in anticipation of litigation. Pacific Gas, 69 Fed. Cl. at 790 (citations omitted); see Binks Mfg. Co. v. National Presto Indus., Inc., 709 F.2d 1109, 1120 (7th Cir. 1983).

As they did in the Pacific Gas litigation,[4] Dairyland's counsel objected upon work product grounds and instructed Mr. Sans Crainte and Mr. Stubbendick not to respond to questions regarding plaintiff's damages claim. However, as the Court held in Pacific Gas, "[w]itness responses to questions regarding the preparation of plaintiff's damages claim are not 'documents [or] tangible things' under RCFC 26(b)(3)." 69 Fed. Cl. at 817. Nor do such questions, directed at Dairyland employees, "call for intangible work product 'of an attorney or other representative of a party concerning the litigation.'" Id. (quoting RCFC 26(b)(3)) (citations omitted). In addition to objecting to questions that sought substantive responses, Dairyland objected to predicate questions that sought simply "yes" or "no" responses. Questions seeking factual predicates – for example, "were you involved in the preparation of Dairyland's damages claim?" – do not implicate protected material even under the most expansive interpretation of work product. See Pacific Gas, 69 Fed. Cl. at 815-16.[5] The work product doctrine also does not

---

[4] The questions and objections at issue in Pacific Gas were virtually identical to the questions at issue here. For example, Pacific Gas's counsel instructed witnesses not to answer questions as to the witness' involvement in preparing the damages claim, the identities of other individuals involved in the preparation of the damages claim, and how costs were determined to be caused by the breach. Pacific Gas, 69 Fed. Cl. at 815.

[5] In Audiotext Comm. Network, Inc. v. U.S. Telecom, Inc., 1995 WL 625962 (D. Kan. Oct. 5, 1995), the defendant sought "[a]ll documents used to calculate the damages alleged to have been suffered" by the plaintiff. Id., at *10. Plaintiff objected upon attorney-client privilege and work product grounds. With respect to the plaintiff's assertion of attorney-client privilege, the court held that "[m]erely documenting facts and figures and delivering such documentation to counsel does not make the documentation privileged as an attorney-client communication." Id. Moreover, even if the documentation was privileged, the attorney-client privilege "would not preclude . . . the disclosure of the facts underlying the communications." Id. With respect to the plaintiff's assertions of work product protections, the court held that the plaintiff's statements that "they prepared certain damage calculation material at the request of counsel . . . alone does not establish the material as work product." Id. The court further held that the plaintiff failed to substantiate its claim that the damage calculation documents contained the mental impressions and trial strategies of its attorneys. Id.

"protect from disclosure facts that the adverse party's lawyer has learned, or the persons from whom he has learned such facts, or the existence or nonexistence of documents, even though the documents themselves may not be subject to discovery." Hoffman v. United Telecomm., Inc., 117 F.R.D. 436, 439 (D. Kan. 1987).

The identities of individuals with whom Mr. Sans Crainte and Mr. Stubbendick spoke concerning damages are not protected. Communications with Dairyland employees seeking information to support the damages claim is not protected and is not information collected in connection with the damages claim. The methodology that Mr. Sans Crainte and Mr. Stubbendick applied, either alone or in conjunction with Mr. Brasel, in determining whether an activity was incremental to DOE's breach is a relevant and significant line of inquiry to the Government's defense of those claims and is not protected.

Dairyland appears to believe that the simple fact that counsel may have instructed employees of Dairyland to prepare or assemble a damages claim renders the product generated from that effort privileged. This cannot be so, as such an interpretation would allow attorneys to block material discovery relating to the ultimate damages claim upon which a suit is based simply by issuing cursory "To Do Lists" to their clients. As in Pacific Gas, the Court here should find that the identical objections that counsel for Dairyland asserted here "attempt[] to stretch the doctrine beyond its recognized boundaries" and enter an order allowing the Government to reopen the depositions of Mr. Brasel, Mr. Sans Crainte, and Mr. Stubbendick so that we can inquire into their involvement in the damages claim.

