IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------------------------

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

vs. Case No. 04-0106 C

THE UNITED STATES,

Defendant.

---------------------------------------------------

* * * * * *

DEPOSITION OF CHARLES V. SANS CRAINTE

TAKEN ON THE 30TH DAY OF JANUARY, 2007

AT THE RADISSON HOTEL LA CROSSE

LA CROSSE, WISCONSIN

9:45 A.M.

* * * * * *

Taken before Lynn M. Ettl, RPR, CRR

www.nwcourtreporters.com

nwcr@nwcourtreporters.com

1-800-628-7551

Q Okay. So other than that, nothing pops in your head?
A No.
Q And your testimony stands on your own. I was just curious. I want to talk about your background. For ease of reference, I pulled up your bio on the Dairyland website. What year did you get your B.S. from Michigan Technical?
A 1971.
Q And then you went straight to Dairyland at that point?
A That's correct.
Q In your bio, and again in an effort to keep this suitably short, your bio goes from 1971 where you were hired as a power plant engineer to 1990 when you were promoted to assistant general manager of Transmission?
A Uh-hum.
Q So there is a 19-year gap in there. Did your job duties change between 1971 as power plant engineer and 1990?
A Yes.
Q Okay. What was your job after being a power plant engineer?
A I took a role at the headquarters as a controls

interface with the market for buying energy when there is a need and for selling excess energy when it's available to sell, and GEN~SYS Energy fills that need.

Q All right. Now at some point, you became vice president of Generation for Dairyland, is that right?

A That's right. It was in early 1999, I believe.

Q And what were your -- and you're currently the vice president of Generation?

A That's correct.

Q What are your -- what -- have your duties changed since 1999 in that role?

A Only in limited degrees, yeah.

Q So what are your general responsibilities as vice president of Generation?

A I'm responsible for the -- all of our power generation equipment, the staffing, the training, the maintenance, the performance. We also have our environmental area that reports to me, and they serve the entire system not just the Generation area, the entire system. John Parkyn, our representative on Private Fuel, is part of my staff as well.

Q How many folks report directly to you currently?

involved in -- in dealing with issues at LACBWR? Is it okay if I call it LACBWR?
A That's fine.
Q Okay.
A I'm guessing about 25 or so, 25 or 30 percent of my time. It's substantial.
Q And what -- what type of work are you performing in connection with LACBWR?
A I'm the management -- I have oversight of the project. It's under my area of responsibility for budget, for manpower. And I have been directly involved in participating in some of the decision-making process relative to Private Fuel Storage and to the reactor pressure vessel removal project and potential future dry cask storage project.
Q And let's take out PFS, because we -- I want to discuss PFS separately. What is your role in, you mentioned, decision-making for the RPV project? What is your role? Do you have any sort of day-to-day operational role in that project?
A Well, Roger Christians reports to me. He's one of my direct reports and he's the plant superintendent. And Generation Support Services

is another area that reports to me. Rob Palmberg is a direct report and his -- his staff cooperate with Roger's staff in this work effort. Generation Support Services, the director, has no nuclear background and it wasn't -- LACBWR wasn't part of his responsibilities when I hired him into that position, so I still provide some oversight.

Q Of that project?

A Yeah.

Q Is it high -- would you characterize it as high level?

A Yeah, I think for the most part I would characterize it as high level.

Q Let me ask while we're on the subject of the RPV. You recall that -- I -- I think you were at Mr. Brasel's deposition when we discussed the RPV project, the details of that project, is that true?

A I -- I recall some of that.

Q And -- and specifically, I believe I handed him the contract, the operative contract for the removal project, and you may recall I went through tasks that are identified in that -- in that contract. Do you recall that?

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

A No, I do not.
Q Okay. Let me ask it this way, then. You -- you understand that there's at least some component of Dairyland's claim that involves the RPV project, is that -- is that true?
A Oh, yes, I -- I understand that.
Q All right. Do you know -- do you know from a dollar amount what that -- what that amount is that Dairyland's claiming?
A I know that we have a -- an expert hired to help us ascertain what that figure is.
Q All right. Then let -- and so along those lines -- well, let me ask. Have you spoken with this expert?
MR. STOUCK: I'm going to object that I think, Counsel, he doesn't have to answer that. Another reason for that, it's our position it's work product. You can ask the expert that.
MR. EKMAN: Technically, I think I can ask them both. That's a yes or no question.
Q (By Mr. Ekman, continuing) Do you have an understanding that the -- that Dairyland is not asking for the entire amount of the RPV project from the Government in this case?

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

it's been a little while since I've seen one, but I would -- reasonable response is probably on a monthly basis. That's what the reports have been.

