IN THE UNITED STATES COURT OF
FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,
Plaintiff,
-vs- Case No. 04-01-06 C
THE UNITED STATES,
Defendant.

---

* * * * * *

DEPOSITION OF KEITH STUBBENDICK
TAKEN ON THE 1ST DAY OF FEBRUARY 2007
AT RADISSON HARBORVIEW
LA CROSSE, WISCONSIN
9:15 A.M.

* * * * * *

Taken before Pauline Hanson, RPR

www.nwcourtreporters.com
nwcr@nwcourtreporters.com
1-800-628-7551

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Q And what was your degree in?
A Accounting.
Q Did you have any other education beyond college?
A No.
Q What was your first job after graduating from Wisconsin?
A I was hired by a regional CPA firm.
Q As an accountant?
A Yes.
Q And how long were you there?
A Six-and-a-half to seven years.
Q And just very briefly, could you tell me generally what kind of work you did at the firm?
A Typical type of work that an out-of-college hired staff accountant progresses up to senior accountant and the various roles that way, working with small businesses, tax reporting, audits, and manufacturing clients, let's see, medical healthcare clients, a range of -- a range of typical type of client experience.
Q And accounting work?
A Yes.
Q What was the name of that firm?
A Hawkins, Ash, Baptie & Company.
Q What did you do -- let's see, now we're in 1986 or

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

so. What did you do then?
A I was hired by Dairyland Power.
Q Okay. And what were you hired, what was your position at that time?
A General accounting manager.
Q And what were your duties in that job?
A I had the responsibility for general ledger reporting with payroll -- no, payroll was not under me at that time. General ledger reporting with billing, and monthly close processes with journal entries. I'm just having to recall who the people were who were reporting to me at that time so I can clarify the duties. We had heavy work equipment and materials type of activity with the vehicles and transportation equipment.
Q Okay.
A Yeah, I guess there were about five.
Q Five?
A Five reporting to me, if I recall correctly.
Q And who did you report to?
A I reported to the director of accounting at that time.
Q And who was that?
A Don Calhoun.
Q All right. How long were you the general account

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

manager?
A I was general accounting manager until January of 1992, when I became director of accounting.
Q And you've held that position then ever since?
A Since that time, yes.
Q How did your role at Dairyland change going from the general accounting manager to director of accounting?
A Under -- with the director of accounting under that, there was also the responsibility for the property accounting and fixed asset management, payroll, the accounts payable. And at the time we actually had an information systems group that was within the accounting area that acted as the intermediary for the old mainframe financial systems and all the report writing and everything that way.
Q And how many folks were under you at that time?
A At the time I took over there were 23 of us in that department, 22 or 23.
Q How many today?
A There are 11 counting myself.
Q So it's a pretty sizeable decrease. What happened, was it a change in responsibilities?
A No. It was the 1990s downsizing and everything else that went on. But at the same time, when I first

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

P7949 relates to other B&C Waste?
A It would seem, yes, it does.
Q I would assume the DTK that appears there as well would relate to Duratek, is that right?
A I'm not sure what it would be, but I would conclude probably, yes, it would.
Q Okay. All right. Thank you. All right.
(Deposition Exhibit Number 2 was marked for identification.)
Q (Mr. Ekman, continuing) Mr. Stubbendick, you've been handed what's been marked as Exhibit 2, which is a document prepared in connection with this case entitled SAFSTOR Cost by Project and Account. Have you seen this document before?
A I've seen some form of this before, yes.
Q And what form of this have you seen?
A Well, it was the same spreadsheet, but it was just ones that were internal documents.
Q And I'll represent to you this is a document that was provided to us by Dairyland's attorneys in connection with this case. It purports to detail the SAFSTOR costs that are flowing through to damages. Mr. Stubbendick, did you have any role in preparing Exhibit 2?
MR. STERN: I'm going to object and

instruct the witness not to answer on work product grounds.

MR. EKMAN: It's the initial disclosures.

MR. STERN: I understand. You can ask him all the questions you want on the initial disclosure, but not asking about his involvement in putting it together or -- we've been through this, John, with every witness other than the fact that you put this piece of paper in front of them.

