ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

Without waiving this objection, defendant incorporates by reference its response to Interrogatory No. 3.

SUPPLEMENTAL RESPONSE:

Although the Court's February 5, 2007 order does not require supplementation of our original response to this interrogatory, defendant further refers plaintiff to the post-trial briefing that the Government filed in Pacific Gas & Electric Co. v. United States, Nos. 04-0074C & -0075C (Fed. Cl.), dated June 30, 2006, and July 7, 2006, copies of which are available on PACER accessible through the Court of Federal Claims' website.

INTERROGATORY NO. 6:

On what schedule (measured in Metric Tons Uranium) does DOE plan to remove DAIRYLAND's SPENT FUEL pursuant to DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? DESCRIBE if, how, and when this plan has changed since the execution of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT; IDENTIFY all documents and evidence RELATED TO this plan; IDENTIFY the five people with the most knowledge of this plan and the nature of such knowledge.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions"

section. Defendant further objects to this interrogatory because it seeks information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court stated that it "does not accept, at least for purposes of discovery, that, as Defendant avers, 'discovery into DOE [Department of Energy]'s current projections about the future [is] irrelevant to any analysis of causation or damages.'" Order, at 1 (Feb. 5, 2007) (brackets in original). In response to the Court's order, defendant states that, at the present time, DOE does not have a current plan regarding the schedule for acceptance of SNF from Dairyland, beyond the contract mechanisms in Articles IV and V of the Standard Contract that detail the manner in which SNF acceptance allocations will be assigned and approved. Nevertheless, as part of any future plan that is developed for the acceptance of SNF from LaCrosse, DOE will have to consider the fact that the SNF from that reactor is failed fuel, at least some of which apparently has suffered extreme degradation. During his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository. Defendant refers plaintiff to that testimony for an explanation of those issues. Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them

under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

In its interrogatory, Dairyland requests that we detail "if, when, and how this plan has changed since the execution of" Dairyland's Standard Contract in 1983. The first official plan that DOE issued in the process of establishing a commitment to accept particular SNF from particular contract holders was the 1991 Annual Capacity Report ("ACR"), in conjunction with the 1991 Acceptance Priority Ranking ("APR").[2] The table titled "Summary of Purchasers' Annual Allocations (MTU)" in the Annual Capacity Reports identifies an acceptance allocation to Purchasers. As set forth in the Standard Contract, the 1991 ACR, in conjunction with the 1991 APR, was the document by which DOE began making firm acceptance commitments to individual utilities based upon the delivery commitment schedules submitted by Purchasers that DOE approved. After issuance of the 1991 ACR/APR, and in accordance with Article V.B.1 of the Standard Contract, the plaintiff in this action submitted several Delivery Commitment Schedules ("DCSs") to the Department of Energy. DOE also issued annual capacity reports and acceptance priority rankings dated 1992, 1994, and 1995, and many nuclear utility plaintiffs with cases pending before the Court of Federal Claims submitted DCSs in response to these ACR/APRs. In submitting their DCSs, the plaintiffs ultimately relied upon the allocations identified in the referenced ACR/APRs. DOE approved several DCSs for the plaintiff in this action. Those DCSs identify both the amount of spent nuclear fuel and high-level radioactive

---

[2] To the extent that DOE issued other "plans" prior to that date, they were not binding upon DOE and did not establish any commitments upon its part. These other non-binding "plans" are identified in the Government's post-trial proposed findings of fact in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.).

waste (collectively, "SNF") and the location of SNF for which an allocation exists under the relevant ACR/APR for a given year. No other binding "schedules" applicable to the Standard Contract were issued by the Department of Energy or accepted by the Department of Energy through the approval of DCSs. The basis for the rate and order of SNF acceptance identified in this interrogatory response are the ACR/APRs issued beginning in 1991, the DCSs that the plaintiff and other contract holders submitted to DOE, and DOE's approval of those DCSs.

Subsequently, DOE announced that it would be unable to begin SNF acceptance by January 31, 1998. Later, in 2004, DOE issued a new ACR, which identified potential SNF acceptance allocations, but that ACR did not result in any approved DCSs and, as the 2004 ACR itself stated, the information contained in the 2004 ACR was for informational purposes only and was not binding on DOE. Subsequently, DOE announced that it had begun the delivery commitment process prematurely and that it was suspending the DCS process until a later date.

