# EXHIBIT 4

**No. 04-0106C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**DAIRYLAND POWER COOPERATIVE,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY AND MOTION FOR A PROTECTIVE ORDER

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**RUSSELL A. SHULTIS**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 353-0897**
**Fax: (202) 307-2503**

**OF COUNSEL:**

**JANE K. TAYLOR**
**Office of General Counsel**
**U.S. Department of Energy**
**1000 Independence Avenue, S.W.**
**Washington, D.C. 20585**

**PATRICK B. BRYAN**
**JOHN C. EKMAN**
**SONIA M. ORFIELD**
**MARIAN E. SULLIVAN**
**Department of Justice**
**Washington, D.C. 20530**

**January 18, 2007**

**Attorneys for Defendant**

The interrogatory is compound, because, even if it is reasonable to study alternative methods of storage, it may be unreasonable to implement dry storage. In any event, any answer requires discovery into a variety of facts. To respond properly to this interrogatory, we need to know, among other things: (i) the cost of Dairyland's wet storage; (ii) the anticipated cost to Dairyland of implementing dry storage, including the design, licensing, and construction of its dry storage facility; (iii) the expected costs for casks; (iv) the necessary facility modifications; (v) Dairyland's cask loading costs; and (vi) anticipated operations and maintenance costs for the dry storage facility. To date, none of the individuals whom we have deposed have been knowledgeable about Dairyland's costs. Individuals who may have knowledge of the costs are scheduled to be deposed in the near future.

Further, there are significant questions as to why, even if dry storage is reasonable and cost-effective, Dairyland did not begin to implement dry storage in the late 1990s. As of today, nine years after DOE's partial breach, Dairyland continues to store its SNF in its wet pool – a mode of storage that Dairyland appears now to assert is more expensive than dry storage. If that is the case, there is a potentially significant failure to mitigate by Dairyland. None of the witnesses questioned in the first round of depositions, including the dry storage project manager, Michael Brasel, could answer these questions. Additionally, to understand whether there is a failure to mitigate, we need additional discovery concerning the cost components of the two options, as well as the technology that would have been available to the plaintiff in the late 1990s. Although individuals deposed to date have not possessed that information, we have upcoming depositions of Dairyland's plant manager and vice president of generation.

Interrogatory No. 13. In this contention interrogatory, Dairyland propounded the following question:

> Do you contend that DOE would have picked up DAIRYLAND's FAILED FUEL later than the rest of its SPENT FUEL had the government begun SPENT FUEL acceptance from utilities starting not later than January 31, 1998? If so, state all bases for this contention.

Pl. Att. 1, at 15. As with Interrogatory No. 9, we objected to this interrogatory in part because "because it is premature prior to the completion of fact discovery, given that defendant does not have adequate information regarding plaintiff's failed fuel to respond appropriately to this interrogatory."[4] Pl. Att. 1, at 16. Nevertheless, we explained that, "during his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository" and "referred plaintiff to that testimony for a response to this interrogatory." Pl. Att. 1, at 16. We also stated that, "although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates," citing 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

Since this response, we have learned additional information concerning the condition of Dairyland's particular SNF, such as that Dairyland possesses seriously failed fuel including significant amounts of fuel that are not intact. Indeed, some of Dairyland's spent fuel is so

---

[4] We further objected "to this interrogatory as vague, overly broad, and unduly burdensome. Given that the design parameters for any storage facility that DOE might operate have not yet been defined, it is impossible to identify every technical impediment that could occur in the acceptance of failed fuel from Dairyland's nuclear reactor." Pl. Att. 1, at 16.

degraded that more than 250 grams of spent fuel was embedded in the resins used in the pool and was shipped to a private waste burial site, approximately six grams were contained in dry active waste and was shipped to a private waste burial site, and more than 42 grams of spent fuel were discharged through Dairyland's filtration system into the Mississippi River. Deposition of Seymour Raffety, dated December 14, 2006, at 151:17-154:5.

The poor condition of significant amounts of SNF may affect our response to this interrogatory depending upon the date by which Dairyland asserts its standard spent fuel assemblies would have been removed in the non-breach world, a litigation position that Dairyland has not yet disclosed. The rate of acceptance that is assumed in Dairyland's claim also could have an effect upon DOE's ability to accept seriously degraded spent fuel. Finally, we need to know whether Dairyland will be arguing the exchanges theory pursued by counsel for Dairyland in Yankee Atomic and Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 333 (2006), and the effect of that argument upon Dairyland's place in the acceptance queue – that is, whether Dairyland allegedly have traded up or down in the queue. If Dairyland takes the position that all of its SNF would have been accepted in the first year (or years) of DOE performance, there likely will be significant questions raised as to whether SNF that is among the most damaged in the United States would have been taken in the nascent program. None of these questions can be answered without Dairyland's articulation of its litigation position concerning the date by which Dairyland's SNF would have been removed in the "but for" world.

Interrogatory No. 14: Here, Dairyland promulgated the following contention interrogatory:

> Do you contend that DAIRYLAND's expenditures supporting [Private Fuel Storage ("PFS")] were unreasonable expenditures

> toward mitigation of DAIRYLAND's damages due to DOE's partial breach of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, state all bases for this contention.

Pl. Att. 1, at 16. We objected to this response, in part, as premature, given that "any determination of whether, from a business or profit-making standpoint upon Dairyland's part, it was 'unreasonable' for Dairyland to invest in Private Fuel Storage ('PFS') cannot be made prior to the completion of discovery." Pl. Att. 1, at 17. Nevertheless, we stated that, "as we have explained in prior briefing in several of the SNF cases pending before this Court, any investment in PFS was not foreseeable at the time of contract formation and, further, was wholly speculative. Any such investment could not be considered proper 'mitigation' of DOE's delay in beginning SNF acceptance." Id.

