No. 04-106C
(Chief Judge Damich)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE FEBRUARY 5, 2007 ORDER AND FOR SANCTIONS, AND DEFENDANT'S MOTION FOR IMPOSITION OF RECIPROCAL OBLIGATIONS UPON THE PARTIES

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, .D.C. 20530
Tele: (202) 305-7571
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

April 20, 2007

TABLE OF CONTENTS

PAGE

SUMMARY OF ARGUMENT ........................................................................................ 1

ARGUMENT ...................................................................................................................... 3

I. DAIRYLAND'S MOTION TO IMPOSE ADDITIONAL BURDENS UPON THE GOVERNMENT'S DOCUMENT PRODUCTION EFFORTS SHOULD BE REJECTED ................................................................. 3

A. The Government Has Undertaken Substantial Efforts To Comply With The Court's February 5, 2007 Order .................................. 3

B. With Regard To Its Request For Additional Document Identification Requirements, Dairyland Seeks To Impose An Impractical Burden That Exceeds The Scope Of The Court's February 5, 2007 Order ............ 6

C. Dairyland's Assertion That We Have Been Intentionally Vague In Identifying Documents Responsive To Its Requests Is Unfounded .... 10

D. The Government Properly Responded To Dairyland's Contention Interrogatories ...................................................................... 11

1. Contrary To Dairyland's Representations, The Government Responded To Interrogatory Nos. 5, 13, And 14 ........................ 11

2. Responses To Interrogatory Nos. 9, 15, 16, and 17, Which The Court's February 5, 2007 Order Did Not Address, Depend Upon Expert Witness Analysis ....................... 14

II. THE COURT SHOULD DENY DAIRYLAND'S REQUEST FOR SANCTIONS ......................................................................................... 16

III. THE COURT SHOULD IMPOSE RECIPROCAL, RATHER THAN UNILATERAL, OBLIGATIONS UPON THE PARTIES RELATING TO DOCUMENT PRODUCTION ........................................................ 18

CONCLUSION ............................................................................................................... 24

# TABLE OF AUTHORITIES

CASES PAGE(S)

In re Aldelphia Communications Corp.,
338 B.R. 546 (S.D.N.Y. 2005) .......... 22

American International Specialty Lines Insurance Co. v. NWI-I, Inc.,
240 F.R.D. 401 (N.D. Ill. 2007) .......... 20

Bergersen v. Shelter Mutual Insurance Co.,
No. 05-1044, 2006 WL 334675 (D. Kan. Feb. 14, 2006) .......... 22

Cardenas v. Dorel Juvenile Group, Inc.,
230 F.R.D. 611 (D. Kan. 2005) .......... 20

In re Convergent Techs. Secs. Litig.,
108 F.R.D. 328 (N.D. Cal. 1985) .......... 16

DE Technologies, Inc. v. Dell Inc.,
238 F.R.D. 561 (W.D. Va. 2006) .......... 20

DE Technologies, Inc. v. Dell, Inc.,
No. 04-628, 2007 WL 128966 (W.D. Va. Jan. 12, 2007) .......... 22

Daval Steel Products v. M/V Fakredine,
951 F.2d 1357 (2d Cir. 1991) .......... 17

Fischer & Porter Co. v. Tolson,
143 F.R.D 93 (E.D. Pa. 1992) .......... 16

Genentech, Inc. v. Unitd States International Trade Commission,
122 F.3d 1409 (Fed. Cir. 1997) .......... 17

Ingalls Shipbuilding, Inc. v. United States,
857 F.2d 1448 (Fed. Cir.1988) .......... 17

R.W. International Corp. v. Welch Foods, Inc.,
937 F.2d 11 (1st Cir. 1991) .......... 17

Residential Constructors, LLC v. Ace Property & Casualty Ins. Co.,
No. 05-01318, 2006 WL 1582122 (D. Nev. June 5, 2006) .......... 7, 21

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

U.S. Commodity Futures Trading Commission v. American Derivatives Corp., No. 05-2492, 2007 WL 1020838 (N.D. Ga. March 30, 2007) ........................................ 23

MISCELLANEOUS

Black's Law Dictionary 1265 (6th ed. 1990) ....................................................................... 7

# INDEX TO APPENDIX

DOCUMENT PAGE

Dairyland's Responses to Defendant's First Set Of Requests For Production Of Documents, dated August 28, 2006 ........ 1

Dairyland's Responses To Defendant's First Set Of Interrogatories, dated August 28, 2006 ........ 24

Dairyland's Initial Disclosures ........ 51

Sample of screen shots from documents produced by Dairyland, showing the "coding" information provided about each document ........ 56

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-106C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE FEBRUARY 5, 2007 ORDER AND FOR SANCTIONS, AND DEFENDANT'S MOTION FOR IMPOSITION OF RECIPROCAL OBLIGATIONS UPON THE PARTIES

Defendant, the United States, respectfully responds to the motion that plaintiff, Dairyland Power Cooperative ("Dairyland"), filed on April 2, 2007. In addition, defendant respectfully requests that the Court, in light of the reciprocal nature of the discovery obligations in this case, compel Dairyland to comply with the same document production obligations as those that the Court has imposed upon the Government.

