IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S OBJECTIONS AND RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to RCFC 33, Dairyland responds to the government's First Set of Interrogatories served on Dairyland on April 26, 2006.

GENERAL RESPONSES AND OBJECTIONS

The following general responses and objections to the interrogatories are incorporated by reference in each of Dairyland's responses below. Dairyland's answers to interrogatories are subject to these general objections regardless of whether Dairyland agrees in individual responses below to answer interrogatories notwithstanding additional objections noted in such individual responses.

1. Dairyland objects to the government's instruction at page 1, which purports to require Dairyland to supplement its responses to the interrogatories "from time to time, but not later than 10 days after such additional information has been obtained." This instruction seeks to impose obligations that go beyond those that are required under RCFC 26(e).

2. Dairyland objects to any interrogatories that seek information or documents in possession of entities other than Dairyland or otherwise outside the possession, custody or

control of Dairyland. Dairyland further objects to the government's definition of "Plaintiff," "you," "your," and "yourself" to include parties other than Dairyland. Dairyland will answer these interrogatories but does not (and cannot) answer them for any "present or former officers, employees, agents, attorneys, or representatives and every person acting upon [Dairyland] behalf and/or connected with plaintiff in the context of the matters at issue in this action."

3. Dairyland objects to the definition of "document" to include "any preliminary drafts of any documents or any working papers related thereto" as it implicates drafts and/or working papers of Dairyland experts and departs from the limited expert discovery as provided by RCFC 26(b)(3).

4. Dairyland objects to the definition of "identify" and "identity" and the corresponding instructions to these definitions under paragraphs A.6(a)-(e) as they purport to require Dairyland to seek, gather, and/or provide information and documents already in the possession of, or equally available to the government, or impose obligations beyond those that are provided by RCFC 26 and 33. Dairyland also objects to definition A.6(b) of "identify" as oppressive, unduly burdensome and seeking information that is neither relevant nor reasonably calculated to lead to the discovery admissible evidence. For example, the government has no need for the addresses and telephone numbers (particularly home addresses and phone numbers) of Dairyland personnel, as all contact with these individuals concerning this litigation should be through counsel. Further, the requiring of Dairyland to respond to all of the elements of "identify" or "identity" in the instructions would cause the government's interrogatories, including discrete subparts, to exceed the twenty-five interrogatories permitted by RCFC 33. This instruction also makes the interrogatories improper pursuant to RCFC 26(b)(2).

5. Dairyland objects to the instructions under paragraphs A.7 on the ground that

these instructions make the government's interrogatories oppressive, overbroad and unduly burdensome. Dairyland will provide in its responses the information specifically sought for each individual interrogatory (to the extent Dairyland possesses such information and it is properly discoverable), and not the information included as part of paragraphs A.7(b). Further, the requiring of Dairyland to respond to all of the elements of "describe in detail," "state in detail," "state each fact," "state all facts," or "explain in detail" in these instructions would cause the government's interrogatories, including discrete subparts, to exceed the twenty-five interrogatories permitted by RCFC 33. This instruction also makes the interrogatories improper pursuant to RCFC 26(b)(2).

6. Dairyland objects that the number of interrogatories served by the government, including discrete subparts, exceed the twenty-five in number permitted by RCFC 33.

7. Dairyland objects to providing documents already in the possession of, or equally available to the government, such as the documents produced by Dairyland in connection with its RCFC 26(a)(1) Disclosures.

8. Dairyland objects to all other instructions and definitions to the extent that they exceed the discovery permitted by RCFC 26, 33.

9. Dairyland objects to the interrogatories that seek publicly available documents or information already available to the government. Such information includes, but is not limited to, formal pleadings and/or other documents filed by or on behalf of Dairyland, official DOE documents, industry newsletters and standard reference materials. This availability makes these interrogatories unduly burdensome and not properly discoverable pursuant to RCFC 26(b)(2).

10. Dairyland objects to the instructions and interrogatories that call for the disclosure of information that is protected by the attorney-client privilege, or any other applicable privilege,

immunity or protection. All interrogatories will be read to exclude discovery of information protected by the attorney-client privilege or work product doctrine. Provision of any such information by Dairyland during the litigation is inadvertent and should not be construed as a waiver of any such privilege or of any other ground for objection to discovery with respect to such information.

