No. 04-106C
(Chief Judge Damich)

Filed Electronically on May 4, 2007

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# DAIRYLAND'S REPLY ON ITS MOTION TO ENFORCE FEBRUARY 5, 2007 ORDER AND FOR SANCTIONS AND RESPONSE TO DEFENDANT'S MOTION FOR IMPOSITION OF RECIPROCAL OBLIGATIONS UPON THE PARTIES

---

Jerry Stouck
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
Greenberg Traurig, LLP

# TABLE OF CONTENTS

Page

I. The Government's Amended Responses Do Not Identify Previously Produced Documents With Reasonable Particularity ..... 2

A. The February 5 Order Did Not Just Direct the Government to Engage in a "Reasonable Effort" to Identify Previously Produced Documents ..... 2

B. The Government's Burden Claims are Unsupported and Unfounded ..... 4

II. The Government Should be Ordered to Fully Respond to Dairyland's Contention Interrogatories ..... 7

A. The Government Has Not Provided Complete Responses to Interrogatory Nos. 5, 13 and 14 ..... 7

B. The Government's Interrogatory Responses Should be Due on June 8 ..... 9

III. The Government's Cross-Motion is Meritless ..... 11

A. The Government Has Waived Any Right to Complain About The Organization of Dairyland's Document Productions ..... 11

B. Dairyland's Documents Have Been Produced in Compliance With RCFC 34 ..... 13

IV. Sanctions Against the Government are Warranted ..... 17

# TABLE OF AUTHORITIES

## Federal Cases

*Bombard v. Fort Wayne Newspapers, Inc.*,
92 F.3d 560, 562 (7th Cir. 1996) 3

*Genentech, Inc. v. United States Int'l Trade Comm'n*,
122 F.3d 1409, 1422 (Fed. Cir. 1997) 17

*Ingalls Shipbuilding, Inc. v. United States*,
857 F.2d 1448, 1455 (Fed. Cir. 1988) 17

*Keenan v. Allan*,
91 F.3d 1275, 1279 (9th Cir. 1996) 4

*Residential Constructors, LLC v. Ace Prop. & Cas. Ins. Co.*,
No. 05-01318, 2006 WL 1582122 (D. Nev. June 5, 2006) 14

*U.S. Commodity Futures Trading Comm'n v. Am. Derivatives Corp.*,
No. 05-2492, 2007 WL 1020838 (N.D. Ga. Mar. 30, 2007) 15

## Other Authorities

7 *Moore's FederalPractice* § 34.11[3] 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S REPLY ON ITS MOTION TO ENFORCE FEBRUARY 5, 2007 ORDER AND FOR SANCTIONS AND RESPONSE TO DEFENDANT'S MOTION FOR IMPOSITION OF RECIPROCAL OBLIGATIONS UPON THE PARTIES

The government's response makes clear that it has not complied with the Court's February 5 Order and that sanctions for its failure to comply are warranted. The government does not argue that, in its Amended Responses to Dairyland's document requests, it has identified its previously produced responsive documents with "reasonable particularity" with regard to each relevant Dairyland request. Instead, the government parses the clear language of the February 5 Order to assert – erroneously – that all the Order required it to do was to engage in a "reasonable effort" to identify responsive documents, and that identifying such documents on a "container" level basis rather than on an individual basis, satisfies that standard. The government also argues that requiring it to identify previously produced responsive documents with more particularity would be too burdensome. However, such an argument is completely unsupported and unfounded.

The government should also be ordered to provide complete responses to each of Dairyland's contention interrogatories, in writing and under oath, by no later than June 8, 2007, which is the current deadline for its expert reports. Despite the government's arguments, the February 5 Order required that these interrogatories be answered. The government has offered no reason for its answers to be delayed any further and offers no legal basis for its suggestion that it can choose to answer –or not answer – these interrogatories in its expert reports.

Finally, the government's cross-motion to impose "reciprocal obligations" upon Dairyland with regard to its document production should be summarily denied. There is absolutely no basis to the government's assertion that Dairyland's documents produced in response to the government's document requests were not produced as they are kept in the usual course of business. The government's cross-motion has nothing to do with the government's discovery needs; prior to the filing of its cross-motion, the government never once suggested that Dairyland's document production was not in compliance with RCFC 34 or that it was having any difficulty in reviewing or organizing Dairyland's documents. Rather, the government's cross-motion is a belated attempt to get the Court to reconsider its February 5 Order and an act of retaliation against Dairyland because it is seeking to enforce the government's obligations under such Order.

## I. The Government's Amended Responses Do Not Identify Previously Produced Documents With Reasonable Particularity

### A. The February 5 Order Did Not Just Direct the Government to Engage in a "Reasonable Effort" to Identify Previously Produced Documents

The government contends that its decision to refer Dairyland to multiple electronic containers that contain previously produced "potentially responsive" documents, rather than identify responsive documents individually or by category, is in

compliance with the Court's February 5 Order because its effort was "reasonable" under the circumstances.[1] Government Response ("Govt. Resp.") at 7-8. The February 5 Order, however, did not simply direct the government to "reasonably search for" or engage in a "reasonable effort" to identify previously produced responsive documents. It ordered the government to "*identify with reasonable particularity* those *documents* it deems responsive to Plaintiff's specific requests."[2] Feb. 5 Order at 2 (emphasis added). "Identify with reasonable particularity" means that Dairyland should not be required to "scour" scores of document containers on the government's document production website to identify previously produced documents that are responsive to its individual requests. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("It is not our function to scour the record in search of evidence to defeat a motion for summary judgment; we rely on nonmoving party to *identify with reasonable particularity* the evidence upon which he relies.") (emphasis added); *Keenan v. Allan,* 91 F.3d 1275, 1279

---

[1] In its Response, the government describes its ongoing efforts to produce more than 300,000 pages of new documents to Dairyland since the February 5 Order. *See* Govt. Resp. at 2-3. It should be noted that these efforts are not the subject of the present motion and are completely distinct from the government's obligation under the February 5 Order to identify previously produced responsive documents with reasonable particularity.

[2] The government asserts, without any supporting affidavits, that its previously produced documents were produced as they were kept in the usual course of business. *See* Govt. Resp. at 8, 23. Of course, the government has never before made such an assertion, even in response to Dairyland's motion to compel, and the government's contention is false for the reasons explained in Dairyland's motion to compel. However, even if such assertion were true, that would not obviate the directive of the Court's February 5 Order nor its purpose. The February 5 Order requires the government to identify its previously produced responsive documents with reasonable particularity because, as the government concedes, none of these previously produced containers of documents were produced in response to Dairyland's requests. As a result, those containers presumably consist of a combination of documents that are responsive *and non-responsive* to Dairyland's requests.

(9th Cir. 1996) (same). *See also* 7 *Moore's Federal Practice* § 34.11[3] (test for whether a request for production of documents satisfies the "reasonable particularity" requirement under Rule 34 is "whether a reasonable person would know what documents or things are called for in the request"). By any measure, the government's document request responses do not comply with the Court's "reasonable particularity" directive. They do not comply because, with a few exceptions, (i) the government has identified only particular containers, not particular documents; (ii) these containers can each contain more than 200 documents; and (iii) absent "scouring" each identified container, there is no way for Dairyland to know whether these containers consist entirely of "potentially" responsive documents, one "potentially" responsive document, or something somewhere in between. Furthermore, the government's explanation of its use of the term "potentially" in its responses highlights rather than clarifies the vagueness of its responses. *See* Govt. Resp. at 10. It also does nothing to address the central point of Dairyland's motion: that the government has not identified these "potentially responsive" documents with "reasonable particularity."

