IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-106C<br>(Chief Judge Damich) |

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR IMPOSITION OF RECIPROCAL OBLIGATIONS UPON THE PARTIES

Defendant, the United States, respectfully submits this reply to the response that plaintiff, Dairyland Power Cooperative ("Dairyland"), filed on May 9, 2007, to our motion seeking to create reciprocal obligations upon the parties relating to document production.

## ARGUMENT

### I. DAIRYLAND'S REPRESENTATIONS THAT WE "THREATENED" IT ARE OUTRAGEOUS

As an initial matter, Dairyland's assertion that we "threatened" it, see Response, at 11,[1] is ludicrous. We acknowledge that we informed counsel for Dairyland that we intended to ask the Court to impose reciprocal obligations upon the parties in this litigation and that we would expect Dairyland to be willing to comply with whatever standard it believed the Government was obligated to satisfy. However, such an assertion is certainly not a "threat," but merely an acknowledgment that the parties, equally, must comply with the same discovery rules.

[1] "Response, at ___" refers to Dairyland's response to our motion seeking to impose reciprocal discovery obligations upon the parties in this case, filed May 4, 2007. "App. __" refers to the appendix to our April 20, 2007 motion for imposition of reciprocal obligations.

Dairyland's apparent belief that the Government, and only the Government, must satisfy extremely onerous and costly discovery obligations cannot be appropriate.

Similarly, Dairyland's allegation that we did not satisfy the meet-and-confer requirements with regard to our request that the Court impose the same obligations regarding document production upon Dairyland as it imposes upon the Government, Response, at 12 n.7, is unsupported. Pursuant to Rule 37(a)(2)(B), courts require a party moving to compel to conduct "a personal or telephonic consultation during which the parties engage in meaningful negotiations" in a "genuine effort to avoid judicial intervention." Shuttle Master, Inc. v. Progressive Games, Inc., 170 F.R.D. 166, 171, 172 (D. Nev. 1996); see Powers v. CSX Transportation, Inc., No. 99-0326, 2001 WL 1190243, at *4 (S.D. Ala. July 16, 2001); Soto v. City of Concord, 162 F.R.D. 603, 623 (N.D. Cal. 1995). We discussed this matter by telephone with counsel for Dairyland, and, although counsel for Dairyland now views this discussion as some type of "threat," counsel was certainly aware of our position regarding this issue and indicated that Dairyland had no intention of performing the same work that the Government has been obligated to undertake.

## II. THE GOVERNMENT HAS NOT "WAIVED" ITS RIGHT TO SEEK RECIPROCAL DOCUMENT PRODUCTION OBLIGATIONS IN THIS CASE

In response to our motion seeking the imposition of reciprocal and equal obligations relating to document production in this litigation, Dairyland claims that we have waived our right to require both parties to comply with the same discovery rules, in the same manner. Response, at 12. Although it complains that we did not file our motion seeking reciprocal discovery obligations until eight months after we received Dairyland's document production to file our motion, Response, at 12, Dairyland had the bulk of our documents at the outset of this

litigation, long before it ever served any document production request. Yet, it waited a significant amount of time before filing its own motion to require the Government to modify its document production procedures. In any event, Dairyland cites no case law supporting a waiver of discovery rights, particularly when our motion was filed in response to the Court's ruling regarding Dairyland's demand for inconsistent discovery obligations.

Further, Dairyland complains that we do not need information about the contents of its documents, given that we were able to take depositions in this case of many of Dairyland's fact witnesses. Response, at 12. Yet, under that rationale, Dairyland, which has also taken its fact witness depositions in this case, did not need the information that it demanded through its motion to compel in order to do so. The fact that we took depositions with the information that we were able to extract from the documents in the manner those documents were provided to us does not mean that our knowledge of those documents was complete or our ability to organize them was easily achieved.

