No. 04-106C
(Chief Judge Damich)

Electronically Filed: July 18, 2007

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

# DAIRYLAND'S MOTION FOR RELIEF FOR GOVERNMENT DISCOVERY VIOLATIONS REGARDING RULE 30(b)(6) DEPOSITION TESTIMONY

Jerry Stouck
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20006
(202) 331-3173 Phone
(202) 261-4751 Fax
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
Greenberg Traurig, LLP

Table of Contents

I. Background ........................................................................................................2

A. The Government's Designees Failed to Provide Testimony on a Number of Designated Topics ........................................................................................2

B. The Government Improperly Instructed Its Witness Not to Answer Deposition Questions.............................................................................................11

II. Argument ..........................................................................................................12

A. The Court Should Sanction the Government For Its Discovery Abuse By Prohibiting It From Offering Evidence at Trial on the Topics for Which The Government's Rule 30(b)(6) Designees Failed to Provide Testimony. ........................12

B. The Court Should Compel Deposition Testimony From David Zabransky Regarding the Issues on Which He was Instructed Not to Answer at His Deposition. .........................................................................................16

Conclusion ..............................................................................................................19

# Table of Authorities


Federal Cases — Page

*Allen v. Chicago Transit Auth*, 198 F.R.D. 495 (N.D. Ill 2001) .................. 18

*Black Horse Lane Assoc. v. Dow Chemical Corp.*, 228 F.3d 275 (3rd Cir. 2000) .................. 16, 17

*Buffington v. Wood*, 351 F.2d 292 (3rd Cir. 1965) .................. 13

*Energy Capital Corp. v. United States*, 45 Fed. Cl. 481 (2000) .................. 18

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) .................. 13

*In re Sealed Case*, 737 F.2d 94 (D.C. Cir. 1984) .................. 18

*Resolution Trust Corp. v. Southern Union Co.*, 985 F.2d 196 (5th Cir. 1993) .................. 12

*RTC v. Dabney*, 73 F.3d 262 (10th Cir. 1995) .................. 19

*Triax v. United States*, 11 Cl. Ct. 130 (1986) .................. 19

Federal Rules

RCFC 30(b)(6) .................. passim

RCFC 30(d)(1) .................. 19

RCFC 37 .................. 15

RCFC 37(b)(2) .................. 13, 15, 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S MOTION FOR RELIEF FOR GOVERNMENT
DISCOVERY VIOLATIONS REGARDING RULE 30(b)(6) DEPOSITION TESTIMONY

Dairyland has sought to learn the government's positions on the issues to be litigated in this case, and to have the opportunity to depose knowledgeable government witnesses regarding those positions, to apprise Dairyland of the factual and legal points it may face at trial. Such discovery is appropriate, and indeed necessary, so that Dairyland can fashion an appropriate litigation strategy. A central part of Dairyland's discovery strategy has been to obtain the government's positions on key issues through contention interrogatories followed Rule 30(b)(6) depositions of the government on those issues. By Order dated January 29, 2007, the Court granted Dairyland's motion to compel depositions, including its Rule 30(b)(6) request on the topics requested by Dairyland. Although the government has never provided proper answers to all of Dairyland's contention interrogatories (a failure that is the subject of another motion), Dairyland proceeded with the Rule 30(b)(6) depositions in order to learn as much as it could about the government's positions. The government designated Christopher Kouts and David Zabransky, two DOE officials who Dairyland was also deposing on an individual basis, to address many of the topics.

Dairyland took the depositions in May. During the depositions, however, the government's designees failed to testify regarding a number of the topics for which the government designated them. These topics go to DOE's positions on key issues such as the parties' purpose and intent in entering into Dairyland's spent fuel contract as well as the reasonableness of Dairyland's mitigation expenses incurred in light of DOE's failure to perform. Because of this failure, the government has effectively completed frustrated Dairyland's effort to discover the government's positions and claimed supporting evidence so that Dairyland can be prepared to appropriately rebut any such arguments at trial. The government has not otherwise disclosed its positions or supporting evidence on these issues either through expert witness reports or other means. Accordingly, to prevent the government from both preventing Dairyland from discovering the government's litigation positions and then surprising Dairyland at trial, the Court should prohibit the government from offering evidence at trial on these issues.

In addition, in the course of Mr. Zabransky's deposition, the government's counsel instructed him not to answer certain questions asserting that the responses would divulge privileged material. The government's privilege claims are meritless; accordingly, the Court should issue an order compelling answers to those questions.[1]

## I. Background

### A. The Government's Designees Failed to Provide Testimony on a Number of Designated Topics

From early in the fact discovery period, Dairyland has been attempting to take limited discovery from the government. That discovery has included the depositions of three individuals

[1] Dairyland's counsel, Robert Shapiro, certifies that he and Mr. Stouck conferred with the government's counsel, in good faith at the depositions in an effort to secure the information Dairyland sought without court action. In addition, Mr. Shapiro subsequently held significant telephone conversations with government counsel regarding the substance of this motion. Those discussions did not eliminate the need to bring this motion for the Court's resolution.

and testimony (from the same three government officials) pursuant to RCFC 30(b)(6). As noted in its Motion to Compel filed on December 18, 2006, Dairyland attempted to schedule these depositions in November 2006. The government opposed making any government witness available for a deposition, and this issue was presented to the Court in Dairyland's December 18, 2006 motion. The Court granted Dairyland's motion in its January 29, 2007 Order, holding that Dairyland could take the depositions of DOE officials Kouts, Zabransky and Pollog, as well as a RCFC 30(b)(6) deposition limited to the list of topics submitted by Dairyland's counsel to the government by letter dated December 13, 2006. For reference, that letter and list of topics is attached as exhibit 1.

As expected, the government designated the three individuals whose depositions the Court compelled also to handle the RCFC 30(b)(6) topics. *See* Letters from Marian Sullivan dated March 9, 2007 and March 20, 2007, attached as exhibits 2 and 3 respectively. Mr. Kouts was deposed on May 1-2, 2007,[2] and Mr. Zabransky was deposed on May 3, 2007.

At their depositions, Messrs. Kouts and Zabransky failed to answer regarding a number of the RCFC 30(b)(6) topics for which they were designated. In particular, the government failed to provide appropriate testimony from Mr. Kouts regarding topics 18 and 19. Topic 18 addresses "[t]he reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998." When Dairyland's counsel asked Mr. Kouts about this issue, Mr. Kouts did not dispute the reasonableness of Dairyland's costs:

> Q Okay. I think I better start with this.
> Do you know whether or not Dairyland has stored its

---

[2] Dairyland's portion of the deposition was taken on May 1, 2007, and the second day was devoted to questioning by counsel in *Energy Northwest v. United States*, No. 04-10C.

spent fuel in its spent fuel pool during the period subsequent to January 31, 1998?
A No.
Q Notwithstanding that answer and that fact, you are -- is this correct, you are able to

00248

testify about the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998?
A Yes.
Q Okay. Then let me ask you, has Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998 been reasonable or unreasonable?
A Since that's a business decision on the part of Dairyland, the government believes that's a decision best made by, in terms of reasonableness or unreasonableness, is based on Dairyland's own individual situation. *The government has no position one way or the other.*

Kouts Dep. Tr. May 1, 2007 (excerpts attached at exhibit 4) (emphasis added) at 247-48; *see also id.* at 255-56:

Q Okay. You -- do you -- does -- can you tell me whether Dairyland's storage of its spent fuel in its spent fuel pool subsequent to January 31, 1998 has been reasonable or unreasonable in any part of that period, you know, as opposed to the whole period which I think the prior answer implied?
A Again, ultimately I'll go back to my previous answer, that's a business decision on the part of Dairyland, that the Department has no

00256

information one way or the other if one time period would be more acceptable or more reasonable than any other time period.
Q Okay. And you've prepared no analysis regarding the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to

January 1998; is that right?
A That's correct.
Q And I take it you also have no position on whether or not the storage of spent fuel by any purchaser in its spent fuel pool during periods -- the period subsequent to January 1998 is reasonable or unreasonable; is that right? You haven't singled Dairyland out for this no position?
A That's correct.

*See also id* at 258-59:

Q Okay. So you cannot testify whether or not there is some storage method for Dairyland's spent fuel other than continued storage in the spent fuel that would have -- in the spent fuel pool that would have been more reasonable than -- than storage in the spent fuel pool during the period subsequent to January 1998; is that right? Or can you testify about that? There are two choices. You can testify about it or you can't testify about whether there would be a more reasonable storage option?
A Not knowing the specifics of -- facing

00259
Dairyland, there's no way for DOE to know that.
Q Okay. No way for you to know that?
A Or the Department has no information associated with that.
Q Or you, in your capacity as a 30(b)(6) witness?
A That's correct.

The government's counsel interjected, however, that Mr. Kouts was merely speaking for DOE and that the government, as supported by experts, might take a different position at trial:

MR. LO RE: To be clear, Jerry, this does not -- this is separate from a position that the government may take during the trial about a particular cost as to whether that cost was incurred, whether our expert witnesses say that those costs are or are not reasonable.
This is Mr. Kouts talking programmatically, not vis-a-vis the Standard Contract and whether those costs were incurred and

should be recovered as part of this litigation.

*Id.* at 251; *see also id.* at 252-53:

MR. LO RE: Just so the record -- it's
fine to have that argument. I want to be clear that
our position is that Mr. Kouts is speaking on behalf
of DOE. DOE programmatically. Whether or not your
costs -- whether or not we challenge your costs in
trial is separate from whether or not Mr. Kouts
monitors, as someone who's intimately involved with

00253
the -- you know, the development of the waste
acceptance program.

