# EXHIBIT 1

**Greenberg Traurig**

Jerry Stouck
Tel. 202.331.3173
Fax 202.331.3101
stouckj@gtlaw.com

December 13, 2006

*VIA E-MAIL, FAX AND US MAIL*

Russell Shultis
Department of Justice
Commercial Litigation Branch
Civil Division – Classification Unit
8th Floor Mailroom
1100 L Street, NW
Washington, D.C. 20530

*Re: Dairyland Power Cooperative vs. United States, No. 04-106C*

Dear Russ:

As requested in your December 6, 2006 letter, enclosed is a list of topics for the Rule 30(b)(6) deposition we want to take in this case. Please let us know whether the government is agreeable to this deposition, and if so, we will schedule it for some time during the first two weeks of February.

Based your response to our request for other depositions, we anticipate the government likely will oppose this one as well and will proceed on that basis unless we hear to the contrary.

Sincerely,

Jerry Stouck

JS/

Enclosure

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH
*Strategic Alliance
Tokyo-Office/Strategic Alliance

www.gtlaw.com

EXHIBIT A

1. The purpose and role of Delivery Commitment Schedules ("DCS") and Final Delivery Schedules under the Standard Contracts.

2. The purpose and role of instructions DOE has issued for completing DCSs, including the instructions issued in 1991 and in 2004.

3. DOE's responses to DCS forms submitted by the utility plaintiffs, including DOE's decision to stop approving such DCS forms.

4. The purpose and role of Annual Capacity Reports and Acceptance Priority Rankings under the Standard Contracts and the development of and basis for the acceptance rates contained therein.

5. The rate(s) of acceptance that DOE planned to use under the Standard Contracts (a) before DOE determined that it would not begin accepting spent fuel in a permanent repository in 1998, and (b) after that time.

6. DOE's purpose and intent in entering the Standard Contracts

7. DOE's understanding of the utilities' purpose and intent in entering the Standard Contracts.

8. How DOE's rate and schedule for acceptance of spent fuel is determined under the Standard Contracts.

9. A reasonable annual rate of acceptance for spent fuel under the Standard Contracts, and the factors to consider in determining a reasonable rate.

10. The purpose and role of exchanges under the Standard Contracts.

11. The purpose and role of the provision on priority for shutdown reactors under the Standard Contract.

12. The earliest date that DOE currently believes that it will begin accepting spent fuel under the Standard Contracts.

13. The acceptance rate that DOE is planning to use once spent fuel acceptance begins pursuant to the Standard Contracts.

14. The purpose and role of provisions of the Standard Contracts governing, and DOE's plans for, scheduling acceptance and acceptance of failed fuel, including failed fuel at Dairyland's site.

15. The schedule on which DOE plans to remove Dairyland's spent fuel pursuant to Dairyland's Standard Contract.

16. The date on which DOE currently plans to complete picking up spent fuel from Dairyland's site.

17. The reasonableness or unreasonableness of Dairyland's expenditures on private fuel storage initiatives.

18. The reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998.

19. The reasonableness or unreasonableness of Dairyland's study, analysis investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998.

20. All efforts undertaken by or on behalf of DOE to examine the manner or process by which DOE would remove spent fuel from Dairyland's site.

21. The role, purpose and development of DOE's Transportation, Aging and Disposal Canister System ("TAD") and DOE's plans, if any, consistent with use of TAD to accept spent fuel stored in other containers.

# EXHIBIT 2

**U.S. Department of Justice**

Civil Division

PDK:JED:HDL:MESullivan
154-04-106

Telephone: (202) 307-0365
Facsimile: (202) 307-2503

*Washington, D.C. 20530*

March 9, 2007

VIA FACSIMILE AND UNITED STATES MAIL

Jerry Stouck
Robert Shapiro
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

Re: Dairyland Power Cooperative v. United States, No. 04-106C (Fed. Cl.)

Dear Messrs. Stouck and Shapiro:

As I stated in the voicemail message I left for Mr. Shapiro yesterday afternoon, we have determined that Messrs. Kouts, Pollog, and Zabransky are available on the following dates for deposition: Christopher Kouts – April 5, 2007, Thomas Pollog – March 30, 2007, and David Zabransky – April 2, 2007. In addition, we have determined that these individuals will be designated to testify about the following topics from the list of proposed RCFC 30(b)(6) topics that you provided by letter dated December 13, 2006:

| | |
|---|---|
| Mr. Kouts | Topics 5, 9, 12, 13, and 15-19 |
| Mr. Pollog | Topics 2, 4, 8, and 20 |
| Mr. Zabransky | Topics 1, 3, 6, 7, 10, 11, 14, and 21 |

You may contact me at (202) 307-0365, if you have any questions about this matter.

