# EXHIBIT 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------:

DAIRYLAND POWER COOPERATIVE, :

: ORIGINAL

Plaintiff, :

:

v. : No. 04-106C

:

UNITED STATES OF AMERICA, :

:

Defendants. :

-----------------------------------:

Washington, D.C.

Thursday, May 3, 2007

Deposition of:

DAVID K. ZABRANSKY

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:14 a.m., when were present on behalf of the respective parties:

MS. SULLIVAN: There's not a pending question.

MR. SHAPIRO: No. Go ahead.

MS. SULLIVAN: We'll be right back.

(Discussion off the record.)

BY MR. SHAPIRO:

Q Other than -- we covered two issues that Booz-Allen -- that you've interfaced with Booz-Allen on, one being the TAD concept, the other being administration of the Standard Contract. Are there any other topics on which you interfaced with Booz-Allen?

A Booz-Allen's assisting in the TAD procurement process.

Q Anything else?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: Booz-Allen's assisting in certain departmental initiatives that are still under deliberation.

BY MR. SHAPIRO:

Q Which initiatives are those?

MS. SULLIVAN: I'm going to direct

Mr. Zabransky not to answer with regard to there are two particular initiatives that are in deliberation or may be under deliberation that there's a formal assertion of deliberative process privilege by the Office of Civilian Radioactive Waste Management. And Mr. Zabransky's answer to that question will go into that material. So....

MR. SHAPIRO: He can't even identify the general topic?

MS. SULLIVAN: Uh-huh.

MR. SHAPIRO: All right. Well, let's move on for the time being then.

MS. SULLIVAN: Okay.

BY MR. SHAPIRO:

Q Another contractor you mentioned, Mr. Zabransky, is the Legend Group. On what issues do you interact with the Legend Group?

A I'm not quite sure yet. They're a new entity that's come on board that is an 8(a), so they've taken over certain responsibilities. But they've teamed with Booz-Allen Hamilton so, at this point, they've only been on board since March. I

 ©2007

BY MR. SHAPIRO:

Q Can you explain for me how a utility could store spent nuclear fuel on an annual basis for $50,000 in a spent fuel pool?

MS. SULLIVAN: Objection. Foundation, relevance.

THE WITNESS: Again, I threw out a hypothetical. I don't know the basis for 50. I don't know the basis for 10 million.

BY MR. SHAPIRO:

Q Well, you've testified that one of your roles is to review annual submittals, settlements that utilities have offered for consideration by the contracting officer. That work doesn't provide you any information to provide even on an order of magnitude basis a reasonable cost estimate for maintaining spent nuclear fuel at a utility site?

MS. SULLIVAN: I'm going to direct Mr. Zabransky not to answer that question on the grounds of attorney work product, attorney/client communication, and also Rule 408, and relevance. It's also objectionable on relevance.


©2007

THE WITNESS: What time is it?

MS. SULLIVAN: It's just after 10:00. We haven't been going an hour yet.

MR. SHAPIRO: If you would like a break.

THE WITNESS: No. Maybe 15 minutes.

MR. SHAPIRO: Ms. Sullivan, I would like you to consider your instruction, whether you really want to maintain that instruction on all the grounds that you mentioned. For example, relevance and Rule 408 are not grounds for an instruction not --

MS. SULLIVAN: I realize that. Not to answer. My instruction not to answer is on the grounds of privilege, attorney work product and attorney/client. The work that Mr. Zabransky does evaluating settlement proposals is at the direction of the Department of Justice. And that's the basis for my instruction not to answer.

The relevance is that what he may evaluate from other utilities is irrelevant to this matter.

And 408 is that, what he learns at settlement is not evidence that can be presented to


©2007

a court subject to 408 and wouldn't provide the basis for any discovery in this matter.

I mean if you can't get it -- he can't testify about it in court, you can't get it in court, why would he be allowed to testify about it here? That's the basis for my objection and my instruction.

BY MR. SHAPIRO:

Q Mr. Zabransky, is it your testimony that you have no knowledge of what a reasonable cost would be for a utility to maintain spent nuclear fuel at its site?

MS. SULLIVAN: I'm going to direct you answer that outside of what you may know from the work you've done at the direction of the Department of Justice with regard to settlement matters.

THE WITNESS: And with the caveat that my knowledge is informed by what I've done for work for the Department of Justice, I really don't have a basis outside that work. And those are specific to specific utilities.

