NO. 04-106C
(Judge Damich)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL AND FOR SANCTIONS RELATING TO THE GOVERNMENT'S RCFC 30(b)(6) TESTIMONY

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 305-7571
Fax: (202) 307-2503

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trail Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT C. SLATER
Trial Attorneys
U.S. Department of Justice

August 17, 2007

Attorneys for Defendant

## TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . iii

INDEX TO APPENDIX . . . . . . . . . . v

BACKGROUND . . . . . . . . . . 2

I. DAIRYLAND'S RCFC 30(b)(6) NOTICE . . . . . . . . . . 2

II. MR. KOUTS AND MR. ZABRANSKY PROVIDED RESPONSIVE TESTIMONY IN CONNECTION WITH THE TOPICS FOR WHICH THEY WERE DESIGNATED TO TESTIFY . . . . . . . . . . 6

A. Testimony Of Mr. Kouts . . . . . . . . . . 6

B. Testimony Of Mr. Zabransky . . . . . . . . . . 11

III. THE GOVERNMENT'S COUNSEL INSTRUCTED MR. ZABRANSKY NOT TO ANSWER CERTAIN DISCRETE QUESTIONS PURSUANT TO VALID INVOCATIONS OF THE DELIBERATIVE PROCESS PRIVILEGE, ATTORNEY-CLIENT PRIVILEGE, AND THE WORK PRODUCT DOCTRINE . . . . . . . . . . 20

A. Assertion Of Deliberative Process Privilege . . . . . . . . . . 20

B. Assertion Of Attorney-Client Privilege And Work Product Doctrine . . . 21

SUMMARY OF ARGUMENT . . . . . . . . . . 22

ARGUMENT . . . . . . . . . . 23

I. DAIRYLAND'S REQUEST FOR SANCTIONS SHOULD BE DENIED, AS THE GOVERNMENT'S RCFC 30(b)(6) DESIGNEES WERE ADEQUATELY PREPARED, PROVIDED RESPONSIVE TESTIMONY AS TO THE TOPICS FOR WHICH THEY WERE DESIGNATED AND OTHERWISE DID NOT ACT IN BAD FAITH IN AN EFFORT TO OBSTRUCT DISCOVERY . . . . . . 23

II. BECAUSE THE GOVERNMENT'S ASSERTED VALID CLAIMS OF DELIBERATIVE PROCESS PRIVILEGE, ATTORNEY-CLIENT PRIVILEGE, AND ATTORNEY WORK PRODUCT DOCTRINE DURING MR. ZABRANSKY'S DEPOSITION, DAIRYLAND'S REQUEST TO RE-OPEN MR. ZABRANSKY'S DEPOSITION IS WITHOUT MERIT . . . . . . . . . . 32

A. The Government's Invocation Of Deliberative Process Privilege Was Proper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B. The Government's Invocation Of The Attorney-Client Privilege And Work Product Doctrine Were Valid, And Mr. Zabransky Otherwise Provided Responsive Testimony Concerning The Subject Matter At Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF AUTHORITIES

### CASES

Banks v. Office of the Senate Sergeant-at-Arms,
241 F.R.D. 370 (D.D.C. 2007) (a Rule 30(b)(6) . . . . . . . . . . Passim

Belmont Holdings Corp. v. Unicare Life & Health Insurance Co.,
No. 98-2365, 2000 WL 1920039 (E.D. Pa. Dec. 1, 2000) . . . . . . . . . . 26

Black Horse Lane Assoc. v. Dow Chemical Corp.,
228 F.3d 272 (3rd 2000) . . . . . . . . . . 27

Boland Marine & Mfg. Co., Inc. v. M/V Bright Field,
No. 97-3087, 1999 WL 280541 (E.D. La. May 3, 1999) . . . . . . . . . . 26, 31

CACI Field Serv., Inc. v. United States,
12 Cl. Ct. 680 (1987) . . . . . . . . . . 32

Dairyland Power Cooperative v. United States,
77 Fed. Cl. 330 (2007) . . . . . . . . . . Passim

Dep't of Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n,
532 U.S. 1 (2001) . . . . . . . . . . 34

Energy Northwest v. United States,
No. 04-10C (Fed. Cl.) . . . . . . . . . . 5

Flamingo Fishing Corp. v. United States,
31 Fed. Cl. 655 (1994) . . . . . . . . . . 34

Marriott Int'l Resorts, L.P. v. United States,
437 F.3d 1302 (2006) . . . . . . . . . . 34

Miller v. Mehltretter,
478 F. Supp. 2d 415 (N.D.N.Y. 2007) . . . . . . . . . . 33

Poole v. Textron, Inc.,
192 F.R.D. 494 (D. Md. 2000) . . . . . . . . . . 24

Prokosch v. Catalina Lighting, Inc.,
193 F.R.D. 633 (D. Minn. 2000) . . . . . . . . . . 24, 31

Reed v. Bennett,
193 F.R.D. 689 (D. Kan. 2000) .......... 25

Startzell v. City of Philadelphia,
No. 05-05287, 2006 WL 2945226 (E.D. Pa. Oct. 13, 2006) .......... 34

Static Control Components, Inc. v. Lexmark Intern., Inc., No. Civ. A 04-84-KSF,
2006 WL 3702464 (E.D. Ky. Dec. 13, 2006) (even if RCFC 30(b)(6) .......... 25, 28, 39

United States v. Dianon Systems, Inc.,
240 F.R.D. 40 (D. Conn. 2006) (Rule 30(b)(6) .......... 25, 28

United States v. Massachusetts Industrial Finance Agency,
162 F.R.D. 410 (D. Mass. 1995) .......... Passim

United States v. Taylor,
166 F.R.D. 356 (M.D.N.C. 1996) .......... 24

## INDEX TO APPENDIX


Document Page

December 13, 2006 letter from Jerry Stouck to Russell Shultis ....................................................1

March 9, 2007 letter from Marian Sullivan to Jerry Stouck..........................................................4

March 20, 2007 letter from Marian Sullivan to Jerry Stouck........................................................5

Excerpts of Testimony from Deposition of Christopher Kouts, May 1, 2007................................7

July 13, 2007 letter from Patrick B. Bryan to Robert L. Shapiro..................................................14

Excerpts of Testimony from Deposition of Christopher Kouts, May 1, 2007..............................17

Excerpts of Testimony from Deposition of David Zabransky, May 3, 2007................................20

Final Rulemaking Notice, Federal Register Volume 48, No. 75, Dated April 18, 1983..............74

Delegation Order No. 00-002.00E To The Under Secretary for Energy, Science and Environment, from the Secretary of Energy, dated November 23, 2005 ..........................................................94

Redelegation Order No. 00-002.06B To The Director, Office of Civilian Radioactive Waste Management from the Under Secretary, dated January 29, 2007 .............................................106

Delegation Memorandum From Ward F. Sproat, Director of Office of Civilian Waste Radioactive Waste Management to Alan B. Brownstein, Chief Operating Officer, Dated April 27, 2007..............................................................................................................................109

Declaration of Alan B. Brownstein, dated May 1, 2007...........................................................113

Defendant's Reponse to Plaintiff's First Set of Interrogatories As Amended In Response to the Court's February 5, 2007 Order And Supplemented Following the Close of Fact Discovery....119

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE,<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | ) | No. 04-106C<br>(Chief Judge Damich) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL AND FOR SANCTIONS RELATING TO THE GOVERNMENT'S RCFC 30(b)(6) TESTIMONY

Defendant, the United States, respectfully responds to "Dairyland's Motion For Relief For Government Discovery Violations Regarding Rule 30(b)(6) Deposition Testimony," which plaintiff, Dairyland Power Cooperative ("Dairyland"), filed on July 18, 2007. For the reasons that follow, Dairyland's motion should be denied, as the Government properly discharged its obligations pursuant to RCFC 30(b)(6) and the Court's prior discovery orders. Further, because the Government suggested certain compromise measures to Dairyland's counsel that would have resolved, at least in part, the disputes discussed in Dairyland's motion – and in light of the fact that Dairyland has misidentified the identity and designations of one of the Government's RCFC 30(b)(6) witnesses whose conduct Dairyland claims to be sanctionable – Dairyland's motion constitutes a waste of judicial resources as well as an abuse of the Court's discovery rule and typifies the uncooperative behavior that this Court discussed during its August 17, 2007 hearing in this matter.

## BACKGROUND

### I. DAIRYLAND'S RCFC 30(b)(6) NOTICE

On December 13, 2006, Dairyland's counsel provided the Government with a list of 21 proposed RCFC 30(b)(6) topics. A1-3.[1] Dairyland's list of proposed deposition topics broadly ranged from such generalized areas of inquiry as "DOE's purpose and intent in entering the Standard Contract," "DOE's understanding of the utilities' purpose and intent in entering the Standard Contracts," and the "reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998," but contained no further explanations or definitions of the specific terms contained within the description of each topic. A2-3. Five days later, on December 18, 2006, prior to receiving any response from the Government regarding its proposed list of deposition topics, and without serving an actual RCFC 30(b)(6) deposition notice upon the Government, Dairyland filed a motion to compel the Government's RCFC 30(b)(6) deposition in this case. Following briefing and argument, the Court, by order dated January 29, 2007, allowed Dairyland to proceed with taking RCFC 30(b)(6) testimony from the Government "limited to the list of topics provided to Defendant's counsel on December 13, 2006." Order, at 1 (Jan. 29, 2007).

