# APPENDIX

Greenberg
Traurig

Jerry Stouck
Tel. 202.331.3173
Fax 202.331.3101
stouckj@gtlaw.com

December 13, 2006

*VIA E-MAIL, FAX AND US MAIL*

Russell Shultis
Department of Justice
Commercial Litigation Branch
Civil Division – Classification Unit
8th Floor Mailroom
1100 L Street, NW
Washington, D.C. 20530

*Re: Dairyland Power Cooperative vs. United States, No. 04-106C*

Dear Russ:

As requested in your December 6, 2006 letter, enclosed is a list of topics for the Rule 30(b)(6) deposition we want to take in this case. Please let us know whether the government is agreeable to this deposition, and if so, we will schedule it for some time during the first two weeks of February.

Based your response to our request for other depositions, we anticipate the government likely will oppose this one as well and will proceed on that basis unless we hear to the contrary.

Sincerely,

Jerry Stouck

JS/

Enclosure

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH
*Strategic Alliance
Tokyo-Office/Strategic Alliance



A 1

EXHIBIT A

1. The purpose and role of Delivery Commitment Schedules ("DCS") and Final Delivery Schedules under the Standard Contracts.

2. The purpose and role of instructions DOE has issued for completing DCSs, including the instructions issued in 1991 and in 2004.

3. DOE's responses to DCS forms submitted by the utility plaintiffs, including DOE's decision to stop approving such DCS forms.

4. The purpose and role of Annual Capacity Reports and Acceptance Priority Rankings under the Standard Contracts and the development of and basis for the acceptance rates contained therein.

5. The rate(s) of acceptance that DOE planned to use under the Standard Contracts (a) before DOE determined that it would not begin accepting spent fuel in a permanent repository in 1998, and (b) after that time.

6. DOE's purpose and intent in entering the Standard Contracts

7. DOE's understanding of the utilities' purpose and intent in entering the Standard Contracts.

8. How DOE's rate and schedule for acceptance of spent fuel is determined under the Standard Contracts.

9. A reasonable annual rate of acceptance for spent fuel under the Standard Contracts, and the factors to consider in determining a reasonable rate.

10. The purpose and role of exchanges under the Standard Contracts.

11. The purpose and role of the provision on priority for shutdown reactors under the Standard Contract.

12. The earliest date that DOE currently believes that it will begin accepting spent fuel under the Standard Contracts.

13. The acceptance rate that DOE is planning to use once spent fuel acceptance begins pursuant to the Standard Contracts.

14. The purpose and role of provisions of the Standard Contracts governing, and DOE's plans for, scheduling acceptance and acceptance of failed fuel, including failed fuel at Dairyland's site.

15. The schedule on which DOE plans to remove Dairyland's spent fuel pursuant to Dairyland's Standard Contract.

16. The date on which DOE currently plans to complete picking up spent fuel from Dairyland's site.

17. The reasonableness or unreasonableness of Dairyland's expenditures on private fuel storage initiatives.

18. The reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998.

19. The reasonableness or unreasonableness of Dairyland's study, analysis investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998.

20. All efforts undertaken by or on behalf of DOE to examine the manner or process by which DOE would remove spent fuel from Dairyland's site.

21. The role, purpose and development of DOE's Transportation, Aging and Disposal Canister System ("TAD") and DOE's plans, if any, consistent with use of TAD to accept spent fuel stored in other containers.

U.S. Department of Justice

Civil Division

PDK:JED:HDL:MESullivan
154-04-106

Telephone: (202) 307-0365
Facsimile: (202) 307-2503

*Washington, D.C. 20530*

March 9, 2007

VIA FACSIMILE AND UNITED STATES MAIL

Jerry Stouck
Robert Shapiro
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

Re: Dairyland Power Cooperative v. United States, No. 04-106C (Fed. Cl.)

Dear Messrs. Stouck and Shapiro:

As I stated in the voicemail message I left for Mr. Shapiro yesterday afternoon, we have determined that Messrs. Kouts, Pollog, and Zabransky are available on the following dates for deposition: Christopher Kouts – April 5, 2007, Thomas Pollog – March 30, 2007, and David Zabransky – April 2, 2007. In addition, we have determined that these individuals will be designated to testify about the following topics from the list of proposed RCFC 30(b)(6) topics that you provided by letter dated December 13, 2006:

| | |
|---|---|
| Mr. Kouts | Topics 5, 9, 12, 13, and 15-19 |
| Mr. Pollog | Topics 2, 4, 8, and 20 |
| Mr. Zabransky | Topics 1, 3, 6, 7, 10, 11, 14, and 21 |

You may contact me at (202) 307-0365, if you have any questions about this matter.

Sincerely,

MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch

FILE

A 4

DPC 3.1

**U.S. Department of Justice**

Civil Division

PDK:JED:HDL:MESullivan
154-04-106

Telephone: (202) 307-0365
Facsimile: (202) 307-2503

*Washington, D.C. 20530*

March 20, 2007

<u>VIA FACSIMILE AND UNITED STATES MAIL</u>

Jerry Stouck
Robert Shapiro
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

Norman M. Hirsch
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603

Re: *Dairyland Power Cooperative v. United States*, No. 04-106C (Fed. Cl.) and *Energy Northwest v. United States*, No. 04-10C (Fed. Cl.)

