U.S. Department of Justice

Civil Division

PDK:DMC:HDL:PBBryan
154-04-106

Telephone: (202) 616-8299
Facsimile: (202) 307-2503

*Washington, D.C. 20530*

July 13, 2007

**VIA FACSIMILE AND REGULAR MAIL**

Robert L. Shapiro, Esq.
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

Re: *Dairyland Power Cooperative v. United States*, No. 04-0106C (Fed. Cl.)

Dear Mr. Shapiro:

This letter concerns our July 9, 2007 telephone conversation, during which you informed the Government, for the first time, of the intent of your client, Dairyland Power Cooperative ("Dairyland"), to file a motion to compel discovery, as well as a request for sanctions, against the Government in connection with Dairyland's RCFC 30(b)(6) depositions of the United States in this matter. During our telephone call, you asserted, without providing any legal or factual support, that one or more of the Government's RCFC 30(b)(6) designees failed to provide adequate responses to certain questions by Dairyland's counsel. In particular, you indicated that Dairyland's motion will challenge certain assertions of deliberative process privilege that the United States made during the Government's RCFC 30(b)(6) depositions in this litigation, including, for instance, the Government's privilege assertions during the May 3, 2007 deposition of Mr. David Zabransky of the United States Department of Energy ("DOE").

Of particular concern, you indicated that Dairyland would file its forthcoming motion without first providing the United States with the opportunity to "meet and confer" with Dairyland in an effort to resolve these matters in lieu of Court action, as is required by the Court's rules, or without otherwise providing the Government in advance with a letter outlining the specific alleged deficiencies regarding which Dairyland intends to seek relief.[1]

---

[1] As you are aware, the Government designated and produced four separate representatives to testify in response to the extensive listing of RCFC 30(b)(6) deposition topics that Dairyland has served upon the Government in this case. Specifically, on May 1 and 2, 2007, the Government produced Mr. Christopher Kouts of DOE to testify in response to Topic Nos. 5, 9, 12, 13, and 16-19 as set forth in the list of RCFC 30(b)(6) topics that Dairyland provided by letter dated December 13, 2006. On May 3, 2007, the Government produced Mr. David

As an initial matter, while we disagree with your assertion that the Government somehow failed to discharge its obligations pursuant to RCFC 30(b)(6) or otherwise improperly invoked the deliberate process privilege, we request the opportunity to "meet and confer" with Dairyland's counsel prior to the filing of any forthcoming discovery motion in the hope of resolving amicably (or otherwise limiting in scope) any such discovery-related disputes. As you are well aware, pursuant to RCFC 37(a)(2) and Appendix A of the Court's rules, prior to the filing of any discovery motions, Dairyland is required to conduct a personal or telephonic consultation during which the parties engage in meaningful negotiations in a "genuine effort to avoid judicial intervention." Shuttle Master, Inc. v. Progressive Games, Inc., 170 F.R.D. 166, 171 (D. Nev. 1996). Indeed, in this case, the Court has expressly ruled that the parties, and Dairyland in particular, must abide by the "meet and confer" requirements before filing any additional discovery motions in this case. See, e.g., February 5, 2007 Order, at page 2 ("Plaintiff is reminded, however, of its obligation pursuant to RCFC 37(a)(2) to meet and confer with opposing counsel before moving to compel.") (emphasis added); February 8, 2007 Order, at page 1 ("The court expects the parties to adhere to both the letter and spirit of the rules regarding resolution of discovery disputes . . ."). As a consequence, should Dairyland seek the Court's intervention without first providing us with the opportunity to meet and confer with Dairyland, we expect to file our own motion with the Court seeking the appropriate relief.

With respect to your assertion that the Government improperly invoked the deliberative process privilege during, in particular, Mr. Zabransky's deposition, we note that Dairyland has provided the Government with no basis whatsoever for such a position, either during or after Mr. Zabransky's deposition. Rather, during our July 9, 2007 telephone call, you merely indicated that the Government had not provided the necessary supporting documentation to support its assertions of the deliberate process privilege. In contrast to your contention, however, the Government's formal invocation of deliberative process privilege, either through affidavits or other information supportive of the privilege claim, need not be generated until after a motion to compel has been filed challenging the Government's identification of that privilege. See, e.g., Abramson v. United States, 39 Fed. Cl. 290, 294 (1997) ("procedural requirements" for invoking deliberative process privilege "generally are satisfied through the production of a declaration or affidavit by the agency head, and produced in response to a motion to compel" (emphasis added)); Tri-State Hosp. Supply Corp. v. United States, 226 F.R.D. 118, 134 n.13 (D.D.C. 2005) (finding that "the government had no obligation to formally invoke the [deliberative process]

---

Zabransky to testify concerning Topic Nos. 1, 3, 6, 7, 10, 11, 14, 15, and 21 as set forth in Dairyland December 13, 2006 list of RCFC 30(b)(6) topics. On May 4, 2007, the Government produced Mr. Thomas Pollog to testify in response to Topic Nos. 2, 4, 8, and 20 as contained in Dairyland's December 13, 2006 listing of RCFC 30(b)(6) topics. In addition, pursuant Dairyland's May 16, 2007 RCFC 30(b)(6) deposition notice, the Government produced Mr. Bernard White from the Nuclear Regulatory Commission on June 12, 2007, and Mr. Pollog on June 21, 2007, to testify concerning matters relating to the Government's handling of its document productions in this matter.

privilege in advance of the motion to compel" and recognizing appropriateness of submitting affidavits explaining basis for privilege as attachment to opposition to motion to compel). Accordingly, to date, Dairyland has not provided the Government with any reason to suggest that the Department of Energy's assertion of the deliberate process privilege is improper in this context, and we reiterate our request to "meet and confer" with Dairyland as soon as possible in an effort to resolve any disagreement that the parties may have regarding this issue without the need for the Court's intervention.

We appreciate your prompt attention to these matters. Please contact me to schedule a "meet and confer" meeting or if you otherwise have any questions or concerns with regard to these issues.

Sincerely,

Patrick B. Bryan

PATRICK B. BRYAN
Trial Attorney
Commercial Litigation Branch

Page 226

what is the date by which DOE plans to complete picking up spent fuel from Dairyland?

A Yes.

MR. LO RE: Objection. Vague.

BY MR. STOUCK:

Q Okay. And when -- can you tell me anything about when that date might be? Will it be when facility operations commence, or 63 months before, or only after? Or can you, you know, give me some best characterization of when, in the future, the government will be able to answer the question of the date by which DOE plans to complete picking up Dairyland's spent fuel?

