foundation, assumes facts not in evidence.
THE WITNESS: And I have no knowledge of the work or of the costs they're incurring. So I can't give a basis as to whether it could have been done for more or less.
BY MR. SHAPIRO:
Q Do you understand that Dairyland is claiming that it could have removed its reactor pressure vessel at a lower cost if its spent nuclear fuel were not in its spent fuel pool?
MS. SULLIVAN: Objection. Vague, foundation. Foundation. Yeah. Go ahead.
THE WITNESS: And no, I have no understanding of that.
BY MR. SHAPIRO:
Q I'll represent to you, Mr. Zabransky, that that's the case, that Dairyland is claiming it could have removed its reactor pressure vessel at a lower cost if its spent nuclear fuel were not still present in its spent fuel pool.
You don't have any knowledge that would be inconsistent with Dairyland's contention in that



regard, do you?
MS. SULLIVAN: Objection. Vague, legal conclusion.
THE WITNESS: I don't have any knowledge that either supports their contention or refutes it.
BY MR. SHAPIRO:
Q Next topic, Mr. Zabransky, I would like to talk about is the anticipated timing of the Department's performance in terms of accepting spent nuclear fuel. And we're still -- and you noted this earlier, we are still talking to you at this point just in your individual deposition as opposed to a 30(b)(6) designation. I don't think you -- you are the designee on this issue for the Department.
But as an individual, when do you expect the Department to start accepting spent nuclear fuel from utilities?
MS. SULLIVAN: Objection. Vague, relevance.
THE WITNESS: And can you repeat the question.
BY MR. SHAPIRO:



Q When do you expect the Department of Energy to start accepting spent nuclear fuel from utilities?
MS. SULLIVAN: And foundation. Same objections. Foundation and speculation.
THE WITNESS: Basically all I can tell you is that the program has Mr. -- Mr. Sproat has announced or said on a number of occasions that the best achievable date is 2017.
BY MR. SHAPIRO:
Q I'm certainly familiar with Mr. Sproat's statements. Do you have any estimate yourself, Mr. Zabransky, of when you expect, based upon all of your work on these issues over the years, when you expect the Department to start accepting spent nuclear fuel?
MS. SULLIVAN: Objection. Vague, relevance, foundation.
THE WITNESS: I have no basis to disagree with Mr. Sproat's assessment.
BY MR. SHAPIRO:
Q You're aware that Mr. Sproat has stated



publicly that he believes that 2020 is actually a more likely date of when the Department will actually start expecting -- accepting utilities' spent fuel because the 2017 best achievable date doesn't take into account litigation, true?
MS. SULLIVAN: Objection. Assumes facts not in evidence, vague, foundation.
THE WITNESS: And, again, I'm aware of Mr. Sproat has made statements that the 2017 best achievable date was conditioned upon certain things. I believe that may have been one of them. I'm not sure that's a totally accurate quote. But those are things he said in the press.
BY MR. SHAPIRO:
Q You don't have any basis for disagreeing with Mr. Sproat's assessment, do you?
MS. SULLIVAN: Objection. Asked and answered, relevance, vague, foundation.
THE WITNESS: No, I don't.
BY MR. SHAPIRO:
Q Do you agree with Mr. Sproat that 2020 is a more likely date for when the Department will



 ©2007

Page 58

start to accept utilities' spent fuel than 2017?
MS. SULLIVAN: Objection. Relevance, foundation, vague.
THE WITNESS: And I'm not privy to all the information Mr. Sproat has. So I have no basis to agree or disagree. He has more information than I have. I defer to his judgment.
BY MR. SHAPIRO:
Q You're aware, aren't you, that Mr. Sproat has also stated publicly that he believes the 2017 best achievable date is probably a slip-by year because of the limited appropriations that OCRWM has received for the 2007 fiscal year, true?
MS. SULLIVAN: Objection to the extent it mischaracterizes Mr. Sproat's statements that have not been provided to the witness. Relevance, vague, foundation.
THE WITNESS: And, again, I'm aware that Mr. Sproat has said something about the issue with the appropriations. I don't know the specific statement without seeing it. I'm not aware that we've -- that anything has changed from the best

Page 59

achievable date being anything but 2017.
BY MR. SHAPIRO:
Q From your perspective, the work that you're doing at OCRWM, how likely do you think it is that OCRWM will, in fact, meet that 2017 best achievable date?
MS. SULLIVAN: Objection. Relevance, vague, foundation.
THE WITNESS: And I -- as I said moments ago, I'm not in a position to know what's going on throughout the program. From my perspective and the areas I work in, there should be no reason that we couldn't meet those dates.
BY MR. SHAPIRO:
Q But you would agree that there's a nonnegligible chance that the Department of Energy may not start accepting utilities' spent fuel until some period much later than 2017, true?
MS. SULLIVAN: Objection. Relevance, vague, to the extent it mischaracterizes the witness' prior testimony, foundation.
THE WITNESS: And to the extent that

Page 60

things could happen to delay it, that's always a potential. But things could happen to accelerate it. Who knows? I don't know.
BY MR. SHAPIRO:
Q What could happen that would accelerate the Department's receipt of spent nuclear fuel from utilities before 2017?
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: Again, you're asking me to speculate. But as to whether it could be delayed. I could speculate it be advanced. Congress could pass different legislation. I don't know.
BY MR. SHAPIRO:
Q You didn't quite answer my earlier question actually about 2017. You would agree that the chance of the Department of Energy's acceptance of utilities' spent fuel, that that could be delayed significantly beyond 2017, that that's a nonnegligible possibility. True?
MS. SULLIVAN: Objection. Compound, vague, relevance, foundation, speculation.
THE WITNESS: And, again, you're asking

Page 61

me to speculate could it go later. And I said sure. But it could equally go earlier. I don't know.
BY MR. SHAPIRO:
Q The part of your answer that is missing for me is do you consider the chance that the Department's acceptance could deviate from 2017, you would agree that that's a nonnegligible chance?
MS. SULLIVAN: Same objections and asked and answered.
THE WITNESS: And I think what I'm saying, Mr. Shapiro, it's nonnegligible it could be delayed. It's nonnegligible it could be advanced.
BY MR. SHAPIRO:
Q Next topic I would like to cover with you, Mr. Zabransky, is the Department's work and your work on developing contracts for new nuclear reactors.
MS. SULLIVAN: Go ahead. Sorry.
BY MR. SHAPIRO:
Q You're aware that the Department is developing contracts with wording other than the current Standard Contracts to cover newly

Page 62

contemplated nuclear reactors, true?
MS. SULLIVAN: I'm going to direct the witness not to answer. There's been a formal assertion of deliberative process by the Office of Civilian Radioactive Waste Management concerning any consideration of, analysis of contracts for new reactors that may be built.
MR. SHAPIRO: Let me ask, Ms. Sullivan, you said there has been a formal assertion. Where is the formal assertion?
MS. SULLIVAN: Mr. Brownstein, the current delegee on behalf of OCRWM, has executed an assertion, a formal declaration asserting deliberative process to preclude Mr. Zabransky's testimony on this topic.
MR. SHAPIRO: Let me respectfully explore the contours of what we, you know, can or can't inquire into to try to minimize the chances of a discovery dispute, or at least to frame it.
BY MR. SHAPIRO:
Q Are you aware, Mr. Zabransky, that there have been public statements by the Department that

Page 63

it is working on a new standard -- or a new contract to cover new nuclear power plants?
A I'm not sure that's the exact statement that's been made by the Department. The Department has acknowledged that it needs to develop -- to sign contracts for new reactors. I'm not sure what it said with respect to what it's doing.
Q What publicly available explanations has the Department offered as to why it has to develop new language for contracts for the acceptance of spent nuclear fuel from new reactors as opposed to simply using the existing wording in the Standard Contracts?
MS. SULLIVAN: Objection. Vague. Objection. Assumes facts not in evidence. And I direct the witness to answer only as to what he knows to be public statements and not testify as to any matters that -- over which the Department has asserted deliberative process with regard to the consideration or analysis of the need for contracts for new reactors.
Do you understand that instruction?

