Page 138

far as entering into the standard contract was other than simply referring to a database?

MS. SULLIVAN: Objection. Mischaracterizes the witness' prior testimony.

THE WITNESS: That administrative record represents the Department's understanding. It's best viewed as the record.

BY MR. SHAPIRO:

Q You're not in any position as a 30(b)(6) designee to have reviewed that material and provide for us the Department's view as to the essence of what it's view is as to what the utilities intended by entering into the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion, compound, vague, mischaracterizes the witness' prior testimony.

THE WITNESS: And, no, I'm not prepared to provide the essence of what's in there.

BY MR. SHAPIRO:

Q So the Department has no view of utilities' intent for entering into the Standard Contract other than the submittals that utilities

Page 139

made to the Department as part of the administrative rule-making process through which DOE drafted the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion.

THE WITNESS: And based upon my preparation for this deposition, no.

BY MR. SHAPIRO:

Q Didn't DOE understand that utilities intended that the Standard Contract would solve the problem of spent fuel accumulation at utility reactor sites?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: And I don't have any information that would say DOE understood that.

BY MR. SHAPIRO:

MR. SHAPIRO: All right. Would this be a good time for a lunch break?

MS. SULLIVAN: Uh-huh.

(Whereupon, at 12:38 p.m., the deposition was recessed, to be reconvened at 1:40 p.m. this same

Page 140

day.)

Page 141

AFTERNOON SESSION (1:47 p.m.)

Whereupon,

DAVID K. ZABRANSKY

having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued)

BY MR. SHAPIRO:

Q Mr. Zabransky, I think we're ready to turn to the next 30(b)(6) topic. This one concerns the purpose and role of exchanges under the Standard Contract.

What is the government's understanding of the purpose of the exchanges provision of the contract?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: The purpose of the exchange provision under the contract is to allow utilities to exchange approved delivery commitment schedules, subject to the Department's approval, to reallocate amongst themselves their place in line of waste acceptance allocations.




©2007

Page 142

BY MR. SHAPIRO:
Q The government has expected that the exchanges provision would enable utilities to optimizing the timing of DOE's acceptance of spent fuel from individual utilities, true?
MS. SULLIVAN: Objection. Vague, legal conclusion.
THE WITNESS: I'm not sure what you mean by the word optimizing.
BY MR. SHAPIRO:
Q In this sense I mean optimizing in the sense of providing the most efficient schedule for utilities. The optimal schedule from a utility's standpoint?
MS. SULLIVAN: Objection. Vague, legal conclusion.
THE WITNESS: And, again, I'm not sure that, necessarily, whether it's optimal or not, if two utilities agree to exchange for whatever reason, the provision allows them to do that subject to DOE's approval.
BY MR. SHAPIRO:

Page 143

Q You've stated earlier that the purpose of the exchanges provision is, well, basically to perform exchanges. What's your understanding as to why the contract has an exchanges provision?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: Again, to allow utilities to make adjustments in their schedule for acceptance, that would facilitate whatever condition they wanted to address, whether it was to -- you know, again, I don't know the reasons they would do it, but it allows them to adjust their place in line by exchanging with another utility an approved DCS to go at another different point in time, later or earlier. Of course the exchange is subject to DOE's approval.
BY MR. SHAPIRO:
Q Why did DOE find it desirable to put that provision into the Standard Contract?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: And, again, I think that to review that you need to go back to DOE's

Page 144

administrative record as to why it put that provision in the contract. I believe it was put in to address utility concerns or utility desires to have some flexibility in adjusting those schedules.
BY MR. SHAPIRO:
Q And that intended purpose of the exchanges provision assumes that DOE would exercise its discretion or disapprove -- its discretion to approve or disapprove exchanges in a reasonable manner, true?
MS. SULLIVAN: Objection. Vague, legal conclusion.
THE WITNESS: And I think that the answer to the question is would DOE approve or disapprove exchanges in a reasonable fashion, the answer is I believe they would, yes.
BY MR. SHAPIRO:
Q We may come back to that topic. Let me move on for the moment to the next topic. The purpose and role of the provision in the Standard Contract providing for priority acceptance of spent fuel from permanently shut down reactors.

Page 145

What is the purpose and role of that provision of the Standard Contract, Mr. Zabransky?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: The provision under the Standard Contract that allows DOE at its discretion to grant priority acceptance of shut down reactors was put in the contract for exactly that purpose, for DOE to have that ability at its discretion to grant that acceptance, to facilitate removal of fuel from reactors that are permanently shut down, potentially to avoid them having fuel for many, many years.
BY MR. SHAPIRO:
Q Why did DOE find it desirable to have a provision that would help ensure that permanently shut down reactors would not otherwise be potentially storing spent fuel for many years?
MS. SULLIVAN: Objection. Vague. Objection to the extent it mischaracterizes the witness' prior testimony.
THE WITNESS: Again, I'm not sure the





©2007

Page 146

provision ensures anything. It allows discretion to grant priority to shut down reactors in the case that DOE thought that that was appropriate for whatever reason.

BY MR. SHAPIRO:

Q Why did DOE think it appropriate to have that provision in the Standard Contract?

MS. SULLIVAN: Objection. Asked and answered, vague.

THE WITNESS: DOE felt it was appropriate to have the provision that allowed it that discretion in the contract. And there's nothing beyond that that I can add to that discussion.

BY MR. SHAPIRO:

Q Since DOE has entered into Standard Contracts with utilities, what role has that provision providing for priority for -- acceptance of spent fuel from shut down reactors, what role has that provision played in the program?

MS. SULLIVAN: Objection. Vague, compound.

THE WITNESS: I'm not sure -- how do you

Page 147

mean played in the program? I don't understand what that means.

BY MR. SHAPIRO:

Q How has that provision affected operation of the program?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: I don't --

MS. SULLIVAN: Assumes facts not in evidence.

THE WITNESS: And, again, I don't understand what operation of the program means. I don't think it's affected the operation of the program at all.

BY MR. SHAPIRO:

Q You're aware that the Department of Energy has not agreed to accord priority for acceptance of spent fuel from permanently shut down reactors, true?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: I'm aware that in response to requests the Department has chosen not to exercise its discretion and grant that -- grant the

Page 148

priority acceptance, correct.

BY MR. SHAPIRO:

Q Why has the Department not granted that priority acceptance to permanently shut down reactors?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: The Department's position is that that issue, which is related to the removal of spent fuel from shut down reactors, is best addressed through the exchange provision of the contract between the utility as opposed to the Department unilaterally reallocating a finite capacity to one utility over another.

BY MR. SHAPIRO:

Q So it has been the Department's expectation that the exchanges provision will operate sufficiently to obviate the need for according priority acceptance to spent fuel at permanently shut down reactors?

