No. 04-106C
(Chief Judge Damich)

Electronically Filed: September 21, 2007

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# DAIRYLAND'S OPPOSITION TO THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT REGARDING PRIVATE FUEL STORAGE

---

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

TABLE OF CONTENTS

Background .......... 2

A. Dairyland's Decision to Pursue PFS .......... 2

B. Dairyland's Participation in PFS Through a Subsidiary .......... 6

C. Development and Status of PFS .......... 7

D. Dairyland's Claim for Damages Related to PFS .......... 9

Argument .......... 10

I. Dairyland Should Not Be Deprived Recovery of Its Efforts To Mitigate Through PFS Solely Because Dairyland Incurred Those Mitigation Costs Through A Subsidiary .......... 10

A. Dairyland Is Entitled to Be Made Whole .......... 11

B. Dairyland Is Entitled to Recover Its Mitigation Expenses As Long As They Were Foreseeable, Substantially Caused by the Breach and Reasonable .......... 11

C. No Damages Doctrine Restricts Recovery of Mitigation Expenses Solely Because They Were Incurred Through a Subsidiary and Such a Rule Would Be Unwise .......... 12

II. Dairyland Is Not Precluded from Recovering Its PFS-Related Costs By *Indiana Michigan v. United States* .......... 15

A. *Indiana Michigan*'s PFS Ruling Is Fact-Bound and Limited .......... 15

B. Dairyland's Attempt to Mitigate Damages Through Participation in PFS Through GFT Has Been Reasonable .......... 19

C. The Need For And Expense Of Dry Storage Has Been Foreseeable .......... 22

D. *Indiana Michigan* Does Not Address Speculative Damages .......... 25

E. *Indiana Michigan* Does Not Address Causation of PFS Damages .......... 26

Conclusion .......... 28

# TABLE OF AUTHORITIES

Federal Cases

*Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564 (1985) ..................... 16

*Beacon Oil Co. v. United States*, 71 F.3d 391 (Fed. Cir. 1995)...................................... 17

*Citizens Fed. Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007)................. 11, 16, 23

*Commissioner of Internal Revenue v. First Sec. Bank of Utah*, 405 U.S. 394 (1972)........................................................................................ 14

*Commissioner of Internal Revenue v. Newman*, 159 F.2d 848 (2d Cir. 1947)................ 14

*Corrigan v. USX Corp.*, 2005 WL 2621981 ........................................................... 13

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)......................... 11

*Home Sav. Of America v. United States*, 399 F.3d 1341 (Fed. Cir. 2005) ..................... 19

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed. Cir. 1986)............ 17

*Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709 (1986) ........................................... 17

*In re Mark Indus.*, 751 F.2d 1219 (Fed. Cir. 1984) ...................................................... 16

*In re Stephen P. McGree*, 120 F.3d 1236 (Fed. Cir. 1997)............................................ 17

*Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639 (2004).............. 18, 21, 23

*Indiana Michigan v. United States*, 422 F.3d 1369 (Fed. Cir. 2005)........................ passim

*Kindle Building Co. v. Ford Motor Co.*, 17 F. Supp. 2d 701 (N.D. Ohio 1997)............. 13

*Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365 (Fed. Cir. 2001)............................... 23

*Miles Laboratories, Inc. v. Shandon, Inc.*, 997 F.2d 870 (Fed. Cir. 1993)...................... 17

*NLRB v. Fullerton Transfer & Storage Ltd.*, 910 F.2d 331 (6th Cir. 1990).................... 13

*Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006) ............................19-20

*Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006) ........................... passim

*San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557 (Fed. Cir. 1997)...................................................................... 25

*Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 ......................... passim

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931)............... 25

*Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515 (2006).................................. 20

*United States v. Cook County, Illinois*, 170 F.3d 1084 (Fed. Cir. 1999)......................... 17

*United States v. Crawley*, 837 F.2d 291 (7th Cir. 1988)................................................ 17

*Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006) .......................... passim

State Cases

*Dist. Concrete Co. v. Bernstein Concrete Corp.*, 418 A.2d 1030 (D.C. 1980) ................ 23

Federal Regulations

48 Fed. Reg. 54391-02 (December 2, 1983)........................................................ 24

Other Authorities

*Restatement (Second) of Contracts* § 347, cmt. c (1981) ................................................ 11

Nina A. Mendelson, *A Control-Based Approach to Shareholder Liability for Corporate Torts*, 102 Col. L. Rev. 1203 (June 2002).................................................... 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | No. 04-106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

DAIRYLAND'S OPPOSITION TO THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT REGARDING PRIVATE FUEL STORAGE

As part of its damages in this case, Dairyland is claiming its costs in pursuing an off-site storage location for its spent fuel, through an organization called Private Fuel Storage ("PFS"). The government's motion for summary judgment asserts that Dairyland should not be permitted to pursue this claim because Dairyland incurred its costs on the PFS effort through a subsidiary. There is no merit to this government argument. The law is clear that mitigation expenses are recoverable as long as they are foreseeable, have a substantial causal relationship to the breach and were reasonable at the time they were made. There is no artificial limitation of mitigation recovery in the law precluding the recovery of costs incurred through a subsidiary, the government offers no reason for creating such a new limitation, and there are good reasons for not doing so.

Alternatively, the government argues that the Federal Circuit's decision in *Indiana Michigan v. United States*, 422 F.3d 1369, 1376 (Fed. Cir. 2005) precludes any utility from recovering its costs incurred pursuing the PFS effort. The government's argument badly misreads *Indiana Michigan*, failing to recognize that, with respect to

recovery of PFS-related costs, that decision was limited to review of trial court factual findings for clear error. Furthermore, the government's argument fails to recognize that Dairyland is materially differently situated than Indiana Michigan and that the evidence in this case regarding PFS will therefore differ substantially from that presented in *Indiana Michigan*.

