IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

Declaration of John Parkyn

1. I am Manager of Special Nuclear Projects for Dairyland Power Cooperative. I began work for Dairyland in 1974 as the Operations Engineer at the LaCrosse Boiling Water Reactor ("LACBWR"). I later also became a Nuclear Regulatory Commission licensed Senior Reactor Operator at LACBWR and Assistant Superintendent, and eventually, Superintendent. In 1994, I was appointed to my current position in which I have focused on Dairyland's efforts to remove its spent nuclear fuel from LACBWR. In particular, I have managed Dairyland's participation in Private Fuel Storage ("PFS"), an effort to build a central interim dry storage facility with a number of other utilities. Since its inception, I have been an officer and board member of Genoa Fuel Tech, Inc. ("GFT"), the wholly-owned, single-purpose subsidiary of Dairyland's through which Dairyland participates in PFS. I have also served as Chairman and CEO of PFS. This declaration is made on my personal knowledge.

2. As Superintendent of LACBWR after it was permanently shutdown in 1987, I was responsible for planning for the decommissioning of the plant, including monitoring the likely timing of the Department of Energy's ("DOE") removal of

LACBWR's spent nuclear fuel. By the early 1990s, it had become apparent to Dairyland that DOE was not going to begin accepting its spent fuel by January 31, 1998 as required by the parties' contract. For example, Dairyland knew that in 1989 DOE reported to Congress that it did not expect to have an operational repository until at least 2010 and that a DOE-provided centralized dry storage facility, termed Monitored Retrievable Storage ("MRS") under the NWPA, could not be built much before that due to the 1987 amendments to the NWPA. *See, e.g.,* Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program (1989), exhibit 1. Although a DOE Nuclear Waste Negotiator was appointed to attempt to find a voluntary host and site for a MRS, that effort was not completed, and the Negotiator's authority was terminated in 1994. Also, in 1994, DOE stated definitively that it would not be able to begin accepting utility spent fuel by 1998. Dairyland kept abreast of these developments in DOE's spent fuel program.

3. In light of the lack of progress in the DOE spent fuel program, Dairyland began to consider whether there were alternatives for the long-term storage of its spent fuel other than continued storage in its spent fuel pool. Initially, dry storage technology was not useful to a utility with a shutdown nuclear plant like LACBWR, since it was storage-only technology, which would have required the continued maintenance of the spent fuel pool to reload the spent fuel into a transportation container for eventual shipment off site. By the mid-1990s, however, transportable dry storage containers were being developed. With the advent of transportable dry storage technology, it is generally preferable for a utility with a shutdown nuclear reactor to use dry storage for its spent fuel, because dry storage is simpler to operate and less expensive to operate and maintain

than wet storage over the long term. In addition, movement of spent fuel to dry storage enables a utility with a shutdown reactor to decommission that reactor, including the spent fuel pool. The preference for dry over wet storage, however, is only applicable in the long run since there is a large effort and cost involved in transitioning from wet to dry storage. This preference for dry storage over wet storage of spent fuel in light of DOE's announced failure to perform was also applicable to Dairyland.

4. In the mid-1990s, however, Dairyland could not practically implement dry storage (or an independent spent fuel storage installation, "ISFSI") at its LACBWR site. First, since transportable dry storage technology was new, Dairyland understood that these projects were likely to be expensive. Second, Dairyland faced significant challenges in developing an ISFSI at its LACBWR site. The site is relatively small. And Dairyland has understood that it would require an exemption from NRC requirements governing the minimum distance between an ISFSI and public access. The LACBWR site is squeezed between the Mississippi River and a main line railway track (with a major public highway just beyond that), greatly limiting Dairyland's options for locating an ISFSI at that site. As of the mid-1990s, Dairyland was unaware that any utility had obtained or sought the sort of exemptions Dairyland would need to develop an ISFSI at LACBWR.

