IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | No. 04-106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

Declaration of Keith Stubbendick

1. I am Director of Accounting of Dairyland Power Cooperative. I began work for Dairyland in 1986 as an accounting manager. I continued in that role until 1992, when I was promoted to my current position. As Director of Accounting, I am responsible for the general ledger accounting and financial reporting, fixed asset management, payroll and accounts payable. Since its inception, I have been secretary-treasurer of Genoa Fuel Tech ("GFT"), the wholly-owned subsidiary of Dairyland's through which Dairyland participates in Private Fuel Storage ("PFS"), since GFT's inception. This declaration is made on my personal knowledge.

2. I understand that one of the reasons that Dairyland found participation in PFS to be more attractive than development of an independent spent fuel storage installation ("ISFSI") at the site of its LaCrosse Boiling Water Reactor ("LACBWR") is the lower per-utility cost of PFS and Dairyland's inability to borrow funds to pay for an ISFSI. As a rural electric cooperative regulated, in part, by the Rural Utilities Service ("RUS"), an arm of the U.S. Department of Agriculture, Dairyland must abide by RUS' rules. Dairyland has understood that one of those rules prohibits Dairyland from

borrowing to fund the development of an asset that would not be "used and useful" in the generation or delivery of electricity. Dairyland has understood that, under this rule, it may not borrow funds with which to develop an ISFSI. In addition, Dairyland has traditionally not maintained a large cash reserve because its only sources of non-loan working capital are through retained patronage margins. Thus, as of the mid-1990s, Dairyland did not believe that it had sufficient funds to develop an ISFSI at LACBWR.

3. I understand that Dairyland has elected to participate in PFS through a wholly-owned, single-purpose subsidiary, GFT. One of the reasons Dairyland made this decision was to minimize the chances of negative tax consequences from Dairyland's participation in PFS. As a not-for-profit cooperative organized pursuant to Internal Revenue Code § 501(c)(12), Dairyland has understood that it is exempt from income taxation as long as at least 85 percent of its gross receipts comes from its members in a given fiscal year. Dairyland has been concerned that if its gross receipts from PFS, when added to other non-member gross receipts, ever exceed 15 percent of Dairyland's total receipts in a year, then Dairyland would lose its federal income tax exemption for that year. Dairyland's focus in this regard has been on receipts from PFS, not profits, because it is receipts that would trigger negative tax consequences for Dairyland. Dairyland has understood that because PFS elected to be taxed as a partnership, the PFS receipts and expenses are annually allocated and reported to the PFS members for reporting on their respective tax returns. PFS could potentially generate gross receipts for its participants even if PFS does not generate a profit. By having its intermediary subsidiary GFT receive any revenues from PFS, Dairyland can control and limit the

amount of non-member receipts it receives in any one year from the subsidiary, thereby helping to avoid loss of Dairyland's tax exempt status.

4. Dairyland is claiming two kinds of costs as mitigation damages related to PFS in this case. First, Dairyland has incurred $8,669,517 in capital contributions to PFS that it has made through GFT. Second, Dairyland has incurred administrative costs (primarily personnel and legal expenses) of $2,267,384 to support its GFT subsidiary. These costs cover expenses to both support GFT as a subsidiary corporation and to support GFT's active participation in PFS (such as through attendance at member meetings) on Dairyland's behalf. GFT does not pay most of its administrative costs directly. As a wholly owned subsidiary of Dairyland, all of GFT's officers and directors have been Dairyland employees, and GFT has no offices or facilities apart from Dairyland's. Thus, when administrative costs have been incurred to support GFT (whether they be personnel time, legal fees or other expenses), they have been incurred initially by Dairyland. Dairyland then bills GFT for these costs, and GFT reimburses Dairyland for these expenses. GFT obtains the funds with which to reimburse Dairyland from Dairyland's provision of funds to GFT through purchases of GFT stock.

5. Dairyland has incurred all of the $10,936,901, noted above, that it is claiming as mitigation damages in this case. These amounts are derived from Dairyland's accounting records. Dairyland's accounting records are audited regularly, and Dairyland's records have been found to be reliable. Dairyland, and not its subsidiary GFT, or any other party, has incurred the costs Dairyland claims as mitigation damages related to PFS. Dairyland has incurred these costs through GFT, by transferring these funds to GFT. GFT has also incurred $10,936,901 in expenses related to PFS, but neither

Dairyland nor GFT is seeking reimbursement of those expenditures as damages in this case.

6. Contrary to the government's assertion, the administrative expenses do not support the promotion and development of PFS as a business enterprise. Dairyland has viewed PFS as merely a means of organizing the group of utilities interested in pursuing an off-site dry storage alternative for their spent fuel in light of DOE's breach, rather than a business enterprise. Further, Dairyland does not provide direct support for PFS, and it obtains reimbursement from PFS (not reflected in the administrative expenses noted above) for expenses it does incur related to PFS' operations. For example, to the extent John Parkyn, a Dairyland employee, does work or incurs costs on behalf of PFS as its Chairman and CEO, Dairyland seeks and obtains reimbursement from PFS for those costs.

