IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | No. 04-106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

Declaration of Charles V. Sans Crainte

1. I am Vice President for Generation of Dairyland Power Cooperative. I began work for Dairyland in 1971 as an engineer. I worked as an engineer with increasing levels of responsibility until 1990 when I became Assistant General Manager for Transmission. The Assistant General Manager title is equivalent to the current Vice President title. I continued in that role until 1997, when I was asked to start a power marketing entity called GENSYS Energy for Dairyland and another cooperative power supplier. In 1999, I was appointed to my present position. As Vice President for Generation, I am responsible for all of Dairyland's power generation assets, including the shutdown LaCrosse Boiling Water Reactor ("LACBWR"). I am also responsible for Dairyland's participation in Private Fuel Storage ("PFS"). John Parkyn reports to me, and I am an officer of Genoa Fuel Tech ("GFT"), the wholly-owned subsidiary of Dairyland's through which Dairyland participates in PFS. Although Dairyland began its participation in PFS before I became responsible for that issue in 1999, as part of my responsibility for supervising Dairyland's participation in PFS since 1999, I have gained

a thorough knowledge and understanding of events concerning PFS that occurred before 1999 as well. This declaration is made on my personal knowledge.

2. As the Dairyland executive in charge of Dairyland's participation in PFS, I (in consultation or in conjunction with Dairyland's President and Chief Executive Officer and subject to the limitations of Dairyland's policies) decide on what actions GFT will take. These actions include recommendation of the membership of GFT's board of directors and the assignment of its officers. These actions also include decisions regarding the extent of any financial contributions to PFS. Further, in consultation with Dairyland's President and Chief Executive Officer, I direct what GFT's position will be on matters to be decided by PFS's membership. The Dairyland executive in charge of generation likewise decided on GFT's actions in the period prior to when I became Vice President for generation.

3. Since PFS's inception through 2005, Dairyland has viewed PFS as providing the best means for Dairyland to mitigate the effects of the government's breach of Dairyland's spent fuel removal contract. PFS has been viewed by Dairyland as providing an opportunity for it to exit the nuclear business entirely by having its spent fuel removed from its site. PFS has also been viewed as a means of removing the spent fuel from the LACBWR so that the reactor may be decommissioned. Dairyland has been eager to complete that decommissioning as soon as practicable so that it may make use of the knowledge of a number of long-standing staff members at LACBWR before their retirement. In addition, because of the opportunity to share development and operation costs with a number of other utilities, PFS has been viewed by Dairyland as a cost-

effective means for it, as a relatively small electric utility, to implement dry storage of its spent fuel.

4. Until recently, Dairyland has believed that PFS has had a good chance of success. PFS has benefited from the support of the Goshutes. And the dry storage technology upon which PFS is based is neither complex nor novel. Indeed, it is the same basic technology already being used at a number of independent spent fuel storage installations ("ISFSIs"). Notably, the NRC has issued PFS a license to build and operate its ISFSI. Each time Dairyland was called upon by PFS to make an additional monetary contribution to that effort (through GFT), Dairyland determined both that PFS' chances of success were sufficiently strong to warrant that expenditure and, more generally, that PFS continued to be the most reasonable and appropriate means for Dairyland to mitigate the effects of the government's breach of Dairyland's spent fuel removal contract. Dairyland's most recent contributions to PFS (through GFT) were made primarily to maintain PFS' potential value by defending the license awarded to PFS by the NRC.

5. Conversely, because of the initial estimates of the large expense of constructing an ISFSI at LACBWR, limitations on Dairyland's ability to borrow funds for that purpose and limitations at the LACBWR site that would require an NRC exemption from set back requirements between an ISFSI and public access, Dairyland has not viewed an on-site ISFSI as a viable mitigation alternative until recently.

6. In recent years, Dairyland has had to reassess its participation in PFS. PFS has faced mounting challenges. In particular, Dairyland understands that utilities participating in PFS have faced strong political pressure from one of Utah's U.S. Senators to stop contributing funds to PFS. In addition, the Utah Congressional

delegation persuaded Congress to create a wilderness designation on nearby federal lands, which constrains access to the PFS site. Also, the Bureau of Indian Affairs has withdrawn its approval of the Goshutes' lease for PFS. Moreover, a number of the other utilities participating in PFS have made significant efforts toward the development of ISFSIs at their own sites, in part due to licensing delays that affected the proposed operational date for the PFS storage facility. Accordingly, Dairyland understands that these utilities have had less incentive to support PFS. By the end of 2005, Dairyland was faced with a situation in which no other utility was planning to contribute additional funds to PFS. Particularly as a relatively small utility, Dairyland is not in a position to be the sole financial supporter of PFS. Therefore, Dairyland reluctantly made a decision at that time to cease further financial contributions to PFS.

7. In this same time frame, Dairyland has decided to take additional steps to attempt to develop an ISFSI at LACBWR. Dairyland has seen the cost estimates for such a project drop dramatically as this technology has matured. In addition, over the past decade, Dairyland has built up a substantial reserve of funds with which it could construct an ISFSI without the need to borrow for this purpose. Furthermore, Dairyland has seen at least one other utility obtain an exemption to the set-back from public access requirements similar to the type that Dairyland would need for an ISFSI at LACBWR. These developments have made an on-site ISFSI a potentially viable mitigation alternative for Dairyland.

I declare under penalty of perjury that the foregoing is true and correct.

9/19/07
Date

Charles V. Sans Crainte