IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Electronically filed: October 15, 2007

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

JOINT NOTICE OF PROPOSED SPECIAL MASTERS

Pursuant to the Court's September 21, 2007 Order, the parties hereby submit their respective statements concerning the appointment of a special master in this case to resolve privilege and other discovery disputes between the parties.

## I. Dairyland's Statement

Dairyland submits the names of the following five persons that it proposes to serve as a special master:

| Name | Affiliation | Billing Rate |
|---|---|---|
| Prof. Stephen A. Saltzburg | GWU Law School | $450[1] |
| Hon. Richard A. Levie (Ret.) | JAMS | $550 + JAMS case management fees |
| Prof. Jack Harlan Friedenthal | GWU Law School | $400 |
| Hon. Curtis E. von Kann (Ret.) | JAMS | $550 + JAMS case management fees |
| Prof. Roger H. Trangsrud | GWU Law School | $450 |

[1] Professor Saltzburg has informed us that his "typical" billing rate is $600/hr but that he would lower it to $450 if requested by the Court.

Dairyland's counsel has spoken with each of these individuals or their respective representatives and they have all confirmed their willingness and availability to serve as a special master. Each of these candidates has very substantial expertise in addressing discovery issues. Three of the candidates occupy endowed chairs at the George Washington University Law School and are noted authorities on matters of federal civil procedure and evidence. The other two individuals, Judges Levie and von Kann, are former District of Columbia Superior Court judges. With the exception of Professor Transgrud, each of these candidates has substantial prior experience serving as a special master. Although Professor Saltzburg is a member of the Bar of Court of Federal Claims, the other four candidates are not. However, each of four is eligible for membership and willing to apply for admission if selected to serve. Attached as attachment A is biographical information and/or a resume for each candidate.

Consistent with the Court's Order, Dairyland counsel attempted to work with government counsel to reach consensus on the list of proposed special masters. Government counsel, however, has been uncooperative. On September 26, 2007, Dairyland counsel Kevin Stern sent a letter to Harold Lester, Jr., Alan Lo Re, Russ Shultis and Josh Gardner at the Department of Justice proposing that the parties exchange names of proposed special masters on October 2 so the parties could try to submit a consensus list by October 5, which was the aspirational deadline that the Court "strongly encourage[d]" the parties to meet. *See* attachment B.[2] The government did not respond to this letter. On October 5, 2007, Mr. Stern spoke with Mr. Lester in an attempt to discuss scheduling a time the following week for the parties to exchange names of proposed special masters. Mr. Lester refused to commit to a meet and confer session, said that that the government did not have any names to propose, and told Mr. Stern that the government was still

[2] Mr. Stern's September 26, 2007 letter was mistakenly dated August 28, 2007.

trying to decide whether it was going to oppose the Court's authority to appoint a special master. *See* attachment C.

On October 9, 2007, Mr. Lester wrote a letter to Dairyland counsel stating that the government was opposed to the appointment of or having to pay for a special master in this case. *See* attachment D.[3] Mr. Lester further stated that, should the Court overrule its objections to the appointment of a special master, the government was "attempting to work to develop" a list of such proposed special masters. *Id.*

On October 11, 2007, Dairyland counsel provided government counsel with its list of proposed special masters, which is identical to the list set forth above. Attachment E. On October 12, Dairyland counsel Robert Shapiro called Mr. Lester to find out where the government currently stood on its consideration of Dairyland's proposed special masters and when Dairyland could expect to receive any proposed names from the government. Mr. Lester did not return Mr. Shapiro's call. On October 15, Mr. Lester informed Mr. Shapiro that, although the government did not have any position on the qualifications or suitability of Dairyland's proposed special masters (except for a potential conflict issue with regard to Professor Friedenthal's appointment), the government could not agree to any of Dairyland's candidates (or any private special master for that matter) because of their cost.

The government's objections to Dairyland's proposed special masters on cost grounds is meritless.[4] The billing rate for each candidate is lower than the prevailing rates for experienced

[3] Mr. Lester's October 9, 2007 letter was mistakenly dated October 8, 2007.

[4] To the extent the government is concerned about the availability of funds to pay for a special master in this case, such concern is dubious at best. In recent testimony before the House Budget Committee on October 4, 2007, Michael F. Hertz, the Deputy Assistant Attorney General, Civil Division, stated that the government has expended $55 million to pay outside consultants in the spent fuel cases to date. *See* attachment F. Surely the government if it chose to could utilize a small portion of these funds to pay for half of the special master costs in this case.

attorneys at large law firms in the District of Columbia. Their rates are also comparable to the $440 per hour rate the U.S. Attorney's Office for the District of Columbia currently considers reasonable for experienced litigators for fee shifting purposes according to its published "Laffey Matrix." *See* attachment G.

Furthermore, the government's argument about potential conflict issues with regard to Dairyland's proposed candidates is nothing more than make weight. Each of Dairyland's proposed candidates has already run a conflict check and none of them found anything that would disqualify them from serving as a special master in this case. Even the government's professed concern about a conflict with regard to Professor Friedenthal is unclear at best.

The government proposes in its statement below that the Court appoint as a special master in this case one of the special masters currently serving in the Court's National Vaccine Injury Compensation Program ("Vaccine Program") or a currently serving Armed Services Board of Contract Appeals Judge. Dairyland does not believe that a Vaccine Program special master would be well-suited for this role given the highly-specialized nature of that position and the likelihood that the privilege and other discovery issues that will have to be addressed by the special master in this case are not typically raised or addressed in Vaccine Program proceedings. Furthermore, Dairyland is concerned that a Vaccine Program special master will not have sufficient available time to devote to this case. Dairyland has similar concerns about having a BCA judge appointed as a special master in this case. BCA judges already have full-time jobs and are unlikely to be able to devote sufficient time to this case given their other responsibilities. It is also not clear that BCA judges typically deal with the privilege and discovery issues that the special master will be called upon to address in this case. Finally, as Executive Branch employees, current BCA judges do not have the same degree of appearance of impartiality as other potential special masters.

Dairyland urges the Court to promptly appoint one of its proposed special masters pursuant to its authority under 28 U.S.C. § 798(c) and RCFC 53 to help resolve the parties' remaining discovery disputes in an expedited and timely manner consistent with the January 2008 trial date.

## II. Government's Statement

As the Court is aware, defendant respectfully objects to the appointment of a special master in this instance to review the discovery motions that plaintiff, Dairyland Power Cooperative ("Dairyland"), has filed in this individual case. The dispute here is a relatively routine discovery matter that does not warrant the extreme measure of appointing a special master. Issues such as those here are routinely handled by the Court, with the assistance of its law clerks, and there is no reason to depart from that type of review here. Further, the fees that would be charged by a private individual serving in this capacity would be substantial. Additionally, before a private individual could be appointed, a thorough conflict check would be required.

To the extent that the Court is able to appoint a Discovery Judge who would be responsible for all discovery in all of the spent nuclear fuel cases, that Judge might consider whether it would be necessary to appoint a special master to assist him or her in handling all of the spent nuclear fuel litigation discovery. However, in an individual case like this one, we do not see the necessity or appropriateness of a special master.

Nevertheless, in compliance with the Court's September 21, 2007 order, defendant states that, based upon the cost of the special masters that Dairyland proposes, defendant cannot agree to Dairyland's individuals.[1] As an alternative, defendant suggests that, to the extent that the

[1] It appears that, based upon a personal relationship with one of the Department of Justice attorneys working on this case, one of Dairyland's proposed special masters, Jack Harlan Friedenthal, is conflicted from this matter.

Court determines that a special master is needed in this instance, the Court first consider using one of the Court's existing special masters, to the extent that one of those individuals could be utilized here to resolve the discovery disputes that Dairyland is pursuing before the Court. As full-time employees of the Court, those special masters should have fewer conflict issues and would not impose unnecessary additional costs upon the parties. Alternatively, defendant suggests that the Court attempt to make an arrangement with the Armed Services Board of Contract Appeals to utilize the services of its Judges to assist in this matter, many of which are members of the bar of this Court (including Mark N. Stempler, Terrence S. Hartman, David W. James, Jr., Carol N. Park-Conroy, Michael T. Paul, Cheryl L. Scott, and Alexander Younger). To the extent that the Court considers the individuals that Dairyland has proposed, the proposed hourly fees appear extreme for the type of document review issues that the special master would perform. At the very least, strict controls should be placed upon the amount that the special master may charge in this case.

Finally, we respond to Dairyland's assertions that counsel for the Government has been wholly uncooperative in the special masters issue. Defendant first received Dairyland's language for this status report about defendant's lack of cooperation at 4:51 p.m. on Monday, October 15, 2007. In response, defendant states that Dairyland's assertions are meritless and add nothing to the proper resolution of this issue. As defendant informed counsel for Dairyland early in this process, the issue of the appointment of a special master is an unusual one for the Government, and the fact that issues about the appointment of a special master in a Winstar case went to the United States Court of Appeals for the Federal Circuit rendered this issue one that required discussion at various levels of the Department of Justice. Counsel for Dairyland's daily demands for immediate responses did not assist in that effort. Because of the time at which defendant received notice of Dairyland's inflammatory language in this report, and the 5 p.m.

deadline for filing of a joint report, defendant has not had an adequate opportunity to respond in full to Dairyland's assertions. To the extent that the Court desires a full explanation of the parties' discussions regarding the special master issue and the time necessary for the Department of Justice to evaluate this issue, defendant respectfully requests that the Court notify defendant of that desire and to provide defendant with an opportunity to present that explanation.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

s/ Russell A. Shultis by s/ Jerry Stouck
RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

