# APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE,<br><br>Plaintiff,<br><br>v.<br>UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-0106C<br>(Chief Judge Damich) |

DECLARATION OF ALAN B. BROWNSTEIN

ALAN B. BROWNSTEIN declares as follows:

1. I am the Chief Operating Officer for the Office of Civilian Radioactive Waste Management ("OCRWM"), Department of Energy ("DOE" or "Department"). As Chief Operating Officer, I report directly to the Principal Deputy Director of OCRWM. I am involved with and familiar with all aspects of DOE's civilian radioactive waste management program, and I regularly provide advice and analysis on policy, business management, and technical issues related to the overall mission of OCRWM to program offices and other Federal departments and agencies.

2. OCRWM was established in 1983, following passage of the Nuclear Waste Policy Act, 42 U.S.C. § 10224 ("NWPA"), to carry out the functions of the Secretary of Energy pursuant to the NWPA. OCRWM currently employs approximately 185 federal employees, and also oversees the activities of over 2,000 contractor employees.

3. I have worked for OCRWM continuously since 1985, when I joined DOE. I have served as OCRWM's Chief Operating Officer since May 2006, and immediately prior to obtaining my current position, I served as the Senior Policy Advisor to the Office of the

Director. Other positions I have held during my tenure at DOE include Director of the Regulatory Coordination Division and Director of the Waste Acceptance Division.

4. In connection with my responsibilities as Chief Operating Officer for OCRWM and my prior positions within OCRWM since 1985, I am generally familiar with the spent nuclear fuel ("SNF") litigation brought by various plaintiffs against the United States government, and I am able to determine whether the Department should assert deliberative process privilege over certain issues that are the subject of documents or deposition testimony.

5. During my tenure at DOE, OCRWM's plans for siting a facility for the disposal of SNF have been the subject of significant interest to many different parties – Congress, other Executive Branch agencies, the DOE Inspector General's office, states, commercial nuclear utilities with which we hold Standard Contracts, and others. As part of this interest, DOE policy makers and OCRWM personnel are often called to explain decisions and actions taken by the Department in its implementation of the NWPA. OCRWM's plans, decisions, and actions also have been the subject of numerous lawsuits. In addition to the suits pending before the Court of Federal Claims, the State of Nevada and others have filed suits seeking review of actions taken to site, build, and operate a nuclear waste repository. In the upcoming license application proceeding before the Nuclear Regulatory Commission ("NRC"), OCRWM will have to defend its plans for the design and operation of the repository, with an expected review of all the studies and analyses that DOE has undertaken to date. While subject to this attention, OCRWM personnel are trying to fulfill their mission, which is to site, build, and operate a facility at which the Department can accept SNF from Standard Contract holders and the DOE complex, including Naval Reactors, for permanent disposal.

6. Most OCRWM personnel also are aware of the litigation brought by Standard Contract holders in the United States Court of Federal Claims and the effect it has had on OCRWM's ability to

continue working toward filing a license application for a permanent SNF repository. All OCRWM and contractor personnel have been asked on numerous occasions to search for and collect documents in response to discovery requests from plaintiffs in these cases. In addition, numerous DOE and contractor personnel have been deposed, often over several days, about their involvement in and knowledge of the program and decisions that have been made. For example, I was deposed for five days in 2002. Two OCRWM employees, Mr. Pollog and Mr. Zabransky, have spent more than 30 days in depositions in this litigation, rather than working on critical assignments relating to waste acceptance at DOE's planned repository, Yucca Mountain, Nevada.

7. As a result of this continued scrutiny, I believe that individuals in OCRWM are becoming more reticent to provide recommendations or opinions about courses of action that may become the subject of questioning by Congress, the Government Accountability Office, the DOE Inspector General, or in the SNF litigation. While employees are required to generate or provide review of documents necessary to the program, I also believe that employees will become increasingly reluctant to express novel ideas or voice potential criticism to their superiors out of concern that they will be called to defend their thoughts in a deposition or another forum. Yet, as we finalize the license application, it is critical to decision-making in the best interest of American citizens that OCRWM employees feel free to state their opinions and make sure that the Yucca Mountain license application is robust and beyond challenge.

8. Pursuant to a formal delegation by the Secretary of Energy to the Under Secretary of Energy, Science and Environment, and a subsequent formal redelegation from the Under Secretary to the Director, OCRWM, the Director or his delegate has responsibility for asserting the Government's deliberative process privilege within the cognizance of OCRWM. By delegation executed by the

Director, dated April 27, 2007, I have been delegated responsibility to assert deliberative process over documents or testimony within the cognizance of OCRWM.

9. DOE has a policy of protecting its deliberative processes in order to assure the free flow of ideas and candid discussion of alternatives, which are essential to the efficient operation of OCRWM and the Department. When DOE asserts a formal claim of deliberative process privilege with respect to predecisional/deliberative documents or testimony in litigation, the privilege is claimed only to protect those intragovernmental documents or testimony reflecting advisory opinions, recommendations, and deliberations which comprise part of the process by which agency decisions and policies are formulated. As part of this process, the Department considers whether the document or testimony falls within the scope of the deliberative process privilege; that is, whether the document was generated before the adoption of a department policy or position, or whether the document reflects the give-and-take of the consultation process leading up to the formulation of an agency policy, position, or decision. The Department also considers whether the document or testimony would be so candid that public disclosure is likely to stifle honest and frank communication within the Department in the future.

10. I understand that, in response to discovery requests from one plaintiff in the SNF litigation, Dairyland Power Cooperative ("Dairyland"), DOE has recently produced more than 1 million additional pages of documents. In reviewing these documents for production, DOE identified and withheld a number of materials involving or disclosing the Department's deliberative process on several subjects. Over the course of the last several weeks, I have spent more than 40 hours reviewing all of these documents and determined that many of these documents can be released. However, with the remaining documents, I have determined that they should be withheld from production because they are documents generated at the request of or to be provided to senior decisionmaking officials

and are worthwhile to protect since public disclosure could discourage candid discussion within DOE in the future and, thereby, undermine the quality of DOE's decisionmaking process.

11. Based upon my detailed review, I hereby assert deliberative process privilege on behalf of DOE for the following 354 documents, which are potentially responsive to Dairyland's requests for production of documents:

**Documents Concerning Legislative And Budgetary Initiatives:**

The following 22 documents address legislative and budgetary initiatives within DOE relating to spent nuclear fuel ("SNF") and high level waste ("HLW") management activities. These initiatives have been developed by individuals at the Department and reflect internal deliberations regarding legislation and budget issues. DOE decision-makers must be allowed to develop and pursue legislative and budgetary initiatives, and to consider alternatives, without fear of public scrutiny before submitting matters to Congress for its consideration.

1. The documents Bates-stamped CTR5710001 - CTR5710004, CTR6080025 - CTR6080042, HQR5010336 - HQR5010340, HQR5010341 - HQR5010343, HQR5010344 - HQR5010346, HQR6120595 - HQR6120599, HQR6120600 - HQR6120602, HQR6120603 - HQR6120605, HQR6270042 - HQR6270043, HQR6270044 - HQR6270047, HQR6270048 - HQR6270051, HQR6270052 - HQR6270058, and HQR6270059 - HQR6270062 are duplicates or different versions of memoranda, analyses, and related documents reflecting deliberations concerning facilities for the Yucca Mountain project. The specific decisions at issue relate to the inclusion of an initial handling facility and initial operating capability at the repository, including discussions of schedule, operation, and budget. These documents were prepared for the Deputy Secretary and contain recommendations and reveal

deliberations within OCRWM associated with the project's facilities and operating capabilities. It is critical to a proper functioning of the Executive Branch that the Administration and DOE be able to examine all viable options, and to consider the ramifications associated with those options, before ultimately presenting proposed legislation to Congress. Release of these internal, predecisional documents would hinder the Administration and OCRWM in its efforts to develop proposed legislation for consideration by Congress.

2. The documents Bates-stamped HQR6700002 - HQR6700013, HQR6700015 - HQR6700026, HQR6700028 - HQR6700039, HQR6130953 - HQR6130968, HQR4921264 - HQR4921279, HQR6700041 - HQR6700053 are duplicates or different versions of whitepapers and outlines related to legislative proposals and initiatives to accelerate DOE's acceptance of SNF and HLW. The documents were requested by senior OCRWM decisionmaking officials and discuss approaches for legislative initiatives, detailing the advantages and disadvantages that would benefit the Department in its efforts to begin accepting SNF and HLW for disposal. Disclosure of these documents would inhibit OCRWM personnel from offering the kind of creative ideas essential to the establishment of Departmental strategy on this controversial subject, which is the subject of much litigation.

3. The document Bates-stamped HQR6270011 is an e-mail to the then-Principal Deputy Director, OCRWM, and the Senior Policy Advisor, OCRWM, detailing the history of discussions between OCRWM and the Office of Management and Budget related to a proposed budget increase. The document discusses proposed levels of funding and program management and provides opinions regarding the impacts to the program if

funding levels are not obtained. Release of this document would infringe upon OCRWM's deliberative process by hindering its ability to obtain candid input from its employees regarding critical budgetary issues.

