# Attachment 1

# In the United States Court of Federal Claims

No. 04-74C
(into which has been consolidated No. 04-75C)

(E-Filed: December 21, 2005)

PACIFIC GAS AND ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

ORDER

The court has before it plaintiff's Motion for Clarification or Reconsideration on Discovery Restriction (Pl.'s Mot. or Motion), Defendant's Response to Plaintiff's Motion for Clarification or Reconsideration on Discovery Restriction (Def.'s Resp. or Response), and plaintiff's Reply in Support of Motion for Clarification or Reconsideration on Discovery Restriction (Pl.'s Reply or Reply). Plaintiff seeks clarification or reconsideration of a statement made by the court in its December 2, 2005 Order. Pl.'s Mot. at 1. In this Order, the court found "that January 28, 2004 is an appropriate cut-off date for document discovery." 12/02/05 Order at 2 n.2. Plaintiff contends that the court should clarify or reconsider this statement because "the issue of a possible 'cut-off date' for discovery has never been briefed in this case and the [c]ourt therefore has not had occasion to fully consider the issue," Pl.'s Mot. at 1, and because "it appears from the context of the discussions at the discovery conferences that the [c]ourt may be conflating the issue of a cut-off date for damages with the issue of a cut-off date for discovery," id. Moreover, plaintiff claims that "there are many . . . examples of documents generated after Janury 2004 [] that are not only relevant to, but compelling evidence concerning, the key disputed issue[s in] this case." Id. at 2.

Defendant responds that "[b]ecause causation is determined by comparing the actual world with the 'but for' world, the cut-off for discovery of documents from the

Government's files should be as early as 1998," let alone January 28, 2004. Def.'s Resp. at 8. Thus, defendant contends, documents that post-date January 28, 2004 "simply are not relevant for purposes of establishing either the Government's liability in this case or PG&E's damages," id. at 12, and therefore the court should not allow plaintiff to "engag[e] in a fishing expedition that is not reasonably calculated to lead to the introduction of admissible evidence in this case," id. (emphasis in original). Defendant concludes that a January 28, 2004 "cut-off date for discovery in this case is not only entirely reasonable and sensible, but is well within this Court's inherent authority to limit the scope of discovery." Id. at 9 (citing Florsheim Shoe Co. v. United States, 744 F.2d 787, 797 (Fed. Cir. 1984) (stating that "[q]estions of the scope and conduct of discovery are . . . committed to the discretion of the trial court")).

In its Reply, plaintiff argues that "[t]he substantive issues the government discusses should be resolved by the [c]ourt in substantive rulings, after trial or perhaps through motions in limine, not back-handedly on the basis of an artifical discovery cut-off that actually prevents the [c]ourt from addressing these substantive issues on a full factual record." Pl.'s Reply at 1 (emphasis in original). Indeed, plaintiff contends, "relevance is a substantive issue that should not be resolved by the [c]ourt at a telephonic discovery conference, or in a footnote to a discovery order, without benefit of full briefing and full consideration of the particular substantive issue involved." Id. at 2. Moreover, plaintiff states that, under its theory of the case, "because the contract is silent on acceptance rate and other 'schedule' issues, the [c]ourt must supply a 'reasonable' rate and schedule . . . , [and] what [the Department of Energy (DOE)] is doing now, or plans to do in the future, is plainly evidence of what a 'reasonable schedule would be." Id. at 4-5. Thus, plaintiff concludes that it "should be able to obtain discovery without any cut-off date restriction, and later the parties can argue (and the [c]ourt can decide) what is relevant and/or should be admitted into the trial record." Id. at 5.

