# In the United States Court of Federal Claims

No. 04-106 C
(Filed: November 20, 2007)

*************************************

| | | |
|---|---|---|
| **DAIRYLAND POWER COOPERATIVE**, Plaintiff, | * | Compelling deposition testimony; sanctions; deliberative process privilege; attorney-client privilege, work product doctrine; RCFC 30(b)(6); FRE 401; FRE 408 |
| v. | * | |
| **THE UNITED STATES**, Defendant. | * | |

*************************************

*Jerry Stouck*, Greenberg Traurig LLP, Washington, DC, counsel of record for Plaintiff; of counsel were *Robert Shapiro* and *Kevin Stern*, Greenberg Traurig LLP, Washington, DC.

*Russell A. Shultis*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, counsel of record for Defendant, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Harold D. Lester, Jr.*, Assistant Director, United States Department of Justice, Washington, DC; of counsel was *Jane K. Taylor*, Office of General Counsel, United States Department of Energy, Washington, DC, *Alan J. Lo Re*, Senior Trial Counsel, and *Patrick B. Bryan, Joshua E. Gardner,* and *Scott C. Slater*, Trial Attorneys, United States Department of Justice, Washington, DC.

---

## OPINION AND ORDER

---

**DAMICH, Chief Judge.**

Before the Court is Plaintiff Dairyland Power Cooperative's Motion For Relief for Government Discovery Violations Regarding Rule 30(b)(6) Testimony, which stems from one case that is part of the ongoing spent nuclear fuel litigation before the Court of Federal Claims.

The basis of Dairyland's motion is twofold.

First, Dairyland alleges that Defendant United States's witnesses, Christopher Kouts and David Zabransky, provided insufficient deposition testimony about specific topics as to which the government had designated them to testify pursuant to Rule 30(b)(6) of the Rules of the Court of Federal Claims (RCFC). Because of this allegedly problematic testimony, Dairyland moves this court for the sanction of prohibiting the government from presenting further evidence concerning these topics.

Second, Dairyland questions Defendant United States's invocations of the deliberative process privilege, attorney-client privilege, the attorney work product doctrine, and of Federal Rules of Evidence (FRE) 401 (relevance) and 408 (compromises or offers to compromise) to prevent Mr. Zabransky from answering particular questions during his deposition. Alleging that these invocations were improper, Dairyland has also requested that this Court reopen Mr. Zabransky's deposition for the purpose of having him answer these questions. As a further sanction for the government's alleged discovery abuse, reflected in both the insufficient deposition testimony and the improper invocations of privilege and evidence rules, Dairyland seeks compensation for attorneys' fees and other costs of litigating this motion for relief.

For the reasons described herein, the Court finds that Mr. Kouts's deposition testimony was responsive to the inquiries pursued. The Court also finds that Mr. Zabransky's deposition testimony was insufficient only as to one topic about which the government had designated him to testify–the U.S. Department of Energy's (DOE) intent in entering into the contract at issue in the spent nuclear fuel litigation. The Court will, therefore, reopen Mr. Zabransky's deposition to allow Dairyland to question him further about this topic and ORDER the government to compensate Dairyland for the costs of further deposing Mr. Zabransky in this regard.

The Court also finds that the government improperly invoked the deliberative process privilege in two instances and will correspondingly reopen Mr. Zabransky's deposition in this regard as well, similarly requiring the government to compensate Dairyland. Dairyland's motion for relief is, therefore, GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

This immediate discovery dispute concerns one of several cases filed by nuclear utilities in the Court of Federal Claims regarding DOE's compliance with the "Standard Contract"[1] issued pursuant to the Nuclear Waste Policy Act (NWPA) of 1982, 42 U.S.C. §§ 10101-10270. The Standard Contract provides for the government's acceptance, transportation, storage, and disposal of spent nuclear fuel (SNF) and other high-level radioactive waste (HLW), the costs of which would be borne by the "generators and owners" thereof. *Id*. at § 10131(b).

---

[1] "Standard Contract for the Disposal of Spent Nuclear Fuel And/Or High-Level Radioactive Waste," published at 10 C.F.R. § 961.11.

Plaintiff Dairyland, an electric generation and transmission cooperative providing electrical power to 25 member electric cooperatives and 14 municipal utility members located in Wisconsin, Minnesota, Iowa, and Illinois, entered into a contract in 1983 with DOE for the removal of spent nuclear fuel and other high-level radioactive waste from Dairyland's La Crosse Boiling Water Reactor (LACBWR) in Genoa, Wisconsin, in exchange for the payment of fees. Compl. ¶¶ 1-2, 4. Dairyland filed its complaint alleging breach of this contract on January 28, 2004. Following summary judgment in a similar case, *Energy Northwest v. United States*, in favor of the plaintiff on the issue of contractual liability, this Court, on April 27, 2006, similarly entered summary judgment in Dairyland's favor on the same issue. Order of Summary Judgment (Apr. 27, 2006); *see also Energy Northwest v. United States*, 69 Fed. Cl. 500 (2006).

