No. 04-106C
(Chief Judge Damich)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MOTION FOR RECONSIDERATION

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 305-7571
Facsimile: (202) 307-2503
Attorneys for Defendant

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., SW

ALAN J. LO RE
MARIAN E. SULLIVAN
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, NW
Washington, D.C. 20530

November 29, 2007

## TABLE OF CONTENTS

PAGE

DISCUSSION . . . . . 1

I. STANDARD FOR DECISION . . . . . 1

II. THE COURT SHOULD RECONSIDER ITS DECISION TO REOPEN THE DEPOSITION OF MR. ZABRANSKY REGARDING THE PARTIES' UNDERSTANDING AND INTENTIONS IN ENTERING INTO THE STANDARD CONTRACT . . . . . 2

A. The *Southern Nuclear* Opinion Was Not Issued Until Two Months *After* Mr. Zabransky's Deposition In This Case And, In Any Event, Is Inconsistent With Other Opinions From This Court . . . . . 2

1. *Southern Nuclear* Was Issued After Mr. Zabransky's Deposition 2

2. The Opinion In *Southern Nuclear* Is Inconsistent With Other Opinions From This Court . . . . . 5

B. The Court's Determination That Mr. Zabransky's Deposition Testimony Is Inconsistent With Testimony In Another Spent Fuel Case Is Incorrect . . 6

III. THE COURT SHOULD RECONSIDER ITS RULING REGARDING THE GOVERNMENT'S RESPONSE TO DAIRYLAND INTERROGATORY NUMBER FIVE . . . . . 12

A. The Government Properly And Fully Responded To Dairyland Interrogatory Number 5 . . . . . 12

B. The Court's Ruling Highlights The Significant Problems In Refusing To Consolidate The SNF Cases . . . . . 13

IV. THE COURT'S AWARD OF SANCTIONS IN THE FORM OF ATTORNEY FEES AND COSTS TO DAIRYLAND IS IMPROPER ABSENT A FINDING OF BAD FAITH . . . . . 15

CONCLUSION . . . . . 17

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

Alaska Pulp Corp. v. United States,
41 Fed. Cl. 611 (1998) . . . . . . . . . . 17

Boland Marine & Mfg. Co., Inc. v. M/V Bright Field,
No. 97-3087, 1999 WL 280541 (E.D. La. May 3, 1999) . . . . . . . . . . 15

Branhill Realty Co. v. Montgomery Ward & Co.,
60 F.2d 922 (2d Cir. 1932) . . . . . . . . . . 9

Commercial Metals Co. v. United States,
176 Ct. Cl. 343, 349 (1966) . . . . . . . . . . 9

Department of Energy v. Westland,
565 F.2d 685 (C.C.P.A. 1977) . . . . . . . . . . 7

Florida Power & Light Co. v. United States,
66 Fed. Cl. 93 (2005) . . . . . . . . . . 2

Gardner & North Roofing & Siding Corp. v. Board of Governors of the Fed. Reserve Sys.,
464 F.2d 838 (D.C. Cir. 1972) . . . . . . . . . . 7

Holland v. United States,
75 Fed. Cl. 492 (2007) . . . . . . . . . . 1, 2

Indiana Michigan Power Co. v. United States,
57 Fed. Cl. 88 (2003) . . . . . . . . . . 15

Indiana Michigan Power Co. v. United States,
112 Fed. Appx. 37 (Fed. Cir. 2004) . . . . . . . . . . 14

National By-Prods., Inc. v. United States,
186 Ct. C 405 F.2d 1256 (1969) . . . . . . . . . . 9

National Sch. of Aeronautics, Inc. v. United States,
135 Ct. Cl. 343, 142 F. Supp. 933 (1956) . . . . . . . . . . 7

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006), appeal pending, No. 2007-5046 (Fed. Cir.) . . . . . . . . . . *passim*

PSEG Nuclear, L.L.C. v. United States,
465 F.3d 1343 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006), appeal pending, Nos. 2007-5052, -5097 (Fed. Cir.) . . . . . . . . . 14

Selman v. United States,
204 Ct. Cl. 675 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Southern Nuclear Operating Co. v. United States,
77 Fed. Cl. 396 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Southern Nuclear Operating Co. v. United States,
No. 98-614C, 2007 WL 3277271 (Fed. Cl. Nov. 1, 2007) . . . . . . . . . . . . . . . . . . . . . . . . 5

System Fuels, Inc. v. United States,
No. 03-2624C, 2007 WL 2989008 (Fed. Cl. Oct. 11, 2007) . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Massachusetts Industrial Finance Agency,
162 F.R.D. 410, 412 (D. Mass. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. United Mine Workers,
330 U.S. 258 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Yankee Atomic Elec. Co. v. United States,
73 Fed. Cl. 333 (2006), appeal pending, Nos. 2007-5025, -5031 (Fed. Cir.) . . . . . . . 4, 13

**STATUTES AND REGULATIONS**

42 U.S.C. §§ 10101-10270 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

**MISCELLANEOUS**

Restatement (Second) of Contracts, § 211 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# INDEX TO APPENDIX

Rule 30(b)(6) Deposition Testimony of David Zabransky (May 3, 2007) . . . . . . . . . . . . . . . . . . 1

Deposition Testimony of Billy Cole (March 12, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Notice of Rule 30(b)(6) Deposition (March 25, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Rule 30(b)(6) Deposition Testimony of Tom Pollog (April 11, 2002) . . . . . . . . . . . . . . . . . . . . . 22

Trial Testimony of Robert Morgan, Northern States Power Co. v. United States, No. 98-484C (Fed. Cl.) (Nov. 16, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | |
| v. | ) | No. 04-106C (Chief Judge Damich) |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

DEFENDANT'S MOTION FOR RECONSIDERATION

Defendant, the United States, respectfully requests that the Court reconsider certain portions of its two orders, both of which were dated November 20, 2007, regarding the motions by plaintiff, Dairyland Power Cooperative ("Dairyland"), titled "Relief For Government Discovery Violations Regarding Rule 30(b)(6) Testimony" and "Motion To Compel Defendant United States's Compliance With The Court's February 5, 2007 Order Compelling Discovery Responses."[1]

DISCUSSION

I. STANDARD FOR REVIEW

"A motion for reconsideration 'enables a trial court to address oversights, and the court appreciates the opportunity to do so.'" Holland v. United States, 75 Fed. Cl. 492, 494 (2007) (quoting Cane Tenn., Inc. v. United States, 62 Fed. Cl. 703, 705 (2004)). The decision whether to grant a motion for reconsideration is largely within the trial court's discretion, id. (citing Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990)), and the Court

[1] On November 29, 2007, the Court issued corrected orders for "minor stylistic changes made in preparation for publication."

possesses the inherent authority to modify its interlocutory orders before the entry of a final judgment. Florida Power & Light Co. v. United States, 66 Fed. Cl. 93, 96 (2005). When an order as to which reconsideration is sought is interlocutory and not a final judgment, the Court, applying the law of the case doctrine, has the power to reconsider and modify its order, subject to the principle that questions once decided ought not to be subject to continued re-argument. Holland, 75 Fed. Cl. at 494 n.2. A motion regarding reconsideration of an interlocutory order is not subject to the "strict" rules governing motions to amend and alter final judgments under Court of Federal Claims Rule 59. Florida Power & Light Co., 66 Fed. Cl. at 95.

## II. THE COURT SHOULD RECONSIDER ITS DECISION TO REOPEN THE DEPOSITION OF MR. ZABRANSKY REGARDING THE PARTIES' UNDERSTANDING AND INTENTIONS IN ENTERING INTO THE STANDARD CONTRACT

### A. The *Southern Nuclear* Opinion Was Not Issued Until Two Months *After* Mr. Zabransky's Deposition In This Case And, In Any Event, Is Inconsistent With Other Opinions From This Court

#### 1. *Southern Nuclear* Was Issued After Mr. Zabransky's Deposition

In response to questions regarding Rule 30(b)(6) topics six and seven, which concerned the issue of the parties' understanding and intentions in entering into the Standard Contract, Mr. Zabransky testified that the reason the Department of Energy ("DOE") entered into the Standard Contract was to "fulfill[] the terms of the requirements of the [NWPA]." Slip. Op. 7 (citing Zabransky Dep. Tr. 133:5-7; 129:17-18; 132:2-5). The Court expressly found that "Mr. Zabransky's testimony does not reflect the sort of egregious uncooperativeness at issue" in other cases and that he "answered the question as to what DOE's purpose was in entering into the Standard Contract." Id.

Despite the Court's finding that Mr. Zabransky fully answered the questions which were the subject of Dairyland's Rule 30(b)(6) deposition, the Court concluded that Mr. Zabransky's testimony "differs from RCFC 30(b)(6) testimony in another spent fuel case, before another judge of this Court, that indeed indicates that Dairyland's position on DOE's contractual intent is correct." Slip Op. 7-8. However, the Court did not review the referenced RCFC 30(b)(6) testimony, as that testimony was not submitted as a part of the pleadings in this case. Instead, it relied solely upon the trial court's factual findings in another SNF case, Southern Nuclear Operating Co. v. United States, 77 Fed. Cl. 396 (2007), regarding the views of the judge assigned to that case about the referenced RCFC 30(b)(6) testimony. See Slip Op. 7-8. Accordingly, based upon another judge's factual findings, the Court ordered that Mr. Zabransky's deposition be re-opened "in regard to further questioning him about DOE's contractual intent" and that the Government compensate Dairyland for attorney fees and costs based upon what the Court deemed to be an "apparent oversight." Slip Op. 8. The decision to re-open Mr. Zabransky's deposition on these topics is incorrect for several reasons.

As a threshold matter, even assuming, *arguendo* that Mr. Zabransky's testimony was somehow inconsistent with the factual findings in Southern Nuclear, the Southern Nuclear opinion was issued two months after Mr. Zabranksy's deposition in this case. As the Court noted in its decision, Dairyland deposed Mr. Zabransky on May 3, 2007. Slip Op. 3. However, the Court did not issue its opinion in Southern Nuclear until July 9, 2007 – over two months after Mr. Zabransky's deposition. Consequently, the Court's conclusion that "information as to the government's contractual intent was certainly available to the government, at least in the form of a published decision that government counsel could have consulted," Slip Op. 8, is factually

incorrect. Simply put, even if it were appropriate to rely upon the factual findings in one opinion by a member of this Court in preparing its Rule 30(b)(6) witness, it would have been impossible for the Government to rely upon an opinion that had not been issued as of the time of Mr. Zabransky's deposition. Consequently, there was no "oversight," as the Court found in its opinion.[2]

Indeed, Dairyland never contended in its motion that Mr. Zabransky's testimony was somehow inconsistent with testimony provided by other Rule 30(b)(6) witnesses. Instead, the sole basis for Dairyland's challenge was that Mr. Zabransky provided incomplete answers, a challenge which this Court expressly rejected. Slip Op. 7. Further, in questioning Mr. Zabransky on these topics, Dairyland never inquired as to whether his testimony was inconsistent with prior Rule 30(b)(6) testimony. A.1-6.[3] Certainly, counsel for Dairyland was well aware of that prior Rule 30(b)(6) testimony, and Dairyland had full access to it. To the extent that Dairyland believed that Mr. Zabransky's testimony somehow conflicted with that prior Rule 30(b)(6) testimony, it had every opportunity to explore that issue with Mr. Zabransky at his deposition. The fact that it chose not to explore this issue in Mr. Zabranksy's deposition, or even to ask questions about it, does not provide a basis to reopen Mr. Zabransky's deposition on this topic.

---

[2] Although the Court in Yankee Atomic Power Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending, Nos. 2007-5025, -5031 (Fed. Cir.), which was issued before Mr. Zabransky's deposition in this case, made a finding similar to the finding in Southern Nuclear regarding the "intent" of the DOE program, as discussed below, the opinions in Yankee Atomic and Southern Nuclear conflict with the Court's opinion in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending, No. 2007-5046 (Fed. Cir.), which also was issued before Mr. Zabransky's deposition in this case.

[3] "A. __" refers to the appendix attached to this motion.

2. The Opinion In *Southern Nuclear* Is Inconsistent With Other Opinions From This Court

In addition to being published after Mr. Zabransky's opinion, the Court's opinion in Southern Nuclear regarding the "intent" of the DOE program is inconsistent with other opinions from this Court. For example, in System Fuels, Inc. v. United States, No. 03-2624C, 2007 WL 2989008 (Fed. Cl. Oct. 11, 2007), the Court held that "[n]or did the Standard Contract require that DOE accept spent fuel at a rate that would eliminate the need for producers to provide additional onsite storage or work off any backlog of fuel." Id. Similarly, the Court in PG&E held that "interpretation of the plain language of the Standard Contract and the NWPA controverts plaintiff's contentions that the Standard Contract itself should contain such an acceptance rate obligation or that Congress or DOE intended that the government be required to accept utilities' spent fuel in accordance with the two-part obligation." PG&E, 73 Fed. Cl. at 386. Consequently, even if the Southern Nuclear case had been available at the time of Mr. Zabransky's deposition, which it was not, other opinions from this Court, issued both before and after Mr. Zabransky's deposition, conflict with the holding in Southern Nuclear and its finding regarding the Government's intent at the time of contract formation.[4]

In any event, the fact that a court made a finding regarding DOE's intent that conflicts with DOE's own understanding of its intent does not create some obligation upon DOE's part to change its understanding or create testimony to support the trial court's finding. Instead, it

[4] The Government moved for reconsideration in Southern Nuclear, in part based upon its finding regarding the "intent" of the DOE waste acceptance program. The Court denied the Government's motion. Southern Nuclear Operating Co. v. United States, No. 98-614C, 2007 WL 3277271 (Fed. Cl. Nov. 1, 2007). The time to file an appeal has not yet elapsed.

merely indicates that a court disagreed with DOE. It does not provide a basis for new testimony from DOE.

B. The Court's Determination That Mr. Zabransky's Deposition Testimony Is Inconsistent With Testimony In Another Spent Fuel Case Is Incorrect

In ordering the re-opening of Mr. Zabransky's deposition, the Court held that prior Rule 30(b)(6) testimony indicates that, in contrast to Mr. Zabransky's testimony that DOE entered into the Standard Contract to implement the terms of the NWPA, instead, consistent with Dairyland's claim, DOE in fact entered into the contracts to "enable utilities to avoid incurring additional at-reactor storage costs beyond January 31, 1998." Slip Op. 7-8.

There is no discrepancy between Mr. Zabransky's testimony and the testimony presented in Southern Nuclear. As Mr. Zabranksy correctly testified, the Standard Contract was implemented by the Department of Energy to implement the terms of the Nuclear Waste Policy Act. On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by spent nuclear fuel ("SNF") and high level radioactive waste ("HLW"); establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing a Nuclear Waste Fund, financed by the utilities, to pay for the costs of

the DOE program. 42 U.S.C. § 10131(b). Notably absent from these congressional findings is any stated requirement to enable utilities to avoid incurring additional at-reactor storage costs beyond January 31, 1998, as Dairyland contends.

Importantly, the NWPA authorized the Secretary to enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id. Simply put, DOE's decision to enter into contracts was a direct result of the promulgation of the NWPA, and Mr. Zabransky's testimony is consistent with these facts.[5]

[5] Further, testimony as to the understanding of Congress regarding the intent of the NWPA is inappropriate. As the Court in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 389 (2006), appeal pending, No. 2007-5046 (Fed. Cir.), explained, "statements made by DOE officials after passage of the NWPA cannot bear the weight plaintiff places on them to determine the government's intent." Id. at 389. The Court in PG&E properly held that "[a]fter-the-fact statements by proponents of a broad interpretation are not a reliable indicator of what Congress intended when it passed the law, assuming extratextual sources are to any extent reliable for this purpose." Id. at 389 (citing Gustafson v. Alloyd Co., 513 U.S. 561, 579 (1995)). Indeed, even if the Court concludes that the NWPA is ambiguous, reference to "legislative history" generally, and post-drafting testimony specifically, to resolve such ambiguity is inappropriate. United States v. United Mine Workers, 330 U.S. 258, 281-82 (1947) (finding remarks of legislators made 11 years after passage of act not probative of intent of drafters); see Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (ruling that the affidavit of a Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); National Sch. of Aeronautics, Inc. v. United States, 135 Ct. Cl. 343, 142 F. Supp. 933, 938 (1956); Department of Energy v. Westland, 565 F.2d 685, 690-91 (C.C.P.A. 1977) (rejecting testimony of former congressman concerning proper interpretation of statute because "no member of the legislature is empowered to speak for that body"); Gardner & North Roofing & Siding Corp. v. Board of Governors of the Fed. Reserve Sys., 464 F.2d 838, 842 (D.C. Cir. 1972) (rejecting letter from congressman written one year after passage of legislation, which was not part of legislative history and therefore could not be considered in determining the intent of the legislature).

In its order, the Court held that Mr. Zabransky's testimony differed from testimony offered by the Government's Rule 30(b)(6) witnesses in the Southern Nuclear case. Slip Op. 8. In Southern Nuclear, under a section of the opinion entitled "Early program goals," the Court found as follows:

> Plaintiffs cite to witness testimony that DOE's objective and planning was to avoid additional at-reactor storage; that 3000 MTU a year would achieve that goal; that DOE understood Congress did not intend for utilities to have paid billions into the NWF and have to bear the cost of additional at-reactor storage after 1998; that before a utility would run out of storage space, DOE would pickup. (Pls.' Post-Trial Br. 35-37.) The intent of the DOE at the time of the execution of the Standard Contracts was "to get a facility operating in '98, to take the stuff away fast enough so that utilities would not have to add additional storage. That was the intent." (Id. at 37, citing Cole Dep. 80-81, Mar. 12, 2002 (PDD 11).) To meet that goal and to reduce the backlog of accumulated SNF, the DOE initially planned a 3000 MTU rate. ( Id.) DOE's RCFC 30(b)(6) witness testified that DOE's goal in the mid-1980s was to "alleviate the purchasers' need to have storage outside of their [spent fuel] pools." As calculated by DOE, the rate that would achieve that objective was 3000 MTU annually. (Pollog Rule 30(b)(6) Dep. 96-97, Apr. 11, 2002 (PDD 26).)

Southern Nuclear, 77 Fed. Cl. at 414. The Court's conclusion in this case that Mr. Zabransky's testimony is inconsistent with the Rule 30(b)(6) deposition testimony referenced in the Southern Nuclear opinion is incorrect for two reasons.[6]

---

[6] As an initial matter, Mr. Billy Cole, one of the individuals upon whom the Court in Southern Nuclear relies, was deposed in his personal capacity and was not designated as a Rule 30(b)(6) witness by the Government. Indeed, Mr. Cole was a contractor for DOE and has no basis to testify as to the Government's understanding at the time of contract formation. A.10-12. Mr. Cole testified that he had no role in the development of the Standard Contract. A.13-14. Indeed, Mr. Cole testified that the Standard Contract does not set forth an acceptance rate, but he does not know why it was omitted because he did not assist and was not involved in developing the contract. A.15. Consequently, Mr. Cole lacks any basis to testify as to the "intent" of DOE at the time of contract formation.

In Southern Nuclear, the Court referred to the testimony of Tom Pollog, a Rule 30(b)(6) witness designated by the Government, for the proposition that DOE's goal in the "mid-1980s" was to "alleviate the purchasers' need to have storage outside of their [spent fuel] pools." Id. at 414. This statement is not inconsistent with Mr. Zabransky's testimony.

First, to the extent that DOE had a program goal in the mid-1980s, that is distinct from a contractual obligation recognized at the time of contract formation. As Judge Hewitt properly concluded in declining to rely upon statements of strategy issued by DOE in PG&E, "[t]he court's role is not to enforce and impose on DOE an obligation to carry out a strategy as it was envisioned at that time in the absence of a contractual understanding." PG&E, 73 Fed. Cl. at 391; see id. at 393 ("These and other examples of predictions, hopes, goals, or aspirations adduced at trial do not amount to binding promises that can be enforced by the court through the award of contract damages."); see also National By-Prods., Inc. v. United States, 186 Ct. Cl. 546, 571, 405 F.2d 1256, 1270 (1969); Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932). Because DOE never obligated itself to satisfy a 3,000 MTU annual acceptance rate, or a specific "program" goal of precluding additional at-reactor storage after January 31, 1998, the Court cannot incorporate such a requirement into the Standard Contract. PG&E, 73 Fed. Cl at 391 ("The court concludes that for it to impose on the government an obligation to accept the utilities' spent fuel in accordance with the alleged two-part obligation or at a rate of 3,000 MTU/year would be tantamount to its enacting either legislation or regulations for the nuclear fuel industry that did not exist before this litigation."). Indeed, the United States Court of Appeals for the Federal Circuit has unequivocally held that damages in SNF cases must be

measured against the Government's contractual obligations. PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343, 1351 (Fed. Cir. 2006). Accordingly, statements from DOE witnesses about "program goals" after contract formation do not contradict Mr. Zabransky's testimony regarding DOE's purposes for entering into the Standard Contract at the time of contract formation.

Second, Mr. Pollog was not identified as a Rule 30(b)(6) witness regarding DOE's understanding and intentions in entering into the Standard Contract. A.16-21. Indeed, when Mr. Pollog testified as to how DOE used the information regarding utility pool capacity, he explained that, "in the mid-eighties," "one of the goals of the program was to develop a system where the acceptance rates would account – would alleviate the purchasers' need to have storage outside of their pools." See A.24 (emphasis added). Mr. Pollog unequivocally testified that he did not know whether this was DOE's goal when it signed the Standard Contract. A.24. Further, Mr. Pollog testified that he did not know what DOE's intent was at the time of contract formation regarding the acceptance rate that it would implement once it began performance. A.25. Indeed, consistent with Mr. Zabransky's deposition testimony in this case, Mr. Pollog testified that the "Nuclear Waste Policy Act told the department to develop a standard contract for the utilities. And that's where the requirement for the – for us actually having a standard contract came from. So, it basically was a driving force or the reason why we had the Standard Contract." A.25-26. Accordingly, there is nothing inconsistent with Mr. Zabransky's testimony in this case as to DOE's purposes in entering into the Standard Contract and Mr. Pollog's testimony regarding DOE's program goals in the mid-1980s.

Indeed, Mr. Zabransky's deposition testimony also is consistent with the testimony of Robert Morgan, who was the Acting Director of the Office of Civilian Radioactive Waste Management when the Standard Contract was promulgated in 1983.[7] Mr. Morgan repeatedly has testified in the SNF cases that, despite the utilities' requests to include in the Standard Contract an obligation that DOE accept SNF in an amount that meets the generation rate and works off the backlog of previously discharged SNF, DOE expressly rejected those requests during contract formation. A.29-30. Mr. Morgan has explained that the reason that DOE rejected these requests, which are similar to the request that Dairyland urges the Court to adopt as the basis for the Government's contractual obligation in this case, was due to the uncertainties of the program – particularly, the uncertainties in a first-of-its-kind waste acceptance program reliant upon developing technologies that were to be investigated, studied, and implemented over the next 15 years. A.30-34. Further, Mr. Morgan testified that he did not understand the NWPA to require DOE to accept SNF at such a rate as to preclude utilities from adding additional at-reactor storage or that required DOE to remove the backlog of SNF over a certain period of time. A.35. Simply put, not only is Mr. Zabransky's testimony consistent with the testimony of Mr. Morgan (as well as Mr. Pollog), it refutes Dairyland's theory regarding the Government's contractual obligation and its assertion that DOE's "purpose" in entered into the Standard Contract was to "enable utilities to avoid incurring additional at-reactor storage costs beyond January 31, 1998."

Given the consistency of Mr. Zabransky's testimony to earlier testimony regarding DOE's intent, and given Dairyland's failure to question any supposed inconsistency during its

---

[7] Mr. Morgan has testified, either live or by designation, in almost every SNF trial to date.

deposition of Mr. Zabransky, there is no basis for reopening Mr. Zabransky's deposition on this issue.

## III. THE COURT SHOULD RECONSIDER ITS RULING REGARDING THE GOVERNMENT'S RESPONSE TO DAIRYLAND INTERROGATORY NUMBER FIVE

### A. The Government Properly And Fully Responded To Dairyland Interrogatory Number 5

The Court should reconsider that portion of its order requiring the Government to provide a supplemental response to Dairyland's interrogatory number five. In interrogatory number 5, Dairyland asked: "On what schedule (measured in Metric Tons Uranium) does DOE contend it is obligated to remove DAIRYLAND'S SPENT FUEL pursuant to DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT?," and Dairyland sought both the factual and legal grounds underlying the Government's response. Slip Op. 5. As the Court noted, the Government responded to Dairyland's interrogatory by explicit reference to the Government's post-trial brief in another SNF case in which counsel for Dairyland was counsel of record, Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending, No. 2007-5046 (Fed. Cir.). In its order, the Court found that the Government's reliance upon post-trial briefing in another SNF case was insufficient, and required the Government to respond to the interrogatory request "in a form that does not refer to other interrogatory responses or documents, but which more directly responds to the question presented." Slip Op. 6. In so doing, the Court imposed an obligation in excess of what is required under the rules.

The Government's position regarding the rate of acceptance to which DOE is obligated is well-known to all of the SNF plaintiffs and, specifically, is well-known to counsel for the plaintiff in Dairyland. Indeed, counsel for plaintiff in this case was counsel of record in both

Yankee Atomic Elec. Co. v. United States, 73 Fed. Cl. 249 (2006), appeal pending, Nos. 2007-5025, - 5031 (Fed. Cir.), and in PG&E, the case in which the Government referred counsel for Dairyland regarding both the rate at which the Government contends it is contractually obligated, as well as the basis for that assertion. Indeed, far from being unaware of the Government's position, the plaintiff in PG&E is appealing the trial court's decision accepting the Government's position that the Government's contractual obligation should be measured against the acceptance rates contained in the 1991 Annual Capacity Report, which is consistent with a steady-state 900 MTU acceptance rate after a short ramp-up for the first ten years of the waste acceptance program. In short, the plaintiff in this case is well aware of the Government's position regarding the acceptance rate to which the Government is contractually obligated. Further, fundamental fairness dictates that the Government be allowed to refer to its briefing in a prior case involving the same plaintiff's counsel, particularly where the Court in this case has relied upon the factual findings in another SNF case to reach the conclusion that the Government has failed to satisfy its obligations properly to prepare a Rule 30(b)(6) witness.

B. The Court's Ruling Highlights The Significant Problems In Refusing To Consolidate The SNF Cases

The Court's ruling in this case, in which it relies upon the factual findings of another SNF case involving the testimony of another Rule 30(b)(6) deponent, on the one hand, but refuses to allow the Government to rely upon its briefing on identical legal issues in other SNF cases involving the same plaintiff's counsel, highlights the significant problems in failing to consolidate these cases for purposes of resolving the central issue in all of the SNF cases. As the Court is aware, the Government repeatedly has sought to consolidate the SNF cases for the purposes of the determination of the acceptance rate, because this is an alleged partial breach of

a standardized contract, and the Government's legal obligation must be the same to each of the contract holders. See Restatement (Second) of Contracts § 211. Instead, in the absence of consolidation, the Government has been forced to present the same witnesses for multiple rounds of depositions in each of the SNF cases on the same issues.[8] Indeed, despite the Government's repeated requests that, absent consolidation, the SNF cases should be stayed pending the determination by the United States Court of Appeals for the Federal Circuit concerning the acceptance rate to which the Government is contractually obligated – an issue that affects all of the SNF cases – many judges on this Court have refused to stay the SNF cases, resulting in the issuance of divergent opinions regarding the acceptance rate, ranging from opinions holding that the Government's obligation to accept SNF should be based upon the rates contained in the 1991 Annual Capacity Report, which are consistent with a 900 MTU steady-state acceptance rate for the first ten years of the program, PG&E, 73 Fed. Cl. at 399, to a determination that the rate is not necessary to resolve the issue of the proper quantum of damages, Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332, 375, n.40 (2006), appeal pending, Nos. 2007-5052, -5097 (Fed. Cir.), to a determination that, although a rate is not required to determine damages, a "reasonable" rate in "most circumstances" would fall within a range of 2,000 MTUs and 3,000 MTUs, Southern Nuclear, 77 Fed. Cl. at 439, n.38, to a determination that a 3,000 MTU rate is appropriate because it appears in assorted DOE planning documents, Indiana

[8] As we explained in our September 28, 2007 letter to the Court regarding the re-institution of coordinated discovery, the Government has presented 24 witnesses for 31 days of deposition pursuant to Rule 30(b)(6), seven days of which were during the coordinated discovery proceedings, and the remaining 24 days in individual SNF cases. In addition, the Government has made available 89 fact witnesses for 129 days of depositions in the SNF cases.

Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003).[9] Consequently, the Government is forced to re-litigate the issue of the same contractual obligations in case after case, and the Government is forced to prepare for deposition the same Government witnesses to testify about the same topics.

## IV. THE COURT'S AWARD OF SANCTIONS IN THE FORM OF ATTORNEY FEES AND COSTS TO DAIRYLAND IS IMPROPER ABSENT A FINDING OF BAD FAITH

In its motion seeking sanctions in the form of costs and attorney fees, Dairyland specifically invoked Court of Federal Claims Rule 37. In our brief, we explained that, pursuant to Rule 37, a party seeking to impose discovery sanctions in connection with a party's failure to discharge adequately the requirements of Rule 30(b)(6) must demonstrate that the violating party "acted willfully or in bad faith to obstruct discovery." United States v. Massachusetts Industrial Finance Agency, 162 F.R.D. 410, 412 (D. Mass. 1995); see Boland Marine & Mfg. Co., Inc. v. M/V Bright Field, No. 97-3087, 1999 WL 280541, at *3 (E.D. La. May 3, 1999) (refusing to impose discovery sanctions where party made a good-faith effort to prepare the Rule 30(b)(6) designee to testify, notwithstanding the fact that the designee was unable to answer certain questions posed by counsel during the deposition).

---

[9] The Government filed a cross-appeal in Indiana Michigan regarding the trial court's finding regarding the acceptance rate. The appellant moved to dismiss the Government's cross-appeal on the grounds that the Government ultimately prevailed at trial in demonstrating that, even under the more aggressive 3,000 MTU rate, the SNF plaintiff in that case was not entitled to any damages based upon DOE's partial breach. Indiana Michigan Power Co. v. United States, 112 Fed. Appx. 37, 38 (Fed. Cir. 2004). The Federal Circuit granted the appellant's motion to dismiss the Government's cross-appeal, concluding that, because the trial court concluded that the plaintiff failed to demonstrate causation for any of its claimed damages under the higher rate, the rate determination was unnecessary to the judgment. Id.

In the Court's order, it agreed with the Government and noted that "sanctions of any sort constitute a 'most severe penalty,'" are only warranted in "extreme circumstances," and that a "trial court must find that the violating party acted willfully and in bad faith" before awarding sanctions. Slip Op. 6. Yet, with respect to deposition topics six and seven, the Court found that Mr. Zabransky "answered the question as to what DOE's purpose was in entering into the Standard Contract." Slip Op. 7. Further, with respect to the Government's invocation of the deliberative process privilege regarding the questioning of Mr. Zabransky concerning possible amendments to the Standard Contract to accept Transport, Aging, and Disposal ("TAD") canisters, the Court expressly found that "[i]t is not apparent to the Court that the government's consideration of TAD canisters . . . are solely commercial in nature" and that the Court "must weigh Plaintiff's need for discovery on these topics against Defendant's interest in confidentiality in the policy-making process." Slip Op. 12-13. Ultimately, the Court concluded that, "[o]n balance, the Court is persuaded that Plaintiff's evidentiary need outweighs the Defendant's interest in confidentiality." Slip Op. 13. Yet, in determining that Mr. Zabransky's deposition should be reopened, it awarded Dairyland compensation for attorney fees and costs that it will incur in reopening his deposition, without a finding that the Government acted willfully and in bad faith. Slip Op. at 15. However, in the absence of any finding of bad faith conduct on the part of the Government, the award of any sanctions is inappropriate.

The award of attorney fees and costs is a form of sanctions. Alaska Pulp Corp. v. United States, 41 Fed. Cl. 611, 616-17 (1998). Yet, in this case, the Court found that Mr. Zabransky fully answered the questions put to him regarding the parties' intent and that the Government's assertion as to the deliberative process privilege related to subject matters that properly were

related to policy decisions. The fact that the Court concluded that Mr. Zabransky's testimony conflicted with an opinion issued after his deposition (an opinion that, as we explained above, is incorrect) and that the Court ultimately determined that, "on balance," plaintiff's showing of need overcame the Government's assertion of privilege, does not amount to willful or bad faith conduct on the part of the Government. Indeed, sanctions of any kind are particularly inappropriate under the circumstances, given the fact that the Government prevailed on the majority of the issues in dispute. Accordingly, sanctions in the form of attorney fees and costs are inappropriate under the circumstances.

## CONCLUSION

Based upon the arguments presented above, we respectfully request that the Court reconsider those aspects of its two orders, dated November 20, 2007, with respect to the issues addressed in this motion.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell A. Shultis by Joshua E. Gardner
RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
MARIAN E. SULLIVAN
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

November 29, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 29th day of November, 2007, a copy of foregoing "DEFENDANT'S MOTION FOR RECONSIDERATION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Joshua E. Gardner