# APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------:
DAIRYLAND POWER COOPERATIVE, :
Plaintiff, :
:
v. : No. 04-106C
:
UNITED STATES OF AMERICA, :
:
Defendants. :
-----------------------------------:

COPY

Washington, D.C.

Thursday, May 3, 2007

Deposition of:

DAVID K. ZABRANSKY

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:14 a.m., when were present on behalf of the respective parties:

 ©2007

Page 2

On behalf of Plaintiff:
ROBERT L. SHAPIRO, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3174

On behalf of Defendant:

MARIAN E. SULLIVAN, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 10150
Washington, D.C. 20005
(202) 307-6288

Page 3

CONTENTS


| EXAMINATION BY: | PAGE |
|---|---|
| Counsel for Plaintiff | 5 |
| Counsel for Defendant | 203 |


Page 4

| ZABRANSKY DEPOSITION EXHIBITS: * | | PAGE |
|---|---|---|
| 1 | Bates number HQR501 0029 | 65 |
| 2 | Bates numbers HQR401 0027 through HQR401 0028 | 71 |
| 3 | Bates number PLAC 0079761 | 78 |
| 4 | Bates numbers PLAC 0079752 through PLAC 0079760 | 79 |
| 5 | Bates numbers PLAC 0110411 through PLAC 0110416 | 97 |
| 6 | Bates numbers PLAC 0097730 through PLAC 0097732 | 111 |
| 7 | Bates number PLAC 0138340 | 112 |

(*Exhibits attached to transcript.)

Page 5

PROCEEDINGS

\- - - - - -

Whereupon,

DAVID K. ZABRANSKY

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SHAPIRO:

Q Good morning, Mr. Zabransky. I'm Robert Shapiro. I know we've sat opposite one another several times before for your deposition. And we'll start -- this is a new deposition because this is in the Dairyland Power Cooperative case. But I do want to ask a couple questions at the outset about your prior testimony. And obviously these are prefaced to the extent you can recall your prior testimony, either at trial or deposition, either in cases where I've been an attorney for the plaintiff or in other spent fuel cases.

And my question is is there anything you would like to change in any of your prior deposition or trial testimony in the spent fuel cases?



 ©2007

Page 126

that's what the Department believes that means. That merely just says that, for instance, not citing Dairyland, but citing a utility with more than one reactor, that if 1998 is not the date, that both parties could reconsider the desires that were expressed for 1998 and perhaps reschedule them to a different reactor.

But in the absence of that agreement, they would be binding on the Department and the purchaser.

BY MR. SHAPIRO:

Q The Department of Energy had no right under the Standard Contract to stop acting on delivery commitment schedules, true?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: Again, the actions that were taken were taken on the advice of counsel. I'm not prepared to offer a legal opinion as to that.

BY MR. SHAPIRO:

Q We discussed a little bit earlier that, after stopping the delivery commitment schedule

Page 127

process in the 1990s, the Department restarted the process in 2004. The Department also stopped the DCS process once again in 2004.

Why did the Department stop processing DCS forms a second time in 2004?

MS. SULLIVAN: Objection. Vague, compound, relevance.

THE WITNESS: The Department stopped in 2004 when it became evident that the 2010 date upon which the initiation of the process was predicated was not going to be attained.

BY MR. SHAPIRO:

Q In 2004, the DCS process that was restarted in roughly July of that year?

MS. SULLIVAN: Objection. Relevance.

THE WITNESS: I believe that's correct.

BY MR. SHAPIRO:

Q And then it was -- it was stopped before the end of that year, 2004, correct?

A I believe --

MS. SULLIVAN: Same objection.

THE WITNESS: In December, I believe,

Page 128

yes.

BY MR. SHAPIRO:

Q What happened in that -- in that interim period that caused that change in expectation?

MS. SULLIVAN: Objection. Relevance, vague.

THE WITNESS: And I believe that what happened in that period of time were budgetary shortfalls. I believe there was a -- the EPA standards on which the Yucca Mountain licensing process was moving forth were remanded. And we had issues related to work being done by the USGS and some of the technical work at Yucca Mountain, the extent to which were not known in 2000 -- July when that process was started .

BY MR. SHAPIRO:

Q Had the Department fully understood the extent of those challenges earlier in 2004, the Department wouldn't have restarted the DCS process?

MS. SULLIVAN: Objection. Vague, compound, foundation, beyond the scope of the 30(b)(6) notice.

Page 129

THE WITNESS: I guess to answer your question the way that it should be answered, as far as I'm concerned, is if the Department didn't believe in July of 2004 that it could have attained that 2010 date, it wouldn't have started the DCS process.

BY MR. SHAPIRO:

Q Let's change to the next 30(b)(6) topic, DOE's purpose and intent in entering into the Standard Contract.

What was DOE's purpose and intent in entering into the Standard Contract?

A The purpose and intent was to --

MS. SULLIVAN: Objection. Legal conclusion. I apologize.

THE WITNESS: Sorry.

The purpose and intent was to implement the provisions of the Nuclear Waste Policy Act.

BY MR. SHAPIRO:

Q Was part of the Department's intent in entering into the Standard Contract to solve the problem of spent fuel accumulation at reactor sites?

Page 130

MS. SULLIVAN: Objection. Vague. Objection. Legal conclusion.

THE WITNESS: And based upon my -- what I was able to obtain, the information obtained in preparation, the purpose and intent was to implement the provisions of the Nuclear Waste Policy Act.

BY MR. SHAPIRO:

Q Didn't the Department understand that the Nuclear Waste Policy Act was intended in part to address the accumulation of spent nuclear fuel at utility reactor sites?

MS. SULLIVAN: Objection. Legal conclusion, vague, beyond the scope of Mr. Zabransky's 30(b)(6) deposition.

THE WITNESS: I don't know what the Department understood on that issue.

BY MR. SHAPIRO:

Q It was the Department of Energy's intent in entering into the Standard Contract to avoid any obligation regarding the timing of its acceptance of spent nuclear fuel from utilities, true?

MS. SULLIVAN: Objection. Legal

Page 131

conclusion, vague, assumes facts not in evidence, and mischaracterizes prior testimony.

THE WITNESS: The intent of entering into the contract was to fulfill the provisions of the Act. That's -- I'm not sure where I can go beyond that.

BY MR. SHAPIRO:

Q The Department's intent in coming up with the specific language of the Standard Contract was to, in part, to try to minimize its obligations, true?

MS. SULLIVAN: Objection. Legal conclusion, vague, asked and answered.

THE WITNESS: And I don't believe that I'm prepared, as part of what I prepared for for this deposition, to answer any questions like that on what's in the Standard Contract.

BY MR. SHAPIRO:

Q You're not prepared to discuss any issues concerning the Department's intent in entering into the -- any of the terms of the Standard Contract?

MS. SULLIVAN: Objection. Vague,

Page 132

mischaracterizes the witness' prior testimony.

THE WITNESS: My understanding was to discuss the purpose and intent of entering into the Standard Contract, which was to fulfill the provisions of the Act.

That was the request that I thought I was supposed to be talking about today. Am I misreading it?

MS. SULLIVAN: Let Mr. Shapiro ask his questions.

BY MR. SHAPIRO:

Q If you would answer the last question that I asked. You're saying you're not prepared to discuss any issues concerning the Department's intent in entering into the terms of the Standard Contract?

MS. SULLIVAN: Same objections.

THE WITNESS: No. I'm really not.

BY MR. SHAPIRO:

Q So it's the Department's view that because the Nuclear Waste Policy Act authorized it to enter into contracts, that that was the extent of

Page 133

the Department's intent in entering into the Standard Contracts with utilities?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: I mean, fulfilling the terms or the requirements of the Act was the reason the Department entered into the contract.

BY MR. SHAPIRO:

Q But what provisions of the Nuclear Waste Policy Act did the Department understand it to be fulfilling by entering into the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: And I believe, without the benefit of reviewing the act, I think it's 302(a).

BY MR. SHAPIRO:

Q What's your understanding of that part of the Nuclear Waste Policy Act?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: It authorizes the Department -- the Secretary to enter into contracts

Page 134

with owners and generators of spent nuclear fuel and high-level waste.
BY MR. SHAPIRO:
Q That provision didn't require the Department to enter into contracts, did it?
MS. SULLIVAN: Objection. Legal conclusion, best evidence.
THE WITNESS: As I said, and I'm doing it from memory, is that it authorizes the Secretary to.
BY MR. SHAPIRO:
Q Well, what was the Department's intent to actually enter into contracts with utilities, given that the Nuclear Waste Policy Act merely authorized the entering into contracts and didn't require them?
MS. SULLIVAN: Objection. Legal conclusion, vague, asked and answered.
THE WITNESS: And that was how the Department intended to fulfill the Act requirements as it saw it at the time.
BY MR. SHAPIRO:
Q The Department understood the Nuclear Waste Policy Act as ultimately -- not merely

Page 135

authorizing but actually requiring the Department to enter into contracts with utilities?
MS. SULLIVAN: Objection. Legal conclusion, vague, beyond the scope of Mr. Zabransky's 30(b)(6) deposition.
THE WITNESS: I don't know what the Department's analysis on that provision was at the time.
BY MR. SHAPIRO:
Q Can you testify as to the Department of Energy's purpose and intent for the Standard Contract for it not to have an acceptance rate term setting out a minimum amount of DOE acceptance of spent nuclear fuel?
MS. SULLIVAN: Objection, vague, legal conclusion.
THE WITNESS: No. I'm not prepared to testify about those provisions of the contract as a 30(b)(6) witness.
BY MR. SHAPIRO:
Q Let me go to the next 30(b)(6) topic, DOE's understanding of utilities' purposes and

Page 136

intents in entering into the Standard Contract.
What was the Department of Energy's understanding as to utilities' intents for entering into the Standard Contract?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: The extent of the Department's understanding as to what the utilities -- what was the word, interest?
MS. SULLIVAN: You can have him reread the question.
MR. SHAPIRO: Can you read the question again.
MS. SULLIVAN: Or the court reporter.
(The reporter read the record as requested.)
THE WITNESS: And the --
MS. SULLIVAN: Same objections.
THE WITNESS: Okay. All right. The Department's understanding as to utilities' intent is contained in the administrative record on the development of the contract.

Page 137

BY MR. SHAPIRO:
Q The administrative record that merely contains submittals by utilities on the draft Standard Contract, correct?
MS. SULLIVAN: Objection. Best evidence.
THE WITNESS: I believe that's in there. Yes.
BY MR. SHAPIRO:
Q I'm asking, based upon either those submittals or any other information, what is the Department's understanding of utilities' purposes and intent in entering into the Standard Contract?
MS. SULLIVAN: Legal conclusion, vague, asked and answered.
THE WITNESS: And the Department's understanding is limited to what's in the administrative record, which is available for your review.
BY MR. SHAPIRO:
Q Are you not prepared to answer the question as to what utilities' -- the Department's understanding of utilities' purposes and intent as

Page 138

far as entering into the standard contract was other than simply referring to a database?

MS. SULLIVAN: Objection. Mischaracterizes the witness' prior testimony.

THE WITNESS: That administrative record represents the Department's understanding. It's best viewed as the record.

BY MR. SHAPIRO:

Q You're not in any position as a 30(b)(6) designee to have reviewed that material and provide for us the Department's view as to the essence of what it's view is as to what the utilities intended by entering into the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion, compound, vague, mischaracterizes the witness' prior testimony.

THE WITNESS: And, no, I'm not prepared to provide the essence of what's in there.

BY MR. SHAPIRO:

Q So the Department has no view of utilities' intent for entering into the Standard Contract other than the submittals that utilities

Page 139

made to the Department as part of the administrative rule-making process through which DOE drafted the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion.

THE WITNESS: And based upon my preparation for this deposition, no.

BY MR. SHAPIRO:

Q Didn't DOE understand that utilities intended that the Standard Contract would solve the problem of spent fuel accumulation at utility reactor sites?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: And I don't have any information that would say DOE understood that.

BY MR. SHAPIRO:

MR. SHAPIRO: All right. Would this be a good time for a lunch break?

MS. SULLIVAN: Uh-huh.

(Whereupon, at 12:38 p.m., the deposition was recessed, to be reconvened at 1:40 p.m. this same

Page 140

day.)

Page 141

AFTERNOON SESSION (1:47 p.m.)

Whereupon,

DAVID K. ZABRANSKY

having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued)

BY MR. SHAPIRO:

Q Mr. Zabransky, I think we're ready to turn to the next 30(b)(6) topic. This one concerns the purpose and role of exchanges under the Standard Contract.

What is the government's understanding of the purpose of the exchanges provision of the contract?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: The purpose of the exchange provision under the contract is to allow utilities to exchange approved delivery commitment schedules subject to the Department's approval, to reallocate amongst themselves their place in line of waste acceptance allocations.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) (Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C) (Wiese, J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C) (Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C) (Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J.)
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.)
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.)
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.)
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.)
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Tuesday, March 12, 2002

Deposition of BILLY M. COLE, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Tuesday, March 12, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 4

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

Page 5

APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312)222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011

Page 6

(202) 434-1675)

On behalf of the Defendant:

R. ALAN MILLER, ESQ.
ERIN E. POWELL, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.
(202) 616-0383

ALSO PRESENT:
SCOTT VANCE

Page 7

CONTENTS

WITNESS EXAMINATION BY COUNSEL FOR
Billy M. Cole PLAINTIFF DEFENDANT
By Ms. Hewitt 8

Afternoon Session - Page 105

EXHIBITS

COLE EXHIBIT NO. PAGE NO.
1 80
2 197

Page 8

PROCEEDINGS

Whereupon,

BILLY M. COLE,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MS. HEWITT:

Q. Good morning, Mr. Cole. My name is Devon Hewitt, and I represent ten of the Plaintiffs in the nuclear utility cases or the spent fuel cases as we call them.

We are here to do your deposition today.

Have you ever had your deposition taken before?

A. No.

Q. Generally what happens is that people ask you questions, and you're required obviously to tell the answers to the best of your recollection truthfully.

Today you will be asked questions by me primarily, but after I'm completed with my questions, other attorneys here representing

Page 9

other Plaintiffs in the action will be allowed to also ask you questions primarily as a follow-up or something that I may have missed.

A. Um-hm.

Q. If you don't understand a question that I have asked, will you agree to ask me to rephrase it or explain what I'm saying so you absolutely understand the question?

A. Certainly, I will.

Q. And if at any time after you have answered a question, if you feel the need to amend something or clarify something that you remembered later, feel free to raise it at a break or on the record, and we'll clarify your earlier answer.

A. Okay.

Q. Will you agree to do that?

A. Yep.

Q. Okay. Also we're relatively informal here, so if you would like a break at any time, please feel free to raise it.

I think what we might do today is go maybe straight through until 12:30 and then break for lunch, but we may stop halfway if we think we all need to just stretch our leg or

Page 22

It was a thermal electric conversion. The heat from that was sent down into thermal electric thermacouples basically, generated heat and generated electricity, very low.
It was physically with all of the cooling, and it was cooled by sodium, liquid metal, and it's, the whole thing stood probably 12 feet tall. Like I said, the reactor sat right on top.
Q. Did you receive any specialized training while you were at Atomics International?
A. No.
Q. And how long did you stay with that company?
A. Three years until they shut the program down.
Q. And what did you do after that?
A. I went looking for a job, and I applied at, since I had been in that field, I applied for a job at Idaho, INEL, Idaho National Engineering Laboratory and Pacific Northwest Laboratory.
I was offered a job at both places. I took the one at Pacific Northwest Laboratory.

Page 23

Sounded better.
Q. And what position were you hired for initially when you joined?
A. As a laboratory technician to build sodium loop for what -- they were trying to get a contract called the FFTF, the fast flux test reactor, and they had 8,000 people out there, and nobody had any experience with liquid metals, and I walked in the door.
My resume said I had built components for the space reactors, and they were liquid metal cooled, and so I got hired, set up their first liquid metal safety programs for dealing with sodium, built the first sodium loop for the FFTF.
That was one of my first responsibility, and until I decided that the laboratory environment was a dead end street for me professionally, and then moved to become an engineering technician.
Q. You became an engineering technician at PNL or another entity?
A. No. I stayed with PNL for 13 and a half -- no. I'm sorry -- 23 and a half years that go-around. Had probably 15 different jobs

Page 24

while I was there.
Q. How long were you a laboratory technician?
A. Year, year and a half maybe at PNL.
Q. And then following that position, you moved into the engineering technician position?
A. Um-hm, as a computer programmer and supporting the engineers and emulating whatever they were coming up with, emulate that kind of, all their engineering concepts on computers.
Q. Was this in support of any particular federal program?
A. Oh, God, yes, lots of them. That's what PNL did. It was a prime contractor for the Department of Energy, well, the Atomic Energy Commission first, and then ERDA, and then the Department of Energy, and we had lots of different contracts.
My primary areas that I worked on in that position were looking at the economics of the nuclear power industry related to, you know, you have got to remember it was fledgling back in those days.
We didn't have a lot of reactors, and so we were doing economic analyses does it make

Page 25

sense to build nuclear power plants versus other sources?
Q. When was this? What period of time?
A. Sixty-four, five, in there.
Q. And --
A. I worked on the PNL, was hired by the Bonneville Power Administration to site nuclear power plants in the Pacific Northwest.
Then I worked on that project, got the sites, all the reactors sited.
This was back when a turnkey thousand megawatt plant was oh, about a hundred million dollars with fuel.
I worked on siting nuclear power plants for Korea.
After a while, I got promoted to the exempt status for the, non-exempt status at the company, became a, what they called a specialist.
Q. When was this?
A. 1970 I think, around that time, maybe a little before.
Q. And your title at that point?
A. Specialist.
Q. And what were you a specialist in?

Page 30

Q. And what was your position at PNL at that time?
A. By then, I was a specialist, or yeah, I think I was still a specialist.
Q. And what was your role on this project?
A. Primary role was all of the engineering computer applications, did a, developed computer programs to emulate the system.
Q. Who did you report to in this position on this project?
A. Mr. Robert McKee.
Q. And what was his position?
A. He was the program manager.
Q. What entity gave PNL this assignment to do the impact statement?
A. Officially the DOE Richland operations office.
Q. And what was that office? What were the functions of that office?
A. Responsible for the Hanford nuclear reservation and all the activities there.
Pacific Northwest Laboratories was one of the entities that worked there.

Page 31

Q. Did you interact with that office at all while you were working on this project?
A. Oh, yes.
Q. And who did you interact with, if you can recall?
A. Don't remember. It was more administrative, their role.
The technical interaction came from headquarters, DOE headquarters, and like I say, I can't remember if it was DOE or ERDA in those days.
I think by the end, it was DOE.
Q. What does ERDA stand for?
A. I've got to think about that right now -- Energy Research and Development Administration.
It was, only existed a couple of years in between the AEC and DOE.
Every administration has to kind of make its mark, change something, change happy to glad, something like that.
Q. What was the purpose of this impact statement or this project?
A. Just see what the environmental impacts are going to be on this industry.

Page 32

Suppose people went out and build all these reactors to supply all this electricity and build all the associated infrastructure, the fabrication facilities, the mining, the reprocessing, because this was a closed fuel cycle at that time.
Q. Did you address in this project the disposal of spent nuclear fuel?
A. Oh, yes.
Q. And in what way did you address that?
A. Well, we looked at various alternatives.
Besides deep geologic disposal, we looked at seabed disposal.
We looked at shooting the stuff, putting it in orbit around the sun.
We looked at above-ground disposal. We looked at all types of shallow land or above-ground dry wells, casks. We looked at everything there was. It was a big program.
Q. Did you make any recommendations regarding alternatives for disposal of spent nuclear fuel?
A. If I remember right, the recommendation that came out of that report, and

Page 33

this is just, I just think this was right, was that probably the safest thing to do would be reprocess it, vitrify it, and dump it in the ocean, but politically that wouldn't be feasible, and so I think the final recommendation was deep geologic disposal.
Q. Did the report or project address who would be responsible for that disposal function?
A. No.
Q. Mr. Cole, do you have an understanding of the term acceptance rate?
A. Sure.
Q. What is your understanding of that term?
A. It's a rate, a rate meaning, rate means function of, over a period of time, how much something can be taken.
Q. And do you have an understanding of how that term has been used in connection with the civilian radioactive waste management program?
A. Oh, yes.
Q. And how has that term been used, or what is your understanding of the term?
A. It's, acceptance rate in this, for

Page 38

the sand.
You can't say it's going to operate forever. Otherwise your study continues forever.
You draw a line saying okay, we're going to cut the study off here. Everybody shuts down. All these reactors that are operating, they're shut down, and the system dwindles down, the facility closes up.
Q. Now that goal of trying to develop a rate that would keep up with discharges and work off of the backlog, was that a goal that PNL articulated, or was it something that DOE --
A. That was not a goal. You're misinterpreting what this report was about.
The goal was not to establish acceptance rates or anything in that report.
It was a, purely an Environmental Impact Statement. If these things happened, what was the impacts to the environment.
Had nothing to do with acceptance rates. That was just one little, less than 1 percent of the piece of the thing.
Q. But is it accurate to say one of the factors was developing an acceptance rate that

Page 39

would keep up, to use your term, with discharges and work off the backlog?
A. Sure.
Q. And that factor, was that something that you suggested or PNL suggested be considered in this report, or was that a factor that was indicated to PNL by DOE or another agency?
A. I can't answer that question because it's neither.
It's just part of an analysis that you do. If I do it this way, I've got all this stuff, and it's going to be generated at this rate, and I've got to dispose of it, so I dispose of it. I build a facility to handle it.
It's a hypothetical situation, purely hypothetical, hypothetical repositories, hypothetical reactors. They didn't exist.
Q. To your knowledge, was this the first time an analysis had been done about disposing of spent nuclear fuel?
A. No, it wasn't the first time. There was programs ongoing the government had. I think one was called AFR program, where they were looking at ways of not necessarily

Page 40

disposing, but AFR meaning away from reactor, how you get maybe central facilities built to handle spent fuel.
Later they called them MRSs and ISFSIs and all this other kind of stuff.
The government had a lot of programs ongoing before that.
This was just the Environmental Impact Statement, what the impacts are going to be to the environment.
There was another study that just preceded that, was kind of started sooner, ended sooner, but was overlapping a little called the GEIS, G-E-I-S, Generic Environmental Impact Statement.
You did a generic, and then you do a specific.
Q. What did you do after this mission plan was or impact statement was published?
A. What did I do after that? In the, this was published I think around 1980.
In the early 1980s, DOE started its, what was called -- the terminology may be incorrect, but it's, it's the implication, the spent fuel management program.

Page 41

PNL, and I don't remember all the details of the transition, but PNL became the manager of that program for the government, or M&O if you will, whatever they called them, about 1981 some time, '81, '82 in there.
When the program was given to PNL to take over, Mr. Darrell Newman was the first, was the manager of that program, and I was consulted, installed as the deputy manager of the program.
Q. What were your responsibilities as deputy manager of this program?
A. Predominantly some of the things I discussed before; one of the, well, one of the primary things that was going on that we were doing was called the storage requirements report that we were developing for the DOE.
This was DOE's way of trying to find out how big a problem the utilities had after the President had shut down reprocessing, and utilities were complaining to the government that they had problems.
You know, the government screws them there. They were looking to the government to help them out, and so we were doing spent fuel



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 50

A. Until late '83 when PNL asked me if I would -- see, in '83, when the Nuclear Waste Policy Act was passed, some of the DOE RW was formed -- didn't exist before.
Q. What does RW refer to?
A. Radioactive waste, but it's DOE's Office of Civilian Radioactive Waste Management is the full term.
Q. And I believe it's used as an acronym?
A. OCRWM, OCRWM -- Office of Civilian Radioactive Waste Management -- anyway, it was formed in '83.
Well, a lot of the people that were brought into DOE RW did not have nuclear backgrounds, especially backgrounds in the civilian area, so I was asked by PNL to take an assignment to Washington, D.C., to open up PNL's waste management office and to help become a tutor for a lot of these DOE people who couldn't spell spent fuel, so I had an office that I set up at, on M Street at 21st and M for PNL, and then I had an office on the seventh floor in the Forrestal Building where I worked daily with the DOE people.
Q. And what position or title did you

Page 51

hold at this time?
A. I don't know. Don't even remember. I've got a stack of business cards I should have brought on all my jobs.
I can't remember what -- specialist in something probably.
Q. And how long did you occupy this position?
A. I was there for probably a year, year and a half, a little over a year.
Let's go less than a year. I don't -- year and four months, something like that.
You can't, when you're on a temporary assignment like that, you're not allowed to stay more than, in those days, more than a year and a half or there's a tax problem because, see, I was on per diem. Well, I was on expenses. They were paying my, making my house payments.
Since I was gone, they paid for a housesitter. They made my rent payments here, and I was making out like a bandit.
Q. And that had to stop?
A. It had to stop. That's right. No. No. You know, you recovered actual expenses, but after a period of time, there was a tax,

Page 52

some kind of liability, and so I left town before the year and a half was up, make sure that it wouldn't be a problem for the company.
Went back to PNL out in Richland, and took over a position of manager of the, I think it was called waste acceptance programs or something like that.
Q. And who did you report to at PNL in that role?
A. Oh, over time, it was two or three different people moved in and out of there.
One of them was Ron Liikala. L-i-i-k-a-l-a.
Another was Jack McElroy. Those were the two I remember.
Q. How long were you manager of waste acceptance at PNL?
A. From middle of '84 -- I'm sorry -- middle of '85 until January '89.
It was waste acceptance transportation, and this is all starting to come back to me now.
The program was office, was waste acceptance transportation and something else. I can't remember.

Page 53

I was responsible -- basically it's a civilian program, so I was put responsible for it.
Q. When you opened up the radioactive waste office here for Richland in 1983, what were your duties during that year and four months you were here in Washington?
A. As I explained, my primary duty was to sit with the DOE people who were, had no real knowledge of the nuclear power industry, and help tutor them, get them up to speed.
Q. Who did you interact with at DOE at that time?
A. Everybody in DOE RW. You get the, get the roster out, and I interacted with everybody, some more than others, but everybody at one point in time.
That was my job, and when they had a problem they couldn't figure out how to solve, they asked me if I could get it solved, and I was liaison back to PNL, to the technical community back there, to instruct them on what DOE needed.
Q. Did you have any role in developing the standard contract?

Page 54

A. No, none other than I explained. Oh, the contract -- no. No. Nope.
Just had a big role in trying to interpret it.
Q. And when did your role trying to interpret the standard contract begin?
A. At July 1983, after the contract was signed by the utilities and became public, we had to, as deputy manager of the program at this time, I had to try to sit down and interpret the contract and figure out what roles and responsibilities were for both sides, and I can keep talking while I fill up my coffee cup.
(There was a pause in the proceedings.)
BY MS. HEWITT:
Q. Did you have any initial impression about the standard contract, Mr. Cole?
MR. MILLER: Objection -- vague.
MS. HEWITT: You can still answer. I'm not sure you can say objections on behalf of a witness you don't represent.
MR. MILLER: I can. I think certainly that I'm entitled to enter objections concerning the form of the question, sure.

Page 55

BY MS. HEWITT:
Q. Did you have any initial impressions, Mr. Cole?
A. My impression of the contract, whether it be initial or later, is the same.
It was put together in haste. It was fraught with ambiguities, contradictions, incorrect statements, but it was pretty damned good under the circumstances.
Q. And what circumstances are you referring to?
A. How quick it had to be put together.
Q. Why did it need to be put together so quickly?
A. Because the law required it. It said you had to have one in place and signed by July something '83.
The Nuclear Waste Policy Act didn't get passed until January 7th, '83.
It was a short period of time to get the right people together, to put it -- and it was my understanding, even though I wasn't part of putting it together, there were people from the government and the utilities both were helping write the language.

Page 56

Consequently, you know, you get a lot of things in there that didn't line up later on.
That was one of the first things I was trying to do was interpret the contract to figure out on a time line basis who was to do what to whom, and that's what we did.
That's how we found these problems, and then we came up with issues, things that need to be resolved because it didn't make any sense.
Q. What didn't make any sense?
A. Some of the things in the contract.
Q. Did you have understanding about whether or not the utilities could or could not sign the contract?
A. It was my impression that they were required to sign the contract. They had no choice.
Q. Why did they have no choice?
A. I don't know. That was my impression. If they wanted this service I guess.
I had just always been told they didn't have a choice.
Sometimes I do what I'm told.
Q. I presume, Mr. Cole, you're familiar

Page 57

with the standard contract?
A. Fairly familiar, yes.
Q. I'm going to give you a copy of the standard contract, and this copy is actually that which is published in the Code of Federal Regulations at Part 961.11.
I'm, I didn't make copies for everybody. I presume everybody is familiar with it.
And I'm going to hand it to you, if you want to just take a moment to look at it?
A. What part do you want me to look at? Because there is a lot of pages.
Q. Well, we're going to, I'm going to take you through some aspects of it, so you can start at the beginning and just flip through to see if that's what you recognize as the standard contract.
A. Um-hm. Yep. That's it.
Q. I would like to ask you about first of all, the second whereas clause, and that's on page 521.
A. Five what?
Q. Twenty-one at the bottom; oh, I'm sorry. It's, on your copy, it would be 570.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 62

A. Yeah.
Q. And what was your --
A. Well, my role was, one of these things that had to be provided was the Annual Capacity Report, and I was responsible for developing the Annual Capacity Report, which the contract specified had to be published 1986 if I remember, the first one.
Q. Do you have an understanding about this paragraph about what other kinds of documentation DOE was supposed to issue or provide to purchasers?
A. Yeah. I annually, besides Annual Capacity Report, they had to put out, if I remember, a total system life cycle cost, and they had to have mission plans.
They had to have, do fee adequacy analysis every year. It was a lot of things. I could go through the contract or the document and delineate them, but I don't remember.
The one I spent more time working on was the Annual Capacity Report work.
Q. Did you have any input or work on the production of something called the annual acceptance priority ranking?

Page 63

A. The APR, oh, yes. We had to do that before you could do an Annual Capacity Report.
Now the contract, though, had them backwards.
It said do the Annual Capacity Report and then couple years later, published an APR, but you can't do the ACR without the APR, so we always did it first, developed the information for the ACR, although we didn't publish it.
Q. Does the standard contract set forth an acceptance rate?
A. No.
Q. Do you know why that was omitted from the standard contract?
A. I was not party to developing the contract.
Q. Did you have any discussions with DOE following enactment or execution of these contracts about the acceptance rate?
A. Of course; that's how we developed the Annual Capacity Report.
That was what the purpose was. The contract required the DOE to develop that, and my job as contractor to the DOE, that was it. Develop that report, which you had to go in

Page 64

there and figure out based on the language in the contract and what the, what the mission plans and analyses told you on what the overall acceptance rate would be how are you going to allocate that capacity and to whom?
The contract implied and interpreted was that oldest fuel first would have the rights.
We interpreted that to mean not necessarily the specific fuel would be the age, you know, the fuel that's that age is not going to be necessarily the fuel that you're going to take, but it's going to buy you a right, and the utility had the right to give you that old fuel or not.
The first year, you would have, the guy with the most stuff in the first year would be General Electric. Wasn't even a utility.
Q. When did you begin working on developing the Annual Capacity Report?
A. 1985.
Q. And who at PNL did you work with in developing this report?
A. Pat McDuffie, Barbara Coles, those were the primary people.

Page 65

Q. And who at DOE did you work with in developing the Annual Capacity Report?
A. Annual, Alan Brownstein.
Q. Anyone else?
A. Not for the development of that report, no; he was my main contact.
Q. Before I get into more depth about the Annual Capacity Report, can you tell me a little bit about the issues that were raised following execution of the standard contracts with regard to what was in or not in the standard contract?
A. I don't know if I quite understand your question.
The issues that we discovered in the contract were not mainly what was in or not in the contract, but where there were contradictions, references to one article referencing another article that didn't exist or referencing an article that obviously was incorrect, or ambiguities or things that needed some clarification because there was not enough information.
Q. And when you use the term we in your prior answer, does that refer to PNL?
A. That refers to me and Mr. McDuffie