5.2.

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY | ) | |
| (98-126C) (Merow, S.J.) | ) | |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | ) | |
| (98-154C) (Merow, S.J.) | ) | |
| MAINE YANKEE ATOMIC POWER COMPANY | ) | |
| (98-474C) (Merow, S.J.) | ) | |
| FLORIDA POWER & LIGHT COMPANY | ) | |
| (98-483C) (Wilson, J.) | ) | |
| NORTHERN STATES POWER COMPANY | ) | |
| (98-484C) (Wiese, J.) | ) | |
| DUKE POWER, A Division of DUKE ENERGY CORP. | ) | |
| (98-485C) (Sypolt, J.) | ) | |
| INDIANA MICHIGAN POWER COMPANY | ) | |
| (98-486C) (Hodges, J.) | ) | |
| SACRAMENTO MUNICIPAL UTILITY DISTRICT | ) | |
| (98-488C) (Yock, S.J.) | ) | |
| SOUTHERN NUCLEAR OPERATING COMPANY, et al. | ) | |
| (98-614C) (Merow, S.J.) | ) | |
| COMMONWEALTH EDISON COMPANY | ) | |
| (98-621C) (Hewitt, J.) | ) | |
| BOSTON EDISON COMPANY | ) | |
| (99-447C) (Allegra, J.) | ) | |
| GPU NUCLEAR, INCORPORATED | ) | |
| (00-440C) (Bush, J.) | ) | |
| WISCONSIN ELECTRIC POWER COMPANY | ) | |
| (00-697C) (Merow, S.J.) | ) | |
| POWER AUTHORITY OF THE STATE OF NEW YORK | ) | |
| (00-703C) (Damich, J.) | ) | |
| OMAHA PUBLIC POWER DISTRICT | ) | |
| (01-115C) (Bush, J.) | ) | |
| NEBRASKA PUBLIC POWER DISTRICT | ) | |
| (01-116C) (Sypolt, J.) | ) | |
| TENNESSEE VALLEY AUTHORITY | ) | |
| (01-249C) (Bruggink, J.) | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | Discovery Judge: |
| | ) | (Judge Sypolt) |
| Defendant. | ) | |

NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Rules of the Court of Federal Claims and the Order of the Discovery Judge dated March 25, 2002, counsel for the above-referenced Utility Plaintiffs will take the deposition of Defendant's designated representative at 10:00 a.m. on April 11, 2002, in conference room 14C on the 14th Floor at the law offices of Shaw Pittman LLP, 1650 Tysons Boulevard, McLean, VA 22102. The deposition will be recorded by stenographic means and will continue day to day until completed.

Defendant's designated representative will be examined with respect to the matters set forth in the attached exhibit.

Dated: April 3, 2002

Respectfully submitted,

Alex D. Tomaszczuk
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
Telephone: 703.770.7940
Fax: 703.770.7901

Counsel of Record for Plaintiffs
Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District

**OF COUNSEL:**
Jay E. Silberg
Devon E. Hewitt
Daniel S. Herzfeld
Jack Y. Chu
SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, DC 20037-1128

M. Stanford Blanton (by Alex D. Tomaszczuk)
M. Stanford Blanton
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, AL 35203
Tel: (205) 251-8100
Counsel of Record for Plaintiff:
Southern Nuclear Operating Company, et al.

Richard C. Johnson (by Alex D. Tomaszczuk)
Richard C. Johnson
Jenner & Block
601 13th Street, N.W.
Suite 1200 South
Washington, D.C. 20005
Tel: (202) 639-6075
Counsel of Record for Plaintiff:
Commonwealth Edison Company

Richard W. Oehler (by Alex D. Tomaszczuk)
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, 40th Floor
Seattle, WA 98101-3099
Tel: (206) 583-8419
Counsel of Record for Plaintiff:
Wisconsin Electric Power Company

Melvin C. Garbow (by Alex D. Tomaszczuk)
Melvin C. Garbow
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004-1206
Tel: (202) 942-5666
Counsel of Record for Plaintiff:
Sacramento Municipal Utility District

Peter K. Shea
Office of General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN 37902-1401
Tel: (865) 632-7319
Counsel of Record for Plaintiff:
Tennessee Valley Authority

# EXHIBIT

1. The rate of acceptance in estimates made by DOE from 1982 to 1987 in the areas of program cost, waste acceptance, transportation planning, and receiving capacity of the program and the basis for those estimates, as set forth in the following documents:

   A. 1985 Mission Plan (and all published drafts) including:

      i. December 1983 Draft
      ii. January 1984 Draft
      iii. April 1984 Draft

   B. Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste (June 1983)

   C. Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting (February 1984)

   D. Fee Adequacy Assessment Report (March 1986)

   E. 1987 Annual Capacity Report

   F. Monitored Retrievable Storage; Submission to Congress (March 1987):

      i. The MRS Proposal
      ii. The Environmental Assessment
      iii. The Program Plan

2. The role and purpose of the Delivery Commitment Schedules ("DCS") and Final Delivery Schedules in the performance of the Standard Contract.

4. The purpose of Annual Capacity Reports and Acceptance Priority Rankings developed pursuant to the Standard Contracts and the basis for the acceptance rates contained therein.

6. The rate(s) of acceptance that DOE planned to use under the Standard Contract before DOE determined that it would not begin accepting SNF in a permanent repository in 1998.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3d day of April 2002, I caused a copy of the foregoing NOTICE OF DEPOSITION to be served by facsimile and by U.S. mail, postage prepaid, on:

Harold D. Lester, Jr.
Assistant Director
Commercial Litigation Branch
Civil Division
United States Department of Justice
Washington, D.C. 20530

Attention: Classification Unit
8th Floor, 1100 L Street, N.W.

Alex D. Tomaszczuk

Document # 1180086 v 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ORIGINAL

```
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY            :
(98-126c) (Merow, S.J.)                   :
CONNECTICUT YANKEE ATOMIC POWER           :
COMPANY, (98-154C) (Merow, S.J.)          :
FLORIDA POWER & LIGHT COMPANY             :
(98-483C) (WILSON, J.)                    :
NORTHERN STATES POWER COMPANY             :
(98-484c (Wiese, J.)                      :
DUKE POWER, A Division of DUKE            :
ENERGY CORP. (98-485C) (Sypolt, J.):
INDIANA MICHIGAN POWER COMPANY            :
(98-486C) (Hodges, J.)                    :
SACRAMENTO MUNICIPAL UTILITY              :
DISTRICT (98-488c) (Yock, S.J.)           :
SOUTHERN NUCLEAR OPERATING COMPANY :
et. al. (98-488c) (Yock, S.J.)            :
COMMONWEALTH EDISON COMPANY               :
(98-621c) (Hewitt, J.)                    :
BOSTON EDISON COMPANY                     :
(99-447C) (Allegra, J.)                   :
GPU NUCLEAR, INCORPORATED                 :
(00-440C) (Bush, J.)                      :
WISCONSIN ELECTRIC POWER COMPANY          :
(00-697C) (Merow, S.J.)                   :
POWER AUTHORITY OF THE STATE OF           :
NEW YORK (00-703C) (Damich, J.)           :
OMAHA PUBLIC POWER DISTRICT               :
(01-115C) (Bush, J.)                      :
NEBRASKA PUBLIC POWER DISTRICT            :
(01-116C) (Sypolt, J.)                    :
TENNESSEE VALLEY AUTHORITY                :
(01-249C) (Bruggink, J.)                  :
          Plaintiff,                      :
                                          :
     vs                                   :
                                          :
THE UNITED STATES,                        :
               Defendant.                 :
- - - - - - - - - - - - - - - - - - - - -x
```

McLean, Virginia
Thursday, April 11, 2002

Deposition of:

THOMAS POLLOG,

the witness, called for examination by counsel for the defendant, pursuant to notice and agreement, commencing at 10:10 a.m., at the offices of Shaw, Pittman, 1650 Tysons Boulevard, McLean, Virginia, before Linda C. Marshall, RPR, a Notary Public in and for the Commonwealth of Virginia, when were present on behalf of the respective parties:

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District, Nebraska Public Power District:

DEVON E. HEWITT, ESQUIRE
JACK CHEW, ESQUIRE
Shaw, Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7962

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:

KRISTI L. REMINGTON, ESQUIRE
Balch & Bingham, LLP
Tenth Floor,
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-347-6000

Page 94

would be needed in an approximate, very approximate manner.
Q Do you know where the information regarding projected annual discharge rate of utilities was collected or reflected?
A Yes.
Q What document or what study or --
A The collection, I believe, would have been done through what we've referred to in DOE as the RWA 59 Form. I believe the official title, I'm not positive about this, is the Nuclear Fuel Data Form. I could be wrong, but it's something like that.
Q And were there any other documents published or produced by DOE or a DOE contractor that took that information and catalogued it or otherwise produced it in another fashion?
A There was at certain times in the program.
Q What was the title of that document or what were those documents?
A I don't recall the exact title. There was a spent fuel storage requirements document.
Q And who published that, do you recall?
A I believe EIA did publish one, although

Page 95

there may have been more, but I think EIA published one. I'm not sure if that was the title of theirs.
Q And were there separate documents published or produced reflecting in-pool storage capacity or was that also in these documents that you talked about earlier?
A I believe it was in separate document.
Q And what document or documents would reflect in-pool storage?
A I believe it would be the in-pool spent fuel storage document. There was one document. I'm not sure. May have been a second one. I don't recall. One was entitled -- at least one was called spent fuel storage requirements.
Q Okay. From these documents I think you testified that DOE could determine the excess storage that was needed for SNF by utilities; is that right?
A I would say DOE was able to approximate how much out of pool -- what the excess would have been.
Q And so --
A Excess of what a utility could store in their pool.

Page 96

Q And so how was that information used by DOE?
A It had various uses, I would guess, over periods of time. When?
Q How was it used, for example, in regards to developing an acceptance rate?
A There were points in time that one of the goals of the program was to develop a system where the acceptance rates would account -- would alleviate the purchasers' need to have storage outside of their pools.
Q And what point in time was this the goal of the program?
A I believe in the mid-eighties.
Q Mid-eighties?
A Yeah.
Q Was there a different goal before the mid-eighties?
A I don't know.
Q Was this DOE's goal when it signed the standard contract?
A I don't know.
Q Was there a different goal after the mid-eighties?
A I would say so, yes.

Page 97

Q And what was that goal after the mid-eighties?
A Well, essentially, what happened was these acceptance rates that were generated in mid-eighties were based on several goals.
One was to alleviate the need for excessive storage capacity for utilities. Also, we looked at the, as I described earlier, the 70,000 metric tons at a reactor and divided it by what we thought was the anticipated lifetime of the facility and come up with the 3,000. They were fairly approximate for a while.
After the mid-eighties, these 3,000 MTU rates sort of became our design objectives. So I'm not saying our goal changed per se, but we didn't reflect it as a goal of the program anymore.
Q Was there a new goal for the program?
A Regarding?
Q The acceptance rate.
A Eventually, there was, yes.
Q What was that goal?
A Well, that would have been we had new constraints put on us regarding the Nuclear Waste Policy Amendments Act. I will refer to it as the

Page 22

A I don't know.
Q What was DOE's intent with regard to the rate it would take spent nuclear fuel and/or high level waste from utilities when it began to actually take it from utilities pursuant to the standard contract?
MS. SULLIVAN: Objection, vague.
BY MS. HEWITT:
Q What was DOE's intent at the time it executed the contract as to what the acceptance rate would be or how fast it would take SNF from utilities when it began to implement the program?

A Can you repeat that for me just one more time? I'm sorry.
MS. HEWITT: Why don't we have the court reporter read the question back.
Maybe I'll read it back.
BY MS. HEWITT:
Q What was DOE's intent at the time it executed the standard contract with regard to the rate of acceptance it would implement once it began the program it started taking spent nuclear fuel from utilities?
A What was DOE's intent at the time the

Page 23

standard contract was enacted?
I don't know what their intent was at the time the standard contract was enacted.
Q Did there come a time where DOE developed some sort of plan about how fast it would take spent nuclear fuel from utilities once it implemented the program?
A DOE published many documents that included acceptance rates in them that were used for illustrative purposes only. If that's what you mean by their intent, then yes, there were documents produced after the standard contract was enacted that would contain illustrative potential acceptance rates.
Q When DOE executed the standard contract, did it have a plan with regard to how fast it would take spent nuclear fuel from utilities when it began to actually do so?
A When -- I don't know what DOE's intent was as it enacted the standard contract.
Q When DOE enacted the standard contract, was there a plan to develop an acceptance rate?
A I don't know when DOE enacted the standard contract or if it had a plan in mind to develop acceptance rates. The contract had

Page 24

certain requirements on it to do certain actions. I don't know if it calls for them to do that, but I'd have to look at the contract to see what the exact wording is in the contract.
Q Are you familiar with the Nuclear Waste Policy Act?
A Yes.
Q What's the purpose of the Nuclear Waste Policy Act?
MS. SULLIVAN: Objection, calls for conclusions as to statutory intent.
You can answer the question, if you know.
THE WITNESS: It would take me quite a while to answer. Essentially, to set up the Office of Radioactive Waste Management and a program for dealing with spent nuclear fuel.
BY MS. HEWITT:
Q And why was a program needed to deal with spent nuclear fuel?
A Why was a program -- I'm just speculating here. What the government's and Congress', and the president's intent was in 1983. If you want to speculate on what the president and Congress' intent was, I can.

Page 25

Q Do you have any knowledge as to what the purpose or intent was behind the Act?
MS. SULLIVAN: Same objection.
THE WITNESS: I have no personal knowledge of what Congress intended or the president intended.
BY MS. HEWITT:
Q Have you discussed possibly the purposes of the Nuclear Waste Policy Act in doing your duties, particularly in regard to implementing the standard contract?
A Yes.
Q And in that capacity, what is your knowledge of the -- what the purpose of the Nuclear Waste Policy Act is?
A Can you repeat that again for me? I'm a little confused. I'm sorry.
Q Well, I think you answered that you did have occasion to discuss the purposes of the Nuclear Waste Policy Act in performing your duties when implementing the standard contract.
A Mm-hmm.
Q In that regard my question is, what are the purposes you understood the Nuclear Waste Policy Act were in performing your duties?

Page 26

A My best recollection is the Nuclear Waste Policy Act told the department to develop a standard contract for the utilities. And that's where the requirement for the -- for us actually having a standard contract came from.
So, it basically was a driving force or the reason why we had the standard contract.
Q Do you know when the first acceptance rate was published after the standard contract was executed?
A The first one after it was executed? I don't know which one was the first one that was published after the standard contract was executed.
Q What was the first one that you recall perhaps?
A The first one that I can recall, I believe, is a draft -- let's see. Probably would be the Mission Plan. If you --
Now, when you say standard contract, what was your term, executed?
Q Yes.
A What do you mean by that?
Q Signed by parties.
A Okay. That's a different date than

Page 27

when it was published in the public register.
Q That's right. It was signed at various dates, but I think they all had to be signed by June, 1983, I think, around that time.
Does the difference -- does that make a difference in one of your prior answers?
A No. Prior answer? No. That's why I'm hesitating. I'm trying to keep the dates straight in my mind.
The first thing I can recall that was done after the standard contracts were actually signed by the utilities, and if that was June, approximately of 1983, the first I can remember would be a draft December, 1983 Mission Plan.
Q December, 1983.
A I believe that's the correct date.
Q Were there acceptance rates published before that time?
A By whom?
Q By DOE?
A I believe so.
Q In what kind of document, do you recall?
A I think there is one -- the report on financing for disposing of commercial spent full,

Page 28

processed high level waste, high radioactive waste.
Q Do you recall whether there was an acceptance rate published before this particular document in 1983 by DOE?
A I don't recall.
Q Were there acceptance rates published in documents produced by contractors for DOE?
A I know of no specific ones.
Q I'm going to give you a copy of the standard contract, Mr. Pollog. Actually, this is my copy.
MS. SULLIVAN: Are you making this an exhibit?
MS. HEWITT: I'm going to wait and see. Probably not, but let him use it if he wants.
MS. SULLIVAN: Are you going to ask him questions about it?
MS. HEWITT: Yes.
MS. SULLIVAN: Can we mark it then so --
MS. HEWITT: Sure.
(Whereupon, Pollog Deposition Exhibit No. 2 was marked for identification.)
BY MS. HEWITT:

Page 29

Q I'm going to ask you to take a look at Article 4, Sub-section B, entitled DOE responsibilities. And particular under that section, paragraph four, which is at the bottom of page 524.
Paragraph four starts, "DOE shall annually provide to the purchaser pertinent information on the waste disposal program, including information on cost projections, project plans and progress reports." Are you familiar with the standard contract?
A Yes.
Q You've had occasion to read it before I take it?
A Yes.
Q Are you familiar with this particular section of the standard contract?
A Yes.
Q What kind of plans and progress reports did DOE publish that related back to this paragraph?
A I know of no specific documents that were published strictly in response to this -- because of Article 4, Section B, Sub-section 4.
Q Were there documents published by DOE

**Northern States Power Company v. U.S No. 98-484C November 16, 2006**

**Heritage Reporting Corporation**

**Page 3772 to Page 4082**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3772

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff,) Case No.
v. ) 98-484C
THE UNITED STATES, )
Defendant.)

National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday, November 16, 2006
Volume 13

The parties met, pursuant to the notice of the Judge, at 10:43 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE

Page 3773

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
14th Floor
McLean, Virginia 22102
(703) 770-7940
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, Northwest
Washington, DC 20037-1122
(202) 663-8063

Page 3774

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

(Index appears at end of transcript)

Page 3775

P R O C E E D I N G S
- - - - -

THE COURT: Let us go on the record. Mr. Tomaszczuk, do we have any preliminary matters?
MR. TOMASZCZUK: Not for the Plaintiff, Your Honor. I think we sorted out the witness availability problem, and so far as Plaintiffs are concerned, we're ready to go forward.
THE COURT: Excellent. Ms. Herrmann?
MS. HERRMANN: Good morning, Your Honor, we're ready as well.
THE COURT: You're ready as well, so that brings forward Mister?
MS. SULLIVAN: Mr. Morgan, Your Honor.
THE COURT: I see we're switching from Mr. Leonard.
MS. SULLIVAN: Mr. Morgan needs to leave today.
THE COURT: We'll have Mr. Morgan on the stand very promptly and make sure he leaves today.
MS. SULLIVAN: Thank you.
THE COURT: Please be seated.

Page 3776

Mr. Morgan, I'd like you to state your name in full, spell your last name for the reporter, and give the reporter your home address.

THE WITNESS: Robert L. Morgan, M-o-r-g-a-n. My home address is 18470 Glenthorne Lane, Glenthorne is one word with an E on the end, Monument, Colorado, 80132.

THE COURT: You may question, Ms. Sullivan.

MS. SULLIVAN: Thank you, Your Honor. Good morning, Your Honor.

Whereupon–

ROBERT L. MORGAN

a witness, called for examination, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Good morning, Mr. Morgan. Mr. Morgan, when did you serve as director of the Office of Civilian Radioactive Waste Management?

A. I was acting director from January of 1983 until approximately January 1984.

Q. And how were you selected to be the director?

A. I was directed by Secretary Hodel.

Page 3777

Q. And as director, to whom did you report?

A. The Secretary.

Q. How many years were you employed by DOE or its predecessor agencies?

A. I joined the Atomic Energy Commission in 1965 and retired in 1988.

Q. And when you retired, you were with DOE?

A. Yes.

Q. Do you hold a Bachelor's degree?

A. Yes.

Q. From where?

A. United States Military Academy.

Q. And what is your degree in?

A. Military engineering.

Q. And when did you receive that degree?

A. 1952.

Q. And do you also hold a Master's degree?

A. Yes, I do.

Q. From where?

A. From Massachusetts Institute of Technology.

Q. And what is your Master's degree, what

Page 3778

subject?

A. I have a Master's in civil engineering and a Master's in nuclear engineering.

Q. And when did you receive those degrees?

A. 1959.

Q. Mr. Morgan, did you also serve in the Army?

A. Yes, I did.

Q. For how long?

A. 13 years.

Q. And after you left the Army, where were you first employed?

A. At Savannah River operations office.

Q. And was that as an employee of the Atomic Energy Commission at that time?

A. Yes.

Q. Would you please summarize briefly your positions from the time you joined the Atomic Energy Commission until you retired from DOE?

A. I was a director of the heavy water organic cooled reactor division at Savannah River, then I was transferred to Canoga Park in 1966. I stayed there until 1973 as a senior

Page 3779

site representative for reactor development and technology. In 1973, I was selected as deputy manager for Savannah River operations office. I held that job until 1980. Then I was selected as manager of that office and had that job until I retired.

Q. And when you served as the director, the acting director of the Office of Civilian Radioactive Waste Management, where were you – where did that fit in your history with DOE?

A. That was a detail in 1983, but I still was the manager of the Savannah River operations office, but I was located in Washington, D.C.

Q. Thank you. And I'm not sure if we gave the dates that you were acting director of the office.

A. 1983, January, until January 1984, I believe.

Q. Thank you. And what have you done since you retired from DOE in 1988?

A. I worked for – or I consulted from 1988 to 1990, then I went to work for a small 8A firm in Washington, D.C., called Meta, we were doing environmental impact statements for

Page 3780

Department of Energy, and I resigned or retired from that job in 1995, and I've been consulting since.

Q. And who do you consult with?

A. Right now, it's primarily SMSI at Los Alamos National Laboratory.

Q. Thank you. Mr. Morgan, turning now to your time as the acting director of the Office of Civilian Radioactive Waste Management, what was accomplished during the year you were acting director?

A. The first thing, we sent out letters to the appropriate governors that were affected by the Nuclear Waste Policy Act. We then dealt with the rule-making Federal Register for the contract, and then we put out the draft mission plan in December of that year, and in the meantime, we were trying to manage the program.

Q. What was the status of the development of the standard contract when you arrived in the office?

A. As I recall, the first notice of Federal Register was published in February, early February. Due to the time lag of submittal, I had not seen that until it was

Page 3781

published.

Q. And when you say, "time lag of submittal," what do you mean?

A. From the time the Department submits a requirement to the Federal Register, there's a time delay from the time it's submitted until it's published.

Q. What happened in the development of the standard contract after you arrived?

A. We received comments from utilities, states, affected Indian tribes, and we tried to resolve those comments and issues and finally issued the final rule-making.

Q. Do you recall meeting with utility representatives prior to the publication of the final standard contract?

A. Yes.

Q. With whom did you meet?

A. I met with GE, Westinghouse, Edison Electric Institute, and there were a number of utilities represented at a meeting there, plus I met with individuals from EEI.

Q. Okay. And who were the individuals from EEI that you met with?

A. Loring Mills.

Page 3782

Q. And what do you recall regarding your conversations with Mr. Mills?

A. Mr. Mills was repeating to me the comments that they had submitted and wanted to ensure that we had an acceptance rate in the contract.

Q. And do you recall what you told Mr. Mills with regard to his request?

A. I denied his request.

Q. Why was that?

A. Primarily because of the uncertainties in the program, there were technical issues, there were licensing issues, NRC had not issued licensing requirements for the repository. We felt it was an intense process requirement. We were concerned about litigation, political activities, and potential changes in legislation, so we felt that it would be inappropriate for me to commit to any acceptance rate in the contract.

Q. Mr. Mills, you mentioned litigation – Mr. Morgan, excuse me, you mentioned litigation. Were there lawsuits filed against DOE regarding the activities of the program while you were director?

Page 3783

A. As I recall, there were three lawsuits.

Q. Mr. Morgan, I placed, before we started this morning, two binders that you see there on the desk. Would you please briefly take a look at those binders, just open them up and see what they are?

MS. SULLIVAN: Your Honor, I placed the contents of DX-2 in the binders before Mr. Morgan because of the volume. I'm not planning on providing – Plaintiff's counsel has DX-2. I plan to discuss specific parts of DX-2 with Mr. Morgan, but I'd first like to have him talk about the entire exhibit.

THE COURT: Very good.

BY MS. SULLIVAN:

Q. Mr. Morgan, did you have an opportunity to review the binders that have been placed before you –

A. Yes.

Q. – that are Defendant's Exhibit 2 before we began today?

A. Yes.

Q. What are the documents in the binders, that are in those binders?

Page 3784

A. It's the administrative record of the rule-making regarding the contract.

Q. Do you recall receiving these documents, the documents that comprised Defendant's Exhibit 2, in the course of the development of the standard contract?

A. Yes.

Q. Why did you receive these documents?

A. Why did I receive them? Because they were requested in the Federal Register notice, and they were requested to me as the acting director.

Q. Do you recall reviewing the comments submitted in response to the Federal Register notice?

A. Yes.

Q. Did you review all the comments submitted?

A. Yes.

Q. Why?

A. Because it was my responsibility to resolve these comments.

Q. Thank you.

MS. SULLIVAN: Your Honor, at this time, the government would move for the

Page 3785

admission of Defendant's Exhibit 2, which is the administrative record to the rule-making for the standard contract that is at issue in this case.

THE COURT: Are we going to go through the entirety of that record, Ms. Sullivan?

MS. SULLIVAN: No, Your Honor. There are three or four specific sets of comments that I will discuss with Mr. Morgan. However, because the record really is the record of the standard contract, it should be considered together as a complete document, and that's the bases for our seeking admission of the entire set of comments.

THE COURT: But you recall the Court's concern originally was that any requested finding, post-trial requested finding would have to be limited to either the testimony of a witness or an exhibit that was the subject of questioning in court, so I have no problem with your, with the admission of the entire record, but recognize that you won't be able later to draw upon exhibits or any part of that record that is not really the subject of testimony in court.

Page 3786

MS. SULLIVAN: We understand the Court's direction with regard to post-trial findings and briefing in this matter.

THE COURT: With that, Mr. Tomaszczuk?

MR. TOMASZCZUK: Subject to that caveat, Your Honor, that addresses one of the concerns I have, and I would just like to interpose for the record a relevance objection. A number of these comments relate to utilities whose cases may be pending before other judges of this court in other cases. Other comments are submitted by entities that we've heard absolutely nothing about. I don't know what possible relevance those comments may have to this court's interpretation of the contract. It seems to me that what's at issue in this case is the actual signed version of the contract, Plaintiff's Exhibits 56, 57, and 58, and these comments, while they may be interesting to the government, I don't think inform this court's determination of the issues in dispute here, namely, what does the contract say and what are the rights of the parties under the contract as executed by the parties.

Page 3787

This is all precontractual material which has no relevance to the Court's determination of what I believe are the central issues in the case.

THE COURT: Except for the extent, Mr. Tomaszczuk, it would inform us all as to why there was resistance on the part of DOE to include an acceptance rate. We've already been through that in brief, but if I understood Ms. Sullivan, her view was -- I guess it's the sanctity of the administrative record that she wishes to preserve. I'll admit it with the understanding, however, that if it's not addressed in court, that is to say specifically addressed in court, I won't pay a very attentive eye to any requested finding based on the matter in the administrative record that is not the subject of testimony.

MS. SULLIVAN: Understood, Your Honor, we would note this is a conformed contract. It is a standardized contract with all of the parties that submitted comments. However, I would, I really do understand the Court's guidance with regard to Mr. Tomaszczuk's point,

Page 3788

that the contracts are what should guide the
Court's determination, we agree.
However, the Plaintiffs have put into
issue what the party's expectations were
regarding the contract formation, that's the
only reason we're seeking to present evidence
that's outside of the contract, is to respond
to those allegations on behalf of Plaintiff.
MR. TOMASZCZUK: I'm sorry, Your
Honor.
THE COURT: Go ahead.
MR. TOMASZCZUK: And with respect to
that issue, it occurs to me to remind the Court
that that evidence has been offered for
purposes of giving the Court, at least the
Plaintiff's view as to the missing term and the
Court's appropriate interpretation of that
missing term, namely the acceptance rate.
However, I would note, and I think
this is important, given the amount of time
that we've spent on the acceptance rate issue
over the last couple of days, I would call back
to what Mr. Gardner said, going back to the
pretrial conference, namely in this particular
case, the acceptance rate does not impact the

Page 3789

determination of damages –
THE COURT: I know.
MR. TOMASZCZUK: – between the period
of time in question up through and including
2004, so this court, in point of fact, can
decide this case without determining the
acceptance rate issue because it doesn't
impact, as we will see when we get to the
government's financial experts, it doesn't
impact even the government's own assessment of
the appropriate damages for this period.
It may impact future claims, but for
this particular case, for this court here
today, it doesn't matter.
THE COURT: I understand that,
Mr. Tomaszczuk, and I smile only because, in
thinking through the problem as I am
continuously doing, I wondered why we had so
much attention on the acceptance rate, and I
assume it's in the nature of we're all together
now, we have the evidence assembled, let's put
it in the record because we may need it at a
future date.
That's what I think we're doing,
Mr. Tomaszczuk. I'm not sure yet, but that's

Page 3790

what I think we're doing.
MR. TOMASZCZUK: And we are also, from
the Plaintiff's standpoint, trying to
anticipate the government's oft repeated
argument that we have to determine the "but-for
world," and in that regard, the acceptance rate
may have some importance. However, on that
subject, I would like to point out to the Court
that the but-for world, in our view, is a
speculative and unnecessary endeavor in this
particular case based on the court's ruling in
Indiana Michigan.
Among other problems with the but-for
world is the fact that the but-for world hasn't
ended, it's still going on. We can't determine
the true nature of the but-for world until such
time as the Department of Energy begins
performance, and until such time as that
occurs, and we can cap the but-for world,
we're, you know, we're essentially firing darts
at a moving target.
THE COURT: Well, I hesitate to move
into a discussion of the but-for world, so I'll
refrain.
MS. SULLIVAN: Your Honor, Mr. Lo Re,

Page 3791

because we have gone into an area that he has
discussed with the Court already, he was going
to address this.
MR. LO RE: And I can understand the
Court's concern with respect to – we've
already, obviously addressed this repeatedly,
but I would, just in response, say that it's
more than coincidence that we are discussing
the rate.
THE COURT: The acceptance rate.
MR. LO RE: There is a component of
that. Certainly, we are here, and we have the
witnesses, and we plan to present our case, but
I think it goes to the fundamental issue that
we have, which is at the end of the day, Your
Honor, the Plaintiff's burden is to establish
what our contractual obligations were under the
contract and whether we call that the but-for
world, the what-might-have-been world,
something else, doesn't matter.
At the end of the day, that's what
this case and all of these cases, that's how we
calculate damages. I think you saw a chart
that, I believe, Mr. Sieracki put up. We
calculate damages by saying, we always go back

Page 3792

in this circuit to what was the obligation, what is the result of the breach of that obligation, and that informs both this case fundamentally before we can calculate any damages.

Yes, in this case, we recognize that because of a quirk of when the claims stopped, we recognized that the calculation may be the same, but I think, Your Honor, because this is the nature of a partial breach claim, we have to look back to what is our contractual obligation, and at bottom, we have to determine what was it that the parties understood when they entered into this contract.

And that's why you're hearing from Mr. Morgan, and that's why you're going to hear from other witnesses about the rate of acceptance.

THE COURT: Mr. Tomaszczuk, I'm going to cut you off only because I know this issue lies close to everybody's heart in this case. DX-2 will be admitted. If I say any more, I know I'm going to bring Mr. Lo Re back, I must have learned something in 73 years. I'll stay quiet. You may proceed.

Page 3793

MR. LO RE: Maybe I should learn that same lesson, Your Honor.

THE COURT: No, I welcome the comments I get from you and Mr. Tomaszczuk. I truly do, I truly do. I'm not saying that just to be comical.

MR. LO RE: Thank you, Your Honor.

THE COURT: DX-2 is admitted, once more with the caveat, if you do not give me a proposed finding that identifies that document in the record, either Mr. Morgan or some other witness, Plaintiff or the government has not testified.

MS. SULLIVAN: Understood, Your Honor.

THE COURT: Madam Reporter, let's receive into evidence Defendant's 2.

(Defendant Exhibit Number DX-2 was received in evidence.)

BY MS. SULLIVAN:

Q. Mr. Morgan, I am going to hand you now a comment from Defendant's Exhibit 2, 2.34.

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: Didn't we give you a standing pass?

Page 3794

MS. SULLIVAN: I didn't know if that carried over from a witness.

THE COURT: As long as Mr. Gardner is not using the pass, you may use it.

MS. SULLIVAN: Your Honor, so the record is clear, this exhibit 2.34 is part of the administrative record. However, it was also marked as Plaintiff's Exhibit 531 and was admitted into evidence by the Court. I'm going to refer to it as 2.34 because of the fact that it is part of Defendant's exhibit.

THE COURT: I got it.

BY MS. SULLIVAN:

Q. Mr. Morgan, do you recognize what I've handed you that is Defendant's Exhibit 2.34?

A. Yes, I do.

Q. Could you identify it for the record, please?

A. It's the Edison Electric Institute comment that we received dated March 7th, 1983.

Q. And do you recall reviewing these comments at the time they were submitted?

A. Yes, I do.

Q. What was EEI or Edison Electric Institute?

Page 3795

A. It's an organization of utilities located in Washington, D.C., I would call it a lobbying organization.

Q. Mr. Morgan, may I direct your attention to page eight of EEI's letter? Let's look at the first paragraph on that page, and I'll read that into the record. "Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent – DOE performance standards and purchaser remedies. Article II states that the disposal services shall commence not later than January 31st, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included, nor does the contract commit DOE to accept any given quantity of SNF/HLW, and, of most significance to utilities, the contract provides no specific remedies in the event that DOE fails to meet the 1998 deadline."

And we'll leave it – actually, let me continue. "(A related difficulty is the absence in the contract of any guidelines for DOE's approval or disapproval of delivery

Page 3796

commitment schedules and final delivery schedules). We recognize that these issues are complicated ones and not easily resolved. On the other hand, they deserve serious study, even if their resolution comes after the draft contract has been promulgated.
We would therefore strongly urge that DOE meet with purchasers to negotiate a mutually acceptable solution to these open items." Mr. Morgan, do you recall this concern as stated here from -- let me ask you, what did you understand the concern to be from EEI, as stated in this paragraph?
A. This was a performance standard, which they wanted an acceptance rate in the contract, which we denied.
Q. And can I direct your attention to page two of the attachment, which is another two pages into the document? And there's a paragraph marked number two on that page that continues on to the next page through the whereas clause, I'll read that into the record, "The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate

Page 3797

commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW.
We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation, plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs.
This would be consistent with the direction of section 302(a)(5) of the Act that DOE take title to SNF/HLW as expeditiously as practicable upon request of the generator or owner. A new clause should be added," and then it goes on to state the clause, "whereas, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated and consistent with its obligation to take title to such fuel

Page 3798

and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste."
Mr. Morgan, did DOE consider this request by EEI for a qualitative description of the rate of acceptance to be included in the contract?
A. Yes, we considered it.
Q. Was it rejected?
A. Yes, it was.
Q. Why?
A. Because of the uncertainties of the program. It would be unconscionable for me to commit the government to things that I felt were extremely difficult and had the potential that we might not meet them.
Q. Did DOE make any changes to the final contract in response to these comments?
A. Yes. The whereas clause was added, which stated that we would receive fuel as expeditiously as practicable.
Q. Let's look at the final standard contract.
MS. SULLIVAN: Your Honor, this is Defendant's Exhibit 2.02. However, the copy

Page 3799

that's there is very hard to read, so I'm going to provide the Court with a different copy. It's the Federal Register notice. It really is a public record.
THE COURT: 2?
MS. SULLIVAN: 2.02.
BY MS. SULLIVAN:
Q. Mr. Morgan, do you recognize what I've handed you to be the final Federal Register notice issued on April 18th, 1983?
A. The Federal Register notice that I have is February 4th, 1983.
Q. I gave you the wrong one. Now, do you recognize what I've given you to be the April 18th, 1983 Federal Register notice?
A. Yes, I do.
Q. Okay. And I direct your attention to the third page of this document, the left-hand column, the second full paragraph which begins, "a new second whereas clause," the third page of the document.
A. Yes.
Q. Or you can read it on the screen.
A. Yes.
Q. Mr. Morgan, I'll read this. "A new

Page 3828

mission plan?
A. It was to outline the plan that we were going to proceed on to try to accomplish the intent of the Nuclear Waste Policy Act.
Q. Mr. Morgan, was DOE obligating itself to accept fuel at the rate set forth in the mission plan?
A. No, the mission plan was a planning document and not a contractual document.
Q. Why did you describe in this paragraph the mission plan as containing a strategy?
A. Well, the strategy or a plan, that was what we'd like to accomplish, but because of the uncertainties of the program, we didn't know whether we'd be able to or not.
Q. Did you understand the strategy to be a contractual requirement?
A. No.
Q. Your statement contains, the portion of your statement I just read contains a statement regarding the intent of the NWPA. How did you determine what you believed to be the intent of the NWPA?
A. That's a difficult question because, in the passage of the Act, there was no

Page 3829

conference report that reflected the changes between the House and Senate version, and depending on who you would talk to on the Hill, you would get different answers as to what the intent was, some going from the status of committing to an MRS solely and others saying not to consider an MRS, but to go for a repository only.
So there was a concern as to what the intent was, and so we tried to strike a middle ground to where we wouldn't be too far out of line and hopefully get any correction from Congress.
Q. Mr. Morgan, did you have an understanding from your review of the NWPA that the Act contained specific requirements regarding the rate at which DOE would accept spent nuclear fuel?
A. It had no requirement.
Q. Did you have any understanding with regard to what the Act required regarding the need to preclude the utilities from adding further storage facilities on-site?
MR. TOMASZCZUK: Objection, I'm sorry, Counsel, objection to the extent it calls for a

Page 3830

legal conclusion.
THE COURT: The objection is overruled. Given his position as the administrator of the program, in fact, the first administrator or director, I presume is the title, I would expect that he would have to have looked into this question. So you may answer, Mr. Morgan.
THE WITNESS: Could you repeat the question, please?
BY MS. SULLIVAN:
Q. Sure. Did you understand that the Act required DOE to accept spent nuclear fuel at a rate that would preclude utilities from adding further storage utilities on-site?
A. No.
MS. SULLIVAN: And, Your Honor, just to be clear, we're not asking that Mr. Morgan draw any legal conclusions.
THE COURT: No, I understood that.
MS. SULLIVAN: We understand that's the province of the Court really just asking for his understanding.
BY MS. SULLIVAN:
Q. Mr. Morgan, did you understand that

Page 3831

the NWPA required DOE to accept spent nuclear fuel at a rate that would work down the backlog in a specific amount of time?
A. No.
Q. Mr. Morgan, you talked about your conversations with members of Congress or their staff members. Were you ever told by Congress you were not meeting the intent of the Act?
A. No.
Q. Mr. Morgan, I'd like to direct your attention to the next paragraph of your statement that begins on that page and continues on the next, and I'll read that into the record. "After the initial operation of the repository through the first few years, we would accept that the weight of acceptance of fuel," I believe that should be rate, "should be the rate of discharge from the reactors that are in operation at the time.
So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being discharged from the reactors. It is anticipated that at that point, it would look at bringing home the second repository.
According to the Act, the second repository