IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Electronically filed: December 3, 2007

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S REPORT ON THE SUFFICIENCY OF THE GOVERNMENT'S ANSWERS TO CERTAIN CONTENTION INTERROGATORIES

Pursuant to the Court's November 20, 2007 order, Dairyland hereby submits its report on whether the government has sufficiently answered certain contention interrogatories that were propounded by Dairyland on October 10, 2006.

Interrogatory Nos. 9, 15, 16 and 17

On August 7, 2007, the government served its Response to Plaintiff's First Set of Interrogatories as Amended in Response to the Court's February 5, 2007 Order and Supplemented Following the Close of Fact Discovery ("Supplemental Response") (attachment 1). In its Supplemental Response, the government stated, *inter alia*, that (i) it "does not currently plan to argue that it was unreasonable for Dairyland to study, investigate, and/or implement dry storage" (supp. resp. to interrog. no. 9); (ii) it "does not currently plan to argue that it was unreasonable for Dairyland to store its spent fuel at LACBWR in wet storage" (supp. resp. to interrog. no. 15); (iii) it "does not currently plan to argue that Dairyland should have explored and/or implemented any particular strategy for the storage of its spent fuel" (supp. resp. to

interrog. no. 16); and (iv) it "does not currently plan to argue that Dairyland should have explored and/or implemented any particular strategy for the storage of its failed fuel" (supp. resp. to interrog. no. 17). These responses, though indicating that the government is not likely to dispute the reasonableness of Dairyland's mitigation efforts, improperly attempt to provide the government with wiggle room to do so at trial. Dairyland is entitled to interrogatory responses that would not permit the government such flexibility. The government's responses are deficient in three interrelated ways. First, the government fails to squarely answer the interrogatories posed by Dairyland and instead answers different questions. Dairyland's interrogatories ask whether the government contends certain things. The government's responses, however, address the government's plans for making arguments on those issues. Second, the government qualifies its responses by stating that it is merely stating its "current" litigation plans. Third, the government has refused to provide the certification required by RCFC 33(b). These deficiencies are interrelated in that plans for making arguments at trial (the answers provided by the government) are more likely to change than a party's contentions (the interrogatories posed by Dairyland), and that is especially so if nobody is certifying the interrogatory response. Plans for making or not making arguments at trial are more likely to change than contentions because litigation plans are merely based on counsel's momentary litigation strategy, but a party's contentions should be based on facts and law.

There is no justification for the government's refusal to certify its interrogatory responses under oath as required by RCFC 33(b). *See Deseret Mgmt. Corp. v. United States*, 75 Fed. Cl. 571 (2007) (government's interrogatory responses must be certified as true and correct under oath without qualifying or limiting language even if the responses are made by counsel of record in the case). The government has taken the position that RCFC 33(b) does not require

certification of responses to contention interrogatories because these responses address legal positions and not factual admissions and that the signature of government counsel in the signature block of the government's Supplemental Response is sufficient. Instead of certifying these responses under oath, the government has offered to consider entering into stipulations with Dairyland regarding the subjects contained in Dairyland's contention interrogatories. Although Dairyland is willing to enter into appropriate stipulations and is currently negotiating with the government over certain stipulations that address some of Dairyland's contention interrogatories, the government is still required to comply with the certification requirements of RCFC 33(b). Indeed, the likelihood of the parties agreeing to binding stipulations on these issues will increase substantially if the government is required to respond appropriately to Dairyland's interrogatories, including the provision of a certification to make absolutely clear that each of the government's interrogatory answers are the fully-considered responses of the government and that those responses bind the government for the purposes of this litigation.

<u>Interrogatory No. 13</u>

Interrogatory No. 13 states "Do you contend that DOE would have picked up DAIRYLAND'S FAILED FUEL later than the rest of its SPENT FUEL had the government begun SPENT FUEL acceptance from utilities starting not later than January 31, 1998?" The government's original response to this interrogatory merely referred Dairyland to David Zabransky's trial testimony in *Yankee Atomic Elec. Co. v. United States*, where Mr. Zabransky purportedly explained issues that *might* arise relating to the acceptance of failed fuel at any repository. The government has not provided any further supplementation to its original response to this interrogatory. *See* attachment 1 at 34. Accordingly, the government's response to interrogatory no. 13 is still clearly deficient, as the government has still not specifically and

unequivocally answered whether it would have picked up *Dairyland's* failed fuel later than the rest of its spent fuel.

For these reasons, the Court should require the government to swiftly provide amended and certified answers that unequivocally answer the reasonable interrogatories posed by Dairyland. The government's delay and obfuscation has required both Dairyland and the Court to spend valuable time addressing the government's failure and has caused Dairyland to incur needless expense. Accordingly, in addition to requiring the government to answer Dairyland's interrogatories, the Court should sanction the government by requiring it to reimburse Dairyland's fees and expenses devoted to pursuing its motion to compel and related efforts like this filing.

Respectfully submitted,

December 3, 2007

s/ Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

WDC 371534499v1 11/30/2007

# Attachment 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0106C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AS AMENDED IN RESPONSE TO THE COURT'S FEBRUARY 5, 2007 ORDER AND SUPPLEMENTED FOLLOWING THE CLOSE OF FACT DISCOVERY

Pursuant to Rule 33 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, provides the following responses to "Plaintiff's First Set Of Interrogatories," which were served on October 10, 2006, amended in response to the Court's order dated February 5, 2007, and supplemented following the close of fact discovery.

GENERAL OBJECTIONS

1. Disclosure of privileged or protected information: Defendant objects to each interrogatory to the extent that it is deemed to require disclosure of classified, confidential, or proprietary information or matters subject to the attorney-client privilege, the attorney work product doctrine, other applicable privileges, or any statutory or regulatory restriction upon disclosure, including the Privacy Act, 5 U.S.C. § 552a. Defendant will not produce privileged or protected documents, materials, or information in response to the document requests. The inadvertent production by defendant of documents protected by the attorney-client privilege, or any other privilege, shall not constitute a waiver of the applicable privilege or protection as to any document so produced, or as to any other document.

2. Exceeding obligations imposed by the Court's rules and orders: Defendant objects to the instructions and definitions accompanying plaintiff's interrogatories to the extent that such instructions and definitions attempt to impose obligations on defendant other than those imposed by RCFC 26 and 34 and the Court's prior orders, including but not limited to, information regarding electronic mail will be produced only in accordance with the requirements provided by the Court's prior order, dated March 14, 2005, limiting the parties' obligations to preserve or search e-mail tapes.

3. Conclusions regarding legal significance of documents: Defendant objects to the plaintiff's interrogatories upon the grounds and to the extent that, by them, plaintiffs seek to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

4. Work product information: Defendant objects to plaintiff's interrogatories on the grounds and to the extent that, by them, plaintiff seeks information prepared and/or developed in anticipation of litigation and/or for trial when plaintiff has not shown that it has substantial need of such materials in the preparation of its case in that plaintiff is unable, without undue hardship, to obtain the substantial equivalent of such information by other means.

5. Irrelevant material: Defendant objects to plaintiff's interrogatories on the grounds and to the extent that, by them, plaintiff seeks the discovery of information which is irrelevant and immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

6. Vague, overly broad, and unduly burdensome: Defendant objects to plaintiff's interrogatories on the grounds that the manner in which they are worded, when read with their definitions and general instructions, are so vague, broad, general, and all inclusive that they do

not permit a proper or reasonable response and are, therefore, unduly burdensome and oppressive. Defendant further objects to these interrogatories to the extent that, to respond to them, defendant would be required to make an extensive investigation, research, compilation, and evaluation of data and records in its possession, which would constitute annoyance, harassment, oppression, undue burden, and undue expense to defendant.

7. Inferences from interrogatories: Defendant objects to any inference that can be drawn from any portion of plaintiff's interrogatories or the responses to them that the documents requested or events referenced in the requests actually exist or occurred. The failure to object to each such inference in no way constitutes an admission by defendant that such information exists or that such events actually occurred.

8. Scope Of The Government As Responding Party: Defendant objects to plaintiff's interrogatories to the extent that they define the term "DOE," or the Department of Energy, to include any Government agencies, offices, bodies, affiliates, contractors, consultants, or individuals other than the Department of Energy itself. To define the term "DOE" as including entities other than DOE itself would render all of plaintiff's discovery requests overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, because doing so would require defendant to seek information from, and about, more than one million Federal employees in numerous offices, agencies, and departments, the missions of which have no relation whatsoever to plaintiff's contract and the locations of which are scattered across the nation and around the world. Further, defendant objects to these interrogatories to the extent that they purport to seek information from the files of the entire

Federal Government. In responding to these interrogatories, defendant has focused upon the knowledge of the Department of Energy.

9. The objections set forth above apply to each of the numbered paragraphs of plaintiff's interrogatories.

DEFENDANT'S RESPONSES TO PLAINTIFF'S INTERROGATORIES

INTERROGATORY NO. 1:

IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or preparation of any COMMUNICATIONS between DOE and/or NRC on the one hand and DAIRYLAND on the other hand RELATING TO SPENT FUEL. For each PERSON identified, DESCRIBE in detail all aspects of that PERSON's involvement.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section and because plaintiff has an equal ability to identify the requested information as defendant, given that plaintiff and defendant were both equally involved in communications between plaintiff and defendant. See Pacific Gas & Electric Co. v. United States, 69 Fed. Cl. 323, 325-26 (2005). Defendant further objects to this interrogatory as irrelevant, given that not every possible communication somehow relating to spent nuclear fuel is related to the damages that plaintiff seeks in this case. We are also unable to identify all such individuals for the reasons set forth in General Objections Nos. 1, 2, 4, 5, 6, and 8, which are incorporated into this response by reference. Defendant also objects to this interrogatory to the extent that it seeks information that is already within plaintiff's custody, possession, and/or control or that is readily available to plaintiff. See Pacific Gas, 69 Fed. Cl. at 325-26.

Without waiving these objections, defendant states that, with regard to the Department of Energy ("DOE"), defendant has previously produced DOE's contract files relating to Dairyland's Standard Contract, which contain communications between Dairyland and DOE, and other files

containing communications between Dairyland and DOE from which, pursuant to RCFC 33(d), plaintiff may ascertain an answer to this interrogatory as easily as defendant. Defendant further states that individuals employed by DOE who may have had some involvement relating to communications with Dairyland may include David Zabransky, Thomas Pollog, Nancy Slater, Alan Brownstein, Susan Klein, and James Carlson. Defendant further states that, with regard to the Nuclear Regulatory Commission ("NRC"), plaintiff, pursuant to RCFC 33(d), should be able to identify a list of individuals who would have had such involvement from the database of documents previously made available, or to be made available, to plaintiff or from the ADAMS database that is available for searching at the NRC, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court ordered that, where Dairyland "has requested the identity of persons involved in the review of preparation, etc., of certain documents or communications, Defendant shall identify those individuals whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial), but not those who merely *may* have had such involvement." Order, at 1 (Feb. 5, 2007) (italics in original). However, it ordered that, "to the extent that Plaintiff has requested that Defendant identify 'all aspects' of any person's involvement in review or preparation, etc., of certain documents or communications, Plaintiff's request is literally overbroad," ordering instead that "Defendant shall identify the nature of such involvement, etc., with reasonabl[e] particularty." Id. at 2. In addition, the Court ordered that, "to whatever extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such

documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proffered database(s)." Id. at 1.

With regard to the review, approval, disapproval, drafting and/or preparation of any communications between DOE and Dairyland "relating to spent fuel," DOE's records indicate that individuals "whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial)" are (1) William Young, DOE Office of Nuclear Energy, who, with the assistance of Charles Thompson and Michael McGown, drafted and/or signed a letter responding to an April 23, 1990 letter from Dairyland; (2) Lake Barrett and Ronald Milner, both now retired from DOE, who responded to letters from Dairyland dated June 12 and August 3, 1998, with Mr. Milner signing the letters on Mr. Barrett's behalf, which most likely were drafted by David Zabransky, possibly with the assistance of Thomas Pollog;[1] (3) David Zabransky, Christopher Kouts, and Paul Dickman, who had verbal communications with representatives of Dairyland in 2002 and/or 2003; and (4) Beth Tomasoni, the contracting officer for the Standard Contract, signed various contract correspondence, although the agency's records do not appear to indicate the drafter of that correspondence, some of which likely involved the Office of General Counsel. Additional responsive information will be found in defendant's response to Interrogatory No. 3 of these interrogatories.

With regard to the review, approval, disapproval, drafting and/or preparation of any communications between the NRC and Dairyland "relating to spent fuel," the NRC's records indicate that individuals "whose involvement was reasonably material, substantive, or the like

[1] The agency's records do not provide information identifying the actual drafter of the letters, and neither Mr. Zabransky nor Mr. Pollog presently has a specific recollection of the specific letters at this time.

(rather than those whose involvement was solely ministerial or secretarial)" are (1) Stephen O'Connor, who was Senior Project Manager for general licenses associated with Independent Spent Fuel Installations ("ISFSIs") when a docket for the LACBWR ISFSI was started; (2) James Randall Hall, who is the Senior Project Manager for general licenses associated with ISFSIs currently responsible for coordinating any activities associated with Part 72 provisions; and (3) Robert Nelson, who is the Chief of the licensing branch for Spent Fuel Storage and Transportation responsible for any communications regarding this docket.

INTERROGATORY NO. 2:

IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or of any DOCUMENTS or COMMUNICATIONS RELATED TO the decommissioning of LACBWR. For each PERSON identified, describe in detail all aspects of that PERSON's involvement.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section and because plaintiff should have an equal ability to identify the requested information as defendant, given that plaintiff and defendant were both equally involved in communications between plaintiff and defendant. See Pacific Gas & Electric Co. v. United States, 69 Fed. Cl. 323, 325-26 (2005). Defendant further objects to this interrogatory as irrelevant, given that not every possible communication somehow relating to the decommissioning of the LaCrosse reactor is related to the damages that plaintiff seeks in this case. We are also unable to identify all such individuals for the reasons set forth in General Objections Nos. 1, 2, 4, 5, 6, and 8, which are

incorporated into this response by reference. Defendant also objects to this interrogatory to the extent that it seeks information that is already within plaintiff's custody, possession, and/or control or that is readily available to plaintiff. See Pacific Gas, 69 Fed. Cl. at 325-26.

Without waiving these objections, defendant states that, with regard to the Department of Energy ("DOE"), defendant has previously produced DOE's contract files relating to Dairyland's Standard Contract, which contain communications between Dairyland and DOE, and other files containing communications between Dairyland and DOE from which, pursuant to RCFC 33(d), plaintiff may ascertain an answer to this interrogatory as easily as defendant. Defendant avers, however, that it is currently unaware of any DOE documents or communications relating to the decommissioning of the LaCrosse reactor. Defendant further states that, with regard to the NRC and pursuant to RCFC 33(d), plaintiff should be able to identify a list of individuals who would have had such involvement from the database of documents previously made available, or to be made available, to plaintiff or from the ADAMS database that is available for searching at the NRC, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court ordered that, where Dairyland "has requested the identity of persons involved in the review of preparation, etc., of certain documents or communications, Defendant shall identify those individuals whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial), but not those who merely *may* have had such involvement." Order, at 1 (Feb. 5, 2007) (italics in original). However, it ordered that, "to the extent that Plaintiff has requested

that Defendant identify 'all aspects' of any person's involvement in review or preparation, etc., of certain documents or communications, Plaintiff's request is literally overbroad," ordering instead that "Defendant shall identify the nature of such involvement, etc., with reasonabl[e] particularty." Id. at 2. In addition, the Court ordered that, "to whatever extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proffered database(s)." Id.

With regard to the review, approval, disapproval, drafting and/or preparation of any documents or communications relating to the decommissioning of the La Crosse nuclear power reactor, DOE has been unable to identify any individuals involved in such documents or communications "whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial)."

The NRC's records indicate that individuals from the NRC "whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial)" are (1) Peter B. Erickson, former Project Manager responsible for review of the LACBWR decommissioning plan; (2) Kenneth Ridgway, Robert Wood, John Minns, and Frank Witt, who provided technical input on the LACBWR decommissioning plan; (3) Richard F. Dudley, Jr., former Acting Director, Non-Power Reactors, Decommissioning and Environmental Project Directorate, Division of Advanced Reactors and Special Projects, Office of Nuclear Reactor Regulation, who had an oversight role; (4) Seymour H. Weiss, former Director, Non-Power Reactors, Decommissioning and Environmental Project Directorate, Division of Advanced Reactors and Special Projects, Office of Nuclear Reactor Regulation, who

had an oversight role; (5) Dennis M. Crutchfield, former Director, Division of Advanced Reactors and Special Projects, Office of Nuclear Reactor Regulation, who had an oversight role; and (6) Herbert N. Berkow, former Project Director, Standardization and Non-Power Reactor Project Directorate, Office of Nuclear Reactor Regulation, who had an oversight role.

INTERROGATORY NO. 3:

Do you contend that the annual receiving capacity listed in any of the Annual Capacity Reports issued by DOE since January 1, 1998 pursuant to the NWPA is binding on DOE and/or DAIRYLAND? If so, explain all bases for such a contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

Without waiving this objection, defendant states that the table titled "Summary of Purchasers' Annual Allocations (MTU)" in the Annual Capacity Reports identifies an acceptance allocation to Purchasers. As set forth in the Standard Contract, the 1991 Annual Capacity Report ("ACR"), in conjunction with the 1991 Annual Priority Ranking ("APR"), was the document by which DOE began making firm acceptance commitments to individual utilities based upon the delivery commitment schedules submitted by Purchasers that DOE approved. After issuance of the 1991 ACR/APR, and in accordance with Article V.B.1 of the Standard Contract, the plaintiff in this action submitted several Delivery Commitment Schedules ("DCSs") to the Department of Energy. DOE also issued annual capacity reports and acceptance priority rankings dated 1992, 1994, and 1995, and many nuclear utility plaintiffs with cases pending before the Court of

Federal Claims submitted DCSs in response to these ACR/APRs. In submitting their DCSs, the plaintiffs ultimately relied upon the allocations identified in the referenced ACR/APRs. DOE approved several DCSs for the plaintiff in this action. Those DCSs identify both the amount of spent nuclear fuel and high-level radioactive waste (collectively, "SNF") and the location of SNF for which an allocation exists under the relevant ACR/APR for a given year. No other binding "schedules" applicable to the Standard Contract were issued by the Department of Energy or accepted by the Department of Energy through the approval of DCSs. The basis for the rate and order of SNF acceptance identified in this interrogatory response are the ACR/APRs issued beginning in 1991, the DCSs that the plaintiff and other contract holders submitted to DOE, and DOE's approval of those DCSs.

With regard to plaintiff's request regarding ACRs issued "since January 1, 1998," the only ACR that DOE issued since that time was the 2004 ACR. That ACR did not result in any approved DCSs and, as the 2004 ACR itself stated, the information contained in the 2004 ACR was for informational purposes only and was not binding on DOE.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not require any further supplemental of this response.

INTERROGATORY NO. 4:

IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or preparation of responses to the delivery commitment schedules DAIRYLAND submitted to DOE. For each PERSON identified, DESCRIBE in detail the activities in which they engaged RELATED TO these activities.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant also objects to this interrogatory to the extent that it seeks information already within plaintiff's custody, possession, and/or control or that is readily available to plaintiff.

Without waiving these objections, defendant states that, pursuant to RCFC 33(d), the answer(s) to this interrogatory may be obtained from the database of documents previously made available, or to be made available, to plaintiff, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant. Defendant has previously produced DOE's files relating to Dairyland's Standard Contract, which contain DOE's records regarding delivery commitment schedules that Dairyland submitted. Defendant further states that individuals employed by DOE who may have had some involvement relating to DCSs that Dairyland submitted in response to the 1991 ACR/APR may include Nancy Slater, Alan Brownstein, Linda Strand, and Michael Detmer and those who may have had some involvement relating to DCSs that Dairyland submitted in response to the 2004 ACR/APR may include David Zabransky, Thomas Pollog, and Christopher Kouts.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court ordered that, where Dairyland "has requested the identity of persons involved in the review of preparation, etc., of certain documents or communications, Defendant shall identify those individuals whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or

secretarial), but not those who merely *may* have had such involvement." Order, at 1 (Feb. 5, 2007) (italics in original). In addition, the Court ordered that, "to whatever extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proffered database(s)." Id.

With regard to the review, approval, disapproval, drafting and/or preparation of responses to the delivery commitment schedules that Dairyland submitted to DOE, DOE's records indicate that individuals from DOE "whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial)" are (1) Alan Brownstein, who, as the Contracting Officer's Technical Representative, recommended approval of delivery commitment schedules ("DCSs"); (2) Linda Strand, who, as Contracting Officer, approved some DCSs; (3) Nancy Slater, who drafted a letter responding to Dairyland DCS submittals; (4) Jim Carlson, who approved the letter; (5) David Zabransky, who worked upon issues associated with DCSs in 2004; (6) Christopher Kouts, who worked upon issues associated with DCSs in 2004; and (7) Thomas Pollog, who worked upon issues associated with DCSs in 2004.

We are unaware of any individuals at the NRC who had any involvement in such a review.

INTERROGATORY NO. 5:

On what schedule (measured in Metric Tons Uranium) does DOE contend it is obligated to remove DAIRYLAND's SPENT FUEL pursuant to DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? State all factual and legal grounds for this contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

Without waiving this objection, defendant incorporates by reference its response to Interrogatory No. 3.

SUPPLEMENTAL RESPONSE:

Although the Court's February 5, 2007 order does not require supplementation of our original response to this interrogatory, defendant further refers plaintiff to the post-trial briefing that the Government filed in Pacific Gas & Electric Co. v. United States, Nos. 04-0074C & -0075C (Fed. Cl.), dated June 30, 2006, and July 7, 2006, copies of which are available on PACER accessible through the Court of Federal Claims' website.

INTERROGATORY NO. 6:

On what schedule (measured in Metric Tons Uranium) does DOE plan to remove DAIRYLAND's SPENT FUEL pursuant to DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? DESCRIBE if, how, and when this plan has changed since the execution of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT; IDENTIFY all documents and evidence RELATED TO this plan; IDENTIFY the five people with the most knowledge of this plan and the nature of such knowledge.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions"

section. Defendant further objects to this interrogatory because it seeks information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court stated that it "does not accept, at least for purposes of discovery, that, as Defendant avers, 'discovery into DOE [Department of Energy]'s current projections about the future [is] irrelevant to any analysis of causation or damages.'" Order, at 1 (Feb. 5, 2007) (brackets in original). In response to the Court's order, defendant states that, at the present time, DOE does not have a current plan regarding the schedule for acceptance of SNF from Dairyland, beyond the contract mechanisms in Articles IV and V of the Standard Contract that detail the manner in which SNF acceptance allocations will be assigned and approved. Nevertheless, as part of any future plan that is developed for the acceptance of SNF from LaCrosse, DOE will have to consider the fact that the SNF from that reactor is failed fuel, at least some of which apparently has suffered extreme degradation. During his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository. Defendant refers plaintiff to that testimony for an explanation of those issues. Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them

under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

In its interrogatory, Dairyland requests that we detail "if, when, and how this plan has changed since the execution of" Dairyland's Standard Contract in 1983. The first official plan that DOE issued in the process of establishing a commitment to accept particular SNF from particular contract holders was the 1991 Annual Capacity Report ("ACR"), in conjunction with the 1991 Acceptance Priority Ranking ("APR").[2] The table titled "Summary of Purchasers' Annual Allocations (MTU)" in the Annual Capacity Reports identifies an acceptance allocation to Purchasers. As set forth in the Standard Contract, the 1991 ACR, in conjunction with the 1991 APR, was the document by which DOE began making firm acceptance commitments to individual utilities based upon the delivery commitment schedules submitted by Purchasers that DOE approved. After issuance of the 1991 ACR/APR, and in accordance with Article V.B.1 of the Standard Contract, the plaintiff in this action submitted several Delivery Commitment Schedules ("DCSs") to the Department of Energy. DOE also issued annual capacity reports and acceptance priority rankings dated 1992, 1994, and 1995, and many nuclear utility plaintiffs with cases pending before the Court of Federal Claims submitted DCSs in response to these ACR/APRs. In submitting their DCSs, the plaintiffs ultimately relied upon the allocations identified in the referenced ACR/APRs. DOE approved several DCSs for the plaintiff in this action. Those DCSs identify both the amount of spent nuclear fuel and high-level radioactive

---

[2] To the extent that DOE issued other "plans" prior to that date, they were not binding upon DOE and did not establish any commitments upon its part. These other non-binding "plans" are identified in the Government's post-trial proposed findings of fact in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.).

waste (collectively, "SNF") and the location of SNF for which an allocation exists under the relevant ACR/APR for a given year. No other binding "schedules" applicable to the Standard Contract were issued by the Department of Energy or accepted by the Department of Energy through the approval of DCSs. The basis for the rate and order of SNF acceptance identified in this interrogatory response are the ACR/APRs issued beginning in 1991, the DCSs that the plaintiff and other contract holders submitted to DOE, and DOE's approval of those DCSs.

Subsequently, DOE announced that it would be unable to begin SNF acceptance by January 31, 1998. Later, in 2004, DOE issued a new ACR, which identified potential SNF acceptance allocations, but that ACR did not result in any approved DCSs and, as the 2004 ACR itself stated, the information contained in the 2004 ACR was for informational purposes only and was not binding on DOE. Subsequently, DOE announced that it had begun the delivery commitment process prematurely and that it was suspending the DCS process until a later date.

In this interrogatory, Dairyland also requests that defendant "IDENTIFY all evidence RELATED TO" the current plan for the schedule upon which DOE will accept Dairyland's SNF and to identify "the five people with the most knowledge of this plan and the nature of such knowledge." As previously discussed, DOE does not currently have a planned schedule for the acceptance of Dairyland's SNF. Accordingly, defendant does not possess any documentation or evidence relating to the current plan and cannot identify individuals knowledgeable about a current plan that does not exist at this time.

INTERROGATORY NO. 7:

IDENTIFY the earliest date on which DOE reasonably believes it will begin to take delivery of SPENT FUEL from PURCHASERS under their STANDARD CONTRACTS and/or DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT.

RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant further objects to this interrogatory because it seeks information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court stated that it "does not accept, at least for purposes of discovery, that, as Defendant avers, 'discovery into DOE [Department of Energy]'s current projections about the future [is] irrelevant to any analysis of causation or damages.'" Order, at 1 (Feb. 5, 2007) (brackets in original). In response to the Court's order, defendant states that, at the present time, DOE currently anticipates that the earliest date by which it is likely to begin accepting SNF from contract holders is 2017. The specific date that DOE will begin acceptance from the La Crosse reactor will be determined in accordance with the schedule mechanism set forth in the contract, through the issuance of the Annual Capacity Report and the

Acceptance Priority Ranking, and the submission and approval of delivery commitment schedules and final delivery schedules in accordance with the allocations for the plaintiff identified in those documents. Until this process is complete, DOE cannot know the specific date upon which it will begin acceptance of SNF from plaintiff. Nevertheless, circumstances could change that would allow or require DOE to perform prior to 2017. Specifically, Congress could enact legislation requiring DOE to construct and accept waste at a centralized interim storage facility in advance of the completion of Yucca Mountain, as Congress has considered legislation in the past that provided for such actions. Alternatively, Congress or the Nuclear Regulatory Commission could mandate that Federal funds be expended to purchase casks for storage of SNF for national security reasons, if circumstances warranted such action. Congress could enact other laws, such as permitting SNF to be stored at other locations temporarily, that would allow DOE to begin SNF acceptance prior to 2017. Such circumstances are discussed at pages 3455 through 3460, 3474, and 3476 of the trial transcript in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.).

INTERROGATORY NO. 8:

On what date does DOE currently plan to complete picking up SPENT FUEL from LACBWR? DESCRIBE how this plan has changed since the execution of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT; IDENTIFY all evidence RELATED TO this plan; IDENTIFY the five people with the most knowledge of this plan and the nature of such knowledge.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant further objects to this interrogatory because it seeks information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court stated that it "does not accept, at least for purposes of discovery, that, as Defendant avers, 'discovery into DOE [Department of Energy]'s current projections about the future [is] irrelevant to any analysis of causation or damages.'" Order, at 1 (Feb. 5, 2007) (brackets in original). In response to the Court's order, defendant states that, at the present time, DOE does not have a current plan regarding the acceptance of SNF from LaCrosse, beyond the contract mechanisms in Articles IV and V of the Standard Contract that detail the manner in which SNF acceptance allocations are assigned and approved. As a result, DOE has not yet identified a date by which it will actually accept, or by which it "plans" to accept, the last of the SNF from the LaCrosse reactor. As part of any future plan that is developed for the acceptance of SNF from LaCrosse, DOE will have to consider the fact that the SNF from that reactor is failed fuel, at least some of which apparently has suffered extreme degradation. During his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v.

United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository. Defendant refers plaintiff to that testimony for an explanation of those issues. Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

In its interrogatory, Dairyland requests that we detail "how this plan has changed since the execution of" Dairyland's Standard Contract in 1983. The first formal plan that DOE issued as part of the process of establishing a commitment to accept particular SNF from particular contract holders was the 1991 Annual Capacity Report ("ACR"), in conjunction with the 1991 Acceptance Priority Ranking ("APR"). The table titled "Summary of Purchasers' Annual Allocations (MTU)" in the Annual Capacity Reports identifies an acceptance allocation to Purchasers. As set forth in the Standard Contract, the 1991 ACR, in conjunction with the 1991 APR, was the document by which DOE began making firm acceptance commitments to individual utilities based upon the delivery commitment schedules submitted by Purchasers that DOE approved. After issuance of the 1991 ACR/APR, and in accordance with Article V.B.1 of the Standard Contract, the plaintiff in this action submitted several Delivery Commitment Schedules ("DCSs") to the Department of Energy. DOE also issued annual capacity reports and acceptance priority rankings dated 1992, 1994, and 1995, and many nuclear utility plaintiffs with cases pending before the Court of Federal Claims submitted DCSs in response to these ACR/APRs. In submitting their DCSs, the plaintiffs ultimately relied upon the allocations identified in the referenced ACR/APRs. DOE approved several DCSs for the plaintiff in this

action. Those DCSs identify both the amount of spent nuclear fuel and high-level radioactive waste (collectively, "SNF") and the location of SNF for which an allocation exists under the relevant ACR/APR for a given year. No other binding "schedules" applicable to the Standard Contract were issued by the Department of Energy or accepted by the Department of Energy through the approval of DCSs. The basis for the rate and order of SNF acceptance identified in this interrogatory response are the ACR/APRs issued beginning in 1991, the DCSs that the plaintiff and other contract holders submitted to DOE, and DOE's approval of those DCSs.

Subsequently, DOE announced that it would be unable to begin SNF acceptance by January 31, 1998. DOE later, in 2004, issued a new ACR, which identified potential SNF acceptance allocations, but that ACR did not result in any approved DCSs and, as the 2004 ACR itself stated, the information contained in the 2004 ACR was for informational purposes only and was not binding on DOE. Subsequently, DOE announced that it had begun the delivery commitment process prematurely and that it was suspending the DCS process until a later date.

In this interrogatory, Dairyland also requests that defendant "IDENTIFY all evidence RELATED TO" the current plan for the date upon which DOE will complete picking up SNF from LaCrosse and to identify "the five people with the most knowledge of this plan and the nature of such knowledge." As previously discussed, DOE does not currently have a plan for the date by it will complete SNF acceptance from LaCrosse. Accordingly, defendant does not possess any documentation or evidence relating to the current plan and cannot identify individuals knowledgeable about a current plan that does not exist at this time.

INTERROGATORY NO. 9:

Do you contend that it was or would have been unreasonable for DAIRYLAND to study, analyze, investigate and/or implement dry storage of its SPENT FUEL at any time subsequent to DOE's partial breach of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, explain all bases for this contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature. Through discovery, defendant anticipates that it may analyze Dairyland's SNF storage decisions and make determinations, for purposes of this litigation, regarding the appropriateness of those decisions. We have not had sufficient discovery in this case to make those determinations at this time. Until we have obtained such discovery and evaluated Dairyland's storage decisions, such determinations are premature.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not address the interrogatories that defendant viewed as premature. Further, we are still developing our positions regarding Dairyland's activities as part of our evaluation of Dairyland's claims in this litigation. Accordingly, Dairyland's request remains premature.

However, defendant states that, except to the extent otherwise identified in the expert reports that we recently issued, defendant does not currently plan to argue that it was unreasonable for Dairyland to study, investigate, and/or implement dry storage. Further, the

Government does not concede that any such studies were caused by DOE's partial breach of the Standard Contract.

INTERROGATORY NO. 10:

IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or preparation of any DOCUMENT or COMMUNICATIONS RELATED TO the removal, transport, storage and disposal of the reactor pressure vessel from LACBWR. For each PERSON identified, DESCRIBE in detail all aspects of that PERSON's involvement.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section and because plaintiff should have an equal ability to defendant to identify the requested information regarding "communications" between the Government and plaintiff, given that plaintiff and defendant were both equally involved in communications between plaintiff and defendant. See Pacific Gas & Electric Co. v. United States, 69 Fed. Cl. 323, 325-26 (2005). Defendant further objects to this interrogatory as irrelevant, given that not every possible document or communication somehow relating to the removal, transport, storage, or disposal of the reactor pressure vessel from the LaCrosse reactor is related to the damages that plaintiff seeks in this case. We are also unable to identify all responsive individuals for the reasons set forth in General Objections Nos. 1, 2, 4, 5, 6, and 8, which are incorporated into this response by reference. Defendant also objects to this interrogatory to the extent that it seeks information that is already within plaintiff's custody, possession, and/or control or that is readily available to plaintiff. See Pacific Gas, 69 Fed. Cl. at 325-26.

Without waiving these objections, defendant states that, with regard to the Department of Energy ("DOE"), defendant has previously produced DOE's contract files relating to Dairyland's Standard Contract, which contain communications between Dairyland and DOE, and other files containing communications between Dairyland and DOE from which, pursuant to RCFC 33(d), plaintiff may ascertain an answer to this interrogatory as easily as defendant. Defendant avers, however, that it is currently unaware of any DOE documents or communications that would have involved DOE employees. Defendant further states that, with regard to the NRC and pursuant to RCFC 33(d), plaintiff should be able to identify a list of individuals who would have had such involvement, if any, from the database of documents previously made available, or to be made available, to plaintiff or from the ADAMS database that is available for searching at the NRC, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court ordered that, where Dairyland "has requested the identity of persons involved in the review of preparation, etc., of certain documents or communications, Defendant shall identify those individuals whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial), but not those who merely *may* have had such involvement." Order, at 1 (Feb. 5, 2007) (italics in original). However, it ordered that, "to the extent that Plaintiff has requested that Defendant identify 'all aspects' of any person's involvement in review or preparation, etc., of certain documents or communications, Plaintiff's request is literally overbroad," ordering instead that "Defendant shall identify the nature of such involvement, etc., with reasonabl[e]

particularty." Id. at 2. In addition, the Court ordered that, "to whatever extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proffered database(s)." Id.

We are not aware of any individual at DOE with involvement in the review, approval, disapproval, drafting and/or preparation of any documents or communications relating to the removal, transport, storage, or disposal of the reactor pressure vessel at the La Crosse nuclear power reactor. The NRC's records indicate that individuals from the NRC "whose involvement" in such documents or communications "was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial)" are (1) William H. Ruland, Deputy Director, Licensing and Inspection Directorate, Spent Fuel Transportation and Storage, who was briefed on Dairyland's request and monitored the staff's progress in responding to it; (2) Robert Nelson, Chief, Licensing Branch, Spent Fuel Transportation and Storage, who approved the special package authorization; (3) Jill Caverly, Project Manager, Licensing Branch, Spent Fuel Transportation and Storage, who served as the project manager for this action; (4) Nancy Osgood, Senior Project Manager, Licensing Branch, Spent Fuel Transportation and Storage, who provided technical advice to the project manger; (5) Michelle DeBose, Licensing Assistant, Licensing Branch, Spent Fuel Transportation and Storage, who reviewed all correspondence related to this action for conformance with administrative requirements and maintained licensing information for this project; (6) Robert Lewis, Chief, Rules, Inspection and Operations Branch, who concurred on the summary of the meeting with Dairyland and Duratek on September 20, 2005; (7) Stewart Treby, Attorney, Office of the General Counsel, who

reviewed the special package authorization for compliance with legal requirements; (8) Gordon Bjorkman, Branch Chief, Spent Fuel Storage and Transportation, who reviewed and concurred on the special package authorization and directed the technical reviewers within his branch; (9) Larry Campbell, Branch Chief, Spent Fuel Storage and Transportation, who reviewed and concurred on the special package authorization and directed the technical reviewers within his branch; and (10) Jason Piotter, Charles Interrante, Christopher Bajwa, Shana Helton, and Elizabeth Thompson, who are Technical Reviewers.

INTERROGATORY NO. 11:

Has DOE given any consideration or undertaken any study, analysis, or investigation of the manner in which DOE will or could dispose of FAILED FUEL? If not, explain why DOE has not considered or studied this topic. If so, also IDENTIFY:

a. The nature of such consideration, study, analysis or investigation.

b. The timeframe of such consideration, study, analysis or investigation.

c. All individuals who participated in such consideration, study, analysis or investigation.

d. The results and/or conclusions of such consideration, study, analysis or investigation.

e. Whether such consideration, study, analysis or investigation included the possibility of storing or disposing of FAILED FUEL in a facility or location other than the deep geologic repository.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as vague, overly broad, irrelevant, and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Plaintiff's interrogatory is not limited to failed fuel in the possession of or generated by Dairyland or other Standard Contract holders. Further, not every aspect of failed fuel is in any way related to Dairyland's damages claim in this litigation. Further, because of the manner in which Dairyland's request is broadly phrased, almost any document having anything to do with spent nuclear fuel storage or disposal could be "related" to this interrogatory, further rendering it overly broad and unduly burdensome.

Without waiving these objections, defendant states that there are large quantities of documents available on the Record Information System website ("RIS-Web") that are potentially responsive to this request and which, pursuant to RCFC 33(d), plaintiff can attempt to develop a response to this extremely broad inquiry. Without any further refinement and narrowing of plaintiff's request, defendant cannot provide any further response to this inquiry. To the extent that plaintiff is able to narrow its interrogatory to permit a targeted search and response, defendant is willing to evaluate that narrowed request and respond appropriately.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court indicated that, "to the extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proferred database(s)." The following documents from which

plaintiff can develop a response to this interrogatory may be found in the Government's past productions:

| Container | First Image | Last Image |
|---|---|---|
| CTR013 | CTR0130476 | CTR0130476 |
| CTR013 | CTR0131092 | CTR0131108 |
| CTR013 | CTR0131163 | CTR0131170 |
| CTR013 | CTR0131205 | CTR0131215 |
| CTR013 | CTR0131343 | CTR0131355 |
| CTR013 | CTR0131401 | CTR0131404 |
| CTR013 | CTR0131420 | CTR0131432 |
| CTR013 | CTR0131470 | CTR0131481 |
| CTR013 | CTR0131530 | CTR0131541 |
| CTR013 | CTR0131548 | CTR0131551 |
| CTR013 | CTR0131576 | CTR0131587 |
| CTR013 | CTR0131675 | CTR0131679 |
| CTR013 | CTR0131708 | CTR0131710 |
| CTR013 | CTR0131829 | CTR0131832 |
| CTR013 | CTR0133181 | CTR0133209 |
| PNL048 | PNL0480004 | PNL0480055 |
| PNL048 | PNL0480142 | PNL0480193 |
| PNL048 | PNL0480198 | PNL0480246 |
| PNL048 | PNL0480247 | PNL0480297 |
| PNL048 | PNL0480298 | PNL0480348 |
| PNL048 | PNL0480349 | PNL0480398 |
| PNL048 | PNL0480399 | PNL0480448 |
| PNL048 | PNL0480449 | PNL0480499 |
| PNL048 | PNL0480500 | PNL0480551 |
| PNL048 | PNL0480560 | PNL0480608 |
| PNL048 | PNL0480613 | PNL0480718 |
| PNL048 | PNL0480754 | PNL0480770 |
| PNL048 | PNL0480791 | PNL0480898 |
| PNL048 | PNL0480933 | PNL0481038 |
| PNL048 | PNL0481042 | PNL0481148 |
| PNL048 | PNL0481149 | PNL0481253 |
| PNL048 | PNL0481266 | PNL0481348 |
| PNL048 | PNL0481349 | PNL0481429 |
| PNL048 | PNL0481430 | PNL0481477 |
| PNL048 | PNL0481597 | PNL0481678 |
| PNL048 | PNL0481679 | PNL0481730 |
| PNL048 | PNL0481731 | PNL0481813 |

| | | |
|---|---|---|
| PNL048 | PNL0481814 | PNL0481897 |
| PNL048 | PNL0481908 | PNL0481989 |
| PNL048 | PNL0481990 | PNL0482038 |
| PNL048 | PNL0482039 | PNL0482088 |
| PNL034 | PNL0340201 | PNL0340212 |
| PNL034 | PNL0340213 | PNL0340224 |
| PNL034 | PNL0340226 | PNL0340238 |
| PNL034 | PNL0340239 | PNL0340253 |
| PNL034 | PNL0340305 | PNL0340312 |
| PNL034 | PNL0340314 | PNL0340322 |
| PNL034 | PNL0340323 | PNL0340330 |
| PNL034 | PNL0340332 | PNL0340339 |
| PNL034 | PNL0340342 | PNL0340349 |
| PNL034 | PNL0340350 | PNL0340358 |
| PNL034 | PNL0340359 | PNL0340366 |
| PNL034 | PNL0340368 | PNL0340379 |
| PNL034 | PNL0340380 | PNL0340391 |
| PNL034 | PNL0340392 | PNL0340403 |
| PNL034 | PNL0340404 | PNL0340415 |
| PNL034 | PNL0340416 | PNL0340427 |
| PNL034 | PNL0340428 | PNL0340434 |
| PNL034 | PNL0340443 | PNL0340453 |
| PNL034 | PNL0340454 | PNL0340463 |
| IDF007 | IDF0073621 | IDF0073787 |
| IDF007 | IDF0073864 | IDF0074013 |
| HQR008 | HQR0080215 | HQR0080216 |
| HQR008 | HQR0080217 | HQR0080220 |
| HQR008 | HQR0080536 | HQR0080556 |
| HQR008 | HQR0080598 | HQR0080598 |
| HQR008 | HQR0080619 | HQR0080620 |
| HQR008 | HQR0080816 | HQR0080842 |
| HQR008 | HQR0080845 | HQR0080856 |
| HQR008 | HQR0080896 | HQR0080902 |
| HQR008 | HQR0080944 | HQR0080944 |
| HQR008 | HQR0080953 | HQR0080953 |
| HQR008 | HQR0081028 | HQR0081032 |

INTERROGATORY NO. 12:

Does DOE plan to accept delivery of FAILED FUEL from DAIRYLAND on a different schedule than the rest of DAIRYLAND's SPENT FUEL before it completes taking delivery of

other SPENT FUEL from DAIRYLAND? If so, DESCRIBE the schedule DOE is planning to use for picking up DAIRYLAND's FAILED FUEL.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant further objects to this interrogatory because it seeks information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court stated that it "does not accept, at least for purposes of discovery, that, as Defendant avers, 'discovery into DOE [Department of Energy]'s current projections about the future [is] irrelevant to any analysis of causation or damages.'" Order, at 1 (Feb. 5, 2007) (brackets in original). In response to the Court's order, defendant states that, at the present time, DOE does not have a current plan regarding the acceptance of SNF from Dairyland, beyond the contract mechanisms in Articles IV and V of the Standard Contract that detail the manner in which SNF acceptance allocations are assigned and approved. As a result, DOE has not yet identified the schedule upon which it will actually accept, or by which it "plans" to accept, Dairyland's failed fuel. As part of any future plan that is developed for the acceptance of SNF from Dairyland, DOE will have to consider the fact that the SNF from

that reactor is failed fuel, at least some of which apparently has suffered extreme degradation. During his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository. Defendant refers plaintiff to that testimony for an explanation of those issues. Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

INTERROGATORY NO. 13:

Do you contend that DOE would have picked up DAIRYLAND's FAILED FUEL later than the rest of its SPENT FUEL had the government begun SPENT FUEL acceptance from utilities starting not later than January 31, 1998? If so, state all bases for this contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature prior to the completion of fact discovery, given that defendant does not have adequate information regarding plaintiff's failed fuel to respond appropriately to this interrogatory. Defendant objects to this interrogatory as vague, overly broad, and unduly burdensome. Given that the design parameters for any storage facility that DOE might operate have not yet been defined, it is impossible to identify every technical impediment that could occur in the acceptance of failed fuel from Dairyland's nuclear reactor.

Without waiving these objections, defendant responds that, during his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository. Defendant refers plaintiff to that testimony for a response to this interrogatory. Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not require any further supplemental of this response.

INTERROGATORY NO. 14:

Do you contend that DAIRYLAND's expenditures supporting PFS were unreasonable expenditures toward mitigation of DAIRYLAND's damages due to DOE's partial breach of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, state all bases for this contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature, as any determination of whether, from a business or profit-making standpoint upon Dairyland's part, it was "unreasonable" for Dairyland to invest in Private Fuel Storage ("PFS") cannot be made prior to the completion of discovery.

Without waiving these objections, defendant states that, as we have explained in prior briefing in several of the SNF cases pending before this Court, any investment in PFS was not foreseeable at the time of contract formation and, further, was wholly speculative. Any such investment could not be considered proper "mitigation" of DOE's delay in beginning SNF acceptance.

SUPPLEMENTAL RESPONSE:

Although the Court's February 5, 2007 order does not require supplementation of our original response to this interrogatory, defendant further refers plaintiff to the post-trial briefing that the Government filed in Pacific Gas & Electric Co. v. United States, Nos. 04-0074C & -0075C (Fed. Cl.), dated June 30, 2006, and July 7, 2006, copies of which are available on PACER accessible through the Court of Federal Claims' website.

INTERROGATORY NO. 15:

Do you contend that it was unreasonable for DAIRYLAND to store its SPENT FUEL in the LACBWR wet fuel storage pool at any time after DOE partially breached DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, DESCRIBE when you contend it became unreasonable for DAIRYLAND to continue to store its SPENT FUEL in the LACBWR wet fuel storage pool and DESCRIBE the specific alternative storage options you believe would have been reasonable for DAIRYLAND to employ to store its SPENT FUEL from that point onward.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature, as such determinations cannot be made prior to the completion of discovery.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not address the interrogatories that defendant viewed as premature. Further, we are still developing our positions regarding Dairyland's activities as part of our evaluation of Dairyland's claims in this litigation. Accordingly, Dairyland's request remains premature.

However, defendant states that, except to the extent otherwise identified in the expert reports that we recently issued, defendant does not currently plan to argue that it was unreasonable for Dairyland to store its spent fuel at LACBWR in wet storage. Further, the Government does not concede that Dairyland has been required to maintain its spent fuel pool for a longer period of time because of DOE's partial breach of the Standard Contract.

INTERROGATORY NO. 16:

DESCRIBE all options that you contend DAIRYLAND should have explored and/or implemented for the storage of its SPENT FUEL after DOE partially breached DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT. If you contend that DAIRYLAND should have explored or implemented options for storage of its SPENT FUEL that are different from those options explored and/or implemented to store DAIRYLAND'S FAILED FUEL, DESCRIBE how and why they should have been different.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature, as such determinations cannot be made prior to the completion of discovery.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not address the interrogatories that defendant viewed as premature. Further, we are still developing our positions regarding Dairyland's activities as part of our evaluation of Dairyland's claims in this litigation. Accordingly, Dairyland's request remains premature.

However, defendant states that it is not its obligation to develop contentions regarding alternative options that Dairyland could have pursued. Defendant further states that, except to the extent otherwise identified in the expert reports that we recently issued, defendant does not currently plan to argue that Dairyland should have explored and/or implemented any particular strategy for the storage of its spent fuel. However, defendant does not concede that DOE's partial breach of the Standard Contract was the cause of any particular method chosen by Dairyland.

INTERROGATORY NO. 17:

DESCRIBE all options that you contend DAIRYLAND should have explored and/or implemented for the storage of its FAILED FUEL after DOE partially breached DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT. If you contend that DAIRYLAND should have explored or implemented options for storage of its FAILED FUEL that are different from those options explored or implemented to store DAIRYLAND'S SPENT FUEL, DESCRIBE how and why they should have been different.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature, as such determinations cannot be made prior to the completion of discovery.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not address the interrogatories that defendant viewed as premature. Further, we are still developing our positions regarding Dairyland's activities as part of our evaluation of Dairyland's claims in this litigation. Accordingly, Dairyland's request remains premature.

However, defendant states that it is not its obligation to develop contentions regarding alternative options that Dairyland could have pursued. Defendant further states that, except to the extent otherwise identified in the expert reports that we recently issued, defendant does not currently plan to argue that Dairyland should have explored and/or implemented any particular strategy for the storage of its failed fuel. However, Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

INTERROGATORY NO. 18:

DESCRIBE all efforts undertaken by or on behalf of DOE to examine the manner or process by which DOE would remove SPENT FUEL from LACBWR. IDENTIFY the five people with the most knowledge of these efforts and the nature of such knowledge.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as vague, overly broad, irrelevant, and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant further objects to this request to the extent that it relates to the manner in which DOE may, in the future, remove fuel from the LaCrosse reactor because, in accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation. Defendant also objects to plaintiff's demand that defendant identify the "five people with the most knowledge" of the efforts identified, as plaintiff is requesting that counsel for defendant interview all individuals within DOE who may have had some involvement in matters and made judgment calls regarding the level of their current knowledge and memory, and plaintiff would then require defendant to disclose the results of the attorney work product; nevertheless, defendant will undertake to identify individuals whom, from a review of documents, may have some knowledge of the efforts identified based upon their apparent involvement in such efforts.

Without waiving these objections, defendant states that, pursuant to RCFC 33(d), the answer(s) to this interrogatory may be obtained from the database of documents previously made available, or to be made available, to plaintiff, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant. To the degree that it has not already done so, defendant will make the database of documents available to plaintiff at mutually acceptable times to allow plaintiff to inspect such records and make such copies as plaintiff

deems appropriate. Documents that may contain information responsive to this request include the Facility Interface Data Study (MOL.20060121.0173), the Facility Interface Capability Assessment, the Near-Site Transportation Infrastructure study, and Service Planning Documents.

With regard to plaintiff's request for identification of individuals who may have been involved in the efforts identified in this interrogatory, defendant is unaware of any individuals who would have worked upon or studied the removal of spent nuclear fuel specifically from the LaCrosse reactor or the LaCrosse site itself. However, individuals may have contemplated the removal of spent nuclear fuel from nuclear utilities in general. Pursuant to RCFC 33(d), the names of those individuals – either DOE employees or contractor employees – may be obtained from the database of documents previously made available, or to be made available, to plaintiff, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant. However, those individuals may include David Zabransky, Ned Larson, and Robert Burgoyne.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court ordered that, where Dairyland "has requested the identity of persons involved in the review of preparation, etc., of certain documents or communications, Defendant shall identify those individuals whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial), but not those who merely *may* have had such involvement." Order, at 1 (Feb. 5, 2007) (italics in original). However, it ordered that, "to the extent that Plaintiff has requested that Defendant identify 'all aspects' of any person's involvement in review or preparation, etc., of certain documents or communications, Plaintiff's request is literally overbroad," ordering instead

that "Defendant shall identify the nature of such involvement, etc., with reasonabl[e] particularty." Id. at 2. In addition, the Court ordered that, "to whatever extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proffered database(s)." Id. at 1. Finally, with regard to this particular interrogatory, the Court ordered that, rather than identify "the 'five people with the most knowledge' in response to [this interrogatory], [defendant] shall instead identify all those individuals whose knowledge is reasonably material, substantive, or the like, relating to the removal of spent fuel from the La Crosse Boiling Water Reactor (LACBWR)."

In accordance with those guidelines, defendant provides the following supplemental response: In the early 1990's, DOE commissioned several studies of the facilities and infrastructure at and near utility sites throughout the country, including the LaCrosse plant, to determine the capabilities for loading of casks and the shipment of SNF from those utility sites. The reports that resulted from these studies are found in the database of documents that has been made available to Dairyland, in Dairyland's own database of documents, and on the RIS-web with the following bates numbers or accession numbers: Site and Facility Waste Transportation Services Planning Document (Draft), March 1991 (PLAC0149483-531); Site and Facility Waste Transportation Services Planning Document, May 1993 (HQV.19931101.0007); Facility Interface Capability Assessment (FICA) Project Cask Handling Assessment La Crosse BWR, October 1990 (HQR0441640-1654); Near-Site Transportation Infrastructure Project Draft Report and Assessment, June 1990 (PLAC0079126-9216); Near-Site Transportation Infrastructure Project Final Report, February 1992 (YMP0032291-2348). The individuals who had substantial

involvement in these studies or the preparation of these reports include Tom Pollog and Mike Conroy, DOE; Bill Lee and Nigel Mote, NAC; Bill Teer, TRW; and Ron Pope, Steve Schmid, and Bill McLain, Oak Ridge National Laboratory.

In 2004, DOE undertook an effort to update these assessments and obtained from utilities information on "Facility Interface Data Sheets" or "FIDS." The FIDS for the LaCrosse plant are found within Dairyland's own database of documents at PLAC0077157-58 and PLAC049331-32. This data was compiled in a report, Final Report on Facility Interfaces for Office of Civilian Radioactive Waste Management, January 2005 (MOL.20060121.0173). David Zabransky and Ned Larson, DOE, and Robert Burgoyne, Booz-Allen, had substantial involvement in this recent effort.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director
Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7571
FAX: (202) 307-2503

OF COUNSEL:

JOSHUA E. GARDNER
PATRICK BRYAN
SCOTT SLATER
Trial Attorneys
Commercial Litigation Branch
Department of Justice

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy

August 7, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 7th day of August 2007, I caused to served by facsimile and first class mail a copy of "DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AS AMENDED IN RESPONSE TO THE COURT'S FEBRUARY 5, 2007 ORDER AND SUPPLEMENTED FOLLOWING THE CLOSE OF FACT DISCOVERY" addressed as follows:

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

Sriwell Miller