IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Electronically filed: December 14, 2007

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S MOTION TO COMPEL PRODUCTION OF ALL FIVE REMAINING PRESIDENTIAL COMMUNICATIONS PRIVILEGE DOCUMENTS

In accordance with the Court's Order of December 12, 2007, Dairyland hereby moves to compel actual production, as opposed to entirely-redacted production, of the following five documents (identified by the same reference numbers used by the parties' and the Court in prior briefing and Orders): E112, E153, E156 (one page), E163 and E165. The Court previously ordered production of these documents with only specified partial redactions after resolving Dairyland's challenges to the government's claims of deliberative process privilege, *see* Order of November 19, 2007 (directing production of E112 (with certain redactions), E153, E156 (one page) and E163 (with minor redaction); Order of December 12, 2007 at 2 n.3 (directing production of E165). Nonetheless, the government is continuing to withhold actual (*i.e.*, other than fully-redacted) production of these documents on claims of presidential communications privilege.

These five documents, together with the five documents addressed in Dairyland's September 18, 2007 motion to compel production of documents withheld under the presidential

communications privilege, are the only documents the Court will have to address with regard to the presidential communications privilege. Dairyland's review indicates that there are no additional documents as to which the government is claiming presidential communications privilege either among the documents to be produced next week under the December 10, 2007 Order or in the three notebooks of *in camera* documents that the Court has not yet addressed pursuant to its June 29, 2007 Order.

The grounds for the present motion are the same grounds set forth in Dairyland's September 18 motion to compel the initial five documents the government withheld under claims of presidential communications privilege, and in Dairyland's November 5, 2007 reply brief in support of that motion. Pursuant to RCFC 37(a)(2), the undersigned certifies he conferred in good faith with government counsel, Russell A. Shultis, in an effort to secure disclosure of these documents without court action, but the government will not disclose these documents without court action.

The Court's December 12 Order also provided that, if Dairyland files the present motion to compel, Dairyland is ordered to "contemporaneously file a statement of need for the documents and why the evidence in the documents is not available with due diligence elsewhere." 12/12/07 Order at 2. As noted in the December 12, Order, the Court directed Dairyland, by Order dated October 17, 2007, to file a comparable statement regarding the five documents addressed in Dairyland's September 18 motion to compel. Dairyland filed that statement on October 18, 2007. The statement set forth below regarding the five documents addressed in the present motion follows the same format as that prior statement.

Statement Of Need And Unavailability Of Evidence Elsewhere

In its October 17 Order, the Court identified the District of Columbia Circuit's decision in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997), as the "most persuasive guidance on the procedural elements involved in weighing a claim of privilege based on presidential communications."[1] In *In re Sealed Case*, the court concluded that a party seeking to overcome a presidential communications privilege claim must demonstrate: "first, that each discrete group of the [requested] materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere." *Id.* at 754.

This Court has already found that the five additional documents the production of which Dairyland is hereby seeking to compel, specifically E112 (with certain redactions), E153, E156 (one page), E163 (with minor redaction) and E165, satisfy the first prong of this test, *i.e.*, they likely contain evidence that is important to this case. That is essentially the finding that the Court made when it directed the government to produce these documents notwithstanding the government's claim of deliberative process privilege. Although that finding is only implicit in the November 19 and December 12 Orders that require production of the five documents covered by the present motion, the Court made its rationale explicit in its October 17 Order in the course of discussing the five documents covered by Dairyand's September 18 motion to compel: "In its decision on the deliberative process privilege, issued on June 29, 2007, this Court has already found in effect that the five documents meet the first of the requirements articulated in *In re*

[1] With all due respect for the Court's ruling, Dairyland continues to believe that notwithstanding the Court's finding that *In re Sealed Case's* guidance is "most persuasive," *Sun Oil Co. v. United States*, 514 F.2d 1020-1024-25 (Ct. Cl. 1974), remains the binding precedent in this jurisdiction regarding this issue. Dairyland clearly meets the *Sun Oil* need standard given this Court's prior ruling that the documents at issue are "highly relevant" to this case.

*Sealed Case*." October 17 Order at 2; *See Dairyland Power Coop. v. United States*, 77 Fed. Cl. 330, 344-45 (2007) (finding that those five subject documents appear "highly relevant to the present litigation"). There is no need or requirement for the Court to reiterate that reasoning each time it applies the reasoning to additional documents, as the Court did in its November 19 and December 12 Orders with respect to the five documents covered by the present motion.

In particular, each of the five additional documents covered by the present motion – like all the documents addressed in Dairyland's September 18 motion to compel, *see* 10/18/07 Dairyland statement of need/unavailability at 2-3– concern consideration of SNF interim storage by the government. *See* Declaration of Ronald A. Milner asserting deliberative process privilege dated March 31, 2006, appended to February 28, 2007 government's opposition to January 18, 2007 Dairyland's motion to compel, at ¶¶ 18.10 (E112), 18.12 (E153), 18.13 (E163 and E165), 18.18 (E156); s*ee also* Assertion of Deliberative Process Privilege declaration, Exhibit 1 hereto, at ¶¶ L (E112), P (E153), Q (E163 and E165), T (E156). Consistent with the findings the Court has already made, interim storage scenarios are highly relevant to several issues in this case, including the schedule and rate of SNF acceptance, priority acceptance for shutdown reactors in general and Dairyland in particular, and the Private Fuel Storage ("PFS") initiative pursued by Dairyland and other utilities. For example, the government has argued that Dairyland's participation in the PFS interim storage effort has been unreasonable mitigation. But that argument would be substantially weakened if it turns out that the government's own internal evaluations (as may well be evidenced by the documents at issue here) show that the government considered interim storage to be a potentially meritorious solution to the government's partial breach. In fact, the government has argued in many other spent fuel cases (and to the Federal Circuit in the pending appeals) that a form of interim storage – Monitored Retrievable Storage

("MRS") was the approach the government preferred and planned to implement in order to meet the contractual 1998 start date. *See, e.g.*, *System Fuels, Inc. v. United States*, No. 03-2623C, slip op. at 21 (Fed. Cl. Oct. 16, 2007) ("[T]he [acceptance] rate projected by DOE assumes that no repository would have become available but that a MRS would have been sited and installed and that temporary storage would occur at the MRS."). Similarly, the government's discussion of interim storage may reveal the government's' views regarding a reasonable rate of acceptance at such facilities or the appropriateness of according priority acceptance at such facilities to spent fuel from permanently shutdown nuclear reactors, such as Dairyland's.

As also explained in Dairyland's October 18 statement, with regard to the second prong of the *Sealed Case* test, it is readily apparent that the five documents covered by the present motion and the evidence contained therein are not available elsewhere with any amount of diligence. The documents themselves have certainly not been produced in any other SNF case. Moreover, the importance of these documents to this case is that they may contain potential admissions from senior government officials regarding interim storage. Thus, it is the documents themselves, authored by government officials, rather than only the factual information in the documents, that makes them uniquely important and certainly not obtainable elsewhere.

In this regard, the present situation is akin to the situation in *Sealed Case.* In that case, the D.C. Circuit held that, in connection with Office of Independent Counsel's ("OIC") grand jury investigation of the former Secretary of Agriculture, Mike Espy, the OIC had demonstrated sufficient need for certain subpoenaed documents withheld by the White House on presidential communications grounds because the documents likely contained evidence of statements made by Espy or his counsel that could be used to show that Espy made false statements to the White

House during its own investigation of Espy's activities. *Sealed Case*, 121 F.3d at 761. Similarly, in this case, the five documents covered by this motion likely contain unique statements from senior government officials that are not obtainable from other sources, and these documents could be used by Dairyland to support its positions and/or rebut the government's positions on a host of highly relevant issues in this case.

Indeed, the government cannot dispute the unavailability of the admissions contained in these documents, because in claiming the deliberative process privilege over these same documents, the government necessarily contended that the sensitive information contained in the documents is *not* publicly available. If it were, the deliberative process privilege would be inapplicable. By claiming the deliberative process privilege, the government asserted that these documents contain deliberative and pre-decisional statements by policy-making or policy-advising government officials. The government cannot be heard to argue now that the high-level information contained in these documents is readily available elsewhere. Nor could the Court reach that conclusion in any event, because in previously finding that the deliberative process privilege did attach to these documents, the Court already found that they contain sensitive, "deliberative" information that is not generally available elsewhere. Indeed, in finding that Dairyland's evidentiary need overcame the deliberative process privilege, the Court directed release of the documents *only* subject to a restrictive, case-specific protective order. These documents and the admissions and other information in them are not available elsewhere.

Finally, Dairyland wishes to reiterate a crucial point articulated more fully in its November 5, 2007 reply brief (at pp. 6-7) on its September 18 motion to compel. The point is that because Dairyland has established a sufficient need for the five disputed documents, it is entitled to receive them even if (assuming *arguendo*) the government had formally invoked the

presidential communications privilege. Thus, it no longer matters whether the government would formally invoke the privilege. If, pursuant to Dairyland's statement of need and unavailability elsewhere, the Court directs the government to release the five documents covered by this motion (and pursuant to Dairyland's prior statement the Court directs release of the five documents covered by Dairyland's September 28 motion), the government cannot at that point further delay release of the documents to Dairyland to permit the government "to come forward with a formal invocation of the presidential privilege." Yet that is precisely what the government has suggested. *See* 10/24/07 government opposition to Dairyland's motion to compel at 2.

The Court only reaches the issues addressed in the statement above (and in Dairyland's comparable October 18 statement) by effectively *assuming* the presidential communications privilege otherwise applies. Dairyland, respectfully, continues to believe that proceeding in that manner puts the cart before the horse – it assumes the privilege applies based on nothing more than government counsel's say-so, and despite the fact that the privilege log indicates these documents never got anywhere near a close presidential advisor. But Dairyland, of course, accepts the Court's decision to proceed as we are proceeding.

Having come this far, and with the discovery deadline and trial approaching, it is simply too late in the day to go see if the presidential communications privilege really does apply. That is irrelevant if, as Dairyland contends and the statement above establishes, Dairyland has sufficient need to overcome the privilege in any event.

## CONCLUSION

For these reasons and the reasons set forth in Dairyland's September 18 motion to compel and November 5 reply brief, the Court should direct release of the five documents addressed in this motion without any redactions other than those already allowed by prior Orders.

Respectfully submitted,

December 14, 2007

s/ Jerry Stouck

JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

*WDC 371,550,833v1 12/14/2007*

**EXHIBIT 1**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY | ) | |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | ) | |
| MAINE YANKEE ATOMIC POWER COMPANY | ) | |
| FLORIDA POWER & LIGHT COMPANY | ) | |
| NORTHERN STATES POWER COMPANY | ) | Case Nos. 98-126C, |
| DUKE POWER, A Division of DUKE ENERGY CORP. | ) | 98-154C, 98-474C, |
| INDIANA MICHIGAN POWER COMPANY | ) | 98-483C, 98-484C, |
| SACRAMENTO MUNICIPAL UTILITY DISTRICT | ) | 98-485C, 98-486C, |
| SOUTHERN NUCLEAR OPERATING COMPANY, <u>et al</u>. | ) | 98-488C, 98-614C, |
| COMMONWEALTH EDISON COMPANY | ) | 98-621C, 99-447C, |
| BOSTON EDISON COMPANY | ) | 00-440C, 00-697C, |
| GPU NUCLEAR, INCORPORATED | ) | 00-703C, 01-115C, |
| WISCONSIN ELECTRIC POWER COMPANY | ) | 01-116C, 01-249C |
| POWER AUTHORITY OF THE STATE OF NEW YORK | ) | 01-551C |
| OMAHA PUBLIC POWER DISTRICT | ) | |
| NEBRASKA PUBLIC POWER DISTRICT | ) | Judge Sypolt |
| TENNESSEE VALLEY AUTHORITY | ) | (Discovery Judge) |
| PSEG NUCLEAR LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## ASSERTION OF DELIBERATIVE PROCESS PRIVILEGE

1. In response to discovery requests from the utility plaintiffs, the Department of Energy (DOE) has reviewed and produced thousands of documents referring or relating to DOE's delay in beginning acceptance of spent nuclear fuel or high level waste by January 31, 1998 and the schedule by which DOE should have begun acceptance. In that process, DOE's attorneys have withheld a small number of documents that involve and/or reflect the Department's deliberative processes. DOE has a policy of protecting its deliberative processes in order to assure free flow of ideas and candid discussion of alternatives, which are essential to its efficient operation.

2. Pursuant to a formal delegation by the Secretary of Energy to the Under Secretary of Energy, Science and Environment, and a subsequent formal redelegation from the Under Secretary to the Director, Office of Civilian Radioactive Waste Management, the Director or her delegate has responsibility for asserting the Government's deliberative process privilege within the cognizance of her Office.

3. Accordingly, because the delay in spent nuclear fuel acceptance controversy is within the cognizance of the Office of Civilian Radioactive Waste Management ("OCRWM"), I, Ronald A. Milner, delegate of Director Dr. Margaret S.Y. Chu, hereby assert the deliberative process privilege on behalf of the Department of Energy for the following described documents:

A. The document Bates-Stamped CTR191370 - CTR191383 is addressed to the Office of the Secretary from an individual in DOE's office of Fissile Materials Assurance Working Group ("FMAWG"). The specific policy decision at issue was the methods through which the Department would safeguard irradiated nuclear materials. The document seeks Secretary-level approval of the attached Program Directions for Safeguarding Irradiated Nuclear Materials. The document also includes a communication from the Acting Deputy Assistant Secretary for Nuclear Material and Facility Stabilization to AMEM field managers regarding the FMAWG drafted program direction, and seeks comments and estimated costs to implement the proposed Program Directions. The document was part of DOE's policy deliberations that led to the Department's decision, and includes a recommendation from FMAWG to the Office of the Secretary relating to that decision.

B. The document Bates-Stamped CTR0451252 - CTR0451269 is a draft of a presentation from the acting director of OCRWM to the Under Secretary of Energy regarding DOE's FY2003 budget request. The specific policy decision at issue was the amount of money DOE would budget for fiscal year 2003 for OCRWM, and the document was part of DOE's policy deliberations that led to DOE's decision.

C. The document Bates-Stamped HQR0380108 - HQR0380111 is a draft document that includes the Department's considerations and recommendations regarding how DOE should improve its interaction with the State of Nevada. The document is part of an ongoing policy deliberation within the DOE regarding its continuing interaction with Nevada as it relates to the storage of spent nuclear fuel at Yucca Mountain.

D. The document Bates-Stamped HQR0950014 - HQR0950025 is a draft memorandum for the Under Secretary of Energy from Assistant Secretary of Energy Huntoon regarding the Department's Decision on Acceptance of Spent Nuclear Fuel from General Atomic's facility. The specific policy decision at issue was how DOE would accept spent nuclear fuel from General Atomic's facility. and the document lists a series of options to be decided upon and a recommendation for a specific option. The document reflects the Department's policy deliberations relating to that decision.

E. The document Bates-Stamped HQR0390447 - HQR0390454 is a legal memorandum from DOE's General Counsel to the Executive Assistant to the

Deputy Secretary of Energy regarding options for the receipt of Cintichem fuel. The specific decision at issue was how DOE would accept Cintichem fuel, and this document reflects DOE's deliberations regarding different methods for accepting the fuel, and provides options, discusses advantages and disadvantages of the options, and makes recommendations regarding the acceptance of Cintichem fuel.

F. The document Bates-Stamped HQR0510001 - HQR0510007 is a briefing memorandum to the Secretary of Energy from Mary Louise Wagner, special advisor to the Secretary of Energy, regarding a meeting with utility executives that provides recommendations and analysis of issues prior to a meeting with executives of PECO and ComEd. The specific decision at issue in this document was whether DOE could settle the utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document reflects part of the Department's deliberations that led to its decision, and also includes materials prepared at the direction of counsel and attorney-client communications.

G. The document Bates-Stamped HQR0510008 - HQR0510011 is a briefing memorandum for the Secretary of Energy from Mary Louise Wagner and Mary Anne Sullivan, General Counsel of the Department of Energy, regarding a meeting with Northern States Utility. The specific decision at issue in this document was whether DOE could settle the utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document reflects part of the Department's deliberations that led to its decision, and also includes materials

prepared at the direction of counsel and attorney-client communications.

H. The document Bates-Stamped HQR0510018 is a summary regarding spent fuel storage costs. The document is part of DOE's ongoing deliberations that involve the possibility of settling the nuclear utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document includes materials prepared at the direction of counsel and attorney-client communications, and provides the estimated costs associated with pursuing a number of options and scenarios regarding DOE's delay in SNF acceptance.

I. The document Bates-Stamped HQR0292342-HQR0292353 is a memorandum from Lake Barrett to Thomas Grumbly regarding the advantages and disadvantages of several litigation options as they relate to the Department's acceptance of spent nuclear fuel. The specific decision at issue in this document was whether DOE could settle the utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document reflects part of the Department's deliberations that led to its decision, and also includes materials prepared at the direction of counsel and attorney-client communications.

J. The document Bates-Stamped HQR0392003-HQR0392005 is a draft of talking points for a telephone call to the Office of Management and Budget ("OMB") regarding a particular settlement option relating to the spent nuclear fuel lawsuits that DOE proposed to OMB. The specific decision at issue in this document was whether DOE could settle the utilities' lawsuits, and upon what terms DOE could settle the lawsuits. The document reflects part of the Department's deliberations

that led to its decision, and also includes materials prepared at the direction of counsel and attorney-client communications.

K. The documents numbered HQR0283563-HQR0283588 and HQR290966-HQR290970 are duplicate memoranda to TJ Glauthier from Holstein and Mary Anne Sullivan, Deputy General Counsel, regarding the Department's response to Indiana Michigan Power Co. v. DOE. The document provides recommendations that the DOE take certain actions in response to the court decision, and requests concurrence with the proposed approach. The document also attaches a draft of a sample letter to contract holders, and includes a draft attachment of the contracting officer's preliminary determination.

L. The documents Bates-Stamped CTR0400568-CTR0400583 and HQR0320182-HQR0320197 are duplicates or different versions of an OMB memorandum from TJ Glauthier, Associate Director Natural Resources, and Charles Curtis, Under Secretary of Energy, requesting comments from various offices, including the Department of Justice, regarding an options paper upon the question of interim storage of high-level radioactive waste. The specific decision at issue was whether DOE would elect to store spent nuclear fuel in an interim storage facility, and this document reflects DOE's considerations and deliberations that relate to that decision. The document discusses issues and options relating to that decision, and the advantages and disadvantages of each option.

M. The document Bates-Stamped HQR0381321 is a March 23, 2000 email message from D. Kim to Mary Louise Wagner at DOE that contains draft language for the

President regarding the President's intent to veto S. 1287, the Nuclear Waste Policy Act ("NWPA") of 2000. The specific decision at issue was the Department's recommendation to the Administration concerning S. 1287, and the document reflects DOE's policy considerations that relate to that decision, including proposed reasons for vetoing the 2000 NWPA.

N. The document Bates-Stamped HQR0240155-HQR0240182 is a set of presentations and cost estimates created in approximately March 2000 that discuss the rate at which DOE considered the pick-up of spent nuclear fuel, and the cost estimates to DOE if Congress passed S.1287. The specific policy deliberation at issue is DOE's ongoing deliberation regarding the rate that it will accept spent nuclear fuel. This document reflects some of DOE's policy considerations as it relates to this deliberation. The presentations include cost estimates and cost assumptions if DOE were to take title of the SNF, and discuss various proposals for the President's budget for a site characterization program, repository development, and waste acceptance.

O. The documents Bates-Stamped HQR0290177-HQR0290190, HQR04214.52-HQR04214.64, and HQR0320231-HQR0320245 are different versions or duplicates of a draft memorandum regarding DOE's policy options for the interim storage of nuclear waste. The documents outline DOE's options for interim storage, and DOE's perceived advantages and disadvantages of each option. The specific decision at issue was whether DOE would accept spent nuclear fuel at an interim storage facility, and these documents reflect DOE's policy deliberations as

they related to DOE's decision.

P. The documents numbered HQR0290044-HQR0290051, HQR0292365-HQR0292368 and HQR0292428-HQRH292434 are different versions or duplicates of a memorandum dated January 31, 1997 from Charles Curtis, Acting Secretary of Energy, and Thomas Grumbly, Under Secretary, regarding DOE's proposed position on interim storage written in preparation for the Senate Energy Committee's February 5, 1997 hearing on interim storage. The specific decisions at issue were whether DOE would accept spent nuclear fuel at an interim storage facility, and whether DOE could offer relief to the utilities involved in the lawsuits. The memorandum discusses whether DOE can offer relief to the utilities involved in lawsuits, and outlines DOE's perceived advantages and disadvantages for this proposed relief. The documents reflect DOE's policy deliberations as they related to these decisions.

Q. The documents Bates-Stamped HQR0320151-HQR0320156, HQR0320213-HQR0320220, HQR0320221-HQR0320227, HQR0320176-HQR0320181, and HQR0320207-HQR0320212 are different versions or drafts of a memorandum entitled "Proposed Presidential Position Regarding Interim Storage of Spent Nuclear Fuel" that discuss the Administration's current position regarding interim storage, and proposed recommendations for the Administration's position. The specific decision at issue was whether DOE would accept spent nuclear fuel at an interim storage facility. The document reflects DOE's policy deliberations as they relate to DOE's position, and provides analysis supporting the proposed

recommendations, including the possibility of expedited acceptance of SNF, legislative implications, costs, and various options regarding interim storage and options for compensating utilities for Federal delays in waste acceptance.

R. The document Bates-Stamped HQR0320199-HQR0320206 is a May 13, 1995 draft memorandum from TJ Glauthier of OMB to Kathleen Peroff; Gary L. Bennethum and Robert L. Civiak discussing the Administration's policy and guidance to DOE regarding the interim storage of SNF. The specific decision at issue was whether DOE would accept spent nuclear fuel at an interim storage facility. The document reflects DOE's policy deliberations as they relate to this decision, and discusses options available to DOE regarding interim storage, a cost analysis involving paying utilities that experience delays from scheduled shipment dates under various assumptions, and a list of principles to consider for interim storage.

S. The documents Bates-Stamped HQR0284037-HQR0284045, HQR320166-HQR320174, HQR0320280-HQR0320288, and HQR03203.21-HQR03203.27 are different versions or duplicates of an August 31, 1995 memorandum for the President from Alice Rivlin and Hazel O'Leary asking for President's decision on an Administration position for the storage of spent nuclear fuel and high level waste. The document reflects DOE's policy deliberations as they relate to how the Department will begin acceptance and storage of spent nuclear fuel and high level waste. The memorandum recommends a Presidential position, and includes recommendations to the President regarding various options of storing SNF, and

discusses the advantages and disadvantages of each option.

T. The document Bates-Stamped HQR0290820-HQR0290832 consists of three drafts of a memorandum entitled "Talking Points for OMB-White House involving the Release of the Department of Energy letter stating the anticipated delay in 1998." The memorandum also includes talking points regarding the Administration's position on S.1936, radiation standards, environmental protection, and interim storage. The document reflects DOE's policy deliberations as they relate to DOE's response to the delay in its acceptance of spent nuclear fuel.

U. The document Bates Stamped HQR0290839-HQR0290841 is a September 4, 1996 email from BJ Johnson to Fidler, Holstein, and TJ Glauthier providing draft policy guidance to DOE regarding when and where DOE will begin to accept spent nuclear fuel. The document reflects DOE's policy deliberations regarding the time and place in which DOE intends to begin acceptance of spent nuclear fuel.

V. The document Bates Stamped HQR0290308-HQR0290325 is a March 31, 1997 predecisional memorandum to TJ Glauthier from Holstein and Thomas Grumbly regarding DOE's 1997 policy options and alternatives involving DOE's acceptance of spent nuclear fuel. The memorandum was prepared for Secretary Pena's meeting with the nuclear utilities on April 3, 1997, and discusses potential proposals that DOE could offer to the utilities for the acceptance of spent nuclear fuel, and the advantages and disadvantages of each of the proposals. The

document also contains potential questions that DOE could pose to utilities, the expected answers from the utilities, potential questions from utilities, and proposed DOE answers to the utilities' questions. The document reflects DOE's policy deliberations as they relate to DOE's response to the utilities' dissatisfaction with the Department's inability to begin acceptance of commercial spent nuclear fuel.

W. The document Bates Stamped HQR0430019 is a predecisional memorandum from Lake Barrett's files regarding the Administration's policy on nuclear waste, and includes options for the path forward once the Yucca Mountain Viability Assessment is released to the public. The document reflects DOE's policy deliberations as they relate to DOE's response to accepting spent nuclear fuel once Yucca Mountain's Viability Assessment is released.

X. The document Bates Stamped CTR0193318-CTR0193319 is an undated draft paper entitled, "Proposal: White Paper on Sabotage Issues Supporting the EIS's Covering Spent Fuel Shipments" that involves discussion of analyses to be performed that relate to the possible sabotage of spent nuclear fuel shipments to Yucca Mountain. The document reflects DOE's policy deliberations regarding how it will address potential sabotage issues in the transportation of spent nuclear fuel.

After personally reviewing each of the above described documents, I conclude that they all reflect DOE's deliberative processes and should be protected from disclosure.

I declare under the penalty of perjury, this 13th day of May, 2002, that the foregoing is true and correct to the best of my knowledge and belief.

Ronald A. Milner
Ronald A. Milner
Chief Operating Officer
Office of Civilian Radioactive Waste Management