# In the United States Court of Federal Claims

No. 04-106 C

(Filed: December 19, 2007)

*************************************

| | | |
|---|---|---|
| **DAIRYLAND POWER COOPERATIVE,** | * | Presidential communications privilege; compelling document production; RCFC 37(a)(2) |
| v. | * | |
| **THE UNITED STATES,** | * | |
| Defendant. | * | |

*************************************

*Jerry Stouck*, Greenberg Traurig LLP, Washington, DC, counsel of record for Plaintiff; of counsel were *Robert Shapiro* and *Kevin Stern*, Greenberg Traurig LLP, Washington, DC.

*Russell A. Shultis*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, counsel of record for Defendant, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Harold D. Lester, Jr.*, Assistant Director, United States Department of Justice, Washington, DC; of counsel was *Jane K. Taylor*, Office of General Counsel, Department of Energy, Washington, DC, *Alan J. Lo Re*, Senior Trial Counsel, and *Patrick B. Bryan, Joshua E. Gardner,* and *Scott C. Slater*, Trial Attorneys, United States Department of Justice, Washington, DC.

---

## OPINION AND ORDER

---

**DAMICH, Chief Judge.**

This discovery dispute arises from one of several cases that concern the "Standard Contract"[1] between nuclear utilities and the U.S. Department of Energy ("DOE") for disposal of

---

[1]"Standard Contract for Disposal of Spent Nuclear Fuel And/Or High-Level Radioactive Waste," published at 10 C.F.R. § 961.11. The Standard Contract served as a template for the individual contracts between the utilities and the U.S. Department of Energy. In every material

spent nuclear fuel ("SNF") and/or high-level radioactive waste ("HLW"). Plaintiff Dairyland Power Cooperative ("Dairyland") moves this Court, pursuant to Rule 37(a)(2) of the Rules of the Court of Federal Claims ("RCFC"), to compel Defendant United States ("the Government") to produce in unredacted form five documents that the Government has completely redacted pursuant to the presidential communications privilege.

In addition to responding to this motion, the Government has cross-moved the Court to enter a protective order prohibiting Dairyland from seeking to compel the production of the five subject documents absent a ruling by the Court that Dairyland has met initial burdens of demonstrating a heightened need for the same documents in accordance with the U.S. Supreme Court's decision in *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367 (2004). Although Dairyland, pursuant to an order of this Court, has filed a statement detailing its purported need for the documents, the Government argues that the statement does not meet the burden *Cheney* prescribed; therefore, the Government does not need to formally respond to Dairyland's motion with an official, particularized assertion of the presidential communications privilege by White House officials at this time, much less produce the documents. Nevertheless, to the extent that the Court finds that Dairyland has met the standards *Cheney* articulated, the Government contends that the Court should allow White House officials to come forward with a formal invocation of the presidential communications privilege.

For the reasons stated herein, the Court holds in abeyance a full decision on Dairyland's motion to compel production of the five subject documents. In addition, the Court ORDERS the Government to file a formal affidavit reflecting a formal White House invocation of the presidential communications privilege over the documents and to submit the documents to the Court in unredacted form for in camera review. The Government's cross-motion for a protective order is consequently DENIED.

## I. BACKGROUND

Dairyland's motion, filed on September 18, 2007, has arisen in the context of discovery over the issue of damages for the Government's breach of the Standard Contract. On June 29, 2007, the Court ordered the Government to produce certain documents it had withheld from Dairyland on deliberative process privilege grounds. *Dairyland Power Coop. v. United States*, 77 Fed. Cl. 330 (2007). Five of these documents, which the Government produced on July 20, 2007, were completely redacted pursuant to assertions of the presidential communications privilege.

As a result, Dairyland moved this Court to compel production of the five documents in unredacted form, arguing that the Court's opinion on the deliberative process privilege had not carved out an exception for redactions under the presidential communications privilege. Dairyland's Motion to Compel Production of "Presidential Communications" Documents ("Pl.'s

---

respect, there is no difference between the Standard Contract and Dairyland's contract.

Mot.") at 3. In any event, Dairyland continued, the Government had failed to indicate the identity of the Government official asserting the privilege and the authority by which he or she had made the assertion. *Id*. Finally, Dairyland maintained that the Court's opinion on the Government's invocation of the deliberative process privilege established that Dairyland had demonstrated a sufficient need for the documents at issue to overcome the presidential communications privilege. *Id*. at 4.

During briefing for this motion and in connection with a request for an enlargement of time in which to file its response, the Government sought an order from the Court requiring Dairyland to first meet the burden, which the Government claimed *Cheney* articulated, of demonstrating a particularized need for the subject documents prior to "shifting the burden upon the White House to formally respond to Dairyland's motion to compel." Defendant's Opposition to Plaintiff's Motion to Compel Production of Documents Withheld Pursuant to the Presidential Communications Privilege, and Cross-Motion for a Protective Order ("Def.'s Resp.") at 6. In considering the Government's request, however, the Court adopted the procedural guidance set forth in *In re Sealed Case ("Sealed Case")*, 121 F.3d 729 (D.C. Cir. 1997), which held that a party seeking to overcome the presidential communications privilege must both establish that the materials sought contained important evidence and that the evidence in the materials was not available with due diligence elsewhere. Order (October 17, 2007) at 1-2 (citing *Sealed Case*, 121 F.3d at 754). The Court, then, "for the sake of clarity," ordered Dairyland to submit "a statement of need for the documents and why the evidence in the documents [was] not available with due diligence elsewhere." *Id*. at 2. However, the Court concluded that its decision on the Government's invocation of the deliberative process privilege established that Dairyland had met the first of the requirements that *Sealed Case* set out, namely, the "likelihood of containing important evidence." *Id*. According to *Sealed Case*, a "likelihood of containing important evidence" means that "the evidence sought must be directly relevant to issues that are expected to be central to the trial." *Sealed Case*, 121 F.3d at 754.

Pursuant to this order, Dairyland, on October 18, 2007, submitted a statement of need supporting its request for the subject documents under the *Sealed Case* criteria. Dairyland's Statement of Need for Documents Withheld on Claims of Presidential Communications Privilege ("Dairyland's Statement of Need"). In further briefing regarding Dairyland's motion, however, the Government continued to argue that *Cheney* established the appropriate standard for overcoming the presidential communications privilege. *See* Def.'s Resp. at 9-15. Dairyland's Statement of Need, the Government continued, satisfied neither the guidelines set by *Cheney* nor *Sealed Case*. *Id*. at 14-20.

The Government also argues that, to the extent the Court finds that Dairyland has met its initial burden of heightened need for the subject documents under *Cheney*, "the appropriate step would be for the Court to allow the White House, following the Court's finding, to come forward with a formal invocation of the presidential privilege." Def.'s Resp. at 21. Moreover, if the Court finds that the White House "has not yet properly asserted the presidential communications privilege in this instance, the White House should nonetheless be afforded the opportunity to provide a suitable affidavit after the Court's finding of heightened necessity, that complies with

the prerequisites for a proper invocation of the privilege." *Id*. (citations omitted).

Dairyland contends that whether the Court should require such a formal invocation is irrelevant. "If the Court agrees with Dairyland that it has already established sufficient need for the documents to overcome a presidential communications privilege claim, the only effect of providing the Government with an opportunity to provide a formal invocation would be to further delay discovery to which Dairyland has been entitled." Dairyland's Reply on Motion to Compel Production of Documents Withheld on Claim of Presidential Communications Privilege and Opposition to Motion for a Protective Order ("Pl.'s Reply") at 7.

The parties completed briefing on both Dairyland's motion to compel and the Government's cross-motion for a protective order on November 21, 2007.

## II. DISCUSSION

The Court agrees with the Government that, in the case of a discovery request aimed at the President and his close advisors, the White House need not formally invoke the presidential communications privilege until the party making the discovery request has shown a heightened need for the information sought. This is the teaching of both *Cheney* and *Sealed Case*. Therefore, the issue here is whether Dairyland's Statement of Need established such a heightened need.

The Government urges the Court to apply a test in the *Cheney* decision (that is actually from *United States v. Nixon*), namely that Dairyland must "satisfy exacting standards of '(1) relevancy; (2) admissibility; and (3) specificity.'" *Cheney*, 542 U.S. at 386 (quoting *United States v. Nixon*, 418 U.S. 683, 700 (1974)). The Government seems to prefer this test to that found in *Sealed Case*, although this Court is unable to clearly discern from the Government's briefs why this is so. The Government does not argue that *Sealed Case* was overruled by *Cheney*. Indeed, in its reply to Dairyland's opposition to its cross-motion for a protective order, the Government cites with approval *American Historical Association v. National Archives and Records Administration* ("*AHA*"), 402 F.Supp.2d 171 (D.D.C. 2005), which discusses *Nixon, Sealed Case,* and *Cheney* as if they were all good law. Defendant's Reply to Plaintiff's Opposition to the Government's Cross-Motion for a Protective Order Regarding Plaintiff's Motion to Compel Production of Documents Withheld Pursuant to the Presidential Communications Privilege ("Def.'s Reply Concerning Cross-Mot.") at 10 (citing *AHA*, 402 F.Supp.2d at 179, 181-84).

The Court's order obliging Dairyland to file its Statement of Need, however, was based on *Sealed Case*, which, but for the Government's argument in favor of the *Nixon/Cheney* test, the Court would naturally apply to determine the Statement's sufficiency. Thus, the Court would first have determined whether Dairyland had demonstrated that materials over which the privilege was asserted likely contained evidence directly relevant to issues expected to be central to trial and then determined whether such evidence was available with due diligence elsewhere. If this Court found that Dairyland had satisfied these standards, it would have proceeded to review the documents in camera to excise non-relevant material and release the documents' relevant contents. *Id*. at 745.

As already mentioned, this Court was unable to discern in the Government's briefs a clear argument why the *Nixon/Cheney* test should displace the *Sealed Case* test. The mere fact that *Cheney* is a U.S. Supreme Court decision that was issued later than *Sealed Case* is not enough, since the two decisions could very well be reconciled, as seems to have been done in *AHA*. Furthermore, relevance seems to be a feature of both tests. And, although specificity is not in the *Sealed Case* test, Dairyland may have satisfied this element anyway, as it seeks only five documents that are clearly described. This leaves only the admissibility prong of the *Nixon/Cheney* test in play. (The Court presumes that the Government would have no objection to adding the *Sealed Case* requirement that the plaintiff show that the information it seeks is not available elsewhere.)

### A. *Cheney*

The precise holding of the *Cheney* decision is somewhat difficult to determine, and assessing the role that *Nixon* plays in the opinion complicates the inquiry. The *Cheney* case began in the U.S. District Court for the District of Columbia when two public interest organizations, the Sierra Club and Judicial Watch, filed suit, alleging that the National Energy Policy Development Group (NEPDG) had failed to comply with the procedural and disclosure requirements of the Federal Advisory Committee Act (FACA). The NEPDG was established by President George W. Bush to develop a national energy policy and was composed of high-ranking government officials, with Vice President Richard Cheney serving as chairman. FACA provides an exemption for committees composed solely of federal government officers or employees, but the plaintiffs alleged that non-federal employees had participated in meetings of the NEPDG. *See Cheney*, 542 U.S. at 372-74.

The Government argued that "to disregard the exemption and apply FACA to the NEPDG would violate principles of separation of powers and interfere with the constitutional prerogatives of the President and the Vice President." *Id.* at 375. The District Court expressed the separation of powers issue in this way:

> The constitutional question suggested by this case is whether Congress can pass a law granting the public access to the deliberative process of a formally constituted group of the President's advisors when at least one of those advisors is a private individual without violating Article II. The application of FACA to this group, argue defendants, interferes with the President's constitutionally protected ability to receive confidential advice from his advisors, even when those advisors include private individuals.

*Judicial Watch v. Nat'l Energy Policy Dev. Group*, 219 F.Supp.2d 20, 44 (D.D.C. 2002).

The District Court deferred ruling on this issue and allowed the plaintiffs to conduct "tightly-reined" discovery to ascertain whether non-federal government employees regularly participated in the activities of the NEPDG. If they did not, then the Court could rule for the Government on statutory grounds rather than join the separation of powers issue. The District Court appreciated that the discovery itself might raise serious constitutional problems, but it felt that these could be resolved pursuant to an assertion of executive privilege and that resolving the matters raised by an

assertion of executive privilege would pose a less serious constitutional issue than the separation of powers.[2] *See id*. at 53-55. The Government then sought a writ of mandamus to vacate the discovery order.

The U.S. Court of Appeals for the District of Columbia Circuit dismissed the petition for a writ of mandamus. The dismissal was based on the ground that alternative avenues for relief remained available. *In re Cheney*, 334 F.3d 1096, 1103-05 (D.C. Cir. 2003). Citing *United States v. Nixon*, the D.C. Circuit held that the Government, to protect against intrusion into the President's prerogatives, must first assert the executive privilege "with particularity." *Id*. at 1104. It characterized the separation of powers argument as–at that time–"hypothetical." *Id*. at 1105. Although the District Court had called for "tightly-reined" discovery, the D.C. Circuit stated that the discovery request was overly broad, but still placed the burden of invoking the privilege and filing objections to the discovery orders with "detailed precision" on the Government. *Id*.

The U.S. Supreme Court vacated the judgment of the D.C. Circuit. The Supreme Court felt that the D.C. Circuit's reliance on *Nixon* was misplaced, because the need for information in the criminal context was weightier than in a civil context. *Cheney*, 542 U.S. at 384. Further, it noted: "A party's need for information is only one facet of the problem. An important factor weighing in the opposite direction is the burden imposed by the discovery orders." *Id*. at 385. Finally, it observed that "the narrow subpoena orders in [*Nixon*] stand on an altogether different footing from the overly broad discovery requests approved by the District Court in this case." *Id*. at 386.

In discussing *Nixon*, the Court noted that: (1) the criminal subpoenas were required to satisfy "exacting standards" of relevancy, admissibility, and specificity; (2) subpoenas were not a means of discovery; (3) the burden was on the party requesting the information; and (4) the Court in *Nixon* "addressed the issue of executive privilege only after having satisfied itself that the special prosecutor had surmounted these demanding requirements." *Id*. at 386-87. Importantly, the *Cheney*

---

[2] *Judicial Watch* stated:

> [T]he breadth and scope of the constitutional issue raised by applying the requirements of FACA to advisory committees established by the President dwarfs the particular, specific questions that will be raised by a very tightly-reigned discovery process. Whether revealing a particular document or piece of information will impermissibly interfere with the President's constitutional authority is a much more narrow inquiry than whether the application of all the FACA procedural requirements to the deliberative process of Presidential advisors will violate the Constitution. Rather than address this broad constitutional question in a factual vacuum, this Court will address the particular questions generated by discovery requests.

*Judicial Watch,* 219 F.Supp.2d at 54.

Court then went on to say: "The very specificity of the subpoena requests serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President." *Id*. at 387.

Nowhere in the opinion does the Court adopt the "exacting standards" of *Nixon* as such and apply them to the circumstances of *Cheney*. It is fair to say, however, that the thrust of the Court's consideration of *Nixon* is that an even more exacting standard should be applied in civil discovery disputes where the scope of the discovery request is very broad.

The Supreme Court opinion dwells on the breadth of the discovery request in *Cheney*. As has already been noted, the D.C. Circuit found the discovery request to be overly broad. The *Cheney* Court was even more dramatic, characterizing the discovery requests as "ask[ing] for everything under the sky." *Id*.[3] The Court also observed that not only was the Request for Production of Documents broad, but also that the "'First Set of Interrogatories' are [sic] similarly unbounded in scope." *Id*. at 388. Indeed, the breadth of the discovery requests in *Cheney* appeared to be a leitmotif of the opinion. For example: "*Given the breadth of the discovery requests in this case compared to the narrow subpoena orders in [*Nixon*]*, our precedent provides no support for the proposition that the Executive Branch 'shall bear the burden' of invoking executive privilege with sufficient specificity and of making particularized objections." *Id*. at 388 (citation omitted) (emphasis added). And: "[The discovery requests] provide respondents all the disclosure to which they would be entitled in the event they prevail on the merits, and much more besides." *Id*. Further:

---

[3]The discovery request at issue in *Cheney* sought:

1. All documents identifying or referring to any staff, personnel, contractors, consultants or employees of the [NEPDG].

2. All documents establishing or referring to any Sub-Group [of the NEPDG].

3. All documents identifying or referring to any staff, personnel, contractors, consultants or employees of any Sub-Group.

4. All documents identifying or referring to any other persons participating in the preparation of the Report or in the activities of the [NEPDG] or any Sub-Group.

5. All documents concerning any communication relating to the activities of the [NEPDG], the activities of any Sub-Groups, or the preparation of the Report ....

6. All documents concerning any communication relating to the activities of the [NEPDG], the activities of Sub-Groups, or the preparation of the Report between any person ... and [a list of agencies].

*Cheney*, 542 U.S. at 387.

"*In these circumstances, Nixon* does not require the Executive Branch to bear the onus of critiquing the unacceptable discovery requests line by line." *Id*. (emphasis added).

In addition to the breadth of the discovery requests, the Court found that the Government objected to the scope of the requests but was ignored. Thus, other avenues were open to the District Court short of forcing the Government to invoke executive privilege. The Court noted with approval the statement in *United States v. Poindexter*, 727 F.Supp. 1501 (D.D.C. 1989): "'[I]t is undesirable as a matter of constitutional and public policy to compel the President to make his decision on privilege with respect to a large array of documents.'" *Cheney*, 542 U.S. at 390 (quoting *Poindexter*, 727 F.Supp. at 1503). It observed that the *Poindexter* court "decided to narrow, on its own, the scope of the subpoenas to allow the Executive 'to consider whether to invoke executive privilege with respect to...a possibly smaller number of documents following the narrowing of the subpoenas.'" *Id*. (quoting *Poindexter*, 727 F.Supp. at 1504).

In sum, the Court in *Cheney*: (1) did not adopt a particular test for use in civil case discovery disputes; (2) emphasized the overbreadth of the discovery requests at issue; (3) noted that the trial court did not consider the overbreadth objections of the Government; and (4) relieved the Government of the burden of asserting executive privilege with particularity before the issue of separation of powers was joined.

**B. *Sun Oil***

The U.S. Court of Claims had occasion to address what it called "presidential privilege" in *Sun Oil Company. v. United States*, 206 Ct. Cl. 742, 514 F.2d 1020 (1975). This decision was post-*Nixon*, but pre-*Cheney*. The case differs from *Cheney* and *Sealed Case* in that it concerned a former President (Nixon), but this issue was not the focus of the decision–the court presumed that the privilege would apply to him. Although what the opinion says may have been superseded by *Cheney*, insofar as *Cheney* is confusing about the significance of *Nixon*, *Sun Oil* presents another interpretation–and one in a civil case. (In essence, it is the *Nixon* test that the Government would have this Court apply to Dairyland's Statement of Need.)

At issue in *Sun Oil* were four documents, which, after having been requested in discovery, were withheld by former President Nixon under a formal, but general, claim of privilege. Some thirty other documents "from the Executive Department" were provided to plaintiffs either voluntarily or by court order after in camera inspection by the trial judge. *Sun Oil*, 514 F.2d at 1021. Plaintiffs sued the United States for denying an application for the erection of an oil drilling platform on an area of the Santa Barbara channel off the coast of California that the plaintiffs had leased from the United States. *Id*. As the court put it, "[p]laintiffs seek to ascertain through the discovery process who made the decision to deny their application to proceed with [the platform], and why it was denied." *Id*.

The court addressed former President Nixon's argument that the plaintiffs had made "no showing of necessity sufficient to support" the discovery. *Id*. at 1022. In discussing the *Nixon* case, the Court of Claims noted that the Supreme Court had held that the claim of executive privilege was

not absolute and concluded: "We think that the same sort of balancing process would be applicable to an incumbent President's claim of privilege in a civil case, albeit the burden on the litigant seeking discovery might be heavier." *Id*. at 1024. The court invoked a rule that it considered to be long-established, holding that "where a demonstrated need for documents sought is clearly sufficient, on balance, to override a claim of privilege, the documents must be produced." *Id*.

The four documents in question, as described in the general assertion of privilege, consisted of two memos between presidential aides and two from presidential aides to the President "allegedly refining still further the options believed open for ultimate presidential consideration and decision." *Id*. at 1025. The court noted that it was "reasonably clear" that the plaintiffs had a need to show who refused the application and why it was refused. *Id*. And–important for the present controversy about the test to be applied–the court stated: "These papers might well lead to the discovery of admissible evidence and are suggestively relevant to the subject matter of this action ... and a generalized claim of privilege...cannot prevail against the plaintiffs' need to develop the facts by resort to discovery." *Id*. The court concluded: "[P]laintiffs have made a sufficient showing of need to overcome the presumption and to justify the in camera inspection of the four contested documents." *Id*.

Thus, the Court of Claims overrode a generalized assertion of the presidential communications privilege for the purposes of in camera inspection of the four documents in question based on (1) the need of the plaintiff for the information, (2) the likelihood that the information would lead to admissible evidence, and (3) relevance. It is difficult, however, to see in these criteria a "heightened" *Nixon* test for civil cases, other than perhaps a heightened relevance standard.

**C. *Sealed Case***

Although *Sealed Case* was a criminal case decided before *Cheney*, as *Cheney* did not overrule it nor set out a particular test for discovery disputes in civil cases, its reasoning merits examination for application in this case. In *Sealed Case*, a grand jury issued a subpoena duces tecum seeking documents pertaining to the White House Counsel's investigation of Alphonso Michael (Mike) Espy, a former Secretary of Agriculture in the Clinton Administration, which was related to an Office of Independent Counsel investigation as to whether Secretary Espy had unlawfully accepted gifts. White House officials produced some of the documents but withheld others on the basis of the deliberative process privilege and the presidential communications privilege. After an examination of the withheld documents in camera, the U.S. District Court for the District of Columbia upheld the Government's assertion of the privileges. *See Sealed Case*, 121 F.3d at 734-36.

The U.S. Court of Appeals for the District of Columbia Circuit vacated and remanded. The court required a showing of need in defense of the grand jury subpoena. *Sealed Case*, 121 F.3d at 753. In discussing what type of showing was necessary, the court turned to the *Nixon* decision, as *Cheney* had not been decided at the time and because *Sealed Case*, like *Nixon*, occurred in a criminal context. The D.C. Circuit puzzled over what *Nixon* required, concluding that the *Nixon* Court failed to elaborate on the demonstrated, specific need standard that it set up. *Id*. at 754. The only detailed discussion of the standard, according to the D.C. Circuit, referred to the tripartite requirement of relevancy, admissibility and specificity, which was already found in the version of Federal Rule of

Criminal Procedure 17(c) then in effect. But, as the court observed, "[i]t would be strange indeed if *Nixon* required nothing more to overcome presidential privilege than the initial showing of relevancy, admissibility and specificity necessary to satisfy Rule 17(c) in all cases, even in cases where no claim of privilege is raised." *Id*. "If this were true," the court concluded, "the privilege would have no practical effect." *Id*. Thus, the D.C. Circuit in *Sealed Case* formulated a test that was purportedly *stronger* than the test set out in *Nixon* (the one the Government would have this Court employ), because the *Nixon* test seemed to be no more than the requirements of Rule 17(c).

The D.C. Circuit, therefore, established this test for judging whether sufficient need is shown: "A party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and, second, that this evidence is not available with due diligence elsewhere." The court elaborated on the first component: "[T]he evidence sought must be directly relevant to issues that are expected to be central to the trial." *Id*. at 754. Regarding the second element, the court elaborated also: "[U]navailability...reflects *Nixon*'s insistence that privileged presidential communications should not be treated as just another source of information." *Id*. at 755.

It is noteworthy that the court did not apply this test *in addition to* the tripartite requirement of relevancy, admissibility and specificity, because the grand jury subpoena did not come within the purview of Rule 17(c), which set forth these criteria. *See id*. at 757. It is also noteworthy that, although the court felt that a grand jury subpoena needed more leeway than a criminal trial subpoena (as in *Nixon*), it applied the importance/availability test nonetheless. *See id*. at 756-57. As the discovery dispute in the case at bar more closely resembles a grand jury subpoena than a criminal trial subpoena, the D.C. Circuit's words regarding the grand jury function are informative: "'The function of the grand jury is to inquire into all information that might possibly bear on its investigation, ... [and a]s a necessary consequence of its investigatory function, the grand jury paints with a broad brush.'" *Id*. at 755 (quoting *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991)). And: "Requiring grand jury subpoenas to comply with the same requirements of relevancy, admissibility, and specificity under Rule 17(c) as applies to trial subpoenas would impose an impossible burden on the grand jury." *Id*. But one must not press this resemblance too far.

**D. The Test to be Applied**

After comparing *Nixon*, *Sealed Case* and *Cheney*, and examining the guidance *Sun Oil* provides, this Court concludes that the *Sealed Case* test comes closest to what the Supreme Court was concerned about in *Cheney*. The *Sealed Case* test is supposed to be stricter than the *Nixon* tripartite requirement. *See id*. at 754-55. This Court has already held that, with regard to the documents in question in this motion, Dairyland has met the normal requirements imposed on document requests in discovery in civil cases. *See* Order (October 17, 2007). The only reservation that the Court has in using the *Sealed Case* test is that *Cheney* opined that the test should be stricter in civil cases than in criminal cases and that *Sealed Case* was a criminal case. *Cheney*, however, did not say what the proper test was. In any event, the grand jury subpoena in *Sealed Case* resembles a discovery request in principle. There is no further guidance in the history of *Cheney*, since on

remand, the D.C. Circuit dismissed the case on separation of powers grounds after a hearing en banc. *In re Cheney*, 406 F.3d 723 (D.C. Cir. 2005).

This Court feels, however, that the very narrow and specific document production in this case substitutes for the elusive and "even stricter" civil test envisioned, but not articulated, by *Cheney*. In *Cheney*, the Supreme Court was concerned with the breadth of the discovery request. *Cheney*, 542 U.S. at 387. Here, Dairyland requests five specific documents that the Government has already described with some specificity and over which the Government has already claimed the presidential communications privilege. Furthermore, as this Court has already observed, even if the *Nixon/Cheney* test is the appropriate one (as the Government argues), its relevance prong and its specificity prong have been satisfied. This leaves only the admissibility prong of the *Nixon/Cheney* test. Although admissibility is not required to be addressed in Dairyland's Statement of Need (because it is not required by the *Sealed Case* test adopted by this Court), the five documents in question appear to be admissible given the descriptions the Government has provided. As a result, it seems that the *Nixon/Cheney* test would also be satisfied.

Therefore, this Court now turns to whether Dairyland's Statement of Need fulfills the *Sealed Case* test.

## III. ANALYSIS

The five subject documents range in date from May 1995 to January 1997. Def.'s Resp. at A13-A16. According to the Government, the documents reflect communications between the President's staff and various high-ranking DOE or other Executive Branch officials concerning then-pending legislative proposals for the development of an interim fuel storage facility for use prior to the opening of a permanent SNF repository at Yucca Mountain, Nevada. *Id.* at 3-4.

The Government's privilege log describes the documents as follows[4]:

1. E154/HQR0290177-190 – a memorandum discussing policy options for interim radioactive waste storage;

2. E167/HQR0320199-206 – a memorandum regarding expedited spent fuel acceptance at a Yucca Mountain fuel repository;

3. E170/HQR0320221-227 – a draft memorandum discussing "options for expedited acceptance, interim storage, and compensating utilities, and presidential principles";

[4]The Court labels the documents with the number Dairyland has given a particular document listed first and the Bates-stamp number listed second.

4. E171/HQR0320231-245 – a memorandum concerning policy options for interim radioactive waste storage;

5. E178/HQR0421452-464 – a memorandum from DOE officials to the Office of Management and Budget and the White House regarding nuclear waste litigation.

*Id*. at A13-A16.

**A. Dairyland's Need for the Documents**

In order to demonstrate its need for the subject documents, Dairyland must demonstrate that the documents likely contain important evidence and that this evidence is not available with due diligence elsewhere. *Sealed Case*, 121 F.3d at 754. The Court rules that Dairyland has met this standard.

**1. The Documents' Relevance**

The Court, in overruling the Government's invocation of the deliberative process privilege over the documents, has already found that the documents' descriptions indicate a high degree of potential relevance to this matter. *Dairyland Power Coop.,* 77 Fed. Cl. at 344-45. But in opposing Dairyland's attempt to overcome the presidential communications privilege, the Government still questions whether White House consideration of legislative proposals pending between 1995 and 1997 could in any way inform the Court about DOE's contractual obligations and the reasonableness of Dairyland's efforts to mitigate the Government's breach of the Standard Contract through private SNF storage efforts. *See* Def.'s Reply Concerning Cross-Mot. at 6-7. And since no other SNF plaintiff has challenged the Government's assertion of the presidential communications privilege over these documents,[5] the Government skeptically views Dairyland's Statement of Need, given the damages many of these same plaintiffs have received. *Id*. at 6.

Other SNF plaintiffs' discovery efforts notwithstanding, the fact remains that the documents appear highly relevant to this case. The descriptions of three of the documents–E154, E170, and E171–refer to interim fuel or radioactive waste storage. And while the Government refers to document E178 as concerning nuclear waste litigation in its privilege log, a high-ranking DOE official, in the invocation of the deliberative process privilege the Court has already addressed, stated the document discussed interim fuel storage. *See* Affidavit of Ronald Milner ¶ 18-11 ("Milner Aff."). Whether Dairyland's efforts to mitigate its damages by pursuing private fuel storage were reasonable is a central point of contention in this case. These documents may, therefore, shed light on the reasonableness of these efforts. Finally, document E167 concerns

---

[5]The documents were also produced in redacted form in another SNF case due to an unchallenged assertion of the presidential communications privilege. *See Pac. Gas & Elec. Co. v. United States*, Case No. 04-74C (filed Jan. 22, 2004); *see also* 77 Fed. Cl. 205 (2006).

spent fuel acceptance and could illustrate Government considerations of what constituted an appropriate rate for such acceptance in the wake of the Standard Contract. *See* Def.'s Resp. at A8 (citing Defendant's Response to Utility Plaintiffs' Joint First Set of Requests for Production of Documents at 38). The Court, then, continues to believe that Dairyland has shown that these documents potentially bear a great deal of relevance to issues that trial will concern, thereby satisfying the first prong of the *Sealed Case* test.

**2. Obtaining the Information in the Documents Elsewhere**

The Government claims that Dairyland can obtain any information the documents might contain through other avenues in the public domain, specifically through documentation of proposed legislation. Def.'s Reply Concerning Cross-Mot. at 8. The subject documents, however, may contain statements by senior Government officials on issues specifically pertinent to this case that are not publicly available. The Court, then, agrees with Dairyland's assertion that "it is the documents themselves, authored by [G]overnment officials, rather than only the factual information in the documents, that makes them uniquely important and certainly not obtainable elsewhere." Dairyland's Statement of Need at 3.

**B. Formal Invocation of the Presidential Communications Privilege**

According to *Cheney*, the Executive Branch shall not bear the burden of "invoking executive privilege with sufficient specificity and of making particularized objections." *Cheney*, 542 U.S. at 388 (citation omitted). *Sealed Case* also states that the White House has no "obligation to formally invoke its privileges in advance of a motion to compel." *Sealed Case*, 121 F.3d at 741. The Government consequently argues that to the extent the Court finds that Dairyland has met its initial burden of heightened need for the subject documents, "the appropriate step would be for the Court to allow the White House, following the Court's finding, to come forward with a formal invocation of the presidential privilege." Def.'s Resp. at 21.

In this case, the Government has only claimed that the documents at issue are subject to the presidential communications privilege, but has not provided the sort of formal White House invocation that occurred in *Sealed Case*, where an affidavit from the White House Counsel stated that the President had specifically authorized him to invoke the privilege over the documents sought. *Sealed Case*, 121 F.3d at 744 n.16. The result of that case was a remand for consideration of whether to release the documents after in camera review. *Id*. at 762. While Dairyland argues that whether the Court should require such a formal invocation is irrelevant because "formal invocation of the privilege cannot diminish Dairyland's need for the documents," the fact remains that both *Cheney* and *Sealed Case* indicate that this Court could not have expected any such invocation, justifying specific objections to Dairyland's requests, prior to Dairyland's motion to compel the documents' production. Pl.'s Reply at 7; *see also Cheney*, 542 U.S. at 388; *Sealed Case*, 121 F.3d at 741. *Cheney* cautioned that the President's "'constitutional responsibilities and status [are] factors counseling judicial deference and restraint' in the conduct of litigation" against him. *Cheney*, 542 U.S. at 385 (citations omitted). In deference to *Cheney*, then, the Court concludes that the White House must be allowed the opportunity to submit an

affidavit formally invoking the privilege and stating the reasons for the invocation, in the context of which the Court can review the subject documents in camera to determine if the privilege actually applies here.

## IV. CONCLUSION

For the foregoing reasons, the Court will not rule on Dairyland's motion to compel the subject documents' production at this time. However, the Court ORDERS the Government, on or before **January 7, 2008**, to file with this Court a suitable affidavit reflecting a formal invocation of the presidential communications privilege over the documents by appropriate White House officials. The Government should also submit the documents to the Court in unredacted form for in camera inspection, at which point the Court will determine whether the presidential communications privilege indeed protects the documents from disclosure by examining the affidavit and the arguments the parties have already presented. As there are only five documents in question, the Court believes this time period to be reasonable, if tight.

The Court DENIES the Government's cross-motion for a protective order.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge