IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Electronically filed: December 21, 2007

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE, | |
| Plaintiff, | No. 04-0106C |
| v. | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

DAIRYLAND'S SUPPLEMENTAL BRIEF FOR
SANCTIONS REGARDING RCFC 30(B)(6) DEPOSITION

In its Order of December 12, 2008, the Court requested supplemental briefing addressing an appropriate sanction regarding Mr. Zabransky's RCFC 30(b)(6) deposition. In particular, the Court asked (1) whether a party seeking sanctions must establish that the violating party acted in bad faith, and if so, whether the government's conduct at issue here constituted bad faith, and (2) when, if ever, is it appropriate to sanction the government when a claim of the deliberative process privilege made in the course of a RCFC 30(b)(6) deposition is found improper by the Court.

1. Bad Faith is Not a Prerequisite for an Award of Expenses

The government's argument in its motion for reconsideration that the Court had to find that the government acted willfully or in bad faith before awarding Dairyland its fees and costs in reopening Mr. Zabransky's deposition on the subjects set out in the Court's Order is contrary to RCFC 37 and is not supported by the authorities cited by the government. Rule 37 provides that the Court "shall" award fees and costs unless the action of the party found not to have cooperated

in discovery is found to have been "substantially justified." *See* RCFC 37(a)(4)(A) (addressing fees and costs for failure to answer questions at a deposition, which addresses Mr. Zabransky's refusal to answer questions concerning the TAD and Booz Allen issues, as well as his failure to answer questions concerning the government's contractual intent),[1] RCFC 37(b)(2) (addressing fees and costs "caused by the failure" to comply with a Court Order, which addresses Mr. Zabransky's failure to answer questions concerning the government's contractual intent),[2] and RCFC 37(d) (addressing fees and costs "caused by the failure" of a party's RCFC 30(b)(6) designee to appear for a deposition, which also addresses Mr. Zabransky's failure to answer questions concerning the government's contractual intent).[3] Ample authority has recognized that the plan language of the rule (and its civil procedure counterpart) makes the award of fees mandatory. *See, e.g., John B . Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 845 F.2d 1172, 1177 (2d Cir. 1988) (noting mandatory nature of Rule 37's requirement that attorney fees and costs be awarded). Wright & Miller explain the principle well:

> The great operative principle of Rule 37(a)(4) is that the loser pays. If a motion under Rule 37(a)(4)(A) – or any of the other rules incorporating it or similar to it – is granted . . . the party or deponent whose conduct necessitated the motion *shall* be required to pay to the moving party the reasonable expenses, including attorney fees, incurred in obtaining the order.

8A Wright & Miller, *Federal Practice and Procedure* § 2288 at 657-58 (1994) (emphasis added); *see also* 1970 Advisory Committee Note re Fed. R. Civ. Pro. 37(a)(4) ("The proposed

---

[1] This rule covers "expenses incurred in making the motion." Under this provision Dairyland should receive its reasonable fees and expenses to brief the motion to compel that resulted in the Court's November 20, 2007 Order.

[2] The applicable Order here is the Court's January 29, 2007 Order granting Dairyland's motion to compel the RCFC 30(b)(6) depositions.

[3] Caselaw supports the proposition that a party's failure to provide a designee appropriately prepared to testify on a noticed subject is equivalent to a failure to appear. *See Black Horse Lane Assoc. v. Dow Chemical Corp.,* 228 F.3d 275, 304 (3rd Cir. 2000).

change provide in effect that expenses should ordinarily be awarded unless a court finds that the losing party acted justifiably in carrying his point to court.”).

Dairyland is entitled to sanctions pursuant to RCFC 37. In its motion, Dairyland sought its expenses, including reasonable attorney fees, of litigating the motion to compel. The authority cited above clearly demonstrates that Dairyland is entitled to such relief. The Court’s November 20 Order ordered somewhat different relief – the expenses, including reasonable attorney fees, of reopening Mr. Zabransky’s deposition. Authority supports that sanction pursuant to RCFC 37(b)(2) regarding Mr. Zabransky’s failure to answer questions regarding the government’s contractual intent. S*ee, e.g.*, *Molina v. El Paso Independent School Dist*, 583 F.2d 213, 216 (5th Cir. 1978). But that sanction should be in addition to the award of expenses, including reasonable attorney fees incurred by Dairyland in litigating its motion to compel.

The authorities cited by the government in its motion for reconsideration are not to the contrary. *United States v. Massachusetts Industrial Finance Agency*,162 F.R.D. 410, 412 (D. Mass. 1995), does not address the provision for attorney fees and costs under Rule 37. In that case, the Court held that a Rule 30(b)(6) designee’s failure to respond to questions due to inadequate preparation was not tantamount to failure to appear. Accordingly, the Court limited the relief for the failure to the provision of certain additional discovery and declined to bar the nonmoving party from presenting its position at trial through witnesses who had been deposed. Similarly, *Boland Marine & Mfg. Co., Inc. v. M/V Bright Field*, 1999 WL 280451 (E.D. La.),[4] also does not address the provision of attorney fees and costs under Rule 37. Indeed, in that case, the Court found that the Rule 30(b)(6) designee at issue “was adequately prepared and testified fully.” *Id.* at *3. And *Alaska Pulp Corp. v. United States*, 41 Fed. Cl. 611, 616-17

[4] The government’s citation to this case in its motion for reconsideration includes typographical errors in both the Westlaw cite and the case number.

(1998) supports this Court's award of fees and costs. In that case, this Court awarded fees and costs incurred in bringing the motion to compel at issue there. This Court linked a finding of willfulness or bad faith only to the more "drastic sanction" of dismissal. *Id.* at 614-15. But Dairyland is not seeking such a drastic sanction.

The provision in Rule 37 providing an exception to the mandatory award of expenses against the losing party in a discovery dispute where the losing party's position was "substantially justified" does create a requirement that the moving party establish bad faith. To the contrary, the very wording of the Rule (which represents a change from the original, pre-1970 version, which provided for an award of expenses where the losing party "was without substantial justification") places the burden of persuasion on the losing party to establish that its conduct was substantially justified rather than for the moving party to establish the converse. *See* 8A Wright & Miller § 2288 at 665 ("Thus the burden of persuasion has since 1970 been on the losing party to avoid assessment of expenses and fees rather than, as formerly, on the winning party to obtain such an award."). Moreover, such a showing requires more than establishing that the noncompliant party was acting in good faith. *See, e.g., Rivers v. American Express Centurion Services Corp.,* 184 F.R.D. 670, 671-72 (M.D. Fla. 1998). A failure to cooperate with discovery is only substantially justified if there is a genuine dispute regarding the discovery or if reasonable people could differ regarding the appropriateness of the contested actions. *See, e.g., Doe v. Lexington-Fayette Urban County Gov't.,* 407 F.3d 755, 765 (6th Cir. 2005).

Here, the government has not attempted to and cannot establish that Mr. Zabransky's failure to testify was substantially justified according to this standard. The Court is appropriately "troubled" by the discrepancy between Mr. Zabransky's testimony in this case and Mr. Pollog's

testimony from 2002. That discrepancy cannot reasonably be explained by any suggestion that Mr. Pollog was somehow better informed than was Mr. Zabransky. Mr. Zabransky and Mr. Pollog have worked closely together at DOE for many years. *See, e.g.*, Zabransky Dep. at 12, excerpt at exhibit 1 (noting that Mr. Zabransky is the government's contracting officer on the Standard Contracts, and Mr. Pollog is the contracting officer's technical representative); Pollog 2002 Dep. at 14-15, excerpt at exhibit 2 (explaining that he worked as part of Mr. Zabransky's "waste acceptance team"). Indeed, Mr. Pollog met with Mr. Zabransky to prepare for his 2002 deposition. *Id.* at 6-7.

The much more likely explanation for the discrepancy in testimony is that Mr. Zabransky's failure to provide information is part of the government's longstanding semantic gamesmanship through which it has attempted to deny Dairyland appropriate discovery with which to support Dairyland's theory of the case. The government argued in its motion for reconsideration, *see* Gov. Mot. at 8-10, that Mr. Zabransky's testimony did not differ from Mr. Pollog's because Mr. Pollog merely discussed program goals and those are different from the contractual obligations addressed by Mr. Zabransky. Under the government's view, Dairyland is entitled to no discovery to support Dairyland's acceptance rate theory, because the government is legally entitled to fiat an acceptance rate by limiting the extent to which it will approve delivery commitment schedules. *See* Govt. Supplemental Response to Interrogatory No. 5 at 5-6, exhibit 3 hereto. But this Court has already rejected limiting discovery to that consistent with the government's legal position, and held instead that Dairyland is entitled to discovery to support its theory of the case. *See* Order of February 5, 2007 at 1. Under Dairyland's long-expressed view, because the parties' contract does not have an acceptance rate term, the Court must determine damages consistent with a reasonable acceptance rate. Evidence of DOE's intentions for

performing under Standard Contracts regarding an acceptance rate (regardless whether expressed as a program goal or contractual obligation) early in the DOE spent fuel acceptance program before breach was anticipated is strong evidence of such a reasonable acceptance rate. *See Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 265 (2006) ("Regulators were aware that utilities faced enormous storage costs. DOE planning documents cited avoidance of these costs as a program goal. Whether aspirational goals rather than contractual requirements, the court nevertheless relies on these statements for foreseeability as well as what would have been reasonable or unreasonable performance by DOE . . ."). Since it is apparent from Mr. Pollog's testimony that the government has had knowledge of such intentions, it was wrong, and certainly not substantially justified, for the government not to provide testimony on this issue from its RCFC 30(b)(6) witness, Mr. Zabransky, in Dairyland's case.

2. An Award of Expenses Is Required Where Court Finds Claim of Deliberative Process Privilege Improper

Nothing in RCFC 37 or case law suggests that the availability of sanctions regarding improper claims of the deliberative process privilege should be governed by different standards than either other improper privilege claims or other discovery violations. In fact, there is precedent for an award of attorney fees under Rule 37 for an improper claim of the deliberative process privilege. *See Grant v. Sullivan,* 134 F.R.D. 107, 114 (M.D. Pa. 1990) (awarding fees and expenses to compel answers to interrogatories). Thus, the government should be required to pay the expenses, including reasonable attorney fees, of bringing a motion to compel regarding claims of the deliberative privilege unless the government was substantially justified in making the particular claim at issue.

Here, to the extent a court finds that a claim of the deliberative process privilege was proper but nevertheless overrules the claim because it finds that the movant's need for the

documents outweighs the government's interest in confidentiality, the government would, in most instances, likely be able to establish that its position was substantially justified.[5] But the government cannot establish that its complete cut off of questioning concerning the Booz Allen consulting work was substantially justified. At a minimum, the cutoff of questioning was sufficiently premature to prevent Dairyland or the Court from making any assessment as to whether the deliberative process privilege could possibly apply to that issue.

Whether the government's claim of the deliberative process privilege regarding the TAD canister issue was substantially justified is a closer issue. If the Court had clearly found that the government's claim of privilege was proper but that Dairyland was entitled to the documents solely because its need for the documents outweighed the government's interest in confidentiality, and the government's claim of privilege was made before the Court had previously addressed that issue, then Dairyland would not assert that such a claim of privilege was not substantially justified. However, the Court's November 20, 2007 Order is not clear on this issue. Although the Court held that Dairyland was entitled to the testimony based on need, it is not clear that the Court otherwise rejected Dairyland's arguments that the government claim of privilege was improper. Order at 13-14. Dairyland argued that the deliberative process privilege, which protects considerations of policy, did not apply to the government's commercial interest in encouraging the use of TAD canisters. The Court noted that it was "not apparent" that such an issue was "solely commercial in nature," but the Court did not determine that the

---

[5] This will not always be the case. For example, in its November 20, 2007 Order, the Court noted that it had already determined, after *in camera* review, that Dairyland was entitled to documents concerning the same canister issue over which the government claimed the deliberative process privilege in the course of Mr. Zabransky's deposition. Had the government pressed its privilege claim regarding that issue after the Court's determination, that action would not be substantially justified. Here, the Court addressed the privilege claim over the documents after Mr. Zabransky's deposition.

government had met its burden of establishing that policy issues were implicated. Similarly, the Court found that the declaration supplied by the government supporting its deliberative process privilege claims provided nothing more than "rote assertions" of the need for confidentiality, and the Court held that "there must be more." *Id.* at 13. Moreover, the Court ultimately characterized the government's claim of privilege as "improper." *Id.* at 14. In an event, because Dairyland prevailed on a large portion of its motion for which the government's actions were not substantially justified, it would be appropriate for the Court to award Dairyland its fees and costs for bringing the entirety of its motion (or, at least, the great majority of those fees and costs). *See Kister v. District of Columbia*, 229 F.R.D. 326, 332 (D.D.C. 2005) (refusing to reduce award of fees by time spent on unsuccessful portion of motion to compel discovery).

For these reasons, the Court should award Dairyland its expenses, including attorney fees, in litigating its motion for sanctions and to compel RCFC 30(b)(6) testimony, as well as its fees and costs to reopen Mr. Zabransky's deposition on the issues of the government's contractual intent and the Booz Allen consulting work.

Respectfully submitted,

December 21, 2007

s/ Jerry Stouck

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP
*WDC 371,552,989v1 12/21/2007*

# Exhibit 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------:
DAIRYLAND POWER COOPERATIVE, :
:
Plaintiff, :
:
v. : No. 04-106C
:
UNITED STATES OF AMERICA, :
:
Defendants. :
----------------------------------:

Washington, D.C.

Thursday, May 3, 2007

Deposition of:

DAVID K. ZABRANSKY

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:14 a.m., when were present on behalf of the respective parties:

 ©2007

c972745c-fe5d-454e-9109-2fab9c441590

MS. SULLIVAN: Objection. Foundation.

THE WITNESS: And like I said, I'm not sure exactly what his roles and responsibilities are.

BY MR. SHAPIRO:

Q I believe you testified earlier that your title at OCRWM is nuclear waste specialist.

A No.

Q No. I'm sorry. I got that wrong. What was it?

A I believe I said nuclear utility specialist.

Q Nuclear utility specialist. Are there other nuclear utility specialists in the Waste Management Office?

A I don't believe so.

Q And you still have the title of contracting officer?

A I have the duties, yes. Yes.

Q And Mr. Pollog is still contracting officer's technical representative?

A That's correct.


©2007

# Exhibit 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126c) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER :
COMPANY, (98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) (WILSON, J.) :
NORTHERN STATES POWER COMPANY :
(98-484c (Wiese, J.) :
DUKE POWER, A Division of DUKE :
ENERGY CORP. (98-485C) (Sypolt, J.):
INDIANA MICHIGAN POWER COMPANY :
(98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY :
DISTRICT (98-488c) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY :
et. al. (98-488c) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621c) (Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C) (Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C) (Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF :
NEW YORK (00-703C) (Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) (Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) (Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) (Bruggink, J.) :
Plaintiff, :
:
vs :
:
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - -x

McLean, Virginia
Thursday, April 11, 2002

Deposition of:
THOMAS POLLOG,
the witness, called for examination by counsel for the defendant, pursuant to notice and agreement, commencing at 10:10 a.m., at the offices of Shaw, Pittman, 1650 Tysons Boulevard, McLean, Virginia, before Linda C. Marshall, RPR, a Notary Public in and for the Commonwealth of Virginia, when were present on behalf of the respective parties:

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQUIRE
JACK CHEW, ESQUIRE
Shaw, Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7962

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
KRISTI L. REMINGTON, ESQUIRE
Balch & Bingham, LLP
Tenth Floor,
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-347-6000



APPEARANCES CONT'D:

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQUIRE
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 50511-7603
312-222-9350

On behalf of Plaintiff SAcramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQUIRE
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, CO 80202-1370

On behalf of Plaintiff Wisconsin Electric Power Company:
SUZETTE W. DERREVERE, ESQUIRE
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011
202-434-1675

On behalf of the Defendant:
MARIAN SULLIVAN, ESQUIRE
ERIN POWELL, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.
202-514-7300



I-N-D-E-X


| Witness: | Page |
|---|---|
| Thomas Pollog | |
| Examination by Ms. Hewitt | 5 |


E-X-H-I-B-I-T-S


| | Page |
|---|---|
| No. 1 - | 20 |
| No. 2 - | 28 |
| No. 3 - | 44 |
| No. 4 - | 71 |
| No. 5 - | 103 |
| No. 6 - | 112 |
| No. 7 - | 122 |
| No. 9 - | 164 |




P-R-O-C-E-E-D-I-N-G-S
(Pollog Deposition Exhibit No. 8 was marked off the record.)
Whereupon,
THOMAS POLLOG,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION ON BEHALF OF THE PLAINTIFF
BY MS. HEWITT:
Q Good morning, Mr. Pollog. My name is Devon Hewitt of the law firm of. Shaw, Pittman. I represent ten of the utilities that are in litigation with the Department of Energy regarding spent nuclear fuel. And I take it you're familiar with this litigation?
A Yes, I am.
Q I understand you've been deposed before in this litigation. I'll go over some ground rules to make sure they're on the record, but I'm sure you've heard these instructions before. I'll ask you a series of questions and I ask that you answer them truthfully.
If you don't understand something that

Page 6

I said or that I speak too quickly, which I often do, ask me to repeat the question or clarify it if something is unclear. Will you agree to do that?
A Yes.
Q If you need a break at any time, feel free to ask and we'll go off the record and take a break.
A Okay.
Q Will you give your full address for the record please?
A Work or home?
Q Where would you like the -- your deposition sent?
MS. SULLIVAN: Actually, it can by sent to me.
BY MS. HEWITT:
Q Then we don't need your address in that case.
Mr. Pollog, what have you done to prepare for your deposition today?
A I have reviewed various documents, met with DOE personnel and DOJ personnel.
Q What DOE personnel have you met with?
A David Zabransky, Alan Brownstein, Jane

Page 7

Taylor, Lake Barrett, Ron Milner. I have had a phone conversation with Vic Trebulus (ph). They are the only DOE personnel I met with concerning preparation for this.
Q And did you meet with any DOE personnel that weren't attorneys in this action?
A No.
Q Did you meet with any other personnel or any other people in preparation for this deposition?
A Yes.
Q Who?
A James Carlson. I didn't meet with him. I had a conversation with him on the phone.
I need to amend my first answer. There's one other DOE person I just remembered. That would be Michael Conroy, C O N R O Y.
Q And at what time did you speak with these individuals?
A Various times over the last two weeks.
Q What topics did you discuss with David Zabransky?
MS. SULLIVAN: Objection, calls for attorney-client and attorney work product information.

Page 8

BY MS. HEWITT:
Q Was counsel present at these conversations?
A All but one.
Q What -- where were -- which conversation was counsel not present?
A Michael Conroy.
Q Where did -- what did you speak with Michael Conroy about?
A A schedule and I believe the 1985 Mission Plan.
Q When you said schedule, what do you mean by schedule as you used the term in your prior answer?
A An illustrative waste acceptance schedule that was contained in that 1985 Mission Plan.
Q Why did you speak with him about that?
A Mike was in our office and he stopped by to say hello to me. And I said, Hey, Mike, you ever remember working on something like this? And he said, yes, I do. I had not seen him for about a year or two.
Q And did -- is he employed by DOE?
A Yes.

Page 9

Q What is his current position?
A I don't know.
Q What was he doing for DOE when he worked on this illustrative waste acceptance schedule?
A He was working for a company called Weston and I don't know specifically what he was doing at that time.
Q Did Weston participate in the drafting of the 1985 Mission Plan?
A According to what Mike told me, yes.
Q Mr. Pollog, when did you start working at DOE?
A November of 1988.
Q What was your appointment previous to that?
A I was in graduate school.
Q Was working at DOE your first job out of graduate school?
A Out of graduate school, yes.
Q And what position did you have with DOE when you started in 1988?
A I believe the position description was either general engineer or nuclear engineer.
Q And in what division of DOE or

Page 14

A I don't think so.
Q And what happened in 1992?
A I took a three-year leave of absence.
Q And I understand you went to Austria; is that right?
A That's correct.
Q That's a wonderful place.
Did you return to DOE then in 1995?
A Yes.
Q And what division or department of DOE did you return to?
A It was still RW. I worked for the engineering division.
Q And who did you report to?
A Jeffrey Williams.
Q And what were your duties in that position?
A We were managing the MPC, Multi Purpose Canister Program and the GA, General Thomas Cast Development Program, were the major responsibilities. There were other minor ones, but they were the two major initiatives I was involved with at that time.
Q And how long did you hold this position?

Page 15

A Until the fall of '96.
Q And did you take on a new position?
A Yes.
Q And what was that?
A I was assigned to the waste acceptance team.
Q And who comprised that team?
A When?
Q When you joined in '96?
A That would have been Mr. Zabransky, who was the team leader, myself, William Floyd and Mary Lee Payton.
Q What were your duties on the team?
A To support Mr. Zabransky in any of the contract issues that were ongoing, other than what Mr. Floyd and Ms. Payton were doing.
Q Did Mr. Floyd have any specific responsibilities?
A Yes.
Q And what were they?
A He was our safeguards expert.
Q Safeguards?
A Yes.
Q What are safeguards?
A Safeguards for nuclear material,

Page 16

preventing theft and diversion for parties we're not favorable to.
Q And Ms. Payton, what were her responsibilities?
A The same. Yet, she was still working on the fee verification issues, collection.
Q How long did you hold this position?
A Until now.
Q And you currently hold that position today?
A Yes.
Q Mr. Pollog, did you have any personal role in drafting the standard contract?
A No.
Q Did you have any personal role in drafting or participating in the ACRs? Are you familiar with the term ACR?
A Which ACRs?
Q Any of them.
A I believe I was involved in production of the 1991 ACRs.
Q Any other ACRs?
A I don't believe so.
Q And what did you do with regard to the 1991 ACRs?

Page 17

A Basically, review the draft we had to received from our contractors.
Q What contractor was that?
A I believe it would have been -- I forget if it was either P&L or TRW at that time.
Q And what was your role in reviewing the document?
A Read it, made suggestions, corrections, anything that I felt was appropriate. Direct my comments to our contractor at the time, resolve my comments.
Q Do you recall whether you made any comment or raised any questions with regard to the acceptance rates in regard to the 1991 ACR?
A I don't recall.
Q You passed your comments back to the contractor? Is that what your testimony was?
A Yes.
Q Did you relay any comments to anybody else at DOE?
A I probably went over it with Mr. Brownstein. I don't recall specifically, but that would have been how I would have done things normally.
Q Did you have any role in drafting any

**Exhibit 3**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0106C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NUMBER 5 PURSUANT TO THE COURT'S NOVEMBER 20, 2007 ORDER

Pursuant to Rule 33 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, provides the following response to Interrogatory number 5 of "Plaintiff's First Set Of Interrogatories," which were served on October 10, 2006, amended in response to the Court's order dated February 5, 2007, and are now being supplemented pursuant to the Court's order regarding the Government's interrogatory responses issued on November 20, 2007.

GENERAL OBJECTIONS

1. Disclosure of privileged or protected information: Defendant objects to each interrogatory to the extent that it is deemed to require disclosure of classified, confidential, or proprietary information or matters subject to the attorney-client privilege, the attorney work product doctrine, other applicable privileges, or any statutory or regulatory restriction upon disclosure, including the Privacy Act, 5 U.S.C. § 552a. Defendant will not produce privileged or protected documents, materials, or information in response to the document requests. The inadvertent production by defendant of documents protected by the attorney-client privilege, or any other privilege, shall not constitute a waiver of the applicable privilege or protection as to

any document so produced, or as to any other document.

2. Exceeding obligations imposed by the Court's rules and orders: Defendant objects to the instructions and definitions accompanying plaintiff's interrogatories to the extent that such instructions and definitions attempt to impose obligations on defendant other than those imposed by RCFC 26 and 34 and the Court's prior orders, including but not limited to, information regarding electronic mail will be produced only in accordance with the requirements provided by the Court's prior order, dated March 14, 2005, limiting the parties' obligations to preserve or search e-mail tapes.

3. Conclusions regarding legal significance of documents: Defendant objects to the plaintiff's interrogatories upon the grounds and to the extent that, by them, plaintiffs seek to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

4. Work product information: Defendant objects to plaintiff's interrogatories on the grounds and to the extent that, by them, plaintiff seeks information prepared and/or developed in anticipation of litigation and/or for trial when plaintiff has not shown that it has substantial need of such materials in the preparation of its case in that plaintiff is unable, without undue hardship, to obtain the substantial equivalent of such information by other means.

5. Irrelevant material: Defendant objects to plaintiff's interrogatories on the grounds and to the extent that, by them, plaintiff seeks the discovery of information which is irrelevant and immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

6. Vague, overly broad, and unduly burdensome: Defendant objects to plaintiff's interrogatories on the grounds that the manner in which they are worded, when read with their

definitions and general instructions, are so vague, broad, general, and all inclusive that they do not permit a proper or reasonable response and are, therefore, unduly burdensome and oppressive. Defendant further objects to these interrogatories to the extent that, to respond to them, defendant would be required to make an extensive investigation, research, compilation, and evaluation of data and records in its possession, which would constitute annoyance, harassment, oppression, undue burden, and undue expense to defendant.

7. Inferences from interrogatories: Defendant objects to any inference that can be drawn from any portion of plaintiff's interrogatories or the responses to them that the documents requested or events referenced in the requests actually exist or occurred. The failure to object to each such inference in no way constitutes an admission by defendant that such information exists or that such events actually occurred.

8. Scope Of The Government As Responding Party: Defendant objects to plaintiff's interrogatories to the extent that they define the term "DOE," or the Department of Energy, to include any Government agencies, offices, bodies, affiliates, contractors, consultants, or individuals other than the Department of Energy itself. To define the term "DOE" as including entities other than DOE itself would render all of plaintiff's discovery requests overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, because doing so would require defendant to seek information from, and about, more than one million Federal employees in numerous offices, agencies, and departments, the missions of which have no relation whatsoever to plaintiff's contract and the locations of which are scattered across the nation and around the world. Further, defendant objects to these interrogatories to the extent that they purport to seek information from the files of the entire

Federal Government. In responding to these interrogatories, defendant has focused upon the knowledge of the Department of Energy.

9. The objections set forth above apply to each of the numbered paragraphs of plaintiff's interrogatories.

DEFENDANT'S RESPONSE

INTERROGATORY NO. 5:

On what schedule (measured in Metric Tons Uranium) does DOE contend it is obligated to remove DAIRYLAND's SPENT FUEL pursuant to DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? State all factual and legal grounds for this contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

Without waiving this objection, defendant incorporates by reference its response to Interrogatory No. 3.

SUPPLEMENTAL RESPONSE:

Although the Court's February 5, 2007 order does not require supplementation of our original response to this interrogatory, defendant further refers plaintiff to the post-trial briefing that the Government filed in Pacific Gas & Electric Co. v. United States, Nos. 04-0074C & -0075C (Fed. Cl.), dated June 30, 2006, and July 7, 2006, copies of which are available on PACER accessible through the Court of Federal Claims' website.

SUPPLEMENTAL RESPONSE PURSUANT TO NOVEMBER 20, 2007 ORDER

Pursuant to the Standard Contract published at 10 C.F.R. § 961.11, DOE was to begin SNF acceptance from the contract holders by January 31, 1998. However, the Standard Contract itself does not identify any minimum or particular rate at which DOE, once it starts acceptance, must continue that SNF acceptance. Instead, the Standard Contract creates a procedural mechanism which requires each contract holder that wants to deliver any particular amount of SNF to DOE in any particular allocation period (each of which is a 12-month period) to submit a delivery commitment schedule ("DCS") to the contracting officer for approval. The submission, which the contract holder must present to the Department at least 63 months before the date upon which the contract holder wants the Government to accept the SNF, is a condition to the Government's subsequent obligation to accept any SNF. See 10 C.F.R. § 961.11, Art. V. If the DCS is disapproved, the Standard Contract contains an administrative mechanism through which any dispute regarding the SNF acceptance rate or order may be resolved, which the contract holder must also pursue as a "condition" to the Department's SNF acceptance. If the DCS is approved, the delivery commitment is established, committing the contract holder to deliver, and the Government to accept, the amount of SNF identified in the DCS.

Pursuant to Articles IV.5 and V of the Standard Contract, the 1991 Annual Capacity Report ("ACR"), in conjunction with the 1991 Annual Priority Ranking ("APR"), initiated the process through which DOE began making firm acceptance commitments to individual utility contract holders. Specifically, after issuance of the 1991 ACR/APR, many of the nuclear utility plaintiffs (including Dairyland) submitted DCSs to the Government, many of which were approved by the Department of Energy contracting officer. In submitting the DCSs, the utility

contract holders relied upon the allocations identified in the ACR/APR, and, in accordance with Article V of the Standard Contract, DOE approved many of those DCS submissions. The DCSs identify both the amount of SNF and the location of SNF for which an allocation exists under the relevant ACR/APR for a given year. Through the mechanisms created by the Standard Contract, those approved DCSs provide the contractual basis for assessing damages in these cases, based upon the Government's inability to accept the amount of SNF identified in those DCSs.

Dairyland Power Cooperative submitted DCSs to DOE on September 17, 1992, requesting the following allocations: (1) 0.72 Metric Tonnes Uranium ("MTUs") in 1998; (2) 5.99 MTUs in 1999; (3) 3.00 MTUs in 2000; (4) 3.86 MTUs in 2001; (5) 3.37 MTUs in 2003; (6) 1.45 MTUs in 2006; and (7) 3.29 MTUs in 2007. Those DCSs were approved by DOE's contracting officer for the Standard Contract on December 22, 1992. Therefore, pursuant to the terms of Dairyland Power Cooperative's Standard Contract, the parties agreed and contractually committed themselves to the acceptance of Dairyland's SNF in accordance with Dairyland's approved DCSs.

DOE has not obligated itself to accept any additional SNF other than the amounts set forth in the approved DCSs.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
MARIAN E. SULLIVAN
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT C. SLATER
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

December 3, 2007

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 3rd day of December 2007, I caused to be sent by first class mail and facsimile a copy of "DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NUMBER 5 PURSUANT TO THE COURT'S NOVEMBER 20, 2007 ORDER"addressed as follows:

JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, N.W.
Suite 1000
Washington, D.C. 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)

________________________