IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 04-106C<br>(Chief Judge Damich) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S DECEMBER 14, 2007 MOTION TO COMPEL AND NOTICE OF FILING OF FORMAL INVOCATION OF PRESIDENTIAL COMMUNICATIONS PRIVILEGE PURSUANT TO THE COURT'S DECEMBER 19, 2007 ORDER

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel. (202) 305-7571
Fax: (202) 305-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Trial Attorneys
U.S. Department of Justice

January 22, 2008

Attorneys for Defendant

## TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I. *DEFENDANT'S RESPONSE TO PLAINTIFF'S DECEMBER 14, 2007 MOTION TO COMPEL:* DAIRYLAND CANNOT MEET ITS INITIAL BURDEN, PURSUANT TO *CHENEY*, TO ESTABLISH SUFFICIENT NEED FOR THE DOCUMENTS AT ISSUE IN ITS DECEMBER 14, 2007 MOTION TO COMPEL, NOR CAN IT OTHERWISE OVERCOME THE ASSERTION OF PRESIDENTIAL COMMUNICATIONS PRIVILEGE . . . . . . . . . . . . . . . . . . . . 8

A. The Five Documents At Issue In Dairyland's December 14, 2007 Motion To Compel Are Not Important To This Case . . . . . . . . . . . . . . . . . . . . . . 8

B. Dairyland Cannot Establish That The Evidence That It Seeks Is Unavailable Elsewhere . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C. Even If The Court Were To Find That Dairyland Has Met Its Initial Burden Pursuant to *Cheney* and *Sealed Case* With Regard To The Five Documents At Issue In Dairyland's December 14, 2007 Motion To Compel, Dairyland Has Not Established Sufficient Need To Override The Formal Assertion Of Presidential Communications Privilege . . . . . . . . . 22

II. *DEFENDANT'S NOTICE OF FILING OF THE WHITE HOUSE'S FORMAL INVOCATION OF THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE PURSUANT TO THE COURT'S DECEMBER 19, 2007 ORDER:* AS EVIDENCED BY THE FORMAL INVOCATION OF PRESIDENTIAL COMMUNICATIONS PRIVILEGE, THE WHITE HOUSE'S INTEREST IN PRESERVING THE CONFIDENTIALITY OF PRESIDENTIAL COMMUNICATIONS CONCERNING THE NATION'S SPENT NUCLEAR FUEL POLICY OUTWEIGHS DAIRYLAND'S NEED FOR THESE DOCUMENTS IN THIS CIVIL CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A. The White House Properly Invoked Presidential Communications Privilege With Regard To The Five Documents At Issue In Dairyland's September 18, 2007 Motion To Compel . . . . . . . . . . . . . . . . . . . . . . . . 26

B. Dairyland's Need For The Five Documents At Issue In Its September 18, 2007 Motion To Compel Does Not Override The Presidential Communications Privilege . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

## CASES

Barron Bankshares, Inc. v. United States,
366 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 16

Cheney v. United States District Court for the District of Columbia,
542 U.S. 367 (2004) . . . . . . . . . . passim

INS v. Chadha,
462 U.S. 919 (1983) . . . . . . . . . . 23, 29

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . passim

Lardner v. United States Department of Justice,
No. 03-180, 2005 WL 759267 (D.D.C. March 31, 2005) . . . . . . . . . . 22, 29

Nixon v. Administrator of General Services,
433 U.S. 425 (1977) . . . . . . . . . . 9

PGL Const. Svs., Inc. v. United States,
47 Fed. Cl. 745 (2000) . . . . . . . . . . 16

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006) . . . . . . . . . . 19, 20

In re Sealed Case,
121 F.3d 729 (D.C. Cir. 1997) . . . . . . . . . . passim

Senate Select Committee on Presidential Campaign Activities v. Nixon,
498 F.3d 725 (D.C. Cir. 1974) . . . . . . . . . . 22. 23

Southern California Federal Sav. & Loan Associate v. United States,
422 F.3d 1319 (Fed. Cir. 2005) . . . . . . . . . . 16

Southern Nuclear Operating Co., v. United States,
77 Fed. Cl. 396 (2007) . . . . . . . . . . 19

United States v. Nixon,
418 U.S. 683 (1974) . . . . . . . . . . passim

United States v. Philip Morris USA, Inc.,
No. 99-2496, 2004 WL 32553662 (D.D.C. Sept. 9, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Zolin,
491 U.S. 554 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

Yankee Atomic Electric Co. v. United States,
54 Fed. Cl. 306 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Yankee Atomic Electric Co. v. United States,
73 Fed. Cl. 249 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**STATUTES**

10 C.F.R. § 961.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16

42 U.S.C. 1010 - 10270 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-106C<br>(Chief Judge Damich) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S DECEMBER 14, 2007 MOTION TO COMPEL AND NOTICE OF FILING OF FORMAL INVOCATION OF PRESIDENTIAL COMMUNICATIONS PRIVILEGE PURSUANT TO THE COURT'S DECEMBER 19, 2007 ORDER

Defendant, the United States, respectfully responds to "Motion To Compel Production Of All Five Remaining Presidential Communications Documents," that the plaintiff, Dairyland Power Cooperative ("Dairyland"), filed on December 14, 2007. In addition, pursuant to the Court's December 19, 2007 order, we submit declarations in support of the White House's invocation of the presidential communications privilege with respect to the five documents at issue in Dairyland's September 18, 2007 "Motion To Compel Production of Presidential Communications Documents," along with a discussion of the "reasons for the invocation, in the context of which the Court can review the subject documents in camera to determine if the [presidential communications] privilege actually applies here." Order, at 14 (Fed. Cl. Dec. 19, 2007).

For the reasons that follow, with regard to the five documents that Dairyland seeks in its December 14, 2007 motion to compel, because Dairyland has failed to meet its initial burden pursuant to Cheney v. United States District Court for the District of Columbia, 542 U.S. 367 (2004), and the Court's December 21, 2007 order and otherwise cannot demonstrate a sufficient need for the documents, the Court should deny Dairyland's request for their production.

Additionally, with respect to the five documents subject to in camera review pursuant to the Court's December 19, 2007 order, given their minimal evidentiary value in this case, Dairyland has not established a sufficient need for the documents to justify overriding the White House's formal assertion of presidential communications privilege.

## BACKGROUND

As the Court is aware, since 1998, over 70 cases have been brought by nuclear utility plaintiffs in this Court seeking recovery from the United States Government in connection with the delay by the Department of Energy ("DOE") in accepting spent nuclear fuel ("SNF") pursuant to the terms of DOE's "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" ("Standard Contract"), the terms of which are published at 10 C.F.R. § 961.11. In response to discovery requests from the plaintiffs in the coordinated discovery phase of the SNF litigation during 2001 and 2002, the United States produced approximately one million pages of documents concerning the Government's actions toward establishing a national repository for SNF and in otherwise performing under the terms of the Nuclear Waste Policy Act and the Standard Contract. The Government made these documents available to Dairyland upon the commencement of its lawsuit against the United States in 2004. In addition to this substantial document production, the United States produced more than one million additional pages of documents to Dairyland from March through September 2007 in response to Dairyland's specific discovery requests in this litigation and a Court order compelling production. During the course of this litigation, the United States has thus produced to Dairyland more than twice the number of documents that it has produced to all the other spent nuclear fuel plaintiffs combined during the course of the past eight years of SNF litigation.

With regard to the five documents at issue in Dairyland's September 18, 2007 motion to compel,[1] and the five separate documents at issue in Dairyland's December 14, 2007 motion,[2] the Government initially identified the disputed documents as subject to both the presidential communications and deliberative process privileges in the privilege log that the Government made available to all SNF plaintiffs in May 2002. As set forth in the declarations of the Counsel to the President, Mr. Fred F. Fielding, and Ms. Susan Smith, Senior Policy Analyst in the Office of Civilian Radioactive Waste Management ("OCRWM") at DOE, the 10 documents at issue in the September 18 and December 14, 2007 motions were generated, at the request of the White House, during the years 1995 through 1997, by a committee of senior-level Executive Branch officials from DOE, the Office of Management of Budget, and the Executive Office of the President. (Copies of the declarations of Mr. Fielding and Ms. Smith are attached hereto at A1-14.)[3] As described by Mr. Fielding and Ms. Smith in their declarations, these documents consist of draft or final recommendations and advice concerning specific matters for decision or action by President Clinton relating to the Federal interim SNF storage policy and the Government's policy in responding to lawsuits against the United States arising from DOE's delay in SNF acceptance.

---

[1] The five documents that are the subject of Dairyland's September 18, 2007 motion to compel have been identified by Dairyland with the reference numbers E154 (Bates-stamped HQR0290177 – 190), E167 (Bates-stamped HQR0320199 – 206) , E170 (Bates-stamped HQR0320221 – 227), E171 (Bates-stamped HQR0320231 – 245), and E178 (Bates-stamped HQR042152 – 464).

[2] The five documents that are the subject of Dairyland's December 14, 2007 motion to compel have been identified by Dairyland with the reference numbers E112 (Bates-stamped CTR040568 – CTR040583), E153 (HQR0290044 – HQR0290051), E156 Bates-stamped HQR0290820 – HQR0290832), E163 (HQR0320151 - HQR0320156), and E165 (HQR032016 – HQR0320181).

[3] "A__" refers to a page in the appendix that is attached to this brief.

On January 18, 2007, Dairyland moved to compel the production of 281 documents that the Government withheld from its large document production pursuant to the deliberative process and attorney-client privileges. Although Dairyland's January 18 motion encompassed the 10 documents at issue in the September 18 and December 14, 2007 motions to compel, Dairyland failed to challenge the Government's assertion of the presidential communications privilege, even though the Government's assertion of the presidential communications privilege over the 10 documents was indicated upon the Government's privilege log – which has been available to the SNF plaintiffs since May 2002. See Plaintiff's Motion To Compel, dated Jan. 18, 2007, at 1.

By order dated June 29, 2007, the Court determined that the deliberative process privilege applied to all 281 documents, but that Dairyland had demonstrated sufficient need to overcome that privilege with regard to 127 of the documents. Among the documents that the Court ordered produced in the June 29 order were the five documents at issue in Dairyland's September 18, 2007 motion to compel. Finally, the Court's order instructed us to submit 131 other documents to the Court for in camera inspection for further determination as to whether Dairyland's stated need for the documents outweighed the Government's assertion of deliberative process privilege, attorney-client privilege, and work product doctrine protection.

On July 23, 2007, the Government produced the 127 documents that the Court instructed us to produce to Dairyland. The Government produced the five documents subject to the privilege in completely redacted form, because Dairyland had not challenged the assertion of the presidential communications privilege. See, e.g., In re Sealed Case, 121 F.3d 729, 745 (D.C. Cir. 1997) (presidential communications privilege applies to documents in their entirety).

Subsequently, by letter dated August 20, 2007, Dairyland objected for the first time to the assertion of presidential communications privilege over these five documents, five years after the United States invoked the privilege in its 2002 privilege log and well after the close of fact discovery in this case.[4] Dairyland then filed its motion to compel those five documents on September 18, 2007. The parties' briefing in connection with that motion concluded on November 21, 2007.

The Government submitted the 131 documents for in camera inspection on July 23, 2007. The Court reviewed these documents on a rolling basis and issued separate orders on November 19, December 4, December 10, and December 21, 2007, directing the United States to produce 35 of the documents to Dairyland.[5] Among the documents that the Court ordered us to produce following the in camera inspection were the five documents that later became the subject of Dairyland's December 14, 2007 motion to compel.[6] As before, because the presidential communications privilege applies to documents in their entirety, see Sealed Case, 121 F.3d at 745, and because Dairyland previously had not challenged the assertion of presidential communications privilege, we produced the documents to Dairyland in fully redacted form.

---

[4] Subsequently, the Court modified its scheduling order for this case and moved the discovery cut-off date to January 15, 2008.

[5] None of the Court's orders addressed the applicability of the Government's assertion of the presidential communications privilege with regard to the documents at issue here.

[6] For three of the five documents at issue in the December 14, 2007 motion to compel (E112, E156, and E163), the Court found that Dairyland had overcome the Government's assertion of deliberative process privilege with regard to only certain portions of the document, and, accordingly, the Court ordered the United States to produce these documents in partially redacted form. In fact, for one of the documents, E156, the Court actually found that document's content did "not appear to be significantly relevant" to this case, and the Court instructed the Government to redact the page Bates-stamped HQR0290826 prior to producing the document to Dairyland. Order, at 3 (Fed. Cl. Nov. 19, 2007).

Dairyland then moved on December 14, 2007, to compel production of unredacted copies of the documents.

Soon thereafter, on December 19, 2007, the Court issued an opinion addressing the five presidential communications documents at issue in Dairyland's September 18, 2007 motion to compel. The Court ruled that Dairyland had satisfied its initial showing of heightened need for the five documents, as required by Cheney v. United States District Court for the District of Columbia, 542 U.S. 367 (2004), and United States v. Nixon, 418 U.S. 683 (1974), and directed the Government to provide a "suitable affidavit reflecting a formal invocation of the presidential communications privilege over the document by appropriate White House officials" to afford the Court the opportunity "to determine whether the presidential communications privilege indeed protects the documents from disclosure." Order, at 14 (Fed. Cl. Dec. 19, 2007). Order, at 14 (Fed. Cl. Dec. 19, 2007). The Court also ordered the Government to submit the five documents for in camera review. See id.

Today, the Government is submitting the five documents for in camera inspection, and, in the interest of efficiency, we are also providing the Court today with the five separate documents at issue in Dairyland's December 14, 2007 motion to compel. In addition, we have attached to this brief a declaration by Mr. Fred. F. Fielding, Counsel to the President, that formally invokes the presidential communications privilege over the subject documents upon behalf of the Office of the President. To further assist in the Court's evaluation of the White House's assertion of presidential communications privilege, we also have attached a supporting declaration by Ms. Susan Smith of DOE, who, along with senior officials from DOE and the Executive Office of the President, participated in the development, drafting, and review of these

documents. As Ms. Smith explains, she and the other senior Executive Branch officials prepared these documents at the request of the White House to assist President Clinton in deciding specific matters relating to Federal interim SNF storage policy as well as the Government's response to lawsuits arising from DOE's delay in SNF acceptance.

## SUMMARY OF ARGUMENT

Dairyland has not, and cannot, establish that the documents at issue in its September 18 and December 14, 2007 motions to compel are sufficiently important to its case to justify overriding the presidential communications privilege. As the declaration of the Counsel to the President establishes, the presidential communications privilege properly applies to the subject documents and its invocation is necessary to encourage candid deliberations between the President and his advisors concerning the nation's SNF policy and the Government's development of the Yucca Mountain repository. Each of the documents concerns an area of presidential decisionmaking – the analysis of pending legislation concerning Federal interim storage policy and the preparation of policy positions to present before the Senate Energy Committee with regard to the Government's response to lawsuits arising from DOE's delay in SNF acceptance – and reflect the deliberations of White House advisors in the process of developing advice for President Clinton.

Dairyland has not explained how these documents shed any light on the Government's position on the issue of the contractual "rate of acceptance" pursuant to the Standard Contract and the reasonableness of Dairyland's investment in the private, for-profit PFS business venture. Dairyland has not demonstrated that these documents are sufficiently important to its case to

justify the overriding of the White House's formal assertion of presidential communications privilege. Consequently, the presidential communications privilege should prevail.

## ARGUMENT

### I. *DEFENDANT'S RESPONSE TO PLAINTIFF'S DECEMBER 14, 2007 MOTION TO COMPEL:* DAIRYLAND CANNOT MEET ITS INITIAL BURDEN, PURSUANT TO *CHENEY*, TO ESTABLISH SUFFICIENT NEED FOR THE DOCUMENTS AT ISSUE IN ITS DECEMBER 14, 2007 MOTION TO COMPEL, NOR CAN IT OTHERWISE OVERCOME THE ASSERTION OF PRESIDENTIAL COMMUNICATIONS PRIVILEGE

#### A. The Five Documents At Issue In Dairyland's December 14, 2007 Motion To Compel Are Not Important To This Case

Dairyland has failed to establish a sufficient showing of heightened need for the five remaining documents at issue in Dairyland's December 14, 2007 motion to compel, as required by Cheney and this Court's December 19, 2007 order. Even if it could meet its initial burden, the White House's formal invocation of the presidential communications privilege should preclude their disclosure to Dairyland.

The presidential communications privilege "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." United States v. Nixon, 418 U.S. 683, 708 (1974) (hereinafter Nixon I). "The expectation of a President to the confidentiality of his conversations and correspondence, like the claim of confidentiality of judicial deliberations, for example, has all the values to which we accord deference for the privacy of all citizens and, added to those values, is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." Id. The presidential communications privilege is necessary to ensure that the "President and those who assist him must be free to explore alternatives in the process of shaping policies and

making decisions and to do so in a way many would be unwilling to express except privately." Id.; see In re Sealed Case, 121 F.3d. 729, 750 (D.C. 1997) ("If presidential advisers must assume they will be held to account publicly for all approaches that were advanced, considered but ultimately rejected, they will almost inevitably be inclined to avoid serious consideration of novel or controversial approaches to presidential problems.").

The presidential communications privilege applies to communications that the President or his advisors have made "in the process of shaping policies and making decisions." Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 449 (1977) (hereinafter Nixon II). "It is well established that 'a President's communications and activities encompass a vastly wider range of sensitive material than would be true of any ordinary individual." Cheney v. United States District Court for the District of Columbia, 542 U.S. 367, 381 (2004). Accordingly, the privilege extends not only to communications made directly to the President, but also to information generated by White House advisors or those from whom White House advisors solicit advice. See In re Sealed Case, 121 F.3d. at 750, 752; see also United States v. Philip Morris USA, Inc., No. 99-2496, 2004 WL 32553662, at *2 (D.D.C. Sept. 9, 2004) ("Thus, restricting the scope of the privilege to only those communications to which the President (or his White House advisors) was a direct participant or to communications regarding a non-delegable power would eviscerate its purpose and limit the President's ability to rely on his advisors to develop candid recommendations on many of the matters directly related to the duties of his office.").

Given the importance of ensuring that the President is free to "explore alternatives in the process of shaping policies," documents subject to the assertion of presidential communications privilege are presumptively privileged – Nixon I, 418 U.S. at 708 – and the presidential

communications privilege "affords greater protection against disclosure" and is "more difficult to surmount" than other forms of executive privilege. Sealed Case, 121 F.3d at 746; see Yankee Atomic Electric Co. v. United States, 54 Fed. Cl. 306, 310 n.2 (2002) (noting difference in protection afforded by the presidential communications and deliberative process privileges). For instance, unlike the deliberative process privilege, the presidential communications privilege applies to final decisions and post-decisional judgments, rather than just pre-decisional documents. See Sealed Case, 121 F.3d at 745. Additionally, unlike other forms of privilege, the presidential communications privilege applies to documents "in their entirety" and is not subject to redaction. See id. at 745. Accordingly, the presidential communications is extremely difficult to overcome, and a party seeking documents in a criminal case must demonstrate at a minimum that the Presidential material is "essential to the justice of the case." Nixon I, at 713 (emphasis added). The burden is even higher in a civil case, as the need for information for use in civil cases "does not share the urgency" that is present in a criminal litigation matter. Cheney, 542 U.S. at 382.

Finally, in assessing an assertion of presidential communications privilege, the judiciary must be mindful of the "special considerations" affecting separation of powers that control when "the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." Cheney, 542 U.S. at 382 ("We have, in short, long recognized the 'unique position in the constitutional scheme' that [the Office of the President] occupies."); see id. at 385 ("The [Supreme] Court has held, on more than one occasion, that '[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of

discovery,' . . . and that the Executive's 'constitutional responsibilities and status [are] factors counseling judicial deference and restraint' in the conduct of litigation against it . . ..").

As the Court has recognized, pursuant to Cheney, prior to requiring the White House to undertake the burden to formally invoke the presidential communications privilege by means of affidavit, Dairyland must satisfy its initial burden of establishing a heightened, particularized need for the subject documents. See Order, at 4 (Fed. Cl. Dec. 19, 2007) ("The Court agrees with the Government that, in the case of a discovery request aimed at the President and his close advisors, the White House need not formally invoke the presidential communications privilege until the party making the discovery request has shown a heightened need for the information sought."). With regard to the specific elements of this initial burden, the Court adopted the two-part test utilized by the United States Court of Appeals for the District of Columbia Circuit in Sealed Case, finding that Dairyland must demonstrate that (1) each discrete group of the subject materials involves "important evidence;" and (2) subject documents are not available "with due diligence elsewhere." Order, at 1 (Fed. Cl. Oct. 17, 2007) (citing Sealed Case, 121 F.3d at 754); see Order, at 4 (Fed. Cl. Dec. 19, 2007). With all due respect, notwithstanding the Court's application of the two-part test in Sealed Case, we continue to believe that before the Court balances Dairyland's need argument against the assertion of privilege, Dairyland must satisfy the "exacting standards" of "relevance," admissibility," and "specificity," pursuant to the Supreme Court's analysis of this issue in Cheney. See 542 U.S. at 386. Only after Dairyland has satisfied those standards should the Court conduct balancing, and the showing of need required to overcome an assertion of presidential communications privilege is higher than the criminal investigation standard set forth in Sealed Case. See Cheney, 542 U.S. at 382.

In its December 14, 2007 motion to compel, Dairyland not only fails to meet its initial burden to demonstrate a particularized need for these documents, but it also fails to articulate sufficient reasons to justify overriding the White House's formal assertion of presidential communications privilege over the subject documents. As Dairyland indicates in its motion, the grounds set forth in its December 14, 2007 motion to compel "are the same grounds" set forth in Dairyland's September 18, 2007 motion. In support of its argument that the first Sealed Case prong is satisfied – that is, that the subject documents contain important evidence – Dairyland relies upon the Court's findings in its November 19, December 10, and December 18, 2007 orders in connection with the Court's review of the documents submitted to the Court for in camera inspection pursuant to the June 29, 2007 ruling regarding Dairyland's challenge to the assertion of deliberative process privilege. See Pl. Dec. 14, 2007 Br. at 3. In those orders, the Court, upon completing its in camera review, found that Dairyland had overcome the Government's assertion of deliberative process and ordered the Government to produce two of the disputed documents (E153 and E165) to plaintiff and to produce in redacted form portions of three other documents (E112, E156, E163). Dairyland's reliance upon the Court's findings, which were made in the context of Dairyland's deliberative process privilege challenge, are insufficient to meet its burden to overcome the White House's assertion of presidential communications privilege here.

As an initial matter, because the presidential communications privilege "affords greater protection against disclosure" and is "more difficult to surmount" than the deliberative process privilege, Sealed Case, 121 F.3d at 746, it is inappropriate for Dairyland to assert that the Court's determination that Dairyland had overcome the protections afforded by the deliberative

process privilege should automatically satisfy the first prong of the Sealed Case test. Given the heightened, more stringent standard of relevance that applies in the context of the presidential communications privilege, in no sense do the Court's November 19, December 10, and December 18, 2007 orders concerning deliberative process privilege establish that the first prong of the Sealed Case test has been satisfied. In addition, with respect to document numbers 112, 156, and 163 – in regard to which the Court found that Dairyland only partially overcame the Government's assertion of deliberative process privilege – it is disingenuous for Dairyland to rely upon the Court's "implicit" finding, as Dairyland phrases it (Pl. Dec. 14, 2007 Br. at 3), in the Court's prior orders following the Court's in camera review of the subject documents, that Dairyland somehow has met its initial burden with regard to the presidential communications privilege. Indeed, as the Court found in its November 19, 2007 order, the contents of at least one of the five documents at issue in Dairyland's December 14, 2007 motion, Document No. 156, "does not appear to be significantly relevant" to the issues before the Court in this case. Order, at 3 (Fed. Cl. Nov. 19, 2007).

Nor does the "statement of need" that Dairyland included in its December 14 motion fully explain why these five documents are "important" to Dairyland's case, as the first prong of the Sealed Case test requires. As it did in its September 18 motion, Dairyland baldly asserts that the five documents at issue in the December 14 motion are "highly relevant" to the "rate of acceptance," priority acceptance for shutdown reactors, and the Private Fuel Storage, LLP ("PFS") business venture. Pl. Dec. 14, 2007 Br. at 4. Yet, as set forth in the declaration of Ms. Smith, the documents at issue are unrelated to those issues:

1. E112 (CTR040568 – CTR040583) – A 16-page April 26, 1995 memorandum from T.J. Glauthier to Charles Curtis. The subject of the memorandum is "Review of Administration Policy For Interim Storage of Radioactive Waste." The document, which presented policy options for the President, was prepared, at the request of the White House, to assist the President in his decisionmaking with regard to whether the Government should support the development of a Federal interim storage facility, pending the opening of a permanent SNF repository.[7]

2. E153 (HQR0290044 – HQR0290051) – An eight-page January 31, 1997 memorandum from Charles Curtis, Acting Secretary of Energy, and Thomas P. Grumbly, Under Secretary of Energy, to T.J. Glauthier of OMB; Barbara Chow, then serving as a senior official within the White House Office of Legislative Affairs; Elgie Holstein, a senior official serving at the White House National Economic Council; and Linda Lance, a senior official serving on the White House Council on Environmental Quality. The document is another version of the draft identified as E178, which is discussed at paragraph 5 on page 28 of this brief. The document, which was prepared at the request of senior White House officials, offered a proposal for the President's consideration, to be presented to the Senate Energy Committee during a forthcoming hearing on Federal interim storage policy, in connection with the Government's response to litigation expected to be brought by certain nuclear utility Standard Contract holders. The document weighed the advantages and disadvantages associated with various settlement measures that the White House was considering at the time in response to the anticipated utility lawsuits.

3. E156 (HQR0290820 – HQR0290832) – A 13-page facsimile transmission from Susan Smith to Dan Dreyfus, Director of OCRWM, enclosing different drafts of a document entitled "Talking Points For OMB-White House - Release Of The Department of Energy Letter Stating The Anticipated Delay In 1998." The document, which was prepared by senior officials within DOE and the Executive Office of the President at the direction of the White House in or around 1997, proposed a statement of position for the President with regard to the

[7] The Court found that Dairyland had overcome the Government's assertion of deliberative process privilege only with regard to certain pages within Document No. E112. Specifically, the Court instructed the Government to redact the entirety of the pages Bates-stamped CTR0400573 – CTR0400583, as well as the second paragraph of page CTR0400568; the distribution list on page CTR0400569; and the middle paragraph and subtitle C on page CTR0400572. See Order, at 1-2 (Fed. Cl. Dec. 4, 2007).

Government's anticipated delay in SNF acceptance pursuant to the Standard Contract.[8]

4. E163 (HQR0320151 - HQR0320156) – A six-page November 7, 1996 draft document, entitled "Proposed Presidential Position Regarding Interim Storage of Spent Nuclear Fuel." The document was prepared by senior officials within DOE and OMB at the request of the White House to propose to the President a statement of position concerning then-pending congressional legislation and other proposals that were being presented by nuclear utilities concerning the implementation of a Federal interim storage facility for SNF. The document weighed the advantages and disadvantages associated with various policy options, and senior White House advisors discussed the document's findings.[9]

5. E165 (HQR032016 – HQR0320181) – A six-page May 18, 1995 memorandum from Charles Curtis to T.J. Glauthier presenting a possible policy position for the Administration concerning Federal interim storage and the Government's then-impending January 31, 1998 contractual deadline by which to begin SNF acceptance pursuant to the Standard Contract. The document is Bates-stamped HQR032016 – HQR0320181. The document presents a proposed approach that reflects the discussions of previous options and was part of the development of the Administration's position with regard to then-pending legislation concerning the issue of Federal interim storage. The document was provided to the White House upon request to assist the President in forming a Federal policy with regard to interim SNF storage.

As these documents reveal, the documents reflect precisely the types of policy discussions that the presidential communications privilege is intended to protect. They consist of draft or final recommendations by senior White House or senior DOE advisors on specific

[8] In its November 19, 2007 order, the Court found that Dairyland had failed to overcome the Government's assertion of deliberative process privilege with regard to the entirety of Document No. 156. Indeed, the Court specifically found that this document "does not appear to be significantly relevant" to this case. Order, at 3 (Fed. Cl. Nov. 19, 2007). The Court instructed the Government to redact the page Bates-stamped HQR0290826 prior to producing the document to Dairyland. See id.

[9] In the Court's November 19, 2007 order, the Court found that Dairyland had not overcome the Government's assertion of deliberative process with regard to the entirety of Document No. 163. Specifically, the Court instructed the Government to redact the last sentence of the first paragraph on the page Bates-stamped HQR0320151. See Order, at 3 (Fed. Cl. Nov. 19, 2007).

matters for decision or action by President Clinton. Although these documents are not, on their face, directed to the President, each of these documents concerns an area of presidential decisionmaking and reflect the deliberations of White House advisors in the process of developing advice for President Clinton. Moreover, as the declaration of Ms. Smith reveals, none of the documents relates specifically to "rate of acceptance" issues, SNF acceptance schedules for "shutdown reactors," or the PFS business venture. Even if these documents discussed "rate" issues, Dairyland's contention that these five documents could provide pertinent evidence concerning the appropriate contractual "rate of acceptance" under the Standard Contract is without merit. The determination of the proper "rate of acceptance" is a legal question of contract interpretation for the Court to decide as a matter of law. See PGL Const. Svs., Inc. v. United States, 47 Fed. Cl. 745, 784 (2000) ("Interpretation of a government contract is a matter of law."). The Standard Contract contains an integration clause that precludes reliance upon any representation, promise, or condition not expressly incorporated into the contract. See 10 C.F.R. § 961.11, Art. XXII. Dairyland has never taken the position that the Standard Contract lacks complete integration. Therefore, Dairyland's reference to documents outside the four corners of the contract – particularly documents, such as these, that were generated more than 10 years after the execution of the Standard Contract – runs afoul of the integration clause and should be disregarded by the Court. See Southern California Fed. Sav. & Loan Assoc. v. United States, 422 F.3d 1319, 1330 (Fed. Cir. 2005) (rejecting reliance upon material not included in an "entire agreement clause" of a contract); Barron Bankshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004) (recognizing the complete nature of an integration clause).

Further, even if the Court could consider these documents, Dairyland has failed to provide any explanation as to how, if at all, the White House's consideration of legislative proposals pending in 1995-1997 time frame could in any way inform the Court concerning the extent of DOE's contractual obligations under the Standard Contract – an agreement executed 12 years earlier in 1983 – to accept delivery of SNF at a particular "rate of acceptance." Accordingly, because these documents cannot, as a matter of law, shed light upon the Government's "rate of acceptance" under the terms of the Standard Contract, Dairyland cannot invoke the need for these documents as a rationale for overcoming the White House's assertion of presidential communications privilege.[10]

Similarly, whether Dairyland's PFS-related investments were in any sense attributable to DOE's partial breach of the Standard Contract or were otherwise "foreseeable" to the Government at the time of contract formation are distinct legal issues that do not depend upon the White House's deliberations in the 1995-1997 time frame about legislative proposals in Congress concerning the possibility of a Federal interim storage program. A private, for-profit PFS business venture is very different from Federal interim SNF storage, and Dairyland has

---

[10] Indeed, during the parties' January 11, 2008 status conference, counsel for Dairyland stated to the Court a somewhat inconsistent position that would appear to undermine the importance of these documents and the positions taken by their authors to Dairyland's case. At the hearing, plaintiff's counsel stated that Dairyland would be "willing to give up" deposing any of these same senior-level officials concerning the substance of these documents in order to expedite the trial date in this matter, given that it is "extremely unlikely" that these documents will "cause us to want to depose more individuals." A33, A47 (Jan. 11, 2008 Hearing Tr. 18:19-23; 32:5-8). Statements such as these suggest that Dairyland all along has intended by its September 18 and December 14, 2007 motions to compel to engage in a "fishing expedition, with the district court as [plaintiff's] unwitting (and perhaps unwilling) agents." United States v. Zolin, 491 U.S. 554, 571 (1989).

failed to articulate how the White House's consideration of Federal interim storage proposals following the Government's announcement that it expected to experience a delay in SNF acceptance could bear any relevance to the reasonableness of Dairyland's alleged damages in connection with Dairyland's decision to invest in its for-profit subsidiary, Genoa Fuel Tech, Inc. ("GFT"), which, in turn, invested in the PFS enterprise. Indeed, none of the documents at issue relates in any way to the issue of the "reasonableness" of a privately built, for-profit interim storage facility, which the PFS venture envisions.[11] Consistent with the Nuclear Waste Policy Act, 42 U.S.C. §§ 1010 - 10270, permanent SNF storage is a uniquely governmental function that implicates national security, the nation's energy policies, and other Federal interests. The risks associated with the private development of a private SNF storage facility are well known and include, among others, significant legal exposure associated with the possibility of environmental or toxic tort harms resulting from the mishandling of SNF, political risks such as state and local government opposition, and negative press and community opposition surrounding the enterprise. Indeed, as the United States Court of Appeals for the Federal Circuit has recognized, the PFS for-profit venture represents an overly speculative business investment that was not foreseeable to the Government at the time that the Standard Contract was executed, precluding recovery of PFS-related investments in this Court. See Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005).

---

[11] As the Court is aware, on August 3, 2007, the United States moved for partial summary judgment with regard to Dairyland's damages claim relating to the expenditures that its subsidiary company, GFT, incurred in connection with investing in the PFS business enterprise. Should the Court grant our motion for summary judgment in this regard, Dairyland's argument that documents at issue in its September 18, and December 14, 2007 motions to compel presidential communications documents are somehow relevant to its claim for PFS-related damages would be rendered moot.

Because Dairyland has failed to demonstrate how, if at all, the five subject documents are in any sense relevant, let alone "important" to its case, the Court should not override the White House's invocation of presidential communications privilege in this instance.[12]

B. Dairyland Cannot Establish That The Evidence That It Seeks Is Unavailable Elsewhere

Dairyland has also failed to show that the evidence it seeks is unavailable from other, non-privileged sources. Pursuant to Sealed Case, Dairyland must have engaged in "efforts . . . to determine whether sufficient evidence can be obtained elsewhere, and should be prepared to detail these efforts and explain why evidence covered by the presidential privilege is still needed." Sealed Case, 121 F.3d at 755 (emphasis added). Here, Dairyland has not shown that it undertook any efforts to determine whether the information could be obtained in a manner other than by interfering with the White House and the performance of its constitutional duties.

Indeed, contrary to Dairyland's suggestion that the position of the Government concerning the reasonableness of private interim storage options, such as PFS, is well understood and is reflected in the Federal Circuit's opinion denying recovery of PFS-related damages in Indiana Michigan, as well this Court's decisions in Southern Nuclear Operating Co., v. United States, 77 Fed. Cl. 396 (2007), and Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006). Moreover, the Government's positions concerning "rate of acceptance" issues involving shutdown

[12] Additionally, because Dairyland has made no showing with regard to the requirements of "admissibility" and "specificity" set forth in Cheney, Dairyland has not met its initial burden, and the Government's assertion of the presidential communications privilege should stand.

rectors, such as Dairyland, is also well documented. See Pacific Gas & Electric Co., 73 Fed. Cl. at 333; Yankee Atomic Electric Co. v. United States, 73 Fed. Cl. 249 (2006).[13]

In support of its assertion that it has met the second prong of the Sealed Test case, Dairyland argues that the five documents are important to its case because they "may contain potential admissions" by senior Government officials regarding "a host of highly relevant issues." Pl. Oct. 18, 2007 Statement of Need, at 3. Without identifying these "highly relevant issues" with any particularity, Dairyland argues that "it is the documents themselves, authored by government officials," rather than the "factual information in the documents," that necessitates their production. Pl. Dec. 14, 2007 Mot. at 5.

The only support that Dairyland provides for its proposition is the Sealed Case court's order compelling the Government to produce documents to the grand jury investigating the alleged criminal behavior of the former Secretary of the Agriculture, Mike Espy. That situation is readily distinguishable from this case. As an initial matter, that case involved a criminal investigation by a grand jury, and the Supreme Court has made clear that the threshold for establishing "need" in a civil case is much higher than in a criminal case. See Cheney, 542 U.S. at 384. Moreover, in Sealed Case, the grand jury sought documents reflecting conversations between Mr. Espy and certain officials to determine whether Mr. Espy had made false material

[13] Further, given the presence of the integration clause in the Standard Contract, and in light of the fact that the Standard Contract was promulgated through notice-and-comment rulemaking, to the extent that any parol evidence is permissible in this case for use at trial, such parol evidence should consist solely of the record of administrative rulemaking, in accordance with the proper means of interpreting regulations. See, e.g., LTV Aerospace Corp., ASBCA No. 17,131, 76-1 BCA ¶ 11,840 (1976) (analyzing regulatory administrative history in interpreting contract clause developed through notice-and-comment rulemaking).

statements to the White House in connection with the grand jury's investigation into Mr. Espy's conduct. The court ordered the documents to be produced for in camera review to determine whether privilege precluded any portions of the subject documents from disclosure, based upon the fact that one of the crimes that the grand jury was investigating related to the content of the conversations reflected in the documents. See Sealed Case, 121 F.3d at 761. Because of such "precise evidence" concerning Mr. Espy, the subject of the investigation, the court noted that the grand jury's need for the subject documents was readily apparent. Id. (citation omitted). Here, by contrast, Dairyland has not demonstrated that the subject documents constitute such "precise evidence" to demonstrate sufficient need for these documents. Unlike Sealed Case, Dairyland's case does not center upon the particular acts of the senior Government officials who had involvement with the subject documents. Rather, Dairyland's case is a contract case for recovery of the damages that it allegedly incurred in connection with storing SNF on-site.

Finally, Dairyland's own actions undermine its argument. During the parties' January 11, 2008 status conference, counsel for Dairyland stated that Dairyland would be "willing to give up" deposing any of these same senior-level officials concerning the substance of these documents in order to expedite the trial date in this matter, given that it is "extremely unlikely" that these documents will "cause us to want to depose more individuals." Jan. 11, 2008 Hearing Tr. 18-19-23; 32:5-8. Statements such as these suggest that Dairyland all along has intended by its September 18 and December 14, 2007 motions to compel to engage in a "fishing expedition, with the district court as [plaintiff's] unwitting (and perhaps unwilling) agents." United States v. Zolin, 491 U.S. 554, 571 (1989).

C. Even If The Court Were To Find That Dairyland Has Met Its Initial Burden Pursuant to *Cheney* and *Sealed Case* With Regard To The Five Documents At Issue In Dairyland's December 14, 2007 Motion To Compel, Dairyland Has Not Established Sufficient Need To Override The Formal Assertion Of Presidential Communications Privilege

Even if the Court finds that Dairyland has established a heightened need for the documents at issue, it still, in light of the White House's formal invocation of the privilege, must balance the parties' competing interests, "assess[ing] the 'public interests at stake in determining whether the privilege should yield in a particular case'" against the "need of the party seeking privileged evidence." Lardner v. United States Dep't of Justice, No. 03-180, 2005 WL 759267, at *13 (D.D.C. March 31, 2005) (quoting Sealed Case, 121 F.3d at 745 & 753). Dairyland may not overcome the privilege simply by demonstrating some theoretical need for the documents. In the criminal investigate context, the D.C. Circuit has held that a court may override the presidential communications privilege only where the information is "important" to the case, Sealed Case, 121 F.3d at 754-55; mere relevancy is insufficient, id. at 755. The Supreme Court recently stressed that the standard for overriding the privilege is even more stringent in the civil discovery setting. See Cheney, 542 U.S. at 384 ("The need for information for use in civil cases, while far from negligible, does not share the urgency or significance of the criminal subpoena.").

Thus, Dairyland must make a greater showing than that the privileged information is "important." Although no court has precisely defined the showing of need required in the civil discovery context, the D.C. Circuit's decision in Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.3d 725 (D.C. Cir. 1974), provides some guidance. In that case, the D.C. Circuit held that a congressional committee – a representative of a coequal branch of the Government – could overcome the presidential communications privilege only if it

demonstrated that the privileged information was "demonstrably critical to the responsible fulfillment of [its] functions." Id. at 731. It is difficult to see why the courts would apply a less exacting standard to a private litigant engaged in civil discovery than they apply to a congressional committee conducting oversight of the Executive Branch. See Cheney, 542 U.S. at 384-85. Dairyland's showing of need falls well short of this standard.

As explained above, the documents consist of draft or final recommendations and advice by senior White House or senior DOE advisors on specific matters requiring a decision by President Clinton. Although these documents are not, on their face, directed to the President, each of these documents concern an area of presidential decision-making – the analysis of pending legislation concerning Federal interim storage policy as well as the preparation of policy positions to present before the Senate Energy Committee with regard to the Government's response to impending lawsuits against the United States arising from DOE's delay in SNF acceptance – and reflect the deliberations of White House advisors in the process of developing advice for President Clinton. Such activities represent unique areas of presidential decision-making. See, e.g., INS v. Chadha, 462 U.S. 919, 947, 948 (1983) (President's active role in the lawmaking process is a central duty of the Chief Executive and "reflects the Framers' careful efforts to check whatever propensity a particular Congress might have to enact oppressive, improvident or ill-considered measures").

For the reasons discussed earlier in this brief, Dairyland cannot articulate how, if at all, the White House's consideration of legislative proposals in the 1995-1997 time frame – which occurred after DOE's announcement in the Federal Register that it did not expect to perform timely under the Standard Contract on January 31, 1998, see Indiana Michigan Power Co. v.

United States, 422 F.3d 1369, 1372 (Fed. Cir. 2005) – could in any way inform the Court concerning the extent of DOE's contractual obligations under the Standard Contract (which was executed 12 years earlier in 1983) to accept delivery of SNF at a particular "rate of acceptance." Likewise, because Dairyland has failed to demonstrate how, if at all, the Government's consideration of Federal interim storage bills – none of which became law – touches upon the validity of Dairyland's PFS-related damages claim, Dairyland cannot show that the five subject documents are in any sense "important" to its case, must less "demonstrably critical." The Court should conclude that Dairyland's showing of need does not override the White House's assertion of presidential communications privilege in this instance. Indeed, as Dairyland's counsel recently admitted during the parties' January 11, 2008 status conference, Dairyland indicated that it would "sacrifice some modest amount of additional discovery" concerning the documents in order to proceed to trial by March 2008. A33, A47 (Jan. 11, 2008 Hearing Tr. 18:19-23; 32:5-8). Further, because Dairyland stated at the same hearing that it is perfectly "willing to give up" deposing any of the senior-level Executive Branch officials identified in the documents in order to expedite the trial date in this case, it hardly appears that the documents at issue in Dairyland's December 14, 2007 motion are the types of evidence that justify overcoming an assertion of the presidential communications privilege.

Indeed, it is not surprising that Dairyland's counsel made such statements to the Court during the January 11, 2008 status conference. In contrast to Nixon, Cheney, Sealed Case and the other more typical examples from case analyzing the presidential communications privilege that the Court discussed in its December 19, 2007 order, this is not a lawsuit directed toward or otherwise centered upon actions that the President, Vice President, or other high-ranking White

House or senior-level Executive Branch officials. Rather, this is a contract dispute in which the majority of the damages for which Dairyland seeks recovery relate to the operations and maintenance costs that Dairyland allegedly incurred in connection with the maintenance of SNF for its own on-site storage. As discussed in our August 3, 2007 motion for partial summary judgment, the remaining portion of Dairyland's damages claim consists principally of Dairyland's demand for reimbursement from the Government for approximately $11 million in costs that Dairyland's subsidiary, GFT, has contributed to date in connection with the development of Private Fuel Storage, LLC ("PFS") – a for-profit business enterprise that certain members of the energy industry formed in the mid-1990s in an effort to develop a private (that is, non-governmental) storage facility for the permanent storage of SNF.

The extent to which the President and his closest advisors may have deliberated the advantages and disadvantages of certain pending legislation or governmental policy initiatives during the 1995-1997 time frame is, at best, only tangentially related to the commercial contract case that is now before the Court and more specifically the efforts establish a privilege entity to handle interim SNF storage. In contrast to Dairyland's unspecified and at best marginal interest in this information, the harm from its disclosure would threaten the interests protected by the presidential communications privilege, as Mr. Fielding articulates in his affidavit. Therefore, under a balancing of interests, the White House's invocation of the presidential communications privilege over the five documents subject to Dairyland's December 14, 2007 motion to compel should prevail.

II. *DEFENDANT'S NOTICE OF FILING OF THE WHITE HOUSE'S FORMAL INVOCATION OF THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE PURSUANT TO THE COURT'S DECEMBER 19, 2007 ORDER:* AS EVIDENCED BY THE FORMAL INVOCATION OF PRESIDENTIAL COMMUNICATIONS PRIVILEGE, THE WHITE HOUSE'S INTEREST IN PRESERVING THE CONFIDENTIALITY OF PRESIDENTIAL COMMUNICATIONS CONCERNING THE NATION'S SPENT NUCLEAR FUEL POLICY OUTWEIGHS DAIRYLAND'S NEED FOR THESE DOCUMENTS IN THIS CIVIL CASE

A. The White House Properly Invoked Presidential Communications Privilege With Regard To The Five Documents At Issue In Dairyland's September 18, 2007 Motion To Compel

As set forth in the declaration of Ms. Smith, the five separate documents at issue in Dairyland's September 18, 2007 motion to compel, which the Court instructed us to produce in camera in its December 19, 2007 order, consist of the following:

1. E154 (HQR0290177 – HQR0290190) –A 14-page draft, dated November 7, 1996, entitled "Policy Options For Interim Storage Of Radioactive Waste." This document was prepared at the request of the White House by senior officials within DOE, including Charles Curtis, Under Secretary of Energy; OMB, including T.J. Glauthier, Associate Director for Natural Resources, Energy and Science; and other senior-level officials from the Executive Office Of the President, including Elgie Holstein of the National Economic Council and John Angell, senior advisor to the White House Chief of Staff. The document presented policy options for President Clinton's consideration concerning the extent to which the Administration should support or endorse the development of an interim storage facility for SNF pending the construction and operation of a permanent SNF repository. The White House requested this analysis following the introduction of various bills in Congress that would require the Government to develop an interim storage facility prior to January 31, 1998. The document provided the White House with a discussion of the advantages and disadvantages associated with various policy positions related to the concept of interim SNF storage. The findings of this analysis were discussed by senior White House officials and its contents were ultimately conveyed to the President to assist in his decisionmaking concerning the appropriate Federal policy to implement regarding this issue.

2. E167 (HQR0320199 – HQR0320206) – An eight-page May 13, 1995 draft memorandum, from T. J. Glauthier, OMB's Associate Director for Natural Resources, Energy and Sciences, to Kathleen Peroff, Deputy Associate Director, Energy and Science Division, OMB; Gary L. Bennethum, Chief, Energy Branch,

Energy and Science Division, OMB; and Robert L. Civiak, a senior official within OMB. The subject of the memorandum is "Yucca - Interim Storage Policy Group." The document was prepared at the request of senior officials within the White House, including the Chief of Staff's office, to assist the President in formulating the Administration's position with regard to interim storage in light of pending legislative proposals in Congress as well as an impending January 31, 1998 deadline for commencing performance under the Standard Contract.

3. E170 (HQR0320221 – HQR0320227) – A seven-page draft, dated June 13, 1995, entitled "Option For Expedited Acceptance Of Spent Fuel At A Yucca Mountain Repository." This document was prepared for senior officials within DOE (including Charles Curtis), OMB (including T.J. Glauthier), and other senior level officials from the Executive Office of the President, including Elgie Holstein of the National Economic Council, at the request of John Angell, senior advisor to the White House Chief of Staff. The document presented policy options for President Clinton concerning the extent to which the Administration should seek to develop an interim storage facility for SNF pending the construction and operation of a permanent SNF repository. The White House requested this analysis following requests from nuclear utilities for the construction of a Federal interim SNF storage facility, as well as the introduction of various bills in Congress to require the Government to develop an interim storage facility prior to January 31, 1998. The memorandum provided the White House with a discussion of the advantages and disadvantages associated with various policy positions with regard to the concept of interim SNF storage. The findings of this analysis were discussed by senior White House advisors at the time and its contents were ultimately conveyed to the President to assist in his decisionmaking concerning the appropriate Federal policy to implement.

4. E171 (HQR0320231 – HQR0320245) – A 15-page document, entitled "Policy Options For Interim Storage Of Radioactive Waste," dated June 13, 1995.[14] This document was prepared for and provided to senior officials within DOE and OMB and other senior level officials from the Executive Office of the President, including advisors within the National Economic Council and the White House Chief of Staff. The document presented policy options for President Clinton concerning the extent to which the Administration should seek to develop an interim storage facility for SNF pending the construction and operation of a permanent SNF repository. The White House requested this analysis following the introduction of various bills in Congress to require the Government to develop an interim storage facility prior to January 31, 1998. The draft statement of policy provided the White House with a discussion of the advantages and disadvantages associated with various policy positions with regard to the concept

---

[14] This document is an earlier draft of the document identified as E154 in paragraph 1, above.

of interim SNF storage. I understand that the findings of this analysis were discussed by senior White House officials and were ultimately conveyed to the President to assist in his decionmaking concerning the appropriate Federal policy with respect to interim storage.

5. E178 (HQR0421452 – HQR0421464) – A 13-page January 31, 1997 memorandum from Charles Curtis, Acting Secretary of Energy, and Thomas P. Grumbly, Under Secretary of Energy, to T.J. Glauthier of OMB; Barbara Chow, a senior official within the White House Office of Legislative Affairs; Elgie Holstein, a senior official on the White House National Economic Council; and Linda Lance, a senior official serving on the White House Council on Environmental Quality. The document, which was prepared at the request of senior White House officials, offered a proposal for the President's consideration, to be presented to the Senate Energy Committee during a forthcoming hearing on Federal interim storage policy, in connection with the Government's response to litigation expected to be brought by certain nuclear utility Standard Contract holders. The document weighed the advantages and disadvantages associated with various settlement measures that the White House was considering at the time in response to the anticipated utility lawsuits.

As these descriptions reveal, the documents reflect precisely the types of policy discussions that the presidential communications privilege is intended to protect. They consist of draft or final recommendations and advice by senior White House or senior DOE advisors on specific matters for decision or action by President Clinton. Although these documents are not, on their face, directed to the President, each of these documents concerns an area of presidential decisionmaking – the analysis of pending legislation concerning interim storage Federal policy, as well as the preparation of policy positions to present before the Senate Energy Committee with regard to the Government's response to impending lawsuits against the United States arising from DOE's delay in SNF acceptance – and reflects the deliberations of White House advisors in the process of developing advice for President Clinton. Such activities represent unique areas of presidential decision-making, as the President's active role in the lawmaking process is a central duty of the Chief Executive and "reflects the Framers' careful efforts to

check whatever propensity a particular Congress might have to enact oppressive, improvident or ill-considered measures." Chadha, 462 U.S. at 947-48. Hence, the heightened protections afforded by the presidential communications privilege properly apply to these documents.

B. Dairyland's Need For The Five Documents At Issue In Its September 18, 2007 Motion To Compel Does Not Override The Presidential Communications Privilege Assertion

This Court, in a prior order, found that Dairyland had established a need for the documents at issue in Dairyland's September 18, 2007 motion to compel. However, in light of the White House's formal invocation of the presidential communications privilege, the Court must now balance the parties' competing interests, "assess[ing] the 'public interests at stake'" against the party's need "in determining whether the privilege should yield in a particular case." Lardner, 2005 WL 759267, at *13 (quoting Sealed Case, 121 F.3d at 745, 753). Here, the White House's interests outweigh any need by Dairyland in this civil case.

As previously discussed, the standard of need that Dairyland must satisfy in a civil case is particularly stringent. See Cheney, 542 U.S. at 382. Dairyland has asserted that its need for the subject documents should outweigh the critical White House interest of preserving the confidentiality of presidential communications because, as Dairyland would have it, these documents "may reveal the government's views regarding a reasonable rate of acceptance" and the reasonableness of the PFS business venture in which Dairyland's subsidiary corporation, GFT, invested. Pl. Oct. 18, 2007 Statement of Need, at 2; see Order, at 12-13 (Fed. Cl. Dec. 19, 2007) (finding that Dairyland's need for the five subject documents may shed light on the "reasonableness" of PFS-related investments, as well as the "appropriate rate" for SNF

acceptance under the Standard Contract).[15] Because none of the five subject documents relates to either of the issues that Dairyland has identified as justifying its request to override the White House's assertion of presidential communications in this instance, the Court should not compel their disclosure here.

For the reasons discussed earlier in this brief, Dairyland cannot articulate how, if at all, the White House's consideration of legislative proposals that were pending in 1995-1997 time frame – which occurred after DOE's announcement in the Federal Register that it did not expect to perform timely under the Standard Contract on January 31, 1998, see Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1372 (Fed. Cir. 2005) – could in any way inform the Court concerning the extent of DOE's contractual obligations under the Standard Contract (which was executed 12 years earlier in 1983) to accept delivery of SNF at a particular "rate of acceptance." Likewise, Dairyland has failed to demonstrate how, if at all, the Government's consideration of Federal interim storage bills – none of which was ultimately enacted – touches upon the validity of Dairyland's PFS-related damages claim, Dairyland cannot show that the five subject documents are in any sense "important" to its case, much less "demonstrably critical," and the Court should not override the White House's assertion of presidential communications privilege in this instance. Indeed, as Dairyland's counsel recently admitted during the parties' January 11, 2008 status conference, Dairyland indicated that it would be willing to "sacrifice some modest

---

[15] As the Court is aware, on August 3, 2007, the United States moved for partial summary judgment with regard to Dairyland's damages claim relating to the expenditures that its subsidiary company, GFT, incurred in connection with investing in the PFS business enterprise. Should the Court grant our motion for summary judgment in this regard, Dairyland's argument that the five subject documents at issue in its September 18, 2007 motion to compel presidential communications documents are somehow relevant to its claim for PFS-related damages would be rendered moot.

amount of additional discovery" concerning the documents now in dispute in order to proceed to trial by March 2008. A24 (Jan. 11, 2008 Hearing Tr. 9:13-17). Further, because Dairyland stated at the same hearing that it is perfectly "willing to give up" deposing any of the senior-level Executive Branch officials identified in the documents in order to expedite the trial date in this case, it hardly appears that the documents at issue in Dairyland's December 14, 2007 motion are the types of evidence that justify intrusion upon the White House's presidential communications privilege. A33, A47 (Jan. 11, 2008 Hearing Tr. 18:19-23; 32:5-8).

Conversely, the harm from disclosure, as Mr. Fielding articulates in his affidavit, would be damaging to the purposes that the presidential communications privilege seeks to protect. As the Supreme Court has recognized, the need for the President to have confidentiality in the course of his decision-making and deliberations is essential. See Nixon I, 418 U.S. at 708. The President and those who assist him must be encouraged to explore alternatives in the process of shaping policies and making decisions. See id.; Sealed Case, 121 F.3d. at 750. If the substance of the communications received and considered by the President or his senior advisers concerning his decisions, actions, and policy positions did not remain confidential but instead were routinely publicly disclosed and reviewed in civil litigation or otherwise, the President or his senior advisors would be less likely to receive or offer candid communications of information and honest opinions forcefully and plainly expressed, thereby hindering the President in the exercise of his constitutional responsibilities. Given the White House's obvious national security, energy, and other policy-related interests in preserving the content of presidential communications concerning the Yucca Mountain program and the Government's attendant obligations pursuant to the Nuclear Waste Policy Act and the Standard Contract, the Court

should not allow a civil plaintiff such as Dairyland with minimal need for the subject documents to override the White House's formal invocation of the presidential communications privilege.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny Dairyland's September 18 and December 14, 2007 motions to compel the production of documents subject to the presidential communications privilege.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Russell A. Shultis by s/ Patrick B. Bryan
RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel. (202) 305-7571
Fax: (202) 305-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Trial Attorneys
U.S. Department of Justice

January 22, 2008

CERTIFICATE OF FILING

I hereby certify that on this 22nd day of January 2008, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S DECEMBER 14, 2007 MOTION TO COMPEL AND NOTICE OF FILING OF FORMAL INVOCATION OF PRESIDENTIAL COMMUNICATIONS PRIVILEGE PURSUANT TO THE COURT'S DECEMBER 19, 2007 ORDER," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Patrick B. Bryan