# APPENDIX

# INDEX TO APPENDIX


| Document | Page |
|---|---|
| Declaration of Fred F. Fielding, Counsel to the President | 1 |
| Declaration of Susan A. Smith | 5 |
| January 11, 2008 Hearing Transcript | 15 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-106C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DECLARATION OF FRED F. FIELDING

I, Fred F. Fielding, hereby declare and state as follows:

1. I am Counsel to the President of the United States. I have held this position since February 1, 2007. As Counsel to the President, my responsibilities include advising and assisting the President on a wide variety of matters, including privilege issues. I base this declaration on my personal knowledge, information available to me in the performance of my official duties, and my knowledge of the issues being litigated in the above-captioned case.

2. In connection with my responsibilities as Counsel to the President, I am aware of the spent nuclear fuel (SNF) litigation brought by various plaintiffs in the United States Court of Federal Claims against the United States Government arising from the delay by the Department of Energy (DOE) in accepting SNF pursuant to the terms of DOE's Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste (Standard Contract), the terms of which are published at 10 C.F.R. § 961.11.

3. I am aware that the defendant in the above-captioned case, the United States, has determined to withhold from the plaintiff in the above-referenced case 10 documents on the basis of the presidential communications privilege. That decision is reflected in the privilege logs prepared by the United States and given to the plaintiff.

4. I have reviewed the declaration of Susan Smith, who currently serves as Senior Policy Analyst in the Office of Civilian Radioactive Waste Management (OCRWM) at DOE. In her declaration, Ms. Smith describes the 10 documents that the United States has withheld from the plaintiff in this case pursuant to the presidential communications privilege, all of which she declares that she has personally reviewed. In her declaration, Ms. Smith also attests that she personally assisted Daniel A. Dreyfus, then serving as the Director of OCRWM, with regard to the development, drafting, or review of these documents during their creation in the 1995-1997 time period. Ms. Smith further declares that she, along with Mr. Dreyfus and a committee of senior-level Executive Branch officials from DOE, the Office of Management of Budget, and the Executive Office of the President, assisted in developing these documents at the request of the White House.

5. A member of my staff has personally reviewed the 10 documents that are described in Ms. Smith's declaration and which the United States has withheld on the basis of the presidential communications privilege. Based upon the declaration of Ms. Smith and consultation with the member of my staff who personally reviewed the documents, I understand that they consist of draft or final proposals, recommendations and advice by senior White House or senior DOE advisors on specific matters for decision or action by President Clinton. Although

these documents are not, on their face, directed to the President, each of these documents concern an area of presidential decision-making (interim storage Federal policy, as well as the Government's policy in responding to lawsuits against the United States arising from DOE's delay in SNF acceptance) and reflect the deliberations of White House advisors in the process of developing advice for President Clinton. Therefore, I assert, on behalf of the Office of the President, the presidential communications privilege with respect to these 10 documents.

6. As the Supreme Court has recognized, the need for the President to have confidentiality in the course of his decision-making and deliberations is essential. The President and those who assist him must be encouraged to explore alternatives in the process of shaping policies and making decisions. In order to ensure candid and honest discussion, both the President and his advisors must operate with the assurance that their communications of opinions, information, and analysis, such as those represented in the 10 documents at issue here, are and will remain confidential. I believe that, if the substance of the communications received and considered by the President or his senior advisors concerning his decisions, actions, and policy positions did not remain confidential but instead were publicly disclosed and reviewed in civil litigation or otherwise, the President or his senior advisors would be less likely to receive or

offer candid communications of information and honest opinions forcefully and plainly expressed, thereby hindering the President in the exercise of his constitutional responsibilities.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, District of Columbia, this 17th day of January 2008.

Fred F. Fielding

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-106C<br>(Chief Judge Damich) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DECLARATION OF SUSAN A. SMITH

I, Susan A. Smith, hereby declare and state as follows:

1. I currently serve as Senior Policy Analyst in the Office of Civilian Radioactive Waste Management (OCRWM) at the United States Department of Energy (DOE). OCRWM is the DOE program office assigned to develop and manage a Federal system for disposing of spent nuclear fuel (SNF) from the nation's commercial nuclear reactors, pursuant to the Nuclear Waste Policy Act, codified at 42 U.S.C. § 10101 - 10226. I have held this position since 2000. Prior to my current position, from 1994 through 2000, I served as Special Assistant to the Director of OCRWM. From 1994 through the present, my responsibilities as both Senior Policy Analyst and Special Assistant to the Director have included, among other duties, providing assistance to the OCRWM Director in connection with the preparation of policy option papers related to OCRWM's responsibilities for the consideration of senior officials within DOE as well as from other Executive Branch agencies, including the Executive Office of

the President. I base this declaration on my personal knowledge, information available to me in the performance of my official duties, and my knowledge of the issues being litigated in the above-captioned case.

2. In connection with my responsibilities at DOE, I am aware of the SNF litigation brought by various plaintiffs in the United States Court of Federal Claims against the United States government arising from the delay by DOE in accepting SNF pursuant to the terms of DOE's Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste (Standard Contract), the terms of which are published at 10 C.F.R. § 961.11. I understand that, in response to discovery requests from the plaintiffs in the coordinated discovery phase of SNF litigation during 2001 and 2002, the United States produced approximately one million pages of documents concerning the Government's actions toward establishing a national repository for SNF and in otherwise performing under the terms of the Nuclear Waste Policy Act and the Standard Contract. I further understand that this document production was made available to the plaintiff, Dairyland Power Cooperative (Dairyland), since the commencement of its lawsuit against the Government in 2004. In addition, I understand that, in response to Dairyland's specific discovery requests in this litigation and a Court order compelling production, the United States produced more than one million additional pages of documents from March through September 2007.

3. I am aware that Dairyland challenges the assertion of the presidential communications privilege with respect to 10 documents that the United States has withheld from its production of approximately two million pages of documents to Dairyland during discovery. These documents were initially withheld from production in all SNF cases on the basis of the

deliberative process privilege and the presidential communications privilege in 2002. I understand that Dairyland filed motions challenging the applicability of the presidential communications privilege to these 10 documents on September 18 and December 14, 2007. On December 19, 2007, following the Court's determination that Dairyland had satisfied its initial showing of particularized need with regard to those documents identified in its September 18, 2007 motion, as required by Cheney v. United States District Court for the District of Columbia, 542 U.S. 367 (2004), and United States v. Nixon, 418 U.S. 683 (1974), the Court issued an order advising the Government to provide a "suitable affidavit reflecting a formal invocation of the presidential communications privilege over the document by appropriate White House officials." Order, at 14 (Fed. Cl. Dec. 19, 2007).

4. I personally have reviewed the 10 documents at issue in Dairyland's September 18 and December 14, 2007 motions to compel. In or around 2001, I initially provided these 10 documents, in conjunction with other files in my possession, to DOE's Office of General Counsel while searching my office files in response to document requests that were served upon the Government in the coordinated discovery phase of the SNF litigation. Each of these documents were generated during the years 1995 through 1997. During that time period, I personally assisted Daniel A. Dreyfus, then serving as the Director of OCRWM, with regard to the development, drafting, or review of these documents. I supported Mr. Dreyfus, who prepared the option papers as a member of a committee of senior-level Executive Branch officials from DOE, the Office of Management and Budget (OMB), and the Executive Office of the President, and provided input in preparing these documents. The documents consist generally of draft or final recommendations and advice concerning specific matters for decision

or action by President Clinton relating to interim SNF storage Federal policy as well as the Government's policy in responding to lawsuits against the United States arising from DOE's delay in SNF acceptance. These documents can be described in more detail as follows:

a. A 14-page draft, dated November 7, 1996, entitled "Policy Options For Interim Storage Of Radioactive Waste," Bates-stamped for purposes of litigation as pages HQR0290177 – HQR0290190.[1] This document was prepared at the request of the White House by senior officials within DOE, including Charles Curtis, Under Secretary of Energy; OMB, including T.J. Glauthier, then serving as the Associate Director for Natural Resources, Energy and Science; and other senior-level officials from the Executive Office Of the President, including Elgie Holstein of the National Economic Council and John Angell, senior advisor to the White House Chief of Staff. The document presented policy options for President Clinton's consideration concerning the extent to which the Administration should support or endorse the development of an interim storage facility for SNF pending the construction and operation of a permanent SNF repository. The White House requested this analysis following the introduction of various bills in Congress that would require the Government to develop an interim storage facility prior to January 31, 1998. The document provided the White House with a discussion of the advantages and disadvantages associated with various policy positions related to the concept of interim SNF storage. Based upon my personal knowledge in assisting with the development of this document, I understand that the findings of this analysis were discussed by senior White

---

[1] The Court identified this document in its December 19, 2007 order with the reference number E154.

House officials and its contents were ultimately conveyed to the President to assist in his decisionmaking concerning the appropriate Federal policy to implement regarding this issue.

b. An eight-page May 13, 1995 draft memorandum, from T. J. Glauthier, then serving as OMB's Associate Director for Natural Resources, Energy and Sciences, to Kathleen Peroff, Deputy Associate Director, Energy and Science Division, OMB; Gary L. Bennethum, Chief, Energy Branch, Energy and Science Division, OMB; and Robert L. Civiak, who also served at the time as a senior official within OMB. The document is Bates-stamped HQR0320199 – HQR0320206.[2] The subject of the memorandum is "Yucca - Interim Storage Policy Group." The document was prepared at the request of senior officials within the White House, including the Chief of Staff's office, to assist the President in formulating the Administration's position with regard to interim storage in light of pending legislative proposals in Congress as well as the Government's then-impending January 31, 1998 deadline for commencing performance under the Standard Contract. The contents of the paper were extracted from option papers generated by Mr. Dreyfus and represented a summary of what the Administration's recommended position concerning these issues should be at that time.

c. A seven-page draft, dated June 13, 1995, entitled "Option For Expedited Acceptance Of Spent Fuel At A Yucca Mountain Repository," Bates-stamped HQR0320221 – HQR0320227.[3] This document was prepared for senior officials within DOE (including Charles Curtis), OMB (including T.J. Glauthier), and other senior level officials from the Executive Office of the President, including Elgie Holstein of the National Economic Council, at the

---

[2] The Court identified this document in its December 19, 2007 order as E167.

[3] The Court identified this document in its December 19, 2007 order as E170.

request of John Angell, senior advisor to the White House Chief of Staff. The document presented policy options for President Clinton concerning the extent to which the Administration should seek to develop an interim storage facility for SNF pending the construction and operation of a permanent SNF repository. The White House requested this analysis following requests from nuclear utilities for the construction of a Federal interim SNF storage facility, as well as the introduction of various bills in Congress to require the Government to develop an interim storage facility prior to January 31, 1998. The memorandum provided the White House with a discussion of the advantages and disadvantages associated with various policy positions with regard to the concept of interim SNF storage. Based upon my personal knowledge in assisting with the development of this document, I understand that the findings of this analysis were discussed by senior White House advisors at the time and its contents were ultimately conveyed to the President to assist in his decisionmaking concerning the appropriate Federal policy to implement.

d. A 15-page document, entitled "Policy Options For Interim Storage Of Radioactive Waste," dated June 13, 1995, Bates-stamped HQR0320231 – HQR0320245.[4] The document is an earlier draft of the document identified in paragraph 4.a, above. This document was prepared for and provided to senior officials within DOE, OMB, and other senior level officials from the Executive Office of the President, including advisors within the National Economic Council and the White House Chief of Staff. The document presented policy options for President Clinton concerning the extent to which the Administration should seek to develop an interim storage facility for SNF pending the construction and operation of a permanent SNF

[4] The Court identified this document in its December 19, 2007 order as E171.

repository. The White House requested this analysis following the introduction of various bills in Congress to require the Government to develop an interim storage facility prior to January 31, 1998. The draft statement of policy provided the White House with a discussion of the advantages and disadvantages associated with various policy positions with regard to the concept of interim SNF storage. Based upon my personal knowledge in assisting with the development of this document, I understand that the findings of this analysis were discussed by senior White House officials and were ultimately conveyed to the President to assist in his decionmaking concerning the appropriate Federal policy with respect to interim storage.

e. A 13-page January 31, 1997 memorandum from Charles Curtis, then serving as Acting Secretary of Energy, and Thomas P. Grumbly, then serving as Under Secretary of Energy, to T.J. Glauthier of OMB; Barbara Chow, then serving as a senior official within the White House Office of Legislative Affairs; Elgie Holstein, a senior official serving at the White House National Economic Council; and Linda Lance, a senior official serving on the White House Council on Environmental Quality. The document is Bates-stamped HQR0421452 – HQR0421464.[5] The document, which was prepared at the request of senior White House officials, offered a proposal for the President's consideration, to be presented to the Senate Energy Committee during a forthcoming hearing on Federal interim storage policy, in connection with the Government's response to litigation expected to be brought by certain nuclear utility Standard Contract holders. The document weighed the advantages and disadvantages associated with various settlement measures that the White House was considering at the time in response to the anticipated utility lawsuits.

---

[5] The Court identified this document in its December 19, 2007 order as E178.

f. A 16-page April 26, 1995 memorandum from T.J. Glauthier to Charles Curtis, Bates-stamped CTR040568 – CTR040583.[6] The subject of the memorandum is "Review of Administration Policy For Interim Storage of Radioactive Waste." The document, which presented policy options for the President, was prepared, at the request of the White House, to assist the President in his decisionmaking with regard to whether the Government should support the development of a Federal interim storage facility, pending the opening of a permanent SNF repository.

g. An eight-page January 31, 1997 memorandum from Charles Curtis, then serving as Acting Secretary of Energy, and Thomas P. Grumbly, then serving as Under Secretary of Energy, to T.J. Glauthier of OMB; Barbara Chow, then serving as a senior official within the White House Office of Legislative Affairs; Elgie Holstein, a senior official serving at the White House National Economic Council; and Linda Lance, a senior official serving on the White House Council on Environmental Quality. The document is Bates-stamped HQR0290044 – HQR0290051, and is another version of the draft identified in paragraph 4.e.[7] The document, which was prepared at the request of senior White House officials, offered a proposal for the President's consideration, to be presented to the Senate Energy Committee during a forthcoming hearing on Federal interim storage policy, in connection with the Government's response to litigation expected to be brought by certain nuclear utility Standard Contract holders. The document weighed the advantages and disadvantages associated with various settlement

---

[6] The Court identified this document in its December 19, 2007 order as E112.

[7] Dairyland identified this document in its December 14, 2007 motion to compel as E153.

measures that the White House was considering at the time in response to the anticipated utility lawsuits.

h. A 13-page facsimile transmission from me to Dan Dreyfus, then serving as the Director of OCRWM, enclosing different drafts of a document entitled "Talking Points For OMB-White House - Release Of The Department of Energy Letter Stating The Anticipated Delay In 1998," which is Bates-stamped HQR0290820 – HQR0290832.[8] The document, which was prepared by senior officials within DOE and the Executive Office of the President at the direction of the White House in or around 1997, proposed a statement of position for the President with regard to the Government's anticipated delay in SNF acceptance pursuant to the Standard Contract.

i. A six-page November 7, 1996 draft document, entitled "Proposed Presidential Position Regarding Interim Storage of Spent Nuclear Fuel," Bates-stamped HQR0320151 – HQR0320156.[9] The document was prepared by senior officials within DOE and OMB at the request of the White House to propose to the President a statement of position concerning then-pending congressional legislation and other proposals that were being presented by nuclear utilities concerning the implementation of a Federal interim storage facility for SNF. The document weighed the advantages and disadvantages associated with various policy options, and the findings contained therein were discussed by senior White House advisors.

---

[8] Dairyland identified this document in its December 14, 2007 motion to compel as E156.

[9] Dairyland identified this document in its December 14, 2007 motion to compel as E163.

j. A six-page May 18, 1995 memorandum from Charles Curtis to T.J. Glauthier presenting a possible policy position for the Administration concerning Federal interim storage and the Government's then-impending January 31, 1998 contractual deadline by which to begin SNF acceptance pursuant to the Standard Contract. The document is Bates-stamped HQR032016 – HQR0320181.[10] The document presents a proposed approach that reflects the discussions of previous options and was part of the development of the Administration's position with regard to then-pending legislation concerning the issue of Federal interim storage. The document was provided to the White House upon request to assist the President in forming a Federal policy with regard to interim SNF storage.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, District of Columbia, this 16 day of January 2008.

Susan Smith

Susan A. Smith

---

[10] Dairyland identified this document in its December 14, 2007 motion to compel as E165.

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 04-106C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Live Tape

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on January 15, 2008.)

Pages: 1 through 36

Place: Washington, D.C.

Date: January 1[illegible], 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net



COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 04-106C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Friday,
January 11, 2008

The parties met, pursuant to notice of the Court, at 2:54 p.m.

Live Tape

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on January 15, 2008.)

BEFORE: HONORABLE EDWARD J. DAMICH
Chief Judge

APPEARANCES: (Via Telephone)

For the Plaintiff:

JERRY STOUCK, Esquire
ROBERT SHAPIRO, Esquire
KEVIN STERN, Esquire

For the Defendant:

RUSSELL A. SHULTIS, Esquire
ALAN LO RE, Esquire
JOSHUA GARDNER, Esquire
PATRICK BRYAN, Esquire
SCOTT SLATER, Esquire

APPEARANCES: (Cont'd)

For CACI:

GILBERT SCHNITZLER
BEN SIMON

P R O C E E D I N G S

(2:54 p.m.)

THE COURT: This is the case of Dairyland Power Cooperative v. The United States, Docket No. 04-106C. Representing the Plaintiff is Mr. Jerry Stouck. Mr. Stouck, are you there?

MR. STOUCK: I am. Good afternoon, Your Honor.

THE COURT: Good afternoon.

Is Mr. Shapiro with you?

MR. STOUCK: Mr. Shapiro is here and has been in our practice recently anyway. He's going to lead.

THE COURT: So I also welcome Mr. Robert Shapiro for Plaintiff.

For the Defendant --

MR. STOUCK: Your Honor, let me note that Kevin Stern is also here with me.

THE COURT: Great, thanks. Welcome to you also, Mr. Stern.

MR. STERN: Thank you, Your Honor.

THE COURT: For the Defendant, Mr. Russell Shultis. Mr. Shultis, are you there?

MR. SHULTIS: Yes, Your Honor, I am.

THE COURT: Anyone with you?

MR. SHULTIS: Yes, I'm here with actually the whole Dairyland team. Mr. Lo Re, Mr. Gardner, Mr. Bryan, and Mr. Slater. And also from CACI we have Mr. Schnitzler and Ben Simon.

THE COURT: Okay. I think I'm going to have to ask my law clerk, who is doubling as a reporter, after we go off the record, after the end of the status conference, for you to stay on to get the spelling of the names so that we have them down.

Welcome to all of you then, and also Happy New Year.

ALL: Thank you, Your Honor.

THE COURT: I want to introduce my law clerk, Amy Hogan Birney. You may have known that John Buckley, who was my third law clerk, has become Acting Clerk of Court because of the resignation of Brian Bishop who was the previous Clerk of Court, leaving a gap in my law clerk staff. Ms. Hogan Birney is a staff attorney here at the Court, so I asked her to assist me by taking over all of the spent nuclear fuel cases. So in the future you can expect to communicate with her. She's here, obviously, with me today.

As is our practice, we digitally record these status conferences and other proceedings, and she's doing that as well. This is an effort to save

money. Since Heritage costs so much, as you all know. (Laughter).

Let's then look at the status of the case and up to trial preparation. Let me just talk for a while and try to put things into at least what is my perspective.

Looking at the deadlines, for example, January 15th technically is the close of discovery. What I have done is that I have extended that deadline, but only for the submission of the affidavits regarding the government's invocation of the Presidential Communications Privilege and also the government's response to the Plaintiff's motion to compel which basically would mean whether or not the Court would order that despite the invocation of the privilege some documents or all documents would have to be provided. So we're looking at a deadline of January 22nd for the government's invocation plus the response, or the affidavits plus the response.

So the 15th is the normal close of discovery. There's been this particularized extension to the 22nd.

On January 17th, according to the scheduling order that's in force now, the parties are supposed to serve proposed stipulations, witness and exhibit

lists. So immediately of course there's a problem if these documents over which the government is asserting the Presidential Communications Privilege are allowed to be seen, discovered by the Plaintiff, then that might affect, of course, your exhibit list.

Then there's the further question, because the government, the Plaintiff has hinted at this, there might be follow-up depositions if any of those documents are discoverable. So we have that problem.

January 23rd is meeting of counsel.

January 28th is the Plaintiff's memorandum of law.

January 29th, and this is the one most important from my perspective, the filing of motions in limine is due. Then the argument for motions in limine is February 27th.

So even the end of January the Court will be faced with motions in limine plus preparation on those motions.

That's kind of an overall schedule. My schedule and concerns. That's a perspective.

Let's look at the outstanding issues. I've already mentioned this, but I want to make the list complete. The motion for summary judgment regarding Plaintiff's claim for -- I haven't mentioned this --

the Plaintiff's claim for recovery of off-site fuel storage investments. This motion for a summary judgment is in supplemental briefing and we're supposed to get a brief, is it the reply from the Plaintiff?

THE CLERK: Yes.

THE COURT: Reply from the Plaintiff on January 22nd.

So this motion for summary judgment will in effect not be set up for decision by the Court until January the 22nd.

Then we have Plaintiff's motion for relief of government discovery violations regarding Rule 30(B)(6) deposition testimony and that has become the supplemental briefing there which centers around I guess bad faith. That has to be determined. It's under advisement by the Court now.

One of the important things that we have to be concerned about is the fact that it's not simply a matter of sanctions, but also a matter of exclusion of evidence. So with the trial looming and pre-trial preparation that becomes an important issue.

The third is Plaintiff's motion to compel the production of documents withheld pursuant to Defendant's invocation of the Presidential

Communications Privilege. That's the one that I have mentioned before. That's a January 22nd deadline.

What I would get then, what the Court would get would be the affidavits plus the argument that the Defendants would make that the Presidential Communications Privilege should prevail and that means from then on I would have to then decide that issue, whether or not now that the privilege has been invoked, whether or not it should prevail and prevent the documents from being discovered or some redacted version or whatever.

The last two motions I think are somewhat inconsequential for our current status conference, and that is Defendant's unopposed motion to amend the trial preparation order and Defendant's unopposed motion for the Court to schedule a site visit.

Without deciding, reserving the right to change my mind, I don't see too much of a problem with either of those, especially because they're unopposed.

The way I see it, I think it's going to be extremely difficult to meet our March trial deadline. To convince me otherwise, let me ask Mr. Shapiro if you agree.

MR. SHAPIRO: No, we do not agree, Your Honor. In fact we have discussed this with our client

in light of the Court's order scheduling this status conference. We knew this would be a concern of the Court. At this stage it would be tremendously prejudicial to Dairyland to delay further. Dairyland is incurring and has incurred a huge amount of legal fees and expenses associated with this case. At this point trial preparation is well underway and simply the cost that would be incurred to stop that and restart that, to delay trial would just be very large.

Dairyland is also facing witnesses that are looking to retire, take leave. We simply cannot afford, on behalf of Dairyland, to stay further.

We are aware that at some level that might mean that Dairyland might have to sacrifice some modest amount of additional discovery, although not that it would be much. There really is not that much outstanding.

For example, the Court noted that it's a problem that there could be documents -- there are only 10 documents at issue with respect to the Presidential Communications Privilege. A decision on those is not due until the 22nd of January. The exhibit lists are due to be exchanged between counsel on the 17th.

The parties I think have long understood --

THE COURT: Let me interrupt you a second. Forgive me, Mr. Shapiro. But the invocation comes in on January 22nd and the government's argument.

MR. SHAPIRO: Right.

THE COURT: That means it's then set up for decision by me. So that means that what you're asking me to do is of course to squeeze the time in which I would come up with a decision on that issue.

MR. SHAPIRO: I wouldn't want the Court to be squeezed. I'm not sure what timeframe the Court would otherwise have in mind to address the ten documents. Of course it's Dairyland's position that the Court has already basically resolved Dairyland's entitlement to those ten documents by looking at the extent to which Dairyland's need for the documents and the lack of availability elsewhere. So with respect to those ten it's a little bit unclear to Dairyland what further work there is to be done by the Court.

But it would be our view that the parties would exchange exhibits otherwise on the 17th of January. But the timeframe for actually providing the Court with an exhibit list is not until the 29th of February. It would be our view, and certainly there is lots of precedent, I think almost every case I've been involved in there end up being exhibits that one

part or another, typically both parties, seek to add to their exhibit list sometime between the initial exchange and the provision to the Court, or even later.

But I think there is a nice window there between the 17th of January and the 29th of February to address those ten documents.

The Court mentioned the release with respect to the --

THE COURT: Let me just point out something else. This window that you are indicating is also a window when the Court is going to have to at least do some preliminary research on the motions in limine. So in addition to dealing with the Presidential Communications issue I will have to deal with those motions as well.

MR. SHAPIRO: They are certainly going to be filed, Your Honor. I can't deny that.

THE COURT: I suspected. So just keep that in mind when you're talking about my schedule and you're trying to understand what I mean by squeezed.

MR. SHAPIRO: I appreciate that, Your Honor.

The Court mentioned, in fact the one thing that puzzled me a little bit, you mentioned the motion to relieve with respect to the 30(B)(6) deposition and

possible preclusion of evidence.

THE COURT: Yes.

MR. SHAPIRO: I don't have that paperwork in front of me and perhaps I'm mis-remembering, but my recollection is that at this point what is before the Court are the requests for fees, but at this point not a preclusion since we had initially requested that and the Court had decided to move in the direction of awarding fees and costs, and the government asked for reconsideration. There was some sort of briefing in there. We did not go back and re-request the preclusion. We only raised the fee issue.

THE COURT: That's an interesting point because I was actually discussing that with Amy before the status conference and we were not sure about that, but we did look at the motion and we saw that those were in there. I don't think we reviewed, though, the actual opinion at that point.

Let me just ask, we can probably agree that that is the case if Mr. Shultis also has the same recollection. What recollection do you have, Mr. Shultis?

MR. SHULTIS: I didn't recall the request for sanctions at all, Your Honor, so I'm afraid I'm no help.

THE COURT: Oh. I know the sanctions is a live issue. I have my doubts about this exclusion of evidence.

What about this, Mr. Shapiro, regardless of whatever is said, since we're on the record, is the Plaintiff willing to drop anything other than sanctions with regard to that motion?

MR. SHAPIRO: You mean anything other than fees with respect to that motion?

THE COURT: Yes, exactly.

MR. SHAPIRO: Yes.

THE COURT: In other words, if you did that, that means that I could decide that at any time. That's where you're going, isn't it?

MR. SHAPIRO: That is exactly my point, Your Honor.

THE COURT: Okay, because I was thinking of that myself, but that doesn't necessarily preclude us from moving on, except for that exclusion of evidence problem. Okay.

The understanding is then, they were just talking about money with that 30(B)(6) motion, and that can be decided at a later date.

MR. SHAPIRO: Right.

MR. LO RE: Your Honor, this is Alan Lo Re.

THE COURT: Yes, Mr. Lo Re?

MR. LO RE: Thank you.

Mr. Bryan has worked on the motions with regard to sanctions. He would just like to add something if he may. Just so the Court is clear as to what our understanding is with respect to what's happened on this issue.

THE COURT: Okay.

MR. BRYAN: Good afternoon, Your Honor. Patrick Bryan here.

THE COURT: Hi.

MR. BRYAN: Just to add on to what Mr. Shapiro said earlier, we would concur with Mr. Shapiro. Our understanding is that the Court has already ruled upon the issue of whether or not a preclusion order is appropriate here. In the Court's prior orders the Court has already determined that a preclusion order is not an appropriate sanction in this instance.

THE COURT: Okay.

MR. BRYAN: The only issue regarding sanctions is whether or not the award of costs and fees is appropriate.

THE COURT: Okay, great. We're on the same page now then. That's great.

MR. BRYAN: Thank you, Your Honor.

THE COURT: Mr. Shapiro, do you want to continue?

MR. SHAPIRO: Yes, thank you, Your Honor.

With respect to the depositions, I've spoken several times at this point with Mr. Gardner on this issue and we have agreed that there would not be any difficulty as far as the parties are concerned with concluding those depositions after the 15th of January. The witnesses that counsel, these are only continuations of depositions, can be easily done in a portion of a --

THE COURT: Which depositions are you talking about?

MR. SHAPIRO: The depositions of Mr. Debransky, Mr. Collick and Mr. Coop. We have been holding off concluding those to see what resolution the Court will reach on the various discovery matters. We know there are some questions that we do want to ask those witnesses, but the parties have agreed that it would be inefficient to ask those questions and then come back for perhaps 20 minutes of questioning on the last couple of documents. So we've been holding off. If worse comes to worse we could even have those depositions next week. But given the time

between now and trial, the parties have agreed that it's just not necessary to push them to that extent. It would not be disruptive of the parties' trial preparation and I don't see, frankly, Your Honor, how the parties having those depositions at a later time affects the Court at all.

THE COURT: Is there going to be an issue with any of the deposition testimony with regard to motions in limine?

MR. SHAPIRO: I don't see how that would be, Your Honor. Certainly the motions that we are planning would not, they wouldn't be impacted by those depositions.

THE COURT: What about on the other side? Mr. Shultis?

MR. SHULTIS: Your Honor, I don't see how.

THE COURT: Okay. I just wanted to make sure.

What about the, Mr. Debransky has not been deposed yet, is that what you're saying, Mr. Shapiro?

MR. SHAPIRO: All three of these individuals were deposed, I believe it was, in the May 2007 timeframe. But they were not concluded because we knew even at that time that there were motions to compel outstanding.

We're talking about doing, as I said, or continuing these depositions for the fairly narrow purpose of asking about documents that have been released since those prior depositions. For the most part those would be the documents that the Court has ordered released. The government also found some additional documents they just recently produced to Dairyland, but I think most of the pertinent documents, and there are not that many that we need to ask about, quite frankly. They're documents that were ordered released from the Court's review of the documents withheld on (inaudible) deliberative process --

THE COURT: What about follow-up depositions if the Court should rule that at least some of the documents over which the government is asserting Presidential Communications Privilege should be produced?

MR. SHAPIRO: Well, Your Honor, I guess the primary reason why the parties had not concluded these three depositions up until now, the parties have been waiting for the Court to address that last motion, those ten documents, and in order for that we can address all of the documents at one sitting with each of those witnesses.

To give the Court a sense, I'm contemplating maybe two hours, three hours of deposition with each individual. Even that may be an overstatement. We just didn't think it would be efficient to have them come in for two hours and if the Court, just to pick a number, said that three of the ten documents should be produced, and we'd want to ask about two of those, why bring people back for 15 minutes, if we simply waited and had the whole thing at one sitting.

THE COURT: And just these three persons will be the deponents after the Presidential Communications Privilege decision has been rendered?

MR. SHAPIRO: That's certainly what we would contemplate.

I suppose what the Court is contemplating, well gee, how do I know without seeing these documents that I might not want to depose someone entirely new.

THE COURT: Exactly.

MR. SHAPIRO: At this point, Your Honor, I think that's just extraordinarily unlikely. And to put a point on it, I think in order to go forward, Dairyland is willing to give up on that possibility. At some point we've got to move forward to trial and we can't have perfection in discovery. If that means I'm surprised at some level by some name that comes

up, that I thought gee, I might like to have deposed that person, I might have to give up on that.

But we have seen certainly the privilege log information from the government. There's nothing that can be gotten from that information that there are any additional deponents hanging out there.

THE COURT: Okay.

The final issue that I'd like you to address is the motion for summary judgment because this, it seems to me, would certainly impact witnesses possibly and exhibits. Therefore, directly impact the trial.

MR. SHAPIRO: We certainly plan to respond by January 22nd. I suppose this is not the time or place, but I think it's certainly pertinent to the Court's question. We do not view the government's motion as having a substantial amount of merit, and indeed the inquiries that the Court made of the government suggested difficulties in the government's motion. But we will certainly respond, and I don't think we will need the full ten days to do so, by January 22nd. So that will be fully teed up.

THE COURT: Okay, but again, looking at it from my perspective, this means then that I have to decide that motion, I have to decide Presidential Communications, and I have to decide motions in limine

in a very short period of time. Plus, of course I have other work to do and I administer the Court.

Do you have a comment on that, Mr. Shapiro?

MR. SHAPIRO: Well, it's difficult for me to comment on the Court's workload. I know that we have delayed trial twice now in order to get to the certain resolution of discovery matters. At the end of the day, as I've been trying to emphasize, Dairyland must get to trial. One of the facts that the Court may well face is that the more there are delays, somehow the more issues there are that can even get teed up for the Court. The Court may actually end up with an ever-increasing workload if the parties are given more time to come up with more issues.

THE COURT: Well, I would preclude that. The easiest way to do that is if we're starting trial on July 7th you would have a normal three months to prepare and the beginning of that three months would be the absolute deadline to tie up the loose ends that we have before us, and I would permit no other loose ends, so therefore there would not be a delay.

Let me, I know that your clients feel strongly about this but it's hard for me to see what great added expense there is here since we're going to proceed at least with the stuff that we're doing

already.

MR. SHAPIRO: A couple of other points, Your Honor.

THE COURT: Go ahead, Mr. Shapiro.

MR. SHAPIRO: On the motions in limine, I think that they are helpful to frame issues to the Court, certainly gives things to the Court to be aware of and concerned about. But in our past experience it is not always the case where the Judges of the Court have even resolved those before trial.

THE COURT: My practice though, is to resolve them before trial.

MR. SHAPIRO: Ideally, of course. If the issues are clear they can be resolved before trial. Sometimes it's not clear until, especially if you've got expert witnesses which are frequently the focus of motions in limine in these kinds of cases. It may not be clear until the witness is on the stand.

I would very much be disappointed if trial got once again delayed to Dairyland's significant prejudice and we find out that often the motions are not that big of a deal, or may find that ultimately you want to hear from all these witnesses because it's difficult to determine the ultimate merit of the parties' arguments about the admissibility of the

evidence without an initial hearing from the witness.

THE COURT: But your prediction places the risk on me. Second, my philosophy of trial is that trial should be for fact finding, period, and everything that can be decided before trial ought to be decided before trial.

In addition, I want to remind you that when we agreed to the original schedule, which seems to be slipping, I said that I would try my best, but that I would not expedite my own schedule, that is to rearrange my priorities in order to move things along. That I wanted to continue business as usual and my usual schedule here at the Court, which even without expediting is difficult to begin with.

Nevertheless, I did manage to get through all of the deliberative process binders and make decisions on those things, which actually was an expedition. I did move things around in order to move those things along.

So I guess the question is, it's becoming clearer and clearer to me that in order to accommodate the Plaintiff I end up discommoding myself, and to a large extent, actually.

But let me ask, before I render a decision, let me ask Mr. Shultis what the government's view is

on all of these issues and the timing, et cetera, et cetera.

MR. SHULTIS: Your Honor, if I could, I'd kind of like to defer to Mr. Lo Re on that.

THE COURT: Sure. Mr. Lo Re?

MR. LO RE: Thank you, Your Honor.

With respect to a delay of several months, first I'll just start by saying we are preparing to go to trial in March. That's our understanding, we're under Court order currently, and we are prepared to do that obviously if the Court so wishes.

Having said that, I can tell you, and one of the reasons I'm answering this is I'm looking at a chart here that has got all of our trials. As the Court is well aware, we have several trials in play regarding spent fuel.

I know you threw out, I don't know if it was hypothetical, but the date of July would certainly work for our schedule because we have another trial before Judge Bruggink beginning in May. So we were getting close.

Obviously our preference is not to have them overlap if possible. So we were getting close with the trial as it was in March. Then if we're going to push it, our preference would be to push it on the

other side of the Dominion trial before Judge Bruggink.

I will say I think that you mentioned all of the pending motions, although I think there happens to be one more pending motion on deliberative process concerning work product that was filed in October. There was a motion to compel that Plaintiff filed back in October, and I don't believe that there's been, I think it's October 5th. It's about 200 documents. I don't believe there has been a resolution on that.

So we fully understand there are a number of issues in play that could affect, frankly, the evidence that's presented at trial as well as the witnesses. The Court mentioned PFS, I think that's a very good example of an issue that if tailored, depending on the outcome of our motion, could have direct impact on the witnesses we present, the examinations that we conduct, and the exhibits that we present at trial.

We wholly agree with the Court that it is to everyone's benefit, we believe, to have as many issues resolved as possible before we step into the Courtroom, frankly because it makes, I think, for a much cleaner record not only before the Court at the trial level, but to the extent any of these issues are

raised on appeal, it just makes, we believe, the issues a lot cleaner.

THE COURT: Okay.

The other concern that I have, I just thought about this, which really makes more specific the question of administering the Court, is the fact that because we have an Acting Clerk of Court, the selection process is going to begin on Monday. We'll have a month to collect resumes and applications. Then when that month is over the first thing that will have to be done is sorting through the resumes, the selection committee will then have to go through those resumes, decide on and interview candidates, interview them, et cetera, et cetera. I'm on that committee, I've got to do that.

In looking at everything that has to be done I can see from your perspective, Mr. Shapiro, that you can do this, but from my perspective, I would have to considerably inconvenience myself and perhaps even do a kind of injustice toward my own integrity the amount of time that I need to decide motions and important issues, and also my duties as a Chief Judge. I just don't see how I can possibly do the March date.

So I'm going to set July 7th as the trial date. In which case I can decide then the motion for

summary judgment regarding the off-site fuel storage investments, and I'll do this as quickly as possible. I'm not going to delay.

With regard to the motion for sanctions, that's somewhat peripheral. If I decide it, okay. If not, it's certainly not going to delay the July 7th trial date.

With regard to Presidential Privilege then, I'll see the affidavit and the argument of the government and make my decision. And because we now have some time I don't have a problem at all, Mr. Shapiro, if there are witnesses that you want to depose consequent to my decision, if I say that there are any documents that will be produced.

I don't want to open discovery, though, for any other reason, nor do I want any other issues to arise that in any way would preclude the July 7th trial date.

What about this deliberative process motion, Mr. Shapiro? Where is --

MR. SHAPIRO: Your Honor, Mr. Lo Re is correct. That motion is still pending before the Court since October. I believe the reply brief was filed the 2nd of November. It's pending before the Court. I had not mentioned that previously because I

think the Court had understood at some level if we could have gone forward in March we would have been willing to --

THE COURT: Yeah.

MR. SHAPIRO: But if we have to delay I think the Court should address that.

THE COURT: Of course. I think since there is time now, then I think that we should in fact tie up all these loose ends and you should have the time insofar as you need it to help the Court do that.

What is there about that --

MR. SHAPIRO: -- July 7th date. And frankly, Your Honor, I'll confer with the likely witnesses. Obviously we would have people offer schedules if at all possible to make them available if that's the date the Court has set for trial. But I just want to note that there is a possibility that there could be an essential witness or two for whom that creates a real hardship. With some of the experts perhaps even a conflicting Court demand.

THE COURT: I understand that. Let me rephrase, that's the earliest date that I can have trial in Dairyland. If you have problems with witnesses and things of that sort we'll have to consider a later date.

MR. STOUCK: Your Honor, this is Mr. Stouck.

THE COURT: Yes, Mr. Stouck.

MR. STOUCK: Does the Court contemplate an alternation to the existing pre-trial schedule? And if so, it might be worthwhile to have a little discussion of that.

I would encourage, since we're geared up and I understand from what Mr. Lo Re has said, they are geared up for pre-trial now, I would encourage that. And in order to give the Court time, we don't want to squeeze the Court, I would encourage that if there is to be any revision at all to the pre-trial schedule that the motions, which on our side are already underway, the motions in limine, that those motions, certainly the PFS motion has already (inaudible). I would just encourage that the Court allow us, or require that motions in limine be filed; in other words, that we not move those to another month before the July 7th date and then run into the same problem that we have.

THE COURT: It doesn't have to be a month before. If the parties agree, we can set an earlier date for motions in limine.

MR. STOUCK: Why not keep the dates we have?

THE COURT: Because I don't want, there has

been a representation which is I think either explicitly or implicitly in terms of a likelihood,that there would be no motions in limine stemming from further depositions, especially because I've opened it now to persons other than the three that were mentioned.

I'm very concerned that we're going to have other motions in limine, and I really would like to have them all before the Court at one time.

I have no objection to moving the deadline for motions in limine up so that there is more than one month before the trial date. I don't have a problem with that. But it seems to me that maybe the deadline should be after the real conclusion of discovery. That is to say even the slight and focused extension, particularized discovery, then have a period of time after that for the filing of motions in limine. It seems that way we don't have to rely upon likelihoods and predictions because we can say there are no more depositions, there are no more documents, and therefore we know at this point the universe over which there might be some questions resulting in motions in limine.

MR. STOUCK: Your Honor, that's obviously fine. I will talk to Mr. Shapiro about the

pre-trial --

THE COURT: Uh huh.

MR. STOUCK: -- just to give the Court an additional measure of time so --

THE COURT: That's fine. But I wouldn't hold you to that in the sense that if there are other motions in limine at a later date --

MR. STOUCK: I understand.

THE COURT: As long as whatever deadline -- that I set. What I would like to do I think, the best thing to do is this, and that is to have another status conference. I'll vacate the pre-trial order that I have now, except in certain particulars with regard to this particularized extension of discovery.

When these motions are resolved by the Court, and I'm not going to hold you to the sanctions one because I can do that at any time. But the one on off-site fuel storage and the one on Presidential Communications Privilege. When those are done we can have another status conference. We can then at that time figure out what depositions, any further depositions that the Plaintiff may want. And once we get those and we get dates, then we can set a date certain, and at that point go into pre-trial cleanly without a lot of loose ends. Then I can be certain,

if July 7th works for the Plaintiff, if that's okay, that it will not be moved again.

I assure you, I don't want it to be moved. I just think, though, that at this point it's virtually impossible for me to do all of these things plus the other things that I have to do. And again, I think that my normal method of proceeding is to do things in a deliberate fashion so that attention is paid, the proper amount of attention is paid to making legal decisions and that's the difficulty that I have.

So let's do that then, unless I hear some objections that cause me to change my mind. I will issue an order then with regard to the outstanding issues. That is to say which ones the Court is going to deal with. When those are done we'll have a status conference and then we'll see where to go from there. But I don't want any new issues to come in.

The only thing I see at this point outstanding would be whether or not there are further depositions. That is to say other persons that stem from the Court's decision with regard to the Presidential Communications Privilege. That's the only other discovery issue that I see as left hanging at this point.

Is that your understanding, Mr. Shapiro?

MR. SHAPIRO: I think actually there are more documents in play with respect to the October 5th --

THE COURT: Yes, I'm sorry. Those too, yes.

MR. SHAPIRO: Again, I think it's just very very unlikely that the Court ordering the disclosure of documents through either of those motions is going to cause us to want to depose more individuals. I shouldn't be categorical about it, but I think it's very unlikely.

THE COURT: I know, exactly. But I'm done with likelihoods.

So what we'll do is when all of this is, when the decisions have all been made let's convene again and see what has to be done to completely dot all I's and cross all T's and then go on from there.

But one thing I can promise you, and that is that if I say, and normally there's a three month preparation time so that would be, we're talking the beginning of July. That's June, May April. In the normal course of events April would be when the pre-trial would begin. So certainly everything will be wrapped up by then. I make my own promise on that point. I just can't possibly make this March deadline, unfortunately.

MR. STOUCK: Your Honor, again, if I may just request --

THE COURT: Go ahead, Mr. Stouck.

MR. STOUCK: Three months --

THE COURT: Yeah.

MR. STOUCK: If I'm understanding correctly, you're going to decide what's on the table right now, which is the October motion, the Presidential Privilege --

THE COURT: Yes.

MR. STOUCK: -- and the off-site storage cost motion.

THE COURT: Yes.

MR. STOUCK: But the deadline for motions in limine will not be set for sure at a time before about the beginning of April.

THE COURT: I doubt it. But let me do this, because you've actually caused me to have another thought. That is, what I can do is at the next status conference what we can do is I will then ask you if you want to agree to shift the dates, you can. You can't shift the date for trial. But if you want to shift the dates in any way you choose, as long as the other side agrees, that's fine with me.

MR. STOUCK: I guess where I'm coming from,

just to be clear, in light of, nobody wants to squeeze the Court. We certainly understand that. But there are going to be a number of motions in limine, and I'm speaking only from our side but I know the government well enough to know that --

THE COURT: Yes.

MR. STOUCK: -- there's going to be a large, a significant number of motions in limine. I just want to be sure that the Court and the parties have sufficient time to deal with those before trial. You say that's your practice.

THE COURT: Yes.

MR. STOUCK: I would just encourage those deadlines be set as early as possible so as not to squeeze the Court and not to run into this problem again.

THE COURT: Yes, that's correct.

Let me ask, I haven't asked the government on this point. Mr. Shultis, would you mind if when the motions in limine are due under the pre-trial order, if we made that earlier than usual so that the Court is not squeezed.

MR. SHULTIS: No, Your Honor. We don't have a problem with that. It does make sense to have that issue resolved as far ahead of time as possible.

THE COURT: Okay. Excuse me. We're having actually a technical problem. I've just been informed that the computer has conked out. The computer is what is recording this status conference. So let me put you on hold and see if we can resolve this.

(Pause).

THE COURT: Okay, we're back, and we're also on the record.

The complicated technical difficulty was a battery.

The last thing that was on the record was the Plaintiff's counsel talking about the exploitation of numerous motions in limine. I think that was you, Mr. Stouck?

MR. STOUCK: A significant number, yes.

THE COURT: A significant number. Okay.

I think it may have been after that that I agreed that it probably would be wise then to allow more time for the disposition of those motions in limine. Mr. Shultis I think agreed that he would be in principle at least, in favor of departing from the kind of date, the time period I guess that we have set in the current pre-trial order and allow for more time for motions in limine.

Is that correct, Mr. Shultis?

MR. SHULTIS: That's correct, Your Honor.

THE COURT: Okay. So as I say, what I'll do is set a status conference. I guess I can't really predict because it will depend upon the Court rendering decisions on I guess those three motions now. The three motions. Once that is done then we can have the status conference, talk about any further depositions as a result of those decisions, no other depositions, and then also talk about pre-trial preparation dates at that time with the idea being that the deadline for the motions in limine will be earlier than it has been under the previous trial preparation order.

Okay. I think that's it. Is that it as far as you can see, Mr. Shapiro?

MR. SHAPIRO: I believe so, Your Honor.

THE COURT: Mr. Shultis?

MR. SHULTIS: Yes, Your Honor.

THE COURT: Okay. Great.

I'm going to go off the record -- hold on. Go ahead.

MR. STOUCK: Forgive me, but --

(Whereupon, at 3:42 p.m., the hearing in the above-entitled matter was concluded.)

//