IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Electronically filed: April 29, 2008

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DAIRYLAND POWER COOPERATIVE'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE INCONSISTENT WITH THE GOVERNMENT'S CONTENTION INTERROGATORY ANSWERS**

Pursuant to RCFC 16, Dairyland Power Cooperative ("Dairyland") respectfully moves the Court to preclude evidence inconsistent with the government's answers to contention interrogatory numbers 9, 13, 15, 16, and 17. During discovery, the government made several concessions in its answers to Dairyland's contention interrogatories. Given the government's statement that it is not going to pursue certain arguments at trial, these issues are no longer in dispute, and evidence contradicting the government's contentions is irrelevant and inadmissible under Fed. R. Evid. Rules 401 and 402. Alternatively, even if the evidence were deemed relevant, it would confuse the issues and should be excluded under Fed. R. Evid. 403.

## I. BACKGROUND FACTS

### A. Interrogatory Nos. 9, 15, 16, and 17

The government served contention interrogatory answers only after much delay and explicit orders compelling the answers. On August 7, 2007, the government served

its Response to Plaintiff's First Set of Interrogatories as Amended in Response to the Court's February 5, 2007 Order and Supplemented Following the Close of Fact Discovery (attachment 1). In its Supplemental Response, the government stated, *inter alia*, that (i) it "does not currently plan to argue that it was unreasonable for Dairyland to study, investigate, and/or implement dry storage" (supp. res. to interrog. no. 9); (ii) it "does not currently plan to argue that it was unreasonable for Dairyland to store its spent fuel at LACBWR in wet storage" (supp. resp. to interrog. no. 15); (iii) it "does not currently plan to argue that Dairyland should have explored and/or implemented any particular strategy for the storage of its spent fuel" (supp. resp. to interrog. no. 16); and (iv) it "does not currently plan to argue that Dairyland should have explored and/or implemented any particular strategy for the storage of its failed fuel" (supp. resp. to interrog. no. 17).

**B. Interrogatory 13**

Additionally, on January 9, 2008 the government filed its Supplemental Response to Plaintiff's Interrogatory Number 13 Pursuant to the Court's December 21, 2007 Order (attachment 2). Interrogatory No. 13 states, "Do you contend that DOE would have picked up DAIRYLAND'S FAILED FUEL later than the rest of its SPENT FUEL had the government begun SPENT FUEL acceptance from utilities starting not later than January 31, 1998?" In its Supplemental Response, the government stated that "we do not intend to develop a contention regarding what DOE 'would have' done regarding failed fuel had it begun SNF acceptance in 1998, given that it is irrelevant and unnecessary to this litigation" (supp. resp. to interrog. no. 13). Additionally, the government did contend that "in the 'but for' world, Dairyland's failed fuel would not have been accepted

pursuant to the terms of the Standard Contract on the same schedule as standard SNF until and unless Dairyland has established that failed fuel could have been safely handled and transported to a Federal facility, in the transportation cask to be provided by DOE, in accordance with applicable regulations and would not have required special handling as defined by Appendix E of the Standard Contract." (supp. resp. to interrog. 13).

Discovery in this case closed not later than April 18, 2008 and the above responses have not been supplemented or amended by the government.

## II. ARGUMENT AND AUTHORITIES

### A. The Court Should Exclude Evidence Contrary to the Government's Contention Interrogatory Answers Because it is Irrelevant Under Federal Rules of Evidence 401 and Inadmissible Under Rule 402

Under RCFC 16, this Court has the authority to rule in advance of trial on the admissibility of documentary or testimonial evidence "to prevent a party before trial from encumbering the record with irrelevant, immaterial or cumulative matters." *Baskett v. United States*, 2 Cl. Ct. 356, 367-68 (1983), *aff'd*, 790 F.2d 93 (Fed. Cir. 1986). "In this manner the court filters out irrelevant evidence and performs its function of 'simplifying issues for trial'." *INSLAW, Inc. v. United States*, 35 Fed. Cl. 295, 303 (1996) (quoting *Baskett*, 2 Ct. Cl. at 359).

Under Fed. R. Evid. Rules 401 and 402, to be admissible, "evidence [must] hav[e] [a] tendency to make the existence of any fact that is of consequence to the determination of the action more…or less probable…." *See* Fed. R. Evid. 401, 402. Here, while the government explored a variety of possible theories for opposing Dairyland's claims for damages, its answers to Dairyland's contention interrogatory numbers 9, 15, 16, and 17 contain important concessions limiting the scope of the government's argument against

Dairyland's mitigation efforts. Accordingly, the reasonableness of Dairyland's mitigation efforts on these issues is no longer in dispute. As such, evidence that disputes the reasonableness of Dairyland's mitigation efforts is not relevant, as it does not "hav[e] [the] tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Similarly, the government has acknowledged that it has no contention regarding what the Department of Energy would have done with respect to the timing of acceptance of failed fuel absent the breach. *See* supp. resp. to interrog. no. 13. Accordingly, the government should not be heard at trial to argue that failed fuel may have been accepted later than other fuel due but for the breach.

The government does contend that Dairyland cannot show when the last of its spent nuclear fuel would have been removed, unless Dairyland establishes that its failed fuel would have been accepted without special handling. *See* supp. resp. to interrog. no. 13. This contention is a legal argument regarding Dairyland's burden of proof, and as such has no place at trial. Additionally, the Standard Contract requires DOE to accept nonstandard fuel on the same schedule as standard fuel if it is "technically feasible." It does not require a utility to establish that its failed fuel would have been accepted without special handling. Because the government has conceded that it does not intend to engage in a factual dispute on the complications of acceptance of failed fuel, and its legal contention should not be heard at trial, any evidence from the government regarding the technical feasibility of accepting failed fuel is irrelevant and inadmissible.

In any event, Dairyland will present ample evidence establishing that its failed fuel would have been removed on the same schedule as the rest of its spent fuel. Ivan Stuart will testify regarding the fact that failed fuel no better than Dairyland's has been removed from numerous sites and transported without incident. Similarly, John Parkyn will testify that in the plans for PFS, Dairyland obtained assurances that its failed fuel would not become an issue regarding the prompt removal of its failed fuel. This testimony is also supported by a documentary record showing that failed fuel has not been expected to become a significant issue for DOE's spent fuel removal program. As reflected in the government's interrogatory response, absent a government attempt to present previously undisclosed evidence, Dairyland's evidence on this issue will be undisputed.

Further, despite having more than ample time to determine its contentions, the government has not supplemented its interrogatory responses or produced any contrary documentation during discovery. The Federal Rules of Civil Procedure require parties to supplement interrogatory responses during the discovery process if "the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known[.]" Fed. R. Civ. Proc. 26(e); *see Klonoski v. Mahlab*, 156 F.3d 255, 268 (1st Cir. 1998) (noting that Rule 26(e) "imposes a broad requirement on parties to update their earlier disclosures and discovery responses."). Courts have consistently excluded evidence where parties have failed to supplement interrogatory answers during the discovery process. *See MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1356-57 (upheld preclusion of testimony for failure of party to supplement interrogatory that required party to identify

its damages theories and factual basis and methodology for its calculations); *Inamed Corp. v. Kuzmak*, 275 F.Supp.2d 1100, 1117-18 (C.D. Cal. 2003) (holding that preclusion was warranted based upon defendant's failure to update a contention interrogatory response to include information that must have been known to him). Consequently, it is far too late for the government to seek to amend its interrogatory responses now to attempt to put these issues into dispute.

Moreover, Dairyland has conducted extensive discovery and employed contention interrogatories in an effort to ascertain the basis of the government's defenses and to narrow the issues in preparation for trial. Indeed, contention interrogatories are utilized by parties "to discover the factual basis for the allegations raised in the complaint, answer, or counterclaim," and "to determine the theory of a party's case." *Exxon Research and Eng'g Co., v. United States*, 44 Fed. Cl. 597, 601 (1999). Similarly, the discovery rules are designed to narrow and clarify the issues and to prevent trial by ambush. *See ELCA Enter., Inc. v. Sisco Equip. Rental & Sales, Inc.*, 53 F.3d 186 (8th Cir. 1995). Yet this is precisely what would happen if the government could change course now. Dairyland would have no opportunity to conduct discovery on the supplemental responses, and Dairyland's discovery efforts would be in vein. The government should not be allowed to flout its obligations under the Federal Rules of Civil Procedure.

**B. The Court Should Exclude Evidence Contrary to the Government's Contention Interrogatory Answers Under Federal Rules of Evidence 403 Because It Would Confuse the Issues**

The Court has the discretion to exclude evidence where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence." Fed. R. Evid. 403. The Court's discretion to exclude evidence on that ground extends even to evidence that is relevant, and the discretion plainly applies to evidence like that here which is not relevant and therefore even more likely to confuse. In *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564 (Fed. Cir. 1986), the Federal Circuit upheld the exclusion of evidence that "would have injected frolics and detours and would have required introduction of counter-evidence, all likely to create side issues that would have unduly distracted the jury from the main issues." *Id.* at 1572-73.

Similarly, the government has conceded that Dairyland's mitigation efforts were reasonable, thus any evidence to the contrary at trial would confuse the issues and distract the Court. Further, if the government is not going to ultimately take the position that failed fuel would have been taken later (thereby delaying the final emptying of Dairyland's spent fuel pool), allowing the government to provide testimony regarding potential complications of acceptance of failed fuel would only serve to confuse the issues.

Indeed, the government has proffered evidence in other spent nuclear fuel cases regarding the potential difficulty of accepting failed fuel on the same schedule as standard fuel. On August 5, 2004 during *Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl.), when asked whether DOE has the capability to handle failed fuel David Zabransky testified:

> "That's something that's going to have to be done on a case by case basis, once we know exactly what's failed about a given assembly. There's many things that can cause an assembly to be failed, that will have to get looked at against the requirements that may exist in the license and technical specifications and make sure that the analysis has been done and the

> license has been granted, such that we can possess fuel in that condition."
> Trial Tr. 4134:25, 4135:1-9 (attachment C).

Additionally, in this case the government has listed several exhibits relating to the complications of failed fuel on its exhibit list, including photographs of failed fuel assemblies[1] and an article detailing the handling of failed fuel.[2] This evidence contradicts the government's contention interrogatory answers and only serves to confuse the issues, thus it must be excluded under Fed. R. Evid. 403.

## III. CONCLUSION

In its answers to Dairyland's contention interrogatories the government has conceded it is not going to dispute the reasonableness of Dairyland's mitigation efforts. Additionally, the government has admitted it is not taking a position on the timing of acceptance of failed fuel. Therefore, the above issues are no longer facts in dispute, and introduction of contradictory evidence has no probative value. In sum, it is irrelevant and inadmissible. Even if such evidence were deemed relevant, in order to prevent confusion of the issues, it must be precluded. For these reasons, Dairyland respectfully submits that the Court grant this motion and exclude evidence that disputes the government's answers to contention interrogatory numbers 9, 13, 15, 16, and 17.

---

[1] *See* Def. ['s] Ex. List at 4, 5, 6, 7, 8, 466, 468, 491, 492, 493, and 494

[2] *See* Def. ['s] Ex. List at 536.

Respectfully submitted,

April 29, 2008

s/ Jerry Stouck

JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

*WDC 371,614,089v1 4/28/2008*

# Attachment 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0106C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AS AMENDED IN RESPONSE TO THE COURT'S FEBRUARY 5, 2007 ORDER AND SUPPLEMENTED FOLLOWING THE CLOSE OF FACT DISCOVERY

Pursuant to Rule 33 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, provides the following responses to "Plaintiff's First Set Of Interrogatories," which were served on October 10, 2006, amended in response to the Court's order dated February 5, 2007, and supplemented following the close of fact discovery.

GENERAL OBJECTIONS

1. Disclosure of privileged or protected information: Defendant objects to each interrogatory to the extent that it is deemed to require disclosure of classified, confidential, or proprietary information or matters subject to the attorney-client privilege, the attorney work product doctrine, other applicable privileges, or any statutory or regulatory restriction upon disclosure, including the Privacy Act, 5 U.S.C. § 552a. Defendant will not produce privileged or protected documents, materials, or information in response to the document requests. The inadvertent production by defendant of documents protected by the attorney-client privilege, or any other privilege, shall not constitute a waiver of the applicable privilege or protection as to any document so produced, or as to any other document.

2. Exceeding obligations imposed by the Court's rules and orders: Defendant objects to the instructions and definitions accompanying plaintiff's interrogatories to the extent that such instructions and definitions attempt to impose obligations on defendant other than those imposed by RCFC 26 and 34 and the Court's prior orders, including but not limited to, information regarding electronic mail will be produced only in accordance with the requirements provided by the Court's prior order, dated March 14, 2005, limiting the parties' obligations to preserve or search e-mail tapes.

3. Conclusions regarding legal significance of documents: Defendant objects to the plaintiff's interrogatories upon the grounds and to the extent that, by them, plaintiffs seek to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

4. Work product information: Defendant objects to plaintiff's interrogatories on the grounds and to the extent that, by them, plaintiff seeks information prepared and/or developed in anticipation of litigation and/or for trial when plaintiff has not shown that it has substantial need of such materials in the preparation of its case in that plaintiff is unable, without undue hardship, to obtain the substantial equivalent of such information by other means.

5. Irrelevant material: Defendant objects to plaintiff's interrogatories on the grounds and to the extent that, by them, plaintiff seeks the discovery of information which is irrelevant and immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

6. Vague, overly broad, and unduly burdensome: Defendant objects to plaintiff's interrogatories on the grounds that the manner in which they are worded, when read with their definitions and general instructions, are so vague, broad, general, and all inclusive that they do

not permit a proper or reasonable response and are, therefore, unduly burdensome and oppressive. Defendant further objects to these interrogatories to the extent that, to respond to them, defendant would be required to make an extensive investigation, research, compilation, and evaluation of data and records in its possession, which would constitute annoyance, harassment, oppression, undue burden, and undue expense to defendant.

7. Inferences from interrogatories: Defendant objects to any inference that can be drawn from any portion of plaintiff's interrogatories or the responses to them that the documents requested or events referenced in the requests actually exist or occurred. The failure to object to each such inference in no way constitutes an admission by defendant that such information exists or that such events actually occurred.

8. Scope Of The Government As Responding Party: Defendant objects to plaintiff's interrogatories to the extent that they define the term "DOE," or the Department of Energy, to include any Government agencies, offices, bodies, affiliates, contractors, consultants, or individuals other than the Department of Energy itself. To define the term "DOE" as including entities other than DOE itself would render all of plaintiff's discovery requests overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, because doing so would require defendant to seek information from, and about, more than one million Federal employees in numerous offices, agencies, and departments, the missions of which have no relation whatsoever to plaintiff's contract and the locations of which are scattered across the nation and around the world. Further, defendant objects to these interrogatories to the extent that they purport to seek information from the files of the entire

Federal Government. In responding to these interrogatories, defendant has focused upon the knowledge of the Department of Energy.

9. The objections set forth above apply to each of the numbered paragraphs of plaintiff's interrogatories.

DEFENDANT'S RESPONSES TO PLAINTIFF'S INTERROGATORIES

INTERROGATORY NO. 1:

IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or preparation of any COMMUNICATIONS between DOE and/or NRC on the one hand and DAIRYLAND on the other hand RELATING TO SPENT FUEL. For each PERSON identified, DESCRIBE in detail all aspects of that PERSON's involvement.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section and because plaintiff has an equal ability to identify the requested information as defendant, given that plaintiff and defendant were both equally involved in communications between plaintiff and defendant. See Pacific Gas & Electric Co. v. United States, 69 Fed. Cl. 323, 325-26 (2005). Defendant further objects to this interrogatory as irrelevant, given that not every possible communication somehow relating to spent nuclear fuel is related to the damages that plaintiff seeks in this case. We are also unable to identify all such individuals for the reasons set forth in General Objections Nos. 1, 2, 4, 5, 6, and 8, which are incorporated into this response by reference. Defendant also objects to this interrogatory to the extent that it seeks information that is already within plaintiff's custody, possession, and/or control or that is readily available to plaintiff. See Pacific Gas, 69 Fed. Cl. at 325-26.

Without waiving these objections, defendant states that, with regard to the Department of Energy ("DOE"), defendant has previously produced DOE's contract files relating to Dairyland's Standard Contract, which contain communications between Dairyland and DOE, and other files

containing communications between Dairyland and DOE from which, pursuant to RCFC 33(d), plaintiff may ascertain an answer to this interrogatory as easily as defendant. Defendant further states that individuals employed by DOE who may have had some involvement relating to communications with Dairyland may include David Zabransky, Thomas Pollog, Nancy Slater, Alan Brownstein, Susan Klein, and James Carlson. Defendant further states that, with regard to the Nuclear Regulatory Commission ("NRC"), plaintiff, pursuant to RCFC 33(d), should be able to identify a list of individuals who would have had such involvement from the database of documents previously made available, or to be made available, to plaintiff or from the ADAMS database that is available for searching at the NRC, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court ordered that, where Dairyland "has requested the identity of persons involved in the review of preparation, etc., of certain documents or communications, Defendant shall identify those individuals whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial), but not those who merely *may* have had such involvement." Order, at 1 (Feb. 5, 2007) (italics in original). However, it ordered that, "to the extent that Plaintiff has requested that Defendant identify 'all aspects' of any person's involvement in review or preparation, etc., of certain documents or communications, Plaintiff's request is literally overbroad," ordering instead that "Defendant shall identify the nature of such involvement, etc., with reasonabl[e] particularty." Id. at 2. In addition, the Court ordered that, "to whatever extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such

documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proffered database(s)." Id. at 1.

With regard to the review, approval, disapproval, drafting and/or preparation of any communications between DOE and Dairyland "relating to spent fuel," DOE's records indicate that individuals "whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial)" are (1) William Young, DOE Office of Nuclear Energy, who, with the assistance of Charles Thompson and Michael McGown, drafted and/or signed a letter responding to an April 23, 1990 letter from Dairyland; (2) Lake Barrett and Ronald Milner, both now retired from DOE, who responded to letters from Dairyland dated June 12 and August 3, 1998, with Mr. Milner signing the letters on Mr. Barrett's behalf, which most likely were drafted by David Zabransky, possibly with the assistance of Thomas Pollog;[1] (3) David Zabransky, Christopher Kouts, and Paul Dickman, who had verbal communications with representatives of Dairyland in 2002 and/or 2003; and (4) Beth Tomasoni, the contracting officer for the Standard Contract, signed various contract correspondence, although the agency's records do not appear to indicate the drafter of that correspondence, some of which likely involved the Office of General Counsel. Additional responsive information will be found in defendant's response to Interrogatory No. 3 of these interrogatories.

With regard to the review, approval, disapproval, drafting and/or preparation of any communications between the NRC and Dairyland "relating to spent fuel," the NRC's records indicate that individuals "whose involvement was reasonably material, substantive, or the like

---

[1] The agency's records do not provide information identifying the actual drafter of the letters, and neither Mr. Zabransky nor Mr. Pollog presently has a specific recollection of the specific letters at this time.

(rather than those whose involvement was solely ministerial or secretarial)" are (1) Stephen O'Connor, who was Senior Project Manager for general licenses associated with Independent Spent Fuel Installations ("ISFSIs") when a docket for the LACBWR ISFSI was started; (2) James Randall Hall, who is the Senior Project Manager for general licenses associated with ISFSIs currently responsible for coordinating any activities associated with Part 72 provisions; and (3) Robert Nelson, who is the Chief of the licensing branch for Spent Fuel Storage and Transportation responsible for any communications regarding this docket.

INTERROGATORY NO. 2:

IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or of any DOCUMENTS or COMMUNICATIONS RELATED TO the decommissioning of LACBWR. For each PERSON identified, describe in detail all aspects of that PERSON's involvement.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section and because plaintiff should have an equal ability to identify the requested information as defendant, given that plaintiff and defendant were both equally involved in communications between plaintiff and defendant. See Pacific Gas & Electric Co. v. United States, 69 Fed. Cl. 323, 325-26 (2005). Defendant further objects to this interrogatory as irrelevant, given that not every possible communication somehow relating to the decommissioning of the LaCrosse reactor is related to the damages that plaintiff seeks in this case. We are also unable to identify all such individuals for the reasons set forth in General Objections Nos. 1, 2, 4, 5, 6, and 8, which are

incorporated into this response by reference. Defendant also objects to this interrogatory to the extent that it seeks information that is already within plaintiff's custody, possession, and/or control or that is readily available to plaintiff. See Pacific Gas, 69 Fed. Cl. at 325-26.

Without waiving these objections, defendant states that, with regard to the Department of Energy ("DOE"), defendant has previously produced DOE's contract files relating to Dairyland's Standard Contract, which contain communications between Dairyland and DOE, and other files containing communications between Dairyland and DOE from which, pursuant to RCFC 33(d), plaintiff may ascertain an answer to this interrogatory as easily as defendant. Defendant avers, however, that it is currently unaware of any DOE documents or communications relating to the decommissioning of the LaCrosse reactor. Defendant further states that, with regard to the NRC and pursuant to RCFC 33(d), plaintiff should be able to identify a list of individuals who would have had such involvement from the database of documents previously made available, or to be made available, to plaintiff or from the ADAMS database that is available for searching at the NRC, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court ordered that, where Dairyland "has requested the identity of persons involved in the review of preparation, etc., of certain documents or communications, Defendant shall identify those individuals whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial), but not those who merely *may* have had such involvement." Order, at 1 (Feb. 5, 2007) (italics in original). However, it ordered that, "to the extent that Plaintiff has requested

that Defendant identify 'all aspects' of any person's involvement in review or preparation, etc., of certain documents or communications, Plaintiff's request is literally overbroad," ordering instead that "Defendant shall identify the nature of such involvement, etc., with reasonabl[e] particularty." Id. at 2. In addition, the Court ordered that, "to whatever extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proffered database(s)." Id.

With regard to the review, approval, disapproval, drafting and/or preparation of any documents or communications relating to the decommissioning of the La Crosse nuclear power reactor, DOE has been unable to identify any individuals involved in such documents or communications "whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial)."

The NRC's records indicate that individuals from the NRC "whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial)" are (1) Peter B. Erickson, former Project Manager responsible for review of the LACBWR decommissioning plan; (2) Kenneth Ridgway, Robert Wood, John Minns, and Frank Witt, who provided technical input on the LACBWR decommissioning plan; (3) Richard F. Dudley, Jr., former Acting Director, Non-Power Reactors, Decommissioning and Environmental Project Directorate, Division of Advanced Reactors and Special Projects, Office of Nuclear Reactor Regulation, who had an oversight role; (4) Seymour H. Weiss, former Director, Non-Power Reactors, Decommissioning and Environmental Project Directorate, Division of Advanced Reactors and Special Projects, Office of Nuclear Reactor Regulation, who

had an oversight role; (5) Dennis M. Crutchfield, former Director, Division of Advanced Reactors and Special Projects, Office of Nuclear Reactor Regulation, who had an oversight role; and (6) Herbert N. Berkow, former Project Director, Standardization and Non-Power Reactor Project Directorate, Office of Nuclear Reactor Regulation, who had an oversight role.

INTERROGATORY NO. 3:

Do you contend that the annual receiving capacity listed in any of the Annual Capacity Reports issued by DOE since January 1, 1998 pursuant to the NWPA is binding on DOE and/or DAIRYLAND? If so, explain all bases for such a contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

Without waiving this objection, defendant states that the table titled "Summary of Purchasers' Annual Allocations (MTU)" in the Annual Capacity Reports identifies an acceptance allocation to Purchasers. As set forth in the Standard Contract, the 1991 Annual Capacity Report ("ACR"), in conjunction with the 1991 Annual Priority Ranking ("APR"), was the document by which DOE began making firm acceptance commitments to individual utilities based upon the delivery commitment schedules submitted by Purchasers that DOE approved. After issuance of the 1991 ACR/APR, and in accordance with Article V.B.1 of the Standard Contract, the plaintiff in this action submitted several Delivery Commitment Schedules ("DCSs") to the Department of Energy. DOE also issued annual capacity reports and acceptance priority rankings dated 1992, 1994, and 1995, and many nuclear utility plaintiffs with cases pending before the Court of

Federal Claims submitted DCSs in response to these ACR/APRs. In submitting their DCSs, the plaintiffs ultimately relied upon the allocations identified in the referenced ACR/APRs. DOE approved several DCSs for the plaintiff in this action. Those DCSs identify both the amount of spent nuclear fuel and high-level radioactive waste (collectively, "SNF") and the location of SNF for which an allocation exists under the relevant ACR/APR for a given year. No other binding "schedules" applicable to the Standard Contract were issued by the Department of Energy or accepted by the Department of Energy through the approval of DCSs. The basis for the rate and order of SNF acceptance identified in this interrogatory response are the ACR/APRs issued beginning in 1991, the DCSs that the plaintiff and other contract holders submitted to DOE, and DOE's approval of those DCSs.

With regard to plaintiff's request regarding ACRs issued "since January 1, 1998," the only ACR that DOE issued since that time was the 2004 ACR. That ACR did not result in any approved DCSs and, as the 2004 ACR itself stated, the information contained in the 2004 ACR was for informational purposes only and was not binding on DOE.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not require any further supplemental of this response.

INTERROGATORY NO. 4:

IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or preparation of responses to the delivery commitment schedules DAIRYLAND submitted to DOE. For each PERSON identified, DESCRIBE in detail the activities in which they engaged RELATED TO these activities.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant also objects to this interrogatory to the extent that it seeks information already within plaintiff's custody, possession, and/or control or that is readily available to plaintiff.

Without waiving these objections, defendant states that, pursuant to RCFC 33(d), the answer(s) to this interrogatory may be obtained from the database of documents previously made available, or to be made available, to plaintiff, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant. Defendant has previously produced DOE's files relating to Dairyland's Standard Contract, which contain DOE's records regarding delivery commitment schedules that Dairyland submitted. Defendant further states that individuals employed by DOE who may have had some involvement relating to DCSs that Dairyland submitted in response to the 1991 ACR/APR may include Nancy Slater, Alan Brownstein, Linda Strand, and Michael Detmer and those who may have had some involvement relating to DCSs that Dairyland submitted in response to the 2004 ACR/APR may include David Zabransky, Thomas Pollog, and Christopher Kouts.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court ordered that, where Dairyland "has requested the identity of persons involved in the review of preparation, etc., of certain documents or communications, Defendant shall identify those individuals whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or

secretarial), but not those who merely *may* have had such involvement." Order, at 1 (Feb. 5, 2007) (italics in original). In addition, the Court ordered that, "to whatever extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proffered database(s)." Id.

With regard to the review, approval, disapproval, drafting and/or preparation of responses to the delivery commitment schedules that Dairyland submitted to DOE, DOE's records indicate that individuals from DOE "whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial)" are (1) Alan Brownstein, who, as the Contracting Officer's Technical Representative, recommended approval of delivery commitment schedules ("DCSs"); (2) Linda Strand, who, as Contracting Officer, approved some DCSs; (3) Nancy Slater, who drafted a letter responding to Dairyland DCS submittals; (4) Jim Carlson, who approved the letter; (5) David Zabransky, who worked upon issues associated with DCSs in 2004; (6) Christopher Kouts, who worked upon issues associated with DCSs in 2004; and (7) Thomas Pollog, who worked upon issues associated with DCSs in 2004.

We are unaware of any individuals at the NRC who had any involvement in such a review.

INTERROGATORY NO. 5:

On what schedule (measured in Metric Tons Uranium) does DOE contend it is obligated to remove DAIRYLAND's SPENT FUEL pursuant to DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? State all factual and legal grounds for this contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

Without waiving this objection, defendant incorporates by reference its response to Interrogatory No. 3.

SUPPLEMENTAL RESPONSE:

Although the Court's February 5, 2007 order does not require supplementation of our original response to this interrogatory, defendant further refers plaintiff to the post-trial briefing that the Government filed in Pacific Gas & Electric Co. v. United States, Nos. 04-0074C & -0075C (Fed. Cl.), dated June 30, 2006, and July 7, 2006, copies of which are available on PACER accessible through the Court of Federal Claims' website.

INTERROGATORY NO. 6:

On what schedule (measured in Metric Tons Uranium) does DOE plan to remove DAIRYLAND's SPENT FUEL pursuant to DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? DESCRIBE if, how, and when this plan has changed since the execution of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT; IDENTIFY all documents and evidence RELATED TO this plan; IDENTIFY the five people with the most knowledge of this plan and the nature of such knowledge.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions"

section. Defendant further objects to this interrogatory because it seeks information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court stated that it "does not accept, at least for purposes of discovery, that, as Defendant avers, 'discovery into DOE [Department of Energy]'s current projections about the future [is] irrelevant to any analysis of causation or damages.'" Order, at 1 (Feb. 5, 2007) (brackets in original). In response to the Court's order, defendant states that, at the present time, DOE does not have a current plan regarding the schedule for acceptance of SNF from Dairyland, beyond the contract mechanisms in Articles IV and V of the Standard Contract that detail the manner in which SNF acceptance allocations will be assigned and approved. Nevertheless, as part of any future plan that is developed for the acceptance of SNF from LaCrosse, DOE will have to consider the fact that the SNF from that reactor is failed fuel, at least some of which apparently has suffered extreme degradation. During his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository. Defendant refers plaintiff to that testimony for an explanation of those issues. Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them

under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

In its interrogatory, Dairyland requests that we detail "if, when, and how this plan has changed since the execution of" Dairyland's Standard Contract in 1983. The first official plan that DOE issued in the process of establishing a commitment to accept particular SNF from particular contract holders was the 1991 Annual Capacity Report ("ACR"), in conjunction with the 1991 Acceptance Priority Ranking ("APR").[2] The table titled "Summary of Purchasers' Annual Allocations (MTU)" in the Annual Capacity Reports identifies an acceptance allocation to Purchasers. As set forth in the Standard Contract, the 1991 ACR, in conjunction with the 1991 APR, was the document by which DOE began making firm acceptance commitments to individual utilities based upon the delivery commitment schedules submitted by Purchasers that DOE approved. After issuance of the 1991 ACR/APR, and in accordance with Article V.B.1 of the Standard Contract, the plaintiff in this action submitted several Delivery Commitment Schedules ("DCSs") to the Department of Energy. DOE also issued annual capacity reports and acceptance priority rankings dated 1992, 1994, and 1995, and many nuclear utility plaintiffs with cases pending before the Court of Federal Claims submitted DCSs in response to these ACR/APRs. In submitting their DCSs, the plaintiffs ultimately relied upon the allocations identified in the referenced ACR/APRs. DOE approved several DCSs for the plaintiff in this action. Those DCSs identify both the amount of spent nuclear fuel and high-level radioactive

---

[2] To the extent that DOE issued other "plans" prior to that date, they were not binding upon DOE and did not establish any commitments upon its part. These other non-binding "plans" are identified in the Government's post-trial proposed findings of fact in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.).

waste (collectively, "SNF") and the location of SNF for which an allocation exists under the relevant ACR/APR for a given year. No other binding "schedules" applicable to the Standard Contract were issued by the Department of Energy or accepted by the Department of Energy through the approval of DCSs. The basis for the rate and order of SNF acceptance identified in this interrogatory response are the ACR/APRs issued beginning in 1991, the DCSs that the plaintiff and other contract holders submitted to DOE, and DOE's approval of those DCSs.

Subsequently, DOE announced that it would be unable to begin SNF acceptance by January 31, 1998. Later, in 2004, DOE issued a new ACR, which identified potential SNF acceptance allocations, but that ACR did not result in any approved DCSs and, as the 2004 ACR itself stated, the information contained in the 2004 ACR was for informational purposes only and was not binding on DOE. Subsequently, DOE announced that it had begun the delivery commitment process prematurely and that it was suspending the DCS process until a later date.

In this interrogatory, Dairyland also requests that defendant "IDENTIFY all evidence RELATED TO" the current plan for the schedule upon which DOE will accept Dairyland's SNF and to identify "the five people with the most knowledge of this plan and the nature of such knowledge." As previously discussed, DOE does not currently have a planned schedule for the acceptance of Dairyland's SNF. Accordingly, defendant does not possess any documentation or evidence relating to the current plan and cannot identify individuals knowledgeable about a current plan that does not exist at this time.

INTERROGATORY NO. 7:

IDENTIFY the earliest date on which DOE reasonably believes it will begin to take delivery of SPENT FUEL from PURCHASERS under their STANDARD CONTRACTS and/or DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT.

RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant further objects to this interrogatory because it seeks information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court stated that it "does not accept, at least for purposes of discovery, that, as Defendant avers, 'discovery into DOE [Department of Energy]'s current projections about the future [is] irrelevant to any analysis of causation or damages.'" Order, at 1 (Feb. 5, 2007) (brackets in original). In response to the Court's order, defendant states that, at the present time, DOE currently anticipates that the earliest date by which it is likely to begin accepting SNF from contract holders is 2017. The specific date that DOE will begin acceptance from the La Crosse reactor will be determined in accordance with the schedule mechanism set forth in the contract, through the issuance of the Annual Capacity Report and the

Acceptance Priority Ranking, and the submission and approval of delivery commitment schedules and final delivery schedules in accordance with the allocations for the plaintiff identified in those documents. Until this process is complete, DOE cannot know the specific date upon which it will begin acceptance of SNF from plaintiff. Nevertheless, circumstances could change that would allow or require DOE to perform prior to 2017. Specifically, Congress could enact legislation requiring DOE to construct and accept waste at a centralized interim storage facility in advance of the completion of Yucca Mountain, as Congress has considered legislation in the past that provided for such actions. Alternatively, Congress or the Nuclear Regulatory Commission could mandate that Federal funds be expended to purchase casks for storage of SNF for national security reasons, if circumstances warranted such action. Congress could enact other laws, such as permitting SNF to be stored at other locations temporarily, that would allow DOE to begin SNF acceptance prior to 2017. Such circumstances are discussed at pages 3455 through 3460, 3474, and 3476 of the trial transcript in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.).

INTERROGATORY NO. 8:

On what date does DOE currently plan to complete picking up SPENT FUEL from LACBWR? DESCRIBE how this plan has changed since the execution of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT; IDENTIFY all evidence RELATED TO this plan; IDENTIFY the five people with the most knowledge of this plan and the nature of such knowledge.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant further objects to this interrogatory because it seeks information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court stated that it "does not accept, at least for purposes of discovery, that, as Defendant avers, 'discovery into DOE [Department of Energy]'s current projections about the future [is] irrelevant to any analysis of causation or damages.'" Order, at 1 (Feb. 5, 2007) (brackets in original). In response to the Court's order, defendant states that, at the present time, DOE does not have a current plan regarding the acceptance of SNF from LaCrosse, beyond the contract mechanisms in Articles IV and V of the Standard Contract that detail the manner in which SNF acceptance allocations are assigned and approved. As a result, DOE has not yet identified a date by which it will actually accept, or by which it "plans" to accept, the last of the SNF from the LaCrosse reactor. As part of any future plan that is developed for the acceptance of SNF from LaCrosse, DOE will have to consider the fact that the SNF from that reactor is failed fuel, at least some of which apparently has suffered extreme degradation. During his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v.

United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository. Defendant refers plaintiff to that testimony for an explanation of those issues. Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

In its interrogatory, Dairyland requests that we detail "how this plan has changed since the execution of" Dairyland's Standard Contract in 1983. The first formal plan that DOE issued as part of the process of establishing a commitment to accept particular SNF from particular contract holders was the 1991 Annual Capacity Report ("ACR"), in conjunction with the 1991 Acceptance Priority Ranking ("APR"). The table titled "Summary of Purchasers' Annual Allocations (MTU)" in the Annual Capacity Reports identifies an acceptance allocation to Purchasers. As set forth in the Standard Contract, the 1991 ACR, in conjunction with the 1991 APR, was the document by which DOE began making firm acceptance commitments to individual utilities based upon the delivery commitment schedules submitted by Purchasers that DOE approved. After issuance of the 1991 ACR/APR, and in accordance with Article V.B.1 of the Standard Contract, the plaintiff in this action submitted several Delivery Commitment Schedules ("DCSs") to the Department of Energy. DOE also issued annual capacity reports and acceptance priority rankings dated 1992, 1994, and 1995, and many nuclear utility plaintiffs with cases pending before the Court of Federal Claims submitted DCSs in response to these ACR/APRs. In submitting their DCSs, the plaintiffs ultimately relied upon the allocations identified in the referenced ACR/APRs. DOE approved several DCSs for the plaintiff in this

action. Those DCSs identify both the amount of spent nuclear fuel and high-level radioactive waste (collectively, "SNF") and the location of SNF for which an allocation exists under the relevant ACR/APR for a given year. No other binding "schedules" applicable to the Standard Contract were issued by the Department of Energy or accepted by the Department of Energy through the approval of DCSs. The basis for the rate and order of SNF acceptance identified in this interrogatory response are the ACR/APRs issued beginning in 1991, the DCSs that the plaintiff and other contract holders submitted to DOE, and DOE's approval of those DCSs.

Subsequently, DOE announced that it would be unable to begin SNF acceptance by January 31, 1998. DOE later, in 2004, issued a new ACR, which identified potential SNF acceptance allocations, but that ACR did not result in any approved DCSs and, as the 2004 ACR itself stated, the information contained in the 2004 ACR was for informational purposes only and was not binding on DOE. Subsequently, DOE announced that it had begun the delivery commitment process prematurely and that it was suspending the DCS process until a later date.

In this interrogatory, Dairyland also requests that defendant "IDENTIFY all evidence RELATED TO" the current plan for the date upon which DOE will complete picking up SNF from LaCrosse and to identify "the five people with the most knowledge of this plan and the nature of such knowledge." As previously discussed, DOE does not currently have a plan for the date by it will complete SNF acceptance from LaCrosse. Accordingly, defendant does not possess any documentation or evidence relating to the current plan and cannot identify individuals knowledgeable about a current plan that does not exist at this time.

INTERROGATORY NO. 9:

Do you contend that it was or would have been unreasonable for DAIRYLAND to study, analyze, investigate and/or implement dry storage of its SPENT FUEL at any time subsequent to DOE's partial breach of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, explain all bases for this contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature. Through discovery, defendant anticipates that it may analyze Dairyland's SNF storage decisions and make determinations, for purposes of this litigation, regarding the appropriateness of those decisions. We have not had sufficient discovery in this case to make those determinations at this time. Until we have obtained such discovery and evaluated Dairyland's storage decisions, such determinations are premature.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not address the interrogatories that defendant viewed as premature. Further, we are still developing our positions regarding Dairyland's activities as part of our evaluation of Dairyland's claims in this litigation. Accordingly, Dairyland's request remains premature.

However, defendant states that, except to the extent otherwise identified in the expert reports that we recently issued, defendant does not currently plan to argue that it was unreasonable for Dairyland to study, investigate, and/or implement dry storage. Further, the

Government does not concede that any such studies were caused by DOE's partial breach of the Standard Contract.

INTERROGATORY NO. 10:

IDENTIFY all PERSONS involved in the review, approval, disapproval, drafting and/or preparation of any DOCUMENT or COMMUNICATIONS RELATED TO the removal, transport, storage and disposal of the reactor pressure vessel from LACBWR. For each PERSON identified, DESCRIBE in detail all aspects of that PERSON's involvement.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section and because plaintiff should have an equal ability to defendant to identify the requested information regarding "communications" between the Government and plaintiff, given that plaintiff and defendant were both equally involved in communications between plaintiff and defendant. See Pacific Gas & Electric Co. v. United States, 69 Fed. Cl. 323, 325-26 (2005). Defendant further objects to this interrogatory as irrelevant, given that not every possible document or communication somehow relating to the removal, transport, storage, or disposal of the reactor pressure vessel from the LaCrosse reactor is related to the damages that plaintiff seeks in this case. We are also unable to identify all responsive individuals for the reasons set forth in General Objections Nos. 1, 2, 4, 5, 6, and 8, which are incorporated into this response by reference. Defendant also objects to this interrogatory to the extent that it seeks information that is already within plaintiff's custody, possession, and/or control or that is readily available to plaintiff. See Pacific Gas, 69 Fed. Cl. at 325-26.

Without waiving these objections, defendant states that, with regard to the Department of Energy ("DOE"), defendant has previously produced DOE's contract files relating to Dairyland's Standard Contract, which contain communications between Dairyland and DOE, and other files containing communications between Dairyland and DOE from which, pursuant to RCFC 33(d), plaintiff may ascertain an answer to this interrogatory as easily as defendant. Defendant avers, however, that it is currently unaware of any DOE documents or communications that would have involved DOE employees. Defendant further states that, with regard to the NRC and pursuant to RCFC 33(d), plaintiff should be able to identify a list of individuals who would have had such involvement, if any, from the database of documents previously made available, or to be made available, to plaintiff or from the ADAMS database that is available for searching at the NRC, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court ordered that, where Dairyland "has requested the identity of persons involved in the review of preparation, etc., of certain documents or communications, Defendant shall identify those individuals whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial), but not those who merely *may* have had such involvement." Order, at 1 (Feb. 5, 2007) (italics in original). However, it ordered that, "to the extent that Plaintiff has requested that Defendant identify 'all aspects' of any person's involvement in review or preparation, etc., of certain documents or communications, Plaintiff's request is literally overbroad," ordering instead that "Defendant shall identify the nature of such involvement, etc., with reasonabl[e]

particularty." Id. at 2. In addition, the Court ordered that, "to whatever extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proffered database(s)." Id.

We are not aware of any individual at DOE with involvement in the review, approval, disapproval, drafting and/or preparation of any documents or communications relating to the removal, transport, storage, or disposal of the reactor pressure vessel at the La Crosse nuclear power reactor. The NRC's records indicate that individuals from the NRC "whose involvement" in such documents or communications "was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial)" are (1) William H. Ruland, Deputy Director, Licensing and Inspection Directorate, Spent Fuel Transportation and Storage, who was briefed on Dairyland's request and monitored the staff's progress in responding to it; (2) Robert Nelson, Chief, Licensing Branch, Spent Fuel Transportation and Storage, who approved the special package authorization; (3) Jill Caverly, Project Manager, Licensing Branch, Spent Fuel Transportation and Storage, who served as the project manager for this action; (4) Nancy Osgood, Senior Project Manager, Licensing Branch, Spent Fuel Transportation and Storage, who provided technical advice to the project manger; (5) Michelle DeBose, Licensing Assistant, Licensing Branch, Spent Fuel Transportation and Storage, who reviewed all correspondence related to this action for conformance with administrative requirements and maintained licensing information for this project; (6) Robert Lewis, Chief, Rules, Inspection and Operations Branch, who concurred on the summary of the meeting with Dairyland and Duratek on September 20, 2005; (7) Stewart Treby, Attorney, Office of the General Counsel, who

reviewed the special package authorization for compliance with legal requirements; (8) Gordon Bjorkman, Branch Chief, Spent Fuel Storage and Transportation, who reviewed and concurred on the special package authorization and directed the technical reviewers within his branch; (9) Larry Campbell, Branch Chief, Spent Fuel Storage and Transportation, who reviewed and concurred on the special package authorization and directed the technical reviewers within his branch; and (10) Jason Piotter, Charles Interrante, Christopher Bajwa, Shana Helton, and Elizabeth Thompson, who are Technical Reviewers.

INTERROGATORY NO. 11:

Has DOE given any consideration or undertaken any study, analysis, or investigation of the manner in which DOE will or could dispose of FAILED FUEL? If not, explain why DOE has not considered or studied this topic. If so, also IDENTIFY:

a. The nature of such consideration, study, analysis or investigation.

b. The timeframe of such consideration, study, analysis or investigation.

c. All individuals who participated in such consideration, study, analysis or investigation.

d. The results and/or conclusions of such consideration, study, analysis or investigation.

e. Whether such consideration, study, analysis or investigation included the possibility of storing or disposing of FAILED FUEL in a facility or location other than the deep geologic repository.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as vague, overly broad, irrelevant, and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Plaintiff's interrogatory is not limited to failed fuel in the possession of or generated by Dairyland or other Standard Contract holders. Further, not every aspect of failed fuel is in any way related to Dairyland's damages claim in this litigation. Further, because of the manner in which Dairyland's request is broadly phrased, almost any document having anything to do with spent nuclear fuel storage or disposal could be "related" to this interrogatory, further rendering it overly broad and unduly burdensome.

Without waiving these objections, defendant states that there are large quantities of documents available on the Record Information System website ("RIS-Web") that are potentially responsive to this request and which, pursuant to RCFC 33(d), plaintiff can attempt to develop a response to this extremely broad inquiry. Without any further refinement and narrowing of plaintiff's request, defendant cannot provide any further response to this inquiry. To the extent that plaintiff is able to narrow its interrogatory to permit a targeted search and response, defendant is willing to evaluate that narrowed request and respond appropriately.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court indicated that, "to the extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proferred database(s)." The following documents from which

plaintiff can develop a response to this interrogatory may be found in the Government's past productions:

| Container | First Image | Last Image |
|---|---|---|
| CTR013 | CTR0130476 | CTR0130476 |
| CTR013 | CTR0131092 | CTR0131108 |
| CTR013 | CTR0131163 | CTR0131170 |
| CTR013 | CTR0131205 | CTR0131215 |
| CTR013 | CTR0131343 | CTR0131355 |
| CTR013 | CTR0131401 | CTR0131404 |
| CTR013 | CTR0131420 | CTR0131432 |
| CTR013 | CTR0131470 | CTR0131481 |
| CTR013 | CTR0131530 | CTR0131541 |
| CTR013 | CTR0131548 | CTR0131551 |
| CTR013 | CTR0131576 | CTR0131587 |
| CTR013 | CTR0131675 | CTR0131679 |
| CTR013 | CTR0131708 | CTR0131710 |
| CTR013 | CTR0131829 | CTR0131832 |
| CTR013 | CTR0133181 | CTR0133209 |
| PNL048 | PNL0480004 | PNL0480055 |
| PNL048 | PNL0480142 | PNL0480193 |
| PNL048 | PNL0480198 | PNL0480246 |
| PNL048 | PNL0480247 | PNL0480297 |
| PNL048 | PNL0480298 | PNL0480348 |
| PNL048 | PNL0480349 | PNL0480398 |
| PNL048 | PNL0480399 | PNL0480448 |
| PNL048 | PNL0480449 | PNL0480499 |
| PNL048 | PNL0480500 | PNL0480551 |
| PNL048 | PNL0480560 | PNL0480608 |
| PNL048 | PNL0480613 | PNL0480718 |
| PNL048 | PNL0480754 | PNL0480770 |
| PNL048 | PNL0480791 | PNL0480898 |
| PNL048 | PNL0480933 | PNL0481038 |
| PNL048 | PNL0481042 | PNL0481148 |
| PNL048 | PNL0481149 | PNL0481253 |
| PNL048 | PNL0481266 | PNL0481348 |
| PNL048 | PNL0481349 | PNL0481429 |
| PNL048 | PNL0481430 | PNL0481477 |
| PNL048 | PNL0481597 | PNL0481678 |
| PNL048 | PNL0481679 | PNL0481730 |
| PNL048 | PNL0481731 | PNL0481813 |

| | | |
|---|---|---|
| PNL048 | PNL0481814 | PNL0481897 |
| PNL048 | PNL0481908 | PNL0481989 |
| PNL048 | PNL0481990 | PNL0482038 |
| PNL048 | PNL0482039 | PNL0482088 |
| PNL034 | PNL0340201 | PNL0340212 |
| PNL034 | PNL0340213 | PNL0340224 |
| PNL034 | PNL0340226 | PNL0340238 |
| PNL034 | PNL0340239 | PNL0340253 |
| PNL034 | PNL0340305 | PNL0340312 |
| PNL034 | PNL0340314 | PNL0340322 |
| PNL034 | PNL0340323 | PNL0340330 |
| PNL034 | PNL0340332 | PNL0340339 |
| PNL034 | PNL0340342 | PNL0340349 |
| PNL034 | PNL0340350 | PNL0340358 |
| PNL034 | PNL0340359 | PNL0340366 |
| PNL034 | PNL0340368 | PNL0340379 |
| PNL034 | PNL0340380 | PNL0340391 |
| PNL034 | PNL0340392 | PNL0340403 |
| PNL034 | PNL0340404 | PNL0340415 |
| PNL034 | PNL0340416 | PNL0340427 |
| PNL034 | PNL0340428 | PNL0340434 |
| PNL034 | PNL0340443 | PNL0340453 |
| PNL034 | PNL0340454 | PNL0340463 |
| IDF007 | IDF0073621 | IDF0073787 |
| IDF007 | IDF0073864 | IDF0074013 |
| HQR008 | HQR0080215 | HQR0080216 |
| HQR008 | HQR0080217 | HQR0080220 |
| HQR008 | HQR0080536 | HQR0080556 |
| HQR008 | HQR0080598 | HQR0080598 |
| HQR008 | HQR0080619 | HQR0080620 |
| HQR008 | HQR0080816 | HQR0080842 |
| HQR008 | HQR0080845 | HQR0080856 |
| HQR008 | HQR0080896 | HQR0080902 |
| HQR008 | HQR0080944 | HQR0080944 |
| HQR008 | HQR0080953 | HQR0080953 |
| HQR008 | HQR0081028 | HQR0081032 |

INTERROGATORY NO. 12:

Does DOE plan to accept delivery of FAILED FUEL from DAIRYLAND on a different schedule than the rest of DAIRYLAND's SPENT FUEL before it completes taking delivery of

other SPENT FUEL from DAIRYLAND? If so, DESCRIBE the schedule DOE is planning to use for picking up DAIRYLAND's FAILED FUEL.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as overly broad and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant further objects to this interrogatory because it seeks information that is not relevant to the determination of damages arising from DOE's delay in accepting spent nuclear fuel beginning in 1998. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court stated that it "does not accept, at least for purposes of discovery, that, as Defendant avers, 'discovery into DOE [Department of Energy]'s current projections about the future [is] irrelevant to any analysis of causation or damages.'" Order, at 1 (Feb. 5, 2007) (brackets in original). In response to the Court's order, defendant states that, at the present time, DOE does not have a current plan regarding the acceptance of SNF from Dairyland, beyond the contract mechanisms in Articles IV and V of the Standard Contract that detail the manner in which SNF acceptance allocations are assigned and approved. As a result, DOE has not yet identified the schedule upon which it will actually accept, or by which it "plans" to accept, Dairyland's failed fuel. As part of any future plan that is developed for the acceptance of SNF from Dairyland, DOE will have to consider the fact that the SNF from

that reactor is failed fuel, at least some of which apparently has suffered extreme degradation. During his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository. Defendant refers plaintiff to that testimony for an explanation of those issues. Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

INTERROGATORY NO. 13:

Do you contend that DOE would have picked up DAIRYLAND's FAILED FUEL later than the rest of its SPENT FUEL had the government begun SPENT FUEL acceptance from utilities starting not later than January 31, 1998? If so, state all bases for this contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature prior to the completion of fact discovery, given that defendant does not have adequate information regarding plaintiff's failed fuel to respond appropriately to this interrogatory. Defendant objects to this interrogatory as vague, overly broad, and unduly burdensome. Given that the design parameters for any storage facility that DOE might operate have not yet been defined, it is impossible to identify every technical impediment that could occur in the acceptance of failed fuel from Dairyland's nuclear reactor.

Without waiving these objections, defendant responds that, during his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository. Defendant refers plaintiff to that testimony for a response to this interrogatory. Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not require any further supplemental of this response.

INTERROGATORY NO. 14:

Do you contend that DAIRYLAND's expenditures supporting PFS were unreasonable expenditures toward mitigation of DAIRYLAND's damages due to DOE's partial breach of DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, state all bases for this contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature, as any determination of whether, from a business or profit-making standpoint upon Dairyland's part, it was "unreasonable" for Dairyland to invest in Private Fuel Storage ("PFS") cannot be made prior to the completion of discovery.

Without waiving these objections, defendant states that, as we have explained in prior briefing in several of the SNF cases pending before this Court, any investment in PFS was not foreseeable at the time of contract formation and, further, was wholly speculative. Any such investment could not be considered proper "mitigation" of DOE's delay in beginning SNF acceptance.

SUPPLEMENTAL RESPONSE:

Although the Court's February 5, 2007 order does not require supplementation of our original response to this interrogatory, defendant further refers plaintiff to the post-trial briefing that the Government filed in Pacific Gas & Electric Co. v. United States, Nos. 04-0074C & -0075C (Fed. Cl.), dated June 30, 2006, and July 7, 2006, copies of which are available on PACER accessible through the Court of Federal Claims' website.

INTERROGATORY NO. 15:

Do you contend that it was unreasonable for DAIRYLAND to store its SPENT FUEL in the LACBWR wet fuel storage pool at any time after DOE partially breached DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT? If so, DESCRIBE when you contend it became unreasonable for DAIRYLAND to continue to store its SPENT FUEL in the LACBWR wet fuel storage pool and DESCRIBE the specific alternative storage options you believe would have been reasonable for DAIRYLAND to employ to store its SPENT FUEL from that point onward.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature, as such determinations cannot be made prior to the completion of discovery.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not address the interrogatories that defendant viewed as premature. Further, we are still developing our positions regarding Dairyland's activities as part of our evaluation of Dairyland's claims in this litigation. Accordingly, Dairyland's request remains premature.

However, defendant states that, except to the extent otherwise identified in the expert reports that we recently issued, defendant does not currently plan to argue that it was unreasonable for Dairyland to store its spent fuel at LACBWR in wet storage. Further, the Government does not concede that Dairyland has been required to maintain its spent fuel pool for a longer period of time because of DOE's partial breach of the Standard Contract.

INTERROGATORY NO. 16:

DESCRIBE all options that you contend DAIRYLAND should have explored and/or implemented for the storage of its SPENT FUEL after DOE partially breached DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT. If you contend that DAIRYLAND should have explored or implemented options for storage of its SPENT FUEL that are different from those options explored and/or implemented to store DAIRYLAND'S FAILED FUEL, DESCRIBE how and why they should have been different.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature, as such determinations cannot be made prior to the completion of discovery.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not address the interrogatories that defendant viewed as premature. Further, we are still developing our positions regarding Dairyland's activities as part of our evaluation of Dairyland's claims in this litigation. Accordingly, Dairyland's request remains premature.

However, defendant states that it is not its obligation to develop contentions regarding alternative options that Dairyland could have pursued. Defendant further states that, except to the extent otherwise identified in the expert reports that we recently issued, defendant does not currently plan to argue that Dairyland should have explored and/or implemented any particular strategy for the storage of its spent fuel. However, defendant does not concede that DOE's partial breach of the Standard Contract was the cause of any particular method chosen by Dairyland.

INTERROGATORY NO. 17:

DESCRIBE all options that you contend DAIRYLAND should have explored and/or implemented for the storage of its FAILED FUEL after DOE partially breached DAIRYLAND'S SPENT FUEL DISPOSAL CONTRACT. If you contend that DAIRYLAND should have explored or implemented options for storage of its FAILED FUEL that are different from those options explored or implemented to store DAIRYLAND'S SPENT FUEL, DESCRIBE how and why they should have been different.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature, as such determinations cannot be made prior to the completion of discovery.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not address the interrogatories that defendant viewed as premature. Further, we are still developing our positions regarding Dairyland's activities as part of our evaluation of Dairyland's claims in this litigation. Accordingly, Dairyland's request remains premature.

However, defendant states that it is not its obligation to develop contentions regarding alternative options that Dairyland could have pursued. Defendant further states that, except to the extent otherwise identified in the expert reports that we recently issued, defendant does not currently plan to argue that Dairyland should have explored and/or implemented any particular strategy for the storage of its failed fuel. However, Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

INTERROGATORY NO. 18:

DESCRIBE all efforts undertaken by or on behalf of DOE to examine the manner or process by which DOE would remove SPENT FUEL from LACBWR. IDENTIFY the five people with the most knowledge of these efforts and the nature of such knowledge.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory as vague, overly broad, irrelevant, and unduly burdensome, particularly given its use of terms which plaintiff has defined very broadly in the "Definitions" section. Defendant further objects to this request to the extent that it relates to the manner in which DOE may, in the future, remove fuel from the LaCrosse reactor because, in accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case, rendering the information sought through this interrogatory irrelevant to this litigation. Defendant also objects to plaintiff's demand that defendant identify the "five people with the most knowledge" of the efforts identified, as plaintiff is requesting that counsel for defendant interview all individuals within DOE who may have had some involvement in matters and made judgment calls regarding the level of their current knowledge and memory, and plaintiff would then require defendant to disclose the results of the attorney work product; nevertheless, defendant will undertake to identify individuals whom, from a review of documents, may have some knowledge of the efforts identified based upon their apparent involvement in such efforts.

Without waiving these objections, defendant states that, pursuant to RCFC 33(d), the answer(s) to this interrogatory may be obtained from the database of documents previously made available, or to be made available, to plaintiff, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant. To the degree that it has not already done so, defendant will make the database of documents available to plaintiff at mutually acceptable times to allow plaintiff to inspect such records and make such copies as plaintiff

deems appropriate. Documents that may contain information responsive to this request include the Facility Interface Data Study (MOL.20060121.0173), the Facility Interface Capability Assessment, the Near-Site Transportation Infrastructure study, and Service Planning Documents.

With regard to plaintiff's request for identification of individuals who may have been involved in the efforts identified in this interrogatory, defendant is unaware of any individuals who would have worked upon or studied the removal of spent nuclear fuel specifically from the LaCrosse reactor or the LaCrosse site itself. However, individuals may have contemplated the removal of spent nuclear fuel from nuclear utilities in general. Pursuant to RCFC 33(d), the names of those individuals – either DOE employees or contractor employees – may be obtained from the database of documents previously made available, or to be made available, to plaintiff, and the burden of ascertaining the answer(s) is substantially the same for plaintiff as it is for defendant. However, those individuals may include David Zabransky, Ned Larson, and Robert Burgoyne.

SUPPLEMENTAL RESPONSE:

In its February 5, 2007 order, the Court ordered that, where Dairyland "has requested the identity of persons involved in the review of preparation, etc., of certain documents or communications, Defendant shall identify those individuals whose involvement was reasonably material, substantive, or the like (rather than those whose involvement was solely ministerial or secretarial), but not those who merely *may* have had such involvement." Order, at 1 (Feb. 5, 2007) (italics in original). However, it ordered that, "to the extent that Plaintiff has requested that Defendant identify 'all aspects' of any person's involvement in review or preparation, etc., of certain documents or communications, Plaintiff's request is literally overbroad," ordering instead

that "Defendant shall identify the nature of such involvement, etc., with reasonabl[e] particularty." Id. at 2. In addition, the Court ordered that, "to whatever extent Defendant intends to rely on RCFC 33(d) to respond to Plaintiff's interrogatories, Defendant shall identify such documents with reasonable particularity and indicate where such documents can reasonably be found in the government's proffered database(s)." Id. at 1. Finally, with regard to this particular interrogatory, the Court ordered that, rather than identify "the 'five people with the most knowledge' in response to [this interrogatory], [defendant] shall instead identify all those individuals whose knowledge is reasonably material, substantive, or the like, relating to the removal of spent fuel from the La Crosse Boiling Water Reactor (LACBWR)."

In accordance with those guidelines, defendant provides the following supplemental response: In the early 1990's, DOE commissioned several studies of the facilities and infrastructure at and near utility sites throughout the country, including the LaCrosse plant, to determine the capabilities for loading of casks and the shipment of SNF from those utility sites. The reports that resulted from these studies are found in the database of documents that has been made available to Dairyland, in Dairyland's own database of documents, and on the RIS-web with the following bates numbers or accession numbers: Site and Facility Waste Transportation Services Planning Document (Draft), March 1991 (PLAC0149483-531); Site and Facility Waste Transportation Services Planning Document, May 1993 (HQV.19931101.0007); Facility Interface Capability Assessment (FICA) Project Cask Handling Assessment La Crosse BWR, October 1990 (HQR0441640-1654); Near-Site Transportation Infrastructure Project Draft Report and Assessment, June 1990 (PLAC0079126-9216); Near-Site Transportation Infrastructure Project Final Report, February 1992 (YMP0032291-2348). The individuals who had substantial

involvement in these studies or the preparation of these reports include Tom Pollog and Mike Conroy, DOE; Bill Lee and Nigel Mote, NAC; Bill Teer, TRW; and Ron Pope, Steve Schmid, and Bill McLain, Oak Ridge National Laboratory.

In 2004, DOE undertook an effort to update these assessments and obtained from utilities information on "Facility Interface Data Sheets" or "FIDS." The FIDS for the LaCrosse plant are found within Dairyland's own database of documents at PLAC0077157-58 and PLAC049331-32. This data was compiled in a report, Final Report on Facility Interfaces for Office of Civilian Radioactive Waste Management, January 2005 (MOL.20060121.0173). David Zabransky and Ned Larson, DOE, and Robert Burgoyne, Booz-Allen, had substantial involvement in this recent effort.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7571
FAX: (202) 307-2503

OF COUNSEL:

JOSHUA E. GARDNER
PATRICK BRYAN
SCOTT SLATER
Trial Attorneys
Commercial Litigation Branch
Department of Justice

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy

August 7, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 7th day of August 2007, I caused to served by facsimile and first class mail a copy of "DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AS AMENDED IN RESPONSE TO THE COURT'S FEBRUARY 5, 2007 ORDER AND SUPPLEMENTED FOLLOWING THE CLOSE OF FACT DISCOVERY" addressed as follows:

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

Trinell Miller

**Attachment 2**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0106C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NUMBER 13 PURSUANT TO THE COURT'S DECEMBER 21, 2007 ORDER

Pursuant to Rule 33 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, provides the following response to Interrogatory number 13 of "Plaintiff's First Set Of Interrogatories," which were served on October 10, 2006 and are now being supplemented pursuant to the Court's order regarding the Government's interrogatory responses issued on December 21, 2007.

GENERAL OBJECTIONS

1. Disclosure of privileged or protected information: Defendant objects to each interrogatory to the extent that it is deemed to require disclosure of classified, confidential, or proprietary information or matters subject to the attorney-client privilege, the attorney work product doctrine, other applicable privileges, or any statutory or regulatory restriction upon disclosure, including the Privacy Act, 5 U.S.C. § 552a. Defendant will not produce privileged or protected documents, materials, or information in response to the document requests. The inadvertent production by defendant of documents protected by the attorney-client privilege, or any other privilege, shall not constitute a waiver of the applicable privilege or protection as to any document so produced, or as to any other document.

2. Exceeding obligations imposed by the Court's rules and orders: Defendant objects to the instructions and definitions accompanying plaintiff's interrogatories to the extent that such instructions and definitions attempt to impose obligations on defendant other than those imposed by RCFC 26 and 34 and the Court's prior orders, including but not limited to, information regarding electronic mail will be produced only in accordance with the requirements provided by the Court's prior order, dated March 14, 2005, limiting the parties' obligations to preserve or search e-mail tapes.

3. Conclusions regarding legal significance of documents: Defendant objects to the plaintiff's interrogatories upon the grounds and to the extent that, by them, plaintiffs seek to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

4. Work product information: Defendant objects to plaintiff's interrogatories on the grounds and to the extent that, by them, plaintiff seeks information prepared and/or developed in anticipation of litigation and/or for trial when plaintiff has not shown that it has substantial need of such materials in the preparation of its case in that plaintiff is unable, without undue hardship, to obtain the substantial equivalent of such information by other means.

5. Irrelevant material: Defendant objects to plaintiff's interrogatories on the grounds and to the extent that, by them, plaintiff seeks the discovery of information which is irrelevant and immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

6. Vague, overly broad, and unduly burdensome: Defendant objects to plaintiff's interrogatories on the grounds that the manner in which they are worded, when read with their definitions and general instructions, are so vague, broad, general, and all inclusive that they do

not permit a proper or reasonable response and are, therefore, unduly burdensome and oppressive. Defendant further objects to these interrogatories to the extent that, to respond to them, defendant would be required to make an extensive investigation, research, compilation, and evaluation of data and records in its possession, which would constitute annoyance, harassment, oppression, undue burden, and undue expense to defendant.

7. Inferences from interrogatories: Defendant objects to any inference that can be drawn from any portion of plaintiff's interrogatories or the responses to them that the documents requested or events referenced in the requests actually exist or occurred. The failure to object to each such inference in no way constitutes an admission by defendant that such information exists or that such events actually occurred.

8. Scope Of The Government As Responding Party: Defendant objects to plaintiff's interrogatories to the extent that they define the term "DOE," or the Department of Energy, to include any Government agencies, offices, bodies, affiliates, contractors, consultants, or individuals other than the Department of Energy itself. To define the term "DOE" as including entities other than DOE itself would render all of plaintiff's discovery requests overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, because doing so would require defendant to seek information from, and about, more than one million Federal employees in numerous offices, agencies, and departments, the missions of which have no relation whatsoever to plaintiff's contract and the locations of which are scattered across the nation and around the world. Further, defendant objects to these interrogatories to the extent that they purport to seek information from the files of the entire

Federal Government. In responding to these interrogatories, defendant has focused upon the knowledge of the Department of Energy.

9. The objections set forth above apply to each of the numbered paragraphs of plaintiff's interrogatories.

DEFENDANT'S RESPONSE

INTERROGATORY NO. 13:

Do you contend that DOE would have picked up DAIRYLAND's FAILED FUEL later than the rest of its SPENT FUEL had the government begun SPENT FUEL acceptance from utilities starting not later than January 31, 1998? If so, state all bases for this contention.

ORIGINAL RESPONSE:

Defendant objects to this interrogatory upon the grounds that plaintiff seeks to have defendant make certain legal conclusions. Defendant also objects to this interrogatory because it is premature prior to the completion of fact discovery, given that defendant does not have adequate information regarding plaintiff's failed fuel to respond appropriately to this interrogatory. Defendant objects to this interrogatory as vague, overly broad, and unduly burdensome. Given that the design parameters for any storage facility that DOE might operate have not yet been defined, it is impossible to identify every technical impediment that could occur in the acceptance of failed fuel from Dairyland's nuclear reactor.

Without waiving these objections, defendant responds that, during his trial testimony on August 5, 2004, in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), David Zabransky explained the issues that might arise relating to the acceptance of failed fuel at any repository. Defendant refers plaintiff to that testimony for a response to this interrogatory.

Defendant also states that, although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. E ¶ A.

SUPPLEMENTAL RESPONSE:

The Court's February 5, 2007 order does not require any further supplemental of this response.

SUPPLEMENTAL RESPONSE PURSUANT TO DECEMBER 21, 2007 ORDER

In its December 21, 2007 order, the Court stated that, "if indeed the Government cannot say whether it would have accepted failed fuel from Dairyland on a schedule different than that for standard fuel given its lack of experience with such a situation and sufficient information from Dairyland regarding the extent of its failed fuel, it should say so directly." Order, at 4 (Dec. 21, 2007).

Dairyland's interrogatory here seeks a statement regarding the contention that the Government will make in this litigation regarding the schedule upon which DOE "would have" accepted Dairyland's failed fuel. The question that Dairyland asks – whether DOE "would have" picked up Dairyland's failed fuel on the same schedule as standard SNF – is irrelevant to this case. The only relevant question is whether DOE, under the terms of the Standard Contract, was required to do so. In response to the Court's direction, we do not intend to develop a contention regarding what DOE "would have" done regarding failed fuel had it begun SNF acceptance in 1998, given that it is irrelevant and unnecessary to this litigation. Further, we have no basis for asserting what DOE definitively "would have" done had it commenced SNF acceptance in 1998,

given that such performance might have involved extra-contractual activities and contract amendments, pursuant to mutual agreement by the parties, that are irrelevant to any consideration of damages for a breach of the existing contract terms.

Nevertheless, regardless of whether the relevant issue is, on the one hand, whether DOE "would have" accepted or, on the other hand, whether DOE was contractually required to accept Dairyland's failed fuel on the same schedule as standard fuel, we expect to contend at any trial of the matter in this case that, in the "but for" world, Dairyland's failed fuel would not have been accepted pursuant to the terms of the Standard Contract on the same schedule as standard SNF until and unless Dairyland had established that the failed fuel could have been safely handled and transported to a Federal facility, in the transportation cask to be provided by DOE, in accordance with applicable regulations and would not have required special handling as defined by Appendix E of the Standard Contract.

Although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel, as the plain language of the contract indicates. 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. 3 ¶ A. For any SNF that a contract holder or "Purchaser," such as Dairyland, has designated as other than standard fuel, the Purchaser is required to obtain confirmation from DOE as to the "technical feasibility" of accepting such fuel pursuant to the "currently agreed to schedule." Id. Before DOE can evaluate whether the acceptance of particular failed fuel will require special handling or technology, the Purchaser must advise DOE of the condition of its fuel and ask DOE to confirm that schedule upon which that fuel will be accepted. See id., Art. VI.2(b) & Appendices E & F. To the extent that the Purchaser's description is inaccurate, DOE has the

right to refuse acceptance of the SNF, even if it has traveled to the Purchaser's site for the purposes of acceptance.

Through discovery in this case, we have learned that Dairyland has never inventoried all of its failed fuel, although it knows that it possesses at least some failed fuel with a level of failure that far exceeds much of the failed fuel that is being stored by many other nuclear utilities. Since 1980, Dairyland has maintained its SNF in a two-tiered storage rack in its spent fuel pool. The two-tiered rack configuration does not allow observation of all of Dairyland's SNF without removing fuel assemblies from the rack. Partly because of the risk of further fuel rod segment displacement of Dairyland's damaged fuel assemblies that could occur from additional handling of those assemblies, Dairyland has sought an exemption from Nuclear Regulatory Commission regulations that require Dairyland to perform a complete inventory of its spent fuel pool on an annual basis. Currently, Dairyland does not plan to perform such a complete inventory before 2010.

Dairyland has never advised DOE of the condition of its SNF pursuant to Appendices E and F of the contract. Further, Dairyland has never been in a position to be able to provide the necessary information about its fuel, even though it has been able to determine that at least some of it is grossly failed. Even today, Dairyland does not possess the information that is necessary to allow DOE to make a determination about Dairyland's specific failed fuel. Accordingly, Dairyland cannot meet its burden of establishing that DOE would have accepted Dairyland's SNF on the same schedule as standard SNF had it begun SNF acceptance in 1998, much less that DOE was contractually required to do so.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

Harold D. Lester, Jr.

HAROLD D. LESTER, JR.
Assistant Director

Russell A. Shultis /by Harold D. L.

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
MARIAN E. SULLIVAN
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT C. SLATER
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

January 9, 2008

CERTIFICATE OF FILING

I hereby certify that on this 9th day of January 2008, I caused to be sent by first class mail and facsimile a copy of "DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NUMBER 13 PURSUANT TO THE COURT'S DECEMBER 21, 2007 ORDER"addressed as follows:

JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, N.W.
Suite 1000
Washington, D.C. 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)

# Attachment 3

**Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, 98-474C August 5, 2004**

**Heritage Reporting Corporation**

**Page 4107 to Page 4238**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Q. And putting the fuel into DOE transportation casks, where is that supposed to happen?
A. At the utility site.
Q. Turning to another subject, Mr. Zabransky, what is failed fuel?
A. Failed fuel is generally fuel that requires some kind of special handling. There's some issue with it that requires something to be looked at.
Q. Do you have an understanding as to whether DOE is required to accept failed fuel, pursuant to the standard contract?
A. It's my understanding DOE is required to accept all the utilities' fuel, pursuant to the contract, yes.
Q. Including failed fuel?
A. Including failed fuel.
Q. Do you have an understanding as to what the contract requirements are for the scheduling of the delivery of failed fuel to DOE?
A. The contract contains provisions that require the utility to notify DOE that it has failed fuel and to seek procedural and schedule a confirmation that that fuel can be accepted on the normal agreed-to schedule, and that's for failed fuel



and other than nonstandard fuels.
Q. Can I have Defendant's Exhibit 7, please? Mr. Zabransky, you've been handed what's been marked as Defendant's Exhibit 7. Do you recognize this document?
A. This document appears to be a copy of the contract between Yankee Atomic Electric and the government for disposal of spent fuel from Yankee Atomic's plant.
Q. Thank you. Could I direct your attention to pages 13 and 14 of this document, specifically Article VI, (a)(2)?
A. Okay.
Q. Do you have that in front of you?
A. Yes, I do.
Q. Mr. Zabransky, could you read the portion that's highlighted on the screen?
A. "DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel. However, for any SNF which has been designated by the purchaser as other than standard fuel, as that term is defined in Appendix E, the purchaser shall obtain delivery and procedural confirmation from DOE prior to delivery. DOE shall advise purchasers within 60 days



after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed-to schedule and any schedule adjustment for such services."
Q. Thank you. Mr. Zabransky, in the provision that you've just read, what is your understanding of the phrase "other than standard fuel"?
A. That would be fuel as defined in Appendix E of the contract, that Appendix E sets forth criteria for standard fuel and it sets forth criteria for nonstandard and failed fuel, which are also called "other than standard fuel."
Q. Can we go to Appendix E, please? Mr. Zabransky, are these the categories of other than standard fuel that you were just referring to?
A. Yes, in the contract, we have standard fuel, which is under C1, and the other than standard fuels are in C2 and C3 of that section.
Q. Can we go back to the provision on page 14? Mr. Zabransky, in the highlighted provision, what is your understanding of the phrase "currently agreed-to schedule"?
A. My understanding is that that would refer to the approved DCSes for delivery of fuel.
Q. And that phrase also, that provision also



refers to a requirement to obtain delivery and procedure confirmation. What is your understanding as to what that will require?
A. Well, that would require that once the failed fuel is identified or nonstandard fuel is identified as to what condition makes it nonstandard, that we'll have to look at, the Department, the receipt facilities that we have and any other equipment that we have, including transportation equipment to verify that there's no issues associated with receiving fuel in that condition.
Q. And what is your understanding of the phrase "technical feasibility" in that provision?
A. In that provision, "technical feasibility" could entail physical capabilities at the facility. It could entail that the facility has been licensed and analyzed for handling fuels in certain conditions. It could entail the procedures that are in place to handle fuel in certain conditions. So all that has to be done for us to be able to accept that fuel.
Q. Has DOE determined the technical feasibility of handling failed fuel?
A. That's something that's going to have to be

Page 4135

done on a case by case basis, once we know exactly what's failed about a given assembly. There's many things that can cause an assembly to be failed, and that will have to get looked at against the requirements that may exist in the license and technical specifications and make sure that the analysis has been done and the license has been granted, such that we can possess fuel in that condition.

Q. And when will that case by case analysis be undertaken?

A. Well, again, it would be after we've been asked to look at a specific type of failed fuel by a utility, and after we have a license that says we can go off and we can compare it against, but we're not in a position right now to do that.

Q. And the license that you're referring to, which license is that?

A. That's the one to operate the repository because, again, that's where it's going to set forth what technical specifications we might have that limit our ability in the facility.

Q. Mr. Zabransky, are you familiar with the exchange provision of the contract?

A. Yes, I am.

Page 4136

Q. What is your understanding as to what that provision provides?

A. That provision of the contract allows utilities to exchange amongst themselves approved delivery commitment schedules, subject to DOE's approval.

Q. Do you recall considering exchanges while you were at Wisconsin Electric?

A. I recall at Wisconsin Electric that we discussed the concept of exchanges, but we never considered any concrete real exchanges.

Q. Do you recall any specific discussions about exchanges?

A. Yes, we talked, in generally, my bosses and myself, was that this was a provision that would be interesting. It's something we could look into. We had been doing a number of exchanges in other things in the fuel cycle in the front-end, as far as uranium and converted product, but that this provision, we needed to take into account the political uncertainties, and this is something that probably was going to be very hard to do. And that if we exchanged a place in line, in essence, we saw it as something where someone would be looking for some of our early allocations,

Page 4137

because we had a number of early allocations, that they'd want us to move back, that we'd have to figure out how to justify that, and that we'd probably have to have some type of premium to justify the pain and political heat that we may take for doing such a thing.

Q. Were you ever asked on behalf of Wisconsin Electric to exchange allocations with another utility?

A. No, I was not.

Q. And did you ask on behalf of Wisconsin Electric to exchange allocations with another utility?

A. No, I did not.

Q. Since you had been at DOE and served as the contracting officer's technical representative and the contracting officer, has any exchange request been submitted to DOE for approval?

A. No, it hasn't.

Q. Has DOE formalized the criteria it would use to evaluate a exchange request should it receive one?

A. The criteria would have to be something that would get looked at in light of when the request was received and what the request was for. So other

Page 4138

than the fact that we have to look at all aspects of the system and make sure we could address or accommodate the exchange, there really are no formal criteria.

Q. Can we have Plaintiffs' Exhibit 145? Mr. Zabransky, do you recognize what's been marked as Plaintiffs' Exhibit 145?

A. Yes, this is a letter from Dr. Daniel Dreyfus, who was the director of the program, to Dr. Kadak, who was at the time president and CEO of Yankee Atomic.

Q. This letter is dated September 28th, 1995. Do you recall seeing it about the time it was prepared?

A. I believe I did. I don't know what my involvement was in creating it, but I believe I was aware it was getting done at the time and sent out.

Q. Could we highlight the last sentence of the second paragraph? Mr. Zabransky, can you read the last sentence that's been highlighted there?

A. In its entirety?

Q. Actually, read the entire thing, although it's not all highlighted.

A. "We believe the exchange provision will allow industry to optimize the allocation of waste