# APPENDIX C

**Arthur, John Deposition Testimony dated 9/22/05**

0001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------:

PACIFIC GAS & ELECTRIC COMPANY, ::

Plaintiff, ::

vs. : No. 04-074C into: which has been consolidated No. : 04-075C

UNITED STATES OF AMERICA, :

Defendant. :

----------------------------------:

Washington, D.C.

Thursday, September 22, 2005

Deposition of:

W. JOHN ARTHUR, III

called for oral examination by counsel for Plaintiff, pursuant to notice, at Greenberg, Traurig, L.L.P., 800 Connecticut Avenue, Northwest, Suite 500, Washington, D.C., before Shari R. Broussard, a Notary Public in and for the District of Columbia, beginning at 9:41 a.m., when were present on behalf of the respective parties:

00002

On behalf of Plaintiff:

JERRY STOUCK, ESQUIRE
ROBERT L. ELAM, ESQUIRE
Greenberg, Traurig, L.L.P.
800 Connecticut Avenue, Northwest
Suite 500
Washington, D.C. 20006
(202) 331-3173

On behalf of Defendant:

HEIDE L. HERRMANN, ESQUIRE
ALAN J. LO RE, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-3315

ALSO PRESENT:

Jane Taylor, Esquire, Department of Energy
Larry Warner, Esquire, Department of Energy
Judge Hewitt (Via telephone)

00003

CONTENTS

| EXAMINATION BY: | PAGE |
|---|---|
| Counsel for Plaintiff | 5, 323 |
| Counsel for Defendant | 318 |

| ARTHUR DEPOSITION EXHIBITS: | * PAGE |
|---|---|
| 1 OCRWM Organizational Chart, 6/27/05 | 20 |
| 2 U.S. Nuclear Waste Technical Review Board, Winter Board Meeting, 2/9/05 | 68 |
| 3 "Project Operational Thermal Management Strategy," 2/9/05 | 88 |
| 4 Spent Nuclear Fuel Verification Plan, Revision 0, 3/97 | 106 |
| 5 Commercial Spent Nuclear Fuel Handling In Air Study, 3/05 | 123 |
| 6 "OCRWM's Transportation Planning Update, 1/21/04 | 167 |
| 7 "Yucca on DOE Christmas List," 5/14/04 | 183 |
| 8 U.S. Nuclear Waste Technical Review Board, Winter 2003 Board Meeting, 1/28/03 | 187 |
| 9 "Alternative Canister Scenarios" | 215 |
| 10 "The Potential of Using Commercial Dual Purpose Canisters for Direct Disposal" | 216 |

00004

| ARTHUR DEPOSITION EXHIBITS: | * PAGE |
|---|---|
| 11 U.S. Nuclear Waste Technical Review Board, Repository Design Update Panel on the Engineered System, 1/20/04 | 229 |
| 12 Afternoon Session, Bates NRC0040160 to 190 | 260 |
| 13 Memo from Huizenga to Distribution, 12/29/99 | 269, 275 |
| 14 "Yucca Mountain Project - Design and Operations in 2010" | 286 |
| 15 Partial Transcript, Yankee Atomic Electric vs. U.S., Pages 7825 to 7844 | 309 |

**8:20 - 9:15**

00008
Q What is your title again?
A I'm a Deputy Director for Office of
Repository Development.
00009
Q When were you appointed that position?
A December of -- let's see -- 2002.
Q By whom?
A It's not an appointment. I'm actually a
career federal employee, so I reported to
Dr. Margaret Chu, who was the Director of OCRWM.
Q Did she select you for your current
position?
A That is correct.
Q You're the head of the Office of
Repository Development; is that correct?
A That's correct.
Q How many DOE employees are in that
office?
A Approximately 95.

---

**10:9 - 11:20**

00010
Q And what are the principal
responsibilities of the office?
A Of my DOE office?
Q Yes.
A Principal responsibilities, I'm
accountable for, first of all, performance -- head
of contracting authority for the Office of Civilian
Radioactive Waste Management. Our office is
accountable for development and preparation of a
license application for the repository. We're
accountable for License Support Network,
development and certification, and then oversight
to the contractors that are doing all of our
engineering, design and other planning.
00011
Q Engineering and design for the
repository?
A Right, long-term planning, yes.
Q The engineering and design of the

repository that your office is responsible for would include both surface and underground facilities or portions of the repository project?

A Correct, everything that's required for -- in support of the license application.

Q That's your office. What about your personal responsibilities? What do you do?

A My personal responsibilities, I am the certifying official for the License Support Network, I'm accountable for the management administration of our overall office, as I mentioned earlier, I am the head of contracting authority for the Office of Civilian Radioactive Waste Management, and then I oversee and supervise a number of our senior executives and senior officials.

---

## 116:8 - 118:11

00116

I'm going to show you a document that relates to failed fuel. So as a predicate to that, Mr. Arthur, can you tell me generally why it is that at the present time there is this interest in failed fuel?

A First of all, our interest right now on the failed fuel has to deal with, and in my definition I mean the failed fuel would be fuel that the cladding is damaged, where also, as we've been made aware over the last year, there could be small pinhole leaks that actually get oxidized under higher temperatures. And most of the interest there, as I talked about earlier, are in that particular area right now and so that's where we have a lot of interest, because we have recent

00117

reports that have been brought to our attention that show at higher temperatures various pinhole leaks get oxidized and that could be issues for us in a hot cell, especially when we're dealing with large volumes of fuel assemblies. So we're working that right now. That's one of the areas I talked about our design where we're making some modifications.

Q Can you be more specific about the

identity of one or more reports that speak to this
issue, you know, who prepared it, dates?
A Couple areas and I have to follow-up on
specifics, but these are reports I believe we've
made public and in the program. There was one that
was done by our contractor, Bechtel SAIC, back in
the March 2005 time frame that actually took some
earlier reports -- you need to go over that to get
the references on them.
Q Yeah.
A It will give you a chain of documents --
that actually showed this to be an issue and so
that's what's causing some of the design
00118
modifications and evaluations that we're currently
doing.
Q Was there any study, you know, subsequent
to, you know, additional analysis of the issue or
the problem subsequent to the March '05 Bechtel
SAIC study?
A There's been a lot of evaluation after
that study, I mean internal reviews to make sure
that we're knowledgable that our facilities can
accommodate the various bare fuel assemblies we're
going to have to deal with.

---

**118:12 - 120:19**

00118
Q Is it true that one of the things that
came to light in connection with that study was
that there may be pinhole leaks that are present in
fuel arriving at the repository that cannot or have
not been detected in advance? Is that one of the
issues?
A That is one of the possible issues. We
still don't have the full knowledge of whether
that's correct or not, but we're trying to get the
necessary information.
Q But the study you referenced suggested
00119
that may be the case?
A That is correct.
Q And prompted further analysis of the
issue?

A That's correct. And I might add on that
that it's a very small amount of the overall. If
you look at our life-cycle projections of the
repository, we're talking about 225,000 assemblies
that could be handled in bare fuel. We're talking
probably less than 5,000 that could have this
particular condition.
Q Assume it turns out to be true, this
pinhole leak issue, what kinds of modifications to
the facility might then, you know, what are you
looking at to sort of deal with it?
A The first of our goal is to know ahead of
time versus opening one and having that issue. So
as much knowledge as we have on the front end prior
to receipt, that's important to us and we want to
be able to deal with that particular fuel, be it
4,000 assemblies, 2,000 or 5,000 in what I call an
off-normal condition, so we would have a regular
00120
routine operation that most of those facilities
deal with.
In these particular areas it may require
us to inert with a particular gas like nitrogen the
particular hot cell we're actually going to deal
with these in order to prevent that oxidation. So
that's why it's very important for us to have that
kind of knowledge.
Q Are those design modifications going to
be made before the license application is
submitted?
A We're currently -- the contractor,
Bechtel SAIC, has recently provided a proposal of
new information to me. My staff is currently
addressing that. We have started some efforts to
be ready to deal with that particular issue.
Q So your current plan is to try to work
this into the license application?
A That is correct.

---

## 136:5 - 137:6

00136
Q Okay. I think it's obvious to me from
this study, but let me just ask, I mean the
existence of this study makes clear that some

amount of the spent nuclear fuel that arrives at the Yucca Mountain repository will be failed fuel or damaged fuel, as defined in here; is that right?
A That's correct, as listed in the first paragraph of the executive summary.
Q The first paragraph says about 4 percent, something like that. It doesn't say it quite that way, but it says it in a backwards way; is that right?
MS. HERRMANN: Objection to the characterization of the document.
THE WITNESS: Let's clarify what the report says.
BY MR. STOUCK:
Q Sure.
00137
A It says that 96 percent, again I'm just reading what's written here, it's estimated that 96 percent of the commercial fuel assemblies will have intact cladding and should not experience fuel oxidation. The balance of the assemblies would have varying amounts of damage.

---

## 194:6 - 194:20

00194
Q Back to this Exhibit Number 8, please, just on page 32. This is not your presentation, but some of this material we've covered to some extent before, although it was a meeting almost two years later I think, so I just want to make sure that we also touch on some of this stuff in the January 2003 time frame.
If you look at the table of contents on page three, Mr. Williams, Jeff Williams is giving a part of the program that's titled on the table of contents "Operating the Waste Management System (waste acceptance, packaging, transportation, repackaging, emplacement)." Do you see that? Have you looked at that?
A On page 32, uh-huh.

---

**196:3 - 197:17**

00196

Q And then there's a reference to the standard contract, but what I'm interested in for now is on line 22. It says, "There's no other facility that's out there that's planning to pick up failed fuel. There's no failed fuel repository. We're it." And that is certainly true today, I mean that's consistent with some of the things we've talked about earlier, right?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: Well, I understand the statement. As I said earlier, our basic intent is to receive and deal with those materials that were received at the repository, so in that context I agree with the statement.

BY MR. STOUCK:

Q What about --

A I'm going to clarify something because you started -- let's go back one time. You started that last question at line 22, "There's no other

00197

facility"?

Q Yes.

A You know, my point in agreeing with that part of the statement is, you know, as I mentioned in my last response, but I'm not aware of what other facilities are out there that are dealing with failed fuel. I believe some utilities are probably dealing with that every day, so I'm not going to comment on that first sentence. But the last one, our goal is to try to receive and deal with those materials that are shipped to Yucca Mountain.

Q And there's certainly no other failed fuel repository for commercial fuel anyway, in terms of the repository, that is consistent with disposal?

A There's only one repository.

**Barrett, Lake Deposition Testimony dated 4/22/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Deposition of LAKE H. BARRETT
Washington, D. C.
Monday, April 22, 2002
9:31 a.m.

Job No.: 11792-4
Pages 1 through 272, Volume 1
Reported by: Diane Gomez, RPR
00002
DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - - X

00003

Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

00004

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER

555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

00005

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
UTILITY DISTRICT:
TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFF
COMMONWEALTH EDISON COMPANY:
DONALD R. CASSLING, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

00006

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF
WISCONSIN ELECTRIC POWER COMPANY:
DONALD J. CARNEY, ESQUIRE (a.m. session)
SUZETTE W. DERREVERE, ESQUIRE (p.m. session)
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D. C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:
KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D. C. 20530

(202) 307-1011

00007

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT UNITED STATES:

HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D. C. 20530
(202) 307-0290

ON BEHALF OF THE UNITED STATES DEPARTMENT OF ENERGY:

JANE K. TAYLOR, ESQUIRE
U.S. DEPARTMENT OF ENERGY
1000 Independence Avenue, Southwest
Washington, D. C. 20585
(202) 586-7530

00008

C O N T E N T S

EXAMINATION OF LAKE H. BARRETT PAGE
By Mr. Cayne 10

E X H I B I T S
(Retained by counsel.)

| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 1 Mission Plan for Civil Radioactive Waste Management Program | 95 |
| 2 Excerpt of Volume 2 of Records of Responses to Public Comments on Draft Mission Plan for the Civilian Radioactive Waste Management Program | 165 |
| 3 Letter dated 9/7/84 D. Hodel to J. Bennett Johnston dated 9/7/84 | 165 |
| 4 Draft of the Civilian Radioactive Waste Management Program Mission Plan as of 12/20/83 | 181 |

| | |
|---|---|
| 5 Annual Capacity Report Briefing for OCRWM Executive Committee, November 1996 | 194 |

00009

E X H I B I T S C O N T I N U E D

(Retained by counsel.)

| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 6 June 1987 annual capacity report | 201 |
| 7 Nuclear Waste Fund Adequacy Assessment dated March 1986 | 220 |
| 8 Draft mission plan amendment dated January 1987 | 223 |
| 9 Annual capacity report issued by the Office of Civilian Radioactive Waste Management in June 1988 | 245 |
| 10 Section 10165 of Title 42 | 246 |
| 11 Section 10168 of Title 42 | 246 |
| 12 Draft 1988 mission plan amendment | 262 |

---

## 10:21 - 11:8

00010

Q What is your current position, Mr. Barrett?
A I'm the deputy director of the Office of

00011

Civilian Radioactive Waste Management.
Q For how many years have you been employed by the Department of Energy?
A Since mid-'85 in various different positions.
Q And prior to 1985 what was your position?
A I worked for the Nuclear Regulatory Commission since the end of '74 in various positions.

---

## 50:1 - 59:11

00050

Q Was it ever the position of your office subsequent to that time that the goal would be to be in a position to accept a single spent fuel assembly by January 31st, 1998?
MR. CRAWFORD: Objection, vague.
Objection, foundation, and objection to the extent it calls for a legal conclusion.

A It was never our plans to take one fuel assembly to my recollection.
Q Do you recall ever having any discussions internally whether the acceptance of a single fuel assembly would satisfy the department's obligations under the contract, the standard contract?
A I never recall any discussions from a systems perspective about the contract, so, no, I don't recall ever having a discussion.
Q What do you mean from a systems perspective?
A We were -- our job was to develop the systems to receive the material, and we never, to my recollection, we never discussed about a system that would receive one fuel assembly. Okay. We always
00051
talked about more.
Q From a systems perspective was it ever your intention to design a system that could only accept 900 MTUs of spent nuclear fuel per year?
MR. CRAWFORD: Objection, vague. Objection, foundation. Objection to the extent it calls for a legal conclusion.
A Repeat the question.
Q From a systems perspective was it ever your intention to design a system that could only accept 900 MTUs of spent nuclear fuel per year?
A There's different things happened as a function of time, okay. What time are you referring to?
Q In 1986.
A In '86, no.
Q In 1986 how many MTUs per year did you attempt to design a system to accept?
A I don't recall a specific number, but it was -- I don't recall a specific number. It's in the records.
Q Would 3,000 refresh your recollection?
00052
A That's probably about right.
Q And how did you come to the 3,000 number?
MR. CRAWFORD: Objection, foundation.
A I'd have to go back and look at records, which I have not done. It is the evolution of the design receipt rates for the first repository, second repository, the MRS in the system. My recollection is

the MRS was to receive 3,000 tons a year circa that time prior to the amendments act, which was in excess of the generation rate of around 2,000.
Q That was important, wasn't it, that it be in excess of the generation rate?
MR. CRAWFORD: Objection, vague.
A Well, important? Yes, in my opinion it was significant that you design a system to remove the backlog of materials that were accumulating under the intent of the act.
Q And why was that significant in your view?
A Because the concept of a Nuclear Waste Policy Act was to -- for the federal government to take the materials from the high-level waste and spent fuel sites into federal custody.
00053
Q And based on that concept it was significant or material that you be able to design a system to remove the backlog of materials that were accumulating, correct?
A Within a reasonable -- within a reasonable sense, correct.
Q What do you mean by within a reasonable sense?
A Well, you can -- there is no automatic number that you would calculate. The higher the numbers, the more the complexity of the system, the more the system costs. So there was a balance, and we did studies that I recall in a general sense as to what would be the appropriate receipt rates for planning designing purposes.
Q The goal was to make the take rate high enough so that you could eliminate the backlog within a reasonable amount of time without making the rate so high that the complexities would send the cost through the ceiling, correct?
MR. CRAWFORD: Objection, vague. Objection, foundation.
00054
A In a general sense.
Q Again, what do you mean when you say in a general sense?
A We did not -- you all get into the contract. We did not consider the contract issues at that time, so we were balancing the size of the system, the uncertainties of an MRS would or wouldn't

be approved, the repositories, where they might be,
how many we would have. So it was a complicated
balancing of many interests, and so to -- it would be
inappropriate to say that we had a numerical number to
move the backlog or anything like that because I don't
recall anything like that.
Q You didn't have a numerical number to move
the backlog but you had a goal to move the backlog,
correct?
A Within a reasonable --
MR. CRAWFORD: Objection, vague.
A Within a reasonable sense, yes. In a
general sense I mean.
Q And in establishing these goals you were
considering the requirements, of course, of the
00055
Nuclear Waste Policy Act of 1982, correct?
MR. CRAWFORD: Objection, foundation.
A We knew that the general policy laid out in
the act for the federal, you know, intention to
dispose of the nation's waste and spent fuel.
Q And you understood the policy behind the
act would call for the elimination of the backlog of
spent nuclear fuel within a reasonable amount of time,
correct?
MR. CRAWFORD: Objection. Foundation.
A Reduction as opposed to elimination. As
long as they operate, you don't eliminate it. So
reduction, yes.
Q And just explain what you meant by as long
as they operate you don't eliminate it?
A Well, when -- when reactors operate, there
is always going to be some inventory of spent fuel
there. We were working to minimize the backlog and
reduce the backlog that was at the sites.
Q So in order to be able to minimize the
backlog, the acceptance rate would have to be at some
level higher than the rate at which spent nuclear fuel
00056
was being produced, correct?
MR. CRAWFORD: Objection to the form.
Objection, vague.
A Our intention was to design a system that
would reduce the backlog to a reasonable sense.
Q And in order for that to happen, as a
matter of mathematics or simple equation, the

acceptance rate would have to be something in excess of the rate at which new spent nuclear fuel was being created, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony.
A In a general sense, yes.
Q And in 1986 you believed that the 3,000 take rate that you were targeting at that point would accomplish the goals you have been alluding to, correct?
MR. CRAWFORD: Objection.
Q And the goal I'm referring to is the reduction of the built up backlog.
MR. CRAWFORD: Objection to the foundation. Objection to the extent it mischaracterizes his prior

00057

testimony.
A Yes.
Q Can you describe for me how the department actually arrived at the 3,000 number?
A I don't --
MR. CRAWFORD: Objection, foundation.
A I don't recall how it was done.
Q Do you recall the general issues that were considered?
A No more than what I've just said to you before.
Q Well, would you please state for me your understanding of the issues that were considered in establishing the 3,000 rate.
A The 3,000 number was there prior to my -- I didn't do the 3,000 number. My understanding of my predecessor's was that 3,000 --
MR. CRAWFORD: I'm going to object to the extent the question calls for speculation.
MR. CAYNE: Again, I'm going to object to counsel's continuing the interruption of the witness.
Q Please continue.

00058

A That my predecessors did some of these balances of performance, reduction of the inventory, the cost and the complexities and the siting and had as a planning purpose the 3,000 number.
Q Did you consider political factors in coming up with the 3,000 number?
MR. CRAWFORD: Well, let me object to the

extent it assumes facts not in evidence. Objection to foundation.
A Political, no. Not political. There was policy regarding Congress would or would not approve an MRS and those sorts of things. And schedules.
Q Was the 3,000 MTU take rate related to the Department of Energy's estimate of the utilities' discharge rate?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
A I personally don't know. I assume -- I don't know.
Q You assumed what?
A That when they -- the production rate at the time was around 2,000. So I assumed that the
00059
3,000 that existed was chosen in consideration with the production rate, you know, the cost and the transportation and the other issues involved.
Q So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation, correct?
MR. CRAWFORD: Objection, speculation. Objection, foundation.
A Yes.

---

## 74:2 - 74:15

00074
Q Had Congress approved the MRS proposal made by the department to the Congress in 1987, would the department have been in a position to accept spent fuel at the 3,000 MTU rate in 1998?
MR. CRAWFORD: Objection, vague.
A It is my recollection that the proposal at that time we theoretically could have done that, 3,000 in '98.
Q So --
A Excuse me. Let me rephrase. Not that we would have reached 3,000 -- we would ramp up to 3,000. We would not have received 3,000 in 1998. We would have started receiving in 1998 and would have ramped up to 3,000 in an appropriate time period.

**84:2 - 93:8**

00084
Q And in January 1993 what position did you take?
A Admiral Watkins made me acting director of RW.
Q And RW stands for?
A Offices of Civilian Radioactive Waste Management.
Q And what were your duties in that position?
MR. CRAWFORD: Objection, vague. Objection, lack of foundation.
A The duties of the director of the Office of Radioactive Waste Management.
Q You ran the program at that point, correct?
A That's correct.
Q And have you basically held that position either as acting director, director, or deputy director through today?
MR. CRAWFORD: Objection, vague.
A I was never the director. I was either the acting director or the deputy director.
Q And today you are the deputy director,
00085
correct?
A Correct.
Q When you took the position as acting director, was the development of an MRS still under consideration?
A Yes.
Q And how did you envision or how did you plan for the MRS to operate at that point in time? I believe it was you said December '93?
A January.
Q Excuse me. January '93.
MR. CRAWFORD: Objection, lack of foundation.
A The plans then were to pursue a volunteer MRS site and to have the volunteer present their proposal for site and congressional approval.
Q Did you envision the MRS as a stand-alone facility at that time, not operating in conjunction with a repository to be built?

MR. CRAWFORD: Objection, foundation.

A My understanding was it was still an integrated facility with a repository. The only

00086

repository at that time was the Yucca Mountain, and a volunteer MRS would integrate into the system.

Q And what do you mean by that phrase that it would integrate into the system?

A It was a variation of the old MRS of the mid-eighties where you could receive the material, repackage it and send it on to the repository.

Q When you say a repackage of the old MRS of the mid-eighties, are you referring to the MRS in the form in which it was originally proposed to Congress?

MR. CRAWFORD: Objection, vague.

A Many of the concepts of the MRS of the mid-nineties retained as much as it could the concept of the mid-eighties, which that was an integrated MRS of the mid-eighties. And we worked to maintain those integration aspects in the early nineties as well.

Q During your time at the Department of Energy was the MRS ever considered or planned to operate as a stand-alone facility separate and apart and without regard to whether a repository was established?

MR. CRAWFORD: Objection, vague.

00087

A No.

Q Did you personally ever suggest, make such a suggestion, that an MRS be operated as a stand-alone facility without regard to whether a repository was ever sited and approved?

A Not to my recollection.

Q Do you recall anyone within the department ever making such a suggestion?

A No.

Q And you've been at the department since 1985, correct?

A Yes.

Q And we went through your different job positions. You never left the department since 1985, correct?

A Correct.

Q Could you describe for me the process that your office went through with respect to the MRS after you were appointed as acting director in January 1993.

You indicated that the MRS was still under consideration at that point, correct?
A Yes, it was. Now, the question again is?
00088
Q At some point after that it was taken off the table?
MR. CRAWFORD: Objection. Foundation. Objection, assumes facts not in evidence.
A Tell me what again you want me to describe about the MRS in what time period, because there's a change as a function of time.
Q I want you to describe for me the -- your office's considerations and deliberations from the period starting January 1993 which ultimately led to the decision to no longer propose the siting and -- the establishment of an MRS.
MR. CRAWFORD: Objection, foundation, and objection, assumes facts not in evidence.
A In the first half of '93, during the budget cycle, we proposed to enter into the next phase with three volunteer MRS site -- siting jurisdictions, which were three Indian tribes. We proposed in the FY '94 budget request monies to go to develop proposals to give to Congress to allow the creation of an MRS to meet the '98 date. That I testified to in the spring of '93. That was our plans until the '94 budget was
00089
created by statute in nominal October of '94 in which the United States Congress and signed by President Clinton did not have funding for the MRS site. At that point there was no ability -- it was unlikely that there was going to be an MRS in 1998. Therefore, it would be difficult for us -- it would be very difficult for us to meet the 1998 date. So in '93 that's my recollection of what happened.
Q You're saying as a result of the budget enacted in October of '94 it would have been difficult --
A '93. '93. October '93.
Q October '93. It would have been difficult to establish an MRS by January 31st, '98, correct?
A Correct.
Q And was it at that point that your office made the decision to no longer consider the development and construction of an MRS?
MR. CRAWFORD: Objection to the foundation.

A I don't remember the details of the evolution in that period, but the MRS certainly waned in our thinking because our three leading candidate

00090

sites were no longer funded.

Q Did you make any efforts to attempt to revive the MRS proposal after October '93?

MR. CRAWFORD: Objection to the foundation.

A We did what we could. I think we got another negotiator from the Clinton administration somewhere in that period, which we supported, but it was -- it wasn't -- we still tried to do it but there wasn't much that could be done.

Q When did you finally give up or cease the effort to establish an MRS?

A What we --

MR. CRAWFORD: Objection to the foundation.

A What we did was we moved to a nonsite-specific technical work on the MRS. We prepared -- our work focused on nonsite-specific work. We submitted a topical analysis to the NRC and we did not, given that the site-specific work was not desired by Congress, we did very little in that area, except to support Mr. Stallings who became the new negotiator.

Q What did your nonsite-specific work

00091

involve?

A It was technical work leading up to the submittal in '95ish I guess of the generic topical safety analysis report for an interim storage facility to the Nuclear Regulatory Commission in hopes that some site -- siting might be able to happen and that we could accelerate receipt -- accelerate building -- and approvals, accelerate approvals through the NRC. That was the concept behind why we did that. And that was done in '94ish, '95ish.

Q And what happened next with respect to the development of the department's MRS plans?

A They were overtaken by events in the mid-nineties, what I refer to as the interim storage battle started to begin between the republican Congress and the Clinton administration.

Q For the record would you please explain what you're referring to by the interim storage battle?

A Well, the republican -- leaders -- some of
the leaders in Congress wished to have an interim
storage legislation and change the act. And then what
00092
happened was instead of we in the department doing
monitored retrievable storage facility, those
discussions were overshadowed by the desire of certain
elements within the Congress to have a stand-alone
interim storage facility, which led to various
legislations that never became law.
Q As a result of these battles, did your
office cease its work on the development of an MRS?
MR. CRAWFORD: Objection to the foundation.
A Effectively, yes. Except for the generic.
We did the generic work. We finished that work
through the nineties, but we didn't do anymore
site-specific MRS work during that mid-nineties
after --
Q When did your office complete the, quote,
generic work?
A I would have to look at the records.
Somewhere in the mid-nineties.
Q And what did you do with the work product
that was created as a result of those efforts?
A They're in the records for anybody to use.
They exist in approvals of the NRC and the docket.
00093
Q Were they submitted to Congress?
A No.
Q After your office completed the work on the
generic, what you refer to as the generic work,
between that date and today did your office or has
your office engaged in any additional efforts with
respect to the establishment of an MRS facility?
A No.

---

## 116:14 - 122:6

00116
Q And what acceptance schedule did the
standard disposal contract provide for?
MR. CRAWFORD: Objection, foundation.
Objection to the extent it calls for speculation.
A I think the contract references other
documents that references things, and I don't

specifically know.

Q So is it your testimony that it provided for a schedule but you don't sitting here today know

00117

what that schedule is?

MR. CRAWFORD: Objection. Argumentative.

A The receipt rate of January -- excuse me, the receipt date of January 31, 1998, clearly was always a goal. Okay. Regarding the acceptance rate of so many tons year one, year two, year three, okay, you know, that has changed over time. My focus has always been to create a siting process that got us a site to allow us to have the -- a reasonable receipt rate going toward the steady state 3,000 tons per year, and that's where my focus has always been, not on contract details. Okay. I am not a lawyer, I'm an engineer, okay, so I have not gone into the contract in any great detail at all.

Okay, now regarding your question here about the acceptance schedule in the contract, actually I don't recall seeing a metric ton per year in the contract.

Q Let me step back a second, Mr. Barrett. You just referred to a reasonable receipt rate going toward the steady state 3,000 tons per year.

A Right.

00118

Q "That's where my focus has always been." Do you recall that testimony?

A That's what I just said I think.

Q Does that continue to be your focus to this very day, sir?

A Yes.

Q And does that continue to be the focus of the Department of Energy's spent nuclear fuel program?

MR. CRAWFORD: Objection to the form. Objection to the foundation. Objection, vague.

A We are still trying to perform under the Nuclear Waste Policy Act to receive the waste into the federal system as soon as we can under the constraints of the law. So, yes, that remains my goal and the organization's goal.

Q Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct?

MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony. Objection, foundation. Objection, vague.

00119

A That has been our goal to do that.

Q And it continues to be your goal today, correct?

A Correct.

Q And it was your goal in 1985, correct?

A Correct.

Q And it was the goal of the department in 1982 when the standard contracts were signed, correct?

MR. CRAWFORD: Objection, vague. Objection, calls for speculation. Objection to the extent it mischaracterizes his prior testimony.

A I wasn't there in '82 so I don't know about '82, but in '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate.

Q And the reasonable rate is the rate that would ramp up -- is a rate that would ramp up towards 3,000 MTUs per year, correct?

MR. CRAWFORD: Objection, vague. And foundation.

Q I believe your counsel cut you off. What was your answer, sir?

00120

A That has been our intent.

Q Let's go back to paragraph three, page seven. You referred to January 31st, 1998, as being a goal. Was it something more, wasn't it a contractual commitment and a statutory command?

MR. CRAWFORD: Objection, argumentative. Objection, best evidence. Objection to the extent it calls for a legal conclusion.

A As an engineer, okay, and as a program administrator, okay, and dependent on what the contract said or what courts said, we were always trying to achieve that goal.

Q And why did you establish that goal for yourself?

A Because --

Q And your department?

A It was set in the law, okay, that our goal was to try to create a facility and to create a system that would meet that goal of January 31st, 1998, to

start to receive fuel. And it has always been an important objective and goal.
Q To start to receive fuel on January 31st,
00121
1998, at a ramp-up level that would -- in a reasonable amount of time and at a 3,000 per year MTU acceptance rate, correct?
MR. CRAWFORD: Objection to the form. Objection to the mischaracterization of prior testimony. Objection to the extent it assumes facts not in evidence.
A It was a systems goal to receive the material at a reasonable rate, okay, of which the 3,000, ramp up to 3,000 tons was a reasonable rate. It was never a -- in my opinion it was never a legal requirement to do 3,000 tons per year.
Q You base the goal on the statute, correct? That's what you've testified to, correct?
A Yes.
Q Back to paragraph three --
A Excuse me. Let me go back to that. When you say the statute does not say 3,000, okay, that was a judgment part. It is the receipt in January 31, 1998, is in the statute. The rate to my knowledge is not in the statute.
Q So why did you set the 3,000 MTU goal?
00122
A That was a --
MR. CRAWFORD: Objection to the fact that that question assumes facts not in evidence.
A That was in our judgment a reasonable rate, steady state rate to move up to under the circumstances we were in.

---

## 149:5 - 149:21

00149
Q Are you familiar with the basis for the 3,000 MTU per year receipt rate in 1985?
MR. CRAWFORD: Objection, asked and answered. Objection, foundation.
A I'm familiar with it. It was established before my arrival or personal participation in establishing that number. It seemed like a reasonable number to me then as it does today.

Q Has there ever been a time since you've been at the Department of Energy that a 3,000 MTU per year rate did not seem reasonable?
MR. CRAWFORD: Objection, vague. Objection, asked and answered. Objection, lack of foundation.
A As this is used in this case, as an assumption for an operating facility rate and capacity, it was a reasonable number.

---

## 159:16 - 160:19

00159
Q And is it your understanding that the standard contract was entered into between the government and the utilities with nuclear reactors in order to carry out the underlying intent of the Nuclear Waste Policy Act?
MR. CRAWFORD: Objection. Mischaracterizes prior testimony. Objection, asked and answered.
00160
Objection, foundation. Objection to the extent it calls for speculation.
A To me the contract was administrivia for aspects of the program.
Q What?
A Administrivia.
Q Can you explain that novel term to me?
A Paperwork. Legal stuff. I didn't pay much attention to the contract. We were -- our sights were set on trying to perform, to take the waste into the government system as quickly as possible.
Q Consistent with the intent of the act?
A Act. Not -- the contract is a small subpiece of the act. The act is primary; the contract is tertiary.
Q Your sights were focused on the requirements of the Nuclear Waste Policy Act of 1982, correct?
A Correct.

---

**196:22 - 198:10**

00196

Q Do you have a general understanding of the

00197

system study being referred to here?

MR. CRAWFORD: Objection. Asked and answered.

A There were various studies done in the eighties and also in the very early nineties on system performance rate, you know, what the costs were, schedules were, plausibility of them.

Q And these system studies looked at system issues, correct?

A Yes.

Q And am I correct that each one of these studies to which you've just referred confirmed an acceptance rate, an aggregate acceptance rate of 3,000 MTU per year?

MR. CRAWFORD: Well, objection, vague.

A I think it's overstated to say it confirmed it. It showed that, you know, at 2,000 it does this, at 3,000 it does that, 4,000 it does something different. I don't know if they actually reached an absolute confirmation that 3,000 was the exact number, but generally they supported the system rate of 3,000 was a reasonable rate.

00198

Q So it's your understanding or your knowledge that each of the various system studies to which you just referred that were undertaken in the -- from the mid-1980s to I think you said the mid-1990s, supported an acceptance rate of 3,000 MTU per year, correct?

MR. CRAWFORD: Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony.

A Yes.

**Barrett, Lake Deposition Testimony dated 4/23/02**

00273
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Tuesday, April 23, 2002
9:36 a.m.

Job No.: 11792-5
Pages 273 through 526, Volume 2
Reported by: Diane Gomez, RPR
00274
DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

00275

Continued Deposition of LAKE H. BARRETT, held
at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

00276

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 893-0527

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest

Washington, D. C. 20004-1206
(202) 942-5000

00277

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:

DONALD R. CASSLING, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

00278

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

SUZETTE W. DERREVERE, ESQUIRE
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D. C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:

KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D. C. 20530
(202) 307-1011

00279

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT UNITED STATES:

HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D. C. 20530
(202) 307-0290

00280

C O N T E N T S


| EXAMINATION OF LAKE H. BARRETT | PAGE |
|---|---|
| By Mr. Cayne | 282 |


E X H I B I T S

(Retained by counsel.)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 13 Memorandum dated 1/28/88, subject: Assumptions for 1988 TSLCC | 286 |
| 14 June 1983 Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High Level Radioactive Waste | 315 |
| 15 Routing Slip with attached memo re: Document Change Proposal to Baseline, the Proposed Waste Acceptance Schedule | 350 |
| 16 Document dated 11/30/82 signed by Lake Barrett | 379 |

17 Document entitled Nuclear Waste PA-172230 through PA-172270 — 425

00281

E X H I B I T S C O N T I N U E D

(Retained by counsel.)

| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 18 Reassessment of the Civilian Radioactive Waste Management Program dated November 1989 | 427 |
| 19 Letter dated 2/5/90 from W. Danker to G. Beeman, PNL 0580984 | 456 |
| 20 Multi-page document | 470 |
| 21 Evaluation of MRS Policy Options: (private) key to interactions with the MRS commission dated 11/15/88 | 476 |
| 22 Annual Capacity Report dated December 1990, PA-102761 through PA-102883 | 484 |
| 23 HQR-010-1621 and HQR-010-1640 | 492 |
| 24 Letter dated 12/17 from Retired Admiral James D. Watkins to the Honorable J. Bennett Johnston | 514 |

## 337:10 - 350:11

00337

Q Is it inconsistent with your understanding, Mr. Barrett, that in determining the adequacy of fees assessed against nuclear utilities that the Department of Energy would consider repository acceptance rates?

MR. CRAWFORD: Objection, vague.

A No, it's not inconsistent.

Q And can you tell me based on your understanding what is the relevance to the Department of Energy of repository acceptance rates in determining the adequacy of fees assessed against operators of nuclear reactors?

MR. CRAWFORD: Objection, vague.

A To determine if the fee is adequate you

00338

need to know when the costs are incurred. So timing of the costs are important in knowing what the fee

adequacy situation is.

Q And how does that relate to the repository acceptance rate?

A Earlier, higher receipt rates cost more earlier at high level, therefore they influence the fee adequacy calculations.

Q In this fee adequacy assessment the Secretary's office projected a 3,000 per annum acceptance rate, 3,000 MTU per annum acceptance rate, correct?

MR. CRAWFORD: Objection to the foundation and objection, best evidence. Are you talking about acceptance rate or design receipt rate? Which one are you talking about? You keep switching back and forth.

Q Do you understand there to be a difference, Mr. Barrett, between design receipt rate and acceptance rate?

A Yes.

Q What is the difference?

A The design receipt rate is what you design

00339

the facility to be capable to do. The acceptance rate is what it will end up being.

Q And you understand it -- it's your understanding that the design receipt rate is a pertinent or a key assumption in the effort by the Department of Energy to assess the adequacy of fees imposed upon owners of nuclear generators, correct?

A Yes.

MR. CRAWFORD: Objection, vague.

Q And in this particular assessment by the Office of the Secretary on the adequacy of fees, the Office of the Secretary projected a repository design receipt rate of 1800 MTUs per year for the first five years and 3,000 MTUs per year for the 21 years following, correct?

MR. CRAWFORD: Objection. Best evidence.

A That's what it says.

Q And it is your understanding that different repository design receipt rates could have an effect on the adequacy of the fees assessed, correct?

A It could.

Q Let me ask you, what effect would it have

00340

had on the adequacy of the fee assessed if the repository design receipt rate had been 900 MTUs per

year for 26 years?
MR. CRAWFORD: Objection, vague.
A Repeat that again.
Q What effect would it have had on the department's assessment of the adequacy of fees imposed against operators of nuclear reactors if the repository design receipt rate had been 900 MTUs per year?
A It would have improved the adequacy.
Q It would have improved the adequacy?
A Yes.
Q And why is that?
A Because expenditures would have been lower earlier, so therefore the costs would be less.
Q How long would the repository have been required to operate in order to reduce the backlog of spent nuclear fuel had the repository design receipt rate been established at 900 MTU per year?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.
00341
A Longer.
Q How much longer?
MR. CRAWFORD: Objection. Same objections.
A I don't know. I would have to calculate. It would be longer.
Q Forever?
MR. CRAWFORD: Same objections.
A It depends on -- if the removal rate is less than the production rate, then it doesn't close until the reactors close and then it catches up eventually.
Q Well, isn't it your understanding as the former acting director of the office and today deputy director that a 900 MTU repository design receipt rate would not be sufficiently high to reduce the existing backlog of spent nuclear fuel?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A It's a function of time.
Q What do you mean by that?
A It would take a much longer time at 900 than say at 3,000 to work off the backlog. When the
00342
reactors run their licensed lifetimes and close, eventually you'll catch up.

Q Well, would it take perhaps in excess of 80 to 90 years to work off the backlog with the repository design receipt rate established at 900 MTUs per year?
MR. CRAWFORD: Same objection.
Q Probably? Could it have been more?
A Could be.
Q Well, does that -- would that fact -- let me step back. Under a repository design receipt rate of 1800 per year for the first five years and 3,000 MTUs per year for the next 21 years, it would have taken how long to work off the backlog?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.
A I don't know.
Q Would it have taken approximately 26 years?
MR. CRAWFORD: Same objections. Argumentative.
A I don't know.
Q Is that conceivable to you?
00343
MR. CRAWFORD: Asked and answered. The same objections, argumentative.
A Could be.
Q Do you think it would be likely to have been less than 30 years?
MR. CRAWFORD: Same objections.
A I haven't done the calculation, but it's going to be the higher the receipt rate, the faster you work off the backlog.
Q I'm asking based on your knowledge of the backlog does it seem likely to you as the deputy director of this office, former acting director that the backlog could have been worked off in 30 years at the repository design receipt rates referenced in Table 3-1 of Exhibit 14?
MR. CRAWFORD: Same objections.
A I don't know exactly if it's less than 30, more than 30. I would have to calculate that out.
Q But does 30 strike you as a fair approximation?
MR. CRAWFORD: Same objections.
Q Sitting here today.
00344
A It's in that order.
Q In that ballpark. So let's go back to the

initial inquiry about the fee assessment adequacy. The program is supposed to operate on a full cost recovery basis, correct?

A Correct.

Q Under the scenario laid out in Exhibit 14, the repository would have had to operate in the ballpark of 30 years, correct?

MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation. Objection, asked and answered.

A Filled with lots of assumptions, yes.

Q Filled with what assumptions?

A Well, how long does nuclear power continue or not?

Q But based on the assumptions referenced in Exhibit 14, the repository would have been required to operate in the ballpark of 30 years, correct?

MR. CRAWFORD: Same objections.

A To do what?

Q To eliminate the backlog of spent nuclear

00345

fuel.

MR. CRAWFORD: Same objections.

A Probably.

Q Probably. Now, let's return to the scenario I asked you to consider a few moments ago, that the repository design receipt rate is set at a level of 900 MTUs. Do you recall we discussed that?

A Yes.

Q And do you recall that you indicated that in order to eliminate the backlog under an annual receipt rate of 900 MTUs, it could take 80, 90, even more years? Do you recall that?

MR. CRAWFORD: Objection to the foundation. Objection to the hypothetical.

A It will take considerably longer at 900 versus the 3,000.

Q Wouldn't that fact that it would take considerably longer have an effect on the adequacy of the fee assessment in light of your testimony that the program was intended to be operated on a full cost recovery basis?

MR. CRAWFORD: Objection to the form.

00346

Objection, vague.

A Not necessarily.

Q And why did you say that, sir?
A Because it all depends upon the amount of capital is there, the return on the investment versus the expenditures. There are different scenarios that were timed generally is on the side to make the fee more adequate.
Q But are there definitely scenarios that you can envision sitting here today, Mr. Barrett, that a repository design receipt rate set at 900 MTUs would have required the Department of Energy to have imposed a higher fee assessment upon the operators of nuclear reactors?
MR. CRAWFORD: Objection to the foundation. Objection, vague.
A Repeat the question again.
Q Certainly. Sitting here today can you identify scenarios under which a repository design rate set at 900 MTUs per year would have required the Department of Energy to have imposed a higher fee assessment upon the operators of nuclear reactors,
00347
higher than the fee assessment that in actuality was imposed by the department?
A No.
Q You don't see any circumstance in which the fact that the department would be required to operate the repository for 80, 90 or more years as opposed to in the ballpark of 30 years would require the assessment of higher fees. Is that your testimony?
A Yes.
Q And what is the basis of that testimony?
A Because the rate of return on the monies not spent would more than pay for the additional costs due to the extended time because this program is front-end loaded dollarwise, it is not back-end loaded dollarwise. So I cannot -- at those low expenditure rates of a 900-ton-per-year system you most likely -- the value of the time of your investments would exceed your costs so that your fee adequacy is probably better. The only exception where you would get into trouble with that in finance space would be if there were other costs on the waste fund that are not part of the system. Such as damages.
00348
Q Is it your testimony then that it would have been less costly for the Department of Energy to

operate a repository for a period of 80, 90 or more years than it would have been for the department to operate a repository in the ballpark of 30 years?
MR. CRAWFORD: Objection to the foundation. Objection, vague.
A No.
Q In fact, it would have been much more expensive to the department to operate the repository for a period of 80, 90 or more years as contrasted with operations in the ballpark of 30 years, correct?
A Yes.
Q Are you aware of any TSLCC or fee adequacy study undertaken at any time that assumed a repository design receipt rate of 900 MTUs per year on a steady state basis?
A No.
Q Are you aware of any TSLCC or fee adequacy study that assumed a 900 MTU per year acceptance rate on a steady state basis?
A No.
00349
Q In fact, Mr. Barrett, to your knowledge have not all of the TSLCC and fee adequacy studies assumed 3,000 MTU per year acceptance rates or repository design receipt rates?
MR. CRAWFORD: Objection to the foundation.
Q To your knowledge, sir.
A Repeat the question again.
Q To your knowledge, Mr. Barrett, have all TSLCC or fee adequacy studies issued on or after 1982 assumed a 3,000 per annum MTU acceptance rate or a repository design receipt rate?
MR. CRAWFORD: Objection to the foundation.
A Some had more.
Q Some had more? Which ones had more?
A Ones that had two repositories in it had rates higher than 3,000.
Q What was the highest annual aggregate rate of any of the TSLCC or fee adequacy studies that you're referring to?
MR. CRAWFORD: Objection. Best evidence.
A Some of the earlier ones, pre-'87, had two repositories at steady state which would run higher at
00350
nominal 6,000 tons.
Q Per year?

A Per year. All recent ones, since '87 or so to my knowledge are basically steady state at 3,000.
Q And by recent ones -- I'm sorry.
A In the 1990s the TSLCCs had a state steady receipt rate at 3,000 tons per year.
Q And what about the most recent study?
A I believe the most recent ones --
MR. CRAWFORD: Objection, best evidence.
A -- is 3,000 tons per year steady state.

---

## 414:14 - 415:9

00414
Q Let me try to ask the question again, because we want the record clear. Did the 1987 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendment to the NWPA?
A No.
MR. CRAWFORD: Objection. Best evidence.
Q So you agree with me that such an MRS was
00415
not lawful in 1989, correct?
MR. CRAWFORD: Objection. Asked and answered.
A The answer is yes.
Q And in fact --
A I do.
Q And, in fact, such an MRS never became lawful under the laws of the United States, correct?
A Yes.

---

## 425:12 - 427:13

00425
Q The court reporter has handed you, Mr. Barrett, a document marked for identification as Exhibit 17, which is encaptioned Nuclear Waste. Is there a need for federal interim storage by the U.S. monitored retrievable storage review commission? November '89, bearing Bates numbers PA-172230 through PA-172270. Do you have that document before you?
A Yes.

Q And let me tell you that this document is an excerpt from the entire -- of the entire report issued by the U.S. monitored retrievable storage
00426
review commission.
Did you ever have an opportunity to review this document in the course of the performance of your duties as an official at the Department of Energy?
A I believe so.
Q Let me turn your attention to page bearing Bates number PA-172244.
A Okay.
Q I'd like to ask you to read the passage, the paragraph that begins at the very bottom of the left-hand column of that page starting, "However, the schedule linkage." Do you see that?
A Yes.
Q Could you read that paragraph up to including number five.
A I've read that.
Q Okay. Let me ask you to focus your attention to the first statement of that section, specifically, "However, the schedule linkage presently in the NWPAA (MRS construction may not begin until the Nuclear Regulatory Commission issues a license with a construction of a repository) would make it impossible
00427
for an MRS to be operational more than three years before the repository." Do you see that statement?
A Yes.
Q Do you agree with that statement?
MR. CRAWFORD: Objection. Asked and answered.
A In general, yes.
Q Do you agree with it as stated here to be accurate and correct?
A It's a judgment call.
MR. CRAWFORD: Same objection.
A I don't disagree with it -- I don't disagree with that statement.

**Barrett, Lake Deposition Testimony dated 4/26/02**

00527
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)
Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, April 26, 2002
8:10 a.m.
Job No.: 11792-8
Pages 527 through 825, Volume 3
Reported by: Diane Gomez, RPR
00528
DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

00529

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

00530

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
JEFFREY L. HANDWERKER, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest

Washington, D. C. 20004-1206
(202) 942-5000

00531

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF COMMONWEALTH
EDISON COMPANY:
CHRISTOPHER P. TOMPKINS, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF DEFENDANT UNITED STATES:
KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D. C. 20530
(202) 307-1011

00532

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT UNITED STATES:
HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D. C. 20530
(202) 307-0290

00533

C O N T E N T S


| EXAMINATION OF LAKE H. BARRETT | PAGE |
|---|---|
| By Mr. Cayne | 535 |


E X H I B I T S

(Attached to the Transcript)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 25 Memorandum dated 2/23/01 from L. Barrett to E. Fygi | 539 |
| 26 Handwritten diagram | 593 |
| 27 Statement of L. Barrett dated 4/25/02 | 599 |
| 28 Memorandum dated 1/25/93 from L. Barrett to the Secretary | 616 |
| 29 OCRWM planning for a no-MRS contingency | 628 |
| 30 Memorandum dated 4/6/93 to L. Barrett | 634 |
| 31 Letter dated 5/13/93 from L. Barrett to J. Cantlon | 678 |
| 32 DOE Office of Civilian Waste Management document | 679 |


00534

E X H I B I T S C O N T I N U E D

(Attached to the Transcript)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 33 DOE instructions for completing Appendix C DCS | 697 |
| 34 Federal Register entry dated 5/25/94 re: Waste Acceptance Issues | 708 |
| 35 Predecisional Draft, Vol. 3, Waste Acceptance Storage and Transportation Project | 718 |
| 36 Civilian Radioactive Waste Management Program Plan, Vol. 1 | 736 |
| 37 Memorandum from R. Milner | 744 |
| 38 Draft 1994 Acceptance Priority Ranking and Annual Capacity Report | 753 |
| 39 Acceptance Priority Ranking and Annual Capacity Report issued 3/95 | 763 |
| 40 1992 Annual Capacity Report | 771 |
| 41 Congressional Act S 1287 | 815 |

---

## 706:19 - 707:15

00706

Q Putting aside the official contractual position, you've already stated, have you not, that it was the position of Mr. Lake Barrett at this point in time, late 1993, that it no longer was reasonable to

00707

assume that the acceptance of spent fuel would begin in 1998, correct?

A I don't think I ever used those words "no longer reasonable to assume."

Q What words would you use?

A It was unlikely.

Q It was unlikely as of late '93 to assume -- the assumption -- put it in a sentence. How would you state it?

A Probably had a low chance of success, okay, for 1998. If this was after the grants. That's how I would say it in plain English.

Q Just so the record is clear, what had a low chance of success?

A Moving fuel in January 31, 1998.

---

## 761:19 - 763:12

00761

Q You said "from my perspective I wasn't really much involved in all these." When you said "all these," what are you referring to?

A ACRs, DCSs, contract language, etc.

00762

Q Because they were moot because of what was happening on the bigger picture?

A Because we were focused on trying to address the 1998 date through the -- at this time through the multipurpose canisters. We had negotiations, and we were focused on trying to get the repository done under extremely difficult budget conditions. So I as the deputy director, which I guess that's what I was then, did not focus on this. And trying to go and change around contracts to me was not a proper utilization of resources.

Q Because the whole issue of annual capacity reports and acceptance priority rankings and other such administrivia was moot until such time as you had a repository plan in place?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony.
A Until we had a facility in a place to move the material. That was our primary focus, was to create a facility so we could start to move the material. That was my main focus.
Q So is my statement correct that all this
00763
administrivia such as acceptance priority rankings and annual capacity reports were, in your opinion, moot until that time?
MR. CRAWFORD: Objection, vague. Objection to the extent it mischaracterizes prior testimony.
A They weren't high on my priority.
Q They weren't on your priority at all?
A They were not on my priority, that's fair. They were not on my priority.
Q Because until you had a repository plan in place, in your words it was moot, correct?
A Okay. Yeah, I'll accept that. Yes.

---

## 763:13 - 764:3

00763
MR. CAYNE: Let's take a five-minute break. It's 3:48.
(There is a recess from the record.)
(Deposition Exhibit Barrett 39 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 39, which is the acceptance priority ranking and annual capacity report issued March 1995, and it bears Bates numbers -- looks like the last four digits on
00764
the first page are 0676 through 0748. Do you have that document before you?
A I do.implementation - 1991 and 1995 ACRs were influenced by litigation concerns

---

**793:20 - 796:3**

00793

Q So as we just discussed, the capacity limits of the 1987 limitation -- 1987 legislation would not have been applicable to that stand-alone

00794

repository. It would not have been applicable as a matter of law, correct?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, best evidence.

A Would not have been applicable to the repository, yeah, engineering or design, correct.

Q The provisions of the '87 amendments would not have been applicable in that context, correct?

A Not have been.

MR. CRAWFORD: Objection, vague. Objection -- same objections as before.

A Not applicable to the repository.

Q Correct. Is that your answer, correct?

MR. CRAWFORD: Objection, same objection.

A Not applicable to the repository.

Q What is not applicable to the repository?

A The MRS limitations.

Q Established by the 1987 amendment to the Nuclear Waste Policy Act, correct?

A That's my understanding, correct.

Q Okay.

00795

A I don't want you -- okay.

MR. CRAWFORD: I have the same objections to that question.

Q Then let's return to Exhibit 39. In light of the sworn testimony you have just provided, sir, why did the Department of Energy choose to use an acceptance rate that reflected capacity limits applicable to and only applicable to an MRS facility when all the governing plans at that point in time did not envision the use of any such facility?

MR. CRAWFORD: Objection, foundation.

A I don't know.

Q Can you give any reason sitting here today to justify why Exhibit 39 contains capacity limitations applicable only in the context of an MRS facility but no such facility was envisioned at the

time Exhibit 39 was prepared?
MR. CRAWFORD: Objection, foundation, asked and answered, argumentative.
A I don't know.
Q Can you come up with any, sir?
00796
MR. CRAWFORD: Objection, argumentative, asked and answered.
A No.

---

## Barrett, Lake Deposition Testimony dated 5/8/02

00826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; :
CONNECTICUT YANKEE ATOMIC POWER :
COMPANY; MAINE YANKEE ATOMIC :
POWER COMPANY; FLORIDA POWER & :
LIGHT COMPANY; NORTHERN STATES :
POWER COMPANY; DUKE POWER, a :
Division of DUKE ENERGY CORP.; :
INDIANA MICHIGAN POWER COMPANY; :
SACRAMENTO MUNICIPAL UTILITY :

Case Nos. 98-126C,
98-154C, 98-474C,
98-483C, 98-484C,
98-485C, 98-486C,
98-488C, 98-614C,
98-621C, 99-447C,
00-440C, 00-695C,
00-703C, 01-115C,
01-116C, 01-249C

- - - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4
Washington, D.C.
Wednesday, May 8, 2002
9:31 a.m.

Job No.: 11792-10
Pages: 826 through 1103
Reported by: Diane Gomez, RPR

00827

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

- - - - - - - - - - - - - - - - - - X

00828

Deposition of LAKE H. BARRETT, VOLUME 4,
held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

00829

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206

(202) 942-5000

00830

A P P E A R A N C E S C O N T I N U E D
ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
UTILITY DISTRICT:
TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING
COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER
COMPANY:
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

00831

A P P E A R A N C E S C O N T I N U E D
ON BEHALF OF PLAINTIFF COMMONWEALTH
EDISON COMPANY:
CHRISTOPHER P. TOMPKINS, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF DEFENDANT UNITED STATES:
HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 307-0290

ALSO PRESENT:
Kimberly Longford, Arnold & Porter

00832

C O N T E N T S

EXAMINATION OF LAKE H. BARRETT PAGE
By Mr. Cayne 834

E X H I B I T S
(Retained by Counsel)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 42 "Civilian Radioactive Waste Management System Alternatives to the Office of Management and Budget" dated 12/22/97 | 836 |
| 43 "Civilian Radioactive Waste Management System Approach to the Office of Management and Budget" dated 3/19/98 | 856 |
| 44 "Parametrics Analysis for Future Program Costs Scenarios" dated 9/16/99 | 900 |
| 45 "Analysis of Total System Life Cycle Cost of Civilian Radioactive Waste Management Program" dated 9/95 | 955 |


00833

E X H I B I T S C O N T I N U E D
(Retained by Counsel)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 46 Federal Register release dated 5/3/95 | 1005 |
| 47 "DOE Acceptance of SNF in Dual-Purpose Canisters" dated 9/2/93 | 1014 |
| 48 Letter dated 9/2/93 from L. Barrett to J. Shetler | 1015 |
| 49 Letter dated 10/4/93 from L. Barrett to N. Dix | 1015 |
| 50 Letter dated 4/26/95 from T. Glauthier and C. Curtis | 1045 |
| 51 Letter dated 3/1/96 from A. Rivlin to F. Murkowski | 1065 |
| 52 1995 Acceptance Priority Ranking and Annual Capacity Report | 1077 |
| 53 E-mail messages 1083 | |
| 54 Letter dated 3/13/97 from B. Tomasoni to R. Cocherell | 1095 |

---

## 900:6 - 900:10

00900
Q From a systems point of view you could have accomplished 3,000 per year, correct?
A Okay. You use "systems" different, but yeah. Our desired performance rate was to level out at 3,000.

---

## 945:13 - 953:7

00945
Q What was the purpose of the ACR?
A It had something to do with the contract.
Q You don't know what the purpose of the ACR was?
MS. HERRMANN: Objection. Calls for a legal conclusion.
Q Beyond that it had something to do with the contract?
A It had something to do with the contract, and it was a planning document for -- with the
00946
contract. That's the extent of my understanding of it.
Q How did you use the ACR?
MS. HERRMANN: Objection. Foundation.
A I used the ACR when it became pretty clear we were not going to meet the '98 date, people said, you know, that you should use the four, six, nine as what I would refer to as an obligation rate.
Q So prior to the time that it became clear that you were not going to meet the '98 date, you did not use the ACR, correct?
A Actually, I did, because prior -- if we were going to make the '98 date, the only way we were going to make the '98 date was with an MRS, and the MRSs had the linkages, so there we were set at the four, six, nine.
Q But you've testified, haven't you, that you cannot satisfy the linkages?
MS. HERRMANN: Objection to the extent it calls for a legal conclusion.

A I don't know what you mean by that question. You say I testified -- help me. I don't
00947
understand that question.
Q What was your reference to linkages a moment ago?
A To meet the '98 date, which I believe is the context of your question, you needed to abide by the linkages unless the law was changed. The linkages put a constraint on the system which was the -- my recollection was the four, six, nine, although the design capacity of the system could be to operate at a higher rate.
Q But you're saying the linkages limited the acceptance rate to four, six, nine?
A The linkages effectively would limit you to four, six, nine.
Q Why is that?
A Because of the -- it's my understanding, was the linkages held us to the four, six, nine because you would hit the legal linkages of so many tons before certain things happened.
Q But the linkages did not have any relevance in a stand-alone repository scenario, did they?
A Correct.
00948
Q So in a stand-alone repository scenario what is the relevance of acceptance rates of 400, 600, 900 MTUs per year?
A Stand-alone repository never got you to the '98 date ever since I've been in the program.
Q But my question is in a stand-alone repository -- today we have a stand-alone repository scenario, correct?
A Correct.
Q Okay. And in today's stand-alone repository scenario, what is the relevance of 400, 600, 900 acceptance rate?
MS. HERRMANN: Objection. Foundation.
A Because of some contractual matter as relates to the contract is my understanding.
Q And what contractual matter are you referring to?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A This gets into the contract issues. There

is no technical limit four, six, nine as it relates to
the repository.
00949
Q So as it relates to a stand-alone repository, the acceptance rate of 400, 600, 900 MTUs per year have no relevance, correct?
MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony.
Q Correct?
A Has no technical design aspect to it.
Q It has no systematic aspect to it, correct?
MS. HERRMANN: Objection. Vague.
A I will define systematic as not involving legal contractual. Okay? And if you take out available financing to build the system, true.
Q What do you mean "if you take out available financing to build the system"?
A Well, for example, from an engineering perspective we would build it up to the 3,000. If for some reason we are held, due to artificial finance constraints due to Congress and appropriations, we may not be able to build it big enough to run at 3,000. You saw some studies that we did with lower receipt rates. Those were because of potentially funding constraints on the program.
00950
Q What lower receipt rate studies were you just referring to?
A Oh, I don't know. Some of those ones you had back here.
Q Could you go through the exhibits and please identify for me which ones you were referring to.
A Which one is that OMB one that had the -- all the 2007, 2010, 2000 whatevers? Not this one.
Q You mean Exhibit 42?
A 43 I think.
Q 43?
A I think 43 had some lower receipt rates in it.
Q And those lower receipt rates in Exhibit 43 were based upon what?
A Funding constraints.
Q Funding constraints imposed by Congress?
A Yes.
Q Did Congress impose such funding

constraints?
A They certainly have.
00951
Q When were those funding constraints imposed?
MS. HERRMANN: Can we just give him a minute to get what he's looking at.
A About every year. For the last five years. We've been funding-constrained by Congress for the last five years.
Q Those funding constraints had an ability (sic) on your office's capability to begin the acceptance of spent nuclear fuel on a timely basis?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A They've slowed us down.
Q Substantially?
A Months.
Q Years?
A If you add them all up, probably a year or so.
Q Getting back to the ACR, what is the relevance of an ACR with an acceptance rate of 400, 600, 900 MTUs per year in today's environment where there is a stand-alone repository?
00952
MS. HERRMANN: Objection. Vague, calls for a legal conclusion.
A I don't know.
Q Is there any?
MS. HERRMANN: Same objections.
A Only as it relates to the legalities of contracts.
Q The 400, 600, 900 MTUs standard was pertinent in the context where an MRS would have gone into effect in 1998 and have been in operation for ten to 12 years prior to repository, correct?
A That's my understanding.
Q And that's the only circumstance in which a 400, 600, 900 MTU take-rate had any relevance, correct?
A That was the basis at that time.
Q At that time, you're referring to what time?
A Back in the eighties when that was -- late eighties, early nineties when that was established,

that's correct.
Q So in the late eighties, early nineties
00953
when the 400, 600, 900 MTU take-rate was established, the only relevance that take-rate had was in the context where an MRS would commence operations in 1998 and would operate by itself for ten to 12 years prior to the time that a repository, a permanent repository, began operations, correct?
A Correct.

---

## 962:3 - 964:7

00962
Q And am I correct that the activities of the nuclear waste negotiator were terminated in 1995?
A I don't know the exact date, but somewhere in the mid-nineties.
Q Were they terminated at that point?
MS. HERRMANN: Objection. Foundation.
A I believe the term of office of Mr. Stallings, the last negotiator, expired by statute.
Q Do you know why his mandate was not renewed?
MS. HERRMANN: Objection. Foundation, speculation, calls for a legal conclusion.
A No.
Q What effect did the termination of the Office of Nuclear Waste Negotiator have on the planning activities of your office?
MS. HERRMANN: Objection. Foundation.
A Not appreciable that I recall.
Q Did it have any effect on your
00963
consideration, for example, of the viability of an MRS facility?
A No, because -- not to my recollection, because the viability of an MRS facility was, you know, negative based on the budget enactment of FY '94.
Q So would you agree that the MRS facility was effectively dead prior to the time that the Office of the Nuclear Waste Negotiator terminated?
A I don't know when the term -- the office

actually terminated. So I don't know. You said '95. I don't know when the negotiator officially terminated.
Q Take a look at page 33 of Exhibit 45. I refer you to paragraph 4.7.
A Uh-huh.
Q Does that indicate that the negotiator's activities terminated in 1995?
A It looks like it.
Q But based on that would you agree that the viability -- that an MRS facility was nonviable significantly before the time the Nuclear Waste
00964
Negotiator's Office terminated?
A Well, in my opinion the MRS siting was not viable once the Congress act on the FY '94 appropriations prohibiting me from providing grants to the Indian tribes. That's in my mind when it became not viable. Exactly when a negotiator terminated I don't remember.

---

## 1050:1 - 1050:9

01050
Q No. My question is with respect to this statement: When the nuclear waste policy was enacted, policy act was enacted, it was envisioned that the department would have a repository available for permanent waste disposal in 1998, and the department entered into contracts with the utility to begin accepting waste in 1998 on that basis. Is that statement consistent with your understanding?
A Yes.

---

**Barrett, Lake Deposition Testimony dated 5/10/02**

01104
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; :
CONNECTICUT YANKEE ATOMIC POWER :
COMPANY; MAINE YANKEE ATOMIC :
POWER COMPANY; FLORIDA POWER & :
LIGHT COMPANY; NORTHERN STATES :
POWER COMPANY; DUKE POWER, a :
Division of DUKE ENERGY CORP.; :
INDIANA MICHIGAN POWER COMPANY; :
SACRAMENTO MUNICIPAL UTILITY :
- - - - - - - - - - - - - - - - - X

Case Nos. 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-695C, 00-703C, 01-115C, 01-116C, 01-249C

(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR
01105
DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

01106

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

01107

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206

(202) 942-5000

01108

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
UTILITY DISTRICT:
TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING
COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER
COMPANY:
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

01109

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF COMMONWEALTH
EDISON COMPANY:
CHRISTOPHER P. TOMPKINS, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF DEFENDANT UNITED STATES:
HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D. C. 20530
(202) 307-0290

ALSO PRESENT:
Thomas Harding, Arnold & Porter

01110

C O N T E N T S


| EXAMINATION OF LAKE H. BARRETT | PAGE |
|---|---|
| By Mr. Cayne | 1114 |
| By Ms. Hewitt | 1327 |
| By Mr. Schechter | 1376 |
| By Mr. Tompkins | 1428 |


E X H I B I T S

(Attached to the Transcript)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 55 "Preferred Repository Receipt Rates Based on Waste Management System Cost Risks and Logistic Impacts" | 1133 |
| 56 Letter dated 5/5/87 from N. McLeod to H. Steinberg | 1139 |
| 57 "Determination of Cost-Effective Waste Management Receipt Rates" | 1148 |
| 58 Parametrics Analysis for Future Program Costs Scenarios dated 11/5/99 | 1166 |
| 59 Letter dated 11/5/86 from J. Braitman to R. Izatt | 1206 |


01111

E X H I B I T S C O N T I N U E D

(Attached to the Transcript)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 60 "Disposal Contract and Annual Capacity Report, Briefing for OCRWM Executive Committee, November 1986" | 1218 |
| 61 Document "Edison Electric Institute Utility Nuclear Waste Management Group" dated 12/8/87 | 1222 |
| 62 Statement of L. Barrett before the Subcommittee on Energy and Power, 4/29/87 | 1231 |
| 63 Program History Briefing to Secretary Pena by L. Barrett | 1243 |
| 64 DOE News Release dated 1/30/98 | 1257 |
| 65 "Analysis of the Total Time Life-Cycle Cost of the Civilian Radioactive Waste Management Program, December 1998" | 1267 |
| 66 Draft RFP | 1287 |

67 Draft Environmental Impact Statement dated 8/12/99 1294

01112

E X H I B I T S C O N T I N U E D
(Attached to the Transcript)

| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 68 "Commercial Spent Nuclear Fuel Additional Storage Installation Plans and Requirements" printed 5/25/00 | 1299 |
| 69 "Proposed Approach for Establishing a Modified Acceptance Strategy" dated 5/16/01 | 1307 |
| 70 Memo from D. Zabransky, "Priority Acceptance for Shut-Down Reactors" | 1313 |
| 71 Draft letter from L. Barrett to S. Quennoz | 1317 |
| 72 Transcript of 9/20/00 M. Sullivan Press Conference | 1321 |
| 73 February 2000 Program Plan Revision | 1376 |
| 74 U.S. Code Excerpt "Site Approval and Construction Authorization" | 1380 |
| 75 12/01 GAO Report | 1394 |
| 76 ICE Review of the Civilian Radioactive Waste Management Program 2001 TSLCC | 1401 |

01113

E X H I B I T S C O N T I N U E D
(Attached to the Transcript)

| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 77 TSLCC Site Recommendation Letter Report, February 2002 | 1412 |

---

**1163:10 - 1166:7**

01163
Q But you do disagree with the statement that there is not a clearly documented rationale for 3,000 MTU per year receipt rate, correct?
A Correct.
Q Because you believe that there is, in fact, a clearly documented rationale for a 3,000 MTU per year receipt rate, correct?
A Yes.
Q And could you explain to me that rationale that you believe has been clearly documented by the

department?
A There was one in the old mission plans. It basically was that the rate of 3,000 tons per year
01164
exceeded a generation rate of a nominal 2,000 tons per year and allowed a catchup of a thousand tons per year delta. And for where the program was at that time that was sufficient, and I felt that was sufficient at that time.
Q Sufficient to do what?
A Sufficient as a design basis for the facility. I didn't want to basically put resources, inasmuch as I was involved in this, into further refinements and expenditures of money on fine-tuning when we needed to focus on do we have a site and can we ever do this.
Q And fine-tuning, for example, whether it should be higher than 3,000?
A Correct.
Q And when you just stated "allowed a catchup of a thousand tons per year delta," what did that statement refer to?
A The receipt rate of a nominal 3,000 tons per year steady state when the generation rate was approximately 2,000 tons per year. The system capacity and take-rate was exceeding the generation
01165
rate in the nation.
Q Why was that important?
A Because we would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be.
Q Did you consider that to be your mission under this statute, the 1982 Nuclear Waste Policy Act?
MS. HERRMANN: Objection. Vague, calls for a legal conclusion.
A Repeat the question again.
Q You stated "We would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be."
Do you recall that statement?
A Yes.
Q Why would you have liked to have caught up, as you stated in that answer?
A Because waste existed in the United States, both commercial waste and defense waste, and we were

to start, either be it '98 or some other date, there would be an inventory existing, and you wanted to work off that inventory as soon as practicable.
01166
Q Why did you want to work off that inventory of spent nuclear fuel as soon as practicable?
A Because I believe that's the intent of the act.
Q By "the act" you're referring to the Nuclear Waste Policy Act of 1982?
A Correct.

---

## 1284:19 - 1286:7

01284
Q So was it clear that in developing the department's transportation plans the department was basing those plans on the assumption that it would accept spent nuclear fuel from commercial reactors at
01285
an annual rate of 3,000 MTUs?
MS. HERRMANN: Objection. Foundation.
A That's my understanding.
Q Did the Department of Energy publish a draft or prepare a draft request for proposal for transportation assuming an acceptance rate of commercial spent nuclear fuel of 3,000 MTUs per year?
A I don't recall what the number was in the draft request for proposal.
Q But you do recall the draft request for proposal, correct?
A Yes.
Q And why did you issue a draft request for proposal?
A It was to alert the industry of what our plans were and desires were for services to move high-level waste to the repository.
Q And what were the department's plans and desires with respect to the movement of nuclear waste at that time?
MS. HERRMANN: Objection. Speculation, foundation. Mr. Barrett is not a 30(b)(6) witness.
01286
A I believe it was to, you know, move fuel up -- ramp up to 3,000 tons per year as soon as

practicable, starting in 2010.
Q So to ramp up to 3,000 tons per year of the
spent nuclear fuel delivered by the commercial
reactors, correct?
A Correct. I'm not -- yes.

---

**1301:21 - 1307:17**

01301
Q The court reporter has handed you a
document marked for identification as Exhibit 68. It
01302
bears Bates numbers HQR-038-1488 through 1490. The
top of the first page states Commercial Spent Nuclear
Fuel Additional Storage Installation, Installation
Plans and Requirements, and it was printed on May
25th, 2000. Do you have that document before you?
A I do.
Q And on the bottom it says, Last updated May
25th, 2000. Do you see that?
A Yes.
Q What is the purpose of this document?
MS. HERRMANN: Objection. Foundation,
speculation.
A It's a background document that I use or
staff would use to know what the dry storage situation
is in the United States and might be over the near
future.
Q What does that mean, for example, in the
first column above California it says "by 12/31/2000
add five sites"?
MS. HERRMANN: Objection. Foundation,
speculation.
A I believe what that means is the first
01303
segment there said there were 11 sites as of spring of
2000 and that by 12/31/2000 there was expected to be
five more sites coming on line, bringing the total
from 11, plus five, to 16.
Q Five more dry storage sites?
A Correct.
Q And these would be dry storage sites opened
by individual commercial reactors?
A Yes.
Q Would you turn to page two of this exhibit.

A Yes.
Q Under General Assumptions, the first assumption is that "all additional storage requirements are accommodated through on-site storage." Why is that assumption made?
MS. HERRMANN: Objection. Foundation, speculation.
A We didn't know for the period they were looking at here, which is what I would say near term, what other alternatives the utilities had. If they had a PFS or some other activity became possible, we would have probably revised it.
01304
Q PFS stands for private fuel storage?
A Correct.
Q What is private fuel storage?
A A proposed facility that's being considered in Utah for storage by utilities.
Q Why did you not assume instead of or also that additional storage requirements would be accommodated through additional spent-fuel pools?
MS. HERRMANN: Objection. Assumes facts not in evidence.
A Didn't think anybody was building any new pools in the United States.
Q And why did you believe that the utilities would only build dry storage as opposed to new pools?
A Because that's what they had been doing.
Q And do you have an understanding of why they have been doing that?
A I believe it's cheap.
MS. HERRMANN: Objection. Speculation.
A I believe it's cheaper and easier for them to do that than building a pool.
Q Is it safer?
01305
A Don't know.
Q Could you look at general assumption number five, please. What is the basis of the assumption that in the absence of information to the contrary all spent nuclear fuel at sites with all reactors shut down is assumed to be placed in dry storage within five years after shutdown of the last reactor at that site?
MS. HERRMANN: Objection. Foundation, speculation.

A I don't know.

Q Does the assumption have no basis?

MS. HERRMANN: Objection. Foundation, speculation.

A I believe utilities have told my staff that's a reasonable assumption, and that's what they use.

Q This document comes from your file, does it not?

A I don't know where it came from. I have papers like this. I don't know if this came from my file or not.

01306

Q But you have no personal understanding why the assumption was made in this document that shut-down reactors would place all spent nuclear fuel within dry storage facilities no more than five years after shutdown?

MS. HERRMANN: Objection. Foundation, speculation.

A Like I said, it's my understanding that utilities have said that's -- someone said that's what they intend to do. People have seen that assumption from NEI and others, and no one ever complained about it before.

Q Why do you understand that utilities plan to put their spent fuel in dry storage within five years after shutdown?

MS. HERRMANN: Objection. Foundation, speculation.

A I believe they would like to decommission their pools.

Q Couldn't they just leave it in the pool?

A Certainly could.

Q And why don't they, to your understanding,

01307

plan to leave it in their pools?

MS. HERRMANN: Objection. Foundation, speculation.

A It's my understanding the utilities are building dry cask storage facilities, like your clients and others, to do -- to decommission their pools. I'm just -- my staff is trying to follow what we thought was industry common practice.

Q And do you understand why that is industry common practice?

MS. HERRMANN: Objection. Foundation, speculation.
A Because they're trying to decommission their plant.
Q And the plant can't be decommissioned without moving the fuel out of the pool?
A Yes.

---

**1331:21 - 1334:16**

01331
Q We had talked quite a bit about a steady-state rate of 3,000 MTUs per year with
01332
reference to a variety of DOE documents. My question is do you have an understanding of the term "steady-state rate"?
A I believe so.
Q What's your understanding of that term?
A Basically constant over time.
Q I believe you testified that there is a relationship between the 3,000 MTU annual steady-state rate and either the discharge rate or generation rate. Is that correct?
A There's a difference.
Q Is there a relationship between the two?
A Discharge rate is what it is. Utilities control that. The receipt rate, which is what you call 3,000, is something that is variable, but depending upon the system we design to build, we can vary that. So there's no direct relationship between the two.
Q My understanding from your testimony -- and please correct me if I'm wrong -- was that the 3,000 MTU steady-state rate or receipt rate as you just used that term, was chosen in part because it exceeded the
01333
discharge rate or the generation rate by utilities. Is that right?
A Correct.
Q What other factors went into choosing a 3,000 MTU receipt rate?
A The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper

balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have -- you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.
Q Do you know if there were any studies that talked about the 3,000 rate being a reasonable number to use?
A I don't know of any that were done back then, but I'm told there were some done. I never had reason to ever look. There were some -- we went
01334
through some of them here that were done in the middle eighties and some done in the early nineties that would say that you can run them at a higher rate. And you can run them at a higher rate and there are puts and takes on costs and performance.
Q And am I right in understanding that the 3,000 steady-state rate has been used as the steady-state rate in the majority of design documents for the facility that DOE will eventually use to take and emplacement spent nuclear fuel?
A Yes, it's around 3,000.
Q And am I also right in understanding that the 3,000 steady-state rate has been the rate that is used in the majority of documents issued by DOE with regard to total system life-cycle costs?
A Correct.

---

**1346:19 - 1347:13**

01346
Q Do you know whether pool overflow was a consideration in developing any acceptance rate in any of the acceptance capacity reports issued by DOE?
A Not that I know of.
01347
Q Were pool overflow rates a consideration in developing the 3,000 steady-state rate used for the design of the repository?
MS. HERRMANN: Objection. Speculation.
A Not specifically, but in a gross national

sense, yes.
Q And how in a gross national sense?
A By setting the performance rate of
nominally 3,000 being higher than the production rate
of 2,000, that would give a thousand tons per year
working off the backlog which should re-present if
there was appropriate distribution amongst the
contract holders' pool over -- anymore pool overflows.

---

## 1369:4 - 1371:21

01369
Q Thank you for clarifying. It actually did
clarify a misimpression I had, so I'm glad I asked the
question.
And is it your testimony that prior to you
actually coming to the Office of Civilian Radioactive
Waste Management DOE had established that a
steady-state rate of 3,000 MTUs on an annual basis
would achieve all those objectives that you just
specified in your prior answer?
MS. HERRMANN: Objection. Foundation.
A In a general sense, yes.
Q At any point during your tenure at OCRWM
did you have a reason to disagree with that rate that
was selected, the 3,000 MTU steady-state rate on an
annual basis?
A Never paid much attention to it. Because
all my energies were focused on trying to get a system
that could run as soon as practicable.
Q But in your tenure at the program did you
01370
ever see any evidence that would indicate that that
3,000 MTU rate was not sufficient to address all of
those needs as you specified a couple of answers ago?
A I saw no reason nor saw no reports that
said 3,000 was a bad choice. There were some studies
done in the late eighties, also in the early nineties
that, you know, it didn't say there was an obvious
better number. That 2,000 was better or 4,000 was
better. And 3,000 appeared to be okay. So I didn't
pay much attention. So I was satisfied. It wasn't
conscious per se. I saw no reason why I should change
it. Let's phrase it that way.
Q And I'll take it a step further. Do you

believe that the 3,000 annual steady-state rate is a reasonable rate for DOE to plan to use in terms of taking spent nuclear fuel from utilities?
A I think it's a reasonable rate. There may be better rates that if we -- if the nation gets a little clearer that we're going to really perform I think we will refine that number and we may, based on events of September 11th, maybe it will be raised.
Q And would you agree that the 3,000 annual
01371
steady-state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?
A Generally so, yes.
Q In your opinion would a steady-state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?
A I would think that's low.
Q Why?
A Because that's about what the generation rate is, and if we start with that, matching the generation rate at 2010 -- if we steady state at 2010, all the fuel that's in dry storage and a lot of the shut-down reactors, it will be difficult to avoid new storages or prolong decommissionings.
Q And what would your opinion be if an annual steady-state rate was chosen that was around 1,000 MTUs per year?
MS. HERRMANN: Objection. Speculation.
A For performance aspect it would be better, you know, better than none, but not as good as 2,000 and not as good as 3,000.

**Barrett, Lake Deposition Testimony dated 5/14/02**

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY, : Case No. 98-126C,
Plaintiff, : 98-154C, 98-474C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : Volume I
- - - - - - - - - - - - - - - - X

Washington, D.C.
Tuesday, May 14, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:30 a.m., Tuesday, May 14, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

00002

APPEARANCES:

On behalf of the Plaintiff:
JERRY STOUCH, ESQUIRE
PETER J. SKALABAN, ESQUIRE
Spriggs & Hollingsworth
1350 Eye Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
HEIDE L. HERRMANN, ESQUIRE
KEVIN B. CRAWFORD, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Room 7002

1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594

00003

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| LAKE H. BARRETT | PLAINTIFFS |
| | By Mr. Stouck 5 |
| | Afternoon Session - Page 87 |

E X H I B I T S

| BARRETT EXHIBIT NO. | PAGE NO. |
|---|---|
| 78 Defendant's Witness List | 6 |
| 79 Excerpt from United States Code Title 42, Section 10222 | 41 |
| 80 9-29-87 letter, Cole to Karol, with attachments | 44 |
| 81 1-86 Transportation Business Plan | 91 |
| 82 3-14-02 Nuclear Waste News | 145 |
| 83 Other Wastes/Nuclear Materials: A General Overview | 152 |
| 84 7-21-94 Meeting notes | 162 |
| 85 12-98 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program | 182 |
| 86 9-15-83 memo, Williamson to Distribution List | 187 |

00004

| BARRETT EXHIBIT NO. | PAGE NO. |
|---|---|
| 87 5-3-00 Letter, Itkin to King | 196 |
| 88 Transportation Under the Nuclear Waste Policy Act | |
| 89 Litigation Chronology | 213 |
| 90 1-8-98 memo, Carlson to Barrett | 216 |
| 91 9-24-96 letter, Grube to 234 Barrett | |
| 92 4-30-96 Memorandum of Agreement | 238 |

**64:6 - 65:24**

00064
Q. Putting aside those minor variations, is it your understanding that when the program starts to operate in 2010, or some other time, that this listing of allocations of oldest fuel first is going to be the actual sequence in which the Department picks up spent fuel from the various contract holders?
MS. HERRMANN: Objection.
THE WITNESS: Could I have that again?
(The record was read as requested.)
A. I doubt it.
BY MR. STOUCK:
Q. And why do you doubt it?
A. Because from a practical matter, the numbers on some of the contract holders are not an efficient size or, for example, Consolidated Edison has 2.9 tons, Dairyland 0.7 tons, and it would not be very efficient to pick up such small amounts for either the Department of Energy's contractor nor the utility itself to
00065
prepare for shipping such small amounts, so most likely there will be some arrangement such as more efficient sizes as determined through a process yet to be worked out.
Q. When you say more efficient sizes, are you referring to fuel casks, filling up casks?
A. Correct, cask campaigns.
Q. So you are referring to filling up casks, but that's not all you are referring to?
A. Correct.
Q. So in addition to filling up casks you are referring to cask campaigns?
A. Correct.
Q. And what do you mean by cask campaigns?
A. From a practical point of view primarily for the utility, but also somewhat for the Department of Energy that you would establish, a term that's sometimes used, bite size, the campaign size of how much tonnage you would take

in a campaign that would be scheduled to be consistent with the reactor's operating cycle or the situation at the contract holder which would be mutually beneficial for both parties.

---

**71:3 - 72:18**

00071
Q. Okay.
Do you think there is any possibility that when the spent fuel acceptance program commences operations in 2010, or at some other time, that the actual sequence of pickup of spent nuclear fuel will be the sequence -- putting aside the minor variations that we referred to previously -- do you think there is any possibility that the actual sequence will be the sequence that is shown on this OFF array on Page 40?
MS. HERRMANN: Objection.
Speculation.
A. Yes.
Q. You do?
A. Yes.
Q. Okay. Can you quantify the possibility?
MS. HERRMANN: Objection.
Speculation.
A. No.
Q. If that sequence were to be followed in actuality, do you believe that the costs would
00072
be greater or less than the costs of a system that includes some -- included some amount of campaign pickups?
MS. HERRMANN: Objection.
Speculation.
A. Greater.
Q. Okay.
So it would be in the utility's interests to avoid that greater cost through some kind of rearrangement of the sequence; would you agree with that?
MS. HERRMANN: Objection. Foundation.
A. From a cost perspective, yes.

Q. Okay, and it would be in DOE's interest from a cost perspective to promote some rearrangement of the sequencing to be more cost-effective, right?
A. Within the extent of the law, yes.

---

## 90:16 - 91:8

00090
Q. Okay. I'm not asking about plans. I'm just asking about -- plans are included in my question. Plans could have been developed to address the problem, study the problem, or if it was a problem study the issue of failed fuel and how to accept it. And whatever special handling procedures may have been or may be necessary in order to accept spent fuel, the DOE had the capability, the technical expertise of developing those special handling procedures and implementing
00091
them by January 1998 when the acceptance of spent fuel was supposed to begin, correct?
MS. HERRMANN: Objection. Vague. Speculation.
A. In a 15-year time period, if there is a will and finances, et cetera, from the technological point of view you can develop a system to accept failed fuel in a 15-year period.

---

## 120:22 - 121:10

00120
Q. What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to this contract?
MS. HERRMANN: Objection. Foundation.
00121
Mr. Barrett is not here as a 30(b)(6) witness.
A. We would have operated our system at our plant which was, you know, whatever the operation rate which transiented and leveled out at 3,000 metric tons per year after five years. That's what we were planning to do.
Q. That's what you would have done?

A. That's what we would have done if we
could have gotten the, you know, the sites
approved, et cetera.

---

## 174:7 - 177:19

00174
Q. Now, you again -- some of these things
I know we touched on earlier, I'm just attacking
it from a different angle here.
You mentioned earlier today shipping
campaigns. Do you recall that?
A. Yes.
Q. Now, would you agree that there are
advantages to shipping campaigns versus moving
over only a small number of assemblies at a time?
A. Yes.
Q. Would you agree that one of the
important advantages of shipping campaigns is that
efficiencies in transportation operations tend to
be realized?
MS. HERRMANN: Objection. Vague.
A. Yes.
Q. Okay, and would you agree that
repetitive operations such as cask handling,
loading, decontamination, receipt and turnaround
00175
are all more efficiently accomplished per cycle in
a campaign versus individual cask transport?
MS. HERRMANN: Objection. Vague,
compound.
A. Yes.
Q. Okay. Good.
Now, also earlier today I believe you
testified that you thought it was possible -- we
looked at I think it was Page 8 from one of the
ACRs which had the oldest fuel first queue, if you
will. Do you recall that?
A. Yes.
Q. And the question was, do you think it's
possible that when DOE commences fuel acceptance
in 2010 or some other time that that queue, with
minor variations that we put to one side for
purposes of the earlier question and I will put
aside here, did you think it was possible that

that queue would be the actual sequence of pickup of spent fuel. Do you recall that?
A. Yes.
Q. And you said you thought that was possible?
A. It was possible. Unlikely.
Q. Unlikely. That would be my next
00176
question. We are back to that now.
Now, would you agree that an acceptance sequence that strictly followed the OFF queue, if you will -- do you understand that reference?
A. Yes.
Q. -- would be economically inefficient?
MS. HERRMANN: Objection. Vague.
A. Not as economical nor efficient as other alignments might be.
Q. Okay. It would be relatively economical and efficient, relative to some other alignments.
A. Yes.
Q. Can you think of any -- do you know of any -- would there be some alignments that might be even less economically efficient than the OFF queue?
A. Well, I suppose you could make them less efficient. You could spread them out. Everybody has a right to go smaller amounts or something like that, but it's just speculative.
Q. Do you think it would make any economic sense to follow that queue for the actual sequence of pickup?
MS. HERRMANN: Objection. Vague.
00177
A. The one that is in that table?
Q. Yes.
A. Do I think it would -- what is the question?
Q. Would it be economically sensible.
A. Yes, it could be sensible. I mean, it is not desirable, but, all things considered, if there is a strict adherence to certain interpretations of the contract, you could do it.
Q. Okay. Your answer is it would be sensible, because it might be required by the contract?

A. Yes.
Q. But that's not -- that's different from economical sense. It would be economically relatively inefficient you already testified?
A. It could be inefficient.
Q. It would be inefficient?
A. It would be inefficient.

---

## 178:3 - 178:12

00178
Q. What is your understanding of the relationship between the objective of economic efficiency and the fuel cost recovery nature of the contract?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. I believe it is the federal government's responsibility to prepare a cost-effective system to minimize the costs on the waste generators for societal good.

---

**Barrett, Lake Deposition Testimony dated 5/15/02**

00242
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiffs, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : VOLUME II
- - - - - - - - - - - - - - -X
Washington, D.C.
Wednesday, May 15, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:05 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

00243
APPEARANCES:

On behalf of the Plaintiff:
JERRY STOUCK, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
HEIDI L. HERRMANN, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594

00244

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR |
| --- | --- |
| LAKE H. BARRETT | DEFENDANT |
| By Mr. Stouck | 246 |

E X H I B I T S

| BARRETT EXHIBIT NO. | PAGE NO. |
| --- | --- |
| 93 Memo, Barrett to Wade | 246 |
| 94 Notes written by PNL re '96 meeting | 253 |
| 95 Document entitled Civilian Radioactive Waste Management System, June '97 | 278 |
| 96 Notes of telephone conversation with Mr. Barrett | 283 |
| 97 Condensed transcript of Mr. Barrett's previous testimony, 4/22/01 (selected pages) | 289 |
| 98 Memo, Tomasoni to Buchheit | 303 |
| 99 Informal Memorandum, 7/8/93 | 309 |
| 100 Condensed transcript of Mr. Barrett's previous testimony (selected pages) | 317 |

00245

| BARRETT EXHIBIT NO. | PAGE NO. |
| --- | --- |
| 101 Memo, Milner to Barrett and attached concurrence sheet | 322 |
| 102 Collection of documents | 340 |
| 103 Excerpt of Proceedings, 1983 Civilian Radioactive Waste Management Information Meeting | 386 |

**339:13 - 340:6**

00339
Q. Okay.
Do you think -- were you sympathetic to
Yankee's predicament at the time? In other words,
to its desire to move this spent fuel off of its
site so that it could complete the decommissioning
activities which had been initiated?
MS. HERRMANN: Objection. Vague.
A. Yes.
Q. Why?
A. I felt that it was in the nation's
interests to support utilities like Yankee who
were trying to clean up their sites and return
that real estate to useful societal purpose in
00340
that we should try to move the fuel off as quickly
as we practically could, consistent with sound
national policies.
Q. Good. That's what you thought, you
know, in your working life at RW?
A. Yes.

---

**363:19 - 363:24**

00363
Q. The question is could a shutdown
reactor, is it possible that a shutdown reactor
could show that granting priority acceptance to it
would be less costly to DOE's -- would reduce the
cost of the waste management system?
A. Yes.

---

**364:20 - 365:11**

00364
Q. And I take it you would agree that
granting priority -- this is a different question
-- not whether the showing could be made, but I
take it you would agree that granting priority to a
shutdown reactor can be shown, at least in some
circumstances, to avoid the establishment of
00365

otherwise unneeded reactor site storage facilities?
A. Yes.
MS. HERRMANN: Objection. Speculation.
Q. And Number 4, "Granting priority can be shown to be clearly cost-effective for consumers from the standpoint of timely decommissioning."
I take it you agree with that? We talked about that earlier.
MS. HERRMANN: Objection. Speculation.
A. Yes.

---

## 394:11 - 395:17

00394
Q. Is it your expectation that when the Department begins to accept and remove from the site Yankee Atomic's standard spent fuel, is it your expectation that the Department will not accept on the same schedule Yankee Atomic's failed fuel?
MS. HERRMANN: Objection. Foundation. Speculation.
A. Repeat the question, please.
Q. Yes.
Is it --
MR. STOUCK: Let's read it back.
(The record was read as requested.)
MS. HERRMANN: Same objections.
A. It was spent fuel and --
00395
Q. First is standard and second is failed?
MS. HERRMANN: You can have it read again.
MR. STOUCK: Yes, read it again.
(The record was read as requested.)
A. Can you define expectation a little bit or not?
BY MR. STOUCK:
Q. Well, I will accept a definition from you if you are uncertain about the word. I mean, do you think it's going to happen that way?
MS. HERRMANN: Same objections.
A. When all is said and done, my expectation, what I really think will happen is

when it moves along it will move together --
contemporary, it will all move contemporary,
that's the failed fuel and the standard fuel.

**Brownstein, Alan Deposition Testimony dated 4/9/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
00002
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia

Tuesday, April 9, 2002

Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

00003

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Tuesday, April 9, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

00004

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.

DANIEL S. HERZFELD, ESQ.

Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal
Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

00005
APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear
Operating Company, Alabama Power Company,
Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric
Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison
Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350
00006
APPEARANCES: (Continued)

On behalf of the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE

BY: BRYANT S. BANES, ESQ.
RUSSELL A. SHULTIS, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530

00007

C O N T E N T S


| WITNESS EXAMINATION BY COUNSEL FOR | |
|---|---|
| ALAN BROWNSTEIN PLAINTIFFS DEFENDANT | |
| By Mr. Tomaszczuk | 9 |
| Afternoon Session -- | 92 |


E X H I B I T S


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 | 44 |
| 2 | 57 |
| 3 | 59 |
| 4 | 74 |
| 5 | 81 |
| 6 | 90 |
| 7 | 111 |
| 8 | 119 |
| 9 | 128 |
| 10 | 152 |
| 11 | 155 |
| 12 | 172 |
| 13 | 180 |
| 14 | 185 |
| 15 | 189 |
| 16 | 192 |

00008

| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 17 | 206 |
| 18 | 209 |
| 19 | 211 |
| 20 | 214 |

---

## 9:18 - 10:14

00009

Q. Mr. Brownstein, would you state your name for the record, please?

A. Alan Brownstein.

Q. And by whom are you employed, sir?

A. Department of Energy.

Q. And what is your title?

A. I'm a director of the Regulatory Coordination Division, and I'm on detail right

00010

now as a special advisor to the, special, senior policy advisor to the director.

Q. You said director of regulatory enforcement division?

A. Regulatory Coordination.

Q. And I'm sorry -- senior policy advisor?

A. Right, to the director; that's a detail right now.

Q. To the director of OCRWM?

A. Of OCRWM.

Q. And that is all within the Department of Energy, correct?

A. Right. Um-hm.

---

### 18:17 - 18:19

00008

Q. Now you're here today as a Department of Energy employee, correct?

A. Correct.

---

**27:22 - 29:11**

00027
Q. Okay. You have been on detail for the
last eight or nine months as a senior policy
advisor?
A. Right, since July I believe, of last
00028
year.
Q. So since July of 2001?
A. That's correct. It has been longer
than eight months, yes.
Q. And since that period, you have been
on detail as a senior policy advisor to the
director of OCRWM?
A. Correct.
Q. And who has been that person?
A. Lake Barrett.
Q. And is Mr. Barrett still serving as
the director of OCRWM?
A. No. He is deputy director.
Q. So are you now reporting to someone
else in that, in your capacity as senior policy
advisor?
A. The new director was confirmed two or
three weeks ago.
Her name is Margaret Chu, C-h-u.
Q. And my question, sir, is are you now
reporting to Ms. Chu?
A. Well, my direct, my first level
supervisor is Ron Milner.
Q. In your capacity as a senior policy
advisor to the director of OCRWM, your first
00029
level supervisor is Mr. Milner?
A. That's correct.
Q. All right.
A. He is the chief operating officer.
Q. And then above him, you report to Mr.
Barrett?
A. That's correct. The reporting chain
is Milner, Barrett, and now Chu.
Q. And so would it be fair to say that
you're also reporting to Ms. Chu at this time?
A. It would be.

---

### 31:10 - 32:5

00031

Q. Mr. Brownstein, I would like to go back to 1985 when you first became a DOE employee. Okay?
What position did you assume at that time?
A. Position title in '85 was a nuclear industry specialist.
Q. Do you recall in what month in 1985 you began service at DOE?
A. September.
Q. What were your duties as nuclear industry specialist?
A. I was responsible for implementing the terms of the standard disposal contract.
I ran the, was responsible for the data inputs that we received from the utilities
00032
called the RW-859 information.
I also ran the graduate fellowship program.
Those were my primary responsibilities

---

### 33:7 - 36:19

00033

Q. What were your duties with respect to implementing the terms of the standard disposal contract?
MR. BANES: Objection -- overbroad.
BY MR. TOMASZCZUK:
Q. I believe that's the term that you used.
You said one of your duties was to implement the terms of the standard disposal contract, is that correct?
A. Sure.
Q. And what --
A. Well, let me give examples. The contract required issuance of something called

the Annual Capacity Report. That had never been
done before, and so as an example, I was
responsible for developing that.
I was responsible for interacting with
the utilities and answering their questions.
00034
I was responsible for implementing
various items as a refund program as we had lost
a lawsuit, actually we lost two lawsuits, and I
was responsible for refunding money to the
utilities, responsible for collecting data on
spent fuel from the utilities, the RW-859.
Those are examples.
Q. Did there come a point in time in your
career at DOE when you, when your duties changed
from your duties that you just described as a
nuclear industry specialist?
A. The, the position itself evolved over
time.
Let me give a broad outline, see if
that's responsive to your question.
Q. Please.
A. In 1985 when I started that position,
I was basically a one-person show doing these
type of activities with contractor support.
Over time, that position evolved into
a branch of which I was the branch chief, and
eventually that position evolved into a
division, and each time, the responsibilities
got a little bit broader.
Q. Okay. Thank you for that. That's
00035
helpful.
When did the duties that you were
performing as a specialist evolve into a branch
chief position.
A. I do not recall the exact dates. I
believe in the late '80s, it went to a branch,
and I believe in the early '90s, it went to a
division.
I just don't recall the exact times.
Q. And when it became a division, what
was the name of the division?
A. Well, let's see. They do this
internally.
The branch was called I believe

Utility Interface and Logistics Branch.

I'm hesitating because I believe the division underwent several names, and I actually just don't recall it. I have to review my resume.

I didn't do that before I came here.

Q. Does the division, whatever its name, still exist today?

A. It does. I mean it's continued to evolve.

Q. And is it the Regulatory Coordination

00036

Division?

A. It is not.

Q. It is not. Okay. What is its current name, if you know?

A. I don't know. I left, I left that area in early '95.

Q. When you say you left that area, what area are you referring to?

A. I'm sorry. I left the, my, my responsibilities, talk about it broadly, interacting with the utilities, and responsibility for the contract, I left that I believe in March of '95 to go into the division director for the Regulatory Coordination Division.

Over this long span of time, names of divisions have changed and evolved and responsibilities, and I have not kept very closely associated or attached to that.

---

## 37:3 - 37:9

00037

Q. So it's fair to say then for roughly a ten-year period, you were responsible for implementing the terms of the standard contract?

A. That's fair.

Q. And in that regard, you were dealing with the utility industry?

A. That's fair.

---

**40:7 - 41:23**

00040

Q. You testified, Mr. Brownstein, that you were responsible I believe for preparing the ACRs, is that right?

A. Correct.

Q. Okay. Were there documents other than the ACRs for which you had responsibility to prepare?

A. Over time, responsibility for the Annual Priority Ranking, those were two separate independent -- the Delivery Commitment Schedules, it was a separate document, so those were the two, in the '80s, those were the two documents I was responsible for.

Q. You said the Delivery Commitment Schedule you view as part of that process?

A. Yes, but not as a separate independent report like the ACR and APR.

Q. But you had responsibility for the DCS process?

00041

A. Yes.

Q. Other than the ACRs, the APRs, and the DCS, were there other documents for which you had responsibility to prepare?

A. When you say responsibility to prepare, those never, those two documents didn't exist, so when I say had responsibility to prepare, I mean starting from conceptually to how we're going to do it. Those were unique documents.

I had responsibilities, for instance, on the RW-859 form and worked with utilities in trying to modify that and trying to implement those terms.

The Energy Information Administration was responsible for implementing that, but that in essence worked as a contractor for my office, so we worked closely with the utilities to try to streamline the information that we felt we needed and minimize the burdens on the utilities.

I view that as a different category of document.

---

### 79:22 - 80:14

00079
Q. Okay. Was it a goal of DOE at this time, July of 1986, that utilities would not need to expand their storage capacities after 1998?
00080
MR. BANES: Objection -- vague. Go ahead.
THE WITNESS: The best as I recall, the, you know, the goal of the department was, was to have the facilities available as soon as we could and start accepting waste as soon as we could and as much as we could.
That was a goal of the department.
BY MR. TOMASZCZUK:
Q. So it was not a specific goal, that the utilities would not need to expand their storage capacities after 1998?
A. That, that was a goal. That was a goal.

---

### 98:17 - 100:17

00098
Do you know whether the contract says that the ACR is for planning purposes only?
A. I do.
Q. And what do you know?
A. It, as I just read to you, it is clearly stated in there that the document is for planning purposes only.
Q. And the underlying contract indicates that the ACR is for planning purposes only, does
00099
it not?
A. It does.
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Okay. I'm sorry. It does. It says that in the contract.
BY MR. TOMASZCZUK:

Q. Do you have an understanding of what that term means, planning purposes only?
MR. BANES: Objection. Calls for a legal conclusion.
You can answer.
THE WITNESS: Okay. I believe I do. I believe I did, and I believe I do, and I tried to take my beliefs, the department's beliefs, and write them into this document, which is under, under the entire Chapter One of the document, so we tried to explain what it meant, what its purpose was, what it did, and what it didn't do.
BY MR. TOMASZCZUK:
Q. When you say Chapter One of the document, what were you referring to?
A. The beginning on page 1.
Q. Is there a particular language that
00100
explicates what the term planning purposes means?
MR. BANES: Objection. Calls for a legal conclusion.
You can answer.
THE WITNESS: I believe the key sentence in my mind is under Section 1.1. The last, the next to last sentence in that first paragraph says as specified in the contract, the ACR is for planning purposes only and thus is not contractually binding on either the DOE or the purchasers.
So it was a planning document.
BY MR. TOMASZCZUK:
Q. Just -- so it's a planning document required by the contract?
A. Yes.

---

## 136:7 - 136:25

00136
Q. All right. What was your intention or what was the Department of Energy's intention in giving Mr. Kraft that information?
What was he supposed to do with that?
A. This, this was, this entire paragraph

is trying to reflect that the department was not only not trying to game the system by accepting a single assembly and walking away, but by demonstrating that the evidence of what our plans were through these other documents clearly showed that we were intending to do something other than take a single assembly.

Q. Was it your intention that the utilities would use or rely on, in any way on that information in preparing their own plans for dealing with their spent nuclear fuel?

A. I believe we addressed that issue in the Annual Capacity Report, and in fact I think it was addressed in the contract itself.

**Brownstein, Alan Deposition Testimony dated 4/10/02**

00242
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
00243
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia

Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

00244

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

00245

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.

DANIEL S. HERZFELD, ESQ.

Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal
Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

00246

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear
Operating Company, Alabama Power Company,
Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric
Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison
Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

00247

APPEARANCES: (Continued)

On behalf of the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE

BY: BRYANT S. BANES, ESQ.
RUSSELL A. SHULTIS, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530

00248

C O N T E N T S


| WITNESS EXAMINATION BY COUNSEL FOR | |
|---|---|
| ALAN BROWNSTEIN PLAINTIFFS DEFENDANT | |
| By Mr. Tomaszczuk | 250 |
| By Mr. Banes | 388 |
| By Mr. Tomaszczuk | 407 |
| By Mr. Hirsch | 411 |
| Afternoon Session -- | 326 |


E X H I B I T S


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 21 | 251 |
| 22 | 263 |
| 23 | 273 |
| 24 | 278 |
| 25 | 286 |
| 26 | 296 |
| 27 | 302 |
| 28 | 304 |
| 29 | 312 |
| 30 | 321 |
| 31 | 347 |

00249

| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 32 | 356 |
| 33 | 361 |
| 34 | 364 |
| 35 | 380 |
| 36 | 410 |
| 37 | 414 |
| 38 | 424 |
| 39 | 428 |
| 40 | 428 |
| 41 | 452 |
| 42 | 452 |

---

## 275:25 - 277:9

00275
Q. Okay. So in Brownstein Exhibit 20, at
00276
page 4, your understanding is when that term
linking is used, that that's a catchall term to
encompass at least these three conditions or
linkages that you just testified about?
A. That's what I was referring to, yes.
Q. Okay. Do you know whether those
linkages were repealed or still exist today?
MR. BANES: Objection. Calls for
legal conclusion.
Go ahead, sir.
THE WITNESS: They have never been
repealed.
The MRS was never successful. The
Office of Negotiators that was established by
the Amendments Act never successfully identified
an MRS, and so we, the idea, that facility came
to an end.
BY MR. TOMASZCZUK:
Q. And was, when was that?
A. I don't recall.
Q. You don't, you have no approximate
understanding of when that occurred?
A. There were two, there were two
negotiators appointed to implement the
Amendments Act.

00277
Both served terms. Both ended their terms unsuccessfully.
I don't recall the dates of those terms.
Q. Would it have been between 1990 and 1995?
A. It would have been.
Q. So somewhere in that timeframe?
A. Yes. That's a guess.

---

## 278:12 - 278:24

00278
MR. TOMASZCZUK: Ms. Reporter, I would like to have marked as Brownstein No. 24 -- I got it right -- the Annual Capacity Report issued in December of 1990.
(Brownstein Exhibit No. 24 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you seen this document before today?
A. Yes.
Q. You had a hand in its preparation?
A. I did.

---

## 282:5 - 283:15

00282
Q. Okay. In any event. It is true, is it not, that the conditions for the lower bounding case reflected in Table 2.2 never materialized, right?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Could you clarify what you mean?
BY MR. TOMASZCZUK:
Q. Sure. There was no MRS?
A. That's correct.
Q. Right. And the language that you referred to on page 5, it indicates, does it

not, that the lower bounding case requires MRS siting, and then refers to the 10,000 MTU storage limitation?
A. That's correct. That process never, never materialized.
Q. So there would be no reason to use the data in Table 2.2 for any purpose now, would there?
00283
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Well, given what counsel has said, if there was a, miraculously an MRS that became available today, since the Amendments Act was not appealed, as I understand it, an MRS would still be subject to that, but that's -- I'm not a lawyer.
That would be my response.
BY MR. TOMASZCZUK:
Q. Are you aware of any efforts being made to miraculously site an MRS today?
A. Not by the government. The closest thing would be the private fuel storage facility.

---

## 283:10 - 283:15

00283
BY MR. TOMASZCZUK:
Q. Are you aware of any efforts being made to miraculously site an MRS today?
A. Not by the government. The closest thing would be the private fuel storage facility.

---

### 299:15 - 299:20

00299
Q. The publication of the ACR was to be contractually binding on whom?
MR. BANES: Objection. Mischaracterizes the document.
THE WITNESS: No one; the ACR was going to be contractually binding on no one.

## 329:14 - 330:12

00329
Q. Okay. Would you then turn to this ACR at page 4?
A. Okay.
Q. And I direct your attention to the second paragraph.
A. Okay.
Q. You can read the paragraph or of course any part of the document you would like. I would like to direct your attention in particular to the last sentence of the second paragraph on page 4.
(The witness reviewed the document.)
00330
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Now this seems to say that if the linkages between the construction of the MRS and the construction of the repository are maintained, which is the first linkage as I understand it, that we have been talking about, it is stated here that commencement of facility operations and initial acceptance of DOE, by DOE could not start until at least 2007?
A. That's correct. That's referring to the repository if the law was not changed.

## 343:17 - 344:8

00343
THE REPORTER: Question: "In your view, how likely is it that the repository will be designed and constructed to accept 900 metric tons a year?"
MR. BANES: Objection. Calls for speculation; lack of foundation.
THE WITNESS: As a steady state? Is that what your question implies?
BY MR. TOMASZCZUK:
00344
Q. As a steady state, I'll take that

answer. That's fine if you want to put that clarification on it to help you answer.
A. I believe we would, I believe that would be a low figure.
I mean every document that you have shown me shows a higher figure than that for steady-state operation.

---

### 376:22 - 278:5

00376
Q. If the, as I understand these instructions, if the ACR on which the DCSs are based is a planning document, which I understand it to be, are the DCSs also planning documents?
00377
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: In my mind, they are.
In order to get, if we can just set aside a specific date for a second, in order to get the government with the right equipment to be able to get through the gate of the utility at the right time, there has to be planning that takes place.
For example, we need to know years in advance how many BWR and PWR casks we should make sure are available through whatever means.
We ought to know how many truck casks and how many rail casks we ought to have available.
In order to do that, we need to understand whose fuel we're going to accept, so there has to be communication between the utilities and us years in advance in order to, to allow that marriage to occur at the end, irrespective of the date.
I believe -- as you know, I did not negotiate this contract in '83, but I believe that was the intent of the process that was laid which we have talked about the ACR, the APR, the
00378
DCSs and the FDSs.
I think that, in that sense, that's a planning arrangement. That's a way to respond

to your question, but I think that is responsive.

---

**405:16 - 405:20**

00405
Q. Did you consider the SNF or high-level waste acceptance rates contained in any of the ACRs to be contractually binding upon DOE?
MR. TOMASZCZUK: Objection -- leading.
THE WITNESS: No.

---

## 412:16 - 412:21

00412
Q. All right, but the DOE goal or objective was to eliminate the need for utilities to provide on-site storage after the DOE began acceptance of spent nuclear fuel, is that correct?
A. That was a goal.

---

## 414:13 - 415:13

00414
MR. HIRSCH: We're on 37, is that correct?
(Brownstein Exhibit No. 37 was marked for identification.)
BY MR. HIRSCH:
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 37, which is a two-page document titled, "Questions from Representative Hastert," and then it appears to have answer on it. It has Bates labels HQR-010-1635 through 1636.
00415
Do you recognize this document, Mr. Brownstein?
A. I don't recall it, but I, it's a document that I would normally prepare and has

my name on it, so I would like to get a chance
to read it.
Q. Why don't you do that?
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. HIRSCH:
Q. Brownstein Deposition Exhibit 37 was a
document you prepared, is that correct?
A. Yes.

---

## 420:23 - 421:24

00420
Q. Okay. Thanks. It goes on to say
until the federal government begins to accept
the spent nuclear fuel from utilities, available
00421
storage capacity at each reactor site will
continue to decrease, and other alternatives
such as dry storage will be needed.
Do you know what your basis for making
that statement was?
A. As each day goes on, spent fuel is
produced, and the utilities, as they undergo,
have to replace that spent fuel on, on a regular
basis.
That spent fuel has to go somewhere on
their site, and the first line defense of the
utilities if you will is their storage pool, and
space was running out in their storage pools,
and they were going to have to look at, at
alternatives.
Once they looked at alternatives like
reracking, they would then have to look at
alternatives beyond the storage pool.
Q. So as of the time you wrote this
document, you recognized that, that nuclear
utilities were running out of, out of space in
their storage pools, is that correct?
A. That was no secret. Everyone
understood that.

---

**424:1 - 425:3**

00424

MR. HIRSCH: Mark this 38.

(Brownstein Exhibit No. 38 was marked for identification.)

BY MR. HIRSCH:

Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 38, which is a document titled, "Spent Fuel Acceptance DOE's Process for Change," appears to be authored by you, and it's got Bates labels HQR-010-2386 through 2399.

Do you recognize this document as a document you prepared?

(The witness reviewed the document.)

THE WITNESS: I recall that this document was prepared for me by one of my contracting support people, and I need to go further and tell you that while there is marks in here by me, I don't recall that this is the draft, that this was, this was actually used at this summit.

This is, this is a my recollection is early draft.

The reason I do that is because of the cartoons in here, I believe I decided not to do

00425

that, so I think this is different than the final one, again, to the best of my recollection.

---

**439:4 - 443:19**

00439

Q. Mr. Brownstein, will you look back at Brownstein Deposition Exhibit 38?

A. Okay.

Q. Will you look at page 2390? There also appears to be a drawing shown here, and then beneath that, there's some text with four bullet points.

Do you see that?
A. Yes, I do.
Q. Somebody drew through the last bullet point.
Is that something that you did, Mr. Brownstein?
A. I probably would have done that.
Q. And why did you strike determine fees in terms of payment?
A. It is, in my mind, the waste acceptance process, the fees in terms of payment while they're part of the contract, is, is a separate, separate subject from the waste acceptance process.
Q. Look at page 2391. At the top of
00440
2391, there's a, what appears to be a slide called waste acceptance expectation.
Do you see that?
A. Yes.
Q. And beneath it appears to be some commentary on the slide.
Do you see that?
A. Yeah. Could I have a chance to read the whole thing?
Q. Please do.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. HIRSCH:
Q. Okay. You see the commentary under the slide says, "We understand your position."
And the second bullet is "Your need to make near term spent fuel management commitments."
What did that indicate?
MR. BANES: Objection. Calls for speculation; lack of foundation.
THE WITNESS: Well, again, my other caveat notwithstanding of whether I actually gave this, and you know, what the final one was, the way I interpret that is that speaking to a
00441
group of utilities, that they were going to have to, to make those decisions with respect to, you know, additional storage at their sites.
BY MR. HIRSCH:

Q. And what kind of spent fuel decisions or commitments did you understand the utilities were going to have to make?

A. Oh, as an example, commitments to dry storage.

Q. And then the last bullet point on this page is "The hardships resulting from the uncertainties in the start of acceptance."

What did you understand were the hardships to the utilities resulting from the uncertainties in the start-up?

MR. BANES: Objection -- vague. Calls for speculation.

THE WITNESS: To the extent that we could not identify a particular point in time when a facility would commence operations, that would put a burden on the utilities of what, of internal decisions that they needed to make in order to continue to keep their plants running to accommodate the spent fuel, and so this statement recognized -- again, I'm not sure that

00442

hardships is a word that I would have used, but purports to indicate in this draft that the department at least has a recognition if in fact not a clear, in fact a clear understanding of that the utilities have been affected by that.

BY MR. HIRSCH:

Q. The DOE recognized that the uncertainties about when the DOE would start acceptance would cause burdens on the utilities, is that correct?

A. Sure. Yes.

Q. There's a -- strike that. And one of the burdens would be, would it not, having to determine or provide alternative storage, is that correct?

MR. BANES: Objection -- vague.

THE WITNESS: Maybe I can use an example, and the way best way to respond to you, if we were going to be 30 days or 180 days or 360 days beyond a certain date, and then begin the waste acceptance process, the utilities would find a, a low capital cost alternative to accommodate their spent fuel, whether it be reracking or transferring to another facility.

It would not invest in multi-million
00443
dollar investment in dry storage capability.
BY MR. HIRSCH:
Q. But if the DOE was going to miss the acceptance date by a long period, say 12 years, then the utilities might be forced to engage in those high-cost, high-capital alternatives, correct?
MR. BANES: Objection. Calls for speculation.
THE WITNESS: It, it is, it is possible.
Again, we made no secret of this program, where we were and the difficulties of commencing facility operations, and we also made it clear in all the documents that we reviewed that until that time, we believed it was the utilities' responsibility, so you know, that burden exists on the, existed on the utilities.
I should say that responsibility.

---

## 452:9 - 453:7

00452
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 41 and Brownstein Deposition Exhibit 42.
Brownstein Deposition Exhibit 41 is a memorandum for the Secretary from Dan Dreyfus.
It has Bates labels HQR-001-0339 and HQR-001-311 through 312.
Can you identify these documents?
A. Can I?
Q. What they are.
A. Yes.
Q. Can you tell me what you understand they are?
A. Sure. They're, as I said, they're recommendations to the Secretary to approve the department's issuance of a Notice of Inquiry regarding waste acceptance issues.
00453
Q. And did you prepare Exhibit 41 and 42, the text, that is?

A. Yes.
Q. And I guess Exhibit 42 shows that it
was approved by the Secretary, is that correct,
the Secretary of Energy?
A. Yes.

---

## 455:24 - 457:14

00455
Q. At the, under the issue heading at
the, on the first page of Exhibit 41 --
00456
A. Okay.
Q. Do you see a reference to eliciting
the views of interested parties on several
issues, one, they're listed as one, two and
three?
A. Yes.
Q. And the third option is options
through the nuclear waste fund to offset a
portion of the financial burden which may be
incurred by utilities in continuing to store
spent nuclear fuel at reactor sites beyond 1998,
is that right?
A. Yes.
Q. What was your understanding at that
time of what the financial burden was to the
utilities for storing spent nuclear fuel beyond
1998?
MR. BANES: Objection -- asked and
answered, and calls for speculation.
THE WITNESS: Things like adding dry
storage to accommodate the spent fuel.
BY MR. HIRSCH:
Q. Mr. Brownstein, did you have any
discussions at the DOE that the DOE's inability
to start accepting waste could delay reactor
00457
decommissioning?
A. I was aware of that, and you know,
over ten years dealing with the subject, I
considered I would certainly have had a
discussion about that, but I don't recall a
specific discussion, but I may have.
Q. Well, let me put it this way. You

were aware I take it of the possibility that the
DOE's failure to pick up spent nuclear fuel
could cause utilities to delay reactor
decommissioning, is that correct?
MR. BANES: Objection -- misleading.
Calls for speculation.
THE WITNESS: Yes.

---

### 459:17 - 460:12

00459
Q. Will you look at, look back I should
say at Brownstein Deposition Exhibit 32?
That is the 1992 ACR.
A. Okay.
Q. Do you see, I would like to refer you
to page 3.
There is a statement that I think we
may have seen in one of the earlier reports, but
it's also in here, recited in here, that, quote,
00460
if the current linkages between MRS facility
construction and repository construction
authorization are maintained, it is estimated
that facility operation and initial acceptance
of SNF by DOE could not start until at least
2007?
A. Yes.
Q. That was a correct statement at the
time, was it not, Mr. Brownstein?
MR. BANES: Objection -- asked and
answered.
THE WITNESS: Yes.

---

### 460:13 - 463:3

00460
BY MR. HIRSCH:
Q. All right. And I think you testified
earlier that the, that the rate -- actually I
would like you to look back at Brownstein
Deposition Exhibit 30 for a minute.
That's the December 1991 ACR.
A. Okay.

Q. Do you see on page 2366 of this document that that contains projected waste acceptance rate?
A. Um-hm. Yes.
Q. And I believe you testified earlier that the rates that were identified in there

00461

were based on or consistent with the statutory limitation on the MRS in the 1987 act amendments, is that correct?
MR. BANES: Objection -- misleading.
THE WITNESS: With respect to the 10,000 MTU limit.
BY MR. HIRSCH:
Q. All right. And is it correct that, and I guess -- and I think you testified to this, that a similar, although slightly different rate was used as the lower bounding case in the prior ACR.
Do you recall that?
A. I recall that.
Q. All right. Apart from the acceptance rate identified in Exhibit 30 in that lower bounding case, is it correct that the DOE had never used that acceptance rate or that type of acceptance rate before?
MR. BANES: Objection -- irrelevant and misleading.
THE WITNESS: When you say that type of acceptance rate, you're referring to 2.1?
BY MR. HIRSCH:
Q. Right. Well, let me clarify it; 2.1

00462

refers to an acceptance rate that after a couple of years, goes up to 900 metric tons a year.
Do you see that?
A. Yes.
Q. And I believe that the lower bounding case example from the previous ACR went up to 875 metric tons.
Do you recall that?
A. Right. I do.
Q. My question is before Exhibit 30 in the prior ACR with the lower bounding case, is it correct that the DOE had never used rates, acceptance rates that low before?

MR. BANES: Objection -- misleading, and lack of foundation.

THE WITNESS: I don't want to speak for -- when you're making a blanket statement DOE never, you know, did, DOE is a large organization.

I can't recall that they did, and this was in response to, to the Amendments Act, so I believe you're right, to the best of my recollection.

BY MR. HIRSCH:

Q. And for example, the rates in the

00463

mission plan were higher than the 1991 ACR, is that correct?

A. Yes.

---

**Brownstein, Alan Deposition Testimony dated 4/11/02**

00467
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
00468
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia

Thursday, April 11, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

00469

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

00470

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.

DANIEL S. HERZFELD, ESQ.

Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901

On behalf of Plaintiff Sacramento Municipal
Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

00471
APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear
Operating Company, Alabama Power, Georgia
Power:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric
Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison
Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350
00472
APPEARANCES: (Continued)

On behalf of the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE

BY: BRYANT S. BANES, ESQ.
RUSSELL A. SHULTIS, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530

00473

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
ALAN BROWNSTEIN PLAINTIFFS DEFENDANT
By Mr. Hirsch 475
By Mr. Banes 543
By Mr. Hirsch 557
By Mr. Neslin 561
By Mr. Carney 641
By Mr. Handwerker 647

Afternoon Session -- 561

E X H I B I T S



| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 43 | 479 |
| 44 | 490 |
| 45 | 506 |
| 46 | 514 |
| 47 | 519 |
| 48 | 534 |
| 49 | 538 |
| 50 | 562 |
| 51 | 576 |
| 52 | 589 |
| 53 | 593 |
| 54 | 598 |

00474

| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 55 | 602 |
| 56 | 605 |
| 57 | 607 |
| 58 | 609 |
| 59 | 612 |
| 60 | 617 |
| 61 | 620 |
| 62 | 621 |
| 63 | 634 |
| 64 | 636 |
| 65 | 659 |
| 66 | 671 |
| 67 | 680 |
| 68 | 717 |
| 69 | 728 |
| 70 | 733 |
| 71 | 753 |
| 72 | 754 |
| 73 | 759 |
| 74 | 762 |
| 75 | 763 |
| 76 | 772 |

---

**630:9 - 631:17**

00630
Q. Mr. Brownstein, if I could ask you to look back to Exhibit 1, which is the contract?
A. Okay.
Q. And I'll refer you to page Bates number ADM-001-0652?
A. Okay.
Q. First column, second paragraph, begins Article VI.B.3.(b)?
A. Um-hm.
Q. Would you read that paragraph?
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. NESLIN:
Q. You're familiar with this --

A. Yes.
Q. Language; and the next to last sentence referring to priority for shutdown
00631
reactors states that this type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity.
Was that a goal of the Department of Energy?
MR. BANES: Objection -- vague.
THE WITNESS: I think it was, it was a goal consistent with other goals that I testified to.
BY MR. NESLIN:
Q. One of the department's objectives consistent with other objectives was to avoid the need for shutdown reactors to wait 20 or 30 years to be decommissioned?
A. Again distinguishing the goal from the contractual commitment, yes.

**Brownstein, Alan Deposition Testimony dated 5/23/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - X
Washington, D.C.
Thursday, May 23, 2002
Deposition of ALAN BROWNSTEIN, a witness
herein, called for examination by counsel for
Plaintiffs in the above-entitled matter, pursuant to
agreement, the witness being duly sworn by JAN A.
WILLIAMS, a Notary Public in and for the District of
Columbia, taken at the offices of Spriggs &
Hollingsworth, 1350 I Street, N.W., Washington, D.C.,
20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the
proceedings being taken down by Stenotype by JAN A.
WILLIAMS, RPR, and transcribed under her direction.
00002
APPEARANCES:

On behalf of the Plaintiffs:
JERRY R. STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
RUSSELL A. SHULTIS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640

00003

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
ALAN BROWNSTEIN PLAINTIFFS
By Mr. Stouck 4

Afternoon Session - Page 143

E X H I B I T S

| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 77 - Condensed testimony of Alan Brownstein, pages 1 through 781 | 6 |
| 78 - Memo dated 7/23/84 with attachments | 37 |
| 79 - Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983 | 42 |
| 80 - Memo dated 4/8/83 with attachments | 55 |
| 81 - Proposed Rules, Nuclear Regulatory Commission, 10 CFR Part 61, Disposal of Radioactive Wastes, 5/18/88 | 81 |
| 82 - U.S. Department of Energy, Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste | 157 |

---

## 104:18 - 107:13

00104

Q. Now, you said earlier, when we were talking -- when we were discussing exchanges, that you were aware or the department was aware that these approved DCSs had different value to different utilities?

A. Well, what I said was could have.

Q. Okay. What do you mean by that, why did you have an understanding, why did the department

00105

have the understanding that the approved DCSs could

have different value to different utilities?

MR. CRAWFORD: Objection, compound; and objection, vague; objection, foundation.

THE WITNESS: If you take two utilities that had, you know, different places in the queue, their situations on, for instance, their cost of storage could have been different. I'll give you a couple of examples.

Maybe one utility had an early allocation that would have been easy for them to rerack or, you know, they had already made the capital costs for a storage facility or had excess storage capacity within their pool.

The value -- we believed the value of that place in the queue to that utility was less than a utility that, if they did not receive the services in that particular year, they would have had to make a major capital expense. So you can see a natural imbalance to the utilities themselves and the value of receiving fuel at any particular time.

And, if there was that imbalance, we assumed, certainly the contract allowed for, you know, a market to develop. And we were going to then be a part of that because the contract required us to

00106

approve it, when the government has to approve it.

We wanted to be careful how we, quote, interfered with the marketplace. And there were these issues, these technical issues that, if we resolved together, would have -- again, since these were primarily equity issues, not issues of key importance to us, we wanted to do as little as possible in interfering with the market. That was my rationale in how these -- how this subject developed.

BY MR. STOUCK:

Q. And that was a subject that you, that being a subject of exchanges of DCSs, approved DCSs, that was something you certainly had responsibility for?

A. Yes.

Q. And you wanted to be careful in not interfering too much with this marketing DCS exchanges because, as a general proposition, you know markets are good, you wanted to allow the utilities to pursue presumably their self interest in making economic exchanges; is that what was behind it or was

there something else behind it?
MR. CRAWFORD: Objection, compound.
THE WITNESS: Markets are efficient. And the efficiency of that market increases with the
00107
amount of information that's available. Whether it be the -- who has got what place in the queue or how the rules are going to be interpreted and applied.
It's one of the reasons we did some -- we went out of our way. When we decided to move forward with the APR process, we did something very strange I think. We went out and published a draft APR and sort of alerted to the utilities as best as we could, hey, we're going to do this, please take a serious look at this.
We tried to do everything we could that the department would minimize its interference in the markets. I hope that's responsive to your question.

---

## 216:10 - 220:20

00216
Q. Okay. In other words, DOE did not -- was not able to or in any event did not begin accepting purchasers' SNF beginning in 1998, right?
A. Yes.
Q. And it follows that then that DOE did not begin accepting fuel in 1998 according to the acceptance rate reflected in the '91 ACR, right?
A. Yes.
Q. Okay. So, in light of those changed circumstances, do you have an opinion whether DCSs previously approved by DOE need to be reevaluated by DOE and the purchasers? This sentence says may. I'm asking you whether in your view they need to be?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion; objection, asked and answered.
00217
THE WITNESS: I would think that we would, I would think both sides would want to do that.
BY MR. STOUCK:
Q. Okay. Why would you think that?
A. We're going to jump from the time period we're talking about to today, for example? Let's not

do this year by year. Let's talk about the utilities.
If the utilities had submitted and gotten approved DCSs, and let's say they were very specific about the fuel that they wanted to deliver. Their situation and views on what they want to deliver to us could have substantially changed. And it seems to me that that should give you -- we should in my opinion give the utilities another opportunity to review and see if that's same fuel.
And I especially feel that way because the department has not, you know, procured casks. I may feel differently if casks had been purchased based on that information as an example.
Q. Okay. As an example would you agree with the categorization that that would be a kind of updating of the DCS information to deal with current circumstances?
MR. CRAWFORD: Objection, vague.
00218
THE WITNESS: I think both sides --
MR. CRAWFORD: And to the extent it calls for a legal conclusion.
THE WITNESS: I think both sides should have the opportunity to update that information.
BY MR. STOUCK:
Q. And you gave me an example of a reason why utilities should be given the opportunity?
A. Right.
Q. Can you give an example of reasons why DOE should be given the opportunity to update that information to deal with current circumstances?
A. The department may have better information on the rate or the timing, both of which I would think would influence utilities' decisions.
Q. Right. Well, you recall that the '91 -- excuse me, the '91 ACR -- do you recall the rate in the '91 ACR?
A. No.
Q. This has been previously marked as Exhibit 30. It's the '91 annual capacity report. I have a copy for you and your counsel. You know where to look for the rate, right?
A. Yes.
Q. Page 5. This was the so-called or I'll
00219

call it 400, 600, 900, and then 900 steady state rate, right?
A. Right.
Q. And so that is not the acceptance rate that is specified in DOE's current planning documents; is that correct?
MR. CRAWFORD: Objection, vague.
THE WITNESS: I believe you're accurate.
BY MR. STOUCK:
Q. Okay. The current planning documents for the program indicate an acceptance rate that ramps up to a steady state of 3,000 tons per MTU per year?
MR. CRAWFORD: Objection.
THE WITNESS: I don't recall what the rampup rate is, but the steady state I believe is 3,000.
BY MR. STOUCK:
Q. Okay. And so presumably, according to your testimony earlier today, those current planning documents are DOE's current best estimate of what the acceptance rate will be when the program actually starts, correct?
MR. CRAWFORD: Objection, vague; and objection to the extent it mischaracterizes prior testimony.
00220
THE WITNESS: I believe that's accurate.
BY MR. STOUCK:
Q. Okay. And so that change in projected acceptance rates, is that another reason why in the language -- why in your view, in the language of paragraph 7C of the instructions, Exhibit 34, all DCSs previously approved by DOE need to be reevaluated?
MR. CRAWFORD: Objection to the foundation; objection, asked and answered; objection, vague.
THE WITNESS: I use that as an example. So I agree.
BY MR. STOUCK:
Q. Okay. You used the acceptance rate change as an example?
A. Yes.
Q. We have now got it in more detailed form on the record.
A. That's fine.

**Burgoyne, Robert Deposition Testimony dated 7/8/04**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
SACRAMENTO MUNICIPAL :
UTILITY DISTRICT, :
Plaintiff : No. 98-488C
v. : (Judge Braden)
THE UNITED STATES OF AMERICA, :
Defendant :
- - - - - - - - - - - - - - - - - X

Deposition of ROBERT M. BURGOYNE
Washington, D.C.
Thursday, July 8, 2004
9:42 a.m.

Job No.: 1-38205
Pages: 1 through 178
Reported by: Diane Gomez, RPR

00002
Deposition of ROBERT M. BURGOYNE, held at the offices of:

ARNOLD & PORTER ,LLP.
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

00003

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER, LLP.
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF DEFENDANT:

VICTORIA L. STROHMEYER, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20005
(202) 305-7573

00004

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT:

SCOTT DAMELIN, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest, Room 12020
Washington, D.C. 20530
(202) 305-2312

00005

C O N T E N T S

EXAMINATION OF ROBERT M. BURGOYNE PAGE
By Mr. Macdonald 7
By Ms. Strohmeyer 171
By Mr. Macdonald 173

E X H I B I T S
(Attached to the Transcript)

| BURGOYNE DEPOSITION EXHIBIT | PAGE |
|---|---|
| 1 Excerpts from Defendant's Responses to Plaintiff's First Set of Interrogatories | 13 |
| 2 E-mails | 95 |
| 3 Document dated 2/1/00 to J. Williams with attached 2001 Waste Input Report | 110 |
| 4 Document, "Transportation Meeting," dated 6/8/01 | 140 |
| 5 E-mail dated 7/31/01 from E. Benz to D. Zabransky | 152 |
| 6 E-mail dated 7/31/01 from E. Benz | 153 |
| 7 E-mail dated 3/4/02 from R. Burgoyne to J. Pollog, et al. | 162 |

00006

E X H I B I T S C O N T I N U E D

| BURGOYNE DEPOSITION EXHIBIT | PAGE |
|---|---|
| 8 E-mail dated 3/18/02 from E. Benz, et al., with attachment | 167 |

---

**11:17 - 11:21**

00011

Q So my question is, what's your current position with the Department of Energy?

A I work on the support contract, the MTS, management technical support contract that Booz Allen has with the Department of Energy.

---

### 13:1 - 13:7

00013

Q Are you being represented by counsel here today?

A Other than Victoria. Yes, I guess the answer is yes.

Q You are being represented by the Department of Justice in the deposition?

A Yes.

---

### 119:12 - 120:6

00119

Q You don't know why they assumed that a reactor when it shuts down will go to dry storage as opposed to simply leaving its fuel in wet storage?

A My presumption would be that it's cheaper for the utility to put it in dry storage and decommission their pool if they have the opportunity to do so.

Q As opposed to simply leaving the fuel in the pool to await final pickup from DOE?

A Because they have to maintain a Part 50 license, and there's a lot of strings attached to the

00120

pool. So I suspect, my opinion is, based on just general knowledge of the industry, that the utility, given a choice, would opt to get rid of that pool. It's an expensive piece, particularly if you only have a small portion of your inventory still sitting in there.

---

### 132:16 - 133:22

00132

Q Do you expect that when DOE actually begins accepting fuel from utilities that it will do so in campaigns?

A Well, yes. I mean, "campaign" is just a term of art that says we're going to go to this utility and we're going to get some fuel. And so we call that a campaign. Now, what we would like to do

00133

and what we've looked at is how we could make those campaigns more efficient and utilize the equipment better and so forth and so on, but those are -- again, these are hundreds of different scenarios that have been exercised to look at ways of making things move better, but campaigning meaning we're going to go to a place, set up, take some fuel. Yeah, that's what we're going to do.
Q And so that I understand your answer, is it your view that it would be more efficient if DOE could go to a single reactor and take multiple shipments -- let's talk about a rail shipment, several railcars that were full of fuel at one time as opposed to going back to a utility each year, taking a half cask or a quarter cask full of fuel?
A Yes.
Q It would be more efficient to go and take a full cask or --
A Well, I mean, I'm just -- my opinion is that they would have never taken a part of a cask. I think if they put a cask in there, they probably would have filled it up.

---

## 137:8 - 138:10

00137
Q Do you have an understanding of the definition of the term "failed fuel" as used in the standard contract?
MS. STROHMEYER: Objection. Calls for a legal conclusion.
A I don't think it's defined, as far as I know.
Q As far as you know, failed fuel is not defined in the standard contract?
A Well, I mean, failed fuel is identified, but I don't know that the specifics are defined as to what constitutes failed fuel.
Q In your view from a transportation standpoint if fuel does not require any special handling, is there any reason for DOE to delay
00138
acceptance of such fuel?
MS. STROHMEYER: Objection. Foundation.
A Can you repeat that again? It doesn't

require special handling?

(The record is read.)

A Well, to my knowledge if it doesn't require special handling I don't know that there would be any reason it couldn't be accepted. If it's -- meets the standard contract dimensions and other clauses and so forth described. I think the NRC has an opinion, but.

**Cole, Billy Deposition Testimony dated 3/12/02:**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
00002
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia

Tuesday, March 12, 2002

Deposition of BILLY M. COLE, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

00003

Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Tuesday, March 12, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

00004

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:

DEVON E. HEWITT, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard

McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern
Nuclear Operating Company, Alabama Power,
Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

00005
APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison
Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal
Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric
Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011
00006
(202) 434-1675)

On behalf of the Defendant:

R. ALAN MILLER, ESQ.
ERIN E. POWELL, ESQ.
U.S. Department of Justice

Civil Division
1100 L Street, N.W.
Washington, D.C.
(202) 616-0383

ALSO PRESENT
SCOTT VANCE

00007
C O N T E N T S
WITNESS EXAMINATION BY COUNSEL FOR
Billy M. Cole PLAINTIFF DEFENDANT
By Ms. Hewitt 8

Afternoon Session - Page 105

E X H I B I T S
COLE EXHIBIT NO. PAGE NO.
1 80
2 197

---

**33:10 - 36:24**

00030

Q. Mr. Cole, do you have an understanding
of the term acceptance rate?
A. Sure.
Q. What is your understanding of that
term?
A. It's a rate, a rate meaning, rate
means function of, over a period of time, how
much something can be taken.
Q. And do you have an understanding of
how that term has been used in connection with

the civilian radioactive waste management program?

A. Oh, yes.

Q. And how has that term been used, or what is your understanding of the term?

A. It's, acceptance rate in this, for

00034

this program is a rate at which spent nuclear fuel could be taken from the utilities by the government.

Q. In the civilian radioactive waste management impact statement, was acceptance rate addressed in any way?

A. Yes, it was. It wasn't at a very high level, not down to details of reactors and utilities and things like that.

It was so much energy was projected to be produced by nuclear over time, and that amount of energy would generate so much spent fuel, and you had to do something with it.

You either reprocessed it or you disposed of it, and it addressed both of those issues as an industry, but it was, also had projections in there that we would probably have two times the amount of spent fuel, maybe, maybe more than that, maybe three times the amount of spent fuel than we wound up projecting today.

It looked like the sky was the limit in those days. People were buying reactors and ordering reactors right and left, and it's going to be great.

So you had all of this industry and

00035

all of these megawatts that were going to be generated by nuclear, so in order to have a repository system that would handle all this stuff, you were going to have to have a couple of big repositories probably, you know, something in the neighborhood of three to six thousand tons per year acceptance, but just about the time the report got published, President Carter says no more reprocessing.

All of a sudden, the utilities started having, becoming, fear of becoming constipated, no place to put their fuel.

Q. When was the report published?

A. I think it was 1980.

Q. And do you recall how the acceptance
rates that were referred to in that document
were developed?
A. Yeah. It was you've got this much
stuff you have got to dispose of over a period
of time, what makes sense? At what rate can I
take the stuff and eventually get rid of it all,
and you know, you built a facility size based on
that.
You don't build a facility that takes
it all in one day because nobody can afford
00036
that, and you don't build a facility that takes
it over 300 years. That doesn't do anybody any
good, so you look at a reasonable period of
time, and you iterate a few times and figure out
what's, how can I keep the cost down and still
get the job done?
And you also don't want to -- you take
a bunch at first, and then the only thing you're
taking is discharge after that.
You have to make sure you keep up with
the discharge, so it was, like I said, it was a,
strictly on a high level.
Q. You made reference in your previous
response to a reasonable period of time.
I didn't understand that. Could you
explain that a little better?
A. Well, yes. You don't want a facility
operating beyond the point in time where you
predict all the reactor is going to be shutting
down and so they're left with fuel sitting
around at that point in time.
That was considered reasonable, and it
would operate, you know, probably to the end of
reactor, reactors', plural, life.

---

## 34:4 - 36:24

00034
Q. In the civilian radioactive waste
management impact statement, was acceptance rate
addressed in any way?
A. Yes, it was. It wasn't at a very high
level, not down to details of reactors and
utilities and things like that.

It was so much energy was projected to be produced by nuclear over time, and that amount of energy would generate so much spent fuel, and you had to do something with it.

You either reprocessed it or you disposed of it, and it addressed both of those issues as an industry, but it was, also had projections in there that we would probably have two times the amount of spent fuel, maybe, maybe more than that, maybe three times the amount of spent fuel than we wound up projecting today.

It looked like the sky was the limit in those days. People were buying reactors and ordering reactors right and left, and it's going to be great.

So you had all of this industry and

00035

all of these megawatts that were going to be generated by nuclear, so in order to have a repository system that would handle all this stuff, you were going to have to have a couple of big repositories probably, you know, something in the neighborhood of three to six thousand tons per year acceptance, but just about the time the report got published, President Carter says no more reprocessing.

All of a sudden, the utilities started having, becoming, fear of becoming constipated, no place to put their fuel.

Q. When was the report published?

A. I think it was 1980.

Q. And do you recall how the acceptance rates that were referred to in that document were developed?

A. Yeah. It was you've got this much stuff you have got to dispose of over a period of time, what makes sense? At what rate can I take the stuff and eventually get rid of it all, and you know, you built a facility size based on that.

You don't build a facility that takes it all in one day because nobody can afford

00036

that, and you don't build a facility that takes it over 300 years. That doesn't do anybody any good, so you look at a reasonable period of time, and you iterate a few times and figure out

what's, how can I keep the cost down and still get the job done?

And you also don't want to -- you take a bunch at first, and then the only thing you're taking is discharge after that.

You have to make sure you keep up with the discharge, so it was, like I said, it was a, strictly on a high level.

Q. You made reference in your previous response to a reasonable period of time. I didn't understand that. Could you explain that a little better?

A. Well, yes. You don't want a facility operating beyond the point in time where you predict all the reactor is going to be shutting down and so they're left with fuel sitting around at that point in time.

That was considered reasonable, and it would operate, you know, probably to the end of reactor, reactors', plural, life.

---

**74:23 - 75:14**

00074

Q. And why was rate not an issue?

A. It just wasn't. We had a rate that we were working with. We were told by the program

00075

what the rate was going to be at that time. I think a full-blown system, everybody projecting it was going to be 3,000 tons a year ramping up from, I don't know, 600, 1200 tons, something like that, ramp up to 3,000, and that's the rate we dealt with.

Q. When was that rate provided to you or PNL?

A. As soon as the program began, 1983.

Q. And that was provided to you by?

A. By DOE.

Q. And anybody particularly within DOE?

A. No. It was part of the program guidance you get.

---

**78:11 - 81:13**

00078
Q. Are you familiar with a meeting that occurred in December of 1983?
The meeting was titled proceedings of the 1983 civilian radioactive waste management information meeting.
A. I'm not familiar with the report, no.
Q. I'm going to --
A. But the meeting sounds interesting.
I'm trying to figure out what meeting it was.
Who was there?
Q. I'm going to give you a couple of excerpts from the report that was issued from that.
A. Who issued the report?
Q. It's the report that says on the title
00079
that it was sponsored by U.S. Department of Energy Office of Civilian and Radioactive Waste Management.
A. Sponsored by, but who, was this an -- what's the report number?
Q. There is a number in the upper left-hand corner. I show you the --
A. That makes a difference. What's the report number? Is it EI report?
Q. I don't see that designation, and I don't know if it has -- there is a CONF?
I'll give you this title. Take a look at it. It's got a forward. I've got excerpts, Table of Contents of that meeting, and then I've got a couple of pages from that report which actually excerpt the program overview given by Robert Morgan, so just take a look at it and see if you have any familiarity with this that might refresh your recollection on the top.
A. Like I said, I'm not familiar with the report, but maybe the meeting.
(The witness reviewed the document.)
THE WITNESS: No, I was not party to this.
This was a high-level meeting, Bob
00080
Morgan and his staff.
This was not the information meetings

I thought it was.
(The witness reviewed the document.)
BY MS. HEWITT:
Q. You can see that there is a portion of
that Robert Morgan program overview that I have
highlighted?
A. Um-hm.
Q. That indicates --
A. Basic strategy.
Q. Yes. Can you take a look at that?
A. Um-hm. I did.
Q. And we're going to make this probably
Billy Cole Exhibit No. 1 to the deposition.
(Cole Exhibit No. 1
was marked for
identification.)
BY MS. HEWITT:
Q. Does that strategy sound familiar to
you at all?
A. Oh, yeah.
Q. How are you familiar with that
strategy?
A. That was a, that was the purpose. The
00081
basic purpose of the Nuclear Waste Policy Act
was to try to help keep the utilities from
having to run out of storage space, so the
utilities are in there for generating
electricity and not storing fuel.
You know, the government had a
responsibility to help them because they, like I
said, they stopped reprocessing.
This is a basic strategy, and a part
of the primary mission was to try to keep them
from having to add more storage.
That was one of the major goals of the
program.

---

## 103:11 - 104:12

00103
Q. So is it correct to say that DOE
developed the acceptance rate based on the
capacity of the system to take spent nuclear
fuel?
A. Yes. That's exactly what it is.

Q. Was that always its guidelines in developing the acceptance rate do you know?
A. They are equal. The acceptance rate is the, the system capacity is the ability for it to accept spent fuel.
Q. Well, you could have a system capacity that is 3,000, but DOE could choose to accept less than 3,000?
A. That's different.
Q. Why is that different?
00104
A. If they chose to accept less than 3,000, then they're not allocating the system capacity, and that's what it said it did.
Wouldn't make much sense to build a facility for 3,000 tons and only take 2,000 tons if you're, unless you're in a ramp-up phase and had problems, and planning, mission plans, things like that don't recognize those kind of contingencies.
You build a 3,000, you operate a 3,000 once you ramp up. Doesn't really recognize the other.

---

## 106:14- 112:14

00106
Q. You had said earlier that you were the manager of waste acceptance at PNL from the middle of 1985 until January 1989, is that right?
A. Probably middle of '85 until January of '89, yes.
Q. What happened in January 1989?
A. I resigned my position at Battelle and left.
Q. Why did you resign?
A. I got a better offer.
Q. And what was that?
00107
A. Vice president of JAI Corporation.
Q. What is JAI Corporation?
A. Johnson Associates, Incorporated, Nuclear Engineering, Beltway bandit.
Q. And what position did you take with them?

A. Vice president.
Q. And what were your responsibilities as vice president?
A. Bring in money.
Q. Did you continue to work on the DOE civilian radioactive waste management program?
A. Yes, I did. I turned around and subcontracted back to PNL.
Q. Did your tasks differ in any way now that you were working for JAI?
A. No, not really. I just was no longer in charge.
I was a subcontractor.
Q. Who did you report to when you were at JAI working on this civilian radioactive waste management program?
A. I think the person that took over for me I believe at that time was Rick Walling, but the man working on most of this stuff for Rick
00108
was Pat McDuffie, so most of my interfaces were with Pat.
Q. And at this time in 1989, who were you interacting with at DOE, if anybody?
A. Alan Brownstein; let's see. What was her name? The people that worked for Alan -- Mary Lou, Mary Lou Payton I think was her name.
Q. And how long, how long were you in the position of vice president at JAI?
A. Well, I'm still. Still there on my business card, even though I'm not very active, but they still, the Board of Directors keeps both me, and I don't refuse it, so that gives me free business cards.
Q. Have you been employed by JAI continuously since 1989?
A. No.
Q. Did there come a point in time where you left JAI?
A. Yes. Yes.
Q. And when was that?
A. August 1993.
Q. And where did you go?
A. I went back to work for PNL, and when I say PNL, I mean Battelle.
00109
Battelle Memorial Institute operated

the Pacific Northwest Laboratories for the Department of Energy, so I worked for Battelle, but they contacted me and asked me to open up an office for them in Germantown, Maryland, on the mixed nuclear waste program since I had done one for the spent fuel program, and after some negotiations and some reasoning, had a lot to do with retirement benefits, I accepted, went up and got the office open, got the program started.
A year and a half later in 1995, Secretary O'Leary downsized all the laboratories.
One of the first ways of downsizing was what they called an enhanced retirement package, so they were downsizing PNL.
On the payroll, I was a PNL employee even though I was here in the Washington, D.C. area, and I was eligible, and I took it, so I retired physically formally and finally retired from Battelle in May 30th -- no -- April 30th, 1995.
May 1st, went back to JAI, same position.
00110
Q. When you returned to JAI on May 1st of 1995, did you return to work on the civilian radioactive waste management program?
A. Yes, I did. One of the roles when I first went to work for JAI, I was working doing some work still for PNL plus a few others, some classified stuff that I can't talk about, but we did a lot of things.
In 1991, DOE hired a new M&O contractor, management and operating contractor, for the commercial waste management program.
The M&O was no longer PNL. It was TRW.
JAI was one of the teammates with TRW that bid on that contract, and we won it.
I became the manager of the waste acceptance department for the new program. What goes around comes around.
Q. And when you returned in 1995 to JAI, did you resume that role?
A. I resumed that role again, yes, because there was a couple interim managers

while I was gone that for one reason or another didn't work out well with DOE, so I came back in.

00111

Q. In your role as manager for waste acceptance, either at PNL or at JAI, did you have occasion to participate in all the APRs that were produced by DOE?

A. Yes.

Q. And did you have occasion to participate in the production of all the ACRs produced by DOE?

A. Yes, in one form or another, yes.

Q. What other responsibilities did you have in the mid-1980s at PNL with regard to the waste management program?

You had mentioned the, developing the ACRs as one, one additional task.

A. No. I told you the FIMS, which is the federal interim storage program, F-I-M-S.

Storage requirements report, I was responsible for developing that.

The ACR issue resolution process, there were a lot of other little jobs. We were doing technical jobs like determining what the effects would be on spent fuel in dry storage for long periods of time and with certain types of atmospheres, either oxygen or inert atmospheres and things like this.

00112

We had all kinds of the nitties going on.

We also developed the first dry storage cask for testing spent fuel in dry storage called the REA 2023 built by Riddenhall Eggers & Associates. It's still sitting out in Idaho right now with fuel in it.

Q. Did you have any role in developing or producing the fee adequacy reports that were issued by DOE?

A. Yes.

Q. What was your role?

A. My predominant role was as manager responsible for the report.

**129:5 - 132:1**

00129

Q. And how did you develop those
acceptance rates?
A. This was using information out of the
nuclear waste policy amendments which made the
statement that you couldn't -- well, first of
all, back up.
By this point in time, DOE, it
basically had the MRS as part of its mission,
part of its planning. It was going to be there
they were hoping.
And in order to do it, under the
requirements of the Nuclear Waste Policy
Amendments Act, the act stated if you had an
MRS, it could not accept more than 10,000 metric
tons of fuel until the repository became either
operational or licensed, was something like
that.
The mission I think at that point in
time showed MRS they could maybe could get one
going in 1998, a limited capacity probably.
Repository wouldn't start probably
00130
until 2010, 12 years later, so they asked me,
you know, what would be a reasonable rate
because, you know, we can't build a big
full-blown facility to get started, but we would
like to make sure that we have something that's
useful, so I came up with this rate which
recognized the 10,000 ton limit over a 12-year
period even though we only published ten years
here because that's all that was required in the
contract, to publish the first ten years, but if
you add the other two years in here, you get
another 1800 tons, and you have got 10,000.
It also recognized what the utilities
had told us were their storage requirements,
their need for out of tool, out of tool storage,
recognizing the ability or inability to keep a
full core reserve.
Information fed to us through a form
they filled out every year called the RW 859;
based on that information, in 1998, there was
less than 400 tons of allocable storage capacity

required on the aggregate by all utilities. Now this takes us back to my statements earlier about issues of operations versus issues of equity.
00131
This is an equity issue. How the utilities might want to divide that up amongst themselves can be their problem, but we would provide enough capacity so that they would not, they as an entity would not have to add any additional storage capacity. The second year, 1999, they were telling me that it was like 575 tons required. The third year was 850 or something like that, and from then on out, it was a nominal 850, 950 ton, nominal 900 tons, so I looked at that and says geeze, isn't that kind of nice? I've got 10,000 tons of capacity that I can use over a 12-year period, and lo and behold, I can also lay it out so that the utilities won't have to, if we actually did that, utilities, even though it's not what we were wanting, it's not 3,000 tons, but it is enough to keep them from having to add additional storage.
Q. And why was that a factor in your consideration of developing the acceptance rate?
A. Because that's a, that's the whole purpose of the Nuclear Waste Policy Act was to keep the utilities from having to add new
00132
storage so they could keep operating.

---

## 162:14 - 163:16

00162
Q. Now the 1995 APR/ACR was the last ACR or APR that was published by DOE, is that right?
A. As far as my, I remember, yes.
Q. Did you have any discussions with DOE about publishing a report after this?
A. Oh, yeah. Me developed those reports. They just never got published.
Q. And why is that?
A. They said it was moot because they didn't know what the start date or anything was

going to be.
Q. But they were using a date of 2010,
00163
weren't they, at that point in time?
A. I think as far as a repository goes,
yeah.
They were still hoping there was some
way they could get some interim facility sooner,
but I think by then, they were using 2010 as a
repository date, and if they started a
repository, I guess they were using these
acceptance rates.
No one has ever changed the acceptance
rate as far as I know, even though the bases for
it no longer existed if you start in 2010.
Q. And that would have been known in 1995
when this APR/ACR was published?
A. If that was based on 2010, probably
so.

---

## 171:9 - 176:8

00171
Q. Do you know how DOE determined that
the repository ultimately built would take or
receive 3,000 metric tons of spent fuel a year
versus some other number?
A. It was designed to do that. It was
designed to accept so many rail casks and/or
truck casks in a given year, and unload them and
process the fuel and put it in storage container
or in, you know, disposal packages, and you
build the number of receiving bays.
I think they figured they could do it
with three receiving bays, and you design all
the stuff so you can take 3,000 tons.
Q. And do you know why they designed it
to a 3,000 ton, metric ton annual capacity?
A. It seemed the original, if I remember
right, like I said, the original was I think
00172
based more on what came out of the old storage,
the commercial radioactive waste management
impact statement, but in the, the later years,
kind of de facto, that appeared to be a pretty
good number that if you built a facility and

operated it nominally at that rate, it would
operate 35, 40 years, and by then, all the
reactors had shut down, and you have taken all
the fuel and cleaned up the backlog, and that
period of time would be about, would be
reasonable because the last reactor would shut
down in 2038 and you would shut the, close the
doors on the repository in 2040 or five years,
maybe 45, somewhere, a few years later after you
get the last fuel after it's cooled a couple of
years, and if you did anything at a faster rate,
then you would take a lot up front, and you
would be sitting idle for a lot of time and the
cost would be too high.
If you did it the slower rate, the
utilities would be stuck with storing it on
their site too many years after they shut down,
so it turned out to be a pretty good number.
Q. Do you know if DOE conducted any
analysis on this topic?
00173
A. Oh, God, yeah. How about $20 million
worth or more?
Every year, somebody did an analysis
to make sure that was still a good number, and
that was all TSLCC work, things like that.
Q. Did PNL participate in any of these
analyses?
A. Yeah, probably. Everybody did.
Practically every laboratory out there
participated.
Q. And did you personally participate in
any of these analyses?
A. No.
Q. And is it your testimony that these
analyses concluded uniformly that 3,000 was a
good rate to use for designing the repository?
A. Um-hm, based on the latest information
on how much spent fuel is projected to be
discharged through the life of the program until
the last reactor shuts down.
Q. Is there significance to the 35,
40-year timeframe that you referenced in your
prior answer?
A. That's when the last reactor shuts
down is like 2038, and if you get a repository
00174

starting to operate in Year 2000 or so, you
operate 35 years, 40 years, then it's all done,
and if you're doing 3,000 tons a year, you're
taking care of the, what's being discharged,
which is nominal 2000 tons a year plus got a
little extra to work off the backlog.
Q. Now where did you get the figure 2000
a year being what is discharged?
A. That's what the, that's what the
utilities discharge every year.
Q. And was the repository designed to
accommodate the discharges?
A. Plus work off the backlog.
Q. Now in the acceptance rates that were
used in the acceptance capacity reports, did
they reflect what the utilities would discharge
or the idea of working off a backlog?
A. I don't know how many times I've got
to repeat how that acceptance rate was developed
in the Annual Capacity Report.
It was based on if you started the
facility in 1998, 400 tons the first year would
be adequate to make sure that you at least
didn't have to add additional storage in that
year, every year, the same.
00175
Had nothing to do with 3,000 tons
working off backlog or anything.
It was the minimum that could be done
to keep them from adding additional storage.
Q. But before that rate was implemented,
there was a 3,000, a ramp-up to 3,000?
A. Um-hm.
Q. And is it fair to say that, that when
the Annual Capacity Report used the 3,000 metric
ton annual acceptance rate, that that reflected
what was required to work off what utilities
were discharging as well as attacking a backlog?
A. Oh, yes, definitely. I'm sorry. I
misinterpreted the question.
Yes.
Q. I'm not always very clear.
A. No. No. That's, that's -- you're
absolutely right. That was, that was the
initial hope of the program.
Not only did they want to help
utilities so they wouldn't have to add

additional capacity, they wanted to make sure
that you had to work off the backlog.
Otherwise you've got utilities
ultimately shutting their reactors down and
00176
sitting there storing that fuel for many, many
years.
If you only handle a 2,000 ton per
year acceptance rate, you would have to operate
probably a 60, 70-year repository to finally
work off the backlog.
Utilities, that's not what they were
paying for.

---

## 201:4 - 203:5

00201
Q. So was the Delivery Commitment
Schedule a final commitment by DOE to take the
fuel reflected therein from the utility?
MR. MILLER: Lack of foundation.
THE WITNESS: I, my personal belief is
that it was a commitment by DOE to take this
stuff and a commitment by the utilities to
deliver, yes.
And I guess I need to leave it at that
because, yes, I think that's true. It is, it
did represent a commitment, and I, you know, I
know that things changed afterwards.
They couldn't get a facility done in
'98, as we all know, and things like that, but
it does not excuse an obligation.
Q. What do you mean by that?
A. DOE had an obligation to take
something under the contract.
Now how much, that could be debated
because it doesn't tell, quote, amounts in the
contract.
If you read the language, I think
00202
literally they could have taken one spent fuel
assembly in and met their obligation.
Q. Was that ever expressed as the intent
of DOE?
A. Of course not. Their intent was to
get a facility operating in '98, to take the

stuff away fast enough so the utilities would not have to add additional storage.
That was the intent.
Q. And do you think that DOE had that intent when they signed the standard contract?
A. Of course.
MR. MILLER: Objection. Calls for the -- lack of foundation.
Sorry.
BY MS. HEWITT:
Q. On what do you base that opinion of yours?
A. They were given that job by Congress, and the job they were given was to, between the DOE and the utilities, to develop a contract and enter into this contract and carry out the roles and responsibilities of the contract, and they went to work trying to do it.
Q. Did you ever have discussions with
00203
people at DOE about their obligations under the standard contract in this regard?
A. Oh, of course. Of course I did. I said you guys are liable. You guys are required to take this stuff.

## Cole, Billy Deposition Testimony dated 3/13/02

00245
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
00246
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia

Wednesday, March 13, 2002

Continued deposition of BILLY M. COLE, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

00247

Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Wednesday, March 13, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

00248

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:

DEVON E. HEWITT, ESQ.

ALEX D. TOMASZCZUK, ESQ.

Shaw Pittman, LLP

1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

00249

APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011

00250

(202) 434-1675)

On behalf of the Defendant:

R. ALAN MILLER, ESQ.
ERIN E. POWELL, ESQ.
U.S. Department of Justice

Civil Division
1100 L Street, N.W.
Washington, D.C.
(202) 616-0383

ALSO PRESENT
SCOTT VANCE

00251
C O N T E N T S
WITNESS EXAMINATION BY COUNSEL FOR
Billy M. Cole PLAINTIFF DEFENDANT
By Ms. Hewitt 252
By Mr. Blanton 260
By Mr. Eidukas 331
By Mr. Macdonald 347
By Mr. Miller 504
Afternoon Session - Page 347

E X H I B I T S

| COLE EXHIBIT NO. | PAGE NO. |
|---|---|
| 3 | 381 |
| 4 | 398 |
| 5 | 410 |
| 6 | 442 |
| 7 | 459 |

---

**345:13 - 346:10**

00345
Q. So when you created that acceptance rate in the 1991 ACR, you did not, you did not

anticipate past there -- that was based on the 12-year period and you didn't anticipate --
A. Actually was only 10 years. The ACR only goes for ten years.
I just used the 12 year because that was the -- you couldn't get ten, more than 10,000 tons in an MRS under the law prior to that repository operating, so I divided over those 12 years.
Q. Thank you. And so I guess what I was trying to get at and may have been misphrasing
00346
it was you didn't intend or anticipate one way or the other that the 900 rate would continue in perpetuity or indefinitely past that ten-year period?
A. No.
MR. MILLER: Asked and answered.
THE WITNESS: I did not intend that it would, and I assumed that it wouldn't, but that was not even a consideration at that time.
Didn't look at it.

---

## 354:18 - 355:13

00354
Q. Did you have discussions with DOE about the prospect that utilities would, in connection with these rates, swap or trade allocation rights?
A. They, the only discussions were that they were allowed to do it if they so choose to do it, but as you look down this list, it shows you reactor.
00355
This one is based on utilities, right.
It shows you per utility how much they have.
Q. Who at DOE would you have had discussions with about this prospect of utilities exchanging slots?
A. Mr. Brownstein.
Q. Anybody else?
A. Probably a hundred people; I don't remember.

I mean he was my primary person that I
dealt with on these issues and on this program.
Anybody else around asking questions
or something, you know --

**Cole, Billy Deposition Testimony dated 6/4/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY, :
(98-154C) (Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY, :
(98-474C) (Merow, S. J.) :
Plaintiffs, : Discovery
: Judge
v. : (Judge
: Sypolt)
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - -x
VOLUME I
Pages 1 - 228

Deposition of BILLY M. COLE, held at the
offices of Spriggs & Hollingsworth, 1350 I Street, N.W.,
Ninth Floor, Washington, D.C., commencing at 10:30 a.m.,
Tuesday, June 4, 2002, before Heidi L. Jeffreys, RDR,
CRR, Notary Public.

00002
A P P E A R A N C E S O F C O U N S E L:
ON BEHALF OF PLAINTIFFS:

FOR YANKEE ATOMIC ELECTRIC POWER COMPANY, CONNECTICUT
YANKEE ATOMIC POWER COMPANY, AND MAINE YANKEE ATOMIC
POWER COMPANY:

SPRIGGS & HOLLINGSWORTH
BY: JERRY STOUCK, ESQUIRE
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5389

ON BEHALF OF THE DEFENDANTS:
FOR THE UNITED STATES:

U.S. DEPARTMENT OF JUSTICE

BY: HEIDE L. HERRMANN, ESQUIRE
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290

00003

I N D E X

WITNESS

ON BEHALF OF THE PLAINTIFFS: Examination by: Page

B. M. Cole Mr. Stouck 5

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 8 | Defendant's witness list | 20 |
| 9 | Deposition transcript | 24 |
| 10 | Memo (Coles to McKee and Wegeng) | 37 |
| 11 | Letter dated 4-11-83 | 112 |
| 12 | CSFM program document | 116 |
| 13 | Article | 118 |
| 14 | Article | 126 |
| 15 | Letter dated 12-15-86 | 129 |
| 16 | Contract | 136 |
| 17 | Letter dated 12-30-86 | 140 |
| 18 | Letter dated 2-8-87 | 151 |
| 19 | Letter dated 3-5-87 | 151 |
| 20 | Memo dated 6-5-87 | 157 |
| 21 | Letter dated 12-22-87 | 169 |
| 22 | Memo dated 10-5-90 | 174 |
| 23 | '89 ACR draft | 174 |
| 24 | Memo dated 8-14-91 | 182 |
| 25 | Letter dated 3-13-97 | 195 |

00004

EXHIBITS (Continuing)

| No. | Description | Page |
|---|---|---|
| 26 | Memo dated 4-22-91 | 200 |
| 27 | Memo dated 6-28-91 | 200 |
| 28 | Memo dated 6-18-92 | 202 |
| 29 | Memo dated 6-29-92 | 205 |
| 30 | Letter dated 12-29-92 | 216 |

**199:5 - 200:11**

00199

Q. Okay. I guess what I'm really trying to get at is your own understanding of this relationship in light of -- the relationship between the DCSs and the obligation, because I think -- I think you said that, you know, it's a step along the way, it's something that sort of needs to be done to make the process work, but I'm trying to find out if that's the same thing as saying it defines the obligation. In your mind, I'm talking about.

A. In my own mind, it's just a piece of the process, but the process has to -- has a starting spot and then an ending spot. And this process has been interrupted for a lot of reasons, so it has to restart. So, anything that had been done prior, in my opinion, in my own opinion, is null and void. The DCSs that were submitted to me, they are worthless. They should be redone because we don't have a 1998 date anymore. They were based on 63 months prior to acceptance, acceptance beginning on January 31st, '98. That didn't happen. When we get a new date that somebody can carve in stone and get a little more confidence in, then

00200

you start the process again, 63 months prior to. If at that point in time everybody feels 63 months prior to is enough time to -- is enough lead time -- and that's all it was for before, give me five years lead time to figure out that I can be there and pick it up. Right now it should all be thrown in the trash. It's worthless.

Q. Because it was based on assumptions that are no longer valid?

A. It's based on a program plan that's no longer valid.

**Klein, Keith Deposition Testimony dated 5/22/02**

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF KEITH A. KLEIN

May 22, 2002
Richland, Washington

00002

APPEARANCES

For the Plaintiffs Yankee Atomic Electric,
Connecticut Yankee Atomic Power Company,
Maine Yankee Atomic Power Company:

Robert L. Shapiro
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5879
(202) 682-1639 Fax

For the Defendant:

Erin Powell

R. Alan Miller
United States
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-0523
(202) 514-8624 Fax

00003

EXAMINATION INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Shapiro | 7 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | 20-page Federal Register Part II Department of Energy Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste DC-107922 - DC-107941. | 49 |
| 2 | 7-page memorandum to distribution from Richard H. Williamson dated September 15, 1983 PNL 173-1282 - PNL 173-1288. | 95 |
| 3 | 21-page Civilian Radioactive Waste Management Program Mission Plan Volume I Overview and Current Program Plans December 20, 1983 Draft CTR042-1065 - CTR042-1085. | 103 |

00004

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 4 | 121-page Mission Plan for the Civilian Radioactive Waste Management Program Volume I Overview and Current Program Plans April 1984 RA-109881 - RA-110001. | 105 |
| 5 | 46-page excerpt from Mission Plan for the Civilian Radioactive Waste Management Program Volume I | 113 |

| | | | |
|---|---|---|---|
| | | June 1985<br>DB-105274 - DB-105678. | |
| | 6 | 3-page letter to Keith A. Klein from P.A. Craig dated January 4, 1984<br>DER006-3244 - DER006-3246. | 130 |
| | 7 | 10-page Program Strategy Draft 2/29/84<br>PNL 150-0158 - PNL 150-0167. | 131 |

00005

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 8 | 3-page Informal Note<br>PNL 001-1324 - PNL 001-1326. | 134 |
| 9 | 6-page RPH Evaluation Study<br>DER004-0273 - DER004-0278. | 143 |
| 10 | 87-page Annual Capacity Report June 1987<br>HQ0002704 - HQ0002791. | 150 |
| 11 | 19-page memorandum to Lake Barrett from Ronald Milner dated Sep 9, 1987<br>PNL 102-0359 - PNL 102-0377. | 153 |
| 12 | 25-page memorandum to various from Samuel Rousso dated January 28, 1988<br>PNL 108-0507 - PNL 108-0531. | 155 |

00006

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 13 | 22-page Draft 1988 Mission Plan Amendment dated June 1988<br>PA-142582 - PA-142610. | 157 |

| | | |
|---|---|---|
| 14 | 47-page Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis July 1989 PNL 170-1529 - PNL 170-1575. | 162 |
| 15 | 27-page AIF Fuel Cycle Conference October 22, 1986 NWPA Progress: At-Reactor Through MRS PNL 067-1476 - PNL 067-1502. | 166 |

---

## 12:1 - 12:9

00012
Q. Next, I'd like to go over your professional
background, and that will hopefully let me focus
during the rest of the deposition on the areas to
inquire about.
I always find it easiest to go backward. If
we could start with your current position, tell me
what that is.
A. Manager of the Richland Operations Office,
Department of Energy.

---

**18:12 - 18:23**

00018
Q. Prior to your position as director of the Office
of Safety & Quality, what was your position?
A. I guess I had two or three different positions in
the office of Civilian Radioactive Waste
Management.
Q. When did you start with RW?
A. I would -- my recollection is whenever it was
formed, that I was there before it was -- whatever
the -- the Nuclear Waste Policy Act that, as I
recall, formed the -- established the Office. And
I believe I was working in those areas at the time
that legislation was passed.

---

**19:22 - 20:3**

00019

Do you recall the two or three positions that you had at RW, what those were?

A. They were all associated -- well, the -- since the Waste Policy Act -- after the formation of RW, to

00020

the best of my recollection, they were all associated with the storage and transportation of -- of waste, predominantly spent nuclear fuel.

---

**54:23 - 57:10**

00054

Q. What do you recall about consideration of the exchanges provision?

MS. POWELL: Objection to the extent it

00055

calls for a legal conclusion.

THE WITNESS: That a strict interpretation of "oldest fuel first" would mean that, you know, assemblies are discharged one at a time from a reactor. And so you could have an assembly that was -- the very first one that was discharged that might be put in location X in this pool. The next one may be put in a position removed from X. Third one might be put somewhere else.

These things may get shuffled over a period of years to -- to just control heat loads. And then as pools were reracked, and/or -- and storage outside of the reactor pools, that eventually you could have a storage cask that might have a very old assembly in it, to a more recently discharged assembly, and so forth, such that a -- a strict taking of the oldest fuel first from reactors would be very difficult to implement.

And so we needed to have some flexibility in the system to allow common sense to be used in terms of -- of what specific assemblies; a serial number, we took from which utilities and -- and when. So that "oldest fuel first" was -- made sense in terms of allocating tons of fuel from

00056

which reactors and -- in a general sense. But

when it came down to specifically which assemblies
we took from where, when, it didn't necessarily
make -- make sense. That was one component of --
I believe it was this exchange provision.
Another component may have been -- may, as I
don't specifically recall -- to allow utilities
to -- to trade amongst themselves, as in -- as in
credits, where -- whereby if a -- a utility had
made provisions through storage outside the pool,
like dry storage casks, that -- that I was
responsible for developing, and were able to
accommodate essentially their lifetime discharge
of fuel, they could be entitled to ship.
But they might have a -- there might be
another utility that was much more anxious to
ship, for whatever reason, and be able -- you
know, would be able, then, through this exchange
provision -- this may not have been the provision.
I just recall having some discussion that -- from
a DOE standpoint on what we accepted, it didn't
really matter to us. If utilities wanted to work
these things out in a way that helped ratepayers,
there is a win/win for utilities, for utilities to
exchange these things. As long as it didn't
00057
impact us or increase costs overall -- it wouldn't
make sense that we'd have to, you know, pick up
fuel here necessarily and go to this other utility
down South.
So that you could see how, you know, it would
deoptimize the transportation system or costs or
otherwise deoptimize or increase costs for the
disposal system. As long as it didn't impact
that, that -- that we were open to utilities
exchanging rights to ship.

---

## 61:10 - 61:20

00061
Q. Was it RW's expectation that the trades, as you've
termed them, make exchanges of approved delivery
commitment schedules by utilities, would make it
more likely that DOE would be able to use larger
train-based shipments that would be less costly
than -- than if the oldest fuel first system was
strictly followed?

A. My recollection, just in general, was it was intended to allow us to optimize the system, to allow common sense to prevail, and -- and minimize the overall cost to the utilities and ratepayers.

---

## 62:14 - 62:20

00062

Q. Do you have any recollection as to what your expectation was about the utility of the exchanges provision?

A. My only recollection was, providing flexibility was -- was good. A strict interpretation of oldest fuel first would create -- would increase costs unnecessarily for the system.

---

## 73:6 - 74:9

00073

Q. Let me ask you about a couple of comments that -- that were made -- I don't think I need to show them to you -- that I don't think show up in the -- in the consideration of comments, the part of this Final Rule, and see if they jog your recollection about any of these issues. Do you recall consideration of comments that a term be put into the contract that Department of Energy take spent fuel at a rate at least as fast as the -- the rate at which utilities were discharging spent -- spent fuel? Do you recall that issue -- that issue at all?

A. I vaguely recall. Yeah, I vaguely recall that.

Q. What do you recall about consideration of that issue?

A. My guess is -- as engineers trying to design a system to meet the intent of the Waste Policy Act, and the intent of the Waste Policy Act being to deal with this national problem, you'd want the system to be able to at least curtail buildup.

00074

And to curtail the buildup at any one time, you have to receive as -- as much as was being discharged. To reduce the buildup, the legacy, you'd have to receive at a rate faster than what

is being generated.
And so as -- as engineers trying to design
the system, it would seem reasonable that we want
to at least take fuel at the rate of -- of
discharge.

---

## 79:8 - 80:16

00079
Q. Is it fair to say that there is a general intent
within RW to -- to ramp-up at whatever facilities,
whether it's MRS or repository without MRS, as --
as fast as technically possible?
MS. POWELL: Objection. Vague.
You can answer.
THE WITNESS: I would say there was
certainly an intention to comply with the -- with
the letter and spirit of the law while minimizing
costs to the -- to the ratepayers and utilities.
Q. (By Mr. Shapiro) When you say "the spirit of the
law," what are you referring to?
A. The spirit of the law being deploying a system
starting in 1998 that was -- that would be -- that
would start taking significant quantities of --
of -- of spent fuel.
Specifically, it -- I think we're beating
around the bush. Maybe I should consult with the
00080
lawyers. But I think what you're getting at --
Q. What do you think I'm getting at?
A. I think you're -- you're asking me did someone
think we could be meeting the spirit of the law
just by taking one spent fuel assembly or pin and
say, Ha, we did what we were supposed to do.
Q. I think we discussed that previously, before. But
you're saying your recollection is no?
A. Correct, that I don't recall anyone thinking that
that would be a very satisfying, even though
some -- a lawyer might. And I don't recall anyone
doing so. A lawyer might argue that that met the
letter of the law. I think the -- everyone that I
was worked with, associated with, did not think
such an arrangement would meet the spirit of the
law.

---

**85:21 - 87:2**

00085
Q. Would it make sense to have a provision that says
you go to the permanently shutdown reactor, get
priority, and take their nonfailed fuel, but
otherwise leave some small quantity of failed fuel
there and still delay decommissioning that
00086
reactor?
A. That wouldn't make sense to me.
Q. Do you think that would make sense to anybody at
RW to do that?
A. I don't know. I don't recall any discussions of
that.
Q. Would it be your expectation in the future, when
RW eventually does start taking spent fuel from
utilities, that it will ultimately take failed
fuel from shutdown reactors expeditiously to
enable such reactors to shut down?
MS. POWELL: Objection to the extent it
calls for speculation.
But you can answer it.
THE WITNESS: I would think so.
Q. (By Mr. Shapiro) And that's because it would make
sense to do that?
A. Well, the -- I would infer from legislation or
the -- or the words that you showed me, that
giving preference to decommissioned reactors, that
the intent was to allow them to fully decommission
and disposition the reactors. And to the extent
that there is fuel remaining, whether it's failed
or unfailed, that would constrain the -- the
decommissioning process; hence, it would make
00087
sense to take it all so the utility could get on
with the decommissioning.

---

**134:21 - 135:5**

00134
Q. Mr. Klein, I'm going to turn to a new document.
It's been marked as Exhibit 8. It's titled
"Informal Note." It appears to have your
signature on the third page.
If you could take a look at this exhibit and

00135
tell me if you recognize or recall this -- this
note at all.
A. (Examination of documents.) All right.
Q. Do you recall this note?
A. Only vaguely.

---

## 136:21 - 137:18

00136
Q. The fourth bullet down, it says provisions would
be made to give shutdown reactors some priority.
Do you have any further recollection as to what
was meant by "some priority"?
A. My thinking would have been that oldest fuel first
00137
and completely, you know, eliminating the
inventory. Shutdown reactors could be competing
priorities. And something like an MRS that you
might not have to get into that -- into that
trade-off that -- that you could deinventory
shutdown reactors without it necessarily being at
the expense of other reactors that were having
pain.
Q. When you say "other reactors that were having
pain," you're referring to reactors that would
otherwise have to incur some additional expense to
deal with spent fuel like reraking or dry cask
storage?
A. Correct. That, in my understanding or sense of
the law, was this is to be a -- a solution to
minimize, you know, the cost to the utilities
and -- and ratepayers, and, you know, we're
working to deliver on that.

---

## 138:23 - 139:11

00138
Q. On Page 2 at the top, there's a reference to
"central questions." And the third one down says,
"Should fuel be shipped in campaigns from a given
00139
reactor, and if so how large a campaign?"
Is this what you were referring to before

the -- before the lunch break, when you were talking about different costs for -- for following oldest fuel first versus given priorities?
A. Exactly. If you're picking up fuel from a -- from a reactor and under some scenarios it made sense to take as much as you could while you're there rather than to have to come back later, particularly if you're talking train/rail shipments.

**Klein, Susan Deposition Testimony dated 4/24/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------XYANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : IPOWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
V. :1 - 274
00002
THE UNITED STATES, :
Defendant. :
-------------------------------------------X
Deposition of Susan Klein
Washington, DC
Wednesday, April 24, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144539

00003

April 24, 2002
9:37 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

00004

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor

Washington, DC 20004

00005

(202) 347-6000

BY: Kristi L. Remington, Esq.

Arnold & Porter

For the Plaintiff SACRAMENTO MUNICIPAL UTILITY DISTRICT

370 Seventeenth Street, Suite 4500

Denver, CO 80202-1370

(303) 863-2334

BY: Timothy R. Macdonald, Esq.

Perkins Coie LLP

For the Plaintiff WISCONSIN ELECTRIC

607 Fourteenth Street, NW

Washington, DC 20005-2011

(202) 434-1609

BY: Suzette W. Derrevere, Esq.

United States Department of Justice, Civil Division

For the Defendant THE UNITED STATES

Commercial Litigation Branch

Federal Claims Section

1100 L Street, NW

00006

Washington, DC 20530

(202) 307-6288

BY: Erin E. Powell, Esq.

Marian E. Sullivan, Esq.

I N D E X

EXAMINATION OF SUSAN KLEIN PAGE

BY MR. HIRSCH 8

| KLEIN DEPOSITION EXHIBITS: | PAGE |
|---|---|
| No. 1 Notice of Deposition. | 10 |
| 2 Letter of 3-4-92, DOE to Commonwealth Edison. | |
| CE03656 through 3664. | 42 |
| 3 Zabransky 4-17-02 Rough Draft Excerpt. | |
| Pages 1 through 52. | 97 |
| 4 Indiana Michigan Power Company v. DOE | |
| Citation, pages 2 through 7. DC Circuit. | 102 |
| 5 Acceptance Priority Ranking & Annual | |
| Capacity Report. March 1995. HQR-039-0597 | |
| through 0666. | 114 |
| 6 Zabransky 4-17-02 Rough Draft Excerpt. | |

00007

Page 113. 120
7 Letter of 9-25-96, ComEd to DOE. COF-001-2165 through 2172. 123
8 US DOE Appendix C, Commonwealth Edison. 0284 through 0290. 123
9 Letter of 3-13-97, DOE to Commonwealth Edison. CE04064. 129
10 Letter of 9-28-95, ComEd to DOE. COF-001-2141 through 2146. 134
11 Letter of 9-26-97, ComEd to DOE. CE04069 through 4070. 137
12 OCRWM Annual Capacity Report. December 1991. HQR-001-2357 through 2418. 146
13 Letter of 2-14-02, Secretary of Energy to The President. Recommendation by the Secretary of Energy. 167
14 42 Section 10134. Repositories. Pages 753 through 757. 175
15 Viability Assessment of a Repository at Yucca Mountain. Overview. December 1998. 187
16 Analysis of the Total System Life Cycle Cost of the CRWM Program. May 2001. 193

00008

17 Letter of 4-8-02, Governor Guinn to Senator Byrd. Statement of Reasons. 198
18 Statement of Lake H. Barrett, OCRWM, March 14, 2002. 208
19 GAO Report to Congressional Requesters. Nuclear Waste. Yucca Mountain Repository Project. December 2001. GAO-02-191. 215
20 GAO Testimony before the Subcommittee. Nuclear Waste. Yucca Mountain Repository Project. GAO-02-539T. 226
21 YMP.GOV Web site. Timeline/Milestones. 4/20/2002. 232
22 Viability Assessment. Preliminary Design Concept. US DOE OCRWM. Volume 2. 249
23 Analysis of the Total System Life Cycle Cost of the CRWM Program. September 1995. 251
24 CRWMS Management and Operating Contractor. TSLCC for Site Recommendation. Letter Report. February 2002. 259
25 Draft Letter of 10-30-01, CO Rep Waisley to Hess/BSC. CTR-045-1118 through 1121. 267

**10:19 - 12:15**

00010
Q. Okay. All right. That's fine.
Ms. Klein, I've handed you what's been marked
as Klein Deposition Exhibit 1 or I'm handing you that
document, which is the notice of deposition that was
00011
issued on April 18th for today's Rule 30(b)(6)
deposition. And if you look on the exhibit page,
you'll see four topics. That's page 5. You see
those topics?
A. Yes, I see those topics.
Q. And you understand you're supposed to be the
Rule 30(b)(6) designated Department of Energy witness
for these four topics?
A. Yes.
Q. What's your current position, Ms. Klein?
A. I'm a senior policy adviser to the Director
and Deputy Director of the Office of Civilian
Radioactive Waste Management at the Department of
Energy.
Q. And how long have you been the senior policy
adviser?
A. For about three years.
Q. So, since about 1999?
A. Yes. I was transferred there but detailed
back to general counsel for a couple years.
Q. When was your detail back to General Counsel's
Office?
00012
A. I think it was '97 that I was transferred to
RW, but I was detailed back to general counsel to work
with the general counsel at the time on any legal
issues and then later on it was limited to issues
involving this litigation.
Q. Okay. We'll get back to that in a second.
But who do you report to as the senior policy adviser?
A. Lake Barrett. Ron Milner and Lake Barrett.
Q. And Mr. Barrett's current title is?
A. Deputy Director of the Office of Civilian
Radioactive Waste Management.
Q. And Mr. Milner's title is?
A. He's the COO, the Chief Operating Officer of
the Office of Civilian Radioactive Waste Management at
DOE.

## 11:10 - 23:15

00011

Q. What's your current position, Ms. Klein?

A. I'm a senior policy adviser to the Director and Deputy Director of the Office of Civilian Radioactive Waste Management at the Department of Energy.

Q. And how long have you been the senior policy adviser?

A. For about three years.

Q. So, since about 1999?

A. Yes. I was transferred there but detailed back to general counsel for a couple years.

Q. When was your detail back to General Counsel's Office?

00012

A. I think it was '97 that I was transferred to RW, but I was detailed back to general counsel to work with the general counsel at the time on any legal issues and then later on it was limited to issues involving this litigation.

Q. Okay. We'll get back to that in a second.
But who do you report to as the senior policy adviser?

A. Lake Barrett. Ron Milner and Lake Barrett.

Q. And Mr. Barrett's current title is?

A. Deputy Director of the Office of Civilian Radioactive Waste Management.

Q. And Mr. Milner's title is?

A. He's the COO, the Chief Operating Officer of the Office of Civilian Radioactive Waste Management at DOE.

Q. And is the Office of Civilian Radioactive Waste Management otherwise known by its acronym as OCRWM?

A. OCRWM, yes, and actually with regard to Ron, I think now I just report to Lake. I was reporting to Ron when he was also Acting Deputy, but now that Margaret is here, to just correct the record. I don't

00013

know how important that is but --

Q. I'm sorry.

A. -- to be perfectly accurate, right now I report to Lake, not to Ron.

Q. Okay.

A. Okay.
Q. And when did you stop reporting to Ron Milner?
A. When Margaret Chu became the Director.
Q. You also report to Ms. Chu?
A. Yes, I do.
Q. Now, it is my understanding that you're a lawyer; is that correct?
A. Yes.
Q. And when did you graduate from college, Ms. Klein?
A. 1971.
Q. And where did you go to law school?
A. Case Western Reserve in Cleveland, Ohio.
Q. And when did you graduate from Case Western?
A. 1974.
Q. And can you give me just a rough outline of what your employment has been after you got out of law
00014
school?
A. I went to work for the United States General Accounting Office. Worked there for three years.
Q. So, from 1974 to?
A. To 1977.
Q. Okay.
A. I wrote decisions of the controller general.
And then I left the General Counsel's Office there and went to what was at the time FEA, the Federal Energy Administration, for three months until it became the Department of Energy in 1977.
Q. And have you been at the Department of Energy from 1977 to the present?
A. Yes.
Q. And can you give me the outline of your employment history at the Department of Energy?
A. I worked in general counsel for a couple years. I can't remember the exact number. I don't know how much detail you want, but then from there I went to conservation and at the time it was called conservation and solar. Worked on the residential conservation service program.
00015
Q. Roughly when was that?
A. I think it was probably '80, 1980. I'm not sure. And then 1984, I believe it was, I came to work in the nuclear area. It was when Ronald Reagan was elected. If that was '84, that's when it was.
Q. And what department did you work in in the

nuclear?
A. At the time it was called Assistant General Counsel for International Development and Defense Programs.
Q. And what were your responsibilities in that position?
A. The Price Anderson Act, transportation of nuclear materials, the Low Level Waste Policy Act of 1980. That was generally my areas -- those were generally my areas.
Q. And who did you report to when you were in that position?
A. Leon Silverstorm.
Q. And who was he?
A. The Assistant General Counsel for IDDP, International Development and Defense Programs.
00016
Q. Did you have any involvement in the passage of the Nuclear Waste Policy Act of 1982?
A. My office handled it, but it was not under me. There was another lawyer in the office handling it, but she would report on it in staff meetings.
Q. And what office was that at the time?
A. International Development -- well, it might have changed its name. That office changed its name many times. I'm not sure what its name was, but it was the same general group of lawyers. We were reorganized. We became Nuclear Affairs and later on Civilian Nuclear Programs. The defense part was taken out, but...
Q. Okay.
A. I don't remember the exact name during that period.
Q. So there was another lawyer in this Nuclear Affairs Office --
A. Uh-huh.
Q. -- better term, who worked on the Nuclear Waste Policy Act?
A. Yes.
00017
Q. And who was that?
A. Amy Shamora.
Q. Is she still with the Department of Energy?
A. Last I heard, she went back to GAO. We had both actually worked at GAO together, but I don't know if she's retired or what.
Q. And so I wasn't sure. Did you do any work in

terms of the Nuclear Waste Policy Act?
A. After its passage, yes.
Q. Okay.
A. Not before its passage.
Q. I see. What kind of work did you do in connection with the Nuclear Waste Policy Act?
A. Price Anderson issues and transportation issues at this time. Later on I did much more, but that's all I did right after passage. I did not work on the standard contract.
Q. Okay.
A. I guess I shouldn't answer your questions before you ask them.
Q. That's fine. When you say you worked on transportation issues, what kind of issues did you
00018
work? What do you mean by that?
A. Well, generally I worked on transportation issues within the department. Our own transportation of nuclear materials, which was under the defense program area, and I interpreted the Department of Transportation regulations and the NRC regulations and our exemption under the Atomic Energy Act. It was really with Price Anderson that I worked with the people in OCRWM.
Q. Okay. So, how long did you work as that in that Assistant General Counsel position?
A. Until I came to RW and I became the Assistant General Counsel of that division eventually.
Q. And when did you become the Assistant General Counsel for RW?
A. I don't remember. I was in that position acting. I came to RW in about -- what did I say? '97. I'd say around '92. I mean, I can -- yeah, '92, approximately.
Q. So, just so I'm clear, from 1984 to roughly 1992 you were in this position as Assistant General Counsel in this office whose name changed but --
00019
A. No.
Q. I'm sorry. Go ahead.
A. I wasn't the Assistant General Counsel from '84 until '92. I was an attorney in that office.
Q. All right. Okay.
A. From '92 to '97 approximately I was the Assistant General Counsel.
Q. All right. For RW?

A. Which means --
Q. In RW; is that right?
A. No. It's in the general --
Q. All right.
A. It's in the General Counsel's Office. We had many clients and RW was one of them, but actually at a certain point in time the whole RW program was moved to the Assistant General Counsel for Environment because we were doing the environmental assessments was the biggest part of the project, and so it was moved there for several years. It was taken out of that office and moved there and then it was moved back to that office.
Q. So, from this period 1984 to 1982 -- '92 --
00020
excuse me -- you were an attorney in this office?
A. Yes.
Q. Of the Assistant General Counsel?
A. That's right.
Q. Whose responsibilities included nuclear affairs?
A. Yes. Absolutely. That's correct.
Q. All right. And when you moved into the position in 1992 of Assistant General Counsel, who did you report to?
A. Jerry Pruzan. He was the deputy general counsel for -- I don't know what they called it -- programs or something.
Q. What did your responsibilities include as the Assistant General Counsel during that period starting in 1992?
A. Interpretation of the Atomic Energy Act. Interpretation of the Nuclear Waste Policy Act. Interpretation of the Low Level Waste Policy Act. And in those capacities, there were many offices that I supported. Environment, safety and health, OCRWM, nuclear energy.
00021
Q. Who did Mr. Pruzan report to?
A. The general counsel.
Q. And that was?
A. I think that was Farrell. I'm not positive.
Q. Farrell?
A. Mike Farrell. I'm not sure. It also was Steve Wakefield. I don't remember.
Q. And how long were you in that position as Assistant General Counsel?

A. I think about five years. I'm not sure, but I think about five years.
Q. So, roughly from 1992 to 1997?
A. Uh-huh. Now, later on I reported to other people. I'm just -- at that time I reported to Jerry Pruzan when I first became.
Q. All right. When you -- as you went along from '92 to '97, who else did you report to?
A. Frank Bay.
Q. Who's he?
A. He was a political appointee. He was and that Jerry Pruzan. They were all political appointees. So they came and went.
00022
Q. I see. All right.
A. And then Mark Schroeder and then --
Q. These people had the title of?
A. Deputy.
Q. Deputy general counsel?
A. For something. It changed around a lot, but... And then after Mark Schroeder was Mary Anne Sullivan, not Marian but Mary Anne Sullivan.
Q. Right. Anybody else that you reported to during that period?
A. Not that I can remember.
Q. And what was Mary Anne Sullivan's title?
A. At the time she was deputy general counsel for something like environment and security. Something like that. And then she became the General Counsel later.
Q. Okay. Now, what position did you take in 1997?
A. The senior policy adviser to RW.
Q. And that's the position you're in now?
A. Yes.
Q. Now, you mentioned that you had a detail?
00023
A. Uh-huh.
Q. Somewhere during this period '97 to the present?
A. Uh-huh.
Q. And when was that detail?
A. 1997 till the end of 1999.
Q. Okay. And what was your detail? What was the position you held?
A. Okay. I was -- I had moved physically. Well, I think the first year I didn't. I don't

remember now. But anyway I reported to Mary Anne
Sullivan with regard to legal issues, and then when
time allowed, I worked on my senior policy adviser hat
for Lake Barrett. But I was technically an employee
of RW for payroll purposes, et cetera.

---

## 31:5 - 32:5

00031
Q. Well, what is the general job responsibilities
of the senior policy adviser?
A. Well, it involves anything that happens to be
coming up at the moment. I mean, so I've worked on
the Inspector General report looking into bias in the
program. I've worked on many employee concerns that
raise issues. I mean, I work, I do work on the spent
fuel litigation. Not in a legal capacity.
Q. Well, what kind of work do you do on the spent
fuel litigation that's not in a legal capacity?
A. I review the briefs that the Justice
Department writes.
Q. Any other work along those lines?
A. I'm a 30(b)(6) witness.
Q. Okay. Anything else?
A. I concur in responses to DCS submittals.
Q. When you started out as a senior policy
adviser in '97 and recognizing you had this detail
00032
along the way, were you reporting to Lake Barrett?
A. Yes.
Q. Was there anybody else you reported to?
A. Ron Milner. Because Ron Milner was the
Acting Deputy Director.

---

## 61:20 - 62:14

00061
Q. And I take it from your -- strike that?
Referring to the 1995 ACR rates that you just
recited, I take it from your earlier testimony that the
00062
D OE is not planning on using those rates in terms of
when it starts accepting spent nuclear fuel?
A. No. Well, once there's an operational

repository, we are planning to use the larger rates
that were -- that I have mentioned. I don't know if
we'll be accepting it outside of a repository. That's
yet to be. It depends upon your definition of accept I
guess.
Q. Do you know when the last time the DOE used
the acceptance rates in the 1995 ACR for planning
purposes?
MS. POWELL: Object to beyond the scope.
You can answer to your personal knowledge.
THE WITNESS: No, I don't.

---

## 84:16 - 85:1

00084
Ms. Klein, it was your belief as I understand
it that the DOE was not going to be able to begin
performing in 1998 and, therefore, the DCS process
should be suspended because the DOE shouldn't pretend
like it was going to start performing in 1998?
MS. POWELL: Okay. The same objection,
beyond the scope and vague, but you can answer.
00085
THE WITNESS: Yes.

---

## 146:22 - 147:15

00146
Q. Now, to the extent that a utility submitted a
00147
DCS form based on the allocation it had for a
particular year, that was based on the 400, 600, 900
rate; is that correct?
A. Yes, that's correct.
MS. POWELL: And I'll object, beyond the
scope, but you can answer.
BY MR. HIRSCH:
Q. Now, if the DOE plans on accepting at a higher
rate closer to the 3,000 metric ton rate, would that
cause the DOE to reevaluate the DCS forms that had been
previously submitted by the utilities?
MS. POWELL: Once again, beyond the scope.
THE WITNESS: Well, it would be required
to reevaluate I guess is a fair word. To reevaluate,

yes. Whether we would change it or not, I don't know.

---

**149:1 - 150:21**

00149
Q. All right. Now that the DOE is planning on picking up at a rate which is significantly higher than the 900 metric ton rate, does the DOE intend to take the position that GPU would be limited to the 31 metric tons from the original 1991 ACR?
MS. POWELL: I'm going to object as beyond the scope, calls for speculation and to the extent it calls for a legal conclusion. But if you can answer that.
MR. HIRSCH: It's not beyond the scope, but --
THE WITNESS: As I say, I don't know what DOE's formal position is on this, but we wouldn't necessarily do it through the mechanism of a DCS. We would reevaluate. I don't know that we would amend the DCS. I don't know what we would do, but we would definitely reevaluate and I don't know what we would -- how we would go about taking the more than 31. If we had capacity for more than 31. I don't know the mechanism that we would use.
I doubt we would amend the DCS, to be honest, because we're not interested in increasing our
00150
legal obligation. We're not interested in increasing damages against the government. So I think we would do it in a way that we could pick up more but without being legally obligated.
BY MR. HIRSCH:
Q. So I'm sorry. I wasn't sure what you meant by reevaluate the situation.
A. Well, reevaluate is the word in here.
Q. I see.
A. It says that we would reevaluate and I would -- it seems to me when we get closer to having a facility, we're going to have to relook at the whole process and how to go about it, I mean.
Q. Relook at the whole DCS process?
A. Relook at the standard contract and the DCS process would be part of it because we have stopped processing them and we will need to start processing them again. So it seems to me that we would have to

make some adjustments, but what mechanism we would use, I don't think anyone that I know of has thought about it yet.

---

## 172:7 - 172:14

*Note:*

Q. Do you agree that the Nuclear Waste Policy Act contemplated that process of siting, licensing, and constructing a repository would have been completed by January 1998?
MS. POWELL: I object, beyond the scope and to the extent it calls for a legal conclusion.
You can answer.
THE WITNESS: I'm thinking. Yes.

---

## 239:13 - 239:16

00239
Q. Let me restate it. Are you aware of any current proposal by the DOE to begin accepting fuel earlier than 2010?
A. No.

---

## 246:14 - 247:4

00246
Q. Is it your understanding that the 3,000 rate would keep up with the utility discharge rate?
A. Yes.
Q. Is that correct?
A. Uh-huh.
Q. And then I guess you mentioned the other reason or rationale. I'm sorry. What was the second rationale?
A. 70,000 metric tons, which is how much we're
00247
authorized to put in the first repository, divided by the life of the repository, which is 25 years.
Q. Gives you about 3,000 metric tons a year?
A. Uh-huh.

---

## 247:18 - 248:5

00247
Q. Well, assuming that all the ramp-up issues are resolved including transportation?
A. Uh-huh.
Q. Are you aware of any reason why the DOE wouldn't operate the facility at a 3,000 metric ton
00248
rate --
A. No, I'm not.
Q. -- over the life of the facility?
A. No, I'm not aware of any reason we would not do that.

---

## 252:19 - 253:5

00252
Q. And then it says: "No MRS or interim storage facility costs, or storage costs at utility sites are included in this TSLCC analysis." Is it correct as of the date of this report, September '95, that the DOE
00253
was not planning on building an MRS facility?
MS. POWELL: Object to beyond the scope, but if you know, you can answer.
THE WITNESS: I believe that's true, yes. We were not planning.

---

**Klein, Susan Deposition Testimony dated 4/25/02**

00275
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------XYANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : IIPOWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
V. :275 - 533

00276
THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Susan Klein
Washington, DC
Thursday, April 25, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144540

00277

April 25, 2002
9:54 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

00278

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.

1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004
00279
(202) 347-6000
BY: Kristi L. Remington, Esq.

Arnold & Porter
For the Plaintiff SACRAMENTO MUNICIPAL UTILITY DISTRICT
370 Seventeenth Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2334
BY: Timothy R. Macdonald, Esq.

Perkins Coie LLP
For the Plaintiff WISCONSIN ELECTRIC
607 Fourteenth Street, NW
Washington, DC 20005-2011
(202) 434-1609
BY: Suzette W. Derrevere, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch
Federal Claims Section
1100 L Street, NW
00280
Washington, DC 20530
(202) 307-6288
BY: Marian E. Sullivan, Esq.
Erin E. Powell, Esq.

I N D E X

EXAMINATION OF SUSAN KLEIN PAGE
BY MR. HIRSCH 283
BY MR. TOMASZCZUK 339
BY MS. REMINGTON 390
BY MR. MACDONALD 408

KLEIN DEPOSITION EXHIBITS: PAGE
No. 26 Analysis of the TSLCC of OCRWMP.
December 1998. 283
27 CRWMS Waste Acceptance System Requirements
Document. Revision 4. January 2002. 286
28 US NRC Web Site. Pages 1 and 2. 307
29 ICE Review of CRWMP 2001 TSLCC.
Burns and Roe. January 2001. 322

30 RW DOE Web Site. NWTRB Presentation.
00281
January 30, 2001. Lake Barrett. 329
31 Alternative Means of Financing and Managing
CRWMP. August 2001. 333
32 Collection of Approved DCSs for Duke.
0292 through 0317. 356
33 Collection of Approved DCSs for Northern
States. 0379 through 0399. 365
34 Interrogatory No. 92 and 93 and Responses. 383
35 Southern Nuclear DCS Notice of September 30,
1996. SN119904(D) through 07. 391
36 Letter of 3-14-97, Southern to Tomasoni.
SN120321(D) through 28. 393
37 OCRWM Annual Capacity Report. December
1991. HQR-001-2357 through 2418. 397
38 CFR 10 Part 500 to End. Revised 1/1/02. 423
39 Letter of 4-1-91, Zabransky to Brownstein.
CTR-001-1696 through 1714. 427
40 Draft DOE Position on Non-Fuel Assembly
Hardware. DF-101718 through 1730. 440
41 Proposed Contract Changes. Revision 0.
April 13, 1992. CTR-001-1510 through 1552. 450
42 Don't Say It - Write It Memo of 3-15-95.
00282
McDuffie to Vance. DC-101117 through 18. 456
43 Acceptance of Non-Fuel Components and GTCC-
Related Issues. DC-102429 through 31. 466
44 Summary Report. June 1995. Technical Issues.
SNL-001-0092 through 105. 472
45 Working Draft. WAST Operational Issues Plan
and Report. April 9, 1996. YMP-012-1859
through 1909. 483
46 Teleconference Call Summary. SNL-001-0227. 492
47 Issue Paper: Maine Yankee Request for DOE
to Observe Loading of GTCC Waste. 500
48 Priority Acceptance for Shutdown Reactors.
HQR-088-0104. D. K. Zabransky. 6/27/95. 516
49 Federal Register. April 18, 1983.
HQR-038-0001 through 20. 523
50 Don't Say It - Write It Memo of 6-28-91.
McDuffie to Langstaff/Brownstein.
Recommended DOE Positions on 17 Contract
Implementation Issues. 525

## 283:16 - 284:6

00283

MS. SULLIVAN: Excuse me. Mr. Hirsch, before we start today, Ms. Klein would like to clarify something that she testified about yesterday if she might.

MR. HIRSCH: Okay.

THE WITNESS: I went back to my office and checked the record and as to the rates that we would

00284

pick up for, they are the same as in the VA that you showed me. You probably want to know what exhibit number that is. And that is in our current requirements document that the 3,000 continues throughout the years as stated in the VA. The viability assessment.

---

## 285:2 - 286:10

00285

Q. The one we were just looking at. The volume 2 of the DOE viability assessment from December of '98.

A. Okay. Uh-huh.

Q. And in particular, I think we were looking yesterday at the table on page 3-2.

A. Yes.

Q. And --

A. Those are approximately. I think there was a 1900 not an 1800 in our requirements document.

Q. Okay.

A. But they're based on -- they're based on these receipt rates, annual repository receipt rates in Table 3-1.

Q. And this table shows a receipt rate of 3,000 starting in 2014 and I guess running until 2032 on this --

A. Yes.

Q. -- table?

A. That's correct.

Q. And I'm sorry. Your clarification after checking with your office this morning with respect to

00286

the rate was what?

A. Was that the rate here in this Volume 2 of the VA, Exhibit 22, in Table 3-1 is the correct rate for

our planning purposes. What we plan, how we plan, the rate at which we plan to accept spent fuel at the repository.
Q. And that is a rate that would ramp up to 3,000 by 2014 and continue on at 3,000 until 2032; is that correct?
A. Yes, that's correct. 2033. Through 2032.

---

## 291:2 - 291:11

00291
Q. All right. But at least until the utility discharge rate goes down, it's the DOE's expectation, is it not, that they're going to continue to pick up 3,000 metric tons?
A. That is the expectation for planning purposes, yes.
Q. Does the DOE consider a 3,000 metric ton acceptance rate to be a reasonable rate to run the spent nuclear fuel program at?
A. I would -- yes.

---

## 351:6 - 352:21

00351
Q. You testified in response to some of the questions posed by Mr. Hirsch that DOE expected for planning purposes when it begins performance to ramp up to 3,000 MTU rate and stay at that steady state rate for a number of years. Do you recall that testimony?
A. Yes, I do.
Q. And that's reflected in various documents that Mr. Hirsch showed you yesterday and today as well?
A. Yes.
Q. And you used that term planning purposes in your answer?
A. Yes.
Q. That intention of DOE to ramp up to the 3,000 MTU rate, is that being used by DOE for purposes other than planning purposes?
A. No, not that I know of.
Q. Is that 3,000 MTU rate the rate that DOE was
00352
to use to determine if the fees are sufficient?

MS. SULLIVAN: Objection, beyond the scope. Answer if you know.
THE WITNESS: I don't know. I'd have to look at the TSLCC to know.
BY MR. TOMASZCZUK:
Q. Would you do so. If you need to refer to a document to answer the question, that's fine. TSLCC, Number 16.
A. That's the most recent one. I have a few of them here. And would you repeat the question?
MR. TOMASZCZUK: Ms. Reporter, could you read it back.
(Requested material was read.)
THE WITNESS: (Pause). I haven't found it. I'm working on it.
BY MR. TOMASZCZUK:
Q. That's all right. Take your time.
A. It appears from this document that those are the rates that we assumed in determining the cost of the program.

---

**354:1 - 354:16**

00354
Q. All right. So, DOE is using the 3,000 MTU rate for the purposes of determining adequacy of the fee, correct?
MS. SULLIVAN: Objection, beyond the scope and also the document speaks for itself. You can answer the question.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. They're using that rate basically to design the facility that they're planning to build at Yucca Mountain; is that right?
A. Yes.
Q. They're using it in any number of documents that we've seen here over the last couple of days, correct?
A. Yes.

---

### 388:11 - 389:12

00388

Q. What is DOE's position with respect to its obligation to accept spent nuclear fuel from purchasers beyond the 10 years of allocations addressed in the ACR? Can you explain that to me what is DOE's position because I don't understand it in this answer.

MS. SULLIVAN: Objection, the document speaks for itself. Objection to the extent it calls for a legal conclusion. Objection, it's beyond the scope. You can answer the question.

And I would note for the record that to the extent the utility plaintiffs have questions about these Interrogatories, a proper vehicle would be a

00389

letter, perhaps a motion with the court, but Ms. Klein is here to testify as to her personal knowledge. If she can.

THE WITNESS: I don't know that the DOE has at this time a position on that.

BY MR. TOMASZCZUK:

Q. Do you have a position?

A. I do.

Q. Can you tell me what it is?

A. My own personal position? Yes.

Q. Yes?

A. Yes, we have an obligation.

---

### 516:13 - 516:17

00516

Q. If the repository were operating at such a rate that granting priority would not harm operating utilities, DOE would consider granting a priority to a shutdown reactor. Is that also fair to say?

A. I think that's fair to say, yes.

---

### 524:17 - 252:8

00524

Q. If DOE had begun accepting fuel in 1998 at a 3,000 MTU rate or a ramp-up, a reasonable ramp-up to a 3,000 MTU rate, do you have an opinion as to whether

DOE could have given priority to shutdown reactors without harming or prejudicing the rights of operating utilities.
00525
MS. POWELL: Object to beyond the scope, but you can answer.
THE WITNESS: It could have given. I think that would be policy considerations that would be looked at, but it would make it certainly --
BY MR. MACDONALD:
Q. Would have made it easier?
A. Much easier, yes.

---

**528:2 - 528:7**

00528
Q. Is it -- I guess first, do you agree that if the acceptance rate exceeded the purchasers' discharge rates and all purchasers were assured that they would not need additional at-reactor storage, DOE could elect to allocate priority to shutdown reactors?
A. Yes, I agree.

---

**Kouts, Christopher Deposition Testimony of 10/11/06**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - x
SYSTEM FUELS, INC., on its own :
behalf and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH MISSISSIPPI : No. 03-2624C
ELECTRIC POWER ASSOCIATION, :(Judge Braden)
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. : PAGES 1 - 96
- - - - - - - - - - - - - - - - - - - - - x
October 11, 2006
Washington, D.C.
Deposition of CHRISTOPHER KOUTS, held at the
offices of Pillsbury, Winthrop, Shaw, Pittman, 2300 N
Street, N.W., Washington, D.C., commencing at 9:43
a.m., Wednesday, October 11, 2006, before Elizabeth
Mingione, Notary Public.
00002
A P P E A R A N C E S O F C O U N S E L:
ON BEHALF OF THE PLAINTIFF:
JAY E. SILBERG, ESQUIRE
PILLSBURY WINTHROP SHAW PITTMAN, LLP
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
AND
DANIEL S. HERZFELD, ESQUIRE
PILLSBURY WINTHROP SHAW PITTMAN, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7900
ON BEHALF OF THE DEFENDANT, UNITED STATES:
MARIAN E. SULLIVAN, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

A L S O P R E S E N T

00003

Eileen Supko

Scott Vance

00004

C O N T E N T S

WITNESS: CHRISTOPHER KOUTS

EXAMINATION BY: PAGE

Mr. Silberg .................................. 7

00005
DEPOSITION EXHIBITS
CHRISTOPHER KOUTS
NUMBER DESCRIPTION PAGE
No. 1 Defendant's Final Witness List, Pages .. 9
1 and 3
No. 2 Letters Dated January 19, 2001 to ..... 11
Hon. Robert C. Byrd and Hon. Bill
Young, from Ivan Itkin, with
Attachment
No. 3 Letter Dated November 15, 1991 to ..... 17
James Howard from John C. Tuck
No. 4 Letter Dated February 14, 1992 to ..... 34
Hon. Krista Sanda from John Bartlett
No. 5 Letter Dated May 29, 1992 to James .... 45
Howard from James Watkins
No. 6 Letter Dated July 31, 1986 to ......... 60
Prospective Offerors, Two Pages
No. 7 U.S. DOE Instructions for Completing .. 68
the Appendix C Delivery Commitment
Schedule
No. 8 Memorandum Dated June 11, 1991, from .. 76
Ronald Milner
00006
DEPOSITION EXHIBITS(continued)
No. 9 Excerpt from Transcript Dated ......... 82
Wednesday, June 14, 2006, Before the
Honorable Emily C. Hewitt, Pages
02669-02676
No.10 Excerpt from Transcript Dated ......... 83
Wednesday, June 14, 2006, Before the
Honorable Emily C. Hewitt, Pages
02831-02838
No.11 Excerpt from Mission Plan Dated June .. 89
1985, Pages HQR-003-1174 to
HQR-003-1191

**63:7 - 63:21**

00063

Q. Okay. Let's go back to the linkages for a minute. The department recognized, did it not, that to meet the 1998 date that's in the 1989 time frame, that the linkages would need to be removed. Is that correct?

A. That's correct.

Q. Did the department ever submit legislation to Congress to remove the linkages?

A. The department's approach was to have that addressed through a negotiated agreement by the Office of the Negotiator which had to be approved by Congress in which the linkages would have been addressed. So the department looked to the negotiator to do that. The department, to my knowledge, did not submit any separate legislation on that issue.

---

**73:11 - 73:22**

00073

Q. In the 1995 time frame, was it your understanding that there would not be an MRS in 1998?

MS. SULLIVAN: Objection, vague.

A. Without rather specific congressional guidance, avoiding a variety of implementation steps, that would not have been -- the implementation would not have been possible. And at that point I don't believe there was any legislation that was being considered that would have taken those steps. So in that time frame it was very -- it was a very, very low probability that an MRS would be available in the 1998 time frame.

---

**Kouts, Christopher Deposition Testimony dated 5/1/07**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
----------------------------------:
DAIRYLAND POWER COOPERATIVE, :
Plaintiff, :
v. : No. 04-106C
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:
ENERGY NORTHWEST, :
Plaintiff, :
v. : No. 04-0010C
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:
Washington, D.C.
Tuesday, May 1, 2007
Volume 1
Deposition of:
CHRISTOPHER KOUTS
called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:10 a.m., when were present on behalf of the respective parties:

00002
A P P E A R A N C E S
On behalf of Dairyland Power Cooperative:
JERRY STOUCK, ESQUIRE
ROBERT L. SHAPIRO, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3173
On behalf of Energy Northwest:
DAVID JIMENEZ-EKMAN, ESQUIRE
CHRISTOPHER TOMPKINS, ESQUIRE
Jenner & Block, LLP
330 N. Wabash Avenue

Chicago, Illinois 60611-7603
(312) 222-9350
On behalf of Defendant:
ALAN J. LO RE, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 12070
Washington, D.C. 20530
(202) 307-0226

00003

C O N T E N T S

EXAMINATION BY: PAGE
Counsel for Dairyland ................... 6
Counsel for the Defendant ............... 296
Counsel for Dairyland ................... 305
KOUTS DEPOSITION EXHIBITS: * PAGE
1 Summary of employment history at DOE .. 6
2 Excerpt of testimony at PG&E trial .... 28
3 Excerpt of testimony at PG&3 trial .... 40
4 Standard Contract between Dairyland
Power Cooperative and the Department
of Energy, dated June 15, 1983 ........ 58
5 March 04, 1992 letter from M. Detmer
to Mr. J.E. Barrett at PG&E ........... 66
6 Excerpt of testimony at PG&E trial .... 79
7 Delivery-commitment schedule forms .... 91
8 July 28, 2004 letter from Mr. Zabransky
to William Berg ....................... 104
9 Letter to Russ Shultis identifying
30(b)(6) topics ....................... 114
10 Letter from Marian Sullivan designating
witnesses for 30(b)(6) topics ......... 114

00004

C O N T E N T S (Continued)

11 Notice of Deposition .................. 114
12 Segment of trial testimony from
Yankee Atomic trial ................... 127
KOUTS DEPOSITION EXHIBITS: * PAGE
13 Excerpt from proceedings of 1983
Civilian Radioactive Waste Management
information meeting held in December
of 1983 ............................... 150
14 June 1987 Annual Capacity Report ...... 166
15 1988 Annual Capacity Report ........... 172
16 December 1991 Annual Capacity Report .. 193
17 1987 Monitored Retrievable Storage
submission to Congress ................ 206

18 1995 APR and ACR ...................... 218
19 Excerpt of 1985 Mission Plan .......... 271
20 Excerpt from June 4, 1999 deposition in Yankee Atomic case ................. 275
21 Letter from Michael J. Lawrence to Ben Rusche, dated July 23rd, 1984 ..... 281
22 Memorandum on the Department of Energy memo letterhead stationary dated
00005
C O N T E N T S (Continued)
December 21, 1992 ..................... 284
23 Letter from Spencer Abraham, Secretary of Energy, to Senator Orrin Hatch, dated July 8, 2002 .................... 288
24 Memorandum on the Department of Energy memo letterhead stationary dated December 20, 1991 ..................... 290

---

## 42:4 - 43:1

00042
Q Okay. What is your understanding today of whether or not ACRs and APRs are binding?
A My understanding is that they are not.
Q They are not binding?
A That's correct.
Q Okay. And that --
A In the government's view, that they are not binding.
Q Okay. I'm asking for your view.
A In my view, they're not binding.
Q None of the ACRs issued by DOE are binding?
A That's correct.
Q And none of the APRs issued by DOE are binding?
A Binding in the sense of creating an obligation for the government. That's my interpretation of your comment.
Q Okay. What's your answer?
00043
A The answer is, no, they are not.

---

## 166:16 - 167:14

00166
Q You've been handed what's been marked Exhibit Number 14. It's the June 1987 Annual Capacity Report, correct?
A Yes.
Q If you turn to page 7. Table 2.1, do you see that?
A Yes.
00167
Q Now let me just ask you, are these the rates of accept -- in 1987, or as of the time of this document, are these the rates of acceptance that DOE planned to use under the Standard Contracts?
A Yes.
Q Okay. Now I want to ask about receipt rates, okay. In 1985, what receipt rate, if any, was DOE planning to use?
A To the extent that there was design -- conceptual design of facilities, the capabilities of the facilities would have been designed to meet the schedules identified for both the repository and the MRS, as identified in the '85 Mission Plan.

---

## 172:21 - 173:9

00172
Q All right. Exhibit 15, Mr. Kouts, is the 1988 ACR. Is that what you have in front of you?
00173
A Yes.
Q Okay. Good. And I take it, on page -- is it 5? What page is this on? Yeah. Page 5 -- are you on page 5?
A Yes.
Q In 1988, those were the acceptance rates that DOE was planning to use under the Standard Contract; is that right?
A Yes.

---

### 176:10 - 177:16

00176
Q Okay. Thank you. Now, the 1987
amendments to the NWPA, are you generally familiar
with that enactment?
A Yes.
Q Okay. And that statute imposed something
we've already referred to, which is -- it authorized
an MRS, correct?
A Yes.
Q And it imposed a 10,000 MTU capacity
limitation on the MRS until a repository was
operational; is that correct?
A Yes.
Q Okay. And it also linked the -- in some
00177
manner linked the MRS to construction authorization
for the repository, correct?
A To be precise, the MRS could not be
constructed until the repository received a
construction authorization from the Nuclear
Regulatory Commission.
Q Right. Okay. Now, back to Exhibit
Number --
A In addition to that, it could not be
sited until the site was selected for a repository.
Q Until a site was selected for a
repository.
A That's correct.
Q Selected by whom?
A Selected by the Secretary, following the
dictates of Section 114.

---

### 177:22 - 179:5

00177
A And the siting was, if the governor in
00178
the state in which the repository was identified or
selected decided to submit a notice of disapproval,
then it would require a joint -- an act of Congress,
if you will, to override by majority vote, which has
been interpreted as meaning a joint resolution of
Congress would have to be passed. And then the

President would have to sign that joint resolution.
Q Okay. Thank you.
A And the siting process also for the MRS would be similar. If the Secretary selected a site for the MRS, that governor would also have, likewise, a right to disapprove it. And that site would then have to go to Congress for override or for a joint resolution by a majority vote. And then the President would have to approve that before the MRS was sited.
Q Okay. Thank you for that. Exhibit 15, page 5, please. Right here.
A Okay.
Q This is the June 1988 Annual Capacity Report.
A Yes.
00179
Q On page 5, this table 2.1, again, just from your prior answers, I take it that in 1988, these were the rates of acceptance that DOE was planning to use under the Standard Contracts?
A Yes.

---

## 180:18 - 181:21

00180
Q Okay. Now, do you know when the 1987 NWPA amendments became law? Was it in 1987?
A It was in early 1988.
Q Thanks. '88. Okay. It was prior to June 1988 when Exhibit 15 was issued?
00181
A Yes.
Q Okay. So at the time of this document, Exhibit 15, the 1987 NWPA amendments were enacted and in force as law in the understand?
A That's correct.
Q So after the 1987 amendments, DOE was still planning to use acceptance rates that ramped up to 3,000 MTU per year in year 6, as shown in page 5; is that correct?
A At the repository. That's correct.
Q Okay. And why did DOE plan to use these rates at the repository, as you say, after the 1987 amendments?
A Because the MRS, with the conditions that

we went through a little earlier, did not allow it to be available in the time frame of prior to 2003.
And, therefore, the planning basis of the program was such that an MRS was not in the system.
And, therefore, the planning basis of the program was to have a repository available in 2003 with these planned acceptance rates.

---

**190:5 - 191:14**

00190
So when did having an MRS on day 1 become something that DOE was planning to do, if you know?
A Well, I have to go back to the Mission Plan, because the Mission Plan originally in the -- the 1985 Mission Plan originally reflected that the department could have the MRS available in the '96 time frame. So in terms of -- in trying to be fully responsive to your questions, there was a group working on MRS. There were people looking at facility designs. There was time frames, budgets, so forth being developed internally within the program for deployment of such facility subsequent to congressional authorization.
So the program had activities, planning activities underway prior to the time, actually, that the 1985 Mission Plan Amendment was issued -- 1985 Mission Plan was issued in 1985.
Q Okay. So as early as the time of the
00191
1985 Mission Plan, subject to congressional authorization, DOE already, at that time, was planning to -- to have an MRS as part of the facilities for the spent fuel program?
MR. LO RE: Objection. Vague as to the term planning.
THE WITNESS: Subject to congressional authorization, yes.
BY MR. STOUCK:
Q Subject to congressional authorization, my statement is correct?
A Uh-huh.
Q Yes?
A Yes.

---

## 192:11 - 193:1

00192

Q Well -- oh. Let's try it this way. Let's say day 1 is 1998. Did there come a time when DOE was planning to commence operations in 1998 at an MRS with the repository to come on line subsequently?

A That strategy of the department was first provided to the Congress in the secretary's reassessment report in 1989.

Q Okay. The strategy was provided. But what about -- does that mean that, in 1989, DOE was planning to start operations in 1998 at an MRS with the repository to come online subsequently?

00193

A Yes.

---

## 193:7 - 194:6

00193

Q Mr. Kouts, you've been handed what's marked Deposition Exhibit Number 16. This is the December 1991 Annual Capacity Report, correct?

A Yes.

Q Okay. Now, if you turn to page 5, you will find rates. And my question is: As of December 1991, is it correct that these rates shown here on page 5 are the rates of acceptance that DOE was planning to use under the Standard Contracts?

A Yes.

Q Okay. And these rates assume -- or these rates reflect, I think is a better word, these rates reflect the 10,000 MTU capacity limit from the 1987 amendments? It assumes -- well it assumes that that capacity limit is in place, but that the linkage between MRS construction and repository construction

00194

is not in place; is that correct?

A As well as the siting and -- as well as the siting linkages, yes.

Q Yes. So with that correction, my statement is correct?

A Yes.

---

## 200:17 - 202:1

00200
Q Now. Can you explain to me the
following. Having -- the DOE recommended the
construction linkage in 1987, correct?
MR. LO RE: Objection. Mischaracterizes
the testimony.
BY MR. STOUCK:
00201
Q Well it was slightly different form and
the Congress modified it when it enacted it.
But the concept of linking the MRS to the
operation of the repository was something that DOE
recommended in the MRS submission and generally
recommended the MRS; is that correct?
A The linkages that the Department proposed
in the 1987 proposal to Congress were that the
facility not be operated until the repository
received a construction authorization from the NRC.
At that point in time, the repository
construction authorization was planned to be
received in 1998.
Therefore, the department's linkage, as
proposed in the MRS proposal, would have allowed the
MRS to operate in 1998.
In addition to that, the Department
proposed a 15,000 metric ton limitation on the
storage field at the MRS.
Q Okay. And the -- okay. As you just
described the linkage in the '87 statute, that was
recommended by DOE?
00202
A That's correct.

---

## 206:18 - 209:11

00206
Q I believe -- you have you have been
handed what's been marked Exhibit Number 17,
Mr. Kouts. It's the 1987 Monitored Retrievable
Storage submission to Congress. Is that right?
A Yes.
00207
Q You've referred to this, maybe we both
have, a couple of times today already, right?

A Yes.

Q Did you yourself, Chris Kouts, play any role in developing this document?

A I helped write it.

Q Okay. Do you know -- yeah. When DOE recommended the 15,000-ton capacity limit that's reflected in this document, you can see reference to it, for example, on page 27, probably elsewhere, when DOE recommended that capacity limit, why did DOE recommend a capacity limit of 15,000 MTU? What was the derivation of that number?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: To the best of my recollection, and I will -- since you're asking me, I will answer it to my recollection, since I'm not responding -- I'm assuming your question is not as a 30(b)(6) witness, but as my own personal recollection.

To the best of my recollection, it was

00208

a -- it derived somewhat from the concept of operations at a facility and the construct of the department's vision of MRS at that time. The MRS was a packaging facility that was to receive spent fuel and package it into disposal ready canisters for subsequent shipment to the repository.

The 15,000-ton limit was a -- an inventory -- it was an inventory of spent fuel that was felt to be approximately 5 years of maximum receipt capability that would be used as a pool of spent fuel that would be used for those packaging operations.

So it was somewhat subject to the construct of the operations of the facility.

And it was -- the 15,000-ton limit was less than 25 percent of the total capacity of the repository. And that was deemed to be an appropriate amount for the facility.

BY MR. STOUCK:

Q Okay. So this --

A To the best of my recollection.

Q Okay. And this inventory of spent fuel

00209

that was felt to be approximately 5 years of maximum receipt capability, so just by arithmetic, that means that maximum receipt capability would be

3,000 tons a year for 5 years? Is that -- is my math right?
A That's correct. Except that the facility would not have initiated operations at 3,000 metric tons. It would have ramped up. So you're talking about a downstream capability. And I believe that was the -- the sizing that we used for the processing -- the processing facilities on the site.

---

## 223:6 - 224:4

00223
Q Okay. What is the earliest date that DOE currently believes it will begin accepting spent fuel under the Standard Contracts?
MR. LO RE: I would like to just put on the record, the government objects to this as outside the scope of the trial and in violation of the order and the decision in Indiana/Michigan.
Go ahead, you can answer.
THE WITNESS: The current planning baseline for the program is to begin receipt in the 2017 time frame. And that schedule is predicated on passage of the administration's legislation that was submitted earlier this year and last year and the availability of annual appropriations to meet the cash flow provided to Congress earlier this year.
BY MR. STOUCK:
Q Okay. So 2017 is the earliest date that
00224
DOE currently believes it will begin accepting spent fuel under the Standard Contracts?
A Subject to the caveats that I stated in my answer, yes.

---

## 244:16 - 245:1

00244
Q Okay. And with respect, going back to Dairyland's expenditures on private fuel storage initiatives, you are telling me that the reasons, the particular reasons that Dairyland decided to make expenditures on private fuel storage are not -- not relevant to your consideration of whether or not

those expenditures are reasonable; is that correct?
00245
A That's correct.

---

### 245:19 - 247:1

00245
Q Okay. Back, though, to -- so my last statement is correct, Mr. Kouts, because you don't -- you don't know the reasons why -- any of the reasons why Dairyland decided to make
00246
expenditures on private fuel storage initiatives; is that correct?
A That's correct. I don't.
Q And so whatever those reasons are couldn't possibly be relevant to your testimony about the reasonableness of those expenditures?
A That's correct.
Q Likewise, the amounts of the expenditures that Dairyland made on private fuel storage initiatives are not relevant to your consideration of whether or not those expenditures are reasonable?
A That's correct.
Q And likewise, the timing of when those expenditures were made, for example, I gave you the one example of 1995, just as a hypothetical, or 2000 or yesterday, the timing of the expenditures that Dairyland may have made on private fuel storage initiatives is not relevant to your consideration of whether those expenditures are reasonable, correct?
A That's correct.
Q Because you do not know about the timing of any of those expenditures?
00247
A That's correct.

---

### 247:9 - 248:20

00247
Q Okay. All right. Let's move on to topic number 7 which reads: The reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period

subsequent to January 31, 1998. Do you see that on the notice which is Exhibit Number 11?
A Yes.
Q Okay. I think I better start with this. Do you know whether or not Dairyland has stored its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998?
A No.
Q Notwithstanding that answer and that fact, you are -- is this correct, you are able to
00248
testify about the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998?
A Yes.
Q Okay. Then let me ask you, has Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998 been reasonable or unreasonable?
A Since that's a business decision on the part of Dairyland, the government believes that's a decision best made by, in terms of reasonableness or unreasonableness, is based on Dairyland's own individual situation. The government has no position one way or the other.
Q The government has no position one way or the other?
A On the reasonableness or the unreasonableness of the cost, the government has no information associated with it.

---

## 255:4 - 256:16

00255
Q So just some follow ups. I take it that -- and, again, going back to some basics -- you know, I'm sure you're listening to what's going on here. But I'm asking you questions in your capacity as a 30(b)(6) witness here. So let's just be clear about that going forward, especially in light of this colloquy, Mr. Kouts but -- do you understand that?
A Yes.
Q Okay. You -- do you -- does -- can you tell me whether Dairyland's storage of its spent

fuel in its spent fuel pool subsequent to
January 31, 1998 has been reasonable or unreasonable
in any part of that period, you know, as opposed to
the whole period which I think the prior answer
implied?
A Again, ultimately I'll go back to my
previous answer, that's a business decision on the
part of Dairyland, that the Department has no
00256
information one way or the other if one time period
would be more acceptable or more reasonable than any
other time period.
Q Okay. And you've prepared no analysis
regarding the reasonableness or unreasonableness of
Dairyland's storage of its spent fuel in its spent
fuel pool during the period subsequent to
January 1998; is that right?
A That's correct.
Q And I take it you also have no position
on whether or not the storage of spent fuel by any
purchaser in its spent fuel pool during periods --
the period subsequent to January 1998 is reasonable
or unreasonable; is that right? You haven't singled
Dairyland out for this no position?
A That's correct.

---

## 261:13 - 262:15

00261
Q Okay. Well, are you nevertheless, in
light of your recent answers to my recent questions,
able to testify about the reasonableness or
unreasonableness of Dairyland's study, analysis,
investigation, and implementation of dry storage for
its spent fuel during the period subsequent to
January 31, 1998?
A To the extent that the Department has no
information associated with the analysis or study,
the only comment -- and has no position on it, the
00262
only comment that the Department would make is that
implementation of such a dry storage initiative
would have to take into consideration a mutually
agreeable amendment to the Standard Contract to
address whether or not the fuel is going to be in
a -- in a form which the Department can accept.

Q So other than that, the mutual amendment, and the form of the -- of the fuel being suitable for acceptance, you have no position on the reasonableness or unreasonableness of Dairyland's study, analysis, investigation, on the one hand, or implementation, on the other hand, of dry storage for its spent fuel after January, '98; is that correct?
A That's correct.

## Kouts, Christopher Deposition Testimony dated 5/2/07

00311
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
----------------------------------:
DAIRYLAND POWER COOPERATIVE, :
Plaintiff, :
v. : No. 04-106C
:
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:
:
ENERGY NORTHWEST, :
Plaintiff, :
v. : No. 04-0010C
:
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:
Washington, D.C.
Wednesday, May 2, 2007
Volume 2
Deposition of:
CHRISTOPHER KOUTS
called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:45 a.m., when were present on behalf of the respective parties:
00312
A P P E A R A N C E S
On behalf of Dairyland Power Cooperative:
JERRY STOUCK, ESQUIRE
KEVIN E. STERN, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3173
On behalf of Energy Northwest:
DAVID JIMENEZ-EKMAN, ESQUIRE
CHRISTOPHER TOMPKINS, ESQUIRE

Jenner & Block, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611-7603
(312) 222-9350
On behalf of Defendant:
ALAN J. LO RE, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 12070
Washington, D.C. 20530
(202) 307-0226

00313

C O N T E N T S

EXAMINATION BY: PAGE
Counsel for Energy Northwest ............ 316
Counsel for the Defendant ............... 426
Counsel for Energy Northwest ............ 439
Counsel for the Defendant ............... 446
KOUTS DEPOSITION EXHIBITS: * PAGE
25 Document .............................. 319
26 Document .............................. 324
27 Document .............................. 338
28 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program .................... 350
29 Preliminary Estimates of the Total System Cost for the Restructured Program, dated December 1990 .......... 361
30 Report issued by the GAO, entitled: Operation of Monitored Retrievable Storage Facility Is Unlikely by 1998 .. 377
31 Report entitled OCRWM Planning for No MRS Contingency .................... 393

00314

C O N T E N T S (Continued)

32 Letter from James Watkins to Bennet Johnston ....................... 398
33 Document .............................. 417
34 Interrogatory responses Government provided in Energy Northwest .......... 420

### 376:7 - 377:3

00376

Q Mr. Kouts, you've been handed what's been marked Exhibit 30 to your deposition, which is a report issued by the GAO, entitled: Operation of Monitored Retrievable Storage Facility Is Unlikely by 1998.
Have you seen this document before?
A Yes, I have.
Q Did you see this at the time it was issued in 1991, September 1991?
A I believe I did. I remember the existence of such a document, yes.
Q Okay. At this time in September of 1991, what was your position at OCRWM?
A I was either -- I was in one of two positions. I was either head of the transportation program or I was working on strategic and
00377
contingency planning, since -- I don't remember the exact change over date. So I could have been in either of those two positions.

---

### 383:11 - 383:17

00383

Q Okay. Mr. Kouts, turning back to the principal findings on page 3, the GAO indicates that it believes that an MRS facility was unlikely by 1998.
At this point in September of 1991, did you believe that an MRS facility was unlikely to be operating by 1998?

---

### 384:7 - 390:3

00384

THE WITNESS: My perspective as an employee of the program, was that we were doing everything we could to implement the MRS in 1998.
And the Department still had a belief and I had a belief that that was still attainable.
BY MR. TOMPKINS:

Q It was attainable. Was it likely?
MR. LO RE: Objection. Vague.
THE WITNESS: I believe it was -- I -- it's difficult to think back as to how I thought in 1991. My perspective at that point was that we still had a very good chance of being successful and that we were going to do everything we could to have that facility available.
In terms of likely or unlikely, there were lots of variables. My belief was that there
00385
was a strong desire to have a facility available to meet our obligations under the contract. And that if the Negotiator found a site, that Congress would approve changes to the conditions under the Act such that we would be able to operate it.
So whether it was likely or unlikely, I believed from my own perspective that it was a very viable approach and that it had -- it had merit to pursue.
BY MR. TOMPKINS:
Q Your last answer, I think, indicates that it was dependent upon a number of other factors; is that true?
MR. LO RE: Objection. Mischaracterizes the testimony.
BY MR. TOMPKINS:
Q And one of those was whether or not the Negotiator identified a site and reached an agreement with the host?
A Yes.
Q Okay. And another contingency was whether or not Congress acted and authorized such a
00386
facility?
A Congress had already authorized the facility.
Q Would Congress need to approve any agreement reached by the Negotiator?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: The plan was that the negotiated agreement with the host site would address the linkages in the Nuclear Waste Policy Act. So in order for the linkages to be removed, Congress had to approve the agreement.
So had those linkages not existed, it's

unclear to me whether or not Congress would have had to approve the agreement; other than if the agreement was monetary, that Congress would have had to approve that it was agreeing to the monetary provisions of that agreement.
BY MR. TOMPKINS:
Q But the Department, at this point, needed to change the linkages which were enacted in 1987 to actually begin acceptance in 1998; is that correct?
00387
MR. LO RE: Objection. No foundation.
THE WITNESS: The Department could not change the linkages. Congress had to change the linkages.
BY MR. TOMPKINS:
Q Okay. And so one of the contingencies for DOE's plan to begin waste acceptance in 1998 was a change by Congress of the existing linkages?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: I wouldn't characterize it as a contingency. I would characterize it as that was the strategy of the Department in having a facility available in 1998, as presented in the Secretary's reassessment report in 1989.
BY MR. TOMPKINS:
Q And without a change in the linkages, the Department would not be able to have an MRS facility in 1998; is that correct?
MR. LO RE: Objection. Mischaracterizes the testimony.
THE WITNESS: If Congress did not change
00388
the linkages such that the Department could not deploy an MRS, until -- or it could not build an MRS until the repository construction authorization was received, the Department would have been unable to have a facility available in the 1998 time frame.
BY MR. TOMPKINS:
Q Were there any other actions that beginning waste acceptance in 1998 was dependent upon? Was there any other necessary contingencies required for acceptance of waste in 1998?
MR. LO RE: Objection. Vague.
Objection. Asked and answered.
THE WITNESS: Congress would have to appropriate the funds for the Department to deploy

the facility. The Nuclear Regulatory Commission would have to license the facility in a timely manner such that the Department could construct it in a time frame that would allow it to have operations in 1998.

There would have had to have been -- any litigation associated with the facility would have had to be addressed in a rapid manner. Extended

00389

litigation would have affected the schedule.

If the Department was unable to obtain permits necessary for the construction of such a facility, depending on wherever that facility was sited, that could have been an issue.

And any aspect of the deployment of the facility that required essentially an action by an outside agency other than the Department was outside the Department's control and potentially could affect the schedule to have it implemented by 1998.

BY MR. TOMPKINS:

Q At this time, in September of 1991, did you have any view about the likelihood of Congress changing the linkages?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: Based on my understanding of the views of the Senate Energy Committee, there was strong support in the Senate Energy Committee for identification of the site, approval of a negotiated agreement that would address the linkages. And there seemed to be other support in

00390

Congress for such an activity.

So to the extent that, of my own personal knowledge, that's what I was led to believe.

**Lawrence, Michael Deposition Testimony dated 5/20/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )
DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME I
May 20, 2002
Richland, Washington
00002
APPEARANCES
For the Plaintiff Yankee Atomic Electric,
Connecticut Yankee Atomic Power Company
Maine Yankee Atomic Power Company:
Robert L. Shapiro
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5879
(202) 682-1639 Fax
For the Defendant:
Heide L. Herrmann

R. Alan Miller
United States
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290
(202) 514-8624 Fax

00003

APPEARANCES

For the Plaintiff Sacramento Municipal
Utility District:

Timothy R. Macdonald
Arnold & Porter
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2334
(303) 832-0428 Fax

For the Plaintiff Commonwealth Edison
Company:

Christopher P. Tompkins
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350
(312) 840-8786 Fax

00004

APPEARANCES

For the Plaintiff Boston Edison Company,
Duke Power, Florida Light & Power,
GPU Nuclear, Indiana Michigan Power
Company, Northern States Power Company,
Power Authority of the State of New
York, Omaha Public Power District,
Nebraska Public Power District, PSEG
Nuclear, LLC:

Daniel S. Herzeld
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7612
(703) 770-7901 Fax

00005

EXAMINATION INDEX

EXAMINATION BY: PAGE NO.
Mr. Shapiro 10

EXHIBIT INDEX

EXHIBIT NO. DESCRIPTION PAGE NO.

1 43-page Draft Contract for 67
Disposal of Spent Nuclear
Fuel and/or High-Level
Radioactive Waste
SN048683 - SN048724.

2 16-page Federal Register 91
Part IV Department of Energy
Standard Contract for Disposal
of Spent Nuclear Fuel and/or
High Level Radioactive Waste
DC-107942 - DC-107956.

3 11-page Memorandum dated 101
April 8, 1983
ZAB-001-0893 - ZAB-001-0902.

00006

EXHIBIT INDEX

EXHIBIT NO. DESCRIPTION PAGE NO.

4 4-page letter to Robert Morgan 107
from Yankee Atomic Electric
Company dated March 4, 1983
YDK-026-103054 - YDK-026-103057.

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 5 | 6-page letter to Robert Morgan from Northeast Utilities dated March 3, 1983 CDB-021-0180 - CDB-021-0185. | 110 |
| 6 | 87-page letter to Robert Morgan from Edison Electric Institute dated March 7, 1983 YDK-026-103876 - YDK-026-103963. | 114 |
| 7 | 21-page Federal Register Part II Department of Energy Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste DC-107922 - DC-107941. | 131 |

00007

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 8 | 4-page Seminar on the Nuclear Waste Policy Act of 1982 - Its Requirements and Significance May 3-5, 1983 agenda YDK-026-104312 - YDK-026-104315. | 164 |
| 9 | 56-page letter to Gentlemen from Robert M. Rosselli attaching Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste PNL028-2010 - PNL028-2064. | 166 |
| 10 | 7-page Memorandum dated September 15, 1983 from Richard H. Williamson Re: Mission Plan Strategy PNL-173-1282 - PNL-173-1288. | 181 |

00008

EXHIBIT INDEX

EXHIBIT NO. DESCRIPTION PAGE NO.

| | | |
|---|---|---|
| 11 | 127-page Draft Civilian Radioactive Waste Management Program Mission Plan Volume I Overview and Current Program Plans December 20, 1983 CTR042-1065 - CTR042-1191. | 194 |
| 12 | 3-page Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting excerpt dated December 12-15, 1983 SN069588 - SN069600. | 199 |
| 13 | 40-page Statement of Michael J. Lawrence Acting Director Office of Civilian Radioactive Waste Management Department of Energy Before the Subcommittee of Energy Conservation and Power House Committee on Energy and Commerce PNL 173-0225 - PNL 173-0264. | 201 |



EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 14 | 4-page letter to Emmett Moore from Thomas Overcast dated April 26, 1984 Re: MRS Institutional Report PNL 117-3151 - PNL 117-3154. | 205 |
| 15 | 24-page Mission Plan for the Civilian Radioactive Waste Management Program Volume I and II of II Volumes April 1984 (No Bates number.) | 206 |
| 16 | 1-page AP Wire SN044976. | 214 |
| 17 | 14-page Nuclear Waste Fund Fee Adequacy: An Assessment. Second Annual Report July 1984 PA-177336 - PA-177349. | 218 |

## 142:17 - 143:9

*Note:*

Q. What was your intent, then?

A. Our intent would have been able to begin accepting it and continue accepting the -- the waste or spent fuel at a rate that over some reasonable period of time, number of years, would have gotten up to whatever the design capacity of the repository was to be. I don't believe at that point in time we had a firm repository rate in mind, although that could -- maybe we did. I

00143

don't know. I just don't recall it. But that -- that we would, over a period of time, be able to get up to that.

We -- we weren't interested in playing games and just taking one and declaring victory. But in terms of commitments, we knew we weren't in a position to commit to any specific quantity that first year or second year, at that particular point in time.

## 149:3 - 149:9

00149

Q. (By Mr. Shapiro) So the intent was to take the spent fuel as quickly as practicable?

A. As expeditiously as practicable upon request of the generator. There are a number of things which could impact the practicality of it, however; the transport system, restrictions, legal objections, and the like.

## 201:8 - 201:18

00201

(Exhibit No. 13 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, we've handed you what we've had marked as Lawrence Exhibit 13,

which is titled "Statement of Michael Lawrence, Accounting Director, RW." It's dated February 22, 1984.
Do you recall this statement?
A. I remember a number of Congressional hearings, not necessarily this specific one.

---

## 201:22 - 202:20

00201
Q. I want to turn your attention, Mr. Lawrence, to the -- I guess it's the third page of the document, although it says 2 at the top. The last three numbers are the Bates No. 228. The last
00202
paragraph on that page says, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998."
Is it fair, then, to say that as of February 22, '84, the plan was still to accept spent fuel at a rate that would preclude the need for additional at-reactor storage after January 31, 1998?
A. Assuming we had a repository in place by January 31, 1998.
Q. And that was also part of the plan, to have a repository operational by 1998?
A. Well, the statement you're referring to says, by achieving this fundamental objective, which was beginning to accept it no later than January 31, 1998. So I was just linking those two thoughts. You can't decouple them.

---

**Milner, Ronald Deposition Testimony dated 5/1/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
00002
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia

Wednesday, May 1, 2002

Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

00003

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

00004

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP

1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal
Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

00005
APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear
Operating Company, Alabama Power Company,
Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric
Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison
Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350
00006
APPEARANCES: (Continued)

On behalf of Plaintiff Yankee Atomic
Electric Company:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.

Washington, D.C. 20005-3305
(202) 898-5821

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

00007

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
RONALD A. MILNER PLAINTIFFS DEFENDANT
By Mr. Tomaszczuk 9

Afternoon Session -- 81

E X H I B I T S

MILNER EXHIBIT NO. PAGE NO.
1 45
2 59
3 61
4 66
5 74
6 83
7 90
8 94
9 100
10 122
11 131
12 133
13 142
14 144
15 152
16 175

00008

MILNER EXHIBIT NO. (Continued) PAGE NO.
17 186

3 18 189
4 19 194
5 20 195

---

## 9:3 - 9:22

00009
RONALD A. MILNER, was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:
BY MR. TOMASZCZUK:
Q. Would state your name for the record?
A. Ronald Milner.
Q. And where are you employed, Mr. Milner?
A. U.S. Department of Energy.

---

## 11:23 - 12:8

00011
Q. Mr. Milner, what is your present position at DOE?
A. My present position is Chief Operating
00012
Officer for the Civilian Radioactive Waste Program.
Q. And how long have you held that position?
A. About two and a half years.
Q. And to whom do you report?
A. Lake Barrett, who is the deputy director.

## 12:17 - 13:20

00012
Q. Can you describe for me your duties as the, what I'll refer to as the COO for OCRWM?
A. Okay. Basically it's to manage the operational aspect of the program.
Q. What do you mean by operational aspect?
Can you tell me what you mean by that term?
A. Day-to-day operations of the program,
00013
administrative principally.
Q. All right. When you say administrative, do you mean you're primarily involved in personnel matters, or am I misunderstanding what you mean by that term?
A. Personnel matters, contractual matters.
Q. When you say contractual matters, what do you mean by that?
A. Matters relating to our support service contracts, our contract with our M&O.
Q. What is your educational background?
A. I'm a mechanical engineer by education.
Q. Okay. From what institution did you obtain a degree?
A. University of Mississippi.
Q. And that was a Bachelor of Science Degree?
A. A Bachelors and a Masters.

## 73:10 - 73:22

00073
Q. And was that a fair statement of DOE's intentions at or about this time, to work off the backlog of spent nuclear fuel that utilities were storing?
MR. SHULTIS: Objection. Calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: Well, at this specific point in time, I don't know what the department's intent was.
At the point I joined the program, my understanding of the intent was to work off the backlog.

---

**83:15 - 85:14**

00083

MR. TOMASZCZUK: Ms. Reporter, could you mark as Milner Exhibit 6 the Table of Contents to the June 1985 Mission Plan which I had alluded to in one of my questions this morning, but it was not contained in the copy that I provided you?

(Milner Exhibit No. 6 was marked for identification.)

BY MR. TOMASZCZUK:

Q. And my question to you, Mr. Milner, is

00084

looking at the Table of Contents, are you able to identify any of the section of the Mission Plan that you have drafted, if any?

A. I did not draft any sections of it.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. You reviewed the entire document prior to its issuance, correct?

A. I'm sure I did, yes.

Q. Were there sections of the Mission Plan that you spent more time on or devoted more attention to than others that you can recall?

MS. HERRMANN: Objection -- vague.

THE WITNESS: Not that I can recall.

BY MR. TOMASZCZUK:

Q. Can I direct your attention to the page 29 of the June '85 Mission Plan?

A. Page 29?

Q. Page 29 should be the last page.

A. Um-hm.

Q. Of this excerpt.

A. Um-hm.

(The witness reviewed the document.)

BY MR. TOMASZCZUK:
00085
Q. This page 29 appears to identify for DOE objectives for a waste acceptance system, and it lists them one, two, three, four?
A. Um-hm.
Q. Right?
A. Correct.
Q. And the first states accept civilian spent fuel at an annual rate that will allow the utilities to maintain orderly operations of their nuclear power plants, recognizing that the oldest spent fuel will have the highest priority for acceptance consistent with the DOE's current contracts with the waste generators?
A. Yes.

---

## 114:19 - 117:23

00114
Q. DOE has no current plans to site an MRS, is that right?
A. That's correct.
Q. And when did DOE essentially give up on plans to site an MRS?
MS. HERRMANN: Objection -- foundation.
00115
Mr. Milner is not a 30(b)(6) witness; and vague.
THE WITNESS: Mid-'90s, '94 timeframe maybe.
BY MR. TOMASZCZUK:
Q. And do you know what caused DOE to give up on attempting to site an MRS?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: Prior to cancelling the MRS effort, there had been an Office of the Nuclear Waste Negotiator that was established, official title appointed by the President to attempt to find a volunteer MRS site. That effort was unsuccessful. Under the Nuclear Waste Policy Act, an MRS can't be cited unless it was through the volunteer effort.

Until the repository site was selected with the failure of the nuclear waste negotiator to find a volunteer, it made no sense to pursue an MRS.
BY MR. TOMASZCZUK:
Q. If I understood your testimony this morning, you spent a couple of years at OCRWM
00116
working on the MRS effort, was that right?
A. That's correct.
Q. That was roughly between 1990 and 1992?
A. Correct, yeah.
Q. And when you stopped working on the MRS effort, was that, did that occur I should say at the same time that DOE gave up on its efforts to site an MRS?
A. It did. It did.
Q. So do I understand that that effort stopped in 1992, is that right?
A. I can't recall; '92 to '94 timeframe.
Q. Would any of the organizational charts at Brownstein -- I'm sorry -- at Milner -- also happened to be an exhibit for your colleague, Mr. Brownstein -- at Milner Exhibit 1 help you pin that timeframe down?
A. It probably would.
Q. Would you take a moment and look at those and attempt to do that?
(The witness reviewed the document.)
THE WITNESS: Okay. Between, it would have been somewhere between '91 and '94.
BY MR. TOMASZCZUK:
00117
Q. And what pages of Milner Exhibit 1 did you use to help you in that answer?
A. Okay. Well, I don't have page numbers on mine.
Q. I'm sorry. You have got to use dates on the documents or captions as best you can.
A. Okay. Looking at one that has I guess some machine printed date of 91040, which we took earlier to be '91.
MS. HERRMANN: Looking at the left margin?
THE WITNESS: Correct, the left margin, yeah.

BY MR. TOMASZCZUK:
Q. All right.
A. And the subsequent page which was dated 3/2/94.
Q. So would I be correct in understanding that at least as of March 2, 1994, DOE's efforts to site an MRS had died?
A. I can't recall specifically that that would have been true.
It was roughly that timeframe.

**Milner, Ronald Deposition Testimony of 5/2/02**

00197
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
00198
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia

Thursday, May 2, 2002
Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons
00199
Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.
00200
APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP

1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal
Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

00201
APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear
Operating Company, Alabama Power Company,
Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric
Power Company:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1609

On behalf of Plaintiff Commonwealth Edison
Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350
00202
APPEARANCES: (Continued)

On behalf of Plaintiff Yankee Atomic
Electric Company:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.

Washington, D.C. 20005-3305
(202) 898-5821

On behalf of the Defendant:

RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

00203

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
RONALD A. MILNER PLAINTIFFS DEFENDANT
By Mr. Tomaszczuk 205

Afternoon Session -- 272

E X H I B I T S

MILNER EXHIBIT NO. PAGE NO.
21 206
22 209
23 211
24 214
25 218
26 220
27 224
28 254
29 258
30 261
31 274
32 279
33 279
34 287
35 292
36 293

00204

MILNER EXHIBIT NO. (Continued) PAGE NO.
37 300

38 306
39 306
40 314
41 325
42 328
43 335
44 338
45 342
46 350
47 354
48 356
49 375
50 380
51 389

---

## 217:8 - 217:22

00217
Q. Isn't it true, Mr. Milner, that the DOE's intentions with respect to repository design receipt rates have stayed constant over the years at 3,000 metric tons?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: It indicates that the steady-state rate stayed at 3,000, yes.
BY MR. TOMASZCZUK:
Q. And that hasn't changed really in 16 years, has it?
MR. SHULTIS: The same objection.
THE WITNESS: Would appear not to have.

---

## 232:7 - 232:16

00232
Q. At or about this point in time, May 1989, are you aware of any documents published by DOE which would have indicated a design rate other than 3,000 metric tons for the steady-state operation?
A. No, not that I can recall.
Q. And would I be fair in assuming that

if there were such documents, you would be aware
of them?
A. I certainly would have hoped so.

---

## 232:22 - 233:9

00232
Q. Mr. Milner, I would now like you to
get in front of you Exhibit 20, which was the
last exhibit that we marked yesterday, but we
adjourned and I didn't ask you any questions
00233
about it.
And this was the November 1989 report
to Congress on reassessment of the Civilian
Radioactive Waste Management Program.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this
report?
A. Yes, I am.

---

## 245:19 - 249:2

00245
Q. Mr. Milner, I was asking you about
Milner Exhibit 20 at the break, and I have a few
more questions on that document.
A. Okay.
Q. Still in the Executive Summary, on the
first page of the Executive Summary, in the
fourth paragraph --
00246
A. Um-hm.
Q. There is a sentence that states for
the first time since the passage of the Nuclear
Waste Policy Act, the program has put together a
schedule based on a realistic assessment of
technology durations and past experience.
That suggests to me that the previous
schedules were not based on a realistic
assessment of activity durations and past
experience.
Do you agree with that?

MR. SHULTIS: Objection. That's a
characterization.
(The witness reviewed the document.)
THE WITNESS: I guess I would agree
with that.
BY MR. TOMASZCZUK:
Q. That the previous schedules were not
realistic, were not a realistic assessment of
activity durations and past experience?
A. Well, I believe that some of the
earlier schedules were endeavoring to meet the
1998 date, subsequently 2003 date, and I think
probably assumed some activities could be done
in a shorter time than realism would indicate.
00247
Q. This paragraph, the next sentence of
this paragraph goes on to state that this
schedule shows a significant slip for the
expected start of repository operations from the
Year 2003 to approximately 2010, correct?
A. Correct. It does.
Q. And did you agree with this change in
the schedule and slippage of the expected start
of repository operations from 2003 to
approximately 2010?
A. Personally I did, yes.
Q. Do you believe today that repository
operations will start in 2010?
MR. SHULTIS: Objection -- asked and
answered.
THE WITNESS: At this point in time, I
believe that's a realistic goal, yes.
BY MR. TOMASZCZUK:
Q. Continuing on in the Executive
Summary, there's a reference at Roman Numerals
Nine and Ten to monitored retrievable storage.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And my question to you is was it true
at the time that the linkages between the
00248
repository and the MRS program made it
impossible for DOE to accept waste at an MRS
facility on its schedule that was independent
from that of the repository?
A. That's correct.
Q. Was it at or about this time, Mr.

Milner, that you began working or were detailed to work on the MRS siting effort?
A. Roughly that time; I believe it might have been slightly afterward.
Q. Within several months of this report do you think?
A. I don't recall. Certainly within a year or so.
Q. Were you involved in the DOE's efforts to work with the Congress to modify the linkages between the repository and the MRS facility?
A. I was not.
Q. Did you believe at the time that if the linkage were modified, that waste acceptance at an MRS facility could begin by 1998?
A. My personal opinion was yes.
Q. Was it also your opinion that if the linkages were not modified, that waste acceptance could not begin at an MRS facility by
00249
1998?
A. Correct.

---

## 330:19 - 335:11

00330
Q. Can I ask you to look at the ACR, the summary page, Mr. Milner?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. The end of the first paragraph indicates that the 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991 APR,
00331
resulting in individual purchaser allocations, right?
A. Correct.
Q. And then further down this paragraph, or in the next paragraph about three quarters of the way down it's stated the annual acceptance rates provide an approximation of the system through-put and are subject to change as the program progresses, correct?
A. Correct.
Q. So that seems to be saying that the rates in the ACR are subject to change?

A. It would seem to say that, yes.
Q. And if that is so, would that not impact the APR?
A. I don't believe it would impact the APR since that was simply a priority ranking.
Q. Well, isn't the 1991 ACR used to develop the allocations in the APR?
A. The allocations I believe to be used for DCS.
Q. Well, I'm sorry. Go back and look at the sentence at the bottom of the first paragraph starting the 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991
00332
APR.
A. Um-hm.
Q. Resulting in individual purchaser allocations -- what do you understand that sentence to be, to mean?
A. I understand that to mean that it takes the, the priority ranking which is contained in the APR and blends that with the capacity rates contained in the ACR to come up with a priority ranking that does have annual capacities by utility.
Q. All right.
A. Annual acceptance rates by utility.
Q. And if the rates in the ACR change, doesn't that necessarily mean that the APR is subject to change also?
MS. HERRMANN: Objection -- asked and answered.
MR. TOMASZCZUK: Well, it's been asked. I'm not sure it's been answered.
THE WITNESS: Priority doesn't change even if the acceptance rate changes. Utility that's first in line is still first in line even if the rates change.
BY MR. TOMASZCZUK:
00333
Q. But the individual allocations for the utilities would change, would they not?
A. Absolutely, yes.
Q. Were you responsible, Mr. Milner, for the development of the instructions for the Delivery Commitment Schedules?
A. I would have been I believe, yes.

Q. And did your office play a role in the review of Delivery Commitment Schedules?
A. It did.
Q. And it was your understanding that beginning in January of 1992, the purchasers, the utilities could submit Delivery Commitment Schedules?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That was my belief, yes.
BY MR. TOMASZCZUK:
Q. Can I ask you to look at page 4 of the ACR?
And I direct your attention to the second paragraph.
At the end of the second paragraph, the sentence reads, quote, if the current linkages between MRS facility construction and
00334
repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007?
A. Correct.
Q. Was that a true statement?
A. That was the best projection at the time, yes.
Q. You believed it to be true?
A. Yes, I did, at that time.
Q. I have to make a quick phone call.
Can we take a five-minute break?
Is that okay? Do you want longer? Do you want ten? Want to take a ten-minute break?
A. That sounds good.
Q. Fine.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, the rates contained at page 5 of the 1991 ACR, Milner Exhibit 42, those rates are based on use of an MRS, correct?
A. That's correct.
Q. And that MRS, one of the assumptions is that MRS also has placed on it certain
00335
statutory linkages or restrictions?
A. That's correct.

Q. At the time that this document was prepared, December 1991, OCRWM had other documents reflecting the design capacity of the geologic repository, is that right?
A. Correct. I believe so.
Q. And those documents reflected a steady-state spent nuclear fuel acceptance schedule of 3,000 MTU?
A. I believe that's correct, yeah.

---

## 356:13 - 357:4

00356
MR. TOMASZCZUK: Ms. Reporter, could we have marked as Milner Exhibit 48 a set of briefing charts entitled interim storage options presented by R.A. Milner originally I gather on February 8, 1994, and then revised on March 8, 1994?
(Milner Exhibit No. 48 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this document?
A. I do, um-hm.
00357
Q. Is this something that you prepared?
A. I don't believe I prepared it, no.
Q. Someone prepared it for you?
A. Yes.

---

## 372:24 - 375:10

*Note:*
Q. Continuing on to the next page, page 60, schedule, it states here that this scenario
00373
is the default case.
What was meant by that?
A. Default case, if none of the other options were viable, that was the default. That was essentially a no federal action case.
Q. All right. And that's sort of where

we are today, right?
A. That's correct.
Q. And then institutional, continued at-reactor storage will lead to local and state discontent.
Were you aware of such discontent at or about this time?
A. I think at about that time, there was the beginnings of some concern on the parts of states and local governments of not removing the spent fuel, in addition to the utilities' concerns.
Q. However, at-reactor storage eliminates MRS siting problems. At-reactor storage could be contested, resulting in inability to move spent fuel from reactor pool, eventually causing early reactor shutdown.
At this time, were you concerned that the inability to move spent fuel from the

00374

reactor pool might cause some reactors to shut down early.
A. Yes.
Q. Is that still a concern today?
A. No.
Q. Why not?
A. Reactors seem to have been able to get licenses or license amendments to construct dry storage, and it has not seemed to be as problematic as was feared at the time.
Q. Do you know whether that's true in Minnesota?
A. There are exceptions.
Q. Failure of DOE to perform according to standard contract may lead to litigation after 1998.
And that was a concern of yours at this time, right?
A. Yes.
Q. Did you discuss that concern about DOE's failure to perform might lead to litigation with others at OCRWM?
A. Not that I specifically recall.
Q. Did Mr. Dreyfus have any reaction to that statement when you presented it in February

00375

of '94?

A. Very general terms, I think he thought that almost anything could lead to litigation at any time.
Q. And then finally, compensation to utilities for at-reactor storage may make this option more acceptable.
Was that discussed at this briefing in February of '94?
A. I believe it was.

---

## 378:20 - 378:25

00378
Q. Am I correct in understanding that at least as of November of '94, if not sooner, the MRS siting effort was dead?
A. We no longer assumed an MRS in the system, that's true, and for all intents and purposes, yes, it was dead.

---

## 389:8 - 391:19

00389
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 51 the March 1995 APR ACR?
(Milner Exhibit No. 51 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. In general terms, yes.
Q. Did your office prepare the document?
A. It did not.
Q. Do you know which office within OCRWM did prepare it?
A. I believe this was still being prepared at that time in the Office of Storage and Transportation.
Q. So Mister, this would have been Mr.
00390
Shelor's office that prepared it?
A. I believe so.

Q. Now at some point in time, you came back to that office, that is, the Office of Waste Acceptance, Storage and Transportation, is that right?
A. That's correct.
Q. But that would have been after this APR/ACR was published?
A. I believe it was.
Q. Notwithstanding the fact that your office didn't publish this, did you have occasion to review this and sign off on it before it was published?
A. I don't recall specifically, but it's likely that I would have concurred in it.
Q. Can I ask you to look at page 1 of the document? And the second paragraph is what I'm going to ask you a few questions about.
There is a reference to the APR and the ACR?
A. Um-hm.
Q. And then there is a sentence in the middle of the paragraph which states the ACR applies projected nominal acceptance rates for
00391
the system to the priority ranking and the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium.
Do you have an understanding of what is meant by the phrase nominal acceptance rates in that sentence.
A. No. I don't know.
Q. Did you have any discussions with any OCRWM employees concerning what was meant by that phrase nominal acceptance rates?
A. Not that I recall.
Q. The last sentence of this paragraph states as specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers, right?
That's what it says?
A. That's correct.

**393:5 - 394:19**

00393
Q. Can I ask you to look back at the DCS instructions?
We looked at those this afternoon -- 43.
And in particular, I was going to ask you to look at, Mr. Milner, paragraph 7C.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And this paragraph reflects in the first sentence that the rates in the ACR provide an approximation and are for planning purposes, right?
A. Correct.
Q. And then the next sentence, there is an assumption stated that the waste management system will begin acceptance of spent nuclear fuel in 1998, correct?
A. Correct.
Q. And then there is this third sentence in the event that such circumstances change, all DCSs previously approved by DOE may need to be
00394
re-evaluated by DOE and the purchasers.
What was meant by that?
MR. SHULTIS: Objection. Calls for speculation.
THE WITNESS: Well, the program and the department position had always been that acceptance of spent fuel was conditioned upon having the facility available to accept it, and if those conditions changed, DCSs would have to be re-evaluated in terms of start of acceptance.
BY MR. TOMASZCZUK:
Q. So if circumstances changed, the DCSs wouldn't be binding?
MR. SHULTIS: Objection. Calls for a legal conclusion.
THE WITNESS: If there was no facility available to accept the fuel in 1998, which ultimately there was not, then yes, they would have to be re-evaluated.

**398:1 - 402:4**

00398
Q. And do you know, Mr. Milner, whether this was the, this document that has been marked as Milner Exhibit 51 was the last APR/ACR issued by the department?
A. I believe it was.
Q. Do you know why no APRs/ACRs have been issued after March of '95?
A. I don't offhand recall, no. I would presume nothing has changed, so it wasn't reissued.
Q. Now as of, certainly as of this point in time, March of '95, the department's efforts to site an MRS had stopped, right?
A. Basically, yes.
Q. Do you know whether the acceptance rates reflected in Table 1 at page 4 of this document assume an MRS or not?
A. I believe they do not.
Q. And what is the basis for that belief?
A. Just my general recollection at the time that we did not assume an MRS facility in the system.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
00399
Q. These rates are identical, are they not, to those contained at Table 2.1 in the 1991 ACR?
MR. SHULTIS: What exhibit is that?
MR. TOMASZCZUK: Exhibit 42.
(The witness reviewed the document.)
THE WITNESS: I'm sorry. What was the table number?
BY MR. TOMASZCZUK:
Q. The Table 2.1 in the '91 ACR at page 5.
A. Okay.
(The witness reviewed the document.)
THE WITNESS: Yes, they are the same.
BY MR. TOMASZCZUK:
Q. And indeed the text under Section 1.2 at page 3 of the '95 ACR/APR?
A. I'm sorry. Page what?

Q. Page 3, I'm at page 3 of Milner
Exhibit 51, under Section 1.2.
A. Um-hm.
Q. And it says in the previous ACR in
pertinent part the projected nominal acceptance
rate was based on the assumption of SNF
acceptance beginning in 1998 at a monitored
00400
retrievable storage facility prior to repository
operations?
A. Correct.
Q. So they're saying the previous ACR had
the rates based on an MRS, right?
A. That's correct.
Q. And the next sentence goes on to say
due to the uncertainty associated with the date
of commencement of operation of the waste
management system, the annual nominal waste
acceptance rates are presented by years of
operation of the system rather than by specific
calendar years.
And we can see that if you compare the
'91 ACR with the '95 ACR?
A. Correct.
Q. Right?
A. Correct.
Q. But isn't it true, Mr. Milner, that
the '95 APR/ACR continued the practice of the
previous ACR indeed going back to 1991 of basing
a rate with an assumption that an MRS would be
operating prior to repository operations?
MR. SHULTIS: Objection -- asked and
answered.
00401
THE WITNESS: I don't know if the
rates are the same, but I'm not sure what the
question really is.
MR. TOMASZCZUK: Can you read my
question back?
THE REPORTER: Question: "But isn't
it true, Mr. Milner, that the '95 APR/ACR
continued the practice of the previous ACR
indeed going back to 1991 of basing a rate with
an assumption that an MRS would be operating
prior to repository operations?"
MR. SHULTIS: Same objection; the
document speaks for itself.

THE WITNESS: The rates are the same. The '95 document does not assume an MRS in the system.
MR. TOMASZCZUK: I'm sorry. Could you read that back for me?
THE REPORTER: Answer: "The rates are the same. The '95 document does not assume an MRS in the system."
BY MR. TOMASZCZUK:
Q. Can I direct your attention to the text at the top of page 4 of the '95 ACR/APR?
A. I stand corrected. It appears that it
00402
does.
Q. It appears that these rates are based on the existence of an MRS?
A. Apparently so.

**Milner, Ronald Deposition Testimony dated 5/3/02**

00403

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY, :(98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :(98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY :(98-474C) :
FLORIDA POWER & LIGHT COMPANY :(98-483C) :
NORTHERN STATES POWER COMPANY :(98-484C) :
DUKE POWER, A Division of DUKE :ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY :(98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :(98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, :et al., (98-614C) :
COMMONWEALTH EDISON COMPANY :(98-621C) :
BOSTON EDISON COMPANY :(99-447C) :
GPU NUCLEAR, INCORPORATED :(00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, :(00-697C) :
POWER AUTHORITY OF THE STATE OF :NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT :(01-115C) :
NEBRASKA PUBLIC POWER DISTRICT :(01-116C) :
TENNESSEE VALLEY AUTHORITY :(01-249C) :
Plaintiffs, : v. :
UNITED STATES OF AMERICA, : Defendant. :
- - - - - - - - - - - - - - - - - - - - - X Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

00404

Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

00405

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:

PETER SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D. C. 20005-3305
(202) 898-5821

00406

APPEARANCES (Continued):

On behalf of the Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D. C. 20005-2011
(202) 434-1690

On behalf of the Plaintiff Southern Nuclear Power:

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of the Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

00407

APPEARANCES (Continued):

On behalf of the Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C. 20530
(202) 305-7561

00408

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
RONALD MILNER PLAINTIFFS FLORIDA POWER &
LIGHT COMPANY, ET AL.
By Mr. Tomaszczuk 410

EXAMINATION BY COUNSEL FOR

PLAINTIFF SACRAMENTO
MUNICIPAL UTILITY DISTRICT
By Mr. Neslin 415

EXAMINATION BY COUNSEL FOR
PLAINTIFF COMMONWEALTH EDISON
Mr. Tompkins 524

Afternoon Session - Page 524

E X H I B I T S

| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 52 | 427 |
| 53 | 440 |
| 54 | 449 |
| 55 | 455 |
| 56 | 460 |
| 57 | 470 |

00409

E X H I B I T S (Continued)

| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 58 | 472 |
| 59 | 477 |
| 60 | 480 |
| 61 | 491 |
| 62 | 497 |
| 63 | 505 |
| 64 | 510 |
| 65 | 515 |
| 66 | 526 |
| 67 | 530 |
| 68 | 532 |
| 69 | 535 |
| 70 | 541 |
| 71 | 548 |
| 72 | 552 |
| 73 | 570 |
| 74 | 577 |

---

**418:18 - 418:25**

00418
Q. That's correct. Did the Department have
any interest in the timely decommissioning of
shutdown reactors?
A. It did.

MR. SHULTIS: Same objection.
BY MR. NESLIN:
Q. That was an interest of the Department's?
A. It was an interest, yes.

---

## 419:1 - 419:24

00419
Q. The Department, would it be fair to say that the Department had an objective of allowing shutdown reactors to decommission in a timely manner?
MR. SHULTIS: Same objection.
THE WITNESS: Well, again, I think it was more a case that the Department preferred not to preclude that ability.
BY MR. NESLIN:
Q. What do you mean by not preclude that ability?
A. The Department did not as I recall have an objective to give priority to shutdown reactors, it simply preferred not to preclude that ability in the future.
Q. My question isn't about asking granting priority, my question is simply did the Department have an objective of allowing shutdown reactors to decommission in a timely manner?
MR. SHULTIS: Same objection.
THE WITNESS: It did, yes.
BY MR. NESLIN:
Q. And would that remain an objective of the Department's today?
A. I believe so.

---

## 447:2 - 448:1

00447
Q. I thought that you testified that you also considered the potential for brokering exchanges between utilities?
A. Yeah, as a concept, yes.
Q. What do you mean, what do you mean by as a concept?
A. We were -- well, looking at the concept of was it appropriate for the Department to do that sort

of thing.
Q. What was your opinion?
A. My personal opinion was that it potentially could serve a useful purpose if the utilities desired such an activity.
Q. And what do you mean by useful purpose, what would that purpose be?
A. Well, certainly one purpose could have been if one utility that was needing to build a dry storage that was farther down in the queue, and another utility that had a higher priority that either didn't at that particular time or perhaps even life of plant storage, which I don't recall anybody was that high in the queue that they had life of plant, but you could preclude the need for constructing dry storage if such an exchange were
00448
made.

---

## 448:9 - 448:15

00448
Q. When you refer to brokering, what do you mean by that?
A. If we had done comparisons and saw a situation where, as I just described, that occurred, I guess one concept might have been that we would contacted both utilities and inquired as to their interest in exchange and trying to bring it about.

---

## 524:23 - 525:24

00524
Q. In that position, do you have a fairly good handle on the current state of the Nuclear Waste Fund?
00525
A. I think I do.
Q. Okay. Just a ballpark estimate, could you tell me how much money utilities have paid into the fund since 1982?
A. Just as a ballpark, I think it's something in the neighborhood of 10, 11 billion.
Q. 10, 11 billion. Now, all these utilities

paid this money to OCWRM on the expectation that they would receive a service, is that your perception?
A. That's my perception, yes.
Q. And that they would receive the service of removal of waste from their reactor sites?
A. Correct.
Q. Now, is it reasonable to assume that these utilities upon paying this fee have some sort of expectation that this waste will be taken away in a timely manner, and they won't have to expend further money to deal with this waste in addition to what they've already paid to the Federal Government?
A. I think they certainly had an expectation that the waste would be removed in a timely manner. I think some utilities would have had to assume that they would continue to pay storage costs in some form or another.

---

## 575:21 - 578:2

00575
Q. One final question on this DCS form and I believe you testified about this earlier too. Instruction 7B states that once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against the allocation. Is
00576
that saying that a utility does not have to deliver the fuel that its allocation was based on?
MR. SHULTIS: Objection, calls for a legal conclusion. The document speaks for itself.
THE WITNESS: In my opinion that's stating that it does not have to deliver the fuel that gave it its place in the queue.
BY MR. TOMPKINS:
Q. Now once it allocates fuel on a DCS form or a range of fuel, as the case may be, what's your understanding of which fuel it has to actually deliver after the DCS form has been approved?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Yeah. I don't think it specifies what fuel, as long as it's over five years old.
BY MR. TOMPKINS:
Q. Okay. Thank you. So a utility could deliver any fuel over five years when it came to

actually accepting that fuel, even if it designated different fuel on the DCS?
A. That's my understanding.
Q. That's your understanding. If that's the case, I think I only have one last exhibit to go over with you, Mr. Milner.
00577
I'd like to mark this document as Milner Exhibit 74.
(Milner Exhibit No. 74 was marked for identification.)
BY MR. TOMPKINS:
Q. This is a letter by Robert Bauer, is this the same Robert Bauer we've been discussing earlier?
A. Yes.
Q. Were you involved in the preparation of this letter or had you seen it before?
A. I don't recall.
Q. The last sentence of the second paragraph states that, "Failed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel." Is Mr. Bauer saying in this letter that once a failed fuel, once a failed fuel assembly is placed in an approved container, it will be treated just like standard fuel?
MR. SHULTIS: Objection, calls for a legal conclusion, also asks for speculation.
THE WITNESS: Let me read the context here.
MR. TOMPKINS: Sure.
THE WITNESS: It appears that it does, however I seem to recall a provision in the contract
00578
that failed fuel was considered nonstandard fuel which may have a different scheduling.

**Milner, Ronald Deposition Fact Testimony dated 5/7/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY )
(98-154C)(Merow, S.J.) ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY) Washington, D.C.
(98-474C)(Merow, S.J.) ) Tuesday
Plaintiffs, ) May 7, 2002
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - -)

Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

00002
APPEARANCES:

On behalf of Plaintiffs:
PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority for the State of New York, Omaha Public Power District, Nebraska Public Power District, and PSEG Nuclear L.L.C.:
DANIEL S. HERZFELD, ESQ.
SHAW PITTMAN LLP

1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7612

00003

APPEARANCES CONTINUED:

On behalf of Defendant:
RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

---

## 17:5 - 25:21

00017

Q. I'd like to call your attention while we're on this document just to page 18 for a moment. In the bottom paragraph it says: The DOE recognizes that under current conditions waste acceptance as a waste management facility cannot begin in 1998. Furthermore the delay in repository schedule and the linkages between the schedule and key milestones in the siting and construction of an MRS facility make it unlikely that the DOE will be able to start accepting waste significantly before 2003. Do you agree that this accurately describes DOE's beliefs at the time of June 1988?

MR. SHULTIS: Objection. The document speaks for itself.

A. I believe it does, at least the department's opinions given the linkages.

BY MR. SKALABAN:

Q. And would it be fair that for a purchaser -- and what I mean by that, someone who has -- utility has executed a standard contract -- would it be fair for a purchaser to read that to

00018

assume that the department is not going it make the 1998 date and is unlikely to start accepting waste significantly before 2003?
MR. SHULTIS: Objection, calls for speculation, asking for a legal conclusion.
A. Well, I think to me this would indicate that the department was being candid in terms of its views of a schedule at that point in time.
How the purchasers would interpret that, I can't say.
BY MR. SKALABAN:
Q. And in "candid," you mean you're giving them a frank opinion that it's unlikely -- or that they cannot begin in 1988 and it's unlikely to begin much before 2003?
MR. SHULTIS: Objection, asked and answered.
A. Yeah, I believe so.
(Discussion off the record.)
MR. SKALABAN: Put on the record that I intended to say 1998.
BY MR. SKALABAN:
Q. And that doesn't change any of your answers, I assume?
A. I assumed that myself.
00019
Q. Now, Mr. Milner, actually to perhaps speed things up a little bit, there are three exhibits I'd like to ask you about, and they're 20, 33, and 42.
BY MR. SKALABAN:
Q. Now, on No. -- Exhibit 20, which is, report to Congress on reassessment of the Civilian Radioactive Waste Management program, dated November 1989 -- 20 -- if you could turn for a moment to page 7 -- or roman numeral seven, the executive summary section.
The fourth paragraph down refers to the secretary's comprehensive review of the schedule for repository-related activities, and it states, quotes:
This schedule shows a significant slip for the expected start of repository operations from the year 2003 to approximately 2010.
And this I assume accurately reflects the department's position at this time, November 1989, when it reported to Congress that it anticipated that a repository would not be available until 2010?
A. Yes.

MR. SHULTIS: Objection. The document speaks for itself.
BY MR. SKALABAN:
Q. And your answer to that question was, yes?
00020
A. In November of 1989 that certainly reflected the department's opinion -- position.
Q. Now, on page 12, in the first full paragraph, it again refers to the statutory linkages between the MRS and the repository. And it states in the second sentence, quotes: If the current statutory linkages to the repository are maintained, an additional delay of five years would result, with startup estimated at 2007 for the basic MRS facility.
Does this suggest that at this time DOE's best estimate of the earliest time that it could begin an MRS operation in view of the scheduled linkages was 2007?
A. I think it reflects the department's view at the time, yes. If the linkages remained in place, that would be the startup date.
Q. At that time the department was estimating a gap between -- in view of the statutory linkages a gap of three years between when the repository would be operational and when the MRS would be operational?
A. Yes, that appears to be the case, yeah.
Q. Okay. Do you have any reason to believe that the department could have accelerated that three-year -- the ability of the MRS to be online three years before the repository any further under
00021
the scheduled linkages?
MR. SHULTIS: Objection, calls for speculation.
A. I don't know.
BY MR. SKALABAN:
Q. Was there any talk that you were aware of that instead of three years, maybe you could have the MRS online in four years?
MR. SHULTIS: Same objection.
A. Take a year longer?
BY MR. SKALABAN:
Q. Well, a year earlier.
A. Extend the time delta to four years. I don't recall.
Q. I mean, this was at this time the department's best estimate --

A. Yes.
Q. -- of how quickly it could get an MRS up
and running under the current statutory linkages?
A. Correct, correct.
Q. And, sir, if you could, please, turn to
Milner 33, which for the record is the annual
capacity report of December 1990, beginning with a
Bates number of HQ 0002486.
A. I'm sorry. What was the page number
00022
again?
MR. SHULTIS: That was just the cover.
Right?
MR. SKALABAN: Yep.
A. Okay.
BY MR. SKALABAN:
Q. And here again, sir, on page 5, you see
that the beginning paragraph, the last sentence of
the beginning paragraph appears to estimate the
possibility that the MRS could be ready three years
prior to the repository operations.
Is that fair?
A. Correct.
Q. And that would again be the department's
best estimate of when it could feasibly get an MRS up
and running before a repository?
A. Yes.
MR. SHULTIS: The document speaks for
itself.
BY MR. SKALABAN:
Q. And we did look at this document before,
and there was the upper and lower bounding case?
A. I believe that's true, yeah.
Q. I just want to call your attention in the
first full paragraph on page 4 -- almost in the
00023
middle of the paragraph, it refers to the lower
bounding case, and it says: The lower bounding case
represents a receipt rate that would be in compliance
with the amendments act restriction on storage limits
at an MRS before a repository starts operations.
Do you see that?
A. Yes.
Q. And then it goes on to say that: However,
this case assumes removal of the schedule linkages
with the repository imposed by the amendments act.
In view of that passage, it's fair to say

that the lower bounding rate in the lower capacity report, which for your reference can be found on page 7, is based on a change -- is based on a change in the law?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. Yes, because it removed one of the linkages.

BY MR. SKALABAN:

Q. It would require the removal -- a Congressional -- a law, a change in the law to remove some of the -- the scheduling?

A. That's correct.

Q. If we could turn to Milner 42, which is

00024

the December 1991 annual capacity report, on page 4, it has what appears to me a similar estimate on when an MRS facility could be available to start spent fuel acceptance in view of the schedule linkages between an MRS and the operation of a repository.

Do you see that in the middle paragraph?

A. I do.

Q. And here again like in the 1990 annual capacity report the department is estimating that the time -- that it could not start MRS facility operations until at least 2007 in view of the statutory schedule linkage?

A. Correct.

Q. And again, at this point in time, the repository was anticipated to be in operation in 2010, so the department here is figuring that at the earliest -- and I'm focusing on the language, until at least 2007, the earliest that an MRS could be available to accept spent fuel before a repository could be available to accept spent fuel would be three years?

MR. SHULTIS: Objection. The document speaks for itself.

BY MR. SKALABAN:

Q. Is that fair?

00025

A. Correct.

Q. Now, sir, on page 5, there are the waste acceptance rates for the 1991 ACR.

Do you see that, sir?

A. Yes.

Q. And this is a waste acceptance schedule

that is based on the assumption of again like the
1990 ACR a change in the law?
A. Correct. I think at that point in time,
it was envisioned that if the nuclear waste
negotiator were successful in finding a volunteer
site for an MRS that that volunteer host would
certainly support a change in the schedule linkage.
Q. And it would still, however, would still
require Congress to change the law, presumably the
president to sign the law or --
A. Correct.
Q. -- or an override veto, but it would
require a change in law to make the schedule linkages
go away?
A. Correct.

---

## 28:11 - 32:11

00028
Q. And then also, sir, if you could please
take out Exhibit 43. And on page -- for the record,
Exhibit 43 is the DCS instructions. It's entitled,
United States Department of Energy instructions for
completing the appendix C delivery commitment
schedule general instructions.
And item two, it says, who should submit.
And it states there, the DCS should be submitted by
all purchasers with allocations in the 1991 annual
capacity report.
And that further suggests, does it not,
that the department was requiring the purchasers to
use this waste acceptance schedule here on page 5 of
the -- of Milner 42 as well as the individual
breakdown of allocations which appear on page 9 of
00029
the 1991 ACR?
MR. SHULTIS: Objection. The document
speaks for itself, calls for a legal conclusion.
A. In my opinion, that's what it states.
BY MR. SKALABAN:
Q. And if I could turn your attention to the
specific instruction portion of this document, Milner
43 of the DCS instructions, there's a paragraph
entitled, 2.7, on page 6. And if you could just take
a moment to read paragraph 2.7.
A. Okay.

Q. This paragraph says -- or -- I'm sorry. In the second sentence of this paragraph after a comma, it states, quote: The total quantity of SNF designated for delivery must not exceed the allocation in the ACR, semicolon, exceeding the allocation will result in the approval of the DCS.
MR. SHULTIS: Objection, mischaracterizes the document.
MR. SKALABAN: Oh, I'm sorry. Okay. Thank you, counsel.
BY MR. SKALABAN:
Q. Exceeding the allocation will result in the disapproval of the DCS.
And doesn't this part 2.7 further confirm
00030
that the department will require the purchasers to follow the waste acceptance schedule in page 5 and page 9 of the 1991 ACR?
MR. SHULTIS: Objection. The document speaks for itself, Mr. Milner is not a 30(b)(6) witness, calls for a legal conclusion.
A. In my opinion, that's what it says -- indicating here.
BY MR. SKALABAN:
Q. And is therefore, assuming that purchasers followed the instructions and submitted DCSs on the basis of the 1991 ACR -- the delivery commitment schedules would then be based upon a waste acceptance schedule that was not consistent with the Nuclear Waste Policy Act?
MR. SHULTIS: Objection, calls for a legal conclusion and -- objection, calls for a legal conclusion, and also Mr. Milner is not a 30(b)(6) witness.
MR. SKALABAN:
Q. Specifically to give you further clarification, I mean the Nuclear Waste Policy Act schedule linkages between the MRS and the repository.
MR. SHULTIS: Same objections.
BY MR. SKALABAN:
00031
Q. The DCSs were -- do you understand my question?
A. No, I don't.
Q. I mean, assuming then, that the purchasers followed the instructions and submitted DCSs based on the schedules in the 1991 annual capacity report,

then the DCSs would be based upon a waste acceptance schedule that was inconsistent with the statutory linkages in the Nuclear Waste Policy Act?
MR. SHULTIS: Objection. It calls for a legal conclusion.
A. You're talking schedule linkage?
BY MR. SKALABAN:
Q. Yes, sir.
A. Well, I just don't view it as inconsistent in the sense that certainly in my opinion at the time there was a possibility of that schedule linkage being removed.
Q. But it was -- but the schedule linkage was there?
A. Yes.
Q. And so as the law then existed and as it exists now, because I don't believe -- scratch that.
As the law then existed, the DCSs were based on a waste acceptance schedule that was
00032
inconsistent with the Nuclear Waste Policy Act's schedule linkages as they existed at this time?
A. Sitting here today looking at that, that would be my opinion.
Q. And to your knowledge, the schedule linkages have never been changed. There's -- I'm sorry.
Let me ask a more artful question.
There hasn't been a change in the law removing those schedule linkages?
A. No, there has not.

---

## 37:9 - 37:22

00037
Q. Okay. I recognize it's kind of a -- a rough approximation.
Is the department of energy planning to or intending to leave failed fuel at the utility reactor sites there indefinitely?
MR. SHULTIS: Objection, calls for a legal conclusion. Also Mr. Milner is not a 30(b)(6) witness.
A. In my opinion, the department does not plan to leave it there definitely.
BY MR. SKALABAN:

Q. Is there any -- well, actually, in your opinion, that wouldn't be a good policy, would it?
A. Not in my opinion.

---

## 40:5 - 40:11

00040
Q. And having worked in the office of storage and transportation in OCRWM and now as its chief operating officer, have you ever heard anyone express the opinion that within OCRWM that failed fuel couldn't be moved or would be technically infeasible to move?
A. No.

---

**Milner, Ronald Coordinated Deposition Testimony dated 5/7/02**

00579
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER ) Volume IV
COMPANY ) Washington, D.C.
(98-154C)(Merow, S.J.) ) Tuesday
MAINE YANKEE ATOMIC POWER COMPANY) May 7, 2002
(98-474C)(Merow, S.J.), et al., )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

00580
APPEARANCES:

On behalf of Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority for the State of New York, Omaha Public Power District, Nebraska Public Power District, and PSEG Nuclear L.L.C.:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7612

On behalf of Plaintiffs Yankee Atomic Electric

Company, Connecticut Yankee Atomic Power Company, and
Maine Yankee Atomic Power Company:
PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

00581

APPEARANCES CONTINUED:

On behalf of Plaintiff Sacramento Municipal Utility
District:
TIMOTHY R. MacDONALD, ESQ.
(Appearing in the AM session only.)
ARNOLD & PORTER
370 17th Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2334

On behalf of Plaintiff Southern Nuclear Operating
Company, et al.:
RONALD A. SCHECHTER, ESQ.
ARNOLD & PORTER
555 12th Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000

00582

APPEARANCES CONTINUED:

On behalf of Plaintiff Wisconsin Electric Power
Company:
SUZETTE W. DERREVERE, ESQ.
(Appearing in the AM session only.)
JENNIFER MacLEAN, ESQ.
(Appearing in the PM session only.)
PERKINS COIE LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1690

On behalf of Defendant:
RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

00583

C O N T E N T S

WITNESS EXAMINATION
PAGE NO.
RONALD A. MILNER
By Mr. Tomaszczuk 586
By Mr. Schecter 689
Afternoon Session 654

E X H I B I T S

MILNER EXHIBIT NO. PAGE NO.
75 Memorandum, Nos.
DB0000124-125 587
76 Letter, and attachments,
Nos. 0379-399 590
77 Letter, and attachments,
Nos. 0292317 602
78 Federal Register,
pages 21793-21798 604
79 Other Wastes/Nuclear Materials:
A. General Overview,
Nos. YMP-012-1493-494 610
80 Memorandum, and attachments,
Nos. HQR-057-1493-569 616
81 Analysis of the Total System
Life Cycle Cost of the

00584

E X H I B I T S C O N T I N U E D

MILNER EXHIBIT NO. PAGE NO.
Civilian Radioactive Waste
Management Program, Nos.
HQR-025-5075-139 628
82 Nuclear Waste Fund Fee Adequacy,
Nos. PA-176267-282 634

83 1996 Acceptance Priority Ranking
and Annual Capacity Report,
September 1997, Nos.
CTR-027-0001-085 638
84 Program Plan, Revision 2,
July 1998, Nos. YMP-001-0885-945 641
85 Civilian Radioactive Waste
Management System Total System
Description, Revision 01,
October 1998, Nos. PA-206300-335 646
86 Analysis of the Total System
Life Cycle Cost of the Civilian
Radioactive Waste Management
Program, December 1998, Nos.
HQR-036-0006-086 651
87 Nuclear Waste Fund Fee Adequacy:
An Assessment, December 1998,
Nos. PA-195781-821 654
00585
E X H I B I T S C O N T I N U E D
MILNER EXHIBIT NO. PAGE NO.
88 Program Plan, Revision 3,
February 2000, Nos.
HQR-043-3798-882 658
89 Nuclear Waste Fund Fee Adequacy:
An Assessment, May 2001 666
90 Nuclear Waste, Technical,
Schedule, and Cost Uncertainties
of the Yucca Mountain Repository
Project 670
91 Total System Life Cycle Cost
for Site Recommendation Letter
Report, February 2002 674
92 Letter, 2-14-02
93 Statement of Lake H. Barrett,
3-14-02 678
94 Certification of Ronald Milner,
4-18-02, and attachment 681
95 Independent Cost Estimate (ICE)
Review, January 2001 683

---

**626:13 - 628:21**

00626
Q. Mr. Milner, you testified I believe on
several occasions that one of your concerns was to

try and maintain some uniformity as I understood your testimony with respect to the various spent nuclear fuel acceptance rates embodied in OCRWM documents. Right?
A. Well, certainly one of my concerns was to try to ensure that the program was using the same set of assumptions, the program was consistently using the same numbers, if you will.
Q. And is it not true that the spent nuclear fuel steady state rates in these two documents prepared at roughly the same periods of time --
00627
during the same periods of time are quite inconsistent. Right?
A. Steady state rates?
MR. SHULTIS: Objection.
BY MR. TOMASZCZUK:
Q. Do you understand what I mean by that term?
A. I know what you mean by, steady state rate, yeah.
Q. And is it not true that the -- that those steady state rates in these two documents prepared roughly within one month of each other are quite different?
A. Well, Exhibit 51 goes through ten years of operation. I can't tell whether that was the steady state rate at that point or not.
Q. Do I understand table one in the 1995 APR/ACR to show a rampup in year three to 900 metric tons and then to remain constant through the next seven years?
A. That's what's indicated in table one, yes.
Q. And the tables which appear on Milner 80 show in each instance rampups to 3,000 metric tons and then staying at that rate for at least 15 if not more years?
00628
A. Correct.
Q. And aren't those quite dissimilar rampup rates or steady state rates?
A. 900 and 3,000 are certainly different numbers. I can't infer from ten years of operation whether that was intended to show a steady state of operation. I do not believe it was.
Q. So if this chart had been projected onward at Milner 51, higher numbers would have appeared for

years 11 and beyond?
MR. SHULTIS: Calls for speculation.
A. In my opinion, higher numbers would have shown up in later years. Whether it's year 11, I don't recall.
BY MR. TOMASZCZUK:
Q. And why is that your view, sir?
MR. SHULTIS: Objection, calls for speculation.
A. Well, my recollection is that in most scenarios, steady state operation was going to be 3,000.

**Milner, Ronald Deposition Testimony dated 5/8/02**

00047
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY ) Volume II
(98-154C)(Merow, S.J.) ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C)(Merow, S.J.) ) May 8, 2002
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - -)
Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.
00048
APPEARANCES:

On behalf of Plaintiffs:
PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Defendant:
RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530

(202) 305-7561

00049

C O N T E N T S

WITNESS EXAMINATION
PAGE NO.
RONALD A. MILNER
By Mr. Skalaban 51

Afternoon Session 159

E X H I B I T S

MILNER EXHIBIT NO. PAGE NO.
96 1992 Annual Capacity Report, Nos. HQ002314-352 61
97 Letter, 9-25-92, and attachments, Nos. YDK008922-229 68
98 Letter, 4-20-94, No. YDK-005-0417 120
99 Letter, 9-29-92, and attachments, various MOF and MPA numbers 160
100 Letter, 9-25-92, and attachments, Nos. CDB006458-6437, and various other numbers 166
101 10 CFR 61.55, Waste

00050

E X H I B I T S C O N T I N U E D

MILNER EXHIBIT NO. PAGE NO.
Classification 186
102 Nuclear Waste Technical Review Board Full Board Meeting, 1-11-94, Nos. YDK-013-0001-035 216
103 Memorandum, 3-8-94, and attachments, Nos. HQR-028-2747-762 221
104 Memorandum, Nos. HQR-058-0330-331 223

105 Defendant's Proposed Stipulation of Facts, Case No. 98-126C 226
106 Letter, 7-15-98, Nos. HQR-041-0600-601 276
107 Memorandum, Nos. EL-115711-713 277
108 Letter, 7-30-93, and attachments, Nos. HQ0013568-578 283

---

## 155:4 - 156:1

00155
Q. Was the department intending to convey to purchasers at this time that the DCS and final delivery commitment schedule process had been in effect suspended?
MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.
A. Well, I guess in my opinion, the -- when you got to the point of final delivery schedules, you then specified specific dates. Since the department didn't have a facility in operation, it felt that it couldn't approve or disapprove final schedules since we didn't know when a facility would be in operation.
BY MR. SKALABAN:
Q. Well, would DCSs in your view be binding if no final delivery schedule had been finalized?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my understanding of the process of the contract is that, no, if a final delivery schedule had not been approved, then nothing in the DCS binds either party to accept or deliver waste on
00156
a specified date.

---

## 266:23 - 267:4

00266
Q. Has it been the objective of OCRWM to operate the waste management system in a way that can achieve maximum efficiency?

00267

A. Yes.

Q. And that's been an objective throughout your time in RW?

A. Yeah, I believe it has.

---

## 268:10 - 270:11

00268

Q. Now, in considering utility exchanges, what was the department's position if you have a utility that has an allocation for example that doesn't perfectly match up? For example, you have a utility one year that has an allocation of 20 MTUs, another one that has an allocation of ten MTUs in a later year, and they want to swap that ten-MTU allocation. The first utility with the allocation of 20 would then be swapping away for example ten MTUs, but still hold a ten-MTU allocation. Would that sort of partial trade, if you will, not a trade of exactly the same allocations, be permissible in the department's view?

MR. SHULTIS: Objection, calls for speculation, Mr. Milner is not a 30(b)(6) witness,

00269

asks for a legal conclusion.

A. Well, since no exchange request or swapping request had ever been made, I can't really say how the department would have ultimately dealt with that. My personal opinion was that a partial trade like that would work.

BY MR. SKALABAN:

Q. Because as a practical matter, it would be coincidence or not very likely that any utility would have the exact same allocation in two different years. Right?

MR. SHULTIS: Same objections.

A. I believe that's true. I'd have to look at the allocations there, but I believe that's true.

BY MR. SKALABAN:

Q. I mean, I think that that's a fair characterization, more likely than not, they're not, and so to have a swap -- to be able to have swaps in the system, the partial trades would need to be allowed?

A. In my opinion, yes.
Q. And that wouldn't be a problem, would it, because the utility could just resubmit new DCSs to reflect that change?
MR. SHULTIS: Same objections, calls for a
00270
legal conclusion, asks for speculation.
A. Yeah. Again, in my personal opinion, because the department had never received a request, in my opinion, that would make sense.
BY MR. SKALABAN:
Q. And you do not have any reason to believe that that would be a problem for the department?
MR. SHULTIS: Same objections.
A. Other than some slight increase in administrative burden, I have no reason to believe that.

---

## 273:5 - 274:1

00273
Q. Would you agree with the opinion that with sufficient advance planning, DOE could develop the casks or casks for nonstandard fuel, failed fuel, and GTCC waste and obtain the necessary licenses from the NRC --
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
BY MR. SKALABAN:
Q. -- to perform in 1998 if it had been able to do so?
MR. SHULTIS: Same objection.
A. Transport casks, you're referring to?
BY MR. SKALABAN:
Q. M-hm.
A. Certainly transport casks could have been developed and in fact I believe were developed that were certified by the NRC for transport of spent fuel. I guess in my recollection, I don't know of any that had been developed for failed fuel or GTCC. I can't offhand at this point -- I have no reason to believe at this point that that couldn't have been
00274
done.

---

**275:4 - 276:9**

00275

Q. And how about if the department had been performing in 1998? Do you think it could have developed a transportation system that could have handled 3,000 MTUs in 1998 or within a few years thereafter?

MR. SHULTIS: Objection, asked and answered.

A. It had never been the department's plan to begin accepting 3,000 MTUs in 1998, but according to the schedule that existed, I don't recall what the year that we ramped up to 3,000 was, but, yes, I think the system could have been developed.

BY MR. SKALABAN:

Q. A system could have been developed in 1998 after a reasonable rampup that would have been capable of handling 3,000 MTU?

A. A system could have been developed with a rampup which began in 1998 and ultimately have ended up with 3,000 MTU whatever that year was, yes, I believe that a system could have been developed.

Q. Because for example from the early mission plans, we see rampup period beginning in 1998 and

00276

within a few years thereafter making 3,000 MTU.

A. M-hm.

Q. Again on that kind of schedule, you wouldn't see a problem on making -- on developing a transportation system to do that?

A. Developing a transportation system? No. Because that's simply -- how many MTU you can handle relates strictly to how many casks trailers and railcars there are.

**Pollog, Thomas Deposition dated 4/11/02**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS- - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :(98-126c) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER :COMPANY, (98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :(98-483C) (WILSON, J.) :
NORTHERN STATES POWER COMPANY :(98-484c (Wiese, J.) :
DUKE POWER, A Division of DUKE :ENERGY CORP. (98-485C) (Sypolt, J.):
INDIANA MICHIGAN POWER COMPANY :(98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY :DISTRICT (98-488c) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY :et. al. (98-488c) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :(98-621c) (Hewitt, J.) :
BOSTON EDISON COMPANY :(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :(00-440C) (Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :(00-697C) (Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF :NEW YORK (00-703C) (Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :(01-115C) (Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :(01-116C) (Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :(01-249C) (Bruggink, J.) :
Plaintiff, : :
vs : :
THE UNITED STATES, : Defendant. :
- - - - - - - - - - - - - - - - - - -x
McLean, Virginia Thursday, April 11, 2002
00002
Deposition of:
THOMAS POLLOG,
the witness, called for examination by counsel forthe defendant, pursuant to notice and agreement,
commencing at 10:10 a.m., at the offices of Shaw,Pittman, 1650 Tysons Boulevard, McLean, Virginia,
before Linda C. Marshall, RPR, a Notary Public inand for the Commonwealth of Virginia, when were
present on behalf of the respective parties:
APPEARANCES:
On behalf of the Plaintiffs Florida Power &Light Company, Northern States Power Company,
Duke Power, Indiana Michigan Power Company,Boston Edison Company, GPU Nuclear, Incorporated,
Power Authority of the State of New York, OmahaPublic Power District, Nebraska Public Power
District, Nebraska Public Power District: DEVON E. HEWITT, ESQUIRE

JACK CHEW, ESQUIRE Shaw, Pittman, LLP
1650 Tysons Boulevard McLean, Virginia 22102-4859
703-770-7962
On behalf of the Plaintiffs SouthernNuclear Operating Company, Alabama Power,
Georgia Power:KRISTI L. REMINGTON, ESQUIRE
Balch & Bingham, LLPTenth Floor,
1275 Pennsylvania Avenue, N.W.Washington, D.C. 20004
202-347-6000

00003

APPEARANCES CONT'D:

On behalf of Plaintiff Commonwealth EdisonCompany:
THEODORE T. EIDUKAS, ESQUIRE Jenner & Block, LLC
One IBM Plaza Chicago, Illinois 50511-7603
312-222-9350
On behalf of Plaintiff SAcramento MunicipalUtility District:
TIMOTHY R. MACDONALD, ESQUIRE Arnold & Porter
Suite 4500 370 Seventeenth Street
Denver, CO 80202-1370
On behalf of Plaintiff Wisconsin ElectricPower Company:
SUZETTE W. DERREVERE, ESQUIRE Perkins Coie, LLP
607 14th Street, N.W. Washington, D.C. 20005-2011
202-434-1675
On behalf of the Defendant: MARIAN SULLIVAN, ESQUIRE
ERIN POWELL, ESQUIRE U.S. Department of Justice
Civil Division 1100 L Street, N.W.
Washington, D.C. 202-514-7300

00004

I-N-D-E-X

Witness: Page
Thomas Pollog
Examination by Ms. Hewitt 5

E-X-H-I-B-I-T-S
Page
No. 1 - 20
No. 2 - 28
No. 3 - 44
No. 4 - 71
No. 5 - 103
No. 6 - 112
No. 7 - 122
No. 9 - 164

---

## 9:12 - 9:20

00009
Q Mr. Pollog, when did you start working
at DOE?
A November of 1988.
Q What was your appointment previous to
that?
A I was in graduate school.
Q Was working at DOE your first job out
of graduate school?
A Out of graduate school, yes.

---

## 94:20 - 98:13

00094
Q What was the title of that document or
what were those documents?
A I don't recall the exact title. There
was a spent fuel storage requirements document.
Q And who published that, do you recall?
A I believe EIA did publish one, although
00095
there may have been more, but I think EIA
published one. I'm not sure if that was the
title of theirs.
Q And were there separate documents
published or produced reflecting in-pool storage
capacity or was that also in these documents that
you talked about earlier?

A I believe it was in separate document.
Q And what document or documents would reflect in-pool storage?
A I believe it would be the in-pool spent fuel storage document. There was one document. I'm not sure. May have been a second one. I don't recall. One was entitled -- at least one was called spent fuel storage requirements.
Q Okay. From these documents I think you testified that DOE could determine the excess storage that was needed for SNF by utilities; is that right?
A I would say DOE was able to approximate how much out of pool -- what the excess would have been.
Q And so --
A Excess of what a utility could store in their pool.
00096
Q And so how was that information used by DOE?
A It had various uses, I would guess, over periods of time. When?
Q How was it used, for example, in regards to developing an acceptance rate?
A There were points in time that one of the goals of the program was to develop a system where the acceptance rates would account -- would alleviate the purchasers' need to have storage outside of their pools.
Q And what point in time was this the goal of the program?
A I believe in the mid-eighties.
Q Mid-eighties?
A Yeah.
Q Was there a different goal before the mid-eighties?
A I don't know.
Q Was this DOE's goal when it signed the standard contract?
A I don't know.
Q Was there a different goal after the mid-eighties?
A I would say so, yes.
00097
Q And what was that goal after the

mid-eighties?

A Well, essentially, what happened was these acceptance rates that were generated in mid-eighties were based on several goals.

One was to alleviate the need for excessive storage capacity for utilities. Also, we looked at the, as I described earlier, the 70,000 metric tons at a reactor and divided it by what we thought was the anticipated lifetime of the facility and come up with the 3,000. They were fairly approximate for a while.

After the mid-eighties, these 3,000 MTU rates sort of became our design objectives. So I'm not saying our goal changed per se, but we didn't reflect it as a goal of the program anymore.

Q Was there a new goal for the program?

A Regarding?

Q The acceptance rate.

A Eventually, there was, yes.

Q What was that goal?

A Well, that would have been we had new constraints put on us regarding the Nuclear Waste Policy Amendments Act. I will refer to it as the

00098

NWPAA for future discussion, if that's okay.

Q And how did that affect, I guess, goal of the acceptance rates?

A Eventually, it would reduce it significantly.

Q Is there a -- is it your testimony that although the acceptance rates were reduced that the 3,000 MTU remained the design objective?

A Yes.

Q I thought that's what I heard you say.

And when you refer to design objective, are you talking about design of the repository?

A Design of the full system.

**Pollog, Thomas Deposition Testimony dated 4/12/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, A Division of DUKE ENERGY CORP. :
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(98-477C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
00002
(98-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - X
Discovery Judge (Judge Sypolt)

McLean, Virginia
Friday, April 12, 2002
VOLUME II

Continued deposition of THOMAS POLLOG, a (30)(B)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been previously sworn, taken at the offices of Shaw

00003

Pittman, 1650 Tysons Boulevard, 14th Floor, McLean, Virginia, at 9:00 a.m., Friday, April 2, 2002, and the proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.

APPEARANCES:

On behalf of Plaintiff Northern States Power:
DEVON HEWITT, ESQ.
JACK Y. CHU, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
703-770-7901

On behalf of Plaintiff Commonwealth Edison:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603
312-923-2829

00004

APPEARANCES: (Continued)

On behalf of Plaintiff Wisconsin Electric:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
202-434-1609

On behalf of Southern Nuclear Operating Company:
KRISTI L. REMINGTON, ESQ.

Balch & Bingham, LLP
Tenth Floor
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-347-6000

On behalf of Sacramento Municipal Utility District:
TIMOTHY P. MACDONALD, ESQ.,
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303) 863-2334

00005

APPEARANCES (Continued)

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
202-514-7300

00006

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
THOMAS POLLOG NORTHERN STATES POWER
By Ms. Hewitt 8
COMMONWEALTH EDISON

By Mr. Eidukas 18
SACRAMENTO MUNICIPAL UTILITY DISTRICT
By Mr. Macdonald 33
DEFENDANT UNITED STATES
By Ms. Sullivan 160
SOUTHERN NUCLEAR OPERATING CO.
By Ms. Remington 162

Afternoon Session - Page 115

E X H I B I T S

POLLOG EXHIBIT NO. PAGE NO.
19 - 1985 Mission Plan 10
20 - 1984 Mission Plan 32
21 - Mission Plan Strategy Memo, 9/15/83 60
22 - Excerpt of Government's Brief 87
23 - DOE Notice, 5/25/94 100
24 - DOE Notice, 5/3/95 105
25 - 1988 Draft Mission Plan Amendment 128
26 - Analysis of TSLCC of CRWMP 146

00007

E X H I B I T S (Continued)

POLLOG EXHIBIT NO. PAGE NO.
27 - 1995 APR ACR 154
28 - 1996 APR ACR 157
29 - Georgia Power Letter to Robert Morgan 163
30 - Protest of 1998 Mission Plan & ACR 168
31 - Letter, Certified Mail, 9/9/88 173
32 - Handwritten Notes 173

---

## 21:17 - 24:21

00021

Q. Close enough, Okay. The 25 years for the
anticipated operational life of the facility, could
you just clarify again what that 25 years represents?
A. I believe it represents what was
anticipated in normal lifetime of the equipment that
would be used in one of these facilities such as
transportation casks, handling equipment, any type of
hardware that was going to need to be purchased to
operate the facility was thought to have about an

00022

operational life before you would need to basically
just get rid of it and buy new stuff of 25 years.
Q. So the 3000, or the rate that was
generated by looking at that, the rate was based on
the calculation or the estimation that the life of
this equipment would be about 25 years, not vice
versa? I sense by your expression they were as clear
as mud?
A. The vice versa, I wasn't sure.
Q. Sorry. In other words, as I understand
it, the DOE in developing this acceptance schedule or
this acceptance rate didn't approach it in the manner
of we want a rate of 3000 and then let's calculate
what the life of this equipment would be.
Rather, they took the 70,000 MTU limit or
what they felt would be the limit on the acceptance,
what the repository would accept and then looked at
the life of the equipment, what they expected the
life of the equipment would be and took those numbers
and then came up with the 3000, not the other way
around.
A. We looked at what the life of the
equipment was and not -- and then divided the total
anticipated capacity to determine the rate. We
didn't look at the rate first. We did not look at
00023
the rate first and then back calculate what the life
of the equipment would be.
Q. Okay. I think that expressed what I was
trying to say. Was there any expectation by the DOE
that the program would last longer than this 25
years? In other words, that they would have to go
out and buy a new set of this equipment?
A. Well, if you look at the early documents,
it actually includes two repositories. So the first
one would be operating for approximately 25 years and
then the second one coming on line or starting
several years, I'm thinking -- it varied at different
points of permanence, but I'm going to say
approximately 10 years after the first one so that
would be 25 years past, so you're talking
approximately 35 years or so.
Q. At each repository, was there any
expectation that at each of the repository there
would be a replacement of the equipment so that each
repository would be operating for more than 25 years?

A. I don't believe so. Well, let me just clarify that. When you say operation, you mean you're still going to be done after no more fuels come in after the repository. The acceptance part of files coming into the gate was expected to last 25
00024
years.
There are additional requirements such as everything would not necessarily be in place within that 25 year period of time. It would take a little bit longer to work off the backlog, and I believe the nuclear policy act specifies we have to provide a 50-year retreatability, capability at the repository. So there would be certain activities going on to fulfill those statutory requirements. But regarding I think accepting fuels through the front gate and doing what we need to do to get into placement would last 25 years plus a few additional years to work off any lag fuel storage.
Q. I think with that clarification we're still on the same page as far as what I meant by operational life and what you said in your earlier testimony -- just to clarify, when you were talking about operational life of the equipment, you've been referring to the operation life of the acceptance equipment?
A. For the most part, yes.

---

## 43:13 - 43:22

00043
Q. Are you aware of any studies where DOE planned on accepting fuel at a repository at less than a 3000 MTU per year steady state rate?
MS. SULLIVAN: Objection, vague.
MS HEWLITT: Before 1998?
MR. MACDONALD: At any time.
THE WITNESS: I am not aware of any studies that stated that the steady state acceptance rate at a repository would be less than -- other than in the ramp-up period, less than 3000 MTUs per year.

---

**44:23 - 45:3**

00044

Q. Maybe my earlier question was inartful, then. Assuming an operation at a repository, not an

00045

MRS, did DOE plan to use a 3000 MTU acceptance rate once it ramped up to a steady state?

A. I believe so.

---

**45:7 - 45:14**

00045

Q. Mr. Pollog, I'd like to ask you a couple of questions about the '83 draft mission plan which you have looked at previously and it should be Exhibit 7. I'd like you to turn to page 2-3. For the record, this is a table that Ms. Hewett asked you about yesterday entitled Waste Acceptance Schedule, is that right?

A. I believe so.

---

**51:14 - 52:8**

00051

Q. Would you turn to page 2.1 of the same document, the 1983 draft mission plan?

A. You said 2.1?

Q. Yeah, 2-1. And in the first paragraph, this document states, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998."

So my question is was the waste acceptance schedule "Designed to provide an acceptance rate in

00052

the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?"

A. Yes.

Q. Do you know why this document doesn't discuss or mention the second objective that you had

talked about, the 25-year life of the operations?
A. No, I do not.

---

## 60:20 - 62:8

00060
MR. MACDONALD: I'd like to have this
document marked as Exhibit 21.
(Pollog Exhibit No. 21 was
marked for identification.)
BY MR. MACDONALD:
Q. For the record, I'm handing you a document
00061
dated September 15, 1983 titled Mission Plan
Strategy. And it's a memo from Richard Williamson to
a collection of people at DOE, including Robert
Morgan, who at the time would have been acting
director of RW, is that right?
A. I believe it would have been either Robert
Morgan or Mike Lawrence, but I'm not positive which
one.
Q. Mike Lawrence is also listed on the
distribution of receiving this memo?
A. Yes.
Q. Do you know who Richard H. Williamson, the
author of the memo is?
A. No.
MS. SULLIVAN: Do you need an opportunity
to look at this document for a minute?
MR. MACDONALD: Yeah. I'm going to ask
you some questions on it. Take as much time as you
need to look at it.
(Witness reviewing document)
BY MR. MACDONALD:
Q. Have you reviewed the document?
A. Yes.
Q. If you would turn to the second page first
to clarify. After reviewing this, does this appear
00062
to be an internal DOE memo discussing the strategy
for the 1983 draft mission plan?
A. It is a -- it appears to be an internal
DOE memo with I would say recommendations for the
mission plan.
Q. And this is based on the date, the 1983

mission plan, which came out in December of 1983?
A. I would guess so.

---

## 62:17 - 63:13

00062
It then continues, "The central criteria
for this schedule is: An acceptance rate during the
first time five years such that no utility would have
to build additional storage facilities. After 1998,
the second bullet is an acceptance rate after the
first five years equivalent to the actual rate of
utility discharge rate of spent fuel each year."
What is meant by the term central
criteria?
00063
A. I would say main criteria.
Q. So the main criteria for the schedule are
two points listed here: An acceptancy rate such that
no utility would have to build additional storage,
that's in the first five years after 1998? Sorry.
That was very inartful. Strike that. An acceptance
rate during the first time years so that no utility
would have to build additional storage.
That's the first main criteria, and the
second main criteria is an acceptance rate after the
first five years equivalent to the utility discharge
rate, is that correct?
A. That's what's stated here.

---

## 136:8 - 136:24

00136
Q. Let's turn briefly to the 1991 ACR. Ask
again, for the record, those rates reflected on page
5 are 400 MTU beginning in 1998 ramping up to a 900
MTU rate, is that correct?
A. Yes.
Q. And like the rates in the 1990 ACR this
rate could not be accomplished without a change in
the law, is that correct?
A. That is correct.
Q. Is it fair to say that this acceptance
rate is not authorized by the statute, okay way of

putting it?
MS. SULLIVAN: Objection. Calls for a legal conclusion. You may answer the question.
THE WITNESS: I am not sure I'd use those words, but I would say it's inconsistent with the Nuclear Waste Policy Act as amended in 1987.

---

## 142:14 - 145:16

00142
Q. Now if we could turn to the 1995 ACR which is Exhibit 15. And the acceptance rates set forth on page 4 have the same rate as the 1992 ACR and it appears to me that the only difference is that rather than having 1998, 1999 going forward has changed from year 1 to year 10, is that correct?
MS. SULLIVAN: Objection. Asked and answered.
THE WITNESS: If you're referring to Table 2.1 in Exhibit 13 and Table 1 in Exhibit 15, that's correct.
BY MR. MACDONALD:
00143
Q. And if you testified about this yesterday, I apologize, but can you explain to me the reason for this change to year one, year two, year three, rather than a specific date?
MS. SULLIVAN: Objection. Asked and answered yesterday.
THE WITNESS: I believe during the comment draft, persons, the people who were commenting on it prior to it being published are, a suggestion was made it should be changed from 1998 to year 1, et cetera, year 2, et cetera. That suggestion was adopted and a change was made.
BY MR. MACDONALD:
Q. Do you know as of the date this was published, the 1995 ACR, whether it was still DOE's plan to -- strike that. This rate, the 400, 600, 900 rate was originally based on an MRS opening in 1998 and a repository opening in 2010, is that correct?
A. Yes.
Q. Do you know in 1995 whether it was still DOE's intention to operate an MRS beginning in 1998?
A. I'm just going to read the text here for a

minute or two if that's okay.
Q. Sure. That would be great.
(Witness reviewing document.)
00144
MS. SULLIVAN: Are you ready?
THE WITNESS: Yeah.
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: Then I'm going to ask again if you can or the reporter can read the question again to make sure I understand.
THE REPORTER: "Question: Do you know in 1995 whether it was still DOE's intention to operate an MRS beginning in 1998?"
MS. SULLIVAN: Same objection.
THE WITNESS: The text says "due to the uncertainty associated with the date of commencement of operation of the waste management system, annual nominal waste acceptance rates are presented by years of operation of a system rather than by specific calendar years."
So I believe the uncertainty had entered into the Department's mind whether the operation of an MRS could start in 1998.
BY MR. MACDONALD:
Q. Do you know if the nuclear waste negotiator was still looking for a site for an MRS in 1995?
MS. SULLIVAN: Objection. Beyond the
00145
scope. You can answer as to your personal knowledge.
THE WITNESS: I'm not positive, but I believe by '95 he no longer was, but I could easily be wrong.
BY MR. MACDONALD:
Q. If in fact DOE was not planning to operate an MRS in 1998, why would it maintain the 400 ramp-up to 900 rates in this ACR?
A. It basically took the rates from the prior ACRs.
Q. Even if it wasn't planning to begin with an MRS at this point in time?
MS. SULLIVAN: Objection. Asked and answered.
THE WITNESS: Even with the increased uncertainty in an MRS project, yes.

**Pollog, Thomas Deposition Testimony dated 5/15/02**

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.), :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - X

Discovery Judge (Judge Sypolt)
Washington, D.C.
Wednesday, May 15, 2002

Deposition of THOMAS POLLOG, a (30)(B)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been duly sworn by BRYAN WAYNE, Notary Public for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by BRYAN

00002

WAYNE, RPR, and transcribed under his direction.

APPEARANCES:

On behalf of Plaintiffs Yankee Atomic, Connecticut Yankee, and Maine Yankee:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5821

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice

Civil Division
1100 L Street, N.W.
Room 12128
Washington, D.C. 20530
202-305-9640

00003

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
THOMAS POLLOG PLAINTIFFS
By Mr. Skalaban: 4

Afternoon Session - Page 123

E X H I B I T S

POLLOG EXHIBIT NO. PAGE NO.
1 - Letter, 3/1/99, Lester to Stock, Shapiro 8
2 - Standard Contract 127
3 - Government's Witness List 167
4 - Copy of 1990 ACR 169
5 - 1991 ACR 171
6 - Unspecified Doc., Contains APR 208
7 - Nancy Montgomery Document, Identifies
35 Issues With Std. Contract Needing
Correction 251
* All exhibits retained by counsel.

---

## 161:2 - 161:13

00161
Q. Assuming the failed fuels are put into
reconstituted assembly such that it can be handled as
any other assembly, then do you see it as a problem
of being accepted on the same schedule of other
standard fuel?
MR. CRAWFORD: Objection.
Mischaracterizes the prior testimony.
THE WITNESS: Most likely not. I don't
want see a problem with it. Other factors would have
to be looked into, like when it was reconstituted, it
was 20 years ago and what the shape is now, but in

general I don't see any major concern.

---

### 162:20 - 163:14

00162

Q. What are the Department's current plans for accepting failed fuel?

A. Failed fuel will be accepted.

Q. Do you expect it will be accepted on the same schedule as other fuel?

A. Possibly.

00163

Q. And why wouldn't it?

A. If that would present some type of special handling need at a repository. Again, trying to limit to the extent possible occupational exposures seen by individuals working at a receiving facility.

Q. What do you mean by special handling?

A. We will have receiving lines at a handling facility. If incoming waste could be received through one of the normal receiving facilities without any special activity needed to be done, that would be basically normal handling. If it has to be taken off the line and handled in a way other than our normal receipt lines, that would be special handling.

---

### 270:13 - 270:22

00270

Q. But ultimately if the utilities don't have to specify the months of delivery on the DCS, don't they have control on when they're going to deliver that to DOE?

A. Yes.

Q. So ultimately the utilities have control over whether that's going to be in a time frame advantageous to DOE or not?

A. Yes. This was a lot of speculative work. We had contractors that wanted to do a lot.

---

**Pollog, Thomas Deposition Testimony dated 5/16/02**

00274
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.), :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - X
Washington, D.C.
Thursday, May 16, 2002
Continued deposition of THOMAS POLLOG, a 30(b)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been previously sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Thursday, May 16, 2002, and the proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.

00275
APPEARANCES:
On behalf of Plaintiffs Yankee Atomic,
Connecticut Yankee, and Maine Yankee:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5821

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640

00276

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
THOMAS POLLOG PLAINTIFFS
By Mr. Skalaban 277

Afternoon Session - Page 379

E X H I B I T S

POLLOG EXHIBIT NO. PAGE NO.
8 Annual Capacity Report 278
9 Instruction Sheet 316
10 Memorandum w/attachment, 9/29/87 336
11 Letter w/attachment, 9/29/87 365
12 Memo, 6/28/91 373
13 Memo, 5/21/91 379
14 Letter w/attachment, 9/25/92 405
15 Letter w/attachment, 9/29/92 405
16 Letter w/attachment, 9/25/92 405
17 Expert Report of Edward C. Abbott 444

---

**277:9 - 277:16**

00277

Q. Mr. Pollog, did you have an understanding of whether or not the ACR issue resolution process which you participated in for approximately a year, year and a half, was that binding?

MR. CRAWFORD: Objection, vague. And objection to the extent it might call for a legal conclusion of some sort.

THE WITNESS: I didn't believe so.

---

**293:3 - 294:23**

00293
Q. Now, if we look at the final delivery schedule provision, are you familiar with that provision? And that is for the record, article Roman 5 capital C.
A. Yes.
Q. Does this provision provide for another negotiation process between DOE and the purchaser?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: What do you mean when you say negotiation?
MR. SKALABAN: A process of negotiation over a final delivery schedule. Is it your understanding that that's provided for by this provision in the contract?
MR. CRAWFORD: Same objection.
THE WITNESS: If a FDS is disapproved, there is a process for negotiation following that disapproval.
BY MR. SKALABAN:
Q. Now, is it your understanding that -- let me ask you your view. Is there anything in this article V C final delivery schedule which precludes a purchaser from requesting in its final delivery
00294
schedule more MTUs or a greater amount of MTUs than are specified in its DCS?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Are you asking me does anything in this article preclude a purchaser from requesting something different than what was in their DCS?
MR. SKALABAN: Yes. And I'm specifically I'm talking about more MTU.
THE WITNESS: Anything in general, though?
MR. SKALABAN: Okay. Let's ask the question anything.
THE WITNESS: I don't see anything that would preclude them from submitting an FDS that is different from their DCS.
BY MR. SKALABAN:
Q. And how about if a -- and I guess that would hold true then if a purchaser wanted to submit an FDS having twice as much fuel and MTU as was on

its original delivery commitment schedule?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: They can certainly submit an FDS with anything on it that they want to put.

---

**309:10 - 309:25**

00309
Q. Was DOE aware that shutdown reactor -- during your entire tenure, was there ever a time that you feel that DOE was not aware that a shutdown reactor would be incurring significant costs associated with or arising from a situation if it could not decommission for 20 to 30 years after it finished generating electricity?
MR. CRAWFORD: Objection, vague.
THE WITNESS: I believe DOE was aware that there are costs associated with on-site storage in the time period between when the reactor was shut down and when they would decommission the facility.
BY MR. SKALABAN:
Q. And was this a goal of DOE's to try to minimize those costs if possible?
A. I believe so.

---

## 390:13 - 390:25

00390
Q. Do you know whether the acceptance rates in the 1991 ACR upon which the DCSs were based, were those sufficient in the aggregate to avoid additional reactor storage?
A. I don't know factually if they were or not, but my belief is most likely not. I would have to see the actual numbers of spent fuel discharges, spent fuel pool sizes, discharge projections, and compare them with the acceptance rates to make a factual determination on that.
Q. And you know I'm referring to the 400, 600, 900 rate when I ask that question?
A. Yes.

---

**Pollog, Thomas Deposition Testimony dated 5/22/02**

00506

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - X
Washington, D.C.
Wednesday, May 22, 2002

Continued deposition of THOMAS POLLOG, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness having been previously duly, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 9:40 a.m., Wednesday, May 22, 2002, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

00507

APPEARANCES:

On behalf of the Plaintiffs:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640

00508

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
THOMAS POLLOG PLAINTIFFS
By Mr. Skalaban 509
Afternoon Session - Page 585

E X H I B I T S

POLLOG EXHIBIT NO. PAGE NO.
18 - Spent Fuel, Government Responsive Document Collections, 2/15/02 551
19 - ID. Number: 001 through 034 554
20 - Letter dated 3/26/93 with attachments 575
21 - ORNL, Acceptance of Failed SNF Assemblies by the Federal Waste Management System 585
22 - Standard Contract Working Group with attachments 599
23 - Ivan Itkin, 10/16-10/22/00 Calendar 607
24 - Ivan Itkin, 10/23-10/29/00 Calendar 610
25 - Memo dated 12/20/91 with attachments 620
26 - Letter dated 4/1/91 with attachments 643
27 - Memo dated 6/11/91 649
28 - Handwritten note 651
29 - Memo dated 9/18/90 657
30 - Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown, 8/91 661
31 - Handwritten notes 670

---

## 667:1 - 668:24

00667

Q. Do you ever recall hearing or having any awareness of a 3,000 to 4,000 MTU rate being a preferable throughput -- the preferable throughput rate for the system?

A. I recall a study where it looked at 3,000 and 4,000 along with other rates I believe. And the analysis indicated that 3,000 was the rate that was

suggested to be used.

Q. And what do you recall why that was suggested as a rate to be used, was that because it was an optimal rate or effective rate, what do you recall about that?

MR. CRAWFORD: Objection, vague.

THE WITNESS: I recall the 3,000 was the rate recommended. Again the reasons I believe had to do with more cask utilization than anything else.

And it may have been the preferred, it may have been the optimal.

But I just don't recall specifically, you know -- all I remember is a recommended rate, I believe it was 3,000, and it had its reasons and they were basically transportation related and cask utilization related. So it was a recommended rate.

Whether it was optimal or preferred I don't recall.

Possibly, but I'm not sure.

00668

MR. CRAWFORD: Objection, best evidence.

BY MR. SKALABAN:

Q. And is it a widely held view within DOE that a 3,000 MTU is the preferred rate for the system?

MR. CRAWFORD: Objection, vague.

THE WITNESS: I would say that 3,000 MTU was widely viewed as the steady state rate we hoped to achieve. Again preferred is -- I'm not sure is the right word.

For whatever reason I think most people assumed 3,000 is a steady state rate based upon work that has been done in the past to indicate that this was probably most suitable for us concerning whatever reason, different people will have different reasons.

And I gave you some, and that's from what I remember mostly related to transportation operations and cask utilization.

BY MR. SKALABAN:

Q. Do you know, is there any camp within DOE that disagrees with the 3,000 MTU rate as a rate to be used as the steady state throughput rate?

MR. CRAWFORD: Objection, vague.

THE WITNESS: Not to my knowledge.

**Pollog, Thomas Deposition Testimony dated 10/12/06**

00001
UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
SYSTEM FUELS, INC., on its own )
behalf and as agent for SYSTEM )
ENERGY RESOURCES, INC. and SOUTH )
MISSISSIPPI ELECTRIC POWER ASSO., ) No. 03-2624C
Plaintiff, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - x
Washington, D.C.
Thursday, October 12, 2006

Deposition of THOMAS E. POLLOG, called for examination by counsel for Plaintiff in the above-entitled matter, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of PILLSBURY WINTHROP SHAW PITTMAN LLP, 2300 N Street, N.W., Washington, D.C., at 9:33 a.m., and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR.

00002
APPEARANCES:

On behalf of Plaintiff:
DANIEL S. HERZFELD, ESQ.
PILLSBURY WINTHROP SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7900

On behalf of Defendant:
MARIAN E. SULLIVAN, ESQ.
LISA DONAHUE, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
National Courts Section
1100 L Street, N.W., Room 10150
Washington, D.C. 20005
(202) 307-6288

ALSO PRESENT:

Eileen Supko and Kurt Espiritu

00003

C O N T E N T S

WITNESS EXAMINATION
PAGE NO.

THOMAS E. POLLOG
By Mr. Herzfeld 4
By Ms. Sullivan 79

E X H I B I T S

(Exhibits attached.)

POLLOG EXHIBIT NO. PAGE NO.
No. 1 Draft Report, Plaintiff's
Exhibit 1021 6
No. 2 Letter, 1-19-01, and attachments,
Nos. NSP-0001824-34 12
No. 3 Letter, 8-19-04, and attachments 46
No. 4 Acceptance Priority Ranking &
Annual Capacity Report, July 2004 53
No. 5 Letter, 5-29-92, Nos.
NSP-0100674-77 61
No. 6 Letter, 1-21-04 62

---

## 11:22 - 13:18

00011

MR. HERZFELD: Exhibit --

00012

(Pollog Exhibit No. 2 was marked for identification.)

BY MR. HERZFELD:

Q. The first question to you is: Do you recognize this document?

A. Yes.

Q. What is it?

A. It is the report to the committees on appropriations of the spent fuel management alternatives available to Northern States Power Company and the federal government Prairie Island nuclear plant units 1 and 2.

Q. And did this respond -- strike that.

Is this the final version of the draft

report we were just talking about?
A. Yes.
Q. You had mentioned earlier that you had worked with Bob Burgoyne in preparing the report; is that correct?
A. Yes.
Q. Was there anybody else that you worked
00013
with in preparing the report?
A. Yes.
Q. Who else?
A. There have been several people on a concurrence chain who would have an opportunity to add input to it before it was finalized: I believe probably Mr. Zabransky. I believe Mr. Jeffrey Williams. Probably would have been reviewed by our front office. I don't know who it was at that time. Our office of congressional affairs. The gentleman we worked with at that point in time was Nick Chumbris, C-H-U-M-B-R-I-S. Nick would have a chance to review it. Fairly certain Susan Klein, who was in our director's office at that time, had a chance to review it. I believe I remember discussing this with her. She would have been probably the most important person in the front office to review it -- or had the most comments, I should say.

---

## 22:2 - 22:7

00022
Q. Turning to page 7, the final report also indicates that Private Fuel Storage is an option too. Correct?
MS. SULLIVAN: Objection. The document speaks for itself.
A. Yes.

---

**Pollog, Thomas Deposition Testimony dated 5/4/07**

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------ X

DAIRYLAND POWER COOPERATIVE, )

Plaintiff, )

vs. ) No.

UNITED STATES OF AMERICA, ) 04-106C

Defendant. )

------------------------------ X

Washington, D.C.

Friday, May 4, 2007

Deposition of:

THOMAS POLLOG,

called for oral examination by counsel for Plaintiff, pursuant to notice, at the Law Offices of Greenberg Traurig, LLP, 800 Connecticut Avenue, Suite 500, Washington, D.C., before Kathy Savich, Registered Professional Reporter, of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:24 a.m., when were present on behalf of the respective parties:

00002

A P P E A R A N C E S

On Behalf of the Plaintiff DAIRYLAND POWER COOPERATIVE

Greenberg Traurig, LLP

800 Connecticut Avenue

Suite 500

Washington, D.C. 20006

(202) 452-4878

sternk@gtlaw.com

caplenr@gtlaw.com

stouckj@gtlaw.com

BY: KEVIN E. STERN, ESQUIRE

ROBERT A. CAPLEN, ESQUIRE

JERRY STOUCK, ESQUIRE

On Behalf of Defendant UNITED STATES OF AMERICA

U.S. Department of Justice - Civil Division

1100 L Street, N.W.

Room 10150

Washington, D.C. 20005

(202) 307-6288

marian.sullivan@usdoj.gov
patrick.bryan@usdoj.gov
BY: MARIAN E. SULLIVAN, ESQUIRE
PATRICK B. BRYAN, ESQUIRE

00003

C O N T E N T S

EXAMINATION BY: PAGE
Mr. Stern 5
Ms. Sullivan 212
Mr. Stern 216

POLLOG DEPOSITION EXHIBITS: PAGE
1 Email string from 7/26/01 32
2 Email with attachment from Barton to Pollog and Zabransky dated 5/20/02 37
3 Notice of deposition 41
4 Annual capacity report dated 12/9151
5 GAO report titled, "Nuclear Waste: Operation of Monitored Retrievable Storage Facility is Unlikely by 1998" dated 9/91 59
6 Memo from Milner dated 12/20/91 81
7 Annual capacity report dated 6/88 86
8 Acceptance priority ranking and annual capacity report dated 3/95 97
(Exhibits continued on the next page.)

00004

POLLOG DEPOSITION EXHIBITS: PAGE
9 Acceptance priority ranking and annual capacity report dated 7-04 109
10 DOE instructions for completing Appendix C of the DCS 119
11 Letter with attachments from Strand to Berg dated 12/22/92 142
12 Letter with attachment from Zabransky to Berg dated 7/28/04 146
13 Memo from Chris to Margaret and Ted dated 11/15/04 157
14 Letter from Zabransky to Berg dated 12/1/04 160
15 Dairyland's standard contract 168
16 FICA project cask handling assessment for LACBWR dated 10/90 185
17 Spreadsheet Bates stamped CTR-013-2788 through 2793 202

## 13:6 - 14:18

00013

Q. Well, why don't you tell me your -- tell me your employment history with the Department of Energy.

A. I started in 1988, and I worked there until the beginning of '92. I took a three-year leave of absence in 1992, '3 and '4, and I returned in 1995, and I have been there since.

Q. And could you tell me what you did during the 1988 to 1992 time frame?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: I had various job responsibilities. When I first joined the Department, I worked in the systems development branch. We were tasked with developing various technologies to assist with central management at nuclear facilities.

00014

After that, I joined the systems integration branch, responsible for developing the technical baseline for our office, the office of civilian radioactive waste management.

And then I joined the utility interface and logistics branch, which I worked with -- essentially what I'm doing now, the terms and conditions of the standard contract.

And then I took my three-year leave of absence.

When I came back in 1995, I worked in the engineering division and was working primarily on storage and transportation technologies.

And then in 1996 I came back to the waste acceptance area, and I've been there

## 16:6 - 17:22

00016

What involvement, since you have

come back to work for DOE starting in 1995, have you had in the implementation and administration of the standard contracts?

MS. SULLIVAN: Objection. Vague and overbroad.

THE WITNESS: From the latter part of 1996 until present I've been in the waste acceptance group or team area assisting in implementing the terms and conditions of the standard contract.

Several years ago, probably three or four, I have been appointed on an unofficial basis as the contracting officer's technical representative on that contract.

BY MR. STERN:

Q. And as the contracting officer's

00017

technical representative, what services or support do you provide to the contracting officer?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: I provide technical expertise, technical advice to the contracting officer wherever he sees fit.

BY MR. STERN:

Q. Can you give me some examples of what you mean by "technical advice."

A. How to implement the contract.

Q. Implement in terms of what?

A. Developing annual capacity reports, acceptance priority rankings, responding to questions from -- developing delivery commitment schedule instructions, responding to utility requests for guidance regarding the contract, implementing the fee provisions of the contract, collecting RW-859 data. In general, just responding to any requests that the contracting officer has for any guidance or advice.

---

## 22:1 - 22:12

00022

Is it fair to say that you do not have responsibility for issuing or making any

determination about what the provisions of the standard contract mean?
MS. SULLIVAN: Objection. Legal conclusion. Vague. Foundation.
THE WITNESS: Yes.
BY MR. STERN:
Q. That would be -- Mr. Zabransky would have that responsibility?
MS. SULLIVAN: Same objections.
THE WITNESS: Yes.

---

## 22:20 - 26:21

00022
Q. Do you have any knowledge about the categories of damages that Dairyland is claiming in this case?
00023
MS. SULLIVAN: Objection. Vague.
THE WITNESS: No.
BY MR. STERN:
Q. And just for the record, I'm going to -- I'm going to break it up into more specifics. Do you have any knowledge about the SAFSTOR costs that Dairyland is claiming in this case?
MS. SULLIVAN: Objection. Vague. Foundation. Asked and answered.
THE WITNESS: No.
BY MR. STERN:
Q. Do you have any knowledge of the costs that Dairyland is claiming in this case relating to the private fuel storage initiative?
MS. SULLIVAN: Objection. Vague. Foundation. Asked and answered. Assumes facts not in evidence.
THE WITNESS: No.
BY MR. STERN:
Q. And do you have any knowledge about
00024
the costs that Dairyland is claiming in this case relating to the removal of its reactor pressure vessels?
MS. SULLIVAN: Objection. Vague.

Foundation. Asked and answered. Assumes facts not in evidence.
THE WITNESS: No.
BY MR. STERN:
Q. And I take it from your answers that you have no position one way or the other on the reasonableness of any of the costs that Dairyland is claiming in this case?
MS. SULLIVAN: Objection. Vague. Legal conclusion. Foundation.
THE WITNESS: No.
BY MR. STERN:
Q. Are you aware that Dairyland has failed fuel?
MS. SULLIVAN: Objection. Vague. Foundation.
THE WITNESS: I am aware Dairyland indicated on an 859 report that they have
00025
failed fuel.
BY MR. STERN:
Q. And do you -- sitting here today, do you have --
A. Also, I need to add, I also saw that in one of the, I believe, FICA reports.
Q. And do you know how much -- sitting here today, how much failed fuel Dairyland has?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: I think the FICA report said they had 49 failed assemblies, and I think the last RW-859 said they had 48. That's what I'm aware of.
BY MR. STERN:
Q. Are you aware of any Dairyland failed fuel that would be technically infeasible for DOE to handle and dispose of?
MS. SULLIVAN: Objection. Legal conclusion. Vague. Foundation.
THE WITNESS: I don't know any of the specifics of Dairyland's failed fuel. I
00026
don't have an answer to that because I just don't know if it's technically feasible or not.
BY MR. STERN:

Q. So I take it from your answer you haven't done any analysis of Dairyland's failed fuel to determine whether it would be technically infeasible for DOE to handle and dispose of it?
MS. SULLIVAN: Same objections.
THE WITNESS: I have not done any analysis regarding that area.
BY MR. STERN:
Q. To your knowledge, has anyone else at DOE ever done any analysis of whether it would be technically feasible for DOE to handle and dispose of Dairyland's failed fuel?
MS. SULLIVAN: Objection. Foundation. Vague. Overbroad.
THE WITNESS: I am not aware of any such analysis.

---

## 45:1 - 45:15

00045
Q. Well, you would agree that ACRs -- the government has consistently stated that ACRs are issued for planning purposes?
MS. SULLIVAN: Objection. Best evidence. Legal conclusion. Vague.
THE WITNESS: Yes.
BY MR. STERN:
Q. And, in fact, the standard contract itself -- excuse me -- the standard contract, all the standard contracts state that ACRs are issued for planning purposes; is that right?
MS. SULLIVAN: Objection. Legal conclusion. Best evidence.
THE WITNESS: I believe that's correct.

---

## 49:3 - 49:21

00049
Q. Mr. Pollog, you've been handed what has been marked Exhibit 4 to your deposition. Let me direct your attention to paragraph 1.1 entitled, "Purpose of the Annual Capacity

Report."
Do you see that?
A. Yes.
Q. And if I could direct your
attention to the last sentence in that
paragraph on that page. It states, "As
specified in the standard contract, the ACR is
for planning purposes only and thus is not
contractually binding on either DOE or
purchasers."
Do you have any basis to disagree
with that statement?
MS. SULLIVAN: Objection. Best
evidence. Legal conclusion.
THE WITNESS: No.

---

### 52:9 - 52:14

00052
Q. And would you agree that one of the
purposes of the ACR is to allow utilities to
do long-term planning that delivery of spent
fuel requires for disposal purposes?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Yes.

---

### 56:14 - 59:9

00056
Q. Now, the 900 MTU acceptance rate --
projected waste acceptance rate in the 1991
ACR was consistent with the 10,000 MTU
limitation based upon an MRS in the 1987
Nuclear Waste Policy Act amendments?
(Discussion off the record.)
BY MR. STERN:
Q. The 900 MTU annual acceptance rate
in the 1991 ACR was consistent with the 10,000
00057
MTU limitation based upon an MRS in the 1987
Nuclear Waste Policy Act amendments?
MS. SULLIVAN: Objection. Legal
conclusion.
THE WITNESS: Yes, it is consistent

with that.
BY MR. STERN:
Q. But you would agree that the 1991 ACR rates -- projected waste acceptance rates were not consistent with the scheduled linkages that Congress placed in the 1987 NWPA amendments?
MS. SULLIVAN: Objection. Legal conclusion. And beyond the scope.
THE WITNESS: Yes.
BY MR. STERN:
Q. The 1987 NWPA amendments act required construction authorization for a permanent repository before an MRS could be opened, correct?
MS. SULLIVAN: Objection. Legal conclusion. Beyond the scope.
00058
THE WITNESS: Yes.
BY MR. STERN:
Q. And as this document, the 1991 ACR, itself admitted, if that linkage was not removed, initial acceptance of the spent fuel by DOE could not start until at least 2007, correct?
MS. SULLIVAN: Objection. The document is the best evidence of its content. Objection. Mischaracterizes the document. Legal conclusion.
THE WITNESS: Yes.
BY MR. STERN:
Q. So the rate that was set out in this -- in the '91 ACR, the one we've been discussing, that could not be accomplished by the DOE without a change in the law by Congress, right?
MS. SULLIVAN: Objection. Legal conclusion. Beyond the scope. And best evidence. And vague.
THE WITNESS: Yes.
00059
BY MR. STERN:
Q. And if the 1991 ACR had set forth a schedule that was fully consistent with the '87 NWPA amendments act, it would have shown zero acceptance, waste acceptance, until 2007,

right?
MS. SULLIVAN: Objection. Legal
conclusion. Beyond the scope. Vague.
THE WITNESS: Yes.

---

## 66:13 - 66:17

00066
MR. STERN: Let me state right now
on the record, then, that Exhibit 5 is a GAO
report dated September 1991 entitled, Nuclear
Waste: Operation of Monitored Retrievable
Storage Facilities Is Unlikely by 1998."

---

## 69:16 - 71:3

00069
Q. And just to sum up here, you don't
have an opinion -- or you don't have any basis
to agree or disagree with the conclusion of
this report that the operation of a monitored
retrieval storage facility was unlikely by
1998?
MS. SULLIVAN: Objection.
00070
Mischaracterizes the document. The document
is the best evidence of its content.
Foundation. Beyond the scope. Vague.
THE WITNESS: Correct.
BY MR. STERN:
Q. Now, I believe you had previously
testified that one of the primary objectives
of the spent fuel and waste acceptance program
was to develop a system where the spent fuel
acceptance rates would alleviate a purchaser's
need for at-reactor storage starting in 1998.
MS. SULLIVAN: Objection. Vague.
Prior testimony is the best evidence of its
content.
THE WITNESS: I believe I testified
that that was the program's goal at certain
points in time in the history of the program.
BY MR. STERN:
Q. At what point in time was that one

of the program's goals?
MS. SULLIVAN: Objection. Foundation. Beyond the scope. Vague.
00071
Relevance.
THE WITNESS: I believe that was in the mid-1980s.

---

### 93:18 - 94:5

00093
Q. In the '91 ACR, the acceptance rate assumed that that linkage would be -- that the law would be amended so that linkage would be severed in terms of the opening of the MRS and the construction authorization for a
00094
repository, right?
MS. SULLIVAN: Objection. Legal conclusion. And the document speaks for itself.
THE WITNESS: Yes.

---

### 119:5 - 126:16

00119
Q. Mr. Pollog, you have been handed what's been marked as Exhibit 10 to your deposition. Does Exhibit 10 appear to be the 1991 DCS instructions issued by DOE?
A. Is that a question?
Q. Yes. Does it appear to be the 1991 DCS instructions?
A. Yes.
Q. Did you have any involvement in the preparation of these instructions?
A. Yes.
Q. What was your involvement?
A. We would have gotten a draft set of instructions from one of our contractors. We would have reviewed them, given our comments, had our comments resolved, and after the waste acceptance group was satisfied with them, we would have had them sent around for

00120
concurrence, seeking approval from the appropriate parts of the organization, gotten comments from them, gotten those comments resolved, and then gotten these published or sent out under the contracting officer's signature.
They were never published in an actual DOE document, but they were provided to contract holders via the contracting officer's transmittal.
Q. And these instructions, the '91 DCS instructions, were tied to the allocations that had been set forth in the 1991 ACR; is that right?
MS. SULLIVAN: Objection. Best evidence. Vague.
THE WITNESS: Yes.
BY MR. STERN:
Q. And, therefore, the DCSs that the purchasers were being instructed to submit would only cover the first ten years of the waste acceptance program?
00121
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Can you repeat that, please?
(The reporter read back the record as requested.)
THE WITNESS: The DCSs used in the 1991 ACR, that would be correct.
BY MR. STERN:
Q. We talked about this a little bit already, but in the 1991 ACR, the assumption was that the repository was not going to open until 2010 at the earliest, right?
MS. SULLIVAN: Objection. Vague. Best evidence.
THE WITNESS: Yes.
BY MR. STERN:
Q. And, therefore, the first ten years of the -- the first ten years of the program, 1998 to 2007, it was assumed that that would be just an MRS facility that would be accepting waste?
MS. SULLIVAN: Objection. Vague.

00122
THE WITNESS: Well, the first ten years and also -- plus the 2008 and 2009.
BY MR. STERN:
Q. Yes, but the '91 ACR had only covered the first ten years, '98 to 2007, right?
MS. SULLIVAN: Objection. Best evidence.
THE WITNESS: Yes.
BY MR. STERN:
Q. And DOE also knew when it issued these instructions, Exhibit 10, that the 1987 NWPA amendments act imposed linkage prohibiting construction of an MRS until there had been a construction authorization for a permanent repository, correct?
MS. SULLIVAN: Objection. Legal conclusion. Foundation. Beyond the scope. Vague.
THE WITNESS: Yes.
BY MR. STERN:
Q. Now, these instructions, they also
00123
mandated that the facilities use the precise yearly allocations that were set forth in the '91 ACR?
MS. SULLIVAN: Objection to the extent that it mischaracterizes the document. Vague.
THE WITNESS: Yes.
BY MR. STERN:
Q. And the utility filling out the DCS, they had no discretion to request that additional spent nuclear fuel with respect to any given year; is that right?
MS. SULLIVAN: Objection. Mischaracterizes the document.
(Discussion held off the record.)
BY MR. STERN:
Q. The utilities, following these instructions, had no discretion to request that additional spent nuclear fuel beyond what had been allocated in the 1991 ACR be accepted by DOE in any given year?
MS. SULLIVAN: Objection. Beyond

00124

the scope of the 30(b)(6) notice. Foundation. Vague. And to the extent it calls for a legal conclusion.

THE WITNESS: No.

BY MR. STERN:

Q. They had no discretion?

A. They did have some discretion.

Q. They had discretion to ask for more -- that for any year set forth in the 1991 ACR where they had an allocation, they could put in the DCS form an additional amount beyond what had been allocated in the DCS?

MS. SULLIVAN: Objection. Beyond the scope of the rule 30(b)(6) notice. Foundation. To the extent it calls for legal conclusion. And vague.

THE WITNESS: They had no discretion to include more in the DCS form than was included -- that was allowed under the allocation given in the ACR.

BY MR. STERN:

Q. And if a utility did do, then -- if

00125

they did put more in than what had been allocated to them in any year under the ACR, the DCS would be disapproved by DOE; is that right?

MS. SULLIVAN: Objection. Beyond the scope of the 30(b)(6) notice. Foundation. Legal conclusion. And compound.

THE WITNESS: Yes.

BY MR. STERN:

Q. And that's -- if you look at the instructions in paragraph 7(a) -- it's on page 2 -- the last sentence there says, "Due to the limited annual acceptance capacity of the FWMS, only DCSs submitted by purchasers with an allocation in the delivery year will be considered for approval." Strike that.

So here it's telling a purchaser that if they submit a DCS in which they don't have an allocation set forth in the '91 ACR, if they submit a DCS for that year, it will not be approved; is that right?

MS. SULLIVAN: Objection to the

00126
extent it mischaracterizes the document. Best evidence.
You can answer.
THE WITNESS: Yes.
BY MR. STERN:
Q. Did these instructions provide any mechanism for a party to protest -- or a purchaser to protest or challenge the acceptance rates for allocations that are set forth in the '91 ACR?
MS. SULLIVAN: Objection. Best evidence.
THE WITNESS: No.
MS. SULLIVAN: And to the extent it calls for a legal conclusion.
THE WITNESS: No.

---

**131:9 - 132:6**

00131
Q. If a utility does not have an approved DCS, or any approved DCSs, does that mean that it is DOE's position that DOE has no obligation to pick up any of its spent fuel?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Beyond the scope of Mr. Pollog's 30(b)(6) notice. Foundation. Vague.
THE WITNESS: No.
BY MR. STERN:
Q. So DOE still has -- believes that even though a utility doesn't have any signed DCSs or approved DCSs, that it still has a legal obligation to pick up a utility's spent
00132
fuel; is that right?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Beyond the scope of Mr. Pollog's 30(b)(6) notice. Foundation.
THE WITNESS: Yes.

---

**132:21 - 135:20**

00132
Q. Didn't DOE at one point have a position that DCSs were not legally binding
00133
unless there was an operating waste acceptance facility?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Beyond the scope of Mr. Pollog's 30(b)(6) deposition notice. Foundation.
THE WITNESS: I believe so.
BY MR. STERN:
Q. So at one point DOE didn't -- at one point there were approved DCSs back in '91 -- or pursuant to the 1991 DCS instruction, DOE approved DCSs submitted by utilities, right?
MS. SULLIVAN: Objection. Beyond the scope of Mr. Pollog's 30(b)(6) notice. Foundation.
THE WITNESS: Yes.
BY MR. STERN:
Q. And at this time those DCSs were approved, there was no operating waste acceptance facility, correct?
MS. SULLIVAN: Objection. Beyond
00134
the scope of Mr. Pollog's 30(b)(6) notice. Foundation. Relevance.
THE WITNESS: Yes.
BY MR. STERN:
Q. So under DOE's previous position, since there was no operating waste acceptance facility, those DCSs were not legally binding upon the parties; isn't that right?
MS. SULLIVAN: Objection. Beyond the scope of Mr. Pollog's 30(b)(6) notice. Mr. Zabransky issued the DCSs and approval of those. Foundation. Legal conclusion. Assumes facts not in evidence.
THE WITNESS: I don't know what DOE's legal position was at that point in time. All I know is when I was working on this issue in the waste acceptance group, I believed that once we signed off on those

DCSs, that we were committing the government. That was my belief as somebody working on this case.
It may not be unanimous with
00135
everybody in the department. I don't know what everybody in the department believed.
BY MR. STERN:
Q. Mr. Brownstein, Alan Brownstein, that wasn't his belief, right?
MS. SULLIVAN: Objection. Foundation. Beyond the scope of Mr. Pollog's 30(b)(6) deposition notice. Hearsay. Speculation.
THE WITNESS: I believe that's correct.
BY MR. STERN:
Q. Mr. Brownstein had a position that unless there was an operating waste acceptance facility, that the approved DCSs did not legally bind either of the parties, right?
MS. SULLIVAN: Objection. Foundation. Beyond the scope. Objection to the extent he's testifying as to hearsay.
THE WITNESS: Yes.

---

## 174:15 - 175:17

00174
Q. So based upon the circumstances that existed at the time, you believe that DOE would have been performing its obligations if it had a 900 MTU acceptance rate?
MS. SULLIVAN: Objection. Mischaracterizes the witness' prior testimony. Calls for a legal conclusion. Beyond the scope of the 30(b)(6) deposition notice.
00175
Foundation.
THE WITNESS: Based upon the situation in 1991 when we published the ACR, considering the legal limitations on the program placed on us by the Nuclear Waste Policy Amendments Act of '87, yes, I thought that would have fulfilled our obligations.

BY MR. STERN:
Q. And those limitations did not exist at the time the parties entered into the standard contract, right?
MS. SULLIVAN: Objection. Calls for a legal conclusion. Beyond the scope of the 30(b)(6) deposition notice. Foundation.
THE WITNESS: Since the amendments act was enacted in 1987, it wasn't in place in '83 or '84.

---

## 186:2 - 187:8

00186
Q. Mr. Pollog, you've been handed what's been marked as Exhibit 16 to your deposition. Does Exhibit 16 appear to be the FICA report for LACBWR?
MS. SULLIVAN: If we could give Mr. Pollog a moment to look through it.
MR. STERN: Sure. Feel free.
THE WITNESS: This is a subset of the full report. This is not the full report.
BY MR. STERN:
Q. Well, on the first -- if I look at the table of contents here, it appears to go to page 13. Does this appear to be the text portion of the report? Is that --
MS. SULLIVAN: Objection mischaracterizes the witness' testimony.
THE WITNESS: Yes.
BY MR. STERN:
Q. And there were appendices or exhibits to the report that are not included here?
00187
A. Yes.
MS. SULLIVAN: Objection. Best evidence.
BY MR. STERN:
Q. And I believe you said you reviewed this report in preparation for your deposition, is that right?
A. Yes.

**188:6 - 192:14**

00188

Q. Now, turning to the first page of the report entitled, "Summary," do you see in the first paragraph there, it says -- the last sentence, it says, "LACBWR fuel is nonstandard, measuring approximately 8.5 feet long and 5.6 inches square in the cross-section."

Do you see that? Do you see that in the report?

A. Yes, I do.

Q. Do you have any basis to agree or disagree with that statement that LACBWR fuel is nonstandard?

MS. SULLIVAN: Objection. Beyond the scope of the rule 30(b)(6) deposition. Foundation.

THE WITNESS: I don't know the

00189

specifics of the fuel at LACBWR. Without knowing the specifics, I couldn't make such a characterization.

BY MR. STERN:

Q. Well, do you understand that there's a definition of nonstandard fuel in the standard contract?

MS. SULLIVAN: Objection. Legal conclusion. Beyond the scope of 30(b)(6) deposition. Foundation.

THE WITNESS: Yes, I do.

BY MR. STERN:

Q. Let's go back to Pollog 15. And it's page 23125, Appendix E of the standard contract. Do you see that?

A. Yes.

Q. And in Appendix E there's a definition for nonstandard fuel, correct?

MS. SULLIVAN: Objection -- are you finished? Objection. Legal conclusion. Best evidence.

THE WITNESS: Yes, I see a

00190

definition of "nonstandard."

BY MR. STERN:

Q. And it states here that, "Nonstandard fuel means SNF that does not meet one or more of the general specifications set forth in subparagraphs 1 through 5 of paragraph B below, and which is classified as nonstandard fuel classes NS-1 through NS-5, pursuant to paragraph B below." Did I read that correctly?

MS. SULLIVAN: Objection. Best evidence.

THE WITNESS: I believe so.

BY MR. STERN:

Q. If you look at paragraph B(1) of Appendix E, it says that standard fuel must meet maximum nominal physical dimensions -- or cannot exceed maximum nominal physical dimensions. Do you see that there?

MS. SULLIVAN: Objection. Beyond the scope of the 30(b)(6) deposition. Calls for legal conclusion.

00191

THE WITNESS: Yes, I do.

BY MR. STERN:

Q. And here in paragraph B(1) it sets forth what's the maximum length any fuel can be in order to be considered standard fuel, right, under the contract?

MS. SULLIVAN: Objection. Legal conclusion. Beyond the scope of the 30(b)(6) deposition. Foundation.

THE WITNESS: Yes.

BY MR. STERN:

Q. So if you go back to the FICA report, Exhibit 16, where NAC wrote, "LACBWR fuel is nonstandard, measuring approximately 8.5 feet long and 5.6 inches square in cross-section," you would agree that that is less than the amount of maximum length in cross-section that is allowed for standard fuel under the standard contract?

MS. SULLIVAN: Objection. Legal conclusion. Best evidence. Foundation.

THE WITNESS: Yes, that's right.

00192

BY MR. STERN:
Q. So based upon what you've seen here and nothing else, you don't have any basis to believe that LACBWR's fuel is nonstandard under the standard contract.
MS. SULLIVAN: Objection. Calls for a legal conclusion. Beyond the scope. Foundation. And speculation.
THE WITNESS: Based upon NAC's representation of the dimensions of the LACBWR fuel and reviewing Appendix E of the standard contract, I have no basis to say it's nonstandard. And this is not information that I know.

---

**211:3 - 212:5**

00211
Q. Sitting here today, do you have -- does DOE have any basis to believe that it would be impossible to remove the spent fuel from the LACBWR facility?
MS. SULLIVAN: Objection. Vague. Beyond the scope of the 30(b)(6) deposition notice. Foundation. And speculation.
THE WITNESS: I don't really have an opinion one way or another if it is impossible or possible. It depends upon what the circumstances are when we come to accept and transport spent fuel.
BY MR. STERN:
Q. And right now the DOE does not know what modifications, if any, would need to be made to the LACBWR facility to remove the spent fuel from the Dairyland pool; is that right?
MS. SULLIVAN: Same objections.
THE WITNESS: Well, since I don't
00212
know what casks -- or DOE probably doesn't know what casks it would use, it would be difficult, if not impossible, to tell what modifications would have to be made to that facility in order to service it.

---

**Rosselli, Robert Deposition Testimony dated 4/15/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANYCONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANYFLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANYDUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANYSACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANYGPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANYPOWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICTNEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,
Plaintiffs,vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C 98-486C, 98-488C, 98-614C
98-621C, 99-447C, 00-440CUNITED STATES, 00-697C, 00-703C, 01-115C
01-116C, 01-249C DEFENDANT.
_________________________
VOLUME I DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District April 15, 2002
- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

00002
APPEARANCES
ARNOLD & PORTER
BY: DAVID S. NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail: David_Neslin@aporter.com
Appearing on behalf of Sacramento Municipal

Utility

SHAW PITTMAN
BY: DANIEL S. HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail: daniel.herzfeld@shawpittman.com
Appearing on behalf of Florida Power & Light
Company, Northern States Power Company, Duke
Power, Indiana Michigan Power Company, Boston
Edison Company, GPU Nuclear Inc., Power
Authority of the state of New York, Omaha
Public Power District, and Nebraska Public
Power District

BALCH & BINGHAM

00003

BY: K. C. HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail: kchairston@balch.com
Appearing on behalf of Alabama Power, Georgia
Power, and Southern Nuclear

JENNER & BLOCK
BY: DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail: dcassling@jenner.com
Appearing on behalf of Commonwealth Edison
Company

U.S. Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and ALAN MILLER
1100 L. Street, N.W.
Washington, D.C. 20530
202-307-6288
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov

**11:1 - 25:24**

00011

Q. Could you briefly describe for me your education at the college and graduate levels, if any?

A. I have a bachelor of administration with a major in business from Baltimoreles College (Phonetic) in Brie, Ohio. And I have an MBA in management from Michigan State University.

Q. And what were the years that you graduated? That you received your degrees?

A. I got my BA in 1966, June '66, and my MBA on 12-67.

Q. Would you briefly describe your employment history following your education?

A. Basically, I have 36, 37 years with working for the United States Government, except for three years when I was in the military from '68 to '71. It's been spent with the Department of Energy or its predecessor organizations.

Q. Which branch of the military were you in?

A. I was in the United States Army in the edgemond general corps.

Q. When you left the army, you went to work for a predecessor at the Department of

00012

Energy?

A. Really, I went to work with a predecessor of the Department of Energy before I went into the army. But then I spent eight months, was drafted, spent three years basically in the army, then had re-employment rights back to a predecessor of the Department of Energy.

Q. What was your first position at the Department of Energy, before you went into the service?

A. I was a management intern working with the space nuclear propulsion office in Cleveland, Ohio. Basically, it was a job that I was learning the administrative aspects of federal government and those particular programs -- contracts, personnel, budget, finance.

Q. And when you returned from the army, did

you go back to the same position?
A. No.
Q. What position did you go to work at?
A. When I came back, I was re-employed at a predecessor of the Department of Energy in Washington, D.C. in their Germantown office.
Q. And what was your position?
A. I was a personnel specialist, I believe,
00013
and I worked basically in three areas. I did personnel policy work. I did personnel operations work. And I did -- I guess it was personnel training and development work.
Q. And what title did you have at that point?
A. I believe it was personnel specialist.
Q. And do you recall the name of the agency that you were working for at that point?
A. It was the Atomic Energy Commission at that point.
Q. And was there a particular office or branch that you were working in?
A. It was the division of personnel.
Q. How long did you work there?
A. In that organization?
Q. Yes, sir. In the division of personnel at the Atomic Energy Commission?
A. I came back in 1971. To the best of my recollection, I left there in 1974.
Q. Where did you go then?
A. I went to the office of Magnetic Fusion Energy.
Q. And was that still within the Atomic Energy Commission?
00014
A. Yes, it was.
Q. And what was your position at the office of Magnetic Fusion Energy?
A. I was a management specialist, and my responsibilities there included budget formulation and execution, accounting control, contract administration, organizational development and human resources management, information resource management.
Q. And how long did you work at the office of Magnetic Fusion Energy?

A. To the best of my knowledge, it was 1979.
Q. And why did you leave that position?
A. If I remember correctly, I was downgraded from a 15 to a 14, and I wanted to get my 15 back, so I moved to a higher level.
Q. Why had you been downgraded?
A. They just felt that the job wasn't supportive of the grade.
Q. So what was your next position?
A. To the best of my knowledge, my next position was a management analyst in the -- and I don't remember what exactly it was called. But it was the defense programs area. And I had
00015
similar responsibilities as I had in magnetic fusion where I was working in the administrative side in human resources, contracts, budget, finance.
Q. And how long did you work in that position?
A. I vaguely remember maybe six months or so. And within the -- under the same general, you know, leadership, I was transferred to the nuclear reactors division, and I did the same thing in support of nuclear reactors.
Q. You did administrative work?
A. Yes.
Q. Working on --
A. Budgets --
Q. -- budgets?
A. -- finance, contracts, human resources organization development.
Q. Why were you transferred to the nuclear reactors division? Do you know?
A. Just they had an opening, and they reassigned me there, because may skills matched what they needed.
Q. And was all of this work to this point in Washington, D.C.?
00016
A. Yes, it was. Germantown, Maryland to be specific.
Q. How long were you at the nuclear reactors division in that position?
A. I'm only going to guess. To the best

of my knowledge, it was probably maybe around a year. And then I transferred, still within that same organizational component, broad organizational component, to the -- I think it was the office of civilian waste. And they did both -- at that time they did civilian waste and defense waste. And I think my title was something like executive assistant or something like that. But I did the same type of work as I previously had been doing. Just it was oriented not toward reactors. It was oriented toward waste management.
Q. Now, is this the first point at which you began working on waste management issues for the Government, or had you had certain responsibilities in that area prior to that point?
A. I think it's fair to say that this was the first time that I got substantively involved on waste management sites.
00017
Q. And this would be sometime around 1980, 1981?
A. Yes, it was around that time. I think it was a couple of years doing that before, roughly a couple of years before the Nuclear Waste Policy Act passed.
Q. And how long were you in that position?
A. I'm going, to the best of my knowledge, say it was about a couple of years, year-and-a-half to two years.
Q. And what was your next position?
A. Director, I believe it was called the resource management division in the office of Civilian Radioactive Waste Management.
Q. And what were your responsibilities as director of that division?
A. There were organizational development, human resources management, contract administration, information resources, budget and finance.
Q. And did you have people working for you in that position?
A. Yes, I did.
Q. Approximately how many? Do you recall?
A. No, I don't.

00018
Q. More than 10?
A. Yes.
Q. More than 20?
A. I really don't remember.
Q. How long did you hold that position?
A. Until 1984.
Q. Let me back up a step. You'd been an executive assistant in the office of civilian waste. Then, you became director of resource management division at the office of Civilian Radioactive Waste Management. Why did you take that position? What led to that change of position?
A. To the best of my recollection, sometime in the span of the -- while I was working in the waste program, initially, they had both defense and commercial waste in that same organization. Then they split out. At some point in there, they split out the defense waste, and essentially what we were working on was the civilian side. And so when the Waste Policy Act passed, they just grabbed that entity that was commercial and gave us a new name.
Q. You were doing the same work?
A. Essentially, it was the same work, yes,
00019
it was.
Q. And you said you held that position until 1984?
A. That's right. May of '84.
Q. And what happened then?
A. I transferred to the Richland operations office here in Richland, Washington.
Q. Now, when you were working as director of the resource management division, was that in Germantown or in the Washington, D.C. area as well?
A. It was a split operation. We had some folks in both locations. I was located in Washington, D.C. in the Forrestal Building.
Q. And in May 1984, you transferred to Richland?
A. Yes.
Q. And what position did you transfer to?
A. Assistant manager for administration.

Q. Administration of what?
A. Administrative services. So I had responsibility for human resources, contract infrastructure, and information resources, budget and finance.
Q. And why did you transfer?
00020
A. Opportunity. It was a promotion.
Q. Now, were you still at that point working in the office of Civilian Radioactive Waste Management, or was this a separate --
A. No, I transferred. I cut my ties with the Civilian Radioactive Waste Management and transferred here. Reassignment I think they called it in the personnel action.
Q. That was May of 1984?
A. Yes.
Q. And how long did you hold your position as assistant manager for administrative services in Richland?
A. Until May of 1994.
Q. And what happened then?
A. I was reassigned here locally to be assistant manager for science and technology.
Q. Is that also at the Richland facility?
A. Yes.
Q. What were your responsibilities as assistant manager of science and technology?
A. I was responsible for the contract management of the Battelle Pacific Northwest National Lab contract.
Q. And what was the reason for that change
00021
in 1994?
A. Career broadening.
Q. And how long did you hold that position?
A. I held that position for five years until 1999. Around May 1999 roughly.
Q. And what happened then?
A. I was asked by the current manager to help him, who was a new manager, with his reorganization. And I spent about three months on that and became -- I was reassigned to be deputy manager for business services at that point, sometime in the September, October time frame.

Q. And what were your responsibilities as deputy manager for business services?
A. I had all the administrative activities -- budget, finance, human resources, procurement. I had responsibility for the infrastructure. I had responsibility for the office of special concerns. I had responsibility for, what we called, the future outcome, it's economic development aspects and how we support community economics, the development. Initially, I had responsibility for the laboratory, Pacific Northwest National Laboratory.
00022
Q. How long were you in this position?
A. Until current.
Q. Is that your current position today?
A. Yes, it is.
Q. Mr. Rosselli, after the time that you left the office of Civilian Radioactive Waste Management, which you estimated was approximately May of 1984, in your other positions within the department, have you had any involvement in waste management issues?
A. Yes.
Q. Would you explain what that was?
A. Here at Hanford we have high-level waste, mixed waste, low-level waste that we receive, treat, and store, you know, on site. So it's part of our ongoing operation. And though I'm not, you know, directly involved, it's not within my responsibility to manage those particular activities. I, as far as my management responsibility from an administrative standpoint, support the activities that go on, whether it's giving them budget of finance support, contract support, bringing people to do the job, that kind of thing. So I provide administrative support to the waste management
00023
operations as they are occurring on site today.
Q. And I understand that with respect to the Hanford site. Have you had any involvement or participation in the Department's spent nuclear fuel program, as it applies to various utilities?
A. Could you repeat that again for me

please?
Q. Have you had any involvement or participation in the Department's spent nuclear fuel program, as it applies to the various utilities?
MR. LESTER: Objection, vague.
BY MR. NESLIN:
Q. Do you understand the question?
A. Yes.
Q. Can you answer the question?
MR. LESTER: Go ahead.
THE WITNESS: Yes. When I was assistant manager for science and technology, there was an individual on the staff that was managing some of the remaining aspects of support. We, here in the Richland office, were given to the OCRWM program. And I mean, he worked for me. The person worked for me.
00024
Q. What support was the Richland office providing for the OCRWM program? Do you recall?
A. To the best of my knowledge, the support -- well, let me back up, because at one point in time, the Richland office was a potential site for a repository in the basalt media. And about the time I was in the program, actively in the program, they had started an exploratory shaft here on site.
So it was at that point an integral part of the office's portfolio. In addition to that, the Pacific Northwest National Laboratory, they have a lot of expertise in nuclear matters having to do -- one area having to do with spent nuclear fuel. So they were providing -- the laboratory was providing to the Washington, D.C. office of Civilian Waste Management support, technical support, as it related to spent nuclear fuel.
Q. Are you referring to Battelle, Pacific Northwest Labs?
A. Yes. Battelle is the parent company.
Q. So Pacific Northwest Labs was doing contracting work for OCRWM?
A. Um-hmm.
00025
Q. Correct?

A. Yes. To the best of my knowledge, that is true.
Q. And that work was being supervised here in Richland?
A. I don't know. I don't know the answer to that one, and if I may explain why. Different programs do things differently in terms of management of the laboratory. Some of them, headquarters manages the investigator directly. In other cases, they'll delegate to the field office to do it. I can't honestly remember how the civilian -- you know, how it was being done and whether there was some support in Richland, or was it being done directly out of headquarters. I don't remember.
Q. Did you, yourself, have any responsibility for overseeing the work that PNL was doing here in connection with OCRWM and the OCRWM program?
A. Not directly, no.
Q. Were you familiar with it? Were you aware of it?
A. Yes, I was.

---

## 11:12 - 11:19

00011
Q. Would you briefly describe your employment history following your education?
A. Basically, I have 36, 37 years with working for the United States Government, except for three years when I was in the military from '68 to '71. It's been spent with the Department of Energy or its predecessor organizations.

---

## 17:11 - 17:20

00017
Q. And what was your next position?
A. Director, I believe it was called the resource management division in the office of Civilian Radioactive Waste Management.
Q. And what were your responsibilities as

director of that division?
A. There were organizational development,
human resources management, contract
administration, information resources, budget and
finance.

---

## 134:23 - 135:5

00134
Q. Mr. Rosselli, you've been handed Exhibit
13 to your deposition. It's a document
entitled, Civilian Radioactive Waste Management
00135
Program Mission Plan, Volume I, Overview and
Current Program Plans, December 20, 1983. And
it includes in large type "draft." You were
still at OCWRM in December of 1983. Correct?
A. Yes, I was.

---

## 136:24 - 140:10

00136
Q. The next sentence states that, "The
waste acceptance schedule will initially preclude
00137
the need for additional at-reactor storage after
January 31, 1998, and ultimately, removed from
at-reactor storage all waste that is more than
five years old."
Do you recall, was that one of
the intended objectives of the waste acceptance
schedule included in the draft Mission Plan that
is, "To preclude the need for additional
at-reactor storage after January 31, 1998?"
A. I don't recall.
Q. Do you recall why this language was
included in the draft Mission Plan?
A. No, I don't.
Q. You were responsible for preparing the
draft Mission Plan. Is that correct?
A. Yes.
Q. It was prepared under your supervision?
A. Yes.
Q. Would you have reviewed this draft of

the Mission Plan?
A. Yes.
Q. Would you have approved its circulation in this form?
A. To the best of my recollection, yes.
Q. So would you have agreed with the
00138
statement in that sentence that, "The waste acceptance schedule will initially preclude the at-reactor storage after January 31, 1998?"
A. As a planning basis, yes.
Q. What do you mean, "as a planning basis?"
A. The Mission Plan was the plan relative to how we would respond to the requirements of the Act.
Q. And what is a plan? What's the significance of describing it as a plan, sir?
A. It's a road map in terms of how you anticipate getting from point A to point B and what are assumptions you have built into that to make that plan possible.
Q. But that road map did reflect DOE's intention for how it would get from point A to point B at that point in time, didn't it?
A. That's correct.
Q. This was accurate to the best of your understanding at that point in time?
A. That is correct.
Q. You considered it to be reasonable?
A. I considered it to be accurate at that point in time, yes.
Q. If you could go to page 2-1 Program
00139
Strategy, the next to the last sentence in the first paragraph, sir, states, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first 5 years, such that no utility will or have to provide additional storage capacity after January 31, 1998." You would have reviewed that language, wouldn't you?
A. Presumably so, yes.
Q. You would have approved that at that point in time for purposes of circulation, wouldn't you?
A. Yes.

Q. You would have consider that to be accurate at that point in time?
A. Yes.
Q. The next sentence states that, "Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." And again, you would have considered that to be accurate at that point in time?
A. Yes.
Q. The last sentence on this page, page 2-1, "Until 1998, each utility will be
00140
responsible for providing its own additional on-site interim storage, unless the utility applies for and is certified for the federal interim storage program." Do you see that?
A. Yes.
Q. Was it your understanding that after 1998, the Department of Energy would become responsible for providing or eliminating the need for additional on-site storage?
A. Yes.

---

## 140:11 - 141:18

00140
Q. If I could direct you to page 2-2, the last paragraph on this page which carries over to the top of page 2-4. Could you review that paragraph, sir? You've reviewed that paragraph, Mr. Rosselli?
A. Yes, I have.
Q. Does this paragraph refresh your recollection, at all, about the purpose or perceived benefits of the exchange provision in the contract?
A. Yes.
Q. How does that refresh your recollection?
A. To the point that after 1998, the utilities would not have to build on-site storage. They could rely upon the Government to
00141
either accept the fuel for disposal or provide some other means.

Q. And exchanges would help to implement the objective?
A. Apparently, that's what it says, yes.
Q. So would it be fair to say that exchanges would help DOE to realize at least one of the objectives set forth in this Mission Plan, that is, avoiding the need for utilities to add at-reactor storage after 1998?
A. Relative to the planning basis, yes.
Q. You say, "the planning basis." But that planning basis would reflect the Department of Energy's intention at that point in time?
A. Yes.
MR. MILLER: Objection. Calls for speculation and a legal conclusion.
THE WITNESS: Yes.

---

## 142:16 - 144:15

00142
Q. And this table indicates that those rates would be sufficient to meet the annual discharge rate from both operating reactors and also decommissioned reactors beginning in 2003. Do you see the line for 2003?
A. Yes.
Q. Would you agree with my characterization?
A. Would you say it again for me please?
Q. This table indicates that the Department's waste acceptance schedule would
00143
receive waste -- it would meet the annual discharge rate from both operating reactors and decommissioned reactors beginning in 2003?
A. Yes. The two repositories could receive 4800. Discharge rate is something like 3500 so, yes.
Q. That's a discharge rate from both operating and decommissioned reactors?
A. That's correct.
Q. Do you recall who prepared this table?
A. No, I don't.
Q. Do you know what the basis of this table was?
A. No, I don't.

Q. But this table stated the Department's intention regarding its waste acceptance schedule as of December 1983. Correct?
MR. MILLER: Objection. Calls for speculation and a legal interpretation.
THE WITNESS: It stated the Department's plan, the intention at that time.
BY MR. NESLIN:
Q. You would agree it stated the Department's intention at that point in time?
MR. MILLER: Same objections.
00144
THE WITNESS: The Department's plan at that point in time.
BY MR. NESLIN:
Q. Did the Department's plan reflect its intention?
A. Yes.
Q. And again, you reviewed this part of the document -- you would have reviewed this part of the document?
A. Yes.
Q. And you would have approved it for purposes of circulation?
A. I either would have approved it or recommended approval for the director of the office.

---

## 148:3 - 148:17

00148
Q. Is that all the Act required the Department to do, is to accept one spent fuel assembly, sir?
MR. MILLER: Same objection.
THE WITNESS: I do not believe that the Act was specific in terms of one or many.
BY MR. NESLIN:
Q. But I'm asking you about the intent behind the Act. You had an understanding of the intent behind the Act in preparing the contract and working on the Mission Plan, didn't you?
A. Yeah. I don't think the intent was that if we only accept one. And I think that

Mr. Morgan stated that here in a public address.

---

**148:21 - 149:17**

00148

Q. It goes on to the say that, "The basic strategy which we've outlined in the Mission Plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site." Is that a true statement?

00149

A. That is.

Q. And was that, in fact, what the utilities were paying for?

MR. MILLER: Objection. Calls for speculation and a legal interpretation.

BY MR. NESLIN:

Q. Do you understand my question, sir?

A. I think the utilities were paying for disposal services.

Q. And were they paying for disposal services sufficient that they would not have to add additional storage on site?

MR. MILLER: Same objections.

THE WITNESS: After 1998, yes.

BY MR. NESLIN:

Q. You would agree?

A. Yes.

---

**154:13 - 154:19**

00154

Q. Mr. Rosselli, Exhibit 16 is a statement of Michael J. Lawrence, acting director, Office of Civilian Radioactive Waste Management, Department of Energy, before the Subcommittee on Energy Conservation and Power, of the House Committee on Energy and Commerce, dated February 22, 1984.

---

**157:1 - 158:10**

00157

Q. If we could turn to page PNL-173-0228. If I could ask you to review the last -- point you to the last paragraph of the text of this page which states that, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule" -- well, let me back up. The preceeding sentence states that, "The programs activities are fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982, which is: to accept high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."

The next sentence goes on to say, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and ultimately, remove all eligible waste from at-reactor storage." Do you see that language?

A. Yes.

Q. Would you agree with that language?

A. Yes.

00158

Q. Did that language state the Department of Energy's position in February of 1984, to your knowledge?

A. Yes.

Q. Would it be fair to say that as of February 1994, the Department believed that an appropriate waste acceptance schedule would preclude the need for additional at-reactor storage after January of 1998?

A. Yes.

---

**166:23 - 169:2**

00166

Q. Does that refresh your recollection at all?

A. I don't remember the speech. I do
00167
remember internal discussions in the Department to be consistent with the Mission Plan that said, utilities would not have to, at their own cost, build additional on-site storage. That we were looking at options, should a repository be delayed beyond 1998. And these were some of the, you know, options that were under consideration.
Q. And internal discussions among who?
A. DOE, OCRWM staff. Specifically, I couldn't remember and tell you.
Q. Would it have been senior staff at your level?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And did you agree with that view that DOE should be accepting waste -- or that DOE planned to accept waste at a rate such that utilities would not be required to add storage after 1998?
A. That was consistent with, you know, the Mission Plan that we were putting together and the intent of that plan.
00168
Q. You agree with that?
A. Yes.
Q. You say that DOE was looking at certain options. Are you referring to the options discussed in the preceeding sentences of this document?
A. Yes.
Q. That's at-reactor cask storage and a monitored retrievable storage system?
A. Yes.
Q. Were there other options that DOE was considering?
A. I honestly don't remember that.
Q. DOE would pay for the implementation of those options?
A. Yes. Let me -- yes, we would. Because we were going to build a monitor retrievable storage out of the -- yes. So

whether it was casks at reactor sites or shipment to an interim storage facility, yes.
Q. And the effect of that would be that individual utilities would not have to add storage after 1998?
A. Yes.
Q. Or incur any costs associated with
00169
additional storage needs after 1998?
A. That's the assumption, yes.

---

## 176:5 - 181:2

00176
(Whereupon, a document entitled The Mission Plan: Volume I, Overview and Current Program Plans was marked Exhibit-23.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 23 is a document captioned, The Mission Plan: Volume I, Overview and Current Program Plans by Robert M. Rosselli. Four Fuel Cycle Conference '84, Atomic Industrial Forum, Inc., Westin Peachtree Plaza, Atlanta, Georgia. April 3, 1984. Could you review the first three pages?
Does this refresh your recollection, at all, regarding whether you participated at the fuel cycle conference in April 1984 in Atlanta, Georgia?
A. I must have, yes.
Q. Does it refresh your recollection? Do you have any memory of it?
A. Yes, I do.
Q. What do you remember about it, sir?
A. I gave a speech.
00177
Q. Do you recall what the purpose of the conference or program was?
A. No, I don't.
Q. Do you recall what groups or individuals might have attended the conference?
A. No, I don't.
Q. Do you recall that your speech involved the Mission Plan?
A. Until seeing this, no, I didn't.

Q. Upon seeing it, you now recall it involved the Mission Plan?
A. Yes, I do.
Q. If I could direct you to page 5 of this document. The paragraph under program strategy. If you could review that paragraph. It carries over on to page 6.
A. Okay.
Q. Have you had a chance to review it, Mr. Rosselli?
A. Yeah. The first paragraph on page 6 through the first paragraph on page 7.
Q. Yes, under Program Strategy. The second sentence under Program Strategy states that, "Keep in mind that the fundamental objective of the program is to begin accepting civilian
00178
radioactive waste on a firm schedule by January 31, 1998." Do you see that?
A. Yes.
Q. Those were your words, sir?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. You believe that to be true?
A. Yes.
Q. The next sentence states that, "A key point here is that the Department does not intend to delay or postpone the schedule of acceptance, even if a permanent geologic repository cannot be completed by that time." Those, too, are your words?
MR. MILLER: Same objections.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. You consider them to be true?
A. Yes.
Q. And if a permanent geologic repository could not be completed by January 1998, that was the strategy at that time, to attempt to accommodate storage needs through its federal
00179
interim storage or a monitored retrievable storage facility?
A. It was the plan that if the repository

wasn't ready, they were looking at other alternatives like at-reactor storage or a monitored retrievable storage.
Q. By the "plan," do you mean DOE's plan?
A. Yes, our Mission Plan.
Q. The top of page 6, the last sentence in the carry-over paragraph, "This approach is designed to ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive wastes early enough to determine their on-site interim storage needs prior to 1998." Those, too, were your words?
A. Yes.
Q. You consider those to be accurate, at the time you wrote them?
A. Yes.
Q. What did you mean by, "utilities establishing firm planning schedules?"
A. Delivery commitments.
Q. And it was your expectation that this would enable them to on-site interim storage

00180

needs prior to 1998?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And by prior, you're referring to the period prior to 1998?
A. Yes.
Q. After 1998 the Department would either begin receiving such waste or would implement some interim measure, such as interim storage or a monitored retrievable storage facility?
MR. MILLER: Objection. Mischaracterizes the document.
MR. NESLIN: You may answer, sir.
THE WITNESS: It was in the Department's plan that after 1998 they would provide some capability, whether it was at the reactor site or some other means to store the waste.
BY MR. NESLIN:
Q. So that in any event, the utilities

would not have to provide additional waste on-site after 1998?

00181

A. Additional storage capacity on-site after 1998, yes.

**Slater, Nancy H.** Deposition Testimony dated 4/21/99:

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - X
Washington, D.C.
Wednesday, April 21, 1999
Deposition of NANCY H. SLATER, a
witness herein, called for examination by counsel
for Plaintiff in the above-entitled matter,
pursuant to agreement, the witness being duly
sworn by JAN A. WILLIAMS, a Notary Public in and
for the District of Columbia, taken at the
offices of Spriggs & Hollingsworth, 1350 I
Street, N.W., Washington, D.C., at 10:10 a.m.,
Wednesday, April 21, 1999, and the proceedings
being taken down by Stenotype by JAN A. WILLIAMS,
RPR, and transcribed under her direction.

00002

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice

1100 L Street, N.W.
Room 10150
Washington, D.C. 20530
(202) 307-6289

00003

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
NANCY H. SLATER PLAINTIFF
By Mr. Shapiro 4
Afternoon session - 94

E X H I B I T S

SLATER EXHIBIT NO. PAGE NO.
1 - Letter dated 3/1/99 50
2 - Letter dated 4/28/87 82
3 - Memo dated 6/29/87 95
4 - Letter dated 10/2/87 97
5 - Letter dated 11/10/87 99

---

## 5:25 - 11:4

00005
Q. I appreciate that. Where do you work?
00006
A. At the U.S. Department of Energy in the Office of Civilian Radioactive Waste Management in the Regulatory Coordination Division.
Q. What's your job title there?
A. Team leader.
Q. And what are you a team leader of?
A. The entire division basically. I serve in lieu of a deputy division director. And we deal with the regulatory concerns between the program and the Nuclear Regulatory Commission, the EPA, National Academy of Science, and dealings with the Nuclear Waste Technical Review Board.
Q. When you say you deal with regulatory concerns of EPA, NRC, and the other agencies, what do you do on a day-to-day basis vis-a-vis

the NRC?

A. Let's see, a typical example would be the fact that we are involved in developing safeguards and security policy guidelines for the eventual acceptance and disposal of a variety of waste forms. And those policy guidelines will be translated into actual waste acceptance criteria by another group.

And the waste owners will then have to

00007

assure that the waste they deliver falls within the boundary parameters established by the guidelines with one exception, there will be no new requirements imposed on the utilities because the standard contract is quite clear in terms of what can be asked for and what cannot.

Q. And so you're constantly working with EPA, NRC in developing various guidelines that they're going to be using?

A. Right, reporting on progress in the program and quality assurance issues, things like that.

Q. How many people are in this division?

A. I don't know, I have to count. Six.

Q. And who heads up the division?

A. Alan Brownstein, he's the division director.

Q. And what is this the division of?

A. Regulatory Coordination.

Q. It's the Regulatory Coordination Division. Is this a division of a larger office?

A. It would be the office of -- we have reorganized, we have new names for everything. But it would be the program management and integration function.

00008

Q. What is the program management and integration function?

A. These are in one division the budget folks, in another division the information management folks, it might be human resource folks in another division. And we are the division -- the only division within that group that has any technical or policy responsibilities. There is a separate office, there are two offices, in the other office is

acceptance and transportation integration.
Q. And who heads up the program management and integration office?
A. Let's see, that would be Dwight Shelor.
Q. How long have you been a team leader in the Regulatory Coordination Division?
A. Let's see, I moved in late '95. About three and a half years, almost four years.
Q. Since that move three and a half, four years ago, have there been any other reorganizations within your office?
A. Within my particular Office of Program Management?
Q. Well, let me start with the Regulatory

00009

Coordination Division. Has there been any reorganization within that division?
A. Yes, because, in fact, we had a RIF last year. And we RIF'd two people out of the division, one of whom was a team leader. Our roles and responsibilities did not change.
Q. When you had two team leaders, was there any division as to what the two team leaders were leading?
A. Yes.
Q. What were the two team leaders leading at that point?
A. The other team leader was leading environmental regulatory issues and issues dealing with the Nuclear Waste Technical Review Board. And my function was primarily Nuclear Regulatory Commission interface.
Q. And now you're basically team leader for all of them?
A. Doing it all.
Q. In that same three and a half to four year time span since you've been in your current position, has there been any other reorganization at the office, the Office of Program Management and Integration?

00010

A. Yes, as a matter of fact, up until December -- actually January 1 of this year, the two offices would have had two associate directors. One retired and so the remaining

office director now manages both. That was
Dwight Shelor.
Q. And who was the associate director that
left?
A. Samuel Rousso.
Q. Before Mr. Rousso left, how did they
have it divided up?
A. Mr. Rousso would have had program
management and Mr. Shelor had acceptance and
transportation. Let's see. Yes, that's right.
Q. Maybe I misunderstood. So this is
within the Office of Program Management and
Integration that's now headed up by Mr. Shelor?
A. There were two offices. Samuel Rousso
headed the management group, basically management
functions, Dwight Shelor headed the acceptance
and transportation group. Samuel Rousso
retired. Both offices continue to exist. But
now Dwight Shelor manages both.
Q. I see. And above the office level the
next thing you get to is the Office of Civilian
00011
Radioactive Waste Management itself?
A. Is the deputy director and the
director, it's the highest level.
Q. And has there been any other

---

**19:21 - 23:17**

Q. What were your duties in this 1991 to
1993 period when you were an industrial
specialist?
A. I was involved in the preparation of
the annual capacity report, the acceptance
00020
priority ranking, answering questions both
internal and external about the terms and
conditions of the contract. Let's see. And
whatever else may have arisen at the time.
I know, when we came in, we were on the
tail end of a rulemaking, net versus gross, as
sold was that clarification. So I wrapped part
of that up. I believe I terminated a couple of
nonutility contracts at the contract holder's
request because they either no longer had the

material or had, in fact, in one case I believe sold it to the government.
Q. Do you remember any other issues you worked on during that period?
A. '91 to '93, I think we began to discuss delivery commitment schedules at that point. Would that be about right? That would be about right.
Q. That would also have included exchange of approved delivery commitment schedules?
A. Actually my recollection is that we discussed exchanges not concurrently, because there was the opportunity to do that a little later. And it was more important given the timing requirement in the contract to have that
00021
guidance issue.
Q. And guidance as to what to do with the delivery commitment schedules themselves?
A. How to fill them out, instructions. I believe, if I'm not incorrect, that that's an OMB reviewed form. And you know that process, that takes time and there must be instructions on how to complete the form.
Q. What was the time concern?
A. I believe the contract requires delivery commitment schedules to be submitted by the purchaser 63 months in advance of the year in which they have an allocation. So back it out from 1998, and they would have been submitting in '92, late '92.
Q. Are there any other issues that you recall working on in the '91 to '93 period?
A. Let's see. I know we addressed priority for shutdown reactors. And nothing else comes to mind right now.
Q. What about the period '93 to '95, what issues did you work on?
A. During that time period, I believe I worked on delivery commitment schedule exchanges, many of the same things from '91 and '93, the
00022
acceptance, priority ranking, the annual capacity report, DCS review and approval.
We began conversations about final delivery schedules and what would be included in

those, safeguards and security, and that was policy development. I know that I worked on numerous reviews of system baseline documents, system requirements documents primarily from a waste acceptance standpoint. And I know we kept working on priority for shutdown reactors.

Q. Let me ask you to clarify what you mean by just a couple of these categories. Safeguards and security, what was involved with safeguards and security?

A. NRC regulations require that a licensee have in place a safeguards and security system. And that means physical security as in physical protection. And that physical protection is based on the attractiveness of the material, would someone want to steal it to make a bomb. They also require as another subelement material control and accounting. That is that, if you as a utility tell me that you're giving me ten MTU, you have to provide me with some documentation to give me confidence that you are;

00023

because, once I accept it, I'm going to have to swear and affirm to the NRC that I've got ten MTU.

And what we were working with the utilities to do, and it was an iterative process, it was lots of help and lot of involvement from the utility as well, was a process that would not impose an undo burden on them to do something that they weren't currently doing.

For example, they would address material control and accounting issues through calculation, burnup, for example, but they would not measure. And measurements would have been an operational impact. So we were looking for ways to get what we needed to accomplish without disrupting their operations. So there were lots of people talking to each other about that.

---

**137:9 - 138:9**

00137

Q. If you could turn to page 761 in the compilation. Do you see the first issue listed

as being of a priority to DOE was whether or not there should be any exceptions to the oldest fuel first priority ranking; do you recall that issue?

A. Yes. The issue there was do I have to give you my oldest fuel. And, from the utility perspective, I have fuel in my pool, I have fuel in the lower forty. I would prefer to give you the newer fuel which is in my pool and free up space there, I'm not interested in giving you the stuff I've already canned.

So, if my oldest fuel is what earns me a place in the ranking based on its discharge dates, must I give that you fuel that earned the ranking. And the answer was no. That fuel earns you a space in the ranking. But on your DCS you

00138

tell us that you want to give us a range of fuels; and, as long as it meets those minimum conditions, five-year-old being the biggest one.

So that's what OFF was about, because it could have been interpreted -- this was the utility perspective. It could have been interpreted to mean that I had to give you the precise fuel that earned me the slot in the ranking.

## Slater-Thompson, Nancy Deposition Testimony dated 4/22/99

00206

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

00207

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
SUSAN SACHS, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.

Room 10150
Washington, D.C. 20530
(202) 307-6289

00208

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
NANCY H. SLATER PLAINTIFF
By Mr. Shapiro 209

E X H I B I T S

SLATER EXHIBIT NO. PAGE NO.
17 - Memo dated 8/5/94 209
18 - Memo dated 5/16/90 with attachments 215
19 - Letter dated 2/10/95 with attachments 221
20 - Memo dated 6/24/93 233
21 - Letter dated 6/24/93 249
22 - Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste dated 6/22/83 254
23 - Acceptance Priority Ranking & Annual Capacity Report dated March 1995 275
24 - Complaint 306

---

**273:11 - 274:5**

00273

Q. So the annual capacity report was not intended to be binding on the parties?

A. It was not intended to be absolute in the sense that again it's a planning document. And DOE, and I distinctly remember saying this and I distinctly remember it being said to me when I was on the utility side, DOE had always stated that, if we were able to improve the system capacity, then the ACR would reflect those improvements in system capacity.

And the APR would be used to readjust which utilities, when, and how much fuel. So, as

a planning document, planning documents are
subject to change.
And the ACR as I understood it was to
00274
communicate to the utilities what DOE believed
was the likely receipt rate at a repository, the
likely acceptance rate, and to accept who was
likely to deliver during the first ten years of
system operation based on the APR.

---

**284:14 - 286:15**

00284
Q. But was that also how DOE expected the
program to work?
A. My understanding of how the program
would work again, if you accept the premise of
the round up or round down for full cask loads,
might mean that in any given year, again the
following year is debited for the additional
amount, that you might actually complete pickup
ahead of schedule if you made the optimistic
assumption that you were always rounding up.
There was some discussion about
campaigning. Do you understand what I mean by
00285
campaigning?
Q. I think I do. But if you could explain
it for the record.
A. Campaigning would be that we might like
to select rather than the first year as the basis
for delivery the first three years and in large
chunks work off three years of fuel for one
utility, work off three years of fuel for the
next.
And this was subject to negotiation
with the utilities obviously because this is not
the unilateral right as I understand it of DOE to
do this. And in the second year accept the first
year and the second year and the third year from
another utility.
This was discussed with the utilities
and it was discussed as a matter of fact when I
was part of the utility industry. And the
utilities were not averse to considering that

because again it's an operational consideration for them. Do I want you to come to my facility every year and disrupt my operations because I won't be doing anything while we're loading fuel or would I rather say don't come the first year,
00286
show up the second year and take my first year, my second year, and maybe my third year. So that was discussed when I was in the industry. And I don't know where that went after that. So I have a recollection that the precise schedule laid out in here, alterations to that schedule were discussed by the utilities.
Q. And the campaign was premised in part I think as you said on the notion that it would be more efficient for utilities to have pickups done in larger amounts than in a series of smaller amounts?
A. In fewer years actually, in fewer years, so that you weren't showing up every year with the consequent interruption of operation.

---

**289:20 - 289:23**

00289
Q. And it was generally anticipated that there would be some amount of DCS exchanges?
A. Yes, I did anticipate that there would be some amount of DCS exchanges.

---

**Slater-Thompson, Nancy Deposition Testimony dated 6/13/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :
- - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

00002
APPEARANCES:

On behalf of the Plaintiffs:
ROBERT L. SHAPIRO, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

(202) 305-7594

00003

C O N T E N T S

WITNESS EXAMINATION
NANCY SLATER THOMPSON
By Mr. Shapiro 4
By Ms. Sullivan 149
By Mr. Shapiro 153

Afternoon Session - Page 67

E X H I B I T S

Ex.No. Description Page
1 December, 1990 ACR 17
2 6-22-83 contract 25
3 March, 1995 APR and ACR 32
4 June, 1987 ACR 47
5 June, 1988 ACR 67
6 December, 1991 ACR 69
7 May, 1993 ACR 84
8 March, 1993 ACR 86
9 9-28-95 letter, Dreyfus to Kadak 113
10 Instructions for Completing the
Appendix C - Delivery Commitment
Schedule 127
11 Review Record 139

---

## 5:2 - 6:25

00005
What is your current position?
A. I am the acting division director of the regulatory coordination division.
Q. How long have you been in that position?
A. I have been in that position since

January of 2001.
Q. What was your position before that one?
A. Team leader in the regulatory coordination division.
Q. How did your duties change when you moved from the team leader position to the acting director position?
A. In the main, I believe that most of the technical and policy-related duties that I had been performing didn't change, but I have now assumed responsibility for personnel actions.
Q. Are there any other teams in that division other than the one in which you were team leader?
A. No, there are not.
Q. How many people are in that division?
A. There are, including details, four in
00006
addition to myself, and one pending for a secretary.
Q. Did someone resign from the division director position? Is that how you became the acting division director?
A. Not a resignation. Alan Brownstein moved on to other duties.
Q. When did you start in the regulatory -- when did you start in the team leader position?
A. We would have to check my personnel actions, but I believe it was about December of 1987. I'm not sure.
Q. Let me ask the question differently. The team leader in the regulatory division, when did you start that?
A. That would have been immediately upon my advent in that division, so I moved from the waste acceptance division, I moved right into the regulatory coordination division.
Q. My recollection is that when I last deposed you your current position at that time was that team leader position in the regulatory division. Is that --
A. Yes.

**94:16 - 101:10**

00094

Q. A little while ago you referred to the ACR as a planning document. What did you mean by that?

MS. SULLIVAN: Objection. The documents speak for themselves.

You may answer.

A. As we have discussed in my prior deposition and previously in this deposition, the ACR represents a planning basis. The acceptance rates are subject to influences by future budget

00095

constraints, lack of a facility, unavailability of transportation casks.

For example, no one would have contemplated at the time that I did these that we would have an RSA, Regional Services Agreement, that would in fact contract out with someone else to provide the transportation which would have financial effects and could have scheduling and capacity effects. It's a planning document. And in fact when I sat on the utilities side of the table the industry recognized that not only was the ACR for planning purposes only, but that in fact their DCSs were for planning purposes, and they filled DCSs out consistent with that planning presumption because providing a range of discharge dates which might be over a 10-year period certainly doesn't permit a system to do more than plan.

Q. A couple sentences before the end of your answer, you said it was understood by the industry that both the ACRs and the delivery commitment schedules were for planning purposes only. By using the word "only," did you mean to exclude -- what did you mean to exclude?

A. That we viewed the DCSs as fungible,

00096

and we have been through that in prior deposition as well; that the industry recognized that in fact they wouldn't be providing us with specifics about what they wanted us to accept until they submitted a final delivery schedule; and the final delivery schedule actually does represent the commitment on their part to this reactor, this time, this amount

of fuel, this age fuel, so greater specificity with the FDS, ball park with the DCS.
It was important for the utilities to give us DCSs because of their very fungibility. If you didn't submit a DCS, you couldn't exchange your slot in the cue, and given that those exchanges were possible, I don't know how one would perceive a DCS as anything other than for planning purposes.
Q. Let's go back first just to the ACRs and the statement that they are for planning purposes only.
When you say that ACRs were for planning purposes only, does that mean that the ACRs were not meant to be binding on the Department of Energy?
MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal
00097
conclusion.
A. I can't speak to that legal issue or speak for a contracting officer. In my estimation, that's a question you would have to ask someone else.
Q. When you published the 1995 ACR, did you understand that you were committing the Department of Energy to accept the amount of spent fuel noted in the waste acceptance projections in that document?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, the document speaks for itself. Objection, vague.
A. My understanding is entirely consistent with the sentence at the bottom of page 1 in the -- I guess this would be Exhibit 3, which is the 1995 ACR. As specified in the Standard Contract, the ACR is for planning purposes only, and this is not contractually binding on either DOE or the purchasers. And so were I to reason this out and not make a legal decision, I would have to say as a simple engineer my clear reading of that language would say if it's in the contract, everyone, including the utility, would be well aware of that.
00098
Q. What about the delivery commitment

schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.

A. In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall siting across the table from numerous utility representatives, clearly recognizing that the DCSs were planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.

Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry who thought that the delivery

00099

commitment schedules were binding on either industry or the department?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.

A. No, I don't.

Q. You said something a minute ago that I guess has me a little confused. You said that the delivery commitment schedules are definitely for planning purposes but they provided relatively little information so you couldn't do much planning with them. I may be getting your language a little wrong, but what did you mean by that?

A. The DCSs -- and you need to put this in the context of their fungibility -- the DCSs, were they to remain as is, would provide you with the location of the reactor to which you would arrive to pick fuel up, so you know the type of fuel, you can plan appropriately for the type of cask to send. Given that they have submitted one

DCS for, let's assume, 10 MTU, you know how many casks to send. The date on which you would show up and schedule a pickup was not resolved until the FDS because that was actually done in
00100
consultation with the utilities because you don't want to show up and disrupt their operations, that's money.
You had no certainty about the age of fuel, however, because if they specified a range of discharge dates that's 10 years apart, that doesn't tell you much in terms of the thermal output of the fuel I am coming to get because conceivably it could range from five-year-old fuel to 15-year-old fuel. There's a big difference. There's a big difference in terms of the number of casks I would have to send to get that as well, assuming that they elected to deliver fuel that was all, say, six years old.
Q. Did the department ever consider restricting the utility's ability to put broad ranges of fuel discharge dates on their delivery commitment schedules?
A. Not that I recall, no.
Q. Would it be fair to say that the department didn't find it necessary to have narrower spent fuel discharge dates on the delivery commitment schedules for purposes of the department's planning?
MS. SULLIVAN: Objection.
00101
Argumentative.
You can answer.
A. Based on my experience on utilities' side of the table, I would say that the industry had communicated to them that they had the ability to fill that out with a range of discharge dates, and they intended to, and I would say from my side of the table as DOE, in my opinion I don't believe I could have restricted them to providing me with a specific discharge date.

## 109:3 - 110:13

00109
Q. Approved. Let's focus on approved. Do you believe that a delivery commitment schedule that's been proposed and approved is binding on any party?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You may answer.
A. In my personal opinion, I do not believe that it is binding because I do not believe -- I am at a loss as to how you could bind yourself to anything in a range of discharge dates. I am at a loss as to how you could bind yourself when it's not final.
Q. So a utility wouldn't even be binding itself as to the total amount of MTU of spent fuel that it would be delivering to DOE in a particular year?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
A. I think it is possible that a utility in fact could deliver less than it indicated on its DCS for whatever reason.
00110
Q. Did you view an approved delivery commitment schedule as binding a utility to not delivering more spent fuel than is set out on that delivery commitment schedule?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
A. It's not the DCS that establishes the allocation. It's simply a reflection.
Q. What sets out the allocation?
A. The ACR; and that's for planning purposes only because that allocation could change.

---

## 125:9 - 125:17

00125
Q. Would it be reasonable to say that the

department intended to minimize the number of
proposed exchanges that it would have to
disapprove?
MS. SULLIVAN: Objection, vague.
A. I don't think we had a specific
intention to minimize or maximize. I think it was
our intention to accommodate, to the extent
practicable, all reasonable requests to exchange.

---

## 159:7 - 160:2

00159
Q. Did you view the DCS instructions as
guidance to utilities as to how to fill out their
delivery commitment schedule forms or did you view
the instructions more directly as requirements for
how the forms must be filled out by utilities?
MS. SULLIVAN: Objection to the extent
it calls for a legal conclusion.
You may answer.
A. I view the DCS instructions as my
expectations for what it would take in completing
these forms in order for me to approve a DCS. For
example, if I told them, which I did on page 2,
section 7, section E, that if they exceeded their
allocation I would disapprove the DCS, I view that
as an instruction.
Actually, that point is also made
clear on page 5, item number 2.5, that says:
The total quantity of SNF designated for delivery
must not exceed the allocation in the ACR.
00160
Exceeding the allocation will result in
disapproval of the DCS (S).

---

**Trebules, Victor Deposition Testimony dated 4/17/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------XYANKEE ATOMIC ELECTRIC COMPANY
:
(98-126C)(Merow, S.J.) :CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : IOMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
V. :1 - 241

00002
THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144458

00003

April 17, 2002
9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

00004

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

00005

(202) 942-5160
BY: Ronald A. Schechter, Esq.

Arnold & Porter
For the Plaintiff SACRAMENTO MUNICIPAL UTILITY DISTRICT
370 Seventeenth Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2301
BY: David S. Neslin, Esq.

Perkins Coie LLP
For the Plaintiff WISCONSIN ELECTRIC
607 Fourteenth Street, NW
Washington, DC 20005-2011
(202) 434-1609
BY: Suzette W. Derrevere, Esq.

Spriggs & Hollingsworth
For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE YANKEE ATOMIC POWER COMPANY
1350 I Street, NW

00006

Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch
Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

I N D E X

EXAMINATION OF VICTOR W. TREBULES, JR. PAGE
BY MR. EIDUKAS 8

TREBULES DEPOSITION EXHIBITS: PAGE
No. 1 Federal Register on Standard Contract. 22
00007
2 Interim Spent Fuel Storage Policy.
CTR-044-0180 through 0201. 37
3 Proceedings of the 1983 Civilian Radioactive
Waste Management Information Meeting.
SN 069588 D, SN 069599 through 600. 48
4 December 20, 1983 Draft Mission Plan.
CTR-042-1065 through 1190. 78
5 A Mission Plan for the Radioactive Waste
Management Program, Volumes 1 and 2.Draft. 84
6 June 1985 Volume I Mission Plan.
CE 14791 through 15200. 143
7 January 1987 Draft Mission Plan Amendment.
DER-002-3157 through 3217. 197
8 June 1987 OCRWM Mission Plan Amendment.
PA-142069 through PA-142139. 211
9 Report to Congress. YMP-002-0181 to 0215. 218
10 Radioactive Waste Review Committee.
HQR-077-1119 through HQR-077-1143. 230

---

**10:21 - 19:17**

00010
Q. Okay. When did you first -- when did you start working for the Department of Energy?
00011
A. Actually, I started working for the Atomic Energy Commission in 1972, which became the Energy Research and Development Administration, which became the Department of Energy. I don't remember the exact year ERDA became the Department of Energy. I think it was about -- I don't remember.
Q. Okay. But you were there when the Department of Energy was first formed it sounds like?
A. Yes. Yes.
Q. What was your first position in the Department of Energy?
A. The Department of Energy or the Atomic Energy

Commission?

Q. I'm going to start with the Department of Energy.

A. Okay. Again, I don't remember exactly when name changed, but I spent the first five years working for the Pittsburgh Naval Reactors Office after I graduated from college, and then I transferred to the Atomic Energy Commission headquarters in Germantown, Maryland and I worked in the Office of Nuclear Energy Programs.

00012

Q. In the Office of Nuclear Energy Programs, did your responsibilities include the handling of spent nuclear fuel at that time?

A. The handling of spent. No, we never handled any spent nuclear fuel.

Q. All right. I will rephrase that. Did your responsibilities include the disposal of spent nuclear fuel?

A. We did planning for activities involving radioactive waste and spent nuclear fuel. We never actually handled, though, any material.

Q. Could you briefly describe what the planning you did entailed that involved the disposal of radioactive waste and spent nuclear fuel.

MR. SHULTIS: Objection. Could we get a little more specific on the time period we're talking about here? I think that's important.

MR. EIDUKAS: I'm talking of the time period where you were at the Office of Nuclear Energy Programs, and I believe the witness has said he doesn't know a specific date when he was doing this.

BY MR. EIDUKAS:

00013

Q. Mr. Trebules, if you can specify a date that you were working on the planning for the disposal of radioactive waste and spent nuclear fuel while at the Office of Nuclear Energy Programs, that would be helpful.

A. Let me try to clarify what I think you asked. I don't remember exactly when ERDA switched over to the Department of Energy. My guess, that was sometime in the 1980s. But in 1977, I joined the Office of Nuclear Energy Programs, which may have been part of ERDA or, you know, Atomic Energy Commission or ERDA or Department of Energy. It was 1977 and at that time I

was involved in the planning activities for nuclear energy programs, which included breeder reactor development like the Clinch River breeder reactor, and I was responsible for preparing what was called the Fish and Energy Program Plan for the Department of Energy, which included some at that time it was called fuel cycle activities, which included handling of radioactive waste.

Q. Did that planning for the handling of nuclear radioactive waste that you just described, did that

00014

involve planning for the disposal of those wastes in a deep geologic repository?

MR. SHULTIS: Objection, relevance.

BY MR. EIDUKAS:

Q. Generally, when your lawyer objects --

MR. SHULTIS: You still have to answer.

BY MR. EIDUKAS:

Q. You still have to answer unless he instructs you not to, if you're able to.

A. As best as I could remember, we did in the Fish and Energy Program document talk about reactor development and waste activities, and it did include I believe reprocessing at that time. This was prior to the ban on reprocessing and ultimate disposal of radioactive waste.

Q. Did those plans that you worked on go so far as to discuss the design of a repository? Did it get that specific?

MR. SHULTIS: Objection, relevance.

THE WITNESS: As best as I could remember, I don't believe we got involved in the -- at least I didn't get involved in the design of repositories for

00015

the disposal of waste. My primary area of emphasis at that time was on reactor development. As I said, the Clinch River breeder reactor and, for example, Whitewater breeder reactor.

BY MR. EIDUKAS:

Q. At some point did your position at either ERDA or the Department of Energy change?

MR. SHULTIS: Objection, vague.

THE WITNESS: I had a number of activities during my career. As I mentioned, I stayed in the Office of Nuclear Energy Programs for a while and then soon after the passage of the Nuclear Waste Policy Act,

about a year or two after the act was passed, then I joined the Office of Civilian Radioactive Waste Management.

BY MR. EIDUKAS:

Q. When you joined the Office of Civilian Radioactive Waste Management, you say a year or two after the act was passed, so we're talking somewhere in the 1983-1984 time frame?

A. That's correct.

Q. What was your first position at the Office of

00016

Radioactive Waste Management?

A. I don't remember the title of my first position. It was probably program analyst or something like that, but I'm not exactly sure.

Q. What did that position entail? What were your responsibilities in that position?

A. First major assignment I could remember was coordinating the preparation of the mission plan for the Civilian Radioactive Waste Management Program.

Q. Was there anything else that your role entailed in that position?

MR. SHULTIS: Objection, vague.

THE WITNESS: That preparation of the mission plan was pretty much a full-time activity for a number of years. So there might have been other minor assignments I was given, but, you know, overall it was primarily the mission plan.

BY MR. EIDUKAS:

Q. Okay. Did there come a time when your position at the Office of Civilian Radioactive Waste Management changed from program analyst working on the mission plan?

00017

MR. SHULTIS: Objection, vague.

THE WITNESS: I had a number of different assignments in the Office of Civilian Radioactive Waste Management over the nearly 20 years that I've worked in that program.

BY MR. EIDUKAS:

Q. I guess what I'm trying to get at is I'd like to have just a brief chronology of the different positions you've been in with dates, if possible. So you started out as a program analyst in the Office of Civilian Radioactive Waste Management in the approximately 1983-1984 time frame. What I'd like you

to do is going forward to the present with dates, if possible, just state the various positions you've held in the OCRWM.

A. Okay. Around the 1984-'85 time frame, as I said, I believe I was a program analyst. I think in 1985 or '86 I became the senior technical adviser and technical assistant to the Director of Office of Civilian Radioactive Waste Management. I don't remember the exact time frame, but when Admiral Watkins became Secretary of Energy, I was detailed to his

00018

office for I think little over half a year as an adviser to the Secretary.

I then came back into the Office of Civilian Radioactive Waste Management I think in 1990 or 1991, and I was the Acting Director of what was called the M&O Management Division with responsibility to bring on board the M&O contractor for the program. I think that was 1991. About the a year or two after that, I became the Director of the Storage Division. The primary responsibility was to work on a proposed monitored retrievable storage facility.

A few years after that, I became the Director of the Program Management Division. And let's see. About four years ago I transferred out to Las Vegas to the Yucca Mountain site characterization office, and I'm currently the Director of the Office of Project Control.

Q. Did you have any involvement in the drafting of the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, asks for legal conclusion.

BY MR. EIDUKAS:

00019

Q. My question was whether or not you had any involvement in actually writing or preparing the text of the Act.

A. Not that I could remember.

Q. At the time that the Act was being -- and when I say the Act, I'm referring to the Nuclear Waste Policy Act of 1982. At the time that Act was being drafted, did you have discussions with people who were involved in drafting that Act?

MR. SHULTIS: Objection, vague.

THE WITNESS: I don't believe so. I obviously talked to people in the department, you know,

who were talking to people, you know, involved in
nuclear energy activities, but I don't know that I've
ever had any conversations with anyone that was
actually involved in drafting the Nuclear Waste Policy
Act.

---

## 52:11 - 54:4

00052
Q. When you worked in the program, do you know
whether or not it was the intent of DOE to receive fuel
at a rate beginning in 1998 that no utility would have
to add any further storage facilities?
MR. SHULTIS: Same objections and
relevance.
THE WITNESS: When I started working in
the program on the mission plan, I remember that we
discussed the objective of reaching waste acceptance
rates that would preclude the utilities from having to
provide additional on-site storage. That was our
objective or planning target.
00053
I believe what happened early on was that
when we sent the draft mission plan out for public
review and comment, we got a number of comments that
said our schedules were too optimistic and we, I
believe, revised those schedules in the actual document
that went out in June of 1985 to the point where it
didn't quite meet the intent of the words described
here.
We started out as best as I could remember
with a number like 400 metric tons in 1998, and we
incorporated a ramp-up period that after four or five
years or so we would eventually get up to about 3,000
metric tons a year, which we believed was the accepted
spent fuel generation rate of the nuclear power plants
at that time.
And it was over that ramp-up period that
we hoped to get to the point where we would preclude
the utilities from having to provide additional on-site
storage. And then when the second repository came
into operation, then we could, when that one reached
full capacity, be able to reduce the backlog.
So, again, I'm speculating that when this
00054

was written that was the intent, but that was changed
after we got comments on those early draft versions of
the mission plan. We adjusted those waste acceptance
schedules a bit.

---

## 59:18 - 60:14

00059
Q. Have you -- I'm sorry. I was going to ask
you whether or not you have since come to such a
conclusion or thought about the implications.
MR. SHULTIS: Same objections and
relevance.
00060
THE WITNESS: I think I would personally
feel that one could argue since the Act was not
specific, if we only accepted one fuel assembly, you
know, we met the intent of the words. However, I also
would be sympathetic to the additional phrase in here
that where it says, "However, we did not believe that
that meets the intent of the Act."
I believe the intent of the Act was for
the government to develop the facilities to solve the
nuclear waste problem, which isn't accepting just one
assembly, and we were to develop the facilities. And
we were trying to do that as expeditiously as we could,
you know, to really deal with the overall problem of
the accumulation of spent fuel.

---

## 97:1 - 103:22

00097
BY MR. EIDUKAS:
Q. And what I mean by how was it prepared, I
don't mean how was it typed. I mean, how were these
numbers decided upon? How was this schedule
developed?
MR. SHULTIS: Objection, vague. Asks for
a legal conclusion.
THE WITNESS: As best as I could remember,
we had two overriding goals or objectives that we were
trying to meet. One was to begin waste acceptance in
1998. The other was to reach a rate for which the
amounts of additional at-reactor storage would be

minimal or zero.

As Table II-1 in Exhibit 5 shows, in the second column, the annual spent fuel generation rate, these were numbers that we got from the Department of Energy's Energy Information Administration. Based on their analysis of the nuclear power plants in operation and the expected amount of spent fuel that they'd be generating, and as you can see in this table, the numbers start at in 1998 at 2,700 metric tons. They go up a little bit. They approach 3,000 metric tons.

00098

So, for the first 10 years of operation, our target was sort of to reach an acceptance rate of about 3,000 metric tons, which would more than the generation rate from all the nuclear plants.

We did recognize, though, at that time we still had a backlog, which is shown in column 4, you know, of over 40,000 metric tons that already was in storage. So, again, our two objectives or goals were to try to begin, as you know, as soon as possible, you know, 1998 or as soon as possible thereafter. And as we indicated before, those were what we characterize as optimistic schedules and reach an acceptance rate of 3,000 metric tons, which would preclude the utilities from having to provide any additional on-site storage.

Then when we got a second repository in operation, again, this is shown in Table 2.1 in column 6, a second repository would come into operation about a half a dozen years after the first, and we expected that to ramp-up faster because we would have experience from operating the first repository. And when those two repositories were then operating in tandem, at that point then we'd be able to start reducing the backlog,

00099

which is indicated in the column on the far right.

You know, eventually to the point where we'd between the two repositories accommodate all the expected spent fuel, which at that time was still judged to be 140,000 metric tons.

BY MR. EIDUKAS:

Q. Okay. So, just looking at the -- let's take the first repository acceptance rate that starts at 400 and ramps up to 3,000 and then stays at 3,000 until it looks like 2025 or 2026 where it goes to has 100 and then stops.

I guess, how were those numbers actually --

how did you actually come up with those numbers? Was there a source or a basis for the actual numbers you have here in this for that schedule?
MR. SHULTIS: Objection, vague.
BY MR. EIDUKAS:
Q. I mean, do you understand what I'm asking? I mean, in other words, is this representing a physical limitation that was projected or recognized? Were these numbers picked out and then the idea was to design repository around them? I guess what I'm
00100
trying to get at what, I guess, first the source for these numbers?
A. Okay.
MR. SHULTIS: Objection, compound.
THE WITNESS: It's a compound answer.
It's somewhat complicated, but again my recollection is that going back to the Nuclear Waste Policy Act, which indicated that the country planned on developing two repositories, and there were various reasons for that, but the plan was to develop two repositories. And based on the projections at the time, again, the source that I'm familiar with is the Department of Energy's Energy Information Administration, which projected we'd have a total of about 140,000 metric tons of spent nuclear fuel to accommodate or dispose of.
There was a provision in the law that said the first repository could not emplace more than 70,000 metric tons until the second repository goes into operation, and I think there were various reasons for that. But that was sort of a guideline that we used that said the first repository should be designed, if the geology permits, to accommodate 70,000 metric tons
00101
and then the other 70,000 metric tons would go in a second repository.
It was that in combination with what I indicated earlier that the objective was to get an acceptance rate of about 3,000 metric tons, which at that time was the anticipated annual spent fuel generation rate from the nuclear power plants in operation. So if you just do the math, you have a capacity for repository of 70,000 metric tons divided by 3,000 metric tons per year. That would indicate that that repository would operate for about 25 years as this table shows.

And then the second repository would be in operation. Again, a capacity of about 70,000 metric tons, at about 3,000 metric tons per year. That one would operate for about 25 years, and the sum of those two would accommodate all the anticipated spent fuel to be generated by the nuclear power plants in operation at that time.

BY MR. EIDUKAS:

Q. Okay. Referring to -- I think other witnesses have called it the steady state rate or the

00102

maximum rate. The 3,000 that's carried out for the most of the years on this schedule for the repository. Does that represent a limitation on how fast the repository was designed to accept waste?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: I'm not quite sure how to answer your question. You said does it. You could design the repository to operate in a number of different ways, and if money or schedule or no object, you could increase its capacity. Although you complicate the operations.

I believe we again established various goals or objectives and operating parameters which we thought were reasonable based on the experience to date because you also had to consider, for example, the transportation requirements to service these repositories. And in 3,000 metric tons per year, that equates to a large number of truck shipments or, you know, somewhat lesser number of train shipments. And, again, you're looking for the reasonable accommodation of all these interrelated factors.

00103

But I think my earlier answer is still pertinent that the overriding objectives were, again, to develop two repositories. The first with the capacity suggested by the Nuclear Policy Act of 70,000 metric tons with an acceptance rate that would accommodate the expected spent fuel generation rate from nuclear power plants in operation. So when you balance all those design factors, you know, for the engineering solution, you get something I think that was represented at the time by the parameters in this Table 2.1 in Exhibit 5.

Let me point out, though, that this is not

our current approach because there have been subsequent actions by Congress which essentially have postponed any work on the second repository. So we knew at the time when we published the mission plan back in the '84-'85 time frame that there were a lot of things beyond our control and, again, this was just a plan. These were just objectives we were trying to meet, and we knew we'd have to accommodate a lot of, you know, prohibitions and hiccups as we began to execute the program.

---

## 122:10 - 124:18

00122
Q. To stop you there, that sentence that you referred to is that "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections of nuclear power growth." Is that connected to the objective you stated that the schedule was intended to ramp up and then to meet the generation rate?
MR. SHULTIS: Objection, looking for a legal conclusion.
THE WITNESS: My recollection is that the main reason we said "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections," the projections
00123
that we were monitoring closely were the EIA projections, the Energy Information Administration projections. And I believe at the time the Nuclear Waste Policy Act was passed, those projections indicated there were would be 140,000 metric tons of spent fuel generated. And if I can look back quickly to Exhibit 4 here.
BY MR. EIDUKAS:
Q. Sure.
A. Again, when the Act was passed in the end of 1982, the number was 140,000 metric tons, which divided by two was the basis for the 70,000 metric ton limit. By the time this draft of the mission plan was published in December of '83, those projections had already fallen to 133,000 metric tons, and one of the factors obviously was Three Mile Island in 1977 I think. You know, that the number of power plants under

construction was dropping. Some were being canceled. And let me just look here. Well, this one still says 133,000 metric tons. But, you know, we thought that the total amount of spent fuel to be generated might continue to decrease. You know, so we
00124
wanted to make sure we could accommodate that.
Q. Okay. To your knowledge, was the objective of having a rate that would meet the generation rate, did that objective ever change over time?
MR. SHULTIS: Objection, asks for a legal conclusion.
THE WITNESS: I think we tried to maintain that as an objective and that sort of became institutionalized with this 3,000 metric tons per year, you know, acceptance capability for one repository, and again when the second one would come online with an additional 3,000 metric tons, then we'd be able to reduce the backlog. That remained a planning objective or assumption for a number of years but got seriously set back when Congress I believe in 1987 pretty much put the second repository program on hold. So, at that time we sort of had to regroup and figure out what we were going to do.

---

## 180:7 - 180:22

00180
Q. So one of the additions, changes here is that there's a column for MRS acceptance, which is the third column. What's the basis or how was this rate for the MRS facility determined?
A. The best answer I could give you is that we, again, had as -- it can sound repetitive, but we again had as our objective to accept spent fuel to preclude the need for additional at-reactor storage, which again was 3,000 metric tons per year at that time. That was our projection. In 1984-'85 we were trying to anticipate what the spent field generation rate would be, you know, some 13, 14 years into the future. So, again, based on the EIA projections, it looked like it would be about 3,000 metric tons per year based on the number of nuclear power plants online. So that was our design target for the MRS. Okay.

---

**Trebules, Victor Coordinated Discovery Deposition Testimony dated 4/18/02**

00242
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------XYANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :POWER AUTHORITY OF THE STATE OF NEW YORK
:VOLUME
(00-703C)(Damich, J.) : IIOMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
V. :242 - 396
00243
THE UNITED STATES, :
Defendant. :
-------------------------------------------X
Deposition of Victor W. Trebules, Jr.
Washington, DC
Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144459

00244

April 18, 2002
9:30 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

00245

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter

For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY,
et al.
555 Twelfth Street, NW
Washington, DC 20004-1206
00246
(202) 942-5160
BY: Ronald A. Schechter, Esq.

Arnold & Porter
For the Plaintiff SACRAMENTO MUNICIPAL UTILITY DISTRICT
370 Seventeenth Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2301
BY: David S. Neslin, Esq.

Perkins Coie LLP
For the Plaintiff WISCONSIN ELECTRIC
607 Fourteenth Street, NW
Washington, DC 20005-2011
(202) 434-1609
BY: Suzette W. Derrevere, Esq.

Spriggs & Hollingsworth
For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE
YANKEE ATOMIC POWER COMPANY
1350 I Street, NW
00247
Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch
Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

00248

I N D E X

EXAMINATION OF VICTOR W. TREBULES, JR. PAGE
BY MS. HEWITT 250, 310
BY MR. SHULTIS 309
BY MR. SCHECHTER 311
BY MR. NESLIN 372

TREBULES DEPOSITION EXHIBITS: PAGE
No. 11 Environmental Assessment.
DER-003-1257 to 1765. 279
12 Statement by Ben C. Rusche.
PA-141922 to 141950. 314
13 Letter of December 17, 1992.
HQR-010-1623 to 1626. 322

---

## 272:10 - 274:14

00272
Q. During your tenure at OCRWM, has the design receipt rate at a steady state been different than 3,000 MTUs on an annual basis?
MR. SHULTIS: Objection, vague.
BY MS. HEWITT:
Q. Do you understand my question?
A. Yes, and as we discussed in some detail yesterday, the receipt rate changed significantly through the various documents we went through yesterday. In the early versions of the draft mission plan and in the subsequent versions of the amendment, it changed because of the facilities involved.
Q. Understand.
00273
A. Obviously when we had a two-repository system, the receipt rate for the system in total was higher than a single repository system or in, again, referring to Exhibit 8, I believe the waste acceptance schedule

we were just talking about, this shows a significant delay in the operation of the second repository. So yesterday in the earlier documents, the earlier exhibits and mission plan documents, we had a combination of the two repositories which had a receipt rate much greater than what this latest version would show.
Q. You're absolutely correct. My question was a little bit unclear. It wasn't very specific. I'm going to further narrow it.
At any time during your tenure at the DOE program, was the design receipt rate for the single repository other than 3,000 MTU on an annual basis?
A. You said at any time during my? I believe basically the nominal design receipt rate target -- again, this was a target; this was an objective -- on an annual basis was 3,000 metric tons.
Q. And that's also what you refer to as the
00274
steady state rate?
A. That's correct.
Q. When you use the term nominal, what do you mean by nominal?
A. Nominal in my jargon typically means like an average or a design number that you try to meet. You know, it usually implies a certain degree of precision. You know, you could say 3,000 plus or minus 20 metric tons, you know, but nominal, when you say nominally 3,000 metric tons, it could vary. In some years it could, depending on the truck and train shipments, it could be 2,980. Next year it could be 3,022, but we sort of average that out over the operation of the facility and say the nominal rate of 3,000 metric tons.

---

## 273:12 - 276:12

00273
Q. You're absolutely correct. My question was a little bit unclear. It wasn't very specific. I'm going to further narrow it.
At any time during your tenure at the DOE program, was the design receipt rate for the single repository other than 3,000 MTU on an annual basis?
A. You said at any time during my? I believe basically the nominal design receipt rate target --

again, this was a target; this was an objective -- on an annual basis was 3,000 metric tons.

Q. And that's also what you refer to as the
00274
steady state rate?

A. That's correct.

Q. When you use the term nominal, what do you mean by nominal?

A. Nominal in my jargon typically means like an average or a design number that you try to meet. You know, it usually implies a certain degree of precision. You know, you could say 3,000 plus or minus 20 metric tons, you know, but nominal, when you say nominally 3,000 metric tons, it could vary. In some years it could, depending on the truck and train shipments, it could be 2,980. Next year it could be 3,022, but we sort of average that out over the operation of the facility and say the nominal rate of 3,000 metric tons.

Q. And I believe you testified earlier that the 3,000 annual MTU steady state rate corresponded to the discharge rate by utilities; is that correct?

MR. SHULTIS: Objection, calls for -- mischaracterizes prior testimony.

THE WITNESS: Yeah. I believe I said yesterday that we had two overriding design objectives, you know, two goals. One was to initiate operations
00275
in 1998. The other was to design a system to try to meet the EIA projection that we were using at the time of the spent fuel discharge rate from the utilities, which at that time I think was nominally, again, nominally about 3,000 metric tons a year. Although it varied, you know, year by year.

BY MS. HEWITT:

Q. I believe yesterday also you testified regarding that -- regarding the 3,000 MTU annual rate and said that it was at some point designed to ensure that utilities did not "have to engage in additional storage, on-site storage after 1998." Is that a correct fair reading of your testimony yesterday?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Again, without looking at the transcript, I think that was close to what I said. I guess I would also want to refer to a paper that was worked on I think before I joined the program. This

is Exhibit 3. This is the proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting. Again, this was developed before I got to
00276
the program, but this became sort of my understanding of the design objective that we were trying to meet.
It's on page 11. There's only two pages in this exhibit, but on page 11, the second column, the largest paragraph near the end. This says, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location."
Again, I think I referred to that as sort of one of our design objectives, you know, with the proper caveats.

---

## 276:21 - 278:7

00276
Q. And then I'd like to explore the meaning of the term on-site storage. Do you have an
00277
understanding of what consists of on-site storage?
A. I have an understanding of what I think that term means, yes.
Q. What's your understanding?
A. The spent fuel discharged from nuclear power plants, first of all, has to be aged a certain amount of time, and it goes into storage at the reactor sites or on the site of the reactor power plants. Typically it goes into storage pools, or I believe if it meets certain conditions, it could go into dry storage on the sites of the nuclear power plants.
Q. And when the term additional on-site storage is used, for example, in that document, does that refer to storage in the spent fuel -- spent nuclear fuel pools as well?
A. I'm sorry. Can you repeat the question again, please.
Q. When the term is used -- and you've used it and other witnesses have used it -- saying that the MTU rate is designed at some point to preclude the need for "on-site storage," does that include storage in the spent nuclear fuel pools that are on site?

00278

A. I think the way we use the term was to provide additional on-site storage over and above what was originally intended to be constructed at the nuclear power plants. Okay? And it would include the storage of the fuel in the pools as well as any other dry storage that the utilities would decide to construct to store their fuel.

**Trebules, Victor Fact Deposition Testimony dated 4/18/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------XYANKEE ATOMIC ELECTRIC COMPANY :VOLUME
(98-126C)(Merow, S.J.) : ICONNECTICUT YANKEE ATOMIC POWER COMPANY :Discovery
(98-154C)(Merow, S.J.) :Judge:MAINE YANKEE ATOMIC POWER COMPANY :(Judge
(98-474C)(Merow, S.J.) :Sypolt)
Plaintiffs, :
V. :
THE UNITED STATES, :PAGES
Defendant. :1 - 160
-------------------------------------------X
Deposition of Victor W. Trebules, Jr.
Washington, DC
Thursday, April 18, 2002
Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144559
00002
April 18, 2002
2:15 P.M.
Deposition of Victor W. Trebules, Jr., held at the offices of:
Spriggs & Hollingsworth
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305
Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

00003

APPEARANCES:

Spriggs & Hollingsworth
For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE YANKEE ATOMIC POWER COMPANY
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch

00004

Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

I N D E X

EXAMINATION OF VICTOR W. TREBULES, JR. PAGE
BY MR. STOUCK 5
TREBULES DEPOSITION EXHIBITS: PAGE
No. 14 Defendant's Witness List. 51
15 Documents CTR 006-1645, 1648 to 53, 1657 to 58, 1661 to 65. 71
16 Documents DB-110060 to 70. 71
17 Letter of April 19. HQR 064-2234 to 2253. 71
18 Memo of 6-21-93. HQR 064-6684 to 85. 71
19 Memo of 7-28-93. DE-108508 to 8515. 71
20 NCAI Briefing. HQR 064-5423 to 5435. 71

21 21 Privilege Log Excerpts. 145

---

## 19:17 - 20:16

00019
Q. Okay. And again referring back to some of
your previous testimony, I believe you testified that
the program had -- and, again, please rephrase or this
is my understanding of what you said I believe a couple
of times previously in your testimony. That there
were two overriding goals or objectives.
00020
One was to begin in 1998 and the other was to
reach a rate, an acceptance rate that at which or for
which amounts of additional at-reactor storage would be
minimal or zero after 1998. Is that a fair
characterization of what you told us here?
MR. SHULTIS: Objection as to
characterization of his testimony, especially regarding
overriding goals.
BY MR. STOUCK:
Q. Okay. Well, if it's not, please tell me, but
I'm trying to -- again, I want to ask you some
follow-up questions. I just want to get back to those
two goals. Recharacterize them for me if you don't
like my characterization.
A. I think that's close. I think that's
reasonably accurate.

---

## Trebules, Victor Deposition Testimony Dated 4/19/02

00001

In the U.S. Court of Federal Claims

---------------------------------x

Yankee Atomic Electric Co., :

et al :

: NO. 98-126C

v. : 98-154C

: 98-474C

United States of America :

---------------------------------x

April 19, 2002

DEPOSITION OF:

Victor W. Trebules, Jr.

a witness, called by counsel pursuant to notice, commencing at 9:00 a.m., which was taken at Spriggs and Hollingsworth, 1350 I St., NW, Washington, DC

00002

Appearances

Jerry Stouck, Esq.
Spriggs and Hollingsworth
1350 I Street, NW
Washington, DC 20005-3305
for Yankee

Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.
U.S. Dept. of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20530
for the government

Richard Johnson, Esq.
Jenner and Block
for Commonwealth Edison

00003

INDEX OF EXAMINATIONS

WITNESS D C RD RC

Victor W. Trebules, Jr..4

Index of Exhibits

(Exhibits maintained by counsel)

Description Page

exhibit number 22.. . . . . . . . . . . . . 39

---

**4:22 - 5:14**

00004:

Q. Good morning, Mr. Trebules. Would you

00005

agree that at the time that you were working on the plan in 1984 and 1985 it was an objective of the spent fuel program that that program be operated in an economically efficient manner?

MR. SHULTIS: Objection as to "economically efficient." It's vague.

A. I believe we said words to that effect in the mission plan, that's correct.

Q. Why was that an objective?

A. To the best of my recollection, I think we used phrases like fiduciary responsibility. People working in the program felt that they had an obligation to try to execute the program efficiently and effectively.E

---

**Zabransky, David Deposition Testimony dated 4/17/02**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - - X
(Caption continued on the next page)
Deposition of DAVID ZABRANSKY
Washington, D.C.
Wednesday, April 17, 2002
9:38 a.m.
Job No.: 12597-1
Pages 1 through 226, Volume 1
Reported by: Diane Gomez, RPR
00002
DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - - X

00003

Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

00004

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER

555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

00005

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER COMPANY:

M. STANFORD BLANTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 251-8100

00006

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:

NORMAN M. HIRSCH, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

RICHARD W. OEHLER, ESQUIRE
PERKINS COIE LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099

(206) 583-8419

00007

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER
COMPANY:

DONALD J. CARNEY, ESQUIRE
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D.C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:

KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D.C. 20530
(202) 307-1011

00008

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT UNITED STATES:

WILLIAM L. OLSEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #7002
Washington, D.C. 20530
(202) 305-7594

00009

C O N T E N T S

EXAMINATION OF DAVE ZABRANSKY PAGE
By Mr. Blanton 13

E X H I B I T S

(Attached to the Transcript)

ZABRANSKY DEPOSITION EXHIBIT PAGE
1 Federal Register Notice dated 28
4/18/83, "Standard Contract for
Disposal of Spent Nuclear Fuel"
2 Letter dated 9/30/96 from 34
R. Cocherell
3 Letter from B. Tomasoni to 39
R. Cocherell
4 Instructions for Completing 43
Appendix C Delivery Commitment
Schedule
5 1995 Acceptance Priority Ranking 44
and Annual Capacity Report
6 Federal Register Notice dated 2/4/83 65
7 Final Interpretation of DOE's 67
Nuclear Waste Acceptance Issues

00010

E X H I B I T S C O N T I N U E D

(Attached to the Transcript)

ZABRANSKY DEPOSITION EXHIBIT PAGE
8 1984 Civilian Radioactive Waste 83
Program Mission Plan
9 1985 Civilian Radioactive Waste 98
Program Mission Plan
10 Excerpts from 1985 Mission Plan 114
11 "FWMS Cases Requested by the DOE HQ" 123
12 Proposed Contract Changes, 124
Revision O, 4/13/92
13 "Index to Tables of Issues Related 127
to the Standard Contract"
14 Document, "Disposal Contract 130
Modifications" dated 10/22/84
15 Document from files of D. Zabransky 138

16 Document with Subject: Potential 139
Modifications to the Standard
Disposal Contract
17 Meeting Notes dated 3/25/87 142
18 Letter from J. Kearney to 150
B. Rusche
00011
E X H I B I T S C O N T I N U E D
(Attached to the Transcript)
ZABRANSKY DEPOSITION EXHIBIT PAGE
19 Letter dated 4/28/87 from 164
S. Kraft to C. Jedrey
20 Letter dated 10/2/87 from 166
C. Jedrey to S. Kraft
21 Statement of Sol Burstein 171
dated 3/19/87
22 Documents from the Wisconsin 173
Production
23 Letter dated 8/29/88 from 179
J. Kearney to C. Kay
24 UWASTE Presentation dated 5/16/89 189
25 UWASTE Report dated 2/16/90 193
26 Preliminary Projection of Spent 197
Fuel Acceptance Rate
27 Letter dated 2/16/94 from 199
S. Parker to D. Dums
28 Document dated 3/31/92, "ACR 214
Response Team Meeting"

---

**101:11 - 105:14**

00101
Q In Exhibit 9 on page 593 of Volume 3 --
A Oh, that's this one here. Hold on.
Q The big, big one.
MR. CRAWFORD: 141648.
MR. HANDWERKER: 141648.
Q If we're all on the same page, the letter you should be looking at is a July 6, 1984, letter on Wisconsin Electric Power Company stationery to Charles Head, acting director. Is that what you're looking at?
A That's what I'm looking at.
Q And it appears to have been written by or
00102

signed by C. W. Fay, vice president nuclear power?
A Uh-huh.
Q As of July 6, 1984, were you a contract administrator at WEPCO?
A I believe I was. I'm not certain, but I could have been.
Q Do you know whether you assisted in the preparation of this letter?
A I believe I assisted in the preparation of this letter.
Q Is it familiar to you?
A I've seen it before.
Q Okay. Well, when is the last time you've seen it, do you recall?
A The last time I've seen it may have been when we were preparing for litigation a year or so ago. Prior to that I hadn't seen it since --
Q July 6, 1984?
A Right, probably.
Q Under comment one, you see the numbered comments?
A I see them.

00103

Q It says "DOE must be prepared to accept spent fuel from utilities on a schedule which will obviate the construction or deployment of additional reactor storage capacity after January 31, 1998." Do you see that sentence?
A I see that.
Q Do you know what that comment was based on?
A That was Wisconsin Electric's belief that that's what should be done.
Q Did you write that comment?
A I don't know if I wrote that comment. I participated in this, the development of this letter, Howard Shimon, myself, who was my boss at the time, probably wrote this together. And I'm sure it went through other concurrences and changes before it reached Bud Fay, C.W. Fay.
Q Was it Wisconsin Electric's position at the time that that was the DOE's contractual obligation?
A It says that that's what the DOE should do. I'm not sure that I would say it says contractual obligation.
Q It says that's what DOE must do?

00104

A Must do. But I don't think -- I don't recollect it ever being discussed in the context of contractual obligations. It was what the program must do on the program mission plan.
Q Did you agree with that statement at the time the letter was sent?
A That was the company's position. I'm not sure I had a position, whether I agreed or disagreed with it. I don't recollect.
Q The next sentence of comment one says "While operation of the first repository by that date at a capacity of 3,000 MTU per year would be the preferred means of accomplishing such an objective, it is essential that DOE firmly commit to employ whatever means are necessary to commence acceptance of spent fuel from utilities on or before the June 31, 1998 date." Do you see that?
A Yes, I see that.
Q Do you recall whether or not you participated in authoring that sentence?
A I don't recall to what extent I did or not.
Q Was that your position at the time this
00105
letter was sent?
A That was my position at the time the letter was sent, and that was the company's position, that the program should commit to whatever it needed to do to cause this to happen.
Q What's the basis for the 3,000 MTU per year? That's M as in man, T as in ton, and U as in uranium. Also M as in metric.
A Again, that's I believe as I talked to earlier, I spoke to earlier, is the -- my understanding, and I think it was the general understanding at the time that 3,000 tons a year would be a sufficient rate to work off the backlog and the discharges in a reasonable time frame.

---

## 150:4 - 150:21

00150
(Deposition Exhibit Zabransky 18 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I'm going to hand you what's

been marked as Zabransky Exhibit 18 which is page 411 through -- what? I can't tell.

A 417, 18, 19?

Q I can't tell. It's a letter, the signature sign is John J. Kearney, Senior Vice President, Edison Electric Institute, a letter to Ben C. Rusche on the draft mission plan amendment. Take a second and review that if you want to.

A In its entirety?

MR. CRAWFORD: Let's get on the record just kind of where this thing was pulled out of.

MR. HANDWERKER: It's from the 1987 mission plan, June '87 mission plan amendment. It's 411 through 418 of the comments.

---

## 163:1 - 164:10

00163

Q Okay. The linkages that you're referring to that would have prevented the MRS development in the way it's suggested in Zabransky 18, are you referring to the linkages in the Nuclear Waste Policy Act amendments of 1987?

A That's correct.

Q Other than the Nuclear Waste Policy Act amendments of 1987, is there any other reason why an MRS could not be developed the way it's envisioned to have been -- it should be developed in Zabransky 18?

A By 1998 as envisioned here, all -- were there no linkages, there still would be the issue of siting and development of a facility, just as there is with a repository.

Q Okay. But I thought I understood you to say that it could not be developed because of the linkages.

A And again this presumed -- this called for an MRS by '98. Even without linkages there's no assurance one could have been developed by '98.

Q No assurance, but as I understand your testimony the linkages made development of an MRS as

00164

envisioned in Zabransky 18 impossible?

A That's correct.

Q Okay. Is there anything else other than the linkages that make it impossible, to your

knowledge?
A Not that I'm aware of, no.
Q And again the linkages we're talking about are the ones contained in the 1987 amendments to the Nuclear Waste Policy Act?
A Correct.

# Zabransky, David Deposition Testimony date 4/18/02

00227
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)
Continued Deposition of DAVID ZABRANSKY
Washington, D.C.
Thursday, April 18, 2002
9:44 a.m.
Job No.: 112597-2
Pages 227 through 459, Volume 2
Reported by: Diane Gomez, RPR
00228
DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

00229

Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

00230

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206

(202) 942-5000
00231
A P P E A R A N C E S C O N T I N U E D
ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
UTILITY DISTRICT:
TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING
COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER
COMPANY:
M. STANFORD BLANTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 251-8100

A P P E A R A N C E S C O N T I N U E D
ON BEHALF OF PLAINTIFF
00232
COMMONWEALTH EDISON COMPANY:
NORMAN M. HIRSCH, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC
POWER COMPANY:
RICHARD W. OEHLER, ESQUIRE
PERKINS COIE LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419

00233

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

DONALD J. CARNEY, ESQUIRE
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D.C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:

KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D.C. 20530
(202) 307-1011

00234

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT UNITED STATES:

WILLIAM L. OLSEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #7002
Washington, D.C. 20530
(202) 305-7594

00235

C O N T E N T S

EXAMINATION OF DAVID ZABRANSKY PAGE
By Mr. Blanton 238
By Mr. Oehler 385
By Mr. Olsen 415
By Mr. Hirsch 416

E X H I B I T S
(Attached to the Transcript)

ZABRANSKY DEPOSITION EXHIBIT PAGE
29 Letter dated 2/2/94 from 239
D. Zabransky to the EIA
30 Document dated 9/21/92 to the 241
U.S. Department of Energy
31 Department of Energy document 256
32 Letter from D. Zabransky to 275
A. Brownstein
33 1987 Annual Capacity Report 295
34 6/88 Annual Capacity Report 304
35 12/90 Annual Capacity Report 317
36 1991 Annual Capacity Report 326

00236

E X H I B I T S C O N T I N U E D
(Attached to the Transcript)

ZABRANSKY DEPOSITION EXHIBIT PAGE
37 1994 Acceptance Priority Ranking 334
and Annual Capacity Report
38 Draft transmittal letter from 363
S. Rousso to D. Dreyfus
39 Analysis of a Total System Life 365
Cycle Cost of the Civilian
Radioactive Waste Management Program
40 1998 TSLCC 370
41 "Basis for the Viability Assessment 374
and TSLCC Cost Estimate Operational
Waste Stream"
42 "Civilian Radioactive Waste 375
Management System Requirements"
43 Letter dated 12/17/96 from 378
B. Tomasoni to J. Miller
44 FDS Submittal dated 12/18/75 399
45 Letter from B. Tomasoni to D. Jones 401

46 Draft letter with handwritten 402
notations
00237
E X H I B I T S C O N T I N U E D
(Attached to the Transcript)
ZABRANSKY DEPOSITION EXHIBIT PAGE
47 Memo from D. Baptist to 407
D. Zabransky
48 "Status of Delivery Commitment 421
Schedules"
49 Correspondence between Commonwealth 427
Edison and the Department of Energy
50 Letter dated 10/25/95 from 432
J. Blanford to S. Rousso

---

## 343:2 - 351:1

00343
Q Do you know whether the '95 ACR that the Department of Energy issued assumed that the existing storage capacity restrictions imposed by the Nuclear Waste Policy Act of 1987 were still in effect even though the program plan did not include a monitored retrievable storage facility?
A It assumed that the limitations were still in effect. I don't know for a fact that the program did not include a monitored retrievable storage facility.
Q How did you pick the rates that went into the '95 ACR?
MR. OLSEN: Objection, foundation.
A They were the same rates that were in the previous ACR.
Q Okay. Was there any analysis done of whether the rates should change or stay the same from the previous ACR?
A I don't believe so.
Q Was there any discussion about whether the rates should go up or down?
00344
A I don't recollect that there was.
Q Just cut and paste? Is that how you did the '95?
A '95 was pretty much a reissue of the previous document from the ACR perspective. The APR

changed.
Q There's a sentence circled on this page that says "Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years." Do you see that?
A I see that.
Q And somebody has written out to the margin "move to page three." Do you see that?
A Okay.
Q And if you look at page three of the document it looks like there's an arrow for an insert, that says "insert page four." Do you see that?
A I see that.
Q What were the uncertainties associated with
00345
the date of commencement of the operation of the waste management system at this point in time?
A At that point in time in 1994 I believe the negotiator's office had been terminated. There was no active program looking for a voluntary MRS, and it became less certain that there was -- there was great uncertainty with respect to the '98 date.
Q More certain that there would not be an MRS by 1998?
A That's a fair statement.
Q Is that a fair statement?
A That's a fair statement.
Q Do you recall any discussions within the Department of Energy about whether or not dates should be eliminated from the acceptance allocations in the '95 ACR?
A Yes, I recall that discussion.
Q Who was that with?
A With Mr. Brownstein and Ms. Slater.
Q And yourself?
A And myself.
Q Can you tell me who said what?
00346
A I believe there was -- Ms. Slater advocated removing dates, to my recollection, going back to how the ACRs used to be.
Q Had there ever been one without dates on the years of allocations?

A I believe so. Let me check. Like this one
here which says, Year one, Year two, Year three.
Q Let me see.
MR. OLSEN: Let the record reflect that
Mr. Zabransky has pointed to exhibit number --
MR. BLANTON: Zabransky 36, which is the
December 1991 ACR.
A And the 1990 ACR also has year one, year
two, year three.
Q Look at page five of Zabransky 36.
A Okay.
Q There's a table there that has the rates
for each year starting in 1998. Is that correct?
A There is, yes.
Q And we can go through this process, but do
you remember that all the other ACRs have a similar
table?
00347
A I'll look, but let me verify.
Yes, other ones do.
Q And is there any such table in the '95 ACR?
A No, there isn't.
Q So that's a change from previous ACRs?
A The change was to remove the years from
Table 1 of this document, yes.
Q And why was that done?
A Discussion centered around the uncertainty
with when year one would be.
Q And the uncertainty regarding when year one
would be resulted from what?
A When a facility would be in operations.
Q You say you and Mr. Brownstein and
Ms. Slater discussed this issue. Is that right?
A Yes.
Q Did anybody take the opposite view that the
years should stay in the ACR?
A I'm sure it was a discussion that had other
viewpoints. I don't know who took what view, but
eventually the dates came out.
Q What was the issue? Why would not they
00348
have come out?
A Why would not they have come out?
Q Why would they not have come out of the ACR
given that you didn't know when you would start?
A I can't recollect all the details of the

conversation. One view was to leave it in the way it was. Another view was to take it out, change it. And Ms. Slater prevailed. I believe that's how that happened.
Q Okay.
A That's my recollection of the situation.
Q I refer to Exhibit 5 of your deposition, which is the '95 ACR. You got it right in front of you.
A Okay.
Q Does that document anywhere inform the reader about when year one is?
MR. OLSEN: Objection. The document speaks for itself.
A I have not found such a statement in the document as to what year year one is.
Q Would it be possible for a utility using
00349
that document to determine when its delivery commitment schedule was due?
MR. OLSEN: Objection, foundation.
A I don't believe so.
Q Are the rates contained in the 1995 ACR the rates DOE currently plans to use when and if it commences spent fuel acceptance?
A The rates contained in the ACR, '95 ACR, were predicated upon some elimination or some restriction on performance. DOE's current plans assume a repository and assume no restrictions on performance and, no, these are not the same rates that we currently plan after the operation of the repository.
Q So the restrictions on -- or the amount of the rate is dependent on the restrictions on performance?
MR. OLSEN: Objection. Calls for a legal conclusion.
MR. BLANTON: I'm just making sure I understood his last answer.
A As the document states, and let me find it
00350
here -- well, it's based upon 8200 tons. That number the first ten years was predicated on some restriction in capacity.
Q Are there no capacity restrictions now because no MRS is assumed?

MR. OLSEN: Objection, calls for a legal conclusion.
A The planning basis right now is for a repository, so there would be no statutory restrictions on annual capacity. There still is a statutory limit on total capacity of 70,000 metric tons.
Q Well, and when you say the planning is based on a repository, you mean a repository with no MRS, correct?
A Currently the planning basis for the program does not include a monitored retrievable storage facility.
Q Okay. When did the planning basis convert from one including a monitored retrievable storage facility to one including only a repository?
A Don't know exactly. That would have been
00351
sometime in the mid-nineties.

---

## 352:8 - 353:20

00352
Q Okay. So the fact that you don't know when you could start to accept waste had anything to do with the DCS process being suspended?
A I think the decision to suspend the process had to do with the determination that there was a commitment and that there was an uncertainty as to date, but it's not tied to this document at this time.
Q I'm not asking if it's tied to the document. I'm asking if just the uncertainties associated with when a facility will be available is the reason you determined to suspend the DCS process?
MR. OLSEN: Objection. Vague.
A Again, as I answered yesterday, there was a discussion; we were advised to suspend the DCS process for a number of reasons by counsel.
00353
Q Well, as -- did I interrupt your answer?
A No.
Q And as I understand it, you're taking the position that your liability to the utilities is limited by the suspension of the DCS process. Isn't it a fact?

MR. OLSEN: Objection, assumes facts not in evidence, and objection to the extent it calls for a legal conclusion.
A I'm not -- I don't know what position you're referring to.
Q You told me yesterday the first hour of your deposition that unless a utility has an approved DCS that the department has no obligation to that utility.
A I did say that, yes.
Q Because of the suspension of the DCS process it's impossible for a utility to have a DCS approved, correct?
A That's correct.

---

## 358:11 - 359:10

00358
Q Was the MPC system envisioned to be an alternative to a monitored retrievable storage facility?
A It was my belief and my understanding that it was viewed as a way of -- their way at that time of trying to meet the '98 date by deploying canisters as opposed to removing fuel.
Q Okay. But if the fuel is going to be stored on the utility site, there wouldn't be any need for an MRS. Is that correct?
A That's true.
Q Was that the thinking at the time?
00359
A I think the thinking at that time was that the MRS was not going anyplace.
Q And that was still back when you were at Wisconsin Electric?
A Yes.
Q Was that also the thinking when you prepared the 1995 annual capacity report, that the MRS process wasn't going anywhere?
A I believe by that point in time the MRS process had ceased.

---

## 359:11 - 360:20

00359
Q Okay. And why in the 1995 annual capacity
report did you continue to impose the MRS capacity
limitations on the acceptance rate?
A There was no discussion of changing the
rates that were in the ACRs from the previous years,
so I don't recall why -- there was no specific why --
it was not a discussion to change them.
Q Well, if an MRS was not in the plans, then
those capacity limitations would not apply, would
they?
MR. OLSEN: Objection to the extent it
calls for a legal conclusion.
00360
A The capacity limitations were on the MRS.
If the MRS was not -- not in the system, there would
be no constraints, but there also would be no facility
to which to move fuel.
Q Okay. On page four of Exhibit 5 to your
deposition, at the top of the page it says "The
projected nominal acceptance rate also reflects the
capacity limit imposed by the act on such a storage
facility prior to repository operations." Why is that
sentence in the document if the MRS was not part of
the department's plan at that particular time?
A Because they did -- they do reflect that.
Q Well, I guess the better question is why
were the limits imposed if the MRS wasn't a part of
the plan?
MR. OLSEN: Objection, asked and answered.
MR. BLANTON: Well, asked.
A This rate was left in the document from the
previous version. No one discussed changing the
rates.

---

## 363:1 - 363:17

00363
Q Did the Department of Energy at any point
starting with the time this document was published,
March 1995, referring to Zabransky Exhibit 5, starting
in March 1995 did the Department of Energy ever use
the acceptance rates published in that document for

its own planning purposes, for the purposes of planning for the operation of the waste management system?

A The Department of Energy never used these rates for the planning for the operation of a repository facility.

Q I'm not asking -- not my question.

A Okay. Repeat the question.

Q Did you ever use these rates beginning in March of 1995 for the planning for the federal waste management system?

A No, we did not.

---

### 364:16 - 365:5

00364

Q Okay. Why did the Department of Energy publish a document to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purpose of planning the system?

A The department carried over the rates it had in the previous ACR and did not change them.

00365

Q Was the department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?

A I believe that that was a consideration.

---

### 454:16 - 455:8

00454

Q Well, Mr. Zabransky, is it correct that the contract did not specifically address the issue of whether a utility could provide different fuel than fuel identified in a DCS form?

MR. OLSEN: Objection. The contract speaks for itself, and objection to the extent it calls for a legal conclusion.

00455

A The DCS provision is in the contract as it's written.

Q And does that DCS provision address the

specific question that I've identified?
A It does not.
MR. OLSEN: Objection to the extent it
calls for a legal conclusion and objection to it's
vague.

## Zabransky, David Deposition Testimony dated 4/19/02

00460
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D. C.
Friday, April 19, 2002
10:03 a.m.

Job No.: 12597-3
Pages 460 through 722 - Volume 3
Reported by: Diane Gomez, RPR
00461
DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

00462

Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

00463

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest

Washington, D. C. 20004-1206
(202) 942-5000

00464

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
UTILITY DISTRICT:
TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFF COMMONWEALTH
EDISON COMPANY:
NORMAN M. HIRSCH, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

00465

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC
POWER COMPANY:
RICHARD W. OEHLER, ESQUIRE
PERKINS COIE LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419

ON BEHALF OF DEFENDANT UNITED STATES:
MARIAN E. SULLIVAN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #10150
Washington, D. C. 20530
(202) 307-6288

00466

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT UNITED STATES:

WILLIAM L. OLSEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #7002
Washington, D. C. 20530
(202) 305-7594

00467

C O N T E N T S

EXAMINATION OF DAVID ZABRANSKY PAGE
By Mr. Hirsch 471
By Mr. Tomaszczuk 565
By Mr. Macdonald 641

E X H I B I T S
(Attached to the Transcript)

ZABRANSKY DEPOSITION EXHIBIT PAGE
51 CTR 0440723 through 0743 480
52 Preliminary Draft OCRWM Position 496
Issue No. 2, Oldest Fuel
First v. Waste Selected for Delivery
CTR 0131268 through 1273
53 E-mail from D. Shelor to J. Carlson 533
dated 9/16/98, CTR 004-0263
54 Presentation to APC, EDB 0020584 - 536
0020602

55 Letter to N. Slater from E. Benz 538
EDB 002056 - 618

00468

E X H I B I T S C O N T I N U E D
(Attached to the Transcript)
ZABRANSKY DEPOSITION EXHIBIT PAGE
56 Waste Acceptance Issues, D. Zabransky 541
presentation to Transportation
Coordination Working Group dated
6/6/95
57 Two e-mails, HQR 0292321 545
58 OPPD DCS forms and correspondence 585
59 GPU DCS forms and correspondence 600
60 NYPA DCS forms and correspondence 606
61 Duke Power Company DCS forms and 612
correspondence
62 Boston Edison DCS forms and 616
correspondence
63 Northern States Power Company DCS 619
forms and correspondence
64 Indiana Michigan DCS forms and 626
correspondence
65 Excerpt from Code of Federal 665
Regulations, 10 CFR Section 61.55

00469

E X H I B I T S C O N T I N U E D
(Attached to the Transcript)
ZABRANSKY DEPOSITION EXHIBIT PAGE
66 Fax titled Acceptance of Nonfuel 673
Components and GTCC-Regulated
Issues, dated 12/13/94
67 Letter dated 12/13/85 to J. Hall 676
from R. Bauer
68 Letter dated 3/1/91 from DOE to 678
D. Zabransky
69 "DOE Acceptance of Dual-Purpose 681
Canisters"
70 "Priority Acceptance for Shut Down 691
Reactors" dated 6/27/95
71 Spent Fuel Privilege Log 712

**632:1 - 632:5**

00632

Q Do the DCS instructions indicate that the DCSs once approved are binding on both parties?

MS. SULLIVAN: Objection. The document speaks for itself.

A I don't see that in the instructions.

---

**Zabransky, David Deposition Testimony dated 6/6/02**

00208

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiff, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. :

- - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, June 6, 2002

Deposition of DAVE ZABRANSKY, Volume II, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., commencing at 9:32 a.m., Thursday, June 6, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

00209

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594

On behalf of Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins & Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2911
(202) 434-1675

Reported by: Cappy Hallock, RPR-CRR

00210

C O N T E N T S

WITNESS EXAMINATION BY COUNSEL FOR
DAVE ZABRANSKY PLAINTIFF
By Mr. Shapiro 212
By Mr. Carney 387
Afternoon Session - Page 281

E X H I B I T S

ZABRANSKY EXHIBIT NO. PAGE NO.
7 4-18-02 Deposition Excerpt 243
8 7-19-93 letter, Tomasoni to 261
Buchheit
9 9-28-95 letter, Dreyfus to 266
Kadak
10 1-28-00 letter, Zabransky to 315
Thomas
11 9-29-00 letter, Zabransky to 318
Zinke
12 Instructions for Completing 339
the Appendix C
13 12-17-96 letter, Tomasoni to 368
Kadak
14 6-3-97 letter, Tomasoni to 371
Buchheit with attachments
15 12-16-97 letter, Fugi to Schiffer 375

---

## 246:5 - 247:25

00246

Q. What would be the use of the information, the currently approved delivery commitment schedules, given that the department's current plan is for a waste acceptance system with a repository that will have acceptance rates that are significantly different from those that were

the basis of the approved delivery commitment schedules?
MR. CRAWFORD: Objection, lack of foundation. Objection to the extent it calls for speculation.
A. I wouldn't see any good use for it. You didn't ask me if they should use it, you asked me if they could use it.
Q. You wouldn't recommend that the department use the information or the currently approved delivery commitment schedules for planning at this time?
A. It's my belief, my personal belief that we need to renegotiate those with the contractholders as was stated would be done when
00247
the initial DCS directions were sent out.
Q. Why do you believe the department has to renegotiate those approved delivery commitment schedules?
A. Because one, we said it would, the department said it would; and two, I think the utilities should have the option of deciding if it's -- their plans have changed. Perhaps they want different locations to be serviced.
Q. What about the amount of acceptance? If the department in fact moves forward with the repository in 2010 with acceptance rates consistent with its plans for a repository, should utilities with currently approved delivery commitment schedules be able to renegotiate for larger amounts of acceptance consistent with the capacity of the repository?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the extent it calls for speculation.
A. And again, if the department winds up with a larger facility that actually operates that way, and the contracting officer feels comfortable to committing to quantities for a larger facility, that can be a subject of renegotiation.

**Zabransky, David Deposition Testimony dated 11/1/05**

00001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
----------------------------------:
PACIFIC GAS & ELECTRIC COMPANY, :
:
Plaintiff, :
:
vs. : No. 04-074C into
: which has been
UNITED STATES OF AMERICA, : consolidated No.
: 04-075C
Defendant. :
----------------------------------:
Washington, D.C.
Tuesday, November 1, 2005
Deposition of:
DAVID ZABRANSKY
called for oral examination by counsel for
Plaintiff, pursuant to notice, at Greenberg,
Traurig, L.L.P., 800 Connecticut Avenue, Northwest,
Suite 500, Washington, D.C., before Shari R.
Broussard, a Notary Public in and for the District
of Columbia, beginning at 9:29 a.m., when were
present on behalf of the respective parties:
00002
On behalf of Plaintiff:
JERRY STOUCK, ESQUIRE
Greenberg, Traurig, L.L.P.
800 Connecticut Avenue, Northwest
Suite 500
Washington, D.C. 20006
(202) 331-3173
On behalf of Defendant:
ALAN J. LO RE, ESQUIRE

SHARON SNYDER, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-3315

00003

C O N T E N T S

EXAMINATION BY: PAGE
Counsel for Plaintiff 5, 172
Counsel for Defendant 167

PG&E Z/P DEPOSITION EXHIBITS: * PAGE
1 Letter from Barrett to Strand, 8/24/92 8
2 Letter from Tomasoni to Sellers, 5/19/97 12
3 Letter from Tomasoni to Barrett, 5/18/93 32
4 Letter from Groff to Zabransky, 9/30/04 42
5 Letter from Zabransky to Groff, 12/1/04 46
6 Letter from Desell to Barrett, 9/13/95 48
7 Canister Considerations for Commercial Spent Nuclear Fuel, Bates HQR 290 0025 to 290 0031 54
8 Letter from Milner to Clarke, 9/15/93 68
9 Letter from Sullivan to U.S. DOE, Rueter, 6/27/91 74
10 Memo from Pollog to File 77
11 Letter from Gisclon to Gibbard, 2/19/92 83
12 Memo Graham to File, 4/8/92 87
13 Letter from Stock to Detmer, 5/18/92 90

14 Letter from Tomasoni to Stock, 5/12/94 91
00004
PG&E Z/P DEPOSITION EXHIBITS: * PAGE
15 Memo from Johnson to Willis, et al., 7/8/99 95
16 Meeting Between Humboldt Bay PP and the Department of Energy, Agenda 102
17 DOE Meeting Minutes, November 11, 1999, Draft 116
18 DOE Meeting Minutes, November 9, 1999, Draft 117
19 e-mail from Moulia to Womack, et al., 1/25/00 129
20 e-mail from Benz to Zabransky, et al., 1/19/98 129
21 DOE Recommends Changes to Yucca Mountain Repository Design 149
22 Letter from Carlson to Sellers, 12/4/00 157
23 Letter from Zabransky to Sellers, 3/22/04 157
24 Letter from Zabransky to Sellers, 8/14/02 164

---

## 129:19 - 130:9

00129
Q Mr. Zabransky, what's been marked as Exhibit Number 19 is an e-mail that says it's sent Tuesday, January 25, 2000, "Subject: DOE Meeting Minutes 1/18/00," and then the first sentence says,
00130
"Attached are the meeting minutes of the 1/18/00 meeting between PG&E and DOE to discuss possible standard contract renegotiation." Do you see that?
A I see that, yes.
Q And then the minutes are attached identifying as attendees you, Mr. Pollog, and Mr. Burgoyne, and from PG&E Mr. Moulia, Judy Sellers, and Mr. Willis. Do you see that?

A I do.

---

## 132:18 - 135:10

00132
Q The second page of this exhibit, which
0003 are the Bates numbers, under the 12-month
notification issue it says, "DOE offered up two
proposals." Do you see that?
A That's what it says.
00133
Q "The second of which they appeared to
prefer:". Do you see it says that?
A That's what it says yes.
Q Let me read number two. "An arrangement
in which the licensee would consolidate annual
shipping allocations over some period and process
to be determined. DOE would only need to
coordinate a periodic rather than annual shipping
campaign from a particular facility. This would be
significantly more efficient from a mobilization
and transportation coordination perspective - all
of which are DOE responsibilities." Do you see
that?
A Yes, and I don't agree with it.
Q You don't agree with it?
A No.
Q That was not DOE's view at that time?
A No.
Q That was not your view at the time?
A I didn't say that.
Q Okay.
A I don't believe -- I believe that that
00134
view is appropriate, but I don't believe those are
all benefits that accrue to DOE.
Q Strike the last --
A I said all of these.
Q These are not all the benefits that
accrue to DOE; is that what you're saying?
A No, I'm saying all the benefits don't
accrue to DOE.
Q Some benefits accrue to the utility?
A Absolutely.
Q Was it DOE's view at that time that this

was a preferred course to follow?
A I don't know that we had a preferred
view. I think that's a mis -- I don't recall that
A or B, one or two was more preferred. I think DOE
was -- would be willing to discuss either. I think
the other clarification was that, in general, that
two referred to was taking allocations that would
have appeared over let's say a five-year period
once a year and aggregating them into one place but
not necessarily at the utility's desire.
Q Aggregating them. What about aggregating
00135
them into one year?
A That's right, but it may mean that DOE
takes all five fuels in the fifth year and that's
what -- that was what the discussion was to be
about there.
Q And your view is that would have had
benefits over the strict oldest fuel first system?
A That would have had benefits to both
parties, to take those and make them campaigns that
would have had benefits, yes.

## Zabransky, David Deposition Testimony dated 5/3/07

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------:

DAIRYLAND POWER COOPERATIVE, :

:

Plaintiff, :

:

v. : No. 04-106C

:

UNITED STATES OF AMERICA, :

:

Defendants. :

----------------------------------:

Washington, D.C.

Thursday, May 3, 2007

Deposition of:

DAVID K. ZABRANSKY

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:14 a.m., when were present on behalf of the respective parties:

00002

On behalf of Plaintiff:

ROBERT L. SHAPIRO, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3174

On behalf of Defendant:

MARIAN E. SULLIVAN, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 10150
Washington, D.C. 20005
(202) 307-6288

00003

C O N T E N T S

EXAMINATION BY: PAGE
Counsel for Plaintiff 5
Counsel for Defendant 203

00004

ZABRANSKY DEPOSITION EXHIBITS: * PAGE
1 Bates number HQR501 0029 65
2 Bates numbers HQR401 0027
through HQR401 0028 71
3 Bates number PLAC 0079761 78
4 Bates numbers PLAC 0079752
through PLAC 0079760 79

5 Bates numbers PLAC 0110411 through PLAC 0110416 97

6 Bates numbers PLAC 0097730 through PLAC 0097732 111

7 Bates number PLAC 0138340 112

---

## 8:3 - 10:16

00008
Q All right. I'll move on to my next topic, which is -- and I'm not sure how much background you have into the reasons for your having an additional deposition today, Mr. Zabransky. But one of our reasons is to make sure we're up to date on some of the prior topics that were covered in previous depositions. And I would like to start just with your position at the Office of Civilian Radioactive Waste Management, I'll use the acronym OCRWM, and what's happening in your office there. First, if you would tell me what is your current job title at OCRWM?
A My current job title hasn't changed in quite a while. It's nuclear utility specialist.
Q And what office are you in now at OCRWM?
A I think now it's called the -- either the Office of Waste Management or the Waste Management Office, depending on what you want to put first.
Q Is the Waste Management Office divided into any divisions?
00009
A No.
Q How many people work for the Waste Management Office?
A I think 10.
Q Chris Kouts is the director?
A Yes.
Q How long has the Waste Management Office had the current organization of Mr. Kouts as the director and no divisions under it?
A I don't know how many -- whenever the last reorganization took place. I don't know when that was. We have them periodically.
Q Do you have any recollection at all on the order of magnitude? Are you talking last year,

last 5 years?
A Last few years. Last couple years.
Q And how does the Waste Management Office fit into the rest of the structure of OCRWM?
A It's one of the -- I don't know the exact number of offices that were created at the last reorganization that report to the director's office.
Q Does Mr. Kouts and the other office
00010
directors, do they report directly to the director? Is there a deputy director or somebody else in between?
MS. SULLIVAN: Objection. Compound.
THE WITNESS: There's a deputy director, but I believe they report directly to the director's office.
BY MR. SHAPIRO:
Q I think I recall that at our prior deposition, Mr. Milner was still working for OCRWM. And he had the title chief operating officer. And I know that Mr. Milner is retired from DOE. Is there another chief operating officer now?
A Yes, there is.
Q Who is that?
A Mr. Brownstein.

---

## 12:6 - 13:16

00012
Q I believe you testified earlier that your title at OCRWM is nuclear waste specialist.
A No.
Q No. I'm sorry. I got that wrong. What was it?
A I believe I said nuclear utility specialist.
Q Nuclear utility specialist. Are there other nuclear utility specialists in the Waste Management Office?
A I don't believe so.
Q And you still have the title of contracting officer?
A I have the duties, yes. Yes.
Q And Mr. Pollog is still contracting officer's technical representative?

A That's correct.
00013
Q What duties do you have other than the duties of contracting officer?
A The -- I support Mr. Kouts in the other functions that fall within the Waste Management Office.
Q What sort of support do you provide to Mr. Kouts?
A I think I provide very good support to Mr. Kouts.
Q Can you describe for us particular roles that you play supporting Mr. Kouts?
A I'll assist Mr. Kouts in whatever efforts he's working on that he requests help in. Preparing presentations, drafting correspondence, working on technical issues relating to Yucca Mountain and waste acceptance and other issues like that.

---

### 15:10 - 16:12

00015
Q What percentage of your time do you estimate over the last, let's say, 2 years that you've spent on your contracting officer duties?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Maybe 30 percent of my time. Including activities like this.
BY MR. SHAPIRO:
Q And activities like this, you're including work on litigation?
A Uh-huh.
Q That's yes?
A That's correct. Sorry.
Q Overall, as a percentage of all your
00016
time, how much time do you estimate over the last 2 years that you've been spending on litigation related matters?
MS. SULLIVAN: I'm sorry. What was the time period?
MR. SHAPIRO: 2 years.
MS. SULLIVAN: 2 years.
THE WITNESS: I don't know. It's hard to

say. I mean, other than when I'm actually testifying or -- I'm really not focused on it much. So I can't really say that it's been that big a percentage of my time over the last 2 years.

---

**23:3 - 24:9**

00023
Q What support does Mr. Pollog provide to you as contracting officer's technical representative?
A He provides technical support in administering the contracts.
Q What specific support has he provided to you in the last year?
A Tom supported the review of the annual submittals that were made by the utilities with which we have settlements.
Q Any other specific support that Mr. Pollog has provided to you in the last year?
A Tom provides -- you know, it's normal routine support, interfacing with the controller's office, et cetera. So I can't speak to specific issues that have come up. But he interfaces on a day-to-day basis with the DOE controller's office on payment issues, et cetera. So -- he's also serving as the contracting officer's representative on the existing TAD proof of concept contracts and
00024
anticipating serve as the COR on the new TAD procurement contracts for final design.
Q You testified that Mr. Pollog interfaces with the DOE controller's office on payment issues. What sort of payment issues?
A Utility payment issues.
Q Are you referring to utilities' quarterly payments of their fees under the Standard Contract?
A That's correct.

---

**29:10 - 29:19**

00029
Q All right. Let's change subjects. I would like to cover, Mr. Zabransky, contacts you've

had with the Dairyland Power Cooperative, the plaintiff in this case.
Have you ever been to Dairyland's LACBWR site in Genoa, Wisconsin?
A No.
Q Have you ever been to Dairyland's offices in La Crosse?
A No.

---

## 35:14 - 36:19

00035
Why don't we start, generally, what do you know about Dairyland?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: This is what I know about Dairyland?
Other than the fact that when I lived in Wisconsin they were the reactor on the other side of the state, and it was an Allis-Chalmers reactor. It was known as the tractor reactor. And it was shut
00036
down really early. And it was a small plant. And one of my friends at Wisconsin Electric came from there. And it was a cooperative. I didn't know much more about it.
BY MR. SHAPIRO:
Q What do you mean by a tractor reactor?
A Allis-Chalmers mainly made tractors. I think it was a derogatory term.
Q What knowledge do you have of Dairyland's LACBWR site in Genoa, Wisconsin?
A Up until the 2004 meeting where they showed us a site layout, which I don't recall, I had no knowledge of it.
Q Well, I'm asking as of today, other than being shown that site in that 2004 meeting, do you have any other knowledge of Dairyland's LACBWR site?
A I believe it's on the Mississippi. I believe it shares a site with some coal plants. But that's about all I know about it.

---

## 37:4 - 37:19

00037

Q What's your understanding of -- well, let's start with the amount of spent nuclear fuel that Dairyland has?

A I believe -- again, my memory is probably not precise on this. It's somewhere in the 30, 40-ton range, metric tons, I believe. I'm not sure of the exact quantity.

Q And what's your understanding of the condition of Dairyland's spent nuclear fuel?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: Well, my -- based upon what I've observed in the 859 reports, there's, I believe, quite a number of identified failed assemblies. It's also stainless steel clad fuel. So I'm not sure of the exact condition. But -- I've never seen it personally.

---

## 38:6 - 39:8

00038

Q Do you have any knowledge of how much it costs Dairyland to maintain its spent nuclear fuel in -- stored in its pool?

MS. SULLIVAN: Objection. Vague, foundation.

THE WITNESS: No.

BY MR. SHAPIRO:

Q Do you have any knowledge of Dairyland's finances?

MS. SULLIVAN: Objection. Vague, relevance.

THE WITNESS: No.

BY MR. SHAPIRO:

Q What do you know about Dairyland's claim for damages in this litigation?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: Nothing.

00039

BY MR. SHAPIRO:

Q What is your understanding of the components of Dairyland's damages claim in this litigation?

MS. SULLIVAN: Objection. Vague, foundation, asked and answered.
THE WITNESS: I haven't seen it. I have no idea what's in it.

---

### 46:15 - 47:8

00046
Q You don't have any understanding as to why Dairyland has not implemented dry storage at its site before now, do you?
MS. SULLIVAN: Objection. Asked and answered. Same objections.
THE WITNESS: I don't know what Dairyland's considerations have been, no.
BY MR. SHAPIRO:
00047
Q You don't know whether Dairyland could construct an ISFSI at its LACBWR site under current NRC regulations, do you?
MS. SULLIVAN: Objection. Foundation. Speculation, vague, and it calls for a legal conclusion.
THE WITNESS: I don't have any information as to what they can or cannot do.

---

### 50:2 - 50:15

00050
Q I'll represent to you, Mr. Zabransky, that Dairyland has incurred costs to help develop a private fuel storage initiative. Are you familiar with private fuel storage?
A I'm familiar with the project, yes.
Q You don't have any knowledge indicating that it has been unreasonable for Dairyland to have incurred these costs toward the development of private fuel storage, do you?
MS. SULLIVAN: Objection. Legal conclusion, vague, foundation, speculation.
THE WITNESS: I don't know what costs they've incurred. So I don't know whether it would be reasonable or unreasonable.

---

### 53:15 - 54:5

00053

Q I'll represent to you, Mr. Zabransky, that Dairyland is also claiming damages related to the removal of its reactor pressure vessel. You don't have any knowledge indicating that Dairyland could have performed the work that it's doing to remove its reactor pressure vessel at a lower cost than it's incurring, do you?

MS. SULLIVAN: Objection. Vague,

00054

foundation, assumes facts not in evidence.

THE WITNESS: And I have no knowledge of the work or of the costs they're incurring. So I can't give a basis as to whether it could have been done for more or less.

---

### 54:16 - 55:5

00054

Q I'll represent to you, Mr. Zabransky, that that's the case, that Dairyland is claiming it could have removed its reactor pressure vessel at a lower cost if its spent nuclear fuel were not still present in its spent fuel pool. You don't have any knowledge that would be inconsistent with Dairyland's contention in that

00055

regard, do you?

MS. SULLIVAN: Objection. Vague, legal conclusion.

THE WITNESS: I don't have any knowledge that either supports their contention or refutes it.

---

### 56:1 - 56:9

00056

Q When do you expect the Department of Energy to start accepting spent nuclear fuel from utilities?

MS. SULLIVAN: And foundation. Same

objections. Foundation and speculation.
THE WITNESS: Basically all I can tell you is that the program has Mr. -- Mr. Sproat has announced or said on a number of occasions that the best achievable date is 2017.

---

## 57:15 - 57:19

00057
Q You don't have any basis for disagreeing with Mr. Sproat's assessment, do you?
MS. SULLIVAN: Objection. Asked and answered, relevance, vague, foundation.
THE WITNESS: No, I don't.

---

## 76:7 - 79:22

00076
Q Are you saying that approved delivery commitment schedules are binding in some manner on utilities?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection to the extent it mischaracterizes the witness' testimony.
THE WITNESS: And I -- the testimony I'm giving is that I believe -- the Department believes they're binding on both parties to approve delivery commitment schedules.
BY MR. SHAPIRO:
Q What's your understanding of what an approved delivery commitment schedule binds the utility to do?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion, and vague.
00077
THE WITNESS: Basically, it requires them or binds them to provide fuels of the ranges they've indicated fuel range -- dates they've indicated basically when, in the year they've indicated they provide it, from the facility they indicate they would like it picked up from.
BY MR. SHAPIRO:
Q What's the basis of the government's position that the approved delivery commitment

schedules requires or binds utilities to provide fuels of the ranges indicated on the delivery commitment schedule forms?
MS. SULLIVAN: Objection. Legal conclusion, and vague.
THE WITNESS: And, again, I mean the contracting officer's guidance, instructed them to complete the forms, instructed them to have that form executed by someone who could bind the company to the information provided on the form. And the Department's expectation has been that that information on the form is something we can rely upon in planning our waste acceptance and
00078
transportation systems.
BY MR. SHAPIRO:
Q There's nothing on the delivery commitment form itself that says it's binding on either utilities or the Department, true?
MS. SULLIVAN: Objection. Legal conclusion, vague, assumes facts not in evidence.
THE WITNESS: And without seeing the form, I'm not sure it says that on there. I believe it does say on the form that information they're providing is truthful under penalty of law. And we rely upon it based upon their assertion that it's binding their company to provide fuel in that fuel range.
(Zabransky Exhibit Number 3 was marked for identification.)
BY MR. SHAPIRO:
Q Mr. Zabransky, you've been handed what's been marked as Exhibit 3 to your deposition. You recognize this document, don't you?
A It's a blank DCS form.
Q Can you point me to anything on this DCS
00079
form, Exhibit 3, that indicates that it is binding on a utility?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: No. On the form, per se, no. I think you have to go to the instructions with the form -- that came with the form from the contracting officer.
(Zabransky Exhibit Number 4 was marked for

identification.)
BY MR. SHAPIRO:
Q Mr. Zabransky, you've been handed what's
been marked as Exhibit 4 to your deposition. And
it's a letter from the Department of Energy. It
looks like it's dated March 4th of 1992 to William
Berg at Dairyland Power Cooperative. It's got at
least one attachment to it.
Do you recognize this document?
A It's a letter that was sent to contract
holders, I think generally to all contract holders
at this time, starting the DCS process and giving
them instructions.

---

## 88:15 - 90:22

00088
Q But if they put in a -- if utilities had
put on the form a higher number than the allocation
in the 1991 Annual Capacity Report, that -- such a
form would have been inconsistent with the
instructions, true?
A That's correct.
Q So the instructions were intended to
restrict utilities from seeking on delivery
00089
commitment schedule forms to deliver all the spent
nuclear fuel they wished to deliver?
MS. SULLIVAN: Objection. Legal
conclusion, vague, best evidence.
THE WITNESS: I mean, the instructions,
whether it restricted them from putting -- taking an
action or not, as it says in section 7A, allocations
are based upon the 1991 ACR in this case and limits
it to the allocations that were in the ACR for each
utility because of the finite capacity of the -- the
ability to accept spent fuel.
BY MR. SHAPIRO:
Q Didn't the instructions go on to warn
utilities that, if they put on proposed delivery
commitment schedule forms an amount of spent fuel
that exceeded the allocation in the 1991 Annual
Capacity Report, that the Department would
disapprove the delivery commitment schedule?
MS. SULLIVAN: Objection. Legal

conclusion, vague, best evidence, and beyond the scope of Mr. Zabransky's 30(b)(6) deposition.

THE WITNESS: I'm not sure the

00090

instructions contain that information. I don't know.

BY MR. SHAPIRO:

Q Let me specifically point your attention to the first attachment to the letter of Exhibit 4, the -- which are termed the general instructions.

And if you turn to page 6 of the general instructions. And then specifically to paragraph 2.7.

Doesn't that paragraph warn utilities that proposed delivery commitment schedule forms will be disapproved if the amount of spent fuel requested to be removed exceeds an allocation in the Annual Capacity Report?

MS. SULLIVAN: Objection. Mischaracterizes the document as to the general versus specific instructions, best evidence, legal conclusion, and beyond the scope of Mr. Zabransky's deposition -- Rule 30(b)(6) deposition.

THE WITNESS: And thank you for pointing that out to me. I missed that. But that was the contracting officer's guidance given back in 1992.

---

## 101:8 - 102:20

00101

But is it the government's view that, absent such an approved delivery commitment schedule, that the Department of Energy has no obligation to pick up that utility's spent nuclear fuel by any particular time?

MS. SULLIVAN: Objection. Legal conclusion, vague, mischaracterizes the witness' prior testimony, asked and answered.

THE WITNESS: I think the obligation in general was to begin in 1998 with operations of an acceptance system. With regard to a specific utility, there is no schedule until there's an approved DCS that establishes a schedule for that utility.

BY MR. SHAPIRO:

00102
Q And if there's no schedule, then there's no obligation on the part of the Department of Energy to pick up that utility's spent nuclear fuel?
MS. SULLIVAN: Objection. Legal conclusion, vague. Objection to the extent it mischaracterizes the witness' prior testimony.
THE WITNESS: And I think the obligation is a different question than schedule. There's no schedule. So it's not necessarily delayed. There's an obligation to pick up the spent fuel. The schedule hasn't been established.
BY MR. SHAPIRO:
Q And it's the Department's view that if the schedule hasn't been established, then the Department of Energy can't be in breach of its obligation yet to pick up that spent nuclear fuel?
MS. SULLIVAN: Objection. Legal conclusion, foundation, vague.
THE WITNESS: And I can't offer an opinion on that legal issue.

---

**108:7 - 109:3**

00108
Q I'm still not sure that you've quite answered my question. If the Department of Energy does not approve a utility's final delivery commitment schedule, does the Department of Energy, in the government's view, still have an obligation to pick up that amount of spent nuclear fuel from the utility?
MS. SULLIVAN: Objection. Legal conclusion, vague, asked and answered.
THE WITNESS: And let me clarify my answer, is that if the FDS, which is covered by an approved DCS, is ultimately not approved by the Department for a reason that's -- again, we've never approved an FDS. But through the process of FDS approval, if agreement cannot be reached as to a specific date, then perhaps the situation would be
00109
that there would be a dispute on that point. But that process is a scheduling process that has never been implemented.

---

### 116:12 - 116:21

00116
DOE would not have approved a delivery commitment schedule form from a utility that sought to deliver more spent nuclear fuel in a year than that utility was allocated by the 1991 ACR, true?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: It's my understanding that DOE did not approve forms submitted by utilities that requested or claimed allocations in excess of those in the ACR.

---

### 117:17 - 118:19

00117
Q I'm not asking about utilities' insight as to whether it would have been futile. I'm asking in fact it would have been futile for a utility to have submitted a proposed delivery commitment schedule form that sought to deliver more spent fuel than that utility's allocation as set out in the
00118
1991 ACR?
MS. SULLIVAN: Objection. Legal conclusion, vague, relevance.
THE WITNESS: And, you know, the instructions indicated the basis for submittals and approval. And there was a finite capacity. DOE followed the instructions and processed the forms accordingly.
BY MR. SHAPIRO:
Q Is there any chance that, if a utility had submitted a DCS that sought a greater amount of spent nuclear fuel acceptance than set out in the 1991 ACR, that DOE might have deviated from its instructions and still have approved that DCS?
MS. SULLIVAN: Objection. Legal conclusion, vague, relevance.
THE WITNESS: And without being aware of any specific circumstances, I don't know that there would be any circumstances that that would happen.

## 126:21 - 127:11

00126

Q We discussed a little bit earlier that, after stopping the delivery commitment schedule

00127

process in the 1990s, the Department restarted the process in 2004. The Department also stopped the DCS process once again in 2004.
Why did the Department stop processing DCS forms a second time in 2004?
MS. SULLIVAN: Objection. Vague, compound, relevance.
THE WITNESS: The Department stopped in 2004 when it became evident that the 2010 date upon which the initiation of the process was predicated was not going to be attained.

## 144:18 - 145:13

00144

Q We may come back to that topic. Let me move on for the moment to the next topic. The purpose and role of the provision in the Standard Contract providing for priority acceptance of spent fuel from permanently shut down reactors.

00145

What is the purpose and role of that provision of the Standard Contract, Mr. Zabransky?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: The provision under the Standard Contract that allows DOE at its discretion to grant priority acceptance of shut down reactors was put in the contract for exactly that purpose, for DOE to have that ability at its discretion to grant that acceptance, to facilitate removal of fuel from reactors that are permanently shut down, potentially to avoid them having fuel for many, many years.

**148:3 - 149:21**

00148
Q Why has the Department not granted that priority acceptance to permanently shut down reactors?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: The Department's position is that that issue, which is related to the removal of spent fuel from shut down reactors, is best addressed through the exchange provision of the contract between the utility as opposed to the Department unilaterally reallocating a finite capacity to one utility over another.
BY MR. SHAPIRO:
Q So it has been the Department's expectation that the exchanges provision will operate sufficiently to obviate the need for according priority acceptance to spent fuel at permanently shut down reactors?
MS. SULLIVAN: Objection. Vague, compound, and mischaracterizes the witness' prior testimony.
00149
THE WITNESS: I'm not sure that the latter part -- I mean, my statement was that the Department's position is that the exchange provision is the best way that utilities can, amongst themselves, reallocate that capacity for acceptance in a way that best addresses the need to remove fuel from shut down reactors.
BY MR. SHAPIRO:
Q Well, the Department has expected that, once it actually starts accepting spent fuel, that the exchanges provision will operate as originally intended, to enable utilities to optimize their acceptance -- the timing of their acceptance of spent fuel, correct?
MS. SULLIVAN: Objection. Vague, compound, assumes facts not in evidence.
THE WITNESS: The Department anticipates that the exchange provision will operate in a way that will allow utilities to exchange amongst themselves to advance, or to tailor their spent fuel acceptance schedules to their needs.

## 164:6 - 164:12

00164
Q What are DOE's plans for scheduling of the acceptance of failed fuel from the utilities?
MS. SULLIVAN: Objection. Vague, beyond the scope of Mr. Zabransky's 30(b)(6) deposition notice, foundation.
THE WITNESS: And DOE's -- again, I can't speak for DOE's plans.

## 165:4 - 165:21

00165
Q Is DOE planning to accept failed fuel from utilities on any -- on any schedule different from fuel that's not failed?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Never having been presented with the specifics of a failed fuel for acceptance, DOE can't answer that question.
BY MR. SHAPIRO:
Q Has DOE at any time been planning to accept failed fuel from utilities on a schedule different from that for fuel that is not failed?
MS. SULLIVAN: Objection. Vague, compound.
THE WITNESS: And, again, Mr. Shapiro, without knowing a specific failed fuel and specific issue -- assembly from a specific reactor, DOE hasn't made a determination as to whether the schedule is appropriate or not.

## 166:20 - 167:14

00166
Q What plans has the Department made for the acceptance of failed fuel from utilities?
MS. SULLIVAN: Objection. Vague.
00167
THE WITNESS: Without knowing the specifics of the failed fuel, I can't tell you the

plans we've made.
BY MR. SHAPIRO:
Q Are you saying that the Department hasn't made any plans for the acceptance of failed fuel from utilities?
MS. SULLIVAN: Objection. Vague, mischaracterizes the witness' prior testimony.
THE WITNESS: I'm saying, Mr. Shapiro, that until a utility identifies the specifics of the failure of the fuel and what the complications are or implications are for the Department, we can't make plans to accept it on a specific schedule.

---

## 170:12 - 171:3

00170
Q So even though the Department knows that utilities have failed fuel, the Department doesn't plan to start making plans to accept that failed fuel until it gets an inquiry about scheduling from utilities under the Standard Contract?
MS. SULLIVAN: Objection. Vague, mischaracterizes witness' prior testimony, compound.
THE WITNESS: I think I've told you we have a process. The process is they'll tell us the specifics. We will tell them if there's any issues or not.
00171
Without the specifics, we can't tell them anything further. The process is established. They haven't started the process.

---

## 174:17 - 175:13

00174
Q What are DOE's plans for the acceptance of Dairyland's failed fuel?
MS. SULLIVAN: Objection. Vague. Objection. Assumes facts not in evidence.
THE WITNESS: And at this point, I don't know that DOE is well versed on the details of
00175
Dairyland's failed fuel, so I don't have specific plans for Dairyland's failed fuel.

BY MR. SHAPIRO:
Q So DOE is not currently planning to
accept Dairyland's failed fuel on a schedule
different from the rest of Dairyland's spent fuel,
true?
MS. SULLIVAN: Objection. Legal
conclusions. Mischaracterizes the witness' prior
testimony.
THE WITNESS: I don't think Dairyland's
fully informed DOE of the detail of its failed fuel,
so DOE hasn't made that determination yet.

---

## 177:19 - 178:3

00177
Q When does the Department expect to
develop a schedule that would provide a -- a date
for the expected completion of removal of
Dairyland's spent fuel?
00178
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: And at this point, I don't
know when that date would be.

---

**Trial Testimony - Carolina Power, et al. v. US (11/13/07)**

01381
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------x
CAROLINA POWER & LIGHT COMPANY and :
FLORIDA POWER CORPORATION, :
Plaintiffs, :No. 04-37C
vs. :
THE UNITED STATES, :
Defendant. :
-----------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.
Tuesday, November 13, 2007
Volume 6
The parties met, pursuant to the notice of the Judge at 9:31 a.m.
BEFORE THE HONORABLE THOMAS C. WHEELER
01382
APPEARANCES:
ON BEHALF OF PLAINTIFFS:
Arnold Bradley Fagg, ESQUIRE
Paul Bessette, ESQUIRE
Linda Eaton, ESQUIRE
David Kerr, ESQUIRE
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5191
ON BEHALF OF THE DEFENDANT:
Andrew P. Averbach, ESQUIRE
Christopher J. Carney, ESQUIRE
Marian Sullivan, ESQUIRE
Lisa Donahue, ESQUIRE

U. S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
12th Floor
Washington, D.C. 20530
(202) 353-0527

---

## 1390:21 - 1393:12
## (Witness: Morgan, Robert)

01390

Q. Okay. I'd like to direct your attention, if we could, to the second column on that page, and the sort of fourth full paragraph in that column. And I'm going to read a portion of that into the record, and

01391

then ask you some questions about it.

"I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend," it doesn't say to, but I presume to "do. I think most of you know that the Act requires that we receive waste from the utilities by January 1st, 1998. Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."

Let's stop right there, if we could, Mr. Morgan. First question, does that fairly characterize the remarks you gave in December of 1983?

A. Yes, it does.

Q. And those were true statements to the best of your knowledge at the time you gave them, correct?

A. Yes.

Q. Okay. And you believed that it made sense that Congress didn't intend for you to

01392

only take one assembly starting in 1998,

correct?
A. Correct.
Q. Okay. I mean, common sense tells us that, doesn't it, Mr. Morgan?
A. Well, looking at the intent of the entire Act, it was to dispose of all the spent fuel from the commercial reactors. That was the intent clearly stated in the Act. With accepting one fuel element, one could not reach that goal.
Q. And you thought these statements were appropriate at the time you gave them, correct, Mr. Morgan?
A. Correct.
Q. Let's move on to the balance of that paragraph. It goes on to say, "the basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on-site during the first year of operation of the repository. In 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another
01393
location."
And let's stop there for a moment. Again, accurately characterized what you said in December of 1983, Mr. Morgan?
A. Yes.
Q. Accurately reflect your views at that time, correct?
A. Yes.
Q. And in fact, that reflected your intent and strategy at the time you made those statements, correct?
A. Yes.

---

**1395:13 - 1396:4**
**(Witness: Morgan, Robert)**

01395
Q. Okay. Last paragraph of this excerpt, Mr. Morgan, it says, "to summarize, the basic strategy is to have a repository in operation

in 1998. We will, however, keep a parallel program going on, an MRS, so that if a repository is not available by 1998, or if Congress decides to authorize the construction of an MRS prior to that time, we will be able to comply with the law, to begin accepting waste in 1998." Again, accurate representation of what you said, Mr. Morgan?
A. Yes.
Q. Reflected your belief at the time?
01396
A. Yes.
Q. You were planning for success here, not failure, is that a fair statement?
A. Yes.

---

**1401:18 - 1402:18**
**(Witness: Morgan, Robert)**

01401
Q. Okay. Again, back to the draft mission plan from 1983, are you with me?
A. Yes.
Q. Okay. And the purpose of this document was to outline the plan that the DOE was going to proceed on to try to accomplish the intent of the Nuclear Waste Policy Act, correct?
01402
A. What we felt was the intent of the Nuclear Waste Policy Act.
Q. And you view this --
A. I cannot attribute intent to Congress.
Q. Well, you've testified and you've stated on multiple occasions, haven't you, Mr. Morgan, what you believe the intent to be?
A. What I believe the intent to be, but I don't know that that was clearly an intent of Congress.
Q. And I'm just asking about what you know, Mr. Morgan, do you understand that?
A. Yes, sir.
Q. Okay. You viewed this document as a proper way to accomplish the goals of the Nuclear Waste Policy Act, correct?

A. The goals or strategy that we were attempting to comply with.

---

**1407:25 - 1408:8**
**(Witness: Mogan, Robert)**

01407
Q. Certainly. The rates that were
01408
developed on this chart that we were looking at, were developed under your direction, correct?
A. Yes.
Q. And you thought these rates to be reasonable at the time you published this in December of 1983, correct?
A. Correct.

---

**1412:15 - 1414:4**
**(Witness: Morgan, Robert)**

01412
Q. Okay. One more paragraph on this document that I'd like to ask you about, Mr. Morgan, is the last paragraph on this page, and it carries over after we skip the chart that we've been talking about to the following page.
And I will just try to read it, so the court reporter can understand it here at a modest rate of pace, and ask you a couple questions about it. "While the Department's acceptance rate during the initial five years
01413
is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its," and we have to turn over two pages, "shipment allocations. The planning basis assumes that after 1998, individual utilities who actually realize this need will arrange for the right to ship spent

fuel to the Department from a utility who is next in the queue in shipment allocation, subject to prior approval by the Department, based on submittal of a request no less than six months prior to the scheduled delivery date.
"The use of such brokering arrangements should prevent the need for any utility to expand on-site storage and minimize transshipments."
Couple questions about that. Again, accurate statement at the time it was contained in this document, as far as you were aware, Mr. Morgan, in December of 1983?
A. Correct.
Q. And correctly reflected your belief
01414
about these brokering arrangements and the ability to prevent the need for expanding on-site storage, correct?
A. Correct.

---

**1488:23 - 1489:6**
**(Witness: Zabransky, David)**

01488
Q. Can I get you to spell your name for the record, sir?
A. Yes, my name is David Zabransky,
01489
Z-A-B-R-A-N-S-K-Y.
Q. And you are employed by who, sir?
A. Department of Energy.
Q. And how long have you been with Department of Energy?
A. Since July of 1994.

---

**1491:3 - 1491:25**
**(Witness: Zabransky, David)**

01491
Q. Okay. You have testified a number of times in these proceedings, is that fair to

say, Mr. Zabransky?
A. I think that's fair to say, yes.
Q. You are the contracting officer, correct?
A. I am at this point in time, yes.
Q. And that's for, in particular, the DOE standard contract with Carolina Power & Light and Florida Power Corporation, correct?
A. For all the contracts. Those would be included, yes.
Q. The ones of interest here today, those two, you're the contracting officer for DOE, correct?
A. That's correct.
Q. What do you understand your authority to be as a contracting officer?
A. To implement the provisions of contract on behalf of the government.
Q. You're familiar with the government's positions regarding that contract, correct?
A. I presume so.

---

**1503:17 - 1503:21**
**(Witness: Zabransky, David)**

01503
Q. But you've testified in the past, haven't you, that the MRS process had ceased certainly by 1995, correct?
A. I believe in the latter part of '95, I have found to be the case.

---

**1514:8 - 1514:19**
**(Witness: Zabransky, David)**

01514
Q. Could you identify the document I've just handed to you for the record, Mr. Zabransky?
THE COURT: Does it have an Exhibit Number?
MR. FAGG: Plaintiffs' Exhibit 60, I'm sorry, Your Honor.

THE WITNESS: Yes, this appears to be a copy of the 1994 annual capacity report.
BY MR. FAGG:
Q. And again, published when?
A. March of '95.

---

**1515:4 - 1515:21**
**(Witness: Zabransky, David)**

01515
Q. Just a couple of questions about this document, Mr. Zabransky. This document carried over the same aggregate acceptance rates as the prior ACRs, correct, going back to 1991?
A. Yes, it was still based on an MRS.
Q. Okay. And this was issued after you came to be at the Department of Energy, correct?
A. Yes.
Q. And no one discussed changing the rates in connection with this document in March of 1995, correct?
A. Again, this document was generated and developed throughout '94, so, no, no one discussed it, to my knowledge.
Q. One of the considerations in carrying over the rates was to minimize the commitments that DOE had to utilities, correct?

---

**1516:9 - 1516:16**
**(Witness: Zabransky, David)**

01516
THE WITNESS: To the extent that it matched the commitments to what the Department could possibly hope to do, it did that, yes.
BY MR. FAGG:
Q. And again, my question was that, was one of considerations in carrying over the rates from the prior ACRs was to minimize the commitments that DOE had to utilities, correct?

---

**1516:23 - 1517:19**
**(Witness: Zabransky, David)**

01516
THE WITNESS: And again, like I said, Mr. Fagg, yes, it minimized them to the extent they were all the Department could hope to do.
01517
All that could have been in place would have been an MRS prior to 2010.
BY MR. FAGG:
Q. DOE was, with these pickup rates, trying to minimize these obligations, correct?
A. I think that's one way of putting it. I'd just like to say that it put them in sync with what it could possibly hope to do. It couldn't do more than this, so to put out rates that would have been beyond these wouldn't have reflected any possibility of performance until 2010.
Q. Another way of putting it, Mr. Zabransky, is these rates were intended in part to minimize DOE's liability to contract holders, correct?
A. That might have been a consideration. But it also, again, as I said, this is all the Department could have done.

---

**1523:20 - 1524:12**
**(Witness: Zabransky, David)**

01523
Q. So for utilities that had submitted DCSes starting in or around March of 1997, DOE was no longer approving those DCSes?
A. They were not processing them, that's right.
Q. Nor were they approving them, were
01524
they?
A. That's true.
Q. The reason that DOE was no longer processing these DCSes was because counsel advised you not to process the DCSes, correct?
A. The reason was that we had the court

decision that told the Department that its position that these were conditioned on the existence of the facility was incorrect. And in light of that contract advice, counsel advised the contracting officer that it would be inappropriate to continue to approve these.

---

**1529:11 - 1530:20**
**(Witness: Zabranksy, David)**

01529
Q. Sure. During the time when you thought there was going to be an operating repository, Mr. Zabransky, you viewed a rate that would have reflected the aggregate rate of discharges by utilities, plus some amount of working off the backlog as a reasonable rate, correct?
MS. SULLIVAN: Objection, Your Honor, vague as to the term reasonable.
THE COURT: Overruled.
THE WITNESS: And again, I think given what you've stated, that if it was a repository system, that a reasonable rate would -- as you said -- keep pace with discharges and work off the backlog. That seems reasonable.
01530
BY MR. FAGG:
Q. And stated slightly differently, your own opinion is that a rate that would have kept pace with the industry discharges and removed some amount of backlog would have been an appropriate rate, correct?
A. In a case without constraints, I agree, yes.
Q. Reasonable and appropriate, correct?
A. As I said, in an unconstrained case, that would be fine.
Q. Industry discharges at a rate of about 2000 MTUs per year; is that correct?
A. That's correct.
Q. And acceptance rate of 3000 MTUs per year does what we've just talked about, in a general sense, doesn't it? It keeps up with the industry discharges and starts working off

the backlog, correct?
A. Yes.

## Trial Testimony - Carolina Power, et al. v. US (11/9/07)

01163
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------x
CAROLINA POWER & LIGHT COMPANY and :
FLORIDA POWER CORPORATION, :
Plaintiffs, :No. 04-37C
vs. :
THE UNITED STATES, :
Defendant. :
-----------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.
Friday, November 9, 2007
Volume 5
The parties met, pursuant to the notice of the
Judge at 9:31 a.m.
BEFORE THE HONORABLE THOMAS C. WHEELER
01164
APPEARANCES:
ON BEHALF OF PLAINTIFFS:
Arnold Bradley Fagg, ESQUIRE
Paul Bessette, ESQUIRE
Linda Eaton, ESQUIRE
David Kerr, ESQUIRE
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5191
ON BEHALF OF THE DEFENDANT:
Andrew P. Averbach, ESQUIRE
Christopher J. Carney, ESQUIRE
Marian Sullivan, ESQUIRE
Lisa Donahue, ESQUIRE

U. S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
12th Floor
Washington, D.C. 20530
(202) 353-0527

---

**1224:15 - 1226:25**
**(Witness: Pollog, Thomas**

01224
Q. Could you state your name for the record, sir?
A. Yes, Thomas Pollog.
Q. And by whom are you employed, Mr. Pollog?
A. U.S. Department of Energy.
Q. And you have been designated, as I understand it, as party representative for purposes of this lawsuit, correct?
A. Yes.
Q. I'd like you, if you could briefly,
01225
Mr. Pollog, to just describe your educational and professional history and your career with the Department of Energy, why don't we start with the education?
A. Yes. I received a Bachelor's of science in nuclear engineering from Penn State in 1981, a Master's of science in environmental systems engineering from Clemson University in 1988. I started working for the Department of Energy in 1988. I've worked there until present. I had a three-year leave of absence from 1992 to '93 and '94, but I was still considered a DOE employee during that time.
Q. Let's go into just a bit more detail and break it up into some pieces. You started in 1988. What was your first role at the Department of Energy?
A. The first things I did, I worked in the systems development branch, and I worked in there for approximately six years to a month, and after that, I was in the systems

integration branch, and I was there for
approximately a year, and after that, I went
into the logistics and utility interface
branch, and I was there for about -- almost two
01226
years.
And then I took my three-year leave of
absence, and I came back in 1995. And upon my
return, I was in the engineering division, and
I was there for approximately a
year-and-a-half, and then I went back into the
waste acceptance area, and I've been there
since the latter part of 1996 until present.
Q. Okay. And just to be clear, in the
period prior to 1992, when you went on your
leave of absence, you were in the waste
acceptance area?
A. Yes, I said it's logistics and utility
interface branch, and that was waste acceptance
function, different title, but same function.
Q. Okay. And the systems development,
was that also in the waste area?
A. No, that was not in the waste
acceptance area.
Q. So when did you come to the waste
acceptance area of DOE?
A. I believe it was in the latter part of
1990.
Q. Latter part of?
A. Mid to latter part of 1990.

---

**1227:11 - 1228:19**
**(Witness: Pollog, Thomas)**

01227
Q. It's fair to say, during the course of
your career, both prior to and subsequent to
your assignment in Vienna, you've been involved
with DOE contractual issues, Mr. Pollog?
A. Yes, that's fair to say.
Q. Okay. You've testified in a number of
these cases, correct?
A. Yes, I have.
Q. Had your deposition taken a number of
times?

A. Yes, I have.
Q. Not by me though, right?
A. Not by you.
Q. Okay. You have been designated by the government as a Rule 30(b)(6) witness on a
01228
couple of occasions, right?
A. That's correct.
Q. And you understood a 30(b)(6) to be speaking on behalf of the Department of Energy, correct?
A. That's right.
Q. And for purposes of those 30(b)(6) depositions, you reviewed documents and became familiar with the subject matters of the depositions?
A. That's correct.
Q. And the subject matters included pickup rate, acceptance rate issues?
A. That's correct.
Q. And those included pickup rate and acceptance rate issues even predating the period in 1988 that you joined the Department, correct?
A. That's correct.

---

**1242:15 - 1249:9**
**(Witness: Pollog, Thomas)**

01242
Q. Mr. Pollog, I'm going to hand you what's in evidence as Plaintiffs' Exhibit 53. And you're familiar with this document, aren't you, Mr. Pollog?
A. Yes, I am.
Q. And this is from the time you were working at DOE, correct?
A. Yes.
Q. And you had a hand in preparing this document, correct?
A. Yes, that's correct.
01243
Q. And this document contains what we've come to euphemistically refer to as the 900 rate, correct?

A. It doesn't include a rate that reaches steady state 900 MTUs per year.

Q. Okay. And, well, let's look at a couple of provisions of this document. Let me direct your attention, if I could, Mr. Pollog, to the Bates page ending 801, and the middle paragraph of that page is referring to waste acceptance rates, correct?

A. Yes, I believe that's correct.

Q. And in particular, this paragraph is referring to some assumptions that embodied in the waste acceptance rates provided later in this document, correct?

A. Yes, that's correct.

Q. And one of those assumptions, let's highlight the first clause after the colon, there is a site for "A monitored retrievable storage (MRS) facility will be obtained and the facility will initiate operations in 1998." That's one of the assumptions, correct?

A. Yes, that's correct.

Q. Okay. And this is written in the

01244

passive voice. Let's talk a little bit about who's going to do this. At this point, DOE was relying upon a provision in the 1987 amendments that appointed a Negotiator, is that correct?

A. Yeah, that's correct, the Negotiator was seeking a volunteer site to host an MRS facility.

Q. And while the Negotiator was undergoing those efforts, DOE was not, itself, independently trying to identify and site a monitored retrievable storage facility, correct?

A. I believe that's correct. I'm not a hundred percent sure because I didn't work in the area of our program that was involved with the storage and the MRS, so I don't know if they were doing anything on their own, but I believe that's probably right.

Q. Did you ever learn that, in the course of your preparing to testify on the behalf of the Department of Energy in all the times you've done it?

A. No, I have not.

Q. And you're the Department of Energy's representative at this trial, right,
01245
Mr. Pollog?
A. That's correct.
Q. Let's look at another one of these assumptions, Mr. Pollog, the statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act of 1982 as amended will be modified. That's an assumption implicit in the rates and pickup dates later, that later appear in this document, correct?
A. Yeah, I believe that's correct.
Q. And just so we're clear, we're talking about an amendment by Congress, so the law, correct?
A. Yes, that's correct.
Q. And the assumption is Congress is going to change the Nuclear Waste Policy Act, so that DOE can do and perform in the way that's set forth later in this document, right?
A. I think what we were seeking was relief from schedule linkages that were contained in the Amendments Act of '87 so.
Q. And what are the schedule linkages?
A. There were several linkages between an MRS and a repository that were placed, that
01246
were in the '87 Amendments Act. I think one that's being referred to here as the start date of an MRS and receipt of construction authorization for the repository, you couldn't start, I believe, MRS operation until we received a construction authorization from the Nuclear Regulatory Commission for the repository.
Q. Okay. And the relief you're talking about, the relief's got to come from Congress, right?
A. Yes.
Q. Because these restrictions are in the law, right?
A. Yes.
Q. Let's look in another provision, though further down, the next sentence says,

"During the first 10 years following projected commencement of Federal Waste Management System operation, the total quantity of SNF that could be accepted is projected to be 8200 MTU." And the passage I'd like to highlight here, "This is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA," and the 8200 MTU is

01247

based upon another provision of the amended Nuclear Waste Policy Act, correct?

A. Yes, that's correct.

Q. And just generally, the rates that are contained in this document were not to address the needs of utilities to avoid additional on-site storage after January 31st, 1998, correct, Mr. Pollog?

A. Again, as I stated, when I started working for the Department in 1988, there was never any discussion about preventing on-site storage for any of the contract holders or utilities from the time I started until the present, so, no, this effort wasn't done to prevent additional at-reactor storage or out of pool at-reactor storage for the facilities, for the contract holders.

Q. Okay. Let's look at a couple of other provisions in this document. Let's go over to Bates page ending 803, and the last sentence on that document, and then carrying over to, with one word on the next page, it says, "As specified in the standard contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the

01248

purchasers," see that language?

A. Yes, I do.

Q. And you're familiar with that language, correct?

A. Yes, I am.

Q. That language has been drawn to your attention, probably not the first one to draw that language to your attention, is that a fair statement?

A. Yes, that's a fair statement.

Q. And this language appears in every

single acceptance capacity report that the Department has ever issued, isn't that correct?
A. I believe that's correct, yes.
Q. Let's look, Mr. Pollog, over on page 806 of this document, page four, I guess Bates label 806. In the middle paragraph, the acceptance rates in table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation.
And the passage I just read,
01249
Mr. Pollog, that's consistent with the schedule linkages we were just talking about?
A. Yes, that's correct.
Q. Okay. And so, again, this is stating that there's one part of the law that's assumed to be changed and another part of the law that is imposing a restriction that's embodied in these rates, fair statement?
A. Yes, that's a fair statement.

---

**1276:2 - 1276:15**
**(Witness: Pollog, Thomas)**

01276
Q. Going to Plaintiffs' Exhibit 55, which is in evidence, you recognize Plaintiffs' Exhibit 55, correct, Mr. Pollog? Well, let me rephrase that, you recognize the type of document that's reflected on Plaintiffs' Exhibit 55, correct?
A. Yes, I recognize a type of document.
Q. These were the instructions that went out to utilities for filling out DCSes, correct?
A. Yes.
Q. And you had a hand in preparing these instructions, correct?
A. Possibly.

---

**1277:1 - 1278:8**
**(Witness: Pollog, Thomas)**

01277

Q. Prior to 1993, back in the 1991/'92 time period, you were involved in putting together the instructions that went out to utilities, correct?

A. Yes, that's correct.

Q. Let me ask you to turn to Bates page 095 of Plaintiffs' Exhibit 55, Mr. Pollog, and in the carryover paragraph, the last sentence of that says, "There is no limit to the number of DCSes that can be submitted for each allocation, as long as the total metric tons of uranium, MTU, requested does not exceed the purchaser's total MTU allocation for that year."

Am I understanding that provision and other provisions in these instructions correctly, Mr. Pollog, that if a purchaser filled out a DCS that identified more MTUs than were allotted to it under the most recent annual capacity report, that the DOE would disapprove that DCS?

A. Yes, that's correct.

Q. No doubt about that, right, it happened, didn't it?

A. Yes, it did.

01278

Q. So if Carolina Power & Light had put down 150 MTUs and the ACR only said 70 MTUs, that DCS would have been rejected, correct?

A. I believe so.

Q. Mr. Pollog, that limitation, okay, the limitation to the amounts in the ACR, that's nowhere in the contract, is it?

A. I don't believe it is.

## Trial Testimony - Northern States v. US (11/13/06)

02942
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
NORTHERN STATES POWER COMPANY, )
Plaintiff ) Case No.
vs. ) 98-484C
THE UNITED STATES, )
Defendant. )
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.
Monday, November 13, 2006
VOLUME 10
The parties met, pursuant to the notice of
the Judge, at 10:04 a.m.
BEFORE: THE HONORABLE JOHN P. WIESE
02943
APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD,, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
(703) 770-7900
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
2300 N Street, N.W.
Washington, D.C. 20037-1122
(202) 663-8063

02944

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

---

**3134:3 - 3137:22**
**(Witness: Kouts, Christopher)**

03134

Mr. Kouts, where are you currently employed?
A I'm currently employed with the Office of Civilian Radioactive Waste Management at the US Department of Energy.
Q And if I could just remind you, Mr. Kouts, since we are making a record today, it would be best if -- I will try to speak slowly, I would appreciate you to try to speak a little slowly so the court reporter can get everything.
A I'll do my best.
Q Thank you. What is your title in the Office of Civilian Radioactive Waste Management?
A I am of the director of the Waste Management Office.
Q How long have you held that position?
A Well, I've held the position essentially since, on an acting basis since October 2002. And

it's the same office that was reorganized earlier this year. So simplistically I've held the responsibility for the same duties since October of 2002. But the name of my office has changed due to a reorganization.

03135

Q Mr. Kouts, could you describe for the Court briefly your responsibilities as director of the Office of Waste Management.

A Yes. They, first of all, constitute the management of all activities associated with the Standard Contract with utilities. In addition to that, I'm responsible for systems analysis for the overall program. In addition to that, I'm responsible for the primary interface with the Office of Environmental Management and the Office of Naval Nuclear Propulsion Programs.

In addition to that, I'm responsible for the evaluation of the waste fund fee on an annual basis, which is required by the Nuclear Waste Policy Act. And also the total system life cycle cost estimate that's done on an annual basis.

Q Mr. Kouts, could you describe to the Court how your responsibilities relate to planning for the acceptance of waste from commercial utilities under the Standard Contract.

A Yes. Assuming that the Department had an operational date for waste receipt, my office would be responsible for following the process as laid out in the contract for the issuance of acceptance priority rankings and Annual Capacity

03136

Reports, the approval, if you will, of delivery commitment schedules, final delivery schedules, et cetera.

Q Now, in your office, sir, do you have staff who report to you?

A Yes, I do.

Q And who are those individuals?

A The specific areas of the waste acceptance area, that would be Mr. David Zabransky and Mr. Thomas Pollog, who is located in the courtroom here.

Q And what is Mr. Zabransky's title?

A He is the contracting officer for the Standard Contract activities.

Q And Mr. Pollog, what is his title?
A Mr. Pollog's title, I believe, is a waste -- he's actually a nuclear engineer. I believe that's what his position description refers to. But he's also a waste acceptance specialist.
Q Does anyone else report to you in connection with DOE's planning for performance on the Standard Contract?
A No. Those are the two primary individuals.
03137
Q Mr. Kouts, to whom do you report?
A I report to the deputy director of the overall program, Mr. Paul Golan. That's G-O-L-A-N.
Q And to whom does Mr. Golan report?
A Mr. Golan reports to Mr. Edward Sproat, S-P-R-O-A-T.
Q And what is Mr. Sproat's title, if you know?
A Mr. Sproat's title is the director of the Office of Civilian Radioactive Waste Management.
Q And as the director of the Office of Civilian Radioactive Waste Management, do you know who Mr. Sproat reports to?
A He reports to the Under Secretary of Energy, the Deputy Secretary of Energy and the Secretary of Energy.
Q Now, Mr. Kouts, can you tell the Court when you first joined the Office of Civilian Radioactive Waste Management?
A I believe in June of 1985.

---

**3235:9 - 3237:12**
**(Witness: Kouts, Christopher)**

03235
Q Do you consider the rate that's depicted in this document to be an effort -- an effort by DOE to minimize its liability under the Standard Contract?
A No. I believe my sense is that this acceptance schedule reflects the reality of us

trying to implement an MRS facility in a very difficult policy environment.

Q Do you have an opinion, Mr. Kouts, as of this time frame in 1991, December 1991, as to whether there was work being performed by DOE to site and locate -- locate and site a constructed MRS?

A Yes. We had a great deal of work under way. We were, again, working with the Nuclear Waste Negotiator administering his grant program and going out to the sites and trying to --

03236

prospective sites and briefing local leaders and citizenry on what this facility would look like, how it would be operated and how the Department would -- would implement this program.

THE COURT: But, again, you didn't have in place the facilities that would have permitted you to achieve the schedules that you were projecting. Is that not a fact?

THE WITNESS: That's correct. We would have needed a site. And we would have needed to go through the licensing process with the NRC, environmental impact statements and so forth. And that facility could have been done in this time frame assuming we had the proper authorization and we had addressed the schedule linkages or Congress addressed the schedule linkages.

THE COURT: Once again, it's a question of defining your performance under the Standard Contract by reference to what the political will will tolerate; is that correct?

THE WITNESS: It was -- as it turned out in response to your question, the -- there was no political will over the next several years to implement an MRS facility.

THE COURT: That term is political will?

03237

THE WITNESS: My Department was trying to walk a careful path, if you will, to try to construct a process and a plan that could potentially be acceptable to a local government through the Office of the Nuclear Waste Negotiator and, hopefully, still be palatable to the Congress to allow us to address the linkages and move forward with it.

So, again, it was a tortuous path that we were walking through, trying to come up with a path forward that hopefully would be acceptable to the policy arena and get us a host site.

**Trial Testimony - Northern States v. US (11/14/06)**

03282
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
NORTHERN STATES POWER COMPANY, )
Plaintiff ) Case No.
vs. ) 98-484C
THE UNITED STATES, )
Defendant. )
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.
Tuesday, November 14, 2006
VOLUME 11
The parties met, pursuant to the notice of
the Judge, at 10:02 a.m.
BEFORE: THE HONORABLE JOHN P. WIESE
03283
APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD,, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
(703) 770-7900
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
2300 N Street, N.W.
Washington, D.C. 20037-1122
(202) 663-8063

03284
APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

---

**3356:21 - 3358:12**
**(Witness: Kouts, Christopher)**

03356
Q As I said, Mr. Kouts, we're going to
start at the end, and now we're going to go back
to the beginning a little bit.
In your direct, you started the MRS
story in 1995. But the story really starts with
03357
the Nuclear Waste Policy Act in 1982; is that
correct?
A I believe we started the story with
1985, not 1995.
Q I'm sorry, 1985. But the story starts
with the Nuclear Waste Policy of 1982; is that
correct?
A If you go back to the original
provisions of the act requesting the proposal,
yes.
Q Okay. And that act required DOE to

submit to Congress a proposal to construct one or more MRS facilities by 1985; is that correct?
A I'm trying to remember if there was a specific date associated with the submission of the proposal. It doesn't come to mind. But I'd have to review the act to verify that.
Q If we could look at 297, binder 57. I'll just throw up the act on the screen.
A Okay.
Q 297, binder 57.
A You're correct. It says: On or before June 1st, 1985, the Secretary shall complete a detailed study -- I'm sorry. On or -- I'll repeat that.
03358
THE COURT: Slowly.
THE WITNESS: On or before June 1st, 1985, the Secretary shall complete a detailed study of the need for and feasibility of and shall submit to Congress a proposal for the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel.
BY MR. SILBERG:
Q Now, did the 1982 Nuclear Waste Policy Act have any linkages with respect to the MRS?
A No, it did not.

---

**3359:8 - 3359:16**
**(Witness: Kouts, Christopher)**

03359
Q This limitation.
Now, it is true, also, that there was no limitation or restriction on the size of an MRS being proposed in this law?
A That's correct.
Q And there was no restriction or limitation or linkage tying the MRS schedule to a repository in the 1982 act?
A That's correct.

---

**3363:4 - 3366:24**
**(Witness: Kouts, Christopher)**

03363

Q Well, I apologize, Your Honor. I thought from the exhibit that this was the '82 act solely. But you're correct.

When you got to the program in 1985, what was DOE doing with respect to an MRS? Had it already retained someone to design the facility?

A Yes. We were using various contractors to assist us in the development of the proposal. Ralph M. Parsons Company, I believe, was the architect and engineering firm that we retained to develop a design for it. We were also using Pacific Northwest Laboratories to work on the needs and feasibility analysis and to assist us in the preparation of the environmental assessment, which was also to accompany the proposal.

Q And had DOE approved design criteria for the MRS at that point in time?

A It was either at that point in time or shortly thereafter, since we had to essentially give specific guidance to the architect and engineering firm to design the facility according to our vision of what that facility should be able

03364

to do.

Q And do you remember what the DOE-approved design criteria for the MRS was with respect to acceptance rate at that point in time?

A I would have to go back and refresh my memory exactly what the facility was capable of. I think on an annual basis, it was capable of up to 3,000 tons -- processing 3,000 tons of material on an annual basis.

Q And do you remember what the storage capacity was?

A The storage capacity as we proposed it to Congress was not to exceed 15,000 metric tons.

Q No. I'm referring to prior to the submission of your proposal.

A I don't recall whether or not we were looking at higher storage amounts in the field. Certainly, since it was dry storage, the only limitations would have been on the size of the

site in terms of the amount of fuel that we could put on it.
Q Okay. Well, let me see if we can't refresh, if I may.
And if you would look at Bates number 9692. This is Plaintiff's Exhibit 286. And
03365
it's -- and if you look at the second -- and what is this document, Mr. Kouts?
A Well, I have two documents.
Q Well, look at page 96 -- Bates number 9692.
A 9692. Okay. Okay. This is a paper by Mr. William Woods and David Jackson on functional design criteria for monitored retrievable storage.
THE COURT: Whoa, whoa, whoa, Mr. Kouts.
THE WITNESS: I'm sorry. My wife is after me on this too.
I'm sorry. It's a paper written by Mr. William Woods and David Jackson on the functional design criteria for monitored retrievable storage.
BY MR. SILBERG:
Q And Mr. Woods is with the Ralph M. Parsons Company?
A That's correct.
Q And Mr. Jackson is with Pacific Northwest Laboratory?
A That's correct.
Q And those are the two entities that you had identified as being hired by DOE to do the design work for the MRS in the 1985 time period?
03366
A The design work and assist us in the needs and feasibility analysis that was required under the act.
Q Okay. And calling your attention to the second column of Bates 9692, in the second full paragraph, the last sentence, could you read that sentence into the record.
A Okay. Let's see.
Q Second full paragraph.
A Second full paragraph. Okay. The receiving and shipping capability will also be expandable to 3,000 MTU per year, and the storage capacity will be expandable in increments to a

maximum capacity of 70,000 metric tons.
Q And does that refresh your recollection as to the size of the facility that you were talking about at that time?
A At that time, this was before we had entered into substantial discussions with the localities around the site. And, yes, the -- it appears here that the base case for the facility was for 3,000 metric ton capability on a throughput basis. And expandable storage up to 70,000 metric tons.

---

**3380:16 - 3382:16**
**(Witness: Kouts, Christopher)**

03380
Q But that wasn't my question, Mr. Kouts. What I asked you about was your statement, if I heard it correctly, that the Mission Plan did not include specific amounts of spent fuel that would be accepted.
A Again, I -- in the context of what I just stated, the context of specific means specific to the facility and the year that we would be accepting it. And I would have to go back and review the context of the testimony. But
03381
that's -- my sense is that's what I was trying to imply.
Q So you're saying the Mission Plan does include specific amounts of spent fuel that the system would accept?
A It identifies at that point the planning basis for the program and the amounts that we believed the facilities could have, based on our knowledge at the time, the capability to receive in any one year.
They were planning numbers. And as you see in later years, those planning numbers changed.
Q Does this not say on the same page, the bottom of page 25, that DOE has identified many possible waste acceptance schedules?
A Yes, it does.
Q And that one such schedule is table 2-3

that has the repository starting up in 1996?
A I don't see a repository starting up in 1996.
Q I'm sorry. MRS starting up in 1996.
A Yes.
Q And that if one looks at the top of page 28, which is where the text continues,
03382
doesn't it say that: Other scenarios are possible, such as a larger MRS facility servicing part or all of both repositories, or two MRS facilities serving two repositories?
A That's correct.
Q And both the examples that are given, together with table 2-3, provide for a larger acceptance capacity; isn't that correct?
A That's correct.
Q Is there anything in this document that refers to a smaller acceptance capacity?
A Not specifically, no.
Q Okay. And you testified that this document signals how DOE might proceed. And I hope I wrote that down correctly as well. Did I?
A That's correct.

---

**3481:12 - 3481:19**
**(Witness: Kouts, Chrisopher)**

03481
Q At some point, I believe you said in prior hearings or testimony, that there was only a faint glimmer that the MRS would be available by 1998.
And at what point in time were you thinking that there was only a faint glimmer?
A Somewhere in the 1994, '95 time frame, as I remember.

---

**3534:5 - 3534:11**
**(Witness: Kouts, Christopher)**

03534
Q Is the 3,000 metric ton rate something

that's been in the program as accepted for a long time and exists today in all of DOE's requirements documents?
A It certainly exists today in our requirements documents. And it's been that way for a good many years, yes.

**Trial Testimony - Northern States v. US (11/15/06)**

03599
IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff ) Case No.
vs. ) 98-484C
THE UNITED STATES, )
Defendant. )

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, November 15, 2006

VOLUME 12

The parties met, pursuant to the notice of the Judge, at 10:01 a.m.
BEFORE: THE HONORABLE JOHN P. WIESE
03600
APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD,, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
(703) 770-7900
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
2300 N Street, N.W.
Washington, D.C. 20037-1122
(202) 663-8063

03601

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

---

**3603:3 - 3604:20**
**(Witness: Pollog, Thomas)**

03603

THE COURT: Please be seated. I would like you to state your name in full, spell your last name, and give the reporter your home address.
THE WITNESS: Thomas Edward Pollog, P-O-L-L-O-G.
THE COURT: And I'm going to ask you to back away from the mic just a little bit.
THE WITNESS: My home address is 4208 40th Street North, Arlington, Virginia 22207.
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q Mr. Pollog, good morning. Where are you currently employed?
A I'm employed at the Department of Energy in the Office of Civilian Radioactive Waste Management.
Q And what position do you currently hold

at DOE?
A I'm a nuclear engineer in the Office of
Waste Management.
Q How long have you been in your current
position?
03604
A In -- as the current organization is
structured, probably 6 months, but performing the
same function since 1996.
Q What are your current responsibilities?
A Assist in the implementation of the
Standard Contract with the utilities.
Q Do you also serve as the contracting
officer's technical representative?
A Yes, I do. On an unofficial basis.
Q And when did you assume the
responsibilities of the contracting officer's
technical representative?
A I believe that was in 2002.
Q And what are the responsibilities of the
contracting officer's technical representative?
A To provide the contracting officer
technical advice concerning implementation of the
terms and conditions of the contract.
Q To whom do you report?
A Christopher Kouts.

---

**3684:17 - 3687:17**

03684
Q Okay. You can put that away for now.
And during your direct examination, you
and Ms. Sullivan discussed the linkages from the
1987 Amendments Act. When I refer to the
Amendments Act, I'm referring to the Nuclear Waste
Policy Amendments Act of 1987. Do you recall that
discussion?
A Yes, I do.
Q So you're familiar with those linkages
03685
in the 1987 Amendments Act?
A Yes.
Q And it's your understanding that the
rate that is in the 1991 ACR is not consistent
with the schedule linkages that Congress placed in

that, correct?

A That's correct.

Q Specifically, the 1991 ACR is consistent with the requirement that no more than 10,000 MTUs be placed in the facility. But it is not consistent with the requirement that the construction on the facility could not begin until the Commission issued a license. And by "the Commission," I mean the Nuclear Regulatory Commission, issued a license for the construction of a repository. Is that correct?

A That's correct.

Q And because of this inconsistency, the rate that was in the 1991 ACR could not be accomplished by the Department of Energy without a change in law; isn't that right?

A Yes.

Q When the 1991 ACR was published, is it your understanding that the Department's best estimate of the earliest time it could accept

03686

waste at an MRS prior to the operation of the repository under the schedule linkages was 3 years ahead of waste acceptance at the repository?

A Yeah. About that.

Q You say "about that."

A Yeah. The 2007 time frame. It depends on when you start. If you're talking three and a half or in the middle of 2010 or the end of 2010. So around 3 years.

Q Roughly 3 years?

A Yes. Right.

Q So given those linkages, the earliest you could start an MRS would be 3 years before opening the repository, roughly 3 years?

A Yes.

Q And when the 1991 ACR was published, the Department projected the repository would begin operation in 2010, correct?

A Yes.

Q So if the Department expected to open the repository in 2010, and it could not accept waste at the MRS more than 3 years prior to that without a change in law removing the linkages --

THE COURT: Sir.

MR. HERZFELD: Sorry, am I going too

03687
fast?
THE COURT: There is no way the reporter can take it down that quickly. If you are reading the question, please read it so that she can take it down.
MR. HERZFELD: Sure. I'm sorry, Your Honor. I'll start over.
BY MR. HERZFELD:
Q I think you may have answered this question but just to be sure I've got it. So if the Department expected to open the repository in 2010, and it could not accept waste at the MRS more than 3 years prior to that without a change in the law removing the linkages, it could not have accepted waste at an MRS before 2007; is that correct, or roughly thereabouts?
A Yes.

---

**3691:14 - 3691:22**
**(Witness: Pollog, Thomas)**

03691
Q But in order for the schedule in the 1991 ACR to apply, it would have required a change in law, correct?
A Yes.
Q And was that law changed?
A Not to my knowledge.
Q And those linkages weren't, in fact, removed?
A That's correct.

---

**3722:22 - 3723:3**
**(Witness: Pollog, Thomas)**

03722
MR. HERZFELD: I don't think -- I think I said, is it your understanding that the purpose of stopping the approval of DCSs was to limit DOE's liability?
03723
THE COURT: You may answer that

question. Yes.
THE WITNESS: Yes.

---

**3728:18 - 3731:8**
**(Witness: Pollog, Thomas)**

03728
Q First, Mr. Pollog, you had the organizational responsibility for getting this completed for the Office of Civilian Radioactive Waste Management; is that correct?
A Yes.
Q And if I could direct your attention to page 3, which is -- of the report, which is NSP-000-1829 under "introduction".
03729
And if I could have you just read into the record the first two sentences.
A This report summarizes to the best of our knowledge, the alternatives that may be available to Northern States Power (NSP) and the federal government to allow NSP to continue operations at Prairie Island Units 1 and 2. Prairie Island Units 1 and 2 are currently licensed by the Nuclear Regulatory Commission to operate through 2013 and 2014 respectively.
Q And is it my understanding that a conference report accompanying a fiscal year 2001 appropriations bill directed the Department of Energy to submit this report; is that correct? And if you need to look at the document, feel free to do so.
A Something to that effect. I don't know if it was the appropriation language itself or a conference report. We were directed somehow through the appropriations process to develop this report.
Q If I could get you to read into the record what the conference report directed you to do.
A The conference report directs that, not
03730
later than 90 days after enactment of the fiscal year 2001 Energy and Water Development Appropriations Act, the Secretary of Energy shall

submit to Congress a report containing a description of all alternatives that are available to the Northern States Power Company and the federal government to allow the company to continue to operate the Prairie Island nuclear generating plant until the end of the term of the license issued to the company by the Nuclear Regulatory Commission, in view of the law of the state of Minnesota that limits the existing quantity of spent --
THE COURT: Excuse me. That limits the quantity.
THE WITNESS: Quantity of spent nuclear fuel that may be stored at the plant, assuming that the existing federal and state laws remain unchanged.
BY MR. HERZFELD:
Q And this report responds to that request; is that correct?
A Yes.
Q Now, in this report, DOE identified various spent nuclear fuel management strategy
03731
alternatives that may be available to NSP and the federal government to address the SNF storage requirements at the Prairie Island Units 1 and 2, such that operations may continue to the full period of the current operating licenses.
Have I characterized it correctly, the report correctly?
A I believe so.

---

**3732:16 - 3734:18**
**(Witness: Pollog, Thomas)**

03732
Q And if we could skip to subsection (b), which is on page 7, NSP-0001833. And the subheading for this is: Shipment to Off-Site, Temporary Nonfederal Storage Facilities.
Do you see that?
A Yes.
Q Under the bullet "shipment to a licensed commercial facility," this states that private fuel storage constituted an option for NSP to

pursue also; is that correct?

03733

A Yes.

MS. SULLIVAN: Objection. Mischaracterizes the document.

MR. HERZFELD: The witness has already answered the question. And I was going to have him read in.

THE COURT: Why don't we just have the witness read the text that you were quoting from.

BY MR. HERZFELD:

Q Sure. I think what I'm referring to in particular is the third sentence under the bullet "shipment to a licensed commercial facility."

A Beginning with the word "shipments?"

Q Correct.

A Shipments could also be made to a licensed facility owned by another company, such as another utility site, the proposed private fuel storage (PFS) facility which is currently undergoing licensing review by the NRC or the Owl Creek project planned for Wyoming by the NEW Company.

Q That's fine -- actually, go ahead and read the next sentence. That's fine.

A Current plans call for the PFS facility to begin accepting SNF in 2003.

03734

MR. HERZFELD: Your Honor, we would like to move to admit Plaintiff's Exhibit 1019.

THE COURT: Ms. Sullivan.

MS. SULLIVAN: One moment, Your Honor. No objection, Your Honor.

THE COURT: Very well, Madam Reporter, we will receive into evidence's Plaintiff's Exhibit 1019.

(Exhibit Number PX-1019 was received into evidence.)

MR. HERZFELD: If I can have a moment, Your Honor.

BY MR. HERZFELD:

Q And just so we hammer the point home, based on the cover letters, this is what the Department of Energy wrote in a report to the United States Congress; is that correct?

A Yes.

# Trial Testimony - PG&E v. US (6/13/06)

02286
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------x
PACIFIC GAS & ELECTRIC :
COMPANY, :No. 04-74C
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :
------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.
Tuesday, June 13, 2006
VOLUME 7
The parties met, pursuant to the notice of the
Judge at 9:03 a.m.
BEFORE THE HONORABLE EMILY C. HEWITT
02287
APPEARANCES:
ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D.C. 20006
(202) 331-3100
ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
ALAN LO RE, ESQ.
HEIDE HERRMANN, ESQ.
SCOTT R. DAMELIN, ESQ.
SHARON A. SNYDER, ESQ.

JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000

---

**2461:10 - 2461:12**
**(Witness: Morgan, Robert)**

02461
Q. Could you please state your full name
for the record?
A. Robert L. Morgan.

---

**2461:20 - 2462:23**
**(Witness: Morgan, Robert)**

02461
Q. Did you ever work for the Office of
Civilian Radioactive Waste Management?
A. Yes, I did.
Q. And when was that, sir?
A. Late January 1983 until -- I believe
it was January 1984.
02462
Q. And what was your role in that office,
sir?
A. I was the director of that office.
Q. Now, prior to your time -- and I'm
going to refer to it as OCRWM, is that okay?
A. Yes.
Q. Prior to your time at OCRWM, did you
work at DOE or any of its predecessor agencies?
A. Yes.
Q. And what were those?
A. I resigned my Army commission in 1965,
joined the Atomic Energy Commission at Savannah
River operations office, a year later, I was
transferred to Canoga Park under reactor
development office, and then 1980 -- or 1973, I
was selected as deputy manager for the Savannah
River operations office and then 1980, became

the manager, retired in 1988.

Q. And the time that you spent at OCRWM, how did that relate to your work at Savannah?

A. I was on detail from Savannah River operations office to Washington during that period of time.

---

**2464:21 - 2465:6**
**(Witness: Morgan, Robert)**

02464

Q. Now, while you were filling out your tenure as the director of OCRWM, what were your primary responsibilities?

A. Management of the Nuclear Waste Policy Act, which included the repository, the MRS

02465

transportation, near-term goals were requirements to notify affected governors what the program was to be, work on the contract for the utilities, which was required to be signed by the 30th of June, as I recall, and then work on a mission plan.

---

**2511:7 - 2512:10**
**(Witness: Morgan, Robert)**

02511

Q. I want to start out to make sure we understand that the contours of your involvement with the issues that are before the Court today, I recall that you testified that you became acting director. Actually, I think you testified that you became director of the program in January of 1983, but in fact, you were appointed acting director in 1983, correct?

A. I'm not sure at what point in time titles changed or whatever, but, yes, I was acting director of the Nuclear Waste Project Office at that point in time that later became OCRWM.

Q. Let me ask a series of questions, you

were not involved in the legislative process leading up to the passage of the Nuclear Waste Policy Act?

A. Not at all.

02512

Q. And prior to your detail from Savannah River to the Nuclear Waste Project Office, you had no knowledge of the details of the Nuclear Waste Policy Act?

A. That's correct.

Q. And you're not here to provide any testimony about the implementation of the NWPA during the time period prior to your arrival as director of the project office, correct?

A. That's correct.

**Trial Testimony - PG&E v. US (6/14/06)**

02633
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------x
PACIFIC GAS & ELECTRIC :
COMPANY, :No. 04-74C
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :
------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.
Wednesday, June 14, 2006
VOLUME 8
The parties met, pursuant to the notice of the
Judge at 9:00 a.m.
BEFORE THE HONORABLE EMILY C. HEWITT
02634
APPEARANCES:
ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D.C. 20006
(202) 331-3100
ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
ALAN LO RE, ESQ.
HEIDE HERRMANN, ESQ.
SCOTT R. DAMELIN, ESQ.
SHARON A. SNYDER, ESQ.

JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000

---

**2775:16 - 2777:5**
**(Witness: Kouts, Christopher)**

02775

Q. All right. Thank you very much. Now, I need to see, I'm going to turn to another subject, and I'm sorry for a little pause here while I get the documents together, but I'll try to be as efficient as I can be.

All right. Mr. Kouts, you were involved in the design of the MRS facility we were just discussing, correct?

A. Yes.

Q. And the MRS facility that you were

02776

involved in the design of had an acceptance capacity in excess of 3,000 MTUs per year, correct?

A. Yes.

Q. And the more rail casks you receive at an MRS facility, the higher capacity that facility could receive, correct?

A. Yes.

Q. And at the interim storage facility that you were involved with the design of, the acceptance rate, depending on the type of cask you received, the DOE received, varied and could be over 3,000 MTUs per year, correct?

A. Can you repeat the question?

MR. STOUCK: Would you like to read it back?

(The reporter read the record as requested.)

THE WITNESS: Yes.

BY MR. STOUCK:

Q. And at least until, well, as of 1993, a system rate of 3,000 MTU per year had been assumed for planning purposes and the

conceptual design of major facilities in the DOE spent fuel program, correct?

02777

A. Yes.

Q. And 3,000 MTU per year is a reasonable acceptance rate for the DOE spent fuel program, correct?

A. A reasonable steady state rate, yes.

---

**2806:20 - 2809:14**
**(Witness: Kouts, Christopher)**

02806

Q. It may be another imprecise question. The linkages limited the ability of the Department to implement an MRS in 1998, correct?

A. Yes.

Q. And just to be clear, the linkages

02807

you're talking about are the ones you testified about, those are the ones that DOE proposed to Congress?

A. Congress went beyond the linkages that the Department proposed to it in implementing the Nuclear Waste Policy Act.

Q. With respect to capacity?

A. Not with respect to capacity, but with respect to other issues.

Q. What other issues?

A. The limitation of 10,000 metric tons until the repository was operational. The site of the facility could not be located within the state of Nevada. The linkage of the construction of the MRS to the construction authorization of the repository, those were all additional linkages that Congress imposed that the Department did not initially propose to Congress, to my recollection, in the 1987 Act.

Q. Which linkages did DOE propose?

A. The Department proposed that the operation of the MRS facility would be linked to the receipt of a construction authorization of the repository by the Nuclear Regulatory Commission.

02808

Q. And excuse me one second, how does that differ from what Congress ultimately enacted?

A. Congress essentially indicated that we could not construct the MRS facility until we received a construction authorization from the repository, for the repository.

Q. If you would take a look at, I think Defendant's 107, Mr. Kouts, is the monitored retrievable storage submission to Congress, and on page 22 here, and, again, if you turn to page 22 -- wait a minute. 22, is that what it is? 27, excuse me, 27 of this document, Mr. Kouts, just want to make sure I understand this distinction to be drawn on this one narrow point, and then I'll move to something else.

On the second paragraph, it says, "To dispel doubts about the resolve to develop a repository, the DOE proposes a direct linkage of MRS operations to the development of a repository. Specifically, the DOE proposes that waste acceptance at the MRS facility be precluded until a construction authorization for the first repository is received." That was what was proposed?

02809

A. That's correct.

Q. And what Congress enacted was linking it to the --

A. What Congress enacted was that we could not -- the linkage that the Department was proposing here was that we could go ahead and license and construct the facility, but we could not operate it or receive fuel at the MRS until the repository received a construction authorization.

What Congress eventually implemented was the fact that we could not construct the MRS facility until we had the construction authorization for the repository.

**2817:16 - 2819:25**
**(Witness: Kouts, Christopher)**

02817
Q. Do you recall, I believe in your testimony, you talked about the '91 ACR, I think the '95 ACR, do you recall the rates of acceptance that were shown in the '87 ACR?
A. Not offhand.
Q. Okay. Do you know if they were the 400, 600, 900 rates that were later published in the '91 ACR and the '95 ACR?
A. I don't recall.
Q. Don't recall one way or the other?
02818
A. No.
Q. Okay. Well, whatever the rates were, would be the -- what would your understanding be of what the rates are in that '87 plan? Would that be the projected receiving capacity as of 1987 of the DOE waste acceptance program?
A. Well, my sense is that this document had illustrative waste acceptance schedules, and to the extent that they linked up with what the Department issued in 1987, you'd have to do the comparison. I don't have the tables memorized, and I can't comment on them unless they're produced and I can look at them.
Q. I'm going to show you the numbers, but whatever the numbers are, you would agree that that was what DOE was planning for waste acceptance as of that time?
A. They were targets for waste acceptance at that time, that's correct.
Q. Targets for waste acceptance. Well, was that with what the '91 ACR showed targets for waste acceptance at that time?
A. They were general planning numbers, and, yes, they initiated, those were the Department's planning numbers at that time,
02819
that's correct.
Q. And in terms of the, okay, so in terms of the meaning and import and significance of the rates of acceptance shown in the '87 ACR, that would be the same as the meaning in your

understanding, meaning and importance and import of the rates of acceptance shown in the '91 and '95 ACRs?
A. Well, not necessarily. May I explain?
Q. Sure.
A. I think in every document that the Department issued that I'm familiar with, there was always a caveat that indicated that these are generally what we think now, and I'm just summarizing and that that may change as we move forward into the future.
So to the extent that those rates modified or evolved from document-to-document indicated a changing in the thoughts and the planning of the Department as of that timeframe.
Q. In terms of planning for waste acceptance?
A. Planning for capabilities of facilities to receive fuel, yes.

---

**2825:1 - 2826:2**
**(Witness: Kouts, Christopher)**

02825
A. I don't want to keep it from you.
Q. Just so we can hopefully round this out and move on, what is the reason that the MRS concept changed from the full integrated MRS to the, which apparently is reflected in these rates that are on the screen, to the more limited MRS that apparently, I think, according to your testimony, is what you understand to be reflected in the '91 ACR, what led to that change from one to the other?
A. Well, Congress did not approve the proposal that was provided by the Department in February 1987, took away the siting, set up the MRS review commission. And, again, there was new policy thinking that was driving that away from the integrated concept that the Department had originally intended back in its proposal in 1987.
Q. Thank you very much. And when did that change occur?

A. That change occurred, began when the
policy amendment acts were passed and the
Department received direct feedback from
Congress on it proposal.
Q. And that was subsequent, I guess, to
02826
the '87 ACR?
A. That's correct.

---

**2828:24 - 2829:7**
**(Witness: Kouts, Christopher)**

02828
Q. So apart from the linkages, there's no
reason that an MRS in 1991 could not have,
02829
using those simple and proven technologies and
methods, there's no reason, other than the
linkages, why DOE could not have implemented a
larger capacity MRS than the one that was
reflected in the '91 ACR, would you agree with
that?
A. No.

---

**2884:13 - 2885:24**
**(Witness: Kouts, Christopher)**

02884
Q. Mr. Stouck asked you some questions
about the Nuclear Waste Policy Act amendments
of 1987 that rendered the MRS proposal that you
discussed about today, I believe you used the
term "null and void." Do you remember that?
A. Yeah.
Q. And I thought that you indicated that
you wanted to explain what you meant by that.
Could you do so?
A. Yes. The Congressional direction was
that the siting was null and void. In other
words, the site that the Department proposed in
Oak Ridge, Tennessee or near Oak Ridge,
02885
Tennessee was unacceptable to Congress.

Therefore, the Department was not to pursue that site.

In addition, Congress was unclear, or let's say unpersuaded by the Department's proposal on the integrated MRS concept and therefore set up an MRS review commission which, again, held hearings and provided its own perspective on the type of MRS, what the linkages should be and implementation should be in the waste management system.

Q. After the amendments were passed, what was your understanding of DOE's understanding of the likelihood of meeting the contractual obligation to begin accepting spent nuclear fuel as of January 31, 1998?

A. Well, the only mechanism that the Department potentially had was through an MRS, and in that regard, the MRS linkages had to be modified legislatively in order for the Department to meet its commitment by January 31, 1998, since the repository had moved forward and the schedule for the repository had, was no longer, not in the 1998 timeframe.

---

**2886:17 - 2887:9**
**(Witness: Kouts, Christopher)**

02886

Q. Now, the linkages that came out of the amendments, can you describe what they did with respect to the capacity limit for the MRS?

A. Yes. I'll just go back in history.

The proposal of the Department with the MRS proposal was to limit the capacity of the MRS to 15,000 metric tons and to link the operation, the initial operation of the MRS facility to the acceptance, or to the receipt

02887

of a construction authorization for the repository.

Congress modified those linkages by indicating that we could not build the MRS until the repository construction authorization was received. We could receive no more than 10,000 tons until the repository was

operational and no more than 15,000 tons in total.

# Trial Testimony - PG&E v. US (6/15/06)

02986
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------x
PACIFIC GAS & ELECTRIC :
COMPANY, :No. 04-74C
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :
------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.
Thursday, June 15, 2006
VOLUME 9
The parties met, pursuant to the notice of the
Judge at 9:03 a.m.
BEFORE THE HONORABLE EMILY C. HEWITT
02987
APPEARANCES:
ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D.C. 20006
(202) 331-3100
ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
ALAN LO RE, ESQ.
HEIDE HERRMANN, ESQ.
SCOTT R. DAMELIN, ESQ.
SHARON A. SNYDER, ESQ.

JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000

02988

APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

---

**2993:11 - 2995:13**
**(Witness: Zabransky, David)**

02993

Q. Good morning, Mr. Zabransky. Mr. Zabransky, where are you currently employed?

A. I'm currently employed at the Department of Energy in Washington, D.C.

Q. And what office within the Department of Energy?

A. The Office of Civilian Radioactive Waste Management.

Q. And what office within the Office of Civilian Radioactive Waste Management?

A. It's currently known as the Waste Management Office or the Office of Waste Management.

Q. And what position do you hold at the

02994

Office of Waste Management?

A. I'm a nuclear utility specialist, and I work for Mr. Chris Kouts, and I also served as the contracting officer to the disposal contracts.

Q. And what are your responsibilities in your position as a nuclear utility specialist?

A. As I said, I work with Mr. Kouts on a number of technical issues related to waste acceptance, on system integration issues, and

I'm serving as contracting officer on the disposal contracts.
Q. When did you become the contracting officer?
A. I believe in July of 2002.
Q. And have you also served as the technical representative, as the contracting officer, or the COTR?
A. I did, I think prior to July of 2002, and subsequent to my employment sometime in '95 or '96, I became COTR.
Q. So from '96 to 2002, you served as the COTR?
A. Yes, I think it was '95 or '96. I'm not exactly sure what year.
02995
Q. And what were your responsibilities as the COTR?
A. At that time, I provided technical advice to the contracting officer as to issues relating to the standard contract.
Q. When did you join DOE?
A. In July of 1994.
Q. And since you joined DOE, have you been in, I believe it's changed names, but have you been in the office responsible for the waste acceptance function?
A. Yes. Unlike others, I've been doing that the entire time.

---

**3013:7 - 3015:4**
**(Witness: Zabransky, David)**

03013
Q. Mr. Zabransky, it seems like you covered two topics in your direct examination. The first of those is exchanges, so I'd like to deal with that one with you first. It's your understanding that the change provision was put into the contract so that utilities were afforded flexibility in managing their inventories of spent fuel, correct?
A. That's correct.
Q. And you believe that the exchange provision can still work, correct?

A. I believe that it eventually will work, yes.
Q. And you were here as the Department's representative, you recall, and we can certainly bring it back up, but you recall the letter from the 1995 timeframe from Director Dreyfuss talking about utilities being able to optimize their acceptance schedules?
03014
A. I recall it generally.
Q. And isn't it true that you and the Department both believe that exchanges that would allow utilities to optimize allocations of waste capacity will still work, correct?
A. I think I just said that. I believe they will eventually.
Q. And it's also your belief that buyers and sellers of exchanges would incur little, if any, brokerage fees for arranging the trades, correct?
A. I think that I've said that early on in the nuclear industry, there were a lot of brokers involved. In the last several years with the internet, I think the brokers are looking for business because it's too easy for utilities to now know with each other what's available, so the secrecy of he has this and you need it isn't there, and I wouldn't go into the brokerage business.
Q. And it has been DOE's position that DOE will act reasonably in approving exchanges, correct?
A. Yes.
Q. And you believe there's no reason why
03015
exchanges shouldn't work on a global basis, correct?
A. As I said, in a mature market, I think they'll work on a global basis.

**3015:23 - 3016:2**
**(Witness: Zabransky, David)**

03015
Q. To help utilities exchange. You believe that utilities would try to facilitate exchanges, correct?
03016
A. I think utilities would try to facilitate exchanges, correct.

---

**3017:24 - 3018:15**
**(Witness: Zabransky, David)**

03017
"QUESTION: Mr. Zabransky, before we took our lunch break, we were talking about
03018
exchanges of approved delivery commitment schedules. I think we were finishing up discussing that from the perspective of utilities. I want to turn to what your belief is as to how DOE would have handled exchanges if the system had been up and running, if DOE was otherwise accepting waste.
Do you think that DOE would have worked to have facilitated exchanges?"
And objection from Mr. Crawford, the government's attorney.
"ANSWER: Again, trying to speculate on what people might have done or might do, I don't. I believe they would. I believe DOE would try to facilitate exchanges."

---

**3018:21 - 3019:10**
**(Witness: Zabransky, David)**

03018
Q. And DOE actually at one point had an electronic bulletin board that posted approved delivery commitment schedules so utilities could see what was available to exchange with, correct?

03019

A. And I think, as we discussed in my deposition, yes, we did, but --

Q. And your understanding of why DOE created a network of information about delivery commitment schedules available to other utilities was to allow or foster potential exchanges between utilities of approved delivery commitment schedules, correct?

A. That was the rationale given by the person who did it, yes.

---

**Trial Testimony - Sacramento Municipal v. US (3/28/05)**

1464
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------x
SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
:NO. 98-488C
Plaintiff :
vs. :
UNITED STATES, :
Defendant. :
-------------------------------- :
Courtroom 5
National Courts Building
715 Madison Place
Washington, D.C.

Monday, March 28, 2005

VOLUME 6

The parties met, pursuant to the notice of the Judge
at 9:39 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

01465
1465
APPEARANCES:
ON BEHALF OF PLAINTIFF:
DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5656

01466
1466
APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

---

**1592:6 - 1594:4**
**(Witness: Zabransky, David)**

01592
Q. Could you please state your full name and business address for the record?
A. My name is David Kevin Zabransky. My business address is 1000 Independence Avenue, Southwest, Washington, D.C.
Q. And who is your current employer, sir?
A. The U.S. Department of Energy.
Q. Mr. Zabransky, could you provide to the Court your post high school education, please?
A. After high school, I went to college. I graduated from Marquette University in Milwaukee, Wisconsin, in 1980, with a degree in Civil and Environmental Engineering.
Q. Now, you mentioned that you are currently employed by the Department of Energy. What office are you in, sir?
A. I'm currently in the office of systems

analysis and strategy development within the Office of Civilian Radioactive Waste Management.

Q. Is that office also referred to as OCRWM?

A. It's referred to as OCRWM and also as RW.

01593

1593

Q. Now, what are your current responsibilities, sir?

A. Currently, I'm a nuclear industry specialist. I act as a contracting officer for the standard contract between the Department and the utilities, and I also do systems analysis and other strategy development activities for my boss, Mr. Kouts.

Q. And how long have you been employed by the DOE?

A. I came to DOE in 1994, so a little, almost 11 years.

Q. And how long have you actually been a contracting officer?

A. I took that over, I believe, in 2002, summer of 2002.

Q. And before that, what was your title?

A. Before that, I was still a nuclear industry specialist, but I also served as the contracting officer's technical representative from about 1995 until about 2002.

Q. Now, Mr. Zabransky, as the contracting officer, what are your specific responsibilities?

A. At this point, I administer the contract between the Department and the utilities, provide

01594

1594

correspondence to the utilities, oversee the collection of the payments and any other processing that's required under the contract.

**Trial Testimony - Sacramento Municipal v. US (3/29/05)**

01826
1826
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
--------------------------------x
SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
:NO. 98-488C
Plaintiff :
vs. :
UNITED STATES, :
Defendant. :
-------------------------------- :
Courtroom 5
National Courts Building
715 Madison Place
Washington, D.C.

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the
Judge at 9:00 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

01827
1827
APPEARANCES:
ON BEHALF OF PLAINTIFF:
DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.

Washington, D.C. 20004-1206
(202) 942-5656
01828
1828
APPEARANCES (Continued:)
ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036
ALSO PRESENT:
STEVEN M. COHN, ESQ.
STEVE J. REDEKER
THOMAS POLLOG

---

**1913:26 - 1914:13**
**(Witness: Zabransky, David)**

01913
Q. Sir, did you believe, back when you were at
01914
1914
Wisconsin Power, that a reasonable acceptance rate would have been a rate that reflected the aggregate rate of discharges of the industry, plus some amount of work off?
A. Absolutely.
Q. And what does that mean, in your mind?

A. What it equates to simply is about 3000 metric tons a year, sir, I believe that would have been a reasonable acceptance rate.
Q. So you believe that a reasonable acceptance rate was 3000 MTU per year, correct?
A. I believe that.

---

**1919:17 - 1920:6**
**(Witness: Zabransky, David)**

01919
THE COURT: And the witness, do you dispute the fact that DOE changed its acceptance rates in 19 -- looks like 1987? 1990, and '91 and '92 and '93 and '94 and '95, but then they went and resumed basically some place mid-'95 back up to 3000.
THE WITNESS: I believe, speaking from '95 on, I believe that that reflects accurately what's in the planning documents, yes.
THE COURT: All right.
THE WITNESS: Before that, I can't speak.
01920
1920
THE COURT: Do you know why they had lower rates, significantly lower rates in 1990 than 1995?
THE WITNESS: Only what I, you know, I wasn't at DOE then, but my understanding was they were basing it on their expectations for MRS.

---

**1964:20 - 1965:21**
**(Witness: Pollog, Thomas)**

01964
Q. Could you please state your name and business address for the record, please?
A. Thomas Pollog, and my address is Offices of Civilian Radioactive Waste Management, 1000 Independence Avenue, SW, Washington, D.C., 20585.
Q. And I think you just said this, but where are you currently employed?
01965
1965
A. I am employed in the Department of Energy

in the Office of Civilian Radioactive Waste Management.

Q. Okay. And to whom within the office are you currently assigned, or to what office within the Department of Energy?

A. That would be the Office of Civilian Radioactive Waste Management, and within that office, the Office of Systems Analysis and Strategy Development.

Q. And what are your current job responsibilities?

A. I'm in the waste acceptance group or -- I perform a waste acceptance function, and that is to implement the standard contract.

Q. And how long have you been in your current position, Mr. Pollog?

A. In this organization, for two years, the Office of Systems Analysis and Strategy Development was formed in 2002, late 2002.

---

**2027:12 - 2027:18**
**(Witness: Pollog, Thomas)**

02027

Q. Who disagrees with the 3000-ton rate as the appropriate steady state rate?

A. Just, are you talking about right now or throughout the history of the program?

Q. Let's start with right now, sir.

A. Okay. Right now, I know of no one who disagrees with that rate.

---

**2030:18 - 2032:13**
**(Witness: Pollog, Thomas)**

02030

Q. Mr. Pollog, you talked about the schedule set forth in the 1991 ACR, and that is on page five of Defendant's Exhibit 290, and I believe you talked about this in your last several answers as a plan that DOE had to operate the system, is that right?

A. Yes, that's correct.

Q. The schedule set forth on page five of the

1991 ACR was inconsistent with the 1987 Amendments Act, isn't that right, sir?

02031

2031

A. Certain provisions of it, yes, that's correct.

Q. Let me be clear, the schedule set forth on this page five of the 1991 ACR was inconsistent with the 1987 amendments, correct?

A. It was inconsistent with at least one of the provisions of the 1987 Nuclear Waste Policy Amendments Act, yes.

Q. And what provision is that, sir?

A. I believe that was the provision that restricted start of operations of the MRS to not before construction authorization issuance by the Nuclear Regulatory Commission.

Q. And if this ACR were to reflect a schedule fully consistent with the 1987 amendments, it would show zero acceptance until 2007, is that right?

A. I believe that's correct, yes.

Q. And that's because a repository had been delayed until at least 2010 at this point?

A. I believe that's correct too. If I might adjust one point to that, that's assuming no other legislation was passed in the interim.

Q. So the schedule set forth on page five of the 1991 ACR would require a change in the law in order to be accomplished, is that right?

02032

2032

A. Yes, that's correct.

Q. In preparing this schedule, Mr. Pollog, the Department of Energy only assumed that the schedule restriction would be abolished by Congress, is that right, as opposed to the capacity limitation?

A. Probably, I think that's correct. I'm trying to think -- there's several restrictions in the Nuclear Waste Policy Act. I'm trying to remember of any other restrictions that were imposed besides the schedule one we were assuming at the time, but I don't believe so, but I don't -- I believe you're correct.

**2031:4 - 2031:23**
**(Witness: Pollog, Thomas)**

Q. Let me be clear, the schedule set forth on this page five of the 1991 ACR was inconsistent with the 1987 amendments, correct?

A. It was inconsistent with at least one of the provisions of the 1987 Nuclear Waste Policy Amendments Act, yes.

Q. And what provision is that, sir?

A. I believe that was the provision that restricted start of operations of the MRS to not before construction authorization issuance by the Nuclear Regulatory Commission.

Q. And if this ACR were to reflect a schedule fully consistent with the 1987 amendments, it would show zero acceptance until 2007, is that right?

A. I believe that's correct, yes.

Q. And that's because a repository had been delayed until at least 2010 at this point?

A. I believe that's correct too. If I might adjust one point to that, that's assuming no other legislation was passed in the interim.

---

**2033:20 - 2034:8**
**(Witness: Pollog, Thomas)**

02033

Q. -- the Department of Energy assumed that only the schedule linkage would be abolished by Congress in publishing the schedule set forth on page five of the 1991 ACR?

A. I believe so.

Q. Why is that, sir?

A. Because the schedule linkage, if it was

02034

2034

abolished, would allow us to start waste acceptance in 1998.

Q. Let me ask a follow-up question. Why did the Department of Energy assume that only the schedule linkage would be abolished, sir?

A. Because we saw that as one of the main impediments to accepting waste in 1998 at an MRS.

**2049:5 - 2049:15**
**(Witness: Pollog, Thomas)**

02049

Q. And I believe you testified about this earlier, but let me be clear, your current plans are to have a capacity of 3000 tons acceptance, is that right, per year?

A. I believe the repository is being designed for a steady state acceptance rate of 3000 metric tons per year, yes.

Q. Sir, that's not going to be a precise amount every year, right at 3000, is it?

A. I don't know, I mean, I don't know the answer to that, probably not, but close.

**2049:5 - 2049:11**
**(Witness: Pollog, Thomas)**

02049

Q. And I believe you testified about this earlier, but let me be clear, your current plans are to have a capacity of 3000 tons acceptance, is that right, per year?

A. I believe the repository is being designed for a steady state acceptance rate of 3000 metric tons per year, yes.

**Trial Testimony - Southern Nuclear v. US (10/26/05)**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO. 98 614C
COMPANY, )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington, D.C.

Wednesday, October 26, 2005

00000

VOLUME 8

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

01732

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:
M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226 3417
and
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, Northwest
Washington, DC 20004

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, DC 20530

---

**1743:15 - 1747:11**
**(Witness: Kouts, Christopher)**

01743

Q Could you state your full name for the record, please?

A Christopher Alexander Kouts.

Q Mr. Kouts, where are you currently employed?

A At in the Office of Civilian Radioactive Waste Management at the Department of Energy.

Q And which office within the Office of Civilian Radioactive Waste Management?

A I'm the director of the Office of Systems

01744

Analysis and Strategy Development.

Q What are your responsibilities in that position?

A Primarily, I deal with the waste acceptance function of the system, the management of the standard contracts with utilities. I'm also responsible for systems analysis, which basically might my task there is to make sure that the system, when deployed, will operate effectively and efficiently. In addition, I also have other responsibilities of total system life cycle cost, fee adequacy assessments. I'm also responsible for safeguards and security policy among other activities.

Q And I believe you've testified to this, but let me ask, do your responsibilities include planning for waste acceptance from the utilities?

A Yes, they do.

Q Okay. How long have you held your current position?

A On an acting basis, since I believe October of 2002 and on a permanent basis, July of 2003.

Q And to whom do you report in your current position?

A I report to the principal deputy director,

01745

Mr. Paul Golan.

Q To whom does Mr. Golan report?

A Mr. Golan reports to the director of the program, who in turn reports to the undersecretary and Secretary of Energy.

Q Is there currently a director of the program?

A No, there is not.

Q When did you first join the Office of Civilian Radioactive Waste Management?

A In the summer of 1985.

Q Would you please summarize briefly the positions you've held within the office since you started in 1985?

A Okay. When I first joined the program, I began work as a member of the MRS team. That was a

team that was put together to develop the MRS proposal to Congress required under Section 141 of the Nuclear Waste Policy Act. I worked on that for approximately three years.

Then I was appointed to take over the transportation program for the program, overall program, and I managed that for about a three year time frame.

I then moved on to working on strategic

01746

planning and contingency planning for the program, policy related activities for several years, then moved on to division, took over a division that basically was responsible for interactions with the Nuclear Regulatory Commission for the program.

From that point, I took a job that basically was a support division to the director of the program at the time, Dan Daniel Dreyfuss, Dr. Daniel Dreyfuss. I held that position for several years, then moved on to a head an effort to develop topical safety analysis report, which would have been submitted which was submitted to the Nuclear Regulatory Commission to facilitate licensing in anticipation of the program receiving direction to implement interim storage. There were several interim storage bills being considered in Congress at that time.

After I completed that task, in the 1998 time frame, I moved over to basically a position that was responsible for being a liaison between the Yucca Mountain project and headquarters and was responsible for major deliverables that the project was delivering, was responsible for, the first of which was the viability assessment submitted to Congress in 1998 and basically transitioning through the entire

01747

site recommendation process.

During the site recommendation process in the 2000 to 2002 time frame, I was responsible for basically all interactions of the program with the undersecretary and the Secretary of Energy. I assisted the secretary in development of his statement, his recommendation statement. I also supported him in his congressional hearings and through the entire site recommendation process.

Subsequent to that, basically I took this

position where I'm currently at now.

---

**1773:8 - 1774:6**
**(Witness: Kouts, Christopher)**

01773
Q Mr. Kouts, are you familiar with the
activities that DOE undertook to site an MRS?
A During this time period?
Q Yes.
A Yes. We were essentially supporting the
Office of the Nuclear Waste Negotiator in
administering a grant program for that office so that
funding could be provided to interested parties. At
the time, it was primarily Indian tribes who were
potentially interested in allowing the siting of such
a facility at their reservation.
Q Were the efforts to site an MRS facility
successful?
A No, they were not.
Q When did those efforts cease?
A They effectively ceased when the Office of
the Nuclear Waste Negotiator essentially ceased to
exist, which was approximately five years which was
01774
exactly five years after the passage of the Nuclear
Waste Policy amendments of 1987.
Q Okay. Defendant's Exhibit 97, please.
The Office of the Nuclear Waste Negotiator, when
did what year was that?
A I believe it was 1992.

---

**1774:25 - 1775:6**
**(Witness: Kouts, Christopher)**

01774
Q Mr. Kouts, I've handed you an excerpt of
01775
Plaintiff's Exhibit 23 823. No, sorry. Yeah, 823.
I skipped ahead. Can you identify this document for
the record?
A Yes. This is an acceptance priority
ranking and annual capacity report that was issued by

the department in March of 1995.

---

**1792:2 - 1793:12**
**(Witness: Kouts, Christopher)**

01792

Q At the time this document was issued, Plaintiff's Exhibit 823 in March of 1995, what was the status of DOE's program?

A Status of the program at that time is that we were still hopeful, I believe, that we would get some kind of legislative relief and get the opportunity to deploy a storage facility earlier.

Our as this indicates, our perspective of our ability to do it by 1998 was such that there was more uncertainty being added to it, but as indicated here, we were still hopeful that it was going to happen in the near future.

If I could also correct something that I might have said earlier, if I remember, the negotiator the negotiator's office went out of business in the 1994 time frame, so and I think where I got confused was essentially that David Leroy, who was the initial negotiator, left at the beginning of the Clinton administration and then there was another gentleman that was appointed at that time, and he carried out until the end of the office, which I believe ended in 1994.

So just prior to this, I believe was toward the end of 1994, the negotiator had just gone

01793

out of business. There was still some hope that there were some Indian tribes that were interested, and there were some discussions about whether or not an interim storage site could be identified in one of those sites that was still interested or Congress could pick another site.

So there was still possibilities and the department was still hopeful, although we admit here, I think, that there are uncertainties and 1998 was going to be a challenge, so therefore, we were putting the acceptance schedule in terms of year one, year two.

---

**1816:19 - 1818:6**
**(Witness: Kouts, Christopher)**

01816
Q So at the time the MRS was proposed, it was not proposed as a standalone facility to operate for ten years within a 10,000 metric ton capacity limit, correct?
A That's correct.
Q Do you still have and well, strike that.
01817
And again, this Exhibit 59 is the proposal to Congress, correct?
A That's correct.
Q And then in 1987, Congress passed the 1987 amendments to the Nuclear Waste Policy Act, which did a variety of things?
A Correct.
Q And one of those was it authorized an MRS facility?
A Yes, it did, subject to certain conditions.
Q And it established, as you say, limitations and conditions on the MRS facility?
A That's correct.
Q Do you still have Plaintiff's Exhibit 134 in front of you, Mr. Kouts?
A Yes, I do.
Q Now, I think you testified earlier that Plaintiff's Exhibit 134 was a was the DOE position that was submitted to the Monitored Retrievable Storage Commission. Is that right?
A That's correct.
Q Let's look at page 4 of that, please, Crystal, on the screen.
Now, Mr. Kouts, if I could get you to turn
01818
to page 4.
A Okay.
Q Now, the conditions that Congress placed on the MRS were not identical to the conditions that DOE proposed for the MRS, correct?
A That's correct.

**1819:2 - 1822:8**
**(Witness: Kouts, Christopher)**

01819
Q And without again, without going through and reading it, Congress told DOE you can't start construction of an MRS facility until the NRC has issued a construction authorization for the repository, correct?
A That's correct.
Q So you couldn't construct you couldn't it wasn't just that you couldn't operate the MRS, you couldn't start to construct the MRS until you had a construction authorization for the repository?
A That's correct.
Q Okay. Then it says if for whatever reason the repository license is revoked, you have to shut the MRS down, correct?
A That's correct.
Q And then it has the capacity limitations?
A Correct.
Q Now, DOE in this position analyzed the impact of the schedule what I call the schedule linkages on the MRS in the repository, is that right?
A That's correct.
Q For instance, if we look down in the next paragraph, start with "if the MRS facility," please.
01820
A Uh huh.
Q "If the MRS facility is constructed in a single phase to perform all the functions described in DOE's 1987 proposal, that is, spent fuel receipt, consolidation, packaging and preparation for placement in the repository and temporary storage for up to 15,000 MTHM " metric tons heavy metal, is that what that's supposed to mean?
A Yes.
Q " and the construction authorization for the repository is received in 1998 as currently expected, waste acceptance at an MRS facility can start no earlier than 2003, a few months before the start of waste acceptance at the repository." Do you see where I'm reading?
A Yes, I am.
Q That was DOE's analysis of the scheduled

linkages at the time?

A Yes, except if you read a little further in that report, it does say, however, going on to the next page, "With an MRS facility that can be developed in stages, the DOE could start accepting waste years earlier, possibly as early as 2000 with the existing linkages and in 1998 or even earlier with alternative, less limiting linkages."

01821

At the bottom of that page, you can see the summary statement by in that section that says, "The DOE continues to believe it is useful to explore the implications of the existing linkages and possible alternatives that would allow the MRS to be more fully realized." What the department's indicating there is we'd like to revisit the linkages to see whether or not we could get the MRS open earlier.

Q All right. And as I understand it, what this is saying is with the existing linkages and, by the way, have the existing linkages ever been repealed?

A No, they have not.

Q The same linkages that are in the 1987 Nuclear Waste Policy Act are the law of this country right now, correct?

A That's correct.

Q What I understand this to be saying, tell me if I'm wrong, on page 4 and top of 5, is it may be possible with the existing linkages for DOE to build a different kind of MRS or phase in so that they could start sooner with MRS, sooner than 2003.

A Right. Essentially, the proposal that we had to Congress was a very large packaging facility that would do a variety of operations that the

01822

repository would have. If you staged it such that you only had to bring on storage initially and have that packaging done later, you could begin acceptance earlier, and that's what the following paragraph on page 5 indicates, that, you know, if you could stage it and there were different technologies that you could pursue, that would allow you to accept fuel at a sooner time period.

**1822:20 - 1822:25**
**(Witness: Kouts, Christopher)**

01822
Q Right. With the existing linkages that are the law of this country right now, the earliest Department of Energy says it could have gotten the MRS in operation is three years before the start of the repository operation?
A With the existing linkages, yes.

---

**1831:17 - 1833:8**
**(Witness: Kouts, Christopher)**

01831
Q Now let's look at Plaintiff's Exhibit 823, which is the 1995 annual capacity report. Got it?
A Yes, I do.
Q All right, sir. All right. Now, you weren't actually involved in the production of the 1995 annual capacity report, were you?
A No, I was not.
Q That wasn't part of your job back then?
A No, it was not. I was a reviewer for the
01832
document, but I did not prepare it.
Q You weren't involved in managing the area that published the ACR?
A That's correct.
Q Now, did I understand your testimony correctly that by March of 1995, the Office of Nuclear Waste Negotiator had been eliminated?
A That's correct. I believe it went out of existence or that office went out of existence in late 1994.
Q And the purpose, as I understand it, of the Office of Nuclear Waste Negotiator was to go out and negotiate with different states to try to get somebody to host a monitored retrievable storage facility. Is that correct?
A That was one of his duties. He was also charged with trying to find a willing host for a repository.
Q Okay. Another thankless job, I'm sure. At any rate, by March of 1995, the Nuclear Waste

Negotiator is history?
A That's correct.
Q He doesn't exist anymore?
A That's correct.
Q DOE had not selected a site for the MRS,
01833
correct?
A That's correct. Nor could we under the current construct of the act, since we could not site it until after the repository was sited.
Q Excellent point.
You hadn't selected a site for the repository by 1995 either
A That's correct.

---

**1837:5 - 1837:10**
**(Witness: Kouts, Christopher)**

01837
Q Now, notwithstanding the difficulties in siting and getting an MRS facility established, this document continues to impose the capacity limitations but not the schedule linkages on the acceptance rate that's contained in the 1995 ACR, correct?
A That's correct.

---

**1845:15 - 1847:6**
**(Witness: Kouts, Christopher)**

01845
Q All right. Now, my question is, as I understand your testimony, somebody decided that the system should operate at a 3,000 metric ton rate, and the system requirements document says we're going to design a facility and a transportation system around that number.
A That's correct.
Q So the number comes first and it drives the design?
A That's correct.
Q All right. And my question is simply:
01846
Isn't it true that the 3,000 metric ton rate that's

reflected on that page is a product of analysis within the Department of Energy over many years?

A Well, it it may be. I I can't remember one specific analysis that said 3,000 metric tons is the right reasonable maximum rate. As I indicated, it actually it predated the existence of the 3,000 metric ton rate predated my involvement with the program. It was actually being considered before in the development of the plan even before that, so maybe in that time frame someone came up with it in relationship to how the repositories would work.

Over the years, it's been more or less accepted. We have looked at greater amounts, lesser amounts over the years, but the requirement hasn't changed. That's probably the best way I can answer that.

Q You keep bouncing around and coming back to 3,000 metric tons, is that right?

A Because we don't have a strong basis, I'd say, for saying it should be higher or should be lower. I have done analyses that indicate that, for instance, a 6,000 ton rate, which means you'd need a lot more capability at the repository, a lot more

01847

capability in the transportation system that would operate for a shorter period of time. But again, the as I characterized earlier, it's been something that's been in the program as accepted for a long time, and it exists today in our requirements documents.

---

**1861:21 - 1863:14**
**(Witness: Pollog, Thomas)**

01861

Q Mr. Pollog, could you please state your name for the record.

A Thomas Pollog.

Q Mr. Pollog, where are you currently employed?

01862

A At the Department of Energy in the Office of Civilian Radioactive Waste Management.

Q And where within the Office of Civilian

Radioactive Waste Management are you employed?
A In the Office of Systems Analysis and Strategy Development.
Q How long have you been in that position?
A I have been in that office for about four years.
Q And what are your current responsibilities?
A I work in the waste acceptance team. I am the contracting officer's technical representative assigned to basically implement the terms and conditions of the standard contract.
Q And when did you assume the responsibilities of the contracting officer's technical representative?
A Approximately three years ago.
Q To whom do you report?
A Chris Kouts.
Q Could you describe the other positions and responsibilities you've held while working at the Department of Energy?
A Yes. I started there in 1988, and my
01863
first one to two years I worked in the systems development group working on developing dry storage technologies. After that, I went into the systems integration group, which was responsible for developing the technical baseline for the Office of Civilian Radioactive Waste Management program.
After that, I took a three year leave of absence, and when I came back from my leave of absence, I went back to the Office of Civilian Radioactive Waste Management and I was in the engineering division, responsible for developing transportation and storage technologies. And starting in the fall of 1996, I'd been working in the waste acceptance area until present.

---

**1906:6 - 1906:24**
**(Witness: Pollog, Thomas)**

01906
Q All right, sir. And they in other words, the DCS that is authorized by the Nuclear Waste Policy Act was never intended to be a firm contract

number that the DOE was bound by as well as the purchaser?

A Well, I've always believed that an approved DCS was a firm commitment on both parties for a certain action. That's always been my belief.

Q All right. Sir, it's true, though, that that view is not shared by everybody within the Department of Energy. Isn't that a fair statement?

A I guess it depends on what time frame you're asking about.

Q Well, let's talk about in the early '90s.

A I think that's probably true, then. It wasn't shared by everybody in the department.

Q Okay. It just happens to be your personal belief that it is?

A That's correct.

---

**1909:9 - 1909:24**
**(Witness: Pollog, Thomas)**

01909

Q The isn't it true, sir, that the 1991 ACR rates that you testified to on direct examination setting forth the I think it was the 900 metric tons that goes into an MRS do you recall that testimony?

A Yes, I do.

Q that that rate that you testified to would not be sufficient in the aggregate to avoid any to avoid at reactor storage by the purchasers?

A I thought I saw an analysis, and I think it was also brought up in the action memo seeking approval for publication of the DCS where we stated I think aggregate would be sufficient to eliminate the need for additional at reactor storage.

Q Then you didn't do any such analysis?

A No, I did not.

---

**1910:19 -1910:25**
**(Witness: Pollog, Thomas)**

01910

Q Yeah, to reiterate, my question was that

you said that there are no studies that you have
generated or put together that show that that rate
would be adequate to to avoid the at reactor
storage of the purchasers.
A I believe that's correct. I did not
generate any studies that would indicate that.

---

**1921:2 - 1922:11**
**(Witness: Pollog, Thomas)**

01921
Q The 2000 metric ton rate was being
discharged from on the aggregate from the utilities
who were trying to have their spent nuclear fuel
picked up by DOE. There was about 2,000 tons. We've
established that, correct, in the '91 time frame?
A A little bit more than, but for argument's
sake, for discussion's sake, we can say 2,000 now and
that will probably work just as well.
Q And the capacity of the utilities to take
this discharge was going to quickly was going to
not be serviced by this rate that is shown on table
2.1, was it?
MR. GARDNER: Your Honor, I object. I'm
not really sure I understand Mr. Baker's question. I
think it's still vague.
JUDGE MEROW: I think he's commenting on
the fact that the 2,000 discharge rate means you're
putting 2,000 metric tons into the storage system but
you're only taking out 900. And the question is will
that eventually lead to a situation where somebody's
going to have to build some additional storage.
MR. BAKER: I like the judge's question.
THE WITNESS: Should I answer that, Your
Honor?
01922
JUDGE MEROW: Yes.
MR. BAKER: Very articulate man.
THE WITNESS: Eventually, yes, that is
what indeed would happen eventually. I think, you
know, the discussion here was for this period of time.
1998 through 2007, this rate would be sufficient to
eliminate in the aggregate, again, the need for
additional at reactor storage. Once you proceeded
past the 2007 time frame, then you're going to be in

that situation.
BY MR. BAKER:

---

**1922:22 - 1923:16**
**(Witness: Pollog, Thomas)**

01922
Q All right, sir. Mr. Pollog, isn't it true that today, or at least as of 2004, that the groups within the Department of Energy believe that this 3,000 metric ton rate is the appropriate steady state
01923
throughput rate for the picking up of spent nuclear fuel at the purchasers' reactors?
A I really don't want to speak for groups within the Department of Energy. I could, you know, speak for myself, but I'm it's difficult for me to speak for the whole groups within the Department of Energy.
Q Well, then, speaking for yourself, then.
A I think if you have a repository based system, an acceptance rate between 2,000 and 3,000 is a reasonable rate.
Q The 2,000 rate, between 2,000 and 3,000, 2,000's just going to meet if it's 2,000, it's just going to meet the discharge rate and not work off the backlog, though. We know that?
A Yes.e

---

**1926:9 - 1926:21**
**(Witness: Pollog, Thomas)**

01926
Q Mr. Pollog, looking at your Pollog demonstrative number one, where you went through the difference between these different factors, the capacity factors, enrichments, burn up, shutdowns, license extensions, and contracts of what was going on in the early '80s versus the current time, all of those factors that you testified to that are on the increase and all of that, none of these factors has changed the 3,000 metric ton acceptance throughput acceptance rate from the early days up to the very day

based upon the 2004 annual capacity report, has it?
A Not at this point in time, but I can envision a scenario where it might.

---

**1927:13 - 1928:5**
**(Witness: Pollog, Thomas)**

01927
Q Mr. Pollog, you had mentioned on cross examination that others in the Department of Energy may not have shared the view that the DCSs were binding commitments. Do you recall that testimony?
A Yes, I do.
Q Do you know how the others at the Department of Energy viewed the delivery commitment schedules?
A I can't speak for everyone again but within my organization, my own boss, Mr. Braunstein (ph), he viewed the DCS as a nonbinding based upon he viewed the binding part of it based upon only having the facility operating at that point in time,
01928
that if we had a facility operating, that it was binding, and if we did not have a facility operating by January 31, 1998, then it was nonbinding. That thought, I think, was several people had that similar idea.

---

**Trial Testimony - Southern v. US (10/27/05)**

01934
IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO. 98 614C
COMPANY, )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington, D.C.

Thursday, October 27, 2005

00000

VOLUME 9

The parties met, pursuant to the notice of the Judge, at 9:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

01935

APPEARANCES:
ON BEHALF OF THE PLAINTIFFS:
M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226 3417
and
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, Northwest
Washington, DC 20004
ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, DC 20530

---

**1936:19 - 1938:9**
**(Witness: Zabransky, David)**

01936

Q Okay. Good morning, Mr. Zebransky. Could you state your full name for the record, please?
A My name is David K. Zebransky.
Q Mr. Zebransky, where are you currently employed?
A I'm employed by the U.S. Department of Energy in Washington, DC.

01937
Q And what office do you work in at the Department of Energy?
A I work in the Office of Civilian and Radioactive Waste Management and in that office, in the Office of Systems Analysis and Strategy Development.
Q And what position do you hold in that office?
A I'm currently a nuclear industry specialist.
Q And what are your responsibilities as a nuclear industry specialist?
A To provide technical input and on nuclear issues to my boss on issues of strategy development and systems analysis.
Q And to whom do you report?
A To Mr. Christopher Kouts.
Q Are you also the contracting officer for the standard contracts between DOE and the nuclear utilities?
A Yes, I am.
Q When did you become the contracting officer?
A I believe around July of 2002.
Q Have you also served as the technical
01938
representative to the contracting officer?
A Yes, I did.
Q And what were your responsibilities as the technical representative to the contracting officer?
A To provide technical advice to the contracting officer on issues under the standard contract.
Q When did you join DOE?
A July of 1994.

---

**1981:20 - 1982:1**
**(Witness: Zabransky, David)**

01981
Q Okay. Now, when you were at WEPCO managing spent fuel and the contract, you believed that a reasonable acceptance rate under the contract was one that would have kept up with discharges and

worked off the backlog of spent fuel at the utility
sites, did you not?
01982
A I did, yes.

---

**1985:12 -1989:23**
**(Witness: Zabransky, David)**

01985
Q Now, you've still got the 2004 ACR in
front of you, I think, don't you?
A Yes.
Q And I've got it somewhere before me.
A I do.
Q And we've looked at the acceptance rate in
this. It's on page 4, I think. No, wrong again. 2.
A 2.
Q What's what we've come to refer to as the
3,000 metric ton rate in this case, correct?
A I
Q The 3,000 metric steady state rate?
A Correct.
Q It's in the planning documents the
01986
department uses to plan the system?
A That's what this is, yes.
Q And has been in the planning documents
that the department uses to plan the system since 1995
or '6, correct?
A I believe that the system for repository
has used these numbers probably back to that time
frame. I'm not sure exactly when, but for quite a
while.
Q All right. Now, you and Mr. Pollog, I
think, prepared, actually prepared this document,
Plaintiff's Exhibit 14, correct?
A We did, yes.
Q And Mr. Kouts was in here testifying
yesterday. Mr. Kouts is your boss?
A He is.
Q And Mr. Kouts provided you with those
rates to include in this ACR, correct?
A He did.
Q In your personal opinion, you believe
that's a reasonable acceptance rate for the system to

operate at, don't you, the one reflected in this 2004 ACR?

A Yes. Again, like I've said before and I'll say again, is that if one were looking at what a

01987

reasonable rate to remove fuel from spent from nuclear sites in a reasonable time frame is, this rate is reasonable. That's why we continue to use it for repository design.

Q All right, sir. Now let's talk about the 1991 ACR, which you've discussed.

A Yes.

Q This was the first one that DOE asked utilities to submit DCSs based on. That's poor grammar, Judge, I'm sorry, but I got to the middle of that sentence and couldn't find a way out of it. This is the first ACR, this Exhibit 97 is the first ACR that was used to prepare DCSs?

A That's correct.

Q Now, the rate and we had a lot of testimony about the MRS schedule linkages yesterday.

A Okay.

Q You know what I'm referring to when I talk about the MRS schedule linkages?

A I'm aware of them generally, yes.

Q MRS can't be construction on the MRS can't start until the repository has received a construction authorization, correct?

A That's my understanding, yes.

Q And, of course, the repository's never

01988

received a construction or the DOE has never received a construction authorization for repository up to today, correct?

A That's correct also.

Q So the rates in this 1991 ACR are based on an assumption that those linkages don't exist, correct?

A I don't know that. To go back and review the document as to what it says.

Q All right. Let me refer you to page 4 and we'll highlight that middle paragraph.

A Okay.

Q Does that refresh your recollection about whether or not these rates are based on an assumption that the schedule linkages between the MRS and the

repository are eliminated by Congress?
A I think the, yes, this basically, as we read it, my recollection is that what I have been told is that DOE was assuming that if there was a negotiated MRS, that part of the negotiation process between the volunteer site and the negotiator would be to remove the schedule linkage.
Q But you know those linkages have never been removed?
A There's never been a voluntary MRS
01989
identified either.
Q And Congress isn't the linkages are in the United States Code, correct? They are in the law. They're in the Nuclear Waste Policy Act?
A Nuclear Waste Policy Act amendments, yes.
Q So Congress would have to do that?
A Yes.
Q The President would have to sign it?
A Yes.
Q And that hasn't happened?
A Not to my knowledge, no.
Q So to the extent that the rates on page 5 of the 1991 ACR
A Yes.
Q are based on an assumption that an MRS could be constructed and operate for ten years without the repository having received a construction authorization, they're inconsistent with your understanding of the linkages between the MRS and the repository in the Nuclear Waste Policy Act, correct?
A Yes, they're inconsistent, but they also make the assumption that that linkage would get removed.

---

**1990:15 - 1991:2**
**(Witness: Zabransky, David)**

01990
Q So DOE didn't think the 1991 was ACR was contractually binding, right?
A Well, again, as I've explained, DOE didn't think the DCSs were, they thought they were conditional commitments. The ACR in itself is a planning document. It's when it was used by the

contracting officer as the basis for the DCSs that it started the contractual process.
Q Okay. And that was you skipped to my next question. DOE didn't consider the DCSs binding, is that your testimony?
01991
A I think DOE erroneously considered them to be deconditional commitments.

---

### 1994:8 - 1997:25
### (Witness: Zabransky, David)

01994
Q In producing this document.
Now, this 1995 ACR has the same acceptance rate that the previous ones did, correct?
A That's correct.
Q That the 1991 did?
A It does, yes.
Q All right. And as we've already discussed, that 1991 ACR rate was well, maybe we haven't. The 1991 rate was constrained by the capacity limitations of the in the Nuclear Waste Policy Act on the MRS facility, correct?
A That's my understanding, yes.
Q That's the 10,000 metric ton limit?
A 10,000 metric tons prior to the beginning of operations of the repository.
Q Right. So what DOE did, basically, was take that 10,000 metric ton capacity limit and divide it by 10 or 12 and came up with something around 900?
01995
A Yeah.
Q I don't think the math works precisely, but that's that was the idea, correct?
A Yes, after a ramp up, yes.
Q Okay. Now, as we've also mentioned, although it reflected those capacity limitations, that rate did not reflect the schedule linkages on the repository and the MRS, right?
A That assumed the schedule linkages were waived, yes.
Q Were waived?
A For the '98 date, right.
Q And this rate does the same thing. This

rate is based on the same rate that was in that '91 ACR, correct, that's in Plaintiff's Exhibit 823?

A It does, makes the same assumption on the elimination of the schedule linkage, yes.

Q Okay. So this assumes acceptance at an MRS for ten years without a repository, correct?

A I think it basically assumes that, yes.

Q And when I say "this," I'm talking about the '95 ACR, which is Plaintiff's Exhibit 823.

A Okay, yes.

Q All right. That was supposed to be the basis for the submittal of these of DCSs after

01996

1994?

A Correct.

Q Now, it's a fact, though, isn't it, Mr. Zebransky, that as of 1994, there was no active MRS program at the Department of Energy?

A I don't can't answer that question. I don't know what was the status of the MRS program at the Department of Energy at that point in time.

Q Are you sure? Are you sure you don't know that by the time the '95 ACR, the MRS process had ceased?

A Again, I wasn't working in that process. I don't know exactly what they were up to. It was sort of winding down, but I don't know if it had ceased or died. It certainly was becoming less lively or less active than it was previously.

Q Let me show you you remember three years ago when I took your deposition?

A No, other than I enjoyed your company, no, I don't.

Q I enjoyed yours too. I'm going to just ask if something will refresh your memory about this.

MS. SULLIVAN: Counsel, what day?

MR. BLANTON: It's April 18, '02.

THE WITNESS: Three and a half years ago.

01997

MR. BLANTON: And I'm going to show him page 359. Kristin, we don't need to put it up yet.

THE WITNESS: Page 359.

MR. BLANTON: 359.

BY MR. BLANTON:

Q Look at lines 6 through 10, and I'll just ask you again if you don't know that by the time the

1995 ACR was issued, that the MRS process had ceased.
A I believe at that time I answered that I believe it had. Now, I don't know that that's correct or right or wrong answer. That was my belief. Others could tell you more as to what they knew, who were working on it. I wasn't working on it.
Q At any rate, you were fairly certain by 1995 that there was not going to be an MRS in 1998, weren't you, Mr. Zebransky?
A I believe I had my doubts, and I believe the department was sufficiently uncertain that they went to this year one, year two as opposed to 1998, yes.
Q In fact, shortly after the publication of the 1995 ACR, the planning basis for the waste system shifted from an MRS and repository system to a repository only system, did it not?
A At some date afterwards, yes, it did.

---

**1998:4 - 1998:11**
**(Witness: Zabransky, David)**

01998
Q Okay. Now, if the MRS were not going to be a part of the waste system, the capacity limits in the 1987 Nuclear Waste Policy Act amendments wouldn't be a constraint on the acceptance rate now, would they?
A I believe that's the case, and that's why they're not a constraint on the current requirements documents.

---

**1998:19 - 1999:12**
**(Witness: Zabransky, David)**

01998
Q It's true, isn't it, Mr. Zebransky, that in leaving that 900 metric ton rate in this 1995 ACR, the intention of the Department of Energy was to try to minimize its liability to contract holders?
A I think I've said that I'm sure that that was one of the things they must have been thinking about, but there was also no other rate they could

01999

have put in there in the short term. They had no other plans at that time, in '94, other than the MRS. It was still the planning basis and it was changed later.

Q Might have been no other rate, but the reason they left the rate they did leave in there is they're trying to minimize their liability to contract holders, correct?

A And again, I think my opinion was that I'm sure that factored in their minds. Keep in mind they also thought that their liability was conditioned upon the existence of the facility.

---

**1999:18 - 2001:18**
**(Witness: Zabransky, David)**

01999

Q Now, the DCS process was also suspended in order to limit the department's liability and commitments to its contract holders, wasn't it?

A I think after the Indiana Michigan decision came out and people understood that these were firm commitments that it was no longer appropriate to continue to make them, and I'm sure that someone who advised the contracting officer

02000

thought it was appropriate to no longer make commitments you couldn't keep.

Q And, in fact, there wasn't any way to tell when a DCS was even due under the year one, year two scheme in the 1995 ACR, was there?

A I think most utilities presumed it was due in the calendar year in the operations they were putting the DCS in for. I never received any questions about that when I was at DOE.

Q But there wasn't any way to tell what year one was?

A People had to interpret that, I guess.

Q I think you already testified, but when you suspended the DCS process in 1997, you did so on advice of counsel?

A Well, the contracting officer suspended it and, yes, counsel advised the contracting officer to

Q I was using the royal "we" there to refer to DOE.
A Okay.
Q Excuse me.
A That's fine. I believe counsel was involved in that decision.
Q And DOE has not reviewed a DCS since 1997,
02001
correct?
A Not that I'm aware of.
Q Even when you resumed the process in 2004, you didn't review any DCSs during that six month period?
A Well, we didn't receive any until October of that year.
Q And didn't review those?
A Received them, we made sure they were complete, we looked at them, we were ready to process them and the decision was made to not process them.
Q Send them back?
A Right, that's correct.
Q So I think the record's fairly clear, but just to make it completely clear, it's been impossible since 1997 for a contract holder to have a approved DCS, correct?
A I think that's a fair statement.

---

**2001:25 - 2002:18**
**(Witness: Zabransky, David)**

02001
DOE has decided that it will not process any DCS
02002
submitted in advance of 63 months prior to the scheduled date of repository commencement?
A I think it's fair to say DOE has decided it will not commit to a pickup of spent fuel at a date it doesn't know it can meet.
Q So DOE is continuing, in essence, to limit its trying to limit its liability to the existence of a repository?
A DOE is, I think, more practically limiting its planning and its commitments to a date it knows it can have a facility. It would be inappropriate to commit to picking up fuel when we know we don't have a

facility to pick it up at.
Q We may be playing word games, but it's not going to enter into a commitment to a utility prior to having a repository commencement date, correct?
A I think that's a yes, we will not commit to pick up fuel if we know we can't pick it up.

## Trial Testimony - System Fuels v. US (1/16/07)

01726
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------x
SYSTEM FUELS, INC., on its own behalf :
and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH : No. 03-2624C
MISSISSIPPI ELECTRIC :
POWER ASSOCIATION, :
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :
-------------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, January 16, 2007

VOLUME 6

The parties met, pursuant to the notice of the
Judge, at 10:00 a.m.

BEFORE: THE HONORABLE SUSAN G. BRADEN
01727
APPEARANCES:
ON BEHALF OF PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D.C. 20037
(202) 663-8000

and

L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

01728

APPEARANCES (Continued:)
ON BEHALF OF THE DEFENDANT:
SHARON A. SNYDER, ESQ.
ALAN J. LO RE, ESQ.
STEPHEN FINN, ESQ.
SCOTT DAMELIN, ESQ.
MARIAN SULLIVAN, ESQ.
U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20036

---

## 1929:8 - 1931:11
## (Witness: Zabransky, David)

01929

Q. Mr. Zabransky, could you state your full name for the record, please?

A. Yes. It is David K. Zabransky.

Q. Mr. Zabransky, where are you currently employed?

A. U.S. Department of Energy in Washington, D.C.

Q. And what are your responsibilities -- what position do you hold at the Department of Energy?

A. I am in the Office of Civilian Radioactive Waste Management. I am a nuclear utilities specialist within that office.

Q. And what are the responsibilities in -- your responsibilities in that position?

A. Among a number of technical activities I do, I also administer or act as contracting officer for the standard contract at this point

01930

in time.

Q. In addition to your role as

contracting officer, what other functions do you serve or provide in the Office of Civilian Radioactive Waste Management?

A. I work for Mr. Chris Kouts, and I do a number of, we do technical studies, technical analyses, development of items for the Yucca Mountain program. Right now, I am working on procurement and design of transport and disposal canisters, issues like that.

Q. When did you become the contracting officer?

A. I believe in July of 2002.

Q. Have you also served as the technical representative to the contracting officer or the, what is known as the COTR?

A. Yes, I did. From, I believe about 1996 until about 2002.

Q. And what were your responsibilities as the COTR?

A. As the COTR, you offer or you provide technical advice to the contracting officer on issues that -- under the standard contract.

Q. When did you join DOE?

01931

A. July of 1994.

Q. And when you joined DOE, did you join the Office of Civilian Radioactive Waste Management?

A. Yes, I did.

Q. Prior to joining DOE, where were you employed?

A. I was employed at Wisconsin Electric Power Company, also known as WEPCO.

Q. How long were you employed with WEPCO?

A. I believe from 1978 to 1994.

---

**2017:11 - 2018:2**
**(Witness: Zabransky, David)**

02017

Q. Now, when they were completing DCS forms, utilities had to follow the instructions the Department of Energy provided, correct?

A. I believe they normally did, yes.

Q. And just to be clear, and those

instructions that the Department of Energy provided to the utilities directed the utilities to use only the allocations in the underlying ACR, correct?
A. I believe they did, yes.
Q. And the utility that asked for allocations beyond those specified in the ACR would not have its DCS approved, correct?
A. I believe that I testified earlier that I am aware of a couple cases where that
02018
occurred before I got to the DOE. But in reviewing the file, I saw that happened, yes.

---

**2030:4 - 2030:17**
**(Witness: Zabransky, David)**

02030
Q. While you were at WEPCO, it was your opinion that an appropriate rate of acceptance under the standard contract would be a rate which kept pace with discharges and removed some of the backlog; isn't that fair?
A. I think I just answered that question that, yes, that's the rate we would like to have had, would have been a rate that would keep pace with discharges and work off the inventories.
Q. And in a 3,000 -- or acceptance rate that ramped up to 3,000 metric tons would meet those requirements, correct?
A. Yeah, that would.

---

**Trial Testimony - System Fuels v. US (4/12/07)**

03339
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------------x
SYSTEM FUELS, INC., and ENTERGY :
ARKANSAS, INC., :
Plaintiffs, :NO. 03-2623C
vs. :
THE UNITED STATES, :
Defendant. :
------------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.
Thursday, April 12, 2007
The parties met, pursuant to the notice of the
Judge at 9:03 a.m.
BEFORE THE HONORABLE CHARLES LETTOW

03340
APPEARANCES:
ON BEHALF OF PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
and
L. JAGER SMITH, JR., ESQ.

Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

03341

APPEARANCES (Continued:)
ON BEHALF OF THE DEFENDANT:
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ.
ALAN J. LO RE, ESQ.
SCOTT DAMELIN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

---

**3343:11 - 3344:20**
**(Witness: Kouts, Christopher)**

03343

Q. Mr. Kouts, where are you currently employed?

A. I'm currently employed within the Office of Civilian Radioactive Waste Management at the U.S. Department of Energy.

Q. And what is your position with the Department of Energy?

A. I am director of the Waste Management Office within the Office of Civilian Radioactive Waste Management.

Q. And what are your responsibilities in that position?

A. I am responsible for the waste acceptance aspects of the system, including management of the standard contract. I'm also

03344

responsible for systems analysis and basically coordination with other DOE programs on DOE waste materials.

Q. And your responsibilities include planning for waste acceptance from the utilities pursuant to the standard contract?

A. Yes, they do.
Q. How long have you held your current position?
A. These duties I've been responsible for on an acting basis and then, later on, a permanent basis since, I believe, October of 2002.
Q. Could you bring the microphone just a little closer to you?
A. Okay.
Q. Thank you. When did you first join the Office of Civilian Radioactive Waste Management?
A. In June of 1985.

---

**3461:1 - 3461:15**
**(Witness: Kouts, Christopher)**

03461
Q. Is there anything in any of the ACRs that say that the delivery commitment schedule is contractually binding?
A. I don't believe so, but I'd have to review the documents to know for sure, to assure myself of that, but my expectation would be that there would be nothing in those documents to indicate that.
Q. And it's also true, is it not, that all the DCSes say that DOE will further define and specify system operating and waste acceptance parameters as the program progresses, do you remember that language in all of the DCSes?
A. Yes.

---

**3469:17 - 3470:7**
**(Witness: Kouts, Christopher)**

03469
Q. In September of 1991, it's correct, is it not, that the General Accounting Office issued a study on the MRS facility, are you familiar with that study?

A. I remember the issuance of the study. I don't remember the specifics of it. I'd be happy to review it, if you have it available.

Q. I do, Plaintiff's Exhibit 198. I've handed you a document, GAO/RCDE, 91-194, U.S.
03470
General Accounting Office report to Congressional requestors, September 1991, entitled, "Nuclear waste operation of monitored retrievable storage facility is unlikely by 1998." Is this the document you're reflecting on?

A. Yes.

---

**3470:21 - 3472:19**
**(Witness: Kouts, Christopher)**

03470

Q. Mr. Kouts, you're aware of the General Accounting Office?

A. Yes, I am.

Q. Can you tell us what it is?

A. It's essentially an office that
03471
supports requests for Congressional review and for individual review of different aspects of the government.

Q. Are you aware that DOE regularly receives reports by GAO?

A. Yes, I am.

Q. And are you aware that DOE received this report by GAO?

A. I assumed it received it, yes.

MR. SILBERG: Your Honor, I would ask admission of this document.

MS. SULLIVAN: Your Honor, there's still been no foundation laid that Mr. Kouts is the proper witness to talk about this document, and he's not a 30(b)(6) witness with regard to the Department of Energy's views on this document, and, again, it's a Congressional document. He's not the proper witness.

THE COURT: The Court can ask about three questions and solve all this, but I'm reluctant to do so. Mr. Silberg, why don't you

ask those three questions? Well, let me start with the first one. Mr. Kouts, what were your responsibilities in September of 1991?
THE WITNESS: In September of 1991, I
03472
was supporting strategic and contingency planning for the program.
THE COURT: Did that include an MRS?
THE WITNESS: Yes, generally looking at, certainly, the contingency of having an MRS available, yes.
THE COURT: Now, Mr. Silberg, I've gotten you started.
BY MR. SILBERG:
Q. And in the context of that, were you aware at that time or thereafter of this report?
A. Yes, I believe I read it when it was issued.
Q. And this report deals with GAO's analysis of the MRS program?
A. My assumption is that its an analysis primarily of the schedule aspects of an MRS, yes.

---

**3476:3 - 3477:1**
**(Witness: Kouts, Christopher)**

03477
Q. When you read this report, Mr. Kouts, did you understand this to set forth GAO's position that it believes it was highly unlikely that DOE can develop an MRS facility by 1998?
A. Yes.
Q. Thank you. And if you'd look back at pages three and four of this report, from the bottom paragraph, when you read that report, was it your understanding that GAO's reasons for its conclusions were that a 1998 date depended on, in part, on the Negotiator completing and DOE approving a siting agreement for an MRS by the end of 1992?
A. No, as I read the report, it was Congress approving the Negotiator's efforts,

not the Department approving.

Q. And that's the sentence that begins the fourth line in that paragraph, "DOE's plans depend on the Negotiator's completing and Congress' approving a siting agreement by the end of 1992. That would permit early development of an MRS facility"?

03477

A. That's correct.

---

## 3478:6 - 3481:1

03478

BY MR. SILBERG:

Q. Mr. Kouts, we were talking about the GAO report of 1991, Plaintiff's Exhibit 198, and if I could ask you to turn to page three of that report? I think, just before we broke for lunch, we were talking about the first of the GAO's reasons for its conclusion that an MRS by 1998 was highly unlikely.

And if you look down on the bottom paragraph, Bates 1342, I think we -- on Bates page 1342, GAO says that, "DOE's plans depend on the Negotiator completing and Congress approving siting agreement by the end of 1992. That would permit early development of an MRS facility."

Now, the Negotiator did not complete the siting agreement by the end of 1992, did it?

A. No, it did not.

Q. Okay. Did it ever complete a siting

03479

agreement?

A. No, we did not.

Q. Second part of that argument says that, and in the next sentence, GAO states, "Because the Negotiator expects the process to take considerable time, he does not believe that these activities could be completed by then," meaning 1990 and 1992. And that, in fact, turned out to be the case, isn't that correct?

A. That's correct.

Q. The second reason that GAO provided in this report for concluding that it was highly unlikely to have an MRS by 1998 was that affected states strongly opposed DOE's siting activities for an MRS facility. Do you see that on the bottom of page 1342, the last line continuing over?
A. Yes, I do.
Q. And that was certainly correct, was it not, that Tennessee opposed the MRS in that facility?
A. Yes, the state of Tennessee did.
Q. Opposed the siting of that facility in Tennessee?
03480
A. Yes.
Q. And that Nevada vigorously opposes Yucca Mountain?
A. That's correct.
Q. And then it goes on at the end of that top paragraph of 1343, GAO says, "Finally, Congress would have to rescind, as DOE has requested, the links between the MRS facility and repository schedules to prevent the facility from adversely affecting the incentive to complete a repository." And Congress never took such action, did it?
A. No, it has not to this date.
Q. Was such a bill in the 1991 to 1995 timeframe, was such a bill ever reported out of committee?
A. Not that I'm aware of.
Q. And after 1995, did DOE ever ask the administration to propose legislation to allow it to undertake siting of an MRS?
A. From my perspective in the program, I'm unaware of any such request.
Q. And we agreed that no agreement with a candidate site was ever negotiated, that's correct?
03481
A. That's correct.

**3484:1 - 3484:15**
**(Witness: Kouts, Christopher)**

03484
Q. Okay. And if we turn for a minute to page 22 of this document, which is Bates 1361, and let me, about halfway down that paragraph, you see the sentence that starts, "the Negotiator told us"?
A. Yes.
Q. Could you just read that into the record, please?
A. "The Negotiator told us that, even with a very aggressive effort, it is unlikely that he can negotiate and gain approval of an agreement by late 1992."
Q. And do you disagree with the statement that's attributed to the Negotiator?
A. I have no basis to disagree with it.

---

**3521:15 - 3524:1**
**(Witness: Kouts, Christopher)**

03521
Q. Did you assume favorable Congressional action to changing the linkage while you were reviewing the 1991 ACR?
A. I believe the 1991 ACR was based on the premise that there would have been a removal of the schedule linkages in the MRS, so that was certainly my assumption when I reviewed that document, and my sense is that was the perspective of the Department when it issued it.
Q. But you don't know what the basis for
03522
that premise was, do you?
A. Well, back in 1991, we had an active program with the Nuclear Waste Negotiator, and we were supporting that office's efforts to identify a facility, site for that facility, so my sense is that the premise for it and the assumption was that the Negotiator was going to be successful.
Q. So you, A, assumed the Negotiator

would be successful, is that correct --
A. Yes.
Q. -- in finding a site? B, that he would negotiate an agreement with a volunteer host community that would contain linkages that would allow the assumption that's made in the 1991 ACR, is that correct?
A. That's correct.
Q. And then you assumed that Congress would enact that agreement into law, is that correct?
A. That's correct.
Q. And you assumed that an application would be filed for that facility with the NRC?
A. A license application, yes, that's correct.

03523

Q. And you assumed that the NRC would favorably review that application?
A. That's correct.
Q. And you assumed that that favorable review of the application would be completed before January 31, 1998?
A. That's correct. In addition, the assumption was that we were going to have the budget to implement the program and that there would be no litigation that would slow us down along the way, so there were a variety of assumptions that played into it, in addition to the ones that you identified.
Q. And you assumed, if the NRC issued a favorable licensing decision, that that would not be held up by litigation?
A. That was the operating assumption of the program at the time.
Q. And you assumed that if the license was not held up by litigation, that you could construct the facility and have it operational by January 31, 1998?
A. That's correct.
Q. And is there a document which explains the basis for all those favorable assumptions?

03524

A. Not one that comes to mind, no.

**3582:5 - 3583:17**
**(Witness: Zabransky, David)**

03582
Q. Mr. Zabransky, I would ask that you speak clearly and slowly into the microphone. Thank you. Mr. Zabransky, where are you currently employed?
A. I'm employed at the U.S. Department of Energy in the Office of Civilian Radioactive Waste Management.
Q. And what is your position within the Office of Civilian Radioactive Waste Management?
A. I believe it's a nuclear utility specialist in the Office of Waste Management -- Waste Management Office.
Q. And what are your responsibilities in that position?
A. A number of technical duties having to do with technical aspects of waste acceptance and waste forms, as well as I served as the contracting officer for the standard contract, disposal contracts.
Q. And to whom do you report?
03583
A. I report to Christopher Kouts.
Q. When did you become the contracting officer for the standard contracts?
A. I believe in July of 2002.
Q. Have you also served as the technical representative to the contracting officer?
A. Yes, I served as the technical representative from, I believe, sometime in 1995 to July of 2002.
Q. And what were your responsibilities as the contracting officer's technical representative?
A. To provide technical advice to the contracting officer on administration of the contract.
Q. When did you join DOE?
A. In July of 1994.

# Trial Testimony - System Fuels v. US (4/13/07)

03677
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------------x
SYSTEM FUELS, INC., and ENTERGY :
ARKANSAS, INC., :
Plaintiffs, :NO. 03-2623C
vs. :
THE UNITED STATES, :
Defendant. :
------------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.
Friday, April 13, 2007
The parties met, pursuant to the notice of the
Judge at 9:02 a.m.
BEFORE THE HONORABLE CHARLES LETTOW
03678
APPEARANCES:
ON BEHALF OF PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
and
L. JAGER SMITH, JR., ESQ.

Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

03679

APPEARANCES (Continued:)
ON BEHALF OF THE DEFENDANT:
JOSHUA E. GARDNER, ESQ.
ALAN J. LO RE, ESQ.
SCOTT DAMELIN, ESQ.
MARIAN SULLIVAN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

---

**3698:8 - 3701:10**
**(Witness: Zabransky, David)**

03698

Q. Now, that MRS had some conditions on it as of that point in time, did it not?
A. Yes, it did.
Q. And let's talk about some of those. Even though your answer that we just looked at doesn't refer to an MRS, you say that's what you had in mind, but that would have had to assume, number one, that there was a site for an MRS, correct?
A. That's a prerequisite, yes.
Q. A site that had been located or identified by the Department of Energy, correct?
A. Or the Negotiator's office, yes.
Q. And neither of those two conditions had existed at this point in time, right?
A. Not yet, no.
Q. And when I say, "at this point in

03699

time," I mean as of March 1995, when the document was published, right, there was no site -- DOE hadn't located a site, nor had the

Office of the Nuclear Waste Negotiator located
a site, correct?
A. That's true.
Q. And Congress, as of this point in
time, March of 1995, had not agreed to sever or
withdraw the linkages that had existed as of
1987, correct?
A. That's correct.
Q. And the NRC, the Nuclear Regulatory
Commission, hadn't approved a site as of this
point in time, correct?
A. Well, since no site was identified, I
presume that's true.
Q. And indeed, there were no NRC hearings
that had been scheduled as of March 1995 to
approve any MRS facility, correct?
A. That follows from the discussion, yes.
Q. And another assumption that underlies
your testimony that this was dependent upon an
MRS operational in 1998 would be that any legal
challenges to such a facility would have been
resolved by 1998, right?
03700
A. That's correct.
Q. And of course that the construction of
the facility would actually be completed by
1998?
A. That's correct, too.
Q. That there would be some
transportation system developed by DOE to
actually pick up spent nuclear fuel from
utilities and deliver it to an MRS site, right?
A. That's correct.
Q. And this assumption that an MRS would
be operational in 1998 also depends upon the
development of casks by DOE, correct?
A. Not necessarily.
Q. Wouldn't DOE need casks to pick up the
spent nuclear fuel at the utility sites?
A. There were casks in existence at the
time that could have been utilized.
Q. And what casks was DOE planning on
using at this point?
A. DOE hadn't developed a plan at that
point in time.
Q. And DOE hadn't licensed any casks at

this point in time, had they?
A. No, but there were licensed casks at
03701
that point in time.
Q. Had DOE procured any casks as of this point in time?
A. Not at that point in time.
Q. So this notion that the 1995 ACR was going to utilize an MRS as of 1998 was dependent upon seven -- or eight, rather, critical assumptions, isn't that fair?
A. That's fair, and I think that was stated in the document.

---

**3705:15 - 3706:24**
**(Witness: Zabransky, David)**

03705
Q. Now, in late 1996, early 1997, you were working as the COTR, is that right, contracting officer's technical representative?
A. That's correct.
Q. And in that time period, late 1996, early 1997, the Department chose to suspend the DCS process, correct?
A. That's correct.
Q. And one of the reasons that the Department of Energy suspended the DCS process and stopped approving or disapproving DCSes was
03706
tied to a decision in the U.S. Court of Appeals regarding DOE's obligations under the contract, correct?
A. That's my understanding, yes.
Q. And without getting into the details of the decision and its legal ramifications, in general, you understand that that Court of Appeals' decision concluded that DOE had an unconditional obligation to begin acceptance of spent nuclear fuel in 1998, correct?
A. That's my general understanding, yes.
Q. And that appellate decision led in turn to DOE's determination to stop reviewing delivery commitment schedules in late 1996, early 1997, correct?

A. I believe it was early '97, that's
correct.
Q. And counsel essentially made that
recommendation?
A. Counsel made a recommendation to the
contracting officer, and she made the final
determination.
Q. And that determination was adopted?
A. Yes.

---

**3719:18 - 3722:11**
**(Witness: Zabransky, David)**

03719
Q. Let's talk about the instructions that
accompanied the DCSes for a moment, and I
believe you indicated, in response to
Ms. Sullivan's questions on direct, that in
completing DCS forms, utilities had to follow
the instructions that the Department of Energy
provided, is that correct?
A. That was my understanding, yes.
03720
Q. I'm sorry. Are you looking for the
document?
A. I was looking for the instructions.
Q. I'll give you a minute, if you'd like
to have them in front of you.
A. Okay.
Q. And, Mr. Zabransky, just so I'm clear,
what document are you looking at now?
A. It appears to be Defendant's Exhibit
297.
Q. And just so the record is clear, this
is the document sent to Mr. Rives, and we were
uncertain about the date, correct?
A. Sometime in March of '92, I guess.
Q. All right. And it's fair to say,
Mr. Zabransky, that these instructions
directed, in this particular instance, Entergy
to use only their allocations in the underlying
annual capacity report, correct?
A. I believe that's what they do, yes.
Q. And that's reflected in Defendant's
Exhibit 297 in the instructions, page one of

the instructions at paragraph two, I'll put
that up on the screen.
A. Where are you going, sir.
03721
Q. I was just asking whether paragraph
two embodied -- or my understanding -- or
reflected my understanding that the
instructions directed the utilities to use the
allocations in the underlying ACR which, in
this instance, was the 1991 ACR?
A. Well, it's there, it's also in the
cover letter that the contracting officer sent.
Q. All right. And just so we're clear,
where are you referring to in the cover letter?
A. In the second paragraph.
Q. All right. I'll put that up. And
that would be the first sentence of the second
paragraph, correct?
A. That's correct.
Q. Why don't you read that into the
record, please?
A. "The allocations in the 1991 annual
capacity report should be the basis for DCS
submittals."
Q. And it's true that a utility that
asked for allocations beyond those specified in
the 1991 ACR would not have its DCS approved,
correct?
A. It's my understanding that's what
03722
happened, yes.
Q. And that in point of fact did happen
in a couple of instances, correct?
A. That's correct.
Q. And in instances where utility
exceeded by .1 metric tons its allocation, its
DCS was disapproved by DOE, correct?
A. I'm not sure what the quantities were.
I just know that if they were not consistent
with the allocations, I believe they were not
approved.

**3734:6 - 3736:23**
**(Witness: Zabransky, David)**

03734

Q. Mr. Zabransky, just to set the stage, the instructions, the DCS instructions, as we've just gone through, they, and the cover letter that you testified about a moment ago, they basically tell the utilities to use the allocations in the 1991 ACR, right?

A. The instructions that were transmitted in 1992, that's correct.

Q. And my question to you now goes beyond the instructions, I'm asking you about the contract, the standard contract for which you're the contracting officer. There's nothing in the contract, is it, that says or tells a utility that it cannot request delivery of spent nuclear fuel greater than its ACR allocations?

A. And, again, I think we have to take the thing in its whole entirety, as we talked about yesterday. The contracting officer issued guidance as to how that process should

03735

work to flesh out what was in the contract. That was discussed with the industry, as we talked about with the EEI groups yesterday, and utilities have those instructions provided to them 1992. No one protested that guidance.

Q. That doesn't quite answer my question, although I appreciate the answer. The contract doesn't say anything or doesn't direct utilities to use only the ACR allocations in submitting their DCSes, correct?

A. It doesn't but the contracting officer provided further guidance.

Q. And that guidance came in the form of these instructions?

A. Came in the form of a letter from the contracting officer with the instructions attached, yes.

Q. And let's look at just another portion of those instructions for just a moment, and for the record, this is Defendant's Exhibit 297. And if I could direct your attention to

subparagraph 7C? And can you read the first
sentence of subparagraph 7C into the record?
A. Sure. "The annual acceptance rates in
the 1991 ACR provide an approximation of the
03736
Federal Waste Management System acceptance
capacity and for planning purposes."
Q. All right. So in these instructions,
the Department of Energy is telling the
utilities explicitly that the acceptance rates
in the 1991 ACR are for planning purposes,
right?
A. Well, I think you need to read that
whole paragraph because it goes on to say we're
assuming we can do this, I'm paraphrasing, but
in the event circumstances change -- and,
again, this is a facility that's never been
built before, never been operated before, if
they change and we've got an approved DCS,
we'll need to get together and reevaluate what
we've approved.
But, Mr. Tomaszczuk, the place hadn't
been built or licensed. It was hard to commit
to a capacity that we could say, yeah, this is
what it's going to do. This was the basis we
were willing to commit to, with the further
caveat that we would discuss it if things
didn't work out that way.

---

**3782:1 - 3783:16**
**(Witness: Zabransky, David)**

03782
Q. And isn't it true that while you were
at Wisconsin Electric, you understood that a
reasonable acceptance rate was one that would
have reflected the aggregate rate of utility
discharges, plus work off some of the backlog?
MS. SULLIVAN: Your Honor, this
question exactly duplicates testimony that was
read into the record during the portion of the
trial that the depo designations were read in.
MR. TOMASZCZUK: I'm not sure it's an
exact duplication. It may be similar in theme,
I'm not sure the precise contours of the

question are the same.
THE COURT: Overruled.
THE WITNESS: And the question was? Sorry.
MR. TOMASZCZUK: Could you read that back.
(The reporter read the record as requested.)
THE WITNESS: And, yeah, I believe that's a reasonable acceptance rate, that, in an unconstrained world, that's the rate we'd have loved to have seen.
BY MR. TOMASZCZUK:
03783
Q. And that was your view then, and it's your view today?
A. I think that my view today is that, in an unconstrained world, that's a reasonable acceptance rate, yes.
Q. And the Department of Energy is currently designing the waste management system to accomplish that dual set of considerations, correct?
MS. SULLIVAN: Objection, Your Honor, relevance as to what the system designs are today.
THE COURT: Overruled.
THE WITNESS: The Department is currently designing the repository to achieve those acceptance rates, yes.

---

**3806:15 - 3807:23**
**(Witness: Zabransky, David)**

03806
Q. Now, it's true, is it not, Mr. Zabransky, that there is no language on any DCS form which says an approved DCS is contractually binding?
A. I don't believe there is, no.
Q. In fact, there's no language anywhere that says that, correct?
MS. SULLIVAN: Objection, vague.
MR. TOMASZCZUK: Fair objection, let me revise.

BY MR. TOMASZCZUK:
03807
Q. There's no language in any of the documents, including the contract or documents issued pursuant to the contract, which indicate that an approved DCS is contractually binding?
A. I'm not aware of any, no.
Q. And there's nothing in the DCS instructions which indicates that an approved DCS is contractually binding?
MS. SULLIVAN: Objection, Your Honor, relevance.
THE COURT: Overruled.
THE WITNESS: I'd like to go look at those again.
BY MR. TOMASZCZUK:
Q. Fair enough.
A. I don't see anything in the instructions that says that.
Q. And just for the record, which document were you looking at?
A. Defendant's Exhibit 297.
Q. All right. And those were the instructions issued in or about March of 1992?
A. That's correct.

---

**3823:4 - 3823:11**
**(Witness: Zabransky, David)**

03823
Q. If, as you've articulated, the DCS is a binding commitment, that is your view, correct?
A. Yes.
Q. Isn't it true, if that's the case, that if DOE had the right to disapprove a final delivery schedule, then the DCS itself is not binding?

---

**3824:4 - 3825:7**
**(Witness: Zabransky, David)**

03824

THE WITNESS: And, again, DOE has the right to disapprove an FDS, as it does, but if you wait for it to process, then DOE must propose an alternate schedule, the purchaser can accept DOE's proposed alternate schedule, and if the two parties can't reach agreement as to what the revised date should be or the revised time should be, then there will be a dispute that needs to be resolved.

But it doesn't change the process, it's a scheduling process, and DOE has the right to say, I can't come on June 5th. I'm proposing July 12th, instead.

Q. So doesn't that mean that the DCS is not binding?

MS. SULLIVAN: Objection, Your Honor, asked and answered.

THE COURT: Overruled.

THE WITNESS: I don't believe it does.

BY MR. TOMASZCZUK:

Q. It's binding, but it's subject to DOE's right to approve it and adjust it?

03825

A. And the --

MS. SULLIVAN: Objection, Your Honor, asked and answered.

THE COURT: Overruled again.

THE WITNESS: And the purchaser has a right to disagree with that and pursue a dispute.

**Trial Testimony - TVA v US (6/24/05)**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
__________________________________________
TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )
__________________________________________
United States Bankruptcy Court
31 E. 11th Street
Courtroom B, Third Floor
Chattanooga, Tennessee 37402

Friday, June 24, 2005

00751

Volume 4

The parties met, pursuant to the notice of the Judge, at 8:30 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

00752

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

---

**819:14 - 819:20**
**(Witness: Barrett, Lake)**

00819

"QUESTION: So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the Act and to reduce, over a reasonable period of time, the backlog of spent nuclear fuel throughout the nation, correct?

"ANSWER: Yes."

---

**824:17 - 826:20**
**(Witness: Barrett, Lake)**

00824
"QUESTION: To your knowledge, Mr. Barrett, have all TSLCC or fee adequacy studies issued on or after 1982 assumed a 3,000, paren, MTU acceptance rate or a repository design receipt rate?"
MR. LO RE: Objection, lack of foundation, best evidence.
THE COURT: Why do you say, refer to the best evidence rule, Mr. Lo Re?
MR. LO RE: Because, Your Honor, the
00825
question refers to the specific TSLCC reports and those documents obviously are the best evidence of what is contained therein.
THE COURT: That's true, but on the other hand, obviously, Mr. Barrett has personal knowledge of those documents. He testified earlier that he had.
MR. LO RE: Your Honor, if I may on that?
THE COURT: Yes, certainly.
MR. LO RE: To the extent Mr. Barrett may have an opinion and that opinion is proved correct or incorrect by the document, I believe it is simply the document that determines the accuracy of the issue, and frankly, I think Mr. Barrett's testimony in this regard is superfluous.
THE COURT: Well, except that what he does is refer in the -- or what the question refers to is fee adequacy studies issued on or after 1982, and he would have knowledge about the whole spectrum of studies, and the Court will allow the question accordingly.
MR. LO RE: Thank you, Your Honor.
MR. SMALL: Ms. Shea, if you would read the answer?
"ANSWER: Some had more.
00826
"QUESTION: Some had more. Which ones had more?
"ANSWER: Ones that had two repositories in it had higher rates than 3,000.
"QUESTION: What was the highest annual aggregate rate of any of the TSLCC or fee adequacy

studies that you're referring to?"
MR. LO RE: Again, Your Honor, objection,
best evidence.
THE COURT: I suppose one could go through
all the reports of the studies, this just seems to be
a more efficient way to get at it. Overruled.
MR. SMALL: Please read the answer.
"ANSWER: Some of the earlier ones,
pre-'87, had two repositories at steady state which
were run higher; at nominal, 6,000 tons."
"QUESTION: Per year?
"ANSWER: Per year. All recent ones since
'87 or so, to my knowledge, are basically steady
state at 3,000.
"QUESTION: And by recent ones -- I'm
sorry.
"ANSWER: In the 1990s, the TSLCCs had a
steady -- had a state steady receipt rate at 3,000
tons per year."

---

**833:20 - 838:25**
**(Witness: Barrett, Lake)**

00833
"QUESTION: But you do disagree with the
statement that there is not a clearly documented
rationale for 3,000 MTU per year receipt rate,
correct?
"ANSWER: Correct.
"CORRECT: Because you believe that there
00834
is in fact a clearly documented rationale for a 3,000
MTU per year receipt rate, correct?
"ANSWER: Yes.
"QUESTION: And could you explain to me
that rationale that you believe has been clearly
documented by the Department?
"ANSWER: There was one in the old mission
plans. It basically was that the rate of 3,000 tons
per year exceeded a generation rate of a nominal
2,000 tons per year and allowed a catchup of 1,000
tons per year delta, and for where the program was at
that time, that was sufficient, and I felt that was
sufficient at that time."
Page 1164, line 16:

"QUESTION: And when you just stated 'allowed a catchup of 1,000 tons per year delta,' what did that statement refer to?
"ANSWER: The receipt of a nominal 3,000 tons per year steady state when the generation rate was approximately 2,000 tons per year. The system capacity and take rate was exceeding the generation rate in the nation.
"QUESTION: Why was that important?
"ANSWER: Because we would like to catch up and, you know, remove the waste that had been
00835
accumulating at whatever the start date of the facility would be."
Page 1165, line 16:
"QUESTION: Why would you have liked to have caught up, as you stated in that answer?
"ANSWER: Because waste existed in the United States, both commercial waste and defense waste, and we were to start, either be it '98 or some other date, there would be an inventory existing, and you wanted to work off that inventory as soon as practicable.
"QUESTION: Why did you want to work off that inventory of spent nuclear fuel as soon as practicable?
"ANSWER: Because I believe that's the intent of the Act.
"QUESTION: By, 'the Act,' you're referring to the Nuclear Waste Policy Act of 1982?
"ANSWER: Correct."
Page 1331, line 7:
"QUESTION: You used a term often in your testimony, the term 'generation rate.' Do you recall using that term?
"ANSWER: Yes.
"QUESTION: What does that term mean?
00836
"ANSWER: To me, that's the amount of spent fuel that the nation's nuclear power reactors produced per year, which is approximately 2,000 tons per year.
"QUESTION: Has it always been approximately 2,000 tons per year?
"ANSWER: I think it's been pretty close.
"QUESTION: Is that the same meaning or

definition that you would give to the term 'discharge rate'?
"ANSWER: Yes.
"QUESTION: We had talked quite a bit about a steady state rate of 3,000 MTUs per year with reference to a variety of DOE documents. My question is, do you have an understanding of the term 'steady state'?
"ANSWER: I believe so.
"QUESTION: What's your understanding of that term?
"ANSWER: Basically, constant over time.
"QUESTION: I believe you testified that there's a relationship between the 3,000 MTU annual steady state rate and either the discharge rate or generation rate, is that correct?
"ANSWER: There's a difference.
00837
"QUESTION: Is there a relationship between the two?
"ANSWER: Discharge rate is what it is. Utilities control that. The receipt rate, which is what you call 3,000, is something that is variable, but depending upon the system we designed to build, we can vary that, so there's no direct relationship between the two.
"QUESTION: My understanding from your testimony, and please correct me if I am wrong, was that the 3,000 MTU steady state rate or receipt rate, as you just used that term, was chosen in part because it exceeded the discharge rate or the generation rate by utilities, is that right?
"ANSWER: Correct.
"QUESTION: What other factors went into choosing a 3,000 MTU receipt rate?
"ANSWER: The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life cycle cost, as well as near term cash flow requirements and performance. If you make the number too high, then you have, you would quickly work off the backlog, and then you would have a lot of idle capacity. If it
00838
was too low, you would have reactors needing to put in dry storage, and 3,000, based on the early 1980s,

seemed like a reasonable number to use."
Skipping to page 1334, line 6:
"QUESTION: And am I right in understanding that the 3,000 steady state rate has been used as the steady state rate in the majority of design documents for the facility that DOE eventually, will eventually use to take an emplacement of spent nuclear fuel?
"ANSWER: Yes, it's around 3,000.
"QUESTION: And am I also right in understanding that the 3,000 steady state rate has been the rate that is used in the majority of documents issued by DOE with regard to total system life cycle costs?
"ANSWER: Correct.
"QUESTION: With regard to those documents, the documents issued in connection with estimating total system life cycle costs, what is that document supposed to reflect, the TSLCC document?
"ANSWER: Our best estimates of what the cost would be, you know, year-by-year for the program, and to determine those, you would have some assumption as to what the receipt rate would be, and we used 3,000.

---

**843:22 - 844:23**
**(Witness: Barrett, Lake)**

00843
"QUESTION: And I'll take it a step further. Do you believe that the 3,000 annual steady state rate is a reasonable rate for DOE to plan to use terms of taking spent nuclear fuel from
00844
utilities?
"ANSWER: I think it's a reasonable rate. There may be better rates that if we, if the nation gets a little clearer that we're going to really perform, I think we will refine that number, and we may, based on events of September 11th, maybe it will be raised.
"QUESTION: And would you agree that the 3,000 annual steady state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?
"ANSWER: Generally so, yes.

"QUESTION: In your opinion, would a steady state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?
"ANSWER: I would think that's low.
"QUESTION: Why?
"ANSWER: Because that's about what the generation rate is and if we start with that, matching the generation rate at 2010, if we steady state at 2010 all the fuel that's in dry storage and a lot of the shutdown reactors, it will be difficult to avoid new storages or prolonged decommissionings."

---

## 850:23 - 851:8

00850
"ANSWER: I don't, I'm hopeful, but I don't know what the actual utility contract holders will do.
00851
"QUESTION: Why are you hopeful?
"ANSWER: From a macroscopic perspective, it has always been my hope that utilities that have a lesser need earlier would exchange the appropriate remuneration or compensation with others that might have a greater need to work out the most effective national utilization of whatever capacity you were able to bring online."

---

## 852:6 - 857:19
## (Witness: Barrett, Lake)

00852
"QUESTION: What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998, pursuant to this contract?"
MR. LO RE: Objection. Your Honor, this question is an inappropriate question because Mr. Barrett was not designated as a 30(b)(6) witness, nor was he testifying as such in this hearing -- in this deposition. In addition, the question lacks foundation.
THE COURT: I'll hear from Mr. Small in a minute, but respecting the first ground of objection, is it fair to assume that that is the, that is, the

30(b)(6) issue, is the reason the -- there must have been interrogatory responses about knowledgeable people in the prior questions, was asked and answered?

MR. SMALL: That's correct, Your Honor. He was not testifying as a 30(b)(6) witness on this specific point, but he was testifying as the deputy director of the Office of Civilian Radioactive Waste

00853

Management, and the interrogatories did identify him as the, one of the individuals with knowledge, with the most knowledge of the schedule that DOE would have followed.

MR. LO RE: Your Honor, if I may?

THE COURT: Yes, certainly.

MR. LO RE: That does not make Mr. Barrett the party representative for 30(b)(6) purposes, and the question that we are discussing here is what schedule would DOE have followed, and we believe that is inappropriate. The Court has several times during this hearing referred to witnesses and indicated, what is your personal understanding, and that's exactly where we are here, Your Honor. What Mr. Barrett's understanding is may be one thing, but what DOE was planning to do is something quite different.

THE COURT: Well, that's exactly right, and that's right where we deal with 801 -- I'm sorry, Federal Rule of Evidence 801, differently than 804 -- well, I'm sorry, 802 and 804. 801 -- Rule 801(d)(2)(d) makes admissible "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Now, that, I

00854

take it, is really what Mr. Small is driving at. 802 deals -- let me think about this. That's one thing, you catch me unawares here, and it's the admissibility of deposition testimony generally. It's Rule 32, but Rule 32 deals with a, let me find it, deals with the deposition testimony of a 30(b)(6) designee differently. We just aren't there. That's the problem. We aren't dealing with Rule 32. We're dealing with, of the RCFC, we're dealing with Rule 801 of the Federal Rule of Evidence.

You see what I'm driving at? I'm sorry to be -- I had to have you hear my thought processes as I was doing it.
MR. LO RE: No, Your Honor, and I believe I understand the distinction because I think we have had this discussion with the Court, with you and other judges on the Court, several times.
THE COURT: That's right. I'm afraid I might have influenced a couple of other judges on the Court in a couple of published rulings.
MR. LO RE: There's nothing wrong with making law, Your Honor.
THE COURT: Well, I've tried very hard not to make law, but this was set out the way it seemed
00855
to be.
MR. LO RE: But I would say, Your Honor, in that vein, that the admission of a party opponent, as far as my understanding of 801(d)(2), certainly that person may be speaking in their capacity in their job, but nonetheless, they are speaking as that individual, not as the Defendant.
THE COURT: Yes.
MR. LO RE: That is the distinction between that and the 30(b)(6), and this was not a 30(b)(6) deposition.
THE COURT: No, and it comes in under 801, but it's not the be-all and end-all of the matter. There is lots of room for other evidence on the subject, and, you know, it's hard to predict just from a particular statement what the outcome will be, if that makes, if that distinction makes it.
MR. LO RE: It does, Your Honor. In my mind, the problem I have is we have a cold record here that says, question, what schedule would DOE follow? And I am more than confident that if Mr. Barrett were sitting in the stand and that question were asked, I would stand up and object, and I am almost sure you would say, Mr. Barrett, I would like you to testify from your personal knowledge.
00856
THE COURT: That's right.
MR. LO RE: And he would.
THE COURT: If you know, you're in the kind of position where you're entitled to have that view.
MR. LO RE: Exactly, and that's the concern

I have here, that if this comes into the record, then I understand what you're saying, but we have a cold record where, all of a sudden, it appears to be the party speaking.

THE COURT: On the other hand, you haven't started your case yet, Mr. Lo Re.

MR. LO RE: Right, Your Honor.

THE COURT: You have lots of opportunity to go at this subject.

MR. SMALL: Your Honor, if it would help the Court?

THE COURT: Yes.

MR. SMALL: We are offering this, of course, under Rule 801, and we have had this discussion before, and the argument here is that we are offering it into evidence. We are not, at this point, arguing, and frankly, I don't anticipate arguing, we are not anticipating arguing that this is somehow such an admission of the Department of Energy, that they are estopped from arguing or

00857

introducing evidence otherwise.

THE COURT: Well --

MR. SMALL: They can introduce evidence, Your Honor.

THE COURT: I think we're all agreed on that subject. May we proceed? This is always educational.

MR. SMALL: Ms. Shea, if you would please read the answer?

"ANSWER: We would have operated our system and our plant which was, you know, whatever the operation rate, which transcended in a level out at 3,000 metric tons per year after five years, that's what we were planning to do.

"QUESTION: That's what you would have done?

"ANSWER: That's what we would have done if we could have gotten the, you know, the sites approved, et cetera."

**863:5 - 864:3**
**(Witness: Milner, Ronald)**

00863
MR. SMALL: "QUESTION: Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?
"ANSWER: Yes, I am.
"QUESTION: What is your current position?
"ANSWER: Chief operating officer.
"QUESTION: When did you first join the Office of Civilian Radioactive Waste Management?
"ANSWER: I believe it was April of '84."
Skipping, skipping ahead to, I believe, page 4716, line 24:
"QUESTION: Mr. Milner, do you recognize the document that I've handed to you and put up on the computer screen?
"ANSWER: Yes, I do.
"QUESTION: Could you identify it for the Court, please?
"ANSWER: It's the original 1985 mission plan for the program.
"QUESTION: Were you responsible for the
00864
preparation of this document?
"ANSWER: I was responsible for developing and issuing this document."

---

**871:10 - 872:16**
**(Witness: Klein, Susan)**

00871
"QUESTION: What is your current position, Ms. Klein?
"ANSWER: I'm a senior policy advisor to the director and deputy director of the Office of Civilian Radioactive Waste Management at the Department of Energy.
"QUESTION: And how long have you been the senior policy advisor?
"ANSWER: For about three years.
"QUESTION: So since about 1999?
"ANSWER: Yes, I was transferred there, but

detailed back to general counsel for a couple of years.
"QUESTION: When was your detail back to general counsel's office?
"ANSWER: I think it was '97 that I was
00872
transferred to RW, but I was detailed back to general counsel to work with the general counsel at the time on many legal issues, and then later on, it was limited to issues involving this litigation.
"QUESTION: But who do you report to as the senior policy advisor?
"ANSWER: Lake Barrett -- Ron Milner and Lake Barrett.
"QUESTION: And Mr. Barrett's current title is?
"ANSWER: Deputy director of the Office of Civilian Radioactive Waste Management.
"QUESTION: And Mr. Milner's title is?
"ANSWER: He's the COO, the chief operating officer of the Office of Civilian Radioactive Waste Management at DOE."

---

**874:10 - 874:13**
**(Witness: Klein, Susan)**

00874
"QUESTION: Does the DOE consider a 3,000 metric ton acceptance rate to be a reasonable rate to run the spent nuclear fuel program at?
"ANSWER: I would, yes."

---

**908:6 - 909:24**
**(Witness: Pollog, Thomas)**

00908
"QUESTION: Mr. Pollog, are you currently employed at the Department of Energy?
"ANSWER: Yes, I am.
"QUESTION: And to what office within the Department of Energy are you currently assigned?
"ANSWER: I work in the Office of Civilian Radioactive Waste Management, the Office of Systems

Analysis and Strategy Development.
"QUESTION: What are your current responsibilities?
"ANSWER: Generally, I'm assigned to implement a standard contract between the Department of Energy and the contract holders.
"QUESTION: How long have you been in your current position?
"ANSWER: Approximately eight years.
"QUESTION: So when did you join the office?
"ANSWER: The office I'm currently in, that office was formed in October of 2002, but my
00909
responsibilities were the same in the prior organization.
"QUESTION: When did you join the prior organization?
"ANSWER: September of 1996.
"QUESTION: Prior to September of 1996, did you serve in the office that had responsibility for the waste acceptance function at DOE?
"ANSWER: Yes, I did. In 1990, '91, and early '92, I was in the office that performs the same functions.
"QUESTION: Mr. Pollog, do you also serve as the contracting officer's technical representative?
"ANSWER: Yes, I do, in an unofficial capacity.
"QUESTION: When did you assume the responsibilities of the contracting officer's technical representation?
"ANSWER: When Mr. Zabransky assumed the responsibilities of the contracting officer, which I believe was in the summer of 2002, I was unofficially assigned the responsibilities of the contracting officer's technical representative.

---

**916:22 - 918:16**
**(Witness: Pollog, Thomas)**

00916
MR. SMALL: "QUESTION: From these documents, I think you testified that DOE could

determine the excess storage that was needed for SNF by utilities, is that right?
00917
"ANSWER: I would say DOE was able to approximate how much out of pool, what the excess would have been.
"QUESTION: Continue, please.
"ANSWER: Excess of what a utility could store in their pool."
THE COURT: Mr. Lo Re.
MR. LO RE: I'm sorry, I was anticipating.
Please --
THE COURT: You're quick. It's good to be quick.
MR. SMALL: "QUESTION: And so how is that information used by DOE?"
MR. LO RE: Your Honor, I'm going to raise a relevance objection here and a foundation objection that, again, I can't tell from this record even what Mr. Pollog is addressing.
THE COURT: The Court has a clue.
Overruled.
MR. SMALL: "ANSWER: It had various issues, I would guess, over periods of time, when --
"QUESTION: How was it used, for example, in regards to developing an acceptance rate?
"ANSWER: There were points in time that one of the goals of the program was to develop a
00918
system where the acceptance rates would account -- would alleviate a purchaser's need to have storage outside of their pools.
"QUESTION: At what point in time was this the goal of the program?
"ANSWER: I believe in the mid-80s."

---

**928:20 - 930:16**

00928
Your Honor, I'm now shifting to the April 18, 2002 continued deposition of Mr. Zabransky in the consolidated discovery of spent nuclear fuel litigation, page 348, line 12:
"QUESTION: I refer to Exhibit 5 of your deposition, which is the '95 ACR. You got it right

00929

in front of you.

"ANSWER: Okay.

Page 363, line 1.

"QUESTION: Did the Department of Energy at any point, starting with the time this document was published, March 1995, referring to Zabransky Exhibit 5, starting in March 1995, did the Department of Energy ever use the acceptance rates published in that document for its own planning purposes, for the purposes of planning for the operation of the Waste Management System?

"ANSWER: The Department of Energy never used these rates for the planning, for the operation of a repository facility.

"QUESTION: Did you ever use these rates beginning in March of 1995 for the planning for the Federal Waste Management System?

"ANSWER: No, we did not."

Skipping to page 364, line 16:

"QUESTION: Why did the Department of Energy publish a document to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purposes of planning the system?"

MR. LO RE: Objection, Your Honor, calls

00930

for speculation, lacks foundation.

MR. SMALL: Your Honor, I think the foundation's been laid by the previous testimony of Mr. Zabransky in the record, and the question is, why did the Department do it? It doesn't call for speculation if the witness knows.

THE COURT: Overruled.

MR. SMALL: "ANSWER: The Department carried over the rates it had in previous ACRs and did not change them.

"QUESTION: Was the Department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?

"ANSWER: I believe that that was a consideration."

**Trial Testimony - TVA v. US (7/11/05)**

01264
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )
Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.
Monday, July 11, 2005
Volume 7
The parties met, pursuant to the notice of the Judge, at 9:32 a.m.
BEFORE: THE HONORABLE CHARLES F. LETTOW
01265
APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319
ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530

(202) 305-7562

---

**1385:13 - 1388:25**
**(Witness: Kouts, Christopher)**

01385

THE COURT: It's all recycled paper.

MR. LO RE: I hope so.

DIRECT EXAMINATION

BY MR. LO RE:

Q. Mr. Kouts, could you please state your full name for the record?

A. Christopher Alexander Kouts.

Q. Mr. Kouts, where are you currently employed?

A. I'm currently employed with the Office of Civilian Radioactive Waste Management at the Department of Energy.

Q. And what is your current position in that

01386

office, sir?

A. I'm director of the Office of Systems Analysis and Strategy Development.

Q. How long have you been in that position?

A. On an acting basis, October of 2002, and on a permanent basis, it was July of 2003.

Q. Could you describe for the Court, Mr. Kouts, your responsibility as the director of Office of Systems Analysis and Strategy Development?

A. The systems analysis portion of it is to basically conduct analyses to make sure that the Waste Management System as the Department envisions it, that's the repository, the transportation component, and the waste acceptance component operate effectively and efficiently.

In addition to that, I have other responsibilities, including the waste acceptance component of the program, which is the management of the standard contract with utilities, interaction with the defense aspects of -- the defense waste programs within the Department to make sure that those materials are appropriately, are being appropriately packaged and developed for the

repository.
In addition, I have safeguards and security
01387
policy and other activities such as fee adequacy acceptance and total system life cycle cost estimates, things like that.
Q. Now, Mr. Kouts, can you describe for the Court how your responsibilities that you just described relate to the planning for waste acceptance from commercial utilities under the standard contract between DOE and the utilities?
A. Basically, my office would prepare the annual capacity reports and the acceptance priority rankings, would issue those. Mr. Zabransky, who's the contracting officer for, for the, for the contracts, works for me, and we, we would start the planning process when it was appropriate to do so with the utilities, so that would come under my office and my responsibilities.
Q. Do you have any other responsibilities regarding waste acceptance in addition to the standard contract holder issues?
A. Excuse me?
Q. Do you have other responsibilities in addition to those with respect to the standard contract holder?
A. We do an evaluation of the fees that come in and determine that the fees are appropriate for
01388
what the utilities are generating in terms of their power, the millage fee, the millage per kilowatt hour. We make sure that what's being provided to the government is the appropriate amount. That more or less summarizes it.
Q. Mr. Kouts, to whom do you report at the Department of Energy?
A. I report to the principal deputy director of the program, Mr. Paul Golan.
Q. And to whom does Mr. Golan report?
A. He reports to the director of the program.
Q. And who is that?
A. There is no director at this point. That position is vacant.
Q. Now, who does the director of the Office of Civilian Radioactive Waste Management -- and for the record, do you mind if I refer to that as OCRWM?

A. That's fine.
Q. Who does the director of OCRWM report to?
A. Reports to the Undersecretary of Energy and to the Secretary.
Q. Now, Mr. Kouts, when did you first join OCRWM?
A. It was, I believe, in June 1985. That's about 20 years ago last month.

# Trial Testimony - TVA v. US (7/12/05)

01561

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

________________________________________

TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )

________________________________________

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, July 12, 2005
Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

01562

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530

(202) 305-7562

---

**1579:1 - 1579:15**
**(Witness: Kouts, Christopher)**

01579
Q. I don't think I've asked you this question, but if I have, I apologize, and I'll say, just say that it's nothing more than I'm asking a second time, and I do apologize if I have. Has the Department ever published a document where it indicated it was going to pick up spent nuclear fuel at the rate of 900 metric tons a year for the life of the program?
MR. LO RE: Your Honor, that's been asked and answered, and I just, rather than put it as an objection, I would just point out that I believe the question was already asked and answered.
THE COURT: Yes, but applying the three strikes rule, I'm not sure it's been asked a third time. The objection is overruled.
THE WITNESS: No.

---

**1582:12 - 1582:25**
**(Witness: Kouts, Christopher)**

01582
Q. Would it be fair to say that a primary, not the sole, but a primary purpose of the MRS proposal that DOE made in 1987 was to allow DOE a way to meet the 1998 start date?
A. Yes.
Q. Because without the MRS, it was very unlikely that DOE would meet that 1998 start date, correct?
A. If you remember my testimony from yesterday, and the proposal itself, we stated the repository was not going to be operational until 2003. Therefore, without the MRS available in the 1998 time frame, we would not have a facility available to receive materials in 1998.

---

**1602:8 - 1603:25**
**(Witness: Pollog, Thomas)**

01602
Q. Good morning, Mr. Pollog.
A. Good morning.
Q. You've stated your full name for the record, is that right?
A. Yes.
Q. All right. Are you currently employed at the Department of Energy?
A. Yes, I am.
Q. And what office within the Department of Energy are you currently assigned?
A. I am in the Office of Civilian Radioactive Waste Management and, within that, the Office of Systems Analysis and Strategy Development.
Q. And what are your current responsibilities?
A. I work in the waste acceptance area. I'm the contracting officer's technical representative, assisting in the implementation of the standard contract.
01603
Q. Do you have a position title?
A. Yes, nuclear engineer.
Q. And how long have you been in that position?
A. Within the current organization, for almost three years, but performing the same function in our prior organization, which was prior to our reorganization, since 1996.
Q. So approximately eight years?
A. That's correct.
Q. And when did you join the office?
A. The Office of Civilian Radioactive Waste Management?
Q. Yes.
A. 1988.
Q. And prior to September 1996, did you serve in the office that had responsibility for waste acceptance function at DOE?
A. Yes, I had a period from 1990 to 1992, I was performing a similar role.
Q. And did you have similar responsibilities during that time period?
A. Yes, I did.

Q. And were you a nuclear engineer also?
A. Yes.

---

**1604:23 - 1605:15**
**(Witness: Pollog, Thomas)**

01604
Q. And you currently also serve as a contracting officer's technical representative, is that right?
01605
A. That's correct.
Q. And when did you assume those responsibilities?
A. I believe it was 2002.
Q. And can you describe what responsibilities you have in that position, please?
A. I provide technical advice to the contracting officer on all issues related to the standard contract.
Q. And who do you report to directly?
A. My immediate superior is Christopher Kouts.
Q. And Mr. Kouts reports to whom?
A. I believe he reports to Mr. Paul Golan.
Q. And what is his position?
A. He is the principal deputy director for the Office of Civilian Radioactive Waste Management.

---

**1658:10 - 1659:25**
**(Witness: Pollog, Thomas)**

01658
Q. Mr. Pollog, the first thing I would just like to ask a couple questions about would be the rates that appear in the 1991 annual capacity report, which was DX-76. Do you recall that document, sir?
A. Yes, I do.
Q. Okay. And the acceptance rates in that document were 400 for the first year, 600 for the second year, and then 900 for the remaining years of the first 10 years, is that correct?
A. Yes, that's correct.
Q. Now, if I understand things correctly, in

your testimony, there was the '87 amendments to the
Nuclear Waste Policy Act that led to those 1991 ACR
rates, is that correct?
A. They led to the 1991 ACR rates, yes.
Q. Now, in 1995, DOE published a combined
01659
acceptance priority ranking and annual capacity
report, is that correct?
A. Yes.
Q. And the rates in that report were the same
as the rates in the 1991 annual capacity report,
correct?
A. Yes.
Q. Okay. And I believe, if I recall
correctly, I made a note, your testimony was that
there was no reason to change the rates?
A. I believe I said no reason or no basis to
change the rates.
Q. Okay. But now, the 1991 ACR rates
contemplated a system beginning with an MRS, didn't
it?
A. Yes.
Q. Okay. But by 1995, hadn't the MRS concept
been discarded?
THE COURT: Ms. Snyder?
MS. SNYDER: I'm sorry. Objection,
foundation, assumes facts not in evidence. I'm
sorry.
THE COURT: Overruled. You may answer.
THE WITNESS: Okay. Not fully, partially,
but not fully.

---

**1665:12 - 1666:18**
**(Witness: Pollog, Thomas)**

01665
Q. Would the 900 rate present the need for
additional storage if that was the rate that
continued until end of program?
A. I don't recall ever seeing an analysis of
that.
Q. Well, sir, earlier, you testified, I
believe, that the industry was generating --
discharging about 2,000 tons a year, is that correct?
A. Yes.

Q. So if pickups were only 900 tons a year, then the capacity that the utilities had would run out at some point in time, correct?
A. Assuming no changes to their pools, no shutdowns, no changes in spent fuel management, yes,
01666
that's probably correct.
Q. And all of those things that you just mentioned could affect future discharges, correct?
A. I'm not sure they would affect future discharges.
Q. Those combination of things would affect the need for additional storage capacity?
A. Yes, I would agree with that.
Q. Now, in your direct testimony, I believe you stated that, in the aggregate, an acceptance rate of 2,100 tons a year would keep up with discharges, is that correct?
A. Yes, I did. Yes.
Q. Would that also eliminate the need for, in the aggregate, additional storage?
A. Theoretically, it should.
Q. Okay. Again, that would be assuming exchanges among utilities?

**Trial Testimony - Wisconsin Electric v. US (9/12/07)**

00553
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------x
WISCONSIN ELECTRIC POWER COMPANY, :
Plaintiffs, :
vs. :NO. 00-697C
THE UNITED STATES, :
Defendant. :
-------------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, September 12, 2007
Volume 3

The parties met, pursuant to the notice of the Judge at 10:00 a.m.

BEFORE THE HONORABLE JAMES MEROW

00554
APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SHARON SNYDER, ESQ.
RUSSELL SHULTIS, ESQ.
STEPHEN FINN, ESQ.
SONIA ORFIELD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

**586:15 - 587:16**
**(Witness: Zabransky, David)**

00586
Q. And when you worked at Wisconsin Electric, did you believe that a reasonable and appropriate acceptance rate was one that would exceed the then current industry aggregate spent fuel discharge rate and would begin to work off the accumulated spent fuel at a reasonable rate?
A. Yes, I did.
Q. And what was the basis of that belief?
A. My basis of my belief was that seemed like a reasonable thing to do.
00587
Q. Was it based on any government programmatic documents?
A. Well, there were programmatic documents that came up with rates which normalized out at about 3000 tons a year, which either coincidentally or on purpose were a rate that would keep up with the pace of discharge and work off the backlog at a reasonable rate, but I think, independently, the industry and myself had come up with that, the determination that would be a good number.
Q. And even after you moved to the Department of Energy, isn't it correct that you continued in that belief?
A. I believe that, today, it's a reasonable rate, yes.

---

**650:15 - 652:15**
**(Witness: Zabransky, David)**

00650
Q. Thank you. Let me ask you to turn now to section two, and I'll ask you to read to yourself the first paragraph, and then I have a question for you regarding that paragraph.
A. Okay.
Q. Now, we already discussed the Nuclear Waste Policy Act Amendments of 1987, I won't have you read the first sentence, but I would

like you to read the second and third sentence in that paragraph for the Court.
A. That starts with, "these conditions"?
00651
Q. Yes.
A. "These conditions placed strict linkages between the MRS and repository development prohibiting start of construction of an MRS until the NRC has issued a construction license for the repository. Given current DOE schedules, the earliest an MRS could be operational is 2007."
Q. So, again, assuming the linkages are not removed, Wisconsin Electric was stating here that the earliest an MRS could be operational is 2007, is that correct?
A. That's what it says, yes.
Q. And then just to go back to the last paragraph in this section, we talked about this before, but I just wanted to be clear on this, this then discusses the Nuclear Waste Negotiator, who I believe you mentioned had a role in this process, and I'd like you to read the last sentence?
A. It says, "If a volunteer site is found by the end of 1992, the MRS could be operational by 1998."
Q. And we saw a similar statement on page 15 in the environmental screening report we
00652
just referred to, correct?
A. It's slightly different, but --
Q. Is the import of it the same, Mr. Zabransky?
A. I think it infers the same information, yes.
Q. And the statements that we've just read regarding an MRS, did you agree with these statements at the time they were submitted to the PSCW?
A. Yes.
Q. And did Congress ever take the action to remove the linkages imposed by the 1987 NWPA amendments?
A. Not that I'm aware of.

**714:10 - 716:9**
**(Witness: Zabransky, David)**

00714

Q. Mr. Zabransky, you testified this morning about the standard contract, I wanted to ask you a couple of follow-up questions about the standard contract. You testified that you believed that 3000 was a reasonable rate, do you recall that?

A. Yes, I do.

Q. Could you explain what you meant by that?

A. Well, I think, in the context of the way the question was asked this morning and the way I've answered it previously, is that looking at the fact that the nuclear plants in this country, the 104-odd plants that currently run, and there used to be more, but generate nominally about 2000 tons a year of spent fuel,

00715

that to pick up that spent fuel that's being generated and to work off the backlog at some rate, about 3000 tons a year is a number that lets you work that off in a reasonable fashion.

If you go much beyond that, and, again, this is based upon -- last time I looked at this was several years ago. If you go to much higher rates, you wind up reaching the point where you've caught up, and you don't have any more fuel to pick up, yet you develop a lot of capability to pick up the fuel.

So you've created casks and trucks and trains and facilities to receive more, yet once you work off the backlog, you're still down to the 2000 tons a year that can be shipped, as it ages enough to be shipped.

Q. While you were employed with WEPCO, did WEPCO ever ask the DOE to pick up fuel at any particular rate?

A. And, again, I think "ask" is -- I'm not sure how to interpret the word "ask." I think, if you look at some of the correspondence we saw this morning, the company

expressed its view that DOE should pick up fuel
at certain rates, that if that's "ask," as you
00716
define it, I guess you could say yes.
Q. And what rate did WEPCO want its spent nuclear fuel to be removed at?
A. I think, as we saw this morning, there's some -- besides using description of a reasonable rate to work off the backlog and keep up with the pace of discharges, I thought there was a document that did have a number of 3000 in it.

**Trial Testimony - Wisconsin Electric v. US (10/9/07)**

04902
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------x
WISCONSIN ELECTRIC POWER COMPANY, :
Plaintiffs, :
vs. :NO. 00-697C
THE UNITED STATES, :
Defendant. :
--------------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.
Tuesday, October 9, 2007
Volume 21
The parties met, pursuant to the notice of the
Judge at 10:05 a.m.
BEFORE THE HONORABLE JAMES MEROW

04903
APPEARANCES CONTINUED:
ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SHARON SNYDER, ESQ.
RUSSELL SHULTIS, ESQ.
STEPHEN FINN, ESQ.
SONIA ORFIELD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

**5023:4 - 5023:24**
**(Witness: Brownstein, Alan)**

05023
Q. Good afternoon, Mr. Brownstein.
A. Hello.
Q. Mr. Brownstein, could you please state your full name for the record?
A. Alan Bruce Brownstein.
Q. And where are you currently employed, sir?
A. I'm at the Department of Energy, within the Office of Civilian Radioactive Waste Management.
Q. What is your current position?
A. I'm the chief operating officer for RW.
Q. How long have you held that position?
A. I was appointed to that in May of 2006.
Q. To whom do you report at DOE?
A. I report to the acting principal deputy director right now.
Q. And who is that?
A. That's Chris Kouts.

---

**5024:16 - 5025:16**
**(Witness: Brownstein, Alan)**

05024
Q. Now, Mr. Brownstein, when did you first join the Department of Energy?
A. In September of 1985.
Q. And could you summarize the positions that you had at DOE leading up to your current position?
A. Sure. I was in a staff position from 1985 through 1991, and 1991, I was elevated to a branch chief of logistics and utility interface branch. I did that from '91 to 1994.
05025
In '94, I was elevated to division director, it was the waste acceptance division, and I did that until 1985. And from 1985, I took over another division called the regulatory

coordination division.
Q. You said '85?
A. I'm sorry, '95.
Q. So just so the record is clear, when did you switch and what was the position you took in '95?
A. In 1995, I was the director of the regulatory coordination division, and I did that through 2001, and in 2001, I served as a senior advisor to the director, and I held that position until appointed as chief operating officer in 2006.

---

**5026:8 - 5026:22**
**(Witness: Brownstein, Alan)**

05026
Q. Let's talk about the jobs that you held that did relate to the standard contract, starting in 1985, if you can briefly describe what those jobs were and how they related to the standard contract.
A. Sure. Actually, all those jobs, the staff position was a nuclear industry specialist, then the branch chief, and then the division director job, they all have essentially the same functions, which were to administer the standard disposal contract, I served as the key link between the Department and the utilities on the contractual issues, fees, terms of payment, and the waste acceptance process.

---

**5068:8 - 5068:18**
**(Witness: Brownstein, Alan)**

05068
Q. Okay. You're familiar with the Nuclear Waste Policy Act, right?
A. Yes.
Q. And you're also familiar with the standard contract?
A. I am.

Q. And one of the goals of the Nuclear
Waste Policy Act was to eliminate the need for
additional at-reactor storage after DOE began
picking up in 1998, correct?
A. That was one of the goals.

---

**5073:21 - 5074:17**
**(Witness: Brownstein, Alan)**

05073
Q. Mr. Brownstein, you recall you were
deposed, correct?
A. Uh-huh.
Q. And you said you have reviewed your
deposition testimony?
05074
A. Right.
MS. HUGHES: May I have a moment, Your
Honor.
THE COURT: Sure.
BY MS. HUGHES:
Q. Mr. Brownstein, if you could turn to
your April 9th, 2002 deposition testimony?
Which you should have with you, and I would
direct your attention to page 70, beginning at
line 17 to line 24. And here, sir, you were
being questioned about the 1985 mission plan.
A. Okay.
Q. "QUESTION: Wouldn't it be fair to
read this document as a reflection of DOE's
intent to reduce the spent fuel backlog?
"THE WITNESS:" -- that would be you --
"that was the DOE's intent, yes."

---

**5075:16 - 5076:1**
**(Witness: Brownstein, Alan)**

05075
Q. You're familiar with the 1987 final
mission plan amendment released in June of '87,
aren't you?
A. Generally.
Q. Well, why don't you take a look at

Plaintiff's Exhibit 124? Which is in volume eight, and it should be on the shelf right there behind you.
A. The June '87 mission plan amendment?
Q. Yes, let me know when you have it.
05076
A. I have it.

---

**5077:9 - 5079:11**
**(Witness: Brownstein, Alan)**

05077
Q. Okay. And you had an understanding, didn't you, working on the program in 1987, that the only way DOE was going to be able to meet a January 31st, 1998 pickup date was if it had an operating MRS by January 31st, 1998?
A. Yes.
Q. That was your understanding, correct?
A. It needed an MRS.
Q. Now, you're familiar with the Nuclear Waste Policy Act amendments, correct?
A. Yes.
Q. And I believe you also testified in your direct testimony that you're familiar with the conditions that the amendments put on construction of an MRS, correct?
A. With respect to the schedule and the capacity numbers, yes.
05078
Q. And those conditions are sometimes referred to as linkages?
A. Yes.
Q. One condition prohibited DOE from selecting an MRS site until the Secretary of Energy had recommended to the President the approval of a site for the development of a repository, correct?
A. I believe that's the case.
Q. Another condition, which I believe you testified to, prohibited construction of the MRS until the NRC issued a construction license for the repository, correct?
A. A construction authorization, yes.
Q. Another condition limited the amount

of spent nuclear fuel that the MRS could accept to 10,000 MTU until a repository began accepting spent nuclear fuel, correct?
A. Correct.
Q. That was a capacity limitation, correct?
A. Yes.
Q. And there was still an additional capacity limitation, correct?
A. Of 15,000 MTU, yes.
05079
Q. That limited the amount of spent nuclear fuel at the MRS to 15,000 MTUs after the repository began acceptance, correct?
A. Correct.
Q. Now, at the time the Amendments Act was passed in 1987 with these conditions or linkages, you understood that if DOE did not pick up fuel beginning no later than January 31st, 1998, the utilities would incur additional at-reactor storage costs, correct?
A. Yes.

---

**5082:21 - 5083:12**
**(Witness: Brownstein, Alan)**

05082
Q. Now, DOE published a draft mission plan amendment in 1988, correct?
A. I believe so.
Q. Okay. You might want to turn to Plaintiff's Exhibit 150, which is in volume 10.
05083
A. Okay.
Q. Now, the draft '88 mission plan amendment recognized the linkages imposed by Amendments Act, didn't it?
A. I would assume it did. I'm only saying that because I wasn't responsible for its preparation, haven't looked at it in a long time, I assume it did.
Q. At the time, you were familiar with the provisions of the draft 1988 mission plan amendment, weren't you?
A. Yes, that's a good assumption.

**5083:25 - 5085:3**
**(Witness: Brownstein, Alan)**

05083
Q. The draft '88 mission plan amendment
05084
said that, "Under current conditions, spent
nuclear fuel receipt cannot begin at a waste
management facility in 1998," correct?
A. Under current conditions, that's
correct.
Q. And the draft 1988 mission plan
amendment also stated that the delay in the
repository and the linkages between the
schedule and key milestones in the siting and
construction of the MRS facility made it
unlikely that DOE will start accepting waste
significantly before 2003, correct?
A. With the schedule linkages, that's
true.
Q. Now, the draft 1988 mission plan
amendments waste acceptance schedule shows
waste acceptance beginning in 2003 at both a
repository and an MRS, correct?
A. That's, yes, table 2.2.
Q. Now, the draft mission plan amendment
assumed the linkages, correct?
A. Yes.
Q. And you understood, at this time, that
with the linkages in place, DOE would not begin
accepting spent nuclear fuel on January 31st
05085
1998, correct?
A. With the linkages in place, that's
true.

---

**5117:11 - 5119:23**
**(Witness: Brownstein, Alan)**

05117
Q. Now, in terms of the statutory
linkages regarding performance with an MRS,
nothing changed between the publication of the

1988 ACR and the publications of the 1991 ACR,
correct?
A. I think that's accurate.
Q. The statutory constraints on the MRS
remained in effect, correct?
A. That's correct.
Q. DOE through its own efforts had not
located a site for the MRS, correct?
A. That's correct.
Q. The Nuclear Waste Negotiator had not
located a site for the MRS, correct?
A. That's correct.
05118
Q. And the Secretary of Energy had not
yet recommended to the President a site for the
repository, correct?
A. Correct.
Q. When did the Secretary of Energy
recommend to the President a site for the
repository?
A. I believe it was in 2001 or 2002.
Q. And obviously, in '91, the NRC had not
issued a construction authorization for the
repository, correct?
A. Correct.
Q. And in those three years between the
publication of the 1988 ACR and the publication
of the 1991 ACR, the date for the anticipated
opening of the repository had slipped seven
years, correct?
A. Correct.
Q. So it had slipped from 2003 to 2010,
right?
A. Correct.
Q. And you understood and the Department
of Energy understood in 1991 that, with the
linkages in place and the repository start now
slipped to 2010, the earliest that an MRS could
05119
be operational was 2007, correct?
A. No, I disagree.
Q. Isn't that what the 1991 ACR says,
Mr. Brownstein, that with the linkages in
place --
A. With the linkages in place, but on
page four of the 1991 ACR, in the first

paragraph under 2.0, it says, "DOE recognizes that waste acceptance at a DOE facility can begin in 1998, only if the following things occur," and it states what those things were, including the Office of the Waste Negotiator obtaining a site or the federal government, possibly for agreement for a site, so it recognized that in this document.
Q. I think you may have misunderstood my question, Mr. Brownstein, my question was, DOE understood in 1991 that, with the linkages in place and the repository start now slipped to 2010, the earliest that an MRS could be operational was 2007, correct?
A. With the linkages in place, that's correct.

---

**5142:4 - 5143:24**
**(Witness: Kouts, Christopher)**

05142
Q. I'm trying not to say good evening. Mr. Kouts, could you please state your full name for the record?
A. Christopher Alexander Kouts.
Q. Where are you currently employed, sir?
A. I'm currently employed with the Office of Civilian Radioactive Waste Management at the U.S. Department of Energy.
Q. And what is your current position?
A. I currently hold two positions. The first is director of the Waste Management Office, and since July, I have been acting principal deputy for the overall program.
Q. And what are your responsibilities in your current positions?
A. Well, as acting principal deputy, I'm responsible for the implementation and management of the overall program. As director of the Waste Management Office, those responsibilities specifically are related to the management of the standard contract with utilities.
05143
I also have systems analysis

responsibility for the entire program, as well as baseline, technical baseline management and some other areas that are not really pertinent at this point.

Q. And I think you mentioned the amount of time that you mentioned in your current position as deputy director. How long have you been the director of waste management?

A. I believe, on an acting basis, it was October of 2002 and, on a permanent basis, July of 2003.

Q. Now, in your current positions, Mr. Kouts, to whom do you report?

A. Well, as director of the Waste Management Office, I report to the principal deputy director who reports to the director of the program, and as acting principal deputy director, I report to the director of the program who is Ward Sproat.

Q. And to whom does Mr. Sproat report?

A. He reports to the Undersecretary of Energy and, through the Undersecretary, to the Secretary of Energy.

**Trial Testimony - Wisconsin Electric v. US (10/10/07)**

05169
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------x
WISCONSIN ELECTRIC POWER COMPANY, :
Plaintiffs, :
vs. :NO. 00-697C
THE UNITED STATES, :
Defendant. :
-------------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.
Wednesday, October 10, 2007
Volume 22
The parties met, pursuant to the notice of the
Judge at 10:04 a.m.
BEFORE THE HONORABLE JAMES MEROW
05170
APPEARANCES CONTINUED:
ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SHARON SNYDER, ESQ.
RUSSELL SHULTIS, ESQ.
STEPHEN FINN, ESQ.
SONIA ORFIELD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

**5256:4 - 5256:13**
**(Witness: Kouts, Christopher)**

05256
Q. Mr. Kouts, throughout the history of the waste management program, DOE has planned a 3000 MTU per year steady state rate of acceptance at the repository, correct?
A. At the first repository? Yes.
Q. And from the beginning of the program, DOE has used the 3000 MTU annual rate of acceptance in its system requirements documents for the program, correct?
A. After an initial ramp-up, yes.

---

**5256:23 - 5258:1**
**(Witness: Kouts, Christopher)**

05256
Q. Thank you for that explanation. You agree that, in its fee adequacy assessments, the DOE has consistently used a 3000 annual,
05257
3000 MTU annual rate of acceptance, correct?
A. Again, I have to caveat my response to the extent that, when fee adequacy assessments were conducted early on in the program and total system life cycle cost estimates were developed, they were developed on essentially the planning basis of the programming at the time. And to the extent that the planning basis of the program at the time exceeded 3000 metric tons, the fee adequacy assessment would have been done on that total system life cycle cost assessment based on that assumption.
So, again, it depends on when in the program that you're referring to the specific analysis.
Q. I understand. You're saying, at some points, DOE was actually projecting that the annual steady state rate of acceptance would exceed 3000 MTUs, is that correct?
A. That's correct.
Q. But you agree that the 3000 MTU steady state annual rate of acceptance has been

consistently used in DOE's program planning
documents?
A. Again, subject to the comments and the
05258
caveats that I gave you earlier, yes.

---

**5259:3 - 5260:12**
**(Witness: Kouts, Christopher)**

05259
Q. Well, the targeted design rate for the
waste management program has been 3000 MTUs for
a long time, hasn't it?
A. I, again --
MR. LO RE: Your Honor, I'm going to
object on grounds of vagueness.
THE COURT: Well, the witness can
answer if he understands the question.
THE WITNESS: Well, I think I
understand the question, I just, again, you
have to, in order for me to respond to your
question, you have to talk about the timeframe
in which you're referring to because, again, if
you're looking at the early years of the
program, you're looking at much higher
acceptance rates and a two repository system
with an MRS and how they interacted. Once the
MRS went away -- or even in the MRS, when the,
in the '90s and certainly in the present day,
we're looking at a 3000 metric ton repository.
BY MS. HUGHES:
Q. Thank you. And a 3000 MTU annual
steady state rate of acceptance at a repository
05260
is a reasonable rate of acceptance, isn't it?
A. Yes, it is.
Q. And the program has never considered
for life of the program steady state rate of
acceptance to be 900 MTUs per year, has it?
A. A life of the program?
Q. Life of the program, yes.
A. To my knowledge, no, the only 900 per
year acceptance rate was based on MRS
acceptance, which was in compliance with the
capacity limitations contained in the Nuclear

Waste Policy Act amendments.

---

**5261:13 - 5262:8**
**(Witness: Kouts, Christopher)**

05261
Q. Do you disagree that an objective of the program is to eliminate the need for additional at-reactor storage after 1998?
A. That's what I would call a sub-objective of the program. The primary objective is to get facilities operational to begin waste acceptance, and to the extent that we can deploy facilities and obviate the need for additional dry storage at reactor sites, that's certainly very beneficial result of that.
Q. Do you agree that an objective of the program from the beginning was to reduce the
05262
backlog of spent nuclear fuel that had been built up at the utilities?
A. An objective of the program.
Q. An objective?
A. As opposed the objective.
Q. An objective?
A. An objective, yes, I would agree with that.

---

## Trial Testimony - Wisconsin Electric v. US (10/11/07)

05447
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------------x
WISCONSIN ELECTRIC POWER COMPANY, :
Plaintiffs, :
vs. :NO. 00-697C
THE UNITED STATES, :
Defendant. :
------------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday, October 11, 2007
Volume 23

The parties met, pursuant to the notice of the
Judge at 10:05 a.m.

BEFORE THE HONORABLE JAMES MEROW

05448
APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SHARON SNYDER, ESQ.
RUSSELL SHULTIS, ESQ.
STEPHEN FINN, ESQ.
SONIA ORFIELD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

**5659:11 - 5661:15**
**(Witness: Zabransky, David)**

05659
Q. Mr. Zabransky, good afternoon.
A. Good afternoon -- good evening.
Q. I want to ask you some employment questions we went over before, but it was quite some time, so I want to set the stage. Where are you currently employed?
A. I'm employed at the Department of Energy in Washington, D.C.
Q. And what's your current position?
A. Nuclear utility specialist in the Office of Civilian Radioactive Waste Management.
Q. Are you also a contracting officer for the standard contract?
A. Yes, I serve as the contracting
05660
officer for the standard disposal contracts.
Q. And what are your responsibilities in your current position, generally?
A. Aside from the contract activities, I also am responsible for other technical waste acceptance issues for other noncommercial spent fuels and high-level waste materials from the Department of Energy and from the Navy and other technical programmatic issues, such as the transportation aging and disposal canister, the TAD.
I guess I developed the technical requirements for that, and I'm working on the procurement for the designs, as well as other policy and analysis issues that come up.
Q. And to whom do you currently report?
A. I report to Christopher Kouts.
Q. And when did you become the contracting officer for the standard contract, I'm sorry?
A. I believe it was in the middle of 2002, I think.
Q. And you have also served as the technical representative to the contracting officer or COTR, when was that position?
05661

A. I believe I started doing that
sometime after a couple of, a year or so after
I came, I believe it might have been '95 or '96
until 2002.
Q. And what were your responsibilities in
that position?
A. To provide technical advice to the
contracting officer of the standard contract.
Q. And you were employed by WEPCO from
approximately 1978 to July of 1994, is that
right?
A. That's correct.
Q. And then you joined the DOE
approximately in July of 1994?
A. That's correct.

---

**5692:16 - 5693:16**
**(Witness: Zabransky, David)**

05692
Q. Do you recall having your deposition
taken in what we've referred to as the
consolidated discovery?
A. I believe I recall it.
Q. And at that time, you were under oath,
is that correct?
A. I was, sir, yes.
Q. And at that time, you stated your
positions accurately to the best of your
knowledge and belief, is that correct?
05693
A. I believe I did, sir, yes.
Q. Let me ask you to turn to page 158.
And I'm going to read the following, line 5:
"QUESTION: Would it make any sense to
have a repository or an MRS and accept fuel at
such a small rate that it took decades to
remove it from the plant sites?
"MR. CRAWFORD: Objection, to the
extent it assumes facts not in evidence.
"ANSWER: It wouldn't have made sense
to the industry, no.
"QUESTION: Would it have made sense

to anyone, would it have made sense to DOE?
"ANSWER: No."
Did I read that correctly?
A. You did, you did.

---

**Trial Testimony - Wisconsin Electric v. US (10/12/07)**

05718
WISCONSIN ELECTRIC POWER COMPANY, :
Plaintiffs, :
vs. :NO. 00-697C
THE UNITED STATES, :
Defendant. :
-------------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.
Friday, October 12, 2007
Volume 24
The parties met, pursuant to the notice of the
Judge at 9:32 a.m.
BEFORE THE HONORABLE JAMES MEROW
05719
APPEARANCES CONTINUED:
ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SHARON SNYDER, ESQ.
RUSSELL SHULTIS, ESQ.
STEPHEN FINN, ESQ.
SONIA ORFIELD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

**5736:18 - 5737:25**
**(Witness: Zabransky, David)**

05736
indicating?
A. What I'm saying is there were DCSes that were in process at the time this decision was made, and Ms. Tomasini, in some cases, before she completed the process of distributing her decision to the contract holders, voided those DCSes.
Q. Have you ever voided a DCS? Let me
05737
rephrase that. Has DOE ever voided a DCS that it has previously approved?
THE COURT: And communicated, you mean?
MR. OEHLER: I'm trying to draw a distinction between DCSes that are submitted by a utility, but not yet acted on by the contracting officer, and those which have actually been approved by DOE.
THE WITNESS: And, again, I just said, Mr. Oehler, there were some that Ms. Tomasini, before she finished the process of sending them back, was advised of this situation, and she decided to not send those back and voided those.
BY MR. OEHLER:
Q. And that was based on the advice of counsel, correct?
A. That's part of the process to complete the approval process and send them back out, is to review it with counsel, yes.
Q. I'm sorry, I don't believe that was responsive. Was that based on the advice of counsel?
A. Yes.

---

**5750:3 - 5751:20**
**(Witness: Zabransky, David)**

05750
Q. Is the limit in the DCS instructions regarding the quantities then inconsistent with

this standard contract provision that allows utility to increase its allocation by 20 percent over the DCS amounts?
A. I don't believe so.
Q. Is it your reading that the utilities could adjust the amount of the approved DCS, notwithstanding the DCS instructions?
A. Well, they could adjust the amount on the approved DCS prior to submittal of the FDS, and when the FDS was submitted with the adjusted quantities, it would get reviewed and approved or -- then acted upon.
Q. Would an FDS that had a higher quantity than the DCS be approved by DOE?
A. That depends.
Q. Depends on what?
A. The circumstances of the time.
Q. What factors might be relevant in that determination?
A. When the FDS was communicated, whether the casks were available, whether the equipment
05751
was available, et cetera, so without knowing the specifics, you can't give an answer as to whether it would have been approved or disapproved.
Q. So those factors though, those all seem to be DOE performance factors that you've articulated, is that a fair summary?
A. They appear to be logistics issues of what equipment was available, so if it's not available, DOE couldn't perform.
Q. Just to make sure, I want to understand then, that you agree then that the amount in the approved DCS was not binding on the utility to the extent that it could adjust the amount under the 20 percent provision they've just referenced in the standard contract, correct?
A. Yes, and that would have been subject to DOE's approval or disapproval at the FDS stage.

**5795:5 - 5795:22**
**(Witness: Zabransky, David)**

05795

Q. Mr. Zabransky, while you were at Wisconsin Electric, was it your belief that DOE had an obligation under the standard contract to accept fuel in significant quantities?

A. Yes, more than one assemblies, quantities that were appreciable, yeah.

Q. And was it also your understanding that, if DOE accepted significant quantities of spent fuel, that Wisconsin Electric would not have to add storage space outside the pool?

A. And, again, I think that's a question that, when you look at over time, I mean, at a point in time when that was not going to be the case, so it depends when that was, Mr. Oehler, but the best of all worlds would have been DOE picking up enough spent nuclear fuel so it wouldn't have needed additional storage space at Point Beach, yes.

---

**5795:23 - 5798:19**
**(Witness: Zabransky, David)**

05795

Q. Let me ask you a more general question -- one moment. There was a document that was discussed before, and I had a question

05796

about it, Plaintiff's Exhibit 117.

MR. OEHLER: I believe this is admitted in evidence, Your Honor.

THE COURT: Yes, it is.

MR. OEHLER: Your Honor, let me take a minute. I want to be certain that I've got the right document. I just wanted to -- this is the document.

BY MR. OEHLER:

Q. So let me ask you to just briefly review it, and then I'm going to direct your attention, your name's referenced on the second page.

A. Okay.

Q. And let's go to the second page, if we can, on Trial Director, and let's blow up the first full paragraph. Now, this talks about, looking at the first two sentences, Mr. Zabransky, this talks about you as the chairman of the group indicated there leading a discussion regarding the draft UNWMG response to the DOE 1987 draft mission plan, do you see that?
A. Okay. Yes.
Q. And do you recall this meeting?
05797
A. I have no reason not to believe what it says in the notes is what happened, I don't recall this is the meeting, no.
Q. Do you recall working on any industry response to the 1987 draft DOE mission plan amendment?
A. I believe I must have.
Q. And midway through that paragraph, and I'll highlight it for you in a second, and let me ask you to read the highlighted sentence for the Court.
A. Sure. "A principal concern of the group was the need to emphasize DOE's obligation to begin accepting spent fuel in significant quantities in 1998."
Q. Thank you. Do you recall what was the source of the industry's position that DOE had an obligation to accept spent fuel in significant quantities in 1998?
A. Well, I mean, this whole -- that topic was a topic that was always discussed at these meetings, and in fact, in the same meeting on page five, we talk about how Mr. Silberg has prepared a letter to the contracting officer that goes along with the same points requesting
05798
that he agree to that as part of a contract modification or interpretation or, et cetera, so that was a common theme of the discussions we had.
Q. Let's stay on page two, if we could. The sentence says that, "DOE has an obligation to begin accepting spent fuel in significant quantities in 1998," correct?

A. That's what it says.
Q. And my question was, what was the source of the industry's position on that issue?
A. I'm not sure how to answer source, that was the industry's position, it was always the industry position, as long as -- or as soon as I got involved with it, that was their position, so I'm not sure I can tell you what the source was, unless I'm not understanding what you're asking me.

**Trial Testimony - Yankee Atomic, et al. v. US (8/2/04)**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
V. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday, August 2, 2004

VOLUME 15

The parties met, pursuant to the notice of
the Judge, at 10:03 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

03379

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
CATHERINE R. BAUMER, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MERRILL J. ATKINS, ESQ.
Assisting General Counsel

19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

03380

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

---

**3443:24 - 3445:9**
**(Witness: Kouts, Christopher)**

03443

CHRISTOPHER KOUTS
was called as a witness, and, having first been duly

03444

sworn, was examined and testified as follows:
MS. SULLIVAN: Thank you, Your Honor.
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q Good morning, Mr. Kouts. Where are you currently employed?

A I'm currently employed with the Office of
Civilian Radioactive Waste Management at the
Department of Energy.
Q What is your current position at DOE?
A I'm director of the office of systems
analysis and strategy development.
Q What are your responsibilities in your
current position?
A Briefly, my office is responsible for
analytical activities to determine and to evaluate how
the waste management system is being deployed, in
other words how the waste acceptance component of the
system, how the transportation component and how the
repository component can act efficiently.
I also have responsibility for the waste
acceptance component, the management of the standard
contract with utilities. And I also have safeguards
and securities policy, technical baseline management,
and a variety of other activities.
03445
Q So do your responsibilities include planning
for waste acceptance from the utilities pursuant to
the standard contract?
A Yes, they do.
Q How long have you held your current
position?
A I was appointed to my current position on an
acting basis in October of 2002, and on a permanent
basis in July of last year.

---

**03445:21 - 03448:1**
**(Witness: Kouts, Christopher)**

03445
Q When did you first join the Office of
Civilian Radioactive Waste Management?
A In the summer of 1985.
Q Would you briefly summarize the positions
that you've held within the Office of Civilian
03446
Radioactive Waste Management.
A Okay. I'll attempt to. And I'll try to be
brief. My first position was to work on the MRS team,
which was a group that was essentially formed to
prepare the proposal to Congress on monitored

retrievable storage under section 14 of the Nuclear Waste Policy Act.

Then after about 3 years in that position, I moved on and was appointed -- I was in a systems engineering group for a short period of time, a systems integration group. And then I was appointed on an acting basis and on a permanent basis head of the transportation program for the program.

That's for spent fuel and high-level waste and the activities associated with cask development and so forth.

After about 3 years in that position, I moved on to work in strategic planning and contingency planning for the program for several years.

After that, I was appointed director of an office responsible for interactions with the Nuclear Regulatory Commission, all regulatory interactions with them and other regulatory agencies, as well as other duties.

After several years in that position, I was

03447

appointed director of a division that basically supported our front office at the time and the director at that time, who was Dr. Daniel Dreyfus.

After several years in that position, I then moved on to a division that developed a topical safety analysis report for a centralized interim storage facility which was intended to be responsive to interim storage legislation that was moving through Congress.

After several years in that position, I then moved on to become a liaison between the Yucca Mountain project, our disposal project, if you will, and headquarters. I also worked for the project director of the Yucca Mountain office and also the director of the overall program.

And working essentially to make sure that major technical and policy products that were produced by the program and by the project were acceptable to the Department, senior management of the Department at the Undersecretary and Secretary level. First of which was the viability assessment that was submitted to Congress in 1998. After that point in time, I worked on site recommendation activities until they were concluded with these, with the President's approval, with the joint resolution of Congress.

Shortly after that I was appointed on an

03448
active basis to this position.

---

**3517:3 - 3517:22**
**(Witness: Kouts, Christopher)**

003517
BY MR. STOUCK:
Q You understand the term failed fuel to mean
fuel that requires special handling at the repository?
A It has other meanings in NRC, but yes, I
understand that context.
Q So, according to your understanding, spent
fuel that does not require special handling is not
failed, according to your understanding. Is that sort
of the definition as far as the repository goes?
A Well, standard in terms of the standard
contract is basically bare spent fuel. That
essentially would not be failed because it would
require us to do special handling at the repository.
So to the extent that failed fuel means it
in that sense, yes, I understand.
Q And if it doesn't require special handling,
it's not failed. That's your understanding --
according to your understanding?
A If it doesn't require special handling at
our facilities, yes.

---

**Trial Testimony - Yankee Atomic, et a. v. US (8/3/04)**

03661
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
________________________________________
YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER ) Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )
________________________________________
Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Tuesday, August 3, 2004
Volume 16

The parties met, pursuant to the notice of
the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

03662
APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel

19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)

03663

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:

JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:

HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

---

**3676:10 - 3676:25**
**(Witness: Morgan, Robert)**

03676

Q. I appreciate your help with that document.
I want to turn now to a slightly different subject.
Actually, it really concerns the document that
Mr. Miller just asked you about, but let me ask you a
few questions before we turn to that document.
It was your belief, when you were acting
director, that the Department of Energy should adopt
a strategy such that no utility would have to plan or
construct additional at-reactor storage after 1998,

isn't that correct?
A. That's correct. Let me just add that there would, there might have to have been contracts by the utilities entered into prior to January 1998 where construction would be going on after that date, so that there would be no new contracts required by the utilities. That was our intent.

---

## 3677:6 - 3678:17
## (Witness: Morgan, Robert)

03677
Q. But if you recall, and I'm referring now again to Plaintiff's Exhibit 678 that Mr. Miller just asked you about and you testified about quite a bit yesterday, this document, program overview, is in fact a written version of a public statement talking about appropriate amount of waste acceptance, isn't it?
A. That was our goal and the intent of trying to be responsive to the Nuclear Waste Policy Act.
Q. And so in this document, you told utilities that, in 1998, DOE would be receiving spent fuel at a rate such that no utility would have to add any storage after that time, correct?
A. That was our goal. That was not a commitment. The mission plan, which I was referencing, is an informational document, not a contract document.
Q. But you wouldn't have made these statements in this program overview on Plaintiff's Exhibit 678 if you didn't think it was appropriate to do so, did
03678
you?
A. Of course not.
Q. And it was your conclusion that the Department should take spent fuel that fast from utilities because you understood that to be the intent of Congress in the Nuclear Waste Policy Act?
A. That was my understanding.
Q. And not only did you think that was the intent of Congress, but you expressed the plan to accept waste from utilities fast enough by 1998 that the utilities would not have to provide any additional storage facilities because you, yourself,

thought it made sense, didn't you?
A. That's correct. And you will note that in
the mission plan, there is an increase of a backlog
during the first few years. If you want to raise
that table from the mission plan, I can show you.

---

**3683:14 - 3683:19**
**(Witness: Morgan, Robert)**

03683
Q. So you did think it appropriate to have
enough waste acceptance capability to meet the
backlog from, meet the discharge rate from utilities?
A. Of course.
Q. And work off the backlog?
A. Yes.

---

**3684:1 - 3684:23**
**(Witness: Morgan, Robert)**

03684
Q. And when you were acting director, you
determined that the contents of the mission plan,
that that was the proper way to accomplish the goals
of the Nuclear Waste Policy Act, correct?
A. Correct.
Q. And you wouldn't have put anything in the
mission plan that you thought was inconsistent with
the Act, correct?
A. Correct.
Q. You were responsible for every word in the
mission plan at some level?
A. Correct.
Q. And the mission plan was the primary
planning document for the program, correct?
A. Correct.
Q. In fact, as far as acceptance rate is
concerned, which is what we've been spending a lot of
time on the last couple days, you viewed the rates
set out in the mission plan as the ideal goal of what
DOE wanted to meet in accepting spent fuel from
contract holders, correct?
A. I believe that's correct. I don't have a

copy of the mission plan in front of me.

---

**3685:10 - 3685:16**
**(Witness: Morgan, Robert)**

03685
Q. And do you see the acceptance rate that's indicated there, again, it's 1,800 MTU for five years and then 3,000 MTU thereafter?
A. Yes.
Q. And you thought that was a reasonable acceptance rate for the program, correct?
A. At that time, yes.

---

**3686:18 - 3686:22**
**(Witness: Morgan, Robert)**

03686
Q. The bottom line is that, in your opinion, DOE should perform the removal of spent nuclear fuel as fast as it reasonably could, didn't you?
A. I believe that was the intent of Congress and the Act.

---

**3690:12 - 3692:13**
**(Witness: Morgan, Robert)**

03690
Q. And you participated in the decision to keep that provision for priority for shutdown reactors in the contract, isn't that true?
A. That's true.
Q. And you agreed with that provision, correct?
A. If I didn't agree, it wouldn't have been in there, excuse me.
Q. And you agreed with keeping that provision because you didn't want to hold up decommissioning and decontamination at the reactor sites of those shutdown reactors?
A. Yes.
Q. And that was an objective of yours,

03691
correct?
A. I wanted to keep open the option of accepting shutdown reactor fuel. That was not a commitment to accept it, but it was an option that we had, if the reactor shut down and if there was a decommissioning starting, that we should consider accepting fuel from shutdown reactors on a priority basis.
Q. And you wanted that option available because it was an objective of yours not to hold up decommissioning and decontamination on reactors?
A. Absolutely.
Q. And you personally thought it was prudent to get the spent fuel out of those utilities so they could get on with that D&D process, correct?
A. I wanted to make sure the option was open and available under the Act.
Q. Then another option that was discussed yesterday during your direct testimony was exchanges of approved delivery commitment schedules?
A. Correct.
Q. You recall that subject coming up?
A. Yes, I recall.
Q. And you recall the discussion that the Department of Energy intended to be reasonable
03692
regarding its right to approve or disapprove exchange requests?
A. That's correct.
Q. And by being reasonable, this meant that the Department would approve exchange requests if at all possible, that's your understanding?
A. That's correct. The fuel had to meet acceptance criteria as a first consideration.
Q. But at the time you were acting director, you had not established any criteria reasons as to why an exchange request would be denied, true?
A. Other than meeting the acceptance criteria, five year old and things that were in the Act.

03888
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )
Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Wednesday, August 4, 2004
Volume 17
The parties met, pursuant to the notice of
the Judge, at 10:00 a.m.
BEFORE: THE HONORABLE JAMES F. MEROW
03889
APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel

19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)

03890

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:

JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:

HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

---

**3902:21 - 2904:13**
**(Witness: Pollog, Thomas)**

03902

Q. Mr. Pollog, are you currently employed at the Department of Energy?
A. Yes, I am.
Q. And to what office within the Department of Energy are you currently assigned?

03903

A. I work in the Office of Civilian Radioactive Waste Management, the Office of Systems Analysis and Strategy Development.

Q. What are your current responsibilities?
A. Generally, I'm assigned to implement a standard contract between the Department of Energy and the contract holders.
Q. How long have you been in your current position?
A. Approximately eight years.
Q. So when did you join the Office?
A. The Office I'm currently in? That Office was formed in October of 2002, but my responsibilities were the same in the prior organization.
Q. And when did you join the prior organization?
A. September of 1996.
Q. Prior to September of 1996, did you serve in the Office that had responsibility for the waste acceptance function at DOE?
A. Yes, I did. In 1990, '91 and early '92, I was in the Office that performs the same functions.
Q. Mr. Pollog, do you also serve as the contracting officer's technical representative?
03904
A. Yes, I do, in an unofficial capacity.
Q. When did you assume the responsibilities of the contracting officer's technical representation?
A. When Mr. Zabransky assumed responsibilities of the contracting officer, which I believe was in the summer of 2002, I was unofficially assigned responsibilities of the contracting officer's technical representative.
Q. What are the responsibilities of the contracting officer's technical representative?
A. To provide the contracting officer with any technical expertise or guidance he needs in implementing the standard contract.

---

**3970:22 - 3972:3**
**(Witness: Pollog, Thomas)**

03970
BY MR. STOUCK:
Q. But let me stick with this for a moment. The contracting officer, do you think the contracting -- was Nancy Slater the contracting

03971

officer at one point?

A. No.

Q. She wasn't, she was the technical representative?

A. I believe she was the contracting officer technical representative for a period of time.

Q. She signed some DCSes, do you know that?

A. I believe that's correct.

Q. What significance would you give her views about the binding nature of DCSes?

A. I'm not sure what you mean by what significance I would give her views, I mean --

Q. Would she know what the significance was?

A. I would hope so.

Q. Well, would you be surprised if she testified in her deposition in this case that she did not recall anyone, anyone, either within the Department of Energy or in industry, who thought that the delivery commitment schedules were binding on either party? Would that surprise you?

A. No.

MS. SULLIVAN: Objection, hearsay.

BY MR. STOUCK:

Q. Why would that not surprise you?

MS. SULLIVAN: Same objection.

03972

THE COURT: Overruled. You can answer the question.

THE WITNESS: No, it didn't surprise me.

---

**3995:12 - 3997:21**
**(Witness: Pollog, Thomas)**

03995

Q. Okay. Do you know when the Department stopped processing or stopped reviewing and approving DCSes or FDSes?

A. I believe I do.

Q. When was that?

A. I believe it was either the end of 1996 or in the very beginning of 1997.

Q. And your understanding is that the Department of Energy stopped processing these DCS and FDS submittals to limit its contractual liability,

isn't that right?
MS. SULLIVAN: Objection, legal conclusion.
THE WITNESS: I'm not sure.
THE COURT: What's the objection?
03996
MS. SULLIVAN: It was asking for a legal conclusion.
THE COURT: Oh.
MR. STOUCK: I asked for his understanding.
THE COURT: If you have an understanding, you can answer. I'll overrule the objection.
THE WITNESS: I wasn't told that, I don't believe, by anybody, but that was my understanding of the situation.
BY MR. STOUCK:
Q. That was your understanding?
A. I believe that was.
Q. Were you told anything at the time about why the Department of Energy had decided to stop processing and approving DCSes and FDSes?
A. I believe so.
Q. Pardon me?
A. I believe so.
Q. Yeah, you were told that counsel told the Department to stop doing that, is that right?
A. I believe counsel advised the Office of Civilian Radioactive Waste Management and the contracting officer to do that, yes.
Q. Counsel told Mr. Zabransky to do that, and Mr. Zabransky told you that counsel had told him to
03997
do that, is that right?
A. I said I believe they advised us to do it, not told us to do that.
Q. Okay. Counsel advised Mr. Zabransky to stop processing these documents, and Mr. Zabransky told you that counsel had advised him of that?
A. I don't know if counsel advised Mr. Zabransky or other program personnel in RW directly. I don't know how the conversation between counsel and the Office of Civilian Radioactive Waste Management actually occurred, but the bottom line is Mr. Zabransky told me that, on advice of counsel, we're going to stop processing them. I don't know if he was told directly by counsel or through his superiors.

Q. But in any event, the advice came from counsel?
A. Yes.
Q. And the purpose was to limit the Department's liability?
A. That was my understanding.

---

**4000:3 - 4000:7**
**(Witness: Pollog, Thomas)**

04000
In fact, though, you do know that the Department of Energy originally held the view that DCSes were not binding because circumstances could change with respect to the 1998 date, correct?
A. I've seen language to that extent.

---

**4003:20 - 4004:14**

04003
Q. Well, let's take a look at what you told us at the deposition.
A. Okay.
Q. Same page, 334 -- I mean, same tab, 334, bottom of page, line 20. Do you see that? "Necessarily, the DCSes submitted and
04004
approved by the Department pursuant to these instructions, in the Department's view, did not create any binding obligations?" Do you see that question?
A. I'm sorry, can you read that for me?
Q. Bottom of page 334, line 20.
A. Yes.
Q. "Necessarily, the DCSes submitted and approved by the Department pursuant to these instructions, in the Department's view, did not create any binding obligations." And then your answer at the top of page 335, "There were, I believe, people who held that view."
A. Yes, I see that.

---

**4014:1 - 4015:25**
**(Witness: Pollog, Thomas)**

04014
Q. Now, when preparing, would you -- well, let me ask this question first. When preparing the 1991 ACR, is it your understanding that the Department's best estimate of the earliest time it could accept waste at an MRS, prior to the operation of a repository, under the schedule linkages, was three years ahead of the repository, do you recall that?
A. I believe that's correct, yes.
Q. So given those linkages, the earliest you could start an MRS would be three years before opening the repository?
A. I believe there is a linkage between the construction of the MRS and construction authorization being issued by NRC with the repository, yes, I think that's correct.
Q. Excuse me, I didn't mean to interrupt. A three-year delay approximately?
A. I believe that's correct, yes.
Q. Was that your understanding at the time that the '91 ACR was prepared?
A. Yes, it was.
Q. Now, so at that time, the repository was projected to open in 2010?
A. I believe, yes, in 1991, the repository was projected to open in 2010, so I think what you said
04015
is correct, yes.
Q. And therefore, the MRS couldn't open until there was construction authorization for the repository, right, under the Act?
A. I believe linkage between the construction of the MRS and the construction authorization of the repository led one to believe that what you said was correct, yes.
Q. So if the 1991 ACR set a schedule, if it were to set forth a schedule that was fully consistent with the '87 Amendments Act, it would have shown zero acceptance until 2007, correct?
MS. SULLIVAN: Objection, legal conclusion.
BY MR. STOUCK:
Q. Isn't that your understanding?
MS. SULLIVAN: Thank you.

THE WITNESS: If we would have maintained consistency with all the linkages, yes, I think that would be correct.
BY MR. STOUCK:
Q. So in other words, the '91 ACR assumed that there would have to be a change in the law in order to accomplish the rate set forth therein?
A. Yes, the 1991 assumed we would receive some congressional relief on that linkage.

---

**4017:12 - 4018:1**
**(Witness: Pollog, Thomas)**

04017
Q. This is Plaintiff's Exhibit 54. But just in further response, or relevant to, I think, the Court's questions, Mr. Pollog, the Department could not, the Department in 1998 could not have picked up 400 tons under the linkages that were then part of the Amendments Act, isn't that right?
A. Yes, that is correct. With the, if we maintain, or if Congress maintained the current linkages that were in the Nuclear Waste Policy Amendments Act of 1987, we could not have picked up the 400 tons in 1998.
Q. And probably could not have picked it up until three years before 2010 or thereabouts?
A. Or thereabouts, yes, without any
04018
Congressional relief.

---

**04021:17 - 04022:13**
**(Witness: Pollog, Thomas)**

04021
Q. All right. And let's move on then to another subject, if we can. To your knowledge, Mr. Pollog, there is no group in the Department of Energy that disagrees that the 3,000 MTU rate is the rate that's to be used as a steady state throughput rate in the program, correct?
A. Are you asking me within all of Department of Energy or the Office of Civilian Radioactive Waste

Management?
04022
Q. There's no group within DOE that disagrees that that is the appropriate way to -- there's no group within DOE that disagrees that the 3,000 MTU rate is the appropriate rate to use as the steady state throughput rate, isn't that right?
A. Are you talking about today or any point in time throughout the Department of Energy or the Office of Civilian Radioactive Waste Management?
Q. Well, let's take them one at a time. Start with today.
A. Today, I'm not aware of any organization within the Department of Energy, or group, I can use group, who disagrees with that.

---

**4022:1 - 4022:13**
**(Witness: Pollog, Thomas)**

04022
Q. There's no group within DOE that disagrees that that is the appropriate way to -- there's no group within DOE that disagrees that the 3,000 MTU rate is the appropriate rate to use as the steady state throughput rate, isn't that right?
A. Are you talking about today or any point in time throughout the Department of Energy or the Office of Civilian Radioactive Waste Management?
Q. Well, let's take them one at a time. Start with today.
A. Today, I'm not aware of any organization within the Department of Energy, or group, I can use group, who disagrees with that.

---

**4035:11 - 4035:16**
**(Witness: Pollog, Thomas)**

04035
Q. Okay. But there's no technical reason why the Department couldn't begin accepting failed fuel, isn't that right?
A. I think I testified, given sufficient budget resources, we could probably engineer a

solution to most failed fuel assemblies.

---

**4039:3 - 4039:21**
**(Witness: Pollog, Thomas)**

04039

MR. STOUCK: Of course, I'm asking for his understanding, but he testified about this extensively, and I would just like to have the Court hear the benefit of it.
THE WITNESS: Okay. I think I mean both parties, contract holders and the Department, would agree that if we can operate with efficiency for both sides, it's beneficial for everyone.
BY MR. STOUCK:
Q. And minimize costs for both sides?
A. If we could do that, yes, that would be beneficial.
Q. Okay. And you agree that, at least at one point in time during the course of this program since the Nuclear Waste Policy Act was enacted, DOE had the objective of minimizing utility reactor storage costs, right?
A. I believe words to that effect were published in mission plans in the 1980s, yes.

---

**4042:9 - 4042:19**
**(Witness: Pollog, Thomas)**

04042

Q. "Do you know whether the acceptance rates in the 1991 ACR upon which the DCSes were based, were those sufficient in the aggregate to avoid additional reactor storage?" Do you see that?
A. Yes, I do.
Q. And your answer was, "I don't know factually if they were or not, but my belief is most likely not." Do you see that?
A. Yes, I do.
Q. That was your testimony?
A. Yes, it was my testimony.

---

**4047:18 - 4048:14**
**(Witness: Pollog, Thomas)**

04047
Q. And you were asked with respect to that rate, at one of your depositions in these cases, do you know whether or not exchanges would have to occur under that rate in order to satisfy each purchaser's storage needs, and you answered that you believed that they would. Do you recall that?
A. Not specifically at this point in time, I don't.
04048
Q. Let's just take a look at it, behind tab one at page 102. Are you there?
A. What was the page again, please?
Q. 102, behind tab one.
A. Yes.
Q. And do you know whether or not that -- the question was whether or not exchanges would have to occur in order to satisfy each purchaser's storage needs under this acceptance rate 2,650, was the question. And your answer there was, "I believe so." Do you see that?
A. Yes, line 6.
Q. That was your testimony?
A. Yes.

---

**4084:25 - 4086:1**
**(Witness: Pollog, Thomas)**

04084
THE COURT: There's been a good deal of
04085
testimony about transportation questions for spent fuel from utilities to DOE. And on the question of efficiency, is there any considerations about taking some kind of action which would not strictly comply with OFF in order to gain efficiencies in picking up fuel of more quantities, say, to eliminate returns for plants, multiple returns to plants for small quantities, than the allocation might otherwise call for?
THE WITNESS: Partially, Your Honor. We've looked at potentially modifying the DCS system where,

instead of it applying to one year, it applies for multiple years. So the, it's a delivery day, or year of delivery. Instead of changing the year, it would be a block of time, two or three years.

So we're still trying to keep the OFF allocation method and the process that's in the contract, we're trying to become a little more efficient by making the year of delivery several years of delivery and then operating within a block, instead of one calendar year or -- block of years, instead of one calendar year. Yes, we have thought about that.

THE COURT: And the potential for exchanges would still apply?

04086

THE WITNESS: I would imagine so, sir, yes.

---

**Trial Testimony - Yankee Atomic, et al. v. US (8/5/04)**

04107
IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER ) Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, August 5, 2004
Volume 18

The parties met, pursuant to the notice of
the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

04108
APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel

19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)

04109

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

---

**4110:15 - 4112:3**
**(Witness: Zabransky, David)**

04110

Q. Good morning, Mr. Zabransky. Are you currently employed at the Department of Energy?
A. Yes, I am.
Q. And to what office within the Department of Energy are you currently assigned?
A. I'm in the Office of Civilian Radioactive Waste Management, and I work in the Office of Systems Analysis and Strategy Development within that office.
Q. What are your current responsibilities?

A. I report to Chris Kouts, and I work on issues related to the standard contract, other
04111
technical issues on commercial waste acceptance, waste acceptance issues, and I serve as the contracting officer for the standard contracts.
Q. You testified you report to Mr. Kouts. Do you know who Mr. Kouts reports to?
A. Yes, Mr. Kouts reports to Ted Garrish, the deputy director.
Q. And to whom does Mr. Garrish report?
A. Mr. Garrish reports to Dr. Choo, the director of the program.
Q. When did you become the contracting officer?
A. I believe it was in July of 2002.
Q. Have you also served as the technical representative to the contracting officer?
A. Yes, I have.
Q. And when did you serve as the technical representative to the contracting officer?
A. From, I believe, around 1995 through July of 2002.
Q. And what were your responsibilities as the contracting officer's technical representative?
A. To provide technical advice to the contracting officer on issues relating to administration of the standard contract.
04112
Q. When did you join DOE?
A. I came to DOE in 1994, I believe July of 1994.

---

## 4118:2 - 4118:12
## (Witness: Zabransky, David)

04118
Q. Was there a time at which DOE stopped processing these DCSes?
A. Yes, I believe it was in early '97. It's hard to remember the exact year that the Department stopped processing DCSes. We did acknowledge that we had received them, but we no longer processed them. We neither approved or disapproved them.
Q. Who made the decision to stop processing

DCSes?
A. I think the decision was made by the contracting officer on the advice of counsel.

---

**4141:22 - 4142:16**
**(Witness: Zabransky, David)**

04141
Q. Does DOE, as this letter indicates, expect utilities to exchange DCSes?
A. DOE continues to expect the utilities will exchange DCSes, yes.
04142
Q. And does DOE encourage utilities to exchange DCSes?
A. I think DOE has been encouraging the utilities to exchange DCSes under the provisions of the contract since DCSes were created back in the early '90s, yes.
Q. As contracting officer, would you have the responsibility for approving exchange requests?
A. Yes, I would, now.
Q. And do you expect that DOE will be able to approve all exchange requests?
A. I think DOE would approve exchange requests that we can accommodate without adversely affecting or impacting others that we have an obligation to pick up fuel from. So to the extent we can accommodate them, I think we'd approve them, yes.

---

**4159:2 - 4160:16**
**(Witness: Zabransky, David)**

04159
Q. Now, for the currently approved delivery commitment schedules, the ones that, before the last week's ACR and new delivery commitment schedule instructions came out, isn't it true that you don't see any good use for the information on those approved delivery commitment schedules because the Department's current plan for its waste management system uses different acceptance rates than those upon which the earlier delivery commitment schedules

were based?

A. I think your statement is partially correct. It's true that our current plans in the ACR that we just put out last week are for greater acceptance rates beginning in 2010 through 2019 then in the first 10 years of the previous ACR, but it's also correct that some of the information provided by the utilities may no longer be valid, and they may have other plans for what they wish to have done beginning in 2010.

Q. So the bottom line, again, the real crux of my question is that you wouldn't see any good use for the information on the currently approved delivery commitment schedules?

A. Those supported operations beginning in

04160

1998. I don't think they're valid for use supporting operations in 2010.

Q. And it's your belief that DOE has to renegotiate those delivery commitment schedules, isn't that correct?

MS. SULLIVAN: Objection, vague. Which delivery commitment schedules are we talking about?

MR. SHAPIRO: The previously approved delivery commitment schedules.

THE WITNESS: I think the disposition of those needs to be resolved. We haven't resolved in the Department how to address that yet, but the DCSes that would be coming in under the APR that we issued last week for 2010 would be for the same fuel that were covered by the DCSes that came in previously. So we'd have to resolve that with the utilities, yes.

---

**4162:11 - 4173:16**
**(Witness: Zabransky, David)**

04162

Q. I want to get one more concern with the delivery commitment schedules, Mr. Zabransky. Under the contract, utilities have the express right to vary the quantities of spent fuel and high-level waste that DOE would pick up by 20 percent from the amounts on those approved delivery commitment schedules at many point before issuance of the final delivery schedule, isn't that correct?

A. I believe that's correct, yes.

Q. But if everybody adjusts their allocation upward by 20 percent, so that the quantity to be accepted is more than the total acceptance rate that the Department has planned for that year, you don't know how the Department would accommodate that contract work, do you?

04163

A. The Department would be obligated to. We'd have to figure out some way to either store more fuel, work nights and weekends, work 24-hour shifts, whatever it took, but the contract gives the utilities rights to do that. Once we sign the DCSes, if they adjust them, we'll have to live with them.

Q. But you don't know how the Department would manage to accommodate that, do you?

A. I just said, Mr. Shapiro, we'd work back shifts, we'd work weekends, we'd park stuff, but it's our obligation to figure that out when and if it happens.

THE COURT: Would that possibly have any impact on accepting canistered fuel? For instance, if a number of canisters resulted in, say, being 10 percent over the allocation, if you accepted canistered fuel?

THE WITNESS: I think canistered fuel, one of the issues with that is if we have to accept it and repackage it immediately, which could be the case, that could severely limit the throughput of the facilities, so that would have to be factored into that.

THE COURT: If you didn't have to reopen them and just, the total quantity might not exactly

04164

match the allocation.

THE WITNESS: And that's one of the reasons I think that provision was put in there for, was that originally there was an understanding that the allocation was a very precise number to the nearest tenth of a ton, but that could result in a less than full cask, two and a half casks, which didn't make a lot of sense, and that by adjusting it plus or minus 20 percent was one way of dealing with that.

BY MR. SHAPIRO:

Q. I wanted to make sure I understood your last testimony correctly, Mr. Zabransky. So you're

saying -- and let's take the current, the most recent ACR that ramps up to an acceptance rate of 3,000 MTUs per year?

A. Yes, it does.

Q. And let's say we're in one of those years with 3,000 MTUs acceptance and utilities with allocations and the allocations that are provided for under that ACR and APR and instructions that were sent along with them would equal that 3,000 MTU, wouldn't it?

A. Yes, it does.

Q. And so if all those utilities bumped up the amounts they want to deliver by 20 percent, and the

04165

Department would have to handle roughly 3,600 MTUs?

A. Yes, it would.

Q. And it's your testimony that the Department would have the capability to manage to do that?

A. No, my testimony was the Department was aware of that when it issued the ACR, and we'll deal with that, that should have come to pass. It doesn't have the capabilities today, but it would have to get them.

Q. So the Department could get those capabilities?

A. I don't see any reason why it couldn't.

Q. I want to ask you just a couple of questions about annual capacity reports, just mentioned the most recent one, the one that was sent out last week, when is spent fuel presumed to start to be picked up by the Department in that annual capacity report?

A. The report issued last week supports operations beginning in 2010.

Q. Is that the date provided in the annual capacity report, or is it like the earlier one that just had a year one instead of an actual year assigned?

A. I believe that report, and I'm doing it

04166

from memory, has a table that shows 400 tons of acceptance in 2010.

Q. I want to ask you a question or two about the prior ACR. That's the one that was issued in 1995.

A. Okay.

Q. Now, the rates in that annual capacity report, you can pull that out if you don't recall it, but the rates in that annual capacity report are considerably smaller than the acceptance rates in last week's July 2004 annual capacity report, isn't that true?
A. Those rates, I believe, were 400, 600 and then 900 through the balance of the 10-year period, yes, they're smaller.
Q. And isn't it true that the Department was trying to minimize its obligations to utilities by using those rates in the 1995 ACR?
A. That may have been one of the considerations that went into that. There was no plans for a repository before 2010 at that point in time, and there was no change from the prior 4, 6, 9, 9, 9 acceptance rates in the '95 ACR, yes.
Q. I'm not asking just what may have been. Is it your opinion the Department was trying to minimize
04167
its obligations by putting in those rates in the 1995 ACR?
A. In my opinion, that was probably one of the things being thought about, yes.
Q. I'm still not quite getting a complete answer to my question. I think you qualified your last answer that said that was probably one of the considerations minimizing the Department's obligations. Wasn't it your opinion that the Department indeed was trying to minimize its obligations?
MS. SULLIVAN: Objection, asked and answered, argumentative.
THE WITNESS: And I think I said, yes, they were, but I'm not sure that was the only consideration for those rates.
BY MR. SHAPIRO:
Q. Now I, want to turn back to your time when you were at WEPCO and looking at ACRs in that time period. Again, we can pull one of these out, but you recall some of those annual capacity reports noted right on there that the ACR's for planning purposes only, and it's not contractually binding on either the Department or purchasers?
A. I believe they all say that, including the
04168

current one.
Q. And when you were at WEPCO, you concluded from that, that WEPCO could not rely on the department to actually accept the fuel based on the ACR, isn't that correct?
A. I believe that WEPCO needed to execute DCSes and have them approved to have any commitment from the government.
Q. You couldn't rely on the ACR?
A. The ACR was the basis for the DCS, no, there's nothing to rely upon an ACR. It's a report.
Q. Now, we've talked about a couple different acceptance rates for the Department to receive spent fuel from utilities. There's the one that ramps up to 3,000 MTU and the current ACR. You believe that acceptance rate is reasonable, don't you?
A. That's the rate that's in our requirements documents, the facilities are being designed for, and that's the rate the Department has put forth as its willing to commit to in the new ACR, yes.
Q. So you believe that the acceptance rate in the 19 -- in the 2004 ACR is reasonable?
A. I believe that the rate in the ACR which presumes we'll have Yucca Mountain up and running is reasonable, yes.
04169
Q. And, again, turning back to your time when you were at WEPCO, much earlier on in the process, you believe that a reasonable acceptance rate would have been one that would have reflected the aggregate rate of discharges, plus some amount of work-off, isn't that correct?
A. I believe that's the case, yes.
Q. And it's your personal opinion that an appropriate rate of acceptance under the standard contract would be a rate which kept pace with discharges and removed some of the backlog, that's correct?
A. Again, to the extent that's accomplishable, I think that's an appropriate thing for the Department to commit to.
Q. And you do think that is accomplishable by the Department?
A. That's the current plans for 2010, the Department's planning to accomplish it, yes.
Q. And, again, turning back to your time at

WEPCO, when you were there, it was your position and
understanding that an acceptance rate that ramped up
to 3,000 MTU would be such a rate that was sufficient
to work off the backlog and the discharges in a
reasonable time frame?
04170
A. That would have been the company's desire
and my desire, yes.
Q. And it was your position and WEPCO's
position when you were there that the Department had
to be prepared to accept spent fuel from the
utilities on a schedule which would obviate the
construction of deployment of additional at-reactor
storage capacity after January 31, 1998?
A. I believe that's the position we
communicated to the Department in response to some of
their mission plans, yes.
Q. You believe that's the position that you
communicated, or you're unsure?
A. I believe it is. I mean, you're asking me
for something that happened 20 years ago, but I think
that's we said, yes.
Q. I think we may have that document. Let's
confirm.
A. Okay.
Q. Mr. Zabransky, you're being handed what is
actually an excerpt from what we have been calling
here Plaintiffs' Exhibit 95, which is the complete
three volume set of the 1985 mission plan. And you
may know or recall the third volume of that set
includes, I believe, all of the comments sent in by
04171
utilities on the draft mission plan.
And what we have here at pages 593 and 594
of volume three of Plaintiffs' Exhibit 95 is a July
6th, 1984 letter from WEPCO to Charles Head. Do you
recognize this letter?
A. I've seen it in, I think, in prior
depositions. I'm not sure I recognize it from the
time.
Q. These are WEPCO's comments --
A. Yes, they are --
Q. -- to the draft mission plan?
A. They appear to be, yes. They are.
Q. Well, let's take a look to see if it
confirms your understanding that you had about

WEPCO's position at the time. If you look at the bottom of the first page, it says in the indented portion, "DOE must be prepared to accept spent fuel from utilities on a schedule which will obviate the construction or deployment of additional at-reactor storage capacity after January 31, 1998."
A. I see that, yes.
Q. And you agreed with that statement?
A. Yes, that's what the WEPCO put forth as its position in July of 1984.
Q. And if you would turn to the second page of
04172
the comments, the comment that's numbered number 2, the top paragraph on the page, it says that, "The DOE repository program should be carried out in a cost-effective manner which protects the interest of those who are required to pay for it.
In other words, DOE should not permit itself to give in to expediency in making decisions or taking actions with significant cost schedule implications." You agreed with that statement?
A. I agreed with it then, and I think we operate the program that way now.
Q. Let's switch subjects, Mr. Zabransky. You talked about failed fuel during your direct examination. It's your understanding that the Yucca Mountain facility is going to be prepared to handle failed fuel to the extent it handles like an individual fuel assembly with normal handling equipment, isn't that correct?
A. That's, again, I don't know what it's actually going to be able to do. The goal is to try to handle failed fuel that -- restate your question. I'm not sure I caught it. Can you repeat the question?
Q. Your understanding is that the Yucca Mountain facility will be prepared to handle failed
04173
fuel to the extent it handles like an individual fuel assembly with normal handling equipment isn't that correct?
A. Well, I think I said in my answer, it's more than just handling equipment. It's all the facility capabilities are there so they can handle failed fuel without any additional requirements. So to the extent that failed fuel behaves in all aspects

like intact fuel or standard fuel, then there should be no reason it couldn't.
Q. And in fact, almost all utilities, nuclear utilities, have some amount of failed fuel, isn't that correct?
A. I think most have it. I don't know the exact quantities or characteristics at each utility, no, but, yes, most have it.

---

## 4178:4 - 4182:3
## (Witness: Zabransky, David)

04178
Q. So the delivery commitment schedule form itself, we can show you one if you need it, that form doesn't even have a place on it to indicate whether or not the fuel is failed, does it?
A. No, it doesn't. Again, Mr. Shapiro, that's because going into it, the Department assumed and put the utilities on notice that it would presume it was all standard. So then to give them a place to check "failed" would be kind of inappropriate, since we've already said it's all standard from an assumption purpose.
Q. Well, do your instructions say that the utility is filling out its form incorrectly if some of that fuel happens to be failed? You're just saying that it makes an assumption?
A. Yes, I am. So going into it, we're committing to pick up that amount of standard fuel.
Q. Well, let me turn back then to the annual capacity report that provides allocations to utilities.
A. Yes.
Q. And we can get you a copy of that if you
04179
need it. But you're familiar with the annual capacity report, the one sent out last week?
A. I'm familiar with it, yes.
MS. SULLIVAN: I would ask that the witness be provided a copy of the report since he's already testified he was going from memory when he answered the previous question. If there are specific questions about the document, it's appropriate to hand the witness a copy.

MR. SHAPIRO: It's Plaintiffs' Exhibit 1952.
BY MR. SHAPIRO:
Q. And why don't we turn to page three in Plaintiffs' Exhibit 1952, the summary of purchaser's annual allocations? Now, this table, the summary of purchaser's annual allocations, this lists the amount of spent fuel that the Department is allocating that each utility, the amount that the Department will pick up in each year?
A. That's correct.
Q. And this allocation is not limited, there's nowhere in this document where it says this allocation is limited to fuel that is not failed, does it?
A. No, this is a complete allocation to that
04180
utility in a given year.
Q. And let me turn back to issues about the acceptance of failed fuel. Other than technical handling reasons, there were other reasons for not accepting failed fuel on the same schedule as standard fuel, isn't that correct?
A. I think that's a simplification, but some of those technical handling reasons can be pretty significant.
Q. Well, under the contract's definition of failed fuel, you would interpret the phrase "special handling" to mean fuel that requires handling with equipment other than the fuel handling tool that otherwise accompanies regular fuel assemblies, isn't that correct?
A. That's one requirement that may kick in with respect to failed fuel, yes.
Q. But isn't that how you would define "ordinary handling"?
A. Excuse me, the word what?
Q. Ordinary handling.
A. Again, no, I'd go farther than that. For instance, the receipt facility at Yucca Mountain could handle failed fuel in an entirely different location than it would handle intact fuel, so it may
04181
need to be scheduled to entirely different facilities if we knew it was failed ahead of time, and we'd have to address that.

That's special handling. It may require
totally different procedures if it's failed. That's
also special handling.
Q. Do you recall having your deposition taken
in the Indiana Michigan case earlier this year?
A. I recall many depositions. I think I had
13 days of depositions.
Q. And you had one earlier this year in the
Indiana Michigan case?
A. I think I did, yes.
Q. And you took an oath much like you did this
morning?
A. Yes.
Q. And you told the truth?
A. Yes, I did.
Q. And you testified accurately?
A. Yes, I did.
Q. And weren't you asked the following
question and give the following answer:
"How would you define 'ordinary handling'?"
You gave an answer, "Spent fuel is handled
with a fuel handling tool. Anything more than that
04182
is not ordinary." Isn't that your correct answer?
A. And, again, that's one type of ordinary
handling.

---

**4183:17 - 4184:6**
**(Witness: Zabransky, David)**

04183
Q. If failed fuel requires no special
handling, it must be taken on the same schedule as
standard fuel, isn't that correct?
A. I think the provision you're referring to
in the contract which requires the utilities to
inform DOE of the type of failure and the nature of
the failure says that if there's no technical issue,
if we have no technical reason that we can't take it,
doesn't require special handling, that there be no
04184
reason to delay it, that's a correct statement.
Q. So if it doesn't require, if failed fuel
doesn't require special handling, it must be taken on
the same schedule as standard fuel, correct?

A. I think that's fine. I agree with that, yes.

---

**4192:18 - 4192:24**
**(Witness: Zabransky, David)**

04192
Q. But your ultimate expectation, Mr. Zabransky, is that DOE is going to be accepting some canistered spent fuel from utilities?
A. I believe that we'll eventually reach an accommodation with a utility or more than one utility to come up with a contract amendment and accept some canisters, yes.

---

**4204:24 - 4205:13**
**(Witness: Zabransky, David)**

04204
Q. And you still believe, as Dr. Dreyfus indicated in Plaintiffs' Exhibit 145, in his letter,
04205
that the exchange provision would allow utilities to optimize allocation of waste capacity, don't you?
A. Yes.
Q. In fact, it's been your belief that the exchange provision would work much like pollution offset credits, isn't that correct?
A. That's one type of model that I think I've said before might be a way this could work, yes.
Q. People will buy, sell, trade -- a willing seller will find a willing buyer, and an exchange will be proffered, the deal will be accepted, isn't that correct?
A. Between those two, yes.

---

**4206:25 - 4207:21**
**(Witness: Zabransky, David)**

04206
THE COURT: I was thinking of your
04207

transportation system that you'd have to develop for transportation to Yucca Mountain, might be the exchanges would be crucial to developing an efficient transportation system.
THE WITNESS: I think it's fair to say, Your Honor, that without, as laid out in the ACRs and as followed up in the Oldest Fuel First, it doesn't necessarily go to the most efficient transportation system, but it's the system that, in the absence of somebody exchanging with each other, we're going to have to live with.
I think the scheduling process that's laid out doesn't always lend itself to the most efficient operation of the system.
BY MR. SHAPIRO:
Q. So if utilities exchanged, Mr. Zabransky, that might actually result in a more efficient transportation system that will be actually easier for the Department to accommodate?
A. If the circumstances of the exchange were to that effect, it could, yes.

---

**4208:22 - 4209:7**
**(Witness: Zabransky, David)**

04208
Q. But ultimately, you believe there's no reason why exchanges shouldn't work on a global basis, isn't that correct?
A. It would be my belief that, like I said, in
04209
a mature situation, where this is no longer a big deal, where trading uranium, trading pollution offset credits becomes a routine thing as it did, that when moving nuclear fuel around the country or leaving it in one state or another state isn't a big deal anymore, this could be a normal exchange process.
But that's a long ways off.

---

**Trial Testimony - Yankee Atomic, et al. v. US (8/11/04)**

04614
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC ) Case Nos.
COMPANY, CONNECTICUT YANKEE ) 98-126C
ATOMIC POWER COMPANY, and MAINE ) 98-154C
YANKEE ATOMIC POWER COMPANY, ) 98-474C
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
Courtroom Number 5
National Courts Building
717 Madison Street, Northwest
Washington, D.C.
Wednesday, August 11, 2004
VOLUME 21
The parties met, pursuant to the notice of the
Judge, at 10:06 a.m.
BEFORE: THE HONORABLE JAMES F. MEROW
04615
APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800
ON BEHALF OF THE UNITED STATES:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
U.S. Department of Justice

1100 L Street, N.W.
(202) 305-7562

---

**4711:23 - 4712:3**
**(Witness: Milner, Ronald)**

04711
Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?
04712
A Yes, I am.
Q What is your current position?
A Chief operating officer.

---

**4741:11 - 4741:18**
**(Witness: Milner, Ronald)**

04741
Q Mr. Milner, are you familiar with DOE's plans for the steady-state acceptance rate?
A I believe I am, yes.
Q What is that rate that you're familiar with?
A The steady-state acceptance rate, the design rate, if you will, of the system is 3,000 metric tons per year.

---

**4749:21 - 4750:6**
**(Witness: Milner, Ronald)**

04749
Q It's true, is it not, that the Department of Energy's intentions with respect to the repository design receipt rates have stayed constant to the present day, 3,000 MTU per year?
A Yes, uh-huh.
04750
Q And that -- that 3,000 MTU steady-state acceptance rate has been used fairly consistently in the OCRWM published documents, correct?
A As far as the steady-state rate, yes.

Q And that's a reasonable rate?
A Yes, I think so.

---

**4753:1 - 4753:10**
**(Witness: Milner, Ronald)**

04753
Q So with the lower acceptance rate in the 1991 annual capacity report, a shutdown reactor might -- might still have to store spent fuel for an extended period of time?
A Yes.
Q So that annual -- that lower rate in the 1991 annual capacity report would not have been sufficient to handle the needs of shutdown reactors?
A Again, in the aggregate it would have been sufficient. Looking at each utility, no.

---

**4757:3 - 4760:11**
**(Witness: Milner, Ronald)**

04757
Q And fast-forward a little bit to June of '88. By that time, the Department of Energy believed that the linkages between the -- the schedule and the key milestones in siting the construction of an MRS facility made it unlikely that the department would be able to start accepting waste significantly before 2003, isn't that correct?
A At a -- at a repository?
Q At any facility.
A At any facility?
Q Linkages.
A Yes, I believe that was the case.
Q And as of November 1989 -- and that was the time that report to Congress on reassessment of the program -- it was the Department of Energy's position that a repository would not be available until 2010, correct?
A Correct.
Q It was also the Department of Energy's view at that time that if the statutory linkages remained in place, that the MRS operations would not

begin until 2007, correct?
A Correct.
04758
Q And that's because that -- that three-year difference between repository and MRS opening, that represented the department's best estimate of how quickly it could get an MRS up and running given the linkages?
A Correct.
Q Now, you believed at the time of that November 1989 report to Congress on the reassessment of the Civilian Radioactive Waste Management Program that if the statutory linkages were modified, that the department could begin to accept waste beginning in 1998?
A Yes.
Q And by 1991, you believe that if the linkages between the MRS construction and the repository authorization were maintained so the initial acceptance by DOE could not begin until 2007?
A Correct.
Q And ultimately, the DOE abandoned its effort to site an MRS sometime roughly between 1991 and 1994?
A Yeah, I think it was probably closer to 1994.
Q And even by February of 1994, RW was doing contingency planning for the possibility that an MRS
04759
might not be sited at all. True?
A I don't recall that, but potentially.
Q Well, let me ask you again about your deposition. And this was a short one. Let me ask you if you recall the following question and giving the following answer. Page 359 if counsel wants to follow.
MS. SULLIVAN: Which day?
MR. SHAPIRO: It's May 2.
BY MR. SHAPIRO:
Q Are you on that page, Mr. Milner?
A Yes, sir.
Q Start on line 5. Do you recall being asked the following question and giving the following answer?
Question: So at least as of February of 1994, OCRWM was concerned about the possibility that

an MRS might not be sited?
Answer: We were certainly doing contingency planning for that, yes.
That was your testimony, Mr. Milner?
A Yes, it was.
Q And that was accurate testimony?
A Yes, at the time.
Q Do you have a different opinion now,
04760
Mr. Milner?
A Well, that was two and a half years ago. I have different recollections than what I did two and a half years ago, but no, that would be accurate.
Q Now, as of December 1994, that -- the end of that year, there was no development work on an interim storage facility, was there, Mr. Milner?
A By that time no, I don't believe so.
Q And DOE has no current plans to site an MRS?
A No.

---

**4776:20 - 4777:23**
**(Witness: Milner, Ronald)**

04776
Q And in your opinion, the department would have looked favorably on exchange requests from shutdown reactors?
A Yes, I think in general terms, I think -- I think we would have. Certainly would have to see the -- the terms of an exchange request but we never
04777
received any.
Q Finally on this topic, Mr. Milner, it's -- in your opinion, just taken in isolation and without other considerations, it would be desirable not to have utilities who have completed decommissioning to have to incur operations and maintenance expenses for 20 years to watch over spent fuel casks on their sites?
A Certainly, I would think that would be desirable.
Q You mentioned a couple times, Mr. Milner, that -- I think it came up in your direct testimony that you don't recall utilities asking about exchanges

of approved delivery commitment schedules. I want to ask you just a few questions about that topic.
First of all, if an exchange request were consistent with the department's transportation capabilities and acceptance capacity for a given delivery year in your opinion, that request would have been approved. True?
A I think so, yeah. Again, you'd have to look at the specifics of a request but yes, I wouldn't see why it would not be.

---