No. 04-106C
(Chief Judge Damich)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.
THE UNITED STATES OF AMERICA,

Defendant.

---

# DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY REGARDING OVERHEAD COSTS

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

April 29, 2008

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. THE COURT HAS THE POWER AND THE DUTY TO GRANT MOTIONS *IN LIMINE* TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. A MOTION *IN LIMINE* IS APPROPRIATE IF A PROPOSED EXPERT'S TESTIMONY IS IRRELEVANT TO THE ISSUES IN A CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. Federal Rule of Evidence 702 Requires That, To Be Admissible, Any Expert Witness Opinions Must Be Both Reliable And Relevant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B. If The Expert's Proffered Opinion Is Reliable, The Court Must Still Determine Whether It Is Relevant, Including Whether It Is Helpful To The Trier Of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. THE LIMITED ANALYSIS THAT DAIRYLAND DIRECTED MR. WILKINS TO PERFORM DOES NOT CONSIDER WHETHER DAIRYLAND WOULD HAVE INCURRED THE SAME OVERHEAD COSTS HAD DOE TIMELY PERFORMED ITS SNF ACCEPTANCE OBLIGATIONS, RENDERING IT IRRELEVANT TO THE CAUSATION ISSUES THAT THIS COURT MUST DECIDE.. . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV. TO THE EXTENT THAT MR. WILKINS IS PERMITTED TO TESTIFY, HIS TESTIMONY SHOULD BE LIMITED TO THOSE MATTERS SPECIFICALLY ADDRESSED IN HIS REPORTS. . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# TABLE OF AUTHORITIES

CASES PAGE(S)

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004). .......... 9

Ancho v. Pentek Corp.,
157 F.3d 512 (7th Cir. 1998). .......... 9

Baskett v. United States,
2 Cl. Ct. 356 (1983). .......... 5

Bourjaily v. United States,
483 U.S. 171 (1987). .......... 6

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970). .......... 9

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993). .......... 6, 7, 8

Dhillon v. Crown Controls, Inc.,
269 F.3d 865 (7th Cir. 2001). .......... 9

Employers Reinsurance Corp. v. Mid-Continent Cas. Co.,
202 F. Supp. 2d 1212 (D. Kan. 2002). .......... 8

Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,
488 F.3d 982 (Fed. Cir. 2007). .......... 13

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005). .......... 9

Joy v. Bell Helicopter Textron, Inc.,
999 F.2d 549 (D.C. Cir. 1993). .......... 6, 7

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999). .......... 6, 7

Lithuanian Commerce Corp. v. Sara Lee Hosiery,
179 F.R.D. 450 (D.N.J. 1998). .......... 6

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Masters v. Hesston Corp.,
291 F.3d 985 (7th Cir. 2002). .......... 6

Myerle v. United States,
33 Ct. Cl. 1 (1897). .......... 9

Northern States Power Co. v. United States,
78 Fed. Cl. 449 (2007),
appeal pending, No. 2008-5037 (Fed. Cir.). .......... 11

Northern States Power Co. v. United States,
79 Fed. Cl. 748 (2007). .......... 11

Otis v. Doctor's Assocs., Inc.,
1998 WL 673595 (N.D. Ill. Sept. 14, 1998). .......... 7

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006)
appeal pending, No. 2007-5076 (Fed. Cir.). .......... 10

Palmerin v. City of Riverside,
794 F.2d 1409 (9th Cir. 1986). .......... 5

Ralston v. Smith & Nephew Richards, Inc.,
275 F.3d 965 (10th Cir. 2001). .......... 6

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005). .......... 7

Sacramento Mun. Util. Dist. v. United States,
70 Fed. Cl. 332 (2006)
appeal pending, No. 2007-5052 (Fed. Cir.).. .......... 10

Saddler v. United States,
287 F.2d 411 (Ct. Cl. 1961). .......... 9

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997).......... 9

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002).......... 6, 7

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Sherbert v. Alcan Aluminum Corp.,
66 F.3d 965 (8th Cir. 1995). .... 8

Summers v. Missouri Pacific R.R. Sys.,
132 F.3d 599 (10th Cir. 1997). .... 8

System Fuels, Inc. v. United States,
78 Fed. Cl. 769 (2007). .... 9

White Mountain Apache Tribe of Az. v. United States,
10 Cl. Ct. 115 (1986). .... 5

STATUTES & RULES

Fed. R. Civ. P. 16. .... 5

R. Ct. Fed. Cl. 16. .... 5

R. Ct. Fed. Cl. 26. .... 13

R. Ct. Fed. Cl. 37. .... 13

MISCELLANEOUS

3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02]. .... 6

# INDEX TO APPENDIX


| DOCUMENT | PAGE |
| --- | --- |
| Expert Witness Report of Charles L. Wilkins. | A.1 |
| Rebuttal Expert Witness Report of Charles L. Wilkins. | A.6 |
| Excerpts of Deposition of Charles L. Wilkins, September 5, 2007. | A.8 |
| Dairyland Witness List. | A.16 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-106C<br>(Chief Judge Damich) |

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE
EXPERT TESTIMONY REGARDING OVERHEAD COSTS

Pursuant to Rule 16 of the Rules of the Court of Federal Claims ("RCFC") and the Court's scheduling order dated February 21, 2008, defendant, the United States, respectfully requests that the Court enter an order excluding the plaintiff's proposed expert testimony regarding overhead costs because the testimony is irrelevant to the issues in this case. Specifically, the testimony regarding overheads from the plaintiff's expert witness, Charles Wilkins, that plaintiff, Dairyland Power Cooperative ("Dairyland"), proposes to present does not address the primary issue relating to whether the requested overhead costs are recoverable: whether the Department of Energy ("DOE") caused Dairyland to incur overhead costs that, absent DOE's partial breach of the Standard Contract at issue in this case, Dairyland otherwise would not have incurred. Because Dairyland has asked Mr. Wilkins to present testimony that does not address this issue, it is irrelevant to the issue of whether Dairyland should recover its claimed overhead costs here and should not burden the trial record.[1]

[1] If Mr. Wilkins is allowed to testify, the Government will present evidence of significant additional deficiencies in his opinion.

## BACKGROUND

Dairyland contends that DOE breached the Standard Contract by failing to commence acceptance of spent nuclear fuel ("SNF") by January 31, 1998, and that, absent DOE's delay, DOE would have removed all of Dairyland's SNF from the LaCrosse Boiling Water Reactor ("LACBWR") by the end of 1998. In addition to claiming costs associated with the operation and maintenance of the LACBWR wet pool from 1998 through 2006, certain insurance costs, the alleged "incremental" costs associated with the removal of the reactor pressure vessel at LACBWR, and costs associated with a third party's investment in Private Fuel Storage, LLC ("PFS"), Dairyland has retained Mr. Wilkins to calculate and apply overhead rates to each of these aspects of Dairyland's damages claim.

Specifically, Mr. Wilkins has calculated two separate overhead rates for Dairyland. The first rate that Mr. Wilkins calculates relates to what he terms "indirect overhead." A.1.[2] Mr. Wilkins opines that service center and operations support costs assigned to the LACBWR indirect cost pool include "only such costs as were required to support LACBWR operations." A.2. According to Mr. Wilkins, examples of these costs centers include office and IT services, human resources, marketing, and generation operations support. A.2. Mr. Wilkins explains that the LACBWR indirect pool costs "benefit only the LACBWR operations." A.3. Mr. Wilkins further opines that these costs contained in the indirect pool costs are properly allocated to LACBWR based upon a "causal/beneficial relationship of such costs incurred to the benefits received by LACBWR." A.2-A.3.

[2] "A. __" refers to the appendix accompanying this motion.

In contrast to the indirect pool costs, Mr. Wilkins also calculates what he terms "general and administrative" ("G&A") overhead, and he explains that the G&A costs were incurred for the general management and administration of the business of Dairyland as a whole, rather than solely LACBWR, "and should be allocated to the total activity of the business unit." A. 3. Mr. Wilkins opines that the G&A rate is "designed to allocate a portion of G&A cost to all final cost objectives" and that the G&A rate is comprised of two components: the base over which G&A costs are to be allocated, excluding G&A costs, and the G&A pool that is to be allocated to all final cost objectives. A.4. Consequently, Mr. Wilkins derived the G&A rate by dividing the base costs into the pool costs. A.4.

Mr. Wilkins acknowledges that Dairyland is not required to prepare, calculate, or record costs related to indirect rates in accordance with the Cost Accounting Standards ("CAS") or the Federal Acquisition Regulations ("FAR"). A.1. Similarly, Mr. Wilkins acknowledges that the Standard Contract between DOE and Dairyland is not governed by the CAS or FAR. A.15. Nevertheless, Mr. Wilkins employs the "techniques and application of the CAS and FAR" to calculate the overhead and G&A rates for each year of Dairyland's operations, from 1999 through 2006, based upon Dairyland's incurred costs for those years. A.1-A.2. Indeed, despite their admitted inapplicability to this case, the FAR and CAS are the "basis under which" Mr. Wilkins constructed the model for calculating the overhead rates and for distributing and allocating the overhead costs. A.15. Mr. Wilkins opines that "these rates are consistent with the costs recorded in Dairyland's general ledger and shown in Dairyland's audited financial statements, and they should be included as an element of costs in calculating total costs incurred for LACBWR operations including any element of such incurred costs that are included as an

element of damages." A.2. Consequently, Mr. Wilkins opines that, to the extent that the Court awards Dairyland damages associated with its "direct" costs, the Court should also award Dairyland approximately $3.02 million in overhead costs and $3.15 million in G&A costs. A.5.

## SUMMARY OF ARGUMENT

As this Court and the United States Court of Appeals for the Federal Circuit have made clear, a plaintiff that is injured as a result of a breach of contract is entitled to recover damages that will place it in the same position, from a monetary standpoint, as it would had no breach occurred. However, the award of damages must not put the plaintiff in a better financial position than it would have been absent the breach. Here, Dairyland has hired an expert witness, Mr. Wilkins, to calculate and apply overhead rates to each of the specific direct cost damages that Dairyland is seeking to recover. However, Dairyland did not direct Mr. Wilkins to conduct an appropriate analysis that would allow him to identify the overhead costs that, absent any delay or partial breach by DOE, Dairyland would have incurred and whether DOE's delay caused Dairyland to incur any additional overhead costs that it would not have incurred absent that delay. Because expectation damages are intended to place the non-breaching party in the same position that it would have occupied absent the breach, and because the analysis that Dairyland asked Mr. Wilkins to perform does not address whether the overhead costs being claimed were the incremental result of DOE's delay, Mr. Wilkins's analysis is simply irrelevant to the causation issue that this Court will have to decide relating to Dairyland's indirect overhead claims and should not be admitted to burden the record in this case.

## ARGUMENT

### I. THE COURT HAS THE POWER AND THE DUTY TO GRANT MOTIONS *IN LIMINE* TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES

This Court has acknowledged that "[a] motion *in limine* is a recognized method under [RCFC] 16 and Fed. R. Civ. P. 16 for obtaining a pretrial order simplifying issues for trial," White Mountain Apache Tribe of Az. v. United States, 10 Cl. Ct. 115, 116 (1986), and "is a useful tool to prevent a party before trial from encumbering the record with irrelevant, immaterial or cumulative matters." Baskett v. United States, 2 Cl. Ct. 356, 367-68 (1983); see Palmerin v. City of Riverside, 794 F.2d 1409, 1413 (9th Cir. 1986) (motion *in limine* is useful to "resolve issues which would otherwise 'clutter up' the trial"). In fact, as this Court has previously acknowledged, the Court has a duty to exercise its power to exclude testimony or evidence in appropriate cases:

> There is no question under [RCFC] 16, that this court, as a trial court, has the power to issue pretrial orders simplifying issues for trial. Not only does this court have such power, it has a duty to exercise it in appropriate cases. This power allows the court, *inter alia*, to define the issues, facts, and theories actually in contention and to weed out extraneous issues. Too, this court also has the authority to issue pretrial rulings concerning the admissibility at trial of proposed testimony and documentary evidence.

Baskett, 2 Cl. Ct. at 359 (emphasis added).

### II. A MOTION *IN LIMINE* IS APPROPRIATE IF A PROPOSED EXPERT'S TESTIMONY IS IRRELEVANT TO THE ISSUES IN A CASE

#### A. Federal Rule of Evidence 702 Requires That, To Be Admissible, Any Expert Witness Opinions Must Be Both Reliable And Relevant

To be admissible, the testimony and opinions of an expert witness must satisfy the requirements of FRE 702 as amended in 2000:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The amended rule affirms the Court's special "gatekeeping obligation" to prevent the introduction of certain expert testimony. Fed. R. Evid. 702 Advisory Committee Note; see, e.g., Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569 (D.C. Cir. 1993); see also 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02] ("[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful"). Specifically, the Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire, in response to which FRE 702 was amended, requires "judges to determine that scientific testimony," as well as technical or other specialized expert testimony, "offered under Federal Rule of Evidence 702 is both relevant and reliable." Masters v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002); see Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002) (court has an obligation to screen expert testimony for both relevance and reliability). Further, the party proposing to introduce expert opinion "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 Advisory Committee Note (citing Bourjaily v. United States, 483 U.S. 171 (1987)); see Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir. 2001) (citing cases); Lithuanian Commerce Corp. v. Sara Lee

Hosiery, 179 F.R.D. 450, 457 (D.N.J. 1998); Otis v. Doctor's Assocs., Inc., 1998 WL 673595, at *4 (N.D. Ill. Sept. 14, 1998).

Further, the Supreme Court has rejected the familiar refrain that it has sufficient safeguards against irrelevant or unreliable expert testimony in the opponent's ability to present its own expert testimony or to cross-examine each other's experts at trial. Daubert, 509 U.S. at 596; see Joy, 999 F.2d at 569 (rejecting "'let it all in' philosophy" of expert testimony). The Supreme Court requires Federal courts to exercise greater care to prevent the admission of unreliable or irrelevant expert opinion because Federal Rules of Evidence 702 and 703 grant expert witnesses "testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." Kumho Tire, 526 U.S. at 138 (quoting Daubert, 509 U.S. at 592).

Further, the United States Court of Appeals for the Federal Circuit has explained that, under the Supreme Court's decision in Daubert, the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). The standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one. Seaboard Lumber Co., 308 F.3d at 1302. The burden of demonstrating Mr. Wilkins' satisfaction of the Daubert standards lies squarely upon Dairyland. Daubert, 509 U.S. at 592 n.10 (citation omitted); Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005).

B. If The Expert's Proffered Opinion Is Reliable, The Court Must Still Determine Whether It Is Relevant, Including Whether It Is Helpful To The Trier Of Fact

Assuming that the expert is qualified to opine on the matter and the methodology used by the expert in reaching his opinion is proven to be reliable, an expert's opinion is still not admissible unless it is relevant:

> Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." The consideration has been aptly described by Judge Becker as one of "fit." "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.

Daubert, 509 U.S. at 590-91 (citations omitted). Thus, whenever expert testimony is offered, the Daubert inquiry must be conducted, including an inquiry into whether the opinion is relevant and "tied to the facts" of a particular "case." Id. at 591.

As part of this relevance inquiry, the Court must determine whether the proffered expert testimony is helpful to the trier of fact. See, e.g., Daubert, 509 U.S. at 591 (helpfulness goes primarily to relevance); Summers v. Missouri Pacific R.R. Sys., 132 F.3d 599, 603 (10th Cir. 1997) ("the second element, helpfulness to the trier of fact, evaluates relevancy"); Employers Reinsurance Corp. v. Mid-Continent Cas. Co., 202 F. Supp. 2d 1212, 1215 (D. Kan. 2002) ("[t]he touchstone of Rule 702 is helpfulness of the expert testimony [to the trier of fact], a condition that goes primarily to relevance"). The opinion of an expert is not "helpful" to the Court and, therefore, is not admissible if it answers a question that the fact-finder could answer without the purported expert opinion. See Sherbert v. Alcan Aluminum Corp., 66 F.3d 965, 967-968 (8th Cir. 1995). "[A]n expert . . . must testify to something more than what is 'obvious to

the layperson' in order to be of any particular assistance to the jury" or the Court. Ancho v. Pentek Corp., 157 F.3d 512, 519 (7th Cir. 1998); see Dhillon v. Crown Controls, Inc., 269 F.3d 865, 871 (7th Cir. 2001) (expert opinion must be more than "common sense").

## III. THE LIMITED ANALYSIS THAT DAIRYLAND DIRECTED MR. WILKINS TO PERFORM DOES NOT CONSIDER WHETHER DAIRYLAND WOULD HAVE INCURRED THE SAME OVERHEAD COSTS HAD DOE TIMELY PERFORMED ITS SNF ACCEPTANCE OBLIGATIONS, RENDERING IT IRRELEVANT TO THE CAUSATION ISSUES THAT THIS COURT MUST DECIDE

As the United States Court of Appeals for the Federal Circuit has held, "[t]he remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citing San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1562 (Fed. Cir. 1997)). Conversely, "[i]t is settled . . . that a [party] is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'" Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v. United States, 287 F.2d 411, 415 (Ct. Cl. 1961)). Further, Dairyland, as the plaintiff in this case, bears the burden of proving each aspect of its damages claim by a preponderance of the evidence. Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004); Myerle v. United States, 33 Ct. Cl. 1, 18 (1897).

This Court has recognized that these principles apply to claims for indirect overhead and has rejected claims to recover such overhead in the SNF cases where the plaintiff failed to demonstrate that the costs resulted from, and were incremental to, DOE's partial breach of the Standard Contract. See System Fuels, Inc. v. United States, 78 Fed. Cl. 769, 798-800 (2007) (rejecting claim for overhead cost pools where plaintiffs failed to meet burden of demonstrating

that these same costs would not have been incurred in the absence of DOE's delay); Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 376-77 (2006) (holding that, although plaintiff may have demonstrated that it incurred overhead costs, plaintiff "failed to meet the burden of demonstrating that such costs, in fact, were incremental"), appeal pending, No. 2007-5052, -5097 (Fed. Cir.).[3]

The Court's decision in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending, No. 2007-5076 (Fed. Cir.), is illustrative of the analysis required of a plaintiff to establish entitlement to overhead. In PG&E, the plaintiff presented the testimony of an expert, Brad Cornell, to opine upon the incremental overhead costs associated with the Government's partial breach of the Standard Contract. Id. at 407-08. Specifically, Professor Cornell analyzed the cost schedules prepared by one of the plaintiff's fact witnesses, Robert Kapus, and "used categories, numbered 1 through 5, to separate costs in Mr. Kapus' cost schedules that he deemed to be marginal to, or caused by, defendant's breach of the Standard Contract (categories 1-3), from those costs he deemed to be unrelated, or not caused by, defendant's breach (categories 4 and 5)." Id. The Court concluded that Professor Cornell's methodology for calculating damages was reliable and reasonably accurate in approximating the plaintiff's alleged damages. Id. at 409.

In contrast to Professor Cornell's methodology in PG&E, Mr. Wilkins simply presumes, without any additional analysis, that all claimed overhead is incremental and, therefore,

---

[3] The plaintiff in SMUD, although it filed a cross-appeal of this Court's judgment with the Federal Circuit, did not appeal the trial court's rejection of its claim regarding overhead.

recoverable as a damage.[4] Applying Mr. Wilkins's opinions, Dairyland would be placed in a significantly better position in the breach world than had DOE performed because it would be able to recover overhead costs in this litigation that Dairyland, even had DOE never breached the Standard Contract, would have incurred anyway. Unfortunately, Dairyland did not direct Mr. Wilkins to conduct any analysis to determine the manner in which Dairyland would have allocated or charged overhead had DOE timely performed or to determine whether Dairyland incurred new and additional overhead costs that would not otherwise have been incurred absent DOE's delay. A.10. Indeed, Mr. Wilkins concedes that Dairyland would have incurred certain overhead costs regardless of DOE's performance. A.11. Yet, when asked how Dairyland was harmed in terms of overhead allocations as a result of DOE's delay, Mr. Wilkins explained that he had not been directed to perform that type of analysis:

> Q. Then how is Dairyland which again is the plaintiff in this case, how is Dairyland harmed by simply reallocating costs from LACBWR to another business unit?
>
> A. Because the – the extent to which Dairyland may have been able to reduce its cost through reductions of staff and others, other – other elements of cost, the extent to which

---

[4] In Northern States Power Co. v. United States, 78 Fed. Cl. 449 (2007), appeal pending, No. 2008-5037, -5041 (Fed. Cir.), the Government made a similar challenge to certain aspects of plaintiff's claimed internal labor and overhead costs. Id. at 468. In the Court's opinion rejecting the Government's arguments, the Court appeared to have focus upon the Government's arguments regarding internal labor, without any specific discussion concerning overhead. Id. The Government subsequently moved for reconsideration regarding, among other issues, the Court's failure to specifically address overheads. In its order denying reconsideration, the Court held that, once it found that the dry storage facility constructed by the plaintiff was caused by DOE's delay in SNF acceptance, the inquiry then turned on whether the claimed overhead was reasonable. Northern States Power Co. v. United States, 79 Fed. Cl. 748, 749-50 (2007). With all due respect, the Court's decision in Northern States is in conflict with the law of this Circuit, which requires a plaintiff to demonstrate that the costs it has incurred are incremental to the alleged breach.

> Dairyland could have redirected its management and supervision to other operations but had to continue to direct them to LACBWR I believe is an impact on Dairyland.
>
> Q. You say may have but you don't know, right, because you haven't done the analysis?
>
> A. No, I haven't done that analysis.

A.12-13 (emphasis added). Mr. Wilkins further acknowledged that he had not been directed to perform any analysis to determine if overhead resources would, in fact, have been used elsewhere within Dairyland had LACBWR ceased to exist after 1998. A.14.

Absent an analysis as to the overhead costs that Dairyland would have incurred absent DOE's delay in SNF acceptance, the limited analysis that Mr. Wilkins was directed to perform provides no helpful information to this Court. Indeed, that limited analysis fails to capture whether these alleged overhead costs are incremental to the breach or, instead, whether the award of such overhead costs would place Dairyland in a better position in the actual world than had DOE performed. Consequently, because the analysis that Dairyland directed Mr. Wilkins to perform is irrelevant to the causation issues that this Court must consider, the trial court record should not be burdened with that irrelevant information.

## IV. TO THE EXTENT THAT MR. WILKINS IS PERMITTED TO TESTIFY, HIS TESTIMONY SHOULD BE LIMITED TO THOSE MATTERS SPECIFICALLY ADDRESSED IN HIS REPORTS

In its witness list provided to the Government on April 18, 2008, Dairyland has identified the scope of Mr. Wilkins testimony as follows: "Mr. Wilkins is a cost accountant who will provide expert testimony on issues related to the damages Dairyland has incurred because of DOE's partial breach of contract. His testimony will address opinions set out in his expert report and in his rebuttal report, as well as matters addressed at his deposition. He may also testify on

other related matters." A.20 (emphasis added). To the extent that the Court permits Mr. Wilkins to testify in this case, the scope of his testimony should be limited to those matters identified in his initial and rebuttal reports.

RCFC 26(a)(2)(B) provides that an expert report shall contain "a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions." RCFC 26(a)(2)(B). Further, RCFC 26(e)(1) provides a duty to supplement an expert report if the party learns that the information contained in the report is either "incomplete or incorrect." RCFC 26(e)(1). Absent "substantial justification," the failure to disclose information pursuant to RCFC 26(a)(2)(B) and 26(e)(1) results in the prohibition from using such testimony at trial. RCFC 37(c)(1). Indeed, the Federal Circuit has held that a trial court does not abuse its discretion in limiting expert testimony to information contained in the expert's report. See Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 994-95 (Fed. Cir. 2007) (affirming limitation of expert testimony to matters raised in expert report even where opposing counsel had opportunity to question expert at deposition on supplemental opinions). Here, to the extent that the Court allows Mr. Wilkins to testify at trial, the scope of his testimony should be limited to those issues expressly identified in his expert report.

CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court exclude Mr. Wilkins' expert report and testimony.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Russell A. Shultis by s/Joshua Gardner
RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

April 29, 2008

# APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | No. 04-106C |
| v. | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, Defendant. | |

**EXPERT WITNESS REPORT OF CHARLES L. WILKINS**

## I. INTRODUCTION

I have been retained by Greenberg Traurig, LLP on behalf of Dairyland Power Cooperative ("Dairyland") in the above-referenced matter to calculate indirect overhead and general & administrative ("G&A") rates to be used in the calculation of costs incurred by Dairyland to maintain its La Crosse Boiling Water Reactor ("LACBWR") nuclear facility for storage of spent nuclear fuel until such time as the spent fuel can be moved to permanent storage provided by the U.S. Government. I understand that Dairyland is not required to prepare, calculate or record costs related to indirect rates in accordance with the regulations applicable to such contracts, mainly the Cost Accounting Standards ("CAS") and Federal Acquisition Regulations ("FAR"). In addition, I understand that Dairyland is not required by the Rural Utility Service ("RUS"), to prepare, calculate or record costs related to indirect rates. Accordingly, the rates prepared and shown in this report employ the techniques and applications of the CAS and FAR, but are not meant nor intended to represent indirect rates that are fully compliant with these regulations. A separate overhead and G&A rate applies to each year of Dairyland's operations included in this analysis, 1999 through 2006.

If additional documentation or information is created or made available to me during the course of this litigation, I may review any such documentation or information and supplement and/or amend this report and/or my opinion(s), as appropriate.

## IV. SUMMARY OF OPINIONS

I have calculated the LACBWR overhead rates and Dairyland's G&A rates for the years 1999 through 2006 based upon Dairyland's incurred costs for those years. My opinions are that these rates are consistent with the costs recorded in Dairyland's general ledger and shown in Dairyland's audited financial statements, and they should be included as an element of costs in calculating total costs incurred for LACBWR operations including any element of such incurred costs that are included as an element of damages. These rates are shown in **Table I** in **Section V** of this report. The application of these rates to Dairyland's claimed costs in this case are shown in **Table II** in **Section V** of this report.

## V. ANALYSIS AND FINDINGS

### A. Dairyland's Incurred Costs Are Consistently Accounted For, Independently Audited And Verified, And Included In Their Annual Statements Of Financial Condition

Dairyland's financial condition is subjected to independent audit. Each year of costs included in Dairyland's financial statements was audited by an independent certified public accounting firm. Although we did not apply audit procedures to these statements, we traced Dairyland's costs from their general ledger to the audited financial statements and confirmed the costs assignable to LACBWR and other cost objectives.

### B. LACBWR Indirect Pool Costs Include A Homogeneous Collection Of Indirect Costs Required To Support LACBWR Operations

Service center and operations support costs assigned to the LACBWR Indirect Cost Pool include only such costs as were required to support LACBWR operations. Service center costs include, but are not limited to, office and IT services, human resources, marketing, and generation operations support based upon a causal/beneficial

relationship of such costs incurred to the benefits received by LACBWR. Unlike indirect costs that support the total operation of Dairyland's business (*i.e.*, G&A costs), LACBWR indirect pool costs benefit only the LACBWR operations and for purposes of this analysis are appropriately grouped into a single, homogeneous indirect cost pool for LACBWR.

### C. The G&A Pool Contains Costs That Are Homogeneous In Nature And Consistently Collected Or Allocated Into A Single G&A Cost Pool

Dairyland is not subject to the CAS.[1] However, the CAS provides definitions of certain costs and cost allocation concepts that are accepted by U.S. Government agencies since it is part of the Federal Acquisition Regulations (FAR) System. Moreover, these definitions as used in the CAS are consistent with the definitions for these same costs and cost allocation concepts as used in cost accounting text books. The CAS describes G&A costs as:

> *"....any management, financial, and other expense which is incurred by or allocated to a business unit and which is for the general management and administration of the business unit as a whole. G&A expense does not include those management expenses whose beneficial or causal relationship to cost objectives can be more directly measured by a base other than a cost input base representing the total activity of a business unit during a cost accounting period."*

A business unit is defined as any segment of an organization, or an entire business organization which is not divided into segments. Dairyland is a business unit. The G&A costs incurred by Dairyland meet the homogeneity test in that they were incurred for the general management and administration of the business as a whole and should be allocated to the total activity of the business unit. Such G&A costs were either incurred and charged to G&A cost accounts or they were incurred and charged to one of several service center cost pools, and further allocated to final cost objectives, LACBWR indirect pool costs or G&A pool costs, based upon a causal-beneficial relationship.

[1] 48 C.F.R. Chapter 1, Part 99.

**D. The Base For Allocation Of G&A Costs Is Total Cost Input**

CAS 410[2] provides the bases by which G&A costs should be allocated within the business unit. The standard states:

> *"The cost input base used to allocate the G&A expense pool shall include all significant elements of that cost input which represent the total activity of the business unit. The cost input base selected to represent the total activity of a business unit during a cost accounting period may be: Total cost input; value-added cost input; or single element cost input. The determination of which cost input base best represents the total activity of a business unit must be judged on the basis of the circumstances of each business unit."*

For Dairyland, the total cost input base is appropriate upon which to allocate G&A costs because that base represents the total activity of Dairyland's business, and G&A costs were incurred for the general management and administration of the business as a whole.

**E. A G&A Rate Reflects The Percent Of G&A Costs That Must Be Added To Each Dollar Of Base Costs To Appropriately Distribute G&A Costs To All Final Cost Objectives**

The G&A rate is designed to allocate a portion of G&A cost to all final cost objectives. Accordingly, the rate is comprised of two components: 1) the base over which G&A costs is to be allocated, which for Dairyland consists of all costs (total cost input, or TCI) excluding G&A costs, and, 2) the G&A pool which is to be allocated to all final cost objectives. The G&A rate is determined by dividing the base costs into the pool costs. Once determined, the rate suggests that for each dollar of base incurred and charged to a final cost objective, an additional amount of G&A determined as the percentage calculated must be added to that final cost objective. The result within any cost accounting period is that the total G&A costs are distributed to all final cost objectives.

[2] FAR 9904.410 Allocation of business unit general and administrative expenses to final cost objectives.

identify the portion of overhead and G&A from Table I that is applicable to these three cost elements. The application of these rates to SAFSTOR costs, PFS capital contributions, insurance costs and RPV removal project marginal costs[10] is calculated and shown in Table II:

**Table II** **$ X 1,000**

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| SAFSTOR | $ 2,838 | $ 2,609 | $ 3,496 | $ 3,808 | $ 4,034 | $ 3,762 | $ 3,828 | $ 4,045 |
| Capital Cont | $ 1,455 | $ 1,670 | $ 1,456 | $ 1,000 | | $ 510 | $ 500 | |
| Insurance | $ 197 | $ 134 | $ 165 | $ 194 | $ 216 | $ 217 | $ 222 | $ 328 |
| RPV Proj. | | | | | | | $ 1,222 | $ 3,818 |
| **Subtotal** | **$ 4,489** | **$ 4,414** | **$ 5,118** | **$ 5,003** | **$ 4,251** | **$ 4,489** | **$ 5,771** | **$ 8,191** |
| OVHD % | 6.9% | 5.0% | 8.2% | 10.1% | 10.0% | 11.1% | 5.3% | 4.2% |
| **OVHD $** | **$ 310** | **$ 221** | **$ 420** | **$ 505** | **$ 425** | **$ 498** | **$ 306** | **$ 344** |
| G&A % | 13.4% | 6.4% | 7.3% | 6.9% | 6.4% | 5.4% | 6.2% | 5.7% |
| **G&A $** | **$ 643** | **$ 297** | **$ 404** | **$ 380** | **$ 299** | **$ 269** | **$ 377** | **$ 486** |

## VII. COMPENSATION

FTI is being compensated for my time at a rate of $550 per hour.

[10] Todd Smith's total estimated RPV removal project marginal costs of $6,809,457 represent costs over the 2005 through 2007 time period. For overhead and G&A rate application purposes for the years 2005 and 2006, I have prorated this total amount based upon actual incurred costs for the RPV removal/disposal project (P7802) in 2005 and 2006. As a result, only $5,040,062 of the $6,809,457 is reflected in Table II. *See* Schedule D.2 for Rate Model Years 2005 & 2006.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**REBUTTAL EXPERT WITNESS REPORT OF CHARLES L. WILKINS**

## I. BACKGROUND

On March 23, 2007, I submitted an expert report that calculated Dairyland's historical indirect overhead and general and administrative ("G&A") rates to be used in the calculation of costs that have been incurred by Dairyland to maintain its LaCrosse Boiling Water Reactor ("LACBWR") nuclear facility for storage of spent nuclear fuel as a result of the government's partial breach of its Standard Contract with Dairyland. The results of my calculations are set forth in Tables I and II of my March 23 report. The government has engaged R. Larry Johnson of Veris Consulting, LLC to opine on Dairyland's damages claim in his case, including its claimed overhead and G&A costs. In his June 15, 2007 expert report (the "Johnson Report"), Mr. Johnson, among other things, asserts that Dairyland should not be allowed to recover any indirect overhead or G&A costs because, in his opinion, such costs are not "incremental" to the government's partial breach. Mr. Johnson further asserts that Dairyland's indirect overhead and G&A

the direct labor employed. In a non-breach environment where the government would have removed all of Dairyland's spent fuel, these indirect costs would have been avoided as an incremental cost to LACBWR due to the reduction of LACBWR employees and, accordingly, would have reduced the indirect overhead pool allocation. Such cost avoidance was not possible in the partial breach environment, thus making such costs incremental to LACBWR operations.

5. Similarly, had the government performed, no allocation of G&A resources to the LACBWR breach-related activities (*e.g.*, SAFSTOR costs) would have been required and corporate management and administration could have devoted their time and resources to other Dairyland divisions and non-breach related activities. For example, instead of devoting their time and attention to LACBWR operations and maintenance during the breach period, Dairyland's Vice President of Generation, Charles Sans Crainte, and other corporate management would have been able to devote more of their time and attention to other power generation sites and to the company's transmission and power delivery efforts. In other words, but for the government's breach, G&A resources would not have been diluted by the executive and overall organization efforts that had to be devoted to LACBWR operations. Accordingly, to the extent that Dairyland has incurred increased direct costs due to the government's partial breach, it has also incurred incremental G&A costs due to the breach.

6. Contrary to Mr. Johnson's assertion, the fact that Dairyland would still have a CEO, a corporate headquarters, a cafeteria and other G&A type functions and related costs in the "non-breach" world does not mean that such indirect allocated costs are not "incremental" to the government's partial breach. Under fundamental cost

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Case No. 04-106C (Chief Judge Damich)

DAIRYLAND POWER COOPERATIVE, )
Plaintiff, )
v. )
UNITED STATES, )
Defendant. )
)

DEPOSITION OF CHARLES WILKINS

September 5, 2007

Washington, D.C.

Reported by: Mary Ann Payonk, CRR-RDR
Certified Realtime Reporter
Job No. 2007-10

Deposition of CHARLES WILKINS held at:

US Department of Justice
1100 L Street, Northwest
Washington, DC 20006

Pursuant to Notice before Mary Ann Payonk, CRR-RDR, Certified Realtime Reporter and notary public.

***



WITNESSES

| WITNESS | PAGE |
|---|---|
| Charles Wilkins | |
| Examination by Mr. Gardner | 5 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Wilkins Rebuttal Expert Report | 5 |
| 2 | Wilkins initial report | 16 |
| 3 | E-mail dated February 22, 2007 | 53 |
| 4 | Printout from accountingglossary.net | 106 |
| 5 | Document with definitions | 134 |
| 6 | Portions of backup for Wilkins report | 163 |
| 7 | Schedule of Summaries A through E1 | 202 |

***



APPEARANCES

ON BEHALF OF PLAINTIFF:
KEVIN E. STERN, ESQUIRE
GREENBERG TRAURIG
800 Connecticut Ave., N.W.
Suite 500
Washington, DC 20006
(202) 452-4878

ON BEHALF OF DEFENDANT:
JOSHUA E. GARDNER, ESQUIRE
Trial Attorney - Commercial Litigation Branch
US Department of Justice
1100 L Street, N.W.
Washington, DC 20530
(202) 305-7571

***



PROCEEDINGS
CHARLES WILKINS
was sworn and testified as follows:
EXAMINATION
BY MR. GARDNER:

**Q Good morning, Mr. Wilkins. We met a few minutes ago. My name is Josh Gardner. I represent the United States in the Dairyland versus United States case. Obviously, I know you've had your deposition taken many, many occasions. All I ask is that you answer questions verbally. If you don't understand a question, I'd just ask you to ask me to rephrase it. I'm more than happy to do that.**

**If you ever need a break for any reason, do not hesitate. Ask. The only request I have is if there's a question pending, if you could answer the question, then we can recess immediately. Is that acceptable?**

A Yes.

**Q Great. Is there any reason, Mr. Wilkins, you can't answer questions today truthfully, honestly and accurately?**

A No.

**Q Okay.**

(Exhibit No. 1 was marked.)

recognized in -- in at least two categories. One is the incurrence of them and one is the assignment of them. And what I'm saying is had there been performance, there could be the effect of two things. One is the lack of incurrence and/or the lack of assignability.

**Q Have you done any analysis into this case to determine whether had LACBWR gone away in 1998 whether there would have been a lack of incurrence of the overhead costs that you've calculated?**

MR. STERN: Objection, vague.

A I haven't done an analysis to see what decisions Dairyland may have made had there been performance on the part of the government.

**Q Okay. So the answer is no, you don't -- you haven't done the analysis to determine whether or not, absent the existence of LACBWR, whether there would have been a lack of incurrence of the overhead that you've calculated; is that right?**

A That's right. I have not.

MR. STERN: Objection.

**Q Same question with respect to G and A. Have you done any analysis to determine, absent LACBWR, whether the G and A costs you've calculated would not have been incurred?**



A I have not.

**Q Okay. Now let's talk about assignments. Have you done any analysis in this case to determine how the assignment of costs for overhead would have been different without the existence of LACBWR?**

MR. STERN: I want to make an objection right now on the record that this seems to be plowing over his original report, which is not the purpose of this deposition. And I'm going to allow him to answer these questions, but at some point there's going to be a limit on that. You had an opportunity to depose him for seven hours previously, and it's not -- this is not the opportunity to ask questions that should have been appropriately asked the first time around.

MR. GARDNER: And just for the record, since we're making a record, Mr. Wilkins is offering an opinion now apparently that certain cost allocations are incremental, and now I'm going to investigate further what he means.

**Q So, Mr. Wilkins, that said, G and A costs, have you done any analysis in this case to determine whether the assignment of G and A costs would have been different in the absence of -- or the nonexistence, I should say, of LACBWR after 1998?**

A No.



**Q Okay. Same question with overheads. Have you done any analysis in this case to determine whether the assignment of overhead costs would -- or, yeah, the assignment of overhead costs would have been different in the absence of LACBWR?**

A No.

**Q Okay.**

A And there's a reason for that.

**Q Okay. What's the reason?**

A Because it's kind of like your hypothetical. When -- when -- if you -- if you go back to the beginning of -- the beginning period of when Dairyland is asserting damages in 1999 --

**Q Uh-huh.**

A -- one would have to take a look at what the business environment was like in 1999 and one would have to make some assumptions about what Dairyland -- what decisions Dairyland would make in 1999 had the government performed.

Among the decisions that could have been made would have been the reduction of forces of people. It could have been the reduction of facilities and space. They could have been reassignment of people to other business ventures of Dairyland that existed at the time. They could have



been additional and new business ventures coming into Dairyland, all of which could have had a fairly substantial change or impact on the distribution of costs.

**Q Now --**

MR. STERN: Did you finish your answer?

THE WITNESS: Yes.

**Q Did you have access to individual employees at Dairyland while you were preparing your initial report and your rebuttal report?**

A Yes.

MR. STERN: Objection, vague.

**Q Did you ever ask any Dairyland employees whether or not there would have been a reduction in force had LACBWR shut down in 1999?**

A No. We were in 2006 so it was -- you know, to ask them, would you have done this in 1999, I don't know that, number one, it was a relevant question. But, number two, I don't know that anybody could have answered it at that point.

**Q Now, we spoke a few minutes ago about the whole damages construct for expectation damages being the difference between the actual world and a world in which there was performance; correct?**

A Yes.

A It's -- it's -- it's my opinion that had the direct costs that were incurred to keep the LACBWR operations alive from 1999 through 2006, the period of this report, there would have been no basis for indirect costs or G and A to be allocated to LACBWR.

**Q Okay. Now that's my question. You say there's no basis to allocate the costs of LACBWR. Do you have any views as to whether Dairyland would still have incurred those costs but simply just been allocated to different entities?**

A That's back to what we were talking about earlier, the decisions that may have been made had the government performed. Some of those costs probably would have been incurred. In fact, I think as we sit here today, we know that definitely some of those costs would have been incurred, but --

**Q Is -- I'm sorry.**

A -- but -- but there is a possibility, I -- I won't say highly or -- or -- or not highly, but there's the possibility some of those costs, both indirect and G and A, would not have been incurred.

**Q You say that some of those costs -- I think you used the word definitely would have been incurred. Which costs definitely would have been incurred?**



A Number one, I didn't use the word "definitely," but --

**Q Certainly, I think you used some definitive term.**

A I said it is -- yes, there are certain costs that, for example, certain facilities costs. I mean, it's not likely they're going to walk away from the facility and just leave people out in the cold. There's certain costs for executives and others in the management sector of the company that would continue to be incurred.

I don't have a complete list of all those costs as we sit here today, but I think for those of us who deal in the cost world, we kind of know what costs would or would not be incurred.

**Q Sure. Of course. So I guess my question is if the damages construct articulated by the Federal Circuit for expectation damages measures the incremental difference between an actual world and a but-for world. And you're telling me many of those allocations, or some of those allocations at least would have been incurred. Even had there been performance, why then is it appropriate to assign those costs against the government?**

MR. STERN: Objection, mischaracterizes



the record and the standard articulated by the Federal Circuit.

A Yeah, because I -- I -- I think you -- you may be confusing incurred and allocated.

**Q I'm talking about just incurred here, not talking about allocated. We'll talk about allocated --**

A I think if you read the statement back, you will used the term "allocated." And I want to be sure we're both clear here that incurred is one thing and allocated is something else.

**Q Okay.**

A What -- what --

**Q Okay. So explain to me, then, the fact that a cost would necessarily be reallocated. Let's say there's no LACBWR, so that allocation gets put into the transmission business unit. The costs are still being incurred, they're just not being allocated to LACBWR, right, under my hypothetical?**

MR. STERN: Objection, vague.

A What's your hypothetical?

**Q My hypothetical is that you have an overhead allocation. There's no LACBWR anymore. It's 2000, and under plaintiff's postulated but-for world, LACBWR goes away at the end of 1998. So that**



**allocation that would have gone to LACBWR now goes to another business unit. Let's say transmission. Those costs are still being incurred by Dairyland under my hypothetical; correct?**

A Yes.

**Q They're simply being reallocated to other business units?**

A Yes.

**Q Now, under that hypothetical, to award damages based upon the reallocation of costs, doesn't that place Dairyland in a better position in the actual world than it would have occupied had there been performance?**

MR. STERN: Objection, vague, go ahead.

A In that hypothetical there are no damages to Dairyland because you just said there are no -- the government has performed. By the end of 1998, there are no direct costs; therefore, there are no indirect costs to be allocated. There's no causal/beneficial relationship between the direct costs that are now not being incurred by Dairyland because the government performed and the support costs that are required to manage those direct costs. So there is no allocation to Dairyland. There are no damages.

**Q Okay. Now let's do hypothetical 2.**

**at the allocation that Dairyland uses is, in fact, how Dairyland actually allocates costs to its different business units?**
A That's my understanding.
Q **Okay. Now, you said that you believed that your views about the recoverability of indirect and G and A is consistent with expectation damages because it's your view that had the government performed, there would be no direct costs and therefore no allocation of the overhead to LACBWR. Is that right?**
A I believe that's right, yeah.
Q **Okay. And you talked about allocation, but what about the incurrence of the actual costs? Would Dairyland have incurred the same cost from those cost pools that are being allocated in the absence of DOE's delay?**
MR. STERN: Objection, asked and answered.
A We're looking back to what we talked about earlier.
Q **We are.**
A And it -- it's anybody's guess. They may have incurred more cost or less, depending upon decisions that were made at the time. And, you know, decisions could have been made every year from 1998,



the end of 1998 through 2006 that could have impacted any year.
Q **Do you know who's actually brought the lawsuit in this case, Dairyland or LACBWR?**
A I don't know.
Q **Well, let's take a look at your -- the title of your report. I think it probably pretty much says it. Right? Yeah, let's just take a look at the case caption here on Exhibit 1. It's Dairyland Power Cooperative versus the United States; correct?**
A Yes.
Q **All right. And you have no opinion whether or not Dairyland, the company who's suing the government, would have incurred more or less costs that are the basis for your allocations had DOE performed; correct?**
MR. STERN: Objection, vague.
A Yeah, I mean, I can't say whether for the reasons that we just talked about whether -- whether the decisions that would have been made by Dairyland after 1998 had the government performed would have been -- would have resulted in more or less costs being incurred by Dairyland.
Q **But if expectation damages, as you and I have discussed, are the measure of the difference**



**between the actual and the but-for world, and you don't know what those costs would have been in the but-for world, how are your opinions consistent with the measure of expectation damages?**
MR. STERN: Objection, vague.
A Because the -- the presumption and I believe the expectation would have been that had the government performed, Dairyland would not have had to incur direct costs in its LACBWR -- in its LACBWR operations. Those costs would have been zero and therefore, there would be no need and no basis to allocate any indirect costs, overhead or G and A, to LACBWR.
Q **But if Dairyland is the party that's claiming damages in this case, and we can accept that as a predicate -- correct?**
A According to the case caption, yes.
Q **According to the case caption. How has Dairyland incurred any costs in the actual world that it would have avoided had DOE performed absent any knowledge as to whether the -- the cost pools would have looked any different?**
A Well, I mean, understand LACBWR is a subset of Dairyland.
Q **Uh-huh.**



A And so if the government had performed, Dairyland would not have incurred any costs in its -- any direct costs in its LACBWR operations and therefore, those costs, the -- the fact that they incurred costs in their LACBWR operations I believe are incremental costs.
Q **But you don't know whether those allocations would have simply been reallocated to other business units had DOE performed; correct?**
A Well, what I -- my response that I just gave you was dealing with direct costs.
Q **And -- but your opinion deals with overhead and G and A, which are by definition indirect costs?**
A And my opinion about that is that to the extent they incurred direct costs, they should get a fair share of indirect costs.
Q **Even if they would have, Dairyland would have incurred those same costs, but with different allocations?**
A They would have been distributed differently had there not been any incurred direct costs in LACBWR.
Q **Then how is Dairyland -- ~~which~~, again, is the plaintiff in this case -- how is Dairyland harmed**

**by simply reallocating costs from LACBWR to another business unit?**

A Because the -- the extent to which Dairyland may have been able to reduce its cost through reductions of staff and others, other -- other elements of cost, the extent to which Dairyland could have redirected its management and supervision to other operations but had to continue to direct them to LACBWR I believe is an impact to Dairyland.

**Q You say may have, but you don't know, right, because you haven't done that analysis?**

A No, I haven't done that analysis.

**Q Okay. If the pools -- let's do another hypothetical. I know you hate the hypotheticals, but we will go at it one more time.**

A Okay.

**Q If those cost pools would not have changed between the but-for and the actual world so the same pools -- no one's getting laid off, Doris the lunch lady's staying put, not buying any more or less mashed potatoes for the cafeteria, those pools are staying the same but the allocations are different, how is Dairyland harmed?**

A Once again, if those -- if -- if the mashed potatoes hadn't changed and there were no



people assigned to LACBWR, that means that there were people -- there -- it probably means that there were people that would have been perhaps a new venture, a new revenue generation venture. There would have been people then reassigned. And again, it deals with the fact that if -- if the LACBWR operations were not required to be continued, those costs would have been allocated differently. Those indirect costs would have been allocated differently.

Some of the people who were assigned to LACBWR may have been assigned to new business ventures in, in which case those costs would have gone to different ventures. They would not have gone to LACBWR.

**Q But under my hypothetical where the pool remains the same, how is Dairyland economically injured? Aren't they in the exact same position in both worlds if the pools of costs remain the same?**

A I don't believe they are.

**Q And again, try to explain to me one more time, because maybe I'm a little thick here. If the pools aren't changing, so Dairyland is incurring the same cost pools, how is Dairyland in a worse position as a result of DOE's delay?**

A See, the -- the scenario that you're



painting in your hypothetical -- and this is why I don't like hypotheticals -- is you're saying if the pool stays exactly the same, but you're also saying that there are no LACBWR operations --

**Q Yes.**

A -- then by definition, there are no damages for LACBWR because there is no direct cost in LACBWR and there is no indirect costs going to LACBWR. That's why your hypothetical doesn't make sense and why I don't like to deal with hypotheticals.

**Q Well, we can respectfully disagree, because I think my hypothetical makes quite a bit of sense. What I'm asking you is if the pool of costs remains the same with or without LACBWR and simply the only difference between the two worlds is costs from that pool are being allocated differently, where is the increased expense for Dairyland in the breach world?**

A This is why your hypothetical does not make sense, because if LACBWR goes away, one of two things happen. The pool will probably be reduced because there wouldn't be a requirement for the kind of ongoing support. If -- if the business base over which that -- those pools of services are being allocated is diminished, then there's a -- there's a



about potential for cost reduction by -- by Dairyland. If there's cost reduction that could have been achieved but didn't -- wasn't achieved because LACBWR operations continued, I believe that's an impact on Dairyland.

Now go a step further and say if LACBWR operations were discontinued and the pool stays the same, meaning that Dairyland has reassigned those staff, those people elsewhere, there are no damages.

**Q Okay. That's all I need to know. That was a very simple answer. Took a lot of work, but thank you.**

A That doesn't deal with your hypothetical, though.

**Q But it does. Again, you've done no analysis to determine whether the pools would have looked any different had there been performance; correct?**

A Right.

**Q Okay.**

A There are a lot of assumptions that need to be made to do that.

**Q And you could make those assumptions; right?**

A Well, someone could make them. But again,

should share in their portion of indirect and G and A.

**Q And that's just -- well, let me back up. So even if the allocations were different but the cost service centers, the service center costs would be identical between the two worlds, is it your view that Dairyland's been economically harmed in that situation?**

A Yes.

**Q Okay. How has Dairyland been harmed if -- simply if the service center costs remain the same between the two worlds, but simply allocating them differently?**

A The concept of causal/beneficial relationship says that if those costs that were incurred and allocated to LACBWR could have been either used elsewhere or could have been reduced, I believe there was an impact to Dairyland as a result of the government not performing.

**Q Have you done any analysis to see whether or not those resources could have been used elsewhere?**

MR. STERN: Objection, asked and answered.

A No. We have gone through that umpteen times.

**Q A little different question.**

A I don't see it as that.



MR. STERN: Objection, asked and answered.

**Q Have you done any analysis to see whether these resources could have been used elsewhere?**

A Again, it goes back to the whole decision process that would have been made back in 1999, 2000, 2001, all the way through by Dairyland --

**Q So the answer is no?**

A -- by Dairyland people. I have not done the analysis.

**Q On page 2 of your rebuttal report, that's Exhibit 1, under the summary of rebuttal opinions, you state in the first sentence that: It is my opinion that Dairyland's claimed overhead and G and A costs assigned to LACBWR operations are incremental to the government's partial breach and that they would not have been incurred by Dairyland or its G and A resources would have been utilized elsewhere had the government performed under its contract with Dairyland. Do you see that?**

A Yes.

**Q Now, I had a real fundamental question. Do you know if LACBWR actually receives allocations of overhead as a factual matter?**

A When you say "allocations of overhead," what -- what -- I don't understand what you mean.



**Q I mean in the ordinary course of business, in the actual world, does Dairyland, in fact, receive -- or does LACBWR, in fact, receive allocations of overhead?**

A Well, there are -- I testified earlier that Dairyland accounting does calculations of the basis for how overhead costs, these service support centers that I talked about, would be allocated. And we reviewed those. And in most cases, I think I said earlier I think there was one that we questioned, and I'm not sure as I sit here right now whether we said, okay, it appears reasonable. They go through those calculations for purposes of distributing costs to final cost objectives, LACBWR being one of them.

**Q You say that -- you're talking about the accounting, Dairyland's accounting shows it would be allocated. Are you talking about the cost business model or the core business model?**

A I think they use what I'm referring to as part of the core business model.

**Q Okay. Do you know what the purpose of the core business model is?**

A I -- I don't know that I know enough about it to say specifically what it's for. I assume that it has to do with identifying costs for rate purposes.



**Q You assume that, but you don't know?**

A I don't know that, yes.

**Q Okay. And is it your understanding, just so we're on the same page here, that the core business model is used to determine the actual allocations of overhead to the different business units at Dairyland?**

A I don't know that I would opine on that one way or the other because I didn't study the core business model in terms of its usage.

**Q Okay. Are you relying upon the core business model to determine how costs are actually allocated to Dairyland, or to LACBWR?**

A No. We did our own an analysis. However, there were portions of some of the allocation concepts that they use in the core business model that we looked at and relied on after determining whether they were reasonable or not.

**Q All right. I just want to go back to an initial question I had. Do you know if, as a matter of fact, LACBWR actually receives allocation of overhead?**

MR. STERN: Objection, vague.

A Well, and again, I -- you know, I -- what I've -- what I've testified to is that I've seen evidence of costs being identified to LACBWR through

**Q Now, on page 4 -- we really are moving here, I promise. Paragraph 3, you refer to my favorite, the FAR cost principles. Do you see that, the Federal Acquisition Regulations?**
A Yes, I see.
**Q Is this one of the sources that you're relying upon for your opinion that the allocation of overhead and G and A to LACBWR is a -- represents an incremental cost?**
A No, not that it represents an incremental cost. It's -- it's -- FAR and CAS were used -- you know, my interpretation of FAR and CAS were used primarily for purposes of how we came up with the cost structures and the cost pools and the allocation process.
**Q Okay. And you're aware, I presume, that the FAR has no application in the standard contract.**
A Yes, and I say that in the first report.
**Q I understand. I just want to make sure. And the CAS also has no application to the standard contract; correct?**
A Yes. And I say that in the first report.
**Q I know you do. Just making sure. So given that the FAR and CAS do not apply in the context of the standard contract, I'm a little confused as to**



**how you are using the FAR and the CAS in this context. If you could just explain that to me, I'd appreciate it.**
A Even though they don't apply to the standard contract, they are a body of -- of rules and cost concepts that many, many people, those involved in any activity related to the federal government, understand, and they are the basis under which I constructed the model for calculating the rates and for doing the cost distribution and allocation.
**Q Now, I've obviously looked through a bit of your background. You've represented nongovernment entities in the past, correct?**
A Yes.
**Q Of course. And you've been involved in litigation between two private parties; correct?**
A Yes.
**Q Involving breaches of contract?**
A Correct, yes.
**Q And cost accounting; right?**
A Yes.
**Q When you do that in the context of a private dispute, do you also apply the FAR and the CAS?**
A In many cases, yes. It depends on the --



the nature of the dispute and whether a government contract is involved or not.
**Q Now, and I'm assuming there is no government contract, so it's a purely private dispute between two parties, two commercial parties. Under that context, would you apply the FAR and the CAS?**
A Yes, in many cases, yes.
**Q Why would you apply the FAR and a CAS in a purely private dispute?**
A Because even though it's a purely private issue, many of the companies involved in those issues have their accounting system set up in accordance with FAR and CAS.
**Q So what you're saying, for example, is a government contractor gets into a dispute with one of its suppliers because the government contractor already complies with the FAR anyway because it does government work. That's why you expect to use the FAR and the CAS; right?**
A That's right.
**Q I see what you're saying. Okay. Now, Dairyland's not a government contractor, are they?**
A Not in the definition of I think you and I would say a government contractor.
**Q Okay. And Dairyland obviously doesn't**



**comply with the FAR and the CAS, do they?**
A No. And I say that in the initial report.
**Q No, I'm just making sure we're on the same page here. In this same paragraph, paragraph 3, page 4, you say "pursuant to fundamental cost accounting principles." Do you see that?**
A Yes.
**Q Are fundamental cost accounting principles the basis for your opinion that the G and A and the overhead constitute incremental costs to Dairyland?**
A They have to do with the way the costs get pooled and allocated.
**Q Because you're offering an opinion that that allocation is appropriate for inclusion as damages. To the extent direct costs are proper for inclusion as damages, it's fair to say you're relying upon fundamental cost accounting principles for the basis for your determination that these are properly includable costs; correct?**
A The indirects.
**Q Yeah, the indirect.**
A Yeah.
**Q And what specific cost accounting principle are you relying upon for that accounting?**
A I talked about two of them here, the FAR

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | ) | No. 04-0106C (Chief Judge Damich) |

DAIRYLAND'S WITNESS LIST

Pursuant to the Court's Trial Preparation Order of February 21, 2008, Dairyland provides the following witness list:

1. Lake E. Barrett. 7805 Potters Mill Court, Derwood, Maryland 20855 (301) 519-8636. Mr. Barrett is a former Deputy Director and Acting Director of the Office of Civilian Radioactive Waste Management ("OCRWM") within the U.S. Department of Energy ("DOE") and he has been a consultant to Dairyland. Mr. Barrett may testify regarding the history of DOE's planning to accept spent fuel from utilities, a reasonable rate and schedule for DOE's acceptance of spent fuel from utilities and DOE's plans and expectations for exchanges amongst utilities of spent fuel acceptance allocations. One half hour of direct examination

2. John W. Bartlett. 1300 Crystal Drive, Arlington, Virginia 22202, (703) 415-4541. Dr. Bartlett, who is a former Director of OCRWM, will testify regarding the objectives and planning for and operation of DOE's commercial spent fuel acceptance and disposition program. He will also testify about his other work on matters related to

spent fuel management, including DOE's spent fuel program. Dr. Bartlett may also testify regarding other related matters. One and a half hours of direct examination.

3. Michael A. Brasel. DPC[1] (608) 689-4220. Mr. Brasel is an engineer with Dairyland. He was the project manager for the removal of the La Crosse Boiling Water Reactor ("LACBWR") reactor pressure vessel ("RPV"), and he is the project manager for Dairyland's on-site dry storage project. Mr. Brasel will testify regarding these projects and his support of Dairyland expert Todd Smith. Mr. Brasel may also testify about other related matters. His testimony may include hybrid fact-expert testimony. One hour of direct examination.

4. Robert M. Brimer. 1218 Redwood Street, Onalaska, Wisconsin 54650 (608) 783-7497. Mr. Brimer is a former director of generation support services at Dairyland. He may testify regarding Dairyland's investigation of exchanging approved delivery commitment schedules. Mr. Brimer may also testify about other related matters. One half hour of direct examination.

5. Roger E. Christians. LACBWR[2] (608) 689-4216. Mr. Christians is the plant manager at LACBWR. Mr. Christians will testify about the layout of LACBGWR and the personnel, activities and costs associated with storage of spent fuel in the LACBWR spent fuel pool. He will also testify about the removal of LACBWR's RPV and its on-site dry storage project. Mr. Christians also may testify about other related matters. His testimony may include hybrid fact-expert testimony. One and a half hours of direct examination.

---

[1] This abbreviation is being used to note individuals located at Dairyland's administrative offices. The address there is 3200 East Avenue South, La Crosse, Wisconsin 54602.
[2] This abbreviation is being used to note individuals located at LACBWR. The address there is 4601 State Road 35, Genoa, Wisconsin 54632.

6. Frank C. Graves. 44 Brattle Street, Cambridge, Massachusetts 02138, (617) 864-7900. Mr. Graves is an expert in economics and the electric utility industry. Mr. Graves' testimony will address opinions described in his expert witness report and his rebuttal expert witness report, as well as matters addressed at his depositions. He may also testify on other related matters. Three and a half hours of direct examination.

7. Christopher Kouts. DOE.[3] Mr. Kouts is an official with OCRWM. Dairyland may call Mr. Kouts to testify regarding the history of DOE's planning to accept spent fuel from utilities, a reasonable rate and schedule for DOE's acceptance of spent fuel from utilities and DOE's plans and expectations for exchanges amongst utilities of spent fuel acceptance allocations. One half hour of direct examination.

8. Loring E. Mills. 132 Eareckson Lane, Stevensville, Maryland 21666, (410) 643-1244. Mr. Mills worked at the Edison Electric Institute ("EEI"), a utility trade association, from 1976 to 1993. Mr. Mills was a vice president of EEI from 1982 to 1993. Mr. Mills will testify concerning the background leading to the enactment of the Nuclear Waste Policy Act of 1982 and the development of the parties' contract. Mr. Mills will testify about the understandings and intentions of the contracting utilities regarding the pace and schedule of spent fuel acceptance. Mr. Mills also may testify about other related matters. Two hours of direct examination.

9. John D. Parkyn. DPC (608) 787-1236. Mr. Parkyn is a manager of special projects at Dairyland and Chairman of Private Fuel Storage ("PFS"). Mr. Parkyn will testify regarding LACBWR's history, Dairyland's contract with DOE, consideration of exchanges of approved delivery commitment schedules and the history and

[3] This abbreviation refers to individuals at the U.S. Department of Energy. The address there is 1000 Independence Avenue, SW, Washington, DC 20585.

Dairyland's participation in PFS. He also may testify about other related matters. His testimony may include hybrid fact-expert testimony. One hour of direct examination.

10. Thomas Pollog. DOE. Mr. Pollog is an official with OCRWM. Dairyland may call Mr. Pollog to testify regarding the history of DOE's planning to accept spent fuel from utilities, a reasonable rate and schedule for DOE's acceptance of spent fuel from utilities and DOE's plans and expectations for exchanges amongst utilities of spent fuel acceptance allocations. One half hour of direct examination.

11. Seymour J. Raffety. LACBWR (608) 689-4222. Dr. Raffety is an engineer at LACBWR. Dr. Raffety may testify regarding the condition of LACBWR's spent nuclear fuel and the administration of Dairyland's contract with DOE. Dr. Raffety may also testify about other related matters. One half hour of direct examination.

12. Charles V. Sans Crainte. DPC (608) 787-1233. Mr. Sans Crainte is vice president of generation for Dairyland. Mr. Sans Crainte will testify about Dairyland's structure, its participation in PFS, the timing of the removal of the LACBWR RPV and its on-site dry storage project. Mr. Sans Crainte may also testify about other related matters. Two hours of direct examination.

13. Todd D. Smith. 79 Aviator Place, Oakland, Maine 04963 (860) 573-5254. Mr. Smith is an expert in the costs of decommissioning nuclear facilities. His testimony will address opinions set out in his expert report, as well as matters addressed at his depositions. He may also testify on other related matters. One and a half hours of direct examination.

14. Ivan F. Stuart. 500 Ocean Drive, Apt. E, Juno Beach, Florida 33408, (561) 691-4696. Mr. Stuart will testify about spent fuel container systems and technologies. In addition, Mr. Stuart will testify as an expert concerning the technical

feasibility of a spent fuel acceptance rate by DOE of 3,000 MTU/yr. Mr. Stuart will also explain the advantages of using acceptance campaigns, and the feasibility of implementation swaps of slots, for spent fuel acceptance. He will further explain that no site or spent fuel specific conditions would have prevented DOE from efficiently accepting spent fuel from Dairyland. Mr. Stuart's testimony will address opinions described in his expert witness report, as well as matters addressed at his deposition. Mr. Stuart may also testify about other related matters. Two hours of direct examination.

15. Keith A. Stubbendick. DPC (608) 787-1245. Mr. Stubbendick is director of accounting at Dairyland. He will testify about the costs Dairyland has incurred because of DOE's partial breach of contract. He will also testify about Dairyland's accounting system and accounting for costs of management and storage of spent fuel, the removal of the LACBWR RPV and the costs of Dairyland's participation in PFS. Mr. Stubbendick may also testify about other related matters. His testimony may include hybrid fact-expert testimony. One and a half hours of direct examination.

16. Charles Wilkins. 2001 M Street, NW, Washington, DC 20036, (202) 285-6967. Mr. Wilkins is a cost accountant who will provide expert testimony on issues related to the damages Dairyland has incurred because of DOE's partial breach of contract. His testimony will address opinions set out in his expert report and in his rebuttal report, as well as matters addressed at his depositions. He may also testify on other related matters. Two hours of direct examination.

17. David K. Zabransky. DOE. Mr. Zabransky is an official with OCRWM. Dairyland may call Mr. Zabransky to testify regarding the history of DOE's planning to accept spent fuel from utilities, a reasonable rate and schedule for DOE's acceptance of

spent fuel from utilities and DOE's plans and expectations for exchanges amongst utilities of spent fuel acceptance allocations. One half hour of direct examination.

Dairyland may also call other witnesses identified on the government's witness list.

Respectfully submitted,

April 18, 2008

JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

Certificate of Service

I certify that the foregoing Witness List was served by hand on the following on April 18, 2008:

Russell A. Shultis
Trial Attorney
Commercial Litigation Branch
Federal Claims Section 1100 L Street, NW
Washington, D.C. 2053

Robert L. Shapiro

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 29th day of April, 2008, a copy of the foregoing "DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY REGARDING OVERHEAD COSTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Russell A Shultis