No. 04-106C
(Chief Judge Damich)

Electronically Filed: April 29, 2008

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# DAIRYLAND'S MOTION TO EXCLUDE WARREN K. BREWER'S TESTIMONY

---

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

TABLE OF CONTENTS

ARGUMENT ........ 2

I. THE COURT SHOULD EXCLUDE EXPERT TESTIMONY THAT IS NOT RELEVANT, RELIABLE AND HELPFUL TO THE COURT ........ 2

II. MR. BREWER'S OPINIONS ON RPV REMOVAL COSTS DO NOT MEET THE STANDARDS OF RULE 702 ........ 4

A. Mr. Brewer's Opinions Are Not the Products of "Reliable Principles or Methods ........ 4

B. Mr. Brewer's Opinions on RPV Removal Costs Are Mere *Ipse Dixit* ........ 6

C. Mr. Brewer's Opinions on Costs in the Duratek RPV Removal Contract Do Not Meet ........ 8

D. Mr. Brewer's Specific Criticisms of Mr. Smith's RPV Removal Cost Estimate Do Not Meet Standards of Rule 702 ........ 11

III. MR. BREWER'S OPINIONS ON OTHER ISSUES DO NOT MEET RULE 702 STANDARDS ........ 19

A. Mr. Brewer's Opinion That WPI Studies Would Have Been Performed in The But-For World Is Not Based on Any Specialized Knowledge and Is Inadmissible ........ 19

B. Mr. Brewer's Opinion on the O&M Cost for Storage of Spent Fuel Is Not Based ........ 20

C. Mr. Brewer's Opinion On But-For Activities and Costs Is Not Based On "Sufficient Facts or Data" And His Opinion on Non-Breach Loading Costs Is Not Legally ........ 21

CONCLUSION ........ 24

# INDEX FOR BREWER APPENDIX:

Expert Witness Report of Warren Brewer
dated 6/15/2007.......................................................................................................1

Excerpts from Deposition of Warrant Brewer
dated 7/19/2007.......................................................................................................46

Excerpt from *Tennessee Valley Authority v. US*
Trial Transcript (7/13/05) .........................................................................................68

Excerpt from Deposition of Warren Brewer
dated 2/23/2006.......................................................................................................70

TABLE OF AUTHORITIES

**Federal Cases**

*Acoustical Design, Inc. v. Control Elecs. Co.*,
932 F.2d 939 (Fed. Cir. 1991)........................................................................ 2

*Algarin v. New York City Dep't of Correction*, 460
F. Supp. 2d 469 (S.D.N.Y. 2006) ................................................................... 8

*Baker v. Dept of Health and Human Services*, No. 99-653V,
2003 WL 22416622 (Fed. Cl. 2003).............................................................. 4

*Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir. 1991) ....................................................... 6

*Coast Fed. Bank v. United States*, 48 Fed. Cl. 402 (2000) ................................................ 3

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194 (4th Cir. 2001) ...................................... 3

*Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993) ................................. 2, 3, 21

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311
(9th Cir. 1995)................................................................................................ 3

*Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001) ..................................... 8

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997)........................................................ 4, 8

*Heller v. Shaw Indus., Inc.*, 167 F.3d 146 (3d Cir. 1999)................................................. 4

*Horton v. W.T. Grant Co.*, 537 F.2d 1215 (4th Cir. 1976) ............................................. 17

*In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230
(5th Cir. 1986)................................................................................................ 8

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*,
456 U.S. 844 (1982)........................................................................................ 6

*Layssard v. United States*, No. 06-0352, 2007 WL 4144936
(W.D. La. Nov. 20, 2007) ............................................................................... 8

*Lippe v. Bairnco Corp.*, 288 BR. 678 (2003)................................................................... 6

*Menz v. New Holland North America, Inc.*, No. 07-1015,
2007 WL 3355409 (8th Cir. Nov. 14, 2007).................................................. 8

*Navarro v. Fuji Heavy Indus.*, 117 F.3d 1027 (7th Cir. 1997) .......................................... 4

*Nichols v. American Nat'l Ins. Co.*, 154 F.3d 875 (8th Cir. 1999) .................................... 3

*Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006) .............................. 2, 23

*Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 339 (2006) ............................ 24

*Sittig v. Louisville Ladder Group LLC*, 136 F. Supp. 2d 610
(W.D. La. 2001) ............................................................................................ 17

*Southern Nuclear Operating Co. v. United States* 77 Fed. Cl. 396 (2007) ..................... 23

*Sparton Corp. v. United States*, 77 Fed. Cl. 1 (2007) ........................................................ 3

*Systems Fuels Inc. v. United States*, 78 Fed. Cl. 769 (2007) ........................................... 23

*United States v. Gwaltney*, 790 F.2d 1378 (9th Cir. 1986),
*cert. denied*, 479 U.S. 1 (1987) ........................................................................... 3

*Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544 (2003) ...................................... 3

*Yankee Atomic v. United States*, 73 Fed. Cl. 249 (2006) ................................................. 23

**Federal Rules**

Fed. R. Evid. 702 ........................................................................................... 2, 4

Fed. R. Evid. 403 ........................................................................................... 3, 6

THE UNITED STATES COURT OF FEDERAL CLAIMS

Electronically filed: April 29, 2008

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S MOTION TO EXCLUDE
WARREN K. BREWER'S TESTIMONY

Pursuant to RCFC 16, Dairyland moves to preclude Warren K. Brewer from testifying as an expert witness.

Mr. Brewer's report primarily critiques the opinions of Dairyland's expert, Todd D. Smith, regarding one category of Dairyland's damages – the increased costs of removing the reactor pressure vessel ("RPV") from Dairyland's nuclear plant due to the presence of spent fuel. *See* Expert Report of Warren K. Brewer at 4-17 ("Report"); Appendix at 6-19 ("App."). Mr. Brewer's report also addresses three other unrelated and relatively minor cost issues. *Id.* at 18-19; App. at 20-21. In the breach world, Dairyland removed the RPV and incurred costs. The government has not addressed the reasonableness of those costs or the reasonableness of the timing of the removal. Dairyland is claiming that the costs of RPV removal would have been much lower had DOE timely performed and removed the spent nuclear fuel prior to Dairyland's need to remove the RPV. Dairyland has proffered a report from Mr. Smith detailing the significantly lower costs to remove the RPV in the non-breach world.

Ultimately, Mr. Brewer merely evaluates documents relied upon by Mr. Smith and other evidence and offers his "opinions" about what the meaning of that means without offering any cost analysis of his own. Such testimony is not only unhelpful to the Court but also entirely inappropriate and unnecessary. The Court is perfectly capable of evaluating the evidence on its own, and unlike Mr. Brewer, is authorized to do so.

The Court should not permit Mr. Brewer, whose "opinions" are not based on reliable principles or methods, to intrude on its role as the ultimate arbiter of fact and law in this case. At bottom, the subjects of Mr. Brewer's opinions are not appropriate subjects for expert testimony, because all Mr. Brewer does is assess other evidence and draw conclusions from it. The Court does not need an "expert" to assist with that. Accordingly, the Court should preclude Mr. Brewer from testifying as an expert.

## ARGUMENT

### I. THE COURT SHOULD EXCLUDE EXPERT TESTIMONY THAT IS NOT RELEVANT, RELIABLE AND HELPFUL TO THE COURT

Under Federal Rule of Evidence 702 ("Rule 702"), expert testimony must be relevant, reliable, and ultimately helpful to the trier of fact to be admissible. *See Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 589 (1993). Mr. Brewer's proposed testimony has none of these attributes. Mr. Brewer's "opinions" fail to meet the criteria for admissibility set out in Rule 702 and *Daubert*, and accordingly, his testimony should be excluded.

"The court has discretion to exclude expert testimony for its lack of helpfulness or relevance or for the expert's lack of qualifications on the issue about which he is being proffered to testify." *Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 433 (2006) (citing *Acoustical Design, Inc. v. Control Elecs. Co.*, 932 F.2d 939, 942 (Fed. Cir.

1991)). The Court should exercise that discretion and exclude expert testimony where the proponent fails to show that the proposed testimony meets the Rule 702 standards by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc*., 259 F.3d 194, 199 (4th Cir. 2001); *United States v. Gwaltney*, 790 F.2d 1378, 1382 (9th Cir. 1986), *cert. denied*, 479 U.S. 1104 (1987). Moreover, in a bench trial, expert testimony should be excluded when it "invades the province of the court and is not helpful." *See Sparton Corp. v. United States*, 77 Fed. Cl. 1, 8 (2007). Expert testimony "is not helpful if it draws inferences or reaches conclusions within the [trier of fact's] competence or within an exclusive function of the [trier of fact]." *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 574 (2003) (citing *Nichols v. American Nat'l Ins. Co.*, 154 F.3d 875, 883 (8th Cir. 1999)). "[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process," and courts are free to exclude such expert testimony. *Coast Fed. Bank v. United States*, 48 Fed. Cl. 402, 439 (2000) (citation omitted).

The Court should also preclude Mr. Brewer from providing any testimony under Federal Rule of Evidence 403 ("Rule 403"). That Rule provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*See also Sparton Corp.*, 77 Fed. Cl. at 9. This is especially true with respect to expert witnesses. *See Daubert,* 509 U.S. at 595; *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n. 17 (9th Cir. 1995). Mr. Brewer's testimony about what "may" or "might" be true will only confuse the issues and cause undue delay since it is not helpful to the Court.

## II. MR. BREWER'S OPINIONS ON RPV REMOVAL COSTS DO NOT MEET THE STANDARDS OF RULE 702

### A. Mr. Brewer's Opinions Are Not the Products of "Reliable Principles or Methods

The Court should also preclude Mr. Brewer from testifying because his opinions are not the "product of reliable principles or methods." Rule 702. An expert must explain how and why he or she reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997) (noting failure of plaintiffs to explain "how and why [they] ... could have extrapolated their opinions"); *Baker v. Dept of Health and Human Services*, No. 99-653V, 2003 WL 22416622, at *32 (Fed. Cl. 2003) ("The focus of the trial court must be solely on principles and methodology, not on the conclusions that they generate."). There must be some connection between the expert's methodology, even if it consists of reasoning based on experience, and the expert's conclusions. *See Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999) (The court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used."); *Navarro v. Fuji Heavy Indus*., 117 F.3d 1027, 1032 (7th Cir. 1997) (under *Daubert*, an expert must "show how his conclusion…is grounded in – follows from – an expert study of the problem").

Mr. Brewer applies neither a reliable nor a testable methodology in his critique of Dairyland's damages claim and Mr. Smith's Report. In the methodology section in Mr. Brewer's Report, he explains that his methodology was essentially comparing the costs and activities in a breach versus non-breach world. Report at 2-3; App. at 4-5. He admitted his methodology was, "to some degree…really just mathematical logic." Dep. 228:22-229:18; App. at 58. Although Mr. Brewer opines at length on costs in the non-

breach world, he admitted at his deposition that, although he considered many documents, he did not "perform any sort of detailed calculations of something." Dep. 54:21-55:19; App. at 47. Indeed, he criticizes the cost inputs Mr. Smith employs in estimating the RPV removal costs, Report at 5; App. at 7, yet when asked whether he could identify better sources for the cost data, he stated that he "made no attempt to do anything like that, and I offer no opinion that there is some better, magical source for any of it." Dep. 134:21-135:6; App. at 50. Mr. Brewer further testified that he performed no cost estimate of his own:

> Q. In developing your opinions regarding Mr. Smith's estimate for nonbreach RPV removal, you did not attempt to develop your own nonbreach world estimate for Dairyland's RPV removal costs, did you?
>
> A. I have not, and I -- I don't believe that was in the scope of anything I was asked to do or -- so I've not done that. It's not – I don't believe it's my job to do that kind of calculation, so I've not.
>
> Q. Let me make sure I understand why you didn't perform your own estimate of -- of RPV removal costs in the nonbreach world. Why didn't you go about your work that way?
>
> A. Because I don't think it's my job to do that calculation or to calculate Dairyland's costs for them.

Dep. 118:4-118:21; App. at 49. In essence, Mr. Brewer's "methodology" is nothing more than his own, subjective belief that certain non-breach world costs as determined by Mr. Smith are unsupported. Because Mr. Brewer fails to use an established or reliable methodology, beyond his mere thoughts on the matter or "mathematical logic," his opinions are neither sufficiently reliable under Daubert nor helpful to assist this Court. They therefore are not admissible under Rule 702.

Moreover, Mr. Brewer cannot claim that he relied on this "experience" in lieu of applying a formal methodology. Even if he did have such experience, under Rule 702,

for Mr. Brewer to rely on that experience in lieu of a recognized and reliable methodology would require him to explain "how that experience leads to the conclusion reached, why the experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Rule 702, Advisory Committee notes on 2000 Amendments, *quoted in Lippe v. Bairnco Corp*., 288 BR. 678, 686 (S.D.N.Y. 2003) (excluding plaintiff's damages expert because he made no effort to show how his experience was applied to analyze the facts in that case).

Contrary to this requirement, Mr. Brewer does not tie whatever experience he may have to his conclusions. In fact, he does not even attempt to demonstrate that his conclusions were the product of his experience in relevant matters. For example, Mr. Brewer admits he is not a civil or structural engineer, but criticizes Mr. Smith's reliance on an engineering study even though the study performed by what Mr. Brewer acknowledged was a "reputable engineering firm." Dep. 243:2-244:14; App. at 61. Mr. Brewer's failure to tie his conclusions to any relevant experience is another powerful indication that he has no relevant experience.[1]

B. Mr. Brewer's Opinions on RPV Removal Costs Are Mere *Ipse Dixit*

Mr. Brewer's "expert" opinions on costs in the non-breach world and his use of "logic" is of no assistance to the Court because they simply offer an evaluation of facts and other evidence. "Determining the weight and credibility of the evidence is the special province of the trier of fact." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 856 (1982); *see also Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th

[1] The only place in his Report that Mr. Brewer mentions applying his alleged experience (in relation to an opinion he is offering) is on page 17 of his Report; App. at 19, but he then supports the opinion *not* with his own experience, but simply by citing a Dairyland document. The Court can evaluate for itself whether that document is inconsistent with Mr. Smith's opinions.

Cir. 1991) (finding expert testimony properly excluded because expert did not substantiate his opinion and providing only an ultimate conclusion with no analysis is meaningless).

In fact, in Mr. Brewer's own words, his expert "opinion" is often nothing more than an assertion that he could not find sufficient information regarding Mr. Smith's or Dairyland's claims. For example:

> Q. With what parts of Mr. Smith's evaluation of the differences between the scope of work required in the actual world versus the world without spent fuel in the pool do you disagree?
>
> A. …There are places where my disagreement is not with the scope of work required, but with the cost estimated for that scope. There are some places where I think there is issue with scope….I think there's potential – there's a couple of other comments I made where I think there's possible scope issues and I think they're less definitive, because I don't know that I have information which would let me be more definitive, other than there appears to be a concern here, but without additional information of various kinds, I can't say for certain, and I certainly can't say what the cost implication of those things would be.

Dep. 115:7-116:22 (objection omitted); App. at 48.[2]

"Opinions" such as these are impermissible *ipse dixit*. *See General Electric*, 522 U.S. at 139 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."); *Menz v. New Holland North America, Inc.*, No. 07-1015, 2007 WL 3355409, at *6 (8th Cir. Nov. 14, 2007) (excluding expert where his testimony was *ipse dixit* because he failed to offer any theory supported by or based on sufficient facts or data to explain his conclusion, and thus his conclusion was mere speculation or

---

[2] In his deposition in the *Pacific Gas and Electric* case, Mr. Brewer was even more explicit; he stated that "in the absence of citing the document, it would simply be [me] saying, 'I know that because I know that'" — the very definition of *ipse dixit*. PG&E Dep. 109:1-5; App. at 72 (quotations added).

conjecture); *Algarin v. New York City Dep't of Correction*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) (expert report inadmissible because it was "not based on reliable principles and methods and is not helpful to the task at hand" where expert's conclusion was "not the product of the application of any analytic method, aside from [expert's] personal experience, and [the expert] cites no support for it, other than his occasional allusions to 'common sense'"). "An expert is not a shaman, and his word must be supported." *Layssard v. United States*, No. 06-0352, 2007 WL 4144936 (W.D. La. Nov. 20, 2007).[3] Similarly, "expert" testimony cannot merely take the form of a closing argument, putting the witness' subjective gloss on the evidence. *See In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986) ("the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument"). Such subjective "opinions" not only fail to satisfy the requirements of Rule 702, (as described above); they are entirely unhelpful because it is the role of counsel to make the arguments and the role of the Court to make evidentiary determinations.

### C. Mr. Brewer's Opinions on Costs in the Duratek RPV Removal Contract Do Not Meet Standards of Rule 702

The heart of Mr. Brewer's report is a criticism of Mr. Smith's opinions regarding the excess costs, *i.e.*, damages, that Dairyland has incurred as a result of having to remove the RPV from LACBWR in the presence of spent fuel, as opposed to removing

[3] *See also Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (expert testimony can be excluded when it is based on "common sense" rather than proper analysis; "'[a]n expert…must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury.'") (internal citation omitted). *Cf. Salem v. United States Line Co.*, 370 U.S. 31, 35 (1962) (expert testimony may be excluded "if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation") (internal citation omitted).

the RPV with no spent fuel present as would have been the case had DOE properly removed Dairyland's spent fuel. Mr. Smith's opinion concerning these "RPV removal damages" is based on a comparison of the actual RPV removal costs that Dairyland incurred in the "breach world," with Mr. Smith's estimate of the costs Dairyland would have incurred for RPV removal if the spent fuel had first been removed from LACBWR (by DOE).

Mr. Smith has substantial, longstanding experience estimating the costs of discrete engineering and other projects at shutdown nuclear plants. He has served as Business Manger and Executive Director of Business Operations – and as such, the principal cost-estimator – at several shutdown nuclear plants, beginning in 1998 and continuing to the present. Mr. Smith also has deep experience in managing projects, and thus their costs, at shutdown nuclear plants. In essence, the focus of Mr. Smith's professional work for almost a decade (since at least 1998) has been estimating and managing the costs of various discrete projects at shutdown nuclear plants.

Mr. Brewer nevertheless opines that Mr. Smith's estimate of RPV removal costs in the but-for world is too flawed to be considered a reasonable basis for calculating the marginal RPV removal costs, or damages. Report at 5; App. at 7. Mr. Brewer spends a good deal of his report opining that Mr. Smith should have used real-world costs from the existing contract that Duratek, Inc. ("Duratek") has with Dairyland for the RPV removal project. These opinions are not based on the application of any "specialized knowledge." Instead, Mr. Brewer simply points out that some costs stated in the Duratek contract are not reflected in Mr. Smith's breach-world cost estimate, and that other real world data may show different results than Mr. Smith's breach-world estimates.

Mr. Brewer's opinions that Mr. Smith's RPV removal estimates are unreliable essentially reduce to the following syllogism (1) in Mr. Smith's Report, his estimated non-breach costs differ from the Duratek breach world costs; (2) they should be the same unless there is a good reason for a difference; (3) Mr. Brewer does not believe there is a good reason for a difference; (4) therefore, Mr. Smith's estimates are wrong. In making these assertions, as shown above, Mr. Brewer employed no specialized methodology or analysis and did not use his "experience" to calculate any costs himself. For example, Mr. Brewer's opinion on the estimated cost for grouting of the RPV in the non-breach world is that Mr. Smith's estimate for non-breach world costs was 1/7 the actual world cost, and "[t]his large difference is unreasonable and without justification." Report at 9; App. at 11. Mr. Brewer then goes on to say, in a variety of other ways, that "there is no reason for the cost of the work to be different;" "there is no reason for the but-for world cost to be estimated differently;" and that "there is no basis for the cost difference between self-performance and use of a general contractor to be …an actual world cost more than seven times greater." Report at 10; App. at 12. Simply repeating this "logic" multiple times does not make it so, but more to the point, repetition does not make Mr. Brewer's "logic" a proper subject of expert testimony. The Court can evaluate the merit of Mr. Smith's opinions and analysis on its own.

Ultimately, Mr. Brewer's criticism of Mr. Smith's non-breach cost estimate based on comparisons and contrasts with the Duratek contract are virtually meaningless because Mr. Brewer admits he does not even know the actual costs of the work covered by the Duratek contract:

Q. You don't know what's in the Duratek numbers either, do you?

A. Not my job to figure that out, no.

Dep. 204:14-204:16; App. at 55. Clearly, Mr. Brewer's opinions on "costs" are not based on any specialized knowledge or experience – or any real analysis – but merely on his own say-so and the weighing of the evidence presented in Mr. Smith's report and the Duratek contract. As such, these "opinions" are not admissible under Rule 702 and must be excluded.

D. Mr. Brewer's Specific Criticisms of Mr. Smith's RPV Removal Cost Estimate Do Not Meet Standards of Rule 702

Mr. Brewer alleges the following specific imperfections in Mr. Smith's work: 1) Mr. Smith relied on estimates from contractors who are not performing the work at LACBWR, Report at 5-7 (App. at 7-9); 2) Mr. Smith's conclusion that Dairyland would self-perform in the but-for world is unreasonable, Report at 7-8 (App. at 9-10); 3) the estimated cost for grouting of the RPV, shipping container, and cutting the RPV nozzles in the but-for world is not reasonable, Report at 9-11 (App. at 11-13); 4) the Duratek "Phase 1 work" costs that Mr. Smith included in his estimate are speculative, Report at 13 (App. at 15); 5) Mr. Smith did not include costs that would be incurred related to the biological shield in the but-for world, Report at 13-14 (App. at 15-16); 6) Mr. Smith provided inadequate technical justification for assuming the lack of certain structural work in the but-for world removal, Report at 14-15 (App. at 16-17); and 7) Mr. Smith does not explain why certain costs are included in contingency and the basis for the amount of contingency is questionable. Report at 16-17; App. at 18-19. These opinions are not admissible under Rule 702 because they do not satisfy the requirements of that Rule – they are unreliable, unhelpful, and not based on any specialized knowledge or method.

1. Mr. Brewer's first attack on Mr. Smith's opinions notes that Mr. Smith testified at his deposition that one reason his estimate of but-for world RPV removal costs is reasonable is that he relied on input from specialty contractors who are actually performing the RPV removal work at LACBWR in the breach world. Report at 5-7; App. at 7-9. Mr. Brewer criticizes this testimony from Mr. Smith by noting that only about 36% of the costs from Mr. Smith's but-for world cost estimate come from contractors performing work at LACBWR. Report at 6-7; App. at 8-9. Mr. Brewer concludes: "It is unclear why this should be *the basis* to assume that *the whole* of Mr. Smith's but-for world estimate is reasonable." Report at 7; App. at 9 (emphasis added).

Of course, Mr. Smith never stated or implied that his use of input from actual LACBWR contractors was "the basis" for concluding that his *entire* but-for cost estimate was reasonable. But even assuming that Mr. Smith had made that point, Mr. Brewer's criticism does not rely on any specialized knowledge or experience. It only relies on Mr. Brewer's arithmetic skills and calculating that only 36% of the costs Mr. Smith uses in his but-for RPV removal estimate do in fact come from current LACBWR contractors. Mr. Brewer made that calculation by simply reviewing documents and other deposition testimony from Mr. Smith indicating the source of various cost input used in Mr. Smith's overall but-for cost estimate. Report at 5-7; App. at 7-9.

That is not expert testimony and it is not helpful to the Court, which can evaluate on its own whether this "criticism" of Mr. Smith matters. At most, the 36% issue that Mr. Brewer has hit upon is a basis for a cross-examination question to Mr. Smith. And the response that Mr. Smith would give if asked that question seems clear: "I never said the use of actual specialty contractor data was the *only* basis for finding my but-for world

costs estimate is reasonable, but the fact that 36% of the costs I use are from actual contractors does support the reasonableness of my estimate."

Mr. Brewer's criticism of Mr. Smith's deposition testimony is simply an attempt, and not a very effective one, to impeach Mr. Smith using basic arithmetic. It is not expert testimony.

2. Mr. Brewer next criticizes Mr. Smith's conclusion that in the but-for world Dairyland would not engage a general contractor to manage the RPV removal project – Duratek is currently performing this role in the actual, breach world – but rather would "self-perform" the RPV removal project. Leaving aside that in the but-for world, with the spent fuel removed, the RPV removal is a substantially less dangerous and less involved undertaking, this criticism of Mr. Smith by Mr. Brewer also does not rest on any specialized knowledge or experience. In fact, Mr. Brewer explicitly relies on mere "logic," asserting that "from a logic perspective, if Mr. Smith does not know the basis for the decision [whether or not to self-perform] in the actual world (as he states he does not), then there is no logical way for him to assert that Dairyland would not reach the same conclusion in the but-for world." Report at 8; App. at 10. Merely applying "logic" is not providing an "expert" opinion. Moreover, the Court, not Mr. Brewer, should be making the determination as to whether Mr. Smith's conclusions are logical.

And in any event, the very substantial experience and resulting specialized knowledge that Mr. Smith does have is more than ample foundation for his appropriate expert opinion that Dairyland would have self-performed the RPV removal in the non-breach world where Dairyland's spent fuel was gone; the RPV removal project therefore would have been significantly easier; and there would have been no time pressure (as existed in the real world) to contract with the company (i.e., Duratek) that controls the

Barnwell disposal site that was scheduled to close to waste from Dairyland. Mr. Smith's opinions will be supported by testimony from Dairyland witnesses that will be uncontroverted.

3. Mr. Brewer then opines that Mr. Smith's estimated costs for grouting of the RPV, shipping container, and cutting the RPV nozzles in the but-for world are unreasonable. Mr. Brewer again bases his opinion, explicitly, on "reason:" he is "not offering an opinion that that rate or the number of hours themselves is wrong, but that…it is unreasonable to estimate any price other than the actual world price." Dep. 175:10-175:16; App. at 52. Mr. Brewer does not actually disagree with Mr. Smith's estimates on the material costs, such as the calculation of the volume of grout needed, the cost of grout per volume, or the cost for pump dump truck rental. Dep. 171:1-172:5 (App. at 51); 176:12-177:1 (App. at 52). Thus, Mr. Brewer opines (although he qualifies his opinion by stating that he has "no specific opinion about [it]"), that since he has a "problem with the overall cost and I've already said that I don't have a real issue with the material part of the cost, then the rest of it must be the labor." Dep. 171:11-172:5; App. at 51. Mr. Brewer's "opinion" essentially is that while he has "no specific comment about why [he] think[s] [Mr. Smith's] number is right or wrong…the way [Mr. Smith] calculates it, obviously there's something very different about the way he comes up with that number and the way Duratek priced that part of the work in the actual world." Dep. 171:21-172:5; App. at 51.

Mr. Brewer ignores that the Duratek contract is a single, fixed price contract for everything. The references to costs for subparts do not reflect the actual contractual bargain. Thus Mr. Brewer's opining is not an expert "opinion," it is merely Mr. Brewer's comment that Mr. Smith's estimates are different than those listed by Duratek in its real-

world fixed price contract. The Court can see, and evaluate, that for itself, and can also listen to Mr. Smith's explanation for the difference and then evaluate it.

Moreover, although Mr. Brewer opines that the cost difference "must be the labor," Dep. 171:11-172:5; App. at 51, Mr. Brewer did not perform his own calculations as to how many hours this work would take, he did not try to calculate an hourly labor rate, he did not know what an appropriate rate to use would be, and he was not even offering an opinion that Mr. Smith's rate or the number of hours was wrong; his opinion was merely that the price should be that listed by Duratek. Dep. 173:14-175:1; App. at 51-52. He also did not attempt to perform his own bottoms-up estimate of the cost of grouting Dairyland's RPV in the but-for world. Dep. 177:3-178:5; App. at 52-53. He criticizes the cost difference between Mr. Smith's estimates and the cost listed by Duratek for fabricating the RPV shipping container, but does not attempt to calculate the correct cost for fabrication, estimate the costs of transporting the shipping container, or provide any further analysis as to what the costs should have been, other than stating that it "should be the cost in the Duratek contract." Report at 12 (App. at 15); Dep. 200:7-200:14 (App. at 54); 202:15-203:9 (App. at 55). Similarly, Mr. Brewer asserts that Mr. Smith's RPV nozzle cutting costs are not reasonable in light of the Duratek listed costs, but does not attempt to apply any knowledge he may have to estimate what it would have cost Dairyland in the non-breach world. Dep. 211:18-212:2; App. at 56. Again, Mr. Brewer's purported "expert" opinion here is to criticize Mr. Smith's estimates (while not performing his own estimates) simply on the basis that Mr. Smith did not use the costs in the Duratek contract, and to assert (without support) that the costs in the Duratek contract should have been utilized by Mr. Smith in his non-breach estimate. This is not "specialized" knowledge, and it is not admissible expert testimony under Rule 702.

4. Mr. Brewer asserts that costs Mr. Smith includes in his non-breach estimate for Duratek "Phase 1" work are "speculative," Report at 13; App. at 15. But Mr. Brewer did not perform his own analysis, nor does he really disagree that Mr. Smith's use of those costs could be correct:

> Q You haven't tried to estimate Phase 1 costs for the nonbreach world, have you?
>
> A I've not, because I'm not aware that there is information available to me for me to do that. If there was information available that broke out the Phase 1 costs by deliverable, then that would be an appropriate way to do it. But I don't think such information exists, so I've not tried to do that.
>
> Q So you're not in a position to say that the estimate that Mr. Smith did come up with for those Phase 1 costs is, in fact, incorrect?
>
> A And I think that's consistent with my comment.

Dep. 225:16-226:11; App. at 57-58.

Rather than expressing any legitimate expert opinion, Mr. Brewer's merely states "two concerns" with Mr. Smith's "approach" – that Mr. Smith's prorating of the Phase 1 costs assume the costs are the same for all the deliverables, and that it is based on there being six deliverables in the Phase 1 work rather than the 12 mentioned in Duratek's pre-contract proposal. Report at 13; App. at 15. Mr. Brewer disagrees with Mr. Smith's prorating approach based on "mathematical logic." Dep. 228:22-229:18; App. at 58. Mr. Brewer uses that "mathematical logic" to opine that he does not know the basis for why Mr. Smith's total number is dividing two by six. *See id.* The Court is equally capable of using math and logic without Mr. Brewer's opining.

5. Next, Mr. Brewer asserts that there would be costs in the non-breach world for removal of the "Bio-Shield wall" at LACBWR and those costs should have been included in Mr. Smith's but-for world estimate. Report at 13-14; App. at 15-16. Mr. Brewer bases

this "opinion" not on any expertise or relevant experience, but simply on his own interpretation of Mr. Smith's deposition testimony. *Id.*; App. at 15-16. Mr. Brewer's "opinion and comment here…simply that there is an activity that would cost money that would have occurred in their – in the but-for world…." is not based on anything other than Mr. Brewer's ipse dixit. Dep. 234:8-21; App. at 59. Here again, the Court is perfectly capable of evaluating Mr. Smith's testimony without input from Mr. Brewer – input that does not remotely qualify as expert testimony under Rule 702.

6. Mr. Brewer then asserts that Mr. Smith provided inadequate justification for not including costs for supports or modifications associated with removing the RPV out of the top of the reactor building in the but-for world. Report at 14; App. at 16. But Mr. Brewer's "opinion" is nothing more than an assertion that there "may" have been a need for supports or modifications – he does not conclude that there *would* have been a need for them, and ultimately he does not *know* whether there would have been a need for them. Dep. 238:13-240:6; App. at 16 ("So there may well be. There may not be. I don't know. And that's why my report says may."). This speculation is not helpful to the Court. *See, e.g.*, *Horton v. W.T. Grant Co.,* 537 F.2d 1215, 1218 (4th Cir. 1976) (relevant testimony is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation); *Sittig v. Louisville Ladder Group LLC,* 136 F. Supp. 2d 610 (W.D. La. 2001) (disallowing expert testimony which would amount to speculation). And again, Mr. Brewer did not even attempt to estimate the costs for any needed supports or modifications. Dep. 244:15-245:2; App. at 61.

Moreover, Mr. Brewer criticizes Mr. Smith's reliance on a 1994 engineering study, performed by a reputable engineering firm, to conclude that no structural

modifications were needed for removing the RPV, Report at 14; App. at 16, but Mr. Brewer is not a civil or structural engineer, Dep. 240:7-240:21; App. at 60, and accordingly, he does not have the expertise nor experience to make such a determination. And Mr. Brewer did not himself examine the issue of whether Dairyland's RPV would have fit through the girders of the polar crane in a "lift though scenario." Dep. 249:19-251:6; App. at 61-62. Ultimately, Mr. Brewer's opinion is not based on any expertise or "specialized knowledge." It certainly cannot be admitted under Rule 702.

7. Finally, Mr. Brewer opines that Mr. Smith does not explain why certain specific costs are included in contingency, and that the amount of contingency is "questionable." Report at 16-17, App. at 18-19. On the first point, Mr. Brewer again relies solely on Mr. Smith's own deposition testimony to opine that including the specific costs in contingency is somehow improper. Report at 16 & n.53; App. at 18 (citing Smith Dep. 251:14-252:15 and other testimony attributed to Mr. Smith but not cited to his deposition transcript). In stating that opinion, Mr. Brewer adds no specialized knowledge or experience, and the opinion is therefore not admissible expert testimony under Rule 702. The government can ask Mr. Smith about the purported inconsistencies between his opinion and his deposition testimony, and the Court can evaluate the responses without Mr. Brewer's help (which in fact is not helpful).

Regarding Mr. Brewer's opinion that Mr. Smith's but-for world contingency amount is "questionable," Report at 17; App. at 19, Mr. Brewer does not actually have an opinion as to what contingency percentage Mr. Smith should have used for his estimate of RPV removal in the non-breach world. Although Mr. Brewer opines that the contingency number could be higher than Mr. Smith's estimate, he does "not offer[ ] an alternative number." Dep. 270:9-271:15; App. at 64. He asserts in his Report that it

"might" have been more appropriate for Mr. Smith to use the contingency level in the 2003 LACBWR decommissioning cost study update, Report at 17; App. at 19, but does not actually have an opinion that it would have been more appropriate to do so. Dep. 272:15-273:22; App. at 64.[4] Again, Mr. Brewer's opining and speculation adds no value and is inadmissible under Rule 702.

For the reasons stated above, no part of Mr. Brewer's criticism of Mr. Smith's estimate of RPV removal costs in the non-breach world rests on appropriate, admissible "expert" testimony. But even if the Court were to conclude that one or a few parts of Mr. Brewer's critique qualifies under Rule 702 – and Dairyland vigorously disputes that – it is clear that the vast majority, if not the entirety, of Mr. Brewer's critique is not only unhelpful ipse dixit, but ultimately both a substantial and confusing distraction from the genuine issues in this case.

## III. MR. BREWER'S OPINIONS ON OTHER ISSUES DO NOT MEET RULE 702 STANDARDS OF ADMISSIBILITY

### A. Mr. Brewer's Opinion That WPI Studies Would Have Been Performed in The But-For World Is Not Based on Any Specialized Knowledge and Is Inadmissible

In section 5.2 of his Report, Mr. Brewer concludes in two paragraphs that, contrary to Mr. Smith's conclusion in estimating non-breach RPV removal costs, two of the engineering analyses performed for Dairyland related to decommissioning of the

[4] Q. You don't actually have an opinion that it would have been more appropriate for Mr. Smith's work to have used the contingency level on that 2003 LACBWR decommissioning study?

A. And I wouldn't say it absolutely should be. One ought to ask LACBWR why they arrived at the percentage they did and then one might be able to conclude whether that was the appropriate number or another number.

Dep. 273:1-273:9; App. at 64.

LACBWR facility, *i.e.*, the "WPI tasks" (sometimes referred to as the LACBWR RPV Activated Material Report) (Task 2) and the Spent Nuclear Fuel Characterization (Task 9), would have been performed in the non-breach world independent of when DOE begins acceptance of spent fuel. Report at 18; App. at 19. Mr. Brewer therefore asserts the costs associated with those tasks should have been included in Mr. Smith's non-breach estimate. First, Mr. Brewer has no experience in characterizing commercial spent fuel or engaging in a study like Task 9. Dep. 291:19-292:9; App. at 66. He does not know whether and what type of inspection DOE would have required in the non-breach world for delivery of fuel to DOE. Dep. 282:16-284:10; App. at 65. Second, and more importantly, this three paragraph "opinion" – that the studies would have been conducted in the non-breach world – does not use or require "specialized knowledge" or skill. Mr. Brewer's simply asserts his conclusory opinion in conclusory fashion. Such unexplained and unsupported "opinions" amount to ipse dixit that is not helpful to the Court and is not admissible under Rule 702.

B. Mr. Brewer's Opinion on the O&M Cost for Storage of Spent Fuel Is Not Based on Specialized Knowledge and Is Not Helpful to the Court

Mr. Brewer's opinion about the operation and maintenance ("O&M") cost for storage of spent fuel in the spent fuel pool at LACBWR also is neither based on specialized knowledge nor helpful to the Court. Mr. Brewer claims that the costs to operate and maintain the spent fuel pool at LACBWR – the costs of operations, maintenance, security, and health physics – would remain essentially the same, regardless of the amount of fuel stored in the spent fuel pool. Report at 18-19; App. at 20-21.

Mr. Brewer is offering an "expert" opinion on a matter that is essentially undisputed and requires no specialized expertise – that Dairyland would still have to pay

for storage of spent fuel if fuel was left in the pool. The principal disputed issue this Court faces is damages related to whether and when DOE would have emptied the pool. Mr. Brewer's unsupported "opinion" on O&M costs does not help the Court resolve that or any other disputed matter before the Court. It is not helpful or admissible under Rule 702, and accordingly, it should be excluded.

C. Mr. Brewer's Opinion On But-For Activities and Costs Is Not Based On "Sufficient Facts or Data" And His Opinion on Non-Breach Loading Costs Is Not Legally Relevant

Mr. Brewer asserts that in the but-for world, Dairyland would have had to engage in activities associated with loading casks to transfer spent fuel to DOE. Report at 19. However, this is common sense; of course there would activities associated with transferring spent fuel to DOE. The two relevant issues are (1) the magnitude of the resulting costs, and (2) the relevance of the costs here. Mr. Brewer helps on neither issue.

On the first issue, Mr. Brewer candidly acknowledges he has no idea what the costs would be:

> The specific effort and cost for this fuel transfer would depend on the type and size of cask provided by DOE in the but-for world. It is not possible to say with certainty what type and size of cask DOE would have provided to LACBWR. Because of this uncertainty, it is reasonable to evaluate the range of loading effort and activities associated with the range of possible casks that might have been brought by DOE . . . The effort and cost to load a cask can be *substantially different* depending on the case assumed.

Report at 20; App. at 22.

Mr. Brewer's resulting "opinion," which never states a cost or even a *range* of costs for cask loading in the but-for world, is thus speculative and not based on "sufficient facts or data," and should be excluded. *See, e.g., Daubert*, 509 U.S. at 590 (finding that "expert" knowledge "connotes more than subjective belief of unwarranted speculation"). Mr. Brewer's analysis consists merely of providing a speculative "range"

of activities for site modification, plant modification, and cask-loading, that could have been undertaken in a but-for world, without offering any "expert" conclusions as to the resulting cost or even the possible *range* of costs. Report at 20-23. Indeed, although he lists possible site modification activities, Mr. Brewer admits that "[a]ttempting to evaluate the costs for such [site] modifications would require detailed information and analysis that is beyond the scope of what I have been requested to do." Report at 22; App. at 24.

Even putting aside the only relevant issue – cost – and focusing on the underlying non-breach world loading activities that Mr. Brewer does address, his opinions are equally speculative and unfounded. Although Mr. Brewer suggests site modifications Dairyland would have been required to make "if" DOE had provided a larger cask, Report at 21; App. at 23, he cites no basis for asserting that DOE would have requested a larger cask, nor does he "offer[] any opinion as to whether Dairyland would have voluntarily made [his suggested] modifications in order to allow DOE to provide larger casks." Dep. 293:11-294:1; App. at 66-67. Mr. Brewer also testified that he did not believe the DOE could require Dairyland to modify the site to accept bigger casks, and that ultimately it would be Dairyland's business determination as to whether to allow larger casks. Dep. 293:11-294:17; App. at 66-67. Thus, his opinion on plant modifications for a larger cask does not rely on "sufficient facts or data," because he has no facts or data to support that DOE would have supplied a larger cask or that any of his hypothetical modification activities would have happened. And Mr. Brewer did not attempt to estimate any of the costs of undertaking any of the plant or site modifications that he claimed would have been required to accommodate a larger cask despite the fact

that "some of those could relatively easily…be estimated." Dep. 298:22-299:16; App. at 68.

As to the second issue noted above – the relevance of the non-breach costs arising from the activities Mr. Brewer mentions – those costs have no relevance to Dairyland's damages claim. Mr. Brewer's legal conclusion that such cask loading costs should be deducted from damages, Report at 22-23; App. at 24-25, has repeatedly and properly been rejected by this Court in other spent fuel cases as a matter of law. The rationale for that rejection is that the cask loading costs and activities Mr. Brewer discusses are not *avoided* by Dairyland here as a result of DOE's "partial" breach of contract; they are merely *deferred* until a later time when DOE will perform. Non-breach costs need only be deducted from damages when they are entirely avoided due to the breach – as typically occurs in total breach cases – not when, as here, the costs will be incurred in the future by the plaintiff and thus are merely *deferred* by DOE's partial breach.

Specifically, this Court has concluded that "Plaintiff's loading costs have been deferred rather than avoided, and the court declines to engage in a guessing game as to whether such deferred costs will have increased or decreased by the time (if ever) defendant performs." *Pacific Gas & Elec.*, 73 Fed. Cl. at 416; *Systems Fuels Inc. v. United States*, 78 Fed. Cl. 769, 797 (2007) (reaching the same conclusion, and finding that cask loading costs are more accurately characterized as deferred costs rather than avoided costs); *Southern Nuclear Operating Co. v. United States* 77 Fed. Cl. 396, 450 (2007) (Adopting the reasoning in *Tennessee Valley Authority v. United States* that "[a]s matters now stand, any benefit inhering in [the utility] because of delayed loading costs would be entirely speculative. It is not possible to ascertain the method DOE will ultimately use for SNF acceptance."); *see also Yankee Atomic v. United States*, 73 Fed.

Cl. 249, 286 (2006); *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 339, 372 (2006). Given that Mr. Brewer's non-opinion as to non-breach cask loading costs is not even legally relevant, it is not helpful under Rule 702 and should be excluded.

CONCLUSION

For the foregoing reasons, the Court should preclude Mr. Brewer's "expert" testimony.

Respectfully submitted,

April 29, 2008

s/ Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)

*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

*WDC 371,614,868v1 4/29/2008*