# APPENDIX

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES OF AMERICA )<br>)<br>)<br>Defendant. )<br>) | Case No. 04-0106C |

**EXPERT WITNESS REPORT**

**OF**

**<u>WARREN K. BREWER</u>**

Warren K Brewer 6/15/07

## TABLE OF CONTENTS


**1 PURPOSE** . . . . . . . . . . 1

**2 SUMMARY OF CONCLUSIONS** . . . . . . . . . . 1

**3 EXPERIENCE** . . . . . . . . . . 2

**4 METHODOLOGY AND DOCUMENTS REVIEWED** . . . . . . . . . . 2

**5 DETAILED OPINIONS CONCERNING DPC'S CLAIMED COSTS** . . . . . . . . . . 4

5.1. Mr. Smith's estimate of RPV removal costs for the but-for world is fundamentally flawed, and it does not form a reasonable basis for the calculation of the marginal costs between the RPV removal costs in the actual and but-for worlds . . . . . . . . . . 4

5.2 Two of the WPI tasks included in the claimed costs are activities that would have to be performed independent of when DOE begins acceptance of spent fuel and thus, are not unique to the actual world . 18

5.3 The operation and maintenance (O&M) costs for storage of spent fuel in the fuel element storage well (FESW) at LACBWR does not depend on the amount of fuel stored in the FESW . . . . . . . . . . 18

5.4 In the but-for world, there would be necessary activities and associated costs to transfer spent fuel to DOE . . . . . . . . . . 19

Curriculum Vitae for Warren K. Brewer . . . . . . . . . . Appendix A

Documents Considered . . . . . . . . . . Appendix B

## 1. PURPOSE

My report provides an evaluation of technical issues related to the claim for damages brought by the Dairyland Power Cooperative (DPC) against the Department of Energy (DOE) for not beginning acceptance of spent nuclear fuel from the nuclear industry contract holders in 1998. DPC's claim relates to the La Crosse Boiling Water Reactor (LACBWR).

My evaluation of DPC's claim focused on the removal of the reactor pressure vessel (RPV), technical studies done by Waste Policy Institute (WPI) related to spent fuel and irradiated material removal from the LACBWR site and operating and maintenance (O&M) costs for storing spent fuel.[1] In evaluating these technical issues associated with the DPC claimed costs, I reviewed the report and supporting documentation submitted by Todd Smith in support of DPC's claimed costs for RPV removal, deposition transcripts, and documents concerning the WPI work.

## 2. SUMMARY OF CONCLUSIONS

In my review, I have arrived at the following opinions:

1. Mr. Smith's estimate of RPV removal costs for the but-for world is fundamentally flawed, and it does not form a reasonable basis for the calculation of the marginal costs between the RPV removal costs in the actual and but-for worlds.

2. Two of the WPI tasks included in the claimed costs are activities that would have to be performed independent of when DOE begins acceptance of spent fuel and thus, are not unique to the actual world.

3. The O&M costs for storage of spent fuel in the fuel element storage well (FESW) at LACBWR does not depend on the amount of fuel stored in the FESW.[2]

4. There would be activities and associated costs in the but-for world to transfer fuel to DOE and these activities and costs have not be accounted for by DPC.

I reserve the right to amend or add to these findings based on new information that is made available, changes to the DPC claim, and testimony offered in this case.

---

1 The Waste Policy Institute also is known as Worldwide Performance and Innovation.

2 The LACBWR fuel storage well is what is typically called the spent fuel pool at other nuclear power plants.

## 3. EXPERIENCE

I am one of the owners of ABZ, Incorporated, an engineering consulting company performing work for the commercial nuclear power industry. My qualifications as an expert in nuclear engineering are based on working in the nuclear industry for more than 30 years. I have experience in design, construction, testing, and operation of nuclear reactors and reactor systems. As a consultant, I have performed activities relating to regulatory interpretation and compliance. I have estimated the cost of decommissioning nuclear power plants, including spent fuel management, and reviewed the estimates of others. I have performed work for state and federal agencies, as well as the utilities.

I have testified four times previously as an expert witness. The most recent expert witness testimony was before the United States Court of Federal Claims concerning the spent fuel claim of System Fuels, Inc., on its Own Behalf and as Agent for System Energy Resources, Inc. and South Mississippi Electric Power Association v. United States, Case No. 03-2624C. Prior to that I testified before the United States Court of Federal Claims concerning the spent fuel claim of the Tennessee Valley Authority (TVA), Case No. 01-249C. I have also testified before an international arbitration tribunal in a dispute between Mitsubishi Heavy Industries (Japan) and Finmeccanica (Italy) concerning misappropriation of engineering design information, and before the New Hampshire Decommissioning Finance Committee, a committee organized by the New Hampshire state legislature to oversee the funding of decommissioning for nuclear plants serving New Hampshire residents.

I am being compensated at the rate of $300 per hour for my work on this matter.

A detailed description of my experience is provided in Appendix A.

## 4. METHODOLOGY AND DOCUMENTS REVIEWED

My opinions were based on an evaluation of how the activities undertaken by DPC in the actual world compare to the activities technically needed in the but-for world. With respect to the RPV removal activities, my review involved assessment of the work needed to remove the RPV in the actual world with fuel present in the FESW compared to the work required to remove the RPV without any fuel in the FESW. This evaluation began with understanding the scope of work being performed in the actual world and understanding how this scope would, or at least might, change if there was no fuel in the FESW. The evaluation concluded with examining how the effort and associated costs for the various activities in the two situations would compare.

With respect to the WPI tasks, my review involved an assessment of whether the specific activities would have been necessary if DOE had begun spent fuel acceptance from the industry in 1998, or if the activities were unique to the actual world. This evaluation included understanding what the various WPI tasks were, understanding the

resulting WPI deliverables, and then determining if the same work would have been required in the but-for world.

With respect to O&M costs, my review involved an assessment of whether the activities needed to store spent fuel would depend on how much fuel was being stored in the FESW at LACBWR.

With respect to activities to transfer fuel to DOE in the but-for world, my review involved identification of the range of activities that would be needed reflecting the range of possible transportation casks that DOE could have provided.

In forming my opinions, I utilized my knowledge and experience in:

a. General design and process of nuclear power plants.

b. Applicable nuclear industry requirements, how they are applied in practice, and how they are translated into required activities or action.

c. Application of those requirements in the field through design, operations, and oversight activities.

d. Decommissioning planning and cost estimating.

e. Dry fuel storage and transport systems, based on numerous projects assisting commercial utilities plan for decommissioning, oversight of dry fuel storage operations, and work in other spent fuel cases.

The documents I considered in forming my opinions are listed in Appendix B.

My evaluation relies on the following specific areas of knowledge and experience.

My knowledge includes the basic physics and engineering involved in the design, construction, and operation of nuclear reactors and plant systems, as well as the basic arrangement of equipment and facilities in nuclear plants. This knowledge is based upon:

a. My academic training in engineering, specifically nuclear physics, heat transfer, and stress analysis.

b. My experience in the design of reactors and reactor systems for the US Navy. This included detailed design work, review of designs, and the actual construction of those designs.

c. My experience in design basis review and documentation, and operational reviews for commercial plants. This included providing

assistance in how to ensure operation conformed to regulatory requirements.

d. My experience from decommissioning planning and cost estimating. This requires knowledge of the layout and functions of plant structures, systems, and components, which is essential in establishing the work needed to decommission a facility.

My general knowledge of plant systems and arrangements is refined and supplemented by visiting and touring the LACBWR site and documents describing the specific activities being undertaken at LACBWR.

While a great deal of this knowledge comes from technical training, it is also due to my actual nuclear design experience in plant design, operation and construction, design basis review work (including detailed calculation reviews), decommissioning work, and severe accident analysis work.

My experience is partly based on shipboard, shipyard, and land-based reactor design, construction, and operations for the US Navy, as part of the DOD/DOE Division of Naval Reactors. During the time I worked there, the relatively small Naval Reactors organization was responsible for the design, construction, and testing of both shipboard reactor plants and land-based prototype reactors, as well as the operation and maintenance of more reactors than existed in the entire US commercial nuclear power industry. The land-based facility work included the same type of large, reinforced concrete structures as are present in commercial power plants, as well as large metal components and foundations. Further, the Naval Reactors construction programs in which I was involved were more complex and had total costs more than an order of magnitude greater than the work on which I am offering opinions in this report.

## 5. DETAILED OPINIONS CONCERNING DPC'S CLAIMED COSTS

5.1 Mr. Smith's estimate of RPV removal costs for the but-for world is fundamentally flawed, and it does not form a reasonable basis for the calculation of the marginal costs between the RPV removal costs in the actual and but-for worlds.

In his expert report, Mr. Todd Smith creates a cost estimate for removal of the RPV in the but-for world.[3] This estimate assumes that all of the fuel has been removed from the FESW prior to the removal of the RPV. Mr. Smith subtracts the cost of his but-for

3 Mr. Smith refers to the but-for world as the non-breach world.

world estimate from contracted and expected costs for removal of the RPV in the actual world to calculate his estimate of DPC's marginal costs for RPV removal.[4]

Mr. Smith's analysis is inaccurate and unsupportable in a number of ways. Collectively, these deficiencies result in Mr. Smith's estimate being so flawed that it should not be considered a reasonable basis for the calculation of marginal costs. This conclusion is based on the following.

5.1.1 Mr. Smith's rationale for why his but-for world estimate is reasonable is not accurate.

Mr. Smith has stated that his but-for world estimate is reasonable because he relied on specialty contractors who were performing the actual world work at LACBWR.[5] However, this is largely inaccurate.

Exclusive of contingency and waste burial costs, the following are the sources of Mr. Smith's estimates:[6]

1. Licensing and Engineering - Mr. Smith estimates the number and type of personnel for these tasks, but the costs are not based on an estimate from contractors performing the work at LACBWR.[7]
2. Grouting - Mr. Smith uses his understanding of the rates charged by PIGCO (the contractor doing this work) and an estimate of material costs from a different contractor.[8]

---

4 Expert Witness Report of Todd D. Smith, March 23, 2007, page 6. Deposition of Todd D. Smith, May 22, 2007, 107:15-107:20 and 112:13-113:14. The marginal costs are calculated by Mr. Smith as his cost for removal of the RPV in the actual world (fuel in the FESW) minus his estimated cost for the removal in the but-for world (no fuel in the FESW).

5 Deposition of Todd D. Smith, May 22, 2007,79:4-79:18.

6 For this evaluation, I have excluded contingency because it is just a percentage of the base estimates, and if distributed proportionately among the estimate parts, it would not affect the result. I have also excluded the waste burial or disposal costs because Mr. Smith has accepted the actual world cost for disposal for use in the but-for world.

7 Expert Report of Todd D. Smith, March 23, 2007, page 4 of Appendix 2, items under "Management Team".

8 Deposition of Todd D. Smith, May 22, 2007,85:21-86:18 and 267:7-268:22.

I have conservatively assumed that this was obtained from vendors doing the work, even though it is unclear Mr. Smith's understanding of the vendor costs resulted in the same value that the vendor would have provided if asked for an estimate, and it is clear that the material cost did not come from a vendor doing the work at LACBWR.

3. Fabrication - Mr. Smith uses an estimate from a vendor not doing the work at LACBWR.[9]
4. Concrete Cutting, Prep Work for RPV Removal - Mr. Smith uses his own calculation. The costs are not an estimate from any contractor working on the RPV project at LACBWR.[10]
5. Nozzle Cutting - Mr. Smith uses an estimate from Bluegrass, the vendor doing the nozzle cutting in the actual world at LACBWR.[11]
6. Gantry System - Mr. Smith uses costs based on a discussion with someone from Bigge, the company doing similar work for the actual world at LACBWR.[12]
7. Packaging and Transport - Mr. Smith bases some of these costs on discussions with contractors that are not doing the work at LACBWR. In particular, $1.1 million for transport came from MHF Logistical.[13] For the other costs in this line, the source is less clear.

The total cost included in Mr. Smith's but-for world for the seven items listed above is $9,405,188. Of this, $3,353,078 was obtained from contractors doing the actual work at LACBWR.[14] Thus, only about 36 percent of Mr. Smith's estimate comes from

---

9 Deposition of Todd D. Smith, May 22, 2007, 260:20-263:3 and 264:3-264:8.

10 Expert Report of Todd D. Smith, March 23, 2007, page 4 of Appendix 2, line items 2 through 5. Deposition of Todd D. Smith, May 22, 2007, 174:3-175:2.

11 Deposition of Todd D. Smith, May 22, 2007, 316:10-318:4.

12 Deposition of Todd D. Smith, May 22, 2007, 257:1-259:1. Bigge Crane and Rigging Company is the crane contractor putting in a gantry crane for removal of the reactor at LACBWR, which is different from the crane assumed in Mr. Smith's but-for world estimate.

13 Deposition of Todd D. Smith, May 22, 2007, 146:20-147:6 and 226:3-227:17. Mr. Smith was uncertain as to whether MHF was doing any work in the actual world. However, MHF is not listed as part of the Duratek project team in the proposal, which became part of the contract for the actual world work.

RPV Removal/Disposal & B/C Waste Disposal Contract, PLAC0049955-PLAC0050102. This is a contract binder that contains the contract itself and associated documents. The project team is listed on PLAC0050003, Table 2.1.

I have conservatively assumed that this was obtained from vendors doing the work because I have no clear evidence that it did not. However, there is no clear evidence that it did come from such contractors.

14 Of this, about $1.8 million relates to packaging and transportation. As explained above, I have conservatively assumed that this was obtained from vendors doing the work because I have no clear evidence that it did not. However, there is no clear evidence that it did come from such contractors.

contractors performing the work at LACBWR. It is unclear why this should be the basis to assume that the whole of Mr. Smith's but-for world estimate is reasonable.[15]

5.1.2 The basic assumption that DPC would self-perform the RPV removal in the but-for world is unsupported and unreasonable.

Although not clearly stated in his expert report, a basic assumption of Mr. Smith's but-for world estimate is that DPC would self-perform the RPV removal.[16] In this context, self-performance means that DPC would directly contract with various contractors to do parts of the work, and DPC would manage, coordinate, and oversee the activities of these individual contractors. All of the individual contractors would report to DPC.

This differs from what is being done in the actual world. In the actual world, DPC has contracted with Duratek for the RPV removal. Duratek has in turn contracted with individual subcontractors to do various parts of the work. Duratek is responsible for managing and coordinating the efforts of these subcontractors. As the general contractor, Duratek thus assumes some of the responsibility and risk that DPC would have under a self-performance scenario.[17]

Mr. Smith's basis for making this self-performance assumption in the but-for world can be summarized as he thought this was a reasonable approach and he thought it was possible, in part, because DPC would be dealing with individual contractors who had done this type of work before. In response to questions about why DPC would self-perform in the but-for world, even though they chose not to in the actual world, Mr. Smith responded that he was unaware of the market conditions that existed at the time this decision was made, recognized that the decision was already made and could not explain that decision, but that he saw no reason that DPC would use a general contractor (such as Duratek) in the but-for world.[18]

Mr. Smith's logic in this regard is incorrect, inconsistent, and does not recognize significant facts. The event pushing the RPV removal timing is the expected closure of the Barnwell radioactive waste disposal site. The potential closure of Barnwell would exist in both the actual and but-for worlds. As a result, the timing of the RPV removal would be essentially the same in both worlds and the market conditions would be the same for both worlds.

---

15 Even when estimates were obtained from vendors doing work at LACBWR, there is no evidence the vendor would be ready or willing to contract to actually perform the work for the estimated price, or that the estimated prices are consistent with what is being charged in the actual world.

16 Deposition of Todd D. Smith, May 22, 2007, 208:6-210:9.

17 Deposition of Todd D. Smith, May 22, 2007, 208:6-209:10.

18 Deposition of Todd D. Smith, May 22, 2007, 210:10-211:10, 211:18-212:14, and 212:16-213:6.

As a result, Mr. Smith's assertion that he did not know the market conditions at the time of the DPC decision can only mean that he does not know what these conditions would have been in the but-for world, since the time frame is the same. Even in the face of this acknowledged lack of understanding, Mr. Smith asserts with certainty that self-performance would be the way to go in the but-for world, but says his lack of knowledge makes it impossible for him to understand the actual world decision.

Also, from a logic perspective, if Mr. Smith does not know the basis for the decision in the actual world (as he states he does not), then there is no logical way for him to assert that DPC would not reach the same conclusion in the but-for world. In fact, in the absence of knowing the DPC reasoning in the actual world, while recognizing that the but-for world activities would occur during the same time frame either way, the more logical conclusion would be that the DPC decision would be the same in both worlds. Such a conclusion is contrary to Mr. Smith's assumption of self-performance in the but-for world.

When asked, Mr. Smith stated he did not know if DPC had the resources to self-perform in the actual world.[19] Mr. Smith was also asked if he believed that DPC would have had the resources to self-perform in the but-for world. In response, he said even if DPC did not have the resources, he believed the three personnel from Sargent and Lundy (S&L) in his estimate could be part of the DPC team for the project.[20] Again, Mr. Smith's analysis is flawed. First, he estimated S&L engineers would perform other work (the S&L engineers are included in the costs for both the actual and but-for worlds).[21] Therefore, if these outside S&L contractors are to form DPC's overall project management team, then additional workers will be needed to perform the work for which the S&L personnel were originally included in Mr. Smith's estimate.[22]

Second, since the RPV work would occur at the same time in both the actual and but-for worlds, DPC would have no more available personnel in the but-for world to manage self-performance than in the actual world. In fact, consistent with the plaintiff's claim that a substantial part of the plant O&M and thus, some part of the staff, are only retained because the fuel remains on site, then the available plant staff would be smaller in the but-for world assumed by Mr. Smith (no fuel on site). As a result, if anything, DPC would be in a worse position to self-perform in the but-for world than in the actual world. Therefore, in my opinion, DPC would have made the same decision in the but-for world.

---

19 Deposition of Todd D. Smith, May 22, 2007, 210:10-210:20.

20 Deposition of Todd D. Smith, May 22, 2007, 213:21-214:12.

21 Deposition of Todd D. Smith, May 22, 2007, 249:15-251:4.

22 The alternative to this conclusion is that the three S&L engineers had no real purpose or work to perform in Mr. Smith's estimate. Such an alternate conclusion would say that if DPC personnel were able to self-perform, Mr. Smith would have included unnecessary personnel in his estimate.

5.1.3 The estimated cost for grouting of the RPV in the but-for world is not reasonable in light of the contracted costs for grouting in the actual world.

Grouting of the RPV consists of filling the vessel internal cavity and the void space between the RPV and the RPV shipping container with a form of concrete. In the actual world contract for the RPV removal, the cost of grouting is identified as $825,000.[23] Mr. Smith's estimate for this work in the but-for world is $109,995 (less than 1/7 the actual world cost).[24] This large difference is unreasonable and without justification.

The scope of work in the but-for and actual worlds for grouting is the same. Thus, there is no reason for the cost of the work to be as different in the actual and but-for worlds as indicated by Mr. Smith's estimate. In the most basic analysis, with other assumptions such as project management being held constant, there is no reason for the but-for world cost to be estimated differently than the actual world cost. As discussed above, Mr. Smith states that his estimate is based on self-performance by DPC. Although I believe that assumption to be unreasonable, even if it were taken into account, there is no basis for the cost difference between self-performance and use of a general contractor to be more than $715,000 (an actual world cost more than seven times greater than the estimated but-for world cost).

When Mr. Smith was asked about the basis for the large difference in actual world costs and estimated but-for world costs, he stated that he did not know about the actual world relationship between Duratek and its subcontractors, the markups applied by Duratek or even if Duratek had estimated the same starting cost for the work.[25] In short, Mr. Smith did not know the details of how the Duratek cost was established. Without such understanding, neither Mr. Smith nor anyone else can know if any estimated but-for world cost was created in a manner that provides for a reasonable comparison to the actual world costs.

In attempting to explain the difference in his estimate and the actual world costs, Mr. Smith also stated that, although he could not say for certain, the costs in the Duratek proposal ($825,000 specifically) may not represent the cost of any specific work, but

---

23 RPV Removal/Disposal & B/C Waste Disposal Contract, PLAC0049955-PLAC0050102. This is a contract binder that contains the contract itself and associated documents. For the scope of work and pricing, the contract (PLAC0049960) refers to the Duratek proposal dated July 6, 2005 (included in this contract binder at PLAC0049993-PLAC0050063). The specific cost referred to here is shown in Table 6.1 on PLAC00500053.

24 Expert Report of Todd D. Smith, March 23, 2007. See specifically, page 7 of Appendix 2. It is understood that Mr. Smith also includes about $1.4 million (about 15 percent) in undistributed contingency in his estimate. Some of this could be attributed to the grouting activity, but there is insufficient total contingency to deal with the concern discussed in this section of my report, as well as the other sections. If the average contingency is added to this activity, Mr. Smith's cost would increase to about $126,000; still far from the actual world cost of $825,000.

25 Deposition of Todd D. Smith, May 22, 2007, 207:12-208:5.

may simply be some sort of progress payment.[26] This attempted explanation is not reasonable.

In the Duratek proposal, which is by reference part of the Duratek contract with DPC, the cost information is contained in Table 6.1, RPV Removal Services Breakdown.[27] This table says nothing about progress payments, but does list distinct costs next to distinct work items. The table appears to show how the total project cost is distributed among the work items. Further, a separate table in the proposal specifies a payment schedule.[28] Given this detailed payment schedule, it would be unconventional, unnecessary, and confusing to have another table of milestone payments (simply a second payment schedule). If the work breakdown were a milestone payment schedule, as suggested by Mr. Smith, there would have to be some direct correlation between the two payment schedules. Specifically, there would have to be a way to add an integral number of payments from the beginning of one list and have the result equal the first item on the other. There is no such correlation.

The appropriate estimated cost for the RPV grouting should be the cost stated in the Duratek contract.

5.1.4 The estimated cost for but-for world fabrication of the RPV shipping container is not reasonable in light of the contracted costs for this container in the actual world.

After its removal from the reactor building, the RPV would be placed in a shipping container for transport to the Barnwell radioactive waste disposal site. In the actual world, the cost for the fabrication of this container is $1,500,000.[29] Mr. Smith's but-for

---

26 Deposition of Todd D. Smith, May 22, 2007, 208:6-209:12.

27 RPV Removal/Disposal & B/C Waste Disposal Contract, PLAC0049955-PLAC0050102. This is a contract binder that contains the contract itself and associated documents. For the scope of work and pricing, the contract (PLAC0049960) refers to the Duratek proposal dated July 6, 2005 (included in this contract binder at PLAC0049993-PLAC0050063). The specific cost referred to here is shown in Table 6.1 on PLAC00500053.

28 RPV Removal/Disposal & B/C Waste Disposal Contract, PLAC0049955-PLAC0050102. This is a contract binder that contains the contract itself and associated documents. For the scope of work and pricing, the contract (PLAC0049960) refers to the Duratek proposal dated July 6, 2005 (included in this contract binder at PLAC0049993-PLAC0050063). The payment schedule is in Table 6.3 in section 6.3 on PLAC00500054.

29 RPV Removal/Disposal & B/C Waste Disposal Contract, PLAC0049955 -PLAC0050102. This is a contract binder that contains the contract itself and associated documents. Cost information is in Table 6.1 on PLAC00500053.

world estimate for the fabrication of this container is $355,000, or less than one half the actual world cost.[30]

The RPV shipping container would be physically the same in both the actual and but-for worlds and thus, physically, there is no reason for the cost to be different in the two worlds.[31] For his but-for world cost, Mr. Smith relies on a calculation by the company Cianbro.[32] However, in the actual world, the container is being fabricated by Brilex.[33] Mr. Smith did not know what Brilex is charging for the fabrication.[34]

Also, Mr. Smith did not know if Cianbro had ever fabricated an NRC approved container such as this shipping container and did not clearly state that Cianbro would be willing to perform the work for the estimated cost.[35]

Thus, Mr. Smith's but-for world estimate for the fabrication of the RPV shipping container, which is less than one half the actual world cost, was:

1. Obtained from a contractor not performing the work.
2. Obtained from a contractor who may never have fabricated an NRC approved container.
3. Established without understanding whether the contractor giving the estimate would be willing to perform the work for that cost.

---

30 Expert Report of Todd D. Smith, March 23, 2007. See specifically, page 7 of Appendix 2. It is understood that Mr. Smith also includes about $1.4 million (about 15 percent) in undistributed contingency in his estimate. Some of this could be attributed to the shipping container fabrication, but there is insufficient total contingency to deal with the concern discussed in this section of my report as well as the other sections. In particular, if contingency is used to explain the difference discussed earlier between the $825,000 actual world grouting and Mr. Smith's estimate of $109,995, this would leave only about $695,000 of contingency. This is not enough to cover the difference in the actual world and but-for world estimated shipping container costs being discussed in this section, much less have any contingency left for other issues discussed later in this report.

If the average contingency is added to this activity, Mr. Smith's cost would increase to about $838,000; still far from the actual world cost of $1,500,000.

31 I understand, as stated previously, that Mr. Smith states his but-for world estimate is based on self-performance by DPC, but there is no information that supports that self-performance would result in such a large cost differential.

32 Deposition of Todd D. Smith, May 22, 2007, 260:20-263:3.

33 Deposition of Todd D. Smith, May 22, 2007, 264:3-264:5.

Duratek Project Status Report, August 2006, PDPC0033426. Brilex is identified as the canister fabrication subcontractor.

34 Deposition of Todd D. Smith, May 22, 2007, 264:6-264:8. Duratek, the general contractor, has included $1,500,000 for the container, but the cost to Duratek from the actual fabricator would likely be something less.

35 Deposition of Todd D. Smith, May 22, 2007, 264:12-264:14 and 263:6-263:17.

4. Established without knowing what price was being charged by the actual world fabricator.
5. Established without understanding what factors, if any, would explain a difference of more than a factor of 2 between the but-for estimate and actual world costs for work which would be of identical scope in the actual and but-for worlds.

The appropriate estimated cost for fabrication of the RPV shipping container should be the cost stated in the Duratek contract.

5.1.5 The estimated cost for cutting the RPV nozzles in the but-for world is not reasonable in light of the contracted costs for nozzle cutting in the actual world.

In order to remove the RPV, the piping nozzles and other connections must be cut. In the actual world, the cost of this work is $1,800,000.[36] The but-for world estimate of Mr. Smith is $355,000 or less than 1/5 of the actual world cost.[37]

The number, location, and size of the nozzles to be cut are the same in the actual and but-for worlds. The only difference is, in the actual world, part of the biological shield which surrounds the reactor vessel was removed before the nozzles were cut. In the but-for world the shield would not be removed before the nozzles were cut. In the actual world, since part of the shield is removed, there will be greater access to some of the nozzles to be cut. This would make the work in the actual world easier than in the but-for world. There is no reason to believe that the work in the but-for world could be accomplished at 1/5 the actual world cost.[38] Further, if it were much cheaper to cut the nozzles without first removing the biological shield, then there is no reason this work could not be done in this less costly way in the actual world.

The appropriate estimated cost for the nozzle cutting is the cost stated in the Duratek contract.

---

36 RPV Removal/Disposal & B/C Waste Disposal Contract, PLAC0049955-PLAC0050102. This is a contract binder that contains the contract itself and associated documents. Cost information is in Table 6.1 on PLAC00500053.

37 Expert Report of Todd D. Smith, March 23, 2007. See specifically, page 7 of Appendix 2. It is understood that Mr. Smith also includes about $1.4 million (about 15 percent) in undistributed contingency in his estimate. Some of this could be attributed to the nozzle cutting. However, the difference in the actual world cost and Mr. Smith's but-for world estimate is larger than the entire contingency amount.

If the average contingency is added to this activity, Mr. Smith's cost would increase to about $408,000; still less than 1/4 the actual world cost of $1,800,000.

38 Again, I recognize that Mr. Smith has stated that his estimated costs are predicated on self-performance by DPC, but there is simply no way that this would account for a factor of 5 change in the cost.

5.1.6 The Duratek Phase 1 costs included in Mr. Smith's estimate are speculative.

The Duratek work at DPC included some studies labeled as Phase 1 work. Mr. Smith includes some of the cost of this work in his calculation of the marginal costs between the actual and but-for worlds.[39] Mr. Smith includes a marginal cost of $140,250 for this Phase 1 work.[40] The basis for this marginal cost stated in Mr. Smith's report is that there are "six deliverables" in the work, only two of which are unique to the actual world; therefore, he divided 2 by 6, resulting in 33 percent of the total cost being unique to the actual world.[41]

I have two concerns with Mr. Smith's approach. First, Mr. Smith's prorating of the costs assumes that the cost to prepare each of the deliverables is the same. No analysis or information establishes this fact. The two deliverables that Mr. Smith identifies as unique to the actual world could be much more or much less than the amount he has estimated.

Second, Mr. Smith's prorating of the costs is based on there being six deliverables in the Phase 1 work. However, the document that Mr. Smith seems to rely on for this fact does not identify deliverables, but lists six "primary unresolved issues."[42] If instead the Duratek proposal for the Phase 1 work is reviewed, Section 5 lists 12 project deliverables.[43] If Mr. Smith had assumed 12 deliverables as listed in the proposal, then his calculated marginal cost for this item would be one half what is stated in his report.

5.1.7 Mr. Smith has not included costs that would be incurred related to the biological shield in the but-for world.

As noted above, in the actual world, part of the biological shield was removed during RPV removal work. In Mr. Smith's but-for world, it is assumed that none of the shield wall would be removed as part of the RPV removal. However, Mr. Smith states this part of the shield wall would ultimately be removed in the but-for world, but says that such

---

39 In this instance, Mr. Smith does the calculation in a slightly different way. Rather than including the total actual world costs and then including an estimated cost for the but-for world, Mr. Smith simply includes as part of the actual world costs, the part of the actual world total that he believes to be unique to the actual world, i.e., the marginal cost.

40 Expert Report of Todd D. Smith, March 23, 2007. See specifically, page 7 of Appendix 2.

41 Expert Report of Todd D. Smith, March 23, 2007. See specifically, page 5.

42 DPC Power Cooperative, La Crosse BWR Pressure Vessel Disposition Analysis, Phase 1 Report, SMIT0000062.

43 Letter from Mark Kirshe (Duratek) to Roger Christians (DPC) dated April 6, 2005. PDPC0027567-PDPC0027581. It should also be noted that a Duratek presentation concerning the Phase 1 work (PLAC0081001-PLAC0081030 dated July 6, 2005), lists on PLAC0081016, 14 Phase 1 deliverables.

removal was not included because it would be decommissioning work and not RPV removal work.[44]

If the shield wall will be removed in both the actual and but-for worlds, then there would be costs in the but-for world decommissioning that would not be incurred in the (future) actual world decommissioning because it was done as part of the RPV removal. Thus, to provide a true marginal cost comparison, the but-for world costs for removal of part of the shield wall (no matter what the method) should be included in the but-for world estimate. If in the but-for world the wall were to be removed by the same method as in the actual world, then the but-for world costs would be equal to the actual world costs.[45]

5.1.8 Mr. Smith provides inadequate technical justification for structural work related to the but-for world RPV removal.

In Mr. Smith's assumed but-for world, the RPV is removed through the top of the reactor building. To accomplish this, a hole is cut through the top of the building and the water storage tank, which is supported from the inside of the building top.[46]

The cost of this work is included in a single line along with other activities such as on-site handling of the RPV shipping container, which would be common to the actual and but-for worlds. As such, the specific cost and basis for the cost of cutting the holes through the building roof and the tank are not clear. However, when asked whether there would be any need for structural modifications because of removal of part of the water tank, Mr. Smith said no modifications would be needed.[47] His only basis for this was that a 1994 S&L study about the potential method of RPV removal did not state anything about such modifications. Mr. Smith simply accepted the lack of a statement in the S&L report as confirmation that no modification would be needed and he did no additional checking or analysis.[48]

---

44 Deposition of Todd D. Smith, May 22, 2007, 330:14-332:10. Mr. Smith says that while the actual world costs included costs for disposal of the portion of the shield wall that was removed, he did not include these costs because they would occur in both the actual and but-for worlds. Clearly, this indicates that he believes that the shield wall would be removed in both worlds.

Also, the distinction between RPV removal and decommissioning work is somewhat artificial since RPV removal is part of decommissioning.

45 It is possible that the shield wall could be removed some other way in the but-for world that has not been established. Even if the wall were not totally removed, there would need to be costs included for the radiological survey of the wall and any necessary decontamination. In any event, there would be but-for world costs that have not been included in Mr. Smith's but-for world estimate.

46 Expert report of Todd D. Smith, March 23, 2007, page 4. In the second paragraph of section III, Mr. Smith states that a 12 foot diameter hole will be cut through the top of the building and the water storage tank.

47 Deposition of Todd D. Smith, May 22, 2007, 12:16-12:17. Mr. Smith is not an engineer.

48 Deposition of Todd D. Smith, May 22, 2007, 280:12-281:18.

The LACBWR reactor building has a domed top. Cutting a hole in the top is similar to removing the keystone of an arch. The keystone is essential to the structural stability. In the case of the LACBWR reactor building roof, the need for temporary supports or other modifications to ensure stability would depend on the details of not only the roof, but the details of the structure inside the overhead water storage tank hanging from the roof. At a minimum, any firm undertaking cutting the holes through the roof and tank would perform an engineering analysis of the stability of the resulting structure, in normal and off-normal conditions, before deciding whether any temporary support or modifications would be needed. Surely, the lack of any statement in the 1994 S&L conceptual report would not be sufficient. Thus, while it cannot be stated with certainty that any modifications would be necessary, there is insufficient information or explanation provided by Mr. Smith to say with any certainty that modifications would not be needed. Any such modifications would increase the but-for world costs.[49]

Mr. Smith had Mr. Brasel review drawings to determine if the space between the support rails of the polar crane was large enough to allow the RPV to be lifted between the rails without dismantling the crane. Although Mr. Smith did not review any of the drawings himself, he accepted the conclusion of Mr. Brasel that the crane would not need to be dismantled, and therefore, included no costs for such work in the but-for world.[50] There is no evidence that Mr. Smith or Mr. Brasel did anything to determine why or how S&L arrived at the conclusion that the crane would have to be dismantled and how this could be reconciled with Mr. Brasel's conclusion from a drawing review that it would not be needed.

Mr. Smith has provided no explanation as to why, in one case, related to roof or tank structural modifications, he accepts the lack of any S&L comment as sufficient basis to assume a determination was made, but in another case, related to the polar crane where S&L makes a clear definitive comment, he questioned S&L's affirmative judgment.

---

49 Mr. Smith's simple acceptance of the lack of S&L comment on structural modifications is also flawed given his actions in regard to other S&L information. In the same report that Mr. Smith says supports his assumption of no needed structural modifications, S&L states that the reactor building polar crane would have to be removed to allow RPV removal. In spite of this statement, Mr. Smith decided not to accept what the S&L report stated. Deposition of Todd D. Smith, May 22, 2007, 141:11-143:11.

50 Deposition of Todd D. Smith, May 22, 2007, 141:11-143:11 and 277:18-281:11. Although Mr. Smith maintains that the crane would not have to be dismantled, he acknowledges there may be some minor modifications needed even if he is correct that the RPV could be lifted between the crane girders. Also, it appears that Mr. Smith did not look at any drawings himself or know what drawings were relied upon by Mr. Brasel to arrive at his conclusion.

5.1.9 Mr. Smith inexplicably states that certain costs are included in contingency.[51]

There are three actual world costs which Mr. Smith agrees would be incurred in the but-for world, but which he has not included explicitly in his but-for world estimate.[52] In his deposition, Mr. Smith stated these items are covered by his contingency. Mr. Smith's report does not indicate this. It is not clear why, since Mr. Smith states that he had no reason to believe that these costs would not occur in the but-for world, and that they were not explicitly included in his estimate like other costs.[53] The costs for these items should be explicitly included in any but-for world estimate and not left to be covered by contingency.

Also, Mr. Smith's inclusion of at least one of these items in contingency is inconsistent with his own statement that contingency is to account for "known unknowns." Decommissioning cost estimators often describe contingency as included to account for the known unknowns. These known unknowns are things such as equipment failures or weather delays. In short, they are things which will most certainly occur in the course of any project, but precisely when and which project cost element will be affected by such events is unknown and unpredictable. The known unknowns do not include increased or additional scope of work.

The cost for NRC licensing of the RPV shipping container would not typically be defined as a known unknown and thus would not be covered by contingency. The added cost for NRC licensing is an additional scope of work. The two delay charges, since they have been identified and are fully known, seem unreasonable to include as contingency. Rather it would seem more appropriate to include these in the basic estimate.

5.1.10 The basis for the amount of contingency in Mr. Smith's but-for world estimate is questionable.

Mr. Smith includes 15 percent contingency in his but-for world estimate. His basis is that 10 percent contingency is sufficient for a large scale decommissioning estimate,

---

51 Deposition of Todd D. Smith, May 22, 2007, 246:10-247:2. Mr. Smith identifies a "contingency" to cover certain risks, meaning costs, related to circumstances or situations that are expected in any project but which cannot be directly accounted for in the base estimate (referred to by Mr. Smith as "known unknowns"). In the actual world, any costs incurred are actually known and, in any event, any risk is being borne by the contractor, Duratek, that has a fixed price contract for the work.

52 The costs are for NRC licensing of the RPV shipping container, delay charges from Bluegrass and delay charges from Bigge. Expert Report of Todd D. Smith, March 23, 2007, page 7 of Appendix 2. These items total $228,580.

53 Deposition of Todd D. Smith, May 22, 2007, 251:14-252:15.

but given the complexities of the RPV work and the limited number of contractors, the contingency should be higher, specifically 15 percent.[54]

Mr. Smith's fundamental assertion that 10 percent contingency is sufficient for large scale decommissioning estimates is not reasonable. I have performed numerous decommissioning estimates and reviewed many others performed by other estimators. While Mr. Smith may have some experience with decommissioning estimates that have 10 percent contingency, this level of contingency is not the norm. I have never been responsible for creating a decommissioning estimate with an overall contingency as low as 10 percent. All of them had a substantial level of contingency, and many higher than the 15 percent that Mr. Smith includes in his RPV estimate. Of the estimates I have reviewed, overall contingency amounts greater than 10 percent are common.[55]

Rather than making a somewhat speculative jump from assumptions about the overall contingency of decommissioning estimates, it might be more appropriate to look at the level of contingency on the RPV removal part of decommissioning estimates. A July 2003 LACBWR decommissioning cost study update prepared by the LACBWR staff includes the costs for RPV removal. In this cost study, the contingency included for the RPV removal work is more than 40 percent.[56]

As discussed above, Mr. Smith agrees some cost items from the actual world would also be applicable to the but-for world, but he has stated these are covered by contingency. If these are eliminated from the contingency, since they really do not apply to anything unknown, at this point are known costs and provide nothing to account for unknowns in other work items, the overall contingency that Mr. Smith has actually included is about 12.6 percent.

There appears to be no solid basis for the amount of contingency included by Mr. Smith in his but-for world estimate.

---

54 Expert Report of Todd D. Smith, March 23, 2007, page 6.

55 For example, in the Maine Yankee Atomic Power Station, Decommissioning Costs Analysis, dated 10/28/97, Appendix C, pages 3 and 9 of 9, the total cost to decommission the station included a contingency of just over 19 percent. When one reviews the estimate in more detail, the specific contingency applied to each activity is different. In Maine Yankee's decommissioning cost analysis, the estimated cost for removal of the reactor vessel included a contingency of 56 percent on that activity.

56 2003 LACBWR Decommissioning & Decontamination Cost Study Update, July 2003, PLAC0023723-PLAC0023745. See specifically PLAC0023745. Admittedly, the details of the estimate contained in this cost study do not correlate well to either the actual world costs or Mr. Smith's but-for world costs. However, it does show the level of contingency the LACBWR staff (the cover says the update was prepared by the staff) believed was necessary. Also, it is noted that the contingency is somewhat skewed by the large costs of waste burial and the associated large contingency. Even if the burial costs are excluded, the contingency is still much larger than 15 percent. The total base cost without contingency is $2,280,353 and the total with contingency is $2,943,799. This is about 29 percent contingency or almost double the contingency used by Mr. Smith.

5.2 Two of the WPI tasks included in the claimed costs are activities that would have to be performed independent of when DOE begins acceptance of spent fuel and thus, are not unique to the actual world.

WPI performed a number of engineering analyses for DPC related to decommissioning of the LACBWR facility. Two of these analyses were work that would have been necessary regardless of when DOE accepted LACBWR spent fuel. These two analyses are Task 2 of Phase 1, LACBWR RPV Activated Material Report,[57] and Task 9 of Phase 1, Spent Nuclear Fuel Characterization.

The scope of the Task 2 analysis was to determine the radiological activation level of the RPV and its internals. This analysis to identify the curie inventory in the reactor vessel was performed so that the RPV could be packaged and disposed of properly.[58] This analysis concluded that the reactor vessel and internals could be transported intact to the Barnwell disposal site. This analysis was not required for the storage of spent nuclear fuel. This work to radiologically characterize the RPV would have been performed as part of decommissioning, independent of the timing of spent fuel acceptance by DOE. The need for the waste characterization would not be affected by the method of removal of the RPV.

The scope of the Task 9 analysis was to review available records for each spent fuel assembly to classify the condition of each assembly, and to assess whether each assembly may require additional inspection activities prior to being loaded into a cask for transportation off site.[59] Evaluation of the condition of each fuel assembly is required to ensure that the fuel meets the cask license limits. A review and classification would have been performed to transfer the assemblies off site in a DOE-supplied cask.

5.3 The O&M cost for storage of spent fuel in the FESW at LACBWR does not depend on the amount of fuel stored in the FESW.

I was asked by the Department of Justice to offer an opinion as to how O&M costs related to the storage of spent fuel at LACBWR would vary depending on the amount of fuel being stored. I evaluated the activities necessary to properly staff, and safely operate and maintain, LACBWR facilities in accordance with NRC requirements. I determined that the costs to operate and maintain the spent fuel pool at LACBWR would essentially remain the same, regardless of the amount of fuel stored in the spent fuel pool. The following are examples of activities included in this cost.

---

57 This task is also referred to as GTCC Determination on PLAC0004249.

58 WPI Phase 1, Task 2 - LACBWR RPV Activated Material Report, 2/19/2003, PLAC0000455-PLAC0000477.

59 WPI Phase 1, Task 9 - LACBWR Spent Fuel Characterization Report, 12/5/2002, PDPC0007773-PDPC0007807.

5.3.1 Operations

As long as there is fuel in the pool, the Operations department is required to maintain two people on shift (a qualified Control Room Operator and a Certified Fuel Handler), in addition to other duties in support LACBWR's NRC license requirements to protect the plant personnel and the health and safety of the public.[60] Because the same monitoring and staffing activities are required throughout this period, the costs for these activities remain essentially the same.

5.3.2 Maintenance

Maintenance must be performed on systems, structures, and components required to support LACBWR's NRC license requirements, as long as there is fuel in the pool. The equipment required to be maintained does not change throughout this period. Therefore, the costs for these activities remain essentially the same.

5.3.3 Security

As long as there is fuel in the pool, the Security department is required to support LACBWR's NRC license requirements to protect the plant personnel and the health and safety of the public. Because the same monitoring, procedures, and activities are required throughout this period, the cost for these activities remains essentially the same.

5.3.4 Health Physics

The Health Physics department is required to support LACBWR's NRC license requirements to protect the plant personnel and the health and safety of the public, as long as there is fuel in the pool. Because the same monitoring, surveying sampling, and laboratory work are required throughout this period, the cost for these activities remains essentially the same.

From my experience and review of LACBWR license requirements and technical specifications, if any amount of fuel were in the pool, there would be no difference in O&M costs for storing spent fuel.

5.4 In the but-for world, there would be necessary activities and associated costs to transfer spent fuel to DOE.

I have been asked by the Department of Justice to offer an opinion concerning the activities needed to transfer spent fuel from LACBWR to DOE in the but-for world. LACBWR has not identified the costs associated with fuel transfer to DOE in the but-for

---

60 La Crosse Boiling Water Reactor Possession Only License, specifically section 6.2.

world. The specific effort and cost for this fuel transfer would depend on the type and size of cask provided by DOE in the but-for world. It is not possible to say with certainty what type and size of cask DOE would have provided to LACBWR. Because of this uncertainty, it is reasonable to evaluate the range of loading effort and activities associated with the range of possible casks that might have been brought by DOE.

The type and size of cask provided by DOE can depend on many factors including, but not limited to, the details of plant facilities and the infrastructure surrounding the plant. The effort and cost to load a cask can be substantially different depending on the cask assumed. DPC has not provided an opinion on what type and size cask would be expected had DOE performed in 1998.

While it is possible to determine the infrastructure limitations in the actual world, it is not possible with certainty to establish what actions would have been taken in the but-for world to reduce or eliminate infrastructure concerns affecting the type or size of cask to be used. The range of possible effort and costs is bounded by two possible cask options for LACBWR. One option would be the use of small legal weight truck casks, similar to those that were used previously to ship spent fuel from LACBWR. The other option is the use large rail type casks.[61] The work involved in all cases falls into three broad categories to support the use of the cask:

1. Plant Modifications
2. Site Modifications, and
3. Direct Cask Loading Costs

5.4.1 Plant Modifications

The LACBWR is a small facility in comparison to large current vintage nuclear power plants. Given the size of the facility it has limited capability to handle commercially available casks. While LACBWR has shipped spent nuclear fuel on several occasions

---

[61] LACBWR has in the past shipped fuel using the NAC-1/NFS-4 legal weight truck cask. The NAC-1/NFS-4 cask has a capacity of 2 BWR assemblies. A legal weight truck cask (GA-9) with capacity to hold 9 BWR assemblies was being developed but has yet to be licensed. A large rail type cask would have a capacity of as many as 68 or more BWR assemblies. Facility Interface Capability Assessment (FICA) Project Cask Handling Assessment La Crosse BWR, NAC C-8802800, October 1990, page 9.

prior to the breach using small truck casks, none of the DOE reference casks could be handled at LACBWR because of the geometry of the cask handling route.[62]

In the but-for world, had DOE provided a truck cask similar to that used previously at LACBWR, LACBWR would not have required any physical plant modifications. However, had DOE provided a larger cask, modifications would have been required to accommodate the cask due to physical limitations of LACWBR, such as:

1. LACBWR's containment openings are too small to accommodate a large rail cask without providing for a larger opening which would have required modification.[63]
2. Cask loading area diameter is insufficient to allow use of a large rail cask.[64]
3. There are additional limitations with the floor load limit, and the polar crane operating limit of 50 tons.[65]

None of these possible plant modifications and the costs associated with them have been accounted for by DPC.

5.4.2 Site Modifications

Given LACBWR's historical use of small truck casks to ship spent fuel, I conclude that in the but-for world, if small legal weight truck casks were used, then no significant site modifications would have been needed. However, if one assumes the use of large rail-type casks for transfer to DOE, there would be several activities that would be required.

---

[62] Facility Interface Capability Assessment (FICA) Project Cask Handling Assessment La Crosse BWR, NAC C-8802800, October 1990, page 2.

[63] Ibid, pages 2 and 11. The document says that the reference LWT cask with a 6 foot diameter will not fit through the airlock doors, thus a large rail cask with a much larger diameter will also not fit through the doors.

[64] Ibid, pages 2 and 11. The document says that the reference LWT cask with a 6 foot diameter will not fit in the cask loading area, thus a large rail cask with a much larger diameter will also not fit in the loading area. In the but-for world LACBWR could have considered other alternatives, including loading larger casks in the reactor pressure vessel (RPV). In that case, there would be additional modifications to support loading a cask in the RPV, including effort and cost associated with removal and disposition of any activated RPV internals, crane upgrades and building modifications. Alternatively, LACBWR could have decided to remove the RPV and install a fuel transfer liner (FTL) in the RPV location which would have required effort and cost to construct the FTL, and make other needed changes to support this structure after removal of the RPV.

[65] Ibid, page 9 for floor load limit and page 10 for the crane operating limit. Also, in his deposition Mr. Sans Crainte stated that to implement a different lifting system there would be modifications and other costs. Deposition of Charles Sans Crainte, January 30, 2007, 158:4-19.

These could include, but not necessarily be limited to the following:

1. Refurbishing or upgrading the haul path between the plant and the rail facility. At a minimum, evaluation would be needed.
2. Providing heavy haul equipment to move loaded casks to the rail facility.
3. Providing the drivers and other labor to actual perform the heavy haul.
4. Providing security to escort the loaded casks between the plant protected area and the transfer point to DOE (if outside the protected area).
5. Providing equipment and labor to transfer the cask from the heavy haul equipment to the rail car.[66]

Attempting to evaluate the costs for such modifications would require detailed information and analysis that is beyond the scope of what I have been requested to do. Therefore, I have made no attempt to quantify the effort or costs associated with the items 1 through 5 above.

5.4.3 Direct Loading

The cost for cask loading for a given number of assemblies depends on the type and size of cask to be used. For a given number of fuel assemblies, using a small cask holding fewer assemblies will generally require more total effort and cost than using a large cask holding more assemblies. The time and cost for loading a cask is not directly or strictly proportional to the number of assemblies.

To determine the range of possible costs for fuel loading, a base cost for loading a single cask or a fixed amount of fuel must be established. A "bottoms-up" estimate of the cost of cask loading could be performed. However, such an estimate would not, without substantial uncertainty, capture the detail of how LABCWR or any specific utility would manage and run such a project or allocate costs. Further, without substantial speculation, such a theoretical estimate would not account for the real-life difficulties, delays and unexpected costs that certainly will occur in any project of this nature, and such experience would be site specific. It is important, if costs are to be compared, that the but-for loading costs reflect the utility's project organization, management approach, plant-specific rules, and cost allocation methods.

---

66 In the event LACBWR chose to use its barge facility to ship casks, similar modifications relating to the haul path, heavy haul transport, security, labor and lifting equipment, etc. could be required, as well as the possible need to dredge and refurbish the landing area. There could also be other costs associated with required reviews and approvals, including but not limited to environmental and transportation approvals for barge shipment.

In general, transferring the fuel from a utility's spent fuel pool to the DOE would require the following:

1. Mobilization and demobilization of equipment and resources[67]
2. Receiving and preparing the cask (or canister) for placement in the spent fuel pool
3. Moving the cask into the pool
4. Loading the fuel assemblies one at a time into the cask
5. Placing a lid on the cask
6. Removing the cask from the pool
7. Draining and drying the cask
8. Completing the cask closure
9. Decontaminating the cask
10. Moving the cask from the building
11. Placing the cask on the appropriate transportation vehicle

LABCWR has some experience with loading spent fuel casks for transport to an offsite facility, and they have no experience with loading large rail type casks. LACBWR has neither actual cost data for loading large casks, nor provided any cost data that can be reasonably relied upon for loading smaller casks. In any event, loading a large cask holding 68 BWR assemblies could take about seven days to load, and that a small cask assumed to hold two BWR assemblies could take between one to two days to load.[68]

---

[67] In addition to the direct loading costs, one would also have to include the cost of mobilization and demobilization which would occur once for each loading campaign. Those costs would depend on how the utility would staff and manage the job.

[68] In deposition of the Plaintiff's expert Mr. Stuart, the witness provided his opinion that the time to load a small cask (such as the NAC-1/NFS-4 used at LACBWR) would be about one day excluding any planning time (Deposition of Ivan F. Stuart, May 24, 2007, 156:3 – 157:7). My opinion is also consistent in with the FICA report for LACBWR that indicates the turnaround time for a legal weight truck as 1 day. Facility Interface Capability Assessment (FICA) Project Cask Handling Assessment La Crosse BWR, NAC C-8802800, October 1990, database printout page 7.

Deposition of R. Alan Chapman, February 23, 2005, 181:7-183:1 in Tennessee Valley Authority v. United States of America, Case No. 01-249C. Loading a small legal truck weight cask at the Browns Ferry Nuclear Plant in December 2003 took from Saturday morning to late Sunday which would be more than one day but less than two days.