# Appendix A

# WARREN K. BREWER

## EDUCATION

Bettis Reactor Engineering School, 1976
M.S., Nuclear Engineering, Massachusetts Institute of Technology, 1976
B.S., Electrical Engineering, Louisiana Tech University, 1974

## EXPERIENCE

**1986 - Present - ABZ, Incorporated.**

Consulting Engineer specializing in nuclear power plant operations, decommissioning, severe accident analysis, electrical systems, instrumentation and controls, inservice inspection and testing (ISI/IST), configuration management, and procedure and technical specification reviews.

### Spent Nuclear Fuel Litigation

Participated in evaluation and analysis of damage claims resulting from the Department of Energy's breach of the contract with nuclear plant operators for the disposal of spent nuclear fuel. Participated in evaluation of actual costs as well as projected costs. Prepared expert witness reports and provided expert testimony.

### Rate Case Support

Testified before state regulators on the adequacy of a decommissioning cost estimate and assisted in the preparation of testimony for rate hearings on decommissioning funding. Prepared reports for state regulators concerning issues and evaluating costs estimates for decommissioning, low-level waste disposal and extended spent fuel storage. Provided training to state regulators on decommissioning technology and methodology of decommissioning cost estimating.

Performed reviews of operating, regulatory and management history of the Rancho Seco plant and assisted in the preparation of expert witness testimony evaluating the prudence, management effectiveness and technical soundness of the operation of the plant. This review included analysis of the management and technical programs for operation, analysis of the implementation of these programs, evaluation of responses to problems, and evaluation of response to regulatory concerns. The resulting testimony was submitted to the Federal Energy Regulatory Commission in support of an action brought by the Pacific Gas and Electric Company.

Performed management and technical reviews of the seismic design of the Pacific Gas and Electric Company's Diablo Canyon Power Plant. These reviews were conducted as the basis for preparation of expert witness testimony before the California Public Utility Commission. These reviews included evaluation of the programs for performance of the engineering and design, review of the seismic design audit conducted by an independent contractor, and review of the actual seismic design criteria, assumptions, inputs and calculations.

Participated in preparation of expert witness testimony concerning the operation and maintenance of a nuclear power plant in the Northeast. The review and analysis included evaluation of technical and management programs and procedures, the implementation of these programs and procedures, and utility response to specific operational and regulatory problems and concerns. In short, the analysis and resulting testimony focused on the question of whether the plant was well-maintained and operated from the standpoint of sound engineering practice, compliance with Nuclear Regulatory Commission (NRC) requirements and adherence to industry standards.

Provided technical and engineering support to Niagra Mohawk Power Corporation (NMPC) on issues related to Nine Mile Point decommissioning cost estimate during negotiations with the New York State Public Service Commission. NMPC had begun a Public Service Commission mandated process to sell its nuclear power plants. The decommissioning cost estimate represented a significant portion of the overall sale.

Provided an expert opinion on general technical, financial, and regulatory issues related to the decommissioning process for Limerick Nuclear Power Plant. Evaluated those issues as they applied to Limerick, including Nuclear Regulatory Commission rules, Public Utility Commission rulings, and decommissioning funding levels.

**Decommissioning Planning**

Provided technical assistance to the Long Island Power Authority (LIPA) in planning for the decommissioning of the Shoreham Nuclear Power Station (SNPS) and developing a technical organization qualified for assuming responsibility of the plant. The analysis required a detailed evaluation of SNPS's Final and Updated Safety Analysis Review, Technical Specifications, and Nuclear Regulatory Commission (NRC) codes and standards. The requirements for maintaining a plant during decommissioning and performing functions, such as fuel removal, decontamination of systems and components, and monitoring potentially radioactive releases, were also reviewed.

Developed a draft decommissioning plan for the San Onofre Nuclear Generating Station, Unit 1 (SONGS-1). This plan included input from other prematurely shutdown plants and an assessment of Nuclear Regulatory Commission (NRC) guidance applicable to SONGS-1. The plan also included a preliminary assessment of decommissioning options, a description of the plant during long-term storage prior to decommissioning, information on organization and staffing, and an evaluation of NRC requirements relative to the plant's shutdown condition. Evaluated spent fuel disposal options for SONGS-1, including onsite storage in independent storage vaults, use of the existing spent fuel pool, storage at other facilities, etc. Also evaluated dismantling options for SONGS-1, including decontamination and dismantlement in 1997, removal of contaminated systems prior to NRC approval of the decommissioning plan, and decommissioning when the licenses for SONGS-2/3 expire in 2013. Provided cost benefit analyses of the options, the uncertainties and a recommended course of action.

Reviewed the decommissioning funding, spent fuel disposal plans and preparations for nine nuclear power plants, as part of an overall study of the nuclear power plants as requested by the United States Congress, Office of Technology Assessment. Conducted panel meetings to review the findings of the report. The panel members included interveners, public utility

commissioners, industry representatives, and university professors. The results of the report were presented to the Nuclear Regulatory Commission Commissioners.

Assisted Taiwan Power in developing the infrastructure for decommissioning a nuclear power plant. Provided a detailed listing and analysis of the U.S. requirements for decommissioning. The list included the technical and regulatory documents necessary to decommission a U.S. nuclear power plant; such as NRC regulations, regulatory guides, and industry documents. Developed an inventory of skills, organizational structure, and position descriptions that would be needed for a successful decommissioning organization.

**Decommissioning Cost Estimating**

For numerous utilities, developed decommissioning cost estimates and updates to the estimates for nuclear power plants. Utilized site-specific information such as labor rates, equipment inventories, staff salaries, and other data to prepare the estimates. Entered the information and data into the Decommissioning Cost Analysis System (DECAS), an ABZ developed, PC-based computer program for estimating the decommissioning costs. DECAS was then used to develop the costs for several different scenarios to determine the least cost decommissioning option. Provided training in DECAS to allow updating of the estimate in the future without outside assistance.

Performed a detailed evaluation of the Nuclear Regulatory Commission (NRC) decommissioning cost estimate for Trojan and evaluated the NRC Decommissioning Cost Estimating Computer Program (CECP). Identified significant deficiencies such as improper scaling, low staffing levels, and difficult user interface. The results of the review was provided to both the Department of Energy (DOE) and the NRC.

Assisted the Southern California Edison San Onofre Nuclear Generation Station (SONGS), Unit 1 plant staff in applying NRC guidance on prematurely shutdown plants to the planning of near-term activities for the plant's shutdown. Because specific regulations do not exist for prematurely shutdown plants, assessments of actions taken by other plants were made and used to minimize the cost and schedule impact on the SONGS-1 shutdown. Evaluated the SONGS-1 operating license to determine the overall impact of the plant shutdown on routine plant activities, such as maintenance, testing, and operation of plant equipment. This evaluation was used to significantly reduce the programs and procedures needed to comply with the license. In addition, specific recommendations were made to seek regulatory relief in areas such as fire protection, security, training and quality assurance. Developed a comprehensive plan for pre-decommissioning initiatives for SONGS-1. This transition plan was used to schedule and implement the activities needed to take the plant from full-power-producing status to decommissioning. The plan provided guidance to managers for developing detailed departmental plans for closure of the unit. The overall goal of the plan was to minimize cost by utilizing existing utility resources and ensure compliance with applicable regulations.

Performed a detailed evaluation of the cost estimate prepared for the Seabrook Nuclear Power Plant for the New Hampshire Nuclear Decommissioning Financing Committee. This evaluation included an independent estimate, detailed evaluation of the costs included, comparison to other estimates, independent verification of input data and assumptions, comparison to actual decommissioning experience, performance of sensitivity analyses for factors such as waste

burial charges, determination of the "most likely" decommissioning option, and analysis of the required decommissioning trust funding schedule.

Evaluated the decommissioning cost estimate for Indian Point Unit 2. This was part of an effort to assist the New York Public Service Commission staff in understanding the estimate, evaluating the projected cost of waste disposal and reviewing staff testimony for the rate hearing. In addition, ABZ provided the staff with a two-day training seminar on decommissioning, including the Nuclear Regulatory Commission rules, decommissioning technologies, estimating decommissioning costs, and disposal of spent fuel.

Performed a comparative analysis of decommissioning cost estimates for a nuclear power plant for British Nuclear Fuels Limited, Inc. (BNFL). Due to significant differences between the estimates, BNFL needed an independent evaluation of each and a detailed understanding of the differences.

For the Massachusetts Attorney General, evaluated the decommissioning cost estimates and funding plans for all nine New England nuclear power plants. Analyzed the estimates against specific criteria related to the disposal of low level radioactive waste and the storage of spent fuel. Each plant's estimate was adjusted accordingly and the decommissioning shortfall determined. The effect of premature decommissioning was also evaluated.

Performed a comprehensive evaluation of decommissioning unit cost factors and reactor vessel disposal options for Mitsubishi Material Corporation. Developed a detailed process for analyzing the cost factors to enable the Japanese to understand the unit cost factor approach to estimating, and become capable of using U.S. experience in development of their own estimates. In addition, evaluated the disposal options for the reactor vessel, including shipment to a waste disposal site, as it own container.

Provided a review of the Turkey Point and St. Lucie decommissioning cost estimates for the Florida Public Service Commission. The review pointed out a number of inconsistencies in the estimated spent fuel storage costs, unit cost factors, use of contingency, etc. Presented the review as part of a decommissioning course for about 20 employees of the Commission staff.

Performed several analyses of the decommissioning costs for the Plumbrook Station for the National Aeronautics and Space Administration (NASA). The Plumbrook reactor was operated from 1967 to 1973 as a test platform for the NASA space reactor program. The reactor was placed in SAFSTOR and is scheduled for decommissioning in 2001. Developed an independent cost estimate and assisted NASA with reviewing contractor proposals for the decommissioning. The reviews included evaluations of the proposed project schedules, equipment inventories, labor force, staffing, etc.

**Decommissioning Project Oversight**

As a result of the Shoreham Nuclear Power Station (SNPS) settlement between the Long Island Lighting Company (LILCO) and the New York Public Service Commission (NYPSC), provided technical oversight to the New York Power Authority's (NYPA's) efforts to decommission SNPS. Several first-time, major, safety-related activities were performed to remove the fuel and contaminated systems from SNPS. These included segmentation of the reactor vessel, transfer of the operating license from LILCO to LIPA, dismantlement of major contaminated

systems, such as residual heat removal and reactor water recirculation. In addition, several staffing and organizational issues were addressed including qualifications of the LIPA staff, development of decommissioning procedures, implementation of the decommissioning plan requirements, and safe removal of the irradiated fuel to another facility. Provided LIPA with detailed monthly assessments, which compared project controls (procedures, plans, etc.) against the standards and codes imposed on the activity.

**Severe Reactor Accident Analysis**

For Louisiana Power & Light Co., developed the first site-specific severe accident cost analysis for a commercial nuclear power plant. The analysis of the Waterford-3 plant included calculation of end-state damage costs, evaluation of insurance pay outs and incorporation of risk assessment data. In addition, provided an update to the study to account for changes in labor rates, burial costs and the risk assessment.

Analyzed the cost to decontaminate the General Public Utilities Service, Inc. (GPU) assets of Three Mile Island, Unit 2 (TMI-2) in the event of contamination due to a severe reactor accident at TMI-1. The cleanup costs were based on two isotopic releases provided by GPU. For each of the releases, the costs were determined for 3 different amounts of the released contamination being present on the GPU responsible TMI-2 buildings and structures at the time of the cleanup effort. The costs were determined consistent with the ABZ methodology for evaluating the cost to cleanup a reactor facility following a severe reactor accident. This methodology has been used for evaluating severe accident costs and determining the appropriate level of nuclear property insurance for about half of the commercial nuclear facilities in the United States.

*Generic Severe Accident Cost Models*

Provided American Nuclear Insurers (ANI) with an analysis of the estimated costs required to cleanup a commercial nuclear power plant after a severe accident. The analysis used several industry recognized studies on severe accidents, decommissioning costs associated with the Three Mile Island, Unit 2 (TMI-2) accident and related Nuclear Regulatory Commission (NRC) data. First, the Industry Degraded Core Rulemaking (IDCOR) analysis on severe accidents was evaluated for information related to accident sequence end-states. Four end-states for a "generic" 800 MWe boiling water reactor (BWR) and pressurized water reactor (PWR) were chosen. The cost estimates for TMI were then adjusted using severe accident scaling factors and the NRC data to estimate the costs for cleanup from IDCOR end-states. The study received industry-wide peer review, was well-received and is known as the "1989 ABZ Study."

Provided American Nuclear Insurers (ANI) with an updated version of the "1989 ABZ Study" for a 400 MWe pressurized water reactor (PWR). Given the substantial interest in the original study, refined the cost analysis using more detailed equations for

calculation of radiation dose, breakouts of the cleanup staffing, cost of waste burial, etc. These factors were used as the basis for an integrated cost analysis computer program which permits virtually any severe accident end-state to be analyzed for cost. This new approach was implemented at a small reactor in the Northeast. The analysis determined the cleanup and stabilization costs associated with four Industry Degraded Core Rulemaking (IDCOR) end-states using plant-specific data, such as core size, regional labor rates, containment configuration, etc. ANI provided the study to the owners of small reactors as a guide for purchasing property damage insurance. Finally, the utility provided the study to the Public Service Commission as justification for the insurance purchased.

Provided Severe Accident Cost Studies for 31 U.S. and four international nuclear stations for the purpose of determining the proper amount of nuclear property insurance. Analyzed each plant based on common characteristics such as size, containment type and reactor type. The insurance claims cost for stabilization and clean-up, and damaged and undamaged property were calculated using the ABZ Severe Accident Cost Analysis System (SACAS) for accidents with varying amounts of core damage for a single accident similar to the accident at Three Mile Island Unit 2. Provided a final report summarizing the SACAS results as well as providing the detailed backup information to support the analysis. These methods have become the standard in the industry and are used by utility risk managers to make recommendations to corporate officers and boards regarding the appropriate level of insurance to purchase.

For Nuclear Electric Insurance Limited (NEIL), provided an analysis that estimated the cashflow requirements for insurance in the event of a severe nuclear accident. ABZ evaluated five nuclear power plants that represented a cross section of the industry. The evaluation consisted of determining the losses from representative accidents using the existing coverages for each plant. Stabilization and clean-up cost were determined using industry data from the Three Mile Island accident and data from the Nuclear Regulatory Commission. In addition, the structure (i.e., primary and excess layers) of the insurance was considered. NEIL used the analysis for re-insurance purposes and to support their underwriting.

Determined the events that would lead to a functional total loss of the nuclear power plant for Nuclear Mutual Limited. Evaluated data from previous losses and studies performed by government agencies. Considered accidents that have occurred in the past, both nuclear and non-nuclear related. Determined the activities needed to restart the plant based on current regulations and recent restarts for plants shutdown for equipment and management problems. An evaluation of the likelihood of restart from a range of accidents was determined. The evaluation included comparing the level of effort and cost needed to restart against the type of accident, and then made a determination of those events which were likely to make restart impossible and therefore result in a total functional loss.

For American Nuclear Insurers (ANI) and the Japanese Atomic Electric Insurance Pool, performed a severe reactor analysis cost study of the two nuclear power plants (OHI-3 and Kashiwazaki-Kariwa-3) owned and operated respectively by the Kansai and Tokyo Electric Power Companies.

Performed a severe reactor analysis cost study of the Daya Bay nuclear power plant for AON Risk Services of Hong Kong. In addition, assessed the nuclear operational safety management of the Daya Bay and Ling Ao units. Several safety systems were selected for review including the operating procedures, maintenance records, and system prints.

**Plant Construction Costs**

Performed an independent evaluation of vendor overnight construction costs for three advanced nuclear power plants. Assisted the Energy Information Agency (EIS) Office of Integrated Analysis and Forecasting (OIAF) in determining the appropriate overnight construction costs to be used in the Electricity Market Module (EMM). The EMM provides inputs to the National Energy Model (NEM). OIAF uses the NEM to prepare the Annual Energy Outlook (AEO), which analyzes and projects national energy use.

**Design Basis / Licensing Basis / Operating Basis**

Provided engineering and management services as part of an integrated team to validate and update the Southern California Edison's San Onofre nuclear plant design basis documentation. Reviewed and evaluated the plant's existing documentation against the regulations, the technical specifications, the Final Safety Analysis report and other requirements. The final product was a verified design package for each system, which formed the bases for future changes in the plant, its design, and technical specifications.

Prepared numerous design basis documents (DBDs) for systems including the safety injection system, the auxiliary feed water system, the chemical and volume control system, the reactor coolant pumps, the systems and procedures that control plant chemistry, steam generators, etc. Each design basis package required the systematic development of the system boundaries, review of the system's licensing basis, determination of the design and licensing margins, resolution of any discrepancies, and reconciliation of review comments. In addition, performed independent reviews of other DBDs performed by others.

The project required a detailed understanding of the plant's thermal and hydraulic performance under both accident and normal conditions. This included evaluation of pressure and temperature limits on the reactor vessel, flows in the reactor coolant systems during upsets, sizing of relief lines, and numerous heat balances. In addition, developed a model to simulate the plant response during loss of coolant accidents in order to estimate the minimum time needed to initiate an important safety action.

Conducted in-depth review of technical specifications and associated surveillance test procedures for an operating boiling water reactor. Provided technical comments on specifications and procedures to the utility. Provided interface with utility representatives for resolution of comments. Data developed was utilized in a computerized system for scheduling and tracking test performance.

**Plant Engineering and Operations**

Managed and participated in the development of computer program for fluid flow analysis. The program is applicable to a wide range of facilities and industries. The program has been marketed world wide since 1992 with an estimated 20,000 to 25,000 users as of the year 2000.

Managed the development of advanced computer systems for assisting plant staff in compliance with regulatory requirements. These systems utilize artificial intelligence programming techniques to model expert knowledge associated with these regulatory requirements. This effort involved understanding and codifying the requirements, understanding how the plant procedures implement the requirements, understanding the ASME code limits for various types of test parameters, and then designing and constructing a computer code for assisting plant staff in the management of test information scheduling and data analysis. The systems developed included:

- Surveillance Requirements Monitor - This system provides assistance in tracking and scheduling technical specification surveillance tests and inservice tests. Development of the system included codifying the detailed plant conditions and administrative requirements for scheduling of these tests. This system has been in commercial use for about two years.

- Data Trending System - This system provides assistance in tracking and trending detailed test data, including assessment of recorded data for compliance with limits specified in the technical specifications and the American Society of Mechanical Engineers (ASME) code. Other functions include tracking the use of measuring and test equipment. This system has been in commercial use for about two years at one facility and for about eight months at a second facility.

- Event Reportability Monitor - This system, developed as a pilot project for the Pacific Gas and Electric Company, provides expert assistance in determining the reportability of plant events in accordance with technical specification requirements and Code of Federal Regulation requirements.

- Limiting Conditions for Operation Monitor - This system, also developed as a pilot project for the Pacific Gas and Electric Company, assists in assessing the status of plant components and equipment against the limiting conditions for operation in plant technical specifications. The system identifies any required corrective action, provides detailed

explanation of the results and keeps a log of required actions and deadlines.

- Personnel Manager - This system was developed to assist plant management to monitor scheduling of nuclear plant operators and ensure compliance with the regulations concerning the use of overtime for nuclear plant operations personnel while ensuring the required staffing was maintained at all times. The system was developed for two different utilities with different operating shifts rotations and plant specific requirements.

Provided expert assistance to the programmers in developing a state-of-the-art desktop nuclear power plant simulator for training operators to learn and understand event-based Emergency Operating Procedures (EOPs). The program included a graphics interface that mimics the plant control boards, a real-time thermohydraulic model and the steps in each EOP. This involved the design of realistic yet workable user interface, evaluation and analysis of emergency procedures to assist in modeling correct operator actions, assisting in developing training text to be included in the system, and development of a simple plant simulation for use as an initial prototype. After procurement of a very detailed plant simulation, evaluated the plant behavior produced and created emergency scenarios for testing and demonstration of system capabilities.

Performed a detailed evaluation of the maintenance program at Diablo Canyon Power Plant. This included comparing the program elements with the regulations, evaluation of specific work packages and implementation of work in the field.

Provided Commonwealth Electric Company (CECO), a co-owner of the Pilgrim Nuclear Power Plant (PNPP), with a comprehensive and detailed evaluation of the plant's personnel, organization, regulatory effectiveness, and improvement programs. Performed several "vertical audits" in technical areas, including design modifications, technical procedure adequacy, and implementation of the plant's test program.

Provided input to the final Electric Power Research Institute (EPRI) report on managing the decommissioning decisions in the context of plant life cycle management.

Evaluated a computer code used to provide design details for a heat recovery steam generator. Provided engineering and technical support to Mitsubishi Heavy Industry (MHI) in a contract dispute with an Italian firm. Evaluated the code, met with the MHI designers, and provided testimony before an international panel of judges.

Analyzed the circumstances surrounding a 1985 overexposure of a former radiation protection technician at the Peach Bottom plant, who claimed that he was overexposed to radiation during an inspection of the off-gas pipe during power operation. Provided a detailed report to support the plaintiff's claim, including an estimation of his actual

exposure using plant prints, operating logs and the depositions of plant managers and operators at the time of the overexposure.

For the nuclear power plants owned and operated by the Korean Electric Power Company, performed a survey of Young Kwang Units 2 and 3 to assess the nuclear operational safety management of the units.

**Regulatory Compliance / Licensing**

Evaluated Baltimore Gas and Electric Company's (BG&E's) document control needs related to the complex licensing and engineering requirements needed to extend the life of the Calvert Cliffs plants. The evaluation included in-depth interviews with management and engineers to address their specific needs, process flow, use of existing computer systems, and interfaces with other plant departments. As a result of the evaluation, an expert system that provided life cycle engineers with an assessment of the impact of document revisions on their system and component analyses was developed, tested and implemented.

Assisted the U.S. Nuclear Regulatory Commission (NRC) and the University of California, Los Angeles (UCLA) in developing a quantitative safety assessment model for evaluating nuclear power plant organizations and the effect of the organization on plant risk. For several years, the NRC had attempted to define more clearly the relationship between the management of the plant and the plant's probabilistic risk assessment (PRA). In addition, the NRC had attempted to understand the depth of technical knowledge beyond the requirements in the regulations needed to safely operate and maintain a nuclear power plant. ABZ provided a framework entitled the Work Process Analysis Model (WPAM) for making the connection between work performed in a power plant and the effect of that work on risk. In addition, ABZ provided a "straw man" for defining the "deep technical" knowledge required by nuclear power plant staffs. A deep technical knowledge matrix consisting of each power plant position and the depth of knowledge required underwent peer review.

Participated in the development of several prototype artificial intelligence-based computer programs designed to explore computer-based assistance for the utility staff with respect to compliance with various regulatory requirements. One of the applications dealt with assessing the reportability of plant events in accordance with the Code of Federal Regulations. This involved understanding the regulations and developing a framework for modeling these requirements in a manner that would be useful to a relatively inexperienced analyst. The other applications dealt with various aspects of compliance with the requirements of the plant's Technical Specifications and operating license. These included applications which dealt with understanding and applying the quality assurance requirements for safety-related work.

**Risk Assessment**

Participated in a cooperative project with the Electric Power Research Institute and Houston Industries to develop a site specific property damage risk assessment profile for the South Texas Project. The work was based on an earlier analysis that was performed for the plant's insurance needs, and was expanded to include additional scenarios, inclusion of risk analysis insights, and development of information to be used in the decision on how much insurance to purchase.

**Environmental Impact Statements**

Reviewed and commented on environmental impact statements for proposed reactor facilities, radioactive waste disposal facilities and commercial power plant decommissioning.

For the U.S. Department of Energy, provided expert assistance in evaluating the generic environmental impact statements for the New Production Reactor. This included verification and validation of offsite releases, environmental impacts and the technical aspects of operation. These different designs were considered in at least five different locations.

**Quality Assurance / Oversight**

Performed a comprehensive evaluation of the Pacific Gas and Electric Company (PG&E) Quality Assurance (QA) Program for the Diablo Canyon Independent Safety Committee, which included a comparison of the program objectives against the regulations, interviews with QA personnel, implementation of QA procedures and the qualifications of QA personnel. The evaluation also included the observation of safety-related work during a refueling outage.

Participated as a member of the Maine Yankee Nuclear Oversight Committee (MYNOC). MYNOC was chartered to identify problems at the Maine Yankee Nuclear Power Station (MYNPS) and report them to the Board of Directors. The committee met quarterly at the station, interviewed members of the plant staff, toured the station, met with the Maine Yankee Atomic Power Company (MYAPC) President, and prepared detailed reports. An overall assessment of the station performance was made and important safety issues identified.

Philadelphia Electric Company (Seco) had expressed an interest in purchasing the Maine Yankee Nuclear Power Plant. The Governor of Maine requested an independent assessment of the capability of SECO to operate Maine Yankee. An evaluation of the operational performance of SECO's units was completed by reviewing the public record and conducting interviews with industry personnel who were familiar with SECO performance, including NRC inspectors and former utility management personnel. Provided a detailed report and presentation to the Governor with supporting documentation.

**Software Quality Assurance**

Developed methods for verification and validation of expert system computer codes based on industry guidelines and accepted criteria for conventional codes. Applied these methods to systems developed and discussed above. Presented lecture to the NRC on methods of verification and validation as part of a lecture series on software quality assurance. Authored paper for ASME meeting in the Fall of 1990 on the subject of expert system verification and validation.

**1986 - Pickard, Lowe and Garrick, Inc.**

Consulting Engineer.

Conducted detailed review of technical specification surveillance test requirements for a nuclear power plant. This included detailed review of the implementing programs and procedures, and providing detailed comments for procedure revisions to ensure regulatory compliance. In this review, primary responsibility was for electrical and instrumentation and controls functions, particularly control of emergency core cooling systems and primary containment isolation.

Conducted detailed review of technical specification requirements, technical specification basis, regulatory background, industry practice and implementing procedures at a nuclear power plant for required logic system functional testing and simulated automatic actuation testing of emergency core cooling systems and primary containment isolation. This work involved review of procedures against detailed system schematics to determine the adequacy of the procedures. Formulated procedure changes and technical response to solve a long-standing regulatory concern with the adequacy of these tests.

Reviewed plant-specific probabilistic risk assessment (PRA). Along with general evaluation, provided assessment of operational considerations and/or lessons resulting from the PRA.

Participated in procedure review and upgrade project. This project involved review of operations procedures as well as surveillance test procedure and preparation of revised procedures to improve technical accuracy and content, and to incorporate human factors considerations for enhancing ease of use and strict compliance.

**1982 - 1986 - United States Navy, Division of Naval Reactors.**

Head, Reactor Plant Systems - New Design Submarine.

Lead responsibility for reactor plant performance, safety and quality.

Conducted various trade-off studies to establish overall design criteria for new design reactor and propulsion plant. This included evaluation of possible performance maintainability, survivability, constructability and cost. Established general design characteristics for further development.

Evaluated various proposed core designs to determine optimum design to fit overall propulsion plant design goals. This included evaluation of thermal hydraulic performance, safety evaluation, normal plant response analysis and reactor structural design assessment, including response under shock loading.

Reviewed and approved conceptual system designs, performance criteria and detailed design bases. As design progressed, this included increasing levels of detail to system design descriptions, design calculations, component sizing, system schematics and construction details.

Participated in design of major plant components to ensure structural soundness, compliance with overall design goals and ability to interface with other systems and propulsion plant arrangement.

Reviewed and approved design of reactor plant structures, such as component foundations. This was very important since effort was made to optimize designs to conserve weight and space while still meeting shock design requirements, satisfying construction constraints and retaining life-cycle maintainability. This work included detailed review of shock analysis and formulation of design modifications to eliminate areas of non-conformance. Also reviewed and approved arrangement and support of major piping to ensure structural capability and maintain adequate flexibility to account for all operating conditions, including ship motion.

Reviewed and approved plant arrangements. This involved participation in audits of the full-scale plant mockup, as well as drawing reviews. The reviews of the full-scale mockup focused on ensuring plant equipment was arranged so that ease of operation and maintenance were maintained within the technical constraints for performance and function.

Reviewed reactor and plant control system designs for compatibility with mechanical system designs and core performance and capabilities.

Reviewed and approved operating transient response predictions to be used in life-cycle evaluations of plant. This included detailed analysis of the reactor core response to various operating and abnormal transients, coupled with the connecting system responses. Thus, this involved evaluation of the core design thermal hydraulic response, as well as the dynamic fluid system response of primary and secondary systems.

Developed life-cycle plant operating profile based on mission requirements and data from previous submarine classes. This profile was used in establishing the detailed core design parameters necessary to achieve the desired core lifetime.

Had lead responsibility for design initiatives to mitigate the consequences of complete loss of AC power and to ensure safety of surrounding population if this type event occurred near port.

Participated in extensive effort to reduce plant weight. This involved evaluation of new materials, unique construction ideas, significant system design change from past practice and alternative design criteria. Each idea evaluated was considered for its total effort on capability, constructability, life-cycle cost and maintainability.

Participated in Naval Reactors crew quizzes for crews of operating submarines to test knowledge and ability of ship crew to safely and efficiently operate the propulsion plant. Responsibility was mainly for testing in the area of reactor plant mechanical system operation.

**1980 - 1982 - United States Navy, Division of Naval Reactors.**

Head, Reactor Plant Systems - TRIDENT Submarines.

Supervised engineering group. Directed efforts concerning design, construction, operation, maintenance, testing and configuration control of reactor plant fluid systems and structures for TRIDENT submarine. Similar duties in connection with land-based TRIDENT reactor plant prototype.

Responsible for shock design of shipboard reactor plant components and structures. Similarly, responsible for seismic design of structures, systems and components unique to land-based prototype. Seismic design was done to the same criteria imposed on commercial nuclear power plants.

Developed inservice test (IST) and inservice inspection (ISI) program for land-based prototype conforming to ASME Code, Section XI. Thus, these programs were in compliance with the requirements imposed on commercial nuclear power plants.

Responsible for design, acceptance testing, operation and maintenance procedure for emergency core cooling system for the land-based prototype. This system was designed to comply with NRC requirements imposed on commercial power plants for similar systems. This also included design of remote shutdown capability, ultimate heat sink and remote operating station habitability systems for long-term cooling if the normal operating stations became uninhabitable.

Responsible for preparation of reactor plant operating, maintenance and test procedures. This included monitoring of the test program performance, evaluation of test results and resolution of test program problems.

Evaluated operation incidents and established corrective actions based on these evaluations. Corrective actions could include design change or procedure changes.

Evaluated and resolved construction deviations from specified requirements. Deviations were evaluated for effect on functional capabilities, structural soundness, and effect on operability and maintainability. These evaluations included evaluation of effect on core thermal hydraulic performance, system response and plant shielding, where applicable.

Participated in examination of prototype operating crews to evaluate level of knowledge and capability to safely operate the reactor plant.

Responsible for design, construction, operation and maintenance of support systems, such as process cooling water and associated cooling tower to support prototype operation.

**1976 - 1980 - United States Navy, Division of Naval Reactors.**

Project Engineer, TRIDENT Class submarine propulsion plant design.

Coordinated government laboratory and shipyard work in all phases of design, construction, operation, testing and maintenance of steam plant fluid systems for TRIDENT submarines and land-based TRIDENT submarine prototype.

Responsible for design of shipboard structures and piping systems in accordance with shock design criteria.

Responsible for preparation of verbatim compliance operating and maintenance procedures. This included performance of procedure verification and validation.

Responsible for design of safety systems unique to the land-based prototype, including compliance with NRC requirements for similar systems in commercial power plants.

Evaluated and resolved shipyard construction deviations for structures and systems under my cognizance. This included approval of as-built conditions of formulation, and approval of corrective actions.

Participated in the evaluation, analysis and resolution of large-scale shipyard error resulting in unapproved material substitutions. This involved tracking and identifying where incorrect materials had been used, evaluating and testing the acceptability of the material as-built, and approving the as-built condition or specifying the required rework.

**Testimony**

State of New Hampshire Decommissioning Finance Committee hearing on the Seabrook Nuclear Power Plant decommissioning funding, 1994

Mitsubishi Heavy Industries, Ltd (Japan) v. Finmeccanica S.p.A., Azienda Ansaldo (Italy), as successor in interest to Ansaldo S.p.A., International Court of Arbitration, Case Number 10269/OL/ESRT/TE, June 2001.

Tennessee Valley Authority v. United States of America, Case No. 01-249C, July 2005.

**Appendix B**

## DOCUMENTS CONSIDERED

Plaintiff production (Documents with PLAC, PDPC, DPID, DAP and SMIT prefix Bates numbers).

Plaintiff fact and expert witness depositions.

The following were relied upon in forming my opinions:

La Crosse Boiling Water Reactor Possession Only License

Expert Witness Report of Todd D. Smith, March 23, 2007

Deposition of Todd D. Smith, May 22, 2007

Deposition of Charles V. Sans Crainte, January 30, 2007

Deposition of Ivan F. Stuart, May 24, 2007

RPV Removal/Disposal & B/C Waste Disposal Contract, PLAC0049955-PLAC0050102

Duratek Project Status Report, August 2006, PDPC0033426

DPC Power Cooperative, La Crosse BWR Pressure Vessel Disposition Analysis, Phase 1 Report, SMIT0000062

Letter from Mark Kirshe (Duratek) to Roger Christians (DPC) dated April 6, 2005, PDPC0027567-PDPC0027581.

Duratek presentation concerning the phase 1 work dated July 6, 2005, PLAC0081001-PLAC0081030.

2003 LACBWR Decommissioning & Decontamination Cost Study Update, July 2003, PLAC0023723-PLAC0023745

WPI Phase 1, Task 2 - LACBWR RPV Activated Material Report, 2/19/2003, PLAC0000455-PLAC0000477

WPI Phase 1, Task 9 - LACBWR Spent Fuel Characterization Report, 12/5/2002, PDPC0007773-PDPC0007807

Maine Yankee Atomic Power Station, Decommissioning Costs Analysis, October 28, 1997, Appendix C, Pages 3 and 9 of 9.

Facility Interface Capability Assessment (FICA) Project Cask Handling Assessment La Crosse BWR, NAC C-8802800, October 1990

Deposition of R. Alan Chapman, February 23, 2005, 181:7-183:1 in Tennessee Valley Authority v. United States of America, Case No. 01-249C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------X

DAIRYLAND POWER COOPERATIVE, :

Plaintiff, :

v. : Case No. 04-0106C

UNITED STATES OF AMERICA, :

Defendant. :

------------------------------X

Washington, D.C.

Thursday, July 19, 2007

Deposition of

WARREN KEITH BREWER

called for oral examination by counsel for Plaintiff, pursuant to notice, at the Law Offices of Greenberg Traurig, LLP, 800 Connecticut Ave., Northwest, Suite 500, Washington, D.C. before Cindy L. Sebo, RMR, CSR, RPR, CRR, Capital Reporting Company, Notary Public in and for the District of Columbia, beginning at 9:03 a.m., when were present on behalf of the respective parties:

Page 54

done on the Dairyland spent fuel case?
MR. SHULTIS: Objection; vague.
THE WITNESS: It's sort of a fair assessment, because I think, in all of these cases -- for example, in the cases where Mr. Leonard was the testifying expert, to some degree, you would say that Mr. Leonard was the supervisor, because the other people working on the case were, in large part, doing work to support what he needed -- what he believed he needed to form his opinions. So in that regard, yeah.
In other regards, I'm not the supervisor, because, like I say, most of the -- most of the business end of the stuff, the arrangements with all these people and everything is really done by Mr. Abbott.
So I mean, I -- you know, in that regard, he's the supervisor.
BY MR. SHAPIRO:
Q. What have you actually done -- you, personally, Mr. Brewer, done on Dairyland's case?

Page 55

A. What have I personally done? I've reviewed documents; I've reviewed depositions; I've reviewed -- you know, been at the site; I reviewed expert reports. I mean, that's the broad shell of what I've done.
Q. Have you done any sort of analysis for Dairyland's spent fuel case?
MR. SHULTIS: Objection; vague.
THE WITNESS: Well, inherent in review of the documents and review of -- of reports and review of depositions is analysis. That's the whole point of doing the review is to analyze what's been said, whether that's reasonable, whether it's supportable, whether it's, from an engineering sense, appropriate.
So, yeah. I mean, that's what the reviews are all about. If by "analysis," you mean have I performed any sort of detailed calculations of something, the answer is no.
BY MR. SHAPIRO:
Q. What work product have you received from others at ABZ, either employees or

Page 56

contractors, regarding the Dairyland case?
A. Nothing. We've had lots of meetings, lots of discussions. I, Mr. Sweeney or others may have, in a lot of cases, said here's a document that's in the production, you ought to look at this for whatever reason, it relates to Issue X, Y or Z, but no work product.
I mean, there's nothing that they produced above and beyond those documents that were produced by Dairyland.
Q. Have you personally created any -- any work product other than -- well, have you created any work product in Dairyland's spent fuel case?
A. No. Other than my expert report, the answer is no.
Q. Did you personally do the drafting of your expert witness report?
A. With one exception, the answer is yes. And the one exception is the list of documents that appears in -- I don't know -- Appendix Z or D. I don't remember what the appendix letter is.
As I have done in any case where I've

Page 57

prepared such a report, the list of documents expressly relied on has been created by our administrative assistant. Basically, I give her the report and say, here's the report, make me a list of all the documents that I refer to in any footnotes or any direct reference in -- within the document. And she makes the list.
So I don't type that. I don't create that, other than by virtue of it's created from the footnotes or -- or text that I had written.
So that's the exception.
Q. Can you describe for us -- how did you go about drafting your expert witness report in the Dairyland spent fuel case?
MR. SHULTIS: Objection; vague.
THE WITNESS: I'm not exactly sure how to answer that. I mean, you know, mechanically, I sat down and started writing based on what I had learned in the review and evaluation of the documents and depositions and -- and everything else that I had reviewed or people had reviewed for me. And so I sat down and started writing the

 ©2007

Page 114

anyone could say it's -- it's more accurate one way or the other. It would be more reflective of what the utilities would ultimately expect they're going to do. Because, you know, ultimately, none of them expect they're going to just walk away and hand the keys to the plant to a contractor and have them do the work.
They're going to be there in some form or fashion to potentially do some of the work and to monitor the work and to manage the work in -- at some level. So, yeah. That's what they think they will do.
MR. SHAPIRO: Let's take a break.
(Recess.)
BY MR. SHAPIRO:
Q. Mr. Brewer, I'm going to switch subjects a little bit, start getting into some of the details of your opinions on -- actually, the second page of your expert witness report.
You say that you compared the effort required to remove Dairyland's RPV in the breach world versus the effort required if there were not

Page 115

spent fuel on the pool, correct?
A. Right.
Q. And you understand that that's part of what Mr. Smith did in his work as well, correct?
A. I think that is what Mr. Smith did in his work.
Q. With what parts of Mr. Smith's evaluation of the differences between the scope of work required in the actual world versus the world without spent fuel in the pool do you disagree?
MR. SHULTIS: Objection; vague.
THE WITNESS: Let me make sure I don't give the wrong impression with my answer.
There are places where my disagreement is not with the scope of work required, but with the cost estimated for that scope.
There are some places where I think there is issue with scope and, for example, the one -- the one place where that would occur is in the whole question about what happens to the biological shield wall, because I think, in the --

Page 116

in Mr. Smith's but-for world costs calculation, there's no costs associated with the removal or decontamination of that -- that wall, even though I think he testified that he did not include the cost of disposal of the concrete blocks because he believed that would happen in both worlds.
Given that belief, then there has to be a cost to remove that wall in the but-for world.
That cost could be equivalent to the costs removal in the actual world. I think there's a scope in that one.
I think there's potential -- there's a couple of other comments I made where I think there's possible scope issues and I think they're less definitive, because I don't know that I have information which would let me be more definitive, other than there appears to be a concern here, but without additional information of various kinds, I can't say for certain, and I certainly can't say what the cost implication of those things would be.

Page 117

BY MR. SHAPIRO:
Q. So the only area that you're pretty sure that there is a difference of opinion between you and Mr. Smith in terms of the scope of RPV removal absent spent fuel in the pool is -- is concerns were removal of that -- the peaks of the Bio-Shield wall?
A. And, like I said, the other -- the other places I have issue, if you will, have to do with things where I can't be quite as definitive, like the work associated with the cutting a hole in the top of the containment building and whatever -- and the structural work that maybe needed there, removal of the reactor building polar crane.
There may be something else I don't recall -- I don't recall anything off the top of my head right now where there is; but clearly, as we go through the particulars, there might be something else, but I just don't remember it right now.
Q. We'll get to some of the specifics

Page 118

that you mentioned, such as the Bio-Shield wall, a bit later. A couple more general questions about your opinions.
In developing your opinions regarding Mr. Smith's estimate for nonbreach RPV removal, you did not attempt to develop your own nonbreach world estimate for Dairyland's RPV removal costs, did you?
A. I have not, and I -- I don't believe that was in the scope of anything I was asked to do or -- so I've not done that. It's not -- I don't believe it's my job to do that kind of calculation, so I've not.
Q. Let me make sure I understand why you didn't perform your own estimate of -- of RPV removal costs in the nonbreach world.
Why didn't you go about your work that way?
A. Because I don't think it's my job to do that calculation or to calculate Dairyland's costs for them.
Q. In your resume appended to your expert

Page 119

witness report, there's a reference to a computer program that you use in your decommissioning cost --
A. Yeah.
Q. -- estimating work, the decommissioning cost analysis system?
A. Yes.
Q. Did you make any use of that system in analyzing Dairyland's RPV removal costs?
A. No, and I wouldn't have. I mean, there would have been no real reason to.
In analyzing the Dairyland cost, it would have -- that -- that clearly relies on the understandings and information that ultimately have been embedded in the DCAS program, but the real -- that real understanding and intelligence in that program is what was put in that program by myself and the people that developed it.
So, yeah, it -- in a very indirect sense, it does rely on that, because to some degree, DCAS is the repository of a lot of information, a lot of experience about

Page 120

decommissioning cost estimating.
But did I run a DCAS model? No. That would have been using a cannon to kill a fly.
Q. I thought the -- isn't it true that the purpose of the DCAS model is to enable you to look at how costs will vary for the decommissioning of a project under different scenarios?
A. That is part of the -- that is part of the use of the program, that's correct, but in a much larger sense than just this activity of the vessel removal.
Q. On Page 5 of your expert witness report, near the top, you conclude that Mr. Smith's analysis is so flawed that it should not be considered a reasonable basis for the calculation of marginal costs.
True?
A. I believe that's what I see, yes.
Q. And that is your opinion?
A. That is my opinion.
Q. What methodology did you utilize to

Page 121

reach that conclusion?
A. My methodology was to review the basis and method by which Mr. Smith calculated those costs -- the but-for world costs, evaluate how I or ABZ would have evaluated such costs, and I believe that in the end, there are significantly unsupported and, in some cases, I believe, just inaccurate assumptions.
In other cases, I think there are situations where the estimated cost is significantly underestimated. There's a much better way to estimate the costs than what has been done. And -- and when I take those into consideration, it would change the answer very substantially.
Given that, that's the basis for my conclusion.
Q. Is there a name for the methodology you use to reach the conclusion that Mr. Smith's analysis is so flawed that it should not be considered?
A. There is no textbook name for that.

Page 134

explained. The issue is not using any one of these as the starting point; it's about understanding what it is that you got from these people and then comparing it to what -- where I can, to what is actually being charged for the work in the real world and determining whether there is a reason to explain the difference in the costs.

So -- so, you know, the fact you went to PIGCO or anyone else for any part of the estimate as a starting point, I'm not offering any opinion whether that's right, wrong or indifferent. You know, we would all, whenever faced with such question, go to the sources we have available, the people we know, perhaps the people we've recently worked. I mean, there are a lot of reasons for picking sources, but it's about the understanding of what you get back from the sources and how you deal with it. That's my issue.

Q. But as you sit here, you can't identify any better sources for the costs data in

Page 135

the seven categories you identify on Pages 5 and 6 of your report than the ones used by Mr. Smith, correct?

A. I've made no attempt to do anything like that, and I offer no opinion that there is some better, magical source for any of it.

Q. You assert that Mr. Smith's implicit assumption -- or an implicit assumption of Mr. Smith's nonbreach world estimate for Dairyland's RPV removal costs is that Dairyland would have self-performed the work absent the breach, correct?

A. I've said that, yes.

Q. What's the basis of your conclusion that that's an assumption that Mr. Smith is making?

A. I think that Mr. Smith -- Mr. Smith said that on multiple occasions in his deposition.

Q. What expertise are you applying in reaching this conclusion?

A. In reaching the conclusion that he said it?

Page 136

Q. No; reaching the conclusion that it's an implicit assumption in Mr. Smith's analysis that Dairyland would have self-performed the RPV work.

A. Well, I'm not sure what the difference is in that and the question I just thought you were asking me. The fact is Mr. Smith, I believe, has said that is an assumption he used to come up with his system.

There is no expertise to decide that, other than if I look at the estimate, there's no costs for a general contractor. So the absence of the general contractor costs could be a hint.

But on the other hand, depending on how a cost estimator did it, they could have rolled that -- that general contractor cost into individual line items, and you wouldn't see a line for the general contractor.

So the fact is it's not a matter of expertise; it's a matter of fact. And I take the fact from what Mr. Smith represents that he did.

Q. What do you understand

Page 137

self-performance to mean?

A. I understand self-performance to basically mean that rather than hiring a company, a general contractor, to do an activity or scope that, in fact, will ultimately take multiple contractors to perform, rather than hiring that one contractor to run the whole job and manage the subcontractors and accept the risk associated with the failures or shortcomings of the -- of the subcontractors, that I, as a utility or any other kind of company, go hire the individual subs.

It's like if I wanted to build a house. Self-performance would be I'd go hire the framing, the carpenters and the plumbers and the electricians and the siding guys and the roofing guys, and I would manage them all. Few people want to deal with that. Utilities, other companies in larger projects, have reasons to not do that either.

But that's the distinction. One is whether or not there's a contractor responsible for all the whole job or whether they're

Page 170

AFTERNOON SESSION
(1:57 p.m.)
Whereupon,
WARREN KEITH BREWER
was recalled as a witness and, having been previously duly sworn, was examined and testified further as follows:
BY MR. SHAPIRO:
Q. Mr. Brewer, I next wanted to visit something that we talked a little bit about already, the grouting portion of Mr. Smith's estimate of RPV removal costs in a nonbreach world.
You say -- I believe it's on Page 9 of your expert witness report -- that Mr. Smith's estimate for grouting is unreasonable in light of the costs in the Duratek contract.
True?
A. True.
Q. Well, let's focus for a few minutes on Mr. Smith's estimate outside of the context of a Duratek contract or any contract.

Page 171

Do you disagree with Mr. Smith's calculation of the volume of grout needed?
A. No, I don't think I had a real issue with -- with the volume.
Q. And you don't have an opinion disagreeing with Mr. Smith's estimated costs of grout per volume.
True?
A. I have not taken any issue with his cost per cubic foot of grout.
Q. And you don't have any opinion disagreeing with Mr. Smith's estimate of the amount of labor needed to perform the grouting, correct?
A. Well, while I make no specific opinion about that, given that -- given that I have a problem with the overall cost and I've already said that I don't have a real issue with the material part of the cost, then the rest of it must be the labor.
So while I have no specific comment about why I think his number is right or wrong in

Page 172

terms of that -- the way he calculates it, obviously, there's something very different about the way he comes up with that number and the way Duratek priced that part of the work in the actual world.
Q. Well, again, let's just focus on Mr. Smith's work, since that's the -- ultimately the subject of your expert witness report.
Do you believe that Mr. Smith calculated the amount of labor needed to perform the grouting incorrectly?
A. And I think what I just said was obviously, I do. And I'll say something slightly different than what I said or additional to what I just said.
If, in fact, that were an accurate way to estimate the cost -- or an accurate way to calculate the -- or an accurate calculation of the cost of doing that work, that would say Dairyland could have gotten this work done for $109,000, rather than 825.
We've already talked about the fact

Page 173

that by using a general contractor, they assumed some risk and, therefore, there could be some difference, but that kind of risk transference in this case is not going to be the basis for a factor of 7 plus in the -- in the cost.
Q. Do you have an opinion, Mr. Brewer, of how much labor would have been required to have performed the grouting of Dairyland's RPV?
A. I think the best estimate of that would be, in essence, the material cost. If you took the $825,000 that the work cost in the real world and subtracted the material costs, that would be the labor costs for doing this work.
Q. I'm asking how many hours? How many hours do you think it takes, person hours --
A. I've not calculated how many hours.
Q. What hourly rate would be appropriate to use for calculating the labor costs for grouting an RPV?
A. That would depend. And I don't know about Dairyland's labor contracts, if any. I don't know about Duratek's labor contracts, for

Page 174

that matter, or PIGCO, the people actually doing the work. I don't know whether they have union people, nonunion people. I don't know what. So I don't -- I've not tried to figure out that number.

Q. You did the decommissioning cost estimating. Give us a ballpark estimate of what would a reasonable labor cost be for grouting and RPV.

MR. SHULTIS: Objection; asked and answered.

THE WITNESS: Well, that's a question that doesn't really have a simple, single figure answer. Labor costs between utilities or locations can vary for a lot reasons and vary quite a bit. So, you know, I don't know that there's a simple, single number for that.

When I do a decommissioning cost, for example, I ask the utility involved, first off, what kind of arrangements they typically have with -- with the contractors that provide labor, do they have to hire all union labor, nonunion labor, is it -- is it different in some way, and

Page 175

use a very site specific kind of labor range.

BY MR. SHAPIRO:

Q. Well, Mr. Smith used $110 per hour for estimating the costs of the labor for grouting Dairyland's RPV.

You don't have an opinion that that labor rate is wrong, do you?

MR. SHULTIS: Objection; asked and answered.

THE WITNESS: As I said before, I'm not offering an opinion that that rate or the number of hours themselves is wrong, but that given the cost in the actual world and given that the scope of work is identical in the actual and the but-for world, it is unreasonable to estimate any price other than the actual world price.

BY MR. SHAPIRO:

Q. How much do you estimate it costs to rent a truck that can pump grout, daily costs for a pump rental?

MR. SHULTIS: Objection; assumes facts.

Page 176

THE WITNESS: I don't have a number for that off the top of my head. And if I were doing this work, it's not necessarily -- even if I was calculating the costs for doing this kind of work in a decommissioning cost estimate, that may or may not be a factor in there. Because the assumption may be made that I'm going to hire a contractor who has such equipment and it's part of his fee for doing the work. It's not a separable number.

BY MR. SHAPIRO:

Q. So you don't have an opinion, then, disputing Mr. Smith's use of a rate of $1,500 per day for a pump truck rental, correct?

MR. SHULTIS: Objection; asked and answered.

THE WITNESS: Like -- like I have said on a couple of times now, that's -- I've not offered any opinion about that. That's not the basis or thrust of the -- of the opinion I've offered. It -- it is not to dispute that number, and I've not. I'm not offering any alternative

Page 177

number for that.

BY MR. SHAPIRO:

Q. And you did not attempt, yourself, to do a bottoms-up estimate of the cost of grouting Dairyland's RPV in the nonbreach world, did you?

A. I did not. And even if I were asked to do the kind of analysis Mr. Smith did, I would not have for the simple reason, as I've explained before, with decommissioning cost estimates, when I have real-world cost data, actual cost data for an activity where the scope of activity is not different, then that actual world experience is the best way to estimate the cost.

And in this case, you know, while, at least at a conceptual level, there's not a great problem with doing the bottoms-up, I would have never done the estimate that way. In this case, for example, I would have taken these tasks and would have gone through the tasks and said, look, which tasks are different from the actual world?

The ones that aren't different, they cost the same thing in a but-for and actual.


©2007