Page 178

There's no reason for them to be different. The ones that are different, then the issue would be to price the differences and approach it that way. It's simply a different way of approaching the estimate.

Q. Well, suppose you were going to use in your -- your expertise as a decommissioning cost estimator, you were going to estimate the cost of grouting a reactor pressure vessel at a theoretical nuclear plant -- we'll call it Cheeseland Power Cooperative -- and they have a shutdown nuclear power plant, and in the nonbreach world, there wouldn't have been any spent fuel and the reactor pressure vessel would have been grouted and you're tasked with estimating that cost and there's no contract to look to, how would you go about that?

A. If I had never done that before, I would talk to people who had performed that or similar type work about what it takes.

And let me give you an example of exactly where I've done that. It's grouting, but

Page 179

it's the same kind of thing.

Seven or eight years ago, we worked on a project for the decommissioning of a reactor called Plum Brook, it's -- it was a NASA run reactor, part of the Space Nuclear Program back in the '60s and '70s.

There were some things, particularly with respect to asbestos abatement and lead abatement, that were going to become significant projects in that.

We had no real -- we, at ABZ, had no real experience in doing that. I didn't have any really good data, personally, on which to base the numbers. We -- we can go to textbooks, but that may or may not make real sense.

So what we did, instead, is we went and got people who had done that kind of work, hired them to be consultants for us, took them to the site, showed them the conditions, asked them what would need to be done.

They provided some basic task info for us in terms of dollars per cleanup of square foot

Page 180

or whatever, provided us with the background data that supported that from real jobs they had done, and that's how we arrived at our base cost that we used then, based on the square foot of asbestos or the square foot of lead paint or whatever those parameters were within the -- the inventory.

So, again, here, if I hadn't done this before, you'd go to the vendor, you'd ask him about the cost to do it, you'd ask him what the basis is in terms of his experience, you'd want to know whether that cost he's given you is his direct cost or the cost he would charge someone to do and, ultimately, you would calculate for this other vessel that has the appropriate dimensions of cost.

Q. So if you didn't have a contract to look to in the Cheeseland example that I gave you, it sounds like you would have undertaken an effort not -- not dissimilar to what Mr. Smith did in estimating the grouting, correct?

MR. SHULTIS: Objection; mischaracterizes prior testimony.

Page 181

THE WITNESS: Not correct. Not correct in the following way: I don't think -- at least I don't know of any explanation or -- or data or facts or evidence that we've been provided that says there was any consideration of the basis for the numbers given by, say, PIGCO or anybody else for what it takes to do this.

In the absence of a contract to look to that -- that I do have, in fact, in the Dairyland case, I would be looking for the basis in prior work in understanding where the numbers come from and why they believed those to be the numbers; and, again, as I said, is that the cost -- their direct cost or is that the cost they would actually charge the customer to do the work; and also ensure that the scope of work that I'm asking for them -- that they understood exactly the scope I was asking them to estimate compared to the scope that was in the real world.

It goes back to what I said earlier today. The basic methodology of getting these estimates from other people is not where my


©2007

Page 198

item here (indicating), oh, it really should have been down here in the container fabrication. So that really should have been 2.2, not 1.5.

I don't think there's any evidence that any of that went on or there was any -- ever any question about that. So they -- I -- I -- I conclude they must not have had any great misgivings about any of the numbers.

Whether they explicitly signed off on each one, I don't know. Ultimately, they signed up for the whole job.

BY MR. SHAPIRO:

Q. Let's turn to the -- to that RPV shipping container, to that issue. I think it's a similar issue.

First, what's your understanding of Mr. Smith's estimate -- Mr. Smith's method for estimating the costs of the RPV shipping container?

A. My understanding is that he got an estimate -- he got some information, I should say -- I don't know if it was an estimate. He got

Page 199

information from a company by the name of Cianbro -- I guess is how you say it. I don't know exactly how you say it -- in terms of the amount and cost of the materials to construct the container based on a drawing of the container and, I think in a separate communication, got information from someone at that company about the costs per pound to fabricate the vessel and basically took those two pieces of information and, in a -- in a very simplified way, multiplied one number and another and got the total cost.

So that's my understanding of how that was developed.

Q. You don't have an opinion that the calculated weight of the RPV shipping package that Mr. Smith used is incorrect, do you?

A. In terms of the weight? Not in any substantial way. I think there's some simplifications in the way the weight was calculated, but they aren't -- they are no different than other people might make in doing such an estimate.

Page 200

Q. You don't have any opinion that Mr. Smith's estimate of a $2.50 per pound cost for fabrication is incorrect, do you?

A. Well, I must, because otherwise, I wouldn't think that the total number was wrong, since it's basically the weight times the cost.

Q. What do you think is the correct cost?

A. I've not calculated a number for that or tried to. I've not even thought about that -- that number very much because, again, I have a number for what it's really -- what Duratek has said it's going to cost to fabricate this container, and it's over a factor of two higher than Mr. Smith's estimate.

Q. Let me just clear up the last question and answer a little bit. I think probably my fault that we spoke over one another.

You said you have not calculated, yourself, a number or tried to calculate a number or even thought much about a per pound cost of fabricating a reactor pressure vessel shipping container for Dairyland's RPV?

Page 201

A. Right, I have not. And anybody who gave me such a number, I'd want to know more about how the number arrives at.

I'll give you an example not from this particular activity, but -- submarines in the Navy are priced on dollars per pound. When you go to build a new class of submarine, the expected cost of the submarine is based on so many dollars per displaced pound -- or pound of displacement.

That works really well until you go through a change of technology in the design. So if I go from one technology to -- to a ship that has a more sophisticated technology, different kinds of materials, for example, that number can change dramatically.

So, again, I -- you know, I'd want to know the -- the basis for -- if I were getting this kind of information Mr. Smith got to use in such a thing, the first thing I would want to know is, okay, where does that number come from? Does it come from fabrication where I have the same kind of QA requirements, the same kind of material

qualification requirements, the same type of everything that this thing is going to have? Or is it from a different kind of technology where those kinds of things may be very different?

And then once I had that, again, if I calculated a number that was very different than what the indications was that the costs were in the actual world, I would want to know and understand why those costs are so different.

Q. Do you know what Dairyland's RPV shipping container is made out of?

A. I think it's made out of a variety of carbon steel. I don't know the exact specification number for the steel.

Q. Whoever fabricated the RPV shipping container for Dairyland, it had to transport that shipping container to Dairyland's LACBWR site.

You didn't attempt to estimate that shipping cost, did you?

A. I did not try to estimate the shipping cost to ship the container from a fabricator to a site.



Q. And you don't have any opinion that the costs of transporting the shipping container estimated by Mr. Smith is incorrect, do you?

A. Again, I have no -- I've not offered any opinion one way or the other about that specific item.

My issue is with the total costs of the container, which would include that shipping cost.

Q. In the ultimate contract that Dairyland signed with Duratek, Dairyland doesn't have the option -- didn't have the option of supplying its own RPV shipping container and getting a -- a credit with the contract, did it?

MR. SHULTIS: Objection; it assumes facts not in evidence.

THE WITNESS: I don't see anything in there that does that.

But let me say one other thing about the whole thing here with the grouting and the container. You know, if it was a simple matter that somehow the Duratek contract doesn't really



represent anything about the price of these activities, but instead, is some other kind of representation that, in fact, Dairyland understood when they reviewed the proposal, you know, that seems like that would have been a relatively simple thing for -- to be explained in the process of presenting this but-for world estimate.

But I've not seen anything that says that. I've not seen any explanation to that effect. I think the fact is that when asked, Mr. Smith basically said he had no idea what was in the Duratek numbers.

BY MR. SHAPIRO:

Q. You don't know what's in the Duratek numbers either, do you?

A. Not my job to figure that out, no.

Q. The RPV shipping container, Dairyland's RPV shipping container was actually fabricated by a firm called Brilex, right?

A. That's my understanding, correct.

Q. You don't know what Brilex charged Duratek for that work, do you?



A. No. And obviously, Mr. Smith didn't either, because he was asked about that.

Q. You don't know if Cianbro could fabricate -- could have fabricated Dairyland's RPV shipping container or not, do you?

A. Well, let me say this: I would probably -- I would -- I would probably never tell you they couldn't have. What it would have cost and how long it would have taken is a whole different question, depending upon their experience in dealing with the type of QA, the type of material certification, things like that that's necessary for this work.

But, I mean, they're a construction company that builds steel structures and steel equipment. You know, with the right kind of supervision and management, anybody that's engaged in that type of work can build a container like that.

Q. And an RPV shipping container is not a particularly complex steel container; is that correct?


©2007

Page 210

of nozzle cutting?

A. I believe that he got information from a company called Bluegrass.

I think, in this instance -- I think, in this instance, I think what he received from Bluegrass was basically a number for a price. I don't know that they provided some other data that he then used to roll up into a price. I think it was just a price.

Q. Other than your work on this Dairyland case, have you ever had occasion to estimate the cost of nozzle cutting?

A. Well, yes, because you have to cut the reactor vessel when you estimate the cost for doing a decommissioning. You also have to estimate the costs to, in most of those cases, segment the vessel, which is a similar process.

Instead of cutting a nozzle or a piece of pipe, basically, you're cutting the entire vessel through. So the same kind of process is used. Diamond wire saw kind of process is generally used.

Page 211

Q. In that prior work, how did you go on about estimating the cost of nozzle cutting?

A. We have data within our system that looks at the cost per inch of metal cut. So that would -- that would take into account both the circumference as well as the thickness of the metal. And those factors would be used on any nozzle or cutting a ring out of the vessel or any of those things to calculate the manpower time necessary to do it.

And then that coupled with labor rates and coupled with material costs for that item per inch would all get rolled into the costs factor, along with, as I said before, considerations of radiological conditions, access to the work area conditions and that kind of thing in the decommissioning estimate.

Q. But you didn't make any attempt to apply that prior experience and knowledge to come up with an estimate yourself of what you think it would have cost Dairyland to have its RPV nozzles cut?

Page 212

A. I am not trying to calculate Dairyland's cost for them, no.

Q. So you can't say that if you had gone about that exercise using the prior knowledge -- the knowledge that you do have in the prior experience, that you would have come up with a -- a cost figure for nozzle cutting for Dairyland's RPV any different than the $355,000 figure that Mr. Smith came up with, right?

A. Well, one of two things would have happened: I would have either come up with a very different number or, if I came up with 355 or 555, for that matter, I would have not stopped with that estimate until I understood why the line item in the Duratek proposal and in that contract said $1.8 million, not 355.

If I found evidence and understood why that was different, either that the 1.8 represented something different in some way, then I might have been left with -- with a different number. But I certainly wouldn't have simply used my basic data that I have in -- as part of my

Page 213

decommissioning cost estimating work, come up with a number like 355 and said I'm done in the face of the $1.8 million number in the contract.

Q. When you say you would have -- you wouldn't have stopped at creating your own estimate, you would have tried to investigate further, suppose you couldn't get any further in your investigation because you couldn't get any further information from -- from Duratek, how would you proceed?

A. If I couldn't get any further information from anyone to explain to me why the two were different, I would have told the person for whom I'm doing the work, look, here's a real-live number for what somebody has said they will charge to do this work, and I have no good reason to give you a -- an estimate less than or different than that.

If they want to then explore with me reasons why it might be different, fine; but if you're saying that I'm at a dead end, then my dead end is the actual world cost, not the bottoms-up

 ©2007

Page 222

the breach world would've made that portion of the work less costly, do you?

A. The answer is increased access almost makes -- it makes almost anything cheaper. I've not offered any opinion that I can quantify that difference or that that difference would be in any way substantial.

That's why, in the end, I say I think the appropriate cost is the same costs in both the actual and the but-for world. Because if I were offering that other kind of opinion, I would have offered the opinion that the but-for world cost would be greater somehow.

MR. SHAPIRO: Is now a good time for a break?

THE WITNESS: Now's a good time for me.

(Recess.)

BY MR. SHAPIRO:

Q. All right. The next subject to discuss, Mr. Brewer, are the Duratek Phase 1 costs.

Page 223

A. Okay.

Q. What is your understanding of how Mr. Smith estimated the portion of those costs that would have been applicable in the nonbreach world?

A. It is my understanding that he, based on a document which was included in his supporting documents, said there were six activities or six -- six deliverables within that work.

He concluded that two of those deliverables would be unique to the actual world and then took two over six, or a third of the total of the Phase 1 work to represent those two deliverables.

Q. Do you disagree with Mr. Smith that the two studies that he identified were ones that would not have been performed in the -- in the nonbreach world?

A. Yeah. I don't remember what they were, but obviously, I didn't take exception to that because, if I had, I would have made a comment to that effect.

Page 224

So, I mean, obviously, I have no disagreement that those two things would be unique.

Q. And in the portion of your expert witness report, Exhibit 1, that discusses Mr. Smith's estimate of -- of these costs, you note what you call two concerns --

A. Um-hum.

Q. -- but you don't state in your opinion that Mr. Smith's estimate regarding these Phase 1 costs is incorrect, do you?

A. No. My report says exactly what it says. I believe that his estimate is -- is speculative, because I don't think -- first off, I think there's reasons why, even if we were going to do the simple linear appropriation that he's done, I'm not sure I would have used the values of two and six. As I point out in one of these, I might have used two and twelve instead.

Because I think, in fact, the Duratek proposal for the Phase 1 work says there are twelve deliverables, not six, and the document

Page 225

that he cites as the basis don't call these deliverables, they say they're six significantly unresolved concerns or something to that effect.

Q. What's the difference in your mind between a deliverable and a concern?

A. A concern is a question of an answer. A deliverable is a product that has to be delivered to the -- to the customer --

Q. But --

A. -- so it's a report or an analysis or something else.

A concern might simply be something that I go and get an answer for and say here's the answer, and that's it. It may not be any kind of analysis that warrants a report or anything else.

Q. You haven't tried to estimate Phase 1 costs for the nonbreach world, have you?

A. I've not, because I'm not aware that there is information available to me for me to do that.

If there was information available that broke out the Phase 1 costs by deliverable,

Page 226

then that would be an appropriate way to do it. But I don't think such information exists, so I've not tried to do that.
Q. So you're not in a position to say that the estimate that Mr. Smith did come up with for those Phase 1 costs is, in fact, incorrect?
A. And I think that's consistent with my comment.
Q. Is that true?
A. That's true, and I think it's consistent with my comment.
I think the comment that says it's speculative doesn't say that, perchance, it might not be right. It just says that there's been no basis established to show that it is right.
So could it be right? It obviously is something less than the full amount of Phase 1. His number is something less than the full amount, so there is some possibility that it would be the right number.
Q. Well, you're not aware of any evidence indicating that the two unique studies cost less

Page 227

than 1/3 of the total, are you?
MR. SHULTIS: Objection; asked and answered.
THE WITNESS: And I'm not aware of any evidence that's been made available that says they're one-third, two-thirds or any other value.
So, right, I'm -- I've not got any evidence it's less than, more than or equal to.
BY MR. SHAPIRO:
Q. You note that Mr. Smith refers to six deliverables in his expert witness report, correct?
A. Correct.
Q. But in the detailed spreadsheet included with his report, Mr. Smith refers to -- to six issues, correct?
A. I don't know. I don't know. I don't recall that.
Q. In noting the two concerns that you identified in Section 5.1.6 of your expert witness report, what methodology did you employ to reach your -- your conclusions?

Page 228

MR. SHULTIS: Objection; vague.
THE WITNESS: The methodology is the methodology I would exercise in doing a decommissioning cost estimate, a severe accident cost analysis, any such thing where, when I have a -- an activity I'll call it -- because I don't know what else the right word is -- that consists of subtasks of some kind and I want to somehow evaluate or identify the costs of those individual subtasks, the appropriate thing to do is to look for the data that would allow one to calculate the costs of the individual tasks, which I don't think exists here, or the data that says how the total costs was arrived at from a sum up of individual tasks.
And so that's -- that's the methodology is to say where is the -- where is the evidence, where is the basis for why the number should be two over six times the total?
And there simply is none.
BY MR. SHAPIRO:
Q. What would you call that methodology

Page 229

that you employed?
A. Well, to some degree, it's -- it is -- I don't know that there's a name. As with a lot of these things, I don't think there's a textbook name, but to some degree, it is really just mathematical logic. And that is that when I know the sum or the product of a bunch of numbers and I know none of the individual numbers, I have no way to estimate the individual numbers with any rigor. Anything else would be guesswork.
So if you tell me that the sum total of these twelve tasks or six tasks, however you want to provide it, is a million dollars and that's all I know, which is all that you know in this case, mathematically and logically, there is no way to tell you what Parts 1 through 6 are individually, other than by guesswork of saying they're all equal and I divide by six.
Q. So this is simply a matter of logic?
A. It's a matter of the kind of analysis engineers do all the time. I don't want -- this idea that it's simply this logic -- if it were

 ©2007

Page 234

think that's what they plan to do, but I don't know for certain what they plan to do.

Q. I'm not asking if you know for certain. What do you think they plan to do?

A. I think they may come in and knock it down, either by cutting it apart or by a physical demolition of some type.

Q. You haven't attempted to estimate the costs that Dairyland would have incurred in the nonbreach world to knock down a portion of the Bio-Shield wall, the portion of the Bio-Shield that it removed -- that it had removed in the breach world, have you?

A. I have not, because I was not trying nor thought -- nor do I believe it's my job to calculate their cost.

My opinion and comment here is simply that there is an activity that would cost money that would have occurred in their -- in the but-for world as envisioned by Mr. Smith that's not been included in the estimate.

Q. What's your understanding of how

Page 235

Dairyland had the Bio-Shield wall taken down in the breach world?

A. What do you mean by -- what was the method by which it was taken down?

Q. Yes.

A. It was diamond wire sawed into blocks.

Q. What's your understanding as to why the diamond wire saw cutting was used as opposed to just the knock-it-down approach that we discussed earlier?

A. Well, there's probably more than one reason. I mean, the -- given -- given the state of the plant and the fact I've not finished removing all the other equipment and everything, I probably wouldn't want to go in and take out the entire shield wall and any kind of support that it provides for all kinds of other things.

I might even have concerns, although I probably could address those concerns about doing something like using excavators, with respect to spreading debris to the pool. But let me say, particularly based on my tour at Dairyland,

Page 236

foreign material exclusion for the pool is not the reason for doing the diamond wire saw cutting.

Because the day we were there, the entire containment was filled with concrete dust. And when the guy that was giving us a tour went to open the hatch on the spent fuel pool, a very significant amount of that concrete dust ended up in the pool.

So, yeah, I think there are foreign material exclusion concerns; but, you know, given what I saw there, I'm not sure that that would have been a reason in the but-for world to be done one way or the other or not done one way or the other.

So I think it would be a cost benefit analysis for the utility, perhaps, as to what they thought was the -- the cheaper, easier, better way for them to do it in the but-for world. And I don't know what their conclusion would be.

Q. With the reactor pressure vessel and a spent fuel in place, Dairyland didn't practically have the option of simply coming in with a big

Page 237

piece of equipment and knocking down the Bio-Shield wall, did it, in a breach world?

A. I don't know that, and that's what I just said. I don't know that I couldn't have taken an excavator type of device and chopped out the piece that eventually got diamond wire sawed out. In fact, what I might have done is diamond wire saw the two boundaries and then knock out the middle with an excavator.

I wouldn't necessarily need to cut it, because I don't care if stuff gets in the vessel. I mean, it's not like there's anything in there I'm going to hurt. I'm not reusing, I'm not trying to run a plant, I can put a containment top over the top of this and do this. So I don't know. I don't know -- I don't think it precludes it.

And I don't know that the fuel in the pool would preclude that kind of option either, particularly given the amount of dust and debris generated from the diamond wire saw process that potentially contaminated the pool as well.

 ©2007

Page 238

Q. Let's change subjects again. Another issue you discuss in your expert witness report, Mr. Brewer, is the aspect of Mr. Smith's estimate of taking the reactor pressure vessel through a hole in the top of the reactor building.
A. Right.
Q. You say there may have been a need for temporary supports or building modifications to cut a hole for the RPV removal out through the top of the reactor building in the nonbreach world, right?
A. Right.
Q. But you did not conclude that there would have been a need for such temporary support for modifications, true?
A. Right. Because I have -- I don't have the information that would be required to determine that, and I don't believe Mr. Smith did either. Mr. Smith, when asked about this, simply said he assumed there was no structural work needed because the 1994 Sargent & Lundy study didn't say anything about it. Well, the 1994

Page 239

Sargent & Lundy study is somewhat of a conceptual study, not necessarily a detailed evaluation.
No engineer faced with that project would take the absence of a comment in that kind of study as being proof that there were nothing needed. You would at least spend the money to do an analysis which would require you to understand the structural internals of that tank and the details of the structure of the dome.
Because, like I say in my report, the dome on that vessel -- on the containment is akin to an archway where, when I cut this 12- or 13-foot hole in it, I'm removing the keystone and, in fact, that means I'm removing, potentially, the basis for the structural stability.
So without -- without the detailed drawings, without doing a detailed engineering analysis of what the stability of that structure is, both under static loads and under dynamic loads, like earthquake loads, wind loads, all those other things, no one can say there wouldn't be structural work done.

Page 240

And Sargent & Lundy's report clearly is not definitive that they nor anyone else ever did such an analysis.
So there may well be. There may not be. I don't know. And that's why my report says may.
Q. Do you have the engineering experience and expertise to have made such a determination?
A. You give me all the drawings and the assumed design loads for the plant, I can do the calculation.
Q. Are you a structural engineer?
A. I am not.
Q. Are you a civil engineer?
A. I've -- I have training in civil engineering. I have done structural analysis for structures as sophisticated or more sophisticated than that roof.
Q. Are you a licensed professional engineer?
A. I am not.
Q. For this kind of work, you would

Page 241

ultimately want the conclusion of a licensed professional engineer, wouldn't you?
A. You know, I don't know that -- I don't know that it's necessary in this case, but for the purpose -- you didn't ask me if I could satisfy some sort of licensing requirement, because, obviously, if -- if it were necessary to have a structural -- a licensed professional engineer sign off, I couldn't do that. I could do the calculation.
Could a different licensed engineer sign off based on my calculation? Yes. Because lots of times, the guy that signs the -- the final thing is not the one who did the calculation. So it wouldn't be different than a lot of other things.
Q. Now, if I understand the criticism that you just articulated about Mr. Smith's reliance on the Sargent & Lundy study is that it's not clear to you how much study Sargent & Lundy did?
A. It's not that it's -- I think it's


©2007

Page 242

more than it's not clear to me. I don't think there's any evidence and I don't think Mr. Smith did anything to conclude -- to determine what they had done or not done. And in the terms of who is in a better position to decide about whether or not there may be structural analysis, yeah, I'm not a licensed professional engineer, but to my understanding, Mr. Smith has no engineering training.

So it's compounded by the fact that in this case, Mr. Smith wants to take the complete absence of any comment from Sargent & Lundy and assert that's the basis that says nothing needs to be done, when, in a different case, the removal of the reactor building crane or the potential therefore, he decided to challenge Sargent & Lundy for some reason. I don't know why.

I don't know why absence of any comment is -- of Sargent & Lundy says Sargent & Lundy endorses his position somehow in one case, when, in the other case, obviously, he felt Sargent & Lundy wasn't qualified to make the

Page 243

decision they made.

Q. You understand Sargent & Lundy to be a reputable engineering firm, don't you?

A. I absolutely -- I believe that's true, yes. Yes. And that's why, particularly with respect to the removal of the reactor building crane, again, absent anything else anyone did, I would want to understand, before I say that's not necessary to be done, the basis on which Sargent & Lundy said that.

They are a reputable engineering firm. They must have had a reason for saying that. And in the absence of knowing why they said it, I don't know that I or anyone else could suddenly say it doesn't need to be done.

They may clearly have had information or knowledge or concerns that are not obvious. So I would want to know why they concluded that before I reached that conclusion.

Q. What area of expertise are you using in your criticism of Mr. Smith's reliance on the Sargent & Lundy study?

Page 244

A. Well, my problem is it's not the reliance on the Sargent & Lundy study; it's the reliance of saying there's nothing in the study.

So my experience that I'm relying on is my experience in the design and fabrication and construction of nuclear facilities that says the preliminary design study by somebody is not sufficient evidence that additional work is not needed; that no one knows that until the details are evaluated.

So it's not that he relied on Sargent & Lundy; I think it's simply that the absence of a statement by Sargent & Lundy is what's being relied on.

Q. You testified a few minutes ago that you did not conclude that temporary supports or modifications would have been needed in the nonbreach world. Therefore, isn't it also true that you did not attempt to estimate the costs of any needed temporary supports or modifications for the nonbreach world?

True?

Page 245

A. That is true. I was not trying to calculate Dairyland's costs for them, no.

Q. We just discussed a minute ago that Mr. Smith relied -- or did not rely on Sargent & Lundy's conclusions about the need to remove the -- the polar crane, right?

A. That's right.

Q. Did Sargent & Lundy, in its study, say that the polar crane necessarily had to be removed in order to -- to get the RPV out to the top of the building?

A. If you're asking me if is there a statement in the Sargent & Lundy study that says the RPV must be removed to do this, no --

Q. You mean crane?

A. -- but if you look at the Sargent & Lundy study, it provides the steps which would be executed to remove the vessel out the top, and one of those steps is the removal of the crane. And they make the point that it ought to be the last thing you do before you go pull the vessel out.

And the reason being that since I

Page 246

really am wanting to get on with the rest of the decommissioning at some point, I don't want to have the crane out of commission for a long time. I need to use it for other things to move stuff around. So I want to take it out last.

And ultimately, unless I provide different facilities, somehow, I'm going to have to put it back in to finish the decommissioning.

Q. What's your assessment of that issue regarding the Sargent & Lundy study? Weren't they assuming that the polar crane was going to come out and not -- not be reinstalled?

A. I don't think it says that at all. Now, I don't know -- let me say this: Again, I don't think it says one way or the other in the end that it will or it won't be definitive.

Again, if all I'm doing is cutting a 12-foot hole in the top of the vessel -- in the top of the containment and when I get the vessel out, I'm going to weld a cover back on it, I better be putting the polar crane back in. I got no way to do the decommissioning without the polar

Page 247

crane or some new crane facility which has got to cost me more than putting the polar crane back in.

So I've got to provide for lifting capability with inside the containment to be able to finish the decommissioning. So I better -- I'm either going to put it back in or there's a cost associated with procuring a new capability to do that, because I've got no other way to do it.

Q. Why would you need the polar crane at that stage of the decommissioning process?

A. There's still a lot of equipment left in there that's got to be taken out. I've got to lift it down to the bottom some way. I'm not going to carry it down the stairs on my back.

Q. How do you know what equipment is left at that stage of the decommissioning process under Sargent & Lundy's analysis?

A. Because it would be no different than what it is today. The reactor vessel removal would take place essentially the same time either way. So the site would have looked, in December of '06, essentially the same way the site looked

Page 248

in '06 -- the building looked in '06 -- December of '06 when I was there.

Q. Well, you've testified earlier that Dairyland advanced the timing of the removal of the RPV in light of the Barnwell anticipated closing.

So how do you know that Dairyland, in the nonbreach world, would have had the same sequence of decommissioning, including having the -- basically, the RPV come out first?

A. Well, I don't think there's any evidence or testimony been provided by anyone that it would be different, and I think there are people that have testified -- and I don't know if it's Christians or Sans Crainte again -- that the driving force about the vessel was -- was Barnwell. And I think they were asked about the decommissioning.

And I don't think there's any evidence that it -- that there's any belief it would have been done differently, that it was still going to be done in this gradual fashion along. The vessel

Page 249

just got moved up because if they don't do it, then there was going to be nowhere to send it or at least nowhere to send part of it.

Because since Envirocare can't take B&C waste, that would have meant if I waited till after Barnwell is closed to send it to Envirocare, then I would have had removed the reactor vessel internals, I would have had B&C wastes and potentially greater than Class C waste that I would have had nowhere to send, and by expediting the vessel removal, I could, as they've done, remove it in one piece with the internals in place and send it to Barnwell.

So the vessel had to be accelerated. The other stuff didn't have to be accelerated. And I don't know that there's any evidence that says anybody thinks it would have been accelerated.

Q. Did you examine the issue of whether Dairyland's RPV would have fit through the girders of the polar crane in a lift through the top scenario?

Page 250

A. No, because I don't have a drawing of that. And I truly expected that that would be one of the documents relied on by Mr. Smith that I could look at, but it wasn't, because -- it's my understanding that Mr. Smith didn't review the drawings; Mr. Brasel did. So they weren't produced as part of those documents that Mr. Smith relied on.

So I don't have the drawing. I didn't look at it because I don't have the drawings.

And let me say one more thing. Even if I looked at the drawings and concluded that it could clear between the girders, that's not the end of the question. That's the end of the question in a very superficial way, because that still didn't -- you know, Sargent & Lundy doesn't say you've got to move the polar crane because the vessel won't fit between. There may be other concerns that they had or other reasons they have for wanting to. I don't know.

So in the absence of knowing why they say you need to do that, even if I look at the

Page 251

drawings and I've got an inch or whatever clearance on each side to pull it through, I don't know that I would still say I'm going to agree with Sargent & Lundy, because they haven't said that it's just this clearance issue. In fact, I don't know what their issue was.

Q. Are you aware -- can you think of any issue applicable to Dairyland's RPV removal other than clearing between the girders of the polar crane that would stop you from -- from not removing the -- the polar crane to lift the RPV out the top?

A. It could be a matter not just of the static measurements, but the potential for movement, particularly if, during the removal, one were to have some sort of a event like a seismic event that would actually cause movement, okay?

So there could be reasons other than simply looking at the fact that the girders are 10 feet apart and the vessel is only 9 feet 9 inches wide, that you wouldn't want to go through that small an opening or that enclosed

Page 252

opening.

So I can think of possible reasons. Are they the real reasons? I don't know. Sargent & Lundy's report doesn't say what their reasons are. There's no other evidence that I've seen that's been provided that says what Sargent & Lundy's reasons are. And it's my understanding that when asked, that Mr. Smith said he didn't know what Sargent & Lundy's reasons were.

So, in the absence of any of us knowing the answer to that, it's speculation on anybody's part that Sargent & Lundy didn't have good and sufficient reason to remove it even if it would fit between the girders.

Q. In reaching that speculation conclusion, aren't you simply trying to take on the Court's role of weighing the evidence?

MR. SHULTIS: Objection.

I withdraw that.

Go ahead.

THE WITNESS: I don't think so. I

Page 253

don't think so. Because this is -- this is really an issue about how do -- how, from a technical standpoint, do people evaluate engineering reports and what they say and how they say it.

So to the extent -- to that extent, I'm really offering information or advice to the Court that says, look, as an engineer who has done construction work, who has done design work and reviewed lots of reports like this, it is speculation to say that the sole and only reason that Sargent & Lundy came to that conclusion was a simple clearance issue; that an engineering evaluation would require more than that.

What the Court does with that fact -- with that information from me in weighing the facts is -- you know, I don't know. That's their -- that's the Court's determination. They can -- they can think that means something, think it doesn't mean something or whatever.

But it's not a legal kind of thing. It's not even just a looking at the facts. It's looking at the facts from the statement of an

Page 270

bottoms-up estimate without tying it to a real-world thing.

So any real-world information you have that can make the costs less certain or remove any kind of risk from the cost changes the view of contingency. So it could drive it up, it could drive it down. Anything in reality you know changes that.

Q. Let's turn more generally to Mr. Smith's use of a contingency percentage.

You don't have an opinion of what contingency percentage you believe Mr. Smith should have used for his estimate of RPV removal in the nonbreach world, do you?

A. I've not offered any alternative number. My observation is that the explanation of how you get to the number he used is, I think, not on solid ground and, again, depending on how you build the baseline number, would change that.

If you make -- if you take my suggestions, recommendations, opinions about some of the costs and make them consistent with the

Page 271

Duratek proposal, then I would suggest a level of contingency that's less than if you don't.

So, again, it depends on the estimate, the baseline estimate. Again, I mean, that's consistent with our -- our decommissioning cost estimates.

For example, in the case of, say, a steam generator replacement or removal, where I have significant real-life data about what that costs and would assume that -- that it would be contracted for in some similar way in the future, I may put a lesser contingency on that event than I would, say, on the removal of pressurizers or other types of equipment where there's not nearly the basis of experience to draw from.

Q. But in the specific experience that Dairyland and Duratek had with the removal of Dairyland's RPV, we know that the anticipated cost was roughly $16-1/2 million?

A. I -- I think that's right.

Q. And how much were the change orders that came about through unanticipated

Page 272

eventualities?

A. I don't remember. It wasn't very big. But I'm not sure that has anything to do with it.

Q. Well, wouldn't that be a reasonable way of looking in the real world what the -- the amount of contingency that you ended up needing to get the work done?

A. Only if you knew what Duratek did in creating that $16-1/2 million. Duratek obviously included some level of contingency in its pricing as they would have included some level of profit.

No one seems to know what they did. So in the absence of knowing that, I have no idea how much contingency was in that $16-1/2 million.

Q. On Page -- which page -- I believe it's 17 of your expert witness report, you say that it might be more appropriate to use the contingency in the 2003 LACBWR decommissioning cost study update, right?

A. Yeah, maybe. That's what I say. I mean, that's what I say. That's what I say. You're right.

Page 273

Q. You don't actually have an opinion that it would have been more appropriate for Mr. Smith's work to have used the contingency level on that 2003 LACBWR decommissioning study?

A. And I wouldn't say it absolutely should be. One ought to ask LACBWR why they arrived at the percentage they did and then one might be able to conclude whether that was the appropriate number or another number.

Now, I'll note, for example, that the LACBWR 2003 decommissioning cost estimate in its -- in the item for the vessel removal assumes a cost for disposal of the vessel that's significantly higher than the actual cost that Duratek charged them.

Again, one would have to ask the Dairyland -- the LACBWR folks how they arrived at their percentage contingency, whether or not the disposal costs changed from -- I think they had 4-point-something million down to 2 million in the real world -- would affect that and what the right number is.

Page 282

how it would be suitable for transport off site.

Now, I think, in fact, in their case, that was really prompted by their consideration about sending the fuel to PFS, but the same kind of thing would be true, just as their study says, no matter where I was sending it, whether I was sending it to PFS, to a different utility, to DOE, to an ISFSI on the site.

Because the casks that the fuel goes in has a license that have specifications about the types of and kind of fuels and the condition of the fuel that can be put therein, so it is necessary to review the status of the fuel to determine whether it's going to comply with -- with those requirements.

Q. But you don't know just what sort of inspection DOE would have required for delivery of fuel to DOE in the nonbreach world, do you?

A. This isn't about inspection. This isn't the inspection. This is a records review. This is something I'd have to do -- no matter what the criteria was that DOE would require in terms

Page 283

of inspections, I'd have to know what my recorded information was and what that says about my fuel. That may drive what the -- what DOE ultimately tells me I may or may not need to do.

I don't know if it will or it won't, but the work here is not about the inspection. It's about that review of documents, which I contend would have to be done no matter who I was giving the fuel to.

Q. Well, maybe it's semantics, but it's review of documents and cataloging of various inspection efforts and putting in one place what the current state of the knowledge is, right?

A. That's right, the current state of the knowledge. Whether that's sufficient for any purpose, whether it be for DOE or -- or for building an ISFSI or for PFS, is a different question. There may be additional work necessary beyond understanding the current state of the knowledge.

This task is about understanding the current state of the knowledge, which I'm going to

Page 284

have to do no matter what. That would then inform someone else or me as to what additional needs to be done. I'm not commenting anything about what additionally may or may not need to be done to build an ISFSI at LACBWR, to send it to DOE or any of those other things. This review and, as you state, understanding of the current state of knowledge is going to be necessary -- it would be necessary no matter what I was going to do with that fuel.

Q. How do you know that having a report prepared would have been necessary to deliver the fuel to DOE in the nonbreach world? What's your basis for making that statement?

A. Because I'm going to have to, as the licensee, understand that the fuel that I am putting into whatever cask or transportation device that anyone brings me meets the requirements of that device. I can't do that without knowing the status of the fuel.

Whether or not the records review, particularly in LACBWR's case where the fuel has

Page 285

been out for a long time, is going to ultimately be sufficient, I don't know. It would obviously -- you know, that remains to be seen and not the point of my comment. One would have to do this records review at a minimum.

Q. Well, you noted that one possibility is that DOE might require a complete reinspection of every assembly, couldn't it, in which case, there would be no point to looking at the prior records; you're going to reinspect.

Isn't that a possibility?

MR. SHULTIS: Objection; it assumes facts. I think it misrepresents prior testimony.

THE WITNESS: The fact is that the utilities -- utilities -- nuclear utilities are required to maintain records on their fuel. I don't believe anyone is going to decide what sort of inspections are necessary on any utility's fuel, LACBWR, Dairyland, anybody else, without first understanding the state of knowledge that exists from those records.

So what additional beyond the review

Page 290

NRC, they do talk about the categorizations in the contract, and there's another one that I don't remember now that they looked at at least. They do the report, and the project did consider different criteria, including the one in the contract.

Q. In the actual results of the WPI study listing each of Dairyland's fuel assemblies in the fuel classification provided, that is not the fuel classification that is set out in the contract between Dairyland and DOE, right?

A. It may not be, but that doesn't have anything to do with or change my opinion in any way.

If you said this study and record review was being done solely for the purpose of delivering the fuel to DOE, you would have collected the data, and what went in that column would have been the appropriate designation for DOE.

The -- the big bulk of the work collecting the data from the records would have

Page 291

been the same either way. It would have been what label gets put in that column. So it wouldn't have changed anything other than the specific letters on the page.

Q. How do you know that the great bulk of WPI's efforts was collecting the data as opposed to analyzing the data to -- to make the classification judgments it made?

A. Well, I think you've kind of mixed it up. It's collecting the data and understanding what that data means, which you have to do either way. Taking that understanding and then putting it in one of these bins or classifications, it's not at all clear to me that has any great amount of analysis required.

The analysis is understanding what the records mean in -- in sufficient detail that one could then put it in one of these classifications.

Q. What work have you previously been engaged in to classify -- to characterize is a better term -- what work have you previously been engaged in that has entailed classifying

Page 292

commercial spent nuclear fuel?

A. I don't think I've ever done the actual classification, and that's not the point of the comment. So I don't think I've ever done actual classification for anybody.

Q. You've never done anything like WPI's Task 9?

A. I've never done that kind of study for anyone, no.

What I have done is -- as part of the decommissioning estimating cost work as part of work in the spent fuel cases, done a lot of work in understanding the licensing process as well as the requirements in the licenses for various types of storage and transportation casks and, from that, understand the kind of information that needs to be collected and that would need to be evaluated to say that -- to say that anybody satisfied the requirements of those licenses.

Q. Let's switch subjects to another part of your expert witness report.

You discussed the possibility that

Page 293

Dairyland's plant or site might need to have been modified in order to deliver its spent fuel to the Department of Energy, depending on the size of the transportation container supplied by the Department of Energy, right?

A. I think I say something slightly different. It would have had to be modified depending on the size and type of cask. The cask is large enough and heavy enough you wouldn't need changes to be made.

Q. You don't have an opinion that DOE would have supplied a cask large enough to have required plant or site modifications absent the breach, do you?

A. I'm not offering any -- any opinion to that effect, nor am I offering any opinion as to whether Dairyland would have voluntarily made my modifications in order to allow DOE to provide larger casks. I don't know.

That would be a -- a Dairyland decision they would have to make on an economic and business basis that I am not trying to make

Page 294

for them.
Q. You don't have any basis to conclude that DOE could have required Dairyland, consistent with the parties spent fuel removal contract, to accommodate a -- to spend money to accommodate a cask that was otherwise too large to be handled at Dairyland's site, do you?
A. Without suggesting I'm making any kind of legal conclusion out of this, I don't think that the Department of Energy could require them to modify the site to take bigger casks.
I think if Dairyland concluded that making the modifications and allowing DOE to bring larger cask was in their self-interest, they could make such determination.
I don't know that anyone could force them to make such modifications.
Q. Can you explain for us an example of a scenario which Dairyland might have made that judgment that it would have been advantageous for Dairyland to have spent money to -- to make modifications for -- for DOE to -- to use a larger

Page 295

cask?
A. Generally -- and I say "generally" because there are some specifics where this is not true. But generally, if I have a specific number of fuel assemblies, like Dairyland does -- they have, I don't know, 330 assemblies or whatever -- to get rid of, the cost to handle and load casks will be a bigger cost the smaller the capacity of the casks that are used.
In the extreme, for example, a legal truck weight cask for BWR fuel could hold as few as two assemblies. A large, rail-type cask could hold 68 or 70 or maybe even more given the size of the LACBWR fuel if someone designed an even higher capacity.
So in the one case, you might have to load five or six casks. In the other case, I might have to load 160 casks. Those 160 would almost certainly cost me more money. It would also certainly be more complicated from the utility standpoint.
If I'm a manager and you tell me I can

Page 296

perform five evolutions and not 160 of these evolutions, it's going to be worth something to me, even absent a cost difference, to only do the five. Now, is it worth the cost of the site mods and plant mods to be able to do that? Maybe not. That's where the business decision comes in.
Q. Do you have an opinion, Mr. Brewer, whether it is -- whether there is any difference in likelihood between the breach and the nonbreach worlds that a larger cask that would have required modifications at the Dairyland site would have been used?
A. I'm not sure I understood the question.
Q. Let me try to rephrase it. Maybe it wasn't clear.
A. Yeah, right.
Q. I might have to break it up a couple of different ways.
Do you have an opinion that it's more likely that in the nonbreach world that the Department of Energy would have ended up coming to

Page 297

Dairyland with a larger cask -- casks large enough to require modifications at Dairyland's site than would have been the case that -- than will be the case in the breach world?
MR. SHULTIS: Objection to the degree it mischaracterizes previous testimony.
THE WITNESS: Again, without offering any comment of a nature of a legal interpretation of the contract, I think what I said before was I don't think that -- that the DOE could decide to bring them a cask so large they would need to modify the site without Dairyland agreeing that they thought that was in their interest to make such modifications and, therefore, wanted DOE to bring such a cask.
BY MR. SHAPIRO:
Q. But do you feel that it is more likely that Dairyland would have made a business judgment that it would have been advantageous to have encouraged DOE to use a larger cask and make the necessary modifications to accommodate it; that that would have been more likely in the breach --

 ©2007

Page 298

in the nonbreach world as opposed to what may happen in the actual world?

A. I don't know. I mean, I think -- you know, I think that the -- to the extent that -- that Dairyland is going to transfer its fuel to an ISFSI, it is sort of already deciding to make modifications to let them load big casks in the actual world.

Of course, if they do so, when DOE comes to pick up the fuel, the fuel is no longer in the pool that's in the ISFSI. So it's a whole different deal anyway.

So I just think -- on this kind of question, I think that the two worlds diverge in ways that -- I'm not offering any opinion about what's more or less likely in terms of what DOE may or may not do in the future.

Q. You haven't attempted to specify just what -- just what sort of plant or site modifications would have been necessary to -- to accommodate a larger cask, have you?

A. I've not tried to create a list that

Page 299

says here are all the things that need to be done. I know some of the things that would need to be done and I think I discussed those in the report, but I don't -- I've made no attempt to make that an all-inclusive list that one could take in -- use as the basis for an estimate to make the kind of business decision we've been talking about.

Q. To put a point on that, you haven't attempted to estimate the costs of undertaking any of the plant or site modifications that might be necessary for Dairyland to accommodate a larger cask, right?

A. I have not. Although, again, some of those could relatively easily, I think, be estimated from some of the actual work that's -- that's occurring. But I've not done that.

Q. Next, Mr. Brewer, I want to ask you about Section 5.4.3 of your expert witness report. It starts on Page 22.

A. Okay.

Q. What's the point of this part of your report?

Page 300

A. Well, here's what I understand the point to be: I understand that there is a dispute between Dairyland and the Government, as there is between the Government and, I think, all the other Plaintiffs in these cases, about the required rate of acceptance of spent fuel. And to that extent, there is a dispute between the parties in terms of -- I'll use the term I think everybody's used in these cases -- the fuel outdate.

As we talked about earlier today, I think Dairyland's contention in this case is that all the fuel would have been removed from the site in the but-for world by the end of 1998. I don't think that's what the Government will be representing or has represented in other cases.

So I think that the point of this comment is to allow the financial people involved -- and I say the "financial people" as in Mr. Johnson and maybe Mr. Neuberger. I don't know about Mr. Neuberger for sure -- to offer opinions about adjustments that would be made if the rate of acceptance were consistent with what the

Page 301

Government will argue as opposed to what Dairyland is arguing.

Because the question is how do the operating costs to store the spent fuel change over time if, in fact, during that time, DOE is picking up fuel? Does it get less and less because there's less fuel? That's the point of the comment, is to provide information that some other expert will use in formulating their opinion.

Q. I think, actually, Mr. Brewer, that you were referring to a different portion of your report, if I understand your last comment.

A. Maybe I didn't know what you were asking me. I thought it was on O&M cost issues.

Q. No. I'm referring to 5.4.3 on Pages 22 and 23.

A. 5. I thought you said 5.3. 5.4.3. 5.4.3.

Well, 5.4.3 is simply the last piece of the 5.4 comment. The 5.4 comment is basically a comment that says, in the but-for world, there

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )

---

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, July 13, 2005
Volume 9

The parties met, pursuant to the notice of the Judge, at 9:35 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

about, only as far as the Court is concerned, Mr. Brewer's qualifications to address licensing requirements for an ISFSI, I'm just going to say dry storage facility, too many consonants in that.

MS. ORFIELD: And this is under the broad heading of nuclear engineering.

THE COURT: That's correct, as far as the Court's concerned. Now, we can leave it at that, or you can pursue the matter further. It's up to you.

MS. ORFIELD: Well, I'm not sure where things stand, but I do believe we've shown ample qualification to address those issues under that heading.

THE COURT: Well --

MS. ORFIELD: Including structural analysis.

THE COURT: You want to make sure that you've done that to your own satisfaction. It's, as we've discussed before, to the Court's mind, the licensing aspects are part and parcel of the nuclear engineering and other work generally in this country, just because of our regulatory spectrum. But, you know, you've got to have a specific qualification if you want the Court to make credibility findings respecting Mr. Brewer's testimony on some of these

UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS & ELECTRIC COMPANY, )
Plaintiff, )
v. ) No. 04-0074C
UNITED STATES OF AMERICA, )
Defendant. )

\- - - - - - - - - - - -

DEPOSITION OF WARREN K. BREWER

VOLUME I

Thursday, February 23, 2006

The deposition of WARREN K. BREWER was convened on Thursday, February 23, 2006, commencing at 9:43 AM, at the offices of GREENBERG TRAURIG LLP, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Cheryl A. Lord, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the District of Columbia.

Page 106

A. That was the intent.
Q. But it never came to fruition?
A. There was never anything produced by ABZ in terms of reports or any kind of written documents about it.
MR. STOUCK: Can we go off the record for a second?
(Recess.)
BY MR. STOUCK:
Q. While I'm thinking of it, Mr. Brewer, you testified in the TVA case at deposition and trial.
Correct?
A. M-hm, yeah.
Q. Have you testified in any other spent nuclear fuel cases?
A. I have not.
Q. Have you been disclosed as an expert witness in any other spent nuclear fuel case?
Do you know?
A. I do not believe so, no.
Q. All right. Let's look at your

Page 107

report, then, exihibit 1 here.
I'm on page -- it's the documents relied on -- B 2. The Bates numbers end in 0038.
A. Okay.
Q. This is a complete -- it says, documents relied on.
Is this a complete list of documents you considered in forming the opinions that are expressed here?
MR. GARDNER: Objection --
BY MR. STOUCK:
Q. Is there a difference between -- is relied-on documents a smaller category than the documents that you considered?
MR. GARDNER: Objection, vague.
A. I reviewed more documents than are here. These are the documents upon which these opinions are based.
BY MR. STOUCK:
Q. So upon which these opinions are based.
In other words, in order to express

Page 108

the opinions set forth in this report, you need to refer to one or more of these documents?
Is that what that means?
I'm trying to find out what "relied on" means.
A. I think that these documents listed here will be documents that are referred to in the opinions either as having some important piece of information or something about the opinion.
Q. Okay. So again in order to express -- could you express all of the opinions in this report without relying on any of these documents?
In order to express the opinions set forth in your report, you need these documents, maybe just for a little tiny piece of it, but you couldn't say what you say in this report without having these documents to point to in one case or another?
MR. GARDNER: Objection, form.
A. Let me just clarify that.

Page 109

In a lot of cases, I could express the opinion that is here without one of these documents, but in the absence of citing the document, it would simply be, I'm saying, I know that because I know that.
BY MR. STOUCK:
Q. I see.
A. Okay.
Q. Sometimes it's support for your opinions?
A. I think that's a fair characterization.
Q. Okay. All right.
Now, are there any documents you wanted to review or requested that you were not able -- in order to express these opinions that you were not able to obtain for whatever reason?
A. I have a bit of a problem with the question for the following reason: I am unaware of any document, a specific document or documents that I would have requested or did request that I didn't get.