No. 04-106C
(Chief Judge Damich)

Electronically Filed: April 29, 2008

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# DAIRYLAND'S MOTION TO EXCLUDE JONATHAN A. NEUBERGER'S TESTIMONY

---

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

# TABLE OF CONTENTS

ARGUMENT………………………………………………………………………….. 2

I. THE COURT SHOULD PRECLUDE TESTIMONY THAT IS NEITHER RELEVANT NOR RELIABLE……………………………………….. 2

II. DR. NEUBERGER'S PROPOSED TESTIMONY CRITICIZING THE GRAVES MODEL IS IRRELEVANT, UNRELIABLE, AND A WASTE OF THE COURT'S TIME……………………………………………….. 4

A. Dr. Neuberger's Proposed Testimony Criticizing the Graves Model is Not "Reliable" Under Rule 702 as it is the Product of Speculation and Hypothesis Rather than "Reliable Principles and Methods"……………………………………………………. 5

B. Dr. Neuberger's Proposed Testimony is Nothing More Than Baseless Speculation and Should be Excluded Under Rules 702, 402, and 403 as it is Unreliable, Irrelevant, Confusing, and a Waster of the Court's Time…………………………………...… 7

CONCLUSION………………………………………………………………………. 15

# APPENDIX INDEX

Expert Witness Report of Jonathan Neuberger dated 6/29/2007...................................................................................................1

Excerpts from Deposition of Jonathan Neuberger dated 8/8/2007.....................................................................................................58

TABLE OF AUTHORITIES

**Cases**

*Acoustical Design, Inc. v. Control Elecs. Co.*,
932 F.2d 939 (Fed. Cir. 1991)........................................................................... 3

*Algarin v. New York City Dep't of Correction*,
460 F. Supp. 2d 469 (S.D.N.Y. 2006)............................................................. 14

*Baker v. Dept of Health and Human Services*,
No. 99-653V, 2003 WL 22416622 (Fed. Cl. 2003)........................................... 5

*Biovail Corp. Int'l v. Andrx Pharm., Inc*.,
239 F.3d 1297 (Fed. Cir. 2001)..................................................................... 3, 7

*Clark v. Takata Corp.*,
192 F.3d 750 (7th Cir. 1999) ........................................................................... 7

*Cooper v. Smith & Nephew, Inc*.,
259 F.3d 194 (4th Cir. 2001) ........................................................................... 3

*Daubert v. Merrell Dow Pharms, Inc.*,
509 U.S. 579 (1993)................................................................................... 2, 5, 6

*DePaepe v. General Motors Corp.*,
141 F.3d 715 (7th Cir. 1998) ........................................................................... 2

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)............................................................................. 7

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997)...................................................................................... 3, 5

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999).......................................................................................... 5

*Layssard v. United States*,
No. 06-0352, 2007 WL 4144936 (W.D. La. Nov. 20, 2007)........................... 14

*Liquid Dynamics Corp. v. Vaughan Co.*,
449 F.3d 1209 (Fed. Cir. 2006)......................................................................... 5

*Navarro v. Fuji Heavy Indus.*,
117 F.3d 1027 (7th Cir. 1997) ......................................................................... 6

*Pacific Gas & Elec. Co. v. United States,*
73 Fed. Cl. 333 (2006) ........................................................................................ 3

*Smith v. Ford Motor Co.,*
215 F.3d 713 (7th Cir. 2000) ............................................................................. 2

*Sparton Corp. v. United States,*
77 Fed. Cl. 1 (2007) ............................................................................................ 5

*United States v. Gwaltney,*
790 F.2d 1378 (9th Cir. 1986), *cert. denied*, 479 U.S. 1104 (1987).............................. 3

*United States v. Rincon,*
28 F.3d 921 (9th Cir. 1994) ............................................................................ 14

*Winters v. Fru-Con Inc.,*
498 F.3d 734 (7th Cir. 2007) ............................................................................. 7

Federal Rules

Fed. R. Evid. 403 ................................................................................................ 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Electronically filed: April 29, 2008

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S MOTION TO EXCLUDE
JONATHAN A. NEUBERGER'S TESTIMONY

Pursuant to RCFC 16, Dairyland moves to preclude Jonathan A. Neuberger from testifying as an expert witness. The "opinions" expressed in Dr. Neuberger's report exclusively criticize Mr. Graves's analysis regarding when Dairyland's spent fuel would have been removed by DOE in the "but for" world.

Dr. Neuberger asserts Mr. Graves's analysis is deficient because it fails to take into account certain variables. He opines that Mr. Graves's modeling framework is flawed and that his model on exchanges is flawed, Report at 12-30 (App. at 15-33); that there are deficiencies in inputs to Mr. Graves's model, including representative cost estimates and assuming a uniform pool reserve, Report at 30-37 (App. at 33-40); and that Mr. Graves's sensitivity analyses overstate the robustness of his model. Report at 38-40; App. at 41-43. However, Dr. Neuberger admits that he does not know whether *any* of these variables, individually or in combination, would have had a material effect on the Graves analysis as he has not created a competing model or provided any quantitative or

empirical analysis that accounts for any of these variables. As such, Dr. Neuberger's proposed testimony is no more than a laundry list of speculation, conjecture and "red herrings." At its most basic, Dr. Neuberger's proposed testimony is an analytically-unsound series of unhelpful rhetorical "what ifs" and "maybes," not based on any discernable analysis. Dr. Neuberger's criticism of Mr. Graves' model is deficient and inadmissible, because Dr. Neuberger has not attempted to demonstrate that his "hypothetical alternatives . . . have 'analytically sound bases' so that they are more than mere 'speculation.'" *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998).

There is no doubt that, if the variables that Dr. Neuberger claims are missing from Mr. Graves's analysis had a material effect on that analysis, Dr. Neuberger would have created his own model that accounted for these "hypothetical alternatives." He did not, and his failure to create such a competing model speaks volumes. Having not created his own model, Dr. Neuberger should not be permitted to waste the Court's time with confusing, rank speculation about "potential" problems with Mr. Graves' model that Dr. Neuberger cannot say – and does not say – have any material effect..

## ARGUMENT

### I. THE COURT SHOULD PRECLUDE TESTIMONY THAT IS NEITHER RELEVANT NOR RELIABLE

The Court functions as a "gatekeeper," admitting only expert testimony which is "relevant[,] reliable," and, ultimately, helpful. *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993). Expert testimony under Rule 702 is "relevant" where a witness offers "scientific, technical, or specialized knowledge" to the court, the knowledge "will *assist the trier of fact to understand the evidence* or determine a fact in issue," and the

"witness qualifie[s] as an expert by knowledge, skill, experience, training or education." *Id.* (italics added). To also be "reliable," proposed expert testimony must be: (1) "the product of sufficient facts and data," (2) "based on reliable principles and methods," and (3) the product of a reliable application of these principles and methods to the facts of the case. *See* Rule 702. Expert testimony that "is connected to existing data only by the ipse dixit of the expert" is inadmissible. *General Electric Co. v. Joiner*, 522 U.S. 136, 139 (1997).

"The court has discretion to exclude expert testimony for its lack of helpfulness or relevance or for the expert's lack of qualifications on the issue about which he is being proffered to testify." *Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 433 (2006) (citing *Acoustical Design, Inc. v. Control Elecs. Co.*, 932 F.2d 939, 942 (Fed. Cir. 1991)). The Court's gatekeeping function permits it to exclude such testimony if not relevant. *See Biovail Corp. Int'l v. Andrx Pharm., Inc.*, 239 F.3d 1297, 1303 (Fed. Cir. 2001) (one purpose of gatekeeping role is to ensure that all expert testimony is both relevant and reliable). The Court should exercise this discretion and exclude expert testimony where the proponent fails to meet its burden and show that the proposed testimony meets Rule 702's standard. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *United States v. Gwaltney*, 790 F.2d 1378, 1382 (9th Cir. 1986), *cert. denied*, 479 U.S. 1104 (1987).

Moreover, the court has the discretion to exclude evidence where its probative value is substantially outweighed by "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed R. Evid. 403 ("Rule 403").

As demonstrated below, Dr. Neuberger's testimony fails to satisfy the requirements of Rule 702 and is unhelpful; therefore, it should be precluded on that basis. In addition, it is a waste of time pursuant to Rule 403.

## II. DR. NEUBERGER'S PROPOSED TESTIMONY CRITICIZING THE GRAVES MODEL IS IRRELEVANT, UNRELIABLE, AND A WASTE OF THE COURT'S TIME

Dr. Neuberger states his assignment was to "present an economic assessment of the modeling framework presented by Frank Graves." Report at 1, ¶ 1; App. at 4. Dr. Neuberger has woefully failed to complete his assignment. Although Dr. Neuberger identifies a series of variables or inputs that he believes are either wrongly included or omitted from the Graves analysis, Dr. Neuberger does not offer an opinion on the quantitative impact to Mr. Graves's analysis if these factors were excluded or included (as the case may be). Rather, Dr. Neuberger's "economic assessment" is merely "point[ing] out weaknesses," Dep. 32:13-21, App. at 61, without any quantitative or empirical analysis.

> Q: You haven't tried to determine which areas ultimately you believe Mr. Graves should have explored in terms of uncertainty in greater detail?
>
> A: I have described any number of elements of uncertainty in my report that I think are important and that should be addressed. On the outside, on the outcome maybe some of those factors wouldn't be important and you could simplify the model by just excluding it….*Having not gone through the exercise and really dug deep into these elements of uncertainty, I don't know which ones are most important.* I don't know which ones will have the biggest effect.
>
> Q: You just testified that you could have determined that some elements of uncertainty were not sufficiently important to have warranted further analysis. How would you have reached such a conclusion?
>
> A: By doing the work.

Dep. 169:9-170:17 (emphasis added); App. at 94-95. It is evident from Dr. Neuberger's report and proposed testimony that he has not "done the work" regarding any of his opinions and thus, his testimony should not be admitted.

### A. Dr. Neuberger's Proposed Testimony Criticizing the Graves Model is Not "Reliable" Under Rule 702 as it is the Product of Speculation and Hypothesis Rather than "Reliable Principles and Methods"

Rule 702 provides that an expert must premise his opinion on "reliable principles or methods." To be "reliable" proposed expert testimony must be: (1) "the product of sufficient facts and data," (2) "based on reliable principles and methods," and (3) the product of a reliable application of these principles and methods to the facts of the case. Rule 702. The Court in *Daubert* set forth a list of factors to be considered in evaluating the validity and relevance of evidence introduced through expert testimony including whether the methodology can and has been tested. *Sparton Corp. v. United States*, 77 Fed. Cl. 1, 7 (2007) (citing *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1221 (Fed. Cir. 2006) (citing *Daubert*, 509 U.S. at 593-94). These requirements help the court assess the reliability of expert testimony to determine whether the expert's technique or theory is simply a subjective, conclusory approach that cannot reasonably be assessed for reliability. *See Daubert*, 509 U.S. at 590. The expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (excluding testimony that failed to exhibit "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *General Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997) (noting failure of plaintiffs to explain "how and why [they] ... could have extrapolated their opinions"); *Baker v. Dept of Health and Human Services*,

No. 99-653V, 2003 WL 22416622, at *32 (Fed. Cl. 2003) ("The focus of the trial court must be solely on principles and methodology, not on the conclusions that they generate."); *Navarro v. Fuji Heavy Indus.*, 117 F.3d 1027, 1032 (7th Cir. 1997) (under *Daubert*, an expert must "show how his conclusion…is grounded in – follows from – an expert study of the problem"). Dr. Neuberger's opinion criticizing Mr. Graves's analysis meets none of these requirements.

Dr. Neuberger's "opinions" are purely speculative and impressionistic -- as described in further detail below, he did not create an alternative analysis (let alone a better analysis than the Graves analysis), he did not perform any quantitative or empirical analysis, and he did not conduct any sensitivity analyses to test how the results of Mr. Graves's analysis might change if the assumptions he asserts are flawed were changed. Nowhere in his Report does he even purport to describe or explain his methodology. Thus, his opinions are not based in an "expert study" of the problem.

Moreover, because he has eschewed empirical analytical tools for theoretical speculation and does not use any quantitative analysis, Dr. Neuberger's methods cannot be tested for reliability as required by Rule 702. Dr. Neuberger opines that utilities will not behave as Mr. Graves assumes in his model, Report 16, ¶41; App. at 19, but not only did he not create his own model, nor run alternative simulations of Mr. Graves's model, Dr. Neuberger conceded that in order for his opinion that utilities would not have behaved as Mr. Graves assumes to be testable by other economists "you might have to create your own model and quantify that effect." Dep. 111:8-112:8; App. at 77-78. Thus, while Dr. Neuberger eschews making models to support his opinions criticizing Mr. Graves, he recognizes that for his own opinions to be reliable and testable, a model

would be necessary. *See Elcock v. Kmart Corp*., 233 F.3d 734, 756, n.13 (3d Cir. 2000) (experts must rely on what other "experts in the particular field would reasonably rel[y] on such data in forming opinions…on the subject [ ] to suggest that an expert should not depend on fictional or random data when rendering an opinion about the quantum of economic harm in a particular plaintiff's case") (internal citations omitted); *see also Winters v. Fru-Con Inc*., 498 F.3d 734 (7th Cir. 2007) (expert was excluded as unreliable and speculative because he failed to test his alternative designs and also failed to utilize any other method of research to compensate for his lack of alternative testing); *Clark v. Takata Corp.,* 192 F.3d 750, 757 (7th Cir. 1999) ("An expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless.").

Dr. Neuberger's "opinions" fail to qualify as expert testimony and are not admissible under Rule 702.

B. Dr. Neuberger's Proposed Testimony is Nothing More Than Baseless Speculation and Should be Excluded Under Rules 702, 402 and 403 as it is Unreliable, Irrelevant, Confusing, and a Waste of the Court's Time

Rule 702 provides that expert testimony should be both relevant and reliable. *See Biovail Corp. Int'l v. Andrx Pharm., Inc.,* 239 F.3d 1297, 1303 (Fed. Cir. 2001) (one purpose of the court's gatekeeping role is to ensure that all expert testimony is both relevant and reliable). Moreover, Rules 402 and 403 outline a standard where irrelevant evidence is inadmissible, Rule 402, and, even where that evidence may be relevant, it "may be excluded if its probative value is substantially outweighed by "the danger of…confusion of the issues…or by considerations of...[a] waste of time." Rule 403. Dr. Neuberger's testimony is not admissible under these rules.

Dr. Neuberger's report offers flimsy opinions where he is either unable or unwilling to state his opinion with a reasonable degree of certainty and provide a substantive basis for his opinion. For example, while opining that failed fuel "may" require additional costs or activities that could delay acceptance of that spent fuel, Report at 18, ¶46; App. at 21, Dr. Neuberger admits (1) he has no expertise regarding failed fuel; (2) he does not have expertise to make a judgment as to the technical feasibility of disposing of failed fuel on one schedule as opposed to another; (3) he did not try to analyze the impact of failed fuel on the market for exchanges as analyzed by Mr. Graves; and (4) that if failed fuel had been considered more explicitly in Mr. Graves's model it "could" have changed the results of his model, but he "did not analyze that." Dep. 122:5-123:1; App. at 79-80.

While hypothesizing alone does not obviate the relevance of Dr. Neuberger's criticisms of the Graves model, the failure to follow through with actual substantive opinions does. Dr. Neuberger did not perform any quantitative analysis, did not simulate Mr. Graves's model, nor did he offer his own alternative model:

> Q: You didn't run any quantitative analysis yourself, did you?
>
> A: I did not separately simulate Mr. Graves's model and I didn't build my own model.

Dep. 35:17-20; App. at 62. Moreover, Dr. Neuberger acknowledged that while there were ways to quantify whether a model was robust and reliable enough to be used for damages, he had not employed any of those techniques:

> Q: ...[W]e were talking about when a model is robust and reliable enough to be used for damages. Don't economists have ways of quantifying robustness or reliability of a model?
>
> A: There are certainly quantification methods that could be used to

> look at a series of predictions to see what their variability might be, for example, or whether they are relatively stable to changes in parameters.
>
> Q: You haven't employed any of those techniques in the Dairyland case to test the robustness of Mr. Graves's work, have you?
>
> A: I have not specifically….

Dep. 40:22-41:19; App. at 63-64 (objection omitted). Moreover, it would not have been difficult for him to perform a quantitative analysis; instead, he simply makes baseless conclusions that the Graves model is unreliable.

> Q: …Why didn't you employ techniques that are available to economists to quantify robustness of a model? Why don't you think that would have been helpful to the Court?
>
> A: …Yes, there are quantitative measures of that variability. And it would not be difficult for me to talk about that. In my report I don't, however. I simply present the results and my conclusion that these results are sufficiently variable that they should not be considered by the court. But the court makes that ultimate determination. So sure, the quantitative measures are there. I could have used them. Instead I chose to describe the results. And to draw my conclusion….

Dep. 42:19-44:13; App. at 65-67 (objection omitted). Dr. Neuberger does not even pretend to base his opinion on expertise he could have employed:

> Q: You say that without this assumption of perfect foresight of storage costs that the results would be different?
>
> A: Yes.
>
> Q: How different would the results be?
>
> A: Having not run that I don't know.
>
> ***
>
> Q: My question is, you did not make any effort to quantify how the results would be different, if less than perfect foresight were assumed.
>
> A: I don't recall that as the question. But, no I did not.

> Q: Thank you. You have the expertise to have analyzed how Mr. Graves's results would have differed, if less than perfect foresight were assumed don't you?
>
> A: I could have made fundamental changes to Mr. Graves's models and estimated the impact of uncertainty about future prices, yes. I have that expertise.
>
> Q: You simply didn't employ that expertise here?
>
> A: I did not feel it was necessary.

Dep. 106:7-109:4; App. at 72-75.

Because he has not made his own models or performed any quantitative analysis, Dr. Neuberger can only offer flimsy, baseless, and ultimately unhelpful, opinions. There are numerous examples of where Dr. Neuberger can only speculate because he has not performed any quantitative analysis:

- Dr. Neuberger opines that he thought it was "likely" that if deficiencies in the Graves model were corrected that there would be more than a year's difference in the timing of the acceptance of spent fuel than in the Graves model. Dep. 59:7-60:21; App. at 68-69 (objection omitted). However, when asked if the alleged deficiency was corrected what would then be the most likely year that Dairyland's spent fuel would be picked up, he stated that: "I haven't explicitly modeled it, so I don't know for sure….I think it's likely that, that number would move, that outdate would move. But I haven't done the analysis. I haven't created a model to say this is what it would be definitely." *Id.*

- Dr. Neuberger opines that Mr. Graves should have more explicitly modeled uncertainty regarding the DOE program. Report at 20, ¶51; App. at 23. But Dr. Neuberger did not attempt to model this uncertainty, despite the fact that he had

the expertise to do so, Dep. 130:10-132:7 (App. at 84-86), and his belief that the most appropriate means of looking at uncertainty is explicit modeling. Dep. 136:1-6; App. at 87.

- Dr. Neuberger opines that Mr. Graves's analysis is flawed because utilities would not have behaved as Mr. Graves predicted and the price that is paid for exchanges and allocations would be more complicated than just the avoidable at reactor cost. Report at 16, ¶41; App. at 19. When asked whether it is possible that utilities might in the non-breach world pay more than their avoidable cost for early allocations and exchanges he explained that he "would have to model that to know." Dep. 110:21-111:7; App. at 76-77.

- Dr. Neuberger opines that he disagrees with Mr. Graves that utilities without must move fuel would not have valued early allocations more. Report at 19, ¶49; App. at 22. But he did not analyze how much more he believed utilities would have valued early acceptance allocations, did not do any analysis of how much earlier in time utilities would value acceptance than later acceptance, nor did he specifically put parameters on what timeframe would be more preferable to a later timeframe. Dep. 127:14-129:17; App. at 81-83.

- Dr. Neuberger opines that risk aversion would influence the market for exchanges, Report at 22-23, ¶57 (App. at 25-26), 60-61. But he did not attempt to model the effect on the market for exchanges for risk aversion and did not apply his admitted expertise in modeling risk aversion here. Dep. 144:11-145:2; App. at 68-69.

- Dr. Neuberger opines that there is no basis for Mr. Graves's assertion that it is highly implausible that purchasers would be entirely averse to exchanging away early acceptance priority. Report at 24, ¶61; App. at 27. However, he has "not specifically studied or investigated utilities willingness to exchange away early allocation rights." Dep. 64:16-65:21 (App. at 70-71).

- Dr. Neuberger asserts that Mr. Graves did not consider the uncertainty of the DOE administration of the acceptance and exchange program. Report at 24, ¶62; App. at 27). However, Dr. Neuberger acknowledges that it is not his opinion that DOE would not have readily approved exchanges and he did not attempt to model the extent to which exchanges that would have been agreed to amongst utilities would not have been approved by DOE. Dep. 159:2-160:6; App. at 90-91. Moreover, because he had not run the numbers and "done the work" himself in terms of incorporating more uncertainty into the exchanges model, he does not actually know whether it would have improved or not improved Dairyland's result. Dep. 171:15-172:9; App. at 96-97.

- Dr. Neuberger asserts that sociopolitical factors could influence the exchanges market. Report at 25-26, ¶64-66; App. at 28-29. Again, Dr. Neuberger did not attempt to model the impact of taking into account sociopolitical factors. Dep. 180:15-20; App. at 98. Moreover, Dr. Neuberger acknowledges that he didn't "know exactly how" he would go about providing an alternative model taking into account the sociopolitical factors. Dep. 180:21-181:12; App. at 98-99.

- Dr. Neuberger opines that while most utilities would support an acceleration of spent fuel acceptance, some utilities would not want to decelerate spent fuel acceptance. Report at 26, ¶65; App. at 29. When asked for the basis for this assumption, he stated: "I don't have any empirical or quantitative basis. This is my impression." Dep. 184:2-185:7; App. at 100-101. Moreover, when asked what "expertise" he was applying to make this conclusion he stated: "common sense." Dep. 187:5-7; App. at 102.

- Dr. Neuberger opines that some market segmentation would have been possible in the exchange market, rather than the mechanism used in the economically efficient non-breach world exchange market in Mr. Graves' model. *See* Report ay 28-29, ¶71-73 (App. at 31-32); Dep. 192:20-194:5 (App. at 103-105). Dr. Neuberger did not do any analysis to determine how much segmentation he thinks would have been possible in the non-breach world, despite having the expertise to do so, and describing what he could have done, but did not. Dep. 192:20-194:20; App. at 103-105.

- Dr. Neuberger opines that Mr. Graves did not use site-specific data as one of his critiques that Mr. Graves "representative" key cost estimates are flawed. Report at 36, ¶95; App. at 39. However, Dr. Neuberger did not attempt to run Mr. Graves's model with site specific costs, although, admittedly, "it may have been helpful. I didn't do it. I just chose not to." Dep. 217:1-10; App. at 106.

- Dr. Neuberger opines that Mr. Graves assumes a uniform pool reserve consistent with standard industry practice and that if some utilities had non-standard

practices this would affect Mr. Graves's model. Report at 37, ¶99; App. at 40. Dr. Neuberger admits that he does not have any basis for determining how likely it is that utilities would have had such a non-standard practice and that he had not attempted to quantify the impact of adoption of non-standard practices on Mr. Graves's models. Dep. 221:22-222:2; App. at 107-108.

If perhaps Dr. Neuberger had first offered his criticisms and then modeled those alternative inputs, or applied any of his admitted expertise beyond mere speculating, there might be some probative value in the quantitative and verifiable results. Failing that however, any *de minimis* value that might be accorded to his uniformly-qualified speculation and hypotheses is substantially outweighed by its danger of confusing the issues and wasting the Court's time. Moreover, testimony under the guise of expert testimony that is "common sense" is not helpful to the Court. If Dr. Neuberger is unwilling to develop alternative theories, engage in empirical or quantitative analysis, and opine without basis or analysis, the Court should bar Dr. Neuberger's testimony. *See Layssard v. United States*, No. 06-0352, 2007 WL 4144936 (W.D. La. Nov. 20, 2007) ("An expert is not a shaman, and his word must be supported."); *Algarin v. New York City Dep't of Correction*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) (expert report inadmissible because it was "not based on reliable principles and methods and is not helpful to the task at hand" where expert's conclusion was "not the product of the application of any analytic method, aside from [expert's] personal experience, and [the expert] cites no support for it, other than his occasional allusions to 'common sense.'); *United States v. Rincon*, 28 F.3d 921, 925 (9th Cir. 1994) (affirming the exclusion of expert testimony under Rule 403 where expert sought to testify about factors that *may*

impact the reliability of eyewitness identifications). Any presentation of this evidence would only confuse the relevant (and supported) issues presented by Mr. Graves and would be a waste of the Court's time and should therefore be excluded.

CONCLUSION

For the foregoing reasons, Dairyland respectfully submits that the Court grant this motion and preclude Dr. Neuberger's testimony.

Respectfully submitted,

April 29, 2008

s/ Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)

*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

*WDC 371,614,183v1 4/29/2008*