# APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 04-0106C |
| THE UNITED STATES OF AMERICA | ) | (Chief Judge Damich) |
| Defendant. | ) | |

EXPERT WITNESS REPORT

OF

JONATHAN A. NEUBERGER, PH.D.

June 29, 2007

*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

# TABLE OF CONTENTS

I. ASSIGNMENT ..... 1

II. QUALIFICATIONS ..... 2

III. SUMMARY OF OPINIONS ..... 3

IV. THE GRAVES MODEL ..... 5

V. THE MODELING FRAMEWORK PRESENTED BY MR. GRAVES IS FUNDAMENTALLY FLAWED ..... 12

A. In Order to be Relevant to Damages, Mr. Graves Must Provide Reliable Predictions of Trading Volumes, Dates and Prices ..... 12

B. The Graves Model Requires Certain Extreme Assumptions Regarding Plant-Level Utility Behavior ..... 13

C. Mr. Graves Does Not Actually Model the Market for Exchanges, but Simply Assumes Exchanges Would Occur in the "But For" World ..... 16

D. The Graves Model Ignores Factors, Such as Uncertainty, Risk Aversion and Sociopolitical Forces, That Would Affect Participation in an Exchanges Market ..... 18

E. Despite Mr. Graves' Claims to the Contrary, the Mechanism Governing Exchanges is Important and Will Affect the Market for Exchanges ..... 26

F. The Deficiencies in the Graves Framework are Largely the Same as Those Identified in *Pacific Gas & Electric* ..... 29

VI. DEFICIENCIES IN KEY INPUTS TO MR. GRAVES' MODEL FURTHER UNDERMINE HIS PREDICTIONS ..... 30

A. Mr. Graves' "Representative" Cost Estimates are Statistically Flawed ..... 31

B. Mr. Graves Assumes a Uniform Pool Reserve That May Understate the Cost of Exchanges ..... 37

VII. MR. GRAVES' SENSITIVITY ANALYSES OVERSTATE THE ROBUSTNESS OF HIS MODEL ..... 38



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

## EXHIBITS

**Exhibit 1** Curriculum vitae of Jonathan A. Neuberger

**Exhibit 2** Documents and Data Reviewed and Considered



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

# I. ASSIGNMENT

1. My name is Jonathan A. Neuberger. I have been asked by counsel for the U.S. Department of Justice ("DOJ") to present an economic assessment of the modeling framework presented by Frank Graves, an expert for Dairyland Power Cooperative ("Dairyland" or "plaintiff"), in support of plaintiff's claim for damages against the Government for partial breach of the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") between Dairyland and the U.S. Department of Energy ("DOE").

2. I understand that the Nuclear Waste Policy Act of 1982 ("NWPA") authorized DOE to enter into contracts with commercial nuclear utilities concerning the acceptance and disposal of spent nuclear fuel ("SNF") generated by those utilities. Under the terms of these contracts, utilities pay fees into a Nuclear Waste Fund, whose purpose is to pay DOE program costs, including the building of a storage facility, the transportation of SNF, and the storage and monitoring of that waste. DOE's acceptance of SNF under the Standard Contract was to commence by January 31, 1998.

3. DOE did not begin accepting SNF in 1998. In response, utilities filed suit for partial breach of the Standard Contract, alleging that the Government's delay imposed on the utilities the obligation to incur costs of storing SNF that would not have been incurred had DOE begun performance in 1998.

4. Dairyland is a signatory to the Standard Contract by virtue of its ownership of the LaCrosse Boiling Water Reactor ("LACBWR"), a shutdown nuclear facility located in LaCrosse, Wisconsin. As part of its effort to quantify damages arising from the Government's partial breach, Dairyland engaged Mr. Graves to offer certain opinions that directly impact the quantification of damages in this case.

5. In particular, Mr. Graves offers a modeling framework in which certain utilities, including Dairyland, engage in exchanges of SNF acceptance rights allocated under the "oldest fuel first" ("OFF") priority ranking in order to accelerate the dates by



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

which their SNF would have been removed by DOE absent the partial breach. Based on this model, Mr. Graves predicts that Dairyland would have had its SNF removed in the "but for" world sooner than indicated by the OFF allocations through the exchange of later acceptance rights for earlier ones. He also predicts the net cost to Dairyland of making such exchanges. Both of these predictions are relevant to damages – earlier SNF removal through Mr. Graves' exchange mechanism means fewer years of wet storage in the "but for" world and higher damages; the net cost of such exchanges represent "but for" costs that are not incurred in the "actual" world, and thus reflect a direct offset or reduction to damages.

6. I have been asked by DOJ counsel to assess Mr. Graves' modeling framework from an economics perspective, including the reasonableness of the assumptions, the economic content of the model's structure, and the reliability of the predictions.

7. I am being compensated at a rate of $425 per hour for my work in this case. I will be compensated at the same rate if I am asked to testify at deposition or trial.

## II. QUALIFICATIONS

8. I am a Principal in the economic consulting firm Economists Incorporated ("EI"). My *curriculum vitae*, which contains a list of my publications, professional experience, and prior testimony, is attached as Exhibit 1 to this report.

9. In May 1978 I received an undergraduate degree in international relations from Georgetown University. I received my master's degree in economics from Johns Hopkins University in May 1985, and my Ph.D. in economics from Johns Hopkins University in July 1988.

10. From 1988 to 1994, I was an Economist in the Research Department of the Federal Reserve Bank of San Francisco. In that capacity, I conducted research and policy analyses of banking and financial markets. In particular, I studied aspects of bank



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

and thrift lending decisions, portfolio management, risk, and the behavior of bank holding company stocks. I also performed competitive analyses related to regulatory applications for bank mergers and acquisitions. During most of this period, I also served as Visiting Assistant Professor of Economics at Mills College, Oakland, California, teaching courses in economics and finance.

11. Subsequent to leaving the Federal Reserve Bank of San Francisco, I served as: an Economist and Manager at the accounting firm Deloitte & Touche, LLP; a Senior Economist at Benderly Economic Associates; a Senior Managing Economist at LECG, Inc.; and a Partner at the consulting firm Bates & White, LLC. In each of these positions, I used the analytical tools of economics, statistics and finance to address issues of financial performance, business conduct, risk management, and economic policy. In addition, much of my professional experience has focused on measuring and assessing economic damages in commercial litigation involving companies in a broad range of industries.

12. I have provided expert trial testimony on seven previous occasions, including six times in the Court of Federal Claims. I have been qualified in court as an expert in economics, economic damages, econometrics, risk management, and corporate finance. I have testified in the Court of Federal Claims in four prior spent nuclear fuel cases: *Indiana Michigan*, *Southern Nuclear*, *Northern States Power*, and *Boston Edison*. In addition to my trial testimony, I have written expert reports and provided deposition testimony on numerous occasions. A list of my prior testimony is contained in my *curriculum vitae*, attached as Exhibit 1 to this report.

## III. SUMMARY OF OPINIONS

13. Mr. Graves' model of the demand for DOE acceptance rights does not assist the Court in determining issues relevant to Dairyland's damages. His overly speculative model relies on numerous unsupported assumptions to predict that Dairyland would have used a market for exchanging DOE rights in the "but for" world to accelerate



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

the acceptance of its SNF relative to its OFF allocations. This acceleration reduces SNF storage costs relative to the "actual" world, thereby increasing Dairyland's claimed damages. At the same time, the cost of exchanges represents a "but for" cost that is not incurred in the "actual" world, and is thus an offset to damages. In order to provide predictions that are relevant to damages, Mr. Graves must reliably estimate the timing, quantity and cost of exchanges. In my opinion, his analysis fails to provide reliable estimates of these key variables.

14. In fact, Mr. Graves does not actually model exchanges but simply assumes that they will occur and enable Dairyland to have its spent fuel removed earlier than under an allocation based on the OFF priority ranking. His general model cannot identify the parties to any individual transaction. He does not describe a market mechanism that would produce the exchanges that he predicts. He fails to adequately consider factors, such as uncertainty or risk aversion, which would affect his hypothetical market. These deficiencies are largely the same as those that I addressed in my expert analysis in the *Pacific Gas & Electric* case. Mr. Graves also ignores the potential negative impact of certain contract provisions on the schedule of acceptance, such as uncertainty related to DOE review of Delivery Commitment Schedules and proposed exchanges, and the possibility of separate treatment of failed fuel.

15. In addition to these conceptual problems, Mr. Graves also uses as key inputs certain cost estimates that determine the prices of exchanges in his model. In my view, these cost estimates are statistically flawed and further undermine the reliability of Mr. Graves' results.

16. In expressing these opinions, I make the following reservations:

a. The opinions I express in this report are based on my review of available documents and various analyses I have performed. I respectfully reserve the right to express additional opinions, supplement or amend the opinions in this report, or provide additional reasons for these opinions, as additional documents



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

are produced, the transcripts of expert and fact depositions become available for my review, and new facts are introduced during discovery and trial.

b. I have identified in Exhibit 2 the documents that I reviewed and considered in preparing my report. In addition to these documents, I may use other exhibits as a summary or to support my opinions in this case. I also may consider additional exhibits introduced in connection with the testimony of other experts or witnesses, or other documents produced in this case, and I may revise or amend my opinions accordingly.

## IV. THE GRAVES MODEL

17. The modeling framework presented by Mr. Graves purports "to describe what would have been reasonable performance by the United States government in accepting spent nuclear fuel and high-level radioactive waste (together, spent fuel) under the terms of its 1983 contract with the Plaintiff."[1] That is, Mr. Graves uses his modeling framework to describe the pace and sequence of SNF acceptance that he believes would have prevailed in the "but for" world.

18. The model used by Mr. Graves in the current case is virtually identical to the framework he presented in *Pacific Gas &Electric*.[2] As noted by Mr. Graves, the mechanics of his analysis are identical to the work that was done in *PG&E* case and he relies on many of the same inputs.[3] The primary difference from the earlier analysis involves estimates of SNF storage costs. In *PG&E*, Mr. Graves relied on cost data derived from decommissioning cost estimates offered by Roderick Knight. In the current matter, Mr. Graves develops his own estimates of SNF storage costs based on an evaluation of publicly available data from a small sample of nuclear power plants.

---

[1] Expert Report of Frank C. Graves, dated March 23, 2007 ("Graves Report"), p. 1.

[2] Expert Report of Frank C. Graves, dated November 10, 2005 in *Pacific Gas & Electric Company v. United States of America.*

[3] Deposition of Frank Graves, June 19, 2007 ("Graves deposition"), p. 95; also see p. 123.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

19. According to Mr. Graves, he developed his alternative model of SNF acceptance because the mechanism described in the Standard Contract for identifying initial allocations of DOE acceptance rights, the "oldest fuel first" principle, is economically inefficient.[4] That is, an acceptance allocation (like OFF) that is based on the dates and amounts when SNF was discharged may not consider the costs utilities face at each plant to store spent fuel subsequent to those discharges. The allocations available under OFF may result in certain utilities incurring costs for spent fuel storage that could, at least according to Mr. Graves, be avoided under an alternative allocation mechanism. In light of the inefficiencies associated with OFF allocations, Mr. Graves asserts that reliance on OFF to allocate SNF acceptance rights "cannot represent a plausible description of the non-breach world."[5]

20. The purpose of the Graves analysis, therefore, is to describe DOE performance under a mechanism for allocating DOE acceptance rights in the "but for" world that is a purportedly more efficient alternative to OFF allocations. As applied to the current case, Mr. Graves concludes that Dairyland would have used this alternative mechanism to have its SNF removed in the "but for" world sooner than under an OFF allocation,[6] thereby reducing "but for" SNF storage costs. Since damages are equal to "actual" costs less "but for" costs, this acceleration of SNF acceptance absent DOE's delay raises Dairyland's claimed damages. At the same time, Mr. Graves' alternative allocation scheme entails costs to Dairyland that are not incurred in the "actual" world. That is, Dairyland must pay to accelerate its SNF removal in the "but for" world,[7] a payment which is not a feature of the "actual" world. This payment raises costs in the "but for" world, thereby offsetting or reducing Dairyland's claimed damages.[8] Since the estimated reduction in Dairyland's SNF storage costs (through earlier acceptance) is greater than the cost to Dairyland of

---

[4] Graves Report, p. 16.
[5] *Id.*, p. 44.
[6] *Id.*, p. 45.
[7] *Id.*, p. 23.
[8] Mr. Graves deposition testimony is consistent with the opinion that the cost of allocations should be an offset to damages. Graves deposition, pp. 120-121.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*