accelerating its SNF acceptance, the net result of Mr. Graves' analysis is higher claimed damages.

21. In order to improve on the OFF allocations, Mr. Graves relies on a provision in the Standard Contract that allows utilities to exchange, with DOE approval, OFF allocations as identified in approved Delivery Commitment Schedules ("DCSs").[9] If a utility can reduce incremental storage costs by trading its later-year allocations for current ones belonging to another utility (net of the price of trading), it has an incentive to do so. Utilities with allocations that do not face immediate avoidable storage costs (or have low avoidable costs) are, in the Graves framework, willing to sell them to other utilities that do. Exchanges of OFF allocations are thus a central feature of Mr. Graves' approach and are the key to the efficiency gains he purports to identify.

22. The underlying motivation for Mr. Graves' alternative allocation mechanism is the concept of "unnecessary" at-reactor storage cost.[10] It is, in fact, the sole criterion Mr. Graves uses in his model. OFF allocations create instances of avoidable SNF storage costs at certain nuclear facilities and are thus economically inefficient, according to Mr. Graves. Employing this criterion, any mechanism that reduces incremental at-reactor storage costs for the industry as a whole is more efficient than OFF and therefore preferable.

23. Mr. Graves' modeling framework consists of two components. The first component involves a physical comparison of the storage capacity at each nuclear power plant with the plant's current and expected SNF storage requirements. This is the so-called "must move" analysis.[11] Whenever a facility faces a situation in which it must incur incremental at-reactor costs to address SNF storage constraints, it faces what Mr. Graves calls a "must move" condition. The two most common "must move"

[9] Graves report, p. 3.
[10] *Id.*, p. 16
[11] The phrase "must move" was coined by Mr. Graves. I am not aware of any official DOE documents that refer to "must move" SNF for nuclear utilities. I am also unaware of any utility planning or other documents that make reference to "must move" situations in addressing SNF storage issues.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

situations are "full pool" and "shutdown." A "full pool must move" situation arises when current-year SNF discharges from the reactor impinge on the pool's full-core reserve ("FCR").[12] To address this operational constraint, the utility must incur incremental storage costs, for example by moving an amount of SNF from the pool to an onsite dry storage facility ("independent spent fuel storage installation," or "ISFSI") sufficient to restore the pool reserve. According to Mr. Graves, a "reasonable" SNF acceptance rate in the "but for" world should enable most facilities to avoid incurring these incremental costs.

24. Another "must move" situation identified by Mr. Graves is a "shutdown must move."[13] This situation arises after a plant has ceased operations and reaches the end of the requisite five-year cooling period for SNF stored in its pool. Timely removal of the SNF at that time would enable the plant to commence decommissioning activities. Costs associated with delayed decommissioning due to having SNF onsite after the five-year cooling period represent avoidable SNF storage costs in Mr. Graves' analysis.[14] Again, an appropriately designed SNF acceptance program in the "but for" world should, according to Mr. Graves, enable the industry to avoid incurring most of these incremental SNF storage costs.

25. Based on this criterion of avoidable storage costs, Mr. Graves accumulates the quantities of "must move" fuel from all facilities over time in his "must move" model to represent "the total demand for government acceptance of spent fuel."[15] He refers to this accumulated quantity of SNF as the "must move mountain."[16]

---

[12] I understand that nuclear power plant operators typically maintain free storage space in their spent fuel pools. A reserve equal to an entire core of assemblies is referred to as "one full core reserve." In addition, operators may choose to reserve additional space beyond a full core reserve. This space provides operational flexibility for refueling and maintenance activities, and may facilitate prudent responses to potential emergencies.

[13] *Id.*, p. 6.

[14] Mr. Graves describes a third "must move" situation, that of an onsite ISFSI that existed prior to 1994. Any such fuel stored at an ISFSI is immediately "must move" in Mr. Graves' model.

[15] *Id.*, p. 7.

[16] Trial testimony of Frank C. Graves, p. 797, in *Yankee Atomic v. The United States of America.*



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

26. The "must move" analysis is used by Mr. Graves to describe what he believes is the "economically appropriate" scale for DOE's SNF acceptance program.[17] According to Mr. Graves, the DOE program should be operated at a rate sufficient to accept current discharges plus some portion of the backlog of previously discharged SNF, thereby staying ahead of the accumulation of "must move" fuel. As Mr. Graves states in his report:

> ...an economically appropriate non-breach acceptance rate would accommodate average Must Move needs, would start early enough so it is not overwhelmed by the higher needs in later years, and would stay somewhat ahead of aggregate Must Move needs.[18]

Given the size and shape of his mountain of "must move" spent fuel, Mr. Graves asserts that an aggregate annual acceptance rate that ramps up rapidly to 3,000 metric tons of uranium ("MTUs"), as described in the 1988 Draft Mission Plan, is appropriate for this purpose. Lower rates of acceptance, or sequences that ramp up to 3,000 MTUs more slowly, entail relatively higher aggregate SNF storage costs, and thus are inefficient according to Mr. Graves' criterion.[19] Acceptance rates greater than 3,000 MTUs per year considered in program planning, for example a 6,000 MTU rate, would reflect an overbuilt system that Mr. Graves believes is also inefficient.

27. Given what he views as the appropriate scale for the program, Mr. Graves also claims that acceptance rights should be allocated among nuclear power plants in such a way as to minimize his definition of "unnecessary" at-reactor storage costs. The "must move" analysis thus serves as an input to the second component of his modeling framework, the "Economic Sequence Model" or "ESM."[20] This model describes the demand for DOE allocation rights by combining the assumed physical

---

[17] Graves report, p. 9.
[18] *Id.*, pp. 8-9.
[19] Notably, Mr. Graves considers some of the acceptance rate sequences offered by plaintiffs in other spent fuel cases as unreasonable, since they do not satisfy his criterion of economic efficiency. Graves deposition, pp.114-115.
[20] Graves report., p. 18.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

characteristics of each "must move" situation with estimates of the costs that are required to address the situation. A "full pool must move" situation, for example, may require offloading a few assemblies to an onsite dry-storage facility in order to restore the pool's reserve. The cost of this activity reflects an incremental cost that, in Mr. Graves' framework, can and should be avoided. The logic of the Graves model is that a utility will be willing to pay up to its avoidable cost to obtain sufficient SNF acceptance rights to address each "must move" situation it faces. The ranked ordering of each utility's "willingness to pay" per plant to address "must move" needs identifies an industry-wide demand curve for DOE acceptance rights for each year. Supply of acceptance rights is given by the assumed aggregate rate of acceptance for that year.[21] Equilibrium in this market, according to Mr. Graves, occurs at the intersection of the downward sloping demand curve and the vertical supply curve.[22]

28. The ESM describes the demand for and supply of DOE acceptance rights. It does not explicitly describe the market for exchanges of these rights. Yet the annual equilibrium identified in the Graves model often requires exchanges of OFF-based acceptance rights in order to produce the so-called efficient allocations. Rather than address exchanges directly, Mr. Graves assumes that all exchanges that improve efficiency (according to his definition) relative to the OFF allocations occur readily and at the marginal or market-clearing price. This is the lowest price at which the demand for current-year acceptance allocations just meets the aggregate supply of available acceptance rights. Mr. Graves acknowledges that, at least in the early years of the program, some utilities facing "must move" situations may have low avoidable costs and may not be willing to pay the market-clearing price to alleviate their "must move" conditions. The scarcity of available acceptance rights, relative to accumulated "must move" demands, means that the Graves modeling framework does not eliminate every "must move" situation. Mr. Graves asserts, nevertheless, that his allocation mechanism, i.e., OFF allocations under a rapid ramp-up to a

---

[21] *Id.*, footnote 17, p. 23.
[22] *Id.*, pp. 22-23.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

steady-state 3,000 MTU rate plus exchanges, is more efficient (in terms of reducing "unnecessary" at-reactor storage costs) than OFF alone.

29. The Graves model is a general one, simulating what he refers to as "the result of a market mechanism that would be efficient in identifying who would be the best users of acceptance."[23] It is not a model of specific exchanges – in fact, Mr. Graves does not predict any individual transactions or exchanges of acceptance rights. He models instead the market for DOE acceptance rights and assumes exchanges facilitate the efficient allocation of those rights.

30. With respect to the plaintiff in this case, Mr. Graves predicts that Dairyland would have occupied a fairly high position in the sequence of demanders for early-year acceptance rights in the "but for" world. Assuming Dairyland's operations and maintenance ("O&M") costs are equal to those of other facilities, and with a relatively small amount of SNF in its pool, Dairyland would have been willing to pay a relatively high per-MTU price to accelerate its SNF acceptance through exchanges. Compared to its OFF-based allocations, which are spread out over the 1998-2004 period at his assumed acceptance rate, Mr. Graves predicts that Dairyland would have purchased 1998 rights and sold its remaining rights, thereby having all of its SNF removed in 1998, at a net exchange cost of $2.8 million (in 2007 present value terms).[24] Since the cost savings to Dairyland of accelerating its SNF acceptance is greater than the cost of exchanging for earlier allocations, Mr. Graves' analysis predicts lower "but for" costs for Dairyland, thereby increasing its claim for damages.

[23] Graves deposition, p. 193.
[24] Graves report, p. 23.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

## V. THE MODELING FRAMEWORK PRESENTED BY MR. GRAVES IS FUNDAMENTALLY FLAWED

### A. In Order to be Relevant to Damages, Mr. Graves Must Provide Reliable Predictions of Trading Volumes, Dates and Prices

31. For Mr. Graves' model to provide the Court with any assistance about issues relevant to damages in this case, it must provide reliable predictions regarding three key elements: (1) whether Dairyland would be able to accelerate its SNF acceptance relative to OFF through the successful use of exchanges; (2) when Dairyland would have each of its SNF elements removed; and (3) the prices it would pay or receive for each of its exchanges. All else equal, the first two of these elements have a direct impact on damages. The sooner Dairyland could have had all of its spent fuel removed in the "but for" world, the lower its storage costs relative to the "actual" world and the higher the damages.

32. The third element that Mr. Graves must predict – prices of "but for" exchanges – is equally important to damages. If the plaintiff incurs costs to exchange DOE acceptance rights in the "but for" world that are not incurred in the "actual" world, then "but for" costs are higher and damages are reduced by exchanging. Prices of both purchases and sales are relevant to this computation. Mr. Graves predicts, for example, that Dairyland would purchase 1998 rights (over and above its OFF allocations) in exchange for selling its allocated rights from 1999-2004. The net cost of these exchanges (assuming purchase price exceeds sales price) represents additional "but for" costs, and is thus an offset to damages.[25]

33. It is important to acknowledge that Mr. Graves must provide reliable estimates for each of these factors that affect damages. Reliable estimates of one, but not the others, are not sufficient for Mr. Graves' results to assist the Court in quantifying the impact of exchanges on Dairyland's damages. If, for example, Mr. Graves predicts that Dairyland would accelerate its SNF acceptance to 1998, but fails to provide a reliable estimate of the cost to Dairyland of that acceleration, then Mr. Graves will

[25] Graves deposition, pp. 120-121.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

have failed to provide sufficient economic bases to predict the impact on damages. In the analyses that follow, I consider Mr. Grave's predictions in light of the reliability of each of these aspects affecting damages.[26] In my opinion, Mr. Graves' analysis does not provide reasonably certain estimates of these three factors, and thus he fails to provide meaningful results to the Court.

### B. The Graves Model Requires Certain Extreme Assumptions Regarding Plant-Level Utility Behavior

34. The mechanics of the Graves ESM are fairly straightforward. Mr. Graves relies on the results of his "must move" model to identify for each nuclear facility when it will face a "must move" situation, the type of "must move" condition it faces, and how much SNF must be moved to accommodate that situation. The taxonomy of these "must move" conditions includes: (1) "shutdown must move," when the spent fuel at a shutdown reactor reaches the end of its five-year cooling period; (2) "full pool must move," when spent fuel discharges at an operating reactor begin to impinge on the pool's full-core reserve; and (3) "ISFSI must move," which includes any SNF stored at an onsite ISFSI built prior to 1994. Mr. Graves uses publicly available cost data from a limited sample of plants to construct his own allegedly "representative" estimates of the costs associated with each of these "must move" conditions.[27] Mr. Graves' cost estimates, expressed on a per-MTU basis, are applied to each "must move" condition and ranked in the model from highest to lowest. This annual ranking purportedly reflects each plant's willingness to pay for acceptance rights in that year. The series of willingness-to-pay amounts are, in effect, the demand curve for DOE acceptance rights. As noted above, the supply curve in Mr. Graves' model is simply a vertical line at that year's aggregate rate of acceptance.

35. Equilibrium in the Graves model occurs at the intersection of the supply and demand curves. Since supply is fixed in each year, the quantity of acceptance rights used in any given year is determined by the aggregate acceptance rate. The "price" that clears this market is the marginal willingness to pay at which demand just

[26] Graves report., p. 45.
[27] Mr. Graves' cost estimates are discussed in more detail in Section VI below.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

matches the available supply. Mr. Graves assumes that every seller of acceptance rights accepts this marginal price, even though all but one of the buyers has a higher willingness to pay.

36. Demand for and supply of acceptance rights in the Graves model are independent of OFF allocations. Demand for acceptance rights is determined solely by current-year "must move" needs; supply is fixed at the annual aggregate acceptance rate. Since every plant that demands current-year acceptance rights will not find itself in the same position with respect to its OFF allocations, an additional step, outside the ESM, is required to identify which plants actually enter the separate (but not explicitly modeled) exchanges market to address their "must move" conditions.[28]

37. Some facilities face "must move" situations but have no current-year allocations of DOE rights. As long as their willingness to pay for rights is above the market-clearing price, the owners of these plants will go to the exchanges market to purchase all of the acceptance rights they need to address current "must move" needs. Other plants have current-year allocations exactly equal to their "must move" requirements. Again assuming their per-MTU avoidable costs are sufficiently high, these facilities use all of their current allocations rather than enter the exchanges market as a seller, because the price they would receive for selling their allocations is, on a per-MTU basis, below their own storage costs. Still other facilities receive OFF-allocated acceptance rights in excess of the amounts they demand in that year. As long as their willingness to pay is above the market-clearing price, these facilities use only the rights they currently need and offer the rest of their allocated rights to other utilities in the exchanges market. Some plants actually face current "must move" conditions but have a willingness to pay for rights that is below the market-clearing marginal price. These facilities forego their own "must move" situations and offer all of their current-year rights to the exchanges market because they would earn more by selling

[28] This additional step entails comparing each plant's demand for acceptance rights in a given year to the OFF allocations available in that year.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

rights (on a per-MTU basis) than it would cost them to address their "must move" conditions.[29]

38. Certain assumptions are required to produce this predicted behavior on the part of utilities in the Graves model. In effect, every decision that every facility makes about SNF storage issues can be summarized in a single variable – the purportedly avoidable cost directly attributable to the immediate "must move" condition as estimated by Mr. Graves. No other factors or information (besides the aggregate acceptance rate) are relevant to Mr. Graves' predictions regarding the efficient allocation and exchange price of DOE acceptance rights. In the Graves model, every utility willingly participates in the exchanges market, offering 100 percent of the acceptance rights it does not currently need to address a "must move" condition.[30] No facility ever withholds rights from the exchanges market or uses allocations that are not needed for immediate "must move" conditions. And every seller of rights accepts the market-clearing price computed from the willingness to pay of the marginal buyer, despite the abundance of information that Mr. Graves assumes would be available to all utilities.[31]

39. The year-by-year predictions of Mr. Graves' model entail a presumption of perfect foresight. Every utility knows with perfect certainty its own SNF storage costs for the current year as well as every future year. Each utility's willingness to pay is determined in the absence of any uncertainty about current or future costs. By extension, market-clearing prices in each year are similarly determined with perfect foresight. Without this assumption, the Graves model would yield different predictions about bidding behavior, exchanges and prices.

[29] Those facilities in the Graves model that receive current-year allocations of acceptance rights but face no immediate "must move" condition offer 100 percent of their current-year rights to the exchanges market and accept the market-clearing price.

[30] While Mr. Graves considers alternative scenarios in which he modifies some of these assumptions, they are consistent with his "base case."

[31] Graves report, p. 19. The model solution identified by Mr. Graves relies on information about the current market as well as future costs and market-clearing prices.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

40. The reliability of Mr. Graves' predictions depend, at least in part, on whether the assumed behaviors are likely to be observed in a reasonable "but for" world. Changes in the underlying assumptions, however, change the predictions of the Graves model, including the identities of exchanging parties, the dates of exchanges, and the prices at which exchanges occur.

41. It might be possible to create the conditions necessary for the assumed behavior by fiat – for example, DOE could require as a condition of the Standard Contract that every signatory agree to Mr. Graves' definition of "must move," agree to offer for exchange any rights that are not required by current "must move" needs, and agree to base its decisions on the market-clearing price identified in a framework like the Graves model. Absent such regulatory or legal rules, however, it is my opinion as an economist that utilities would not behave as Mr. Graves assumes. The demand for DOE acceptance rights, as well as the supply and demand for exchanges of those rights, is far more complex than Mr. Graves assumes.

### C. Mr. Graves Does Not Actually Model the Market for Exchanges, but Simply Assumes Exchanges Would Occur in the "But For" World

42. Through the use of his modeling framework, Mr. Graves purports to identify an efficient sequence of SNF acceptance that is preferable, in an economic sense, to the sequence resulting from the OFF acceptance priority ranking. Improvements over OFF, however, are only possible through exchanges of acceptance rights among utilities. That is, exchanges are a fundamental feature of Mr. Graves' analysis and are the key to any efficiency improvements he claims relative to the OFF allocations.

43. Despite the central role that exchanges play in his analysis, Mr. Graves does not actually model the market for exchanges. He instead models the demand, and only the demand, for DOE acceptance rights. There is no explicit characterization in the Graves model of an exchanges market separate from the market for acceptance rights. In order to obtain any improvements relative to OFF, moreover, Mr. Graves simply assumes that exchanges occur to accommodate his so-called efficient



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*