sequence of acceptance rights. That is, Mr. Graves assumes the result that he is allegedly modeling.

44. The absence of an actual exchanges market in the Graves model means that Mr. Graves cannot identify the parties to any individual trade. While his framework reveals facilities that may face an incentive (in terms of potentially avoidable SNF storage costs) to purchase acceptance rights in an exchanges market, he cannot identify the facility (or its owner) that supplies those rights in the exchanges market. Mr. Graves simply assumes that some utility that does not face an immediate "must move" situation will be willing to provide early-year acceptance rights to operators like Dairyland that need these rights. Since the exchange market is simply assumed and not analyzed in the Graves framework, it is impossible to ascertain the identity of any supplier to a particular exchange.

45. As a matter of economics, the market for acceptance rights is *not* the same as the market for exchanges. An exchanges market is a subset of the larger market for acceptance rights. In any given year, exchanges represent only a fraction, often a small fraction, of the total amount of available DOE acceptances. Mr. Graves fails to consider any differences between the market for acceptance rights and the market for exchanges. In his model, all that matters for identifying demand for acceptance rights is avoidable cost. Exchanges are simply an assumed consequence of this oversimplified framework. Mr. Graves fails to acknowledge that there are factors besides just cost that could impact a market for exchanges separate from a market for acceptance rights.[32] Mr. Graves' analysis, however, sheds no light on these factors or their likely impact on an exchanges market.

46. Mr. Graves' assumptions regarding the ease with which exchanges would occur also ignores another important aspect about spent fuel acceptance – the condition of the SNF. Mr. Graves acknowledged at his deposition that Dairyland's spent fuel pool

---

[32] Mr. Graves did not engage in any discussions with utility personnel at Dairyland to determine their interest in a hypothetical exchanges market, or to identify factors that could influence supply and demand in that market (Graves deposition, pp. 104-105). Mr. Graves also failed to see any benefit from conducting a broader survey of utility attitudes with respect to his representation of an exchanges market (Graves deposition, pp.117-119).



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

contained a number of failed fuel assemblies,[33] but he simply assumed that failed fuel would be accepted by DOE on the same schedule as standard fuel. Depending on the extent of the failure, however, these assemblies may require additional costs or activities that could delay acceptance. The Standard Contract provides that failed fuel may be accepted at an adjusted schedule.[34] As Mr. Zabransky of DOE testified at his deposition, "To the extent that there are technical feasibility issues associated with the picking up of that failed fuel, the Department may need to adjust the schedule of pickup."[35] Mr. Graves' analysis ignores the issue of failed fuel; he does not distinguish failed from standard fuel, and the number of failed fuel assemblies has no effect on his analysis.[36]

### D. The Graves Model Ignores Factors, Such as Uncertainty, Risk Aversion and Sociopolitical Forces, That Would Affect Participation in an Exchanges Market

47. As described above, Mr. Graves offers a stylized and simplistic depiction of the market for DOE acceptance rights. On the demand side of that market, Mr. Graves uses the notion of avoidable storage cost as the sole and summary determinant of demand. He largely ignores the supply side of the market, as the supply of acceptance rights in any given year is determined by DOE's aggregate acceptance rate. The analytical problem addressed in the Graves model is simplified considerably by assuming a predetermined vertical supply curve.

48. While it may be economically reasonable to ignore the supply side of the market for acceptance rights, this omission is not justified in the market for exchanges. The supply curve in this market is not predetermined. Participation in the exchanges market is voluntary. Individual utilities can decide whether or not to participate in this market. Moreover, participation involves consideration of factors that are omitted from the Graves model. It is unsupportable from an economics perspective,

[33] Graves deposition, pp. 52-53.

[34] Mr. Graves acknowledges in his report that the Standard Contract (Article VI.A.2 (b)) includes the provision that failed fuel may affect acceptance priority. Graves report, footnote 12, page 11.

[35] Deposition of David Zabransky, May 3, 2007, p. 150.

[36] Graves deposition, p.90.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

however, to simply assume away one of the most substantive elements of the problem at hand.

49. A fundamental feature of the Graves model is that DOE acceptance rights are only valuable to (and thus in demand by) those facilities that face current "must move" situations. For every other facility, earlier acceptance rights have no additional value relative to later rights. In the absence of an immediate "must move" condition, utilities are indifferent to the timing of their allocations, assuming decelerated acceptance through exchanges does not create a future "must move" condition. Thus, a utility that faces a "must move" situation in three years values current allocations the same as those available next year or the year after, that is, of no additional value other than what they can potentially fetch in the exchanges market.[37] It is only in the third year when it faces an imminent "must move" condition that this utility will demand acceptance rights. Given this assumed value structure, every utility in the Graves model offers all of its currently unneeded rights to the exchanges market, regardless of the price at which these rights are assumed to exchange. Some facilities that actually face immediate "must move" situations sell their OFF-allocated rights rather than use them if their individual valuations are below the market-clearing price. Mr. Graves even predicts that exchanges will occur after a few years at a zero price (except for some *de minimus* transactions costs). This prediction is the direct consequence of the extreme simplifying assumptions that underlie the Graves model.

50. Mr. Graves effectively assumes 100 percent participation in his exchanges market. Yet it is economically reasonable to expect that participation in this market will fall short of 100 percent. Even in the "but for" world of DOE compliance, uncertainty about continued DOE performance, for example, will cause utilities to value earlier acceptance rights beyond simple "must move" needs. This valuation will certainly

---

[37] In the *PG&E* case, Mr. Graves argued that currently available but unneeded acceptance rights were actually a nuisance that provided additional incentive to sell. See deposition testimony of Frank C. Graves in the *PG&E* case, January 24, 2006, pp. 252-253.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

alter the demand for rights, but it also may inhibit participation in an exchanges market.

51. It is important to recognize that this uncertainty does not require a "doomsday scenario" or widely held beliefs that the DOE program will fail, as Mr. Graves suggests.[38] And it is not unique to the "actual" scenario in which DOE performance is delayed. All that it takes from an economics perspective is some uncertainty about the contours of DOE performance in the "but for" world that affects a utility's SNF storage decisions and the costs and benefits to participating in Mr. Graves' exchanges market. To Mr. Graves, there are only benefits to exchanging. Uncertainty, however, imposes costs on economic decisions that the Graves model does not recognize.[39]

52. As a matter of economics, a model that incorporates uncertainty will not yield the same predictions as one that does not include the effects of uncertainty. Even if the same underlying incentives apply (e.g., cost minimization, profit maximization, or system-wide efficiency), decision making in the presence of uncertainty generally produces different results than the same decisions in the absence of uncertainty. Mr. Graves' base case simulation ignores uncertainty and thus cannot reliably predict its impact on an exchanges market.

53. Mr. Graves acknowledges that "[s]ome uncertainty would doubtless be present in a market for exchanges for acceptance priority."[40] Yet he fails to incorporate this uncertainty explicitly into his model. If a market is "doubtless" affected by some

---

[38] Graves report, p. 34. Any uncertainty on the part of utilities regarding specific features of DOE's acceptance program, such as the timing of acceptance at individual plants, or aggregate acceptance rates, or the potential for unexpected delays, will affect the environment in which utilities evaluate participation in an exchanges market. A decision not to participate in an exchanges market does not require an expectation that the DOE program is doomed to failure.

[39] Economic decision making under uncertainty requires acknowledging that different outcomes are possible, some of which may impose substantial costs. In the presence of uncertainty, optimal decision making involves consideration of the probability-weighted costs of these various outcomes. For example, a nuclear accident is a low-probability event. Yet the potential costs of an accident are so significant that nuclear operators spend millions of dollars planning and preparing for such events.

[40] Graves report, p. 34.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

factor, it is appropriate as an economist to model that factor as a fundamental feature of the framework.

54. Mr. Graves argues that such explicit modeling of uncertainty is unnecessary,[41] and that it can be addressed through simulations involving changes in certain parameters of the certainty-based model. I disagree with Mr. Graves that such sensitivity analysis is the most appropriate way to address the impact of uncertainty on an economic model. I also interpret his simulation results differently than he does. Mr. Graves provides two simulations that he claims reflect a "reasonable interpretation" of uncertainty and risk.[42] In each one, Mr. Graves assumes that uncertainty advances the demand for DOE acceptance rights relative to his base case.[43] In one simulation (Case 21), he assumes utilities bid their avoidable costs three years in advance of their "must move" needs; in the other (Case 22) he assumes advanced bids for six years prior to "must move" needs. In both simulations, according to Mr. Graves, Dairyland still successfully exchanges rights and has its SNF accepted in 1998. He thus claims that uncertainty does not appreciably change his model's predictions.

55. In contrast to Mr. Graves' interpretation of these simulations, my review of these results reveals significant differences that highlight the potential importance of uncertainty. As part of discovery in this case, I was provided with electronic versions of the ESM for certain (but not all) of the simulations Mr. Graves describes in his report. Comparing the "base case"[44] to the "advanced bid FPMM" versions of the model, there are dramatic differences in which utilities successfully address their "must move" needs in 1998, the first year of the DOE program. While Dairyland is able in both simulations to have its SNF removed in 1998, it is one of only 10

---

[41] *Id.*

[42] *Id.*, p. 35.

[43] Since Mr. Graves has no mechanism for altering the market supply of rights, he assumes uncertainty affects only the demand for rights. In the Graves model, supply for exchanges is indirectly affected as the increased demand reduces the net of total of available rights minus current demand.

[44] While Mr. Graves' "base case" assumes no license extensions, all of the sensitivity analyses were performed on a version of the ESM that assumes license extensions for all operating reactors. The "base case" used here for comparison purposes is actually Graves Case 2.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

facilities that does so under both scenarios (out of 27 in the "base case"). In total, 17 facilities whose "must move" needs were met in 1998 in the "base case" are unable to address these same needs in the presence of advanced bidding due to uncertainty. Twenty-three facilities that did not address SNF needs in 1998 in the "base case" are able to advance their needs to 1998 in the alternative simulation. Even with this incomplete characterization of uncertainty, the Graves model produces entirely different results compared to the "base case."

56. In addition, Mr. Graves' uncertainty simulations reveal significant effects on the cost of exchanges. In the Case 21 simulation presented in his report, the net cost of exchanges to Dairyland increases by more than 80 percent ($5.1 million compared to $2.8 million in the base case).[45] Case 22 net costs are more than four times the base case ($12.4 million versus $2.8 million).[46] As noted above, Mr. Graves must provide reliable estimates of the cost of exchanges, as well as their quantity and timing, if he is to assist the Court in quantifying damages. Yet Mr. Graves provides no guidance as to which of these cost estimates is most reliable in the presence of uncertainty that "doubtless" would exist in an exchanges market.

57. Risk aversion is another aspect of uncertainty that would influence the market for exchanges. This influence could manifest itself on both the demand and supply sides of the market. On the demand side, a risk-averse utility could demand acceptance rights in excess of its immediate "must move" needs or in advance of those needs. Such "excess" demand could reflect, for example, a desire to obtain more operational flexibility by expanding the pool reserve. In the presence of uncertainty and risk aversion, such flexibility has value to utilities over and above their immediate "must move" needs. This additional source of demand for acceptance rights is captured by Mr. Graves in his two advanced-bid scenarios (Cases 21 and 22) described above.

---

[45] Graves report, p. 36.
[46] *Id.*, p. 37.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

58. While risk aversion could affect the demand for exchanges, it also could affect the supply side of an exchanges market by inhibiting participation. Risk-averse utilities could decide that uncertainty regarding the ability to exchange OFF allocations is sufficiently costly to hinder strategic planning, capital budgeting or other long-term decisions. Such utilities may decide that the relative certainty of using their own OFF-based allocations is preferable to the uncertainty of participating in an exchanges market. Mr. Graves views considerations such as this to be "non-economic" in nature and unimportant,[47] but in fact they reflect an expanded set of costs and benefits that characterize many real-world economic decisions.

59. Mr. Graves claims to address the issue of reduced participation in his sensitivity analyses. He suggests that reduced participation is akin to a scenario in which the aggregate DOE acceptance rate is lower than his 3,000 MTU per year rate. He refers to his Case 7, which models the effects of the acceptance sequence described in the 1991 DOE Annual Capacity Report ("ACR"). This rate involves a three-year ramp-up to a 900 MTU annual rate, with maintenance of that rate through 2007. Mr. Graves notes that even under this lower acceptance rate, Dairyland successfully exchanges DOE allocations to have its fuel removed in 1998. As a consequence of this result, he suggests that reduced participation, due to "non-economic" factors like risk aversion, does not affect his conclusions. He fails to note, however, that the costs to Dairyland in this lower acceptance rate scenario – an offset to damages – are almost 10 times the costs in his base case ($21.2 million versus $2.8 million).

60. Moreover, Mr. Graves misses the point about an important aspect of risk aversion. In the presence of uncertainty, it is reasonable to expect that attitudes towards risk will not be homogeneous across all utilities. Decisions by certain utilities will reflect strong aversion to risk, while other utilities will be less risk averse.[48] If risk aversion reduces participation in an exchanges market (which is likely), and this attitude toward risk is concentrated among those utilities who are sellers of early-year

---

[47] *Id.*, p. 34.

[48] Mr. Graves made no inquiries regarding the level of risk aversion at Dairyland, or at any other utility.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

allocation rights (which is possible), then there may be little or no supply of acceptance rights to an exchanges market in the early years of the DOE program. If this occurs, then many utilities, like Dairyland, will be unable to purchase rights, or be unwilling to do so at the extremely high costs that would prevail under this smaller supply. The exchanges market would look very different in this environment. The important point here is that the distribution of attitudes about risk is relevant, and is not addressed in Mr. Graves' model or any of his sensitivity scenarios.[49]

61. Mr. Graves asserts that, "It is highly implausible that intangible or non-economic factors would make Purchasers entirely averse to exchanging away early acceptance priority."[50] Yet there is no basis for this assertion. The Graves model does not adequately incorporate so-called "non-economic" factors like uncertainty or risk aversion, and thus is not a sufficient tool to address this question. The sensitivity analyses Mr. Graves presents also do not capture the impact of uncertainty on the supply of DOE acceptance rights to an exchanges market. Even if one accepts that the alternative simulations of the Graves model are reasonable representations of uncertainty and risk aversion, the results of these simulations show significant effects on the quantity, timing and cost of exchanges. These results simply are not reliable inputs for estimating Dairyland's damages.

62. Another aspect of uncertainty that Mr. Graves does not consider involves the administration of the DOE acceptance program itself. The exchange provision in the Standard Contract involves exchanges of allocations identified in approved Delivery Commitment Schedules. Under the Standard Contract, these DCSs must be approved by DOE, and the proposed exchanges themselves are also subject to DOE approval.[51] There are thus two layers of approvals required for the exchanges market to function that cannot be predicted with absolute certainty. In addition,

---

[49] In fact, on p. 33 of his report, Mr. Graves makes the assertion that, in the presence of risk aversion, potential buyers of exchanges would have correspondingly high or higher intangible values than sellers. Mr. Graves thus makes apparently strong assumptions about risk attitudes without any basis.

[50] Graves report, p. 32.

[51] Standard Contract, Article V.E.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

DCSs cover a period of ten years. To the extent that proposed exchanges involve allocations beyond ten years, there may not be sufficiently certain rights to exchange.

63. Mr. Graves' arguments regarding the impact of sociopolitical factors are similarly unconvincing and unsupported. Utility companies typically take into account the interests of multiple stakeholders, including shareholders, ratepayers, and the communities in which they operate. A cooperative like Dairyland may have an even more complex amalgam of interests affecting its management decisions than a typical investor-owned utility.[52] Operations of nuclear power plants are particularly sensitive to local concerns and have been the frequent targets of community activists, environmentalists, and other "non-economic" interest groups. Utilities have often had to address these concerns in making operational and other decisions at their nuclear facilities.

64. Mr. Graves asserts, without support, that sociopolitical interests and concerns will "generally be closely aligned"[53] with economic incentives as he defines them. Yet there is no *a priori* reason to believe that economic and non-economic interests will be aligned. Mr. Graves suggests that concerns about spent fuel storage are "largely all-or-nothing,"[54] but cites to no supporting evidence. In fact, events in a previous SNF case in which Mr. Graves worked contradict his assertion. In the *PG&E* matter, residents near PG&E's Diablo Canyon nuclear power plant, an operational facility, successfully lobbied for a legal agreement with the company forbidding it to transfer SNF from PG&E's shutdown facility at Humboldt Bay to Diablo Canyon. Even though Diablo Canyon would continue to operate and store SNF from its own reactor, local residents did not want any additional SNF on the site. In that case, sociopolitical forces constrained PG&E's behavior in a situation that was not "all-or-

---

[52] For a list of Dairyland's current membership, see http://www.dairynet.com/our_members/index.php?&format=print.

[53] *Id.*, p. 33.

[54] *Id.*, p. 34.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

nothing" and in a way that was not necessarily consistent with the company's economic incentives to minimize cost.[55]

65. These sociopolitical forces also could influence a utility's decisions regarding participation in an exchanges market. While most parties likely would support an acceleration of SNF acceptance, the same support would not be forthcoming for companies that decelerate acceptance, that is, those utilities that sell early DOE rights in exchange for later ones. It is not difficult to imagine that utility executives would face opposition from any number of interest groups in explaining why they were delaying acceptance of their SNF, even in a situation that was not "all-or-nothing."[56] Mr. Graves has not identified a single utility executive who has stated their willingness to delay DOE acceptance by selling early-year rights.

66. Mr. Graves dismisses sociopolitical factors as unimportant or simply consistent with "must move" economic incentives. Yet such factors would influence the willingness of utilities to participate in an exchanges market and could run counter to Mr. Graves' criteria for economic efficiency. Mr. Graves' dismissal of these factors reflects a failure on his part to acknowledge the potential for "non-economic" forces to change the outcomes he predicts in his hypothetical exchanges market.

### E. Despite Mr. Graves' Claims to the Contrary, the Mechanism Governing Exchanges is Important and Will Affect the Market for Exchanges

67. As mentioned previously, the modeling framework presented by Mr. Graves focuses on the demand for DOE acceptance rights and does not explicitly model the market for exchanging those rights. Instead, Mr. Graves simply assumes that exchanges will take place in a manner that promotes his definition of economic efficiency. Mr. Graves even claims that the actual exchange mechanism is unimportant:

---

[55] Similar sociopolitical pressures may have prevented Dairyland from removing its SNF by shipping it to WEPCO's Point Beach plant. As John Parkyn testified at his deposition, "Politically, obviously it's a – transshipment of spent fuel in this state is a pretty hot issue…it's a publicity issue of we're shipping stuff around….The persons who don't want the see the industry go forward obviously often object to transportation of spent fuel." Deposition of John Parkyn, December 12, 2006, pp. 205-06.
[56] Graves report, p. 34.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*