> The exact mechanism by which exchanges would have occurred was not developed, because the program has not progressed to that stage. But as in many other markets, a number of alternative mechanisms (e.g., a formal centralized exchange, brokers, bulletin boards, and/or bilateral trades) are possible and would have reached essentially the same result.[57]

68. As a matter of economics, however, it is not the case that every exchange mechanism will produce the same result. These results depend on such factors as information available to the parties, relative bargaining strengths, and the structure of the underlying market.[58] Alternative mechanisms will produce different results in terms of the identities of successful bidders and sellers, and the prices at which transactions occur. It is not correct from an economics perspective for Mr. Graves to simply gloss over these details as irrelevant to Dairyland's damages.

69. In fact, Mr. Graves implicitly assumes a particular exchange mechanism, similar to so-called *Walrasian tâtonnement*. This mechanism, associated with the 19th century French economist Léon Walras, involves a fictional auctioneer overseeing a perfectly competitive market. This auctioneer is imagined to continuously call out prices in the market and tally offers for supply and demand. If amounts demanded at a particular price exceed amounts supplied, then the auctioneer calls out a higher price. If supply is greater than demand, a lower price is announced. When a price is called out at which the amount offered is equal to the amount demanded, the auctioneer effectively closes the market and arranges all announced trades at the last or marginal price.

70. Yet this is not the only plausible exchange mechanism that could arise in the market for exchanges of DOE acceptance rights, especially when the trading parties (rather than a central authority) are responsible for organizing the market. And many of these alternative mechanisms will not produce the results predicted by Mr. Graves. Rather than a benign auctioneer seeking to clear the market, for example, the

---

[57] *Id.*, footnote 12, p. 16.

[58] As noted below, the Court in *PG&E* determined that Mr. Graves relies on "highly speculative assumptions" regarding many of these factors.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

exchanges market could easily develop into one characterized by bilateral trades betweens sellers and buyers. The terms of each transaction would differ in those circumstances, with potentially none occurring at Mr. Graves' market-clearing price.[59]

71. In the presence of bilateral trades and the extensive information about nuclear plant costs that Mr. Graves suggests would be readily available to exchange-market participants, sellers could approximate the willingness to pay of each demander of exchanges. They could thus target those facilities with the highest valuations. Especially during the early years of the program when demand for rights exceeds the available supply, potential sellers of rights could segment the market and charge higher prices to those willing to pay more. In a perfectly segmented market, only the marginal buyer of rights would actually pay the market-clearing price predicted by Mr. Graves. Everyone else would pay higher prices closer to their own willingness to pay. Such a result also would largely eliminate the benefits of exchanges to buyers of rights, further inhibiting the operations of this market.

72. Another possible exchange mechanism is some form of competitive auction. Auction results, however, are affected by the design of the auction as well as market characteristics such as the availability of information. Auction theory suggests that different forms of auctions under idealized conditions will produce similar results. Practical experience in auctions, on the other hand, reveals that auction design matters and that the academic's idealized setting often is not relevant in practice.[60]

73. It is important to note that utility interests would not automatically be aligned in a market for exchanging DOE acceptance rights, as Mr. Graves seems to assume. Sellers of scarce allocations (especially in the early years when Dairyland is expected to exchange) may be unwilling to accept the marginal bid price that would clear the market. If a form of auction is chosen as the market exchange mechanism, some

[59] Mr. Graves acknowledged at deposition that bilateral trades may result in buyers paying different prices rather than a single market-clearing price, and that these prices may differ from the price in a market-clearing setting. Graves deposition, pp. 157-158.

[60] For discussion of auction theory and practical auction experience, see *Auctions: Theory and Practice*, Paul Klemperer, Princeton University Press, 2004; and *Putting Auction Theory to Work*, Paul Milgrom, Cambridge University Press, 2004.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

types of auctions are more susceptible to collusion than others. A potential acquirer also may be unwilling to assist another facility in accelerating its spent fuel removal, thereby increasing its market value. And in deregulated markets, suppliers of allocation rights may not wish to sell to competitors. Strategic behavior could severely disrupt the operations of an exchanges market as Mr. Graves has envisioned it.

74. Mr. Graves has assumed, whether implicitly or explicitly, a market mechanism that distributes the benefits of an exchanges market in a particular way. Other plausible exchange mechanisms would distribute these benefits differently, resulting in alternative though equally plausible predictions about who accelerates and decelerates DOE acceptance and the prices at which exchanges occur. As a matter of economics, Mr. Graves is incorrect that the exchange mechanism does not matter. Moreover, he has made no attempt to learn from utility executives how they would have organized a hypothetical exchanges market.

### F. The Deficiencies in the Graves Framework are Largely the Same as Those Identified in *Pacific Gas & Electric*

75. Finally, it should be noted that the modeling framework presented in this case by Mr. Graves is virtually unchanged from the one he used in the *PG&E* case. The model uses the same mechanics, relies on the same informational assumptions, and is equally vague about the details of exchanges and an exchanges market. The only substantive difference from *PG&E* involves the cost data that forms the basis for the computation of each facility's willingness to pay for DOE allocations.[61]

76. In my expert report in *PG&E,* my critique of the Graves model included discussion of many of the same deficiencies as presented here. In my view, Mr. Graves' analysis did not provide a reliable basis for assessing damages. As the Court noted in its decision, "Mr. Graves' hypothetical model of a market for exchanges of utilities' DCSs was too speculative to be helpful to the court in its resolution of this case."[62]

[61] Deficiencies with the current cost estimates are discussed in the next section of this report.
[62] *Pacific Gas & Elec. Co. v. United States,* 73 Fed. Cl. 333, 435-36 (2006).



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

In particular, the Court noted that Mr. Graves' conclusions relied on several "highly speculative assumptions," including: that DOE would have approved every exchange; that every utility would have offered its rights to the exchanges market; that all exchanges would occur at the marginal price; and that market participants had perfect information and were driven solely by economic considerations. The Court determined that such speculation was simply not helpful in deciding PG&E's damages.

77. Yet these are the same "highly speculative assumptions" that Mr. Graves relies on to present his opinions in the current case. Mr. Graves has not adequately modified his assumptions or methodology to address the concerns that I raised in *PG&E*. Instead he presents the same model, using the same mechanics, and relying on the same assumptions.

## VI. DEFICIENCIES IN KEY INPUTS TO MR. GRAVES' MODEL FURTHER UNDERMINE HIS PREDICTIONS

78. Based on the discussion presented in the previous section, the model used by Mr. Graves provides an unreliable framework for predicting when Dairyland would have had its SNF removed in the "but for" world. Even if the Court determines, however, that Mr. Graves' modeling framework is a reasonable tool for the task for which it is offered, there are significant problems with key inputs to that model that further undermine the reliability of Mr. Graves' predictions.

79. In particular, Mr. Graves derives what he asserts are "representative" cost estimates for addressing the different "must move" conditions in his ESM. These cost estimates, computed from a limited sample of plant-level data, are one of the key determinants of bid prices for DOE acceptance rights in the Graves model. The derivation of these cost estimates, however, violates numerous principles of statistics and econometrics, rendering the estimated costs largely meaningless. This critique is



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

not simply an academic exercise – the per-MTU price of bids determines Dairyland's costs to accelerate its SNF acceptance in the "but for" world and is essential to computing the size of any associated offset to damages.

80. In addition to the cost estimates, Mr. Graves assumes other inputs to his model that affect estimates of bid prices for DOE acceptance rights, including his assumption regarding full core reserve.

### A. Mr. Graves' "Representative" Cost Estimates are Statistically Flawed

81. One of the key drivers in the Graves model is the avoidable SNF storage costs that utilities would be required to incur to address their "must move" needs. Mr. Graves describes three different "must move" conditions in his ESM: 1) "full pool must move;" 2) "shutdown must move;" and 3) "ISFSI must move." Each of these three conditions involves different sets of expenditures, and the potentially avoidable incremental costs associated with each determine the amount that each facility is willing to pay to have its spent fuel removed. Expressed on a per-MTU basis, these costs are used to rank each demander of DOE acceptance rights in each year, with the willingness to pay of the marginal demander setting the price for exchanges in that year.

82. SNF storage costs are, to a large degree, site specific.[63] Characteristics of each site influence the costs to build an ISFSI, the expense of operating a spent fuel pool, or the type of cask design the utility must use for dry storage. While some aspects of SNF storage costs may be similar across facilities, such as the price of a particular kind of cask, variation in costs determines what each facility will be willing to pay to address a particular "must move" condition.

83. Despite the importance of site-specific cost data for an exchanges market, Mr. Graves does not have site-specific data for every nuclear power plant. He develops instead purportedly "representative" cost estimates and applies the same costs to every nuclear facility. He thus assumes away any plant-by-plant variation in costs. In

---

[63] Graves Report, p. 30. Mr. Graves acknowledges that storage costs differ across plants and also over time.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

the version of the ESM presented in this case, Mr. Graves derives cost estimates from a sample of 14 plants using publicly available information from documents such as regulatory filings, company reports and news releases. Details on the sample of data and the derivation of the cost estimates are not included in Mr. Graves' report, but are described in a separate Brattle Group memorandum entitled "Explanation of ISFSI Cost Data."[64]

84. With respect to ISFSI costs, Mr. Graves breaks these costs down into four categories: ISFSI fixed installation costs; ISFSI variable installation costs; ISFSI decommissioning costs; and ISFSI annual O&M. The sum of the first three of these categories represents the cost to build a dry storage facility (in a "full pool must move" condition), while the fourth represents the costs of operating an existing ISFSI for an additional year (for an "ISFSI must move" condition). The cost memorandum also includes a fifth category of SNF storage costs, annual pool O&M, which represents the cost to operate a spent fuel pool for an additional year (applicable to "shutdown must move" conditions).

85. It is unclear from the memorandum exactly what criteria Mr. Graves uses in selecting the 14 sets of documents he ultimately relies on for his cost estimates. As stated in the memo:

> A cost number or set of cost numbers for a site is selected only if it can be determined with reasonable certainty what it does and does not include, if it reports a significant portion of the total ISFSI cost such as fixed and variable installation cost or total ISFSI expenditure (e.g. it cannot include something like just O&M cost, in which case we would have to make several assumptions to infer other ISFSI costs), and if it can be reasonably allocated among the four cost categories described above with the information available.[65]

The memo provides no definitions for operative terms like "reasonable certainty" or "reasonably allocated." It also fails to define what constitutes "a significant portion

[64] GRAV0005848 – 81. There is no identified author for this memorandum.
[65] GRAV0005850.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

of the total ISFSI cost." This latter definition apparently is rather imprecise, since two of the 14 cost estimates (for Duane Arnold and Fort Calhoun) include data for only one of the four ISFSI cost categories, each of which comprises less than 40 percent of the total ISFSI capital costs Mr. Graves estimates for those sites.

86. The ISFSI cost data provided in the publicly available documents do not generally conform to the four categories of ISFSI expenses described above. In many instances, the data are incomplete. Out of the 14 site-specific cases reviewed by Mr. Graves, complete data for all four categories are available only in three instances.[66] This means that Mr. Graves must estimate costs for the missing data items. To accomplish this, Mr. Graves generally fills in the missing data points using averages of the available data. ISFSI decommissioning costs are available in six cases; the average of these six is applied to the other eight sites. Nine estimates of ISFSI variable costs are provided in the documents; Mr. Graves averages these nine numbers and applies them to the other five. One site presents no data on fixed installation costs. In this instance, Mr. Graves uses general ISFSI installation costs from two completely unrelated studies.[67]

87. Although Mr. Graves asserts that his small sample of cost data is "representative" of industry costs, there is no way to confirm from his analysis that his sample is, in fact, representative. First, he uses no underlying or systematic sampling methodology. The only criterion is whether the data were publicly available and relatively detailed. At his deposition, Mr. Graves suggested that this lack of sampling methodology involved no bias since data selection was not based on any specific criteria.[68] In my view, there is no objective basis to confirm this suggestion, and the sample may be biased for reasons that Mr. Graves did not consider. Second, Mr. Graves argues that the number of plants in his sample, 14, is "a decent number of plants compared to

[66] In fact, complete data are only available for 2 separate facilities, as two of the 14 sets of documents relate to different scenarios for the same plant, Arkansas Nuclear One.
[67] Missing data for O&M costs (both pool and ISFSI) are estimated in the same way, using averages of available data. For pool O&M, only three observations are available; the average of these three data points is applied to every nuclear plant. For ISFSI O&M, nine observations are available; the average of these nine is similarly applied to every facility.
[68] Graves deposition, pp. 188-89.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

the population," which he pegs at 60.[69] In fact, this comparison is incorrect, as the relevant metric is the number of commercial nuclear plants (118) rather than the number of utilities that operate those plants. Mr. Graves' sample is a much smaller percentage of the population of nuclear power plants than it is of the number of nuclear utilities. Third, Mr. Graves asserts that his cost estimates are similar to those of other experts in prior SNF cases,[70] though in my view he overstates the extent of that similarity, as described in more detail below.

88. In the next step of his derivation of ISFSI costs, Mr. Graves recognizes that the total capital costs to build an ISFSI include both fixed and variable components. The fixed components correspond to ISFSI fixed installation plus decommissioning costs, while the variable component depends on the number of casks installed on each dry storage facility. Mr. Graves employs a linear regression using data for the 14 sites to estimate the "representative" ISFSI setup costs used in the ESM, broken down into these fixed and variable components.

89. The dependent (left-hand side) variable in the regression equation is total ISFSI capital costs, defined as the sum of ISFSI fixed installation costs, ISFSI decommissioning costs, and the product of variable ISFSI costs and the number of casks. These total capital costs are regressed on a constant term and the number of casks to produce parameter estimates for fixed and variable ISFSI capital costs. The parameters from this regression are then used in the ESM as "representative" costs for every facility.

90. Mr. Graves' regression analysis of ISFSI costs is problematic for at least two reasons. First, the data necessary to measure total ISFSI capital costs as defined by Mr. Graves are available for only three sites. The other 11 observations used in the regression are all constructed using, at least in part, averages of the other data. That is, most of the observations of the dependent variable in the regression are based on averages of data points that are part of other observations of the dependent variable.

---

[69] *Id.*, pp. 173-74 and 189.
[70] *Id*, p. 189.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

There really are not 14 distinct observations for this regression -- there are only three, with the other 11 derived from those three and from incomplete data from the other sites. This procedure thus eliminates variation that the regression equation is supposed to explain, thereby diminishing the reliability of tests of statistical significance (like t-statistics).

91. Second, even assuming that all 14 observations of the dependent variable are valid, independent data points (which they are not), this small sample size limits the statistical power of the regression and any statistical inferences that can be drawn from the regression results. Mr. Graves' cost memorandum suggests that the parameter estimates are statistically significant, but the significance test used depends on an assumption of a normally distributed error term. Mr. Graves does not claim knowledge that the error term in his linear ISFSI cost equation is normally distributed, and the small sample size prevents invoking the Central Limit Theorem to establish the assumption of normally distributed errors that is needed for making statistically valid inferences. There are simply not enough data points to conclude that the regression results are "representative" of ISFSI costs faced by any utility at any plant.

92. Mr. Graves refers to estimates of the SNF storage costs he used in the *PG&E* case as supportive of the estimates he offers here. Those estimates were provided by Mr. Knight and were derived from four decommissioning cost estimates.[71] In fact, there are significant differences in these two sets of cost estimates. Mr. Graves' current estimate of the biggest single cost, ISFSI fixed installation, is $43.3 million. Mr. Knight estimated approximately $7 million for this activity. Mr. Graves' current estimate of ISFSI O&M costs, $4.4 million, falls completely outside the range of values estimated by Mr. Knight ($4.9 million to $8.6 million). And Mr. Graves' current estimate of pool O&M, $8.7 million, is well below the range of values identified by Mr. Knight in the *PG&E* case ($10.4 million to $14.7 million). Rather

---

[71] Notably, Mr. Knight did not testify in the *PG&E* trial, so the analytical support for these estimates was never presented to the Court.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

than confirming Mr. Graves' results, these comparisons undermine Mr. Graves' estimated costs.

93. In his expert report, Mr. Graves acknowledges that costs are relatively unimportant in determining the efficient allocation of DOE acceptance rights: "…the exchange results are driven primarily by the quantities and timing of Must Move spent fuel relative to the acceptance rate; storage costs are a second-order factor with little effect on the results."[72] This point is reiterated in the cost memorandum provided in this case: "…it should be noted that trading behavior in the ESM appears to be primarily quantity-driven, so trading patterns will be relatively inelastic to changes in the cost inputs discussed below."[73] The significance of this admission cannot be understated – in a cost-based model of the market for DOE acceptance rights, costs apparently do not matter. Despite the paradox of this statement, however, costs do matter for damages. These costs determine the prices each utility would pay for exchanges and thus is relevant to a reliable estimate of an offset to damages.

94. In addition, by assigning the same costs to every nuclear facility, Mr. Graves eliminates much of the variation in costs across plants. This cost heterogeneity creates differences in behavior among facilities, and will produce different sets of bids for DOE acceptance rights. Mr. Graves claims to capture the impact of different costs in his sensitivity analyses, cases 8 through 20. Yet the first eight of these scenarios simply change costs for every facility in the same proportion and thus fail to incorporate any cost heterogeneity. In cases 16-20, Mr. Graves introduces some randomness to costs, but five simulations are insufficient to capture the effects of cost heterogeneity in any statistically meaningful way. It is the actual distribution of these cost differences that affects the identity of sellers and buyers of exchanges.

95. Finally, I note that Mr. Graves does not even use site-specific data when he has it available. His cost analysis, for example, uses three observations for annual pool O&M expenditures, yet Mr. Graves assigns the average of these three data points to

[72] Graves report, p. 31.
[73] GRAV0005848.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*