every facility, including those for which data are available. The same procedure is used for the other categories of costs.

96. Mr. Graves also fails to use cost data from his ultimate client in this case, Dairyland. To the extent that Dairyland's costs differ from his "representative" costs, the Graves model may not accurately capture Dairyland's incentives to exchange or the price it would be willing to pay for exchanges.

### B. Mr. Graves Assumes a Uniform Pool Reserve That May Understate the Cost of Exchanges

97. As part of the assumptions underlying his analysis, Mr. Graves assumes that every nuclear plant maintains a pool reserve equal to one full core of assemblies. This assumption is applied to every facility and forms part of the basis for determining each plant's "must move" condition.

98. To the extent that this assumed reserve understates the actual reserve policies at different nuclear plants, however, then Mr. Graves' assumption understates demand for DOE acceptance rights and underestimates the prices of exchanges. Since a higher reserve effectively reduces the amount of available pool storage, plants with higher reserves would face "must move" conditions earlier, thereby increasing the demand for available acceptance rights. This may result in Dairyland not being one of the winning bidders or facing higher costs to exchange, thus increasing the size of the offset to Dairyland's damages.

99. At his deposition, Mr. Graves admitted that higher pool reserves would tend to increase the price of exchanges.[74] He suggested that an assumption of more than one full core reserve was not consistent with "standard industry practice."[75] This suggestion is irrelevant, however, since all it would take to affect the price of exchanges is for a few facilities to adopt "non-standard" reserve policies.

---

[74] Graves deposition, pp. 166-167.
[75] *Id.*, p. 168.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

## VII. MR. GRAVES' SENSITIVITY ANALYSES OVERSTATE THE ROBUSTNESS OF HIS MODEL

100. The modeling framework presented by Mr. Graves is highly simplified. All decisions regarding SNF storage are reduced to a consideration of "avoidable" or "unnecessary" direct storage costs. As described in earlier parts of this report, it is my opinion that numerous other factors would and could influence utility decisions regarding the best ways to address spent fuel storage constraints.

101. Rather than incorporate any of these factors into his base model, Mr. Graves argues that the impact of "different market and political conditions that might prevail" on the market for DOE acceptance rights can be addressed through sensitivity analyses.[76] He presents numerous simulations of his model in which certain parameters are changed to reflect the influence of these various effects. Mr. Graves claims that these scenarios confirm the robustness of his results, i.e., that changes in parameters do not alter his conclusions, because Dairyland typically succeeds in having its SNF acceptance accelerated to 1998. While such simulation or sensitivity analysis can be a useful tool, in my view Mr. Graves overstates the robustness of his results, especially with respect to the price of exchanges.

102. In that regard, many of Mr. Graves' sensitivity scenarios predict a higher net cost of exchanges for Dairyland than in his "base case." Incorporating uncertainty or risk aversion, for example, results in substantial increases in the cost to Dairyland of accelerating its SNF acceptance. Higher pool reserves also raise exchange costs. In fact, Mr. Graves' "base case" produces one of the lowest estimates of net costs to Dairyland, and thus yields one of the lowest offsets to damages.

103. Mr. Graves presents his "must move" analysis as a means to justify his assumption about "economically reasonable" aggregate rates of acceptance. He concludes that a rapid ramp-up to a steady state rate of 3,000 MTUs per year is appropriate. In his simulation analysis, Mr. Graves presents scenarios that include alternative ramp-ups to the 3,000 MTU annual rate. In one of these scenarios (Case 5), the ramp-up to

---

[76] Graves report p. 24.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

3,000 MTUs takes 10 years, as presented in the 1987 DOE Mission Plan. Mr. Graves predicts in this scenario approximately a 50 percent increase in system-wide spent fuel storage costs, although Dairyland's costs to exchange are roughly the same. In another scenario (Case 4), DOE acceptance ramps up to the 3,000 MTU rate even faster than in Mr. Graves' base case, although acceptance is lower in the first several years. In this instance, system-wide SNF storage costs are more than three times the base case, and the costs to Dairyland to accelerate SNF acceptance to 1998 approximately triples relative to the base case. Mr. Graves asserted at his deposition that these alternative 3,000 MTU rate scenarios are "unreasonable."[77] These results suggest that, rather than being robust, Mr. Graves' results are quite sensitive to important model assumptions, even those that include a 3,000 MTU steady state acceptance rate.

104. As previously mentioned, Mr. Graves considers several sensitivity scenarios that attempt to capture cost variability. Eight of these scenarios, however, change costs for every facility in the same way, doubling or halving certain categories of costs for every facility. These cost analyses fail to introduce any heterogeneity between plants, however, and have the expected result of leaving the so-called efficient allocations largely unchanged. Some of these scenarios show higher or lower exchange costs for Dairyland, depending on the particular change in costs.

105. Mr. Graves does perform five cost scenarios in which some variability between plants is introduced randomly. Mr. Graves fails to consider whether the parameters of the randomization have any relationship to the distribution of actual SNF storage costs, so the validity of these scenarios is questionable. The actual distribution of costs among potential buyers and sellers of exchanges is the relevant consideration in this regard, and Mr. Graves' analysis reveals little about this aspect of cost variability.

106. Mr. Graves presents two scenarios involving advanced bidding for acceptance rights, purportedly as a means to address considerations of uncertainty and risk aversion.

---

[77] Graves deposition, pp. 111-113.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

While these scenarios may capture some demand-side elements of risk aversion, they ignore any impact on supply and the willingness of utilities to participate in an exchanges market. These two scenarios, Cases 21 and 22, also predict significantly higher system-wide costs than the base case. And the cost to Dairyland to accelerate its SNF acceptance in these scenarios is as much as four times higher than Mr. Graves' base case.

107. These sensitivity results confirm that Mr. Graves' modeling framework is not robust to changes in model parameters. While the prediction that Dairyland is able to accelerate its SNF acceptance largely survives, the sensitivity analysis shows that the cost of exchanges is highly sensitive. Without a reasonable or reliable prediction about this cost, however, Mr. Graves' modeling framework fails to assist the Court in determining Dairyland's damages.



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

I declare that the foregoing report is true and correct.

Executed on June 29, 2007

Jonathan A. Neuberger



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

# Exhibit 1

## Curriculum Vitae of Jonathan A. Neuberger



*Protected material*
*To be disclosed only in accordance with*
*U.S. Court of Federal Claims Protective Order*

# CURRICULUM VITÆ

## Jonathan A. Neuberger

**Address**

Economists Incorporated
EmeryStation North
5980 Horton Street
Emeryville, CA 94608
(510) 547-6910
neuberger.j@ei.com

**Home**

361 28th Street
San Francisco, CA 94131
(415) 826-8634

**Education**

Ph.D. Economics, Johns Hopkins University, 1988

M.A. Economics, Johns Hopkins University, 1985

B.S. International Relations, Georgetown University, 1978 (Magna Cum Laude, Phi Beta Kappa)

**Areas of Expertise**

Economic Damages; Commercial and Financial Litigation Analysis; Intellectual Property Valuation and Litigation Analysis; Microeconomic and Financial Analysis; Tax and Transfer Pricing Analysis; Statistics and Econometrics

**Professional Experience**

Principal, Economists Incorporated (2006 – present)

Senior Vice-President, Economists Incorporated (2002 – 2006)

Partner, Bates & White, LLC (2000 – 2002)

Senior Managing Economist, LECG, Inc. (1998 – 2000)

Senior Economist, Benderley Economic Associates (1996 – 1998)

Economist and Manager, Deloitte & Touche, LLP (1994 – 1996)

**Professional Experience (continued)**

Economist, Federal Reserve Bank of San Francisco (1988 – 1994)

**Qualifications**

***Analysis of Economic Damages***

- Served as testifying expert for the U.S. government in multiple breach of contract cases involving private companies and federal government agencies
- Analyzed companies operating in a broad range of industries, including aerospace and defense, electric power generation, telecommunications, timber, and financial services
- Calculated economic damages under alternate theories, including expectations, lost profits, restitution, reliance and replacement cost of capital
- Testified on behalf of non-government clients involved in commercial and other private litigation
- Designed, developed, and implemented opinion survey regarding loss of asset values on behalf of private client in the civil aviation industry; interpreted and testified on survey results
- Served as consulting expert in dozens of commercial litigation matters involving economic damages; developed analyses, prepared written reports, and briefed testifiers

***Financial Analysis for Litigation***

- Testified on behalf of the federal government in the largest government contracting dispute in history; analyzed corporate financial condition, financing requirements and available sources and costs of external finance; performed *pro forma* financial projections; estimated bankruptcy risk

**Qualifications (continued)**

### *Financial Analysis for Litigation*

- Served as testifying expert in *Winstar* litigation involving failed savings and loan associations; analyzed thrift operations, lending decisions, board of directors' oversight and corporate governance; estimated the value of goodwill and the costs of raising external capital to replace goodwill
- Conducted financial analyses in a number of securities litigation matters, involving such instruments as common and preferred stock, corporate bonds, derivative securities, futures, swaps and options
- Evaluated the appropriateness of investment recommendations by financial advisors
- Performed event studies and other stock price analyses to estimate damages
- Analyzed damages claims involving prejudgment interest

### *Analysis for Intellectual Property Litigation*

- Performed economic analyses of damages and other issues in patent and copyright disputes
- Computed damages using different methodologies, including lost profits, unjust enrichment and reasonable royalties
- Quantified the value of complementary assets in the income generated by use of patented technology
- Estimated costs to "invent around" patented technology

**Qualifications (continued)**

***Antitrust Analysis***

- Performed economic analysis of competitive impacts arising from bank mergers and acquisitions
- Defined relevant geographic markets, analyzed mix of available banking services, and investigated actual and potential competition from bank and non-bank financial institutions
- Designed, developed and implemented surveys of consumer and business banking customers
- Analyzed economic consequences of non-competitive behavior in consumer goods markets, including price fixing, illegal cartels, and other restraints of trade
- Assessed the impact of alleged anticompetitive behavior by motor sports sanctioning bodies

***Valuation and Other Non-Litigation Analyses***

- Performed valuation analyses of companies, divisions, tangible property and intangible assets in a broad range of manufacturing and service industries
- Utilized alternative valuation methodologies, including discounted cash-flow, market, and cost-based approaches
- Conducted valuation analyses of intellectual property
- Helped companies to develop strategies to maximize the value of intellectual property portfolios
- Authored research in applied microeconomic issues in banking and financial markets