**Qualifications (continued)**

***Transfer Pricing***

- Performed transfer-pricing analyses for a broad range of multinational companies operating in industries such as computer peripheral equipment, semi-conductors, semiconductor manufacturing equipment, aerospace, engineering services, and employment services
- Analyzed intercompany transfers of goods, services, and intellectual property
- Prepared transfer-pricing analyses for multiple purposes, including tax planning and strategy, audit defense work, and Tax Court litigation
- Worked for a variety of clients, including U.S. companies, foreign companies, and the Internal Revenue Service

***Risk Management***

- Co-founded EI's Risk Management Practice
- Designed, developed and implemented models of risk measurement to assist banks and other financial institutions to manage multiple types of business risk, including market, interest rate, and operational risks
- Co-authored chapter in risk-management handbook prepared by Casualty Actuarial Society

**Testimony**

*Boston Edison Company and Entergy Nuclear Generation Company v. United States*, U.S. Court of Federal Claims; filed expert report, testified at deposition and trial, June 2007.

*Northern States Power Company v. United States*, U.S. Court of Federal Claims; filed expert report, testified at deposition and trial, November 2006.

**Testimony (continued)**

*Ralph Franklin & Son Logging v. United States*, U.S. Court of Federal Claims; filed expert report, testified at deposition, August 2006.

*Janeanne Doar, et al. v. Chiao Smith & Associates, et al.*, Superior Court of California, County of Marin; testified at deposition, December 2005, May 2006.

*Timothy Gens v. Gary Ferrell et al.*, Superior Court of California, County of San Mateo; testified at deposition, March 2006.

*Pacific Gas & Electric Co. v. United States,* U.S. Court of Federal Claims; filed expert report, testified at deposition, March 2006.

*Southern Nuclear Operating Co., Alabama Power Co., Georgia Power Co. v. United States*, U.S. Court of Federal Claims; filed expert report, testified at deposition and trial, October 2005.

*In Re J.T. Thorpe Inc., J.T. Thorpe, Thorpe Holding Co., Thorpe Technologies, Inc.,* U.S. Bankruptcy Court, Central District of California; filed expert report and declaration, testified at deposition, June 2005.

*Metabyte, Inc., and Vivek Mehta v. Canal+ Technologies, S.A.*, U.S. District Court for the Northern District of California; filed expert report, testified at trial, June 2005.

*Precision Pine & Timber Co. v. United States*, U.S. Court of Federal Claims; filed expert reports, testified at deposition and trial, June 2005.

*Barron Aircraft, LLC v. Dassault Falcon Jet Corp.;* Superior Court of the State of Delaware, New Castle County; filed expert report, September 2004.

*Gwen Sykes v. Douglas Sykes,* Superior Court of the State of California, County of Alameda; filed expert report, September 2004.

**Testimony (continued)**

*Indiana Michigan Power Co. v. United States,* U.S. Court of Federal Claims; filed expert report, testified at deposition and trial, March 2004.

*Local America Bank of Tulsa, FSB, et al. v. United States,* U.S. Court of Federal Claims; filed expert report, testified at deposition, April 2003, August 2003.

*Dan Hixson v. El Monte Motors,* State of California Arbitration, filed expert report; testified at deposition, May 2003.

*Pinpoint Consumer Targeting Services, LLC v. United States,* U.S. Court of Federal Claims; filed expert report, March 2003.

*A.G. Route Seven Partnership, et al. and Federal Deposit Insurance Corporation v. United States*, U.S. Court of Federal Claims; filed expert report; testified at deposition, January 2002.

*McDonnell Douglas Corporation and General Dynamics Corporation v. United States*, U.S. Court of Federal Claims; filed expert report; testified at deposition and trial, May 2001.

**Publications and Working Papers**

"Tax Reform and Bank Behavior," *FRBSF Weekly Letter*, December 16, 1988.

"Capital Market Imperfections and the q-Theory of Investment: Theory and Evidence," *Federal Reserve Bank of San Francisco Working Papers in Applied Economics, #89-03,* 1989.

"The Thrift Insurance Crisis," with Michael C. Keeley, *FRBSF Weekly Letter*, March 31, 1989.

"Corporate Investment," *FRBSF Weekly Letter*, June 30, 1989.

"FIRREA and Deposit Insurance Reform," *FRBSF Weekly Letter*, December 1, 1989.

**Publications and Working Papers (continued)**

"Bank Pricing of Retail Deposit Accounts and "The California Rate Mystery,"" with Gary C. Zimmerman, *Federal Reserve Bank of San Francisco Economic Review*, No. 2, 1990.

"Imperfect Information and the Community Reinvestment Act," with William C. Gruben and Ronald H. Schmidt, *Federal Reserve Bank of San Francisco Economic Review*, No. 3, 1990.

"Interest Rate Competition," with Gary C. Zimmerman, *FRBSF Weekly Letter*, July 27, 1990.

"Costly Information and the CRA," with Ronald H. Schmidt, *FRBSF Weekly Letter*, September 21, 1990.

"How to Close Troubled Banks," *FRBSF Weekly Letter*, December 7, 1990.

"Risk and Return in Banking: Evidence from Bank Stock Returns," *Federal Reserve Bank of San Francisco Economic Review*, No. 4, 1991.

"Depositor Discipline and Bank Runs," *FRBSF Weekly Letter*, April 12, 1991.

"Bank Stock Risk and Return," *FRBSF Weekly Letter*, November 1, 1991.

"Bank Holding Company Stock Risk and the Composition of Bank Asset Portfolios," *Federal Reserve Bank of San Francisco Economic Review*, No. 3, 1992.

"Risk-Based Capital Standards and Bank Portfolios," *FRBSF Weekly Letter*, January 10, 1992.

"Is A Bad Bank Always Bad?" *FRBSF Weekly Letter*, May 1, 1992.

"First Quarter Bank Results: Good News, Bad News," with Karen J. Trenholme, *FRBSF Weekly Letter*, July 24, 1992.

**Publications and Working Papers (continued)**

"Interest Rate Risk and Bank Capital Standards," *FRBSF Weekly Letter*, November 6, 1992.
"On the Changing Composition of Bank Portfolios," *FRBSF Weekly Letter*, March 19, 1993.

"Interest Rate Risk at U.S. Commercial Banks," *FRBSF Weekly Letter*, July 23, 1993.

"Conditional Risk and Return in Bank Holding Company Stocks: A Factor-GARCH Approach," in *Conference on Bank Structure and Competition*, Federal Reserve Bank of Chicago, 1994.

"Industry Effects in the Stock Returns of Banks and Nonfinancial Firms," *FRBSF Weekly Letter*, March 24, 1994.

"A Market-Based Approach to CRA," with Ronald H. Schmidt, *FRBSF Weekly Letter*, May 27, 1994.

"Transfer Pricing and Foreign Exchange Risk," (with Mukesh Bajaj and Brian Becker), *Transfer Pricing*, Tax Management, Inc., Vol. 8, No. 6, July 14, 1999.

# Exhibit 2

## Documents and Data Reviewed and Considered

1. U.S. Department of Energy, Office of Civilian Radioactive Waste Management, "Annual Capacity Report," DOE/RW-0331P, December 1991 (ACR: HQR002 0797-0859) and "Acceptance Priority Ranking and Annual Capacity Report," DOE/RW-0457, March 1995 (HQR029 0676-0745).
2. EIA 2000, Final 1998 RW-859 Database, Rev. 1. Washington, D.C.: U.S. Department of Energy, Energy Information Administration (ACC: MOV.20000714.0015.)
3. Preliminary Estimates of Total System Cost for the Restructured Program: An Addendum to the May 1989 Analysis of the Total-System Life Cycle Cost for the Civilian Radioactive Waste Management System, U.S. Department of Energy, OCRWM, DOE/RW-0295P, December 1990. (HQR292 0029-0129.)
4. *Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 435-36 (2006).
5. Expert Witness Report of Frank C. Graves, March 23, 2007, and supporting electronic files.
6. Expert Witness Report of Frank C. Graves in *Pacific Gas & Electric v. United States of America*, November 10, 2005, and supporting electronic files.
7. Rebuttal Report of Frank C. Graves in *Pacific Gas & Electric v. United States of America*, March 10, 2006, and supporting electronic files.
8. Expert Witness Report of Todd D. Smith, March 23, 2007, and supporting electronic files.
9. Expert Witness Report of Charles Wilkins, March 23, 2007, and supporting electronic files.
10. Expert Witness Report of Ivan F. Stuart, March 23, 2007, and supporting electronic files.
11. Expert Witness Report of Warren K. Brewer, June 15, 2007.

12. Expert Witness Report of R. Larry Johnson, June 15, 2007.

13. Deposition of Lake H. Barrett, May 14, 2007.

14. Deposition of William L. Berg, April 27, 2007.

15. Deposition of Michael A. Brasel, December 13, 2006 and April 25, 2007.

16. Deposition of Robert M. Brimer, January 31, 2007.

17. Deposition of Roger E. Christians, February 1, 2007.

18. Deposition of Frank C. Graves, June 19, 2007.

19. Trial testimony of Frank C. Graves, in *Yankee Atomic v. The United States of America*.

20. Deposition testimony of Frank C. Graves in *Pacific Gas & Electric v. United States of America*, volumes 1 and 2, January 24 and 25, 2006 and May, 19 2006.

21. Deposition of Christopher Kouts, volumes 1 and 2, May 1 and 2, 2007.

22. Deposition of John Parkyn, December 12, 2006.

23. Deposition of Thomas Pollog, May 4, 2007.

24. Deposition of Seymour J. Raffety, December 14, 2006.

25. Deposition of Charles V. Sans Crainte, January 30, 2007 and April 26, 2007.

26. Deposition of Todd D. Smith, May 22, 2007.

27. Deposition of Ivan Stuart, May 24, 2007.

28. Deposition of Keith Stubbendick, February 1, 2007 and April 26, 2007.

29. Deposition of Bernie White, June 12, 2007.

30. Deposition of Charles Wilkins, May 11, 2007.

31. Deposition of David K. Zabransky, May 3, 2007.

32. Deposition of Ivan F. Stuart May 24, 2007.

33. Dairyland Members, viewed on 6/27/2007 at http://www.dairynet.com/our_members/index.php?&format=print

34. *Auctions: Theory and Practice*, Paul Klemperer, Princeton University Press, 2004.

35. *Putting Auction Theory to Work*, Paul Milgrom, Cambridge University Press, 2004.

36. PDPC0000001-PDPC0048695.

37. PLAC0000001-PLAC0153744.

38. DAP0010001-DAP0013658.

39. WILK0000001-WILK0001512.

40. SMIT0000001-SMIT0000126.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
--------------------------------:
DAIRYLAND POWER COOPERATIVE     :
                                :
         Plaintiff         ,    :
vs.                             : Civil Action No.
                                : 04-106C
UNITED STATES OF AMERICA        :
                                :
         Defendant         .    :
--------------------------------:
```

Washington, D.C.

Wednesday, August 8, 2007

Deposition of:

JONATHAN A. NEUBERGER, PhD

called for oral examination by counsel for Dairyland, pursuant to notice, at Greenberg, Traurig, 800 Connecticut Avenue, N.W., Washington, D.c., before Ronald E. Bennett, of Capital Reporting Company, a Notary Public in and for the District of Columbia, beginning at 9:12 a.m., when were present on behalf of the respective parties:

 ©2007



1eac65e9-97d1-46c2-83f0-6e9652e239fe

A P P E A R A N C E S

ROBERT L. SHAPIRO, ESQUIRE
KEVIN E. STERN, ESQUIRE
GREENBERG, TRAURIG, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
202-452-4878
Fax: 202-261-0107
E.mail: shapiror@gtlaw.com

PATRICK B. BRYAN, ESQUIRE
JOSHUA E. GARDNER, ESQUIRE
U.S.Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
202-616-8299
Fax: 202-305-1571

Also Present: Dean M. Murphy, Ph.D


©2007

# C O N T E N T S


| EXAMINATION BY: | | PAGE |
|---|---|---|
| | Mr. Shapiro | 5 |
| | Mr. Bryan | 223 |

NEUBERGER DEPOSITION EXHIBITS: *

| | | |
|---|---|---|
| 1 | Expert Report | 6 |
| 2 | Contract | 121 |

to be made regarding participants behavior, for example. And based on the reviewer's expertise or experience, those assumptions really aren't consistent with the way economic actors behave. Then that process can be used to impose more reasonable behavior, less extreme assumptions on the behavior of the model. And the resulting predictions.

So generally we identify weaknesses in order to highlight areas that can be improved. And can lead to more sustainable supportable economically sensible predictions.

Q. I don't mean to be -- I think you know where I'm heading or what I'm trying to get at on this issue. Your opinion in the Dairyland case is not merely pointing out areas where perhaps there are weaknesses in Mr. Graves's model, correct?

A. I think that is exactly what I do. I point out weaknesses. And by pointing out those weaknesses, indicate areas that I think could be improved.

Q. Don't you also go a further step and

enough for use in assisting the court in determining Dairyland's damages?

A. I think exactly the way I have, reviewing the model, reviewing the results, looking at the predictions and seeing if those predictions are sufficiently reliable and sufficiently robust to provide a reasonable basis for quantifying damages. I think another economist would go through exactly the process that I've gone through.

Q. But as you testified earlier, you didn't conduct any quantitative analysis other than merely reviewing Mr. Graves's work in order to reach your sufficiently unreliable or sufficiently non-robust conclusions, did you?

A. Actually I think all of the work that I did in this case was quantitative in nature.

Q. You didn't run any quantitative analysis yourself, did you?

A. I did not separately simulate Mr. Graves's model and I didn't build my own model.

Q. You didn't run any quantitative analysis where you could quantify the extent of the

 ©2007

1eac65e9-97d1-46c2-83f0-6e9652e239fe

If that variation was only two times instead of 10 times, I would certainly feel more comfortable relying on that. I don't know if it would be sufficiently robust or not. It would depend upon other factors as well.

But I see a lot of variation in this model from relatively small changes in parameters. I think as a result, those results are not what I would call robust. And I think most economist, if not all of them, would agree with me, that a model whose results change quite significantly as a result of small perturbations in parameters in that model is not a robust model, and is one that should not be relied on a by a court.

Q. There is no recognized standard among economists for how much variation and results is too much for a model to be reliable for damages estimation purposes, correct?

A. Not to my knowledge.

(Brief Recess.)

BY MR. SHAPIRO:

Q. Before we took the break, Dr. Neuberger,


©2007



1eac65e9-97d1-46c2-83f0-6e9652e239fe

we were talking about when a model is robust and reliable enough to be used for damages. Don't economists have ways of quantifying robustness or reliability of a model?

MR. BRYAN: Objection. Vague.

THE WITNESS: There are certainly quantification methods that could be used to look at a series of predictions to see what their variability might be, for example, or whether they are relatively stable to changes in parameters.

BY MR. SHAPIRO:

Q. You haven't employed any of those techniques in the Dairyland case to test the robustness of Mr. Graves's work, have you?

A. I have not specifically. It's consistent with my testimony that they aren't bright line rules about what makes something robust or not, at least in terms of what should be considered reliable for damages purposes.

Q. You say there are not bright line rules for when a model is robust enough for damage purposes. Can you put any sort of quantitative


©2007



1eac65e9-97d1-46c2-83f0-6e9652e239fe

parameters on even a range of robustness that is generally recognized by economists as good enough or not good enough?

MR. BRYAN: Objection. Vague.

THE WITNESS: Again, I think imposing rules like that really isn't consistent with what would be appropriate in the legal setting. I can certainly, and I talk in my report about some of the variations in, for example, the costs to Dairyland to accelerate its spent fuel acceptance.

And I note the extent of variability in some of those predictions. But I haven't specifically put a boundary around the range of those predictions to say that, if the numbers were within this range, it would be reliable. If they fall outside this range, they are not reliable. I'm not aware of any such boundaries or rules that would inform the court.

Q. I want to go back actually to the previous question and answer when I asked whether you would employ techniques for testing robustness, and you said you hadn't. Why didn't you employ techniques


©2007

1eac65e9-97d1-46c2-83f0-6e9652e239fe

that are available to economists to quantify robustness of a model? Why don't you think that would have been helpful to the court?

MR. BRYAN: Objection. Vague. Compound.

THE WITNESS: As an economist, I can present the range of results that Mr. Graves gets in some of his sensitivity analyses. And I do that. I described some of those rages certainly with respect to the costs to Dairyland to accelerate its acceptance.

The problem there, the issue there, as I see it, is translating that range into a rule of some sort that the court could then say, okay, this violates that rule, therefore, it's not reliable.

All I can do, I believe, is to indicate to the court what the weaknesses are in this modeling framework and why I believe the results are not robust. It's then up to the court to say this is sufficiently non-robust for me to exclude it as unreliable. That's a determination I believe that the court can make.

Yes, there are quantitative measures of

that variability. And it would not be difficult for me to talk about that. In my report I don't, however. I simply present the results and my conclusion that these results are sufficiently variable that they should not be considered reliable by the court. But the court makes that ultimate determination.

So, sure, the quantitative measures are there. I could have used them. Instead I chose to describe the results. And to draw my conclusion. And then allow the court to draw its own as well, based on whatever weight it gives my testimony and whatever weight it gives Mr. Graves's testimony.

Q. Did you not use the quantitative measure of variability because of your concern, if you had run those, they might actually bolster Mr. Graves's opinion that his model is robust enough?

A. Absolutely not.

Q. And since you didn't run any of your own sensitivities on Mr. Graves's model, to the extent you're looking at the variability of the results of Mr. Graves's model, you really are just looking at

order of $8 million. If the price goes up a couple million dollars, there's ten million dollars right there. But I believe, based on the parameters that Mr. Graves populates his model with, one year's difference of pool, O&M, would be approximately $8 million.

Q. Do you think there's much chance that, if the deficiencies in Mr. Graves's models were corrected, that you would be looking at more than a one year's difference in the timing of the acceptance of Dairyland spent fuel?

MR. BRYAN: Objection. Vague.

A. I think it's entirely possible.

Q. I asked if you thought it was likely.

A. Yes.

Q. So you think it's more likely that if a deficiency in Mr. Graves's model corrected, that there would be more than a one year difference in the timing of the acceptance of Dairyland spent fuel?

A. I think that is likely. Yes.

Q. What year do you think would be the most

likely year, if the deficiencies are corrected, Mr. Graves's model is to the years in which Dairyland spent fuel would be picked up by Department of Energy?

A. Having not --

MR. BRYAN: Objection. Beyond the scope of the Doctor's expert report. Vague.

A. I haven't explicitly modeled it, so I don't know for sure. I do know, if some of the concerns that I raised with Mr. Graves's modeling framework were incorporated, it's entirely possible there would by no exchanges in 1998, and there might be only limited exchanges in 1999. That it might actually take several years of the operation of the DOE acceptance program before exchanges could legitimately be done.

So I think it's entirely possible. I think it's likely that, that number would move, that outdate would move. But I haven't done the analysis. I haven't created a model to say this is what it would be definitively.

Q. But it is your opinion that in the





1eac65e9-97d1-46c2-83f0-6e9652e239fe