# APPENDIX

veris

# Expert Report of R. Larry Johnson

**Dairyland Power Cooperative v.**

**The United States**

**In the United States Court of Federal Claims**

**No. 04-106C (Chief Judge Edward J. Damich)**

**Prepared By:**

**R. Larry Johnson, CPA**

R Larry Johnson

**June 15, 2007**

11710 Plaza America Drive
Suite 300
Reston, VA 20190
703.654.1400 Main
703.796.1200 Fax

41 South High Street
Suite 3700
Columbus, OH 43215
614.456.4440 Main
614.220.9202 Fax

230 Half Mile Road
Red Bank, NJ 07701
732.747.9800 Main
732.747.8700 Fax

VERIS CONSULTING, LLC
www.verisconsulting.com

# TABLE OF CONTENTS

Introduction ........................................ 1

Detailed Findings:
Scenario 1 – Plaintiff's Claim ........................................ 6
Scenario 2 – Acceptance by 2005 ........................................ 23
Scenario 3 – Acceptance after 2008 ........................................ 24

Curriculum Vitae of R. Larry Johnson ........................................ 25

Documents Considered ........................................ 31

Compensation ........................................ 33

## INTRODUCTION

I have been engaged by the United States Department of Justice (DOJ) to review, analyze and express my opinions regarding the claim for damages made by Dairyland Power Cooperative (Dairyland) that it asserts resulted from an asserted partial breach by the U.S. Department of Energy (DOE) of contract No. DE-CR01-83NE44377 dated June 15, 1983 ("the Standard Contract").

Dairyland's damages claim was asserted in its February 12, 2007 Revised Summary of Damages. That claim identified costs in three defined categories titled SAFSTOR, Private Fuel Storage and Insurance. That Summary included reference to activities labeled RPV Removal Project, LACBWR Applied Overhead and Company Applied G&A. Footnotes to those labels indicated that Overhead and G&A rates had "not yet been determined at this time and will be the subject of expert analysis" and that "the incremental cost of the RPV Removal has not yet been determined at this time and will be the subject of expert analysis."

Subsequently, Dairyland has produced two expert reports dated March 23, 2007 prepared by Mr. Charles Wilkins and Mr. Todd Smith. The report of Mr. Wilkins purports to calculate indirect overhead rates and G&A rates "to be used in the calculation of costs incurred by Dairyland to maintain its LaCrosse Boiling Water Reactor (LACBWR)." The report of Mr. Smith purports to describe "what would have been a reasonable cost to perform the removal of the Dairyland Power Cooperative (DPC) LACBWR site's Reactor Pressure Vessel (RPV) assuming the United States government had accepted spent nuclear fuel and high level radioactive waste (spent fuel) under the terms of its 1983 contract." Moreover, Mr. Smith's report calculates the subtraction of "the non-breach estimate from the breach estimate."

Neither of these reports provide any opinions regarding any damages incurred by Dairyland. In fact, each of these experts has expressly testified that he has not formed opinions about damages. As a consequence, no expert of the Plaintiff has identified an opinion, and importantly any basis for adding to Dairyland's asserted damages amounts representing a provision for "applied overhead", "applied G&A" or "RPV Removal".

Dairyland's Revised Summary of Damages asserts $41.3 million in damages through December 31, 2006 as follows:

| | |
|---|---|
| SAFSTOR | $ 28,671,951 |
| Private Fuel Storage, LLC | 10,936,900 |
| Insurance | 1,672,551 |
| Total Asserted Damages | $ 41,281,402 |

The results of my analysis of these claimed damages is described in the Detailed Findings section of this report.

I have also separately evaluated the calculations made by Messrs. Wilkins and Smith which reflect the following:

| | |
|---|---|
| Overhead and G&A | $ 6,184,000 |
| RPV Removal | 6,809,457 |
| Total Expert Calculations | $ 12,993,457 |

I have also described my opinions about those calculations in the Detailed Findings section. For reasons specifically described therein, it is my opinion that should the Plaintiff attempt to incorporate additional damages based in any way on the reports of Messrs. Wilkins and Smith that not only would such additional damages not be based upon any expert damages opinions but that any such additions should not be considered as damages incurred by Dairyland as a consequence of the partial breach.

The process by which the Plaintiff's assertions or experts' calculations were reviewed and analyzed by me included inspection of accounting and cost related documents, spreadsheets, invoices, contracts and other documents reflecting historical costs incurred by Dairyland. My analysis also included a review of documents and spreadsheets produced by the Plaintiff's experts. In the conduct of my engagement, I have been assisted by various members of the staff of Veris Consulting, LLC.

I have considered and relied upon the conclusions of Mr. Warren Brewer ("Mr. Brewer") with regard to technical issues related to the storage of spent fuel in DPC's spent fuel pool, also

referred to by DPC as SAFSTOR, as well as the reasonableness of certain activities associated with SAFSTOR.

The opinions and conclusions contained in this report are presented in the context of three different non-breach scenarios. Each of these scenarios assume that the DOE commenced acceptance of spent nuclear fuel in 1998. The variable in each scenario is the date at which DOE would have completed acceptance of all of Dairyland's spent nuclear fuel in the non-breach world.

Scenario 1 reflects the Plaintiff's assumption that completion of acceptance would be by the end of 1998 although Plaintiff has not identified the process that would have been involved to achieve that goal nor has it included any related cost; Scenario 2 assumes completion of acceptance at the end of 2005 pursuant to instruction from DOJ counsel; and Scenario 3 assumes completion of acceptance after 2008, also pursuant to instruction from DOJ counsel.

I have been instructed by counsel that the Government asserts the existence of other than standard fuel at Dairyland. I understand that Scenario 1, which is the Plaintiff's assertion, assumes that the DOE's acceptance schedule should treat other than standard fuel and spent fuel in an identical fashion. I have further been instructed that the Government asserts a contrary position and under its interpretation, the acceptance schedule for other than standard fuel would not be the same and would be such that the cost of storage would continue beyond that contemplated in Scenario 1 by the Plaintiff. I have not evaluated the damage measurement implications to Scenario 1 of a variance from the Plaintiff's assertion that other than standard fuel and spent fuel should be accepted on the same schedule.

I am not opining as to which, if any, of these acceptance dates is contractually appropriate. Instead, I am providing an analysis of damages that would arise from these scenarios. Should the court rule at the trial of this matter that assumptions other than those contained in this report are contractually appropriate, I would be prepared at the trial of this matter after sufficient analysis, and with input from Mr. Brewer, to calculate the associated damages.

Where I have not offered an opinion regarding a claimed cost, it should not be taken as an implied opinion that DPC has proven that the cost resulted from the DOE's partial breach.

I reserve the right to modify my conclusions should there be a subsequent determination by me of the need for any such modifications.

# DETAILED FINDINGS

## SCENARIO 1 – PLAINTIFF'S CLAIM

The following table reflects my evaluation of Dairyland's claimed damages, as well as my evaluation of its experts' calculations:

| | Claimed Damages | Wilkins' Calculation of Overhead and G&A | Smith's Calculation of RPV Removal |
|---|---|---|---|
| As asserted or calculated | $ 41,281,402 | $ 6,184,000 | $ 6,809,457 |
| Elements not incremental to partial breach | (1,992,501) | (6,184,000) | |
| Elements not reasonable | (11,198,780) | | (6,809,457) |
| As adjusted[1] | $ 28,090,121 | $ - | $ - |

The above adjustments are described in detail below.

**Elements Not Incremental**

In my opinion, costs includable as an element of damages must be incremental to the partial breach in order to be characterized as damages. As such, those costs must be directly related and necessary to the activities caused by the breach and reflect expenditures that would not have been made but for the breach.

In their calculations, Dairyland and Mr. Wilkins have included costs that, in my opinion, are not incremental to the partial breach, as follows:

| | |
|---|---|
| Indirect Overhead and G&A | $ 6,184,000 |
| Baseline Activity Costs | 1,805,834 |
| WPI Activities | 75,167 |
| Nukem Resin Removal and Disposal | 60,000 |
| NRC Annual Fees | 51,500 |
| | $ 8,176,501 |

[1] It is my understanding that Scenario 1 contemplates that spent fuel will be completely accepted by the end of 1998 in the non-breach world. It is also my understanding that such an assertion would require some variation of the acceptance schedule that would apply. In his expert report, Mr. Frank Graves has acknowledged a cost to vary Dairyland's acceptance schedule. However, the Plaintiff's Revised Summary of Damages dated February 12, 2007 does not provide an offset to asserted damages for the cost to achieve this assertion, and I have not quantified any offset.

Indirect Overhead and G&A

In order for costs to be appropriately includable as damages, an evaluation of the underlying activities and associated underlying costs must be performed to determine if those underlying costs are incremental to the breach. If an expenditure associated with the underlying cost pool is not affected by the breach, then those costs would have been incurred by Dairyland regardless of the breach and therefore are not appropriately includable as damages.

Mr. Wilkins has failed to perform any such evaluation. In fact, he has failed to consider the existence of a non-breach world. Mr. Wilkins' calculations are nothing more than a cost accounting model which allocates all costs among all of Dairyland's business units without regard to whether they would have been incurred in a non-breach world. Consequently, his calculations and results are not appropriate for use in the measurement of damages.

In fact, Mr. Wilkins has not asserted these costs as a measurement of damages. He testified as follows:

*Q "...You were not asked to assess damages in this case, is that correct?*
*A That is correct."*[2]

And

*Q "Okay. And if I understand you correctly, you weren't ever asked to assess damages in this matter. Is that correct?*
*A That's right. I was asked to calculate the overhead and G and A rates associated with the costs incurred by Dairyland."*[3]

Mr. Wilkins provided the following tautology:

*A "I think you need to separate damages and the process of allocating costs to a final cost objective. Damages can be stated in a number of different ways. The cost accounting tenets that go with allocating costs to final cost objectives include the allocation of overhead and G and A. Now, if one were to take that allocation of costs to a final cost objective and say that that is the basis for damages, then I believe that those overhead and G and A costs should be a component of damages. But as I say there can be a lot of different bases for damages. (Emphasis added)*
*Q Where did you get your understanding that damages were based upon costs in this case?*
*A Again, I wasn't asked to opine on damages."*[4]

[2] Deposition of Charles Wilkins, 5/11/07, p. 8
[3] Deposition of Charles Wilkins, 5/11/07, p. 9
[4] Deposition of Charles Wilkins, 5/11/07, p. 11

Not only did Mr. Wilkins offer no opinion on damages, his work did not include an assessment of whether a particular cost had been properly recorded nor did he develop an understanding of the nature of that cost.

*Q "So is it fair to say that you weren't concerned with gaining an understanding about the nature of costs within specific account codes?*
*A We weren't asked to go in and audit the cost. We didn't look at when Dairyland incurred a cost and charged it to a cost account, we weren't engaged to try to audit that cost to make sure it was in the proper account. We relied on their ability to do that."*[5]

Mr. Wilkins himself has recognized that the costs he has measured do not reflect incremental costs. As an example:

*Q "But with regard to the G and A cost pool, that pool would exist whether LACBWR existed or not, right?*
*A It probably would in some fashion."*[6]

And more specifically

*Q "Would the investment in PFS necessarily cause an increase in Dairyland's G and A costs?*
*A It wouldn't necessarily cause an increase in it, but I don't understand the context of your question."*[7]

And

*Q "Are additional costs being incurred for the -- is Dairyland incurring additional costs for its CEO in the breach world?*
*A Assuming that the CEO is paid a salary that continues, normal increases and so forth, they are not paying additional costs to the CEO, and no one is making that argument."*[8]

Further, an example of the inappropriateness of the measurements made by Mr. Wilkins is his inclusion of depreciation costs related to Dairyland's Corporate Headquarters. Mr. Wilkins has allocated a portion of these costs, despite the fact that the partial breach has no bearing on the amount of these costs. Mr. Stubbendick, Dairyland's Director of Accounting, has testified:

*Q "What cost does headquarters depreciation expense include?*
*A That would be depreciation related to the specific buildings. And in this case, the La Crosse headquarters building.*

....

*Q Okay. If there were no LACBWR, you'd still have a headquarters, right?*

---

[5] Deposition of Charles Wilkins, 5/11/07, p. 62
[6] Deposition of Charles Wilkins, 5/11/07, p. 88
[7] Deposition of Charles Wilkins, 5/11/07, pp. 94-95
[8] Deposition of Charles Wilkins, 5/11/07, p. 153

*A We would still have the headquarters as it exists, yes.*
*Q So the depreciation on the headquarters would be the same even if LACBWR didn't exist?*
*A This would not change based on LACBWR, that is correct."*[9]

It is clear that Dairyland has not incurred any incremental costs as a result of the breach related to its corporate headquarters and therefore any cost attributable to the depreciation of the corporate headquarters is not an element of damages.

A similar example of the failings of Mr. Wilkins' calculations is his inappropriate allocation of a portion of the cafeteria costs at Dairyland's Corporate Headquarters. The testimony of Mr. Stubbendick, Dairyland's Director of Accounting, demonstrates that the costs incurred to run the cafeteria are unaffected by the existence of LACBWR:

*Q "Cafeteria, food?*
*A It's in the admin building, yes.*
*Q And I assume unaffected by LACBWR?*
*A Yes."*[10]

The measurements made by Mr. Wilkins clearly represent allocations of costs which are not incremental to the partial breach. Mr. Wilkins has not opined to the contrary. In my opinion, none of these costs should be considered as an element of damages incurred by Dairyland as a consequence of the breach.

Baseline Activity Costs

Dairyland utilizes activity codes in its accounting system to associate a particular scope of work with a particular cost. In its asserted damages, Dairyland has included "Baseline" activity coded costs. However, Dairyland's accounting records indicate that the Baseline activity code is comprised of $1,805,834 of internal labor charges for which no description of the specific activities has been provided.

I have reviewed Dairyland documents that indicate that costs coded to Baseline activities include work related to decommissioning activities.[11] Costs related to decommissioning would

[9] Deposition of Keith Stubbendick, 4/26/07, p. 42 and p. 45
[10] Deposition of Keith Stubbendick, 2/1/07, p. 148
[11] PLAC0103840

be incurred absent the partial breach and would therefore not be appropriately claimable as damages.

Further, testimony provided by Roger Christians, the LACBWR Plant Manger, indicates that internal labor charged to the Baseline activity code does not necessarily relate to LACBWR (i.e., spent fuel related) activities:

> *Q "Well, do – I mean, why do people code their time to the Baseline Activity? See the bottom line that says zero activity?*
> *A Uh-huh. I don't know the answer to that.*
> *Q Who would know?*
> *A I would guess the accounting folks would know what – what things are included in that.*
> *Q Oh, okay. Do you ever bill your time to Baseline Activity?*
> *A There are sometimes I do.*
> *Q Okay. When do you do that?*
> *A And that's if I'm going uptown for a meeting of some kind that has nothing to do with LACBWR.*
> ....
> *Q So it's – so that's what Baseline Activity is, something not related to LACBWR?*
> *A Well, I don't know that. That's what I have used it for in the past infrequently, but there may be other things included in there."*[12]

In my opinion, the inclusion of the "Baseline" internal labor as an element of damages requires a demonstration that the asserted labor costs would not have been incurred but for the breach. Dairyland has failed to provide such a demonstration and has clearly included costs that would have been incurred in a non-breach world.

Worldwide Performance and Innovation ("WPI") Activities

WPI performed a variety of services for Dairyland related to the removal of spent fuel and the Reactor Pressure Vessel (RPV) from LACBWR's reactor building. Several of the scopes of work performed by WPI relate to activities that would have occurred in the non-breach world and I have therefore removed $75,167 as follows:

| | |
|---|---|
| GTCC Waste Determination | $ 43,760 |
| Other Radioactive Materials Packaging / Disposal | 14,148 |
| Spent Nuclear Fuel Characterization | 17,259 |
| WPI Activities | $ 75,167 |

[12] Deposition of Roger Christians, 2/1/07, pp. 71-72

**Greater than Class C ("GTCC") Waste Determination**

The scope of work entitled "GTCC Waste Determination" relates to the determination and quantification of radioactive materials Greater Than Class C from all LACBWR sources in the fuel storage pool."[13] Mr. Brasel, Dairyland's RPV Project Manager, testified that these GTCC Waste Determination costs are related to the removal of Dairyland's RPV and that removal of Dairyland's RPV is a decommissioning activity:

*Q All right. If you turn to page 6, this is the GTCC Determination.*
*A Yes.*
*Q And it says that they'll quantify, WPI will quantify the radio – radioisotopic inventory. And what they're doing there, as I understand it, is calculating if GTCC exists; is that fair?*
*A Yes.*
*Q And this task focuses on the RPV; is that true?*
*A Yes, it does.*
*Q All right. If we go to page 8 – oh, let me ask. Did WPI do that work?*
*A Task 2, yes.*[14]

Mr. Brasel further testified as follows:

*A I don't know and I'm not going to infer what Dave Rybarik was getting at. I can say that the – WPI, through the project that we worked with them, provided several work products, and I know of one of those products that was used for the current reactor pressure vessel removal project.*
*Q Okay. What was that?*
*A That was the determination of the radionuclide content and number of curies in the reactor vessel, the characterization of the reactor vessel.*
*Q And was that something that was necessary in order to determine whether or not it – it could be ultimately shipped to a low-level waste site?*
*A Yes.*[15]

And with respect to decommissioning:

*Q "Is the disposal of Dairyland's reactor pressure vessel a decommissioning activity?*
*A Disposal of the reactor pressure vessel a decommissioning activity? Yes."*[16]

Mr. Brewer has also opined that this activity would have been necessary regardless of when DOE accepted LACBWR spent fuel. I have removed $43,760 from damages as this cost would have been incurred by Dairyland regardless of the DOE's partial breach and is therefore a non-incremental cost erroneously asserted as damages.

---

[13] PLAC0004249
[14] Deposition of Michael Brasel, 12/13/06, pp. 122-123
[15] Deposition of Michael Brasel, 4/25/07, pp. 79-80
[16] Deposition of Michael Brasel, 12/13/06, p. 120

**Other Radioactive Materials Packaging/Disposal**

The scope of work entitled "Other Radioactive Materials Packaging/Disposal" relates to the preparation of plans for the disposal of a variety of radioactive components and equipment.[17] Mr. Michael Brasel, Dairyland's Project Manager testified as follows with respect to this cost:

> *Q "... You can see there's a reference to the remaining spent fuel pool contents. Do you see that?*
> *A Yes.*
> *Q And is it true to say that the fuel racks, control blades, fittings, and support stands are items that would need to be removed from the plant as part of decommissioning?*
> *A Yes.*
> *Q And then if you look down on Scope of Work, just Number 1, there's a reference to reviewing the LACBWR inventory of the pool to deal – to develop a miscellaneous radioactive materials disposition plan?*
> *A Yes.*
> *Q Do you see that? Is that also a decommissioning-related project?*
> *A I would say yes."*[18]

I have removed $14,148 from damages based upon this testimony that this cost is a decommissioning cost and was therefore a non-incremental cost erroneously asserted as damages.

**Spent Nuclear Fuel Characterization**

The scope of work entitled "SNF Characterization" involves reviewing all currently available records and documentation for each LACBWR spent fuel assembly to assess its condition and, if necessary, developing a program for additional characterization.[19] Mr. Brewer has opined that this activity would have been necessary regardless of when DOE accepted LACBWR spent fuel. I have removed $17,259 from damages as this cost would have been incurred by Dairyland regardless of the DOE's partial breach and is therefore a non-incremental cost erroneously asserted as damages.

[17] PLAC0004252
[18] Deposition of Michael Brasel, 12/13/06, p 124
[19] PLAC0004258

Nukem Resin Removal and Disposal

In 1999, DPC contracted with Nukem for the disposal and removal of spent resin that had been accumulating in LACBWR's spent resin storage system since 1987.[20] The cost claimed as damages by Dairyland for the removal and disposal of this resin was $60,000. Mr. Roger Christians, LACBWR's Plant Manager testified as follows with respect to resin removal and disposal:

*Q "...Right. And if you look back on the exhibit, Exhibit 12, you can see that in the first paragraph it says the resin has been accumulating in LACBWR spent resin storage system since 1987, correct?*
*A Yes.*
*Q And so I mean, it's been – it had been accumulating at least since shutdown?*
*A Uh-hum.*
*Q And your spent fuel wasn't going to be all – it wasn't – DOE wouldn't have begun taking away the spent nuclear fuel from LACBWR until beginning 1998, right?*
*Q What I'm getting at is, that you would have had resins accumulating from 1987 until your fuel was all gone, regardless of when that date was, right?*
*A Yes, we would accumulate resins.*
*Q And I mean, you would have accumulated those, some resins, even if all your fuel had been taken away in 1998?*
*A Say that again, please.*
*Q You would have accumulated some resins in storing your spent nuclear fuel even if it had all been taken away in 1998?*
*A We would have accumulated resins up to that point to some degree, yes.*
*Q Sure. And that would have all been decommissioned?.*
*A You have to get rid of everything on the site as a part of the decommissioning process."*[21]

I have removed this cost from damages based upon this testimony that this cost is a decommissioning cost and was therefore a non-incremental cost erroneously asserted as damages.

Nuclear Regulatory Commission Annual Fees

Dairyland's Nuclear Regulatory Commission ("NRC") Part 50 license requires it to pay an annual fee to the NRC. The annual fee that Dairyland pays to the NRC runs from an October 1st to September 30th fiscal year. In 1999, Dairyland paid $206,000 for its annual fee that covered the last three months of 1998 and the first nine months of 1999. This is consistent with the testimony of Mr. Keith Stubbendick, Dairyland's Director of Accounting:

[20] PLAC0012436
[21] Deposition of Roger Christians, 2/1/07, pp. 159-160

*A "Again, I ask you this because we don't have the invoices. Would it be reasonable to assume, based on this NRC regulation and the statement within that, and then your math, that this $206,000 would have been for the 1999 NRC fee?*
*A That would be a fair assumption.*
*Q All right. So if that was the case, again, if you look at the invoice on number – on Exhibit 9, it would seem to me that the '99 payment would be for a time period that covered October 1st, 1998 through September 30th, 1999.*
*Q ...(Mr. Ekman, continuing) The billing period for the fiscal year 2000 invoice is October 1st, '99 through September 30th, 2000. It would seem to be logical to conclude that the previous invoice that we don't have would be for October 1st, 1998 through September 30th, 1999, and then Exhibit 9 would pick up from there. Is that a fair assumption?*
*A I would think that could be concluded, yes.*
*Q And so if that's true, the $206,000 annual fee for '99 would potentially cover that whole period, that year period of September – or October 1, '98 through September 30, '99, right?*
*A Yes.*
*Q And of that amount, three months would have been in '99, that would be – or '98, that would be October, November, and December, right?*
*A Assuming that the billing was in a similar format, yes, that would be right.*
*Q And that's – and three months is one – is 25 percent of the year, right?*
*A Yes.*
*Q All right. Can you tell me what 25 percent of $206,000 is?*
*A That would be about 51 50, I believe.*
*Q 51 50.*
*Q ...(Mr. Ekman, continuing) $51,500 then?*
*A Yeah.*
*Q So is it fair to assume that's what happened, that's what is happening here, is that that 51,500 is actually relative to amounts from 1998 rather than applicable to amounts after 1999, January 1st of '99?*
*A That would be fair."* [22]

The Plaintiff's damages assertion assumes completion of acceptance of LACBWR's spent nuclear fuel by DOE at the end of 1998. Consequently, DPC would be responsible for the cost of maintaining its fuel in SAFSTOR through 1998. Therefore, I have removed one quarter of this $206,000 annual fee charge, or $51,500, from Dairyland's damage calculations.

[22] Deposition of Keith Stubbendick, 2/1/07, pp. 172 -174

**Elements Not Reasonable**

The damages assertions made by Dairyland and the calculations made by Mr. Smith include the following elements that are not reasonable:

| | |
|---|---|
| RPV Removal Project | $ 6,809,457 |
| Private Fuel Storage, LLC | 10,936,900 |
| Lobbying Costs | 261,880 |
| | $ 18,008,237 |

The basis of my opinion is described in, among other things, the six specific failures which are described hereinafter.

RPV Removal Project

Mr. Smith has asserted that the difference in the Reactor Pressure Vessel (RPV) removal costs between the actual approach taken by Dairyland versus an alternative method he asserts would have been taken in the non-breach work, amounts to $6,809,457 as follows:

| | |
|---|---|
| Breach World (Duratek Contract) | $ 17,625,423 |
| Non-Breach World (Mr. Smith) | 10,815,966 |
| Difference | $ 6,809,457 |

Mr. Smith's report makes no mention of damages or whether his marginal cost calculation reflects a measurement of damages. In his deposition, Mr. Smith stated:

> *"...I believe different people have different opinions and definitions of marginal costs, of incremental costs, of damages. I can tell you my report subtracts the nonbreach scenario from the breach scenario and comes up with a number. I have not spent a lot of time defining it other than a marginal cost in my report."*[23]

When questioned as to whether he is planning or has been asked to opine as to damages, Mr. Smith was even less than clear:

*Q "Are you planning or have you been asked to offer and opinion on damages in this case?*
*A The only opinion I've offered is in that report.*
*Q That's what I'm asking you. I understand that this is your opinion in the report but are you going to opine on damages at trial?*
*A It hasn't been discussed at this point.*
*Q It has not?*

[23] Deposition of Todd Smith, 5/22/07, pp. 112-113

*A No*
*Q So you don't know?*
*A I don't"*[24]

Notwithstanding Mr. Smith's uncertainty as to whether his calculation of asserted marginal costs represents damages and his uncertainty as to whether he will be offering any such opinions at trial, it is my opinion that Mr. Smith's calculations, estimates and results provide no basis and are unreliable for use with respect to the measurement of damages. Moreover, his calculations reflect accounting and engineering judgments; by his own admissions, Mr. Smith is neither a trained accountant nor engineer.

The approach Mr. Smith used to estimate costs in the non-breach world relied upon estimates from a variety of sources including family members and former colleagues. He then incorporates responses from these sources and constructs a non-breach world. He provided non-specific scopes of work to these sources but it appears to me that he does not possess the appropriate background to understand and comprehensively communicate the specific required details of scope of work necessary to obtain an objectively reliable cost estimate.[25] It is therefore inappropriate for Mr. Smith to communicate, through any delivery method, descriptions of work scope at Dairyland for which he lacks the requisite technical understanding.

Mr. Smith's approach and analysis contain numerous specific failures, any and all of which undermine his conclusions and make their use inappropriate for any measurement of damages. Mr. Smith's failures include:

1. Failure to utilize Dairyland's known breach world actual costs for scopes of work that he concedes would be the same between the breach and non-breach worlds. Consequently, for activities he concedes would be the same between the breach and non-breach world, he estimates a different non-breach cost from that actually incurred and then asserts the difference as marginal costs.

[24] Deposition of Todd Smith, 5/22/07, pp. 107-108
[25] SMIT0000069 As an example, this email reflects that Mr. Smith was prepared to accept an estimate that, had he not been advised in an "additional note" of additional costs, would have been incomplete.

An example of this failing is the work scope for Nozzle Cutting which is identified in the pricing section of the Duratek contract as representing $1,800,000 of the total contract price. Despite the fact that Mr. Smith admits that the Nozzle Cutting activity would be no different in the non-breach world, he inappropriately creates a difference in cost by calculating his own estimate for the costs of the nozzle cutting activity. Mr. Smith's marginal cost analysis includes a $1,445,000 difference in cost between the breach and non-breach world for an activity he acknowledges is the same. When asked to explain the more than five fold difference between his estimate and the price provided in the Duratek contract, Mr. Smith testified:

*Q "Got it. What about the nozzle cutting. You've got $1.8 in the Duratek contract for the nozzle cutting. Do you see that?*
*A I have that but it's directly coming from the contract, yes.*
*Q What is the cost driver in that activity?*
*A Again, that is the labor necessary to cut all the nozzles away from the reactor pressure vessel.*
*Q And do you see that in the Duratek contract, there is $1.8 million for that activity but on page 7 in appendix 2 of your report, do you see where you've got $355,000 for that activity in the nonbreach world?*
*A Yes.*
*Q Why is that?*
*A That's a direct quote from Bluegrass Cutting who is actually performing or has performed the nozzle cutting for the LACBWR facility.*
*Q So does that mean that since they're actually performing and they said that they would perform it for $355,000 as a direct quote, that there is a $1.4 million markup by Duratek in the nozzle cutting?*
*A I can't represent that.*
*Q Why not?*
*A Because I don't know what goes into the $1.8 million of nozzle cutting under the Duratek contract.*
*Q But you said that the – what did you say that the driver was for that activity?*
*A The driver in the nonbreach world would be the actual labor of cutting the nozzles free from the RPV.*
*Q But the driver is the same in the breach world, isn't it?*
*A Yes.*
*Q So why is there a difference between your estimate and the breach world? Why is that?*
*A You would have to ask Duratek.*
*Q You don't know?*
*A I don't know."*[26]

2. Without consultation with Dairyland personnel, and without basis, Mr. Smith asserts that Dairyland would have self-performed the RPV removal project in the non-breach world as contrasted to engaging a general contractor as they actually did in the breach world.

[26] Deposition of Todd Smith, 5/22/07, pp. 218-220

*Q "Why did you assume in the nonbreach world that Dairyland is self-performing?*
*A I believe that is a reasonable approach to take.*
*Q Why?*
*A Because I believe that in this type of a scenario, Dairyland would have the resources, would gain the resources and it's entirely possible for them to self-perform the work."*[27]

Mr. Smith further testified:

*Q "But I guess my question—doesn't Dairyland have the resources in the breach world?*
*A I don't know whether they have the resources in the breach world. I know that they've made a business decision to push the risk of removing the reactor pressure vessel out to a contractor. Duratek accepted that risk. Arguably there is a cost involved with accepting that level of risk. And they entered into a contract."*[28]

Mr. Smith continued:

*Q "Well, did anybody at Dairyland tell you that if they had to do it over again, they wouldn't hire a contractor like Duratek?*
*A No. It's my professional experience, having dealt with a contractor and having gone through numerous self-performances, that I believe the reasonable way to go is self-performing in a nonbreach world."*[29]

And finally:

*Q "...We were talking a little bit ago about Dairyland choosing to use a general contractor like Duratek as opposed to self-performing. Do you remember our discussion about that?*
*A Yes*
*Q Did you ever have any discussions with Dairyland personnel as to why they choose to hire a general contractor to remove the reactor pressure vessel in the actual world?*
*A No."*[30]

An example of the impact of Mr. Smith's self-performance assumption can be seen in his differential costs associated with the grouting activity, an activity that Mr. Smith has identified as the same in the breach and non-breach worlds and has nonetheless calculated a differential cost of approximately $725,000. Mr. Smith explained that difference:

*"...One thing that is a major difference between a nonbreach world and a breach world is, in the nonbreach world, Dairyland is self-performing this work. In the breach world, Duratek has taken on the entire risk of removing, packaging, transporting and disposing of a reactor pressure vessel. So inherently from a Duratek contract, there is risk*

[27] Deposition of Todd Smith, 5/22/07, p. 208
[28] Deposition of Todd Smith, 5/22/07, p. 209
[29] Deposition of Todd Smith, 5/22/07, p. 210
[30] Deposition of Todd Smith, 5/22/07, pp. 238-239

> *associated with taking on that entire scope of work. Therefore, there are contingencies, there are profits, there are numerous factors to the Duratek contract because of the fact that they took on such a large risk for this project."*[31]

Mr. Smith's independent "management" decision that Dairyland would have self-performed in the non-breach world is inconsistent with his own assertion that in preparing his analysis he ensured that he was consistent with the manner in which Dairyland actually operates.

> *"...I relied mostly on Mr. Brasel to bounce my thoughts off of in developing my report to make sure I'm consistent, to make sure I'm within the guidelines of the way that the Dairyland facility operates and does business."*[32]

By disregarding Dairyland's actual conduct and superimposing his notions, Mr. Smith has created marginal costs that do not exist.

3. Improperly including engineering judgments and decisions that are inconsistent with the opinions offered by Dairyland's RPV Project Manager.

An example of this failure is the work scope that would be required related to Dairyland's Polar Crane in the non-breach world. Mr. Brasel, Dairyland's RPV Project manager testified that the Polar Crane would need to be removed to support the non-breach RPV removal path:

> *Q "All right. What would you have had to do again hypothetically if you had been able to take it out through the roof? What – what would you have needed to do? Let's start with number one. Were there interferences that would need to be removed to lift it up?*
> *A We didn't get into the engineering. It was more of a concept idea, but conceptually, you would have to still remove the shield plugs and then you would have to do something with your crane, because we have a Polar crane, building 50-ton crane.*
> *Q So the Polar crane would be in the way of –*
> *A Yes, it would have to be removed and then probably reinstalled to – to get out of the way of the removable path if it went through the roof."*[33]

However, contrary to Mr. Brasel's testimony, Mr. Smith testified that the polar crane would not need to be removed to support the non-breach removal path:

[31] Deposition of Todd Smith 5/22/07, pp. 207-208
[32] Deposition of Todd Smith, 5/22/07, p. 124
[33] Deposition of Michael Brasel, 12/13/06, p. 142

*A "It was considered whether the total dismantlement of the polar crane was necessary in order to remove the RPV from containment. And it was found that the dismantlement of the polar crane was not necessary in order to remove the RPV through the top.*
*Q And how was that decided? How did you decide that?*
*A The dimensions between the two girders of the polar crane are such that it will allow the passage of the RPV up between the two girders of the polar crane.*
*Q So how close is that space? I mean, you're talking about the space between the two girders that the crane mechanics runs on?*
*A Uh-huh.*
*Q How far apart are they?*
*A I don't remember specifically.*
*Q How much of a clearance does it need in order for the RPV to be able to go between those girders?*
*A I don't know. It needs at least enough clearance so that it doesn't make contact with the polar crane and I was – my work was to make sure that there was enough clearance or, if there wasn't enough clearance, how you create enough clearance in order to support a top removal of the RPV."*[34]

4. Failure to provide proper evidential matter for his estimates, and the estimates he received from others, which he then used to measure his differences between breach and non-breach worlds. Rather than submitting technical details and work scopes to the 3rd party specialty contractors upon whom he apparently has relied and receiving a thorough and complete quote, Mr. Smith relied on phone calls and emails as support for his non-breach cost estimates.

*Q "And they contemplated a 750 to a thousand ton crane and did they make the determination that that would be adequate to lift the reactor pressure vessel at LACBWR?*
*A Yes.*
*Q So that was a Bigge estimate based on some sort of statement of work that you provided to them, right?*
*A No, that was actually a conversation that I had with Bigge when I was reviewing this particular option and they contemplated a 750 to a thousand ton capacity crane and my question to Bigge was, if I married a million dollars in my estimate to cover the cost of the mobilization, utilization, demobilization of the crane, I asked, would that be adequate, and their answer was it would probably be in the 700, $800,000 range but they're not sure. So I carried a million dollars for that crawler crane to make sure that I was adequately covered for that particular piece of equipment.*
*Q So I take it that was not a formal quote or it was?*
*A That was not a formal quote, no.*[35]

5. The breach world costs to which Mr. Smith compares his estimate of non-breach world costs include amounts that have not actually been incurred by Dairyland through

[34] Deposition of Todd Smith, 5/22/07, pp. 140–142
[35] Deposition of Todd Smith, 5/22/07, pp. 223-224

December 31, 2006. Specifically, of the $17,625,423 of breach costs asserted by Mr. Smith, only $9,906,159[36] had been incurred by Dairyland as of December 31, 2006.

The Plaintiff's claim purports to reflect actual damages through December 31, 2006. However, the "marginal costs" that have been measured by Mr. Smith include, in his comparison to the breach world, amounts that had not been expended by the end of 2006. In fact, of the total breach costs that he asserts, $7,719,264 had not been expended by year-end 2006 and therefore none of his so called marginal costs had actually been incurred by Dairyland as of December 31, 2006. Mr. Smith has acknowledged as much:

> *Q Do you understand that some of these costs that are included in that figure have not yet been incurred?*
> *A I do understand that, yes.*[37]

6. Failure to consider certain activities that would have been required in the non-breach world and their related costs. As an example, Mr. Brewer has opined that in the non-breach world, Dairyland would have been required to remove its bio-shield wall using some method which would involve radiological survey and decontamination work. Mr. Smith's non-breach world does not provide for such an activity and consequently there is no provision for the related cost in his non-breach world estimate.

Overall, Mr. Smith's approach, methodology and technical assumptions contain pervasive errors and inconsistencies which render his analysis unusable as the basis for any measurement of damages.

<u>Private Fuel Storage</u>

Dairyland is alleging damages of $10,936,900 related to its investment in Private Fuel Storage ("PFS"). It is my understanding that PFS was formed to represent the interest of its members in the development, construction, ownership and operation and maintenance of a private temporary spent nuclear fuel storage facility. I also note that the investment in PFS was not even made by Dairyland but rather through an affiliate and it was done in that way to, among other things, insulate liability and transfer the profit opportunity so that Dairyland would not

[36] PDPC0032852
[37] Deposition of Todd Smith, 5/22/07, p. 113

jeopardize its tax status.[38] Further, Charles Sans Crainte, Dairyland's Vice President of Generation testified that the Dairyland affiliate's investment in PFS has value.[39] I have been instructed by DOJ counsel to remove the costs for PFS from the damage claim in their entirety.

Lobbying Costs

Dairyland has asserted as damages certain lobbying costs. Those costs include amounts paid to the following entities:

| | |
|---|---|
| Governmental Strategies Incorporated | $ 75,000 |
| Mr. Lake Barrett | 186,880 |
| | $ 261,880 |

Dairyland is asserting damages in the amount of $75,000 for amounts paid to Government Strategies Incorporated ("GSI") for Quarterly Dues from 1999 through 2006. In return for these dues, Dairyland received "advice and representation on decommissioning plant issues associated with Decommissioning Plant Coalition and relations with Members of Congress and Congressional Committees."[40]

Dairyland is also asserting damages in the amount of $186,880 for amounts paid to Mr. Lake Barrett. Mr. Barrett is a lobbyist who has been hired by DPC to "provide advice to Dairyland regarding nuclear fuel related policies and business issues, and general Federal activities in related areas."[41]

Lobbying costs are not a necessary cost for the storage of spent fuel and therefore are not appropriately claimable as an element of damages. Consequently I have removed them from Dairyland's asserted damages.

[38] Deposition of Keith Stubbendick, 2/1/07, pp. 183-186 & Deposition of Charles Sans Crainte, 1/30/07, pp. 15-18
[39] Deposition of Charles Sans Crainte, 1/30/07, pp. 190-191
[40] PDPC0029814
[41] PDPC0030033

## SCENARIO 2 – ACCEPTANCE BY 2005

I have been asked to calculate the impact on damages based upon an instruction from DOJ counsel to assume a scenario where acceptance of Dairyland's spent nuclear fuel would have been completed by 2005.

Under this non-breach world scenario, Dairyland would have been required to operate and maintain its facility and store its spent fuel through the end of 2005. Mr. Brewer has opined that the costs of maintaining Dairyland's fuel in its spent fuel pool are not dependent on the number of assemblies that are stored in the pool. Consequently, under this scenario, Dairyland would bear all costs associated with the wet storage of its fuel until the date that the DOE removes the last spent fuel assembly.

Dairyland's asserted damages claim and its experts' calculations should be reduced as follows for Scenario 2:

| | Claimed Damages | Wilkins' Calculation of Overhead and G&A | Smith's Calculation of RPV Removal |
|---|---|---|---|
| As asserted or calculated | $ 41,281,402 | $ 6,184,000 | $ 6,809,457 |
| Elements not incremental to partial breach | (1,992,501) | (6,184,000) | |
| Elements not reasonable | (11,198,780) | | (6,809,457) |
| Scenario 1, as adjusted | 28,090,121 | - | - |
| 1999-2005 Wet Storage Costs | (23,117,108) | | |
| Non-incremental labor[42] | (370,615) | | |
| **Scenario 2, as adjusted[43]** | $ 4,602,398 | $ - | $ - |

[42] The costs as adjusted by me with respect to Scenario 1 includes certain costs charged to dry storage related activities. Of those certain costs, $370,615 of the total represents internal labor charges through 2005. Our adjustments for wet storage costs include removal of the associated internal labor included in wet storage costs. On the basis that these employees are not considered incremental under Scenario 2, I have further removed the internal labor charges associated with these employees that the Plaintiff asserted as dry storage related.

[43] Resulting damages under scenario 2 include wet storage costs of $3,945,995 and dry storage related activities (Fuel Removal P6564), as adjusted of $656,403.

**SCENARIO 3 – ACCEPTANCE AFTER 2008**

I have been asked to calculate the impact on damages based upon an instruction from DOJ counsel to assume a scenario where acceptance of Dairyland's spent nuclear fuel would have been completed after 2008.

Under this non-breach world scenario, Dairyland would have been required to operate and maintain its facility and store its spent fuel through the end of 2006. Mr. Brewer has opined that the costs of maintaining Dairyland's fuel in its spent fuel pool are not dependent on the number of assemblies that are stored in the pool. Consequently, under this scenario, Dairyland would bear all costs associated with the wet storage of its fuel until the date that the DOE removes the last spent fuel assembly. I have been instructed by DOJ counsel to assume that certain Dairyland fuel should be characterized as other than standard fuel and that Dairyland would be required to store such fuel for an indeterminate period of time. Consequently, I have been instructed that Dairyland's asserted fuel storage related activities and costs, whether wet storage costs or costs of dry storage related activities would be no different in the breach world and the non-breach world and I have therefore removed all such costs.

Dairyland's asserted damages claim and its experts' calculations should be reduced as follows for Scenario 3:

| | Claimed Damages | Wilkins' Calculation of Overhead and G&A | Smith's Calculation of RPV Removal |
|---|---|---|---|
| As asserted or calculated | $ 41,281,402 | $ 6,184,000 | $ 6,809,457 |
| Elements not incremental to partial breach | (1,992,501) | (6,184,000) | |
| Elements not reasonable | (11,198,780) | | (6,809,457) |
| Scenario 1, as adjusted | 28,090,121 | - | - |
| 1999-2005 Wet Storage Costs | (23,117,108) | | |
| 2006 Wet Storage Costs | (3,945,995) | | |
| Dry storage related activities[44] | (1,027,018) | | |
| **Scenario 3, as adjusted** | $ - | $ - | $ - |

[44] In the event that the Plaintiff's inclusion of costs for dry storage related activities is permitted as an element of damages, the amount included in the $1,027,018 representing internal labor charges should be removed on the basis of it not being incremental as explained in footnote 42 of Scenario 2. The amount of such internal labor charges that should be removed in that event amounts to $419,441 through 2006.

# CURRICULUM VITAE

## R. LARRY JOHNSON, CPA

**EXPERIENCE:**

**CHAIRMAN/CEO – VERIS CONSULTING, LLC (2000 – Present)**
**PARTNER EMERITUS – JOHNSON LAMBERT & CO. (2006 –Present)**
**MANAGING PARTNER - JOHNSON LAMBERT & CO. (1986 – 2005)**

Direct client responsibility for all litigation consulting services. Experience includes forensic analysis; liability, causation and damages consultation; discovery assistance; preparation of damages analysis and expert testimony. Engagements have included many which required several thousands of hours of assistance and involved damages in the hundreds of millions of dollars.

Specialized industries involved in litigation assignments have included insurance, nuclear power, finance, software development, telecommunications, real estate, government contractors, professional service firms and hotels.

As managing partner of Johnson Lambert & Co., oversaw the accounting and auditing practice of that firm; as CEO of Veris Consulting, LLC, oversees all consulting services that firm provides, including survey research and technology consulting.

For 18 years through 1986 associated with Ernst & Whinney. Admitted to partnership in 1978, named partner in charge of accounting and auditing for its Washington, D.C. practice in 1980 and served as Mid-Atlantic Regional Director of insurance services.

**MEMBER-AICPA FINANCIAL SERVICES EXPERTS PANEL (2000 – 2001)**

One of 15 original members of panel designed to monitor developments affecting the delivery and reporting of financial services in the U.S.

**MEMBER-AICPA INSURANCE COMPANIES COMMITTEE (1989 – 1993) (1997 – 1999)**

One of 15 members responsible for development of accounting and financial reporting for U.S. insurance enterprises.

**MEMBER-ACCOUNTING STANDARDS EXECUTIVE COMMITTEE (1994 – 1997)**

One of 15 members of the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants, which was the highest authority in the U.S. Accounting Profession with responsibility for industry-specific accounting and reporting matters.

**OTHER AICPA COMMITTEES**

Served as a member of the AICPA Committee on Relations with Actuaries and on task forces including the following:

- Auditing Loss Reserves
- Mutual Life Insurance Companies
- Deposit Accounting (Chair)
- Mass Tort Liabilities

**EDUCATION:** BS University of Maryland, magna cum laude. Completed MBA course work, George Washington University.

**TRIAL AND ARBITRATION TESTIMONY**

- *In the Matter of the Arbitration Between WellPoint Health Networks, Inc. and Unicare Life & Health Insurance Company v. John Hancock Life Insurance Company* (February 2007)
- *Robert D. Ferguson v. Hannover Rickverisicherungs-Atkiengesellschaft* (Bankr. S.D.N.Y, No. 04 CIV 9254) (December 2006)
- *Northern States Power Company v. United States* (Fed. Cl., No. 98-484 C) (November 2006)
- *In the Matter of the Arbitration Between Virginia Surety Company, Inc., Petitioner, and Certain Underwriters* (June 2006)
- *John Hancock Life Insurance Co. v. Vestmont Limited Partnership, et al.*, (D. Mass., No. 05-11614) (May 2006)
- *American Federal Bank F. S. B. v. United States* (Fed. Cl., No. 95-498C) (April 2006)
- *Southern Nuclear Operating Company et al. v. United States* (Fed. Cl., No. 98-614C) (January 2006)
- *Elizabeth R. Costle, Commissioner of Insurance Banking and Securities of the State of Vermont, as Receiver of Ambassador Insurance Company v. Doris June Chait, et al.* (D. N.J., No. 85-2441) (June and July 2005)
- *Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, Maine Yankee Atomic Power Company v. United States* (Fed. Cl. Nos. 98-126C, 98-154C, 98-474C) (August 2004)
- *American Capital Corporation and Transcapital Financial Corporation and Federal Deposit Insurance Corporation as Successor to the Rights of Transohio Savings Bank v. United States* (Fed. Cl., No. 95-523C) (July 2004)
- *Donna Lee H. Williams v. Prudential Securities, Inc. et al.* (Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. CI96-3225) (September 2003)

**DEPOSITION TESTIMONY**

- *In the Matter of Karen L. Suter, Commissioner of the Department of Banking and Insurance of the State of New Jersey, in her capacity as Liquidator of Home State Insurance Company v. PricewaterhouseCoopers LLP* (Sup. Ct. of New Jersey – Mercer County, Docket No. MER L-001752 01) (March 2007 and September 2006)
- *In the Matter of the Arbitration Between WellPoint Health Networks, Inc. and Unicare Life & Health Insurance Company v. John Hancock Life Insurance Company* (February 2007; February 2006;)
- *VeriSign v. Holtenhoff* (Superior Court of California, County of Santa Clara, No. 104CV31579) (December 2006)
- *Alabama Hospital Association et al. v. General Reinsurance Corporation, et al, Baptist Health System, Inc. v. General Reinsurance Corporation, et al.* (In the Circuit Court for the Fifteenth Judicial Circuit of Alabama, Montgomery County, Alabama, No. CV-2004-1757) (December 2006)
- *Northern States Power Company v. United States* (Fed. Cl., No. No. 98-484 C) (August 2006)
- *In Re: Motorola Securities Litigation (N.D. Ill, No. 03 C 00287) (June 2006)*
- *In re Enron Corporation Securities Litigation; Mark Newby, et al. v. Enron Corp.; The Regents of the University of California et al. v. Kenneth L. Lay, et al. (S.D. Tex, Civil Action No. H-01-3624; MDL Docket No. 1446)* (May 2006)
- *In the Matter of the Arbitration Between Virginia Surety Company, Inc., Petitioner, and Certain Underwriters* (April 2006)
- *John Hancock Life Insurance Co. v. Vestmont Limited Partnership, et al.* (D. Mass., No. 05-11614) (April 2006)
- *Pacific Gas & Electric Company v. United States* (Fed. Cl., No. 04-0074C) (March 2006 and May 2006)
- *American Federal Bank F. S. B. v. United States* (Fed. Cl. No. 95-498C) (June 2005 and February 2006)
- *Ferguson v. Hannover Ruckversicherungs-Aktiengesellschaft and Lion Holding, Inc.*, S.D.N.Y., Nos. 02 Civ.4258 and 02 Civ. 4261 (June 2005 and February 2006)
- *Southern Nuclear Operating Company et al. v. United States* (Fed. Cl., No. 98-614C) (August 2005)

- *Tribune Company v. Swiss Reinsurance America Corporation* (N.D. Ill, No. 02 C 4772) (January 2005)
- *M. Diane Koken v. Viad Corporation* (January 2005)
- *In Re The Arbitration Between The Canada Life Assurance Company and The Guardian Life Insurance Company of America* (December 2004)
- *Arbitration between Swiss Re Life & Health, Inc. as successor in Interest to the Lincoln Entities v. ES Rückversicherung, A.G.* (September 2004)
- *American Capital Corporation and Transcapital Financial Corporation and Federal Deposit Insurance Corporation as Successor to the Rights of Transohio Savings Bank v. United States* (Fed. Cl., No. 95-523C) (June 2004)
- *Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, Maine Yankee Atomic Power Company v. United States* (Fed. Cl. Nos. 98-126C, 98-154C, 98-474C) (June and August 2002 and May 2004)
- *Circle Group Internet, Inc. v. Atlas, Pearlman, Trop & Borkson, P.A. et al. v. Spector & Wong, LLP et al.* (S.D.Fla., Case No. 02-61082-CIV) (May 2004)
- *Scott B. Lakin, et al. v. KPMG, et al.* (In the Circuit Court of Jackson County, Missouri at Kansas City, Case No. 02CV233493) (March 2004)
- *Quartet Holdings Inc., Quartet Services, Inc. and Ronald G. Tepper v. BDM International, Inc. and TRW, Inc.*, (Superior Court for the District of Columbia Civil Division Civil Action No. 0000344-01) (February 2004)
- *In the Matter of an Arbitration between Alta Health & Life Insurance Company, and Swiss Re Life & Health America, Inc* (July 2003)

**SPEECHES:**

Evolving Theories of Liabilities and Damages Against Third Parties – International Association of Insurance Receivers 2005 Insolvency Workshop (February 2005)

Evaluating Risk Transfer in Reinsurance Contracts – Reinsurance Association of America, New York (July 2001)