# DOCUMENTS CONSIDERED

**Expert Reports:**

Expert Report of Mr. Todd Smith, dated March 23, 2007

Expert Report of Mr. Charles Wilkins dated March 23, 2007

Expert Report of Mr. Frank C. Graves, dated March 23, 2007

Expert Report of Mr. Warren Brewer dated June 8, 2007

**Deposition Testimony:**

Deposition Testimony of Mr. Michael Brasel, dated December 13, 2006 and April 25, 2007

Deposition Testimony of Mr. Roger E. Christians, dated February 1, 2007

Deposition Testimony of Mr. Seymour Raffety, dated December 14, 2006

Deposition Testimony of Mr. Charles Sans Crainte, dated January 30 and April 26, 2007

Deposition Testimony of Mr. Todd Smith, dated May 22, 2007

Deposition Testimony of Mr. Keith Stubbendick, dated February 1 and April 26, 2007

Deposition Testimony of Mr. Charles Wilkins, dated May 11, 2007

**Document Productions:**

PDPC0000001-PDPC0048695

PLAC0000001-PLAC0153744

DAP0010001-DAP0013658

WILK0000001-WILK0001512

SMIT0000001-SMIT0000126

**Excel Files**

Labor data request 022207.xls

activityaccountpayable(PDPC0030139-PDPC0030268).xls

activityacctsource(PDPC0030072-PDPC0030093).xls

activityapinvoiceno(PDPC0031097-PDPC0031206).xls

activitycv(PDPC0031238-PDPC0031241).xls

activityinventory(PDPC0030355-PDPC0030419).xls

activityjournalentries(PDPC0031207-PDPC0031213).xls

activitypayroll(PDPC0030552-PDPC0030629).xls

activitytransp(PDPC0031214-PDPC0031237).xls

Labor costs LACBWR OM(PDPC0030631-PDPC0030720).xls

Labor costs LACBWR Other Accts(PDPC0030722-PDPC0030726).xls

1999MODEL – Actual (DPID0001836).xls

2000MODEL – Actual (DPID0001837).xls

2001MODEL – Actual (DPID0001838).xls

2002MODEL – Actual (DPID0001839).xls

2003MODEL – Actual (DPID0001840).xls

2004MODEL – Actual (DPID0001841).xls

2005MODEL – Actual (DPID0001842).xls

Dairyland Damages (DPID0001835).xls

activity ap invoice no (PDPC0032857-71).xls

activity inventory (PDPC0032874-94).xls

activity journal entries (PDPC0032872-73).xls

activity summary (PDPC0032853-56).xls

activity transportation (PDPC0032902-04).xls

LACBWR labor 70106 – 123106 (PDPC0032895 -901).xls

## COMPENSATION

The Compensation for our work is at our normal professional rates, which range between $150-$450 per hour depending on the personnel assigned to the engagement. Our compensation is in no way dependent on our findings or the ultimate outcome of the case.

IN THE UNITED STATES DISTRICT COURT

OF FEDERAL CLAIMS

-----------------------------------: ORIGINAL

DAIRYLAND POWER COOPERATIVE, :

Plaintiff, :

vs. : No. 04-106C

UNITED STATES OF AMERICA, : No. CL0500121

Defendant. :

-----------------------------------:

Washington, D.C.

Tuesday, June 17, 2007

Deposition of:

R. LARRY JOHNSON

called for oral examination by counsel for Plaintiff, pursuant to notice, at Greenberg Traurig, L.L.P., 800 Connecticut Avenue, Northwest, Suite 500, Washington, D.C., before Shari R. Broussard, of Capital Reporting Company, a Notary Public in and for the District of Columbia, beginning at 9:04 a.m., when were present on behalf of the respective parties:

 ©2007

A P P E A R A N C E S

On behalf of Plaintiff:

KEVIN E. STERN, ESQUIRE

Greenberg Traurig, L.L.P.

800 Connecticut Avenue, Northwest

Suite 800

Washington, D.C. 20006

(202) 452-4878

On behalf of Defendant:

RUSSELL A. SHULTIS, ESQUIRE

U.S. Department of Justice

National Courts Section

1100 L Street, Northwest

Washington, D.C. 20530

(202) 305-7571

ALSO PRESENT:

Jonathan Couchman, Veris Consulting

Emily P. Flinn, Veris Consulting

Robert Sweeney, ABZ, Inc.


©2007

A Accounting.

Q And you are currently a certified public accountant?

A Yes.

Q Do you hold any other degrees or certificates?

A I hold a designation that is known as a Fellow of the Life Management Institute, which is a designation obtained after passing an eight-part series of examinations, in addition to holding the CPA certificate.

Q And what type of examinations did you have to pass to obtain that certification or designation?

A A variety of examinations related to the mathematics, economics, law, and accounting for life insurance and life insurance products.

Q And when did you obtain that designation?

A Approximately 1974ish.

Q Am I correct in stating that you are not a certified forensic accountant?

A That's correct, I don't have that


©2007

designation.

Q And you do not have a designation as a certified fraud examiner?

A I do not.

Q Do you have any legal training?

A I took a couple of business law classes as a part of my undergraduate curriculum, and at the time I took the CPA examination business law was one of the practice areas. With those exceptions, I don't have legal training.

Q Do you consider yourself to be an economist?

A That's a -- that's a term that I think gets thrown around a bit loosely. I -- my undergraduate program included a minor in economics. I think I had probably 24 credits in economics. I -- as a part of the forensic work that I've done for the past several years, I've done a number of analyses that have focused on economic measurements, damage considerations, models of a but-for world and lost profits analyses and those types of things. Some of which, or many

of which some people would consider to be included in the broad discussion or headline of economics.

I do not consider myself an economist in what I consider to be the more strict definition of an economist.

Q Do you have any experience in the operation or maintenance of nuclear power plants?

A No, sir.

Q Do you have any experience in the decommissioning of nuclear power plants?

A No.

Q I take it from your last answer you do not have any experience in the removal or disposal of reactor pressure vessels from shutdown nuclear power plants?

A I have no experience in that operation, no.

Q And I understand from your CV that you're currently Chairman of Veris Consulting?

A Veris, but yes.

Q Veris. Thank you.

How much of your current work at Veris


©2007

the evidentiary and factual support for Dairyland's damage claim?

MR. SHULTIS: Objection. Vague.

THE WITNESS: I was asked to evaluate the support for, assumptions about, and theories fundamental to the claim in all of its aspects to the extent that they were something that was within the scope of my expertise.

BY MR. STERN:

Q Were you asked specifically to opine on whether any amount of Dairyland's damages claim was caused or not caused by the government's partial breach of contract?

MR. SHULTIS: Objection. Asked and answered.

THE WITNESS: A part of the analysis I conducted was to consider and identify to what extent, if any, elements of the claim made by Dairyland represented costs that were incremental, that is, were related to, or wouldn't have been incurred but for the breach, and to the extent that that involves causation, I did it to that extent.

 ©2007

BY MR. STERN:

Q Is that what you're telling me?

MR. SHULTIS: Objection. Mischaracterizes prior testimony, calls for a legal conclusion, and asked and answered.

THE WITNESS: What I'm telling you is my opinion in that case is accurately described at the bottom of 59, continuing over to 60, in which there is determining first, secondly, and thirdly.

That's what I said in that matter, that's what I believed in that matter, and that's what I continue to believe in that matter.

BY MR. STERN:

Q Well, I'm trying to ask you what was the -- because this doesn't really set forth an opinion you would agree, it just describes what you did. I'm trying to understand what was the basis for the opinions that you say are set forth here on pages 59 and 60.

A And my opinions were if the costs -- in order to be included as damages, the costs, one, needed to be incurred; two, needed to be related to

the storage of spent fuel; and, three, the costs would have -- would have not been incurred absent the breach. That's what I concluded. That's what I opined on.

Q And that opinion included the claimed internal labor and overhead cost --

A That including anything --

Q -- that Southern Nuclear was asserting in that case?

MR. SHULTIS: Objection. Asked and answered.

THE WITNESS: That included any aspect of the damages that Southern was claiming that I believe failed to meet those three criteria.

BY MR. STERN:

Q And then on page 60, the indented paragraph here, do you see that?

A Yes.

Q And this purports to be a quote from the TVA case, which is another spent fuel case?

A Yes.

MR. SHULTIS: What page are you on?

it should be included as damages.

MR. STERN: Off the record for a second.

(Discussion off the record)

BY MR. STERN:

Q So in this instance the expertise in which you rely upon is your understanding of what constitutes incremental damages; is that fair?

A Incremental costs, which my opinion is how you measure economic harm in this situation.

Q And was there anything else?

A No. Anything else other than what we've already covered?

Q Right.

A Mr. Brower's opinion, testimony of the witness, and my expertise in evaluating incremental cost.

Q Is there any particular reason why a lawyer, for example, couldn't make the simple determination that you made?

A I don't know how smart you are.

Q Well, assuming I'm of average intelligence, which is debatable I'm sure, is there


©2007

any particular reason that I couldn't read Mr. Brasel's testimony and Mr. Brower's opinion and come to the same conclusion and make a similar deduction?

A Do you believe incremental cost was necessary for damages? If you do, then you would reach the same conclusion.

Q Okay. Now, the $14,148 in charges charged by WPI for other radioactive materials, packaging and disposal, you made that deduction based upon your understanding of Mr. Brasel's testimony; is that right?

A That's correct.

Q And Mr. Brasel testified that this activity involved decommissioning activity; is that right?

A He said it was a decommissioning related project.

Q And I assume your answer with regard to what expertise you relied upon in making this determination that this was an appropriate deduction is what you answered previously regarding

 ©2007

considered them accordingly. I wasn't instructed to do or not do anything with them.

Q But the instances in your report where you've relied in part or in whole on Mr. Brower's opinions, was that based upon an independent assessment as to the correctness of those opinions or was it based upon something else?

A It was based upon the opinions. When Mr. Brewer opines that something was a decommissioning required activity, I -- I neither agreed nor disagreed with the substance of the opinion. Rather, I considered and relied upon it where I've identified.

Q You relied upon it in order to make a determination how much to deduct from Dairyland's damages claim; is that right?

A I relied upon it to consider whether something was an incremental cost, and if not, to measure and adjust damages accordingly.

Q If he said it's a decommissioned related cost, that was all you needed to know in order to determine whether it's not incremental or not?

A That plus the amount of what the cost was.

Q And to do that you presumably looked at Dairyland's data that was provided and made the appropriate deduction?

A Correct.

Q You didn't do anything to independently determine whether or not any particular cost was a decommissioning related cost or not, correct?

A Me, Larry Johnson or --

Q Yes.

A No, I've identified that in two of the three instances there is deposition testimony by Dairyland witnesses that indicates it, and I considered that as well. But I do not have and have not offered the technical opinion that it was something that would have been required as a part of decommissioning activities.

Q The third related WPI activity cost that you deducted was 17,259 that was charged for SNF characterization?

A Yes.

 ©2007

Q And in this instance you relied upon the opinion of Mr. Brewer to make that deduction; is that right?

A I did.

Q And it was Mr. Brewer's opinion that this activity would have been necessary regardless of when the government performed and accepted Dairyland's spent fuel, right?

A Yes, sir.

Q And I take it that the expertise that you rely upon in making this deduction was similar to the expertise you relied upon in making the other WPI related deductions?

A Yes, sir.

Q And did you discuss this specific cost with Mr. Brewer in your one telephone conversation you had with him before you made that deduction?

A I don't recall. I think his report is explicit. I don't recall.

Q You don't recall whether you gleaned it from reading his report or talking about it with him or both?

A Right.

Q Now, other than what Mr. Brewer opined, do you have any other reason or basis for making this deduction?

A No.

Q Let's go to Nukem N-U-K-E-M, it's capital N, Resin Removal and Disposal. And for this activity you deducted $60,000 that was charged by Nukem, the vendor for removal of spent fuel resin?

A Yes, sir.

Q And if I understand your report, the reason you made this deduction, it's because you understood Mr. Christians to have testified that this was a decommissioning related cost, correct?

A That the resin had been accumulating since 1987 and its removal was something that would have been required as part of decommissioning.

Q Other than Mr. Christians' testimony, is there any other basis or reason for your determination that this cost should be deducted?

A I don't think so.

Q And --

testimony and rely upon Mr. Smith's characterization of what he thinks he told Mr. Brasel and what he thinks Mr. Brasel said, it wasn't sworn testimony, that would not be where I would start. But that's what you choose to do. That's apparently what Mr. Smith chose to do.

Q Well, what expertise do you rely upon to determine which one is right? Do you have any basis to determine one way or the other?

A I start with the notion that Mr. Brasel has given sworn testimony that contradicts what Mr. Smith has done and perhaps contradicts what Mr. Smith said Mr. Brasel told him. I would defer to the sworn testimony.

I would, at a minimum, seek to resolve it before I asserted a cost that was inconsistent with the sworn testimony of the project manager.

Q And on what expertise do you rely upon to make that judgment in this instance, other than being able to read Mr. Brasel's testimony?

MR. SHULTIS: Objection. Asked and answered.

THE WITNESS: I -- I certainly am not in a position to judge the truthfulness of Mr. Brasel's sworn testimony. I can't rely on expertise. And to my knowledge only God has that expertise.

What I have said is Mr. Brasel has testified about something that is contradictory to one of Mr. Smith's assertions in his but-for world. That's what I've said. I think that's clear, and I think that the evidence confirms that.

BY MR. STERN:

Q Well, why couldn't a nonaccounting expert or damages expert read the same testimony and draw the same conclusion?

A Oh, I think you could.

Q So then what's the basis of having an expert opinion on this topic?

A The nature of the expert opinion is -- speaks to one of six particular criticisms of what Mr. Smith has done and his disregard for actual cost, actual activities, his lack of precision, his lack of formality, his lack of sophistication, the

A Yes.

Q Are there any other examples you're aware of besides that?

A There might be others in Mr. Brewer's report having to do with various issues related to the removal through the top of the reactor building, but that's -- that's stuff as to which I don't have an independent opinion.

Q And my next question was, is this opinion here based solely upon Mr. Brewer's opinion?

A It is.

Q Do you know whether or not the bioshield wall would have to be removed as part of the RPV removal process if the RPV is removed from the top of the reactor building?

A Of my own knowledge and expertise?

Q Yes.

A I do not.

MR. STERN: We can take a break right now.

(Brief recess)

MR. SHULTIS: Kevin, during the break


©2007

Plant Coalition dues?

A Yes.

Q And this particular invoice is referenced in Footnote 40 of your expert report?

A Yes.

Q And is the basis for your opinion that these dues are not necessary costs for the storage of spent fuel based upon your review of this document here?

A Yes.

Q Anything else?

A There are other dues invoices. I'd have to look at each one of those specifically. I certainly looked at this one. I don't recall which others, if any, I looked at and what they said. The "they said" being the invoice itself.

Q Well, then other than this invoice and perhaps some other similar invoices, is there any other evidence or information you relied upon that formed the basis for your opinion that these costs are not a necessary cost for the storage of spent fuel?


©2007

A Other than what the invoices describe as what they're getting for their dues, no.

Q And other than your review of these invoices, do you have any basis to believe that Dairyland would have joined the Decommissioning Plant Coalition starting in 2003 had the government removed all of its spent fuel in 1998?

A You asked me that question and I said I don't know but that it appeared to me that the advice and representation being given was not related to spent fuel but to decommissioning issues. But I don't have knowledge of what they would have done.

Q Wouldn't you agree that because the government hasn't removed any spent fuel from any decommissioning plant or plant attempting to decommission, that spent fuel issues would be one of those issues that this organization would be involved in?

A I don't know.

Q You don't know one way or the other?

A It's not mentioned what the advice and


©2007

representation was going to be, so I don't know.

Q Did you review any deposition testimony that you recall that discussed or described what the Decommissioning Plant Coalition does on behalf of Dairyland?

A I don't recall that, no.

Q Would it be important to you in forming your opinion to read whatever testimony is available regarding that issue -- on this issue?

A I looked at what I believe was sufficient evidence to support the conclusion I reached.

Q And that's the invoices, right?

A Yes, sir.

Q Now, on Mr. Barrett's cost do you have any reason to believe that Dairyland would have hired Lake Barrett as a consultant in 2003 if the government had removed Dairyland's spent fuel in 1998?

A Again, I -- all I know is I looked at the contract and the services relate to nuclear fuel policies and general federal activities. I don't know what they would have done in the -- in a

so-called but-for world, but I don't see attribution in this contract to spent fuel or to the government's breach.

Q But it does state that he's been employed to provide advice to Dairyland regarding nuclear fuel related policies and business issues, doesn't it?

A It says that, yes, sir.

Q And general federal activities in the related areas, right?

A Yes, sir, it does.

Q You don't believe that refers at all to Dairyland spent fuel issues?

A It might include it. It certainly isn't limited to it.

Q So it's your opinion that if Dairyland may have hired Lake Barrett to provide consulting or advice on other issues unrelated to the removal of spent fuel, then it should not be able to recover these costs as damages?

A It's not just that. It's that this is not a cost that was necessary to the storage of


©2007

spent fuel, in addition to they might have hired him anyway.

Q But would you agree that this cost is incremental to the government's breach if the evidence is that Dairyland would not have hired Mr. Barrett or employed him had the government performed and removed Dairyland's spent fuel in 1988?

A No.

Q It's not incremental?

A No.

Q Because?

A Because it's not necessarily related to the storage of spent fuel.

Q And, again, you didn't review Mr. Barrett's deposition testimony before rendering this opinion, right?

A I have not.

Q And to this day you haven't read his testimony, right?

A I have not.

Q And you didn't think that was important

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------:
PACIFIC GAS & ELECTRIC COMPANY :
:
Plaintiff, :
:
v. : Case No.:
: 04-074c
UNITED STATES OF AMERICA, :
:
Defendant. :
:
---------------------------------:

ORIGINAL

Washington, D.C.
March 7th, 2006

Deposition of:

LARRY JOHNSON,

called for oral examination by counsel for Plaintiff, pursuant to notice, at the offices of Greenberg Traurig, LLP, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., beginning at 9:50 a.m, before Teague Gibson of Capital Reporting, a Notary Public.

* * * * *

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

JERRY STOUCK, ESQ.
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3173

ON BEHALF OF THE DEFENDANT:

JOHN C. EKMAN, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, D.C., 20530
(202) 353-0897

ALSO PRESENT: Jon Couchman
Lauren Polino
Robert Kapus

expertise to estimate the future loading costs, right, I thought you told me that?

A I believe to the extent it calls upon the same skill set as he used to estimate the cost of the past but for world activity, yes.

Q Why do you believe he would have the expertise to do the estimate because you think it draws on the same skill sets that he has already used to estimate the but for costs?

A That is my reasonable understanding and expectation.

Q Have you added to Mr. Brewer's opinion about but for loading costs except the ability to subtract the 6.4 million dollars from the damages?

A I'm really good at subtraction and I have subtracted it because it's a cost avoided.

Q I thought it's not avoided, it's deferred, some cost is going to be incurred in the future?

A It is a cost through January 2004 which has been avoided.

Q And the fact that some cost for the same activity is going to be incurred in the future, do

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------------------------

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

vs. Case No. 04-0106 C

THE UNITED STATES,

Defendant.

---------------------------------------------------

* * * * * *

DEPOSITION OF MICHAEL A. BRASEL

TAKEN ON THE 13TH DAY OF DECEMBER, 2006

AT THE RADISSON HOTEL LA CROSSE

LA CROSSE, WISCONSIN

9:15 A.M.

* * * * * *

Taken before Lynn M. Ettl, RPR, CRR

www.nwcourtreporters.com

nwcr@nwcourtreporters.com

1-800-628-7551

APPEARANCES:

ROBERT L. SHAPIRO and KEVIN E. STERN, of the firm of GREENBERG TRAURIG, L.L.P., 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C. 20006, appeared representing the Plaintiff.

THOMAS J. ZAREMBA, of the firm of WHEELER, VAN SICKLE & ANDERSON, S.C., AnchorBank Building, 25 West Main Street, Suite 801, Madison, Wisconsin 53703, appeared representing the Plaintiff.

RUSSELL A. SHULTIS and JOHN C. EKMAN, of the U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, Federal Claims Section, 1100 L Street N.W., Washington, D.C. 20530, appeared representing the Defendant.

ALSO PRESENT:

Robert Sweeney, Consultant, c/o ABZ, 4451 Brookfield Corporation Drive, Suite 107, Chantilly, Virginia 20151.

Emily P. Flinn and Jonathan Couchman, Veris Consulting, L.L.C., 11710 Plaza America Drive, Suite 300, Reston, Virginia 20190.

Charles Sans Crainte, Dairyland Power Cooperative.

Q Okay. Now, you mention this hole in the roof possibility, which the NRC didn't like, you said?
A Initially, yes. We presented that idea because that's how most reactor vessels are removed.
Q All right. What would you have had to do again hypothetically if you had been able to take it out through the roof? What -- what would you have needed to do? Let's start with number one. Were there interferences that would need to be removed to lift it up?
A We didn't get into the engineering. It was more of a concept idea, but conceptually, you would have to still remove the shield plugs and then you would have to do something with your crane, because we have a Polar crane, building 50-ton crane.
Q So the Polar crane would be in the way of --
A Yes, it would have to be removed and then probably reinstalled to -- to get out of the way of the removable path if it went through the roof.
Q All right. Now, it would have to be reinstalled if you assume there's spent fuel in the pool, correct?
A No, we would probably still reinstall or -- or

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | ) | Case No. 04-0106C |

**EXPERT WITNESS REPORT**

**OF**

**WARREN K. BREWER**

Warren K Brewer 6/15/07

DXD003 0001

removal was not included because it would be decommissioning work and not RPV removal work.[44]

If the shield wall will be removed in both the actual and but-for worlds, then there would be costs in the but-for world decommissioning that would not be incurred in the (future) actual world decommissioning because it was done as part of the RPV removal. Thus, to provide a true marginal cost comparison, the but-for world costs for removal of part of the shield wall (no matter what the method) should be included in the but-for world estimate. If in the but-for world the wall were to be removed by the same method as in the actual world, then the but-for world costs would be equal to the actual world costs.[45]

5.1.8 Mr. Smith provides inadequate technical justification for structural work related to the but-for world RPV removal.

In Mr. Smith's assumed but-for world, the RPV is removed through the top of the reactor building. To accomplish this, a hole is cut through the top of the building and the water storage tank, which is supported from the inside of the building top.[46]

The cost of this work is included in a single line along with other activities such as on-site handling of the RPV shipping container, which would be common to the actual and but-for worlds. As such, the specific cost and basis for the cost of cutting the holes through the building roof and the tank are not clear. However, when asked whether there would be any need for structural modifications because of removal of part of the water tank, Mr. Smith said no modifications would be needed.[47] His only basis for this was that a 1994 S&L study about the potential method of RPV removal did not state anything about such modifications. Mr. Smith simply accepted the lack of a statement in the S&L report as confirmation that no modification would be needed and he did no additional checking or analysis.[48]

---

44 Deposition of Todd D. Smith, May 22, 2007, 330:14-332:10. Mr. Smith says that while the actual world costs included costs for disposal of the portion of the shield wall that was removed, he did not include these costs because they would occur in both the actual and but-for worlds. Clearly, this indicates that he believes that the shield wall would be removed in both worlds.

Also, the distinction between RPV removal and decommissioning work is somewhat artificial since RPV removal is part of decommissioning.

45 It is possible that the shield wall could be removed some other way in the but-for world that has not been established. Even if the wall were not totally removed, there would need to be costs included for the radiological survey of the wall and any necessary decontamination. In any event, there would be but-for world costs that have not been included in Mr. Smith's but-for world estimate.

46 Expert report of Todd D. Smith, March 23, 2007, page 4. In the second paragraph of section III, Mr. Smith states that a 12 foot diameter hole will be cut through the top of the building and the water storage tank.

47 Deposition of Todd D. Smith, May 22, 2007, 12:16-12:17. Mr. Smith is not an engineer.

48 Deposition of Todd D. Smith, May 22, 2007, 280:12-281:18.