No. 04-106C
Chief Judge Damich

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S *MOTION IN LIMINE* TO EXCLUDE THE TESTIMONY OF IVAN F. STUART

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tele: (202) 305-7571
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

April 29, 2008

Attorneys for Defendant

## TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . iii

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF IVAN F. STUART . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . 4

I. RELEVANT STANDARDS . . . . . . . . . . 4

A. The Court Has The Power And The Duty To Grant Motions In Limine Where Appropriate . . . . . . . . . . 4

B. The Proponent Must Demonstrate And The Court Must Ensure That A Proffered Expert's Opinions Are Both Relevant And Reliable . . . . . . . . 4

C. The Expert's Opinions Must Be Demonstrably Reliable And Supported By Sound Methodology To Be Admissible At Trial . . . . . . . . . . 6

D. The Expert's Opinions Must Be Relevant To Be Admissible At Trial, Meaning They Must Assist The Trier Of Fact In Resolving Issues Actually Before It . . . . . . . . . . 7

II. MR. STUART'S OPINIONS ARE NOT RELEVANT AS THEY CANNOT ASSIST THE COURT IN RESOLVING ANY OF THE ISSUES BEFORE IT . . 8

III. MR. STUART'S OPINIONS ARE NOT RELIABLE . . . . . . . . . . 10

A. Mr. Stuart's Opinions Concerning DOE's Ability To Perform At The 3,000 Rate Commencing In 1998 Are Unsupported And Widely Contradicted . . . . . . . . . . 10

1. Mr. Stuart's Opinions Are Unsupported . . . . . . . . . . 10

2. Mr. Stuart's Opinions Are Contradicted By The Very Documents Upon Which He Purports To Rely, As Well As His Own Testimony . . . . . 13

B. Mr. Stuart's Opinions Concerning Acceptance Campaigns Are At Odds With The Standard Contract . . . . . 16

C. Mr. Stuart Is Not Qualified To Opine On The Subject Of Exchanges . . 18

CONCLUSION . . . . . 20

# TABLE OF AUTHORITIES

## CASES

Baskett v. United States,
2 Cl. Ct. 356, 367-68 (1983) . . . . . . . . . . 4

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) . . . . . . . . . . 5, 6, 7, 8

Domingo v. T.K., M.D.,
289 F.3d 600 (9th Cir. 2002) . . . . . . . . . . 6

Employers Reinsurance Corp. v. Mid-Continent Cas. Co.,
202 F. Supp. 2d 1212 (D. Kan. 2002) . . . . . . . . . . 7

Joy v. Bell Helicopter Textron, Inc.,
999 F.2d 549 (D.C. Cir. 1993) . . . . . . . . . . 5

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) . . . . . . . . . . *passim*

Maine Yankee Atomic Power Co. v. Untied States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . 8

Masters v. Hesston Corp.,
291 F.3d 985 (7th Cir. 2002) . . . . . . . . . . 5, 6

Pacific Gas & Elec. v. United States,
73 Fed. Cl. 333 (2006) . . . . . . . . . . *passim*

Palmerin v. City of Riverside,
794 F.2d 1409 (9th Cir. 1986) . . . . . . . . . . 4

PSEG Nuclear, L.L.C. v. United States,
465 F.3d 1343 (Fed. Cir. 2006) . . . . . . . . . . 8, 10

Ralston v. Smith & Nephew Richards, Inc.,
275 F.3d 965 (10th Cir. 2001) . . . . . . . . . . 5

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005) . . . . . . . . . . 6

Sacramento Municipal Utility v. United States,
No. 98-488C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Summers v. Missouri Pacific R.R. Sys.,
132 F.3d 599 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

White Mountain Apache Tribe of Az. v. United States,
10 Cl. Ct. 115, 116 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Zenith Elec. Corp. v. WH-TV Broad. Corp.,
395 F.3d 416 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**STATUTES AND REGULATIONS**

10 C.F.R. § 961.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

40 C.F.R. 197 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-106C<br>(Chief Judge Damich) |

DEFENDANT'S MOTION *IN LIMINE* TO
EXCLUDE THE TESTIMONY OF IVAN F. STUART

Pursuant to Rule 16 of the Rules of the Court of Federal Claims ("RCFC") and the Court's scheduling order dated February 21, 2008, defendant, the United States, respectfully requests that the Court enter an order to exclude the testimony of plaintiff's proposed expert witness, Ivan F. Stuart, at the upcoming trial in this case.

BACKGROUND

Plaintiff, Dairyland Power Cooperative ("Dairyland") contends that the Department of Energy ("DOE") breached the Standard Contract by failing to commence acceptance of spent nuclear fuel ("SNF") as of January 31, 1998, and that, absent DOE's delay, the Government would have removed all of Dairyland's SNF from its La Crosse Boiling Water Reactor ("LACBWR") no later than the end of 1998. Among Dairyland's claims for damages are costs attributable to the operation and maintenance of the LACBWR wet pool from 1998 through 2006; alleged incremental expenses associated with the removal of the LACBWR reactor pressure vessel; and costs associated with an investment in Private Fuel Storage, LLC, by Genoa Fuel Tech, Inc., Dairyland's for-profit subsidiary. Dairyland's actual entitlement to damages,

however, turns, at least in part, on the question of the rate at which DOE was obligated to accept SNF under the Standard Contract. Dairyland has retained Mr. Stuart to opine on "the ability of DOE to implement a spent fuel acceptance schedule with a reasonable ramp up to 3,000 MTU [metric tons of SNF annually] and that would accommodate swaps of acceptance allocations amongst contracting utilities." A1.[1]

Mr. Stuart intends to offer the following opinions at trial: (1) the acceptance of 3,000 MTU per year by DOE with a reasonable ramp-up beginning in 1998 would have been readily achievable if appropriate planning and preparations had started sufficiently in advance of the January 31, 1998 deadline set forth in the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste ("Standard Contract"), which was executed by all of the SNF plaintiffs and entered into by the parties to this litigation on June 15, 1983; (2) sufficient advance work was clearly possible in view of the large body of experience in the transportation of spent fuel gathered by and/or available to DOE prior and subsequent to 1983; (3) adequate planning and preparations would have ensured the availability of a sufficient number of casks to transport SNF, as well as the availability of a suitable transportation network; (4) this network could have been used for the acceptance of SNF in "campaigns," and it would have been flexible enough to accommodate exchanges of acceptance allocations amongst contracting utilities; and (5) there are no site-specific conditions that would have prevented DOE from utilizing acceptance campaigns to transport spent fuel from LACBWR. Id. at 2.

Not only are Mr. Stuart's opinions wholly irrelevant to the issues before this Court, they lack sufficient support and fail to take into account a myriad of contradictory information.

---

[1] "A ___" refers to the appendix accompanying this motion.

## SUMMARY OF ARGUMENT

Each of the several opinions comprising Mr. Stuart's assessment that DOE could have begun accepting SNF under the Standard Contract in 1998, ramping-up to a 3,000 rate of acceptance within five years, are not relevant to the issues before this Court. The important question of what rate was envisioned under the Standard Contract is a legal one and, to the extent that it requires factual evidence, will be decided by referenced to evidence regarding the actual requirements of the Standard Contract – not after-the-fact testimony about what DOE purportedly should have been able to do, regardless of whether the contract required it. Mr. Stuart's opinion concerning DOE's ability to perform at a given rate simply is not germane to the issue of what rate was actually required under the Standard Contract. Moreover, Mr. Stuart expresses no opinions as to what, if any, damages Dairyland is entitled as a result of the Government's partial breach.

Further, Mr. Stuart consistently failed to employ any testable methodology or to perform any analysis in support of his conclusions. Instead, his opinions derive merely from his general "industry experience." However, the experiences upon which Mr. Stuart relies are drawn from projects that are incomparable to the SNF acceptance program contemplated by the Standard Contract. Moreover, in forming his opinions, Mr. Stuart ignored a great deal of widely available contradictory information, some of which appears in the very documents that he purportedly considered.

Because Mr. Stuart's proffered opinions and testimony are irrelevant and unreliable, they should be excluded from the trial in this case.

# ARGUMENT

## I. RELEVANT STANDARDS

### A. The Court Has The Power And The Duty To Grant Motions In Limine Where Appropriate

Under RCFC 16, a motion *in limine* is a recognized method for obtaining a pretrial order simplifying the issues for trial. White Mountain Apache Tribe of Az. v. United States, 10 Cl. Ct. 115, 116 (1986). Such a motion also is useful to prevent a party from encumbering the trial record with irrelevant, immaterial, or cumulative matters. Baskett v. United States, 2 Cl. Ct. 356, 367-68 (1983); see Palmerin v. City of Riverside, 794 F.2d 1409, 1413 (9th Cir. 1986) (finding motion *in limine* useful to "resolve issues which would otherwise 'clutter up' the trial."). Moreover, the Court has a duty to exclude testimony or evidence in appropriate cases, and it possesses the authority to issue pretrial rulings concerning the admissibility at trial of proposed testimony and documentary evidence. Baskett, 2 Cl. Ct. at 359.

### B. The Proponent Must Demonstrate And The Court Must Ensure That A Proffered Expert's Opinions Are Both Relevant And Reliable

As amended in 2000, Federal Rule of Evidence 702 provides as follows with regard to the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The amended rule affirms the Court's special "gatekeeping obligation" to prevent the introduction of unhelpful and untrustworthy expert testimony. Advisory Committee

Notes, 2000 Amendments, Fed. R. Evid. 702; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569 (D.C. Cir. 1993). The Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire, in response to which Rule 702 was amended, require judges to determine that scientific testimony, as well as technical or other specialized expert testimony, is both relevant and reliable. Masters v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002); see Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002) (observing that courts are obligated to screen expert testimony for both relevance and reliability). The standard articulated in Daubert must be met even in non-jury cases. Seaboard Lumber, 308 F.3d at 1302.

Further, the Supreme Court has specifically rejected the notion that an opponent's ability to present its own expert testimony or to cross-examine its adversary's experts at trial constitutes a sufficient safeguard against the admission of irrelevant or unreliable evidence. Daubert, 509 U.S. at 596; see also Joy, 999 F.2d at 569 (rejecting "'let it all in' philosophy"). To the contrary, Federal courts are required to exercise great care to prevent the admission of flawed expert opinions because Federal Rules of Evidence 702 and 703 grant expert witnesses "testimonial latitude" unavailable to other witnesses based on the assumption that the expert's opinion is reliably based. Kumho Tire, 526 U.S. at 138 (quoting Daubert, 509 U.S. at 592).

Additionally, the party proposing to introduce an expert's testimony bears the burden of establishing the pertinent admissibility requirements by a preponderance of the evidence. Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (citing Bourjaily v. United States, 483 U.S. 171 (1987)); Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir. 2001) (citations omitted)). As to Mr. Stuart's proposed testimony and opinions,

therefore, the burden of meeting the Daubert standard lies squarely upon Dairyland. See Daubert, 509 U.S. at 592 n.10; Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005).

C. The Expert's Opinions Must Be Demonstrably Reliable And Supported By Sound Methodology To Be Admissible At Trial

The trial judge is required not only to determine whether a proffered expert is qualified in his or her field, but also to determine whether the methodology underlying the expert's conclusions is reliable. Masters, 291 F.3d at 991. Federal Rule of Evidence 702 expressly incorporates the Daubert and Kumho Tire standards for the admission of expert testimony. Pursuant to those decisions, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590, 593-94; see Kumho Tire, 526 U.S. at 149-50; Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702. As the Supreme Court explained, expert knowledge connotes more than subjective belief or unsupported speculation. Daubert, 509 U.S. at 590. The reasoning between steps in the expert's theory must be based on objective, verifiable evidence and scientific or other methodology of the kind traditionally employed by experts in the field. E.g., Domingo v. T.K., M.D., 289 F.3d 600, 607 (9th Cir. 2002). In some instances, reliability depends upon the opinion's scientific foundations, while in others the relevant indicia of reliability are focused upon personal knowledge or experience. Kumho Tire, 526 U.S. at 150. In all cases, however, the expert's preparation must be acceptable to others in the field. Id.

The Court in Daubert set forth the following, non-exclusive list of factors for lower courts to consider in determining whether an expert's opinion is reliable: (1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error when applied; and (4) whether the

theory has been generally accepted in the scientific community. Daubert, 509 U.S. at 593-94. Under this standard, an expert may not simply rely upon his or her "expertise" or "industry experience" without offering an acceptable methodology. Zenith Elec. Corp. v. WH-TV Broad. Corp., 395 F.3d 416, 418 (7th Cir. 2005). To do so would amount to reliance upon mere intuition, which the courts may not do. Id. At bottom, "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable." Id. at 419. Utilizing the same data and methods, another person must be able to replicate the expert's results without contradiction. Id.

D. The Expert's Opinions Must Be Relevant To Be Admissible At Trial, Meaning They Must Assist The Trier Of Fact In Resolving Issues Actually Before It

Assuming that an expert is qualified to testify on a matter and that his or her opinions are demonstrably reliable, such testimony still must be relevant. As the Supreme Court has recognized:

> Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. [] The consideration has been aptly described [. . .] as one of "fit."

Daubert, 509 U.S. at 590-91 (citations omitted). Thus, whenever expert testimony is offered, the requisite Daubert inquiry must include an exploration of whether the opinion is relevant and tied to the particular facts of the case at hand. Id. As part of this effort, the court must determine whether the proffered testimony is helpful to the trier of fact in resolving the issues before it. Id. at 591; see also Summers v. Missouri Pacific R.R. Sys., 132 F.3d 599, 603 (10th Cir. 1997) ("helpfulness to the trier of fact[] evaluates relevancy."); Employers Reinsurance Corp. v. Mid-Continent Cas. Co., 202 F. Supp. 2d 1212, 1215 (D. Kan. 2002) ("[t]he touchstone of Rule 702 is

helpfulness of the expert testimony [to the trier of fact], a condition that goes primarily to relevance"). Expert testimony that does not relate to any issue in the case is not relevant and, as a result, not helpful. Daubert, 509 U.S. at 590-91.

## II. MR. STUART'S OPINIONS ARE NOT RELEVANT AS THEY CANNOT ASSIST THE COURT IN RESOLVING ANY OF THE ISSUES BEFORE IT

With regard to the first prong of the Daubert inquiry, Mr. Stuart's testimony concerning DOE's ability to perform at a given rate under the Standard Contract is not relevant because that subject is not at issue in this case. At the heart of the case is an important question: at what rate was the Government obligated to accept SNF from the nuclear utilities. Dairyland theorizes that, following a five-year ramp-up, the Government would have accepted from the industry 3,000 MTUs of spent fuel per year. Under this rate, and in conjunction with certain unspecified exchanges of acceptance allocations belonging to other utilities, Dairyland postulates that DOE would have removed all SNF from its facility by the end of 1998. In contrast, the Government maintains that, under the 900 MTU acceptance rate, as mandated in the 1991 Annual Capacity Report issued under the Standard Contract, Dairyland would have been responsible for storing SNF on-site beyond the 2006 damages cut-off in this case.[2]

As the United States Court of Appeals for the Federal Circuit recognized in another SNF case, any issue related to the types of damages permitted under the Standard contract, if any, "and the extent of those damages can be resolved by solely resolving the DOE's contractual obligations." PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343, 1351 (Fed. Cir. 2006) (emphasis added). Likewise, as the Court has further explained, "[t]he impact of DOE's breach

---

[2] The critical issue of what rate was prescribed by the Standard Contract is currently on appeal.

is dependent upon . . . the scope of DOE's performance obligation under the standard contract generally, and the parties' contract specifically . . . ." Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 339, 435-36 (2006) (emphasis added). Moreover, "[o]nly by determining the scope of defendant's performance obligation can the court adequately determine which losses claimed by plaintiff are 'the natural and proximate result' of defendant's failure to begin accepting spent fuel from utilities by January 31, 1998." Id. at 375 n.38.

It is axiomatic that, under FRE 702, as well as Daubert and its progeny, the Court may only admit expert testimony that is relevant to determine a fact in issue. See Daubert, 509 U.S. at 590-91. Yet, Mr. Stuart's opinions are not contingent upon whether DOE was contractually obligated to achieve any particular rate of acceptance. Id. at 32 (Tr. 92:11-24). Indeed, he did not analyze what rate was prescribed by the Standard Contract – he merely assumed the applicability of a 3,000 rate at the instruction of counsel. Id. at 32 (Tr. 92:11-24), 34 (Tr. 98:19-20). Hence, his testimony cannot assist the Court in resolving the principal damages issue in this case. Moreover, Mr. Stuart offers no opinions relating to any of the other issues actually before the Court. These include the amount of damages allegedly attributable to Dairyland's operation and maintenance of the LACBWR wet pool from 1998 through 2006; the propriety of damages associated with the removal of the LACBWR reactor pressure vessel; and whether Dairyland can recover costs associated with an investment in Private Fuel Storage, LLC, by Genoa Fuel Tech, Inc., Dairyland's for-profit subsidiary.

Simply put, Mr. Stuart is offering an opinion as to what he believes the Government could have achieved, as opposed to what it was required to achieve. By ignoring the contract's fundamental requirements, however, such as DOE's obligation to issue an annual acceptance

priority ranking beginning on April 1, 1991 (see 10 C.F.R. 961.11, Art. IV.B.5(a)), in conjunction with the issuance of the annual capacity report beginning in 1987 (see 10 C.F.R. 961.11, Art. IV.B.5(b)), which form the only basis for evaluating the Government's contract liability (see PSEG Nuclear, 465 F.3d at 1351; Pacific Gas & Elec., 73 Fed. Cl. at 387 (holding that insertion of 3,000 MTU rate into Standard Contract would render ACR process "inexplicable, inoperative . . ., insignificant, meaningless, [or] superfluous")), Mr. Stuart's analysis is of no consequence to the issues before this Court.

Because Mr. Stuart's opinions cannot assist the Court in resolving any of the issues before it, allowing him to testify would only permit the introduction of irrelevant evidence and unnecessarily occupy additional time and resources at trial.

## III. MR. STUART'S OPINIONS ARE NOT RELIABLE

### A. Mr. Stuart's Opinions Concerning DOE's Ability To Perform At The 3,000 Rate Commencing In 1998 Are Unsupported And Widely Contradicted

#### 1. Mr. Stuart's Opinions Are Unsupported

Mr. Stuart's opinions concerning the achievability by DOE of a 3,000 MTU rate of acceptance after a ramp-up beginning in 1998 are unsupported and ignore a wealth of contrary evidence. Mr. Stuart concludes that "[t]he acceptance of 3,000 MTU per year by DOE with a reasonable ramp up beginning in 1998 would have been readily achievable if appropriate planning and preparations had started sufficiently in advance of the January 31, 1998 deadline set by the [Dairyland] contract and the Standard Contract." A2 (emphasis added). He further opines that such preparations were "clearly possible"; that adequate planning would have ensured the availability of sufficient casks for transportation of Dairyland's SNF; that "acceptance campaigns" could have accommodated exchanges of acceptance allocations between Dairyland

and other nuclear utilities, thereby facilitating performance beginning in 1998; and that LACBWR site conditions did not preclude the utilization of such campaigns. Id. Collectively, Mr. Stuart's opinions evidence his overarching assessment: the Government readily could have performed under the Standard Contract beginning in 1998 had it simply done a better job planning and preparing to meet its contractual commitments.

In conjunction with developing his opinions in this case, Mr. Stuart never spoke with anyone at DOE, or within any department of the Government, to determine what specific activities DOE undertook to plan and perform under the Standard Contract. Id. at 9, 22. Nor did he prepare any analysis of these efforts by the Government. As a result, Mr. Stuart does not know what DOE's planning and preparations actually entailed. When asked at deposition in this case why he thought DOE had failed to begin accepting SNF in 1998, he responded "I don't really know the answer to that question[,]" id. at 38 (Tr. 116:13-14), and "I can't give you a reason why that hasn't happened." Id. (Tr. 117:3-4). Absent any understanding of DOE's planning and preparations in relation to the Standard Contract, or any knowledge of the actual reasons why DOE failed to begin accepting SNF in 1998, Mr. Stuart can hardly offer a reliable critique of DOE's planning and preparations. See Zenith Elec., 395 F.3d at 418 (condemning proffered expert opinion derived from "experience" and "intuition" but devoid of supporting methodology).

Moreover, in defining "appropriate" planning and preparations, Mr. Stuart focused exclusively on issues relating to technical feasibility, such as hiring and training personnel, procuring casks for transportation and storage, and assembling transportation and other physical resources. A37 (Tr. 110:22-112:23). Mr. Stuart also estimated that, with approximately five to

seven years of advance planning, DOE could have accomplished the tasks necessary to commence acceptance of Dairyland's and other utilities' SNF beginning in 1998. Id. (Tr. 113:4-5). Yet, he conceded that the quantification of this planning window was not subject to "a great deal of certainty," and that "it's quite dependent on resources." Id. (Tr. 112:8-9, 25, 113:1).

More significantly, Mr. Stuart performed no analysis to reach his conclusion. Instead, he relied exclusively upon a handful of personal industry experiences that were all markedly different from the program contemplated and governed by the Standard Contract. Among those experiences, Mr. Stuart pointed enthusiastically to Europe's history transporting SNF, which he considers "enlightening." Id. at 3, 33 (Tr. 94:19-23), 37 (Tr. 113:7). His premise is simple: "They've found the staff, they've found the number of casks, and they have operated it on a very long-term basis." Id. at 37 (Tr. 113:8-10). His premise also is superficial.

The Standard Contract's peculiar constraints do not apply in Europe, and Mr. Stuart performed no analysis of the political issues surrounding the transportation of SNF in European countries. Id. at 33 (Tr. 94:14), 65 (Tr. 806:8). Moreover, as Mr. Stuart conceded at trial in Pacific Gas & Elec. v. United States, No. 04-74C, France did not accept 3,000 MTU per year of SNF from its nuclear reactors until approximately 36 years after it began accepting spent fuel. Id. at 67 (Tr. 813:4). France and the United Kingdom together did not accept this much SNF for 24 years. Id. (Tr. 813:16). No entity or Government organization in the United States has ever transported so much SNF in a single calendar year. Id. (Tr. 814:22). Accordingly, the European SNF experience does not support Mr. Stuart's casual assessment that DOE could have accepted 3,000 MTU per year of SNF from this nation's nuclear utilities within five years of 1998.

In forming his opinions, Mr. Stuart also considered the transportation of SNF from research reactors, as well as movements of SNF by the United States Navy. Id. at 7, 31 (Tr. 76:3-77:23), 41 (Tr. 148:10-18), 42 (Tr. 171:11-172:9). These experiences, however, do not provide reliable bases for comparison. As Mr. Stuart admitted, the fuel used to power research reactors is much smaller and lighter than commercial reactor fuel, and research reactors contain far less fuel than their commercial counterparts. Id. at 31 (Tr. 77:1-13), 35 (Tr. 105:7-19). He further has admitted that, between the time the Navy began transporting SNF and when it is to stop doing so in 2035, projections indicate that it will have moved only about 65 metric tons, a small percentage of that which DOE is to transport to Yucca Mountain. Id. at 67 (Tr. 815:3-11).

Further, not only is Mr. Stuart's oversimplified assessment of DOE's ability to perform in 1998, reaching the 3,000 rate shortly thereafter, unsupported by appropriate methodology or analysis, he neglects to account for the many substantial impediments to performance faced by DOE beyond mere issues of technical feasibility, staffing, and transportation resources. Among these are shifting legislative and administration directives, scientific obstacles, public opposition, legal challenges, and lack of funding.

2. Mr. Stuart's Opinions Are Contradicted By The Very Documents Upon Which He Purports To Rely, As Well As His Own Testimony

The documents considered by Mr. Stuart in forming his opinions in this case, as well as his own prior testimony, contradict his blithe assessment that, with better planning and preparation, DOE could have achieved performance at the 3,000 MTU rate commencing after a five-year ramp-up beginning in 1998. In fact, these materials demonstrate that numerous obstacles well beyond DOE's control contributed to its failure to begin accepting SNF in 1998.

For instance, a 2006 publication by the National Research Council's Committee on Transportation of Radioactive Waste, which Mr. Stuart claims to have considered, expressly recognized that siting a Federal repository for nuclear waste "turned to be a more arduous process than envisaged by Congress when the [Nuclear Waste Policy] Act was passed [in 1982]." A55. Shortly after enactment of the NWPA, the Office of the Nuclear Waste Negotiator reported to Congress that it had been unable to identify a viable candidate site for the acceptance of SNF beginning in 1998. Id. at 61 (Tr. 659:2-8). Further, the Committee recognized that, in 1987, Congress restricted DOE's geographic options by amending the NWPA so as to terminate site characterization activities at all locations other than Yucca Mountain, Nevada. Id. at 55. As of 1998, the date established for the commencement of performance by DOE under the Standard Contract, scientific site characterization efforts had yet to confirm the viability of the nation's sole potential SNF repository as mandated by Congress. Id.

In July 2002, four years after the Standard Contract's acceptance deadline had passed, Congress finally authorized DOE to submit a license application to the United States Nuclear Regulatory Commission ("NRC") for the construction and operation of the Yucca Mountain repository. Id. Congress did so over the longstanding objections of the state of Nevada. Id. DOE planned to submit its license application in 2004. Id. However, in that year the United States Court of Appeals for the District of Columbia Circuit struck down a portion of the Environmental Protection Agency's ("EPA") health and safety standards relating to Yucca Mountain, 40 C.F.R. 197. This Court action required re-issuance by the EPA of a remanded environmental standard before DOE even could submit its license application to the NRC. Id.

Another document considered by Mr. Stuart, a 2001 appropriations report by DOE, also demonstrates that scientific site characterization work at Yucca Mountain took far longer than anticipated by Congress. Id. at 49. This report additionally documents the "steady erosion of Administration support for activities associated with the waste acceptance and transportation functions of the Office of Civilian Waste Management." Id. at 53. Moreover, the appropriations report complains that "funding constraints" have hindered DOE's ability to meet its obligations under the Standard Contract. Id.

Mr. Stuart was not ignorant of the appropriations issues plaguing DOE. Both during his deposition in this case and at trial in PG&E, he testified that DOE's lack of funding resulted in the termination of a substantial cask development program intended to facilitate DOE's acceptance of SNF from the utilities in 1998. Id. at 39 (Tr. 120:1-5), 62 (Tr. 688:4-5). Mr. Stuart further testified that "I'm not making any judgments, as we discussed earlier, about whether or not DOE had the money. It clearly would have taken money to do this." Id. at 40 (Tr. 136:2-25).

Finally, in a 1994 speech to the Institute of Nuclear Materials Management, Ivan Selin, Chairman of the United States Nuclear Regulatory Commission, announced as follows:

> The latest effort at Yucca Mountain is progressing but, at best is years from the early phases of licensing, much less the actual underground disposal of spent fuel. A monitored retrievable storage (MRS) facility was expected to start accepting commercial spent fuel beginning in 1998, but no such facility is clearly on the horizon.

Id. at 43. Mr. Stuart considered the written transcript of Mr. Selin's remarks a "prime reading document." Id. at 58 (Tr. 24-25). Moreover, he agreed that the industry held a general belief during the mid-1990s that an interim storage MRS facility might "break the logjam regarding the

acceptance of spent nuclear fuel under the standard contract." Id. at 64 (Tr. 790:2). However, the project did not come to fruition, and Mr. Stuart admitted during his deposition that he did not know why. Id. at 39 (Tr. 121:7).

While Mr. Stuart would have this Court believe that some additional efforts by DOE to hire and train personnel, procure casks, and acquire trucks and railroad cars in the five to seven years before 1998 could have yielded performance by DOE under the Standard Contract at that time, the very documents upon which he relies, as well as his prior testimony, demonstrate that DOE faced far more intractable obstacles to timely performance, none of which Mr. Stuart has accounted for in his analysis.

B. Mr. Stuart's Opinions Concerning Acceptance Campaigns Are At Odds With The Standard Contract

Mr. Stuart's opinions regarding the viability of "acceptance campaigns" to facilitate the removal of Dairyland's SNF are not reliably based and are fatally undermined by the Standard Contract, which prescribes an entirely different and mutually exclusive method of acceptance. Mr. Stuart defines an acceptance campaign as "the movement of spent fuel from one location to another using multiple casks at a time and with the associated personnel and equipment in a repetitive manner." A6. The goal of such a campaign is to achieve operational efficiencies in the transportation of SNF. Id. at 6, 36 (Tr. 107:7-9) ("So show up with as many casks as you can reasonably and take as much fuel as you can at a time. That's the concept.)

To support his campaign theory, Mr. Stuart points to DOE's encouragement of the use of campaigns in other contexts, including the transportation of SNF from foreign nuclear reactors to the United States and for the movement of research reactor fuel. Id. at 7. None of these scenarios, however, were governed by - and similarly constrained by - the Standard Contract,

which obligates DOE to accept the nuclear utilities' SNF, including Dairyland's, on an OFF basis. The relevant contractual provision states:

> Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance . . . .

10 C.F.R. § 961.11, Art. IV B.5.(a) (emphasis added).

Strikingly, Mr. Stuart admitted at deposition that "the OFF schedule's not compatible with campaigns. It would limit [DOE's] ability to have a campaign." Id. at 35 (Tr. 102:18) (emphasis added). Additionally, Mr. Stuart explained that "OFF is inconsistent with my campaign concept" and that adherence by DOE to the contractually mandated OFF schedule "will force you many times to not have campaigns." Id. at 36 (Tr. 107:14-15, 109:11-12) (emphasis added). He also has previously agreed that the OFF schedule applies under the Standard Contract, id. at 72 (Tr. 1416:3), and that the Standard Contract is devoid of even a single reference to the subject of campaigns. Id. at 68 (Tr. 820:7-11), 71 (Tr. 1400:7-13). Mr. Stuart has further conceded that were DOE to accept all of a utility's SNF through the use of a campaign, it is "very likely" that DOE could not accept another utility's oldest fuel first as required under OFF. Id. at 73 (Tr. 1419:4).

Regardless of any efficiencies that Mr. Stuart presumes would accompany his campaign concept, he also admitted at deposition in this case that he was offering no opinions as to whether the Standard Contract requires DOE to accept SNF pursuant to a campaign scheme as opposed to an OFF scenario. Id. at 33 (Tr. 97:4-5). Thus, his opinions, offered from a technical perspective,

do not reach the question of whether the Standard Contract would have allowed DOE to employ acceptance campaigns in lieu of OFF – which it does not.

Moreover, Mr. Stuart admitted that he conducted no analysis whatsoever to quantify whether, had DOE employed acceptance campaigns in violation of the Standard Contract, these campaigns would have resulted in any actual efficiencies over acceptance based on the OFF schedule. Id. (Tr. 96:7-17). For this conclusion, he relied solely upon his "experience." Id. (Tr. 96:12). Such experiential guesswork does not provide a testable methodology as required to support Mr. Stuart's opinions regarding acceptance campaigns. See Zenith Elec., 395 F.3d at 418.

The Standard Contract requires DOE to accept SNF on the basis of OFF. Mr. Stuart admits that his campaign concept is "not compatible" and "inconsistent" with this contractually prescribed schedule. He further admits that he performed no analysis to determine whether the use of acceptance campaigns by DOE would have resulted in any actual performance efficiencies. Accordingly, Mr. Stuart's opinions regarding DOE's ability to have utilized acceptance campaigns conflict with the Standard Contract and are without reliable bases.

C. Mr. Stuart Is Not Qualified To Opine On The Subject Of Exchanges

Mr. Stuart is not qualified to opine on the subject of exchanges. In presenting his opinions about DOE's ability to perform at the 3,000 MTU rate after a ramp-up commencing in 1998, Mr. Stuart summarily concludes that the use of acceptance campaigns by DOE also would have accommodated exchanges, or "swaps," of SNF from other nuclear utilities. A2, 8-9. His conclusion is unfounded.

During his deposition, Mr. Stuart provided no methodology to support his assertion, and he offered no facts to justify it. To the contrary, Mr. Stuart agreed that he was offering no opinion as to how exchanges would have worked had DOE commenced performance in 1998, no opinion regarding the costs of an exchange, and no opinion as to the likelihood of whether any utility would have agreed to exchange its DCS allocations with Dairyland, thereby allowing Dairyland to advance before it in the SNF acceptance queue. Id. at 33 (Tr. 33:9-17).

That Mr. Stuart declined to opine on these issues stands to reason. He has no experience with the subject of exchanges, and he has previously conceded that he never personally engaged in any exchanges of slots for the acceptance of SNF, he never modeled an exchange, he never conducted a uranium exchange, and he never testified as an expert with respect to exchanges.[3] Id. at 69 (Tr. 830:8-22), 73 (Tr. 1419:12-1421:7).

Even Dairyland recognizes that Mr. Stuart is not qualified to provide expert testimony concerning exchanges. It named Frank Graves, not Mr. Stuart, as its expert on this subject even though this Court has previously excluded Mr. Graves's testimony as overly speculative. Pacific Gas & Elec., 73 Fed. Cl. at 435-36. Moreover, while Mr. Stuart could have elected to rely upon Mr. Graves's opinions regarding exchanges as support for his own theories, Mr. Stuart failed to do so. Instead, as he conceded at deposition, he had neither seen nor considered Mr. Graves's report when he prepared his own, nor had he spoken with Mr. Graves about this case. A30 (Tr. 56:21-57:13).

[3] At deposition in this case, Mr. Stuart agreed that his background and experience had not changed since he testified in Sacramento Municipal Utility v. United States, No. 98-488C, and Pacific Gas & Electric Company v. United States, No. 04-74C. Id. at 28 (Tr. 18:10-12), 28-29 (Tr. 21:23-22:3).

Because Mr. Stuart is not qualified to opine on the subject of exchanges, and because his exchange-related assertions are without support, the Court should prohibit Mr. Stuart from testifying about exchanges.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court exclude the expert report and testimony of Ivan F. Stuart.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell A. Shultis by s/Scott Slater
RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

April 29, 2008