IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Case No. 04-106C (Chief Judge Damich)

DAIRYLAND POWER COOPERATIVE, )
Plaintiff, )
v. )
UNITED STATES, )
Defendant. )
)

DEPOSITION OF IVAN STUART

Thursday, May 24, 2007

Washington, D.C.

Reported by: Mary Ann Payonk, CRR-RDR

Certified Realtime Reporter

~~Job No. 0705~~

Page 18

Storage Initiative? Is that what you're telling me?
MR. SHAPIRO: Objection, vague.
A Other than what I just answered a moment ago about being anxious to get the fuel off their site, I don't know of any other driving force.
Q Okay. Let's get back to your resume real quickly. Again, you said you don't think that your resume has changed since you submitted it in the Pacific Gas and Electric case, is that correct?
A Yes. There may be a typo or something but certainly not in any significant way that I can think of.
Q Okay. Have you worked on any projects -- why don't I back up? What projects have you worked on since you testified in the Pacific Gas and Electric case in June of 2006?
MR. SHAPIRO: Objection, vague.
A I worked on the preparation of a proposal to the Department of Energy to do a specific review of the Yucca Mountain license application.
Q Okay. And when was that?
A It occurred from about September of 2006 until very early this year, January, February.
Q Okay. And you said to do a specific review of the Yucca Mountain license application.

Page 19

Could you explain what that review entailed?
A I -- I didn't see a very detailed specification from the department so I can't tell you in total, but I do know that the part that I was being considered for by another company was to review the compatibility of the application with the NRC's rules and regulations and guidance.
Q And what other company was it that you were just referring to?
A It was a company located in Denver, Colorado. The name of the gentleman I dealt with all the time was Dr. Bickell. I think he spelled it B-I-C-K-E-L-L. John Bickell.
Q Okay.
A He had a sort of a catchy name for the company, but it doesn't come to mind at the moment.
Q Okay. If you think of it later, you can tell me.
A All right.
Q What happened with that proposal?
A It was not accepted by the department, and I understand another company has been awarded the contract.
Q All right. Who is that?
A Can't say I remember the name. I do

Page 20

remember the name of one of the gentlemen who was a part of that company whose name is Brian Grimes. He's a former NRC individual.
Q Okay. Any other projects that you've worked on?
A Depending on definition of "projects," I worked with a former associate at NAC who now consults privately. He's in Atlanta, and he asked me to prepare some materials that could go onto a website that he's developing that would serve as a marketing tool for selling his services and my services and some other people who work with him.
Q Okay. And who is that?
A His name is Nigel Mote, M-O-T-E.
Q Okay. And I take it that that -- so you did work with him on that project, and that's actually happened. That wasn't a proposal?
A That's a case where he's developing a website, material I gave him, I'm sure, although I haven't seen it yet, is on the website. So in that sense, it's not something that you reach a final point that you know you have a project or you're not. It's something he's developing.
Q So are you still working with him on that matter?

Page 21

A Yes, in the sense that I haven't terminated relationship. We have a longstanding relationship and whenever he has any needs for advice and counsel, he calls me and we decide what work I can do or what advice I can give him.
Q Okay. Is there anything else that you've done since 2006?
A No.
Q Okay. Is there anything in particular, you know, that you've worked on since 2006 that you feel is particularly applicable to the Dairyland Power Cooperative situation?
MR. SHAPIRO: Objection, vague.
A Nothing that I would single out as being specific to Dairyland. Just the material I've talked about so far this morning. I consider that generally applicable to the area that I usually am asked to do some consulting on.
Q Okay. Now, you've previously testified in the Yankee cases, the Sacramento Municipal Utility District case, and the Pacific Gas and Electric case, correct?
A Yes.
Q Is there any reason that I can't rely on what you've told us before in those cases about your

background?
A Nothing that comes to mind at the moment. I don't think there's been any changes --
Q Okay.
A -- in each of those cases relative to what we're talking about today.
Q Okay. Now, have you testified in any non-spent nuclear fuel cases? In other words, have you testified in any cases aside from the Yankees? And is it okay if I refer to the Sacramento Municipal Utility District case as SMUD?
A Yes. Everybody does.
Q Yeah. Instead of saying Pacific Gas & Electric, is it okay if I say PG&E?
A Yes, that's fine.
Q Okay. So aside from the Yankee cases, SMUD and PG&E, have you testified in any other cases?
A Are you including in that question all of my lifetime?
Q Yes.
A Are you including in that all of the license applications that the utilities have initiated that involved testimony before the ACRS, before the NRC, and --



Q Yes, I am.
A -- ASLBs? All of that?
Q Yes.
A I think it would -- the answer to your question's yes, I have.
Q Okay. So you have -- the Yankees, SMUD and PG&E are the only lawsuits that you've testified in, is that fair to say?
A No.
Q Okay. What other lawsuits have you testified in?
A During my years at General Electric, there was occasions when the utilities filed lawsuits against General Electric, and I was a witness in some of those cases.
Q Okay. And what sort of testimony did you provide to General Electric on behalf of General Electric?
A It was testimony relative to licensing material that had been submitted for various utility applicants. Generally, it was related to testing, engineering testing, I mean, on containment design for the power plants.
Q So were utilities suing GE in those cases?
A Yes.



Q Okay. Which utilities?
A I'd be hesitant to try to name them at the moment without a little bit of reflection.
Q Well, if you recall them later, will you let me know?
A Yes, but I'm -- unless you're specifically asking me to make a list, I probably won't think about it again because that was some 20, 30 years ago.
Q Okay. Well, let me put it to you this way: It did not involve either -- it didn't involve Dairyland, did it?
A Dairyland has a power plant that was not built by GE.
Q Right.
A So I can tell you, it wasn't Dairyland.
Q Okay. And just with regard to the regulatory matters that you were -- is it fair to say that the other testimony that you've provided have been in regulatory matters?
A Yes.
Q Okay. And so were they also license applications, things like that?
A Yes.
Q And were you testifying on behalf of --



and when I say "NAC," that's National Assurance Corporation, is that correct?
A The company started calling themselves Nuclear Assurance Corporation.
Q Okay.
A Which is where NAC came from.
Q Okay.
A Today, they call themselves NAC International, where "NAC" doesn't have a specific meaning as it used to have. It's like General Electric and GE.
Q Right.
A GE's now GE, not General Electric, but everybody knows it as General Electric.
Q So did you provide that testimony on behalf of NAC International?
A As you can see from my resume, I spent some years as a licensing manager at GE, so a great deal of the licensing testimony that I did was with GE.
Q Okay.
A And then when I was at NAC, I was also responsible for licensing. But I don't actually specifically recall an occasion when I testified on any cases for NAC.

identification.
Q Would that include which assemblies were intact?
MR. SHAPIRO: Objection, vague.
A I think that may be an oversight, if you will, in the contract, that there is talk about failed fuel but not talk about -- talking about nonfailed fuel. So I know that from the NRC's point of view, you have to identify which is intact and which is failed if you're going to put the fuel into a cask. But I'm not clear on what the DOE wants in that regard in terms of what your question was about identifying fuel that's intact.
Q Okay. Would it be -- well, so assuming that DOE followed the NRC's point of view, I take it that then they should know about the condition of the fuel. Is that what you're saying?
MR. SHAPIRO: Objection, vague.
A I didn't like your characterization of the NRC's point of view. It's a mandatory requirement on the part of NRC, it's not just a view that they have. But I think it's an obligation on the part of the department to know which fuel is failed and to know what the NRC's requirements are if they're going to take the fuel.



Q Okay. Well, I used the NRC's view because you used it. I was trying to follow your terms.
A Well, just as long as we're clear when you're asking the question. I don't treat it as a view, I treat it as a requirement.
Q Okay. Well, whatever it is that you think it is, I'm following, okay?
A That's fine with me.
Q Okay. Now, we got started on this because you have met with Mr. Shapiro, I guess it was yesterday, and you had talked over this discussion on the opinion that you had regarding Appendix E versus what position Mr. Stouck and apparently Mr. Shapiro held regarding opinion E. Do you recall that?
A Yes.
Q Does Mr. Stouck share your opinion today? Your -- I guess really what I want to know is at the end of the day, did you adopt Mr. Stouck's and Mr. Shapiro's opinion of -- regarding Appendix E and failed fuel and standard fuel?
MR. SHAPIRO: Objection, vague, compound.
A Your question is fairly broad in the sense of Appendix E and failed fuel and so forth. The subject was the very narrow subject of is failed



fuel nonstandard.
Q Uh-huh.
A To which I previously held the opinion yes, it was, because it seemed to me that's what the contract was saying. At the end of the day, as you characterize it, I was adopting the position that Mr. Shapiro and Mr. Stouck had that failed fuel could be standard fuel. It wasn't excluded.
(Recess taken from 10:18 to 10:25)
Q Mr. Stuart, have you communicated with any of the other experts who have offered opinions on behalf of Dairyland in this case?
A I'm actually not aware of who the experts are or will be on this project.
Q Have you spoken to a gentleman named Charles Wilkins?
A No.
Q What about Todd Smith?
A No.
Q Okay. What about Frank Graves?
A I know Frank from before, but I haven't talked to him on this particular case.
Q And when you say "from before," you're referring to a PG&E case?
A Actually, Yankee case.



Q Did you rely on -- well, since you haven't -- did you rely on any of those reports for yours, for your analysis?
MR. SHAPIRO: Objection, vague.
A Any of what reports?
Q The reports from the other -- you haven't met with the other expert so I assume you didn't rely on them for anything in forming your opinion.
A Well, as I said, I don't know who the experts are in this case so I haven't talked to anybody that I know's an expert so I haven't relied on anything someone who may turn out to be an expert has said in this case.
Q Okay. Did you have any assistance writing your report?
MR. SHAPIRO: Objection, vague.
A No.
Q Just so I'm clear on that, the assistance I'm talking about is pretty broad so you -- you wrote, literally typed your report yourself?
A The report has several parts in it. They're in my computer. I've extracted them from documents from time to time and I assembled all that and I sent it to Mr. Shapiro, and his firm prepared the report in whatever form it came to you, which if

slightly different way.
Q Mr. Stuart, have you ever designed a failed fuel can?
MR. SHAPIRO: Objection, vague.
A I was the vice president of engineering at NAC.
Q Uh-huh.
A My staff designed many failed fuel cans. I wouldn't characterize that as me designing it.
Q Uh-huh.
A I didn't do the engineering calculations, but it was done under my supervision and it had to be approved by the NRC; therefore, the licensing documents that I was responsible for had to go to the NRC. So I was intimately involved in the design in that sense, but I wouldn't classify myself as the designer. Is that clear, or is it --
Q No, that's clear. I get it. How long did it take to design a failed fuel can? And just so that I'm clear, I'm talking about through the NRC approval process.
A All the way from a blank piece of paper to the NRC approval?
Q Yes.
A Of course, that was highly dependent upon



NRC's availability, but many times, we were able to get a priority treatment because they knew it was something that was going to happen fairly soon. So I would say a typical time might be in the neighborhood of a month.
Q Okay. Have you ever been involved in loading a can with failed fuel?
A Involved again means that I actually pick it up and put it in the can? Or does it mean I was responsible as a manager for the people who were doing it?
Q Responsible as a manager for the people who were doing it.
A Yes, I was that.
Q Okay. When was that?
A All during the time I was at NAC, which was 1990 to 1998, I had responsibility for people who were loading fuel, failed fuel into canisters.
Q Okay.
A To cans. Excuse me.
Q Okay. Were you present when that was done?
A I was present in one occasion because it happened to be in a -- done in Atlanta, which is fairly close to my office. So in that case, I was



present.
Q Okay. And when was that case?
A And that was a case where we were taking the spent fuel out of the Georgia Tech research reactor prior to the Olympics being held in Atlanta, which I think was 1996.
Q Uh-huh.
A So NAC had the contract to take that fuel and take it to Savannah River, so I was -- I went down there to observe it one day.
Q Okay. Took one day?
A For the entire project?
Q Yes.
A I believe it was actually two days.
Q Okay.
A But I was there for part of a day.
Q Okay. And what kind of reactor was that at Georgia Tech?
A That was a research reactor.
Q Okay. And did they have failed fuel there?
A Yes.
Q They did? How much?
A In terms of tons or something like that?
Q Well, however you want to quantify it.



A Well, the research reactor fuel is very small and lightweight so it probably was something less than a ton. I mean, it was like a tenth of a ton or something like that.
Q How many assemblies?
A How many total, or how many failed?
Q Both.
A I -- I'm hesitant to give you a number at the moment. We used the truck casks, one of the truck casks, so it probably was in the neighborhood of 20 or 30 assemblies or less.
Q Total?
A Yes. I mean, they're very small.
Q Uh-huh.
A And one or two maybe failed.
Q Okay. And when you say they're very small, that's your -- what are the general dimensions you're talking about?
A They're like 3 foot long and maybe 3 inches wide.
Q Okay.
A They are metallic fuel. They're not in rods like typical commercial fuel.
Q Oh, I see.
A They are sometimes referred to as plate

may not have been done at Maine Yankee, but -- because it had a higher capacity crane, but I think it was done at all of them. The system that we used had the dry transfer concept in it.
Q Do you know whether Dairyland submitted delivery commitment schedules to Department of Energy?
A No, I don't.
Q So it wasn't -- that fact wasn't important to your analysis, then, is that fair?
MR. SHAPIRO: Objection, vague.
A I didn't consider that in my analysis.
Q Okay. Do you know how much spent nuclear fuel would remain at LACBWR today if DOE had begun acceptance in 1998 pursuant to the rates provided in the 1991 annual capacity report?
MR. SHAPIRO: Objection, vague.
A I don't have a number in my head as to what that would be. Given all the assumptions that you were just making, it might be possible to calculate it.
Q Okay. But you didn't do that analysis?
A No.
Q Okay. Are there any statements -- I'd like to talk about your testimony in PG&E if that's



okay.
A All right.
Q Are there any statements that you made either in court or in depositions that you believe were not incorrect in the PG&E case?
MR. SHAPIRO: Objection, vague.
A Did you say that I believe are incorrect?
Q Yeah, that you'd want to change today.
A Don't believe so.
Q Okay. What I'm going to do is I wanted to walk through some of your prior testimony. And I just want to confirm that that testimony is still accurate today, that you still -- is that okay?
A Okay.
Q And so when I'm talking about your opinions, I'm talking about your opinion in this case, in Dairyland, okay? Is that fair?
A Okay. But I thought you just said we were going to talk about PG&E.
Q Well, I'm going to ask you about your testimony in PG&E, and I -- what I want to know is I want to know whether the specific things are different here in Dairyland.
A And you'll make the distinction when we're talking PG&E versus --



Q I will. And if I'm unclear, please let me know.
A Okay.
Q Now, the -- the opinions you've rendered in this case are not conditioned upon whether there's a contractual obligation under the standard contract for the Department of Energy to accept spent nuclear fuel at any particular rate, is that correct?
MR. SHAPIRO: Objection, vague.
A I did not assume any particular rate as I prepared my report.
Q In Dairyland?
A In Dairyland, right.
Q Fair enough.
And your opinions are not conditioned upon whether DOE was obligated to achieve any particular rate or ramp-up, is that correct?
MR. SHAPIRO: Objection, vague.
Q Do you know what I mean by "ramp-up"?
A Yes, I do.
Q Okay.
A Again, I did not assume any such obligation in my analysis.
Q Okay. And in performing your analysis,



you didn't specifically contemplate whether DOE performance began at a multiple retrievable storage facility or a permanent repository, is that correct?
MR. SHAPIRO: Objection, vague.
A That's correct. I did not make any such assumptions.
Q Okay. You didn't perform any analysis as to how DOE planned to commence performance pursuant to the standard contract between 1991 and 1994, is that correct?
MR. SHAPIRO: Objection, vague.
A I -- I did not have any considerations of that in my analysis.
Q Right. Okay. I'm sorry, I might have misspoken, but when I mentioned earlier an MRS, I meant to refer to a multiple retrievable storage facility. Did you understand that?
MR. SHAPIRO: Objection, vague.
SPEAKER: It's monitor.
Q I'm sorry, monitored. That's what I said.
A I understood what you meant, anyway.
Q So --
A When you said MRS, that means something to me.
Q Okay. Now, in your report you look at the

European situation. We'll talk about your report in more depth, but is it fair to say that in your report, you consider or use European experience as a basis for comparison?

MR. SHAPIRO: Objection, vague.

A Yes.

Q Okay. Now, when you looked at the European experience for your report, you did not consider a political issue surrounding the transportation of spent nuclear fuel in Europe and then analyze how those issues might apply in the United States, did you?

MR. SHAPIRO: Objection, vague.

A No, I did not.

Q Okay. And the European experience that you looked at examined the transportation of spent nuclear fuel for reprocessing, not permanent disposal, correct?

A Well, I -- I know that the fuel in the European case was going to reprocessing facilities, but I -- I didn't make any judgments about whether or not that would have made any difference in my analysis.

Q Okay. Fair enough.

A In fact, much of the fuel that went to the



reprocessing facilities hasn't yet been reprocessed. It's just being stored.

Q Right. But it's not -- it's being -- if it's being reprocessed, then does that mean that it's a -- the reprocessing hasn't taken place yet but it's not kept there indefinitely?

MR. SHAPIRO: Objection.

Q Right?

MR. SHAPIRO: Objection, vague.

A Since I haven't been around indefinitely yet, I don't know, but I understand it's going to be there for a while.

Q For a while. But it's going to be returned eventually?

A The concept is that it gets reprocessed and the waste goes back to the utility.

Q Okay. Now, when you offer an opinion about the rate of acceptance that DOE could achieve, you weren't constrained or affected by what happens to the spent nuclear fuel once it's delivered to that destination, correct?

A That was not a consideration of mine.

Q And you have not performed an analysis to determine the relative efficiencies between the campaign scenario and the oldest fuel first concept,



is that correct? Do you know what the oldest fuel first concept is?

MR. SHAPIRO: Objection, vague, compound.

A Yes, I know what the oldest fuel first concept is.

Q Okay.

A Your question was did I compare the efficiency of campaigns with the OFF, as it's called, concept.

Q Right.

A I didn't perform what I would call a specific analysis, but my experience tells me that the efficiency is significantly greater to use campaigns than to use the OFF schedule.

Q Okay. But you didn't actually quantify how much that would be?

A That's correct. I did not.

Q Would it be fair to say that your opinion in this case is that there are no technical impediments to campaigns taking place to remove the spent nuclear fuel from LACBWR?

MR. SHAPIRO: Objection, vague.

A That's correct.

Q Okay. So -- and you're not offering an opinion as to whether DOE is required to accept



spent nuclear fuel from utilities pursuant to a campaigning scheme as opposed to an OFF scenario, right?

A That's correct. I'm not offering any opinions on that.

Q Okay. And you're not offering an opinion as to how exchanges would have worked if DOE had begun performing in 1998?

A That's correct.

Q And you're not offering an opinion as to how much an exchange of acceptance allocations would have cost, is that correct?

A That's correct.

Q Okay. And you're not offering an opinion as to how likely utilities would be to exchange acceptance allocations either, is that correct?

A Yes, it is.

MR. SHULTIS: Why don't we take a quick break? Off the record.

(Recess taken from 11:28 through 11:32)

Q Mr. Stuart, welcome back. I was wondering if you could take a look at your expert report, please --

A Okay.

Q -- marked as Exhibit 1.

Page 98

If you look at the first page of your report, actually about -- in the second paragraph, the second sentence you write: I have been asked to present my opinions on the ability of DOE to implement a spent fuel acceptance schedule with a reasonable ramp-up to 3,000 MTU that would accommodate swaps of acceptance allocations amongst contracting utilities. Do you see that?

A Yes.

Q First of all, who told you to provide that opinion?

A In this particular case, Mr. Shapiro is the person that said basically I'd like you to include that subject, as you have done in other cases.

Q Okay. So the 3,000 MTU rate was an assumption you made?

MR. SHAPIRO: Objection, vague.

A Yes, that's one of the assumptions that I made.

Q What is a reasonable ramp-up?

A If you're starting a program from nothing, not having done it before, as we are talking about in the case of the DOE waste program, it seems to me that as you look at yearly objectives that one item

Page 99

you might first think about is what's the generation rate of the spent fuel so that at least you're keeping up with that and perhaps doing better. And once you've determined that, you determine about what equilibrium level you need to be at, since it's a long-term program. And then you need to think about, well, should I do it gradually and get to that point or should I try to bite the bullet and the first year achieve the equilibrium level.

I think a reasonable ramp-up rate, assuming that you do want to achieve 3,000 per year, which again is reasonable to me because of the generation rate experience, that to do a few hundred to a thousand maybe in the first year and then gradually get up is a reasonable ramp-up rate. It's the sort of ramp-up rate that we were considering at Owl Creek, and I've heard the PFS people speak about the same sort of thing.

I think it's a generally accepted idea that you have to sort of crawl before you walk and walk before you run.

Q Is there any specific period before you get to the equilibrium rate?

A I don't think there's anything cast in stone, so to speak. I think if it's a program as I

Page 100

would characterize this program, to remove certain material at a rate that's somewhat faster than it's been generated, that to get to that point, the equilibrium point, as I characterize it, should be relatively quick. It's not a long-term-type situation, it's something you should do relatively quickly.

Q Relatively being there's not a -- there's just not a specific three- or five- or seven-year period that's -- there's no magic in that number, is there?

MR. SHAPIRO: Objection, vague.

A Oh, no, I don't think there's a magic in it. But when you start talking about not achieving something for, say, seven years, that doesn't sound like it's relatively quickly. If you do it in two years, that's pretty quick. Three years? Probably okay. Seven? Starting to be a long-term program.

Q What rate did you assume for Owl Creek? What rate of acceptance?

A At the equilibrium level?

Q Uh-huh.

A 3,000.

Q Okay. And what ramp-up -- what was the ramp-up period at Owl Creek?

Page 101

A From memory, I believe we said 500, a thousand and 2,000 and then 3,000.

Q But at Owl Creek, the waste was essentially going to be a large-scale ISFSI. It wasn't going into permanent repository, right?

A That's correct. It was an MRS-type thing.

Q Right. What did you assume about swaps?

MR. SHAPIRO: Objection, vague.

Q Do you know what I'm talking about?

A Yes, I know what swaps are. I wouldn't say I assumed anything about swaps other than to, in my view, knowledge that swaps would encourage the efficiency of a program and were certainly compatible with the idea of campaigns as opposed to following the OFF schedule, which seemed to be very inefficient-looking to me.

Q Does your campaign theory depend on swaps?

MR. SHAPIRO: Objection, vague.

A No, it doesn't depend on swaps.

Q How could it be achieved without them?

A I think inherent in your last question and then this one, you're thinking in terms of the alternative is OFF schedule. And I -- you don't have to have swaps in order to pick up the fuel in campaigns. You only have to have it, I guess, is if-

Page 102

you're going to slavishly follow the OFF schedule. Then campaigns would be very, very difficult.

If I look at some of the charts that I've seen that says a site would have something like a half a ton or a tenth of a ton and nothing for a couple more years, it would be very -- very difficult to have campaigns for that kind of a scenario in that site. But if your objective is to have an efficient program, efficient for both sides, the DOE as well as the utility, campaigns are so logical it almost goes without saying.

Our experience at NAC was that the DOE programs that we were involved in insisted on campaigns. And certainly, nobody objected to that.

Q Okay. So is it fair to say that campaigns cannot or do not assume an OFF schedule?

A I guess I would like to say that the OFF schedule's not compatible with campaigns. It would limit their ability to have a campaign.

Q What other alternatives exist under the contract to support campaigns if you don't follow OFF, oldest fuel first?

MR. SHAPIRO: Objection, vague.

A Could I have that question again? Seems like it was compounded double negative or something.

Page 103

Q What alternatives are there under the standard contract which would allow you to do campaigns if you did not follow the oldest fuel first schedule?

MR. SHAPIRO: Objection, vague.

A I'm finding it very difficult to answer your question. If you do not follow the OFF schedule, then seems to me you have great flexibility for campaigns. Now, whether or not that's an alternative under the contract, as you worded the question, I'm not certain. But if you were not to follow the OFF schedule, not be constrained by it, then it seems to me you have all sorts of options to operate with campaigns irrespective of whether or not they're swaps.

Q Do campaigns work if you have a 900 MTU per year equilibrium rate?

MR. SHAPIRO: Objection, vague.

A Yes, campaigns would work then too.

Q Could you explain how?

A A campaign in my view is three, four, maybe five casks sent to a site to pick up fuel. That -- if that's an acceptable definition of a campaign, that's independent of the number of those campaigns you have in the year and therefore

Page 104

independent of the total fuel that you pick up in a year.

So if you told me as the manager of operating this system I only have to achieve 900 per year, that wouldn't make me not have campaigns. If you told me that I had to achieve 3,000 a year, that wouldn't stop me or make me have campaigns.

I would have campaigns anyway, because I would think it's not wise to go to a site more often than you have to. It's disruptive to the utility and the plant, and it's certainly more work for the department to conduct a onesies and twosies, as I call it, rather than do campaigns. So the total amount that you achieve in a year is not related to will campaigns work or won't they work, it only relates to how many you might have.

Q And when you refer to the number of casks for a campaign, does it matter if you're dealing with truck casks or casks -- rail casks?

A Well, we went through this with one of the other cases, and apparently there was some confusion when I was talking about campaigns because in that particular case, we were talking about in terms of tons as opposed to number of casks. I don't think it matters, frankly, whether we're talking about

Page 105

truck casks or large rail casks.

Again, to refer back to the DOE program for research reactors, we've had campaigns there that were as few as three or four casks and as many as 11. When it was all said and done, though, there weren't very many tons taken up because, as we talked about this morning, research reactors have not very many tons of fuel. So it's not -- it's not important whether you took a lot of tons so much as it was you took a lot of casks because you could, for example, unload an entire research reactor with three or four casks.

You can't unload a commercial reactor with any reasonable number of casks. I mean, it would take many, many, many casks. So it's more important that you take the amount of fuel in an efficient way -- my view -- by having a number of casks and not quibble about whether it's a small cask or a big cask that you're talking about. Am I clear?

Q I guess my question is: Is there something about the quantity of fuel that determines whether a campaign -- the quantity of fuel that a utility needs to get rid of that determines the type of campaign or the number of -- I guess I'm a little unclear about that part of your question.

A Of my answer?
Q Yes.
A Well, yeah, that -- that's what I was trying to say. In some of the earlier cases when we were talking about large casks, 10 tons apiece, and I was saying it was in my view four or five casks minimum, so to speak in a campaign -- one's not a campaign. Two is a stretch. Three, four, five, you're now talking about a campaign.
In the context of big casks, that means it's 10, 20, 30, 40 or 50 tons. In terms of -- and so that's an important element for a commercial reactor that normally is discharging something like 30 to 40 tons in a refueling cycle. And so that's okay as a way to describe campaigns and amount of fuel that you're taking from a commercial reactor.
When you go to the research reactor, the three, four, five casks is still important in my view to define a campaign. Unfortunately, you end up with a whole lot less tons. But that doesn't really change the concept.
The idea is get the efficiency of taking the fuel by having several containers, casks. Do the operations of getting the fuel out in one series and don't do it in a onesies and twosies basis



because that's very inefficient. There's so much time wrapped up in doing all the other things to take the fuel and put it in a cask. The putting it in the cask part turns out to be the relatively short part.
Q Uh-huh.
A So show up with as many casks as you can reasonably and take as much fuel as you can at a time. That's the concept.
Q I just want to be clear. Your campaign concept is inconsistent with OFF, isn't that correct?
MR. SHAPIRO: Objection, vague.
A I would say OFF is inconsistent with my campaign concept.
Q Okay, fair enough. But they don't go together?
MR. SHAPIRO: Objection, vague.
A It's not an absolute situation. If you look at any one of the many removal rates that have been published and talked about that supposedly represents the DOE program, at some point in time, you're taking enough fuel that you could do campaigns reasonably. It's -- it's at those early stages that it seems like it's inconsistent.



And then even in the later stages when in some plants you could reasonably do a campaign, there's still others that are not reasonable to do a campaign according to the OFF schedule.
Q Okay.
A So it's not an absolute yes and an absolute no. It's overall, as you look at the program, there always seems to be some plants that are sort of getting the short end of the deal. They -- you can't bring a campaign there if you're going to follow the OFF schedule to the letter. So sometimes you can do a campaign with OFF, sometimes you can't, if you're stuck with OFF. That's what I'm trying to say.
Q Okay. So if you're sticking strictly to OFF, you would basically mess up the campaign concept?
MR. SHAPIRO: Objection, vague.
Q If you're talking about an acceptance schedule that sticks strictly to the oldest fuel first over the, say, the life of the program, that is -- that just is inconsistent with your concept of campaigns?
MR. SHAPIRO: Objection, vague, compound.
A It's only inconsistent in what I was



saying in that from time to time, if you're following OFF, you'll be doing things that are not consistent with a campaign.
It's not that the program can't have campaigns, it's just that from time to time, you will be doing things that in a campaign world will seem silly. You're going to pick up one fuel assembly, for example, or two at a time when you could easily have a campaign and pick up 30 tons. That's what I'm saying. There's -- that's the restraint of following the OFF schedule. It will force you many times to not have campaigns.
Q Okay. Could you go to page 2 of your opinion? Do you see in the about a third of the way down the page underneath, it says "my principal opinions are as follows," then the first sentence: The acceptance of 3,000 MTU per year by DOE with a reasonable ramp-up beginning in 1998 would have been readily achievable if appropriate planning and preparations had started sufficiently in advance of the January 31, 1998, deadline set by the DPC contract and the standard contract. I'm a little confused. When you're referring -- do you see that, sir?
A Yes.

Q Okay. When you're referring to the DPC contract and the standard contract, are there -- are you referring to something other than the contract that Dairyland signed with the Department of Energy for the acceptance of spent nuclear fuel?

A Well, generally when I say "the standard contract," I'm thinking about all of the utilities that have these contracts as it relates to the program. So in this case, I may have been a little redundant, but I was referring to the -- the DPC contract.

Q But it's just the DPC contract is the -- you're still referring to Dairyland's contract with the Department of Energy for the acceptance of their spent nuclear fuel, right?

A Yes, I am.

Q Okay. In this sentence I notice you said that a 3,000 MTU per year rate would have been achievable if appropriate planning and preparations had taken place. Could you define the term "appropriately" as you're using in it that sentence?

A To start a program like this, there are many things that you have to think about. Obviously, you need the staff to operate the program.



Q Uh-huh.

A So you need to hire them and train them. You need the casks, so you need to purchase them or arrange to have them available if you're going to lease them. Likewise, the railcars that go with the casks. So all of that has to be accomplished by day one when you expect the program to start. And so that's the kind of items that I'm referring to when I say "appropriate planning," to have done all of that work before you send the first cask out to the first site.

Q Is it fair to say that the appropriate planning as you were using it, you were saying all the -- thinking of all the steps that were necessary just to begin acceptance, then? Is that what you're saying?

MR. SHAPIRO: Objection, vague.

A That's basically a good summary of what I'm trying to say.

Q Okay. And when you say that -- you say that planning -- appropriate planning and preparations had started sufficiently in advance, what is "sufficiently in advance"? What period is that?

A My opinion is that somewhere about five to



seven years before you expect to start the program, definition being "start the program" is the first cask heads out to a site, somewhere in that neighborhood is a reasonable amount of time for the planning.

Q Okay. What is the longest lead item for that, for that planning?

A I don't think you can say with a great deal of certainty what is the long lead item. The reason I say that is, for example, the ability to hire people kind of fluctuates from time to time. But I -- I tend to think that actually, the procurement of the casks, the cask fleet, might well turn out to be the pacing item, so to speak, the long lead item. That's how I would characterize it.

Q Okay. Is the period that it takes a function of resources?

MR. SHAPIRO: Objection, vague.

A That's what I meant when I said hiring people is resources. In terms of the casks, obviously, the department wouldn't build them itself. It would go to manufacturers or cask suppliers and so they are resources.

Q Uh-huh.

A So, yeah, it's quite dependent on



resources. But over the years as we've thought about this in the industry there doesn't seem to be any bottlenecks that would prohibit you from starting a program like this with a lead time of, say, five to seven years, as I mentioned. And that's where the European experience, of course, is very enlightening, because they've achieved this level. They've found the staff, they've found the number of casks, and they have operated it on a very long-term basis.

Q Okay. But when I'm referring to the goal, I'm just talking about the acceptance of getting to the point where you could accept 3,000 metric tons of uranium per year in a -- sufficiently in advance. I'm just wondering, could you tell me what -- I'm just trying to find out about the factors that would determine whether or not you could do that, whether or not you could achieve that goal sufficiently in advance.

MR. SHAPIRO: Objection, vague.

A Well, I thought my responses so far in the last couple of questions was planning to get the program started.

Q Uh-huh.

A Right? I thought I heard you refer to the

3,000 tons rate. What I'm saying is there's a ramp-up to that rate.
Q Uh-huh.
A So I've characterized it as something like five to seven years to do the planning to be ready to start. If you had in mind a specific ramp-up rate, then that would of course influence the number of casks you bought, the number of staff that you hired.
Q Uh-huh.
A Since you didn't need all of those for day one, but you need them later, that's part of what I call reasonable planning.
Q Well, I'm just wondering if the period, the ramp-up that you're referring to, is also a function of the resources you can bring to bear to the issue.
MR. SHAPIRO: Objection, vague.
A It is a function of those same resources. But again, looking towards the European experience and the other opinions I expressed in my report, neither the number of casks nor the number of staff or number of railcars or number of locomotives, none of that seems to be large enough to make it a very difficult or impossible task, to be ready and to get



to the 3,000 ton rate. So I'm not sure I understand the --
Q Well, my question then is: Have you actually priced or done a dollar estimate of the costs that it would take to get to that ramp -- to get to that rate?
MR. SHAPIRO: Objection, vague, compound.
A Well, while we were doing the Owl Creek project, we did a lot of costing and pricing analysis as to what it would take for that project to achieve the 3,000 tons per year.
Q Did the Owl Creek project involve transporting the fuel to the site?
A Yes.
Q Okay. And how much did that cost?
MR. SHAPIRO: Objection, vague.
A I -- I don't have a number off the top of my head. The project had in mind that it would have a price of, say, a dollar per kilogram, some number of dollars per kilogram. And I know it was broken down in terms of the cost of the cask and the cost of the actual transport, but I don't have those numbers anymore. In fact, I left those numbers at NAC when I left NAC.
Q Uh-huh. But as part of the -- what you



did in formulating your opinion in this case, you didn't actually formulate or do an estimate of the cost that it would take to achieve the 3,000 MTU per year acceptance rate in this case, did you?
A Do you mean by that the cost to DOE?
Q Yes.
A No, I did not do that.
Q Okay. Obviously sitting here today in 2007, DOE has not begun acceptance, accepting the -- did not begin accepting the fuel in 1998. Why do you think that didn't occur?
MR. SHAPIRO: Objection, vague.
A I don't really know the answer to that question. I have observed certain decisions on the part of the government that seem to increase the chances that it should happen, and other decisions that seem to decrease it, and so I can't say that I really know the reason.
Q How would you figure that out? I mean, do you know anybody who would know?
MR. SHAPIRO: Objection, vague.
A Well, I -- I did know. I think I still know some significant number of DOE people, and they may have their own opinions.
Q But I'm asking for your opinion. What is



your opinion as to why that hasn't happened?
MR. SHAPIRO: Objection, vague.
A Why -- I think I told you I -- I can't give you a reason why it hasn't happened. I've seen things that I think would improve the chances it would happen and some that would not. And I -- I could tell you those if you want.
Q Sure.
A Going back to the early 1990s, the department had a program that was called the Cask Systems Development Program where they decided to purchase a certain number of transport casks. And they had different casks in mind, truck casks and rail casks. And they -- they actually awarded four different contracts, one of which was to NAC, so I'm very familiar with that one.
And the idea was to design a specific cask to meet DOE requirements that drew upon the technology of the time. So that, I would consider a very positive feature. As I say, it started in early 1990 so it was a positive feature that should have gotten DOE to the point in 1998 where they had a fleet of casks ready to go.
There was the idea of an MRS, which was in my view clearly much more simpler facility to

construct and license than a repository would be, so I viewed that as a positive feature to get independent of when the repository was actually available so that fuel could be taken in 1998. So those were positive features.

On the MPC concept, which the department -- I would say they actually promoted I think was an improvement on the technology that existed at the time and caused the utilities to I think focus on that system as something that you might characterize as a standard system, make life easier for the department in that regard. Those are positive things.

The negative things that I saw was limitations on the capacity, the MRS. The idea that you couldn't have an MRS unless the repository already had a construction permit were negative things, in my view. So positive things I think were sufficient to make the department ready for the program in 1998 to start. The negative ones clearly made it just about impossible.

Q Okay. Who was responsible for the negative ones, the MRS capacity and the linkage of the MRS to the licensing of permanent repository?

MR. SHAPIRO: Objection, vague.



A I don't know who was responsible for that.

Q I mean, is that something -- isn't that something that's established? Aren't both those things requirements of the Nuclear Waste Policy Act amendments?

MR. SHAPIRO: Objection, vague, argumentative.

Q Do you know?

A I believe -- well, some of those were in the act.

Q Do you have anything else?

A No.

Q Okay. What about the positive aspects? What happened to the multipurpose cask program?

A That was canceled.

Q Okay. Why?

A I don't know. The department canceled the contract they had let with Westinghouse.

Q And you don't know why they canceled the contract?

A No.

Q Do you talk with people at the Department of Energy or have you ever spoken to people at the Department of Energy about that?

A In the past during the time when it was



canceled? I did ask the question, and I'd heard that it was defunded.

Q Uh-huh. What does that mean?

A I think the funding was either expended or nonexistent or withdrawn. I don't know exactly what it is, but --

Q Who defunded it?

A I don't know.

Q Is that an act of Congress?

A I don't know.

Q You didn't ask?

A No, I don't believe I asked at the time, but seemed unimportant. If it was done, it was done.

Q It didn't matter to you why?

A It didn't matter to me as to who?

Q It didn't matter to you why it was done? Or who, for that matter.

A Well, it -- it was of general interest, but I wasn't involved in the project so it didn't take up too much of my time and thinking.

Q What about monitored retrievable storage? What happened to that project?

MR. SHAPIRO: Objection, vague.

A It sort of disappeared. It was a subject



that was talked about a lot and then suddenly, it wasn't talked about. It wasn't like the MPC project that got canceled where you could read that Westinghouse was told it had been canceled. In this case, MRS seemed to just stop being talked about.

Q You don't know why?

A No.

Q Have you ever asked anybody at DOE why?

A I don't recall a specific one, but I'm sure that I did ask them about it.

Q What did they tell you?

A As I said, I don't recall a specific time of asking anybody, but I'm sure in some conversations I asked the question. After all, I was pursuing a private MRS and I'm sure that at some point in time in talking to the DOE we said, what happened to the government MRS? But it -- as I said, it just seemed to be one of those subjects that suddenly became invisible.

Q Have you ever formulated an opinion? By that I don't necessarily mean something that you put in an expert report, I'm just talking about a personal opinion as to why any of those things -- why the MRS went away.

A Well, I wouldn't say I have an opinion.

the basis of bare fuel. So I couldn't see anything in those casks, their design, that was inconsistent with the repository as I understood the plan DOE had at that time.

Q And when you say that they transported -- is it fair to say that they transported bare fuel?

MR. SHAPIRO: Objection, vague.

Q These two casks that you're referring to here.

A Yes, that's what I thought I said. They were designed to be used with bare fuel.

Q Right.

A In the case of the STC, it later was licensed and approved to handle canistered fuel.

Q Okay.

A But that was later.

Q And when you say "bare fuel," does that mean that this fuel was being transported wet?

MR. SHAPIRO: Objection, vague.

A No. In the U.S., all the fuel is transported dry because the NRC demands that.

Q Have they always demanded that?

A No.

Q When did that change?

A I believe it was in the mid 1980s. And at



that time, there had been some incidents with casks that had wet interiors, and the NRC decided they didn't like that anymore. They wanted to see it shipped dry. In Europe, for example, they still ship some wet and some dry.

Q If you look further down in that same paragraph on page 4, you say that if existing casks were determined to be insufficient, DOE could have readily developed a transportation cask in time to commence the performance of its contractual obligations in 1998. Do you see that, sir?

A Yes.

Q What makes you believe that casks necessary -- the necessary casks could have been readily developed in time to begin acceptance in 1998?

A As I indicated earlier, the Cask System Development Program had defined a series of casks that the department wanted to procure. The technology was very similar to the other ones that I've mentioned here. And if they had proceeded with those contracts, they would have had casks designed and licensed and presumably fabricated in time.

Q Would that process take five to seven years prior to 1998?



A I believe it could have been done in that period of time because the technology was again, as I said, not too far removed from what existed. I don't know that all of the four different designs that DOE wanted to procure could have been done in that time, but the resources were there. The cask vendors could have done their part. The fabricators were certainly around. And once again, the European experience utilized a similar fleet of casks size-wise, number of casks. So, I mean, this is something that had been done before.

Q Well, when you say "the resources were there," I just want to be clear. The resources being the capability was there, but it would have taken on DOE's part a certain amount of money in order to actually make it happen, right?

MR. SHAPIRO: Objection, vague.

Q You're not saying that DOE had the money, you're saying that the resource was there in terms of the capability, is that fair?

MR. SHAPIRO: Objection, vague, compound.

A I'm not making any judgments, as we discussed earlier, about whether or not DOE had the money. It clearly would have taken money to do this.



Q Okay. And just so that I'm clear about the time in advance, I'm not asking you so much whether or not there is a capability to begin, say, seven years before 1998 to develop the transportation cask, I'm asking, just so that I'm clear, you would have to begin five to seven years -- begin that process five to seven years before 1998 in order to have what you needed by that time, right?

MR. SHAPIRO: Objection, vague.

A What I said was that I felt that the fact of seven years was a reasonable window to make it happen.

Q Uh-huh.

A There could have been other ways to do it faster than that, but I'm saying I thought five to seven years was a reasonable window to make available to make it happen.

Q How many fabricators were there in the '90s?

MR. SHAPIRO: Objection, vague.

A That clearly varied over time, but I remember one particular study that NAC did, and we concluded that worldwide, there were something like 15 or 20 clearly capable fabricators in the world.

Page 146

A I -- I don't know specific knowledge. I mean, I know what it was according to the FICA report back in 1991. And I'm not aware of whether or not they changed it at all. They may have done some things, but I'm not aware of it.
Q Okay. I also noticed in this -- in the last sentence in the second paragraph in subsection E it says: In addition, barge transport is conducted at the site servicing the adjacent coal plant.
So are you suggesting that at LACBWR, they could use a barge cask or a cask that would be loaded on a barge?
A I'm saying that they do have a barge facility there.
Q Uh-huh.
A And as I understand it, they transport coal in and out frequently, so that may be an option.
Again, going back to the NSTI study, that was one of the parameters that the study group looked at, was there a highway, as I mentioned, a railway, as I mentioned, and was there a barge facility? And again, this was looked at in the context of options for taking the fuel off site.

Page 147

Q Have you ever spoken to anyone at LACBWR about the possibility of transporting spent nuclear fuel by barge from that facility?
A Only briefly in that same teleconference when I asked the question were you thinking about possibly using the barge facility. The answer was no, we hadn't really thought about that as one of the better options.
Q And this was in March, just last March that you had that conversation?
A Right, yeah.
Q Okay. Has spent nuclear fuel ever been transported in this country by barge?
A Yes.
Q When?
A Exact dates?
Q Well, can you just tell me what the example would be?
A The fuel from the Brookhaven National Laboratory reactor, which is in Long Island, was taken by barge to Charleston, South Carolina, in NAC casks and transported from Charleston by rail to the Savannah River site. And that was done in 1999 or thereabouts, '98, '99.
~~Q Is that a research reactor?~~

Page 148

A Yes.
Q Is that -- so is their fuel smaller dimensionally than commercial fuel?
A Yes. It's the same stuff we talked about this morning, yeah.
Q Okay. I was wondering if you could take a look at Exhibit 1 of your report. First of all, can you describe what it is that is depicted in Exhibit 1, for the record?
A Yes. This is the experience that NAC has transporting fuel from the utility sites to various other locations. The first part, three or four pages of it, are just most transport experiences that related to fuel from utility sites. The second part of it was identified as International, or transportation from other than our reactors. Some of them are from reactors, but they're mostly from research reactors or other test facilities.
Q Okay. What was your personal involvement -- well, first of all, were these -- these were all shipments that were -- involved NAC International, is that correct?
A That's correct.
Q Okay. What was your personal involvement in those shipments?

Page 149

A Well, first of all, I didn't arrive at NAC until 1990.
Q Right.
A So any that is listed as pre-1990, I had no involvement whatsoever.
Q Okay, okay.
A Anything after that, generally, as I mentioned before, my staff were involved in designing canisters and so my involvement probably was of the nature of getting the equipment designed that was unique for that particular transportation and getting it licensed and then turning that over to the other department at NAC who actually managed and operated the casks itself.
At some point in time, that particular portion of the organization was folded into my responsibility, so at a certain point in time, I was responsible for transportation also.
Q Okay. And when you say you were responsible for, that was in a supervisory role?
A Yes.
Q Okay. I wanted to take -- on the first page, I noticed about two-thirds of the way down the page, there is a -- it appears to be some shipments
~~to and from the LACBWR facility. Do you see that?~~

department talking about larger fleets, which I acknowledge was reasonable, because you would want to have more than the minimum for uncertainties and swaps and all those sorts of things. So I think it complements my opinion very well.

Q Okay. So the estimate in your opinion, is it fair to say, then, that that was sort of a starting point? That would take development before you actually came to the exact number that was needed?

MR. SHAPIRO: Objection, vague.

A No, I wouldn't characterize it as either of those. I would just say it was intended to demonstrate that you can move 3,000 tons of fuel per year without buying a huge fleet of casks. 30's not huge.

Q 30's not huge. But 90's not huge either?

A No, it's not. But keep in mind that, obviously bigger, but it has truck casks, so they're sort of inefficient relative to the rail casks. But in my view, the two documents are entirely compatible.

Q Okay. Got it.

(Exhibit No. 6 was marked.)

Q Mr. Stuart, you have been handed what has



been marked as Defendant's Exhibit Number 6. And would you agree that this document is the document that's listed under item 13, Exhibit 3 of your report, a document titled The Safe Transport Of Spent Nuclear Fuel And High Level Radioactive Waste In The United States, Committee on Transportation on Radioactive Waste, National Research Council, 2006? Is this the document that you used for your report?

A Yes.

Q Okay. How did you use this information?

A Well, first of all, this is a -- a report on at least one of the conferences of this committee that I attended and so I was interested again in confirming my judgments that I knew I was going to make and had made in other cases regarding the Navy's experience in transporting fuel and also in terms of the total amount of fuel that had been transported at various times.

There's many times these reports that catalog how much fuel has been transported have footnotes that say there's no details on this and that transport, so this is not a complete list, but it's a -- at least a partial list.

So I went back here to see if this later report had actually uncovered different amounts of



fuel that had been transported because, as I said in my report, the amount of fuel that had been transported, according to my recollections, was approximately enough to fill the cores of 20 plants. And I was looking here again to determine if there was better data.

Q Okay. Anything else?

A Between the Navy experience and the total quantity, no, I think nothing else.

MR. SHULTIS: Okay, fair enough.

Okay, Mr. Stuart, I want to thank you very much for your time. It's been a pleasure meeting you and chatting with you today. Unless Robert has questions, we are done here today.

MR. SHAPIRO: I don't have any questions. We will want the opportunity to read and sign his transcript.

MR. SHULTIS: Thank you.

MR. SHAPIRO: Thank you.

AND FURTHER THIS DEPONENT SAITH NOT

DEPOSITION CONCLUDED AT 3:07 P.M.



DISTRICT OF COLUMBIA:

I, Mary Ann Payonk, RMR, CRR, Shorthand Reporter and Notary Public, certify that the aforementioned appeared before me, was sworn, and was thereupon examined by counsel and that the foregoing is a true, correct and full transcript of the testimony adduced.

I further certify that I am neither related to nor associated with any counsel or party to this proceeding nor otherwise interested in the event thereof.

Given under my hand this 12th day of June, 2007.

Mary Ann Payonk, RPR, RMR, RDR
Certified Realtime Reporter

Ex. C-171

• S-13-94
Tel. 301-415-8200

Remarks by Ivan Selin
Chairman, U.S. Nuclear Regulatory Commission
before the
Annual Meeting of
Institute of Nuclear Materials Management
Naples, Florida
July 18, 1994

# TIMELY TOPICS ON SPENT FUEL STORAGE

## INTRODUCTION

I'm very pleased to discuss with you a matter of crucial importance to our nation -- the storage of spent nuclear fuel from our commercial power reactors. I'm talking not only about spent fuel storage at operating reactors, but also at plants in permanent or extended shutdown. In addressing this issue, I'm hoping to correct numerous current misimpressions some may have about the NRC's views on the relative safety of pool and dry long-term storage for older fuel. Both pool storage and dry storage are safe technologies. But there are significant differences; pool storage requires a greater and more consistent operational vigilance and the satisfactory performance of a larger number of active systems, while dry storage is almost passive.

The history of spent fuel management in this country has taken several turns, with a final resolution still out of reach. Several repository programs have started, stalled, and stopped. The latest effort at Yucca Mountain is progressing but, at best is years from the early phases of licensing, much less the actual underground disposal of spent fuel. A monitored retrievable storage (MRS) facility was expected to start accepting commercial spent fuel beginning in 1998, but no such facility is clearly on the horizon. All of these recent developments have changed the circumstances that we face in spent fuel management.

The obvious conclusion is that an increasing number of plants, both operating and permanently shut-down reactors, will have to provide for additional spent fuel storage on-site for a longer period than originally planned, and even after plant decommissionings, prudence requires that provision be made for continual, stand-alone on-site storage. After pool capacity is reached, most utilities opt for some sort of dry storage. But the dry storage option has triggered an unprecedented amount of local opposition at many sites, further taxing NRC and industry resources.

For those plants in premature or extended shutdown, the NRC finds several strong reasons why the interim, on-site storage of spent fuel should often be shifted from the existing fuel pool to a dry storage system. These reasons include the continuing operational support activities needed to keep a fuel pool operating properly. Water chemistry and cleanliness, surveillance of rack and fuel condition, and maintenance and surveillance of support systems are all activities that are second nature to an operating plant, but may not always receive adequate attention in a plant that is permanently shut down. Let me stress our continued confidence in the safety of wet pool storage, <u>if done</u>

DP0001842

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER FER-001-0835

properly, remains undiminished, but dry cask storage offers fewer opportunitie for things to go wrong. Therefore, the NRC increasingly views dry storage as the preferred method of interim storage of mature spent fuel for plants in permanent shutdown, as well as for supplementary storage in many operating plants.

In other words:

1. The results of calculations and laboratory testing, coupled with our growing operational and regulatory experience, show conclusively that dry cask storage techniques are safe for the interim storage of spent nuclear fuel for time periods of many decades.

2. Compared with pool storage, the dry cask storage systems are far simpler, use fewer support systems, and offer fewer operational and design challenges, and therefore are less likely to lead to human or mechanical error. These simpler designs also foster improved operational and regulatory efficiencies. We continue to conclude that pool storage remains an abundantly safe storage method, provided that circulation, corrosion-control, and supporting pumps, piping, and instrumentation are properly maintained.

3. Based on our safety reviews and actual experience to date, we conclude that dry cask storage is preferred in many instances, especially for operating plants with limited pool storage capacity and for shut-down plants.

I would now like to discuss our regulatory policies and practices concerning the interim storage of spent fuel and the increasing use of dry cas systems.

THE NEED FOR STORAGE CAPACITY

At a number of sites in the United States, existing reactor pool storage capacity has been reached or will soon be reached. An operational high-level waste repository remains years away in a program that has suffered substantial delays in the past. ~~The future of the MRS is uncertain.~~ Most plants have expanded their pool storage by re-racking to the extent possible. Clearly, th use of a dry cask storage system at reactor sites is increasingly becoming the only available option for continued operation of many of our nation's nuclear plants.

There are other reasons that this alternative storage technology is attractive. Most obviously, for operating plants, there must be additional room in their pools to support upcoming refueling outages; and transferring some of the older fuel to dry storage is the best way to maintain their full core reserve (that is, their ability to unload the full core). In some cases, 'ry storage may be preferable to re-racking a pool that is approaching thermal structural, or criticality safety limits.

Licensees with permanently shut-down plants have a strong desire to be able to empty and decommission their reactor spent fuel pools. But a number o

DP0001843

pool support systems, including cooling water, electric power, instrumentation, and radiation detection, must remain operable so long as fuel remains in the pool. Neither the pool nor the support systems can be decommissioned; but rather, must be maintained, operated, and tested as if the plant were operating. For some of the older plants, the spent fuel pools are not lined with stainless steel; the cooling and clean-up systems have increasingly demanding maintenance problems; leakage paths may exist from the pool piping systems in some of the older designs; and the support systems are vulnerable to loss of off-site power or other challenges. In such instances, there is an even more compelling case for moving the fuel to a new, modern, dry storage system.

DRY STORAGE TRENDS

Dry storage designs have developed significantly in the decade since Congress enacted programs for dry storage in the Nuclear Waste Policy Act of 1982. Both in this country and overseas, steel casks, concrete casks, and concrete vaults are available in a variety of sizes and shapes. Vendors and utilities continue to talk to the NRC staff about newer dry cask systems, options for storing the unique fuel from certain plants, and amendments to existing approved designs. In the very near future we expect to certify the nation's first dual-purpose cask that is designed for both storage and transportation, a design developed by the Nuclear Assurance Corporation (NAC). The first anticipated use of this dual-purpose NAC cask will be in Spain, under the auspices of Empresa Nacional de Residuos Radioactivos S.A. (ENRESA), the Spanish national waste management company. In addition, we are actively reviewing a second dual-purpose design developed by VECTRA Technologies, Inc., for use at the Rancho Seco Nuclear Station. This dual-purpose design is a variant of the NUHOMS system, which has been licensed for use at H.B. Robinson, Oconee, and Calvert Cliffs. In addition, we expect to receive a major application from the U.S. Department of Energy (DOE) for several different canister designs for the so-called multi-purpose canister (MPC).

DOE foresees obtaining the initial MPC certification for storage and transportation under Parts 71 and 72, respectively; later they would apply for an MPC license as the innermost canister of a disposal package for the high-level waste repository.

We have experienced a strong and steadily increasing trend in licensing dry storage systems at a variety of sites. We have continued to issue site-specific licenses, most recently for the Prairie Island Station in Minnesota. We also have a process to approve cask designs by generic rule, and we have so crafted that process that from a technical and engineering standpoint, a generically approved cask and a site-specific cask are equally acceptable. We are currently in a rulemaking proceeding to certify the seventh cask design approved for use by reactor licensees under an NRC general license. The first utility to store spent fuel under the general license was Consumers Power Company at the Palisades Station. Five other stations are actively pursuing the general license storage option -- Arkansas Nuclear One, Point Beach, Davis-Besse, Oyster Creek, and Fitzpatrick. Other plants have talked to us informally, indicating their inclination toward dry storage of their spent fuel.

SAFETY IMPLICATIONS

DP0001844

Let me now describe several features of dry storage systems that make their use attractive as an interim fuel storage option. First of all, the systems are all very large and inherently passive. There are no cooling fans or pumps requiring redundancy, piping, ducting, instrumentation and controls, and maintenance. All designs cool to the ambient air by natural convection and conduction. The size of these cask systems makes them highly stable on the storage pad. The spent fuel is stored in a sealed, inert environment, surrounded by a helium gas after air and moisture have been evacuated. This helium environment is passive from a chemical corrosion standpoint, and quite effective from a heat removal standpoint. The large shielding designs have proven to be well within our dose rate acceptance criteria, and measured dose rates have turned out to be a factor of two or three less than that predicted by calculation. Heat-removal performance has been similarly effective. Casks cooled by natural convection often have outlet temperatures significantly and consistently below the allowable design values. Fuel assemblies are collected and stored in a basket, which maintains structural integrity and a safe criticality geometry. The dual-purpose and MPC concepts will further reduce fuel handling, packaging, and occupational exposure. The passive design features allow a reduced amount of operator surveillance and oversight -- human intervention is typically restricted to occasional temperature measurements, security checks, radiation surveys, and visual inspections. Although we have licensed these designs for a 20-year period, we believe that the present designs may eventually be shown to perform satisfactorily for at least 100 years, a much longer time than is likely to be necessary for interim storage fore ultimate spent fuel disposal. I would like to emphasize, we are talking here only about interim storage and the program to develop a permanent repository must continue to go forward.

Nevertheless there will continue to be an essential role for pool storage. Dry storage could not replace pool storage entirely even if we wanted it to, principally because the freshly discharged fuel is much more radioactive and, more importantly, much hotter. Freshly discharged fuel must be cooled in a pool at least for at least five years. However, fuel that has cooled sufficiently can be stored safely and effectively in dry storage containers. Furthermore, pool systems and dry cask storage systems can both be designed, constructed, maintained, and operated safely. Some utilities have installed sufficient pool capacity to handle all interim storage needs for the lifetime of the plant. Thus, the industry can and will continue to have major reliance on pool storage. Licensees that perform within the respective safety envelopes remain free to choose either wet or dry storage; the NRC does not specify choices among risk-acceptable alternatives.

SAFEGUARDS IMPLICATIONS

From a domestic safeguards aspect, the large passive spent fuel casks offers substantial resistance to penetration by an adversary. On-going studies continue to validate that the vulnerability to radiological sabotage or theft of special nuclear material is low. The inherent physical protection provided, in part, by storage casks minimizes the need for additional extensive security. As a result, Commission policy on the protection of spent fuel takes advantage of cask design features in defining adequate protection of spent fuel.

With respect to specific physical protection measures required, we make no special distinction between measures needed for dry cask versus pool storage.

DP0001845

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER FER-001-0838

This approach assumes that basic capabilities for a trained and equipped security organization, procedural and physical access controls, communications, detection, assessment, and response are in place.

From an international safeguards perspective, the operator of a spent fuel storage facility, whether pool or dry cask, is required to provide a listing of the identity, locatior, and content of each spent fuel assembly. The International Atomic Energy Agency (IAEA) must be given the opportunity to maintain containment and surveillance to assure no removal of spent fuel. For a spent fuel pool, these measures are fundamentally straightforward, but do have some complications. In particular, in case of malfunctioning of the surveillance camera, the IAEA has to count the spent fuel assemblies and check the attributes of spent fuel assemblies on a random basis. For dry cask storage, the IAEA provides for surveillance of the storage area, observes the loading of the spent fuel into the cask, and then verifies the seal of the cask thereafter. However, malfunctioning of the surveillance camera will not result in IAEA's re-counting spent fuel assemblies as long as the integrity of the seal of the cask is maintained. This simplifies the IAEA task, as well as easing the burden on the operator.

CONCLUSION

Spent fuel storage, whether wet or dry, is a regulatory issue that the NRC takes very seriously. When new storage space is needed at a particular operating power plant, for the reasons I have discussed this morning, dry storage is almost certainly preferred as a supplement to wet storage for the older fuel at the site. Dry storage may often be even more desirable at the permanently shut-down plants, where it is a candidate to replace, and not just to supplement, pool storage. The technology and process for regulatory review and oversight of spent fuel storage have been fully developed. I'm confident that the program for the nation's spent fuel storage is well under control. The storage systems are performing their required safety functions and are protecting the environment.

On a more strategic level, the high level of safety performance of these spent fuel storage systems is not universally recognized. In many areas, public perception of spent fuel storage, and even some professional perception, is unbalanced. One of the more striking examples involved the Prairie Island site, where it was argued that, although it is safe to run a two-unit reactor on the island, it is not safe to store aged spent fuel in dry casks on the same island. This issue requires a better understanding of the very low risk associated with dry spent fuel storage and public confidence that such storage is an interim solution. Better progress in providing long-term disposition of spent fuel is required before the public will understand and generally accept interim on-site storage of spent fuel. The Department of Energy is giving priority attention to the matter of long-term storage and disposition of spent fuel. I am confident that they will continue to pursue this issue diligently and I am hopeful that timely resolution of this issue can be achieved.

DP0001846

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER FER-001-0839

U.S. DEPARTMENT OF ENERGY

OFFICE OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT

# REPORT TO THE COMMITTEES ON APPROPRIATIONS

# PLAN FOR TRANSPORTATION CASK FABRICATION AND THE DEPLOYMENT OF WASTE ACCEPTANCE CAPABILITIES

JANUARY 2001

YMP-012-1929

Executive Summary

This Plan was prepared by the Office of Civilian Radioactive Waste Management on behalf of the Secretary of Energy in response to direction from the House Committee on Appropriation on the Energy and Water Development Appropriations Act, 2001. The Plan provides the Department of Energy strategy for the timely fabrication of transportation casks and deployment of waste acceptance capabilities.

The Department's Plan builds on the successful transportation experience gained in its current radioactive materials shipping campaigns as well as recent private sector advances in the design, certification and manufacture of efficient spent nuclear fuel transportation technology. It provides sufficient time for detailed logistics and acquisition planning and mobilizing the manufacturing capabilities, technical resources and equipment necessary to assure performance of the Department's waste acceptance mission.

The Department's Plan for the timely fabrication and deployment of waste acceptance capabilities is embodied in the Draft Request For Proposal "Acquisition of Waste Acceptance and Transportation Services for the Office of Civilian Radioactive Waste Management."[1] The strategy adopted for this draft solicitation was structured to make maximum use of private industry capabilities as mandated by the Nuclear Waste Policy Act, as amended.[2] The Department believes that current industry performance has shown that manufacturing capacity is available to meet present and future cask fabrication needs and that private industry can ensure the timely provision of the necessary services and equipment required to fulfill the Office of Civilian Radioactive Waste Management waste acceptance mission objectives at competitive fixed prices and fixed rates. This approach was developed with contract holders' input, along with input from equipment fabricators, vendors and transporters, and a limited number of State and industry representatives.

A consultation draft Plan was distributed to the contract holders to review and provide comments on the Plan. A section has also been added to the Plan to discuss the contract holders' comments. Comments received were both general and specific and where appropriate, specific elements of this Plan have been changed to address the comments. Some of the comments involved issues related to the Standard Contract and the Department's waste acceptance obligation, which are the subject of ongoing negotiation or litigation between contract holders and the Department and, therefore, were not addressed in this Plan. A sample copy of the letter to the contract holders and all of the comments that the Department received are provided as Appendix C to this Plan.

The Department has been focusing its efforts on site characterization activities at Yucca Mountain, Nevada to determine if this site is suitable for further development as a geologic repository. Due to funding constraints, the Department has prioritized its scientific and engineering activities on timely completion of site characterization. If the site is recommended by the President and approved by

---

1 Draft RFP number DE-RE-98RW00320, Acquisition of Waste Acceptance and Transportation Services for the Office of Civilian Radioactive Waste Management, September 1998.

2 NWPA section 137(a)(2).

Congress, the Department intends to implement this Plan, updated as necessary, to acquire and deploy the transportation infrastructure in a manner that will allow for timely waste acceptance.

# Table of Contents

Executive Summary.....1

Table of Contents.....2

1. Introduction.....3

2. Background and Experience.....3

3. Waste Acceptance and Transportation Capabilities Deployment Plan.....4

3.1. Strategy Formulation.....4

3.2. Scope and Description of the Acquisition Plan.....7

3.3. Potential Implementation Schedule.....10

4. Fabrication Industry Analysis.....11

5. Review of the Proposed Plan.....13

6. Consultation with Contract Holders.....13

Appendix A

Cask Status and Fabrication Capabilities.....A-1

Appendix B

History and Status of the Department's Acquisition and Deployment Plan...B-1

Appendix C

Letter to Contract Holders and Comment Letters.....C-1

Tables and Figures

*Figure 1* RSC Contract Phases..... 10

*Figure 2* Potential Implementation Schedule.....11

*Table 1* Proposed Fleet Deployment.....12

*Table A-1* Transport Only Truck Casks.....A-2

*Table A-2* Transport Only Rail Casks.....A-2

*Table A-3* Dual Purpose (Storage / Transport) Casks.......................... A-3

*Table A-4* Cask Fabricators.......................................................... A-4

1. Introduction:

This Plan provides the Department's strategy for the timely fabrication of transportation casks and deployment of waste acceptance capabilities. The Plan has been prepared by the Office of Civilian Radioactive Waste Management (OCRWM) on behalf of the Secretary of Energy in response to direction in the report of the House Committee on Appropriations (H.R. Rep. No. 106-693, at 98 (2000)) on the Energy and Water Development Appropriations Act, 2001 (Pub. L. 106-377).

The Committee report specifically states the following:

> *Waste acceptance and transportation* - The Committee is concerned about the steady erosion of Administration support for activities associated with the waste acceptance and transportation functions of the Office of Civilian Radioactive Waste Management. The Department needs to demonstrate its ability to remove spent fuel from utility sites for Federal management, and, in particular, its commitment to the timely removal of spent fuel. Accordingly, the Department should submit to the Committee by December 31, 2000, a Plan for the timely fabrication and deployment of waste acceptance capabilities. The Plan should be developed after consultation with affected contract holders and consider currently licensed transportation systems and other transportation.

2. Background and Experience

The Department has safely and successfully transported highly radioactive materials, including spent nuclear fuel, for many years and has gained substantial experience in the operational and institutional aspects of nuclear materials transportation.

In 1999, the Department began a major transportation program to support disposal of transuranic waste at the Waste Isolation Pilot Plant (WIPP). Over 100 shipments have been successfully completed. This activity will span decades over which transuranic waste will be shipped to WIPP from 23 sites located throughout the country.

In May 1996, the Department of Energy, in cooperation with the U.S. State Department, initiated a program under which spent nuclear fuel and target material at research reactors in 41 countries, containing uranium that was enriched in the United States, could be shipped to two DOE facilities, the Savannah River Site (SRS) and the Idaho National Engineering and Environmental Laboratory (INEEL), for management pending permanent disposition. This program supports the U.S. nonproliferation objective to reduce and eventually eliminate highly enriched uranium in civil commerce. The spent nuclear fuel is entering the United States through the Charleston Naval Weapons Station in Charleston, South Carolina and the Concord Naval Weapons Station in Concord, California. To date, 18 shipments have been successfully completed, 15 to SRS and three to INEEL. Through these efforts a set of practices, developed in cooperation with states along the shipping routes, have been adopted to permit the safe predictable movement of such materials. Many of these operational protocols have been adapted and integrated into the Department's plans to acquire transportation services for shipments of spent nuclear fuel to a geologic repository.

# GOING THE DISTANCE?

## The Safe Transport of Spent Nuclear Fuel and High-Level Radioactive Waste in the United States

Committee on Transportation of Radioactive Waste

Nuclear and Radiation Studies Board
Transportation Research Board

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

Prepublication Draft
Subject to Editorial Correction

NATIONAL ACADEMIES PRESS
Washington, D.C.

#6

Plaintiff's
Exhibit
447
04-74C(04-75C)

Copyright © National Academy of Sciences. All rights reserved.

The 1982 Act vests authority with the Secretary of Energy for carrying out the federal government's spent fuel and high-level waste disposal program, including transportation. It established a Nuclear Waste Fund[25] to cover the costs of transportation and disposal. It also authorized the Secretary of Energy to enter into contracts with owners of spent fuel and high-level waste of domestic origin. These contracts allow the Secretary of Energy to take title to spent fuel and waste for transportation and disposal.

The Nuclear Waste Policy Act established a process to identify two repository sites in different regions of the United States (one in the eastern or midwestern United States and the other in the western United States) for disposal of the nation's spent fuel and high-level waste. After the Act was passed, the DOE initiated a screening program that eventually resulted in the selection of three potential repository sites in the western United States: Hanford, Washington; Deaf Smith County, Texas; and Yucca Mountain, Nevada.

In 1987, Congress amended the Nuclear Waste Policy Act. This Amended Act directed DOE to terminate its characterization activities at all sites except Yucca Mountain. It capped the disposal capacity of Yucca Mountain at 70,000 MTHM (77,000 short tons) until after a second repository is operating. This capacity has been allocated by DOE for disposal of both commercial spent fuel and DOE-owned spent fuel and high-level waste (TABLE 1.2). It also directed the Department to postpone the identification of a site for a second repository.

After the passage of the Amended Act, DOE initiated what would ultimately be a 15-year program to characterize the Yucca Mountain site to determine its suitability to host a repository. In 1998, DOE issued a viability assessment for this site in which it concluded (DOE, 1998a, summary, p. 2) that "Yucca Mountain remains a promising site for a geologic repository" and "work should proceed to support a decision in 2001 on whether to recommend the site to the President for development as a repository."

In late 2001, then Secretary of Energy Spencer Abraham recommended to President G.W. Bush that a federal repository be developed at Yucca Mountain. The President forwarded the recommendation to the Congress, which in July 2002, and over the objections of Nevada, authorized DOE to submit an application to the USNRC for a license to construct and operate a repository. DOE planned to submit this application to the USNRC before the end of 2004 and to begin operating the repository by 2010.

DOE was unable to submit the application in 2004, however, and has encountered setbacks that could delay its plans to establish a repository at Yucca Mountain. In 2004, the Federal Court of Appeals for the District of Columbia struck down part of the Environmental Protection Agency's health and safety standards for Yucca Mountain (Title 40, Part 197 of the Code of Federal Regulations). This remanded standard must be reissued[26] by the Environmental Protection Agency before the USNRC can issue a license for Yucca Mountain. DOE also encountered problems in establishing the database of information that will be used to support its license application for Yucca Mountain. The Nuclear Waste Policy Act requires that this database, referred to as the Licensing Support Network, be established at least six months before the license application is docketed by the USNRC. DOE brought this database online in 2004 but the USNRC has so-far refused to certify that it is complete.

The Nuclear Waste Policy Act committed the federal government to begin disposing of commercial spent fuel in the federal repository by January 31, 1998. However, siting such a repository turned out to be a more arduous process than envisaged by Congress when the Act was passed. After the 1998 deadline passed, commercial power plant operators began filing

---

[25] The Nuclear Waste Fund was established by the U.S. Treasury and is funded through a 1.0 mil (0.1 cents) per kilowatt hour fee on nuclear-generated electricity (see DOE, 2001a).

[26] The Environmental Protection Agency issued a new draft standard for public comment on August 8, 2005. The final standard had not yet been issued when this report was being finalized for publication in December 2005.

Copyright © National Academy of Sciences. All rights reserved.

TABLE 1.2 Spent Fuel and High-Level Waste Disposal at Yucca Mountain

| Material | Quantity[1] | Number of shipping sites |
|---|---|---|
| Commercial spent fuel | 29,000 cubic meters<br>63,000 MTHM[2] | 73 (72 commercial power plant sites and one commercial storage facility) |
| Defense spent fuel and high-level waste | 7000 MTHM | From sites shown below |
| Naval spent fuel | 900 cubic meters<br>65 MTHM | 1 (INL) |
| Other DOE spent fuel[3] | 1000 cubic meters<br>2,435 MTHM | 4 (Hanford, INL, Savannah River, Fort St. Vrain) |
| High-level waste | When processed:<br>21,000 cubic meters<br>58,000 metric tons<br>22,000 canisters | 4 (Hanford, INL, SRS, West Valley) |

NOTES: INL = Idaho National Laboratory; SRS = Savannah River Site. (1) The quantities of commercial and defense waste listed in this table represent the current legislated capacity of Yucca Mountain. Quantities are given in terms of volumes and masses. (2) Metric tons of heavy metal. (3) Includes defense and research reactor spent fuel.
SOURCE: DOE, 2002a, Appendix A.

lawsuits against DOE to recover the additional costs incurred for extended onsite storage of spent fuel. The U.S. government settled with one of the plaintiffs (Exelon Nuclear Power Corp.) in 2004. Sixty cases are still pending before the courts, and discussions to settle some of those cases are underway. The Exelon settlement commits the federal government to pay the utility $80 million immediately, with further annual payments as costs are incurred for continued storage of spent fuel at its sites. The federal government will pay Exelon a total of about $300 million if Yucca Mountain opens by 2010, and possibly more if the opening is delayed beyond that date. Settlement costs for the entire nuclear industry could cost taxpayers[27] billions of dollars. DOE is under pressure from the nuclear industry and the Congress to move forward with Yucca Mountain or establish one or more centralized interim storage sites to reduce the growing spent fuel inventories at commercial power plant sites as well as the federal government's future monetary liabilities.

The Private Fuel Storage facility could be used as an interim step toward permanent disposal at Yucca Mountain. The facility's location in Utah was selected in part because of its proximity to Nevada. Even though Private Fuel Storage, LLC is now poised to receive a license from the USNRC, it may still face several obstacles to opening. These include opposition from the state of Utah as well as other states and communities along likely transportation routes.

### 1.3.3 Spent Fuel and High-Level Waste Transportation

Small-quantity spent fuel shipping programs have been carried out routinely both by the federal government and private sectors for several decades. The primary objective of these

[27] The settlements are being paid out of the federal government's judgment fund and not out of the Nuclear Waste Fund.

Copyright © National Academy of Sciences. All rights reserved.

Page 411

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------x

PACIFIC GAS & ELECTRIC COMPANY, Plaintiff, :No. 04-74C

vs.

THE UNITED STATES, Defendant.

------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, June 6, 2006

VOLUME 2

The parties met, pursuant to the notice of the Judge at 8:59 a.m.

BEFORE THE HONORABLE EMILY C. HEWITT

Page 412

APPEARANCES:

ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D.C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
ALAN LO RE, ESQ.
HEIDE HERRMANN, ESQ.
SCOTT R. DAMELIN, ESQ.
SHARON A. SNYDER, ESQ.
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000

Page 413

APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***

Page 414

P R O C E E D I N G S

- - - - -

THE COURT: The examination of Mr. Mills continues. The witness continues under oath, ready for redirect. Before we turn to that, let me ask if there are any housekeeping matters at this time. Plaintiff?

MR. STOUCK: No, Your Honor, there's a matter that's under discussion, but we'll take it up later.

THE COURT: United States?

MR. EKMAN: None from us, Your Honor.

THE COURT: Thank you. Mr. Reynard will hand out to Ms. Ott and each of the parties the time sheet that we're keeping so that you know what we're doing here, and we try to be transparent, not everyone's clocks and watches will agree when they look at their watch instead of the clock. If you see an evident error, it should be arithmetic, and feel free to suggest a correction.

Mr. Stouck, you may proceed your examination when you are ready.

Whereupon--

LORING MILLS

Page 639

offered to utilities to store their fuel in a dry storage mode.
Q. And this is spent nuclear fuel?
A. This is all spent nuclear fuel, yes.
Q. Did you have any responsibility for the licensing of the casks that NAC used and sold?
A. Yes, licensing was almost a daily subject at NAC for me because every time we had a new transportation program, we had to get prior approval by the NRC, and it invariably involved something different from the last time we did it, so that was a continuing issue. And then the new casks that we were developing, both for here in the U.S., as well as in Europe, again, was a continuing NRC interface subject.
Q. And can you just give us some examples of some of the cask design and licensing projects that you worked on at NAC?
A. Yes. The very first demonstration program of dry storage in the United States was being done by a utility company known as Virginia Power, and we supplied some of the casks to that utility for the demonstration.

Page 640

Those were storage only casks, and they are located at the Surry site in Virginia.
Q And what was your responsibility with respect to those?
A. The responsibility I had there was the design of casks and the licensing of them and the management of the manufacturer of the casks.
THE COURT: You said they're storage only?
THE WITNESS: Yes.
THE COURT: And the alternative to that would be what?
THE WITNESS: Well, there's two alternatives. One is transport only, and the other one is dual-purpose, both storage and transport, which I'll get to in a moment, as I go down my list.
BY MR. STOUCK:
Q. I'm sorry for the interruption, for my interruption. How about some more examples?
A. After the demonstration program at Virginia Power, NAC decided to develop a dual-purpose cask that had the purpose of storage only and also transportation. And not

Page 641

only did they decide to develop it for here in the U.S., but they were able to successfully interest a Spanish company in developing and paying part of the cost of developing that cask. That cask became known as the STC. It was the very first licensed dual-purpose cask in the U.S. Unfortunately, it has not yet been used in the U.S., but it is being used in Spain by a utility there.
Q. And when was the STC licensed?
A. The STC was licensed in 1995.
Q. And your responsibility for that project was what?
A. Again, in complete design from scratch through licensing, through testing, and eventually manufacturing, following when it was manufactured for the Spanish utility.
Q. And did you have responsibility at NAC, Mr. Stuart, for licensing with respect to the transport casks?
A. Yes, the fleet of transport casks that I indicated NAC owned and operated, as opposed to selling to utilities every time we had a licensing matter, a change over the conditions

Page 642

of the license, it was my responsibility to get that change.
Q. Okay. Do you recall the Nuclear Regulatory Commission making any pronouncements in approximately the mid-1990s concerning dry cask storage for spent nuclear fuel?
A. There was a speech by the chairman of the NRC, Mr. Ivan Selin – not too many Ivans in the world, so I remember that one.
THE COURT: How is his last name spelled?
THE WITNESS: S-e-l-i-n. And as I say, he was chairman of the NRC, and he gave a speech to a conference known as the INMM, which stands for International Nuclear Materials Management, and that's a conference that occurred here in Washington quite frequently. And this particular session, I don't think it was in Washington, but I know he gave a speech to that group.
BY MR. STOUCK:
Q. And were you aware of that speech at that time?
A. Yes, I consider that one of my prime reading documents for the evening when he gave

Page 643

that speech.
Q. If you turn to your notebook that I've handed you, you'll see Plaintiff's Exhibit 209. I'd like to direct your attention to that please.
A. Okay.
Q. And is this – well, what is this?
A. Well, this is a speech that I mentioned to the INMM, and I notice it was given in Naples, Florida, not here in Washington on that occasion, in July of '94.
Q. And if we look at – before we look at some particular portions here, can you characterize what was the significance of this speech?
A. Well, the chairman gave a presentation of NRC's view of, as he called it, timely topics in spent fuel storage, and he discussed what was happening in his view about the entire waste program of the country and the implications for dry storage of spent fuel.
Q. Okay. Let's take a look at the very beginning of this. And if you could maybe read for us the first paragraph?
A. Yes. He started out by saying, "I'm

Page 644

very pleased to discuss with you a matter of critical importance to our nation – the storage of spent nuclear fuel from our commercial power reactors. I'm talking not only about spent fuel from storage at operating reactors, but also at plants in permanent or extended shutdown.
In addressing this issue, I'm hoping to correct numerous current impressions some may have about the view the U.S. Nuclear Regulatory Commission (NRC) has on the relative safety of pool and dry long-term storage for older fuel. Both pool storage and dry storage are safe technologies, but there are significant differences.
Pool storage requires a greater and more consistent operational vigilance and the satisfactory performance of a larger number of active systems, while dry storage is almost passive."
Q. Why don't we take turns, if it's okay with you?
A. Sure.
Q. Just to try to save voices.
A. Right.

Page 645

Q. And I would note that the date that's on the speech is July 1994, do you see that?
A. Yes, I thought I mentioned that earlier.
Q. Okay. I'll continue with the second paragraph. "The history of spent fuel management in this country has taken several turns, with a final resolution still out of reach. Several repository programs started, stalled, and stopped. The latest effort at Yucca Mountain is progressing, but at best, is years from the early phases of licensing, much less the actual underground disposal of spent fuel.
A monitored retrievable storage (MRS) facility was expected to start accepting commercial spent fuel beginning in 1998, but no such facility is clearly on the horizon. All of these recent developments changed the circumstances that we face in spent fuel management." Do you see that?
A. Yes.
Q. And then would you like to continue?
A. Okay. "The obvious conclusion is that an increasing number of plants, both operating

Page 646

and permanently shutdown reactors, will have to provide for additional spent fuel storage on-site for a longer period than originally planned.
And even after plant decommissioning, prudence requires that provision be made for continual, stand-alone, on-site storage. After pool capacity is reached, most utilities opt for some sort of dry storage, but the dry storage option has triggered an unprecedented amount of local opposition at many sites, further taxing NRC and industry resources."
Q. Then I'll pick up, continuing with the article, "For those plants in permanent or extended shutdown, the NRC finds several strong reasons why the interim on-site storage of spent fuel should often be shifted from the existing fuel pool to a dry storage system."
And then the next sentence says, begins, "these reasons include," and there are a series of reasons, and I'd like you to just pick up, and we can conclude this little portion, or this longer portion with the last sentence of that paragraph after the reasons he lists, where it says, "therefore," do you see

Page 655

designs for so-called multi-purpose canister, MPC."
Q. What was the multi-purpose canister, Mr. Stuart?
A. The multi-purpose canister, in my view, is a system for spent fuel storage and for transport that is made up of three key elements. The heart of the system is a canister. It's a relatively thin metal canister that's sealed and welded and has the fuel inside of it.
This canister is approved for both storage by NRC and transport. However, it must be stored in one of the other three parts of the system known as the storage cask, or it may be inserted into the transport cask, which is the third part, and transported, so it's a multi-piece system and has a multi-function, both transport and storage.
MR. STOUCK: Your Honor, we're going to be moving away from the Selin speech. I'd like to move for admission of Plaintiff's Exhibit 209.
THE COURT: PX-209 is admitted.
(Plaintiff Exhibit Number 209 was

Page 656

received in evidence.)
MR. STOUCK: Thank you.
BY MR STOUCK:
Q And, Mr. Stuart, how did the MPC concept originate?
A. I believe it originated with a thought at Virginia Electric Power. Again, a gentleman there by the name of Stuart, who's not related, had proposed to Admiral Watkins, who was Secretary of the DOE at the time, that there was an opportunity, now that the industry had matured in both storage and transport technology, to combine both elements, the best elements of both of those technologies, and come up with something that he called the MPC. He had a slightly different name for it when he proposed it, but following that proposal, Admiral Watkins did document that he was planning to have the Department pursue that kind of a system.
Q. Would you please turn to Plaintiff's Exhibit 177 in your notebook, which I believe is in evidence and Mr. Bartlett – I won't say that here, but it's in evidence. Do you recognize this?

Page 657

A. Yes, I do.
Q. This is a letter from Admiral Watkins to Senator Johnston dated December 17th, 1972?
A. 1992.
Q. Excuse me, 1992, thank you. Before we get, I guess, to the details of the letter, when did the Department of Energy begin its work on the MPC concept?
A. Well, it began by issuing an RFP, a request for proposal to the industry, and many members of the industry bid on that proposal, and eventually, Westinghouse won that contract.
Q. Okay. Now, let's take a look at this letter. Let's look at the letter, then we'll look at the attachment. The second paragraph here says, "Enclosed for your information is a summary of my new strategy to provide SNF interim storage in 1998.
It will broaden and complement existing siting efforts and use a more effective SNF management system." Do you see that?
A. Yes.
Q. And then the last paragraph there says, "I believe this new strategy for the

Page 658

Department and the Congress will produce the results needed to begin SNF receipt in 1998 and will maintain the nation's options for sustaining the use of nuclear power as established in the Energy Policy Act of 1992." Do you see that?
A. Yes, I do.
Q. And at this time you were at NAC, you were aware of the emergence of this MPC concept at DOE?
A. Yes, I was. It was clearly a big change from where the industry had been, and it was very clear in my mind that the Department had, so to speak, put the handwriting on the wall that they wanted to see MPCs in the system.
Q. Let's take a look at the attachment now under MRS. There's an attachment on the first page. There's a section that says, "MRS facility and siting," do you see that?
A. Yes.
Q. And the first paragraph, if you could just, I guess, look at it, it begins, "The office of the nuclear waste negotiator," do you see that?

Page 659

A. Yes.
Q. And I'm just paraphrasing here, it says the office has not been able to identify a viable candidate site that can be recommended to Congress by June 1993 and will permit spent fuel receipt by January 1998 as planned. Do you see that?
A. Yes.
Q. Thus, alternative actions are required. Do you see that?
A. Yes.
Q. Then it says, "The Department has examined potential alternative actions and has concluded the following: Number 1, it now appears that a multi-purpose and standardized container system for spent fuel receipt, storage, and disposal can be developed to reduce costs, minimize required handling of spent fuel assemblies, and provide more efficient storage at both an interim storage site and nuclear plant sites.
Such a system would simplify the design of a storage facility, but would require expeditious development and certification to be effective." Do you see that?

Page 660

A. Yes.
Q. And does that comport with your recollection of what was going on at DOE with respect to the development of the MPC at that time?
A. Yes, it is.
Q. And then on the next page, there's a separate section devoted to standardized container system, do you see that?
A. Yes.
Q. And, again, in the interest – I'd be delighted to have you read this for us.
A. That's okay. My voice is holding out.
Q. Okay. Good.
A. From, "The Department will immediately"?
Q. Yes.
A. "The Department will immediately refocus spent fuel container design activities on development of a standardized system with capabilities for receipt, dry storage, transport, and disposal of spent fuel. Such a standardized system had been endorsed by a recent resolution of the Edison Electric Institute UWASTE committee."

Page 661

Q. And thank you. Now, in terms of – well, we may have touched on this – more than touched on it, but in terms of development of dry storage and transport technology, what is your understanding of the significance of DOE's decision to introduce the MPC concept at that time? How significant was it?
A. As I mentioned a moment ago, it was my view that the Department had, as I say, put the handwriting on the wall, and everyone who was a competitor of NAC began to develop MPC designs of their own concept.
Q. And NAC had already started that or started that?
A. Yes, NAC had the advantage of the dual-purpose cask, which it had designed and licensed, and it was able to take that particular system and utilize it in an MPC system of the type I described, the three-part.
Q. And you referred to the contract that was eventually let by the Department of Energy to Westinghouse?
A. That's correct.
Q. For the development of the MPC?
A. Yes.

Page 662

Q. What happened with that contract? Was the system eventually developed?
A. No, it was not. The contract was canceled after a very few short years. I'm told it was because of lack of funding, and by that time, the industry had started to enter the licensing process on their own systems.
Q. All right. How long did you hold the position of vice president? What was the title, vice president of engineering?
A. Vice president of engineering, yes.
Q. At NAC, how long did you hold that?
A. I held that position for about 10 years.
Q. And then what did you do?
A. While I stayed with NAC, I moved over to another project. I was very interested in the MRS program that the Department had at the time, and I got involved with a project that was known as the Owl Creek project in Wyoming. And this was a private party's group of people in Wyoming who believed that a private MRS would be a good business opportunity.
Q. And can you describe – well, what is an MRS? We've heard some testimony about MRS.

Page 687

familiar. It was a day-to-day activity, one of the most important projects NAC had at the time.

Q. So –

THE COURT: Can I interrupt for just a second?

MR. STOUCK: Yes, Your Honor.

THE COURT: When you heard timely topics in spent fuel storage, was there any – that's eight years later or so, was there any interaction between that new light cast on the subject and the development of the CSDP program? It seems to be a change in direction.

THE WITNESS: Yes, it is. You're very perceptive. It turns out all of those four CSDP projects were terminated by the time that Ivan Selin speech happened.

THE COURT: Were they already terminated, or was it an interaction with the speech, if you know?

THE WITNESS: I don't believe there was any interaction. The NAC contract was terminated in '91, and I'm told that the other three by 1993, so that was about a year before that speech.

Page 688

THE COURT: Let me just ask you what were – how did those contracts come to be terminated?

THE WITNESS. Again, I was advised by the Department that they had lack of funding.

THE COURT: Thank you. My next – I'm sorry, I should have said if you know, but thank you.

MR. STOUCK: Thank you, Your Honor.

BY MR. STOUCK:

Q Mr. Stuart, how familiar were you with the effort at the Department of Energy, with the part in the program, the spent fuel program, that led to the solicitation of the cask contracts that you just described?

A. The CSDP contracts or the MPC contracts?

Q. The CSDP contracts, were you familiar with that part of the program?

A. Yes, I was quite familiar with it because – I wasn't there at the beginning, as I indicated, but I was quite familiar with it because we had to continually report to the Department on our progress. So there was quite a frequent interchange on the activities, on

Page 689

the specifications, the requirements they had and why they had the requirements, so I was very familiar with that.

Q. Can you take a look in your notebook at Plaintiff's Exhibit 86, please?

A. Yes.

Q. Do you recognize this as a document that DOE produced –

A. Yes.

Q. – in the course of planning for the transportation part of its program?

A. Yes, I do.

Q. And do you know – well, let's take a look at page 15, if we could, of this. This is a January 1986 Department of Energy document, but let's take a look at page 15, if we could, under, "Objective." Are you there?

A. Yes.

Q. The last two sentences of that paragraph, can you read that for us? How's your voice?

A. "In addition, the DOE's commitment to begin receiving radioactive waste for disposal in 1998 is unequivocal. Thus, supportive actions such as the development of adequate

Page 690

transportation capabilities will be conducted to ensure successful start-up of the disposal program on schedule."

Q. And is that consistent with your understanding at that time of DOE's efforts –

A. Yes, it was.

Q. – in the transportation area? Excuse me.

A. Yes, it was.

Q. Now, let's take a look at the top of page 16. It's the first new sentence, I'll read it. "Also included in this initiative is the development of storage/transport casks. Such prototypes must be proven in enough time to procure a fleet that will accommodate the first shipments to the proposed MRS facility scheduled to begin as early as January 1996." Do you see that?

A. Yes, I do.

Q. And is that also consistent with your understanding of what DOE's transportation planning efforts were at that time?

A. Yes, it is.

Q. On page 17 under paragraph 4.1, if I could call your attention to the first sentence

Page 781

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------x
PACIFIC GAS & ELECTRIC :
COMPANY, :No. 04-74C
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :
-----------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, June 7, 2006

VOLUME 3

The parties met, pursuant to the notice of the Judge at 9:00 a.m.

BEFORE THE HONORABLE EMILY C. HEWITT

Page 782

APPEARANCES:

ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D.C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
ALAN LO RE, ESQ.
HEIDE HERRMANN, ESQ:
SCOTT R. DAMELIN, ESQ.
SHARON A. SNYDER, ESQ.
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000

Page 783

APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***

Page 784

P R O C E E D I N G S

THE COURT: We are on the record to continue testimony in PG&E versus United States this morning. Our first main order of business is cross-examination of Mr. Stuart. Before we turn to that, let me ask if there are any housekeeping matters at this time. For the Plaintiff?

MR. STOUCK: No, Your Honor.

THE COURT: Thank you. United States?

MR. EKMAN: No, Your Honor.

THE COURT: Thank you. Mr. Lo Re?

MR. LO RE: Good morning, Your Honor.

THE COURT: Good morning, Mr. Stuart.

Whereupon--

IVAN STUART

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

THE COURT: You're welcome to come to the stand. Please be seated. The witness continues under oath. Cross-examination by Mr. Lo Re. Cross-examination will be within the scope of direct.

Page 789

1994 that momentum was building for an MRS?
A. Yes, but as I pointed out in the testimony you just read, when you say MRS to me, in that time frame, I include a private MRS possibility, as well as the government MRS.
Q. Okay. So the momentum for both of them was building?
A. Well, the momentum for an MRS was building, some of it was government MRS, some of it was private.
Q. And in fact, Mr. Stuart, you personally engaged in meetings with individuals from DOE who represented the concept of the MRS into 1995, isn't that right?
A. Yes.
Q. And the people that you met with included the MRS negotiator, a waste negotiator, David Leroy, correct?
A. That's correct.
Q. Now, in fact, Mr. Stuart, there was a general belief in the industry that if the government was spending money on the MRS concept, that an MRS might in fact break the logjam regarding the acceptance of spent nuclear fuel under the standard contract,

Page 790

correct?
A. Yes.
Q. Now, could we look at PX-177, please? This is the exhibit that you looked at with Mr. -- it should be in your binder. I think you looked at it with Mr. Stouck yesterday.
A. Is that the document that's identified as transportation business plan?
Q. This is the document that is a letter, it's the cover letter, and then below, the second page is a new strategy for management of commercial spent nuclear fuel. I believe it's PX-177.
A. This is the Watkins to Johnston letter?
Q. That's right.
A. Okay.
Q. Now, Mr. Stuart, in this memo, do you read it as saying anything about whether MPCs are covered under the standard contract? Does it?
A. I don't recall seeing anything to that effect.
THE COURT: When you said in the memo, Counsel, I'm not what are you referring to.

Page 791

MR. LO RE: I'm sorry, I'm referring to the memo that is attached to the letter, the cover page of PX-177. The memo is entitled, "A New Strategy For Management of Commercial Spent Fuel." It's page HQR, and it ends in 091.
THE COURT: Right. So it's PX-2 and 3 -- PX-177 pages 2 and 3.
MR. LO RE: That's correct, Your Honor.
THE COURT: And then you used an acronym.
MR. LO RE: MPC.
BY MR. LO RE:
Q. I believe you used that on direct examination. What does MPC stand for, sir?
A. Stands for multi-purpose canister or a cask system.
THE COURT: Thank you.
BY MR. LO RE:
Q. Now, on the second page of this document, of this attachment, which is the page that ends in 92, it refers to a standardized canister system, do you see that?
A. Yes.
Q. Did you understand that standardized

Page 792

canister system to be the same as an MPC?
A. Yes.
Q. Thank you. Mr. Stuart, are you aware that in 1992, DOE expressed the view to utilities that it would not even consider initiating actions to make canistered fuel acceptable under the standard contract until an MPC was licensed?
A. I didn't quite understand it that way. In fact, I understood it in the reverse direction, that while the Department was promoting the MPC, they acknowledged publicly, because the MPC included a sealed canister, that that would have to be recognized in the standard contract, and therefore, that it would need to be a change.
Q. And do you understand the distinction between a multi-purpose canister and a dual-purpose canister?
A. I believe I understand the difference, but when I hear someone use those words, I generally like to question them to make sure they're using the same terminology that I do.
Q. How do you interpret both of those?
A. Well, to start with, the dual-purpose

Page 805

BY MR. LO RE:
Q. I asked, "Do you think it is?
"ANSWER: It could certainly be considered such. I don't think I would call it a methodology. I would call it a verification of experience, verification of the ability to duplicate the experience."
And that's what I asked, and that's what you answered, correct?
A. Yes.
Q. Now, let's talk a little bit about verification of experience. When you examined that European experience and conducted your verification, you didn't look at the regulatory scheme under which the European ship their fuel to reach the conclusion how that scheme would apply to the United States, correct?
A. As I answered when you asked me that question at this same deposition, I did not go back and look at the European regulatory requirements because I happen to know them, because I happen to have designed a cask that meets the regulatory requirements, the same STC that's being used in Spain.
So having that knowledge, I didn't

Page 806

have to go back and look at the European regulatory standards because I know that they're very comparable to the U.S.
Q. And so you also, Mr. Stuart, did not perform any analysis as to the political issues surrounding transportation of spent nuclear fuel in Europe, did you?
A. That's correct.
Q. And you didn't perform any analysis accounting for potential political challenges to the transportation of spent nuclear fuel across the United States, correct?
A. That is correct.
Q. Now, the European experience that you looked at examined fuel that was going to two places, isn't that right?
A. Yes, that's correct.
Q. And that fuel, I believe you testified yesterday, was being reprocessed, is that right?
A. It's going to those two places for the purposes of reprocessing, but it may not have actually been reprocessed at any one time.
Q. It's on the queue to be reprocessed?
A. That's correct, Counsel.

Page 807

Q. It's not being disposed of in a permanent repository, is that right?
A. Yes, that's correct.
Q. Now, Mr. Stuart, the ultimate destination of fuel affects the way it is transported, isn't that right?
A. I think we may have to define some terms for me to answer that.
Q. It's a yes or no question, sir.
A. I don't believe I could give a yes or no answer without being somewhat misleading, whichever answer I gave you.
THE COURT: Let me try to give some guidance to the witness. If a question can fairly in conscience be answered yes or no, I'd advise you to answer that way. If you don't know the answer or the question is too confusing to answer, you can say that. You can answer yes or no, but the answer is incomplete, you should say yes or no and then ask to explain, which the lawyer will or will not allow you to do. But the lawyer who called you to the stand originally will be then alerted to ask you later if the issue is misleading.

Page 808

THE WITNESS: Yes, very good. Thank you, Your Honor.
I would answer no, but I think it needs some explanation.
BY MR. LO RE:
Q. Now, Mr. Stuart, when you performed your analysis in this case, you made no assumptions as to whether spent nuclear fuel that DOE was accepting and transporting was going to be reprocessed or disposed of, correct?
A. Yes, that is correct.
Q. Now, Mr. Stuart, when you talked about the various numbers that DOE could achieve in transportation, you were not constrained by what happened once DOE delivered the fuel to its destination, is that right?
A. Yes.
Q. And is it fair to say, Mr. Stuart, that the only constraint on the amount of fuel that you determined DOE could move would be the number of casks and the transportation infrastructure surrounding that transportation, is that right?
A. Not entirely.

Page 809

Q. Why don't you explain that?
A. At the other end, if you will, the processing end, whether it be just continued storage or disposal, there obviously is some limitation on how much that particular facility could handle, so there is some constraint there. I didn't, in my own mind, pick a number, however, as you say, the numbers you talked about, the various pickup rates, in my view, are certainly within the capacity of a reasonable receipt facility.
Q. Now, I'd like to look at the chart, staying on that European experience that we discussed, I'd like to look at the chart that Mr. Stouck showed you, and I believe – is it PX-42?
THE COURT: It's Plaintiff's Demonstrative Exhibit 42. It's not in evidence.
MR. LO RE: Thank you, Your Honor.
MR. STOUCK: Would you like to have it on the screen, Mr. Lo Re? I think we can arrange that.
MR. LO RE: Thank you, Counsel.
BY MR. LO RE:

Page 810

Q. Now, Mr. Stuart, the fuel that's being shipped here is obviously being shipped by two separate countries, is that right? I'll ask a better question. It's being shipped within two separate countries?
A. Well, it's being shipped from many parts of the world, so it's going to two separate countries as their destination, but it's coming from lots of places.
Q. So the destination is separate, two separate destinations?
A. That's correct.
Q. Okay. And these are two separate arrangements to transport this particular fuel, is that right?
A. Could you give me a definition of arrangements?
Q. Yeah.
A. What's included in your thought of arrangement?
Q. Well, when we talked about your transportation opinion yesterday, we talked about that transportation being executed under the standard contract, is that right?
A. Yes.

Page 811

Q. There's not one standard contract that applies to both fuel that's being transported to the U.K. and fuel that's being transported to France, correct?
A. I don't know the answer to that question.
Q. And the fuel is being transported by separate entities, the fuel that's going to France is being transported by – is it Cogema?
A. Well, again, I think we need to define transported by. There is a transport company that transports this fuel. It's actually neither Cogema nor BNFL. It happens to be a company that both of them own, and that company has the transport casks, and so those two companies, Cogema and BNFL, have found it economic to have a single company that does the transportation.
And so I just wanted to be clear when you said, "arranging."
Q. Thank you.
A. That company does the transportation and arranges for it, although the contract is ultimately with the two companies, Cogema and BNFL.

Page 812

Q. Now, Mr. Stuart, I'd like to look at the rates of acceptance on this chart. If we were to look at – just breaking the two apart, in other words, a single country receiving 3,000 MTU, when did that first happen? When did one country accept 3,000 MTUs of spent fuel?
A. In 1996, the French company came very close to 3,000. It was about 2,900 and something.
Q. That was 1996, did you say?
A. Yes.
Q. And when did the French start receiving fuel?
A. Do you mean by that the –
Q. According to this chart, yes, according to this chart, when did the French start receiving fuel?
A. I don't believe this chart purports to show the first time they ever received fuel. What it shows is, as early as 1960, they were receiving fuel. They may actually have been receiving some prior to that.
Q. So according to this chart, putting aside what you just said, according to this

Page 813

chart, it was 35 years from the time this chart begins, or 36 years to the time that the French received 3,000 MTU worth of fuel?
A. Yes, but there's a very good reason for that.
Q. Mr. Stuart, when did the U.K. receive 3,000 MTU of fuel?
A. They haven't.
Q. Now, let's look at both of the countries combined. Combined, when did both the U.K. and France hit the 3,000 MTU mark on your chart, sir?
A. The first year was 1984.
Q. And that's 24 years before this chart begins, which is 1960, correct?
A. Yes, but there is no relationship between the time that it took to get there and that particular year.
Q. So the answer is, yes, it was 24 years, right?
A. Yes, it was.
Q. Thank you.
THE COURT: Yes or no, if possible.
THE WITNESS: Okay.
BY MR. LO RE:

Page 814

Q. Mr. Stuart, you testified, and I think you misspoke, I looked at the transcript last night, you said that it turns out to be 100 metric tons by 1998. In fact, this chart shows that it's 100 metric tons by 2003, correct?
A. It's 100,000 metric tons.
Q. 100,000 metric tons, yes, excuse me.
A. Yes, I believe I answered the question that Mr. Stouck asked me, which was did I know what the number was by 1998, and I said it was over 100,000.
Q. So they had received 100,000 tons by 1998?
A. Yes.
Q. Okay. Thank you. I want to talk – if we can go from that, thank you. I'd like to talk about your examination of the experience of moving fuel in the United States. Now, in the United States, no one has ever moved 3,000 MTU in a single year, is that right, MTU of spent nuclear fuel?
A. Yes, that's correct.
Q. And you talked a little bit on direct examination about the Navy. Do you know what the Navy projects to move in total from the

Page 815

time it began moving fuel until it projects that it will stop moving fuel in 2035?
A. I have seen the number. It doesn't come to mind. It's not a huge number.
Q. Does the number 65 metric tons of spent nuclear fuel sound right?
A. That sound very close, yes.
Q. That's the aggregate amount, right?
A. I'm sorry?
Q. That's the aggregate amount?
A. Yes.
Q. Now, I want to talk a little bit about the NAC experience that you testified on direct examination. The biggest cask that NAC has ever moved is two, includes two assemblies, is that right?
A. Depends on which kind of assemblies you're talking about.
Q. What do you mean?
A. As I believe I described to you in the deposition, the NAC truck casks are licensed for many different kinds of fuel and so, for example, in the fuel that we took from Iraq that I described –
Q. No, I'm sorry, sir. I'm talking about

Page 816

moving fuel in the United States, just in the United States now.
A. Even in the United States, NAC has moved fuel that has more than two assemblies' worth in a cask. It's not commercial nuclear power plant fuel. It's slightly different, smaller.
Q. Let's focus for a moment on the commercial fuel from a nuclear utility. Has NAC ever moved such fuel with a cask that it holds more than two assemblies?
A. No.
Q. And is it fair to say that most of the casks that you moved include one assembly, one assembly of commercial spent nuclear fuel?
A. Your question switched from NAC to me.
Q. No, I mean NAC.
A. Oh, you're excluding my GE experience?
Q. Correct.
A. The answer is yes.
Q. And none of the casks that NAC has moved were transported by rail, is that right?
A. I'm sorry, would you say that again?
Q. Sure. None of the casks that NAC has transported were transported by rail?

Page 817

A. No, that's not correct.
Q. The ones that were transported by rail were a truck cask that were put on rail, is that right?
A. Yes.
Q. So to be clear, NAC has never transported fuel using a rail cask, is that right?
A. I would say, yes, provided we agree that rail and truck is not a good nomenclature for the cask. A truck cask, as we traditionally call them, are small casks, but truck casks can go on rail, just as they can go on trucks.
Q. I understand, but what I'm talking about is a rail cask, a cask that is designed to be put on to a rail car and not a truck. The answer is that NAC has never transported spent nuclear fuel on such a cask, is that right?
A. That's correct.
Q. Thank you.
THE COURT: To cut into your lunchtime a little bit more, what portion of an MTU is a single assembly, PWR and BWR?

Page 818

THE WITNESS: Pressurized water reactor assembly, the standard type fuel is just slightly under one-half of an MTU, it's about .4 something. The boiling water type standard again is about .18.
THE COURT: Thank you.
BY MR. LO RE:
Q. Now, Mr. Stuart, the NAC STC cask that you testified about on direct examination, that holds about 26 PWR assemblies, is that right?
A. Once again, I have to qualify the answer. It's 26 in the earlier concept that I mentioned, bare fuel, no canister. In the concept that's being used at the Yankee plants, it ranges from 37 of the PWR assemblies of the Yankee Rowe type plant and 24 of the other plants, Maine Yankee and Connecticut Yankee.
Q. Now, let's talk about the capacity of the NAC STC cask to BWR fuel. How many BWR assemblies can fit into a NAC STC cask?
A. Are we talking specifically the STC cask?
Q. Yes.
A. Yeah. The STC cask has not been licensed for BWR fuel as of the moment. There

Page 819

has not been a request to do that in the – I can give you my opinion on how many it could hold, but it has not actually been licensed.
Q. Have there been any estimates as to how many BWR assemblies it can hold?
A. Yes, and, again, we have to decide which kind of BWR assemblies. For example, the model that you see in front of the Court here is a short, relatively short BWR, and that particular kind of fuel, because of its size, would fit into the STC and probably hold about as many as is planned to be in the Holtec system which PG&E is buying, which is 80. So it should be somewhere in that range because the diameter of the cask, the interior diameter is about the same.
Q. Thank you. Now, Mr. Stuart, you testified about the use of campaigns. I believe you testified you believed the campaigns would be clearly efficient under the standard contract, is that right?
A. Yes.
Q. Mr. Stuart, the standard contract does not – strike that. You described campaigns, is it fair to

Page 820

say, sir, as the movement of spent fuel from one location to another using multiple casks at a time?
A. Yes, that's how I define a campaign.
Q. And, Mr. Stuart, the standard contract does not provide for campaigns, is that right?
A. I don't know of any place where it does discuss it.
Q. There's no provision in the contract that discusses campaigns?
A. I believe there is not any, yeah.
Q. Thank you. Now, in fact, the standard contract includes a provision, I think you talked about this on direct examination, using the oldest fuel first ranking, is that right?
A. Yes.
Q: Now, do you know whether – let's take a look at that. It's PX-54, please.
THE COURT: I'm sorry, whose screen is this coming up on?
MR. LO RE: From the government.
BY MR. LO RE:
Q. This is the standard contract, Mr. Stuart, let's take a look at page 10 of that, please.

Page 829

this to be consistent with your conclusion that PG&E's fuel did not need special handling?
A. There's nothing in this document that says anything that sounds like special handling to me as I expressed my opinion about the Humboldt Bay fuel.
Q. And so when you express your opinion about the special handling of Humboldt Bay fuel, you don't consider putting an assembly, such as the one in front of us that is, let's say, broken into a specific canister or can as requiring special handling, is that right?
A. That's correct.
Q. Thank you. Now, Mr. Stuart, you testified about the feasibility of exchanges yesterday, do you recall that?
A. Yes.
Q. Now, with respect to –
THE COURT: Counsel, did you intend to bring PX-28 in or not?
MR. LO RE: Your Honor, it's hearsay. I don't think there's a reason to put it into the record.
THE COURT: Go ahead.
BY MR. LO RE:

Page 830

Q. Mr. Stuart, you didn't perform any analysis on how exchanges would have worked if DOE had begun performing in 1998, did you?
A. No, I did not.
Q. And you have never personally engaged in exchanges of spent nuclear fuel, have you, slots for the acceptance of spent nuclear fuel?
A. No, I have not.
Q. You haven't performed any analysis as to how much an acceptance slot would cost any particular utility, have you?
A. No, I have not.
Q. And you haven't made any determination as to whether a utility might decide that it's simply too costly to engage in exchanges, is that right?
A. That's correct.
Q. And you haven't performed any analysis as to whether uncertainty with respect to DOE approval of exchanges might affect a utility's incentive to trade those slots, have you?
A. No, I have not.
Q. Now, Mr. Stuart, you talked about a crane that PG&E is planning to use at the Humboldt Bay facility yesterday. I think you

Page 831

referred to it as a cherry-picker.
A. Yes.
Q. Have you performed any analysis as to the cost that PG&E expects to incur in developing that crane?
A. No.
Q. You also talked about loading of spent nuclear fuel into casks. Do you recall that, sir?
A. Yes.
Q. Now, you've never supervised the loading or unloading of spent nuclear fuel at a nuclear power plant, have you?
A. No, I have not.
Q. And in fact, you've only witnessed one loading of spent nuclear fuel, is that right?
A. Yes, I believe we discussed that at the deposition.
Q. And that was the fuel that was being loaded at Georgia Tech?
A. Yes.
Q. For the Olympics, to get the fuel away from the Olympic sites, is that right?
A. Prior to the Olympics, yeah.
Q. And that was not commercial spent

Page 832

nuclear fuel, correct?
A. That's correct.
Q. And you spent about half a day watching that loading, is that right?
A. Yes.
MR. LO RE: Your Honor, if I may have one moment?
THE COURT: Yes.
MR. LO RE: Your Honor, I have no further questions.
THE COURT: Thank you. Are you good to continue?
THE WITNESS: Yes, I'm fine.
THE COURT: Redirect examination.
MR. STOUCK: Yes, Your Honor. Thank you.
THE COURT: Redirect examination of the witness by Mr. Stouck. Redirect will be within the scope of cross.
MR. STOUCK: First of all, can we have Demonstrative 54 up, the European chart?
THE COURT: That's Plaintiff's Demonstrative Exhibit 42.
MR. STOUCK: I'm sorry. Thank you, Your Honor. I see that now that I looked at my

Page 1159

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------x

SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
:NO. 98-488C
Plaintiff :
vs. :
UNITED STATES, :
Defendant. :

-------------------------------:

Courtroom 5
National Courts Building
715 Madison Place
Washington, D.C.

Friday, March 25, 2005

VOLUME 5

The parties met, pursuant to the notice of the Judge at 10:05 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

Page 1160

APPEARANCES:

ON BEHALF OF PLAINTIFF:
DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5656

Page 1161

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

ALSO PRESENT:
STEVEN M. COHN, ESQ.
STEVE J. REDEKER
THOMAS POLLOG

***Index appears at end of transcript***

Page 1162

P R O C E E D I N G S
- - - - -

MR. LO RE: Your Honor, good morning. We have a couple of preliminaries.
THE COURT: Okay.
MR. LO RE: Thanks. First, Your Honor, you had asked for our schedule, the trial schedule.
THE COURT: Oh, yes, thank you.
MR. LO RE: And we've actually got it here. It sets forth the trial through to next year.
THE COURT: I'm with you, I understand.
MR. LO RE: Now, we can file this.
THE COURT: Oh, no, no.
MR. LO RE: The next trial we have is in June, Your Honor.
THE COURT: In June?
MR. LO RE: Yes.
THE COURT: You're rolling right along here, aren't you?
MR. LO RE: Yes, ma'am.
THE COURT: Now, we're going to meet again in July, of next year.
MR. LO RE: Next year.
THE COURT: I was going to say I don't remember we had that.

Page 1399

for purposes of whether it's standard under the standard contract, correct?

A. I believe what I said to you, and we were discussing this in a deposition, was that since the definitions are not very explicit, in my opinion, it seemed to me that the subject of special handling was very important in trying to determine the category of failed fuel, and I pointed out to you that my inspection of the videotapes of some of the fuel at SMUD showed me there was no special handling needed.

Q. So you applied the special handling criteria to the SMUD F-2 fuel?

A. Depending on what you mean by, "applied it." I looked at the pictures, the videos, I know that SMUD individuals classified the fuel that I saw as F-2, and I said that I could not see anything in the fuel that I examined that would require special handling, as it related to the question of whether or not that fuel could be taken by the Department of Energy in the course of taking the fuel.

Q. And to the extent that no special handling was needed, you concluded that it could be taken on the same queue as SMUD's standard fuel?

A. Yes.

Q. Okay. Now, Mr. Stuart, your report refers

Page 1400

to campaigns, correct?

A. Yes.

Q. Now, campaigns – you can leave that contract, the first page of the contract up, please. Campaigns are not contemplated under the standard contract, are they?

A. They're not specifically identified. I don't know if they were contemplated by whoever wrote the standard contract.

Q. And that's a poor way of putting it. They're not identified in the standard contract, are they?

A. That's correct.

Q. In fact, there's no provision that even refers to campaigns, correct?

A. In the standard contract?

Q. In the standard contract.

A. Yes, I could not find any.

Q. Now, you have performed an analysis whereby, within a four to five-year campaign, SMUD could have had all of its fuel accepted, is that right?

A. I prepared an analysis that said within a period of a few years, with several campaigns, the fuel could be removed from SMUD, if the casks that

Page 1401

were used were of the larger size that were contemplated in the cask development program that I described a few moments ago.

Q. Now, you did no written analysis for SMUD with respect to the possibility of campaigns, correct?

A. As I believe I said at the deposition, I prepared an analysis that was described in the Yankee case, and I relied on that because I believe it applies to the SMUD case as well.

Q. Now, in the Yankee case, the analysis that you relied upon from the Yankee case, you did not offer an opinion as to the order in which campaigns would occur, correct?

A. Could you tell me what you mean by order of the campaigns?

Q. Yeah, when a campaign would start and where it would go.

A. You mean plant-by-plant?

Q. Yes.

A. I did not offer such an opinion.

Q. And you didn't offer an opinion either in the real world or in the breach world for such an order of campaigns, correct?

A. That's correct.

Page 1402

Q. Now, the Yankee plants are in the northeastern part of the country, correct?

A. Yes.

Q. And the SMUD plant is obviously a completely different region of the country, correct?

A. Yes.

Q. Now, the casks that you refer to in your campaign analysis you mentioned a moment ago, the larger rail casks, those are based on the – is it the CSPD?

A. Not quite, CSDP.

Q. Okay. And that is an analysis that DOE performed, correct?

A. I think I'm losing the track of your thinking here.

Q. Sure.

A. I don't know of any DOE analysis relative to the CSDP.

Q. Who prepared the CSDP? Who –

A. I think you might be referring to the FICA, not to the CSDP.

Q. Who, the question is, who prepared it, who prepared the CSDP?

THE COURT: I want to know what it is, first.

Page 1415

campaigns, correct?
A. To do what?
Q. To take the oldest fuel, the number one fuel and then take the second oldest fuel, isn't that right?
A. I believe you'd have to do that whether it's a campaign or not.
Q. So campaigns are regional, correct?
A. No, when you're doing a campaign, it's specific to a site.
Q. And you wouldn't go to several sites in a particular area of the country during a campaign?
A. Oh, that's not too likely because you would be taking fuel from one plant to another plant, if you were doing it in a campaign, as I think you're suggesting, and that would present some issues with the NRC, I believe. My concept of the campaign is you take a number of casks to a specific site, and you load them and take some amount of fuel away, as opposed to a single cask; that's not a campaign.
Q. And you would have to, under the Oldest Fuel First concept, you would have to take that, that utility's oldest fuel in the first campaign, correct?
A. I don't – I'm losing the train of your thought.

Page 1416

Q. We just said that the Oldest Fuel First concept applies under the contract, correct?
A. Yes.
Q. And in order for that to apply –
A. Excuse me a second, the contract, as I understand it, doesn't specifically say Oldest Fuel First as we now talk about it, OFF.
Q. What does it say?
A. It would –
THE COURT: Why don't you go back, the contract is right before you on the screen.
THE WITNESS: Yes, it talks about that that's how they would determine it, but when we're talking about OFF, if that's what we're talking about.
BY MR. LO RE:
Q. Yes.
A. I mean, it doesn't say, "OFF," in there, is what I'm saying, it says they're going to do it on an Oldest Fuel First concept, is that right?
Q. Yes.
A. Okay.
Q. And if the, if a particular –
THE COURT: Which may be less efficient than the campaign concept that you're discussing.

Page 1417

THE WITNESS: Yes, it certainly would be, in my opinion.
THE COURT: Yeah.
MR. LO RE: So –
THE COURT: It could be depending where the oldest fuel is.
THE WITNESS: Yes.
THE COURT: You follow Mr. – the hypothetical that we just heard, there's one in, you know, Maine and one in California, that would be very inefficient.
THE WITNESS: Yes –
THE COURT: To go to Maine to pick up more than one and –
THE WITNESS: If all you did is pick up the oldest fuel at plant A, that would be very inefficient. It wouldn't be a campaign.
THE COURT: Would it be a campaign if you picked up all the oldest fuel in the state of Maine or in the northeast?
THE WITNESS: It could be a campaign, Your Honor, but as I'm indicating, if there's more than one site in Maine, taking fuel from one site to another site, I think the NRC would have some questions about that. It's not traditional to do

Page 1418

that.
THE COURT: They just don't want more waste in one area than they need to have?
THE WITNESS: They want you to pick up the fuel.
THE COURT: And get it out of there.
THE WITNESS: And go wherever you're going, and don't take it somewhere else in-between.
THE COURT: Okay.
BY MR. LO RE:
Q. So if you did a campaign at a single utility and took all of SMUD's fuel over the course of several years, you would not be taking another utility's oldest fuel?
A. In that –
THE COURT: I think, under your question, it's not a campaign.
MR. LO RE: It wouldn't be a campaign.
THE WITNESS: I'm losing track of the question. Would you either say it again or rephrase it, please?
BY MR. LO RE:
Q. Sure, yeah. If you performed a campaign once you were a single utility, and you took all of that utility's fuel?

Page 1419

A. Yes.
Q. There would be another utility that didn't have its oldest fuel taken?
A. That's very likely.
Q. Thank you. Now, Mr. Stuart, your report refers to exchanges, correct?
A. Yes.
Q. Mr. Stuart, in your 35 years in the industry, have you ever testified as an expert with respect to exchanges of spent nuclear fuel pickup dates?
A. No, as I think we discussed in the deposition, I have not done that.
Q. Have you --
THE COURT: I think this is a good place for us just to make a notation in the record that, starting where you're questioning now, you have registered an objection to any testimony about this, but you're going to proceed anyway, so that if I go back and look at the transcript, I'm going to remember that, what we talked about beforehand.
MR. LO RE: That's right. Thank you.
THE COURT: Okay.
BY MR. LO RE:
Q. Now, you have never engaged in any

Page 1420

exchanges of slots for the pickup of nuclear fuel, have you?
A. No, I have not.
Q. And you have never modelled a world where exchanges would occur of spent nuclear fuel, have you?
A. No, I have not.
Q. And in fact, Mr. Stuart, in this particular case, you didn't model an actual world where exchanges would occur, did you?
A. No, I did not.
Q. Now, you refer in your report -- strike that.
You refer in your direct testimony to uranium exchanges, correct?
A. Yes.
Q. And you did not include a reference to uranium exchanges in your initial report in this case, correct?
A. I believe that's correct, yes.
Q. Now, these uranium exchanges that you refer to, you have personally never conducted an exchange of the pickup of uranium, have you?
A. No, I have not.
Q. And you have never been qualified as an

Page 1421

expert with respect to the propriety of uranium exchanges, have you?
A. No, I have not.
Q. Now, Mr. Stuart, you referred to uranium exchanges that you have heard about while you were working at NAC, correct?
A. Yes.
Q. Now, those exchanges, or the reference to those exchanges were made by other people at NAC, is that right?
A. Yes.
Q. And you didn't consult with those people when you, in your direct testimony, referred to uranium exchanges, did you?
A. No, I did not.
Q. In your analysis, in your direct testimony, when you referred to uranium exchanges, did you provide any written analysis to reach that conclusion?
A. To reach what conclusion?
Q. Well, why don't we look at it? It's paragraph 34 of your expert opinion. Now, paragraph 34 of your direct testimony -- and I misspoke, what I mean is expert direct testimony. It says, "If there were a functioning DOE program, it is my opinion that

Page 1422

it is very likely that exchanges of acceptance rights between utilities would happen." And what I want to focus on is the next sentence, which says, "These exchanges would be similar to the exchange market that existed between utilities in the uranium context."
Now, in forming that opinion, sir, you didn't perform any written analysis, did you?
A. No, I did not.
THE COURT: Mr. Lo Re, while you're organizing yourself, just for those of you who are visiting here today, the building closes technically at 6:00. It's my intention to continue with the witness and finish him today, so he can get home to, by airplane tomorrow, and he doesn't have to come back.
So if you, if you decide to stay through everything, you've got to stay here in this room after 6:00. You can't be wondering around the halls or anything like that. I'm going to have to have everybody stay put until we're totally finished. So that gives everybody fair warning if you need to go home for anything. I see a couple people are taking a lot of notes. I don't know if you were not here at the beginning of the trial, but we do have daily