No. 04-106C
(Chief Judge Damich)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.
THE UNITED STATES OF AMERICA,

Defendant.

---

# DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, FRANK C. GRAVES

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 305-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Trial Attorneys
U.S. Department of Justice

April 29, 2008

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . iii

INDEX TO APPENDIX . . . . . x

BACKGROUND . . . . . 2

SUMMARY OF ARGUMENT . . . . . 11

ARGUMENT . . . . . 12

I. THE COURT HAS THE POWER AND THE DUTY TO GRANT MOTIONS *IN LIMINE* TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES . . . . . 12

II. A MOTION *IN LIMINE* IS APPROPRIATE IF A PROPOSED TESTIFYING EXPERT WITNESS LACKS THE QUALIFICATIONS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE* . . . . . 13

A. To Be Admissible, Mr. Graves' Opinions Must Be Reliable And Relevant . . . . . 13

B. To Establish That Mr. Graves' Testimony Is Reliable, Dairyland Must Establish That He Is Qualified To Render The Opinions At Issue . . . . . 15

C. To Be Admissible, Mr. Graves' Opinions Must Be Helpful To The Trier Of Fact . . . . . 16

III. MR. GRAVES' OPINION CONCERNING THE RATE OF ACCEPTANCE SHOULD BE EXCLUDED . . . . . 17

A. Mr. Graves Is Not A Qualified Expert Witness On The Issue Of The Proper Pace For DOE's Acceptance Of Spent Nuclear Fuel . . . . . 17

B. Even If Mr. Graves Were Qualified To Be An Expert Witness Upon The Rate Of Acceptance, The Methodology Underlying His Conclusions Is Unreliable . . . . . 18

TABLE OF CONTENTS (cont.)

PAGE

C. Even If Mr. Graves' Opinion Was Reliable, The Opinion Is Not Helpful To The Trier Of Fact And Is, Therefore, Irrelevant . . . . . . . . . . . 19

IV. MR. GRAVES' OPINIONS CONCERNING THE HYPOTHETICAL EXCHANGES MARKET SHOULD BE EXCLUDED . . . . . . . . . . . . . . . . . . . . 20

A. Mr. Graves' Exchanges Model Is Not Reliable . . . . . . . . . . . . . . . . . . . . . 20

B. Mr. Graves' Exchanges Opinion, Even If Reliable, Is Not Helpful To The Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

V. TO THE EXTENT THAT MR. GRAVES IS PERMITTED TO TESTIFY, HIS TESTIMONY SHOULD BE LIMITED TO THOSE MATTERS SPECIFICALLY ADDRESSED IN HIS REPORTS . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

CASES PAGE(S)

Ancho v. Pentek Corp.,
157 F.3d 512 (7th Cir. 1998) ........ 17

Apostol v. United States,
838 F.2d 595 (1st Cir. 1988) ........ 16

Baskett v. United States,
2 Cl. Ct. 356 (1983) ........ 12

Bluebonnet Sav. Bank, FSB v. United States,
67 Fed. Cl. 231 (2005), aff'd,
466 F.3d 1349 (Fed. Cir. 2006) ........ 32

Bluebonnet Sav. Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003) ........ 33

Bourjaily v. United States,
483 U.S. 171 (1987) ........ 14

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,
509 U.S. 209 (1993) ........ 24

Callahan v. A.E.V., Inc.,
182 F.3d 237 (3d Cir. 1999) ........ 24

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd in part, rev'd in part,
301 F.3d 1328 (Fed. Cir. 2002) ........ 22

Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,
447 U.S. 557 (1980) ........ 27

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000) ........ 32

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004) ........ 22

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

Concord Boat Corp. v. Brunswick Corp.,
207 F.3d 1039 (8th Cir. 2000) . . . . . . . . . . 24

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) . . . . . . . . . . passim

Dhillon v. Crown Controls, Inc.,
269 F.3d 865 (7th Cir. 2001) . . . . . . . . . . 16

Dolphin Tours, Inc. v. Pacific Creative Serv., Inc.,
773 F.2d 1506 (9th Cir. 1985) . . . . . . . . . . 21

Domingo v. T.K., M.D.,
289 F.3d 600 (9th Cir. 2002) . . . . . . . . . . 15

Elkind v. Ligget & Meyers, Inc.,
635 F.2d 156 (2d. Cir. 1980) . . . . . . . . . . 24

Employers Reinsurance Corp. v. Mid-Continent Cas. Co.,
202 F. Supp. 2d 1212 (D. Kan. 2002) . . . . . . . . . . 17

Federal Trade Comm'n v. Elders Grain, Inc.,
868 F.2d 901 (7th Cir. 1989) . . . . . . . . . . 26, 27

Fifth Third Bank v. United States,
55 Fed. Cl. 223 (2003) . . . . . . . . . . 22

Franklin Fed. Sav. Bank v. United States,
55 Fed. Cl. 108 (2003) . . . . . . . . . . 22

General Elec. Co. v. Joiner,
522 U.S. 136 (1997) . . . . . . . . . . 15, 21

Genty v. Resolution Trust Corp.,
937 F.2d 899 (3d Cir. 1991) . . . . . . . . . . 16

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

Glendale Fed. Bank, FSB, v. United States,
43 Fed. Cl. 390 (1999), aff'd in relevant part, vacated in part,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . 23

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . 33

Hamling v. United States,
418 U.S. 87 (1974) . . . . . . . . . . 16

Hanover Shoe, Inc. v. United Shoe Machinery Corp.,
392 U.S. 481 (1968) . . . . . . . . . . 27

Hi-Shear Tech. Corp. v. United States,
53 Fed. Cl. 420 (2002), aff'd,
356 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . 33

Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,
488 F.3d 982 (Fed. Cir. 2007) . . . . . . . . . . 36

Honorable v. Easy Life Real Estate Sys.,
100 F. Supp. 2d 885 (N.D. Ill. 2000) . . . . . . . . . . 27

Illinois Brick Co. v. Illinois,
431 U.S. 720 (1977) . . . . . . . . . . 27

Image Tech. Services, Inc. v. Eastman Kodak Co.,
903 F.2d 612 (9th Cir. 1990) . . . . . . . . . . 28

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . 32

Joy v. Bell Helicopter Textron, Inc.,
999 F.2d 549 (D.C. Cir. 1993) . . . . . . . . . . 13

Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.,
28 F. Supp. 2d 126 (S.D.N.Y. 1998) . . . . . . . . . . 21

TABLE OF AUTHORITIES (Cont'd)


CASES PAGE(S)

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) . . . . . 13, 15

Lithuanian Commerce Corp. v. Sara Lee Hosiery,
179 F.R.D. 450 (D.N.J. 1998) . . . . . 14

Masters v. Hesston Corp.,
291 F.3d 985 (7th Cir. 2002) . . . . . 14, 16

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) . . . . . 24

Nebraska Public Power District v. United States,
73 Fed. Cl. 650 (2006), appeal pending,
No. 2007-5083 (Fed. Cir.) . . . . . 11

O'Connor v. Commonwealth Edison Co.,
13 F.3d 1090 (7th Cir. 1994) . . . . . 15

Oiness v. Walgreen Co.,
88 F.3d 1025 (Fed. Cir. 1996), cert. denied,
519 U.S. 1112 (1997) . . . . . 23

Otis v. Doctor's Assocs., Inc.,
1998 WL 673595 (N.D. Ill. Sept. 14, 1998) . . . . . 14

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006), appeal pending
Nos. 07-5046 (Fed. Cir.) . . . . . passim

Palmerin v. City of Riverside,
794 F.2d 1409 (9th Cir. 1986) . . . . . 12

Ralston v. Smith & Nephew Richards, Inc.,
275 F.3d 965 (10th Cir. 2001) . . . . . 14, 16

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005) . . . . . 15

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006) appeal pending No. 07-5046 (Fed Cir.) ............. 5, 10, 28

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) .................................... 5, 28

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) .................................... 14, 15

Sherbert v. Alcan Aluminum Corp.,
66 F.3d 965 (8th Cir. 1995) ........................................ 17

Shockley v. Arcan, Inc.,
248 F.3d 1349 (Fed. Cir. 2001) .................................... 22, 23

Slattery v. United States,
69 Fed. Cl. 573 (2006) .............................................. 22

Southern Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003) .............................................. 23

Southern Pac. Communications Co. v. AT&T,
556 F. Supp. 825 (D.D.C. 1982), aff'd,
740 F.2d 1011 (D.C. Cir. 1984) ................................ 21, 25, 31

Story Parchment Co. v. Paterson Parchment Paper Co.,
282 U.S. 555 (1931) .................................................. 33

Suess v. United States,
52 Fed. Cl. 221 (2002) .............................................. 23

Summers v. Missouri Pacific R.R. Sys.,
132 F.3d 599 (10th Cir. 1997) ...................................... 17

United States v. Bourgeois,
950 F.2d 980 (5th Cir. 1992) ........................................ 16

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

United States v. E.I. Du Pont De Nemours & Co.,
118 F. Supp. 41 (D. Del. 1951) . . . . . . . . . . 28

United States v. Realty Multi-List, Inc.,
629 F.2d 1351 (5th Cir. 1980) . . . . . . . . . . 28

Virgin Atlantic Airways Ltd. v. British Airways PLC,
69 F. Supp. 2d 571 (S.D.N.Y. 1999), aff'd,
257 F.3d 256 (2d Cir. 2001) . . . . . . . . . . 24

Weisgram v. Marley Co.,
528 U.S. 440 (2000) . . . . . . . . . . 24

White v. Delta Constr. Int'l Inc.,
285 F.3d 1040 (Fed. Cir. 2002) . . . . . . . . . . 33

White Mountain Apache Tribe of Az. v. United States,
10 Cl. Ct. 115 (1986) . . . . . . . . . . 12

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961) . . . . . . . . . . 22, 33

William Green Constr. Co. v. United States,
201 Ct. Cl. 616, 477 F.2d 930 (1973), cert. denied,
417 U.S. 909 (1974) . . . . . . . . . . 33

Wunderlich Contracting Co. v. United States,
173 Ct. Cl. 180, 351 F.2d 956 (1965) . . . . . . . . . . 33

Yankee Atomic Electric Co. v. United States,
No. 2007-5025 (Fed. Cir.) . . . . . . . . . . 10

Yankee Atomic v. United States,
73 Fed. Cl. 249 (2006) . . . . . . . . . . 6

STATUTES AND REGULATIONS

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

10 C.F.R. § 961.11 . . . . . . . . . . passim

Fed. R. Civ. P. 16 . . . . . . . . . . 12

Fed. R. Evid. 702 . . . . . . . . . . passim

R. Ct. Fed. Cl. 16 . . . . . . . . . . 15

R. Ct. Fed. Cl. 26 . . . . . . . . . . 36

R. Ct. Fed. Cl. 37(c)(1) . . . . . . . . . . 36

MISCELLANEOUS

3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02] . . . . . . . . . . 14

Restatement (Second) of Contracts § 347(c) . . . . . . . . . . 21

# INDEX TO APPENDIX

DOCUMENT PAGE


Defendant's Witness List, Dairyland v. United States (April 18, 2008) . . . . . . . . . . 1

Dairyland's Witness List, Dairyland v. United States (April 18, 2008) . . . . . . . . . . 5

Defendant's Supplemental Response to Interrogatory 13, Dairyland v. United States (January 9, 2008) . . . . . . . . . . 8

Court-Stamped Copy of "Plaintiff's Cross Motion for Summary Judgment and Plaintiff's Response Opposing Defendant's Motion to Dismiss or, Alternatively, for Summary Judgment," as filed by Dairyland in Dairyland v. United States, 91-176C (J. Tidwell), dated October 19, 1992 . . . . . . . . . . 14

Court-Stamped Copy of Brief for Appellant Dairyland Power Cooperative, Dairyland v. United States, "Appeal From A Decision Of The United States Court of Federal Claims In 91-1676C Entered March 29, 1993, From Judge Moody R. Tidwell," Dated July 12, 1993 . . . . . . . . . . 34

Expert Witness Report of Frank C. Graves (March 23, 2007) . . . . . . . . . . 49

Excerpts, Rebuttal Report of Frank C. Graves (August 17, 2007) . . . . . . . . . . 67

Excerpts, Deposition of Frank C. Graves, Pacific Gas and Electric v. United States (January 24, 2006) . . . . . . . . . . 70

Excerpts, Deposition of Frank C. Graves, Pacific Gas and Electric v. United States (January 25, 2006) . . . . . . . . . . 101

Excerpts, Deposition of Frank C. Graves, Pacific Gas and Electric v. United States (May 19, 2006) . . . . . . . . . . 105

Excerpts, Deposition of Frank C. Graves, Dairyland v. United States (June 19, 2007) . . . . . . . . . . 110

Excerpts, Deposition of Frank C. Graves, Dairyland v. United States (September 6, 2007) . . . . . . . . . . 140

Excerpts, Deposition of Seymour J. Raffety, Ph.D., Dairyland v. United States (December 14, 2006) . . . . . . . . . . 148

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-106C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE
THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, FRANK C. GRAVES

Pursuant to RCFC 16 and the Court's February 21, 2008 scheduling order, defendant, the United States, respectfully requests that the Court enter an order to exclude the testimony of Mr. Frank C. Graves, whom the plaintiff, Dairyland Power Cooperative ("Dairyland"), intends to call as an expert witness to testify at trial regarding the "opinions described in his expert report and his rebuttal expert witness report, as well as matters addressed at his depositions" and "other related matters." Pl. Witness List 3 ¶ 6 (A6).[1] In particular, in the expert reports that he has submitted in this case, Mr. Graves offers opinions regarding two principal issues. First, Mr. Graves will offer testimony in this case regarding a reasonable "acceptance rate in the non-breach world" at which the Department of Energy would have accepted Dairyland's spent nuclear fuel under the parties' contract. Expert Witness Report of Frank C. Graves ("Graves Report"), at 5 (A52). Second, Mr. Graves is expected to offer testimony concerning the acceleration of Dairyland's place in the Standard Contract's "oldest-fuel-first" ("OFF")

[1] "A __" refers to the appendix to this motion.

acceptance queue through the operation of a hypothetical market for the exchange of approved delivery commitment schedules ("DCSs"), developed by Mr. Graves for the SNF litigation. Graves Report at 4, 15-18 (A51A, A57A-59). For the reasons that follow – and consistent with the Court's ruling in another related SNF case, Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending No. 07-5046 (Fed. Cir.), in which the Court granted our substantially similar motion *in limine* to preclude Mr. Graves from testifying concerning virtually the same model that Mr. Graves posits in this case as a basis for determining Dairyland's damages – the United States requests that the Court exclude Mr. Graves from testifying at trial in this matter.[2]

BACKGROUND

In this case, Dairyland seeks $54.4 million in costs that it allegedly has incurred through December 31, 2006, at its LaCrosse Boiling Water Reactor ("LACBWR") nuclear power plant in connection with the storage of SNF following the delay by the Department of Energy ("DOE") in performing pursuant to the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract"), the terms of which are published at 10 C.F.R. § 961.11.[3] Dairyland contends that all of LACBWR's SNF would have been removed by DOE in 1998, the first year of industry-wide acceptance. Consequently, Dairyland claims as damages all costs associated with the storage of LACBWR's SNF beginning in 1999. Yet, this

---

[2] In addition, for the reasons discussed below, to the extent that the Court denies our motion to preclude Mr. Graves from testifying at trial, we request that the Court limit Mr. Graves' testimony to those matters specifically addressed in his report.

[3] Pursuant to the amended complaint that Dairyland filed on November 9, 2007, Dairyland's claim also includes certain costs relating to the alleged incremental costs associated with the dismantlement of LACBWR's reactor pressure vessel ("RPV") that run through 2007.

"fuel out date" is premised upon two assumptions, both of which Dairyland proposes to establish through the expert testimony of Mr. Graves.

First, the 1998 fuel-out date is premised upon Dairyland's contention that the Standard Contract obligated DOE to accept SNF at a rate that would exceed the industry-wide generation rate and work off the backlog of SNF stored at commercial nuclear reactors. In his expert report, Mr. Graves seeks to determine a "reasonable" rate of acceptance at which the Government should have performed pursuant to the Standard Contract, based upon his experience as an economist, his knowledge of the electric utility industry, and his review of a variety of DOE program documents that post-date the Standard Contract from which he selected the rate that he ultimately elected to model. Graves Report, at 11-12 (A55-56); Deposition of Frank Graves, June 19, 2007 ("Graves Dep."), at 146:20-22 (A130). Specifically, according to Mr. Graves, the "economically reasonable" rate at which DOE allegedly would have and should have accepted SNF from the nuclear industry is the 3,000 MTU steady-state acceptance rate that is set forth in certain DOE program documents that were issued after the formation of the Standard Contract. Graves Report, at 11-12 (A55-56); Graves Dep. at 146:20-22 (A130).

Second, Dairyland's assertion of a 1998 fuel out-date at LACBWR requires both the implementation of the faster acceptance rate (as posited by Mr. Graves) and the Court's acceptance of a factually unsupported opinion that a market for the exchange of approved DOE acceptance allocations would have developed among the utilities in the years leading up to the commencement of acceptance of SNF by DOE in 1998.

The Standard Contract contains provisions through which the parties were to define the amounts of SNF that DOE would accept from each of the nuclear utility contract holders

beginning on January 31, 1998. Specifically, Article V of the Standard Contract, entitled "Delivery Of SNF And/Or HLW," specifies that DOE would furnish each contract holder, or "Purchaser," with a "delivery commitment schedule(s) in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF." 10 C.F.R. § 961.11, Art. V.B.1. Pursuant to Article V.B.1, "[a]fter DOE ha[d] issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser [was to] submit to DOE the delivery commitment schedule(s) which shall identify all SNF . . . the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." Id. Pursuant to the Standard Contract, a utility's SNF acceptance is determined upon an OFF basis, with the oldest discharged SNF receiving the earliest acceptance rights by DOE. See 10 C.F.R. 961.11, Art. VI, B.1.(a).

The Standard Contract also provides that, once DOE had approved a DCS, a Purchaser would "have the right to exchange" those "approved" DCSs with the approved DCSs of other Standard Contract holders, subject to DOE's unilateral right, in advance and "in its sole discretion," to approve or disapprove any such exchanges:

> E. Exchanges. Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; *provided, however,* that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange approved DCSs with parties to other contracts with DOE for disposal of SNF and/or HLW; *provided, however*, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges. Not less than six (6) months prior to the delivery date specified in the Purchaser's approved delivery commitment schedule, the Purchaser shall submit to DOE an exchange request, which states the priority rankings of both the Purchaser and any other Purchaser with whom the exchange of approved DCS is proposed. DOE shall approve or disapprove the proposed exchange within thirty (30) days after receipt. In the event of

> disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval.

Id., Art. V.E. (emphasis added). Pursuant to this “Exchanges” provision, contract holders that had obtained approved DCSs could attempt to exchange those DCSs with other contract holders that also had approved DCSs. For example, pursuant to the exchanges provision, a utility that had been allocated early-year acceptance rights could attempt to exchange those rights with another utility that owned allocations in later years. Once two contract holders had reached an agreement to exchange approved DCSs, they would have to submit their exchange requests to DOE, which had, “in its sole discretion,” the right to approve or disapprove those requests. Id.[4]

Dairyland seeks to present Mr. Graves at trial to testify concerning his opinions that the Standard Contract’s OFF priority ranking system is inefficient. Graves Report, at 16-17 (A57-58). To remedy what he views as an inefficient contractual acceptance mechanism, Mr. Graves purports to simulate the effect of exchanges of DCSs between Standard Contract holders in the “but for” world. Graves Report, at 18 (A59). To determine how this hypothetical exchanges market would have worked in the “but for” world, Mr. Graves utilizes two models which result in the two opinions that Mr. Graves offers in his expert report. First, Mr. Graves quantifies and

[4] The mere fact that DOE has the discretion to disapprove exchange requests renders Dairyland’s exchanges theory speculative. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). Further, as discussed in greater detail below, in two other SNF cases involving a nuclear utility similarly situated to Dairyland, this Court rejected the plaintiff’s contention that exchanges would have occurred had DOE begun SNF acceptance in 1998 because the contention was impermissibly speculative. See Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332, 375 (2006) (“To accept [plaintiff’s] position [regarding exchanges], the court would need to speculate about whether [plaintiff] would have been successful in trading [plaintiff’s] acceptance priority with another utility or convincing DOE to accept [plaintiff’s] SNF early. The law does not permit the court to do so.”), appeal pending No. 2007-5052 (Fed. Cir.); Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006) (holding that “Mr. Graves’ hypothetical model of a market for exchanges of utilities’ DCSs was too speculative to be helpful to the court in its resolution of this case”), appeal pending No. 2007-5046 (Fed. Cir.).

represents a so-called "must move" SNF "mountain" that purports to depict all SNF that currently is stored and that is projected to be stored at commercial nuclear utilities that he believes could – and should – be removed by DOE. Graves Report, at 8 (A54). Mr. Graves uses his graphical projection of the "must move" mountain to argue for the implementation of a 3,000 metric tons of uranium ("MTU") steady-state rate of SNF acceptance by DOE, following a short ramp-up period. Graves Report, st 8 (A54). The term "must move," however, is a creation by Mr. Graves for this litigation (and for several other cases before this Court), and it does not exist in the Standard Contract, the Nuclear Waste Policy Act, or any other DOE program documents. Deposition of Frank Graves, Pacific Gas & Electric Co. v. United States, No. 04-0074C (Hewitt, J.), January 24, 2006, at 48:15-22 (A80).

Second, and based upon his belief that the OFF acceptance queue is inefficient, Mr. Graves models a hypothetical market for the exchanges of approved DCSs that he calls the "Economic Sequence Model" ("ESM"). Graves Report, at 18-19 (A59-60). Mr. Graves first created the ESM in connection with his expert testimony two other prior SNF cases before this Court: Yankee Atomic v. United States, 73 Fed. Cl. 249 (2006), involving three prematurely shutdown utilities; and Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), involving the prematurely shutdown Humboldt Bay facility.[5] The ESM combines the timing and

[5] Although the Court in Yankee permitted Mr. Graves to testify at trial, the Court ultimately did not rely upon his exchanges model in determining damages. While Mr. Graves opined in Yankee that, under his model of exchanges, the plaintiffs would be able to trade upward in the SNF acceptance queue to ensure removal of all SNF onsite by 1998, the Court ultimately disagreed with that conclusion, finding that portions of the costs incurred by the Yankee plaintiffs to store SNF in wet pool storage onsite were not recoverable against the Government. See Yankee, 73 Fed. Cl. at 299, 306 ("However, plaintiffs' would still have incurred wet pool operational costs because it is concluded their pools would not have been emptied by the fuel-out dates tendered [by Mr. Graves]").

quantity of SNF for each utility in a so-called “must move” condition with estimates of the incremental at-reactor storage cost of addressing the asserted “must move” situation. Graves Report, at 18-19 (A59-60). Mr. Graves’ opinion concerning the hypothetical exchanges market is based upon an assumption that sufficient contract holders with early DOE acceptance rights would have offered sufficient DOE acceptance rights to the market and would have been willing to delay removal of SNF from their sites. Id. These acceptance rights are reallocated within Mr. Graves’ hypothetical market based upon the assumption that every operational and shutdown utility with “must move” SNF would have bid upon the available acceptance rights in any year based upon an industry-wide average of avoidable storage costs calculated upon an MTU basis. Id.

The cost of acceptance rights is established through the application of the lowest price that clears the market – that is, by the amount of money upon a per-MTU basis that the last bidder which obtains allocations in that year is willing to pay. Graves Report, at 22 (A62). This willingness to pay is determined solely by each utility’s avoided storage costs. Graves Report, at 18-19 (A59-60). This bid price becomes the price at which all trades are conducted in that year. Graves Report, at 22 (A62). Mr. Graves’ model assumes that the “sellers” of allocations – those that decelerate their place in the acceptance queue – are price takers that lack the ability to behave strategically.[6] Graves Report, at 22 (A62); Graves Deposition, at 203:24-204:5 (A146-147). Mr. Graves further assumes that DOE approves all exchanges, even though utilities are

---

[6] Mr. Graves hypothesizes that the trading of these acceptance rights will occur at prices greater than zero for only the first three years of the program – beginning in 1998 – and then predicts that the bid prices for exchanging acceptance rights approach zero because the supply of acceptance rights exceed the demand for these rights. Graves Report, at 23 (A63).

required to submit their exchange requests to DOE, which has, "in its sole discretion," the right to approve or disapprove those requests. 10 C.F.R. § 961.11, Art. V.E; Graves Report, at 16 (A57).[7]

To determine the marginal bid price, the ESM contains financial inputs associated with the following storage activities: (i) continued wet storage operations and maintenance ("O&M") costs (applied in his model to shutdown reactors); (ii) dry storage construction costs, including per cask costs to add capacity at a dry storage facility ("ISFSI") (applied in his model to operational reactors); and (iii) dry storage O&M costs. Graves Deposition, at 8:4-15 (A113); Graves Report, at 18-19 (A59-60). The cost inputs are significant because Mr. Graves' model uses those inputs, and his calculation of the marginal bid price, to quantify the cost of trading to utilities, such as Dairyland, that accelerate their place in the acceptance queue. Graves Report, at 18-19 (A59-60); Graves Deposition, at 8:25-9:21 (A113-114). The costs of accelerating within the acceptance queue become a necessary offset to Dairyland's damages claim; the larger the cost to Dairyland to accelerate in the acceptance queue, the lower Dairyland's damages claim becomes. Graves Deposition, at 120:17-121:4 (A126-127). Indeed, Mr. Graves himself admits that the amounts which Dairyland would have paid to avoid those storage costs must be included in the damages claim as an offset to the Government. Graves Deposition, at 120:17-121:4 (A126-127).

---

[7] Mr. Graves' model also assumes that DOE would accept non-standard SNF, or "failed fail," according to the same schedule as standard SNF. Graves Deposition, at 51:17-52:4, 60:7-20 (A122-123, A124). However, the Standard Contract does not require DOE to accept a utility's failed fuel on the same schedule as standard fuel in light of the technical complexities associated with removing non-standard fuel, and, as a consequence, DOE very well might not accept a utility's failed fuel pursuant to the same schedule as standard SNF. See 10 C.F.R. § 961.11, Art. VI.A.2(b) & App. 3 ¶ A; see Def. Supplemental Response to Interrog. 13, dated Jan. 9, 2008, at 6 (A8-13).

This Court granted the Government's motion *in limine* to preclude Mr. Graves from testifying at trial in PG&E, which involved a similarly-situated plaintiff. In PG&E, the Court found that Mr. Graves' model was premised upon the following four factually-unsupported and speculative assumptions: (1) the model assumed that the market for SNF exchanges would be perfectly competitive, with no asymmetries of information or market power; (2) it assumed that DOE would have approved of all exchanges, even though DOE had the right, in its "sole discretion," to disapprove any request; (3) it assumed, without any support, that all utilities would have participated in the exchange system; and (4) it assumed that the lowest market-clearing price (that is, "the price that . . . the last bidder which obtains allocations in a given year is willing to pay") would be the price of all transactions in the market. See PG&E, 73 Fed. Cl. at 436. Because the model relied upon such dramatic assumptions that lacked sufficient factual foundation, the Court found Mr. Graves' exchanges model to be detached from the facts of the case and, therefore, precluded his testimony at trial with regard to exchanges. Id. Similarly, with regard to Mr. Graves' opinions concerning a reasonable rate of acceptance, the Court excluded him from testifying at trial, finding that his testimony would not be helpful to the Court, given that Mr. Graves had no involvement with regard to either DOE's SNF acceptance program or the promulgation of the Standard Contract, and he otherwise lacked any firsthand knowledge concerning the parties' intentions at the time of contract formation. See id. at 436.

By his own admission, the opinions that Mr. Graves seeks to offer at trial in this case with regard to (1) the "reasonable" rate of acceptance and (2) the market for exchanges that would have developed in the "but for" world – as well as his underlying methodology – are virtually identical to the opinions that Mr. Graves provided in PG&E. Graves Deposition, at

95:7-12 (A125). As in PG&E, the Court in this case should preclude Mr. Graves from providing testimony concerning these issues at trial, given the overly speculative nature of his exchanges theory and his lack of firsthand knowledge and involvement with regard to the formation of the Standard Contract and implementation of the SNF acceptance program. [8]

---

[8] On February 4, 2008, the Federal Circuit heard oral arguments for the appeals in Yankee Atomic Electric Co. v. United States, No. 2007-5025 (Fed. Cir.), Sacramento Municipal Utility District v. United States, No. 2007-5052 (Fed. Cir.), and Pacific Gas & Electric Co. v. United States, No. 2007-5046 (Fed. Cir.). These three appeals present significant, overarching issues that will likely affect the resolution of this case. Specifically, these appeals are expected to resolve (or, at a minimum, address critical questions related to) the following issues implicated in this case: (1) the rate of acceptance of SNF required by the Standard Contract and the necessity of resolving that issue in evaluating damages claims; (2) whether the trial court abused its discretion in excluding Mr. Graves' expert testimony with regard to the very topics for which Dairyland now seeks to present to the Court; (3) the allocation of the burden, in an expectation damages case, to establish a world in which there would be performance and what performance would have met DOE's minimum contractual obligations, as well as whether the "substantial causal factor" test eliminates the need for the plaintiff to establish such a world; and (4) the standard for the recoverability of company expenditures, such as internal labor, that the Government contends plaintiff would have incurred in the absence of DOE's breach.

In addition, on December 3, 2007, the Federal Circuit heard oral argument in Nebraska Public Power District v. United States, No. 2007-5083 (Fed. Cir.). The issue in Nebraska Public Power is whether the United States Court of Appeals for the District of Columbia exceeded its jurisdiction in issuing a writ of mandamus precluding the Government from invoking the "Unavoidable Delays" clause of the Standard Contract and whether, because of the absence of an appropriate waiver of sovereign immunity, that writ is void. Currently, the Government is precluded from arguing the application of this contract provision. This clause, by its terms, excuses the Government from liability for delayed performance based upon the circumstances beyond its control identified in that clause, including acts of the Government in either its sovereign or contractual capacity. In Nebraska Public Power District v. United States, 73 Fed. Cl. 650, 674 (2006), appeal pending, No. 2007-5083 (Fed. Cir.), this Court ruled that the writ of mandamus preventing the Government from relying upon the "Unavoidable Delays" clause of the Standard Contract was void ab initio.

## SUMMARY OF ARGUMENT

Consistent with this Court's ruling in PG&E, the Court should preclude Mr. Graves from providing expert testimony at trial concerning (1) an economically "reasonable" rate of SNF acceptance and (2) a hypothetical market for exchanges of SNF acceptance rights pursuant to the Standard Contract.

First, with regard to his opinions regarding an "economically reasonable" rate of acceptance, Mr. Graves is not qualified to determine DOE's responsibilities for the rate of SNF acceptance under the terms of the Standard Contract. Mr. Graves had no involvement with regard to the promulgation of the Standard Contract, and he otherwise lacks any direct knowledge concerning the parties' intentions at the time of contract formation. Mr. Graves is not an expert in spent fuel management, and he has had no involvement whatsoever in the DOE waste acceptance program. In connection with his opinions, Mr. Graves reviewed a variety of DOE program documents that post-date the Standard Contract from which he selected the rate that he ultimately elected to model. Further, even if otherwise qualified to testify concerning an economically reasonable rate of acceptance, Mr. Graves' testimony concerning an "economically reasonable" rate of acceptance would not be helpful to the Court, given that Dairyland and the Government plan to call to the stand at trial several percipient fact witnesses directly involved in DOE's nuclear waste disposal program and the development of the Standard Contract. These fact witnesses will provide testimony to the Court concerning the parties' intentions in entering the Standard Contract, and will be more helpful to the Court in its resolution of the contractually-required rate of SNF acceptance.

Second, Mr. Graves' testimony with regard to the hypothetical market for exchanges should be excluded because his model is overly speculative and is devoid of any factual foundation. Mr. Graves never spoke to representatives of Dairyland in connection with his opinions in this case, and he otherwise did not rely on any information from Dairyland or its employees in creating his model. Further, Mr. Graves made no effort to incorporate any actual SNF storage cost data from Dairyland to determine whether Dairyland had, in fact, any financial incentive to bid for earlier acceptance rights from other utilities through exchanges. Because Mr. Graves' model relies upon assumptions concerning Dairyland's (and other utilities') willingness to engage in exchanges that lack any factual foundation, Mr. Graves' model for exchanges is too speculative to be helpful to the Court, and he should be excluded from testifying at trial concerning these matters.

## ARGUMENT

### I. THE COURT HAS THE POWER AND THE DUTY TO GRANT MOTIONS *IN LIMINE* TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES

This Court has acknowledged that "[a] motion *in limine* is a recognized method under [RCFC] 16 and Fed. R. Civ. P. 16 for obtaining a pretrial order simplifying issues for trial," White Mountain Apache Tribe of Az. v. United States, 10 Cl. Ct. 115, 116 (1986), and "is a useful tool to prevent a party before trial from encumbering the record with irrelevant, immaterial or cumulative matters." Baskett v. United States, 2 Cl. Ct. 356, 367-68 (1983); see Palmerin v. City of Riverside, 794 F.2d 1409, 1413 (9th Cir. 1986) (motion *in limine* is useful to "resolve issues which would otherwise 'clutter up' the trial"). In fact, as this Court has previously acknowledged, the Court has a duty to exercise its power to exclude testimony or evidence in appropriate cases:

> There is no question under [RCFC] 16, that this court, as a trial court, has the power to issue pretrial orders simplifying issues for trial. Not only does this court have such power, it has a duty to exercise it in appropriate cases. This power allows the court, *inter alia*, to define the issues, facts, and theories actually in contention and to weed out extraneous issues. Too, this court also has the authority to issue pretrial rulings concerning the admissibility at trial of proposed testimony and documentary evidence.

Baskett, 2 Cl. Ct. at 359 (emphasis added).

## II. A MOTION *IN LIMINE* IS APPROPRIATE IF A PROPOSED TESTIFYING EXPERT WITNESS LACKS THE QUALIFICATIONS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE*

### A. To Be Admissible, Mr. Graves' Opinions Must Be Reliable And Relevant

To be admissible, the testimony and opinions of an expert witness must satisfy the requirements of FRE 702 as amended in 2000:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The amended rule affirms the Court's special "gatekeeping obligation" to prevent the introduction of certain expert testimony. Fed. R. Evid. 702 advisory committee's note; see also, e.g., Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569 (D.C. Cir. 1993); see also 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02] ("[e]xpert testimony which does not relate to any issue in the case is not

relevant and, ergo, non-helpful"). Specifically, the Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire, in response to which FRE 702 was amended, requires "judges to determine that scientific testimony," as well as technical or other specialized expert testimony, "offered under Federal Rule of Evidence 702 is both relevant and reliable." Masters v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002); see also Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002) (the Court has an obligation to screen expert testimony for both relevance and reliability). Further, the party proposing to introduce expert opinion "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 advisory committee's note (citing Bourjaily v. United States, 483 U.S. 171 (1987)); see Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir. 2001) (citing cases); see Lithuanian Commerce Corp. v. Sara Lee Hosiery, 179 F.R.D. 450, 457 (D.N.J. 1998); Otis v. Doctor's Assocs., Inc., 1998 WL 673595, at *4 (N.D. Ill. Sept. 14, 1998).

The United States Court of Appeals for the Federal Circuit has explained that, under the Supreme Court's decision in Daubert, the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). The standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one. Seaboard Lumber Co., 308 F.3d at 1302. The burden of demonstrating Mr. Graves' satisfaction of the Daubert standards lies squarely upon Dairyland. Daubert, 509 U.S. at 592 n.10 (citation omitted); Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005).

Ultimately, "[p]roposed testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known." Daubert, 509 U.S. at 590, 593-94; see Kumho Tire, 526 U.S. at 149-50; Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702. As the Supreme Court explained in Daubert, 509 U.S. at 590, expert "'knowledge' connotes more than subjective belief or unsupported speculation." Accord O'Connor v. Commonwealth Edison Co., 13 F.3d 1090, 1106 (7th Cir. 1994). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific" or other "methodology of the kind traditionally used by experts in the field." Domingo v. T.K., M.D., 289 F.3d 600, 607 (9th Cir. 2002). In some cases, reliability will depend upon the "scientific foundations" of the opinion testimony, while, in other cases, "the relevant reliability concerns may focus upon personal knowledge or experience." Kumho Tire, 526 U.S. at 150. However, "it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable." Id. at 151.

B. To Establish That Mr. Graves' Testimony Is Reliable, Dairyland Must Establish That He Is Qualified To Render The Opinions At Issue

As the first step in analyzing whether proposed expert testimony is reliable, the Court must determine whether the expert rendering the opinion is "qualified" in the relevant field to do so, by reason of his or her knowledge, skill, experience, training, or education." Fed. R. Evid. 702; see Masters, 291 F.3d at 991 ("[t]o gauge reliability, the district judge must determine

whether the expert is qualified in the relevant field . . ."); Ralston, 275 F.3d at 969 (expert must be qualified by knowledge, skill, experience, training or education). Trial courts have broad discretion in deciding whether a witness qualifies as an expert. Hamling v. United States, 418 U.S. 87, 108 (1974); United States v. Bourgeois, 950 F.2d 980, 986-87 (5th Cir. 1992). However, the party proferring the witness as an expert has the burden of laying a foundation that establishes that the witness is qualified. See, e.g., Genty v. Resolution Trust Corp., 937 F.2d 899, 917 (3d Cir. 1991); Apostol v. United States, 838 F.2d 595, 599 (1st Cir. 1988). The Court's special "gatekeeping obligation" demands that the Court require the plaintiff to meet this burden before qualifying the expert, "only admitting such testimony after receiving satisfactory evidence of its reliability." Dhillon v. Crown Controls, Inc., 269 F.3d 865, 869 (7th Cir. 2001).

C. To Be Admissible, Mr. Graves' Opinions Must Be Helpful To The Trier Of Fact

Assuming that the expert is qualified to opine on the matter and the methodology used by the expert in reaching his opinion is proven to be reliable, an expert's opinion is still not admissible unless it is relevant:

> Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." The consideration has been aptly described by Judge Becker as one of "fit." "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.

Daubert, 509 U.S. at 590-91 (citations omitted). Thus, whenever expert testimony is offered, the Daubert inquiry must be conducted, including an inquiry into whether the opinion is relevant and "tied to the facts" of a particular "case." Id. at 591.

As part of this relevance inquiry, the Court must determine whether the proffered expert testimony is helpful to the trier of fact. See, e.g., Daubert, 509 U.S. at 591 (helpfulness goes primarily to relevance); Summers v. Missouri Pacific R.R. Sys., 132 F.3d 599, 603 (10th Cir. 1997) ("the second element, helpfulness to the trier of fact, evaluates relevancy"); Employers Reinsurance Corp. v. Mid-Continent Cas. Co., 202 F. Supp. 2d 1212, 1215 (D. Kan. 2002) ("[t]he touchstone of Rule 702 is helpfulness of the expert testimony [to the trier of fact], a condition that goes primarily to relevance"). The opinion of an expert is not "helpful" to the Court, and therefore is not admissible, if it answers a question that the fact-finder could answer without the purported expert opinion. See Sherbert v. Alcan Aluminum Corp., 66 F.3d 965, 967-968 (8th Cir. 1995). "[A]n expert . . . must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury" or the Court. Ancho v. Pentek Corp., 157 F.3d 512, 519 (7th Cir. 1998).

## III. MR. GRAVES' OPINION CONCERNING THE RATE OF ACCEPTANCE SHOULD BE EXCLUDED

### A. Mr. Graves Is Not A Qualified Expert Witness On The Issue Of The Proper Pace For DOE's Acceptance Of Spent Nuclear Fuel

Mr. Graves is not qualified to testify as an expert concerning the a reasonable "acceptance rate in the non-breach world" at which the Department of Energy would have accepted Dairyland's spent nuclear fuel under the parties' contract. Graves Report, at 5 (A52). It is clear from Mr. Graves' report and prior testimony that he does not possess any knowledge, skill, experience, training, or education in the areas implicated by an opinion concerning the rate at which DOE would have accepted SNF from the industry beginning in 1998. Mr. Graves asserts little knowledge of the Standard Contract and, certainly, no specialized knowledge or

experience that would qualify him to determine DOE's responsibilities for the rate of SNF acceptance under the terms of the Standard Contract. Mr. Graves had no involvement in the formation of the Standard Contract and otherwise has no firsthand knowledge of the partes' contractual intent in entering into the contract. Graves Deposition, at 130:15-131:1 (A128-129); Deposition of Frank Graves, Pacific Gas & Electric Co. v. United States, No. 04-0074C (Hewitt, J.), January 24, 2006, at 49:1-3 (A80A). Mr. Graves is not an expert in public policy or Government affairs. Deposition of Frank Graves, Pacific Gas & Electric Co. v. United States, No. 04-0074C (Hewitt, J.), January 24, 2006, at 47:14-48:4 (A79-80). He is not an expert in spent fuel management. Id. at 147:21-148:6 (A85-86). Indeed, Mr. Graves has had no involvement whatsoever in the DOE waste acceptance program. Id. at 148:7-10 (A86). As a result, Dairyland should be precluded from offering testimony from Mr. Graves concerning the rate at which DOE "would have and should have" accepted SNF beginning in 1998.[9]

B. Even If Mr. Graves Were Qualified To Be An Expert Witness Upon The Rate Of Acceptance, The Methodology Underlying His Conclusions Is Unreliable

Mr. Graves' methodology for determining the economic reasonableness of his selected rate of acceptance also is unreliable. Mr. Graves makes various assumptions for the purpose of defining the "must move" analysis that lack any factual predicate. Mr. Graves assumes that all

---

[9] Mr. Graves selected the rate to analyze for economic reasonableness from certain DOE program documents, all of which post-date the formation of the Standard Contract and which will, in any event, be available to the Court at trial for consideration. Graves Report, at 11-12 (A55-56); Graves Deposition, at 146:20-22 (A130). However, as we will demonstrate at trial, as required by the Standard Contract, the contractually required acceptance rate was first set forth in the 1991 Annual Capacity Report. Based upon Dairyland's allocations pursuant to this rate and the OFF acceptance queue established by the Standard Contract, Dairyland would have been required to store its SNF at LACBWR until at least 2012 and, consequently, would have been obligated to pay for all wet storage costs at LACWBR through 2012, not 1998, as asserted in its claim.

SNF stored at a shutdown facility becomes "must move" five years after plant shutdown and that SNF at operating reactors becomes "must move" when the utility's wet pool exceeds single full core reserve.[10] Graves Report, at 5-6 (A52-53). Nevertheless, Mr. Graves' model does not account for the fact that many utilities re-racked their wet SNF storage pools after 1995, expanding the available SNF storage in those pools and deferring the need for a separate dry storage facility. Graves Deposition, Jan. 24, 2006, at 156:13-157:4, 194:20-195:5 (A87-88, A92-93). If Mr. Graves were to alter his assumption that SNF stored at prematurely shutdown reactors constitutes "must move" SNF, the slope of the "must move" mountain declines significantly, thereby affecting the conclusion concerning the "reasonable" rate of acceptance. The fact that simple, factually-supported adjustments to his assumptions would modify the conclusions that he generates renders his model unreliable.

C. Even If Mr. Graves' Opinion Was Reliable, The Opinion Is Not Helpful To The Trier Of Fact And Is, Therefore, Irrelevant

Mr. Graves' expert opinion is fundamentally unhelpful to this Court. At issue in this case is the rate of acceptance at which DOE was contractually obligated to accept SNF – an issue upon which Mr. Graves does not opine. This Court does not need Mr. Graves' testimony upon the alleged "reasonableness" of the 3,000 MTU steady-state rate to determine the Government's contractual obligation under the Standard Contract. Further, it is irrelevant to the contents of the terms of the Standard Contract, which establish the parties' obligations under the contract. As reflected upon the parties' witness lists, numerous percipient fact witnesses directly involved

[10] This five-year time period for operating reactors is based upon a provision in the Standard Contract that requires SNF to have cooled for at least five years prior to being eligible for acceptance from DOE. See 10 C.F.R. § 961.11, App. E ¶ 3.

with DOE's SNF acceptance program are expected to testify at trial in this matter, including, among others, Mr. Robert Morgan, the former director of DOE's Nuclear Waste Policy Act ("NWPA") Project Office at the time the Standard Contract was drafted and executed: Mr. Loring Mills, formerly with the Edison Electric Institute (a utility trade association, from 1976 to 1993; and Mr. Christopher Kouts, the Principal Deputy Director of DOE's Office of Civilian Radioactive Waste Management. Def. Witness List, at 2-3 (A2-3); Pl. Witness List, at 3 (A6). Because the Court will hear testimony from these and other percipient fact witnesses who have had direct involvement with DOE's SNF program, Mr. Graves' testimony is unnecessary and unhelpful to the Court. See PG&E, 73 Fed. Cl. at 436 (Notwithstanding the degree of Mr. Graves' general experience in the electric utility field, such experience alone "did not render Mr. Graves an expert who could provide testimony more helpful to the court on the issue of DOE's rate of acceptance than that of the numerous percipient fact witnesses directly involved in the nuclear waste disposal program").

## IV. MR. GRAVES' OPINIONS CONCERNING THE HYPOTHETICAL EXCHANGES MARKET SHOULD BE EXCLUDED

### A. Mr. Graves' Exchanges Model Is Not Reliable

As discussed above, expert "'knowledge' connotes more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. Indeed, Mr. Graves' opinions must be supported by facts and not constitute unsupported speculation. See General Elec. Co., 522 U.S. at 146. Here, Mr. Graves' opinions are based upon speculative and overly-simplistic economic theory and lack grounding in any facts.

In determining whether a hypothetical model, such as Mr. Graves' ESM model, provides sufficient basis for an award of damages, the Court must determine whether the plaintiff has

established a realistic and complete "but for" world. Dolphin Tours, Inc. v. Pacific Creative Serv., Inc., 773 F.2d 1506, 1512 (9th Cir. 1985) ("[i]n projecting free market profits, antitrust plaintiffs are not entitled to assume favorable aspects of an anticompetitive market"); Restatement (Second) of Contracts § 347(c). Where, as here, Dairyland attempts to prove that it has suffered damages using a computer model of the "hypothetical" 'but for' company premised upon a number of critical assumptions," the "failure to establish the reasonableness of these assumptions is fatal" to the damages claim. Southern Pac. Communications Co. v. AT&T, 556 F. Supp. 825, 1076 (D.D.C. 1982), aff'd, 740 F.2d 1011 (D.C. Cir. 1984); see Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V., 28 F. Supp. 2d 126, 133-34 (S.D.N.Y. 1998) (calculations based upon "series of assumptions and projections" prevent lost profits from being reasonably certain). Dairyland's damages models may not be based upon mere speculation or hypotheticals. Slattery v. United States, 69 Fed. Cl. 573, 582 (2006) (citing Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108 (2003), and Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822 (1961)).

This Court has repeatedly rejected as inherently speculative expert models that lack evidentiary foundation, finding that the proof upon which a plaintiff relies in such models "must be rooted in fact" and that "[a] claim whose basic structural components lack such factual foundation is simply speculation." Castle v. United States, 48 Fed. Cl. 187, 206 (2000), aff'd in part, rev'd in part, 301 F.3d 1328 (Fed. Cir. 2002). A plaintiff's damages model must "be based on sufficient factual evidence, must use assumptions and calculations that are moored in that factual evidence, and must be credible." Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 107-08 (2004); see Shockley v. Arcan, Inc., 248 F.3d 1349, 1362 (Fed. Cir. 2001) (plaintiff

must supply "adequate evidence to enable the fact-finder to responsibly estimate future losses based on sound economic models and evidence, not pure guesswork").

In Fifth Third Bank v. United States, 55 Fed. Cl. 223 (2003), the Court rejected the plaintiff's damages model, explaining that the model failed because it created a certain result "without identifying any specific investments or opportunities" that would have allowed the plaintiff to obtain the modeled result:

> Plaintiff's model ignores the presence of competitors similarly unfettered by the breaching provisions of FIRREA. But the most outstanding flaw is the assumption that the But-for-Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged. The court agrees with defendant that this deficiency renders plaintiff's model speculative as a matter of fact and law.

Id. at 241 (emphasis added); see Shockley, 248 F.3d at 1363-64 (rejecting accounting expert's model because underlying assumption lacked factual underpinnings and, therefore, any basis in economic reality); Oiness v. Walgreen Co., 88 F.3d 1025, 1029-30, 1032 (Fed. Cir. 1996) (rejecting model where damages rested upon unsupported assumptions "fraught with speculation," and expert's "projections lacked evidentiary support"), cert. denied, 519 U.S. 1112 (1997); accord Southern Nat'l Corp. v. United States, 57 Fed. Cl. 294, 305 (2003); see also Glendale Fed. Bank, FSB, v. United States, 43 Fed. Cl. 390, 399 (1999) ("The court believes that plaintiff's lost profits model suffers from serious defects, which undercut the basis for using it as a credible model for ascertaining lost profits . . . ."), aff'd in relevant part, vacated in part, 239 F.3d 1374 (Fed. Cir. 2001); Suess v. United States, 52 Fed. Cl. 221, 228-29 (2002) (rejecting damages model as "premised on unrealistic assumptions").

The Supreme Court is in accord. Specifically, the Supreme Court has held that expert opinion cannot sustain a judgment when the opinion "is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993). Where expert testimony is speculative, it is not competent proof, and such testimony contributes nothing to a "'legally sufficient evidentiary basis.'" Weisgram v. Marley Co., 528 U.S. 440, 454 (2000) (citing Brooke Group, 509 U.S. at 242). As the Supreme Court has instructed, while "[e]xpert testimony is useful as a guide to interpreting market facts, . . . it is not a substitute for them." Brooke Group, 509 U.S. at 242; see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 n. 19 (1986) (expert opinion evidence "has little probative value in comparison with the economic factors.").

The decisions of other courts further support the conclusion that hypothetical expert models that lack evidentiary support must be rejected. The United States Court of Appeals for the Eighth Circuit has held that deficiencies in the foundation of an expert's opinion resulted in conclusions that were "mere speculation." Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000). Similarly, in Virgin Atlantic Airways Ltd. v. British Airways PLC, 69 F. Supp. 2d 571 (S.D.N.Y. 1999), aff'd, 257 F.3d 256 (2d Cir. 2001), the district court held that "an expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case." Id. at 579-80; see Elkind v. Ligget & Meyers, Inc., 635 F.2d 156, 170-172 (2d. Cir. 1980) (rejecting expert testimony on the price at which the market would have valued the stock if there had been disclosure as hypothetical and "entirely speculative"); Callahan v. A.E.V., Inc., 182 F.3d 237, 257 (3d Cir.

1999) (hypothetical "but for" calculations "usually rely upon unrealistic ex ante assumptions about the business environment, such as assumptions of perfect knowledge of future demand, future prices, and future costs that tend to overstate the plaintiff's damages claim").[11]

Mr. Graves' model is not premised upon any investigation that he undertook concerning the willingness of nuclear utilities to exchange acceptance allocations with other utilities, his client's subjective beliefs in the 1980s and early 1990s concerning the viability of exchanges, or the substantial obstacles to exchanges that might exist. Graves Dep. at 13:23-14:7, 117:18-118:6 (A116-117, A125A-125B); Graves Deposition, Sept. 6, 2007, at 13:24-14:10, 92:17-93:1 (A142A-142B, 143B-143C). In preparing his model, Mr. Graves failed to contact any utility – including Dairyland – to determine the viability of the evidentiary foundation for an exchanges market that might have developed absent DOE's delay in beginning SNF acceptance. Id. Critically, Mr. Graves admits that his model does not necessarily set forth what would have happened had DOE timely performed. Graves Deposition, at 192:25-193:19 (A133-134); Deposition of Frank Graves, Pacific Gas & Electric Co. v. United States, No. 04-0074C (Hewitt, J.), January 24, 2006, at 44:19-46:4 (A76-78); Graves Report, at 19-20 (A60-61). Instead, Mr. Graves' model is based entirely upon the application of incomplete economic theory following from assumptions that a market for exchanges of SNF acceptance allocations, absent DOE's

---

[11] As the district court recognized in Southern Pacific Communications Co. v. American Telephone & Telegraph Co., 556 F. Supp. 825 (D.D.C. 1982), "[i]n an effort to keep speculation in check, a number of courts have distinguished between damage claims based upon reasonable business plans actually developed and adopted by businessmen in the regular course of business and claims based upon made-for-trial speculation about what different business decisions the plaintiff might have made under different circumstances." Id. at 1084. Mr. Graves' model fits the "made-for-trial speculation" of which the Southern Pacific court pejoratively speaks. Dairyland's hypothetical exchanges model is not based upon any pre-existing business plan, but, instead, is the pure fabrication of its hired expert.

delay in beginning SNF acceptance, would have been analogous to a perfectly competitive market.

Consistent with a perfectly competitive market, the "base case" scenario in Mr. Graves' model assumes that all entities with SNF acceptance allocations would have participated in the exchanges market and that no utilities would have rationed their participation. Deposition of Frank Graves, Pacific Gas & Electric Co. v. United States, No. 04-0074C (Hewitt, J.), January 25, 2006, at 380:13-381:9 (A103-104). Mr. Graves fails to consider factors besides SNF storage costs that might have motivated potential buyers and sellers of acceptance rights. Graves Report, at 18-19 (A59-60). In addition, Mr. Graves' model fails to acknowledge that potential sellers of acceptance allocations might have faced pressure from shareholders, creditors, local governments, and other sources that could have reduced their willingness to participate in an exchanges market. Deposition of Frank Graves, Pacific Gas & Electric Co. v. United States, No. 04-0074C (Hewitt, J.), January 24, 2006, at 12:12-13:13, 251:1-252:3 (A73-74, A97-98). Mr. Graves further assumes that market participants would have had perfect information available to them, that the market would have negligible transaction and information costs, that decision-making concerning market participation would have been driven solely by economic considerations as measured by Mr. Graves, that all utilities trading down in the acceptance queue would have been price takers, and that the market would have had sufficiently numerous participants. Graves Deposition, Sept. 6, 2007, at 45:2-4, 72:17-24, 126:18-127:1 (A143, 143A, 144-145); Graves Deposition, June 19, 2007, at 245:13-247:10 (A137-139); Graves Deposition, May 19, 2006, at 38:20-39:9 (A108-109); Graves Deposition, Jan. 24, 2006, at 251:1-252:3 (A97-98). These assumptions are all consistent with the "invisible hand" theory and perfect

competition. See Federal Trade Comm'n v. Elders Grain, Inc., 868 F.2d 901, 907 (7th Cir. 1989) (model of perfect competition implies infinite number of sellers, identical costs, a perfectly homogeneous product, and perfectly informed buyers).[12]

Courts have rejected the application of economic models premised upon perfectly competitive marketplaces. "No market fits the economist's model of perfect competition." Elders Grain, 868 F.2d at 907. As the United States Supreme Court has recognized, "[t]here is no reason for believing that the marketplace of ideas is free from market imperfections any more than there is to believe that the invisible hand will always lead to optimum economic decisions in the commercial market." Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 592 (1980). "'[I]n the real economic world rather than an economist's hypothetical model,' the latter's drastic simplifications generally must be abandoned." Illinois Brick Co. v. Illinois, 431 U.S. 720, 742 (1977) (quoting Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 493 (1968)).

---

[12] Notwithstanding the factually unsupported assumptions that underlie Mr. Graves's analysis, Mr. Graves claims to have tested the "robustness" of his model through the inclusion of a so-called "sensitivity analysis" in his report. Graves Report, at 24-42 (A63A-63G, A64-65, 65A-65E). For example, Mr. Graves purports to address the question of utilities' actual willingness to participate in such a market – notwithstanding the fact that he has not endeavored to contact any utilities to determine whether they, in fact, would agree to enter into an exchanges transaction – by modeling various alternative scenarios in which he assumes reduced participation rates among utilities to demonstrate that Dairyland would still be able to achieve an early fuel-out date through exchanges. Graves Deposition, Sept. 6, 2007, at 13:24-14:10, 92:17-93:1 (A142A-142B, 143B-143C); Graves Deposition, June 19, 2007, at 67:8-68:17, 117:18-118:6, 125:7-18 (A124A-124B, 125A-125B, 127A). However, the lack of factual support that pervades his base case scenario is also true for his sensitivity analysis, as Mr. Graves did not rely upon any Dairyland employees or otherwise communicate with any other utilities in order to verify any of the assumptions that he incorporated into his sensitivity analysis. Graves Dep. at 13:23-14:7, 67:8-68:17, 117:18-118:6, 125:7-18 (A116-117, A124A-124B, 125A-125B, 127A); Graves Deposition, Sept. 6, 2007, at 13:24-14:10, 92:17-93:1 (A142A-142B, 143B-143C).

The district court's holding in Honorable v. Easy Life Real Estate Sys., 100 F. Supp. 2d 885 (N.D. Ill. 2000), is instructive here. In analyzing a model premised upon perfect competition, the district court found that the conditions which must exist to support a "perfect" market are theoretical, not real:

> [E]conomic theories that imply that market prices are efficient, thus beneficial for consumers, presuppose that consumers are informed, markets are competitive, and the costs of making transactions are not excessively burdensome. To produce theoretical equilibrium, neoclassical economics in fact assumes *perfect* information, *perfect* competition, and *no* transaction costs, among other idealizations. But these assumptions must be relaxed, and perhaps, ultimately replaced, if economic theory is to have any application to what happens in actual markets.

Id. at 888-89 (italics in original). Indeed, the court concluded that, if perfect market conditions "fail to obtain to a sufficient degree, even the rough efficiency of the market outcome can no longer be presumed," and "the conclusion (that are markets are efficient) no longer follows from the premises." Id. at 889; see Image Tech. Services, Inc. v. Eastman Kodak Co., 903 F.2d 612, 617 (9th Cir. 1990) ("market imperfections can keep economic theories about how consumers will act from mirroring reality"); United States v. Realty Multi-List, Inc., 629 F.2d 1351, 1368 (5th Cir. 1980) (perfect competition is theoretical concept as all markets subject to varying degrees of imperfections); United States v. E.I. Du Pont & De Nemours & Co., 118 F. Supp. 41, 49 (D. Del. 1951) ("[w]e start . . . with recognition that all practicable forms of competition are 'imperfect,' and that 'perfect competition' of economic theory is academic.").

Upon examination, there are numerous factors that would preclude a hypothetical market for DOE acceptance rights from operating as depicted by Mr. Graves' model. These factors include the requirement for Government approval of exchanges, and the Government's right "in

its sole discretion" to deny exchange requests, the limited number of participants, the conditions of SNF at each plant, the varying SNF costs of participants, the effect of socio-political considerations and risk upon utilities' desires and abilities to participate, the actual exchange mechanism, and the lack of perfect information concerning utility costs. By ignoring each of these facts, Mr. Graves has rendered his model unreliable.[13]

The opinions that he gave in the Yankee litigation, when compared to his opinions here, further confirm the unreliability of his opinions. There are several inconsistencies between Mr. Graves' model used in Yankee and the model that underlies his opinions here. Graves Deposition, at 95:5-12 (A125); Graves Deposition, Jan. 24, 2006, at 71:12-18, 171:4-172:4, 194:20-195:5 (A81, A89-90, A92-93). Specifically, Mr. Graves' opinion changed concerning the amounts that utilities were willing to pay, the years in which utilities were bidding for or selling allocations, the number of SNF allocations (in MTUs) being sought by utilities each year, and the fundamental operating status of certain utilities. Graves Deposition, at 95:5-12 (A125); Graves Deposition, Jan. 24, 2006, at 171:4-172:4, 199:22-201:13 (A89-90, A94-96). Significantly, between his Yankee and Dairyland models, Mr. Graves' conclusions concerning the behaviors of the three Yankee utilities and, consequently, the "but for" world varies

---

[13] As discussed previously, according to the Standard Contract, utilities may exchange approved DCSs, subject to DOE's right, "in its sole discretion," to approve or disapprove any proposed exchange. 10 C.F.R. 961.11, Art. V.E. The mere fact that DOE has the discretion to disapprove exchange requests renders Dairyland's exchanges theory speculative. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997); see also Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332, 375 (2006) ("To accept [plaintiff's] position [regarding exchanges], the court would need to speculate about whether [plaintiff] would have been successful in trading [plaintiff's] acceptance priority with another utility or convincing DOE to accept [plaintiff's] SNF early. The law does not permit the court to do so."); Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 at 436 (holding that "Mr. Graves' hypothetical model of a market for exchanges of utilities' DCSs was too speculative to be helpful to the court in its resolution of this case").

substantially. Graves Deposition, at 95:5-12 (A125); Graves Deposition, Jan. 24, 2006, at 199:22:201:13, 278:16-279:1 (A94-96, A99-100). As set forth below, the three Yankee utilities obtain substantially different allocations in his hypothetical exchange market:

**Table 1**
**MTUs of Acceptance Resulting From Exchanges According to ESM**
**(Dairyland v Yankee Model)**

| | Maine Yankee | | Connecticut Yankee | | Yankee Atomic | |
|---|---|---|---|---|---|---|
| | **Dairyland** | **Yankee** | **Dairyland** | **Yankee** | **Dairyland** | **Yankee** |
| **1998** | 40.8 | | | | 127 | 122.4 |
| **1999** | 20.4 | | | | | 5 |
| **2000** | | | | 34.5 | | |
| **2001** | 20.4 | 250 | 10.2 | 414.6 | | |
| **2002** | 30.6 | 291.8 | | | | |

In the Yankee version of his model, all three Yankee utilities are treated as shutdown and have all of their SNF removed by 2002. Graves Deposition, Jan. 24, 2006, at 199:22-201:13 (A94-96). In contrast, in the Dairyland version of the model, Maine Yankee and Connecticut Yankee are treated as operating reactors and bid in an entirely different manner (with Connecticut Yankee failing to bid for any allocations in the first six years of the DOE program). Graves Deposition, at 95:5-12 (A125); Graves Deposition, Jan. 24, 2006, at 36:2-14, 200:11-18 (A75, A95). Given that Mr. Graves purports to model the "but for" world in both cases, the different outputs of his model demonstrate the model's fundamental lack of reliability and indicate that, in any SNF case in which he testifies, the particular plaintiff in that case will be assumed to be given priority treatment other every other contract holder, even though, in other SNF cases, he will assume or has assumed that other plaintiffs will be given priority treatment over every

contract holder. In essence, his inconsistent testimony from case to case seeks to maximize damages against the Government in every case, by creating preferences for every contract holder (essentially allowing every contract holder to move forward in the acceptance queue, with none moving backwards) that, in the "but for" world, realistically could not have occurred. As a result of these inconsistencies, the output of his model changed dramatically, highlighting the significant error rate in his analysis.[14]

Finally, by ignoring risk in assuming full participation by all utilities in his hypothetical market, Mr. Graves' model improperly presumes that all contract holders would have a high level of certainty and definitive knowledge of the future. Graves Deposition, Jan. 24, 2006, at 134:11-136:4, 251:1-252:3 (A82-84, A97-98). After assuming the existence of "efficient" and uninterrupted Government performance in the "but for" world, Mr. Graves assumes that all contract holders would act in their own best interests (defined solely by financial considerations) based upon that perfect and certain knowledge. The problems of such an assumption are obvious:

> By modeling a "but for" company whose investment decisions are determined . . . with perfect knowledge of future demand and future costs rather than on any business plan that [plaintiff] actually adopted or considered in the real world, [plaintiff's] hypothetical [model] avoids any element of management fallibility. The "but for" company never makes mistakes in planning or building its [business]. To permit damages to be awarded on the basis of such an idealized business plan would open . . . defendants to virtually unlimited damage claims based upon whatever after-the-fact scheme

[14] The dramatic variability of Mr. Graves' results is also demonstrated by the "sensitivity analysis" presented in his expert report in this case. In his sensitivity analysis, depending upon the particular assumption made, Dairyland's trading costs vary between less than $2 million and tens of million of dollars. Graves Report, at 31, 37 (A64, A67); Graves Rebuttal Report, August 17, 2007, at Appendix 2 (A69).

> plaintiffs, or their lawyers and economists might conjure up. Such conjectures about what plaintiffs might have thought of doing at an earlier time provide no meaningful measure of damages actually suffered by plaintiffs.

Southern Pac. Communications, 556 F. Supp. at 1083 (citations omitted; emphasis added). "The model merely represents an after-the-fact conjecture about what [plaintiffs] might have considered doing in the 'but for' world created by [plaintiffs'] economists and computer experts." Id. at 1083. By assuming that utilities would not have been required to consider uncertainty and risk in the "but for" world – even though the exchanges he models all would have been completed (and the acceptance queue fully re-ordered) by the date of DOE's first acceptance in 1998 – the model provides the Court no insight into what the "but for" world would have looked like.[15]

B. Mr. Graves' Exchanges Opinion, Even If Reliable, Is Not Helpful To The Court

In this case, Dairyland offers Mr. Graves' testimony for the proposition that Dairyland's SNF fully would have been removed from its LACBWR reactor site by 1998, as opposed to 2013 under the OFF queue and Dairyland's proposed contractual rate of acceptance. However, as the plaintiff, Dairyland bears the burden of establishing "foreseeability, causation, and reasonableness" of its damages. Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005). Ultimately, "[t]he remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." Id. at 1373. Conversely, "the non-breaching party should not be placed in a better

---

[15] If Mr. Graves is allowed to testify, the Government will present evidence of significant additional deficiencies in his opinion.

position through the award of damages than if there had been no breach."[16] Bluebonnet Sav. Bank, FSB v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l Inc., 285 F.3d 1040 1043 (Fed. Cir. 2002) ("the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'").

Dairyland also bears the burden of proving "the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." Willems v. Indus., Inc. v. United States, 295 F.2d 822, 831 (Ct. Cl. 1961). To meet its burden to demonstrate damages arising from the Government's breach of the Standard Contract, a claimant must furnish the Court with "a reasonable basis for the computation" of damages. Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 199, 351 F.2d 956, 968 (1965). Speculative damages are not compensable. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63 (1931); William Green Constr. Co. v. United States, 201 Ct. Cl. 616, 626, 477 F.2d 930, 936-37 (1973), cert. denied, 417 U.S. 909 (1974); Hi-Shear Tech. Corp. v. United States, 53 Fed. Cl. 420, 436 (2002), aff'd, 356 F.3d 1372 (Fed. Cir. 2004).

In creating his model, Mr. Graves failed to conduct any empirical study concerning the willingness of nuclear utilities to exchange acceptance rights in the "but for" world. He never

---

[16] To the extent that Dairyland asserts that the "but for" world is speculative and counterfactual and, therefore, not susceptible of proof, it is unclear how Dairyland will meet its burden upon the issue of exchanges. In fact, to the extent that Dairyland cannot establish the "but for" world and prove which of the costs that it has been required to incur would not have been necessary in the "but for" world, it will have failed to establish causation for its claimed damages. See, e.g., Bluebonnet Sav. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005) (plaintiffs must establish plausible 'but-for-world" as part of causation analysis), aff'd, 466 F.3d 1349 (Fed. Cir. 2006); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 430 n. 25 (2000) (plaintiffs bear burden of propounding realistic "but for" scenario); see also Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been . . . .").

even spoke to representatives of Dairyland in connection with his opinions in this case, and he otherwise does not rely on any information from Dairyland or its employees in creating his model. Graves Dep. at 13:23-15:6; 29:1-9 (A116-118, A121); Graves Deposition, Sept. 6, 2007, at 13:24-14:10, 92:17-93:1 (A142A-142B, 143B-143C). Indeed, had Mr. Graves reviewed Dairyland's internal documents, his conclusions concerning the viability of exchanges, and, in particular, the degree of Dairyland's willingness to incur the costs associated with forwarding its position in the SNF acceptance queue through exchanges, may have been affected. For example, according to Dairyland nuclear engineer, Dr. Seymour Raffety, a senior Dairyland employee with nearly 40 years experience at the company with responsibility for managing Dairyland's SNF, Dairyland never even "looked into [exchanges] far enough" to determine whether it would have been worthwhile to seek an exchange to move upward in the queue. Deposition of Dr. Seymour Raffety, Dec. 14, 2007, at 79:19 – 80:2 (A150-151). Indeed, contrary to Mr. Graves's assertion that Dairyland, in the "but for" world, would have exchanged with other utilities to ensure the earliest possible SNF acceptance slot, Dr. Raffety testified that, to the extent that it would have engaged in exchanges in the "but for" world at all, Dairyland would have been interested in exchanging for both "[e]arlier <u>and later</u>" allocations. <u>Id.</u> at 79:12-18 (A150).

Mr. Graves has not shown that the limited cost data that he compiled for his analysis is representative of costs that Dairyland would have faced. Graves Deposition, at 173:19-174:13 (A131-132); Graves Deposition, Sept. 6, 2007, at 13:24-14:10, 92:17-93:1 (A142A-142B, 143B-143C). Further, Mr. Graves made no effort to incorporate any actual SNF storage cost data from Dairyland to determine whether Dairyland had, in fact, any financial incentive to bid for earlier acceptance rights from other utilities through exchanges. In his model's "base case" scenario, he

assumes that Dairyland would incur SNF onsite storage costs in the early to mid 1990s – which is the time period during which Mr. Graves' assumes that Dairyland would engage in exchanges – amounting to $8.7 million annually. Graves Deposition, at 9:22-10:2 (A114). To derive this number, Mr. Graves relies on publicly-available data from only three commercial nuclear power plant facilities (Humboldt Bay, Rancho Seco, and Trojan). Graves Deposition, at 210:13-19, 212:11-16 (A135-136). In reality, however, publically available information that Dairyland released during the time period when it would have engaged in hypothetical exchanges indicates that Dairyland only estimated that it would incur $1.3 million per year in wet pool operation and maintenance ("O&M") costs to store SNF onsite in its wet pool. A14, A31; A34, A46). Such a lower estimate of SNF storage costs, by Mr. Graves' own admission, would have decreased Dairyland's willingness to engage in exchanges. Graves Deposition, at 27:13-28:10 (A119-120).

By failing to incorporate facts and data from his own client or from a representative sample of the industry, Mr. Graves instead bases his exchanges model upon speculative assumptions that lack any factual foundation. Indeed, as the Court in PG&E found, Mr. Graves' hypothetical exchanges model is premised upon the following four factually-unsupported and speculative assumptions: (1) the model assumes that the market for SNF exchanges would be perfectly competitive, with no asymmetries of information or market power; (2) it assumes that DOE would approve all exchanges, even though DOE has the right under the Standard Contract, in its sole discretion, to disapprove any exchanges request; (3) Mr. Graves assumes, without any factual support, that all utilities would have participated in the exchange system; and (4) Mr. Graves assumes that the lowest market-clearing price (that is, "the price that . . . the last bidder which obtains any allocations in a given year is willing to pay") would be the price of all

exchanges in the market. See PG&E, 73 Fed. Cl. at 436. As in PG&E, the Court should likewise find in this case that Mr. Graves' model of exchanges is "too speculative to be helpful to the court in its resolution of this case." PG&E, 73 Fed. Cl. at 436.

## V. TO THE EXTENT THAT MR. GRAVES IS PERMITTED TO TESTIFY, HIS TESTIMONY SHOULD BE LIMITED TO THOSE MATTERS SPECIFICALLY ADDRESSED IN HIS REPORTS

In its witness list provided to the Government on April 18, 2008, Dairyland has identified the scope of Mr.Graves' testimony as follows: "Mr. Graves is an expert in economics and the electric utility industry. Mr. Graves' testimony will address opinions described in his expert report and his rebuttal expert witness report, as well as matters addressed at his depositions. He may also testify on other related matters." Pl. Witness List 3 ¶ 6 (A6). To the extent that the Court permits Mr. Graves to testify in this case, the scope of his testimony should be limited to those matters identified in his initial and rebuttal reports.

RCFC 26(a)(2)(B) provides that an expert report shall contain "a complete statement of all opinions to be expressed and the reasons and basis therefor; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions." RCFC 26(a)(2)(B). Further, RCFC 26(e)(1) provides a duty to supplement an expert report if the party learns that the information contained in the report is either "incomplete or incorrect." RCFC 26(e)(1). Absent "substantial justification," the failure to disclose information pursuant to RCFC 26(a)(2)(B) and 26(e)(1) results in the prohibition from using such testimony at trial. RCFC 37(c)(1). Indeed, the Federal Circuit has held that a trial court does not abuse its discretion in limiting expert testimony to information contained in the expert's report. See Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982,

994-95 (Fed. Cir. 2007) (affirming limitation of expert testimony to matters raised in expert report even where opposing counsel had opportunity to question expert at deposition on supplemental opinions). Here, to the extent that the Court allows Mr. Graves to testify at trial, the scope of his testimony should be limited to those issues expressly identified in his expert report.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court exclude the testimony and opinions of Mr. Graves.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell A. Shultis by s/ Patrick B. Bryan
RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 305-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Trial Attorneys
U.S. Department of Justice

April 29, 2008

CERTIFICATE OF FILING

I hereby certify that on this 29th day of April 2008, a copy of the foregoing "DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, FRANK C. GRAVES," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Patrick B. Bryan