yes.

Q So in the Yankee case, there were more shutdowns by 1998 who were bidding as shutdowns than in this case where there are fewer shutdowns bidding as shutdowns; is that right?

A Right. I think there was about 3,000 tons more of shutdown fuel in the early years in the Yankee case than in this case.

Q And among other people that that potentially affects Maine Yankee and Connecticut Yankee; is that right?

A Yes. They're examples of shutdown analysis in the Yankee case that weren't shut down in this case.

Q Are there any other large again general changes in the data?

A Well, large and general changes, no. There are some, you know, minor refinements to the data that we made, where we thought we found errors in the sources. And we with fixed those. But those are not large.

Q And I think we'll talk about those. We

was provided to us from Mr. Shapiro.

A Yes.

Q Obviously, if during our discussion -- and I'll represent to you this is what we got from PG&E's counsel. If during our discussion you see something that you think may conflict with the signed version, I'd like you to tell me about that. That shouldn't occur. Okay?

A Fine.

Q But if it does, please point it out, just to make sure that, you know, the records's clear. I'd really rather not use the black and white version.

A Neither would I.

Q Good. All right. I want to go through -- start by going through your report, and just some questions that I have, follow-ups obviously.

In the introduction approach, there is a sentence down toward the bottom of that first paragraph that says, I describe in this report a reasonable description of how the government would

have performed in the hypothetical non-breach world where it did satisfy its contractural obligations.

Do you see that?

A Yes.

Q What do you mean by that sentence?

A Well, of course, we're in a breach world, where the government did not satisfy its obligations. And so we need a description or model of what the world would have looked like had it done so. And we have to develop that based on reasonable economic principles of what good efficient performance would have looked like. And so I've -- in this report, I lay out a description of what I think satisfies that kind of expectation.

Q All right. You are not here to provide any expert opinion concerning what DOE's obligations or for that matter PG&E's obligations are under the standard contract; is that right?

A Right. I'm not trying to offer any legal interpretation of what are the thresholds of

performance that either was entitled to. I'm offering an economic view of what would have been a reasonable performance to expect based on the foreseeable economics and costs of the program.

**Q All right. You're not here to -- and we'll talk about your -- what I'll call your rate opinion in a moment.**

**But you're not here to provide testimony to the court that DOE was obligated to perform at the rate that's set forth in your report?**

A Again, not in any legal sense. Obviously, the contract itself is not clear as to what was the performance parameters that were expected or required. So I'm offering again just an economic view of what would have been a plausible, justifiable approach to performance, which would have been reasonable for the parties to expect the government to have satisfied.

**Q You're not here to testify that as a matter of law the government was obligated to perform consistent with the economic efficiencies as defined in your report; is that right?**

A Well, I think as efficiency have various kinds, it is sought in the program, and is a reasonable public policy expectation to have for a full cost program that's being imposed on the or provided for the nuclear utilities. So I do think that as a matter of public policy they were obligated to perform efficiently.

Whether that means they had to adhere narrowly to this representation of it, that's another question. I don't think that they had -- that this is the only exact solution to the problem. But solutions very similar to mine would have been needed and appropriate.

**Q But you're not here as an expert on public policy; is that right?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I don't know even know what an expert on public policy would be.

BY MR. EKMAN:

**Q Someone with a public policy master's degree. I can tell you they do give them out. I think you can actually get Ph.D.'s in them. Let**

me ask it a different way.

Are you an expert in government affairs?

MR. SHAPIRO: Objection. Vague.

THE WITNESS: No.

BY MR. EKMAN:

Q Is it your opinion that DOE's obligated, under the standard contract, to pick up must-move fuel when it becomes must-move?

A Well, it strikes me as a legal question again, which is not the scope of my testimony. So in that sense, I don't have an opinion on that.

Q And I'm going to try to avoid asking you the same questions that you were asked for three-and-a-half days in Yankee.

But must-move fuel, just for the record, that's your -- you coined that term, you believe you may have coined that term?

A I may have, yes. I haven't seen it in anybody else's work.

Q You understand that that is not a term that appears in the standard contract?

A That's correct.

**Q And you weren't involved in the promulgation of the standard contract?**

A Correct.

**Q Have you ever read the administrative history of the standard contract?**

A Not that I recall.

**Q Are you an expert in government contracts?**

A No.

**Q With respect to this sentence, aren't you also describing how utilities would have behaved in the non-breach world, as opposed to simply how the government would have performed?**

A Well, they're interrelated. Certainly to the extent there are the exchanges, those are at least initiated by utilities perceiving, you know, that they have a preferred schedule relative to the one that was the default OFF initiation in the program.

On the other hand, that feeds back to the logical burden on the government and affects the total costs of the program. So I'm looking at

relative to someone else.

Q So with respect to the first category, if in a particular year the marginal bidder is ISFIS, what you characterize as ISFIS must-move fuel, and instead of bidding it at 6-and-a-half million, bits at half a million, it's possible then that the marginal bid, and therefore the overall price of the allocations, would drop in that particular case, provided that that bidder still wins?

A That's correct.

Q In the Yankee model, one of your inputs is crane upgrades.

Do you recall that?

A Yes, I do.

Q And that's no longer an input in this model; is that right?

A That's right.

Q And why is that?

A On reflection, we decided that crane upgrades would have been likely required regardless of breach or non-breach, because they

A Brought -- we ate with Jerry Stouck. And we brought Jerry up to speed on what we discussed this morning, a little summary. Let's see. He had a couple of questions about what is -- refreshing his memory about what's new about the model or different than prevailed in the past versions. Talked a little bit about what kind of failed fuel there is at the facilities. And then we mostly talked about the Wizards, how they're -- non-related stuff.

**Q All right. Well, let me follow up on a couple of question that we talked -- topics we talked about earlier.**

**Could there have been uncertainty in DOE's performance, even in the non-breach world?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: Yes. There's -- there are parameters even within the contract that are explicit about allowing for adjustment for emergencies and circumstances that might perturb the pattern of performance. And industry circumstances could always occur that would

necessitate a -- sort of a major change in the program: A terrorist event, or a major failure of a bunch of nuclear facilities that suddenly had to be shut down.

So there's -- everyone could imagine that there would be some degree of volatility in the performance. But for purposes of figuring out what was reason to expect, we wouldn't predicate the design or your expectations on the worst case scenario, but on the scenario that unfolded in response to what you expected to be the character of the problem.

And that's pretty well defined in this case. Because we know that the discharges are, while not perfectly static, are at least pretty easily to predict. And they clear -- and it's pretty to understand when they create an economic problem at each of the facilities.

So anticipating a program that would deal with that, with some slack in it, is enough to deal with I think reasonably the kinds of uncertainties that people would have. And, of

course, to figure out, in a litigation setting, what performance would've looked like, we have to specify a representative example of that, which is what I've got.

BY MR. EKMAN:

**Q Let me rephrase that a little bit.**

**Assuming DOE performed and was doing all the stuff up through '98 that you think moves toward performance, and then even assuming DOE performs, could there still be -- see at DOE a start performance at your rate in 1998, on February 1st, could there be some uncertainty still in the DOE program and in DOE's ability to accept fuel?**

A I think I'm not seeing any difference between that and your previous question. Sure. There could be anxieties that some degree of emergencies could arise that would perturb or delay or shift priority slightly for awhile.

On the other hand, you know, the program has a pretty big architecture to it. And it would take a lot to derail the whole program. And if

efficient approaches to solving the problem.

**Q And the individuals would be people like Mr. Bartlett, Mr. Mills, Mr. Stuart?**

A Correct.

**Q Anyone else you can think of?**

A Well, there's some people who aren't directly witnesses, whose correspondences and so on support those analyses. There was a letter between Mr. Dreyfus and Mr. Kadak explaining that exchanges would be encouraged and supported. Nancy Slater provided similar reassurances that PWR and BWR fuels would be handled by the program equally.

There were various other documents that are consistent with it, where there's not a witness actually participating.

**Q You're not an expert at DOE's spent fuel wast management program, are you?**

A Well, it's a pretty vaguely defined term.

**Q Do you consider yourself to be an expert in DOE's spent fuel management program?**



1700 Pennsylvania Avenue, N.W. Washington, D.C. 20006
JABS REPORTING, INC. www.jabsreporting.com
(202) 296-6102 (888) 805-5227

A I know more about it than the average layman.

Q So do I.

Does that make you an expert, in your opinion?

A No. I guess not.

Q Other than these cases, have you performed any work concerning the standard contract?

A No.

Q Were you ever retained by any other utilities in these cases?

MR. SHAPIRO: Objection. Vague.

THE WITNESS: Just the ones that you've seen in testimonial situations.

BY MR. EKMAN:

Q All right. At the bottom of page 4 there is a reference to full core reserve.

Do you see that?

A Uh-huh.

Q Now, your model is run off the assumption that all utilities operate with a

pool's decommissioned?
A Right.
Q Do you know if all shutdown utilities -- and by all shutdown utilities, I'm talking about the ten that were currently shut down -- if they had the financial wherewithal to actually decommission after five years?
A I haven't studied that.
Q Now, on note two, there is a statement concerning re-racking.
Do you see that?
A Yes.
Q Now, as in Yankee, you do not consider re-racking as a potential alternative to increased space; is that right?
A That's correct.
Q And if you did assume re-racking, what that would do is potentially reduce the bids, the cost of the bids or the value of the bids, for operating reactors who are facing space constraints; is that right?
A Yes. To the extent they have a

re-racking option, the re-rackers would bid less and conceivably drop out of their position that they might have otherwise had in the purchase queue.

**Q And one of the reasons you don't use that is because obtaining the information needed for that kind of input would be fairly difficult.**

**Would you agree with that?**

A It does get to be quite a bit more specific about the engineering configuration and the rack configuration at each site. So it would add another layer of information requirements.

**Q Have you seen any studies, for instance, for Diablo Canyon concerning its ability to re-rack?**

A No. I haven't seen any.

**Q In any event, you end by saying, However, this approach to re-racking lends conservatism to my results. Because if lower costs are available to purchasers other than PG&E, that would make it easier for PG&E to have its spent fuel removed sooner.**

every year for allocations to keep their wet pool from encroaching on one full core?

A That's plausible.

Q You're aware -- you have a fewer number of shutdown reactors in this model than you did in the Yankee model, right?

A In the early years.

Q And are you aware though that there are ten bidders in those first five years who are -- who by 1998 were shut down reactors?

A There are ten bidders not yet shut down, who were shut down by '98?

Q Who were shut down by '98 total?

A But who were not already shut down at all, or who were --

Q Who are not treated as -- some are treated as shutdown in your model, some are not. In Yankee, they were all treated as shutdown.

A Right.

Q In this model, it's a split.

A Right. Because we have older data. And they hadn't announced their shutdown.

Q But we know that, ultimately, there are ten facilities shut down by 1998 prematurely; is that right?

A That sounds about right.

Q Would it surprise you if -- and I did the math on this yesterday -- would it surprise you if I told you that slightly more than 5,000 of the 6,073 MTU's of must-move fuel in the first five years are purchased by the 20 utilities we talked about: The ten who ultimately did shut down, as well as the ten who ultimately constructed ISFIS's by 1998? Would that type of scale surprise you?

A No. Not on its face. Again, we've got -- I'd have to review the data. But I think many of those early shutdown units were fairly small. So they have, again, a fairly small denominator to drive up their bid.

And, similarly, we talked about the full pools that keep hitting their full core reserve threshold. They also can avoid a lot per ton by having their fuel taken away. So they sound like

Q Do you know why SMUD shut down prematurely?

A Not in tight detail. I recall there was some concerns about operating, safety, and economics of fixing those problems, so shut down earlier than it expected to last, as well.

Q Do you understand that the rate payers actually -- the citizens actually voted to shut it down?

A I think that's right.

Q Getting back to figure one. We talked about this a lot. And, again, I'm not going to duplicate what we talked about at trial.

But this must-move mountain assumes no license renewal; is that right?

A That's right.

Q And the effect of that is that beginning in 2012, if you assume license renewal for currently opperating reactors, the blue part is going to drop in terms of its slope; is that right?

A That's right. There's an acceleration

A Right.

**Q And are you aware whether Maine Yankee needed that re-rack just to get to DOE acceptance?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I don't know what to get to DOE acceptance --

BY MR. EKMAN:

**Q In other words, get to its first allocations, even under a 3,000 range?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: Well, Maine Yankee was contemplating re-racking in a non-performance world. So it had nothing to do whether they were going to get up to their entitlement that they would have had in a performance world, or whether they could have gotten by without it. They were simply trying to figure out how to make economic sense of the world they were in.

BY MR. EKMAN:

**Q All right. Now, in this case, you relied on the 1994 spent fuel storage requirements report; is that right?**

A 1995.

Q **1995; is that right?**

A Yes.

Q **In the Yankee, you relied on NAC?**

A Yes.

Q **And you said there were concerns about the proprietary nature of the NAC data?**

A Yes.

Q **What was proprietary about the NAC data? Or why did you believe that it was potentially proprietary?**

A Well, I think this was explored at the time. I don't recall all the details. But this was a data set that NAC had developed and was under their control. They used it for commercial purposes of a variety of kinds. And we didn't have any authority to use it a second time.

Q **Why did you pick the '95 document, as opposed to say an earlier document, like a '92 document?**

A Well, we know that the data is -- in the '95 document is about a year, a little bit more

couldn't have operated over a substantial portion of the life of the program. Because as we've been discussing, there are adjustments to people's needs that arise over time. Somebody can shut down early. Somebody can extend and not need their rights that they previously thought they needed.

So they'll be a -- a sort of a rebalancing function that's required periodically, even if everybody at some point in time feels comfortable there'll be some exchanges that are needed later on to keep them comfortable.

**Q Do you know when, at what point in time, all the folks in the first three years would have needed to have completed their transactions?**

A I would say most parties would probably want to have closed down their transactions two to three years in advance of the time when they would become must-move, because they would be otherwise going to have to pursue some other solution that might take a couple years to arrange.

**Q Now, in the Yankee version of your**

model, all three of them are considered shutdown, correct?

A Yes.

Q And all of them get their fuel removed by 2002; is that right?

A Yeah. And it might even be 2001, I forget. But it's 2001 or '2.

Q And Yankee Rowe gets its fuel removed in 1999?

A I think that's right.

Q Now, here, Yankee actually moves up a year to 1998 is that right?

A I believe that's also right.

Q And then the other two are bidding as full pools?

A Correct.

Q And not as shutdowns?

A Right. Part of the reason Yankee Rowe moves up is because there's less competition at the front end.

Q And you haven't, at least in this model, you haven't endeavored to try to figure out when

**the CY and MY, Connecticut Yankee and Maine Yankee, would have been out, based upon their subsequent --**

A As operating pools? Or do you mean in a --

**Q In a shut --**

A -- if they then shut down with -- no. I haven't done that. That's sort of a blend of the analysis I've done and a re-analysis a year or so later to see if anybody would then value the things differently than they did the time before, resolved. So I haven't done an iterative solution to the model like that.

**Q All right. Now, given that -- well, do you believe there could be multiple but-for worlds?**

A This is a very metaphysical question here.

**Q It is indeed.**

A Well, not for our purposes. There has to be a clarity to what we think is a good representation of what it could have been like.

Q And I mean ultimately, given the -- given the relatively small amount of money that any of these utilities can make in those first few years, would you agree that the money itself -- or the money's just really a -- the monies a cherry; it's not what's going to drive the decision-making?

MR. SHAPIRO: Objection. Vague.

THE WITNESS: In the analysis that I did, where everyone participates and puts no risk premium or hesitancy premium in their bids, that's true. The money turns out to be quite low. There are lots of people saving a lot more money than the cost of the exchanges in this program. You can buy exchanges for 10,000 dollars and have half a million dollars of savings per ton if you're actually experiencing times a lot of tons. So it's possible to have several million dollars of benefits from participating as a buyer.

If it turned out that the cherries weren't enough to get people to start talking at the price levels that I've got, people would raise

their willingness to pay, and I think attract them and still have a lot of savings from inducing participation in exchanges.

BY MR. EKMAN:

**Q Can you explain to me why say Portland was -- let me ask it this way. Let's use utilities I know.**

**Can you tell me why Southern Nuclear would want to save Pacific Gas & Electric money?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: You don't enter into any of these transactions any more than you do in any other commercial exchange, because of your hope for the satisfaction and enjoyment of the counter party. You do this for yourself. You're making some money at what you deem to be a low risk or low opportunity cost on that -- retaining that right that you could have otherwise had.

In fact, it may be that you're saving yourself money, if, as we just discussed, you would say, boy, if I don't get rid of these rights and find somebody who wants them, DOE's gonna keep

happen.

Q Well, let's talk about that chart. Because, unfortunately, that was new to me at trial. And I didn't have the courage to ask a lot of questions I didn't know the answers to. So I'm going to ask them here.

A Okay.

Q Let's talk about your assumption.

According to this chart -- first of all, the OFF allocation is based upon the 1995 data; is that right?

A The OFF is based on the discharges that had already been reflected through the end of 1993, and then the discharges that would be projected based on the SFR from 1995 on.

Q So, for example, in this chart, unlike in the Yankee chart, Maine Yankee and CY kick in somewhere later than 1998 as shutdown; is that right?

A Yes. That's right. With spectacular glasses, we could probably find them. So Haddamneck is. Connecticut Yankee, that's about