twenty -- about a third of the way down.

Q 2011 or so?

A 2011, yeah.

Q 2012?

A Uh-huh.

Q The shutdown pool operation, the number of plant years, 198.

In fact, that 198 assumes no license renewal, right?

A That's right.

Q And even if I were to eliminate from the category the Connecticut Yankees, Maine Yankees of the world, and assumed that there would have been extended storage; in other words, go back to your Yankee chart, there's going to be a number of years here that at least through 2027 are not going to be present; is that right, under OFF?

A Repeat again for me what we eliminated.

Q Well, I'm trying to assume that Maine Yankee may go back, you know --

A To being shut down.

Q -- to being shut down.

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - x
PACIFIC GAS AND ELECTRIC COMPANY, :
:
Plaintiff, : No. 04-0074C
:
v. : Volume II
:
UNITED STATES OF AMERICA, :
:
Defendant. :
- - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, January 25, 2006

Continued Deposition of:

FRANK C. GRAVES,

called for examination by counsel for the Defendant, at the Offices of Greengerg Traurig, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Barbara A. Huber, court reporter and notary public in and for the District of Columbia, and commencing at 9:30 a.m., when were present on behalf of the respective parties:

APPEARANCES:

On Behalf of the Plaintiff:

ROBERT L. SHAPIRO, ESQUIRE
Greengerg Traurig, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006
202-331-3174
shapiro@gtlaw.com

DEAN M. MURPHY, ESQUIRE
The Brattle Group
44 Brattle Street
Cambridge Massachusetts 02138-3736
617-864-7900
dmurphy@brattle.com

On Behalf of Defendant:

JOHN C. EKMAN, ESQUIRE
TED LUNDSFORD, ESQUIRE
TODD J. COCHRAN, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
202-353-0897
john.ekman@usdoj.gov

Also Present:

Allyson Reed
Stuart D. Gurrea

storage if and when such a storage option becomes available for a site such as Humbolt Bay power plant unit 3.

Do you see that?

A I see it.

Q So this appear to, at least for Humbolt Bay, to state a preference for getting the materials out of the wet pool and into dry storage?

A Apparently, yes.

Q Have you seen Exhibit 4 before?

A I have not.

Q Now, in areas of the country where -- again, under the assumption that there are areas that might support trading versus areas that might opposing trading.

In the areas that support trading, participation is not going to increase over and above the participation set forth in your ESM model; is that right?

MR. SHAPIRO: Objection. Vague.

THE WITNESS: As -- I have simulated, in

a sense, everyone being willing to participate in the ESM model. So I can't have more potential sellers than that, if, of course, it turns out that everyone doesn't exchange in every year. So you don't need to have everybody participating to accomplish considerable improvements in the schedule. But if only a portion of the country participates, that would be a smaller sample -- a smaller population of sellers.

BY MR. EKMAN:

**Q In making its decision, do you know if PG&E takes into account its stakeholders in their preferences?**

**And by stakeholders, that includes the rate payers as well as its shareholders.**

A Absolutely.

MR. SHAPIRO: Objection.

BY MR. EKMAN:

**Q Have you investigated what the opinions of the stakeholders are, including the rate payers, concerning the presence of spent nuclear fuel in Eureka San Luis Obispo?**

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - -x

PACIFIC GAS & ELECTRIC COMPANY, :

Plaintiff, :No. 04-00743, into

v. :which has been consolidated

THE UNITED STATES, :No. 04-0075C

Defendant. :(Judge Hewitt)

- - - - - - - - - - - - - - - - - - -x

Washington, D.C.

Friday, May 19, 2006

Deposition of FRANK C. GRAVES, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Greenberg Traurig, LLP, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C. 20006, at 9:43 a.m., Friday, May 19, 2006, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

CERTIFIED COPY

APPEARANCES:

On behalf of the Plaintiff:

ROBERT L. SHAPIRO, ESQ.
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202)331-3174

On behalf of the Defendant:

JOHN C. EKMAN, ESQ.
JOSHUA GARDNER, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202)353-0897

ALSO PRESENT:

JONATHAN A. NEUBERGER
Senior Vice President
Economists Incorporated

ALLYSON REED
Navigant Consulting

(Continued)

ALSO PRESENT: (Continued)

HUGH HILL

Summer Intern

United States Department of Justice

DEAN M. MURPHY, Ph.D.

Principal

The Brattle Group

their participation.

I don't know that it would shut down their participation.

For instance, there would be people for whom the, let's say the year five or year six in which this disruption might occur is a critical year in their needs to have fuel moved, so such people might say, you know, if I think any time now there could one of these, in the first few years, something is going to break and this isn't going to work, they sort it out after that, but they might accelerate their requests for acceptance rights. They might be willing to pay more.

So it would affect preferences and timing of decisions, but I don't know that it would kill people's willingness to use what, the program while it was working.

BY MR. EKMAN:

Q. Now your model is, at least the price component of your model is based solely on avoided storage cost, is that right?

A. Yes.

Q. And you do not, your, at least your base case does not price, build a price into your

market for uncertainty, for example?
A. Well, let me just clarify one thing. Again, the price is derived from avoided cost, but it's not exclusively dependent on what the avoided costs are.
It's also dependent on what the total amount of acceptance is and how far down the list of or the rank order of people with must move plans can be served a in a given year.
Q. The marginal bidder is also in what determines the overall market price in your model?
A. That's right.
Q. So --
A. So the price depends on more than one thing, and --
Q. I understand that.
A. And in the base case, there's no assumption that there's any disruption or loss of total capacity in the program.
In other scenarios, I look at lower acceptance rates, and those are equivalent to saying what would happen if, you know, this, only a fourth of the program worked, the program worked at a fourth of its designed capacity, for

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Case No. 04-106C (Chief Judge Damich)

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant. | ) |
| | ) |

DEPOSITION OF FRANK C. GRAVES

Tuesday, June 19, 2007

Washington, D.C.

Reported by: Mary Ann Payonk, CRR-RDR

Certified Realtime Reporter

Job No. 0706

Deposition of FRANK C. GRAVES held at the offices of:

U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

Pursuant to Notice before Mary Ann Payonk, CRR-RDR, Certified Realtime Reporter and notary public.

***

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

ROBERT L. SHAPIRO, ESQUIRE
GREENBERG TRAURIG
800 Connecticut Ave., N.W.
Suite 500
Washington, DC 20006
(202) 452-4878

ON BEHALF OF DEFENDANT:

RUSSELL A. SHULTIS, ESQUIRE
PATRICK B. BRYAN, ESQUIRE
Commercial Litigation Branch
US Department of Justice
1100 L Street, N.W.
Washington, DC 20530
(202) 305-7571

ALSO PRESENT:

Mr. Ted Lunsford, Contract Solutions LLC
Mr. Stuart D. Gurrea, Economists Incorporated
Mr. Dean Murphy, The Brattle Group

explore the possibility that those numbers could be considerably different, so I'm not relying on just that estimate.

Q Could you tell me how you used that $8.7 million figure?

A Certainly. One of the analyses I conduct is done in what I call the economic sequencing model, and that model establishes an appropriate economic priority for use of the capacity of the program according to the willingness to pay of the parties to mitigate their at-reactor storage costs. One of those costs is wet pool O&M, so in order to determine how much a party with a pool that they're maintaining would be willing to pay, I need to know what it costs them annually.

Q So the annual cost is -- would you say that that's a driver in your analysis?

MR. SHAPIRO: Objection, vague.

A It's a factor. As I explain later, in fact, the costs don't vary across facilities nearly as much as the volumes of waste do. So the cost per ton of waste that the parties ought to be willing to pay to avoid their problem is less sensitive to costs than it is to volume. But costs matter.

Q Okay. Does that figure affect Dairyland's

willingness to pay for allocations, in your analysis?

MR. SHAPIRO: Objection, vague.

A Yes, in the sense that it factors into the competition for adjusted positions in the queue.

Q Could you explain that a little bit? Could you tell me how that factors into competition for adjusted positions in the queue?

A Okay. Dairyland would like to have its waste removed as soon as possible, but in order to do so, it has to be willing to pay as much or more than others who have rights to move their fuel that they may not regard as important to use. So the economic sequencing model determines what the marginal willingness to pay is, and Dairyland is part of that process to decide whether they have costs that are as high or higher per ton than other parties. And it turns out they do, and so they are willing to pay to accelerate their position to 1998 removal so that as a result of whether their costs are -- per ton are higher than other parties.

Q Okay. So is it fair to say that you assume Dairyland's wet storage O&M costs are 8.7 million?

MR. SHAPIRO: Objection, vague.

A I believe in the base case that is the number I use. But, as I mention, I rely on several analyses which vary that cost considerably.

Q Okay. And could you tell me how much that cost varies from the base case?

MR. SHAPIRO: Objection, vague.

A It depends on the scenario. I describe some 22 or so variations on my base case analysis in my testimony or in my report, and about 12 or so of those involve varying the costs -- maybe 10 -- at the -- of the different kinds of at-reactor storage costs that can be borne.

So, for instance, some of them double the cost of each of the factors at the at-reactor -- that you could incur, double the cost of dry O&M, wet O&M, casks and so on. Some of them cut them in half. Some of them do that one factor at a time. Other scenarios randomly mix and match doublings and halvings across the parties, but the basic range I analyze is twice as great or half as great.

Q So the low would be 4.35 million in your scenarios?

A I -- I believe that's correct, yes.

Q Okay. Now, did you actually investigate Dairyland's wet storage O&M costs?

A John Raymer, or Reimer, perhaps.
Q Could it be Bob Brimer?
A There we go. That sounds more like it.
Q Okay.
A Sorry about that. I can't remember all their names. And I think there was a -- the plant engineer may have been named Mike Braslet or Brasel.
Q Mike Brasel?
A Yes.
Q Roger Christians?
A It's certainly possible, but I can't be certain.
Q Okay. And what information did you draw from this trip?
A Well, it was partly contextual, just to see the site, find out what the attitude of the company had been toward the program and towards their attempts to manage the waste over the time. So I learned about some of their earlier attempts to arrange alternative disposals of the waste and how those hadn't worked. As I say, I visited the site, saw what the configuration was like.
Q Did you -- of the fellows that you just referred to, did you rely on information that you received from any of them?

A No. I would say there's -- there's nothing in my report that is adjusted to reflect a specific insight that I gained at their -- at the site. My analysis would have been virtually the same without it. It just helps to lend some specificity to, you know, my awareness of the situation.

Q Did you discuss exchanges?

A Yes.

Q Who did you discuss that with?

A Well, I can't tell -- remember who was more active in worrying about that than others. As I recall, the -- the men named Chuck and Bob would have been more likely could be involved in those discussions with us. They -- but I couldn't tell you for sure.

Q Did they validate anything for you with regard to your opinion in this case?

MR. SHAPIRO: Objection, vague.

A I suppose in one sense you could say they validated my confidence that I already had, which was that people in this sector of the industry would have been and, in fact, were actively interested in exchanges as a mechanism of improving their position in the spent fuel management queue or process and

that they were, you know, actively interested in using available means to mitigate their situation.

Q Okay. But you didn't test your assumptions regarding wet pool operations and maintenance costs with them?

A No.

Q Are you aware that Mr. Brimer is no longer an employee for Dairyland?

A Not specifically no, but I --

Q Okay.

A But I accept that.

Q I'll represent to you that he is a Dairyland retiree. What insight did Mr. Brimer provide?

A Well, I think you're exceeding my ability to refine who was the source of what knowledge, from my memory, anyway.

Q Okay. So you can't remember?

A I can't tell you.

Q What about Mr. Sans Crainte? Do you remember what information he provided?

A No. I -- I know generally. I reviewed the history of the plant and some of the -- its relevance to their system and some of their attempts to arrange exchanges and then later, I looked at the

it appears to be a draft agenda for a meeting between Dairyland and the Department of Energy, and it's -- the draft agenda is dated April 16, 1990?

A **It certainly addresses alternative arrangements with DOE, and it -- those are the dates, so that's very plausible.**

Q Okay. That's what it appears to be, correct?

A **Yes.**

Q I take it you have not seen this document before.

A **I don't recall seeing it.**

Q Okay. And if you go to the first page and you go down underneath Roman numeral II in subsection B1, do you see where it says: SAFSTOR costs 2.5 million each year, and then underneath says 1.3 million of which is directly related to the presence of spent fuel? Do you see that, sir?

A **I do.**

Q Okay. So if Dairyland in 1990 had $1.3 million, were experiencing $1.3 million in wet pool O&M costs, would that have affected their willingness to trade in your model?

MR. SHAPIRO: Objection, vague.

A **As I described earlier, their willingness**

to pay is a function of their annual avoidable costs and the volume of waste involved because it's based on a dollars-per-ton basis per year. So this is one of the factors. The numerator is the avoidable costs. This -- and so whatever that number properly is would affect their willingness to pay.

I don't know whether this is, you know, a -- an official and complete estimate of that cost, but if it were, that would be the type of number they would use in their own such analysis.

Q Okay. Have you seen the 1.3 number in your analyses at all?

A I don't recall seeing it. I do vaguely recall the 2.5 million from other documents around this time, but I don't recall seeing the 1.3.

Q Okay.

(Exhibit No. 2 was marked.)

Q I'm going to hand you another document, Exhibit 2. Mr. Graves, you've been handed -- I'm sorry. You said you saw the $2.5 million figure from other documents?

A Yes.

Q Did you incorporate that into your analysis?

MR. SHAPIRO: Objection, vague.

A As I mentioned before, I don't incorporate any specific estimates from just Dairyland into my analysis. I use industry-typical values and then vary those across a wide range so that I can get relative willingness to pay calibrated in a consistent fashion. So if I only knew about Dairyland but don't know about specifics about other sites in an equivalent way, then I can't be certain if I'm making a fair comparison.

Q Okay. I understand that. But Dairyland's actual experience relative to the rest of the industry does affect their willingness to pay for exchanges, is that not correct?

A That would be correct.

Q Okay. Can I just ask quickly, what document did you get the $2.5 million figure from? Do you know?

A There were some internal memos, four or five, that I cite in my Documents Relied On list, which were describing some of Dairyland's history and its experience from around 1993 or 1994 that I read for background. And I'm pretty sure the number 2.5 was in one of those.

Q Okay. Did you use the $2.5 million figure to determine an industry average? Did you use that

A Correct.

Q Okay. And all the utilities with regard to post-9/11 security costs were obviously operating under -- in the same framework before 9/11 with regard to their security costs. Is that fair to say?

MR. SHAPIRO: Objection, vague.

**A Certainly with respect to, yeah, any -- any incremental burdens imposed by 9/11.**

Q And you don't know of any reason that Dairyland at the LACBWR site would have experienced heightened security costs, do you, in 1990 relative to other utilities, do you?

**A No, I'm not aware of any special reasons why they would have had different security costs.**

**(Recess, 10:19 a.m. through 10:29 a.m.)**

Q Mr. Graves, did you consider technical impediments to fuel removal, spent fuel removal, in your model?

MR. SHAPIRO: Objection, vague.

**A No. I have no special adjustments for any circumstances where a particular piece of waste might be difficult to move.**

Q Why is that?

**A Couple of reasons. One is it's my general**

understanding that failed fuel is covered by the contract and has been handled successfully in other settings. So it appeared to be a secondary consideration.

Q So where did you obtain that understanding? Let me break that down. I'm sorry. You said it was your general understanding first that failed fuel is covered by a contract. Where did you learn that?

A Well, I believe that's in the contract document itself.

Q Really? Where?

A I would have to review the document, but that's my recollection. So, you know, I would need to look at the document to find it.

Q Did you have any discussions with Mr. Shapiro or his colleagues regarding that?

A Yes.

Q Okay. What were those discussions about? I'm sorry, could you describe those discussions?

A Well, there's kind of two levels of discussion that went on. One is the question of whether it's -- whether it is valid to conclude that the failed fuel would be covered by the obligations of DOE. And second, we discussed whether there was

analyses on the cost of the overall waste handling.

Q How much failed fuel does Dairyland have?

A I don't remember the metric as to how -- what percentage of the fuel was failed.

Q Did you ever consider that?

MR. SHAPIRO: Objection, vague.

A I consider failed fuel to be must-move fuel, and I don't anticipate -- don't reflect in my modeling any belief that it imposes a different avoidable cost on a utility that would affect its willingness to pay to get out. So in terms of both the must-move analysis and the economic sequencing, it doesn't change companies' desires, positions in the queue, the total amount that has to be moved, or the economic motivation they have to get out. It may change the process that's pursued at the site for actually removing the waste, but it doesn't affect the avoidable costs of the utility itself, so I don't consider it a distinct kind of waste from other waste.

Q What if it had an effect on the relative cost of removal at one utility site versus another?

MR. SHAPIRO: Objection, vague.

A Well, it's still an obligation under the contract that it be removed, and there's been

MR. SHAPIRO: Objection, vague.

A I think I specified before that the handling costs would have to be both large enough to make deferral of waste removal an attractive economic alternative, and they would have to be differential enough that only a few utilities had that problem compared to others so that it wouldn't shift the balance of interest in waste removal unevenly across the universe of parties with spent fuel. So I need two conditions.

Q Okay. But do you have any -- can you tell me in the case of Dairyland what those costs would be in order to make them sufficiently material?

MR. SHAPIRO: Objection, vague.

A I can't tell you specifically, but intuitively, I would expect they would have to be many millions of dollars more for that fuel, many millions of dollars more for the pickup and removal of that failed fuel than for all the rest of the fuel because otherwise, they're bearing at least 1.3 and possibly much more costs per year from waiting. And the number would have to get to be large relative to that so that waiting is economically preferred. So tens of millions, maybe?

Q Okay. And just so that I'm clear, that's

an economic analysis. You're not a -- you don't have the technical expertise to bear on whether or not Dairyland's failed fuel can actually be canisterized, correct?

MR. SHAPIRO: Objection, vague.

A I don't have the engineering knowledge of how much more difficult it might be. The whole discussion we've just had has been predicated on the notion that it's feasible though potentially more costly because more elaborate mechanisms might have to be pursued. You can't kind of have it both ways and say either it costs more or it's just impossible. So what I thought we were talking about it in terms of it being more expensive to accomplish, not being impossible.

Q I just wanted to make sure I understood the context of your comment. You don't -- you're not offering yourself as a technical expert as to whether this can actually be done?

A No.

Q Okay. And you don't know whether it could actually have been done by 1998, do you?

A Well, in the breach world, I don't know whether the technology would have been -- was available and ready to be used. But in a nonbreach