your report and how your analyses has changed since you submitted your report in the Pacific Gas and Electric case. Okay?

A Okay.

Q So first of all, could you tell me what the differences are between -- maybe I shouldn't say report. Let me say analysis. How has your analysis changed for this case as opposed to the Pacific Gas and Electric case?

MR. SHAPIRO: Objection, vague.

**A The mechanics of my analysis are identical to the work that was done in the PG&E case, and many of the deputy inputs are the same. The ones that are explicitly different are the costs of developing and maintaining spent fuel repositories in O&M at the sites. In the PG&E case, I relied on Rod Knight's data. And as we have discussed earlier this morning, in this case I submitted similar data on my own from some 14 facilities that had good public records about their cost structure. And there were some changes in the numbers as a result. The basic character of it was that the ISFSI setup cost went up quite a bit and the O&M costs went down a bit. Cask costs were also slightly less. They're in the ballpark of the ranges that I've seen from**

A **Aside from the fact that we just talked about using -- running a scenario for the 2006 study, Sierra WMS requirements documents, which of course didn't exist at the time of the PG&E study --**

Q Uh-huh.

A **-- no, I didn't do any other analysis of DOE.**

Q Did you add any -- any information from any other governmental agency that you didn't use in PG&E?

MR. SHAPIRO: Objection, vague.

A **Not that I can recall.**

Q So not the Nuclear Regulatory Commission or anything like that?

A **Well, outside of the context of the cost studies, which are vetted through the NRC, I don't recall any adjustments.**

Q Okay. Did you ever vet with any utility what they would be willing to pay, specifically, what they would have been able -- willing to pay for the acquisition of allocations --

MR. SHAPIRO: Objection.

Q -- in the nonbreach world?

MR. SHAPIRO: Objection, vague.

A **I -- I didn't do any surveying of anybody**

to say what -- what would you have thought that world looked like and what would you have been willing to pay in that circumstance, though I have anecdotally or indirectly three pieces of data, one of which -- all of which arise from these testimonies.

We know that in the Yankee case and PG&E and now Dairyland, there's utilities who have seen my representation of what that world would have looked like and they felt they could credibly file a damage claim saying that we would have been willing to pay that and we feel harmed that we didn't get the opportunity to do so, so there's one piece of empiricism of sorts that supports that.

Going more broadly to just go door to door and ask people what they would have thought I guess isn't useful for two reasons. One, they would have needed a very complete spec and probably a model of what the circumstances were that they thought the nonbreach world would have looked like for them to answer the question, and they wouldn't have it, so they would have given piecemeal, vague answers that you couldn't interpret.

And the second thing is that ultimately isn't really the way market dynamics work anyway.

guess my question is: How does your opinion affect Dairyland's damages claim? How do you expect Judge Damich to use your opinion in this case to assess damages?

MR. SHAPIRO: Objection, vague.

A I don't know for sure how they have framed their damage assessment, but I expect that it includes -- I would expect that it relies on the dates that I suggested they could get out, and that they might have to incur a cost to do so, since they would be proving their position in the queue and that nonetheless, they feel they bear damages from not having had the opportunity to do so, and those are the differences in costs that they incurred without this world of prevailing versus the costs they would have had in that world.

Q So is it fair to say that you would expect that the costs of inquiring allocations should be an offset to damages?

MR. SHAPIRO: Objection, vague.

A As an economic matter, if you expect there would be some costs that you would incur in the performance world, such as acquiring rights, you should reflect those in your calculations to compare to the costs you're incurring in the breach world.

And, you know, there may be some disagreement about how conservatively to represent those costs or not. But I think in principle, they ought to be part of the calculation.

Q Do you think it's fair to calculate damages by taking the costs in the actual world and subtracting the costs in the but-for world and then you've got damages, right?

MR. SHAPIRO: Objection, vague, argumentative.

A Qualitatively, that's correct. There's some calculational nuances to it, but that's the general idea.

Q Right. And in -- and in your scenarios, you predict an exchanges cost that range from 2 million to 21 million, right?

A Those are possible costs. I don't predict that they will be -- they will span that range. I don't think the $21 million scenario is a very credible scenario. And as I told you, I don't think the scenario 4 with the 2006 Sierra WMS pace is a credible scenario.

Q Right.

A Certainly, the '91 ACR scenarios aren't ones that should have governed expectations.

tolerance in the contract was correct, that failed -- and that it -- it -- I don't have any reason on the strength of what we discussed at lunch to change my view about anything I said this morning about its -- the way it ought to be modeled.

Q Okay. Anything else?

A We talked a little bit about surveying, whether there was any other insight about whether surveys of other utilities would be insightful. And we didn't think so. Largely for the same reasons I articulated that, it's described -- it would be asking people about a world they had no experience in, that is, a performance world that didn't exist and they don't have a representation of, so to ask them how they would have behaved in that world absent the support of a model would be, in my view, frivolous and nonproductive. I couldn't think of any way of making it less so.

Q Anything else?

A No, but I will tell you I couldn't think of anything else that's new or different about the modeling framework that, you know, I should bring to your awareness. I'll be happy to do so if something occurs to me this afternoon, but I think you're safe in relying on our PG&E descriptions of the mechanics

**depositions that this is one of your favorite topics so I don't think we were dignifying it with the importance you seem to see in it.**

Q For the record, my favorite topic is the Green Bay Packers, so failed fuel is a distant, distant second.

**A Second?**

Q Way back there.

**A That's good. At least it's not your number one.**

Q Did you talk about anything else?

**A I suspect we did, but those are the key themes that I remember right now. I can't think of anything.**

Q Did you review the standard contract?

**A No.**

Q Now, before we took a break for lunch you said you were going to offer -- you had an opinion about the acceptance rate. Is that fair?

**A Yes.**

Q Okay. Have you studied the formation of the standard contract in forming your opinion?

MR. SHAPIRO: Objection, vague.

**A I know a little bit about its institutional history, but I don't know if that's**

**the same as studying it, its formation.**

Q When I say "studying it," I'm asking you was it -- was -- did you have to do something with regard to learning about the standard contract in order to form your opinion? Did you try to learn about how the contract was written and as -- as part of the exercise that you were engaged in in this case?

**A Up to a point, certainly. I'm aware that the contract on its face doesn't specify a pace or a schedule for acceptance at any particular site and that those details were, you know, to be sorted out later. So in that sense, we then have to rely on other criteria for deciding what a reasonable pace and schedule would be. They're not, to my knowledge, in any way specified in the four corners of the document.**

Q Okay. So is it fair to say that the standard contract does not contain the 3,000 MTU per year acceptance rate?

MR. SHAPIRO: Objection, vague.

**A I'm not aware of any reference to any specific acceptance rate in the contract.**

Q Okay. Does the standard contract include any qualitative test for performance that you know

ACR rate was a breach rate, were you making an economic determination?

A Sure, let's call it an economic determination.

Q Okay. But an economic standard of performance is not what's required in the contract, right?

MR. SHAPIRO: Objection, vague, argumentative.

A I think the problem is the contract doesn't state what constitutes performance, so it has to be judged by other criteria of reasonable public policy, good-faith effort, cost-effectiveness, economic principles.

Q Okay. But all I'm asking you is that standard that you just described is not described in the standard contract. Would you agree with that?

A Sure. That's the problem with the contract. There's no standard.

Q Now, you referred to the 1988 mission plan rate as reasonable. Do you recall that?

A Yes, I think that's a reasonable rate.

Q And again, your determination that it's a reasonable rate is not -- I mean, you're not a lawyer, right?

A It wasn't based on a sampling theory that 14 is enough.

Q Right.

A It's, you know, we need to get at least eight, or some such number. It was based on attempting to get all the available data we could find that had the constituent parts broken out and explained in terms that we could understand so we could know how to use them in pooling them in our analysis.

Q Okay.

A So if somebody just said, well, we have a total spent fuel cost per year of $42 million, we don't know how to use that. We don't know whether that constitutes O&M, setup, cask purchases, so we -- it might be out there as a piece of data, but it's not very useful. So we would -- found as much as we could that was useful.

Q How did you know that what you found was representative of a industry?

A I guess there's two or three sources of confidence in that. One is, as you just observed, there's only 60 or so players in this business, and we had data on aspects of 14 of them, which is on the order of a fourth. So that's a, you know, a --

¿ 000

a nontrivial portion of the population.

Second, we had prior reports which unfortunately we were no longer able to rely upon from NAC and Scientech that described their industry experience with these kinds of costs, which arose from a large variety of contexts of supplying those kinds of services.

And the numbers we found in our analysis were broadly consistent with their analyses, and where they differed, it was partly explainable in terms of things like increased security since 9/11. So we had a prior notion of what was reasonable from other hearings.

Q Why couldn't you use the documents from NAC and Scientech?

MR. SHAPIRO: Objection, vague.

A There were two sides to the same problem. One is there was no NAC or Scientech expert who was going to provide the underlying expert testimony in support of those numbers. And we only knew them at a summary level where we couldn't -- or at a disguised level where we couldn't reconstruct their validity on out own from our own analysis. So while we don't doubt their credibility, we couldn't independently establish it and testify as to the

much O&M cost but nothing else changed? Then when they get down to K16, I'm letting each utility have its own mixture of doublings and halvings, which are not the same at each utility, and I run five different tests of that kind of variation.

Q Okay. But you're --

A These are much more extreme tests than the case where you'd say, well, suppose a few people have a double -- you know, twice as much fuel, wet pool O&M. That will have a lot less effect than if everyone has twice as much wet pool O&M.

Q But your test doesn't do sensitivity analysis regarding relative changes, correct?

A Well, sure. Every one of those is a relative change. For some people, they are primarily facing or only facing wet pool O&M so those utilities become more expensive.

Q Uh-huh.

A Others are facing, you know, ISFSI expansion costs and for them, the O&M costs a big deal. Or if they're going to have to build an ISFSI, then the setup cost is a big deal. So they certainly affect different subsets of the plants in the universe of purchasers.

Q If you were -- maybe I should ask you this

about your model. Your model actually predicts a market. Is that fair to say?

MR. SHAPIRO: Objection, vague.

A It simulates the result of a market mechanism that would be efficient in identifying who would be the best users of acceptances.

Q Uh-huh.

A It doesn't -- it shouldn't be construed as the only way that a market could be designed or that a market could transact to reach those same results. There's lots of different ways it could happen, but analytically could be a way of showing what might result in a market.

Q It does -- the way -- I'm sorry. It predicts the way a market could develop, correct?

A Yes.

Q Okay. It does not predict individual transactions, is that fair to say?

A That's correct.

Q So is it fair to say that changes across players in a market could affect their relative likelihood that an exchange will occur?

MR. SHAPIRO: Objection, vague.

A If one player's market cost or operational circumstances change, they may have more inclination

would have a high -- I don't know if the T statistic is what measures that or not, but by -- by interjecting an average in these series of numbers, doesn't it by definition sort of --

A Improve the signal-to-noise ratio?

Q I guess so.

A Yeah, sure, a little bit. But again, the numbers are one tenth or one twentieth of the total costs of other numbers that are varying quite a bit by the time you build back the total capital that's involved, so it's not the lion's share of the numbers.

Q Are the wet pool O&M costs -- those seem to vary quite a bit. Is that a significant variance, did you think?

MR. SHAPIRO: Objection, vague.

A It's a material variation. There's no statistical test of whether it's a significant variant. I only have three observations for that.

Q Well, that's what I was asking -- I'm sorry, go ahead.

A So again, there again what I do for that is the same as I have done in my -- for all of these factors, is take what appears to be the best estimate I've had of a represented value and then

pool O&M and dry -- dry O&M.

Q Okay. So it's really -- that is one of the drivers to your analysis, is it not?

MR. SHAPIRO: Objection, vague.

A **In some circumstances. You know, in the end result, it turns out that's true. It wasn't known a priori that that would be the case. In other words, there's nothing -- the model isn't set up for that to come true. It just happens to be the result.**

Q Okay. And in this instance, you -- what you did is you took the annual wet O&M costs at Humboldt Bay and Rancho Saco, and is it Trojan? Those are the three examples that you used to come up with an average annual O&M cost?

A **Correct.**

Q Is that right?

A **Yes.**

Q Okay. And that's how you came up with the $8.7 million average figure, correct?

A **Yes, it is.**

Q Okay. And is there any particular reason why you chose those three?

A **No. Again, it's based on where the data was, not on any preference for those three. They**

case. I do run a sensitivity in which I look at what would happen if there was a million-dollar fee for a transaction in $5,000 per cask, which I think is an extremely high fee but nonetheless one that illustrates what the effect of having a broker or an intermediary would be.

Q Does that fee that -- the one that you assume in your analysis, is that one that would be charged to any marginal player in the entire market?

A Sure. Anybody who bought rights would pick up a million-dollar transaction fee and $5,000 a cask.

Q Okay. Why shouldn't the transaction costs be included in the base case?

A Well, I'm not sure these are more likely to arise at this level than not. The base case is simpler to understand, and the transaction cost case is a variation on that that throws in a friction of sorts so that the base case was the simple situation and the -- each sensitivity layers on various nuances of uncertainty in costs, uncertainty in the participation levels and things like that. So this is an uncertainty case.

Q So you don't deny that transaction costs would exist, right?

MR. SHAPIRO: Objection, vague.

A Yes. I don't have any problem with the notion that they would probably exist, though not uniformly for everybody, and not necessarily at this level. This -- I had to set them this high to sort of make them show up as a difference in the analysis because, you know, these numbers are small compared to the amount of money that's at stake, but they're huge compared to the amount of effort it takes to get in to be an intermediary in this business. So this is a lot of money for intermediation.

It's not clear that competition for that -- that opportunity would let anybody collect this much money.

Q Would you expect that the transaction costs from utility to utility would vary?

A Sure. They could be different from one utility to another, of course.

Q Isn't the bargaining power, say, of Entergy much different from the bargaining power, say, of Dairyland?

MR. SHAPIRO: Objection, vague.

A Yes, but it's not all about bargaining power. It's also about competition for being an intermediary because it is a very easy problem to

analyze and set up a framework for identifying attractive trades. And so -- and there's a lot of players who would -- you know, who are familiar with that kind of activity of trading, so I don't think it would be terribly hard to motivate people to do it.

This is a normal kind of activity in the culture of the utility industry to trade economic rights for cost savings that are mutually beneficial. So yeah, there would be some transaction costs and they could vary a bit from deal to deal. But they wouldn't be very much, I don't think.

Q Okay. Did you get anything else out of this document?

A No. That's about it.

Q Okay. Did you -- you mentioned a little bit earlier about private fuel storage not being viable. Do you -- is that -- did you say that? Do you recall saying that?

A I do.

Q Why do you say that?

A Well, I -- it's my understanding, which is pretty secondhand, that private fuel storage has hit some sort of road block with respect to using the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Case No. 04-106C (Chief Judge Damich)

DAIRYLAND POWER COOPERATIVE, )
Plaintiff, )
v. )
UNITED STATES, )
Defendant. )
______________________________________)

DEPOSITION OF FRANK GRAVES

September 6, 2007

Washington, D.C.

Reported by: Mary Ann Payonk, CRR-RDR
Certified Realtime Reporter
Job No. 2007-11

Deposition of FRANK GRAVES held at the offices of:

Department of Justice
1100 L Street, Northwest
Washington, D.C. 20006

Pursuant to Notice before Mary Ann Payonk, CRR-RDR, Certified Realtime Reporter and notary public.

***

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

ROBERT L. SHAPIRO, ESQUIRE
GREENBERG TRAURIG
800 Connecticut Ave., N.W.
Suite 500
Washington, DC 20006
(202) 452-4878

ON BEHALF OF DEFENDANT:

PATRICK BRYAN, ESQUIRE
JOSHUA GARDNER, ESQUIRE
Commercial Litigation Branch
US Department of Justice
1100 L Street, N.W.
Washington, DC 20530
(202) 305-7571

ALSO PRESENT:

Stuart Gurrea
Eric Schaeb
Rob Sweeney

***

MR. SHAPIRO: Objection, vague.

A I think I could do some that would be credible from the point -- from my point of view in the sense that I have studied the question of what I think the nonbreach world should have looked like. But the problem is that if I were to ask a question that said let's suppose the nonbreach world looked like as has been described in my direct report, would you be willing to trade, we might -- you -- you would be only getting conditional answers that would be conditional on whether or not you, in fact, agreed with that characterization of the nonbreach world. And those -- since that is in dispute, having answers that were conditional on a fact that's in dispute I don't think would resolve the courts -- help the courts resolve the question of whether or not those answers tell you what would have happened.

The predicate largely determines the -- in some ways determines the answer. If you're told that it's a poorly designed, half-speed, convoluted process, you might be giving a different answer. And the issue is not if -- how would you answer, it's what is -- what would have been reasonable to expect.

Q You did not endeavor to present to utilities a set of predicates to assess their

attitudes towards trading in a nonbreach world. True?

A No. And it's also my perception that that is rarely done to the level that would be required in polling processes. People don't like to participate in polls where they say let's spend an hour discussing the predicates of the questions I'd like to ask you and then we will go through them. It's usually a pretty perfunctory process with, you know, people not making those kinds of investments in understanding the question -- the -- the foundations of your questions.

Q What's the basis for your testimony? I'm sorry, strike that.

What was the basis for your position you just articulated about polling and utilities not wanting to waste time or spend the time in responding to a poll?

MR. SHAPIRO: Objection, vague.

A Well, I have been contacted by pollers from time to time so I have some experience being asked questions of this kind. I've worked in occasional conjunction with market research firms where I've used market research data in my work so I know a little bit about how this is compiled. I'm not offering my opinion as an expert market researcher, but I'm offering my skepticism that it would be -- it

centralized markets.

Q But you're assuming that information would be widely and easily available; correct?

A I know it's widely and easily available. I used to it run my analysis, and that's exactly the same kind that would have motivated parties to look for trading partners.

Q Would parties look at who got allocations through ACRs?

MR. SHAPIRO: Objection, vague.

A Sure. That's part of the information they would be aware of.

Q What else?

A Well, in the but-for world, as I describe in my direct testimony, you would have known the aggregate acceptance rates. You would have known the OFF initial allocations. You could have made pretty well-informed guesses as to who had what kinds of costs. You could have seen who has immediate needs versus future needs.

It would have been very easy using all of that information to get on the phone and start calling around and say, hey, could I do a deal with you? And if somebody was reluctant, you could call any of a number of other parties. There were dozens of

would have performed at a 3,000 rate if utilities were to follow OFF --

MR. SHAPIRO: Objection, vague.

Q -- in that world of not exchanges if the utilities were to follow the OFF schedule as opposed to engaging in exchanges?

MR. SHAPIRO: Objection, vague, calls for a legal conclusion.

Q Again, assuming that the utilities voluntarily chose not to engage in exchanges.

MR. SHAPIRO: Same objection.

A The legal criterion are not my expertise, is not my area of expertise. But my personal judgment is that scenario where the program was set up with a 3,000 rate and exchanges welcome and feasible but none happen to be chosen would not be a breach.

The breach, to my mind, depends on how the program -- what the program offers to the participants, and whether or not they choose to participate after that point is up to them. But I believe very strongly that they, in fact, would have participated substantially in such exchanges and that your scenario, voluntary withdrawal from exchanges, is extremely unlikely.

Q Is it your opinion that if DOE were to --

(Recess taken from 11:46 through 11:57)

BY MR. BRYAN:

Q Mr. Graves, during the break, did you have any -- what did you discuss with counsel?

A We discussed that some of these -- many of your recent questions actually don't address my rebuttal testimony, or in some cases, my testimony at all. They have to do with the broader context of why Dairyland is bringing its case, and those are outside of the scope of my report.

Q Which questions in particular?

A Questions about the obligation, why Dairyland is here, who at Dairyland agrees with my testimonial view, what their expectations were. Things like that are not things I can inform the courts about.

Q You don't inform the Court as to what Dairyland's views are with regard to Dairyland's willingness to engage in exchanges. True?

MR. SHAPIRO: Objection, vague.

A My answer is that's correct. I don't actually address their willingness to engage in exchanges. What I address is the economic benefit of exchanges they could have had under a reasonable program and how it would have affected their position

in the queue.

Q What else did you talk to counsel about during the break?

A We briefly discussed that there's only a small amount of Class C waste, greater than Class C waste, and that in my direct report I have a footnote indicating that it's not been viewed as a basis for requiring continued maintenance of a wet pool or building an ISFSI.

Q Which footnote are you referring to?

A I don't have the testimony in front of me, so I don't know. I don't know the number.

(Exhibit No. 2 was marked.)

BY MR. BRYAN:

Q You've just been handed what's been marked as Exhibit Number 2, Mr. Graves. It's a -- this is a copy of your initial report in this case; correct?

A Correct.

Q Can you identify for me the footnote that you were referring to concerning GTCC?

A Footnote 1 discusses high-level waste and the fact that I don't consider it separately because it's small in quantity. I think that's the only reference, but let me check briefly. Yeah, that appears to be footnote 1.

Q You said in response to that last question, "It can happen through bilateral mechanisms, public -- multiple exchanges using the same information." What do you mean by "using the same information"? I'm not sure I understood that.

A Well, for instance, NASDAQ is a decentralized process of stocks trading in clearing, and yet all the brokers and dealers who are using NASDAQ mechanisms are working off of the same basic description of the stocks and their recent trade and so they can jointly achieve an efficient outcome, just like the New York Stock Exchange, which is centralized. And you can't tell the difference from the outside point of view as to how the market mechanics worked. What you see is the effect of a market, finding the marginal buyer and seller, and setting the price on that basis.

Q Did you model a market in which trades would take place at prices other than the marginal bid?

A No, because I don't think that's the effect that a competitive market tends to drive towards. I'm trying to predict the result of what a market would do, and that is to drive transactions towards the same opportunity cost, which is the

marginal bid.

Q Other than adding some transaction costs, did you test the effects of any other kinds of significant inefficiencies?

A Well, other kinds of inefficiencies are consistent with several of my sensitivity studies that look at what would happen if, for instance, acceptance rates were slower or lower, which is equivalent to inefficiencies arising from reluctance or impediments to exchange. I also analyze accelerated bid scenarios where the acceleration exceeds economic needs dictated by must move conditions, anyway, and those can be -- are the kinds of things that might arise if parties feel a political need to solve their problems earlier than they otherwise would.

So there's scenarios that are -- represent the effect of inefficiencies, but they don't explicitly model the inefficient behavior themselves. I also don't think there would be many inefficiencies in this market, so I'm not -- I don't think it's particularly relevant to search for all kinds of possible inefficiencies.

Q In this market that you're describing, if trades take place through bilateral negotiations, how would prices be equal or close to the marginal price

upon your experience and not upon any particular tests or analyses?

MR. SHAPIRO: Objection, vague, argumentative. And it is argumentative if you are going to instruct the witness that you don't think he's answered your question. He thinks he's answered your question. If you've got a different view, that's fine, but that's not a proper question.

Q Please answer the question.

A I have very deep expertise in utility planning custom and practice and technique, and it's impossible for me to bring to this analysis or any other planning or performance study of the industry the kind of a context-free knowledge of the industry. I already come with that expertise, and that's partly why I'm valuable and relevant to the process.

So in some sense, you're asking about am I qualified to have that expertise, and I think I am. Beyond that, I can't prove that a -- that my expertise actually describes the industry through some study that validates my expertise. That -- that's circular. That validation has also already occurred because I get repeatedly hired to -- to work in that capacity.

Q Did you run any sensitivity analyses to assess the effect of nonextreme potential

manifestations of strategic behavior?

MR. SHAPIRO: Objection, vague.

A No, I don't -- I can't think of any scenarios that are equivalent to a little bit of strategic behavior.

Q Did you ever run any sensitivity analyses to assess the effects of nonextreme potential manifestations of all of these factors combined?

MR. SHAPIRO: Objection, vague.

Q Would you like me to identify the factors? The ones we have been talking about.

A I think I remember the ones you were talking about. No, I haven't done any weak forms of joint interaction of these either.

The point of doing extreme studies is to say are they -- are the -- do the factors have enough leverage that it's worth studying their -- their influence at a smaller level? And if the extreme studies show that that's not the case, then you don't go back and say, well, just in case, let me spend a lot of time studying something that I've shown can't have an effect if it's large but might have an effect if it's small. That's -- that's not an efficient use of time or money or information to the Court.

Q Why do you say that that's not an

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

COPY

vs. Case No. 04-0106 C

THE UNITED STATES,

Defendant.

---

* * * * * *

DEPOSITION OF SEYMOUR J. RAFFETY, PH.D.

TAKEN ON THE 14TH DAY OF DECEMBER, 2006

AT THE RADISSON HOTEL LA CROSSE

LA CROSSE, WISCONSIN

9:05 A.M.

* * * * * *

Taken before Lynn M. Ettl, RPR, CRR

www.nwcourtreporters.com

nwcr@nwcourtreporters.com

1-800-628-7551

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

APPEARANCES:

ROBERT L. SHAPIRO and KEVIN E. STERN, of the firm of GREENBERG TRAURIG, L.L.P., 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C. 20006, appeared representing the Plaintiff.

THOMAS J. ZAREMBA, of the firm of WHEELER, VAN SICKLE & ANDERSON, S.C., AnchorBank Building, 25 West Main Street, Suite 801, Madison, Wisconsin 53703, appeared representing the Plaintiff.

RUSSELL A. SHULTIS and JOHN C. EKMAN, of the U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, Federal Claims Section, 1100 L Street N.W., Washington, D.C. 20530, appeared representing the Defendant.

ALSO PRESENT:

Robert Sweeney, Consultant, c/o ABZ, 4451 Brookfield Corporation Drive, Suite 107, Chantilly, Virginia 20151.

Emily P. Flinn and Jonathan Couchman, Veris Consulting, L.L.C., 11710 Plaza America Drive, Suite 300, Reston, Virginia 20190.

Charles Sans Crainte, Dairyland Power Cooperative.

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

Q (By Mr. Shultis, continuing) When you said that you would have participated in -- when you said that Dairyland was thinking about it, were they thinking about moving up in the queue?

MR. SHAPIRO: Objection, vague.

A Probably most important reason would be to adjust the quantities to be shipped in any one year or in any campaign to make it more efficient. We -- I think we had one or two years when we hardly had the commitment for one full assembly, let alone a reasonable shipping campaign.

Q (By Mr. Shultis, continuing) So does that mean that you would have sought allocations to ship out more fuel earlier?

MR. SHAPIRO: Objection, vague, calls for speculation.

A Earlier and later. Didn't know what commitments would -- exchanges could be made.

Q (By Mr. Shultis, continuing) I -- my question is, would Dairyland have tried to move up in the queue to get -- to have more spent nuclear fuel taken from its site earlier or would Dairyland have dropped back in the queue?

MR. SHAPIRO: Objection, vague, calls for speculation.

"Confidential-To be used only in litigating Case No. 04-106C, Dairyland Power Cooperative vs. The United States, and in accordance with U.S. Court of Federal Claims Protective Order entered 8-17-06"

A I don't think we looked into it far enough to answer that question.
Q (By Mr. Shultis, continuing) I mean, you didn't know if you'd want to go up or down?
MR. SHAPIRO: Objection, vague.
A There were other things besides just going up and down that were potential values and things to be gained.
Q (By Mr. Shultis, continuing) What is that? What were those other --
A Well, what it would cost or -- or what -- what the exchanges would cost to either us, or -- or we could gain by selling them, or -- and, of course, the most important thing would be adjusting shipping campaigns.
Q So would -- Dairyland wouldn't have expected to trade an allocation for nothing?
MR. SHAPIRO: Objection --
Q (By Mr. Shultis, continuing) You would have either had to pay for somebody else's allocation or somebody else would have had to pay for Dairyland's allocation; is that fair?
MR. SHAPIRO: Objection, vague, speculation, compound.
A Who knows. It never got to the point of