No. 04-106C
(Chief Judge Damich)

Electronically Filed: May 14, 2008

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# DAIRYLAND'S MEMORANDUM OF FACT AND LAW

---

JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, N.W.
Suite 1000
Washington, DC 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

TABLE OF CONTENTS

STATEMENT OF FACTS .......... 2

I. MEANS OF SPENT FUEL STORAGE AT COMMERCIAL NUCLEAR POWER PLANTS .......... 2

II. DAIRYLAND AND THE LACROSSE BOILING WATER REACTOR ("LACBWR") 3

III. GOVERNMENT SPENT FUEL DISPOSAL PROGRAM .......... 5

A. Development of Government Responsibility for Disposal Program .......... 5

B. Development of the Standard Contract .......... 6

C. Reasonable Acceptance Rate .......... 7

D. Reasonable Sequence of Acceptance .......... 8

E. DOE's Failure to Make Progress Toward Performance .......... 10

IV. DAIRYLAND RESPONSE TO ANTICIPATED AND ACTUAL FAILURE OF DOE PERFORMANCE .......... 12

A. Extended SAFSTOR Operations .......... 12

B. RPV Removal .......... 13

C. Private Fuel Storage .......... 15

D. Overhead and G&A Costs .......... 17

V. AMOUNT OF DAMAGES .......... 17

STATEMENT OF ISSUES OF FACT AND LAW .......... 18

ISSUES OF LAW .......... 18

ISSUES OF FACT .......... 18

VI. DISCUSSION OF LEGAL PRINCIPLES .......... 19

A. Basic Damages Principles .......... 19

B. The Evidence Establishes Foreseeability .......... 20

C. The Evidence Establishes Causation .......... 24

1. Causation of Direct Damages ..... 25

2. Causation of Mitigation Damages ..... 29

D. The Evidence Establishes Reasonable Certainty ..... 31

E. Government Offset of PFS Costs. ..... 33

CONCLUSION ..... 36

# TABLE OF AUTHORITIES


Federal Cases — Page

*Ace Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000) ........ 27-28, 31, 32

*Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562 (Fed. Cir. 1987) ........ 26

*B-E-C-K Constructors v. United States*, 571 F.2d 25 (Ct. Cl. 1978) ........ 25

*Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ........ 19, 20, 24, 31, 32

*Chain Belt Co. v. United States*, 115 F. Supp. 701 (Ct. Cl. 1953) ........ 34

*Cienega Gardens v. United States*, 38 Fed. Cl. 64 (1997) ........ 34

*Citizen Fed. Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007) ........ 23

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ........ 20

*Consumers Energy Co. v. United States*, 65 Fed. Cl. 364 (2005) ........ 28

*Dairyland Power Coop. v. United States*, 27 Fed. Cl. 805 (1993), *aff'd*, 16 F.3d 1197 (Fed. Cir. 1994) ........ 4

*David Nassif Assocs. v. United States*, 557 F.2d 249 (Ct. Cl. 1977) ........ 27

*David Nassif Assocs. v. United States*, 644 F.2d 4 (Ct. Cl. 1981) ........ 27

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) ........ 20, 28, 32

*Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283 (Fed. Cir. 2000) ........ 25

*Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239 (4th Cir. 1987) ........ 5

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001) ........ 19, 28

*In re Kellet Aircraft Corp.*, 186 F.2d 197 (3d Cir. 1950) ........ 35

*Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) ........ 12

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005)........ 19, 20, 29, 30, 34

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003)........ 21

*Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164 (1990)........ 35

*Koby v. United States*, 53 Fed. Cl. 493 (2002)........ 36

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960)........ 27, 29, 31

*Macke Co. v. United States*, 467 F.2d 1323 (Ct. Cl. 1972)........ 26

*Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747 (Fed. Cir. 1999)........ 25

*Northern States Power Co. v United States*, 78 Fed. Cl. 449 (2007)........ 31

*Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997)........ 12

*Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006)........ 35

*Pacific Gas & Electric Co. v. United States*, 73 Fed. Cl. 333 (2006)........ 27, 35

*Roedler v. Department of Energy*, 255 F.3d 1347 (Fed. Cir. 2001)........ 25

*Sacramento Mun. Utility Dist. v. United States*, 70 Fed. Cl. 332 (2006)........ passim

*San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557 (Fed. Cir. 1997)........ 19

*Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2007)........ passim

*Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554 (Ct. Cl. 1966)........ 25

*System Fuels, Inc. v. United States*, 79 Fed. Cl. 37 (2007)........ 20, 26, 28

*T.C. Bateson Constr. Co. v. United States*, 319 F.2d 135 (Ct. Cl. 1963)........ 36

*Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515 (2006)........ passim

*Tennessee Valley Auth. v. United States*, 60 Fed. Cl. 665 (2004)........ 21, 29, 30, 31

*Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158 (1st Cir. 1992)........ 27

*Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996)........ 21

*Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006) ....................................... passim

*Yankee Atomic Elec. Co. v. United States*, 2004 WL 1535686 (Fed. Cl.) .................................... 25

*Yankee Atomic Elec. Co. v. United States*, 2004 WL 1535688 (Fed. Cl.) ....................21-22, 29-30

State Cases

*Dist. Concrete Co. v. Bernstein*, 418 A.2d 1030 (D.C. 1980) ..................................................... 23

Federal Statutes

42 U.S.C. § 10131(a)(2)............................................................................................................ 6

42 U.S.C. § 10156(a)(1) (2000) ............................................................................................... 22

42 U.S.C. § 10222(a)(5)(B) (2000)............................................................................................ 1

Federal Rules

48 Fed. Reg. 16,590 ........................................................................................................... 7, 21

48 Fed. Reg. 54,391 ............................................................................................................... 22

59 Fed. Reg. 27,007 ............................................................................................................... 12

60 Fed. Reg. 21,793 ............................................................................................................... 12

Fed. R. Evid. Rule 1006............................................................................................................ 32

Other Authorities

Restatement (Second) of Contracts § 347............................................................... 19, 25, 34

Restatement (Second) of Contracts § 350(2) ........................................................... 29, 33, 36

E. Allen Fansworth, *Fansworth on Contracts*, § 12.14 (1990) ............................................. 20, 22

Dan B. Dobs, *Law of Remedies* § 12(6)(2) (1993) ............................................................... 34

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S MEMORANDUM OF FACT AND LAW

This case presents a straightforward claim for breach of contract damages. As required by the Nuclear Waste Policy Act of 1982 ("NWPA"), DOE entered into contracts with all nuclear utilities, under which, in return for very substantial fees, DOE assumed financial responsibility for storage and disposal of commercial spent nuclear fuel and high-level radioactive waste "beginning not later than January 31, 1998." 42 U.S.C. § 10222(a)(5)(B) (2000). Dairyland has paid all fees required under its contract with DOE (the "Contract"), but, more than ten years after the mandatory 1998 "start" date, has received no performance in return from DOE.

Dairyland paid DOE millions of dollars in Contract fees. Because of DOE's breach, however, Dairyland has been required to incur additional and very substantial costs to investigate, implement and operate means to store its spent fuel for an extended period after 1998. Those costs are exactly the type of costs that the NWPA and DOE's spent fuel contracts were designed and intended to allow utilities like Dairyland to avoid. Under well-established law, those costs are recoverable as damages here.

## STATEMENT OF FACTS

### I. MEANS OF SPENT FUEL STORAGE AT COMMERCIAL NUCLEAR POWER PLANTS

Commercial nuclear reactors in the United States were designed to temporarily store spent fuel "wet," in pools pending its removal from the plant site. *See, e.g., Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 252 (2006). In this arrangement, spent fuel is stored under water that removes residual heat generated by radioactive decay and provides shielding so that the radiation from the spent fuel does not affect people or the environment. Spent fuel pools are equipped with racks that hold the spent fuel. Given a particular rack arrangement, any particular pool can hold only a specified amount of spent fuel. *Id.* The operation of a spent fuel pool requires utilities to bear the labor, maintenance, security, management and other costs of operating the pool. This cost does not vary significantly with the amount of spent fuel in the pool.

Commercial nuclear reactors can also store spent nuclear fuel in a "dry" form. *See Sacramento Mun. Utility Dist. v. United States,* 70 Fed. Cl. 332, 341 n.10 (2006) ("*SMUD*"). In this arrangement, after sufficient in-pool decay time, spent fuel is moved from the spent fuel pool to containers that are designed to keep radiation from the spent fuel from reaching the atmosphere. These containers are costly to purchase. In addition, the movement of spent fuel from wet to dry storage is expensive, as it entails special purpose equipment and substantial labor costs. Once spent fuel is in dry storage, however, the ongoing costs of a dry storage facility for operations, maintenance, labor, security and other costs are less than those of a spent fuel pool containing a similar amount of spent fuel.

## II. DAIRYLAND AND THE LACROSSE BOILING WATER REACTOR ("LACBWR")

Dairyland is a wholesale electrical cooperative that generates and transmits electricity to 25 electrical distribution cooperatives and 19 municipal utilities located in Wisconsin, Minnesota, Iowa and Illinois. Dairyland is the sole owner of the LaCrosse Boiling Water Reactor ("LACBWR"), which is a permanently shutdown 50 megawatt ("MW") capacity boiling water nuclear reactor located on the Mississippi River in Genoa, Wisconsin. LACBWR was one of the nation's early commercial nuclear-powered electric generating facilities. It was created through a 1962 contract between Dairyland and the Atomic Energy Commission ("AEC") entered into in accordance with the AEC's Second Round Cooperative Program Demonstration Program. LACBWR's initial nuclear reaction (nuclear fission "criticality") occurred in 1967. LACBWR began commercial operation in 1969. As contemplated by the 1962 contract, the AEC sold LACBWR to Dairyland through a contract modification executed on August 6, 1973. The purchase price for LACBWR and two cores of nuclear fuel was $1. The AEC granted Dairyland a provisional operating license for LACBWR on August 28, 1973.

At the time Dairyland acquired LACBWR, Dairyland expected that it would be able to reprocess its spent fuel. Reprocessing enables additional energy from the enriched uranium in the spent fuel and from plutonium produced during plant operation to be utilized. Reprocessing also substantially reduces the volume of radioactive waste requiring disposal. On March 11, 1974, Dairyland entered into an agreement with Nuclear Fuel Services, Inc. ("NFS") to provide storage and reprocessing of LACBWR's spent fuel. On April 7, 1977, however, President Carter banned the reprocessing of spent fuel from domestic commercial nuclear power plants, and LACBWR's spent fuel was never reprocessed. In light of that development, Dairyland attempted to rescind the 1973 contract modification, but this Court and the Federal Circuit

rejected that claim. *Dairyland Power Coop. v. United States*, 27 Fed. Cl. 805 (1993), *aff'd*, 16 F.3d 1197 (Fed. Cir. 1994). Dairyland decided to permanently shutdown LACBWR for economic reasons on April 30, 1987. The Nuclear Regulatory Commission ("NRC") converted Dairyland's license to operate LACBWR to a possession-only license (for the spent fuel) on August 4, 1987.

After shutting down, Dairyland moved the fuel in the LACBWR reactor to its spent fuel pool. The LACBWR pool now holds 333 spent fuel assemblies weighing approximately 38 metric tonnes uranium ("MTU"), the standard unit of measure. Under NRC regulations, upon shutdown Dairyland had to consider its options for decommissioning LACBWR. Decommissioning involves the dismantlement and decontamination of the plant and site in a manner that satisfies NRC requirements and the requirements of other federal and state regulators such as the Environmental Protection Agency. *See, e.g.*, *Yankee Atomic*, 73 Fed. Cl. at 284 n.37. Ultimately, decommissioning of LACBWR cannot be completed until all of its spent fuel is removed from its spent fuel pool. Upon studying its decommissioning options for LACBWR following shutdown, Dairyland concluded that because the spent nuclear fuel must remain on site until DOE accepts it, Dairyland had only one reasonable option for decommissioning LACBWR. That option is custodial "SAFSTOR," which under NRC regulations essentially involves placing the unit in a mothball condition to assure that the public health and safety are adequately protected before the plant is later decontaminated and dismantled. *Id.* LACBWR officially entered SAFSTOR status in 1991 when the NRC approved its decommissioning plan. Under the terms of its possession only license, Dairyland is supposed to complete decommissioning LACBWR within 40 years, or by 2031.

## III. GOVERNMENT SPENT FUEL DISPOSAL PROGRAM

### A. Development of Government Responsibility for Disposal Program

From the dawn of the Atomic Age, the disposal of commercial spent fuel has always been a federal government responsibility. *See, e.g., Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 246 (4th Cir. 1987). But the government has never met this obligation.

Until 1977, like Dairyland, commercial nuclear utilities in the United States had expected that their spent fuel would be reprocessed, as is done to this day in Europe and elsewhere in the world. Indeed, some commercial spent fuel was reprocessed at NFS's facility in West Valley, New York in the 1960s. However, with traditional technologies, reprocessing also results in some amount of weapons-grade plutonium.

President Carter's 1977 ban of reprocessing of spent fuel from commercial nuclear power plants was intended to limit the amount of such plutonium in the hopes of limiting the proliferation of nuclear weapons. *See Yankee Atomic*, 73 Fed. Cl. at 254. The 1977 ban effectively thwarted the development of a domestic reprocessing industry. In light of the reprocessing ban, the federal government undertook the development of a solution for the disposition of spent fuel from commercial nuclear power plants. The federal solution that was developed was for deep geologic disposal of the material.

The particulars of the federal program for the disposal of spent fuel from commercial nuclear reactors were set out in the NWPA. The NWPA set a date of January 31, 1998 for the commencement of spent fuel disposition services from DOE.

The NWPA required that DOE's obligations to utilities be set out in contracts. The NWPA did not set out the specific terms for the rate or sequence of spent fuel acceptance from utilities. These terms were not set out in the NWPA, at least in part, because it was not

immediately clear just how much acceptance or what acceptance sequence would be needed. However, the developers of the NWPA understood and intended that spent fuel would be accepted from utilities at a reasonable rate consistent with the purpose of the NWPA to alleviate the problem of spent fuel accumulation caused by the termination of reprocessing. *See, e.g., Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515, 519 (2006) ("*TVA*"); *see also* 42 U.S.C. § 10131(a)(2), In particular, the developers of the NWPA understood and intended that spent fuel acceptance from utilities would be at a sufficient rate such that by January 31, 1998, no utility would have to add to the spent fuel storage capacity of its nuclear plants nor incur otherwise avoidable spent fuel storage costs; in other words, January 31, 1998 would be a point of demarcation between utility and federal financial responsibility for spent fuel storage and disposition costs. See i*d.*

B. Development of the Standard Contract

President Reagan signed the NWPA into law on January 7, 1983. Because the NWPA required that contracts between DOE and utilities be signed by June 30, 1983, the contracts between DOE and utilities were developed hurriedly. DOE decided not to negotiate the terms of individual contracts with each commercial nuclear utility. Instead, DOE decided to develop a standard contract to be used with all utilities through notice and comment rulemaking. *See* 48 Fed. Reg. 5458 (1983). Ultimately, DOE drafted the standard contract and provided for little input from utilities. Utility input was largely limited to providing comments in response to the proposed rule containing the initial draft standard contract published in February 1983, and attendance at a few meetings with DOE officials.

In the standard contract published as a final rule by DOE in April 1983, DOE largely refused to include terms in the contract that were not otherwise set out as requirements in the

NWPA. *See* 48 Fed. Reg. 16,590 (1983). Accordingly, DOE did not include an acceptance rate term in the standard contract and instead left that as an open term. In one of the very few instances where DOE accepted a suggestion from utilities to alter the draft standard contract published in February 1983, DOE added a provision providing for the exchange of spent fuel acceptance allocations among utilities. *See id.* at 16,592. In the final standard contract, DOE rejected requests from some utilities to delete a provision in the published draft contract permitting DOE to accord priority acceptance to spent fuel from permanently shutdown nuclear power plants. *Id.* at 16,593. In rejecting calls to delete this provision, DOE explained that it was important to ensure that utilities not be required to store spent fuel at reactors for prolonged periods after those reactors permanently shut down. *Id.*

DOE and Dairyland entered into a standard contract, *i.e.*, the Contract, on June 15, 1983.

C. <u>Reasonable Acceptance Rate</u>

DOE made clear its understanding of the elements of a reasonable acceptance rate soon after enactment of the NWPA. DOE understood and intended that no utility would have to add additional spent fuel storage capacity after January 31, 1998. *See, e.g.*, Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983, Program Overview by Robert Morgan (the first acting director of the DOE spent fuel disposition program) (Dairyland Exh. 72). DOE also understood and intended that the acceptance rate should reflect an efficient spent fuel acceptance program. *See, e.g.*, Mission Plan for the Civilian Radioactive Waste Management Program, Vol. I (DOE/RW-0005) (Dairyland Exh. 96). In addition, DOE understood and intended that the acceptance rate would be sufficient to both accommodate discharges of spent fuel from commercial reactors after January 31, 1998 and to work off the backlog of previously discharged spent fuel being stored by utilities as of that time. *See, e.g.*,

Memorandum of Richard Williamson re Mission Plan Strategy dated September 15, 1983 (Dairyland Exh. 68 at PNL-173-1283); *TVA*, 69 Fed. Cl. at 519. Nuclear utilities shared these understandings.

An acceptance rate from commercial nuclear utilities ramping promptly up to 3000 MTU per year starting in 1998 would have been consistent with these elements for a reasonable acceptance rate. At the time of the formation of the Standard Contract, nuclear utilities were projected to discharge at least 2,000 MTU per year in 1998 and thereafter. *See* Dairyland Exh. 15, Spent Fuel Storage Requirements June 1982; *TVA*, 69 Fed. Cl. at 519. A 3000 MTU per year acceptance rate would have enabled virtually all utilities to not incur avoidable spent fuel storage costs after January 31, 1998. Such a rate would also have been programmatically efficient in that it would have been technologically achievable and would have helped to minimize program costs. Indeed, DOE's plans for the spent fuel acceptance program since its inception, up to and including its July 2004 Acceptance Capacity Ranking and Annual Priority Report ("ACR/APR") (Dairyland Exh. 588), have been consistent with – and have almost always been predicated upon – a 3000 MTU per year acceptance rate. Absent the breach, DOE would and could have attained the 3000 MTU per year acceptance rate promptly after commencement of the program.

D. Reasonable Sequence of Acceptance

A reasonable sequence of spent fuel acceptance would have made liberal use of the standard contract's exchange mechanism. The standard contract indicates that spent fuel acceptance allocations for particular batches of spent fuel should be provided to utilities in the order in which they discharged that spent fuel from their reactors – an oldest-fuel-first ("OFF") sequence. An OFF sequence would not have worked well for either utilities or DOE. An OFF sequence would not have provided for acceptance from utilities that most needed spent fuel

acceptance in order to minimize their spent fuel storage costs. In addition, an OFF sequence would have been grossly inefficient for DOE. For DOE to pick up spent fuel according to the OFF sequence, DOE would have to travel frequently to numerous reactors throughout the country, accepting small batches on each visit and visiting many reactors every year or every other year. For example, if DOE actually picked up its spent fuel according to the OFF ranking shown in the 2004 ACR/APR (which assumes a 3000 MTU program-wide annual acceptance rate), DOE would have to visit LACBWR every year for the first 8 years of program operation, and pick up small amounts (ranging from .8 to 7.8 MTU) of spent fuel each year. *See* Dairyland Exh. 588 at 3.

If DOE had commenced spent fuel acceptance in 1998 at a reasonable rate, Dairyland and many other utilities would have engaged in exchanges in order to consolidate spent fuel acceptance into concentrated "campaigns" and to minimize their spent fuel storage costs. DOE and utilities expected that the standard contract's exchange mechanism would have been used to enable utilities to optimize the sequence of DOE's acceptance of spent fuel from individual commercial utilities. *See, e.g.*, September 28, 1995 letter from Daniel Dreyfus of DOE to Andrew Kadak (Dairyland Exh. 346) (exchange mechanism would "allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of [DOE]."). Although the standard contract provides DOE with discretion in the approval of exchanges, DOE intended to and would have exercised that discretion reasonably to effectuate the parties' intent for the exchanges provision. Indeed, the parties expected the exchange provision to work well enough to eliminate the need for DOE to accord priority acceptance to spent fuel from permanently shutdown reactors. *Id.* And to the extent such exchanges did not develop sufficiently to accomplish the parties' intent of eliminating avoidable

at-reactor storage costs, DOE would have used the priority acceptance from shutdown reactors provision as necessary to ensure that no shutdown commercial reactor would had to have waited for an extended period before delivering the last of its spent fuel to DOE.

With reasonable exchanges, absent DOE's breach the last spent fuel would have been removed from LACBWR in 1998. The fact that all of Dairyland's spent fuel would have been removed in the first year of DOE's acceptance of spent fuel from utilities should not be surprising given that Dairyland has a relatively very small amount of spent fuel, Dairyland's spent fuel is relatively old (thus it is assigned early acceptance allocations even before exchanges) and Dairyland and other utilities would had had substantial economic incentives to engage in exchanges.

E. DOE's Failure to Make Progress Toward Performance

Within the first few years after the start of DOE's program for spent fuel disposal, it became evident that the program was not making progress toward development of a repository that would enable DOE to start accepting spent fuel by January 31, 1998. By 1987, Congress responded to this lack of progress by refocusing the DOE program on the characterization of Yucca Mountain as a potential disposal site through passage of the Nuclear Waste Policy Amendments Act of 1987. The amendments also substantially restricted DOE's ability to use temporary storage of utility spent fuel as a means of performing its spent fuel removal obligations to utilities by January 31, 1998. The amendments linked establishment of temporary storage under the NWPA, called Monitored Retrievable Storage ("MRS"), to progress in development of the repository. *See, e.g., TVA*, 69 Fed. Cl. 520. The amendments prohibited the siting of an MRS until DOE received construction authorization from the NRC for a repository; the amendments also prohibited DOE from storing more than 10,000 MTU of spent fuel at an

MRS facility until the repository was licensed by NRC to receive spent fuel. *Id.*

Enactment of the 1987 amendments put DOE's ability to perform its contractual obligations by January 1998 in great jeopardy. DOE acknowledged the likelihood that it would not start accepting spent fuel from utilities by January 31, 1998 through publication of documents such as the Draft 1988 Mission Plan Amendment (DOE/RW-0187) (Dairyland Exh. 146) and the 1989 Report to Congress on the Reassessment of the Civilian Radioactive Waste Management Program (DOE/RW-0316P) (Dairyland Exh. 168). DOE further acknowledged serious difficulties in starting performance by 1998 in documents such as the 1991 Annual Capacity Report ("ACR") (DOE/RW-0331P) (Dairyland Exh. 233), in which it made clear that DOE would not be able to accept any spent fuel from utilities by 1998 unless Congress amended the NWPA again to cut the linkages between the repository and an MRS facility. Congress never did so. The 1991 ACR also projected only limited acceptance of spent fuel from utilities in the first years of the program in anticipation that, at best, only some of the linkages between the repository and a MRS would be cut. As a further response to its anticipated delay in performance of spent fuel removal services from utilities, DOE initiated a "multi-purpose" (*i.e.*, storage and transportation) canister program in the early 1990s to help accommodate utilities requiring spent fuel storage outside of spent fuel pools until DOE could start accepting (and transporting) utility spent fuel.

In light of the publicly-available information on the lack of progress in the DOE program, by the mid-1990s, it became clear to Dairyland that DOE would not perform at all by January 31, 1998. This was clear from the continued lack of reported progress in the DOE program and the substantial impediments imposed by the 1987 NWPA amendments. DOE further made clear the likelihood that it would not perform by 1998 by arguing that it lacked an obligation to do so in

the absence of a repository in a Notice of Inquiry published in 1994, 59 Fed. Reg. 27,007, and in a Final Interpretation of the Standard Contract published in 1995, 60 Fed. Reg. 21,793. Even after the D.C. Circuit rejected the Final Interpretation in *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996), which held that DOE's obligation to perform by January 31, 1998 was "unconditional," DOE responded by formally informing utilities in 1996 that it would nonetheless not perform by 1998. *See Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754, 757 (D.C. Cir. 1997).

DOE did not accept any spent fuel from any utility, including Dairyland, by January 31, 1998. DOE has still not removed any spent fuel from Dairyland or any other utility.

It is entirely unclear when, if ever, DOE will start to accept spent fuel from Dairyland. DOE has previously said that it would not perform before 2010. More recently, DOE has acknowledged that it cannot start accepting spent fuel from utilities until at least 2017 and probably not until even later.

## IV. DAIRYLAND RESPONSE TO ANTICIPATED AND ACTUAL FAILURE OF DOE PERFORMANCE

Dairyland has responded reasonably to the anticipated and then actual failure of DOE to perform its spent fuel removal obligations, including incurring reasonable costs. The nature of those costs is described next, and the amount of those costs is then set forth in the succeeding section.

### A. Extended SAFSTOR Operations

Because DOE did not remove the spent fuel at LACBWR in 1998 and still has not done so, Dairyland has been required to maintain the spent fuel at LACBWR in its spent fuel pool and to maintain LACBWR in SAFSTOR mode. This cost amounts to millions of dollars per year. It includes personnel and supplies required to maintain the spent fuel pool, security, insurance and

other expenses. As expressed in the government's contention interrogatory answers and in the reports of its expert witnesses, the government has almost no quarrel with the amount of SAFSTOR costs claimed by Dairyland if it is concluded that Dairyland's spent fuel would have been removed in 1998.

Dairyland has expended effort to investigate the possibility of developing an on-site a dry storage facility, termed an independent spent fuel storage installation ("ISFSI"), in which to maintain its spent fuel in light of DOE's extended failure to remove it. Through 2006, the period for which Dairyland is seeking such damages in this case, this effort has largely been limited to some studies of viable options. As also expressed in the government's contention interrogatory answers and in the reports of its expert witnesses, the government has no quarrel with the reasonableness of Dairyland's mitigation in this regard or the amount Dairyland is claiming as mitigation damages for this effort. In Dairyland's accounting, these costs are included in its SAFSTOR accounts.

A significant portion of the costs Dairyland has incurred due to the government's breach is the requirement of maintaining nuclear liability and nuclear property insurance coverages for an extended period. Dairyland's accounting system groups these costs separately from the SAFSTOR accounts; therefore, they are set out separately below.

B. <u>RPV Removal</u>

In 2005 through 2007, Dairyland undertook a project to remove from LACBWR a substantial internal component, the reactor pressure vessel ("RPV"). Dairyland had the RPV transported to a low level radioactive waste disposal facility in Barnwell, South Carolina. Low level radioactive waste is categorized by the NRC into three basic categories – A, B and C. The Barnwell facility has been the only facility available to Dairyland that is licensed to accept B and

C waste. The RPV contains B and C waste. The Barnwell facility has been scheduled to close to waste from states outside of its "Compact," and Wisconsin is not in that Compact.

Dairyland would have preferred to remove its spent fuel before removing the RPV. The RPV is very large, very heavy and was located immediately adjacent to the spent fuel pool. But in light of the imminent closure of Barnwell to its waste, Dairyland had little choice but to remove the RPV when it did.

Dairyland had planned, if the spent fuel had first been removed from its spent fuel pool, to remove the RPV straight up through the top of the reactor building using a standard crane and requiring no cutting of the reactor building walls. With the spent fuel remaining in the pool, the NRC made clear to Dairyland that, to ensure safety, it had to remove the RPV away from the spent fuel pool and out the side of the reactor building. That removal method required substantial cutting of both the reinforced concrete bioshield wall surrounding the RPV and the thick reactor-building wall. That removal method also necessitated the use of a relatively expensive "gantry" crane that uses girders to move the RPV to the side rather than simply lifting it up.

As reflected in its detailed accounting records, Dairyland incurred a total of $18,288,290 to remove the RPV. To determine the damages appropriately attributable to DOE's breach from this project, Dairyland engaged an expert in the field of the costs of decommissioning nuclear power plants, Todd Smith, to calculate the cost Dairyland would have incurred to remove its RPV absent the breach, *i.e.*, with the spent fuel removed from the LACBWR spent fuel pool. The difference between the non-breach removal cost calculated by Mr. Smith and the actual cost of the project constitutes Dairyland's RPV removal damages due to the breach.

C. Private Fuel Storage

In light of DOE's anticipated failure to begin removal of spent fuel from LACBWR for an extended period after 1998 and the substantial uncertainty regarding just when, if ever, DOE would come to remove Dairyland's spent fuel, Dairyland reasonably incurred costs to explore development of an off-site ISFSI. When this effort began in the mid-1990s, the prospect of development of an off-site ISFSI with other utilities was particularly attractive to Dairyland. This was so because it is generally preferable for a utility with a shutdown nuclear reactor to use dry storage for its spent fuel rather than wet, but Dairyland could not practically develop an ISFSI at LACBWR at that time. Until the 1990s, dry storage technology was for storage only; the spent fuel had to be transferred to a transportable container in a spent fuel pool to be removed from the dry storage facility. Only transportable, dry storage systems were useful for utilities with shutdown reactors, since only the transportable systems enabled the utility to decommission the reactor's spent fuel pool. In the 1990s, transportable dry storage technology was new, and Dairyland understood that implementation of an ISFSI would therefore be quite expensive. Dairyland could not afford the large costs on its own. Relatedly, Dairyland did not have the funds available to it for a large capital project like an ISFSI. Unlike other utilities, as a not-for-profit cooperative, Dairyland cannot readily borrow funds for capital projects unless projects would be "used and useful" in the generation of electricity. Moreover, Dairyland did not maintain large cash reserves. In addition, Dairyland faced significant technical and legal challenges in developing an ISFSI at LACBWR. Dairyland understood that, due to the small size and configuration of the LACBWR site, it might need an exemption from certain NRC requirements governing the minimum distance between an ISFSI and public access. As of the

mid-1990s, Dairyland was unaware of any utility obtaining such an exemption. Conversely, an off-site ISFSI did not share these problems.

Dairyland and 10 other utilities formed Private Fuel Storage ("PFS") in 1995 to develop a privately-managed site for the interim storage of spent fuel pending contract performance by DOE. In essence, PFS picked up where DOE and its Nuclear Waste Negotiator left off with the concept of Monitored Retrievable Storage ("MRS"). The 1987 NWPA Amendments created the Nuclear Waste Negotiator's office in an effort to locate a suitable site for a MRS. But the authority of that office expired before a site was located.

Dairyland has participated in the PFS effort through a subsidiary both to provide Dairyland an extra layer of legal protection between Dairyland and any potential liabilities of PFS and to ensure that its participation in PFS would not endanger its tax exemption. Dairyland must receive at least 85 percent of its annual gross receipts from its member in order to remain tax exempt for that year. If PFS were to ever generate gross receipts (not necessarily profits) for its owners and Dairyland's share exceeded 15 percent of its total annual receipts, Dairyland could lose its tax-exempt status for that year if those receipts were received directly. With an intermediary subsidiary, Dairyland can control and limit the amount of gross receipts it receives in any one year.

Since 1995, PFS has made considerable progress toward its goal of developing a private MRS. The NRC has issued PFS a license to construct and operate a private ISFSI at a site owned by the Skull Valley Band of Goshutes in Utah. Nevertheless, PFS faces significant challenges. The federal government has withdrawn its approval of the PFS lease of the Goshute land, and the State of Utah has aggressively opposed PFS in various forums. In addition, utility

support for PFS has waned, as operating utilities have had to develop on-site ISFSIs to avoid running out of space for their spent fuel.

D. Overhead and G&A Costs

Another significant portion of the costs Dairyland has incurred due to the government's breach is the overhead and general and administrative ("G&A") costs appropriately attributable to activities caused by the breach. Overhead includes items such as office space, human resources and computer services provided in support of an activity such as LACBWR operations. G&A includes the general and administrative costs of running Dairyland that cannot otherwise be apportioned to the individual activities of the organization. Dairyland's accounting system does not automatically calculate overhead and G&A amounts. Accordingly, Dairyland has retained an expert witness, Charles Wilkins, to calculate the appropriate amounts of these costs attributable to the breach.

V. AMOUNT OF DAMAGES

Dairyland has incurred substantial costs due to DOE's failure to begin removal of Dairyland's spent fuel by January 31, 1998. Dairyland has incurred the following categories of costs through 2006:

| | |
|---|---|
| SAFSTOR | $28,242,264 |
| Insurance | $1,672,551 |
| RPV Removal | $7,453,467 (includes 2007 costs) |
| Private Fuel Storage | $10,936,901 |
| LACBWR applied overhead | $2,994,431 |
| Dairyland applied G&A | $3,107,366 |
| Total: | $54,406,979 |

## STATEMENT OF ISSUES OF FACT AND LAW

### ISSUES OF LAW

Dairyland believes this case does not "require" the Court to "resolve" any legal issues; rather, the case requires the Court to apply well-established principles of contract damages and mitigation law to the facts presented here. The established legal principles involved in this case are set forth below at pp 19-36.

### ISSUES OF FACT

1. Whether DOE's anticipated and then actual breach of contract was a substantial causal factor motivating Dairyland to incur the costs it claims as damages.

2. Whether Dairyland's damages were reasonably foreseeable to the government

3. Whether the fact of Dairyland's damages is established, and whether the amount of damages claimed by Dairyland is a fair and reasonable approximation of those damages.

4. Whether, if DOE had performed its Contract obligations as required beginning in 1998, and continued performing at a reasonable rate and on a reasonable schedule for spent fuel acceptance, it is fair and reasonable in the context of determining Dairyland's damages to estimate that DOE would have removed all spent fuel from LACBWR by the end of 1998.

5. Whether the government can satisfy its burden to show, factually, that any one or more items of cost that Dairyland claims as mitigation damages was not incurred by Dairyland in a reasonable attempt to mitigate the effects of DOE's breach of contract.

6. Whether the government can satisfy its burden to show that Dairyland's damages should be offset because even if DOE had performed its Contract obligations as required, Dairyland would have incurred any one or more item of cost that Dairyland claims as damages.

## VI. DISCUSSION OF LEGAL PRINCIPLES

This case presents a straightforward claim for breach of contract damages.

### A. Basic Damages Principles

As the Federal Circuit reaffirmed in another spent fuel case, *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005), "[t]he remedy for breach of contract is damages sufficient to place the injured party in as good a position a it would have been had the breaching party fully performed. *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997). 'The general principle is that all losses, however described, are recoverable.' Restatement (Second) of Contracts § 347 cmt. c (1981)." *Accord Bluebonnet Sav. Bank v. United States,* 266 F.3d 1348, 1355 (Fed. Cir. 2001); *SMUD*, 70 Fed. Cl. at 360; *TVA*, 69 Fed. Cl. at 522; *see* Restatement (Second) of Contracts § 347 cmt. a (1981) (Rest. 2d Cont.).

These "benefit of the bargain" or "expectation" damages also encompass mitigation expenses incurred by the non-breaching party, including that party's costs of pursuing alternatives to the breaching parties' required performance. *See* Rest. 2d Cont. § 347, cmt. a, b (expectation measure includes costs to "arrange a substitute transaction" and "costs incurred in a reasonable effort, whether successful or not, to avoid loss"); *Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060, 1067-68 (Fed. Cir. 2001) (affirming award for additional costs of "cover" transactions); *Bluebonnet Sav. Bank,* 266 F.3d at 1355-56. The damages incurred by Dairyland are of these types – because of DOE's anticipated and then actual breach, Dairyland incurred costs to maintain LACBWR in SAFSTOR mode and to investigate alternative spent fuel storage arrangements, and has done so in a reasonable way. Under settled law, also reaffirmed in *Indiana Michigan*, such damages "are recoverable where: (1) the

damages were reasonably foreseeable by the breaching party. . . , (2) the breach is a substantial causal factor in the damages, and (3) the damages are shown with reasonable certainty." *Indiana Michigan*, 422 F.3d at 1373; *see Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002); *Bluebonnet Sav. Bank*, 266 F.3d at 1355. The evidence in this case establishes these elements with respect to all categories of damages Dairyland claims, and Dairyland therefore should be awarded the damages it seeks and thus made whole for the DOE breach.

B. <u>The Evidence Establishes Foreseeability</u>

"Foreseeability is a question of fact. . . ." *Bluebonnet Sav. Bank*, 266 F.3d at 1355. It may be established by showing that the breaching party actually foresaw the consequences of the breach, *see* E. Allan Farnsworth, *Farnsworth on Contracts*, § 12.14 at 245-46 n.18 (1990) ("the term *foreseeable* must be taken to include *foreseen*"), or that the consequences were foreseeable "in the ordinary course of events." Rest. 2d Cont. § 351 (2)(a). In the latter event, "the test is an objective one based on what [the promisor] had reason to foresee." *Id.* cmt. a.

Under either test, the evidence establishes that Dairyland's damages were foreseeable in the event of a DOE breach. Overwhelming evidence shows that an important purpose of both the NWPA and the DOE spent fuel contracts that implement that statute – a purpose well-understood by DOE – was to prevent contracting utilities from having to incur additional costs of spent fuel storage after January 31, 1998. This purpose of avoiding additional spent fuel storage costs is essentially undisputed, and has already been relied upon by this Court in numerous other spent fuel cases. *See Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 667 (2003); *Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 404 (2007); *System Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 59 (2007); *TVA*, 69 Fed. Cl. at 528; *Yankee Atomic*, 73 Fed. Cl. at 265 ("The deposition testimony of several DOE officials involved with the SNF program

supports plaintiff's assertion that the intent of the NWPA and the parties was to avoid the construction by utilities of additional at-reactor storage."). That same testimony will be placed in the trial record here through testimony designations, *e.g.*, 4/22/02 Barrett Depo. Tr. at 55-56; *id*. at 59:4-11; 5/01/02 Milner Depo. Tr. at 73:20-22, and additional testimony to the same effect will be given at trial. Similarly, in *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003), the Court found "uniform support" in the summary judgment record there for the conclusion that "Congress and the parties anticipated that [DOE] would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site. . . ." *See also* 48 Fed. Reg. 16,590, 16,593 (promulgation of final standard contract; rejecting comments suggesting that contract provision for priority acceptance from shutdown plants be deleted, stating: "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity.").

Where an acknowledged purpose of the contract at issue is to help utilities *avoid* spent fuel storage costs that could be avoided through removal of spent fuel, and DOE's breach of that contract has led a utility to incur such storage costs (and to explore other spent fuel storage options), *a fortiori* those costs are a foreseeable consequence of the breach. This Court recognized as much in *Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl. Feb. 18, 1998):

> As noted in *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665, 674 n.10 (2004), 'the intent of the NWPA and the parties to the Standard Contract was to avoid the construction by utilities of additional at-reactor storage after January 31, 1998.' DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall, *i.e.*, the construction of dry storage facilities for spent nuclear fuel at nuclear power electricity generating plants. . . .

*Yankee Atomic*, Order of June 28, 2004, 2004 WL 1535688, at *7. *Cf. Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1023 (Fed. Cir. 1996) (profits on transactions lost due to a breach are reasonably foreseeable when the "purpose of the contract . . . was for the plaintiff to make profits on the subject of the contract."). This Court made the same factual finding after trial in *TVA*: "DOE also recognized that utilities might be forced to build additional on-site storage facilities if DOE were not successful in performing under its contracts for SNF disposal, as reflected by the fact that one of DOE's goals was to preclude the utilities' need to provide storage outside their spent fuel pools. . . . In short, the court finds that it was foreseeable to DOE that failure to perform under the contract would result in damages of the nature and magnitude that TVA claims." *TVA*, 69 Fed. Cl. at 528.

Contrary to this Court's finding after trial in *TVA* (quoted above) that the magnitude, as well as the nature, of damages claimed by a spent fuel plaintiff was foreseeable, the government argued in *Yankee Atomic* that the magnitude of damages was not foreseeable. Even apart from the legal question whether the magnitude of damages need be foreseeable, *see* E. Allan Farnsworth, *Farnsworth on Contracts* § 12.14 at 262 (3d ed. 2004 ) ("The magnitude of the loss need not have been foreseeable. . . ."), as a matter of fact, here the magnitude of Dairyland's damages here was actually foreseen by DOE. Although the "Federal Interim Storage" ("FIS") contemplated by section 136(a)(1) of the NWPA, 42 U.S.C. § 10156(a)(1) (2000), expired in 1990, fee schedules for such storage that DOE developed in 1983 established a "full cost recovery" fee of $670 per kg. of uranium/fuel. *See* 48 Fed. Reg. 54,391 (Dec. 2 1983). At that rate, storage of LACBWR's 38 MTU (each MTU equals 1000 kg.) would cost more than $25 million, and amount that if adjusted for inflation would probably exceed Dairyland's damage

claim. So the magnitude of cost for Dairyland's "interim" spent fuel storage in the breach world, after 1998, was actually foreseen by DOE, in 1983.

The finding in *SMUD* that the utility's use of dual-purpose, transportable spent fuel storage containers was not foreseeable, *see SMUD*, 70 Fed. Cl. at 373, applies an overly-strict and incorrect legal standard, and is factually wrong, at least on the evidence Dairyland will present. A plaintiff need not show that a particular type of mitigation effort was foreseeable. *See, e.g., Citizen Fed. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007); *Dist. Concrete Co. v. Bernstein*, 418 A.2d 1030, 1037 (D.C. 1980) ("Foreseeability of the particular *injury* is what is required by this doctrine. The reasonableness of the method of correction is a different matter going to mitigation of damages issues.") (emphasis in original); *see also Southern*, 77 Fed. Cl. at 405 ("While the general response to a breach must be foreseen, the particular way that a mitigating decision is implemented need not."). Thus, the correct legal test under contract mitigation law, as discussed further below, is whether use of such dual-purpose containers was "reasonable" under the circumstances. And the factual answer is clearly yes given, among other things, that DOE itself had implemented a multi-purpose container program in the early 1990's and that making the spent fuel "transport-ready" would obviously facilitate its removal when DOE commenced performance. Indeed, the fact that DOE was itself promoting multi-purpose containers in the early 1990s would seem to satisfy even *SMUD*'s overly-strict foreseeability requirement, and the Court never explained why it didn't. *See Yankee Atomic*, 73 Fed. Cl. at 288-89 (declining to follow *SMUD* ruling on foreseeability of transportable spent fuel storage containers).

For the same reason, the government's argument that the costs Dairyland claims for its participation in PFS were not foreseeable is meritless. Given that DOE actually foresaw that

utilities (especially shutdown utilities) would incur large spent fuel storage costs if the government did not promptly remove their spent fuel after 1998, it does not matter whether the government actually foresaw the particular means of mitigating such storage costs utilities might undertake in light of the government breach. Nonetheless, given that DOE itself also was attempting an offsite ISFSI – the MRS – similar mitigation, in the form of PFS, *was* actually foreseen by DOE.

C. The Evidence Establishes Causation

Causation, like foreseeability, is a question of fact. *Bluebonnet Sav. Bank*, 266 F.3d at 1356. Here, the evidence establishes that it was DOE's anticipated and then actual breach that caused Dairyland to incur the costs it claims as damages. Indeed, the government has not and cannot point to anything else that caused Dairyland to incur these costs, and there was no other cause. Dairyland simply had no reason – other than DOE's default – to continue to maintain LACBWR in SAFSTOR, incur nuclear insurance costs, investigate an on-site ISFSI, participate in PFS, and incur additional costs to remove its RPV. Thus, DOE's breach was more than a "substantial factor" causing Dairyland to incur the damages claimed here, it was the *only* causal factor. *See TVA*, 69 Fed. Cl. at 515 ("TVA's decision to build dry storage was made in direct response to DOE's breach").

For purposes of assessing causation, Dairyland's damages can be considered of two types – direct damages caused by DOE's breach and mitigation expenses undertaken by Dairyland in an effort to reduce further damages stemming from the breach. Dairyland's SAFSTOR, insurance and RPV removal costs fall into the direct damage category while its PFS costs and

costs for investigating an on-site ISFSI fall into the mitigation category.[1] Overhead and G&A costs are applicable to both categories.

1. Causation of Direct Damages

The Standard Contract does not prescribe any particular schedule for DOE's acceptance of spent fuel. Accordingly, as the Court explained in *Yankee Atomic*, "DOE was to commence pickup at a *reasonable* rate no later than January 31, 1998." *Yankee Atomic*, Order of June 28, 2004 at 9, No. 98-126, 2004 WL 1535686 at *6 (denying motions *in limine*) (emphasis added). This requirement of a reasonable rate for DOE's performance reflects well-settled law that, where a contract is missing a term addressing a significant issue, the court must enforce a reasonable term. *See, e.g.*, Rest. 2d Cont. § 204. For example, *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000), held that if a contract does not specify a time for performance, the government must perform within a reasonable time. *Accord B-E-C-K Constructors v. United States*, 571 F.2d 25, 31 (Ct. Cl. 1978); *see Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 565 (Ct. Cl. 1966).[2] Federal Circuit precedent also dictates that "reasonable" in this case means consistent with the purpose of the NWPA and the contemporaneous understandings of DOE and the contracting utilities. In *Roedler v. Department of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001), which involved one of the same standard contracts involved here, the Court instructed: "[f]or determination of contractual and beneficial

---

1 The costs of Dairyland's effort to investigate the viability of an on-site ISFSI are grouped with its SAFSTOR costs in Dairyland's accounting system.

2 Here, of course, although the rate of acceptance is an open term, the Contract is not entirely silent on scheduling matters. Explicit Contract terms, including that DOE would take title to spent fuel "as expeditiously as practicable" (second whereas clause) and the provisions for exchanges of acceptance slots (Art. V.E.) and for priority acceptance of spent fuel from shut down plants (Art. VI.B.1.(b)), demonstrate that the parties intended to provide for a robust and efficient schedule. *See, e.g.*, *Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747, 753 (Fed. Cir. 1999) (contract interpretation should "give[] effect to all its terms and leav[e] no provision meaningless").

intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose."

Overwhelming evidence – well known throughout the nuclear industry – shows that both DOE and the contracting utilities long understood and intended, consistent with the purpose of the NWPA, that DOE would remove utility spent fuel beginning not later than January 31, 1998 on a schedule that was robust, efficient and calculated to help utilities avoid additional spent fuel storage costs after that date. *See, e.g., Yankee Atomic*, 73 Fed. Cl. at 267 ("intent not only of the NWPA, but of the parties, (including the government) at the time of contracting was to avoid the tremendous costs of additional on-site storage"). Indeed, except for DOE's ACR/APR documents issued in 1991 and 1995, which used the 900 MTU rate for reasons this Court has appropriately rejected, *e.g., Yankee Atomic*, 73 Fed. Cl. at 271-73; *System Fuels,* 79 Fed. Cl. at 56-58, the 3000 MTU per year acceptance rate that Dairyland maintains is reasonable appears in virtually every DOE planning document from 1983 up to the present, including the ACR/APR that DOE issued in June 2004. *See Southern,* 77 Fed. Cl. at 420-21. In addition, substantial evidence shows that DOE was actively planning, after enactment of the NWPA but before DOE recognized that it would not meet the 1998 deadline, to remove spent fuel from utilities on a schedule that incorporated the 3000 MTU rate and was otherwise effective and efficient. *Id.* at 413-17. This powerful evidence of contractual intent is entitled to great weight. *See, e.g. Alvin, Ltd. v. United States Postal Serv.,* 816 F.2d 1562, 1566 (Fed. Cir. 1987) (quoting *Macke Co. v. United States*, 467 F.2d 1323, 1325 (Ct. Cl. 1972)) ("'how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself'"). Further, as noted above in the fact section, DOE planning documents and other substantial evidence also show that exchanges of acceptance allocations were expected to

occur, and would have occurred, to make the DOE spent fuel acceptance schedule more efficient. *See TVA*, 69 Fed. Cl. at 533; *Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 413 (2006); *see also David Nassif Assocs. v. United States*, 557 F.2d 249, 259 n.6 (Ct. Cl. 1977) (finding that, although office building lease documents did not clearly address the subject, "it is a fair inference to say that what the parties had in mind was a cafeteria of a size reasonable under all the circumstances"); *David Nassif Assocs. v. United States*, 644 F.2d 4, 7 (Ct. Cl. 1981) (after trial on question of "reasonable" size for cafeteria, assessing evidence of "what was intended"); *Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158, 1164 (1st Cir. 1992) (determining reasonable time for performance "on the basis of all the evidence").

In addition to other evidence of a reasonable DOE acceptance schedule noted above, Dairyland will also present evidence showing that DOE would have completed removal of spent fuel from LACBWR by 1999 had DOE performed its Contract obligations as required. That evidence will consist of expert analysis and opinions of Mr. Frank Graves, which relies upon and is consistent with DOE spent fuel program documents and with testimony from others (including former DOE program participants) concerning what the parties intended to be, and what would be, a reasonable and efficient spent fuel removal schedule in the non-breach world. Since all of Dairyland's spent fuel would have been removed from LACBWR by the end of 1998 absent the breach, the SAFSTOR, insurance, additional RPV removal, and related overhead and G&A costs Dairyland incurred in 1999 and subsequent years have been caused by the breach.

Ultimately, Dairyland's proof of when LACBWR's spent fuel pool would have been empty absent the breach need only support a fair and reasonable approximation of its damages. *See, e.g.*, *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960); *Ace Fed. Reporters, Inc. v.*

*Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000); *Energy Capital*, 302 F.3d at 1329; *Hughes,* 271 F.3d at 1066-70. Dairyland's evidence of that date more than satisfies that standard.

In its contention interrogatory responses, the government has taken the position that the DOE contract "prescribes" (or contains a "mechanism" for prescribing) a rate and schedule for spent fuel acceptance. Under that theory, the delivery commitment schedules ("DCS") submitted by utilities in the 1990s, combined with the very slow 900 MTU annual acceptance rate published in DOE's 1991 and 1995 Annual Capacity Reports ("ACR") (but not in any ACR before or since), create a "binding" contractual acceptance rate and schedule. The purported relevance of the slow-rate theory to damages arises from the fact that the theory produces a slow, elongated, inefficient schedule for DOE's spent fuel acceptance from contracting utilities. Under such a schedule, DOE's acceptance of spent fuel from certain utilities is delayed for many years after the 1998 program start-date. For Dairyland, as explained above, such a schedule would mean DOE would pick up small amounts of spent fuel from LACBWR year after year without removing all of it for many years. Based on that slow schedule, the government is expected to argue that most of the costs Dairyland claims as damages, such as the SAFSTOR costs, would have been incurred "even if" DOE had performed its Contract obligations. This Court has appropriately rejected the government's reliance on approved DCSs as binding and limiting the performance owed utilities. *See, e.g., Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 369-72 (2005); *System Fuels,* 79 Fed. Cl. at 56-58 ("DOE's behavior in the years that closely followed the enactment of the NWPA and the contract formation serves as a more reliable basis for contract interpretation than the retrenching steps it took once the prospect of breach and liability appeared on the horizon.").

In addition, the government's slow-rate theory must be rejected because there is no evidence (or even argument from the government) that it portrays a "reasonable" spent fuel pick-up schedule. There is no factual evidence, and the government has disclosed no expert opinion, that a 900 MTU/yr. acceptance rate would have been reasonable or consistent with the purpose of the DOE contracts or the NWPA. To the contrary, the government's slow-rate theory is demonstrably unreasonable because, as noted above, it would require most utilities to build expensive dry storage facilities "even if" DOE had performed beginning in 1998. Moreover, it would not be enough to keep up with current utility spent fuel discharges of approximately 2000 MTU/year), much less work off the backlog of previously discharged spent fuel.

2. Causation of Mitigation Damages

As reaffirmed in *Indiana Michigan*, mitigation efforts are not merely an option for the victim of a contract breach, but a duty: "Once a party has reason to know that performance by the other party will not be forthcoming, . . . he is *expected* to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." *Indiana Michigan,* 422 F.3d at 1375 (quoting Rest. 2d Cont. § 350 cmt. b) (emphasis added). Given the unmistakable early evidence of DOE's threatened default, which became apparent at least as early as DOE's 1989 Report to Congress on the Reassessment of the Radioactive Waste Management Program – and given the potentially disastrous consequences of not planning for extended on-site spent fuel storage – Dairyland's mitigation efforts beginning in the 1990's plainly were "appropriate in the circumstances." *See TVA*, 60 Fed. Cl. at 674 (spent fuel plaintiff was "justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance"); *cf. Yankee Atomic Elec. Co. v. United States*, Order of June 28,

2004, 2004 WL 1535688, at *6 ("Should plaintiffs have waited until [January] 31, 1998 and then decided what to do with their nuclear waste? The court thinks not.").

What matters to causation of Dairyland's mitigation costs in this case is *that* DOE would have removed Dairyland's spent fuel in a reasonable time starting in January 1998, not precisely *when* DOE would have done so. DOE's fundamental performance obligation under the Contract was to remove Dairyland's spent fuel, and DOE has not done so. The costs Dairyland has incurred as a result, to investigate on-site and off-site dry storage alternatives "directly and naturally resulted from th[at] breach." *Locke*, 283 F.2d at 524. To the extent the government contends that Dairyland would have incurred some element of its claimed mitigation damages even if DOE has performed as the Contract requires, the government has the burden to prove that contention if it is "to eliminate or reduce [plaintiff]'s mitigation-related damages." *See TVA*, 69 Fed. Cl. at 523; *id*. at 530-31 ("the government frames this argument as one of causation, . . . but in the circumstances of this case, it realistically is a contention aimed at limiting the amount of damages TVA may recover as a result of its mitigation efforts."); *see also SMUD,* 70 Fed. Cl. at 362-65 (finding causation established as a matter of fact, without discussing the rate or schedule for DOE acceptance in the non-breach world); *id* at 375 n.40 (noting that factual record in that case was inadequate to make a finding about the rate of acceptance).

The government may argue, in particular, that Dairyland's expenditures to explore off-site SNF storage were not caused by DOE's breach. In *Indiana Michigan*, this Court made a factual finding that Indiana Michigan's payments to PFS were not caused by the breach, *TVA,* 60 Fed. Cl. at 658-59, and the Federal Circuit affirmed that finding, *Indiana Michigan*, 422 F.3d at 1376. This is an example of an issue where the particular facts presented in different spent fuel cases differ in material ways. The Federal Circuit seemingly recognized this in *Indiana*

*Michigan*, as it was careful to limit the basis for its affirmance on the PFS damages issue by noting that "the *credited evidence* also showed that the utility's investment in the private fuel storage facility was speculative and that the high cost of the venture was unforeseeable." *Id.* at 1376 (emphasis added). As noted above, in this case Dairyland will present evidence (apparently not offered in *Indiana Michigan*) showing that DOE, in 1983, actually foresaw the very high cost of spent fuel interim storage, which is what PFS will provide. Similarly, in *Indiana Michigan* plaintiff's own witness expressed their belief that PFS was "a 'speculative' venture," *see TVA*, 60 Fed Cl. at 659, whereas in this case Dairyland's witnesses will explain that they continue to view PFS as a potentially viable option. Subsequent to *Indiana Michigan*, PFS has obtained an NRC license, which plainly runs counter to assessments of PFS as speculative. Indeed, this Court recently granted a claim for damages for the costs of participation in PFS. *Northern States Power Co. v United States,* 78 Fed. Cl. 449, 465-67 (2007). In *Northern States Power*, this Court rejected the government's argument that *Indiana Michigan* was controlling, and the Court went on to find as a factual matter that the utility's expenditures to participate in PFS "were rational, reasonable and no less foreseeable than the development of the on-site [ISFSI for that utility]." *Id.* at 466. In particular, the Court credited the testimony of the utility's witness that PFS was the utility's only option for spent fuel storage. *Id.* In addition, the Court relied on a DOE report identifying PFS as a viable option for that utility to pursue for its spent fuel storage needs. *See* "Spent Fuel Management Alternatives Available to Northern States Power" (January 2001) (Dairyland Exh. 449).

D. <u>The Evidence Establishes Reasonable Certainty</u>

Reasonable certainty is also a question of fact. *See Bluebonnet Sav. Bank,* 266 F.3d at 1356-58. The standard is well-established: "[c]ertainty is sufficient if the evidence adduced

enables the court to make a fair and reasonable approximation of the damages." *Locke*, 283 F.2d at 524. Moreover, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Id.*; *accord Bluebonnet Sav. Bank*, 266 F.3d at 1356-57; *Ace Federal*, 226 F.3d at 1333.

Here, the fact of damage is clear. And Dairyland's damages proof easily meets the "fair and reasonable approximation" standard. Consistent with *Indiana Michigan*, the damages Dairyland is claiming are limited to past costs that have already been incurred. By definition, such costs are neither speculative nor uncertain, as the Federal Circuit recognized in *Indiana Michigan*. Plainly the actual, past costs Dairyland claims as damages here are far more "reasonably certain" than the future lost profits of a new venture upheld in *Energy Capital Corp.*, 302 F.2d 1314, which were projected to occur in a future "but for" world, not in the actual, "breach" world where Dairyland has *already* incurred its claimed damages.

Second, the past costs Dairyland is claiming as damages are taken, almost entirely, *directly* from Dairyland's accounting system, which the company uses to account for its costs in the ordinary course of its business. Costs Dairyland is claiming as damages identified above will be set forth on a summary damages exhibit (Dairyland Exh. 730), which, consistent with Fed. R. Evid. Rule 1006, summarizes underlying Dairyland's accounting records.

Because Dairyland's accounting system is reliable, and because the costs Dairyland is claiming as damages are taken from that accounting system, Dairyland's claimed damages are more than "reasonably certain." Notably, in addition to the accounting system reports that are the source for most figures on Dairyland's summary cost exhibits, Dairyland has provided the government with hundreds of invoices covering virtually all claimed costs, as well as schedules that "tie" the invoices to particular cost entries on the accounting reports that Dairyland also

provided the government. The government reviewed those invoices and raised objections or questions about only a relative handful – all of which objections and questions Dairyland answered during the discovery process in a manner that should satisfy the government.

For these reasons, the damages amounts claimed by Dairyland easily satisfy the "reasonable certainty" standard.

E. Government Offset of PFS Costs.

As noted above, under established mitigation law, in order to reduce or eliminate the mitigation costs that Dairyland has already incurred, the government bears the burden of proving that Dairyland's mitigation efforts were unreasonable or that particular claimed costs are not reasonable. *See* Rest. 2d Cont. § 350(2); *SMUD*, 70 Fed. Cl. at 366; *TVA*, 69 Fed. Cl. at 523.

As reflected in its pending motion for partial summary judgment, the government is expected to contend that Dairyland should recover as damages none of the costs it has incurred in connection with its participation in PFS. The government's argument that Dairyland is legally precluded from recovering its PFS costs because it has participated in PFS through a subsidiary are meritless and are thoroughly addressed in Dairyland's briefing on the government's motion. Similarly, the government argues in its motion that the Federal Circuit's decision in *Indiana Michigan* precludes recovery of PFS participation costs. Dairyland has also debunked that argument.

If this Court rejects the government's summary judgment motion, then as reflected in the government's contention interrogatory answers, Dairyland expects that the government will argue that Dairyland's participation in PFS has not constituted reasonable mitigation. There is no merit to that contention. The evidence demonstrates that Dairyland's participation in PFS was eminently "reasonable," which is the well-settled mitigation standard. The reasonableness

standard is universally recognized. The Court of Claims applied that standard more than fifty years ago in *Chain Belt Co. v. United States*, 115 F. Supp. 701 (Ct. Cl. 1953), a case much like this one where the injured party, prior to but in anticipation of the government's breach, had to arrange an alternative to the government's performance. In language equally applicable here, the *Chain Belt* court explained:

> [P]laintiff was under an obligation to avoid by a reasonable effort any damages which it should have foreseen and, having done so, it may recover as damages the expense incurred in such reasonable effort to avoid harm . . . . It makes no difference whether the breach has already occurred, or where . . . it is merely impending under circumstances such that it was not reasonable for plaintiff to expect defendant to prevent the harm.

*Id*. at 714. The Federal Circuit applied this rule in a prior spent fuel case that affirmed the availability of "pre-breach" mitigation damages. *See Indiana Michigan*, 422 F.3d at 1375; *TVA*, 69 Fed. Cl. at 528 ("There is no dispute that TVA acted to mitigate the damages caused by DOE's partial breach. . . . TVA's expenses of its mitigation are accordingly recoverable to the extent they are reasonable."); *SMUD*, 70 Fed. Cl. at 366 ("if an injured party's efforts to mitigate damages from a breach are reasonable, they are recoverable").

As is implicit in the "reasonableness" standard, costs of mitigation are recoverable whether or not the effort is successful. *See* Rest. 2d Cont. § 347 cmt. c. (costs incurred in reasonable efforts to avoid loss are recoverable "whether successful or not"); *Cienega Gardens v. United States*, 38 Fed. Cl. 64, 79 (1997) ("[w]hether or not an attempt to mitigate damages is successful, the non-breaching party may recover for injury incurred during such mitigation as long as the attempt was reasonable"), *vacated on other grounds*, 162 F.3d 1123 (Fed. Cir. 1998); Dan B. Dobbs, *Law of Remedies* §12(6)(2), at 127 (2d ed. 1993) ("Dobbs") ("[T]he plaintiff's damages are adjusted upwards to reflect all the reasonable costs he incurs in attempting to avoid

losses, whether or not he was successful in doing so."); *see also Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164, 166 (1990) (reasonableness of the injured party's mitigation action is "judged by the facts and circumstances at the time the action is taken"); *id*. (injured party does not have to undertake extraordinary efforts to "ferret out the single best situation which will absolutely minimize the breaching party's damages"); *In re Kellet Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950) ("[w]here a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen."); *see also Southern*, 77 Fed. Cl. at 406 *citing, e.g., Old Stone Corp. v. United States*, 450 F.3d 1360, 1368 (Fed. Cir. 2006). Ultimately, it is the government's burden to prove that Dairyland's efforts to mitigate its damages caused by DOE's breach were unreasonable. *Southern*, 77 Fed. Cl. at 407, *citing TVA*, 69 F.3d at 523; *PG&E*, 73 Fed. Cl. at 406; *Yankee Atomic*, 73 Fed. Cl. at 264; *Old Stone*, 450 F.3d at 1370.

These standards have particular applicability to the government's arguments that Dairyland should not recover the costs of its participation in PFS. The fact that PFS has not yet been successful is irrelevant to the determination of the reasonableness of Dairyland's expenditures on that effort at the time those expenditures were made. "That there were (and are) questions whether PFS would ultimately be built does not make it unreasonable and outside the realm of possible mitigation. Guaranteed success is not a prerequisite to recovery of mitigation expenses." *Southern*, 77 Fed. Cl. at 443. The evidence Dairyland will present at trial will establish that it was reasonable at the time for Dairyland to expend funds for participation in PFS.

Finally, as this Court has also recognized in other spent fuel cases, applying established law, "[t]o eliminate or reduce [plaintiff]'s mitigation-related damages, the government bears the

burden of showing that [plaintiff]'s mitigation efforts were unreasonable." *TVA*, 69 Fed. Cl. at 523; *SMUD* 70 Fed Cl. at 367 ("the Government bears the burden of proving that actions to mitigate were unreasonable"); *Yankee Atomic*, Order of August 29, 2003 at 3 ("[d]efendant would have the burden of proof as to any such failure to mitigate assertion") (citing *T.C. Bateson Constr. Co. v. United States*, 319 F.2d 135, 140 (Ct. Cl. 1963); *see Koby v. United States*, 53 Fed. Cl. 493, 496 (2002)). The government cannot carry its burden to show that Dairyland's claimed mitigation damages are *not* reasonable and "appropriate in the circumstances." *See* Rest. 2d Cont. § 350 cmt. b. The Court, therefore, should award those damages and make Dairyland whole.

CONCLUSION

For the reasons set forth above and to be established through trial evidence, the Court should enter judgment for Dairyland for damages in the amount it claims at trial.

Respectfully submitted,

May 14, 2008

s/ Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

*WDC 371,621,920v3 5/14/2008*