**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 04-106C**
**(Chief Judge Damich)**

---

**DAIRYLAND POWER COOPERATIVE,**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

---

# DEFENDANT'S RESPONSE TO DAIRYLAND'S MOTION TO EXCLUDE R. LARRY JOHNSON'S TESTIMONY

---

**GREGORY G. KATSAS**
**Acting Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**RUSSELL A. SHULTIS**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tel: (202) 305-7571**
**Fax: (202) 307-2503**

**Attorneys for Defendant**

**OF COUNSEL:**

**JANE K. TAYLOR**
**Office of General Counsel**
**U.S. Department of Energy**
**1000 Independence Ave., S.W.**
**Washington, D.C. 20585**

**PATRICK B. BRYAN**
**JOSHUA E. GARDNER**
**SCOTT SLATER**
**Civil Division**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20530**

**May 15, 2008**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX TO APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY. . . . . . . . . . . . 3

II. MR. JOHNSON'S EXPERT OPINIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. Mr. Johnson's Opinions Regarding Non-Incremental Costs. . . . . . . . . . . . 7

B. Mr. Johnson's Opinions Concerning Unreasonable Costs. . . . . . . . . . . . . 9

C. Mr. Johnson's Opinions Concerning Direction From Counsel And Input From Other Government Experts. . . . . . . . . . . . . . . . . . . . . . . 11

III. MR. JOHNSON'S EXPERIENCE AND QUALIFICATIONS.. . . . . . . . . . . . . . . 12

IV. MR. JOHNSON'S OPINIONS REFLECT HIS SPECIALIZED KNOWLEDGE OF ACCOUNTING AND DAMAGES. . . . . . . . . . . . . . . . . . . 13

A. Mr. Johnson Is Not Offering Any Legal Opinions Concerning Dairyland's Claimed Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

B. Dairyland's Assertion That Mr. Johnson Has Employed An Incorrect Causation Standard Is Misplaced. . . . . . . . . . . . . . . . . . . . . . . . 18

C. Mr. Johnson's Opinions Concerning The Non-Incremental Nature Of Dairyland's Claim For Overhead And "Baseline" Charges Are Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1. Mr. Johnson Has Employed His Specialized Knowledge, Employed A Proper Damages Methodology, And Considered Sufficient Facts And Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

TABLE OF CONTENTS (cont'd)

PAGE


2. Dairyland's Characterization Of Other Opinions From This Court Are Incorrect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3. Mr. Johnson's Opinions Regarding "Baseline" Charges Are Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

D. Dairyland's Challenge To Mr. Johnson's Opinions Concerning The Reasonableness Of Certain Costs Lacks Merit. . . . . . . . . . . . . . . . . . 28

1. Mr. Johnson's Critique of Mr. Smith's Opinions Constitutes Proper Expert Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

2. Mr. Johnson's Opinions Regarding Lobbying Costs Are Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

E. Mr. Johnson's Expert Testimony Does Not Intrude On The Province Of The Court And Provides The Court With Useful And Relevant Opinions Based Upon His Extensive Professional Experience. . . . . . . . . 31

F. Mr. Johnson Properly Monetized And Deducted Costs From Dairyland's Damages Claim Based Upon the Expert Opinions Offered by the Government's Expert Witness, Mr. Brewer, And Instructions From Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

TABLE OF AUTHORITIES

CASES PAGE(S)

Abbott Labs. v. Brennan,
952 F.2d 1346 (Fed. Cir. 1992). . . . . . . . . 18, 19

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004). . . . . . . . . 20

American Sci. & Eng'g, Inc. v. United States,
8 Cl. Ct. 129 (1985). . . . . . . . . 20

Beech Aircraft Corp. v. Rainey,
488 U.S. 153 (1988).. . . . . . . . . 32

Betterbox Communications Ltd. v. BB Technologies, Inc.,
300 F.3d 325 (3d Cir. 2002).. . . . . . . . . 4, 5

Bluebonnet Sav. Bank, FSB v. United States,
67 Fed. Cl. 231 (2005), aff'd,
466 F.3d 1349 (Fed. Cir. 2006). . . . . . . . . 21

Carolina Power & Light Co. v. United States,
04-00037C (Fed. Cl. Nov. 15, 2007). . . . . . . . . 12

Citizens Federal Bank v. United States,
474 F.3d 1314 (Fed. Cir. 2007). . . . . . . . . 21

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000). . . . . . . . . 21

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004). . . . . . . . . 19, 21

Connecticut Yankee Atomic Power Co. v. United States,
No. 98-154C (Fed. Cl.). . . . . . . . . 12

Daubert v. Merrill Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993).. . . . . . . . . 3, 5

Deal v. Hamilton County Bd of Educ.,
392 F.3d 840 (6th Cir. 2004). . . . . . . . . 3

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960). . . . . . . . . . 20

First Tennessee Bank Nat. Assoc. v. Barreto,
268 F.3d 319 (6th Cir. 2001). . . . . . . . . . 5

First Union Nat. Bank v. Benham,
423 F.3d 855 (8th Cir. 2005). . . . . . . . . . 6

Forrest v. Beloit Corp.,
424 F.3d 344 (3d Cir. 2005).. . . . . . . . . . 32

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001). . . . . . . . . . 21

Granite Mgt. Corp. v. United States,
74 Fed. Cl. 155 (2006). . . . . . . . . . 21

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd,
422 F.3d 1369 (Fed. Cir. 2005). . . . . . . . . . 15

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005). . . . . . . . . . 20

Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,
456 U.S. 844 (1982).. . . . . . . . . . 33

J.D. Hedin Constr. Co. v. United States,
197 Ct. Cl. 782, 456 F.2d 1315 (Ct. Cl. 1972). . . . . . . . . . 18, 20

Krauss v. Greenbarg,
137 F.2d 569 (3d Cir. 1943).. . . . . . . . . . 19, 21

Krofft Entertainment, Inc. v. CBS Songs,
653 F. Supp. 1530 (S.D.N.Y. 1987).. . . . . . . . . . 19

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999).. . . . . . . . . . 3, 4

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Living Designs, Inc. v. E.I. Dupont De Nemours & Co.,
431 F.3d 353 (9th Cir. 2005). . . . . . . . . . 4

Maine Yankee Atomic Power Co. v. United States,
No. 98-474C (Fed. Cl.). . . . . . . . . . 12

Menne v. Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988). . . . . . . . . . 18

Micro Chemical, Inc. v. Lextron, Inc.,
317 F.3d 1387 (Fed. Cir. 2003). . . . . . . . . . 3, 6

Northern States Power Co. v. United States,
78 Fed. Cl. 449 (2007), appeal pending,
No. 2008-5037, -5041 (Fed. Cir.). . . . . . . . . . 26

Northern States Power Co. v. United States,
79 Fed. Cl. 748 (2007). . . . . . . . . . 26

Northern States Power Co. v. United States,
98-484C (Fed. Cl. Nov. 11, 2006). . . . . . . . . . 12

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006), appeal pending,
No. 2007-5076 (Fed. Cir.). . . . . . . . . . 24, 25

Point Productions A.G. v. Sony Music Entertainment, Inc.,
215 F. Supp. 2d 336 (S.D.N.Y. 2002). . . . . . . . . . 18

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005). . . . . . . . . . 5

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006), appeal pending,
No. 2007-5052, -5097 (2007). . . . . . . . . . passim

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997). . . . . . . . . . 20

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002). . . . . . . . . . 3

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Shyface v. Secy of Health and Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999). . . . . . . . . . 18, 21

Southern Nuclear Operating Co. v. United States,
77 Fed. Cl. 396 (2007), appeal pending,
No. 2008-5020 (Fed. Cir.). . . . . . . . . . 24, 25

Southern Nuclear Operating Co. v. United States,
No.98-614C (Fed. Cl. Oct. 27, 2005). . . . . . . . . . 12

System Fuels, Inc. v. United States,
78 Fed. Cl. 769 (2007). . . . . . . . . . 25

System Fuels, Inc. v. United States,
79 Fed. Cl. 37 (2007). . . . . . . . . . 32, 33

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006). . . . . . . . . . 27

Tyler v. Union Oil Co.,
304 F.3d 379 (5th Cir. 2002). . . . . . . . . . 6

United States v. Jones,
107 F.3d 1147 (6th Cir.), cert. denied,
521 U.S. 1127, 117 S. Ct. 2527, 138 L. Ed.2d 1027 (1997). . . . . . . . . . 4

United States v. Lopez-Lopez,
282 F.3d 1 (1st Cir. 2002). . . . . . . . . . 6

United States v. Mamah,
332 F.3d 475 (7th Cir. 2003). . . . . . . . . . 6

United States v. Urbina,
431 F.3d 305 (8th Cir. 2006). . . . . . . . . . 32

United States v. Young,
316 F.3d 649 (7th Cir. 2002). . . . . . . . . . 4

WestFed Holdings, Inc. v. United States,
52 Fed. Cl. 135 (2002). . . . . . . . . . 21

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Yankee Atomic Electric Company v. United States,
No. 98-126C (Fed. Cl.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

RULES

Fed. R. Evid. 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Evid. 704. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

MISCELLANEOUS

5A Corbin on Contracts, § 992. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Keeton et al., Prosser and Keeton On The Law Of Torts, 266-68 (5th ed. 1984). . . . . . . . . . 18, 19

C. McCormack, Handbook on the Law of Damages, § 73 (1935).. . . . . . . . . . . . . . . . . . . . . . . . 19

Restatement (Third) of Torts § 26 (Proposed Final Draft 2006). . . . . . . . . . . . . . . . . . . . . . . . . 21

# INDEX TO APPENDIX

DOCUMENT PAGE


Trial Transcript Excerpts, Carolina Power & Light v. United States (November 15, 2007). . . . . . . . . . Def. A.1

Trial Transcript Excerpts, Northern States v. United States (November 21, 2006). . . . . . . . . . Def. A.4

Trial Transcript Excerpts, Southern Nuclear v. United States (October 27, 2005). . . . . . . . . . Def. A.9

Trial Transcript Excerpts, Yankee Atomic v. United States (August 19, 2004). . . . . . . . . . Def. A.14

R. Larry Johnson Deposition Excerpts, Dairyland v. United States (July 17, 2007). . . . . . . . . . Def. A.17

Letter from Kevin E. Stern to Russell A. Shultis (April 8, 2008). . . . . . . . . . Def. A.23

Excerpts of Expert Report of Todd D. Smith (March 23, 2007). . . . . . . . . . Def. A.26

Dairyland's Witness List, Dairyland v. United States (April 18, 2008). . . . . . . . . . Def. A.28

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | |
| v. | ) | No. 04-106C (Chief Judge Damich) |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

DEFENDANT'S RESPONSE TO DAIRYLAND'S
MOTION TO EXCLUDE R. LARRY JOHNSON'S TESTIMONY

Pursuant to Rule 16 of the Rules of the Court of Federal Claims ("RCFC"), and the Government's February 21, 2008 trial preparation order, defendant, the United States, responds to the motion filed by the plaintiff, Dairyland Power Cooperative ("Dairyland"), seeking to exclude the expert testimony of the Government's expert accounting and damages witness, R. Larry Johnson.

SUMMARY OF ARGUMENT

Dairyland's motion to exclude the Government's accounting and damages expert fails to overcome the fact that Mr. Johnson is an expert qualified to testify regarding accounting and damages matters and that Mr. Johnson performed significant and relevant analysis upon Dairyland's claimed costs – analysis that Dairyland failed to perform. Indeed, Mr. Johnson brings to his opinions in this case his 38 years of accounting experience as a certified public accountant, and he repeatedly has been qualified as an accounting and damages expert (having testified in numerous trials and arbitrations (including four spent nuclear fuel trials)) and has offered expert testimony in approximately 75 other cases.

In its motion *in limine*, Dairyland argues that Mr. Johnson's opinions and testimony

provide nothing useful to the Court and, to the extent that Dairyland acknowledges that Mr. Johnson is offering helpful testimony, that the testimony intrudes upon the Court's role as trier-of-fact. However, a cursory review of Mr. Johnson's expert opinions, set forth in his expert report and deposition testimony, reveals that they are relevant, supportable, and reliable, and that his opinions will prove useful to the Court, without intruding upon the Court's province to weigh the evidence presented at trial and reach legal and factual conclusions regarding that evidence.

Mr. Johnson's opinions that certain costs are not incremental to the partial breach of the Standard Contract by the Department of Energy ("DOE") or are not supported as a matter of accounting do not invade the Court's role in determining the weight and credibility of the evidence. Instead, Mr. Johnson's opinions offer a comprehensive and understandable framework for evaluating the validity and bases of Dairyland's damages claim. Further, contrary to Dairyland's repeated assertions, Mr. Johnson applies well-established and reliable accounting principles to his analysis, and he provides the Court with a basis for understanding and assessing the significant deficiencies and inconsistencies contained within the plaintiff's damages claim and the opinions of two of Dairyland's expert witnesses, Todd Smith and Charles Wilkins.

Finally, Mr. Johnson's reliance upon the expert testimony of other Government expert witnesses, including Warren Brewer, as well as his reliance upon instructions from Government counsel, provides an appropriate basis for his expert testimony and has been recognized as such by this Court. Although certain activities undertaken by Mr. Johnson, when viewed in a narrow and discrete manner and out of context of his overall expert opinion, can be viewed as the basic subtraction of certain dollar amounts, Dairyland's motion fundamentally mischaracterizes Mr. Johnson's overall expert opinion. Among his other opinions, Mr. Johnson recognized the expert

opinions of Mr. Brewer, and the instructions from counsel, and monetized those opinions and instructions to account for certain costs that should be deducted from Dairyland's damages claim.

In sum, Dairyland's multiple complaints concerning Mr. Johnson's expert testimony are without merit, and this Court should deny Dairyland's motion to exclude his expert testimony in this case.

## ARGUMENT

### I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

The United States Court of Appeals for the Federal Circuit has explained that, under the Supreme Court's decision in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). Although the standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one, Seaboard Lumber Co., 308 F.3d at 1302, the "'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." Deal v. Hamilton County Bd of Educ., 392 F.3d 840, 852 (6th Cir. 2004). Further, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003) (quoting Advisory Committee Note to Federal Rule of Evidence 702).

Although the Supreme Court in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), expanded the Court's gatekeeping function under Daubert from "scientific" testimony to all expert testimony, the Court concluded that, in cases not involving scientific testimony, "[t]he

factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." Id. at 150. In that circumstance, the Supreme Court explained that "the relevant reliability concerns may focus upon personal knowledge or experience." Id.; see Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 329 (3d Cir. 2002) (affirming the trial court's admittance of a marketing expert who opined upon the likelihood of confusion between two trademarks, and concluding that testimony was based upon the witness's "'personal knowledge or experience' . . . rather than a methodology that satisfies the Daubert factors"); Living Designs, Inc. v. E.I. Dupont De Nemours & Co., 431 F.3d 353, 368 n.14 (9th Cir. 2005) ("Concerning the reliability of non-scientific testimony such as [Berly's], the 'Daubert factors . . . simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it'") (citation omitted) (emphasis in original); United States v. Young, 316 F.3d 649, 657 (7th Cir. 2002) (affirming admission of psychiatric mental health nurse who offered testimony concerning domestic abuse victim's recantation, concluding that her methodology was reliable based upon her extensive experience and review of relevant documents in the case).

The United States Court of Appeals for the Sixth Circuit has explained the distinction in the sufficiency of expert methodology between scientific and non-scientific expert testimony:

> In United States v. Jones, 107 F.3d 1147, 1158 (6th Cir.), cert. denied, 521 U.S. 1127, 117 S. Ct. 2527, 138 L. Ed.2d 1027 (1997), this court recognized that the four specific factors utilized in Daubert may be of limited utility in the context of non-scientific expert testimony. We noted that "[i]f [the Daubert] framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony – that derived substantially from practical experience – would be excluded. Such a result

> would turn Daubert, a case intended to relax the admissibility requirements for expert scientific evidence, on its head." Id. at 1158. Indeed, even the Berry court itself recognized that "[t]he distinction between scientific and non-scientific expert testimony is a critical one[,]" and that Daubert is "only of limited help" in assessing technical or experiential expertise.

First Tennessee Bank Nat. Assoc. v. Barreto, 268 F.3d 319, 334-35 (6th Cir. 2001) (rejecting application of Daubert reliability factors to banking expert's opinion concerning prudent lending practices because expert testimony "derived largely from [expert's] own practical experiences throughout forty years in the banking industry"). Ultimately, the inquiry under Rule 702 is a flexible one, Daubert, 509 U.S. at 594, and trial courts "have substantial discretion in deciding how to test an expert's reliability." Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005) (citation omitted).

Under Rule 702, an expert witness must possess "specialized knowledge" regarding the area of testimony. Fed. R. Evid. 702. The United States Court of Appeals for the Third Circuit, in discussing the requisite specialized knowledge necessary to qualify as an expert under Rule 702, explained:

> "The basis of this specialized knowledge 'can be practical experience as well as academic training and credentials,'" and "[w]e have interpreted the specialized knowledge requirement liberally." However, "'at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . .'"

Betterbox Communications, 300 F.3d at 327-28 (citations omitted) (affirming admittance of marketing expert on the issue of the likelihood of confusion in certain trademarks based upon his experience in the field).

Under Rule 702, a witness may qualify as an expert "based on his own knowledge, skill, experience, training or education." First Union Nat. Bank v. Benham, 423 F.3d 855, 862 (8th Cir. 2005) (citing Fed. R. Evid. 702). Further, the factual basis for an expert's opinion goes to the credibility of the testimony rather than the admissibility, and it is up to Dairyland, the party challenging the admissibility of Mr. Johnson's testimony, to examine the factual basis for his opinions through cross-examination. Id.; see Tyler v. Union Oil Co., 304 F.3d 379, 393 (5th Cir. 2002) (holding that attempt to show that expert's underlying data were unreliable is an issue to resolve upon cross-examination at trial). Indeed, where the parties' experts rely upon conflicting sets of facts, "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony" in determining whether they have appropriate expertise. Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003).[1] Ultimately, the Court must find that an expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. United States v. Lopez-Lopez, 282 F.3d 1, 14 (1st Cir. 2002) (affirming admittance of expert on the *modus operandi* of individuals importing drugs into the United States because expert's testimony was not within fact-finder's common knowledge).

## II. MR. JOHNSON'S EXPERT OPINIONS

Mr. Johnson has offered expert accounting and damages-related opinions in this case based upon his 38 years of experience as a certified public accountant. Significantly, Dairyland does not question Mr. Johnson's expertise to provide accounting-related opinion testimony. Mr.

[1] This situation is to be distinguished from an expert who issues opinions that lack any arguable factual support, a situation which may be a proper basis for the exclusion of that expert's opinions. See United States v. Mamah, 332 F.3d 475, 477-478 (7th Cir. 2003) (affirming exclusion of sociologist and anthropologist as experts because they based their opinions upon insufficient facts or data).

Johnson's expert opinions, which Dairyland challenges, may be grouped into one of three categories: (1) costs that are not incremental to DOE's partial breach; (2) costs that are not reasonable; and (3) costs that are removed from the damages claim based upon instruction from counsel or based upon the opinions of the Government's technical expert, Warren Brewer.

A. Mr. Johnson's Opinions Regarding Non-Incremental Costs

First, Mr. Johnson has offered the opinion that certain of Dairyland's claimed costs are not incremental to the Government's partial breach because Dairyland would have incurred the same costs even had DOE performed. In other words, these costs are fixed from an accounting and damages perspective. Mr. Johnson's opinions concerning non-incremental costs relate to several areas of Dairyland's claim: (1) the indirect overhead and the general and administrative ("G&A") costs upon which Dairyland's expert witness, Charles Wilkins, opines;[2] (2) claimed labor costs charged to the "Baseline" activity code; and (3) a variety of smaller, miscellaneous costs.[3] With respect to the indirect overhead and G&A costs, Mr. Johnson opined that Mr.

---

[2] On April 29, 2008, the Government moved to exclude the testimony associated with Dairyland's claimed overhead.

[3] These additional opinions related to miscellaneous costs relate to the following three areas: (1) claimed costs for activities performed by Worldwide Performance and Innovation ("WPI") that would have been necessary even had DOE performed; (2) charges by Nukem Nuclear Technologies ("Nukem") for activities associated with spent resin disposal that was related to decommissioning the plant; and (3) Nuclear Regulatory annual fees for the last quarter of 1998 because, under Dairyland's damages theory, SNF would have been on site until at least the end of 1998. A.12-16.

Tellingly, in direct response to Mr. Johnson's opinions, Dairyland has dropped in full its claim for the Nukem charges and the NRC fees for the last quarter of 1998. Def. A.23-24. In addition, Dairyland has dropped its claims related to a substantial portion of the WPI charges, including the costs associated with Greater-Than-Class C Waste determinations and radioactive materials packaging and disposal. Id. The only WPI charges that remain in Dairyland's claim relate to costs associated with spent nuclear fuel characterization. Mr. Johnson, relying upon the

Wilkins lacked a basis for concluding that the indirect overhead and G&A costs that Mr. Wilkins calculated are properly recoverable as damages. A.9.[4] Specifically, Mr. Johnson explained in his report that

> for costs to be appropriately includable as damages, an evaluation of the underlying activities and associated underlying costs must be performed to determine if those underlying costs are incremental to the breach. If an expenditure associated with the underlying cost pool is not affected by the breach, then those costs would have been incurred by Dairyland regardless of the breach and therefore are not appropriately includable as damages.

A.9. Mr. Johnson opined that, because Mr. Wilkins failed to conduct this analysis in his evaluation of indirect overhead and G&A costs and, indeed, failed to conduct any analysis of whether such costs would have been incurred even if DOE had timely performed, Mr. Wilkins' opinions are nothing more than "a cost accounting model which allocates all costs among all of Dairyland's business units without regard to whether they would have been incurred in a non-breach world." A.9.

With respect to the costs charged to the "Baseline" activity code that Dairyland has claimed as damages, Mr. Johnson explained that Dairyland utilizes certain activity codes in its accounting system to associate costs with a particular work scope. A.11. Mr. Johnson opined, however, that Dairyland has failed to demonstrate that these costs are incremental to DOE's

---

expert opinions of another Government expert, Mr. Brewer, has identified and removed these costs from Dairyland's claim because these same activities would have been necessary had DOE performed. A.14.

[4] "A.__" refers to the appendix filed by Dairyland in connection with its motion to exclude. "Pl. Mot. __" refers to the Dairyland's "Motion To Exclude R. Larry Johnson's Testimony," filed on April 29, 2008. "Def. A.__" refers to the appendix filed by the Government in connection with the response to Dairyland's motion.

partial breach. A.11. Specifically, Mr. Johnson reviewed Dairyland's accounting records and the testimony of Dairyland's employees, which reflect that costs charged to the "Baseline" activity code relate to decommissioning activities or are otherwise unrelated to LACBWR and the storage of spent fuel. A.11-12.[5] Further, Mr. Johnson reviewed the specific charges made to the "Baseline" activity code and noted that "Dairyland's accounting records indicate that the Baseline activity code is comprised of $1,805,834 of internal labor charges for which no description of the specific activity has been provided." A.11. Consequently, Mr. Johnson opined that, because these costs appear to include both decommissioning-related work and other work unrelated to LACBWR, Dairyland failed to demonstrate that these same "Baseline" costs would not have been incurred in the absence of DOE's partial breach, and there has been no demonstration of increased cost to Dairyland associated with these charges. A.11-12.

B. <u>Mr. Johnson's Opinions Concerning Unreasonable Costs</u>

Second, Mr. Johnson has opined that several aspects of Dairyland's claimed damages are not reasonable from a cost accounting and damages analysis perspective. First, Mr. Johnson has offered an accounting and damages critique of Dairyland's expert, Todd Smith, concerning Mr. Smith's estimate of the hypothetical costs associated with the removal of Dairyland's reactor pressure vessel ("RPV") had the Department of Energy ("DOE") performed. A.17. Specifically, applying his substantial experience in financial analysis, cost accounting, and the analysis of damages claims, Mr. Johnson opines that Mr. Smith's calculations and estimates "provide no basis and are unreliable for use with respect to the measurement of damages" because Mr.

---

[5] For example, Mr. Johnson noted that Roger Christians, a Dairyland employee, testified that he would charge time to the "Baseline" activity code for activities that "had nothing to do with LACBWR." A.12.

Smith's approach, methodology, and technical assumptions contain pervasive errors. A.18-23.

Mr. Johnson identified the following significant flaws in Mr. Smith's analysis:

1. Mr. Smith failed to utilize Dairyland's known actual world actual costs for scopes of work that Mr. Smith admitted would be the same between the breach and non-breach worlds, A.18-20;

2. Mr. Smith asserts, without any basis, that Dairyland would have self-performed the RPV removal project in the non-breach world, as contrasted to engaging a general contractor, as Dairyland did in the actual world, A.20-21;

3. Mr. Smith improperly included engineering judgments and decisions that are inconsistent with the opinions offered by Dairyland's own fact witnesses, A.21-22;

4. Rather than rely upon formal quotes for work estimates, Mr. Smith relied upon information received from phone calls and emails to measure the differences between breach and non-breach worlds, A.22; and

5. Mr. Smith failed to consider that certain activities, such as the removal of the bio-shield wall, would have been required regardless of DOE's delay, A.23.[6]

Based upon these significant errors, Mr. Johnson opined that Mr. Smith's estimate does not provide a reliable estimate of damages associated with the RPV removal project. A.23.

The second aspect of Dairyland's damages claim that Mr. Johnson opines is not reasonable relates to two sets of lobbying costs. Specifically, Dairyland has claimed $75,000 in quarterly dues from 1999 through 2006 to Government Strategies Incorporated ("GSI") for "advice and representation on decommissioning plant issues associated with Decommissioning Plant Coalition and relations with Members of Congress and Congressional Committees." A.24.

---

[6] Mr. Johnson also opined that certain of the claimed damages asserted by Mr. Smith had not yet been incurred as of the then-operable December 31, 2006 damages cut-off date. A.23. Since Mr. Johnson issued his expert opinions, the Court has amended the damages cut-off to allow Dairyland to claim the 2007 costs associated with the RPV removal project. Accordingly, this particular aspect of Mr. Johnson's critique has been mooted.

Dairyland has also claimed $186,880 for amounts paid to Lake Barrett, a former DOE official, who is currently a lobbyist and paid consultant to Dairyland, and who is also an individual identified on Dairyland's witness list in this case. A.24; Def. A.28. Dairyland retained Mr. Barrett to "provide advice to Dairyland regarding nuclear fuel related policies and business issues, and general Federal activities in related areas." A.24. Mr. Johnson opined that, because lobbying costs are not a necessary cost for the storage of spent fuel, these costs should be removed from the damages claim. A.24.

C. Mr. Johnson's Opinions Concerning Direction From Counsel And Input From Other Government Experts

Third, at the request of counsel, Mr. Johnson modeled two alternative SNF acceptance scenarios and removed the costs associated with Dairyland's investment in a company that invested in Private Fuel Storage, LLC. A.23-26.[7] First, Mr. Johnson, at the instruction of counsel, modeled an SNF acceptance scenario in which DOE accepted the last SNF assembly from Dairyland by 2005. A.25. A 2005 "out date" corresponds to the acceptance rate of 3,000 MTU after a brief ramp-up without the use of exchanges of approved delivery commitment schedules.[8] Incorporating the opinion from Mr. Brewer that the cost of maintaining SNF in the wet pool does not depend upon the number of SNF assemblies, Mr. Johnson calculated that the damages to Dairyland would be reduced to approximately $4.6 million. A.25. Second, Mr. Johnson modeled an SNF acceptance scenario in which DOE accepted the last SNF assembly

[7] As the Court is aware, the Government has moved for summary judgment concerning Dairyland's claimed costs associated with PFS. To the extent that the Court grants our motion, this aspect of Mr. Johnson's opinions would be moot.

[8] A more in-depth discussion of "exchanges" is contained in the Government's motion *in limine* regarding Dairyland's expert witness, Frank Graves.

from Dairyland after 2008. A.26. The Government instructed Mr. Johnson to assume this scenario based upon the existence of grossly failed SNF that Dairyland possesses and that Dairyland may have to store for an indeterminate period of time. A.26. In addition, this acceptance scenario is consistent with the Government's position that the contractually-mandated acceptance rate is the one published in the 1991 Annual Capacity Report, which has a slower ramp-up rate than the acceptance rate that forms the basis for Dairyland's damages claim. Under this scenario, Mr. Johnson identifies costs and removes them from Dairyland's damages calculation. A.26.

## III. MR. JOHNSON'S EXPERIENCE AND QUALIFICATIONS

The Government has offered Mr. Johnson as an expert in the fields of financial accounting, cost accounting, auditing, and the analysis of economic damages. This Court has repeatedly qualified Mr. Johnson in these areas. See Carolina Power & Light Co. v. United States, 04-00037C (Fed. Cl. Nov. 15, 2007) (Def. A. 2-3 (Tr. 1944:24-1945:3)); Northern States Power Co. v. United States, 98-484C (Fed. Cl. Nov. 11, 2006) (Def. A.6 (Tr. 4866:7-11)); Southern Nuclear Operating Co. v. United States, No.98-614C (Fed. Cl. Oct. 27, 2005) (Def. A.10 (Tr. 2021:5-10)) (noting that he has been qualified as an expert in the Court of Federal Claims on three separate occasions, and in the United States District Court for the Northern District of California once, as an expert in the areas of economics, economic damages, and corporate finance); see generally Yankee Atomic Electric Company v. United States, No. 98-126C (Fed. Cl.), Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Fed. Cl.), and Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Fed. Cl. Aug. 19, 2004) (Def. A.15 (Tr. 6189:14-6190:2)).

Mr. Johnson, who has a Bachelor of Science degree from the University of Maryland and has completed MBA course work at the George Washington University, has been the Chief Executive Officer of VERIS Consulting, LLC since 2000 and was Managing Partner of the accounting firm of Johnson, Lambert & Company from 1986 to 2005. A.27. In these positions, Mr. Johnson has been involved in, among other things, forensic analysis of damages claims, liability, causation and damages consulting, and the preparation of damages analysis. A.27. Many of Mr. Johnson's professional engagements have involved several thousands of hours of assistance and involved damages claims in the hundreds of millions of dollars. A.27. Mr. Johnson also worked for Ernst & Whinney for 18 years, and was admitted to partnership in 1978. A.27. From 1994 to 1997, Mr. Johnson was a member of the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants, which was the highest authority in the United States accounting profession with responsibility for industry-specific accounting and reporting matters. A.27. Mr. Johnson brings an extensive specialized knowledge of accounting and damages analysis to this case, supported by over seven years of particular experience in the assessment of accounting and damages in the spent nuclear fuel cases.

## IV. MR. JOHNSON'S OPINIONS REFLECT HIS SPECIALIZED KNOWLEDGE OF ACCOUNTING AND DAMAGES

### A. Mr. Johnson Is Not Offering Any Legal Opinions Concerning Dairyland's Claimed Damages

In Dairyland's motion to exclude, it asserts that Mr. Johnson is somehow offering legal conclusions regarding causation. Pl. Mot. at 6. Dairyland's contention is without merit. Mr. Johnson has, through 38 years of professional accounting experience and substantial

involvement in litigation-related matters, developed the specialized knowledge that will help this Court, as the trier of fact, understand the evidence presented at trial and determine the facts in issue. Indeed, Mr. Johnson is not offering any legal conclusions, but, rather, is offering an expert accounting opinion that certain costs included in Dairyland's damages claim are not incremental to DOE's partial breach of the Standard Contract from a cost-accounting perspective because they are fixed costs.

As Mr. Johnson unequivocally explained in his deposition in this case, he is offering accounting and economic damages opinions concerning Dairyland's claimed damages, and he is <u>not</u> offering any legal conclusions:

> Q Is incremental an accounting term of art?
> A It's used frequently in accounting. I'm sure there is also English language usage of it. I'm sure it exists in many contexts. It's not unique to accounting.
> Q Do you know if it's a legal term of art?
> A I'm not a lawyer.
> Q So you don't know?
> A I don't know.
> Q Now, are you offering an opinion on -- we've talked about this a little bit more, but I just want to be clear. <u>Are you offering an opinion here on what is the proper standard for damages causation in this case?</u>
> A <u>To the extent it calls for a legal conclusion, no.</u>

Def. A.21 (Johnson Depo Tr. 101) (emphasis added).

Indeed, rather that offer legal conclusions, Mr. Johnson explained in his deposition that he is providing an analytic framework in which to evaluate Dairyland's claimed damages:

> Q Were you specifically asked to opine on the evidentiary and factual support for Dairyland's damage claim?

* * * *

> THE WITNESS: I was asked to evaluate the support for, assumptions about, and theories fundamental to the claim in all of its aspects to the extent that they were something that was within the scope of my expertise.
>
> Q Were you asked specifically to opine on whether any amount of Dairyland's damages claim was caused or not caused by the government's partial breach of contract?
>
> * * * *
>
> THE WITNESS: A part of the analysis I conducted was to consider and identify to what extent, if any, elements of the claim made by Dairyland represented costs that were incremental, that is, were related to, or wouldn't have been incurred but for the breach, and to the extent that that involves causation, I did it to that extent.

Def. A.20 (Johnson Depo. Tr. 66-67).

Simply put, Mr. Johnson is not offering any legal conclusions regarding Dairyland's claimed damages, but, rather, is providing a useful framework in which to evaluate whether Dairyland's claimed costs are incremental to DOE's delay in SNF acceptance. Courts routinely allow for expert testimony concerning whether a particular activity claimed as a damage is incremental to the breach. For example, in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), this Court considered the testimony of the Government's technical expert, Ed Abbott, concerning whether certain activities, such as plaintiff's spent fuel pool rerack, were incremental to the costs that the plaintiff allegedly incurred as a result of the Government's delay in SNF acceptance. Id. at 656-57. Further, similar to the opinions offered by Mr. Johnson in this case, in Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332 (2006), appeal pending, No. 2007-5052, -5097 (Fed.

Cir.), the Court considered the testimony of the Government's expert accountant, Stephen Kiraly, regarding whether certain claimed overhead costs by the plaintiff were incremental to the Government's delay in SNF acceptance.[9] In short, Mr. Johnson's opinions regarding the incremental nature of Dairyland's claimed damages falls squarely within the appropriate scope of expert testimony and does not intrude upon the Court's role in this case.

Rather than offer legal conclusions, Mr. Johnson, based upon his accounting experience and detailed review of Dairyland's damages claim and supporting documentation, has offered a number of specific opinions regarding the improper inclusion of certain costs in Dairyland's damages claim from a cost-accounting perspective. Indeed, contrary to Dairyland's assertion, Mr. Johnson has applied well-established cost accounting methodology and analyzed Dairyland's damages claim with a specific emphasis on fixed versus variable costs:

> Q So when I talk about damages causation, I'm referring to that issue.
>
> So going back to my previous question, outside of previous litigation experience, what kind of education, training, and experience do you have in determining damages causation?
>
> A In a matter in which the assertion of damages has to do with the measurement of a cost that an entity asserts it incurred as a consequence of an activity that is being litigated, I believe the very nature of that assertion is that it is a cost that's related to the breach activity and it wouldn't have been incurred but for the breach activity.
>
> That seems to me to be the very foundation of the nature of a claim that's focused on a cost that is being included as an element of harm as a consequence of the particular activity that's being litigated. That in my mind involves

[9] The plaintiff did not raise on appeal this aspect of the Court's opinion.

> the measurement of whether or not a cost is incremental.
>
> Where the -- the notion of it being incremental has to do with whether it is directly traceable and related to the particular activity and whether or not it varies with the level of activity, so that without the level of activity it wouldn't have been incurred and as the activity increases or decreases, the cost reacts in a similar way.
>
> Those are very fundamental cost accounting principles. Those are things that I have dealt with specifically since 1968 in looking at financial assertions involving a whole host of things.
>
> The nature of fixed versus variable cost is that academic thing that I both studied and taught. It's something that I've looked at in a variety of models of cost of doing business, of pricing of products, of assertions made by clients, in examinations of those assertions that I've made.

Def. A.19 (Johnson Depo. Tr. 62-65) (emphasis added).

Tellingly, Dairyland itself has acknowledged the validity of many of Mr. Johnson's opinions and has removed the following items from its damages claim:

- WPI's GTCC low-level radioactive waste determination work;
- WPI's radioactive materials packaging and disposal work;
- Nukem resin removal and disposal work; and
- NRC annual fees for the last quarter of 1998.

Def. A.23-24 (Dairyland letter). This recognition by Dairyland of the legitimacy of certain of Mr. Johnson's opinions undermines Dairyland's arguments concerning the exclusion of Mr. Johnson in this case.

B. Dairyland's Assertion That Mr. Johnson Has Employed An Incorrect Causation Standard Is Misplaced

In addition to claiming that Mr. Johnson is offering legal opinions, Dairyland asserts that Mr. Johnson should be excluded because he incorrectly employs a "but for" causation standard rather than the "substantial causal factor" standard in his analysis. Pl. Mot. 6-7. Dairyland mischaracterizes the proper standard for causation in this Court.

Contrary to Dairyland's suggestion, the "substantial causal factor" test for causation is no less demanding a standard than the "but for" causation test. The traditional causation standard in breach of contract cases in the Federal Circuit requires the plaintiff to prove that the claimed damage "was attributable solely to, and was therefore directly caused by, the [breach]." J.D. Hedin Constr. Co. v. United States, 456 F.2d 1315, 1330 (Ct. Cl. 1972). The "substantial factor" test, by contrast, originated in tort law to analyze concurrent cause cases. See Keeton et al., Prosser and Keeton On The Law Of Torts, 266-68 (5th ed. 1984). However, even in tort cases, the substantial factor test has not "replaced the need for each liable defendant to be a but-for and substantial contributor to the indivisible injury," Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988), and the courts have made clear that, when the claimed damages could have resulted from multiple factors, the plaintiff must establish that the "breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Productions A.G. v. Sony Music Entertainment, Inc. 215 F. Supp. 2d 336, 344 (S.D.N.Y. 2002). Indeed, the Federal Circuit requires application of both tests, even in the tort context. Shyface v. Secy of Health and Human Servs., 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, the "substantial factor" test may only be applied in place of a "but for" test if doing so would "generally yield identical results." Abbott Labs. v. Brennan, 952 F.2d 1346, 1352-53

(Fed. Cir. 1992); Columbia First Bank v. United States, 60 Fed. Cl. 97, 105 (2004) (under the substantial factor test, plaintiff required to show that the breach "directly and primarily" caused the alleged loss); Krauss v. Greenbarg, 137 F.2d 569, 572 (3d Cir. 1943) (defining substantial factor to mean the "predominating" factor). Further, rather than relaxing the burden placed upon a plaintiff, the Federal Circuit in Abbott observed that the "substantial factor" test is more rigorous than the "but for" test. Abbott, 952 F.2d at 1353. The Abbott court explained that "no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it . . ." Id. (citing Prosser & Keaton, The Law of Torts, 268).[10]

Consequently, precedent makes clear that the substantial causal factor test is no less demanding than the "but for" standard for determining causation as, even under the substantial factor test, courts require a plaintiff to show that the breach was the primary or predominant cause of the loss. Columbia First, 60 Fed. Cl. at 105 (under the substantial factor test, plaintiff required to show that the breach "directly and primarily" caused the alleged loss); Krauss, 137 F.2d at 572 (3d Cir. 1943) (defining substantial factor to mean the "predominating" factor).

---

[10] A concurrent causation issue was addressed in Krofft Entertainment, Inc. v. CBS Songs, 653 F. Supp. 1530 (S.D.N.Y. 1987). There, Krofft claimed that CBS breached a licensing agreement which caused Krofft to be unable to obtain financing to produce a Broadway play. CBS maintained that there could be no causation if it established that, even if it had not breached the license agreement, Krofft would still have been unable to obtain financing. The district court agreed. In addressing the law of causation, the district court cited C. McCormack, Handbook on the Law of Damages § 73 at 261 (1935), for the proposition that in a breach of contract case a breaching party's act or omission ordinarily can only be considered a "substantial factor" in causing the damage "where the damage would not have occurred 'but for' the alleged wrongful act or omission . . . ." Id. at 1534. Similarly, the court cited 5A Corbin on Contracts §§ 992 at 6-7, and 997 at 21 (1964) for the proposition that "[i]t must be shown that but for the breach" the damages would not have been incurred. Id. "Corbin concludes that a plaintiff cannot charge the other party with losses and disappointments that would have occurred in the absence of any breach by the other party, since such losses were 'not caused by the other party's breach of duty.'" Id. (quoting Corbin, supra, § 992 at 6).

Accordingly, there is no distinction between the substantial causal factor test and the longstanding causation principles applicable in this Court. The court in J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 456 F.2d 1315 (1972), barred a claim for borrowing costs where the plaintiff's financial trouble resulted from both the breach and other factors, because "the proof is not sufficient to show that plaintiff's financial stringency leading to the borrowing of these funds was attributable solely to, and was therefore directly caused by, the improper termination." Id. at 782, 456 F.2d at 1330. At a minimum, therefore, Dairyland is obligated to show "there were no other substantial causes" for its alleged damages. American Sci. & Eng'g, Inc. v. United States, 8 Cl. Ct. 129, 139 (1985).

Indeed, a plaintiff seeking expectancy damages, such as Dairyland in this case, bears the burden of proving, by a preponderance of the evidence, that the Government's breach caused it to incur each of the costs that it seeks. Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005); see Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). To satisfy this burden, the non-breaching party must establish that the loss is one that, "but for" the breach of contract, would not have been suffered. Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960); see San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)). To make this showing, the non-breaching party must establish the activities in which it would have had to engage, and the costs that it would have incurred, had the breaching party properly performed absent a breach, so that, by comparing those "but for" non-breach world activities and costs against those that were actually required following the breach, the court can identify those activities and costs that were

an incremental result of, or "caused" by, the breach. Bluebonnet Sav. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006); see Granite Mgt. Corp. v. United States, 74 Fed. Cl. 155, 169 (2006) (plaintiffs bear burden of propounding realistic "but for" scenario); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 430 n.25 (2000) (same); see also Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiff must demonstrate "what might have been").

Recently, in Citizens Federal Bank v. United States, 474 F.3d 1314 (Fed. Cir. 2007), this Court stated that "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion" and that, depending upon the circumstances, the trial court may utilize the "substantial factor" causation test rather than the "but for" test. Id. at 1318-19. Yet, even under the "substantial factor" test, the plaintiff cannot avoid its obligation to establish that, absent DOE's delay, it would not have incurred the costs that it is seeking. A plaintiff attempting to establish that a breach was a "substantial factor" in causing its damages must establish that the claimed damages were "primarily the result of the breach," WestFed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 160 (2002), and that the alleged breach was the predominating or primary factor that led to the claimed damages. Krauss v. Greenbarg, 137 F.2d 569, 572 (3d Cir. 1943); Shyface v. Secretary of Health & Human Servs., 165 F.3d 1344, 1353 (Fed. Cir. 1999); see Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 105 (2004) ("Plaintiff must prove that the changes . . . that were imposed by the breaching provisions of FIRREA were a substantial factor causing the alleged loss, that is, that the breaching provisions directly and primarily caused the lost profits damages it seeks."); Restatement (Third) of Torts (Proposed Final Draft) § 26 cmt. j (2006) (in applying substantial

factor test, "[t]he [causation] element that must be established by whatever standard of proof is the but-for or necessary-condition standard of this Section.").[11]

Accordingly, Dairyland's assertion that Mr. Johnson should be excluded because he employs an incorrect causation standard is incorrect. Rather, Mr. Johnson appropriately evaluated whether the costs that Dairyland has claimed as damages would have been incurred regardless of DOE's delay in acceptance and opined that, where such a circumstance occurred, these costs should not properly be claimed as damages. Mr. Johnson's analysis is entirely consistent with the precedent applicable to this Court, and Dairyland's motion to exclude Mr. Johnson on this basis should be rejected.

Finally, Dairyland's own expert, Todd Smith, has purportedly engaged in precisely the same causation analysis regarding the costs of removing the reactor pressure vessel ("RPV").[12] In Mr. Smith's report, he states: "I have been asked to prepare this report to describe what would have been a reasonable cost to perform the removal of [Dairyland's RPV] assuming the United States government had accepted spent nuclear fuel and high level radioactive waste (spent fuel) under the terms of its 1983 contract with [Dairyland]." Def. A.26. In reaching his conclusions in this case, Mr. Smith calculates the costs that Dairyland actually incurred to remove the RPV (what he refers to as the "breach scenario") and compares those costs against an estimate of the hypothetical cost to remove the RPV had DOE performed beginning in 1998

---

[11] The issue of whether the "substantial causal factor" causation standard is less demanding than the "but for" causation standard is currently on appeal to the Federal Circuit in the SMUD case. That case, along with PG&E and the three Yankee cases, has been fully briefed, and oral arguments were held on February 4, 2008.

[12] As we will demonstrate at trial, although Mr. Smith purportedly applied this causation analysis, there are significant errors in Mr. Smith's analysis.

(what he terms the "non-breach scenario"). Def. A.26. Mr. Smith refers to the difference between these two scenarios as the "marginal cost" to Dairyland. Def. A.26. In short, Mr. Smith's opinion as to the "marginal" costs of the RPV removal is simply an application of the requirement that, regardless of the name assigned to a causation analysis, any analysis must evaluate whether, "but for" the breach, the costs being sought would have been incurred. Dairyland's position – that it is appropriate for its expert to offer opinions as to incremental costs, but inappropriate for the Government's expert to offer opinions as to non-incremental costs – is both unprincipled and unsupported.

### C. Mr. Johnson's Opinions Concerning The Non-Incremental Nature Of Dairyland's Claim For Overhead And "Baseline" Charges Are Appropriate

#### 1. Mr. Johnson Has Employed His Specialized Knowledge, Employed A Proper Damages Methodology, And Considered Sufficient Facts And Data

Despite Dairyland's vague challenge to Mr. Johnson's opinions regarding Mr. Wilkins's calculation of indirect overhead and G&A rates, it is plain from the face of Mr. Johnson's report that he has specialized cost-accounting knowledge, has applied a well-recognized methodology, and has considered substantial facts and data in this case. As Mr. Johnson explained in his report, "an evaluation of the underlying activities and associated underlying costs must be performed to determine if those underlying costs are incremental to the breach. If an expenditure associated with the underlying cost pool is not affected by the breach, then those costs would have been incurred by Dairyland regardless of the breach and therefore are not appropriately includable as damages." A.9. As discussed above, Mr. Johnson opined that, because Mr. Wilkins failed to conduct this analysis in his evaluation of indirect overhead and G&A costs, Mr. Wilkins' opinions are nothing more than "a cost accounting model which allocates all costs

among all of Dairyland's business units without regard to whether they would have been incurred in a non-breach world." A.9. Notably, Mr. Johnson went one step further in his analysis. He actually considered certain of the underlying cost centers that Mr. Wilkins allocated to consider whether these cost centers would have incurred the same costs regardless of DOE's delay. A.9-11. Based upon the testimony of certain Dairyland employees as well as documentation concerning the cost centers, Mr. Johnson employed his cost-accounting methodology and concluded that either the costs would have been borne in both the breach and non-breach worlds or Dairyland failed to demonstrate that these costs would have been different. A.9-11. Accordingly, Mr. Johnson's opinions in this case fall squarely within the confines of Rule 702, and the Court should reject Dairyland's motion to exclude these opinions.

2. Dairyland's Characterization Of Other Opinions From This Court Are Incorrect

Dairyland, referring to several SNF cases from this Court, suggests that Mr. Johnson's opinions regarding overhead costs have previously been rejected. Pl. Mot. 7-8 (citing Southern Nuclear Operating Co. v. United States, 77 Fed. Cl. 396 (2007), appeal pending, No. 2008-5020 (Fed. Cir.); Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending, No. 2007-5076 (Fed. Cir.);[13] Sacramento Mun. Util. District v. United States, 70 Fed. Cl. 332, 376-77 (2006)). However, upon even cursory review, it is evident that Dairyland has misconstrued these cases.

For example, Dairyland claims that the Court rejected Mr. Johnson's opinions regarding the non-incremental nature of overhead costs in Southern Nuclear. Although Mr. Johnson

[13] Notably, in PG&E, plaintiff filed a substantially similar motion seeking to exclude Mr. Johnson's opinions. The Court denied plaintiff's motion. See PG&E, 73 Fed. Cl. at 437.

offered opinions concerning, among other things, non-incremental overheads in that case, the Court did not address those opinions in its published decision and, instead, addressed Mr. Johnson's opinions regarding internal labor. See Southern Nuclear, 77 Fed. Cl. at 441-42. In fact, Dairyland's citation to SMUD is particularly puzzling given that, in that case, the Court held that, although the plaintiff may have demonstrated that it incurred overhead costs, the plaintiff "failed to meet the burden of demonstrating that such costs, in fact, were incremental." SMUD, 70 Fed. Cl. at 376-77. In fact, in SMUD, the Court accepted both the Government's expert's opinions regarding both non-incremental overhead and non-incremental internal labor. Id. at 375-77; see System Fuels, Inc. v. United States, 78 Fed. Cl. 769, 798-800 (2007) (rejecting claim for overhead pools where plaintiffs failed to meet burden of demonstrating that these same costs would not have been incurred in the absence of DOE's delay).

The Court's decision in PG&E is illustrative of the analysis required of a plaintiff to establish entitlement to overhead, which Dairyland's expert witness, Mr. Wilkins, failed to conduct in this case. In PG&E, the plaintiff presented the testimony of an expert, Brad Cornell, to opine upon the incremental overhead costs associated with the Government's partial breach of the Standard Contract. 73 Fed. Cl. at 407-08. Specifically, Professor Cornell analyzed the cost schedules prepared by one of the plaintiff's fact witnesses, Robert Kapus, and "used categories, numbered 1 through 5, to separate costs in Mr. Kapus' cost schedules that he deemed to be marginal to, or caused by, defendant's breach of the Standard Contract (categories 1-3), from those costs he deemed to be unrelated, or not caused by, defendant's breach (categories 4 and 5)." Id. The Court concluded that Professor Cornell's methodology for calculating damages was reliable and reasonably accurate in approximating the plaintiff's alleged damages. Id. at 409. In

contrast to Professor Cornell's methodology in PG&E, Mr. Wilkins simply presumes, without any analysis, that all claimed overhead is incremental and, therefore, recoverable as a damage.[14] Mr. Johnson's expert testimony regarding Dairyland's incremental costs addresses a significant void in Dairyland's case and ultimately quantifies and monetizes the costs that must be removed from Dairyland's damage claims as a result of such an analysis.

3. Mr. Johnson's Opinions Regarding "Baseline" Charges Are Appropriate

In addition to Dairyland's claim regarding Mr. Johnson's opinion concerning overhead allocations, Dairyland also contends that Mr. Johnson's opinion concerning certain labor charges to the "Baseline" account lacks any "specialized knowledge" and that Mr. Johnson's opinions concerning internal labor have been rejected by the Court. Pl. Mot. 7, 12. Dairyland has misconstrued the nature of Mr. Johnson's opinion and the holdings of the Court on this issue.

As discussed above, Dairyland utilizes activity codes in its cost accounting system to associate costs with a particular scope of work. A.11. Dairyland has claimed certain internal labor costs that were charged to the "Baseline" activity code as damages. A.11. Mr. Johnson opined that Dairyland has failed to demonstrate that these labor costs are incremental to DOE's

---

[14] In Northern States Power Co. v. United States, 78 Fed. Cl. 449 (2007), appeal pending, No. 2008-5037, -5041 (Fed. Cir.), the Government made a similar challenge to certain aspects of plaintiff's claimed internal labor and overhead costs. Id. at 468. In the Court's opinion rejecting the Government's arguments, the Court appeared to have focus upon the Government's arguments regarding internal labor, without any specific discussion concerning overhead. Id. The Government subsequently moved for reconsideration regarding, among other issues, the Court's failure to specifically address overheads. In its order denying reconsideration, the Court held that, once it found that the dry storage facility constructed by the plaintiff was caused by DOE's delay in SNF acceptance, the inquiry then turned on whether the claimed overhead was reasonable. Northern States Power Co. v. United States, 79 Fed. Cl. 748, 749-50 (2007). With all due respect, the Court's decision in Northern States is in conflict with the precedent binding upon this Court, which requires a plaintiff to demonstrate that the costs it has incurred are incremental to the alleged breach.

partial breach because "Dairyland's accounting records indicate that the Baseline activity code is comprised of $1,805,834 of internal labor charges for which no description of the specific activity has been provided." A.11. Applying his expertise in cost accounting, Mr. Johnson reviewed Dairyland's documents and the testimony of Dairyland's employees, which reflect that certain costs charged to the "Baseline" activity code actually relate to decommissioning activities or are otherwise unrelated to LACBWR and the storage of spent fuel. A.11-12. Based upon his analysis, Mr. Johnson opined that, because Dairyland failed to demonstrate that these same "Baseline" costs would not have been incurred in the absence of DOE's partial breach, there has been no demonstration of increased cost to Dairyland associated with these charges. A.11-12.

Mr. Johnson's challenge to the lack of support or detail for labor charges has been accepted by this Court in other SNF cases. See Tennessee Valley Authority v. United States, 69 Fed. Cl. 515, 540 (2006) (rejecting plaintiff's claim for certain internal labor charges where "proofs respecting its internal charge-backs for salaried staff . . . leave much to be desired," because "TVA did not provide detailed hours and amounts per employee in its ledger reports," and did "not indicate the actual services provided by most of the pertinent salaried staff at the two facilities, nor does the evidence disclose the extent to which most of the employees were committed to the dry storage projects."); see also SMUD, 70 Fed. Cl. at 375-76 (rejecting a portion of plaintiff's claimed internal labor because the evidence reflected that plaintiff was engaged in decommissioning activities rather than SNF activities). As in TVA, Mr. Johnson's opinion is that Dairyland failed to provide any description as to the activities performed by employees that were charged to the "Baseline" activity code and, given that the code is designed

to capture decommissioning-related costs and was also used for work that was unrelated to LACBWR, Dairyland has not demonstrated that these costs are incremental to DOE's delay in SNF acceptance. Mr. Johnson's opinion is based upon his analysis of the facts and data in this case, and his opinion is consistent with the standard for the recovery of internal labor costs articulated by this Court. Accordingly, Dairyland's challenge to this aspect of Mr. Johnson's opinions should be rejected.

## D. Dairyland's Challenge To Mr. Johnson's Opinions Concerning The Reasonableness Of Certain Costs Lacks Merit

### 1. Mr. Johnson's Critique Of Mr. Smith's Opinions Constitutes Proper Expert Testimony

In its motion, Dairyland claims that Mr. Johnson's opinions concerning the reasonableness of certain claimed costs should be excluded for four reasons: (1) his opinions are based, in part, upon the opinions of Mr. Brewer; (2) he has subtracted certain costs based upon the instruction of counsel; (3) his opinions intrude upon the exclusive role of the Court to weigh evidence; and (4) he provides no "reason, principle, or method to support his conclusion." Pl. Br. 14. Specifically, Dairyland challenges Mr. Johnson's opinions concerning the reasonableness of Mr. Smith's estimate for the RPV removal project and his opinions concerning the reasonableness of certain lobbying charges included in the damages claim. Pl. Mot. 14-20. As discussed below, each of these criticisms is misplaced.

First, with respect to Mr. Johnson's critique of Mr. Smith's RPV removal estimate, Dairyland claims that Mr. Johnson does not offer any independent expert opinion, but, rather, refers to the testimony of fact witnesses, Mr. Smith, and Mr. Brewer to reach his conclusions. Pl. Mot. 15. Indeed, Dairyland goes so far as to state that Mr. Johnson's opinions regarding the

RPV removal are "repetitive" of the critiques offered by Mr. Brewer in his report. Pl. Mot. 3-4. Dairyland has mischaracterized the nature of Mr. Johnson's methodology and analysis in this case.

Mr. Johnson applies the same methodology that he applied in connection with his incremental cost opinions – namely, that to properly be considered as a damage, there must be a demonstration of an increased cost in the actual world that would not have been incurred had the breaching party timely performed. A.17-18. Indeed, one of the primary opinions that Mr. Johnson offers regarding Mr. Smith's estimate is that, based upon Mr. Johnson's analytical framework, Mr. Smith's "calculations, estimates and results provide no basis and are unreliable for use with respect to the measurement of damages." A.18. To reach this conclusion, Mr. Johnson applies his analytical framework to the facts and data of this case, including, among other things, the testimony of fact witnesses and the opinions of the Government's technical expert, Mr. Brewer, as well as the testimony by Mr. Smith. A.17-23. As with Mr. Johnson's opinions concerning the non-incremental nature of Dairyland's claimed overhead, Dairyland's real criticism concerning Mr. Johnson's critique of Mr. Smith appears to be that Mr. Johnson focused upon too much information in reaching his opinions. We are not aware of any support for the proposition that an expert's consideration of testimony from fact and expert witnesses in forming his opinions is a basis for exclusion. In short, Dairyland fails to identify any aspect of this analysis that Mr. Johnson performed which fails to satisfy the requirements of FRE 702.[15]

---

[15] Dairyland's claim that Mr. Johnson's critique of Mr. Smith's RPV removal estimate is "repetitive" of the critique offered by Mr. Brewer is entirely misplaced. Although both Mr. Johnson and Mr. Brewer identify certain fundamental deficiencies in Mr. Smith's analysis, the approach that each takes differs substantially. Mr. Brewer's analysis focuses on specific technical deficiencies in Mr. Smith's analysis – deficiencies upon which Mr. Brewer is well-

Dairyland claims that Mr. Johnson's critique of Mr. Smith's estimate is "nothing more than possible cross-examination questions for Mr. Smith." Pl. Br. 16. Regardless of whether the Government could question Mr. Smith on the significant deficiencies in his report, Mr. Johnson has considered the facts and data associated with Mr. Smith's estimate, including the opinions of Mr. Brewer, and applied a proper damages methodology in considering whether Mr. Smith's estimate produces accurate results. Indeed, Dairyland does not seriously dispute that Mr. Johnson's critique of Mr. Smith's analysis is proper expert testimony. Rather, it appears to assert that there is a factual basis for Mr. Smith's opinion. Pl. Mot. 17-18. Indeed, to the extent that it is correct, a contention with which the Government disagrees, Dairyland has every opportunity to cross-examine Mr. Johnson on those issues at trial.

2. <u>Mr. Johnson's Opinions Regarding Lobbying Costs Are Appropriate</u>

Dairyland also challenges Mr. Johnson's opinions concerning certain lobbying costs that Dairyland included in its damages claim. Specifically, Mr. Johnson opined that the inclusion of two sets of lobbying costs – costs associated with Government Strategies Incorporated and Lake Barrett – are not reasonable for the inclusion as a damage because these costs are not necessary to the storage of SNF. A.24. Dairyland asserts that Mr. Johnson has not employed any "specialized knowledge" regarding this opinion and that Mr. Johnson did not consider Mr. Barrett's testimony in reaching his conclusions. Pl. Mot. 20.

---

situated to comment given his years of experience working in the nuclear power industry. By contract, Mr. Johnson's critiques focus on the failure to provide a suitable framework by which to analyze economic damages. Accordingly, although both Mr. Johnson and Mr. Brewer discuss the same issue – namely, the deficiencies in Mr. Smith's opinions – they are not "repetitive," as Dairyland asserts.

As with the other categories that he questioned, Mr. Johnson provides an analytic framework in which the Court may consider whether these costs are appropriately claimed as damages. This analysis is particularly helpful in this case because, despite squarely having the burden of proof, the plaintiff failed to provide any analysis as to the costs that it would have borne had DOE performed. Accordingly, Mr. Johnson, employing his substantial experience and expertise in evaluating damages claims, provides a useful context through which the Court can evaluate whether these discrete costs should be recoverable against the Government. Further, to the extent that Dairyland believes that Mr. Johnson failed to consider certain facts or data, that criticism goes to the ultimate weight that the Court may afford Mr. Johnson's opinions and does not serve as a basis to exclude his testimony at trial.

### E. Mr. Johnson's Expert Testimony Does Not Intrude On The Province Of The Court And Provides The Court With Useful And Relevant Opinions Based Upon His Extensive Professional Experience

Mr. Johnson's expert testimony is not objectionable simply because it addresses or analyzes an ultimate issue to be decided by the fact-finder. Dairyland's contention that Mr. Johnson is invading the province of the Court – by assessing the evidence to conclude that certain of Dairyland's claimed costs are not incremental, erroneously asserted, or not supported - is without merit. Pl. Mot. 9. Mr. Johnson offered a number of opinions that required him to review and analyze cost data and documentation, as well as the deposition testimony of Dairyland employees. Indeed, rather than "weigh" evidence or rely upon Dairyland's witnesses as a basis for questioning certain costs, as Dairyland claims, Mr. Johnson has simply considered the undisputed testimony provided by Dairyland's employees to obtain a factual understanding

as to the nature of certain cost categories, a methodology entirely consistent with the requirement that an expert rely upon sufficient "facts and data" pursuant to FRE 702.

For example, to determine whether certain costs are fixed from a cost accounting perspective, Mr. Johnson had to understand the specific nature of these costs. Accordingly, Mr. Johnson considered the testimony of, among others, Dairyland employees Mr. Stubbendick, Mr. Christians, Mr. Sans Crainte, and Mr. Brasel to obtain an understanding of the specific activities underlying the various work orders and invoices in this case. Indeed, had Mr. Johnson not considered this testimony, we fully expect that Dairyland would have moved to exclude Mr. Johnson for failing to consider sufficient facts and data.

Pursuant to Federal Rule of Evidence 704, expert testimony is not objectionable simply because it embraces an ultimate issue to be decided by the fact-finder. See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988) (recognizing that Federal Rules of Evidence 702 through 705 "permit experts to testify in the form of an opinion, and without any exclusion of opinions on 'ultimate issues'"); United States v. Urbina, 431 F.3d 305, 311 (8th Cir. 2006) (affirming admission of expert testimony concerning *modus operandi* of drug traffickers because "a court can allow opinion testimony if the expert's specialized knowledge is helpful to the [fact-finder] to understand the evidence or determine a fact in issue, even if the opinion embraces an ultimate issue to be decided by the [fact-finder]"); Forrest v. Beloit Corp., 424 F.3d 344, 353 (3d Cir. 2005) (affirming expert testimony from biomechanical engineer that presence of a guard would have prevented plaintiff's injury, because expert may offer testimony concerning ultimate issue in case). Further, in the SNF context, this Court has considered the testimony of experts who base their opinions upon the testimony of fact witnesses. See System Fuels, Inc. v. United

States, 79 Fed. Cl. 37, 68-69 (2007) (allowing testimony of expert witness who relied upon deposition testimony of fact witness in offering opinions concerning tax-related damages).

Interestingly, the one case that Dairyland cites to support its assertion that Mr. Johnson "intrudes on the sole province of the Court," Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844 (1982), does not even address expert witness testimony. Although the case addresses the general proposition that "[d]etermining the weight and credibility of the evidence is the special province of the trier of fact," Id. at 856, it provides absolutely no guidance on how or under what circumstances expert testimony would violate the special province of the trier of fact.[16]

Ultimately, the Court will decide whether Dairyland met its burden of proof to establish that all the costs claimed as damages are incremental to the breach. Mr. Johnson's expert testimony, contrary to the plaintiff's assertion, does not invade the province of the Court, and his specialized knowledge of accounting and damages will provide great assistance to the Court through his analysis of the plaintiff's evidence.

F. Mr. Johnson Properly Monetized and Deducted Costs From Dairyland's Damages Claim Based Upon the Expert Opinions Offered By The Government's Expert Witness, Mr. Brewer, And Instructions From Counsel

Finally, Dairyland accuses Mr. Johnson of simply "parroting" the expert opinions of Mr. Brewer, and instructions from Government counsel, and then deducting the costs for certain non-

[16] In Inwood Laboratories, a court of appeals had reversed a district court's ruling, holding that the trial court failed to given sufficient weight to certain evidence offered by a plaintiff. The Supreme Court concluded that, "[b]y rejecting the District Court's findings simply because it would have given more weight to evidence of mislabeling than did the trial court, the Court of Appeals erred. Determining the weight and credibility of the evidence is the special province of the court." Inwood Labs., 456 U.S. at 856.

incremental and unsupported activities identified by the experts and counsel. Pl. Mot. 13-20. Dairyland asserts that Mr. Johnson fails to bring any "specialized knowledge" to his analysis and concludes that "it does not qualify as expert testimony." Pl. Mot. 17. Dairyland's characterization of Mr. Johnson's expert testimony is incorrect.

As explained above, Mr. Johnson's expert testimony is based upon his specialized knowledge of accounting and damages issues developed over almost four decades of practice. The Court's inquiry should focus upon the question of whether Mr. Johnson's specialized knowledge will help the Court to understand the evidence, including whether certain costs are incremental or not incremental to the breach, and the quantification or monetization of such costs. Although certain individual steps undertaken by Mr. Johnson as part of his work in this case involve the basic deduction of certain costs in Dairyland's damages claim, Mr. Johnson's expert testimony provides a valuable and reliable addition to this case by providing the Court with a roll-up or aggregation of Dairyland's damages claim and the deductions to that claim asserted by the Government. Mr. Johnson's application of the opinions of other expert witnesses provides the Court with a reliable and comprehensive assessment of the detailed elements of Dairyland's damages claim that will be missing from Dairyland's case-in-chief.

For example, with respect to his reliance upon Mr. Brewer, Mr. Johnson reviewed the scope of work for WPI's efforts concerning SNF characterization, which involved WPI's review of "all currently available records and documentation for each LACBWR spent fuel assembly to assess its condition and, if necessary, developing a program for additional characterization." A.14. Based upon Mr. Brewer's specialized technical knowledge, Mr. Brewer concluded that this activity would have been necessary regardless of when DOE accepted SNF at Dairyland.

A.14. Accordingly, based upon Mr. Johnson's understanding of the scope of WPI's work, and his understanding from Mr. Brewer that this same activity would have been required regardless of the timing of DOE's performance, Mr. Johnson identified and excluded this cost from Dairyland's claimed damages as being inconsistent with the methodological framework for evaluating damages that Mr. Johnson employed in this case. In short, just as it is appropriate for Mr. Johnson to rely upon facts and data in the form of testimony from Dairyland fact witnesses, it is equally appropriate for Mr. Johnson to rely upon the specialized, technical knowledge from Mr. Brewer in reaching his opinions in this case.

Further, Mr. Johnson also properly applied instructions from Government counsel, for purposes of his damages analysis, that certain activities and costs should be identified and deducted from Dairyland's damages claim. Specifically, Mr. Johnson is relying upon instruction from counsel for the exclusion of costs associated with the investment in PFS and to run two alternative SNF acceptance scenarios.

Although failing to cite any legal authority for its criticism, Dairyland claims that "at no point does Mr. Johnson offer any opinion, let alone one based on 'specialized knowledge.'" Pl. Mot. 18. As described in detail above, Mr. Johnson's extensive experience in accounting and damages analysis will assist the trier of fact to understand the evidence and determine the facts at issue. Mr. Johnson's expert testimony and opinions regarding the monetization of certain deductions, even when taken at the direction of counsel, provide the Court with a helpful, relevant, and comprehensive assessment of Dairyland's damages claim.

For example, Mr. Johnson was instructed by counsel to assume two alternate SNF acceptance scenarios for Dairyland. The first scenario assumed that an exchange of acceptance

allocations was not possible, despite the plaintiff's assertion that Dairyland would have engaged in such an exchange at some market price. A.25. As a result of this instruction, and contrary to the plaintiff's litigation position, LACBWR would not have been able to remove all of it spent nuclear fuel in 1998. As a result, Dairyland would have incurred all costs for SAFSTOR at its LACBWR facility through the year 2005 even had DOE performed (assuming Dairyland's asserted annual rate of acceptance). Based upon counsel's instruction, Mr. Johnson reviewed the relevant cost data and supporting documentation produced by the plaintiff, as well as the opinion of Mr. Brewer that the cost for SNF pool maintenance does not depend upon the number of assemblies contained in the pool, and adjusted plaintiff's claimed damages accordingly after identifying the costs allocated to that effort.

The second scenario that counsel instructed Mr. Johnson to model assumed that DOE accepted the last of Dairyland's SNF after 2008 even had DOE begun performance beginning on an industry-wide basis in 1998, a scenario consistent with the Government's posited acceptance rate and the undisputed fact that Dairyland possesses grossly failed SNF.[17] As with the first alternative scenario, Mr. Johnson evaluated the relevant cost data and supporting documentation,

---

[17] In its motion, Dairyland contends that the Government's instruction regarding failed fuel has no evidentiary basis because it is contrary to one of the Government's response to Dairyland's contention interrogatories and, in any event, will be contradicted at trial by the testimony of Dairyland's expert witness, Ivan Stuart. Pl. Mot. 21, n.6. First, there is no dispute that Dairyland possesses grossly failed fuel that requires "special handling," as that term is used in the Standard Contract. Simply put, because it is Dairyland's burden to show that the required special handling would not result in the placement of its SNF in the back of the SNF queue, there is nothing inconsistent with the Government's instruction to Mr. Johnson and the Government's response to Dairyland's interrogatory. Second, the Government has moved to exclude the testimony of Mr. Stuart in this case. To the extent that Dairyland relies upon Mr. Stuart to establish how DOE would have handled Dairyland's SNF, and Mr. Stuart is excluded in this case, there is no basis upon which to determine when Dairyland's SNF would have been accepted had DOE timely begun SNF acceptance from nuclear utility contract holders.

as well as Mr. Brewer's opinions, and concluded that, under this scenario, Dairyland suffered no damages.

Mr. Johnson's opinions modeling different acceptance scenarios is directly relevant to the critical issue in this case – the proper quantum of damages based upon the Government's contractually-obligated acceptance schedule. Notably, Dairyland failed to undertake such an analysis. Mr. Johnson's expert testimony on this and other similar matters will provide helpful and relevant testimony to the Court. Mr. Johnson's testimony will provide the Court with a comprehensive assessment of Dairyland's damages claim and the Government's proposed deductions from that claim.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny Dairyland's motion *in limine* to exclude the expert testimony of Mr. Johnson.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell A. Shultis
RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

May 15, 2008

Attorneys for Defendant