# APPENDIX

**Carolina Power & Light Company & FL Power v US No. 04-37C November 15, 2007**

**Heritage Reporting Corporation**

**Page 1929 to Page 2059**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1941

in the Yankee cases, as well as in Southern Nuclear and Northern States.

Q. Has your litigation experience been limited to a specific industry?

A. No. I would say that it's involved a variety of financial service providers, such as banks, thrifts and insurance companies. It's involved high technology companies, it's involved real estate type enterprises. The expertise that I bring is accounting, cost accounting, financial measurements, auditing and damages type things, which would not be typically industry-specific, but topically specific. And that's the subject matter typically of my testimony.

Q. Have you ever visited a nuclear utility?

A. I have not.

Q. And do you believe the fact that you've never visited a nuclear utility affects your ability to assess damages in this case?

A. I do not.

Q. And why not?

A. Well, as I just said, my area of expertise involves accounting measurements,

Page 1942

cost accounting, auditing principles and practices, damages measurements. And in my opinion, it's clear that I'm able to apply that expertise to evaluating the damages claim that's been made by the Plaintiffs here. To the extent that that evaluation has implicated knowledge specifically of the technical requirements of the storage or removal of spent fuel, I have considered the opinions of Mr. Maret and I sat through his testimony as well yesterday. So as regards technical matters, I have used his opinions and I have attached the financial consequences to his technical opinions about circumstances that would exist in the but-for world as contrasted with the actual world.

Q. Are you a member of any professional associations?

A. Yes. The – kind of the association of the accounting profession is the American Institute of Certified Public Accountants. I'm not only a member, but for a substantial period of time was asked to, and did, serve in a variety of standard setting roles within that organization, probably the principal one of

Page 1943

which was at the committee of that organization which is known as the accounting standards executive committee, which is kind of the overall accounting standards setting committee within the accounting profession. 15 people are asked to serve on that committee, and I was one of those people.

Q. Mr. Johnson, why have you been retained by the government in this case?

A. I was retained, I think – specifically, Veris Consulting was retained, and I was the one who issued the expert report on the matter. But specifically, it was – the retention was to obtain information about the elements of the claim being made by the Plaintiff in this matter, to look at information and evidence supporting that claim, and to conduct my own independent evaluation of whether or not I believed the costs being asserted by the Plaintiff were costs that were consistent with what my view of what damages ought to be. And if they were not, to so report, which is what I've done.

Q. And did Veris Consulting conduct an audit in this case?

Page 1944

A. I don't know that I would characterize it as an audit per se, because an audit might have some connotations and some standards that are specifically attached to it. It was certainly similar to, in that it looked at the assertions being made by the Plaintiff, the financial assertions about the extent of the harm that was asserted to be caused by the partial breach. And we looked for evidential support and we looked for the underlying foundation for those assertions. And by doing so, we looked at documents and a variety of other material, and that is similar to an audit. And ultimately, I formed an opinion about those assertions and I've expressed that opinion in deposition and trial – excuse me, and in my report.

Q. And are you being compensated for your work?

A. Veris Consulting is. I'm an employee of Veris Consulting, but Veris Consulting is being compensated.

MS. DONAHUE: Your Honor, at this time, I would move to have Mr. Johnson



Def. A. 2

Page 1945

qualified as an expert witness in the areas of financial analysis, cost accounting, auditing, and analysis of economic damages.

THE COURT: All right. Any voir dire, Mr. Fagg?

MR. FAGG: Mr. Kerr will be conducting it.

THE COURT: Mr. Kerr.

MR. KERR: A few quick questions, Your Honor.

THE COURT: Sure.

VOIR DIRE EXAMINATION

BY MR. KERR:

Q. Good morning, Mr. Johnson.

A. Good morning.

Q. You have no expertise in the operation of a nuclear power plant; is that correct?

A. I have no particular expertise. I've obviously read a lot of information, but I do not hold myself out to be expert in the operation of a nuclear power plant.

Q. And you have no expertise about the storage of spent fuel, correct?

A. That would be a similar response. I've obviously read information, but I do not

Page 1946

possess expertise in that.

Q. And you have no expertise about Boraflex degradation?

A. No, sir, I do not. I've listened to testimony and read information, but I'm certainly not an expert in Boraflex degradation.

Q. And you have no expertise about CRUD cleanup in spent fuel pools?

A. Similar response.

Q. And no expertise about loading spent fuel casks?

A. I have no technical expertise with respect to loading of spent fuel casks.

Q. And you have no expertise about FERC regulations; is that correct?

A. That would also be correct.

Q. Okay.

MR. KERR: Thank you. Your Honor, we have no objection to admitting Mr. Johnson as an expert for the financial accounting and cost accounting.

THE COURT: All right. Very well, you may proceed, Ms. Donahue.

MS. DONAHUE: Thank you, Your Honor.

Page 1947

DIRECT EXAMINATION (Continued)

MS. DONAHUE: Your Honor, I probably should have done this earlier. The other thing I would move to do is to move Mr. Johnson's expert report and the supplement to his report, which are found at Defendant's Exhibits 308 and 311 into evidence.

THE COURT: All right. Any objection?

MR. KERR: Your Honor, we object on the basis of hearsay.

THE COURT: I understand and technically you are correct, but I will admit the documents into evidence. And certainly you may cross-examine the witness about anything that appears in those reports.

(Defendant's Exhibit Numbers DX-308 and DX-311 were received in evidence.)

MR. KERR: Thank you, Your Honor.

MS. DONAHUE: And similarly, Your Honor, I know that we're not putting demonstratives into evidence, but I would offer Defendant's Demonstrative Number 5.

THE COURT: I'll accept them as demonstrative evidence.

(Defendant's Exhibit Number DX-D5 was

Page 1948

received in evidence.)

MS. DONAHUE: Thank you.

BY MS. DONAHUE:

Q. Mr. Johnson, are you familiar with Progress Energy and the nuclear units in question in this litigation?

A. Yes, as it relates to the claim that's been asserted, I'm familiar with that claim, and the elements of it, which are comprised of the operations of Carolina Power, which are conducted through three nuclear plants, Harris, Robinson and Brunswick, as well as Florida Power, which is conducted through Crystal River.

Q. Can you please describe the manner in which you believe damages should be calculated in this case?

A. Yes. I think that I alluded to previously in the general discussion about damages, the notion of but-for worlds. I think as this demonstrative shows, I believe that the proper measurement of damages is to compare what has actually occurred – and in this demonstrative, I would label that actual costs – to what would have occurred in the but-for

**Northern States Power Company v. U.S No. 98-484C November 21, 2006**

**Heritage Reporting Corporation**

**Page 4691 to Page 4871**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 4863

analysis and damage measurement experiences I've had, and it's on those bases that I've developed the opinions that I have in this case.

Q. Have you ever visited a nuclear utility?

A. I have not.

Q. And does that in any way affect your ability to assess damages in these cases?

A. No, for the reasons I just described having to do with other experiences, I do not believe it does.

Q. Mr. Johnson, are you a member of any professional associations?

A. Yes. The profession of the CPAs in this country is largely administered and standards set through an organization known as the American Institute of CPAs. I've been both a member of that, but during -- for a substantial period of time, primarily throughout the 1990s, I was involved in the standard setting role for the accounting profession.

The accounting rules in this country prior at least to Sarbanes-Oxley legislation,

Page 4864

were largely developed by the private sector through the AICPA, and the AICPA did that through committees, the highest authority being something that was known as the accounting standards executive committee. That committee is kind of the umbrella that looks at all the accounting done by all U.S. enterprises and, after research and study and some type of public discourse, would issue pronouncements on proper accounting, about costs or about particular industries or in respect of issues that emerge as the world changed.

I was a member of that committee for three years. That committee was active, met two or three days a month, each month, issued several statements of position over that period of time dealing with a variety of cost accounting measurements. One of the things that I think that the accounting profession has always sought to do is to make sure, when there was a rule being established, that enterprises could follow it.

So that when there is an accounting rule that says, you can only capitalize a cost that is an incremental cost, as an example,

Page 4865

there was analysis of whether or not preparers, companies that were faced with that requirement, could actually measure incremental, in the way I believe it's been used in this court.

And so I think that not only have I an experience in developing an idea of what is incremental, but also how to measure that, because, as I said, I think it is important that a business be able to measure whether something is incremental or not, and I know there was, as I sat here this morning, there was testimony about whether or not it was possible to measure what a cost would have looked like.

That is an issue and a question that I dealt with for a substantial period of time as a standards setter, and the answer was, at all times, yes, it was. And in fact, there are a number of accounting pronouncements that require that precise type of analysis that a cost both be related to an activity and be something that wouldn't have occurred, but for that activity.

And in order for a preparer to prepare

Page 4866

a financial statement, they've got to go through that process, and they can't simply say, it's hard, or I don't know how to do it.

So I draw on those experiences as well in forming the opinions that I've developed in this matter.

MS. HERRMANN: Your Honor, at this time, the government moves to have Mr. Johnson qualified as an expert witness in the areas of financial analysis, cost accounting, auditing and analysis of economic damages.

THE COURT: Mr. Tomaszczuk, would you like voir dire of this gentleman?

MR. TOMASZCZUK: Could I just ask counsel to repeat the last category for which Mr. Johnson is being qualified, financial analysis, cost accounting and?

MS. HERRMANN: Auditing and analysis of economic damages.

MR. TOMASZCZUK: No voir dire at this time, Your Honor. We'll reserve for cross.

THE COURT: Very well. Thank you very much. Mr. Johnson, we're going to see you again next week sometime.

THE WITNESS: Yes, yes, Your Honor.

Page 4859

worked on other cases involving nuclear utilities, right?

A. Yes, I have.

Q. In which cases would that be in?

A. Southern Nuclear would be the most recent one in which I testified in this court. In addition to that, I also testified in the litigation involving three of the so-called Yankee companies, which would be Maine Yankee, Connecticut Yankee, and Yankee Atomic. I also provided an expert report and deposition testimony in the PG&E litigation, but I did not testify in the trial of that matter.

Q. Could you give the Court an idea of your role in those matters?

A. Yes. I think it would be similar to what I've done in this particular matter, which is to look at the Plaintiff's assertions about damages and look at them in the context of whether or not they were, "they" being the assertions of damages, were consistent with what I believe a proper measurement of damages would be. It would focus on whether or not the costs are being asserted as damages are incremental.

Page 4860

And by that, I mean that it's a cost that's related to the breach activity and that it would not have been incurred, but for the breach activity. So there is a twofold test, and I've applied that consistently in the prior experience. I think it's consistent with my view of what cost accounting is and what damages measurements should include, which is to look at something and see whether it's incremental or not.

I've also – a large part of what we've done is to – I think audit might be a reasonable term to use, which is to verify, if you will, by looking at underlying documentation, whether or not there is evidence of the existence of the cost, whether or not there's evidence that the manner in which the cost is being charged is consistent with that evidence, so it establishes or seeks to establish that the costs are valid and that they have been consistently and appropriately recorded.

I have also typically, as I have in this matter, considered the opinions and conclusions of technical experts who have an

Page 4861

expertise in the operation of a nuclear facility so that I could attach some cost accounting measurement to opinions that they might have about what the world either looked like or would have looked like. So as an example, if an expert were to say, in looking at what the alternatives would be in a circumstance, I don't believe a reracking would have worked, I believe that an ISFSI would have been constructed, I have considered that and then looked at the cost accounting implications of that and measured them.

And I've done that consistently in the type of work that I've done. So I don't have that expertise to be able to determine the proper manner of storage of spent fuel or the operation of the nuclear facility, but I've used the opinions of others who do have that expertise and have attached financial measurements and monetization to those opinions.

Q. Now, and I think this leads to a couple other questions, other than what you've done in these cases, have you engaged in any other accounting or expert analysis concerning

Page 4862

nuclear utilities?

A. No, I think when I was at Ernst & Whinney, that firm at that time had a utility consulting practice that did a lot of rate-making work, and I occasionally consulted with them on some cost accounting, but I had no direct involvement in that practice then, and other than the matters about which I've already testified I've been involved in, in this court, I have no other nuclear experience.

Q. Do you think that affects your ability to assess damages in this case?

A. None whatsoever. As I've indicated, the processes that I've applied and the opinions that I've developed have been based upon the knowledge that I have and to the extent that that, those measurements are dependent upon some knowledge of the operation of a nuclear plant or the storage of spent fuel, I've considered the opinions of others in that regard and have monetized that.

So I think cost accounting knowledge that I have is transferable among industries, the auditing experience I have is transferable among industries, as is both the financial



Def. A. 6

Page 4867

THE COURT: Don't leave the country.

THE WITNESS: And everyone can make their plane.

THE COURT: Please.

MS. HERRMANN: Your Honor, I should remind the Court that because of my unusual circumstances, the able John Ekman is going to take over on the direct examination of Mr. Johnson next Thursday.

THE COURT: All right. Well, it will be a pleasure to have Mr. Ekman back. We will finally have someone who can follow the numbers as quickly as Mr. Ekman puts them under. Ms. Herrmann, we will miss you very much in this case. You've contributed very significantly. I look forward to seeing you in some of the takings cases of which I have quite a few on my docket.

MS. HERRMANN: Oh, wonderful.

THE COURT: And they are – I suppose you've heard about Talari.

MS. HERRMANN: Yes.

THE COURT: Talari is being challenged in another case, on which I have just gotten a request that four amicus want to come in, and

Page 4868

you may be assigned that case.

MS. HERRMANN: Good to know.

THE COURT: Best of luck to you then.

MS. HERRMANN: Thank you, Your Honor.

THE COURT: And I'd like to wish everybody a very happy Thanksgiving and travel safely, and particularly, ladies, if you can't make it, I very much doubt that you can make a 5:00 flight. It would be better for you to go tomorrow. It really would be, but give it a try. Okay. Travel safely, and so we see you then next Thursday.

MR. LO RE: Yes, Your Honor.

THE COURT: And remember Mr. Ekman, he's up there with you now.

MR. EKMAN: And I promise to speak slowly or more slowly.

THE COURT: And that flashing technique on those numbers as they flashed off that demonstrative.

MR. LO RE: And, Your Honor, is it 10:30 on Wednesday?

THE COURT: Yes, Wednesday.

MR. TOMASZCZUK: Thursday.

THE COURT: 10:30, Thursday, and then

Page 4869

we'll continue through whenever we finish.

(Whereupon, at 2:57 p.m., the trial was recessed, to reconvene at 10:30 a.m., on Thursday, November 30, 2006.)

Page 4870

C O N T E N T S

WITNESS CROSS REDIRECT RECROSS
JONATHAN NEUBERGER 4695 4823, 4842 4837
WITNESS DIRECT
RICHARD JOHNSON 4847

AFTERNOON SESSION: 4845

E X H I B I T S

PLAINTIFF EXHIBIT MARKED RECEIVED
16.......................................4789

Page 4871

CERTIFICATE OF REPORTER

DOCKET NO.: 98-484C

CASE TITLE: Northern States Power Company v. U.S

HEARING DATE: November 21, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: November 21, 2006

Cynthia Simmons Ott, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

**Southern Nuclear Operating Co. v. U.S. No. 98-614C October 27, 2005**

**Heritage Reporting Corporation**

**Page 1934 to Page 2173**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2018

So on the one hand, the economic issues spanned those industries. On the other hand, where there were industry-specific factors, I educated myself through my own research efforts and also by talking to individuals who had direct industry experience.

Q Dr. Neuberger, have you been involved in other types of business consulting?

A I have.

Q Can you give some examples?

A Sure. Second category of work I've done over the last 11 or so years has been what I'll call general business consulting, and that's included some strategy consulting, you know, working with companies to develop strategies, to structure their business operations in ways that address different aspects of those strategies and just to provide general consulting support to those companies.

Q Have you performed any business valuations?

A Yes, over the years I've done quite a few business valuations. This has included valuations of publicly traded companies as well as privately held companies, small and large. It's included valuing divisions within companies, also valuing specific

Page 2019

assets within those companies. I've also done a fair bit of valuation of intellectual property assets, like patents and copyrights, and I've done that in the context of litigation and outside of litigation.

Q Have you also been involved in the business of litigation consulting?

A I have. For the last seven or eight years, my -- the focus of my business activities has been in litigation consulting, and in that area, I have provided applied economic analyses for companies engaged in litigation.

Q Can you give an example -- give me a general idea of the kinds of cases on which you provided consulting services?

A Sure. Again here it's a fairly broad range of types of cases. I have been involved in breach-of-contract cases like this one. I have been involved in antitrust cases alleging price fixing or other anticompetitive matters. I've worked in a fair number of securities litigation cases. I've also worked in intellectual property lawsuits, like patent or copyright infringement cases.

Q I asked you this earlier, but for another segment of the work you perform, in litigation -- in

Page 2020

the context of litigation, what kinds of industries have you been -- have the cases involved?

A Again, these cases have spanned a fairly broad range of industries, including telecommunications, financial services, aerospace companies, timber companies, nuclear power generators, pharmaceutical companies, really quite a broad range.

Q And what types of clients have you represented?

A I've worked for several different government agencies, so obviously, I've done work on behalf of the Department of Justice. I've also performed litigation-related analyses for the Securities and Exchange Commission and the Internal Revenue Service. I've worked for -- through various law firms that have brought me in pretty broad range of corporations, including some fairly large pharmaceutical companies, some large telecommunications companies and really quite a few others. I can't think of any off the top of my head.

Q And how many cases have you worked on?

A I would estimate over the last seven or eight years, probably somewhere in the range of 50 to 75 cases.

Q Have you ever testified before?

Page 2021

A I have.

Q How many times?

A I've testified either at deposition or at trial on 12 previous occasions.

Q Have you ever been qualified as an expert witness?

A Yes, I've been qualified as an expert on three previous occasions in the Court of Federal Claims and on one occasion in Federal District Court in the Northern District of California.

Q In those cases, in what areas were you qualified as an expert?

A I have been qualified as an expert in economics, in economic damages and in corporate finance.

Q Can you again generally describe some of the cases, obviously other than this one, in which you've offered expert testimony?

A Yes. I testified earlier this year in the Court of Federal Claims in the case of Precision Pine and Timber versus the United States. That was before Judge George Miller. I testified last year in the Indiana Michigan case. I was the government's damages expert in that case before Judge Hodges. I also testified

Page 2014

Q Can you give just some examples of some projects you worked on while you were at the Federal Reserve?

A Sure. My job responsibilities at the Fed, and this was true pretty much for all of the economists in the research department at the San Francisco Fed, my job responsibilities essentially were threefold. First of all, I was tasked to conduct economic research, to write research articles and to publish those articles. The kinds of work that I did was primarily focused on banking and financial markets so the research studies that I authored involved assessing changes in bank regulations and bank legislation on the impact – the impact of those changes on bank behavior, and that included bank profitability, bank competition, bank portfolio composition and bank risk.

Q When did you leave the Fed?

A Actually, there's two other areas. I talked about three areas of responsibility. The second, economists in the research department were also asked to perform economic analyses of the competitive consequences of bank mergers and acquisitions.

Banking, as you may know, is a regulated

Page 2015

industry, and any applications or any proposals for mergers or acquisitions must be approved by the banking institution's regulatory body, and we did that at the San Francisco Fed.

And then finally, my third responsibility as an economist in the research department of the San Francisco Fed was a little bit more of a public information role. I was asked to brief officers and directors of the bank on regional economic conditions and the research that various members of the staff were doing at the Fed and also to give speeches to the public.

Q All right. Now, when did you leave the Fed?

A I left in 1994.

Q All right. What have you been doing since that time?

A Over the past 11 years, I've worked for several different consulting firms, providing economic analysis to corporations, law firms, government agencies.

Q Could you just elaborate a little bit more on the type of work in which you've been involved for the past 11 years?

A Sure. And I'll paint some fairly broad

Page 2016

strokes here.

One area that I've done a fair bit of work in is to analyze companies' what are called transfer prices or intercompany prices. These relate to transactions between related entities, and U.S. and foreign tax authorities require that those transactions take place at their fair market value and that the taxpayer be able to document the valuations that are placed on those transactions.

So I performed a number of those kinds of studies for companies, for planning purposes, companies engaged in Tax Court litigation and also companies that are facing IRS or foreign tax authority audits. That's one area that I've worked in.

Q And what types of industries has that type of work crossed?

A I've really performed those kinds of studies of intercompany pricing across a pretty broad range of companies ranging from financial services companies, brokerage firms, insurance companies and the like, to manufacturing companies, and the manufacturing companies have been really all over the map. Boeing manufacturing airplanes, various companies that were manufacturing semiconductors, like Samsung or Toshiba, companies that were manufacturing

Page 2017

equipment to build semiconductors, so hardware software computer peripherals, business services, really a fairly broad range of industries.

Q Did you have direct experience working in these different industries prior to your engagement?

A With the exception of the financial services industry, no.

Q And since – with the exception of the financial industry or financial services industry, no, how did you – how are you able to perform these valuation analyses in these other industries?

A Really, the economic issues that were raised by these various transactions were often independent of the specific industry. Now, obviously, each industry, each company has its own specific facts, circumstances and situation.

And the early part of every engagement was to conduct research or other investigations to learn about the industry, to learn about the specific company, to address any industry-specific factors that might affect those valuations, and to talk to people either in the firms themselves, in the – the compliance themselves or others who were knowledgeable about factors that could affect the analysis that I was asked to perform.

Page 2022

before Judge Hodges in the A12 litigation in 2001.
Q Now, outside of testimony, have you prepared expert reports in other cases?
A Yes. In the Court of Claims, I've worked on quite a few Winstar cases, and in one of those instances, one of those Winstar cases, I actually wrote an expert report and testified at a couple of different depositions.
I've also worked in the Gorini cases as well, which are Winstar-related, and then quite a few other contract disputes between private contractors and the federal government.
Q You mentioned the Precision Pine and Timber case before Judge George Miller. Could you give just a general description of the nature of your testimony in that case?
A Sure. Just as a little background, that case involved suspension of logging operations on federal timber lands in Arizona as a result of lawsuits brought under the Endangered Species Act.
I was asked in that case to provide an economic assessment of regional and national conditions in timber and lumber markets in the period leading up to that suspension and also including the suspension. That was the first part of my assignment.

Page 2023

The second part involved a statistical analysis of the prices that plaintiffs used in their claim for damages.
Q Prior to your retention in the Precision Pine litigation, did you have any previous experience working in timber and lumber markets?
A I did not.
Q Well, Dr. Neuberger, given that fact, could you explain to the Court how you were able to provide an economic assessment of the timber and lumber markets in that litigation?
A Yes. Again, as the first – in the first stages of my analysis and my assignment in that case, I spent a great deal of time doing research into the industry. And this entailed some online research as well as research of various printed publications.
I, during the course of that research, identified several trade associations that publish information and data about regional and national timber and lumber markets, and I was able, through various websites and other publications, to learn about the structure of that industry, the nature of competition in that industry, a number of recent trends and developments that affected competition or the ability of firms to cut timber and sell lumber

Page 2024

profitably. That included issues related to export markets and imports from Canada, among other places.
So as a result of my own research, I was able to put together a pretty good picture of market conditions during the period leading up to the suspension that was at issue in that case.
In addition, as part of my assignment, I was given access to knowledgeable personnel within the United States Forest Service. These individuals were responsible for managing timber sale contracts, so they knew about the administration of those contracts, and they also knew quite a bit about timber and lumber markets, specifically in the southwest.
Finally, I was also given access to some non-Forest Service personnel, people who were experts in the timber and lumber industry, and that included some academics as well as industry consultants and the like.
Q Do you believe that your lack of prior experience in the timber industry affected your ability to analyze those markets?
A I don't think so at all. I think economists by training are educated in understanding the operation of markets. It's been a fairly common feature during my 20-plus years as an economist to

Page 2025

develop an understanding of a market, whatever it might be, to understand the scope of that market, the types of activities that go on with that market, within that market, the nature of competition.
So on the one hand, the economic issues really weren't dependent upon that particular industry. Obviously, during the course of my research I learned about some specific factors in that industry and developed that, or included that in my analysis.
But the economic analysis itself was a fairly straightforward matter not dependent on the specific industry. But in addition, where there were technical issues or other issues that I needed some industry expertise, I was able to rely on outside experts.
Q Now, I think you've answered this, but has all of your work, consulting work, been on behalf of the government?
A It has not. I did – as I mentioned, I have worked for a couple of different government agencies, but I also have done work for private companies engaged in commercial litigation, and in that role, I've worked both for defendants and for Plaintiffs.
Q Have you ever been on the opposite side of

Page 2026

the V from the United States?
A Not in the Court of Federal Claims, although a lot of the work I've done on tax-related issues I have represented taxpayers in Tax Court against the Internal Revenue Service.
Q Now, you mentioned in addition to being qualified in a few cases in this court, that you are also qualified as an expert in the Federal District Court for the Northern District of California. Is that right?
A That's correct.
Q What was that case about?
A It was a breach-of-contract case. The specifics involved an acquisition of one company by another company, and as part of the acquisition agreement, there was a contract that identified certain payments that were to be made from the buyer to the seller.
And during the course of that acquisition and afterwards, those payments were not made, so the plaintiff sued for breach of that agreement, and I was asked to quantify damages in that case.
Q Dr. Neuberger, have you provided expert opinions in connection with regulated industries?
A I have. A lot of the work that I've done

Page 2027

over the years, both as a consulting expert and as a testifying expert in the Winstar litigation, certainly involved a regulated industry. And in that Winstar litigation, there were a variety of economic issues as well as regulatory issues.
You know, the Winstar litigation, as you may know, involves the regulatory treatment of goodwill, and so banks keep accounting records both in terms of GAAP accounting as well as RAP, or regulatory accounting principle accounting. And we had to address issues that involved both of those – both of those sets of accounting records.
Q Does every industry, in your experience, have some specific or unusual facts or circumstances that require industry-specific knowledge?
A Some do. Again, I think it's important to recognize that my role as an economist is to apply the analytical skills that I have to the specifics of each and every case, and that's exactly what I've done over the years.
In instances where there were technical issues or really idiosyncratic factors in that industry, I've been able to rely on other experts to educate me about those factors and how they might affect my assignment as an economist.

Page 2028

Q Prior to this case, have you ever worked in a case involving a nuclear utility?
A As I mentioned before, I did testify in the case of Indiana Michigan v. United States. I was the government's damages expert in that case, and I should point out that the opposing expert in that case was Tucker Allen and so the – the model that Tucker Allen used in that case to quantify damages was, for all intents and purposes, identical to the one in this case. So I've seen this model before and worked with it.
Q Have you ever visited a nuclear utility?
A No, I haven't.
Q Do you believe that your lack of direct experience in the nuclear industry affects your ability to provide testimony in this case?
A I do not.
Q And why is that?
A Again, I think it's important for me to stay close to my expertise, and my expertise is as an economist and an expert in economic damages.
And in that regard, I will – or I have applied my analytical skills in the toolkit that I bring to the table to the questions that I was asked to address in this case.

Page 2029

Q Are you here to provide any technical opinions with respect to the nuclear industry or with respect to the operations of a nuclear power plant?
A No. Technical questions of that nature are really beyond the scope of my expertise.
Q All right. Then could you generally, we'll get into details later, but generally describe what your opinions are in this case?
A Well, my assignment in this case was to assess and critically review certain aspects of the damages model that Plaintiffs used to present their claim for damages.
I'm here because of my expertise in economics and economic damages. As a trained economist and based on my experience as a practicing economist, I have extensive background in designing, developing and implementing economic and financial models.
As a damages expert, I've applied that modeling expertise in a variety of settings, both developing my own models of damages and assessing opposing experts' models.
So in this case, my assignment was to apply my expertise as an economist, to assess certain aspects of the damages model used by Plaintiffs'