**Yankee Atomic Electric v. U.S No. 98-126C, 98-154C, 98-474C August 19, 2004**

**Heritage Reporting Corporation**

**Page 6003 to Page 6219**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 6187

to educate myself or, more likely, consult with others who already have that expertise, and to the extent necessary, consider it and ultimately rely upon, if appropriate, the work that that other person would be doing and the advice consultation that person would provide.

Q. This case obviously involves nuclear utilities, right?

A. Yes.

Q. Prior to this litigation, have you ever worked on a case involving a nuclear utility?

A. No, I have not.

Q. Have you ever visited a nuclear utility?

A. No, I have not.

Q. Do you believe that fact that you've never worked on a case involving a nuclear utility or the fact that you've never visited a nuclear utility affects your ability to assess damages in this case?

A. Absolutely not.

Q. And could you explain why not?

A. Well, what I have done in this particular matter is to understand the nature of costs that are general in nature and not specific to the nuclear industry and consider and evaluate to what extent they were or were not includable as an element of

Page 6188

damage, given what I believe the proper measure of damages ought to be.

To the extent that the cost assertions made by the respective Plaintiffs involve the types of costs for which specialized knowledge is required, I have worked with Mr. Abbott. And I have clearly considered his views and opinions about the nature of costs, about the need for certain functions or, in some circumstances, whether or not the cost would be incremental.

That is to say whether they would occur only in the breach world and not in the nonbreach world. I have associated the costs, I have dollarized those particular functions and those particular assertions that Mr. Abbott's made by reference to data provided by the respective Plaintiffs, but I have clearly relied upon Mr. Abbott in those circumstances and for that expertise.

Q. Can you please describe what involvement you have with professional associations?

A. Yes, the accounting profession, at least up until about the last year, and the Congressional oversight that occurred was largely a self-regulated profession and set its own standards, and it set the standards for financial reports for U.S. businesses.

Page 6189

It did that through the American Institute of Certified Public Accountants.

I have served on several committees of that organization for a period of four years in the 1990s. I was one of 15 members of what's known as the Accounting Standards Executive Committee, which is a body of 15 people appointed by the profession whose responsibility it is to set standards of accounting and financial reporting for all U.S. businesses.

I served on a number of task forces for that same organization and chaired a number of committees over the period from 1988 through about a year ago.

MR. EKMAN: Your Honor, at this time, I move to have Mr. Johnson qualified as an expert witness in the areas of financial analysis, cost accounting auditing and analysis of economic damages. And I'd be happy to repeat that if you didn't get it.

MR. SHAPIRO: Your Honor, I don't think we object to the general qualification. There obviously may be specific topics that come up in the course of Mr. Johnson's direct examination. I think it would be more productive to address those in the context of cross-examination.

THE COURT: Okay. The witness is so

Page 6190

qualified in the categories stated, subject to objections to specific questions as they might arise.

MR. SHAPIRO: Thank you, Your Honor.

MR. EKMAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. EKMAN:

Q. All right. Let's turn now to the substance of your opinions that you're going to be offering over the next couple days. I want to begin with some general ideas that are applicable to your analyses that you conducted for each of the three Yankee facilities, okay?

A. Yes.

Q. And we do have a little presentation as well for this. Mr. Johnson, would you describe the manner in which you believe damages should be calculated in this litigation?

A. Yeah, it's the difference between what would have happened, but for the breach, and what did happen, and that requires various considerations of activities and costs to very specifically determine whether or not they were incremental, and that means, incremental means that they wouldn't have happened, but for the breach.

So that if, as an example, one says, Well,

Page 6191

the president of the company spent 20 percent of their day today working on something to do with spent fuel. That's not an element of damage. That compensation cost would have been incurred, regardless.
If someone says, We would have four people doing X kind of activity, but you would have had the same four people doing that same activity in the nonbreach scenario, that's not an element of damage.
So the bottom line of all of the work that we did was to focus on clearly those costs that could be identified, segregated and supported as incremental.
And in doing that, we focused on whether or not they were reasonable, whether they were supported, whether there was a basis for them and, ultimately, whether they could be clearly demonstrated to be something that would not have occurred, but for the breach.
Q. And you're familiar with Dr. Wise?
A. Yes, I am.
Q. And in connection with your work, did you review Dr. Wise's expert report in this case?
A. I did.
Q. And in connection with your review of that report, did you reach any opinions as to the

Page 6192

substance of Dr. Wise's report?
A. Well, I think Dr. Wise's report says that it does what I said it should have done. It says, and his testimony has been that he was, it was designed to identify the incremental cost, but it missed the boat completely. It didn't do anything like that.
And I have identified a number of deficiencies. The bottom line is, what Dr. Wise did was compare two numbers that he was given, one which he was given to be the breach world cost and the other he was given as the nonbreach world. And he compared the two, identified the difference and then discounted those to present value. So he did add the practice of discounting to the equation. But he didn't go beyond that, in my opinion.
He didn't do anything to determine — at one point, I believe he identified that his role was to make sure the costs were incremental. He failed miserably in that. So I think, individually, what he did, or what he failed to do is shown in these seven things. The first and foremost of which is he failed to determine that the costs were incremental to the breach.
He didn't really look to the underlying

Page 6193

documentation and bases for the assertions being made, whether those were assertions of breach or nonbreach activities, to determine that the appropriate conclusion have been reached, and that was that the activity and the associated cost wouldn't have occurred, but for the breach.
And I think it's also important to understand, there's a lot of this thing where people say, Well, we spent the money. My job wasn't to figure out whether they spent the money, but to determine whether it was spent for something that would not have happened, but for the breach. And I believe Dr. Wise failed to do that.
There were a number of very conceptual issues, which he just simply assumed, he – or was told to. As an example, the reracking costs have all been included in each of the respective Plaintiffs' damage assertions as an incremental cost, without any questioning of whether or not the reracking effort would have been necessary in the nonbreach world. So I've identified that as well.
He failed to consider whether costs were reasonably certain to occur, and as a result of that , I believe he has included speculation in his damages. I believe that the test ought to be

Page 6194

incremental, but a reasonably certain basis for those incremental costs, and I don't believe Dr. Wise did that. He applied no reasonableness test to any of it. He simply took numbers and did some mathematics to them.
If his expert opinion was one number subtracted from another, okay, I wouldn't have any exception to his report. There are a number of costs that we don't believe were supported, either because the information either was not provided to us, or it is a cost for which I believe it's almost impossible to provide appropriate support, because the nature of the potential cost is sufficiently speculative.
And ultimately, when he was all done, he used, I think, the wrong discount rate. So the only part of the work that I believe was genuinely his, I think, was improper, in that he used a discount rate, which he reduced for tax, which I don't believe was appropriate. He did that because, essentially, I believe he was told by the respective Plaintiffs that that's what should be done.
Q. Now, as part of your work on this case, did you evaluate the damages claims of the three Yankee facilities?
A. Along with several members of my firm and

IN THE UNITED STATES DISTRICT COURT

OF FEDERAL CLAIMS

------------------------------------:

DAIRYLAND POWER COOPERATIVE, :

Plaintiff, :

vs. : No. 04-106C

UNITED STATES OF AMERICA, : No. CL0500121

Defendant. :

------------------------------------:

Washington, D.C.

Tuesday, July 17, 2007

Deposition of:

R. LARRY JOHNSON

called for oral examination by counsel for Plaintiff, pursuant to notice, at Greenberg Traurig, L.L.P., 800 Connecticut Avenue, Northwest, Suite 500, Washington, D.C., before Shari R. Broussard, of Capital Reporting Company, a Notary Public in and for the District of Columbia, beginning at 9:04 a.m., when were present on behalf of the respective parties:

Page 58

expert in damages causation?
A I said what I thought I was expert in.
Q Uh-huh.
A And I gave an example where I thought causation was an element of the measurement because I said at times causation does affect the measurement.
I don't believe that I'm an expert in all elements of causation in all matters, however, where a claim involves an assertion that there has been economic harm as a result of a particular activity and that that economic harm represents a cost that's been incurred as a consequence of that, I believe central to the question of whether or not there was economic harm is whether or not that's a cost that wouldn't have been incurred but for that activity. So I consider that as a part of the analysis that I would conduct of the measurement of damages, as I have done precisely in this matter.
Q So in this case do you believe that you are offering expert testimony on damages causation?
MR. SHULTIS: Objection. Asked and

Page 59

answered.
THE WITNESS: I -- I have -- I have clearly set forth a variety of costs that I don't believe should be includable as damages because they're -- it's either clear that they don't represent costs that are incremental, and I've defined what I believe to be incremental, or where there's been no demonstration by the plaintiff that they are incremental, and in all cases I've clearly set forth what I believe to be the meaning of incremental.
So if that's giving causation opinions, which I don't believe it necessarily is, then I've done it. But I've done it to that extent.
BY MR. STERN:
Q Well, is it saying then if a cost isn't incremental, you're saying that the cost was not incurred as a result of any actions by the government in this case?
MR. SHULTIS: Objection. Mischaracterizes prior testimony.
THE WITNESS: Could you repeat that for

Page 60

me, please?
(The reporter read the record as requested.)
THE WITNESS: If the cost isn't incremental to the asserted breach by the government, then the cost wasn't incurred as a consequence of the asserted breach by the government. That's what I'm saying.
BY MR. STERN:
Q I'm not sure I understand that. So when you say that "In my opinion a certain cost incurred by Dairyland is not incremental," is it your opinion that this cost would not have been incurred by Dairyland or would have been incurred by Dairyland notwithstanding the breach by the government?
MR. SHULTIS: Objection. Vague.
THE WITNESS: You actually have them reversed. From what I can tell the cost would have been incurred regardless and, therefore, it's not incremental and, therefore, it's not includable as an element of damage.

Page 61

BY MR. STERN:
Q So what you are saying, and correct me if I'm wrong, is that if it's not incremental, you're claiming that that damage or that cost was not caused by the government's breach; isn't that right?
A Yeah. If it's not incremental to the breach activity, then it was not caused by the government's breach.
Q Outside of previous litigation engagements, what kind of education, training, experience do you have in determining damages causation?
A Why don't you -- you keep using "damages causation." Can you give me what you mean? I've described how I've considered causation specifically in this matter and more generally and you keep referring to that as damages causation.
Could you perhaps clearly and at one point just define for me what you mean by "damages causation" before I tell you whatever it is that I believe I'm expert about?

Page 62

Q Well, I'm sure you've heard the term before, haven't you, "causation damages, damages causation"?
A I hear those words and I -- I suspect there are very separate elements to that, and I've described the manner in which I've considered causation as it affects incrementality. I -- my sense is your question is broader than the way in which I've used it.
Q Well, no, my question is more that this is a legal proceeding, correct?
A I -- yes, that's correct, it's my understanding this is a legal proceeding.
Q And you certainly understand, I think we talked a little bit about this, that the ultimate determiner of whether Dairyland's entitled to recover any of the costs that they're claiming would be based on a determination by the court as to whether or not those damages were caused by the government's actions or inactions in this case.
A I understand that.
Q So when I talk about damages causation,

Page 63

I'm referring to that issue.
So going back to my previous question, outside of previous litigation experience, what kind of education, training, and experience do you have in determining damages causation?
A In a matter in which the assertion of damages has to do with the measurement of a cost that an entity asserts it incurred as a consequence of an activity that is being litigated, I believe the very nature of that assertion is that it is a cost that's related to the breach activity and it wouldn't have been incurred but for the breach activity.
That seems to me to be the very foundation of the nature of a claim that's focused on a cost that is being included as an element of harm as a consequence of the particular activity that's being litigated. That in my mind involves the measurement of whether or not a cost is incremental.
Where the -- the notion of it being incremental has to do with whether it is directly

Page 64

traceable and related to the particular activity and whether or not it varies with the level of activity, so that without the level of activity it wouldn't have been incurred and as the activity increases or decreases, the cost reacts in a similar way.
Those are very fundamental cost accounting principles. Those are things that I have dealt with specifically since 1968 in looking at financial assertions involving a whole host of things.
The nature of fixed versus variable cost is that academic thing that I both studied and taught. It's something that I've looked at in a variety of models of cost of doing business, of pricing of products, of assertions made by clients, in examinations of those assertions that I've made.
It's also been a part of what I've done in a variety of litigation-related matters where in a particular circumstance a plaintiff might assert as an aspect or element or the entirety of damage cost that it has asserted it incurred as a

Page 65

consequence of activity or actions that it is litigating.
Q So again, correct me if I'm wrong, if I understand your answer, outside of litigation-related experience, the main education, training, experience upon which you rely upon to offer opinions related to damages causation is your cost accounting background?
A Well, I gave a really --
Q You correct me if I'm wrong.
A And you say "correct me if I'm wrong," whatever your question is, so I can assure you that I will.
Q Please do.
A I gave you a very long answer and I think that answer probably is the best answer I can give. And then you said so it's limited to your cost accounting. I don't think that's what I said. I think I said what I said.
Q Let's go to the introduction of your report, Exhibit 1. And on page one, first paragraph, you wrote:

"Introduction. I have been engaged by the United States Department of Justice to review, analyze, and express my opinions regarding the claim for damages made by Dairyland Power Cooperative that it asserts resulted from an asserted partial breach by U.S. Department of Energy Contract Number DE-CR01-83NE44377 dated June 15th, 1983."

And I think all the parties agree that we refer to that contract in shorthand as the standard contract, correct?

A Yes, sir.

Q Were there any specific aspects or components of Dairyland's damages claim that you were asked to evaluate as part of your retention by the DOJ?

A I was asked to review and analyze the entirety of the claim based upon the expertise and skills that I possess, which do not include technical proficiency in the technical requirements for the storage of spent fuel.

Q Were you specifically asked to opine on



the evidentiary and factual support for Dairyland's damage claim?

MR. SHULTIS: Objection. Vague.

THE WITNESS: I was asked to evaluate the support for, assumptions about, and theories fundamental to the claim in all of its aspects to the extent that they were something that was within the scope of my expertise.

BY MR. STERN:

Q Were you asked specifically to opine on whether any amount of Dairyland's damages claim was caused or not caused by the government's partial breach of contract?

MR. SHULTIS: Objection. Asked and answered.

THE WITNESS: A part of the analysis I conducted was to consider and identify to what extent, if any, elements of the claim made by Dairyland represented costs that were incremental, that is, were related to, or wouldn't have been incurred but for the breach, and to the extent that that involves causation, I did it to that extent.



BY MR. STERN:

Q Were you asked to opine, specifically asked to opine on the qualifications and credibility of Dairyland's experts?

A I -- I don't -- I don't think I was asked to opine on their qualifications. I was asked, to -- to the extent that it impacted on measurements of economic harm or cost, I was asked to evaluate the work, but not the qualifications.

Q Well, do you believe in your report that you have actually opined on the qualifications of at least some of Dairyland's experts?

A I think that, with respect to Mr. Smith, that based upon my reading of his qualifications and his testimony, that it appears to me that he has provided opinions about technical matters; or has developed estimates of costs that require a technical expertise that it is not apparent to me that he has, and I have said so.

Q So we'll talk more about this later specifically, but is it your opinion that Mr. Smith, at least portions of his opinion he's



not qualified to render opinions on?

MR. SHULTIS: Objection. Asked and answered.

THE WITNESS: To the -- to the extent that he has made engineering judgments, and it appears as if he has, I -- I see -- I don't see the basis for that expertise.

To the extent that he has compiled or been informed of estimates of cost or types of activity that involve highly technical matters, involving the storage of spent fuel and its removal, it doesn't seem to me that that process was one that was in the kind of formal, rigid, and specific identification of requirements that I think would be necessary.

And from what I have read and seen of his expertise, I would question his ability to have constructed the type of requirements and needs analysis that I think would be necessary to produce a reliable estimate, and I have said that as well.

BY MR. STERN:

Q Like I said, we'll talk more about it


©2007

answered.
THE WITNESS: Because one would need to understand in this world in which you've hypothesized what the cost was of this thing not being done that you hypothesize this person could have done. Presumably it isn't being done in your hypothetical world. What is the costs associated? Is there a compromise to the operations? Is there inefficiency? And if there's not, I don't see where there's a cost.
If there is, show me the measurement of that. Explain to me what it is and how it is that the enterprise is harmed or some real cost incurred or some real opportunity forgone, and I'll consider it. But you haven't described it in any way that would permit some type of real evaluation of whether and to what extent there is any forgone situation.
BY MR. STERN:
Q So unless I can give to you in the hypothetical specific activity that that person would have performed but for the government's



breach as opposed to what he did, then you believe that's not an incremental cost; is that right?
A I don't -- first of all, is this a cost that somebody is asserting is incremental and it's being asserted because of your theory of opportunity cost or -- I'm trying to understand the context of the question and I really at this point in time don't understand the context of the question.
Q Well, I'm sorry I'm confusing you, but if I understand your testimony correctly, in my hypothetical the human resource employee, the one who's devoting his time and attention to LACBWR related activities because the spent fuel is still there.
A How much of his time?
Q 10 percent.
A Okay.
Q And that if the fuel is gone and those employees were no longer there, he could devote that 10 percent to some other activity at the company human resource related.



If I understand your testimony correctly, unless Dairyland can identify what that specific other activity would have been, then you cannot opine as to whether or not that's an incremental cost suffered by Dairyland?
A I would start with the view that that 10 percent is not incremental. That person would still be there, they would still be serving a human resources function.
If you got rid of the LACBWR activity, you would not get rid of the person. In any material way the costs wouldn't change. You would have to create some theory of what this person would have done with four hours a week in a way that demonstrated that there was actual harm, and I -- I am skeptical that that would be the case.
Q Okay. So we'll get more into that in a moment when we go to Mr. Wilkins' opinions and your critique of that. But, again, under my hypothetical it's your opinion that that's not an incremental cost that I've just described to you?
A Unless there can be a demonstration,



that's correct, it's not an incremental cost.
Q Is incremental an accounting term of art?
A It's used frequently in accounting. I'm sure there is also English language usage of it. I'm sure it exists in many contexts. It's not unique to accounting.
Q Do you know if it's a legal term of art?
A I'm not a lawyer.
Q So you don't know?
A I don't know.
Q Now, are you offering an opinion on -- we've talked about this a little bit more, but I just want to be clear. Are you offering an opinion here on what is the proper standard for damages causation in this case?
A To the extent it calls for a legal conclusion, no.
Q Now, do you know what standard for damages causation the courts have applied in other spent fuel cases so far?
A I could not identify expressly the standards that they've applied, no.

Page 102

Q Have you read any of the opinions rendered by courts in other spent fuel cases?
A I think I've read portions of the so-called Indiana-Michigan decision. I don't recall having read any portions of other decisions. I might have, but I don't recall.
Q Do you recall what standard of damages causation the court applied in Indiana-Michigan?
A I don't. I'd have to refer back to the decision itself.
Q Well, have you heard of the standard "substantial causal factor"?
A I don't know whether I have or not.
Q Well, do you believe that Dairyland should be allowed to recover claimed costs if DOE's partial breach was a substantial causal factor in Dairyland's decision to expend the claimed costs?
MR. SHULTIS: Objection. Calls for a legal conclusion.
THE WITNESS: I think that that's a legal question for the court to decide.

Page 103

BY MR. STERN:
Q So you don't have an opinion on that one way or the other?
A I have the opinions I have and I understand the context in which I express them, and they are not opinions about law. They -- I'm providing opinions about what I believe the economic measurements are, and I understand that that's a consideration but not necessarily the means by which the court will decide what damages are. And I'm certainly not expressing any legal opinions.
Q Well, do you know if any court has adopted the standard that you appear to be applying in this case, that Dairyland can only recover a claimed cost if it is only incurred as but for the government's partial breach?
MR. SHULTIS: Objection. Mischaracterizes prior testimony and assumes facts.
THE WITNESS: I've said I don't -- I can't tell you what the courts have held. I -- I -- so I can't be responsive to whether or not the

Page 104

courts have adopted a but-for world requirement that is such that in order to be includable, there has to be a demonstration that such a cost wouldn't have been incurred but for. I simply don't know what the courts have said in that respect.
BY MR. STERN:
Q Well, do you think that Dairyland should be allowed to recover claimed costs if DOE's partial breach was the substantial but not the sole factor that caused Dairyland to expend the claimed costs?
MR. SHULTIS: Objection. Asked and answered.
THE WITNESS: That's a legal consideration. That sounds like the same thing you just said except stating more words.
BY MR. STERN:
Q Well, let's push the legal issue aside and just plain language I just used there. You have an opinion on but for, right?
MR. SHULTIS: Objection.

Page 105

BY MR. STERN:
Q So I'm asking you if you think, notwithstanding whatever the legal rules may be, whether you think Dairyland should be able to recover a claimed cost if the partial breach was a substantial but not the sole factor, not the but-for factor that caused Dairyland to expend the claimed cost?
MR. SHULTIS: Objection. Mischaracterizes prior testimony.
THE WITNESS: So in your substantial but not sole the cost would have been incurred regardless?
BY MR. STERN:
Q Substantial, not the entire reason.
A I have no idea what that means. I ask --
Q You don't know what the meaning of the word "substantial" is, sir?
A I don't know of the meaning which your implying to it. I'm simply asking for clarification.
In your question does that mean that the

Lester, H
Shultis, R 7020

Greenberg
Traurig

Kevin E. Stern
Tel. 202.452.4878
Fax 202.261.0107
sternk@gtlaw.com

April 8, 2008 .

*VIA HAND DELIVERY*

Russell A. Shultis
Department of Justice
Commercial Litigation Branch
Civil Division – Classification Unit
8th Floor Mailroom
1100 L Street, NW
Washington, D.C. 20530

Re: *Dairyland Power Cooperative v. United States,* No. 04-106C

Dear Russ:

I am writing in response to your April 2, 2008 letter regarding Dairyland's revised damages claim that was provided to the government on March 21, 2008. As requested in your letter, please find enclosed a copy of the March 21, 2008 Revised Summary of Damages and supporting schedules in Excel format.

You also requested in your letter that Dairyland provide a list of each specific claimed SAFSTOR cost that was adjusted from Dairyland's prior damages claim dated February 12, 2007, an explanation for each change, and any documentation associated with that change. As mentioned in my March 21 letter accompanying the revised damages claim, all of the adjustments to Dairyland's claimed SAFSTOR costs were downward adjustments from the February 12, 2007 damages claim. No additional SAFSTOR costs are being claimed. The adjustments that have been made fall into two categories. First, a small number of claimed cost items have been removed that the government's expert, Larry Johnson, has challenged and that we no longer dispute. These deducted costs are set forth in the attached table.

The second category of SAFSTOR costs deducted are accounting-related adjustments that were made by Charles Wilkins in connection with his calculation of the LACBWR overhead and Dairyland G&A rates set forth in his March 23, 2007 expert report. As you may recall, Mr. Wilkins' calculations of the overhead and G&A rates are based principally upon identifying and categorizing Dairyland's incurred costs as either direct or indirect. In order for a LACBWR cost to be considered a direct cost under Mr. Wilkins' analysis, the cost had to be charged either to a LACBWR assigned cost account, *i.e.*, cost

154-04-106
CB

account nos. 517xx - 530xx, or charged to the LACBWR cost center, cc 71. Applying these criteria, Mr. Wilkins determined, based upon his review of Dairyland's accounting records, that a handful of the claimed SAFSTOR costs included in Dairyland's February 12, 2007 damages claim are in fact indirect costs that were already included in his indirect cost pools. Accordingly, he deducted these costs from the claimed direct SAFSTOR costs to avoid any double-counting. These adjustments were identified and set forth in schedules supporting Mr. Wilkins' March 23, 2007 expert report. *See* LACBWR Charges by Activity by Year and Accounting Treatment; LACBWR Charges Sort by Project Related to Damages Summary; *see also* Wilkins Expert Report, Table II.

For ease of reference, I have enclosed a second Excel spreadsheet file of Dairyland's March 21, 2008 Revised Summary of Damages that is color-coded to show these two types of cost deductions. Cells highlighted in orange reflect challenged SAFSTOR costs that have been deducted because they are no longer disputed. Cells highlighted in yellow reflect costs that have been deducted because they are indirect costs.

Finally, as indicated above, we have already produced all documentation associated with these deductions.

I trust that this explanation is sufficient, but feel free to contact me if you have any questions or need further clarification.

Sincerely,

Kevin E. Stern

Attachment
Enclosure

**Dairyland March 21, 2008 Revised Summary of Damages**

**SAFSTOR Cost Deductions That Are No Longer Disputed**

| Cost Description | Year | Project | Cost Account | Deducted Amount |
|---|---|---|---|---|
| 1998 NRC Annual Fees | 1999 | P4052 | 51795 | $51,500 |
| Nukem Spent Fuel Resin Removal and Disposal | 1999 | P4042 | 52004 | $60,000 |
| WPI Activities - GTCC Waste Determination | 2002 | P6564 | 53001 | $40,252 |
| WPI Activities - Radioactive Materials Packaging/Disposal | 2002 | P6564 | 53001 | $10,879 |
| WPI Activities - GTCC Waste Determination | 2003 | P6564 | 53001 | $3,508 |
| WPI Activities - Radioactive Materials Packaging/Disposal | 2003 | P6564 | 53001 | $3,269 |
| Wheeler Van Sickle Legal Fees | 2006 | 0 (Baseline) | 51793 | $1,001 |
| **Total** | | | | **$170,409** |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

EXPERT WITNESS REPORT OF TODD D. SMITH

## I. Introduction and Approach

I have been asked to prepare this report to describe what would have been a reasonable cost to perform the removal of the Dairyland Power Cooperative (DPC) LaCrosse Boiling Water Reactor (LACBWR) site's Reactor Pressure Vessel (RPV) assuming the United States government had accepted spent nuclear fuel and high level radioactive waste (spent fuel) under the terms of its 1983 contract with the plaintiff, Dairyland Power Cooperative (DPC). DPC owns one nuclear facility, LACBWR, located in Genoa, WI and covered by the contract with the government (via the U.S Department of Energy, DOE) for spent fuel removal. It is well known and accepted that the government has not satisfied it obligations of that contract, having failed to remove spent fuel from any utility. I describe in this report how the LACBWR site could have reasonably removed and disposed of its RPV assuming the government had performed under the terms of the 1983 agreement with the utility and I have developed an associated RPV removal cost estimate (the non-breach scenario). I have also described how the utility is currently removing and disposing of the RPV and the consideration given to the current methodologies based on spent fuel still being stored on site (the breach scenario). Finally, I considered the cost estimates for each of the breach and non-breach approaches to come up with the marginal costs to DPC based upon subtracting the non-breach estimate from the breach estimate.

In reaching my conclusions, I have considered information contained in a number of documents related to the construction methodologies of specialty contractors who are experts in the industry on the removal, packaging, transporting and disposal of RPV's. I have also considered cost estimates, actual costs and actual performances of these various specialty contractors who I have personally worked with on various commercial decommissioning projects over the past ten years. Appendix 1 provides a listing of the data and information I considered in forming

my opinions. Appendix 2 provides the details of the cost estimate and sequential schedule I developed in order to form my opinion under this "non-breach" scenario.

I have over 12 years of direct experience in the decommissioning of various nuclear facilities throughout New England. My work has included initial estimating of the costs to decommission commercial facilities, managing the entire business unit at three different commercial nuclear decommissioning projects with duties including management of the overall decommissioning budgets and schedules, management of the contracts and procurement departments, management of the waste packaging transport and disposal unit, the development of various decommissioning costs estimates to submit to the Federal Energy Regulatory Commission (FERC) totaling in excess of $2 Billion. I have testified in various FERC settings on these cost estimates and to date, have not had a single dollar of disallowed decommissioning expenditures due to imprudence. I have testified in federal courts regarding contract disputes with Decommissioning Oversight Contractors (DOC's) at two different decommissioning sites with total disputes in excess of $150 million. I received an MBA from Thomas College in 1999 and a B.S. in Accounting from Thomas College in 1992. I am being compensated at a rate of $250/hr to provide this expert witness service and additional details of my experience and qualifications to offer such an opinion, including my testimony over the past four years are included in this report under appendix 3.

## II. Detailed Approach to the RPV Removal Project in a Breach World

In order to develop a concept of how an RPV would be removed under a breach and a non-breach world, there needs to be a particular understanding of the similarities and differences between a breach and non-breach work scope as it relates to the variable. The variable within both the breach and non-breach world that dictates the approach to an RPV removal is whether or not the spent fuel is still located within the Reactor Building (RB) adjacent to the RPV.

Once it has been established that the spent fuel would still be present in the RB during the performance of this RPV removal work and direction has been received from the Nuclear Regulatory Commission (NRC) with respect to its "preferred method" of RPV removal, a breach world has been established along with a relevant work scope and associated costs. In particular, I understand that the NRC has directed that the RPV be removed out the side of the RB because of the presence of spent nuclear fuel within the RB.

As provided by DPC under the breach scenario of removing the RPV out the side of the RB, the Duratek proposal provides the following work scope for removing, packaging, transporting and disposing of the RPV:

In order for the RPV to be removed out through the side of the RB, a portion of the Bio-Shield wall, which completely surrounds the RPV, must be removed. This work scope consists of cutting the Bio-Shield wall out in block sections with

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S WITNESS LIST

Pursuant to the Court's Trial Preparation Order of February 21, 2008, Dairyland provides the following witness list:

1. Lake E. Barrett. 7805 Potters Mill Court, Derwood, Maryland 20855 (301) 519-8636. Mr. Barrett is a former Deputy Director and Acting Director of the Office of Civilian Radioactive Waste Management ("OCRWM") within the U.S. Department of Energy ("DOE") and he has been a consultant to Dairyland. Mr. Barrett may testify regarding the history of DOE's planning to accept spent fuel from utilities, a reasonable rate and schedule for DOE's acceptance of spent fuel from utilities and DOE's plans and expectations for exchanges amongst utilities of spent fuel acceptance allocations. One half hour of direct examination

2. John W. Bartlett. 1300 Crystal Drive, Arlington, Virginia 22202, (703) 415-4541. Dr. Bartlett, who is a former Director of OCRWM, will testify regarding the objectives and planning for and operation of DOE's commercial spent fuel acceptance and disposition program. He will also testify about his other work on matters related to

CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May, 2008, a copy of foregoing "DEFENDANT'S RESPONSE TO DAIRYLAND'S MOTION TO EXCLUDE R. LARRY JOHNSON'S TESTIMONY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Joshua E. Gardner