No. 04-106C
(Chief Judge Damich)

Electronically Filed: May 15, 2008

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# DAIRYLAND'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY REGARDING OVERHEAD COSTS

---

JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, N.W.
Suite 1000
Washington, DC 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

TABLE OF CONTENTS

BACKGROUND .......... 2

ARGUMENT .......... 5

I. MR. WILKINS' ANALYSIS AND TESTIMONY IS CLEARLY RELEVANT TO SHOWING THE OVERHEAD AND G&A COSTS INCURRED BY DAIRYLAND AS A RESULT OF THE GOVERNMENT'S BREACH .......... 5

A. The Court in Other Spent Fuel Cases Has Properly Held That The Plaintiff is Not Required to Show That The Claimed Overhead Costs Would Not Have Been Incurred Absent The Government's Breach in Order to Recover Such Costs .......... 5

B. Whether Dairyland Would Have Incurred the Same Level of Overhead and G&A Costs in the "Non-Breach World" is Irrelevant .......... 11

II. MR. WILKINS SHOULD BE ALLOWED TO TESTIFY ABOUT MATTERS ADDRESSED AT HIS DEPOSITION AND OTHER RELATED MATTERS .......... 15

CONCLUSION .......... 16

APPENDIX INDEX

Expert Witness Report of Charles L. Wilkins dated March 23, 2007 .......... A1

Schedule B.2 to Wilkins Expert Report .......... A11

Rebuttal Expert Witness Report of Charles L. Wilkins dated August 17, 2007 .......... A22

Excerpts from September 5, 2007 Charles Wilkins Deposition Transcript .......... A23

# TABLE OF AUTHORITIES

## Federal Cases

*Ace Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000) ........................................ 13

*Comdyne I, Inc. v. Corbin*, 908 F.2d 1142 (3d Cir. 1990)........................................................... 7

*Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir 1982) ...............................................6-7

*Dunn Appraisal Co. v. Honeywell Info. Sys., Inc.*, 687 F.2d 877 (6th Cir. 1982) .......................6-7

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002).................................... 13

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982 (Fed. Cir. 2007)...........15-16

*Locke v. United States*, 283 F.2d 521 (Cl. Ct. 1960) .................................................................. 13

*M.H. McCloskey, Jr. v. United States*, 66 Cl. Ct. 105 (1928)...................................................... 10

*Northern States Power Co. v. United States*, 78 Fed. Cl. 449 (2007)..................................8-9, 13

*Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006) .................................... 9, 13, 14

*Sacramento Mun. Utility Dist. v. United States*, 70 Fed. Cl. 332 (2006)..................................9-10

*Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2007......................7-8, 13, 14

*System Fuels, Inc. v. United States*, 78 Fed. Cl. 769 (2007).................................................... 9, 10

*System Fuels, Inc. v. United States*, 79 Fed. Cl. 37 (2007)...................................................... 9, 13

*Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515 (2006)........................................ passim

*United States v. CBS, Inc.*, 103 F.R.D. 365 (C.D. Cal. 1984)....................................................... 7

## State Cases

*Charleston Lumber Co., Inc. v. Miller Housing Corp.*,
458 S.E.2d 431 (S.C. Ct. App. 1995)........................................................................................... 7

Federal Regulations

10 C.F.R. § 961.11 .......... 8

Other Authorities

S. R. Shapiro, *Comment Note: Overhead Expense as Recoverable Amount of Damages*, 3 A.L.R.3d 689, 1965 WL 13309 (1965) .......... 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY REGARDING OVERHEAD COSTS

The government has moved to exclude the testimony of Dairyland's cost accounting expert, Charles Wilkins, which calculates the overhead and general and administrative ("G&A") costs that Dairyland has incurred as a result of the government's partial breach. The government's argument that Mr. Wilkins' testimony is irrelevant to the issues in this case – because he has not identified the additional overhead costs that Dairyland has incurred as a result of the government's breach, or the overhead costs it would not otherwise have incurred absent the government's breach – is essentially a legal argument that finds virtually no support under the relevant case law. The government has raised this same argument against the recoverability of overhead costs (and/or internal labor costs) in other spent fuel cases and, in almost every instance, the Court has rejected it and awarded the utility's claimed overhead and internal labor costs. *See, e.g., Tennessee Valley Auth. v. United States,* 69 Fed. Cl. 515, 538 (2006) ("*TVA*").

The government's motion is based entirely upon a legally-incorrect argument and semantic gamesmanship. Mr. Wilkins' work demonstrates that, but for the government's breach, Dairyland would not have incurred its claimed overhead and G&A costs in connection with its

breach-related activities. No further proof by Dairyland is required. Dairyland need not prove that the claimed overhead and G&A costs would have disappeared from Dairyland entirely absent the breach. Rather, sound and long-standing cost accounting principles and overwhelming legal precedent recognize that if overhead and G&A costs are properly allocated to breach-related activities, then the resources represented by those costs would have been efficiently devoted to other uses or reduced absent the breach. And neither cost accounting principles nor legal precedent require a showing of just how the resources represented by the properly allocated overhead and G&A costs would have been devoted to other uses or reduced absent the breach.

## BACKGROUND

Dairyland's damages claim in this case consists of two types of costs it has incurred as a result of the government's breach: (1) direct costs and (2) overhead and G&A costs. Dairyland's claimed direct costs consist of SAFSTOR costs associated with operating and maintaining its spent fuel pool at the La Crosse Boiling Water Reactor ("LACBWR") from 1999 through 2006, nuclear property and liability insurance costs, marginal costs associated with the removal of the reactor pressure vessel from LACBWR, and costs associated with pursuing on-site dry storage of its spent fuel and off-site interim storage through the Private Fuel Storage ("PFS") initiative. The claimed overhead and G&A costs consist of the costs incurred by Dairyland in order to support its breach-related activities represented by the claimed direct costs. Wilkins Expert Report at 4-5, 9-10 (A.4-5, A.9-10).[1] The overhead cost pool consists of incurred service center and operations costs that were required to support LACBWR activities, including the activities associated with the government's breach. *Id*. at 4 (A.4). The service center and

---

[1] "A.__" refers to the appendix accompanying this response.

operations support costs in the LACBWR overhead cost pool include, among other things, costs for office and information technology services, human resources, marketing, and generation operations support. *Id.* The G&A cost pool consists of any management, financial and other expenses that were incurred to support the management and administration of Dairyland's business as a whole. *Id*. at 5 (A.5). Examples of costs that are included in the Dairyland G&A cost pool include the salaries and benefits paid to the CEO and the Board of Directors, the accounting department, depreciation and amortization expense of the corporate headquarters building, and interest paid on outstanding corporate debt. *See* Supporting Schedule B.2 to Wilkins Expert Report (A.11-A.13).

Dairyland's cost accounting expert, Charles Wilkins, is a Certified Public Accountant with more than 35 years of experience as an industry executive and professional consultant in the government contracts field. He has worked with numerous government contractors to determine and develop appropriate overhead and G&A cost pool structures and rates, and has been qualified as an expert witness in cost accounting in numerous state and federal courts and before several arbitration panels. Mr. Wilkins has used Dairyland's cost accounting data to develop and calculate the overhead and G&A rates for each year of the 1999-2006 damages period. *See* Wilkins Expert Report at 7 (A.7). Mr. Wilkins was asked by Dairyland to calculate appropriate overhead and G&A rates because Dairyland does not calculate these rates or allocate overhead and G&A costs to its various business units in the ordinary course of its business. *Id.* at 1 (A.1). Unlike most for-profit utilities, as a wholesale rural electrical cooperative whose electricity rates are not regulated or approved by its regulator, the Rural Utilities Service (RUS), or any other regulatory body, Dairyland is not required to allocate indirect costs to its business units. *Id*.

However, all of these costs are recorded on Dairyland's general ledger and reported in its audited financial statements. *Id.* at 4 (A.4).

To calculate LACBWR's overhead and G&A rates, Mr. Wilkins' analysis consisted of, among other things, (i) obtaining a complete understanding of Dairyland's cost accounting system and organizational structure; (ii) compiling, reviewing and analyzing Dairyland's cost accounting detail as recorded in its general ledger; (iii) confirming that the cost accounting detail was consistent with Dairyland's audited financial statements; (iv) identifying the types of costs that should be included in each indirect and direct cost pool; and (v) allocating these costs to the various indirect and direct cost pools based upon an appropriate allocation methodology. The accounting methods and concepts employed by Mr. Wilkins are based upon generally accepted cost accounting principles and the Cost Accounting Standards (CAS) (48 C.F.R. Part 99) and Federal Acquisition Regulations (FAR) used by federal government contractors to determine their indirect rates and recovery of overhead and G&A costs under federal government contracts. 9/5/07 Wilkins Depo. Tr. at 130(6)-(15) (A.24). Although the CAS and FAR technically do not apply to Dairyland's standard contract in this case, they constitute a body of accounting rules and cost accounting concepts that the federal government utilizes and requires for its contractors that are wholly consistent with generally accepted accounting principles. *Id.* at 130(16)-134(9) (A.24-25).

## ARGUMENT

### I. MR. WILKINS' ANALYSIS AND TESTIMONY IS CLEARLY RELEVANT TO SHOWING THE OVERHEAD AND G&A COSTS INCURRED BY DAIRYLAND AS A RESULT OF THE GOVERNMENT'S BREACH

#### A. The Court in Other Spent Fuel Cases Has Properly Held That The Plaintiff is Not Required to Show That The Claimed Overhead Costs Would Not Have Been Incurred Absent The Government's Breach in Order to Recover Such Costs

The sole basis for the government's argument that Mr. Wilkins' testimony concerning Dairyland's claimed overhead and G&A costs should be precluded on "relevance" grounds is that Mr. Wilkins has not demonstrated that these claimed costs were "incremental" to the government's breach. In particular, the government claims that Mr. Wilkins' testimony should be deemed inadmissible and not be heard by this Court because "Dairyland did not direct Mr. Wilkins to conduct any analysis to determine the manner in which Dairyland would have allocated or charged overhead had DOE timely performed or to determine whether Dairyland incurred new and additional overhead costs that would not otherwise have been incurred absent DOE's delay." Govt. Mot. at 11.[2] The government's argument is without merit; it is an argument that has been consistently raised by the government in other spent fuel cases, and other Judges of this Court have almost universally rejected it. These cases have held unequivocally that properly allocated overhead and G&A costs are recoverable. It is not necessary to also analyze exactly how Dairyland's overhead and G&A resources would have been used absent the breach. Mr. Wilkins' opinion, that Dairyland would not have devoted these resources to breach-related activities, is, under sound cost accounting principles, both legally and factually sufficient to establish Dairyland's entitlement to recover these costs.

[2] "Govt. Mot." refers to Defendant's Motion *In Limine* to Exclude Expert Testimony Regarding Overhead Costs.

In *TVA*, the plaintiff claimed allocated internal labor charges, including allocated overhead costs, on grounds that they were incurred in connection with its spent fuel dry storage facility that was constructed as a result of the government's breach. 69 Fed. Cl. at 537. In objecting to these claimed costs, the government raised the same arguments it is making in the present motion, *viz.*, that these costs should not be recoverable because TVA would have paid its employees for their work regardless of DOE's breach and TVA should not be allowed to recover "expenses which would properly have been incurred regardless of the breach." *Id.* (internal quotations and citations omitted). In response to the government's argument, TVA pointed out that the use of its internal resources on the dry storage project obviated the need for it to retain outside contractors and purveyors of services to do the necessary work, and that its use of its own skilled labor to perform the technical work produced significant cost savings compared to the charges that would have been incurred using outside firms. *Id.*

After thoroughly surveying the existing case law regarding this issue, *see id.* at 537-39, the Court agreed with the plaintiff and rejected the government's arguments:

> [T]he fact that TVA used its own internal resources to support its mitigation is not fatal to its claim for damages in mitigating a breach of contract. Rather, the test for recovery is a targeted one: *whether use of the internal resources by TVA deprived it of the ability to employ those resources on other projects.* That TVA would have paid its employees in all events is not material to this inquiry.

*Id.* at 539 (internal citations and quotations omitted; emphasis added). Importantly, in awarding TVA its claimed internal labor costs, the Court did not require that TVA identify what other company projects these employees would have worked on absent the government's breach.

The *TVA* court's holding relied upon and followed two courts of appeal decisions involving breaches of contract, *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785 (9th Cir 1982), and *Dunn Appraisal Co. v. Honeywell Info. Sys., Inc.*, 687 F.2d 877, 883-84 (6th Cir.

1982). In *Convoy*, the Ninth Circuit upheld the district court's award of the costs of the hours its salaried personnel spent supervising an unsatisfactory computer system that the plaintiff had purchased from the defendant. 672 F.2d at 785. The defendant argued that supervisory staff costs could not be recovered because the plaintiff would have paid the employees' salaries regardless of the breach. *Id.* The court disagreed, reasoning that "[t]he issue is not whether [the plaintiff] would have paid the supervisors' salaries if the defendant had not breached the contract, but whether the breach deprived [the plaintiff] of the services it paid for." *Id.*

In *Dunn*, the Sixth Circuit applied the reasoning of *Convoy* to hold that a portion of a chief executive officer's salary could be recovered by his employer to the extent he spent a portion of his time dealing with a problem caused by the defendant's defective computer equipment. 687 F.2d at 883-84. The holding and reasoning of *Convoy* and *Dunn* have been followed in numerous other cases outside the spent fuel context. *See, e.g.*, *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1150 (3d Cir. 1990) (citing *Dunn* in awarding plaintiff mitigation costs in a defamation action for the time spent by chief executive officer in responding to defendant's statements); *United States v. CBS, Inc.*, 103 F.R.D. 365, 370-71 (C.D. Cal. 1984) (citing *Convoy* in holding that nonparty witnesses in antitrust actions were entitled to recover costs incurred in connection with responding to defendants' discovery demands, including costs for time spent by regular, full-time personnel on document production); *Charleston Lumber Co., Inc. v. Miller Housing Corp.*, 458 S.E.2d 431, 437 (S.C. Ct. App. 1995) (citing *Convoy* and *Dunn* in holding that employee time diverted from pursuit of employer's business is compensable damage in fraud action).

The standard for recovery of allocated internal labor and overhead costs enunciated in *TVA* has since been followed in other spent fuel cases. In *Southern Nuclear Operating Co. v.*

*United States*, 77 Fed. Cl. 396 (2007), the plaintiff claimed internal labor, management, overhead and payroll costs that had been allocated and booked to its dry storage and related projects. *Id.* at 440, 441. As it did in *TVA*, the government argued that these costs should not be recoverable because the plaintiff had failed to show any deferred work or incremental costs, and the plaintiff "is not entitled to recover expenses which would properly have been incurred regardless of the breach." *Id.* at 441 (quoting the government's brief; internal quotations and citations omitted). According to the government, recovery of overhead costs would be appropriate only "[i]f the nonbreaching party incurs cost for salary, overhead or other charges that would not have been spent absent the breach. . . ." *Id.* Citing and applying the *TVA* test, the Court rejected the government's position and awarded Southern Nuclear its claimed internal labor and overhead costs, reasoning as follows:

> Use of internal labor is less expensive than hiring contractors which reduces costs to ratepayers and ultimately to the federal taxpayers who bear the burden of judgments entered by this court. As damages continue, not only in this case, but also in the some fifty cases pending in this court, to not allow recovery appropriately established costs of internal labor (assuming causation and foreseeability is established) may lead to the use of contractors to perform future mitigation efforts at a higher cost, a result that is neither reasonable nor prudent.

*Id.* at 442-43.

The *Southern Nuclear* court further noted that, under the standard contract, the fees paid to DOE by utilities are intended to cover all of DOE's costs to transport and dispose of spent fuel, including "all direct costs*, indirect costs, and all allocable overhead*." *Id.* at 443; 10 C.F.R. § 961.11 (text of standard contract) (emphasis added). "Therefore, reciprocity in this regard is neither unreasonable nor unforeseen." *Southern Nuclear*, 77 Fed. Cl. at 443.

Relying upon the same test and rationale of *TVA* and *Southern Nuclear*, internal labor and overhead costs were also awarded to the spent fuel plaintiff in *Northern States Power Co. v.*

*United States*, 78 Fed. Cl. 449 (2007). The government once again argued that these allocated costs should not be recoverable because these costs would have been incurred even in the absence of the government's breach. *Id.* at 468. And, once again, the Court disagreed:

> We are unable, however, to discern any principled distinction between the employee fully engaged in breach-related work and the employee whose involvement in such work may have been only limited. In either case, a cost was incurred that is properly chargeable to the activity benefitted the development of a dry storage facility. Our concern here, it should be noted, is not in determining whether a loss was caused by the breach (in which case the issue of causation that defendant raises would, of course, be relevant), but rather whether the cost was incurred to ameliorate the effects of a breach. And since *every use of a resource has an opportunity cost -- namely, the alternative uses of that resource* -- it is quite appropriate to recognize as a cost of mitigation any diversion of labor that was applied to the accomplishment of that mitigation.

*Id.* (emphasis added); *see also System Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 66-67 (2007) (Lettow, J.) ("*System Fuels II*") (applying *TVA* test in awarding plaintiff its claimed internal labor costs). The same government argument was also made, and also rejected in *Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006) ("*PG&E*"): "Defendant contends that PG & E failed to demonstrate any alternative, profitable responsibilities to which it could have allocated its employees 'but for' DOE's delay. The court disagrees. To the extent that the costs of PG & E's internal labor were in fact performed on a 'breach-related project,'. . . the court finds that such labor costs should be properly awarded to plaintiff." *Id.* at 408 (quoting the government's brief; internal citation and quotations omitted).

In support of its motion, the government cites two other spent fuel decisions by Judge Braden, *System Fuels, Inc. v. United States*, 78 Fed. Cl. 769 (2007) ("*System Fuels I*"),[3] and *Sacramento Mun. Utility Dist. v. United States,* 70 Fed. Cl. 332 (2006) ("*SMUD*"), where the Court denied the plaintiffs recovery of certain claimed overhead costs. But Judge Braden did not

[3] There are two separate and distinct spent fuel cases before this Court in which the lead plaintiff is System Fuels, Inc.

grant a motion *in limine* in those cases. Rather, her decisions were based on factual determinations made on the basis of evidence heard at trial.

In *System Fuels I,* Judge Braden specifically stated, consistent with the case law cited above, that "[i]f the plaintiff has incurred overhead expenses as a result of the defendant's breach of contract, it has generally been held that the plaintiff's overhead expenses, to the extent they are reasonably foreseeable and properly allocated, are recoverable." 78 Fed. Cl. at 799 n.28 (citing S.R. Shapiro, *Comment Note: Overhead Expense as Recoverable Amount of Damages,* 3 A.L.R.3d 689, 1965 WL 13309 (1965); *M.H. McCloskey, Jr. v. United States,* 66 Cl. Ct. 105, 130 (1928)). Judge Braden awarded the plaintiffs their allocated "materials loader" overhead costs incurred in the operation of a storeroom and the supply chain function for its dry storage project, rejecting the government's arguments that the plaintiffs would have had the same number of employees and incurred the same costs with or without the partial breach. 78 Fed. Cl. at 799-800. Judge Braden did deny the plaintiffs their claimed "capital suspense" loader overhead costs, but not, as the government asserts, because the plaintiffs had not demonstrated that these same costs would not have been incurred in the absence of DOE's delay (*see* Govt. Mot. at 9-10). Rather, the Court denied these overhead costs because plaintiffs "were unable to verify exactly what portion of the capital suspense loader was incurred for work exclusively on the dry storage project. . . ." *Id.* at 800.

In *SMUD* – which was decided before *System Fuels I* – Judge Braden denied the plaintiff recovery of "other overhead costs" because it similarly had failed to meet its evidentiary burden of demonstrating that such costs were in fact incremental. 70 Fed. Cl. at 376-77. However, there is no inconsistency between this decision (or the denial of capital suspense loader costs in *System Fuels I*) and the other decisions cited above. Denial of overhead cost recovery in *SMUD* and

(partially) in *System Fuels I* was based upon the quality of evidence that was presented *at trial* and not based upon a government motion *in limine*. Indeed, the government has not cited a single case where this or any other court has rejected evidence regarding claimed overhead costs on a motion *in limine*. This is hardly surprising, because this is the kind of issue that can only be decided — or at least should only be decided — on a full trial record where the Court will be able to fully assess the quality of Mr. Wilkins' opinions and Dairyland's evidence regarding these claimed costs.

B. Whether Dairyland Would Have Incurred the Same Level of Overhead and G&A Costs in the "Non-Breach World" is Irrelevant

The foregoing cases are legally on point with the present case, and thereby establish that Mr. Wilkins' expert testimony is both relevant and helpful to the Court and, therefore, admissible. Like the plaintiffs in other spent fuel cases, Dairyland here is claiming incurred overhead and G&A costs associated with its breach-related projects and activities, and the government does not dispute that Mr. Wilkins is highly qualified to analyze and quantify these costs. Just as in these other spent fuel cases, Mr. Wilkins has opined in this case that Dairyland's allocation of overhead resources to its breach-related activities represent *opportunity costs* incurred by Dairyland and are, therefore, incremental to the breach. In particular, Mr. Wilkins has opined that:

> 4. . . . In a non-breach environment where the government would have removed all of Dairyland's spent fuel, these indirect costs would have been avoided as an incremental cost to LACBWR due to the reduction of LACBWR employees and, accordingly, would have reduced the indirect pool allocation. Such cost avoidance was not possible in the partial breach environment, thus making such costs incremental to LACBWR operations.
>
> 5. Similarly, had the government performed, no allocation of G&A resources to the LACBWR breach-related activities (*e.g.*, SAFSTOR costs) would have been required and corporate management and administration could have

> devoted their time and resources to other Dairyland divisions and non-breach related activities. . . . In other words, but for the government's breach, G&A resources would not have been diluted by the executive and overall organization efforts that had to be devoted to LACBWR operations. Accordingly, to the extent that Dairyland has incurred increased direct costs due to the government's partial breach, it has also incurred incremental G&A costs due to the breach.

Wilkins Rebuttal Expert Witness Report at 4-5 (A.17-18).

Mr. Wilkins also explained the incremental nature of Dairyland's claimed indirect costs during his deposition:

> Q. Let me ask you from a cost perspective, because you're a cost guy, considering that Dairyland would spend the same amount for its CEO in the breach and the nonbreach world, why has Dairyland suffered any economic harm related to its CEO in the breach world?
>
> A. Well, I cover that in the report, probably both reports. And we talked about it earlier today. It's, again, the alignment of the benefits received to the -- I'm sorry, alignment of the costs incurred or allocated to the benefits received. The fact that LACBWR operations are continuing necessitates some oversight and some effort on the part of management that could be used elsewhere if those operations were not there. And therefore, I believe that a portion of that G and A cost which -- part of which is represented by the CEO, should be allocated to LACBWR, LACBWR's direct costs.
>
> Q. But has CEO -- has Dairyland suffered any harm in terms of dollars spent for paying the CEO between the breach world and the nonbreach world?
>
> A. They may not have paid any additional money for the CEO if it's the same person, but I believe they've lost the ability of that person to do other things.
>
> Q. Opportunity cost, if you will. You hate the term "opportunity cost." I won't use it.
>
> A. That's fine. I'll accept that.

9/5/07 Wilkins Dep. Tr. at 252(15)-253(17) (A.26). Thus, had the government performed and removed Dairyland's spent fuel, no allocation of overhead and G&A resources to Dairyland's

breach-related activities would have been required, and Dairyland could have either devoted those resources to non-breach related activities and the company's revenue-generating segments, or it may have been able to reduce these costs through staff reductions and/or reduced acquisitions of services or materials.

The foregoing cases further demonstrate that, contrary to the government's argument, for Dairyland to recover its claimed overhead costs and, hence, for Mr. Wilkins' testimony to be admissible, there is no evidentiary requirement that he identify any specific lost opportunities to generate revenue or reduce costs through internal resources. There is also no requirement that he demonstrate that Dairyland would have incurred a lower level of overhead and G&A costs "but for" the government's breach. *See TVA*, 69 Fed. Cl. at 538; *Southern Nuclear*, 77 Fed. Cl. at 442; *Northern States*, 78 Fed. Cl. at 468; *PG&E*, 73 Fed. Cl. at 408; *System Fuels II*, 79 Fed. Cl. at 67. Indeed, the Federal Circuit and its predecessor have made it clear that a plaintiff's proof of damages need not specify exactly what transactions would have transpired absent a government breach. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1329 (Fed. Cir. 2002) (affirming award of damages based on lost profits from loaning money without identifying exactly what loans would have been made absent the breach); *Ace Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (approving award of damages for hearing transcription services without any specification of which hearings plaintiffs would have transcribed absent the breach); *Locke v. United States*, 283 F.2d 521, 524-25 (Cl. Ct. 1960) (approving award of damages for lost typewriter-repair business without requiring proof of exactly which typewriters plaintiff would have repaired absent the breach).

Furthermore, Dairyland's use of its existing overhead and G&A resources to support LACBWR and other breach-related activities is invariably less expensive than requiring it to

employ third party contractors to provide such necessary services. *See TVA*, 69 Fed. Cl. at 537; *Southern Nuclear*, 77 Fed. Cl. at 442-43. If LACBWR were its own free-standing organization, independent of Dairyland, there can be no doubt that it would have had to hire or contract out its CEO, accounting, information technology, human resources, corporate recordkeeping, engineering, and the other necessary support functions and services that comprise its claimed overhead and G&A costs. The fact that Dairyland has provided these necessary services to support not only its breach-related activities, but also the company's non-breach related activities, does not make them any less real costs incurred as a result of the government's breach.

The government attempts to contrast the overhead cost analysis performed by Mr. Wilkins in this case with the overhead analysis of Brad Cornell that was accepted by the Court in *PG&E*. *See* Govt. Mot. at 10. Professor Cornell's overhead cost analysis in *PG&E* principally consisted of reviewing PG&E's accounting records line-by-line and interviewing PG&E staff to identify the incremental overhead costs. However, just because Mr. Wilkins has taken a slightly different approach than Professor Cornell did to identify and calculate Dairyland's incremental overhead costs does not make his approach any less valid. Both approaches were aimed at the same goal of accurately identifying the total costs attributable to the government's breach and, conversely, excluding those overhead costs that are not properly attributable to the government's breach. Moreover, in *PG&E*, the Court accepted Professor Cornell's analysis notwithstanding the government's argument that "'PG&E failed to demonstrate any alternative, profitable responsibilities to which it could have allocated its employees 'but for' DOE's delay.'" *PG&E*, 73 Fed. Cl. at 408 (quoting the government's brief). This is precisely the same criticism the government is lodging against Mr. Wilkins' analysis here, and it should be rejected just as it was in *PG&E*.

In sum, there exists no valid basis for excluding Mr. Wilkins' expert testimony in this case. At most, the government's criticisms of Mr. Wilkins go towards the quality of his opinions and analysis, and not their relevance or admissibility.

## II. MR. WILKINS SHOULD BE ALLOWED TO TESTIFY ABOUT MATTERS ADDRESSED AT HIS DEPOSITION AND OTHER RELATED MATTERS

Taking issue with Dairyland's representation in its witness list that Mr. Wilkins' trial testimony may include "matters addressed at his deposition and other related matters," the government argues that, if Mr. Wilkins' testimony is allowed, it "should be limited to those matters identified in his initial and rebuttal reports." Govt. Mot. at 13. The government's purported concern about the potential scope of Mr. Wilkins' testimony is baseless. Mr. Wilkins intends to and should be allowed to testify to matters that flow directly from the opinions and analysis set forth in his reports, including all of the supporting schedules he created and data he relied upon. Dairyland's disclosure that Mr. Wilkins may testify about matters addressed at his deposition merely reflects the reality that, during his two depositions, he was asked questions from government counsel that required him to further explain or expand upon his previously disclosed opinions and the bases for such opinions. Indeed, despite its expressed concern that Mr. Wilkins' trial testimony may stray into opinions and subjects that were not disclosed in his reports, the government does not identify any opinions or matters that were raised during Mr. Wilkins' depositions that he should be precluded from testifying about. In this regard, the one case cited by the government, *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982 (Fed. Cir. 2007), is clearly inapposite. In that case, the district court precluded the plaintiff from relying upon the doctrine of equivalents in a patent infringement dispute because the one and only time that its expert disclosed his opinion on equivalents was during his deposition testimony under examination by his own attorney, and this occurred after the expert had denied

during defense counsel's examination forming any opinions on equivalents. *Id.* at 994-95. Under these circumstances, the Federal Circuit held that the district court had not abused its discretion in precluding the expert's testimony to prevent "ambush" at trial. *Id.* at 995. However, in the present case, the government does not and cannot allege that Mr. Wilkins expressed any new opinions at any point during his depositions. Accordingly, there is no basis or need for an order *in limine* that would artificially limit Mr. Wilkins' trial testimony to the specific matters identified in his expert reports.

CONCLUSION

For the foregoing reasons, Dairyland respectfully requests that the Court deny the government's motion *in limine* to exclude expert testimony regarding overhead costs.

Respectfully submitted,

May 15, 2008

s/ Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)

*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**EXPERT WITNESS REPORT OF CHARLES L. WILKINS**

## I. INTRODUCTION

I have been retained by Greenberg Traurig, LLP on behalf of Dairyland Power Cooperative ("Dairyland") in the above-referenced matter to calculate indirect overhead and general & administrative ("G&A") rates to be used in the calculation of costs incurred by Dairyland to maintain its La Crosse Boiling Water Reactor ("LACBWR") nuclear facility for storage of spent nuclear fuel until such time as the spent fuel can be moved to permanent storage provided by the U.S. Government. I understand that Dairyland is not required to prepare, calculate or record costs related to indirect rates in accordance with the regulations applicable to such contracts, mainly the Cost Accounting Standards ("CAS") and Federal Acquisition Regulations ("FAR"). In addition, I understand that Dairyland is not required by the Rural Utility Service ("RUS"), to prepare, calculate or record costs related to indirect rates. Accordingly, the rates prepared and shown in this report employ the techniques and applications of the CAS and FAR, but are not meant nor intended to represent indirect rates that are fully compliant with these regulations. A separate overhead and G&A rate applies to each year of Dairyland's operations included in this analysis, 1999 through 2006.

## II. BACKGROUND AND QUALIFICATIONS

I am a Senior Managing Director in the Forensic and Litigation Consulting practice of FTI Consulting, Inc. ("FTI") in Washington, DC. I have more than thirty-five years of experience in dispute resolution matters as an industry executive and as a professional advisor, in which the U.S. Government was a party in the dispute. My industry experience includes the aerospace and defense, Indian gaming, healthcare, manufacturing, government, telecommunications, oil and gas, utility, energy, and construction sectors, among others.

I have been engaged in dispute, regulatory and profit maximization matters on behalf of organizations in more than thirty different countries. I have led teams in determining the appropriate indirect cost pool structures and related rates, applying compliance review procedures for statutory, regulatory and internal policy compliance and have supervised many other types of financial and business consulting engagements. I have served as an arbitrator and mediator on domestic and international dispute matters. I have provided expert witness testimony on a variety of matters for both government agencies and contractors. Prior to its acquisition by FTI, I was a Partner in KPMG's Forensic and Litigation Services practice where I was responsible for the firm's national public contract litigation services practice. During my industry career, I held key management positions, including senior corporate auditor, controller and chief financial officer, in manufacturing organizations, including those involved in aerospace, defense, electronics, capital goods, mining and other industries.

During my professional career I have worked with many contractors, large and small. I have had occasion to develop or orchestrate the development of myriad cost structures, including indirect cost pools, their related base and indirect rate.

My attached resume provides more details about my qualifications, including a listing of my testimony during the last four years and a list of publications I have authored over the past ten years.

## III. SOURCES OF INFORMATION

In calculating the LACBWR indirect overhead rates and Dairyland G&A rates and reaching my opinion I have reviewed documents and related correspondence and relied upon discussions with Dairyland representatives as set forth below:

Documents Reviewed

1. Dairyland's Audited Financial Statements, specifically the *Consolidated Statement of Revenue & Expenses* for years 1999 through 2005,

2. Dairyland's internal Statement of Revenues and Expenses for years 1999 through 2006,

3. Dairyland's 2004 annual report,

4. Dairyland's 2004 Operating & Construction Budget (PLAC0104394 – 0104505),

5. US Dept of Agriculture - Rural Utility Service ("RUS") Uniform System of Accounts – Electric, Bulletin 1767B-1, provided and used by Dairyland,

6. Dairyland's detail accounting schedules related to their *Consolidated Statement of Revenue & Expenses* for years 1999 through 2006 by the applicable "RUS" General Ledger Account, Cost Center and Ledger Type,

7. Dairyland's Activity Based Core Business Models for years 1999 through 2004,

8. Dairyland's additional schedules related to headcount, depreciation, interest, and material purchases/issues,

9. Expert Witness Report of Todd D. Smith, and

10. Nuclear Decommissioning Trust and Nuclear Fuel Storage fund account project costs and financial reclassifications, including the Reactor Pressure Vessel ("RPV") Removal Project P7802.

Dairyland Representatives

1. Charles V. Sans Crainte, Vice President, Generation
2. Keith A. Stubbendick, Director of Accounting
3. Lori A. Flock, Payroll Manager,
4. Robert C. Mueller, Vice President, Finance & Administration.

If additional documentation or information is created or made available to me during the course of this litigation, I may review any such documentation or information and supplement and/or amend this report and/or my opinion(s), as appropriate.

## IV. SUMMARY OF OPINIONS

I have calculated the LACBWR overhead rates and Dairyland's G&A rates for the years 1999 through 2006 based upon Dairyland's incurred costs for those years. My opinions are that these rates are consistent with the costs recorded in Dairyland's general ledger and shown in Dairyland's audited financial statements, and they should be included as an element of costs in calculating total costs incurred for LACBWR operations, including any element of such incurred costs that comprise Dairyland's claimed damages in this case. These rates are shown in **Table I in Section V** of this report. The application of these rates to Dairyland's claimed costs in this case are shown in **Table II in Section V** of this report.

## V. ANALYSIS AND FINDINGS

### A. Dairyland's Incurred Costs Are Consistently Accounted For, Independently Audited And Verified, And Included In Their Annual Statements Of Financial Condition

Dairyland's financial condition is subjected to independent audit. Each year of costs included in Dairyland's financial statements was audited by an independent certified public accounting firm. Although we did not apply audit procedures to these statements, we traced Dairyland's costs from their general ledger to the audited financial statements and confirmed the costs assignable to LACBWR and other cost objectives.

### B. LACBWR Indirect Pool Costs Include A Homogeneous Collection Of Indirect Costs Required To Support LACBWR Operations

Service center and operations support costs assigned to the LACBWR Indirect Cost Pool include only such costs as were required to support LACBWR operations. Service center costs include, but are not limited to, office and IT services, human resources, marketing, and generation operations support based upon a causal/beneficial

relationship of such costs incurred to the benefits received by LACBWR. Unlike indirect costs that support the total operation of Dairyland's business (*i.e.*, G&A costs), LACBWR indirect pool costs benefit only the LACBWR operations and for purposes of this analysis are appropriately grouped into a single, homogeneous indirect cost pool for LACBWR.

### C. The G&A Pool Contains Costs That Are Homogeneous In Nature And Consistently Collected Or Allocated Into A Single G&A Cost Pool

Dairyland is not subject to the CAS.[1] However, the CAS provides definitions of certain costs and cost allocation concepts that are accepted by U.S. Government agencies since it is part of the Federal Acquisition Regulations (FAR) System. Moreover, these definitions as used in the CAS are consistent with the definitions for these same costs and cost allocation concepts as used in cost accounting text books. The CAS describes G&A costs as:

> *"....any management, financial, and other expense which is incurred by or allocated to a business unit and which is for the general management and administration of the business unit as a whole. G&A expense does not include those management expenses whose beneficial or casual relationship to cost objectives can be more directly measured by a base other than a cost input base representing the total activity of a business unit during a cost accounting period."*

A business unit is defined as any segment of an organization, or an entire business organization which is not divided into segments. Dairyland is a business unit. The G&A costs incurred by Dairyland meet the homogeneity test in that they were incurred for the general management and administration of the business as a whole and should be allocated to the total activity of the business unit. Such G&A costs were either incurred and charged to G&A cost accounts or they were incurred and charged to one of several service center cost pools, and further allocated to final cost objectives, LACBWR indirect pool costs or G&A pool costs, based upon a causal-beneficial relationship.

[1] 48 C.F.R. Chapter 1, Part 99.

**D. The Base For Allocation Of G&A Costs Is Total Cost Input**

CAS 410[2] provides and bases by which G&A costs should be allocated within the business unit. The standard states:

> *"The cost input base used to allocate the G&A expense pool shall include all significant elements of that cost input which represent the total activity of the business unit. The cost input base selected to represent the total activity of a business unit during a cost accounting period may be: Total cost input; value-added cost input; or single element cost input. The determination of which cost input base best represents the total activity of a business unit must be judged on the basis of the circumstances of each business unit."*

For Dairyland, the total cost input base is appropriate upon which to allocate G&A costs because that base represents the total activity of Dairyland's business, and G&A costs were incurred for the general management and administration of the business as a whole.

**E. A G&A Rate Reflects The Percent Of G&A Costs That Must Be Added To Each Dollar Of Base Costs To Appropriately Distribute G&A Costs To All Final Cost Objectives**

The G&A rate is designed to allocate a portion of G&A cost to all final cost objectives. Accordingly, the rate is comprised of two components: 1) the base over which G&A costs is to be allocated, which for Dairyland consists of all costs (total cost input, or TCI) excluding G&A costs, and, 2) the G&A pool which is to be allocated to all final cost objectives. The G&A rate is determined by dividing the base costs into the pool costs. Once determined, the rate suggests that for each dollar of base incurred and charged to a final cost objective, an additional amount of G&A determined as the percentage calculated must be added to that final cost objective. The result within any cost accounting period is that the total G&A costs are distributed to all final cost objectives.

[2] FAR 9904.410 Allocation of business unit general and administrative expenses to final cost objectives.

### F. Dairyland's Accounting System Provides For The Classification Of Costs To The Appropriate Cost Objectives

Dairyland's accounting system appropriately classifies recorded costs as direct or indirect by using a series of general ledger accounts.[3] Functional visibility is provided and accounted for using a cost center structure that, for purposes of calculating indirect overhead rates, is used to identify service center costs, operational support costs, or G&A costs. Service center costs can then be further allocated (distributed) to a final cost objective[4]; an example is LACBWR Cost Center ("Cctr") 71, or the various indirect (pool) costs, which include operational support and G&A.

The results of my calculation of LACBWR indirect overhead and Dairyland G&A rates for the years 1999-2006 are shown in Table I:

**Table I** **$ X 1,000**

| Year | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| LACBWR | | | | | | | | |
| O/head $ | $ 510 | $ 511 | $ 533 | $ 579 | $ 571 | $ 592 | $ 629 | $ 739 |
| Base $ | $ 7,410 | $ 10,208 | $ 6,492 | $ 5,710 | $ 5,713 | $ 5,314 | $ 11,762 | $ 17,393 |
| Rate % | 6.9% | 5.0% | 8.2% | 10.1% | 10.0% | 11.1% | 5.3% | 4.2% |
| Year | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| DPC G&A $ | $ 19,991 | $ 10,638 | $ 12,352 | $ 12,649 | $ 12,529 | $ 11,379 | $ 13,887 | $ 15,247 |
| Base $ | $ 149,609 | $ 166,903 | $ 169,012 | $ 182,559 | $ 194,281 | $ 211,422 | $ 224,526 | $ 266,298 |
| Rate % | 13.4% | 6.4% | 7.3% | 6.9% | 6.4% | 5.4% | 6.2% | 5.7% |

Dairyland identifies its LACBWR operations segment of the business principally by a dedicated cost center, Cctr 71, to which both direct and indirect costs are charged. In the overhead calculation, the LACBWR base includes (1) all costs charged directly to the LACBWR cost center, (2) other non-Cctr 71 costs accounted for in the RUS GL accounts designated to record and account for LACBWR direct activities (*i.e.*, GL accounts 517xx,

[3] A direct cost is any cost that can be identified specifically with a particular final cost objective. FAR 31.202 Direct costs. An indirect cost is any cost not directly identified with a single, final cost objective, but identified with two or more final cost objectives or an intermediate cost objective. FAR 31.203 Indirect costs.

[4] A final cost objective means a cost objective which has allocated to it both direct and indirect costs, and in the contractor's accumulation system, is one of the final accumulation points. CAS 9904.402-30(a)(4) Definitions.

520xx, 524xx, and 530xx),[5] (3) Cctr 71 costs that were charged as indirect but were appropriately reclassified as direct costs to Cctr 71 for overhead rate calculation purposes, and (4) applicable project costs recorded directly or reclassified to DPC's Nuclear Decommissioning Trust ("NDT") or Nuclear Fuel Storage ("NFS") special fund accounts.[6, 7]

There are four categories of claimed costs which are included in the LACBWR bases for both overhead and G&A in Table I above: (1) SAFSTOR costs, (2) Private Fuel Storage LLC ("PFS") capital contributions, (3) insurance costs, and (4) Reactor Pressure Vessel ("RPV") Removal Project marginal costs.[8] These four cost components are included in both the indirect pool base and G&A base in Table I above and, accordingly, should carry their share of overhead and G&A costs.[9]

The application of overhead and G&A rates to these three categories of claimed costs are not additive to the overhead and G&A costs shown in Table I, but merely

[5] DPC uses the U.S. Department of Agriculture- Rural Utility Service ("RUS") Uniform System of Accounts to account and record its costs. The accounts principally used to record Nuclear Power Generation Operations for LACBWR are the 517 series related to operation Supervision and Engineering, 520 series for Radioactive Expenses, 524 series for Miscellaneous Nuclear Power Expenses, and the 530 series related to the Maintenance of Reactor Plant Equipment.

[6] The RUS uniform chart of accounts requires accounting for *Other Special Funds* under *Other Property and Investments* - Account 128 and states in part "that it includes the amount of cash and to book the cost of these investments which have been segregated in special funds not provided for elsewhere. A separate account, with appropriate title, shall be kept for each fund." Accordingly, Dairyland has established two funds, the NDT and NFS, to accumulate the estimated amounts necessary to decommission LACBWR. The assets of these funds are available solely to satisfy the future costs of decommissioning and are recorded as "other non-current assets" in the consolidated balance sheets. Commencing in 2005, Dairyland has used project numbers to account for the actual costs incurred that are directly related to the decommissioning and/or fuel storage efforts (*e.g.*, P3531, P6564, P7667, P7802, P7949); these costs are then subsequently applied and charged against the applicable liability reserve account on the balance sheet. For rate application purposes, the costs of these projects have been appropriately included in the LACBWR base.

[7] Each of these categories of costs were recorded and reflected in Dairyland's audited financial statements.

[8] "SAFSTOR" costs are the costs whereby the facility is maintained in safe storage, (principally accounted for in Cctr 71 with additional direct support requested and accounted for the aforementioned RUS GL LACBWR accounts). PFS Capital Contributions are actual costs incurred by Dairyland for capital payments for shares, made to PFS through Genoa Fuel Tech, Inc. (GFT). Insurance costs consist of actual premium payments for LACBWR's nuclear liability and property insurance policies. RPV removal project marginal costs represent the difference between the actual costs Dairyland has incurred to remove and dispose of the RPV and the costs Dairyland would have incurred had the government performed and removed the spent fuel from the LACBWR reactor building, as estimated by Todd D. Smith in his expert report.

[9] Dairyland's damages claim also includes a separate cost category called "DPC to GFT costs". These costs are not included in the base for my calculation of overhead and G&A rates because such costs have been separately accounted for by Dairyland in a non-operating subsidiary investment account and accordingly would not be appropriate to include in the base.

identify the portion of overhead and G&A from Table I that is applicable to these three cost elements. The application of these rates to SAFSTOR costs, PFS capital contributions, insurance costs and RPV removal project marginal costs[10] is calculated and shown in Table II:

**Table II** **$ X 1,000**

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| SAFSTOR | $ 2,838 | $ 2,609 | $ 3,496 | $ 3,808 | $ 4,034 | $ 3,762 | $ 3,828 | $ 4,045 |
| Capital Cont | $ 1,455 | $ 1,670 | $ 1,456 | $ 1,000 | | $ 510 | $ 500 | |
| Insurance | $ 197 | $ 134 | $ 165 | $ 194 | $ 216 | $ 217 | $ 222 | $ 328 |
| RPV Proj. | | | | | | | $ 1,222 | $ 3,818 |
| **Subtotal** | **$ 4,489** | **$ 4,414** | **$ 5,118** | **$ 5,003** | **$ 4,251** | **$ 4,489** | **$ 5,771** | **$ 8,191** |
| OVHD % | 6.9% | 5.0% | 8.2% | 10.1% | 10.0% | 11.1% | 5.3% | 4.2% |
| OVHD $ | **$ 310** | **$ 221** | **$ 420** | **$ 505** | **$ 425** | **$ 498** | **$ 306** | **$ 344** |
| G&A % | 13.4% | 6.4% | 7.3% | 6.9% | 6.4% | 5.4% | 6.2% | 5.7% |
| G&A $ | **$ 643** | **$ 297** | **$ 404** | **$ 380** | **$ 299** | **$ 269** | **$ 377** | **$ 486** |

## VII. COMPENSATION

FTI is being compensated for my time at a rate of $550 per hour.

[10] Todd Smith's total estimated RPV removal project marginal costs of $6,809,457 represent costs over the 2005 through 2007 time period. For overhead and G&A rate application purposes for the years 2005 and 2006, I have prorated this total amount based upon actual incurred costs for the RPV removal/disposal project (P7802) in 2005 and 2006. As a result, only $5,040,062 of the $6,809,457 is reflected in Table II. *See* Schedule D.2 for Rate Model Years 2005 & 2006.

Charles L. Wilkins
*Senior Managing Director*
Forensic and Litigation Consulting

FTI Consulting, Inc.
1201 I (Eye) Street NW
Washington, DC 20005

Dated: March 23, 2007

**DAIRYLAND**
**Indirect Detail by Pool**
**Calendar Year 2005**

**SCHEDULE B.2**

| | | | | 9xx : Indirect Accounts | | | | |
|---|---|---|---|---|---|---|---|---|
| Grouping | CCtr | Description | Pool Description | Labor | Bene | O&M | Other | Totals |
| F&A - Adm | 36 | Records Mgmt | Admin Services | 66,256 | 44,423 | 88,385 | | 199,064 |
| F&A - Adm | 44 | Publication Services | Admin Services | 175,023 | 117,502 | 303,911 | | 596,436 |
| F&A - Adm | 45 | Cafeteria | Admin Services | 63,912 | 42,896 | 22,133 | | 128,941 |
| F&A - Adm | 46 | Admin Services | Admin Services | 217,075 | 145,283 | 272,853 | | 635,211 |
| | | | | 522,266 | 350,104 | 687,282 | - | 1,559,652 |
| F&A - Aviation | 34 | Aviation | Aviation | 177,386 | 118,849 | (166,092) | | 130,143 |
| | | | | 177,386 | 118,849 | (166,092) | - | 130,143 |
| F&A - Fac | 33 | Building Services | Facilities | 240,511 | 161,520 | 55,901 | | 457,932 |
| | | | | 240,511 | 161,520 | 55,901 | - | 457,932 |
| F&A - G&A | 31 | F&A Div Mgmt | G&A | 236,217 | 158,396 | 285,303 | | 679,916 |
| F&A - G&A | 32 | Accounting | G&A | 537,212 | 359,876 | 170,837 | | 1,067,925 |
| F&A - G&A | 35 | Financial Mgmt | G&A | 342,290 | 229,518 | 316,266 | | 888,074 |
| Corp-GA | 39 | Miscellaneous | G&A | 90,498 | 139,169 | 2,749,882 | | 2,979,549 |
| Mgmt - GA | 48 | President CEO | G&A | 587,689 | 394,661 | $365,931 | | 1,348,281 |
| Corp | | HQ Depreciation & Interest | G&A | | | | $5,861,656 | 5,861,656 |
| | | | | 1,793,906 | 1,281,620 | 3,888,219 | 5,861,656 | 12,825,401 |
| Gen 1 | 60 | Environmental | Gen - Environmental | 148,840 | 99,675 | 72,769 | | 321,284 |
| Gen 1 | 61 | Air Quality | Gen - Environmental | 121,297 | 81,247 | 20,725 | | 223,269 |
| Gen 1 | 62 | Environ. Impact | Gen - Environmental | 87,692 | 58,692 | 86,144 | | 232,528 |
| Gen 1 | 63 | Chemical Services | Gen - Environmental | 71,682 | 62,609 | $26,119 | | 160,410 |
| | | | | 429,511 | 302,223 | 205,757 | - | 937,491 |
| Gen 2 | 59 | Gen Div Mgmt | Gen - Mgmt | 209,578 | 137,635 | 89,424 | | 436,637 |
| Gen 2 | 95 | Plant Operations | Gen - Mgmt | 39,558 | 26,842 | 7,599 | | 73,999 |
| | | | | 249,136 | 164,477 | 97,023 | - | 510,636 |
| Gen 3 | 86 | Gen Engineering Records | Gen - Ops Support | 56,916 | 38,290 | 7,707 | | 102,913 |
| Gen 3 | 88 | Gen Support Serv | Gen - Ops Support | 33,604 | 22,452 | 3,122 | | 59,178 |
| Gen 3 | 89 | Generation Eng. | Gen - Ops Support | 103,395 | 69,035 | 28,757 | | 201,187 |
| Gen 3 | 90 | Performance Admin. | Gen - Ops Support | 93,792 | 62,570 | 49,076 | | 205,438 |
| Gen 3 | 91 | Generation Maint. | Gen - Ops Support | 35,385 | 23,534 | 32,386 | | 91,305 |
| Gen 3 | 98 | Nuclear & Special Projects | Gen - Ops Support | - | - | - | | - |
| | | | | 323,092 | 215,881 | 121,048 | - | 660,021 |
| Corp | 38 | GEN~SYS ENERGY | Gen - Overhead | - | - | 2,476 | | 2,476 |
| Gen | 66 | Genoa Site | Gen - Overhead | 800 | 530 | $487 | | 1,817 |
| Gen | 67 | Genoa #3 Oper | Gen - Overhead | 147 | 98 | $0 | | 245 |
| Gen | 68 | Genoa #3 Mech Maint | Gen - Overhead | 589 | 7,270 | $4,785 | | 12,644 |

**DAIRYLAND**
**Indirect Detail by Pool**
**Calendar Year 2005**

**SCHEDULE B.2**

| Grouping | CCtr | Description | Pool Description | 9xx : Indirect Accounts Labor | Bene | O&M | Other | Totals |
|---|---|---|---|---|---|---|---|---|
| Gen | 70 | Genoa #3 Major Projects | Gen - Overhead | - | - | $0 | | - |
| Gen | 76 | JPM | Gen - Overhead | - | - | $0 | | - |
| Gen | 77 | JPM Projects | Gen - Overhead | - | - | $25 | | 25 |
| Gen | 78 | JPM Operations | Gen - Overhead | - | 16,278 | $234 | | 16,512 |
| Gen | 79 | JPM Mech Maint | Gen - Overhead | - | - | $862 | | 862 |
| Gen | 82 | Alma Operations | Gen - Overhead | - | - | $1,217 | | 1,217 |
| Gen | 84 | Alma - Mech Maint | Gen - Overhead | 471 | 3,544 | $0 | | 4,015 |
| Gen | 87 | Elk Mound | Gen - Overhead | - | - | $0 | | - |
| Gen | 92 | Flambeau | Gen - Overhead | - | - | $100 | | 100 |
| Gen | 100 | Seven Mile Creek | Gen - Overhead | - | - | $0 | | - |
| Gen | 110 | Methane Digestors | Gen - Overhead | - | - | $0 | | - |
| | | | | 2,007 | 27,720 | 10,186 | - | 39,913 |
| Gen | 71 | LACBWR | Gen - Overhead | 539 | 358 | $30 | | 927 |
| | | | | 539 | 358 | 30 | - | 927 |
| Gen 4 | 64 | Quality Assurance | Gen Quality | 73,488 | 49,222 | 16,241 | | 138,951 |
| | | | | 73,488 | 49,222 | 16,241 | - | 138,951 |
| F&A - Gra | 28 | Graphic Design | Graphics | - | - | - | | - |
| | | | | - | - | - | - | - |
| Mgmt - HR/Mtk | 26 | Integrated Planning | HR & Marketing | 290,848 | 195,016 | $158,958 | | 644,822 |
| Mgmt - HR/Mtk | 47 | Strategic Planning | HR & Marketing | 359,242 | 240,839 | $456,298 | | 1,056,379 |
| CorpSup - HR/ | 47 | Strategic Planning | HR & Marketing | - | - | $0 | | - |
| Mgmt - HR/Mtk | 51 | Human Resources | HR & Marketing | 452,540 | 303,106 | $378,247 | | 1,133,893 |
| | | | | 1,102,630 | 738,961 | 993,503 | - | 2,835,094 |
| F&A - Mtl$ | 37 | Material Control | Material Burden | - | 1,965 | (2,471) | | (506) |
| F&A - Mtl$ | 41 | Purchasing | Material Burden | 204,850 | 137,235 | 10,293 | | 352,378 |
| | | | | 204,850 | 139,200 | 7,822 | - | 351,872 |
| F&A - Office S | 43 | Procurement | Office & IT Services | - | - | 596 | | 596 |
| Mgmt - Offc Se | 49 | Safety & Security | Office & IT Services | 431,829 | 289,418 | $99,504 | | 820,751 |
| Mgmt - Offc Se | 53 | Info Technology | Office & IT Services | 268,027 | 179,607 | $227,338 | | 674,972 |
| Mgmt - Offc Se | 55 | DPC Applic. Systems | Office & IT Services | 481,582 | 322,038 | $21,049 | | 824,669 |
| Mgmt - Offc Se | 56 | Technical Services | Office & IT Services | 337,989 | 226,228 | $769,940 | | 1,334,157 |
| Mgmt - Offc Se | 57 | Info Center | Office & IT Services | 109,535 | 73,256 | $94,036 | | 276,827 |
| | | | | 1,628,962 | 1,090,547 | 1,212,463 | - | 3,931,972 |
| PD | 01 | Power Delivery Mgmt | Power Delivery Overhead | 518,672 | 347,352 | $237,839 | | 1,103,863 |
| PD | 02 | Trans Support Serv | Power Delivery Overhead | 71,561 | 47,939 | $9,120 | | 128,620 |
| PD | 04 | Trans Maint North | Power Delivery Overhead | 19,437 | 13,065 | $7,040 | | 39,542 |

**DAIRYLAND**
**Indirect Detail by Pool**
**Calendar Year 2005**

**SCHEDULE B.2**

| | | | | 9xx : Indirect Accounts | | | | |
|---|---|---|---|---|---|---|---|---|
| Grouping | CCtr | Description | Pool Description | Labor | Bene | O&M | Other | Totals |
| PD | 05 | Trans Maint South | Power Delivery Overhead | 9,204 | 6,280 | $5,981 | | 21,465 |
| PD | 06 | Trans Maint West | Power Delivery Overhead | 7,321 | 5,018 | $2,682 | | 15,021 |
| PD | 07 | Electrical Maintenance | Power Delivery Overhead | 75,587 | 50,670 | $11,148 | | 137,405 |
| PD | 08 | SubStation Construction | Power Delivery Overhead | - | - | $0 | | - |
| PD | 09 | Transmission Const | Power Delivery Overhead | 22,090 | 14,795 | $4,772 | | 41,657 |
| PD | 10 | Field Operations | Power Delivery Overhead | 11,052 | 7,418 | $6,151 | | 24,621 |
| PD | 11 | Fleet Operations | Power Delivery Overhead | 315,736 | 211,148 | $404,251 | | 931,135 |
| PD | 12 | Transmission Eng. | Power Delivery Overhead | - | - | $0 | | - |
| PD | 13 | Transmission Design | Power Delivery Overhead | 51,970 | 34,728 | $1,737 | | 88,435 |
| PD | 14 | RE/ROW/RS | Power Delivery Overhead | 165,850 | 110,787 | $137,843 | | 414,480 |
| PD | 15 | Survey | Power Delivery Overhead | 16,092 | 10,738 | $8,507 | | 35,337 |
| PD | 16 | Vegetation Mgmt | Power Delivery Overhead | 18,740 | 25,710 | $1,153 | | 45,603 |
| PD | 17 | Electrical Engineering | Power Delivery Overhead | 185,551 | 124,314 | $30,513 | | 340,378 |
| PD | 19 | Telecomm. Services | Power Delivery Overhead | 344,225 | 232,019 | $356,344 | | 932,588 |
| PD | 42 | Power Delivery Services | Power Delivery Overhead | - | - | $0 | | - |
| PD | 99 | Power Deliver Capital Projects | Power Delivery Overhead | - | - | $3,171 | | 3,171 |
| PD | 120 | Contracts and Compliance | Power Delivery Overhead | 148,419 | 99,255 | $16,977 | | 264,651 |
| PD | 122 | Power Delivery Projects | Power Delivery Overhead | - | - | $0 | | - |
| | | | | 1,981,507 | 1,341,236 | 1,245,229 | - | 4,567,972 |
| F&A - Prt | 22 | Printing | Printing | - | - | - | | - |
| | | | | - | - | - | - | - |
| SOC | 94 | Compliance Coordination | System Ops | - | - | $0 | | - |
| SOC | 73 130 | Load Management | System Ops | - | - | $514,827 | | 514,827 |
| SOC | 93 127 128 | Operations Computers | System Ops | 1,838 | 1,588 | $1,326 | | 4,752 |
| SOC | 96 126 | System Oper. Center | System Ops | - | - | $4,052 | | 4,052 |
| SOC | 97 125 | System Operations | System Ops | 149,212 | 99,677 | $36,968 | | 285,857 |
| | | | | 151,050 | 101,265 | 557,173 | - | 809,488 |
| | | | | 8,880,841 | 6,083,183 | 8,931,785 | 5,861,656 | 29,757,465 |
| | | | | 8,880,882 | 6,083,223 | 8,932,677 | 5,861,656 | 29,758,438 |
| | | | | (41) | (40) | (892) | - | (973) |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**REBUTTAL EXPERT WITNESS REPORT OF CHARLES L. WILKINS**

## I. BACKGROUND

On March 23, 2007, I submitted an expert report that calculated Dairyland's historical indirect overhead and general and administrative ("G&A") rates to be used in the calculation of costs that have been incurred by Dairyland to maintain its LaCrosse Boiling Water Reactor ("LACBWR") nuclear facility for storage of spent nuclear fuel as a result of the government's partial breach of its Standard Contract with Dairyland. The results of my calculations are set forth in Tables I and II of my March 23 report. The government has engaged R. Larry Johnson of Veris Consulting, LLC to opine on Dairyland's damages claim in his case, including its claimed overhead and G&A costs. In his June 15, 2007 expert report (the "Johnson Report"), Mr. Johnson, among other things, asserts that Dairyland should not be allowed to recover any indirect overhead or G&A costs because, in his opinion, such costs are not "incremental" to the government's partial breach. Mr. Johnson further asserts that Dairyland's indirect overhead and G&A

costs should not be recoverable because I have not offered an opinion that these costs constitute "damages" to Dairyland. As discussed below, Mr. Johnson's opinions are flawed under fundamental cost accounting principles and mischaracterize my report and deposition testimony.

## II. SUMMARY OF REBUTTAL OPINIONS

It is my opinion that Dairyland's claimed overhead and G&A costs assigned to LACBWR operations are "incremental" to the government's partial breach in that they would not have been incurred by Dairyland or its G&A resources would have been utilized elsewhere had the government performed under its Standard Contract with Dairyland. Furthermore, as my expert report and deposition testimony make clear, it is my opinion that, if the court determines that Dairyland's claimed direct costs are recoverable as damages, then my calculated indirect overhead and G&A costs associated with these direct costs should also be recoverable as damages.

## III. BASES FOR REBUTTAL OPINIONS

### A. Dairyland's Claimed Overhead And G&A Costs Are "Incremental" To The Government's Partial Breach

1. Mr. Johnson claims that the calculated indirect overhead and G&A costs set forth in Table II of my original report are not "incremental" to the government's partial breach. Mr. Johnson appears to define a cost as "incremental to the breach" if the cost is shown to be "directly related and necessary to the activities caused by the breach and reflect expenditures that would not have been made but for the breach." Johnson Report at 6. Mr. Johnson does not cite any relevant authority to support his definition and I am not aware of any authority (accounting-related or otherwise) that defines an incremental cost as a cost that must be "directly related and necessary to the activities [at

issue]." However, during my deposition in this case, government counsel defined "incremental to the breach" somewhat differently and more broadly than Mr. Johnson:

> Q: Okay. What if damages are calculated based upon whether or not the costs are incremental to the breach? Would this analysis be appropriate?
>
> A: Describe for me what you mean by "incremental to the breach."
>
> Q: Well, when – suppose damages are defined as the – essentially, **the difference between the cost that Dairyland incurred because DOE did not begin accepting fuel pursuant to the standard contract versus the cost that it would have incurred in any event.** In other words, it's the difference. Do you understand what I'm saying?

Wilkins Deposition, pp. 14-15 (emphasis added).

In addition, various accounting authorities define an "incremental cost" in a way similar to government counsel's definition:

- The "[d]ifference in costs between two or more alternatives," *Dictionary of Accounting Terms*, 3d ed. (2005);
- The "[a]dditional business expense incurred as a result of taking a particular action," *Dictionary of Marketing Terms*, 3d ed. (2000);
- "[T]he increase or decrease in costs as a result of one more or one less unit of output," AccountingGlossary.net, http://accountingglossary.net/definition/1512-INCREMENTAL_COST; and
- "The additional cost of an additional quantity," AccountingCoach.com, http://www.accountingcoach.com/accounting-terms/accounting-dictionary/accounting-terms-I.html.

2. Consistent with the accepted accounting and economic definition of "incremental cost" (*i.e.*, the definitions set forth in the foregoing accounting authorities), it is my opinion that, to the extent that Dairyland has incurred incremental direct costs due to the government's partial breach, it has also incurred incremental indirect overhead and G&A costs due to the breach. Accordingly, it is my opinion Dairyland's claimed indirect costs should be considered incremental to the government's breach.

3. My opinion flows directly from basic cost accounting principles. Cost accounting is the historical process of tracking the costs associated with performing certain activities within an organization. These principles are developed and defined in, among other places, cost accounting textbooks such as the AICPA-sponsored publication *Cost Accounting: A Comprehensive Guide* by Steven M. Bragg (2001) and *Government Contracts Costs & Pricing* by Karen L. Manos (2004), and in the Federal Acquisition Regulations (FAR) Cost Principles Part 31 and the Cost Accounting Standards, 48 C.F.R. Part 99, for organizations that sell goods and services to the federal government. These principles rely upon systematic processes of assigning or allocating costs where benefits are received. Pursuant to fundamental cost accounting principles, had the government performed under the Standard Contract and removed Dairyland's spent nuclear fuel in a reasonable and timely manner (*i.e.*, by the end of 1998), Dairyland would not have incurred LACBWR direct costs during the 1999-2006 time period to maintain current LACBWR operations and, therefore, there would be no direct costs for which indirect overhead support was required.

4. For example, the Office and IT Services allocation in my model contains overhead support activities for Procurement, Safety & Security, Information Technology, DPC Application Systems, Technical Services, and the Information Center. These support services provide the necessary IT and office interfaces and consumption utilized by LACBWR employees, including efforts by LACBWR employees that rely on Dairyland's IT connectivity, accounting and other internal software applications, vendor procurement, purchase order processing, and safety and security training and oversight. For LACBWR, as with other final cost objectives, these services are directly related to

the direct labor employed. In a non-breach environment where the government would have removed all of Dairyland's spent fuel, these indirect costs would have been avoided as an incremental cost to LACBWR due to the reduction of LACBWR employees and, accordingly, would have reduced the indirect overhead pool allocation. Such cost avoidance was not possible in the partial breach environment, thus making such costs incremental to LACBWR operations.

5. Similarly, had the government performed, no allocation of G&A resources to the LACBWR breach-related activities (*e.g.*, SAFSTOR costs) would have been required and corporate management and administration could have devoted their time and resources to other Dairyland divisions and non-breach related activities. For example, instead of devoting their time and attention to LACBWR operations and maintenance during the breach period, Dairyland's Vice President of Generation, Charles Sans Crainte, and other corporate management would have been able to devote more of their time and attention to other power generation sites and to the company's transmission and power delivery efforts. In other words, but for the government's breach, G&A resources would not have been diluted by the executive and overall organization efforts that had to be devoted to LACBWR operations. Accordingly, to the extent that Dairyland has incurred increased direct costs due to the government's partial breach, it has also incurred incremental G&A costs due to the breach.

6. Contrary to Mr. Johnson's assertion, the fact that Dairyland would still have a CEO, a corporate headquarters, a cafeteria and other G&A type functions and related costs in the "non-breach" world does not mean that such indirect allocated costs are not "incremental" to the government's partial breach. Under fundamental cost

accounting principles (including the government's Cost Accounting Standards, *see* CAS 410, Allocation of Business Unit General and Administrative Expense to Final Cost Objectives, 48 C.F.R. § 9904.410 (2007)), G&A costs are supposed to be allocated to final cost objectives based upon a causal and beneficial relationship. The concept is that fluctuations in demand of applicable services will cause an equivalent shift in the allocations or follow the benefits appropriately to the business unit or final cost objective based on a beneficial or casual relationship. In other words, G&A costs must be allocated based upon the benefits appreciated by the user. Such benefits are derived by consumption, utilization, or some other applicable metric in which the individual, business, or process receives assistance from the originating activity; the concept of this principle is that business units share proportionately to the benefits received. Thus, had LACBWR's operations ceased as a result of the government performing its obligations under the Standard Contract, there would be no direct costs incurred for LACBWR operations and, therefore, LACBWR would not have appreciated any benefits from the various services incorporated in the G&A pool. Accordingly, the government's partial breach resulted in incremental G&A costs attributable to LACBWR operations.

7. By way of example, in his report Mr. Johnson cites my allocation of a portion of the cafeteria costs at Dairyland's administrative offices as "not incremental to the partial breach." Johnson Report at 9. Mr. Johnson has apparently failed to comprehend that the cafeteria cost that is allocated as part of the Admin Services Pool is based upon the headcount of personnel residing in the administrative offices. Specifically, for years 1999 through 2002, LACWBR had approximately 36% of the total LACBWR headcount residing in the administrative offices consuming and utilizing the

resources of the cafeteria. *See* Wilkins Report, Rate Models 1999-2002, Schedules B.1 and E.3 (showing LACBWR Admin Headcount is 10 out of a total of 28 LACBWR employees). Had the government performed its obligations under the Standard Contract, it is highly unlikely that Dairyland would have had such LACBWR personnel in the administrative offices, and Dairyland would not have incurred such costs related to LACBWR personnel working out of the administrative offices. This is clearly an incremental cost incurred by Dairyland as a result of the partial breach by the government. That these costs were incrementally caused by the government's breach is further demonstrated in subsequent years wherein the cafeteria cost allocation to LACBWR in my analysis is reduced to zero (-0-) because the LACBWR personnel were no longer residing in the administrative offices. *See* Wilkins Report, Rate Models 2003-06, Schedules B.1 and E.3 (showing LACBWR Admin Headcount is -0- ).

### B. If Dairyland's Claimed Direct Costs Are Recoverable As Damages, Then The Calculated Indirect Overhead And G&A Costs Associated With These Direct Costs Should Also Be Recoverable As Damages

Mr. Johnson's assertion that I do not believe the overhead and G&A costs I have calculated constitute damages to Dairyland (Johnson Report at 7) mischaracterizes my report and deposition testimony. Although I was not asked for and do not have an opinion on whether Dairyland's claimed costs were caused by the government's partial breach, it is my opinion that, to the extent that Dairyland incurred direct costs due to the government's breach, then Dairyland has also incurred indirect overhead and G&A costs associated with those direct costs. Put another way, to the extent that Dairyland recovers direct costs as damages in this case as a result of the government's breach of contract, it is my opinion that it should also recover as damages the indirect costs associated with

such direct costs based upon an application of the overhead and G&A rates I have calculated. The indirect overhead and G&A costs associated with Dairyland's claimed costs in this case have been calculated by me and are set forth in Table II of my original report. The cost allocations that result from the overhead and G&A rates I calculated are based upon real costs incurred by Dairyland and recognition of the real benefits received by the using organization. A portion of such indirect costs would not have been attributable to LACBWR had the government performed its obligations under the Standard Contract.

## IV. DOCUMENTS CONSIDERED

- Expert Report of R. Larry Johnson dated June 15, 2007, and documents and deposition testimony specifically referenced in such report;
- Documents listed in Expert Witness Report of Charles L. Wilkins dated March 23, 2007 (p. 3).

## V. QUALIFICATIONS

My qualifications, publications and prior expert testimony are set forth in my March 23, 2007 report and have not changed.

## VI. COMPENSATION

FTI is being compensated for my time at a rate of $550 per hour.

Charles L. Wilkins
Senior Managing Director
Forensic and Litigation Consulting
FTI Consulting, Inc.
1101 K Street NW
Washington, DC 20005

Dated: August 17, 2007

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Case No. 04-106C (Chief Judge Damich)

DAIRYLAND POWER COOPERATIVE, )
Plaintiff, )
v. )
UNITED STATES, )
Defendant. )
_______________________________________)

DEPOSITION OF CHARLES WILKINS

September 5, 2007

Washington, D.C.

Reported by: Mary Ann Payonk, CRR-RDR
Certified Realtime Reporter
Job No. 2007-10

Q Now, on page 4 -- we really are moving here, I promise. Paragraph 3, you refer to my favorite, the FAR cost principles. Do you see that, the Federal Acquisition Regulations?
A Yes, I see.
Q Is this one of the sources that you're relying upon for your opinion that the allocation of overhead and G and A to LACBWR is a -- represents an incremental cost?
A No, not that it represents an incremental cost. It's -- it's -- FAR and CAS were used -- you know, my interpretation of FAR and CAS were used primarily for purposes of how we came up with the cost structures and the cost pools and the allocation process.
Q Okay. And you're aware, I presume, that the FAR has no application in the standard contract.
A Yes, and I say that in the first report.
Q I understand. I just want to make sure. And the CAS also has no application to the standard contract; correct?
A Yes. And I say that in the first report.
Q I know you do. Just making sure. So given that the FAR and CAS do not apply in the context of the standard contract, I'm a little confused as to



how you are using the FAR and the CAS in this context. If you could just explain that to me, I'd appreciate it.
A Even though they don't apply to the standard contract, they are a body of -- of rules and cost concepts that many, many people, those involved in any activity related to the federal government, understand, and they are the basis under which I constructed the model for calculating the rates and for doing the cost distribution and allocation.
Q Now, I've obviously looked through a bit of your background. You've represented nongovernment entities in the past, correct?
A Yes.
Q Of course. And you've been involved in litigation between two private parties; correct?
A Yes.
Q Involving breaches of contract?
A Correct, yes.
Q And cost accounting; right?
A Yes.
Q When you do that in the context of a private dispute, do you also apply the FAR and the CAS?
A In many cases, yes. It depends on the --



the nature of the dispute and whether a government contract is involved or not.
Q Now, and I'm assuming there is no government contract, so it's a purely private dispute between two parties, two commercial parties. Under that context, would you apply the FAR and the CAS?
A Yes, in many cases, yes.
Q Why would you apply the FAR and a CAS in a purely private dispute?
A Because even though it's a purely private issue, many of the companies involved in those issues have their accounting system set up in accordance with FAR and CAS.
Q So what you're saying, for example, is a government contractor gets into a dispute with one of its suppliers because the government contractor already complies with the FAR anyway because it does government work. That's why you expect to use the FAR and the CAS; right?
A That's right.
Q I see what you're saying. Okay. Now, Dairyland's not a government contractor, are they?
A Not in the definition of I think you and I would say a government contractor.
Q Okay. And Dairyland obviously doesn't



comply with the FAR and the CAS, do they?
A No. And I say that in the initial report.
Q No, I'm just making sure we're on the same page here. In this same paragraph, paragraph 3, page 4, you say "pursuant to fundamental cost accounting principles." Do you see that?
A Yes.
Q Are fundamental cost accounting principles the basis for your opinion that the G and A and the overhead constitute incremental costs to Dairyland?
A They have to do with the way the costs get pooled and allocated.
Q Because you're offering an opinion that that allocation is appropriate for inclusion as damages. To the extent direct costs are proper for inclusion as damages, it's fair to say you're relying upon fundamental cost accounting principles for the basis for your determination that these are properly includable costs; correct?
A The indirects.
Q Yeah, the indirect.
A Yeah.
Q And what specific cost accounting principle are you relying upon for that accounting?
A I talked about two of them here, the FAR

Page 134

and CAS, in terms of pooling cost concepts. I think just regular cost accounting is another concept that applies here.
Q Okay. I just want to make sure I understand. So the cost accounting principles you're relying upon are the FAR and the CAS; correct?
A And cost accounting in general, because it all deals with the economic movement of cost to cost objectives.
(Exhibit No. 5 was marked.)
BY MR. GARDNER:
Q Mr. Wilkins, once you get me started on the Internet, there's no stopping me. I went back to the accounting glossary, same one you were using, accountingglossary.net, and I pulled up the definition of cost accounting. I'd like to read into the record and then get some of your views about it. "Cost accounting is a managerial accounting activity designed to help managers identify, measure and control operating costs." Mr. Wilkins, do you agree with that definition?
A Yes.
Q Now, that definition of cost accounting doesn't deal in terms of incremental costs, does it?
A No, it doesn't talk about that.

Page 135

Q So you're not relying upon cost accounting principles for your determination that these overhead and G and A costs are incremental; correct?
A No. I'm -- I'm relying on cost accounting and FAR and CAS for the purposes of identifying how the cost accounting structure should be pooled and the basis for how costs should get allocated to identify it to the final cost objectives, one of which is LACBWR, using some economic measurement criteria.
Q And obviously, cost accounting principles aren't used to measure economic damages; correct?
A Cost accounting, no. Cost accounting principles are used to identify costs to whatever cost objective you choose to structure in your accounting system.
Q In the course of -- of your work, Mr. Wilkins, have you ever had occasion to challenge the assertion of overhead costs as a damage?
A The -- the entire -- like the entire concept of overhead costs, or specific elements of it?
Q Let's take them both. How about the entire construct?
A I don't recall ever having challenged overhead costs as a cost concept.
Q What about as recoverable as a damage?

Page 136

A I don't recall ever having challenged overhead costs as a recoverable damage as a concept.
Q You're drawing a distinction as a concept versus what?
A The amount of that cost as it relates to its application to direct cost.
Q In other words, the calculations of the allocations you have had occasion to challenge before?
A Yes. I may have challenged the base upon which the overhead is calculated, therefore, the rate would be impacted --
Q I see.
A -- but not the overhead cost as a concept itself.
Q And have you ever challenged the allocation of particular overhead costs on the bases that those particular allocations were fixed?
A No.
Q Okay. Have you ever challenged the allocation of overhead or parts of overhead on the basis that that allocation would have been incurred regardless?
MR. STERN: Objection, vague.
A No, but -- but let me -- I want to -- want to be clear, because I'm involved in another matter

Page 137

right now where the question of fixed and variable costs have come up as part of the issues in the case.
Q What case is that?
A It's actually one that I'm working on for the department.
Q Is that with Tom Denakis (ph)?
A No.
Q Which -- who is it with?
A Hannah Shimowin (ph).
Q Okay. What division?
A I don't know the division, but she's located on Mass Avenue up near the train station.
Q Okay. What's the name of the case?
A Tunica Biloxi.
Q Could you spell that?
A T-U-N-I-C-A, B-I-L-O-X-I, I believe.
Q I'm glad I asked you to spell that. And what is that case about?
A It has to do with the Native American Self-Preservation Act, and it deals with establishing education programs on reservations and whether those costs should be recovered under the act.
Q And I take it the Indian tribe is seeking to recover those costs.
A Yes.

Page 250

A Yes, that's right. And I believe perhaps a stronger word would be it -- it would have been allocated differently in the breach world and nonbreach world.

Q Unless there were other activities going on at LACBWR in the nonbreach world; correct?

A The only way it wouldn't be allocated the same is if the other activities were exactly the same value as the -- as the LACBWR activities that's no longer.

Q Because, in fact, if the level of activities at LACBWR had increased because there was more project work going on, say, because of decommissioning, the allocations could be even greater in the but-for world than they are in the actual world; right?

A That's true.

Q You've done no analysis to determine whether the allocations to LACBWR under either the G and A or the overhead pool would have been greater in the but-for world than the actual world; correct?

A That's true, greater or less, either way.

Q All right, cost center 48. Let's go back. It's my favorite year, 2005. Now, actually, yeah, let's do it this way. Let's talk about cost center

Page 251

48. Cost center 48, you see, that is the president and CEO. Do you see that?

A Yes.

Q I'm sorry to do this to you. Turn back to your rebuttal report, page 5 of Exhibit 1. In here, on paragraph 6 you state that the fact that Dairyland would have a CEO in the nonbreach world does not mean that such indirect allocated costs are not incremental to the government's partial breach. Do you see that?

A Yes.

Q Now, if Dairyland incurs the same costs for the CEO in both the breach and nonbreach worlds, how would any portion of that cost be incremental?

A Because of the very reasons we've gone over time and time again, zero in the nonbreach. Whatever it is in accordance with the damages here in the breach world, the indirect costs get factored on. If there's direct costs, the indirect costs get factored on.

Q And I know this seems pedantic. I just want to make sure we get this all down. What you're really saying is that the allocation of the president's and CEO's cost may have been different between the but-for and the actual world, but the actual costs incurred by Dairyland wouldn't

Page 252

necessarily be different between the but-for and the actual world; correct?

A That's -- that's more than -- yes, that's right.

Q Okay. And despite the fact that Dairyland is going to have to suffer the same costs in both the actual and the but-for world for its CEO and president, it's your opinion that it's still appropriate to include those costs as damages through the G and A allocation; correct?

A Yes, because I believe that's the economics of distributing G and A in terms of the oversight and management of the company to all of the operating units or entities.

Q Let me ask you, from a cost perspective, because you're a cost guy, considering that Dairyland would spend the same amount for its CEO in the breach and the nonbreach world, why has Dairyland suffered any economic harm related to its CEO in the breach world?

A Well, I cover that in the report, probably both reports. And we talked about it earlier today. It's, again, the alignment of the benefits received to the -- I'm sorry, alignment of the costs incurred or allocated to the benefits received. The fact that

Page 253

LACBWR operations are continuing necessitates some oversight and some effort on the part of management that could be used elsewhere if those operations were not there. And therefore, I believe that a portion of that G and A cost which -- part of which is represented by the CEO, should be allocated to LACBWR, LACBWR's direct costs.

Q But has CEO -- has Dairyland suffered any harm in terms of dollars spent for paying the CEO between the breach world and the nonbreach world?

A They may not have paid any additional money for the CEO if it's the same person, but I believe they've lost the ability of that person to do other things.

Q Opportunity cost, if you will. You hate the term "opportunity cost." I won't use it.

A That's fine. I'll accept that.

Q Do you know what opportunities the president CEO had to forego as a result of LACBWR's continued existence?

A Well, here again, we go back to the whole scenario of what decisions would have been made based upon the facts and circumstances at the time, had this not happened. So I don't know.

Q You don't know?