No. 04-106C
(Chief Judge Damich)

Electronically Filed: May 15, 2008

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# DAIRYLAND'S OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF FRANK C. GRAVES

---

JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, N.W.
Suite 1000
Washington, DC 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

# TABLE OF CONTENTS

I. MR. GRAVES IS WELL QUALIFIED TO PRESENT SUPPORTABLE TESTIMONY CONCERNING THE RATE OF ACCEPTANCE................................ 3

A. Mr. Graves is Well Qualified To Testify About the Reasonable Rate of Acceptance........................................................................................... 3

B. Because Mr. Graves' Methodology Is Reasonable And Based on Valid Data, It Is Reliable And, Thus, Should Be Considered By The Court ................... 6

II. THE GOVERNMENT'S OBJECTIONS TO MR. GRAVES' ANALYSES OF EXCHANGES ARE EQUALLY WITHOUT MERIT ................................................ 8

A. Mr. Graves' Analysis Is Fundamentally Sound And Is Based On Proven Data..... 9

1. Mr. Graves' Opinions Provide an Ample Depiction of the Non-Breach World ........................................................................................ 10

2. Mr. Graves Relies on Facts In the Record – Not Mere Speculation........... 12

B. Mr. Graves Properly Tested His Analysis Against Various Countervailing Factors........................................................................................ 16

## APPENDIX INDEX

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 1535686 (Fed. Cl. June 28, 2004)............................................................ A1

Expert Witness Report of Frank C. Graves dated March 23, 2007 .............................. A12

Dairyland Exhibit No. 86........................................................................... A61

Dairyland Exhibit No. 72........................................................................... A86

Dairyland Exhibit No. 58........................................................................... A89

Rebuttal Report of Frank C. Graves dated August 17, 2007 ...................................... A109

Excerpts from June 19, 2007 Frank Graves Deposition Transcript........................... A136

Excerpts from August 8, 2007 Jonathan Neuberger Deposition Transcript ............... A143

Excerpts from July 15, 2004 Yankee Trial Transcript................................................ A148

Dairyland Exhibit No. 346........................................................................... A151

Excerpts from May 3, 2007 David Zabransky Deposition Transcript........................ A152

TABLE OF AUTHORITIES

Federal Cases | Page

*Ace Federal Reporters, Inc. v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000) ........................ 11

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ............................... 5

*Consumers Energy v. United States*, 65 Fed. Cl. 364 (2005) ........................................... 5

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) .......................................... 10

*Energy Capitol Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) ......................... 11

*Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336 (2005) ....................... 5

*Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283 (Fed. Cir. 2000) .............................. 5

*Fifth Third Bank of Western Ohio v. United States*, 55 Fed. Cl. 223 (2003) ................... 11

*Hayes v. United States*, 43 Fed. Cl. 735 (1999) ............................................................ 18

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................... 10

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) ............................................... passim

*Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387 (Fed. Cir. 2003) ..................... 14-15

*Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006) ........................... passim

*Reservation Ranch v. United States*, 39 Fed.Cl. 696 (1997),
*aff'd* 217 F.3d 850 (1999) ............................................................................................ 18

*Roedler v. DOE*, 255 F.3d 1347 (Fed. Cir. 2001) ............................................................ 5

*S. Nat'l. Corp. v. United States*, 57 Fed. Cl. 294 (2003) ........................................... 11-12

*Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495 (2005) ............................. 5

*Sys. Fuels, Inc. v. United States*, 66 Fed. Cl. 722 (2005) ................................................. 5

*Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006) ...................... 1, 2, 5, 20

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C,
2004 WL 1535686 (Fed. Cl. June 28, 2004) ........................................................ passim

Rules

Fed. R. Evid. 401 .......................................................................................................... 10

Fed. R. Evid. 702 .......................................................................................................... 10

Regulations

10 C.F.R. 961.11 .......................................................................................................... 12

Other Authorities

Rest. 2d Contracts § 204 .............................................................................................. 2, 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DAIRYLAND'S OPPOSITION TO THE GOVERNMENT'S MOTION
*IN LIMINE* TO EXCLUDE THE TESTIMONY OF FRANK C. GRAVES

The government's motion to preclude Dairyland from presenting evidence from its expert Frank Graves is without merit. The government's motion is very similar to the motion *in limine* it filed in *Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006), and the government relies heavily on Judge Hewitt's grant of the government's motion there. *See, e.g.*, Govt. Mot. at 2. But the government fails to acknowledge that it also filed a similar motion *in limine* in *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006), and that Judge Merow soundly rejected the government's motion. *Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 1535686 at *7 (Fed. Cl. June 28, 2004). The government also fails to acknowledge that after hearing from Mr. Graves at trial, Judge Merow found Mr. Graves' "testimony on the efficiencies and cost avoidances from campaigns and trades [to be] compelling." *Yankee Atomic*, 73 Fed. Cl. at 303. As explained below, Judge Merow's opinion rejecting the government's motion *in limine* contains by far the sounder analysis and conclusions.

Judge Hewitt erred in excluding Mr. Graves' opinions from trial in large measure by relying on government counsel's inaccurate and unfair characterizations of Mr. Graves' opinions in the government's motion, *see Pacific Gas & Elec.*, 73 Fed. Cl. at 435-36, rather than relying

on Mr. Graves' own articulation of his opinions in his Expert Witness Report ("Expert Report") and Rebuttal Report. It is important that this Court not make the same error, because the government is clearly attempting the same gambit here.

Specifically, the government's motion twice repeats the false statement that Mr. Graves relies on four extreme assumptions in formulating his opinion. *See* Govt. Mot. at 9, 34. On the contrary, Mr. Graves' opinion does not rely on extreme assumptions. As noted by Judge Merow in *Yankee* in "[r]esponding to criticism that political pressure would impede the 'invisible hand' Graves responded his model would work even if only *half* the utilities participated." *Yankee Atomic*, 73 Fed. Cl. at 99 (emphasis added). Here the government, nevertheless, again falsely asserts Mr. Graves relies on extreme assumptions. That is simply incorrect, and this Court should not make the same mistake of giving credence to government counsel's incorrect assertions.

It is also telling that the government did not append Mr. Graves' full Expert Report or Rebuttal Report to its motion. The government only appended the Introduction and Appendix 2 of Mr. Graves' Rebuttal Report, thus making it clear it does not want the Court to rely upon Mr. Graves' own articulation of his opinions. Moreover, the government did not even mention, much less make *any* effort to refute Judge Merow's opinion in *Yankee* rejecting the government's motion *in limine* to exclude Mr. Graves' testimony. For the Court's convenience, a copy of the unpublished *Yankee Atomic* opinion is attached (A1)[1].

Finally, if after reading this opposition, the Court has doubts regarding the admissibility of Mr. Graves' testimony or even just what Mr. Graves' opinions are (which it should not), the Court should conduct a *Daubert* hearing at which it could hear from Mr. Graves directly. To be

---

[1] "A____" refers to the appendix accompanying this response.

clear, Dairyland does not believe a *Daubert* hearing is necessary to appropriately address the issues the government raises and deny its motion; but if the Court is left with any doubts (which it should not be), such a hearing is available to allow Mr. Graves to dispel them.

## I. MR. GRAVES IS WELL QUALIFIED TO PRESENT SUPPORTABLE TESTIMONY CONCERNING THE RATE OF ACCEPTANCE

### A. Mr. Graves is Well Qualified To Testify About the Reasonable Rate of Acceptance

The government asserts that Mr. Graves "is not qualified to testify as an expert concerning the pace…on which DOE would have accepted Dairyland's spent nuclear fuel under the parties' contract." Govt. Mot. at 17. The government reasons that this must be the case because Mr. Graves is not an expert on the standard contract, nor was he involved in its creation, and is not an expert on public policy or on DOE's spent fuel removal program or spent fuel management. *Id.* at 17-18.

The government's argument is a straw man and deliberately ignores the nature of the analysis and opinion Mr. Graves is offering on this issue. Mr. Graves, of course, does not pretend to be an expert in the various fields listed by the government. Mr. Graves is an economist, and he provides an economic analysis of what a reasonable rate of acceptance would have been. Mr. Graves is the *only* witness who will present evidence regarding a reasonable rate of acceptance based on the utilities' economic needs for spent fuel removal. Mr. Graves does not purport to be an expert on DOE's programs, and he relies upon the prior testimony of Dr. John Bartlett and Ivan Stuart, together with DOE's own planning documents to understand the parameters of the DOE progam. *See* Expert Report at 10 (A23).

Mr. Graves' opinions are relevant because as discussed further below, given that the rate of acceptance is an open term in the standard contract, DOE was obligated to perform at a

reasonable rate. *See, e.g.*, Dairyland's Memorandum of Fact and Law at 8-10; Rest. 2d Contracts, § 204. Mr. Graves focuses from an economic perspective on what would be a reasonable rate of acceptance that would allow utilities to avoid incurring additional at-reactor storage costs. Mr. Graves' analysis provides detailed economic analysis for an issue addressed in a 1984 letter from Michael Lawrence, Manager of DOE's Richland Operations Office, to the Director of OCRWM commenting on DOE's Draft Mission Plan. *See* Dairyland Ex. #86 (A61). In the letter, Mr. Lawrence states that "to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU plus some amount up to 630 MTU." *Id.* This conclusion is remarkably similar to Mr. Graves' analysis that a reasonable rate of acceptance is 3,000 MTU. *See* Expert Report at 11 (A24). Without Mr. Graves' testimony to explain the economic basis for conclusions by DOE officials like those contained in Mr. Lawrence's letter, the evidence available to the Court concerning the utilities' economic needs for spent fuel acceptance will be conclusory statements in program documents. Therefore, Mr. Graves' testimony is both relevant and helpful to the Court.

As detailed in Mr. Graves' Expert Report, he is highly qualified to provide an economic analysis of the non-breach (*i.e*. the "but for") world related to spent nuclear fuel. *Id*. at 2-3 (A15-A16). Mr. Graves has over 25 years experience in assisting utilities in the design and implementation of long-range planning, investment and operating policies, including market design and performance evaluations, capacity expansion and network modeling, estimation of incremental costs, price forecasting, financial simulation and valuation assessments. *Id.* Indeed, Mr. Graves was qualified as an expert witness in *Yankee Atomic* by Judge Merow on the same topics as those being covered here – rate of acceptance and exchange market modeling. *Yankee Atomic*, 2004 WL 1535686 at *7.

Moreover, in arguing that Mr. Graves' testimony regarding a reasonable rate of acceptance is irrelevant, the government erroneously relies on its legal theory of the case. Under its theory of contract construction, the government argues it was permitted to unilaterally determine the applicable acceptance rate through publication of the 1991 Annual Capacity Report ("ACR"). *See* Govt. Mot. at 18, n.9. On the contrary, Dairyland contends, as noted above, that DOE was to commence pick up of spent fuel at a reasonable rate. In *PG&E*, Judge Hewitt acknowledged that the standard contract does not contain a specific acceptance rate, however, she erred in holding that the government's obligation was set by the 1991 ACR. *See Pacific Gas & Elec. Co.*, 73 Fed. Cl. at 397-401. All other courts to consider the question have rejected that reading of the standard contract. *See, e.g., Yankee Atomic,* 73 Fed. Cl. at 274-75; *Sys. Fuels, Inc. v. United States*, 66 Fed. Cl, 722, 730-32 (2005); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 343 n.8 (2005); *Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495, 503-05 (2005); *Consumers Energy v. United States*, 65 Fed. Cl. 364, 369-70 (2005); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 655-56 (2003). Thus, the determination of a reasonable rate of acceptance is central to this case, and Mr. Graves' testimony regarding what a reasonable rate would be is relevant and important. The government cannot rely on its theory of the case to exclude relevant testimony.

The requirement of a reasonable rate reflects well-settled law that where a contract is missing a term addressing a significant issue, the court must enforce a reasonable term. *See, e.g.*, Rest. 2d Cont. § 204; *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000). Federal Circuit precedent also dictates that "reasonable" in this case means consistent with the purpose of the NWPA and the contemporaneous understandings of DOE and the contracting utilities. *See Roedler v. DOE,* 255 F.3d 1347, 1352 (Fed. Cir. 2001). Ample

evidence supports Dairyland's position that the parties understood and intended under the contract that spent fuel would be picked fast enough so that no utility would have to add additional storage capacity or otherwise incur avoidable costs after January 31, 1998. *See, e.g.*, Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983 Program Overview by Robert Morgan (the first acting director of the DOE spent fuel disposition program), Dairyland Ex. #72 (A86). In essence, Mr. Graves' analysis helps to quantify this qualitative concept. Contrary to the government's assertion, Govt. Mot. at 18, n.9, Mr. Graves did not merely select a rate to analyze from among DOE program documents. Instead, he "considered a number of different rates . . . [that] encompass (or are at least very similar to) most of the rates that have been used in program planning over the history of the program. Expert Report at 11 (A24). Mr. Graves even included the 1991 Annual Capacity Report rate favored by the government in his analysis. *Id.* at 12, Figure 3 (A25).

B. Because Mr. Graves' Methodology Is Reasonable And Based on Valid Data, It Is Reliable And, Thus, Should Be Considered By The Court

In one conclusory paragraph, the government charges that Mr. Graves' methodology in connection with the reasonableness of his projected rate of acceptance is "unreliable" because "simple, factually-supported adjustments to his assumptions would modify the conclusions he generates." Govt. Mot. at 18-19. However, the government fails to identify (with two exceptions) those underlying assumptions and fails to articulate, let alone demonstrate, how and to what extent adjustments to those assumptions might alter Mr. Graves' conclusions. Moreover, the government fails to acknowledge in its motion that Mr. Graves thoroughly addressed and refuted the issues raised by the government in its motion in his initial Expert Report. *See* Expert Report at 5-6 n.2 (A18-A19); *see also id*. at 25-26 (A38-A39).

First, the government argues that Mr. Graves' results would change if he "were to alter his assumption that SNF stored at prematurely shutdown reactors constitutes 'must move' SNF." Govt. Mot. at 19. But Mr. Graves explains in his Expert Report that he studied this scenario and concluded that accounting for license life extensions (*i.e.*, the adjustment the government suggests) would not alter his conclusions regarding when DOE would have removed spent fuel from Dairyland absent the breach. *See* Expert Report at 25-26 (A38-139).

Second, the government erroneously relies on Mr. Graves' deposition testimony in *PG&E* to argue that "Mr. Graves' model does not account for the fact that many utilities re-racked their wet SNF storage pools." Govt. Mot. at 19. On the contrary, Mr. Graves explained in his Expert Report in this case that his decision not to differentiate between re-racking and expansion of a utility's storage capacity through the addition of dry storage could only serve to move back in time his estimated date when DOE would have removed Dairyland's spent fuel absent the breach. *See* Expert Report at 5-6 n.2 (A18-A19). In short, Mr. Graves applied a simplifying and conservative assumption.

Moreover, even if the government had a valid complaint about the assumptions underlying Mr. Graves' methodology (which it does not), a motion *in limine* is not the proper mechanism to challenge Mr. Graves' opinions in that manner.[2] The government will have every opportunity to challenge Mr. Graves' testimony, along with his methodology and underlying assumptions, during its cross – examination at trial (or by evidence, if there is any, that contradicts his assumptions). *See, e.g.*, *Yankee Atomic*, 2004 WL 1535686 at *5 ("Graves' opinion will be subjected to scrutiny at trial; it will not be excluded at pre-trial.").

[2] *See infra* pp. 14-15 (explaining disputes over factual matter are not proper for a motion *in limine*).

## II. THE GOVERNMENT'S OBJECTIONS TO MR. GRAVES' ANALYSES OF EXCHANGES ARE EQUALLY WITHOUT MERIT

Mr. Graves bases his economic analysis on the straightforward economic principle that profit-maximizing companies, like utilities, will act in their economic self-interests. Thus, as explained by Mr. Graves in his Expert Witness Reports, utilities would have been willing to pay for exchanges for early acceptance allocations in order to avoid spent fuel storage costs. Expert Report at 15-18 (A28-A31).

Mr. Graves accepts that, under the Standard Contract, initial allocations, or slots, for pick-up are based on the date on which the particular batch of fuel was discharged from a reactor, with the earliest (*i.e.*, oldest) fuel receiving the first allocations, *i.e.*, oldest fuel first ("OFF"). *Id*. at 15 (A28). *See* Contract, Art. VI.B.2(a), Dairyland Ex. #58 (A89). However, subject to DOE approval, acceptance slots could be exchanged among utilities. *Id.*, Art. V.E. Mr. Graves has fashioned an economic model of the market for these acceptance slots. A utility would have the economic incentive to buy an earlier acceptance allocation at a price less than the cost to store the fuel. Conversely, a utility would be motivated to sell an allocation and accept a later place in the queue for that fuel if the exchange price was greater than its storage costs. Expert Report at 16 (A29) ("In the non-breach world, [utilities] would have used exchanges to improve on the initial OFF acceptance priority, because they would have been able to realize very large cost savings by doing so.").

To characterize the non-breach world, Mr. Graves presents extensive quantitative analyses, including many sensitivity analyses addressing a wide range of assumptions regarding the non-breach spent fuel program. *See id.* at 24-40 (A37-A53). In his Rebuttal Report, Mr. Graves presents additional, expanded analyses addressed to the criticisms of his analysis leveled

by the government's proffered expert, Neuberger. *See* Rebuttal Report at 3-24 (A111-A132). Mr. Graves' opinions, thus, necessarily reflect the entirety of his analyses.

The government, however, wrongly, bases its criticisms of Mr. Graves' work by focusing exclusively on the "base case" of his exchanges model. It is only by ignoring the bulk of Mr. Graves' work that the government can contend that Mr. Graves' analysis is overly-simplistic (Govt. Mot. at 15, 21, 24), fails to consider departures from perfect competition (*id.* at 25-27) or otherwise fails to take into account countervailing factors that could impact his results *(id*. at 30-31).

A. Mr. Graves' Analysis Is Fundamentally Sound And Is Based On Proven Data

Mr. Graves' Expert Report provides a robust estimate, based on established economic principles, of how an exchange process would have influenced the timing and sequence of DOE's acceptance of Dairyland's spent fuel. Significantly, the government has elected not to present at trial any evidence of a competing estimate of how the exchange process would have worked absent the breach. And perhaps more importantly for its present motion, the government has elected not to present at trial any quantification or other specification of the impact, *if any*, of the supposed flaws it claims inhabit Mr. Graves' analysis.

As explained in his Expert Report, Mr. Graves' opinion on exchanges is based upon ordinary market structure and price formation principles commonplace throughout the economy, which lead market participants to pay up to their avoidable storage costs for improving their position in the acceptance sequence. *See* Expert Report at 16 (A29). ("In the non-breach world, [utilities] would have used exchanges to improve on the initial [oldest fuel first] acceptance priority, because they would have been able to realize very large cost savings by doing so…. By pursuing exchanges with one another, [utilities] in the aggregate could save billions of dollars in

unnecessary at-reactor storage costs.”). Mr. Graves’ opinions are fundamentally sound and should be accepted into evidence.

### 1. Mr. Graves’ Opinions Provide an Ample Depiction of the Non-Breach World

The government’s contention that Mr. Graves’ model of exchanges is speculative because he has failed to establish a “realistic and complete ‘but for’ world,” *see* Govt. Mot. at 20-21, is inconsistent with binding precedent governing acceptance of economic analyses of non-breach worlds. That precedent requires merely that the analysis be reasonable, not that it be “complete,” which according to the government apparently means quantifying every conceivable influence on a market as well as specifying not merely the results of market transactions but specifying each of the transactions as well.

Expert testimony “assist[s] the trier of fact to understand the evidence or to determine a fact in issue.” Fed. R. Evid. 702. As the Supreme Court has observed, “[t]his condition goes primarily to relevance.” *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993). Relevant evidence is defined as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Fed. R. Evid. 401. “The Rule’s basic standard of relevance is thus a liberal one.” *Daubert*, 509 U.S. at 587. With respect to expert testimony like Mr. Graves’, the inquiry is “whether the reasoning or methodology underlying the testimony is scientifically valid and [] whether the reasoning or methodology can properly be applied to the facts at issue.” *Id*. at 592-93. The inquiry is necessarily “a flexible one, one based on the uniqueness of the circumstances present.” *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).

Applying these principles guiding the admissibility of expert testimony, Judge Merow in *Yankee Atomic* denied the government's request that Mr. Graves be excluded from testifying because his analysis and opinion lacked "real world" experience. *Yankee Atomic*, 2004 WL 1535686 at *3. Judge Merow ruled that it was insufficient as a matter of law to exclude Mr. Graves' testimony at trial "because [he] does not identify which utilities would trade or sell to plaintiffs." *Id.* Judge Merow also stated that "[p]roof of damages need not always specify transactions that would have occurred but for the breach." *Id.* (citing *Energy Capitol Corp. v. United States*, 302 F.3d 1314, 1329 (Fed. Cir. 2002); *Ace Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000); *Locke v. United States*, 283 F.2d 521, 524-25 (Ct. Cl. 1960)).

As Judge Merow recognized, the Federal Circuit and its predecessor have long made clear that a plaintiff's proof of damages need not specify exactly what transactions would have transpired absent a government breach. *Energy Capital*, 302 F.3d at 1329 (affirming award of damages based on lost profits from loaning money without identifying exactly what loans would have been made absent the breach); *Ace Federal Reporters*, 226 F.3d at 1333 (approving award of damages for lost hearing transcription services without any specification of which hearings plaintiffs would have transcribed absent the breach); *Locke*, 283 F.2d at 524-25 (approving award of damages for lost typewriter-repair business without requiring proof of exactly which typewriters plaintiff would have repaired absent the breach).

The government asserts, nonetheless, that this Court has previously rejected damage models because they fail to identify specific transactions that would have been engaged in absent the breach. *See* Govt. Mot. at 22, citing, *inter alia*, *Fifth Third Bank of Western Ohio v. United States*, 55 Fed. Cl. 223 (2003) and *S. Nat'l. Corp. v. United States*, 57 Fed. Cl. 294 (2003). The government has misread those decisions. As Judge Miller (the Judge in both cases) explained

about her *Fifth Third* decision in *S. Nat'l.,* the plaintiff's damage expert in the prior case, "was not faulted for failing to name names; rather . . . he did not identify any *type* or *category* of activity, opportunity, or investment [in which the plaintiff would have engaged absent the breach]." 57 Fed. Cl. at 304 (emphasis added). This is not the situation here, where Mr. Graves' analysis makes clear the type of activity – exchanges for earlier acceptance allocations, based on established economic principles – in which Dairyland would have engaged absent the breach.

Moreover, the inherent difficulty in modeling the non-breach market for exchanges should not operate to the benefit of the government whose actions (or rather, lack of actions) have made that proof difficult. The exchange provision is part of the standard contract, and the Court must give meaning to the contract terms. *See* 10 C.F.R. 961.11, Art. V.E. As noted by Judge Merow in *Yankee Atomic:*

> Defendants' contract breach is established. That breach prevented the very market the government assails as speculative – the lack of real market data on the sale of allocation slots for the storage of spent nuclear fuel. By partially breaching the contract, defendant cannot exclude Graves' opinion on the grounds that there is no market data. There is no market data because the government's breach thwarted this possibility.

*Yankee Atomic*, 2004 WL 1535686 at *4, *accord Locke*, 283 F.2d at 521 (Ct. Cl. 1960) ("The defendant who has wrongfully broken a contract should not be permitted to reap advantage for his own wrong by insisting on proof which by reason of his breach is unobtainable.").

2. Mr. Graves Relies on Facts In the Record – Not Mere Speculation

The government argues that Mr. Graves does not use sufficiently representative cost data in his analysis. Govt. Mot. at 33-34. But Mr. Graves made use of a detailed study, produced to the government in discovery, that incorporated all the storage costs data available. *See* Expert

Report at 18-19, n.13 (A31-A32).[3] The storage cost study made sure that Mr. Graves was comparing apples to apples both in terms of the calculation of the costs as well as the year in which they were incurred. *Id.* With one exception, the government fails to offer any opinion of its own regarding what data it claims Mr. Graves should have used.

The one exception addresses the wet storage cost data that Mr. Graves used in his base case analysis. *See* Govt. Mot. at 33-34. In his base case, Mr. Graves utilized $8.7 million per year to represent the average of utilities' wet storage costs, instead of the $1.3 million that Dairyland was estimating for wet storage costs in 1990. The difference in the costs can be explained by inflation and by the large difference in pre- and post- 9/11 security costs. *See* 6/19/07 Graves Depo. Tr. 213:2-18 (A138). Perhaps more importantly, Mr. Graves' conclusions are not sensitive to wide differences in these wet storage operation and maintenance ("O&M") costs. *See* Expert Report at 30 (A43). The government cannot show that inclusion of the 1990 Dairyland data or any other data would alter the results of Mr. Graves' analysis. Mr. Graves explained that he conducted a variety of sensitivity analyses varying the cost inputs (doubling them, cutting them in half, randomizing them) and found that none of those variations altered the results of his analysis. *See id*. Regarding the 1990 Dairyland data in particular, Mr. Graves

---

[3] Mr. Graves explained at his deposition that some of the cost data upon which he relied in *Yankee Atomic* was no longer available, thus requiring Mr. Graves to use different data in this case. However, Mr. Graves testified that the use of this different data had no material impact on his analysis. *See, e.g.*, 6/19/07 Graves Depo. Tr. at 174:2-11 (A137) ("[W]e had prior reports which unfortunately we were no longer able to rely upon from NAC and Scientech that described their industry experience with these kinds of costs, which arose from a large variety of contexts of supplying those kinds of services. And the numbers we found in our analysis were broadly consistent with their analyses, and where they differed, it was partly explainable in terms of things like increased security since 9/11…"). As a result of Mr. Graves being unable to rely upon some of the same data as he did in *Yankee Atomic*, some of the data concerning fuel storage costs he used in this case came from different years. Again, to the extent the government believes Mr. Graves' use of slightly different cost data is a significant issue, the government may seek to cross examine Mr. Graves on this issue at trial.

determined that taking these specific costs into account would not have altered his results. Rebuttal Report at 17 (A125).

The government's objections are not to the facts and assumptions underlying Mr. Graves' opinion, but rather the application of those facts and assumptions to Mr. Graves' economic principles and methodology. As noted by the court in *Yankee Atomic*, the government's objections are appropriate for cross-examination at trial, not as part of a motion *in limine*. 2004 WL 1535686 at *3, 5.

Moreover, Mr. Graves' opinions are consistent with the facts. Indeed, Judge Merow found that the "factors used in reaching Graves' conclusions are 'real world' figures. While many of the facts are in dispute and many facts are subject to extrapolation or projection, many of the underlying figures represent costs that have been incurred and facts and opinions of others, while perhaps disputed, exist independently." *Id.* at *5. In addition, contrary to the government's assertion, Mr. Graves does not present Dairyland's "only evidence" of a 1998 fuel out date. *See* Govt. Mot. at 2-3. Mr. Graves' analysis is consistent with Dairyland's entire anticipated presentation of evidence (as reflected in its memorandum of fact and law, witness list, and exhibit list) on the issues of reasonable acceptance rate and the market exchange process.

As such, unlike this case, all of the cases cited by the government in support of its argument involved experts who relied on either non-existent data or facts that were indisputably wrong. Govt. Mot. at 23-24. Just because the government asserts (with no evidentiary support) that a fact or an assumption is wrong, does not render expert testimony based on such fact or assumption inadmissible. As the Federal Circuit counseled in *Micro Chemical, Inc. v. Lextron,*

*Inc.*, 317 F.3d 1387 (Fed. Cir. 2003), the court does not exclude expert testimony because of factual disputes:

> Defendants confuse the requirement for sufficient facts and data with the necessity for a reliable foundation in principles and method and end up complaining that [the expert's testimony] was not based on 'reliable facts'….When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of the facts underlying on expert's testimony….When facts are in dispute, the expert sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

317 F.3d at 1392 (citing Advisory Committee note to Fed. R. Evid. 702).

Likewise, the government's objections to refinements in the analyses performed by Mr. Graves between his work in the *Yankee Atomic* case and his analysis in this case are, at best, proper topics to be addressed in cross-examination at trial, not as part of a motion *in limine*. Govt. Mot. at 28-30. In any event, this government's objection is wholly irrelevant. The ultimate point of Mr. Graves' analysis in this case is his determination of when Dairyland's spent fuel would have been removed absent the government's breach. His analysis of that issue has not changed from the *Yankee Atomic* case to this case, because Mr. Graves did not analyze that issue in the *Yankee Atomic* case. Similarly, Mr. Graves' Expert Report in the present case does not even address when the *Yankee* plaintiffs' fuel would have been removed absent the breach. Therefore, in claiming that Mr. Graves has changed his opinions merely to help his current client the government is not relying on Mr. Graves' actual opinions. In Table 1 on page 29 of the government's motion, the government presents what it purports to be a comparison of spent fuel acceptance amounts for the Yankee utilities between Mr. Graves' opinions in this case and the Yankee cases. However, the government's table is wrong. The table appears to compare Mr. Graves' data from his scenario 1 in this case against his conclusions in *Yankee*. But that

comparison is apples to oranges. The correct comparison is Mr. Graves' scenario 2 in this case, since it is in that scenario that the Yankees are counted as shutdown utilities (the same fact that was included in the *Yankee* data). Under Mr. Graves' modeling in scenario 2 in this case, the *Yankees* are shown to have the last of their spent fuel removed *earlier* or in the same year that was shown in *Yankee*. Thus, the government's claim that Mr. Graves manipulates his findings to help his current client is utterly without support and fundamentally misleading. Certainly, Mr. Graves has never presented such conclusions. Further, this is just one more example of the several times in its motion that the government makes a criticism without any support or citation.[4]

B. Mr. Graves Properly Tested His Analysis Against Various Countervailing Factors

The government also objects to Mr. Graves' exchange model on the grounds that he failed to take into account various countervailing or alternative factors, and in doing so, mistakenly relied on the economic theory of perfect market competition. Govt. Mot. at 25-28, 30-31. These are the incorrect assertions that Judge Hewitt erroneously relied upon in excluding Mr. Graves' testimony. *See Pacific Gas & Elec.*, 73 Fed. Cl. at 436.

Contrary to the government's assertions, Mr. Graves' opinion is not premised on a perfectly competitive market. Govt. Mot. at 25-26. For example, contrary to the government's assertion, *id*. at 25, Mr. Graves does not assume the market would have negligible transaction and information costs. In fact, Mr. Graves acknowledges transaction costs may exist and he

[4] *See, e.g.*, Govt. Mot. at 19 (the government offers no support for its contention that "simple, factually-supported adjustments to [Mr. Graves'] assumptions would modify the conclusions that he generates…"); *id.* at 31 (The government asserts that under the OFF queue Dairyland's fuel would be removed by 2013. The government offers no support for the latter conclusion, and there appears to be none. Even under OFF at a reasonable 3000 MTU acceptance rate, the last of Dairyland's spent fuel would have been removed in 2004.).

models transaction costs in a sensitivity analysis. *See* 6/19/07 Graves Depo. Tr. 244: 24-247:13 (A139-A142); *see also* Expert Report at 37-39 (A50-A52) ("I found that transaction costs would have only very modest effects on removal schedules and exchange costs."). As such, no cases cited by the government in support of its argument are inconsistent with Mr. Graves' analysis. Govt. Mot. at 26-27.

In his Expert Report Mr. Graves also modeled market imperfection by describing numerous quantitative evaluations he conducted of the potential effect of a wide range of factors, including the risk and political factors cited by the government. *See id.* at 25; Expert Report at 24-42 (A37-A58). Mr. Graves analyzed these factors through sensitivity analyses, using often extreme assumptions about costs, program parameters, and the potential effects of various risks to determine whether they would affect his conclusions. *Id.* In his Rebuttal Report, Mr. Graves ran expanded sensitivity analyses to further prove the robustness of his results. Rebuttal Report at 3-4 (A111-A112). Notably, when asked whether Mr. Graves' way of dealing with uncertainty in the non-breach market for exchanges was wrong, the government's proffered expert on this issue, Dr. Jonathan Neuberger, acknowledged that the "scenario analysis is a useful tool." 8/8/07 Neuberger Depo. Tr. at 134:1-135:17 (A146-A147).

In all, Mr. Graves addressed and analyzed the following factors in his reports, all of which resulted in no material impact to Mr. Graves' conclusions: (i) uncertainty, risk aversion and sociopolitical factors; (ii) license extensions and acceptance rates; (iii) storage costs estimates; (iv) information possessed by a utility regarding storage needs and costs of other utilities; (v) utilities' full core reserve policies; (vii) re-racking; and (viii) efficiency gains. *See* Expert Report at 24-42 (A37-158), Rebuttal Report at 3-24 (A111-A132). In all instances, Mr. Graves concluded that these alternative factors either were irrelevant to his analysis or did not

materially affect his opinions relating to the hypothetical exchange market. *Id*. In any event, these matters again are, at most, topics for cross-examination, not a basis for excluding Mr. Graves' testimony.

The government claims that the range of results flowing from Mr. Graves' sensitivity analyses reflects an unreliably high error rate in Mr. Graves' analysis of Dairyland's trading costs, contending the costs vary dramatically depending on the particular assumptions made. Govt. Mot. at 30, n.14. The government apparently ignores Mr. Graves' Rebuttal Report:

> "[M]y Base Case analysis is a reasonable representation of the non-breach world. The sensitivity analyses that I have run show that the timing of LACBWR's fuel removal is not sensitive to reasonable changes in assumptions, and the cost of exchanges might change by a couple of million dollars one way or the other from my Base Case result, but in any case would be on the order of a few million dollars in total."

Rebuttal Report at 23-24 (A131-132). The government's wholly unsupported assertions about Mr. Graves' opinions that directly contradict this passage should be – must be – disregarded.

The government also asserts that Mr. Graves failed to consider the prospect that the government would deny exchange requests. *See* Govt. Mot. at 27-28. However, Mr. Graves acknowledges there is a possibility that DOE may not approve all exchanges. *See Yankee* Trial Tr. 961:10-962:12, July, 15, 2004 (A149-A150). Although DOE has the discretion under its contract with Dairyland (and all other contracting utilities) to approve or disapprove requested exchanges, as Judge Merow recognized, such contractual "discretion may not be exercised arbitrarily or capriciously." *Yankee Atomic,* 2004 WL 1535686 at *3; *see also Reservation Ranch v. United States*, 39 Fed.Cl. 696, 714-15 (1997), *aff'd* 217 F.3d 850 (1999); *Hayes v. United States*, 43 Fed. Cl. 735, 740 (1999). On this issue, the Court should follow Judge Merow's ruling in *Yankee Atomic*: "DOE's right to approve the exchanges on which Graves [sic] opinion rests, does not render his opinion inadmissible on that basis. Good faith action may be

presumed." *Yankee Atomic*, 2004 WL 1535686 at *3. Moreover, the evidence to be adduced at trial will establish overwhelmingly that DOE expected to support exchanges and expected that the exchanges market would work. *See, e.g.,* Letter from OCRWM director Dan Dreyfus to Andrew Kadak dated Sept. 28, 1995, Dairyland Ex. 346 (A151); 5/3/07 Zabransky Depo. Tr. at 148:15-149:21 (A154-A155). The factual record also confirms that DOE would act reasonably in approving exchange request. *See, e.g.,* 5/3/07 Zabransky Depo. Tr. at 144:6-16 (A153).

In addition, the government raises a number of other issues that are simply beside the point. For example, the government charges that "[b]efore preparing his model, Mr. Graves failed to contact any utility-including Dairyland-to determine the viability of or evidentiary foundation for an exchanges market that might have developed absent DOE's delay in beginning SNF acceptance." Govt. Mot. at 24, 32-33. Contrary to the government's suggestion, Mr. Graves is not required to perform a survey of the nuclear utility industry as a pre-condition to rendering an expert opinion on spent fuel exchanges. Nonetheless, Mr. Graves did consider the prospect of polling utilities, but determined this procedure would be inappropriate because all of the people who would be interviewed "are operating in a world of breached performance, with no evidence before them about what a non-breached performance environment would have looked like." Rebuttal Report at 13 (A121). Indeed, when Dr. Neuberger was asked whether it would be unique in his experience to have a survey done in a breach of contract action as to how life would have been absent the breach of contract, he stated that "I'm not aware of many cases where it's been done. I'm not aware of any case off the top of my head. Whether it would be a unique circumstance I haven't researched it enough to know whether that is true." 8/8/08 Neuberger Depo. Tr. 74:8-75:8 (A144-A145). Not surprisingly, notwithstanding its failure to

conduct a survey, the government offers no countervailing survey or criticism of empirical analysis.

The government further attempts to confuse the issues by citing deposition testimony of Dr. Seymour Rafferty in which he contends that Dairyland never looked into exchanges far enough to determine whether it was worthwhile. Govt. Mot. at 33. However, what the government fails to recognize is that Dr. Raffety was reporting on the potential for exchanges in the actual, "breach" world, not in the "but for" world. Dairyland did not look into exchanges very far, because by the mid-1990s the utilities did not expect DOE to perform under the standard contract and never fully examined the possibility of exchanges. By that point, there was nothing to exchange. Dr. Raffety's further testimony that Dairyland may have traded up or traded down – with respect to particular allocation – is consistent with Mr. Graves' opinions**.** Trading allocations for particular batches of spent fuel up or down is also not inconsistent with moving Dairyland's overall fuel-out date forward (*i.e*. earlier) in time.

Ultimately, even though Judge Hewitt had no "doubt '[t]hat a market would develop around the exchange provision of the Standard Contract,'" she nevertheless found "the preponderance of the credible evidence adduced at trial does not indicate that PG&E would have used the exchanges provision, or how it would have used it." *Pacific Gas & Elec. Co.*, 73 Fed. Cl. at 413 (citation omitted). But Judge Hewitt excluded the most relevant evidence on these very issues – the expert testimony of Frank Graves, which the *Yankee* court deemed "compelling." *Yankee*, 73 Fed. Cl. at 303. It is imperative that this Court not make the same mistake.

In sum, Mr. Graves' opinions are well founded, based on facts, and reliable. The government has presented no valid or proper basis for excluding Mr. Graves' opinions. The

government argues if Mr. Graves' is permitted to testify, he should be limited to those matters in his Expert Reports. Govt. Mot. at 35-36. As a practical matter, the Court cannot rule in advance of trial that unreported testimony is precluded. As such, arguing this matter on a motion *in limine* is not proper.

CONCLUSION

For the foregoing reasons, the Court should deny the government's motion *in limine* to exclude the testimony of Mr. Frank Graves.

Respectfully submitted,

May 15, 2008

s/ Jerry Stouck
JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP