H Yankee Atomic Elec. Co. v. U.S.
Fed.Cl.,2004.
Only the Westlaw citation is currently available.
United States Court of Federal Claims.
YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff,
v.
THE UNITED STATES, Defendant.
**No. 98-126C.**

June 28, 2004.

ORDER [FN1]

FN1. This should also be deemed applicable in *Connecticut Yankee v.. United States,* No. 98-154 C and *Maine Yankee v. United States,* No. 98-474 C.MEROW, Senior J.

***1** Before the court are several motions *in limine.*

*Motion* in limine *to preclude the testimony of Frank Graves*

Asserting it is speculative, defendant seeks to preclude the introduction of the damages theory, model and opinion of Frank C. Graves, one of plaintiffs' expert witnesses ("Graves"). Graves has a bachelors degree in mathematics and a masters degree from the MIT Sloan School of Management. According to his report, Graves has nineteen years of experience in assisting utilities in the design and implementation of long-range planning, investment and operating policies, capacity expansion and network modeling, investment and contract prudence reviews, estimation of marginal costs, design and pricing of new services, and financial simulation and valuation techniques. (Appendix to defendant's Motion, pp. 1-32 and Appendix to plaintiffs' Opposition, pp. 1-47).

When the capacity of a DOE storage facility is eventually approved, by appropriate regulatory action, the contract between DOE and the various utilities contains a procedure to establish a time and quantity schedule for SNF pickup based on DOE-issued delivery commitments including exchanges thereof. Graves propounds what he describes as a reasonable estimate of how the contract's exchange provision would have affected the timing of the removal of SNF from plaintiffs' facilities under reasonable rates of acceptance. Graves' report creates an economy that would have existed had defendant commenced performance in a so-called "but for world." "But for" defendant's contract breach, basic economic principles of supply and demand would have created a market for exchanges based on an individual utility's cost to store its SNF until its pickup commitment, and a price at which another utility was willing to exchange its earlier pickup date. If storage costs were greater than an earlier pickup price, an exchange could occur. In that market, Graves opines, Yankee Atomic would have purchased/swapped for earlier acceptance slots for $11.8 million dollars and have all its spent fuel picked up by January 1999.[FN2] Using the same economic model, Graves opines that Connecticut Yankee and Maine Yankee (both of which had remaining storage space) would have exchanged their early allocation slots for later times, netting $7.8 million and $9.1 million, resulting in removal of their SNF by August 2001 and June 2002 respectively. Precisely how much SNF DOE would have removed each year or in what order, will not be proffered according to plaintiffs. Rather, Graves apparently will testify that regardless of the precise acceptance schedule, applying reasonable rates, Yankee's pool would have been cleared in 1999, Connecticut Yankee's in 2001, and Maine Yankee in 2002.

FN2. The government also assails Graves' reliance on the so called priority for shut-down reactors. The government's position is the Standard Contract provides only that priority may be given to shut-down reactors, not that priority must be given to shut-down reactors. Absent that priority, Graves' opinion crumbles the government argues. Priority for shut-down reactors is the subject of defendant's motion for partial summary judgment.

The government's argument that it was obliged to pick-up only a minimum amount of fuel, or only fuel for which there was an approved delivery commitment has been rejected. *Commonwealth*

*Edison Co. v. United States*, 56 Fed. Cl 652, 663 (2003) explained that to date the delivery commitment "mechanism does not create a contractually binding obligation for either party.""Even if the process ... could, if followed and completed in good faith, create a contractual obligation, the third step in the process was not completed because plaintiff did not submit and defendant did not approve a [final delivery schedule] for any year."*Id.*, at 666.In *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 97-98 (2003), the court also found the delivery commitment schedules were not controlling and were used by DOE as an attempt to keep acceptance rates low to decrease the "limit of the [g]overnment's liability to plaintiff for breach."*Id.* at 99.The Standard Contract did not set a specific rate of spent fuel acceptance, or a date by which the government was required to complete accepting the fuels; therefore, as the court stated in its June 26, 2003 Order in the instant case, in the unlikely event an award of damages to plaintiffs, or any one of them, requires the development of a pick-up schedule for all SNF and/or HLW from all utilities under the Standard Contract, the court reserves its option of invoking the primary jurisdiction doctrine by initiating the matter by means of the call procedure of 28 U.S.C. § 2507(a).[FN3]

FN3.*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003) held that damages for the government's breach of contract were based ona 3,000-ton annual rate of acceptance commencing in January, 1998.

***2** Plaintiffs also point out that Graves' opinion is only part of their damage case. Plaintiffs will also present evidence of their reliance damages-actual expenses. Plaintiffs' position that it could have purchased earlier pickups is an alternative position.

*Standards for motions* in limine

RCFC 16 motions *in limine*"... prevent a party before trial from encumbering the record with irrelevant, immaterial or cumulative matters. Such a motion enables a court to rule in advance on the admissibility of documentary or testimonial evidence and thus expedite and render efficient a subsequent trial."*Norman v. United States*, 56 Fed. Cl. 255, 267 (2003) (citation omitted).

Expert testimony "assist[s] the trier of fact to understand the evidence or to determine a fact in issue."Fed.R.Evid. 702. As the Supreme Court has observed, "[t]his condition goes primarily to relevance."*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."Fed.R.Evid. 401. "The Rule's basic standard of relevance is thus a liberal one."*Daubert*, 509 U.S. at 587.

Fed.R.Evid. 702(1) provides that an expert witness with "scientific, technical, or other specialized knowledge may testify if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."Accordingly, in its "gatekeeper" function, the court excludes expert testimony that it finds to be irrelevant or not based upon the application of the particular facts of the case to reliable methodologies or theories. *Micro Chemical, Inc. v.. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed.Cir.2003), *citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92. *See also* *Fed.R.Evid. 104*.The inquiry is "whether the reasoning or methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology can properly be applied to the facts at issue."*Daubert*, 509 U.S. at 592-93. This inquiry is necessarily " 'a flexible one,' ' based on the uniqueness of the circumstances present. *Id., citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a [court] to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). If the relevancy of evidence is dependent upon disputed facts, evidence may be admitted "upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Fed.R.Evid. 104(b).

***3** Defendant argues Graves' damages theory and underlying model are too speculative to support a damage award and fail the reasonable certainty

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

standard. The Standard Contract provides that once DOE approved a utility's delivery commitment, that utility could exchange or sell it, subject to DOE's unilateral right, in advance and "in its sole discretion," to approve the exchange. Graves' assumption that DOE would not only have begun pickup, but have approved the delivery slot exchanges he hypothesizes, thus allowing for utilities to barter among themselves, is flawed defendant asserts. In the twenty-one years since the Standard Contract was promulgated, no contract holder has ever submitted an exchange request to DOE. Accordingly, there being no "real world" experience to test the market theories upon which Graves relies, his analysis is asserted to be speculative and based on assumptions that are incorrect or inconsistent with plaintiffs' data.

Under the Standard Contract, after the capacity of a DOE storage facility is established and the delivery procedure is commenced, a utility may seek approval of an exchange six months prior to a delivery commitment date. The DOE has thirty days to provide written reasons for any disapproval. Although the government has discretion to approve or disapprove requested exchanges, discretion may not be exercised arbitrarily or capriciously. *Reservation Ranch v. United States*, 39 Fed. Cl. 696, 714-15 (1997), *aff'd*, 217 F.3d 850 (1999). *See also* *Hayes v. United States*, 43 Fed. Cl. 735, 740 (1999). Accordingly, DOE's right to approve the exchanges on which Graves opinion rests, does not render his opinion inadmissible on that basis. Good faith action may be presumed. Defendant also points out that in 1992 Yankee Atomic analyzed the possibility of exchanging its allocations, an analysis that showed significant savings, yet Yankee Atomic did not pursue any exchanges then, and therefore, would not pursue that avenue in Graves' hypothetical world. Graves can be cross-examined in this area. DOE's other objections related to transportation issues, such as cask availability and geographic locations of proposed swaps as well as any impact that "Greater-Than-Class C" low-level radioactive waste ("GTCC")(which the defendant asserts it has no contractual obligation to pick up) would have on exchange market prices, can also be explored in cross-examination. Defendant alleges the continued presence of GTCC on plaintiffs' property after pickup of the SNF would eliminate or reduce plaintiffs' damages. As the court stated in its June 26, 2003 Opinion, to the extent it is necessary to resolve the GTCC policy issue in order to determine damages, evidence on this issue is appropriate.

*Standards for the fact of damages and the amount of damages:*

Analogizing to *Winstar* cases that have rejected expectation damages because of the failure to identify specific investment opportunities that the thrifts would have followed in the "but for world," defendant likewise urges the rejection of Graves' analysis and opinion for lack of "real world" experience. The court rejects the government's assertion that Graves' opinion should not be introduced at trial because it does not identify which utilities would trade or sell to plaintiffs. Proof of damages need not always specify transactions that would have occurred but for the breach. *See* *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1329 (2002)(affirming damage award for agreement for lender to provide loans to make HUD housing more energy efficient without evidence of which loans would have been made); *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (2000) (approving damages for breach of transcription contract without evidence of specific proceedings the reporters would have handled but for the breach); *Locke v. United States*, 283 F.2d 521, 524-25 (Ct.Cl.1960)(approving damages for breach of a typewriter repair contract without evidence of specific machines plaintiff would have repaired.). If there is a reasonable probability of damages, the amount of which is uncertain, the court makes a "fair and reasonable approximation of the damages ."*Ace-Federal Reporters*, 226 F.3d at 1333,*quoting* *Locke v. United States*, 283 F.2d at 524. Such damages may rest on "reasonable inferences based upon the evidence."*Energy Capital Corp.*, 302 F.3d at 1329,*citing* *Locke*, 283 F.2d at 524 ("... we may act upon probable and inferential as well as direct and positive proof.").*See also* *California Federal Bank v. United States*, 245 F.3d 1342, 1350 (Fed.Cir.2001)(If the fact of damages proximately caused by the breach is clear, there must be some basis on which a reasonable estimate of the profit may be made.). If the jury method of ascertaining damages is applied, the court must determine (1) clear proof of injury; (2) there is no more reliable method to calculate damages; and (3) there is sufficient evidence from which to make a fair and reasonable approximation of damages. *Raytheon Co. v. White*, 305 F.3d 1354, 1367 (Fed.Cir.2002)."In

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

estimating damages, the Court of Claims occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties .”*Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1357 (Fed.Cir.2001) citing *Specialty Assembling & Packing Co. v. United States,* 355 F.2d 554, 572 (Ct.Cl.1966), citing *United States v. Smith,* 94 U.S. 214, 219, 12 Ct. Cl. 119, 24 L.Ed. 115 (1876). Accusations that Graves' proof is speculative will not preclude the introduction of the evidence. *Id.* Whether the exchanges Graves describes “could have” or “would have” occurred can be explored at trial.

***4** Defendant's objection that Graves does not rely upon any “real world” exchanges for his economic theories is strikingly similar to the objections rejected in *Energy Capital Corp. v. United States,* 302 F.3d 1314 (Fed.Cir.2002). At issue in *Energy Capital* was a contract between HUD and the plaintiff under which plaintiff would extend energy efficiency loans to HUD property owners. 302 F.3d 1316-18. Following HUD's breach of that agreement, the question became whether, and to what extent plaintiff would have profited from those loans-loans which could not have been made without the consent of HUD, the holders of the first mortgages and the underlying fee owners. Responding to the government's assertion that the resulting damage award was speculative because there was no testimony that the first mortgagees would have consented to the energy loans, the Federal Circuit characterized the government's argument as an attack on the sufficiency of the evidence. 302 F.3d 1329. The Federal Circuit counseled that the trial court made reasonable inferences from evidence which included incentives to the first mortgagees to consent to the thwarted loans, and deferred to the trial court's broad discretion to weigh that evidence.

Similarly, the government here argues DOE has not consented to any exchanges, nor been requested to do so. The court will await the close of evidence to make its findings and will not exclude Graves' opinion on the grounds the government urges. See also *Ace Federal Reporters,* 226 F.3d at 1333 (noting that if a reasonable probability of damages is established, damages may be fairly and reasonably approximated.).

Defendant's contract breach is established. That breach prevented the very market the government assails as speculative-the lack of realmarket data on the sale of allocation slots for the storage of spent nuclear fuel. By partially breaching the contract, defendant cannot exclude Graves' opinion on the grounds that there is no market data. There is no market data because the government's breach thwarted this possibility.

*Graves relies on facts in record-not mere speculation*

In constructing his economic model-a “should have been world” if DOE had commenced performance, Graves assumes (1) certain storage costs; (2) a rate of acceptance by DOE; and (3) certain fuel would be classified as “must move”-fuel that needed to be removed to eliminate continuing storage costs-for example, SNF held by a shutdown utility for more than five years (the necessary cooling time for SNF prior to acceptance) or SNF that exceeded available storage space. From this theoretical supply and demand, “swap” prices would have developed Graves opines, with an ascertainable market price arising naturally (and scientifically) from the economic tenants of supply and demand. As noted, under the Standard Contract, initial allocations, or slots, for pick-up are based on “Oldest Fuel First.” However, under the contract, subject to DOE approval, slots could be exchanged among plant owners. Graves creates a model economy or market for these acceptance slots based on economic engines. A plant owner would have the economic incentive to buy an earlier swap allocation at a price less than the cost to store the fuel. Conversely, a plant owner would be motivated to sell a swap allocation and accept a later place in the queue if the exchange price was greater than its storage costs.

***5** Defendant objects to various factual assumptions Graves makes. Many of those objections go to facts that are in dispute, the rate (or a reasonable rate) of acceptance, storage costs in the “but for or the “breach world.” Defendant's objections are to the application of facts to Graves' economic principles and methodology. As the Federal Circuit counseled in *Micro Chemical, Inc. v. Lextron, Inc.,* 317 F.3d 1387 (Fed.Cir.2003), the court does not winnow expert testimony because of factual disputes. Rather the court scrutinizes the methodology used.

Defendants confuse the requirement for sufficient facts and data with the necessity for a reliable foundation in principles and method, and end up complaining that [the expert's testimony] was not based on 'reliable facts'.... When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of the facts underlying one expert's testimony ...

When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

317 F.3d at 1392, citing Advisory Committee note to Rule 702.

Defendant may by cross-examination and presentation of a competing theory, explore the facts it disputes. *Cf. Litton Sys., Inc. v. Honeywell, Inc.*, 87 F.3d 1559 (Fed.Cir.1996), *vacated, and remanded*,520 U.S. 111 (1997). Graves' opinion will be subjected to scrutiny at trial; it will not be excluded pre-trial.

Expectation damages in the *Winstar* cases cited by defendants (decided on summary judgment not by a motion *in limine* ) were not based on experience but solely on projections and assumptions that may not have been supported by the evidence. In contrast, without prejudging the evidence, here, at least some of the costs have been incurred, SNF quantities are ascertainable, and both parties have projections of acceptance rate, delivery schedules, and quantities. Specifically, Graves relies upon the expert witness report of John W. Bartlett, former Director of the Office of Civilian Radioactive Waste Management, to determine how the government should have and did structure its spent fuel acceptance program, an opinion supported by DOE publications. SNF inventory, projected discharge data, and storage costs were obtained from James P. Malone of NAC International; SNF storage capacity was taken from a DOE publication. Transportation data was obtained from the expert witness report of Ivan F. Stuart of NAC International. Appendix, p. 4. Pool capacities, inventories, and reactor discharge rates for all the spent fuel facilities in the United States were obtained from DOE publications and from Mr. Malone. Annual aggregate acceptance amounts used were found to be reasonable by Dr. Bartlett and supported by the opinion of Ivan Stuart, and also contained in a DOE planning document titled, "Civilian Radioactive Waste Management System Requirements Document," dated January 1999. *Id.* pp. 7-8.While the government may present contrary evidence, plaintiffs' position is not fiction. Approval of exchanges is supported by deposition testimony. Id. p. 13-14.Factors used in reaching Graves' conclusions are "real world" figures. While many of the facts are in dispute and many facts are subject to extrapolation or projection, many of the underlying figures represent costs that have been incurred and facts and opinions of others, while perhaps disputed, exist independently. *See* Graves' Opinion, Exhibit 1, List of Data and Documents considered in Forming Opinions, Defendant's Motion, Appendix, pp. 22-23. Accordingly, Graves' opinion is not based on "unsupported speculation." *Energy Capital*, 302 F.3d at 1329.

***6** Importantly, both ramp-up and acceptance rates, along with storage costs are not created by Graves out of whole cloth. Graves relies upon the rates set forth in the 1999 Civilian Radioactive Waste Requirements document for a centralized interim storage facility that was never developed. The government argues that the same document contains different rates that apply to the planning of "overall system level requirements." And while both eventually reach a steady-state rate of 3,000 MTU per year, the ramp-up rates for planning the system level requirements are significantly lower in the first three years than the ramp-up rates upon which Graves relies. According to the government, with the system-wide ramp-up rates, Yankee Atomic would not have been able to purchase sufficient allocations in year one of Graves' model. Graves relies upon the expert report of Dr. John Bartlett, who admitted in his deposition that the rate he chose was "illustrative of reasonable performance." From this the government argues that, as the assumptions change, so does Graves' opinion, which makes it too speculative. Again, this criticism goes to the weight of the opinion, not its preclusion at this pre-trial stage. As the court found in its June 26, 2003 Order, DOE was to commence pickup at a reasonable rate no later than January 31, 1998. Plaintiffs proffer that Graves' ramp-up rate is supported by (1) DOE's own planning

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

documents; (2) the opinion of Dr. Bartlett; (3) the amount of "must move fuel;" and (4) the opinion of Ivan Stuart. The government's cited cases where expert opinion was not supported by any evidence are not convincing. The government does not suggest any other rate would be reasonable. That plaintiffs' damages could vary with changes in acceptance rate does not preclude the introduction of Graves' opinion.

Likewise, the government's criticism concerning storage costs (a factor in Graves' economic methodology) is fair game for cross-examination. "Fair and reasonable" approximation, not an exact calculation (which would of course be impossible in this situation) is all that is needed. Of course, the court is not ruling here on a request for future damages, a motion addressed separately. That plaintiffs' damages could vary depending upon rates of acceptance does not make plaintiffs' damages speculative or otherwise unrecoverable. Graves' estimate of how the exchange provision would have affected the timing of the removal of plaintiffs' spent fuel will not be precluded at this stage. The government's cites *Castle v. United States*, 48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part and remanded in part*, 301 F .3d 1328 (2004) as supporting its argument that a damage award may not be based on speculative assumptions. Here, cited disagreements with storage costs go to the amount, not the existence of damages. *Castle* followed trial and damages were rejected because assumptions, such as the credit quality of the bank's loan portfolio, were contrary to the evidence. Its analysis and applicability as to the existence of damages vice the amount of damages are better suited for trial.

***7** Without prejudging the weight to be accorded Graves' report, his testimony may be presented. Graves' report purports to be grounded in fundamental economic principles of market supply and demand and cost avoidance applied to data that the court will not find to be insufficient at this pretrial stage.

Although there are numerous SNF cases pending in this court, apparently only these three plaintiffs rely on a damage theory based upon exchanges. Defendant complains that any damages assessed in this case would not be binding in subsequent damage assessments in other cases that may utilize a differing acceptance schedule on which damages can be based. However, damages are unique to each utility, and may well not depend upon any overall schedule for their determination.

The parties disagree on whether the fact of damage from the government's partial breach is established, and/or whether Graves' opinion can be categorized as addressing the fact of damage, the amount of damage, or something in between. Plaintiffs allege the fact of damage is established and refer to government's expert, R. Larry Johnson's February 19, 2004 report that concludes plaintiffs are entitled to very substantial damages in every factual scenario he examined except scenario 1. Pltfs' App. A133. Scenario 1 is based on the 1995 acceptance rates which the court rejected as controlling in its June 26, 2003 Order denying the government's motion for partial summary judgment on the rate of spent fuel acceptance. As a result, plaintiffs state, damages are certain; therefore, the court must hear the evidence to reach a reasonable approximation of the amount of damages. In that calculation, Graves' opinion will be offered to show when DOE would have completed removing plaintiffs' fuel absent the DOE's breach, a constituent fact contributing to the estimation of the amount of damages-to which the government offers no alternative model.

In its Reply the government says that while this court has determined a contract breach, issues as to causation and damages remain and Graves' opinion does not establish either causation or injury in fact. His opinion will be offered as the only evidence that plaintiffs suffered any damages-for which reasonable certainty is required. The government also asserts Graves' opinion is the only causation testimony plaintiffs plan on presenting, and Graves does not establish the amount of damages (for which a reasonable approximation standard applies); rather Graves' opinion supplies a factual predicate (causation) for the opinion of Mr. Wise who then quantifies damages, according to the government. As such, the government asserts that Graves' causation opinion must be reasonably certain. As Graves' opinion is not based on reasonable certainty, the government asserts, the opinion should be precluded. Again, such scrutiny awaits trial; Graves' testimony will not be precluded at this stage. Whether Graves' opinion goes to the fact of damage, the amount of damages, or a combination thereof, will be explored at trial. The arguments defendant makes about his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

opinion can be explored in *voir dire*, cross-examination and argument. It bears emphasis, however, that while the court has ruled that the government breached the contract, plaintiffs must still establish that the breach caused damages and the amount of those damages. Whether plaintiffs are able to prove either the existence or the amount of damages awaits trial.

*Motion* in limine *to preclude the testimony of Dr. Bartlett*

***8** Defendant also moves to preclude the expert report of Dr. John W. Bartlett, former Director of DOE's Office of Civilian Radioactive Waste Management ("OCRWM"). Dr. Bartlett was the Director of OCRWM from 1990 until 1993. This office had and has the responsibility to develop and manage the federal system for the disposal of all spent nuclear fuel ("SNF") and high-level radioactive waste.

In sum, Dr. Bartlett makes three points. First, absent the breach, the DOE would have ramped-up to 3,000 MTU per year. Supporting that proffer is, not only his own experience and knowledge, but Graves' opinion and government documents, including the 1985 Mission Plan, which utilized the 3,000 MTU rate. Second, Dr. Bartlett's opinion that exchanges would have been an important part of the "but for world," is based on his own knowledge and experience in the "real world," and supported by his discussions with utilities while he was Director, as well as DOE publications. Thirdly, Dr. Bartlett's opinion is that utilities would be encouraged to organize deliveries efficiently and less expensively by "campaigning." FN4

FN4. Plaintiffs explain that a transportation "campaign" is the acceptance and transportation of a substantial amount of spent fuel or radioactive waste from a site during each visit in contrast to acceptance of a small amount from a particular location. In other words, it is more cost efficient to pick up a substantial amount of SNF from one site than small amounts from several.

Defendant asserts Dr. Bartlett's opinion does not meet the threshold of Fed.R.Evid. 702 because he is not qualified to render an opinion as to the "proper pace and schedule" for DOE's acceptance of SNF and the viability of exchanges or transportation campaigns. Defendant complains that Dr. Bartlett lacks experience and knowledge of how an exchange system would have operated; he fails to identify an acceptance or ramp-up rate; he has virtually no knowledge of the Standard Contract and no specialized knowledge or experience as to DOE's responsibilities thereunder, and during his tenure as Director of OCRWM, his involvement with the Standard Contract was "absolutely minimal." Defendant also asserts Dr. Bartlett lacks experience with "acceptance campaigns" or exchanges and largely relies on the opinion of Ivan Stuart, another of plaintiff's experts. Defendant also complains Dr. Bartless was unable to project whether or how many exchanges would be submitted for approval, thus his opinion is pure conjecture.

In addition to questioning his qualifications, defendant also assails Dr. Bartlett's methodology, asserting it is unreliable and incoherent. His exchange theory is based on expectation and belief formed during his tenure as OCRWM Director and review of documents first given to him by plaintiffs' attorneys. His conclusion that acceptance campaigns are a good idea is baseless according to the government.

Finally, defendant posits that Dr. Bartlett's opinion is simply not helpful to the court as the trier-of-fact; it fails to account for many variables, and is inconsistent with what is required by the Standard Contract as opposed to what might be a good idea.

Plaintiffs' counter that defendant's position is diametrically opposed to its prior motion to exclude Dr. Bartlett from testifying because of the possible application of the lifetime ban under 18 U.S .C. § 207. Defendant now argues Dr. Bartlett's opinion is not based on scientific principles; defendant's prior motion to exclude Dr. Bartlett's testimony was on the grounds he relies on scientific, technical, or other specialized knowledge obtained while Director of OCRWM. The court held in its December 30, 2002 Order that there was not a sufficient showing that Dr. Bartlett's service as Director of OCRWM involved the "particular matter" now before the court, and if so whether that involvement was sufficiently personal and substantial so as to call for the permanent testimonial bar of the Ethics in Government Act, 18

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S.C. § 207(a)(1). Accordingly, the court ordered that Dr. Bartlett may serve as an expert witness in this litigation consistent with the Federal Rules of Evidence, subject to the qualifications contained in that Order. Plaintiffs also represent that Dr. Bartlett may testify as a fact witness.

***9** Without prejudging his acceptance as an expert in this case for all purposes that may be advanced, it is noted that plaintiffs present Dr. Bartlett's experience and personal knowledge not only from his three years as director of DOE's SNF program, but from his experience commencing in 1957 with the design of the Navy's first nuclear-powered surface ship and his doctorate degree from Rensselaer Polytechnic Institute where he studied and taught courses in nuclear engineering and the nuclear fuel cycle. In 1968, Dr. Bartlett was a Fulbright professor of Nuclear Engineering in Istanbul, Turkey, where he taught atomic physics, reactor engineering and reactor design. Dr. Bartlett worked for the contractor to the Atomic Energy Commission Division of Waste Management and Transportation where he developed the program plan for a complete system for nuclear waste management. Plaintiffs represent that he was on the ground floor of designing and planning this country's spent nuclear fuel and high-level waste disposal plan.

In 1974 Dr. Bartlett led the Nuclear Waste Management Planning Office's preparation of a five volume compilation of technologies in nuclear waste management. With a consulting firm starting in 1978, Dr. Bartlett's work included providing technical support to the Nuclear Regulatory Commission's promulgation of regulations pursuant to the Nuclear Waste Policy Act. He provided peer review of DOE's 1985 plans for the spent fuel program.

In October of 1989, he was nominated by President Bush to be the director of DOE's spent fuel disposal program; he was confirmed by the Senate in 1990. As Director he communicated with CEOs of leading utilities which included discussions about exchanges. After leaving DOE in 1993, Dr. Bartlett consulted in the field of radioactive waste disposal program planning, including the logistics of an attempted spent fuel repository in Australia. His work included transportation logistics. A 3,000 rate he assumes is a rate that was adopted in *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003).

For the reasons stated above, defendant's objections or disagreements with Dr. Bartlett's facts, assumptions, and reasoning can be explored in cross-examination subject to the qualifications and conditions contained in the court's December 30, 2002 Order. Whether factual or expert testimony, or a combination thereof, the court will not preclude plaintiffs from offering Dr. Bartlett's opinion; it cannot be said at this stage, he lacks specialized knowledge, skill or experience related to the matters about which he intends to offer expert testimony in this case, that his methodology is flawed or that all his assumptions are speculative. Fed.R.Evid. 702. Given the uniqueness of the facts in this case, lack of specific experience with government-run industry-wide disposal of SNF will not, in and of itself, preclude expert testimony. Dr. Bartlett will not be offering legal opinions as to the meaning of provisions of the Standard Contract, according to plaintiffs. Dr. Bartlett will assist the court regarding the Standard Contract. *Restatement (Second) of Contracts* § 204 (1981)(The court must supply missing contract terms that are reasonable under the circumstances). His opinion as to the operation of a functional disposal program may assist the court in resolving issues of reasonable contract administration. *See* *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003)(stating that "[c]ourts should read contract provision to 'effectuate [its] spirit and purpose." ').

*Motion to Exclude the Testimony of Kenneth W. Blair*

***10** Plaintiffs assert they needed to build and load an Independent Spent Fuel Storage Installation ("ISFSI") because of defendant's breach. Plaintiffs move to exclude testimony from Kenneth W. Blair, defendant's scheduling expert, whose "Summary of Opinion" states that "contractor delays to the fuel preparation activities," not DOE's inaction, resulted in an eleven-month delay in completion of transfer of fuel to plaintiffs' ISFSI. This position may be used to support defendant's argument that it is not liable for costs arising from contractor delays, plaintiffs assert.

In its August 29, 2003 Order, the court stated that, to the extent defendant asserts that a portion of plaintiffs' damages are attributable to contractor delays, defendant-as the breaching party-must demonstrate that plaintiffs' remedial actions were not

commercially reasonable in that regard. According to plaintiffs, Blair has no opinion on the commercial reasonableness of plaintiffs' actions and cite deposition testimony to that effect. While they do assert that the building and loading of the ISFSI was due to the government's breach, plaintiffs do not dispute that certain activities took longer than originally anticipated. Plaintiffs do not allege that DOE activities or inaction caused delays in completion of their ISFSIs.

Additionally, plaintiffs seek to exclude Blair's testimony that plaintiffs are responsible for any delays associated with its ISFSI project, by virtue of the fact that plaintiffs hired NAC as its contractor. This, plaintiffs assert is an inadmissible legal conclusion offered by Blair, a civil engineer not a lawyer. Any probative value is outweighed by the unnecessary time that would be used in allowing Blair to testify, particularly given his inability to opine as to the commercial reasonableness of plaintiffs' remedial acts, and thus his opinion is properly excludable under Fed.R.Evid. 402 (“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, ... or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”).

Plaintiffs contend Blair's testimony is inherently unreliable because he admitted his opinions are incomplete and subject to amendment pending review of additional documents, and because he cannot state with a minimal degree of certainty that he is the primary author of his report, which he acknowledges was co-authored with his colleague Kelly Heuer. Plaintiffs complain that Blair's expert report also fails to contain the basis and reasons for his opinion as required by Fed.R.Civ.P. 26(a)(2), the court's November 8, 2001 Order respecting expert witness disclosures, and Fed.R.Evid. 702 which requires an expert to explain how experience led to the conclusion reached. Plaintiffs also state that Blair believes he discarded preliminary sketches, notes of conversations and drafts of his opinion in violation of the court's November 8, 2001 Order requiring “[a]ll material considered by a testifying expert (including that rejected) or material generated by the expert in formulating opinions should be produced.... This would include any communications from persons, including counsel, addressing or commenting on the substance of the testimony to be presented.”

***11** In opposition, defendant represents that it is not taking the position that plaintiffs attempted to mitigate damages by building ISFSIs. Rather, defendant asserts that factors other than need for spent fuel storage motivated plaintiffs to shift to dry storage. Defendant does note, that the ISFSIs were failed mitigation attempts because their costs exceed those of wet storage. In short, delays in the ISFSI projects extended the period during which the Yankees are claiming both wet and dry storage costs. Evidence in that regard is, defendant's counter, consistent with this court's order of December 24, 2003 that “[p]laintiff cannot complain in that its decision to move to dry storage was, at least in part, premised on saving costs. If this saving did not occur, through no fault of the government, additional damages over the cost of assumed continued wet storage should remain plaintiff's responsibility.”Defendant also points out that Blair's opinion is, to some extent, subject to modification because the ISFSI project is currently under construction. Finally, defendant asserts that Blair's opinion is no less credible because he wrote his report in collaboration with colleagues, and plaintiffs have been provided with all drafts of his report; what was discarded were notes of phone calls with follow-up issues that were thrown away when resolved.

In Reply, plaintiffs cite to Blair's testimony that further documents that the court declined to order produced in its Orders of August 29, 2003 and December 24, 2003 “are required” in order to complete the analysis upon which his opinions are based. Appendix 3 to Blair's report states “[a]ny remaining existing documents are required in order to complete the schedule delay analysis.”Pltf's Motion, p. 039. Plaintiffs also reassert the court's insistence that the touchstone for judging plaintiffs' conduct in responding to the government's breach is reasonableness.

In general, for the reasons expressed with respect to the denial of the motion to preclude the testimony of Frank Graves, this motion to preclude Blair's testimony shall also be denied. The issues as to the relevance of contract delay to damages claimed can best be handled on a trial record. The points raised by plaintiffs can better be addressed by *voir dire* before any evidence is presented or by cross-examination

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

thereafter.

*Motion to Exclude testimony from Daniel Fischel*

Plaintiffs seek to exclude the testimony of Daniel R. Fischel ("Fischel"). Fischel is the Director, Chairman and President of Lexecon, Inc., a consulting firm that specialized in the application of economics to a variety of legal and regulatory issues. He is also the Lee and Brena Freeman Professor of Law and Business at the University of Chicago Law School. His credentials are contained in his expert report. His Summary of Conclusions responds to Graves' opinion that "had DOE commenced acceptance of spent fuel by January 31, 1998 with a reasonable aggregate acceptance rate, it should and would have completed removal of spent fuel from Plaintiffs' facility by January 1999;" and "in order to achieve removal by this date, Plaintiff would need to swap removal slots with other Purchasers" at certain costs. Pltfs' Motion, App., p. 02. Based on those conclusions, another of plaintiffs' experts, Dr. Kenneth T. Wise opines that damages of Yankee Atomic are $70.6 million in the minimum in the "Breach World," not including the $11.8 million Yankee Atomic would have allegedly spent for the allocation slots in the "Non-Breach World."

***12** Based on his review and analysis, Fischel reached two conclusions: (1) claimed damages do not result from DOE's failure to commence disposing of SNF and HLW by January 31, 1998 (the "Causation Opinion" according to plaintiffs); and (2) claimed damages are dependent upon assumptions about future events, assume a particular schedule, assume DOE would pick-up GTCC and "failed" waste, and assume exchanges would minimize aggregate at-reactor storage costs (the "Speculativeness Opinion") according to plaintiffs. Plaintiffs complain that Fischel's opinion is not based on DOE's failure to continue acceptance of spent fuel at a reasonable rate until such acceptance is completed and that Fischel's underlying assumption is that the breach was the failure of DOE to commence removal by December 31, 1998, a legal conclusion already rejected by this court in its Order of June 26, 2003 which adopted in part the ruling in *Commonwealth Edison Co. v. United States,* 56 Fed. C. 652, 664 (2003)(rejecting the argument that DOE was only required to begin acceptance and had no obligation to continue acceptance at a reasonable rate.).

Plaintiffs complain Fischel's Speculative Opinion is not useful to the court because he was unable to define "speculative" in deposition, yet used it in different contexts, and argue he uses an unknown and unidentified methodology. After a teleconference with the court, Fischel admitted his methodology is unnamed. Plaintiffs also assert that Fischel criticizes Graves' expert opinion because the latter assumes future events, yet was unable to identify any such future events and admitted he had no expertise to do so. Fischel's criticism of the opinions of Dr. Bartlett and Graves for failing to take into account program, loading, and societal costs is assertedly unfounded and Fischel was unable to evaluate whether or not those issues have any bearing on those opinions. Plaintiffs complain that Fischel rendered legal opinions as to the acceptance schedules that are asserted to be consistent with the terms of the Standard Contract and as to whether purchasers could exchange allocations that had not been projected, requested and approved, and opines on efficiencies of exchanges under the Standard Contract vice exchanges in Graves' Opinion, all testimony that is either a legal opinion or would not be helpful to the court. In sum, plaintiffs posit that Fischel's report is more advocacy than expertise and should be excluded from the witness box.

Defendant disagrees and asserts plaintiffs misunderstand Fischel's opinion. Defendant asserts that in Fischel's opinion the damage claims proffered by plaintiffs are not based on an analysis of damages arising from the government's failure to commence removal in 1998. Rather, Fischel critiques plaintiffs' damage claims because they are founded upon the "speculative and implausible" assumptions that the government would have completed removal by a certain date. Fischel criticizes plaintiffs' damage theory because it is "not linked to a failure to start but rather is linked on a series of speculative and implausible assumptions relating to the time of removal independent of the time of commencement."This, according to Fischel, is a "fundamental disconnect, a lack of causal connection between the alleged breach and the claimed damage."As a result of this "disconnect," it is asserted plaintiffs' experts have failed to measure damages from both the failure to commence removal in 1998 and acceptance thereafter. Defendant calls plaintiffs' objections about Fischel's methodology and

implausible assumptions confusing and counters that Fischel's critical analysis of plaintiffs' experts will aid the court in its examination of this matter.

***13** Fischel is not offering legal opinions defendant insists. Even if his opinions are legal, as defendant points out, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."Fed.R.Evid. 704. Fischel's opinions regarding the assumption made by plaintiffs experts are based upon his expertise in economics and damages. Defendant claims that his opinions will aid the court in examining other expert testimony; that it is not inadmissable. Fed.R.Evid. 702.

Similar to the results reached with respect to the proposed testimony of Frank Graves, it is concluded that Fischel's proposed testimony cannot be rejected by an *in limine* motion. Fischel's inability to name his methodology does not render it inadmissable. Questions of reliability of that analysis can be explored at trial. As for objections about Fischel's inability to quantify impact of future events, Fischel testified in deposition that "... predicting the future is difficult, and therefore a damage claim which is premised upon predictions about the future is speculative for that reason."Def. Op., p. 10. Fischel's point is that one cannot quantify how future events may affect future costs. Furthermore, the failure of Fischel to quantify societal and private costs he complains are missing from Graves' analysis does not warrant the pre-trial exclusion of Fischel's opinion. Other criticism of Fischel's analysis and his subsidiary opinions can be explored in cross-examination and argument.

Accordingly, it is ORDERED that:

(1) Defendant's motions to preclude the testimony of Frank Graves and John W. Bartlett shall be DENIED;

(2) Plaintiffs' motions to preclude the testimony of Kenneth W. Blair and Daniel Fischel shall be DENIED.

Fed.Cl.,2004.
Yankee Atomic Elec. Co. v. U.S.
Not Reported in Fed.Cl., 2004 WL 1535686 (Fed.Cl.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE<br>Plaintiff, | : | |
| | : | No. 04-106C |
| v. | : | (Chief Judge Damich) |
| UNITED STATES OF AMERICA<br>Defendant. | : | |

**EXPERT WITNESS REPORT OF FRANK C. GRAVES**

# EXPERT WITNESS REPORT OF FRANK C. GRAVES

I. Introduction and Approach ........ 1
I.A. Approach to Modeling Non-Breach Spent Fuel Acceptance ........ 3
II. Pace of Acceptance in the Non-Breach World ........ 5
II.A. The Economic Need for Spent Fuel Removal – Must Move Analysis ........ 5
II.B. Feasibility of Acceptance Rate ........ 9
II.C. Acceptance Rate Conclusion ........ 11
III. Sequence of Acceptance in the Non-Breach World ........ 15
III.A. Modeling the Acceptance Priority Resulting From Exchanges ........ 18
III.B. Modeling Exchanges – Analysis and Base Case Results ........ 20
III.C. Modeling Exchanges – Sensitivity Analyses ........ 24
Scenarios – Nuclear Life Extensions and Early Shutdowns ........ 25
Scenarios – Acceptance Rates ........ 27
Scenarios – Storage Cost Variability ........ 30
Scenarios – Potential Barriers to Participation in Exchanges ........ 31
Scenarios – OFF Priority ........ 39
Other Benefits of Exchanges ........ 42
IV. Characterizing the Breach World ........ 42
V. Discussion and Conclusion ........ 44

APPENDICES

Appendix A: List of Documents Considered
Appendix B: Resume of Frank C. Graves
Appendix C: Disclosure of Deposition and Testimony
Apendix D: Disclosure of Publications
Appendix E: Summary of Scenario Results

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE<br>Plaintiff,<br><br>v.<br>UNITED STATES OF AMERICA<br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | No. 04-106C<br>(Chief Judge Damich) |

EXPERT WITNESS REPORT OF FRANK C. GRAVES

## I. INTRODUCTION AND APPROACH

I have been asked to prepare this report to describe what would have been reasonable performance by the United States government in accepting spent nuclear fuel and high-level radioactive waste (together, spent fuel) under the terms of its 1983 contract with the Plaintiff, Dairyland Power Cooperative (Dairyland). Dairyland owns a shutdown nuclear plant, the LaCrosse plant (referred to as LACBWR, the LaCrosse boiling water reactor), which is covered by a contract with the government (via the U.S. Department of Energy, DOE) for spent fuel removal. It is well known and accepted that the government has failed to remove spent fuel from any commercial nuclear facility. I describe in this report a reasonable description of how the government would have performed in the hypothetical non-breach world where it did satisfy its contract obligations. In particular, I characterize the schedule of spent fuel acceptance from LACBWR in that non-breach environment.

In reaching my conclusions, I have considered information contained in a number of documents related to spent fuel storage and disposal, the DOE spent fuel program, and publicly available information on nuclear power plants. I have also considered representative estimates of spent

fuel storage costs derived from public data on the actual and estimated storage costs at U.S. nuclear facilities, and the testimonies of Dr. John Bartlett, Mr. Ivan Stuart, and Mr. Loring Mills regarding what level of program performance would be feasible and reasonable. Appendix A. provides a complete listing of the data and information I considered in forming my opinions.

I have over 25 years experience in assisting utilities in the design and implementation of long-range planning, investment, and operating policies, and in assisting their counsel with regulatory compliance and policy review. My work has involved market design and performance evaluations, capacity expansion and network modeling, investment and contract prudence reviews, estimation of marginal costs, price forecasting, design and pricing of new services, and financial simulation and valuation assessments. I have testified on the economics of electric and gas industry restructuring before the FERC and State regulatory commissions on numerous topics, including market entry, antitrust, retail and wholesale transmission access, power contract interpretations, service unbundling, new services, and cost of capital. I have testified in state and federal courts regarding contract disputes and compliance with environmental regulations. I recently testified regarding the government's failure to remove spent nuclear fuel in a similar case involving the Yankee Atomic, Maine Yankee and Connecticut Yankee nuclear plants. I also submitted reports and was deposed in the Pacific Gas & Electric Co. spent fuel case, though did not testify at trial. I am the author of several papers on approaches to and the impacts of restructuring of the electric and gas industries in the U.S., and I am a member of professional societies for mathematics, electrical engineering, finance, and energy economics. I received an M.S. with a concentration in finance from the M.I.T. Sloan School of Management in 1980, and a B.A. in Mathematics from Indiana University in 1975. Additional detail on my experience and qualifications to offer the opinions included in this report is set out in Appendix B. Appendices C and D list the cases in which I have testified as an expert at trial or by deposition during the

preceding four years, and my publications for the preceding ten years, respectively. The Brattle Group is being paid $475 per hour for my time working on this matter.

### I.A. Approach to Modeling Non-Breach Spent Fuel Acceptance

Dairyland's contract is one of approximately sixty such contracts, based on a standard form (the Standard Contract, or Contract) signed around the same time between the government and owners of U.S. commercial nuclear reactors (Purchasers, in the Standard Contract). Each Contract provides that the DOE will remove Purchaser's spent nuclear fuel and high-level radioactive waste (HLW) from their nuclear facilities, in exchange for payments based on the amount of power generated by the nuclear reactors and designed to cover the full costs of the program.[1] In aggregate, these Contracts cover spent nuclear fuel disposal from all U.S. commercial reactors.

The Standard Contract does not spell out a timetable for the schedule of spent fuel acceptance from individual Purchasers or facilities, nor indeed for the overall program. The Contract does specify that the DOE would begin acceptance by January 31, 1998. Article IV.B.5 references an initial priority ranking for acceptance under a paradigm known as Oldest Fuel First (OFF), which allocates the earliest acceptance priority to the oldest spent fuel based on reactor discharge dates. The Contract also contemplated, in Article V.E, that Purchasers could exchange their positions in the acceptance priority order. Finally, the Contract specifies that spent fuel must cool for at least 5 years, after which it becomes eligible for pickup. In this context, the schedule of non-breach spent fuel acceptance at any particular facility can be viewed as depending on the performance of

1 Throughout the remainder of this report, I focus on spent nuclear fuel and do not consider high-level radioactive waste (HLW) separately. This is because HLW quantities are sufficiently small in aggregate and for Dairyland, as well as similar in character to spent fuel that their inclusion would not alter my conclusions.

the overall program, and the schedule of acceptance from other facilities. Conceptually, the problem can be separated into two parts:

- Pace of acceptance: the aggregate rate at which the spent fuel program accepts spent fuel.
- Sequence of acceptance: The allocation of the program's aggregate acceptance among individual Purchasers and facilities (the acceptance priority).

Despite the Contract's lack of specificity, economic logic can be used to characterize a reasonable non-breach program, addressing both pace and sequence. This characterization is based on the timing and quantity of the different Purchasers' economic needs for spent fuel removal, along with evidence that a program capable of reasonably serving those needs would have been economically reasonable and technically achievable. The importance of implementing the DOE program in an efficient manner, in terms of pace and sequence, is reflected in many DOE spent fuel program documents. This need and expectation was testified to by John Bartlett, former Director of the DOE spent fuel program, during the summer 2004 trial in the Yankee cases, as well as in the PG&E trial in summer 2006, and it is consistent with mitigating the financial burden on Purchasers, who are responsible for the total costs of the spent fuel program.

To characterize the non-breach program, I have developed an analytic model that I use to evaluate the timing of spent fuel removal from particular facilities, under a set of reasonable assumptions about pace and sequence. In addition to the Base Case analysis on which I base my conclusions, I have also considered several alternative acceptance rates and a number of issues that could affect acceptance sequence, evaluating the potential effect of a wide range of scenarios on the fuel removal schedule for Dairyland. Examination of these alternative scenarios tests and ultimately confirms the validity of my analyses.

## II. PACE OF ACCEPTANCE IN THE NON-BREACH WORLD

To evaluate the acceptance rate in the non-breach world, I rely on evidence regarding Purchasers' economic need for spent fuel removal, and on evidence regarding what acceptance rate would be feasible and reasonable. This latter evidence comes in part from the DOE's plans for the spent fuel program over time, and it is corroborated by other sources.

### II.A. THE ECONOMIC NEED FOR SPENT FUEL REMOVAL – MUST MOVE ANALYSIS

To identify Purchasers' economic needs for spent fuel removal, it is first necessary to understand the underlying economics of spent fuel storage. An operating nuclear reactor must have a spent fuel pool, and the costs of operating that pool (e.g., security, engineering and maintenance) are essentially fixed, i.e., independent of the quantity of fuel in the pool. Any individual pool can accommodate only a limited amount of spent fuel because of physical space limits and how the fuel is arranged in the pool. I understand that almost all operating nuclear plants make it a practice to reserve sufficient space in the pool to accommodate the discharge of all the fuel in the reactor core in case of emergency – a so-called Full Core Reserve or Full Core Offload Capability (FCR or FCOC). Thus the available storage capacity in an operating plant's pool is the total pool capacity minus FCR, minus the inventory of spent fuel already stored in the pool.

If an operating plant runs out of available storage space in its pool and has additional spent fuel discharges to accommodate, then either some spent fuel must be removed from the site (e.g., delivered to the DOE under the spent fuel program), or substantial incremental cost must be incurred to create additional at-reactor storage capacity (e.g., installing a dry storage facility).[2]

[2] In some circumstances, it may be possible to create additional capacity within a pool, for instance by re-racking the spent fuel assemblies in an arrangement of greater density. Though re-racking can be less costly than dry storage, it nonetheless incurs a substantial expense. Re-racking is not an issue for Dairyland, and I do not consider the possibility of additional re-racking at other facilities (beyond the early

When a reactor shuts down permanently, the pool must continue to operate for some time, until the last fuel discharged becomes cool enough for handling (5 years, under the Standard Contract). After that time, the pool can be decommissioned and ongoing pool operating costs can be avoided, if and when the spent fuel is removed.

This leads to an economic concept for understanding how the government's spent fuel program should have worked in the non-breach world. Spent fuel storage imposes essentially no incremental (avoidable) cost, as long as the spent fuel inventory does not exceed a pool's capacity, or until 5 years beyond reactor shutdown. However, once 1) pool storage limits are reached, or 2) the plant has been shut down for at least 5 years, the plant owner begins to incur avoidable incremental costs from adding or maintaining storage capacity. This results in an economic need to remove spent fuel, which I refer to as a "Must Move" condition. That is, a facility is in a Must Move condition if it needs to remove spent fuel in order to avoid significant incremental or ongoing storage costs. I label the two circumstances that can lead to a Must Move condition as Full Pool Must Move (FPMM), when an operating facility runs out of available pool space, or Shutdown Must Move (SDMM), five years after shutdown when all the spent fuel is available to be removed.

I have performed an analysis of the Must Move needs of each commercial nuclear power plant in the U.S. This analysis determines, for each facility, when spent fuel storage requirements will begin to impose significant incremental costs, and how much spent fuel would have to be removed by what time to avoid that incremental cost. Reliable data on historical and forecasted

---

re-rackings that occurred for reasons unrelated to program performance), in part because it is difficult to obtain data on the potential for re-racking at individual sites. This approach to re-racking lends conservatism to my results. This is because to the extent that my analysis ignores lower-cost alternatives at other facilities, then it will, if anything, show a later fuel removal date for Dairyland than would otherwise be the case.

nuclear reactor operations are readily available, due to extremely detailed record-keeping and the relative predictability of spent fuel discharges over time.[3] This makes it straightforward to develop a quantitative model of future Must Move requirements. (In this case, "future" means looking forward in time from shortly before the government's 1998 contractual breach.) This analysis is based on DOE data on spent fuel pool storage capacities, inventories and projected spent fuel discharges.[4] For each nuclear facility, the Must Move analysis tracks the amount of spent fuel initially present at the facility, the amount and timing of additional spent fuel discharges, and the spent fuel pool storage capacity (net of FCR), to determine when each facility reaches one of the two possible Must Move conditions. The sum of these Must Move needs over time represents the total demand for government acceptance of spent fuel. The aggregate results of my Must Move analysis – the industry-wide timing and quantities of spent fuel that will incur avoidable economic cost, distinguished according to the two categories – are illustrated in Figure 1.[5]

---

3 Of course, there is some uncertainty regarding future discharges based on changing operating practices and license renewals. However, often those effects are relatively easy to project as alternative scenarios. As explained later, I have done this kind of sensitivity analysis in reaching my conclusions.

4 Spent Fuel Storage Requirements 1994-2042, US Department of Energy, Office of Civilian Radioactive Waste Management, June 1995. Minor adjustments were made to these data to eliminate implied premature shutdowns for several reactors, for which there was no apparent basis.

5 The DOE data on which this figure is based assume that reactors retire at the end of their original license lives. Later I consider a case that reflects actual early shutdowns of a few plants and expected license extensions of the remainder. Both assumptions about plant lives yield essentially the same results for my analysis, as I show later.




**Figure 1: Aggregate Must Move Spent Fuel**

This figure shows the aggregate quantity of Must Move spent fuel starting in 1998 at several thousand metric tons (MTU) that reach Must Move status prior to the program's contractual start date, climbing at around 1,000 to 2,000 MTU/year for about the first twenty years, then climbing at over 3,000 MTU/year for about the next twenty years as large numbers of plants begin to shut down, starting around 2015.[6,7] This pattern is consistent with the fact that spent fuel is discharged from operating reactors at a rate of about 2,000 MTU per year, which begins to drop off when significant numbers of plants begin to shut down. With regard to these needs, an

---

[6] Spent fuel quantities are measured in units of metric tons of uranium (MTU), reflecting the mass of uranium in the original fuel.

[7] Figure 1 is based on data showing that reactors shut down at the end of their original license lives. To the extent that many plants receive license extensions and operate beyond their original lives, as is now expected, the industry will continue to discharge about 2,000 MTU/year for many additional years, and the

economically appropriate non-breach acceptance rate would accommodate the average Must Move needs, would start early enough so it is not overwhelmed by the higher needs in later years, and would stay somewhat ahead of aggregate Must Move needs. A rate that did not satisfy these criteria would impose unnecessary costs and risks on nuclear plant owners and their customers. This is not to say that the acceptance rate should necessarily always accommodate all Must Move needs. Particularly at the beginning of the program when there is a small backlog of Must Move needs, if acceptance did not begin until 1998, it might be impractical to expect the program to immediately accommodate all the backlogged spent fuel removal needs. But a reasonable acceptance rate should not be persistently below the level needed to accommodate Must Move fuel.

### II.B. Feasibility of Acceptance Rate

Recognizing the economic need to remove spent fuel, another important consideration in judging the overall reasonableness of an acceptance rate is whether it is technically feasible and economically reasonable to implement it. This includes considering whether the rate is reasonable with respect to loading spent fuel at reactor sites, transporting it to the permanent repository (perhaps by way of an interim storage facility), and emplacing the waste in the permanent repository. A good starting point for understanding what rate would be technically feasible and reasonable in this context is the planning that occurred for the DOE spent fuel program itself, especially before its severe delay and other performance difficulties became widely apparent.

timing of the increased shutdown needs will be delayed. I have examined this in alternative scenarios discussed later.

To my knowledge, all of the many DOE planning documents and studies, beginning with the Draft 1983 Mission Plan and continuing through today, use a steady-state acceptance rate of 3,000 MTU/year at a geologic repository (this would correspond to one 10 MTU cask per day, 300 days per year). All the program plans also show repository acceptance beginning at a lower rate and ramping up to the steady state rate in 3-6 years. This long history of planning for a ramp-to-3,000 MTU/year acceptance rate is consistent with evidence that this rate is feasible and reasonable throughout all parts of the waste management system. Ivan Stuart has testified in the Yankee and PG&E spent fuel trials that it would have been technically feasible and programmatically reasonable for the waste disposal program to load spent fuel at a rate of 3,000 MTU/year from reactors and transport it at this rate to an interim and/or permanent facility. Dr. John Bartlett has testified that this rate is reasonable for emplacing spent fuel in a permanent repository. He also confirms that it would be feasible and reasonable for the program to ramp up to the 3,000 MTU/year steady state acceptance rate within three years, more quickly than is reflected in most of the planning documents.

Among the program planning acceptance rates that ramp up to 3,000 MTU/year, several slightly different ramp-up profiles have been used. In addition, the planned acceptance rate of the overall program sometimes differed from the 3,000 MTU/year rate, e.g., in cases where there were additional facilities such as a second repository or an interim storage facility, and/or if a repository was substantially delayed relative to the start of the program. Early in the DOE's planning, some plans considered acceptance rates as high as 6,000 MTU/year, reflecting two repositories operating in parallel, and some contemplated starting acceptance prior to 1998. Later, as it became clear in the early 1990s that the DOE would be unable to have a repository ready for operation by the 1998 program start date, some plans showed very limited acceptance –

only 900 MTU/year – for an extended period, reflecting the use of a temporary facility with limited storage capacity.

### II.C. Acceptance Rate Conclusion

In my numerical analyses characterizing non-breach acceptance, I considered a number of different acceptance rates. These rates encompass (or are at least very similar to) most of the rates that have been used in program planning over the history of the program. Figure 2 illustrates several of these rates, showing their cumulative acceptance over time, and also showing for comparison the Must Move results discussed previously. (Figure 3 following shows the annual acceptance quantities for these rates.) With respect to Must Move needs, any of the 3,000 MTU rates may be candidates for reasonable acceptance rates – they accommodate average Must Move needs, are not overwhelmed by the higher needs in later years, and generally stay ahead of aggregate Must Move needs after the first few years of program operation. The highest (6,000 MTU) and lowest (900 MTU) rates do not satisfy these criteria.




**Figure 2: Non-Breach Acceptance Rate and Must Move Spent Fuel (Supply and Demand for Spent Fuel Acceptance)**

| Acceptance Rate (MTU) | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 Forward |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1988 Mission Plan | 1,200 | 1,200 | 2,000 | 2,000 | 2,700 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 1983 Mission Plan [1] | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 1987 Mission Plan Amendment | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 2,000 | 2,650 | 2,650 | 2,650 | 2,650 | 3,000 |
| 2006 CRWMS Requirements Doc | 400 | 600 | 1,200 | 2,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 1985 Mission Plan: Improved | 5,200 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,900 | 4,800 | [2] |
| 1991 Annual Capacity Report | 400 | 600 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | [3] |

[1]: The 1983 Draft Mission Plan rate reflects only acceptance at a single repository starting operations in 1998, though that plan also contemplated a second repository starting five years later.
[2]: The 1985 Mission Plan: Improved Performance rate ultimately reached 6,000 MTU/year, with two repositories operating in parallel.
[3]: The 1991 Annual Capacity Report rate was not specified beyond 2007. For the purpose of this analysis, it is continued at 900 MTU/year through 2009, then follows the 1988 Mission Plan rate pattern starting in 2010.

**Figure 3: Aggregate Non-Breach DOE Acceptance Rate**

Starting with a modest backlog of a few thousand MTU of Must Move spent fuel at the start of the program in 1998, any of the 3,000 MTU/year acceptance rates would make it possible to work down the backlog within a few years and to get somewhat ahead of the actual economic need to remove spent fuel, staying ahead of needs by a few years thereafter. That aggregate "slack" provides a buffer that would simplify program logistics, allow it to perform well in later years when Must Move fuel is generated faster than 3,000 MTU/year, and allow for the possibility that actual Must Move needs might differ from the forecast (e.g., because of unexpected early shutdowns). Just on the basis of comparing these 3,000 MTU/year acceptance rates with aggregate Must Move needs, it is clear that these rates would make it possible for all facilities, including LACBWR, to have all of their Must Move needs served (and thus incur no ongoing incremental spent fuel storage costs) starting within a few years of 1998 when cumulative supply exceeds demand.[8] The rates with a slower start, of course, take slightly longer to catch up with overall needs and are less efficient with regard to addressing at-reactor storage needs.

These acceptance rates are also consistent with overall program efficiency, which is of course an important public policy goal in any context, but perhaps particularly here since the Purchasers are required to pay the full cost of the program. While I have not formally analyzed how overall program cost is influenced by the aggregate acceptance rate, other analyses have concluded that the most efficient program acceptance rate would be 3,000 MTU/year or more. Several studies, including some performed for the DOE, have found that at-reactor storage costs are the only

8 As explained later, exchanges of acceptance priority would be necessary to achieve this. The Contract provided for such exchanges.

program costs that vary substantially with acceptance rate, and at-reactor costs (and thus overall program costs) are minimized at an acceptance rate of 3,000 to 5,000 MTU/year.[9]

This result is intuitively credible: The overall program must eventually accept, transport and dispose of all spent fuel. Broadly speaking, repository size and development costs are driven by the total amount of spent fuel that must eventually be disposed, not the rate at which it is accepted. Total loading and transportation costs also depend primarily on the quantity of spent fuel and the distance it must be moved, not the acceptance rate.[10] Operating costs are minimized by loading the repository expeditiously and at a steady rate, but not substantially faster than the spent fuel needs to be removed. Since at-reactor storage costs are the only costs that vary meaningfully with the acceptance rate, a rate that minimizes at-reactor costs by keeping generally a bit ahead of Must Move requirements will also approximately minimize overall program costs.

The very high rate (6,000 MTU) and low rate (900 MTU) illustrated above are not economically reasonable with respect to the program's goals and Purchasers' storage needs. The 6,000 MTU rate was conceived at a time when it seemed that numerous additional nuclear plants might be constructed. Without these additional plants, this rate would have significant excess, unused capacity. At the other extreme, the 900 MTU/year rate of the 1991 ACR was designed to comply with statutory restrictions on the amount of fuel stored at an interim storage site, once it became clear that the permanent repository would be substantially delayed. This rate simply

---

9 E.g., Civilian Radioactive Waste Management System Throughput Rate Analysis, August 17, 1993, prepared for U.S. Department of Energy by System Analysis, Civilian Radioactive Waste Management System Management and Operating Contractor. See also McKee, R. W. and H. D. Huber, "Determination of Cost Effective Waste Management System Receipt Rates," Pacific Northwest Laboratory, from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 28 - May 3, 1991.

allocated the total allowed acceptance over time, from 1998 to the then-forecast start of repository operation in 2010. Thus it was simply a way to manage the combination of the government's failure to develop a timely repository and its self-imposed restriction on an interim facility. It had little, if anything, to do with addressing the program's original purpose – to deal with Purchasers' aggregate spent fuel storage needs – and would necessarily force many plants to incur substantial unnecessary onsite storage costs, regardless of how efficiently this limited acceptance was allocated.

## III. SEQUENCE OF ACCEPTANCE IN THE NON-BREACH WORLD

Although the Contract does not explicitly identify the sequence in which spent fuel would actually have been accepted in the non-breach world, its provisions, in particular the initial OFF allocation of acceptance priority and the exchange mechanism, create the basis for understanding how a reasonable sequence would have been achieved.[11] It is necessary to make some initial allocation of acceptance rights in a program like this, and OFF can be an acceptable way of doing that. With the OFF ranking creating a well-defined initial right for spent fuel removal

[10] Costs may also be affected by the extent to which shipments can be consolidated, as I address later. This issue can be separated from the question of the aggregate acceptance rate.

[11] In addition to the OFF and Exchange provisions, the Contract also raises shutdown priority, emergency deliveries, and failed fuel as issues that may affect acceptance priority. Article VI.B.1 states that priority "may" be granted to shut down facilities, though does not say how that determination would be made; Article V.D makes allowance to accept emergency deliveries. I do not consider these alternative allocations of acceptance priority. Shutdown priority rights are not clearly defined, and would affect only the initial priority allocation, not the economically efficient allocation. By ignoring this possibility, my results for LACBWR are conservative. The need for emergency deliveries may not materialize, and would likely be small relative to the overall program, so would not substantially change the result in any case. Regarding failed fuel (other-than-standard fuel), the contract appears to allow (at Article VI.A.2(b)) other-than-standard fuel to be accepted on an adjusted schedule, if it is not feasible to accept it on the same schedule as standard fuel. I am aware of no such technical feasibility issues. Experience has shown that failed fuel has not created substantially different technical requirements for placement in dry storage, as evidenced by testimony from Michael Meisner, Chief Nuclear Officer of Maine Yankee Atomic Power Co., during that company's summer 2004 spent fuel hearing. I am not aware of any evidence to suggest that DOE has been planning to accept failed fuel on a different schedule than other spent fuel. Thus I do not treat failed fuel differently.

priority, Purchasers could exchange their allocations to redistribute acceptance priority and substantially improve the program's efficiency.[12] While the DOE has the right to approve exchanges, its position was that Purchasers themselves would "optimize" the acceptance sequence, without direct involvement by the DOE.

In the non-breach world, Purchasers would have used exchanges to improve on the initial OFF acceptance priority, because they would have been able to realize very large cost savings by doing so. As I show later, the OFF acceptance priority is highly inefficient and would impose substantial unnecessary costs on Purchasers. In brief, the problem with OFF is that it allocates acceptance to many facilities at times when they have no need for it, while simultaneously many other facilities are incurring large unnecessary storage costs that could be easily avoided by reallocating acceptance priority. By pursuing exchanges with one another, Purchasers in the aggregate could save billions of dollars in unnecessary at-reactor storage costs, as I show later. Exchanges are entirely voluntary so they would be pursued (and paid for) insofar as they are in Purchasers' individual interest, making almost all Purchasers better off and none worse off.

It is important to understand that because the OFF priority is so inefficient at addressing storage needs, it presents many, many opportunities for Purchasers to make exchanges that advance relevant fuel removal for one Purchaser while not delaying removal for any other Purchaser. For example, if Plant A is an operating reactor that will not reach full pool status until 2008 but has OFF allocations in each year starting in 1998, it can exchange its 1998 OFF allocation for an equal quantity in 2002. By doing so, it will have just as much fuel removed by the time it needs

[12] The exact mechanism by which exchanges would have occurred was not developed, because the program has not progressed to that stage. But as in many other markets, a number of alternative mechanisms (e.g., a formal centralized exchange, brokers, bulletin boards, and/or bilateral trades) are possible and would have reached essentially the same result. In fact, multiple different exchange mechanisms might have co-existed, as is the case in many markets.

it, and the consolidation would probably also simplify removal logistics. Plant B, a shutdown reactor that wants removal in 1998, could benefit immensely from being on the other side of such an exchange and would be willing to pay for the opportunity. In this case, one plant advances its fuel removal and the other is not delayed. Ultimately both benefit overall. It is not the case, as might at first be suspected, that one of the parties gains (by advancing its fuel removal) at the expense of the other's loss (delayed removal). With exchanges, no facility's storage burden is ever extended beyond when it would have ended under OFF; instead the burden is reduced for the large majority of facilities and unchanged for the rest.

In the non-breach world, it would have been simple and straightforward to identify and achieve attractive exchanges. It requires determining the relative need for spent fuel removal priority among the Purchasers, which can be done by analyzing spent fuel storage capacities and requirements at individual facilities to determine their respective economic needs. This is just what I have done in the analyses I describe below (and was performed in part in the DOE document that I use as my data source). These can be readily reflected in a price at which exchanges would beneficially occur. Indeed, such analysis is much easier than determining supply and demand in many other markets that nonetheless can be usefully forecasted and that in operation perform quite well. Purchasers who desired to exchange acceptance priority in the non-breach world could have easily identified potential buyers and sellers of acceptance priority, along with the approximate prices at which they would be willing to transact. Potential sellers are just those with OFF priority in advance of their Must Move needs; those with needs in advance of their OFF priority are potential buyers.

In fact, given any sort of exchange mechanism, such as a centralized exchange, bulletin board or broker, the only information an individual Purchaser would require to participate in exchanges is their own costs and removal needs. The market price of exchanges would contain implicitly all

other relevant information about the costs and needs of other facilities, just as it does in other markets. The price depends on the aggregate balance of supply and demand of acceptance priority, but individual Purchasers need not know in advance what it will be.

The timing of when exchanges would have occurred would have been somewhat flexible. It is likely that many exchanges would have occurred in the early 1990s, after Delivery Commitments Schedules (DCSs) were issued by the DOE, and before the 1998 start of acceptance. But these dates are not strict constraints; arrangements to exchange could have been made before DCSs were issued, and additional exchanges would continue to be made over time, including beyond 1998, as storage needs were revised from earlier expectations. Exchanges could have continued on an ongoing basis throughout much of the program's life.

### III.A. Modeling the Acceptance Priority Resulting From Exchanges

I have developed a model, the Economic Sequence Model (ESM), which can be used to characterize the efficient sequence of spent fuel removal. That is, it finds the removal priority (and thus the fuel removal schedule for each plant, and net cost of exchanges) resulting from exchanges of OFF acceptance priority among Purchasers. As I discuss below, by altering the inputs to the ESM I can evaluate a range of scenarios representing different acceptance rates, potential inefficiencies in exchanges and differences in other assumptions and parameters.

The ESM is conceptually very simple. In each year it begins with the Must Move needs of each facility, determines the storage costs that could be avoided if those needs were met (using representative spent fuel storage costs), and ranks the facilities according to their economic priority for removing spent fuel.[13] This economic priority ranking is based on the facilities'

---

[13] Some of the basic data for the ESM come from the Must Move analysis described above, which itself was based on DOE data on spent fuel discharges, capacity and inventory at each facility. The ESM also relies

"willingness to pay", or avoidable annual costs, for spent fuel removal priority (on a cost-per-MTU basis, since exchanges would occur on an MTU-for-MTU basis). In economic terms, this ranking creates the demand curve for acceptance priority in that year. The year's available acceptance is allocated according to this priority ranking – i.e., to those with the greatest economic need, matching supply (total annual acceptance) to demand.[14] If any Must Move needs are unmet in a given year, they are carried over to the following year (because that fuel is still Must Move) and combined with new Must Move needs. The process is repeated, year after year, to determine the economically efficient acceptance sequence, given the overall program acceptance rate.[15] The model yields the least-cost, redistributed spent fuel removal schedule, after exchanges, for all plants, including LACBWR. It also yields the corresponding price of exchanges for acceptance priority. When applied to a given plant's initial and final priority allocations, this yields the plant's net exchange costs.

It is reasonable to expect that Purchasers would make essentially all advantageous exchanges, arriving at a good approximation of an economically efficient acceptance sequence. This is because they have substantial incentives to do so. Any materially different sequence would entail considerable unnecessary storage costs – potentially millions to tens of millions of dollars a year at a single facility, up to billions of dollars in aggregate. Since information regarding the allocations and likely needs of potential exchange counterparties is readily available, there is ample opportunity for Purchasers to identify and perform essentially all advantageous exchanges.

---

on estimates of the representative cost of spent fuel storage (e.g., O&M costs, the cost of developing a new dry storage facility) that I obtain from publicly available records of the actual and projected costs at a sample of existing plants.

14 Consistent with the efficient use of transportation resources, the ESM allocates acceptance so as to completely fill each transport cask.

15 For some extreme scenarios, the process is complicated by the need to ensure that allocating priority according to immediate needs does not interfere with greater needs in the long term, but conceptually the approach is the same.

Still, as discussed below, I give careful consideration to what would have occurred even if exchanges were less than efficient, in some cases quite inefficient.

The modeling approach I have used to identify the efficient sequence – balancing supply and demand and finding the marginal value of a good – is a standard economic approach commonly applied in modeling other industries to understand market outcomes. This approach is applied successfully across markets that use different exchange mechanisms, and in markets using multiple mechanisms. My sensitivity analyses thoroughly address the concern that such modeling cannot perfectly represent every factor that might inject some friction into the exchange process and thereby complicate efficient reallocation. However, because the data regarding the supply and demand of spent fuel acceptance priority are much more detailed and accurate than corresponding data in other markets, it is possible to have greater confidence in the results here.

### III.B. Modeling Exchanges – Analysis and Base Case Results

The Base Case analysis uses a ramp-to-3000 MTU/year acceptance rate that first appeared in the 1988 Draft Mission Plan; this is neither the fastest nor slowest ramp-up that has been used in program planning. The Base Case also assumes efficient exchanges of acceptance rights and representative storage costs. In addition to this Base Case, I have also analyzed a number of scenarios involving different assumptions on issues including acceptance rate, estimated storage costs, reactor lives and barriers to efficient exchanges. These scenarios, which I discuss later, test and ultimately confirm the validity of my Base Case analysis.

The ESM results for the Base Case, depicted graphically in Figure 4, show that the program could and would have served the vast majority of Must Move needs as they arose, shortly after the program began. This figure shows the matrix of facilities (in rows) and years (in columns),

with shaded cells representing an unserved Must Move condition (the color indicates the nature of the unserved need, e.g., full pool or shutdown). More shaded cells in the matrix indicate more unserved Must Move needs, and generally greater aggregate incremental storage costs for the system. As can be seen from the fact that very few cells are shaded in Figure 4, exchanges allow almost all Must Move needs to be served, with exceptions at only a few facilities in the first few years. Starting in 1998, all plants at risk of running out of pool space would have had enough spent fuel removed to avoid developing a new dry storage facility or adding more fuel to an existing one. Since aggregate acceptance is not then sufficient to immediately serve all Must Move needs, eight plants would continue to operate their existing storage facilities and incur incremental storage costs for up to a few years. These are plants with less pressing needs – plants with relatively large fuel quantities, in pre-existing dry storage facilities or shutdown pools. However, beginning about 2001 and thereafter, those plants would also be served, and all additional Must Move needs of all types would be served at or before the time the needs arose, as the program begins to get ahead of immediate needs. Must Move needs continue to arise after 2001, but by reallocating priority via exchanges, there would be sufficient acceptance to serve all those needs, plus remove some additional spent fuel in advance of need.

Using representative storage cost estimates, this acceptance priority results in about [$88] million in fuel storage costs for the unserved Must Move needs across the entire program.[16]

16 This is estimated as the number of plant-years with unserved Must Move needs, times the associated cost. E.g., this Base Case has 5 plant-years of Pool O&M at $[8.7 million]/year, plus 8 plant-years of Dry O&M at $[4.4 million]/year, for an estimated system cost of $[88] million (in 2007 present value).




**Figure 4: Unserved Must Move Needs – Base Case**

Of course, since there is a shortage of available acceptance in the early years before all Must Move needs could be served, Purchasers would not relinquish acceptance priority freely. The ESM determines the market value or price of early acceptance priority as the willingness to pay of the marginal Purchaser in that year (the first Purchaser whose Must Move needs could not be entirely served). This is consistent with market results expected in microeconomic theory, which observes that prices are set by the intersection of the aggregate willingness to pay curve

(the demand curve) with the supply curve.[17] The exchange prices for the Base Case show that acceptance priority starts at an initial value of $[67,380 per MTU in 1998 and then drops quickly to zero in 2001. This occurs because in the first few years cumulative acceptance is below the aggregate Must Move need, causing the resource (spent fuel acceptance priority) to be scarce and valuable. Beginning in 2001 and beyond, total acceptance exceeds immediate Must Move needs for spent fuel removal – i.e., supply exceeds demand – and the value accordingly goes to zero.[18]

These prices relate to the program mechanics for exchanging priority. Since the Standard Contract contemplated exchanges of acceptance priority rather than independent purchases and sales of acceptance rights, each Purchaser wanting a different acceptance priority would exchange away some of their existing allocation and acquire the same quantity in a different year, paying or receiving the net difference in value based on the timing.

In this Base Case, LACBWR would have all of its spent fuel removed in the first year of the program, 1998, as a result of exchanging its OFF priority allocations (that occur in years 1998 through 2004 under this acceptance rate) for all 1998 allocations. Figure 4 shows LACBWR (labeled in red) with no unserved Must Move spent fuel – i.e., its Must Move fuel is removed in 1998. LACBWR's exchanges would have involved a net economic cost estimated at $[2.8] million in 2007 present value, but this would allow it to save [6] years of unnecessary pool

---

17 Here, the "supply curve" is vertical in each year at that year's annual acceptance, since the program would have fixed, pre-specified annual acceptance quantities that are not affected by price.

18 This is not to say that exchanges beyond 2001 would occur at precisely $0/MTU; there could be some nominal price to reflect administrative and convenience costs. But since there is an excess supply and there could be inconvenience to having fuel removed before it becomes Must Move, the price would be essentially zero. Having a valuable service sell at a zero price is by no means unheard of in the electric industry. Some power plants offer to sell their output for nothing (or even at a loss, i.e., a negative price) at times when it would be more costly to shut down than to operate for free.

operating costs.[19] LACBWR advances its acceptance because it has very high economic priority. That is, it has a high willingness to pay relative to most other facilities, even those wanting to advance their removal priority. This is because it has small quantities of Must Move spent fuel to remove (only 38 MTU in total), and is therefore willing to pay quite a lot, on a per-MTU basis, for earlier priority. Figure 5 shows LACBWR's initial OFF allocation and final removal schedule after exchanges.

| Year | OFF Priority Allocation *(MTU)* *[1]* | Must Move Needs *(MTU)* *[2]* | Priority Allocation After Exchanges *(MTU)* *[3]* | Unserved Must Move Needs After Exchanges *(MTU)* *[4]* | Acceptance Priority Value *(1998 $/Mtu)* *[5]* |
|---|---|---|---|---|---|
| 1998 | 7 | 38 | 38 | 0 | 67,380 |
| 1999 | 3 | 0 | 0 | 0 | 23,556 |
| 2000 | 4 | 0 | 0 | 0 | 4,883 |
| 2001 | 3 | 0 | 0 | 0 | 0 |
| 2002 | 5 | 0 | 0 | 0 | 0 |
| 2003 | 5 | 0 | 0 | 0 | 0 |
| 2004 | 11 | 0 | 0 | 0 | 0 |
| 2005 | 0 | 0 | 0 | 0 | 0 |
| 2006 | 0 | 0 | 0 | 0 | 0 |
| 2007 | 0 | 0 | 0 | 0 | 0 |
| 2008 | 0 | 0 | 0 | 0 | 0 |
| 2009 | 0 | 0 | 0 | 0 | 0 |
| | | | LaCrosse Exchange Costs (PV 1998 $Million): | | **$2.0** |
| | | | LaCrosse Exchange Costs (PV 2007 $Million): | | **$2.8** |
| | | | Lacrosse Fuel Out Under OFF: | | 2004 |
| | | | Lacrosse Fuel Out With Exchanges: | | 1998 |

**Figure 5: LACBWR's Non-Breach Spent Fuel Removal, Summary of Base Case Results**

### III.C. Modeling Exchanges – Sensitivity Analyses

In addition to the Base Case, I have considered a number of alternative scenarios to assess the robustness of my results to different market and political conditions that might prevail. These take into account the effects of issues such as alternate acceptance rates, license extensions and

[19] This is equal to the quantity of acceptance allocations exchanged (totaling 38 MTU in 1999 through 2004) times the difference in value between 1998 and the year of the OFF allocation, totaling about $[2.0] million in 1998 present value. The future value of this in 2007 (at the risk-free interest rate of 3.7%) is $[2.8] million.

early shutdowns, alternative estimates of storage costs, uncertainty, reluctance to exchange, and different types and degrees of inefficiency that might conceivably occur in an exchange market. Where appropriate, I have performed analytic sensitivity analyses with the ESM. With modifications to the input data and interpretation of the results, the ESM can be used to evaluate (or in some cases to bound) the performance of the system and the resulting fuel removal schedules under these alternative scenarios. To illustrate the results of these other scenarios, I use the same type of facility-year matrix as in Figure 4 to show unserved Must Move needs, and similarly estimate the incremental aggregate storage costs involved. In addition to the figures included in the body of the report, Appendix E reproduces in one place the results for all the scenarios I discuss, for ease of comparison. As explained below, the results of these additional analyses show that the conclusions I draw from the Base Case are very robust.

**Scenarios – Nuclear Life Extensions and Early Shutdowns**

The data I used for the Base Case are 1995 DOE data, which reflect original license lives for all plants (except for a few plants that had already shut down early by that time). We now know that several additional plants have shut down early, and most of the remaining plants are planning for (and in some cases have received) license extensions that will allow them to operate for an additional 20 years. This change in reactor lives will affect the amount and timing of Must Move fuel. I evaluate the effect of these updated reactor life parameters in Case 2, shown below in Figure 6, and find they have very little effect relative to the Base Case results. Note that there are very few shaded cells overall, indicating few delays of Must Move fuel removal, just as in the Base Case. There is also no effect on the timing of LACBWR's fuel removal – it is removed in 1998 in both cases. While the several early shutdown plants create some additional Must Move spent fuel, this is mostly delayed until a few years after the start of the program (because of the 5-year cooling requirement), and so aggregate acceptance still catches up with

removal needs in 2001. Eliminating the high-cost full-pool needs that would have occurred without these early shutdowns actually decreases the price of exchanges, so that LACBWR's exchange costs go down to $[1.9] million.

All the remaining sensitivity cases I discuss in this report use the same, updated assumptions on reactor lives as Case 2, but I have also tested all of them with original reactor lives, and the results are essentially unchanged in all cases. [20]




**Figure 6: Unserved Must Move Needs – Updated Reactor Lives**

[20] I use Case 1, the Base Case, as a "reference case" in the figures illustrating the remaining sensitivity cases discussed below, even though it assumes original reactor lives while all the sensitivity cases are based on alternative reactor lives of Case 2. Since the Base Case is virtually identical to Case 2, the distinction is immaterial. For the more "pure" comparison with Case 2, see Appendix E.

**Scenarios – Acceptance Rates**

As was illustrated in Figures 2 and 3, a number of different aggregate program acceptance rates have been used in the DOE's program planning. I have analyzed the effect of several of these different acceptance rates on my results. In addition to the rate analyzed in the Base Case, I consider three alternative 3,000 MTU rates (differing in the initial ramp-up years; see Figure 3 for the precise differences), plus one low 900 MTU rate, and one high 6,000 MTU rate. All of the 3,000 MTU rates yield similar results, as shown by Cases [3 through 5] in Figure 7. The slightly faster ramp-up period of Case 3 means program acceptances catches up with aggregate Must Move needs more quickly, while the modestly slower starts of Cases 4 and 5 correspond to slightly later dates; all of these involve some differences in the fuel removal dates of a few plants. Still, exchanges allow the large majority of Must Move needs to be served and avoid the need to construct any new dry storage facility, though the slower starts do require adding more spent fuel to some existing dry facilities. Under any of these 3,000 MTU rates, LACBWR's spent fuel is removed in 1998, though with somewhat different exchange costs. With these alternate 3,000 MTU rates, the incremental fuel storage costs across the entire program range from $[34] to $[271] million (vs. $88 million in the Base case). Cases 4 and 5 are less efficient at addressing at-reactor storage needs than the Base Case rate, and both cannot avoid adding more spent fuel to dry storage facilities after the 1998 start of the program, which is contrary to the stated program goal of avoiding the need for additional at-reactor storage.[21] Indeed, this goal can be interpreted as a desire to prevent utilities from incurring any avoidable storage costs (including for continued operation of existing facilities) after January 31, 1998. In that case, an

---

[21] E.g., the Draft 1983 Mission Plan, at page 2-1, stated that DOE planned an "acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998."