Department of Energy
Richland Operations Office
P.O. Box 550
Richland, Washington 99352

JUL 23 1984

Ben C. Rusche, Director
Office of Civilian Radioactive
Waste Management, HQ

RL COMMENTS ON THE DRAFT MISSION PLAN DATED APRIL 1984

In response to the May 2, 1984, letter soliciting Draft Mission Plan comments, Michael J. Lawrence to recipient, the Richland Operations Office (RL) and our involved major contractors have reviewed both volumes of the Plan and offer our comments to you in the following enclosures:

- Enclosure 1 - DOE-RL written comments.
- Enclosure 2 - DOE-RL editorial comments on marked-up pages of the Plan.
- Enclosure 3 - Rockwell comments.
- Enclosure 4 - Pacific Northwest Laboratory (PNL) comments.

Earlier comments from our February 1, 1984, submission on the December 1983 Draft Mission Plan which continue to be significant have been restated and included here.

The most significant comments, some of which are discussed in detail in the enclosures, are as follows:

1. It should be noted that to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU plus some amount up to 630 MTU, depending upon the extent Federal Interim Storage is utilized.

2. The seventeen years of additional at-reactor spent fuel storage after 1997 (see "Remaining Backlog", Table II-1) would cost on the order of one billion 1983 dollars assuming storage casks are utilized. If title to the

"BEST AVAILABLE COPY"

PLAINTIFF'S EXHIBIT 86 04-106

fuel passes to the DOE on January 31, 1998, as implied in the DOE/utility disposal contracts, the financial responsibility for this post-1997 storage could rest with DOE. This cost has not yet been considered in the Nuclear Waste Fund Fee Adequacy Analysis.

3. Partially reviewed preliminary analysis by PNL indicates there may be a need for some kind of treatment of spent fuel as a waste form in order to meet current NRC/EPA regulatory requirements. RL does not necessarily agree with the PNL analysis or the proposed need for a contingency treatment plan. The PNL analysis will be reviewed in detail by both Basalt Waste Isolation Project (BWIP) and Commercial Spent Fuel Management Program (CSFM). However, preliminary performance assessment analysis by BWIP indicates that for purposes of the Mission Plan the basic assumption that spent fuel can be disposed of without treatment is a valid one and implies essentially no programmatic risk.

4. The third paragraph of page 3A-5 should be modified to insure that the Mission Plan does not in any sense preclude the use of the Timely Site Characterization Clause contained in Section 112(f) of the NWPA.

If you have any questions on these comments, please call me or my staff at any time.

Michael J. Lawrence

Michael J. Lawrence
Manager

BWI:RDH

Enclosures:
1. RL comments
2. Marked up pages
3. Rockwell comments
4. PNL comments.

cc w/encls:
R. H. Bauer, HQ
J. W. Bennett, HQ
C. R. Head, HQ

3 0 0 2 2 0 0 3

DG-000039

Enclosure 1

RL COMMENTS ON DRAFT MISSION PLAN
DATED APRIL 1984

1. The marked up selected pages of the Draft Mission Plan in Enclosure 2 provide recommended editorial changes intended to be constructive.

2. We concur in the Rockwell comments of Enclosure 3 and in the PNL comments of Enclosure 4 as marked up.

3. Page 2-1, first paragraph states "The acceptance rate is based on the emplacement capacity currently projected for the two planned geologic repositories..." Based upon our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998. Then, according to Table II-1, p. 2-2, the first repository acceptance rate should start at 2,800 MTU/yr. and increase to 3,500 MTU/yr. in six years rather than starting at 400 MTU/yr. and increasing to 3,000 MTU/yr. We understand that, as a practical matter, the achievable initial acceptance rate of the first repository will likely be less than the design rate, probably on the order of the 400 MTU/yr. indicated in Table II-1. The implication here is that the first repository should start acceptance operations 2-3 years before 1998 in order to meet the 1998-and-beyond acceptance rate requirements intended in the NWPA.

Our earlier analysis indicated that an initial acceptance rate of about 2,000 MTU/yr. was required based on selective acceptance of spent fuel only from reactors having difficulty maintaining a full core reserve (FCR). Further, an additional incremental acceptance rate of up to 630 MTU/yr. would be required in 1998-2000 depending upon the extent Federal Interim Storage (FIS) may be utilized.

It should be reasserted that the financial responsibility for the interim storage of spent nuclear fuel prior to January 31, 1998, is clearly with the operators of civilian nuclear power reactors as specified in the NWPA and in the DOE/utility disposal contracts. Assuming DOE would be financially responsible for the additional spent fuel storage after 1997, as reflected in the 17 year excess in the "Remaining Backlog" of Table II-1, something on the order of one billion 1983 dollars would be required for this additional interim storage at power reactor sites (see pp. 2-8 and 2-9 under "Federal Storage to Meet Waste Acceptance Commitments"). Neither this post-1997 federal storage cost, nor the cost of extending any federal interim storage that may be required beyond 1997 have been included in the Nuclear Waste Fund Fee Analysis to date.

9002 2010

4. Current waste fund fee adequacy analysis justifies the 1 mill/kwh fee based upon an initial acceptance rate of 1,800 MTU/yr. and includes an MRS, if required, to provide post-1997 storage. If the present Mission Plan initial acceptance rate of 400 MTU/yr. is retained, it is likely that the 1 mill/kwh fee will be perceived as too high in addition to not providing post-1997 storage relief to the utilities as intended by the NWPA (see previous comment).

5. Page 3-C-5, third paragraph, states that "...there is sufficient time to develop and license new casks to serve repository or Monitored Retrievable Storage facilities..." and that there is "...a lack of near-term demand..." The transportable storage cask, if available and licensable, could be used by reactor operators beginning in 1986-87 to provide at-reactor interim storage and eventual shipment in 1998. Otherwise an expendable single purpose storage cask would be utilized prior to 1998, when the reactor operator would perform an additional fuel transfer operation to move the fuel from the storage cask to a transport cask. If an accelerated schedule is adopted to provide transportable storage casks by the late 1980's, Figure III-C-1 should be revised to reflect the revised schedule.

6. Page 3-E-1, last paragraph, the objectives of systems integration should also include:

- Minimize total system life cycle costs
- Maintain total radiation exposures ALARA

7. On page 3-E-9 the blocks for "SNF storage" should reflect:

TVA R/C - 9/85

TVA Casks - 9/87

CP&L - 1/88

VEPCO - 6/88

CP&L and VEPCO should be shown separately, to reflect that metal and concrete/canister casks have different handling steps.

9002 2011

DOE/RW-0005 DRAFT
Volume I of II Volumes

# Mission Plan for the Civilian Radioactive Waste Management Program

ENCLOSURE 2

RL comments -
Marked up pages only
7/2/84

## Volume I

## Overview and Current Program Plans

April 1984

9 0 0 0 2 2 0 1 2

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, D.C. 20585

delayed, there will probably be a time at which it will make sense to centralize the storage of the spent fuel. The exact trigger point for such a decision will depend on the costs and availability of alternatives, and a specific authorization by the Congress.

4. Monitored Retrievable Storage

The Nuclear Waste Policy Act requires the Department to complete a study by June 1, 1985 on the need for and feasibility of a Monitored Retrievable Storage facility. At that time, the Department must also submit to the Congress a proposal for the construction of one or more such facilities; including a siting plan, ~~at least three alternative sites, site specific~~ designs, specifications, and cost estimates based upon consideration of at least three site types.
The Department currently plans to recommend in the proposal that Congress authorize the Department to proceed with activities on the critical path for deployment of a facility, namely siting and licensing. This action could assure the ability to deploy Monitored Retrievable Storage facilities when needed and authorized by Congress. However, the Department does not plan to seek Congressional authorization for construction unless there is a serious delay in the repository, such as the inability to characterize, recommend or license a site.

The Department's goal in the 1985 proposal to Congress will be to show, with a high degree of confidence, that one or more Monitored Retrievable Storage facilities can be available not later than January 31, 1998. The Monitored Retrievable Storage siting and licensing activities would proceed from 1985 through repository construction authorization and the initial stages of repository underground construction to maintain this option.

If authorized by Congress, site selection activities would take place during the mid-to-late 1980s. Site selection criteria are currently being prepared to support this activity. Following site selection, a full license application would be submitted to the Nuclear Regulatory Commission. When the Nuclear Regulatory Commission issues a license, the Monitored Retrievable Storage program would be placed in standby, ready for activation when and if a need is determined and authorized by Congress.

5. Transportation

The Department will take title to spent nuclear fuel and high-level radioactive wastes at the reactor sites or other points of origin and arrange for their transportation to Federal Storage facilities or repositories. This places full responsibility for the management of these transportation activities with the Department. The Act also requires the Department to rely on private industry to the fullest extent possible for these transportation activities unless the Secretary of Transportation, in consultation with the Secretary of Energy, determines that this is not possible at reasonable cost.

It is the Department's goal to carry out these responsibilities in a safe, environmentally acceptable, timely and cost-efficient manner minimizing to the extent possible the number of shipments. Critical to achieving this is a

9002 2013

proceed with construction of

If the repository is delayed and technologies for Government assisted at-reactor storage are not feasible or available, the decision to ~~build a~~ Monitored Retrievable Storage facility would be needed by the 1993 to 1994 time frame to meet a 1998 start up date. If the repository is delayed for a short period and the at-reactor alternatives are technically and institutionally feasible, then a large centralized Monitored Retrievable Storage facility would not need to be deployed and the associated major capital expenditures could be avoided.

Should it be necessary to deploy Monitored Retrievable Storage, the designs being developed will include capability to easily accommodate any containers or transport/storage casks shipped from the utilities.

1. Monitored Retrievable Storage Facility Siting

An inconsistency in the Act with regard to Monitored Retrievable Storage siting merits discussion before describing current Department plans in the area. Specifically, even though Section 141 (b)(2)(C) requires the Proposal to include "site-specific designs," Section 141 (h) states explicitly that "any facility authorized pursuant to this section shall be subject to the provisions of sections 115, 116(a), 116(b), 116(d), 117, and 118." These latter sections provide for State review of the site selection, participation of States, consultation with States and Indian tribes, and participation of Indian tribes. In other words, although the phrase "site-specific designs" suggests that site selection with its attendant State and Indian tribe participation must take place prior to the submission of the proposal in 1985, Section 141(h) would require such participation only after the facility is authorized. The Act also requires (Section 141(b)(2)(A)) that the 1985 proposal establish a Federal program for the siting of these storage facilities, further implying that site selection activities are to occur after the proposal is submitted, rather than before.

To identify and select specific sites prior to the proposal to Congress, the Department would have to propose sites without prior meaningful involvement of potentially affected locales in the siting process. Such actions would not be consistent with the overall spirit of the Act and its orientation toward providing for State and Indian tribe participation in waste facility siting decisions. For this reason the Department has adopted a siting approach that utilizes reference site data for facility design purposes while and in parallel developing a siting plan, with opportunities for comment from the States, Indian Tribes, local governments and the general public.

2. Basis for Monitored Retrievable Storage Facility Design Development

Monitored Retrievable Storage will provide a back-up facility or insurance that will permit the government to accept and store spent fuel or waste if the repository is significantly delayed or other alternatives are not available. To do this effectively, its design must have performance capabilities and flexibility to meet various possible demand scenarios or system needs. As a minimum it must be based upon a technology that is sufficiently mature so as to leave little or no uncertainty regarding the ability of the facility to be expeditiously licensed, constructed and operated.

9 0 0 0 2 2 0 1 4

BEST AVAILABLE COPY

a. Concept Selection

The Act specifically directs the Department to develop ~~a minimum of five alternative designs for at least three sites.~~ designs for at least three alternative sites and at least five site/concept combinations. To satisfy this requirement in a cost-effective manner it was decided to select two suitable storage concepts for the Monitored Retrievable Storage application for further design and make these designs suitable for three sites. Four basic storage concepts studied rather extensively by various organizations over the last few years were the primary initial candidates. These concepts are briefly described below before discussing the approach for selecting which concepts will be recommended to Congress. Representative drawings of these options are shown in Figure III-B-2.

(1) Metal Storage Casks: Metal storage casks are very similar to proven spent fuel transportation casks. They are constructed primarily of lead and steel or ductile iron with water or other materials providing additional radiation shielding. Cooling is provided by conduction of heat through the metal walls and natural convection to the atmosphere. Dual purpose transport and storage casks are being utilized in Europe, but none have yet been licensed for use in the U.S.

(2) Concrete Casks: Concrete Casks or silos are similar to metal casks, although the designs differ because of the different materials of construction. The cask-in-trench (or berm) concept is an adaptation of the basic above-ground silo design where earth in addition to concrete used to provide radiation shielding and physical protection.

(3) Drywells: Drywells are cylindrical holes into which sealed metal canisters containing spent fuel or high-level waste are placed. There are two variations of this concept: field drywells where the canisters are inserted into sealed metal containers in the ground, and tunnel drywells in which the entire installation is in mined tunnels. Radiation shielding and a heat transfer medium are provided by the surrounding overpack material and the earth.

(4) Vaults: Vaults are large structures (or caverns) where spent fuel packages are stored. There are many different types of vault designs for spent fuel and high-level waste storage. In an open cycle surface vault design, canisters of spent fuel or reprocessing waste are stored in large, shielded warehouse-type structures through which cooling air circulates by natural convection. In a closed cycle surface vault design, spent fuel or high-level waste canisters are cooled by a passive, secondary heat transfer mechanism. A "tunnel rack" design is considered an underground open cycle vault. In this design large, open racks of spent fuel or reprocessed waste canisters are stored in tunnels using remotely controlled emplacement equipment. Cooling is by natural convection, and radiation shielding is provided by the surrounding media.

BEST AVAILABLE COPY

9 9 0 0 2 2 0 1 5

C. Transportation

or whatever applicable regulation is in effect at the time of transport,

The ability to transport radioactive waste safely and economically is critical to implementation of the Nuclear Waste Policy Act. This ability is contingent upon the availability of appropriate types and quantities of equipment and a stable, conducive regulatory and political environment. The Act places responsibility for the transportation on the Department and directs the Department to take title of the spent fuel from the utilities at the reactor site for shipment to storage or repositories. In this regard, the Department plans to use packaging that has been certified by the Nuclear Regulatory Commission in accordance with 10 CFR Part 71. The Act also directs that private industry be utilized to the maximum extent practical in performing the transportation functions. As discussed in Section II, the Department is faced with three major tasks in fulfilling this responsibility. It must:

- Provide for the full institutional (as contrasted to physical) development of the system -- this includes working with other Federal agencies, State and local governments, and affected Indian tribes to address regulatory issues and public concerns about nuclear waste transportation and resolving to the extent possible those institutional issues which could become impediments to the safe, efficient functioning of the system.

- Provide for the technical or physical development of the system -- this includes defining the technical requirements of the transportation system and working with industry and other interested parties to ensure the various components are available when needed.

- Establish the management structure and procedures for operation of the system.

This section of the Mission Plan discusses the status and plans for achieving these tasks.

1. Institutional Development of the Transportation System

a. Goals and Objectives

Adequate types and quantities of equipment will not, by themselves, assure the ability to transport materials safely and efficiently. Stable regulations and regulatory bodies and a conducive public and political environment will be equally necessary. Full public trust and confidence in both the institutions and technology for transport will be of fundamental importance.

The Department is committed to addressing, and resolving to the extent possible, concerns over nuclear transportation expressed by the Federal, state, local and tribal officials and the public. By its very nature, transportation is an activity that creates interest and concern beyond the immediate vicinity of a repository or storage site. Individuals who live along potential radioactive material transportation routes, as well as the state and local officials representing them, are understandably concerned over the safety of shipments. Their jurisdictional responsibilities, authorities and concerns must be recognized and addressed openly and fairly.

9002 2016

Current Federal regulations are designed to assure maximum public safety in the shipment of hazardous and radioactive material. Commercial radioactive waste will be transported in accordance with all applicable Federal regulations. This has been and will continue to be the foundation for the Department's planning to ensure safe transportation of radioactive waste.

Many states have adopted the Federal hazardous materials transportation regulations (the governing regulations, 49 CFR 100-199, promulgated by the U.S. Department of Transportation under authority of the Hazardous Materials Transportation Act). However, several state and local regulations have been enacted in recent years which are inconsistent with Federal rules and with each other. These inconsistencies must be resolved in order that the waste shipments can be made in an efficient manner while at the same time assuring that state and local concerns about safety are adequately resolved.

The Department sees its role in this regard as two fold. First, as an agency with substantial technical expertise in the field of radioactive materials transportation, the Department will take an active role in working with state, local and tribal officials to identify and resolve public concerns. Second, the Department will work with other Federal agencies to determine what changes, if any, should be made to the existing Federal regulations to be more responsive to public or intergovernmental concerns. As a last resort, differences will be resolved through regulatory hearings and the courts.

Many current public issues have already been identified by state and local representatives. Some of the current issues are discussed below.

b. Current Issues

Ensuring that radioactive waste transportation activities are conducted in a safe, environmentally acceptable and economic manner is a concern shared by all. Accordingly, the Department will continually assess the impacts of its transportation plans and activities on all affected parties. This will include generic analyses of the safety, environmental impacts, and costs of radioactive waste transportation associated with various storage and disposal facility siting options. Further, the impacts of all transportation activities will be analyzed on a site-specific basis. Specific environment analyses that will incorporate assessments of transportation impacts will be included in the Environmental Assessments, Site Characterization Plans, and Environmental Impact Statements.

Routing of nuclear waste shipments is a primary concern of state, local and tribal officials. The U.S. Department of Transportation routing regulation (49 CFR 177, Docket H.M. 164) currently allows the States to designate highway routes for the transportation of highway route controlled quantities (which includes spent fuel and high-level waste). If there are no State designated routes, the shipments are generally to be transported via the most direct Interstate highway, utilizing the shortest available routes between facilities and the Interstate system and bypassing cities when Interstate beltways are available. The Department intends to contract with carriers that will comply fully with ~~this~~ applicable regulations for its shipments under the Nuclear Waste Policy Act of 1982.

, at destinations, and possibly at truck or rail fleet maintenance facilities located elsewhere;



2. Technical Development of the Transportation System

a. Background

In its future role under the Act as the primary shipper of commercial spent nuclear fuel and high-level waste, the Department must ensure the availability of a waste transportation system to serve a variety of program needs: Federal Interim Storage and spent fuel research and development activities in the near term, and repository or Monitored Retrievable Storage in the long term. Components of this transportation system include packaging (casks); specialized on-site services at reactors, and actual cask transportation.

Currently there are limited types and quantities of shipping casks capable of transporting spent fuel or high-level waste. Most of these casks were designed to ship spent fuel to reprocessing plants within 6 months to a year after discharge from the reactor. Thus, they were designed to ship fuel that is considerably "hotter", both in terms of heat and radiation levels, than fuel that has aged 10 years or more that would be typical of the majority of fuel shipped to the first repository or MRS facility. These casks will be utilized on an as available basis for early shipments, but they may not be cost-effective for supporting the repository and/or monitored retrievable storage facilities. New cask designs may be capable of significantly reducing the total number of shipments without compromising safety in any manner. The program will sponsor activities to assure the availability of cost-effective shipping casks that take into account the decreased radiation levels and the number of shipments and any related impacts. In addition, a system of transportable storage casks may be feasible. Such casks would be designed to meet Federal regulations for transportation as well as dry storage of spent fuel. Once loaded, they could remain at the reactor site, Federal Interim Storage or Monitored Retrievable Storage Facility in a storage mode until the repository was ready to receive the shipment. At this time they would be transported directly to their destination without any major additional packaging and handling operations.

Considerable time and effort is required to develop, test and license a new cask: five years of effort were required to design and certify a recent rail cask design. However, there is sufficient time to develop and license new casks to serve repository or Monitored Retreivable Storage facilities. A lack of near-term demand for these casks has provided little incentive to date for the private sector to invest funds in developing these designs. Because the Department will in all probability be the major customer for shipping casks and transport services in the future, it follows that some near-term Federal involvement or incentives will be required to assure the availability of such casks in the long-term.

b. Near-Term Shipping Requirements

Prior to 1998, requirements of the program could consist of transporting up to 1900 metric tonnes (MTU) of spent nuclear fuel to Federal Interim Storage facilities and a limited amount (less than a few hundred MTU) of spent fuel going to Federal research and development locations. While the Act allows for up to 1900 MTU of spent fuel to be accepted at Federal Interim Storage locations, the Department expects that not more than a few hundred metric tons at most would actually be shipped to the Federal Interim Storage locations.

BEST AVAILABLE COPY

9 0 0 2 2 0 1 8

evaluating progress towards meeting mission goals of moving large amounts of spent fuel efficiently and safely from reactor sites to storage or disposal sites by .398.

The details of this multiphased approach will be proposed in a Transportation Business Plan which is currently being developed. The Business Plan will provide for timely interaction and communication with the private sector on both the contracting plans, funding availability, and equipment requirements. This will include information on the timing and scope of major procurement actions and an indication of the plans for cask ownership, maintenance and transport. A first draft plan will be available in the spring of 1984 for comment by a spectrum of concerned and/or interested parties and the public in general. This sharing of information sufficiently in advance of transportation needs should allow adequate lead-time for engineering, certification and production of required equipment and development of servicing capabilities, while maximizing private sector involvement. The strategy outlined in the plan and described briefly below will evolve through an iterative process as the requirements of the program become more definitive.

PHASE I

It is currently envisioned that the first phase of the multiphase approach will proceed over the next two years and consist of defining the transportation system in terms of the mission needs, capabilities, schedules, cost objectives, and operating constraints.

During this phase the Department will provide more definitive information concerning shipments in the long-term ~~shipments~~: sizes, weight, and waste forms; quantities, timing, and locations of shipments; and handling constraints at origin and destination. Certain transportation activities initiated over the last several years will compliment this effort. These activities include estimating the number and types of casks that will be needed to serve storage and disposal facilities under various scenarios; conceptualizing the key features desired in modifications of existing designs or a new generation of shipping casks; identifying the physical interface requirements at the various reactor sites; continued development of transportation risk assessment methodologies; evaluating current and new materials for cask construction; and testing and evaluating old and current cask designs under severe accident conditions.

The Department will simultaneously arrange for a competitive exploration of alternative transportation system design concepts by the private sector in order to identify systems which appropriately balance safety, capability, and cost. The private sector will be invited to propose technical aspects of the system components (types, numbers, and characteristics of casks and transporters) as well as the administrative aspects of the system (cask ownership, certification responsibilities, contracting arrangements).

PHASE 2

Phase two would be the engineering development phase, and would roughly last five to eight years depending on the amount of development needed for a particular cask or other component of the transportation system. During this

BEST AVAILABLE COPY

## D. Interim Storage

Although the Nuclear Waste Policy Act of 1982 requires the Federal Government to ultimately provide a permanent repository for spent nuclear fuel and high-level radioactive waste, approximately sixteen years will have elapsed between passage of the Act and the availability of alternative storage or disposal options. With existing storage technology, spent fuel inventories at nearly half of domestic commercial nuclear power plants will exceed the projected on-site spent fuel storage capabilities by 1998, with some reaching their storage limit in the mid-1980's. The Act addresses this problem by providing for research to expand existing on-site storage and by providing the Federal Interim Storage needed before utilities can implement on-site storage expansion programs.

Specifically, the Act provides that:

(1) Reactor operators have the primary responsibility for storage of their fuel and the effective utilization of storage that exists or may be added;

(2) The Federal Government has the responsibility to encourage and expedite the efficient use and expansion of on-site storage; and,

(3) If these efforts prove insufficient and the Nuclear Regulatory Commission finds that the lack of spent fuel storage is a threat to continued orderly reactor operation, the Federal Government must provide not more than 1900 metric tons of interim storage capacity for spent fuel.

To understand the problems or issues involved in discharging these responsibilities, and the basis for current Departmental planning in this area, the current at-reactor storage situation is described in detail below.

### 1. Current Situation/Issues

The Department has published a report annually over the last several years analyzing in detail the current spent fuel storage situation in the U.S. The most recent report, Spent Fuel Storage Requirements, DOE/RL 8[4]-1, ~~January~~ May 198[4], describes in detail projected spent fuel discharges over the next ~~couple of~~ decade[s], current reactor storage capacities, and the potential for increasing these capacities through existing, licensable technologies, namely by reracking of pools to the maximum extent practical, ~~and~~ through transshipments, and by increasing the discharge exposure of the fuel. ~~A more recent~~ The analysis shows that the storage needs of some utilities could begin to exceed their capacities as early as 198[5]. The ~~January 1983~~ report shows that even if all utilities are able to rerack, ~~and~~ transship, and extend discharge exposures to the maximum extent practical, there will be storage problems from 198[7] on unless new storage technologies that are not currently fully developed, licensed or demonstrated in the United States are made available for utility use.

Fulfillment of the Act's requirements, particularly the Department's responsibility to encourage and expedite efficient use of on-site storage

BEST AVAILABLE COPY

d. Improve the system design in a deliberate, controlled and well-coordinated manner.

This chapter will describe current plans to achieve these objectives following presentation of additional background information.

2. Background

There exist a number of alternative designs for a safe, efficient and economical nuclear waste management system that could adequately provide for the management of high-level wastes and spent fuel from the source of the waste to the final repository and any intermediate stops, such as at an monitored retrievable storage or Interim Storage. Several utilities and design/engineering firms (including cask designers and manufacturers) have expressed an interest in contributing to the development of technical and institutional alternatives for the total design of the waste management system and the Department believes opportunities for such participation are appropriate.

Numerous technical and institutional factors need to be considered. There are many possible types and forms of material that may eventually be under the control of the Federal waste management system and each of these may have unique considerations that must be factored into the design of waste canisters. For example, spent fuel assemblies come in various cross-sectional dimensions, lengths, cladding materials, ages and thermal heat generating rates. Transportation has its own unique set of design considerations as does Storage, either at reactor or at Federal facilities. Each geological formation considered for the repository has its own characteristics that will influence the design of the emplacement package. Defense wastes may be disposed of in the repository. All of these requirements must be factored into the design and improvement of an overall system.

An example of the type of waste packaging, handling and transportation alternative that might be included in an advanced overall system is an "all-purpose" disposable nuclear waste cask. The cask would serve as a self shielded waste canister that could theoretically be loaded and sealed at the source, and stored at the reactor site, transported and stored at a Monitored Retrievable Storage or emplaced in a repository facility without ever being reopened. This concept would reduce the number of packaging and handling operations from three in Figure III-E-2 or five in Figure III-E-3 to only one. As an alternative, institutional arrangement to implement this, the Department might provide the canister and cask to the utilities for use in storage and eventual transportation. Equipment could then be simplified and standardized at most locations.

While such a system may not be practical because of technical or institutional reasons, some derivation of it could be. For example, it may be more practical to have a standard waste canister which is then stored and shipped in reusable "dual-purpose" casks. Waste canisters and transportable storage casks may be provided to the utilities that may also also help solve near-term storage problems and minimize additional utility costs. This approach could be developed as an option available to reactor operators that desire it.



BEST AVAILABLE COPY

Considering the various types of wastes, the various sizes of spent fuel assemblies, and the various types of transportation casks currently in use, the interface requirements at the various facilities must be carefully coordinated. Where possible, standardization of canister and cask handling and lifting devices should be achieved. Canister loading at the source could avoid the unnecessary duplication of those facilities at storage or repository sites.

3. Strategy and Planned Activities

The first step will be to document the currently planned systems concept in a baseline or reference Systems Design Description. This Systems Design Description will describe the planned facilities and operations of the system from the time the fuel leaves the source (reactor site) until it is emplaced in the repository. It will also describe the interfaces between storage, transportation and emplacement operations. This document will be prepared utilizing the expertise of each of the Department's programs involved and will then be the baseline for evaluation of proposed improvements to any part of the system.

Three main activities will be initiated to identify and evaluate potential improvements. First, new, novel ideas for improvements to the system will be solicited from industry and utilities through a competitive procurement. Utilities, which ~~who~~ have ~~the~~ expertise in the handling of spent fuel, are urged to team with designers and engineers, who are experienced in the design of waste handling equipment and facilities, with storage and transportation cask manufacturers, and with others who have other desirable expertise, to identify and develop technical and institutional alternatives for ~~the~~ near-term and long-term handling, packaging, shipping, and storing of spent fuel in ways that can facilitate and/or minimize handling and packaging for final disposal. Thus, the time, effort, exposure and costs throughout the back-end of the fuel cycle may be minimized while possibly providing near-term benefits to the utilities in solving storage problems in the process. Concepts for standardization of interfaces and equipment for packaging, handling and transportation operations that can lead to additional economies will be identified, to the maximum extent practical. Once the various alternatives are identified and developed to a comparable state, they can be evaluated on common health, safety, environmental, technical, and economic grounds. The best concepts, or selected features from the various concepts, can then be further developed and incorporated into technical program planning as appropriate.

Key officials from each of the Department's programs (repository, monitored retrievable storage, transportation and interim storage) will participate in the evaluation of the proposed concepts.

Second, in addition to the studies initiated under the competitive solicitation discussed above, additional supplementary studies will be conducted as necessary. These studies will concentrate on ideas not being addressed by other studies, but which appear to ~~by~~ the Department's management to offer potential benefit to achieving the objectives of the systems integration program.

BEST AVAILABLE COPY

Enclosure 3

Rockwell Hanford Operations
Energy Systems Group
P.O. Box 800
Richland, WA 99352

Rockwell International

July 2, 1984

In reply, refer to R84-2409

Mr. O. L. Olson, Project Manager
Basalt Waste Isolation Project Office
Department of Energy
Richland Operations Office
Richland, Washington 99352

Dear Mr. Olson:

BASALT WASTE ISOLATION PROJECT REVIEW OF THE PUBLIC DRAFT "MISSION PLAN FOR THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM," APRIL 1984
(Contract DE-AC06-77RL01030)

The Basalt Waste Isolation Project (BWIP) staff has completed a limited review of the subject document to determine (1) whether previously submitted substantive comments (see Attachment 1) had been incorporated into the present draft and (2) whether any new major deficiencies appeared in the present public draft. Substantive comments provided on the Mission Plan in prior letters have indeed been incorporated into this draft. Only minor editorial and/or format problems were identified which are presented in Attachment 2. If you have any questions, please contact H. Babad on 376-7984.

Very truly yours,

E. B. Ash, Director
Basalt Waste Isolation Project

EBA/RMS/DGB/amd

Att.(2)

cc: J. H. Anttonen - DOE-RL
P. E. Rasmussen - DOE-RL
J. J. Sutey - DOE-RL

(I/AC - DOE-RL 858)

9000 2 2023

Attachment 1

Previously Submitted Comments Concerning the Mission Plan

1. Letter, May 1, 1984, E. B. Ash to O. L. Olson, "Basalt Waste Isolation Project Review "Final" Revision Chapter 5, Volume II, "Department of Energy-Headquarters Mission Plan"

2. Letter, April 24, 1984, E. B. Ash to O. L. Olson, "Mission Plan Schedule Scenarois"

3. Letter, April 20, 1984, R. J. Gimera to O. L. Olson, "Repository Section of the Mission Plan"

4. Letter, April 3, 1984, E. B. Ash to O. L. Olson, "Final Review of Draft Mission Plan (April 2, 1984 Revision)

5. Letter, March 28, 1984, R. J. Gimera to O. L. Olson, "Draft Schedule Information for the Mission Plan

6. Letter, March 23, 1984, E. B. Ash to O. L. Olson, "Volume II of the Mission Plan"

7. Letter, March 2, 1984, E. B. Ash to O. L. Olson, "Revision of Volume II of Mission Plan (DOE-RL 697 Revised)

8. Letter, March 1, 1984, E. B. Ash to O. L. Olson, "Review of Mission Plan Volume II

9 0 0 0 2 2 0 2 2 4

ATTACHMENT 2

General

Reference should be made to the Mission Plan to the Generic Requirements document, to provide the reader with a transition from issues (Chapter 1, Volume II) and items required for successful construction of a repository. This reference, and perhaps a few words accompanying the reference, will allow the reader to realize the full extent to which the Department of Energy (DOE) has compiled the relevant external criteria and internal regulations that control the repository program.

This document would be more useful to the lay reader if accompanied by a detailed glossary.

The narratives in Chapter 2 (Volume II) are inconsistent in their treatment and referencing of the issues in Chapter 1. A policy should be established and issue references either added to all narratives or deleted from the few (e.g., Section 2.5) that contain them.

Page 2-1, Fifth Paragraph

~~The design should allow for some five-year-old waste, but shouldn't be based solely on five-year-old waste.~~

Page 2-3, Tectonics

The last sentence should be changed to read, "The final plan...completion in time to support the Basalt Waste Isolation Project Site Characterization Plan." It is unlikely that the tectonics plan will be issued in September 1984.

Page 2-6, Second Paragraph

Does the second sentence intend to preclude projects from drilling deeper than proposed disposal locations?

Page 2-6, Fourth Paragraph

The first sentence is incorrect. The Nuclear Regulatory Commission's (NRC) agreement on the Site Characterization Plan (SCP) is not required.

Page 3-A-5, Third Paragraph

The Mission Plan includes no discussion of the "grandfather" clause [Section 112(f) of the Nuclear Waste Policy Act (NWPA)]. To the contrary, Page 3-A-5 specifically states, "Before sinking any exploratory shaft, the Department is to hold a public hearing in the vicinity of the site to inform the residents of the SCP and to receive their comments."

9 0 0 0 2 2 0 2 5

BEST AVAILABLE COPY

Page 3-A-6, Fourth Paragraph

1. In the sentence beginning "A key provision..." add the word "accessible" prior to "environment".

2. It is incorrect to state, "The objective...is to...isolate the waste for 10,000 years without posing undue risk..." since the overall performance objective (10CFR60.112) is to "assure that releases of radioactive materials to the accessible environment ...conform to such...standards as may have been established by the Environmental Protection Agency". Per 10CFR60.101(a)(1), the Commission must then make a finding that "the issuance of a license will not constitute an unreasonable risk to the health and safety of the public".

Page 3-A-7, Item 3.c

Item 3.c should include the phrase "along the path of likely radionuclide travel".

Page 3-A-11, Figure 3-A-3

Key for basalt and tuff are reversed.

Page 3-A-13, Figure 3-A-4

This figure is not consistent with text on Page 3-A-12, first paragraph.

Page 3-A-21, Sixth Sentence

The specific intent to utilize the second exploratory shaft to "facilitate subsurface construction" should have a caveat such as: "provided such usage would not impose unrecoverable safety-related efforts or inhibit licensing of the repository".

Page 3-A-21, First Paragraph

SCP "progress reports", not "updates" will be issued every six months in accordance with the NWPA Section 113(b)(3) and 10CFR60.10(g). A commitment to revise the SCP semi-annually is overly burdensome. The term "update" is used elsewhere as well (i.e., Page 3-A-22).

Page 3-A-22, Second Paragraph

Regarding the need for a Test and Evaluation Facility, add "late" prior to "1987" for consistency with statements on Pages 3-A-17 and 4-1.

Page 3-A-22, Fifth Paragraph

On Page 3-A-22, Second Paragraph of 6.a(2), the DOE commits to submit a Title I repository design and a "preliminary (Title I)" waste package design. It is not clear what is meant, especially in relation to Figure 3-A-5 which implies a "partial Title II" repository design and an undefined product of "preliminary design studies" on the Waste Package will be provided.

8 6 0 0 2 2 0 2 6

BEST AVAILABLE COPY

Page 3-A-23, First Sentence

What is meant by "protecting ...the quality of the environment"?

Page 3-A-23, First Paragraph

? Has the NRC concurrence with the plan to submit a Title II design long after the Construction Authorization Application (CAA)?

Page 3-A-23, Second, Third Paragraphs

Operational, closure, and termination phases of the program are discussed, but these phases are not listed in Table III-A-1, Page 3-A-28.

Page 3-A-23 and Figure 3-A-5

The plan refers to a License Application being submitted in June 1995, but such an application is not mentioned in Table III-A-1, nor discussed elsewhere. In fact, there is no such specific requirement, but rather a 10CFR60.32(d) requirement does exist for the DOE to submit an "update" of its application in accordance with 10CFR60.24. This approach is intended to avoid the two step adjudicatory process which has hamstrung nuclear power plant proceedings, wherein applications for both a construction permit and an operating license are required. This should be clearly reflected in the plan.

Page 3-A-24, Fourth Paragraph

Omit "other than salt" in first sentence.

Page 3-A-39

The dates contained in the reference case schedule are already inaccurate. The NRC has just signed off on the Siting Guidelines and the Environmental Assessments will take longer then stated to complete.

Page 3-A-43, First-Fourth Paragraphs

Alternative Schedule 4 should seek to minimize the numbers of construction authorizations and applications to reduce the opportunity for adjudicatory proceedings. If possible, amendments to the initial applicable should be utilized. Otherwise, four CAAs are conceivable when combined with a two-phase surface and subsurface repository concepts.

Page 4-4, Quality Assurance

No discussion on Quality Assurance could be found in Chapter III.A. This is either misreferenced or the material omitted from this draft.

90002 2027

BEST AVAILABLE COPY