**Article IV—Responsibilities of the Parties**

*A. Purchaser's Responsibilities*

1. *Discharge Information.*

(a) On an annual basis, commencing October 1, 1983, the Purchaser shall provide DOE with information on actual discharges to date and projected discharges for the next discharges to date and projected discharges for the next ten (10) years in the form and content set forth in Appendix B, annexed hereto and made a part hereof. The information to be provided will include estimates and projections and will not be Purchaser's firm commitment with respect to discharges or deliveries.

(b) No later than October 1, 1983, the Purchaser shall provide DOE with specific information on:

(1) Total spent nuclear fuel inventory as of April 7, 1983;

(2) Total number of fuel assemblies removed from the particular reactor core prior to 12:00 a.m. April 7, 1983 for which there are plans for reinsertion in the core, indicating the current planned dates for reinsertion in the core. Estimates of the burned and unburned portion of each individual assembly are to be provided.

(c) In the event that the Purchaser fails to provide the annual forecast in the form and content required by DOE, DOE may, in its sole discretion, require a rescheduling of any delivery commitment schedule then in effect.

2. *Preparation for Transportation.*

(a) The Purchaser shall arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility. The Purchaser shall notify DOE of such activities sixty (60) days prior to the commencement of such activities. The preparatory activities by the Purchaser shall be made in accordance with all applicable laws and regulations relating to the Purchaser's responsibilities hereunder. DOE may designate a representative to observe the preparatory activities conducted by the Purchaser at the Purchaser's site, and the Purchaser shall afford access to such representative.

(b) Except as otherwise agreed to by DOE, the Purchaser shall advise DOE in writing as specified in Appendix F, annexed hereto and made a part hereof, as to the description of the material in each shipping lot sixty (60) days prior to scheduled DOE transportation of that shipping lot.

(c) The Purchaser shall be responsible for incidental maintenance, protection and preservation of any and all shipping casks furnished to the Purchaser by DOE for the performance of this contract. The Purchaser shall be liable for any loss of or damage to such DOE-furnished property, and for expenses incidental to such loss or damage while such casks are in the possession and control of the Purchaser except as otherwise provided for hereunder. Routine cask maintenance, such as scheduled overhauls, shall not be the responsibility of the Purchaser.

*B. DOE Responsibilities*

1. DOE shall accept title to all SNF and/or HLW, of domestic origin, generated by the civilian nuclear power reactor(s) specified in Appendix A, provide subsequent transportation for such material to the DOE facility, and dispose of such material in accordance with the terms of this contract.

2. DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility. Such cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries. Such cask(s) shall be suitable for use at the Purchaser's site, meet applicable regulatory requirements, and be accompanied by pertinent information including, but not limited to, the following:

(a) Written procedures for cask handling and loading, including specifications on Purchaser-furnished cannisters for containment of failed fuel;

(b) Training for Purchaser's personnel in cask handling and loading, as may be necessary;

(c) Technical information, special tools, equipment, lifting trunnions, spare parts and consumables needed to use and perform incidental maintenance on the cask(s); and

(d) Sufficient documentation on the equipment supplied by DOE.

3. DOE may fulfill any of its obligations, or take any action, under this contract either directly or through contractors.

4. DOE shall annually provide to the Purchaser pertinent information on the waste disposal program including information on cost projections, project plans and progress reports.

5. (a) Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.

(b) Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

**Article V—Delivery of SNF and/or HLW**

*A. Description of SNF and HLW*

The Purchaser shall deliver to DOE and DOE shall, as provided in this contract, accept the SNF and/or HLW which is described in accordance with Article VI.A. of this contract, for disposal thereof.

*B. Delivery Commitment Schedule*

1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.

2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

*C. Final Delivery Schedule*

Final delivery schedule(s), in the form set forth in Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

*D. Emergency Deliveries*

Emergency deliveries of SNF and/or HLW may be accepted by DOE before the date provided in the delivery commitment schedule upon prior written approval by DOE.

*E. Exchanges*

Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; *provided, however,* that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; *provided, however,* that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges. Not less than six (6) months prior

to the delivery date specified in the Purchaser's approved delivery commitment schedule, the Purchaser shall submit to DOE an exchange request, which states the priority rankings of both the Purchaser hereunder and any other Purchaser with whom the exchange of approved delivery commitment schedules is proposed. DOE shall approve or disapprove the proposed exchange within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval.

**Article VI—Criteria for Disposal**

*A. General Requirements*

1. *Criteria.*

(a) Except as otherwise provided in this contract, DOE shall accept hereunder only such SNF and/or HLW which meets the General Specifications for such fuel and waste as set forth in Appendix E, annexed hereto and made a part hereof.

(b) Purchaser shall accurately classify SNF and/or HLW prior to delivery in accordance with paragraphs B and D of Appendix E.

2. *Procedures.*

(a) Purchaser shall provide to DOE a detailed description of the SNF and/or HLW to be delivered hereunder in the form and content as set forth in Appendix F, annexed hereto and made a part hereof. Purchaser shall promptly advise DOE of nay changes in said SNF and/or HLW as soon as they become known to the purchaser.

(b) DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel; however, for any SNF which has been designated by the Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services.

*B. Acceptance Procedures*

1. *Acceptance Priority Ranking.*

Delivery commitment schedules for SNF and/or HLW may require the disposal or more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:

(a) Except as may be provided for in subparagraph (b) below and Article V.D. of this contract, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V.

(b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

2. *Verification of SNF and/or HLW.*

During cask loading and prior to acceptance by DOE for transportation to the DOE facility, the SNF and/or HLW description of the shipping lot shall be subject to verification by DOE. To the extent the SNF and/or HLW is consistent with the description submitted and approved, in accordance with Appendices E and F, DOE agrees to accept such SNF and/or HLW for disposal when DOE has verified the SNF and/or HLW description, determined the material is properly loaded, packaged, marked, labeled and ready for transportation, and has taken custody, as evidenced in writing, of the material at the Purchaser's site, f.o.b. carrier. A properly executed off-site radioactive shipment record describing cask contents must be prepared by the Purchaser along with a signed certification which states: "This is to certify that the above-named materials are properly described, classified, packaged, marked and labeled and are in proper condition for transfer according to the applicable regulations of the U. S. Department of Transportation."

3. *Improperly described SNF and/or HLW.*

(a) *Prior to Acceptance*—If SNF and/or HLW is determined by DOE to be improperly described prior to acceptance by DOE at the Purchaser's site, DOE shall promptly notify the Purchaser in writing of such determination. DOE reserves the right, in its sole discretion, to refuse to accept such SNF and/or HLW until the SNF and/or HLW has been properly described. The Purchaser shall not transfer such SNF and/or HLW to DOE unless DOE agrees to accept such SNF and/or HLW under such other arrangements as may be agreed to, in writing, by the parties.

(b) *After Acceptance*—If subsequent to its acceptance DOE finds that such SNF and/or HLW is improperly described, DOE shall promptly notify the Purchaser, in writing, of such finding. In the event of such notification, Purchaser shall provide DOE with a proper designation within thirty (30) days. In the event of a failure by the Purchaser to provide such proper designation, DOE may hold in abeyance any and all deliveries scheduled hereunder.

**Article VII—Title**

Title to all SNF and/or HLW accepted by DOE for disposal shall pass to DOE at the Purchaser's site as provided for in Article VI hereof. DOE shall be solely repsonsible for control of all material upon passage of title. DOE shall have the right to dispose as it sees fit of any SNF and/or HLW to which it has taken title. The Purchaser shall have no claims against DOE or the Government with respect to such SNF or HLW nor shall DOE or the Government be obligated to compensate the Purchaser for such material.

**Article VIII—Fees and Terms of Payment**

**A. Fees**

1. Effective April 7, 1983 Purchaser shall be charged a fee in the amount of 1.0 mill per kilowatt-hour (1M/KWH) on electricity generated by Purchaser's nuclear power reactor(s). The said fee shall be paid as specified in paragraph B of this Article VIII.

2. For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power reactor prior to April 7, 1983, a one-time fee will be assessed by applying industry-wide average dollar per kilogram charges to four (4) distinct ranges of fuel burnup so that the integrated cost across all discharged (i.e. spent) fuel is equivalent to an industry-wide average charge of 1.0 mill per kilowatt-hour. For purposes of this contract, discharged nuclear fuel is that fuel removed from the reactor core with no plans for reinsertion. In the event that any such fuel withdrawn with plans for reinsertion is not reinserted, then the applicable fee for such fuel shall be calculated as set forth in this paragraph 2. The categories of spent nuclear fuel burnup and the fee schedule are listed below:

[In 1982 dollars]

| Nuclear spent fuel burnup range | Dollars per kilogram |
|---|---|
| 0 to 5,000 MWDT/MTU | $80.00 |
| 5,000 to 10,000 MWDT/MTU | 142.00 |
| 10,000 to 20,000 MWDT/MTU | 162.00 |
| Over 20,000 MWDT/MTU | 184.00 |

This fee shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII.

3. For in-core fuel as of April 7, 1983, that portion of the fuel burned through April 6, 1983 shall be subject to the one-time fee as calculated in accordance with the following methodology: (a) determine the total weight in kilograms of unranium loaded initially in the particular core; (b) determine the total megawatt-days (thermal) which have been generated by all of the fuel assemblies in the said core as of 12:00 A.M. April 7, 1983; (c) divide the megawatt-days (thermal) generated in the said core by the total metric tons of initially loaded uranium in that core and multiply the quotient by the conversion factor 0.0078 to obtain a value in dollars per kilogram; and (d) multiply the dollars per kilogram value by the kilograms determined in (a) above to derive the dollar charge for the one-time fee to be paid for the specified in-core fuel as of 12:00 A.M. April 7, 1983. For purposes of this contract, in-core fuel is that fuel in the reactor core as of the date specified, plus any fuel removed from the reactor with plans for reinsertion. That portion of such fuel unburned as of 12:00 A.M. April 7, 1983 shall be subject to the 1.0 mill per kilowatt-hour charge.

4. DOE will annually review the adequacy of the fees and adjust the 1M/KWH fee, if necessary, in order to assure full cost recovery by the Government. Any proposed adjustment to the said fee will be transmitted to Congress and shall be effective after a period of ninety (90) days of continuous session has elapsed following receipt of such transmittal unless either House of Congress adopts a resolution disapproving the proposed adjustment. Any adjustment to the 1M/KWH fee under paragraph A.1. of this Article VIII shall be prospective.

*B. Payment*

1. For electricity generated by the Purchaser's civilian nuclear power reactor(s) on or after April 7, 1983, fees shall be paid quarterly by the Purchaser and must be received by DOE not later than the close of business on the last business day of the month following the end of each assigned three month period. The first payment shall be due on July 31, 1983, for the period April 7, 1983 to June 30, 1983. [add as applicable: A one time adjustment period payment shall be due on ———, for the period ——— to ———]. The assigned three month period, for purposes of payment and reporting of kilowatt hours, shall begin ———.

2. For SNF discharged prior to April 7, 1983, and for in-core burned fuel as of 12:08 A.M. April 7, 1983, the Purchaser shall, within two (2) years of contract execution, select one of the following fee payment options:

(a) *Option 1*—The Purchaser's financial obligation for said fuel shall be prorated evenly over forty (40) quarters and will consist of the fee plus interest on the outstanding fee balance. The interest from April 7, 1983, to date of the first payment is to be calculated based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period. Beginning with the first payment, interest is to be calculated on Purchaser's financial obligation plus accrued interest, at the ten-year Treasury note rate in effect on the date of the first payment. In no event shall the end of the forty (40) quarters extend beyond the first scheduled delivery date as reflected in the DOE-approved delivery commitment schedule. All payments shall be made concurrently with the assigned three month period payments. At any time prior to the end of the forty (40) quarters, Purchaser may, without penalty, make a full or partial lump sum payment at any of the assigned three month period payment dates. Subsequent quarterly payments will be appropriately reduced to reflect the reduction in the remaining balance in the fee due and payable. The remaining financial obligation, if any, will be subject to interest at the same ten-year Treasury note rate over the remainder of the ten year period.

(b) *Option 2*—The Purchaser's financial obligation shall be paid in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the outstanding fee balance. Interest is to be calculated from April 7, 1983, to the date of the payment based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period until payment.

(c) *Option 3*—The Purchaser's financial obligation shall be paid prior to June 30, 1985, or prior to two (2) years after contract execution, whichever comes later, in the form of a single payment and shall consist of all outstanding fees for SNF and in-core fuel burned prior to April 7, 1983. Under this option, no interest shall be due to DOE from April 7, 1983, to the date of full payment on the outstanding fee balance.

3. *Method of Payment*

(a) Payments shall be made by wire transfer, in accordance with instructions specified by DOE in Appendix G, annexed hereto and made a part hereof, and must be received within the time periods specified in paragraph B.1. of this Article VIII.

(b) The Purchaser will complete a Standard Remittance Advice, as set forth in Appendix G, for each assigned three month period payment, and mail it postmarked no later than the last business day of the month following each assigned three month period to Department of Energy, Office of Controller, Cash Management Division, Box 500, Room D-208, Germantown, Maryland 20874.

4. Any fees not paid on a timely basis or underpaid because of miscalculation will be subject to interest as specified in paragraph C of this Article VIII.

*C. Interest on Late Fees*

1. DOE will notify the Purchaser of amounts due only when unpaid or underpaid by the dates specified in paragraph B above. Interest will be levied according to the following formula:

Interest = Unpaid balance due to DOE for assigned three month period × Quarterly Treasury rate plus six percent (6%) × Number of months late including month of payment (fractions rounded up to whole months) ÷ 12

2. Interest is payable at any time prior to the due date for the subsequent assigned three month period fee payment. Nonpayment by the end of the subsequent assigned three month period will result in compounding of interest due. Purchaser shall complete a Standard Remittance Advice of interest payments.

3. Following the assessment of a late fee by DOE, payments will be applied against accrued interest first and the principal thereafter.

*D. Effect of Payment*

Upon payment of all applicable fees, interest and penalties on unpaid or underpaid amounts, the Purchaser shall have no further financial obligation to DOE for the disposal of the accepted SNF and/or HLW.

*E. Audit*

1. The DOE or its representative shall have the right to perform any audits or inspections necessary to determine whether Purchaser is paying the correct amount under the fee schedule and interest provisions set forth in paragraphs A, B and C above.

2. Nothing in this contract shall be deemed to preclude an audit by the General Accounting Office of any transaction under this contract.

3. The Purchaser shall furnish DOE with such records, reports and data as may be necessary for the determination of quantities delivered hereunder and for final settlement of amounts due under this contract and shall retain and make available to DOE and its authorized representative examination at all reasonable times such records, reports and data for a period of three (3) years from the completion of delivery of all material under this contract.

Article IX—Delays

*A. Unavoidable Delays by Purchaser or DOE*

Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE—such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather—cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

*B. Avoidable Delays by Purchaser or DOE*

In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

Article X—Suspension

A. In addition to any other rights DOE may have hereunder, DOE reserves the right, at no cost to the Government, to suspend this contract or any portion thereof upon written notice to the Purchaser within ninety (90) days of the Purchaser's failure to perform its obligations hereunder, and the Purchaser's failure to take corrective action within thirty (30) days after written notice of such failure to perform as provided above, unless such failure shall arise from causes beyond the control and without the fault or negligence of the Purchaser, its contractors or agents. However, the Purchaser's obligation to pay fees required hereunder shall continue unaffected by any suspension. Any such suspension shall be rescinded if and when DOE determines that Purchaser has completed corrective action.

B. The DOE reserves the right to suspend any scheduled deliveries in the event that a national emergency requires that priority be given to Government programs to the exclusion of the work under this contract. In the event of such a suspension by the Government, the DOE shall refund that portion of payments representing services not delivered as determined by the Contracting Officer to be an equitable adjustment. Any disagreement arising from the refund payment, if any, shall be resolved as provided in the clause of this contract, entitled "DISPUTES."

**Article XI—Remedies**

Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law.

**Article XII—Notices**

All notices and communications between the parties under this contract (except notices published in the **Federal Register**) shall be in writing and shall be sent to the following addressees:

To DOE: ____________________

____________________

____________________

To the Purchaser: ____________________

____________________

However, the parties may change the addresses or addressees for such notices or communications without formal modification to this contract; *provided, however*, that notice of such changes shall be given by registered mail.

**Article XIII—Representation Concerning Nuclear Hazards Indemnity**

A. DOE represents that it will include in its contract(s) for the operation of any DOE facility an indemnity agreement based upon Section 170(d) of the Atomic Energy Act of 1954, as amended, a copy of which agreement shall be furnished to the Purchaser; that under said agreement, DOE shall have agreed to indemnify the contractor and other persons indemnified against claims for public liability (as defined in said Act) arising out of or in connection with contractual activities; that the indemnity shall apply to covered nuclear incidents which (1) take place at a contract location; or (2) arise out of or in the course of transportation of source, special nuclear or by-product material to or from a contract location. The obligation of DOE to indemnify shall be subject to the conditions stated in the indemnity agreement.

B. The provisions of this Article XIII shall continue beyond the term of this contract.

**Article XIV—Assignment**

The rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved; *provided, however*, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer.

**Article XV—Amendments**

The provisions of this contract has been developed in the light of uncertainties necessarily attendant upon long-term contracts. Accordingly, at the request of either DOE or Purchaser, the parties will negotiate and, to the extent mutually agreed, amend this contract as the parties may deem to be necessary or proper to reflect their respective interests; *provided, however*, that any such amendment shall be consistent with the DOE final rule published in the **Federal Register** on April 18, 1983 entitled, "Standard Contract for Disposal or SNF and/or HLW", as the same may be amended from time to time.

**Article XVI—Disputes**

A. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). The decision of the Board shall be final and conclusive unless determined by a court of competent jursidiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

B. For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable. The certification shall be executed by the Purchaser if an individual. When the Purchaser is not an individual, the certification shall be executed by a senior company official in charge at the Purchaser's plant or location involved, or by an officer or general partner of the Purchaser having overall responsibility for the conduct of the Purchaser's affairs.

C. For Purchaser claims of $50,000 or less, the Contracting Officer must render a decision within sixty (60) days. For Purchaser claims in excess of $50,000, the Contracting Officer must decide the claim within sixty (60) days or notify the Purchaser of the date when the decision will be made.

D. This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph A above; *provided, however*, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

**Article XVII—Officials Not To Benefit**

No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

**Article XVIII—Covenant Against Contingent Fees**

The Purchaser warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Purchaser for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or in its discretion to increase the contract price or consideration, or otherwise recover, the full amount of such commission, brokerage, or contingent fee.

**Article XIX—Examination of Records**

The Purchaser agrees that the Comptroller General of the United States or any of his duly authorized representatives shall have access to and the right to examine any directly pertinent books, documents, papers and records of the Purchaser involving transactions related to this contract until the expiration of three years after final payment under this contract.

**Article XX—Permits**

The Government and the Purchaser shall procure all necessary permits or licenses (including any special nuclear material licenses) and comply with all applicable laws and regulations of the United States, States and municipalities necessary to execute their respective responsibilities and obligations under this contract.

**Article XXI—Rights in Technical Data**

*A. Definitions.*

1. "Technical data" means recorded information regardless of form or characteristic, of a specific or technical nature. It may, for example, document research, experimental, developmental, or demonstration, or engineering work, or be usable or used to define a design or process, or to procure, produce, support, maintain or operate material. The data may be graphic or pictorial delineations in media such as drawings or photographs, text in specifications or related performance or design-type documents or computer software (including computer programs, computer software data bases, and computer software documentation). Examples of technical data include research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identification, and related information. Technical data as used herein do not include financial reports, cost analyses, and other information incidental to contract administration.

2. "Proprietary data" means technical data which embody trade secrets developed at private expense, such as design procedures or techniques, chemical composition of materials, or manufacturing methods, processes, or treatments, including minor modifications thereof, provided that such data:

(a) Are not generally known or available from other sources without obligation concerning their confidentiality;

(b) Have not been made available by the owner to others without obligation concerning its confidentiality; and

(c) Are not already available to the Government without obligation concerning their confidentiality.

3. "Contract data" means technical data first produced in the performance of the contract, technical data which are specified

Case 1:04-cv-00106-EJD Document 276-6 Filed 05/15/2008 Page 5 of 20



to be delivered under the contract, or technical data actually delivered in connection with the contract.

4. "Unlimited rights" means rights to use, duplicate, or disclose technical data, in whole or in part, in any manner and for any purpose whatsoever, and to permit others to do so.

*B. Allocation of Rights*

1. The Government shall have:

(a) Unlimited rights in contract data except as otherwise provided below with respect to proprietary data properly marked as authorized by this clause;

(b) The right to remove, cancel, correct or ignore any marking not authorized by the terms of this contract on any technical data furnished hereunder, if in response to a written inquiry by DOE concerning the proprietary nature of the markings, the Purchaser fails to respond thereto within 60 days or fails to substantiate the proprietary nature of the markings. In either case, DOE will notify the Purchaser of the action taken;

(c) No rights under this contract in any technical data which are not contract data.

2. Subject to the foregoing provisions of this rights in technical data clause, the Purchaser shall have the right to mark proprietary data it furnishes under the contract with the following legend and no other, the terms of which shall be binding on the Government:

**Limited Rights Legend**

This "proprietary data," furnished under "Contract No.——" with the U.S. Department of Energy may be duplicated and used by the Government with the express limitations that the "proprietary data" may not be disclosed outside the Government or be used for purposes of manufacture without prior permission of the Purchaser, except that further disclosure or use may be made solely for the following purposes:

(a) This "proprietary data" may be disclosed for evaluation purposes under the restriction that the "proprietary data" be retained in confidence and not be further disclosed;

(b) This "proprietary data" may be disclosed to contractors participating in the Government's program of which this contract is a part, for information or use in connection with the work performed under their contracts and under the restriction that the "proprietary data" be retained in confidence and not be further disclosed; or

(c) This "proprietary data" may be used by the Government or others on its behalf for emergency work under the restriction that the "proprietary data" be retained in confidence and not be further disclosed. This legend shall be marked on any reproduction of this data in whole or in part.

3. In the event that proprietary data of a third party, with respect to which the Purchaser is subject to restrictions on use or disclosure, is furnished with the Limited Rights Legend above, Purchaser shall secure the agreement of such third party to the rights of the Government as set forth in the Limited Rights Legend. DOE shall upon request furnish the names of those contractors to which proprietary data has been disclosed.

**Article XXII—Entire Contract**

A. This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

B. Nothing in this contract is intended to affect in any way the contractual obligation of any other persons with whom the Purchaser may have contracted with respect to assuming some or all disposal costs or to accept title to SNF and/or HLW.

*C. Appendices*

A. Nuclear Power Reactor(s) or Other Facilities Covered
B. Discharge Information (Ten Year; Annual)
C. Delivery Commitment Schedule
D. Final Delivery Schedule
E. General Specifications
F. Detailed Description of Purchaser's Fuel
G. Standard Remittance Advice

In witness whereof, the parties hereto have executed this contract as of the day and year first above written.

United States of America
United States Department of Energy
By: ______
(Contracting Officer)

Witnesses as to Execution on Behalf of Purchaser
(Name) ______
(Address) ______
(Name) ______
(Address) ______
(Purchaser's Company Name)
By: ______
Title: ______

I, (*Name*), certify that I am the (*Title*) of the corporation named as Purchaser herein; that (*Name*) who signed this document on behalf of the Purchaser was then (*Title*) of said corporation; that said document was duly signed for and on behalf of said corporation by authority of its governing body and is within the scope of its corporate powers.

In Witness Whereof, I have hereunto affixed my hand and the seal of said corporation this —— day of ——, 1983

(Corporate Seal)
(Signature) ______

**Appendix A**

*Nuclear Power Reactor(s) or Other Facilities Covered*

Purchaser ______
Contract Number/Date ——/—— ______
Reactor/Facility Name ______
Location:
Street ______
City ______
County/State ——/—— ______
Zip Code ______
Capacity (MWE)—Gross ______
Reactor Type:
BWR ☐
PWR ☐
Other (Identify) ______
Facility Description ______
Date of Commencement of Operation ______
(actual or estimated)
NRC License #: ______
By Purchaser:
Signatue ______
Title ______
Date ______

**Appendix B**

*Ten Year Discharge Forecast*

To be used for DOE planning purposes only and does not represent a firm commitment by Purchaser.

Purchaser ______
Contract Number/Date ——/—— ______
Reactor/Facility Name ______
Location:
Street ______
City ______
County/State ——/—— ______
Zip Code
Type: BWR ☐
PWR ☐
Other (Identify) ______

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 10 yr total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Discharge date—mo/yr (or refueling shut down date) | | | | | | | | | | | |
| Metric tons: | | | | | | | | | | | |
| —initial | | | | | | | | | | | |
| —discharged | | | | | | | | | | | |
| Number of assemblies discharged (per cycle) | | | | | | | | | | | |

By Purchaser:
Signature ______
Title ______
Date ______

Type:
BWR ☐
PWR ☐
Other (Identify) ______
Refueling Shutdown Date ______
Metric Tons Uranium (Initial/Discharged):
Initial ______
Discharged ______
Number of Assemblies Discharged: ______

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:
Signature ______
Title ______

**Appendix B (Enclosure 1)**

*Actual Discharges*

Purchaser ______
Contract Number/Date ______
Reactor/Facility Name ______
Location:
Street ______
City ______
County/State ______
Zip Code ______



ADM-001-0709

Date ____

Appendix C

*Delivery Commitment Schedule*

This delivery commitment schedule shall be submitted by Purchaser to DOE as specified in Article V.B. of this contract.

Purchaser ____
Contract Number/Date ____
Reactor/Facility Name ____
Location:
Street ____
City ____
County/State ____
Zip Code ____
Type Cask Required: ____
Shipping Lot Number ____
(Assigned by DOE)
Proposed Shipping Mode:
Truck ☐
Rail ☐
Barge ☐
DOE Assigned Delivery Commitment Date ____
Range of Discharge Date(s) (Earliest to Latest)
Mo—— Day—— Yr—— to Mo—— Day—— Yr——
Metric Tons Uranium:
(Initial) ____
(Discharged) ____
Number of Assemblies:
BWR ____
PWR ____
Other ____

Unless otherwise agreed to in writing by DOE, the Purchaser shall furnish herewith to DOE suitable proof of ownership of the SNF and/or HLW to be delivered hereunder. The Purchaser shall notify DOE in writing at the earliest practicable date of any change in said ownership.

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:
Signature ____
Title ____
Date ____
Approved by DOE:
Technical Representative ____
Title ____
Date ____
Contracting Officer ____
Date ____

Appendix D

*Final Delivery Schedule*

(To be submitted to DOE by Purchaser for each designated Purchaser Delivery site not later than twelve (12) months prior to estimated date of first delivery)

Purchaser: ____
Contract Number/Date ____
Reactor/Facility Name ____
Location:
Street ____
City ____
County/State ____
Zip Code ____
Type(s) cask(s) required: ____
No. Assemblies per cask ____
Shipping Lot Number ____
Shipping Mode:
(Assigned by DOE)
Truck ____
Rail ____
Barge ____
Metric Tons Uranium:
(Initial) ____
(Discharged) ____
Range of Discharge Date(s) (Earliest to Latest)
(From approved commitment schedule)
Mo—— Day—— Yr—— to Mo—— Day—— Yr——
Number of Assemblies:
BWR ____
PWR ____
Other ____
Purchaser's Delivery First Estimate
Mo—— Day—— Yr—— last Mo—— Day—— Mo——

Unless otherwise agreed to in writing by DOE, the Purchaser shall furnish herewith to DOE suitable proof of ownership of the SNF and/or HLW to be delivered hereunder. The Purchaser shall notify DOE in writing at the earliest practicable date of any change in said ownership.

To confirm acceptability of delivery date(s):
Purchaser Contact ____
Phone ____
Title ____
DOE Contact ____
Phone ____
Title ____

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:
Signature ____
Title ____
Date ____
Approved by DOE:
Technical Representative ____
Title ____
Date ____
Contracting Officer ____
Date ____

Appendix E

*General Specifications*

*A. Fuel Category Identification*

1. Categories—Purchaser shall use reasonable efforts, utilizing technology equivalent to and consistent with the commercial practice, to properly classify Spent Nuclear Fuel (SNF) prior to delivery to DOE, as follows:

a. "Standard Fuel" means SNF that meets all the General Specifications therefor set forth in paragraph B below.

b. "Nonstandard Fuel" means SNF that does not meet one or more of the General Specifications set forth in subparagraphs 1 through 5 of paragraph B below, and which is classified as Nonstandard Fuel Classes NS–1 through NS–5, pursuant to paragraph B below.

c. "Failed Fuel" means SNF that meets the specifications set forth in subparagraphs 1 through 3 of paragraph B below, and which is classified as Failed Fuel Class F–1 through F–3 pursuant to subparagraph 6 of paragraph B below.

d. Fuel may have "Failed Fuel" and/or several "Nonstandard Fuel" classifications

*B. Fuel Description and Subclassification—General Specifications*

1. *Maximum Nominal Physical Dimensions.*

| | Boiling water reactor (BWR) | Pressurized water reactor (PWR) |
|---|---|---|
| Overall Length | 14 feet, 11 inches | 14 feet, 10 inches |
| Active Fuel Length | 12 feet, 6 inches | 12 feet, 0 inches |
| Cross Section [1] | 6 inches × 6 inches | 9 inches × 9 inches |

[1] The cross section of the fuel assembly shall not include the channel.

NOTE.—Fuel that does not meet these specifications shall be classified as Nonstandard Fuel—Class NS–1.

2. *Nonfuel Components.* Nonfuel components including, but not limited to, control spiders, burnable poison rod assemblies, control rod elements, thimble plugs, fission chambers, and primary and secondary neutron sources, that are contained within the fuel assembly, or BWR channels that are an integral part of the fuel assembly, which do not require special handling, may be included as part of the spent nuclear fuel delivered for disposal pursuant to this contract.

Note.—Fuel that does not meet these specifications shall be classified as Nonstandard Fuel—Class NS–2.

3. *Cooling.* The minimum cooling time for fuel is five (5) years.

Note.—Fuel that does not meet this specification shall be classified as Nonstandard Fuel—Class NS–3.

4. *Non-LWR Fuel.* Fuel from other than LWR power facilities shall be classified as Nonstandard Fuel—Class NS–4. Such fuel may be unique and require special handling, storage, and disposal facilities.

5. *Consolidated Fuel Rods.* Fuel which has been disassembled and stored with the fuel rods in a consolidated manner shall be classified as Nonstandard Fuel Class NS–5.

6. *Failed Fuel.*

a. Visual Inspection.

Assemblies shall be visually inspected for evidence of structural deformity or damage to cladding or spacers which may require special handling. Assemblies which (i) are structurally deformed or have damaged cladding to the extent that special handling may be required or (ii) for any reason cannot be handled with normal fuel handling equipment shall be classified as Failed Fuel—Class F–1.

b. Previously Encapsulated Assemblies.

Assemblies encapsulated by Purchaser prior to classification hereunder shall be classified as Failed Fuel—Class F–3. Purchaser shall advise DOE of the reason for the prior encapsulation of assemblies in sufficient detail so that DOE may plan for appropriate subsequent handling.

c. Regulatory Requirements.

Spent fuel assemblies shall be packaged and placed in casks so that all applicable regulatory requirements are met.

*C. Summary of Fuel Classifications*

1. *Standard Fuel:*
a. Class S–1: PWR
b. Class S–2: BWR
2. *Nonstandard Fuel:*
a. Class NS–1: Physical Dimensions
b. Class NS–2: Non Fuel Components
c. Class NS–3: Short Cooled
d. Class NS–4: Non-LWR
e. Class NS–5: Consolidated Fuel Rods.

3. *Failed Fuel:*
a. Class F-1: Visual Failure or Damage
b. Class F-2: Radioactive "Leakage"
c. Class F-3: Encapsulated

*D. High-Level Radioactive Waste*

The DOE shall accept high-level radioactive waste. Detailed acceptance criteria and general specifications for such waste will be issued by the DOE no later than the date on which DOE submits its license application to the Nuclear Regulatory Commission for the first disposal facility.

**Appendix F**

*Detailed Description of Purchaser's Fuel*

This information shall be provided by Purchaser for each distinct fuel type within a Shipping Lot not later than sixty (60) days prior to the schedule transportation date.
Purchaser ———
Contract Number/Date ——/———
Reactor/Facility Name— ———

I. Drawings included in generic dossier:
———

1. Fuel Assembly DWG# ——
2. Upper & Lower end fittings DWG# ——
Dossier Number: ——
DOE Shipping Lot #: ——
# Assemblies Described:
———BWR
———PWR
———Other

II. *Design Material Descriptions.*

*Fuel Element:*

1. Element type —— (rod, plate, etc.)
2. Total length) ——/(in.)
3. Active length —— (in.)
4. Cladding material —— (Zr. s.s., etc.)

*Assembly Description:*

1. Number of Elements ——
2. Overall dimensions (length —— (cross section) —— (in.)
3. Overall weight ——

III. Describe any distortions, cladding damage or other damage to the spent fuel, or nonfuel components within this Shipping Lot which will require special handling procedures. (Attach additional pages if needed.)

IV. Assembly Number ——
Shipping Lot #——

| | Irradiation history cycle No. 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| 1. Startup date (mo/day/yr) | | | | | |
| 2. Shutdown date (mo/day/yr) | | | | | |
| 3. Cumulative fuel exposure (mwd/mtu) | | | | | |
| 4. Avg. reactor power (mwth) | | | | | |

5. Total heat output/assembly in watts, using an approved calculational method: ——— as of Date ———

Any false, fictitious or fradulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).
By Purchaser:
Signature ———
Title ———

Date ———

**Appendix G**

*Standard Remittance of Advice (RA) for Payment of Fees*

Assigned Three-Month Period Covered:
from ——— to ———
I. A. Purchaser (Utility name and address):

B. Contract Number ———
II. Payment for Spent Nuclear Fuel—$——
A. Financial Obligation as of April 7, 1983 ———
B. Financial Obligation as of Date of First/Single Payment ———
C. Date of First/Single Payment ———
D. Unpaid Balance to Date ———
E. Date of This Payment ———
F. Ten Year Treasury Note Rate ———
III. Payment for M/KWH Fee—$——
A. Total Nuclear KWH Generated During Assigned Three Month Period Covered ———
B. Date of This Payment ———
C. M/KWH Fee Schedule Rate ———
IV. Underpayment (as notified by DOE) ———
A. Date of Notification ———
B. DOE Invoice Number———
C. Interest Paid ———
V. Late payments (as notified by DOE) ———
A. Date of Notification ———
B. DOE Invoice Number———
C. Interest Paid ———
VI. Other Credits Claimed (Explain
$ ( )
VII. *Total Remittance* $———
Prepared by:
Title:
Phone Number:
Date:
Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001.)
By Purchaser:

Signature Title Date

FOR DOE USE ONLY THIS LINE

1. Deposit to Account 89-5227 ———
2. Receip of Payment Verification ———
a. Date Payment Received———
b. Verification Performed by———
3. Posted to Cumulative Remitter Ledger:
a. Date Posted ———
b. Posted by ———
4. Late Payments:
a. Calculation of late charge (attach schedule)
b. Billing date ———
5. After processing RA furnish copy to OCRWM

*Instructions for Completing DOE Remittance Advice*

Upon completion, this form must be mailed on the last workday of the month following each assigned three-month period.

*Section I:*

Name & Address (self explanatory)
Contract Number will be the identification number assigned by DOE upon execution.

*Section II:*

Based upon permanently discharged inventory of spent fuel and HLW amassed prior to April 7, 1983, and that portion of the in-core fuel burned through April 6, 1983. Under either payment option 1 or 2, interest will accrue and be compounded at 13-week Treasury bill rates until the first/single payment is made. If the 10 year option is selected, purchaser's financial obligation will be paid in level payment of principal and interest over the first payment. Payments will be made in quarterly installments concurrently with the normal three month assigned period. If option 2 is selected, purchaser will liquidate its total financial obligation, consisting of the fee plus accrued interest, in the form of a single payment. If option 3 is selected, no interest will accrue and lines A and E only must be filled out. This section of the Remittance Advice should be completed for each payment under the 10 year option and only once with either single payment option. (See Annex B, to be completed only once.)
a. Self explanatory
b. Fee obligation plus accrued interest
c. Self explanatory
d. Self explanatory
f. Ten year Treasury Note rate in effect at first/single payment
$ Amount paid

*Section III:*

Based upon electricity generated on or after April 7, 1983, a schedule should be attached specifying the gross power generated by each plant during the assigned three-month period as measured at the out put terminals of the turbine generator. (See Annex A, to be completed with each submission of the remittance advice.)
a. Total of power generation from attached schedules
b. Self explanatory
c. Fee schedule rate in effect at time of payment

*Sections IV & V:*

(Same instructions as above) DOE will invoice purchasers when underpayments or late payments occur, reference a particular payment, and state the reason for the invoice.
A. The date the purchaser received DOE invoice
B. DOE's invoice #
C. Interest paid
$. Consists of interest if late payment or fees plus interest if under payment

*Section VI:*

Explain on an attached sheet of paper, if necessary, why DOE has been overpaid and the proposed disposition of the payment, e.g., apply credit against this payment or send refund.
$ If applied against this payment, this number is negative. If refund desired, leave blank and pay gross amount due from Sections II through V.

*Section VII:*

The sum of Sections II through VI.

**Instruction Guide for Remittance of Nuclear Waste Disposal Fee to Department of Energy Via Wire Transfer**

Payments made to the Department of Energy (DOE) for Nuclear Waste Disposal

Case 1:04-cv-00106-EJD Document 276-6 Filed 05/15/2008 Page 8 of 20



Fees will be affected by the Purchaser's commercial bank via the Federal Reserve Communications System (also known as Fedwire) to the Department of Treasury. If the Purchaser's commercial bank is not a Federal Reserve member, then the Purchaser's bank will use a correspondent member bank to effect the transfer of funds.

Purchaser must provide specific information to its bank so that the transfer of funds can take place. Failure to correctly provide the information could result in delay crediting of the remittance to DOE and could subject the purchaser to late charges.

If additional information is required, contact DOE representatives, Mark Loop or Joe Startari, on (301) 353–4899 or 353–5857).

**Annex A to Appendix G**

*Standard Remittance of Advice (RA) for Payment of Fees*

This Annex should be completed to compute the MKWH fee for SNF burned on or after April 7, 1983.

I. *Identification*

A. Purchaser: ____________

B. *Period Covered*

| | Last report | This report | Next report |
|---|---|---|---|
| 1. Date submitted: | | | |
| 2. Period covered: Start date: | | | |
| Finish date: | | | |
| 3. Length of period covered (days): | | | |

C. Unit Identification (Only one unit may be covered in each report.)

1. Reactor/Facility Name: ____________
2. Location: ____________
3. Type: ____________
4. Capacity: ____________
5. Date of Commencement of Operations: ____________
6. NRC License No.: ____________

II. *Fee Calculation*

| | Prior period | This period |
|---|---|---|
| 1. Gross Thermal Energy produced (MWH). | | |
| 2. Gross Electrical Energy produced (MWH). | | |
| 3. Gross Thermal Energy not used to generate electrical output (MWH). | | |
| 4. Gross electrical equivalent of thermal electricity (MWH). | | |
| 5. Net electrical energy produced (MWH). | | |
| 6. Electricity consumed/lost on site (MWH). | | |
| 7 Current fee rate: —— mill/kWh | | |
| 8. Current fee due: | | |

Prepared by: ____________

Phone number: ____________

Date: ____________

**Annex B to Appendix G**

*Standard Remittance of Advice (RA) for Payment of Fees*

This Annex should be completed only for SNF burned before midnight between April 6/7, 1983.

I. *Identification*

A. Purchaser: ____________

B. Unit Identification (Only one unit may be covered in each report.)

1. Reactor/Facility Name: ____________
2. Location: ____________
3. Type: ____________
4. Capacity: ____________
5. Date of Commencement of Operations: ____________
6. NRC License No.: ____________

II. *Fee Calculation*

A. *Discharged nuclear fuel*

| | | | | |
|---|---|---|---|---|
| 1. burnup [1] (MWDT/MTU) | 0–5,000 | 5,000–10,000 | 10,000 20,000 | 20,000 up |
| 2. initial loading (KgU) (with indicated burnup) | | | | |
| 3. fee rate ($/KgU) | 80.00 | 142.00 | 162.00 | 184.00 |
| 4. fee ($) | | | | |
| 5. total fee (4) | | | | |

B. Nuclear fuel in the reactor core as of midnight of 6/7 April 1983.

| Assembly identification | Initial loading (KgU) | Burnup [1] as of midnight 6/7 April 1983 (MWDT/MTU) | Fee |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7 | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |
| 11 | | | |
| 12. | | | |
| 13. | | | |
| 14. | | | |
| 15. | | | |
| 16. | | | |
| 17. | | | |
| 18. | | | |
| 19. | | | |
| 20. | | | |
| 21 | | | |
| 22 | | | |
| 23. | | | |
| 24. | | | |
| 25. | | | |

[1] Please provide (as an attachment) a clear reference to the methodology used to derive the burnup figures (computer codes, etc.) and a clear reference to all data used in the derivation of those figures.

C. Total fee.

[FR Doc. 83–10078 Filed 4–13–83; 11:50 am]

BILLING CODE 6450–01–M

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE<br>Plaintiff,<br><br>v.<br>UNITED STATES OF AMERICA<br>Defendant. | No. 04-106C<br>(Chief Judge Damich) |

REBUTTAL REPORT OF FRANK C. GRAVES

## 1. INTRODUCTION

This rebuttal report responds to criticisms directed at my March 23, 2007 expert witness report, made by Dr. Jonathan Neuberger in his report of June 29, 2007.[1] Dr. Neuberger claims that my analysis does not assist the court in determining Dairyland's damages. He asserts that my analysis is "fundamentally flawed", "overly speculative" and "relies on numerous unsupported assumptions" and that it thus fails to provide reliable estimates of the timing, quantity and cost of exchanges. Broadly, he criticizes my analysis for allegedly:

- Using extreme assumptions regarding utility behavior;
- Failing to actually model the market for exchanges, failing to identify the market mechanism(s) of exchanges, and failing to predict specific transactions;
- Ignoring factors, such as uncertainty, risk aversion and sociopolitical forces that would affect participation in exchanges;
- Using flawed input parameters (storage costs and utilities' full core reserve policy); and
- Overstating the robustness of my results.

It is important to understand at the outset what exactly Dr. Neuberger does and does not opine on. He has no opinion about the central question I have addressed, *i.e.*, the non-breach fuel

[1] My qualifications have not changed from those set out in my initial expert witness report in this case; my compensation has increased to $510 per hour. My testimony, depositions and publications are also unchanged, except for additions noted in Appendix 1.

removal schedule and exchange costs of Dairyland (or any other Purchaser, for that matter).[2] He does not offer any alternative characterization of the non-breach world, saying that this was beyond the scope of his assignment.[3] He performed no sensitivity analyses using my model, nor developed any independent modeling or quantification of the timing of Dairyland's spent fuel removal or its exchange costs.[4]

His central conclusion is that my analysis is not sufficiently reliable to assist the court in determining damages. His basis for this conclusion is that I did not incorporate, at least not to his satisfaction, several factors (*e.g.*, uncertainty, risk aversion, sociopolitical factors) that he claims could influence the result.[5] He reaches this conclusion despite having done no analysis and having no opinion regarding how likely it is that the issues he is concerned about would have arisen in the non-breach world, or how significant their impact might have been if they did arise.[6] He conceded in deposition that these issues are amenable to quantitative analysis, and that he is qualified to perform such analysis,[7] but this too was outside the scope of his assignment.

After considering Dr. Neuberger's concerns and opinions carefully, I find them to be rhetorical, hypothetical and without quantitative foundation. His opinions are simply speculation that some of the factors he names may have arisen in the non-breach world, and that they might have had an effect. He mischaracterizes my analysis, failing to acknowledge that in my original report I described numerous quantitative evaluations of the potential effect of a wide range of factors,

---

2 See Deposition of Jonathan A. Neuberger, dated August 8, 2007 ("Neuberger Deposition"), page 62 at 13-22 and page 63 at 1. Dr. Neuberger stated in deposition that he believes my non-breach result may be too optimistic – *i.e.*, that Dairyland's fuel removal would likely have occurred later than 1998, though he is inconsistent on this point. At one point he said that he believes fuel removal would have been delayed by at least a year relative to my 1998 fuel removal date for Dairyland, and possibly several years (Neuberger Depostion, 59 at 16-21). Shortly thereafter, in response to the question whether he believed the non-breach result would look more like my result (1998 removal) or more like the OFF result (2004 removal), he said first "I don't have an expert opinion about what the but for world, whether the but for world would have been closer to an OFF allocation or Mr. Graves's allocations." (Neuberger Depostition, 62 at 20) He then continued in the same response to say "I think it's much more likely that we would end up or would have ended up in something resembling OFF." (Neuberger Deposition, 63 at 2-6)

3 Neuberger Deposition, 53 at 18.

4 Neuberger Deposition, 14 at 12-21 and 35 at 17-20.

5 Needless to say, I disagree strongly with Dr. Neuberger's assessment on this point. I have included these factors in my analyses, in an entirely reasonable fashion, and I discuss this at length in my original report.

6 For example, see Neuberger Deposition, 188 at 13-20 and 189 at 6-10, 59 at 22 and 60 at 1-21, 164 at 1-5, 106 at 7-12, and 129 at 5-17.

7 Neuberger Deposition, 108 at 16-22 and 109 at 1-4, 131 at 19-22 and 132 at 1-7, and 144 at 12-22 and 145 at 1-2.

including the risk and political factors he cites. I analyzed these factors through sensitivity analyses, using often extreme alternative assumptions about costs, program parameters and the potential effects of risk, sociopolitical factors, etc. to determine whether they would affect my conclusions. Contrary to his representations, I have already tested the potential effect of the issues raised by Dr. Neuberger, modeling them quantitatively in sensitivity analyses. I showed in my original report, and I will amplify with additional analyses here, that these concerns do not alter my fundamental conclusions regarding the quantity, timing and cost of Dairyland's spent fuel removal.

To ignore my analysis, which Dr. Neuberger recommends, would leave the Court with no investigation of the effect of exchanges, and no evidence on which to base a determination of when Dairyland would have had its spent fuel removed in the non-breach world. Neither Dr. Neuberger nor any other defendant witness in this case offers any opinion on this. In the absence of evidence on how exchanges would have worked it would likely be tempting to assume, for convenience, that spent fuel would be accepted according to the original Oldest-Fuel-First (OFF) schedule. That would be a substantial mistake. This is equivalent to assuming that in the non-breach world, the DOE would have used the nuclear industry's own funds to develop a spent fuel program that was entirely capable of serving virtually all of the industry's spent fuel storage needs, but then it would have implemented the program so poorly that it would have left most of those needs unserved for very long periods, at great expense to the industry. While the DOE might find that result convenient in the context of this litigation, it is unlikely that it would ever have supported this characterization in the non-breach world. Indeed, other testimonies and documents explain that officials at DOE OCRWM aspired to make the program both cost-effective and responsive to purchasers' needs.[8]

Section 2 of this report addresses Dr. Neuberger's primary concerns with my analysis. I explain how I have already considered in my original report the issues he criticizes, and I clarify why these issues do not affect my estimate of LACBWR's spent fuel removal timing, quantity, and exchange cost in the non-breach world. I also present some expanded sensitivity analyses to

8 For example, see the John W. Bartlett Expert Witness Report in Case Nos. 98-126C, 98-154C and 98-474 C (Senior Judge Merow), dated June 30, 1999, page 10. See also his testimony during trial, dated July 14, 2004, page 609 at 5-19.

further prove the robustness of my results. Section 3 summarizes my overall conclusions of Dr. Neuberger's critiques.

## 2. DR. NEUBERGER'S CRITIQUES

### 2.1. PREDICTING TRADING VOLUMES, DATES AND PRICES

Dr. Neuberger claims that "In order to provide predictions that are relevant to damages, Mr. Graves must reliably estimate the timing, quantity and cost of exchanges. ... Reliable estimates of one, but not the others, are not sufficient."[9] He goes on to opine that my "...analysis does not provide reasonably certain estimates of these three factors."[10] Yet Dr. Neuberger has done no analysis and offers no contrary evidence, and in fact he has no opinion of his own regarding appropriate values for any of these three factors or for how uncertain any of them might be.[11] He identifies some conceptual issues that can affect economic performance under some circumstances, but he makes no attempt to ascertain whether or how they might actually affect Dairyland's spent fuel removal schedule. He then asserts that since my analyses did not satisfy him (though he never specifies what would be required to satisfy him), my conclusions are not reliable.

In contrast to this conceptual speculation, my report presented extensive quantitative analyses, including many sensitivity analyses that addressed an extraordinarily wide range of assumptions regarding the non-breach spent fuel program. I consistently found, and explained in my original report, that the timing and quantity of spent fuel removal are extremely robust across all of these potentially confounding factors. Specifically, Dairyland is always able to have its entire spent fuel quantity removed in 1998, across all scenarios, including some too extreme to be considered likely or even plausible non-breach performance. The cost of exchanges can be reliably determined within a modest range of at most a couple million dollars. Thus my analyses do produce reliable results that are essential for determining damages. In fact, I provide the only evidence in this case regarding the timing, quantity and cost of exchanges.

---

9 Expert Witness Report of Jonathan A. Neuberger, dated June 29, 2007 ("Neuberger Report"), paragraphs 13 and 33.

10 Neuberger Report, para. 33.

11 Neuberger Deposition, 57 at 13-22 and 5B at 1-2, and 62 at 13-22 and 63 at 1.

### 2.2. Extreme Assumptions

Dr. Neuberger claims that "the Graves model requires certain extreme assumptions regarding plant-level utility behavior."[12] These "extreme assumptions," as Dr. Neuberger mischaracterizes them, basically say that in the non-breach world, utilities would have carried out simple, easily identified transactions among themselves to reallocate acceptance priority according to actual fuel removal needs. They would have done this in order to substantially reduce their fuel storage costs, to the mutual benefit of all utilities involved. Further, they would have based the timing of spent fuel removal (not the fact of fuel removal, since it would all be removed eventually) on the avoidable costs of fuel storage, not on unrelated factors. These assumptions are not extreme at all, particularly for electric utilities, which are very familiar with optimizing and trading among themselves to reduce their costs.

Nonetheless, I relaxed these assumptions in several of my sensitivity analyses. For example, I examined situations:

- where utilities do pay significant costs for early fuel removal even when there is no immediate need,
- where utilities do withhold acceptance rights from exchanges, and
- where other parameters spanning a broad range of cost uncertainty and other types of risk are changed.

I found in these alternate cases that the result was very similar, at least for Dairyland (though the result necessarily changed for some other facilities). Thus, contrary to Dr. Neuberger's labeling, my basic analysis is in no way extreme, though my results survive sensitivity analyses that often are quite extreme, often unduly so.

### 2.3. Modeling The Market for Exchanges and Market Mechanisms

Dr. Neuberger criticizes the fact that I do not explicitly model the exchange process: "Exchanges are a fundamental feature of Mr. Graves' analysis ... [but] Mr. Graves does not actually model the market for exchanges"[13] He claims that the market for acceptance rights is not the same as

12 Neuberger Report, paras 34-41.
13 Neuberger Report, paras 42-43.

the market for exchanges, and that there are factors affecting the second that are separate from the first. However, he does not identify what these distinguishing factors are, making his asserted concern untestable and not useful.

He erroneously claims that I assume a "fictional auctioneer overseeing a perfectly competitive market" and he asserts that trading in a bilateral market (rather than under a central authority) would lead to a different result than a central market mechanism.[14] While I did model a centralized, efficient market in my Base Case, I also tested the potential effect of several types of significant inefficiencies, including in Case 23 a brokered exchange mechanism that yields essentially the same result for Dairyland, despite assuming implausibly high broker fees. Moreover, my conclusions are based on and supported by all my simulations, not just my Base Case; as previously explained, the results are very robust across a broad range of assumptions. Particularly where information is widely and easily available (as it is here), many alternative mechanisms would lead to similar, approximately efficient, market results.

More specifically, Dr. Neuberger claims that a market mechanism of bilateral trades might have resulted in transactions at many different prices, close to the buying parties' willingness to pay, which would eliminate most of the benefit for buyers. First, it is unlikely that wide availability of information would leave sellers with an advantage over buyers as he suggests, since both have equal access to the information. Second, he is implying that sellers could exercise market power to price discriminate, but he has done no analysis to test whether market power would even be a potential concern.[15] There is no plausible method for exercising market power, for several reasons. First, there is not sufficient concentration of sellers to manipulate the process of trading. In 1998 there are 15 potential sellers that are fairly similar in size. The market concentration in my Case 2, as measured by the Herfindahl-Hirschman Index is 1,227 - a level deemed only "moderately concentrated" by the U.S. Department of Justice as applied in its Merger Guidelines. Second, there is very little incentive or ability for sellers to profitably manipulate the price of exchanges. The supply curve is absolutely flat, that is, there is no difference in the marginal cost of the 1st or 1,000th MTU of acceptance rights. Thus, "withholding" would not raise the cost of the marginal supplier. Third, sellers who withhold (by using OFF rights for

[14] Neuberger Report, paras 68-69.
[15] Neuberger Deposition, 197 at 9-22 and 198 at 1-3.

which they did not yet have Must Move needs) forego sales revenue on those volumes. Unless the percentage price increase is bigger than the percentage volume reduction, there is no net benefit. Generally this will not be the case because the buyers on the margin tend to have larger volumes making it uneconomic for suppliers to withhold. Finally, several of these potential sellers in 1998 will want to trade to satisfy their own subsequent Must Move needs for which they do not have sufficient prior OFF rights.

Nonetheless, as discussed in my original report, the acceptance rate sensitivities I ran allow me to put an outer bound on the effect of withholding acceptance rights from the exchange market (*e.g.*, for political reasons). As I explained there, even if the majority of acceptance rights were to be physically withheld (a scenario much more extreme than price withholding to raise the exchange price), LACBWR's fuel removal date would be unchanged. Less extreme levels of withholding, though still implausible in a market power context, would have much less effect.

Dr. Neuberger's critique about market mechanisms is ultimately irrelevant. An economist studying the oil market would not explicitly model the mechanisms of the NYMEX futures market, broker transactions, bilateral transactions, or the many other exchange mechanisms that exist for transacting crude oil.[16] Nor would he attempt to characterize particular transactions that occur via any trading mechanism. Doing so would not be necessary to understand or predict the result of trading activity. Similarly I do not explicitly model the exchange mechanisms for acceptance priority. It is implausible to suggest that the particular market mechanism would have had a meaningful effect here, and any modest effect, if present, could go in either direction (so there is no basis for concluding my results are biased). Moreover, any mechanism that did not reach an efficient reallocation would encourage the emergence of more effective market mechanisms. Because of the easy availability of information in this case, even the most basic mechanism – bilateral exchanges without intermediation – would support an approximately efficient reallocation of acceptance priority. Furthermore, it is very likely that intermediation

[16] If the question of interest in economic analysis regards the performance of some particular market mechanism – *e.g.*, whether a futures exchange is being manipulated – then of course it may be appropriate to model market mechanisms. But to understand the overall balance of supply and demand and reasonably estimate the market outcome, it is not necessary to represent trading mechanics explicitly.

would have occurred. The very modeling I did to analyze the non-breach world would be a likely step by an entrepreneurial broker who sought to facilitate exchanges.

### 2.4. PREDICTING SPECIFIC EXCHANGE TRANSACTIONS

Elaborating on his criticism that I do not model exchanges explicitly, Dr. Neuberger complains that I "cannot identify the parties to any individual trade."[17] This is true, of course, but is not an indication of weakness in my approach. Economic modeling of virtually any market typically characterizes the interaction of aggregate supply and demand, and the resulting price. There is no attempt to predict which individual parties will transact with which others, since there are typically many, many different but ultimately equivalent possible combinations of buyers and sellers that yield approximately the same final allocation and price, and it is this final allocation and price that are of interest. In a market, exchanges occur because it is in the best interest of all parties to pursue them, but it is neither necessary nor usually possible to characterize which individual combinations of parties will transact.

By way of analogy, there are a number of oil producing countries that can supply oil very cheaply, and many oil-consuming countries value oil highly. It is a common practice in economics to predict that oil will be exchanged, along with predictions of who will sell and who will buy, and at approximately what price. But any attempt to say exactly which producers will transact with which buyers is foolish, since many alternative pairings of sellers with buyers are essentially equivalent. Since the same commodity is being exchanged in every case, there is no reason to assume it will not clear at a fairly uniform price (net of transportation costs). Spent fuel acceptance rights are similarly homogeneous.

My analysis can and does identify all of the potential exchange partners available for any transaction. For example, Figure 1 shows all the potential exchange partners for 1998 in my Case 2.[18] Some have 1998 OFF rights in excess of their 1998 Must Move needs (*i.e.*, are "sellers" of 1998 acceptance rights, at the top of the list), while others have Must Move needs in

---

17 Neuberger Report, para. 44.

18 I have used Case 2 (with early retirements of a handful of plants) rather than my Base Case for ease of comparison later in this report with possible exchange partners in Case 21, which is also based on early retirement Must Move demands.

excess of OFF rights ("buyers", at the bottom).[19] LACBWR needs to acquire a net 31.2 MTU of 1998 acceptance priority rights, and can purchase the entirety of those rights from any one of the first nine plants, each of which has more than 31.2 MTU to supply. The next six plants have smaller amounts, so Dairyland could have acquired the rights it needs from some combination of the first 15 plants. The identity of the seller(s) would have no effect on LACBWR's final fuel pickup date or its estimated exchange cost. Similarly, each of the other buyers and sellers has many alternative potential exchange partners and combinations. The identity of the particular transaction partner(s) is indeterminate and unimportant. For example, LACBWR may purchase 31.2 MTU from Dresden; or it may instead purchase 20 MTU from Dresden and 11.2 from Haddam Neck; or it may purchase some from Ginna, some from Monticello, and the balance from Turkey Point; and so forth.

[19] Although each of these plants can be thought of as a "buyer" or "seller" of 1998 acceptance priority, this is not a strictly accurate description. "Buyers" of 1998 acceptance are also concurrent "sellers" of another year's acceptance priority, and vice versa, since any transaction is an exchange of rights in one year for an equal quantity in another. Exchanges alter only the timing of acceptance, never affecting a party's total quantity of acceptance rights.

| | Plant | OFF Rights *(MTU)* | ESM Rights *(MTU)* | Difference (OFF-ESM) *(MTU)* |
|---|---|---|---|---|
| 1 | Dresden | 251.3 | 70.0 | 181.3 |
| 2 | Haddam Neck | 87.9 | 0.0 | 87.9 |
| 3 | Maine Yankee | 84.2 | 10.2 | 74.0 |
| 4 | Vermont Yankee | 72.8 | 0.0 | 72.8 |
| 5 | Ginna | 61.8 | 0.0 | 61.8 |
| 6 | Oyster Creek | 96.0 | 40.8 | 55.2 |
| 7 | Monticello | 41.9 | 0.0 | 41.9 |
| 8 | Turkey Point | 40.7 | 0.0 | 40.7 |
| 9 | Millstone | 46.1 | 10.2 | 35.9 |
| 10 | Nine Mile Point | 58.3 | 30.6 | 27.7 |
| 11 | Quad Cities | 22.7 | 0.0 | 22.7 |
| 12 | Fort Calhoun | 9.3 | 0.0 | 9.3 |
| 13 | Robinson | 70.1 | 61.2 | 8.9 |
| 14 | Pilgrim | 3.9 | 0.0 | 3.9 |
| 15 | Point Beach | 61.7 | 61.2 | 0.5 |
| 16 | Indian Point | 30.5 | 31.0 | -0.5 |
| 17 | San Onofre | 75.3 | 76.0 | -0.7 |
| 18 | Big Rock | 13.6 | 20.4 | -6.8 |
| 19 | North Anna | 0.0 | 10.2 | -10.2 |
| 20 | Surry | 20.0 | 30.6 | -10.6 |
| 21 | Rancho Seco | 0.0 | 12.8 | -12.8 |
| 22 | Fort St. Vrain | 0.0 | 15.0 | -15.0 |
| 23 | Humboldt Bay | 13.1 | 29.0 | -15.9 |
| 24 | Duane Arnold | 0.0 | 20.4 | -20.4 |
| 25 | Palisades | 0.0 | 30.6 | -30.6 |
| 26 | Brunswick | 0.0 | 30.6 | -30.6 |
| 27 | LaCrosse | 6.8 | 38.0 | -31.2 |
| 28 | Oconee | 24.8 | 61.2 | -36.4 |
| 29 | David-Besse | 0.0 | 40.8 | -40.8 |
| 30 | Calvert Cliffs | 0.0 | 40.8 | -40.8 |
| 31 | Shoreham | 0.0 | 46.0 | -46.0 |
| 32 | Arkansas Nuclear | 0.0 | 71.4 | -71.4 |
| 33 | Department of Energy | 0.1 | 82.0 | -81.9 |
| 34 | Prairie Island | 0.0 | 102.0 | -102.0 |
| 35 | Yankee Rowe | 20.0 | 127.0 | -107.0 |
| | **Total** | **1212.9** | **1200.0** | **12.9** |

"Sellers" with OFF>Early Needs (plants 1–15)

"Buyers" with OFF<Early Needs (plants 16–35)

***Sources and Notes:***
Source: TBG Analysis
* OFF rights are allocated in whole discharge amounts, as listed in the DOE's Acceptance Priority Ranking. Therefore, total OFF rights do not exactly match total ESM rights in 1998.

**Figure 1: Potential Swap Partners for 1998 Acceptance in Case 2**

None of these exchanges would harm the "sellers" ability to remove fuel according to their needs (even ignoring the payment they receive), as they would receive an equal quantity of somewhat later OFF rights from Dairyland, and none would wait longer for fuel removal than under OFF. In fact, several of these 1998 sellers would <u>improve</u> their fuel removal schedules (reduce their storage costs) with exchanges, relative to their OFF allocation.

### 2.5. FACTORS THAT MAY AFFECT PARTICIPATION IN EXCHANGES

Dr. Neuberger criticizes my approach for what he perceives to be a failure to adequately consider non-cost factors, such as uncertainty, risk aversion, and sociopolitical forces, which could affect participation in exchanges. This is simply not true. He ignores that I have considered explicitly the very issues he raises. I ran several sensitivity analyses that capture the potential effects of

any of a number of factors that might limit the supply of acceptance priority rights for exchanges, or increase demand for them. After careful consideration and quantitative analysis, I found that these factors do not affect my conclusions for Dairyland, even if they were to manifest in the ways Dr. Neuberger suggests.

For example, he claims that uncertainty about continued DOE performance will cause utilities to value and hoard or retain acceptance rights in advance of their actual fuel removal needs. In his interpretation, this could increase utilities' demand for early acceptance priority and/or limit their willingness to supply early rights for exchanges.[20] First, this is an inappropriate characterization of the non-breach world, being instead a "threat-of-breach" world where anxiety about a potential breach causes an outcome similar to the actual breach. It is not economically appropriate to analyze damages from an acknowledged liability for breach of contract under the assumption that even under non-breach circumstances, the defendant would have performed poorly! This is tantamount to blaming the plaintiff for having reasonable expectations. But even if I accept for the sake of argument Dr. Neuberger's concern about increased demand or reduced supply for exchanges, I have already shown that this does not have a significant effect on the outcome for Dairyland. I ran several sensitivity analyses that capture the effect of limited exchange participation – *e.g.*, due to uncertainty, risk aversion, sociopolitical factors, or strategic behavior. For instance, Case 21 models an extreme excess demand situation where every utility with an impending full pool bids to remove its excess fuel three years in advance of the actual must-move problem (*e.g.*, because of extreme uncertainty and/or risk aversion concerning DOE's continued performance). Regarding sociopolitical barriers to trades, the lower overall acceptance rates in Cases 4 and 5 (and much more extreme, Case 7) represent supply shortage situations, in which many potential sellers withhold their rights from exchanges. Nonetheless, as I showed in my original report, these scenarios have little effect on the results of exchanges, particularly for Dairyland.

Even in Case 21, where all operating facilities want to have acceptance rights three years in advance of their must-move dates due to full pools, there would still be many parties potentially willing and able to exchange with Dairyland, as seen below in Figure 2. This table is

---

[20] Neuberger Report, para. 50.

comparable to Figure 1, except that it reflects the more conservative (risk averse) trading philosophy. It shows that there are 16 potential "sellers" of which 11 have enough slack OFF rights to cover LACBWR's needs by themselves. Interestingly, this is one more seller than in the prior case in Figure 1. This occurs because the increased demand in Figure 2 causes Yankee Power to sell rather than buy acceptance rights. Otherwise, the fix of sellers and the quantities of rights they will have to sell are nearly the same as in Figure 1 (seen by comparing the last two columns of Figure 2). This means they do not have any need to hoard OFF rights in 1998 to cover Must Move needs that would arise in 1999-2001.

| | Plant | OFF Rights *(MTU)* | ESM Rights *(MTU)* | Difference with +3 Yr FPMM (OFF-ESM) *(MTU)* | Figure 1 Difference with Strict FPMM (OFF-ESM) *(MTU)* |
|---|---|---|---|---|---|
| 1 | Dresden | 251.3 | 70.0 | 181.3 | 181.3 |
| 2 | Haddam Neck | 87.9 | 0.0 | 87.9 | 87.9 |
| 3 | Maine Yankee | 84.2 | 10.2 | 74.0 | 74.0 |
| 4 | Nine Mile Point | 58.3 | 0.0 | 58.3 | 27.7 |
| 5 | Oyster Creek | 96.0 | 40.8 | 55.2 | 55.2 |
| 6 | Ginna | 61.8 | 10.2 | 51.6 | 61.8 |
| 7 | Robinson | 70.1 | 19.2 | 50.9 | 8.9 |
| 8 | Vermont Yankee | 72.8 | 30.6 | 42.2 | 72.8 |
| 9 | Monticello | 41.9 | 0.0 | 41.9 | 41.9 |
| 10 | Point Beach | 61.7 | 20.4 | 41.3 | 0.5 |
| 11 | Turkey Point | 40.7 | 0.0 | 40.7 | 40.7 |
| 12 | Quad Cities | 22.7 | 0.0 | 22.7 | 22.7 |
| 13 | Yankee Rowe | 20.0 | 0.0 | 20.0 | -107.0 |
| 14 | Fort Calhoun | 9.3 | 0.0 | 9.3 | 9.3 |
| 15 | Millstone | 46.1 | 40.8 | 5.3 | 35.9 |
| 16 | Pilgrim | 3.9 | 0.0 | 3.9 | 3.9 |
| 17 | Indian Point | 30.5 | 31.0 | -0.5 | -0.5 |
| 18 | San Onofre | 75.3 | 76.0 | -0.7 | -0.7 |
| 19 | Big Rock | 13.6 | 20.4 | -6.8 | -6.8 |
| 20 | Fort St. Vrain | 0.0 | 15.0 | -15.0 | -15.0 |
| 21 | Humboldt Bay | 13.1 | 29.0 | -15.9 | -15.9 |
| 22 | Calvert Cliffs | 0.0 | 18.6 | -18.6 | -40.8 |
| 23 | St. Lucie | 0.0 | 20.4 | -20.4 | n/a |
| 24 | Prairie Island | 0.0 | 20.4 | -20.4 | -102.0 |
| 25 | Fitzpatrick | 0.0 | 20.4 | -20.4 | n/a |
| 26 | Fermi | 0.0 | 20.4 | -20.4 | n/a |
| 27 | WNP | 0.0 | 30.6 | -30.6 | n/a |
| 28 | Salem | 0.0 | 30.6 | -30.6 | n/a |
| 29 | LaCrosse | 6.8 | 38.0 | -31.2 | -31.2 |
| 30 | Oconee | 24.8 | 61.2 | -36.4 | -36.4 |
| 31 | Kewaunee | 0.0 | 40.8 | -40.8 | n/a |
| 32 | Surry | 20.0 | 61.2 | -41.2 | -10.6 |
| 33 | Shoreham | 0.0 | 46.0 | -46.0 | -46.0 |
| 34 | Waterford | 0.0 | 61.2 | -61.2 | n/a |
| 35 | North Anna | 0.0 | 61.2 | -61.2 | -10.2 |
| 36 | Duane Arnold | 0.0 | 71.4 | -71.4 | -20.4 |
| 37 | Department of Energy | 0.1 | 82.0 | -81.9 | -81.9 |
| 38 | Susquehanna | 0.0 | 102.0 | -102.0 | n/a |
| | **Total** | **1212.9** | **1200.0** | **12.9** | **199.1** |

***Sources and Notes:***
Source: TBG Analysis
* OFF rights are allocated in whole discharge amounts, as listed in the DOE's Acceptance Priority Ranking.
Therefore, total OFF rights do not exactly match total ESM rights in 1998.

**Figure 2: Potential Swap Partners for 1998 Acceptance in Case 21**