Dr. Neuberger claims that utilities would be unwilling to exchange away early acceptance rights in part because interest groups would oppose any delay in acceptance.[21] He ignores my discussion[22] that anticipates this speculation and explains why such interest groups would be unlikely to oppose exchanges that improve spent fuel management. An efficient priority allocation would substantially reduce the kinds of nuclear fuel handling activities that such interest groups are likely to oppose, for both the sellers and the buyers. For example, it would reduce unnecessarily frequent movement of small fuel quantities, and avoid construction of unnecessary new dry storage facilities.

In deposition, Dr. Neuberger claimed that polling utilities would have been an appropriate method to determine willingness to participate in exchanges in the non-breach world.[23] I find this suggested procedure to be inappropriate. All of the people Dr. Neuberger apparently imagines should have been interviewed are operating in a world of breached performance, with no evidence before them about what a non-breach performance environment would have looked like. They have no credible property rights to trade today, nor would they even know how many such rights they might have been initially allocated without performing some kind of analyses similar to what I have described in my reports. (Many current utility managers are not even the same people who would have been in charge of trading, had there been no breach.) To the extent these managers happened to hold informal beliefs about the non-breach world, those beliefs would be implicit, possibly inconsistent, and likely heavily tainted by breach-world experience, making any such "results" not a reliable predictor of non-breach behavior. Dr. Neuberger claims he would have used this survey method despite its obvious flaws: even though he describes it as "a little bit unique, because you are asking someone what would you have done if circumstances had been different."[24] Of course, in a non-breach world, all of these ambiguities would have been lifted and utility managers could and would have readily evaluated the attractiveness of trading acceptance rights, much like they now do for many other rights and services in well-functioning markets.

21 Neuberger Report, para. 65.
22 Expert Witness Report of Frank C. Graves, dated March 23, 2007 ("Graves Report"), pages 33-34.
23 Neuberger Deposition, 69-71.
24 Neuberger Deposition, 71 at 15-18.

He also claims that "there are dramatic differences in which utilities successfully address their 'Must Move' needs in 1998"[25] between the Base Case and my Case 22 results (in which utilities approaching a full pool want fuel removal well in advance of the actual problem). He tries to use the changes in who gets out early to show that my modeling involves extreme uncertainty. This is an incorrect interpretation of my analysis that misses the point entirely. The difference he observes in these cases is a result of the assumption of the sensitivity analysis – that some utilities could value acceptance very differently than in the Base Case. It is not surprising that this different assumption implies that different utilities would want and get earlier removal. But even if we accept the assumption of this sensitivity case at face value (*i.e.*, that utilities might value early acceptance in this way), it does not materially affect Dairyland's outcome, because of the underlying facts of the situation: Dairyland has little spent fuel and thus a very high willingness to pay for exchanges, relative to others. Even with very different assumptions on how other utilities value early removal, the result for Dairyland is essentially the same.

Dr. Neuberger disagrees with me that sensitivity analysis is the "most appropriate way to address the impact of uncertainty on an economic model."[26] (emphasis added) This is a purely rhetorical claim. He offers no evidence as to what alternative approach would be better, nor any analysis of how much (or even why) it would matter. In deposition, Dr. Neuberger suggested that Monte Carlo simulation might be a better approach, saying that 10,000 or even 100,000 model runs would be needed to adequately characterize the results.[27] Of course, Monte Carlo simulation can be a useful tool, but it is best suited for understanding the potential for rare outcomes that may occur in unusual combinations of circumstances, as when evaluating whether there is a risk of nuclear core meltdown if several different reactor components fail simultaneously. Here, where the goal is to develop a reasonable estimate of damages, it is not important to characterize the rare one-in-10,000 or one-in-100,000 extreme outcomes. To estimate damages, it is important to understand the reasonably likely outcomes, not the implausible extremes.

---

25 Neuberger Report, para. 55.

26 Neuberger Report, para. 54.

27 Neuberger Deposition, 138 at 15-22 and 139 at 1. Monte Carlo simulation, as described by Dr. Neuberger in this context, would create a model, possibly similar in structure to mine, that determines the timing and cost of Dairyland's fuel removal given a particular setting of input variables (*e.g.*, demand for fuel removal from each facility). By running the model many times with different, randomly selected values from a reasonable range of possible values for each of the input variables, Monte Carlo simulation allows characterization of the distribution of results. However, as explained herein, such modeling is not always necessary.

In the end, whether sensitivity analysis is the "most appropriate" way to address uncertainty is a judgment based on the needs of the analysis.[28] Indeed, sensitivity analysis can itself be part of the judgment process about when and what more elaborate methods of analysis would be useful. Despite Dr. Neuberger's generic disagreement with my approach, where sensitivity analyses show very little effect on the result of interest, other techniques, including Monte Carlo analysis, are unnecessary and would not meaningfully improve the result. It is also important to note that the sensitivity analyses I have performed in some cases depict situations that are so extreme that they are not reasonable depictions of the non-breach world, and so their results cannot be interpreted as reasonable measures of the non-breach outcome. I modeled them nonetheless to illustrate that even with <u>un</u>reasonably extreme assumptions, the outcome for Dairyland is largely unchanged. This gives me high confidence that any <u>reasonable</u> portrayal of the non-breach world, including dynamic or stochastic modeling, would yield results very similar to my Base Case.

### 2.6. Failed Fuel

Dr. Neuberger raises a concern that the presence of failed fuel at LACBWR could cause the DOE to impose a different schedule on its fuel removal than would otherwise prevail. If so, this might delay Dairyland's fuel-out date beyond 1998. He has done no analysis of the relative extent of failed fuel at Dairyland versus other reactors, nor is he capable of making the engineering assessments of whether the fuel at Dairyland has the physical infirmities that might actually cause the handling problem he imagines. I too am not a nuclear engineer with the expertise to resolve the technical scope of this issue, but I do rely on the empirical fact that failed fuel has been successfully handled at a few ISFSIs around the world without material impediment to the schedule of fuel removal. Specifically, Exelon has removed failed fuel from its Dresden plant and moved it to its ISFSI in a multi-purpose canister, and failed fuel was among the elements shipped from two facilities in South Korea to the INEEL facility in Idaho in

[28] Of course, there are other techniques for addressing uncertainty in economic models beyond sensitivity analysis and Monte Carlo simulation – *e.g.*, risk-adjusted discounting, decision analytic techniques, and option valuation, to name a few, that can be used individually or in combination.

1998.[29] Maine Yankee, as another example, was successful in removing all of its failed fuel from its spent fuel pool and transporting it to a dry storage facility, and Michael Meisner, Chief Nuclear Officer of Maine Yankee Atomic Power Co., testified during the Yankee trial that the removal of that fuel required no special handling.[30]

Dr. Neuberger does not consider that even if some failed fuel takes longer to handle, it would be possible to start planning for that situation earlier and avoid delays. Ivan Stuart has testified that failed fuel would not have been a barrier to fuel acceptance. DOE documents also reveal that "It is the Department's intent that all currently designed nuclear fuel ... will be subject to the same scheduling procedures. ... Failed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel."[31]

### 2.7. SPENT FUEL STORAGE COSTS

Dr. Neuberger claims that the representative spent fuel storage cost values I use are flawed; especially that "the derivation of these cost estimates, however, violates numerous principles of statistics and econometrics, rendering the estimated costs largely meaningless."[32] He criticizes the fact that I do "not have site-specific data for every nuclear power plant."[33] It is true that these estimates are based on relatively few data points, and that I do not use site-specific data for every plant, but this simply reflects the reality that public data on nuclear fuel storage costs is fairly limited. It is precisely because these data limitations create uncertainty in cost estimates (and the recognition that costs vary across facilities) that I performed a wide range of sensitivity analyses on costs. What these analyses showed, and Dr. Neuberger fails to acknowledge, is that the particular values of storage costs across facilities have little effect on Dairyland. They do not change the quantity or timing of Dairyland's fuel removal at all, and they have very little effect

29 Holtec International Dry Spent Fuel Storage information page; see http://www.holtecinternational.com/dryspentfuel.html (last accessed 8/16/2007). Parker, Dixon and Shelton, Thomas; Operational Aspects of Triga Shipment from South Korea to INEEL, NAC International, October 1998.

30 See the testimony of Michael J. Meisner in Case Nos. 98-126C, 98-154C and 98-474 C (Senior Judge Merow), pages 3,157-3,159. See also his rebuttal testimony in this case, dated August 24, 2004, page 6,937.

31 Robert Bauer's comments on "other than standard fuel," as described in Senior Judge Merow's Opinion and Order in the Yankee Case, dated September 30, 2006, page 80.

32 Neuberger Report, para. 79.

33 Neuberger Report, para. 83.

on exchange costs. As a result, further collection and refinement of this data would not result in a better or more informative analysis – just more data.

His mocking comment – "in a cost-based model of the market for DOE acceptance rights, costs apparently do not matter"[34] – displays a fundamental and perhaps deliberate misunderstanding of my analysis. My result – that the efficient allocation is insensitive to changes in storage costs – is not the logical conundrum that Dr. Neuberger suggests. Costs do matter, of course, but not by themselves. This is because the efficient allocation is determined by the ranking of cost <u>per MTU</u>, which is influenced primarily by MTU, and only secondarily by costs. This is because the volume of must-move spent fuel at each facility as expressed in MTU (which is known precisely) varies by much more than costs, even allowing for a large range of cost uncertainty. Where cost does play a role, it is only the costs of marginal facilities that affect the market for exchanges. The fact that a few facilities might in principle have very high willingness to pay does not change the market result. Similarly, even if someone suffering dehydration would be willing to pay an exorbitant sum for water, you can still buy a bottle for about a dollar. Since LACBWR is high in the economic priority ranking, even substantially different costs do not change whether it would be able to accelerate its removal priority, and its cost for exchanges is insensitive to storage cost parameters.

One of Dr. Neuberger's concerns regarding costs is that I did not use LACBWR's actual pool O&M cost, and thus my model "may not accurately capture Dairyland's incentives to exchange or the price it would be willing to pay for exchanges." It is true that Dairyland's pool O&M cost appears to be substantially below the costs of other plants for which I had data – approximately $4.5 million per year rather than the $8.7 million estimate I used for average industry pool O&M.[35] I tested the potential effect of this, and found that using LACBWR's actual O&M cost had no effect on the Base Case result. In fact, LACBWR's actual pool O&M would have to be below $1.45 million per year in order to affect the Base Case result at all. (This level would make LACBWR's bid equal to the marginal bid in 1998.) I also re-ran all of my previous

---

[34] Neuberger Report, para. 93.

[35] The March 23, 2007 Expert Witness Report of Charles L. Wilkins show that LACBWR 2006 SAFSTOR costs were approximately $4.0 million, and overhead and general & administrative rates add about 9.9%. This results in a total pool O&M cost of approximately $4.5 million.

sensitivity analyses using this actual cost for LACBWR. Appendix 2 to this rebuttal report presents the results of this, showing that it does not change the result at all in any of the cases, with one exception. In Case 22 participants bid up to six years in advance of their full pool Must Move needs, and LACBWR's lower actual cost may make it economic for it to wait until 1999 for fuel removal.

Another of Dr. Neuberger's concerns about costs is that the five cost diversity scenarios (Cases 16-20) I analyzed "are insufficient to capture the effects of cost heterogeneity in any statistically meaningful way."[36] He also claims that "the validity of these scenarios is questionable" because my sensitivity analyses may not accurately reflect which particular sites have higher vs. lower costs.[37] This is irrelevant, and it is wholly contradictory to his other opinion that perhaps a Monte Carlo analysis of uncertainties would have been useful. The reason I performed these analyses is to determine whether cost diversity is likely in principle to have a meaningful effect on the results. Since the cases already examined show little effect, it would likely be a waste of effort to attempt further detailed study of the cost inputs. But perhaps Dr. Neuberger is concerned that despite those five randomized cases, there are some particular, key combinations of costs at different facilities that would somehow fundamentally alter the result. It is possible to run additional randomized cost diversity cases to address his concerns, with enough of which, the chance of some undetected key combination going unnoticed diminishes substantially. Dr. Neuberger speculated that it might be necessary to run 10,000 or more cases in a Monte Carlo simulation. It is impractical and unnecessary to run so many cases. I have run 100 additional such cases, and found again that the result is essentially unchanged in all these cases. Figure 3 below summarizes the results of these cases, showing that cost diversity at this level does not affect Dairyland's 1998 fuel removal date, and that it could affect resulting exchange costs by -30% to +45%, or by about plus or minus $1 million.[38] That is, a standard deviation of about

---

36 Neuberger Report, para. 94.

37 Neuberger Report, para. 105.

38 This is an interval spanning 95% of the results obtained from the sampling distribution of resulting exchange costs by sorting them in ascending order and picking exchange costs that correspond to 2.5% and 97.5% of the sample. This also shows that, at least at the level of outcomes with one-in-100 likelihood, there do not appear to be extreme outcomes that could cast doubt on the Base Case results. While additional random trials could conceivably bring to light a key combination of inputs that yields extreme results, even this would not have a meaningful impact on estimating reasonable damages.

76% in storage costs across facilities a very significant level of cost variability leads to a fairly narrow band of resulting exchange costs centered roughly on my Base Case and Case 2 results.[39]




Note: All sensitivites assume license extensions and existing early shutdowns.

**Figure 3: Additional Cost Diversity Scenarios**

### 2.8. Uniform Full-core Reserve

Dr. Neuberger expresses concern that my assumption of a single full core reserve policy for all utilities may understate the cost of exchanges, because if some facilities had a policy of holding more than one FCR, this would accelerate their Must Move needs and increase demand for early acceptance. He says that "This may result in Dairyland not being one of the winning bidders or facing higher costs to exchange."[40] First, my assumption of one FCR is consistent with DOE's own forecasts of spent fuel storage requirements, and with common industry practice.[41] Dr.

---

39 Note that my method of stressing cost assumptions by using doubling and halving multipliers on storage costs <u>increases average</u> costs (by 17%), which increases the price of exchanges and is responsible for much of the distribution of exchange costs lying above the Case 2 result. If cost sensitivities were designed to maintain the <u>same average</u> storage costs, the results would be more centered on the exchange costs in my Base Case.

40 Neuberger Report, para. 98.

41 In analyzing the industry's need for additional spent fuel storage, the DOE assumes a one-FCR policy at all sites. See Spent Fuel Storage Requirements 1994-2042, US Department of Energy, Office of Civilian Radioactive Waste Management, June 1995. This document is my primary data source for estimating facilities' spent fuel storage needs.

Neuberger cites no evidence for the suggested prevalence of utilities' practice of holding more than 1 FCR. Further, I have already considered the possible effect of different FCR policies, discussing it explicitly in my original report.[42] Case 21 simulates advancing all full-pool Must Move needs by three years. Since three years is about two fuel cycles, and each fuel cycle discharges about 1/3 of the core, this is equivalent to an increase from 1 FCR to 1 2/3 FCR policy <u>at every single facility</u>. This is an unreasonably extreme characterization of the potential for different FCR policies, but serves to put an outer limit on the possible size of the effect. In this very extreme case, LACBWR's fuel-out date is unchanged, and its exchange costs increase to $5.1 million. Dr. Neuberger speculates that "all it would take to affect the price of exchanges is for <u>a few facilities</u> to adopt 'non-standard' reserve policies"[43] (emphasis added). On the contrary, even if <u>all</u> facilities had a <u>much</u> larger FCR policy, the effect on LACBWR's exchange costs would be only a few million dollars (with no effect on LAWBWR's 1998 fuel-out date). Higher FCR policy at "a few facilities" would have no effect at all, for most possible facilities; applied at the three most sensitive facilities, a 1 2/3 FCR policy would increase Dairyland's exchange costs to $3.5 million.

### 2.9. MARKET FAILURE

In a market economy, in the absence of serious market failures (and very often even in the presence of them), trading and exchanges will lead to a fairly efficient allocation of goods and an approximately uniform price. Despite this broadly recurring result, Dr. Neuberger implies that this would not have occurred in the case of exchanges of acceptance priority. Without providing any evidence or analysis to support his contentions, he seems to be invoking some form of "market failure" to explain why he believes exchanges would fail to efficiently reallocate acceptance priority, though he does not put it explicitly in those terms.

There are a number of general reasons why markets sometime fail to reach an efficient reallocation. Markets can fail to reach an inefficient reallocation due to factors such as

- poorly defined or missing property rights (such that the performance obligations and rights of claimholders are not clear and amenable to valuation and exchange),

---

42 Graves Report, 36.

43 Neuberger Report, para. 99.

- agency problems (conflicts of interest and difficulties in monitoring and enforcing agreements between parties),
- externalities (significant costs or benefits not being incurred by the parties to a transaction),
- strategic behavior (exercise of market power); and
- information asymmetry (with unequal costs or barriers to obtaining necessary information, such as occurs with used cars that can be hard-to-detect "lemons").[44]

However, the market for exchanges of acceptance priority is not exposed to any of these problems to a degree that would cause concern, and on some dimensions it is considerably better than many other very effective markets.

For example, property rights for acceptance priority are well-defined (in a non-breach world) and explicitly transferable under the Standard Contract. With numerous potential sellers, there is little scope to exercise market power. There are no agency problems (at least to no greater extent than for power and fuel which utilities regularly exchange), and externalities are not an issue since utilities internalize all the costs of spent fuel storage and exchange costs. (There are external costs and benefits to third parties from having spent fuel handling and transportation occur in their neighborhoods, but these problems are (1) what the program was intended to overcome and (2) not made larger or more complex by exchanges.) As discussed earlier, market power is not a plausible concern. Information is readily available – potential counterparties are known, and very precise data about their storage needs and initial acceptance rights was published regularly by the DOE. Even cost data, though less precise and less available, would have been sufficient in the years prior to 1998 to allow meaningful economic planning for exchanges, particularly since the market result is largely insensitive to the particular cost numbers, as shown above.

[44] Despite Dr. Neuberger's concerns about uncertainty, uncertainty in itself is not necessarily a barrier to efficient market performance. Virtually all markets involve at least some uncertainty, and some very effective markets, such as securities markets, involve quite a lot of uncertainty, yet they are often deemed to be among the most efficient of markets. In fact, much of the rationale for some of these markets is to price and hedge uncertainty by allowing participants to transact now on known terms, rather than waiting to see what the spot market may offer in the future.

The emergence of entities like Edlow International, who attempted to broker exchanges and other storage alternatives even in the breach world, provides strong evidence for the plausibility of a non-breach market such as I have modeled. The ease with which I developed a spreadsheet model to identify economically attractive exchanges is further evidence that they would have been simple to identify and execute. In the end, we cannot observe a working exchange market because the DOE's breach prevented it from forming. But given how simple it would have been to identify attractive exchanges, and the very large fuel storage costs that could have been saved with them, it is only reasonable to assume that they would have occurred.

## 3. CONCLUSIONS

The Standard Contract explicitly enabled exchanges of acceptance priority. Purchasers wanted the ability to exchange, and DOE agreed to it. Exchanges would have been an integral part of the spent fuel removal schedule in the non-breach world. I reasonably conclude that exchanges would have been implemented in the non-breach world to turn the highly inefficient OFF priority ranking into what the program could, should and would have been an effective, efficient program for addressing utilities' needs to have fuel removed and disposed. It is essential that the beneficial impacts of likely exchanges be recognized when assessing damages to LACBWR from DOE's failure to perform.

Dr. Neuberger implies that there are numerous factors that may have impaired exchanges, and suggests that DOE's acceptance of spent fuel would have been substantially less efficient than I believe it would. While he makes numerous implications and suggestions about possible complications to trading, he actually has <u>no opinion</u> about how efficient exchanges would have been – though he acknowledges that some exchanges would have occurred.[45] He also has <u>no opinion</u> about the quantity, timing and cost of exchanges or about when Dairyland or any other facility would have had its spent fuel removed in the non-breach world. His complete lack of an opinion about Dairyland's spent fuel removal is not surprising, given that he performed absolutely no analysis of this question himself.

---

45 Neuberger Deposition, 62 at 20-22 and 63 at 1.

He criticizes my analysis by naming a laundry list of factors that he claims might in principle have some effect on exchanges of spent fuel acceptance priority, and further claiming that I have failed to model these factors adequately. These rhetorical complaints ignore the fact that I have actually analyzed these issues and found that they do not materially affect my conclusions. At several points he claims that I did not consider particular factors, when in fact I examined them in sensitivity analyses and discussed them explicitly in my original report.[46] Those sensitivity analyses also demonstrate that additional methods of analyzing uncertainty and possible inefficiencies are not necessary and would not be helpful.

Dr. Neuberger claims that my analyses do not reliably predict the quantity, timing and cost of exchanges. But the opposite is true. Even stressing the analysis with extreme, unreasonable characterizations of the non-breach world, I <u>always</u> find that the timing and quantity of exchanges would have allowed LACBWR to remove <u>all</u> of its spent fuel at the beginning of the program <u>in 1998</u>. I acknowledge that it is not possible to predict the cost of exchanges with this same level of precision. Still, it is possible to have reasonable confidence in the approximate exchange costs. My Base Case shows exchange costs of $2.8 million. Looking at 100 Monte Carlo sensitivity cases for uncertain storage costs shows a potential range of $1.55 million to $3.22 million for 95% of the cases. Low acceptance-rate sensitivities (which also represent extreme non-trading cases) can affect exchange costs somewhat, though acceptance rates that show much higher costs do so because they are needlessly inefficient, and may therefore be less reasonable characterizations of the non-breach world. Conversely, when acceptance ramp-up and rates are higher, exchange costs can go down to zero. Potential barriers to exchanges such as uncertainty, risk aversion and sociopolitical factors are also modeled in my Cases 21 and 22. But these are intentionally very extreme cases (particularly Case 22) where every facility wants to accelerate its fuel removal by three years or more. A more reasonable assumption would be that some subset of facilities might want to advance their removals by a year or two ahead of their actual needs.

Ultimately I believe that my Base Case analysis is a reasonable representation of the non-breach world. The sensitivity analyses I have run show that the timing of LACBWR's fuel removal is

[46] Neuberger Report, paras 14, 52, and 83.

not sensitive to reasonable changes in assumptions, and that the cost of exchanges might change by a couple of million dollars one way or the other from my Base Case result, but in any case would be on the order of a few million dollars in total.

Overall, I find Dr. Neuberger's criticisms to be uncompelling and obfuscative to understanding the reasonable economic expectations that Purchasers under the Standard Contract could have had. I had already considered the issues he raises, despite his failure to acknowledge that fact. He has done no analysis and presented no evidence to suggest that the issues he raises would be likely to occur, or have a material impact on non-breach exchanges if they did occur. Instead, he has cited a litany of economic concerns that sometimes prevail in other markets, and simply offered an untested opinion that these probably would be material to a more proper analysis of spent fuel removal, had he been asked to perform one.

Respectfully submitted,

Frank C. Graves

August 17, 2007

## Appendix 1

## Updates to Disclosure of Deposition, Testimony, and Publications of Frank C. Graves (since February 2006)

**Additional Papers and Presentations**

"Utility Supply Portfolio Diversity Requirements," (with Philip Q Hanser), prepared for the Edison Electric Institute (EEI), May, 2007.

"Rate Shock Mitigation," (with Greg Basheda and Philip Q Hanser), prepared for the Edison Electric Institute (EEI), May, 2007.

"Electric Utility Automatic Adjustment Clauses: Benefits and Design Considerations," (with Philip Q Hanser and Greg Basheda), prepared for the Edison Electric Institute (EEI) June, 2006.

**Additional Testimonies**

Direct and rebuttal testimony before the Corporation Commission of the State of Oklahoma, Case No. PUD 200700012, January 17, 2007 and June 18, 2007, on behalf of Oklahoma Gas & Electric Company (OG&E) regarding the application of OG&E for an order of commission granting preapproval to construct Red Rock Generating Facility and authorizing a recovery rider.

Testimony in U.S. District Court of New York SI:04Cr733 (TPG), May 17, 2007, on behalf of defendant Mark Kaiser in regard to whether defendant's role in accounting misrepresentations can reliably associated with losses to shareholders.

Rebuttal testimony before the Illinois Commerce Commission on behalf of Midwest Generation EME L.L.C. and Edison Mission Marketing and Trading, Docket Number 06-0800, April 6, 2007, on whether proposed benchmarks for evaluating the Illinois retail supply auctions are reasonable and useful.

# Appendix 2

## Unserved Must Move Needs – Results for All Cases 1 Through 27, Including Impact of Actual LACBWR Cost

| | | | Initial Analysis Using Representative Costs | | Using LACBWR Actual Cost | | |
|---|---|---|---|---|---|---|---|
| | | Sensitivity | LACBWR Fuel Out Year *[a]* | LACBWR Exchange Cost 1998-2030 *(2007 $mil PV)* *[b]* | LACBWR Fuel Out Year *[f]* | LACBWR Exchange Cost 1998-2030 *(2007 $mil PV)* *[g]* | Change in 2007 Damages *(2007 $mil PV)* *[h]* |
| Base | [1] | 1988 MP (Base Case) | 1998 | 2.8 | 1998 | 2.8 | 0.0 |
| | [2] | 1988 MP (Updated Reactor Lives) | 1998 | 1.9 | 1998 | 1.9 | 0.0 |
| Acceptance Rate | [3] | 1983 MP | 1998 | 0.9 | 1998 | 0.9 | 0.0 |
| | [4] | CRWMS Req. Doc '06 | 1998 | 8.5 | 1998 | 8.5 | 0.0 |
| | [5] | 1987 MP Amendment | 1998 | 2.7 | 1998 | 2.7 | 0.0 |
| | [6] | 1985 MP: Improved | 1998 | 0.0 | 1998 | 0.0 | 0.0 |
| | [7] | 1991 ACR | 1998 | 21.2 | 1998 | 21.2 | 0.0 |
| Storage Cost | [8] | Double Pool O&M Cost | 1998 | 3.6 | 1998 | 3.6 | 0.0 |
| | [9] | Double Dry O&M Cost | 1998 | 3.3 | 1998 | 3.3 | 0.0 |
| | [10] | Double Dry Setup Cost | 1998 | 1.9 | 1998 | 1.9 | 0.0 |
| | [11] | Double Cask Cost | 1998 | 1.9 | 1998 | 1.9 | 0.0 |
| | [12] | Halve Pool O&M Cost | 1998 | 1.6 | 1998 | 1.6 | 0.0 |
| | [13] | Halve Dry O&M Cost | 1998 | 1.8 | 1998 | 1.8 | 0.0 |
| | [14] | Halve Dry Setup Cost | 1998 | 1.9 | 1998 | 1.9 | 0.0 |
| | [15] | Halve Cask Cost | 1998 | 1.9 | 1998 | 1.9 | 0.0 |
| | [16] | Randomize Costs - Random Draw 1 | 1998 | 2.7 | 1998 | 2.7 | 0.0 |
| | [17] | Randomize Costs - Random Draw 2 | 1998 | 2.3 | 1998 | 2.3 | 0.0 |
| | [18] | Randomize Costs - Random Draw 3 | 1998 | 2.6 | 1998 | 2.6 | 0.0 |
| | [19] | Randomize Costs - Random Draw 4 | 1998 | 2.6 | 1998 | 2.6 | 0.0 |
| | [20] | Randomize Costs - Random Draw 5 | 1998 | 2.3 | 1998 | 2.3 | 0.0 |
| Barriers to Exchanges | [21] | Advanced FPMM (3 Yrs.) | 1998 | 5.1 | 1998 | 5.1 | 0.0 |
| | [22] | Early-Bid FPMM (3/6 Yrs.) | 1998 | 12.4 | **1999** | **5.2** | **2.7** |
| | [23] | Transaction: 1m Fixed + 5k var | 1998 | 2.7 | 1998 | 2.7 | 0.0 |
| OFF | [24] | 1988 MP | 2004 | N/A | 2004 | N/A | 0.0 |
| | [25] | 1991 ACR | 2013 | N/A | 2013 | N/A | 0.0 |
| | [26] | 1985 MP: Improved | 2002 | N/A | 2002 | N/A | 0.0 |
| Breach | [27] | No Fuel Pickup | ? | N/A | ? | N/A | N/A |

***Note:*** All cases other than [1] assume license extensions and existing early shutdowns.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Case No. 04-106C (Chief Judge Damich)

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant. | ) |

DEPOSITION OF FRANK C. GRAVES

Tuesday, June 19, 2007

Washington, D.C.

Reported by: Mary Ann Payonk, CRR-RDR
Certified Realtime Reporter
Job No. 0706

a nontrivial portion of the population.

Second, we had prior reports which unfortunately we were no longer able to rely upon from NAC and Scientech that described their industry experience with these kinds of costs, which arose from a large variety of contexts of supplying those kinds of services.

And the numbers we found in our analysis were broadly consistent with their analyses, and where they differed, it was partly explainable in terms of things like increased security since 9/11. So we had a prior notion of what was reasonable from other hearings.

Q Why couldn't you use the documents from NAC and Scientech?

MR. SHAPIRO: Objection, vague.

A There were two sides to the same problem. One is there was no NAC or Scientech expert who was going to provide the underlying expert testimony in support of those numbers. And we only knew them at a summary level where we couldn't -- or at a disguised level where we couldn't reconstruct their validity on out own from our own analysis. So while we don't doubt their credibility, we couldn't independently establish it and testify as to the

happened to report it.

Q Okay. Suppose you put in -- you added Dairyland and their experience of $1.3 million in annual wet pool O&M. Okay? And then you did the same average. Do you know how much the average wet pool O&M per year comes down to?

A Not off the top of my head. And there's at least one adjustments you have to make before you did that, which is all of these numbers are supposed to be in 2007 terms. So that 1. 3 estimate would have to be both inflated and adjusted for any other post -- any more recent additions that are imposed on the process. If there's more security costs, etc., those would be in there. I think their more recent estimates are higher than that.

Q How much are they? Do you know?

A 3 to 4 million, something like that, per year.

Q Okay. Well, suppose we use the 3- to 4 million, just because I want to get -- understand for the record what direction that brings it. Doesn't that bring down the average wet pool O&M that you would use in your analysis? Wouldn't that bring that down considerably even if you used a 3- or $4 million figure?

beneficially swap and he could be an intermediary and make things happen.

Q Do you figure he would have charged for his services?

A Sure.

Q How much?

A Not a lot.

Q Why do you say that?

A Because it's not a service he -- I don't think he could have gotten a lot for it, because it's an easily replaced service. Utilities themselves know each other well in this industry. They have an experience of trading with each other. They know a lot about -- there's public data on what their economic circumstances would have been, so if Edlow had said, look, I want to keep $5 million apiece from you guys for brokering his arrangements, I think he would have found himself unemployed. But he might have been able to get a few percent of the transactions and make a little bit of money.

Q How much do you assume he would have made, or a broker like him would have made, in your analysis?

A In my analysis, I don't include any brokerage fees or intermediation fees in the base

case. I do run a sensitivity in which I look at what would happen if there was a million-dollar fee for a transaction in $5,000 per cask, which I think is an extremely high fee but nonetheless one that illustrates what the effect of having a broker or an intermediary would be.

Q Does that fee that -- the one that you assume in your analysis, is that one that would be charged to any marginal player in the entire market?

A Sure. Anybody who bought rights would pick up a million-dollar transaction fee and $5,000 a cask.

Q Okay. Why shouldn't the transaction costs be included in the base case?

A Well, I'm not sure these are more likely to arise at this level than not. The base case is simpler to understand, and the transaction cost case is a variation on that that throws in a friction of sorts so that the base case was the simple situation and the -- each sensitivity layers on various nuances of uncertainty in costs, uncertainty in the participation levels and things like that. So this is an uncertainty case.

Q So you don't deny that transaction costs would exist, right?

MR. SHAPIRO: Objection, vague.

A Yes. I don't have any problem with the notion that they would probably exist, though not uniformly for everybody, and not necessarily at this level. This -- I had to set them this high to sort of make them show up as a difference in the analysis because, you know, these numbers are small compared to the amount of money that's at stake, but they're huge compared to the amount of effort it takes to get in to be an intermediary in this business. So this is a lot of money for intermediation.

It's not clear that competition for that -- that opportunity would let anybody collect this much money.

Q Would you expect that the transaction costs from utility to utility would vary?

A Sure. They could be different from one utility to another, of course.

Q Isn't the bargaining power, say, of Entergy much different from the bargaining power, say, of Dairyland?

MR. SHAPIRO: Objection, vague.

A Yes, but it's not all about bargaining power. It's also about competition for being an intermediary because it is a very easy problem to

analyze and set up a framework for identifying attractive trades. And so -- and there's a lot of players who would -- you know, who are familiar with that kind of activity of trading, so I don't think it would be terribly hard to motivate people to do it.

This is a normal kind of activity in the culture of the utility industry to trade economic rights for cost savings that are mutually beneficial. So yeah, there would be some transaction costs and they could vary a bit from deal to deal. But they wouldn't be very much, I don't think.

Q Okay. Did you get anything else out of this document?

A No. That's about it.

Q Okay. Did you -- you mentioned a little bit earlier about private fuel storage not being viable. Do you -- is that -- did you say that? Do you recall saying that?

A I do.

Q Why do you say that?

A Well, I -- it's my understanding, which is pretty secondhand, that private fuel storage has hit some sort of road block with respect to using the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE | |
| Plaintiff , | |
| vs. | Civil Action No. 04-106C |
| UNITED STATES OF AMERICA | |
| Defendant . | |

Washington, D.C.

Wednesday, August 8, 2007

Deposition of:

JONATHAN A. NEUBERGER, PhD

called for oral examination by counsel for Dairyland, pursuant to notice, at Greenberg, Traurig, 800 Connecticut Avenue, N.W., Washington, D.c., before Ronald E. Bennett, of Capital Reporting Company, a Notary Public in and for the District of Columbia, beginning at 9:12 a.m., when were present on behalf of the respective parties:

didn't really talk to industry executives, whether at Dairyland or anywhere else about certain aspects of an exchanges market. I thought that would have been helpful to inform his model and his analysis. But I don't think there's a specific place in my report where I say Mr. Graves didn't do a survey but he should have.

Q. Although you say it would have been helpful if Mr. Graves had talked to utility executives about their attitudes toward exchanges, you acknowledge that it would be unique in your experience to have a survey done in a breach of contract action as to how life would have been absent breach of contract?

MR. BRYAN: Objection. Vague. I'm not really saying it was unique. I can think of that one case I did it in. There's at least one instance.

I know there patent infringement matters, for example, that surveys are often conducted about consumer attitudes regarding branding and choices available pre and post infringement and that kind of

thing. I don't think it's that unique.

Q. I'm talking about a breach of contract action.

A. I'm not aware of very many cases where it's been done. I'm not aware of any off the top of my head. Whether it would be a unique circumstance I haven't researched it enough to know whether that is true.

Q. You referred a couple times to the fact you haven't seen any evidence of a utility wishing to decelerate the acceptance of its spent fuel. What do you mean by decelerate?

A. As I understand Mr. Graves's model, he's predicting that certain utilities, in particular in this case Dairyland, would have made use of an exchanges market to have their spent fuel picked up earlier than it would have been under the OFF allocations, the acceptance priority rankings.

That's the situation that I refer to as acceleration. So relative to OFF allocations, the utilities, like Dairyland, were attempting to get their fuel picked up sooner. Basically

Afternoon Session

BY MR. SHAPIRO:

Q. Dr. Neuberger, before we took our lunch break we were talking about your understanding of how Mr. Graves dealt with uncertainty. And we discussed that Mr. Graves deals with uncertainty in part by looking at certain sensitivity analysis, correct?

A. Yes.

Q. Is it your understanding or is it your opinion that Mr. Graves' way of dealing with uncertainty is wrong?

A. I think scenario analysis is a useful tool. With respect to the kinds of uncertainty that would affect in my view this market, it's not clear to me that that's the best way to characterize uncertainty.

Based on my knowledge of uncertainty models they do typically produce different results. There is different criteria, additional criteria that get taken into account in presence of

uncertainty versus in the absence of uncertainty.
So I think scenario analysis can be useful. But I don't think it's a replacement and certainly I would say it's not a preferable tool for addressing uncertainty whether in this model or really most models.
Q. You say that use of sensitivities by Mr. Graves is not the best method for looking at uncertainty. Is it an acceptable method?
A. As I said, I think it can be useful tool. I think there are some questions that Mr. Graves is capable of asking through a sensitivity analyses. I don't think that's the same thing as building a model with uncertainty in it and then simulating that. So I think it is a useful tool. It can give you some insights. I don't think it's a replacement for an explicit modeling of uncertainty.
Q. I believe it's paragraph 54 of your report you say that, along the same lines, that you don't believe the use of sensitivities is the most appropriate means of looking at uncertainty, right?
A. Yes.

00794

794

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
V. )
THE UNITED STATES, ) Consolidated
Defendant. )

Courtroom Number 7

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, July 15, 2004

VOLUME 4

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

00961

A Yes.

Q And your model assumes that Commonwealth Edison then would want to use allocations, want to attain allocations in 2002 to remove fuel from that shutdown plant?

A I forget when Zion shutdown, so I don't know if it has a waiting period to participate or not.

Q Do you know if they have an ISFSI?

A I don't recall.

Q You recognize that logistical problems with the acceptance of the amounts you model could lead DOE to disapprove proposed exchanges, correct? In other words, let me just ask it to try to get it to a yes or no question, or yes or no answer.

If a proposed exchange presented a logistical problem, that could lead -- you agree that that could lead to DOE disapproving the exchange, correct?

A It's certainly conceivable. I guess the question would be, you know, how material is the logistical problem relative to the advantages of the utilities involved. It might be an appealable or debatable process. If someone were to say, this is going to cause you a little inconvenience and it's going to cause me a great deal of convenience to solve

00962

this, maybe we should compare my problem to yours and see if this is worth deferring to the logistical concern or not.

Q I use the word "could", again, to try to precipitate a yes or no answer instead of "would". It could lead them to do that. That could be a result. DOE could decide to reject the exchange or disapprove the exchange?

A Sure.

Q Conversely they could not. It's possible they wouldn't allow it anyway?

A Sure.

MR. EKMAN: Can we take a break?

THE COURT: Sure. Return at half past. I've got the wrong glasses on.

MR. EKMAN: How about 3:45.

THE COURT: Okay. That's fine. Return at 3:45.

(Whereupon, a recess was taken at 3:34 p.m., and the proceedings reconvened at 3:49 p.m.)

MR. EKMAN: Ready, Your Honor?

THE COURT: Yes. We're ready.

MR. EKMAN: Very good.

BY MR. EKMAN:

Q Mr. Graves, are you familiar with the term

HQO.950929.0010

**Department of Energy**
Washington, DC 20585
September 28, 1995

Dr. Andrew C. Kadak
President and Chief Executive Officer
Yankee Atomic Electric Company
580 Main Street
Bolton, Massachusetts 01740-1398

Dear Dr. Kadak:

Thank you for your letter of September 7, 1995, expressing your thoughts on the viability of the exchange process for Delivery Commitment Schedules and restating your position on the Department's obligation to afford priority waste acceptance to the spent fuel from Yankee Atomic Electric Company's Rowe power station.

While your letter describes circumstances that you believe will impede the exchange of delivery commitment schedules, we continue to believe that once the Federal waste management system is operational, the exchange provision will be exercised by Purchasers as originally anticipated. Article V.E of the Standard Contract for the Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (Standard Contract) grants Purchasers the right to exchange, with DOE concurrence, approved delivery commitment schedules. This provision was included in the Standard Contract in response to comments received during the Standard Contract rulemaking, in order to allow Purchasers greater flexibility in managing their inventories of spent fuel. We believe the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department.

With respect to the Department's ability to grant priority acceptance of the spent fuel from your Rowe power station, as I noted in my letter of July 13, 1995, to State Representative Herren, there are statutory limits on the amount of spent fuel that the Department can accept prior to the opening of a permanent repository. Consequently, the Department does not have the ability to grant priority acceptance to shutdown reactors without adversely affecting other utilities. The Congress is debating the issue of centralized interim storage of spent nuclear fuel. The outcome of this debate may involve new policy direction for this program, and may include policy guidance on the priority acceptance of spent fuel from shutdown reactors.

Sincerely,

Daniel A. Dreyfus, Director,
Office of Civilian Radioactive
Waste Management

PLAINTIFF'S
EXHIBIT
346
04-106

Printed with soy ink on recycled paper

HQO.19950929.0010.0001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------:
DAIRYLAND POWER COOPERATIVE, :
:
Plaintiff, :
:
v. : No. 04-106C
:
UNITED STATES OF AMERICA, :
:
Defendants. :
----------------------------------:

Washington, D.C.

Thursday, May 3, 2007

Deposition of:

DAVID K. ZABRANSKY

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:14 a.m., when were present on behalf of the respective parties:


©2007

administrative record as to why it put that provision in the contract. I believe it was put in to address utility concerns or utility desires to have some flexibility in adjusting those schedules.

BY MR. SHAPIRO:

Q And that intended purpose of the exchanges provision assumes that DOE would exercise its discretion or disapprove -- its discretion to approve or disapprove exchanges in a reasonable manner, true?

MS. SULLIVAN: Objection. Vague, legal conclusion.

THE WITNESS: And I think that the answer to the question is would DOE approve or disapprove exchanges in a reasonable fashion, the answer is I believe they would, yes.

BY MR. SHAPIRO:

Q We may come back to that topic. Let me move on for the moment to the next topic. The purpose and role of the provision in the Standard Contract providing for priority acceptance of spent fuel from permanently shut down reactors.


©2007

priority acceptance, correct.

BY MR. SHAPIRO:

Q Why has the Department not granted that priority acceptance to permanently shut down reactors?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: The Department's position is that that issue, which is related to the removal of spent fuel from shut down reactors, is best addressed through the exchange provision of the contract between the utility as opposed to the Department unilaterally reallocating a finite capacity to one utility over another.

BY MR. SHAPIRO:

Q So it has been the Department's expectation that the exchanges provision will operate sufficiently to obviate the need for according priority acceptance to spent fuel at permanently shut down reactors?

MS. SULLIVAN: Objection. Vague, compound, and mischaracterizes the witness' prior testimony.


©2007

THE WITNESS: I'm not sure that the latter part -- I mean, my statement was that the Department's position is that the exchange provision is the best way that utilities can, amongst themselves, reallocate that capacity for acceptance in a way that best addresses the need to remove fuel from shut down reactors.

BY MR. SHAPIRO:

Q Well, the Department has expected that, once it actually starts accepting spent fuel, that the exchanges provision will operate as originally intended, to enable utilities to optimize their acceptance -- the timing of their acceptance of spent fuel, correct?

MS. SULLIVAN: Objection. Vague, compound, assumes facts not in evidence.

THE WITNESS: The Department anticipates that the exchange provision will operate in a way that will allow utilities to exchange amongst themselves to advance, or to tailor their spent fuel acceptance schedules to their needs.

BY MR. SHAPIRO:


©2007