**No. 04-106C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**DAIRYLAND POWER COOPERATIVE,**

**Plaintiff,**

**v.**
**THE UNITED STATES OF AMERICA,**

---

**Defendant.**

# DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE WARREN K. BREWER'S TESTIMONY

---


**GREGORY G. KATSAS**
**Acting Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**RUSSELL A. SHULTIS**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tel: (202) 305-7571**
**Fax: (202) 307-2503**

**OF COUNSEL:**

**JANE K. TAYLOR**
**Office of General Counsel**
**U.S. Department of Energy**
**1000 Independence Ave., S.W.**
**Washington, D.C. 20585**

**ALAN J. LO RE**
**Senior Trial Counsel**

**PATRICK B. BRYAN**
**JOSHUA E. GARDNER**
**SONIA ORFIELD**
**SCOTT SLATER**
**ANTHONY MOSES**
**Trial Attorneys**
**Civil Division**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20530**


**May 15, 2008**

**Attorneys for Defendant**

# TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX TO APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY. . . . . . . . . . . . 2

II. MR. BREWER'S EXPERIENCE AND QUALIFICATIONS. . . . . . . . . . . . . . . . . 4

III. MR. BREWER'S OPINIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. Mr. Smith's Estimate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B. Mr. Brewer's Critique Of Mr. Smith's Estimate. . . . . . . . . . . . . . . . . . . . . 6

C. Mr. Brewer's Other Opinions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV. MR. BREWER'S OPINIONS REGARDING MR. SMITH'S ESTIMATE ARE RELIABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V. MR. BREWER'S OPINONS REGARDING MR. SMITH'S ESTIMATE ARE USEFUL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

VI. MR. BREWER'S OTHER OPINIONS ARE ADMISSIBLE. . . . . . . . . . . . . . . . 18

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

CASES PAGE(S)

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Beech Aircraft Corp. v. Rainey,
488 U.S. 153 (1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Betterbox Communications Ltd. v. BB Technologies, Inc.,
300 F.3d 325 (3d Cir. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13

Bluebonnet Savings Bank v. United States,
67 Fed. Cl. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Boston Edison Co. v. United States,
80 Fed. Cl. 468 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

California Fed. Bank v. United States,
54 Fed. Cl. 704 (2002)
aff'd, 395 F.3d 1263 (Fed. Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Coast Federal Bank v. United States,
49 Fed. Cl. 53 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Columbia First Bank v. United States,
60 Fed. Cl. 97 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Daubert v. Merrill Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Deal v. Hamilton County Bd of Educ.,
392 F.3d 840 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

First Tennessee Bank Nat. Assoc. v. Barreto,
268 F.3d 319 (6th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

First Union Nat. Bank v. Benham,
423 F.3d 855 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

Forrest v. Beloit Corp.,
424 F.3d 344 (3d Cir. 2005).. . . . . . . . . . . 3

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999).. . . . . . . . . . . 2

Micro Chemical, Inc. v. Lextron, Inc.,
317 F.3d 1387 (Fed. Cir. 2003). . . . . . . . . . 2, 3, 18

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005). . . . . . . . . . 2

San Carlos Irrigation & Drainage Dist.v. United States,
111 F.3d 1557 (Fed. Cir. 1997). . . . . . . . . . 8

Seaboard Lumber Co. v. United States,
48 Fed. Cl. 814 (2001),
aff'd, 308 F.3d 1283 (Fed. Cir. 2002).. . . . . . . . . . . 8

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002). . . . . . . . . . 2

Southern National Corp. v. United States,
57 Fed. Cl. 294 (2003). . . . . . . . . . 9

System Fuels, Inc.v. United States,
78 Fed. Cl. 769 (2005). . . . . . . . . . 4

Tennessee Valley Authority v. United States,
No. 01-249C (Fed. Cl. July 13, 2005). . . . . . . . . . 4

Tyler v. Union Oil Co.,
304 F.3d 379 (5th Cir. 2002). . . . . . . . . . 3

United States v. Lopez-Lopez,
282 F.3d 1 (1st Cir. 2002). . . . . . . . . . 4

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

United States v. Taylor,
239 F.3d 994 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. Urbina,
431 F.3d 305 (8th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Wisconsin Electric Power Company v. United States,
No. 00-697C (Fed. Cl. Oct. 10,2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

RULES

Fed. R. Evid. 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

# INDEX TO APPENDIX

DOCUMENT PAGE

Expert Report of Warren K. Brewer, Dairyland v. United States (June 15, 2007). . . . . . . . . . Def. A 1

Expert Witness Report of Todd D. Smith Dairyland v. United States (March 23, 2007). . . . . . . . . . Def. A 46

Excerpts of Deposition of Warren K. Brewer Dairyland v. United States (July 19, 2007). . . . . . . . . . Def. A 67

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | |
| v. | ) | No. 04-0106C (Chief Judge Damich) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE WARREN K. BREWER'S TESTIMONY

Pursuant to Rule 16 of the Rules of this Court ("RCFC"), defendant, the United States, respectfully responds to "Dairyland's Motion To Exclude Warren K. Brewer's Testimony," which plaintiff, Dairyland Power Cooperative ("Dairyland"), filed on April 29, 2008.

SUMMARY OF ARGUMENT

Dairyland has offered a scattershot of arguments concerning the expert testimony of the Government's expert, Mr. Warren Brewer. In short, however, it appears that Dairyland is arguing that Mr. Brewer's opinions are not relevant or reliable. Plaintiff's Motion "Pl. Mot." 2. Notwithstanding Dairyland's assertions, even a cursory review of Mr. Brewer's opinions reveals that they are both relevant and reliable. Indeed, Dairyland's motion to exclude the expert testimony of Mr. Brewer is simply another improper attempt to shift the burden of demonstrating the "but for" world from Dairyland to the Government. Dairyland's primary criticism is that, although Mr. Brewer offers a critique of the significant deficiencies contained in Mr. Smith's "but for" world estimate,[1] Mr. Brewer has not offered an alternative model that cures these deficiencies. Yet, it is Mr. Smith's – and not Mr. Brewer's – obligation to provide a sufficient

[1] Mr. Todd Smith is Dairyland's expert regarding costs associated with Dairyland's removal of the Reactor Pressure Vessel from Dairyland's nuclear power plant.

depiction of the "but for" world. Mr. Brewer, applying well-established and reliable engineering principles, provides the Court with a useful basis for understanding the significant deficiencies contained in Mr. Smith's estimate. Further, Mr. Brewer's opinions offer a helpful framework for evaluating the validity of Dairyland's damages claim. Consequently, this Court should reject Dairyland's motion to exclude Mr. Brewer's opinions in this case.

## ARGUMENT

### I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

The United States Court of Appeals for the Federal Circuit has explained that, under the Supreme Court's decision in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Court has an obligation to screen expert testimony for both relevance and reliability.[2] Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). Although the standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one, Seaboard Lumber Co., 308 F.3d at 1302, the gatekeeper function was designed to protect juries and is largely irrelevant in the context of bench trials. Deal v. Hamilton County Bd of Educ., 392 F.3d 840, 852 (6th Cir. 2004). Further, the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003) (citing Advisory Committee Note to Federal Rule of Evidence 702). The inquiry under Rule 702 is a flexible one, Daubert, 509 U.S. at 594, providing the trial courts with "substantial discretion in deciding how to test an expert's reliability." Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005) (citation omitted).

[2] Although the Supreme Court in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), expanded the Court's gatekeeping function under Daubert from "scientific" testimony to all expert testimony, the Court noted that "[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." Id. at 150.

Under Rule 702, an expert witness must possess "specialized knowledge" regarding the area of testimony. Fed. R. Evid. 702. However, the basis for this specialized knowledge can be practical experience as well as academic training so long as the expert possesses skill or knowledge greater than the average layman. Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 327-28 (3d Cir. 2002); First Union Nat. Bank v. Benham, 423 F.3d 855, 862 (8th Cir. 2005) (citing Fed. R. Evid. 702). Further, the factual basis for an expert's opinion goes to the credibility of the testimony rather than the admissibility, and it is up to the party challenging the admissibility of an expert's testimony to examine the factual basis for the opinions through cross-examination. Id.; see Tyler v. Union Oil Co., 304 F.3d 379, 393 (5th Cir. 2002) (holding that attempt to show that experts underlying data were unreliable is an issue to resolve upon cross-examination at trial). Indeed, where the parties' experts rely upon conflicting sets of facts, "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony" in determining whether they have appropriate expertise. Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d at 1392.

Pursuant, to Federal Rule of Evidence 704, expert testimony is not objectionable simply because it embraces an ultimate issue to be decided by the fact-finder. See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988) (recognizing that Federal Rules of Evidence 702 through 705 permit experts to testify in the form of an opinion, and without any exclusion of opinions on ultimate issues); United States v. Urbina, 431 F.3d 305, 311 (8th Cir. 2006) (affirming admission of expert testimony concerning *modus operandi* of drug traffickers because a court can allow opinion testimony if the expert's specialized knowledge is helpful to the fact-finder to understand the evidence or determine a fact in issue); Forrest v. Beloit Corp., 424 F.3d 344, 353 (3d Cir. 2005) (affirming expert testimony from biomechanical engineer that presence of a guard

would have prevented plaintiff's injury, because expert may offer testimony concerning ultimate issue in case). Ultimately, the Court must find that an expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. United States v. Lopez-Lopez, 282 F.3d 1, 14 (1st Cir. 2002) (affirming admittance of expert on the *modus operandi* of individuals importing drugs into the United States because expert's testimony was not within fact-finder's common knowledge); United States v. Taylor, 239 F.3d 994, 998 (9th Cir. 2001) (affirming admittance of academic expert on the relationship between pimps and prostitutes because it is not the subject of common knowledge).

## II. MR. BREWER'S EXPERIENCE AND QUALIFICATIONS

The Government is offering Mr. Brewer as an expert in the field of nuclear engineering with experience in nuclear reactor design, construction, testing, and operation. This Court has repeatedly qualified Mr. Brewer in these areas. See Wisconsin Electric Power Company v. United States, No. 00-697C (Fed. Cl. Oct. 10, 2007) (Tr. 5400:23-5401:2, 5421:15-18) (court accepted Mr. Brewer as an expert in the field of nuclear engineering, reactor regulation, nuclear plant and equipment design, and cost estimating regarding nuclear facilities); Boston Edison Co. v. United States, 80 Fed. Cl. 468, 477 n.12 (2008) (Mr. Brewer testified as an expert decommissioning-cost estimator); System Fuels, Inc. v. United States, 78 Fed. Cl. 769, 797 n.27 (2005) ("Mr. Brewer is a co-owner . . . [of] an engineering consulting firm for the commercial nuclear industry . . . [who] has over 30 years of experience in the nuclear industry, including the design, construction, and testing of operational nuclear reactors . . . [and was] admitted as an expert, pursuant to Fed. R. Evid. 702."); Tennessee Valley Authority v. United States, No. 01-249C (Fed. Cl. July 13, 2005) (Tr. 1844:19-1850:9) (Mr. Brewer accepted as an expert in field of nuclear engineering and cost evaluation regarding nuclear fuel handling and storage).

Mr. Brewer is a co-owner of ABZ, Inc., an engineering consulting company that performs work for the commercial nuclear power industry. Mr. Brewer has worked in the nuclear industry for more than 30 years and has experience in design, construction, testing, and operation of nuclear reactors and reactor systems. Def. A. 4.[3] As a consultant, Mr. Brewer has performed activities relating to regulatory interpretation, and he has extensive experience in the estimation of costs related to decommissioning nuclear power plants, which includes costs related to spent nuclear fuel management. Id. Mr. Brewer's work has required him to review the cost estimates of others as well as create cost estimates himself.

Mr. Brewer possesses a Bachelor of Science degree in electrical engineering from Louisiana Tech University, possesses a Master's degree in nuclear engineering from the Massachusetts Institute of Technology, and is a graduate of the Bettis Reactor Engineering School. Def. A. 27. For approximately 10 years, Mr. Brewer worked for the United States Navy, Division of Naval Reactors, where Mr. Brewer held progressively responsible positions relating to the design of nuclear reactors for submarines. Def. A. 38-42. In addition to his experience testifying before the Court of Federal Claims in spent nuclear fuel cases, Mr. Brewer has testified before an international arbitration tribunal concerning the misappropriation of engineering design

---

[3] "Def. A. _" refers to the appendix to this response brief. "Pl. Mot._" refers to Dairyland's Motion Dairyland's Motion In Limine to exclude Mr. Brewer's testimony, dated April 29, 2008.

information and before the New Hampshire Decommissioning Finance Committee regarding the funding of decommissioning for nuclear power plants serving New Hampshire residents. Def. A. 4.

## III. MR. BREWER'S OPINIONS

Mr. Brewer has analyzed the estimate offered by Mr. Todd Smith, an expert retained by Dairyland to establish and quantify Dairyland's damages. To fully appreciate Mr. Brewer's critique of Mr. Smith's estimate, the Court must first understand the nature of Mr. Smith's report.

### A. Mr. Smith's Estimate

Mr. Smith offers an estimate of the cost increase that Dairyland allegedly incurred when it recently completed removing its Reactor Pressure Vessel ("RPV"). Def. A. 46-47. Mr. Smith assumes that, if DOE had performed under the Standard Contract, all of the spent nuclear fuel ("SNF") in the spent fuel pool at the LaCrosse Boiling Water Reactor ("LACBWR") would have been removed from the site and that, "but for" DOE's partial breach of the Standard Contract, Dairyland would have elected to remove the RPV through an opening cut in the top of the reactor building, rather than through the side of the reactor building as has actually occurred.

The actual cost of the RPV removal project is well-defined. In 2007, Dairyland's contractor, Duratek Inc. ("Duratek"), completed work upon its contract with Dairyland for removal of the RPV at LACBWR. Mr. Smith estimated the cost of removing the RPV through the top of the reactor building at LACBWR - the "but for" world estimate - which he then subtracted from the cost of the Duratek contract to determine the "marginal cost" that Dairyland allegedly incurred because of DOE's partial breach of the Standard Contract. Def. A. 52.

According to Mr. Smith the cost difference between those two removal methods is $6,809,457. Def. A. 52.

B. Mr. Brewer's Critique Of Mr. Smith's Estimate

Mr. Brewer had numerous criticisms of Mr. Smith's estimate. First, even though Mr. Smith claimed that he based his "but for" world estimate upon costs quoted by specialty contractors who were performing similar work at LACBWR, a review of those quotes shows that Mr. Smith's estimate was, to a greater degree, based upon costs from contractors who were not performing similar work at LACBWR. Def. A. 7-9. Second, Mr. Smith inconsistently based his "but for" world estimate upon the assumption that, in the "but for" world, Dairyland would have elected to supervise and manage the RPV removal work itself, even though, in reality, Dairyland hired a contractor, Duratek, to do so, at a greater cost than Mr. Smith budgeted in the "but for" world. Def. A. 9-10. Third, Mr. Smith's estimate shows cost savings for materials and activities that are actually the same in both the actual and "but for" worlds. Def. A. 11-14. Fourth, Mr. Smith failed properly to account for the costs that would have been different in the "but for" world. Def. A. 15-16. Fifth, Mr. Smith failed to provide a technical justification for the structural work that would have been needed to remove the RPV through the top of the reactor building. Def. A. 16-17. Finally, Mr. Smith's "but for" world estimate included a "contingency" cost, even though Mr. Smith failed to explain how he determined that figure. Def. A. 18-19.

As discussed in detail below, in reaching his opinions regarding Mr. Smith's estimate, Mr. Brewer reviewed each of the costs that Mr. Smith included in his "but for" world estimate. Mr. Brewer reviewed the basis for each of those costs and, applying the knowledge and experience that he uses in performing similar work, such as decommissioning cost estimating for

other nuclear utilities, Mr. Brewer critiqued Mr. Smith's cost estimate and offered an opinion regarding Mr. Smith's estimate based upon Mr. Brewer's knowledge and experience.

C. Mr. Brewer's Other Opinions

Mr. Brewer also offered several opinions that did not respond to Mr. Smith's estimate. First, Mr. Brewer offered the opinion that two studies performed by one of Dairyland's contractors, WPI, would have been required regardless of when DOE accepted Dairyland's SNF. Def. A. 20. Second, Mr. Brewer concluded that the operations and maintenance ("O&M") costs of storing SNF at LACBWR do not depend upon the amount of SNF stored in the spent fuel pool. Def. A. 20-21. Finally, Mr. Brewer offered the opinion that, in the "but for" world, Dairyland would have incurred costs to transfer its SNF to DOE. Def. A. 21-25. In this endeavor, Mr. Brewer discussed the factors that affect the cost of maintaining a spent fuel pool and the activities that would be required if Dairyland had been required to load SNF into DOE casks. Mr. Brewer then applied his knowledge and experience to offer his opinions.

IV. MR. BREWER'S OPINIONS REGARDING MR. SMITH'S ESTIMATE ARE RELIABLE

Dairyland's primary challenge to Mr. Brewer's testimony is that, although he has offered a critique of Mr. Smith's "but for" estimate, he has not offered an alternative estimate of his own. Pl. Mot. 4-8. Dairyland asserts that, because Mr. Brewer has not developed an alternative estimate, he has failed to apply a reliable methodology to form his opinions. Id. Dairyland's criticism of Mr. Brewer's opinions is without merit and, indeed, amounts to a veiled attempt to inappropriately to shift the burden of proof regarding damages to the Government.

First, Dairyland cites to no legal authority for its contention that it is improper for an expert to offer a critique of a damages model without offering an alternative model. Indeed,

contrary to Dairyland's novel and unsupported contention, courts have routinely allowed expert critiques of damages models without offering an alternative model. See generally California Fed. Bank v. United States, 54 Fed. Cl. 704 (2002) (accepting defendant's expert's critique of plaintiff's damages model without requiring defendant's expert to offer alternative model), aff'd, 395 F.3d 1263, 1271 (Fed. Cir. 2005); Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 827-828 (2001) (accepting experts' critiques of Government's expert's damages model in counterclaim without requiring experts to offer alternative model), aff'd, 308 F.3d 1283 (Fed. Cir. 2002).

Second, Dairyland's complaints about Mr. Brewer's opinions fail to recognize that the burden of demonstrating the "but for" world for purposes of establishing an entitlement to the recovery of damages falls squarely upon Dairyland, not the Government. Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004); see San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (plaintiff must show that, "but for" the breach, the damages alleged would not have been suffered) (emphasis added); Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960) (holding that the loss must be one which the non-breaching party can show that, "but for" the breach of contract, would not have been suffered); Bluebonnet Savings Bank v. United States, 67 Fed. Cl. 231, 238 (2005) (holding that, because plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible "but for" world); Southern National Corp. v. United States, 57 Fed.Cl. 294, 306 (2003) (rejecting plaintiffs argument in Winstar case that they were not required to provide detailed evidence of the but-for world to recover expectancy damages); Coast Federal Bank v. United States, 49 Fed.Cl. 53, 55 (2001) (holding that plaintiff bears the burden of propounding a realistic but-for scenario). To the extent that Mr. Smith's opinion lacks sufficient evidentiary

support or otherwise lacks credibility, the Government need not offer an alternative damages estimate. See Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 107-08 (2004) (rejecting plaintiff's expert's damages model because it was not based upon sufficient factual evidence and was not credible).

Third, Dairyland's contention that Mr. Brewer has presented no methodology is without merit. Mr. Brewer explained in his deposition that he is offering a qualitative analysis of Mr. Smith's estimate:

> Q. With what parts of Mr. Smith's evaluation of the differences between the scope of work required in the actual world versus the world without spent fuel in the pool do you disagree?
>
> * * *
>
> THE WITNESS: Let me make sure I don't give the wrong impression with my answer. There are places where my disagreement is not with the scope of work required, but with the cost estimated for that scope. There are some places where I think there is issue with scope and, for example, the one -- the one place where that would occur is inthe whole question about what happens to the biological shield wall, because I think, in the – in Mr. Smith's but-for world costs calculation, there's no costs associated with the removal or decontamination of that -- that wall, even though I think he testified that he did not include the cost of disposal of the concrete blocks because he believed that would happen in both worlds. Given that belief, then there has to be a cost to remove that wall in the but-for world. That cost could be equivalent to the costs removal in the actual world. I think there's a scope in that one. I think there's potential -- there's a couple of other comments I made where I think there's possible scope issues and I think they're less definitive, because I don"t know that I have information which would let me be more definitive, other than there appears to be a concern here, but without additional information of various kinds, I can't say for certain, and I certainly can't say what the cost implication of those things would be.

Def. A. 68.

Mr. Brewer also explained the methodology that he employed in his critique of Mr. Smith's estimate:

> Q. What methodology did you utilize to reach that conclusion?
>
> A. My methodology was to review the basis and method by which Mr. Smith calculated those costs -- the but-for world costs, evaluate how I or ABZ would have evaluated such costs, and I believe that in the end, there are significantly unsupported and, in some cases, I believe, just inaccurate assumptions.
>
> In other cases, I think there are situations where the estimated cost is significantly underestimated. There's a much better way to estimate the costs than what has been done. And -- and when I take those into consideration, it would change the answer very substantially.
>
> Given that, that's the basis for my conclusion.

Def. A. 69.

Further, Mr. Brewer related his experience to his critique of Mr. Smith's work:

> Q. Is there a name for the methodology you use to reach the conclusion that Mr. Smith's analysis is so flawed that it should not be considered?
>
> A. There is no textbook name for that. There is no textbook name for the method by which I do decommissioning cost estimates either. It is part and parcel of the normal engineering evaluation of anything.
>
> An engineer doing any kind of work would look at the available information and, if a result were calculated, he would then look at all the available information and -- and determine is there a reason my calculation is consistent, inconsistent, different from this other data point or other data points I might have.
>
> And in the absence of understanding why it's different, most engineers would have a hard time trying to go forward with that.
>
> So I -- you know, I think this is – it is not different than an engineering evaluation that one would do for reviewing stress calculations. In this case, it just happens to be a cost estimate. It would be the same method I have used in more than one instance

> of doing estimate reviews of decommissioning cost estimates from other people.
>
> And we've -- I've done that in the past, and we talked about at least one of those instances earlier, the Mass AG report. I've done reviews for other people of other people's estimates, and it's the same kind of thing; it's comparing my understanding of how to create the estimate, understanding how the estimate was created and saying are the assumptions and choices made in creating that estimate the best choices that can be made or supportable. And -- and it's that methodology that I've used here.

Def. A. 70.

Rather than *ipse dixit*, as Dairyland suggests, Mr. Brewer explained that his methodology is subject to replication by other experts:

> Q. Is your methodology -- and I'm particularly focusing on the part that enabled you to reach a conclusion that Mr. Smith's estimate is so flawed that it should not be considered a reasonable basis for the calculation of marginal costs.
>
> Is your methodology capable of being tested by others in the field?
>
> A. Sure. But let me say this: The -- the conclusion -- that conclusion is, in large part, driven by the fact that when I look at the estimate, absent the contingency, the but-for world estimate is about $9.4 million. I believe there are at least three instances where there is good and sufficient reason to say that the more appropriate number is as much as 3 million more than that.
>
> An estimate of $9 million with what I believe to be a $3 million mistake in it is not reliable for any purpose by my estimation.
>
> Is there a handbook that says that 3 out of 9 is not reliable? No, there's no such handbook.

Def. A. 70.

Mr. Brewer's methodology, based upon his experience applying well-established practical principles, is more than sufficient to allow him to offer expert opinions in this case. See First Tennessee Bank Nat. Assoc. v. Barreto, 268 F.3d 319, 334-35 (6th Cir. 2001)

(accepting expert testimony based upon expert's own practical experiences throughout 40 years in the banking industry); First Union Nat. Bank v. Benham, 423 F.3d 855, 862 (8th Cir. 2005) (allowing for qualification of expert based upon knowledge, skill, experience, training, or education); Betterbox Communications, 300 F.3d at 329 (affirming expert testimony based upon personal knowledge or experience rather than a methodology that satisfies the Daubert factors).

V. MR. BREWER'S OPINONS REGARDING MR. SMITH'S ESTIMATE ARE USEFUL

Dairyland also contends that Mr. Brewer's opinions are not useful to the Court because they are merely based upon logic and Mr. Brewer's preference for real world data. Pl. Mot. 8-19. However, Dairyland has it backwards. Mr. Smith's estimate is flawed because he has based his estimate upon unreliable data and faulty logic while Mr. Brewer attempts to alert the Court to these deficiencies based upon the application of well-established engineering principles. Ultimately, Dairyland's arguments to exclude Mr. Brewer's opinions are a veiled attempt to harbor Mr. Smith's estimate from scrutiny.

As Mr. Brewer explained in his deposition, actual data regarding the cost of an activity tends to be a more reliable indicator than an estimate:

> Q. Well, the three instances where you've said that -- where you're claiming that you've come up with an alternative cost, you're simply pointing to parts of the Duratek proposal that lists out prices and you're -- you're referring to your conclusion that Mr. Smith should have relied on those subprices in the Duratek proposal, correct?
>
> A. That's an oversimplification of what I said and what I think I just said.
>
> There's real-world data, for example, for what it costs to grout the reactor vessel. There may be reason in a particular instance, a particular but-for world assumption to assume a different cost, but the only reason to assume a different cost than what's being paid

> for in the actual world is a definable difference in scope or condition for that activity.
>
> Absent that, it is an unreasonable choice for any estimator to make that it suddenly can be done much cheaper.
>
> I mean, the implication is if one could simply do it at a very small fraction of the cost in the actual world, then Duratek is absolutely ripping off Dairyland. So either the work can be done that much cheaper or it can't, and in the actual world, it's not.
>
> Dairyland judged the value of the activity, obviously concluded it was rational and reasonable because they signed the contract, there is no demonstrable difference -- there is no difference in scope, there's no good reason to pick a different number.

Def. A. 71.

Dairyland complains that Mr. Brewer is inconsistent in his criticism of Mr. Smith's use of quoted costs from specialty subcontractors. Pl. Mot. 12-13. However, Mr. Brewer actually commented upon Mr. Smith's selective use costs obtained from some specialty subcontractors:

> Section 5.1.1 of your -- your report, where you seem to complain that Mr. Smith did not use even more inputs from specialty contractors who were actually doing the work.
>
> Is that --
>
> A. It's a mischaracterization of my comment, I think. So let me try to explain my comment.
>
> My comment is really this: That I believe, in his deposition, Mr. Smith was asked why is his estimate reasonable? And I believe the explanation that was given was that it's because he used inputs from people doing the work at LACBWR.
>
> The fact is, I believe, when one looks at the costs that he got from those companies, it's less than half of the total cost. So while that might be part of a rationale for defending an estimate as being reasonable, I'm not sure why it -- getting half of the costs is suddenly the basis for asserting that all of the costs are reasonable.

> So it's not -- I'm not even suggest -- I'm not suggesting he needed to get other estimates from people doing the work. There are a lot of ways one can create an estimate and support it as being reasonable. That would be one way.
>
> But my issue is that that's the -- that's my understanding of his explanation of why his total estimate is reasonable, and I'm not sure I get that.

Def. A. 72. Mr. Brewer also criticized Mr. Smith's decision to reduce the cost of studies in his "but for" world estimate based upon the costs in the Duratek contract without obtaining an understanding for the basis of those costs and Mr. Smith's arbitrary choice of a contingency in his "but for" world estimate. Def. A. 15. Although Dairyland implies that Mr. Brewer's criticisms are arbitrary, the point is that Mr. Smith made assumptions in calculating his estimate without explaining, or even considering, how these assumptions would affect the analysis.

Dairyland also argues that Mr. Brewer's criticism of Mr. Smith's assumption that Dairyland would not have hired a contractor to manage the RPV removal project in the "but for" world is flawed because it is based solely upon "logic." Pl. Mot. 13-14. Again, Mr. Brewer explained why making disparate assumptions in the two worlds gives rise to an inaccurate cost estimate:

> Q. But do you have an opinion that it would have cost Dairyland less to have self-performed?
>
> * * *
>
> THE WITNESS: For the same -- for doing the same thing, either -- in the actual world, it most likely would -- could -- it could cost less. And I say "it could cost less" because I'm not paying profit to this extra person, I'm not paying for them to absorb risk. But if, in fact, I have to go hire staff augmentation people to manage the self-performance, it may depend on how many of those people and what types of people I've got to hire.

> But by and large, because of the things I said before, self-performance would be less expensive in general for any given scope of work, because if I hire a general contractor, part of what I'm paying him for is the acceptance of risks that I want to get rid of it. And so almost -- almost certainly, that would be a more expensive process.
>
> I think it's possible that in some particular set of circumstances, that -- the distinction may not be very large, but I think as a general fact, that is probably true.

Def. A. 73.

Dairyland also suggests that Mr. Brewer's criticism that Mr. Smith fails to account for cost differences arising from the same activity in both the "but for" and actual worlds is not useful because it is based merely upon "reason." Pl. Mot. 14-15. Mr. Smith claims that the cost of filling the internal cavity of the RPV and RPV shipping container with grout would have been $700,000 less in the "but for" world than it was in the actual world. Def. A. 11-12. Mr. Smith also finds over $1 million in savings on the cost of the shipping container used to transport the RPV to the low-level radioactive waste site without explaining why that shipping container would be different in the "but for" world. Def. A. 12-13. Mr. Smith concludes that the cost of cutting piping nozzles and other connections to the RPV would have been almost $1.5 million less in the "but for" world, even though that same activity was necessary in the actual world. Def. A. 14-15. Conversely, Mr. Smith excludes the cost of removing the biological shield around the RPV in his "but for" world estimate, even though that activity certainly would have taken place in the "but for" world as well. Def. A. 15-16. Mr. Brewer, understandably, took issue with each of these discrepancies because Mr. Smith failed to explain why he concluded that there was a cost difference for identical activities that took place in both worlds, and Mr.

Brewer explained the reasons that Mr. Smith's assumptions are either unfounded or inappropriate. Def. A. 11-16, 57.

Dairyland argues that Mr. Smith's failure to provide adequate engineering analysis for his assumption that the RPV could be lifted through the top of the reactor building is "speculation." Pl. Mot. 17-18. Removing the RPV through the top of the reactor building at LACBWR would have been a challenging task. When loaded with grout, the RPV would have weighed at least 175 tons. Lifting the RPV through the top of the reactor building would have required lifting the RPV, which is approximately 39 feet in length, at least 100 feet from its base to clear the upper most section of the containment dome. To get the RPV though the top of the reactor building, an opening in the top of the reactor building would have been needed. That opening, which Mr. Smith assumed to be approximately 12 feet in diameter, would have had to be cut through the containment dome, which is composed of steel. However, as Mr. Brewer noted, cutting a hole in the top of the reactor building is similar to removing the keystone in an arch - the piece being removed is essential to structural stability. Def. A. 17. Further, at the top of the containment shell, there is a 42,000 gallon storage tank and associated equipment and piping" through which an opening would have been needed and through which the RPV would have to be safely negotiated if it were removed through the top of the reactor building. Even before the RPV could have reached the top of the reactor building, the RPV had to fit between the girders of a polar crane that may not have been wide enough to accommodate the width of the RPV. Mr. Smith did not analyze any of these issues and ignores the scope of work required. Thus, it is Mr. Smith's estimate, not Mr. Brewer's criticism, that is speculative.

The fact that Mr. Smith ignored important real world data without providing a logical explanation for doing so does not make Mr. Brewer's opinion less useful to the Court. Rather, it

demonstrates why Mr. Smith's estimate is not credible. Where the parties' experts rely upon conflicting sets of facts, "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony" in determining whether they have appropriate expertise. Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003). For that reason, the Court should not exclude Mr. Brewer's opinions regarding Mr. Smith's estimate.

## VI. MR. BREWER'S OTHER OPINIONS ARE ADMISSIBLE

Dairyland also claims that Mr. Brewer's opinions regarding WPI costs, the O&M cost of running a spent fuel pool, and the costs that Dairyland would have incurred to load DOE casks are not admissible because Mr. Brewer is not applying any specialized knowledge that is helpful to the Court. Pl. Mot. 19-24. As discussed below, each of these opinions is admissible.

In offering each of these opinions, Mr. Brewer is relying upon his background as a nuclear engineer with almost 20 years of experience in estimating the costs for storing and transporting SNF out of a utility's spent fuel pool in connection with decommissioning cost estimates. Thus, Mr. Brewer relies upon well-established cost estimation techniques that he has employed for numerous utilities in the course of decommissioning cost estimation. Indeed, Mr. Brewer's estimates have been accepted by public utility commissions, state agencies, and nuclear insurance companies. In addition, Mr. Brewer has testified before state regulators on the adequacy of a particular decommissioning cost estimate and assisted in the preparation of testimony for rate hearings on decommissioning trust funding. Similarly, Mr. Brewer has prepared reports for state regulators concerning issues and evaluating cost estimates for decommissioning, low-level waste disposal, and extended spent fuel storage. In fact, Mr. Brewer has provided training to state regulators on both decommissioning technology and on the methodology of decommissioning cost estimating.

Dairyland argues that Mr. Brewer is not qualified to offer an opinion regarding the WPI studies because he has no experience characterizing spent nuclear fuel. Pl. Mot. 20. However, the relevant experience regarding this opinion is in determining what tasks would be necessary for Dairyland to decommission LACBWR regardless of DOE performance. As noted above, Mr. Brewer has extensive experience in that area. While admitting that Mr. Brewer's opinion regarding O&M costs is "essentially undisputed," Dairyland suggests that such an opinion does not aid the Court. Pl. Mot. 21. However, most of Dairyland's damages are O&M costs. Thus, if the Government prevails in its position that Dairyland's spent fuel pool would not have been emptied by the end of 1998 even if DOE had performed pursuant to the Standard Contract, most of Dairyland's damages would be eliminated. In that event, this opinion would be very useful to the Court in determining damages in this matter.

Finally, Dairyland argues that Mr. Brewer's opinion regarding the cost of loading the DOE supplied cask is not based upon sufficient data and is not legally relevant. Pl. Mot. 21-24. Once again, Dairyland fails to understand that it has the burden of proving damages. Consequently, the import of Mr. Brewer's opinion is to show that Dairyland has failed adequately to support its damages claim. Further, Dairyland's claim that Mr. Brewer's opinion is not legally relevant is an issue which this Court has not yet decided. It is up to this Court, not Dairyland, to decide whether Mr. Brewer's opinion is legally relevant.

## CONCLUSION

For the foregoing reasons, Mr. Brewer's expert opinions are relevant, reliable, and admissible. Therefore, Dairyland's motion to exclude his testimony should be denied.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell A. Shultis
RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SONIA ORFIELD
SCOTT SLATER
ANTHONY MOSES
Trial Attorneys
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

May 15, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 15th day of May 2008, a copy of foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE WARREN K. BREWER'S TESTIMONY " was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Russell A. Shultis