**Software Quality Assurance**

Developed methods for verification and validation of expert system computer codes based on industry guidelines and accepted criteria for conventional codes. Applied these methods to systems developed and discussed above. Presented lecture to the NRC on methods of verification and validation as part of a lecture series on software quality assurance. Authored paper for ASME meeting in the Fall of 1990 on the subject of expert system verification and validation.

**1986 - Pickard, Lowe and Garrick, Inc.**

Consulting Engineer.

Conducted detailed review of technical specification surveillance test requirements for a nuclear power plant. This included detailed review of the implementing programs and procedures, and providing detailed comments for procedure revisions to ensure regulatory compliance. In this review, primary responsibility was for electrical and instrumentation and controls functions, particularly control of emergency core cooling systems and primary containment isolation.

Conducted detailed review of technical specification requirements, technical specification basis, regulatory background, industry practice and implementing procedures at a nuclear power plant for required logic system functional testing and simulated automatic actuation testing of emergency core cooling systems and primary containment isolation. This work involved review of procedures against detailed system schematics to determine the adequacy of the procedures. Formulated procedure changes and technical response to solve a long-standing regulatory concern with the adequacy of these tests.

Reviewed plant-specific probabilistic risk assessment (PRA). Along with general evaluation, provided assessment of operational considerations and/or lessons resulting from the PRA.

Participated in procedure review and upgrade project. This project involved review of operations procedures as well as surveillance test procedure and preparation of revised procedures to improve technical accuracy and content, and to incorporate human factors considerations for enhancing ease of use and strict compliance.

**1982 - 1986 - United States Navy, Division of Naval Reactors.**

Head, Reactor Plant Systems - New Design Submarine.

Lead responsibility for reactor plant performance, safety and quality.

Conducted various trade-off studies to establish overall design criteria for new design reactor and propulsion plant. This included evaluation of possible performance maintainability, survivability, constructability and cost. Established general design characteristics for further development.

Evaluated various proposed core designs to determine optimum design to fit overall propulsion plant design goals. This included evaluation of thermal hydraulic performance, safety evaluation, normal plant response analysis and reactor structural design assessment, including response under shock loading.

Reviewed and approved conceptual system designs, performance criteria and detailed design bases. As design progressed, this included increasing levels of detail to system design descriptions, design calculations, component sizing, system schematics and construction details.

Participated in design of major plant components to ensure structural soundness, compliance with overall design goals and ability to interface with other systems and propulsion plant arrangement.

Reviewed and approved design of reactor plant structures, such as component foundations. This was very important since effort was made to optimize designs to conserve weight and space while still meeting shock design requirements, satisfying construction constraints and retaining life-cycle maintainability. This work included detailed review of shock analysis and formulation of design modifications to eliminate areas of non-conformance. Also reviewed and approved arrangement and support of major piping to ensure structural capability and maintain adequate flexibility to account for all operating conditions, including ship motion.

Reviewed and approved plant arrangements. This involved participation in audits of the full-scale plant mockup, as well as drawing reviews. The reviews of the full-scale mockup focused on ensuring plant equipment was arranged so that ease of operation and maintenance were maintained within the technical constraints for performance and function.

Reviewed reactor and plant control system designs for compatibility with mechanical system designs and core performance and capabilities.

Reviewed and approved operating transient response predictions to be used in life-cycle evaluations of plant. This included detailed analysis of the reactor core response to various operating and abnormal transients, coupled with the connecting system responses. Thus, this involved evaluation of the core design thermal hydraulic response, as well as the dynamic fluid system response of primary and secondary systems.

Developed life-cycle plant operating profile based on mission requirements and data from previous submarine classes. This profile was used in establishing the detailed core design parameters necessary to achieve the desired core lifetime.

Had lead responsibility for design initiatives to mitigate the consequences of complete loss of AC power and to ensure safety of surrounding population if this type event occurred near port.

Participated in extensive effort to reduce plant weight. This involved evaluation of new materials, unique construction ideas, significant system design change from past practice and alternative design criteria. Each idea evaluated was considered for its total effort on capability, constructability, life-cycle cost and maintainability.

Participated in Naval Reactors crew quizzes for crews of operating submarines to test knowledge and ability of ship crew to safely and efficiently operate the propulsion plant. Responsibility was mainly for testing in the area of reactor plant mechanical system operation.

**1980 - 1982 - United States Navy, Division of Naval Reactors.**

Head, Reactor Plant Systems - TRIDENT Submarines.

Supervised engineering group. Directed efforts concerning design, construction, operation, maintenance, testing and configuration control of reactor plant fluid systems and structures for TRIDENT submarine. Similar duties in connection with land-based TRIDENT reactor plant prototype.

Responsible for shock design of shipboard reactor plant components and structures. Similarly, responsible for seismic design of structures, systems and components unique to land-based prototype. Seismic design was done to the same criteria imposed on commercial nuclear power plants.

Developed inservice test (IST) and inservice inspection (ISI) program for land-based prototype conforming to ASME Code, Section XI. Thus, these programs were in compliance with the requirements imposed on commercial nuclear power plants.

Responsible for design, acceptance testing, operation and maintenance procedure for emergency core cooling system for the land-based prototype. This system was designed to comply with NRC requirements imposed on commercial power plants for similar systems. This also included design of remote shutdown capability, ultimate heat sink and remote operating station habitability systems for long-term cooling if the normal operating stations became uninhabitable.

Responsible for preparation of reactor plant operating, maintenance and test procedures. This included monitoring of the test program performance, evaluation of test results and resolution of test program problems.

Evaluated operation incidents and established corrective actions based on these evaluations. Corrective actions could include design change or procedure changes.

Evaluated and resolved construction deviations from specified requirements. Deviations were evaluated for effect on functional capabilities, structural soundness, and effect on operability and maintainability. These evaluations included evaluation of effect on core thermal hydraulic performance, system response and plant shielding, where applicable.

Participated in examination of prototype operating crews to evaluate level of knowledge and capability to safely operate the reactor plant.

Responsible for design, construction, operation and maintenance of support systems, such as process cooling water and associated cooling tower to support prototype operation.

**1976 - 1980 - United States Navy, Division of Naval Reactors.**

Project Engineer, TRIDENT Class submarine propulsion plant design.

Coordinated government laboratory and shipyard work in all phases of design, construction, operation, testing and maintenance of steam plant fluid systems for TRIDENT submarines and land-based TRIDENT submarine prototype.

Responsible for design of shipboard structures and piping systems in accordance with shock design criteria.

Responsible for preparation of verbatim compliance operating and maintenance procedures. This included performance of procedure verification and validation.

Responsible for design of safety systems unique to the land-based prototype, including compliance with NRC requirements for similar systems in commercial power plants.

Evaluated and resolved shipyard construction deviations for structures and systems under my cognizance. This included approval of as-built conditions of formulation, and approval of corrective actions.

Participated in the evaluation, analysis and resolution of large-scale shipyard error resulting in unapproved material substitutions. This involved tracking and identifying where incorrect materials had been used, evaluating and testing the acceptability of the material as-built, and approving the as-built condition or specifying the required rework.

**Testimony**

State of New Hampshire Decommissioning Finance Committee hearing on the Seabrook Nuclear Power Plant decommissioning funding, 1994

Mitsubishi Heavy Industries, Ltd (Japan) v. Finmeccanica S.p.A., Azienda Ansaldo (Italy), as successor in interest to Ansaldo S.p.A., International Court of Arbitration, Case Number 10269/OL/ESRT/TE, June 2001.

Tennessee Valley Authority v. United States of America, Case No. 01-249C, July 2005.

# Appendix B

**DOCUMENTS CONSIDERED**

Plaintiff production (Documents with PLAC, PDPC, DPID, DAP and SMIT prefix Bates numbers).

Plaintiff fact and expert witness depositions.

The following were relied upon in forming my opinions:

La Crosse Boiling Water Reactor Possession Only License

Expert Witness Report of Todd D. Smith, March 23, 2007

Deposition of Todd D. Smith, May 22, 2007

Deposition of Charles V. Sans Crainte, January 30, 2007

Deposition of Ivan F. Stuart, May 24, 2007

RPV Removal/Disposal & B/C Waste Disposal Contract, PLAC0049955-PLAC0050102

Duratek Project Status Report, August 2006, PDPC0033426

DPC Power Cooperative, La Crosse BWR Pressure Vessel Disposition Analysis, Phase 1 Report, SMIT0000062

Letter from Mark Kirshe (Duratek) to Roger Christians (DPC) dated April 6, 2005, PDPC0027567-PDPC0027581.

Duratek presentation concerning the phase 1 work dated July 6, 2005, PLAC0081001-PLAC0081030.

2003 LACBWR Decommissioning & Decontamination Cost Study Update, July 2003, PLAC0023723-PLAC0023745

WPI Phase 1, Task 2 - LACBWR RPV Activated Material Report, 2/19/2003, PLAC0000455-PLAC0000477

WPI Phase 1, Task 9 - LACBWR Spent Fuel Characterization Report, 12/5/2002, PDPC0007773-PDPC0007807

Maine Yankee Atomic Power Station, Decommissioning Costs Analysis, October 28, 1997, Appendix C, Pages 3 and 9 of 9.

<u>Facility Interface Capability Assessment (FICA) Project Cask Handling Assessment La Crosse BWR</u>, NAC C-8802800, October 1990

Deposition of R. Alan Chapman, February 23, 2005, 181:7-183:1 in Tennessee Valley Authority v. United States of America, Case No. 01-249C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

EXPERT WITNESS REPORT OF TODD D. SMITH

## I. Introduction and Approach

I have been asked to prepare this report to describe what would have been a reasonable cost to perform the removal of the Dairyland Power Cooperative (DPC) LaCrosse Boiling Water Reactor (LACBWR) site's Reactor Pressure Vessel (RPV) assuming the United States government had accepted spent nuclear fuel and high level radioactive waste (spent fuel) under the terms of its 1983 contract with the plaintiff, Dairyland Power Cooperative (DPC). DPC owns one nuclear facility, LACBWR, located in Genoa, WI and covered by the contract with the government (via the U.S Department of Energy, DOE) for spent fuel removal. It is well known and accepted that the government has not satisfied it obligations of that contract, having failed to remove spent fuel from any utility. I describe in this report how the LACBWR site could have reasonably removed and disposed of its RPV assuming the government had performed under the terms of the 1983 agreement with the utility and I have developed an associated RPV removal cost estimate (the non-breach scenario). I have also described how the utility is currently removing and disposing of the RPV and the consideration given to the current methodologies based on spent fuel still being stored on site (the breach scenario). Finally, I considered the cost estimates for each of the breach and non-breach approaches to come up with the marginal costs to DPC based upon subtracting the non-breach estimate from the breach estimate.

In reaching my conclusions, I have considered information contained in a number of documents related to the construction methodologies of specialty contractors who are experts in the industry on the removal, packaging, transporting and disposal of RPV's. I have also considered cost estimates, actual costs and actual performances of these various specialty contractors who I have personally worked with on various commercial decommissioning projects over the past ten years. Appendix 1 provides a listing of the data and information I considered in forming

my opinions. Appendix 2 provides the details of the cost estimate and sequential schedule I developed in order to form my opinion under this "non-breach" scenario.

I have over 12 years of direct experience in the decommissioning of various nuclear facilities throughout New England. My work has included initial estimating of the costs to decommission commercial facilities, managing the entire business unit at three different commercial nuclear decommissioning projects with duties including management of the overall decommissioning budgets and schedules, management of the contracts and procurement departments, management of the waste packaging transport and disposal unit, the development of various decommissioning costs estimates to submit to the Federal Energy Regulatory Commission (FERC) totaling in excess of $2 Billion. I have testified in various FERC settings on these cost estimates and to date, have not had a single dollar of disallowed decommissioning expenditures due to imprudence. I have testified in federal courts regarding contract disputes with Decommissioning Oversight Contractors (DOC's) at two different decommissioning sites with total disputes in excess of $150 million. I received an MBA from Thomas College in 1999 and a B.S. in Accounting from Thomas College in 1992. I am being compensated at a rate of $250/hr to provide this expert witness service and additional details of my experience and qualifications to offer such an opinion, including my testimony over the past four years are included in this report under appendix 3.

## II. Detailed Approach to the RPV Removal Project in a Breach World

In order to develop a concept of how an RPV would be removed under a breach and a non-breach world, there needs to be a particular understanding of the similarities and differences between a breach and non-breach work scope as it relates to the variable. The variable within both the breach and non-breach world that dictates the approach to an RPV removal is whether or not the spent fuel is still located within the Reactor Building (RB) adjacent to the RPV.

Once it has been established that the spent fuel would still be present in the RB during the performance of this RPV removal work and direction has been received from the Nuclear Regulatory Commission (NRC) with respect to its "preferred method" of RPV removal, a breach world has been established along with a relevant work scope and associated costs. In particular, I understand that the NRC has directed that the RPV be removed out the side of the RB because of the presence of spent nuclear fuel within the RB.

As provided by DPC under the breach scenario of removing the RPV out the side of the RB, the Duratek proposal provides the following work scope for removing, packaging, transporting and disposing of the RPV:

In order for the RPV to be removed out through the side of the RB, a portion of the Bio-Shield wall, which completely surrounds the RPV, must be removed. This work scope consists of cutting the Bio-Shield wall out in block sections with

as many as 18 blocks averaging 11.5 tons per block for a total of ~206 tons of concrete cutting, rigging and removal.

Similar to the Bio-Shield wall, a portion of the RB wall will need to be removed to support the RPV removal pathway. This work scope consists of cutting the RB wall out in block sections with as many as 8 blocks averaging 7.75 tons per block for a total of ~62 tons of concrete removal.

Removal of the RPV through the side of the RB shell wall will require the removal of one polar crane support column. The polar crane was installed when the plant was built and rotates around the RB, acting as the main hoisting mechanism for the RB.

A large gantry system will then be assembled with the RB interior runway girders 40' long and 4' high and the RB exterior runway girders 70' long and 8' high. A temporary lifting device (TLD) will be erected onto the runway girders with the capacity to lift the RPV (as grouted), move it horizontally out the RB and lower it into the RPV shipping container staged adjacent to the RB.

Prior to the RPV being lifted and removed from the RB, it will be filled with grout (often referred to as "flowable fill") with a wet density of ~50lbs/cf. The RPV will be grouted in a series of lifts using an injection method so to allow grout cure time.

After the grout has cured, all of the Control Rod Drive Mechanisms (CRDM's) under the RPV and the outlet RPV nozzles attached to the exterior RPV walls must be cut away in order to free up the RPV for removal. There are 29 CRDM's and 28 nozzles with pipe diameters ranging from 2" diameter to 22" diameter with various pipe (carbon steel and stainless steel) thicknesses.

The RPV will then be removed out the side of the RB and lowered into the RPV shipping container. The RPV shipping container is fabricated in two sections. The RPV will be lowered into the bottom section of the shipping container, the top section of the container will then be rigged down over the RPV and seal welded to the lower section of the shipping container.

Once the RPV has been lowered into the RPV shipping container and seal welded, the annulus space between the RPV and the RPV shipping container will be grouted with medium density grout weighing approximately 70lbs/cf.

The entire package will be down ended, loaded onto a heavy haul trailer and transported to the north end of the LACBWR site where it will be trans-loaded onto a specially designed railcar.

Once secured to the rail car, the entire package (weighing approximately 466 tons) will be transported via rail to the Barnwell disposal facility in Barnwell, SC.

Upon arrival, the package will be transloaded from the rail car, onto a heavy haul trailer and transported to the disposal facility for final burial.

## III. Detailed Approach to the RPV Removal Project in a Non-Breach World

The approach taken to removing the RPV assuming a non-breach world was to develop a safe and cost effective approach assuming the elimination of the spent fuel from the RB. A work scope was developed to remove the RPV straight out the top of the RB as a reasonable means to accomplish the work scope. A "top removal" approach has been successfully performed at other commercial nuclear decommissioning sites. By using this "top removal" approach, two major work scopes now being performed under the breach world would be eliminated: the first work scope being the need to cut, rig and remove hundreds of tons of concrete from the bio-shield and RB walls respectively, the second would be the elaborate gantry system installation needed to support horizontal removal of the RPV. The details for this "top removal" approach are as follows:

In order for the RPV to be removed out through the top of the containment building, a section about 12' diameter .6" thick weighing approximately 1.5 tons would have been removed from the top of the RB. In addition, a section about 12' diameter .375" thick weighing approximately 1 ton of the water storage tank located at the top of the RB would have been locked down and removed.

Removal of the RPV through the top of the RB shell would not have required modification of the polar crane, as the outside diameter of the RPV will fit between the main girders of the polar crane when being lifted vertically.

A large capacity crawler crane would have been assembled just outside the RB adjacent to where the RPV will be lowered into the RPV shipping container.

Prior to the RPV being lifted and removed from the RB, it would have been filled with grout (often referred to as "flowable fill") with a wet density of ~50lbs/cf. The RPV will be grouted in a series of lifts using an injection method so to allow grout cure time.

After the grout had cured, all of the CRDM's under the RPV and the outlet RPV nozzles attached to the exterior RPV walls would have been cut away in order to free up the RPV for removal. There are 29 CRDM's and 28 nozzles with pipe diameters ranging from 2" diameter to 22" diameter with various piping (carbon steel and stainless steel) thickness.

The RPV would then have been removed through the top of the RB and lowered into the RPV shipping container. The remainder of the RPV grouting, down ending and transloading to the rails cars for transportation and disposal would have been the same.

## IV. Calculation of Marginal Costs of the Breach and Non-Breach Approach

Marginal costs exist between the RPV removal approaches due to the fact that RPV removal contract between DPC and Duratek in the breach world is greater than the RPV removal non-breach estimate. The approach to calculating these marginal costs is very direct as follows:

As provided by DPC, the overall cost to perform the work scope described in section II under a breach scenario is currently $17,625,423 mostly under a fixed price contract basis (I have not included certain DPC costs that would be consistent between the two approaches).

I have provided a reasonable estimate based on my direct experience with the work scope described in section III under a non-breach scenario totaling $10,815,966.

The phase I feasibility study performed by Duratek on disposing of the La Crosse Boiling Water Reactor (LACBWR) had six deliverables. Two of the six deliverables were specific to the breach world only and the other four would need to be considered under a breach or non-breach world. Therefore, 33% of the feasibility study was added to the breach world costs.

The non-breach world grouting estimate was developed based upon calculating the volume of grout needed to fill the RPV and the volume of grout to fill the annulus space between the RPV and its shipping container once the RPV has been loaded into it container. Calculations were derived from actual drawings of both the RPV and the RPV shipping container.

The fabrication of the RPV shipping container was developed from the drawings of the actual RPV shipping container used under the breach world. A quantity take off estimate was performed to calculate the pounds of steel to fabricate (at various thicknesses) and an estimated "per pound" fabrication price was used based on the complexities on this type of fabrication project. Transportation from the fabricator to LACBWR was included in this price.

Under the non-breach world estimate, nearly 268 tons of concrete cutting, rigging and removal (valued at $2,400,000 in DPC's current contract with Duratek) has been eliminated. However, the cutting of a 12' diameter hole in the top of the RB as well as the water storage tank (estimated at $83,123) for the vertical removal has been added. Other preparatory work in the non breach world prior to the RPV removal would have included "locking down" the upper cavity surfaces as well as locking down the interior of the water storage tank (together estimated at $18,702).

The RPV nozzle cutting work consists of cutting 22 RPV nozzles on the sides of the RPV (8 - 22" nozzles, 2 - 14" heavy wall nozzles, 12 small nozzles), the cutting of the 29 CRDM's as well as 11 other nozzles underneath the RPV.

The need to erect an elaborate gantry system (valued at $3,750,000 in DPC's current contract with Duratek) for horizontal removal of the RPV is eliminated and is replaced with the mobilization of a high capacity crawler crane (estimated at $1,000,000 in the non-breach estimate)

Packaging the RPV would have consisted of the following: to rig, lift and transport the RPV shipping container from site preparation area to just outside the RB, offload and upright the RPV shipping container, rig and lift the RPV into its shipping container and stand by during grouting and welding by other contractors, rig and down end the loaded RPV shipping container onto a heavy haul trailer, then transport to the north end of the site and transload onto the rail cars for transport to Dunbarton, SC.

Transportation of the approximate 466 ton total package measuring 40' long and 11' wide would be accomplished using a 12 axle heavy duty flat car, an 8 axle heavy duty flat car, special train service, two buffer cars and 1 passenger car. The package would be transported from Genoa, WI to Dunbarton, SC via rail. Once the package arrived at Dunbarton, SC, it would be transloaded onto a heavy haul trailer and transported the last distance (approximately 1 mile) to its burial spot at the Barnwell disposal facility.

There would have been no discrepancies in the RPV disposal costs under the breach or non-breach world; thus the same figure of $2,000,000 was used in the non-breach estimate. This figure is in line with my knowledge of RPV disposal costs as they relate to Barnwell's facility.

Consistent with all estimates of this magnitude and complexity, a contingency factor was applied to this overall non-breach work scope in order to account for the "known unknowns". Normally in a large scale commercial decommissioning estimate a contingency factor of 10% is sufficient due to the risk disbursed throughout several hundred million dollars of work. Considering the complexities of this RPV removal work scope within the overall decommissioning scheme, coupled with the fact that there are very few qualified contractors who have proven track records in performing such work successfully, a 15% contingency factor is warranted.

The overall marginal cost for the RPV removal, packaging, transportation and disposal scope of work are calculated be subtracting the non-breach estimate of $10,815,966 from the breach contract between DPC and Duratek of $17,625,423 for a total of $6,809,457 in marginal costs to DPC. Although the analysis between the breach and non-breach world is comprehensive and covers various tasks under the overall work scope, the majority of the damage stems from the difference in concrete cutting and cranes used with each application.

## V. Conclusion

The ultimate work scope under each scenario is the same in that the overall goal is the removal, packaging, transportation and disposal of DPC's RPV. However, as depicted in sections II and III of this analysis, the methods by which the goal is accomplished are very different. There are two major components that create this difference in the breach vs. non-breach world and contribute the vast majority of the marginal costs calculated. The first non-breach component is the elimination of roughly 268 tons of concrete cutting in the bio shield wall and the RB wall. The second non-breach component is the elimination of a sophisticated gantry system to support the horizontal removal of the RPV and replacing it with a large capacity crane to support vertical removal of the RPV. These two important factors in a non-breach world carry more than $5M in overall cost reductions. After consideration and comparison with the remaining work scopes to accomplish the RPV removal at DPC, final marginal costs total $6,809,457. End of report.

Signature: Todd D. [signature] Date: 7/23/07

**Appendix 1**
**List of Information and Documents considered in forming opinion**

- "A Proposal to Dairyland Power Cooperative For Phase II Disposition of the LACBWR Reactor Pressure Vessel", July 6, 2005, Duratek Services Inc, 140 Stonebridge Drive, Columbia, SC 29210
- Nuclear Regulatory Commission January 11, 2005 meeting minutes published January 14, 2005, Subject: Closed meeting with Dairyland Power Cooperative to discuss removal of the reactor pressure vessel at La Crosse Boiling Water Reactor
- DPC Power Cooperative La Crosse BWR Pressure Vessel Disposition Analysis Phase I Report, Duratek, (M-2005-023)
- www.bestplaces.net/col/ Cost of Living Index between Bangor, ME and Akron, OH
- http://tonto.eia.doe.gov/oog/info/wohdp/diesel.asp Historical Diesel Prices in the Mid West 2002 – 2006
- www.mapquest.com Distance From Youngstown, OH to Genoa, WI
- http://data.bls.gov/PDQ/servlet/SurveyOutputServlet Consumer Price Index Comparison of the Midwest 1999-2006
- Transportation Estimate from MHF Logistical Solutions to rail a 932,000lb package 40' long X 11' Wide from Genoa, WI to Dunbarton, SC.
- Quantity Take off and pricing estimate from Cianbro Corporation dated February 16, 2007 and March 5, 2007
- Dairyland Power Cooperative Memorandum dated December 29, 2006, December 29, 2005, December 28, 2004, September 30, 2004, and January 23, 2004. Subject: Insurance & Tax Rates
- Memorandum on Midpoint Salaries for Sample LACBWR Positions, January 23, 2007
- La Crosse BWR RPV Removal & Decommissioning Options, Bigge Power Constructors
- Dairyland Power Cooperative Purchase Order # 38559 Rev. 2 to Duratek for Phase II RPV Removal Work Scope
- Dairyland Power – Genoa, Craft 5541 Madison/WRV Ironworkers Local 383 Labor Rates Effective January 1, 2006 – December 31, 2006, Dated August 31, 2006
- 1994 Sargent & Lundy Appendix B One-Piece Removal of Reactor Pressure Vessel, MB544.D403 July 1994 Assuming Fuel was out of Reactor Building (a Non-Breach World)
- Diagram of RPV Package sitting on Heavy Duty Rail Cars, Duratek, June 1, 2005, Sketch No. C06012005
- Dairyland Power Cooperative Memorandum from Bob Brimer December 16, 1996, Subject: LACBWR Decommissioning Cost Study Monthly Meeting
- Dairyland Power Cooperative Disposition of the LACBWR Reactor Pressure Vessel, Appendix A – Project Execution Plan, Duratek, DRTK-2005-000261
- Email from Bob Brady, Shaw Brothers Inc. on the cost of "flowable Fill", February 12, 2007
- Various documents and contracts from Maine Yankee's Decommissioning project where an RPV removal work scope was performed
- Various documents and contracts from Connecticut Yankee's Decommissioning project where an RPV removal work scope was performed

- Bigge Drawing (Engr. No. 04E43) of RPV Downending Stand Assembly
- Communications with Bluegrass Inc. on the costs for cutting the RPV nozzles and CRDM's off the LACBWR RPV.
- Various communications with DPC's staff regarding details of the work scope under the non-breach approach

# Appendix 2
# Cost Estimates and Associated Details

3/23/2007

# RPV Removal Project
# Breach World

## 2005 Duratek Fixed Price Contract

| Description From Section 6 of Duratek Phase II Proposal | Amount |
|---|---|
| Licensing & Engineering | $ 2,400,000 |
| Grouting | $ 825,000 |
| Fabrication | $ 1,500,000 |
| Concrete Cutting | $ 2,400,000 |
| Nozzle Cutting | $ 1,800,000 |
| Gantry System | $ 3,750,000 |
| Packaging & Transport | $ 2,250,000 |
| Disposal | $ 2,000,000 |
| **Totals** | **$ 16,925,000** |

| Month of | RPV Removal Scope of Work | Monthly Cost | Phase Costs |
|---|---|---|---|
| Jul-05 | Phase I - Feasibility study (study addressed 6 issues, 4 are applicable to the breach and non-breach world and 2 issues are applicable to the breach world only) cost represents 33% of Phase I study | | $ 140,250 |
| Aug-05 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 612,739 | |
| Sep-05 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 513,810 | |
| Oct-05 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 463,810 | |
| Nov-05 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 430,834 | |
| Dec-05 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 530,834 | |
| Jan-06 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 381,905 | |
| Feb-06 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 322,548 | |
| Mar-06 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 322,548 | |
| Apr-06 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 290,953 | |
| May-06 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 290,953 | |
| Jun-06 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 347,858 | |
| Jul-06 | Phase II - Engineering, Licensing, Procedures, Procurement | $ 601,239 | |
| **Week of** | | | |
| 8/5/2006 | Initial Invoice for Phase II Work | $ 349,239 | |
| 9/4/2006 | Mobilize and train on the 6th and 7th | $ 946,335 | |
| 9/4/2006 | 701 floor - layout cores | | |
| 9/4/2006 | Build Bath tub for shield plugs | | |
| 9/4/2006 | Mobilize Extenda-boom Forklift, 110 ft JLG; 50t RT, hatch cart | | |
| 9/11/2006 | remove mezzanie platform; install hatch cart | | |
| 9/11/2006 | start scaffolding in Reactor Building | | |
| 9/11/2006 | begin siding removal for Reactor Building Closure | | |
| 9/11/2006 | 701 floor - core bores, cut and remove FB-4 | | |
| 9/11/2006 | finish Bath tub, stage shield plugs, build enclosure, layout cores, drill cores | | |
| 9/18/2006 | Reactor Building - Finish scaffolding and Siding | | |
| 9/18/2006 | Cut Shield Plugs | | |
| 9/25/2006 | Reactor Building (RB) - layout core holes Core upper holes | | |
| 9/25/2006 | bi-part door delivered on September 29th | | |
| 9/25/2006 | 701Floor - install handrail | | |
| 9/25/2006 | Shield Plugs - Bathtub and enclosure clean-up, remove enclosure | | |
| 9/25/2006 | Bio-Shield Wall (BSW)- start and finish scaffolding | | |
| 9/25/2006 | Polar Crane Mods (PCM) - layout holes and map rebar, start drilling | | |
| 10/2/2006 | Reactor Building - core lower holes | $ 843,573 | |
| 10/2/2006 | RB Enclosure - install door frame | | |

3/23/2007

## RPV Removal Project
## Breach World

| Month of | RPV Removal Scope of Work | Monthly Cost | Phase Costs |
|---|---|---|---|
| 10/2/2006 | 701 Floor - map and layout MB-10/17 holes, Drill holes start install colluns and brackets , core bores for FB1,2,3 | | |
| 10/2/2006 | BSW - layout cores and start coring; remove wall face platform | | |
| 10/2/2006 | PCM - finish holes , start mod installation | | |
| 10/9/2006 | RB - start cutting when polar crane mod work complete | | |
| 10/9/2006 | 701 Floor - finish install colluns and brackets | | |
| 10/9/2006 | BSW - Coring | | |
| 10/9/2006 | PCM - finish mod installation | | |
| 10/9/2006 | Mobilize - Large Fork lift, HTC or large RT | | |
| 10/16/2006 | RB - finish upper removal | | |
| 10/16/2006 | BSW - Coring | | |
| 10/16/2006 | RPV Feet trimming work | | |
| 10/16/2006 | Remove RPV Expansion seal | | |
| 10/23/2006 | RB - commence on lower cuts | | |
| 10/23/2006 | BSW - Finish Coring | | |
| 10/23/2006 | Install RB wall rocker bearings | | |
| 10/23/2006 | RPV Preps. - Cut and remove expansion Joint and Water seal | | |
| 10/30/2006 | RB - finish lower cuts and begin removal of scaffolding | | |
| 10/30/2006 | RB Closure - start bi-parting door installation | $ 909,525 | |
| 11/6/2006 | RB - Finish RB Scaffolding Removal | | |
| 11/6/2006 | Finish bi-parting door | | |
| 11/13/2006 | 701 Floor - start cut/ remove FB 1,2 3 | | |
| 11/13/2006 | Install Pipe supports for nozzle cutting | | |
| 11/20/2006 | 701 Floor - finish cut/ remove FB 1,2 3 | | |
| 11/20/2006 | Shield Plugs - demobilze bathtub | | |
| 11/20/2006 | Start BSW cutting | | |
| 11/20/2006 | RPV Preps - Install wheels stops | | |
| 11/20/2006 | install CRDM for nozzle cutting | | |
| 11/27/2006 | BSW Cutting and rigging | $ 988,668 | |
| 12/4/2006 | BSW Cutting and rigging | | |
| 12/11/2006 | BSW Cutting and rigging | | |
| 12/18/2006 | BSW Cutting and rigging | | |
| 12/25/2006 | BSW Cutting and rigging | $ 1,199,716 | |
| 1/1/2007 | BSW Cutting and rigging | | |
| 1/8/2007 | BSW Cutting and rigging complete | | |
| 1/8/2007 | Install BS wall rocker bearings, Recieve ganty | | |
| 1/8/2007 | Remove Remaining Accessible RPV insulation and coat accessible RPV ( if Required) | | |
| 1/15/2007 | Cut Recirc nozzles | | |
| 1/22/2007 | Cut Recirc nozzles | | |
| 1/29/2007 | Cut Recirc nozzles | $ 1,128,859 | |
| 2/5/2007 | Cut Recirc nozzles | | |
| 2/12/2007 | Cut MS nozzles | | |
| 2/19/2007 | RPV Preps - cut stablizers | | |
| 2/19/2007 | Cut misc nozzles | | |
| 2/26/2007 | Cut undervessel Q1 | $ 1,115,669 | |
| 3/5/2007 | receive test weights' set matting, stage test weights, place girders on 701floor | | |
| 3/5/2007 | Canisiter arrives at site - receive, unload and upend | | |
| 3/5/2007 | Cut undervessel Q2 | | |
| 3/5/2007 | Rail siding | | |
| 3/5/2007 | Mobilize - 90t rt, 14 lint Platform trailer, 250 t crane | | |
| 3/12/2007 | start gantry erection | | |
| 3/12/2007 | Cut undervessel Q3 | | |
| 3/19/2007 | gantry erection | | |
| 3/19/2007 | Cut undervessel Q4 | | |
| 3/26/2007 | finish gantry erection, perform gantry test and demob test weights, attached spreader beam, lift RPV and place in canister lower half | | |

3/23/2007

# RPV Removal Project
## Breach World

| Month of | RPV Removal Scope of Work | Monthly Cost | Phase Costs |
|---|---|---|---|
| 3/26/2007 | install lift lug, stage canister halves amd shielding, install scaffolding, remove RPV supports; remove remaining insulation ( if any) coat remaining sufrace ( if required) , grout lower portion of Canister | | |
| 4/2/2007 | Install any weather protection, | $ 1,115,669 | |
| 4/2/2007 | cut stablizers that remain ,if any, start Canister Preheat, Welding, NDE | | |
| 4/2/2007 | mobilize Rails cars and bolster to site | | |
| 4/9/2007 | RPV package - Canister Preheat, Welding, NDE | | |
| 4/16/2007 | Canister Preheat, Welding, NDE | | |
| 4/16/2007 | Install / Test HydrualicGanty systems | | |
| 4/23/2007 | Finish Canister Preheat, Welding, NDE, install shielding, grout remaining portion of canister | | |
| 4/30/2007 | Downend Canister and load on heavy hauler | | |
| 4/30/2007 | move canister on heavy hauler to rail siding | | |
| 5/7/2007 | load on rail car, tie down and remove trunnions | $ 851,859 | |
| 5/14/2007 | Demobilization Starts | | |
| 5/21/2007 | Demobilization Finish | | |
| 6/5/2007 | Final Invoice (Includes RPV Disposal price) | $ 2,365,863 | |
| | **Addendum's to Phase II RPV Removal Project** | | |
| 1 | Shield Plug Cutting and Removal $270K (Not in Breach scope of work) | $ - | |
| 2 | Technical and QA changes (no cost addendum) | $ - | |
| 3 | Supply Crane & Man-Lift for Enclosure Door Installation | $ 94,500 | |
| 4 | Additional Costs for NRC vs. DOT Approval of RPV Package | $ 63,018 | |
| 5 | All Labor and Bluegrass Stand - By Charges for Paint Abatement Delay | $ 137,062 | |
| 6 | Bigge Equipment Stand - By Charges for Paint Abatement Delay | $ 28,500 | |
| 7 | Technical and QA changes (no cost addendum) | $ - | |
| | | | |
| | **Phase II Costs** | | **$ 17,248,086** |
| | **Breach Costs of Duratek's Phase I & II RPV Removal Project** | | **$ 17,388,336** |
| | | | |
| | **DPC Costs Associated with the Breach only Scenario** | | |
| | Cost to purchase both RB Doors for Enclosure | | **$ 147,135** |
| | Sargent & Lundy engineering costs | | **$ 89,958** |
| | | | |
| | **TOTAL COST OF RPV REMOVAL UNDER BREACH SCENARIO** | | **$ 17,625,429** |

3/23/2007

# RPV Removal Cost Estimate
## Non-Breach World

| | Sequential Scope of Work | COMMENTS | CREW SIZE | DURATION (HRS) | LABOR RATE (HRLY) | LABOR COSTS | MATERIALS | SUBS | EQUIPMENT DURATION (MONTHS) | MONTHLY EQUIPMENT RENTAL RATES | TOTAL EQUIPMENT | | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Fabrication and Transport of RPV steel shell and rocker frame to site | See Estimate Details | | | | $ - | | $ 729,923 | | | $ - | | $ 729,923 |
| 2 | Remove three plugs from reactor cavity | DPC labor | 3 | 4 | $ 49.26 | $ 591 | $ - | | | $ - | $ - | | $ 591 |
| 3 | Install Lock down in upper cavity surfaces | Airless Sprayer $3,486, Coating 17gal @ $104/gal, labor is 20 hrs - DPC labor | 3 | 20 | $ 49.26 | $ 2,955 | $ 4,318 | | 0.25 | $ 5,000 | $ 1,250 | | $ 8,523 |
| 4 | Lock down interior of 42,000 gallon water tank at top of containment | 200sf of surface area, DPC labor | 3 | 40 | $ 49.26 | $ 5,911 | $ 1,768 | | 0.5 | $ 5,000 | $ 2,500 | | $ 10,179 |
| 5 | Remove Expansion Ring | DPC labor | 4 | 160 | $ 49.26 | $ 31,525 | | | | | $ - | | $ 31,525 |
| 6 | Fill RPV with 50lbs/cf flowable fill | See Estimate Details | | | | $ - | $ - | $ 68,080 | | $ - | $ - | | $ 68,080 |
| 7 | Fill the annulus between the RPV and the shell with grout (2 step process based on welding the 2 RPV package sections together) | See Estimate Details | | | | $ - | | $ 41,875 | | | $ - | | $ 41,875 |
| 8 | Cut 22 RPV nozzles on sides of vessel (8 - 22" nozzles, 2 - 14" heavy wall nozzles, 12 small nozzles), Remove bottom RPV nozzles (29 CRDM's and 11 other nozzles) | See Estimate Details | | | | $ - | | $ 355,000 | | | $ - | | $ 355,000 |
| 9 | Heavy Rigging contractor - receive and set up RPV canister on rocker frame, postion cranes around site,cut openigs in top of RB and storage water tank, rig RPV out top of containment, downend and transload to rail, replace cut opening in top of RB | See Estimate Details | | | | $ - | | $ 2,883,123 | | | $ - | | $ 2,883,123 |
| 10 | Transport package via rail to Barnwell's disposal facility in South Carolina | | | | | $ - | | $ 1,105,000 | | | $ - | | $ 1,105,000 |
| 11 | Dispose of RPV package at Barnwell | Duratek Actual Fixed Price Contract | | | | $ - | | $ 2,000,000 | | | $ - | | $ 2,000,000 |
| | | | | | | $ - | | | | | | | |
| | SUB-TOTALS | | 13 | 224 | | | | | | | | | |
| | MANAGEMENT TEAM | | | | | | | | | | | | |
| 12 | Independent Engineering - Sargent & Lundy | S&L rates are between $90/hr - $120/hr for DPC | 3 | 4680 | $ 105.00 | $1,474,200 | | $ 90,000 | | | | | $ 1,564,200 |
| 13 | Safety Engineer (August 2006 - June 2007) 3/4 TIME | Utilized appropriate 2006 salaries with 2006 adder of 66.30% for a "loaded" labor rate | 0.75 | 1907 | $ 56.71 | $ 81,097 | | | | | | | $ 81,097 |
| 14 | Licensing Engineer (April 2005 - June 2007) 3/4 TIME | Utilized appropriate 2006 salaries with 2006 adder of 66.30% for a "loaded" labor rate | 0.75 | 4680 | $ 56.71 | $ 199,057 | | | | | | | $ 199,057 |
| 15 | Contracts / Procurment Manager (April 2005 - June 2007) Full Time | Utilized appropriate 2006 salaries with 2006 adder of 66.30% for a "loaded" labor rate | 1 | 4680 | $ 69.87 | $ 327,014 | | | | | | | $ 327,014 |
| | | SUB - TOTALS | 18.5 | 16171 | | $2,122,351 | $ 6,086 | $ 7,273,001 | | | $ 3,750 | | $ 9,405,188 |
| | | Contingency | | | | | | | | | | 15% | $ 1,410,778 |
| | | Total RPV Removal Estimate | | | | | | | | | | | $ 10,815,966 |

Def. A. 59



Breach vs Non Breach analysis of DPC RPV Removal Project (2).xls
Non-Breach RPV Removal Estimate

## RPV Shipping Package Fabrication costs (Includes Transport to Site)

### Dairyland Package Fabrication Costs

| | width (inches) | length (inches) | thickness (inches) | SF | lbs |
|---|---|---|---|---|---|
| Package dimensions | | | | | |
| A516 Grade 70 Steel | | | | | |
| Main Cylinder 1.5" steel @ 61.2lbs/sf | 131.00 | 475.00 | 1.50 | 1,373 | 84,030 |
| Stiffening Ring | | | | | 2,192 |
| Hoisting Weldment | | | | | 8,000 |
| Shielding ring 96" long x 1.75" steel @ 71.4lbs/sf | 134.00 | 96.00 | 1.75 | 188 | 13,395 |
| Backing Steel Under Shielding | | | | 350 | 21,420 |
| Hoisting End Stiffeners (32) | | | | | 3,200 |
| Footing End Weldments (2) | | | | | 6,000 |
| End Plates (2) 4" steel @ 163.2lbs/sf | 131.00 | | 4.00 | 190 | 31,018 |
| Footing End W sections (W18X130) | | | | 32 | 4,160 |
| Plate above W Sections | | | | 44 | 3,614 |
| Downending Stand (From DPC Drawing) | | | | | 21,580 |
| Misc Supporting Steel for RPV Support inside package | | | | | 10,000 |
| **(1" plate = 40.8lbs/sf) Total Pounds to Fabricate** | | | | | 208,609 |
| **(Standard quote of $2.50/lb to fabricate) Fabrication Price Per Pound** | | | | | $ 2.50 |
| **Fabrication Costs** | | | | | $ 521,523 |

### Transport of Dairyland Canister

| | Miles | | | | |
|---|---|---|---|---|---|
| Transport Brilex Industries Youngstown, OH to Genoa, WI (Includes saddles, craddles and tie downs) (700 miles) | | | | | |
| Nine Axle transporter ($200/hr) at a speed of 25 miles per hour, 1 point vehicle ($50/hr), 1 rear vehicle ($50/hr), $200,000 for wire raisings, potential bridge reinforcing, misc. | 700 | | | | $ 208,400 |
| **Totals for Dairyland RPV Package & Transport** | | | | | **$ 729,923** |

## RPV Grouting Costs

### Dairyland Grouting

| | Radius (ft) | Length (ft) | Volume (cy) | | |
|---|---|---|---|---|---|
| RPV Package dimensions | 5.5 | 39.6 | 137.2 | | |
| RPV Dimensions | 4.2 | 37.0 | 74.7 | | |
| Volume of grout for outer annulus (cy) | | | 62.5 | | |
| **Estimate to perform the work** | | | | | |
| Grout Testing | | | $ 10,000 | | |
| Mobilize and set up for RPV internal grouting 5 persons 40 hrs @ $110/hr | | | $ 22,000 | | |
| Grout the internals 5 person crew 40 hours @ 110/hr | | | $ 22,000 | | |
| Grout for RPV Interior (94.0/cy @ $70/cy) | | | $ 6,580 | | |
| Pump Truck Rental 5 days @ $1,500/day | | | $ 7,500 | | |
| **Estimate to fill RPV with grout** | | | | $ 68,080 | |
| Mobilize and set up for annulus grouting 5 persons 20 hrs @ $110/hr | | | $ 11,000 | | |
| Grout the annulus to first RPV package section 5 person crew 20 hours @ 110/hr | | | $ 11,000 | | |
| Grout for Annulus (42.5/cy @ $70/cy) | | | $ 2,975 | | |
| Pump Truck Rental 2 days @ $1,500/day | | | $ 3,000 | | |
| Mobilize and set up for annulus grouting 5 persons 10 hrs @ $110/hr | | | $ 5,500 | | |
| Grout the annulus to the top of the RPV package 5 person crew 10 hours @ 110/hr | | | $ 5,500 | | |
| Grout for Annulus (20/cy @ $70/cy) | | | $ 1,400 | | |
| Pump Truck Rental 1 day @ $1,500/day | | | $ 1,500 | | |
| **Estimate to fill RPV Annulus with grout** | | | | $ 41,875 | |
| **Estimate for Grouting RPV** | | | | **$ 109,955** | |

| | |
|---|---|
| **RPV Heavy Rigging** | |
| **LaCrosse RPV Removal (2006 Contract)** | |
| RPV Weight 150 tons | |
| Grouted RPV weight 250 tons | |
| Mobilize rigging contractor | $ 400,000 |
| Engineering | $ 350,000 |
| Receive Heavy Lift Crane | $ 300,000 |
| Position and erect all lifting equipment | $ 700,000 |
| Cut a 12' diameter opening on top of containment large enough to allow for RPV passage | $ 25,000 |
| Rig, Lift and transport RPV shipping container from site preparation area next to Reactor Building, offload and upright RPV shipping container, rig and lift RPV into shipping container and stand by during grouting and welding by others, rig and down end loaded RPV shipping container onto heavy haul, transport to north end of site, transload onto rail for transport to Barnwell, SC | $ 750,000 |
| Order fabrication of a 13' diameter containment top cover | $ 8,123 |
| Cut opening in water storage tank large enough to allow for RPV passage | $ 25,000 |
| Install new 13' diameter containment top cover | $ 25,000 |
| Demobilize rigging contractor | $ 300,000 |
| **Total Lump Sum to Perform the work** | **$ 2,883,123** |
| **RPV Nozzle Cutting** | |
| **Dairyland** | |
| Cut 22 RPV nozzles on sides of vessel (8 - 22" nozzles, 2 - 14" heavy wall nozzles, 12 small nozzles), remove bottom RPV nozzles (29 CRDM's and 11 other nozzles) | $ 355,000 |
| **Grouted RPV Transport costs** | |
| **Dairyland** | |
| Rail transport from Genoa, WI to Barnwell, SC | |
| Total Package weight is Approx. 466 ton, 40' length and 11' width, 12 axle and 8 axle heavy duty flatcars, Special train service, 2 buffer cars and one passenger car | |
| Blocking and bracing of the load | $ 75,000 |
| Rail transport from Genoa, WI to Dunbarton, SC | $ 620,000 |
| Fuel Surcharge | $ 60,000 |
| Transload Package over road from Dunbarton, SC to Barnwell Facility | $ 350,000 |
| **Total Grouted RPV Transport Cost from LACBWR to Barnwell Facility** | **$ 1,105,000** |

3/23/2007

# RPV Removal Breach vs. Non-Breach Analysis

| LACBWR RPV Removal Project | DPC Contract with Duratek (Breach World) | Non-Breach World |
|---|---|---|
| **Phase I** | | |
| Feasibility study (study addressed 6 issues, 4 are applicable to the breach and non-breach world and 2 issues are applicable to the breach world only) cost represents 33% of Phase I study | $ 140,250 | |
| **Phase II** | | |
| Licensing & Engineering (Overhead) | $ 2,400,000 | $ 2,171,369 |
| Grouting | $ 825,000 | $ 109,955 |
| Fabrication | $ 1,500,000 | $ 729,923 |
| Concrete Cutting, Prep Work for RPV Removal | $ 2,400,000 | $ 50,819 |
| Nozzle Cutting | $ 1,800,000 | $ 355,000 |
| Gantry System (Breach) / Crawler Crane (non-breach) | $ 3,750,000 | $ 1,000,000 |
| Packaging & Transport | $ 2,250,000 | $ 2,988,123 |
| Disposal | $ 2,000,000 | $ 2,000,000 |
| **Addendum's to Phase II RPV Removal Project** | | |
| Shield Plug Cutting and Removal $270K (Not in Breach scope of work) | $ - | |
| Technical and QA changes (no cost addendum) | $ - | |
| Supply Crane & Man-Lift for Enclosure Door Installation | $ 94,500 | |
| Additional Costs for NRC vs. DOT Approval of RPV Package | $ 63,018 | |
| All Labor and Bluegrass Stand - By Charges for Paint Abatement Delay | $ 137,062 | |
| Bigge Equipment Stand - By Charges for Paint Abatement Delay | $ 28,500 | |
| Technical and QA changes (no cost addendum) | $ - | |
| **DPC Costs Associated with the Breach only Scenario** | | |
| Cost to purchase both RB Doors for Enclosure | $ 147,135 | |
| Sargent & Lundy engineering costs | $ 89,958 | |
| **Contingency on Non-Breach World Estimate** | | $ 1,410,778 |
| **Totals** | **$ 17,625,423** | **$ 10,815,966** |

**Estimate of RPV Removal under a "NON-BREACH" Scenario**

## Sequential Scope of Work

1 Fabrication and Transport of RPV steel shell and rocker frame to site
2 Remove three plugs from reactor cavity
3 Mobilize rigging contractor
4 Install Lock down in upper cavity surfaces
5 Fill RPV with 50lbs/cf flowable fill
6 Remove Expansion Ring
7 Cut 22 RPV nozzles on sides of vessel (8 - 22" nozzles, 2 - 14" heavy wall nozzles, 12 small nozzles)
8 Attach lifting lugs to RPV
9 Remove bottom RPV nozzles (29 CRDM's and 11 other nozzles)
10 Position and set up crane north of containment
11 Set rocker frame and temporary supports in place
12 Set steel shielding shell (1.5" thick steel) on rocker frame and temporary supports
13 Position railcar at north end of site
14 Lock down interior of 42,000 gallon water tank at top of containment
15 Rig crane to Containment top where opening is to be cut
16 Cut a 12' diameter opening on top of containment large enough to allow for RPV passage
17 Place the containment top piece in temporary storage location
18 Order fabrication of a 13' diameter containment top cover
19 Rig crane to overhead 42,000 gallon water storage tank
20 Cut opening in water storage tank large enough to allow for RPV passage
21 Place water tank piece in the same temporary storage location as the containment top
22 Modify the polar crane (last activity performed prior to activities related to direct removal of RPV). Assume manlifts for access
23 Rig the lift crane to the top flange of the RPV (custom fabricated rigging to fit RPV flange)
24 Lift the RPV through the opening in Containment
25 Lower the RPV into shielding shell located next to crane within the landing area
26 Fill the annulus between the RPV and the shell with grout (2 step process based on welding the 2 RPV package sections together)
27 After grout is cured, rotate the package to the horizontal position
28 Remove rocker frame from package
29 Load package onto heavy haul trailer
30 Transport package to rail car at the north end of the site
31 Lift the package from the heavy hauler onto the railcar
32 Install new 13' diameter containment top cover
33 Demobilize rigging contractor
34 Transport package via rail to Barnwell's disposal facility in South Carolina
35 Dispose of RPV package at Barnwell

**Appendix 3**
**Resume of Todd D. Smith**

## PROFESSIONAL EXPERIENCE:

### *Yankee Rowe 2005 - Present*

Executive Director of Business Operations - (Yankee Rowe Nuclear Facility, Rowe, MA) Responsible for the overall business operations of Yankee Rowe's decommissioning project. Oversee all Project Controls, Contracts, IT, Warehouse and Procurement functions during the decommissioning of Yankee Rowe. Duties include: contract negotiations, overall budgeting, cost control, complete downsizing plan, earned value performance, various litigations, performance indicator reporting, estimating, oversight of the warehouse, all facets of procurement and asset recovery.

### *Connecticut Yankee 2004 - Present*

Executive Director of Business Operations & Waste Management - (Connecticut Yankee Nuclear Facility, Haddam Neck, CT) Responsible for the overall business operations of CT Yankee's $418 million decommissioning project. Oversee all Project Controls, Contracts, IT, Warehouse and Procurement functions during the decommissioning of Connecticut Yankee. Duties include: contract negotiations, overall budgeting, cost control, complete downsizing plan, earned value performance, various litigations, primavera scheduling, performance indicator reporting, estimating, oversight of the warehouse, all facets of procurement and asset recovery. Served as director of waste management with overall responsibility for the characterization, removal, packaging, transport and disposal of 350 million lbs of waste shipped offsite in a 30 month window.

### *TSSD Services Inc. 1999 - 2004*

Owner – The Company specializes in commercial nuclear decommissioning by supplying project managers, senior level engineers, QA engineers, licensing engineers, cost and scheduling engineers, safety directors, fuel transfer personnel, etc. to various utility clients across the country. At time of sale, TSSD carried ~45 employees with annual revenues for 2004 in excess of $8 Million.

### *Maine Yankee 1998 - 2004*

- Business Manager - (Maine Yankee Nuclear Facility, Wiscasset, ME) Responsible for all Project Controls and Procurement functions of Maine Yankee's $550 million decommissioning project. Duties include: contract negotiations, overall budgeting, cost control, complete downsizing plan, earned value performance, various litigations, primavera scheduling, performance indicator reporting, estimating, oversight of the warehouse, all facets of procurement and asset recovery. Responsible for the evaluation process of Decommissioning Oversight Contractors (DOC) bids for Maine Yankee post termination of our original Decommissioning contractor.

- Project Controls Manager - (Maine Yankee Nuclear Facility, Wiscasset, ME)
  Responsible for all Cost and scheduling activities during the decommissioning of Maine Yankee. Duties include: budgeting cost control, earned value performance, litigation, primavera scheduling, performance indicator reporting and estimating.

- Cost Engineer - (Maine Yankee Nuclear Facility, Wiscasset, ME)
  Responsible for the development of various cost tracking systems in the areas of budget performance, safe work hours, staffing headcounts and trust fund balances to help manage the overall decommissioning project. Maintained responsibility for the oversight of Maine Yankee's original Decommissioning contractor's project controls group.

*Cianbro Corporation 1992-1997*

- Cost & Administrative Manager - (Maine Yankee Nuclear Facility, Wiscasset, ME)
  Responsible for all cost accounting and administrative functions during the 1997 refueling outage. Duties include: overseeing accounts receivable / payable, payroll, and shipping / receiving. In addition, the development and implementation of a Microsoft Excel based cost / performance tracking system, contract administration, development of an automated receivable tracking system, preparing various cost estimates, cost reporting and all financial analysis.

- Cost Engineer / H.R. Coordinator - (Yankee Rowe Nuclear Facility, Rowe, MA)
  Responsible for the prescreening, interviewing, and hiring of all on-site personnel for the decommissioning of the plant. Additional responsibilities include: cost engineering duties including the development of tracking systems to monitor project performance, overseeing the indoctrination process, training coordination and class instruction as necessary.

- Cost & Scheduling Engineer - (Georgia Pacific Corporation, Woodland, ME)
  Responsible for all cost accounting and scheduling for a $10MM capital expansion of the paper mill. Duties include: approving material requisitions, invoices to be paid, customizing and maintaining all financial reports, performing a weekly cost / benefit analysis for quantities of work in place using Microsoft Excel based cost spreadsheets, and maintaining a Primavera SureTrak schedule.

## EXPERT WITNESS & LITIGATION EXPERIENCE:

- Served as Maine Yankee Atomic Power Co.'s key witness in the most recent DOE litigation on the cost of damages to Maine Yankee as a result of the DOE's breach of contract. A decision was rendered in Maine Yankee's favor awarding Maine Yankee 97% of the requested damages.

- Served as the expert witness for Yankee Rowe's most recent FERC Rate Case in 2005 which included the development of Yankee's Decommissioning "cost to complete" estimate as well as Yankee's estimate of long term dry fuel storage? Successfully testified to FERC in support of above said estimates totaling in excess of $170 million leading to a settlement with all FERC interveners providing 100% recovery of costs for Yankee Rowe.

- Served as the expert witness for Connecticut Yankee's most recent FERC Rate Case in 2004 which included the development of Connecticut Yankee's Decommissioning "cost

to complete" estimate as well as Connecticut Yankee's estimate of long term dry fuel storage? Successfully testified to FERC in support of above said estimates totaling in excess of $500 million leading to a settlement with all FERC interveners providing 100% recovery of costs for Connecticut Yankee.

- Served as the expert witness for Maine Yankee's most recent FERC Rate Case in 2003 which included the development of Maine Yankee's Decommissioning cost to complete as well as Maine Yankee's estimate of long term dry storage of fuel. Successfully testified to FERC in support of above said estimates totaling in excess of $700 million leading to a settlement with all FERC interveners providing 100% recovery of costs for Maine Yankee.

- Member of Maine Yankee's litigation team against Stone & Webster (S&W) resulting from the dispute over the termination of S&W's fixed price contract to decommission Maine Yankee which Maine Yankee terminated due to S&W's insolvency. Served as key witness to develop and defend the cost estimate of damages caused by the S&W termination. S&W's limit of liability was $65 Million on the project and Maine Yankee was awarded $64.8 Million as a result of litigation.

- Member of Connecticut Yankee's litigation team against Bechtel Power Co. over the termination of Bechtel's fixed price contract to decommission Connecticut Yankee of which Connecticut Yankee terminated due to Bechtel's lack of performance. Served as key witness to develop and defend the cost estimate of damages caused by the Bechtel termination. Connecticut Yankee and Bechtel settled out of court with Bechtel paying Connecticut Yankee an undisclosed sum of money.

- Serving as Dairyland Power Cooperative's (DPC) expert witness in the DOE litigation on the cost of damages to Dairyland as a result of the DOE's breach of contract with respects removing spent nuclear fuel from its LACBWR site. The scope of the cost estimate relates to the calculation of damages for removal of the reactor pressure vessel (RPV) while spent nuclear fuel is adjacent to the RPV.

## OTHER QUALIFICATIONS:

- Served on an expert review panel for CH2MHill to evaluate various decommissioning options and how to apply commercial decommissioning experience to the $60 Billion UK Decommissioning market.
- Served on an expert review panel for the Fast Flux Test Facility (FFTF) to evaluate various decommissioning options and how to apply commercial decommissioning experience to the DOE facilities.
- Served as the lead negotiator for the waste transport and disposal contracts for Maine Yankee, Yankee Rowe and Connecticut Yankee's Decommissioning projects respectively totaling in excess of 1 billion lbs of waste and $200 Million.

## EDUCATION:

- M.B.A., Thomas College, 1999
- B.S. Accounting, Thomas College, 1992

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------X

DAIRYLAND POWER COOPERATIVE, :

Plaintiff, :

v. : Case No. 04-0106C

UNITED STATES OF AMERICA, :

Defendant. :

-------------------------------X

Washington, D.C.

Thursday, July 19, 2007

Deposition of

WARREN KEITH BREWER

called for oral examination by counsel for Plaintiff, pursuant to notice, at the Law Offices of Greenberg Traurig, LLP, 800 Connecticut Ave., Northwest, Suite 500, Washington, D.C. before Cindy L. Sebo, RMR, CSR, RPR, CRR, Capital Reporting Company, Notary Public in and for the District of Columbia, beginning at 9:03 a.m., when were present on behalf of the respective parties:

Page 114

anyone could say it's -- it's more accurate one way or the other. It would be more reflective of what the utilities would ultimately expect they're going to do. Because, you know, ultimately, none of them expect they're going to just walk away and hand the keys to the plant to a contractor and have them do the work.
They're going to be there in some form or fashion to potentially do some of the work and to monitor the work and to manage the work in -- at some level. So, yeah. That's what they think they will do.
MR. SHAPIRO: Let's take a break.
(Recess.)
BY MR. SHAPIRO:
Q. Mr. Brewer, I'm going to switch subjects a little bit, start getting into some of the details of your opinions on -- actually, the second page of your expert witness report.
You say that you compared the effort required to remove Dairyland's RPV in the breach world versus the effort required if there were not

Page 115

spent fuel on the pool, correct?
A. Right.
Q. And you understand that that's part of what Mr. Smith did in his work as well, correct?
A. I think that is what Mr. Smith did in his work.
Q. With what parts of Mr. Smith's evaluation of the differences between the scope of work required in the actual world versus the world without spent fuel in the pool do you disagree?
MR. SHULTIS: Objection; vague.
THE WITNESS: Let me make sure I don't give the wrong impression with my answer.
There are places where my disagreement is not with the scope of work required, but with the cost estimated for that scope.
There are some places where I think there is issue with scope and, for example, the one -- the one place where that would occur is in the whole question about what happens to the biological shield wall, because I think, in the --

Page 116

in Mr. Smith's but-for world costs calculation, there's no costs associated with the removal or decontamination of that -- that wall, even though I think he testified that he did not include the cost of disposal of the concrete blocks because he believed that would happen in both worlds.
Given that belief, then there has to be a cost to remove that wall in the but-for world.
That cost could be equivalent to the costs removal in the actual world. I think there's a scope in that one.
I think there's potential -- there's a couple of other comments I made where I think there's possible scope issues and I think they're less definitive, because I don't know that I have information which would let me be more definitive, other than there appears to be a concern here, but without additional information of various kinds, I can't say for certain, and I certainly can't say what the cost implication of those things would be.

Page 117

BY MR. SHAPIRO:
Q. So the only area that you're pretty sure that there is a difference of opinion between you and Mr. Smith in terms of the scope of RPV removal absent spent fuel in the pool is -- is concerns were removal of that -- the peaks of the Bio-Shield wall?
A. And, like I said, the other -- the other places I have issue, if you will, have to do with things where I can't be quite as definitive, like the work associated with the cutting a hole in the top of the containment building and whatever -- and the structural work that maybe needed there, removal of the reactor building polar crane.
There may be something else I don't recall -- I don't recall anything off the top of my head right now where there is; but clearly, as we go through the particulars, there might be something else, but I just don't remember it right now.
Q. We'll get to some of the specifics

Page 118

that you mentioned, such as the Bio-Shield wall, a bit later. A couple more general questions about your opinions.

In developing your opinions regarding Mr. Smith's estimate for nonbreach RPV removal, you did not attempt to develop your own nonbreach world estimate for Dairyland's RPV removal costs, did you?

A. I have not, and I -- I don't believe that was in the scope of anything I was asked to do or -- so I've not done that. It's not -- I don't believe it's my job to do that kind of calculation, so I've not.

Q. Let me make sure I understand why you didn't perform your own estimate of -- of RPV removal costs in the nonbreach world.

Why didn't you go about your work that way?

A. Because I don't think it's my job to do that calculation or to calculate Dairyland's costs for them.

Q. In your resume appended to your expert

Page 119

witness report, there's a reference to a computer program that you use in your decommissioning cost --

A. Yeah.

Q. -- estimating work, the decommissioning cost analysis system?

A. Yes.

Q. Did you make any use of that system in analyzing Dairyland's RPV removal costs?

A. No, and I wouldn't have. I mean, there would have been no real reason to.

In analyzing the Dairyland cost, it would have -- that -- that clearly relies on the understandings and information that ultimately have been embedded in the DCAS program, but the real -- that real understanding and intelligence in that program is what was put in that program by myself and the people that developed it.

So, yeah, it -- in a very indirect sense, it does rely on that, because to some degree, DCAS is the repository of a lot of information, a lot of experience about

Page 120

decommissioning cost estimating.

But did I run a DCAS model? No. That would have been using a cannon to kill a fly.

Q. I thought the -- isn't it true that the purpose of the DCAS model is to enable you to look at how costs will vary for the decommissioning of a project under different scenarios?

A. That is part of the -- that is part of the use of the program, that's correct, but in a much larger sense than just this activity of the vessel removal.

Q. On Page 5 of your expert witness report, near the top, you conclude that Mr. Smith's analysis is so flawed that it should not be considered a reasonable basis for the calculation of marginal costs.

True?

A. I believe that's what I see, yes.

Q. And that is your opinion?

A. That is my opinion.

Q. What methodology did you utilize to

Page 121

reach that conclusion?

A. My methodology was to review the basis and method by which Mr. Smith calculated those costs -- the but-for world costs, evaluate how I or ABZ would have evaluated such costs, and I believe that in the end, there are significantly unsupported and, in some cases, I believe, just inaccurate assumptions.

In other cases, I think there are situations where the estimated cost is significantly underestimated. There's a much better way to estimate the costs than what has been done. And -- and when I take those into consideration, it would change the answer very substantially.

Given that, that's the basis for my conclusion.

Q. Is there a name for the methodology you use to reach the conclusion that Mr. Smith's analysis is so flawed that it should not be considered?

A. There is no textbook name for that.

Page 122

There is no textbook name for the method by which I do decommissioning cost estimates either. It is part and parcel of the normal engineering evaluation of anything.

An engineer doing any kind of work would look at the available information and, if a result were calculated, he would then look at all the available information and -- and determine is there a reason my calculation is consistent, inconsistent, different from this other data point or other data points I might have.

And in the absence of understanding why it's different, most engineers would have a hard time trying to go forward with that.

So I -- you know, I think this is -- it is not different than an engineering evaluation that one would do for reviewing stress calculations. In this case, it just happens to be a cost estimate. It would be the same method I have used in more than one instance of doing estimate reviews of decommissioning cost estimates from other people.

Page 123

And we've -- I've done that in the past, and we talked about at least one of those instances earlier, the Mass AG report. I've done reviews for other people of other people's estimates, and it's the same kind of thing; it's comparing my understanding of how to create the estimate, understanding how the estimate was created and saying are the assumptions and choices made in creating that estimate the best choices that can be made or supportable And -- and it's that methodology that I've used here.

Q. Is your methodology -- and I'm particularly focusing on the part that enabled you to reach a conclusion that Mr. Smith's estimate is so flawed that it should not be considered a reasonable basis for the calculation of marginal costs.

Is your methodology capable of being tested by others in the field?

A. Sure. But let me say this: The -- the conclusion -- that conclusion is, in large part, driven by the fact that when I look at the

Page 124

estimate, absent the contingency, the but-for world estimate is about $9.4 million. I believe there are at least three instances where there is good and sufficient reason to say that the more appropriate number is as much as 3 million more than that.

An estimate of $9 million with what I believe to be a $3 million mistake in it is not reliable for any purpose by my estimation.

Is there a handbook that says that 3 out of 9 is not reliable? No, there's no such handbook.

Q. Well, you've said you think that your methodology is capable of being tested by others.

If your methodology is simply application of your experience and understanding to what Mr. Smith did, how can anybody else test -- test that?

A. I think that --

MR. SHULTIS: Objection; mischaracterizes prior testimony.

THE WITNESS: -- I think that in the

Page 125

instances where I have a distinct -- a distinct difference in what I believe is the more appropriate cost, another person who performs such estimates could review both what Mr. Smith did and what I've done and what is written in my report and come to a conclusion that they agree with this side, they agree with that side, they think there's some middle ground.

So to that extent, they can test what I've done.

BY MR. SHAPIRO:

Q. But you haven't actually made any estimate of any part of the RPV removal cost?

A. Absolutely not true. Absolutely not true.

Q. What part have you --

A. There are at least three instances in here where I think the report clearly says the right number you should use for this activity is the actual world cost. And it goes back to exactly what I said earlier about decommissioning cost estimates.

Page 126

In the instance where I have real world, actual data for an activity, the best judge in the absence of some defined difference in scope is that actual world cost, that absent being able to define and explain a difference, that's what it is.

So there are instances -- I have not done a total cost estimate. That's the question you asked me earlier. I've not done that, but there are at least three instances where I have said I think the right cost is this.

So there's clearly -- clearly is an appropriate way for a third party to test what I've said.

Q. Well, the three instances where you've said that -- where you're claiming that you've come up with an alternative cost, you're simply pointing to parts of the Duratek proposal that lists out prices and you're -- you're referring to your conclusion that Mr. Smith should have relied on those subprices in the Duratek proposal, correct?

Page 127

A. That's an oversimplification of what I said and what I think I just said.

There's real-world data, for example, for what it costs to grout the reactor vessel. There may be reason in a particular instance, a particular but-for world assumption to assume a different cost, but the only reason to assume a different cost than what's being paid for in the actual world is a definable difference in scope or condition for that activity.

Absent that, it is an unreasonable choice for any estimator to make that it suddenly can be done much cheaper.

I mean, the implication is if one could simply do it at a very small fraction of the cost in the actual world, then Duratek is absolutely ripping off Dairyland. So either the work can be done that much cheaper or it can't, and in the actual world, it's not.

Dairyland judged the value of the activity, obviously concluded it was rational and reasonable because they signed the contract, there

Page 128

is no demonstrable difference -- there is no difference in scope, there's no good reason to pick a different number.

Q. You didn't attempt -- we'll get to the grouting estimate later.

Let's do it in a little more orderly manner. Let's cover some of your specific criticisms of Mr. Smith's work.

You note that to some extent, Mr. Smith's estimate entails using inputs from specialty contractors who were actually performing the parts of the RPV removal work at LACBWR, correct?

MR. SHULTIS: Objection; that's a little vague. Did you want to point to a particular part of Mr. Brewer's report?

MR. SHAPIRO: That's going to be the part that starts on Page 5.

BY MR. SHAPIRO:

Q. But you understand that Mr. Smith's estimate entails using inputs from specialty contractors who were actually performing the work

Page 129

at LACBWR for the RPV removal, correct?

A. It's my understanding that some part of Mr. Smith's estimate relies on estimates from people at those companies -- at companies that are doing work at LACBWR.

Q. And you would agree that it is appropriate for Mr. Smith to have used inputs from contractors who were actually doing the work or did the work at LACBWR to the extent that those inputs were available, correct?

A. Yeah.

Let me make -- let me make this real easy. My -- my issue with that concept -- not the concept, it's the execution. And -- and the execution problem is when I go to, say, Bluegrass for the nozzle cutting estimate and they tell me it cost $355,000 to cut the nozzles, but in the real world, the cost that Duratek is charging Dairyland is $1 8 million, there's a disconnect of some kind.

Either Dairyland -- Dairyland is getting taken for a ride by Duratek and Duratek is

Page 130

really exploding the number on them, or there's something different about what the -- what the information was that was provided to Mr. Smith as opposed to what was provided to Duratek as part of their process.

And it's not clear that the kind of estimate provided to Mr. Smith by that company or any of these others was the same kind of information they provided to Duratek in the sense that was it provided by people who can contractually speak for the company, was it an estimate that they would be willing to stand contractually behind. I don't know any of that, and I don't find any evidence that anyone knows that.

So it's not about the concept of going to contractors doing the work. That, in fact's not a bad idea. It's about the what happens after you get the number.

Q. I appreciate all that information. I was actually focusing on a -- what I thought was a different criticism of Mr. Smith's work in

Page 131

Section 5 1.1 of your -- your report, where you seem to complain that Mr. Smith did not use even more inputs from specialty contractors who were actually doing the work.

Is that --

A. It's a mischaracterization of my comment, I think. So let me try to explain my comment.

My comment is really this: That I believe, in his deposition, Mr. Smith was asked why is his estimate reasonable? And I believe the explanation that was given was that it's because he used inputs from people doing the work at LACBWR.

The fact is, I believe, when one looks at the costs that he got from those companies, it's less than half of the total cost. So while that might be part of a rationale for defending an estimate as being reasonable, I'm not sure why it -- getting half of the costs is suddenly the basis for asserting that all of the costs are reasonable.

Page 132

So it's not -- I'm not even suggest -- I'm not suggesting he needed to get other estimates from people doing the work. There are a lot of ways one can create an estimate and support it as being reasonable. That would be one way.

But my issue is that that's the -- that's my understanding of his explanation of why his total estimate is reasonable, and I'm not sure I get that.

Now --

Q. Did Mr. Smith say that the only reason is -- his estimate is reasonable that he used inputs from contractors doing the actual work?

A. I did not find any other explanation.

So whether he ever uttered the words "it's my only reason," I don't know that. I don't know that I found in his deposition testimony any other reason explained.

So, again, I don't know that he ever spoke those particular words.

Now, while we're here, let me make one other point to you, just because it'll probably

Page 133

eventually come up regardless. If you flip over to Page 6, there's something that really should be corrected in the report.

If you look at the middle line of the last paragraph there, the first figure there, 9,405,188, really ought to be 7,405,000. And because of that change, the percentage in the last line ought to be, I think, 45 percent, not 36. I mean, I don't want to overstate my case here.

Q. Okay. I appreciate that clarification.

On Pages 5 and 6 of your report, Exhibit 1 to your deposition, Mr. Brewer, you list sources that Mr. Smith used for seven components of the cost estimate --

A. Yeah.

Q. -- for the RPV removal.

Do you have an opinion that there were better sources for -- for the cost data than -- than the ones used by Mr. Smith?

A. I'm not offering any -- any opinion to that extent other than what I think I've already

Page 166

case basis with the people that are sending it there.

Q. Do you know the difference in costs between disposing of standard versus oversized debris?

MR. SHULTIS: Objection; vague.

BY MR. SHAPIRO:

Q. At Envirocare.

A. I don't. And, in fact, I think that anyone that tells you that there is an absolute answer to that, because of the negotiability of their rates, may or may not be accurate in that answer.

So I don't know the answer to that. I've not tried to negotiated that with them on anything.

Q. Going back to the self-performance concept for a moment, you don't have an opinion that it would have cost Dairyland more to have self-performed its RPV removal, do you?

A. No, I -- I don't. And, in fact, I mean, I would agree -- I think this is one where

Page 167

Mr. Smith and I would agree.

Q. You don't have --

A. Self-performance would not be more expensive and it wouldn't be, because if I hire a contractor, like they have in the actual world, to some degree, I'm paying that contractor some part of the price to accept certain risk that I'm wanting to get rid of.

If I self-perform, I'm not paying anybody to accept those risks, because I still got the risk. So --

Q. But do you have an opinion that it would have cost Dairyland less to have self-performed?

MR. SHULTIS: Objection; asked and answered.

THE WITNESS: For the same -- for doing the same thing, either -- in the actual world, it most likely would -- could -- it could cost less. And I say "it could cost less" because I'm not paying profit to this extra person, I'm not paying for them to absorb risk. But if, in

Page 168

fact, I have to go hire staff augmentation people to manage the self-performance, it may depend on how many of those people and what types of people I've got to hire.

But by and large, because of the things I said before, self-performance would be less expensive in general for any given scope of work, because if I hire a general contractor, part of what I'm paying him for is the acceptance of risks that I want to get rid of it. And so almost -- almost certainly, that would be a more expensive process.

I think it's possible that in some particular set of circumstances, that -- the distinction may not be very large, but I think as a general fact, that is probably true.

Q. In the nonbreach world and Mr. Smith's nonbreach world estimate, you don't state an opinion, either in Section 5.1.2 of your report or elsewhere, regarding the -- the costs impact of a self-performance assumption for the nonbreach RPV removal versus using a contractor, do you?

Page 169

A. I offer no opinion about the magnitude of that difference, no.

MR SHAPIRO: Why don't we take a break now? We went beyond the time I had anticipated.

MR. SHULTIS: We'll take about an hour.

(Whereupon, at 12:48 p.m., a luncheon recess was taken.)


©2007

Page 178

There's no reason for them to be different. The ones that are different, then the issue would be to price the differences and approach it that way. It's simply a different way of approaching the estimate.

Q. Well, suppose you were going to use in your -- your expertise as a decommissioning cost estimator, you were going to estimate the cost of grouting a reactor pressure vessel at a theoretical nuclear plant -- we'll call it Cheeseland Power Cooperative -- and they have a shutdown nuclear power plant, and in the nonbreach world, there wouldn't have been any spent fuel and the reactor pressure vessel would have been grouted and you're tasked with estimating that cost and there's no contract to look to, how would you go about that?

A. If I had never done that before, I would talk to people who had performed that or similar type work about what it takes.

And let me give you an example of exactly where I've done that. It's grouting, but

Page 179

it's the same kind of thing.

Seven or eight years ago, we worked on a project for the decommissioning of a reactor called Plum Brook, it's -- it was a NASA run reactor, part of the Space Nuclear Program back in the '60s and '70s.

There were some things, particularly with respect to asbestos abatement and lead abatement, that were going to become significant projects in that.

We had no real -- we, at ABZ, had no real experience in doing that. I didn't have any really good data, personally, on which to base the numbers. We -- we can go to textbooks, but that may or may not make real sense.

So what we did, instead, is we went and got people who had done that kind of work, hired them to be consultants for us, took them to the site, showed them the conditions, asked them what would need to be done.

They provided some basic task info for us in terms of dollars per cleanup of square foot

Page 180

or whatever, provided us with the background data that supported that from real jobs they had done, and that's how we arrived at our base cost that we used then, based on the square foot of asbestos or the square foot of lead paint or whatever those parameters were within the -- the inventory.

So, again, here, if I hadn't done this before, you'd go to the vendor, you'd ask him about the cost to do it, you'd ask him what the basis is in terms of his experience, you'd want to know whether that cost he's given you is his direct cost or the cost he would charge someone to do and, ultimately, you would calculate for this other vessel that has the appropriate dimensions of cost.

Q. So if you didn't have a contract to look to in the Cheeseland example that I gave you, it sounds like you would have undertaken an effort not -- not dissimilar to what Mr. Smith did in estimating the grouting, correct?

MR. SHULTIS: Objection, mischaracterizes prior testimony.

Page 181

THE WITNESS: Not correct. Not correct in the following way: I don't think -- at least I don't know of any explanation or -- or data or facts or evidence that we've been provided that says there was any consideration of the basis for the numbers given by, say, PIGCO or anybody else for what it takes to do this.

In the absence of a contract to look to that -- that I do have, in fact, in the Dairyland case, I would be looking for the basis in prior work in understanding where the numbers come from and why they believed those to be the numbers; and, again, as I said, is that the cost -- their direct cost or is that the cost they would actually charge the customer to do the work; and also ensure that the scope of work that I'm asking for them -- that they understood exactly the scope I was asking them to estimate compared to the scope that was in the real world.

It goes back to what I said earlier today. The basic methodology of getting these estimates from other people is not where my

Page 182

difficulty or my opinions lie; it's about the execution of that that's really my issue.

BY MR. SHAPIRO:

Q. In your opinion, it's important to know what other utilities are actually paying for -- for work such as grouting?

A. In the absence of the real-world contract, that would be one of my considerations. In the presence of the real-world contract, my consideration is what is the reason or reasons that make the cost materially different.

And by "materially different," you know, if the difference between some kind of bottoms-up estimate and the real-world cost were, you know, small, single digit kind of percent differences, I don't know anybody would have a debate one way or the other, you know.

But when you come up with a -- with a bottoms-up estimate that is different by a multiple of -- of five, six, seven times the actual world, you need to understand why that difference exists.

Page 183

Q. How many utilities have grouted an intact RPV that you're aware of?

A. Probably not very many, because not many people have actually -- not many commercially utilities have removed reactor vessels. So it's going to be a small number.

But on the other hand, I'm not sure that that's -- that wouldn't be a significant factor in -- in any kind of understanding about the cost.

Q. I'm just trying to figure out what the universe of this experience is in the industry.

A. That's my point. It's not limited -- this process of grouting this vessel is not necessarily limited to reactor vessels.

It would not be particularly different if I were grouting a container that had other kinds of low-level waste in it, because it's a matter of pumping the concrete in, it's a matter of making sure that you get rid of the voids in the concrete.

I think there's -- I think there's

Page 184

substantial experience that would be applicable to grouting a vessel even if no one had ever grouted a vessel because of other kinds of things that you do that with.

Q. But some utilities have grouted reactor pressure vessels?

A. Well, sure. Yeah.

Q. The Maine Yankee, you're aware they grouted theirs?

A. Yes.

Q. What's your understanding of what Maine Yankee and what costs Maine Yankee incurred to have its reactor pressure vessel grouted?

A. I don't know.

Q. You're aware that Connecticut Yankee grouted its reactor pressure vessel, aren't you?

A. I do know that.

Q. And what's your understanding of the costs that Connecticut Yankee incurred to have its reactor pressure vessel grouted?

A. I don't know. And again, the most direct evidence of what it would cost to grout the

Page 185

Dairyland vessel is the cost that it cost to grout the Dairyland vessel.

Q. We'll get to that in a minute.

Are you aware of the costs that any utility has incurred to have its reactor pressure vessel grouted?

A. I do not know that number for anyone. Not that I think this is a really substantial difference, but I don't know that there's a BWR that's been grouted, but maybe it has. The other plants you've noted, Trojan, Maine Yankee, CY, all PWRs, the vessel is different.

Q. Now, if Dairyland thought that the grouting subprice in the Duratek proposal was -- was overpriced, Dairyland didn't have the option under the contract of breaking out that -- that portion of the work and supplying its own grouting, did it?

MR. SHULTIS: I think I'm going to object on the grounds that it assumes facts.

THE WITNESS: I don't know if he was done or not.


©2007