**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**DAIRYLAND POWER COOPERATIVE,**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

**No. 04-106C**
**(Chief Judge Damich)**

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF JONATHAN A. NEUBERGER**

**GREGORY G. KATSAS**
**Acting Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**RUSSELL A. SHULTIS**
**Commercial Litigation Branch**
**Civil Division**
**U.S. Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tel: (202) 305-7571**
**Fax: (202) 305-2503**

**OF COUNSEL:**

**JANE K. TAYLOR**
**Office of General Counsel**
**U.S. Department of Energy**
**1000 Independence Ave., S.W.**
**Washington, D.C. 20585**

**ALAN J. LO RE**
**Senior Trial Counsel**

**PATRICK B. BRYAN**
**JOSHUA E. GARDNER**
**SCOTT SLATER**
**Trial Attorneys**
**U.S. Department of Justice**

**May 15, 2008**

**Attorneys for Defendant**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . ii

INDEX TO APPENDIX . . . . . . . . . . v

SUMMARY OF ARGUMENT . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . 2

I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY . . . . . . . . . . 2

II. DR. NEUBERGER'S EXPERIENCE AND QUALIFICATIONS . . . . . . . . . . 6

III. DR. NEUBERGER'S OPINIONS . . . . . . . . . . 8

A. Mr. Graves' Models And Opinions . . . . . . . . . . 9

B. Dr. Neuberger's Economic Critique Of Mr. Graves' Exchanges Model . . . . . . . . . . 14

IV. DR. NEUBERGER'S ECONOMIC CRITIQUE OF MR. GRAVES' MODEL IS BOTH RELEVANT AND RELIABLE . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . 28

TABLE OF AUTHORITIES

CASES PAGE(S)

Betterbox Communications Ltd. v. BB Technologies, Inc.,
300 F.3d 325 (3d Cir. 2002) .......... 3, 5, 25

Bluebonnet Sav. Bank, FSB v United States,
339 F.3d at 1345 (Fed Cir 2003) .......... 22

California Fed. Bank v. United States,
54 Fed. Cl. 704 (2002),
aff'd, 395 F.3d 1263 (Fed. Cir. 2005) .......... 21

Clark v. Takata Corp.,
192 F.3d 750 (7th Cir. 1999) .......... 22

Columbia First Bank FSB v. United States,
60 Fed. Cl. 97 (2004) .......... 23

Daubert v. Merrill Dow Pharm., Inc.,
509 U.S. 579 (1993) .......... 2, 5

Deal v. Hamilton County Bd. of Educ.,
392 F.3d 840 (6th Cir. 2004) .......... 3

Elcock v. Kmart Corp.,
233 F.3d 734 (3d Cir. 2000) .......... 22

First Tennessee Bank Nat. Assoc. v. Barreto,
268 F.3d 319 (6th Cir. 2001) .......... 4, 25

First Union Nat. Bank v. Benham,
423 F.3d 855 (8th Cir. 2005) .......... 5, 25

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) .......... 22

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) .......... 3

Living Designs, Inc. v. E.I. Dupont De Nemours & Co.,
431 F.3d 353 (9th Cir. 2005) .......... 3

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

Micro Chem., Inc. v. Lextron, Inc.,
317 F.3d 1387 (Fed. Cir. 2003) ..... 3, 6

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006),
appeal pending, No. 07-5046 (Fed. Cir.) ..... passim

Pacific Gas & Electric Co. v. United States,
Nos. 04-74C (Fed. Cl.) ..... 12

Pacific Gas & Electric Co. v. United States,
No. 2007-5046 (Fed. Cir.) ..... 13

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005) ..... 5

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006),
appeal pending, Nos. 2007-5052, -5097 (Fed. Cir.) ..... 9

Sacramento Municipal Utility District v. United States,
No. 2007-5052 (Fed. Cir.) ..... 13

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) ..... 9, 22

Seaboard Lumber Co. v. United States,
48 Fed. Cl. 814 (2001),
aff'd, 308 F.3d 1283 (Fed. Cir. 2002) ..... 21

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) ..... 3

Tyler v. Union Oil Co.,
304 F.3d 379 (5th Cir. 2002) ..... 5

United States v. Jones,
107 F.3d 1147 (6th Cir.),
cert. denied, 521 U.S. 1127 (1997) ..... 4

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

United States v. Lopez-Lopez,
282 F.3d 1 (1st Cir. 2002) ........ 6

United States v. Mamah,
332 F.3d 475 (7th Cir. 2003) ........ 6

United States v. Taylor,
239 F.3d 994 (9th Cir. 2001) ........ 6

United States v. Young,
316 F.3d 649 (7th Cir. 2002) ........ 4

Winters v. Fru-Con Inc.,
498 F.3d 734 (7th Cir. 2007) ........ 22

Yankee Atomic Electric Co. v. United States,
73 Fed. Cl. 249 (2006) ........ 10

Yankee Atomic Electric Co. v. United States,
No. 2007-5025 (Fed. Cir.) ........ 13

STATUTES/RULES

10 C.F.R. 961.11 ........ 9, 18

Fed. R. Evid. 702 ........ 5

INDEX TO APPENDIX

DOCUMENT PAGE

Expert Report of Frank C. Graves, Dairyland v. United States
(March 23, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Def. A 1

Frank C. Graves Deposition Excerpts, Yankee Atomic v. United States
(July 15, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Def. A 58

Frank C. Graves Deposition Excerpts, Pacific Gas and Electric v. United States
(May 19, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Def. A 61

Frank C. Graves Deposition Excerpts, Dairyland v. United States
(June 19, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Def. A 64

Frank C. Graves Deposition Excerpts, Dairyland v. United States
(September 6, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Def. A 77

Jonathan A. Neuberger, PhD Deposition Excerpts, Dairyland v. United States
(August 8, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Def. A 82

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | |
| v. | ) | No. 04-106C (Chief Judge Damich) |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION
TO EXCLUDE THE TESTIMONY OF JONATHAN A. NEUBERGER

Pursuant to RCFC 16, defendant, the United States, responds to the motion that the plaintiff, Dairyland Power Cooperative ("Dairyland"), filed on April 29, 2008, seeking to exclude the expert testimony of the Government's economist, Dr. Jonathan A. Neuberger. The United States intends to call Dr. Neuberger at trial to provide an economic critique of the opinions of Dairyland's expert, Mr. Frank C. Graves, with regard to the hypothetical market for the exchange of spent nuclear fuel ("SNF") acceptance rights that Mr. Graves has developed for this litigation (and other SNF cases before the Court). As set forth in greater detail below, because Dr. Neuberger bases his opinion upon sound and reliable economic principles that are relevant and useful to the Court, Dairyland's motion to exclude Dr. Neuberger's expert testimony should be denied.[1]

[1] Consistent with this Court's ruling in a related SNF case, Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending, No. 07-5046 (Fed. Cir.), in which the Court granted the Government's motion *in limine* to exclude Mr. Graves' testimony concerning his overly-speculative economic models regarding the rate of acceptance and hypothetical market for the exchange of DOE SNF acceptance rights, the United States filed a motion to exclude Mr. Graves' testimony in this case on April 29, 2008, as his Dairyland model is substantially similar

SUMMARY OF ARGUMENT

Dairyland's motion to exclude the expert testimony of Dr. Neuberger is nothing more than an attempt improperly to shift the burden of demonstrating the "but for" world from Dairyland to the Government. Indeed, Dairyland's primary criticism of Dr. Neuberger is that, although he offers an economic critique of the significant deficiencies contained in Mr. Graves' hypothetical exchanges model, which itself purports to model an economic marketplace, Dr. Neuberger has not offered an alternative model that cures these deficiencies. Yet, it is the obligation of Mr. Graves – and not of Dr. Neuberger – to provide a sufficiently reliable depiction of the "but for" world. If Mr. Graves fails to satisfy this obligation, Dairyland's attempt to base its damages claim upon Mr. Graves' theories likewise fails. Dr. Neuberger, applying well-established and reliable economic principles, provides the Court with a useful basis for understanding the significant deficiencies contained within Mr. Graves' hypothetical exchanges model. Dr. Neuberger's opinions reveal that they are both relevant and reliable, and Dairyland's complaints concerning Dr. Neuberger's opinions are without merit. Accordingly, the Court should reject Dairyland's motion to exclude Dr. Neuberger's opinions in this case.

ARGUMENT

I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

The United States Court of Appeals for the Federal Circuit has explained that, under the Supreme Court's decision in Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993), the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard

---

to his model in PG&E. Should the Court grant our motion to exclude Mr. Graves from testifying at trial in this case, Dairyland's motion to exclude Dr. Neuberger's testimony would be moot, as Dr. Neuberger's economic critique of Mr. Graves' model would no longer be necessary.

Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). Although the standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one, Seaboard Lumber Co., 308 F.3d at 1302, the "'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 852 (6th Cir. 2004). Further, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003) (quoting Advisory Committee Note to Federal Rule of Evidence 702).

Although the Supreme Court in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), expanded the Court's gatekeeping function under Daubert from "scientific" testimony to all expert testimony, the Court concluded that, in cases not involving scientific testimony, "[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." Id. at 150. In that circumstance, the Supreme Court explained that "the relevant reliability concerns may focus upon personal knowledge or experience." Id.; see Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 329 (3d Cir. 2002) (affirming the trial court's admittance of a marketing expert who opined upon the likelihood of confusion between two trademarks, and concluding that testimony was based upon the witness's "personal knowledge or experience . . . rather than a methodology that satisfies the Daubert factors"); Living Designs, Inc. v. E.I. Dupont De Nemours & Co., 431 F.3d 353, 368 n.14 (9th Cir. 2005) ("Concerning the reliability of non-scientific testimony such as [Berly's], the 'Daubert factors . . . simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of

the expert, rather than the methodology or theory behind it") (citation omitted) (emphasis in original); United States v. Young, 316 F.3d 649, 657 (7th Cir. 2002) (affirming admission of psychiatric mental health nurse who offered testimony concerning domestic abuse victim's recantation, concluding that her methodology was reliable based upon her extensive experience and review of relevant documents in the case).

The United States Court of Appeals for the Sixth Circuit has explained the distinction in the sufficiency of expert methodology between scientific and non-scientific expert testimony:

> Contrary to First Tennessee's argument, the fact that Iorlano's opinions may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible. In United States v. Jones, 107 F.3d 1147, 1158 (6th Cir.), cert. denied, 521 U.S. 1127, 117 S. Ct. 2527, 138 L. Ed.2d 1027 (1997), this court recognized that the four specific factors utilized in Daubert may be of limited utility in the context of non-scientific expert testimony. We noted that "[i]f [the Daubert] framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony – that derived substantially from practical experience – would be excluded. Such a result would turn Daubert, a case intended to relax the admissibility requirements for expert scientific evidence, on its head." Id. at 1158. Indeed, even the Berry court itself recognized that "[t]he distinction between scientific and non-scientific expert testimony is a critical one[,]" and that Daubert is "only of limited help" in assessing technical or experiential expertise.

First Tennessee Bank Nat. Assoc. v. Barreto, 268 F.3d 319, 334-35 (6th Cir. 2001) (rejecting application of Daubert reliability factors to banking expert's opinion concerning prudent lending practices because expert testimony "derived largely from [expert's] own practical experiences throughout forty years in the banking industry"). Ultimately, the inquiry under Rule 702 is a flexible one, Daubert, 509 U.S. at 594, and trial courts "have substantial discretion in deciding

how to test an expert's reliability." Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005) (citation omitted).

Under Rule 702, an expert witness must possess "specialized knowledge" regarding the area of testimony. Fed. R. Evid. 702. Then-Judge Alito, writing on behalf of the United States Court of Appeals for the Third Circuit, explained in discussing the requisite specialized knowledge necessary to qualify as an expert under Rule 702:

> "The basis of this specialized knowledge 'can be practical experience as well as academic training and credentials,'" and "[w]e have interpreted the specialized knowledge requirement liberally." However, "'at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . .'"

Betterbox Communications, 300 F.3d at 327-28 (citations omitted) (affirming admittance of marketing expert on the issue of the likelihood of confusion in certain trademarks based upon his experience in the field).

Under Rule 702, a witness may qualify as an expert "based on his own knowledge, skill, experience, training or education." First Union Nat. Bank v. Benham, 423 F.3d 855, 862 (8th Cir. 2005) (citing Fed. R. Evid. 702). Further, the factual basis for an expert's opinion goes to the credibility of the testimony rather than the admissibility, and it is up to Dairyland, the party challenging the admissibility of Dr. Neuberger's testimony, to examine the factual basis for the opinions through cross-examination. Id.; see Tyler v. Union Oil Co., 304 F.3d 379, 393 (5th Cir. 2002) (holding that attempt to show that expert's underlying data were unreliable is an issue to resolve upon cross-examination at trial). Indeed, where the parties' experts rely upon conflicting sets of facts, "it is not the role of the trial court to evaluate the correctness of facts underlying

one expert's testimony" in determining whether they have appropriate expertise. Micro Chem., 317 F.3d at 1392.[2]

At bottom, the Court must find that an expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. United States v. Lopez-Lopez, 282 F.3d 1, 14 (1st Cir. 2002) (affirming admittance of expert on the *modus operandi* of individuals importing drugs into the United States because expert's testimony was not within fact-finder's common knowledge); United States v. Taylor, 239 F.3d 994, 998 (9th Cir. 2001) (affirming admittance of academic expert on the relationship between pimps and prostitutes because, "[b]y and large, the relationship between prostitutes and pimps is not the subject of common knowledge").

## II. DR. NEUBERGER'S EXPERIENCE AND QUALIFICATIONS

The Government is offering Dr. Neuberger as an expert in the fields of economics and economic damages. This Court has repeatedly qualified Dr. Neuberger in these areas, and he has offered such testimony in five SNF cases before the Court: Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005); Southern Nuclear Operating Co. v. United States, 77 Fed. Cl. 396 (2007); Northern States Power Co. v. United States, 78 Fed. Cl. 449 (2007); Boston Edison Co. v. United States, 80 Fed. Cl. 468 (2008); and, most recently, Dominion Resources, Inc. v. United States, No. 04-00083 (Bruggink, J.). Pl.

[2] This situation is to be distinguished from an expert who issues opinions that lack any arguable factual support, a situation which may be a proper basis for the exclusion of that expert's opinions. See United States v. Mamah, 332 F.3d 475, 477-478 (7th Cir. 2003) (affirming exclusion of sociologist and anthropologist as experts because they based their opinions upon insufficient facts or data).

A50-52) (Report by Jonathan A. Neuberger, dated June 29, 2007 ("Neuberger Report"), at Curriculum Vitae 5-7).[3]

Dr. Neuberger, a principal at Economists Incorporated, an economics consulting firm, has approximately 20 years of experience conducting economic analyses and possesses a Ph.D. in economics from Johns Hopkins University. Pl. A5-6 (Neuberger Report at 2-3 ¶¶ 8-12). Dr. Neuberger's areas of expertise include, among other areas, economic damages, commercial and financial litigation analysis, microeconomics and financial analysis, and statistics and econometrics. Pl. A6 (Neuberger Report at 3 ¶ 12). From 1988 to 1994, Dr. Neuberger was an economist with the Federal Reserve Bank of San Francisco. Since then, Dr. Neuberger has worked as an economic consultant at Deloitte & Touche, Benderley Economic Associates, LECG, Inc., Bates & White, and, most recently, Economists Incorporated. Pl. A5-6 (Neuberger Report at 2-3 ¶¶ 8, 10, 11).

With respect to Dr. Neuberger's work analyzing damages claims, Dr. Neuberger has been qualified as a testifying expert in multiple breach of contract cases involving both private companies and Federal agencies. Pl. A6, Pl. A50-52 (Neuberger Report at 3 ¶ 12, Curriculum Vitae 5-7). Dr. Neuberger has analyzed companies in a variety of different industries, including aerospace and defense, electric power generation, telecommunications, timber, financial services and, significantly for purposes of this litigation, nuclear power generation. Pl. A47, Pl. A50-52 (Neuberger Report at Curriculum Vitae at 2, 5-7). Dr. Neuberger also has designed, developed, and implemented an opinion survey concerning loss of asset values on behalf of a private client

[3] "Pl. A___" refers to a page in the appendix that Dairyland attached to its April 29, 2008 motion to exclude Dr. Neuberger's testimony. "Def. A__" refers to a page in the appendix that is attached to this brief.

in the civil aviation industry and has designed, developed, and implemented surveys of consumer and business banking customers. Pl. A47, 50 (Neuberger Curriculum Vitae at 2, 5). In addition, Dr. Neuberger has designed, developed, and implemented models of risk measurement to assist banks and other institutions to manage multiple types of business risk, including market, interest rate, and operational risks, and has co-authored a chapter in a risk-management handbook prepared by the Casualty Actuarial Society. Id. (Neuberger Curriculum Vitae at 2, 5). Dr. Neuberger has worked with models that involve uncertain events and the presence of risk aversion and has expertise in understanding how certain types of risks and external pressures may be modeled. Pl. A5-6 (Neuberger Report at 2-3 ¶¶ 8-12). Dr. Neuberger has published dozens of articles on a variety of topics, including market imperfections, interest rate competition, risk management, and analysis of the market impacts of changes in Government economic policy and regulation. Pl. A52-54 (Neuberger Curriculum Vitae at 7-9). Further, Dr. Neuberger has served as a Visiting Assistant Professor of Economics at Mills College, in Oakland, California, and has taught classes in both economics and finance. Pl. A6 (Neuberger Report at 3 ¶ 10).

## III. DR. NEUBERGER'S OPINIONS

Dr. Neuberger has analyzed the models used by Frank Graves, whom Dairyland has retained to support Dairyland's damages claim in this case, and has offered economic critiques of Mr. Graves' model and resulting conclusions. Notably, however, Dairyland barely even references Mr. Graves, his model, or his conclusions in its motion to exclude Dr. Neuberger's testimony. However, to fully appreciate Dr. Neuberger's opinions, the Court must first understand the nature of Mr. Graves' models and his opinions.

A. Mr. Graves' Models And Opinions

Under the Standard Contract, acceptance rights are determined by an "oldest fuel first" ("OFF") basis, with the oldest discharged fuel receiving the earliest acceptance rights by the Department of Energy. 10 C.F.R. 961.11, Art. VI, B.1.(a). Mr. Graves believes that the OFF priority ranking is economically inefficient because it fails to take into account the costs that utilities face to store spent nuclear fuel ("SNF"), and he asserts the application of OFF would result in many utilities having to incur otherwise avoidable storage costs. To remedy what he views as an inefficient contractual acceptance mechanism, Mr. Graves has created a model that purports to simulate the trading, or exchange, of approved Delivery Commitment Schedules ("DCSs") between contract holders in the "but for" world.[4]

To determine how this hypothetical exchanges market would have operated in the "but for" world, Mr. Graves utilizes two separate models. The first is his so-called "must move" model, in which Mr. Graves utilizes storage and discharge data as of 1993 from every commercial nuclear facility in the United States in an effort to account for the then-existing storage capacities of each facility. Def. A8-9 (Expert Report by Frank C. Graves, March 23, 2007 ("Graves Report"), at 8). Based upon this set of data, Mr. Graves determines when a

[4] Under the Standard Contract, utilities may exchange approved DCSs subject to DOE's right, in its "sole discretion," to approve or disapprove any proposed exchange. 10 C.F.R. 96.11, Art. V.E. The mere fact that DOE has the discretion to disapprove exchange requests renders Dairyland's exchanges theory speculative. See, e.g., San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). This Court recently rejected another SNF plaintiff's contention that exchanges would have occurred in the "but for" world because the contention was impermissibly speculative. See Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332, 375 (2006) ("To accept SMUD's position [regarding exchanges], the court would need to speculate about whether SMUD would have been successful in trading SMUD's acceptance priority with another utility or convincing DOE to accept SMUD's SNF early. The law does not permit the court to do so"), appeal pending, Nos. 2007-5052, -5097 (Fed. Cir.)

particular utility is in a "must move" situation based upon whether that utility would have to incur incremental storage costs to address its SNF storage capacity limitations.[5] Def. A6-7. Based upon certain critical assumptions contained in Mr. Graves' "must move" model, he then identifies for each nuclear facility when it would face a "must move" situation and how much SNF must be moved to alleviate that situation. Mr. Graves utilizes his "must move"analysis for two purposes: (1) he uses the slope and shape of the "must move" mountain of SNF to support his opinion that DOE program performance requires a 3,000 MTU steady-state rate of acceptance; and (2) he uses the "must move" analysis as an input to the second component of his framework, the "Economic Sequence Model" ("ESM"). Def. A8-9, 11, 18-19 (Graves Report at 8-9, 11, 18-19).

The ESM combines the timing and quantity of SNF in each "must move" situation with estimates of the incremental at-reactor storage costs of addressing that situation. Def. A18-9 (Graves Report at 18-19). Notably, Mr. Graves created the ESM for purposes of the SNF litigation during the Yankee Atomic case, another SNF case involving shutdown nuclear utilities. See Yankee Atomic Electric Co. v. United States, 73 Fed. Cl. 249 (2006). Rather than conduct any empirical studies of nuclear utilities and their willingness to exchange acceptance rights, Mr. Graves simply assumes such demand based upon the storage costs that he believes utilities would desire to avoid. Id. However, Mr. Graves made no effort to incorporate any actual SNF storage cost data from Dairyland to determine whether Dairyland had, in fact, any financial incentive to bid for earlier acceptance rights from other utilities through exchanges. In his

[5] The term "must move" is a term created by Mr. Graves and does not appear in the Standard Contract, the Nuclear Waste Policy Act, or DOE program documents.

model's "base case" scenario, he assumes that Dairyland would incur SNF onsite storage costs in the early to mid-1990s – which is the time period during which Mr. Graves assumes that Dairyland would engage in exchanges – amounting to $8.7 million annually. Def. A66-67 (Graves Deposition, June 19, 2007, 9:22-10:2). To derive this number, Mr. Graves relies on publicly-available data from only three commercial nuclear power plant facilities (Humboldt Bay, Rancho Seco, and Trojan). Def. A76 (Graves Deposition at 210:13-19, 212:11-16). In reality, however, publically available information that Dairyland released during the time period when it would have engaged in hypothetical exchanges indicates that Dairyland only estimated that it would incur $1.3 million per year in wet pool operation and maintenance ("O&M") costs to store SNF onsite in its wet pool. Def. A68 (Graves Deposition at 27:13-19). Such a lower estimate of SNF storage costs, by Mr. Graves' own admission, would have decreased Dairyland's willingness to engage in exchanges. Def. A68 (Graves Deposition at 27:13-28:10).

Based upon the outputs of the ESM, Mr. Graves concludes that the majority of the cost of storing "must move" SNF could have been avoided in the "but for" world through the exchange of approved DCSs between contract holders. Def. A18-19, 21-22 (Graves Report at 18-19, 21-22). Mr. Graves' base-case opinion concerning a hypothetical exchanges market is based upon an assumption that all contract holders would have participated in the market and that all contract holders with early DOE acceptance rights would have offered all of those rights to the market. Def. A19 (Graves Report at 19); Def. A74 (Graves Deposition at 118:24-119:18); Def. A59-60 (Graves Testimony in Yankee Atomic Electric Co. v. United States, No. 98-126C, (Merow, S.J.), July 15, 2004, at 859:3-13, 984:9-23). Mr. Graves also assumes that every utility with "must move" SNF bids on rights based on average per-MTU avoidable storage costs and

that the lowest price that clears the market is the marginal price at which all trades are conducted in that year. Def. A18-19 (Graves Report at 18-19, 22-23); Def. A63 (Deposition of Frank Graves, Pacific Gas & Electric Co. v. United States, No. 04-0074C (Hewitt, J.), May 19, 2006, at 39:10-13). Mr. Graves hypothesizes that those utilities which bid at or above the market-clearing price will accelerate their position in the DOE acceptance queue through exchanges, while those whose per-MTU avoidable costs fall below the market-clearing price will be unsuccessful in trading in that year will incur the costs to address their "must move" condition and will re-enter the market the following year. Def. A18-19 (Graves Report at 18-19); Def. A74 (Graves Deposition, June 19, 2007, at 118:24-119:18).

This Court granted the Government's motion *in limine* to preclude Mr. Graves from testifying at trial in Pacific Gas & Electric Co. v. United States, Nos. 04-74C & -75C (Fed. Cl.), which involved a similarly-situated plaintiff. In PG&E, the Court found that Mr. Graves' model was premised upon the following four factually-unsupported and speculative assumptions: (1) the model assumed that the market for SNF exchanges would be perfectly competitive, with no asymmetries of information or market power; (2) it assumed that DOE would have approved of all exchanges, even though DOE had the right, in its "sole discretion," to disapprove any request; (3) it assumed, without any support, that all utilities would have participated in the exchange system; and (4) it assumed that the lowest market-clearing price (that is, "the price that . . . the last bidder which obtains allocations in a given year is willing to pay") would be the price of all transactions in the market. See PG&E, 73 Fed. Cl. at 436. Because the model relied upon such dramatic assumptions that lacked sufficient factual foundation, the Court found Mr. Graves' exchanges model to be detached from the facts of the case and, therefore, precluded his

testimony at trial with regard to exchanges. Id. Similarly, with regard to Mr. Graves' opinions concerning a reasonable rate of acceptance, the Court excluded him from testifying at trial, finding that his testimony would not be helpful to the Court, given that Mr. Graves had no involvement with regard to either DOE's SNF acceptance program or the promulgation of the Standard Contract, and he otherwise lacked any firsthand knowledge concerning the parties' intentions at the time of contract formation. See id. at 436.[6]

By his own admission, the opinions that Mr. Graves seeks to offer at trial in this case with regard to (1) the "reasonable" rate of acceptance and (2) the market for exchanges that would have developed in the "but for" world – as well as his underlying methodology – are virtually identical to the opinions that Mr. Graves provided in PG&E. Def. A72 (Graves Deposition at 95:7-12).

[6] On February 4, 2008, the Federal Circuit heard oral arguments in the PG&E appeal, for the appeals in Yankee Atomic Electric Co. v. United States, No. 2007-5025 (Fed. Cir.), Sacramento Municipal Utility District v. United States, No. 2007-5052 (Fed. Cir.), and Pacific Gas & Electric Co. v. United States, No. 2007-5046 (Fed. Cir.). These three appeals present significant, overarching issues that will likely affect the resolution of this case. Specifically, these appeals are expected to resolve (or, at a minimum, address critical questions related to) the following issues implicated in this case: (1) the rate of acceptance of SNF required by the Standard Contract and the necessity of resolving that issue in evaluating damages claims; (2) whether the trial court abused its discretion in excluding Mr. Graves' expert testimony with regard to the very topics that Dairyland now seeks to present to the Court; (3) the allocation of the burden, in an expectation damages case, to establish a world in which there would be performance and what performance would have met DOE's minimum contractual obligations, as well as whether the "substantial causal factor" test eliminates the need for the plaintiff to establish such a world; and (4) the standard for the recoverability of company expenditures, such as internal labor, that the Government contends plaintiff would have incurred in the absence of DOE's breach.

B. Dr. Neuberger's Economic Critique Of Mr. Graves' Exchanges Model

Dr. Neuberger has offered economic opinions that Mr. Graves' hypothetical exchanges model does not capture numerous fundamental features of a trading market and provides an incomplete and overly simplistic depiction of the market forces and incentives that would affect the operation of such a market. Pl. A7 (Neuberger Report at 4 ¶ 14) , Pl. A19 (Neuberger Report at 16 ¶ 43), Pl. A21 (Neuberger Report at 18 ¶ 47); Def. A93-95, 107, 108-109 (Deposition of Jonathan Neuberger, August 8, 2007, at 50:1-51:2, 62:9-12, 167:18-168:22, 177:18-178:22). Consequently, Dr. Neuberger opines that Mr. Graves' analysis "fails to provide reliable estimates" of the "timing, quantity and cost of exchanges." Pl. A6-7 (Neuberger Expert Report at 4 ¶ 13). In fact, Dr. Neuberger opines that "Mr. Graves does not actually model exchanges but simply assumes that they will occur and enable Dairyland to have its spent fuel removed earlier than under an allocation based on the OFF priority ranking," Pl. A7 (Neuberger Report at 4 ¶ 14), and Mr. Graves does not identify "the parties to any individual [exchanges] transaction" and he "does not describes a market mechanism that would produce the exchanges that he predicts." Id. Nor does he "adequately consider factors, such as uncertainty or risk aversion," that, from an economical standpoint, affect his hypothetical market. Id. Consequently, Dr. Neuberger opines that Mr. Graves' analysis is not useful in determining "issues relevant to Dairyland's damages." Pl. A6-7 ((Neuberger Report at 3-4 ¶ 13).

Dr. Neuberger provides specific criticisms of the significant flaws in Mr. Graves' model. He opines that Mr. Graves' hypothetical model relies upon certain questionable and unsupported assumptions, as reflected, among others, in the below critiques by Dr. Neuberger:

- Mr. Graves relies upon data from only a handful of the more than 100 commercial nuclear power plants as the basis for his conclusion as to the avoidable costs utilities would have faced in the "but for" world. Pl. A33-34 (Neuberger Report at 30 ¶ 79, and 31 ¶ 83). Indeed, notably absent from the cost data that Mr. Graves' incorporates into his model is any actual cost data concerning Dairyland's estimated costs at its LaCrosse Boiling Reactor Facility. Dr. Neuberger explains how Mr. Graves' "representative" cost estimates are statistically flawed:

> Despite the importance of site-specific cost data for an exchanges market, Mr. Graves does not have site-specific data for every nuclear power plant. He develops instead purportedly "representative" cost estimates and applies the same costs to every nuclear facility. He thus assumes away any plant-by-plant variation in costs.
>
> * * *
>
> Although Mr. Graves asserts that his small sample of cost data is "representative" of industry costs, there is no way to confirm from his analysis that his sample is, in fact, representative. First, he uses no underlying or systematic sampling methodology. The only criterion is whether the data was publically available and relatively detailed. At his deposition, Mr. Graves suggested that this lack of sampling methodology involved no bias since data selection was not based on any specific criteria.

Pl. A34 ( Neuberger Report at 31 ¶ 83), Pl. A36 (Neuberger Report at 33 ¶ 87).[7]

- Dr. Neuberger offers an economic critique of the numerous issues that Mr. Graves completely failed to consider in his hypothetical economic marketplace. In that

[7] At his deposition, Mr. Graves admitted that he did not utilize any systematic sampling methodology in determining which utility cost data to incorporate into his hypothetical exchanges model. Def. A75 (Graves Deposition at 172:24-173:2).

regard, Dr. Neuberger opines that Mr. Graves' characterization of his hypothetical exchange market is incomplete and, therefore, unlikely to produce reliable predictions concerning trading volumes or prices because Mr. Graves ignores all factors relevant to a utility's participation in the market but the avoidable cost in determining demand for acceptance rights. Def. A90-91, 100, 107, 108-109 (Neuberger Deposition at 34:7-20, 38:19-39:1, 110:3-20, 167:18-168:1, 177:18-178:2). Specifically, Dr. Neuberger explains that Mr. Graves' model completely ignores issues such as risk aversion, uncertainty, and political, regulatory, and community pressure. Def. A104, 108-9 (Neuberger Deposition at 136:7-137:14, 177:6-178:2, 179:1-17). For example, it simply assumes 100-percent participation and full market certainty:

> Mr. Graves effectively assumes 100 percent participation in his exchanges market. Yet it is economically reasonable to expect that participation in this market will fall short of 100 percent. Even in the "but for" world of DOE compliance, uncertainty about continued DOE performance, for example, will cause utilities to value earlier acceptance rights beyond simple "must move" needs. This valuation will certainly alter the demand for rights, but it also may inhibit participation in an exchanges market.
>
> * * *
>
> As a matter of economics, a model that incorporates uncertainty will not yield the same predictions as one that does not include the effects of uncertainty. Even if the same underlying incentives apply (e.g., cost minimization, profit maximization, or system-wide efficiency), decision making in the presence of uncertainty generally produces different results than the same decisions in the absence of uncertainty. Mr. Graves' base case simulation ignores uncertainty

> and thus cannot reliably predict its impact on an exchanges market.

Pl. A22-23 (Neuberger Report at 19-20 ¶¶ 50, 52).

- Dr. Neuberger explains that Mr. Graves' model is economically incomplete, as it focuses on the demand side of exchanges and completely ignores factors affecting the supply side of the market:

  > On the demand side of the market, Mr. Graves uses the notion of avoidable storage cost as the sole and summary determinant of demand. He largely ignores the supply side of the market, as the supply of acceptance rights in any given year is determined by DOE's aggregate acceptance rate. The analytical problem addressed in the Graves model is simplified considerably by assuming a predetermined vertical supply curve.
  >
  > While it may be economically reasonable to ignore the supply side of the market for acceptance rights, this omission is not justified in the market for exchanges. The supply curve in this market is not predetermined. Participation in the exchanges market is voluntary. Individual utilities can decide whether or not to participate in this market. Moreover, participation involves considerations of factors that are omitted from the Graves model. It is unsupportable from an economics perspective, however, to simply assume away one of the most substantive elements of the problem at hand.

  Pl. A21-22 (Neuberger Report at 18-19 ¶¶ 47-48).

- Dr. Neuberger also opines that Mr. Graves' model fails to consider the condition of utilities' SNF generally, including the significant number of "failed fuel" assemblies at LACBWR. Pl. A20-21 (Neuberger Report at 17-18 ¶ 46). Mr. Graves' model assumes that DOE would accept non-standard SNF, or "failed fail," according to the same

schedule as standard SNF. Def. A69, 71 (Graves Deposition, at 51:17-52:4, 60:7-20). However, as Dr. Neuberger notes in his analysis, Mr. Graves' factually-unsupported assumption with regard to failed fuel is illustrative of the oversimplified framework that underlies Mr. Graves' depiction of the market for DOE acceptance rights:

> Mr. Graves' assumptions regarding the ease with which exchanges would occur also ignores another important aspect about spent fuel acceptance – the condition of SNF. Mr. Graves' acknowledged at his deposition that Dairyland's spent fuel pool contained a number of failed fuel assemblies, but he simply assumed that failed fuel would be accepted by DOE on the same schedule as standard fuel. Depending on the extent of the failure, however, these assemblies may require additional costs or activities that could delay acceptance.[8]

Pl. A20-21 (Neuberger Report at 17-18 ¶ 46).

- As Dr. Neuberger notes, another aspect of uncertainty that Mr. Graves does consider involves the administration of the DOE acceptance program itself:

> The exchange provision in the Standard Contract involves exchanges of allocations identified in the approved DCSs. Under the Standard Contract, these DCSs must be approved by DOE, and the proposed exchanges are also subject to DOE approval. There are thus two layers of approvals required for the exchanges market to function that cannot be predicted with absolute certainty.

Pl. A27 ((Neuberger Report at 24 ¶ 62).

- Dr. Neuberger also criticizes Mr. Graves for unrealistically assuming that all utilities have perfect information concerning every other utility's "must move" needs and

---

[8] Indeed, Mr. Graves has acknowledged that the Standard Contract does not require DOE to accept a utility's failed fuel on the same schedule as standard fuel in light of the technical complexities associated with removing non-standard fuel. See 10 C.F.R. § 961.11, Art. VI.A.2(b); Def. A15 (Graves Report at 15 n.11).

associated costs. Pl. A18 (Neuberger Report at 15 ¶ ¶ 38-39); Pl. A31 (Neuberger Report at 28 ¶ 71); Pl. A33 (Neuberger Report at 30 ¶ 76). Dr. Neuberger opines that Mr. Graves' assumption is unrealistic because, even in the "but for" world where DOE performed on an industry-wide basis beginning in 1998, there would have been significant uncertainty regarding future events that could affect a utility's operations and spent fuel storage needs, and these uncertainties would exert unknown influences upon Mr. Graves' model. Def. A97-99 (Neuberger Deposition at 96:22-98:2, 106:3-108:1); Pl. A7 (Neuberger Report at 4 ¶ 14). Uncertainties could result in utilities that act differently than Mr. Graves' model predicts, with the result being that prices for allocations could move in any direction from year to year, rather than fall every year as Mr. Graves hypothesizes. Def. A99 (Neuberger Deposition at 107:9-17); Pl. A22 (Neuberger Report at 19 ¶ 49).[9]

- According to Dr. Neuberger, by focusing solely upon avoidable costs, Mr. Graves fails to consider the effect of utility risk management and utility strategic behavior in his model:

> In the presence of uncertainty, it is reasonable to expect that attitudes toward risk will be homogeneous across all utilities. Decisions by certain utilities will reflect strong aversion to risk, while other utilities will be less risk averse. If risk aversion reduces participation in an exchanges market (which is likely), and this attitude toward risk is concentrated among those utilities who are sellers of early-year allocation rights (which is possible), then there may be little or no supply of acceptance rights to an exchanges market in the early years of the DOE program. If this occurs, then many utilities, like Dairyland, will be unable to

[9] Dr. Neuberger testified that he has the expertise to develop a model that properly considers these important factors and discussed a potential methodology for the development of such a model at his deposition. Def. A94, 104-105 (Neuberger Deposition at 55:8-56:21, 136:1-137:14, 138:11-140:9, 141:1-4).

> purchase rights, or be unwilling to do so at the extremely high costs that would prevail under this smaller supply. The important point here is that the distribution of attitudes about risk is relevant, and is not addressed in Mr. Graves' model or any of his sensitivity scenarios.

Pl. A26-27 (Neuberger Report at 23-24 ¶60)(citations omitted); Pl. A30-31 (Neuberger Report, at 27-28, ¶ 70 ("Rather than a benign auctioneer seeking to clear the market, for example, the exchanges market could easily develop into one characterized by bilateral trades between sellers and buyers. The terms of each transaction would differ in those circumstances, with potentially none occurring at Mr. Graves' market-clearing price.").

- Dr. Neuberger criticizes Mr. Graves' assumption that every utility is aware of every other utility's cost structure and willingness to pay for current acceptance rights, explaining that this assumption fails to account for the fact that utilities conceal elements of their cost structures for competitive reasons. Def. A133 (Neuberger Deposition at 194:21-195:12). Dr. Neuberger also critiques Mr. Graves' opinion that prices for exchanges fall to zero after the third year of trading and explains that Mr. Graves fails to consider the inherent value to utilities in possessing approved DCSs. Pl. A22 (Neuberger Report at 19 ¶ 49). This failure is a result of Mr. Graves' lack of consideration of risk and uncertainty. Def. A102-103 (Neuberger Deposition at 127:14-129:4, 129:18-130:9).

Hence, in Dr. Neuberger's assessment of Mr. Graves' analysis – and by Mr. Graves' own admission, Def. A72 (Graves Deposition, June 19, 2007, at 95:5-12) – Mr. Graves' modeling framework that he presents in this case is virtually unchanged from the one that he used in PG&E. In that regard, Mr. Graves relies upon the same highly speculative assumptions in this case that the Court in PG&E identified in its order to exclude Mr. Graves'

testimony at trial: (1) that DOE would have approved every exchange; (2) that every utility would have offered its rights to the exchanges market; (3) that all exchanges would occur at the marginal price; and (4) that market participants had perfect information and were driven by solely economic considerations. Pl. A32-33 (Neuberger Report at 29-30 ¶¶ 76-77); see PG&E, 73 Fed. Cl. at 436.

## IV. DR. NEUBERGER'S ECONOMIC CRITIQUE OF MR. GRAVES' MODEL IS BOTH RELEVANT AND RELIABLE

Dairyland's primary challenge to Dr. Neuberger's testimony is that, although he has offered an economic critique of Mr. Graves' hypothetical "but for" world model, he has not offered an alternative model. Pl. Mot. at 6, 10-15. Dairyland asserts that, because Dr. Neuberger has not developed an alternative model, his opinions that Mr. Graves' model produces unreliable results is based upon conjecture and speculation. Id. Dairyland's criticism of Dr. Neuberger's opinions is without merit.

As an initial matter, contrary to Dairyland's novel and unsupported contention, courts have routinely allowed expert critiques of damages models without offering an alternative model. See, e.g., California Fed. Bank v. United States, 54 Fed. Cl. 704, 708-9, 712 n.12 (2002) (accepting defendant's expert's critique of plaintiff's damages model without requiring defendant's expert to offer alternative model), aff'd, 395 F.3d 1263 (Fed. Cir. 2005); Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 827-28 (2001) (accepting Government expert's critique of opposing expert's damages model without requiring expert to offer alternative model), aff'd, 308 F.3d 1283 (Fed. Cir. 2002).

Second, Dairyland's complaints about Dr. Neuberger's opinions fail to recognize that the burden of demonstrating the "but for" world for purposes of establishing an entitlement to the

recovery of damages falls squarely upon Dairyland, and not the Government. See Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 386 (2006), appeal pending, No. 2007-5046 (Fed. Cir.) ("Plaintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract.") (quoting Glendale Fed. Bank, FSB v. United States 239 F.3d 1374, 1380 (Fed. Cir. 2001)); see also id. at 406 ("[t]o derive the proper amount for the damages award, the cost resulting from the breach must be reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach" (quoting Bluebonnet Sav. Bank, FSB v. United States, 339 F.3d 1341 at 1345 (Fed. Cir. 2003))).; see also San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered") (emphasis added).[10]

---

[10] Dairyland relies upon case law from outside the Federal Circuit, such as Elcock v. Kmart Corp., 233 F.3d 734 (3d Cir. 2000), Winters v. Fru-Con Inc., 498 F.3d 734 (7th Cir. 2007), and Clark v. Takata Corp., 192 F.3d 750, 757 (7th Cir. 1999), for the erroneous proposition that Dr. Neuberger's testimony must be precluded because he did not present an alternative model to support his critique of Mr. Graves' theories. Pl. Mot. at 6-7. Dairyland's reliance on these cases in misplaced. None of these cases – which involve tort, product liability, and design-defect claims wherein the court critiques the methodology of the plaintiff's liability expert – articulates such a bright-line rule. In fact, in Winters, the court specifically noted that alternative design testing is not an absolute prerequisite to the admission of expert testimony in light of the fact that "the Daubert inquiry is a flexible one." Winters, 498 F.3d at 742-743 (noting that "[t]here could be situations where the district court determines the proposed expert's testimony regarding an alternative design is reliable despite a lack of testing of the alternative design because the expert has adhered to the 'standards of intellectual rigor that are demanded in [his or her] professional work,' such as relying on the data generated by other researchers, making proper personal observation or taking other appropriate actions.")(citations omitted). Further, because these cases involve tort and product liability claims in which the court critiqued the methodology utilized by plaintiff's expert witness, insofar as these cases are relevant at all, these cases are consistent with the Government's position, in that they support the notion that the burden rests upon plaintiff – and not the defendant's expert – to show "'what might have been'" with reasonable certainty," PG&E, 73 Fed. Cl. at 386. See, e.g., Clark, 192 F.3d at 758 (affirming trial court's exclusion of plaintiff's expert who "failed to identify, much less offer, any evidence to support his conclusion that a lap belt, if properly fastened, could have" prevented plaintiff's injury).

Indeed, Dairyland has it backwards. It is Mr. Graves who has based his opinions upon insufficient facts and data and who has failed properly to consider significant factors in his model, and Dr. Neuberger's opinion simply attempts to alert the Court to these substantial deficiencies based upon the application of well-established, reliable economic principles. Indeed, in creating his model, Mr. Graves spoke to no utilities – including Dairyland – as to their willingness to participate in his hypothetical exchanges market. Def. A73-74 (Graves Deposition, June 19, 2007, at 117:18-118:1); Def. A78-79, 81. (Graves Deposition, Sept. 6, 2007, at 8:8-9:16, 13:24-14:1, 23:30-24:2). As Dr. Neuberger repeatedly discussed in both his expert report and his deposition, "reliable principles and methods" of economic modeling require consideration of a variety of factors, and Mr. Graves completely failed to consider these factors in his model. Pl. A7, Pl. A18, Pl. A21, Pl. A23-24 (Neuberger Report at 4 ¶ 14, 15 ¶ 38, 18 ¶ 47-48, 20 ¶ 52-55); Def. A87, 92-94, 100-101 (Neuberger Deposition at 22:18-24:22, 49:9-51:2, 56:13-21, 113:9-114:6). To the extent that Mr. Graves' model lacks sufficient evidentiary support or otherwise lacks credibility, the Government need not offer an alternative damages model. See Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 107-08 (2004) (rejecting plaintiff's expert's damages model because it was not based upon sufficient factual evidence, did not use assumptions that were "moored in that factual evidence," and was not credible).

Dairyland's contentions that Dr. Neuberger has presented no methodology and otherwise has not "done the work" necessary to support his critique of Mr. Graves' model, and that the absence of a quantitative analysis is fatal to Dr. Neuberger's expert opinions, Pl. Mot. at 4-5, are without legal or factual merit. In fact, as Dr. Neuberger explained in his deposition, he performed a quantitative analysis through his extensive analysis Mr. Graves' allocation rights

model, the formulas that drive Mr. Graves' model, and the cost estimates that are the key inputs to Mr. Graves' economic sequence model. Def. A84-85 (Neuberger Dep. at 13:15-14:11). Dr. Neuberger explained in his deposition the methodology that he performed to complete his critique of Mr. Graves' model:

> I used my knowledge, training and experience as an economist to conduct a critical review of Mr. Graves' model, including the assumptions, the methodology and the predictions of that model. That methodology is a well-established methodology among trained economists. I would say every economist who enters a graduate program in economics is trained in that methodology beginning right from the start of the program.

Def. A86 (Neuberger Dep. at 20:19-21:7). In conducting his economic analysis, Dr. Neuberger performed a three-step methodology that is universally employed by professional economists: (1) Dr. Neuberger performed an economic assessment of the assumptions upon which Mr. Graves' modes are based; (2) Dr. Neuberger analyzed the underlying methodology that Mr. Graves utilized in developing his models; and (3) Dr. Neuberger assessed the predictions of the modeling framework that Mr. Graves developed to determine whether the predictions made economic sense. Def. A87 (Neuberger Deposition at 22:18-25:15).

Dr. Neuberger also explained the difference in methodology between the creation of a model and the critique of a model:

> If a model is considered to be deficient in let's say the fundamental assumptions underlying the model's behavior, if you tweak that model, you're still ignoring the deficiency. You still have the deficiency in there. Are some of Mr. Graves' simulations more meaningful than others? Perhaps. But I still think, if you have got a model that is deficient, simulating that model under various circumstances doesn't make it suddenly not deficient anymore. So that is the primary reason that I didn't run my own scenarios of [Mr. Graves'] model. Because I believe the fundamental structure is deficient. The output is going to be informed by those deficiencies.

> So just focusing on a subset of the scenarios doesn't overcome those deficiencies. Yes, there is variability in the results using [Mr. Graves'] model. But the model in every one of its variations in those scenarios still has the fundamental deficiencies that I identify in my report.

Def. A93 (Neuberger Deposition at 50:1-19).

Dr. Neuberger's methodology, based upon his significant experience applying well-established economic principles, is more than sufficient to allow him to offer expert opinions in this case. See First Tennessee, 268 F.3d at 334-35 (accepting expert testimony based upon "[expert's] own practical experiences throughout forty years in the banking industry"); First Union, 423 F.3d at 862 (allowing for qualification of expert based upon "knowledge, skill, experience, training or education"); Betterbox Communications, 300 F.3d at 329 (affirming expert testimony based upon "personal knowledge or experience . . . rather than a methodology that satisfies the Daubert factors"). Indeed, rather than *ipse dixit*, as Dairyland suggests, Dr. Neuberger explained that his critiquing methodology is subject to replication by other experts, and provides the Court with a basis for determining the reliability of Dr. Neuberger's opinions:

> I think if you took this model, Mr. Graves' report, and gave it to 10 other economists, there would be tremendous overlap in the criticism that each of those economists would present in terms of review, critical review of Mr. Graves' work.

Def. A87 (Neuberger Deposition at 22:1-6); see Def. A86 (Neuberger Deposition at 21:2-7 ("[My] methodlogy is a well-established methodology among trained economists. I would say every economist who enters a graduate program in economics is trained in that methodology beginning right from the start of the program."); Def. A88 (Neuberger Deposition at 28:5-18). Further, Dr. Neuberger explained that an another economist could test his methodology in critiquing Mr. Graves by performing the same analysis that he performed – in short, by

"reviewing [Mr. Graves'] model, reviewing the results, looking at the predictions and seeking if those predictions are sufficiently reliable and sufficiently robust to provide a reasonable basis for quantifying damages." Def. A90 (Neuberger Deposition at 35:3-9). Simply put, Dr. Neuberger's opinions have a sufficient indicia of reliability to qualify him as an expert in this case.

Dairyland next contends that, because Dr. Neuberger has not run any alternative models, Dr. Neuberger lacked any degree of confidence in his opinions and that this lack of confidence is evidenced by the use of the word "may" and "could" in his opinions. Pl. Mot. at 8. In this regard, as Dairyland would have it, Dr. Neuberger cannot state his "flimsy opinions" with a "reasonable degree of certainty," thereby rendering them unhelpful to the Court. Id. Contrary to Dairyland's assertion, Dr. Neuberger unequivocally stated his confidence that Mr. Graves' model produces unreliable results, even without developing a counter-model, based upon his understanding of economics and review of the scenarios modeled by Mr. Graves in his report. Def. A89 (Neuberger Dep. at 33:8-10) ("As it currently stands, I believe [Mr. Graves'] model is not adequate for the purpose for which it is offered."); Def. A90 (Graves Deposition at 35:21-36:7). Indeed, Dr. Neuberger explained the basis of his findings:

> But I see a lot of variation in [Mr. Graves'] model from relatively small changes in parameters. I think as a result, those results are not what I would call robust. And I think most economists, if not all of them, would agree with me, that a model whose results change quite significantly as a result of small perturbations in parameters in that model is not a robust model, and is one that should not be relied on by a court.

Def. A91 (Neuberger Dep. at 40:6-14).

Dr. Neuberger further explained the qualitative effect of Mr. Graves' failure to produce a proper model:

> In order to provide predictions that are relevant to damages, Mr. Graves must reliably estimate the timing, quantity and cost of exchanges. In my opinion, [Mr. Graves'] analysis fails to provide reliable estimates of these key variables.
>
> In fact, Mr. Graves does not actually model exchanges but simply assumes that they will occur and enable Dairyland to have its spent fuel removed earlier than under an allocation based on the OFF priority ranking. His general model cannot identify the parties to any individual transaction. He does not describe a market mechanism that would produce the exchanges that he predicts. He fails to adequately consider factors, such as uncertainty or risk aversion, which would affect his hypothetical market. These deficiencies are largely the same as those I addressed in my expert analysis in the Pacific Gas & Electric case. Mr. Graves also ignores the potential negative impact of certain contract provisions on the schedule of acceptance, such as uncertainty related to DOE review of [DCSs] and proposed exchanges, and the possibility of separate treatment of failed fuel.

Pl. A6-7 (Neuberger Report at 3-4, ¶¶ 13-14); Def. A90-91, 94, 96, 106, 111-13 (Neuberger Deposition at 36:22-38:5, 55:14-56:21, 84:9-85:9, 160:7-161:15, 188:8-191:11, 195:21-197:1). There simply is no basis for Dairyland's contention that Dr. Neuberger has not offered a sufficiently definitive opinion in this case.

Finally, Dairyland claims that Dr. Neuberger's opinions are of no help to the Court because Dr. Neuberger, as Dairyland would have it, is merely "merely pointing out weaknesses" in Mr. Graves' analysis. Pl. Mot. at 4. However, that is precisely why Dr. Neuberger's opinions are helpful to the Court in this case. One of Dr. Neuberger's opinions is that Mr. Graves' model is deficient for a variety of reasons and that, based upon these deficiencies, the Graves' model tells the Court little, if anything, as to how an exchanges market would have operated in the "but

for" world. Dr. Neuberger seeks to offer the Court a framework for evaluating the validity and reliability of Mr. Graves' hypothetical exchanges model. Based upon Dr. Neuberger's critique, the Court will be able to understand the significant errors and omissions contained in Mr. Graves' model and analysis and why the model fails to meet Dairyland's burden of proof. Absent a reliable "exchanges" model, this Court should rely upon the contractual mechanism for allocating acceptance rights, referred to in the Standard Contract as OFF. Consequently, Dr. Neuberger's testimony is both relevant and helpful to the Court in understanding the significant deficiencies contained in Mr. Graves' model.[11]

CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny Dairyland's motion to exclude the expert testimony of Dr. Neuberger.

[11] Indeed, after Dr. Neuberger offered his economic critique of Mr. Graves' model, Mr. Graves submitted a rebuttal report in which he endeavored to incorporate into his model or otherwise respond to many of Dr. Neuberger's criticisms. However, as we will demonstrate at trial, Mr. Graves' "modeling" of the issues such as political risk and uncertainty lack any empirical support, and Mr. Graves only "models" each of these issues separately, rather than considering the collective effects that these issues may have upon the results of his model. Regardless of the serious deficiencies in Mr. Graves' revised analysis, the fact that such a revised analysis was conducted supports the conclusion that Dr. Neuberger's economic critique is relevant and reliable and warrants serious consideration by the Court.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell A. Shultis by s/ Patrick B. Bryan
RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 305-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Trial Attorneys
U.S. Department of Justice

May 15, 2008

CERTIFICATE OF FILING

I hereby certify that on this 15th day of May 2008, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF JONATHAN A. NEUBERGER," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Patrick B. Bryan