B. The Questions That The Government Posed Do Not Seek Information Covered By The Attorney-Client Privilege

During the deposition, counsel for Dairyland appeared, at times, to interpose attorney-client privilege objections to the Government's questions.[6] The attorney-client privilege, which protects communications "where legal advice is sought," Pacific Gas & Elec., 69 Fed. Cl. at 810 (quoting First Fed. Sav. Bank of Hegewisch v. United States, 55 Fed. Cl. 263, 266 (2003)) (additional citations omitted), fundamentally is different from the work product doctrine. The privilege "does not apply to the fact of communication between a client and attorney. It is the substance of the communication which is protected not the fact that there has been communication." Id. at 811 (citations omitted). The Supreme Court has held that the privilege protects only communications, not facts:

> The protection of the privilege extends only to communications and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

Upjohn Co. v. United States, 449 U.S. 383, 395-96 (1981) (citing Philadelphia v. Westinghouse Electric Corp., 205 F. Supp. 830, 831 (D. Pa. 1962); see Diversified Industries, Inc. v. Meredith, 572 F.2d 596, 611 (8th Cir. 1978) (en banc)) (additional citation omitted). As with assertions of work product, the attorney-client privilege "impedes the search for truth and is therefore to be strictly construed." First Fed. Sav. Bank, 55 Fed. Cl. at 266.

---

[6] Counsel's distinction between the two objections was less than clear as counsel objected to questions upon "work product privilege" grounds as well as "attorney-client work product." See Stubbendick Dep. at 30:20-21, 36:11-12 (A. 26, 31).

To the extent that Dairyland asserts attorney-client privilege with respect to the questions that the Government posed, the questions themselves belie that assertion. At no point did the Government request the contents of substantive communications between Mr. Sans Crainte or Mr. Stubbendick and counsel for Dairyland. In Pacific Gas, the Court noted that, had the attorney-client privilege been asserted in response to the identical questions posed in that case, "the transcripts above do not appear to call for such information." Pacific Gas, 69 Fed. Cl. at 816-17. The questions that the Government posed – set forth above – do not seek privileged information, and Dairyland's witnesses should be required to respond to these questions.

In addition, courts have held that, by presenting information as part of its case, a party waives the privilege with respect to matters covered in that presentation. Nobles, 422 U.S. at 239. The United States Court of Appeals for the Federal Circuit has adopted the test set forth in Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash, 1975), to determine if a party has waived the attorney-client privilege or the work product doctrine in putting the matter subject to the privilege at issue. Afro-Lecon, Inc. v. United States, 820 F.2d 1198, 1204-05 (Fed. Cir. 1987). The party has waived the attorney-client privilege when:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

Zenith Radio Corp. v. United States, 764 F.2d 1577, 1579 (Fed. Cir. 1985) (quoting Hearn, 68 F.R.D. at 581).

Applying the analysis set forth in Hearn, it is clear that Dairyland's privilege claims fall within the factors articulated in that case. Not only was the assertion of privilege the result of Dairyland's filing suit, but Dairyland's damages -- and its initial disclosures in particular -- placed the information regarding damages squarely at issue. Since information regarding damages is vital to the Government's defense, application of the work product doctrine here would plainly place a hardship upon the development of the Government's case. Without the information, the Government is not able adequately to defend against costs that may be specious or at least questionable.

In addition to counsel's objections at depositions, Dairyland's updated damages suggest that counsel is attempting to cloak information about the damages calculations from our scrutiny. Even though Mr. Stubbendick was prevented from discussing any contact or information that he provided to experts or discussing who had input into the process of determining what categories of costs were recoverable, Mr. Stubbendick was permitted to discuss the "Core Business Model" at his deposition. Stubbendick Dep. 62:24-163:10 (A. 34-135). As explained by Mr. Stubbendick, the Core Business Model is a tool Dairyland used to calculate the damages that it identified in its initial disclosures. However, in the updated claim that Dairyland submitted on February 13, 2007, the Core Business Model was completely removed and replaced by new line items that are "TBD" (presumably, meaning that these amounts are to be determined) and which are "subject to expert analysis." February 13, 2007 letter from Kevin Stern; July 28, 2006 Summary of Damages; February 12, 2007 Revised Summary of Damages (A. 135-137). Consequently, much of Mr. Stubbendick's testimony, which was necessary to a full understanding of Dairyland's damages claim, now appears to have been completely invalidated.

Moreover, until the Government receives Dairyland's expert reports, we do not know what information Dairyland has provided to its expert as the factual basis for those computations. The Court should not permit Dairyland to engage in these sharp practices and should permit the Government to re-depose Mr. Brasel, Mr. Sans Crainte, and Mr. Stubbendick in a full, fair, and comprehensive manner.

CONCLUSION

For the reasons stated herein, the Government respectfully requests that the Court order that the deposition of Charles Sans Crainte and Keith Stubbendick be reopened so that the Government can inquire into their work upon the damages claim, including Dairyland's initial disclosures.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/Russell A. Shultis
RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

March 19, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 19th day of March 2007, a copy of foregoing "DEFENDANT'S MOTION TO COMPEL DEPOSITION TESTIMONY IMPROPERLY WITHHELD UPON THE BASIS OF PRIVILEGE OR UPON DOCTRINAL GROUNDS " was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Russell A. Shultis