Q And you'll -- you'll receive reports on every major project that's going on on LACBWR -- at LACBWR?

A Not unless I -- we specifically set that process up. Roger Christians provides me with updates on a periodic basis, as well.

Q Have you ever had any conversation with Mr. Brasel concerning this litigation?

MR. STOUCK: Objection, form. It's vague.

A That is a very vague question, John. I'm certain that we've discussed the litigation in some respect.

Q (By Mr. Ekman, continuing) I'll ask a more specific one. Did you instruct Mr. Brasel at any time to do any work on that damages claim?

MR. STOUCK: Objection to that and I'll instruct him not to answer that. It's within our work product.

Q (By Mr. Ekman, continuing) Did you meet with Mr. Brasel concerning the damages claim?

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

A No, I don't think that I did.
Q Do you know if you attended any meetings with Mr. Brasel concerning -- that involved the damages claim?
MR. STOUCK: You know, same instruction not to answer, but it's also -- can you tell us what you mean by the damages claim? I mean, that's just inherently vague. Are you talking about the Rule 26 Disclosures?
MR. EKMAN: Yeah.
MR. STOUCK: Okay. Then my instruction stands.
MR. EKMAN: The initial disclosures.
MR. STOUCK: Yeah, yeah.
MR. EKMAN: Okay. Your instruction is not to answer?
MR. STOUCK: Yeah.
MR. EKMAN: All right.
MR. STOUCK: Except to what's written on the pieces of paper, that's work product.
MR. EKMAN: Let's mark this.
(Charles V. Sans Crainte Deposition Exhibit Number 1 was marked for identification.)
Q (By Mr. Ekman, continuing) Mr. Sans Crainte, the

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

represent to the -- my -- the CEO and the board of directors if we're going to litigate with the Government what -- what is it likely to be about. And so I've made requests of staff to estimate what damages were before we got -- even got to litigation.

Q (By Mr. Ekman, continuing) Sure. And just so you know, I'm not being critical of the fact that you guys prepared a damages claim. But what I -- you do understand -- when I say damages claim, do you understand what I'm referring to?

A I'm a little concerned that I may not. Go ahead.

Q Okay. Well, when I say damages, do you understand what I'm referring to? If not, I'm happy to define it.

A Please do.

Q All right. When -- when I talk about the damages claim, obviously I'm talking about costs that Dairyland either believed they would seek or are seeking in connection with this case. Same thing for damages. I'm talking about in connection with this case, just as you did, as you used it in your response.

MR. STOUCK: Okay. I'm going to object to that deposition -- that definition as

just inherently vague, so, but you may answer the next question if it's posed.

Q (By Mr. Ekman, continuing) The question was, was that a fair definition?

MR. STOUCK: Regardless of what he says, I object on vagueness grounds.

A I think -- I -- I view damages as -- as those things that we would be seeking from the Government that -- expenses that have been incurred as a result of the Government's fail to -- failure to remove the fuel beginning January 1998.

Q (By Mr. Ekman, continuing) Okay. I think we --

A Expenses that otherwise would not exist.

Q All right. I think we've reached some consensus on that. You don't recall, then, what the damage -- what the discussion was in this particular meeting?

A Well --

Q Is that fair?

MR. STOUCK: Well, about what?

MR. EKMAN: About the damages claim.

MR. STOUCK: Okay. Well, I'm going to object and instruct him not to answer that question on work product grounds.

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Q (By Mr. Ekman, continuing) Have you had conversations with your attorneys concerning the damage -- the description of the damages claim?

MR. STOUCK: I object to that question on attorney-client privilege grounds and instruct him not to answer.

MR. EKMAN: It's a predicate answer. How am I going to know -- if he hasn't talked to you, how does he have work product?

MR. STOUCK: The whole subject matter is -- you know, you're not entitled to ask about what he discussed with us, period. That's our position.

MR. EKMAN: Well, that's our motion. We'll have him back.

Q (By Mr. Ekman, continuing) You can put that aside. Unfortunately, we're not done with damages yet. Let me ask a couple more questions about some other folks. What is the -- do you know William Berg?

A Yes, I do.

Q And Mr. Berg, as I understand, is the president and CEO of Dairyland?

A That's correct.

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

And I'm sure Mike was involved in that.
Q (By Mr. Ekman, continuing) Do you recall when the first time was that you asked folks to prepare estimates on -- on damages?
MR. STOUCK: I'm going to object and instruct him not to answer. I'll let him answer the one question, but that's -- those damage claims, at least as I'm understanding it, are work product that we maintain you are not entitled to ask him about.
Q (By Mr. Ekman, continuing) Did -- when you asked --
MR. STOUCK: But if you want to ask him about the Rule 26 Disclosures, that would be --
MR. EKMAN: I'm going to.
MR. STOUCK: That's probably what the case is about.
MR. EKMAN: I'm going to.
MR. STOUCK: I'll just make a little suggestion.
Q (By Mr. Ekman, continuing) When you -- when you asked folks to prepare damages estimates or look at estimates that may ultimately flow through to damages, did you -- did you do so independent of

counsel or did -- in other words, it was your idea to do this as a business person as opposed to having been instructed by a lawyer that you needed to start assembling the damages estimate?

MR. STOUCK: Objection, instruct you not to answer for work product grounds, on work product grounds.

MR. EKMAN: That's fine. I'm making a record.

Q (By Mr. Ekman, continuing) Do you know an individual named Tom Zaremba?

A Yes, I do.

Q It seems like a silly question since he's here. What's Mr. Zaremba's role?

A If he was not here, I might have just --

Q What is Mr. Zaremba's role at Dairyland?

MR. STOUCK: Objection, form. It's vague.

A Mr. Zaremba is counsel. He's --

MR. STOUCK: Sure, go ahead.

A Works for Wheeler, Van Sickle, and they're Dairyland's counsel. They're out of Madison, Wisconsin.

Q (By Mr. Ekman, continuing) Does Mr. Zaremba provide solely -- provide only legal advice to

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Mr. Barrett?
MR. STOUCK: Objection, form. It's vague.
A I don't know how to -- how to respond to that.
MR. STOUCK: It's the same question.
Q (By Mr. Ekman, continuing) You try to avoid telling Mr. Barrett what your lawyers think. Is that a fair statement?
A That's what -- yes.
Q Thoughts that your lawyers have imparted to you in confidence, you've tried to avoid telling that to Mr. Barrett?
A We've tried to avoid those conversations.
Q And not just you, but we in general being Dairyland in general, true?
A That was -- yes.
MR. EKMAN: All right. Let's mark this.
(Charles V. Sans Crainte Deposition Exhibit Number 4 was marked for identification.)
Q (By Mr. Ekman, continuing) You've been handed what's been marked as Exhibit 4, which is entitled Dairyland Power Cooperative v. The United States, Summary of Damages. And I'll

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

represent to you that this was provided to us in connection with initial disclosures that were provided to us by counsel in this case, counsel to Dairyland in this case. Have you seen this document before?
A Yes.
Q Okay. When did you see it?
A I don't know specifically.
Q Were you involved in the preparation of this document?
A Not directly.
Q How about indirectly?
A I was -- yeah, I'm sure I reviewed it upon its completion.
Q All right. Did you provide any information that went into this document?
A Not specifically that I can recall.
Q Any generally?
A No.
Q Do you know who was involved in the preparation of this document? Do you know if anyone from Dairyland -- let me rephrase that. Do you know who prepared this document?
A I believe this was prepared by our accounting department, Pete Stubbendick and his staff, with

the involvement of staff at LACBWR.
Q All right. And do you know who at LACBWR was involved?
MR. STOUCK: Let's just stop there. This is -- you're getting into material that we consider to be work product.
MR. EKMAN: Now I'm asking about the initial disclosures.
MR. STOUCK: Ask him about the facts that are on this page. That's what's at issue in this lawsuit, not how it was put together, who put it together, what the strategies for putting it together were. Ask the people who know what these costs are. Those are fair questions.
Our problem is with when you get into who pulled the stuff together and how and why they did it. That's just -- that's second order information. Ask him about the numbers. Ask him about who knows about the numbers. Ask him about where the numbers come from. Ask him about what they reflect. Not who put them together. That's our position. I'm not going to let him answer those questions.

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

MR. EKMAN: Under what assertion?
MR. STOUCK: It's work product.
Q (By Mr. Ekman, continuing) Damages begin in this particular document in 1999. Do you see that?
A Yes.
Q Do you know why?
A Because the Government failed to begin removing the fuel in 1998.
Q Who decided that 1999 -- or do you know how it was decided that 1999 would be the year that Dairyland's damages began?
A We had internal discussions with staff when I got involved in my position about this. And we have a very small amount of fuel at the site, about 38 metric tons. In the grand scheme of things, that is a very minute amount. And it was our expectation, my staff's, that it would be removed immediately, as soon as the Department of Justice began -- or the Department of Energy began retrieving fuel.
Q And what's the basis for that expectation?
A It's a -- it's a shut-down facility. We have fuel at a location that doesn't need to be there. One more exposed site in the -- in the country. The -- my understanding is that the -- the

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"