MR. EKMAN: We have not been through with every witness. This is initial disclosures. And Mr. Sans Crainte was allowed to answer questions about who participated in this.

MR. STERN: I was not at Mr. Sans Crainte's deposition, so I don't know what you're saying is accurate. The question is what involvement he had in putting this together. I'm going to object and instruct him not to answer on work product grounds.

Q (Mr. Ekman, continuing) Did you have any involvement in putting this together?

MR. STERN: I'm going to object and instruct the witness not to answer.

MR. EKMAN: Obviously this will be subject

to a motion. These are the initial disclosures. I'm entitled to know who put together the initial disclosures. There's absolutely nothing work product in that Mr. Sans Crainte was unable to answer questions about it and said Mr. Stubbendick would have knowledge about it. I think I'm entitled to know whether it's even worthwhile asking this witness any questions about this particular document.

MR. STERN: And you have a motion to compel on that. And I'm sure -- you know, we've been through this song and dance already.

MR. EKMAN: We have not been through the song and dance.

MR. STERN: You can ask him plenty of questions about -- you have all the information in front of you, all the underlying data. Feel free to ask questions about it, but not about his involvement in helping to put together this document.

Q (Mr. Ekman, continuing) Are you going to follow your counsel's instruction not to answer?

A I am.

Q I assume going forward, if your counsel instructs

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

you not to answer, you'll continue to follow that instruction, correct?
A I will.
Q What personnel were involved in preparing this document?
MR. STERN: Objection, instruct the witness not to answer --
Q (Mr. Ekman, continuing) Who --
MR. STERN: -- work product grounds.
Q (Mr. Ekman, continuing) Who requested you prepare this document?
MR. STERN: Objection, instruct the witness not to answer --
Q (Mr. Ekman, continuing) What guide --
MR. STERN: -- on work -- let me finish my objection -- on work product and attorney-client privilege.
Q (Mr. Ekman, continuing) What guidance were you provided in preparing this document?
MR. STERN: Objection, instruct the witness not to answer on attorney-client privilege grounds.
Q (Mr. Ekman, continuing) Were you provided any guidance in preparing this document?
MR. STERN: Objection, instruct the

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

witness not to answer under attorney-client privilege grounds.

Q (Mr. Ekman, continuing) Have you spoken with any Dairyland employees concerning this document?

MR. STERN: Objection, instruct the witness not to answer on work product grounds.

Q (Mr. Ekman, continuing) Have you spoken with any attorneys concerning this document?

MR. STERN: Objection, instruct the witness not to answer on work product and privilege grounds.

Q (Mr. Ekman, continuing) How is this document prepared?

MR. STERN: Objection, instruct the witness not to answer on work product and privilege grounds.

Q (Mr. Ekman, continuing) How is the information collected that went into this document?

MR. STERN: Objection, instruct the witness not to answer, work product privilege grounds.

MR. EKMAN: You've got to absolutely be kidding me on that, absolutely be kidding me.

Q (Mr. Ekman, continuing) We will talk again. Account number 52008 is for RAD plant dismantlement. Do you

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Q Do you know how these costs are related to SAFSTOR?
A The routine HP work, as I understand it, is the part of a SAFSTOR activity in and of itself. And the P4042 is the routine HP work.
Q Do you know where RAD plant dismantlement is listed on this initial disclosure?
A The 52008 would be an account number that had expenses charged to it, and it's part of that P4042.
Q So all P4042 activities are flow through to SAFSTOR?
A Yes.
Q And flow through, therefore, to damages to the government, true?
A This was included in that damages claim, yes.
Q Was there -- in determining what account numbers and account descriptions would flow through, was there any discussion concerning whether particular line items should not be included on the initial disclosures?
MR. STERN: Object, instruct the witness not to answer on attorney-client privilege grounds.
Q (Mr. Ekman, continuing) Let me ask, to the extent there were discussions, were those discussions with attorneys?
A There would have been attorneys involved with some

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

discussions.

Q All discussions?

A No.

Q Have you seen this document before?

A Yes.

Q When did you see it?

A Well, this specific one that I was handed, a while ago, 20 minutes or whatever; but the -- what it represents, last July.

Q So you saw a version of this document last July?

A Yes.

Q Is that right?

A Yes.

Q And is -- there is -- there is a July date down on the bottom, is that right?

A Yes.

Q Did you see it before July 28, 2006?

A I don't recall specifically.

Q I'm going to ask again, did you prepare -- did you assemble the information here?

MR. STERN: Object, instruct the witness not to answer.

MR. EKMAN: In -- I mean, that's just -- there's just a factual predicate. Whether he did or didn't, that cannot be privileged. It

cannot be work product. How am I to get at how particular decisions were made to include or not include things?

MR. STERN: Why don't you ask about the factual basis underlying the inclusion of these numbers in here? You were on that line of questioning just a moment ago, but you seem to have gone back to your original line of questioning.

Q (Mr. Ekman, continuing) Why is -- well, I think the answer was because it was part of the code. And my question where there was objection to is were there discussions about eliminating particular account numbers that may flow through to activity numbers but in fact may be related to something other than SAFSTOR, for instance, limited dismantlement?

MR. STERN: Is that a question?

MR. EKMAN: That is a question.

MR. STERN: Could you read the question back, please?

(The court reporter read back as requested.)

MR. STERN: Again, I'm going to object and instruct the witness not to answer, attorney-client privilege.

Q (Mr. Ekman, continuing) Did you discuss the inclusion of RAD plant dismantlement in this document as part of the damages?

A I do not recall discussing including that or not including that.

Q How about including or not including any specific account numbers?

MR. STERN: Objection, instruct the witness not to answer, privileged.

Q (Mr. Ekman, continuing) Do you know who prepared this document?

A Ultimately it was prepared by Greenberg Traurig in the form that you are seeing here.

Q Is there a prior version that was prepared by somebody at Dairyland?

A Yes.

Q Do you know who prepared the prior version?

A It was a group effort by a staff member of mine and myself and trying to think of the -- there were LACBWR personnel involved as we were compiling it and reviewing it.

Q Did Greenberg Traurig have access to your account system or would you have to provide them with that accounting information?

A You mean would they actually be able to access? No.

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Q So they have to rely on you to get the information?
A Yes.
Q Were you given any direction in terms of what activities to include in this particular document?
MR. STERN: Objection, instruct the witness not to answer, privileged work product.
Q (Mr. Ekman, continuing) Were you given any instructions by anyone as to what activities not to include?
MR. STERN: Objection, instruct the witness not to answer, attorney-client work product.
Q (Mr. Ekman, continuing) Let me ask you what work is being done under routine HP?
A People from the plant could answer it more specifically. But, as I understand it, there are three health physics technicians, plus a supervisor, and so it is the monitoring, again, the specific activity would -- could be delineated better by them, but it's the routine, more of an operating type of a monitoring that's going on that requires health physics technicians.
Q And do you know what's being done under 520078 RAD plant dismantlement?
A I do not, not on where it's flowing into this.

A I do not know exactly what they would have been doing in part of that.
Q Again, to the extent that category made it through to the draft, it simply made it through because of the activity number, correct?
A The P4045 is what's coming through, yes.
Q How did you know what activity numbers to include in -- on this spreadsheet?
A On the P4045?
Q No. Just in general.
MR. STERN: Object, instruct the witness not to answer, work product.
Q (Mr. Ekman, continuing) Let's look at what we have. We have P4042, P4045, P4046, 4047, 4049, 4051, 4052, zebra muscle control at 4054, training 4822, quality assurance 4848, NRC fees 6267, fuel removal 6564, special security 6815, decommissioning plants coalition 7140, and baseline activity of 0. Are there any other activity numbers related to SAFSTOR at LACBWR?
A These are the activity numbers related to SAFSTOR.
Q This is all of them?
A That I am aware of.
Q So -- and then within each activity code there are again the additional account numbers?

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Q Have you spoken with Mr. Brasel about this case?
A Yes.
Q And have you spoken to Mr. Brasel about the SAFSTOR costs that are included in Exhibit 2?
A Not about those specific costs.
Q What costs have you talked to Mr. Brasel about?
A He was working with Todd Smith's group, the chemical --
MR. STERN: I'm going to instruct the witness not to answer. It deals with discussions with consulting experts at this time.
Q (Mr. Ekman, continuing) Outside of that, did you have any -- did you have any communications with Mr. Brasel concerning the damages in this case?
A The project numbers that are used for SAFSTOR are ones that Roger Christians and Mike Brasel both have input in as far as how they're used that way. So I had worked with him on that aspect of it.
Q So, in other words, Mr. Christians and Mr. Brasel gave you input into what activity codes should be -- what activity codes should have accounting information collected, is that right, for what account codes that accounting information be collected? Let me rephrase the question.

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

what the -- the claim amount is that's near here.
Q And I assume that you couldn't tell me, because that would be pretty detailed information, which of these accounts have had dollars or which of these account numbers have had actual dollars removed internally from them, is that true?
A As they would tie to the project number, right. I would have to go through those on a basically case-by-case basis.
Q And you'd have to go to activity 4042, 52008, RAD plant dismantlement, and look at a particular year and see what the total was charged for that year and then compare it to the total on this?
A Yes.
Q If it's the same, it's the same; if it's different, something got taken out?
A That's correct.
Q But to the extent something was taken out, you're not -- you're not qualified to make those determinations, is that right?
A That is correct.
(Deposition Exhibit Number 4 was marked for identification.)
Q (Mr. Ekman, continuing) Mr. Stubbendick, you've been handed what's been marked as Exhibit 4, which is a

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Dairyland Power Cooperative Core Business Model 1999 Actual. Have you seen this document before?

A Yes, I have.

Q What is the Core Business Model?

A Core Business Model is an internal document that was developed in the mid '90s initially to be able to anticipate the expected open access in the utility power markets whereby, similar to telecommunications, it was anticipated that power suppliers would be as interchangeable as who do you have for your telephone providers. And so we needed to identify what the components were of the main rates that we were charging to the 25 class A cooperatives that make up Dairyland Power Cooperative that way so that they could be able to identify in particular what the generation component was of that rate, because that would be what they would end up having to -- if this open access were to occur as it was anticipated, then that would be what they would use as their comparable generation number that somebody else perhaps would be supplying to them instead.

Q And does -- do you still have a Core Business Model?

A It is used in some form of what, for example, 1999 would have been. It's -- it's -- it's a very

limited internal use for rate setting. And on an after-the-fact basis, we do update parts of it with actuals for the purpose of identifying the impact of what in particular LACBWR has on some of the nonoperating margins or -- or the impact of the operating margins of our financial statements for purpose of bond disclosure issues.

Q Is the Core Business Model a mechanism that achieves full cost accounting?

A No.

Q What do you use to do that?

A We again follow the chart of accounts that's prescribed by FERC, adopted by RUS. We do not need to do a full GNA cost assignment back up to individual accounts or anything like that. It is not required by them. And it's not something that we perform. This is just done, again, for a limited rate setting purpose.

Q This may seem like a silly question. I think it was written a false factual predicate or incorrect factual predicate, but let me just ask. Does this model take fixed overhead costs and allocate them to various plants?

A What would you define as fixed overhead?

Q What would you -- what would you define as a fixed

overhead? Let me ask that. Let's start there.

A What the -- again, recognizing the limited purpose of what this model is used for, it was -- it -- for the purpose of the unbundled rates was to identify what the cost component -- what the -- what the costs flowing into the components that would derive a generation rate, a power delivery rate, which at the time would have been called Transmission, those were the two main business functions that a utility would typically see. Then there would be a -- there was a recognition that LACBWR, being in a SAFSTOR state and being a nonfunctioning generation asset, would become, if we had customers leaving the cooperative, fold and going to get power from somebody else, they would have the requirement to continue to fund or to be obligated for their share of the LACBWR. So we had to carve out the LACBWR piece as well as recognizing it as a stranded asset. And there were two other very small components of customer service and planning and substations if the individual cooperatives had that as part of their rates so that they could properly identify the cost rate. So that was the basic premise of taking it as the generation and the transmission. And so then what it did was across the company take what the

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

main costs were for each of those components of the business, again, based on the FERC/RUS charts of account that dictates which accounts go into which areas or which type of business, recognize that as being the -- the core direct cost, if you will, of those areas. And then it was through this mechanism that it takes all of the administrative and general type of a costs, the nonplant specific type of a cost, and through appropriate mechanisms try to identify an element of cost as it applied back to each of those main business functions so that a rate could be determined for that purpose.

Q All right. Now, what -- what is a -- what would you define as a fixed cost?

A Well, in a pure accounting standpoint, typically you think of depreciation expense, interest expense, and taxes as they relate. Dairyland is a tax exempt cooperative, so we don't have any income tax type issues, but there are some limited real estate and property taxes. And in Wisconsin you don't pay property taxes on manufacturing facilities. Instead, as a utility, you pay a gross receipts tax. It's applied based on revenue. So those would be our type of tax components there.

Q And that's a fixed cost? Wouldn't the tax vary

depending upon the amount of revenue that's --
A That's correct.
Q The number itself is fixed?
A The concept of tax is a fixed cost, but it's variable based upon the level of activity, yes.
Q Are there any examples of things within the Dairyland system that you would consider fixed costs that do not vary based upon the level of activity within the system?
A Well, the existing debt that we would have as far as interest expense, to the degree that you're not adding facilities for which you're borrowing, you're not going to have any additional interest expense. And so if your sales went up by 10 percent or 30 percent, you're still going to have that same interest expense.
Q Of course if you paid off some of the principal, your total amount would decline?
A There would be a typical type of debt service payment where you've got payment -- payments for principal and payment for interest.
Q Let me give you an example that I think of when I think of a fixed cost that probably wouldn't vary. What about the salary, for instance, of Mr. Sans Crainte or Mr. Berg, for example, do you know if

their -- would you characterize that as a fixed cost
or a variable cost?
A They're going to be a general and administrative
cost as required for where it's coded for the
purpose of the FERC/RUS accounts like that. There
is no bonus or anything type of arrangement that's
involved with the performance level of the company
or the increase of sales or anything that way.
Q And -- and Mr. Sans Crainte and Mr. Berg are going
to get paid, you know, I'm looking here at the
business model, there's a variety of facilities,
whether Flambeau stops operating tomorrow, whether
LACBWR goes away, they're still presumably going to
get their salaries, is that fair?
A That's correct.
Q Would you define that example as a fixed cost or do
you see that as a variable cost or is it something
else?
A I would call it a general and administrative cost
that is going to be incurred. And just depending on
how it would end up being allocated to facilities is
going to be the only variable nature of what that
process would be.
Q Are general and administrative costs generally not
affected by, again, whether a particular facility

exists or does not exist?
A No.
Q Okay. Give me -- what do you mean by that?
A For example, if you had a plant that had 100 employees at it that either you closed or else if you doubled it, you're going to have impacts with HR, you're going to have impacts with payroll, impacts with other administrative functions based on employee head count or impacts that way.
Q Okay. And but what -- can you think of any types of administrative overhead costs that would not change based upon your example?
A Well, we've got a 26-member board of directors that if we have one plant or, you know, two additional new plants or whatever, we would still have the cost related to that board of directors.
Q And what about related to -- what about related to LACBWR, do you know what effect, just generally speaking or conceptually, the existence of LACBWR and -- and the spent fuel at LACBWR has on those administrative expenses?
A I couldn't answer that. As far as generally, I mean, it's going to be just part of -- it's a component of the business that our senior staff has to be involved with at times, our board of directors

is involved with at certain times, our payroll and HR people are involved with at certain times. But as far as something further than that, I couldn't exactly answer how it would increase or decrease a workload or anything that way.

Q If the -- if the -- how many employees of Dairyland are there total?

A Right now there's about 575.

Q So roughly --

A It's typically 550 to 600 depending. It flexes up in the summertime with some temporary students and other things that way but --

Q So what would that make LACBWR be, roughly is that 5 percent of the total?

A 25 out of 550 or 600.

MR. EKMAN: 5 percent?

MS. FLINN: Little less.

Q (Mr. Ekman, continuing) 5 percent. Do you know if -- when you use payroll and HR as an example, do you know if all these employees were able to be let go tomorrow because of the conclusion of operations at LACBWR, whether that would affect the HR and payroll department?

A I'm sure it would have an impact on it.

Q Small impact, big impact?

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

A It would -- I administer payroll, so I know from our standpoint, I mean, it would just be that many fewer employees that we'd be handling. I don't know how HR would be impacted. It would be speculation on my part.

Q I suppose it would also depend if, for example, Mr. Christians is the plant manager --

A Yes.

Q -- if Mr. Christians was let go in sort of the very literal sense of see you later versus reintegrated into some other capacity, true, in -- within Dairyland --

A Well --

Q -- it could affect whether -- in other words, shutting down LACBWR may or may not decrease the total number of employees by 25; some of those employees may find themselves in another facility doing some other thing for Dairyland?

A The 25 LACBWR -- LACBWR based employees would not have a LACBWR based position. I guess that's all I could answer. I don't know where they would end up going.

Q Stoneman is one of the facilities, right?

A It was.

Q What was that?

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

A Again, it was a small coal fired power plant down near Cassville, Wisconsin.
Q And what happened to Stoneman?
A It was closed down for economic reasons in the mid '90s.
Q How many employees were at Stoneman, do you know, at the time it closed down?
A Boy, by the time it finally closed down, it was pretty minimal. I don't recall, but it was pretty -- pretty minimal. We were in a period of time where we had excess generating capacity. And that facility was isolated geographically from any of the rest of our system. And it just was -- it was a 50-year-old, approximately, system and for economic reasons was shut down.
Q Do you know if employees from Stoneman were integrated into other facilities at Dairyland?
A Under the union contract they -- any of those that would have been covered had either -- not bargaining rights, the bid rights or whatever for opting into other positions. I believe there were some that were outright severed. And then there may have been one or -- somebody might have been near retirement age and took an early retirement. I don't recall specifically.

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Q And in the year before -- in the year before Stoneman disappeared, I assume it got some sort of allocation of administrative overheads, is that fair?

A It probably did. I mean, I -- actually, no, I don't, because I'm not quite sure -- I'm trying to think. I want to say that plant closed down in about 1993 or something. And that was probably about the time this model was first put together in any of its initial forms or whatever that way.

Q What does -- how does Dairyland account for administrative and overhead costs, vis-a-vis its facilities?

A For the Dairyland administrative staff? --

Q Yes.

A -- are you talking about?

Q I'm trying to contrast -- let me give an example. You understand Mr. Brasel, for example, works at home office, right?

A His cost center is based out of the home office.

Q And he does work at the coal plants, right?

A He can. Primarily it's LACBWR right now, yes.

Q In the past it's been the coal?

A Uh-huh.

Q When he works at LACBWR, he works at coal, he's

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

charging his time specifically to an activity number, correct?

A And a specific plant's account as well.

Q Now, Mr. Sans Crainte, on the other hand, based on the deposition that I took of him on Tuesday, I understand that he bills very little of his time to specific activity codes?

A Yeah, 920 is the typical labor account that somebody in his level is going to be using. And there's related expense 921 accounts that that same type of area would use, yes.

Q Sure. For --

A But they can tag onto it any kinds of a specific project if they would want to. Again, the P numbers being just an O&M tracking.

Q To the extent -- and Mr. Sans Crainte said he has charged his time specifically to P numbers, but generally speaking he does not. And of course for Mr. Sans Crainte, there's going to also be administrative time, right, secretaries, those kinds of things that are needed to support a vice president, true?

A Yes.

Q And I assume that they don't generally charge their time either to specific P numbers?

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

A Right. And, again, unless -- not any of the P numbers that we would be seeing. It's going to be -- again, they've got their own type of numbers that they would be using for that if there was something that they were involved in where it was again intended to track the time.

Q Okay. Now, again, I assume there are other examples of activities that, particularly at the home office where folks aren't necessarily charging their time to specific projects?

A Yes.

Q Records engineering might be an example, is that true?

A Yeah, where they would be using 920 for that.

Q How -- what happens to the money that's then collected? How is Mr. Sans Crainte's salary, for example, distributed among the plants? Or perhaps a better question is is it distributed among the plants?

A From any kind of published financial statements, it does not. There is no requirement, again, for the accounting rules and reporting requirements that we have through FERC/RUS to do any kind of an allocation or delineation of any of those type of 920 accounts or senior staff back across the