In this interrogatory, Dairyland also requests that defendant "IDENTIFY all evidence RELATED TO" the current plan for the schedule upon which DOE will accept Dairyland's SNF and to identify "the five people with the most knowledge of this plan and the nature of such knowledge." As previously discussed, DOE does not currently have a planned schedule for the acceptance of Dairyland's SNF. Accordingly, defendant does not possess any documentation or evidence relating to the current plan and cannot identify individuals knowledgeable about a current plan that does not exist at this time.

INTERROGATORY NO. 7:

IDENTIFY the earliest date on which DOE reasonably believes it will begin to take delivery of SPENT FUEL from PURCHASERS under their STANDARD CONTRACTS and/or DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT.

RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant further objects to this interrogatory because it seeks information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court stated that it "does not accept, at least for purposes of discovery, that, as Defendant avers, 'discovery into DOE [Department of Energy]'s current projections about the future [is] irrelevant to any analysis of causation or damages.'" Order, at 1 (Feb. 5, 2007) (brackets in original). In response to the Court's order, defendant states that, at the present time, DOE currently anticipates that the earliest date by which it is likely to begin accepting SNF from contract holders is 2017. The specific date that DOE will begin acceptance from the La Crosse reactor will be determined in accordance with the schedule mechanism set forth in the contract, through the issuance of the Annual Capacity Report and the

Acceptance Priority Ranking, and the submission and approval of delivery commitment schedules and final delivery schedules in accordance with the allocations for the plaintiff identified in those documents. Until this process is complete, DOE cannot know the specific date upon which it will begin acceptance of SNF from plaintiff. Nevertheless, circumstances could change that would allow or require DOE to perform prior to 2017. Specifically, Congress could enact legislation requiring DOE to construct and accept waste at a centralized interim storage facility in advance of the completion of Yucca Mountain, as Congress has considered legislation in the past that provided for such actions. Alternatively, Congress or the Nuclear Regulatory Commission could mandate that Federal funds be expended to purchase casks for storage of SNF for national security reasons, if circumstances warranted such action. Congress could enact other laws, such as permitting SNF to be stored at other locations temporarily, that would allow DOE to begin SNF acceptance prior to 2017. Such circumstances are discussed at pages 3455 through 3460, 3474, and 3476 of the trial transcript in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.).

INTERROGATORY NO. 8:

On what date does DOE currently plan to complete picking up SPENT FUEL from LACBWR? DESCRIBE how this plan has changed since the execution of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT; IDENTIFY all evidence RELATED TO this plan; IDENTIFY the five people with the most knowledge of this plan and the nature of such knowledge.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant further objects to this interrogatory because it seeks information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court stated that it "does not accept, at least for purposes of discovery, that, as Defendant avers, 'discovery into DOE [Department of Energy]'s current projections about the future [is] irrelevant to any analysis of causation or damages.'" Order, at 1 (Feb. 5, 2007) (brackets in original). In response to the Court's order, defendant states that, at the present time, DOE does not have a current plan regarding the acceptance of SNF from LaCrosse, beyond the contract mechanisms in Articles IV and V of the Standard Contract that detail the manner in which SNF acceptance allocations are assigned and approved. As a result, DOE has not yet identified a date by which it will actually accept, or by which it "plans" to accept, the last of the SNF from the LaCrosse reactor. As part of any future plan that is developed for the acceptance of SNF from LaCrosse, DOE will have to consider the fact that the SNF from that reactor is failed fuel, at least some of which apparently has suffered extreme degradation. During his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v.

United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository. Defendant refers plaintiff to that testimony for an explanation of those issues. Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

In its interrogatory, Dairyland requests that we detail "how this plan has changed since the execution of" Dairyland's Standard Contract in 1983. The first formal plan that DOE issued as part of the process of establishing a commitment to accept particular SNF from particular contract holders was the 1991 Annual Capacity Report ("ACR"), in conjunction with the 1991 Acceptance Priority Ranking ("APR"). The table titled "Summary of Purchasers' Annual Allocations (MTU)" in the Annual Capacity Reports identifies an acceptance allocation to Purchasers. As set forth in the Standard Contract, the 1991 ACR, in conjunction with the 1991 APR, was the document by which DOE began making firm acceptance commitments to individual utilities based upon the delivery commitment schedules submitted by Purchasers that DOE approved. After issuance of the 1991 ACR/APR, and in accordance with Article V.B.1 of the Standard Contract, the plaintiff in this action submitted several Delivery Commitment Schedules ("DCSs") to the Department of Energy. DOE also issued annual capacity reports and acceptance priority rankings dated 1992, 1994, and 1995, and many nuclear utility plaintiffs with cases pending before the Court of Federal Claims submitted DCSs in response to these ACR/APRs. In submitting their DCSs, the plaintiffs ultimately relied upon the allocations identified in the referenced ACR/APRs. DOE approved several DCSs for the plaintiff in this

action. Those DCSs identify both the amount of spent nuclear fuel and high-level radioactive waste (collectively, "SNF") and the location of SNF for which an allocation exists under the relevant ACR/APR for a given year. No other binding "schedules" applicable to the Standard Contract were issued by the Department of Energy or accepted by the Department of Energy through the approval of DCSs. The basis for the rate and order of SNF acceptance identified in this interrogatory response are the ACR/APRs issued beginning in 1991, the DCSs that the plaintiff and other contract holders submitted to DOE, and DOE's approval of those DCSs.

Subsequently, DOE announced that it would be unable to begin SNF acceptance by January 31, 1998. DOE later, in 2004, issued a new ACR, which identified potential SNF acceptance allocations, but that ACR did not result in any approved DCSs and, as the 2004 ACR itself stated, the information contained in the 2004 ACR was for informational purposes only and was not binding on DOE. Subsequently, DOE announced that it had begun the delivery commitment process prematurely and that it was suspending the DCS process until a later date.

In this interrogatory, Dairyland also requests that defendant "IDENTIFY all evidence RELATED TO" the current plan for the date upon which DOE will complete picking up SNF from LaCrosse and to identify "the five people with the most knowledge of this plan and the nature of such knowledge." As previously discussed, DOE does not currently have a plan for the date by it will complete SNF acceptance from LaCrosse. Accordingly, defendant does not possess any documentation or evidence relating to the current plan and cannot identify individuals knowledgeable about a current plan that does not exist at this time.

INTERROGATORY NO. 9:

Do you contend that it was or would have been unreasonable for DAIRYLAND to study, analyze, investigate and/or implement dry storage of its SPENT FUEL at any time subsequent to DOE's partial breach of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, explain all bases for this contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature. Through discovery, defendant anticipates that it may analyze Dairyland's SNF storage decisions and make determinations, for purposes of this litigation, regarding the appropriateness of those decisions. We have not had sufficient discovery in this case to make those determinations at this time. Until we have obtained such discovery and evaluated Dairyland's storage decisions, such determinations are premature.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not address the interrogatories that defendant viewed as premature. Further, we are still developing our positions regarding Dairyland's activities as part of our evaluation of Dairyland's claims in this litigation. Accordingly, Dairyland's request remains premature.

INTERROGATORY NO. 10:

IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or preparation of any DOCUMENT or COMMUNICATIONS RELATED TO the removal,

transport, storage and disposal of the reactor pressure vessel from LACBWR. For each PERSON identified, DESCRIBE in detail all aspects of that PERSON's involvement.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section and because plaintiff should have an equal ability to defendant to identify the requested information regarding "communications" between the Government and plaintiff, given that plaintiff and defendant were both equally involved in communications between plaintiff and defendant. See Pacific Gas & Electric Co. v. United States, 69 Fed. Cl. 323, 325-26 (2005). Defendant further objects to this interrogatory as irrelevant, given that not every possible document or communication somehow relating to the removal, transport, storage, or disposal of the reactor pressure vessel from the LaCrosse reactor is related to the damages that plaintiff seeks in this case. We are also unable to identify all responsive individuals for the reasons set forth in General Objections Nos. 1, 2, 4, 5, 6, and 8, which are incorporated into this response by reference. Defendant also objects to this interrogatory to the extent that it seeks information that is already within plaintiff's custody, possession, and/or control or that is readily available to plaintiff. See Pacific Gas, 69 Fed. Cl. at 325-26.

Without waiving these objections, defendant states that, with regard to the Department of Energy ("DOE"), defendant has previously produced DOE's contract files relating to Dairyland's Standard Contract, which contain communications between Dairyland and DOE, and other files containing communications between Dairyland and DOE from which, pursuant to RCFC 33(d), plaintiff may ascertain an answer to this interrogatory as easily as defendant. Defendant avers, however, that it is currently unaware of any DOE documents or communications that would have

involved DOE employees. Defendant further states that, with regard to the NRC and pursuant to RCFC 33(d), plaintiff should be able to identify a list of individuals who would have had such involvement, if any, from the database of documents previously made available, or to be made available, to plaintiff or from the ADAMS database that is available for searching at the NRC, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court ordered that, where Dairyland "has requested the identity of persons involved in the review of preparation, etc., of certain documents or communications, Defendant shall identify those individuals whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial), but not those who merely *may* have had such involvement." Order, at 1 (Feb. 5, 2007) (italics in original). However, it ordered that, "to the extent that Plaintiff has requested that Defendant identify 'all aspects' of any person's involvement in review or preparation, etc., of certain documents or communications, Plaintiff's request is literally overbroad," ordering instead that "Defendant shall identify the nature of such involvement, etc., with reasonabl[e] particularty." Id. at 2. In addition, the Court ordered that, "to whatever extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proffered database(s)." Id.

We are not aware of any individual at DOE with involvement in the review, approval, disapproval, drafting and/or preparation of any documents or communications relating to the

removal, transport, storage, or disposal of the reactor pressure vessel at the La Crosse nuclear power reactor. The NRC's records indicate that individuals from the NRC "whose involvement" in such documents or communications "was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial)" are (1) William H. Ruland, Deputy Director, Licensing and Inspection Directorate, Spent Fuel Transportation and Storage, who was briefed on Dairyland's request and monitored the staff's progress in responding to it; (2) Robert Nelson, Chief, Licensing Branch, Spent Fuel Transportation and Storage, who approved the special package authorization; (3) Jill Caverly, Project Manager, Licensing Branch, Spent Fuel Transportation and Storage, who served as the project manager for this action; (4) Nancy Osgood, Senior Project Manager, Licensing Branch, Spent Fuel Transportation and Storage, who provided technical advice to the project manger; (5) Michelle DeBose, Licensing Assistant, Licensing Branch, Spent Fuel Transportation and Storage, who reviewed all correspondence related to this action for conformance with administrative requirements and maintained licensing information for this project; (6) Robert Lewis, Chief, Rules, Inspection and Operations Branch, who concurred on the summary of the meeting with Dairyland and Duratek on September 20, 2005; (7) Stewart Treby, Attorney, Office of the General Counsel, who reviewed the special package authorization for compliance with legal requirements; (8) Gordon Bjorkman, Branch Chief, Spent Fuel Storage and Transportation, who reviewed and concurred on the special package authorization and directed the technical reviewers within his branch; (9) Larry Campbell, Branch Chief, Spent Fuel Storage and Transportation, who reviewed and concurred on the special package authorization and directed the technical reviewers within his

branch; and (10) Jason Piotter, Charles Interrante, Christopher Bajwa, Shana Helton, and Elizabeth Thompson, who are Technical Reviewers.

INTERROGATORY NO. 11:

Has DOE given any consideration or undertaken any study, analysis, or investigation of the manner in which DOE will or could dispose of FAILED FUEL? If not, explain why DOE has not considered or studied this topic. If so, also IDENTIFY:

a. The nature of such consideration, study, analysis or investigation.

b. The timeframe of such consideration, study, analysis or investigation.

c. All individuals who participated in such consideration, study, analysis or investigation.

d. The results and/or conclusions of such consideration, study, analysis or investigation.

e. Whether such consideration, study, analysis or investigation included the possibility of storing or disposing of FAILED FUEL in a facility or location other than the deep geologic repository.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as vague, overly broad, irrelevant, and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Plaintiff's interrogatory is not limited to failed fuel in the possession of or generated by Dairyland or other Standard Contract holders. Further, not every aspect of failed fuel is in any way related to Dairyland's damages claim in this litigation. Further, because of the manner in which Dairyland's request is broadly phrased, almost any document having anything

to do with spent nuclear fuel storage or disposal could be "related" to this interrogatory, further rendering it overly broad and unduly burdensome.

Without waiving these objections, defendant states that there are large quantities of documents available on the Record Information System website ("RIS-Web") that are potentially responsive to this request and which, pursuant to RCFC 33(d), plaintiff can attempt to develop a response to this extremely broad inquiry. Without any further refinement and narrowing of plaintiff's request, defendant cannot provide any further response to this inquiry. To the extent that plaintiff is able to narrow its interrogatory to permit a targeted search and response, defendant is willing to evaluate that narrowed request and respond appropriately.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court indicated that, "to the extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proferred database(s)." The following documents from which plaintiff can develop a response to this interrogatory may be found in the Government's past productions:

| Container | First Image | Last Image |
|---|---|---|
| CTR013 | CTR0130476 | CTR0130476 |
| CTR013 | CTR0131092 | CTR0131108 |
| CTR013 | CTR0131163 | CTR0131170 |
| CTR013 | CTR0131205 | CTR0131215 |
| CTR013 | CTR0131343 | CTR0131355 |
| CTR013 | CTR0131401 | CTR0131404 |
| CTR013 | CTR0131420 | CTR0131432 |
| CTR013 | CTR0131470 | CTR0131481 |
| CTR013 | CTR0131530 | CTR0131541 |