The plaintiff, and its attorneys, are well aware of the Government's position upon the issue of PFS, and, significantly, the Government's position that costs related to PFS are not recoverable has been adopted by this Court in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), and in Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 333 (2006). However, there still remains significant analysis of the Dairyland-specific facts to determine whether additional grounds for contesting PFS in this case exist, beyond the grounds previously accepted by this Court and affirmed by the United States Court of Appeals for the Federal Circuit. In Indiana Michigan, some of the evidence upon which the Court relied in finding PFS speculative was internal documents from the plaintiff in which its own employees expressed their belief, at the time of the investment, that the investment was unlikely to result in success. Here, we should be entitled to take discovery into those issues before we have to identify all of our contentions regarding PFS.

Interrogatory No. 15. In this contention interrogatory, Dairyland asked the following question:

> Do you contend that it was unreasonable for DAIRYLAND to store its SPENT FUEL in the LACBWR wet fuel storage pool at any time after DOE partially breached DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, DESCRIBE when you contend it became unreasonable for DAIRYLAND to continue to store its SPENT FUEL in the LACBWR wet fuel storage pool and DESCRIBE the specific alternative storage options you believe would have been reasonable for DAIRYLAND to employ to store its SPENT FUEL from that point onward.

Pl. Att. 1, at 17.

Again, Dairyland is asking us to state all of our contentions regarding its on-site activities and its internal decision-making processes before we have had complete discovery regarding those activities and processes and before we have had an opportunity to analyze them. This interrogatory essentially mirrors Interrogatory No. 9 and requires all of the same information identified above to respond. To date, we have not deposed any individual with knowledge of Dairyland's decision-making nor have we deposed individuals knowledgeable about Dairyland's costs. Once those depositions are complete, we will be able to provide a response.

Dairyland cites to the district court's decision in In re One Bancorp Securities. Litigation, 134 F.R.D. 4 (D. Me. 1991), to support its position that the Government should be required, now and before it has completed substantial discovery, to develop and convey to Dairyland all of its not-yet-formulated contentions regarding the appropriateness of actions that Dairyland took and about which we are still learning. Yet, in One Bancorp, it was the plaintiffs that sought to defer until after the close of discovery their obligation to disclose their contentions underlying the lawsuit that they had filed. As the district court there determined, "[p]laintiffs must have some

factual basis for the allegations in their complaint" and ordered the plaintiffs to disclose them. Id. at 8. Here, Dairyland, not the Government, filed the complaint, and, long before Dairyland filed that complaint, counsel for Dairyland had access to the bulk of the discovery, including over a million pages of documents produced following document production requests, that the Government has produced in the SNF litigation. In contrast, until very recently, the Government had no discovery from Dairyland, and the contentions to which Dairyland demands responses relate to aspects of Dairyland's decision-making about which the Department of Energy had no involvement. Dairyland's insistence that, prior to substantial discovery, we state whether Dairyland's on-site actions with regard to its SNF storage were "reasonable" – before we have taken discovery to understand the contents of Dairyland's fuel pool, the level of damage to Dairyland's SNF or the degree to which it requires special handling, and the circumstances that caused Dairyland to decide to construct a dry storage facility – is unreasonable.

D. The Government Has Appropriately Responded To Dairyland's Demands For Information Regarding Identification Of Individuals

1. Dairyland's Interrogatory No. 17 Does Not Request Identification Of Individuals, And Its Inclusion Of This Contention Interrogatory Here Appears To Be In Error

Dairyland complains that the Government has improperly relied upon RCFC 33(d) "in vague terms" to reference prior document productions and the identifies of individuals who may have knowledge of certain matters. Pl. Mtn. 9. In its list of challenged responses, Dairyland includes Interrogatory No. 17. Id. at 9-10. However, Interrogatory No. 17 does not include a request for the identities of individuals, instead asking us to "DESCRIBE all options that [we] contend DAIRYLAND should have explored and/or implemented for the storage of its FAILED FUEL after DOE partially breached" the Standard Contract, along with an explanation of "how

and why" Dairyland should have explored or implemented different storage options. Pl. Att. 1, at 18. The interrogatory itself is a contention interrogatory to which we responded by stating that it is premature. Pl. Att. 1, at 18. For the reasons explained above, we should not be required to develop our contentions regarding Dairyland's storage of its failed fuel until we have had a complete opportunity to discovery appropriate information regarding Dairyland's failed fuel, the level of its failure, and the manner in which Dairyland has and might have stored it. However, Dairyland's inclusion of this interrogatory in its challenge to the Government's reference to past document and discovery productions appears to be in error.

2. With Regard To Dairyland's Demand In Interrogatory No. 18 For Identification Of Individuals With The "Most Knowledge" Regarding Certain Topics, Counsel For Plaintiff's Past Use Of Sanctions Motions To Punish The Government For Witnesses' Lack Of Memory Regarding Matters In Which They Were Once Involved, As Well As The Work Product Doctrine, Precludes Us From Providing Such Attestations

Although it does not mention this specific request in detail, Dairyland's motion requests that the Court compel us to respond to its inquiry in Interrogatory No. 18 to identify the "five people with the most knowledge" regarding certain efforts. In our response to that interrogatory, as well as other interrogatories, we attempted to identify those persons who, to the best of our knowledge after a reasonable inquiry, either were involved or were most likely to be involved (where we could not ascertain with certainty that anyone from the Government was involved) in the matters identified in the interrogatory and/or who we believed were likely to have relevant knowledge, based upon what appeared to be their past involvement with various activities. However, we cannot attest to the current "knowledge" or recollection of every