## SUMMARY OF ARGUMENT

Dairyland seeks sanctions against the Government for the Government's alleged failure to comply with this Court's February 5, 2007 order. Dairyland has interpreted that order to require that the Government identify, by Bates number, every single document that is responsive to each of Dairyland's broad individual requests for the production of documents. Dairyland also requests that the Court set a date when the Government must definitively respond to Dairyland's contention interrogatories. As discussed below, the Government has complied with the Court's February 5, 2007 order to identify with "reasonable particularity" those documents that are responsive to each of Dairyland's written document production requests and continues to provide copies to Dairyland of documents responsive to Dairyland's document production

requests in accordance with the Court's order. Through its motion, Dairyland seeks to impose an unreasonable interpretation of the Court's order upon the Government that would undermine the benefit that the production website provides to all of the spent nuclear fuel ("SNF") plaintiffs. Further, the Government has responded to Dairyland's contention interrogatories appropriately, and Dairyland's request for sanctions should be denied.

Given the state of Dairyland's own production of documents to the Government, Dairyland's demands that the Court impose additional incredibly burdensome obligations upon the Government is somewhat mystifying. Although Dairyland insists that the Government must list the Bates-stamp numbers of every document that the Government has produced in the past that relates to each of Dairyland's specific individual document production requests, Dairyland has undertaken no such effort with its own production to the Government of more than 34,000 documents totaling more than 189,000 pages. Although Dairyland has informed us that it has no obligation to categorize its documents because it is producing them as they are maintained in the "ordinary course of business," we can identify no difference in the manner in which Dairyland and the Government have produced their documents. If the Government has an obligation to produce documents in a manner that reasonably identifies for Dairyland the specific document production requests to which the various documents are responsive, we cannot understand how Dairyland does not have an identical obligation.

Under Dairyland's theory, the Government is required to review and categorize the entirety of <u>both</u> parties' productions, while Dairyland need not undertake that effort for <u>either</u> production. That is, because Dairyland did not categorize the documents that <u>it</u> produced, the Government, to the extent that it wants to use any of those documents, will have to conduct a

complete review, analysis, and organization of Dairyland's produced documents. Dairyland's attempt to impose unequal burdens on the parties, and its effort to produce documents in a manner that requires the Government to expend substantial effort and resources to attempt to identify those documents that are responsive to particular issues in this case, should be rejected, and Dairyland should be compelled to comply with the same rules that the Court imposes upon the Government.

## ARGUMENT

### I. DAIRYLAND'S MOTION TO IMPOSE ADDITIONAL BURDENS UPON THE GOVERNMENT'S DOCUMENT PRODUCTION EFFORTS SHOULD BE REJECTED

#### A. The Government Has Undertaken Substantial Efforts To Comply With The Court's February 5, 2007 Order

As the Court is aware, we have been working diligently with the Department of Energy ("DOE") and the Nuclear Regulatory Commission ("NRC") to comply with the Court's February 5, 2007 order. DOE and the NRC have conducted extensive searches among wide ranges of employees and offices within their agencies and have forwarded requests to hundreds of agency and contractor employees. The Government has expended significant resources to identify and produce documents that are responsive to Dairyland's discovery requests. Since the Court issued its order on February 5, 2007, we have undertaken substantial additional document searches and have posted more than 300,000 pages of additional documents populating more than 250 electronic containers, primarily in response to Dairyland's broad document production requests. On March 23, 2007, the Government produced revised written responses to Dairyland's written discovery requests, which included a guide identifying responsive materials from past document productions as well as materials added in response to recent productions, to each of Dairyland's

requests on a container-by-container basis. Dairyland Mtn. Exh. 1.[1] This effort has, at various times, occupied approximately 15 attorneys and consultants, in addition to numerous litigation support contractor employees, and it is continuing despite several technical hurdles. Our litigation consultants alone have devoted more than 1,400 manhours on this effort, at an estimated cost of more than $325,000, and our litigation support contractor has already devoted more than 7,000 manhours processing those documents for production to Dairyland.[2]

In addition to these recent efforts, we had previously produced many documents that would be responsive to Dairyland's current production requests by posting them in electronic containers on a production website, a database that was made accessible to SNF plaintiffs long ago. In response to the Court's February 5, 2007 order that we "at least identify with reasonable particularity those documents it deems responsive to Plaintiff's specific requests," Order, at 2 (Feb. 5, 2007), we undertook a substantial effort to comply with that order. Because of the breadth of Dairyland's production requests and the volume of more than 1 million pages of documents that we had previously produced to the SNF plaintiffs, we could not realistically create a list identifying each and every document, by Bates-stamp number, that appeared responsive to each of Dairyland's individual document production requests. Nevertheless, at our direction, our consultants reviewed the entirety of our previously produced document collections and identified which of the containers of documents contained documents responsive to

---

[1] "Dairyland Mtn. ___" refers to "Dairyland's Motion To Enforce February 5, 2007 Order And For Sanctions," dated April 2, 2007. "App. ___" refers to the appendix to this response brief.

[2] We have not yet estimated the costs to our litigation support contractor for this effort.

Dairyland's individual requests.[3] The effort and time that were involved in reviewing the entirety of those previously produced document collections was substantial. At the same time that we undertook that effort, we attempted to identify, through word searches of the past productions, specific documents that seemed responsive to the requests, and we identified the results of those searches in our written document production responses. Through this effort, which required more than an additional 600 manhours (and an estimated cost of more than $150,000) to complete, the Government was able to identify to Dairyland those containers with documents responsive to its individual production requests and, by implication, those containers that did not have documents responsive to those requests. Any additional effort – specifically, a document-by-document listing, as Dairyland apparently seems to believe is now necessary – would take months and thousands of manhours to perform.

Dairyland is still not satisfied. On March 27, 2007 counsel for Dairyland complained about the Government's response to Dairyland's contention interrogatories. Dairyland argued that the Government's supplemental responses to those interrogatories, which were not specifically referenced in the Court's February 5, 2007 order, were inadequate even though the Government provided additional information in its supplemental responses. Although Dairyland's counsel was unable to articulate at that time the specific manner in which some of the Government's responses were not sufficient, Dairyland's counsel threatened to file a motion

[3] For example, we identified six containers of documents that contained documents responsive to Dairyland Request For Production No. 32; 38 containers with documents responsive to Dairyland Request No. 33; and three containers with documents responsive to Dairyland Request No. 34. See Dairyland Mtn. Exh. 1, at "Page 15 of 17."

to compel and seek sanctions if the Government did not provide more information in response to Dairyland's contention interrogatories. See Dairyland Mtn. Exh. 5.

The following day, counsel for Dairyland engaged Government counsel in a conference call regarding the Government's document production. After that discussion, Dairyland's counsel sent a letter suggesting that the Government's efforts were not consistent with the Court's February 5, 2007 order because the Government was unable to state, unequivocally, that every single document in each container identified as containing responsive documents was, in fact, responsive to the identified document production request. See Dairyland Mtn. Exh. 3. On April 2, 2007, Dairyland filed a motion seeking sanctions based upon these complaints.

At the same time that we have been required to review and catalog in a manner reflective of Dairyland's specific production requests the entirety of the Government's past document production, we have also been required to attempt to digest Dairyland's document production of more than 34,000 documents, given that Dairyland tied only approximately 40 of those 34,000 documents to the Government's individual document production requests.

B. With Regard To Its Request For Additional Document Identification Requirements, Dairyland Seeks To Impose An Impractical Burden That Exceeds The Scope Of The Court's February 5, 2007 Order

With regard to Dairyland's motion to compel the production of documents previously produced, this Court, in its February 5, 2007 order, stated

> As to document requests, to the extent that the government has already produced documents in earlier coordinated discovery in the spent nuclear fuel litigation or otherwise, Defendant shall at least identify with reasonable particularity those documents it deems responsive to Plaintiff's specific requests.

Order, at 2 (Feb. 5, 2007).

Because documents produced on the production website are organized in electronic containers, the Government has identified responsive documents on a container-by-container basis. Nothing in the Court's February 5, 2007 order suggests that practice is not proper. The manner in which we identified documents responsive to each of Dairyland's specific document production requests was directly responsive to the complaint that Dairyland made in its original December 28, 2006 motion to compel. There, Dairyland represented that the Government's production website "consists of posting of various large 'containers' of documents that the government has produced over time in response to various document requests and disclosure requirements in the various SNF cases." Dairyland's Motion to Compel Discovery Responses, at 2 (Dec. 28, 2006). It complained that "[t]hese document containers are only labeled generically, apparently based upon the source of the documents," id., and that "[t]he government's website does not disclose what types of documents are contained in the containers and the containers do not reference any particular document requests or disclose whether the documents contained therein are being produced as they are kept in the ordinary course of business." Id. at 2-3.

In response to this complaint, the Court issued an order requiring the Government to tie documents on the production website to Dairyland's specific document production requests at least with "reasonable particularity," suggesting that the Government was permitted to follow a course that is suitable under the circumstances and not excessive. See Black's Law Dictionary 1265 (6th ed. 1990) (defining "reasonable" as "[f]air, proper, just, moderate, suitable under the circumstances"); see also Residential Constructors, LLC v. Ace Property & Casualty Ins. Co., No. 05-01318, 2006 WL 1582122, at *3 (D. Nev. June 5, 2006) (in producing documents on

CDs, producing party "is not required to index each document in each file," but may "identify the files it has produced and in which boxes or group of document numbers the files are located"). Consistent with the format in which documents have always been made available on the production website, the Government has identified responsive documents on a container-by-container basis. Aside from its desire to sort through a "smaller haystack," Dairyland has failed to explain why the effort that the Government undertook is not reasonable. In fact, given the manner in which Dairyland phrased its original objections, our efforts to tie documents and production requests on a container-by-container basis appears to be exactly what Dairyland originally requested.

Responding to Dairyland's document production requests on a container-by-container basis has benefitted Dairyland. Generally, documents have been placed in containers on the production website in the manner, and order, in which they were found in Government or contractor files. That is, documents from the files of a particular individual were produced together in the order in which they were provided to us, and the individual who provided the documents was identified. Alternatively, if documents came from archived storage units, documents from a particular box were generally produced together in an electronic file. If the number of documents from a single individual or box were too large to fit within a single container, we would place them in multiple containers, while still maintaining the segregation of sources for the documents. Dairyland is now seeking, without support, to use the fact that responsive materials have been identified according to the responsive container to argue that the Government must unilaterally break its document production into even smaller pieces. Given that counsel for Dairyland long ago converted these files into searchable electronic files, a

further breakdown of each document in each container would be a meaningless, but incredibly time-consuming and expensive, effort.

Dairyland is seeking to penalize the Government for the fact that the production website was created before Dairyland filed its case. The document production website was designed to provide all the SNF plaintiffs – in the 66 SNF cases that have been filed in this Court – with equal access to Government documents without having to duplicate that effort for every plaintiff. As a result, Dairyland's counsel has had access to thousands of documents through the production website years before the Government received a single document request, or a document, from Dairyland. Consequently, the Government approached the task of labeling responsive documents reasonably, in accordance with the fact that documents were posted on the website in electronic containers long ago.

Further, the burden that Dairyland is seeking to impose upon the Government is considerable. To comply with Dairyland's current wishes, the Government would be required again to review all previously produced materials and categorize them for Dairyland on a document-by-document basis. That would require the Government to repeat and significantly expand the effort that has been taking place over the past months in order to catalog documents for the benefit of a single SNF plaintiff. Other SNF plaintiffs have used the production website without seeking the assistance that Dairyland now demands and, importantly, without providing the Government with the type of document categorization of their own produced documents that the Court has imposed upon the Government here. Given the narrow interests that would benefit from that effort, imposing such a burden is not reasonable.

C. Dairyland's Assertion That We Have Been Intentionally Vague In Identifying Documents Responsive To Its Requests Is Unfounded

Dairyland also takes issue with the fact that, in our written response to Dairyland's document production request, the Government listed the containers of documents from past document production efforts containing "additional documents that are potentially responsive to" that Dairyland document request. Dairyland Mtn. 2 & 3; see, e.g., Dairyland Mtn. Exh. 1, at 17. Dairyland interprets this language to mean that the containers identified "may," but may not, contain responsive documents. Dairyland Mtn. 2 & 3-4. Given that the parties discussed this issue during a conference call on March 28, 2007, Dairyland should be well aware that it has misinterpreted the language that we used.

We did not state that each container "potentially" contains some responsive documents. Instead, we represented that each container contains documents that are "potentially responsive" to the request at issue. As we attempted to explain to counsel for Dairyland during our March 28, 2007 conference call, the language that we used was intended to reflect that many of Dairyland's document production requests are broadly worded and could be interpreted in more than one way. Accordingly, the matter of whether documents are responsive to a particular document production request may depend upon the interpretation placed upon the language in the request. As a result, we used the language "potentially responsive" to reflect the fact that, under a broad interpretation of the document request, there would be responsive documents in all of the identified containers, even though, under a narrower or unduly restrictive interpretation of the request, some of those documents may not be viewed as responsive. We also informed Dairyland that we had attempted to comply with the spirit of the request and that we had not

made any effort to send Dairyland's counsel on some type of fishing expedition in containers that did not contain responsive documents.

Despite the parties' conversation, Dairyland elected simply to include this issue in its motion to enforce the Court's February 5, 2007 order. We do not see any reason to revise the language in our revised written document production responses again or the need to provide yet additional explanations of the meaning of the language.

D. The Government Properly Responded To Dairyland's Contention Interrogatories

1. Contrary To Dairyland's Representations, The Government Responded To Interrogatory Nos. 5, 13, And 14

Dairyland complains that the Government improperly challenged several of Dairyland's contention interrogatories – Interrogatory Nos. 5, 9, 13, 14, 15, 16, and 17 – as premature and that the Government should be required to provide affirmative responses to each of those contention interrogatories. As an initial matter, Dairyland's assertion that we did not provide substantive responses to Interrogatory Nos. 5, 13, and 14 is in error.

Dairyland's assertion that we challenged Interrogatory No. 5 as premature is simply wrong. In Interrogatory No. 5, Dairyland asked, "On what schedule (measured in Metric Tons Uranium) does DOE contend it is obligated to remove DAIRYLAND's SPENT FUEL" pursuant to the Standard Contract and to state "all factual and legal grounds for this contention." Dairyland Mtn. Exh. 2, at 14. As evidenced by our response to Interrogatory No. 5, which is contained on page 15 of Exhibit 2 to Dairyland's April 2, 2007 motion, we responded by incorporating by reference our response to Interrogatory No. 3, in which we explained the manner in which the 1991 Annual Capacity Report ("ACR"), in conjunction with the 1991 Acceptance Priority Ranking ("APR"), ultimately formed the basis of commitments that the

Department of Energy ("DOE") made to particular contract holders. Dairyland Mtn. Exh. 2, at 11-12. We further explained that "[n]o other binding 'schedules' applicable to the Standard Contract were issued by [DOE] or acceptance by [DOE] through the approval of" delivery commitment schedules. Id. at 12. In addition, we referred Dairyland to our June 30 and July 7, 2006 post-trial briefing in Pacific Gas & Electric Co. v. United States, Nos. 04-74C & -75C (Fed. Cl.), a case in which counsel for Dairyland represented the plaintiff. During a telephonic conference with attorneys for Dairyland, we questioned why this response was inadequate. Mr. Kevin Stern, one of Dairyland's attorneys, stated that Dairyland's counsel should not have to go look at other documents, beyond the written interrogatory responses themselves, to obtain an answer. Such a response makes it clear that Dairyland is not attempting to obtain necessary information that it does not already possess, but, instead, is attempting, at best, to place form over substance. Counsel for Dairyland is well aware of our positions on the rate of SNF acceptance applicable to this litigation, as well as the manner in which that rate, applying the contract mechanisms, would provide allocations to Dairyland, and our response to Interrogatory No. 5 needs no further development.

We also provided a substantive response to Interrogatory No. 13, in which Dairyland asked whether we contend that "DOE would have picked up DAIRYLAND's FAILED FUEL later than the rest of its SPENT FUEL had the government begun SPENT FUEL acceptance from utilities starting not later than January 31, 1998." Dairyland Mtn. Exh. 2, at 33. In response, we referred Dairyland to the trial testimony of David Zabransky, a DOE employee, in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), another case in which counsel for Dairyland represented the plaintiff. Dairyland Mtn. Exh. 2, at 33. Mr. Zabransky's

testimony, in which he identified the issues that might arise relating to DOE's acceptance of failed fuel at any repository, represents the best information that we have at this point in time regarding what DOE "would have picked up." In addition, we stated our position that, "although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, it is not necessarily obligated to accept them under the same schedule as standard fuel," identifying the "plain language" in Article VI.A.2(b) and Appendix E of the Standard Contract as our support. Although it is possible that additional discovery and expert analysis regarding the level of failures associated with Dairyland's specific failed fuel might provide us with additional information upon which to supplement this answer, we do not at this time have any additional information to add to that which we have already provided. Dairyland's complaint, again, is unfounded.

Similarly, we responded to Interrogatory No. 14 with the information that we currently possess regarding that question. There, Dairyland asked whether we "contend that DAIRYLAND's expenditures supporting [Private Fuel Storage, LLC ('PFS')] were unreasonable expenditures toward mitigation of DAIRYLAND's damages due to DOE's partial breach." Dairyland Mtn. Exh. 2, at 34. In response, we objected that the interrogatory was premature, as we have not completed our factual analysis obtained through discovery, but, without waiving that objection, we provided a substantive response, explaining that any investment in PFS was not foreseeable at the time of contract formation, was wholly speculative, and could not be considered proper "mitigation" of DOE's delay in the first place. Id. at 34-35. We also referred Dairyland to our June 30 and July 7, 2006 post-trial briefing in Pacific Gas & Electric, in which we had explained to counsel for Dairyland in detail our positions regarding

alleged PFS damages. Given that counsel for Dairyland litigated the PG&E case through trial and to final judgment, it seems incomprehensible that counsel does not understand our positions. We have learned during discovery that Dairyland did not actually invest in PFS, but, instead, invested in or created another corporation which, in turn, invested in PFS. We expect to develop positions regarding the implications of that fact scenario in the future, but, to date, we have not developed those positions or conducted all of the necessary legal analysis to assist in developing them. Nevertheless, our present responses to place Dairyland on notice of the general positions that we will be taking in this litigation.

2. Responses To Interrogatory Nos. 9, 15, 16, and 17, Which The Court's February 5, 2007 Order Did Not Address, Depend Upon Expert Witness Analysis

Dairyland claims that the Court ordered the Government to provide additional information in its February 5, 2007 order and that the Court should now order the Government to provide a definitive response "by no later than the government's expert disclosure deadline of June 8, 2007." Dairyland Mtn. 8.

Contrary to Dairyland's claims, the Court's February 5, 2007 order does not suggest that our responses to these contention interrogatories were inadequate. None of the interrogatories in question involved relevance or the identity issues that were addressed in the Court's order. As Dairyland recognizes, the Court's prescriptions "do not concern any of Dairyland's contention interrogatories." Dairyland Mtn. 6. Further, as explained below, given that the information requested, to the extent that we will ever develop it, will be developed through expert witnesses, we do not currently possess the "contention" information that Dairyland seeks.

The questions that Dairyland has asked in Interrogatory Nos. 9, 15, 16, and 17 all relate to matters outside the knowledge of DOE. That is, Dairyland is asking the Government to state its "contentions" regarding matters in which DOE has never been involved. Specifically, these interrogatories ask us to state definitive contentions regarding (1) whether it was unreasonable for Dairyland to move to dry storage following DOE's breach; (2) whether it was unreasonable for Dairyland to maintain its SNF in wet storage following DOE's breach; (3) all options that Dairyland should have explored for storing its SNF following DOE's breach; and (4) all options that Dairyland should have explored for storing its failed fuel following DOE's breach. Dairyland Mtn. Exh. 2, at 24, 35-37. The "reasonableness" of Dairyland's actions in response to DOE's delays involves an analysis of Dairyland's on-site conditions. Because DOE is not responsible for advising Dairyland on its on-site activities or commenting on their appropriateness, it has not previously conducted an "analysis" that would easily permit us to state our "contentions" on the reasonableness of Dairyland's actions without any discovery or, importantly, without expert analysis.

We are likely to develop contentions, in conjunction with our expert witnesses' work, regarding some, though possibly not all, that are responsive to Dairyland's contention interrogatories.[4] To the extent that we develop such responses, they will be identified in our expert reports. Dairyland's assertion that we should have been required to provide such

---

[4] We are aware of no authority that would require us to develop contentions regarding matters that we determine are irrelevant to this litigation or about which, for some other reason, we do not need to develop contentions. To the extent that, in consultation with our experts, we decide not to take a position regarding some of the matters identified in Dairyland's contention interrogatories, we are not aware of any obligation to create a contention simply because Dairyland would like us to do so.

contentions prior to our experts' development of their opinions and in response to a February 5, 2007 order that did not address Dairyland's contention interrogatories is unfounded.[5]

## II. THE COURT SHOULD DENY DAIRYLAND'S REQUEST FOR SANCTIONS

Dairyland also requests that the Court impose sanctions against the Government pursuant to RCFC 37(b), based upon "[t]he government's failure to comply with the February 5 Order," which Dairyland alleges is "contempuous." See Dairyland Mtn. 8-9. Because, in its discussion of sanctions, Dairyland does not mention the Government's responses to Dairyland's contention interrogatories, we presume that Dairyland's request for sanctions does not involve the contention interrogatories.[6] Instead, Dairyland's sanctions request appears to focus upon its belief that the Government has not identified with "reasonable particularity" those documents responsive to each of Dairyland's individual document production requests. As previously explained, however, the Government has complied with the Court's February 5, 2007 order to

---

[5] The Rules of this Court specifically contemplate that responses to contention interrogatories might be deferred until after designated discovery has been completed or another later time. RCFC 33(c). Generally, Dairyland has the burden of showing why it must receive earlier answers, presenting "specific, plausible grounds for believing that securing early answers to its contention questions will materially advance the goals of the Federal Rules of Civil Procedure." Fischer & Porter Co. v. Tolson, 143 F.R.D 93, 96 (E.D. Pa. 1992) (quoting In re Convergent Techs. Secs. Litig., 108 F.R.D. 328, 339 (N.D. Cal. 1985)).

[6] To the extent that Dairyland seeks sanctions based upon the Government's responses to its contention interrogatories, we have already explained that we actually provided substantive responses to three of the seven interrogatories about which it is complaining, precluding any sanctions request. With regard to the remaining four contention interrogatories, the Court's February 5, 2007 order did not address those interrogatories, making a motion for sanctions for contempt of that order unfounded. In any event, we should not be sanctioned because we have not yet developed contentions regarding matters that are outside of the knowledge of the agency involved in the contract underlying this litigation.

identify with “reasonable particularity” those documents responsive to each of those production requests.

In any event, to the extent that the Court intended to order us to conduct an even greater in-depth identification of documents than we were able to do, sanctions would not be appropriate for our inability to undertake that effort in the time allotted without a clear indication that we must identify, by Bates-stamp number, every single document that might be viewed as responsive to each of Dairyland’s document production requests. The United States Court of Appeals for the Federal Circuit has recognized that, before sanctions under Rule 37 are appropriate, “the offending party must have notice of the alleged discovery misconduct and be given an opportunity to comply.” Genentech, Inc. v. Unitd States Int’l Trade Comm’n, 122 F.3d 1409, 1422 (Fed. Cir. 1997) (citing Ingalls Shipbuilding, Inc. v. United States, 857 F.2d 1448, 1455 (Fed. Cir.1988) (requiring a predicate “warning” order setting out the parties’ deficiencies before sanctions could be imposed)).[7] “The litigants would then be on notice by court order of what was expected, and failure to comply would be sufficient basis for imposition of a sanction under [Rule] 37.” Ingalls Shipbuilding, 857 F.2d at 1455; see R.W. Int’l Corp. v. Welch Foods, Inc., 937 F.2d 11, 15 (1st Cir. 1991) (“when a court issues a broad-form discovery order, and the party to whom it is addressed complies with it somewhat less than fully, withholding documents arguably outside the order's scope, the district court cannot dismiss without first entering an order commanding production of the specific materials”); Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1363 (2d Cir. 1991) (Rule 37 requires as a predicate for sanctions “a clearly

[7] Although the sanctions issue in Genentech and Ingalls related to a sanction of dismissal, rather than a lesser sanction, the rationale of the decisions applies here.

articulated order of the court requiring specified discovery"). To the extent that the Court believes that the Government must identify every document by Bates-stamp number, rather than by container, responsive to each of Dairyland's broad document production requests, the Court should clearly order that relief and provide the Government with an opportunity to respond before considering sanctions.

## III. THE COURT SHOULD IMPOSE RECIPROCAL, RATHER THAN UNILATERAL, OBLIGATIONS UPON THE PARTIES RELATING TO DOCUMENT PRODUCTION

As previously discussed, in its original December 28, 2006 motion to compel, Dairyland complained that the Government's production website "consists of posting of various large 'containers' of documents that the government has produced over time in response to various document requests and disclosure requirements in the various SNF cases." Dairyland's Motion to Compel Discovery Responses, at 2 (Dec. 28, 2006). It further complained that "[t]hese document containers are only labeled generically, apparently based upon the source of the documents." Id. It stated that "[t]he government's website does not disclose what types of documents are contained in the containers and the containers do not reference any particular document requests or disclose whether the documents contained therein are being produced as they are kept in the ordinary course of business." Id. In response to these complaints, the Court ordered the Government to engage in a substantial effort to review the entirety of its past document productions – productions that were made over the course of nine years – and categorize all of them to identify which ones related to Dairyland's specific document production requests.

Interestingly, while making these demands upon the Government, Dairyland undertook no similar effort itself. It has produced to us more than 34,000 documents (encompassing more

than 189,000 pages) that Dairyland selected from its files, presumably having identified them as responsive to the Government's document production requests or necessary as a part of its initial disclosures. Yet, other than 27 pages of Dairyland organizational charts and approximately another dozen or so documents that it specifically referenced in its interrogatory responses (usually without Bates-stamp number identification or any direction as to where the document was located in Dairyland's production),[8] and the "Summary of Damages" identified in its initial disclosures, App. 53-55, Dairyland has not identified for us which of the more than 34,000 produced documents, or containers of documents, are responsive to any of the Government's

---

[8] Dairyland identified four documents in response to Interrogatory No. 6 (although it did not identify the Bates-stamp numbers for those four documents), App. 36; one document in response to Interrogatory Nos. 7 and 9 (although, again, without any Bates-stamp number or other information allowing easily to locate the document in its production), App. 37 & 39; one document in response to Interrogatory No. 8 (with a Bates-stamp number), App. 38; one document in response to Interrogatory No. 11 (without any Bates-stamp number), App. 40; three documents in response to Interrogatory No. 13, App. 42-43; 27 pages of organization charts (Bates stamp numbers PDPC0000001-27) in response to Interrogatory No. 14, App. 43; a general reference in response to Interrogatory No. 16 to "RW-859 Nuclear Fuel Data Surveys submitted by Dairyland, which have already been produced," with no identification of where in its production such documents exist, App. 45; and an "original LLC agreement" and an unidentified number of "subsequent subscription agreements"in response to Interrogatory No. 19 (all without any Bates-stamp or other identifying references), App. 47.

With regard to the remainder of its interrogatory and document production responses, Dairyland identified no particular documents. For example, in response to Interrogatory No. 12, it stated that "Dairyland has already produced numerous documents pertaining to its efforts to achieve a legislative solution to the government's breach," App. 42, but did not identify or direct us to any of them. It also stated that it had "already produced numerous documents pertaining to PFS, its offsite and onsite dry storage plans, and its decommissioning activites," App. 41, but, again, did not identify any of them or direct us to them in its document production. In response to Interrogatory No. 19, it directed us to "numerous documents pertaining to [its] relationship with PFS, including, but not limited to, the original LLC agreement and subsequent subscription agreements which show the extent of Dairyland's participation," without any further direction as to the location of the referenced documents or, given Dairyland's representation that the responsive documents were "not limited to" those documents, any of the other responsive unidentified documents. App. 47.

specific document production requests. As a result, we have been required to attempt to review each of the more than 34,000 documents that Dairyland produced to attempt to tie them to specific issues and production requests, with limited success.

Dairyland has informed us that it has no obligation to undertake any such effort because it has produced its documents "as they are kept in the usual course of business." Dairyland Mtn. Exh. 3, at 2; see Dairyland's Reply On Its Motion To Compel Discovery Responses, at 11 (Jan. 24, 2007) ("Dairyland provided to the government over 184,000 pages of responsive documents as they are kept in the ordinary course of business and that were collected specifically in response to the government's document requests . . . ."). RCFC 34 requires that a party responding to a document production request either must produce documents "as they are kept in the usual course of business or shall organize and label them to correspond to the categories of the request." RCFC 34(b). However, "Rule 34 does not explain what it means to produce documents 'as they are kept in the usual course of business,' and there is little case law to guide the courts." DE Technologies, Inc. v. Dell Inc., 238 F.R.D. 561, 566 (W.D. Va. 2006) (citing Cardenas v. Dorel Juvenile Group, Inc., 230 F.R.D. 611, 618 (D. Kan. 2005)). Nevertheless, "under Rule 34, a party who chooses the option to produce documents as kept in the ordinary course of business bears the burden of showing that the documents were, in fact, produced in that manner." Id. (citing Cardenas, 230 F.R.D. at 618); see American Int'l Specialty Lines Ins. Co. v. NWI-I, Inc., 240 F.R.D. 401, 410 (N.D. Ill. 2007) (placing burden on producing party to establish that it produced its documents as kept in the usual course of business). "A mere assertion that they were so produced is not sufficient to carry that burden." Cardenas, 230 F.R.D. at 618.

We cannot understand how the more than 34,000 documents that Dairyland produced to us were somehow produced as they were "kept in the usual course of business." Dairyland did not identify cabinets of original files, produced as the files are maintained within its organization, that it made available for us to come and review. Instead, it electronically produced selected documents – those documents that it had selected as responsive to the Government's production requests – and produced them with Bates numbers, but in no discernable order. See App. 56-87. In some instances, Dairyland provided us with the identity of the custodian of the document. See App. 82-87. However, for what appears to be more than half of the documents produced, no custodian or source information was provided, and no information regarding the location in which the document was found was provided. See, e.g., App. 56-81. Even on a higher level, in light of Dairyland's production of its Bates-stamped documents electronically in various containers, Dairyland provided no overall information regarding the source of documents within each container or the general location from which the documents in each container generally came. As a result, we are still working to review each of the more than 34,000 documents that Dairyland produced and to attempt to tie them to specific issues and production requests.

Documents are not produced "as kept in the usual course of business" where the "[p]laintiff has gathered these documents together from different entities and locations and has assembled the documents together in the boxes, which have now been imaged onto a computer database." Residential Constructors, LLC v. Ace Property & Caualty Ins. Co., No. 05-01318, 2006 WL 1582122 (D. Nev. June 5, 2006). "The purpose behind the 1980 Amendment that added the 'usual course of business' language to Rule 34(b) was to allow the discovering party

access to business records in the manner documents were normally maintained by the producing party to prevent deliberate shifting of the materials from the sequence which they were ordinarily kept to somewhere else . . . .'" Id. (quoting In re Aldelphia Communications Corp., 338 B.R. 546 (S.D.N.Y. 2005)) (emphasis added). Here, it seems clear that Dairyland has not provided documents to us "in the manner [in which they] were normally maintained," but, instead, has provided us with its own selections of documents, which it then scanned onto CDs.[9]

To the extent that Dairyland continues to contend that its production somehow comports with the "as kept in the usual course of business" portion of RCFC 34, the Government's production similarly comports with it. We cannot see how the Government's production efforts differ in any way from Dairyland's, except for the fact that the Government's efforts began well before Dairyland's as a result of the fact that other spent nuclear fuel plaintiffs (including other clients of counsel for Dairyland) sought documents well before Dairyland filed its complaint in

[9] Further, at least one court has determined that documents were not produced "as kept in the usual course of business" where "some of the documents were kept as hard-copies, but were then scanned onto a CD for production," given that "a receiving party may not be able to determine which specific images comprise a single document or attachments to a document since there are no staples which bind together the scanned images as they would hard copies in a file." Bergersen v. Shelter Mutual Ins. Co., No. 05-1044, 2006 WL 334675, at 2 (D. Kan. Feb. 14, 2006). However, other courts have not adopted such a rule, finding that "Rule 34 does not necessarily require that documents be produced in an *identical* format" as the format in which the files exist in the producing party's files. DE Techs., Inc. v. Dell, Inc., No. 04-628, 2007 WL 128966, at *2 (W.D. Va. Jan. 12, 2007) (italics in original). We have produced hard-copy documents, as has Dairyland, in an electronic form for the convenience not only of the Government and Dairyland, but to ensure that all spent nuclear fuel plaintiffs have access to the documents being produced. This effort, in and of itself, should not be construed here to convert files that would otherwise be considered to be produced "as kept in the usual course of business" into another type of production. In this instance, though, where Dairyland has selected documents from pre-existing files to produce to the Government, rather than making available to the Government the entirety of those files containing responsive records, Dairyland cannot validly argue that it, but not the Government, produced documents "as kept in the usual course of business."

this Court. Nevertheless, the documents that we produced were pulled from various files that were maintained in the usual course of business, and they were not reorganized or reordered in an effort to attempt to "conceal" information or to hide documentation. To the extent that the Court finds that Dairyland has no obligation to tie its document production to the Government's production requests, the Court will have imposed inequitable obligations on the parties, given that their production methods were substantially the same.

In any event, even when a party produces documents as kept in the usual course of business, "it must either direct the responding party to the location or locations within its files where documents responsive to each of their specific requests may be found, or provide a key or index to assist the responding party in locating the responsive documents." U.S. Commodity Futures Trading Comm'n v. American Derivatives Corp., No. 05-2492, 2007 WL 1020838, at *5 (N.D. Ga. March 30, 2007). Producing parties "do not satisfy their Rule 34 obligations by merely opening their files, and leaving [the requesting party] to sift through documents in an effort to locate those that are responsive to its requests." Id. "Rather, [the producing parties] are obligated to provide some reasonable assistance to [the requesting party] in the location of responsive documents," directing the requesting party "to the specific location or locations within its files where documents responsive to each of [its] requests may be found, or provide a key or index to assist [the requesting party] in locating the responsive documents." Id. That is an obligation that we have already fulfilled in this case, but Dairyland has undertaken no such effort.

Given that Dairyland, contrary to its assertion, has not produced its more than 34,000 documents "as kept in the usual course of business," Dairyland's failure to tie, at the very least,

the containers of its documents to specific document production requests that the Government served does not meet the requirements of RCFC 34. Further, Dairyland's actions have imposed inequitable discovery obligations upon the parties, with the Government having expended substantial resources to attempt to create the identification of documents that Dairyland demanded but with Dairyland expending no such effort with regard to the documents that it produced. Under Dairyland's view, it is the Government, and only the Government, that must organize and categorize all documents in the case, both those that the Government produces and those that Dairyland produces. To eliminate this inequity, and to ensure that the parties are required equally and consistently to comply with their obligations under RCFC 34, we respectfully request that the Court, having ordered the Government to undertake certain efforts to identify documents from its production to Dairyland here, impose reciprocal obligations with regard to the identification of documents upon Dairyland in this case.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny Dairyland's motion to enforce its February 5, 2007 order and for sanctions. Further, we respectfully request that the Court order Dairyland to undertake the same level of effort to tie documents from its document production to the Government's document production requests that the Government is required to undertake.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

April 20, 2007

s/Russell A. Shultis
RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

Attorneys for Defendant

# APPENDIX