11. Dairyland objects to instruction E seeking separate responses to each subpart as unduly burdensome. For example, many of the subparts requests that particular information be included in the description. It would be unduly burdensome to repeat such information both in the description and in a separate subpart. On an interrogatory-by-interrogatory basis, Dairyland will, subject to its objections, respond to the interrogatories in a manner that coherently and efficiently supplies the information requested.

12. Dairyland's answers to interrogatories are not intended to waive, and should not be construed as waiving the right to object to the relevance or admissibility as evidence of any information or documents provided, or the subject matter thereof.

13. Dairyland objects to instructions D, F, G, H and J as exceeding what is required under RCFC 33.

14. Except where a different meaning is indicated by context, the responses use the terms "SNF," "spent fuel," "spent nuclear fuel," "spent fuel and high-level waste," "SNF and HLW," interchangeably to cover all material DOE is obligated to accept under the parties' contract.

SPECIFIC RESPONSES AND OBJECTIONS

INTERROGATORY NO. 1

For every current or former Dairyland employee identified in Dairyland's RCFC 26(a)(1) Disclosures, please provide the following information: (i) dates of employment; (ii) most recent job title at Dairyland; (iii) department in which the employee works; (iv) responsibilities in employee's most recent job at Dairyland; (v) whether the employee has supervisory authority at Dairyland; (vi) categories of damages of which each employee may possess knowledge; (vii) all prior job titles and job descriptions relevant to employee's knowledge concerning categories of damages sought by Dairyland; and (viii) description of employee's knowledge concerning the damages sought by Dairyland.

OBJECTIONS

Dairyland objects to the phrases "categories" and "supervisory authority" as vague. Dairyland also objects that this interrogatory is overbroad and unduly burdensome, particularly where the interrogatory seeks information about "categories of damages of which each employee may possess knowledge" and "description of employee's knowledge concerning the damages sought by Dairyland."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows:

Michael A. Brasel

(i) February 2002 - present

(ii) Project Engineer

(iii) Generation Division

(iv) Project Manager for the Reactor Pressure Vessel Removal Project and the Dry

Cask Storage Project.

(v) No.

(vi) Reactor Pressure Removal Project; LACBWR SAFSTOR costs

(vii) None.

(viii) Knowledge of RPV removal and disposal costs, dry cask storage technologies and costs.

<u>Roger E. Christians</u>

(i) October 1973 - present

(ii) Plant Manager, LACBWR

(iii) Generation Division

(iv) Overall management of LACBWR facility.

(v) Yes.

(vi) LACBWR SAFSTOR costs

(vii) Technical Support Engineer - LACBWR; Shift Supervisor - LACBWR; Control Room Operator - LACBWR

(viii) Knowledge of spent fuel management issues at LACBWR.

<u>John D. Parkyn</u>

(i) June 1966 - August 1966; October 1974 - present

(ii) Manager Nuclear and Special Projects

(iii) Generation Division

(iv) Removal of LACBWR spent fuel from DPC property so LACBWR can be decommissioned and dismantled.

(v) No.

(vi) Off-site storage/PFS

(vii) Operations Engineer - LACBWR; Assistant Superintendent - LACBWR; Superintendent - LACBWR. In these prior positions (1974-94) Mr. Parkyn helped develop and/or approved all budgets which related to plant operation and shutdown.

(viii) Knowledge of Dairyland's PFS capital contributions and related costs based upon his role in leading Dairyland's PFS efforts and as Chairman of the PFS Board of Managers.

Seymour J. Raffety

(i) November 1968 - present

(ii) Reactor Engineer/Radiation Protection Engineer, LACBWR

(iii) Generation Division

(iv) Spent fuel storage, DOE contract administration, Special Nuclear Material accountability, radiation protection technical issues.

(v) No.

(vi) LACBWR SAFSTOR costs

(vii) None

(viii) Knowledge of spent fuel management issues at LACBWR.

Charles V. Sans Crainte

(i) July 1971 - present

(ii) Vice President, Generation

(iii) Generation Division

(iv) Direct and oversee all functions of Generation Division, including management responsibility for the budget, operations, maintenance and staffing for all of Dairyland's electric generating plants, including LACBWR. Specific to LACBWR, responsibilities include planning

and management for SAFSTOR and later decommissioning, including, plans for the removal of the spent nuclear fuel.

(v) Yes.

(vi) LACBWR SAFSTOR costs; off-site storage/PFS.

(vii) None.

(viii) Knowledge of the overall budget for LACBWR O&M expenses, contracts and consultants for outside services related to LACBWR projects, and PFS participation costs.

Keith A. Stubbendick

(i) March 1986 - present

(ii) Director of Accounting

(iii) Accounting Division

(iv) Direct and oversee all functions of the accounting department.

(v) Yes.

(vi) LACBWR SAFSTOR costs; off-site storage/PFS; insurance expense.

(vii) None.

(viii) Knowledge of the accounting systems which were used to generate the reports to determine Dairyland's damages computation.

INTERROGATORY NO. 2

Identify the persons most knowledgeable about each technology or facility that Dairyland has ever used to store SNF or HLW, or both, making sure to identify persons with knowledge of the cost and technical aspects of each technology or facility, knowledge of the history of each technology or facility, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects to the phrases "each technology or facility," "the cost and technical aspects of each technology or facility" and "all documents relating to your response" as vague. Dairyland further objects that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to identify "all documents related to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland has always stored its SNF and HLW in its spent fuel pool at LACBWR. Seymour Raffety is the person most knowledgeable of this facility, and Keith Stubbendick is the person most knowledgeable about the costs associated with this facility.

INTERROGATORY NO. 3

Describe in detail any plans to change the technology or facility that Dairyland currently uses to store SNF or HLW, or both, including plans that were never implemented, making sure to identify those persons who are most knowledgeable about each plan, explain why each plan was considered, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects to the phrases "describe in detail," "change the technology" and "all documents relating to your response" and the term "plans" as vague. Dairyland further objects that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to identify "all documents related to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Since 1994, Dairyland has developed and participated in plans to remove its spent fuel from wet pool storage

and store it at a private offsite dry storage facility owned and operated by PFS. The person who is most knowledgeable about these plans is John Parkyn. Dairyland has pursued offsite dry storage through PFS because of the government's notice in 1994 that it would fail to timely accept spent fuel and its later breach of Dairyland's spent fuel contract. In addition, Dairyland believed that offsite dry storage would allow it to remove its spent fuel promptly and less expensively so it could then proceed with decommissioning and dismantlement of LACBWR, and because the LACBWR site could not accommodate an Independent Spent Fuel Storage Installation ("ISFSI") under existing NRC regulations. Offsite dry storage would also allow termination of the NRC license for the LACBWR facility. Dairyland has already produced numerous documents pertaining to PFS and its offsite dry storage plans.

Dairyland is presently developing plans for an ISFSI at LACBWR and has contracted with Sargent & Lundy to put together a Project Work Plan and provide budgetary engineering costs. The person at Dairyland who is most knowledgeable about these plans is Michael A. Brasel. Dairyland is now pursuing an onsite ISFSI because of (i) the government's breach of its spent fuel contract, (ii) it is more economical in the long term than wet storage, (iii) the PFS project has been slowed by political roadblocks, and (iv) because Dairyland reasonably expects the NRC to grant waivers or exemptions to its ISFSI siting regulations that would permit construction of an ISFSI at the LACBWR site. Dairyland has already produced its documents pertaining to these plans.

INTERROGATORY NO. 4

Identify all categories of damages sought by Dairyland arising from DOE's breach of the Standard Contract including any costs associated with your wet pool storage facilities for which you claim DOE should be liable and identify all documents relating to your response.

OBJECTIONS

Dairyland objects to the term "categories" and the phrase "all documents relating to your response" as vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where the interrogatory seeks information about "all categories of damages" and "all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland refers the government to its RCFC 26(a)(1) Disclosures, Part C.

INTERROGATORY NO. 5

Identify those persons, both within plaintiff's organization and outside of plaintiff's organization, who are most knowledgeable about the parties' understanding, prior to, at the time of, as well as subsequent to the execution of plaintiff's contract, as to the rate and sequence of SNF and HLW acceptance that DOE would be obligated to maintain under the Standard Contract, making sure to identify: (i) each person's area of expertise; (ii) the nature of each person's knowledge; (iii) how each person obtained that knowledge; (iv) when each person gained that knowledge; (v) each person's position within and relationship to plaintiff, if any; and (vi) all documents that relate to each person's understanding of the rate of SNF and/or HLW acceptance that DOE would be obligated to maintain under the Standard Contract.

OBJECTIONS

Dairyland objects that the phrases "most knowledgeable," "parties' understanding," "rate of sequence of acceptance," "would be obligated to maintain," "area of expertise" and "all documents that relate to each person's understanding" are vague. Dairyland also objects that the terms "nature," "knowledge," "obtained," and "gained" are vague. Dairyland further objects that

the interrogatory requests information about persons outside of the plaintiff's organization. Dairyland objects that subpart (i) is vague, as the questions asks about factual matters, and it is not clear how "expertise" relates to these matters. Dairyland also objects that subpart (vi) is vague, as it is unclear what relationship between the documents and the person's knowledge is being sought. Dairyland further objects that subparts (iii), (iv), and (vi) are overbroad and unduly burdensome.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows:

Seymour Raffety, Loring Mills, John Bartlett and Lake Barrett.

(i)-(v). See the response to Interrogatory No. 1 and Dairyland's RCFC 26(a)(1) Disclosures regarding Messrs. Raffety, Mills and Bartlett. Mr. Barrett worked in the Office of Civilian Radioactive Waste Management for many years. Since his retirement, he has been a consultant for utilities, including Dairyland.

(vi). Dairyland has produced numerous documents pertaining to the parties' understanding as to the rate and/or sequence of SNF and/or HLW acceptance in connection with its RCFC 26(a)(1) Disclosures, Part B. Documents, and subsequent document productions.

INTERROGATORY NO. 6

Describe in detail all spent fuel acceptance schedules or acceptance scenarios used by Dairyland, including all decommissioning studies submitted to FERC, the NRC, or the PSC, making sure to: (i) identify the assumed start date for SNF acceptance; (ii) identify the annual rate at which SNF would be removed from the site (in MTUs) according to each schedule; (iii) identify when all the SNF was to be removed from the site under each schedule; and (iv) identify each person who has knowledge regarding each schedule.

OBJECTIONS

Dairyland objects that the phrases "describe in detail," "spent fuel acceptance schedules or acceptance scenarios," "used by" and "decommissioning studies" are vague. Dairyland objects that the term "assumed" is also vague. Dairyland further objects to identifying and describing "all" schedules or scenarios "used," and each person who has knowledge regarding each schedule or scenario.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Pursuant to RCFC 33(d), Dairyland refers the government to its 1994 LACBWR Decommissioning Cost Study prepared by Sargent & Lundy and its 1998, 2000, and 2003 Decommissioning Cost Study Updates prepared by Dairyland, which have already been produced.

In addition, Dairyland used acceptance scenarios in order to fill out delivery commitment schedule correspondence pursuant to the government's instructions and, pursuant to RCFC 33(d), the government is referred to those instructions to determine the schedules used.

INTERROGATORY NO. 7

Describe in detail all modifications that were made, or that will be made, to Dairyland's spent fuel pool buildings, making sure to identify any modifications relating to the removal of SNF from the pool or to move SNF from the pool into casks of any kind, and identify all documents related to your response.

OBJECTIONS

Dairyland objects that the phrases "describe in detail" and "all documents related to your response" and the term "modifications" are vague. Dairyland further objects that this interrogatory is overbroad, unduly burdensome and neither relevant nor reasonably calculated to

lead to the discovery of admissible evidence, particularly where it seeks information relating to "all modifications" to Dairyland's spent fuel buildings and requires Dairyland to identify "all documents related to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland's spent fuel wet pool is located within the LACBWR reactor containment building, which also contains the reactor pressure vessel ("RPV") and a variety of other systems for the power plant. Since the plant was shut down in 1987, Dairyland has made several modifications to the reactor containment building as part of decommissioning. In addition, pursuant to RCFC 33(d), Dairyland refers the government to its contract with Duratek, Inc., dated August 11, 2005, for the removal and disposal of the RPV, which has already been produced and sets forth the modifications that will be made to the reactor containment building in order to remove the RPV.

Furthermore, once the RPV is removed from the containment building, Dairyland anticipates fabricating and installing a transfer tank where the RPV once was that will serve the purpose of providing a site for the loading of spent fuel into canisters for dry storage.

INTERROGATORY NO. 8

Describe in detail Dairyland's current and projected SNF, HLW, and GTCC waste, making sure to identify where each type of waste is being stored, quantify the amount in each waste category, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrase "describe in detail" is vague. Dairyland objects further to this interrogatory's implied distinction between HLW and GTCC waste. Dairyland also

objects that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to "identify all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows:

SNF (current and projected): 37.959 MTU stored in the LACBWR spent fuel pool

HLW/GTCC waste (current and projected): none

Dairyland has already produced numerous documents pertaining to the amount of SNF it is storing, including, but not limited to, its RW-859 Nuclear Fuel Data Surveys, and directs the government to a May 23, 2006 letter from the South Carolina Department of Health and Environmental Control (PLAC0046023), which shows that Dairyland's recent waste shipment containing its fuel shrouds, control blades and start-up sources to the Barnwell facility met the requirements for Class C waste.

INTERROGATORY NO. 9

Describe in detail each of Dairyland's decommissioning cost studies, making sure to identify each individual who worked upon those studies, identify the source of knowledge and area of expertise for each of the individuals identified, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "describe in detail," "worked upon," "area of expertise" and "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to identify each and every individual who worked on each and every decommissioning

cost study, the source of knowledge and area of expertise of each individual and to identify "all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Pursuant to RCFC 33(d), Dairyland refers the government to its decommissioning cost studies and decommissioning cost study updates described in response to Interrogatory No. 7, which have already been produced.

The principal persons at Dairyland who have worked on decommissioning cost studies and cost study updates include Larry L. Nelson, Health and Safety Supervisor - LACBWR, Roger E. Christians, Plant Manager - LACBWR, and Mike Johnsen, a Technical Support Engineer who is no longer employed at Dairyland.

INTERROGATORY NO. 10

Identify all documents relating to the costs of spent fuel storage at LACBWR including any estimates prepared on Dairyland's behalf.

OBJECTIONS

Dairyland objects that the phrase "that in any way address the cost of spent fuel storage" and the term "estimates" are vague. Dairyland further objects that this interrogatory is overbroad and unduly burdensome, particularly where the interrogatory seeks information about "all" documents.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Pursuant to RCFC 33(d), Dairyland refers the government to its RCFC 26(a)(1) Disclosures.

INTERROGATORY NO. 11

Describe in detail Dairyland's decision to shut down the LACBWR making sure to explain when Dairyland first considered closing LACBWR, when Dairyland finally decided to shut down LACBWR, identify the individuals most knowledgeable about the decision to shut down LACBWR, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "describe in detail," "most knowledgeable" and "all documents relating to your response" are vague. Dairyland also objects that this interrogatory is overbroad and unduly burdensome, particularly where the interrogatory seeks information about "all documents relating to [its] response" and is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: The decision to permanently shut down LACBWR was made in April 1987 based on the conclusion of Dairyland senior management at that time that Dairyland would not need the power output from LACBWR until after the anticipated LACBWR retirement date and that the operating costs for LACBWR, compared to the operating costs for Dairyland's other generating units, made it uneconomical for Dairyland to continue operating LACBWR. The individual most knowledgeable about the decision to shut down LACBWR is Jack Leifer, Dairyland's former Assistant General Manager, Operations.

Dairyland has already produced numerous documents pertaining to the decision to permanently shut down LACBWR, including, but not limited to, Dairyland's Board Minutes dated April 24, 1987.

INTERROGATORY NO. 12

Identify all actions taken by Dairyland to mitigate the damages allegedly incurred as a result of the Government's delay in acceptance of SNF from the LACBWR and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "all actions" and "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to "identify all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland has attempted to mitigate its damages resulting from the government's breach of its spent fuel removal contract through its membership in PFS, a limited liability company founded to develop a private offsite dry storage facility that would temporarily store Dairyland's and other civilian reactors' spent fuel pending the delayed opening of the permanent federal repository, and also through its current efforts to develop an onsite dry storage facility. Dairyland has also mitigated its damages by proceeding with and completing several decommissioning activities despite the continued presence of spent fuel in its wet pool, such as removal and disposal of its RPV. Dairyland has already produced numerous documents pertaining to PFS, its offsite and onsite dry storage plans, and its decommissioning activities.

Dairyland has also made numerous attempts to achieve a legislative solution to the government's breach, including legislation included in the proposed Nuclear Waste Policy Amendments Act of 1999, S.1287 in the First Session of the 106th Congress, which would have

authorized the Department of Energy to take title to Dairyland's spent fuel as part of a settlement of Dairyland's contract claim. That bill was approved by the Congress but vetoed by President Clinton. Dairyland has already produced numerous documents pertaining to its efforts to achieve a legislative solution to the government's breach.

INTERROGATORY NO. 13

Identify all "non-standard fuel," "failed fuel," and "nonfuel components," as those terms are defined by the Standard Contract, that is in the possession of Dairyland making sure to identify where the non-standard, failed fuel and non-fuel components are currently stored, quantify the amounts in each category, identify all persons with knowledge of those subjects, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrase "all documents relating to your response" is vague. Dairyland further objects that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to identify "all persons with knowledge" and "all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland has no non-standard fuel and no non-fuel components except in the RPV, and those components are scheduled to be removed and disposed of by no later than 2007. With regard to identification of Dairyland's failed fuel, pursuant to RCFC 33(d), Dairyland refers the government to the LaCrosse Boiling Water Reactor Fuel Condition Report (LAC-TR-140) dated December 16, 2002, the Summary Report entitled "Research of Material Displaced From LACBWR Spent Fuel Assemblies" (LAC-TR-141) dated February 21, 2003, and the RW-859 Nuclear Fuel Data

Surveys, which have already been produced. In addition, Dairyland has recently discovered that LACBWR Fuel Assembly Number 2-07 is failed. The person at Dairyland with the most knowledge of its non-standard fuel, failed fuel and non-fuel components (or lack thereof) is Seymour Raffety.

INTERROGATORY NO. 14

Describe in detail the organizational structure of Dairyland, making sure to identify senior management, including name and position title, from 1983 to the present and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "describe in detail," "organizational structure" and "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to "identify all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Pursuant to RCFC 33(d), Dairyland refers the government to the Dairyland management organization charts from 1983 to the present (PDPC0000001-27), which have been produced.

INTERROGATORY NO. 15

Identify all owners and their respective ownership interests (as a percentage) in both Dairyland and LACBWR.

OBJECTIONS

Dairyland objects that this interrogatory is overbroad and unduly burdensome, particularly where the interrogatory seeks information about "all" owners.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland is a not-for-profit, non-stock cooperative association incorporated under the laws of the states of Wisconsin and Minnesota that provides wholesale electric generation and transmission service to 25 Class A distribution cooperative members under long-term all-requirements contracts. As a cooperative, Dairyland is owned and controlled by its members, which are distribution cooperatives that provide electric service at retail to their members in rural areas of the states of Wisconsin, Minnesota, Iowa and Illinois. Dairyland also provides wholesale electric service to 14 municipal utility members. Dairyland's board of directors is composed of one representative of each of the 25 Class A distribution cooperative members and one representative of four Class B cooperative members as a group. Dairyland is the sole owner of LACBWR.

INTERROGATORY NO. 16

Describe in detail when Dairyland would have lost its full core offload capability if it had continued to operate the LACBWR, making sure to specify the amount of space that was available in the spent fuel pool in terms of the number of assemblies that the pool can accommodate prior to the last discharge from the reactor, the number of assemblies that were typically discharged from the reactor during each fuel cycle, the number of spaces that are currently available in the spent fuel pool, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "full core offload capability," "typically discharged" and "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to

"identify all documents relating to [its] response." Dairyland also objects that this interrogatory is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland likely would never have lost full core offload capability because it would have increased its spent fuel storage capacity in the pool or through dry storage as necessary. At the time of its shutdown in 1987, LACBWR's spent fuel pool capacity was 440 fuel assemblies, and it held (and continues to hold) 333 fuel assemblies. Prior to shutdown, LACBWR would typically discharge 24 assemblies during each fuel cycle, which typically lasted about 18 months toward the end of the plant's operating life. This information can be found in RW-859 Nuclear Fuel Data Surveys submitted by Dairyland, which have already been produced.

INTERROGATORY NO. 17

Describe in detail all analyses by, or on behalf of, Dairyland relating to the exchange of delivery commitment schedules pursuant to the Standard Contract making sure to identify each person with knowledge regarding this topic and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the term "analyses" and the phrase "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to identify "each person with knowledge regarding this topic" and "all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Due to the government's breach of its spent fuel removal contract, Dairyland never did any analyses or had any analyses performed on its behalf relating to the exchange of delivery commitment schedules.

INTERROGATORY NO. 18

Identify all persons with knowledge concerning DOE's obligations to accept GTCC waste or failed fuel, including persons with knowledge of the timing of such acceptance, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "with knowledge concerning," "obligations," and "all documents relating to your response" are vague. Dairyland objects further that this interrogatory is overbroad and unduly burdensome, particularly where it requires Dairyland to identify "all persons with knowledge" and "all documents relating to [its] response." Dairyland objects further that this interrogatory cannot be answered as posed, as DOE's obligations regarding GTCC waste and failed fuel are legal, not factual, matters.

INTERROGATORY NO. 19

Describe in detail Dairyland's relationship with PFS making sure to describe the history of this relationship, identify all persons with knowledge of this relationship, and identify all documents relating to your response.

OBJECTIONS

Dairyland objects that the phrases "describe in detail," "relationship with" and "all documents relating to your response" and the term "history" are vague. Dairyland further objects that this interrogatory is overbroad and unduly burdensome, particularly with regard to

"describing the history" of Dairyland's relationship with PFS, identifying "all persons with knowledge" of this relationship and "all documents relating to [its] response."

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland has been a member of PFS through Dairyland's wholly-owned subsidiary, Genoa FuelTech, Inc., since PFS's founding as Mescalero Fuel Storage, LLC in September, 1995. Dairyland joined with a number of other nuclear utilities to serve on a steering committee and then to create PFS as an organization to license and operate a temporary, away-from-reactor spent fuel storage facility until their spent fuel could be taken by the DOE for placement in the much-delayed permanent federal repository. John Parkyn, Dairyland's Nuclear and Special Projects Manager, is the Chairman of the PFS Board of Managers and has served as its Chairman since shortly after its founding. Dairyland has invested several millions of dollars as member equity in PFS. Dairyland has also loaned staff members from time to time to work on elements of the PFS project, including negotiations with the initial host organization, the Mescalero Apache Tribe, in New Mexico, and later with the Skull Valley Band of Goshute Indians, in Utah, and the development and support of the NRC license application. Persons at Dairyland with the most knowledge of Dairyland's relationship with PFS are John Parkyn and Charles Sans Crainte.

Dairyland has already produced numerous documents pertaining to relationship with PFS, including, but not limited to, the original LLC agreement and subsequent subscription agreements which show the extent of Dairyland's participation.

Respectfully submitted,

August 28, 2006

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

*As to the Answers*:

The preceding interrogatory answers are based on a review of business records and the personal recollections of a number of employees. Dairyland has made a good faith effort to supply true and correct responses to the interrogatories. I have reviewed each response and believe each to be true and correct.

I declare under penalty of perjury that the foregoing statement is true and correct.

Date: 8/28/06

C V Sans Crainte
Charles V. Sans Crainte
Vice President, Generation

CERTIFICATE OF SERVICE

I certify that I caused a copy of the foregoing Dairyland's Objections and Responses to Defendant's First Set of Interrogatories be served by hand this 28th day of August 2006 on:

Russell Shultis
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Classification Unit, Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530

Todd W. Monroe