B. The Government's Burden Claims are Unsupported and Unfounded

The government has no one but itself – and specifically its imposing and convoluted document production website – to blame for its current predicament. Having spent years creating haystacks full of documents, the government cannot now complain that it is too difficult to find the documents responsive to Dairyland's requests within those haystacks. That is Dairyland's complaint, and the Court has already recognized it is a valid complaint for Dairyland (not the government) to make by granting Dairyland's motion to compel and issuing the February 5 Order. To allow the government to escape compliance with that Order now would *reward* the government for its years of haystack

building and reduce the February 5 Order to a mere "never mind." The Court should not do that for many reasons, not the least of which is that Dairyland is entitled to appropriate responses to the document production requests it served now more than six months ago.

In any event, the government's claim that it would be unduly burdensome to require it to more specifically identify previously produced documents that are responsive to Dairyland's requests is both unsupported and unfounded. The government's description of the time and expense it has incurred so far in complying with this portion of the February 5 Order is not supported by any affidavit. More fundamentally, the government's asserted numbers simply do not add up. For example, the government asserts that it has already devoted more than 600 person hours at an estimated cost of $150,000 to this effort. Govt. Resp. at 5. But if that is true and it is also true, as the government asserts, that the government has employed at least 15 attorneys and consultants on this project (*see* Govt. Resp. at 4), then the government should have been able to complete this work inside of a week's time (15 persons x 40 hours/week = 600 hours), not the almost six weeks it took to respond after the February 5 Order. Moreover, if the government's effort so far has cost $150,000 and it has devoted 600 person hours to the effort, then the government has been paying its attorneys and consultants at an average rate of $250 per hour, an amount which is highly unlikely. Furthermore, if all the government did was perform computerized word searches to identify relevant containers and documents (*see* Govt. Resp. at 5), that effort should have taken a small fraction of 600 hours.

In addition, even assuming that the government's claims about the time and expense incurred so far were legitimate (rather than implausible), the government's bald

assertion that it will take "months and thousands of manhours" to identify and list previously produced responsive documents on a document-by-document basis is belied by the responses the government has provided so far. In particular, the government *has already provided* an individual listing, by Bates range number, of responsive documents in partial response to 9 of Dairyland's requests. *See* Dairyland Mtn., Exh. 1 (Responses to request nos. 7, 8, 11, 14, 15, 24, 32, 34, 37).[3] Apparently, the government was able to identify some individual documents that are responsive to these 9 requests by performing word searches of its past productions. *See* Govt. Resp. at 5. Surely if the government was able to identify specific responsive documents by performing appropriate word searches for some of Dairyland's requests, then it should be able, with relatively little additional effort, to do the same for the remaining requests, particularly now that the government has already identified the individual containers that hold potentially responsive documents.

It is no answer that Dairyland could just as easily perform its own word searches of the identified containers for several reasons. First, the government created the haystack problem with its chosen method of document production, and the burden should not fall on Dairyland for resolving the problem. Second, the government has superior knowledge of the sources and organization of its own prior document productions and its production website and, therefore, it has always been in a better position to identify what

---

[3] In addition to identifying specific responsive documents, the government also responded to each of these 9 Dairyland document requests by listing multiple containers of documents that contain "potentially responsive" documents. Thus, the government's responses to these 9 requests are still deficient for the same reason that its responses to Dairyland's other requests are deficient, *i.e.*, the identification of multiple containers that contain potentially responsive documents do not satisfy the February 5 Order's "identify with reasonable particularity" requirement.

specific documents that were previously produced are responsive to Dairyland's requests. Third, another essential purpose behind having the government identify these documents, as opposed to Dairyland, is that it shows what documents *the government considers* responsive to Dairyland's requests.

II. The Government Should be Ordered to Fully Respond to Dairyland's Contention Interrogatories

A. The Government Has Not Provided Complete Responses to Interrogatory Nos. 5, 13 and 14

Of the seven contention interrogatories Dairyland has propounded (interrogatory nos. 5, 9, 13, 14, 15, 16 and 17), the government asserts that it has already provided sufficiently "substantive" responses to three of them, namely, interrogatory nos. 5, 13 and 14. However, while it is true that, unlike Dairyland's other contention interrogatories – where the government has provided *no* response at all – the government's responses to these three interrogatories do contain some substance, that does not mean that the responses are complete or even answer the questions propounded. In interrogatory no. 5 Dairyland has asked, "On what schedule (measured in Metric Tons Uranium) does DOE contend it is obligated to remove DAIRYLAND'S SPENT FUEL" pursuant to Dairyland's contract and to "[s]tate all factual and legal grounds for this contention." The government asserts that it has sufficiently responded to this interrogatory by incorporating by reference its response to interrogatory no. 3 and referencing in general its post-trial briefing in *Pacific Gas & Elec. Co. v. United States*. Govt. Resp. at 11-12. The government's response to interrogatory no. 3, however, does not state any schedule measured in Metric Tons Uranium that the government contends it is obligated to remove Dairyland's spent fuel. *See* Mot., Exh. 2 at 11-12. Moreover, the response references not only the 1991 ACR/APR, but also the 1992, 1994 and 1995 ACR/APRs and then

confusingly states, "The basis for the rate and order of SNF acceptance identified in this interrogatory response are the ACR/APRs issued beginning in 1991, the DCSs that the plaintiff and other contract holders submitted to DOE, and DOE's approval of those DCSs." *Id.* at 12. In sum, there is no basis for the government's assertion that it has sufficiently and clearly answered interrogatory no. 5. It is simply not true that Dairyland's counsel already "knows" the government's position – which is not only ever-hidden but also ever-changing. The government should be ordered to provide a direct answer to this straightforward interrogatory.

The government also contends that it has already responded to interrogatory no. 13, in which Dairyland has asked whether the government contends that "DOE would have picked up DAIRYLAND'S FAILED FUEL later than the rest of its SPENT FUEL had the government begun SPENT FUEL acceptance from utilities starting not later than January 31, 1998." However, the government's current response is non-responsive. The government has directed Dairyland to the trial testimony of David Zabransky in *Yankee Atomic*, where, according to the government, Mr. Zabransky "explained the issues that *might arise* relating to the acceptance of failed fuel at any repository." Dairyland Mtn., Exh. 2 at 33 (emphasis added). The government also states that it was "not necessarily obligated" to accept utilities' failed fuel on the same schedule as standard fuel. *Id.* at 33-34. But just because the government believes that it "might not have" picked up Dairyland's failed fuel on the same schedule as its other spent fuel does not mean that it "would not have." Moreover, the government concedes that it is entirely possible that its current response to interrogatory no. 13 will need to be supplemented based upon additional discovery and "expert analysis." Govt. Resp. at 13. Accordingly, the

government should be compelled to provide a full and complete response to this interrogatory by a date certain.

The government's current response to interrogatory no. 14 is also, by its own admission, still not complete. In its Response, the government states that it is still developing its position regarding whether Dairyland's expenditures supporting Private Fuel Storage, LLC were unreasonable mitigation expenditures, notwithstanding the fact that the government has had all relevant information regarding the amount and basis for these expenditures for several months. See Govt. Resp. at 14. Yet the government does not assert that it needs any additional discovery or expert analysis to provide a complete response to this interrogatory. Thus, there is no basis for the government's continued delay in providing a full and complete response to interrogatory no. 14.

B. <u>The Government's Interrogatory Responses Should be Due on June 8</u>

Prior to filing the present motion, government counsel represented to Dairyland's counsel that it would be in a position to answer Dairyland's contention interrogatories when it submitted its expert reports, which are due on June 8, 2007. Dairyland therefore has justifiably requested in the present motion that the government be ordered to do what it said it can do, *i.e.*, that it be ordered to provide its contention interrogatory responses by June 8. However, in its Response, the government once again refuses to agree to any specific deadline for providing its responses. Instead, the government only states that "To the extent that we develop [responses to Dairyland's contention interrogatories], they will be identified in our expert reports." Govt. Resp. at 15. The government's position is untenable.

Like all parties, the government is required under the Rules to answer all interrogatories – including contention interrogatories – "separately and fully in writing

under oath." RCFC 33(b)(1). It cannot use unsworn expert reports as a means to comply with this fundamental discovery obligation. Dairyland is entitled to know what the government's contentions are on the key issues in this case, not just what its experts may or may not contend.[4] Of course, if the government does not have a position or contention regarding any of the matters raised in Dairyland's contention interrogatories – which is what the government suggests may be the case, *see* Govt. Resp. at 15 – then Dairyland is entitled to know this as well by a date certain, "separately and fully in writing under oath."

Dairyland submits that the government's continued objection to a Court-mandated deadline for its contention interrogatory responses can be explained by an unstated agenda on the government's part. Subsequent to the filing of the present motion, government counsel warned Dairyland's counsel that it was planning on seeking a seven-week extension of the deadline for the submission of its expert reports from June 8 to July 27, 2007, on grounds that its experts are currently too busy working on other spent nuclear fuel cases to complete their reports in this case by June 8. In other words, the apparent reason the government is unwilling to commit to provide its contention interrogatory responses by June 8 is because it has no present intention to submit its expert reports by that date, or even a date remotely close to June 8. However, the notion that the government should be allowed to once again hold up Dairyland's case and continue to hide the ball on its contentions because it has chosen to overextend its experts is ridiculous. The Court should reject any effort by the government to extend its expert

[4] Indeed, the government has acknowledged the propriety and importance of contention interrogatories by propounding its own contention interrogatories on Dairyland. *See* Exh. 6, attached hereto. Unlike the government, Dairyland has already provided its responses to these interrogatories without obtaining any enlargements of time. *See id.*

report deadline beyond June 8, 2007 and order the government to respond to Dairyland's contention interrogatories by June 8.[5]

III. The Government's Cross-Motion is Meritless

Prior to filing the present motion, government counsel threatened Dairyland's counsel that, if Dairyland sought to enforce the February 5 Order, the government would move to reciprocally require Dairyland to reorganize its document production to correspond to the government's requests. *See* Dairyland Mot., Exh. 5. The government has now followed through on its improper threat by filing a motion seeking to impose "reciprocal obligations" upon Dairyland relating to its document production on the basis that Dairyland's documents have not been produced in conformance with RCFC 34. The government's cross-motion is an obvious disingenuous ploy that has nothing to do with the organization of Dairyland's various document productions and everything to do with the government attempting to seek untimely reconsideration of the February 5 Order and attempting to "punish" Dairyland for seeking to enforce such Order. It has no basis in law or fact and should be summarily denied.

A. The Government Has Waived Any Right to Complain About The Organization of Dairyland's Document Productions

As an initial matter, the government's motion should be denied on waiver or laches grounds. Dairyland produced the vast majority of its documents, comprising

---

[5] The government has yet to file a motion for enlargement on its expert report deadline even though this Court's Special Procedures Order requires that motions for enlargement be filed as soon as the need is known. *See* May 16, 2006 Special Procedures Order at 4(a)(i) ("Motions for enlargement must be filed as early as possible."). To make matters even more unclear, the government recently requested (and Dairyland agreed to) May deposition dates for Dairyland's experts, which would suggest that it is now rethinking seeking an enlargement of time for its expert reports. However, after agreeing to a May 23 deposition date for one of Dairyland's experts, Frank Graves, the government has now informed Dairyland that it absolutely cannot depose Mr. Graves in May and is now requesting deposition dates for Mr. Graves in late June.

approximately 180,000 pages, to the government almost eight months ago.[6] *See* Declaration of Todd W. Monroe ("Monroe Decl.") (Exh. 7, attached hereto) ¶¶ 3-6. Until the filing of the present cross-motion, the government *never once complained* to Dairyland that the organization of Dairyland's document production is not in compliance with RCFC 34.[7] *Id.* ¶ 13. The government has also never complained to Dairyland about any difficulties it has had in "attempting to tie [Dairyland's documents] to specific issues and production requests (Govt. Resp. at 21)." Monroe Decl. ¶ 14. Indeed, the government has been able to depose nine Dairyland fact witnesses even though Dairyland's document production was not organized to correspond with the government's document requests. The government's utter and complete silence on this issue for more than eight months, only to be suddenly raised at the close of fact discovery in response to a Dairyland motion that seeks to enforce a Court order and sanctions against the government, constitutes a waiver on the government's part. The foregoing facts also demonstrate that there is no credible basis for the government's unsupported assertion that, as a result of the organization of Dairyland's document production, it is "still

[6] Dairyland produced 1,835 pages of documents in connection with its initial disclosures on July 28, 2006 and 179,835 additional pages of documents responsive to the government's First Set of Requests for Production of Documents on August 2, 23, 28 and September 11, 2006. Monroe Decl. (Exh. 7) ¶¶ 3-6.

[7] The government also did not, in violation of the Court's meet-and-confer requirements, make any demand upon Dairyland to reorganize its document production prior to filing its present cross-motion. In addition to the threat noted above, the only other government communication between government and Dairyland counsel on this issue before the government filed its cross-motion was a telephone conversation between Harold Lester and Robert Shapiro. In that conversation, Mr. Lester inquired whether Dairyland's documents were produced as they are kept in the usual course of business, and Mr. Shapiro responded that they were all produced either in that manner or organized to correspond to the categories in the government's requests.

working to review each the more than 34,000 documents that Dairyland produced and to attempt (sic) to tie them to specific issues and production requests." Govt. Resp. at 21.

B. Dairyland's Documents Have Been Produced in Compliance With RCFC 34

The government's claim that Dairyland has not produced documents in response to its requests for production as they are kept in the ordinary course of business is meritless.[8] Documents responsive to the government's First Set of Requests for Production of Documents were gathered and copied from relevant Dairyland employee files and central archive files maintained by the company in the precise order and format in which they appeared in the files, including preserving appropriate document boundaries regarding staples and attachments.[9] Monroe Decl. ¶ 7. In addition, Dairyland produced copies of the file folders from which the produced documents came. *Id.* ¶ 8. At the government's request, all documents produced by Dairyland have been produced on CDs and DVDs in digital image form. *Id.* ¶ 9. This electronic production has preserved and clearly identifies the appropriate boundaries for each document and file folder in terms of, among other things, cover sheets, staples and attachments. *Id.* ¶ 10. To further assist the government in determining the custodian or source of a particular document,

[8] Of course, only documents produced in response to requests for production must be produced in compliance with the requirements of RCFC 34. Thus, Dairyland was not required to produce its initial disclosure documents as they are kept in the usual course of business, although it in fact did so.

[9] Subsequent to Dairyland's August 28, 2006 production, government counsel has written several follow-up letters to Dairyland counsel requesting additional specific documents and data. In almost every case, Dairyland has agreed to produce the requested documents in the format the government has requested, along with, where applicable, relevant bibliographic coding. Dairyland has also produced documents in response to the government's Second Set of Requests for Production of Documents. Most of the documents produced in response to the Second Set of Requests were various photographs and videos obtained from a wide variety of files.

Dairyland has also Bates-labeled every document that was produced from Dairyland's corporate headquarters with a "PDPC" prefix, and every document produced from its nuclear plant site with a "PLAC" prefix. *Id.* ¶ 9.

Finally, Dairyland has voluntarily provided to the government, at its own expense, detailed bibliographic coding for almost every document produced. *Id.* ¶ 11. This coding includes beginning and ending Bates number, document type (*i.e.*, file folder/binder tabs, letter, e-mail, etc.) document date, title, author, recipient, copyee and custodian. *Id.* Contrary to the government's assertion (*see* Govt. Resp. at 21), document custodian information has been included in the bibliographic coding for more than 33,000 of the 34,000 documents produced by Dairyland to date. Monroe Decl. ¶ 12.[10] In sum, Dairyland has not only produced its documents as they are kept in the usual course of business, it has also gone above and beyond its duties under the Rules in providing the government with additional document information – including extensive electronic coding – that has undoubtedly further assisted it in processing and organizing the documents in accordance with its litigation needs.[11]

---

[10] In contrast, the government has not provided Dairyland with bibliographic coding for any of the documents it has produced in this case.

[11] In this regard, Dairyland's document production is clearly distinguishable from the production in *Residential Constructors, LLC v. Ace Prop. & Cas. Ins. Co.*, No. 05-01318, 2006 WL 1582122 (D. Nev. June 5, 2006), upon which the government relies (*see* Resp. at 21-22). In *Residential Constructors*, the court ordered the plaintiff to provide defendant with an accompanying table of contents or index to its document production after the plaintiff had, like Dairyland, produced responsive documents in digital imaged format organized in the manner in which they were kept in the usual course of business. *Id.* at *2. In this case, Dairyland has already provided the government with such a searchable index in the form of the detailed bibliographic coding it has provided for each produced document.

The government, however, preposterously suggests that production of documents as they are kept in the usual course of business required Dairyland to do something different. According to the government, Dairyland was required "to identify cabinets of original files, produced as the files are maintained within its organization," and make those files "available for [the government] to come and review." Govt. Resp. at 21. In other words, rather than affirmatively identifying and producing responsive documents to the government in the manner and order in which they have been maintained in Dairyland's files, the government argues that, in order to comply with RCFC 34, Dairyland had to make the original files (and file cabinets) containing these responsive documents available to the government *for physical inspection.* Furthermore, according to the government, Dairyland was required to not only make responsive documents available for inspection, it was also apparently required to make non-responsive and privileged documents available for inspection if these documents also happen to be located in a file (or file cabinet) that contains responsive documents. *See* Govt. Resp. at 21 (complaining that Dairyland only produced "documents that it had *selected* as responsive to the Government's production requests") (emphasis added).

However, the principal case upon which the government relies in support of this proposition, *U.S. Commodity Futures Trading Comm'n v. Am. Derivatives Corp.*, No. 05-2492, 2007 WL 1020838 (N.D. Ga. Mar. 30, 2007) (*see* Govt. Resp. at 23), supports Dairyland's position, not the government's. In that case, the court stressed that production of documents as they are kept in the usual course of business means that a producing party "cannot attempt to hide a needle in a haystack by mingling responsive documents with large numbers of nonresponsive documents." *Id.* at *4 (internal citation

and quotations omitted). Dairyland here has complied with this directive by only selecting and producing responsive documents, as opposed to doing what the government erroneously suggests it should have done, *i.e.*, make available for physical inspection files that contain both responsive *and* non-responsive documents. In contrast, the government's prior document production posted on its website does precisely what *U.S. Commodities* warns against – it consists of multiple haystacks (*i.e.*, "containers") that improperly mingle documents responsive to Dairyland's requests with an unknown number of non-responsive documents.

The government's position also finds no support under the facts of this case. In this case, the government requested in its requests for production that Dairyland "*produce* all documents in its possession, custody, and/or control, or otherwise available to plaintiff, that are responsive to the requests . . . . and that plaintiff *produce* them within thirty (30) days after service of these requests." Exh. 8 at 1, attached hereto. The government did *not* request that Dairyland make its responsive documents, or the files containing its responsive documents, available *for physical inspection*, *i.e.,* available so that the government could come to Dairyland's offices and facilities to review them and then select specific documents for production. Accordingly, there is no basis to the government's assertion that Dairyland's documents were not produced as kept in the usual course of business or that the organization or method of Dairyland's document production is not in compliance with RCFC 34 or the terms of its own requests for production. And there is no basis in law or equity for the imposition of any "reciprocal obligations" upon Dairyland just because the government is required to comply with the terms of the Court's February 5 Order.

IV. Sanctions Against the Government are Warranted

The government insists that it should not be sanctioned for its violation of the February 5 Order because the order was not sufficiently clear that it required the government to "identify, by Bates-stamp number, every single document that might be viewed as responsive to each of Dairyland's document requests." Govt. Resp. at 17. Of course, Dairyland is not contending, nor did the Court order, that the government was obligated to identify *every single* document that might be responsive to each Dairyland document request. The government was only required to identify with reasonable particularity those documents it had already produced "in earlier coordinated discovery in the spent nuclear fuel litigation or otherwise." Feb. 5 Order at 2. Nevertheless, the government's contention that it did not have sufficient notice or understanding of its obligations under the February 5 Order is, again, directly belied by its Amended Responses to Dairyland's requests (Dairyland Mtn., Exh. 1), where the government did in fact identify, by Bates-stamp number, specific documents that are responsive to 9 of Dairyland's requests. The government has offered no explanation as to why it apparently felt obligated to identify specific documents in partial response to some of Dairyland's requests, but not the others.[12] Based upon the government's response, the only logical explanation is that the government decided on its own – for reasons of its own – that it would not fully comply with its obligations under the February 5 Order.

[12] *Genentech, Inc. v. United States Int'l Trade Comm'n,* 122 F.3d 1409, 1422 (Fed. Cir. 1997) and *Ingalls Shipbuilding, Inc. v. United States,* 857 F.2d 1448, 1455 (Fed. Cir. 1988) (*see* Govt. Resp. at 17) are inapposite. In both of these cases, the Federal Circuit held that before the sanction of *dismissal* can be imposed, the offending party must have notice of the alleged discovery misconduct and be given an opportunity to respond. Dairyland is not seeking the sanction of dismissal here and there is nothing in the language of RCFC 37(b) that requires the Court to give an offending party "one more chance" to comply with a discovery order before imposition of a lesser sanction.

If there was any lingering question about whether sanctions against the government are appropriate in this instance, the government has now answered it with its disingenuous cross-motion to impose "reciprocal obligations" upon Dairyland. The only purpose of this cross-motion is to punish Dairyland and drive up its costs because it is seeking to enforce a Court order against the government. It absolutely has nothing to do with the government's discovery needs or Dairyland's compliance with the Rules. Sanctions are the only way to break the government's ongoing pattern of discovery abuse in this case.

Respectfully submitted,

Dated: May 4, 2007

/s/ Jerry Stouck

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
Counsel for Plaintiff
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

# EXHIBIT 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 04-0106C<br>(Chief Judge Damich) |

DAIRYLAND'S OBJECTIONS AND RESPONSE TO DEFENDANT'S SECOND SET OF INTERROGATORIES

Pursuant to RCFC 33, Dairyland responds to the government's Second Set of Interrogatories served on Dairyland on March 30, 2007.

GENERAL RESPONSES AND OBJECTIONS

The following general responses and objections to the interrogatories are incorporated by reference in each of Dairyland's responses below. Dairyland's answers to interrogatories are subject to these general objections regardless of whether Dairyland agrees in individual responses below to answer interrogatories notwithstanding additional objections noted in such individual responses.

1. Dairyland objects to the government's instruction at page 1, which purports to require Dairyland to supplement its responses to the interrogatories "from time to time, but not later than 10 days after such additional information has been obtained." This instruction seeks to impose obligations that go beyond those that are required under RCFC 26(e).

2. Dairyland objects to any interrogatories that seek information or documents in possession of entities other than Dairyland or otherwise outside the possession, custody or

control of Dairyland. Dairyland further objects to the government's definition of "Plaintiff," "you," "your," and "yourself" to include parties other than Dairyland. Dairyland will answer these interrogatories but does not (and cannot) answer them for any "present or former officers, employees, agents, attorneys, or representatives and every person acting upon [Dairyland] behalf and/or connected with plaintiff in the context of the matters at issue in this action."

3. Dairyland objects to the definition of "document" to include "any preliminary drafts of any documents or any working papers related thereto" as it implicates drafts and/or working papers of Dairyland experts and departs from the limited expert discovery as provided by RCFC 26(b)(3).

4. Dairyland objects to the definition of "identify" and "identity" and the corresponding instructions to these definitions under paragraphs A.6(a)-(e) as they purport to require Dairyland to seek, gather, and/or provide information and documents already in the possession of, or equally available to the government, or impose obligations beyond those that are provided by RCFC 26 and 33. Dairyland also objects to definition A.6(b) of "identify" as oppressive, unduly burdensome and seeking information that is neither relevant nor reasonably calculated to lead to the discovery admissible evidence. For example, the government has no need for the addresses and telephone numbers (particularly home addresses and phone numbers) of Dairyland personnel, as all contact with these individuals concerning this litigation should be through counsel. Further, the requiring of Dairyland to respond to all of the elements of "identify" or "identity" in the instructions would cause the government's interrogatories, including discrete subparts, to exceed the twenty-five interrogatories permitted by RCFC 33. This instruction also makes the interrogatories improper pursuant to RCFC 26(b)(2).

5. Dairyland objects to the instructions under paragraphs A.7 on the ground that

these instructions make the government's interrogatories oppressive, overbroad and unduly burdensome. Dairyland will provide in its responses the information specifically sought for each individual interrogatory (to the extent Dairyland possesses such information and it is properly discoverable), and not the information included as part of paragraphs A.7(b). Further, the requiring of Dairyland to respond to all of the elements of "describe in detail," "state in detail," "state each fact," "state all facts," or "explain in detail" in these instructions would cause the government's interrogatories, including discrete subparts, to exceed the twenty-five interrogatories permitted by RCFC 33. This instruction also makes the interrogatories improper pursuant to RCFC 26(b)(2).

6. Dairyland objects that the number of interrogatories served by the government, including discrete subparts, exceed the twenty-five in number permitted by RCFC 33.

7. Dairyland objects to providing documents already in the possession of, or equally available to the government, such as the documents produced by Dairyland in connection with its RCFC 26(a)(1) Disclosures.

8. Dairyland objects to all other instructions and definitions to the extent that they exceed the discovery permitted by RCFC 26, 33.

9. Dairyland objects to the interrogatories that seek publicly available documents or information already available to the government. Such information includes, but is not limited to, formal pleadings and/or other documents filed by or on behalf of Dairyland, official DOE documents, industry newsletters and standard reference materials. This availability makes these interrogatories unduly burdensome and not properly discoverable pursuant to RCFC 26(b)(2).

10. Dairyland objects to the instructions and interrogatories that call for the disclosure of information that is protected by the attorney-client privilege, or any other applicable privilege,

immunity or protection. All interrogatories will be read to exclude discovery of information protected by the attorney-client privilege or work product doctrine. Provision of any such information by Dairyland during the litigation is inadvertent and should not be construed as a waiver of any such privilege or of any other ground for objection to discovery with respect to such information.

11. Dairyland objects to instruction E seeking separate responses to each subpart as unduly burdensome. For example, many of the subparts requests that particular information be included in the description. It would be unduly burdensome to repeat such information both in the description and in a separate subpart. On an interrogatory-by-interrogatory basis, Dairyland will, subject to its objections, respond to the interrogatories in a manner that coherently and efficiently supplies the information requested.

12. Dairyland's answers to interrogatories are not intended to waive, and should not be construed as waiving the right to object to the relevance or admissibility as evidence of any information or documents provided, or the subject matter thereof.

13. Dairyland objects to instructions D, F, G, H and J as exceeding what is required under RCFC 33.

14. Except where a different meaning is indicated by context, the responses use the terms "SNF," "spent fuel," "spent nuclear fuel," "spent fuel and high-level waste," "SNF and HLW," interchangeably to cover all material DOE is obligated to accept under the parties' contract.

SPECIFIC RESPONSES AND OBJECTIONS

INTERROGATORY NO. 20

On what schedule, measured in MTUs per year, does Dairyland contend that DOE was obligated to accept Dairyland's SNF pursuant to Dairyland's Standard Contract beginning in 1998? State all factual and legal grounds for this contention.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Because Dairyland's Standard Contract does not specify a schedule or precise amount of SNF that DOE is obligated to accept starting on January 31, 1998, DOE was obligated to accept Dairyland's SNF at a reasonable rate. *See Restatement (Second) Contracts* § 204 (1981). A reasonable SNF acceptance rate would have been a rate sufficient to prevent Dairyland (as well as other utilities) from incurring additional at-reactor storage costs from January 31, 1998 forward. *See, e.g.,* DOE Dec. 1983 Draft Mission Plan; Dec. 1983 OCRWM information meeting statement of Acting OCRWM Director Robert Morgan; Feb. 22, 1984 Congressional testimony of Acting OCRWM Director Michael J. Lawrence; M. Lawrence, July 23, 1984 DOE Comments on Draft Mission Plan; trial testimony of Loring Mills, Ivan Stuart, John Bartlett and Frank Graves in *Yankee Atomic*; Expert Witness Reports of Frank C. Graves and Ivan Stuart submitted here. Because

Dairyland faced avoidable at-reactor storage costs in 1998 that could only be eliminated if DOE had accepted all of Dairyland's SNF, DOE was obligated to accept all of Dairyland's SNF in 1998. As set forth in the Expert Witness Report of Frank C. Graves ("Graves Report") and in several DOE planning documents and studies, an aggregate acceptance rate of approximately 3,000 MTU/year would have fulfilled DOE's contractual obligation because it would have prevented Dairyland and other utilities from incurring additional at-reactor storage costs, assuming that a modest number of acceptance allocations were exchanged amongst utilities.

INTERROGATORY NO. 21

On what schedule, measured in MTUs per year, does Dairyland contend that DOE was obligated to accept SNF pursuant to the Standard Contract on an aggregate, industry-wide basis beginning in 1998? State all factual and legal grounds for this contention

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland incorporates by reference its Response to Interrogatory No. 20 above.

INTERROGATORY NO. 22

At what minimum rate of acceptance, measured in MTUs per year, does Dairyland contend that DOE could have accepted Dairyland's SNF pursuant to Dairyland's Standard

Contract beginning in 1998 without causing Dairyland to incur any damages? State all factual and legal grounds for this contention.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "damages" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Regardless of what rate of acceptance would have been used, DOE could have accepted all of Dairyland's 38 MTU of SNF in 1998 pursuant to its contractual obligation. Had DOE done so (and had DOE not announced its intention not to perform several years prior to 1998, thereby inducing Dairyland's efforts to mitigate damages), Dairyland would not have incurred any monetary damages.

INTERROGATORY NO. 23

On what schedule, measured in MTUs per year, does Dairyland contend that DOE was obligated to accept Dairyland's failed fuel pursuant to Dairyland's Standard Contract beginning in 1998? State all factual and legal grounds for this contention.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as

unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Pursuant to Dairyland's Standard Contract, DOE was obligated to accept and could have accepted Dairyland's failed fuel on the same schedule as Dairyland's other SNF. *See Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 309 (2006); *Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 400-01 (2006). *See also* Response to Interrogatory No. 20 above.

INTERROGATORY NO. 24

If, beginning in 1998, DOE had begun performing and had continued to perform its obligations pursuant to the Standard Contract, on what schedule, measured in the amount of MTUs exchanged each year, does Dairyland contend that it would have exchanged its DCSs? State all factual and legal grounds for this contention, and specifically identify all contract holders with whom Dairyland would have exchanged DCSs and the allocations that Dairyland and its trading partners would have exchanged.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: As set forth in the Graves Report, Dairyland could and would have engaged in a sufficient number of DCS exchanges with other utilities to enable DOE acceptance of all of its SNF (38 MTU) in 1998. Because DOE's partial breach prevented development of any DCS exchange market, the specific identity of the utilities with whom Dairyland would have exchanged and the specific allocations that would have been exchanged in the non-breach world cannot be determined. Nevertheless, the Graves Report demonstrates that there would have been numerous potential DCS trading partners available to Dairyland had DOE performed.

April 30, 2007

Respectfully submitted,

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

*As to the Answers*:

The preceding interrogatory answers are based on a review of business records and the personal recollections of a number of employees. Dairyland has made a good faith effort to supply true and correct responses to the interrogatories. I have reviewed each response and believe every factual assertion contained therein to be true and correct.

I declare under penalty of perjury that the foregoing statement is true and correct.

Date: 4-26-07

Charles V. Sans Crainte
Vice President, Generation

CERTIFICATE OF SERVICE

I certify that I caused a copy of the foregoing Dairyland's Objections and Responses to Defendant's Second Set of Interrogatories be served by facsimile and first class mail this 30th day of April 2007 on:

Russell Shultis
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Classification Unit, Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530

Kevin E. Stern

# EXHIBIT 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | No. 04-106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

DECLARATION OF TODD W. MONROE

TODD W. MONROE, being duly sworn, deposes and says:

1. I am an associate with Greenberg Traurig, LLP, counsel to Dairyland Power Cooperative ("Dairyland") in this case. I have conducted and supervised the collection, substantive review, processing and production of documents from Dairyland in this case.

2. Dairyland has to date produced approximately 190,000 pages of responsive documents to the government as part of its initial disclosures and in response to the government's requests for production of documents.

3. On July 28, 2006, Dairyland produced approximately 1,835 pages of documents and electronic files to the government in support of its initial disclosures.

4. On August 2, 2006, Dairyland produced approximately 61,000 pages or 13,665 documents in response to the government's First Set of Requests For Production of Documents ("First Request"). Certain confidential documents were withheld from that production as no protective order had yet been entered in this case. The remaining confidential documents, comprising approximately 20,000 pages, were produced on August 23, 2006.

5. On August 28, 2006, Dairyland produced approximately 69,000 more pages or approximately 15,500 documents in response to the government's First Request.

6. On September 11, 2006, Dairyland substantially completed its production of documents in response to the government's First Request and produced approximately 28,000 pages or approximately 6,050 documents. Thus, as of September 11, 2006, Dairyland had produced approximately 179,835 pages of documents to the government.

7. The Dairyland documents produced in response to the government's First Requests were collected under my supervision from relevant Dairyland employee files and central file archives maintained by the company. These documents were scanned and produced in the order and format in which they appeared in the files, including preserving appropriate document boundaries regarding staples, binder clips and attachments.

8. Dairyland also produced copies of the file folders and binder tabs from which the responsive documents came. Over 1,600 file folders and binder tabs have been produced. These markers provide the government with the boundaries and subject matter of certain document collections and provide guidance on how the files were maintained by the various document custodians at Dairyland.

9. At the government's request, Dairyland has produced all of its documents on either CD or DVD, providing all of the images (except where native Excel files were requested and available) in portable, electronic ("tiff") files, with a Bates number "burned" into the image, including a unique Bates prefix reflecting the Dairyland site from where it was collected. Every produced document collected from Dairyland's corporate headquarters bears a "PDPC" Bates label prefix and every produced document from its nuclear plant site bears a "PLAC" Bates label prefix.

10. Dairyland's electronic document production has preserved and clearly identifies the appropriate boundaries for each document and file folder in terms of, among other things, cover sheets, staples and attachments.

11. Dairyland has voluntarily provided bibliographic coding for nearly all of its documents produced to the government. Dairyland's bibliographic coding includes, for nearly every document, beginning and ending Bates number, document type (*i.e.*, file folder/binder tabs, letter, e-mail, etc.) document date, title, author, recipient, copyee and custodian.

12. Dairyland's current document database contains nearly 34,000 documents that have been produced to the government in this case. Less than 1,000 of these 34,000 documents do not have document custodian information. In some instances, the custodian field (which was included with the bibliographic coding sent to the government) lists "Tech Library" or "Central Files" as the custodian. It is Dairyland's policy that, to the extent it is practicable, all files are maintained in a central location and checked out for use and updating when necessary.

13. I have never received nor seen any correspondence or communication from government counsel complaining that Dairyland's document production was not produced as they documents are kept in the usual course of business or is otherwise not in compliance with RCFC 34.

14. I have never received nor seen any correspondence or communication from the government counsel complaining that it was having difficulty identifying which documents from Dairyland's document production were responsive to a particular issue or government document request.

I declare under penalty of perjury that the foregoing is true and correct.

5/4/07
Date

Todd Monroe

# EXHIBIT 8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 04-0106C<br>(Chief Judge Damich) |

**DEFENDANT'S FIRST SET OF REQUESTS**
**FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rule 34 of the Rules of the United States Court of Federal Claims, defendant, the United States, hereby requests that plaintiff, Dairyland Power Cooperative ("Dairyland"), produce all documents in its possession, custody, and/or control, or otherwise available to plaintiff, that are responsive to the requests in the numbered paragraphs below and that plaintiff produce them within thirty (30) days after service of these requests. Because these requests for production are continuing, they require supplemental response(s) if plaintiff obtains additional information and/or discovers additional documents after service of its original response. Such supplemental responses shall be served from time to time, but not later than 10 days after such additional information has been obtained.

## I. DEFINITIONS AND INSTRUCTIONS

A. The following definitions apply in responding to these interrogatories:

1. "Plaintiff," "you," "your," and "yourself" shall refer to the plaintiff in this action, as well as its present or former officers, employees, agents, attorneys, or representatives

and every person acting upon its behalf and/or connected with plaintiff in the context of the matters at issue in this action.

2. "Person" and "individual" shall include any natural person, corporation (private or governmental), subsidiaries, syndicate, trust, partnership, proprietorship, firm, group, association, joint venture, governmental or other public entity or agency, or any other form of organization or legal entity, and all respective officials, directors, officers, employees, representatives, independent contractors, investigators, consultants, agencies, or agents, whether or not still alive or in existence.

3. "Official," "director," "officer," "employee," "representative," "agency," or "agent" shall include any person, natural, corporate, or otherwise, including any attorney, serving or acting in such capacity (by contract or otherwise) at any relevant time even though such person no longer serves or acts in such capacity.

4. "Document" shall be construed in the broadest sense possible under RCFC 34 and shall include the original and any copy of any and all writings as that term is defined in Federal Rule of Evidence 1001, and all written, typed, printed, recorded, graphic, computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored on paper, cards, tape, film, electronic facsimile, computer storage devices, or any other medium in your possession, custody, or control, or whose existence is or was ever known to you, including but not limited to: correspondence, letters, notes (whether of visits, meetings, telephone calls, or otherwise), memoranda (whether of visits, meetings, telephone calls, or otherwise), appointment calendars, schedules, telegrams, telexes, facsimiles, electronic mail, press releases, notices, brochures, pamphlets, guidelines, manuals,

instructions, summaries or abstracts, diaries, notebooks, minutes, computer printouts or information stored in a computer-readable form, tests, reports, files, file jackets, analyses, studies, testimony, speeches, worksheets, invoices, bills, written estimates, contracts, agreements of any kind, purchase orders, change orders, proposed changes, schedules, plans, charts, diagrams, drawings, graphs, designs, blueprints, tables, photographs, books, articles, or extracts from any of the foregoing, and any other writings or documentary materials of any nature whatsoever, whether or not divulged to other parties, together with any attachments thereto and enclosures therewith. These requests encompass all forms and manifestations of electronically or optically coded, stored, and/or retrievable information, including, but not limited to, "e-mail" (to the extent required pursuant to the court's March 14, 2005 order), digital images and graphics, digital or analog audio tapes and files, and digital or analog video tapes and files. The term "document" or "documents" also shall include each copy that is not identical to the original or to any other produced copy, and any preliminary drafts of any documents or any working papers related thereto, and specifically includes internal memoranda. If a document responsive to any interrogatory or production request was, but no longer is, in your possession and control, describe in detail the contents of the document, its date of creation and disposition, and its present location and custodian.

5. "Complaint" shall refer to the pleadings filed by plaintiff to commence this action in the United States Court of Federal Claims.

6. "Identify" or "identity" shall have the following meanings:

a. When used with reference to an entity or organization, the response shall state the type of entity or organization (*e.g.*, corporation, partnership, joint venture, or sole

proprietorship) and give the full name and present or last known address of the entity or organization.

b. When used with reference to a person, the response shall state the person's full name, current or last known home and work address and telephone numbers, current or last known business affiliation and job description, and any past or present affiliation with plaintiff or defendant. If such information is not current, the date of this information shall be specified.

c. When used with reference to a document, the response shall state the type of document (*e.g.*, memorandum, letter, note, contract), its date, author(s), addressee(s) (if any), synopsis of content, and present location. In lieu of providing this information, plaintiff may attach a copy of the document to its response to this discovery request. A request that you identify a document is not limited to documents in your possession, custody, or control.

d. When used in reference to a source of information (*e.g.*, a conference, communication, conversation, discussion, meeting, or presentation), the response shall identify each individual providing information. The response shall also state whether the information has been reduced to writing or other tangible form. If so, this writing or other record shall be identified in the manner described in subparagraph c. above.

e. When used in reference to an item of property, the response shall identify the precise location of that property and the property interest involved. The response shall also state whether the ownership interest has been reduced to writing or other tangible form. If so, this writing or other record shall be identified in the manner described in subparagraph c. above.

7. "Describe in detail," "state in detail," "state each fact," "state all facts," or "explain in detail," as used herein, shall mean the following:

a. Describe fully by reference to detailed underlying facts rather than the ultimate facts or conclusions of law or fact.

b. Disclose each and every fact, circumstance, condition, and thing known to you about the subject of the interrogatory and provide a full identification and description of the source(s) of such facts, circumstances, conditions, and things, including, but not limited to:

(1) the identity of each person involved in each such event, including, but not limited to, persons employed by plaintiff and/or those persons purporting to act for plaintiff;

(2) the specific acts of each person participating in each such event;

(3) the date and time of each such event;

(4) the address and location of each such event; and

(5) the identity of each person present during each such event.

8. The word "explain" means to state with specificity each and every fact, ultimate fact, particular circumstances, incident, act, omission, detail, and event that relates to the reference, contention, or response.

9. Use of the phrase "making sure to" means that the subsequent issues should be addressed specifically in addition to your response to the general question that was raised in the interrogatory.

10. The word "substantiate" means to identify each document and/or communication, including each and every provision of the contract, upon which you rely in making the reference, contention, or response, and to state any other facts relating to the reference, contention, or response.

11. "Relating to" means containing, constituting, discussing, describing, identifying, referring to, supporting, explaining, contradicting, and/or in any way pertaining to the subject specified.

12. The term "Standard Contract" refers to the "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste," the terms of which are published at 10 C.F.R. § 961.11.

13. "Plaintiff's contract" or "your contract" refers to the Standard Contract that the plaintiff, or plaintiffs, in this action (regardless of whether the relationship is as purchaser or licensee) entered with the Department of Energy.

14. "DOE" refers to the United States Department of Energy.

15. "HLW" refers to high-level radioactive waste as defined in Article I, clause 12, of the Standard Contract.

16. "SNF" refers to spent nuclear fuel as defined in Article I, clause 18, of the Standard Contract.

17. "ISFSI" refers to independent spent fuel storage installation, such as that used in the dry storage of spent nuclear fuel.

18. "Delivery commitment schedules" or "DCS" refers to the forms described in Article V, paragraph B, of the Standard Contract and includes any schedules that have been

proposed by the utility, any schedules proposed by DOE if the utility's schedule is rejected, and any schedules developed pursuant to subsequent attempts to negotiate mutually acceptable schedules.

19. "FERC" refers to the Federal Energy Regulatory Commission.

20. "NRC" refers to the Nuclear Regulatory Commission.

21. "GTCC" refers to Greater-Than-Class-C waste, which is radioactive waste that exceeds the concentration limits of radionuclides established for Class C waste in 10 C.F.R. § 61.55.

22. "MTU" refers to Metric Tons of Uranium.

23. "Re-racking" means the process by which additional and/or space-conserving racks are added to the spent fuel pool as a means of increasing SNF storage capacity.

24. The term "full core offload capability" or "full core offload reserve" refers to the practice of reserving spent fuel pool space at all times to permit the unloading of all of the fuel bundles in the reactor core. A fuel pool is considered full when the normal fuel cycle discharge of fuel would violate the reserve spaces required for full core offload.

25. "NWPA" refers to the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270 (1982).

26. "MRS" refers to a monitored retrievable storage facility as contemplated in 1987 amendments to the Nuclear Waste Policy Act.

27. "LACBWR" refers to the LaCrosse Boiling Water Reactor which includes the nuclear power plant and all related properties.

28. "PFS" refers to Private Fuel Storage, LLC.

29. "PSC" refers to the Public Service Commission of Wisconsin.

B. To bring within the scope of these discovery requests all information and documents that might otherwise be construed to be outside their scope:

1. The singular of each word shall be construed to include its plural and vice versa, and the root word and all forms thereof (*i.e.*, participles and infinitives, *etc.*) shall be construed to include each other;

2. "And" as well as "or" shall be construed both conjunctively as well as disjunctively;

3. "Each" shall be construed to include "all," and vice versa;

4. "Any" shall be construed to include "all," and vice versa;

5. The present tense shall be construed to include the past tense, and vice versa;

6. The masculine shall be construed to include the feminine, and vice versa;

7. "Knowledge," "information," "possession," "custody," and "control" possessed or exercised by a person shall be construed to include "knowledge," "information," "possession," "custody," and "control" possessed or exercised by such person's agents, representatives, and attorneys;

8. "Include" and "including" shall have their ordinary meaning and shall mean "including, but not limited to;"

9. In general, all terms used herein shall be construed in an ordinary, common-sense manner, and not in a technical, strained, overly-literal, or otherwise restrictive manner.

C. In answering these interrogatories, furnish all information, however obtained, including hearsay, that is within your possession, custody, and/or control, including information known by, or in the possession, custody, or control of, yourself, or any of your officials, directors, officers, employees, agents, investigators, consultants, and attorneys.

D. If plaintiff cannot answer the following interrogatories in full after exercising due diligence to secure the information, so state, and answer to the extent possible. Explain in detail the reasons for plaintiff's inability to answer the remainder, and identify whatever information or knowledge plaintiff has concerning the unanswered portion.

E. Provide separate responses for each interrogatory or its subpart; do not join together and provide a common response or answer to two or more interrogatories or to subparts of an interrogatory.

F. Where exact statistical or numerical information, including dates or times, cannot be furnished, estimated or approximate information shall be supplied. Where an estimate or approximation is supplied, it should be so indicated, and an explanation provided as to the basis upon which the estimate or approximation was made. State the reason(s) why exact statistical or numerical information cannot be furnished.

G. If any response, or any portion of any response, to any of the following interrogatories or subparts thereof is not made on or by the present knowledge of the person signing or swearing to such response, identify each person from whom the information was obtained and whether it is a matter of each such person's personal knowledge. State the number of the interrogatory for which each such person supplied information.

H. To the extent that you consider any of the following interrogatories, or their subparts, to be objectionable, answer that portion of the interrogatory, or subpart, to which you have no objection and separately state the portion of the interrogatory, or subpart, to which you object and state with specificity all grounds for your objection. If you object to an interrogatory upon the ground that it is too broad (*i.e.*, that it calls both for information which is relevant to the subject matter of the action and information which is not relevant), provide the information that is relevant. If you object to an interrogatory upon the ground that to provide an answer would constitute an undue burden, provide all requested information that can be supplied without undertaking an undue burden. For those portions of an interrogatory to which you object or otherwise decline to answer, state the reason for such objection or declination.

I. Unless indicated otherwise in the specific interrogatory, these interrogatories call for information and documents beginning in 1982 up to the present.

J. To the extent you believe information and/or documents responsive to these interrogatories have already been produced to the Government by Dairyland identify with specificity where in the prior production the information or documents may be found.

**REQUESTS FOR PRODUCTION**

REQUEST NO. 1

All documents relating to your responses to Defendant's First Set of Interrogatories.

REQUEST NO. 2

All documents relating to permanently shutting down LACBWR, including all documents relating to the projected timing for the permanent shutdown, and all documents relating to the reasons for any shutdown.

REQUEST NO. 3

All documents relating to the operations and maintenance associated with wet storage, including all documents relating to personnel and staffing for wet pool operations and the costs associated with wet pool operations.

REQUEST NO. 4

All documents relating to projected SNF discharge rates at LACBWR.

REQUEST NO. 5

All documents relating to the presence of high burn-up fuel, failed fuel, non-standard fuel, other than standard fuel, and/or GTCC radioactive waste in plaintiff's wet pools or upon plaintiff's reactor sites.

REQUEST NO. 6

All documents relating to decommissioning, including, but not limited to, all decommissioning studies, either developed by Dairyland or outside contractors.

REQUEST NO. 7

Any investigations, analyses, and/or studies of additional or alternative storage options for Dairyland's SNF and/or HLW.

REQUEST NO. 8

All documents relating to PFS, including all documents relating to Dairyland's participation in PFS and documents relating to Dairyland's damages attributable to PFS.

REQUEST NO. 9

All documents concerning or reflecting the substantive, technical, and/or economic bases for Dairyland's construction of an ISFSI.

REQUEST NO. 10

All spent fuel management studies produced by, or upon behalf of, Dairyland.

REQUEST NO. 11

All documents relating to any modifications to site facilities necessary to support the transfer of fuel from Dairyland's spent fuel pools.

REQUEST NO. 12

All documents relating to any modifications to site facilities necessary to support transfer of SNF to DOE from Dairyland's spent fuel pools.

REQUEST NO. 13

All documents relating to Dairyland's spent fuel pools, including, but not limited to: capacity, including but not limited to license capacity; historical changes in capacity; current inventory (including data relating to the type and composition of the material in Dairyland's spent fuel pools, as well as details about burn-up and enrichment of the material in the pools);

and specific identification (both in type and amount) of materials other than SNF that are stored in Dairyland's spent fuel pools.

REQUEST NO. 14

All documents relating to any re-racking at LACBWR including, but not limited to, memoranda, notes, letters, or printed e-mails relating to any decisions concerning re-racking and the extent of any actual or potential re-racking.

REQUEST NO. 15

All documents concerning Boraflex racks, including all documents concerning problems experienced at LACBWR as a result of any use of Boraflex racks.

REQUEST NO. 16

Copies of current certificates of compliance, including any amendments and/or pending modifications, for the casks that Dairyland is using or intends to use for its SNF.

REQUEST NO. 17

All documents relating to the design basis for Dairyland's ISFSI, including the number of casks to be used in the ISFSI and any analysis of the amounts and types of inventory to be stored in the ISFSI over time.

REQUEST NO. 18

All documents supporting or otherwise concerning the costs claimed as damages associated with SAFSTOR at LACBWR.

REQUEST NO. 19

All documents supporting or otherwise concerning the costs claimed as damages associated with and ISFSI .

REQUEST NO. 20

All documents supporting, refuting, or otherwise relating to Dairyland's damages.

REQUEST NO. 21

Any documents relating to the assignment of Dairyland's Standard Contract, of Dairyland's SNF and/or HLW, and/or of any claims arising out of the Standard Contract to any third parties.

REQUEST NO. 22

All documents, including all documents submitted to the Federal Energy Regulatory Commission, the Nuclear Regulatory Commission, state regulatory commissions, other utilities, and any other third parties, that relate to Dairyland's proposed, submitted, approved, or disapproved delivery commitment schedules.

REQUEST NO. 23

All documents relating to priority for the acceptance of SNF and/or HLW from shutdown reactors.

REQUEST NO. 24

All documents relating to the exchange of delivery commitment schedules among utilities.

REQUEST NO. 25

All documents relating to DOE's obligation to accept GTCC waste.

REQUEST NO. 26

All documents relating to DOE's responsibilities with respect to the timing, rate, and scheduling of acceptance of SNF and/or HLW from utilities under the Standard Contract and the Nuclear Waste Policy Act.

REQUEST NO. 27

All documents created at any time after 1976 relating to, referring to, or associated with the promulgation and/or formation of the Standard Contract and/or the NWPA, including all documents prepared by or upon behalf of Dairyland concerning the promulgation and/or formation of the Standard Contract and/or the NWPA.

REQUEST NO. 28

All drafts of the Standard Contract.

REQUEST NO. 29

All comments regarding the Standard Contract or proposed changes to the Standard Contract to or from nuclear industry groups or other third parties.

REQUEST NO. 30

All documents considered and/or reviewed by each of plaintiff's expert witnesses in forming his opinions, including any and all electronic files, analyses, spreadsheets, and models.

REQUEST NO. 31

All electronic files, documents, and analyses relating to any and all scenarios, actual or hypothetical, considered by each of plaintiff's expert witnesses.

REQUEST NO. 32

All communications between each of plaintiff's expert witnesses and counsel.

REQUEST NO. 34

All communications between each of plaintiff's expert witnesses and any Dairyland employee regarding or relating to the contents of the expert witness reports and/or work performed upon behalf of plaintiff.

REQUEST NO. 35

All of plaintiff's expert witnesses' work papers and notes, in electronic and hard copy, and all drafts of the expert reports.

REQUEST NO. 36

All communications with plaintiff's expert witnesses involving the request for expert services.

REQUEST NO. 37

All electronic files relating to the costs or categories of costs claimed in any of Dairyland's expert reports that contain analysis or output from Dairyland's accounting systems, human resources systems, procurement systems, or their equivalents. Such electronic files shall be in a form, to the extent that it exists, that permits data manipulation (i.e., spreadsheet, database, or accounting system files, but not image files).

REQUEST NO. 38

All electronic files of spreadsheets relating to Dairyland's expert reports or that are referenced in Dairyland's expert reports. Such electronic files shall be in a form, to the extent that it exists, that permits data manipulation (i.e., spreadsheet, database, or accounting system files, but not image files).

REQUEST NO. 39

All contracts and invoices for plaintiff's expert witnesses' services.

REQUEST NO. 40

All spreadsheets attached to Dairyland's expert reports in manipulative electronic format, with formulas.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-6288
FAX: (202) 307-2503

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LORE
Senior Trial Counsel
JOHN C. EKMAN
SONIA ORFIELD
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

April 26, 2006

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 26th of April, 2006, I caused to be sent by first class mail and facsimile a copy of "DEFENDANT'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS," addressed as follows:

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)

[signature]