## III. DAIRYLAND'S REPRESENTATION THAT IT HAS PRODUCED DOCUMENTS AS KEPT IN THE ORDINARY COURSE OF BUSINESS EITHER IS IN ERROR OR IS CONSISTENT WITH THE MANNER IN WHICH THE GOVERNMENT PRODUCED ITS DOCUMENTS

Dairyland's main defense to our motion is that Dairyland, but not the Government, has produced documents "as they are kept in the ordinary course of business" and that, therefore, it has no obligation under RCFC 34 to tie its document productions to specific document production requests. It includes a declaration from an attorney at its counsel's office, Todd Monroe, who attests that documents responsive to the Government's document production requests "were collected under [his] supervision from relevant Dairyland employee files and central file archives maintained by the company." Monroe Declaration ¶ 7. Yet, from this

statement, it seems clear that Mr. Monroe and those assisting him made judgment calls about what documents in files were responsive to document production requests and that they extracted those documents from the files for production. Accordingly, his representation that the documents extracted "were scanned and produced in the order and format in which they appeared in the files, including preserving appropriate document boundaries regarding staples, binder clips and attachments," Monroe Declaration ¶ 7, does not mean that Dairyland produced to us its files as they are maintained "in the ordinary course of business." At best, it means that Dairyland produced selected documents from files that were kept in the ordinary course of business.

Interestingly, Dairyland does not cite to a single case supporting its position that a party can selectively identify documents from its files that are responsive to the other party's document production requests and then claim that they were produced as "kept in the ordinary course of business." As we explained in our motion seeking reciprocal obligations, documents are not produced "as kept in the usual course of business" where the "[p]laintiff has gathered these documents together from different entities and locations and has assembled the documents together in the boxes, which have now been imaged onto a computer database." Residential Constructors, LLC v. Ace Property & Caualty Ins. Co., No. 05-01318, 2006 WL 1582122 (D. Nev. June 5, 2006). "The purpose behind the 1980 Amendment that added the 'usual course of business' language to Rule 34(b) was to allow the discovering party access to business records in the manner documents were normally maintained by the producing party to prevent deliberate shifting of the materials from the sequence which they were ordinarily kept to somewhere else . . . .'" Id. (quoting In re Aldelphia Communications Corp., 338 B.R. 546 (S.D.N.Y. 2005))

(emphasis added). Here, it seems clear that Dairyland has not provided documents to us "in the manner [in which they] were normally maintained," but, instead, has provided us with its own selections of documents, which it then scanned onto CDs.

Further, to the extent that Dairyland continues to contend that its production somehow comports with the "as kept in the usual course of business" portion of RCFC 34, the Government's production similarly comports with it. As indicated in the accompanying declaration from Steve Salaj, we cannot see how the Government's production efforts differ in any way from Dairyland's description of its own efforts, except for the fact that the Government's efforts began well before Dairyland's as a result of the fact that other spent nuclear fuel plaintiffs (including other clients of counsel for Dairyland) sought documents well before Dairyland filed its complaint in this Court. Nevertheless, the documents that we produced were pulled from various files that were maintained in the usual course of business, and they were not reorganized or reordered in an effort to attempt to "conceal" information or to hide documentation. To the extent that the Court finds that Dairyland has no obligation to tie its document production to the Government's production requests, the Court will have imposed inequitable obligations on the parties, given that their production methods were substantially the same.

Dairyland claims that it should be excused from any obligation to tie documents to specific document production requests because it provided "custodian" information regarding approximately 33,000 of the 34,000 documents that it produced to us. First, we do not understand the reason that the identification of "custodian" information should excuse compliance with RCFC 34, particularly when the Government also previously provided

custodian information regarding its document production. Second, as identified in the declaration accompanying this brief, our records wholly conflict with Mr. Monroe's representation. Instead, we have been able to locate custodian information for less than half of the documents that Dairyland has produced. See Declaration of Steve Salaj, attached to this reply. That is, our records do not indicate the source or custodian of more than 19,000 documents that Dairyland produced to us. See, e.g., App. 57-87. Nevertheless, even with custodian information, we lack any information regarding which documents from each custodian relate to the specific topics in our document production requests. We have been required to devote significant manhours in an effort to attempt to identify what documents might be relevant to specific topics and issues. Dairyland has been of no assistance in that effort.

Dairyland's actions have imposed inequitable discovery obligations upon the parties, with the Government having expended substantial resources to attempt to create the identification of documents that Dairyland demanded but with Dairyland expending no such effort with regard to the documents that it produced. Under Dairyland's view, it is the Government, and only the Government, that must organize and categorize all documents in the case, both those that the Government produces and those that Dairyland produces. To eliminate this inequity, and to ensure that the parties are required equally and consistently to comply with their obligations under RCFC 34, we respectfully request that the Court, having ordered the Government to undertake certain efforts to identify documents from its production to Dairyland here, impose reciprocal obligations with regard to the identification of documents upon Dairyland in this case.

CONCLUSION

For the foregoing reasons, and those set forth in our motion dated April 20, 2007, we respectfully request that the Court order Dairyland to undertake the same level of effort to tie documents from its document production to the Government's document production requests that the Government is required to undertake.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell A. Shultis
RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

May 25, 2007

Attorneys for Defendant

# ATTACHMENT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-0106C<br>(Chief Judge Damich) |

DECLARATION OF STEVE SALAJ

I, Steve Salaj, hereby declare:

1. My name is Steven C. Salaj. I am a Project Manager employed by CACI, Inc., 1100 North Glebe Road, Arlington, Virginia. Under contract to the U.S. Department of Justice I managed the collection and processing of the document production to Dairyland Power Cooperative.

2. I have reviewed the declaration that Mr. Todd Monroe executed on May 4, 2007, and that Dairyland Power Cooperative attached to "Dairyland's Reply On Its Motion To Enforce February 5, 2007 Order And For Sanctions And Response To Defendant's Motion For Imposition Of Reciprocal Obligations Upon The Parties," dated May 4, 2007. Based upon my review of our records of Dairyland's document productions and the information that we obtained from Dairyland regarding the documents in those productions, I am able to offer the following information responding to those representations.

3. In paragraph 7 of his declaration, Mr. Todd Monroe states that the Dairyland documents produced to the Government "were scanned and produced in the order and format in which they appeared in the files, including preserving appropriate document boundaries regarding staples, binder clips and attachments." We have no way to verify Mr. Monroe's

statement. However, in comparison, the manner in which we have scanned and produced documents that the Government has produced to Dairyland, and those that the Government has produced to other spent nuclear fuel plaintiffs (including documents produced on our Production Website), is very similar to the method that Mr. Monroe describes. At the Department of Justice's direction, we have scanned documents that we received from the Department of Energy and the Nuclear Regulatory Commission in the order and format in which they appeared in the files provided to us, with the exception that privileged documents were separated out and scanned separately. Our scanning/eConversion process also preserved appropriate document boundaries regarding staples, binder clips, and attachments (with the one exception of attachments to e-mails received electronically – the attachment to an e-mail would be processed as a separate document immediately following the email). We also scanned the file folders and binders tabs received with paper documents.

4. In paragraph 8 of his declaration, Mr. Monroe states that '[o]ver 1,600 file folders and binder tabs have been produced" and that "[t]hese markers provide the government with the boundaries and subject matter of certain document collections and provide guidance on how the files were maintained by the various document custodians at Dairyland." Examples of the labels on the file folders that Dairyland produced are "WPI task 2," "WPI Phase I tasks 7 - 9 and 11," and "Task 15.5."

5. In comparison with Mr. Monroe's statement that Dairyland's file folders and binder tabs provide the Government with the boundaries and subject matter of certain document collections, our Production Website Index provides this same information to Dairyland and the other spent nuclear fuel plaintiffs. Our "containers" represent a distinct collection of documents

from one source: although there can be multiple containers from a particular custodian, all of the documents within a single container were produced by one source (as opposed to multiple sources).

6. In paragraph 11 of his declaration, Mr. Monroe states that Dairyland has "provided bibliographic coding for nearly all of its documents produced to the government," including, "for nearly every document, beginning and ending Bates number, document type (*i.e.*, file folder/binder tabs, letter, e-mail, etc.) document date, title, author, recipient, copyee and custodian." For the categories that Mr. Monroe identified, we received coding information as follows:

> Beginning and ending Bates number: This information is provided for nearly every document that was electronically produced.
>
> Document Type: We received this information for 32,752 of the 34,448 documents produced.
>
> Document Date: We received this information for all of the documents produced, although the date provided for 11,289 of the documents is "00/00/0000."
>
> Title: We received this information for 33,428 of the 34,448 documents produced.
>
> Author: We received this information for 33,323 of the 34,448 documents produced.
>
> Recipient: We received this information for 12,696 of the 34,448 documents produced.
>
> Copyee: We received this information for 5,447 of the 34,448 documents produced.
>
> Custodian: We received this information for 15,320 of the 34,448 documents produced.

7. In paragraph 12 of his declaration, Mr. Monroe asserts that "[l]ess than 1,000 of these 34,000 documents" produced to the Government in this case "do not have document custodian information." Our records, and the file information that we were provided by Dairyland, do not comport with this representation. With regard to the "Custodian" of each of the documents produced, we received that information for only 15,320 of the 34,448 documents produced. We did not receive "Custodian" information for 19,128 of the produced documents.

8. In our Concordance database, there are currently 34,448 documents that we received from Dairyland. Of those, 19,128 are without a custodian, or approximately 56 percent. Of the 14 productions loaded so far (PROD15 with about 2400 pages is not yet loaded), only PROD01, 02, and 13 have a custodian listed. Following are the custodians of record:

Adv. Committee/Board = Identified as Custodian for 191 documents

Central Files (or Filing) = Identified as Custodian for 2,243 documents

LACBWR Central Files = Identified as Custodian for 328 documents

Tech Library = Identified as Custodian for 2,234 documents

Mike Brasel = Identified as Custodian for 3,787 documents

Mike Johnson = Identified as Custodian for 6,097 documents

Lynne Goodman = Identified as Custodian for 209 documents

Seymour Raffety = Identified as Custodian for 231 documents

During the course of its productions, Dairyland provided bibliographic data to us in several different files, some of which included Custodian data, and some of which did not. The largest such file that it provided to us was on September 22, 2006, containing bibliographic data for over 33,000 records. In its transmittal letter for that disk, a copy of which is attached, Dairyland said

that it was providing us with the bibliographic coding data for all documents that Dairyland had produced to date. Attached is a copy of the first page from that data file. As evidenced by the first line of that page, the data fields that Dairyland included on that CD did not include "Custodian."

I declare under the penalty of perjury, this 25th day of May, 2007, that the foregoing is true and correct to the best of my knowledge and belief.

Steve Salaj

STEVE SALAJ

Greenberg
Traurig

Kevin E. Stern
Tel. 202.452.4878
Fax 202.261.0107
sternk@gtlaw.com

September 22, 2006

*VIA HAND DELIVERY*

Russell Shultis
Department of Justice
Commercial Litigation Branch
Civil Division – Classification Unit
8th Floor Mailroom
1100 L Street, NW
Washington, D.C. 20530

Re: *Dairyland Power Cooperative v. United States*

Dear Russ:

Please find enclosed one DVD labeled Bib Code Data containing the bibliographic coding for all documents Dairyland has produced to date.

Please let me know if you have any questions.

Sincerely,

Kevin E. Stern

Enclosure

BIBCODE

þBEGPRODNOþ□þENDPRODNOþ□þDOCTYPEþ□þDOCDATEþ□þTITLEþ□þAUTHORþ□þRECIPIENTþ□þCOPYEEþ

þPLAC0000001þ□þPLAC0000001þ□þFILE FOLDER/BINDER TABSþ□00/00/0000□þWPI TASK 2þ□þ[UNKNOWN]þ□þþ□þþ

þPLAC0000002þ□þPLAC0000006þ□þHANDWRITTEN NOTESþ□01/01/1988□þCALC OF ACT PRODUCTS IN OTHER/RX COMPONENTS AS OF 1 JAN 88þ□þ[UNKNOWN]þ□þþ□þþ

þPLAC0000007þ□þPLAC0000007þ□þMAP/DRAWING/DIAGRAM/PHOTOGRAPHþ□00/00/0000□þLACBWR STEAM SEPARATOR DWG NO 41-503-109 REV 0þ□þALLIS-CHALMERS MANUFACTURING COMPANYþ□þþ□þþ

þPLAC0000008þ□þPLAC0000008þ□þE-MAILþ□01/15/2003□þNQA TASK 2-RESPONSE TO DPC COMMENTS DATED 1-13-03þ□þNELSON, LARRY Lþ□þCHRISTIANS, ROGER E;COTA, RICH J;EGGE, DON G;JOHNSEN, MIKE N;RAFFETY, SEYMOUR J;RYBARIK, DAVID L;HART, DELENE A;BRASEL, MICHAEL Aþ□þSANSCRAINTE, CHUCK Vþ

þPLAC0000009þ□þPLAC0000024þ□þBUSINESSþ□01/13/2003□þWPI RESPONSES TO DPC COMMENTS RELATIVE TO TASK 2 THE APPLICABLE COMMENTS WERE PROVIDED TO WPI VIA TRANSMITTALS NUMBER DPC-WPI-2002-1077 AND 1090 DATED 11/06/02 AND 12/4/2002þ□þWPIþ□þþ□þþ

þPLAC0000025þ□þPLAC0000030þ□þMANUAL/TECHNICALþ□01/14/2003□þTABLE 3 RPV AND INSTALLED COMPONENTS ESTIMATED CURIE CONTENT IN ACTIVATED METAL AS OF JANUARY 2003 MANUAL CALCULATION REVISION 0þ□þWORLDWIDE PERFORMANCE AND INNOVATIONþ□þþ□þþ

þPLAC0000031þ□þPLAC0000031þ□þE-MAILþ□12/05/2002□þNQA TASK 2 REPLY TO DRAFT RESPONSEþ□þJOHNSEN, MIKE Nþ□þCHRISTIANS, ROGER E;RAFFETY, SEYMOUR J;EGGE, DON G;COTA, RICH J;HART, DELENE A;RYBARIK, DAVID L;BRASEL, MICHAEL A;MIRASOLA, DEB Aþ□þNELSON, LARRY Lþ

þPLAC0000032þ□þPLAC0000034þ□þBUSINESSþ□00/00/0000□þ[UNTITLED]þ□þ[UNKNOWN]þ□þþ□þþ

þPLAC0000035þ□þPLAC0000036þ□þMEETING/PRESENTATIONþ□11/25/2002□þWPI PROJECT TEAM MEETING MINUTES NOVEMBER 25 2002þ□þCHRISTIANS, ROGERþ□þBRASEL, MIKE;JOHNSEN, MIKE;NELSON, LARRY;RAFFETY, SEYMOUR;RYBARIK, DAVIDþ□þþ

þPLAC0000037þ□þPLAC0000038þ□þE-MAILþ□11/21/2002□þNQA TASK 2-DRAFT WPI RESPONSES TO DPC COMMENTSþ□þJOHNSEN, MIKE Nþ□þCHRISTIANS, ROGER E;RAFFETY, SEYMOUR J;EGGE, DON G;COTA, RICH J;HART, DELENE A;RYBARIK, DAVID L;BRASEL, MICHAEL A;MIRASOLA, DEB Aþ□þSANSCRAINTE, CHUCK Vþ

þPLAC0000039þ□þPLAC0000054þ□þBUSINESSþ□11/06/2002□þDRAFT WPI RESPONSES TO DPC COMMENTS RELATIVE TO TASK 2 THE APPLICABLE COMMENTS WERE PROVIDED TO WPI VIA TRANSMITTAL NUMBER DPC-WPI-2002-1077 DATED 11/06/02þ□þ[UNKNOWN]þ□þþ□þþ

þPLAC0000055þ□þPLAC0000055þ□þE-MAILþ□11/06/2002□þNQA TASK 2 COMMENTSþ□þJOHNSEN, MIKE Nþ□þCHRISTIANS, ROGER E;RAFFETY, SEYMOUR J;EGGE, DON G;COTA, RICH J;HART, DELENE A;RYBARIK, DAVID L;BRASEL, MICHAEL A;MIRASOLA, DEB Aþ□þSANSCRAINTE, CHUCK Vþ

þPLAC0000056þ□þPLAC0000063þ□þBUSINESSþ□00/00/0000□þTASK 2 COMPILED LACBWR COMMENTSþ□þ[UNKNOWN]þ□þþ□þþ

þPLAC0000064þ□þPLAC0000067þ□þBUSINESSþ□00/00/0000□þDPC NEEDS RELATED TO WPI TASK 2 REPORTþ□þ[UNKNOWN]þ□þþ□þþ

þPLAC0000068þ□þPLAC0000080þ□þBUSINESSþ□10/17/2002□þEXECUTIVE SUMMARY FILE DPC.0101.02.01 REVISION Dþ□þWORLDWIDE PERFORMANCE AND INNOVATIONþ□þþ□þþ

þPLAC0000081þ□þPLAC0000082þ□þMANUAL/TECHNICALþ□10/17/2002□þFILE DPC.0101.02.01 REVISION Dþ□þWORLDWIDE PERFORMANCE AND INNOVATIONþ□þþ□þþ

þPLAC0000083þ□þPLAC0000086þ□þHANDWRITTEN NOTESþ□00/00/0000□þ[UNTITLED]þ□þ[UNKNOWN]þ□þþ□þþ

þPLAC0000087þ□þPLAC0000090þ□þMANUAL/TECHNICALþ□05/00/1996□þTHERMAL CROSS SECTIONSþ□þ[UNKNOWN]þ□þþ□þþ

þPLAC0000091þ□þPLAC0000182þ□þMANUAL/TECHNICALþ□08/00/2000□þLOW-LEVEL RADIOACTIVE WASTE CLASSIFICATION CHARACTERIZATION AND ASSESSMENT WASTE STREAMS AND NEUTRON-ACTIVATED METALSþ□þROBERTSON, DE;THOMAS, CW;PRATT, SL;LEPEL, EA;THOMAS, VWþ□þDIVISION OF RISK ANALYSIS AND APPLICATIONS US NUCLEAR REGULATORY RESEARCHþ□þþ

þPLAC0000183þ□þPLAC0000184þ□þBUSINESSþ□08/00/2000□þBIBLIOGRAPHIC DATA SHEET LOW-LEVEL RADIOACTIVE WASTE CLASSIFICATION CHARACTERIZATION AND ASSESSMENT WASTE STREAMS AND NEUTRON-ACTIVATED METALS REPORT NUMBER NUREG/CR-6567þ□þROBERTSON, DE;THOMAS, CW;PRATT, SL;LEPEL, EL;THOMAS, VWþ□þUS NUCLEAR REGULATORY COMMISSIONþ□þþ

þPLAC0000185þ□þPLAC0000185þ□þBUSINESSþ□08/00/2000□þLOW-LEVEL RADIOACTIVE WASTE CLASSIFICATION CHARACTERIZATION AND ASSESSMENT WASTE STREAMS AND NEUTRON-ACTIVATED METALSþ□þ[UNKNOWN]þ□þþ□þþ

þPLAC0000186þ□þPLAC0000187þ□þHANDWRITTEN NOTESþ□00/00/0000□þ[UNTITLED]þ□þ[UNKNOWN]þ□þþ□þþ

þPLAC0000188þ□þPLAC0000188þ□þE-MAILþ□10/18/2002□þNQA TASK 2-DRAFT LACBWR RPV ACTIVATED MATERIALS REPORTþ□þJOHNSEN, MIKE Nþ□þCHRISTIANS, ROGER E;RAFFETY, SEYMOUR

CERTIFICATE OF FILING

I hereby certify that on this 25th day of May 2007, a copy of foregoing "DEFENDANT'S DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR IMPOSITION OF RECIPROCAL OBLIGATIONS UPON THE PARTIES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.