Topic 19, similarly, addresses "[t]he reasonableness or unreasonableness of Dairyland's study, analysis, investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998." Once again, Mr. Kouts' testimony did not dispute the reasonableness of Dairyland's mitigation on this issue, but the government's counsel attempted to limit the effect of that testimony:

Q Okay. Well, are you nevertheless, in
light of your recent answers to my recent questions,
able to testify about the reasonableness or
unreasonableness of Dairyland's study, analysis,
investigation, and implementation of dry storage for
its spent fuel during the period subsequent to
January 31, 1998?
A To the extent that the Department has no
information associated with the analysis or study,
the only comment -- and has no position on it, the

00262
only comment that the Department would make is that
implementation of such a dry storage initiative
would have to take into consideration a mutually
agreeable amendment to the Standard Contract to
address whether or not the fuel is going to be in
a -- in a form which the Department can accept.
Q So other than that, the mutual amendment,
and the form of the -- of the fuel being suitable

for acceptance, you have no position on the
reasonableness or unreasonableness of Dairyland's
study, analysis, investigation, on the one hand, or
implementation, on the other hand, of dry storage
for its spent fuel after January, '98; is that
correct?
A That's correct.
MR. LO RE: Just so the record is clear,
we take the same position with respect to this
question, number 8, that we took with respect to
number 7.

*Id.* at 261-262.[3]

At Mr. Zabransky's deposition, the government likewise failed to provide testimony regarding topics 6, 7, 9 and 14. Topic 6 addresses "DOE's purpose and intent in entering the Standard Contracts." But Mr. Zabransky was not prepared to address this issue:

Q If you would answer the last question
that I asked. You're saying you're not prepared to
discuss any issues concerning the Department's
intent in entering into the terms of the Standard
Contract?
MS. SULLIVAN: Same objections.
THE WITNESS: No. I'm really not.

Zabransky Dep. Tr. May 3, 2007 (excerpts attached at exhibit 5) at 132; *see also id* at 135:

BY MR. SHAPIRO:
Q Can you testify as to the Department of
Energy's purpose and intent for the Standard
Contract for it not to have an acceptance rate term
setting out a minimum amount of DOE acceptance of
spent nuclear fuel?
MS. SULLIVAN: Objection, vague, legal
conclusion.
THE WITNESS: No. I'm not prepared to
testify about those provisions of the contract as a
30(b)(6) witness.

[3] The deposition transcript refers to topics 7 and 8 rather than topics 18 and 19 mentioned in the attachment to the December 13, 2006 letter, as counsel during the deposition were referring to topic numbers in Dairyland's notice of deposition directed solely at Mr. Kouts.

This second excerpt, above, also demonstrates a failure to provide testimony regarding Topic 9: "A reasonable annual rate of acceptance for spent fuel under the Standard Contracts, and the factors to consider in determining a reasonable rate." Mr. Zabransky made clear that he was "not prepared to testify regarding those provisions of the contract as a 30(b)(6) witness." *Id.*

Topic 7 addresses "DOE's understanding of the utilities' purpose and intent in entering the Standard Contracts." Mr. Zabransky also was not prepared to address this issue either:

> BY MR. SHAPIRO:
> Q You're not in any position as a 30(b)(6)
> designee to have reviewed that material and provide
> for us the Department's view as to the essence of
> what it's view is as to what the utilities intended
> by entering into the Standard Contract?
> MS. SULLIVAN: Objection. Legal
> conclusion, compound, vague, mischaracterizes the
> witness' prior testimony.
> THE WITNESS: And, no, I'm not prepared
> to provide the essence of what's in there.
> BY MR. SHAPIRO:
> Q So the Department has no view of
> utilities' intent for entering into the Standard
> Contract other than the submittals that utilities
>
> 00139
> made to the Department as part of the administrative
> rule-making process through which DOE drafted the
> Standard Contract?
> MS. SULLIVAN: Objection. Legal
> conclusion.
> THE WITNESS: And based upon my
> preparation for this deposition, no.

*Id.* at 138-39.

Topic 14 addresses "[t]he purpose and role of provisions of the Standard Contracts governing, and DOE's plans for, scheduling acceptance and acceptance of failed fuel, including failed fuel at Dairyland's site." Mr. Zabransky also was not prepared to testify on this topic:

> BY MR. SHAPIRO:

Q Does the Department -- what impact is there on the fact that fuel is failed as opposed to not failed on the licensing of the facilities for Yucca Mountain?
A I can't speak to the details on that.
Q Do you have any knowledge of that situation?
A I'm not prepared to speak on behalf of the Department on that issue.
Q You're not prepared to speak for the Department of Energy on its plans for the -- for having a licensed facility to be able to accept failed fuel?
MS. SULLIVAN: Objection to the extent it mischaracterizes the witness' prior testimony.
THE WITNESS: I'm not prepared to speak on the effect of failed fuel in the license application.

00172
BY MR. SHAPIRO:
Q Are you able to at least say that the Department is working to take into account that it's going to have to deal with failed fuel in its license application?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: And, again, failed fuel is not a generic term. It's a specific term. The Department may have made some assumptions about what it may have to deal with it. It doesn't mean it addresses all the failed fuel that's out there.

*Id.* at 171-72; *see also id.* at 173-75:

Q And I understand that the license application will be final when it's final. But what is the current state of the planning of that application with respect to failed fuel?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: And, again, it's being

00174
considered. I don't know the details of what's being considered in any specific area.
BY MR. SHAPIRO:
Q Is any part of that consideration

contemplating accepting failed fuel at a time frame
separate from acceptance of fuel that's not failed?
MS. SULLIVAN: Objection. Vague,
compound.
THE WITNESS: And, again, I'm not sure I
can speak with a definitive nature as to that from
our end. But on the other end I can say that, as
I've said, failed fuel is not all -- failed fuel is
different things. So some failed fuel may not be
on -- scheduled different. Other failed fuel might
be. I can't speak to those details.
BY MR. SHAPIRO:
Q What are DOE's plans for the acceptance
of Dairyland's failed fuel?
MS. SULLIVAN: Objection. Vague.
Objection. Assumes facts not in evidence.
THE WITNESS: And at this point, I don't
know that DOE is well versed on the details of

00175
Dairyland's failed fuel, so I don't have specific
plans for Dairyland's failed fuel.
BY MR. SHAPIRO:
Q So DOE is not currently planning to
accept Dairyland's failed fuel on a schedule
different from the rest of Dairyland's spent fuel,
true?
MS. SULLIVAN: Objection. Legal
conclusions. Mischaracterizes the witness' prior
testimony.
THE WITNESS: I don't think Dairyland's
fully informed DOE of the detail of its failed fuel,
so DOE hasn't made that determination yet.

Mr. Zabransky's assertion that Dairyland has not fully informed DOE of the details regarding its failed fuel is not true. In the course of discovery, Dairyland provided the government with the results of a detailed study characterizing all of its spent fuel. Indeed, the government recently provided an updated discovery response noting that at least one of the individuals from whom it has submitted an expert witness report relied on this study in forming his opinions. *See* Defendant's Second Amended Response to Plaintiff's Second Request for Production of

Documents (excerpt attached at exhibit 6) at 12 (noting reliance by Warren Brewer on WPI Phase 1, Task 9 - LACBWR Spent Fuel Characterization Report, December 5, 2002 , PDPC0007773-PDPC0007807).

B. The Government Improperly Instructed Its Witness Not to Answer Deposition Questions

The government's counsel instructed Mr. Zabransky not to answer questions regarding four subjects restricting his testimony both as an individual and as a Rule 30(b)(6) designee. First, counsel instructed Mr. Zabransky, testifying as an individual, not to answer questions concerning DOE's development of new contracts for the disposal of spent fuel for newly contemplated nuclear reactors on the ground that such answers would reveal information protected by the deliberative process privilege. *See* Zabransky Dep. Tr. May 3, 2007 at 61-72. Mr. Zabranksy was instructed not to answer regarding whether he is aware that the Department is developing such contracts, *id.* at 61-62, his understanding as to why DOE is developing new contract language, *id.* at 64-65, any questions regarding email produced in discovery by the government that clearly address the development of such contracts, *id.* at 65, Mr. Zabransky's knowledge of DOE negotiations with any particular utilities about the wording for a new contract for the removal of spent nuclear fuel, *id.* at 67, Mr. Zabransky's expectation regarding the time frame when DOE might be issuing new language for contracts for the removal of spent nuclear fuel, *id.* at 69, the changes that DOE is considering making in the wording of new contracts, *id* at 69-70, provisions that DOE is considering putting into the new contracts that would address the rate of acceptance of spent nuclear fuel from utilities, *id.* at 70, provisions that DOE is considering putting into the new contracts that would address the sequence of removal of utilities' spent nuclear fuel. *Id.* at 70-71.

Second, Mr. Zabransky was instructed to not answer questions, as an individual, regarding his knowledge of what reasonable costs would be for storing spent nuclear fuel at a utility site on the ground of work product doctrine, the attorney-client privilege, Fed. R. Ev. 408 and relevance. *Id.* at 41-44.

Third, counsel instructed Mr. Zabransky not to answer questions, as an individual, regarding certain DOE initiatives on which Mr. Zabransky is working with Booz-Allen on the ground of the deliberative process privilege. Zabransky Dep. Tr. at 26-27. Mr. Zabransky was instructed even not to identify the general topic of that work. *Id.*

Fourth, counsel instructed Mr. Zabransky not to answer questions regarding how DOE is planning to encourage utilities to implement the use of DOE's Transportation, Aging and Disposal Canister Systems ("TADs") in light of DOE's view that TADs are not acceptable waste forms under the Standard Contract on the ground of the deliberative process privilege. *Id.* at 189-90. This questioning is part of Topic 21 in the list of RCFC 30(b)(6) topics.

## II. Argument

### A. The Court Should Sanction the Government For Its Discovery Abuse By Prohibiting It From Offering Evidence at Trial on the Topics for Which The Government's Rule 30(b)(6) Designees Failed to Provide Testimony.

With appropriate cooperation, the provision in RCFC 30(b)(6) for deposing organizations "streamlines the discovery process." *Resolution Trust Corp. v. Southern Union Co.*, 985 F.2d 196, 197 (5th Cir. 1993). Rather than cooperation, however, the government has engaged in repeated delaying tactics and gamesmanship. Ultimately, the government has refused to do what the Rules and this Court's January 29, 2007 Order require – provide a designee who can testify for the government on the specified topics. *E.g.*, *id.* Its initial refusal to cooperate with the scheduling of the RCFC 30(b)(6) depositions (or any depositions) led to this Court's Order of January 29, 2007 compelling the depositions. But even in light of this Court's Order, the

government presented witnesses that failed to provide testimony on a number of the topics as outlined above. In the same vein, the government has failed to respond to Dairyland's contention interrogatories (this failure is the subject of another motion). In short, the government has refused to disclose its positions on potentially significant issues until discovery is closed and perhaps even until trial itself. This government attempt at litigation by surprise is exactly what the discovery rules are supposed to prevent. *See, e.g., Buffington v. Wood*, 351 F.2d 292, 297 (3rd Cir. 1965) (noting "directive of the Federal Rules to eliminate surprise from litigation").

In these circumstances, the Court should enforce its January 29, 2007 Order and sanction the government pursuant to RCFC 37(b)(2) and 37(d) by precluding the government from offering evidence at trial on the topics for which Messrs. Kouts and Zabransky (where designated as a RCFC 30(b)(6) witnesses) failed to provide testimony. Unlike the government, Dairyland and its witnesses have responded fully to both the government's written discovery requests and its deposition questions, and Dairyland's positions on these issues are well-known to the government. Regarding the reasonableness of or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool since January 31, 1998, the government knows that Dairyland claims that this storage has been reasonable as it is seeking the costs of such storage as damages in this action. This issue of the reasonableness of Dairyland's costs is important under the law of mitigation of damages. *See, e.g., Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1376 (Fed. Cir. 2005). Since the government's Rule 30(b)(6) designee, Mr. Kouts, was unable to dispute Dairyland's position on this issue, the government should be prohibited from disputing this issue further.

The government's argument that Mr. Kouts was only responsible to speak "programmatically" is without merit. Dairyland has sought a government spokesperson on this

significant issue in this case, the Court ordered that such discovery be had, and the government designated Mr. Kouts as its spokesperson. There is no provision in either Rule 30(b)(6) or this Court's Order of January 29, 2007 for the government's designees to limit their testimony to "the program," as opposed to speaking for the government. Likewise, the claim of government counsel at Mr. Kouts' deposition that the government's expert witnesses might say that Dairyland's costs of spent fuel storage are not reasonable is a red herring for two reasons. First, the fact that the government's experts might have opinions did not relieve the government of its obligation to provide appropriate Rule 30(b)(6) testimony as directed by the Court so that Dairyland could obtain appropriate discovery of any claimed support for such a position. Second, the government has now served its expert reports, and none of the government's experts purport to dispute the reasonableness of Dairyland's storage of spent fuel in its pool since January 31, 1998 or the costs that Dairyland has incurred for that storage.

During the parties' meet and confer regarding this motion, the government offered to supply a letter from counsel stating that the government does not plan to dispute the reasonableness of Dairyland's costs. But such a letter is of inferior evidentiary value to a sworn admission of a RCFC 30(b)(6) designee or a Court Order.

The same is true regarding the reasonableness of Dairyland's study, analysis investigation and implementation of dry storage for its spent fuel since January 31, 1998. The government has known Dairyland's position that Dairyland's efforts in this regard have been reasonable as Dairyland is seeking recovery of its costs for that effort. The government's designee did not dispute Dairyland's position, and the government's experts also have not disputed the reasonableness of Dairyland's efforts or the costs Dairyland has incurred for those efforts.

Similarly, the government has been well aware of Dairyland's position regarding the parties' intent in entering into the Standard Contract – to enable utilities to avoid incurring additional at-reactor storage costs from January 31, 1998 forward. *See, e.g.*, Dairyland's Objections and Responses to the Government's Second Set of Interrogatories, Response to Interrogatory 20, attached as exhibit 7. The government's designee, Mr. Zabransky, was unable to testify regarding this issue, and the government should not be permitted to dispute Dairyland's position on this issue at trial.

The government has also been well aware of Dairyland's position regarding the annual rate of acceptance for spent fuel under the Standard Contracts and the factors to be considered in determining a reasonable rate – 3000 MTU per year because that rate "would have prevented Dairyland and other utilities from incurring additional at-reactor storage costs, assuming that a modest number of acceptance allocations were exchanged amongst utilities." *Id.* As the government's designee was entirely unprepared to address this issue, the government should not be permitted to further dispute Dairyland's position.

In addition, Dairyland's position regarding failed fuel has been clear – DOE was obligated to accept and could have accepted Dairyland's failed fuel on the same schedule as Dairyland's other spent fuel. *Id.* Interrogatory No. 23. As the government's designee did not provide appropriate testimony on this issue, the government should not be permitted to dispute Dairyland's position on this issue at trial.

Furthermore, Dairyland should receive its cost and attorney's fees in bringing this motion and of taking the depositions of Messrs. Kouts and Zabransky. The government's discovery violations have needlessly and significantly increased Dairyland's costs in this litigation. RCFC 37 requires this relief unless the government's failure was substantially justified or other

circumstances make an award of expenses unjust. There is no justification for the government's discovery failure here, and it would not be unjust to require the government to pay Dairyland's costs of bringing this motion.

There is ample authority supporting the remedy sought by Dairyland. Rule 37(b)(2)(A) and (B) explicitly provide for the preclusion sanctions Dairyland seeks, and the award of costs and attorneys fees is mandated by both RCFC 37(b)(2) and 37(d). Case law is in accord. In *Black Horse Lane Assoc. v. Dow Chemical Corp.*, 228 F.3d 275 (3rd Cir. 2000), the plaintiff-appellant did not cooperate in the scheduling of a Rule 30(b)(6) deposition, requiring the trial court to issue an order directing that the deposition be held on a specific date. *Id.* at 281. Even after the party's Rule 30(b)(6) designee appeared, he was unprepared to provide useful testimony. *Id.* at 300, 304. The trial court sanctioned the plaintiff in two ways. First, it precluded the plaintiff from introducing evidence contrary to the positions of its unprepared Rule 30(b)(6) designee; second, the court imposed monetary sanctions in the form of the costs and attorney's fees associated with the taking the deposition and bringing the sanctions motion before the Court. *Id.* at 281. On appeal, the Third Circuit affirmed the monetary sanctions. *Id.* at 305. The appellate court held that the challenge to the preclusion sanction moot, because it affirmed the trial court's grant of summary judgment dismissing the plaintiff's amended complaint. *Id.* at 301, n.16. The present case is not materially different from *Black Horse Lane.*

### B. The Court Should Compel Deposition Testimony From David Zabransky Regarding the Issues on Which He was Instructed Not to Answer at His Deposition.

The Court should compel the government to provide testimony from Mr. Zabransky regarding the topics on which he was instructed not to testify on grounds of privilege. For three of the four subjects on which Mr. Zabransky was directed not to answer (new spent fuel contracts, encouragement of use of TADs and work with Booz-Allen), the government's

instruction was based on the deliberative process privilege. As this Court recently held in its June 29, 2007 Order, the deliberative process privilege is intended to protect against "potential harm to governmental decisionmaking." *See* June 29, 2007 Slip Op. at 2. As this Court explained, for the privilege to apply, the information protected must be both pre-decisional and "deliberative." *Id.* at 4. As the Court explained further, the "deliberative" part of the test requires that the information contains "opinions, recommendations or advice pertaining to agency decisions" and that ultimately, "the material is 'so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency.'" *Id.* (internal citation omitted).

The government's claims of deliberative process privilege in the course of Mr. Zabransky's deposition do not meet these tests. The government here is not attempting to protect decisionmaking on public policy issues such as the development of the Yucca Mountain waste disposal program. Rather, it is trying to shield the government's commercial interests in the development of new spent fuel contracts and its related desire to encourage use of TADs. As a privilege available only to the government, invocation of the deliberative process privilege should be limited to instances where uniquely governmental interests are at stake. That is simply not the case here. Furthermore, far from limiting its claims of privilege to material that is particularly candid or personal, the government foreclosed questioning on the entirety of the subject matters. In the context of the work with Booz-Allen, the government would not permit sufficient questioning to permit a conclusion that any sort of decisionmaking is at issue.

In addition, even if the government has an interest in shielding disclosure of this information, that interest is likely outweighed by Dairyland's need for the information in this litigation. *Id.* At this point, however, the government has not established any interest in

withholding the information at issue. Dairyland is limited in its ability to show a need for this information due to the government's failure to respond to the Rule 30(b)(6) inquiries noted above. For example, if the government were to take the position that Dairyland's efforts at developing dry storage have not been reasonable because such dry storage canisters are not an acceptable waste form under the Standard Contracts, then Dairyland would have a strong interest in discovering more information about the TADs. Conversely, if the Court grants Dairyland's request for a preclusion remedy, Dairyland may not have a need for this information. The same is true regarding DOE's consideration of new spent fuel contracts. If the government is not going to dispute (or if the Court grants Dairyland's request for sanctions to prevent the government from disputing) Dairyland's position that a 3000 MTU acceptance rate would have been reasonable, then Dairyland would have less of an interest in learning about new spent fuel contracts which might reveal the government's current commercial view of what a reasonable contractual relationship would be on this issue.

The government's claim of privilege regarding Mr. Zabransky's knowledge of the costs to maintain spent fuel is entirely without merit. The attorney-client privilege only protects communications, and even then, the privilege does not protect information simply because it came from counsel. *See, e.g., Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 485 (2000). Communications to a client (like Mr. Zabransky) are only privileged if they reflect legal advice or reveal the substance of client confidences. *See, e.g., In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984). And the work product doctrine only protects a party's strategies, legal theories and mental impressions regarding litigation efforts. *See* Order of March 27, 2007 at 2, citing *Allen v. Chicago Transit Auth*, 198 F.R.D. 495, 500 (N.D. Ill 2001). Dairyland, however, is seeking to learn neither about Mr. Zabransky's communications with counsel nor about his

work on the spent fuel litigation. The fact that Mr. Zabransky may have gained his knowledge through counsel or his work on the litigation is beside the point since Dairyland is not seeking to discover the government's confidential client confidences or litigation strategies or legal theories. The government is improperly attempting to shield Mr. Zabransky's knowledge of a potentially significant issue in this case based on how he might have obtained that knowledge.[4]

The government's invocation of Fed. R. Ev. 408 and relevance as grounds for its instruction to Mr. Zabransky not to answer questions regarding his knowledge of the costs of spent fuel storage is entirely inappropriate. RCFC 30(d)(1) makes clear that an instruction not to answer is only permitted to preserve a privilege or to enforce a limitation directed by the court or the present a motion for a protective order. *See, e.g., RTC v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995). Accordingly, instructions not to answer based on relevance are inappropriate. *Id.* Likewise, an instruction not to answer based on Fed. R. Ev 408, which is a subset of the relevance rule, is also not permitted. *See Triax v. United States*, 11 Cl. Ct. 130, 134 (1986). The government's invocation of Fed. R. Ev. 408 is particularly misplaced, because Dairyland does not seek discovery of Mr. Zabransky's conduct or statements made in settlement negotiations. It is only seeking Mr. Zabransky's knowledge

<u>Conclusion</u>

For the foregoing reasons, the Court should issue an Order prohibiting the government from offering evidence at trial on the following issues:

(1) The parties' understanding and intention in entering into the Standard Contract;

(2) A reasonable annual acceptance rate for spent fuel under the Standard Contracts;

[4] Once again, although there is no balancing test regarding the attorney-client privilege, if the Court grants Dairyland's request for sanctions to preclude the government from disputing the reasonableness of Dairyland's spent fuel storage costs, Dairyland would have no further need for this testimony from Mr. Zabransky.

(3) Whether absent the breach, DOE would have delayed acceptance of Dairyland's failed fuel beyond the time of DOE's acceptance of the remainder of Dairyland's spent fuel;

(4) The reasonableness of Dairyland's storage of its spent fuel in its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998; and

(5) The reasonableness of Dairyland's study, analysis and investigation of dry storage for its spent fuel during the period subsequent to January 31, 1998.

Further, as a sanction for the government's discovery abuse and its failure to comply with the Court's discovery Order of January 29, 2007, the Court should order the government to pay Dairyland its costs, including attorney fees, for litigating this motion to compel and taking the depositions of Messrs. Kouts and Zabransky.

In addition, the Court should issue an order reopening the deposition of Mr. Zabransky to compel answers to Dairyland's questions regarding new spent fuel disposal contracts being developed by the government, the costs to maintain spent fuel, Mr. Zabransky's work with Booz Allen and DOE's consideration of whether spent fuel in TAD canisters will be deemed by DOE to be an acceptable waste form for purposes of the Standard Contract.

Respectfully submitted,

July 18, 2007

s/ Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

# EXHIBIT 1

Greenberg
Traurig

Jerry Stouck
Tel. 202.331.3173
Fax 202.331.3101
stouckj@gtlaw.com

December 13, 2006

*VIA E-MAIL, FAX AND US MAIL*

Russell Shultis
Department of Justice
Commercial Litigation Branch
Civil Division – Classification Unit
8th Floor Mailroom
1100 L Street, NW
Washington, D.C. 20530

*Re: Dairyland Power Cooperative vs. United States, No. 04-106C*

Dear Russ:

As requested in your December 6, 2006 letter, enclosed is a list of topics for the Rule 30(b)(6) deposition we want to take in this case. Please let us know whether the government is agreeable to this deposition, and if so, we will schedule it for some time during the first two weeks of February.

Based your response to our request for other depositions, we anticipate the government likely will oppose this one as well and will proceed on that basis unless we hear to the contrary.

Sincerely,

Jerry Stouck

JS/

Enclosure

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH
*Strategic Alliance
Tokyo-Office/Strategic Alliance

# EXHIBIT A

1. The purpose and role of Delivery Commitment Schedules ("DCS") and Final Delivery Schedules under the Standard Contracts.

2. The purpose and role of instructions DOE has issued for completing DCSs, including the instructions issued in 1991 and in 2004.

3. DOE's responses to DCS forms submitted by the utility plaintiffs, including DOE's decision to stop approving such DCS forms.

4. The purpose and role of Annual Capacity Reports and Acceptance Priority Rankings under the Standard Contracts and the development of and basis for the acceptance rates contained therein.

5. The rate(s) of acceptance that DOE planned to use under the Standard Contracts (a) before DOE determined that it would not begin accepting spent fuel in a permanent repository in 1998, and (b) after that time.

6. DOE's purpose and intent in entering the Standard Contracts

7. DOE's understanding of the utilities' purpose and intent in entering the Standard Contracts.

8. How DOE's rate and schedule for acceptance of spent fuel is determined under the Standard Contracts.

9. A reasonable annual rate of acceptance for spent fuel under the Standard Contracts, and the factors to consider in determining a reasonable rate.

10. The purpose and role of exchanges under the Standard Contracts.

11. The purpose and role of the provision on priority for shutdown reactors under the Standard Contract.

12. The earliest date that DOE currently believes that it will begin accepting spent fuel under the Standard Contracts.

13. The acceptance rate that DOE is planning to use once spent fuel acceptance begins pursuant to the Standard Contracts.

14. The purpose and role of provisions of the Standard Contracts governing, and DOE's plans for, scheduling acceptance and acceptance of failed fuel, including failed fuel at Dairyland's site.

15. The schedule on which DOE plans to remove Dairyland's spent fuel pursuant to Dairyland's Standard Contract.

16. The date on which DOE currently plans to complete picking up spent fuel from Dairyland's site.

17. The reasonableness or unreasonableness of Dairyland's expenditures on private fuel storage initiatives.

18. The reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998.

19. The reasonableness or unreasonableness of Dairyland's study, analysis investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998.

20. All efforts undertaken by or on behalf of DOE to examine the manner or process by which DOE would remove spent fuel from Dairyland's site.

21. The role, purpose and development of DOE's Transportation, Aging and Disposal Canister System ("TAD") and DOE's plans, if any, consistent with use of TAD to accept spent fuel stored in other containers.

# EXHIBIT 2

**U.S. Department of Justice**

Civil Division

PDK:JED:HDL:MESullivan
154-04-106

Telephone: (202) 307-0365
Facsimile: (202) 307-2503

*Washington, D.C. 20530*

March 9, 2007

VIA FACSIMILE AND UNITED STATES MAIL

Jerry Stouck
Robert Shapiro
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

Re: Dairyland Power Cooperative v. United States, No. 04-106C (Fed. Cl.)

Dear Messrs. Stouck and Shapiro:

As I stated in the voicemail message I left for Mr. Shapiro yesterday afternoon, we have determined that Messrs. Kouts, Pollog, and Zabransky are available on the following dates for deposition: Christopher Kouts – April 5, 2007, Thomas Pollog – March 30, 2007, and David Zabransky – April 2, 2007. In addition, we have determined that these individuals will be designated to testify about the following topics from the list of proposed RCFC 30(b)(6) topics that you provided by letter dated December 13, 2006:

| | |
|---|---|
| Mr. Kouts | Topics 5, 9, 12, 13, and 15-19 |
| Mr. Pollog | Topics 2, 4, 8, and 20 |
| Mr. Zabransky | Topics 1, 3, 6, 7, 10, 11, 14, and 21 |

You may contact me at (202) 307-0365, if you have any questions about this matter.

Sincerely,

MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch

# EXHIBIT 3

**U.S. Department of Justice**

Civil Division

PDK:JED:HDL:MESullivan
154-04-106

Telephone: (202) 307-0365
Facsimile: (202) 307-2503

*Washington, D.C. 20530*

March 20, 2007

VIA FACSIMILE AND UNITED STATES MAIL

Jerry Stouck
Robert Shapiro
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

Norman M. Hirsch
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603

Re: *Dairyland Power Cooperative v. United States*, No. 04-106C (Fed. Cl.) and *Energy Northwest v. United States*, No. 04-10C (Fed. Cl.)

Gentlemen:

I write concerning the upcoming deposition of Mr. Christopher Kouts. As I indicated in my letter to Messrs. Stouck and Shapiro, dated March 9, 2007, Mr. Kouts is available for deposition on Thursday, April 5, 2007. However, based upon counsel's representations to the Court in Dairyland's Motion to Compel Depositions, filed December 18, 2006, and during the hearing held on January 25, 2007, we understand that Mr. Hirsch, as counsel for Energy Northwest, is prepared to join in that deposition and ask any questions that he may have for Mr. Kouts in an additional three-hour period. Pursuant to this understanding, Mr. Kouts is available for deposition beginning at 1:30 pm on Wednesday, April 4, 2007, and concluding on Thursday, April 5, 2007. We trust that, within this time, you will be able to ask any questions that you may have for Mr. Kouts.

In addition, in my letter dated March 9, 2007, I had indicated the RCFC 30(b)(6) topics for which the Government would designate Messrs. Kouts, Pollog and Zabransky. We determined that Mr. Zabransky, rather than Mr. Kouts, will be the Government's designee for Topic 15.

You may contact me at (202) 307-0365, if you have any questions about this matter.

Sincerely,

MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch

# EXHIBIT 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------:
DAIRYLAND POWER COOPERATIVE, :
Plaintiff, :
v. : No. 04-106C
UNITED STATES OF AMERICA, :
Defendant. :
-----------------------------------:
ENERGY NORTHWEST, :
Plaintiff, :
v. : No. 04-0010C
UNITED STATES OF AMERICA, :
Defendant. :
-----------------------------------:

ORIGINAL

Washington, D.C.

Tuesday, May 1, 2007

Volume 1

Deposition of:

CHRISTOPHER KOUTS

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:10 a.m., when were present on behalf of the respective parties:

A That's correct.

Q Okay. Thank you. I guess I can skip the question about how have you obtained your understanding of Dairyland's expenditures.

You don't know when Dairyland first made expenditures on private fuel storage initiatives, correct?

A That's correct.

Q Okay. All right. Let's move on to topic number 7 which reads: The reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998. Do you see that on the notice which is Exhibit Number 11?

A Yes.

Q Okay. I think I better start with this. Do you know whether or not Dairyland has stored its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998?

A No.

Q Notwithstanding that answer and that fact, you are -- is this correct, you are able to

testify about the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998?

A Yes.

Q Okay. Then let me ask you, has Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998 been reasonable or unreasonable?

A Since that's a business decision on the part of Dairyland, the government believes that's a decision best made by, in terms of reasonableness or unreasonableness, is based on Dairyland's own individual situation. The government has no position one way or the other.

Q The government has no position one way or the other?

A On the reasonableness or the unreasonableness of the cost, the government has no information associated with it.

MR. STOUCK: Can we take a short break?

MR. LO RE: Sure.

MR. STOUCK: Just very short.

(Whereupon, at 3:39 p.m. a recess was taken until 3:43 p.m.)

BY MR. STOUCK:

Q When you say the government has no information associated with the costs as one part of your answer about why the government has no position one way or the other on reasonableness of the cost, you're referring to DOE? I mean the reason I ask that is because, clearly the -- the Department of Justice people have information about the costs of storage in the pool. That's -- I'll represent that to you. As a part of this litigation, we've certainly provided them information about those costs.

So your answer, I take it, is that DOE has no information about the costs of storage?

A That's correct.

Q By -- cost of storage by Dairyland in its spent fuel pool.

Okay. And you don't expect that DOE will obtain any cost information in the foreseeable

future that would allow it to form a position on the reasonableness of expenditures that Dairyland makes storing spent fuel in its spent fuel pool after 1998, correct?

MR. LO RE: Other than information provided to DOJ, is that what you mean?

MR. STOUCK: My question was about DOE.

MR. LO RE: Separated from --

BY MR. STOUCK:

Q You're not going to tell me tomorrow -- you know, tonight a whole bunch of documents came in with cost information, so tomorrow DOE has a position?

A The Department doesn't collect spent fuel storage cost information from utilities. It basically collects information on the spent fuel itself but does not in any way collect information on individual utility cost for pool storage.

Q Therefore, the Department has no position upon --

A The reasonableness or the unreasonableness of the cost.

Q Right. And that -- there being no position by the Department on that subject is not going to change in the next 6 months or a year; is that correct? You don't anticipate that it will?

A The best way for me to answer that is we haven't had the interest on collecting that information in the past. And I don't foresee any reason in the near future why we would want to collect that information.

MR. LO RE: To be clear, Jerry, this does not -- this is separate from a position that the government may take during the trial about a particular cost as to whether that cost was incurred, whether our expert witnesses say that those costs are or are not reasonable.

This is Mr. Kouts talking programmatically, not vis-a-vis the Standard Contract and whether those costs were incurred and should be recovered as part of this litigation.

MR. STOUCK: Right. Let me say now that I have an objection. Which is not all that frequent at my own deposition, but it does occur, which is


©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

that -- and we can pursue this otherwise. But let me just state it for now. We will pursue it otherwise.

The 30(b)(6) device is intended as a way for us to get the government's position. And the state of the record so far is that the government has no position on the reasonableness of these costs.

And if you're telling me that you may come to trial and take a position on the reasonableness of these costs, then my response to that is that you haven't fulfilled your 30(b)(6) obligation.

So, you know, we can take that up some other time.

MR. LO RE: Just so the record -- it's fine to have that argument. I want to be clear that our position is that Mr. Kouts is speaking on behalf of DOE. DOE programmatically. Whether or not your costs -- whether or not we challenge your costs in trial is separate from whether or not Mr. Kouts monitors, as someone who's intimately involved with

the -- you know, the development of the waste acceptance program.

MR. STOUCK: Again, as you know from the deposition notice and from the rule and from your vast experience in litigation, we have asked the defendant, United States, to designate a witness to testify about these topics on behalf of the United States. And so, if Mr. Kouts can't do it on behalf of the United States, we need someone who can do it.

MR. LO RE: Well, if one of my experts later says that the costs that you incurred are unreasonable for X, Y, Z reason, then I want -- I want you guys to be on notice that that may be the case.

You will certainly know months and months before we step into the courthouse what our position is. But as Mr. Kouts sits here today, he's saying that the position of the -- of DOE is that they do not collect costs associated with spent fuel storage.

MR. STOUCK: I understand that. I understand your position.


©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

MR. LO RE: Okay.

MR. STOUCK: My position is that this deposition was where the government was supposed to tell us their position on those topics and you haven't done it and we have to pursue it.

MR. LO RE: Certainly you aren't suggesting that Mr. Kouts was to come in here today and testify about an expert opinion that may be rendered months from now.

MR. STOUCK: I am stating that Mr. Kouts was required by the rules and by court order, I might add, to come in here and testify today about the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 30, 1998, amongst these other topics.

And as far as I'm concerned, the record is that the government, the United States, has no position on that issue.

MR. LO RE: And I understand what you're saying. And I've put on the record what our position is with respect to that. I think that's

all we're going to be able to do today.

MR. STOUCK: Yep. I agree. Today.

BY MR. STOUCK:

Q So just some follow ups. I take it that -- and, again, going back to some basics -- you know, I'm sure you're listening to what's going on here. But I'm asking you questions in your capacity as a 30(b)(6) witness here. So let's just be clear about that going forward, especially in light of this colloquy, Mr. Kouts but -- do you understand that?

A Yes.

Q Okay. You -- do you -- does -- can you tell me whether Dairyland's storage of its spent fuel in its spent fuel pool subsequent to January 31, 1998 has been reasonable or unreasonable in any part of that period, you know, as opposed to the whole period which I think the prior answer implied?

A Again, ultimately I'll go back to my previous answer, that's a business decision on the part of Dairyland, that the Department has no

information one way or the other if one time period would be more acceptable or more reasonable than any other time period.

Q Okay. And you've prepared no analysis regarding the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 1998; is that right?

A That's correct.

Q And I take it you also have no position on whether or not the storage of spent fuel by any purchaser in its spent fuel pool during periods -- the period subsequent to January 1998 is reasonable or unreasonable; is that right? You haven't singled Dairyland out for this no position?

A That's correct.

MR. LO RE: Objection. Outside the scope of this 30(b)(6) deposition.

BY MR. STOUCK:

Q Can you tell me -- do you have an understanding of why Dairyland has stored its spent fuel in its spent fuel pool during the period


©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

subsequent to January 31, 1998 as opposed to doing something else with it?

A I would assume that it was a decision made that that was the best course -- business course for that individual entity.

Q But other than that assumption, you have no knowledge or no other response to my question --

A No.

Q -- why they have done it?

Okay. Do you know -- is there a storage option for spent fuel that Dairyland could have employed during the period subsequent to January 31, 1998 that would have been more reasonable than continued storage of the spent fuel in the spent fuel pool?

MR. LO RE: Objection. Asked and answered.

BY MR. STOUCK:

Q For example dry storage, off-site storage, or anything else.

A Only to the extent that if Dairyland did undertake dry storage, they would have to consider

 ©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

issues associated with what kind of dry storage that was, whether or not it was in a manner that would be consistent with the Standard Contract.

And if it was not in a manner consistent with the Standard Contract, then Dairyland would have had to seek a mutually agreeable contract amendment to address that issue.

Other than that, that's essentially a business decision on the part of Dairyland, in terms of what type of storage and what that storage costs in relation to the resources that it has available.

Q Okay. So you cannot testify whether or not there is some storage method for Dairyland's spent fuel other than continued storage in the spent fuel that would have -- in the spent fuel pool that would have been more reasonable than -- than storage in the spent fuel pool during the period subsequent to January 1998; is that right? Or can you testify about that? There are two choices. You can testify about it or you can't testify about whether there would be a more reasonable storage option?

A Not knowing the specifics of -- facing

Dairyland, there's no way for DOE to know that.
Q Okay. No way for you to know that?
A Or the Department has no information associated with that.
Q Or you, in your capacity as a 30(b)(6) witness?
A That's correct.
Q Okay. Let's move on to topic number 8 on the list, the reasonableness or unreasonableness of Dairyland's study, analysis, investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998.
Do you see that?
A Yes, I do.
Q Okay. I'm going to try to break this down because that's a big mouthful.
First, let me ask, do you know whether or not -- well, let me break it down first. I'm going to try to separate study, analyze, investigate from implement.
A Okay.
Q All with respect to dry storage. Study,

analyze, investigate dry storage on the one hand, and on the other hand, implement dry storage. Okay.

Let's start with implement dry storage. Do you know whether or not Dairyland has incurred any costs for the implementation of dry storage at its reactor site?

A No.

Q Do you know where Dairyland's reactor site is?

A Yes. I believe it's in Wisconsin.

Q Have you been there?

A No, I have not.

Q Okay. Now, let's talk about study, investigate, analyze. Do you know whether or not Dairyland has incurred any expenses for the study, analysis, or investigation of dry storage for its spent fuel?

A My assumption is, if it's studied, analyzed or analyzed it, it must have spent some resources in order to do that. But I do not know the extent to which those resources were expended.

Q Okay. Do you know whether it has studied


©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

or analyzed it at all?
A No, I do not.
Q Okay. If it had, you would assume there's a cost associated?
A Yes.
Q But you don't know whether in fact Dairyland has studied or analyzed or investigated?
MR. LO RE: Objection. Asked and answered.
BY MR. STOUCK:
Q Right?
A That's correct.
Q Okay. Well, are you nevertheless, in light of your recent answers to my recent questions, able to testify about the reasonableness or unreasonableness of Dairyland's study, analysis, investigation, and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998?
A To the extent that the Department has no information associated with the analysis or study, the only comment -- and has no position on it, the

only comment that the Department would make is that implementation of such a dry storage initiative would have to take into consideration a mutually agreeable amendment to the Standard Contract to address whether or not the fuel is going to be in a -- in a form which the Department can accept.

Q So other than that, the mutual amendment, and the form of the -- of the fuel being suitable for acceptance, you have no position on the reasonableness or unreasonableness of Dairyland's study, analysis, investigation, on the one hand, or implementation, on the other hand, of dry storage for its spent fuel after January, '98; is that correct?

A That's correct.

MR. LO RE: Just so the record is clear, we take the same position with respect to this question, number 8, that we took with respect to number 7.

MR. STOUCK: Right.

MR. LO RE: Vis-a-vis a challenge at court.

 ©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

**EXHIBIT 5**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------:

DAIRYLAND POWER COOPERATIVE, :

:

Plaintiff, :

:

v. : No. 04-106C

:

UNITED STATES OF AMERICA, :

:

Defendants. :

----------------------------------:

Washington, D.C.

Thursday, May 3, 2007

Deposition of:

DAVID K. ZABRANSKY

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:14 a.m., when were present on behalf of the respective parties:

MS. SULLIVAN: There's not a pending question.

MR. SHAPIRO: No. Go ahead.

MS. SULLIVAN: We'll be right back.

(Discussion off the record.)

BY MR. SHAPIRO:

Q Other than -- we covered two issues that Booz-Allen -- that you've interfaced with Booz-Allen on, one being the TAD concept, the other being administration of the Standard Contract. Are there any other topics on which you interfaced with Booz-Allen?

A Booz-Allen's assisting in the TAD procurement process.

Q Anything else?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: Booz-Allen's assisting in certain departmental initiatives that are still under deliberation.

BY MR. SHAPIRO:

Q Which initiatives are those?

MS. SULLIVAN: I'm going to direct



©2007

Mr. Zabransky not to answer with regard to there are two particular initiatives that are in deliberation or may be under deliberation that there's a formal assertion of deliberative process privilege by the Office of Civilian Radioactive Waste Management. And Mr. Zabransky's answer to that question will go into that material. So....

MR. SHAPIRO: He can't even identify the general topic?

MS. SULLIVAN: Uh-huh.

MR. SHAPIRO: All right. Well, let's move on for the time being then.

MS. SULLIVAN: Okay.

BY MR. SHAPIRO:

Q Another contractor you mentioned, Mr. Zabransky, is the Legend Group. On what issues do you interact with the Legend Group?

A I'm not quite sure yet. They're a new entity that's come on board that is an 8(a), so they've taken over certain responsibilities. But they've teamed with Booz-Allen Hamilton so, at this point, they've only been on board since March. I

 ©2007

BY MR. SHAPIRO:

Q Can you explain for me how a utility could store spent nuclear fuel on an annual basis for $50,000 in a spent fuel pool?

MS. SULLIVAN: Objection. Foundation, relevance.

THE WITNESS: Again, I threw out a hypothetical. I don't know the basis for 50. I don't know the basis for 10 million.

BY MR. SHAPIRO:

Q Well, you've testified that one of your roles is to review annual submittals, settlements that utilities have offered for consideration by the contracting officer. That work doesn't provide you any information to provide even on an order of magnitude basis a reasonable cost estimate for maintaining spent nuclear fuel at a utility site?

MS. SULLIVAN: I'm going to direct Mr. Zabransky not to answer that question on the grounds of attorney work product, attorney/client communication, and also Rule 408, and relevance. It's also objectionable on relevance.


©2007

THE WITNESS: What time is it?

MS. SULLIVAN: It's just after 10:00. We haven't been going an hour yet.

MR. SHAPIRO: If you would like a break.

THE WITNESS: No. Maybe 15 minutes.

MR. SHAPIRO: Ms. Sullivan, I would like you to consider your instruction, whether you really want to maintain that instruction on all the grounds that you mentioned. For example, relevance and Rule 408 are not grounds for an instruction not --

MS. SULLIVAN: I realize that. Not to answer. My instruction not to answer is on the grounds of privilege, attorney work product and attorney/client. The work that Mr. Zabransky does evaluating settlement proposals is at the direction of the Department of Justice. And that's the basis for my instruction not to answer.

The relevance is that what he may evaluate from other utilities is irrelevant to this matter.

And 408 is that, what he learns at settlement is not evidence that can be presented to

a court subject to 408 and wouldn't provide the basis for any discovery in this matter.

I mean if you can't get it -- he can't testify about it in court, you can't get it in court, why would he be allowed to testify about it here? That's the basis for my objection and my instruction.

BY MR. SHAPIRO:

Q Mr. Zabransky, is it your testimony that you have no knowledge of what a reasonable cost would be for a utility to maintain spent nuclear fuel at its site?

MS. SULLIVAN: I'm going to direct you answer that outside of what you may know from the work you've done at the direction of the Department of Justice with regard to settlement matters.

THE WITNESS: And with the caveat that my knowledge is informed by what I've done for work for the Department of Justice, I really don't have a basis outside that work. And those are specific to specific utilities.

BY MR. SHAPIRO:



©2007

Q I'm not asking how you obtain knowledge. It would certainly be our legal position that you can't shield your knowledge by the form in which you might have gained it.

Do you have any knowledge about what a reasonable cost would be for a utility to store spent nuclear fuel at its site?

MS. SULLIVAN: Same direction and same objection. And asked and answered.

THE WITNESS: Again, I mean, I think I've been instructed by counsel not to base my answer on what I've learned working for counsel. And what I've learned working for counsel, without going beyond that, is that every utility is different. And every cost is different. So without knowing the specifics, I can't give you a reasonable number.

BY MR. SHAPIRO:

Q You don't have any knowledge that Dairyland could have stopped maintaining its spent nuclear fuel in wet storage before now, do you?

MS. SULLIVAN: Objection. Vague, foundation, assumes facts not in evidence.

 ©2007

me to speculate could it go later. And I said sure. But it could equally go earlier. I don't know.

BY MR. SHAPIRO:

Q The part of your answer that is missing for me is do you consider the chance that the Department's acceptance could deviate from 2017, you would agree that that's a nonnegligible chance?

MS. SULLIVAN: Same objections and asked and answered.

THE WITNESS: And I think what I'm saying, Mr. Shapiro, it's nonnegligible it could be delayed. It's nonnegligible it could be advanced.

BY MR. SHAPIRO:

Q Next topic I would like to cover with you, Mr. Zabransky, is the Department's work and your work on developing contracts for new nuclear reactors.

MS. SULLIVAN: Go ahead. Sorry.

BY MR. SHAPIRO:

Q You're aware that the Department is developing contracts with wording other than the current Standard Contracts to cover newly


©2007

contemplated nuclear reactors, true?

MS. SULLIVAN: I'm going to direct the witness not to answer. There's been a formal assertion of deliberative process by the Office of Civilian Radioactive Waste Management concerning any consideration of, analysis of contracts for new reactors that may be built.

MR. SHAPIRO: Let me ask, Ms. Sullivan, you said there has been a formal assertion. Where is the formal assertion?

MS. SULLIVAN: Mr. Brownstein, the current delegee on behalf of OCRWM, has executed an assertion, a formal declaration asserting deliberative process to preclude Mr. Zabransky's testimony on this topic.

MR. SHAPIRO: Let me respectfully explore the contours of what we, you know, can or can't inquire into to try to minimize the chances of a discovery dispute, or at least to frame it.

BY MR. SHAPIRO:

Q Are you aware, Mr. Zabransky, that there have been public statements by the Department that


©2007

it is working on a new standard -- or a new contract to cover new nuclear power plants?

A I'm not sure that's the exact statement that's been made by the Department. The Department has acknowledged that it needs to develop -- to sign contracts for new reactors. I'm not sure what it said with respect to what it's doing.

Q What publicly available explanations has the Department offered as to why it has to develop new language for contracts for the acceptance of spent nuclear fuel from new reactors as opposed to simply using the existing wording in the Standard Contracts?

MS. SULLIVAN: Objection. Vague. Objection. Assumes facts not in evidence. And I direct the witness to answer only as to what he knows to be public statements and not testify as to any matters that -- over which the Department has asserted deliberative process with regard to the consideration or analysis of the need for contracts for new reactors.

Do you understand that instruction?

 ©2007

THE WITNESS: I do. And I guess I'm not aware -- if you want to show me the statement you're referring to. But I'm....

BY MR. SHAPIRO:

Q Well, I don't have any specific statements that I know are publicly available that I have in my list of exhibits.

Are you aware of any publicly available statements that -- or public statements by the Department explaining why it is developing a new contract for the acceptance of spent nuclear fuel?

MS. SULLIVAN: Objection. Assumes facts not in evidence, foundation. And the same direction with regard to answer only as to what public statements you may be aware of.

THE WITNESS: And I'm aware of statements that, to the effect that the Department recognizes it needs to sign contracts for new reactors. I'm not aware of the statements that you attribute to the Department. If you show where they are.

BY MR. SHAPIRO:

Q What's your understanding as to why the

 ©2007

Department is developing new contract language?

MS. SULLIVAN: And I'm going to direct him not to answer that question based on the assertion of deliberative process privilege.

MR. SHAPIRO: Let's mark this Exhibit 1.

(Zabransky Exhibit Number 1 was marked for identification.)

BY MR. SHAPIRO:

Q Mr. Zabransky, you've been handed what's marked as Exhibit 1 to your deposition. It appears to be a printout of an E-mail from Jane Taylor, dated December 13, 2006, to a number of individuals. And you're listed as a cc.

Do you recognize this E-mail?

MS. SULLIVAN: I'm going to direct the witness not to answer questions about this document for the same reasons that I think this falls within the assertion of deliberative process. And I'm concerned that this document was produced.

Is this part of the documents that were just recently produced?

MR. SHAPIRO: I frankly don't know


©2007

exactly when it was produced, but I know it was produced by the Department.

MS. SULLIVAN: Based on the date December 13, 2006 I think it's part of the recent production of Dairyland.

MR. SHAPIRO: I imagine it was produced after that date.

MS. SULLIVAN: Right. So that's going to be -- that's going to be my instruction.

MR. SHAPIRO: Are you anticipating that the government's going to be calling back this E-mail?

MS. SULLIVAN: We probably will. I don't know what -- I don't know what the protective order in Dairyland provides for. I need to research that. Let me -- actually, let me provisionally claw back, once I -- until I have an understanding as to why, what the parameters of the clawback provision are in Dairyland.

MR. SHAPIRO: Well-- let's put Exhibit 1 aside for the moment.

MS. SULLIVAN: Okay.



©2007

BY MR. SHAPIRO:

Q Mr. Zabransky, is the Department of Energy currently negotiating with any particular utilities about the wording of a -- new wording for a contract for the removal of spent nuclear fuel?

MS. SULLIVAN: Assumes facts not in evidence. I'm going to direct him not to answer the question on the basis of the assertion of deliberative process. I'm sorry, you want to know whether he's talking with --

MR. SHAPIRO: Yes.

MS. SULLIVAN: Whether he knows?

MR. SHAPIRO: Right.

MS. SULLIVAN: Can I have a second?

MR. SHAPIRO: Sure.

(Discussion off the record.)

MS. SULLIVAN: Yeah. I'm going to maintain my instruction not to answer because I don't want his answer to be construed as a waiver of the privilege, the assertion of privilege over all matters relating to DOE's deliberations with regard to new contracts.



©2007

MR. SHAPIRO: My question is -- let's make sure that we've got the right instruction to the right question.

My last question was whether Mr. Zabransky is aware whether the Department is negotiating with any particular utilities about the wording of a new contract for the removal of spent nuclear fuel. Not about internal deliberations, but whether there are external discussions.

MS. SULLIVAN: And I understand that you want to know, and I understand that discussions they might be having with other utilities or specific utilities would not be privileged. But Mr. -- allowing Mr. Zabransky to testify as to whether or not he knows goes down the road of letting him testify about these matters generally, and subjects him to questioning about matters that he may be providing advice about, which is the nature of the deliberative process privilege and why the Department has chosen to assert it.

I don't know if there's another way that we can give you the answer that no, they're not


©2007

talking to the utilities. But I can't let Mr. Zabransky talk about that.

BY MR. SHAPIRO:

Q Do you have any expectation, Mr. Zabransky, of the time frame when the Department might be issuing new language for contracts for the removal of spent nuclear fuel such that we could talk about the document?

MS. SULLIVAN: I'm going to direct him not to answer that question as well. I would also like to lodge a relevance objection to all questions about new -- contracts for new reactors that may be built. But I'm going to instruct him not to answer that based on the assertion of the deliberative process privilege by the Department.

BY MR. SHAPIRO:

Q Let me ask a couple more of my questions, not that I'm not anticipating an objection, but, again I want to frame the issue.

What changes is DOE considering making in the wording of new contracts for the removal of spent nuclear fuel that would be different than the


©2007

current Standard Contracts?

MS. SULLIVAN: Relevance and the same direction not to answer based upon the Department's assertion of deliberative process privilege over this matter.

BY MR. SHAPIRO:

Q What if any provisions is the Department considering putting into those new contracts for the acceptance of spent nuclear fuel that would address the rate of acceptance of spent nuclear fuel from utilities?

MS. SULLIVAN: Same objection. Relevance. And same direction not to answer.

BY MR. SHAPIRO:

Q What provisions for -- in new contracts for the acceptance of spent nuclear fuel by the Department is the Department considering that would address the sequence of removal of utilities' spent nuclear fuel?

MS. SULLIVAN: Objection. Relevance. Objection. Assumes facts not in evidence. And the same direction not to answer based on the assertion


©2007

of the deliberative process privilege.

MR. SHAPIRO: Exhibit 2.

(Zabransky Exhibit Number 2 was marked for identification.)

MS. SULLIVAN: Yep. I'm going to provisionally call this one back. And we will have to let you know.

MR. SHAPIRO: All right.

MS. SULLIVAN: Thank you.

MR. SHAPIRO: Just, for the record, Mr. Zabransky, we had marked -- I don't think anything would otherwise appear in the record. We had marked for purposes of identification Exhibit 2 to your deposition what appears to be an E-mail -- printout of an E-mail from Ben McRae to a number of individuals, topic is meeting on Standard Contract. The date is December 5th of 2006.

Ms. Sullivan has indicated that the Government will want to likely claw back -- that back.

MS. SULLIVAN: And both Exhibit 2 and Exhibit 1 have been marked -- the majority of --


©2007

both Mr. McRae and Ms. Jane Taylor, who is the author of Exhibit 1, are both attorneys from the Department of Justice. And I believe that most of the recipients are also attorneys. So that would be the basis for an assertion of privilege and the subject matter.

But we will get back to you about our clawback of that.

BY MR. SHAPIRO:

Q Who is Martha Crosland?

MS. SULLIVAN: You can answer that question.

THE WITNESS: She's an attorney in the Office of General counsel.

BY MR. SHAPIRO:

Q Of the Department of Energy?

A Department of Energy.

Q And who is Mary Neumayr?

A I believe she's the assistant general counsel of the Department of Energy.

Q And Mr. McRae is an assistant general counsel at the Department of Energy?



©2007

mischaracterizes the witness' prior testimony.

THE WITNESS: My understanding was to discuss the purpose and intent of entering into the Standard Contract, which was to fulfill the provisions of the Act.

That was the request that I thought I was supposed to be talking about today. Am I misreading it?

MS. SULLIVAN: Let Mr. Shapiro ask his questions.

BY MR. SHAPIRO:

Q If you would answer the last question that I asked. You're saying you're not prepared to discuss any issues concerning the Department's intent in entering into the terms of the Standard Contract?

MS. SULLIVAN: Same objections.

THE WITNESS: No. I'm really not.

BY MR. SHAPIRO:

Q So it's the Department's view that because the Nuclear Waste Policy Act authorized it to enter into contracts, that that was the extent of


©2007

authorizing but actually requiring the Department to enter into contracts with utilities?

MS. SULLIVAN: Objection. Legal conclusion, vague, beyond the scope of Mr. Zabransky's 30(b)(6) deposition.

THE WITNESS: I don't know what the Department's analysis on that provision was at the time.

BY MR. SHAPIRO:

Q Can you testify as to the Department of Energy's purpose and intent for the Standard Contract for it not to have an acceptance rate term setting out a minimum amount of DOE acceptance of spent nuclear fuel?

MS. SULLIVAN: Objection, vague, legal conclusion.

THE WITNESS: No. I'm not prepared to testify about those provisions of the contract as a 30(b)(6) witness.

BY MR. SHAPIRO:

Q Let me go to the next 30(b)(6) topic, DOE's understanding of utilities' purposes and

far as entering into the standard contract was other than simply referring to a database?

MS. SULLIVAN: Objection. Mischaracterizes the witness' prior testimony.

THE WITNESS: That administrative record represents the Department's understanding. It's best viewed as the record.

BY MR. SHAPIRO:

Q You're not in any position as a 30(b)(6) designee to have reviewed that material and provide for us the Department's view as to the essence of what it's view is as to what the utilities intended by entering into the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion, compound, vague, mischaracterizes the witness' prior testimony.

THE WITNESS: And, no, I'm not prepared to provide the essence of what's in there.

BY MR. SHAPIRO:

Q So the Department has no view of utilities' intent for entering into the Standard Contract other than the submittals that utilities


©2007

made to the Department as part of the administrative rule-making process through which DOE drafted the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion.

THE WITNESS: And based upon my preparation for this deposition, no.

BY MR. SHAPIRO:

Q Didn't DOE understand that utilities intended that the Standard Contract would solve the problem of spent fuel accumulation at utility reactor sites?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: And I don't have any information that would say DOE understood that.

BY MR. SHAPIRO:

MR. SHAPIRO: All right. Would this be a good time for a lunch break?

MS. SULLIVAN: Uh-huh.

(Whereupon, at 12:38 p.m., the deposition was recessed, to be reconvened at 1:40 p.m. this same



©2007

Without the specifics, we can't tell them anything further. The process is established. They haven't started the process.

BY MR. SHAPIRO:

Q Does the Department -- what impact is there on the fact that fuel is failed as opposed to not failed on the licensing of the facilities for Yucca Mountain?

A I can't speak to the details on that.

Q Do you have any knowledge of that situation?

A I'm not prepared to speak on behalf of the Department on that issue.

Q You're not prepared to speak for the Department of Energy on its plans for the -- for having a licensed facility to be able to accept failed fuel?

MS. SULLIVAN: Objection to the extent it mischaracterizes the witness' prior testimony.

THE WITNESS: I'm not prepared to speak on the effect of failed fuel in the license application.


©2007

BY MR. SHAPIRO:

Q Are you able to at least say that the Department is working to take into account that it's going to have to deal with failed fuel in its license application?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: And, again, failed fuel is not a generic term. It's a specific term. The Department may have made some assumptions about what it may have to deal with it. It doesn't mean it addresses all the failed fuel that's out there.

MS. SULLIVAN: Can I take a two-minute break?

MR. SHAPIRO: Sure.

(Whereupon, a recess was taken between 2:27 p.m. and 2:30 p.m.)

BY MR. SHAPIRO:

Q Let me reask my last question again because I'm not sure that your last answer was responsive. I was asking are you at least able to say that the Department is working to take into account that it's going to have to deal with failed

fuel in its license application?

A And I guess, to respond to that, to clarify, is I can't say what's going to be in the final license application. But I do know that I can say on behalf of the Department that it's aware of the issue of failed fuel; that failed fuel is a consideration that will have to be dealt with in the license application or the license application amendments -- license amendments later on.

So DOE has considered failed fuel in its development of the Yucca Mountain license facility. I don't know how it's going to appear in the final license application, nor do I know how it relates to the breadth or depth of the failed fuel we may find out at existing utility sites that we don't know about.

Q And I understand that the license application will be final when it's final. But what is the current state of the planning of that application with respect to failed fuel?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: And, again, it's being

 ©2007

considered. I don't know the details of what's being considered in any specific area.

BY MR. SHAPIRO:

Q Is any part of that consideration contemplating accepting failed fuel at a time frame separate from acceptance of fuel that's not failed?

MS. SULLIVAN: Objection. Vague, compound.

THE WITNESS: And, again, I'm not sure I can speak with a definitive nature as to that from our end. But on the other end I can say that, as I've said, failed fuel is not all -- failed fuel is different things. So some failed fuel may not be on -- scheduled different. Other failed fuel might be. I can't speak to those details.

BY MR. SHAPIRO:

Q What are DOE's plans for the acceptance of Dairyland's failed fuel?

MS. SULLIVAN: Objection. Vague. Objection. Assumes facts not in evidence.

THE WITNESS: And at this point, I don't know that DOE is well versed on the details of


©2007

Dairyland's failed fuel, so I don't have specific plans for Dairyland's failed fuel.

BY MR. SHAPIRO:

Q So DOE is not currently planning to accept Dairyland's failed fuel on a schedule different from the rest of Dairyland's spent fuel, true?

MS. SULLIVAN: Objection. Legal conclusions. Mischaracterizes the witness' prior testimony.

THE WITNESS: I don't think Dairyland's fully informed DOE of the detail of its failed fuel, so DOE hasn't made that determination yet.

BY MR. SHAPIRO:

Q I have a few more questions for you, Mr. Zabransky, on failed fuel. And I'll go back at the end to a few questions on an -- as an individual. But let's continue for the time being with your testimony as a 30(b)(6) designee.

Switching to the next topic, which is the schedule in which DOE plans to remove Dairyland's spent fuel. On what schedule does DOE plan to


©2007

# EXHIBIT 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-0106C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S SECOND AMENDED RESPONSE TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 26(e) and Rule 34 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, provides the following first amended response to the second request for production of documents served by plaintiff, Dairyland Power Cooperative ("Dairyland"), which follows our production of expert reports by Warren K. Brewer, R. Larry Johnson, and Jonathan A. Neuberger.

GENERAL OBJECTIONS

1. Defendant objects to each and every production request to the extent that it calls for the disclosure of material or information that is subject to any claim of privilege or protection, including without limitation, the attorney-client privilege, the work-product doctrine, or any Government privilege. Defendant will not produce privileged or protected documents, materials or information in response to the document requests. The inadvertent production by defendant of documents protected by the attorney-client privilege, or any other privilege, shall not constitute a waiver of the applicable privilege or protection as to any document so produced, or as to any other document.

10. Duratek presentation concerning the phase 1 work dated July 6, 2005, PLAC0081001-PLAC0081030.

11. 2003 LACBWR Decommissioning & Decontamination Cost Study Update, July 2003, PLAC0023723-PLAC0023745.

12. WPI Phase 1, Task 2 - LACBWR RPV Activated Material Report, February 19, 2003, PLAC0000455-PLAC0000477.

13. WPI Phase 1, Task 9 - LACBWR Spent Fuel Characterization Report, December 5, 2002, PDPC0007773-PDPC0007807.

14. Maine Yankee Atomic Power Station, Decommissioning Costs Analysis, October 28, 1997, DXD001 0020 - 0211.

15. Facility Interface Capability Assessment (FICA) Project Cask Handling Assessment La Crosse BWR, NAC C-8802800, October 1990, DXD 002 0001-0041.

16. Deposition of R. Alan Chapman, Tennessee Valley Authority v. United States of America, Case No. 01-249C, February 23, 2005, DXD 002 0042 - 0281.

17. Expert Witness Report of Warren K. Brewer, June 15, 2007, DXD 003 0001-0045.

The documents upon which Mr. Neuberger relied, that he reviewed, or that he prepared are the following:

1. Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 435-36 (2006).

2. Expert Witness Report of Frank C. Graves, March 23, 2007, and supporting electronic files.

# EXHIBIT 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 04-0106C<br><br>(Chief Judge Damich) |

DAIRYLAND'S OBJECTIONS AND RESPONSE TO DEFENDANT'S SECOND SET OF INTERROGATORIES

Pursuant to RCFC 33, Dairyland responds to the government's Second Set of Interrogatories served on Dairyland on March 30, 2007.

GENERAL RESPONSES AND OBJECTIONS

The following general responses and objections to the interrogatories are incorporated by reference in each of Dairyland's responses below. Dairyland's answers to interrogatories are subject to these general objections regardless of whether Dairyland agrees in individual responses below to answer interrogatories notwithstanding additional objections noted in such individual responses.

1. Dairyland objects to the government's instruction at page 1, which purports to require Dairyland to supplement its responses to the interrogatories "from time to time, but not later than 10 days after such additional information has been obtained." This instruction seeks to impose obligations that go beyond those that are required under RCFC 26(e).

2. Dairyland objects to any interrogatories that seek information or documents in possession of entities other than Dairyland or otherwise outside the possession, custody or

SPECIFIC RESPONSES AND OBJECTIONS

INTERROGATORY NO. 20

On what schedule, measured in MTUs per year, does Dairyland contend that DOE was obligated to accept Dairyland's SNF pursuant to Dairyland's Standard Contract beginning in 1998? State all factual and legal grounds for this contention.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Because Dairyland's Standard Contract does not specify a schedule or precise amount of SNF that DOE is obligated to accept starting on January 31, 1998, DOE was obligated to accept Dairyland's SNF at a reasonable rate. *See Restatement (Second) Contracts* § 204 (1981). A reasonable SNF acceptance rate would have been a rate sufficient to prevent Dairyland (as well as other utilities) from incurring additional at-reactor storage costs from January 31, 1998 forward. *See, e.g.,* DOE Dec. 1983 Draft Mission Plan; Dec. 1983 OCRWM information meeting statement of Acting OCRWM Director Robert Morgan; Feb. 22, 1984 Congressional testimony of Acting OCRWM Director Michael J. Lawrence; M. Lawrence, July 23, 1984 DOE Comments on Draft Mission Plan; trial testimony of Loring Mills, Ivan Stuart, John Bartlett and Frank Graves in *Yankee Atomic*; Expert Witness Reports of Frank C. Graves and Ivan Stuart submitted here. Because

Dairyland faced avoidable at-reactor storage costs in 1998 that could only be eliminated if DOE had accepted all of Dairyland's SNF, DOE was obligated to accept all of Dairyland's SNF in 1998. As set forth in the Expert Witness Report of Frank C. Graves ("Graves Report") and in several DOE planning documents and studies, an aggregate acceptance rate of approximately 3,000 MTU/year would have fulfilled DOE's contractual obligation because it would have prevented Dairyland and other utilities from incurring additional at-reactor storage costs, assuming that a modest number of acceptance allocations were exchanged amongst utilities.

INTERROGATORY NO. 21

On what schedule, measured in MTUs per year, does Dairyland contend that DOE was obligated to accept SNF pursuant to the Standard Contract on an aggregate, industry-wide basis beginning in 1998? State all factual and legal grounds for this contention

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland incorporates by reference its Response to Interrogatory No. 20 above.

INTERROGATORY NO. 22

At what minimum rate of acceptance, measured in MTUs per year, does Dairyland contend that DOE could have accepted Dairyland's SNF pursuant to Dairyland's Standard

Contract beginning in 1998 without causing Dairyland to incur any damages? State all factual and legal grounds for this contention.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "damages" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Regardless of what rate of acceptance would have been used, DOE could have accepted all of Dairyland's 38 MTU of SNF in 1998 pursuant to its contractual obligation. Had DOE done so (and had DOE not announced its intention not to perform several years prior to 1998, thereby inducing Dairyland's efforts to mitigate damages), Dairyland would not have incurred any monetary damages.

INTERROGATORY NO. 23

On what schedule, measured in MTUs per year, does Dairyland contend that DOE was obligated to accept Dairyland's failed fuel pursuant to Dairyland's Standard Contract beginning in 1998? State all factual and legal grounds for this contention.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as

unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Pursuant to Dairyland's Standard Contract, DOE was obligated to accept and could have accepted Dairyland's failed fuel on the same schedule as Dairyland's other SNF. *See Yankee Atomic Elec. Co. v. United States,* 73 Fed. Cl. 249, 309 (2006); *Pacific Gas & Elec. Co. v. United States,* 73 Fed. Cl. 333, 400-01 (2006). *See also* Response to Interrogatory No. 20 above.

INTERROGATORY NO. 24

If, beginning in 1998, DOE had begun performing and had continued to perform its obligations pursuant to the Standard Contract, on what schedule, measured in the amount of MTUs exchanged each year, does Dairyland contend that it would have exchanged its DCSs? State all factual and legal grounds for this contention, and specifically identify all contract holders with whom Dairyland would have exchanged DCSs and the allocations that Dairyland and its trading partners would have exchanged.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.