Sincerely,

MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch

# EXHIBIT 3

**U.S. Department of Justice**

Civil Division

PDK:JED:HDL:MESullivan
154-04-106

Telephone: (202) 307-0365
Facsimile: (202) 307-2503

*Washington, D.C. 20530*

March 20, 2007

VIA FACSIMILE AND UNITED STATES MAIL

Jerry Stouck
Robert Shapiro
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

Norman M. Hirsch
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603

Re: *Dairyland Power Cooperative v. United States*, No. 04-106C (Fed. Cl.) and *Energy Northwest v. United States*, No. 04-10C (Fed. Cl.)

Gentlemen:

I write concerning the upcoming deposition of Mr. Christopher Kouts. As I indicated in my letter to Messrs. Stouck and Shapiro, dated March 9, 2007, Mr. Kouts is available for deposition on Thursday, April 5, 2007. However, based upon counsel's representations to the Court in Dairyland's Motion to Compel Depositions, filed December 18, 2006, and during the hearing held on January 25, 2007, we understand that Mr. Hirsch, as counsel for Energy Northwest, is prepared to join in that deposition and ask any questions that he may have for Mr. Kouts in an additional three-hour period. Pursuant to this understanding, Mr. Kouts is available for deposition beginning at 1:30 pm on Wednesday, April 4, 2007, and concluding on Thursday, April 5, 2007. We trust that, within this time, you will be able to ask any questions that you may have for Mr. Kouts.

In addition, in my letter dated March 9, 2007, I had indicated the RCFC 30(b)(6) topics for which the Government would designate Messrs. Kouts, Pollog and Zabransky. We determined that Mr. Zabransky, rather than Mr. Kouts, will be the Government's designee for Topic 15.

You may contact me at (202) 307-0365, if you have any questions about this matter.

Sincerely,

MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch

# EXHIBIT 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | No. 04-106C |
| ENERGY NORTHWEST, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | No. 04-0010C |

ORIGINAL

Washington, D.C.

Tuesday, May 1, 2007

Volume 1

Deposition of:

CHRISTOPHER KOUTS

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:10 a.m., when were present on behalf of the respective parties:

A That's correct.

Q Okay. Thank you. I guess I can skip the question about how have you obtained your understanding of Dairyland's expenditures.

You don't know when Dairyland first made expenditures on private fuel storage initiatives, correct?

A That's correct.

Q Okay. All right. Let's move on to topic number 7 which reads: The reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998. Do you see that on the notice which is Exhibit Number 11?

A Yes.

Q Okay. I think I better start with this. Do you know whether or not Dairyland has stored its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998?

A No.

Q Notwithstanding that answer and that fact, you are -- is this correct, you are able to

testify about the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998?

A Yes.

Q Okay. Then let me ask you, has Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998 been reasonable or unreasonable?

A Since that's a business decision on the part of Dairyland, the government believes that's a decision best made by, in terms of reasonableness or unreasonableness, is based on Dairyland's own individual situation. The government has no position one way or the other.

Q The government has no position one way or the other?

A On the reasonableness or the unreasonableness of the cost, the government has no information associated with it.

MR. STOUCK: Can we take a short break?

MR. LO RE: Sure.

MR. STOUCK: Just very short.

(Whereupon, at 3:39 p.m. a recess was taken until 3:43 p.m.)

BY MR. STOUCK:

Q When you say the government has no information associated with the costs as one part of your answer about why the government has no position one way or the other on reasonableness of the cost, you're referring to DOE? I mean the reason I ask that is because, clearly the -- the Department of Justice people have information about the costs of storage in the pool. That's -- I'll represent that to you. As a part of this litigation, we've certainly provided them information about those costs.

So your answer, I take it, is that DOE has no information about the costs of storage?

A That's correct.

Q By -- cost of storage by Dairyland in its spent fuel pool.

Okay. And you don't expect that DOE will obtain any cost information in the foreseeable


©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

future that would allow it to form a position on the reasonableness of expenditures that Dairyland makes storing spent fuel in its spent fuel pool after 1998, correct?

MR. LO RE: Other than information provided to DOJ, is that what you mean?

MR. STOUCK: My question was about DOE.

MR. LO RE: Separated from --

BY MR. STOUCK:

Q You're not going to tell me tomorrow -- you know, tonight a whole bunch of documents came in with cost information, so tomorrow DOE has a position?

A The Department doesn't collect spent fuel storage cost information from utilities. It basically collects information on the spent fuel itself but does not in any way collect information on individual utility cost for pool storage.

Q Therefore, the Department has no position upon --

A The reasonableness or the unreasonableness of the cost.


©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

Q Right. And that -- there being no position by the Department on that subject is not going to change in the next 6 months or a year; is that correct? You don't anticipate that it will?

A The best way for me to answer that is we haven't had the interest on collecting that information in the past. And I don't foresee any reason in the near future why we would want to collect that information.

MR. LO RE: To be clear, Jerry, this does not -- this is separate from a position that the government may take during the trial about a particular cost as to whether that cost was incurred, whether our expert witnesses say that those costs are or are not reasonable.

This is Mr. Kouts talking programmatically, not vis-a-vis the Standard Contract and whether those costs were incurred and should be recovered as part of this litigation.

MR. STOUCK: Right. Let me say now that I have an objection. Which is not all that frequent at my own deposition, but it does occur, which is

that -- and we can pursue this otherwise. But let me just state it for now. We will pursue it otherwise.

The 30(b)(6) device is intended as a way for us to get the government's position. And the state of the record so far is that the government has no position on the reasonableness of these costs.

And if you're telling me that you may come to trial and take a position on the reasonableness of these costs, then my response to that is that you haven't fulfilled your 30(b)(6) obligation.

So, you know, we can take that up some other time.

MR. LO RE: Just so the record -- it's fine to have that argument. I want to be clear that our position is that Mr. Kouts is speaking on behalf of DOE. DOE programmatically. Whether or not your costs -- whether or not we challenge your costs in trial is separate from whether or not Mr. Kouts monitors, as someone who's intimately involved with

the -- you know, the development of the waste acceptance program.

MR. STOUCK: Again, as you know from the deposition notice and from the rule and from your vast experience in litigation, we have asked the defendant, United States, to designate a witness to testify about these topics on behalf of the United States. And so, if Mr. Kouts can't do it on behalf of the United States, we need someone who can do it.

MR. LO RE: Well, if one of my experts later says that the costs that you incurred are unreasonable for X, Y, Z reason, then I want -- I want you guys to be on notice that that may be the case.

You will certainly know months and months before we step into the courthouse what our position is. But as Mr. Kouts sits here today, he's saying that the position of the -- of DOE is that they do not collect costs associated with spent fuel storage.

MR. STOUCK: I understand that. I understand your position.


©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

MR. LO RE: Okay.

MR. STOUCK: My position is that this deposition was where the government was supposed to tell us their position on those topics and you haven't done it and we have to pursue it.

MR. LO RE: Certainly you aren't suggesting that Mr. Kouts was to come in here today and testify about an expert opinion that may be rendered months from now.

MR. STOUCK: I am stating that Mr. Kouts was required by the rules and by court order, I might add, to come in here and testify today about the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 30, 1998, amongst these other topics.

And as far as I'm concerned, the record is that the government, the United States, has no position on that issue.

MR. LO RE: And I understand what you're saying. And I've put on the record what our position is with respect to that. I think that's

all we're going to be able to do today.

MR. STOUCK: Yep. I agree. Today.

BY MR. STOUCK:

Q So just some follow ups. I take it that -- and, again, going back to some basics -- you know, I'm sure you're listening to what's going on here. But I'm asking you questions in your capacity as a 30(b)(6) witness here. So let's just be clear about that going forward, especially in light of this colloquy, Mr. Kouts but -- do you understand that?

A Yes.

Q Okay. You -- do you -- does -- can you tell me whether Dairyland's storage of its spent fuel in its spent fuel pool subsequent to January 31, 1998 has been reasonable or unreasonable in any part of that period, you know, as opposed to the whole period which I think the prior answer implied?

A Again, ultimately I'll go back to my previous answer, that's a business decision on the part of Dairyland, that the Department has no


©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

information one way or the other if one time period would be more acceptable or more reasonable than any other time period.

Q Okay. And you've prepared no analysis regarding the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 1998; is that right?

A That's correct.

Q And I take it you also have no position on whether or not the storage of spent fuel by any purchaser in its spent fuel pool during periods -- the period subsequent to January 1998 is reasonable or unreasonable; is that right? You haven't singled Dairyland out for this no position?

A That's correct.

MR. LO RE: Objection. Outside the scope of this 30(b)(6) deposition.

BY MR. STOUCK:

Q Can you tell me -- do you have an understanding of why Dairyland has stored its spent fuel in its spent fuel pool during the period


©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

subsequent to January 31, 1998 as opposed to doing something else with it?

A I would assume that it was a decision made that that was the best course -- business course for that individual entity.

Q But other than that assumption, you have no knowledge or no other response to my question --

A No.

Q -- why they have done it?

Okay. Do you know -- is there a storage option for spent fuel that Dairyland could have employed during the period subsequent to January 31, 1998 that would have been more reasonable than continued storage of the spent fuel in the spent fuel pool?

MR. LO RE: Objection. Asked and answered.

BY MR. STOUCK:

Q For example dry storage, off-site storage, or anything else.

A Only to the extent that if Dairyland did undertake dry storage, they would have to consider


©2007

issues associated with what kind of dry storage that was, whether or not it was in a manner that would be consistent with the Standard Contract.

And if it was not in a manner consistent with the Standard Contract, then Dairyland would have had to seek a mutually agreeable contract amendment to address that issue.

Other than that, that's essentially a business decision on the part of Dairyland, in terms of what type of storage and what that storage costs in relation to the resources that it has available.

Q Okay. So you cannot testify whether or not there is some storage method for Dairyland's spent fuel other than continued storage in the spent fuel that would have -- in the spent fuel pool that would have been more reasonable than -- than storage in the spent fuel pool during the period subsequent to January 1998; is that right? Or can you testify about that? There are two choices. You can testify about it or you can't testify about whether there would be a more reasonable storage option?

A Not knowing the specifics of -- facing

Dairyland, there's no way for DOE to know that.
Q Okay. No way for you to know that?
A Or the Department has no information associated with that.
Q Or you, in your capacity as a 30(b)(6) witness?
A That's correct.
Q Okay. Let's move on to topic number 8 on the list, the reasonableness or unreasonableness of Dairyland's study, analysis, investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998.
Do you see that?
A Yes, I do.
Q Okay. I'm going to try to break this down because that's a big mouthful.
First, let me ask, do you know whether or not -- well, let me break it down first. I'm going to try to separate study, analyze, investigate from implement.
A Okay.
Q All with respect to dry storage. Study,

analyze, investigate dry storage on the one hand, and on the other hand, implement dry storage. Okay.

Let's start with implement dry storage. Do you know whether or not Dairyland has incurred any costs for the implementation of dry storage at its reactor site?

A No.

Q Do you know where Dairyland's reactor site is?

A Yes. I believe it's in Wisconsin.

Q Have you been there?

A No, I have not.

Q Okay. Now, let's talk about study, investigate, analyze. Do you know whether or not Dairyland has incurred any expenses for the study, analysis, or investigation of dry storage for its spent fuel?

A My assumption is, if it's studied, analyzed or analyzed it, it must have spent some resources in order to do that. But I do not know the extent to which those resources were expended.

Q Okay. Do you know whether it has studied

or analyzed it at all?

A No, I do not.

Q Okay. If it had, you would assume there's a cost associated?

A Yes.

Q But you don't know whether in fact Dairyland has studied or analyzed or investigated?

MR. LO RE: Objection. Asked and answered.

BY MR. STOUCK:

Q Right?

A That's correct.

Q Okay. Well, are you nevertheless, in light of your recent answers to my recent questions, able to testify about the reasonableness or unreasonableness of Dairyland's study, analysis, investigation, and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998?

A To the extent that the Department has no information associated with the analysis or study, the only comment -- and has no position on it, the

only comment that the Department would make is that implementation of such a dry storage initiative would have to take into consideration a mutually agreeable amendment to the Standard Contract to address whether or not the fuel is going to be in a -- in a form which the Department can accept.

Q So other than that, the mutual amendment, and the form of the -- of the fuel being suitable for acceptance, you have no position on the reasonableness or unreasonableness of Dairyland's study, analysis, investigation, on the one hand, or implementation, on the other hand, of dry storage for its spent fuel after January, '98; is that correct?

A That's correct.

MR. LO RE: Just so the record is clear, we take the same position with respect to this question, number 8, that we took with respect to number 7.

MR. STOUCK: Right.

MR. LO RE: Vis-a-vis a challenge at court.


©2007