BY MR. SHAPIRO:


©2007

Q I'm not asking how you obtain knowledge. It would certainly be our legal position that you can't shield your knowledge by the form in which you might have gained it.

Do you have any knowledge about what a reasonable cost would be for a utility to store spent nuclear fuel at its site?

MS. SULLIVAN: Same direction and same objection. And asked and answered.

THE WITNESS: Again, I mean, I think I've been instructed by counsel not to base my answer on what I've learned working for counsel. And what I've learned working for counsel, without going beyond that, is that every utility is different. And every cost is different. So without knowing the specifics, I can't give you a reasonable number.

BY MR. SHAPIRO:

Q You don't have any knowledge that Dairyland could have stopped maintaining its spent nuclear fuel in wet storage before now, do you?

MS. SULLIVAN: Objection. Vague, foundation, assumes facts not in evidence.


©2007

me to speculate could it go later. And I said sure. But it could equally go earlier. I don't know.

BY MR. SHAPIRO:

Q The part of your answer that is missing for me is do you consider the chance that the Department's acceptance could deviate from 2017, you would agree that that's a nonnegligible chance?

MS. SULLIVAN: Same objections and asked and answered.

THE WITNESS: And I think what I'm saying, Mr. Shapiro, it's nonnegligible it could be delayed. It's nonnegligible it could be advanced.

BY MR. SHAPIRO:

Q Next topic I would like to cover with you, Mr. Zabransky, is the Department's work and your work on developing contracts for new nuclear reactors.

MS. SULLIVAN: Go ahead. Sorry.

BY MR. SHAPIRO:

Q You're aware that the Department is developing contracts with wording other than the current Standard Contracts to cover newly

 ©2007

contemplated nuclear reactors, true?

MS. SULLIVAN: I'm going to direct the witness not to answer. There's been a formal assertion of deliberative process by the Office of Civilian Radioactive Waste Management concerning any consideration of, analysis of contracts for new reactors that may be built.

MR. SHAPIRO: Let me ask, Ms. Sullivan, you said there has been a formal assertion. Where is the formal assertion?

MS. SULLIVAN: Mr. Brownstein, the current delegee on behalf of OCRWM, has executed an assertion, a formal declaration asserting deliberative process to preclude Mr. Zabransky's testimony on this topic.

MR. SHAPIRO: Let me respectfully explore the contours of what we, you know, can or can't inquire into to try to minimize the chances of a discovery dispute, or at least to frame it.

BY MR. SHAPIRO:

Q Are you aware, Mr. Zabransky, that there have been public statements by the Department that

 ©2007

it is working on a new standard -- or a new contract to cover new nuclear power plants?

A I'm not sure that's the exact statement that's been made by the Department. The Department has acknowledged that it needs to develop -- to sign contracts for new reactors. I'm not sure what it said with respect to what it's doing.

Q What publicly available explanations has the Department offered as to why it has to develop new language for contracts for the acceptance of spent nuclear fuel from new reactors as opposed to simply using the existing wording in the Standard Contracts?

MS. SULLIVAN: Objection. Vague. Objection. Assumes facts not in evidence. And I direct the witness to answer only as to what he knows to be public statements and not testify as to any matters that -- over which the Department has asserted deliberative process with regard to the consideration or analysis of the need for contracts for new reactors.

Do you understand that instruction?

 ©2007

THE WITNESS: I do. And I guess I'm not aware -- if you want to show me the statement you're referring to. But I'm....

BY MR. SHAPIRO:

Q Well, I don't have any specific statements that I know are publicly available that I have in my list of exhibits.

Are you aware of any publicly available statements that -- or public statements by the Department explaining why it is developing a new contract for the acceptance of spent nuclear fuel?

MS. SULLIVAN: Objection. Assumes facts not in evidence, foundation. And the same direction with regard to answer only as to what public statements you may be aware of.

THE WITNESS: And I'm aware of statements that, to the effect that the Department recognizes it needs to sign contracts for new reactors. I'm not aware of the statements that you attribute to the Department. If you show where they are.

BY MR. SHAPIRO:

Q What's your understanding as to why the


©2007

Department is developing new contract language?

MS. SULLIVAN: And I'm going to direct him not to answer that question based on the assertion of deliberative process privilege.

MR. SHAPIRO: Let's mark this Exhibit 1.

(Zabransky Exhibit Number 1 was marked for identification.)

BY MR. SHAPIRO:

Q Mr. Zabransky, you've been handed what's marked as Exhibit 1 to your deposition. It appears to be a printout of an E-mail from Jane Taylor, dated December 13, 2006, to a number of individuals. And you're listed as a cc.

Do you recognize this E-mail?

MS. SULLIVAN: I'm going to direct the witness not to answer questions about this document for the same reasons that I think this falls within the assertion of deliberative process. And I'm concerned that this document was produced.

Is this part of the documents that were just recently produced?

MR. SHAPIRO: I frankly don't know


©2007

exactly when it was produced, but I know it was produced by the Department.

MS. SULLIVAN: Based on the date December 13, 2006 I think it's part of the recent production of Dairyland.

MR. SHAPIRO: I imagine it was produced after that date.

MS. SULLIVAN: Right. So that's going to be -- that's going to be my instruction.

MR. SHAPIRO: Are you anticipating that the government's going to be calling back this E-mail?

MS. SULLIVAN: We probably will. I don't know what -- I don't know what the protective order in Dairyland provides for. I need to research that. Let me -- actually, let me provisionally claw back, once I -- until I have an understanding as to why, what the parameters of the clawback provision are in Dairyland.

MR. SHAPIRO: Well-- let's put Exhibit 1 aside for the moment.

MS. SULLIVAN: Okay.


©2007

BY MR. SHAPIRO:

Q Mr. Zabransky, is the Department of Energy currently negotiating with any particular utilities about the wording of a -- new wording for a contract for the removal of spent nuclear fuel?

MS. SULLIVAN: Assumes facts not in evidence. I'm going to direct him not to answer the question on the basis of the assertion of deliberative process. I'm sorry, you want to know whether he's talking with --

MR. SHAPIRO: Yes.

MS. SULLIVAN: Whether he knows?

MR. SHAPIRO: Right.

MS. SULLIVAN: Can I have a second?

MR. SHAPIRO: Sure.

(Discussion off the record.)

MS. SULLIVAN: Yeah. I'm going to maintain my instruction not to answer because I don't want his answer to be construed as a waiver of the privilege, the assertion of privilege over all matters relating to DOE's deliberations with regard to new contracts.


©2007

MR. SHAPIRO: My question is -- let's make sure that we've got the right instruction to the right question.

My last question was whether Mr. Zabransky is aware whether the Department is negotiating with any particular utilities about the wording of a new contract for the removal of spent nuclear fuel. Not about internal deliberations, but whether there are external discussions.

MS. SULLIVAN: And I understand that you want to know, and I understand that discussions they might be having with other utilities or specific utilities would not be privileged. But Mr. -- allowing Mr. Zabransky to testify as to whether or not he knows goes down the road of letting him testify about these matters generally, and subjects him to questioning about matters that he may be providing advice about, which is the nature of the deliberative process privilege and why the Department has chosen to assert it.

I don't know if there's another way that we can give you the answer that no, they're not


©2007

talking to the utilities. But I can't let Mr. Zabransky talk about that.

BY MR. SHAPIRO:

Q Do you have any expectation, Mr. Zabransky, of the time frame when the Department might be issuing new language for contracts for the removal of spent nuclear fuel such that we could talk about the document?

MS. SULLIVAN: I'm going to direct him not to answer that question as well. I would also like to lodge a relevance objection to all questions about new -- contracts for new reactors that may be built. But I'm going to instruct him not to answer that based on the assertion of the deliberative process privilege by the Department.

BY MR. SHAPIRO:

Q Let me ask a couple more of my questions, not that I'm not anticipating an objection, but, again I want to frame the issue.

What changes is DOE considering making in the wording of new contracts for the removal of spent nuclear fuel that would be different than the

 ©2007

current Standard Contracts?

MS. SULLIVAN: Relevance and the same direction not to answer based upon the Department's assertion of deliberative process privilege over this matter.

BY MR. SHAPIRO:

Q What if any provisions is the Department considering putting into those new contracts for the acceptance of spent nuclear fuel that would address the rate of acceptance of spent nuclear fuel from utilities?

MS. SULLIVAN: Same objection. Relevance. And same direction not to answer.

BY MR. SHAPIRO:

Q What provisions for -- in new contracts for the acceptance of spent nuclear fuel by the Department is the Department considering that would address the sequence of removal of utilities' spent nuclear fuel?

MS. SULLIVAN: Objection. Relevance. Objection. Assumes facts not in evidence. And the same direction not to answer based on the assertion


©2007

of the deliberative process privilege.

MR. SHAPIRO: Exhibit 2.

(Zabransky Exhibit Number 2 was marked for identification.)

MS. SULLIVAN: Yep. I'm going to provisionally call this one back. And we will have to let you know.

MR. SHAPIRO: All right.

MS. SULLIVAN: Thank you.

MR. SHAPIRO: Just, for the record, Mr. Zabransky, we had marked -- I don't think anything would otherwise appear in the record. We had marked for purposes of identification Exhibit 2 to your deposition what appears to be an E-mail -- printout of an E-mail from Ben McRae to a number of individuals, topic is meeting on Standard Contract. The date is December 5th of 2006.

Ms. Sullivan has indicated that the Government will want to likely claw back -- that back.

MS. SULLIVAN: And both Exhibit 2 and Exhibit 1 have been marked -- the majority of --

 ©2007

both Mr. McRae and Ms. Jane Taylor, who is the author of Exhibit 1, are both attorneys from the Department of Justice. And I believe that most of the recipients are also attorneys. So that would be the basis for an assertion of privilege and the subject matter.

But we will get back to you about our clawback of that.

BY MR. SHAPIRO:

Q Who is Martha Crosland?

MS. SULLIVAN: You can answer that question.

THE WITNESS: She's an attorney in the Office of General counsel.

BY MR. SHAPIRO:

Q Of the Department of Energy?

A Department of Energy.

Q And who is Mary Neumayr?

A I believe she's the assistant general counsel of the Department of Energy.

Q And Mr. McRae is an assistant general counsel at the Department of Energy?



©2007

mischaracterizes the witness' prior testimony.

THE WITNESS: My understanding was to discuss the purpose and intent of entering into the Standard Contract, which was to fulfill the provisions of the Act.

That was the request that I thought I was supposed to be talking about today. Am I misreading it?

MS. SULLIVAN: Let Mr. Shapiro ask his questions.

BY MR. SHAPIRO:

Q If you would answer the last question that I asked. You're saying you're not prepared to discuss any issues concerning the Department's intent in entering into the terms of the Standard Contract?

MS. SULLIVAN: Same objections.

THE WITNESS: No. I'm really not.

BY MR. SHAPIRO:

Q So it's the Department's view that because the Nuclear Waste Policy Act authorized it to enter into contracts, that that was the extent of

authorizing but actually requiring the Department to enter into contracts with utilities?

MS. SULLIVAN: Objection. Legal conclusion, vague, beyond the scope of Mr. Zabransky's 30(b)(6) deposition.

THE WITNESS: I don't know what the Department's analysis on that provision was at the time.

BY MR. SHAPIRO:

Q Can you testify as to the Department of Energy's purpose and intent for the Standard Contract for it not to have an acceptance rate term setting out a minimum amount of DOE acceptance of spent nuclear fuel?

MS. SULLIVAN: Objection, vague, legal conclusion.

THE WITNESS: No. I'm not prepared to testify about those provisions of the contract as a 30(b)(6) witness.

BY MR. SHAPIRO:

Q Let me go to the next 30(b)(6) topic, DOE's understanding of utilities' purposes and


©2007

far as entering into the standard contract was other than simply referring to a database?

MS. SULLIVAN: Objection. Mischaracterizes the witness' prior testimony.

THE WITNESS: That administrative record represents the Department's understanding. It's best viewed as the record.

BY MR. SHAPIRO:

Q You're not in any position as a 30(b)(6) designee to have reviewed that material and provide for us the Department's view as to the essence of what it's view is as to what the utilities intended by entering into the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion, compound, vague, mischaracterizes the witness' prior testimony.

THE WITNESS: And, no, I'm not prepared to provide the essence of what's in there.

BY MR. SHAPIRO:

Q So the Department has no view of utilities' intent for entering into the Standard Contract other than the submittals that utilities

made to the Department as part of the administrative rule-making process through which DOE drafted the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion.

THE WITNESS: And based upon my preparation for this deposition, no.

BY MR. SHAPIRO:

Q Didn't DOE understand that utilities intended that the Standard Contract would solve the problem of spent fuel accumulation at utility reactor sites?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: And I don't have any information that would say DOE understood that.

BY MR. SHAPIRO:

MR. SHAPIRO: All right. Would this be a good time for a lunch break?

MS. SULLIVAN: Uh-huh.

(Whereupon, at 12:38 p.m., the deposition was recessed, to be reconvened at 1:40 p.m. this same


©2007

Without the specifics, we can't tell them anything further. The process is established. They haven't started the process.

BY MR. SHAPIRO:

Q Does the Department -- what impact is there on the fact that fuel is failed as opposed to not failed on the licensing of the facilities for Yucca Mountain?

A I can't speak to the details on that.

Q Do you have any knowledge of that situation?

A I'm not prepared to speak on behalf of the Department on that issue.

Q You're not prepared to speak for the Department of Energy on its plans for the -- for having a licensed facility to be able to accept failed fuel?

MS. SULLIVAN: Objection to the extent it mischaracterizes the witness' prior testimony.

THE WITNESS: I'm not prepared to speak on the effect of failed fuel in the license application.

 ©2007

BY MR. SHAPIRO:

Q Are you able to at least say that the Department is working to take into account that it's going to have to deal with failed fuel in its license application?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: And, again, failed fuel is not a generic term. It's a specific term. The Department may have made some assumptions about what it may have to deal with it. It doesn't mean it addresses all the failed fuel that's out there.

MS. SULLIVAN: Can I take a two-minute break?

MR. SHAPIRO: Sure.

(Whereupon, a recess was taken between 2:27 p.m. and 2:30 p.m.)

BY MR. SHAPIRO:

Q Let me reask my last question again because I'm not sure that your last answer was responsive. I was asking are you at least able to say that the Department is working to take into account that it's going to have to deal with failed

fuel in its license application?

A And I guess, to respond to that, to clarify, is I can't say what's going to be in the final license application. But I do know that I can say on behalf of the Department that it's aware of the issue of failed fuel; that failed fuel is a consideration that will have to be dealt with in the license application or the license application amendments -- license amendments later on.

So DOE has considered failed fuel in its development of the Yucca Mountain license facility. I don't know how it's going to appear in the final license application, nor do I know how it relates to the breadth or depth of the failed fuel we may find out at existing utility sites that we don't know about.

Q And I understand that the license application will be final when it's final. But what is the current state of the planning of that application with respect to failed fuel?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: And, again, it's being

 ©2007

considered. I don't know the details of what's being considered in any specific area.

BY MR. SHAPIRO:

Q Is any part of that consideration contemplating accepting failed fuel at a time frame separate from acceptance of fuel that's not failed?

MS. SULLIVAN: Objection. Vague, compound.

THE WITNESS: And, again, I'm not sure I can speak with a definitive nature as to that from our end. But on the other end I can say that, as I've said, failed fuel is not all -- failed fuel is different things. So some failed fuel may not be on -- scheduled different. Other failed fuel might be. I can't speak to those details.

BY MR. SHAPIRO:

Q What are DOE's plans for the acceptance of Dairyland's failed fuel?

MS. SULLIVAN: Objection. Vague. Objection. Assumes facts not in evidence.

THE WITNESS: And at this point, I don't know that DOE is well versed on the details of


©2007

Dairyland's failed fuel, so I don't have specific plans for Dairyland's failed fuel.

BY MR. SHAPIRO:

Q So DOE is not currently planning to accept Dairyland's failed fuel on a schedule different from the rest of Dairyland's spent fuel, true?

MS. SULLIVAN: Objection. Legal conclusions. Mischaracterizes the witness' prior testimony.

THE WITNESS: I don't think Dairyland's fully informed DOE of the detail of its failed fuel, so DOE hasn't made that determination yet.

BY MR. SHAPIRO:

Q I have a few more questions for you, Mr. Zabransky, on failed fuel. And I'll go back at the end to a few questions on an -- as an individual. But let's continue for the time being with your testimony as a 30(b)(6) designee.

Switching to the next topic, which is the schedule in which DOE plans to remove Dairyland's spent fuel. On what schedule does DOE plan to

 ©2007

THE WITNESS: And with regard specifically just to the were either considered acceptable waste forms under the contract, the answer is no.

BY MR. SHAPIRO:

Q So there's no material difference between the two, and neither is currently considered an acceptable waste form?

MS. SULLIVAN: Objection. Vague, and objection, legal conclusion.

THE WITNESS: Well, and again I'm not sure -- I didn't mean to imply that they're not materially different items. They are materially different items.

BY MR. SHAPIRO:

Q Materially different in terms of their status as acceptable waste forms?

A With regard to the specific issue as to how they're considered under the contract, I don't believe there's any difference.

Q If the Department doesn't currently consider TADs to be acceptable waste forms under the

Standard Contract, how is the Department planning to encourage utilities to implement the use of TADs?

MS. SULLIVAN: And this I'm going to direct Mr. Zabransky not to answer. There's been an invocation of the deliberative process privilege by the Department with regard to DOE's analysis or consideration of implementing the TADs initiative pursuant to the Standard Contract and standard -- vis-a-vis Standard Contract holders.

BY MR. SHAPIRO:

Q Focusing just on dual purpose containers, then, for the moment, Mr. Zabransky, do you foresee a means by which the spent fuel in those containers would become considered by DOE to be an acceptable waste form?

MS. SULLIVAN: Same direction not to answer the question.

THE WITNESS: Can we go talk?

MR. SHAPIRO: Sure.

MS. SULLIVAN: Sorry. I'm trying to be very precise in my invocation.

(Discussion off the record.)

# EXHIBIT 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 04-0106C<br>(Chief Judge Damich) |

DEFENDANT'S SECOND AMENDED RESPONSE TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 26(e) and Rule 34 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, provides the following first amended response to the second request for production of documents served by plaintiff, Dairyland Power Cooperative ("Dairyland"), which follows our production of expert reports by Warren K. Brewer, R. Larry Johnson, and Jonathan A. Neuberger.

GENERAL OBJECTIONS

1. Defendant objects to each and every production request to the extent that it calls for the disclosure of material or information that is subject to any claim of privilege or protection, including without limitation, the attorney-client privilege, the work-product doctrine, or any Government privilege. Defendant will not produce privileged or protected documents, materials or information in response to the document requests. The inadvertent production by defendant of documents protected by the attorney-client privilege, or any other privilege, shall not constitute a waiver of the applicable privilege or protection as to any document so produced, or as to any other document.

10. Duratek presentation concerning the phase 1 work dated July 6, 2005, PLAC0081001-PLAC0081030.

11. 2003 LACBWR Decommissioning & Decontamination Cost Study Update, July 2003, PLAC0023723-PLAC0023745.

12. WPI Phase 1, Task 2 - LACBWR RPV Activated Material Report, February 19, 2003, PLAC0000455-PLAC0000477.

13. WPI Phase 1, Task 9 - LACBWR Spent Fuel Characterization Report, December 5, 2002, PDPC0007773-PDPC0007807.

14. Maine Yankee Atomic Power Station, Decommissioning Costs Analysis, October 28, 1997, DXD001 0020 - 0211.

15. Facility Interface Capability Assessment (FICA) Project Cask Handling Assessment La Crosse BWR, NAC C-8802800, October 1990, DXD 002 0001-0041.

16. Deposition of R. Alan Chapman, Tennessee Valley Authority v. United States of America, Case No. 01-249C, February 23, 2005, DXD 002 0042 - 0281.

17. Expert Witness Report of Warren K. Brewer, June 15, 2007, DXD 003 0001-0045.

The documents upon which Mr. Neuberger relied, that he reviewed, or that he prepared are the following:

1. Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 435-36 (2006).

2. Expert Witness Report of Frank C. Graves, March 23, 2007, and supporting electronic files.

**EXHIBIT 7**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S OBJECTIONS AND RESPONSE TO DEFENDANT'S SECOND SET OF INTERROGATORIES

Pursuant to RCFC 33, Dairyland responds to the government's Second Set of Interrogatories served on Dairyland on March 30, 2007.

GENERAL RESPONSES AND OBJECTIONS

The following general responses and objections to the interrogatories are incorporated by reference in each of Dairyland's responses below. Dairyland's answers to interrogatories are subject to these general objections regardless of whether Dairyland agrees in individual responses below to answer interrogatories notwithstanding additional objections noted in such individual responses.

1. Dairyland objects to the government's instruction at page 1, which purports to require Dairyland to supplement its responses to the interrogatories "from time to time, but not later than 10 days after such additional information has been obtained." This instruction seeks to impose obligations that go beyond those that are required under RCFC 26(e).

2. Dairyland objects to any interrogatories that seek information or documents in possession of entities other than Dairyland or otherwise outside the possession, custody or

SPECIFIC RESPONSES AND OBJECTIONS

INTERROGATORY NO. 20

On what schedule, measured in MTUs per year, does Dairyland contend that DOE was obligated to accept Dairyland's SNF pursuant to Dairyland's Standard Contract beginning in 1998? State all factual and legal grounds for this contention.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Because Dairyland's Standard Contract does not specify a schedule or precise amount of SNF that DOE is obligated to accept starting on January 31, 1998, DOE was obligated to accept Dairyland's SNF at a reasonable rate. *See Restatement (Second) Contracts* § 204 (1981). A reasonable SNF acceptance rate would have been a rate sufficient to prevent Dairyland (as well as other utilities) from incurring additional at-reactor storage costs from January 31, 1998 forward. *See, e.g.,* DOE Dec. 1983 Draft Mission Plan; Dec. 1983 OCRWM information meeting statement of Acting OCRWM Director Robert Morgan; Feb. 22, 1984 Congressional testimony of Acting OCRWM Director Michael J. Lawrence; M. Lawrence, July 23, 1984 DOE Comments on Draft Mission Plan; trial testimony of Loring Mills, Ivan Stuart, John Bartlett and Frank Graves in *Yankee Atomic*; Expert Witness Reports of Frank C. Graves and Ivan Stuart submitted here. Because

Dairyland faced avoidable at-reactor storage costs in 1998 that could only be eliminated if DOE had accepted all of Dairyland's SNF, DOE was obligated to accept all of Dairyland's SNF in 1998. As set forth in the Expert Witness Report of Frank C. Graves ("Graves Report") and in several DOE planning documents and studies, an aggregate acceptance rate of approximately 3,000 MTU/year would have fulfilled DOE's contractual obligation because it would have prevented Dairyland and other utilities from incurring additional at-reactor storage costs, assuming that a modest number of acceptance allocations were exchanged amongst utilities.

INTERROGATORY NO. 21

On what schedule, measured in MTUs per year, does Dairyland contend that DOE was obligated to accept SNF pursuant to the Standard Contract on an aggregate, industry-wide basis beginning in 1998? State all factual and legal grounds for this contention

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Dairyland incorporates by reference its Response to Interrogatory No. 20 above.

INTERROGATORY NO. 22

At what minimum rate of acceptance, measured in MTUs per year, does Dairyland contend that DOE could have accepted Dairyland's SNF pursuant to Dairyland's Standard

Contract beginning in 1998 without causing Dairyland to incur any damages? State all factual and legal grounds for this contention.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "damages" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Regardless of what rate of acceptance would have been used, DOE could have accepted all of Dairyland's 38 MTU of SNF in 1998 pursuant to its contractual obligation. Had DOE done so (and had DOE not announced its intention not to perform several years prior to 1998, thereby inducing Dairyland's efforts to mitigate damages), Dairyland would not have incurred any monetary damages.

INTERROGATORY NO. 23

On what schedule, measured in MTUs per year, does Dairyland contend that DOE was obligated to accept Dairyland's failed fuel pursuant to Dairyland's Standard Contract beginning in 1998? State all factual and legal grounds for this contention.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as

unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.

RESPONSE

Notwithstanding the objections noted above, Dairyland responds as follows: Pursuant to Dairyland's Standard Contract, DOE was obligated to accept and could have accepted Dairyland's failed fuel on the same schedule as Dairyland's other SNF. *See Yankee Atomic Elec. Co. v. United States,* 73 Fed. Cl. 249, 309 (2006); *Pacific Gas & Elec. Co. v. United States,* 73 Fed. Cl. 333, 400-01 (2006). *See also* Response to Interrogatory No. 20 above.

INTERROGATORY NO. 24

If, beginning in 1998, DOE had begun performing and had continued to perform its obligations pursuant to the Standard Contract, on what schedule, measured in the amount of MTUs exchanged each year, does Dairyland contend that it would have exchanged its DCSs? State all factual and legal grounds for this contention, and specifically identify all contract holders with whom Dairyland would have exchanged DCSs and the allocations that Dairyland and its trading partners would have exchanged.

OBJECTIONS

Dairyland objects that the number of interrogatories served by the government, including discrete subparts, has exceeded the twenty-five in number permitted by RCFC 33. Dairyland further objects to the term "schedule" as vague. Dairyland also objects to this Interrogatory as unduly burdensome to the extent it requires Dairyland to state "all" factual and legal grounds for its contentions.