In response to the Court's order, the Government designated three employees of the Department of Energy – Christopher Kouts, David Zabransky, and Thomas Pollog – to testify

[1] "A___" refers to the appendix attached to this brief.

concerning the RCFC 30(b)(6) topics identified in Dairyland's December 13, 2006 letter.[2] In particular, the United States identified Mr. Kouts – a member of the Senior Executive Service with nearly 30 years of experience at DOE who currently serves as the Acting Assistant Director of DOE's Office of Civilian Radioactive Waste Management ("OCRWM") – as the Government's designee with regard to eight of the topics contained in Dairyland's December 13, 2007 letter:

- Topic No. 5: "The rate(s) of acceptance that DOE planned to use under the Standard Contracts (a) before DOE determined that it would not begin accepting spent fuel in a permanent repository in 1998, and (b) after that time."
- Topic No. 9: "A reasonable annual rate of acceptance for spent fuel under the Standard Contracts, and the factors to consider in determining a reasonable rate."[3]

---

[2] In total, the Government has designated and produced four separate representatives to testify in response to the extensive number of RCFC 30(b)(6) deposition topics that Dairyland has served upon the Government in this case. Specifically, on May 1 and 2, 2007, the Government produced Mr. Kouts to testify in response to Topic Nos. 5, 9, 12, 13, and 16-19 as set forth in the list of RCFC 30(b)(6) topics that Dairyland provided by letter dated December 13, 2006. On May 3, 2007, the Government produced Mr. Zabransky to testify concerning Topic Nos. 1, 3, 6, 7, 10, 11, 14, 15, and 21. On May 4, 2007, the Government produced Mr. Pollog to testify in response to Topic Nos. 2, 4, 8, and 20. In addition, pursuant to Dairyland's May 16, 2007 RCFC 30(b)(6) deposition notice, the Government produced Mr. Bernard White from the Nuclear Regulatory Commission on June 12, 2007, and Mr. Pollog on June 21, 2007, to testify concerning matters relating to the Government's handling of its document productions in this matter. Dairyland does not challenge in its motion the RCFC 30(b)(6) testimony provided by Mr. Pollog on May 4, 2007, in connection with Topic Nos. 2, 4, 8, and 20. Nor does Dairyland challenge the RCFC 30(b)(6) testimony provided by Mr. Pollog and Mr. White relating to the Government's document production.

[3] In its motion, Dairyland erroneously charges Mr. Zabransky with failing "to provide testimony regarding Topic 9: 'A reasonable annual rate of acceptance for spent fuel under the Standard Contracts, and the factors to consider in determining a reasonable rate.'" Plaintiff's Motion, at 8. However, Mr. Zabransky was not the Government's RCFC 30(b)(6) designee with regard to Topic No. 9. As the Government expressly stated in its March 9, 2007 letter to Dairyland's counsel, which Dairyland included in the appendix to its motion, the Government designated Mr. Kouts (and not Mr. Zabransky) as its RCFC 30(b)(6) designee with regard to Topic No. 9. A4. Therefore, the Government was under no obligation to prepare Mr. Zabransky

- Topic No. 12: "The earliest date that DOE currently believes that it will begin accepting spent fuel under the Standard Contracts."

- Topic No. 13: "The acceptance rate that DOE is planning to use once spent fuel acceptance begins pursuant to the Standard Contracts."

- Topic No. 16: "The date on which DOE currently plans to complete picking up spent fuel from Dairyland's site."

- Topic No. 17: "The reasonableness or unreasonableness of Dairyland's study, analysis, investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998."

- Topic No. 18: "The reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998."

- Topic No. 19: "The reasonableness or unreasonableness of Dairyland's study, analysis investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998."

A4.

In addition, Mr. Zabransky, who serves as DOE's Contracting Officer for the Standard Contract, was designated as the Government's RCFC 30(b)(6) witness regarding the following topics contained in Dairyland's December 13, 2006 letter:

- Topic No. 1: "The purpose and role of Delivery Commitment Schedules ('DCS') and Final Delivery Schedules under the Standard Contracts."

- Topic No. 3: "DOE's responses to DCS forms submitted by the utility plaintiffs, including DOE's decision to stop approving such DCS forms."

- Topic No. 6: "DOE's purpose and intent in entering the Standard Contract."

- Topic No. 7: "DOE's understanding of the utilities' purpose and intent in entering the Standard Contracts."

---

to testify concerning Topic No. 9. Dairyland does not challenge the sufficiency of Mr. Kouts' testimony concerning Topic No. 9.

- Topic No. 10: "The purpose and role of exchanges under the Standard Contracts."
- Topic No. 11: "The purpose and role of the provision on priority for shutdown reactors under the Standard Contract."
- Topic No. 14: "The purpose and role of provisions of the Standard Contracts governing, and DOE's plans for, scheduling acceptance and acceptance of failed fuel, including failed fuel at Dairyland's site."
- Topic No. 15: "The schedule on which DOE plans to remove Dairyland's spent fuel pursuant to Dairyland's Standard Contract."
- Topic No. 21: "The role, purpose and development of DOE's Transportation, Aging and Disposal Canister System ("TAD") and DOE's plans, if any, consistent with use of TAD to accept spent fuel stored in other containers."

A4-6.

Although the Government initially offered to schedule the Government's Rule 30(b)(6) deposition in April 2007, at the request of Dairyland's counsel and counsel for Energy Northwest,[4] we produced Messrs. Kouts and Zabransky for deposition on May 1-2, 2007, and May 3, 2007, respectively. Over the course of these three days, Messrs. Kouts and Zabransky, acting in good faith, provided complete and honest answers to the questions posed by Dairyland's counsel.

[4] At the request of Energy Northwest, the plaintiff in a separate SNF case that is pending before the Court, Energy Northwest v. United States, No. 04-10C (Fed. Cl.), and with the consent of Dairyland's counsel, the Government permitted counsel for Energy Northwest and counsel for Dairyland to participate in the deposition of Mr. Kouts on May 1-2, 2007.

## II. MR. KOUTS AND MR. ZABRANSKY PROVIDED RESPONSIVE TESTIMONY IN CONNECTION WITH THE TOPICS FOR WHICH THEY WERE DESIGNATED TO TESTIFY

### A. Testimony of Mr. Kouts

In its motion, Dairyland presents to the Court an incomplete synopsis of the testimony of Messrs. Kouts and Zabransky, which was fully responsive to Dairyland's designated topics, by selectively quoting from the testimony of the Government's RCFC 30(b)(6) witnesses. Notwithstanding Dairyland's inaccurate portrayal of the record, Messrs. Kouts and Zabransky prepared diligently over the course of several weeks concerning the topics for which they were designated, and they provided complete, educated, and honest answers in response to the questions posed by Dairyland's counsel. For example, although Dairyland claims that Mr. Kouts failed to provide responsive testimony in connection with Topic Nos. 18 (relating to the "reasonableness or unreasonableness" of Dairyland's storage of its spent fuel during the period subsequent to January 31, 1998) and 19 (relating to the "reasonableness or unreasonableness" of the costs that Dairyland allegedly has incurred to study the implementation of dry storage during the period subsequent to January 31, 1998), the record indicates that Mr. Kouts, in fact, provided complete and candid testimony concerning these subject areas. In that regard, Mr. Kouts testified that DOE does not collect cost data in the ordinary course concerning a given utility's incurred expenditures in connection with spent nuclear fuel storage costs and that, as a consequence, the agency does not posses any information upon which to base a determination as to the "reasonableness or unreasonableness" of the costs that Dairyland has incurred for spent nuclear fuel storage. A9-13 (Kouts Tr: 247:9-263:6). For example, the following exchanges are instructive:

Mr. Stouck: [S]o your answer, I take it, is that DOE has no information about the costs of storage?

Mr. Kouts: That's correct.

A9 (Kouts Tr. 249:5-18).

Mr. Stouck: You're not going to tell me tomorrow – you know, tonight a whole bunch of documents came in with cost information, so tomorrow DOE has a position?

Mr. Kouts: The Department doesn't collect spent fuel storage cost information from utilities. It basically collects information on the spent fuel itself but does not in any way collect information on individual utility cost for pool storage.

Mr. Stouck: Therefore, the Department has no position upon –

Mr. Kouts: The reasonableness or the unreasonableness of the cost.

Mr. Stouck: Right. And that – there being no position by the Department on that subject is not going to change in the next 6 months or a year; is that correct? You don't anticipate that it will?

Mr. Kouts: The best way for me to answer that is we haven't had the interest on collecting that information in the past. And I don't foresee any reason in the near future why we would want to collect that information.

A10 (Kouts Tr. 250:10-251:9).

Mr. Stouck: Can you tell me – do you have an understanding of why Dairyland has stored its spent fuel in its spent fuel pool during the period subsequent to January

31, 1998 as opposed to doing something else with it?

Mr. Kouts: I would assume that it was a business decision made that was the best course – business course for that individual entity.

Mr. Stouck: But other than that assumption, you have no knowledge or no other response to my question –

Mr. Kouts: No.

A11 (Kouts Tr. 256:20-257:8).

Mr. Kouts also provided responsive testimony with regard to Topic No. 19, which sought testimony concerning "[t]he reasonableness or unreasonableness of Dairyland's study, analysis, investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998." Consistent with his testimony on Topic No. 18, Mr. Kouts again explained that DOE's spent nuclear fuel program office does not collect cost data relating to any utility's spent nuclear fuel storage studies, analyses, or other related costs:

Mr. Stouck: Do you know whether or not Dairyland has incurred any costs for the implementation of dry storage at its reactor site?

Mr. Kouts: No.

A12 (Kouts Tr. 260:4-7).

Mr. Stouck: Do you know whether or not Dairyland has incurred any expenses for the study, analysis, or investigation of dry storage for its spent fuel?

Mr. Kouts: My assumption is, if it's studied, analyzed or analyzed it, it must have spent some resources in order to do that. But I do not know the extent to which those resources were expended.

Mr. Stouck: Okay. Do you know whether it has studied or analyzed it at all?

Mr. Kouts: No, I do not.

Mr. Stouck: Okay. If it had, you would assume there's a cost associated?

Mr. Kouts: Yes.

Mr. Stouck: But you don't know whether in fact Dairyland has studied or analyzed or investigated?

Mr. Lo Re: Objection. Asked and answered.

Mr. Stouck: Right?

Mr. Kouts: That's correct.

A12 (Kouts Tr. 260:14-261:12)

At the deposition, counsel for the Government reminded counsel for Dairyland that, although Mr. Kouts was speaking as a RCFC 30(b)(6) witness, the Government had engaged experts in this matter who would be submitting reports. Accordingly, the Government reserved its right to challenge the reasonableness of Dairyland's costs through those reports. A10 (Kouts Tr. 251:10-15, 253:10-20). Counsel for the Government explained that Dairyland would have ample time during expert discovery to vet any expert opinions regarding the reasonableness of Dairyland's costs. A10 (Kouts Tr. 253:10-20). When pressed during the deposition, Dairyland's counsel was unable to provide any authority for his apparent position that Mr. Kouts was obligated to have knowledge of the opinions of the Government's experts weeks before those experts issued their reports. A11 (Kouts Tr. 254:6-17).

Pursuant to Rule 30(b)(6), Mr. Kouts was only required to testify regarding matters within his personal knowledge or reasonably known to DOE. Mr. Kouts was not compelled to speculate as to matters that are outside of the agency's scope of business. Indeed, as Mr. Kouts repeatedly explained to Dairyland's counsel, neither he nor DOE possessed knowledge relating to the reasonableness of Dairyland's storage of spent nuclear fuel in its spent fuel pool or of Dairyland's study, analysis, investigation, and implementation of dry storage for its spent fuel. In fact, even Dairyland's counsel recognized that it was Dairyland – not DOE – which eventually provided the organization's spent fuel storage cost data to the Department of Justice for purposes of the litigation.[5] A9 (Kouts Tr. 249:5-18).

On July 9, 2007, more than two months after Mr. Kouts' deposition, counsel for Dairyland informed the Government that Dairyland sought to file the instant motion without first seeking to "meet and confer" with the Government beforehand in an effort to avoid the Court's intervention. Because the Government requested that Dairyland first provide an opportunity for the parties to "meet and confer," counsel for Dairyland and counsel for the United States conferred by telephone on July 16, 2007, during which the Government suggested several compromise measures that would have resolved, at least in part, the disputes discussed in Dairyland's motion. A14-16.

[5] Indeed, as Dairyland is well aware, the Government has retained three expert witnesses, including an accountant, Mr. Larry Johnson, who submitted an expert report that critiques, from an accounting perspective, the costs that Dairyland seeks to recover from the United States in this litigation. Pursuant to the Court's scheduling orders, Mr. Johnson submitted his expert report to Dairyland on June 15, 2007. Counsel for Dairyland deposed Mr. Johnson in this matter concerning the substance of his expert report on July 17, 2007.

In particular, consistent with Mr. Kouts' testimony in connection with Topic Nos. 18 and 19, counsel for the United States offered during the July 16, 2007 "meet and confer" to stipulate in writing that DOE did not contest the reasonableness of the costs incurred by Dairyland relating to spent nuclear storage expenditures or studies, based upon the fact that DOE does not collect such data in the ordinary course of the agency's official activity, while reserving the right to offer expert testimony to critique (from an accounting perspective, for example) the costs that Dairyland seeks to recover against the United States in this litigation. See Plaintiff's Motion, at 14. In response, Dairyland's counsel informed us by telephone that Dairyland rejected our accommodation on the grounds that Dairyland considered a written stipulation to be insufficient and inferior to a Court order to the same effect. See id. Hence, two days later, on July 18, 2007, Dairyland filed the instant motion with the Court.

B. Testimony of Mr. Zabransky

In its motion, Dairyland asserts that Mr. Zabransky failed to provide responsive testimony regarding Topic Nos. 6 ("DOE's purpose and intent in entering the Standard Contracts"), 7 ("DOE's understanding of the utilities' purpose and intent in entering the Standard Contract"), 9 ("A reasonable annual rate of acceptance for spent fuel under the Standard Contracts, and the factors to consider in determining a reasonable rate"), and 14 ("The purpose and role of provisions of the Standard Contracts governing and DOE's plans for, scheduling acceptance and acceptance of failed fuel, including failed fuel at Dairyland's site"). Dairyland cites several incomplete excerpts of Mr. Zabransky's testimony on these topics in support of its position. Nevertheless, when the record is reviewed in its entirety, it becomes clear that Mr. Zabransky,

like Mr. Kouts, provided complete and educated responses to Dairyland's questions during the deposition.[6]

As an initial matter, with regard to Dairyland's complaint that Mr. Zabransky failed to provide responsive testimony to Topic No. 9 ("A reasonable annual rate of acceptance for spent fuel under the Standard Contracts, and the factors to consider in determining a reasonable rate"), we note that, by letter dated March 9, 2007, the Government expressly designated Mr. Kouts, not Mr. Zabransky, to testify as to this topic. A4. Therefore, Mr. Zabransky was under no obligation to prepare himself to testify concerning Topic No. 9, and Dairyland otherwise does not challenge the sufficiency of the extensive testimony concerning Topic No. 9 that Mr. Kouts provided during his deposition on May 1, 2007.[7] Therefore, Dairyland's motion with respect to Topic No. 9 is utterly without merit and should be denied by this Court.

With regard to Topic No. 6 ("DOE's purpose and intent in entering the Standard Contracts"), Mr. Zabransky repeatedly testified that the agency's understanding as to its "purpose and intent" for entering into the Standard Contract was to fulfill the requirements of the Nuclear

---

[6] Indeed, the Government selected Mr. Zabransky as a Rule 30(b)(6) designee in large part because of his direct and daily involvement with respect to the Standard Contract in his capacity as the agency's Standard Contract contracting officer – a position requiring close familiarity with the individual provisions of the Standard Contract – as well as Mr. Zabransky's own extensive prior experience in the nuclear industry dating back to 1980, when, upon graduation from college, Mr. Zabransky joined Wisconsin Electric and Power Company as an engineer in the nuclear power department.

[7] Mr. Kouts provided more than nine pages worth of testimony that directly answered Dairyland's counsel's questions concerning this topic, in which, among other pieces of information, Mr. Kouts specifically identified numerous factors to consider in determining a "reasonable" rate of acceptance in response to Topic No. 9. A17-19 (Kouts Tr. 227:14-236:22).

Waste Policy Act pursuant to Section 302(a), which permitted DOE to issue contracts for the disposal of spent nuclear fuel:

> Mr. Shapiro: What was DOE's purpose and intent in entering into the Standard Contract?
>
> * * *
>
> Mr. Zabransky: The purpose and intent was to implement the provisions of the Nuclear Waste Policy Act.

A52 (Zabransky Tr. 129:11-18); A53 (Zabransky Tr. 131:3-6).

Dissatisfied with Mr. Zabransky's response, Dairyland's counsel then endeavored to secure from him legal conclusions consistent with its theory of the case. In response, Mr. Zabransky again emphasized DOE's understanding as to the purpose and intent for the issuance of the Standard Contracts:

> Mr. Shapiro: The Department's intent in coming up with the specific language of the Standard Contract was to, in part, to try to minimize its obligations, true?
>
> Ms. Sullivan: Objection. Legal conclusion, vague, asked and answered.
>
> Mr. Zabransky: And I don't believe that I'm prepared, as part of what I prepared for for this deposition, to answer any questions like that on what's in the Standard Contract.
>
> Mr. Shapiro: You're not prepared to discuss any issues concerning the Department's intent in entering into the – any of the terms of the Standard Contract?

| | |
|---|---|
| Ms. Sullivan: | Objection. Vague, mischaracterizes the witness' prior testimony. |
| Mr. Zabransky: | My understanding was to discuss the purpose and intent of entering into the Standard Contract, which was to fulfill the provisions of the Act. That was the request that I thought I was supposed to be talking about today. Am I misreading it? |

A53 (Zabransky Tr. 131:8-132:8).

| | |
|---|---|
| Mr. Shaprio: | So it's the Department's view that because the Nuclear Waste Policy Act authorized it to enter into contracts, that that was the extent of the Department's intent in entering into the Standard Contracts with utilities? |
| Ms. Sullivan: | Objection. Legal conclusion, vague. |
| Mr. Zabransky: | I mean, fulfilling the terms of the requirements of the Act was the reason the Department entered into the contract. |
| Mr. Shapiro: | But what provisions of the Nuclear Waste Policy Act did the Department understand it to be fulfilling by entering into the Standard Contract? |
| Ms. Sullivan: | Objection. Legal conclusion, vague. |
| Mr. Zabransky: | And I believe, without the benefit of reviewing the act, I think it's 302(a). |
| Mr. Shapiro: | What's your understanding of that part of the Nuclear Waste Policy Act? |
| Ms. Sullivan: | Objection. Legal conclusion, vague. |

| | |
|---|---|
| Mr. Zabransky: | It authorizes the Department – the Secretary to enter into contracts with owners and generators of spent nuclear fuel and high-level waste. |
| Mr. Shaprio: | That provision didn't require the Department to enter into contracts, did it? |
| Ms. Sullivan: | Objection. Legal conclusion, best evidence. |
| Mr. Zabransky: | As I said, and I'm doing it from memory, is that it authorizes the Secretary to. |
| Mr. Shapiro: | Well, what was the Department's intent to actually enter into contracts with utilities, given that the Nuclear Waste Policy Act merely authorized the entering into contracts and didn't require them? |
| Ms. Sullivan: | Objection. Legal conclusion, vague, asked and answered. |
| Mr. Zabransky: | And that was how the Department intended to fulfill the Act requirements as it saw it at the time. |

A53-A54 (Zabransky Tr. 132:20-134:19).

Similarly, Dairyland's assertions that Mr. Zabransky failed to provide responsive testimony in connection with Topic No. 7 ("DOE's understanding of the utilities' purposes and intent in entering the Standard Contracts") are unfounded. In response to the broad, generalized questions posed by Dairyland's counsel relating to Topic No. 7, Mr. Zabransky provided proper and educated responses, in which Mr. Zabransky conveyed DOE's position that the agency's general understanding of utilities' general purposes and intent in entering the Standard Contract

was reflected in the administrative record from the rulemaking proceedings, which includes DOE's official responses to the comments that it received from various utilities in the early 1980s during the formation of the Standard Contract.[8] A54 (Zabransky Tr. 136:2-138:7). Notwithstanding Mr. Zabransky's straightforward and candid testimony, at no point during the deposition did Dairyland's counsel ask any specific questions regarding the comments that Dairyland or any other utility provided to DOE during the course of the administrative rulemaking procedures. Nor did Dairyland's counsel show Mr. Zabransky any drafting history documents from the administrative record or otherwise attempt to elicit additional testimony from Mr. Zabransky relating to the contents of the administrative record.

Finally, with regard to Topic No. 14 (relating to the provisions of the Standard Contract dealing with "failed fuel," as well as DOE's plans for scheduling acceptance of failed fuel), Dairyland's contention that Mr. Zabransky was not prepared to testify concerning the subject of failed fuel is baseless and unsupported by the record. Dairyland premises its contention principally on testimonial excerpts highlighting Mr. Zabransky's inability to speak about DOE's licensing of failed fuel facilities. Plaintiff's Motion, at 9-10. As drafted by Dairyland, however, Topic No. 14 did not contemplate testimony on the subject of failed fuel licensing. Rather, it addressed "[t]he purpose and role of provisions of the Standard Contracts governing, and DOE's plans for, scheduling acceptance and acceptance of failed fuel, including failed fuel at Dairyland's site." A2. Mr. Zabransky's

---

[8] For example, DOE's specific responses to the utility industry's comments during the drafting phase of the Standard Contract are contained in the April 18, 1983 final rulemaking notice, which was published in the Federal Register and is included in the attached appendix. A74-93.

lengthy discussion of this matter occupies 25 pages of the deposition transcript. A58-64 (Zabransky Tr. 150:12-175:13). For example, the following excerpts demonstrate the extent of Mr. Zabransky's familiarity, preparedness, and responsiveness to Dairyland's counsel's inquiries pursuant to Topic No. 14:

| | |
|---|---|
| Mr. Shapiro: | Let's move on to the next topic . . . Mr. Zabransky, what's your understanding of how the Standard Contract addresses the timing of the acceptance of failed fuel? |
| Mr. Zabranksy: | [U]nder the provisions of the contract, the purchaser, the contract holder would have to apprise the Department of its failed fuel and the circumstances of its failed fuel, and seek confirmation that it can be delivered on the normal schedule. To the extent that there are technical feasibility issues associated with the picking up of that failed fuel, the Department may need to adjust the schedule of pickup. |

A58 (Zabransky Tr. 150:12-21).

| | |
|---|---|
| Mr. Zabransky: | There's an assumption on DOE's part – presumption on the DOE's part that all fuel on the DCS, delivery commitment schedule, is not failed. |
| Mr. Shapiro: | Where is that presumption evidenced? |
| Mr. Zabransky: | I believe it's in the instructions provided with the DCS form. |
| Mr. Shapiro: | That was part of Exhibit 4. Take a look and point that out to me please. |
| Mr. Zabransky: | That would be on page 3. Subparagraph h. |

A58 (Zabransky Tr. 153:11-21).

Mr. Shapiro: What's the Department's understanding as to what a utility needs to provide in a request for delivery and procedure confirmation concerning failed fuel?

Ms. Sullivan: Objection. Legal conclusion.

Mr. Zabransky: At this point, since we've never had such a request, I imagine it will wind up being a dialogue. But they need to at least tell us to start with what the fuel is, what the condition is, and what problem it's caused them, so we can evaluate if it causes us any problems.

A61 (Zabransky Tr. 162:7-18).

Mr. Zabransky: [U]ntil a utility identifies the specifics of the failure of the fuel and what the complications are or implications are for the Department, we can't make plans to accept it on a specific schedule.

Mr. Shapiro: Well, I'm talking – I'm asking more generally. Has the Department made plans for the acceptance of failed fuel from utilities?

Ms. Sullivan: Objection. Vague, asked and answered.

Mr. Zabransky: And, I guess I'll answer it from two perspectives. From a technical basis there is no such thing as a general request for receipt of failed fuel. It's all specific. From a contractual purpose, our plans are the provisions we have in the contract.

Mr. Shapiro: Well, the Department has been planning for many years for the acceptance of failed fuel from the utilities, correct?

Ms. Sullivan: Objection. Vague, mischaracterizes the witness' prior testimony.

Mr. Zabransky: And, again, sir, as I said, the process is established. The specifics need to be evaluated before the Department – the Department's plans are to evaluate the specifics and determine whether or not there's a reason – any basis that the schedule would need to be adjusted. Beyond that, to discuss failed fuel, you need to discuss it in the absolute of what assembly and what condition. There's no such thing as a general, this failed fuel is okay. So when presented with a question from the utility, the purchaser, the Department will evaluate it and determine what schedule it can be accepted on.

Mr. Shapiro: The Department has made no effort to get its arms around the situation, to be prepared to accept failed fuel from the utilities?

Ms. Sullivan: Objection. Vague, asked and answered, mischaracterizes the witness' prior testimony.

Mr. Zabransky: Again, the Department has requested information from utilities. They provided some information. But no utility has availed itself of the ability to ask the Department about specific assemblies.[9]

A62 (Zabransky Tr. 167:11-169:14).

[9] Dairyland avers that Mr. Zabransky did not provide credible testimony regarding this issue because, during discovery in this case, Dairyland produced to "the government" a study characterizing its spent nuclear fuel. Plaintiff's Motion, at 10. However, as Dairyland is well aware, the "study" was not produced to DOE, but, rather, to the Department of Justice in the context of this litigation. Plaintiff's Motion, at 10-11 (citing Dairyland's "study," produced in this case at Bates number PDPC0007773-PDPC0007809). Because DOE has not received Dairyland's fuel characterization study in the ordinary course of agency business, it is disingenuous for Dairyland to suggest that Mr. Zabransky failed to testify credibly under oath.

## III. THE GOVERNMENT'S COUNSEL INSTRUCTED MR. ZABRANSKY NOT TO ANSWER CERTAIN DISCRETE QUESTIONS PURSUANT TO VALID INVOCATIONS OF THE DELIBERATIVE PROCESS PRIVILEGE, ATTORNEY-CLIENT PRIVILEGE, AND THE WORK PRODUCT DOCTRINE

### A. Assertion of Deliberative Process Privilege

Dairyland's motion challenges the Government's invocation of the deliberative process on three instances during Mr. Zabransky's deposition in which Dairyland's counsel sought testimony concerning (1) DOE's recent development of new contracts for the disposal of spent nuclear fuel from future nuclear reactors; (2) DOE's deliberations concerning Transportation, Aging and Disposal Canister Systems ("TADs") for use under the Standard Contract; and (3) the involvement of Government contractor Booz Allen Hamilton ("Booz Allen") in connection with Transportation issues, including the implementation of TADs. Plaintiff's Motion, at 11-12, 16-19. As Dairyland is aware, however, counsel for the Government's instructions at the deposition were made pursuant to a formal declaration of deliberative process privilege issued by Mr. Alan Brownstein, the Chief Operative Officer for OCRWM within the Department of Energy.[10] A36 (Zabransky Tr. 62:2-7); A26 -27 (Zabransky Tr. 24:15-27:7). Mr. Brownstein's declaration, which was executed on May 1, 2007, prior to Mr. Zabransky's deposition, specifically asserts

[10] Pursuant to a formal delegation by the Secretary of Energy to the Under Secretary of Energy, Science and Environment, and a subsequent formal redelgation from the Under Secretary to the Director of OCRWM, the Director of OCRWM or his delegate has responsibility for asserting the Government's deliberative process privilege related to agency action within OCRWM. A94-105; A106-108. By delegation executed by the Director of OCRWM, Ward F. Sproat, on April 27, 2007, Mr. Brownstein has been delegated responsibility to assert deliberative process over documents or deposition responses within the cognizance of OCRWM. A109-112. A copy of Mr. Sproat's delegation, as well as Mr. Brownstein's formal declaration of deliberative process privilege, are attached. A109-118. Counsel for the Government informed Dairyland's counsel of Mr. Brownstein's declaration both during Mr. Zabransky's deposition and during the parties' "meet and confer" prior to the filing of Dairyland's motion. A14-16; A26-27; A36.

deliberative process privilege upon behalf of DOE to preclude testimony relating to the precise areas of inquiry concerning which Mr. Zabransky was instructed not to answer at his deposition, namely "any possible amendment to the Standard Contract for Transport, Aging and Disposal ("TAD") canisters including any discussion or analysis regarding possible amendments for the acceptance of TADs or canistered fuel from Standard Contract holders," as well as testimony regarding "any possible new contracts for new reactors, including any discussion or analysis of a new contract or amendments to the Standard Contract for new reactors." A116-117.

B. Assertion of Attorney-Client Privilege and Work Product Doctrine

Dairyland also challenges the Government's invocation of attorney-client privilege and the work product doctrine on one instance during Mr. Zabransky's deposition in which Dairyland's counsel sought testimony from Mr. Zabransky (in his individual capacity, and not as a RCFC 30(b)(6) designee) concerning his knowledge as to whether the costs incurred by utilities to date, including Dairyland, for spent nuclear storage matters have been "reasonable." As Mr. Zabransky and the Government's counsel explained during his deposition, any knowledge concerning such an area of inquiry derives from his work at the instruction of – and under the guidance of – counsel during the course of the continuing spent nuclear fuel litigation. A30-34 (Zabransky Tr. 39:2-55:5). Further, notwithstanding the instruction of Government's counsel, Mr. Zabransky, in fact, provided responsive testimony to Dairyland's inquiries in this regard, as Mr. Zabransky testified at his deposition that, "without knowing the specifics" as to the costs that each utility has incurred to date, he was unable to assess the reasonableness of their costs. A31 (Zabransky Tr. 44:10-16); A32 (Zabransky Tr. 47:10-17). With regard to Dairyland's costs in particular, Mr. Zabransky testified that he "had no idea what costs [Dairyland] occurred," and,

thus, he did not possess sufficient knowledge to testify as to whether such expenditures were "reasonable or unreasonable" under the circumstances.[11] A32 (Zabransky Tr. 47:19-49:22).

SUMMARY OF ARGUMENT

Dairyland's extraordinary request for sanctions in connection with the Rule 30(b)(6) depositions of Messrs. Kouts and Zabransky is without merit. With regard to Mr. Kouts' deposition, he provided responsive and educated testimony sufficient to satisfy Topic Nos. 18 and 19 concerning the agency's limited understanding, based upon information that DOE receives in the ordinary course of its affairs, as to the costs that Dairyland and other utilities have incurred in connection with spent nuclear fuel storage and related studies and analysis. The Government is not precluded from presenting expert testimony at trial (in the form of, for example, an accounting critique) to challenge certain of the specific expenditures that Dairyland seeks in this litigation upon an issue ultimately to be decided by the Court, as such expertise is beyond the scope of DOE's knowledge or Mr. Kouts' knowledge as a Rule 30(b)(6) designee and fact witness.

With regard to Mr. Zabransky's RCFC 30(b)(6) testimony, Dairyland erroneously asserts that Mr. Zabransky failed to provide responsive testimony concerning Topic No. 9 ("A reasonable annual rate of acceptance"), a topic for which Mr. Zabransky was never designated by the Government to testify as its representative. Concerning the remaining deposition topics at issue, the record reflects that Mr. Zabransky, in fact, provided responsive and educated testimony concerning Topic Nos. 6 ("DOE's purpose and intent in entering the Standard Contracts"), 7

[11] Because Mr. Zabransky was not designated by the Government pursuant to RCFC 30(B)(6) to testify on the Government's behalf concerning this topic, he was under no obligation to prepare himself to testify as to such matters in anticipation of his deposition.

("DOE's understanding of the utilities' purpose and intent in entering the Standard Contract"), and 14 ("The purpose and role of provisions of the Standard Contracts governing and DOE's plans for, scheduling acceptance and acceptance of failed fuel, including failed fuel at Dairyland's site"). Accordingly, because Messrs. Kouts and Zabransky testified responsively to the topics for which they were designated, and given that Messrs. Kouts Zabransky acted in good faith in testifying as RCFC 30(b)(6) designees and otherwise did not act to disrupt Dairyland's right to discovery, there is no basis for the imposition of sanctions against the United States.

In addition, because the Government asserted valid claims of deliberative process privilege, attorney-client privilege, and attorney work product doctrine during Mr. Zabransky's deposition, Dairyland's request to re-open Mr. Zabransky's deposition for a limited purpose should be denied.

## ARGUMENT

### I. DAIRYLAND'S REQUEST FOR SANCTIONS SHOULD BE DENIED, AS THE GOVERNMENT'S RCFC 30(b)(6) DESIGNEES WERE ADEQUATELY PREPARED, PROVIDED RESPONSIVE TESTIMONY AS TO THE TOPICS FOR WHICH THEY WERE DESIGNATED, AND OTHERWISE DID NOT ACT IN BAD FAITH IN AN EFFORT TO OBSTRUCT DISCOVERY

According to Dairyland, because Messrs. Kouts and Zabransky "failed to testify for a number of topics" for which they were designated, the Court should grant Dairyland the extraordinary relief of "prohibit[ing] the government from offering evidence at trial on those issues." Plaintiff's Motion, at 2. Because the topics at issue in Dairyland's motion relate to such broad and overarching issues as "DOE's purpose and intent in entering the Standard Contracts" (Topic No. 6) and "[a] reasonable annual rate of acceptance for spent nuclear fuel under the Standard Contracts" (Topic No. 9), Dairyland essentially requests that the Government not be

permitted to present its case at trial, effectively resulting in a default judgment against the United States. Dairyland's extraordinary request for sanctions is unsupported by the applicable facts and law, and the Court should deny outright Dairyland's attempt to deprive the Government of its right to present its case at trial.

An organization named as a deponent pursuant to Rule 30(b)(6) "shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf," and such designee must testify "as to matters known or reasonable available to the organization." RCFC 30(b)(6). Thus, in the Federal courts, an individual designated to testify pursuant to Rule 30(b)(6) is required to testify "to the knowledge of the corporation, not the individual." See Poole v. Textron, Inc., 192 F.R.D. 494, 504 (D. Md. 2000) (emphasis in original). Hence, a Rule 30(b)(6) designee "does not give his personal opinions," but, rather, he presents the organization's "position" with respect to the topics at issue in the subject Rule 30(b)(6) deposition notice. United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996) (citing cases).

Rule 30(b)(6) also imposes an obligation upon the party propounding the deposition notice to "describe with reasonable particularity the matters on which examination is requested." RCFC 30(b)(6) (emphasis added). "The responding party 'must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the interrogator] and to prepare those persons in order that they can answer fully, completely, unevasively, the question posed by [the interrogator] as to the relevant subject matters.'" Prokosch v. Catalina Lighting, Inc., 193 F.R.D. 633, 638 (D. Minn. 2000). For the Rule to function effectively, the requesting party "must take care to designate, with painstaking specificity, the particular subject

areas that are intended to be questioned, and that are relevant to the issues in dispute." Id. (emphasis added). "An overbroad Rule 30(b)(6) notice subjects the noticed party to an impossible task." Reed v. Bennett, 193 F.R.D. 689, 692 (D. Kan. 2000).

In this regard, Rule 30(b)(6) does not require the designee to speculate as to unknown matters, or to investigate each fact potentially relevant to a described topic that may be known by any employee of the organization. See Banks v. Office of the Senate Sergeant-at-Arms, 241 F.R.D. 370, 373, 375 (D.D.C. 2007) (a Rule 30(b)(6) designee must be prepared to testify as to matters that are "*reasonably available*" to the organization and is thus not required to "conduct detailed independent investigations beyond what is reasonably known to company" ) (emphasis in original). Nor must a Rule 30(b)(6) witness provide definitive answers to every single question asked during the deposition, especially when the deposing party's remaining inquiries are resolved through other discovery. See, e.g., Static Control Components, Inc. v. Lexmark Intern., Inc., No. Civ. A 04-84-KSF, 2006 WL 3702464, * 3 (E.D. Ky. Dec. 13, 2006) (even if RCFC 30(b)(6) designee did not provide responsive testimony, refusing to impose sanctions where deposing party had received answers from other means of discovery). In addition, because a Rule 30(b)(6) is a fact witness, questions designed to elicit what amounts to expert testimony from a Rule 30(b)(6) designee whom the entity has not also designated as an expert are inherently improper. United States v. Dianon Systems, Inc., 240 F.R.D. 40, 42 (D. Conn. 2006) (Rule 30(b)(6) designee not required to provide testimony that could be interpreted to "bless or condemn the trial opinions rendered by the parties' experts").

Thus, in determining whether a Rule 30(b)(6) designee has met his or her obligation to testify as to "matters known or reasonably available to the organization," a "rule of reason

applies." Banks, 241 F.R.D. at 373. As a consequence, the mere "inability to fully testify on all topics set forth in a Rule 30(b)(6) notice is not tantamount to a complete failure of a corporate designee to appear that would justify sanctions." Belmont Holdings Corp. v. Unicare Life & Health Insurance Co., No. 98-2365, 2000 WL 1920039, at *2 (E.D. Pa. Dec. 1, 2000) (citation omitted). Rather, a party seeking to impose discovery sanctions against a responding party pursuant to Rule 37(b) in connection with a party's alleged failure to discharge adequately the requirements of Rule 30(b)(6) must demonstrate that the violating party "acted willfully or in bad faith to obstruct discovery." United States v. Massachusetts Industrial Finance Agency, 162 F.R.D. 410, 412 (D. Mass. 1995); see Boland Marine & Mfg. Co., Inc. v. M/V Bright Field, No. 97-3087, 1999 WL 280541, at *3 (E.D. La. May 3, 1999) (refusing to impose discovery sanctions where party made a good-faith effort to prepare the Rule 30(b)(6) designee to testify, notwithstanding the fact that the designee was unable to answer certain questions posed by counsel during the deposition).

In this case, the record of deposition testimony indicates that the Government's designees adequately discharged their obligations pursuant to RCFC 30(b)(6). As discussed previously, Messrs. Kouts and Zabransky provided complete, honest, and educated testimony in connection with the topics for which they were designated, and Dairyland otherwise does not allege that the Government or its designees in any way "acted willfully or in bad faith to obstruct discovery." Massachusetts Industrial, 162 F.R.D. at 412.[12] Specifically, with regard to Topic Nos. 18 ("The

[12] Although Dairyland asserts that there is "ample authority" to support the extraordinary relief that it seeks in its motion, the only specific authority to which Dairyland cites is Black Horse Lane Associates v. Dow Chemical Corp., 228 F.3d 272 (3rd 2000). Black Horse is wholly inapposite to the facts at issue here. In Black Horse, a party's Rule 30(b)(6) designee failed to appear for his deposition, notwithstanding the fact that the deposition had been ordered by the

reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1999") and 19 ("The reasonableness or unreasonableness of Dairyland's study, analysis investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998"), Mr. Kouts – a senior DOE official with nearly 30 years of relevant agency experience – testified that DOE does not collect cost data in the ordinary course concerning a given utility's incurred expenditures in connection with spent nuclear fuel storage costs and that, as a consequence, the agency does not posses any information upon which to base a determination as to the "reasonableness or unreasonableness" of the costs that Dairyland has incurred for spent nuclear fuel storage, studies, analyses, or other related costs.[13] A8A-8F; A9-13.

---

trial court. Id. at 280. The trial court again ordered the Rule 30(b)(6) designee to appear at a deposition. Although he had been ordered twice by the court to testify, the designee, who himself was a lawyer and member of the bar, testified during the second deposition that he was unaware that he was the party's designated representative and that he had not even bothered to read the relevant deposition notice listing the topics for which he had been designated prior to the deposition. Id. at 300, 305. In addition, although the designee was personally involved with the underlying facts at issue in the case, he provided "as little information as possible" in response to each of opposing counsel's questions. Id. at 305. Under those circumstances, the United States Court of Appeals for the Third Circuit affirmed the lower court's finding that the designee had acted intentionally with "flagrant disregard for obligation as a Rule 30(b)(6) witness." Id. at 304. Accordingly, the Black Horse court affirmed the lower court's award of the requested sanctions, which operated to preclude the violating from asserting a position and introducing evidence contrary to the positions asserted by the Rule 30(b)(6) designee during his deposition. Id. at 281, 305. Here, however, Messrs. Kouts and Zabransky acted in good faith in providing responsive testimony, and their conduct otherwise comes nowhere near the "flagrant disregard" exhibited by the Rule 30(b)(6) designee in Black Horse.

[13] In addition, consistent with Mr. Kouts's testimony, in the Government's supplemental responses to Dairyland's Interrogatory No. 15, the Government clearly provided its position with respect to the "reasonableness" of Dairyland's costs for spent fuel storage. A154-55. Accordingly, because Dairyland has received answers to its questions concerning the reasonableness of costs from two sources – Mr. Kouts and the Government's supplemental interrogatory responses – Dairyland should not be entitled to the relief that it seeks here. See,

Notwithstanding Mr. Kouts' responsive testimony, and as Dairyland itself recognizes, during the parties' "meet and confer" prior to the filing of Dairyland's motion, the Government was willing, in an effort to avoid the Court's intervention with this matter, to stipulate that DOE's spent nuclear fuel program office has no basis to dispute the "reasonableness" of the costs that Dairyland has incurred to date with regard to spent nuclear fuel storage, studies, and related costs, given that DOE does not collect and process this data in the ordinary course of its affairs, while reserving the right to offer expert testimony to critique (from an accounting perspective, for example) the costs that Dairyland seeks to recover against the United States in this litigation. Plaintiff's Motion, at 14. Dairyland refused the Government's proposed accommodation, however, and now effectively seeks to prevent the Government from offering expert critiques of costs that Dairyland seeks to recover from the United States in this litigation. Dairyland's efforts are nothing more than an attempt to interpret Mr. Kouts's testimony in such a way as to "bless or condemn the trial opinions rendered by the parties' experts," which is improper under Rule 30(b)(6). Dianon Systems, Inc., 240 F.R.D. at 42. Mr. Kouts, as a lay fact witness, was not in a position to provide conclusory opinions as to the validity of the SNF-related costs that Dairyland has incurred to date. As Mr. Kouts testified, from his perspective as a DOE program officer, he simply lacks information from the agency sufficient to determine whether the disputed costs are reasonable. Dairyland has received expert reports and productions from all three of the Government's experts, each of whom it has deposed as of this date, and each of whom has a

---

e.g., Static Control Components, Inc. v. Lexmark Intern., Inc., No. Civ. A 04-84-KSF, 2006 WL 3702464, * 3 (E.D. Ky. Dec. 13, 2006) (even if Rule 30(b)(6) does not provide responsive testimony, refusing to impose sanctions where deposing party had received answers from other means of discovery).

separate critique to offer of Dairyland's damages calculations – based upon their relevant experience in the fields of accounting, economics, and engineering, respectively. Thus, Dairyland cannot in good faith claim ignorance as to the Government's position on the specific critique of Dairyland's damages calculation that the Government will articulate at trial.

Pursuant to Rule 30(b)(6), Mr. Kouts was only required to testify regarding matters within his personal knowledge or reasonably known by his agency, DOE. See RCFC 30(b)(6) (persons designated from governmental agency shall testify as to matters "reasonably available to the organization"); Banks, 241 F.R.D. at 373-75. He was not required to issue an expert opinion or otherwise to engage in a detailed investigation of the materials reviewed by the Department of Justice attorneys involved in handling this litigation or the expert witnesses whom the Department of Justice has retained for this matter.[14] Absent personal or agency knowledge relating to deposition Topics Nos. 18 and 19, Mr. Kouts could not reasonably be expected to testify as to the substance of such matters. See RCFC 30(b)(6); Banks, 241 F.R.D. at 375 (criticizing expectation that 30(b)(6) witness conduct detailed investigations beyond what was reasonably known to entity as "[t]hat, in essence, would be to investigate Plaintiff's case for him."). Because Mr. Kouts testified as to the agency's understanding of these topics, based upon his own preparation and experience as a DOE senior official, and given that Dairyland does not, and cannot, assert that either the Government or Mr. Kouts acted in bad faith or otherwise attempted to "obstruct discovery," Dairyland's request for sanctions is without merit. Massachusetts Industrial, 162 F.R.D. at 412.

[14] In fact, as previously mentioned, even Dairyland's counsel recognized that Dairyland recently provided the organization's spent fuel storage cost data to the Department of Justice, not to DOE, for purposes of the litigation. A9.

Similarly, with regard to the testimony provided by Mr. Zabransky in his capacity as a RCFC 30(b)(6) designee, as demonstrated previously, Mr. Zabransky provided educated and complete responses to the questions posed by Dairyland's counsel. As an initial matter, as discussed previously, with regard to Dairyland's complaint that Mr. Zabransky failed to provide responsive testimony to Topic No. 9 ("A reasonable annual rate of acceptance for spent fuel under the Standard Contracts, and the factors to consider in determining a reasonable rate"), we note that, by letter dated March 9, 2007, the Government expressly designated Mr. Kouts, not Mr. Zabransky, to testify as to this Topic. A4. Therefore, Mr. Zabransky was under no obligation to prepare himself to testify concerning Topic No. 9, and Dairyland otherwise does not challenge the sufficiency of the extensive testimony concerning Topic No. 9 that Mr. Kouts provided during his deposition on May 1, 2007.[15] Accordingly, Dairyland's motion with respect to Topic No. 9 is utterly without merit and should be denied by this Court.

With regard to the remaining topics at issue, Mr. Zabransky provided educated and complete responses to the questions posed by Dairyland's counsel. For example, as discussed previously, concerning Topic No. 6, Mr. Zabransky testified that "DOE's purpose and intent in entering the Standard Contract" was to implement the provisions of the Nuclear Waste Policy Act, and that, at the time the Act was passed in 1982, the agency felt that, by entering into

[15] Mr. Kouts provided no less than nine pages worth of testimony that directly answered Dairyland's counsel's questions concerning this topic, in which, among other pieces of information, Mr. Kouts specifically identified numerous factors to consider in determining a "reasonable rate of acceptance" in response to Topic No. 9. A17-19. Indeed, Dairyland does not challenge Mr. Kouts's testimony concerning this issue in its motion.

standard contracts with nuclear utilities, the agency was fulfilling the intent of the Act.[16] A52-54. Similarly, with regard to Topic No. 7 ("DOE's understanding of the utilities purposes and intent in entering the Standard Contracts"), Mr. Zabransky conveyed DOE's position that the agency's general understanding of utilities' general purposes and intent in entering the Standard Contract was reflected in the administrative record from the rulemaking proceedings, which includes DOE's official responses to the comments that it received from various utilities in the early 1980s during the formation of the Standard Contract. A54. Finally, with regard to Topic No. 14 (relating to the provisions of the Standard Contract dealing with "failed fuel," as well as DOE's plans for scheduling acceptance of failed fuel), Mr. Zabransky testified that, under the agency's understanding of the Standard Contract, the individual utility is obligated to appraise DOE as to the specifics of its failed fuel and that, "[t]o the extent that there are technical feasibility issues associated with the picking up of that failed fuel, the Department may need to adjust the schedule of pickup." A58; see A59-64.

---

[16] To the extent that Mr. Zabransky or Mr. Kouts was unable to provide Dairyland with a definitive answer in response to certain questions that Dairyland's counsel posed during their depositions, such a fact alone does not entitle Dairyland to seek sanctions pursuant to RCRC 37(d), particularly given that the Government and its designees made a good faith effort to prepare properly for the depositions. See, e.g., Boland Marine & Mfg. Co., Inc. v. M/V Bright Field, No. 97-3087, 1999 WL 280541, at *3 (E.D. La. May 3, 1999) (refusing to order party to re-produce Rule 30(b)(6) designee where party made a good-faith effort to prepare the designee to testify, notwithstanding the fact that the designee was unable to answer certain questions posed by counsel during the deposition). Indeed, to the extent that Dairyland intended to ask certain specific questions of the Government's designee(s), Dairyland should have narrowed its Rule 30(b)(6) deposition notice to reflect with specificity the areas of inquiry regarding which it sought to depose the Government. See, e.g., Prokosch v. Catalina Lighting, Inc., 193 F.R.D. 633, 638 (D. Minn. 2000) (for Rule 30(b)(6) to function effectively, the requesting party "must take care to designate, with painstaking specificity, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute") (emphasis added).

Further, Dairyland's contention that Mr. Zabransky was not prepared to testify is not supported by the record. As Mr. Zabransky himself testified, he spent multiple days over the course of "several weeks" preparing for his deposition and educating himself as to DOE's position and understanding concerning the nine topics for which he was designated. A72 (Zabransky Tr. 208:1-19). Because Mr. Zabransky provided responsive testimony to Topic Nos. 6, 7, and 14 and otherwise testified competently as the Government's RCFC 30(b)(6) designee with regard to the remaining topics for which he was designated, and given the extensive amount of time that he spent preparing for the depositions and his unique status and experience as DOE's Contracting Officer with regard to the Standard Contract, Mr. Zabransky properly discharged his obligations pursuant to RCFC 30(b)(6). As a consequence, Dairyland is not entitled to the severe remedy that it seeks in its motion, given that, pursuant to RCFC 37(b), there is simply no indication from the record that either Mr. Zabransky or Mr. Kouts "acted willfully or in bad faith to obstruct discovery." Massachusetts Industrial Finance Agency, 162 F.R.D. at 412; see Boland Marine, No. 97-3087, 1999 WL 280541, at *3.

## II. BECAUSE THE GOVERNMENT'S ASSERTED VALID CLAIMS OF DELIBERATIVE PROCESS PRIVILEGE, ATTORNEY-CLIENT PRIVILEGE, AND ATTORNEY WORK PRODUCT DOCTRINE DURING MR. ZABRANSKY'S DEPOSITION, DAIRYLAND'S REQUEST TO RE-OPEN MR. ZABRANSKY'S DEPOSITION IS WITHOUT MERIT

### A. The Government's Invocation Of Deliberative Process Privilege Was Proper

In its motion, Dairyland challenges the Government's invocation of the deliberative process relate to three instances during Mr. Zabransky's deposition in which Dairyland's counsel sought testimony concerning (1) DOE's development of new contracts for the disposal of spent nuclear fuel from new nuclear reactors that might open in the future, (2) DOE's deliberations

concerning Transportation, Aging and Disposal Canister Systems ("TADs") for use under the Standard Contract, and (3) the involvement of Government contractor Booz Allen in connection with the implementation of TADs and other related contract administration issues. Plaintiff's Motion, at 11-12, 16-19. As relief, Dairyland requests that the Court compel Mr. Zabransky to appear for an additional deposition to provide testimony concerning the above subjects concerning which the Government instructed Mr. Zabransky not to answer during his May 3, 2007 deposition.

Dairyland's position fails as a matter of fact and law. "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." Dep't of Interior & Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9, (2001). As this Court recently held, the deliberative process privilege is designed to "protect against premature disclosure of proposed policies before they have been finally formulated or adopted" as well as to protect against confusing the issues and misleading the public by dissemination of information "suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." Dairyland Power Cooperative v. United States, 77 Fed. Cl. 330, 336 (2007). When applicable, the deliberative process privilege protects from disclosure both documentary and testamentary evidence that reflect agency deliberations or policy matters in the decision-making process. See Miller v. Mehltretter, 478 F. Supp. 2d 415, 429-30 (N.D.N.Y. 2007) (deliberative process privilege barred Federal agent's decision-making testimony); Startzell v. City of Philadelphia, No. 05-05287, 2006 WL 2945226, at *3-4 (E.D. Pa. Oct. 13, 2006) (refusing to compel testimony of government official regarding certain discrete topic

where counsel validly instructed witness not to answer question at deposition); see also Flamingo Fishing Corp. v. United States, 31 Fed. Cl. 655, 657-58 (1994) (granting Government's motion for a protective order to prevent deposition of Federal agents upon basis of executive privilege, among other reasons).

This Court has identified three procedural requirements for assertion of the privilege: (1) the agency head must assert the privilege after personal consideration; (2) the agency head must state "with particularity" the information subject to the privilege; and (3) the agency must aver "precise and certain reasons for preserving the confidentiality of the requested information." Dairyland, 77 Fed. Cl. at 336-37 (citations omitted). Further, an agency head may, when carefully undertaken, delegate authority to invoke the privilege on the agency's behalf." Marriott Int'l Resorts, L.P. v. United States, 437 F.3d 1302, 1308 (2006). In addition to the procedural requirements, the information sought must itself meet two substantive tests: it must be both pre-decisional and deliberative in nature. Dairyland, 77 Fed. Cl. at 337 (citation omitted). Notwithstanding the applicability of the deliberative-process privilege, the privilege can be overcome, but only upon a showing of evidentiary need weighed against the harm that may result from disclosure. Id. (citing CACI Field Serv., Inc. v. United States, 12 Cl. Ct. 680, 687) (1987)).

Here, the Government's invocation of deliberative process privilege meets the above criteria, and Dairyland otherwise has not provided the Court with any basis to overcome the privilege. As Dairyland is aware, however, counsel for the Government's instructions not to answer were made pursuant to a formal declaration of deliberative process privilege issued by Mr. Alan Brownstein, the Chief Operative Officer for OCRWM within DOE. Mr. Brownstein's declaration, which was executed on May 1, 2007, prior to Mr. Zabransky's deposition,

specifically asserts deliberative process privilege upon behalf of DOE to preclude testimony relating to the precise areas of inquiry concerning which Mr. Zabransky was instructed not to answer at his deposition, namely "any possible amendment to the Standard Contract for Transport, Aging and Disposal ('TAD') canisters including any discussion or analysis regarding possible amendments for the acceptance of TADs or canistered fuel from Standard Contract holders," as well as testimony regarding "any possible new contracts for new reactors, including any discussion or analysis of a new contract or amendments to the Standard Contract for new reactors."[17] A116-117.

In his declaration, Mr. Brownstein, as the Chief Operative Officer of OCRWM, attests to his familiarity with regard to all aspects of DOE's civilian waste management program, and he further provides "precise and certain reasons for preserving the confidentiality of the requested information" that demonstrate the "pre-decisional and deliberative" nature of the information at issue. Dairyland, 77 Fed. Cl. at 337. Specifically, among other reasons, Mr. Brownstein indicates that, because DOE is actively engaged in consideration of the TAD initiative as well as the possibility of new contracts or amendments to the Standard Contract for new reactors, DOE decisionmakers will no longer be able to obtain frank advice from OCRWM personnel (such as Mr. Zabransky) that are called to testify as to such matters because these individuals "will not enjoy the benefit of providing such recommendations without the glare of public scrutiny."

[17] These are precisely the topics concerning which Mr. Zabransky was instructed not to answer during his deposition on the grounds of deliberative process privilege. A26 -27 (Zabransky Tr. 24:15-27:7); A36 (Zabransky Tr. 62:2-7);. The Government's instruction concerning the involvement of Government contractor Booz Allen falls within these subjects. As Mr. Zabransky testified, Booz Allen is currently engaged in assisting the Government in developing the TAD program and other related contract administration matters. A26-27 (Zabransky Tr. 24:15-27:7).

A117. Further, Mr. Brownstein indicates that protection from disclosure is necessary in this context because the "environment in which OCRWM personnel operate will become further stifled in that employees will be reluctant to provide their frank advice and opinions" and that disclosure of testimony "would thwart the Federal Government's decision-making functions because such disclosure would tend to inhibit the frank and candid discussion necessary to effective government." A117. Because Mr. Brownstein's declaration identifies with particularity the pre-decisional and deliberative information to be protected, as well as the reasons why protection from disclosure is necessary, the agency's assertion of deliberative process conforms with the standards articulated by this Court and thus constitutes a valid assertion of the privilege.

In its motion, Dairyland cites to no legal authority as a basis for its challenge of the Government's assertion of the deliberative process, and Dairyland otherwise provides no support whatsoever for its blanket statement that the Government's interest in shielding disclosure of the subject information is "likely outweighed by Dairyland's need for the information in this litigation." Plaintiff's Motion, at 17. Rather, Dairyland baldly asserts that the Government's invocation of privilege is improper here simply because there are no "governmental interests at stake." Id. According to Dairyland, the Government's purpose in asserting the deliberative process privilege is to "shield the government's commercial interests" in connection with DOE's plans to cite a disposal facility for spent nuclear fuel. Id. This argument is without merit. As the Court is well aware, and as articulated in Mr. Brownstein's declaration, DOE's actions in establishing a national repository for spent nuclear fuel is a matter of the utmost national interest and importance, and, pursuant to the Nuclear Waste Policy Act, DOE's role in creating this

program constitutes a uniquely governmental function pursuant to the Nuclear Waste Policy Act. Because Dairyland fails to provide a basis to upset the assertion of deliberative process privilege in this instance, the Court should deny Dairyland's request to compel Mr. Zabransky to provide testimony concerning the information at issue.

B. The Government's Invocation of the Attorney-Client Privilege And Work Product Doctrine Were Valid, And Mr. Zabransky Otherwise Provided Responsive Testimony Concerning The Subject Matter At Issue

Dairyland also challenges the Government's invocation of attorney-client privilege and the work product doctrine on one instance during Mr. Zabransky's deposition in which Dairyland's counsel sought testimony from Mr. Zabransky in his individual capacity (and not as a RCFC 30(b)(6) designee) concerning his personal knowledge as to whether the costs incurred by utilities to date, including Dairyland, for spent nuclear storage matters have been "reasonable."[18] As Mr. Zabransky and the Government's counsel explained during his deposition, the entirety of his knowledge concerning the reasonableness of costs derives from his work at the instruction of – and under the guidance of – the Government's counsel in anticipation of the continuing spent nuclear fuel litigation. A30-34 (Zabransky Tr. 39:2-55:5). For Mr. Zabransky to testify as to his understanding of such costs, Mr. Zabransky would inevitably be forced to divulge the substance of communications between Mr. Zabransky and legal counsel as

[18] Dairyland erroneously asserts that counsel for the Government instructed Mr. Zabransky not to answer questions concerning the reasonableness of costs upon the basis of "relevance" and Fed. R. Ev. 408 (which Dairyland characterizes as a "subset of the relevance rule"). Plaintiff's Motion, at 18-19. However, during the deposition, the Government's counsel expressly indicated that the specific grounds for the instruction to Mr. Zabransky were attorney-client privilege and work product doctrine – and not relevance. A31 (Zabransky Tr: 42:11-14). Therefore, we do not address Dairyland's arguments concerning the appropriateness of relevance as a basis for an instruction not to answer, as Dairyland's discussion of this issue is inapplicable.

well as the details of certain analyses that he performed at the direction of counsel in connection with settlement negotiations during the course of continuing spent nuclear fuel litigation. As such, the attorney-client privilege or work product doctrine should apply to protect the substance of these discussions.

Notwithstanding the application of privilege in this instance, however, Mr. Zabransky, in fact, provided responsive testimony to Dairyland's inquiries in this regard, as Mr. Zabransky testified at his deposition that he did not know the "specifics" as to the costs that each utility has incurred to date and that, as a consequence, he was unable at his deposition to assess the reasonableness of their costs. A44. With regard to Dairyland's costs in particular, Mr. Zabransky testified that he "had no idea what costs [Dairyland] occurred," and, thus, he did not possess sufficient knowledge to render an opinion as to whether such expenditures were "reasonable or unreasonable" under the circumstances. A48, 49-50. Accordingly, because Dairyland received responsive testimony from Mr. Zabransky, Dairyland was in no sense prejudiced by the Government's invocation of privilege, and, therefore, the Court should deny Dairyland's motion to re-open Mr. Zabransky's deposition.[19]

---

[19] As a separate basis to deny Dairyland's motion concerning the Government's invocation of attorney-client privilege and work product doctrine, Dairyland also received responsive testimony from Mr. Kouts concerning the Government's position as to the reasonableness of costs that utilities have incurred for spent nuclear fuel storage, as discussed previously in this brief. In addition, in the Government's supplemental responses to Dairyland's Interrogatory No. 15, the Government provided its position with respect to the "reasonableness" of Dairyland's costs for spent fuel storage. A154-55. Accordingly, because Dairyland has received answers to its questions concerning the reasonableness of costs from two sources – Mr. Kouts and the Government's supplemental interrogatory responses – Dairyland should not entitled to the relief that it seeks here. <u>See, e.g., Static Control Components, Inc. v. Lexmark Intern., Inc.</u>, No. Civ. A 04-84-KSF, 2006 WL 3702464, * 3 (E.D. Ky. Dec. 13, 2006) (even if fact witness does not provide responsive testimony, refusing to impose sanctions where deposing party had received answers from other means of discovery).

## CONCLUSION

For the above reasons, the Court should deny Dairyland's "Motion For Relief For Government Discovery Violations Regarding Rule 30(b)(6) Deposition Testimony," dated July 18, 2007.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell A. Shultis
RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 305-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT C. SLATER
Trial Attorneys
U.S. Department of Justice

August 17, 2007

Attorneys for Defendant