Gentlemen:

I write concerning the upcoming deposition of Mr. Christopher Kouts. As I indicated in my letter to Messrs. Stouck and Shapiro, dated March 9, 2007, Mr. Kouts is available for deposition on Thursday, April 5, 2007. However, based upon counsel's representations to the Court in Dairyland's Motion to Compel Depositions, filed December 18, 2006, and during the hearing held on January 25, 2007, we understand that Mr. Hirsch, as counsel for Energy Northwest, is prepared to join in that deposition and ask any questions that he may have for Mr. Kouts in an additional three-hour period. Pursuant to this understanding, Mr. Kouts is available for deposition beginning at 1:30 pm on Wednesday, April 4, 2007, and concluding on Thursday, April 5, 2007. We trust that, within this time, you will be able to ask any questions that you may have for Mr. Kouts.

In addition, in my letter dated March 9, 2007, I had indicated the RCFC 30(b)(6) topics for which the Government would designate Messrs. Kouts, Pollog and Zabransky. We determined that Mr. Zabransky, rather than Mr. Kouts, will be the Government's designee for Topic 15.

FILE

A 5

You may contact me at (202) 307-0365, if you have any questions about this matter.

Sincerely,

MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 04-106C |
| ENERGY NORTHWEST,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 04-0010C |

Washington, D.C.

Tuesday, May 1, 2007

Volume 1

Deposition of:

CHRISTOPHER KOUTS

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:10 a.m., when were present on behalf of the respective parties:


A 7
©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

Page 2

APPEARANCES

On behalf of Dairyland Power Cooperative:
JERRY STOUCK, ESQUIRE
ROBERT L. SHAPIRO, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3173
On behalf of Energy Northwest:
DAVID JIMENEZ-EKMAN, ESQUIRE
CHRISTOPHER TOMPKINS, ESQUIRE
Jenner & Block, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611-7603
(312) 222-9350
On behalf of Defendant:
ALAN J. LO RE, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 12070
Washington, D.C. 20530
(202) 307-0226

Page 3

CONTENTS

EXAMINATION BY: PAGE
Counsel for Dairyland .................... 6
Counsel for the Defendant ............... 296
Counsel for Dairyland .................... 305
KOUTS DEPOSITION EXHIBITS: * PAGE
1 Summary of employment history at DOE .. 6
2 Excerpt of testimony at PG&E trial .... 28
3 Excerpt of testimony at PG&3 trial .... 40
4 Standard Contract between Dairyland Power Cooperative and the Department of Energy, dated June 15, 1983 ........ 58
5 March 04, 1992 letter from M. Detmer to Mr. J.E. Barrett at PG&E ........... 66
6 Excerpt of testimony at PG&E trial .... 79
7 Delivery-commitment schedule forms .... 91
8 July 28, 2004 letter from Mr. Zabransky to William Berg ........................ 104
9 Letter to Russ Shultis identifying 30(b)(6) topics ...................... 114
10 Letter from Marian Sullivan designating witnesses for 30(b)(6) topics ......... 114

Page 4

CONTENTS (Continued)

11 Notice of Deposition .................. 114
12 Segment of trial testimony from Yankee Atomic trial .................... 127
KOUTS DEPOSITION EXHIBITS: * PAGE
13 Excerpt from proceedings of 1983 Civilian Radioactive Waste Management information meeting held in December of 1983 ................................ 150
14 June 1987 Annual Capacity Report ...... 166
15 1988 Annual Capacity Report ........... 172
16 December 1991 Annual Capacity Report .. 193
17 1987 Monitored Retrievable Storage submission to Congress ................ 206
18 1995 APR and ACR ........................ 218
19 Excerpt of 1985 Mission Plan .......... 271
20 Excerpt from June 4, 1999 deposition in Yankee Atomic case .................. 275
21 Letter from Michael J. Lawrence to Ben Rusche, dated July 23rd, 1984 ..... 281
22 Memorandum on the Department of Energy memo letterhead stationary dated

Page 5

CONTENTS (Continued)

December 21, 1992 ...................... 284
23 Letter from Spencer Abraham, Secretary of Energy, to Senator Orrin Hatch, dated July 8, 2002 ..................... 288
24 Memorandum on the Department of Energy memo letterhead stationary dated December 20, 1991 ...................... 290

(*Exhibits attached to transcript.)





917ffa92-9800-4498-95e6-5e4b9a24ccb0

PROCEEDINGS

\- - - - - - 

Whereupon,

CHRISTOPHER KOUTS

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

(Kouts Exhibit No. 1 was marked for identification.)

EXAMINATION

BY MR. STOUCK:

Q Good morning, Mr. Kouts.

A Good morning.

Q We've met before. And I know that you are experienced at testifying in depositions, so I won't belabor the mechanics.

Is there any reason today, like illness or medication, that you cannot give your best testimony?

A Not that I'm aware of.

Q Okay. You've been handed what's been marked Exhibit Number 1 to this deposition, which is a -- a summary, I would say, I think of your



employment history at DOE. And I want to ask you about the accuracy of this document.

MR. LO RE: Is this -- for the record, Counsel, is this a document --

MR. STOUCK: I don't know the source of this document, if that's your question. Okay. I don't know where this came from. It's a compilation from somewhere. I don't -- it's certainly not an official resume. It doesn't look like one to me. That's why I'm going to ask him about the accuracy of it. That's one of the reasons.

BY MR. STOUCK:

Q So starting at the top, Mr. Kouts you did join DOE in 1985; is that correct?

A Yes.

Q Approximately when in 1985?

A I believe it was in June of 1985.

Q What was your immediately prior position? Or were you in school? Or did you have a job?

A No. I worked in a different area of the Department, in the Office of Conservation and Renewable Energy.



Q I see. So June of '85 is when you joined OCRWM?

A That's correct.

Q Prior to that you were employed by the Department of Energy?

A Yes.

Q When were you first employed by the Department of Energy?

A I believe I was first employed by the Department of Energy in 1978.

Q Okay. But prior to June of 1985, you had no involvement with OCRWM or the spent nuclear fuel program; is that correct?

A No. That's not correct.

Q Okay. What -- prior to June 1985, what involvement did you have with OCRWM or the spent nuclear fuel program?

A In one of the positions that I held, which was working, at that time, for the Office of Environment, and I don't remember the specific organizational name at that time because that has mutated over the years, I was responsible for



reviewing National Environmental Policy Act analyses for DOE radioactive waste programs. Those programs were the precursor to the -- the Office of Civilian Radioactive Waste Management, which was not formed until after the Nuclear Waste Policy Act was passed in 1982.

Q So this work that you did reviewing environmental impact statements; is that --

A That's correct.

Q Was prior to the Nuclear Waste Policy Act?

A Yes.

MR. LO RE: I'm going to just put an objection on the record here. Several objections.

One, I'm going to object to this line of questions in general. Mr. Kouts has been offered, as you know, looking at the notice of deposition, Mr. Kouts is being offered as a 30(b)(6) witness today.

And there are some very clearly delineated issues to which he is to speak about.

I understand that you have some leeway in

Page 10

those. But I would object -- I put a standing objection on the record to a long recitation of Mr. Kouts' record.

Also with respect to this document, I'm going to note for the record that the document, the lower left-hand portion, has got a number starting with WDC and then a long series of numbers, indicating to me that this is a document not generated by the Department of Energy.

I note that it has no Bates number on it. I'll object to the use on those grounds.

Finally, I note that the number on this document seems to correspond to a pleading that Greenberg Traurig made; that is the motion to compel depositions in this case, dated December 18th, 2006.

So it appears that this is a document created by counsel. So on those grounds, I'm going to lodge those objections. Thank you.

MR. STOUCK: First of all, let's get the deposition straight because it's certainly -- it's not just our position but it's our deposition. So I will state that this deposition is not limited to

Page 11

30(b)(6). But it is a deposition of Mr. Kouts and the 30(b)(6) deposition, which I believe is what the Court ordered. But beyond that, I'll note your objection.

MR. LO RE: Thank you.

BY MR. STOUCK:

Q And so, between the time the Nuclear Waste Policy Act was enacted, Mr. Kouts, in June of 1985, you had no involvement with OCRWM and the spent nuclear fuel program; is that right?

A Yes.

Q Thank you. All right. Is this first block here, '85 to '88, if you just look at the description of your work there and tell me if it's generally accurate or if there's something -- I realize it's a summary. Is that generally what you were doing from 1985 to 1988 on the MRS team?

A I was on the MRS team. My duties extended beyond just the needs and feasibility analysis. But this is -- you know, this is a -- as you indicated, a summary. It's not an all-inclusive summary.

Page 12

Q Right. I understand that. And did your work on the MRS team end in 1988?

A The team was disbanded at that time, yes.

Q Okay. And you then moved -- is it correct that you then moved to the systems analysis branch --

A Yes.

Q -- for some period of time in 1988?

A Yes.

Q And it looks like there's a typo in the next block there. It says 1998. But it -- did -- did you become the head of the OCRWM transportation program in 1989? Or was it '88? Do you recall when that was?

Let me ask a different question. Was your next position, after some period of time in the systems analysis branch, to be the head of the OCRWM transportation program?

A Yes.

Q Okay. And when did you assume that position?

A Generally in the 1988 time frame.

Page 13

Q '88. Do you recall when in '88?

A Not specifically, no.

Q Okay. And did that position extend to 1991; is that correct?

A Approximately.

Q Okay. Can you give me your best recollection of when you ceased to be the head of the OCRWM transportation program?

A I was -- to my recollection, I was transportation branch chief for approximately 3 years. I don't remember specifically what day I moved on to different -- to different duties.

Q Okay. I've acknowledged that. I'm not certain about the accuracy of this document. That's why I'm going through it so closely.

Okay. Did you next move into a position in strategic planning; is that correct?

A Strategic and contingency planning; that is correct.

Q Was that part of OCRWM?

A Yes.

Q Okay. And what -- you know, what was the





A 8 b

917ffa92-9800-4498-95e6-5e4b9a24ccb0

Page 14

organizational -- if I looked on an organization chart, what would the unit or branch be that you worked in on strategic and contingency planning?
A You're taxing my memory. To the best of my recollection, it was an office of policy and strategic planning but I don't remember the specific name of it.
Q Okay. And that started in approximately 1991.
A Approximately, yes.
Q And extended for how long?
A Several years.
Q Okay.
A As this indicates, I don't know exactly. It was probably about around a 2-year period. It could have been less, could have been more.
Q Okay. Was your next position director of regulatory coordination?
A Yes.
Q Okay. Again what -- can you give me a more specific organizational chart designation of where that fit into OCRWM, what part of the

Page 15

organization?
A I remember the acronym of the office it was in. It was called OSIR. It was the Office of Systems Integration and Regulatory. And that's basically -- that's basically all I do remember.
Q Okay. Is this a reasonably accurate brief summary of what you did; i.e. coordinated all of the NRC interaction with OCRWM?
A Yes.
Q Okay. And, you know, again, can you tell me whether the indication here that that position lasted for approximately 2 years is accurate? Or can you give me a better estimate?
A It was -- I believe it was under 2 years. But I don't know specifically. It was around 2 years. I don't remember the specific time frame.
Q Did you then, next, go to work for Director Dreyfus?
A Yes. I had a division supporting the director of the program.
Q Do you recall when that position started?
A I remember the sequence of employment. I

Page 16

don't remember the specifics in terms of what month I started.
Q Did you go to work for Dr. Dreyfus immediately upon his confirmation or, you know, immediately upon his becoming the director of OCRWM?
A No. It was sometime after that.
Q Okay. How long after he became director of OCRWM did you start working for him?
A I would say roughly about a year or so afterwards.
Q Okay. And how long did you work for Director Dreyfus?
A Approximately 2 years.
Q Okay. And were you -- what was your title?
A I was a division director. And I can't remember the specific name of the division. It was -- it was a division that, again, that supported the director in policy analysis and supported his -- supported his needs.
Q Okay. Well, were you his principal assistant?

Page 17

A He also had an executive assistant. I managed a group of people who developed documents for the director, other than what his executive assistant did.
Q Okay. Who was his executive assistant?
A His executive assistant at that time, as I remember, was Susan Smith.
Q Now, it says here -- you know, in brief summary, it says Kouts was responsible for making sure that Dreyfus had all the information that he needed to carry out his responsibilities. Is that kind of a reasonably accurate brief summary of what your job was?
A It's -- I think that to more fully understand what that position was responsible for, it was responsible for drafting policy papers, drafting testimony, responses to interrogatories from Congress, correspondence, things like that.
Q Okay. Thank you. And it also says here that you managed the effort to produce a program plan for OCRWM that was issued in December of 1994. Is that accurate?

Page 18

A That's correct.
Q And what is the official title of that document?
A It's called the OCRWM program plan.
Q Was it issued in December of '94?
A I believe it was, yeah.
Q Okay. And what was your next position after you left Mr. -- Dr. Dreyfus' office?
A As the -- as your chart indicates here, or as your paper indicates, I took over a division responsible for developing a topical safety analysis report on centralized interim storage.
Q What is your best recollection about when that position started -- when your work for Dr. Dreyfus ended and this position you just mentioned started?
A The '95/'96 time frame. Again, I have not gone back and reviewed my employment history to find out exactly when I left each position.
Q Did leave your work for Dr. Dreyfus at the time that he ceased to be director of OCRWM or prior to that time?

Page 19

A Prior to that time.
Q So he was still the director when you left?
A That's correct.
Q Now, why is it that -- why is it that centralized interim storage was being considered in this sort of mid to late, you know, whatever time frame it was that you were working on that in '95 or '96?
MR. LO RE: I need to lodge another objection here. And I may be wrong about this. But my understanding is that this is a 30(b)(6) deposition. We have now spent 20 minutes on Mr. Kouts' background. As I said, I'm happy to give counsel some leeway here.
Can you explain to me, Counsel, why you are entitled to ask this --
MR. STOUCK: I already told you, it's my deposition. And this is a deposition of Mr. Kouts.
MR. LO RE: So you're --
MR. STOUCK: And as convenience to the government, we have also agreed to combine the

Page 20

30(b)(6) deposition questions on which you've designated Kouts.
MR. LO RE: Do you have a copy of the notice of deposition, the fact deposition for Mr. Kouts?
MR. STOUCK: It's one deposition notice. You want to look at the Court order where he granted our motion to compel the depositions?
MR. LO RE: Yeah. I would.
MR. STOUCK: Well, I don't have it. You can call your office.
MR. LO RE: Okay. Let's take a break.
(Whereupon, at 9:25 a.m. a recess was taken until 9:27 a.m.)
MR. LO RE: I just want to say one thing.
MR. STOUCK: Sure. We're on.
MR. LO RE: Okay. Based on the representation of counsel and the fact that he showed me the order from Judge Damich granting plaintiff's motion to take both a fact and 30(b)(6) deposition, I will withdraw my objection to the background questions.

Page 21

MR. STOUCK: Yeah. And I'll also note that we did find a copy of the order for you.
MR. LO RE: Thank you.
BY MR. STOUCK:
Q I'm just curious about this. And we'll talk about MRS matters a little later, Mr. Kouts. But I was curious about the centralized interim storage facility that was being worked on in some fashion in this '95/'96 time frame.
Can you just briefly tell me how that came about that DOE was looking at that in that time frame?
A In that time frame, and I believe if you go back, you could look at our budget request for that time frame, the Department requested funds to develop a topical safety analysis report for a centralized interim storage facility.
The rationale behind undertaking this effort was that there were a variety of bills that were winding their way through Congress. And all of those bills anticipated a very quick deployment of a storage facility, should a site be identified and





A 8 d

917ffa92-9800-4498-95e6-5e4b9a24ccb0

8D

Page 22

should the Congress approve it, which would also have meant that the Nuclear Waste Policy Act would have had to be amended.

In anticipation of the potential passage of those bills, the Department undertook the development of a topical safety analysis report to -- that would have been used to expedite the licensing of such a facility should authorization modifying the Act allowing the implementation of such a facility be passed and enacted by Congress and signed by the President.

Q Okay. And was the development of that safety analysis report your principal responsibility during the time that you were in this position, starting after your work for Dr. Dreyfus?

A No. There were other activities within the division.

Q Okay. Well, how would you -- just, again, summarize your -- what was the job that you were in at that time? Generally, what were your responsibilities?

A Well, in addition to the topical safety

Page 23

analysis report on -- on a centralized interim storage facility, we also worked on a topical safety analysis report for a dry transfer system that could be deployed at reactor sites. And the potential use of that would have been to assist those reactors that did not have transfer capability on site for spent fuel into dry storage devices or into larger transportation casks.

Q Okay. What was your position? What was your title? It indicates here, on this paper that we're looking at, storage and technology division?

A That's correct.

Q You were working in that division?

A I was the director of the storage and technology division.

Q Okay. You were the director. Got it. Okay.

And were both of those SARs completed, the two that you've told me about?

A Yes, they were.

Q And do you -- you know, what's your best -- and was your next position as Yucca Mountain

Page 24

liaison?

A That's correct.

Q And that was liaison between headquarters and the Yucca Mountain project office?

A That's correct.

Q Can you give me your best estimate of when you assumed that position?

A It was in either in late 1997 or early 1998. I remember undertaking a substantial effort on the -- on the 1998 viability assessment, which is incorrectly identified here. You have it down as a liability assessment. It's a viability assessment that was directed by Congress. That was submitted in 1998. I remember working on it. And I believe I started, perhaps, in late 1997 in that position.

Q Okay.

A But I -- again, I don't have a specific month that I transferred into my new duties.

Q Okay. And your next position was your current position; is that correct? First on an acting basis and then permanent?

A Actually, this is inaccurate. Because

Page 25

the office of systems analysis and strategy development no longer exists. We reorganized last year. And the title of my office now is the waste management office. And I'm director of that office.

It has essentially the same duties that the previous position had except they don't have safeguards now. That went to another organization. But by and large that's -- it was a major change.

Q Well, let's take it one step at a time. After you left your position as Yucca Mountain liaison, did you become the director for what was then called the Office of Systems Analysis and Strategy Development?

A I became the acting director for that office.

Q Was that in 2002?

A Yes.

Q When in 2002?

A Approximately in October of 2002.

Q And at some point you became the not acting but the permanent director of that office?

A I believe that was in July of 2003, as





A 8 e

917ffa92-9800-4498-95e6-5e4b9a24ccb0

your paper indicates.

Q Right. And then at some point, that office, as you just said, was reorganized, kept most of its functions. Maybe a couple went somewhere else. Kept most of its functions but now has a different name?

A That's correct.

Q And you're still the director?

A Yes, I am.

Q And when did that reorganization take place?

A The reorganization took place last year. The effective date of the organization was April or May. I don't remember the specific date.

Q Okay. Thanks a lot. For now, I'm done with that piece of paper, although obviously you can keep it in front of you.

Let me ask you this, Mr. Kouts. I want to get -- since the beginning of 2006, about the last year, almost a half, can you give me your best estimate of approximately what percentage of your time, what percentage of your time from, you know



in the last, say, year and a half, just an estimate, but your best estimate, what percentage of your time has been spent in any way on this spent nuclear fuel litigation, whether depositions, trial testimony, talking to lawyers, getting ready for things. Just an estimate. But I would like your best estimate.

MR. LO RE: Objection. Vague.

BY MR. STOUCK:

Q If you're more comfortable with a different time -- if there's some other way you can estimate in your mind a different time frame, that would be okay, too.

MR. LO RE: Same objection.

THE WITNESS: I'd say somewhere between 10 and 20 percent of my time.

BY MR. STOUCK:

Q And that would be since the beginning of 2006?

A Roughly. If you're talking about actual time spent in the office or whether in depositions or in court, I would say no more than 10 to 20 percent.



MR. STOUCK: Okay. Thanks. Can you mark this as Number 2, please.

(Kouts Exhibit No. 2 was marked for identification.)

BY MR. STOUCK:

Q Mr. Kouts, you've been handed what's been marked as Exhibit Number 2 to this deposition, which is an excerpt of your testimony at the Pacific Gas and Electric trial last summer. I was questioning you. And just to orient you, as you may recall, I asked you some questions about ACRs and APRs and DCSs. And you gave me some answers, which I thought were different from answers that you had given in a deposition in June of 1999. And I asked you about that.

And again, just generally -- we'll look at the specific testimony. Just generally, you told me you had learned some things since that deposition which led you to have different answers. That's how you explained the discrepancy. Do you recall the exchange, generally?

A Generally.



Q Let's look at the specifics. If you look at page, the upper-left panel here, page 2745, on line 5, it says -- I asked you the following question: Your understanding has been obtained, your understanding about -- I'm sorry. Excuse me. Line 11. I apologize for that. Line 11.

Quote, this was my question: Your understanding, whatever understandings you have about DOE's contractual obligations under the Standard Contract, you have obtained since June 4, 1999, correct?

And you answered: That's correct.

Do you see that?

A Yes, I do.

Q That was your testimony?

A It appears to be, yes.

Q And that was truthful?

A Yes, it was.

Q Okay. And June 4, 1999, do you recall that was the -- that was the date of the deposition that I -- that we took of you in the Yankee case?

A I'll accept your -- I don't remember the



 ©2007



917ffa92-9800-4498-95e6-5e4b9a24ccb0

9.F

Page 246

expenditures on private fuel storage initiatives; is that correct?
A That's correct. I don't.
Q And so whatever those reasons are couldn't possibly be relevant to your testimony about the reasonableness of those expenditures?
A That's correct.
Q Likewise, the amounts of the expenditures that Dairyland made on private fuel storage initiatives are not relevant to your consideration of whether or not those expenditures are reasonable?
A That's correct.
Q And likewise, the timing of when those expenditures were made, for example, I gave you the one example of 1995, just as a hypothetical, or 2000 or yesterday, the timing of the expenditures that Dairyland may have made on private fuel storage initiatives is not relevant to your consideration of whether those expenditures are reasonable, correct?
A That's correct.
Q Because you do not know about the timing of any of those expenditures?

Page 247

A That's correct.
Q Okay. Thank you. I guess I can skip the question about how have you obtained your understanding of Dairyland's expenditures.
You don't know when Dairyland first made expenditures on private fuel storage initiatives, correct?
A That's correct.
Q Okay. All right. Let's move on to topic number 7 which reads: The reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998. Do you see that on the notice which is Exhibit Number 11?
A Yes.
Q Okay. I think I better start with this. Do you know whether or not Dairyland has stored its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998?
A No.
Q Notwithstanding that answer and that fact, you are -- is this correct, you are able to

Page 248

testify about the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998?
A Yes.
Q Okay. Then let me ask you, has Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998 been reasonable or unreasonable?
A Since that's a business decision on the part of Dairyland, the government believes that's a decision best made by, in terms of reasonableness or unreasonableness, is based on Dairyland's own individual situation. The government has no position one way or the other.
Q The government has no position one way or the other?
A On the reasonableness or the unreasonableness of the cost, the government has no information associated with it.
MR. STOUCK: Can we take a short break?
MR. LO RE: Sure.

Page 249

MR. STOUCK: Just very short.
(Whereupon, at 3:39 p.m. a recess was taken until 3:43 p.m.)
BY MR. STOUCK:
Q When you say the government has no information associated with the costs as one part of your answer about why the government has no position one way or the other on reasonableness of the cost, you're referring to DOE? I mean the reason I ask that is because, clearly the -- the Department of Justice people have information about the costs of storage in the pool. That's -- I'll represent that to you. As a part of this litigation, we've certainly provided them information about those costs.
So your answer, I take it, is that DOE has no information about the costs of storage?
A That's correct.
Q By -- cost of storage by Dairyland in its spent fuel pool.
Okay. And you don't expect that DOE will obtain any cost information in the foreseeable





9

Page 250

future that would allow it to form a position on the reasonableness of expenditures that Dairyland makes storing spent fuel in its spent fuel pool after 1998, correct?

MR. LO RE: Other than information provided to DOJ, is that what you mean?

MR. STOUCK: My question was about DOE.

MR. LO RE: Separated from --

BY MR. STOUCK:

Q You're not going to tell me tomorrow -- you know, tonight a whole bunch of documents came in with cost information, so tomorrow DOE has a position?

A The Department doesn't collect spent fuel storage cost information from utilities. It basically collects information on the spent fuel itself but does not in any way collect information on individual utility cost for pool storage.

Q Therefore, the Department has no position upon --

A The reasonableness or the unreasonableness of the cost.

Page 251

Q Right. And that -- there being no position by the Department on that subject is not going to change in the next 6 months or a year; is that correct? You don't anticipate that it will?

A The best way for me to answer that is we haven't had the interest on collecting that information in the past. And I don't foresee any reason in the near future why we would want to collect that information.

MR. LO RE: To be clear, Jerry, this does not -- this is separate from a position that the government may take during the trial about a particular cost as to whether that cost was incurred, whether our expert witnesses say that those costs are or are not reasonable.

This is Mr. Kouts talking programmatically, not vis-a-vis the Standard Contract and whether those costs were incurred and should be recovered as part of this litigation.

MR. STOUCK: Right. Let me say now that I have an objection. Which is not all that frequent at my own deposition, but it does occur, which is

Page 252

that -- and we can pursue this otherwise. But let me just state it for now. We will pursue it otherwise.

The 30(b)(6) device is intended as a way for us to get the government's position. And the state of the record so far is that the government has no position on the reasonableness of these costs.

And if you're telling me that you may come to trial and take a position on the reasonableness of these costs, then my response to that is that you haven't fulfilled your 30(b)(6) obligation.

So, you know, we can take that up some other time.

MR. LO RE: Just so the record -- it's fine to have that argument. I want to be clear that our position is that Mr. Kouts is speaking on behalf of DOE. DOE programmatically. Whether or not you costs -- whether or not we challenge your costs in trial is separate from whether or not Mr. Kouts monitors, as someone who's intimately involved with

Page 253

the -- you know, the development of the waste acceptance program.

MR. STOUCK: Again, as you know from the deposition notice and from the rule and from your vast experience in litigation, we have asked the defendant, United States, to designate a witness to testify about these topics on behalf of the United States. And so, if Mr. Kouts can't do it on behalf of the United States, we need someone who can do it.

MR. LO RE: Well, if one of my experts later says that the costs that you incurred are unreasonable for X, Y, Z reason, then I want -- I want you guys to be on notice that that may be the case.

You will certainly know months and months before we step into the courthouse what our position is. But as Mr. Kouts sits here today, he's saying that the position of the -- of DOE is that they do not collect costs associated with spent fuel storage.

MR. STOUCK: I understand that. I understand your position.





A 10

10

Page 254

MR. LO RE: Okay.

MR. STOUCK: My position is that this deposition was where the government was supposed to tell us their position on those topics and you haven't done it and we have to pursue it.

MR. LO RE: Certainly you aren't suggesting that Mr. Kouts was to come in here today and testify about an expert opinion that may be rendered months from now.

MR. STOUCK: I am stating that Mr. Kouts was required by the rules and by court order, I might add, to come in here and testify today about the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 30, 1998, amongst these other topics.

And as far as I'm concerned, the record is that the government, the United States, has no position on that issue.

MR. LO RE: And I understand what you're saying. And I've put on the record what our position is with respect to that. I think that's

Page 255

all we're going to be able to do today.

MR. STOUCK: Yep. I agree. Today.

BY MR. STOUCK:

Q So just some follow ups. I take it that -- and, again, going back to some basics -- you know, I'm sure you're listening to what's going on here. But I'm asking you questions in your capacity as a 30(b)(6) witness here. So let's just be clear about that going forward, especially in light of this colloquy, Mr. Kouts but -- do you understand that?

A Yes.

Q Okay. You -- do you -- does -- can you tell me whether Dairyland's storage of its spent fuel in its spent fuel pool subsequent to January 31, 1998 has been reasonable or unreasonable in any part of that period, you know, as opposed to the whole period which I think the prior answer implied?

A Again, ultimately I'll go back to my previous answer, that's a business decision on the part of Dairyland, that the Department has no

Page 256

information one way or the other if one time period would be more acceptable or more reasonable than any other time period.

Q Okay. And you've prepared no analysis regarding the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 1998; is that right?

A That's correct.

Q And I take it you also have no position on whether or not the storage of spent fuel by any purchaser in its spent fuel pool during periods -- the period subsequent to January 1998 is reasonable or unreasonable; is that right? You haven't singled Dairyland out for this no position?

A That's correct.

MR. LO RE: Objection. Outside the scope of this 30(b)(6) deposition.

BY MR. STOUCK:

Q Can you tell me -- do you have an understanding of why Dairyland has stored its spent fuel in its spent fuel pool during the period

Page 257

subsequent to January 31, 1998 as opposed to doing something else with it?

A I would assume that it was a decision made that that was the best course -- business course for that individual entity.

Q But other than that assumption, you have no knowledge or no other response to my question --

A No.

Q -- why they have done it?

Okay. Do you know -- is there a storage option for spent fuel that Dairyland could have employed during the period subsequent to January 31, 1998 that would have been more reasonable than continued storage of the spent fuel in the spent fuel pool?

MR. LO RE: Objection. Asked and answered.

BY MR. STOUCK:

Q For example dry storage, off-site storage, or anything else.

A Only to the extent that if Dairyland did undertake dry storage, they would have to consider




917ffa92-9800-4498-95e6-5e4b9a24ccb0

A 11

Page 258

issues associated with what kind of dry storage that was, whether or not it was in a manner that would be consistent with the Standard Contract.
And if it was not in a manner consistent with the Standard Contract, then Dairyland would have had to seek a mutually agreeable contract amendment to address that issue.
Other than that, that's essentially a business decision on the part of Dairyland, in terms of what type of storage and what that storage costs in relation to the resources that it has available.
Q Okay. So you cannot testify whether or not there is some storage method for Dairyland's spent fuel other than continued storage in the spent fuel that would have -- in the spent fuel pool that would have been more reasonable than -- than storage in the spent fuel pool during the period subsequent to January 1998; is that right? Or can you testify about that? There are two choices. You can testify about it or you can't testify about whether there would be a more reasonable storage option?
A Not knowing the specifics of -- facing

Page 259

Dairyland, there's no way for DOE to know that.
Q Okay. No way for you to know that?
A Or the Department has no information associated with that.
Q Or you, in your capacity as a 30(b)(6) witness?
A That's correct.
Q Okay. Let's move on to topic number 8 on the list, the reasonableness or unreasonableness of Dairyland's study, analysis, investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998.
Do you see that?
A Yes, I do.
Q Okay. I'm going to try to break this down because that's a big mouthful.
First, let me ask, do you know whether or not -- well, let me break it down first. I'm going to try to separate study, analyze, investigate from implement.
A Okay.
Q All with respect to dry storage. Study,

Page 260

analyze, investigate dry storage on the one hand, and on the other hand, implement dry storage. Okay.
Let's start with implement dry storage. Do you know whether or not Dairyland has incurred any costs for the implementation of dry storage at its reactor site?
A No.
Q Do you know where Dairyland's reactor site is?
A Yes. I believe it's in Wisconsin.
Q Have you been there?
A No, I have not.
Q Okay. Now, let's talk about study, investigate, analyze. Do you know whether or not Dairyland has incurred any expenses for the study, analysis, or investigation of dry storage for its spent fuel?
A My assumption is, if it's studied, analyzed or analyzed it, it must have spent some resources in order to do that. But I do not know the extent to which those resources were expended.
Q Okay. Do you know whether it has studied

Page 261

or analyzed it at all?
A No, I do not.
Q Okay. If it had, you would assume there's a cost associated?
A Yes.
Q But you don't know whether in fact Dairyland has studied or analyzed or investigated?
MR. LO RE: Objection. Asked and answered.
BY MR. STOUCK:
Q Right?
A That's correct.
Q Okay. Well, are you nevertheless, in light of your recent answers to my recent questions, able to testify about the reasonableness or unreasonableness of Dairyland's study, analysis, investigation, and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998?
A To the extent that the Department has no information associated with the analysis or study, the only comment -- and has no position on it, the

Page 262

only comment that the Department would make is that implementation of such a dry storage initiative would have to take into consideration a mutually agreeable amendment to the Standard Contract to address whether or not the fuel is going to be in a -- in a form which the Department can accept.

Q So other than that, the mutual amendment, and the form of the -- of the fuel being suitable for acceptance, you have no position on the reasonableness or unreasonableness of Dairyland's study, analysis, investigation, on the one hand, or implementation, on the other hand, of dry storage for its spent fuel after January, '98; is that correct?

A That's correct.

MR. LO RE: Just so the record is clear, we take the same position with respect to this question, number 8, that we took with respect to number 7.

MR. STOUCK: Right.

MR. LO RE: Vis-a-vis a challenge at court.

Page 263

MR. STOUCK: It won't surprise you that we do, too. And I think we're entitled to answers on that question.

MR. LO RE: That's perfectly fine, Jerry. Once again, we're just making a record here.

BY MR. STOUCK:

Q Okay. Your understanding is that bare spent fuel is the only acceptable waste form under the Standard Contract; is that correct?

A Yes.

Q Is that explicit in the Standard Contract; do you know? Are there words that say that, you know, in substance? Or is that an interpretation?

A It's laid out in the appendix in terms of what's an acceptable waste form.

Q Okay. And do you understand the term TAD, T-A-D?

A Yes.

Q What is that?

A That is a device that the Department is in the process of developing that would allow a

Page 264

canister to be loaded at a utility site and sealed at a utility site with all the -- a canister that would be provided by the Department for the purposes of transport to the repository, that would meet both the transportation requirements, aging requirements at the repository, and disposal requirements at the repository.

Q Are TADs an acceptable waste form under the Standard Contract?

MR. LO RE: Objection calls for a legal conclusion. Calls for speculation.

THE WITNESS: No. They would have to be a mutually agreeable contract amendment by both parties in order to allow the use of TADs.

BY MR. STOUCK:

Q Okay. And is that -- is it your understanding that that would be true for the same reasons that a mutual acceptable contract amendment would be necessary in order to accept a currently available spent fuel -- dry storage containers?

A That's correct.

Q Okay. That's because, under the

Page 265

appendices to the Standard Contract, it's your understanding that only -- those appendices state that only bare fuel is an acceptable waste form?

A As identified in the appendix, yes.

Q Okay. All right. Now let's go back -- I've just got a few more. Can we go off the record for just one second.

(Discussion off the record.)

BY MR. STOUCK:

Q Actually, this -- before we leave TADs and acceptable waste forms, Mr. Kouts, if you look through the Standard Contract appendices, can you show me -- I don't want you to go searching for it, but could you identify a place in there where you think it's set forth that -- do you have something in mind that you can point to without too much trouble? I appreciate that. It's Exhibit Number 4. It's pretty thick. So it's probably got a clip on it.

MR. LO RE: That's it.

BY MR. STOUCK:

Q And I certainly don't want to put words