MR. LO RE: I'll object on the grounds of vagueness, compound and also outside the scope of the damages matter in this -- in the Dairyland trial.

THE WITNESS: The specific date, no. The general time frame will be as we move forward into the planning process for Yucca Mountain and the DCSs are submitted, the facility is built, we get to the point where we know specifically whether or not

Page 227

there will be any trades, exchanges, subject to the approval of the contracting officer, of acceptance rights. And, in addition, we understand the technical details associated with Dairyland spent fuel.

BY MR. STOUCK:

Q Okay. So all of those things will have to occur before DOE or the government will be able to determine the date by which DOE will complete picking up Dairyland's spent fuel; is that correct?

A That's correct.

Q Okay. Now let's go to -- thank you for that, Mr. Kouts.

Let's now go to topic number -- I have different numbers on every sheet. Topic number -- let's go to topic number 2, the reasonableness of rates.

Would you say that all of the various and different acceptance rates set out in the ACRs issued by DOE are reasonable acceptance rates?

MR. LO RE: Objection. Vague.

THE WITNESS: They were reasonable, given

Page 228

the types of facilities that were being considered at that time and the abilities of those facilities to operate at those rates.

BY MR. STOUCK:

Q Okay. Thank you. And can you -- the other part of this issue is, can you tell me the factors to consider in determining a reasonable rate of acceptance for spent fuel under the Standard Contracts?

MR. LO RE: Objection. Vague as to the term reasonable.

THE WITNESS: Factors for consideration are whether or not there are any statutory limitations on the capabilities of the facility and the deployment of the facility. In addition, the -- the overall cost of facilities and the ability of the Department to obtain a appropriations to build facilities at a specific receipt rate, and the technical complexity of the facilities.

BY MR. STOUCK:

Q Okay. Anything else?

A Now that you mention it, yes. I would

Page 229

say the ability of the Department to move spent fuel in any specific year, depending on the capabilities of the reactor sites and the capabilities of the casks that it might have available to move.

In addition, the -- the types of materials that the Department is moving. The mix of whether or not there's rail or truck and the percentage of rail and truck that is perceived to be needed in order to move that specific amount of fuel.

I mean, all those are factors.

Q How about consistency with the intent of the Nuclear Waste Policy Act? Is that a factor to consider in determining the reasonable acceptance rate?

A To the extent that there's an interpretation of what's consistent with the Act, I believe all those other considerations are consistent with the Act.

Q So is consistency --

A With the intent of the Act, yes.

Q Yes, that's a factor to consider?





A 17

917ffa92-9800-4498-95e6-5e4b9a24ccb0

Page 230

A Yeah. Sure.
Q Okay. And what about -- what about reduction of at-reactor storage costs in an -- after 1998 or after January 1998. Is that a factor to consider -- you know, the ability of the particular rates to reduce or eliminate at-reactor storage costs after January 1998, is that a factor to consider in determining reasonable acceptance rate -- a reasonable acceptance rate under the Standard Contracts?
MR. LO RE: To be clear, are you talking about performance beginning in 1998 or in general?
MR. STOUCK: I'm talking about determination of a reasonable rate under the Standard Contract. I mean --
MR. LO RE: Vague as to time.
MR. STOUCK: Okay. Since the contract specifically states the priority for providing fuel into the system, which is oldest fuel first, to the extent that the Department can effect dry storage is dependent on the ability of the Department to work off the queue that addresses those facilities that

Page 231

have dry storage needs.
To the extent that one facility or one reactor needs additional capability, there is -- given an acceptance rate by the Department, there is the option open to contract holders to exchange rights and avoid spent fuel storage.
For the Department to seriously consider increasing the acceptance rate and incurring the significant capital cost associated with increasing the acceptance rates in order to reduce dry storage, at this point, would be not the most reasonable approach for the Department to take in terms of husbanding the resources of the nuclear waste fund.
BY MR. STOUCK:
Q Are you finished?
A Pretty much.
Q Okay. So does that mean that reducing or eliminating at-reactor storage costs after 1998 is not a factor to consider in determining a reasonable acceptance rate under the Standard Contract? Is that the --
MR. LO RE: Objection. Mischaracterizes

Page 232

the testimony.
BY MR. STOUCK:
Q Well --
A That's not what I said.
Q Okay. Wait a minute. So it is a factor -- I mean, I'm trying to decide if it is or it is not.
A It needs to be considered. However, the Department's ability to -- given the constraints that it has in implementing the contract and the way the contract is structured with oldest fuel first priority, limits the Department's ability to provide services to any specific contract holder unless that contract holder decides to exchange rights with another contract holder earlier in the queue.
Q Okay. So is reducing or eliminating at-reactor storage costs after 1998, is that or is that not a factor to consider in determining a reasonable acceptance rate?
A Subject to the caveats that I mentioned above, yes.
Q It is?

Page 233

A Yes.
Q Subject to the caveats?
A Yes.
Q Now, is it your understanding that the Standard Contract's terms, the language of the Standard Contract, requires acceptance in the oldest fuel first sequence?
A It does not require the specific fuel to be received. But it provides the ordering under which an allocation in any one year to which purchaser is to be provided.
Q Okay. Well, is the ordering of the allocation required by the Standard Contract?
A It specifically states oldest fuel first in the contract.
Q Okay. And the oldest fuel first -- is it your understanding -- let me start over. Strike that.
Prior to the submission of any DCSs, okay, prior to the submission of any DCSs, another way to think about it, would be in 1990, if you want to put a time frame on it, but prior to the

Page 234

submission of any DCSs, is it your understanding that the Standard Contract requires acceptance of spent nuclear fuel in the sequence of oldest fuel first?

A Again, you're mischaracterizing what I said earlier.

Q I'm not trying to.

A The oldest fuel first is the date of discharge in the fuel from the reactor, which indicates essentially the right of that facility or that contract holder in terms of the formulation of the queue, in terms of a specific fuel, that that contract holder can provide at the point of waste acceptance. That's only subject to the technical conditions of the fuel and also the -- whether or not the fuel is five-year cooled or older.

Q Okay. I'm going to now move on to another topic. But I would like you to do one thing, if you could, and if it's okay with your counsel.

I would like you to look back -- I'll show you where to go. Look back over your answer

Page 235

about the factors to consider in determining a reasonable acceptance rate and take a few minutes to review. And then I just want to ask you if there are any others that you would like to add to the list?

MR. LO RE: Can you identify the page?

MR. STOUCK: I'm looking for it. It looks like 15:06:33. 160, I guess. That's the time.

MR. LO RE: There's a gray line. Do you have a gray line?

MR. STOUCK: Yeah, it's 160. Just above that. It starts: The witness: Factors for consideration are whether or not any statutory limitation -- I think that was the first one he mentioned. Just at the bottom of the 159.

(Discussion off the record.)

BY MR. STOUCK:

Q Okay. Have you had a chance to review your response on the factors that -- to consider in determining a reasonable acceptance rate?

A Yes.

Page 236

Q Okay. Anything you want to add?

A No.

Q And just before we wrap up the topic, you referred to -- when I asked you about whether consistency with the intent of the Nuclear Waste Policy Act was a factor to consider, I think a part of your response was, to the extent the intent can be determined; do you recall that?

A Yes.

Q Okay. Are you, Chris Kouts -- I'm asking now Chris Kouts, are you able to testify about the intent of the Nuclear Waste Policy Act as it relates to determining a reasonable acceptance rate? Is that something you can testify about?

MR. LO RE: Objection. Calls for a legal conclusion.

THE WITNESS: No.

BY MR. STOUCK:

Q Okay. Do you want to take a break?

A Yeah.

Q Let's take a break now.

(Whereupon, at 3:20 p.m. a recess was taken until 3:26 p.m.)

Page 237

BY MR. STOUCK:

Q Topic number 6 is where I am. The reasonableness or unreasonableness of Dairyland's expenditures on private fuel storage initiatives.

Okay, Mr. Kouts?

A Okay.

Q All right. First of all, let's just get, again, sort of make sure we're on the same wavelength with respect to terms here. What is your understanding of the term "private fuel storage initiatives?"

A It is a private initiative to develop a spent fuel -- independent spent fuel storage installation in Utah on the Goschute reservation.

Q Okay. Do you know if, in the -- as phrased in the notice, if you look at that, and, you know, I was reading from that also in my questions, the word initiative has an "S" on it.

A Uh-huh.

Q Do you know if -- and you've referred to, certainly to one such initiative. Which I think is





A 19

917ffa92-9800-4498-95e6-5e4b9a24ccb0

19

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------:

DAIRYLAND POWER COOPERATIVE, :

Plaintiff, : COPY

: No. 04-106C

v. :

UNITED STATES OF AMERICA, :

Defendants. :

-------------------------------------:

Washington, D.C.

Thursday, May 3, 2007

Deposition of:

DAVID K. ZABRANSKY

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:14 a.m., when were present on behalf of the respective parties:


©2007

On behalf of Plaintiff:
ROBERT L. SHAPIRO, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3174

On behalf of Defendant:

MARIAN E. SULLIVAN, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 10150
Washington, D.C. 20005
(202) 307-6288



CONTENTS


EXAMINATION BY: PAGE
Counsel for Plaintiff 5
Counsel for Defendant 203




ZABRANSKY DEPOSITION EXHIBITS: * PAGE


1 Bates number HQR501 0029 65
2 Bates numbers HQR401 0027 through HQR401 0028 71
3 Bates number PLAC 0079761 78
4 Bates numbers PLAC 0079752 through PLAC 0079760 79
5 Bates numbers PLAC 0110411 through PLAC 0110416 97
6 Bates numbers PLAC 0097730 through PLAC 0097732 111
7 Bates number PLAC 0138340 112


(*Exhibits attached to transcript.)



PROCEEDINGS

\- - - - - - -

Whereupon,

DAVID K. ZABRANSKY

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SHAPIRO:

Q Good morning, Mr. Zabransky. I'm Robert Shapiro. I know we've sat opposite one another several times before for your deposition. And we'll start -- this is a new deposition because this is in the Dairyland Power Cooperative case. But I do want to ask a couple questions at the outset about your prior testimony. And obviously these are prefaced to the extent you can recall your prior testimony, either at trial or deposition, either in cases where I've been an attorney for the plaintiff or in other spent fuel cases.

And my question is is there anything you would like to change in any of your prior deposition or trial testimony in the spent fuel cases?





©2007

Page 6

MS. SULLIVAN: Objection. Vague.
THE WITNESS: Sitting here right now without the benefit of reviewing things, I'm not in a position to provide an answer to that question.
BY MR. SHAPIRO:
Q Was the answer then, as far as you can recall, there wasn't anything that you would like to change from your prior testimony?
MS. SULLIVAN: Objection to the extent it mischaracterizes the witness' testimony.
THE WITNESS: I think the answer is, is sitting here right now, it's difficult for me to recall specifics of the many, many, many days that I've spent in this process. So nothing comes to mind without reviewing things.
BY MR. SHAPIRO:
Q Is there anything in your prior spent fuel trial or deposition testimony that you now believe is incorrect?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: And I think, as in the previous answer, sitting here right now, I'm not

Page 7

aware of anything, without reviewing in detail, anything that I would classify as incorrect.
BY MR. SHAPIRO:
Q Is there anything in your prior spent fuel trial or deposition testimony that you now regret having said?
MS. SULLIVAN: Objection. Vague, relevance.
THE WITNESS: I mean I'm sure there are things, if I looked at transcripts of the deposition testimony, I probably said things I regret saying. I'm just not in a position today specifically to say what they might be.
BY MR. SHAPIRO:
Q Is there anything in any of your spent fuel trial or deposition testimony that you believe is being interpreted incorrectly by the utilities?
MS. SULLIVAN: Objection. Vague. Objection. Foundation.
THE WITNESS: And again, I'm not sure I'm in a position to determine or even know how utilities are interpreting my prior testimony or

Page 8

depositions.
BY MR. SHAPIRO:
Q All right. I'll move on to my next topic, which is -- and I'm not sure how much background you have into the reasons for your having an additional deposition today, Mr. Zabransky. But one of our reasons is to make sure we're up to date on some of the prior topics that were covered in previous depositions. And I would like to start just with your position at the Office of Civilian Radioactive Waste Management, I'll use the acronym OCRWM, and what's happening in your office there.
First, if you would tell me what is your current job title at OCRWM?
A My current job title hasn't changed in quite a while. It's nuclear utility specialist.
Q And what office are you in now at OCRWM?
A I think now it's called the -- either the Office of Waste Management or the Waste Management Office, depending on what you want to put first.
Q Is the Waste Management Office divided into any divisions?

Page 9

A No.
Q How many people work for the Waste Management Office?
A I think 10.
Q Chris Kouts is the director?
A Yes.
Q How long has the Waste Management Office had the current organization of Mr. Kouts as the director and no divisions under it?
A I don't know how many -- whenever the last reorganization took place. I don't know when that was. We have them periodically.
Q Do you have any recollection at all on the order of magnitude? Are you talking last year, last 5 years?
A Last few years. Last couple years.
Q And how does the Waste Management Office fit into the rest of the structure of OCRWM?
A It's one of the -- I don't know the exact number of offices that were created at the last reorganization that report to the director's office.
Q Does Mr. Kouts and the other office




©2007

Page 10

directors, do they report directly to the director? Is there a deputy director or somebody else in between?
MS. SULLIVAN: Objection. Compound.
THE WITNESS: There's a deputy director, but I believe they report directly to the director's office.
BY MR. SHAPIRO:
Q I think I recall that at our prior deposition, Mr. Milner was still working for OCRWM. And he had the title chief operating officer. And I know that Mr. Milner is retired from DOE. Is there another chief operating officer now?
A Yes, there is.
Q Who is that?
A Mr. Brownstein.
Q That's one of the roles that was always a little mystifying to me. Maybe you can explain for me your understanding of how -- how does the chief operating officer fit into the OCRWM structure?
A I don't have an understanding of that.
Q You don't have any understanding at all?

Page 11

A No. Don't relate -- don't deal with Mr. Brownstein. So I don't understand how it fits into the overall scheme of things.
Q Do you know of anyone who interacts with Mr. Brownstein?
MS. SULLIVAN: Objection. Foundation, speculation.
THE WITNESS: I'm sure there are people that interact with him. I don't interact with him on a regular basis other than talking with him as a friend.
BY MR. SHAPIRO:
Q Is Mr. Brownstein -- is he regularly on interoffice correspondence in the Waste Management Office and other parts of OCRWM?
MS. SULLIVAN: Objection. Foundation.
THE WITNESS: No. I don't believe so.
BY MR. SHAPIRO:
Q Is your understanding that Mr. Brownstein's role has more to do with continued work on completing the license application for Yucca Mountain?

Page 12

MS. SULLIVAN: Objection. Foundation.
THE WITNESS: And like I said, I'm not sure exactly what his roles and responsibilities are.
BY MR. SHAPIRO:
Q I believe you testified earlier that your title at OCRWM is nuclear waste specialist.
A No.
Q No. I'm sorry. I got that wrong. What was it?
A I believe I said nuclear utility specialist.
Q Nuclear utility specialist. Are there other nuclear utility specialists in the Waste Management Office?
A I don't believe so.
Q And you still have the title of contracting officer?
A I have the duties, yes. Yes.
Q And Mr. Pollog is still contracting officer's technical representative?
A That's correct.

Page 13

Q What duties do you have other than the duties of contracting officer?
A The -- I support Mr. Kouts in the other functions that fall within the Waste Management Office.
Q What sort of support do you provide to Mr. Kouts?
A I think I provide very good support to Mr. Kouts.
Q Can you describe for us particular roles that you play supporting Mr. Kouts?
A I'll assist Mr. Kouts in whatever efforts he's working on that he requests help in. Preparing presentations, drafting correspondence, working on technical issues relating to Yucca Mountain and waste acceptance and other issues like that.
Q What issues have you assisted Mr. Kouts on in the last year?
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: That -- I can't begin to enumerate the things that have come from the last year. In general, dealing with Qs and As from the



 ©2007

Page 14

Hill. Working on initiatives within the Department for the Yucca Mountain program. Working on procurements and other departmental initiatives that I'm not sure I can go into.
BY MR. SHAPIRO:
Q Why aren't you sure you can go into other departmental initiatives?
A The Department is doing -- is considering certain things or contemplating certain activities that are still being deliberated within the Department.
Q What procurements have you worked on in the past year?
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: I worked on the procurement to -- of the TAD as it's called, the transportation, aging and disposal canister proof of concept design studies. And I'm working on the procurement of the detail designs for the transportation, aging and disposal canister system.
BY MR. SHAPIRO:
Q You testified you're also working on

Page 15

initiatives from the Department. And you differentiated between some that you're not sure you can talk about and some that you didn't make that qualification. Which ones can you tell us about?
A I've been working on the TAD, transportation, aging and disposal, TAD, canister system effort for the last couple of years.
Q Any other initiatives?
A No. That's really the -- time consuming.
Q What percentage of your time do you estimate over the last, let's say, 2 years that you've spent on your contracting officer duties?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Maybe 30 percent of my time. Including activities like this.
BY MR. SHAPIRO:
Q And activities like this, you're including work on litigation?
A Uh-huh.
Q That's yes?
A That's correct. Sorry.
Q Overall, as a percentage of all your

Page 16

time, how much time do you estimate over the last 2 years that you've been spending on litigation related matters?
MS. SULLIVAN: I'm sorry. What was the time period?
MR. SHAPIRO: 2 years.
MS. SULLIVAN: 2 years.
THE WITNESS: I don't know. It's hard to say. I mean, other than when I'm actually testifying or -- I'm really not focused on it much. So I can't really say that it's been that big a percentage of my time over the last 2 years.
Quite frankly, I've lost track of the number of days.
BY MR. SHAPIRO:
Q In your estimate of how much of your time you've spent on litigation, are you including the time that you spend evaluating annual submittals from utilities with which the government has settled its litigation to determine the amount of additional compensation those utilities receive?
A Can you read that back so I understand.

Page 17

Q Sure. Let me break it up in a couple of parts.
You understand that the government has settled litigation with some utilities, correct?
A I understand that, yes.
Q Like one of those is Commonwealth Edison?
A Exelon Corp., yes.
Q Now called Exelon Corp. As part of that settlement, Exelon and other utilities that have reached similar settlements submit annual claims to the contracting officer seeking additional compensation. Are you familiar with that?
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: Yes. I'm familiar with that.
BY MR. SHAPIRO:
Q How much of your time over the last couple of years has been spent evaluating and otherwise addressing those claims to the contracting officer for additional compensation from those settling utilities?
MS. SULLIVAN: Objection. Vague,



 ©2007

Page 18

relevance.
THE WITNESS: I think over the last couple of years, I probably spent several weeks a year working on that stuff.
BY MR. SHAPIRO:
Q With whom do you work most closely at OCRWM?
A Mr. --
MS. SULLIVAN: Objection. Vague.
THE WITNESS: I presume you mean on a reporting relationship or --
BY MR. SHAPIRO:
Q Just in general, who do you interact with most at OCRWM?
A Mr. Kouts and Ms. Smith, Susan Smith.
Q What's Ms. Smith's role at OCRWM?
A She works for Mr. Kouts.
Q What's your understanding of Ms. Smith's duties?
A I'm not aware of her PD, what she does, her position description. You would have to ask Mr. Kouts or Ms. Smith exactly what her duties are.

Page 19

Q What sort of interactions do you have with Ms. Smith?
A She reports to Mr. Kouts. We work jointly on a number of issues, to support Mr. Kouts.
Q What issues are you working with Ms. Smith on?
A Can you be more clear?
Q Well, you've identified Ms. Smith as a person along with Mr. Kouts who you interact with the most at OCRWM. And you say you interact with her on certain issues. And I would like to know what those issues are.
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: Let's see. This week we're working on a presentation for Mr. Kouts to give at a conference he's going to be attending in a couple of weeks.
BY MR. SHAPIRO:
Q What's the presentation on?
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: I believe it's on the Yucca Mountain program and the Global Nuclear Energy

Page 20

Partnership.
BY MR. SHAPIRO:
Q And what other issues besides that presentation have you worked with Ms. Smith on in the last year?
A Ms. Smith and I often work on supporting Mr. Kouts in developing responses to congressional Qs and As.
Q What other projects have you worked with Ms. Smith on?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: I believe we worked jointly on the OMB Circular A-123 team.
BY MR. SHAPIRO:
Q What is OMB Circular A-123?
A I'm not quite sure. It's OMB -- it's an OMB circular that says we should do something. And Ms. Smith had the lead on that. And I provided minor assistance to her on that. But the greater context is really something I didn't focus on.
Q What's your understanding of the need for that OMB Circular A-123?

Page 21

MS. SULLIVAN: Objection. Foundation.
THE WITNESS: I don't have an understanding. I didn't -- I assisted. I didn't bother to find out exactly what the basis was.
BY MR. SHAPIRO:
Q What assistance did you provide?
MS. SULLIVAN: Objection. Relevance, vague.
THE WITNESS: I think I provided certain information with respect to the number of lawsuits and things like that.
BY MR. SHAPIRO:
Q Can you recall any other projects that you've worked on with Ms. Smith over the last year?
A Well, again, we've worked on numerous presentations over the last year and numerous Qs and As. I wouldn't call them projects. They're just activities that are pretty much consistent throughout the year that occur on a regular basis.
Q Well, can you describe the next activity that you can recall that happens on a regular basis?
A Are you asking me to describe different

Page 22

presentations as opposed to presentations in general?
Q Yes.
A I believe there was one last week to the US Transport Council that Mr. Kouts gave.
Q What was the subject of that presentation?
A I believe that subject was transportation, aging and disposal canisters, TAD canisters.
Q Do you recall working on presentations in any subjects other than TADs or the GNEP program?
A I think I spoke of the Yucca Mountain updates mostly. Besides those general topics, I'm not aware of any or don't recall any at this time.
Q Do you ever give such presentations, or are those given, at least within the Waste Management Office, are those all given by Mr. Kouts?
MS. SULLIVAN: Objection. Vague, compound.
THE WITNESS: I don't think there's any hard or firm rule. Mr. Kouts gives them. Other

Page 23

people give them when necessary.
BY MR. SHAPIRO:
Q What support does Mr. Pollog provide to you as contracting officer's technical representative?
A He provides technical support in administering the contracts.
Q What specific support has he provided to you in the last year?
A Tom supported the review of the annual submittals that were made by the utilities with which we have settlements.
Q Any other specific support that Mr. Pollog has provided to you in the last year?
A Tom provides -- you know, it's normal routine support, interfacing with the controller's office, et cetera. So I can't speak to specific issues that have come up. But he interfaces on a day-to-day basis with the DOE controller's office on payment issues, et cetera. So -- he's also serving as the contracting officer's representative on the existing TAD proof of concept contracts and

Page 24

anticipating serve as the COR on the new TAD procurement contracts for final design.
Q You testified that Mr. Pollog interfaces with the DOE controller's office on payment issues. What sort of payment issues?
A Utility payment issues.
Q Are you referring to utilities' quarterly payments of their fees under the Standard Contract?
A That's correct.
Q Are you referring to any other payment issues beyond those?
A No.
Q Do you supervise anyone at OCRWM?
A No, I do not.
Q What contractors of DOE do you interface with?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Are you talking -- I mean, contractors of the OCRWM program.
BY MR. SHAPIRO:
Q Contractors of the OCRWM program.
A I interface with many contractors, from

Page 25

BSC, Bechtel SAIC LLC, and Booz-Allen Hamilton and now I believe it's called the Legend Group, and Sandia National Labs, and associated subcontractors. Probably too numerous to recall.
Q What issues do you interface with Booz-Allen on?
A I interface with Booz-Allen on issues related to transportation -- to TAD canisters. And administration of the Standard Contract.
Q What sort of support does Booz-Allen provide on the administration of the Standard Contract?
A Booz-Allen supplies personnel to assist in the review of submittals from utilities pursuant to settlement agreements.
Q Other than those review of submittals pursuant to settlement agreements, is Booz-Allen supporting OCRWM in the administration of the Standard Contract in any other manner?
A In the administration of the contract, no.
THE WITNESS: Can I ask you a question?

Page 26

MS. SULLIVAN: There's not a pending question.

MR. SHAPIRO: No. Go ahead.

MS. SULLIVAN: We'll be right back.

(Discussion off the record.)

BY MR. SHAPIRO:

Q Other than -- we covered two issues that Booz-Allen -- that you've interfaced with Booz-Allen on, one being the TAD concept, the other being administration of the Standard Contract. Are there any other topics on which you interfaced with Booz-Allen?

A Booz-Allen's assisting in the TAD procurement process.

Q Anything else?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: Booz-Allen's assisting in certain departmental initiatives that are still under deliberation.

BY MR. SHAPIRO:

Q Which initiatives are those?

MS. SULLIVAN: I'm going to direct

Page 27

Mr. Zabransky not to answer with regard to there are two particular initiatives that are in deliberation or may be under deliberation that there's a formal assertion of deliberative process privilege by the Office of Civilian Radioactive Waste Management. And Mr. Zabransky's answer to that question will go into that material. So....

MR. SHAPIRO: He can't even identify the general topic?

MS. SULLIVAN: Uh-huh.

MR. SHAPIRO: All right. Well, let's move on for the time being then.

MS. SULLIVAN: Okay.

BY MR. SHAPIRO:

Q Another contractor you mentioned, Mr. Zabransky, is the Legend Group. On what issues do you interact with the Legend Group?

A I'm not quite sure yet. They're a new entity that's come on board that is an 8(a), so they've taken over certain responsibilities. But they've teamed with Booz-Allen Hamilton so, at this point, they've only been on board since March. I

Page 28

don't know exactly what their functions are versus Booz-Allen. I'm still dealing with the same people. So I'm not -- I can't really differentiate at this point.

Q Are there any issues that you can identify the Legend Group as working on?

A I would say they're the same as Booz-Allen at this point.

Q What's the relationship between Booz-Allen, the Legend Group, and Bechtel SAIC?

A As I just said, Legend Group is the 8(a). Booz is a partner with them. And neither have any relationship with Bechtel SAIC.

Q Another entity you mentioned is Sandia National Laboratories. On what issues do you interface with Sandia?

A I interface with Sandia on issues related to post-closure requirements for transportation, aging and disposal canisters.

Q Other than those post-closure requirements, do you work with Sandia on any other issues?

Page 29

A No.

Q We've covered contractors that you're currently interfacing with. Over the last, let's use the time period 3 years, are there any other OCRWM contractors that you had previously worked with that you're no longer working with?

A Without reviewing exactly when -- 3 years who was on board when, these are generally the same contractors that have been on board.

Q All right. Let's change subjects. I would like to cover, Mr. Zabransky, contacts you've had with the Dairyland Power Cooperative, the plaintiff in this case.

Have you ever been to Dairyland's LACBWR site in Genoa, Wisconsin?

A No.

Q Have you ever been to Dairyland's offices in La Crosse?

A No.

Q To your recollection, have you ever been to any Dairyland facility?

MS. SULLIVAN: Objection. Vague.





©2007

Page 30

THE WITNESS: I don't know what other facilities they have. So I can't say yes or no unless you identify them.
BY MR. SHAPIRO:
Q Have you ever met with any Dairyland employees or representatives?
A Yes.
Q On what occasion did you meet with Dairyland employees or representatives?
A I believe I probably met with them when I worked at Wisconsin Electric, in a different forum. But I don't recall exactly where. And since I've been at Wisconsin Electric -- excuse me, at the Department of Energy, I think there have been a number of times where Dairyland has come in over the years for different purposes.
Q Well, let me cover first your interaction with Dairyland for the time period back when you were working for WEPCO. On what issue did you meet with Dairyland employees or representatives at that time?
MS. SULLIVAN: Objection. Vague.

Page 31

THE WITNESS: And I think it mischaracterizes what I said. I said I may have met them at certain industry conferences, et cetera. I'm not sure we've met on any issues per se.
BY MR. SHAPIRO:
Q All right. Let's turn, then, to the time period since you've been working for OCRWM. What's the first meeting, the earliest meeting that you can recall that you had with any employees or representatives of Dairyland Power?
A I can't recall any specific meetings with them except perhaps the last meeting, which was sometime in 2004, I think.
Q So the last meeting that you've had with Dairyland is the only one that you can recall in any detail?
A In very sparse detail at that, yes.
Q What do you recall of that last meeting that you had with representatives at Dairyland Power Cooperative?
A I recall that a number of their representatives came in to meet with program

Page 32

management, I think it was early 2004, and to speak about their La Crosse -- or the LACBWR reactor and storage. And to talk about a demonstration program.
Q Who do you recall was there on behalf of Dairyland Power Cooperative?
A I -- again, I think Mr. Barrett was there. I'm not sure. I think he was there. And I'm sure Chuck Sans Crainte was there. I think it's S-A-N-S C-R-A-I-N-T-E or something like that.
Q C-R-A-I-N-T-E. Sans Crainte?
A Sans Crainte. And I think a guy named Christian, Roger Christian.
Q Roger Christian?
A May have been there.
Q At that meeting who was -- besides yourself, who was present from the Department of Energy?
A Again, my recollection of this meeting is only refreshed because I found an E-mail about it when I was going through my records for discovery. Other than that, I probably wouldn't have even remembered that meeting.

Page 33

So from our end, I still remember those names from the -- Dairyland's probably bringing these people. On our end, I'd have to guess, I'm sure it was Mr. Kouts was there with me. I'm not sure who else was there. Probably Mr. Paul Dickman at the time. I don't know if Margaret Chu attended or not.
Q What do you recall about the demonstration project that Dairyland wanted to talk about?
A I don't recall many details at all about it. They wanted to do some kind of demonstration.
Q Do you have any recollection of what Dairyland wanted to demonstrate?
A I think it was something like demonstrating shipping spent fuel.
Q Well, we've covered meetings with representatives of Dairyland Power Cooperative. Other than -- and the only one you specifically recall is that one in 2004. Do you recall speaking on the telephone with any employees or representatives of Dairyland?

Page 34

A Not -- perhaps in response to our setting up meetings. I don't know. I don't recall.

Q Other than delivery commitment schedule and final delivery schedule correspondence, do you recall any other correspondence that you've had with Dairyland Power Cooperative?

MS. SULLIVAN: Objection. Vague, relevance.

THE WITNESS: And are you talking about me personally?

BY MR. SHAPIRO:

Q You -- you personally.

A No, I don't. Not without reviewing the correspondence files.

Q Do you recall any correspondence between Dairyland and OCRWM other than correspondence dealing with delivery commitment schedules or final delivery schedules?

MS. SULLIVAN: Objection. Vague, foundation.

THE WITNESS: Again, I don't recall any such correspondence. If some exists it's in the

Page 35

correspondence files, and I didn't review those.

BY MR. SHAPIRO:

Q Do you recall any other contacts between yourself and Dairyland Power Cooperative beyond what we've already discussed today?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: I'm sure, again, over the years, I've talked to Dairyland people. I don't recall any specifics at this point.

BY MR. SHAPIRO:

Q The next topic I would like to discuss with you, Mr. Zabransky, is what knowledge you have of Dairyland Power Cooperative.

Why don't we start, generally, what do you know about Dairyland?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: This is what I know about Dairyland?

Other than the fact that when I lived in Wisconsin they were the reactor on the other side of the state, and it was an Allis-Chalmers reactor. It was known as the tractor reactor. And it was shut

Page 36

down really early. And it was a small plant. And one of my friends at Wisconsin Electric came from there. And it was a cooperative. I didn't know much more about it.

BY MR. SHAPIRO:

Q What do you mean by a tractor reactor?

A Allis-Chalmers mainly made tractors. I think it was a derogatory term.

Q What knowledge do you have of Dairyland's LACBWR site in Genoa, Wisconsin?

A Up until the 2004 meeting where they showed us a site layout, which I don't recall, I had no knowledge of it.

Q Well, I'm asking as of today, other than being shown that site in that 2004 meeting, do you have any other knowledge of Dairyland's LACBWR site?

A I believe it's on the Mississippi. I believe it shares a site with some coal plants. But that's about all I know about it.

Q What knowledge do you have about Dairyland's spent nuclear fuel?

MS. SULLIVAN: Objection. Vague.

Page 37

THE WITNESS: Yeah. Can you be more specific? I mean, it's radioactive.

BY MR. SHAPIRO:

Q What's your understanding of -- well, let's start with the amount of spent nuclear fuel that Dairyland has?

A I believe -- again, my memory is probably not precise on this. It's somewhere in the 30, 40-ton range, metric tons, I believe. I'm not sure of the exact quantity.

Q And what's your understanding of the condition of Dairyland's spent nuclear fuel?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: Well, my -- based upon what I've observed in the 859 reports, there's, I believe, quite a number of identified failed assemblies. It's also stainless steel clad fuel. So I'm not sure of the exact condition. But -- I've never seen it personally.

BY MR. SHAPIRO:

Q And what's your understanding of how Dairyland's spent nuclear fuel is being stored?





©2007

Page 38

MS. SULLIVAN: Objection. Vague.
THE WITNESS: To my belief, it's still currently being stored in a pool. But I'm not sure that I would be the best person to know that.
BY MR. SHAPIRO:
Q Do you have any knowledge of how much it costs Dairyland to maintain its spent nuclear fuel in -- stored in its pool?
MS. SULLIVAN: Objection. Vague, foundation.
THE WITNESS: No.
BY MR. SHAPIRO:
Q Do you have any knowledge of Dairyland's finances?
MS. SULLIVAN: Objection. Vague, relevance.
THE WITNESS: No.
BY MR. SHAPIRO:
Q What do you know about Dairyland's claim for damages in this litigation?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Nothing.

Page 39

BY MR. SHAPIRO:
Q What is your understanding of the components of Dairyland's damages claim in this litigation?
MS. SULLIVAN: Objection. Vague, foundation, asked and answered.
THE WITNESS: I haven't seen it. I have no idea what's in it.
BY MR. SHAPIRO:
Q Well, I'll represent to you at least initially that one component of Dairyland Power Cooperative's claim for damages is for costs to maintain its spent nuclear fuel in wet storage since 1998.
Do you have any knowledge, Mr. Zabransky, that would support a conclusion that Dairyland could have maintained its spent nuclear fuel in wet storage more cheaply than it has?
MS. SULLIVAN: Objection. Vague, relevance, foundation -- not relevance. Sorry. Vague, foundation, speculation.
THE WITNESS: And since I have no idea

Page 40

what they've done or what it's cost them or any specifics, I have no idea what they've done. So I can't even answer a question as to could they have done it differently. I don't even know what they did in the first place.
BY MR. SHAPIRO:
Q What would a reasonable cost be to maintain spent nuclear fuel in wet storage?
MS. SULLIVAN: Objection. Vague, foundation, relevance.
THE WITNESS: And I'm not sure I'm in a position to determine what a reasonable cost is. I don't know.
BY MR. SHAPIRO:
Q So would $10 million per year be a reasonable cost to maintain spent nuclear fuel in wet storage?
MS. SULLIVAN: Objection. Vague, foundation, speculation.
THE WITNESS: It might be. It might be that $50,000 might be a reasonable cost. I don't know the circumstances.

Page 41

BY MR. SHAPIRO:
Q Can you explain for me how a utility could store spent nuclear fuel on an annual basis for $50,000 in a spent fuel pool?
MS. SULLIVAN: Objection. Foundation, relevance.
THE WITNESS: Again, I threw out a hypothetical. I don't know the basis for 50. I don't know the basis for 10 million.
BY MR. SHAPIRO:
Q Well, you've testified that one of your roles is to review annual submittals, settlements that utilities have offered for consideration by the contracting officer. That work doesn't provide you any information to provide even on an order of magnitude basis a reasonable cost estimate for maintaining spent nuclear fuel at a utility site?
MS. SULLIVAN: I'm going to direct Mr. Zabransky not to answer that question on the grounds of attorney work product, attorney/client communication, and also Rule 408, and relevance. It's also objectionable on relevance.





©2007

Page 42

THE WITNESS: What time is it?
MS. SULLIVAN: It's just after 10:00. We haven't been going an hour yet.
MR. SHAPIRO: If you would like a break.
THE WITNESS: No. Maybe 15 minutes.
MR. SHAPIRO: Ms. Sullivan, I would like you to consider your instruction, whether you really want to maintain that instruction on all the grounds that you mentioned. For example, relevance and Rule 408 are not grounds for an instruction not --
MS. SULLIVAN: I realize that. Not to answer. My instruction not to answer is on the grounds of privilege, attorney work product and attorney/client. The work that Mr. Zabransky does evaluating settlement proposals is at the direction of the Department of Justice. And that's the basis for my instruction not to answer.
The relevance is that what he may evaluate from other utilities is irrelevant to this matter.
And 408 is that, what he learns at settlement is not evidence that can be presented to

Page 43

a court subject to 408 and wouldn't provide the basis for any discovery in this matter.
I mean if you can't get it -- he can't testify about it in court, you can't get it in court, why would he be allowed to testify about it here? That's the basis for my objection and my instruction.
BY MR. SHAPIRO:
Q Mr. Zabransky, is it your testimony that you have no knowledge of what a reasonable cost would be for a utility to maintain spent nuclear fuel at its site?
MS. SULLIVAN: I'm going to direct you answer that outside of what you may know from the work you've done at the direction of the Department of Justice with regard to settlement matters.
THE WITNESS: And with the caveat that my knowledge is informed by what I've done for work for the Department of Justice, I really don't have a basis outside that work. And those are specific to specific utilities.
BY MR. SHAPIRO:

Page 44

Q I'm not asking how you obtain knowledge. It would certainly be our legal position that you can't shield your knowledge by the form in which you might have gained it.
Do you have any knowledge about what a reasonable cost would be for a utility to store spent nuclear fuel at its site?
MS. SULLIVAN: Same direction and same objection. And asked and answered.
THE WITNESS: Again, I mean, I think I've been instructed by counsel not to base my answer on what I've learned working for counsel. And what I've learned working for counsel, without going beyond that, is that every utility is different. And every cost is different. So without knowing the specifics, I can't give you a reasonable number.
BY MR. SHAPIRO:
Q You don't have any knowledge that Dairyland could have stopped maintaining its spent nuclear fuel in wet storage before now, do you?
MS. SULLIVAN: Objection. Vague, foundation, assumes facts not in evidence.

Page 45

THE WITNESS: And I'm not sure I understand the question. Are you asking me could they have done the dry storage before now?
BY MR. SHAPIRO:
Q Could Dairyland have gone to dry storage or found any other means of ceasing its cost of maintaining its spent nuclear fuel in wet storage?
MS. SULLIVAN: Objection. Foundation, compound, speculation and vague.
THE WITNESS: And only Dairyland can tell -- I don't know what Dairyland could have done. I'm not aware of what they could have done or when they could have done it.
BY MR. SHAPIRO:
Q Let me cover specifically dry storage, one option you mentioned. You don't have any knowledge that Dairyland could have implemented dry storage before now, do you?
MS. SULLIVAN: Objection. Vague, foundation.
THE WITNESS: I don't have any knowledge of anything that would have prevented them from

Page 46

implementing dry storage before now.
BY MR. SHAPIRO:
Q Well, if you would answer my question, please, Mr. Zabransky. You don't have any knowledge that Dairyland could have implemented dry storage before now, do you?
MS. SULLIVAN: Same objections.
THE WITNESS: And again your question is partial. I mean, your -- I have no knowledge whether they could have implemented it before now or couldn't have implemented it before now. It would be up to them. Utilities have implemented dry storage for years.
BY MR. SHAPIRO:
Q You don't have any understanding as to why Dairyland has not implemented dry storage at its site before now, do you?
MS. SULLIVAN: Objection. Asked and answered. Same objections.
THE WITNESS: I don't know what Dairyland's considerations have been, no.
BY MR. SHAPIRO:

Page 47

Q You don't know whether Dairyland could construct an ISFSI at its LACBWR site under current NRC regulations, do you?
MS. SULLIVAN: Objection. Foundation. Speculation, vague, and it calls for a legal conclusion.
THE WITNESS: I don't have any information as to what they can or cannot do.
BY MR. SHAPIRO:
Q You don't have any opinion that it has been unreasonable for Dairyland not to implement dry storage before now, do you?
MS. SULLIVAN: Objection. Legal conclusion, vague, foundation, speculation.
THE WITNESS: And given my prior answer that I have no idea what they could or couldn't have done, I have no basis for making any determination.
BY MR. SHAPIRO:
Q I'll represent to you, Mr. Zabransky, that Dairyland has also incurred costs to explore the development of an on-site ISFSI. You don't have any knowledge indicating that Dairyland could have

Page 48

accomplished this work at a lower cost than it has, do you?
MS. SULLIVAN: Objection. Foundation, vague, speculation.
THE WITNESS: Since I have no idea what the costs were that they've incurred, I can't answer your question, sir.
BY MR. SHAPIRO:
Q You don't have any knowledge indicating that it has been unreasonable for Dairyland to incur costs to explore development of an on-site ISFSI, do you?
MS. SULLIVAN: Objection. Legal conclusion, vague, foundation, speculation.
THE WITNESS: And, again, without knowing what costs they've incurred, whether they're reasonable or not, from a common man perspective, I can't answer it.
BY MR. SHAPIRO:
Q But you would agree that it has been reasonable for Dairyland to at least explore the possibility of developing an ISFSI at its LACBWR

Page 49

site?
MS. SULLIVAN: Objection to the extent it mischaracterizes the witness' testimony. Objection, vague, foundation, speculation and legal conclusion.
THE WITNESS: If your question is is it reasonable from an engineering perspective to consider options? Yes. Whether the costs that are incurred are reasonable or not, I have no idea.
Can we take a break now?
MS. SULLIVAN: Sure. Is that all right?
MR. SHAPIRO: Sure. Absolutely.
(Whereupon, a recess was taken between 10:12 a.m. and 10:24 a.m.)
BY MR. SHAPIRO:
Q Can you think of any reason, Mr. Zabransky, why it would be unreasonable for Dairyland to develop an ISFSI at its LACBWR site?
MS. SULLIVAN: Objection. Legal conclusion, vague, foundation, speculation.
THE WITNESS: And, again, I don't know what the circumstances would be. So whether it's reasonable or unreasonable or not, I don't know.

Page 50

BY MR. SHAPIRO:
Q I'll represent to you, Mr. Zabransky, that Dairyland has incurred costs to help develop a private fuel storage initiative. Are you familiar with private fuel storage?
A I'm familiar with the project, yes.
Q You don't have any knowledge indicating that it has been unreasonable for Dairyland to have incurred these costs toward the development of private fuel storage, do you?
MS. SULLIVAN: Objection. Legal conclusion, vague, foundation, speculation.
THE WITNESS: I don't know what costs they've incurred. So I don't know whether it would be reasonable or unreasonable.
BY MR. SHAPIRO:
Q To your knowledge, the Department of Energy has no position on whether private fuel storage is a good idea or not, true?
MS. SULLIVAN: Objection. Vague, speculation.
THE WITNESS: And, again, I'm not sure

Page 51

how you define good idea.
BY MR. SHAPIRO:
Q Does the Department of Energy have any position on whether private fuel storage should be built?
MS. SULLIVAN: Objection. Vague, foundation.
THE WITNESS: And this is a question you're asking me as me. So to the extent I believe the Department has issued some letters on that and maybe has made some statements, I don't recall what they are specifically, but those letters and statements and others would be in a position to know what the Department's position is. I can't speak for the Department's position.
BY MR. SHAPIRO:
Q Have you ever done any work in your position at OCRWM that concerns private fuel storage?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: And I guess can you clarify concerns private fuel storage.

Page 52

BY MR. SHAPIRO:
Q Well, I'll come up with some examples. Have you worked on any responses to congressional inquiries about private fuel storage?
A I believe that there are points in time where I may have collected data from public Web sites as to the schedule for private fuel storage and the status, to respond to congressional inquiries.
Q Have you ever addressed any issues concerning transportation of spent nuclear fuel, either to or from the proposed site for private fuel storage?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: And with respect to transportation to or from private fuel storage, no, I have not.
BY MR. SHAPIRO:
Q Have you addressed any issues concerning the spent fuel storage system that has been proposed for use at private fuel storage?
MS. SULLIVAN: Objection. Vague,

Page 53

foundation, assumes facts not in evidence.
THE WITNESS: With the caveat that that's some type of Holtec system, H-O-L-T-E-C, system, I believe at this point, not specifically with respect to private fuel storage. But may have addressed similar systems for other locations.
BY MR. SHAPIRO:
Q In your work on the TAD concept for the Department of Energy, has any of that work considered how TADs might be used at private fuel storage?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: No.
BY MR. SHAPIRO:
Q I'll represent to you, Mr. Zabransky, that Dairyland is also claiming damages related to the removal of its reactor pressure vessel. You don't have any knowledge indicating that Dairyland could have performed the work that it's doing to remove its reactor pressure vessel at a lower cost than it's incurring, do you?
MS. SULLIVAN: Objection. Vague,