Page 64

THE WITNESS: I do. And I guess I'm not aware -- if you want to show me the statement you're referring to. But I'm....
BY MR. SHAPIRO:
Q Well, I don't have any specific statements that I know are publicly available that I have in my list of exhibits.
Are you aware of any publicly available statements that -- or public statements by the Department explaining why it is developing a new contract for the acceptance of spent nuclear fuel?
MS. SULLIVAN: Objection. Assumes facts not in evidence, foundation. And the same direction with regard to answer only as to what public statements you may be aware of.
THE WITNESS: And I'm aware of statements that, to the effect that the Department recognizes it needs to sign contracts for new reactors. I'm not aware of the statements that you attribute to the Department. If you show where they are.
BY MR. SHAPIRO:
Q What's your understanding as to why the

Page 65

Department is developing new contract language?
MS. SULLIVAN: And I'm going to direct him not to answer that question based on the assertion of deliberative process privilege.
MR. SHAPIRO: Let's mark this Exhibit 1.
(Zabransky Exhibit Number 1 was marked for identification.)
BY MR. SHAPIRO:
Q Mr. Zabransky, you've been handed what's marked as Exhibit 1 to your deposition. It appears to be a printout of an E-mail from Jane Taylor, dated December 13, 2006, to a number of individuals. And you're listed as a cc.
Do you recognize this E-mail?
MS. SULLIVAN: I'm going to direct the witness not to answer questions about this document for the same reasons that I think this falls within the assertion of deliberative process. And I'm concerned that this document was produced.
Is this part of the documents that were just recently produced?
MR. SHAPIRO: I frankly don't know



 ©2007

Page 66

exactly when it was produced, but I know it was produced by the Department.

MS. SULLIVAN: Based on the date December 13, 2006 I think it's part of the recent production of Dairyland.

MR. SHAPIRO: I imagine it was produced after that date.

MS. SULLIVAN: Right. So that's going to be -- that's going to be my instruction.

MR. SHAPIRO: Are you anticipating that the government's going to be calling back this E-mail?

MS. SULLIVAN: We probably will. I don't know what -- I don't know what the protective order in Dairyland provides for. I need to research that. Let me -- actually, let me provisionally claw back, once I -- until I have an understanding as to why, what the parameters of the clawback provision are in Dairyland.

MR. SHAPIRO: Well-- let's put Exhibit 1 aside for the moment.

MS. SULLIVAN: Okay.

Page 67

BY MR. SHAPIRO:

Q Mr. Zabransky, is the Department of Energy currently negotiating with any particular utilities about the wording of a -- new wording for a contract for the removal of spent nuclear fuel?

MS. SULLIVAN: Assumes facts not in evidence. I'm going to direct him not to answer the question on the basis of the assertion of deliberative process. I'm sorry, you want to know whether he's talking with --

MR. SHAPIRO: Yes.

MS. SULLIVAN: Whether he knows?

MR. SHAPIRO: Right.

MS. SULLIVAN: Can I have a second?

MR. SHAPIRO: Sure.

(Discussion off the record.)

MS. SULLIVAN: Yeah. I'm going to maintain my instruction not to answer because I don't want his answer to be construed as a waiver of the privilege, the assertion of privilege over all matters relating to DOE's deliberations with regard to new contracts.

Page 68

MR. SHAPIRO: My question is -- let's make sure that we've got the right instruction to the right question.

My last question was whether Mr. Zabransky is aware whether the Department is negotiating with any particular utilities about the wording of a new contract for the removal of spent nuclear fuel. Not about internal deliberations, but whether there are external discussions.

MS. SULLIVAN: And I understand that you want to know, and I understand that discussions they might be having with other utilities or specific utilities would not be privileged. But Mr. -- allowing Mr. Zabransky to testify as to whether or not he knows goes down the road of letting him testify about these matters generally, and subjects him to questioning about matters that he may be providing advice about, which is the nature of the deliberative process privilege and why the Department has chosen to assert it.

I don't know if there's another way that we can give you the answer that no, they're not

Page 69

talking to the utilities. But I can't let Mr. Zabransky talk about that.

BY MR. SHAPIRO:

Q Do you have any expectation, Mr. Zabransky, of the time frame when the Department might be issuing new language for contracts for the removal of spent nuclear fuel such that we could talk about the document?

MS. SULLIVAN: I'm going to direct him not to answer that question as well. I would also like to lodge a relevance objection to all questions about new -- contracts for new reactors that may be built. But I'm going to instruct him not to answer that based on the assertion of the deliberative process privilege by the Department.

BY MR. SHAPIRO:

Q Let me ask a couple more of my questions, not that I'm not anticipating an objection, but, again I want to frame the issue.

What changes is DOE considering making in the wording of new contracts for the removal of spent nuclear fuel that would be different than the

Page 70

current Standard Contracts?
MS. SULLIVAN: Relevance and the same direction not to answer based upon the Department's assertion of deliberative process privilege over this matter.
BY MR. SHAPIRO:
Q. What if any provisions is the Department considering putting into those new contracts for the acceptance of spent nuclear fuel that would address the rate of acceptance of spent nuclear fuel from utilities?
MS. SULLIVAN: Same objection. Relevance. And same direction not to answer.
BY MR. SHAPIRO:
Q What provisions for -- in new contracts for the acceptance of spent nuclear fuel by the Department is the Department considering that would address the sequence of removal of utilities' spent nuclear fuel?
MS. SULLIVAN: Objection. Relevance. Objection. Assumes facts not in evidence. And the same direction not to answer based on the assertion

Page 71

of the deliberative process privilege.
MR. SHAPIRO: Exhibit 2.
(Zabransky Exhibit Number 2 was marked for identification.)
MS. SULLIVAN: Yep. I'm going to provisionally call this one back. And we will have to let you know.
MR. SHAPIRO: All right.
MS. SULLIVAN: Thank you.
MR. SHAPIRO: Just, for the record, Mr. Zabransky, we had marked -- I don't think anything would otherwise appear in the record. We had marked for purposes of identification Exhibit 2 to your deposition what appears to be an E-mail -- printout of an E-mail from Ben McRae to a number of individuals, topic is meeting on Standard Contract. The date is December 5th of 2006.
Ms. Sullivan has indicated that the Government will want to likely claw back -- that back.
MS. SULLIVAN: And both Exhibit 2 and Exhibit 1 have been marked -- the majority of --

Page 72

both Mr. McRae and Ms. Jane Taylor, who is the author of Exhibit 1, are both attorneys from the Department of Justice. And I believe that most of the recipients are also attorneys. So that would be the basis for an assertion of privilege and the subject matter.
But we will get back to you about our clawback of that.
BY MR. SHAPIRO:
Q Who is Martha Crosland?
MS. SULLIVAN: You can answer that question.
THE WITNESS: She's an attorney in the Office of General counsel.
BY MR. SHAPIRO:
Q Of the Department of Energy?
A Department of Energy.
Q And who is Mary Neumayr?
A I believe she's the assistant general counsel of the Department of Energy.
Q And Mr. McRae is an assistant general counsel at the Department of Energy?

Page 73

A I think he's the deputy assistant counsel.
Q Who was Neal Strauss?
A I think he was an assistant general counsel before he retired at the end of the year.
Q Who is Cathy Reynolds?
A She's an attorney that works for Martha Crosland.
Q What area of the general counsel's office is Ms. Crosland responsible for?
A She reports to Mr. McRae.
Q And what area is Mr. McRae responsible for?
MS. SULLIVAN: Relevance. Go ahead.
THE WITNESS: I believe he's the deputy assistant general counsel for civilian nuclear programs.
BY MR. SHAPIRO:
Q And who is Mike Bowers?
A I believe he works -- an attorney who works for Mr. Strauss.
Q Who have I left out? Who is David Hill?

Page 74

A David Hill is general counsel.
MS. SULLIVAN: With the Department of Energy.
THE WITNESS: With the Department of Energy.
BY MR. SHAPIRO:
Q I may want to come back later, Mr. Zabransky, for some additional questions to you in your individual capacity. But I think at this point I would like to switch to your role as a designee of the government to address certain topics pursuant to Rule 30(b)(6) of the court's rules.
Are you aware that you've been designated by the government as a designee to address certain topics?
A Yes, I am.
Q Let's start to run down some of those. One of those topics that you've been identified as the designee on is the purpose and role of delivery commitment schedules and final delivery schedules under the Standard Contract. Are you aware that you're the designee on that issue?

Page 75

A Yes, I am.
Q What is the -- from the Department's perspective, what is the purpose of delivery commitment schedules under the Standard Contract?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: The purpose of the delivery commitment schedules, or DCSs, is to initiate the scheduling process and to determine the spent fuel commitments for pickup from utilities by the Department.
BY MR. SHAPIRO:
Q Can you explain for me how do the delivery commitment schedules determine spent fuel commitments for the pickup from utilities by the Department?
MS. SULLIVAN: Objection to the extent it mischaracterizes the witness' testimony.
THE WITNESS: Again, the planning basis as implemented by the contracting officer requires that the DCSs, which are submitted at least 63 months before the year of delivery by the utilities, specify the fuel types, fuel ranges they

Page 76

want picked up from what facilities in a given year. And the Department would initiate -- would acknowledge those and transmit back to them its agreement to perform those services in those years.
So -- yeah.
BY MR. SHAPIRO:
Q Are you saying that approved delivery commitment schedules are binding in some manner on utilities?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection to the extent it mischaracterizes the witness' testimony.
THE WITNESS: And I -- the testimony I'm giving is that I believe -- the Department believes they're binding on both parties to approve delivery commitment schedules.
BY MR. SHAPIRO:
Q What's your understanding of what an approved delivery commitment schedule binds the utility to do?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion, and vague.

Page 77

THE WITNESS: Basically, it requires them or binds them to provide fuels of the ranges they've indicated fuel range -- dates they've indicated basically when, in the year they've indicated they provide it, from the facility they indicate they would like it picked up from.
BY MR. SHAPIRO:
Q What's the basis of the government's position that the approved delivery commitment schedules requires or binds utilities to provide fuels of the ranges indicated on the delivery commitment schedule forms?
MS. SULLIVAN: Objection. Legal conclusion, and vague.
THE WITNESS: And, again, I mean the contracting officer's guidance, instructed them to complete the forms, instructed them to have that form executed by someone who could bind the company to the information provided on the form. And the Department's expectation has been that that information on the form is something we can rely upon in planning our waste acceptance and



 ©2007

transportation systems.
BY MR. SHAPIRO:
Q There's nothing on the delivery commitment form itself that says it's binding on either utilities or the Department, true?
MS. SULLIVAN: Objection. Legal conclusion, vague, assumes facts not in evidence.
THE WITNESS: And without seeing the form, I'm not sure it says that on there. I believe it does say on the form that information they're providing is truthful under penalty of law. And we rely upon it based upon their assertion that it's binding their company to provide fuel in that fuel range.
(Zabransky Exhibit Number 3 was marked for identification.)
BY MR. SHAPIRO:
Q Mr. Zabransky, you've been handed what's been marked as Exhibit 3 to your deposition. You recognize this document, don't you?
A It's a blank DCS form.
Q Can you point me to anything on this DCS



form, Exhibit 3, that indicates that it is binding on a utility?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: No. On the form, per se, no. I think you have to go to the instructions with the form -- that came with the form from the contracting officer.
(Zabransky Exhibit Number 4 was marked for identification.)
BY MR. SHAPIRO:
Q Mr. Zabransky, you've been handed what's been marked as Exhibit 4 to your deposition. And it's a letter from the Department of Energy. It looks like it's dated March 4th of 1992 to William Berg at Dairyland Power Cooperative. It's got at least one attachment to it.
Do you recognize this document?
A It's a letter that was sent to contract holders, I think generally to all contract holders at this time, starting the DCS process and giving them instructions.



Q Are these instructions that are appended to Exhibit 4 the instruction to which you were just referring?
A I believe so, yes.
Q Can you point us to the language that you were referring to?
A As far as --
Q As far as indicating that approved delivery commitment schedules are binding on utilities?
MS. SULLIVAN: Objection to the extent it calls for legal conclusion. Best evidence.
THE WITNESS: Again, the instructions on page 7 require that an individual authorized to bind the purchaser shall sign the form. And, indeed, I recall in the Dairyland case, Mr. Berg himself signed the forms.
BY MR. SHAPIRO:
Q Beyond the -- and you're referring on page 7 to the paragraph marked 3.0?
A I believe so. Yes.
Q Beyond that paragraph of the specific



instructions on Exhibit 4, is there any other part of the instruction that indicates that approved delivery commitment schedules are binding on utilities?
MS. SULLIVAN: Objection. Legal conclusion, best evidence, subject of previous deposition testimony.
THE WITNESS: And I don't think so in the instructions. But I believe in the contract, the FDS provisions stipulate or -- that the FDSs, final delivery schedules, will be based upon approved delivery -- approved DCSs.
BY MR. SHAPIRO:
Q Now, you noted that the paragraph 3.0 of the instructions that are appended to Exhibit 4 call for a duly authorized individual from the utility to sign the delivery commitment schedule form.
But the -- if you look back on Exhibit 3, the delivery commitment schedule form, what's being signed, by the -- that duly authorized individual is a statement merely that the utility certifies that the spent nuclear fuel is of domestic origin and

Page 82

that the utility has the right to deliver that spent nuclear fuel to the Department of Energy, correct?

MS. SULLIVAN: Objection. Legal conclusion, best evidence, mischaracterizes the document.

THE WITNESS: And the Department's position is that all the information contained on the form is being attested to by that signator -- signature.

BY MR. SHAPIRO:

Q What's the basis of that interpretation of Exhibit 3, the delivery commitment schedule form?

MS. SULLIVAN: Objection. Vague.

BY MR. SHAPIRO:

Q That the signature -- I'm sorry, that the signature is attesting to all of the information on the form as opposed to simply the three lines in small print that appear directly above the signature?

MS. SULLIVAN: Objection. Legal conclusion. , Mischaracterizes witness' prior testimony, best evidence.

Page 83

THE WITNESS: If the Department couldn't rely upon the rest of the information as being binding, there would be no basis for the Department to review and approve these documents. It's a commitment to provide certain fuels that we can plan to pick up. And the Department's approval implies -- says it will do those things.

Without any commitment on the part of the utility that that's what it wants done, there's no basis for this process. This is required under the contract for the contract to operate.

BY MR. SHAPIRO:

Q Do you understand, Mr. Zabransky, that there can be a difference between representations on a form that might be the utility's best estimate at the time as opposed to a representation that would legally bind the utility?

MS. SULLIVAN: Objection. Legal conclusion, compound, foundation.

THE WITNESS: There could be. But the Department wanted a commitment in this case and made that clear, I believe, to the utilities. We've

Page 84

asked for in other cases best estimates that were not binding, specifically asked for that information.

BY MR. SHAPIRO:

Q And what is it about the representations on the delivery commitment schedule form that indicates that they should be deemed binding as opposed to best estimates?

MS. SULLIVAN: Legal conclusion, vague. Objection to the extent it mischaracterizes the witness' testimony.

THE WITNESS: The information provided in the form is required to accept the fuel on the schedule proposed. If the information wasn't truthful and accurate, it wouldn't necessarily be possible for the Department to fulfill the request to pick up the fuel in that year.

BY MR. SHAPIRO:

Q Approved delivery commitment schedule forms set out the minimum amount of spent fuel to be delivered by a utility and accepted by the Department of Energy, not a maximum. True?

Page 85

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: I believe they set out the maximum number of assemblies that the utility wishes to have picked up at that point in time, yes. So I'm not sure I agree with your answer -- your question.

BY MR. SHAPIRO:

Q The approved delivery commitment schedule forms don't set out a minimum amount of spent nuclear fuel to be delivered by a utility?

MS. SULLIVAN: Objection. Legal conclusion, vague, asked and answered, best evidence.

THE WITNESS: I believe the instructions themselves tell the utilities to put down the maximum number of assemblies they may deliver under this delivery commitment form.

BY MR. SHAPIRO:

Q Which instruction are you referring to?

A Instruction 2.8.

Q Maybe you can explain for me because I

Page 86

don't understand it. What part of 2.8 says that delivery commitment schedules set out the maximum amount of spent nuclear fuel that a utility would wish to deliver?

MS. SULLIVAN: Legal conclusion. Best evidence.

THE WITNESS: I believe if you go down to the one, two, three, four -- fifth line down, halfway across, it says, state the maximum number of assemblies that may be delivered.

BY MR. SHAPIRO:

Q Doesn't that sentence -- isn't that sentence really referring to the possibility that different spent fuel assemblies might have different amounts of metric tons of uranium per assembly? And so they want the form to reflect the maximum number of assemblies, not the maximum amount of spent nuclear fuel?

MS. SULLIVAN: Objection. Assumes facts not in evidence, compound, vague, and best evidence.

THE WITNESS: And you asked me does the form state the maximum amount of spent fuel to be

Page 87

delivered. And I believe it does.

BY MR. SHAPIRO:

Q Didn't the instructions appended to Exhibit 4 instruct utilities to limit the amount of spent nuclear fuel they would put on a delivery commitment schedule form to the amount of an allocation set out in the 1991 Annual Capacity Report?

MS. SULLIVAN: Objection. Legal conclusion, best evidence.

THE WITNESS: I believe the MTUs were established by the allocations in the Annual Capacity Report; that's correct.

BY MR. SHAPIRO:

Q So the instructions did not permit utilities to put on delivery commitment schedule forms -- let's go off the record.

(Discussion off the record.)

BY MR. SHAPIRO:

Q Let me start the question over.

The instructions that was appended to Exhibit 4 do not permit utilities to put on delivery

Page 88

commitment schedule forms whatever amount of spent nuclear fuel they wish to deliver to the Department of Energy in a given year, true?

MS. SULLIVAN: Objection, vague -- objection. Legal conclusion, vague, best evidence, and mischaracterizes the witness' prior testimony.

THE WITNESS: And I'm not sure the instructions prevent them from doing anything.

BY MR. SHAPIRO:

Q Why do you say you're not sure?

A Well, your question was do these prevent them from putting on a form a number they want to have picked up. No. It doesn't prevent them from putting it on the form.

Q But if they put in a -- if utilities had put on the form a higher number than the allocation in the 1991 Annual Capacity Report, that -- such a form would have been inconsistent with the instructions, true?

A That's correct.

Q So the instructions were intended to restrict utilities from seeking on delivery

Page 89

commitment schedule forms to deliver all the spent nuclear fuel they wished to deliver?

MS. SULLIVAN: Objection. Legal conclusion, vague, best evidence.

THE WITNESS: I mean, the instructions, whether it restricted them from putting -- taking an action or not, as it says in section 7A, allocations are based upon the 1991 ACR in this case and limits it to the allocations that were in the ACR for each utility because of the finite capacity of the -- the ability to accept spent fuel.

BY MR. SHAPIRO:

Q Didn't the instructions go on to warn utilities that, if they put on proposed delivery commitment schedule forms an amount of spent fuel that exceeded the allocation in the 1991 Annual Capacity Report, that the Department would disapprove the delivery commitment schedule?

MS. SULLIVAN: Objection. Legal conclusion, vague, best evidence, and beyond the scope of Mr. Zabransky's 30(b)(6) deposition.

THE WITNESS: I'm not sure the

Page 90

instructions contain that information. I don't know.

BY MR. SHAPIRO:

Q Let me specifically point your attention to the first attachment to the letter of Exhibit 4, the -- which are termed the general instructions. And if you turn to page 6 of the general instructions. And then specifically to paragraph 2.7.

Doesn't that paragraph warn utilities that proposed delivery commitment schedule forms will be disapproved if the amount of spent fuel requested to be removed exceeds an allocation in the Annual Capacity Report?

MS. SULLIVAN: Objection. Mischaracterizes the document as to the general versus specific instructions, best evidence, legal conclusion, and beyond the scope of Mr. Zabransky's deposition -- Rule 30(b)(6) deposition.

THE WITNESS: And thank you for pointing that out to me. I missed that. But that was the contracting officer's guidance given back in 1992.

Page 91

BY MR. SHAPIRO:

Q You would agree, Mr. Zabransky, that Exhibit 3, the delivery commitment schedule form itself, it doesn't state anywhere that the amount of spent nuclear fuel listed is the maximum amount of spent fuel to be delivered by that utility in that year, true?

MS. SULLIVAN: Objection. Legal conclusion, vague, best evidence, I believe asked and answered.

THE WITNESS: As I said, you need to read the form in conjunction with the instructions that came with the form.

BY MR. SHAPIRO:

Q But the form itself doesn't state that the amount of spent nuclear fuel set out on the form is a maximum to be delivered by the utility in a -- in the specified year, true?

MS. SULLIVAN: Same objections and definitely asked and answered.

THE WITNESS: The form says what it says. The instructions go with the form.

Page 92

BY MR. SHAPIRO:

Q Well, I'm trying to determine your interpretation of the form. I don't think it's that complicated of a question.

The form, Exhibit 3, doesn't state anywhere that the amount of spent nuclear fuel designated is a maximum amount to be delivered by a utility in a given year, true?

MS. SULLIVAN: Objection. Argumentative, asked and answered, vague, legal conclusion, best evidence.

THE WITNESS: And the form in itself does not say it. But the form was sent out in conjunction with the instructions.

BY MR. SHAPIRO:

Q And it's the Department's position, the Government's position, that if the delivery commitment schedule form is read in conjunction with the instructions, then it does set out the maximum amount of spent nuclear fuel to be delivered by that utility in that year?

MS. SULLIVAN: Objection. Legal conclusion, vague, best evidence.

Page 93

THE WITNESS: And, again, I'm interpreting your question, which is it's the Department's position that the form, as filled out by the utility, represents the maximum amount of spent fuel they want to deliver in that year. That's correct.

BY MR. SHAPIRO:

Q Well, your answer is slightly different than my question. My question is whether the form, read in conjunction with the instructions, indicates the maximum amount of spent nuclear fuel to be delivered by a utility in a given year.

MS. SULLIVAN: Same objections.

THE WITNESS: And, again, without having the luxury of reading the question you asked, I thought that was the question I was answering. So yes.

BY MR. SHAPIRO:

Q How can the -- how can an approved delivery commitment schedule indicate the maximum amount of spent nuclear fuel to be delivered by a





©2007

Page 94

utility in a given year, since the forms don't take into account the possibility for exchanges of approved delivery commitment schedule forms?
MS. SULLIVAN: Objection. Vague, compound, legal conclusion.
THE WITNESS: Any exchange of an approved delivery commitment form for a certain number of tons would be an exchange subject to approval by the Department and presumably would be for a commensurate number of tons.
BY MR. SHAPIRO:
Q But through exchanges, you would agree it's possible that a utility could end up delivering more spent nuclear fuel than it's otherwise indicated on its own delivery commitment schedule forms for a particular year, true?
A Only --
MS. SULLIVAN: Objection. Legal conclusion, vague. Go ahead.
THE WITNESS: Only through the acquisition of additional approved delivery commitment schedules from somebody else, and subject

Page 95

to the Department's approval.
BY MR. SHAPIRO:
Q Another reason why approved delivery commitment schedule forms can't set out the maximum amount of spent nuclear fuel to be delivered by a utility in a particular year is that the forms don't take into account utilities' right to adjust by 20 percent the amount of spent nuclear fuel on an approved delivery commitment schedule form, correct?
MS. SULLIVAN: Objection. Legal conclusion, vague, assumes facts not in evidence.
THE WITNESS: And, again, while they have the right to increase by 20 percent or decrease by 20 percent the amount on an approved DCS, that's subject to the approval of an FDS by the Department of Energy.
So to the extent that the Department couldn't accommodate that increase, it would be the same as on the DCS form.
BY MR. SHAPIRO:
Q You recall, Mr. Zabransky, that in 2004, the Department of Energy sent out new delivery

Page 96

commitment schedule forms and instructions to utilities?
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: Yes, I do.
BY MR. SHAPIRO:
Q And you recall that the instructions -- the 2004 instructions instructed utilities to disregard the previously approved delivery commitment schedules and submit new delivery commitment schedule forms for their spent nuclear fuel?
MS. SULLIVAN: Objection. Legal conclusion, vague, best evidence, mischaracterizes the document.
THE WITNESS: And I don't believe that's the intent of what the Department sent out, or exactly what it sent out.
The Department instructed them to submit new DCS forms for 2010. But the caveat was that those would replace the existing forms only through mutual agreement.
MS. SULLIVAN: We have been going another

Page 97

hour. Do you want a break? Can he do this next document?
THE WITNESS: Yeah. Let's take a short break.
MS. SULLIVAN: Is that all right, Robert? He would like a short break.
MR. SHAPIRO: Sure. Fine.
(Whereupon, a recess was taken between 11:26 a.m. and 11:39 a.m.)
(Zabransky Exhibit Number 5 was marked for identification.)
BY MR. SHAPIRO:
Q Mr. Zabransky, you've been handed what's been marked as Exhibit 5 to your deposition. Do you recognize this document?
A Yes, I do.
Q And would you tell us what this is, please.
A I believe these were the instructions that were sent out in 2004 to -- when DOE restarted the DCS process for 2010 operations.
Q These are the instructions that we were

Page 98

discussing just prior to our little break?
A That's correct.
Q And as you may recall, what we were discussing specifically was whether the -- these instructions, Exhibit 5, instructed utilities to disregard the previously approved delivery commitment schedules. And you had said that that was not your understanding of the intent of the instructions.
Can you point me to anything in the instructions themselves, Exhibit 5, that -- that's consistent with your understanding of the intent of these instructions?
MS. SULLIVAN: Objection. Legal conclusion, vague, best evidence, and beyond the scope of Mr. Zabransky's 30(b)(6) deposition.
THE WITNESS: And, again, what I said was that the -- that was not the intent of the instructions. In response to the instructions, DOE had questions from utilities to that point. And DOE sent the letter out to the questioning utilities and posted on its Web site the clarification that the

Page 99

intent would be -- the intent of this exercise was to allow them to submit new DCSs. As it says in 7A, that since the date is now 2010 versus 1998, that they should submit new DCSs.
But the clarification that we provided to utilities who asked the question, and would have done with everybody had we not stopped this process, was that these only replaced the existing DCSs through mutual agreement.
If the utility was happy with its current DCSs, it could have told us to keep using them. So that these -- these supplanted the existing DCSs only through mutual agreement, not unilaterally by DOE's saying we're ignoring the old ones.
BY MR. SHAPIRO:
Q Are you aware, Mr. Zabransky, that some utilities have no approved delivery commitment schedules?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: I believe that to be the case, correct.
BY MR. SHAPIRO:

Page 100

Q Under the government's view, then, if the Department never approves the delivery commitment schedule forms for those utilities, would the Department ever be in breach of its spent fuel acceptance obligations to those utilities?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: And with respect to an obligation, the obligation is to pick up all their spent fuel. With those utilities without an approved DCS, we would not have mutually agreed on a date on which we'd pick up certain spent fuels.
BY MR. SHAPIRO:
Q So if a utility doesn't have an approved delivery commitment schedule, there's -- there's no date on which the Department is obligated to ever pick up its spent nuclear fuel?
MS. SULLIVAN: Objection. Legal conclusion, vague, mischaracterizes the witness' previous testimony.
THE WITNESS: And what I said was there's no schedule by which we've agreed mutually with them

Page 101

to pick up certain spent fuels.
BY MR. SHAPIRO:
Q I understand your statement, Mr. Zabransky, that absent an approved delivery commitment schedule there's no mutually agreed upon schedule for the pickup of a utility's spent nuclear fuel.
But is it the government's view that, absent such an approved delivery commitment schedule, that the Department of Energy has no obligation to pick up that utility's spent nuclear fuel by any particular time?
MS. SULLIVAN: Objection. Legal conclusion, vague, mischaracterizes the witness' prior testimony, asked and answered.
THE WITNESS: I think the obligation in general was to begin in 1998 with operations of an acceptance system. With regard to a specific utility, there is no schedule until there's an approved DCS that establishes a schedule for that utility.
BY MR. SHAPIRO:



 ©2007

Q And if there's no schedule, then there's no obligation on the part of the Department of Energy to pick up that utility's spent nuclear fuel?

MS. SULLIVAN: Objection. Legal conclusion, vague. Objection to the extent it mischaracterizes the witness' prior testimony.

THE WITNESS: And I think the obligation is a different question than schedule. There's no schedule. So it's not necessarily delayed. There's an obligation to pick up the spent fuel. The schedule hasn't been established.

BY MR. SHAPIRO:

Q And it's the Department's view that if the schedule hasn't been established, then the Department of Energy can't be in breach of its obligation yet to pick up that spent nuclear fuel?

MS. SULLIVAN: Objection. Legal conclusion, foundation, vague.

THE WITNESS: And I can't offer an opinion on that legal issue.

BY MR. SHAPIRO:

Q You're aware, Mr. Zabransky, that the



Department of Energy has not approved delivery commitment schedules for all of Dairyland Power Cooperative's spent nuclear fuel, correct?

A I don't know what number had been approved. I know some have been approved for the allocations that existed. I'm not sure if that covered the entire quantity or not.

Q I'll represent to you that the amount of spent nuclear fuel that is covered in Dairyland's approved delivery commitment schedules is not all of Dairyland's spent nuclear fuel.

When is the Department of Energy obligated to remove the amount of spent nuclear fuel -- Dairyland's spent nuclear fuel that's not set out on any of its approved delivery commitment schedule forms?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: I'm not sure the contract has a date that requires the Department to finish by any point in time.

BY MR. SHAPIRO:



Q So the Department of Energy has no obligation to ever complete the removal of spent nuclear fuel from Dairyland?

MS. SULLIVAN: Objection. Legal conclusion, vague, mischaracterizes the witness' prior testimony.

THE WITNESS: And you keep using the word obligation. I'm using the word schedule. No schedule has been established for the removal of all of Dairyland's spent fuel. The Department has an obligation to remove all the spent fuel. But no schedule has been established that I'm aware of.

BY MR. SHAPIRO:

Q Well, I'm using the term obligation in the context of the approved delivery commitment schedule forms because I thought it was your understanding -- is the government's understanding that the delivery commitment schedule forms do create a binding obligation on the part of utilities and the Department? Isn't that right?

MS. SULLIVAN: Objection: Legal conclusion, vague. I'm not sure there's a question.



Mischaracterizes -- objection to the extent it mischaracterizes the prior testimony.

THE WITNESS: I mean my testimony was that the approved delivery schedules create a schedule and a commitment to move fuel on that schedule.

BY MR. SHAPIRO:

Q And absent such a form, there can be no commitment by the Department of Energy to complete removal of the utility's spent nuclear fuel -- Dairyland's spent nuclear fuel?

MS. SULLIVAN: Objection. Legal conclusion, vague, to the extent it mischaracterizes the witness' prior testimony, and asked and answered.

THE WITNESS: Absent an approved DCS for the fuel, there's been no schedule established by which it will be removed or should be removed, no.

BY MR. SHAPIRO:

Q What is the purpose of the final delivery commitment schedules under the Standard Contract?

MS. SULLIVAN: Objection to the extent it

calls for a legal conclusion.

THE WITNESS: The final delivery schedules -- I don't think it's FDCS. It's just FDS -- are the next step in the scheduling process that allows the parties to further refine the schedule that was established in the DCS process.

BY MR. SHAPIRO:

Q Are approved final delivery schedules binding on utilities or the Department of Energy?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: Just like the DCSs would be binding on both parties, the approved FDS would be binding on both parties also.

BY MR. SHAPIRO:

Q And an approved final delivery schedule sets out in the government's view the maximum amount of spent fuel to be accepted by the Department of Energy from a utility in the specified year?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: I think it's within a



specified year. And it's within a specified time period within that year.

BY MR. SHAPIRO:

Q Is it also the government's view that, absent an approved final delivery schedule, the government does not have an obligation to pick up spent nuclear fuel from a utility in a particular year?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: And to the extent there is a -- an approved DCS that supports the FDS, then, no, the FDS created the commitment to pick up spent fuel in a given year -- the DCS, excuse me, created that commitment.

BY MR. SHAPIRO:

Q So it's the Department's view that it can have commitments to pick up spent nuclear fuel from a utility even if it doesn't approve a final delivery schedule for that spent nuclear fuel?

MS. SULLIVAN: Objection. Legal conclusion, vague, to the extent it mischaracterizes



the witness' prior testimony.

THE WITNESS: The FDS refines the information on the DCS. It further stipulates what performance should be. But the underlying commitment is still from the DCS.

BY MR. SHAPIRO:

Q I'm still not sure that you've quite answered my question. If the Department of Energy does not approve a utility's final delivery commitment schedule, does the Department of Energy in the government's view, still have an obligation to pick up that amount of spent nuclear fuel from the utility?

MS. SULLIVAN: Objection. Legal conclusion, vague, asked and answered.

THE WITNESS: And let me clarify my answer, is that if the FDS, which is covered by an approved DCS, is ultimately not approved by the Department for a reason that's -- again, we've never approved an FDS. But through the process of FDS approval, if agreement cannot be reached as to a specific date, then perhaps the situation would be



that there would be a dispute on that point.

But that process is a scheduling process that has never been implemented.

BY MR. SHAPIRO:

Q You say the final delivery schedule process has never been implemented because the Department has never approved a final delivery schedule?

A And because we've never been within a year of operations, to allow that process to really go forth.

Q You're aware, though, that utilities, including Dairyland, have submitted proposed final delivery schedules to the Department of Energy. True?

MS. SULLIVAN: Objection. Vague, assumes facts not in evidence.

THE WITNESS: I'm not -- I know some have. I wasn't aware that Dairyland had. But that may be the case.

BY MR. SHAPIRO:

Q What's the government's understanding of





A 47

Page 110

the significance of the Department's refusal to approve or disapprove Dairyland's submitted final delivery schedule?

MS. SULLIVAN: Objection. Legal conclusion, vague, assumes facts not in evidence.

THE WITNESS: I mean, my understanding is, to the extent that Dairyland submitted an FDS, that it would have been for a year, a calendar year or a specific period where the Department knew it could not perform.

And as a result, those forms were not processed. We couldn't commit to picking up fuel in a given year. When we knew we weren't picking up fuel, it would be inappropriate to represent to Dairyland that, yes, we'll be there to pick up this fuel.

BY MR. SHAPIRO:

Q Was part of the Department's motivation in refusing to approve Dairyland's final delivery commitment schedules -- final delivery schedules an effort to limit its contractual liability to Dairyland?

Page 111

MS. SULLIVAN: Objection. Legal conclusion, vague, assumes facts not in evidence.

THE WITNESS: No.

BY MR. SHAPIRO:

Q Why did the Department refuse to act on Dairyland's final delivery schedule?

MS. SULLIVAN: Objection. Assumes facts not in evidence.

THE WITNESS: Again, I don't recall a specific FDS request from Dairyland. But I'm sure you can show me one.

MR. SHAPIRO: I'm not sure, but I probably can.

(Zabransky Exhibit Number 6 was marked for identification.)

BY MR. SHAPIRO:

Q Mr. Zabransky, you've been handed what's been marked as Exhibit 6 to your deposition, a letter from Mr. Berg of Dairyland dated November 19th, 1997 to Beth Tomasoni. You're listed as a cc on the letter.

Do you recognize the document?

Page 112

A I don't recall this document at all. But it doesn't mean I didn't see it before.

Q But you would agree that Exhibit 6, this document, appears to be a submittal of a final delivery schedule from Dairyland for delivery in 1998, correct?

MS. SULLIVAN: Objection. Best evidence.

THE WITNESS: That's what it appears to be.

(Zabransky Exhibit Number 7 was marked for identification.)

BY MR. SHAPIRO:

Q Mr. Zabransky, you've now been handed what's been marked as Exhibit 7 to your deposition. It's a letter dated March 5th, 1998 from Beth Tomasoni to Mr. Berg of Dairyland. Do you recognize this document?

A Again, I'm sure I've seen it before. I'm not -- but -- so I've seen it before, yes, I'm sure. I don't recognize it today but I know I've seen it before.

Q You would agree that Exhibit 7 is the

Page 113

Department of Energy's response to Dairyland's final delivery schedule?

MS. SULLIVAN: Objection. Best evidence.

THE WITNESS: That's what it appears to be. That's correct.

BY MR. SHAPIRO:

Q What role did you have in the development of responses to final delivery schedules such as Exhibit 7?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: At this point in time, I'm sure I caused the letters to be typed for Beth's signature.

BY MR. SHAPIRO:

Q You recall, don't you, that the Department's responses to submitted final delivery schedule forms from all utilities were basically verbatim, the same as appears on Exhibit 7. True?

MS. SULLIVAN: Objection. Vague. Objection. Relevance. Objection. Assumes facts not in evidence.

THE WITNESS: And, again, I don't recall



 ©2007

Page 114

there were that many FDS submittals by utilities. But I would assume that the responses would be similar, yes.

BY MR. SHAPIRO:

Q You would agree that the Department of Energy did not disapprove Dairyland's final delivery schedule in Exhibit 7, true?

MS. SULLIVAN: Objection. Legal conclusion.

THE WITNESS: Basically, the response says we were not able to approve. In essence, we neither approved or disapproved. We took no action.

BY MR. SHAPIRO:

Q What right did the Department of Energy have under the Standard Contract to take no action to the final -- to the submitted final delivery schedule as set out on Exhibit 7?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: Well, again, at that point in time, by the end of 1997, we had made it clear we were not going to be performing in 1998. So

Page 115

pursuing a scheduling process for deliveries in 1998 first struck us as a little disingenuous, since requesting deliveries -- when we already announced we could not come, again, why Dairyland did that, I don't know. It was clear the Department was not coming in 1998.

On advice of counsel, we took the approach of not approving these documents.

BY MR. SHAPIRO:

Q I asked this with respect to the final delivery schedules. Let me go back and ask a similar question with respect to the delivery commitment schedule forms and instructions.

Was part of the Department's motivation in instructing utilities to limit their delivery commitment schedule forms -- to limit the amount of spent nuclear fuel they set out in their delivery commitment schedule forms to the allocations set out in the 1991 Annual Capacity Report, was that motivated in part in an effort to limit the Department of Energy's contractual liability to utilities?

Page 116

MS. SULLIVAN: Objection. Legal conclusion, vague, compound, and relevance.

THE WITNESS: And the answer is no. It was motivated by the capacity of the facilities the Department thought it would have available.

BY MR. SHAPIRO:

Q And I know we've already moved to some extent to the -- one of the other 30(b)(6) topics, which is DOE's responses to delivery commitment schedule forms submitted by utilities. But I have a few more questions on that -- that topic.

DOE would not have approved a delivery commitment schedule form from a utility that sought to deliver more spent nuclear fuel in a year than that utility was allocated by the 1991 ACR, true?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: It's my understanding that DOE did not approve forms submitted by utilities that requested or claimed allocations in excess of those in the ACR.

BY MR. SHAPIRO:

Page 117

Q And it would have been futile for another utility to have sought approval of such a DCS that sought to deliver more spent fuel than that utility's allocation in 1991, true?

MS. SULLIVAN: Objection. Legal conclusion, vague, relevance.

THE WITNESS: And, again, I don't know how a utility who would have submitted DCSs by the deadline in 1991 would have known what other utilities were doing and DOE's reaction to that, which took several, several months after that.

So utilities in 1991 would have worked based upon their understanding of the process and their desires and would have had no insight as to whether it would be futile or not.

BY MR. SHAPIRO:

Q I'm not asking about utilities' insight as to whether it would have been futile. I'm asking in fact it would have been futile for a utility to have submitted a proposed delivery commitment schedule form that sought to deliver more spent fuel than that utility's allocation as set out in the

Page 118

1991 ACR?
MS. SULLIVAN: Objection. Legal conclusion, vague, relevance.
THE WITNESS: And, you know, the instructions indicated the basis for submittals and approval. And there was a finite capacity. DOE followed the instructions and processed the forms accordingly.
BY MR. SHAPIRO:
Q Is there any chance that, if a utility had submitted a DCS that sought a greater amount of spent nuclear fuel acceptance than set out in the 1991 ACR, that DOE might have deviated from its instructions and still have approved that DCS?
MS. SULLIVAN: Objection. Legal conclusion, vague, relevance.
THE WITNESS: And without being aware of any specific circumstances, I don't know that there would be any circumstances that that would happen.
BY MR. SHAPIRO:
Q Why did the Department of Energy stop acting on submitted delivery commitment schedule

Page 119

forms?
A The Department of Energy stopped, I believe, in early 1997 because, since it was made clear to the Department that these were binding commitments that had schedule impacts, it couldn't continue to process or establish schedules it knew it couldn't meet.
It would be inappropriate to tell utilities that yes, we'd be there in this year when we knew that that was not going to happen.
Q How was it made clear to the Department of Energy that approved delivery commitment schedules -- schedule forms were binding?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Vague.
THE WITNESS: It was my understanding that was as a result of I believe the Indiana Michigan case.
BY MR. SHAPIRO:
Q You're referring to the Indiana Michigan case before the US Court of Appeals for the District of Columbia Circuit?

Page 120

A I'm not sure. I guess so.
Q So did the Department of Energy stop approving or disapproving delivery commitment schedule forms submitted by utilities in part to limit the Department's contractual liability to utilities?
MS. SULLIVAN: Objection. Legal conclusion, vague, asked and answered.
THE WITNESS: Again, the motivation to stop was to -- because, at that point, we are -- we would be making commitments that we knew we couldn't meet. That would be acting in, I don't think, the best faith to say yes, we'll do this, when we knew we couldn't.
BY MR. SHAPIRO:
Q Well, the Department knew even prior to the issuance of the Indiana Michigan decision it wasn't going to be able to accept spent nuclear fuel from utilities as set out on approved delivery commitment schedules, did they?
MS. SULLIVAN: Objection. Legal conclusion, foundation, beyond the scope of the

Page 121

30(b)(6) notice, vague.
THE WITNESS: And prior to that --
MS. SULLIVAN: And relevance.
THE WITNESS: And prior to that decision, the Department's position was that the commitments were conditioned on the existence of an interim storage facility or a repository constructed under the act.
BY MR. SHAPIRO:
Q So it was the Department of Energy's understanding that, prior to the Indiana Michigan decision, that the delivery commitment schedule forms were not binding on the Department unless the Department had a facility?
MS. SULLIVAN: Objection. Legal conclusion, vague, to the extent it mischaracterizes the witness' prior testimony.
THE WITNESS: I don't believe I said that. I said that it was an opinion of the Department that they were conditional. So that they were binding but they were conditional upon the acceptance of an existing facility.

Page 122

BY MR. SHAPIRO:

Q So was the Department's view prior to the issuance of the Indiana Michigan decision that approved delivery commitment schedule forms set out the maximum amount of spent fuel that a utility could deliver, but even that amount of acceptance was conditional?

MS. SULLIVAN: Objection. Compound, legal conclusion, vague, and to the extent it mischaracterizes the witness' prior testimony.

THE WITNESS: And without getting into analysis of a legal opinion that I'm really not in a position to get into, the Department's position prior to that decision was that the DCS schedule was conditioned on the existence of a facility constructed under the act, whether interim storage or repository facility.

And the decision told the Department that position was wrong.

BY MR. SHAPIRO:

Q So the Department's view at the time it was acting on utilities' delivery commitment

Page 123

schedule forms and when it sent out its instructions is that in fact those approved delivery commitment schedule forms would not be binding on either the utilities or the Department unless the Department had a facility to which to take the spent nuclear fuel?

MS. SULLIVAN: Legal conclusion, vague, to the extent it mischaracterizes the witness' prior testimony.

THE WITNESS: And they were binding, I believe, with respect to everything on the form, except with the exception that the schedular performance was conditioned on the existence of the facility.

BY MR. SHAPIRO:

Q Let me point your attention back to Exhibit 4 for a moment, Mr. Zabransky. That's the 1992 transmittal of instructions and the instructions themselves, to Dairyland Power.

And specifically paragraph 7C of the instructions.

A Uh-huh.

Page 124

Q Is this the paragraph that sets out the understanding that we've been talking about that, in the event that the Department did not have a facility available in 1998, that the approved delivery commitment schedule forms would have to be, as it's termed here, reevaluated?

MS. SULLIVAN: Objection. Legal conclusion, vague, best evidence.

THE WITNESS: And I'm not sure that this is where that's pointed out. I believe there were other Department documents that let the Departments -- or informed the contract holders and others of the Department's opinion with respect to the conditional nature of the schedule of acceptance.

BY MR. SHAPIRO:

Q Doesn't this paragraph 7C on Exhibit 4 indicate that the delivery commitment schedules are conditional on the availability of a facility by 1998?

MS. SULLIVAN: Objection. Legal conclusion, vague, best evidence.

Page 125

THE WITNESS: I don't think this points that out. This merely says that -- this assumes that -- the DCSs assume it will start in 1998. In the event it didn't start in 1998, the parties would have to review -- could reevaluate the commitments made on those DCSs and decide they wanted to do different things.

That's a different question, I think, than what you're referring to.

BY MR. SHAPIRO:

Q So the Department didn't view that language in paragraph 7C of the instructions, Exhibit 4, as indicating that the approved delivery commitment schedules would not be binding on either the Department or the utilities in the event that the waste management system was not able to accept utilities' spent fuel beginning in 1998?

MS. SULLIVAN: Objection. Legal conclusion, vague, compound, best evidence, and beyond the scope of Mr. Zabransky's 30(b)(6) deposition.

THE WITNESS: And, no, I don't think

Page 126

that's what the Department believes that means. That merely just says that, for instance, not citing Dairyland, but citing a utility with more than one reactor, that if 1998 is not the date, that both parties could reconsider the desires that were expressed for 1998 and perhaps reschedule them to a different reactor.

But in the absence of that agreement, they would be binding on the Department and the purchaser.

BY MR. SHAPIRO:

Q The Department of Energy had no right under the Standard Contract to stop acting on delivery commitment schedules, true?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: Again, the actions that were taken were taken on the advice of counsel. I'm not prepared to offer a legal opinion as to that.

BY MR. SHAPIRO:

Q We discussed a little bit earlier that, after stopping the delivery commitment schedule

Page 127

process in the 1990s, the Department restarted the process in 2004. The Department also stopped the DCS process once again in 2004.

Why did the Department stop processing DCS forms a second time in 2004?

MS. SULLIVAN: Objection. Vague, compound, relevance.

THE WITNESS: The Department stopped in 2004 when it became evident that the 2010 date upon which the initiation of the process was predicated was not going to be attained.

BY MR. SHAPIRO:

Q In 2004, the DCS process that was restarted in roughly July of that year?

MS. SULLIVAN: Objection. Relevance.

THE WITNESS: I believe that's correct.

BY MR. SHAPIRO:

Q And then it was -- it was stopped before the end of that year, 2004, correct?

A I believe --

MS. SULLIVAN: Same objection.

THE WITNESS: In December, I believe,

Page 128

yes.

BY MR. SHAPIRO:

Q What happened in that -- in that interim period that caused that change in expectation?

MS. SULLIVAN: Objection. Relevance, vague.

THE WITNESS: And I believe that what happened in that period of time were budgetary shortfalls. I believe there was a -- the EPA standards on which the Yucca Mountain licensing process was moving forth were remanded. And we had issues related to work being done by the USGS and some of the technical work at Yucca Mountain, the extent to which were not known in 2000 -- July when that process was started .

BY MR. SHAPIRO:

Q Had the Department fully understood the extent of those challenges earlier in 2004, the Department wouldn't have restarted the DCS process?

MS. SULLIVAN: Objection. Vague, compound, foundation, beyond the scope of the 30(b)(6) notice.

Page 129

THE WITNESS: I guess to answer your question the way that it should be answered, as far as I'm concerned, is if the Department didn't believe in July of 2004 that it could have attained that 2010 date, it wouldn't have started the DCS process.

BY MR. SHAPIRO:

Q Let's change to the next 30(b)(6) topic, DOE's purpose and intent in entering into the Standard Contract.

What was DOE's purpose and intent in entering into the Standard Contract?

A The purpose and intent was to --

MS. SULLIVAN: Objection. Legal conclusion. I apologize.

THE WITNESS: Sorry.

The purpose and intent was to implement the provisions of the Nuclear Waste Policy Act.

BY MR. SHAPIRO:

Q Was part of the Department's intent in entering into the Standard Contract to solve the problem of spent fuel accumulation at reactor sites?

Page 130

MS. SULLIVAN: Objection. Vague. Objection. Legal conclusion.

THE WITNESS: And based upon my -- what I was able to obtain, the information obtained in preparation, the purpose and intent was to implement the provisions of the Nuclear Waste Policy Act.

BY MR. SHAPIRO:

Q Didn't the Department understand that the Nuclear Waste Policy Act was intended in part to address the accumulation of spent nuclear fuel at utility reactor sites?

MS. SULLIVAN: Objection. Legal conclusion, vague, beyond the scope of Mr. Zabransky's 30(b)(6) deposition.

THE WITNESS: I don't know what the Department understood on that issue.

BY MR. SHAPIRO:

Q It was the Department of Energy's intent in entering into the Standard Contract to avoid any obligation regarding the timing of its acceptance of spent nuclear fuel from utilities, true?

MS. SULLIVAN: Objection. Legal

Page 131

conclusion, vague, assumes facts not in evidence, and mischaracterizes prior testimony.

THE WITNESS: The intent of entering into the contract was to fulfill the provisions of the Act. That's -- I'm not sure where I can go beyond that.

BY MR. SHAPIRO:

Q The Department's intent in coming up with the specific language of the Standard Contract was to, in part, to try to minimize its obligations, true?

MS. SULLIVAN: Objection. Legal conclusion, vague, asked and answered.

THE WITNESS: And I don't believe that I'm prepared, as part of what I prepared for for this deposition, to answer any questions like that on what's in the Standard Contract.

BY MR. SHAPIRO:

Q You're not prepared to discuss any issues concerning the Department's intent in entering into the -- any of the terms of the Standard Contract?

MS. SULLIVAN: Objection. Vague,

Page 132

mischaracterizes the witness' prior testimony.

THE WITNESS: My understanding was to discuss the purpose and intent of entering into the Standard Contract, which was to fulfill the provisions of the Act.

That was the request that I thought I was supposed to be talking about today. Am I misreading it?

MS. SULLIVAN: Let Mr. Shapiro ask his questions.

BY MR. SHAPIRO:

Q If you would answer the last question that I asked. You're saying you're not prepared to discuss any issues concerning the Department's intent in entering into the terms of the Standard Contract?

MS. SULLIVAN: Same objections.

THE WITNESS: No. I'm really not.

BY MR. SHAPIRO:

Q So it's the Department's view that because the Nuclear Waste Policy Act authorized it to enter into contracts, that that was the extent of

Page 133

the Department's intent in entering into the Standard Contracts with utilities?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: I mean, fulfilling the terms or the requirements of the Act was the reason the Department entered into the contract.

BY MR. SHAPIRO:

Q But what provisions of the Nuclear Waste Policy Act did the Department understand it to be fulfilling by entering into the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: And I believe, without the benefit of reviewing the act, I think it's 302(a).

BY MR. SHAPIRO:

Q What's your understanding of that part of the Nuclear Waste Policy Act?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: It authorizes the Department -- the Secretary to enter into contracts



 ©2007

with owners and generators of spent nuclear fuel and high-level waste.

BY MR. SHAPIRO:

Q That provision didn't require the Department to enter into contracts, did it?

MS. SULLIVAN: Objection. Legal conclusion, best evidence.

THE WITNESS: As I said, and I'm doing it from memory, is that it authorizes the Secretary to.

BY MR. SHAPIRO:

Q Well, what was the Department's intent to actually enter into contracts with utilities, given that the Nuclear Waste Policy Act merely authorized the entering into contracts and didn't require them?

MS. SULLIVAN: Objection. Legal conclusion, vague, asked and answered.

THE WITNESS: And that was how the Department intended to fulfill the Act requirements as it saw it at the time.

BY MR. SHAPIRO:

Q The Department understood the Nuclear Waste Policy Act as ultimately -- not merely



authorizing but actually requiring the Department to enter into contracts with utilities?

MS. SULLIVAN: Objection. Legal conclusion, vague, beyond the scope of Mr. Zabransky's 30(b)(6) deposition.

THE WITNESS: I don't know what the Department's analysis on that provision was at the time.

BY MR. SHAPIRO:

Q Can you testify as to the Department of Energy's purpose and intent for the Standard Contract for it not to have an acceptance rate term setting out a minimum amount of DOE acceptance of spent nuclear fuel?

MS. SULLIVAN: Objection, vague, legal conclusion.

THE WITNESS: No. I'm not prepared to testify about those provisions of the contract as a 30(b)(6) witness.

BY MR. SHAPIRO:

Q Let me go to the next 30(b)(6) topic, DOE's understanding of utilities' purposes and



intents in entering into the Standard Contract.

What was the Department of Energy's understanding as to utilities' intents for entering into the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: The extent of the Department's understanding as to what the utilities -- what was the word, interest?

MS. SULLIVAN: You can have him reread the question.

MR. SHAPIRO: Can you read the question again.

MS. SULLIVAN: Or the court reporter.

(The reporter read the record as requested.)

THE WITNESS: And the --

MS. SULLIVAN: Same objections.

THE WITNESS: Okay. All right. The Department's understanding as to utilities' intent is contained in the administrative record on the development of the contract.



BY MR. SHAPIRO:

Q The administrative record that merely contains submittals by utilities on the draft Standard Contract, correct?

MS. SULLIVAN: Objection. Best evidence.

THE WITNESS: I believe that's in there. Yes.

BY MR. SHAPIRO:

Q I'm asking, based upon either those submittals or any other information, what is the Department's understanding of utilities' purposes and intent in entering into the Standard Contract?

MS. SULLIVAN: Legal conclusion, vague, asked and answered.

THE WITNESS: And the Department's understanding is limited to what's in the administrative record, which is available for your review.

BY MR. SHAPIRO:

Q Are you not prepared to answer the question as to what utilities' -- the Department's understanding of utilities' purposes and intent as