MS. SULLIVAN: Objection. Vague, compound, and mischaracterizes the witness' prior testimony.

Page 149

THE WITNESS: I'm not sure that the latter part -- I mean, my statement was that the Department's position is that the exchange provision is the best way that utilities can, amongst themselves, reallocate that capacity for acceptance in a way that best addresses the need to remove fuel from shut down reactors.

BY MR. SHAPIRO:

Q Well, the Department has expected that, once it actually starts accepting spent fuel, that the exchanges provision will operate as originally intended, to enable utilities to optimize their acceptance -- the timing of their acceptance of spent fuel, correct?

MS. SULLIVAN: Objection. Vague, compound, assumes facts not in evidence.

THE WITNESS: The Department anticipates that the exchange provision will operate in a way that will allow utilities to exchange amongst themselves to advance, or to tailor their spent fuel acceptance schedules to their needs.

BY MR. SHAPIRO:

Page 150

Q Let's move on to the next topic, which is the purpose and role of the provision of the Standard Contract governing acceptance of failed fuel and DOE's plans and scheduling of the acceptance of failed fuel.
Let me first ask, Mr. Zabransky, what's your understanding of how the Standard Contract addresses the timing of the acceptance of failed fuel?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: I mean, under the provisions of the contract, the purchaser, the contract holder would have to apprise the Department of its failed fuel and the circumstances of its failed fuel, and seek a confirmation that it can be delivered on the normal schedule.
To the extent that there are technical feasibility issues associated with the picking up of that failed fuel, the Department may need to adjust the schedule of pickup.
BY MR. SHAPIRO:

Page 151

Q So this provision of the contract provides a contingency in the event that something is happening in the course of the operating DOE program, true?
MS. SULLIVAN: Objection. Vague, to the extent it mischaracterizes the witness' testimony.
THE WITNESS: Again, I'm not -- can you repeat your question.
BY MR. SHAPIRO:
Q This provision concerning -- this provision in the Standard Contract concerning the timing of acceptance of failed fuel provides a contingency to address something that might happen in the course of an operating DOE program, true?
MS. SULLIVAN: Objection. Vague, mischaracterizes the witness' prior testimony, assumes facts not in evidence.
THE WITNESS: I mean, you would have to clarify what you mean by an operating DOE program.
BY MR. SHAPIRO:
Q A program in which DOE is actually accepting spent fuel from utilities?

Page 152

A I think --
MS. SULLIVAN: Same objections.
THE WITNESS: I think it would have an implication there. It has an implication in the licensing process also.
BY MR. SHAPIRO:
Q Explain for me what is the implication in the licensing process for the provision of the Standard Contract addressing the timing of the acceptance of failed fuel from utilities.
MS. SULLIVAN: Objection. Legal conclusion.
THE WITNESS: I guess let me clarify. The parameters of failed fuel would have an impact on the license process. But to clarify, the focus of the contract provision is in the operational mode.
BY MR. SHAPIRO:
Q I want to make sure that we're on the same page, Mr. Zabransky, as to, again, those provisions for the -- in the contract for the timing of the acceptance of failed fuel, how they -- how it

Page 153

actually works. And I can certainly pull out a copy of the contract.
But for purposes -- let me start with delivery commitment schedules. For purposes of delivery commitment schedule submittals and approvals, there's no differentiation, is there, between failed fuel and fuel that is not failed, is there?
MS. SULLIVAN: Objection. Legal conclusion, vague, compound.
THE WITNESS: There's an assumption on DOE's part -- presumption on the DOE's part that all fuel on the DCS, delivery commitment schedule, is not failed.
BY MR. SHAPIRO:
Q Where is that presumption evidenced?
A I believe it's in the instructions provided with the DCS form.
Q That was part of Exhibit 4. Take a look and point that out to me, please.
A That would be on page 3. Subparagraph h.
Q Subparagraph h on page 3 of the

instructions on Exhibit 4 states that a utility intending to deliver failed fuel should submit proposed handling procedures to DOE for evaluation What's your understanding of the timing of that submittal?

MS. SULLIVAN: Objection. Mischaracterizes the document, best evidence, vague

THE WITNESS: I don't believe the -- that can be any time the utility wanted to do that.

BY MR. SHAPIRO:

Q Let me ask a similar question with respect to final delivery schedules. The contract's provision for the submittal and approval of final delivery schedules doesn't differentiate between failed fuel and fuel that is not failed, do they?

MS. SULLIVAN: Objection. Vague, compound, legal conclusion.

THE WITNESS: And at this point, no instructions were ever developed for those. But they'd have to. It's a big difference whether fuel is failed or not failed from a transportation standpoint.



BY MR. SHAPIRO:

Q But there's nothing on the final delivery schedule forms themselves that call for disclosure of the condition of the listed fuel, that's failed or not, is there?

MS. SULLIVAN: Objection. Best evidence, legal conclusion, vague.

THE WITNESS: And as I said, the Department never developed implementing instructions for that form as it did for the DCSs. But when it does, that will be one of the things that would have to be included per the provisions of the contract. Failed fuel has to be identified by the utilities prior to acceptance.

BY MR. SHAPIRO:

Q I'll get to that, but let me address one form at a time. If you could take a look, again, at Exhibit 6 to your deposition. And that's -- has a submittal of a final delivery schedule form from Dairyland Power. But you would agree that the form itself that comes right from the Standard Contract does not provide a space on it for the specification



if fuel has failed or not, correct?

MS. SULLIVAN: Objection. Legal conclusion, best evidence, vague, asked and answered.

THE WITNESS: And, again, no, this form doesn't. This again was out of the contract. This was never a DOE form. We never published a form as we did with DCSs.

Having said that, the DCSs subsume that these were all standard assemblies. And the FDS is a subset of the DCS form. And it would frankly be impossible to perform without the knowledge whether the fuel is failed or not. And they would be misdescribing the fuel per NRC requirements if they didn't inform us accordingly.

BY MR. SHAPIRO:

Q Isn't the form that is contemplated by the Standard Contract that calls for the description of fuel as failed or not, isn't that Appendix F?

MS. SULLIVAN: Objection. Legal conclusion, best evidence.

THE WITNESS: Yes. Appendix F requires a



detailed description of the purchaser's fuel.

BY MR. SHAPIRO:

Q Now, the Standard Contract doesn't provide for Schedule Fs to be submitted until 60 days prior to the scheduled delivery date; isn't that correct?

MS. SULLIVAN: Objection. Legal conclusion.

THE WITNESS: I believe that's the requirement.

BY MR. SHAPIRO:

Q So the Standard Contract doesn't contemplate utilities informing DOE of whether or not their fuel has failed or not until 60 days prior to the scheduled delivery date, correct?

MS. SULLIVAN: Objection. Legal conclusion.

THE WITNESS: I don't believe that's correct.

BY MR. SHAPIRO:

Q What part of that interpretation of the contract is not correct?





©2007

MS. SULLIVAN: Objection. Legal conclusion.

THE WITNESS: That's when they're required to tell us the details of the fuel. If they choose to wait until that point in time to tell us, it may be technically not feasible to pick it up on the schedule, and the schedule would have to be adjusted. It would be in their best interest to tell us as soon as possible.

BY MR. SHAPIRO:

Q Why would it be in the utilities' best interest to tell the Department earlier than the time frame otherwise provided for in the Standard Contract as to the condition of the spent nuclear fuel to be delivered?

MS. SULLIVAN: Objection. Foundation, speculation, beyond the scope of the 30(b)(6) notice.

THE WITNESS: And, again, I think you're mischaracterizing the provision of the contract for failed fuel. It says shall seek delivery confirmation. Appendix F is the detailed



description of the fuel. They can choose to wait that long before they seek delivery confirmation. But that's not the same as what's required under the failed fuel provisions under the contract.

BY MR. SHAPIRO:

Q I'm not sure that that answer is really responsive to my question, which is why would it be in the utilities' best interest to tell the Department earlier than 60 days prior to the date of scheduled delivery that some of the fuel otherwise scheduled for delivery might be failed?

MS. SULLIVAN: Objection. Foundation, speculation, beyond the scope of Mr. Zabransky's Rule 30(b)(6).

THE WITNESS: I think you're mischaracterizing the contract provisions.

BY MR. SHAPIRO:

Q I don't think -- my last question didn't purport to characterize the contract provision. I'm working off of a statement that you made a few minutes ago where you said it would be -- where perhaps utilities could wait until 60 days before



scheduled delivery, but it would be in their best interest to tell DOE earlier.

And I'm asking -- I'm really trying to ask about your statement about why it would be in utilities' best interest to inform DOE earlier?

MS. SULLIVAN: Same objections. And asked and answered.

THE WITNESS: And my response was based upon your premise that they didn't need to tell anything about the fuel until 60 days before. And I think that's an erroneous reading of the contract.

BY MR. SHAPIRO:

Q What provision of that contract is it that you contend requires utilities to inform DOE at some earlier time that they have failed fuel?

MS. SULLIVAN: Objection. Legal conclusion, argumentative.

THE WITNESS: And I believe the provision of the contract that requires them to notify DOE of fuel -- proposed handling requirements or handling procedures and seek DOE's approval that it can accept that fuel under the normal schedule is not



the same as the Appendix F requirements.

BY MR. SHAPIRO:

Q You're correct. That's not Appendix F. But that provision, we'll find it, that provision of the contract doesn't have any deadline on it, does it, for utilities' submittal of that delivery -- acceptance confirmation?

MS. SULLIVAN: Objection. Legal conclusion, best evidence.

THE WITNESS: And I think you're correct, sir. It doesn't have a deadline.

BY MR. SHAPIRO:

Q I'm back to my prior question. Is there any deadline other than the 60-day one in Appendix F for provision of that information to DOE by utilities?

MS. SULLIVAN: Objection. Legal conclusion, best evidence.

THE WITNESS: Only from the practical application standpoint that, if, indeed, they have fuel that requires special handling and they need DOE's confirmation that they can handle it with



 ©2007

Page 162

those special procedures. If you really want that fuel to move you better get that prior to 60 days before.
So it's in their best interest to nail those issues down as soon as possible.
BY MR. SHAPIRO:
Q What's the Department's understanding as to what a utility needs to provide in a request for delivery and procedure confirmation concerning failed fuel?
MS. SULLIVAN: Objection. Legal conclusion.
THE WITNESS: At this point, since we've never had such a request, I imagine it will wind up being a dialogue. But they need to at least tell us to start with what the fuel is, what the condition is, and what problems it's caused them, so we can evaluate if it causes us any problems.
BY MR. SHAPIRO:
Q Well, suppose the failed fuel, that issue isn't -- hasn't caused the utility any problems. What does the utility need to tell DOE?

Page 163

MS. SULLIVAN: Objection. Vague, compound, speculation.
THE WITNESS: And they need to describe it sufficiently to us so we can determine whether it will cause us any problems.
BY MR. SHAPIRO:
Q You would agree, Mr. Zabransky, that the Standard Contract didn't specify just what sort of information had to be provided by utilities in terms of a request for such delivery and procedure confirmation concerning failed fuel, correct?
MS. SULLIVAN: Objection. Vague, legal conclusion.
THE WITNESS: And I agree that it's not specific. But I think those that drafted it were intelligent enough to recognize that those conditions -- they couldn't predict at this point what those licensing conditions might be.
BY MR. SHAPIRO:
Q DOE understands that many utilities possess failed fuel, correct?
MS. SULLIVAN: Objection. Foundation,

Page 164

beyond the scope of the 30(b)(6) notice, vague, and relevance.
THE WITNESS: And I'm not prepared to speak for DOE on that topic.
BY MR. SHAPIRO:
Q What are DOE's plans for scheduling of the acceptance of failed fuel from the utilities?
MS. SULLIVAN: Objection. Vague, beyond the scope of Mr. Zabransky's 30(b)(6) deposition notice, foundation.
THE WITNESS: And DOE's -- again, I can't speak for DOE's plans.
BY MR. SHAPIRO:
Q You didn't prepare to provide testimony concerning DOE's plans and scheduling for the acceptance of failed fuel?
MS. SULLIVAN: Oh, I'm sorry. I misread the topic. I thought it said the Standard Contracts governing. I didn't understand. I'm sorry. I thought I was misreading.
THE WITNESS: Okay.
MS. SULLIVAN: Yeah. Please go ahead.

Page 165

THE WITNESS: Well, DOE's plans would be to implement the Standard Contract provision.
BY MR. SHAPIRO:
Q Is DOE planning to accept failed fuel from utilities on any -- on any schedule different from fuel that's not failed?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Never having been presented with the specifics of a failed fuel for acceptance, DOE can't answer that question.
BY MR. SHAPIRO:
Q Has DOE at any time been planning to accept failed fuel from utilities on a schedule different from that for fuel that is not failed?
MS. SULLIVAN: Objection. Vague, compound.
THE WITNESS: And, again, Mr. Shapiro, without knowing a specific failed fuel and specific issue -- assembly from a specific reactor, DOE hasn't made a determination as to whether the schedule is appropriate or not.
BY MR. SHAPIRO:


©2007

Page 166

Q Is the -- part of the difficulty in answering the question that DOE hasn't gotten close enough to accepting any -- any spent fuel that it's had occasion to consider whether you might have to accept failed fuel later than other fuel?

MS. SULLIVAN: Objection. Vague, compound.

THE WITNESS: I think part of the difficulty is we have never been asked to consider it by a utility pursuant to the contract.

BY MR. SHAPIRO:

Q Well, the Department has plans to ultimately accept failed fuel from utilities, doesn't it?

A And, again, when the Department is presented with a request from a utility as to a specific case, as to whether or not there needs to be a schedule adjustment, the Department will evaluate it. We've never been requested to do so.

Q What plans has the Department made for the acceptance of failed fuel from utilities?

MS. SULLIVAN: Objection. Vague.

Page 167

THE WITNESS: Without knowing the specifics of the failed fuel, I can't tell you the plans we've made.

BY MR. SHAPIRO:

Q Are you saying that the Department hasn't made any plans for the acceptance of failed fuel from utilities?

MS. SULLIVAN: Objection. Vague, mischaracterizes the witness' prior testimony.

THE WITNESS: I'm saying, Mr. Shapiro, that until a utility identifies the specifics of the failure of the fuel and what the complications are or implications are for the Department, we can't make plans to accept it on a specific schedule.

BY MR. SHAPIRO:

Q Well, I'm talking -- I'm asking more generally. Has the Department made plans for the acceptance of failed fuel from utilities?

MS. SULLIVAN: Objection. Vague, asked and answered.

THE WITNESS: And, I guess I'll answer it from two perspectives. From a technical basis there

Page 168

is no such thing as a general request for receipt of failed fuel. It's all specific. From a contractual purpose, our plans are the provisions we have in the contract.

BY MR. SHAPIRO:

Q Well, the Department has been planning for many years for the acceptance of failed fuel from utilities, correct?

MS. SULLIVAN: Objection. Vague, mischaracterizes the witness' prior testimony.

THE WITNESS: And, again, sir, as I said, the process is established. The specifics need to be evaluated before the Department -- the Department's plans are to evaluate the specifics and determine whether or not there's a reason -- any basis that the schedule would need to be adjusted.

Beyond that, to discuss failed fuel, you need to discuss it in the absolute of what assembly and what condition. There's no such thing as a general, this failed fuel is okay.

So when presented with a question from the utility, the purchaser, the Department will

Page 169

evaluate it and determine what schedule it can be accepted on.

BY MR. SHAPIRO:

Q The Department has made no effort to get its arms around the situation, to be prepared to accept failed fuel from utilities?

MS. SULLIVAN: Objection. Vague, asked and answered, mischaracterizes the witness' prior testimony.

THE WITNESS: Again, the Department has requested information from utilities. They provided some information. But no utility has availed itself of the ability to ask the Department about specific assemblies.

BY MR. SHAPIRO:

Q What opportunity are you talking about that utilities haven't availed themselves of?

A They have a contract provision that requests the Department's confirmation as to the feasibility of accepting fuel on a normal schedule. They could have done that for the last 20 years.

Q Wouldn't the Department's response,



 ©2007

Page 170

consistent with what your prior testimony has been, if a utility 20 years ago, in 1987, had sent such an inquiry to the Department, the Department would simply say we don't know because we don't have a schedule yet?

MS. SULLIVAN: Objection. Vague, speculation.

THE WITNESS: And I can't guess the Department's response because they never asked the question.

BY MR. SHAPIRO:

Q So even though the Department knows that utilities have failed fuel, the Department doesn't plan to start making plans to accept that failed fuel until it gets an inquiry about scheduling from utilities under the Standard Contract?

MS. SULLIVAN: Objection. Vague, mischaracterizes witness' prior testimony, compound.

THE WITNESS: I think I've told you we have a process. The process is they'll tell us the specifics. We will tell them if there's any issues or not.

Page 171

Without the specifics, we can't tell them anything further. The process is established. They haven't started the process.

BY MR. SHAPIRO:

Q Does the Department -- what impact is there on the fact that fuel is failed as opposed to not failed on the licensing of the facilities for Yucca Mountain?

A I can't speak to the details on that.

Q Do you have any knowledge of that situation?

A I'm not prepared to speak on behalf of the Department on that issue.

Q You're not prepared to speak for the Department of Energy on its plans for the -- for having a licensed facility to be able to accept failed fuel?

MS. SULLIVAN: Objection to the extent it mischaracterizes the witness' prior testimony.

THE WITNESS: I'm not prepared to speak on the effect of failed fuel in the license application.

Page 172

BY MR. SHAPIRO:

Q Are you able to at least say that the Department is working to take into account that it's going to have to deal with failed fuel in its license application?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: And, again, failed fuel is not a generic term. It's a specific term. The Department may have made some assumptions about wha it may have to deal with it. It doesn't mean it addresses all the failed fuel that's out there.

MS. SULLIVAN: Can I take a two-minute break?

MR. SHAPIRO: Sure.

(Whereupon, a recess was taken between 2:27 p.m. and 2:30 p.m.)

BY MR. SHAPIRO:

Q Let me reask my last question again because I'm not sure that your last answer was responsive. I was asking are you at least able to say that the Department is working to take into account that it's going to have to deal with failed

Page 173

fuel in its license application?

A And I guess, to respond to that, to clarify, is I can't say what's going to be in the final license application. But I do know that I can say on behalf of the Department that it's aware of the issue of failed fuel; that failed fuel is a consideration that will have to be dealt with in the license application or the license application amendments -- license amendments later on.

So DOE has considered failed fuel in its development of the Yucca Mountain license facility. I don't know how it's going to appear in the final license application, nor do I know how it relates to the breadth or depth of the failed fuel we may find out at existing utility sites that we don't know about.

Q And I understand that the license application will be final when it's final. But what is the current state of the planning of that application with respect to failed fuel?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: And, again, it's being



 ©2007

Page 174

considered. I don't know the details of what's being considered in any specific area.

BY MR. SHAPIRO:

Q Is any part of that consideration contemplating accepting failed fuel at a time frame separate from acceptance of fuel that's not failed?

MS. SULLIVAN: Objection. Vague, compound.

THE WITNESS: And, again, I'm not sure I can speak with a definitive nature as to that from our end. But on the other end I can say that, as I've said, failed fuel is not all -- failed fuel is different things. So some failed fuel may not be on -- scheduled different. Other failed fuel might be. I can't speak to those details.

BY MR. SHAPIRO:

Q What are DOE's plans for the acceptance of Dairyland's failed fuel?

MS. SULLIVAN: Objection. Vague. Objection. Assumes facts not in evidence.

THE WITNESS: And at this point, I don't know that DOE is well versed on the details of

Page 175

Dairyland's failed fuel, so I don't have specific plans for Dairyland's failed fuel.

BY MR. SHAPIRO:

Q So DOE is not currently planning to accept Dairyland's failed fuel on a schedule different from the rest of Dairyland's spent fuel, true?

MS. SULLIVAN: Objection. Legal conclusions. Mischaracterizes the witness' prior testimony.

THE WITNESS: I don't think Dairyland's fully informed DOE of the detail of its failed fuel, so DOE hasn't made that determination yet.

BY MR. SHAPIRO:

Q I have a few more questions for you, Mr. Zabransky, on failed fuel. And I'll go back at the end to a few questions on an -- as an individual. But let's continue for the time being with your testimony as a 30(b)(6) designee.

Switching to the next topic, which is the schedule in which DOE plans to remove Dairyland's spent fuel. On what schedule does DOE plan to

Page 176

remove Dairyland's spent fuel?

MS. SULLIVAN: Objection. Relevance, vague.

THE WITNESS: At this point, aside from the approved DCSs that we have with Dairyland, I don't think, at this point, the Department has developed a schedule for the removal of the remainder of the spent fuel.

BY MR. SHAPIRO:

Q What do you mean aside from the DCSs? Isn't it simply the case that, right now, the Department of Energy has no schedule for the acceptance of Dairyland's spent fuel?

MS. SULLIVAN: Objection. Vague, mischaracterizes the witness' prior testimony.

THE WITNESS: Well, at this point the start date is not determined. But the schedule is the DCSs that the parties executed. And unless we mutually agree to alter them, we will follow through and deliver and pick up fuel on that schedule when we begin.

BY MR. SHAPIRO:

Page 177

Q I don't understand, Mr. Zabransky. Those delivery commitment schedules had particular years in them that are passed. How do you follow that -- what does it mean to follow that schedule?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: Again, we've missed 1998. But when we operate, we'll go back and we'll pick up the commitment for '98. It will be delayed. We'll receive the fuel.

BY MR. SHAPIRO:

Q Does DOE have any date by which it expects to complete the removal of Dairyland's spent fuel?

MS. SULLIVAN: Objection. Vague, relevance.

THE WITNESS: No, it does not.

BY MR. SHAPIRO:

Q When does the Department expect to develop a schedule that would provide a -- a date for the expected completion of removal of, Dairyland's spent fuel?


©2007

Page 178

MS. SULLIVAN: Objection. Relevance.
THE WITNESS: And at this point, I don't know when that date would be.
BY MR. SHAPIRO:
Q The final 30(b)(6) topic I would like to discuss with you, Mr. Zabransky, is the role, purpose and development of DOE's TAD system, the transportation, aging and disposal system.
What is the purpose of the TAD system?
A The --
MS. SULLIVAN: Objection. Vague.
THE WITNESS: DOE's --
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: DOE's purpose in developing the TAD system is to simplify the operations, design and licensing of a repository by designing -- by developing a single canister that can be used for transportation, aging at the repository, and ultimate permanent disposal.
BY MR. SHAPIRO:
Q What is the need for aging at the repository?

Page 179

MS. SULLIVAN: Objection. Vague, relevance.
THE WITNESS: The repository will be designed and licensed for specific thermal loads in the underground drifts. And to the extent that spent fuel might be received from utilities inconsistent with those thermal licensing requirements with the underground, it may need to be aged above ground prior to being disposed of underground.
BY MR. SHAPIRO:
Q If you can help me out, Mr. Zabransky. At one point I have a recollection of the Department talking about accepting -- in the acceptance of spent fuel from the utilities, of opening up all containers so that it could blend, was the word used, blend the spent fuel for purposes of equalizing the thermal heat load.
Is that the same kind of consideration?
MS. SULLIVAN: Objection. Vague, relevance, foundation.
THE WITNESS: I believe that the end

Page 180

result is the same.
BY MR. SHAPIRO:
Q Has the Department determined that it's not necessary to have each container with a relatively even heat load, that it's sufficient if the heat load is -- is equalized on a drift basis? Is that a fair way of characterizing it?
MS. SULLIVAN: Objection. Vague, relevance.
THE WITNESS: I don't believe that to be the case.
BY MR. SHAPIRO:
Q Can you explain for me the -- why it's no longer necessary to blend the heat loads for every single container?
MS. SULLIVAN: Objection. Vague, relevance.
THE WITNESS: I didn't say -- again, you didn't ask me that question, sir. I didn't answer that question.
BY MR. SHAPIRO:
Q All right. Is it still necessary to have

Page 181

the same heat load for every container?
A I believe that --
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: -- the purpose of aging is to allow for the heat loads to be uniform at the time of placement.
BY MR. SHAPIRO:
Q So some of those TAD containers may have to age at Yucca Mountain for an extensive period of time?
MS. SULLIVAN: Objection. Relevance, vague.
THE WITNESS: It depends on the specific fuel from the specific reactor, but there may be many years of aging required, yes.
BY MR. SHAPIRO:
Q Again, to take a step further and make sure I understand how this is working. You have some spent fuel that has been discharged for decades and has essentially been aging, if not on a pad, in a pool someplace, and some spent fuel that is many years from even being discharged and is going to be




©2007

Page 182

much hotter, only 5 years cooled when it's transported.

So is it the plan that DOE is going to have to wait for that more recently discharged fuel to cool down to the same level as the much older discharged fuel when it finally gets in place into Yucca Mountain?

THE WITNESS: I don't believe --

MS. SULLIVAN: Wait. Vague. Objection. Vague, relevance, compound.

THE WITNESS: And again, I'm not sure I'm prepared to answer the detailed technical issues as to how precise the match has to be. I don't know if it's a five-node or a seven-node line load that's being contemplated right now. But it's not drift by drift.

BY MR. SHAPIRO:

Q Is the purpose for the TAD system essentially the same as that of the multipurpose canister system that was contemplated by DOE in the early to mid 1990s?

MS. SULLIVAN: Objection. Vague, assumes

Page 183

facts not in evidence.

THE WITNESS: I think it's fair to say that the TAD system shares many of the same programmatic goals that the MPC system shared or had.

BY MR. SHAPIRO:

Q What, if any, material differences are there between the goals that the MPC system was intended to achieve and the goals of the TAD concept?

MS. SULLIVAN: Objection. Vague, foundation, beyond the scope of the 30(b)(6) --

THE WITNESS: And I --

MS. SULLIVAN: -- designation.

THE WITNESS: From the overall perspective, they both envisioned single canister that can be used for storage, transport and disposal. So I think there -- programmatically it was very similar.

BY MR. SHAPIRO:

Q So you agree that one of the purposes of the TAD system was to facilitate utility storage of

Page 184

spent fuel outside of their spent fuel pools, correct?

MS. SULLIVAN: Objection. Vague, mischaracterizes the witness' prior testimony.

THE WITNESS: DOE's purpose are for transportation, aging and disposal, and aging at Yucca Mountain.

If utilities chose to use a TAD system at their site, it would be up to them to decide.

BY MR. SHAPIRO:

Q Doesn't DOE in fact intend to provide incentives to utilities to use TADs for storage of spent nuclear fuel, to maximize the amount of its spent fuel that the Department can ultimately receive in TADs?

MS. SULLIVAN: Objection. Vague, vague and assumes facts not in evidence.

THE WITNESS: Okay. Yes, I think DOE has probably stated that it's considering incentives to get utilities to choose to utilize TADs for additional on-site storage, to minimize the proliferation of nondisposable canisters.

Page 185

Can we take a second?

MR. SHAPIRO: Why don't we take our next break.

(Whereupon, a recess was taken between 2:47 p.m. and 3:00 p.m.)

BY MR. SHAPIRO:

Q Mr. Zabransky, is the spent fuel that DOE is planning to encourage that utilities store in TADs, is that spent fuel going to be in an acceptable waste form under the Standard Contract?

MS. SULLIVAN: I'm going to direct Mr. Zabransky not to answer any questions with regard to the TAD initiative and how the Standard Contract may need to be -- could be considered to be modified, et cetera. There's been -- subject to the invocation of deliberative process privilege by the Department with regard to testimony, Mr. Zabransky's testimony on that topic.

BY MR. SHAPIRO:

Q Why don't we go back to, not TADs, but to the dual purpose storage transportation systems that utilities such as Dairyland are using or considering



 ©2007

Page 186

using.
Is spent fuel in those systems considered an acceptable waste form under the Standard Contract?
MS. SULLIVAN: I'm sorry, counsel. Currently? Are you asking for a current interpretation?
MR. SHAPIRO: Yes. Yes.
MS. SULLIVAN: Objection. Legal conclusion.
THE WITNESS: Okay. This is as a 30(b)(6)? Or is this --
MS. SULLIVAN: Yeah. I mean it's within the scope of the -- but he's asking you currently.
THE WITNESS: Okay. And the answer is no, it's not considered to be acceptable waste form under the current parameters.
BY MR. SHAPIRO:
Q Why not?
MS. SULLIVAN: Objection. Vague, legal conclusion.
THE WITNESS: Because when developed, the

Page 187

contract did not contemplate canisters that would need to be cut open and disposed of, because they didn't exist at the time.
BY MR. SHAPIRO:
Q Is there any material difference in this regard between dual purpose containers that utilities are using and the TADs?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: In what regard?
BY MR. SHAPIRO:
Q In regard to them not being contemplated at the time the Standard Contract was entered into and, therefore, not being acceptable waste forms.
MS. SULLIVAN: Objection. Vague, compound. Are you asking him with regard to the TADs initiative or the Standard Contract?
MR. SHAPIRO: I'm asking about the Standard Contract. Let me rephrase my question.
MS. SULLIVAN: Okay.
MR. SHAPIRO: There have been a couple back-and-forths, so I'll take some care with it.
MS. SULLIVAN: I appreciate that.

Page 188

BY MR. SHAPIRO:
Q Is there any material difference between dual purpose storage transportation container systems that utilities are using for their spent nuclear fuel and TADs regarding the extent to which those container systems are currently considered acceptable waste forms under DOE's Standard Contracts with utilities?
MS. SULLIVAN: Objection. Legal conclusion, vague.
Do we need to talk?
THE WITNESS: Well, I mean, we might need to talk. Can we talk?
MS. SULLIVAN: Can we talk about this?
MR. SHAPIRO: Sure. Go ahead.
(Discussion off the record.)
MS. SULLIVAN: Okay. Thank you. Can we have the question read back.
(The reporter read the record as requested.)
MS. SULLIVAN: Objection. Legal conclusion, vague, assumes facts not in evidence.

Page 189

THE WITNESS: And with regard specifically just to the were either considered acceptable waste forms under the contract, the answer is no.
BY MR. SHAPIRO:
Q So there's no material difference between the two, and neither is currently considered an acceptable waste form?
MS. SULLIVAN: Objection. Vague, and objection, legal conclusion.
THE WITNESS: Well, and again I'm not sure -- I didn't mean to imply that they're not materially different items. They are materially different items.
BY MR. SHAPIRO:
Q Materially different in terms of their status as acceptable waste forms?
A With regard to the specific issue as to how they're considered under the contract, I don't believe there's any difference.
Q If the Department doesn't currently consider TADs to be acceptable waste forms under the



 ©2007

Page 190

Standard Contract, how is the Department planning to encourage utilities to implement the use of TADs?
MS. SULLIVAN: And this I'm going to direct Mr. Zabransky not to answer. There's been an invocation of the deliberative process privilege by the Department with regard to DOE's analysis or consideration of implementing the TADs initiative pursuant to the Standard Contract and standard -- vis-a-vis Standard Contract holders.
BY MR. SHAPIRO:
Q Focusing just on dual purpose containers, then, for the moment, Mr. Zabransky, do you foresee a means by which the spent fuel in those containers would become considered by DOE to be an acceptable waste form?
MS. SULLIVAN: Same direction not to answer the question.
THE WITNESS: Can we go talk?
MR. SHAPIRO: Sure.
MS. SULLIVAN: Sorry. I'm trying to be very precise in my invocation.
(Discussion off the record.)

Page 191

MS. SULLIVAN: Okay. I withdraw that instruction not to answer.
THE WITNESS: Okay.
MS. SULLIVAN: You can have the question --
(The reporter read the record as requested.)
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: And as DOE has said, it would be willing to consider a mutually agreeable contract modification that would address that issue.
BY MR. SHAPIRO:
Q Do you foresee any other means other than a contract modification by which spent fuel in dual purpose containers would be considered to be an acceptable waste form?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: I can't conceive any other means of doing that, no.
BY MR. SHAPIRO:
Q You stated earlier, Mr. Zabransky, that

Page 192

the reason spent fuel -- let's focus right now on the dual purpose containers. The reason why spent fuel in dual purpose containers is not considered an acceptable waste form is that they simply weren't contemplated in the contract.
But can you point me to a specific provision in the contract that would indicate that such spent fuel was not acceptable?
MS. SULLIVAN: Objection. Vague, legal conclusion.
THE WITNESS: And all I can point you to is they didn't exist at the time the contract was created. There was no such thing as a dual purpose canister. So it couldn't contain a provision about them since they didn't exist.
BY MR. SHAPIRO:
Q But is there anything in the contract that's inconsistent with the acceptance of such containers?
MS. SULLIVAN: Objection. Legal conclusion, vague, best evidence.
THE WITNESS: The contract discusses

Page 193

acceptance of spent fuel. It doesn't discuss acceptance of the hardware containing the spent fuel and the implications of that on the Department.
BY MR. SHAPIRO:
Q Ultimately, DOE plans to accept dual purpose containers of utilities, doesn't it?
MS. SULLIVAN: Objection. Assumes facts not in evidence, vague.
Do you need to talk to me?
THE WITNESS: No.
MS. SULLIVAN: Okay.
THE WITNESS: DOE is creating facilities that have that capability. Whether it accepts them or not is subject to the mutually agreeable contract modification that I mentioned earlier.
BY MR. SHAPIRO:
Q When -- turning back to TADs for the moment. When does DOE anticipate that TADs will be available to utilities for use to store spent nuclear fuel?
MS. SULLIVAN: I don't have a privilege assertion for this. I just want to check with him




©2007

Page 194

whether we need this protected.
MR. SHAPIRO: Okay.
(Discussion off the record.)
MS. SULLIVAN: Thank you. Okay. Objection. Vague, relevance.
THE WITNESS: And the question was when does DOE envision TADs might be available for use by utilities. I'm paraphrasing what I think you asked me.
MR. SHAPIRO: Yes. Roughly.
MS. SULLIVAN: Same objections.
THE WITNESS: Okay. I guess the answer to that is it's our plan and our hope that if the program we put in place is successful, that a licensed TAD should be commercially available for utilities to procure sometime around 2011.
BY MR. SHAPIRO:
Q Is the expectation, then, that the TAD would be something that utilities would procure rather than DOE?
MS. SULLIVAN: Objection. Relevance, vague.

Page 195

THE WITNESS: We need to talk.
MS. SULLIVAN: Okay.
(Discussion off the record.)
THE WITNESS: And the question was.
MS. SULLIVAN: Yeah. Reread the question, please, if we could.
(The reporter read the record as requested.)
MS. SULLIVAN: Objection. Vague, relevance.
THE WITNESS: All right. And in response, the answer that I would give is, with respect to TADs that are utilized solely for moving spent fuel from a utility site directly to Yucca Mountain for disposal, DOE would procure those as part of the transportation system.
With respect to TADs utilities may choose to utilize for on-site storage, that would be up to the utility to procure.
BY MR. SHAPIRO:
Q Couldn't DOE provide the utility with TADs for transportation earlier such that the

Page 196

utility could use that same TAD for storage?
A DOE --
MS. SULLIVAN: Objection. Relevance, vague. Objection. Speculation.
THE WITNESS: And DOE's belief is that it's not -- it cannot spend waste fund dollars for use for on-site storage. So it would not provide a TAD for anything other than transport.
BY MR. SHAPIRO:
Q If the TAD is being used for disposal as well as transport, how does it entail any additional cost to the program to provide the TAD at an earlier point in time when it can also be used for storage?
MS. SULLIVAN: Objection. Vague, relevance.
THE WITNESS: And, again, it's an earlier point in time issue. And it's also an issue that utilities may not all use TADs for on-site storage issue. It's also -- many issues here, I'm now going to get into the details of --
MS. SULLIVAN: Okay.
BY MR. SHAPIRO:

Page 197

Q The details of what you've been precluded from discussing?
A Right.
Q Let me explore the contours of that in the next question. If DOE provides TADs to utilities as the -- let me take a step back first. You understand, Mr. Zabransky, that the Standard Contract contemplates that DOE will provide utilities with transportation packaging for their spent nuclear fuel, correct?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: Yes, I understand that.
BY MR. SHAPIRO:
Q If DOE provides utilities with TADs to serve as that transportation container, would the spent fuel in those TADs be considered to be acceptable waste forms at that point?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: And you asked me earlier if TADs are currently considered acceptable waste forms

Page 198

and I just said no.
BY MR. SHAPIRO:
Q I just asked a slightly different question.
A And --
MS. SULLIVAN: Okay. So are you asking as to a modification of the contract?
BY MR. SHAPIRO:
Q If DOE provides utilities with TADs to serve as transportation containers as contemplated by the Standard Contract that DOE has to provide, would the spent fuel in those TADs be considered to be acceptable waste forms under the Standard Contract at that point?
MS. SULLIVAN: And I believe that's the same question you asked earlier when I invoked the deliberative process privilege on behalf of the Department. And I would instruct Mr. Zabransky not to answer that question based on the assertion of deliberative process over DOE's deliberation and analysis with regards to how they're going to implement the TAD initiative with regard to Standard

Page 199

Contract holders.
MR. SHAPIRO: I expected I would get that objection.
MS. SULLIVAN: Okay.
MR. SHAPIRO: I just wanted to be sure.
BY MR. SHAPIRO:
Q Mr. Zabransky, let me go back now to your testimony as an individual, not as a 30(b)(6) witness. I just had a couple of questions on the failed fuel issue.
You're aware, aren't you, Mr. Zabransky, that utilities have demonstrated that failed fuel can safely be removed from their pools and safely stored in ISFSIs in transportable canisters on the same schedule as the rest of utilities' spent fuel, correct?
MS. SULLIVAN: Objection. Foundation, vague, compound, and legal conclusion.
THE WITNESS: And I guess I'm aware they've stored some failed fuel in containers. I'm not sure they've stored all types of failed fuel in containers.

Page 200

So, again, it's a question of all failed fuel isn't the same.
BY MR. SHAPIRO:
Q Are you aware of any instances, Mr. Zabransky, that a utility has not been able to store its failed fuel in an ISFSI on the same schedule it was moving its nonfailed fuel to an ISFSI?
MS. SULLIVAN: Objection. Foundation, vague, speculation, relevance.
THE WITNESS: And I'm aware of utilities -- or at least I'm aware from the standpoint that I've read the articles that they have pellets in a bucket in the spent fuel pool. And I'm sure those can't go into storage on the same schedule as intact fuel assemblies. And that's failed fuel.
BY MR. SHAPIRO:
Q Why do you say that the failed fuel that's currently stored in a bucket can't go into an ISFSI on the same schedule as other utilities' spent nuclear fuel?

Page 201

A To my knowledge there's no certificate of compliance that would cover such storage of spent fuel, pieces and bits.
Q Is there any technological difference between the ISFSIs that utilities have and are currently building and the MRS concept as it was contemplated by DOE under the standard -- not under the Standard Contract. Under the NWPA.
MS. SULLIVAN: Objection. Foundation, vague, speculation, relevance.
THE WITNESS: And I wasn't at DOE at the time when they were designing the MRS, so I don't know the details of what they were contemplating.
BY MR. SHAPIRO:
Q To your knowledge, are you aware of any technological distinction between ISFSIs and an MRS?
MS. SULLIVAN: Objection. Vague, foundation.
THE WITNESS: And I may have a fair understanding of an ISFSI. I'm not sure I have an understanding of what the details are of DOE's MRS. So I can't respond to your question.




©2007

Page 202

(Discussion off the record.)

MR. SHAPIRO: Mr. Zabransky, that's all the questions I have for you at this time. As you've heard, there are certain lines of inquiry that have been foreclosed today we may address in a motion.

As also you may be aware, the government has recently produced many thousands of pages of documents to us that we have not yet had an opportunity to review. In fact, the Department has not completed -- the government has not completed producing documents to us. We may seek to visit with you again when we have an opportunity to actually receive those documents and see if there are any that pertain to you that warrant talking with you again.

But as of right now, I don't have any further questions.

MS. SULLIVAN: I appreciate that. And we would like to oppose the need to re-open Dr. Zabransky's deposition based on document production matters. And we'll see what your motion

Page 203

that's been filed says.

I have a few questions I would like to ask Mr. Zabransky.

EXAMINATION

BY MS. SULLIVAN:

Q Mr. Zabransky, I would like to make sure something is clear on the record. I believe Mr. Shapiro asked you a series of questions as to DOE's obligations to accept fuel contained in DPCs. I want to make sure we're clear.

What is your understanding as to DOE's obligation to accept the spent fuel itself contained in dual purpose canisters?

A DOE has the obligation to accept the spent fuel contained within the canister, but not the canister itself.

Q Okay. Mr. Zabransky, we talked a lot about failed fuel, or you talked a lot about failed fuel with Mr. Shapiro today. And I believe at one point you said all failed fuel isn't the same. What do you mean by that?

A As we just discussed recently with

Page 204

Mr. Shapiro, there's failed fuel that merely may be a little bent or a little warped or missing a -- have a bent grid strap, that would be on one end of the spectrum of failed fuel.

There is failed fuel to the point where some utilities have pellets in a bucket. That's on the other extreme end of failed fuel.

And while one end of the spectrum may pose little technical challenges, the other end may be significant.

Q And I believe you discussed with Mr. Shapiro the scheduling process for the schedule for considering the acceptance of failed fuel.

What are some of the factors that DOE would have to consider in determining a schedule for the acceptance of failed fuel from a particular utility?

A And, again, sort of like we just talked, I mean, if it's -- if the utility says merely, hey, this has a bent grid strap, that may pose little technical challenge and be no reason to adjust the schedule.

Page 205

If on the other hand it is grossly failed, sitting in a bucket, it can't be picked up without falling apart further. It can be put in the transport cask but may fall apart during transport. All of those things would have to be looked at as to whether or not we could receive it normally, as well as any conditions we may have in a license with respect to handling fuels with certain characteristics.

Q When you say license, what are you referring to?

A The license for Yucca Mountain, for the receipt facility.

Q Do you also have to look at the license for and examine the failed fuel from a utility against the license for any transport cask?

A Yes. The transport casks have certain requirements with respect to contents, how -- whether they can be failed or not and what remediation has to be taken if they are failed.

Q So are there numerous factors -- there are numerous factors that DOE would have to look at



 ©2007

Page 206

in the consideration of setting the schedule for the acceptance of failed fuel?
A Based upon the specifics of the spent fuel that we're talking about, yes.
Q Mr. Shapiro asked you when DOE would develop a schedule for the acceptance of the remainder of Dairyland Power Cooperative's spent nuclear fuel. And I believe you said you didn't know when that was. Is that correct?
A I don't know the specific year at this point. Because, again, the program's best estimate is now 2017. But following the process through under the contract, we would begin developing schedules, the ACRs that support the DCSs 63 months before the first year of operation, and continue to add years on to those once those operations commenced.
So the first 10 years, 11 year, 12 would be added on. Ultimately all the Dairyland spent fuel would be encompassed within that schedule to allow for DCSs to be created. But I don't know today what day that would be that it starts.

Page 207

Q Mr. Zabransky, did you prepare -- oh. Some of Mr. Shapiro's last questions involved a comparison between the DOE MRS concept and ISFSIs at utility sites. And I believe you said you didn't know the details of the MRS. Were you involved in the MRS planning when you began at DOE?
A No, I was not. I mean, I did get there in '94. There was still some -- the MRS program going on. But I was not involved with the details of what was going on with that.
Q But the ACR that you issued -- let me back up.
Were you responsible for issuing an ACR shortly after you joined DOE?
A Yes, I was.
Q And what did that ACR contemplate in terms of performance by DOE?
A It contemplated performance at an MRS.
Q But you didn't have any responsibility for the planning of the details of that MRS?
A I did not know what they considered as part of the facilities, no.

Page 208

Q Mr. Zabransky, did you prepare to testify today regarding DOE's current understanding of certain terms and conditions of the Standard Contract that are identified in Dairyland's Rule 30(b)(6) deposition notice?
A Yes.
Q And did those provisions include the exchange provision, the DCS provisions, priority for shut down reactor provision?
A Yes. They do.
Q And did you -- how many -- did you spend several days preparing for your deposition on those topics?
A Yes, I did, on those topics.
Q Over the course of several weeks?
A A couple days over the course of several weeks, yes, that's correct.
Q Okay.
MS. SULLIVAN: We'll read and sign.
MR. SHAPIRO: I have no further questions.
(Whereupon, at 3:40 p.m., the

Page 209

deposition of DAVID K. ZABRANSKY was concluded.)
* * * * *




©2007

Page 210

CERTIFICATE OF NOTARY PUBLIC

I, VICKY STALLSWORTH REINER, RMR, CRR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotypy and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by and of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Vicky Stallsworth Reiner
Notary Public in and for the
District of Columbia

My commission expires:
September 30, 2007

Page 211

ACKNOWLEDGEMENT OF DEPONENT

I, DAVID K. ZABRANSKY, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes or corrections; if any, appear in the attached errata sheet signed by me.

Date DAVID K. ZABRANSKY

Page 212

Marian E. Sullivan, Esq.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Suite 10150
Washington, D.C. 20005

IN RE: DAIRYLAND POWER COOPERATIVE
vs.
UNITED STATES OF AMERICA

Dear Ms. Sullivan:

Enclosed please find your copy of the deposition of DAVID K. ZABRANSKY, along with the original signature page. As agreed, you will be responsible for contacting the witness regarding signature.

Within 30 days of receipt, please forward errata sheet and original signed signature page to counsel for Plaintiff, Robert L. Shapiro.

If you have any questions, please do not hesitate to call. Thank you.

Yours,

Vicky Stallsworth Reiner
Reporter/Notary

cc: Robert L. Shapiro, Esq.

Page 213

Capital Reporting Company
1821 Jefferson Place, NW
3rd Floor
Washington, D.C. 20036
(202) 857-3376

ERRATA SHEET

Case Name: DAIRYLAND POWER COOPERATIVE v. UNITED STATES OF AMERICA

Witness Name: DAVID K. ZABRANSKY

Deposition Date: May 3, 2007

Page No. Line No. Change/Reason for Change







73