Background

A. Dairyland's Decision to Pursue PFS

Dairyland permanently shut down its nuclear plant, the La Crosse Boiling Water Reactor ("LACBWR"), in April 1987. *See* Parkyn Tr. at 17. Since that time, Dairyland has been storing its spent fuel in its spent fuel pool. *See* Raffety Tr. at 144. By the early 1990s, it had become apparent to Dairyland that DOE was not going to begin accepting Dairyland's spent fuel by January 31, 1998 as required by the parties' contract. For example, Dairyland knew that in 1989 DOE reported to Congress that it did not expect to have an operational repository until at least 2010 and that a DOE-provided centralized dry storage facility, termed Monitored Retrievable Storage ("MRS"), could not be built much before that due to the 1987 amendments to the Nuclear Waste Policy Act of 1982 ("NWPA"). *See* Parkyn Decl. ¶ 2; *see also Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 269-71 (2006); *Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 359-63 (2006).

The prospects for DOE performance did not improve as time progressed. Although a DOE "Nuclear Waste Negotiator" was appointed to attempt to find a voluntary host and site for a MRS, it was recognized by the early 1990s that DOE's MRS effort would not be successful. *PG&E*, 73 Fed. Cl. at 364-65. In 1994, DOE stated

definitively that it would not be able to begin accepting utility spent fuel by 1998. *Yankee Atomic*, 73 Fed. Cl. at 271. Dairyland kept abreast of these developments in DOE's spent fuel program. *See* Parkyn Decl. ¶ 2.

In light of the lack of progress in the DOE spent fuel program, Dairyland began to consider whether there were available options for long-term storage of its spent fuel that were better or more cost-effective than continued storage of its spent fuel in Dairyland's spent fuel pool. Parkyn Decl. ¶ 3. In the 1990s, dry storage of spent fuel, the storage of spent fuel inside shielded casks on large concrete pads away from a reactor's spent fuel pool, *PG&E,* 73 Fed. Cl. at 410, was relatively new. *See Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 423 and 427 (2007). Although the concept of transportable dry storage containers had been known to DOE and the utility industry since the early 1980s, *see Yankee Atomic,* 73 Fed. Cl. at 286-87, in the early 1990s the only dry storage technology available was limited to storage of the spent fuel, requiring the repackaging of the spent fuel for eventual transport to a DOE disposal facility. *See PG&E*, 73 Fed. Cl. at 410. This technology was not useful to a utility with a shutdown nuclear plant like LACBWR, since it would have required the continued maintenance of the spent fuel pool. Repackaging spent fuel from storage casks to transport casks is not technically feasible without a spent fuel pool or other comparable facility. *Id;* Parkyn Decl. ¶ 3.

By the mid-1990s, transportable dry storage containers were being developed. Parkyn *Id*. And with the advent of transportable dry storage technology, it became generally preferable for a utility with a shutdown nuclear reactor to use dry storage for its spent fuel. Although dry storage requires significant initial capital costs, such storage is

simpler and much less costly to operate and maintain than wet storage over the long term. In addition, movement of spent fuel to transportable dry storage casks enables a utility with a shutdown reactor to decommission that reactor, including its spent fuel pool. *See* Parkyn Decl. ¶ 3; *PG&E*, 73 Fed. Cl. 410; *Yankee Atomic*, 73 Fed. Cl. at 284. This preference for dry storage over wet storage of spent fuel in light of DOE's announced failure to perform was also applicable to Dairyland. *Id.*

Nonetheless, in the mid-1990s, Dairyland could not practically implement dry storage (or an independent spent fuel storage installation, "ISFSI") at its LACBWR site. First, since transportable dry storage technology was new, Dairyland understood that implementation of dry storage ISFSIs was likely to be extremely expensive. Parkyn Decl. ¶ 4. For example, Maine Yankee incurred almost $67 million just through 2002 to develop its dry storage facility. *Yankee Atomic,* 73 Fed. Cl. at 326. Dairyland simply could not afford such huge costs on its own.

Second, and relatedly, Dairyland did not have funds available to it for a large capital project like a dry storage facility. Unlike virtually every other utility with a spent fuel case before the Court, Dairyland is a not-for-profit cooperative. As a not-for-profit cooperative, Dairyland does not have the same flexibility of a for-profit corporation to borrow money for capital expenditures. *See* Stubbendick Decl. ¶ 2. Dairyland may only borrow funds for capital projects if those projects would be "used and useful" in the generation of electricity. *Id.* Dairyland determined that it could not borrow money to develop a dry storage facility, since such a facility would not assist in the generation of electricity. *Id.* In addition, Dairyland does not maintain large cash reserves because its only sources of non-loan working capital are through retained patronage margins. *Id.*

Therefore, as of the mid-1990s, Dairyland had neither available cash nor borrowing capacity with which to pursue a dry storage facility on its own.

Third, Dairyland faced significant technical and legal challenges in developing an ISFSI at its LACBWR site. The site is relatively small. *See* Parkyn Dep. at 36. And Dairyland has understood that location of an ISFSI at LACBWR would require an exemption from NRC requirements governing the minimum distance between an ISFSI and public access. *Id.* at 36-38. The LACBWR site is squeezed between the Mississippi River and a main line railway track (with a major public highway just beyond that), greatly limiting Dairyland's options for locating an ISFSI at that site. *Id.* As of the mid-1990s, Dairyland was unaware that any utility had sought or obtained the sort of exemption Dairyland would need to develop an ISFSI at LACBWR. *See* Parkyn Decl. ¶ 4.

Conversely, off-site dry storage did not share these problems. Indeed, in the mid-1990s, a number of nuclear generation utilities, including Dairyland, saw advantages to pursuing dry storage on a group basis, rather than individually. *See* Parkyn Decl. ¶ 5. These advantages included the ability to share costs and the ability to avoid limitations on the development of ISFSIs at reactor sites by locating such a facility away from reactor sites. *Id.* At the same time, the Mescalero Apache Tribe, which had developed a significant interest in hosting an MRS in response to inquiries by the Nuclear Waste Negotiator, contacted Northern States Power Company ("NSP") at the time of its well-publicized fuel storage expansion efforts at its Prairie Island Nuclear Generation Station in late 1993. *Id.* NSP and the Mescalero Apache Tribe invited a number of utilities,

including Dairyland, to determine interest in forming a company to pursue a private MRS on the Tribe's reservation. *Id.*

After some initial scoping of interest, 11 of the utilities, including Dairyland, formed PFS as a limited liability company in 1995. *Id*. The utilities' goal for PFS was to provide an interim storage site at which their spent fuel could be stored pending contract performance by DOE. Parkyn Depo. at 106. In essence, PFS picked up where DOE and its Nuclear Waste Negotiator left off with the MRS concept. PFS even focused on some of the same sites, including the Mescalero Apache reservation in New Mexico, as those considered by the Negotiator. Faced with DOE's failure to develop an MRS or other facility at which to take utilities' spent fuel, these utilities grouped together to develop a private MRS to provide a "cover" remedy in light of DOE's impending breach of contract. *Id.* Dairyland decided to participate in this PFS effort (along with ten other utilities) for addressing the DOE breach in light of the difficulties Dairyland faced in pursuing an ISFSI at LACBWR and the long-term advantages of dry storage over continued wet storage at LACBWR.

B. Dairyland's Participation in PFS Through a Subsidiary

Dairyland decided to participate in PFS through a subsidiary. *See* Parkyn Decl. ¶ 6. Dairyland set up Genoa Fuel Tech, Inc. ("GFT") as a wholly-owned subsidiary of Dairyland exclusively for that purpose. *Id.* Dairyland decided to use a subsidiary for this purpose for two reasons. First, the use of a subsidiary provides Dairyland with an additional layer of legal protection between Dairyland and any potential liabilities of PFS. Sans Crainte Depo. at 17-18. Second, the use of a subsidiary helped Dairyland ensure that its participation in PFS would not endanger its tax exemption as a not-for-

profit cooperative under Internal Revenue Code § 501(c)(12). *Id.* at 17. Dairyland must receive at least 85 percent of its annual gross receipts from its members in order to remain tax exempt for that year. *See* Stubbendick Depo. at 184. Thus, if PFS were to ever generate gross receipts (not necessarily profits) for its owners and Dairyland's share of those gross receipts exceeded 15 percent of its total annual receipts, Dairyland could lose its tax-exempt status for that year if it received those receipts directly. Stubbendick Decl. ¶3. By having its intermediary subsidiary GFT obtain any receipts, Dairyland can control and limit the amount of gross receipts it receives in any one year from the subsidiary, thereby helping to avoid loss of the tax exempt status. *Id.*

Although Dairyland has structured its participation in PFS to incur costs through a subsidiary, Dairyland has always remained completely in control of that participation. All of GFT's officers and directors have been employees of Dairyland. Parkyn Decl. ¶ 6. And Dairyland's executives determine what actions GFT takes. Sans Crainte Decl. ¶ 2. And, contrary to the central premise of the government's motion, Dairyland itself (not its subsidiary, GFT, PFS or any other entity) has incurred all of the PFS-related costs for which Dairyland is seeking recovery in this case. Stubbendick Decl. ¶ 5.

C. Development and Status of PFS

Since 1995, PFS has made considerable progress toward its goal of developing a private MRS. PFS elected John Parkyn of Dairyland Chairman of the project. Dairyland wanted Mr. Parkyn to lead PFS to help maximize the chances that PFS would develop in a manner that would be most beneficial to Dairyland. Parkyn Decl. ¶ 7. After efforts to finalize an agreement with the Mescalero Apache Tribe broke down, PFS reviewed alternative sites and eventually chose to collaborate with the Skull Valley Band of

Goshutes in Utah in 1996. *Id.* The Bureau of Indian Affairs initially approved the lease between PFS and the Goshutes. *Id.*. And on February 21, 2006, the NRC issued PFS a license to construct and operate a private MRS at the PFS site in Utah. *Id.*

Notwithstanding this progress, PFS faces important challenges. First, the Bureau of Indian Affairs has withdrawn its approval of the PFS lease. *Id.* ¶ 8. Although PFS and the Goshutes have appealed that agency action, the project cannot move forward unless and until that decision is reversed. *Id.*

More fundamentally, utility support for PFS has waned. Most of the utility participants in the PFS effort other than Dairyland had more urgent spent fuel storage needs than Dairyland. While Dairyland has hoped that PFS would enable it to decommission LACBWR and thereby exit the nuclear business, most of the other utility participants had a more immediate need for additional spent fuel storage to keep their reactors operating. *Id.* Those reactors were running out of room in their spent fuel pools in which to store additional spent fuel. Absent a dry storage alternative somewhere, those utilities faced the prospect of having to shut down their nuclear power plants. *Id.* To avoid such catastrophic events, those utilities have been forced to develop ISFSIs at their reactor sites at great expense in order to accommodate their accumulating spent fuel. *Id.* Once those utilities had incurred the substantial initial costs to develop their own ISFSIs, they have had less incentive to further pursue the centralized ISFSI represented by PFS. *Id.* In addition, a number of those utilities faced powerful political pressure from one of Utah's U.S. Senators to cease their support of PFS. *Id.* Accordingly, over the past few years, these utilities have ceased to provide PFS with additional monetary support. *Id.* Faced with the prospect of having no other utilities making new financial contributions to

PFS, Dairyland reluctantly decided to cease its monetary support of PFS as well. *See* Sans Crainte Decl. ¶ 4. Although Dairyland initially viewed PFS as a cost-effective means of developing a dry storage option by sharing the development and operational costs with a number of other utilities, the benefits of the PFS effort to Dairyland became substantially reduced as the situation developed under which Dairyland would no longer be able to share the remaining PFS development costs with other utilities. *Id.*

D. Dairyland's Claim for Damages Related to PFS

Dairyland has incurred two types of costs related to its pursuit of PFS. First, it has incurred $8,669,517 in capital contributions to PFS. Stubbendick Decl. ¶ 4. Second, Dairyland has incurred administrative costs (primarily personnel and legal expenses) of $2,267,384 to support its GFT subsidiary. *Id.* Consistent with the framework of structuring its participation in PFS through a subsidiary, Dairyland has incurred all of theses costs through GFT. Dairyland has transferred $10,936,955 to GFT to support PFS. Therefore, Dairyland's claim for PFS-related costs represents its nearly $11 million in expenditures on GFT. *See* Stubbendick Depo. at 223-24.

GFT does not pay most of its administrative costs directly. As a wholly owned subsidiary of Dairyland, all of GFT's officers and directors have been Dairyland employees, and GFT has no offices or facilities apart from Dairyland's. *Id.* Thus, when administrative costs have been incurred to support GFT (whether they be personnel time, legal fees or other expenses), they have been incurred initially by Dairyland. *Id.* Dairyland then bills GFT for these costs, and GFT reimburses Dairyland for these expenses. *Id.* GFT obtains the funds with which to reimburse Dairyland from Dairyland's prior transfers to GFT. *Id.*

## Argument

I. Dairyland Should Not Be Deprived Recovery of Its Efforts To Mitigate Through PFS Solely Because Dairyland Incurred Those Mitigation Costs Through A Subsidiary

To a significant extent, the government's argument regarding PFS and GFT are semantic rather than substantive. The government states that Dairyland and GFT are separate legal entities, GFT is not in privity of contract with the government, GFT rather than Dairyland has invested in PFS, and Dairyland cannot recover GFT's losses. Govt. Mot. at 7-12. Dairyland does not disagree. Dairyland's claim related to PFS is not for GFT's losses. In fact, GFT has not lost anything. It would not have existed absent the government's breach and, as a mere pass-through vehicle to facilitate Dairyland's participation in PFS, GFT's transfers from Dairyland have equaled its expenditures on PFS. Instead, Dairyland's claim related to PFS is for Dairyland's own expenditures on GFT. The government's persistence with this argument is surprising since the structure of Dairyland's claim for PFS damages was explained to the government no later than the deposition of Dairyland's Director of Accounting, Keith Stubbendick noted above. Stubbendick Depo. at 224:

> Q: So Dairyland is suing not for PFS but, rather, for the investment in Genoa Fuel Tech?
> A: Yes. That cost represents our investment in Genoa Fuel Tech.
> Q: And nobody else invested in Genoa Fuel Tech, right?
> A: Genoa Fuel Tech is 100 percent subsidiary, yes.

Beyond semantics, the government is merely seeking to create a new rule whereby mitigation expenses otherwise meeting all the standard for recoverability should not be recovered, merely because the expenses were incurred through a subsidiary. The government offers no grounds for imposing such a rule, and there can be none. To the contrary, such a rule would inappropriately discourage nonbreaching parties from

optimally structuring their mitigation efforts, including the use of a subsidiary where appropriate, as here, to minimize risks and tax liability.

A. Dairyland Is Entitled to Be Made Whole

As the non-breaching party, Dairyland is entitled to recover sufficient damages to be put in as good a position as it would have occupied had the contract not been breached. *Indiana Michigan*, 422 F.3d at 1373. As *Indiana Michigan* emphasized, "all losses, however described, are recoverable." *Id.* quoting *Restatement (Second) of Contracts* § 347, cmt. c (1981). The required showing for recovery of damages is well known: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting, (2) the breach is a substantial causal factor in the damages, and (3) the damages are ascertainable with reasonable certainty. *Indiana Michigan*, 422 F.3d at 1373, citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002).

B. Dairyland Is Entitled to Recover Its Mitigation Expenses As Long As They Were Foreseeable, Substantially Caused by the Breach and Reasonable

The Federal Circuit made clear in *Indiana Michigan* that expenses incurred in connection with efforts to avoid or reduce damages, *i.e.*, mitigation, are also recoverable in the spent fuel cases. *Id.* at 1375. As the Federal Circuit recently described them, "'mitigation damages'... are intended to reimburse a non-breaching party to a contract for the expenses it incurred in attempting to rectify the injury the breach caused it." *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1320 (Fed. Cir. 2007), citing *Restatement (Second) of Contracts* § 347 cmt. c. Such damages are recoverable as long as the nonbreaching party establishes foreseeability, causation and reasonableness. *Indiana Michigan*, 422 F.3d at 1376.

Dairyland is prepared to establish at trial that its mitigation effort represented by its participation in PFS through GFT was reasonably foreseeable (and as shown below, actually foreseen) by the government, substantially caused by the breach and a reasonable course of action. Under these circumstances, and binding Federal Circuit precedent, Dairyland should be permitted to recover its costs of participating in PFS.

C. No Damages Doctrine Restricts Recovery of Mitigation Expenses Solely Because They Were Incurred Through a Subsidiary and Such a Rule Would Be Unwise

The government cites no doctrine or rationale that supports restricting recovery of mitigation expenses solely because they were incurred through a subsidiary. The only authority the government cites as supposed support for this proposition is *Southern Nuclear*, 77 Fed. Cl. 396. *See* Govt. Mot. at 10. *Southern*'s discussion of this issue is, however, cryptic, and it appears to be merely dicta. 77 Fed. Cl. at 445-46. More fundamentally, *Southern* is distinguishable from Dairyland's situation. In *Southern*, the utilities owning the majority interest in the nuclear power plants are Alabama Power Co. and Georgia Power Co., which are the parties that contracted with the government. *Id.* at 398-99. The two utilities are owned by Southern Co., a holding company. *Id.* at 399. Unlike the present case, the two utilities were not apparently claiming costs they incurred themselves. Southern Co. made capital contributions to PFS, but there is no indication in the court's opinion that the two utilities paid Southern to do so or that the claim for PFS-related costs in that case represented costs paid by the utilities in privity of contract with the government. Rather, the opinion states that the litigation expert hired by plaintiffs in that case made an allocation that simply divided Southern Co.'s total contribution to PFS into thirds (one for each of the three nuclear plants owned by the two utilities) and that counsel for the government agreed that the allocation (with certain exceptions) was

supported "from a books and records perspective." *Id.* at 445. *Southern* also notes evidence cited by the plaintiffs in that case that the utilities were to reimburse the holding company, but there is no citation to any evidence that such reimbursement actually took place. In that circumstance, it is not surprising that this Court was reluctant to award PFS-related costs, since the costs were not actually paid by the plaintiff utilities that are the contracting parties. In Dairyland's case, conversely, its Director of Accounting, Keith Stubbendick has explained that Dairyland's claim for PFS-related damages is precisely equal to the costs that Dairyland itself has incurred for PFS through contributions to GFT. Stubbendick Decl. ¶ 5.

Furthermore, the creation of a new rule restricting the recoverability of reasonable mitigation expenses solely because they are incurred through a subsidiary would be inappropriate, particularly in this case. Business organizations, like Dairyland, "certainly have legitimate reasons to use subsidiaries." Nina A. Mendelson, *A Control-Based Approach to Shareholder Liability for Corporate Torts*, 102 Col. L. Rev. 1203 1246 (June 2002). As acknowledged by the government, Dairyland used a subsidiary structure for its participation in PFS, in part, to limit Dairyland's liability. "[T]here is nothing illegal or immoral with the well-established principle that individuals can create corporate entities through which to undertake and also to limit risk of personal responsibility for their private enterprise." *See Corrigan v. USX Corp.*, 2005 WL 2621981 at *5 (N.D. Ohio), quoting *Kindle Building Co. v. Ford Motor Co.*, 17 F. Supp. 2d 701, 703 (N.D. Ohio 1997); quoting *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 342 (6th Cir. 1990) (Engle, S.J., concurring). Likewise, the other major reason for Dairyland's use of a subsidiary to participate in PFS was to limit its tax

liability. And there is nothing inappropriate with a taxpayer organizing its affairs to minimize its tax liability. *See Commissioner of Internal Revenue v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394, 398 (1972) ("Taxpayers are, of course, generally free to structure their business affairs as they consider to be in their best interests, including lawful structuring (which may include holding companies) to minimize taxes."), citing *Commissioner of Internal Revenue v. Newman*, 159 F.2d 848, 850-51 (2d Cir. 1947) (Hand, J. dissenting). Indeed, the government does not dispute at all the testimony of Dairyland's executives that liability limitation and tax avoidance made use of a subsidiary the most appropriate structure for Dairyland's participation in PFS.

Yet, a new rule prohibiting recovery of mitigation expenditures incurred through a subsidiary, as proposed by the government, would obviously discourage use of the subsidiary structure, even where that structure is the most appropriate means of mitigation. This Court has recently rejected arguments that would similarly discourage use of the most appropriate forms of mitigation. In *PG&E*, 73 Fed. Cl. at 419, this Court rejected government arguments that the plaintiff there should not recover as mitigation the cost of dual-purpose, transportable dry storage containers on the theory that only single-purpose (storage only) containers existed at the time of contracting. The Court ruled on factual grounds but also observed "that to hold otherwise would be to provide a perverse incentive to non-breaching parties attempting to mitigate their foreseeable damages from a breach of contract through reasonable and appropriate methods." *Id.*, n. 71. The Court explained further that if recovery of "the most reasonable and appropriate method of mitigating a non-breaching party's foreseeable damages" were denied by the court, "non-breaching parties to contracts would have a significant disincentive to taking

reasonable and appropriate steps to mitigate a breach of contract." *Id.*; *see also Yankee Atomic*, 73 Fed. Cl. at 286. This reasoning applies with equal force to the artificial rule suggested by the government here; accordingly, the government's suggested rule should be rejected.

## II. Dairyland Is Not Precluded from Recovering Its PFS-Related Costs By *Indiana Michigan v. United States*

In the last two pages of the government's motion, the government makes a half-hearted argument that the Court should enter summary judgment in the government's favor on the PFS-related portion of Dairyland's claim because recovery of such damages "has already been precluded by past decisions of this Court and the Federal Circuit." Govt. Mot. at 14. The government's argument conflates and confuses (seemingly deliberately) a number of legal concepts – recovery of "speculative damages," foreseeability, causation, and reasonableness of mitigation – in the apparent hope that one of them might gain favor with this Court as a ground for precluding Dairyland's claim for PFS-related damages. Ultimately, however, the government's basic argument – that Dairyland's claim for PFS-related damages is amenable to preclusion on a motion for summary judgment – is flat wrong, and clearly contrary to the decisions relied upon by the government. Dairyland addresses the government's argument in some detail, however, given the importance of this issue to Dairyland's case.

### A. *Indiana Michigan*'s PFS Ruling Is Fact-Bound and Limited

*Indiana Michigan*'s ruling regarding PFS-related costs is both limited and fact-bound. The following is the entirety of the Federal Circuit's discussion on the recoverability of PFS-related damages:

> The *credited evidence* also showed that the utility's investment in the private storage facility was speculative and that the high cost of the venture was unforeseeable. In 1994, Indiana Michigan and several other nuclear utilities sought to construct and operate their own storage facility for SNF storage, ostensibly in contemplation of DOE's impending breach. Indiana Michigan invested $7.2 million. Its own witness characterized the planned facility, in which it abandoned financial investment in 2002, as "too speculative" when proposed. While DOE should have foreseen that its breach would force Indiana Michigan to find alternative storage for its SNF, it is not liable for such a speculative venture and unforeseeable costs.

422 F.3d at 1376 (emphasis added).

The reference to the "credited evidence" makes clear that the Federal Circuit's review was highly limited. First, consistent with the nature of the appellate review being undertaken, the Federal Circuit's ruling was limited to a review of the record developed by Indiana Michigan before the trial court in that case. Second, the Federal Circuit also acknowledged that it was merely reviewing the trial court's findings of fact for clear error. *Id.* at 1373; *see also, e.g., Citizens Fed. Bank*, 474 F.3d at 1321 (holding that foreseeability is a question of fact reviewed for clear error). And the Federal Circuit understood further that such findings may only be held clearly erroneous where "the appellate court is left with a 'definite and firm conviction that a mistake has been committed.'" *Southern*, 422 F.3d at 1373. quoting *In re Mark Indus.*, 751 F.2d 1219, 1222-23 (Fed. Cir. 1984). Thus, where the Federal Circuit referred to "credited evidence" it was necessarily referring to evidence credited by the trial court, not itself. *See Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573 (1985) (Court of Appeals must give "due regard" to the trial court judge's credibility determinations of physical and documentary evidence, witnesses and inferences from other facts). Indeed, the appellate court may not reverse even if it would have weighed the evidence differently and/or decided the case differently as long as the trial court's account of the

evidence is plausible in light of the record viewed in its entirety. *See, e.g., Miles Laboratories, Inc. v. Shandon, Inc.*, 997 F.2d 870, 874 (Fed. Cir. 1993)*; Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986).

Ultimately, the Federal Circuit, as an appellate body, lacks authority to independently review the record and make factual findings. *See, e.g., Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). Thus, the *Indiana Michigan* ruling regarding PFS-related costs should be read as holding nothing more than that the trial court's findings were not clearly erroneous. And that ruling cannot be used to preclude any other utility, including Dairyland, from seeking PFS-related damages based on the trial record created in another case. *See Beacon Oil Co. v. United States*, 71 F.3d 391, 395 (Fed. Cir. 1995) (holding that rulings in earlier case could not foreclose relitigation of similar issues under either collateral estoppel or *stare decisis* doctrines).

To the extent the Federal Circuit's ruling is construed more broadly than merely finding no clear error by the trial court, that broader ruling is merely dicta to which no deference is appropriate. *See, e.g., In re Stephen P. McGree*, 120 F.3d 1236, 1238 (Fed. Cir. 1997) ("dictum consists, inter alia, of statements in judicial opinions upon a point or points not necessary to the decision of the case . . . the effect of that is 'that dictum is not authoritative. It is the part of an opinion that a later court, even if it is an inferior court, is free to reject.'"), quoting *United States v. Crawley,* 837 F.2d 291 (7th Cir. 1988). Moreover, where the appellate court does not fully and squarely resolve an issue, its statement regarding it is not binding precedent. *See, e.g., United States v. Cook County, Illinois*, 170 F.3d 1084, 1088 (Fed. Cir. 1999) (rejecting claim of precedent governing a rule of law where prior case did not reflect any investigation into the text, legislative

history or purpose of a statute). The Federal Circuit's decision in *Indiana Michigan* does not reflect any investigation into the facts of that case beyond review for clear error of the pertinent part of the trial court's decision, *compare Indiana Michigan Power Co. v. United States,* 60 Fed. Cl. 639, 658-59 (2004), much less any effort (which would have been inappropriate) to delve more broadly into the issue of whether PFS-related costs should be recoverable by other utilities. Thus, the government's effort to read *Indiana Michigan* as a binding precedent against recoverability of PFS-related costs is plainly wrong.

Not surprisingly, the government fails to acknowledge that the two spent fuel decisions of this Court that have addressed PFS-related costs subsequent to the Federal Circuit's *Indiana Michigan* decision have appropriately not treated that appellate ruling as precluding recoverability of PFS-related costs. To the contrary, while acknowledging the Federal Circuit's ruling, the Judges in those cases each independently made factual findings based on the evidence presented in their individual cases. In *Southern*, this Court explicitly rejected the government's argument that *Indiana Michigan* foreclosed recovery of PFS-related expenses because the appellate ruling was fact-bound. 77 Fed. Cl. at 445. Instead, in *Southern* this Court made its decision based "on this record" before it. *Id.* In *PG&E*, similarly, this Court based its ruling on "[t]he preponderance of the credible evidence adduced at trial." 73 Fed. Cl. at 429. The Court made findings based on its view of what "the evidence illustrate[d]" in that case. *Id.* at 430. The Court went on to discuss the testimony of specific witnesses it heard in the trial before it. *Id.* (discussing testimony of Christopher Warner and William Stock).

The Court should proceed accordingly here. The Court must receive the evidence that will be presented by Dairyland and the government in this case and make its own findings of fact based on that evidence regarding the recoverability of Dairyland's PFS-related costs.

B. Dairyland's Attempt to Mitigate Damages Through Participation in PFS Through GFT Has Been Reasonable

The limited and fact-bound nature of *Indiana Michigan* precludes it from supporting a ruling that it forecloses recoverability of PFS-related costs by Dairyland. Nevertheless, Dairyland is mindful that it may not be intuitive to the Court why the evidence to be presented at trial will support Dairyland's recovery of PFS-related costs in light of determinations in the spent fuel cases of other utilities that the evidence presented in those cases did not support the recoverability of PFS-related costs by those utilities. Dairyland's situation has differed in several material ways from those of the utilities covered by the prior rulings of this Court regarding PFS. Most importantly, unlike those other utilities, Dairyland faced significant technical and financial constraints to constructing an ISFSI onsite. Thus for Dairyland, unlike other utilities who have already built onsite ISFSIs, PFS was the primary strategy for mitigating the effects of DOE's breach.

The nonbreaching party need "only make those decisions that are fair and reasonable under the circumstances." *Southern*, 77 Fed. Cl. at 406, citing *Home Sav. Of America v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005). The reasonableness of mitigation is determined at the time the decision is made to mitigate. *Id.* And the fact that a reasonable effort to mitigate may turn out to be unsuccessful does not preclude recovery of such costs. *Id.*, citing, *e.g., Old Stone Corp. v. United States*, 450 F.3d 1360,

1368 (Fed. Cir. 2006). Ultimately, it is the government's burden to prove that Dairyland's efforts to mitigate through participation in PFS were unreasonable. *Id.*, citing, *e.g.*, *Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515, 523 (2006); *PG&E*, 73 Fed. Cl. at 406; *Yankee Atomic*, 73 Fed. Cl. at 264; *Old Stone*, 450 F.3d at 1370.

In its motion, the government makes no effort to establish that Dairyland's decisions to participate in and to keep spending money on PFS were unreasonable at the times those decisions were made. And it could not make an effort to do so. As explained in the background section above, Dairyland faced constraints on the primary alternative to developing PFS – specifically, an on-site ISFSI – that were not shared by the other utilities participating in PFS. Only one of the nuclear plants addressed by the Court's prior rulings regarding PFS-related costs faced physical constraints on building an on-site ISFSI similar to Dairyland's, and there is no indication from the trial court decision regarding that other plant that those constraints were a factor in motivating participation in PFS.[1] And none of the other utilities faced the financial constraints faced by Dairyland. In addition, the operating status of the other utilities[2] made PFS a more questionable mitigation strategy for them than it has been for Dairyland, whose plant has been permanently shutdown. Utilities with operating reactors face timing pressures that Dairyland does not. As explained above, if an operating reactor does not find additional space in which to store its spent fuel beyond its spent fuel pool, it faces the draconian

[1] There is no indication that the Indiana Michigan, Alabama Power or Georgia Power faced comparable restrictions on their ability to locate ISFSIs at their sites. And PG&E faced this issue at only one of its nuclear reactors –Humboldt Bay.

[2] Indiana Michigan, PG&E, Alabama Power and Georgia Power all own operating reactors more than ten times larger than LACBWR and for which spent fuel storage outside of the spent fuel pool was potentially essential for continued operation of those power plants. PG&E also owns Humboldt Bay, which is a shutdown reactor.

prospect of having to shutdown. The cases addressing PFS cost recoverability in the context of operating reactors have recognized this imperative. *Southern*, 77 Fed. Cl. at 401, 421 (plaintiffs faced two choices, allowing their pools to fill up forcing a shutdown or obtaining additional storage); *Indiana Michigan*, 60 Fed. Cl. at 642-43 (plaintiff's claim for past costs depends on whether breach required plaintiff to expand fuel pool capacity because plaintiff believed that its pool would otherwise be full by 1995) and at 658 (plaintiff's witness testified that PFS was no longer an option because it would not be ready in time); *PG&E*, 73 Fed. Cl. at 425 (holding that PG&E would have been required to construct additional storage at its Diablo Canyon plant in order to prevent it from reaching capacity in 2006 even had the government performed (under low acceptance rate found applicable by the Court in that case)).

Furthermore, the uncontested evidence from Dairyland's witnesses is that Dairyland viewed its participation in PFS to be reasonable and appropriate at the time those decisions were made. Parkyn Decl. ¶ 5; Sans Crainte Decl. ¶¶ 3-4. "That there were (and are) questions whether the PFS would ultimately be built does not make it unreasonable and outside the realm of possible mitigation. Guaranteed success is not a prerequisite to recovery of mitigation expenses." *Southern*, 77 Fed. Cl. at 443. The testimony from Dairyland personnel cited by the government in its motion is not to the contrary. Mr. Sans Crainte's testimony that that PFS' chances of success is not very good reflected only his assessment at the time of his deposition earlier this year, well after Dairyland had decided to cease making further financial contributions to PFS. And the testimony from Mr. Brimer was merely that PFS is not popular with a lot of people;

he did not testify that he thought either that PFS was speculative or that Dairyland's effort and expenditures participating in it have been anything other than reasonable.

Conversely, as found by this Court, the testimony of the witnesses in the other spent fuel cases supported the conclusions that PFS was not reasonable mitigation because it was too "speculative," *i.e.* not sufficiently likely to succeed. In *Indiana Michigan*, the plaintiff's own witness' testimony "agreed that plaintiff's investment in PFS was a 'speculative' venture." 60 Fed. Cl. at 659. Likewise, in *PG&E*, the Court relied on PG&E's own internal documents and testimony from PG&E's own witnesses "that these offsite storage projects had a low probability of success." 73 Fed. Cl. at 430.[3] Similarly, in *Southern*, the Court cited testimony from that plaintiff's representative to PFS that he "was against participation in the venture, felt the project was speculative and had no real chance of solving plaintiffs' storage needs, and may never be licensed." 77 Fed. Cl. at 443. Of course, none of these witnesses relied upon by the Court in those prior cases regarding the speculativeness of PFS have been listed by either party here as potential witnesses to be relied upon in Dairyland's case.

C. The Need For And Expense Of Dry Storage Has Been Foreseeable

The remaining issue addressed in *Indiana Michigan* is foreseeability of the magnitude of the costs associated with PFS. As explained above, the limited nature of the Federal Circuit's ruling prevents it from having a preclusive affect on Dairyland's case. But as with reasonableness of mitigation, it is appropriate for Dairyland to explain here why a different result should apply to it.

[3] As counsel for PG&E in that case, we believe that the Court misconstrued this testimony; the assessment of the low probability of success for PFS was made long after PG&E had made its monetary contributions to PFS.

Generally, a plaintiff must prove that both the magnitude and type of damages it seeks were foreseeable by the breaching party. *See, e.g., Landmark Land Co., Inc. v. FDIC,* 256 F.3d 1365, 1378 (Fed. Cir. 2001). But a plaintiff need not show that a particular type of mitigation effort was foreseeable. *See, e.g., Citizens Fed. Bank,* 474 F.3d at 1321; *PG&E,* 73 Fed. Cl. at 418-19 quoting *Dist. Concrete Co. v. Bernstein Concrete Corp.*, 418 A.2d 1030, 1037 (D.C. 1980) ("Foreseeability of the particular *injury* is what is required by this doctrine. The reasonableness of the method of correction is a different matter going to mitigation of damages issues.") (emphasis in original); *Southern*, 77 Fed. Cl. at 405 ("While the general response to a breach must be foreseen, the particular way that a mitigating decision is implemented need not.").

Analysis of foreseeability got confused in *Indiana Michigan* because the trial court did not follow these principles. The trial court ruling in *Indiana Michigan* confused the issue of foreseeability by improperly focusing on whether the record before it showed that PFS itself had been foreseeable: "It was an expensive system that defendant could not have foreseen even if it were otherwise liable for such costs." 60 Fed. Cl. at 659. The trial court in *Indiana Michigan* did not attempt to determine whether the utility's need to provide alternative storage for its spent fuel in response to a breach had been foreseeable. Perhaps mindful of this trial court error, the Federal Circuit did not state, as the trial court did, that PFS was a "system that defendant could not have foreseen." Instead, the Federal Circuit focused on the trial court's statement that PFS was "expensive," and concluded that the government is not liable for such "unforeseeable costs." But there is no support for the conclusion that PFS costs were unforeseeable in

either the appellate or trial court decisions. Accordingly, this Court should give that conclusion no weight.

Ultimately, Dairyland will present at trial compelling evidence that the large expense of mitigation in the form of dry storage (either on or off site) was foreseen by the government in 1983. *See*, *Yankee Atomic*, 77 F.3d at 267 (noting DOE's publication of fees for interim storage of spent fuel running as high as $670,000 per MTU in 1983 dollars), citing 48 Fed. Reg. 54391-02 (December 2, 1983). Since Dairyland has 38 MTU of spent fuel, this government document contemplated that interim storage of Dairyland's spent fuel would potentially cost more than $25 million in 1983 dollars and obviously a much larger amount in current dollars, amounts far in excess of the $11 million Dairyland seeks related to PFS. Conversely, Dairyland is not aware of any evidence indicating that large mitigation expenses were not foreseeable. And the government certainly does not cite to any such evidence in either its motion or its proposed findings of uncontroverted facts.

In *PG&E* and *Southern*, the Court did conclude that the costs associated with PFS were not foreseeable. 73 Fed. Cl. at 430; 77 Fed. Cl. at 445. But those conclusions are irreconcilable with other parts of those decisions; thus, those holdings also should not be given any consideration here. In both of those cases, the Court awarded the plaintiffs damages for onsite ISFSIs that were far greater than the amounts sought in those cases for damages related to PFS. *See Southern*, 77 Fed. Cl. at 445, 460 (awarding tens of millions of dollars for ISFSI construction yet denying $8 million in PFS-related costs); *PG&E*, 73 Fed. Cl. at 421, 430, (denying PFS-related costs of approximately $900,00 in PFS-related costs while awarding approximately $8 million for an onsite ISFSI). Clearly,

*PG&E* and *Southern* found that it was foreseeable to the government at the time of contracting that utilities would incur large costs to provide alternative interim spent fuel storage in the event of a DOE breach of contract; otherwise, the Court could not have made the large awards it did in those cases. And once it is concluded that large mitigation costs were foreseeable, the precise form of alternative spent fuel storage that those costs were spent on cannot alter the foreseeability conclusion.

D. *Indiana Michigan* Does Not Address Speculative Damages

In light of the government's repeated references to PFS as "speculative," Govt. Mot. at 13-14, it is important to make clear the distinction between the speculativeness of a mitigation effort, which goes to the reasonableness of the mitigation and speculative damages, which goes to whether damages can be determined with reasonable certainty. *Indiana Michigan*, *Southern* and *PG&E* each address speculativeness of the PFS venture. They do not address speculative damages.

The rule that "speculative damages" may not be recovered is a concept that goes to the reasonable certainty prong for determining whether costs are recoverable as damages. As explained, in context, by the Federal Circuit in *Indiana Michigan*, "[w]hile the amount of damages need not be 'ascertainable with absolute exactness or mathematical precision,' recovery for speculative damages is precluded." 422 F.3d at 1373, citing *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997). This concept is traced to the seminal case of *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 561 (1931), where the Supreme Court explained that damages should be awarded as long as their amount is not "mere guesswork." Here, there is no uncertainty, much less guesswork, regarding the amount

Dairyland has incurred to participate in PFS. Dairyland's Director of Accounting, Mr. Stubbendick has stated under penalty of perjury that the amounts in Dairyland's claim for PFS-related costs are the precise amounts paid by Dairyland as reflected in its reliable, regularly-audited accounting records. Stubbendick Decl. ¶ 5.

*Indiana Michigan*'s characterization of PFS as "a speculative venture," conversely, goes to the issue of the reasonableness of that mitigation effort. For example, if it were known at the time Dairyland made its expenditures on PFS that PFS had only a negligible chance of success, such expenditures might not have been reasonable. *Cf PG&E*, 73 Fed. Cl. at 418-19 (differentiating foreseeability from reasonableness and explaining that plaintiff's use of dual-purpose casks is more appropriately evaluated under principles of mitigation and its reasonableness).

E. *Indiana Michigan* Does Not Address Causation of PFS Damages

The Federal Circuit's one-paragraph discussion of PFS-related costs in *Indiana Michigan*, 422 F.3d at 1376, does not mention causation. Thus, the government's insinuation that "the Federal Circuit's reasoning," Govt. Mot. at 13-14, implicates causation of PFS-related expenses reflects an inaccurate reading of that decision. The government asserts that *Southern* and *PG&E* cited "anticipated profits," Govt. Mot. at 14, from PFS suggesting that participation in PFS was caused by business interests unrelated to the delay in spent fuel acceptance. *PG&E*, however, does not mention anticipated profits as a relevant concern. Instead, it found that participation in PFS by that utility was motivated by a desire for an "insurance-policy type backup to [its] primary storage program." 73 Fed. Cl. at 430. Similarly, although *Southern* observes that "[a]n equity interest is retained [by Southern Co.] along with any subsequent profit or losses," that

decision did not hold that an interest in profits motivated Southern Co.'s investment in PFS. *Id.* at 445.

More fundamentally, the theoretical potential for PFS to generate profits does not alter the fact that Dairyland's participation in that effort was substantially caused by DOE's anticipated and actual failure to perform its contractual obligations.[4] The declaration of Dairyland's executive is clear and undisputed that Dairyland's participation in PFS was motivated by concern over DOE's anticipated failure to start picking up spent fuel. *See* Parkyn Decl. ¶ 9.

Furthermore, Dairyland is so structured that it literally has no interest in attempting to generate profits. Dairyland is a not-for-profit cooperative pursuant to IRC § 501(c)(12). *See* Stubbendick Decl. ¶ 7, citing Bylaws of Dairyland Power Cooperative, Art. X, Sec. 1 (July 1, 2002). It exists to provide wholesale electric service to its 25 Class A members under all-requirements contracts. *Id.* These 25 Class A members are themselves not-for-profit rural electric distribution cooperatives. *Id.* As such, the Class A members are local membership cooperatives whose members are the individual electric consumers. *Id.* To the extent Dairyland receives revenues from any investment in excess of applicable costs and expenses, those revenues would merely be either applied to offset losses, or (if Dairyland has no losses), be credited to unallocated surplus or reserves of the Cooperative, or credited to the capital accounts of the electric service patrons of Dairyland. *Id.*, citing Dairyland Bylaws, Art. X, Sec. 3(b).

---

[4] The government's insinuation that Dairyland's participation in PFS was motivated by the project's profit potential since it created GFT, in part, to help protect Dairyland's tax-exempt status, Govt. Mot. at 14, is incorrect. As noted above, Mr. Stubbendick explains that Dairyland's need for GFT to protect its tax-exempt status is linked to PFS' potential merely to generate revenues, not necessarily profits.

Finally, even had there been some interest within Dairyland of earning a "profit" of some sort from PFS, such an interest would not alter the fact that Dairyland's primary motivation for participating in PFS was clearly to provide a means of moving its fuel out of its spent fuel pool in light of DOE's failure to perform. *See Yankee Atomic*, 73 Fed. Cl. at 298 ("That there was an independent or secondary reason for building the ISFSIs does not detract from the primary or substantial causal factor – the delay of over a decade in DOE's acceptance, transportation and disposal.").

Conclusion

For the foregoing reasons, the government's motion for summary judgment should be denied.

Respectfully submitted,

Dated: September 21, 2007

s/ Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

*WDC 371461419v1 8/13/2007*