5. In the mid-1990s, a number of nuclear generation utilities, including Dairyland, saw advantages to pursuing dry storage on a group basis, rather than individually. These advantages included the ability to share costs and the ability to avoid limitations on the development of ISFSIs at reactor sites by locating such a facility away from reactor sites. The advantage of sharing costs was particularly pertinent to Dairyland

since it has had only 38 MTU of spent fuel. Thus, its share of operating costs of a large ISFSI would be much less than its costs of operating an ISFSI at LACBWR for just Dairyland's spent fuel. At the same time, the Mescalero Apache Tribe, which had developed a significant interest in hosting an MRS in response to inquiries by the Nuclear Waste Negotiator, contacted Northern States Power Company ("NSP") at the time of its well-publicized fuel storage expansion difficulties at its Prairie Island Nuclear Generation Station in late 1993. NSP and the Mescalero Apache Tribe invited a number of utilities, including Dairyland, to determine interest in forming a company to pursue a private MRS on the Tribe's reservation. After some initial scoping of interest, 11 of the utilities, including Dairyland formed PFS in 1995. The utilities' goal for PFS was to provide an interim storage site at which their spent fuel could be stored pending contract performance by DOE. In essence, PFS picked up where DOE and its Nuclear Waste Negotiator left off with the MRS concept. PFS even focused on some of the same sites as those considered by the Negotiator. Faced with DOE's failure to develop an MRS or other facility at which to take utilities' spent fuel, these utilities grouped together to develop a private MRS in light of DOE's impending breach of contract. Dairyland decided to participate in this PFS effort (along with ten other utilities) for addressing the DOE breach in light of Dairyland's inability to pursue an ISFSI at LACBWR and the long-term advantages of dry storage over continued wet storage at LACBWR.

6. Dairyland decided to participate in PFS through a subsidiary. Dairyland did so for two reasons. First, Dairyland wanted to minimize its potential liability for any claims arising from PFS. Second, Dairyland wanted to minimize potential negative tax consequences from its participation in PFS. Dairyland set up Genoa Fuel Tech ("GFT")

as a wholly-owned subsidiary of Dairyland exclusively for that purpose. Although Dairyland has structured its participation in PFS to incur costs through a subsidiary, Dairyland has been completely in control of that participation. All of GFT's officers and directors have been employees of Dairyland. And GFT has never had any employees.

7. Since 1995, PFS has made considerable progress toward its goal of developing a private MRS. PFS elected me Chairman of the project. Dairyland wanted me to lead PFS to help maximize the chances that PFS would develop in a manner that would be equally beneficial to Dairyland. After efforts to finalize an agreement with the Mescalero Apache Tribe broke down, PFS reviewed alternative sites and eventually chose to collaborate with the Skull Valley Band of Goshutes in Utah in 1996 to locate an ISFSI on their reservation (another potential host site considered by the Nuclear Waste Negotiator). The Bureau of Indian Affairs initially approved the lease between PFS and the Goshutes. And on February 21, 2006, the NRC issued PFS a license to construct and operate a private MRS at the PFS site in Utah. Dairyland has carefully considered the decision of whether to expend more funds on PFS each time it has been called upon to do so, and Dairyland has believed its participation in PFS to be reasonable and appropriate at the time each of those decisions were made.

8. Notwithstanding this progress, PFS faces important challenges. First, the Bureau of Indian Affairs has withdrawn its approval of the PFS lease. Although PFS and the Goshutes have appealed that agency action, the project cannot move forward unless and until that decision is reversed. More fundamentally, in recent years, utility support for PFS has waned. Most of the utility participants in the PFS effort other than Dairyland had more urgent spent fuel storage needs than Dairyland. While Dairyland has hoped

that PFS would enable it to exit the nuclear business and decommission LACBWR, most of the other utility participants needed additional spent fuel storage to keep their reactors operating. Those reactors were running out of room in their spent fuel pools in which to store additional spent fuel. Absent a dry storage alternative somewhere, those utilities faced the need to shut down their nuclear power plants. To avoid such catastrophic events, those utilities have been forced to develop ISFSIs at their reactor sites at considerable expense in order to accommodate their accumulating spent fuel. Once those utilities had incurred the initial costs to develop their own ISFSIs, they had had less incentive to further pursue the centralized ISFSI represented by PFS. In addition, a number of those utilities faced powerful political pressure from one of Utah's U.S. Senators to cease their support of PFS. Accordingly, these utilities have ceased to provide PFS with additional monetary support.

9. Contrary to the government's assertion, Dairyland's participation in PFS has not at all been motivated by an interest in obtaining profits from PFS. Dairyland's participation in PFS has been motivated solely by concern over DOE's anticipated failure to start picking up spent fuel.

I declare under penalty of perjury that the foregoing is true and correct.

9/20/07
Date

John Parkyn