7. Contrary to the government's assertion, Dairyland has no interest in obtaining profits from either PFS or any other venture. Dairyland is a not-for-profit cooperative. *See* Bylaws of Dairyland Power Cooperative, Art. X, Sec. 1 (July 1, 2002), exhibit 1 hereto. Dairyland exists to provide wholesale electric service to its 25 Class A members under all-requirements contracts. These 25 Class A members are themselves not-for-profit rural electric distribution cooperatives. As such, the Class A members are local membership cooperatives whose members are the individual electric consumers. To the extent Dairyland receives revenues from any investment in excess of applicable costs and expenses, those revenues would merely be either applied to offset losses, or (if Dairyland has no losses), be credited to unallocated surplus or reserves of the

Cooperative, or credited to the capital accounts of the electric service patrons of Dairyland. *See* Dairyland Bylaws, Art. X, Sec. 3(b), exhibit 1 hereto.

I declare under penalty of perjury that the foregoing is true and correct.

9/21/07
Date

Keith Stubbendick

BYLAWS
OF
DAIRYLAND POWER COOPERATIVE
LA CROSSE, WISCONSIN

JULY 1, 2002

ARTICLE X

Nonprofit Operation

Section 1. Interest or Dividends on Capital Prohibited. The Cooperative shall at all times be operated on a cooperative, nonprofit basis for the mutual benefit of its patrons. No interest or dividends shall be paid or payable by the "Cooperative on memberships or any other capital furnished by its patrons.

Section 2. Patronage Capital in Connection with Furnishing Electric Energy. In the furnishing of electric energy, the Cooperative's operations shall be so conducted that all patrons will, through their patronage, furnish capital for the Cooperative. In order to induce patronage and to assure that the Cooperative will operate on a nonprofit basis, the Cooperative is obligated to account on a patronage basis to all its patrons for all amounts received and receivable from the furnishing of electric energy in excess of operating costs and expenses properly chargeable against the furnishing of electric energy as herein provided. Subject to such classifications as are provided for in Section 6 of this Article, all amounts in excess of operating costs and expenses at the moment of receipt by the Cooperative are received with the understanding that they are furnished by the patrons as capital. The Cooperative is obligated to pay by credit to a capital account for each patron all such amounts in excess of operating costs and expenses properly allocated or allocable to such patron. The books and records of the Cooperative shall be set up and kept in such a manner that at the end of each fiscal year the amount of capital, if any, so furnished by each patron is clearly reflected and credited in an appropriate record to the capital account of each patron, and the Cooperative shall, within a reasonable time after the close of the fiscal year, notify each patron of the amount of capital so credited to its account. All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash, in pursuance of a legal obligation to do so, and the patron had then furnished the Cooperative corresponding amounts for capital.

Section 3. Nonoperating Margins.

(a) From Furnishing Goods and Services Other than Electric Service: If the Cooperative engages to a substantial extent in the business of furnishing goods or services other than electric service, all amounts received and receivable therefrom which are in excess of costs and expenses properly chargeable against the furnishing of such goods and services shall, insofar as permitted by law, be allocated and assigned annually on a patronage basis and credited on the books of the Cooperative to those patrons so furnished such goods and services as patronage capital, in substantially the same manner as provided in Section 2 with respect to the furnishing of electric service.

(b) From Investments, Rental, and Other Incidental Services: Except as provided in paragraph (a) above, all other amounts received by the Cooperative in excess of costs and expenses chargeable thereto shall, insofar as permitted by law, be first applied to offset any losses incurred during the current or any prior fiscal year, and then, to the extent not needed for that purpose, may in the discretion of the Board of Directors be credited, in whole or in part, to unallocated surplus or reserves of the Cooperative, with the balance, if any then allocated among the classes of business for which the receipts exceed the allocable costs and expenses, in proportion to the amounts of such margins, and to its electric service patrons within each such class on a patronage basis, and any amount so allocated shall be included as a part of the capital credited to the accounts of said electric service patrons as provided for in Section 2 of this Article.

Section 4. Retirement of Capital. In the event of dissolution or liquidation of the Cooperative, after all outstanding indebtedness of the Cooperative shall have been paid and membership fees without interest or monetary dividends thereon have been retired, outstanding capital credits shall be retired, without priority, on a pro rata basis. If, at any time prior to dissolution or liquidation, the Board of Directors shall determine that the financial condition of the Cooperative will not be impaired thereby, the capital then credited to patrons' accounts may be retired in full or in part. After June 10, 1987, the Board of Directors shall determine under rules of general application the method, basis, priority and order of retirement, if any, for all amounts theretofore or thereafter furnished as capital. Notwithstanding the above limitations, the Board of Directors, upon determining that the financial condition of the Cooperative will not be impaired thereby, is authorized in its discretion and under rules of general application to retire to any member cooperative an amount of capital not to exceed the amount of capital retired by such member cooperative to estates or heirs of deceased members of such member cooperative derived from allocations of capital of the Cooperative to such member cooperative and in turn allocated by such member cooperative to such deceased members during their lifetimes. Any such retirements of capital by the Cooperative shall be charged against capital allocated to the member cooperative receiving such retirement in the order of priority in which capital has been allocated to such member and shall be based upon such reports and certifications from member cooperatives as may be reasonably required for such retirements.

Section 5. Assignability of Capital. Capital credited to the account of each patron shall be assignable only on the books of the Cooperative pursuant to written instructions from the assignor, and only to successors in interest of such patron, unless the Board of Directors, acting under policies of general application, shall determine otherwise.

Section 6. Classification of Business. In determining and allocating the operating costs and expenses properly chargeable against the furnishing of electric energy or other services to form the basis of determining, in turn, the respective amounts of capital furnished by patrons through their patronage, it shall be the duty of the Board of Directors to classify the business done by the Cooperative with all of its patrons into appropriate classes or departments of business or patronage. Such classification shall be based on factors relating to the cost of rendering such service, or doing such business, and rate schedules applied thereto in accordance with accepted accounting and engineering practice. The Board shall consider such factors as the length of contract, the respective obligations of the parties thereunder, and like factors, to the extent that such factors have relevance to the cost of rendering service thereunder, and to the rates charged therefore. All member rural electric cooperative associations to which the

Cooperative furnishes electric energy under uniform long term contracts with uniform rates which are subject to adjustment by the directors of the Cooperative, to return at least the cost of service, shall have like business with the Cooperative assigned to the same classification. After making such classifications, the Board shall then allocate and charge against each class of business all of those items of cost and expense properly chargeable and allocable thereto, in accordance with accepted accounting and engineering practice. In allocating and charging costs to each class of business, the Board shall consider and give such weight to factors of demand, energy consumption, number of patrons, gross revenue and directly allocable costs within each class as may be appropriate to equitably and properly allocate costs attributable to each class of business. If the receipts from every class of business in any year exceed the costs and expenses allocable and chargeable thereto, then the excess of receipts over expenses for each class of business shall be allocable to each such class as capital credits and to patrons within each such class on a dollar patronage basis. If, however, the costs and expenses chargeable or allocable against any one or more classes of business exceed the receipts from all patrons within such class or classes of business, then such deficit shall be charged against the patronage margins otherwise assignable to any remaining class or classes of business, on a dollar volume patronage basis, so that in no year shall there be credited to patrons as patronage capital an amount greater than the excess of receipts from all patrons over the costs and expenses of doing business with all patrons. All patronage margins contributed by patrons within a given class of business shall be assigned to such patrons on a dollar volume basis of patronage, but no patronage capital shall be deemed to have been contributed by, or shall be allocated to, any patron within any class of business, if the receipts from all patrons within such class do not exceed the costs and expenses chargeable or allocable to such class. In the event patronage from any patron falls into two or more classes of business, capital credits assigned to such patron shall be the net amount of the capital credits determined after debiting and credit such patron's account with all patronage debits and credits from all such classes of business.

Section 7. Contractual Character of Operations. The patrons of the Cooperative, by dealing with the Cooperative, acknowledge that the terms and provisions of the Articles of Incorporation and Bylaws shall constitute and be a contract between the Cooperative and each patron, and both the Cooperative and the patrons are bound by such contract as fully as though each patron has signed a separate instrument containing such terms and provisions. The provisions of this Article of the Bylaws shall be called to the attention of existing patrons of the Cooperative by mailing a copy thereof to each such patron within thirty days after its adoption, and to others upon their becoming patrons.

Section 8. Promulgation and Notification of Rules. Within four months from the adoption of this bylaw provision, the Board of Directors of the Cooperative shall:

(1) promulgate and adopt specific rules and regulations governing the classification of patronage and business and the allocation of costs between and among classes of business and patronage;

(2) classify the patronage and business being done with the Cooperative into separate classes in accordance with the provisions of Section 6 of this Article and the rules and regulations of the Board of Directors as provided for under (1) above.

The Board of Directors shall review such rules, regulations, and classifications at least annually and shall make such revisions therein as may be fair and equitable.

Copies of such rules, regulations, and classes of business and of any revisions therein so made shall be mailed to each patron within thirty days after they have been adopted by the Board of Directors and shall be given to any new patron upon its becoming a patron and each patron shall at the same time be advised of the class or classes of business into which its patronage falls.

Section 9. Arbitration. Any patron shall have the right to object to any of such rules, regulations, and classifications by filing written notice at the office of the Cooperative specifying its objection to such rules, regulations, or classifications within sixty days after copies thereof have been mailed to such patron by the Cooperative. Such objections shall be reviewed and acted upon by the Board of Directors at its next meeting and if the Cooperative, acting through the Board of Directors, cannot agree with such patron with respect to such rules, regulations, or classifications, then any controversy between them with respect thereto or with respect to the interpretation to be given to any other provision of this article shall upon request of either party be submitted to arbitration for settlement and determination under the provisions of Chapter 298 of the Wisconsin Statutes. The arbitrator appointed under said statute shall review the rules, regulations and classifications in controversy as adopted by the directors and, if he or she finds that they are inequitable or discriminatory, such arbitrator shall have the power to direct appropriate revisions therein.

Unless notice of objections by any patron is given as above provided, the action of the Board shall not be subject to review or change except by action at any meeting of the members.