Attorneys for Defendant

s/ Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

October 15, 2007

# Attachment A

# THE GEORGE WASHINGTON UNIVERSITY LAW SCHOOL
WASHINGTON DC



**Stephen A. Saltzburg**
Wallace and Beverley Woodbury University
Professor of Law

Email: ssaltz@law.gwu.edu
Telephone: (202) 994-7089
Fax: (202) 994-9811

**Education:** B.A., Dickinson College; J.D., University of Pennsylvania

**Biographical sketch:** Professor Saltzburg joined the GW Law faculty in 1990. Before that, he had taught at the University of Virginia School of Law since 1972, and was named the first incumbent of the Class of 1962 Endowed Chair there. In 1996, he founded and began directing the master's program in Litigation and Dispute Resolution at GW. Professor Saltzburg served as reporter for and then as a member of the advisory committee on the Federal Rules of Criminal Procedure and as a member of the advisory committee on the Federal Rules of Evidence. He was the reporter for the Civil Justice Reform Act Committee for the District of Columbia District Court before he assumed the chair of that committee. He has served as a special master in two class action cases in the District of Columbia District Court, and continues to serve as a mediator for the U.S. Court of Appeals for the District of Columbia. He also has mediated a wide variety of disputes involving public agencies as well as private litigants; has served as a sole arbitrator, panel chair, and panel member in domestic arbitrations; and has served as an arbitrator for the International Chamber of Commerce. Professor Saltzburg's public service includes as associate independent counsel in the Iran-Contra investigation; as deputy assistant attorney general in the Criminal Division of the U.S. Department of Justice, as the Attorney General's ex-officio representative on the U.S. Sentencing Commission; and as director of the Tax Refund Fraud Task Force, appointed by the Secretary of the Treasury. He currently serves as a council member in the ABA Litigation Section, and is a member of the ABA House of Delegates from the Criminal Justice Section. He was appointed to the ABA Task Force on Terrorism and the Law and to the Task Force on Gatekeeper Regulation and the Professional in 2001, and to the ABA President's Advisory Group on Citizen Detention and Enemy Combatant Issues in 2002. In 2001 he was appointed by Chief Judge Edward R. Becker of the U.S. Court of Appeals for the Third Circuit as co-chair of the Task Force on the Selection of Lead Counsel in Class Actions, which published its final report in 2002. Professor Saltzburg is the author of numerous books and articles on evidence, procedure, and litigation.

**Current Semester Courses:** College of Trial Advocacy , Evidence , Trial Advocacy

© 2005 The George Washington University Law School

**RESUME**
**STEPHEN ALLAN SALTZBURG**
**WALLACE AND BEVERLEY WOODBURY UNIVERSITY PROFESSOR**

**HOME ADDRESS**
1646 21st Street, N.W.
Washington, D.C. 20009
(202) 797-9028
Fax (202) 265-7716

**WORK ADDRESS**
George Washington University Law School
2000 H Street, N.W.
Washington, D.C. 20052
202) 994-7089, Fax (202) 994-7143
E-Mail: ssaltz@law.gwu.edu

**PRESENT TEACHING POSITIONS**
Wallace and Beverley Woodbury University Professor of Law, George Washington University
Director, National Trial Advocacy College at the University of Virginia

**FORMER TEACHING POSITIONS**
Howrey Professor of Trial Advocacy, Litigation and Professional Responsibility, George Washington University Law School, 1990-2004
University of Virginia School of Law, 1972-1990, Class of 1962 Chairholder, 1987 - 1990

**SUBJECTS TAUGHT**
Civil Procedure, Constitutional Law, Criminal Law, Criminal Procedure, Evidence, Trial Advocacy

**EDUCATION**
A.B., Dickinson College, 1967; J.D., University of Pennsylvania, 1970

**CLERKSHIPS**
Honorable Stanley A. Weigel, (ND/CAL), 1970 - 71
Honorable Thurgood Marshall, 1971 - 72

**GOVERNMENT SERVICE**

**Executive**

Director, Tax Refund Fraud Task Force, U.S. Treasury Department, 1994 - 1995
U.S. Department of Defense Code Committee, 1989 - 1992
Ex Officio Member, U.S. Sentencing Commission, 1989 - 1990
Deputy Assistant Attorney General, Criminal Division, 1988 - 1989
Associate Counsel, Office of Independent Counsel, 1987 - 1988
Member, Military Justice Act of 1983 Commission, 1984-1985

**Judiciary**

Co-Chair, Third Circuit Task Force on Selection of Class Counsel, 2001 - present
Special Master, Hammon v. Barry, U.S. District Court for the District of Columbia (class action employment case), 1990 - 1994

Special Master, Hartman v. Powell, U.S. District Court for the District of Columbia (class action employmen
Special Master, The Diversified Group, Inc. v. Paul Daugerdas, U.S. District Court for the Southern District of New York (attorney-client and work product issues), 2003
Mediator, United States Court of Appeals for the District of Columbia Appellate Mediation Program, 1992 - Present
Mediator, Cobell v. Babbitt, U.S. District Court for the District of Columbia, 1999
Chair, U.S. District Court for the District of Columbia Civil Justice Reform Act Advisory Group, 1994 - 1999
Reporter, U.S. District Court for the District of Columbia Civil Justice Reform Act Advisory Group, 1991- 1993
Member, Advisory Committee on Federal Rules of Criminal Procedure, 1990 - 1995
Reporter, Advisory Committee on Federal Rules of Criminal Procedure, 1984 - 89
Liaison Member from Advisory Committee on Federal Rules of Criminal Procedure to Advisory Committee on Federal Rules of Evidence, 1993- 1995
Co-Chairman and Reporter of the Virginia Supreme Court's Advisory Committee on Rules of Evidence, 1984 - 1985

**MEDIATION AND ARBITRATION**

Mediator--Antitrust, Civil Rights, Contracts (Commercial and Government), Defamation, Disability, Employment, Environmental, Family Law, Fraud, Intergovernmental, Securities
Arbitrator--United States Cases; International Chamber of Commerce

**PUBLIC SERVICE**

Chair, ABA Criminal Justice Section Committee on Trial Advocacy, 1990 – 1996
Chair, ABA Criminal Justice Section, 2007-2008
Member, ABA Criminal Justice Standards Committee, 1996 - 1999
Member, ABA House of Delegates 2001-Present
Chair, ABA Justice Kennedy Commission, 2003 - 2004
Vice-Chair, ABA Litigation Section Committee on Trial Evidence, 1991-1995
Member, ABA Litigation Section Council, 2001-Present
Co-Chair, ABA Litigation Section Task Force on Civil Trial Standards, 1997-1998
Chair, ABA Litigation Section Task Force on the Independent Counsel Statute, 1997- 1999
Member, ABA Special Committee on the Prosecution Function, 1991- 1993
Member, ABA Task Force on Enemy Combatants
Member, ABA Task Force on Gatekeepers and the Profession
Member, ABA Task Force on Terrorism and the Law, 2001-2002
Reporter, American College of Trial Lawyers Task Force on Litigation Issues, 1986 – 88
Member, NIJ Less than Lethal Liability Panel, 1993 - 2004
Reporter, National Committee to Prevent Wrongful Executions, 2000-2002

**HONORS**

Honorary Faculty Member, Judge Advocate General School, Charlottesville, Virginia

Recipient, William J. Brennan, Jr. Award, University of Virginia Trial Advocacy Institute
Member, Fellow of the American Bar Foundation, 1993 - Present
2000 ALI-ABA Francis Rawle Award for Outstanding Contributions to Post-Grad Legal Educ.

**BAR MEMBERSHIPS**
California, 1971; District of Columbia, 1972; Virginia, 1977

**PUBLICATIONS**
List Supplied Upon Request

## PUBLICATIONS OF STEPHEN A. SALTZBURG

**BOOKS**

American Criminal Procedure (First Edition, 1980 (Author), Second Edition, 1984 (Author), Third Edition, 1988 (Author), Fourth Edition, 1992 (Co-Author), Fifth Edition, 1996 (Co-Author), Sixth Edition, 2000 (Co-Author), Seventh Edition. 2004 (Co-Author), Eighth Edition, 2007 (Co-author)

Basic Criminal Procedure (First Edition, 1994, Second Edition, 1997, Third Edition 2003, Fourth Edition 2005) (Co-Author)

California and Federal Evidence Trial Book (1999) (Co-Author)

Criminal Law: Cases and Materials (First Ediiton, 1994, Second Edition 2000) (Co-Author)

Emerging Problems Under the Federal Rules of Evidence (First Edition, 1983) (Reporter); Second Edition 1991 (Reporter); Third Edition, 1998 (Contributing Editor)

Evidence in America (4 Volumes, 1987) (Co-Author)

Evidence: The Objection Method (First Edition, 1997), (Second Edition, 2002) (Co-Author)

Evidence Supplement: Rules, Statutes, Commentary (1980)

Federal Criminal Jury Instructions (3 Volumes, First Edition, 1985, Second Edition 1991) (Co-Author)

Federal Rules of Evidence Manual (First Edition, 1975, Second Edition, 1977, Third Edition, 1982, Fourth Edition, 1986, Fifth Edition, 1990, Sixth Edition, 1994, Seventh Edition, 1998, Eighth Edition, 2002, Ninth Edition, 2006 (Co-Author)

Federal Rules of Evidence Manual: The Trial Book (1998)

Federal Rules of Evidence Trial Book (1998)

Materials on International Human Rights and U.S. Criminal Law and Procedure (1989)(Collaboration)

Military Evidentiary Foundations (1994) (Co-Author)

Military Rules of Evidence Manual (First Edition, 1981, Second Edition, 1986, Third Edition, 1991, Fourth Edition, 1997, Fifth Edition, 2003, Sixth Edition 2007) (Co-Author)

A Modern Approach to Evidence (First Edition, 1977, Second Edition, 1982) (Co-Author)

Ohio Rules of Evidence Trial Book (1999)(Co-Author)

Texas Rules of Evidence Trial Book (2000) (Co-Author)

Trying Cases to Win: Anatomy of a Trial (1999) (Co-Author)

Trying Cases to Win: Evidence: Weapons for Winning--Hearsay, Confrontation (2003) (Co-Author) (plus 2003 Supplement)

Trying Cases to Win: Evidence: Weapons for Winning—Lay Witness and Expert Opinion (2004) (Co-Author)

Trying Cases to Win: Evidence: Weapons for Winning–Relevance, Authentication, Motions in Limine, Voir Dire, Depositions (2000)(Co-Author)(plus 2003 Supplement)

Washington Evidence Trial Book (1999) (Co-Author)

**ARTICLES**

"Impeaching" Cooperating Witnesses, 22 Criminal Justice 47-49 (Summer 2007)

Improper use of the Trial Judge as Voucher, 22 Criminal Justice 55- 57 (Spring 2007)

Preparing for Disasters: An Introduction, 15 ABA Criminal Justice Section Newsletter 1-2, 16 (Winter 2007)

Improper Use of Plea Agreements to Vouch, 21 Criminal Justice 49-51 (Winter 2007)

The Fourth Amendment: Internal Revenue Code or Body of Principles? 74 George Washington Law Review 956-1018 (2006)

Testimonial Hearsay and Confrontation, 21 Criminal Justice 47-49 (Fall 2006)

A Grand Slam of Professional Irresponsibility and Judicial Disregard, 34 Hofstra L. Rev. 783-819 (2006)

Reverse Rule 404 (b) Evidence, Part II, 20 Criminal Justice 56-58 (Summer 2006)

Reverse Rule 404 (b) Evidence, Part I, 20 Criminal Justice 42-44 (Spring 2006)

Guilt Assuming Hypotheticals: Basic Character Evidence Rules, 20 Criminal Justice 47-49 (Winter 2006)

Compulsory Process Clause, in The Heritage Guide to the Constitution 355-357 (2005)

Plea Agreements: Confrontation Versus Vouching, 20 Criminal Justice 65-67 (Fall 2005)

Other Act Evidence: The Importance of Context, 20 Criminal Justice 59-61 (Summer 2005)

Dangers of Homicidal Cross-Examination, 20 Criminal Justice 44-46 (Spring 2005)

Supplemental Arguments: Good or Bad Idea? 19 Criminal Justice 57-59 (Winter 2005)

Prior Inconsistent Statements and Collateral Matters, 19 Criminal Justice 45-47 (Fall 2004)

Threats: Bolstering of Impeaching, 19 Criminal Justice 45-46 (Summer 2004)

Privilege Versus Compulsory Process, 19 Criminal Justice 68-69 (Spring 2004)

Interpreting Code: Part II, 18 Criminal Justice 48-49, 47 (Winter 2004)

Interpreting Code: Part I, 18 Criminal Justice 46-47 (Fall 2003)

Closing Argument Vouching: Crossing the Line, 18 Criminal Justice 42-45 (Summer 2003)

The Supreme Court, Criminal Procedure and Judicial Intergrity, 40 American Criminal Law Review 133-158 (Winter 2003)

Limits on Non-hearsay Use of Statements, 18 Criminal Justice 66-70 (Spring 2003)

Three Basic Principles, 17 Criminal Justice 40-45 (Winter 2003)

Offers of Proof: The Basic Requirement, 17 Criminal Justice 50-54 (Fall 2002)

Questioning the Judicial Role in Dealing with Expert Testimony in Complex & Non-Complex Cases, 3 The Sedona Conference Journal 185-197 (Fall 2002)

Permissible, Impermissible Corroboration of Witnesses, 17 Criminal Justice 36-39 (Spring 2002)

Declarations Against Interest and the Confrontation Clause, 16 Criminal Justice 51-57 (Winter 2002)

Declarations Against Interest, 16 Criminal Justice 36-39 (Fall 2001)

Due Process, History, and *Apprendi v. New Jersey*, 38 American Criminal Law Review 243-253 (2001)

Keeping the Reformist Spirit Alive in Evidence Law, 149 University of Pennsylvania Law Review 1277-1293 (2001)

Opening the Door to Bolstering, 16 Criminal Justice 50-55 (Summer 2001)

Inextricably Intertwined? Maybe Not, 16 Criminal Justice 60-65 (Spring 2001)

Excited Utterances and Family Violence, 15 Criminal Justice 39-43 (Winter 2001)

Third Party Hearsay Exceptions for Business Records, 15 Criminal Justice 36-40 (Fall 2000)

Rhetorical Questioning, 15 Criminal Justice 38-41, 61 (Summer 2000)

Perjury and False Testimony: Should the Difference Matter So Much, 68 Fordham Law Review 1537-1580 (April 2000)

Importance of Corroboration: Self-Defense as an Example, 15 Criminal Justice 65-69 (Spring 2000)

Self-Defense and the Rules of Evidence, 14 Criminal Justice 46-50 (Winter 2000)

The Unusual Harm from a Compound Question, 14 Criminal Justice 40-41, 44-46 (Fall 1999)

Race: Fair and Unfair Use, 14 Criminal Justice 36-40, 56 (Summer 1999)

Admissibility of Pretrial Proffers at Trial, 14 Criminal Justice 36-39, 44 ( Spring 1999)

Judges Interrogate Witnesses: Crossing the Line, 13 Criminal Justice 40-44 (Winter 1999)

*Terry v. Ohio*: A Practically Perfect Doctrine, 72 St. John's Law Review 911-974 (Summer-Fall 1998)

Opinions on Intent: Mirroring Facts of the Case, 13 Criminal Justice 21-24 (Fall 1998)

Non-English-Speaking Witnesses and Leading Questions, 13 Criminal Justice 37-41 (Summer (1998)

Trial Judge Reverses Course: *In Limine* Rulings, 13 Criminal Justice 31-35 (Spring 1998)

Transcripts of Tapes, 12 Criminal Justice 30-34 (Winter 1998)

Authentication: Multiple Defendants, 12 Criminal Justice 50-53(Fall 1997)

Authenticating Evidence: Some Basics, 12 Criminal Justice 57-51 (Summer 1997)

Stipulations, Probative Value and Unfair Prejudice, 12 Criminal Justice 45-48 (Spring 1997)

Rule of Completeness and Post-Arrest Statements, 11 Criminal Justice 40-42 (Winter 1997)

Improper Witness Vouching, Attacks on Counsel, 11 Criminal Justice 48-51 (Fall 1996)

Limiting Closing Arguments About Evidence, 11 Criminal Justice 42-44 (Summer 1996)

Bias Evidence and Gang Membership, 11 Criminal Justice 46-50 (Spring 1996)
Summaries: Two Types, 10 Criminal Justice 33-36 (Winter 1996)

The Top Ten List: Rules Lawyers Must Know, 22 Litigation 6-10, 71-72

Stipulations, Part III: Convicted Felons on Trial, 10 Criminal Justice 31-34 (Summer 1995)

Stipulations to Exclude Other Act Evidence: What is Adequate, 10 Criminal Justice 39-42 (Spring 1995)

Stipulations by the Defense to Remove Other Act Evidence, 9 Criminal Justice 35-40 (Winter 1995)

Hearsay Exceptions for Business and Public Records, 9 Criminal Justice 40-43 (Fall 1994)

Testimony from an Opinion Witness: Avoid Using the Word "Expert" at Trial, 9 Criminal Justice 35-38 (Summer, 1994)

Expert Opinions by Mental Health Professionals: The Challenges of FRE 704 (b), 9 Criminal Justice 31-35 (Spring 1994)

The Trial Judge as Gatekeeper: Expert Testimony after Daubert, 8 Criminal Justice 38-41 (Winter 1994)

Criminal Procedure in the 1960s: A Reality Check, 42 Drake Law Review 179-203 (1993)

Opinions by Expert Witnesses: Testifying to Ultimate Issues, 8 Criminal Justice 32-35 (Fall 1993)

A Last Word on Impeaching the Witness with Prior "Bad Acts," 8 Criminal Justice 37-40 (Summer 1993)

Improving the Quality of Jury Decisionmaking, 341-377, in Verdict: Assessing the Civil Jury System (1993)

Uncharged Acts: Substantive versus Impeachment Use, 8 Criminal Justice 35-38 (Spring 1993)

Impeaching the Witness: Prior "Bad Acts" and Extrinsic Evidence, 7 Criminal Justice 28-31 (Winter 1993)

Former Testimony, Similar Motive, and Constitutional Implications, 7 Criminal Justice 29-33 (Fall 1992)

Hearsay, Confrontation and Sufficiency, 7 Criminal Justice 39-42 (Summer 1992)

Sentencing Procedures: Where Does Responsibility Lie, Federal Sentencing Reporter 247-50 (March/April 1992)

Polygraph Evidence, Key Witnesses, Deals, Experts...and the Door Opens, 7 Criminal Justice 37-41 (Spring 1992)

Proper and Improper Handling of Uncharged Crimes, 6 Criminal Justice 43-46 (Fall 1991)

Prior Inconsistent Statements: Fair and Unfair Use, 6 Criminal Justice 45-49 (Summer 1991)

The Control of Conduct in Criminal Organizations, 71 Boston University Law Review 421-438 (March 1991)

Bolstering and Attacking the Cooperating Witness, 6 Criminal Justice 43-45 (Spring 1991)

Other Act Evidence: A Change in Discovery Practice, 5 Criminal Justice 34-35 (Winter 1991)

National Security and the Fourth and Fifth Amendments (Chapter 22 in National Security Law)

1001-1032 (Caroline Academic Press 1990)

National Security and Privacy: Of Governments and Individuals Under the Constitution and the Foreign Intelligence Surveillance Act, 28 Va. J. Int'l L. 129-155 (1987)

*Miranda v. Arizona* Revisited: Constitutional Law or Judicial Fiat, 26 Washburn Law Journal 1-26 (1986)

Another Victim of Illegal Narcotics: The Fourth-Amendment (as Illustrated by the Open Fields Doctrine), 48 University of Pittsburgh Law Review 1-25 (1986)

Impeachment of Witnesses and the Federal Rules of Evidence, 22 Criminal Law Bulletin 101-117 (1986)

The Required Records Doctrine: Its Lessons for the Privilege Against Self-Incrimination, 53 Chicago Law Review 6-44 (1986)

Lawyers, Clients, and the Adversary System, 37 Mercer Law Review 674-700 (1986)

Understanding the Jury with the Help of Social Science, 83 Michigan Law Review 1120-1140 (1985)

Corporate Attorney-Client Privilege in Shareholder Litigation and Similar Cases: Garner Revisited, 12 Hofstra Law Review 817-848 (1984)

Pretrial Discovery of Scientific Evidence, 101 F.R.D. 613-621 (1984)

Corporate and Related Attorney-Client Privilege Claims: A Suggested Approach, 12 Hofstra L. Rev. 279-321 (1984)

Frye and Alternatives, 99 Federal Rules Decisions 208-218 (1983)

Habeas Corpus: The Supreme Court and the Congress, 44 Ohio State Law Journal 367-391 (1983)

Burdens of Persuasion in Criminal Cases: Harmonizing the Views of the Justices, 20 American Criminal Law Review 393-421 (1985)

Peremptory Challenges and the Clash Between Impartiality and Group Representation, 41 Maryland Law Review 337-383 (1982) (with Mary Ellen Powers)

Tactics of the Motion in Limine, 9 Litigation No. 4, at 17-21, 63 (1983)

Communications Failing Within the Attorney-Client Privilege, 66 Iowa Law Review 811-841 (1981)

The Flow and Ebb of Constitutional Criminal Procedure in the Warren and Burger Courts, 69 Georgetown Law Journal 151-209 (1980)

The Reach of the Bill of Rights Beyond the Terra Firma of the United States, 20 Virginia Journal of International Law 741-776 (1980)

Privileges and Professionals: Lawyers and Psychiatrists, 66 Virginia Law Review 597-651 (1980)

Virginia's Model Jury Instructions for Criminal Cases, 6 Virginia Bar Journal 16-22, 26 (Spring 1980)

The Unnecessarily Expanding Role of the American Trial Judge, 64 Virginia Law Review 1-81 (1978)

A Special Aspect of Relevance: Countering Negative Inferences Associated with the Absence of Evidence, 66 University of California Law Review 1015-1060 (1978)

Pleas of Guilty and the Loss of Constitutional Rights: The Current Price of Pleading Guilty, 76 Michigan Law Review 1265-1307 (1978)

The Federal Rules of Evidence and the Quality of Practice in Federal Courts, 27 Cleveland State Law Review 173-194 (1978)

Discovering and Applying Foreign and International Law in Domestic Tribunals, 18 Virginia Journal of International Law 611-618 (1978)

Standards of Proof and Preliminary Questions of Fact, 27 Stanford Law Review 271-305 (1975)

Another Ground for Decision--Harmless Trial Court Errors, 47 Temple Law Quarterly 193-277 (1974)

The Harm of Harmless Error, 59 Virginia Law Review 988-1032 (1973)

**Book Review** The Closed Enterprise System, 121 University of Pennsylvania Law Review 176-185 (1972)

**Newspaper** Analyzing the Supreme Court for Non-Lawyers, Series 1972-73 (approximately 25 articles), The Daily Progress, Charlottesville, VA

**Miscellaneous**

Moderator, The Future of Class Actions in Mass Tort Cases: A Roundtable

Discussion, 66 Fordham L. Rev. 1657-1698 (April 1998)

Panel Discussion--Jury Nullification, 145 F.R.D. 166-193 (March 1993)

The Federal Rules of Evidence and the Continuing Education of Judges and Lawyers, 5 Virginia Law School Report 6 (Winter 1981)

Personal Jurisdiction: Some History and Trends in the Supreme Court, in ALI-ABA Civil Practice and Litigation in Federal and State Courts, Vol. I, at 33-86 (1981)

Foreword to Fa, A Comparative Study of Judicial Review Under Nationalist Chinese and American Constitutional Law (University of Maryland Press, 1980)

THE RESOLUTION EXPERTS



*Recognized as one of the "500 Leading Judges in America," by Lawdragon Magazine, 2006*

**Hon. Richard A. Levie (Ret.)**

**Special Master/Disc. Referee Dispute Resolution Experience**

A full-time ADR professional, Judge Levie serves as a special master/discovery referee in large, complex cases with the goals of assisting judicial officers to whom the cases are assigned, as well as the parties.

He is frequently appointed by judges and called upon by parties to handle significant and challenging cases. Judge Levie is adept at deciding discovery and privilege disputes; developing procedures to govern pretrial proceedings in an efficient and productive manner; drafting case management orders to fit the particular case, preparing reports and recommendations; reviewing complicated, voluminous documents; and conducting in-person and telephonic conferences to resolve discovery disputes and monitor and evaluate procedures with the parties, as well as offer guidance on how to maximize the process and reach agreement on important issues in lieu of filing motions.

**Representative Matters**

- Special Master for discovery and privilege in *U.S. v. Philip Morris et al.*, (Kessler, J., D.D.C.), the largest civil RICO action ever brought by the United States. The case sought $280 billion in disgorgement and other equitable relief against the major tobacco manufacturers and two related trade groups. This almost four year project also involved supervision of a staff of three attorneys.
- Special Master for discovery and privilege in a criminal case [*United States v. McDonnell Douglas* (Friedman, J., D.D.C.)]
- Special Master for discovery and privilege in a series of telecommunication cases [*APCC Services, Inc. et al. v. AT&T Corporation et al.* (Huvelle, J., D.D.C.)
- Special Master for privilege in an environmental third party subpoena action [*United States v. Duke Energy (UARG)*, (Kay, Mag.-Judge, D.D.C.)
- Special Master in *U.S. v. Federal Trade Commission* (Kessler, J., D.D.C.) involving a dispute over a third party subpoena issued by the tobacco companies to the FTC, focusing on 1,000 documents to which privileges, including governmental privileges, were claimed

**Honors, Memberships, and Professional Activities**

- Recognized as one of the "500 Leading Judges in America," by *Lawdragon Magazine*, 2006
- Fellow, College of Commercial Arbitrators
- Board of Directors and instructor, Einstein Institute for Science, Health and the Courts, 1997-2002
- Adjunct Professor, George Washington University School of Law, Washington, D.C., 1987-2003
- Served on the faculties of the National Judicial College, National Institute for Trial Advocacy, the Attorney General's Advocacy Institute, and the Trial Advocacy Workshop at Harvard Law School. Topics include: management of complex cases, alternative dispute resolution and settlement, pretrial, injunctions, and summary judgment
- Publications and Presentations:
  - Contributing Author, Best Practices-*College of Commercial Arbitrators Guide to Best Practices for Commercial Arbitrators*
  - Co-Author: "New ADR Process Provides Valuable Tool for Corporate and Outside Counsel" *Metropolitan Corporate Counsel,* September 2006 http://www.metrocorpcounsel.com/pdf/2006/September/09.pdf
  - Co-Author: "Want to Make Everyone a Winner: Use Mediation for IP Disputes," Philadelphia Intellectual Property Association, Spring 2006
  - Licensing Executives Society Presentation, "Mediation and Arbitration-Saving Time and Money for Counsel and Clients," February 2006
  - D.C. Bar CLE Presentation, "Getting the Most Out of Court Mediation"
  - Presented programs and talks on mediation and arbitration techniques and advocacy to the D.C. Bar, law firms, government agencies, and other organizations in Washington, D.C., New York, and Philadelphia
  - Presented talks on "Recent Trends in Alternative Dispute Resolution," to solicitors and barristers in the United Kingdom

**Background and Education**

- Mediator/Arbitrator, ADR Associates, LLC, 2000-2003
- Associate Judge, District of Columbia Superior Court (1985-2000), and Presiding Judge, Civil Division and Multi-Door Dispute Resolution Division, (1998-2000)
- District of Columbia Court of Appeals, (sat by designation) 1994 and 1997
- Litigator, Department of Justice and Commodity Futures Trading Commission, 1971-1972; 1976-1985
- Private Practitioner, Washington, D.C., 1973-1976
- J.D., George Washington University School of Law, 1969
- B.A., Dickinson College, 1966

JAMS
THE RESOLUTION EXPERTS

# Arbitration Fee Schedule

*Hon. Richard A. Levie (Ret.)*

## PROFESSIONAL FEES

**$550 per hour**

*Weekends and holidays are subject to additional charges.*

## NON-REFUNDABLE CASE MANAGEMENT FEE

| *One day is defined as 10 hours of professional time* | *Fee* |
| --- | --- |
| **1-3 days** | $400 per party, per day |
| **Time in excess of initial 30 hours** | 10% of professional fees |

- Professional fees include time spent for hearings and pre- and post-hearing reading and research, and award preparation.
- The Case Management Fee includes access to an exclusive nationwide panel of judges, attorneys, and other ADR experts, dedicated services including all administration through the duration of the case, document handling, and use of JAMS conference facilities including after hours and on-site business support.
- The Case Management Fee is reassessed on cases that continue beyond originally scheduled professional time.

## CANCELLATION/CONTINUANCE POLICY

| | *Cancellation/Continuance Period* | *Fee* |
| --- | --- | --- |
| 1 day or less | 14 days or more prior to session | 100% REFUNDABLE, except for time incurred |
| 2 days or more | 30 days or more prior to session | 100% REFUNDABLE, except for time incurred |
| Hearings of any length | Inside the cancellation/continuance period | NON-REFUNDABLE |

- Unused hearing time is non-refundable.
- Hearing fees are non-refundable if time scheduled (or a portion thereof) is cancelled or continued within the cancellation period unless the Arbitrator's time can be rescheduled with another matter. The cancellation policy exists because time reserved and later cancelled generally cannot be replaced. In all cases involving non-refundable time, the party causing the continuance or cancellation is responsible for the fees of all parties.
- A retainer for anticipated preparation and follow-up time will be billed to the parties. Any unused portion will be refunded.
- All fees are due and payable upon receipt of invoice and payment must be received in advance of hearing. JAMS reserves the right to cancel your hearing if fees are not paid by all parties by the applicable cancellation date and JAMS confirms the cancellation in writing.
- Receipt of payment for all fees is required prior to service of an arbitration award that the Arbitrator has rendered.
- For arbitrations arising out of employer-promulgated plans, the only fee that an employee may be required to pay is the $400 per party fee for a one-day case. The employer must bear the employee's share of any increased CMF. Any questions or disagreements about whether a matter arises out of an employer-promulgated plan or an individually negotiated agreement or contract will be determined by JAMS, whose determination shall be final.
- For arbitrations arising out of pre-dispute arbitration clauses between companies and individual consumers, JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses, Minimum Standards of Procedural Fairness applies. In those cases, when a consumer (as defined by those Minimum Standards) initiates arbitration against the company, the only fee required to be paid by the consumer is $250. All other fees must be paid by the company.

JAMS agreement to render services is with the attorney, the party and/or other representatives of the party.

THE GEORGE WASHINGTON UNIVERSITY LAW SCHOOL
WASHINGTON DC



**Jack Harlan Friedenthal**
Howrey Professor of Trial Advocacy,
Litigation, and Professional Responsibility

Email: jfried@law.gwu.edu
Telephone: (202) 994-6968
Fax: (202) 994-9811

**Education:** B.A., Stanford University; J.D., Harvard University

**Biographical sketch:** Professor Friedenthal joined the Law School in the summer of 1988 as dean and served in that capacity through June 1998. Prior to that he was the George E. Osborne Professor of Law at Stanford Law School, where he began his teaching career in 1958. He has taught courses in civil procedure, evidence, conflict of laws, trial advocacy, domestic relations, legal writing, law and poverty, and law for undergraduates.

He served as associate dean for academic affairs at Stanford from 1984 to 1987, and he was a visiting professor at Harvard Law School and at the University of Michigan Law School. Professor Friedenthal has been a special master in a number of major federal cases including disputes between the National Football League and the Football Players Association, and has frequently served as a consultant in both the public and private sectors on matters of court procedure, employment discrimination, legal assistance programs, and foreign conflicts of laws. He currently serves as a public member of the National Architectural Accreditation Board.

His publications include the widely used Civil Procedure, co-authored with Miller, Sexton and Hershkoff; Civil Procedure, with Kane and Miller; and Introduction to Evidence, with M. Singer. He has written numerous articles and book reviews on civil procedure and many other topics.

**Current Semester Courses:** Evidence

© 2005 The George Washington University Law School

*JACK H. FRIEDENTHAL*
*George Washington University Law School*
*720 20th Street, N.W.*
*Washington, D.C. 20052*
*(202) 994-6968*
*E-Mail: jfried@main.nlc.gwu.edu*

*Personal*

Birthdate: September 22, 1931

Home address: 1420 Lady Bird Drive
McLean, Virginia 22101

Home phone: (703) 556-9730

*Education*

A.B. Stanford University - 1953 - Great Distinction; Phi Beta Kappa
J.D. Harvard University - 1958 - Magna Cum Laude:
Harvard Law Review (Developments Editor)

*Bar Association Membership*

State of California, Federal District Court and Court of Appeals - Since 1959
District of Columbia, 1989

*Present and Previous Employment*

| | |
|---|---|
| Howrey Professor of Trial Advocacy, Litigation and Professional Responsibility The George Washington University Law School | 2004 - present |
| Freda H. Alverson Professor of Law The George Washington University Law School | 1998 - 2004 |
| Dean, The George Washington University Law School | 1988 - 1998 |
| George E. Osborne Professor of Law Stanford Law School, Stanford, CA | 1980 - 1988 (Emeritus since 1988) |
| Professor, Stanford Law School | 1964 - 1980 |
| Associate Professor, Stanford Law School | 1961 - 1964 |
| Assistant Professor, Stanford Law School | 1958 - 1961 |
| Visiting Professor, Harvard Law School | 1976 - 1977 |
| Visiting Professor, University of Michigan Law School, Ann Arbor, Michigan | Spring, 1965<br>Summer, 1971 |

Associate Dean for Academic Affairs
Stanford Law School 1984 - 1987

*Subjects Taught*

Civil Procedure, Evidence, Conflict of Laws, Trial Advocacy, Domestic Relations, Legal Writing, Law & Poverty, Law for Undergraduates.

*Judicial-type Activities*

Special Master for cases between the National Football League Management Council and the NFL Players regarding disputes as to their collective bargaining agreement, 1996 to 2002.

Member of the Infractions Committee of the National Collegiate Athletic Association, September 1992 to 2001 (Chair 1999 to 2001). (Served maximum term of nine years; currently "on-call" when needed to substitute for members who are unable to participate.) Current member of Special NCAA Committee on Enforcement Procedure and Chair of Subcommittee on Potential Use of Arbitration Methods in NCAA Rules Enforcement.

Special Consultant in a Federal District Court action brought by the citizens of Guam to redress the taking of their property during World War II and immediately thereafter. Appointed by the Honorable Robert Peckham, Chief Judge, U.S. District Court, Northern California, 1982 - 1984. The matter involved the methods of distribution and the entitlement of the citizens of Guam to special funds provided by Congress for the actions of the United States Navy.

Special Master in a civil antitrust litigation brought by the United States, appointed by The Honorable Stanley Weigel, U.S. District Court, Northern District, California, 1976 - 1978.

*Consultantships, Advisory Committees* (selected list)

Member of a special Ninth Circuit committee to study proposed alterations to the Federal Rules of Discovery, 1977 - 1978.

Member of a special subcommittee of the California State Bar to study the alteration of the Bar Examination regarding Code Pleading and Civil Procedure, 1970 - 1971.

Employment by attorneys in cases involving complex matters of civil procedure and evidence to prepare legal briefs and memoranda and to argue before the courts. (throughout career)

Public Member of the National Architectural Accreditation Board, 1992 - present. (This Board is entrusted with the job of accrediting schools of architecture in the United States in order that their graduates can become eligible to be licensed.)

## *PUBLICATIONS*

*Books*

Introduction to Evidence, with M. Singer, Foundation Press, 1985.

Civil Procedure, 4th Edition [text], with Kane & Miller, Thompson/West Publishing Company, 2005 (1st Edition, 1985).

Civil Procedure, 9th Edition, with Cound, Miller, Sexton & Hershkoff, Thompson/West Publishing Company, 2006 (1st Edition, 1968).

2007 Civil Procedure Supplement, with Cound, Miller, Sexton & Hershkoff, Thompson/West Publishing Company (26 prior editions).

Pleading, Joinder, Discovery, with Cound & Miller, West Publishing Company, 1968.

Civil Procedure: Quick Review Sum & Substance, 6th Edition, with Miller, Thompson /West Publishing Company, 2005.

*Articles* (selected list)

"The Value of an Initial Look at Counterintuitive Evidence Rules, 50 St. Louis Law Journal 1039 (2006) (with Daniel Shieh).

"Exploring Some Unexplored Practical Issues (of Civil Procedure), 47 St. Louis University Law Review 3 (2003).

"Judicial Discretion to Deny Summary Judgement in the Era of Managerial Judging," 31 Hofstra Law Review 91 (2002) (with Joshua Gardner).

"The Crack in the *Steel* Case," 68 George Washington Law Review 258 (2000).

"Secrecy in Civil litigation: Discovery and Party Agreements," 9 J of Law & Public Policy 67 (2000).

"Cases on Summary Judgment: Has There Been a Material Change in Standards," 63 Notre Dame Law Review 770 (1988).

"A Divided Supreme Court Adopts Discovery Amendments to the Federal Rules of Civil Procedure," 69 California Law Review 201 (1981).

"Herbert v. Lando: A Note on Discovery," 31 Stanford Law Review 1059 (1979).
"Discovery and Use of an Adverse Party's Expert Information," 14 Stanford Law Review 445 (1962); also 8 Trial Lawyer's Guide 56 (1964).

THE RESOLUTION EXPERTS



**Hon. Curtis E. von Kann (Ret.)**

**Government/Public Agency Dispute Resolution Experience**

Judge von Kann is Chair of the JAMS Government Dispute Resolution Group and has served as a mediator, neutral case evaluator, special master, arbitrator, adjudicator and hearing officer in a wide variety of cases involving state or federal government agencies. In addition, a broad range of tort, contract, commercial and administrative cases have provided him with extensive experience in dealing with the kinds of claims, defenses, discovery issues, evidentiary issues, tactical considerations and trial management issues which often arise in governmental as well as private litigation. He is frequently quoted in the Wall Street Journal and other national media concerning government dispute resolution issues.

**Representative Matters**

- **Class Actions.** Adjudication of hundreds of compensation claims filed by African-American farmers against the U.S. Department of Agriculture pursuant to a class action consent decree.
- **Congressional Compliance.** Hearing Officer in Office of Compliance cases brought against Members of Congress and others pursuant to the Congressional Accountability Act of 1995.
- **Enforcement Actions.** Mediation of claims brought by the U.S. Drug Enforcement Administration against a major pharmaceutical supplier under the Controlled Substances Act.
- **Environmental.** Mediation of cost recovery and allocation actions brought by the U.S. Environmental Protection Agency and state environmental agencies.
- **False Claims Act.** Mediation of False Claims Act litigation between the U.S. Department of Justice and various healthcare providers and government contractors.
- **Federal Grants.** Special Master to the Deputy Attorney General of the United States in resolution of disputes concerning an $8 billion federal grant program.
- **Government Contractors.** Co-mediation in Puerto Rico (with a Spanish-speaking mediator) of competing contractor claims for reimbursement by the Federal Emergency Management Agency of hurricane cleanup costs.
- **Hazardous Waste.** Hearing Officer in the hearing of compensation claims among the seven states comprising the Southeast Low-Level Radioactive Waste Compact.
- **Healthcare.** Mediation and neutral case evaluation of complex claims and counterclaims between the Health Care Financing Administration and private insurers under the Medicare As Secondary Payer Act.
- **Intellectual Property.** Appointed by Librarian of Congress to arbitration panel to set copyright royalty rates for use of recorded music by Internet webcasters.

**Honors, Memberships, and Professional Activities**

- Member, JAMS National Arbitration Committee, 2002-present
- College of Commercial Arbitrators, 2002-present (Board Member, Editor-in-Chief of College's *Guide to Best Practices for Commercial Arbitrators*)
- Member, Chartered Institute of Arbitrators, London, 2002-present
- National Board of Trustees, American Inns of Court Foundation, 1996-2000
- Independent Counsel of the United States, 1996-1998
- Distinguished Neutral, CPR Institute for Dispute Resolution, 1996-1997
- President, Harvard Law School Association of Washington, DC, 1975-1976

**Background and Education**

- Chair, ADR Department of Ross, Dixon & Masback, 1995-1997
- Judge, District of Columbia Superior Court, 1985-1995
- Civil Litigator, Hogan & Hartson (partner) and other law firms, 1969-1985
- J.D., Harvard Law School, 1969
- B.A., *cum laude*, Harvard College, 1964

**References Available Upon Request**

555 13th Street, NW • Suite 400 West • Washington, DC 20004 • Tel 202-942-9180 • Fax 202-942-9186 • www.jamsadr.com

JAMS
THE RESOLUTION EXPERTS

# Arbitration Fee Schedule

*Hon. Curtis Emery von Kann (Ret.)*

## PROFESSIONAL FEES

**$550 per hour**

*Weekends and holidays are subject to additional charges.*

## NON-REFUNDABLE CASE MANAGEMENT FEE

| *One day is defined as 10 hours of professional time* | *Fee* |
|---|---|
| **1-3 days** | $400 per party, per day |
| **Time in excess of initial 30 hours** | 10% of professional fees |

- Professional fees include time spent for hearings and pre- and post-hearing reading and research, and award preparation.
- The Case Management Fee includes access to an exclusive nationwide panel of judges, attorneys, and other ADR experts, dedicated services including all administration through the duration of the case, document handling, and use of JAMS conference facilities including after hours and on-site business support.
- The Case Management Fee is reassessed on cases that continue beyond originally scheduled professional time.

## CANCELLATION/CONTINUANCE POLICY

| | *Cancellation/Continuance Period* | *Fee* |
|---|---|---|
| 1 day or less | 30 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| 2 days or more | 60 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| Hearings of any length | Inside the cancellation/continuance period | NON-REFUNDABLE |

- Unused hearing time is non-refundable.
- Hearing fees are non-refundable if time scheduled (or a portion thereof) is cancelled or continued within the cancellation period unless the Arbitrator's time can be rescheduled with another matter. The cancellation policy exists because time reserved and later cancelled generally cannot be replaced. In all cases involving non-refundable time, the party causing the continuance or cancellation is responsible for the fees of all parties.
- A retainer for anticipated preparation and follow-up time will be billed to the parties. Any unused portion will be refunded.
- All fees are due and payable upon receipt of invoice and payment must be received in advance of hearing. JAMS reserves the right to cancel your hearing if fees are not paid by all parties by the applicable cancellation date and JAMS confirms the cancellation in writing.
- Receipt of payment for all fees is required prior to service of an arbitration award that the Arbitrator has rendered.
- For arbitrations arising out of employer-promulgated plans, the only fee that an employee may be required to pay is the $400 per party fee for a one-day case. The employer must bear the employee's share of any increased CMF. Any questions or disagreements about whether a matter arises out of an employer-promulgated plan or an individually negotiated agreement or contract will be determined by JAMS, whose determination shall be final.
- For arbitrations arising out of pre-dispute arbitration clauses between companies and individual consumers, JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses, Minimum Standards of Procedural Fairness applies. In those cases, when a consumer (as defined by those Minimum Standards) initiates arbitration against the company, the only fee required to be paid by the consumer is $250. All other fees must be paid by the company.

JAMS agreement to render services is with the attorney, the party and/or other representatives of the party.

THE GEORGE WASHINGTON UNIVERSITY LAW SCHOOL
WASHINGTON DC



**Roger H. Trangsrud**
James F. Humphreys Professor of Complex Litigation and Civil Procedure

Email: rtrang@law.gwu.edu
Telephone: (202) 994-6182
Fax: (202) 994-1117

**Education:** B.A., Carleton College; J.D., University of Chicago

**Biographical sketch:** After serving on the University of Chicago Law Review, Professor Trangsrud clerked for Justice Walter Rogosheske of the Minnesota Supreme Court and practiced law with the D.C. firm of Hogan & Hartson. In 1982, he joined the faculty of the Law School, where he has taught civil procedure, federal jurisdiction, remedies, and complex litigation. His writings are primarily in the fields of complex litigation and jurisdiction.

He was appointed associate dean for academic affairs in 1993, and senior associate dean for academic affairs in 2000; he served in that position until 2006 with the exception of one year as Interim Dean of the Law School in 2004–05. Recently, he co-authored a new casebook, Complex Litigation and the Adversary System, and a treatise on Complex Litigation: Problems in Advanced Civil Procedure.

**Current Semester Courses:** Civil Procedure I , Complex Litigation

© 2005 The George Washington University Law School

**ROGER H. TRANGSRUD**

James F. Humphreys Professor of Complex Litigation and Civil Procedure
George Washington University Law School
2000 H. St., N.W.
Washington, D.C. 20052
(202) 994-6182
rtrang@law.gwu.edu
[fax] (202) 994-1117

## PROFESSIONAL EXPERIENCE

James F. Humphreys Professor of Complex Litigation and Civil Procedure (August 2006 - present)

Senior Associate Dean for Academic Affairs and Oswald Symister Colclough Research Professor of Law, George Washington University Law School (2000- 2004 and August 2005 - August 2006)

Interim Dean and Oswald Symister Colclough Research Professor of Law, George Washington University Law School (June 2004 - July 2005)

Associate Dean for Academic Affairs, George Washington University Law School (1993 - 2000) (on leave 1996-97)

Professor of Law, George Washington University Law School (1989-present)

Associate Professor of Law, George Washington University Law School (1982-89)

Of Counsel, Ross, Dixon & Masback, Washington, D.C. (1989)

Associate, Hogan & Hartson, Washington, D.C. (1976-82)

Law Clerk, Justice Walter Rogosheske, Minnesota Supreme Court (1975-76)

**EDUCATION**

J.D. (1975) University of Chicago Law School ... Member, University of Chicago Law Review ... Joseph Henry Beale Prize for Excellence in Legal Writing and Oral Advocacy

B.A. (1972) Carleton College ... Magna Cum Laude ... Phi Beta Kappa ... Newberry Library Scholar in the Humanities

**PUBLICATIONS**

Joinder Alternatives in Mass Tort Litigation, 70 Cornell L. Rev. 779-849 (1985)

The Federal Common Law of Personal Jurisdiction, 57 Geo. Wash. L. Rev. 849-906 (1989)

Mass Trials in Mass Tort Cases: A Dissent, 1989 Univ. of Ill. L. Rev. 69-88 (1989)

COMPLEX LITIGATION AND THE ADVERSARY SYSTEM (Foundation Press 1998) [Casebook co-authored with Professor Jay Tidmarsh]

COMPLEX LITIGATION AND THE ADVERSARY SYSTEM - Teacher's Manual (Foundation Press 1999) [co-authored with Professor Jay Tidmarsh]

1999 SUPPLEMENT TO COMPLEX LITIGATION AND THE ADVERSARY SYSTEM (Foundation Press 1999) [co-authored with Professor Jay Tidmarsh]

2000 SUPPLEMENT TO COMPLEX LITIGATION AND THE ADVERSARY SYSTEM (Foundation Press 2000-forthcoming)[co-authored with Professor Tidmarsh]

Federalism and Mass Tort Litigation, 148 U. Penn. L. Rev. 2263 (2000)

COMPLEX LITIGATION: PROBLEMS IN ADVANCED CIVIL PROCEDURE (Foundation Press 2002) (Treatise on complex litigation co-authored with Professor Tidmarsh)

The Adversary System and Modern Class Action Practice. __ Geo. Wash. L. Rev. __ (2007) (forthcoming)

## ACADEMIC PRESENTATIONS AND PAPERS

"Federalism and Mass Tort Litigation" at a Symposium at the University of Pennsylvania Law School re the Manual on Complex Litigation (1999)

"Problems in Modern MDL Practice" at a Symposium at the University of Pennsylvania Law School re the Proposed Third Edition of the Manual on Complex Litigation (1994)

"Mass Torts and the Bankruptcy Process" - David Berger Symposium at the University of Pennsylvania Law School (1992)

"Some Unaddressed Problems in Mass Tort Litigation" at a Seminar in Philadelphia sponsored by Andrews Publications (1992)

"Trade Secrets and American Civil Discovery" included in larger publication by Professor Kitagawa of Kyoto University

"Aggregate v. Individual Treatment of Factually Related Claims" at AALS Civil Procedure Section Meeting (1988)

"Civil Procedure in the Law School Curriculum" at the AALS Workshop for Civil Procedure Teachers at the University of Virginia (1988)

"Voir Dire by Attorneys in Federal Court" at Federal Practice Committee/ABA Meeting (1985)

Lecturer on Civil Procedure for the SMH Bar Review (1984-85)

## COURSES TAUGHT

Civil Procedure I and II, Federal Jurisdiction, Complex Litigation, Remedies

## OTHER PROFESSIONAL AND COMMUNITY ACTIVITIES

Mediator, Appellate Mediation Program, United States Court of Appeals for the District of Columbia Circuit (1989 - 2003)

Commercial Arbitrator on numerous occasions in American Arbitrator Association proceedings (1996 - present)

Expert Witness or Consultant in State and Federal Class Actions involving CNA Insurance, American Honda Finance Corporation, Honda North American Motors, Exxon, Georgia Pacific, Cortaulds Fibers, Inc., Winn-Dixie, St. Jude Medical, the Dallas Mavericks, and BaxterHealthcare

Founding Member of the AALS Civil Procedure Sub-committee on Complex Litigation (1990)

American Bar Association (Litigation Section) (1976 - present)

Vice President, Church Council, Redeemer Lutheran Church, McLean, Virginia (1990-1992); Chair, Trust & Endowment Committee (1993-94)

# Attachment B

Greenberg Traurig

Kevin E. Stern
Tel. 202.452.4878
Fax 202.261.0107
sternk@gtlaw.com

August 28, 2007

***VIA FACSIMILE AND FIRST CLASS MAIL***

Russell A. Shultis
Department of Justice
Commercial Litigation Branch
Civil Division – Classification Unit
8th Floor Mailroom
1100 L Street, NW
Washington, D.C. 20530

Re: *Dairyland Power Cooperative v. United States,* No. 04-106C

Dear Russ:

I am writing in regards to the part of the Court's September 21, 2007 Order concerning the appointment of a special master to handle the parties' discovery disputes. In light of the parties' goal to submit the names of five proposed special masters by next Friday, October 5, we would like to schedule a meet and confer session on Tuesday, October 2, to exchange lists of proposed names and discuss each candidate. Please let us know your availability on this day as soon as possible.

Sincerely,

Kevin E. Stern

cc: Alan J. Lo Re
Harold J. Lester, Jr.
Joshua E. Gardner

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH
*Strategic Alliance
Tokyo-Office/Strategic Alliance

www.gtlaw.com

# Attachment C

Greenberg Traurig

Kevin E. Stern
Tel. 202.452.4878
Fax 202.261.0107
sternk@gtlaw.com

October 5, 2007

***VIA FACSIMILE AND FIRST CLASS MAIL***

Harold J. Lester, Jr.
Department of Justice
Commercial Litigation Branch
Civil Division – Classification Unit
8th Floor Mailroom
1100 L Street, NW
Washington, D.C. 20530

Re: *Dairyland Power Cooperative v. United States,* No. 04-106C

Dear Harv:

I am writing as a follow up to our conversation this afternoon regarding the parties' obligation, pursuant to the Court's September 21, 2007 order, to submit jointly a list of five proposed special masters to handle discovery matters in this case. As you know, the Court's order "strongly encourage(d)" the parties to submit this list by today, October 5, and requires the parties to submit their list by no later than October 15. On September 26, 2007, I sent a letter to you, Alan Lo Re, Russ Shultis and Josh Gardner proposing that the parties exchange names of proposed special masters on October 2 so the parties could meet the Court's directive. The government did not respond to this letter. When I called you today to discuss scheduling a time next week for the parties to exchange names, you refused to commit to a meet and confer session, said that that the government did not have any special master names to propose, and told me that the government was still trying to decide whether it was going to oppose the Court's authority to appoint a special master.

We are disappointed with the government's failure to honor the Court's directive to make special master recommendations by today and frustrated with its unwillingness to cooperate with Dairyland in the special master selection process. We have developed a list of suggested special masters and are prepared to share it with the government as soon as you are prepared to exchange lists. However, we are not inclined to give you our list when the government hasn't decided if it will cooperate in the process and has developed no list of its own and, thus, may be inclined to merely disagree with each of the individuals on our list. If the government can assure us that it will not oppose the Court's authority to appoint a special master (including the equal splitting of the special master's fees) and it has no names

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH
*Strategic Alliance
Tokyo-Office/Strategic Alliance

to propose of its own, then we are willing to share our list with you without a corresponding list from the government.

Please feel free to contact me if you wish to discuss this further.

Sincerely,

Kevin E. Stern

cc: Alan J. Lo Re
Russell A. Shultis

# Attachment D

**U.S. Department of Justice**

Civil Division

PDK:JED:HDL
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

Telephone: (202) 616-0478
Facsimile: (202) 307-2503

*Washington, D.C. 20530*

October 8, 2007

VIA TELECOPY AND FIRST CLASS MAIL

Robert L. Shapiro
Kevin E. Stern
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

Re: *Dairyland Power Cooperative v. United States*, No. 04-0106C (Fed. Cl.)

Dear Messrs. Shapiro and Stern:

This letter is in response to the letter that was faxed to us on September 26, 2007, regarding the Court's appointment of a special master,[1] Mr. Stern's additional letter dated October 5, 2007, and your telephone inquiry earlier today. In your letters, you request that we expedite this issue and schedule a "meet and confer" session to exchange lists of potential special masters, but represent that, despite our verbal request for them, you will not identify any proposed special masters for our consideration until we provide you with our list of proposed special masters.

As you knew even before our hearing before the Court of Federal Claims on September 21, 2007, the Government is opposed to the appointment of a special master in this individual case. We also object to any imposition of costs upon the Government to hire a special master for this single case. Further, because of the extremely unusual nature of the Court's suggestion, we must discuss this issue thoroughly with higher levels in the Department of Justice before we can engage in the type of effort that you envision. Accordingly, we have not been in any position to

[1] Your letter was mistakenly dated August 28, 2007. We presume that you intended to date it "September 26, 2007."

exchange lists of possible special masters with you, but we are working to satisfy the Court's ordered deadline of October 15, 2007.[2]

Although we expect to continue our opposition to the appointment of a special master here, we anticipate that we will suggest to the Court that, to the extent that it overrules our objections, it should consider the appointment of either a current or retired Board of Contract Appeals judge. We are attempting to work to develop the type of list that the Court anticipates and will provide it to you when we have developed it.

We understand from your letters that you have already identified the five names that you wish to propose to the judge, but that you do not want to share those names with us. In that event, it will, of course, be impossible for us to share those names with our superiors within the Department of Justice and obtain guidance regarding the manner in which to respond to those names. We hope that you will reconsider your position and allow us to discuss those individuals' names with our superiors. If you will not, we anticipate that the parties will have to share their separate lists of potential special masters with the Court in this case.

Very Truly Yours,

HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch

---

[2] Your characterizations in your October 5, 2007 letter of the Government's conduct as a "failure to honor the Court's directive" and our "unwillingness to cooperate with Dairyland" are inappropriate. As explained above, the issue here is not a routine matter, such as taking a position on a request for an enlargement of time or attempting to schedule a deposition. As you are well aware from counsel for Dairyland's own involvement in the Winstar cases, the Government pursued action from the United States Court of Appeals for the Federal Circuit when a Court of Federal Claims judge appointed a special master in a Winstar case. It seems surprising that you would not anticipate that the appointment of another special master, here in a single case, would require significant discussion within the Department of Justice about the most appropriate manner in which to respond.

# Attachment E

Greenberg Traurig

Kevin E. Stern
Tel. 202.452.4878
Fax 202.261.0107
sternk@gtlaw.com

October 11, 2007

*VIA FACSIMILE AND FIRST CLASS MAIL*

Harold J. Lester, Jr.
Department of Justice
Commercial Litigation Branch
Civil Division – Classification Unit
8th Floor Mailroom
1100 L Street, NW
Washington, D.C. 20530

Re: *Dairyland Power Cooperative v. United States,* No. 04-106C

Dear Harv:

I am writing in response to your October 9 letter[1] setting forth the government's current position on the Court's appointment of a special master. Your assertion that the government has consistently made it known that it opposes the appointment of a special master in this case is not supported by the record. I invite you to read the transcript from the September 21, 2007 hearing where government counsel merely raised the government's cost concerns and stated the government's preference that the special master's rulings in this case be applied "across the board" to other spent fuel cases in a coordinated discovery fashion. *See* Sept. 21, 2007 Tr. at 18-19.

In any event, Chief Judge Damich obviously heard the government's points raised at the hearing and still decided to order the parties to submit a joint list of proposed special masters for appointment in this particular case. Thus, regardless of the government's current position, if the government continues to refuse to cooperate with Dairyland in the selection process, then it is simply defying the Court's order.

Because your letter now states an intent to share with us a list of potential special masters, we have decided to provide you with our list in an attempt to see if any of these persons would be acceptable to the government. As you will see, our proposed special masters are either retired judges or current law professors, most of which have experience serving as special masters. We have spoken with each of these individuals or their representatives and they have all confirmed their willingness and availability to serve as a

[1] Your letter was mistakenly dated October 8, 2007.

WDC 371512566v1 10/11/2007



ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH
*Strategic Alliance
Tokyo-Office/Strategic Alliance
www.gtlaw.com

special master. In addition to our list, I have enclosed biographical information and/or a resume for each candidate. Please let us know as promptly as possible whether any of these persons are acceptable. Of course, if you have any questions about any of our proposed candidates, please do not hesitate to contact us.

Finally, in your October 9 letter you state that the government is contemplating suggesting to the Court that it appoint a current or retired Board of Contract Appeals judge as a special master. Although we will certainly consider whatever individuals you ultimately propose, we are concerned that current and former BCA judges may not be particularly well-suited for this role. It is not clear to us that BCA judges typically deal with the privilege and discovery issues that the special master will be called upon to address in our case. In addition, current BCA judges are unlikely to be able to devote sufficient time to the task in the short term given their other responsibilities. Further, as Executive Branch employees, current BCA judges do not have the same degree of appearance of impartiality as other potential special masters.

Sincerely,

Kevin E. Stern

Enclosures

cc: Alan J. Lo Re
Russell A. Shultis

# Attachment F

STATEMENT OF MICHAEL F. HERTZ
DEPUTY ASSISTANT ATTORNEY GENERAL, CIVIL DIVISION
U.S DEPARTMENT OF JUSTICE
BEFORE THE HOUSE BUDGET COMMITTEE
OCTOBER 4, 2007

Mr. Chairman, and members of the Committee, I am Michael F. Hertz, and I am a Deputy Assistant Attorney General of the Department of Justice, Civil Division. I am pleased to testify today regarding the status of litigation concerning the Department of Energy's obligations under the Nuclear Waste Policy Act ("NWPA") of 1982.

Let me note at the outset that much of the litigation about which you have asked the Department of Justice to provide testimony is still pending in the Federal courts. As a result, the Department's pending matter policy applies to any discussion of those cases. Pursuant to that policy, I will be happy to discuss matters that are in the public record.

Background

In 1983, pursuant to the NWPA, the Department of Energy ("DOE") entered into 76 standard contracts with entities, mostly commercial utilities, that were producing nuclear power. Through the standard contracts, DOE agreed that by January 31, 1998, it would begin accepting spent nuclear fuel and high-level radioactive waste (collectively, "SNF") created by the utilities. In return, the utilities agreed to make quarterly payments into the Nuclear Waste Fund ("NWF")

created by the statute. The utilities began making payments into the NWF in 1983.

In 1987, Congress designated Yucca Mountain in Nevada as the sole site for a Federal repository for disposal of the SNF. DOE has been unable to begin construction of the federal repository, however, and anticipates that it will be unable to begin SNF acceptance until at least 2017.

In May 1995, DOE published a notice in the Federal Register advising the utilities that held standard contracts and others that DOE would be unable to begin acceptance of SNF on January 31, 1998. The notice also explained that DOE's acceptance beginning on that date was conditioned upon the existence of an operational repository. 60 Fed. Reg. 21793 (May 3, 1995).

In response to this notice, several nuclear utilities filed suit in the United States Court of Appeals for the District of Columbia challenging DOE's understanding. The District of Columbia Circuit held that DOE was required to begin SNF acceptance in some type of facility by January 31, 1998. See Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1277 (D.C. Cir. 1996). After DOE continued to inform utilities that it would be unable to begin accepting SNF by January 31, 1998, the utilities again sued and requested an order directing that DOE perform under the Standard Contract. The District of Columbia Circuit denied the utilities' request and instead found that the utilities' remedy

could be addressed through breach of contract claims. Northern States Power Co. v. United States, 128 F.3d 754, 759 (D.C. Cir. 1997), cert. denied, 525 U.S. 1015 & 1016 (1998). The court did, however, issue an order that barred DOE from asserting that its delays in performing the standard contract were "unavoidable," and, therefore, excused pursuant to the "unavoidable delays" provision of the standard contracts.

Status Of Court Of Federal Claims Litigation

To date, utility companies have filed 67 cases in the United States Court of Federal Claims, alleging that DOE's delay in beginning SNF acceptance constituted a breach of contract. The Court of Appeals for the Federal Circuit, in Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000), has ruled that the delay constitutes such a breach.

The utilities' damages claims largely are for the costs incurred to store SNF that they allege DOE would have accepted from them absent the breach. Specifically, storage costs that utilities allege they would not have expended had DOE begun timely performance under the Standard Contract. In addition, several utilities have alleged damages arising from the "diminution-in-value" of their plants

as the result of DOE's delay, claiming that they realized these damages when they sold their plants to other utilities as part of the sale.

Utility industry reports estimate that the claims will total about $50 billion, which far exceeds the amount the utilities have paid into the NWF pursuant to the Standard Contract. DOE's most recent estimate of potential liability is $7 billion, based upon a projected start date of 2017. These estimates do not fully take into account the Government's defenses or the possibility that plaintiffs will be able to prove the full extent of their claims.

In the first case to proceed to trial on the merits in March 2004, the trial court found that the utility had not incurred any damages as a result of the partial breach of contract through the date of trial and denied any monetary recovery, although it ruled that the utility may return to court if and when it incurs damage because of the delay in spent fuel acceptance. Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004). In affirming this ruling on appeal, the appellate court held that all claims for breach of the standard contracts may only be through the date of the complaint and that utilities must file new complaints with the trial court seeking damages as they are incurred. Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005).

As a result of this ruling, utilities must file new cases with the trial court at least every six years to recover any costs incurred as the result of DOE's delay, and we will continue to litigate these claims until after DOE begins performance of the standard contracts. We recently received our first new complaint implementing this ruling, filed by Northern States Power Company, which was filed shortly before the trial court issued a decision on the first claim filed by Northern States in 1998.

Of the 67 lawsuits filed, 56 cases remain pending either in the Court of Federal Claims or in the Court of Appeals for the Federal Circuit, seven have settled, two were voluntarily withdrawn, and only two have been litigated through final unappealable judgment.

While asserting legitimate defenses to plaintiffs' claims in litigation, we also have made concerted efforts to settle claims. The settlements resolving seven of the cases involve four companies: Exelon Generation, LLC, South Carolina Electric & Gas Company, Omaha Public Power District and Duke Power Company. These settlements provide for the periodic submission of claims to the contracting officer for costs incurred since the date of the last submission. In total, the Government has paid $290 million pursuant to these settlements and one trial court judgment that was not appealed.

Of those 56 pending cases, the trial court has entered judgment in eight, and so far six of those have been appealed. The past damages awarded in these eight judgments total approximately $420 million, with the trial court holding that the plaintiffs could return to court after they had incurred additional damages as a result of DOE's delay. Between judgments and settlements, the Government's liability currently stands at $710 million. This reflects costs claimed by utilities from 1998 through 2004 for the nine judgments, and through 2006 for the seven settlements.

The following chart summarizes the status of the 67 cases that have been filed:

| Number of cases | Status/Comments |
|---|---|
| 2 | Voluntarily withdrawn |
| 7 | Settled (settlements cover 1998 through 2006) |
| 2 | Final unappealable judgments (judgments cover 1998 through 2004) |
| 6 | Final judgments on appeal (judgments cover 1998 through 2004) |
| 2 | Final judgments/time to appeal has not yet run (judgments cover 1998 through 2004) |
| 48 | Pending/no judgment (includes new complaint filed August 2007) |
| 67 | Total |

Significant Issues On Appeal

There are two major issues that should be decided in the pending appeals which will have a significant effect upon the Government's continuing liability in these cases. The first issue concerns the Government's ability to present a defense based upon the "unavoidable delays" clause in the contracts. As noted, the District of Columbia Circuit, in Northern States, mandated that the Government could not rely upon such a defense in its litigation of delay claims arising from its breach. One of the trial court judges at the Court of Federal Claims found the District of Columbia Circuit's writ of mandamus to be void and that DOE is entitled to raise the "unavoidable delays" defense. Nebraska Public Power District v. United States, 73 Fed. Cl. 650 (2006). That ruling is on appeal to the Federal Circuit and, if affirmed, the Government may be able to pursue an absolute defense to the utilities' damages claims.

The second major issue to be decided in the cases on appeal is the scope of the Government's obligation to utilities regarding the amount of SNF to be accepted. The utilities' claims are uniformly premised upon arguments that DOE was contractually obligated to accept much larger amounts of SNF on an annual basis than the Government believes that obligation to be. This issue is squarely presented in several of the pending appeals and, depending upon how the appellate

court decides the issue, will significantly inform the size of the damages awards that utilities receive in these cases.

Payment Of Judgments And Settlements

To date, all payments to the utilities have come from the Judgment Fund. In Alabama Power Co. v. United States Department of Energy, 307 F.3d 1300 (11th Cir. 2002), the Court of Appeals for the Eleventh Circuit ruled that the Government could not use the NWF to pay for any of the damages that the utilities incur as a result of DOE's delay. The only other available funding source that has been identified to date is the Judgment Fund. We are also unaware of any statutory requirement that DOE be required to reimburse the Judgment Fund for judgments paid, unlike other statutory schemes that govern the adjudication of contract and other monetary disputes with the Government.

Litigation Costs

The costs to the Government to litigate these cases are significant. The Department of Justice has expended approximately $17 million in attorney costs, $55 million in expert funds and $22 million in litigation support costs in defense of these suits. These costs represent nearly a third of the expenditures since 1998, for the component within the Civil Division responsible for litigating these suits. In addition, DOE and the Nuclear Regulatory Commission have expended many

manhours to support this effort. Given that these cases will continue to be filed and litigated into the foreseeable future, these costs will continue to be incurred.

Although these cases are similar in dollar amount to other cases defended by the Commercial Litigation Branch of the Department of Justice, these cases are distinct in two key aspects. First, the standardized contract at issue requires the Government to provide the services at issue and the utilities pay the costs for those services, rather than the reverse. Second, the Government will continue to incur liability for its inability to perform these contracts until after DOE begins to accept SNF waste – either at Yucca Mountain or some other facility – in amounts that DOE would have accepted if performance had begun in January 1998.

In summary, the SNF litigation has already cost the Government significant sums in terms of liability and litigation costs and will most likely continue to do so into the foreseeable future.

**Attachment G**

UNITED STATES ATTORNEY'S OFFICE
FOR THE DISTRICT OF COLUMBIA

555 4TH STREET, NW
WASHINGTON, DC 20530
(202) 514-7566



## LAFFEY MATRIX 2003-2008

| Experience | 03-04 | 04-05 | 05-06 | 06-07 | 07-08 |
|---|---|---|---|---|---|
| 20+ years | 380 | 390 | 405 | 425 | 440 |
| 11-19 years | 335 | 345 | 360 | 375 | 390 |
| 8-10 years | 270 | 280 | 290 | 305 | 315 |
| 4-7 years | 220 | 225 | 235 | 245 | 255 |
| 1-3 years | 180 | 185 | 195 | 205 | 215 |
| Paralegals & Law Clerks | 105 | 110 | 115 | 120 | 125 |

Years (Rate for June 1 - May 31, based on prior year's CPI-U)

**Explanatory Notes**

1. This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia. The matrix is intended to be used in cases in which a "fee-shifting" statute permits the prevailing party to recover "reasonable" attorney's fees. *See, e.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412 (b) (Equal Access to Justice Act). The matrix does not apply in cases in which the hourly rate is limited by statute. See 28 U.S.C. § 2412(d).

2. This matrix is based on the hourly rates allowed by the District Court in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021 (1985). It is commonly referred to by attorneys and federal judges in the District of Columbia as the "Laffey Matrix" or the "United States Attorney's Office Matrix." The column headed "Experience" refers to the years following the attorney's graduation from law school. The various "brackets" are intended to correspond to "junior associates" (1-3 years after law school graduation), "senior associates" (4-7 years), "experienced federal court litigators" (8-10 and 11-19 years), and "very experienced federal

SITE MAP

court litigators" (20 years or more). *See Laffey*, 572 F. Supp. at 371.

3. The hourly rates approved by the District Court in *Laffey* were for work done principally in 1981-82. The Matrix begins with those rates. *See Laffey*, 572 F. Supp. at 371 (attorney rates) & 386 n.74 (paralegal and law clerk rate). The rates for subsequent yearly periods were determined by adding the change in the cost of living for the Washington, D.C. area to the applicable rate for the prior year, and then rounding to the nearest multiple of $5 (up if within $3 of the next multiple of $5). The result is subject to adjustment if appropriate to ensure that the relationship between the highest rate and the lower rates remains reasonably constant. Changes in the cost of living are measured by the Consumer Price Index for All Urban Consumers (CPI-U) for Washington-Baltimore, DC-MD-VA-WV, as announced by the Bureau of Labor Statistics for May of each year.

4. Use of an updated *Laffey* Matrix was implicitly endorsed by the Court of Appeals in *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc). The Court of Appeals subsequently stated that parties may rely on the updated *Laffey* Matrix prepared by the United States Attorney's Office as evidence of prevailing market rates for litigation counsel in the Washington, D.C. area. See *Covington v. District of Columbia*, 57 F.3d 1101, 1105 & n. 14, 1109 (D.C. Cir. 1995), *cert. denied*, 516 U.S. 1115 (1996). Lower federal courts in the District of Columbia have used this updated *Laffey* Matrix when determining whether fee awards under fee-shifting statutes are reasonable. *See, e.g.*, *Blackman v. District of Columbia*, 59 F. Supp. 2d 37, 43 (D.D.C. 1999); *Jefferson v. Milvets System Technology, Inc.*, 986 F. Supp. 6, 11 (D.D.C. 1997); *Ralph Hoar & Associates v. Nat'l Highway Transportation Safety Admin.*, 985 F. Supp. 1, 9-10 n.3 (D.D.C. 1997); *Martini v. Fed. Nat'l Mtg Ass'n*, 977 F. Supp. 482, 485 n.2 (D.D.C. 1997); *Park v. Howard University*, 881 F. Supp. 653, 654 (D.D.C. 1995).

**Last Updated on 07/06/2007**