4. The documents Bates-stamped HQR6530008 and HQR6530009 - HQR6530011 are an e-mail and memorandum between the Director of OCRWM and the Deputy Secretary and General Counsel of DOE. These documents discuss legislative initiatives and strategy for proposing legislation related to the development of a repository for spent nuclear fuel, and they reflect internal deliberations concerning these subjects. Disclosure of the documents would intrude upon the deliberative province of OCRWM managers, and threaten to stifle the free exchange of ideas by subordinates which are necessary to informed decision making by management. The e-mail also contains a request for legal review by the General Counsel of the attached legislative proposal.

**<u>Risk Management Analyses And Assessments:</u>**

The following 88 documents contain risk management analyses and assessments by OCRWM employees and contractors concerning the licensing of Yucca Mountain. This category of documents is comprised of deliberative discussions, editorial commentary, and contemplation of the risks accompanying the activities necessary to acquire necessary repository licenses. These risks involve scheduling, costs, engineering, technology, environmental impacts and logistics. Disclosure of the following documents would reveal preliminary judgments subject to further refinement and revision. Were such materials released, Departmental employees and contractors would hesitate to participate in the exchange of ideas and discussion necessary to address risk related topics, thereby hindering OCRWM's ability to minimize risks associated with acquiring the licenses required to establish a repository for SNF.

1. The documents Bates-Stamped CTR5452707 - CTR5452772, CTR5730190 - CTR5730204, CTR5900001 - CTR5900067, HQR6410227 - HQR6410292, and HQR6430329 - HQR6430394 are duplicate or similar drafts or portions of drafts of a risk management plan relating to the establishment of a SNF repository. The plan focuses on minimizing technical and programmatic risks that may jeopardize the project. The drafts include topical sections devoted to risk planning, risk assessment, risk handling and response, and risk monitoring. The documents are works-in-progress, not final drafts. As such, they are comprised of selections of deliberative material assembled for consideration and editing by OCRWM personnel and senior managers. Disclosure of such revisions would stifle the candid exchange of thinking necessary to develop sufficiently well-considered and thorough strategies for managing the risks associated with licensing and establishing a repository for SNF.

2. The documents Bates-Stamped CTR5200001 - CTR5200006, CTR5200007 - CTR5200012, CTR5200013 - CTR5200018, CTR5200019 - CTR5200025, CTR5200026 - CTR5200032, CTR5200040 - CTR5200045, CTR5720001 - CTR5720004, CTR5720005 - CTR5720006, CTR5720007 - CTR5720008, CTR5720009, CTR5720010 - CTR5720011, CTR5720012 - CTR5720013, CTR5730155 - CTR5730164, CTR5730165 - CTR5730180, CTR5730181 - CTR5730189, CTR5731725 - CTR5731727, CTR5780042 - CTR5780044, CTR5780211 - CTR5780238, CTR5780239 - CTR5780245, CTR5780246 - CTR5780252, CTR5780255 - CTR5780263, CTR5780264 - CTR5780273, CTR5780274 - CTR5780283, CTR5780288 - CTR5780397, CTR5780398 - CTR5780480, CTR5780481 - CTR5780537, CTR5780538 - CTR5780545,

CTR5780546 - CTR5780631, CTR5780632 - CTR5780639, CTR5780801 - CTR5780806, CTR5780807 - CTR5780826, CTR5780827 - CTR5780829, CTR6090681 - CTR6090683, CTR6090684 - CTR6090686, HQR5840428 - HQR5840436, HQR5840437 - HQR5840442, HQR5840443 - HQR5840448, HQR6131305 - HQR6131322, HQR6360047 - HQR6360054, HQR6490045 - HQR6490050, HQR6490051 - HQR6490053, HQR6490054 - HQR6490056, HQR6490057 - HQR6490060, HQR6490061 - HQR6490064, HQR6490065 - HQR6490068, HQR6490220 - HQR6490223, HQR6490298 - HQR6490306, HQR6490307 - HQR6490309, HQR6490310 - HQR6490318, HQR6490319 - HQR6490333, HQR6490334 - HQR6490336, HQR6490337 - HQR6490351, HQR6490352 - HQR6490357, HQR6490358 - HQR6490360, HQR6490361 - HQR6490362, HQR6490363, HQR6490364 - HQR6490365, HQR6490366 - HQR6490372, HQR6490373 - HQR6490375, HQR6490376 - HQR6490447, HQR6490448 - HQR6490473, HQR6490474 - HQR6490477, HQR6490478 - HQR6490481, HQR6490482 - HQR6490483, HQR6490484 - HQR6490503, HQR6490504 - HQR6490514, and HQR6541541 - HQR6541547 are "risk registers," or matrices identifying and tracking the status of various risks associated with the licensing of Yucca Mountain. Broadly stated, these risks include permitting, regulation, policy, design, technology, engineering, safety, scheduling, costs, and litigation. The matrices contain narrative statements of risks, provide candid evaluations of those risks by OCRWM personnel and contractors, and include corresponding summaries of OCRWM's evolving risk management strategies. These analyses were regularly updated and provided to the Director, OCRWM. These

materials are prepared for and relied upon by OCRWM's senior managers, including its Director, in the course of making programmatic decisions. Disclosure of these documents would reveal deliberative thinking and commentary underlying managerial determinations. Further, production would chill future deliberations relating to risk management. In addition, because some of these documents were prepared at the direction of DOE counsel in anticipation of upcoming licensing litigation before the Nuclear Regulatory Commission ("NRC"), I have been advised that those documents also qualify as privileged under the work product doctrine.

3. The documents Bates-Stamped CTR5780113 - CTR5780119, CTR5780131 - CTR5780137, CTR5780138 - CTR5780145, CTR5780208 - CTR5780210, CTR6090656 - CTR6090658, CTR6090755 - CTR6090759, CTR6090772 - CTR6090783, HQR4960799 - HQR4960802, HQR5520127 - HQR5520138, HQR5520181 - HQR5520190, HQR6110597 - HQR6110601, HQR7030359 - HQR7030360, and HQR7030363 - HQR7030371 are suggested revisions and editorial commentary relating to the risk registers described above. Authored by government employees and OCRWM contractors, the documents contain creative thinking intrinsic to the process of assessing risk strategies for presentation to and further consideration by OCRWM's senior managers. Disclosure of these documents would expose their drafters to criticism for suggestions that may never have been adopted by management, thereby discouraging these individuals from sharing their insights in the future.

4. The documents Bates-Stamped CTR6090475 - CTR6090512, CTR6091119 - CTR6091164, and CTR6091189 - CTR6091222 are duplicate or similar copies of a licensing strategy relating to the establishment of a repository for SNF to be presented

to the Director, OCRWM. The draft strategy includes topical sections devoted to license application, the development of strategy and decision making processes, as well as risk registers containing judgments and preliminary assessments by OCRWM and its contractors. The documents are works-in-progress, not final drafts. As such, they are comprised of selections of deliberative material assembled for consideration and editing by OCRWM personnel and senior managers. Disclosure of these materials would inhibit the free flow of ideas necessary to develop successful strategies for licensing and managing the risks associated with establishing the Yucca Mountain facility.

**Documents Concerning Possible SNF Interim Storage**

The following 12 documents address the issue of whether DOE would elect to store SNF in an interim storage facility or location prior to final disposal at a repository, and, if so, the possible ways in which interim storage could be accomplished as well as the effects of pursuing such an option. This issue has been repeatedly revisited by DOE, the Executive Branch, and Congress, although no final decision has been made. DOE decision makers must be allowed to gather information and determine the viability of all options presented before identifying and presenting their recommendation to the Secretary of Energy, the Office of Management and Budget, and the President.

1. The documents Bates-stamped HQR5050225 - HQR5050228, HQR5050229 - HQR5050233, HQR5051056 - HQR5051060, HQR5050963 - HQR5050981, HQR5051034 - HQR5051035, HQR5051036 - HQR5051038, HQR5051040 - HQR5051043, HQR5051045 - HQR5051049, HQR5051061 - HQR5051064, HQR5051065 - HQR5051072, HQR5051073 - HQR5051079, and HQR5051083 - HQR5051089, are various papers and memoranda addressing the Government's

assessments of interim SNF storage options and beginning SNF acceptance, including DOE's assessment as to the advantages and disadvantages of various options and legal authorities for the various options and communications with the Office of Management and Budget. These documents were prepared for senior Department officials and OMB personnel and analyze DOE's options for interim SNF storage, including the perceived advantages and disadvantages of each option. The specific decision at issue was whether DOE would accept SNF at an interim storage facility, and these documents reflect DOE's policy deliberations as they related to DOE's decision. DOE continually receives Congressional inquiries regarding its ability to provide interim SNF storage, and it is important that the Department speak with one voice in response to Congress's questions. While the Department considers many ideas in formulating policy, the ideas that it considers are merely the opinions of individuals, and not the Department's policy. It would be detrimental to the process if Congress and other parties could delve into all of the suggestions considered. If employees see that their individual opinions are publicized and ultimately have a detrimental effect upon the decision making process, they will be less likely to offer creative opinions and ideas in the future.

**Documents Contemplating Accelerated SNF Acceptance**

The following four documents address the potential options for accelerating the development of SNF disposal facilities, and the accelerated acceptance of commercial and non-commercial SNF. Because the consideration of these goals as program objectives would be of extreme interest to many of OCRWM's constituencies, release of these documents would lead to extensive questioning of program personnel: by Congress in its consideration of appropriations, in the licensing proceedings by the State of Nevada and other parties, and in the litigation pending before the U.S. Court of Federal

Claims. Here, DOE management asked program personnel to think creatively about the program and its goals. If program personnel are questioned about this work, it will negatively affect their willingness to freely provide feedback and recommendations in response to future requests from policy makers.

1. The documents Bates-stamped HQR6650001 - HQR6650005 and CTR5970556 are draft documents analyzing and assessing scenarios for the accelerated development of the OCRWM transportation infrastructure, accelerated SNF and HLW acceptance scenarios, and accelerated SNF storage alternatives. Because the contemplation of these goals as program objectives would be of extreme interest to so many of the program's constituencies, release of these documents would lead to extensive questioning of program personnel: by Congress in its consideration of budgets, in the licensing proceedings by the State of Nevada and other parties, and in the litigation pending before the U.S. Court of Federal Claims. If program personnel are questioned about this work, it will affect their willingness to freely provide feedback and recommendations in response to future requests from policy makers

2. The document Bates-stamped HQR5050268 - HQR5050282 is a preliminary draft discussing OCRWM's schedule and strategy options to allow for the acceptance of commercial SNF at Yucca Mountain. The paper addresses various issues concerning waste forms to be accepted, schedule issues, and potential risks, *i.e.*, litigation or legislative. This document reveals internal assessments of the various options and associated risks for accepting SNF at Yucca Mountain. It is important to the proper functioning of the Executive Branch that DOE be able to fully and freely consider all

options in the continuing development of the OCRWM program, and release of this document would stifle the contributions necessary to such consideration.

3. The document Bates-stamped CTR5970654 - CTR5970701 is a draft OCRWM presentation concerning the status, issues, and plans for OCRWM's transportation and waste acceptance program prepared for the then-Undersecretary of Energy. Because OCRWM has not finalized its plans for transportation for the program, these documents provide insight into some of the issues that are still under consideration and are the subject of continuing analysis and advice by program personnel. Release of this document would have a chilling effect upon DOE's on-going analysis.

**Program Costs and Budgetary Documents**

The next 31 documents relate to the process of formulating annual budgets for OCRWM based upon various assumptions regarding repository development, transportation development and capabilities, different acceptance scenarios, and other factors. Each year, the submission of OCRWM's budget request to Congress for the upcoming fiscal year constitutes a major effort within the Department. This annual budget request must be considered and approved by high-level DOE officials.

1. The documents Bates-stamped HQR5010858 - HQR5010859, HQR5010860 - HQR5010861, HQR5010862 - HQR5010863, HQR5010864 - HQR5010865, HQR5011316 - HQR5011330, HQR5011331 - HQR5011351, HQR5011352 - HQR5011357, HQR6120792 - HQR6120793, HQR6120794 - HQR6120795, HQR6120796 - HQR6120797, HQR6120798 - HQR6120799, HQR6340440 - HQR6340523, HQR6340756 - HQR6340788, HQR6340789 - HQR6340801, HQR6340802 - HQR6340814, HQR6340815 - HQR6340827, HQR6340828 -

HQR6340840, HQR6340841 - HQR6340948, HQR6340949 - HQR6340955, HQR6340956 - HQR6340966, HQR6340967 - HQR6341090, HQR6550001, HQR6530022 - HQR6530034, HQR7030004 - HQR7030063, HQR7030064 - HQR7030110, HQR7030111 - HQR7030157, HQR7030158 - HQR7030171, HQR7030172 - HQR7030185, HQR7030186 - HQR7030306, HQR7030307 - HQR7030358, and HQR7030510 - HQR7030588 address DOE's budget for fiscal year FY 2008. These documents reflect DOE deliberations regarding a budgetary request prepared for submission to OMB. These documents were prepared in the process of formulating a recommendation regarding DOE's FY 2008 budget requests, and they reflect DOE's policy deliberations in the budget process. The documents were prepared during various stages of DOE's internal budget formulation process and do not represent the final budget decisions. If released, individuals of OCRWM could be questioned about the process of presenting future budget requests to Congress regarding the priorities selected by OCRWM for a given budget, especially when particular priorities were not selected or presented for consideration in future budget requests. The release of these documents could inhibit the ability of DOE employees to offer complete and frank advice to DOE officials on budget matters. Many of these documents were part of OCRWM's effort to validate and support the program's budget request, including decisions regarding the selection of program priorities and goals and the budget implications of selecting the program's priorities. Such briefings to OMB are necessary because the OMB formulates the final budget policy for the Executive Branch and the budget is not final until it is submitted by OMB on behalf of the

President to Congress. Accordingly, these briefings should be considered to be the advice and recommendations to OMB in the formulation of DOE's final budget.

**Documents Concerning Yucca Mountain Licensing Activities**

The following 40 documents concern the process of submitting a license application for the establishment of the Yucca Mountain repository. The licensing of Yucca Mountain is the focus of the OCRWM program and has been the subject of ongoing litigation and controversy. As the Department plans to submit a license application to the NRC in the near future, interested parties have an intense interest in all aspects of DOE's work on this subject. It is vital to allow DOE employees to work in an open environment to develop the best license application possible, without concern that every idea, concept and thought will be subject to public dissection and potential litigation, particularly when much of the work will ultimately not be part of the final license application.

1. The documents Bates-stamped HQR6490209 - HQR6490211, HQR6131970 - HQR6131973, HQR4961774 - HQR4961777, HQR6490212 - HQR6490215, CTR5820388 - CTR5820391, CTR5820397 - CTR5820400, CTR5830071 - CTR5830076, and CTR5820379 are draft decision papers addressing waste forms to be included in the Yucca Mountain license application and the level of design needed for inclusion in the application. These documents describe and evaluate decisions to be made by the Director concerning the content of the license application. Release of the options being considered as part of this process would bring inquiries from interested parties to which the program would have to respond, diverting resources from the development of the program and chill employees' ability to express ideas freely to ensure a quality license application. Further, DOE personnel would be less likely to

offer the kind of creative ideas necessary to make an informed decision if they are aware of the potential publication of their comments and the ensuing difficulties.

2. The documents Bates-stamped CTR5780253 - CTR5780254, CTR5780284 - CTR5780287, HQR6650327 - HQR6650331, CTR5820401 - CTR5820402, HQR6131965 - HQR6131969, HQR4961769 - HQR4961773, CTR6090039 - CTR6090083, CTR6090084 - CTR6090187, CTR6090362 - CTR6090396, CTR6090410 - CTR6090434, CTR6090706 - CTR6090754, CTR6090849 - CTR6090952, CTR6140001 - CTR6140102, CTR6140103 - CTR6140128, CTR6140129 - CTR6140147, CTR6140693 - CTR6140794, CTR6200001 - CTR6200103, HQR5330001 - HQR5330101, HQR5330102 - HQR5330202, HQR7021656 - HQR7021661, HQR7030486 - HQR7030509, and HQR7030589 - HQR7030674 are white papers addressing OCRWM's development of licensing strategy for the Yucca Mountain license application prepared for the Director to assist in his decision-making regarding how to proceed with the licensing of Yucca Mountain. The document Bates-stamped CTR582000428 - CTR582000431 incorporates discussion and comments by Director Sproat on various licensing activities. These documents reveal deliberations within DOE regarding the development of the licensing strategy for Yucca Mountain, and, particularly given the contentious nature surrounding the repository's proposed licensing, the release of these documents will have a chilling effect upon the ability of the Secretary and OCRWM to engage in a candid and complete analysis of the issues associated with the development of Yucca Mountain.

3. The documents Bates-stamped HQR5010328 - HQR5010331, HQR5010332 - HQR5010335, HQR5010349 - HQR5010352, HQR6120608-HQR6120611, HQR6120587 - HQR6120590, HQR6120591 - HQR6120594, HQR5830001 - HQR5830005, HQR5830006 - HQR5830030, CTR5760030, and HQR6950036 - HQR6950039, are draft project plans, presentations, and approvals to address a changed approach to the proposed Yucca Mountain design to incorporate and maximize the use of the TAD system, including an assessment of the risk factors involved in various design scenarios. The documents also address the potential cost range for the OCRWM project, assuming the adoption of certain approaches to the development of Yucca Mountain. Disclosure of these documents would inhibit the provision by OCRWM personnel and contractors of meaningful commentary on these subjects.

4. The documents Bates-stamped HQR6130969 - HQR6130984 and HQR4921280 - HQR4921295 are preliminary draft reviews concerning potential options for DOE to address the Resource Conservation and Recovery Act issues related to SNF acceptance at Yucca Mountain. These documents address the program's internal deliberations on approaches to address issues involving and compliance with Federal environmental laws and regulations as part of the development of Yucca Mountain, including interactions with other Government agencies, such as the Environmental Protection Agency. The resolution of this issue is not yet finalized, and release of this information would inhibit continued deliberations on this subject, which directly implicates the Department's ongoing licensing efforts.

Documents Concerning the Transportation, Aging, and Disposal Canister System:

The following 112 documents relate to DOE's initiative to develop an integrated transportation, aging, and disposal canister system ("TAD"). Initiated in October 2005, the program goal was to promote the standardization of SNF storage, transportation, and disposal packaging. Under this concept, specially-designed TAD canisters would serve as the key component facilitating most of the temporary storage of SNF at utility sites, transport to the repository, aging of the spent fuel at the repository, and ultimate disposal. Since DOE's commencement of the TAD initiative, DOE has been actively deliberating a number of its essential elements, including the design of TAD cannister specifications to ensure that they comply with relevant Federal regulations. In particular, over the course of the past two years, DOE officials have engaged in very careful deliberations with regard to the agency's strategy in seeking the necessary licensing approval from the NRC for the proposed TAD cannister design and system implementation. In establishing these various policies and proposals, DOE personnel have developed extensive supporting documentation to justify, challenge, question and/or disprove the proposed TAD system requirements. These materials, generally documented in spreadsheets, tables, charts and graphs, and set forth in both separate documents and included as part of more comprehensive documents such as memoranda and white papers, represent an integral part of the recommendations and advice provided to the Department's officials as part of the agency's decision-making process. The agency officials involved in formulating the documents identified below provided their input concerning the proposed TAD system with the understanding that they could offer straightforward, candid assessments to senior DOE personnel that would remain part of the predecisional, deliberative process that would be protected from further disclosure. Release of the below documents would impair the ability of senior agency decision makers to obtain from DOE staff the candid analysis and advice that is reflected therein.

1. The documents Bates-stamped CTR5830021 - CTR5830031, CTR5830039 - CTR5830046, CTR5830033 - CTR5830038, CTR5830170 - CTR5830182, CTR5910045 - CTR5910055, CTR5910073 - CTR5910085, CTR5910104 - CTR59140116, CTR5910137 - CTR5910147, CTR6140221 - CTR6140232, CTR6140344 - CTR6140357, CTR6330001 - CTR6330006, CTR5800069 - CTR5800081, CTR5800058 - CTR5800068, CTR5800082 - CTR5800094, CTR5800095 - CTR5800106, CTR5800117 - CTR5800127, CTR5820223 - CTR5820233, CTR5820211 - CTR5820221, CTR5820157 - CTR5820168, CTR5820245 - CTR5820257, CTR6340007 - CTR6340018, CTR6330028 - CTR6330034, CTR6330021 - CTR6330027, CTR6330014 - CTR6330020, CTR6330007 - CTR6330013, CTR5910093 - CTR5910103, CTR3520012 - CTR3520017, CTR4430236 - CTR4430246, CTR5800028 - CTR5800038, CTR5800039 - CTR5800050, CTR3520001 - CTR3520011, CTR5820150 - CTR5820156, CTR5910117 - CTR5910127, CTR5820066 - CTR5820072, CTR5820101 - CTR5820107, CTR5830360 - CTR5830370, CTR5830324 - CTR5830350, CTR5830313 - CTR5830323, CTR5830295 - CTR5830305, CTR5830275 – CTR5830287, CTR5830234 - CTR5830260, CTR5830208 - CTR5830233, CTR5830196 - CTR5830207, CTR5830183 - CTR5830195, CTR5830158 - CTR5830169, CTR5830146 - CTR5830157, CTR5830134 - CTR5830145, CTR5830122 - CTR5830133, CTR5830107 - CTR5830117, CTR5830095 - CTR5830105, CTR5830077 - CTR5830088, CTR5830047 - CTR5830053, CTR5830001 - CTR5830013, CTR5820328 - CTR5820338, CTR5820317 - CTR5820327, CTR5820304 - CTR5820314, CTR5820271 -

CTR5820282, CTR5820258 - CTR5820269, CTR5820234 - CTR5820244, CTR5820183 - CTR5820193, CTR5820199 - CTR5820209, CTR5830261 - CTR5830274 are duplicates or different draft versions of a DOE decision paper entitled "Approach for Transport, Aging, and Disposal Cannister System Licensing," which discusses the level and type of TAD cannister design information available to support the NRC licensing actions associated with the TAD system and the licensing of the Yucca Mountain repository. The document discusses various licensing strategies and options relating to DOE's approach in seeking NRC license approval for the TAD cannister design and system implementation. The decision paper discusses the advantages and disadvantages of each licensing strategy, and ultimately proposes that the Department pursue a particular licensing approach. Release of the options being considered as part of that process would discourage agency staff from providing such candid advice to senior agency decision-makers, thereby hindering the Director of OCRWM and the Secretary from obtaining the best advice possible in the future.

2. The documents Bates-stamped CTR6141307 – CTR6141331, CTR6090687 - CTR6090705, CTR6090802 – CTR6090808, CTR6140317 – CTR6140342, CTR6140523 – CTR6140549, CTR6140803 – CTR6140814, HQR6131392 – HQR6131404, HQR5840412 – HQR5840424, HQR4960738 – HQR4960754, CTR6140795 – CTR6140802, CTR6140648 – CTR6140665, CTR6140601 – CTR6140612, CTR6140550 – CTR6140600, CTR6140498 – CTR6140522, CTR6140343, CTR6110001 – CTR6110034, CTR6102413 – CTR6102437, CTR6091250 – CTR6091262, CTR6091223 – CTR6091244, CTR6091031 – CTR6091043, CTR6090784 – CTR6090801, CTR6090593 – CTR6090655,

CTR6090530 – CTR6090592 reflect specific comments and edits provided by agency staff in connection with the drafting of the DOE decision paper entitled "Approach for Transport, Aging, and Disposal Cannister System Licensing." As discussed above, this decision paper addresses the level and type of TAD cannister design information available to support the NRC licensing actions associated with the TAD system and the licensing of the Yucca Mountain repository. The document discusses various licensing strategies and options relating to DOE's approach in seeking NRC license approval for the TAD cannister design and system implementation. The decision paper discusses the advantages and disadvantages of each licensing approach, and ultimately proposes that the Department pursue a particular licensing strategy. Release of the suggestions of DOE personnel would undermine the Administration's ability to speak with one voice regarding such important policy decisions.

3. The document Bates-stamped HQR5520002 – HQR5520102 constitutes a collection of 11 draft decision papers ready for final DOE approval, as of December 15, 2006, concerning the TAD program. Among others, the following draft decision papers are contained within this document: "Commercial SNF Burnup Credit for Disposal, Transportation, and Storage;" "Approach for Transport, Aging, and Disposal Cannister System Licensing;" and "Cask and Transportation System." These decision papers, which were drafted by a variety of DOE staff, senior employees, and OCRWM contractors, address several design, safety, and licensing-related issues in connection with the Department's development of the TAD program. Disclosure of the options considered would impede DOE's ability to speak with one voice with regard to

important policy decisions concerning safety, transportation, and engineering issues affecting the TAD program.

4. The documents Bates-stamped HQR6110602 – HQR6110605 and HQR4960785 are portions of the same string of e-mail communications from the Director of OCRWM and other senior managers during the time period December 2006 through January 2007 regarding DOE's strategy in seeking the necessary licensing approval from the NRC for the proposed TAD cannister design and system implementation. These e-mail strings, which contain the subject line "TAD information in the LA," reveal agency deliberations among key senior personnel concerning the interplay between the development of the TAD program and the Yucca Mountain NRC license application process. As such, these comments represent an integral part of the recommendations and advice provided to the Department's officials as part of the agency's decision-making process in connection with the pending Yucca Mountain repository license review process before the NRC. The officials whose communications are contained in these documents provided their input with the understanding that they could offer straightforward, candid assessments to senior DOE personnel and that such communications would be protected from disclosure. Releasing these documents now will chill DOE staff members' willingness to provide such advice and hinder OCRWM's efforts to finalize the design and implementation of the TAD system.

5. The documents Bates-stamped CTR5780685 – CTR5780747 and CTR6090001 - CTR6090038 are a series of e-mails containing comments with respect to an attached DOE draft decision paper discussing certain studies relating to thermal conditions within the Yucca Mountain repository which the agency is now conducting to support

the pending license application. The documents consider various licensing strategies and options relating to DOE's approach in seeking NRC license approval for the TAD cannister design and system implementation. In addition, the decision paper contemplates the advantages and disadvantages of each licensing strategy, and ultimately proposes that OCRWM pursue a particular licensing approach. Release of the options being considered as part of that process would discourage DOE staff from providing candid advice to senior agency decision makers, thereby hindering the Director of OCRWM and the Secretary from obtaining the best advice possible in the future.

6. The documents Bates-stamped CTR5830054 – CTR5830070, CTR6141349 – CTR6141365, CTR6141332 – CTR6141348, CTR6141060 – CTR6141083, CTR6140474 – CTR6140497, CTR6140246 – CTR6140262, CTR6140233 – CTR6140245, CTR6140204 – CTR6140220, CTR6140171 – CTR6140203, CTR6140154 – CTR6140166, CTR6091165 – CTR6091188, CTR6091007 – CTR6091030, CTR6090513 – CTR6090529, CTR6090435 – CTR6090467, CTR5910056 – CTR5910072, CTR5820002 – CTR5820013, CTR5800008 – CTR5800019, CTR5760017 – CTR5760026, CTR6140624 – CTR6140647, and CTR6090760 – CTR6090771 are duplicates or different draft versions of a DOE decision paper entitled "10 CFR Analysis and Licensing Approach for Transportation Casks," which addresses the appropriate regulatory and licensing strategy for considering analyses of site-specific, frequency-based external phenomena/accidents potentially impacting loaded transportation casks awaiting processing inside the geologic repository operations area. These drafts, some of which are attached to e-mail

communications containing specific edits or comments from DOE staff, discuss various licensing strategies and options relating to DOE's approach in seeking NRC license approval for the TAD cannister design and system implementation. As the licensing process before the NRC is still pending, releasing these documents now would chill DOE staff members' willingness to provide such advice, and hinder OCRWM's efforts to finalize the design and implementation of the TAD system.

**Environmental Impact Documents:**

The following eight documents relate to OCRWM's deliberations concerning its preparation of Environmental Impact Statements. The NWPA required the Department to prepare a Final Environmental Impact Statement ("FEIS"), which accompanied DOE's recommendation to the President of the Yucca site, which he approved in 2002. The next step in the process is for the Department to begin preparing a license application to the NRC for construction of a repository at Yucca Mountain. Because of the passage of time between the issuance of the FEIS and the projected submission date of the license application, the Department is preparing a Supplemental EIS ("SEIS") that includes more current information concerning the Yucca site. The SEIS will be submitted with the license application to the NRC. Because the environmental impact of the repository is of great public concern, it is critical that the Department present this information in as robust and complete a manner as possible. For this reason, DOE has worked extensively to ensure that the analyses and information contained in the EIS and SEIS are presented accurately, fairly, and concisely. To this end, Departmental personnel reviewed and considered numerous approaches for the preparation of the EIS and SEIS and the individual issues that, by law, its submissions are required to address.

1. The document Bates-numbered CTR5703504 - CTR5703505 is an issue paper concerning the treatment of metric tons of heavy metal equivalence for high-level

radioactive waste in the repository environmental impact statement EIS. The issue paper reflects a recommendation for calculating the quantity of high-level waste to be disposed of at Yucca Mountain. This document has been prepared for decision makers for the purpose of selecting a specific methodological approach for the EIS. It is critical that these decision makers receive full and candid advice about the consequences and ramifications of their decisions with respect to such an approach. Disclosure of this document would undermine managers' ability to obtain candid advice concerning environmental impacts.

2. The documents Bates-numbered CTR5872135 - CTR5872233, CTR5872234 - CTR5872332, CTR5872333 - CTR5872431 and CTR5872432 - CTR5872530 are all copies of the same document. Each consists of an e-mail chain, commencing on October 30, 2006, which solicits comments from working group members concerning the technical approach for the SEIS. This document presents the proposed approaches to be employed in various sections of the SEIS, including accident scenario impacts, air quality analyses, and biological resource and soils analyses. Preparation of the SEIS requires careful assessments of the approach to be employed in articulating the possible environmental impacts relating to the Yucca Mountain repository. Revelation of these papers would discourage Federal and contractor employees from submitting their assessments for consideration by those preparing necessary environmental impact statements.

3. The document Bates-numbered HQR5850401 - HQR5850407 is a preliminary draft, dated September 25, 2007, entitled "Issue/Decision: Treatment of Inventory in the Supplemental Yucca Mountain Repository Environmental Impact Statement." This

document reflects advice provided to members of a working group responsible for drafting the SEIS. The document describes and makes a recommendation concerning how inventory of SNF and HLW is addressed in the Yucca Mountain license application and FEIS. It also explains how the SEIS will address issues relating to repository pre-closure, transportation, and the use of transport, aging and disposal canisters, as well as long term performance. It is important that those presenting strategies such as these to decision makers be afforded the unfettered opportunity to articulate the benefits and pitfalls of their proposed approaches, and not be subject to second-guessing regarding their deliberative contributions.

4. The document Bates-numbered HQR6350018 - HQR635021 is entitled "Options Analysis for Transportation Planning and Related Analysis Under the National Environmental Policy Act." It reflects DOE's consideration of potential options available in the method and timing for the selection of a transportation mode and a corridor route in Nevada for shipments of SNF to the Yucca Mountain repository. The document discusses the advantages and disadvantages of options for the method to be employed in reaching a Departmental policy with respect to these issues. Given the sensitivity of the determination of where and how SNF is to be transported, including the areas through which the fuel will travel, senior managers require candid and frank assessments of the advantages and disadvantages of each option before deciding upon a proper approach. Disclosure of these documents would unnecessarily restrict management's receipt of such assessments.

**<u>Documents Relating To Private Fuel Storage:</u>**

The three documents Bates-stamped HQR6540003 - HQR6540004, HQR6540005 -

HQR6540007, and HQR6540008 - HQR6540010 are e-mail and attachments prepared by OCRWM employees forwarding a draft background information and talking points paper regarding the Private Fuel Storage ("PFS") project in Utah. They relate to an anticipated meeting between Secretary Bodman and the Governor, Jon Huntsman. Additionally, the two documents Bates-stamped HQR6440218 - HQR6440219 and HQR6440220 - HQR6440221 are duplicate drafts of the background and talking points paper. These draft papers reveal the then-current status of the PFS project, discussions of the Department's prior positions on the subject, and discussions with Congressional members regarding PFS. The papers also include a set of draft talking points for the Secretary to use in his meeting with the Governor. It is critical that Department staff be able to brief the Secretary on upcoming meetings with high-ranking officials, so that he is well informed about DOE's past positions on PFS and is sensitive to the politics of the situation without fear of scrutiny by the public. If Department personnel believe their suggestions will be taken as the Department's official position, or that their suggestions could be taken out of context, possibly causing embarrassment or inconvenience to the Secretary, they will be reluctant to provide such information in the future.

**Documents Related to GNEP/GNEI:**

The following documents relate to or the Global Nuclear Energy Initiative ("GNEI") programs, which later evolved into the Global Nuclear Energy Partnership ("GNEP") programs, through which DOE continues to develop strategies for the potential disposition, storage and disposal of spent nuclear fuel through reprocessing or recycling of that fuel. In the documents that follow, prepared for senior Department officials, individuals within OCRWM, or contractors who work for OCRWM, provide advice and recommendations on issues concerning such strategies. It is critical that individuals within the program be able to provide advice and recommendations at this initial stage of

the program. To the extent that every suggestion regarding possible storage and disposal strategies, whether well-founded or not, becomes subject to an intense level of scrutiny outside the Department, individuals working to develop the program will be reluctant to make such suggestions or engage in candid discussion about all options. Release of these documents would make individuals less willing to risk providing candid views and would hinder the Director's ability to obtain the best advice possible in the future.

1. The documents Bates-Stamped HQR4940244 - HQR4940252, HQR4940253 - HQR4940261, HQR6111074 - HQR6111082, and HQR6111083 - HQR6111091 are multiple copies of a draft presentation regarding interim storage strategies and the GNEP program. The draft presentation was created by an OCRWM contractor, Sandia National Laboratories, for OCRWM officials and discusses proposed developmental phases for the program as well as making technical and regulatory recommendations. Release of this document will discourage Department employees from requesting assistance from its contractors which specialize in this type of assistance and will frustrate the ability of the program to fully evaluate future options.

2. The document Bates-Stamped HQR6470860 - HQR6470864 discusses policy for future options for Yucca Mountain and GNEP. It provides decision makers with a framework for discussion of coordinated strategies for both Yucca Mountain and GNEP to ensure a consistent Department policy for disposal of SNF. If interested constituencies raise questions based upon this document now, such questions will discourage DOE personnel from providing frank advice regarding these matters and hinder the ability of the Department to adequately address a vital issue under its purview.

3. The documents Bates-Stamped HQR6111879 - HQR6111899 and NVR0060316 - NVR0060353 are copies of a draft strategic plan for the GNEI program for OCRWM review. This plan contains analysis by DOE employees, including handwritten notes, regarding the purpose of the proposed plan, as well as possible strategies that could be employed in the course of implementing the plan. Moreover, release of this document, which provides projected costs for the program, are so preliminary that any reliance on them by the public could be misleading and cause the program to spend time explaining now moot cost projections or proposals to Congress and other interested parties. Releasing this document now will chill employees' willingness to provide such advice, and will hamper the ability of the program to evaluate and implement future storage options.

4. The documents Bates-Stamped HQR6470541 - HQR6470546, HQR6470768 - HQR6470774, HQR6470775 - HQR6470781, HQR6470818 - HQR6470825, HQR656 0495 - HQR6560500, HQR6560722 - HQR6560728, HQR6560729 - HQR6560735 are multiple copies of OCRWM's draft GNEI Business Plan. These drafts discuss proposed initiatives and implementation options as well as estimated program costs. Premature release of this document, like other documents that include projected actions and associated costs for GNEI could adversely affect the Department's relationship with Congress and may not reflect what the GNEP program seeks to achieve, but will be forced to expend resources to explain. In addition, because the GNEI/GNEP program is in its initial stage of development, release of these documents will inhibit employees' future willingness to provide such advice and thwart DOE's efforts to continue thorough development of the program.

5. The documents Bates-Stamped HQR4990471 - HQR4990495, HQR6110051 - HQR6110075, and HQR6110099 - HQR6110100 are copies of drafts of portions of the GNEI business plan. Each draft has a cover page which is a memo from Christopher Kouts the then Director of OCRWM's Office of Waste Management to the then Principal Deputy Director of OCRWM, Paul Golan, concerning the contents of the plan. These drafts, which include handwritten comments, discuss proposed initiatives and actions to implement them as well as estimated costs. Premature release of this document, like other documents that include projected actions and associated costs for GNEI could adversely affect the Department's relationship with Congress and other parties and may not reflect what the GNEP program ultimately seeks to achieve, but will be forced to spend resources to explain. In addition, because the GNEP program is in its initial stage of development, release of these documents will inhibit employees' future willingness to provide such advice and impede DOE's efforts to continue thorough development of the program.

**Transportation Licensing Documents**

The eight documents Bates-Stamped HQR6530035, CTR5780748 - CTR5780757, CTR5780758 - CTR5780768, CTR5780006 - CTR5780016, CTR5780769 - CTR5780779, CTR5820027 - CTR5820038, CTR5820678 - CTR5820690, and CTR5820015 - CTR5820026 are e-mails and draft memoranda, including comments and mark-ups, regarding the Department's position on how to meet NRC licensing requirements relating to the use of transportation casks in shipping SNF to Yucca Mountain, and how to respond to the position taken by the NRC on this issue. The documents contain recommendations, discussion, analysis, and feedback by OCRWM personnel and contractors on cask licensing issues. Release of these documents would reveal internal strategy and

deliberations regarding OCRWM's dealings with the NRC. It is essential that OCRWM personnel and contractors be able to openly and candidly discuss the critical issues associated with NRC licensing and to provide advice on these subjects without fear that their every suggestion, whether well-founded or not, will become subject to outside scrutiny. Release of these documents would chill these individuals' willingness to render advice in the future, thereby hindering the Director's ability to determine the best possible solutions to NRC licensing issues.

**Briefing Book Documents**

The documents Bates-stamped HQR7023739 - HQR7023744, HQR7023745 - HQR7023750, HQR7023754 - HQR7023758, and HQR7023759 - HQR7023762 are all copies of cover e-mail and attached document addressed to various individuals throughout the Department forwarding comments from the Deputy Secretary, Clay Sell, regarding proposed questions and answers on various DOE program issues to be included in his briefing book. The document Bates-stamped HQR7023751 - HQR7023753 is a copy of the email without the attached document. The documents Bates-stamped HQR7023925 - HQR7023927 and HQR7023928 - HQR7023930 are two copies of an e-mail message from the Secretary's staff seeking further input from the Deputy Secretary and other individuals regarding these questions and answers. A number of these proposed questions and answers relate to OCRWM's plans for disposal of SNF and the license application it plans to file with the NRC. Because the Secretary and Deputy Secretary are key representatives of the Department and its policies, it is essential that they be able to engage in give and take discussions with DOE staff to ensure that their public representations are sound and correct. Release of these draft documents would not only inhibit staff members from providing candid feedback on various policy issues, but premature release to the public of draft policy positions held by the Secretary or the Deputy Secretary would

bring public inquiry, and could compromise the Department's relations with Congress, the NRC, or other entities that regularly interact with DOE, and which look to the Secretary and the Deputy Secretary to keep them apprised of the Department's activities and policies.

I declare under the penalty of perjury, this 17 day of September, 2007, that the foregoing is true and correct to the best of my knowledge and belief.

Alan B. Brownstein
Chief Operating Officer
Office of Civilian Radioactive Waste Management

DEPARTMENT OF ENERGY
DELEGATION ORDER NO. 00-002.00G
TO THE UNDER SECRETARY

1. <u>DELEGATION.</u> Under the authority vested in me as Secretary of Energy and pursuant to section 642 of the Department of Energy Organization Act (Public Law 95-91, 42 U.S.C. 7252), I delegate to the Under Secretary authority to take the following actions:

1.1 Implement section 13 of the Federal Energy Administration Act of 1974 (15 U.S.C. 772), to collect, assemble, evaluate and analyze energy information and to exercise all information gathering authorities provided in section 13.

1.2 Implement section 11 of the Energy Supply and Environmental Coordination Act of 1974 (ESECA) (Pub. L. 93-319, 15 U.S.C. 796), to request, acquire and collect such energy information as the Under Secretary determines to be necessary to assist in the formulation of energy policy or to carry out the purposes of ESECA, and to exercise all energy information reporting authorities provided in section 11.

1.3 Initiate condemnation proceedings and execute declarations of taking, sign all correspondence and other documents in connection with such proceedings, and take all other necessary and appropriate actions to acquire, in connection with the Government's power of eminent domain, real or personal property or interests therein for the Department of Energy (Department or DOE). The authority to initiate condemnation proceedings and execute declarations of taking shall not be further delegated.

1.4 Under section 8 of the Federal Nonnuclear Energy Research and Development Act of 1974 (Public Law 93-577, 42 U.S.C. 5907) carry out functions relating to identification of opportunities to accelerate the commercial applications of new energy technologies.

1.5 Direct a head of field organization to curtail or suspend the operation of nuclear reactors, nuclear facilities or related activities when, in the opinion of the Under Secretary, continuing operations might result in an undue risk to the environment and/or to the safety and health of Departmental or contractor employees or to the public. This authority may not be redelegated.

1.6 Approve determinations preceding Program Opportunity Notices (PONs).

1.7 Under section 643 of the Department of Energy Organization Act (42 U.S.C. 7253), establish, alter, consolidate or discontinue such second tier or below organizational units or components within the Under Secretary's assigned programs and organizational elements as the Under Secretary may deem to be necessary or appropriate.

A. In exercising this authority, or as redelegated pursuant thereto, the Under Secretary will be limited by approved budgets, staffing level allocations, and Senior Executive Service and other executive resource position allocations. Organizational changes shall not be announced or implemented until appropriate union coordination and other pre-release clearances have been obtained.

B. This authority does not include approval of additional, deletion, or transfer of mission and functions of or between Departmental Headquarters or Field Elements, which authority is reserved to the Secretary.

C. The authority to alter or consolidate second tier or below organizational elements may be redelegated, in whole or in part consistent with the terms of the Department of Energy Organization Act, to assigned Heads of Departmental Headquarters and Field Elements and to an official or officials one level below the Head of the Departmental Headquarters or Field Element.

D. The authority to establish or discontinue organizational elements at the second tier or below may only be redelegated to the Head of the Departmental Headquarters or Field Element.

E. This authority shall be exercised in accordance with, and shall be subject to the requirements of, the Secretary of Energy's Memorandum to All Department of Energy Employees relating to functional accountability, dated May 23, 2006.

1.8 On a nonexclusive basis, assert the Federal Government's deliberative process privilege with respect to any Environmental Management matters arising under the Under Secretary's cognizance. This delegation is made to protect internal predecisional Department of Energy documents in judicial or administrative proceedings in situations where the court may require the claim to be formally asserted by an affidavit from an agency official.

1.9 Under section 624 of the Department of Energy Organization Act (42 U.S.C. 7234) and in accordance with the Federal Advisory Committee Act (5 U.S.C. App. 2), nominate, appoint, renew the term of, and terminate the service of members of the Environmental Management Site Specific Advisory Board. Pursuant to 18 U.S.C. 208(b)(3), after consultation with the Department's Designated Agency Ethics Official, issue conflict-of-interest waivers for special Government employees serving on a Federal Advisory Committee that is administratively supported by an organization that reports to the Under Secretary.

1.10 On matters pertaining to the Office of Civilian Radioactive Waste Management:

A. Sign all documents and take such other actions as may be necessary and appropriate for the submission for publication to the Federal Register of notices concerning actions undertaken to implement the authorities and functions provided in the Nuclear Waste Policy Act of 1982 (Public Law 97-425). The authority delegated does not include rulemaking authority.

B. Report and transmit, on a semi-annual basis, site characterization progress reports for the Yucca Mountain site in the State of Nevada to the Nuclear Regulatory Commission, the Governor and the legislature of the State of Nevada, and other interested parties including the United States Congress. The reports are required under section 113(b)(3) of the Nuclear Waste Policy Act of 1982, as amended (Public Law 97-425, as amended by Title V, Subtitle A, of Public Law 100-203). Any such report, which is issued by the Under Secretary pursuant to this Order, must be submitted for concurrence by the General Counsel and the Assistant Secretary for Congressional and Intergovernmental Affairs prior to its transmittal to the Nuclear Regulatory Commission, the Governor and the legislature of the State of Nevada, Congress, and other interested parties.

Each such report will be submitted to the Office of the Secretary at least one week prior to transmittal to the Nuclear Regulatory Commission, the Governor and the legislature of the State of Nevada.

C. Assert, on a non-exclusive basis, the Federal Government's deliberative process privilege with respect to any matters arising under his or her cognizance.

1.11 Under section 91.b. of the Atomic Energy Act of 1954, as amended (42 U.S.C 2121), and National Security Decision Directive Number 282 (September 30, 1987) on matters related to the Office of Nuclear Energy, Science and Technology:

A. Authorize the transfer of special nuclear material to the Departments of the Army, Air Force, and Navy (Navy Facilities Engineering Command only) in such quantities and at such times as necessary for cores for new military reactors and for replacement cores for existing military reactors, and for miscellaneous purposes (other than use in atomic weapons) for which material, fabrication and new reactors the Congress shall have authorized funds.

B. Authorize the Departments of the Army, Air Force, and Navy to manufacture, produce or acquire utilization facilities, other than nuclear powered ships, for which Congress shall have authorized funds.

1.12 In reference to Energy Efficiency and Renewable Energy, on a nonexclusive basis:

A. Under the National Energy Conservation Policy Act (NECPA) Public Law 95-619, as amended:

1. Make determinations pursuant to sections 216(d)(1) and (2).

2. Grant waivers pursuant to section 216(e).

3. Exercise authorities vested in me pursuant to Title III, Parts 1 and 2, except the authority to suspend grants pursuant to sections 395(e) and 400(d) of the Energy Policy and Conservation Act, as amended.

4. Exercise authorities vested in me pursuant to Title V, Part 3 of NECPA, amended by the Federal Energy Management Improvement Act of 1988 (42 U.S.C. sections 8251-8261) except the authority to report annually to the Congress as required by section 548(b) of NECPA.

B. Under section 656 of the Department of Energy Organization Act, periodically publish a list of certain Executive Agency Conservation Officers (Public Law 95-91, 42 U.S.C. 7266). This authority may only be redelegated to the Assistant Secretary for Energy Efficiency and Renewable Energy.

C. Under 10 C.F.R. 451.2, serve as the Deciding Official for the Renewable Energy Production Incentive Program, as described in 10 C.F.R. Part 451. This authority may not be delegated beyond the Manager of the Golden Field Office. In exercising the authority in this paragraph, the delegate(s) shall be governed by the rules and procedures established in 10 C.F.R. Part 451.

D. With the concurrence of the General Counsel, request from the General Services Administration (GSA) that the Secretary of Energy be authorized to intervene in proceedings relating to utility matters before any Federal or State regulatory agency or commission in order to represent the consumer interests of executive agencies of the Federal Government in such proceedings and to intervene in such proceedings pursuant to an authorization received from GSA, subject to the concurrence and with the assistance of the General Counsel.

1.13 In reference to the Great Plains project under section 19(g)(2) of the Federal Nonnuclear Energy Research and Development Act of 1974 (Public Law 93-577, as amended by Public Law 95-238)(the Federal Nonnuclear Act) and as provided

by section 646(a) of the Department of Energy Organization Act (Public Law 95-91):

A. Carry out all functions of the Contracting Officer as that term is defined in the Asset Purchase Agreement dated as of October 7, 1988, and amended as of October 31, 1988, February 16, 1994, and December 21, 1998, between the United States of America, Dakota Gasification Company, Dakota Coal Company and Basin Electric Power Cooperative, which was executed as part of the conveyance of the Department of Energy's interests in the Great Plains Coal Gasification Project in Beulah, North Dakota, to Dakota Gasification Company and Dakota Coal Company.

B. Undertake all actions that are necessary and proper, on behalf of the United States of America, acting by and through the Secretary of Energy, to administer all agreements and contracts entered into by the Department of Energy in connection with the conveyance of the Department's interests in the Great Plains project.

In exercising the authority delegated by this order, the delegate may act without regard to the provisions of the Federal Property and Administrative Services Act of 1949, as amended, except section 207 of that Act (40 U. S. C. 5488), or any other law, as specifically provided for by section 19(g)(2) of the Federal Nonnuclear Act, supra.

1.14 In reference to the Naval Petroleum Reserves:

A. Perform all functions vested in me by Subtitle B of the National Defense Authorization Act for Fiscal Year 1996 (Public Law 104-106) relating to the sale of Naval Petroleum Reserve Numbered 1, including the finalization of equity.

B. Perform the functions specified in 10 U.S.C. 7427 and 7428, and vested in me by the President of the United States in Executive Order No. 12929, in order to meet the goals and objectives of the Naval Petroleum Reserves.

C. Perform all functions vested in me by law (10 U.S.C. 7420-7439, including 10 U.S.C. 7420 note) relating to the administration of and jurisdiction over the Naval Petroleum Reserves, except for condemnation proceedings affecting such Reserves.

D. Perform all duties and responsibilities required by the Unit Plan Contract between the United States of America and Chevron U.S.A., Inc., numbered Nod-4219, dated June 19, 1944, as amended; the Amendatory and Supplemental Agreement, between the same parties, numbered Nod-8477, dated December 22, 1948, as amended; and the Agreement to Terminate the Unit Plan Contract, between the same parties, dated February 5, 1998.

E. Perform all duties and responsibilities relative to the disposition of the United States share of petroleum produced from the Naval Petroleum Reserves to or for the Department of Defense and the Strategic Petroleum Reserve pursuant to 10 U.S.C. 7430(k) and (l).

1.15 In reference to the regulation of imports and exports of natural gas:

A. Perform the functions vested in me by sections 301(b) and 402(f) of the Department of Energy Organization Act to regulate natural gas under section 3 of the Natural Gas Act, as amended by section 201 of the Energy Policy Act of 1992 (15 U.S.C. 717b):

1. Consistent with the authority delegated by this Order, the Under Secretary or a delegate may attach such terms and conditions to import and export authorizations as the Under Secretary or a delegate shall determine to be appropriate.

2. The authority delegated by this Order does not include the authority to approve the construction and operation of particular facilities, the site at which such facilities shall be located, and, with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports, except the Under Secretary or a delegate is authorized to disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and, with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports.

B. Establish and review priorities for the curtailment of natural gas pursuant to the Natural Gas Act (15 U.S.C. 717), sections 401, 402, and 403 of the Natural Gas Policy Act of 1978 (Public Law 95-621, 15 U.S.C. 3391-3393); and consult with the Deputy Secretary concerning energy emergency-related curtailment policy guidance, as necessary or appropriate.

1.16 In reference to fuel use under the Powerplant and Industrial Fuel Use Act (FUA), (Public Law 95-620, 42 U.S.C. 8301 et seq.) as amended:

A. Monitor compliance with the prohibition against the construction of new powerplants without the capability to use coal or another alternate fuel as a primary energy source, pursuant to section 201 of FUA; grant or deny exemptions from such prohibition, pursuant to sections 211 through 214 of FUA; issue prohibitions against the use of oil or natural gas to certifying existing electric powerplants under section 301 of FUA; grant or deny

exemptions to certifying existing electric powerplants under sections 311 through 314 of FUA; and take such other actions as may be necessary or appropriate to perform any of the above functions pursuant to section 701 of FUA.

B. Issue notices of effectiveness, modification or rescission to coal conversion orders issued pursuant to section 2 of the Energy Supply and Environmental Coordination Act of 1974 (Public Law 93-319, 15 U.S.C. 791 et seq.) as amended.

1.17 In reference to electric power regulations under the Federal Power Act ((FPA), 16 U.S.C. 791(a)-825(r)).

A. Implement section 206(d) of the FPA to investigate and determine, upon the Under Secretary's or a delegate's own motion or the request of any State commission, the cost of production or transmission of electric energy by means of facilities that are subject to the jurisdiction defined by section 201 of the FPA, as the Under Secretary or a delegate determines is necessary or appropriate to perform his functions.

B. Implement section 311 of the FPA to conduct investigations regarding the generation, transmission, distribution, and sale of electric energy, however produced, throughout the United States and its possessions, including the generation, transmission, distribution, and sale of electric energy by any agency, authority or instrumentality of the United States, or by any State or municipality or other political subdivision of a State, as the Under Secretary or a delegate determines is necessary or appropriate to perform his functions.

C. Implement section 307 of the FPA, to investigate any facts, conditions, or practices which the Under Secretary or a delegate may find necessary or proper in order to determine whether any person has violated or is about to violate any provision of the FPA or any rule, regulation, or order thereunder, or to aid in the enforcement of the provisions of the FPA or in prescribing rules or regulations thereunder, or in obtaining information to serve as a basis for recommending further legislation concerning the matters to which the FPA relates.

D. Regulate the export of electric energy to a foreign country, pursuant to the provisions of sections 202(e) and 202(f) of the FPA; and authorize the construction, operation, maintenance, or connection of facilities, at the borders of the United States, for the transmission of electric energy between the United States and a foreign country, pursuant to the provisions of Executive Order No. 10485, as amended by Executive Order No. 12038.

E. After issuance of an order pursuant to section 202(c) of the FPA, by the Secretary or Deputy Secretary, review compliance filings, and issue implementing letters and directives, and take such other actions as are necessary and appropriate to implement and administer the section 202(c) order.

1.18 In reference to energy emergency preparedness:

A. Exercise the authority under section 101(c) of the Defense Production Act of 1950 (50 U.S.C. App. 2071(c)), delegated to the Secretary in Department of Commerce Defense Priorities and Allocations System (DPAS) Delegation 2, as amended, contained in the Department of Commerce DPAS regulation at 15 C.F.R. Part 700. The exercise of this authority is subject to the concurrence of the General Counsel.

B. Exercise the authority under section 209(b) of the Public Utility Regulatory Policies Act (16 U.S.C. 824a-2(b)) with respect to the reliability of the interstate electricity transmission system.

C. Carry out the responsibilities assigned to the Secretary in section 701(1) and (2) of Executive Order 12656 (Assignment of Emergency Preparedness Responsibilities) with respect to energy supply and distribution and related activities, except insofar as those responsibilities have been assigned to the Under Secretary for Nuclear Security.

D. Carry out the responsibilities assigned to the Secretary in Homeland Security Presidential Directive (HSPD)-5 (Management of Domestic Incidents) and the National Response Plan adopted pursuant to HSPD-5 with respect to energy supply and distribution and related activities, except insofar as those responsibilities have been assigned to the Under Secretary for Nuclear Security.

E. Carry out the responsibilities assigned to the Secretary in HSPD–7 (Critical Infrastructure Identification, Prioritization, and Protection) with respect to energy supply and distribution and related activities, except insofar as those responsibilities have been assigned to the Under Secretary for Nuclear Security.

F. Carry out the responsibilities assigned to the Secretary in HSPD-8 (National Preparedness) with respect to energy supply and distribution and related activities, except insofar as those responsibilities have been assigned to the Under Secretary for Nuclear Security.

1.19 Participate in any proceeding before the Federal Energy Regulatory Commission, pursuant to the provisions of section 405 of the Department of Energy Organization Act (42 U.S.C. 7175), or in any proceeding before any Federal or State agency or commission whenever such participation is related to the exercise of authority delegated to the Under Secretary or a delegate.

1.20 Formulate and establish enforcement policy, initiate and conduct investigations, conduct conferences, administrative hearings and public hearings, prepare required reports, issue orders, and take such other action as may be necessary or appropriate to perform any of the above functions.

1.21 In reference to the sale or lease of real property at a Department of Energy defense nuclear facility, make the discretionary decision of whether to hold harmless and indemnify any eligible entity, pursuant to the conditions contained in 50 U.S.C. 2811. This authority may only be exercised after obtaining the concurrence of the General Counsel. This authority may only be redelegated Department officials who have been appointed by the President with the advice and consent of the Senate who have oversight responsibilities for defense nuclear facilities, and may not be redelegated further.

1.22 Under section 988 of the Energy Policy Act of 2005:

A. Approve requests for reduction or elimination of the cost sharing requirement for a research and development activity of an applied nature in accordance with 988 (b)(3);

B. Approve requests for reduction of the cost sharing requirement for the non-federal share of demonstration and commercial application activities in accordance with 988(c)(2); and

C. Exclude research and development of a basic or fundamental nature from the cost sharing requirements, as described in 988(b)(1).

These authorities may not be redelegated, and may only be exercised after providing notification to the Office of the Secretary. Furthermore, the approval authorities delegated in subparagraphs A and B can only be exercised in cases of exceptional need.

1.23 Exercise the authority of the Secretary of Energy under Subtitle J of the Energy Policy Act of 2005 (Public Law 109-58, 42 U.S.C. 16371 to 16378). The authority specifically provided to the National Energy Technology Laboratory pursuant to Subtitle J of the Energy Policy Act of 2005 shall not be affected by this Order.

2. RESCISSION. Delegation Order 00-002.00F is hereby rescinded.

3. LIMITATION.

3.1 In exercising the authority delegated in this Order, a delegate shall be governed by the rules and regulations of the Department of Energy and the policies and procedures prescribed by the Secretary or delegate(s).

3.2 Nothing in this Order precludes the Secretary from exercising any of the authority delegated by this Order.

3.3 Nothing in this Order shall be construed to supersede or otherwise interfere with the authorities provided to the Administrator for Nuclear Security by law or by delegation. Furthermore, nothing herein constitutes authority to exercise authority, direction, or control of an employee of the National Nuclear Security Administration or its contractors.

3.4 Any amendments to this Order shall be in consultation with the Department of Energy General Counsel.

4. AUTHORITY TO REDELEGATE.

4.1 Except as expressly prohibited by law, regulation, or this Order, the Under Secretary may delegate this authority further, in whole or in part.

4.2 Copies of redelegations and any subsequent redelegations shall be provided to the Office of Management, which manages the Secretarial Delegations of Authority system.

5. DURATION AND EFFECTIVE DATE.

5.1 All actions pursuant to any authority delegated prior to this Order or pursuant to any authority delegated by this Order taken prior to and in effect on the date of this Order are ratified and remain in force as if taken under this Order, unless or until rescinded, amended or superseded.

5.2 This Order is effective JAN 2 9 2007.

Samuel W. Bodman
Secretary of Energy

DEPARTMENT OF ENERGY
REDELEGATION ORDER NO. 00-002.06B
TO THE DIRECTOR, OFFICE OF CIVILIAN
RADIOACTIVE WASTE MANAGEMENT

1. DELEGATION. Pursuant to section 202(b) of the Department of Energy Organization Act (Public Law 95-91, 42 U.S.C. 7132(b)) and Secretary of Energy Delegation Order to the Under Secretary, I delegate to the Director, Office of Civilian Radioactive Waste Management, authority to take the following actions:

1.1 Sign all documents and take such other actions as may be necessary and appropriate for the submission for publication to the Federal Register of notices concerning actions undertaken to implement the authorities and functions provided in the Nuclear Waste Policy Act of 1982 (Public Law 97-425). The authority delegated does not include rulemaking authority.

1.2 Report and transmit, on a semi-annual basis, site characterization progress reports for the Yucca Mountain site in the State of Nevada to the Nuclear Regulatory Commission, the Governor and the legislature of the State of Nevada, and other interested parties including the United States Congress. The reports are required under section 113(b)(3) of the Nuclear Waste Policy Act of 1982, as amended (Public Law 97-425, as amended by Title V, Subtitle A, of Public Law 100-203). Any such report, which is issued by the Director pursuant to this Order, must be submitted for concurrence by the General Counsel, the Assistant Secretary for Congressional and Intergovernmental Affairs, and the Under Secretary prior to its transmittal to the Nuclear Regulatory Commission, the Governor and the legislature of the State of Nevada, Congress, and other interested parties.

Each such report will be submitted to the Office of the Secretary at least one week prior to transmittal to the Nuclear Regulatory Commission, the Governor and the legislature of the State of Nevada.

1.3 Establish, alter, consolidate or discontinue such organizational units or components within assigned organizational elements as deemed to be necessary or appropriate.

A. In exercising this authority, or as redelegated pursuant thereto, delegates will be limited by approved budgets, staffing level allocations, and Senior Executive Service and other executive resource position allocations. Organizational changes shall not be announced or implemented until appropriate union coordination and other pre-release clearances have been obtained.

B. This authority does not include approval of additional, deletion, or transfer of mission and functions of or between Departmental Headquarters or Field Elements, which authority is reserved to the Secretary.

C. Heads of Departmental Headquarters may delegate the authority to alter or consolidate organizational elements further, in whole or in part, consistent with the terms of the Department of Energy Organization Act, to an official or officials one level below the Head of the Departmental Headquarters.

D. The authority to establish or discontinue organizational elements at the first or second level below the Departmental Headquarters may not be redelegated.

E. Acting Heads of Departmental Headquarters may not redelegate these authorities and may only establish, alter, consolidate or discontinue organizational units at the third level and below. During the tenure of an acting Head of a Departmental Headquarters, organizational units below the Head of Departmental Headquarters may not exercise redelegations granting the authority to alter or consolidate units.

F. This authority shall be exercised in accordance with, and shall be subject to the requirements of, the Secretary of Energy's Memorandum to All Department of Energy Employees relating to functional accountability, dated May 23, 2006.

1.4 Assert on a nonexclusive basis, the Federal Government's deliberative process privilege with respect to any matters arising under his or her cognizance.

2. RESCISSION. Delegation Order 00-002.06A is hereby rescinded.

3. LIMITATION.

3.1 In exercising the authority delegated in this Order, a delegate shall be governed by the rules and regulations of the Department of Energy and the policies and procedures prescribed by the Secretary or delegate(s).

3.2 Nothing in this Order precludes the Secretary or the Under Secretary from exercising any of the authority delegated by this Order.

3.3 Any amendments to this Order shall be in consultation with the Department of Energy General Counsel.

4. AUTHORITY TO REDELEGATE.

4.1 Except as expressly prohibited by law, regulation, or this Order, the Director, Office of Civilian Radioactive Waste Management may delegate this authority further, in whole or in part.

4.2 Copies of redelegations and any subsequent redelegations shall be provided to the Office of Management, which manages the Secretarial Delegations of Authority system.

5. DURATION AND EFFECTIVE DATE.

5.1 All actions pursuant to any authority delegated prior to this Order or pursuant to any authority delegated by this Order taken prior to and in effect on the date of this Order are ratified and remain in force as if taken under this Order, unless or until rescinded, amended or superseded.

5.2 This Order is effective January 29, 2007.

David K. Garman
Under Secretary