The court agrees with plaintiff. The Rules of the Court of Federal Claims (RCFC) call for a "broad scope of discovery in this court." Int'l Paper Co. v. United States, 36 Fed. Cl. 313, 317 (1996). Indeed, RCFC 26(b)(1) states that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party," and "the court may order discovery of any matter relevant to the subject matter involved in the action." As the Federal Circuit has explained, "[t]he scope of civil discovery is broad and requires nearly total mutual disclosure of each party's evidence prior to trial. . . . The information sought during discovery in a civil case need not be admissible at trial and need only be reasonably calculated to lead to discovery of admissible evidence." Afro Lecon, Inc. v. United States, 820 F.2d 1198, 1203 (Fed. Cir. 1987) (citing Hickman v. Taylor, 329 U.S. 495, 507 (1947)) (interpreting the identical Rule 26(b)(1) of the Federal Rules of Civil Procedure).

Although the court is aware of its "inherent authority to limit the scope of discovery," Def.'s Resp. at 9 (citing Florsheim Shoe, 744 F.2d at 797), the court does not believe it necessary under these circumstances to limit discovery of all documents to those created on or before January 28, 2004, the date of plaintiff's amended complaint. Instead, as plaintiff states, the relevance of such documents can be ruled upon "through motions in limine," during trial, or even after trial, rather than "on the basis of an artificial discovery cut-off that actually prevents the [c]ourt from addressing these substantive issues on a full factual record." Pl.'s Reply at 1 (emphasis in original). While the court notes that the Federal Circuit has stated that "where a 'claim is premised upon the government's partial breach, its damages were limited to those costs incurred prior to the date of its suit,'" Def.'s Resp. at 3-4 (emphasis in original) (quoting Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376-77 (Fed. Cir. 2005)), it does not follow that discovery should be necessarily limited to documents created prior to the date of suit.[1] Indeed, as plaintiff states, "it cannot be said [at this time] that nothing about DOE's current and future plans is relevant." Pl.'s Reply at 6 (emphasis in original).

Accordingly, the court STRIKES footnote 2 of its December 2, 2005 Order.[2] Absent any specific discovery limitations previously ordered by the court and not hereby stricken,[3] the parties shall be able to obtain document discovery without a universal "cut-off date" limitation and in accordance with the discovery rules of the RCFC.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge

---

[1]This Order does not address or rule on the question of whether damages must necessarily be limited to those incurred prior to January 28, 2004.

[2]However, the January 28, 2004 cut-off date for discovery of "all communications between PG&E and either the DOE or the United States Nuclear Regulatory Commission [(NRC)] related to spent fuel" shall still remain, as shall any other limitations placed on the discovery of such communications by the court's December 2, 2005 Order.

[3]For example, the specific limitations on document discovery ordered by the court in its October 18, 2005 Order shall remain in place, as these limitations were ordered after hearing the parties' oral arguments during two telephonic conferences held on October 14 and 17, 2005, and after careful attention by the court to extended arguments.

# Attachment 2

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PACIFIC GAS & ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-0074C, into which has been consolidated No. 04-0075C<br>(Judge Hewitt) |

## DECLARATION OF RONALD A. MILNER

RONALD A. MILNER declares as follows:

1. I am the Chief Operating Officer for the Office of Civilian Radioactive Waste Management ("OCRWM"), Department of Energy ("DOE"). As Chief Operating Officer, I report directly to the Director and Deputy Director of OCRWM. I am involved with and familiar with all aspects of DOE's civilian radioactive waste management program, and am personally responsible for the day-to-day operations of OCRWM.

2. I have worked for DOE since 1977, and I have worked for OCRWM continuously since 1984. I have been a member of the Senior Executive Service since 1992. I have served as OCRWM's Chief Operating Officer since 2000, and immediately prior to my current position, I served as the Acting Deputy Director of OCRWM for approximately three years.

3. OCRWM was established in 1983 following passage of the Nuclear Waste Policy Act. ("NWPA") 42 U.S.C. § 10224. OCRWM currently employs approximately 150 federal employees, and also oversees the activities of numerous contractor employees. OCRWM personnel work under my supervision. The OCRWM Program is currently organized into the following components: (1) Program Management -- Program management activities are managed from Washington, D.C. Responsibilities include oversight of quality assurance, program

Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal Claims

planning and administration, program management and integration, external interactions, human resources, and the OCRWM budget; (2) Yucca Mountain Project -- The Yucca Mountain site is located in Nye County, Nevada, approximately 100 miles northwest of Las Vegas. For two decades, OCRWM has conducted scientific and engineering investigations at Yucca Mountain to determine its suitability as a nuclear waste repository; (3) Science and Technology Program -- The program explores technological improvements that could enhance the performance, safety, and efficiency of the repository at Yucca Mountain, and/or reduce the costs of the civilian radioactive waste management system; and (4) Waste Acceptance and Transportation Project -- Headquartered in Washington, DC., responsibilities include development of waste acceptance, storage and transportation systems. Activities also include interactions with other waste owners, generators and international waste management programs.

4. During my tenure at DOE, OCRWM has been subject to constant scrutiny by many different parties – Congress, other Executive Branch agencies, the DOE Inspector General's office, the states affected by OCRWM's plans for siting of disposal and storage facilities, the commercial nuclear utilities with which we hold Standard Contracts, and others. As part of this scrutiny, DOE policy makers and OCRWM personnel are constantly called to explain decisions and actions taken by the Department in the implementation of the Nuclear Waste Policy Act. OCRWM's plans, decisions and actions also have been the subject of numerous lawsuits. In addition to the suits pending before the Court of Federal Claims, the State of Nevada and others have filed suits seeking review of actions taken to site the repository. In the upcoming license application proceeding before the NRC, OCRWM will have to defend its plans for the design and operation of the repository, with an expected review of all the studies



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

and analysis that DOE has undertaken to date. While under this scrutiny, OCRWM personnel are trying to fulfill their mission, which is to site, build and open a facility at which they can accept spent nuclear fuel ("SNF") from Standard Contract holders and the DOE weapons complex for eventual long-term disposal.

5. OCRWM personnel are aware of this constant scrutiny of their actions and the potential for further scrutiny if preliminary drafts or opinion papers are released based upon the experience of the program. [redacted]

PRIVILEGED INFORMATION UNRELATED TO THIS LITIGATION

DESCRIBES EFFECT OF INADVERTENT RELEASE OF DELIBERATIVE PROCESS DOCUMENT ON EMPLOYEES' WILLINGNESS TO PROVIDE CANDID ADVICE IN ANOTHER CIRCUMSTANCE

6. OCRWM personnel are also very aware of the litigation brought by Standard Contract holders in the United States Court of Federal Claims. In the litigation numerous OCRWM personnel have been deposed about their involvement in the program. Several people have been deposed repeatedly -- Mr. Pollog has sat for 11 days of deposition and Mr. Zabransky has sat for 16 days of deposition. While Messrs. Pollog and Zabransky have played a crucial role in supporting the Office of General Counsel and assisting the Department of Justice in defending



Protected Material To Be Disclosed Only In Accordance With Protective Order Entered By U.S. Court Of Federal Claims

the Department in the spent nuclear fuel litigation, I have had comparatively little involvement in the litigation and have not routinely provided assistance to the Office of General Counsel regarding it;[1] despite my relative lack of involvement in this matter, I, myself, sat through six days of deposition, during which I was asked about drafts of documents, my comments on potential policies, and my participation in decisions regarding actions taken or not taken by the program. Mr. Lake Barrett, the former deputy director of the program, sat through seven days of deposition. It is common knowledge throughout the program that the litigation continues and that personnel may be subject to further depositions.

7. As a result of this scrutiny, individuals under my general supervision are very reticent to provide recommendations or opinions about courses of action that may become the subject of questioning by Congress, the Government Accountability Office, the DOE Inspector General, in the litigation, or in the license application proceedings. While employees are required to generate or provide review of documents necessary to the program, employees are increasingly reluctant to express a novel idea or voice a potential criticism to their superiors for concern they will be called to defend their thoughts in a deposition or another forum. Yet, as we finalize the license application, it is critical to decision-making in the best interest of American citizens that OCRWM employees feel free to state their opinions and make sure that the license application is robust and beyond reproach.

8. It is my understanding that, in response to discovery requests from the utility plaintiffs in the spent nuclear fuel cases filed in the Court of Federal Claims, DOE has reviewed

---

[1] Given the scope and import of the spent nuclear fuel litigation, there is no individual within OCRWM who has not become somewhat informed about the litigation.



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

and produced hundreds of thousands of documents referring or relating to DOE's delay in beginning acceptance of spent nuclear fuel or high-level radioactive waste by January 31, 1998 and the schedule by which DOE should have begun acceptance. In that process, DOE has identified and withheld a small number of documents that involve and/or reflect the Department's deliberative processes. DOE has a policy of protecting its deliberative processes in order to assure the free flow of ideas and candid discussion of alternatives, which are essential to its efficient operation.

9. Congress established OCRWM to carry out the functions of the Secretary of Energy pursuant to the NWPA. Pursuant to a formal delegation by the Secretary of Energy to the Under Secretary of Energy, Science and Environment, and a subsequent formal redelegation from the Under Secretary to the Director, Office of Civilian Radioactive Waste Management, the Director or her delegate has responsibility for asserting the Government's deliberative process privilege within the cognizance of OCRWM.

10. In connection with my responsibilities as Chief Operating Officer for OCRWM and my prior positions within OCRWM since 1984, I am generally familiar with the spent nuclear fuel litigation. Based upon the thorough review of the documents at issue by counsel with DOE's Office of General Counsel, my own personal detailed review of these documents, and my experience as an official within OCRWM for 22 years, I have determined that the Department can and should assert the claim of deliberative process privilege with respect to certain documents more thoroughly described in this declaration. As part of the spent nuclear fuel litigation, I previously executed declarations asserting deliberative process privilege over numerous DOE documents. It is my understanding that the Court has been provided with my



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

prior declarations, dated May 13, 2002, June 13, 2003 (two declarations), and November 10, 2005, respectively. This declaration includes, and I continue to assert a claim of deliberative process privilege over, most of the documents that were included in my prior declarations.

11. Because the controversy regarding the delay in spent nuclear fuel acceptance is within the cognizance of OCRWM, I, Ronald A. Milner, Chief Operating Office of OCRWM and delegate of the Director of OCRWM, hereby assert the deliberative process privilege upon behalf of DOE for the documents listed below. Most of the documents I discuss below reflect our standard practice of soliciting input from knowledgeable individuals to ensure that policy makers have the best information and recommendations upon which to base their decisions. If these documents are released and staff members are called upon to testify about their stated opinions and recommendations that are reflected in these documents, the environment in which OCRWM personnel operate will become further degraded in that employees will be reluctant to provide their frank advice and opinions. I have determined that disclosure of any of the deliberative contents of the documents identified in the following list would be injurious to the Federal Government's decision-making functions because such disclosure would tend to inhibit the frank and candid discussion necessary to effective government. Indeed, disclosure would have a chilling effect upon many future discussions at DOE.

12. When the Department asserts a formal claim of deliberative process privilege with respect to predecisional/deliberative documents, the privilege is claimed only to protect those intragovernmental documents reflecting advisory opinions, recommendations and deliberations which comprise part of the process by which agency decisions and policies are formulated. The Department does not seek to protect documents containing factual matters unless such factual



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

matters are so intertwined with advisory opinions, recommendations, conclusions, or reasoning by Government officials that the factual material cannot be excised from the privileged material or unless the factual matter itself, through its selection and distillation by the author, would reveal the author's mental process or the agency's deliberations. The privilege is not claimed to protect all opinions, conclusions, mental impressions, and thought processes of Government officials, but only those the disclosure of which would interfere with vital Government functions or would cause injury to and negatively impact the quality of agency decisions.

13. When the Department asserts a formal claim of deliberative process privilege with respect to predecisional/deliberative documents, the Department first considers whether the document falls within the scope of the deliberative process privilege; that is, whether the document was generated before the adoption of a department policy or position, or whether the document reflects the give-and-take of the consultation process leading up to the formulation of an agency policy, position or decision. The Department also considers whether the document is recommendatory in nature or is a draft rather than a final document; whether the document weighs the pros and cons as to the agency's ultimate adoption of one viewpoint or another; and whether the material is so candid or personal in nature that public disclosure is likely to stifle honest and frank communication within the Department in the future.

14. Consequently, the Department considers protecting recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy or position of the Department. These types of documents inaccurately reflect or prematurely disclose the views of Government officials, suggesting an agency position which is, as yet, only a personal position. Disclosure of



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

documents containing reasons and rationales that were not ultimately relied upon by the department in reaching its decisions could create public confusion and not accurately reflect the Department's decision on a particular matter or issue.

15. I understand that the process of reviewing and producing documents as part of this SNF litigation began in 1998, and continues to this day. This review and production has encompassed literally hundreds of thousands of documents related to OCRWM's civilian radioactive waste management program.

16. Obviously, this quantity of documents, reviewed and produced over a number of years, cannot be reviewed and considered by a single individual. As a result, a number of DOE employees, including attorneys from the Office of General Counsel, have been involved with and responsible for collecting documents responsive to the plaintiff's discovery requests, reviewing all of those documents, and then producing the responsive, non-privileged documents to plaintiffs. During this same review process, both DOE staff employees and DOE attorneys also identified a small number of documents that those individuals believed might involve or reflect DOE's predecisional, deliberative review and assessment of the Department's policies, decisions, strategies and/or positions.

17. As a result of this internal document review, and my understanding that the Government must identify documents during discovery that it intends to withhold from production to plaintiffs on the basis of privilege, I conducted my own personal review of the documents that were initially identified or considered by other individuals within the Department to be predecisional and deliberative. As the Secretary's delegee to assert deliberative process privilege over matters under the cognizance of OCRWM, I executed my first "deliberative



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

process" declaration in May 2002, as part of what was described to me as the coordinated discovery phase of the SNF litigation. However, the same process of initial identification of potential documents protected by the deliberative process privilege, and then individual, detailed review of each identified document by myself, applies to all of the declarations that I executed during this litigation.

18. Recently, I was informed by counsel at DOE and the Department of Justice that, in response to the Court's order in the above-captioned case, which resulted from the plaintiff's motion to compel the production of numerous documents withheld from production on the basis of deliberative process privilege, the Government was directed to provide the Court with *ex parte* declarations covering all of the documents over which the Government continued to assert a claim of deliberative process privilege. Over a period of three days, I spent approximately ten hours reviewing each of the 281 documents that were included in my prior declarations submitted as part of the spent nuclear fuel litigation. As a result of this review, I have determined that the Department will waive its claim of deliberative process over 14 documents, either in whole or in part. However, based upon my detailed review of the documents, I hereby reassert the deliberative process privilege upon behalf of DOE for the following documents which are potentially responsive to plaintiff's requests for production of documents:

1. The document Bates-Stamped HQR0380108 - HQR0380111 (E174)[2] is a draft document that includes the Department's considerations and recommendations regarding how DOE should improve its interaction with the State of Nevada. The

---

[2] "E___" refers to the number that plaintiff has assigned to the document at issue in its motion to compel.



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

document is part of an ongoing policy deliberation within the DOE regarding its continuing interaction with Nevada as it relates to the storage of spent nuclear fuel at Yucca Mountain. [redacted] If confidential suggestions such as this one were released, and individuals questioned regarding the potential policies presented, Department employees would be reluctant to make such suggestions in the future.

SENSITIVE INFORMATION REGARDING DOE'S RELATIONSHIP W/ NEVADA; DOES NOT PROVIDE GREATER INSIGHT TO CONTENTS OF DOCUMENT THAN DESCRIBED ABOVE; INFORMATION NOT RELEVANT TO ISSUES IN THIS LITIGATION

2. The document Bates-Stamped HQR0390447 - HQR0390454 (E176) is a legal memorandum from DOE's General Counsel to the Executive Assistant to the Deputy Secretary of Energy regarding options for the receipt of Cintichem fuel. The specific decision at issue was how DOE would accept Cintichem fuel, and this document reflects DOE's deliberations regarding different methods for accepting the fuel, and provides options, discusses advantages and disadvantages of the options, and makes recommendations regarding the acceptance of Cintichem fuel. The release of this document would cause second-guessing by multiple parties of the method of acceptance ultimately chosen by DOE, and therefore would inhibit DOE's willingness and ability to respond to future requests for acceptance such as this one.



Protected Material To Be Disclosed Only In Accordance With Protective Order Entered By U.S. Court Of Federal Claims

**Advice Concerning Possible Settlements:**

The following four documents all address the issue of whether DOE could settle the utilities' lawsuits, and the sensitivities involved in such a decision. Each of the documents contains analysis of various options that DOE could pursue, and their effect upon the program and the potential for settlement.

3. The document Bates-Stamped HQR0510001 - HQR0510007 (E180) is a briefing memorandum to the Secretary of Energy from Mary Louise Wagner, special assistant to the Secretary of Energy, regarding a meeting with utility executives that provides recommendations and analysis of issues prior to a meeting with executives of PECO and ComEd. The specific decision at issue in this document was whether DOE could settle the utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document reflects part of the Department's deliberations that led to its decision, and also includes materials prepared at the direction of counsel and attorney-client communications. The document identifies for the Secretary various "sensitivities" that must be contemplated. The release of this information would discourage employees from identifying such sensitivities for the Secretary in the future, which would lead to less well-informed decision-making by the Secretary. Because the Department is still engaged in continuing settlement negotiations with numerous Standard Contract holders, it is particularly important that individuals feel free to provide input and make suggestions regarding potentially creative means of settlement without fear that their suggestions (intended only for internal use) would be obtained by the utilities and,



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

depending upon the context of the suggestion, used against the Department in settlement negotiations. Knowing that their preliminary ideas and concerns might be disclosed to the utilities, potentially to the Department's detriment, has already chilled Department employees from becoming involved in these activities. To the extent that additional settlements are to occur, the free flow of ideas within the Department must be encouraged and not chilled. Further, the one-sided disclosure of information about the Department's internal settlement positions would seem inherently unfair and counterproductive to the idea that parties negotiate settlements on a level playing field.

4. The document Bates-Stamped HQR0510008 - HQR0510011 (E181) is a briefing memorandum for the Secretary of Energy from Mary Louise Wagner and Mary Anne Sullivan, General Counsel of the Department of Energy, regarding a meeting with Northern States Utility. The specific decision at issue in this document was whether DOE could settle the utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document reflects part of the Department's deliberations that led to its decision, and also includes materials prepared at the direction of counsel and attorney-client communications. The document identifies for the Secretary various "sensitivities" that must be contemplated. The release of this information would discourage employees from identifying such sensitivities for the Secretary in the future, which would lead to less well-informed decision-making by the Secretary.



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

5. The document Bates-Stamped HQR0510018 (E183) is a summary regarding spent fuel storage costs. The document is part of DOE's ongoing deliberations that involve the possibility of settling the nuclear utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document includes materials prepared at the direction of counsel and attorney-client communications, and provides the estimated costs associated with pursuing a number of options and scenarios regarding DOE's delay in SNF acceptance. If outside parties gained access to this information, they would second-guess the decision ultimately made by DOE, questioning DOE officials about each and every option considered. This would prompt DOE decision-makers to stop seeking creative suggestions that may ultimately be rejected, and consider markedly fewer options in the future.

6. The document Bates-Stamped HQR0292342-HQR0292353 (E160) is a memorandum from Lake Barrett, former Acting Deputy Director, OCRWM, to Under Secretary of Energy Thomas Grumbly regarding the advantages and disadvantages of several litigation options as they relate to the Department's acceptance of spent nuclear fuel. The specific decision at issue in this document was whether DOE could settle the utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document reflects part of the Department's deliberations that led to its decision, and also includes materials prepared at the direction of counsel and attorney-client communications. This document contains analyses of options that may have later been proven impractical or impossible. Outside parties with access to this information would question DOE's decision to



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

reject such options, suppressing the willingness of DOE officials to suggest a variety of options in the future. DOE decision-makers would be left without the w materials necessary to make a comprehensive and well-considered decision.

7. The document Bates-Stamped CTR191370 - CTR191383 (E110) is addressed to the Office of the Secretary from an individual in DOE's office of Fissile Materials Assurance Working Group ("FMAWG"). The specific policy decision at issue was the methods through which the Department would safeguard irradiated nuclear materials. The document seeks Secretary-level approval of the attached Program Directions for Safeguarding Irradiated Nuclear Materials. The document also includes a communication from the Acting Deputy Assistant Secretary for Nuclear Material and Facility Stabilization to AMEM field managers regarding the FMAWG drafted program direction, and seeks comments and estimated costs to implement the proposed Program Directions. The document was part of DOE's policy deliberations that led to the Department's decision, and includes a recommendation from FMAWG to the Office of the Secretary relating to that decision. Here, Mr. Chris Einberg of the Office of Civilian Radioactive Waste Management was specifically asking Mr. Scott Vance for input regarding the proposed program direction, which had not yet been adopted. If this pre-decisional document were released, and Mr. Einberg and Mr. Vance subject to deposition regarding their input, Mr. Einberg and other individuals[3] would be less likely to provide frank input in the future. It is critical that decision-makers

---

[3] Mr. Vance is no longer with the program.



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims

receive unfettered advice from qualified individuals before finalizing this kind of policy decision.

8. The document Bates-Stamped HQR0510020 - HQR0510024 (E184) is a memorandum prepared by Mary Louise Wagner, Senior Policy Advisor to the Secretary, at the direction of Mary Anne Sullivan, then-DOE General Counsel, for the Secretary of Energy containing legal advice and mental impressions regarding DOE's request to the President for approval to begin negotiations with the United States Senate for nuclear waste legislation, following the decision of the United States Court of Appeals for the District of Columbia in Northern States Power Co. v. U.S. Dep't of Energy, 128 F.3d 754 (D.C.Cir. 1997). In addition to the attorney client privilege and attorney work product protection asserted for this document, the document reveals the deliberations within DOE regarding its response to the spent nuclear fuel lawsuits and forms part of the deliberative process. The document Bates-Stamped HQR0510012 (E182) is a memorandum detailing points to be made concerning a proposal for on-site storage of nuclear utilities' spent nuclear fuel. The memorandum was prepared by Mary Louise Wagner (DOE) at the direction of Mary Anne Sullivan (DOE General Counsel) for the Secretary of Energy and reveals the legal advice and mental impressions of DOE legal counsel regarding DOE's position for on-site storage of spent nuclear fuel and DOE's position regarding proposed congressional legislation regarding interim storage of spent nuclear fuel. Document contains analysis and recommendations from the Secretary of Energy to the President regarding the administration of NWPA,



Protected Material To Be Disclosed Only
In Accordance With Protective Order
Entered By U.S. Court Of Federal
Claims