The parties in this case then entered into discovery concerning the issue of damages. As part of this discovery, Dairyland's counsel, in a letter dated December 13, 2006, provided the government with a list of 21 deposition topics pursuant to RCFC 30(b)(6).[2] Def.'s Response to Plf.'s Motion to Compel and for Sanctions Relating To The Government's RCFC 30(b)(6) Testimony ("Def.'s Response"), Ex. 1. The list included such general areas of inquiry as "DOE's purpose and intent in entering the Standard Contracts" and "DOE's understanding of the utilities' purpose and intent in entering the Standard Contracts." *Id*. On December 18, 2006, Plaintiff filed a motion to compel the depositions of three DOE employees–David Zabransky, Christopher Kouts, and Thomas Pollog–and for an RCFC 30(b)(6) deposition limited to the list of topics in the letter of December 13, 2006. Plf.'s Mot. To Compel Depositions. By an order dated January 29, 2007, the Court granted Dairyland's motion. Order (Jan. 29, 1997), at 1. Defendant consequently designated Messrs. Zabransky, Kouts, and Pollog to testify concerning the RCFC 30(b)(6) topics. Def.'s Response, Ex. 2, 3.

Dairyland has raised concerns about the testimony of Mr. Kouts, who was deposed on May 1-2, 2007,[3] and that of Mr. Zabransky, who was deposed on May 3, 2007. The deposition testimony by these two witnesses at issue pertains to only five of the 21 RCFC 30(b)(6) topics Dairyland initially listed. In this regard, Dairyland filed its motion for relief for government

---

[2] RCFC 30(b)(6) allows a party to "name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination [in a deposition] is requested." RCFC 30(b)(6). In this event, "the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify." *Id*.

[3] Dairyland's portion of the deposition was taken on May 1, 2007, and the second day was devoted to questioning by counsel in *Energy Northwest*, Case No. 04-10 C (filed January 7, 2004).

discovery violations on July 18, 2007.[4] *See* Dairyland's Motion for Relief (Plf.'s Mot.) for Government Discovery Violations Regarding Rule 30(b)(6) Deposition Testimony. The government responded on August 17, 2007; Dairyland replied to this response on August 22, 2007. *See* Def.'s Response; Dairyland's Reply on its Motion for Relief for Government Discovery Violations Regarding Rule 30(b)(6) Deposition Testimony (Plf.'s Reply).

Mr. Kouts, a senior DOE employee serving as Acting Assistant Director of DOE's Office of Civilian Radioactive Waste Management (OCRWM), allegedly provided insufficient testimony as to:

- Topic No. 18: "The reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998."
- Topic No. 19: "The reasonableness or unreasonableness of Dairyland's study, analysis[,] investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998."

Plf.'s Mot. at 3, Ex. 1.

Mr. Zabransky, DOE's Contracting Officer for the Standard Contract, allegedly provided insufficient deposition testimony about:

- Topic No. 6: "DOE's purpose and intent in entering the Standard Contracts."
- Topic No. 7: "DOE's understanding of the utilities' purpose and intent in entering the Standard Contract."
- Topic No. 14: "The purpose and role of provisions of the Standard Contracts governing, and DOE's plans for, scheduling acceptance and acceptance of failed fuel, including failed fuel at Dairyland's site."

Plf.'s Mot. at 7, Ex. 1; Plf.'s Reply at 8 (withdrawing request for relief concerning topic 9 of RCFC 30(b)(6) topics listed in letter of December 13, 2006).

Dairyland consequently seeks an order precluding the government from offering evidence at trial on four issues these five topics encompassed: 1) the parties' understanding and intention in entering into the Standard Contract; 2) whether absent the breach, DOE would have delayed acceptance of Dairyland's failed fuel[5] beyond the time of DOE's acceptance of the remainder of

---

[4]Dairyland filed a corrected motion for relief two days later which contained numbered appendix pages and no other changes. *See* Corrected Dairyland's Motion for Relief for Government discovery Violations Regarding Rule 30(b)(6) Testimony.

[5]"Failed fuel" means spent nuclear fuel that, while otherwise meeting the Standard Contract's specifications, is contained in defective fuel assemblies (e.g. structural deformity, damage requiring special handling).

Dairyland's spent fuel; 3) the reasonableness of Dairyland's storage of its spent fuel in its spent fuel pool after January 31, 1998; and 4) the reasonableness of Dairyland's study, analysis, and investigation of dry storage for its spent fuel during the period following January 31, 1998. Plf.'s Mot. at 19-20. Such sanctions, Dairyland argues, would preclude the government "from both preventing Dairyland from discovering the government's litigation positions and then surprising Dairyland at trial." *Id*. at 2.

Dairyland also disputes the basis on which the government precluded Mr. Zabransky from answering questions regarding four other related subjects. In regard to three of these subjects, the government invoked the deliberative process privilege: 1) DOE's development of new contracts for the disposal of spent fuel for newly contemplated nuclear reactors, 2) certain DOE initiatives on which Mr. Zabransky was working with the consulting firm of Booz Allen Hamilton, and 3) whether DOE was planning to encourage utilities to implement the use of DOE's Transportation, Aging, and Disposal Canister Systems (TAD) in light of DOE's view that TADs did not constitute acceptable forms of waste under the Standard Contract. Def.'s Response at 11-12. Mr. Zabransky also did not answer questions regarding his knowledge of what reasonable costs would be for storing spent nuclear fuel at a utility site after the government objected on the grounds of work product doctrine, the attorney-client privilege, and Federal Rules of Evidence (FRE) 401 (relevance) and 408 (prohibiting the use of settlement offers and negotiations to prove liability or a claim's validity). *Id*.

## II. DISCUSSION

This Court will first examine whether Messrs. Kouts and Zabransky provided insufficient testimony regarding the specified RCFC 30(b)(6) topics and Dairyland's request to preclude the government from submitting further evidence on these topics. Afterwards, the Court will consider the issue of whether the government improperly precluded Mr. Zabransky from answering certain questions. Finally, the Court will examine whether the government's conduct in both these regards merits the sanction of ordering the government to compensate Dairyland for the costs Dairyland has incurred in litigating this motion.

### A. The RCFC 30(b)(6) Topics

RCFC 30(b)(6) requires that when a party seeking to depose a governmental agency announces the subject matter of the proposed deposition, the agency must produce someone familiar with that subject. The rule specifically states:

> A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. A subpoena shall

> advise a non-party organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization.

RCFC 30(b)(6). To satisfy RCFC 30(b)(6), or the corresponding Rule 30(b)(6) of the Federal Rules of Civil Procedure[6], the governmental or corporate deponent has an affirmative duty to make available persons who will be able to "give complete, knowledgeable and binding answers" on its behalf. *Reilly v. NatWest Mkts. Group., Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) (quoting *Sec. & Exch. Comm'n v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y. 1992).

If an RCFC 30(b)(6) deponent produces a witness who has insufficient knowledge concerning the areas of inquiry, essentially defeating the purpose of the discovery process, then RCFC 37(b)(2) allows courts to impose various sanctions. These measures include the preclusion of evidence in the form of "[a]n order that the matters regarding which the [deposition] order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order" or "[a]n order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence." RCFC 37(b)(2)(A), (B). A court may also "require the party failing to obey the [deposition] order or the attorney advising that party or both to pay the reasonable expenses, including attorneys' fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." RCFC 37(b)(2).

While the Federal Circuit has not addressed the issue of sanctions for insufficient deposition testimony pursuant to RCFC 30(b)(6), other courts have held that sanctions of any sort constitute a "most severe penalty" and are only warranted in "extreme circumstances." *Commodity Futures Trading Comm'n v. Noble Metals Int'l., Inc.*, 67 F.3d 766, 770-71 (9th Cir. 1985) (quoting *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 603 n.5 (9th Cir. 1988). A trial court must find that the violating party acted willfully and in bad faith. *Wiltec Guam*, 857 F.2d at 603. When the deponent is not an individual person, but a corporate or government entity, a deponent's failure to thoroughly investigate available records to identify an appropriate witness can be tantamount to failure to testify under RCFC 37(b) in general, thereby meriting the previously described sanctions. *See Resolution Trust Co. v. Southern Union Co., Inc.*, 985 F.2d 196, 197-98 (5th Cir. 1993). The Third Circuit's decision in *Black Horse Lane Associates, L.P. v. Dow Chemical Corporation* provides an example of

---

[6]The U.S. Court of Federal Claims has endeavored to create a set of rules that conforms to the Federal Rules of Civil Procedure to the extent practicable given differences in jurisdiction between the Court and the United States district courts. Consistent with this objective, case law and the Advisory Committee Notes accompanying the Federal Rules of Civil Procedure will guide the interpretation of the Rules of the Court of Federal Claims. In this particular instance, RCFC 30(b)(6) is exactly identical to Rule 30(b)(6) of the Federal Rules of Civil Procedure. *See* 2002 Rules Committee Note, Rules of the United States Court of Federal Claims.

instances where courts have viewed the imposition of sanctions as a proper remedy for faulty witness preparation for RCFC 30(b)(6) deposition testimony. In that case, a witness, in a clear demonstration of bad faith, *inter alia*, denied knowledge of documents he signed even after admitting he never signed documents he did not read first. *Black Horse Lane Assoc.'s, L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 300 (3d Cir. 2000).

In considering whether Messrs. Kouts and Zabransky were knowledgeable witnesses prepared to fully address the topics posed in the RCFC 30(b)(6) notice, the Court must note that there exists no obligation to produce witnesses who know every single fact surrounding a matter, only those that bear relevance or are material to events directly underlying a dispute. *See Banks v. Office of the Senate Sergeant-at-Arms*, 241 F.R.D. 370, 373 (D.D.C. 2007); *Wilson v. Lakner*, 228 F.R.D. 524, 529 n.7 (D. Md. 2005). Additionally, a witness's inability to testify as to information unavailable to the company he represents will not constitute a violation of an RCFC 30(b)(6) deposition order. *See Banks*, 241 F.R.D. at 373, 375 (a Rule 30(b)(6) designee needs not conduct investigations beyond what is "reasonably known to the company").

**1. The Parties' Understanding and Intentions in Entering into the Standard Contract (Topics 6 & 7)**

The issue of the parties' understanding and intentions in entering into the Standard Contract stems from topics 6 and 7 of Dairyland's initial RCFC 30(b)(6) topic list. Dairyland has conflated these topics into one issue as to which Dairyland seeks to preclude the government from submitting further evidence.

Dairyland states that DOE entered into the Standard Contract in order to enable utilities to avoid incurring additional at-reactor storage costs beyond January 31, 1998. Plf.'s Mot. at 15 (citing Dairyland's Objections and Responses to the Government's Second Set of Interrogatories, Response to Interrogatory 20, attached as Exhibit 7). In violation of RCFC 30(b)(6)'s requirement that a corporate or government deponent provide prepared witnesses ready to speak for the agency they represent (Dairyland alleges) Mr. Zabransky was supposedly not prepared to testify about this general issue because he was not prepared "to discuss any issues concerning the Department's intent in entering into the terms of the Standard Contract." Plf.'s Mot. at 7 (quoting Zabransky Dep. Tr. 132: 12-18); *see also* Zabransky Dep. Tr. 131: 14-17. Nonetheless, Mr. Zabransky, in response to questions concerning what DOE's contractual intent actually was, stated that "fulfilling the terms or the requirements of the [NWPA] was the reason [DOE] entered into the contract." Zabransky Dep. Tr. 133: 5-7; *see also* 129: 17-18, 132: 2-5.

Unlike the analogy Dairyland attempts to make in its briefing, Mr. Zabransky's testimony does not reflect the sort of egregious uncooperativeness at issue in *Black Horse Lane*. *See* Plf's Mot. at 16 (citing *Black Horse Lane*, 228 F.3d. at 300, 304). He answered the question as to what DOE's purpose was in entering into the Standard Contract, though Dairyland's counsel was obviously displeased that Mr. Zabransky gave an answer that did not support Dairyland's position as to why DOE entered into the Standard Contract. The problem with Mr. Zabransky's testimony concerning this issue, however, is that it differs from RCFC 30(b)(6) testimony in

another spent nuclear fuel case, before another judge of this Court, that indeed indicates that Dairyland's position on DOE's contractual intent is correct.

The NWPA authorized DOE to enter into contracts for the acceptance, transportation, and disposal of spent nuclear fuel. 42 U.S.C. § 10222(a)(1). Again, Dairyland states that DOE entered into the Standard Contract in order to enable utilities to avoid incurring additional at-reactor storage costs beyond January 31, 1998. Plf.'s Mot. at 15 (citing Dairyland's Objections and Responses to the Government's Second Set of Interrogatories, Response to Interrogatory 20, attached as Exhibit 7). But in *Southern Nuclear Operating Company v. United States*, 77 Fed. Cl. 396 (2007), which concerned damages for breach of the same spent nuclear fuel contract at issue here, the Court cited deposition testimony describing "a program goal of eliminating the need for additional at-reactor storage." 77 Fed. Cl. at 414. In fact, the DOE's intent "at the time of the execution of the Standard Contracts was..... 'to take the stuff away fast enough so that utilities would not have to add additional storage.'" *Id*. (citations omitted). And an RCFC 30(b)(6) deponent in that case stated that DOE's goal "in the mid-1980s was to 'alleviate the purchasers' need to have storage outside of their [spent fuel] pools." *Id*. (citations omitted).

The discrepancy between deposition testimony on this same issue in another case involving the exact same contract and Mr. Zabransky's testimony in this case is puzzling. Neither party has presented evidence that Mr. Zabransky knew of this other testimony. Nonetheless, the *Banks* decision still provides useful guidance here. Again, in that case, the United States District Court for the District of Columbia held that a Rule 30(b)(6) designee was not required to conduct investigations beyond what is "reasonably known to the company" for which he was testifying. *Banks*, 241 F.R.D. at 373, 375. Here, in contrast, information as to the government's contractual intent was certainly available to the government, at least in the form of a published decision that government counsel could have consulted.

Reopening Mr. Zabransky's deposition in regard to further questioning him about DOE's contractual intent, along with ordering the government to compensate Dairyland for attorneys' fees and costs incurred as a result, then, constitutes a proper remedy for this apparent oversight. Without evidence of willful evasiveness on Mr. Zabransky's part, though, the Court does not believe it should bar further government evidence as to DOE's contractual intent.

### 2. Whether Absent the Breach, DOE Would Have Delayed Acceptance of Dairyland's Failed Fuel Beyond the Time of DOE's Acceptance of the Remainder of Dairyland's Spent Fuel (Topic 14)

This issue concerns the distinction between spent and failed fuel.[7] The only RCFC 30(b)(6) topic about which Dairyland sought testimony that also concerns this same distinction was topic 14, which is not only worded differently, but much more narrowly (i.e. "[t]he purpose and role of provisions of the Standard Contracts governing, and DOE's plans for, scheduling

[7] *Supra* note 4.

acceptance and acceptance of failed fuel, including failed fuel at Dairyland's site"). The Court, then, will examine whether to preclude the government from submitting evidence on this more expansively worded issue by examining whether Mr. Zabransky's testimony as to topic 14 was responsive.

Mr. Zabransky extensively answered a number of questions pertinent to topic 14. When asked about his "understanding about how the Standard Contract addresses the timing of the acceptance of failed fuel," Mr. Zabransky stated that a given utility would have to apprise DOE of its situation, seek confirmation that delivery could occur on schedule, and remain aware of DOE's needs to adjust the pickup schedule in the event that technical feasibility issues had arisen. *Id*. 150:6-21. This answer alone addresses topic 14's reference to the Standard Contract's provisions for the acceptance of failed fuel. In responding to a question as to "DOE's plans for scheduling of the acceptance of failed fuel from the utilities," Mr. Zabransky stated that such plans "would be to implement the Standard Contract provision." *Id*. 164:6-7; 165:1-2. And he stated that DOE could not say whether DOE would actually accept failed fuel from utilities on a schedule different from that for fuel that was not failed, since DOE had never been presented with the possibility of having to accept failed fuel. *Id*. 165:4-21.

The Court simply does not believe Mr. Zabransky provided insufficient or unresponsive testimony regarding the actual acceptance of failed fuel. And just as it contends in regard to topic 6, Dairyland seems to imply that this Court should find that Mr. Zabransky's answers were lacking in some way simply because they did not go further than discussing his understanding of the Standard Contract's approach to failed fuel acceptance requests and admitting that DOE had never dealt with such requests. Without further proof that Mr. Zabransky knew of actual DOE plans for failed fuel acceptance, or evidence that DOE concealed such plans for failed fuel acceptance, the Court believes that to do so would basically mean penalizing the government simply for presenting an answer that did not satisfy Dairyland.

**3. The Reasonableness of Dairyland's Storage of its Spent Fuel in its Spent Fuel Pool after January 31, 1998 (Topic 18)**

Dairyland argues that the government has been well aware of Dairyland's position that Dairyland's efforts to store its spent fuel after January 31, 1998, were reasonable and that Mr. Kouts, the government's RCFC 30(b)(6) designee, did not dispute the reasonableness of such activities. Plf.'s Mot. at 14. In its briefing, Dairyland specifically highlights Mr. Kouts's testimony that because DOE had no information about what time period would have been reasonable for the storage of spent fuel and because decisions about such storage were really business matters best dealt with by Dairyland, the government had no position on the subject. Kouts Dep. Tr. 247:16 - 248:15, 255:13 - 256:16, 258:12 - 259:7.

Dairyland's concern in regard to this issue, however, primarily stems from the fact that the government will likely introduce expert reports regarding the reasonableness of Dairyland's costs. During Mr. Kouts's testimony, the government's counsel admitted that Mr. Kouts was only speaking for DOE, given that DOE ordinarily did not collect cost data concerning utilities'

spent nuclear fuel storage costs, and that the government might take a different position upon receipt of such information. *Id*. 249:5-18, 250:10-251:19, 252:16 - 253:1-2, 10-20. Each parties' briefing acknowledges that the government has since submitted to Dairyland three expert reports that critique Dairyland's damages calculations and are relevant to whether Dairyland's spent fuel storage costs were reasonable. Def's Response at 28-29; Plf.'s Reply at 4-5.

Citing the case of *United States v. Dianon*, the government charges that Dairyland's questioning of Mr. Kouts was "nothing more than an attempt to...'bless or condemn the trial opinions rendered by the parties' experts,' which is improper under Rule 30(b)(6)." Def.'s Response at 28 (citing *United States v. Dianon Sys., Inc.*, 240 F.R.D. 40, 42 (D. Conn. 2006)). In response, Dairyland correctly distinguishes the *Dianon* case on its facts involving a Rule 30(b)(6) witness's actually having been asked, unlike Mr. Kouts, to "embrace" the opinions of experts. Plf.'s Reply at 4-5 (citing *Dianon*, 240 F.R.D. at 42). Dairyland contends, then, that it did not ask Mr. Kouts to support an expert opinion, but merely state his own position as to whether Dairyland's storage of spent fuel in its spent fuel pool after January 31, 1998, was reasonable or not.

But Dairyland misses the main issue that must be addressed–why this Court should preclude the government from presenting further evidence on whether Dairyland's spent fuel storage after January 31, 1998, was reasonable or not simply because Mr. Kouts did not have enough information to comment on this topic on DOE's behalf. If DOE indeed did not collect the specified cost data, Mr. Kouts certainly could not have testified as to the reasonableness of Dairyland's storage measures simply because he did not possess the knowledge to do so. Excluding the expert reports or any other future evidence about this topic, then, simply makes no sense.

**4. The Reasonableness of Dairyland's Study, Analysis, and Investigation of Dry Storage for its Spent Fuel during the Period following January 31, 1998 (Topic 19)**

The patterns of argument surrounding Dairyland's request to preclude the government from offering further evidence on whether Dairyland's study, analysis, and investigation of dry storage for its spent fuel after January 31, 1998, was reasonable is basically identical to that surrounding the question of precluding further evidence of whether Dairyland's spent fuel storage after January 31, 1998, was reasonable. Mr. Kouts testified that "[t]o the extent that the Department has no information associated with the analysis or study, the only comment....the Department would make is that implementation of such a dry storage initiative would have to take into consideration a mutually agreeable amendment to the Standard Contract to address whether or not the fuel is going to be....in a form which the Department can accept." Kouts Dep. Tr. 261: 20 - 262: 6. Otherwise, DOE had no position as to the "[t]he reasonableness or unreasonableness of Dairyland's study, analysis, investigation....or implementation of dry storage for its spent fuel" during the period subsequent to January 31, 1998." *Id*. 262: 7-15. Dairyland refers to these statements as insufficient testimony and seeks to preclude the government from presenting further evidence in this regard, specifically the previously mentioned expert reports,

which also examine this issue.

In the parties' briefing, the arguments presented in regard to the reasonableness of actual storage are also applied here. Again, nowhere does Dairyland explicitly state why this Court should exclude government evidence as to this topic simply because Mr. Kouts did not take a position on the same topic, especially when DOE did not collect pertinent cost data. The Court will, therefore, arrive at the same conclusion for the same reasons and find that Mr. Kouts adequately fulfilled his obligations as an RCFC 30(b)(6) designee.

**B. The Government's Invocations of Privilege and of Evidence Rules**

For three of the four subjects on which Mr. Zabransky was directed not to answer–new contracts for spent nuclear fuel disposal concerning newly contemplated nuclear reactors, encouragement of TAD use, and work with the Booz Allen consulting firm–the government's counsel invoked the deliberative process privilege in instructing Mr. Zabransky not to testify. The government's counsel also prevented him from testifying about his knowledge of what reasonable costs for spent nuclear fuel storage would be on the grounds of work-product doctrine and attorney-client privilege. Finally, the government objected to this latter inquiry on grounds of FRE 401, which prohibits irrelevant evidence, and FRE 408, which precludes the use of settlement offers and settlement negotiations to prove liability or a claim's validity.

**1. The Deliberative Process Privilege**[8]

The U.S. Supreme Court has declared that "[t]he deliberative process privilege rests on the *obvious* realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Dep't of Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (emphasis added). The privilege shields documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id*. at 8 (citation omitted). In addition to certain procedural requirements not at issue here, the information sought to be protected must itself meet two substantive tests: it must be both pre-decisional and deliberative in nature. *Abramson v. United States*, 39 Fed. Cl. 290, 294 (1997). "Pre-decisional" means "antecedent to the adoption of an agency policy." *Walsky*, 20 Cl. Ct. at 320 (citing *Jordan v. Dep't of Justice*, 591 F.2d at 774). "Deliberative" means "containing opinions, recommendations, or advice pertaining to agency decisions." *Abramson*, 39 Fed. Cl. at 295 (citing *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 184 (1975)). Essentially, in evaluating the Government's claim of privilege, "the test is whether

---

[8]For a further description of the law surrounding the deliberative process privilege, the Court refers the parties to its opinion of June 29, 2007, on Dairyland's motion to compel production of 281 documents withheld under the deliberative process and attorney-client privileges. *See Dairyland Pwr. Co-op v. United States*, 77 Fed. Cl. 330 (2007).

the material is 'so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency.'" *Exxon Corp. v. Dept. of Energy*, 91 F.R.D. 26, 43 (D. Tex. 1981) (citing *Coastal States Gas Corp. v. Dept. of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). However, the privilege is not absolute and can be overcome upon a showing of evidentiary need weighed against the harm that disclosure of documents upon which the privilege is invoked might cause. *CACI Field Servs., Inc. v. United States*, 12 Cl. Ct. 680, 687 (1987).

As the government's counsel noted during Mr. Zabransky's deposition, Mr. Alan Brownstein, the chief operating officer of OCRWM, executed a formal declaration of deliberative process privilege on May 1, 2007, in regard to "any possible amendment to the Standard Contract for Transport, Aging, and Disposal ('TAD") canisters including any discussion or analysis regarding possible amendments for the acceptance of TADs or canistered fuel from Standard Contract holders," in addition to "any possible new contracts for new reactors, including any discussion or analysis of a new contract or amendments to the Standard Contract for new reactors." Brownstein Decl. ¶ 10. Executing the declaration pursuant to formal delegations of authority, Mr. Brownstein stated that DOE remained engaged in consideration of the TAD initiative and the possibility of new contracts or amendments to the Standard Contract for new reactors. DOE would become unable to obtain frank advice from OCRWM personnel called to testify about such matters because the same individuals would have to worry about the "glare of public scrutiny." *Id.* ¶¶ 4, 11. Protection from disclosure was also necessary because the "environment in which OCRWM personnel operate will become further stifled in that employees will be reluctant to provide their frank advice and opinions" and disclosure "would thwart the Federal Government's decision-making functions because such disclosure would tend to inhibit the frank and candid discussion necessary to effective government." *Id.* at 11.

Dairyland claims that there is no policy recommendation at stake and that the government is only seeking to "shield the government's commercial interests in the development of new spent fuel contracts and its related desire to encourage use of TADs." Plf.'s Mot. at 17. And in regard to work with Booz Allen, the government "would not permit sufficient questioning to permit a conclusion that any sort of decisionmaking [was] at issue." *Id.* Correctly stating that the party claiming the privilege bears the burden of establishing its entitlement to it, Dairyland cites precedent holding that the privilege only applies to deliberations on matters of policy and national security, and not the supposedly commercial issues surrounding the consideration of terms for possible Standard Contract amendments concerning TADs and the terms of new contracts covering new nuclear reactors. Plf.'s Reply at 9-11 (citing *Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 484 (2000); *Kaiser Aluminum & Chem. Corp. v. United States*, 157 F. Supp. 939, 945-46 (Ct. Cl. 1958), 141 Ct. Cl. 38 (1958); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). Mr. Brownstein's declaration, then, only "recite[s] the general rationale for the deliberative process privilege without identifying any particular concern with disclosure of information on these issues." *Id.* at 11.

The Court must balance the concerns of both parties in determining whether to uphold the government's invocation of the privilege. It is not apparent to the Court that the government's

consideration of TAD canisters and other SNF disposal terms in contracts for newly contemplated nuclear reactors are solely commercial in nature, contrary to Plaintiff's characterization. To the extent these considerations are matters of policy even in the slightest, the court must weigh Plaintiff's need for discovery on these topics against Defendant's interest in confidentiality in the policy-making process.

In *Kaiser Aluminum*, before this Court's predecessor, the U.S. Court of Claims, the plaintiff aluminum company had a contract with the government for the purchase of certain manufacturing plants. In an action for breach of contract, the plaintiff sought certain documents in discovery, including a background economic advisory paper prepared by the General Services Administration (GSA). GSA maintained that disclosure "would tend to discourage the staffs of Government agencies preparing such papers from giving complete and candid advice and would thereby impede effective administration of the functions of such agencies." *Kaiser Aluminum*, 141 Ct. Cl. at 43 n.1. The court upheld the government's invocation of the privilege. In the case at bar, Mr. Brownstein likewise avers in his declaration that "OCRWM's ability to continue to work toward filing a licensing application" would be impeded and expresses his belief that OCRWM personnel "are becoming reticent to provide recommendations or opinions about courses of action that may become the subject of questioning by Congress, the Government Accountability Office, DOE Inspector General or in the litigation." Brownstein Decl. ¶¶ 7-8. Despite the applicability of the principle buttressing the privilege as addressed in *Kaiser Aluminum* and its progeny, there must nevertheless be more than rote assertions that policy advisers would be discouraged by the disclosure of internal advice on a policy issue.

Even so, the Court is not convinced that Plaintiff's evidentiary need to question Mr. Zabransky about contract terms for new nuclear reactors, especially as to acceptance rates, outweighs Defendant's interest in maintaining a zone of confidentiality in its policy process. While such information may be potentially relevant, Plaintiff already has access to documentary and other information relevant to its case for damages in this regard. However, given that the deliberative process privilege is to be narrowly construed and that the burden of persuasion is on the government, the Court finds on the other hand that Plaintiff is entitled to question Defendant at deposition on the matters of TAD canisters and the Booz Allen consulting work. The inquiry regarding the government's subsequent consideration of canister storage of SNF implicates the reasonableness of Plaintiff's mitigation efforts in advance of the government's failure to begin SNF acceptance in January 1998. On balance, the Court is persuaded that Plaintiff's evidentiary need outweighs Defendant's interest in confidentiality. It should be noted that the Court has already determined, after *in camera* review, to order Defendant to produce certain documents regarding canister storage as to which it invoked the deliberative process privilege. The strict terms of the protective order in effect in this case is a factor in Plaintiff's favor in these determinations.

The Court further finds in favor of Plaintiff on the Booz Allen questioning, at least to the extent that Plaintiff shall be allowed a sufficient zone of questioning to assess the subject matter of the Booz Allen work and whether that work does in fact implicate policy recommendations within DOE on matters relevant to Plaintiff's claim.

**2. The Attorney-Client Privilege, Work Product Doctrine, FRE 408, And Relevance**

The government has invoked the attorney-client privilege and the work product doctrine to preclude Mr. Zabransky from testifying about his knowledge of reasonable costs to maintain and store spent fuel. The crux of Dairyland's case to compel Mr. Zabransky's testimony in regard to his knowledge of reasonable spent fuel storage costs is that the government improperly precluded the same testimony based on how he obtained the knowledge–through work at the direction of the Department of Justice on the continuing spent nuclear fuel litigation. Dairyland argues that while some questions might inadvertently involve privileged information, "it is more likely that [Mr. Zabransky] has gained any such knowledge through review of utility documents and discussions with utilities." Plf.'s Reply at 12. The government has argued that the information sought was irrelevant, pursuant to FRE 401, because it involved other utilities. FRE 408, which prohibits the use of any prior settlement offers or compromises to prove or disprove a claim's validity, also supposedly made any such information from Mr. Zabransky inadmissible because he would have obtained such information in his capacity as a DOE employee doing work concerning settlement offers and negotiations in other spent nuclear fuel litigation. Def.'s Response at 37-38;. Zabransky Dep. Tr. 41-44.

The attorney-client privilege protects a person's communications with an attorney made for the purposes of seeking legal advice. *Upjohn Co. v. United States*, 449 U.S. 383 (1981); *Energy Capital Corp.,* 45 Fed. Cl. at 485; *Cabot v. United States*, 35 Fed. Cl. 442, 445 (1996). The work-product doctrine attaches to documents and materials prepared in anticipation of litigation by a party or its representative. *Hickman v. Taylor*, 329 U.S. 495, 511-12 (1947). FRE 408 precludes the use of conduct or statements during settlement negotiations at trial to prove liability, invalidity of a claim, or its amount. FRE 408; *see also Triax v. United States*, 11 Cl. Ct. 130, 134 (1986). And FRE 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FRE 401.

FRE 401 and 408 do not apply here because, as Dairyland correctly notes in its briefing, an instruction not to answer a deposition question can only stem from the invocation of a privilege or a court-imposed limitation or protective order, thereby making incorrect the government's attempt to shield deposition testimony on account of these rules. RCFC 30(d)(1); *see also Triax v. United States*, 11 Cl. Ct. 130, 134 (1986). Whether any answer by Mr. Zabransky would have qualified under the attorney-client privilege or as work product is, however, more complicated.

The government states that "Mr. Zabransky would inevitably be forced to divulge the substance of communications between Mr. Zabransky and legal counsel as well as the details of certain analyses that he performed at the direction of counsel in connection with settlement negotiations during the course of continuing spent nuclear fuel litigation." Def.'s Response at 37-38. Dairyland, in contrast, states that it only seeks information Mr. Zabransky obtained "through review of utility documents and discussions with utilities." Plf.'s Reply at 12.

The attorney-client privilege only protects disclosure of actual communications between counsel and client; it does not protect disclosure of underlying facts by those who communicated with the attorney. *Upjohn*, 449 U.S. at 395-96. Indeed, the Supreme Court has noted: "The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." *Id*. (Citation omitted). As a result, the Court cannot preclude the disclosure of information Mr. Zabransky obtained from company documents and third parties simply because he relayed this information to government counsel.

The work product doctrine is, however, more expansive. Attorney work product includes "interviews, statements, memoranda, correspondence, briefs, mental impressions, [and] personal beliefs...." *Hickman*, 329 U.S. at 511. Materials prepared by an attorney's agent can also qualify as work product, given how "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial." *United States v. Nobles*, 422 U.S. 225, 238-39 (1975). In this case, Mr. Zabransky sought and obtained information concerning reasonable costs for spent fuel storage as an agent of the Justice Department, which was working on the spent nuclear fuel litigation. But disclosing Mr. Zabransky's impressions of what reasonable costs for spent fuel storage would be when he formed such impressions in the course of evaluating potential settlement strategies in the spent nuclear fuel litigation would quite simply imply a settlement amount that the government was considering in these other cases. Determining acceptable settlement amounts can be part of an attorney's planning for litigation, thereby making such deliberations qualify as attorney work product. The Court, then, accepts the government's invocation of the work product doctrine and will not reopen Mr. Zabransky's deposition for the purpose of further questioning him about this issue.

## III. CONCLUSION

For the foregoing reasons, Plaintiff Dairyland's motion for relief from Defendant United States's purported discovery violations pursuant to RCFC 30(b)(6) is GRANTED IN PART and DENIED IN PART. Specifically, the Court GRANTS the motion solely with respect to reopening Mr. Zabransky's deposition to compel testimony on the specific question of DOE's intent in entering into the Standard Contract. Additionally, the Court reopens Mr. Zabransky's deposition to compel testimony on DOE's encouragement of TAD use and DOE initiatives with the Booz Allen consulting firm. The Court also awards Dairyland compensation for the attorneys' fees and costs that Dairyland will incur in reopening Mr. Zabransky's deposition for further testimony on these issues.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge