# APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | No. 04-0074C, into which has been consolidated No. 04-0075C (Judge Hewitt) |

EXPERT WITNESS REPORT OF FRANK C. GRAVES

## I. INTRODUCTION AND APPROACH

I have been asked to prepare this report to describe what would have been reasonable performance by the United States government in accepting spent nuclear fuel and high-level radioactive waste (together, spent fuel) under the terms of its 1983 contract with the Plaintiff, the Pacific Gas and Electric Company (PG&E). PG&E owns two nuclear plants, Humboldt Bay and Diablo Canyon, both covered by the contract with the government (via the U.S. Department of Energy, DOE) for spent fuel removal. It is well known and accepted that the government has not satisfied the obligations of that contract, having failed to remove spent fuel from any utility. I describe in this report a reasonable description of how the government would have performed in the hypothetical non-breach world where it did satisfy its contract obligations. In particular, I characterize the schedule of spent fuel acceptance from the two PG&E plants in that non-breach environment.

In reaching my conclusions, I have considered information contained in a number of documents related to spent fuel storage and disposal, the DOE spent fuel program, and

publicly available information on nuclear power plants. I have also considered representative estimates of spent fuel storage costs provided by Roderick Knight of Knight Cost Engineering Services, LLC, and testimonies of Dr. John Bartlett and Mr. Ivan Stuart regarding what level of program performance would be feasibility and reasonable. Appendix 1 provides a complete listing of the data and information I considered in forming my opinions.

I have over twenty years experience in assisting utilities in the design and implementation of long-range planning, investment, and operating policies, and in assisting their counsel with regulatory compliance and policy review. My work has involved market design and performance evaluations, capacity expansion and network modeling, investment and contract prudence reviews, estimation of marginal costs, price forecasting, design and pricing of new services, and financial simulation and valuation assessments. I have testified on the economics of electric and gas industry restructuring before the FERC and State regulatory commissions on numerous topics, including market entry, antitrust, retail and wholesale transmission access, power contract interpretations, service unbundling, new services, and cost of capital. I have testified in state and federal courts regarding contract disputes and compliance with environmental regulations. I recently testified regarding the government's failure to remove spent nuclear fuel in a similar case involving the Yankee Atomic, Maine Yankee and Connecticut Yankee nuclear plants. I am the author of several papers on approaches to and the impacts of restructuring of the electric and gas industries in the U.S., and I am a member of professional societies for mathematics, electrical engineering, and energy economics. I received an M.S. with a concentration in finance from the M.I.T. Sloan School of Management in 1980, and a B.A. in Mathematics from Indiana University in 1975. Additional detail on my experience and qualifications to offer the opinions included in this report is set out in Appendix 2. Appendices 3 and 4 list the cases in which I have testified as an expert at trial or by deposition during the preceding four years, and my publications for the preceding ten years. The Brattle Group is being paid $475 per hour for my time working on this matter.

### I.A. Approach to Modeling Non-Breach Spent Fuel Acceptance

PG&E's contract is one of approximately sixty such contracts, based on a standard form (the Standard Contract, or Contract) signed around the same time between the government and owners of U.S. commercial nuclear reactors (Purchasers, in the Standard Contract). Each Contract provides that the U.S. government, represented by the DOE, will remove Purchaser's spent nuclear fuel and high-level radioactive waste (HLW) from their nuclear facilities, in exchange for payments based on the amount of power generated by the nuclear reactors and designed to cover the full costs of the program.[1] In aggregate, these Contracts cover spent nuclear fuel disposal from all U.S. commercial reactors.

The Standard Contract does not spell out a timetable for the schedule of spent fuel acceptance from individual Purchasers or facilities, nor indeed for the overall program. The Contract does specify that the DOE would begin acceptance by January 31, 1998. Article IV.B.5 creates an initial priority ranking for acceptance under a paradigm known as Oldest Fuel First (OFF), which allocates the earliest acceptance priority to the oldest spent fuel. The Contract also contemplated, in Article V.E, that Purchasers could exchange their positions in the acceptance order. Finally, the Contract specifies that spent fuel must cool for at least 5 years, after which it becomes eligible for pickup. In this context, the schedule of non-breach spent fuel acceptance at any particular facility depends on the performance of the overall program, and the schedule of acceptance from other facilities. Conceptually, the problem can be separated into two parts:

1. Pace of acceptance: the aggregate rate at which the spent fuel program accepts spent fuel.
2. Sequence of acceptance: The allocation of the program's aggregate acceptance among individual Purchasers and facilities (the acceptance priority).

Despite the Contract's lack of specificity, economic logic can be used to characterize the

---

[1] Throughout the remainder of this report, I focus on spent nuclear fuel and do not consider high-level radioactive waste (HLW) separately. This is because HLW quantities are sufficiently small and similar in character to spent fuel that their inclusion would not alter my conclusions.

non-breach program, addressing both pace and sequence. This characterization is based on the timing of Purchasers' economic needs for spent fuel removal and evidence that a program capable of reasonably serving those needs would have been economically reasonable and technically achievable. The importance of implementing the DOE program in an efficient manner, in terms of pace and sequence, is reflected in many DOE spent fuel program documents. This need and expectation was testified to by John Bartlett, former Director of the DOE spent fuel program, during the summer 2004 trial in the Yankee cases, and it is consistent with mitigating the financial burden on Purchasers, who are responsible for the total costs of the spent fuel program.

## II. AGGREGATE ACCEPTANCE RATE IN THE NON-BREACH WORLD

To determine the acceptance rate in the non-breach world, I rely on evidence regarding Purchasers' economic need for spent fuel removal, and on evidence that it would be feasible and reasonable to accept spent fuel at a rate consistent with those needs. This latter evidence comes in part from the DOE's plans for the spent fuel program over time, and it is corroborated by other sources.

### II.A. The Economic Need for Spent Fuel Removal – Must Move Analysis

To identify Purchasers' economic needs for spent fuel removal, it is first necessary to understand the basic economics of spent fuel storage. An operating nuclear reactor must have a spent fuel pool, and the costs of operating that pool (e.g., security, engineering and maintenance) are essentially fixed, i.e., independent of the quantity of fuel in the pool. Any individual pool can accommodate only a limited amount of spent fuel because of physical space limits and how the fuel is arranged in the pool. I understand that almost all operating nuclear plants make it a practice to reserve sufficient space in the pool to accommodate the discharge of all the fuel in the reactor core in case of emergency – a so-called Full Core Reserve or Full Core Offload Capability (FCR or FCOC). Thus the available storage capacity in an operating plant's pool is the total pool capacity minus FCR, minus the inventory of spent fuel already stored in the pool.

If an operating plant runs out of storage space in its pool and has additional spent fuel discharges to accommodate, then either some spent fuel must be removed from the site (e.g., delivered to the DOE under the spent fuel program), or substantial incremental cost must be incurred to create additional at-reactor storage capacity (e.g., installing a dry storage facility).[2] When a plant shuts down, the pool must continue to operate for some time, until the last fuel discharged becomes cool enough for handling (5 years, under the Standard Contract). After that time, the pool can be decommissioned and ongoing pool operating costs can be avoided, if/when the spent fuel is removed.

This leads to an economic concept for understanding how the government's spent fuel program would have worked in the non-breach world. Spent fuel storage imposes essentially no incremental (avoidable) cost, as long as the spent fuel inventory does not exceed a pool's capacity, or until 5 years beyond reactor shutdown. However, once 1) pool storage limits are reached, or 2) the plant has been shut down for at least 5 years, the plant owner begins to incur incremental costs from adding or maintaining storage capacity. This results in an economic need to remove spent fuel, which I refer to as a "Must Move" condition. That is, a facility is in a Must Move condition if it needs to remove spent fuel in order to avoid significant incremental storage costs. I label the two circumstances that lead to a Must Move condition as Full Pool Must Move (FPMM), when an operating facility runs out of pool space, or Shutdown Must Move (SDMM), five years after shutdown when all the spent fuel can be removed.

I have performed an analysis of the Must Move needs of each commercial nuclear power plant in the U.S. This analysis determines, for each facility, when spent fuel storage requirements will begin to impose significant incremental costs, and how much spent fuel would have to be removed by what time to avoid that incremental cost. Reliable data on

2 In some circumstances, it may be possible to create additional capacity in a pool, for instance by re-racking the spent fuel assemblies in an arrangement of greater density. Though re-racking can be less costly than dry storage, it also incurs a substantial expense. I do not consider re-racking in my analyses, in part because it is difficult to obtain data on the potential for re-racking at individual sites. However, this approach to re-racking lends conservatism to my results, because if lower-cost alternatives are available to Purchasers other than PG&E, that would make it easier for PG&E to have its spent fuel removed sooner.

historical and forecasted nuclear reactor operations is readily available, due to extremely detailed record-keeping and the relative predictability of operations over time, making it straightforward to develop a quantitative model of future Must Move requirements. This analysis is based on DOE data on spent fuel pool storage capacities, inventories and projected spent fuel discharge data.[3] For each nuclear facility, the Must Move analysis tracks the amount of spent fuel initially present at the facility, the amount and timing of additional spent fuel discharges, and the spent fuel pool storage capacity (net of FCR), to determine when each facility reaches one of the two possible Must Move conditions. The aggregate results of my Must Move analysis – the industry-wide quantities of spent fuel that will incur avoidable economic cost, distinguished according to the two categories – are illustrated in Figure 1.[4]




3 *Spent Fuel Storage Requirements 1994-2042*, US Department of Energy, Office of Civilian Radioactive Waste Management, June 1995. Minor adjustments were made to this data to eliminate implied premature shutdowns for several reactors, for which there was no apparent basis.

4 The DOE data on which this analysis is based assumes that reactors retire at the end of their original license lives. (This assumption does not to affect my results for PG&E's plants; the sensitivity of my results to this and other assumptions is discussed later.) The narrow band at the top of the Full Pool Must Move area corresponds to pre-1998 FPMM spent fuel, which is treated slightly differently from other FPMM in later analyses.

**Figure 1: Aggregate Must Move Spent Fuel**

The aggregate quantity of Must Move spent fuel starts in 1998 at several thousand metric tons (MTU), climbs at around 1,000 to 2,000 MTU/year for about the first twenty years, and climbs at over 3,000 MTU/year for about the next twenty years as large numbers of plants shut down.[5] With regard to these needs, an economically appropriate non-breach acceptance rate would accommodate the average Must Move needs, would start early enough so it is not overwhelmed by the higher needs in later years, and would stay somewhat ahead of aggregate Must Move needs. A rate that did not satisfy these criteria would impose unnecessary costs and risks on nuclear plant owners and their customers.

**II.B. Feasibility of Acceptance Rate**

Recognizing the economic need to remove spent fuel, another important consideration in judging the overall reasonableness of an acceptance rate is whether it is technically feasible and economically reasonable to implement it throughout the entire program. This includes whether the rate is reasonable with respect to loading spent fuel at reactor sites, transporting it to the permanent repository (possibly by way of an interim storage facility), and emplacing the waste in the permanent repository. A good starting point for understanding what rate would be technically feasible and reasonable in this context is the planning that occurred for the DOE spent fuel program itself.

All of the many DOE planning documents and studies that I am aware of, beginning with the 1985 Mission Plan and continuing through today, use a steady-state acceptance rate of 3,000 MTU/year at a geologic repository.[6] All the program plans also show repository acceptance beginning at a lower rate and ramping up to the 3,000 MTU/year steady state rate in 3-6 years. This long history of using a ramp-to-3,000 MTU/year acceptance rate in program planning is consistent with the fact that this rate is feasible and reasonable

[5] Spent fuel quantities are often measured in units of metric tons of uranium (MTU), reflecting the mass of uranium in the original fuel.

[6] The acceptance rate of the overall program may differ from this, e.g., if there are additional facilities such as a second repository or an interim storage facility, and/or if a repository is substantially delayed relative to the start of the program.

throughout the entire waste management system. Ivan Stuart confirms that it would have been technically feasible and programmatically reasonable for the waste disposal program to load spent fuel at a rate of 3,000 MTU/year from reactors and transport it at this rate to an interim and/or permanent facility. Dr. John Bartlett similarly testifies that this rate is reasonable for emplacing spent fuel in a permanent repository, corresponding to one 10 MTU cask per day, 300 days per year. He also confirms that it would be feasible and reasonable for the program to ramp up to the 3,000 MTU/year steady state acceptance rate within three years.

### II.C. Acceptance Rate Conclusion

Among the program planning acceptance rates that ramp up to 3,000 MTU/year, several slightly different ramp-up profiles have been used. For my numerical analyses to characterize non-breach acceptance, I use the rate shown in Table 1. This particular rate first appeared, to my knowledge, in the Draft 1988 Mission Plan.[7] This acceptance rate, beginning in 1998, satisfies the criteria I specified above and so is economically appropriate with respect to the industry's aggregate need to remove spent fuel.

| | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004 Forward** |
|---|---|---|---|---|---|---|---|
| Acceptance (MTU) | 1,200 | 1,200 | 2,000 | 2,000 | 2,700 | 3,000 | 3,000 |

Source: Draft 1988 Mission Plan; 1990 Annual Capacity Report

**Table 1: Aggregate Non-Breach DOE Acceptance Rate**

[7] In the Draft 1988 Mission Plan, this acceptance rate began in 2003, which is clearly inconsistent with the Contract requirement that acceptance begin in 1998. The 1990 version of the DOE Annual Capacity Report, a periodic publication that projected program acceptance for planning purposes, used the same acceptance rate, but starting in 1998, as the basis for its Upper Bounding Case.




**Figure 2: Non-Breach Acceptance Rate and Must Move Spent Fuel (Supply and Demand for Spent Fuel Acceptance)**

Figure 2 compares graphically this DOE acceptance rate (the supply of spent fuel acceptance) with my results for the quantity of Must-Move spent fuel (the demand for spent fuel acceptance). As can be seen, this acceptance rate is reasonable with respect to Must Move needs. Starting with a modest backlog of Must Move spent fuel at the start of the program in 1998, this acceptance rate would make it possible to work down the backlog within a few years and to get somewhat ahead of the actual economic need to remove spent fuel, staying ahead thereafter. That aggregate headroom provides a buffer for dealing with later years in which Must Move fuel is generated at a faster rate than the program's acceptance rate, as well as for the possibility that actual Must Move needs might differ from the forecast. Just on the basis of comparing this acceptance rate with aggregate Must Move needs, it can be seen that all facilities, including the PG&E plants, could have all of their Must Move needs served (and thus incur no incremental spent fuel storage costs) from about 2001 forward, when cumulative supply exceeds demand.

This acceptance rate is also consistent with overall program efficiency, which is of course an important public policy goal in any context, but particularly here since the Purchasers are required to pay the full cost of the program. While I have not formally analyzed how overall program cost is influenced by the aggregate acceptance rate, other analyses have concluded that the most efficient program acceptance rate would be 3,000 MTU/year or more. Several studies, including some performed for the DOE, have found that at-reactor storage costs are the only program costs that vary substantially with acceptance rate, and at-reactor costs are minimized at an acceptance rate of 3,000 to 5,000 MTU/year.[8]

This result makes intuitive sense as well. The overall program must eventually accept, transport and dispose of all spent fuel. Broadly speaking, repository size and development costs are driven by the total amount of spent fuel that must eventually be disposed, not the rate at which it is accepted. Total loading and transportation costs are primarily determined by the quantity of spent fuel and the distance it must be moved, not by the acceptance rate.[9] Pre-closure operating costs are minimized by loading the repository expeditiously and at a steady rate, but not faster than the spent fuel is created and can be ready to move. Since at-reactor storage costs are the only costs that vary substantially with the acceptance rate, a rate that minimizes at-reactor costs will also approximately minimize overall program costs.

## III. SEQUENCE OF ACCEPTANCE IN THE NON-BREACH WORLD

Although the Contract does not explicitly identify the sequence in which spent fuel would actually be accepted, its provisions, in particular the initial OFF acceptance priority and the exchange mechanism, create the basis for understanding how a reasonably efficient

---

8 E.g., *Civilian Radioactive Waste Management System Throughput Rate Analysis*, August 17, 1993, prepared for U.S. Department of Energy by System Analysis, Civilian Radioactive Waste Management System Management and Operating Contractor. See also McKee, R. W. and H. D. Huber, "Determination of Cost Effective Waste Management System Receipt Rates," Pacific Northwest Laboratory, from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 28 - May 3, 1991.

9 Costs can also be affected by the extent to which shipments are consolidated, as I address later. This issue is separate from the question of the aggregate acceptance rate.

sequence would have been achieved.[10] With the OFF acceptance priority creating a well-defined initial property right for spent fuel removal services, Purchasers could exchange their allocations to redistribute acceptance priority and improve efficiency.[11] While the DOE does have the right to approve exchanges, its position was that Purchasers themselves would "optimize" the acceptance sequence, without direct involvement by the DOE.

In the non-breach world, Purchasers would have used exchanges to improve on the initial OFF acceptance allocation until they reached a good approximation of the economically efficient allocation, because they face substantial incentives to do so. The OFF acceptance priority is highly inefficient and would impose substantial avoidable costs on Purchasers. In brief, the problem with OFF is that it disperses removal priority for a given facility steadily across many years of plant operation and retirement, when the economic need for removal is typically far more concentrated in time. Accordingly, removal according to OFF priority would be entirely inadequate for some facilities, and unnecessary for others. By pursuing exchanges with each other, Purchasers in the aggregate could save hundreds of millions of dollars by avoiding unnecessary at-reactor storage costs. Exchanges are entirely voluntary so they would be pursued insofar as they are in Purchasers' individual interest, making many Purchasers better off and none worse off. Attractive exchanges would also be readily identifiable and easily achieved. It is quite straightforward to determine the allocation and need for spent fuel removal – much as I have done in this proceeding. (Indeed, such analysis is much easier than determining supply and demand in many other markets that perform quite well.) It requires the type

10 In addition to the OFF and Exchange provisions, the Contract also raises shutdown priority, emergency deliveries, and failed fuel as issues that may affect acceptance priority. Article VI.B.1 states that priority "may" be granted to shut down facilities, though does not say how that determination would be made. Article V.D makes allowance to accept emergency deliveries. In my analyses, I do not consider these alternative allocations of acceptance priority. Shutdown priority rights are ambiguous, and would affect only the initial priority allocation, not the economically efficient allocation. The need for emergency deliveries may not materialize, and would likely be small relative to the overall program, so would not substantially change the result in any case. Regarding failed fuel, the contract arguably allows it to be accepted on an adjusted schedule, if it is not feasible to accept it on the same schedule as non-failed fuel. I am aware of no such technical feasibility issues. Experience has shown that failed fuel has not created substantially different technical requirements for placement in dry storage, as evidenced by testimony from Michael Meisner, Chief Nuclear Officer of Maine Yankee Atomic Power Co., during that company's summer 2004 spent fuel hearing. I am not aware of any evidence to suggest that DOE has been planning to accept failed fuel on a different schedule than other spent fuel. Thus I treat failed fuel the same as non-failed fuel.

11 The exact mechanism by which exchanges would have occurred was never developed, because the program never progressed to that stage.

of analyses that I describe below – a determination of the initial OFF priority allocation, and analysis of spent fuel storage capacities and requirements at individual facilities to determine economic needs. This analytic simplicity means that Purchasers who desired to exchange acceptance priority in the non-breach world could have easily identified potential buyers and sellers of acceptance priority, along with the approximate prices (which might be zero) at which they would be willing to transact.

### III.A. Determining the Economically Efficient Sequence

I have developed a model, the Economic Sequence Model (ESM), that determines the efficient sequence of spent fuel removal, given the Must Move needs of individual facilities and the program's acceptance rate as determined above. This model closely approximates the results I would expect to observe under exchanges of OFF acceptance allocations among Purchasers. The ESM is in principle very simple. In each year it begins with the Must Move needs of each facility, determines the storage costs that could be avoided if those needs were met (using representative spent fuel storage costs provided by Rod Knight), and ranks the facilities according to their economic priority for removing spent fuel. This economic priority ranking is based on the facilities' "willingness to pay", or avoidable annual costs, for spent fuel removal on a cost-per-MTU basis (because exchanges would occur on an MTU-for-MTU basis). In economic terms, this ranking creates the demand curve for spent fuel acceptance. The ESM then allocates the available acceptance in that year according to this economic priority ranking – i.e., it allocates acceptance to those who need it most, matching supply (total annual acceptance) to demand.[12] If any Must Move needs are unmet in a given year, they are carried over to the following year (because that fuel is still Must Move) and combined with new Must Move needs, and the process is repeated, year after year.

The ESM determines the economically efficient acceptance sequence, given the overall program acceptance rate. In reality, exchanges might not reach this precise sequence.

[12] Consistent with the efficient use of transportation resources, the ESM includes a constraint that acceptance must be allocated so as to completely fill each transport cask.

However, they would achieve approximately this sequence, because any substantially different sequence would incur considerable unnecessary storage costs. The avoidable costs could be millions to tens of millions of dollars each year for a single facility. To avoid these unnecessary costs, Purchasers would be keenly motivated to identify and carry out additional exchanges until essentially all advantageous exchanges had been made – that is, until the revised allocation reached a good approximation of the efficient allocation, minimizing at-reactor storage costs. Since information regarding the allocations and likely needs of potential exchange counterparties is readily available, there is ample opportunity for Purchasers to identify and perform essentially all advantageous exchanges well in advance of the fuel removal dates.

The ESM results show that the program could and would have served the vast majority of Must Move needs once the program began. All Full Pool Must Move needs would have been served when needed; i.e., starting in 1998, all plants at risk of running out of pool space would have had enough spent fuel removed to avoid developing a new dry storage facility or adding to an existing one. A few plants with existing dry storage facilities or shutdown pools would continue to operate them and incur incremental storage costs for up to a couple of years, in order to accommodate the greater economic needs of others. However, beginning about 2001 and thereafter, all Must Move needs of all types would be served as soon as they arose, and the program would begin to get ahead of immediate needs. This is the same basic result that was observed previously by comparing the aggregate Must Move quantity with total acceptance in Figure 2. Must Move needs would continue to arise after 2001, but with proper allocation, there would be sufficient acceptance to serve all those needs, plus remove additional spent fuel that was not yet incurring any incremental storage cost.

Purchasers would not give away allocation rights freely in the early years when not all Must Move fuel could be served, since in those years, potentially unserved Purchasers would be willing to pay up to their avoidable costs. The ESM determines the market value or price of early acceptance priority as the willingness to pay of the marginal Purchaser in that year (where the marginal Purchaser is the first whose Must Move needs

could not be entirely served in a particular year). This is consistent with trading results expected in microeconomic theory, which observes that prices are set by the intersection of the aggregate willingness to pay curve (the demand curve) with the supply curve.[13] Figure 3 illustrates the resulting market value (price) of acceptance allocations for each year.




Note: Value of acceptance allocations goes to (approximately) zero in 2001 and remains zero thereafter.

***Figure 3:* Market Value of Acceptance Allocations from the Economic Sequence Model**

The ESM results show that acceptance allocations start at an initial value of $102,000/MTU in 1998 and then drop quickly to zero in 2001. This reflects the fact that in the first few years, cumulative acceptance is below the aggregate Must Move need, causing the resource (spent fuel acceptance) to be scarce and valuable. Beginning in 2001 and beyond, total acceptance exceeds the immediate need for spent fuel removal –

13 Here, the "supply curve" is vertical in each year at that year's annual acceptance, since the program would be run with fixed, pre-specified annual acceptance quantities that are not affected by price.

i.e., supply exceeds demand – and the value accordingly goes to zero.[14] Since the Standard Contract contemplated exchanges (i.e., swaps) of acceptance allocations rather than independent purchases and sales, each Purchaser wanting to acquire a different acceptance schedule would exchange away some of their existing allocation and acquire the same quantity in a different year, paying or receiving the net difference in value.

### III.B. Implications for PG&E Plants

From the results described in the previous section, it is possible to identify when PG&E's plants (indeed, any plant) would have had spent fuel removed in the non-breach world – this is just the efficient re-allocation of acceptance rights identified by the ESM.

For Humboldt Bay, in order to facilitate removing spent fuel and decommissioning the nuclear unit in the non-breach world, PG&E would have advanced acceptance as much as was economical. Its initial acceptance allocations under OFF (at the acceptance rate I use) would have occurred in 1998 (13 MTU) and 1999 (16 MTU).[15] Of course, Humboldt Bay would have preferred to remove all its spent fuel in 1998 and thereby avoid another year of unproductive expenditures on spent fuel storage. The ESM results show that Humboldt Bay's avoided costs would place it among those willing to pay for accelerated removal in 1998, as shown in Table 2. That is, it would have been economical for Humboldt Bay to pay to exchange all of its 1999 allocations for 1998 allocations at the market price, removing all 29 MTU of its spent fuel promptly in 1998 and terminating its spent fuel pool O&M and other site maintenance costs sooner. The ESM results show that exchanging the 1999 OFF allocations for 1998 allocations would have imposed a net exchange cost of $1.4 million in 2005 present value.[16] Even if Humboldt Bay's spent fuel were removed on a strict OFF basis, only one year's

---

[14] This is not to say that exchanges beyond 2001 would occur at precisely $0/MTU; there could be some nominal price to reflect administrative and convenience costs. But since there is an excess supply, the price would be essentially zero.

[15] Strictly speaking, the allocations are associated with PG&E, not Humboldt Bay, and PG&E's allocations are not distinguished between Humboldt Bay and Diablo Canyon. However, since all of Humboldt Bay's OFF allocations and Must Move needs occur well in advance of any of Diablo Canyon's allocations or needs, the two plants' acceptance can be treated separately.

[16] This is equal to the quantity of acceptance allocations exchanged (16 MTU) times the difference in value between 1998 and 1999 (approximately $68,000/MTU), which is $1.1 million in 1998. This value is moved forward to 2005 at a risk-free interest rate of 3.6% to yield the 2005 value of $1.4 million.

incremental pool operating cost would have been incurred in the non-breach world.

| *Year* | *Must Move Needs (MTU)* | *OFF Priority Allocation (MTU)* | *ESM Priority Allocation (MTU)* | *Difference (Unserved Must Move Needs under ESM) (MTU)* |
|---|---|---|---|---|
| 1998 | 29 | 13 | 29 | 0 |
| 1999 | 0 | 16 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 |

**Total Payments for Exchanges (PV in 2005 Dollars): $1.4 Million**

Note: Humboldt Bay has no further Must Move needs after removal of its approximately 29 MTU of spent fuel.

**Table 2: Summary of Non-Breach Spent Fuel Removal – Humboldt Bay**

Diablo Canyon, being an operating plant with adequate space in its pools for several years beyond 1998, would have had no immediate need to remove its spent fuel in the non-breach world. Diablo Canyon's initial acceptance allocations under OFF begin to accrue in 2004 (47 MTU) and continue thereafter, averaging about 70 MTU/year, as shown in Table 3. Diablo Canyon's cumulative OFF allocations are always ahead of (earlier than) its Must Move needs, so it would not have needed to use exchanges to advance its fuel removal position. Thus, even if DOE removed Diablo Canyon's spent fuel strictly on an OFF basis, its pool would not have filled up, and PG&E would not have incurred any incremental storage costs there. In fact, Diablo Canyon could afford to delay its acceptance by a couple of years relative to its initial OFF allocations. By the time Diablo Canyon's OFF allocations had begun to arise, though, the value of acceptance rights would have gone to essentially zero, and it would not have had an opportunity to profit meaningfully from exchanges. (Diablo Canyon may have engaged in some exchanges nonetheless to improve the convenience of its allocation schedule.)

| *Year* | *Must Move Needs (MTU)* | *OFF Priority Allocation (MTU)* | *ESM Priority Allocation (MTU)* | *Difference (Unserved Must Move Needs under ESM) (MTU)* |
|---|---|---|---|---|
| 1998 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 |
| 2004 | 0 | 47 | 0 | 0 |
| 2005 | 0 | 65 | 0 | 0 |
| 2006 | 0 | 69 | 0 | 0 |
| 2007 | 42 | 94 | 51 | 0 |
| 2008 | 0 | 78 | 0 | 0 |
| 2009 | 74 | 74 | 65 | 0 |
| 2010 | 38 | 75 | 38 | 0 |
| 2011 | 36 | 39 | 36 | 0 |
| 2012 | 74 | 111 | 74 | 0 |
| 2013 | 0 | 39 | 0 | 0 |
| 2014 | 74 | 112 | 74 | 0 |
| 2015 | 38 | 0 | 38 | 0 |
| 2016 | 36 | 113 | 36 | 0 |

**Total Payments for Exchanges (PV in 2005 Dollars): $0**

Note: Diablo Canyon's Must Move needs beyond 2016 continue to be met by the efficient allocation of acceptance priority.

**Table 3: Summary of Non-Breach Spent Fuel Removal –Diablo Canyon**

### III.C. Inefficiency of OFF and Incentives for Efficient Acceptance Priority

It is unreasonable to expect that the OFF allocation, or any allocation similar to it, would actually have been used by DOE, because it is extraordinarily inefficient, and there are enormous gains to be had by reallocating acceptance through exchanges. Figure 4 illustrates how much better the ESM allocation addresses Must Move needs, compared with the OFF allocation. With each row corresponding to a nuclear facility and each column to a year, this figure shows a shaded cell to indicate an unserved Must Move need at a given facility in a given year, with the color of the shading indicating the nature of

the unserved need (e.g., full pool or shutdown). As can be seen, the ESM allocation has unserved removal needs at only a few facilities, and only in the first three years. It entirely avoids adding more spent fuel to an existing or new dry storage facility. The OFF acceptance schedule, by contrast, would entail the unnecessary construction of several new dry storage facilities after 1998, and require extended operation of many wet and dry storage facilities for many years. [17] Based on the representative storage costs applied in the ESM, the OFF allocation could impose as much as $2.7 billion in incremental storage costs, vs. only about $0.1 billion with the ESM allocation – a difference of about $2.6 billion.[18]

[17] This is based on a facility-level allocation of OFF; actually OFF allocations are assigned at the Purchaser level. Some Purchasers with multiple facilities may choose a different allocation across those facilities.

[18] Cost estimates are in present value to 2005. These costs are approximate, but do offer a reasonable estimate of magnitude of storage costs involved. A 1989 study found that a "modified shutdown priority" for acceptance, very similar to the ESM allocation, would approximate the result of exchanges, and could save approximately $1.3 million in at-reactor storage costs as compared with OFF priority. See *Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis*, Pacific Northwest Laboratory, October 1989.




| ESM | | OFF |
|---|---|---|
| 3 | Shutdown Pool Operation (Plant-Years) | 198 |
| 8 | Dry Storage-Operation Only (Plant-Years) | 71 |
| 0 | Dry Storage-Add Spent Fuel (Plant - Years) | 41 |
| 0 | New Dry Storage Facilities | 8 |
| **11** | **Total Unserved Plant-Years** | **318** |
| 7 | Total Unserved Plants | 52 |

**Figure 4: Unserved Must Move Needs under ESM and OFF Allocations**

The most important benefit of reallocating acceptance according to economic need is the ability to avoid unnecessary at-reactor storage costs. But exchanges would also have other benefits. One is that while an OFF acceptance allocation would entail accepting essentially arbitrary and usually small amounts of spent fuel from many different Purchasers in each year, exchanges would tend to consolidate acceptance into fewer, larger batches, or "campaigns". This would likely simplify logistics and reduce costs both at reactors and in transportation, relative to the OFF allocation, and so I would

expect that the DOE itself would have actively encouraged such exchanges. Ivan Stuart supports the proposition that campaigns are a more efficient way to accept spent fuel, as does a study directed specifically at this question.[19] Figure 5 illustrates the number of facilities and the quantities of acceptance under both the ESM and OFF allocations. As can be seen, ESM entails fewer, larger acceptances than the OFF allocation.[20] In the first three years of the program, the ESM allocation would involve pickups at 61 facilities per year, averaging 72 MTU. In contrast, in these first three years OFF entails pickups at 100 facilities, averaging 44 MTU per pickup. The discrepancy increases further in years 2001 and beyond when the ESM allocation, having dealt with all backlogged Must Move needs and having slack acceptance capacity, would facilitate even more substantial campaigns.[21]




| ESM | | 1998 - 2000 | OFF | |
|---|---|---|---|---|
| 61 | Sites | Total Site Visits | 100 | Sites |
| 72 | MTU | Average Pick-up/Site Visit | 44 | MTU |

**Figure 5: Acceptance Campaigns Under ESM and OFF Allocations**

19 J.W. Doman and T.E. Tehan, "Significance of Campaigned Spent Fuel Shipments", High Level Radioactive Waste Management, 1993.

20 Again, based on a facility-level rather than Purchaser-level OFF allocation.

21 It is not possible to make a direct comparison in later years, because the allocation of program slack (over 1,000 MTU in 2001, almost 2,000 MTU in 2002 and continuing throughout the program) is not specified by the ESM.

## IV. Sensitivity Analyses and Conclusion

In the non-breach world, both Humboldt Bay and Diablo Canyon would have had spent fuel removed promptly when needed after the 1998 start date for contract performance, and would have avoided incurring any incremental spent fuel storage costs beyond 1998. Performing several sensitivity analyses, I found these results unchanged. An acceptance rate that is somewhat different (i.e., a different ramp-up to the 3,000 MTU/year steady state acceptance) would not change my conclusions. Indeed, even aggregate acceptance rates that are substantially lower and delayed – rates that would not be reasonable non-breach acceptance rates – yield the same result for PG&E's plants, though not necessarily for others.

Experience has shown that reactors do not necessarily retire at the end of their original license lives; some have shut down early and most others are now expected to receive license extensions. Testing the effect of this, I found that it would not change the timing of spent fuel removal from PG&E's plants. Other sensitivity analyses, e.g., with different storage costs, show that my results are not affected by reasonable variation in other assumptions. In fact, even if exchanges were not to occur at all and acceptance was based on OFF priority, the results for the PG&E facilities would be almost unchanged. This is because PG&E's OFF allocations closely match its Must Move needs, a circumstance that many other facilities do not share. These sensitivity analyses show that my conclusions regarding the PG&E facilities are extraordinarily robust.

Respectfully submitted,

November 10, 2005

Frank C. Graves
Principal

**Appendix 1**
**List of Information and Documents Considered in Forming Opinions**

1. U.S. Department of Energy Contract No. DE-CR01-83NE44402, Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (June 30, 1983).

2. *Nuclear Waste Policy Act of 1982*, as presented in 42 USC Chapter 108 – Nuclear Waste Policy, 1/6/97.

3. *Nuclear Waste Policy Amendments Act of 1987*, as presented in 42 USC Chapter 108 – Nuclear Waste Policy, 1/6/97.

4. *Mission Plan for the Civilian Radioactive Waste Management Program*, U.S. DOE, June 1985, DOE/RW-0005.

5. *OCRWM Mission Plan Amendment*, June 1987, US DOE, DOE/RW-0128.

6. *Draft 1988 Mission Plan Amendment*, June 1988 US DOE, DOE/RW-1087.

7. *Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program*, November 1989, US DOE, DOE/RW-0247.

8. *The DOE Position on the MRS Facility*, U.S. DOE, June 1989, DOE/RW-0239.

9. *MRS Systems Study Task G Report – The Role and Functions of Surface Storage of Radioactive Material in the Federal Waste Management System*, Pacific Northwest Laboratory, Apr. 1989.

10. *MRS System Study Summary Report*, U.S. DOE, June 1989, DOE/RW-0235.

11. *Annual Capacity Report*, U.S. DOE. (1987, 1988, Draft 1989, 1990, 1991, 1992.)

12. *1992 Acceptance Pricing Ranking*, U.S. DOE, May 1993, Revision 1.

13. *Acceptance Priority Ranking & Annual Capacity Report*, U.S. DOE, (1995, 2004).

14. *Spent Fuel Storage Requirements 1994-2042*, U.S. DOE, June 1995, DOE/RW-0431-Rev.1.

15. *Viability Assessment of a Repository at Yucca Mountain*, US DOE, December 1998, DOE/RW-0508.

16. *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*, U.S. DOE, December 1998, May 2001, DOE/RW-0510.

17. *Civilian Radioactive Waste Management System Requirements Document*, U.S. DOE, Revision 05, January 1999; Revision 06, September 2004.

18. *Civilian Radioactive Waste Management System, Waste Acceptance System Requirements Document*, U.S. DOE, Revision 4, January 2002.

19. *Civilian Radioactive Waste Management Program Plan*, U.S. DOE, Revision 3, February 2000.

20. *Civilian Radioactive Waste Management System Throughput Rate Analysis*, August 17, 1993, Prepared for U.S. Department of Energy, Prepared by System Analysis, Civilian Radioactive Waste Management System Management and Operating Contractor.

21. *Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis*, Pacific Northwest Laboratory, October 1989.

22. "Significance of Campaigned Spent Fuel Shipments" by J.W. Doman and T.E. Tehan, published in Volulme I of High Level Radioactive Waste Management, Proceedings of the Fourth Annual International Conference, Las Vegas, Nevada, April 26-30, 1993.

23. Gottlieb, Peter and W. Bailey III, F. Emami, L.M. Ford, and J.F. King, "Throughput Study for the Civilian Radioactive Waste Management System," from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 12-16, 1992.

24. McKee, R.W. and H.D. Huber, "Determination of Cost Effective Waste Management System Receipt Rates," Pacific Northwest Laboratory, from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 28-May 3, 1991.

25. S.R. Rod, "Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown," Pacific Northwest Laboratory, August 1991.

26. *Spent Nuclear Fuel Discharges from U.S. Reactors 1993*, February 1995, Energy Information Administration, Department of Energy.

27. *2005 – 2006 Information Digest, NUREG-1350, Volume 17*. United States Nuclear Regulatory Commission. July 2005.

28. *License Expiration, Capacity and Generation for U.S. Nuclear Power Plants*, Nuclear Energy Institute, April 2005. Available at www.nei.org.

29. *2002 Summary of U.S. Generating Company In-Pool Spent Fuel Storage Capability Projected Year That Full Core Discharge Capability is Lost.* Energy Resources International, June 2002. Available at www.nei.org

30. *2002 Form 10-K/A.* PG&E Corporation, Pacific Gas and Electric Company. Securities and Exchange Commission.

31. *Issuance of Amendments for Diablo Canyon Nuclear Power Plant, Unit No. 1 (TAC No. M84006) and Unit No. 2 (TAC No. M84007).* Available at www.nrc.gov. March 1, 1995.

32. *Dresden – Issuance of Amendment (TAC No. MA5414).* Available at www.nrc.gov. August 24, 2000.

33. *Draft Issuance of Amendment to Facility Operating License No. NPF-29 Grand Gulf Nuclear Station, Unit 1 (TAC No. M92993).* Available at www.nrc.gov. December 21, 1998.

34. *Palisades Plant – Issuance of Amendment Re: Revision to Operating License Expiration Date (TAC No. MA8753),* December 14, 2000. Available at www.nrc.gov.

35. *Change to Operating License Expiration Date to Reflect Facility Construction Time, Peach Bottom Atomic Power Station, Units 2 and 3 (TAC Nos. M83762 and M83763),* March 28, 1994. Available at www.nrc.gov.

36. *Amendment Application Nos. 195 and 180, Supplement 1 Proposed Change to the Operating License Expiration Date San Onofre Nuclear Generating Station Units 2 and 3,* February 24, 2000. Available at www.nrc.gov.

37. *San Onofre Nuclear Generating Station (Songs), Units 2 and 3 – Issuance of Amendments Re: Extend License Expiration Date (TAC Nos. MA7348 and MA7349),* March 9, 2000. Available through www.nrc.gov.

38. *Turkey Point Units 3 and 4 – Issuance of Amendments Re: Radiological Effluent Releases – 10 CFR 20 Requirements (TAC Nos. M82921 and M82922),* April 20, 1994. Available at www.nrc.gov.

39. *Amendment No. 158 to Facility Operating License for Fort Calhoun,* Nuclear Regulatory Commission.

40. Gross Domestic Product Implicit Price Deflator, from Federal Reserve Bank of St. Louis Economic Research database, October 28, 2005.

41. Blue Chip Economic Indicators, October 10, 2005.

42. Cost of Capital Yearbook, Ibbotson Associates (2001, 2005).

43. Yields on Treasury Securities released on 10/24/2005 (Federal Reserve Bank of St. Louis).

44. Yankee Atomic v. United States, 98-126C, Trial Transcript (Testimonies of Dr. John Bartlett, Michael Meisner and Ivan Stuart).

45. Settlement Agreement between Exelon and DOE in lawsuits No. 98-621C, No. 04-102C, No. 04-103C, No. 04-104C, dated August 5, 2004.

46. Letter from Daniel Dreyfus, OCRWM Director, to Dr. Andrew Kodak, President and CEO of Yankee Atomic, dated September 28, 1995.

47. Communication with David Vosburg (PG&E) regarding Diablo Canyon's current spent fuel storage needs.

48. *Deposition of Nancy Slater*, April 21, 1999.

49. *John W. Bartlett Expert Witness Report*

50. *Ivan F. Stuart Expert Witness Report*

51. *Roderick Knight Expert Witness Report*

## Frank C. Graves

Mr. Graves assists corporations, often regulated utilities, in the design and implementation of long-range planning, investment, and operating policies, and he assists their counsel with regulatory compliance and litigation support. He has extensive experience with electric utility capacity expansion and network modeling, investment and contract prudence reviews, estimation of marginal costs, design and pricing of new services, financial simulation, risk management and valuation techniques. He has testified before the FERC and state regulatory commissions, as well as in federal court, on the economics of gas and electric industry restructuring, breach of contract disputes, cost of service, risk management for supply procurement, and adequacy of market competition. He received an M.S. with a concentration in finance from the M.I.T. Sloan School of Management in 1980, and a B.A. in Mathematics from Indiana University in 1975.

### REPRESENTATIVE CONSULTING EXPERIENCE

*Regulated Industry Restructuring*

- As a result of vertical unbundling, many utilities must procure a substantial portion of their power from resources they do not own or operate. Market prices for such supplies are quite volatile. In addition, utilities may face future customer switching to or from their supply service, especially if they are acting as provider of last resort (POLR). This problem is a blending of risk management with the traditional least-cost Integrated Resource Planning (IRP). Regulatory standards for findings of prudence in such a hybrid environment are often not well understood or articulated, leaving utilities at risk for cost disallowances that can jeopardize their credit-worthiness. Mr. Graves has assisted several utilities in devising updated procurement mechanisms and associated regulatory guidelines that clarify the conditions for approval of plans, in order to make possible the expedited procurement of power from wholesale market suppliers.

- There is a strong tendency in electric restructuring to impose "provider of last resort" (POLR) transitional supply obligations on the incumbent distcos. Unfortunately, POLR obligations that are extremely protective of customers harm the development of competitive retail power markets and can impose extreme, viability-threatening costs or risks on distcos. Mr. Graves developed policy papers and tutorials on this problem for the Edison Electric Institute, and advised several utilities on the design and valuation of alternative POLR specifications and coverage strategies.

- As a means of unbundling to retain ownership but not control of generation, some utilities turned to divesting output contracts. Mr. Graves was involved in the design and approval of such agreements for an entire fleet of generation. The work entailed estimating and projecting cost functions that were likely to track the future marginal and total costs of the units, and analysis of the financial risks the plant operator would bear from the output pricing formula. Testimony on risks under this form of restructuring was presented.

- Mr. Graves worked with the executive committees of several utilities in designing regulatory strategies for influencing the pace and procedures associated with the transition to retail electric access. These have also included comprehensive business strategies and integrated planning tools for service unbundling and pricing, incentive ratemaking, corporate reorganization, market forecasting, asset valuation, and risk management.

- Mr. Graves contributed to the design and pricing of unbundled services on several natural gas pipelines. To identify attractive alternatives, the marginal costs of possible changes in a pipeline's service mix were quantified by simulating the least-cost operating practices subject to the network's physical and contractual constraints. Such analysis helped one pipeline to justify a zone-based rate design for its firm transportation service. Another pipeline used this technique to demonstrate that unintended degradations of system performance and increased costs could ensue from certain proposed unbundlings that were insensitive to system operations.

- For several natural gas pipeline companies, Mr. Graves evaluated the cost of equity capital in light of the requirements of FERC Order 636 to unbundle and reprice pipeline services. In addition to traditional DCF and risk positioning studies, the risk implications of different degrees of financial leverage (debt capitalization) were modeled and quantified. Aspects of rate design and cost allocation between services that also affect pipeline risk were considered.

- Mr. Graves assisted several utilities in forecasting market prices, revenues, and risks for generation assets being shifted from regulated cost recovery to competitive, deregulated wholesale power markets. Such studies have facilitated planning decisions, such as whether to divest generation or retain it, and have been used as the basis for quantifying stranded costs associated with

restructuring in regulatory hearings. Mr. Graves' work in this area has helped several utilities develop long term planning models for managing their generation assets in a competitive market.

*Market Competition*

- Regulatory and legal approvals of utility mergers require evidence that the combined entity will not have undue market power and that it will create operating synergies that produce benefits for electric customers. Mr. Graves assisted several utilities in evaluating the competitive impacts of potential mergers and acquisitions. He has identified ways in which transmission constraints reduce the number and type of suppliers, along with mechanisms for incorporating physical flow limits in FERC Delivered Price Test for mergers.

- A major concern associated with electric utility industry restructuring is whether or not generation markets are adequately competitive. Because of the state-dependent nature of transmission transfer capability between regions, itself a function of generation use, the quality of competition in the wholesale generation markets can vary significantly and may be susceptible to market power abuse by dominant suppliers. Mr. Graves helped one of the largest ISOs in the U.S. develop market monitoring procedures to detect and discourage market manipulations that would impair competition.

- Vertical market power arises when sufficient control of an upstream market creates a competitive advantage in a downstream market. It is possible for this problem to arise in power supply, in settings where the likely marginal generation is dependent on very few fuel suppliers who also have economic interests in the local generation market. Mr. Graves analyzed this problem in the context of the California gas and electric markets and filed testimony to explain the magnitude and manifestations of the problem.

- The increased use of transmission congestion pricing has created interest in merchant transmission facilities. Mr. Graves assisted a developer with testimony on the potential impacts of a proposed line on market competition for transmission services and adjacent generation markets. He also assisted in the design of the process for soliciting and ranking bids to buy tranches of capacity over the line.

- Many regions have misgivings about whether the preconditions for retail electric access are truly in place. In one such region, Mr. Graves assisted a group of industrial customers with a critique of retail restructuring proposals to demonstrate that the locally weak transmission grid made adequate competition among numerous generation suppliers very implausible.

*Electric and Gas Transmission*

- For the electric utility regulatory commission of Colombia, S.A., Mr. Graves led a study to assess the inadequacies in the physical capabilities and economic incentives to manage voltages at adequate levels. The *Brattle* team developed minimum reactive power support obligations and supplement reactive power acquisition mechanisms for generators, transmission companies, and distribution companies.

- On behalf of the Electric Power Research Institute (EPRI), Mr. Graves wrote a primer on how to define and measure the cost of electric utility transmission capacity for better planning, pricing, and regulatory policies. The text covers the basic electrical engineering of power circuits, utility practices to exploit transmission economies of scale, means of assuring system stability, economic dispatch subject to transmission constraints, and the estimation of marginal costs of transmission. The implications for a variety of policy issues are also discussed.

- The natural gas pipeline industry is wedged between competitive gas production and competitive resale of gas delivered to end users. In principle, the resulting basis differentials between locations around the pipeline ought to provide efficient usage and expansion signals, but traditional pricing rules prevent the pipeline companies from participating in the marginal value of their own services. Mr. Graves worked to develop alternative pricing mechanisms and service mixes for pipelines that would provide more dynamically efficient signals and incentives.

- Mr. Graves analyzed the spatial and temporal patterns of marginal costs on gas and electric utility transmission networks using optimization models of production costs and network flows. These results were used by one natural gas transmission company to design receipt-point-based transmission service tariffs, and by another to demonstrate the incremental costs and uneven

distribution of impacts on customers that would result from a proposed unbundling of services.

*Utility Operations*

- Several utilities with coal-fired power plants are facing allegations from the U.S. EPA that they have conducted past maintenance on these plants which should be deemed "major modifications", thereby triggering New Source Review standards for air quality controls. Mr. Graves has helped one such utility assess limitations on the way in which GADS data can be used retrospectively to quantify comparisons between past actual and projected future emissions. For another utility, Mr. Graves developed estimates of changes in emissions before and after repairs using production costing simulations. In both cases, testimony was presented.

- The U.S. Government is contractually obligated to dispose of spent nuclear fuel at commercial reactors after January 1998, but it has not fulfilled this duty. As a result, nuclear facilities that are shutdown or facing full spent fuel pools are facing burdensome costs and risks. Mr. Graves prepared testimony on the incremental costs being borne by three nuclear operating companies with shutdown units as a result of this federal failure to perform.

- Capturing the full value of hydroelectric generation assets in a competitive power market is heavily dependent on operating practices that astutely shift between real power and ancillary services markets, while still observing a host of non-electric hydrological constraints. Mr. Graves led studies for several major hydro generation owners in regard to forecasting of market conditions and corresponding hydro schedule optimization. He has also designed transfer pricing procedures that create an internal market for diverting hydro assets from real power to system support services firms that do not yet have explicit, observable market prices.

- The impacts of transmission open access and generation competition on utility financial health are well documented. In addition, there substantial impacts on fuel suppliers, due to revised dispatch, repowerings and retirements, changes in expansion mix, and altered load shapes and load growth under more competitive pricing. For EPRI, Mr. Graves contributed to a study that projected changes in fuel use within and between ten large power market

regions spanning the country under different scenarios for the pace and success of restructuring.

- Mr. Graves led a gas distribution company in the development of an incentive ratemaking system to replace all aspects of its traditional cost of service regulation. The base rates (for non-fuel operating and capital costs) were indexed on a price-cap basis (RPI-X), while the gas and upstream transportation costs allowances were tied to optimal average annual usage of a reference portfolio of supply and transportation contracts. The gas program also included numerous adjustments to the gas company's rate design, such as designing new standby rates so that customer choice will not be distorted by pricing inefficiencies.

- An electric utility with several out-of-market independent power contracts wanted to determine the value of making those plants dispatchable and to devise a negotiating strategy for restructuring the IPP agreements. Mr. Graves developed a range of forecasts for the delivered price of natural gas to this area of the country. Alternative ways of sharing the potential dispatch savings were proposed as incentives for the IPPs to renegotiate their utility contracts.

- For an electric utility considering the conversion of some large oil-fired units to natural gas, Mr. Graves conducted a study of the advantages of alternative means of obtaining gas supplies and gas transportation services. A combination of monthly and daily spot gas supplies, interruptible pipeline transportation over several routes, gas storage services, and "swing" (contingent) supply contracts with gas marketers was shown to be attractive. Testimony was presented on why the additional services of a local distribution company would be unneeded and uneconomic.

- A power engineering firm entered into a contract to provide operations and maintenance services for a cogenerator, with incentives fees tied to the unit's availability and operating cost. When the fees increased due to changes in the electric utility tariff to which they were tied, a dispute arose. Mr. Graves provided analysis and testimony on the avoided costs associated with improved cogeneration performance under a variety of economic scenarios and under several alternative utility tariffs.

- Mr. Graves helped several pipelines design incentive pricing mechanisms for recovering their expected costs and reducing their regulatory burdens. Among these have been Automatic Rate Adjustment Mechanisms (ARAMs) for indexation of operations and maintenance expenses, construction-cost variance-sharing for routine capital expenditures that included a procedure for eliciting unbiased estimates of future costs, and market-based prices capped at replacement costs when near-term future expansion was an uncertain but probable need.

- For a major industrial gas user, he prepared a critique of the transportation balancing charges proposed by the local gas distribution company. Those charges were shown to be arbitrarily sensitive to the measurement period as well as to inconsistent attribution of storage versus replacement supply costs to imbalance volumes. The tariff design, a commodity charge on a per-cash-in/cash-out at spot market gas prices with penalties for very deep imbalances, or an incremental storage inventory and withdrawal capacity used on-peak, were shown to be cheaper, more efficient, and less complex to administer. This analysis helped the parties reach a settlement based on the cash-in/cash-out design.

- The Clean Air Act Amendment authorized electric utilities to trade emission allowances (EAs) as part of their approach to complying with $SO_2$ emissions reductions targets. For the Electric Power Research Institute (EPRI), Mr. Graves developed multi-stage planning models to illustrate how the considerable uncertainty surrounding future EA prices justifies waiting to invest in irreversible control technologies, such as scrubbers or SCRs, until the present value cost of such investments is significantly below that projected from relying on EAs.

- For an electric utility with a troubled nuclear plant, Mr. Graves presented testimony on the economic benefits likely to ensue from a major reorganization. The plant was to be spun off to a jointly-owned subsidiary that would sell available energy back to the original owner under a contract indexed to industry unit cost experience. This proposal afforded a considerable reduction of risk to ratepayers in exchange for a reasonable, but highly uncertain prospect of profits for new investors. Testimony compared the incentive benefits and potential conflicts under this arrangement to the

outcomes foreseeable from more conventional incentive ratemaking arrangements.

- Mr. Graves helped design Gas Inventory Charge (GIC) tariffs for interstate pipelines seeking to reduce their risks of not recovering the full costs of multi-year gas supply contracts. The costs of holding supplies in anticipation of future, uncertain demand were evaluated with models of the pipeline's supply portfolio that reveal how many non-production costs (demand charges, take-or-pay penalties, reservation fees, or remarketing costs for released gas) would accrue under a range of demand scenarios. The expected present value of these costs provided a basis for the GIC tariff.

- Mr. Graves performed a review and critique of a state energy commission's assessment of regional natural gas and electric power markets in order to determine what kinds of pipeline expansion into the area was economic. A proposed facility under review for regulatory approval was found to depend strongly on uneconomic bypass of existing pipelines and LDCs. In testimony, modular expansion of existing pipelines was shown to have significantly lower costs and risks.

- For several electric utilities with generation capacity in excess of target reserve margins, Mr. Graves designed and supervised market analyses that compared the marginal operating costs of all power plants not needed to meet target reserves to the marginal costs for 50 to 100 neighboring utilities. These cost curves were then overlaid on the corresponding curve for the client utility to identify which neighbors were competitors and which were potential customers. The strength of their relative threat or attractiveness could be quantified by the present value of the product of the amount, duration, and differential cost of capacity that was displaceable by the client utility.

- Mr. Graves specified algorithms for the enhancement of the EPRI EGEAS generation expansion optimization model, to capture the first-order effects of financial and regulatory constraints on the preferred generation mix.

- For a major electric power wholesaler, Mr. Graves developed a framework for estimating how pricing policies affect the relative attractiveness of capacity expansion alternatives. Traditional cost-recovery pricing rules can significantly distort the choice between two otherwise equivalent capacity

plans, if one includes a severe "front end load" while the other does not. Price-demand feedback loops in simulation models and quantification of consumer satisfaction measures were used to appraise the problem. This "value of service" framework was generalized for the Electric Power Research Institute.

- For a large gas and electric utility, Mr. Graves participated in coordinating and evaluating the design of a strategic and operational planning system. This included computer models of all aspects of utility operations, from demand forecasting through generation planning to financing and rate design. Efforts were split between technical contributions to model design and attention to organizational priorities and behavioral norms with which the system had to be compatible.

- For a major electronic and semiconductor firm, Mr. Graves critiqued and refined a proposed procedure for ranking the attractiveness of research and development projects. Aspects of risk peculiar to research projects were emphasized over the standards used for budgeting an already proven commercial venture.

- For an oil and gas exploration and production firm, Mr. Graves developed a framework for identifying what industry groups were most likely to be interested in natural gas supply contracts featuring atypical risk-sharing provisions. These provisions, such as price indexing or performance requirements contingent on market conditions, are a form of product differentiation for the producer, allowing it to obtain a price premium for the insurance-like services.

- For a natural gas distribution company, Mr. Graves established procedures for redefining customer classes and for repricing gas services according to customers' similarities in load shape, access to alternative gas supplies, expected growth, and need for reliability. In this manner, natural gas service was effectively differentiated into several products, each with price and risk appropriate to a specific market. Planning tools were developed for balancing gas portfolios to customer group demands.

- For a Midwestern electric utility, Mr. Graves extended a regulatory *pro forma* financial model to capture the contractual and tax implications of canceling

and writing off a nuclear power plant in mid-construction. This possibility was then appraised relative to completion or substitution alternatives from the viewpoints of shareholders (market value of common equity) and ratepayers (present value of revenue requirements).

- For a corporate venture capital group, Mr. Graves conducted a market-risk assessment of investing in a gas exploration and production company with contracts to an interstate pipeline. The pipeline's market growth, competitive strength, alternative suppliers, and regulatory exposure were appraised to determine whether its future would support the purchase volumes needed to make the venture attractive.

- For a natural gas production and distribution company, he developed a strategic plan to integrate the company's functional policies and to reposition its operations for the next five years. Decision analysis concepts were combined with marginal cost estimation and financial *pro forma* simulation to identify attractive and resilient alternatives. Recommendations included target markets, supply sources, capital budget constraints, rate design, and a planning system. A two-day planning conference was conducted with the client's executives to refine and internalize the strategy.

- For the New Mexico Public Service Commission, he analyzed the merits of a corporate reorganization of the major New Mexico gas production and distribution company. State ownership of the company as a large public utility was considered but rejected on concerns over efficiency and the burdening of performance risks onto state and local taxpayers.

*Financial Analysis*

- As a tax-revenue enhancement measure, the IRS was considering a plan to recapture deferred taxes associated with generation assets that were divested or reorganized during state restructurings for retail access. Mr. Graves prepared a white paper demonstrating the unfairness and adverse consequences of such a plan, which was instrumental in eliminating the proposal.

- The energy and telecom industries have been plagued by scandals regarding alleged trading and accounting misrepresentations, such as wash trades, manipulations of mark-to-market valuations, premature recognition of revenues, and improper use of off-balance sheet entities. In many cases, this

conduct has preceded or caused financial collapse and subsequent shareholder suits. Mr. Graves lead research on accounting and financial evidence for such misconduct, including event studies of the stock price movements around the time of the contested practices, and reconstruction of accounting and economic justifications for the way asset values and revenues were recorded.

- Recent gas price increases in the U.S. put several natural gas and electric utilities in the position of having to counter claims that they should have hedged more of their fuel supplies at times in the past. Mr. Graves developed testimony to rebut this hindsight criticism and risk management techniques for fuel (and power) procurement for utilities to apply in the future to avoid prudence challenges.

- A large public power agency was concerned about its debt capacity in light of increasing competitive pressures to allow its resale customers to use alternative suppliers. Mr. Graves lead a team that developed an Economic Balance Sheet representation of the agency's electric assets and liabilities in market value terms, which was analyzed across several scenarios to determine safe levels of debt financing. In addition, new service pricing and upstream supply contracting arrangements were identified to help reduce risks.

- Wholesale generating companies intuitively realize that there are considerable differences in the financial risk of different kinds of power plant projects, depending on fuel type, length and duration of power purchase agreements, and tightness of local markets. However, they often are unaware of how if at all to adjust the hurdle rates applied to valuation and development decisions. Mr. Graves lead a Brattle analysis of risk-adjusted discount rates for generation; very substantial adjustments were found to be necessary.

- A major telecommunications firm was concerned about when and how to reenter the Pacific rim for wireless ventures following the economic collapse of that region in 1997-99. Mr. Graves lead an engagement to identify prospective local partners with a governance structure that made it unlikely for them to divert capital from the venture if markets went soft. He also helped specify contracting and financing structures that create incentives for the venture to remain together should it face financial distress, while offering strong returns under good performance.

- There are many risks associated with operations in a foreign country, related to the stability of its currency, its macro economy, its foreign investment policies, and even its political system. Mr. Graves has assisted firms facing these new dimensions to assess the risks, identify strategic advantages, and choose an appropriate, risk-adjusted hurdle rate for the market conditions and contracting terms they will face.

- The glut of generation capacity that helped usher in electric industry restructuring in the US led to asset devaluations in many places, even where no retail access was allowed. In some cases, this has led to bankruptcy, especially of a few large rural electric cooperatives. Mr. Graves assisted one such coop with its long term financial modeling and rate design under its plan of reorganization, which was approved. Testimony was provided on cost-of-service justifications for the new generation and transmission prices, as well as on risks to the plan from potential environmental liabilities.

- Power plants often provide a significant contribution to the property tax revenues of the townships where they are located. A common valuation policy for such assets has been that they are worth at least their book value, because that is the foundation for their cost recovery under cost-of-service utility ratemaking. However, restructuring throws away that guarantee, requiring reappraisal of these assets. Traditional valuation methods, *e.g.*, based on the replacement costs of comparable assets, can be misleading because they do not consider market conditions. Mr. Graves testified on such matters on behalf of the owners of a small, out-of-market coal unit in Massachusetts.

- Stranded costs and out-of-market contracts from restructuring can affect municipalities and cooperatives as well as investor-owned utilities. Mr. Graves assisted one debt-financed utility in an evaluation of its possibilities for reorganization, refinancing, and re-engineering to improve financial health and to lower rates. Sale and leaseback of generation, fuel contract renegotiation, targeted downsizing, spin-off of transmission, and new marketing programs were among the many components of the proposed new business plan.

- As a means of reducing supply commitment risk, some utilities have solicited offers for power contracts that grant the right but not the obligation to take

power at some future date at a predetermined price, in exchange for an initial option premium payment. Mr. Graves assisted several of these utilities in the development of valuation models for comparing the asking prices to fair market values for option contracts. In addition, he has helped these clients develop estimates of the critical option valuation parameters, such as trend, volatility, and correlations of the future prices of electric power and the various fuel indexes proposed for pricing the optional power.

- For the World Bank and several investor-owned electric utilities, Mr. Graves presented tutorial seminars on applying methods of financial economics to the evaluation of power production investments. Techniques for using option pricing to appraise the value of flexibility (such as arises from fuel switching capability or small plant size) were emphasized. He has applied these methods in estimating the value of contingent contract terms in fuel contracts (such as price caps and floors) for natural gas pipelines.

- Mr. Graves prepared a review of empirical evidence regarding the stock market's reaction to alternative dividend, stock repurchase, and stock dividend policies for a major electric utility. Tax effects, clientele shifting, signaling, and ability to sustain any new policies into the future were evaluated. A one-time stock repurchase, with careful announcement wording, was recommended.

- For a division of a large telecommunications firm, Mr. Graves assisted in a cost benchmarking study, in which the costs and management processes for billing, service order and inventory, and software development were compared to the practices of other affiliates and competitors. Unit costs were developed at a level far more detailed than the company normally tracked, and numerical measures of drivers that explained the structural and efficiency causes of variation in cost performance were identified. Potential costs savings of 10-50 percent were estimated, and procedures for better identification of inefficiencies were suggested.

- For an electric utility seeking to improve its plant maintenance program, Mr. Graves directed a study on the incremental value of a percentage point decrease in the expected forced outage rate at each plant owned and operated by the company. This defined an economic priority ladder for efforts to reduce outage that could be used in lieu of engineering standards for each

plant's availability. The potential savings were compared to the costs of alternative schedules and contracting policies for preventive and reactive maintenance, in order to specify a cost reduction program.

- Mr. Graves conducted a study on the risk-adjusted discount rate appropriate to a publicly-owned electric utility's capacity planning. Since revenue requirements (the amounts being discounted) include operating costs in addition to capital recovery costs, the weighted average cost of capital for a comparable utility with traded securities may not be the correct rate for every alternative or scenario. The risks implicit in the utility's expansion alternatives were broken into component sources and phases, weighted, and compared to the risks of bonds and stocks to estimate project-specific discount rates and their probable bounds.

**PROFESSIONAL MEMBERSHIPS**

IEEE Power Engineering Society
*Mathematical Association of America*
American Finance Association
International Association for Energy Economics
Energy Modeling Forum (Stanford University)

**EXPERT TESTIMONY**

Direct testimony before the Illinois Commerce Commission on behalf of Midwest Generation EME, LLC, Docket No. 05-0159, June 8, 2005, regarding the appropriate load caps for a POLR auction.

Affidavit to the Federal Energy Regulatory Commission on behalf of Dominion Energy, Inc., Docket No. EC05-43-000, April 11, 2005, regarding unmitigated market power concerns arising from the Exelon – PSEG Merger.

Expert and rebuttal reports and oral testimonies before the American Arbitration Association on behalf of Liberty Electric Power, LLC, Case No. 70 198 4 00228 04, December 2004, regarding damages under termination of a long-term tolling contract.

Oral direct and rebuttal testimony before the United States Court of Federal Claims on behalf of Connecticut Yankee Atomic Power Company, Docket No. 98-154 C, July 2004 (direct) and August 2004 (rebuttal), regarding non-performance of the U.S. Department of Energy in accepting spent nuclear fuel under the terms of its contract.

Direct, supplemental and rebuttal testimony before the Public Service Commission of Wisconsin, on behalf of Wisconsin Public Service Corporation and Wisconsin Power and Light Company, Docket No. 05-EI-136, February 27, 2004 (direct), May 4, 2004 (supplemental) and May 28, 2004 (rebuttal) in regard to the benefits of the proposed sale of the Kewaunee nuclear power plant.

Direct and rebuttal testimony before the Public Utility Commission of Texas on behalf of CenterPoint Energy Houston Electric LLC, Reliant Energy Retail Services LLC, and Texas Genco LP, Docket No. 29526, March 2004 (direct) and June 2004 (rebuttal), in regard to the effect of Genco separation agreements and financial practices on stranded costs and on value of control premiums implicit in Texas Genco Stock price.

Rebuttal and additional testimony before the Illinois Commerce Commission, on behalf of Peoples Gas Light and Coke Company, Docket No. 01-0707, November 2003 (rebuttal) and January 2005 (additional rebuttal), in regard to prudence of gas contracting and hedging practices.

Rebuttal testimony before the State Office of Administrative Hearings on behalf of Texas Genco and CenterPoint Energy, Docket No. 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, October 23, 2003, regarding proposed exclusion of part of CenterPoint's purchased power costs on grounds of including "imputed capacity" payments in price.

Rebuttal testimony before the Federal Energy Regulatory Commission (FERC) on behalf of Ameren Energy Generating Company and Union Electric Company, Docket No. EC03-53-000, October 6, 2003, in regard to evaluation of transmission limitations and generator responsiveness in generation procurement.

Rebuttal testimony before the New Jersey Board of Public Utilities on behalf of Jersey Central Power & Light Company, Docket No. ER02080507, March 5, 2003, regarding the prudence of JCP&L's power purchasing strategy to cover its provider-of-last-resort obligation.

Oral testimony (February 17, 2003) and expert report (April 1, 2002) before the United States District Court, Southern District of Ohio, Eastern Division on behalf of Ohio Edison Company and Pennsylvania Power Company, Civil Action No. C2-99-1181, regarding coal plant maintenance projects alleged to trigger New Source Review.

Expert Report before the United States District Court on behalf of Duke Energy Corporation, Docket No. 1:00CV1262, September 16, 2002, regarding forecasting changes in air pollutant emissions following coal plant maintenance projects.

Direct testimony before the Public Utility Commission of Texas on behalf of Reliant Energy, Inc., Docket No. 26195, July 2002, regarding the appropriateness of Reliant HL&P's gas contracting, purchasing and risk management practices, and standards for assessing HL&P's gas purchases.

Direct and rebuttal testimonies before the Public Utilities Commission of the State of California on behalf of Southern California Edison, Application No. R. 01-10-024, May 1, 2002, and June 5, 2002, regarding Edison's proposed power procurement and risk management strategy, and the regulatory guidelines for reviewing its procurement purchases.

Rebuttal testimony before the Texas Public Utility Commission on behalf of Reliant Resources, Inc., Docket No. 24190, October 10, 2001, regarding the good-cause exception to the substantive rules that Reliant Resources, Inc. and the staff of the Public Utility Commission sought in their Provider of Last Resort settlement agreement.

Direct testimony before the Federal Energy Regulatory Commission (FERC) on behalf of Northeast Utilities Service Company, Docket No. ER01-2584-000, July 13, 2001, in regard to competitive impacts of a proposed merchant transmission line from Connecticut to Long Island.

Direct testimony before the Vermont Public Service Board on behalf of Vermont Gas Systems, Inc., Docket No. 6495, April 13, 2001, regarding Vermont Gas System's proposed risk management program and deferred cost recovery account for gas purchases.

Affidavit on behalf of Public Service Company of New Mexico, before the Federal Energy Regulatory Commission (FERC), Docket No. ER96-1551-000, March 26, 2001, to provide an updated application for market based rates.

Affidavit on behalf of the New York State Electric and Gas Corporation, April 19, 2000, before the New York State Public Service Commission, *In the Matter of Customer Billing Arrangements*, Case 99-M-0631.

Supplemental Direct and Reply Testimonies of Frank C. Graves and A. Lawrence Kolbe (jointly) on behalf of Southern California Edison Company, Docket Nos. ER97-2355-00, ER98-1261-000, ER98-1685-000, November 1, 1999, regarding risks and cost of capital for transmission services.

Expert report before the United States Court of Federal Claims on behalf of Connecticut Yankee Atomic Power Company, *Connecticut Yankee Atomic Power Company, Plaintiff v. United States of America*, No. 98-154 C, June 30, 1999, regarding non-performance of the U.S. Department of Energy in accepting spent nuclear fuel under the terms of its contract.

Expert report before the United States Court of Federal Claims on behalf of Maine Yankee Atomic Power Company, *Maine Yankee Atomic Power Company, Plaintiff v. United States of America*, No. 98-474 C, June 30, 1999, regarding the damages from non-performance of the U.S. Department of Energy in accepting spent nuclear fuel and high-level waste under the terms of its contract.

Expert report before the United States Court of Federal Claims on behalf of Yankee Atomic Electric Company, *Yankee Atomic Electric Company, Plaintiff v. United States of America*, No.

98-126 C, June 30, 1999, regarding the damages from non-performance of the U.S. Department of Energy in accepting spent nuclear fuel and high-level waste under the terms of its contract.

Prepared direct testimony before the Federal Energy Regulatory Commission on behalf of National Rural Utilities Cooperative Finance Corporation, Inc., *Cities of Anaheim and Riverside, California v. Deseret Generation & Transmission Cooperative*, Docket No. EL97-57-001, March 1999, regarding cost of service for rural cooperatives versus investor-owned utilities, and coal plant valuation.

Expert report and oral examination before the Independent Assessment Team for industry restructuring appointed by the Alberta Energy and Utilities Board on behalf of TransAlta Utilities Corporation, January 1999, regarding the cost of capital for generation under long-term, indexed power purchase agreements.

Oral testimony before the Commonwealth of Massachusetts Appellate Tax Board on behalf of Indeck Energy Services of Turners Falls, Inc., *Turners Falls Limited Partnership, Appellant vs. Town of Montague, Board of Assessors, Appellee*, Docket Nos. 225191-225192, 233732-233733, 240482-240483, April 1998, regarding market conditions and revenues assessment for property tax basis valuation.

Direct and joint supplemental testimony before the Pennsylvania Public Utility Commission on behalf of Pennsylvania Electric Company and Metropolitan Edison Company, No. R-00974009, *et al.*, December 1997, regarding market clearing prices, inflation, fuel costs, and discount rates.

Direct Testimony before the Pennsylvania Public Utilities Commission on behalf of UGI Utilities, Inc., Docket No. R-00973975, August 1997, regarding forecast of market clearing energy and capacity prices.

Testimony before the Public Utilities Commission of the State of California on behalf of the Southern California Edison Company, No. 96-10-038, August 1997, regarding anticompetitive implications of the proposed Pacific Enterprises/ENOVA mergers.

Direct and supplemental testimony before the Kentucky Public Service Commission on behalf of Big Rivers Electric Corporation, No. 97-204, June 1997, regarding wholesale generation and transmission rates under the bankruptcy plan of reorganization.

Affidavit before the Federal Energy Regulation Commission on behalf of the Southern California Edison Company in Docket No. EC97-12-000, March 28, 1997, filed as part of motion to intervene and protest the proposed merger of Enova Corporation and Pacific Enterprises.

Direct, rebuttal, and supplemental rebuttal testimony before the State of New Jersey Board of Public Utilities on behalf of GPU Energy, No. EO97070459, February 1997, regarding market clearing prices, inflation, fuel costs, and discount rates.

*Oral direct testimony before the State of* New York on behalf of Niagara Mohawk Corporation in *Philadelphia Corporation, et al., v. Niagara Mohawk*, No. 71149, November 1996, regarding interpretation of low-head hydro IPP contract quantity limits.

Oral direct testimony before the State of New York on behalf of Niagara Mohawk Corporation in *Black River Limited Partnership v. Niagara Mohawk Power Corporation*, No. 94-1125, July 1996, regarding interpretation of IPP contract language specifying estimated energy and capacity purchase quantities.

Oral direct testimony on behalf of *Eastern Utilities Associates* before the Massachusetts Department of Public Utilities, No. 96-100 and 2320, July 1996, regarding issues in restructuring of Massachusetts electric industry for retail access.

Affidavit before the Kentucky Public Service Commission on behalf of *Big Rivers Electric Corporation* in PSC Case No. 94-032, June 1995, regarding modifications to an environmental surcharge mechanism.

Rebuttal testimony on behalf of utility in *Eastern Energy Corporation v. Commonwealth Electric Company*, American Arbitration Association, No. 11 Y 198 00352 04, March 1995, regarding lack of net benefits expected from a terminated independent power project.

Direct testimony before the Pennsylvania Public Utility Commission on behalf of Pennsylvania Power & Light Company in *Pennsylvania Public Utility Commission et al. v. UGI Utilities, Inc.*, Docket No. R-932927, March 1994, regarding inadequacies in the design and pricing of UGI's proposed unbundling of gas transportation services.

Direct testimony before the Pennsylvania Public Utility Commission, on behalf of Interstate Energy Company, *Application of Interstate Energy Company for Approval to Offer Services in the Transportation of Natural Gas*, Docket No. A-140200, October 1993, and rebuttal testimony, March 1994.

Direct testimony before the Pennsylvania Public Utility Commission, on behalf of Procter & Gamble Paper Products Company, *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Company*, Docket No. R-932655, September 1993, regarding PG&W's proposed charges for transportation balancing.

Oral rebuttal testimony before the American Arbitration Association, on behalf of Babcock and Wilcox, File No. 53-199-00127-92, May 1993, regarding the economics of an incentive clause in a cogeneration operations and maintenance contract.

Answering testimony before the Federal Energy Regulatory Commission, on behalf of CNG Transmission Corporation, Docket No. RP88-211-000, March 1990, regarding network marginal costs associated with the proposed unbundling of CNG.

Direct testimony before the Federal Energy Regulatory Commission, on behalf of Consumers Power Company *et al.*, concerning the risk reduction for customers and the performance incentive benefits from the creation of *Palisades Generating Company*, Docket No. ER89-256-000, October 1989, and rebuttal testimony, Docket No. ER90-333-000, November 1990.

Direct testimony before the New York Public Service Commission, on behalf of Consolidated Natural Gas Transmission Corporation, *Application of Empire State Pipeline for Certificate of Public Need*, Case No. 88-T-132, June 1989, and rebuttal testimony, October, 1989.

**PUBLICATIONS, PAPERS AND PRESENTATIONS**

"The New Role of Regulators in Portfolio Selection and Approval" (with Joseph B. Wharton), presented at EUCI Resource and Supply Planning Conference, New Orleans, November 4, 2004.

"Disincentives to Utility Investment in the Current World of Competitive Regulation," (with August Baker), prepared for the Edison Electric Institute (EEI), October, 2004.

"Power Procurement for Second-Stage Retail Access" (with Greg Basheda), presented at Illinois Commerce Commission's 'Post 2006 Symposium', Chicago, IL, April 29, 2004.

"Utility Investment and the Regulatory Compact," (with August Baker), presented to NMSU Center for Public Utilities Advisory Council, Santa Fe, New Mexico, March 23, 2004.

"How Transmission Grids Fail," presented to NARUC Staff Subcommittee on Accounting and Finance, Spring 2004 Meeting, Scottsdale, Arizona, March 22, 2004

"Resource Planning & Procurement in Restructured Electricity Markets," presented to NARUC Winter Committee Meetings, Washington, D.C., March 9, 2004.

"Resource Planning and Procurement in Evolving Electricity Markets," (with James A. Read and Joseph B. Wharton), white paper for Edison Electric Institute (EEI), January 31, 2004.

"Analysis of Alternative Standards for Reactive Power and Voltage Support Services for Colombia" (with Martin L. Baughman and W. Mack Grady),in *IEEE Transactions on Power Systems*.

"Transmission Management in the Deregulated Electric Industry – A Case Study on Reactive Power" (with Judy W. Chang and Dean M. Murphy), *The Electricity Journal*, Volume 16, Issue 8, October, 2003.

"Flaws in the Proposed IRS Rule to Reinstate Amortization of Deferred Tax Balances Associated with Generation Assets Reorganized in Industry Restructuring," (with Michael J. Vilbert), white paper for Edison Electric Institute (EEI) to the IRS, July 25, 2003.

"Resource Planning & Procurement in Restructured Electricity Markets" (with James A. Read and Joseph B. Wharton), presented at Northeast Mid-Atlantic Regional Meeting of Edison Electrical Institute, Philadelphia, PA, May 6, 2003 and at Midwest Regional Meeting, Chicago, IL, June 18, 2003.

"New Directions for Safety Net Service – Pricing and Service Options" (with Joseph B. Wharton), white paper for Edison Electric Institute (EEI), May 2003.

"Volatile Markets Demand Change in State Regulatory Evaluation Policies," (with Steven H. Levine), chapter 20 of *Electric & Natural Gas Business: Understanding It!*, edited by Robert E. Willett, Financial Communications Company, Houston, TX, February 2003, pp. 377-405.

"New York Power Authority Hydroelectric Project Production Rates," report prepared for NYPA (New York Power Authority) on the embedded costs of production of ancillary services at the Niagara and St. Lawrence hydroelectric projects, 2001-2006, January 22, 2003.

"Regulatory Policy Should Encourage Hedging Programs" (with Steven H. Levine), *Natural Gas*, Volume 19, Number 4, November 2002.

"Measuring Gas Market Volatility - A Survey" (with Paolo Coghe and Manuel Costescu), presented at the Stanford Energy Modeling Forum, Washington, D.C., June 24, 2002.

"Unbundling and Rebundling Retail Generation Service: A Tale of Two Transitions" (with Joseph B. Wharton), presented at the Edison Electric Institute Conference on Unbundling/Rebundling Utility Generation and Transmission, New Orleans, LA, February 25, 2002.

"Regulatory Design for Reactive Power and Voltage Support Services" (with Judy W. Chang), prepared for Comision de Regulacion de Energia y Gas, Bogotá, Colombia, December 2001.

"Provider of Last Resort Service Hindering Retail Market Development" (with Joseph B. Wharton), *Natural Gas*, Volume 18, Number 3, October 2001.

"Strategic Management of POLR Obligations" presented at Edison Electric Institute and the Canadian Electricity Association Conference, New Orleans, LA, June 5, 2001.

"Measuring Progress Toward Retail Generation Competition" (with Joseph B. Wharton) Edison Electric Institute E-Forum presentation, May 16, 2001.

"International Review of Reactive Power Management" (with Judy W. Chang), presented to Comision de Regulacion de Energia y Gas, Bogotá, Colombia, May 4, 2001.

"POLR and Progress Towards Retail Competition - Can Kindness Kill the Market?" (with Joseph B. Wharton), presented at the NARUC Winter Committee Meeting, Washington, D.C.,

February 27, 2001.

"What Role for Transitional Electricity Price Protections After California?" presented to the Harvard Electricity Policy Group, 24th Plenary Session, San Diego, CA, February 1, 2001.

"Estimating the Value of Energy Storage in the United States: Some Case Studies" (with Thomas Jenkin, Dean Murphy and Rachel Polimeni) prepared for the Conference on Commercially Viable Electricity Storage, London, England, January 31, 2001.

"PBR Designs for Transcos: Toward a Competitive Framework" (with Steven Stoft), *The Electricity Journal*, Volume 13, Number 7, August/September 2000.

"Capturing Value with Electricity Storage in the Energy and Ancillary Service Markets" (with Thomas Jenkin, Dean Murphy and Rachel Polimeni) presented at EESAT, Orlando, Florida, September 18, 2000.

"Implications of ISO Design for Generation Asset Management" (with Edo Macan and David A. Andrade), presented at the Center for Business Intelligence's Conference on Pricing Power Products & Services, Chicago, Illinois, October 14-15, 1999.

"Residual Service Obligations Following Industry Restructuring" (with James A. Read, Jr.), paper and presentation at the Edison Electric Institute Economic Regulation and Competition Committee Meeting, Longboat Key, Florida, September 26-29, 1999. Also presented at EEI's 1999 Retail Access Conference: *Making Retail Competition Work*, Chicago, Illinois, September 30-October 1, 1999.

"Opportunities for Electricity Storage in Deregulating Markets" (with Thomas Jenkin and Dean Murphy), *The Electricity Journal*, October 1999.

*How Competitive Market Dynamics Affect Coal, Nuclear and Gas Generation and Fuel Use – A 10 Year Look Ahead* (with L. Borucki, R. Broehm, S. Thumb, and M. Schaal), Final Report, May 1999, TR-111506 (Palo Alto, CA: Electric Power Research Institute, 1999).

"Price Caps for Standard Offer Service: A Hidden Stranded Cost" (with Paul Liu), *The Electricity Journal*, Volume 11, Number 10, December 1998.

*Mechanisms for Evaluating the Role of Hydroelectric Generation in Ancillary Service Markets* (with R.P. Broehm, R.L. Earle, T.J. Jenkin, and D.M. Murphy), Final Report, November 1998, TR-111707 (Palo Alto, CA: Electric Power Research Institute, 1998).
"PJM Market Competition Evaluation White Paper," (with Philip Hanser), prepared for PJM, L.L.C., October, 1998.

"The Role of Hydro Resources in Supplying System Support and Ancillary Services," presented at the EPRI Generation Assets Management Conference, Baltimore, Maryland, July 13-15, 1998.

Published in *EPRI Generation Assets Management 1998 Conference: Opportunities and Challenges in the Electric Marketplace*, Proceedings, November 1998, TR-111345 (Palo Alto, CA: EPRIGEN, Inc., 1998).

"Regional Impacts of Electric Utility Restructuring on Fuel Markets" (with S.L. Thumb, A.M. Schaal, L.S. Borucki, and R. Broehm), presented at the EPRI Generation Assets Management Conference, Baltimore, Maryland, July 13-15, 1998. Published in *EPRI Generation Assets Management 1998 Conference: Opportunities and Challenges in the Electric Marketplace*, Proceedings, November 1998, TR-111345 (Palo Alto, CA: EPRIGEN, Inc., 1998).

*Energy Market Impacts of Electric Industry Restructuring: Understanding Wholesale Power Transmission and Trading* (with S.L. Thumb, A.M. Schaal, L.S. Borucki, and R. Broehm), Final Report, March 1998, EPRI TR-108999, GRI-97/0289 (Palo Alto, CA: Electric Power Research Institute, 1998).

"Pipeline Pricing to Encourage Efficient Capacity Resource Decisions"(with Paul R. Carpenter and Matthew P. O'Loughlin), filed on behalf of Columbia Gas Transmission Corporation and Columbia Gulf Transmission Company, with their comments on *Financial Outlook for the Natural Gas Pipeline Industry*, FERC Docket No. PL98-2-000, February 1998.

"One-Part Markets for Electric Power: Ensuring the Benefits of Competition" (with E. Grant Read, Philip Q Hanser, and Robert L. Earle), Chapter 7 in *Power Systems Restructuring: Engineering and Economics*, M. Ilić, F. Galiana, and L. Fink, eds. (Boston: Kluwer Academic Publishers, 1998, reprint 2000), pp. 243-280.

"Railroad and Telecommunications Provide Prior Experience in 'Negotiated Rates'" (with Carlos Lapuerta), *Natural Gas*, July 1997.

"Considerations in the Design of ISO and Power Exchange Protocols: Procurement Bidding and Market Rules" (with J.P. Pfeifenberger), presented at the Electric Utility Consultants Bulk Power Markets Conference, Vail, Colorado, June 3-4, 1997.

"The Economics of Negative Barriers to Entry: How to Recover Stranded Costs and Achieve Competition on Equal Terms in the Electric Utility Industry" (with William B. Tye), Electric Industry Restructuring, *Natural Resources Journal*, Volume 37, No. 1,Winter 1997.

"Capacity Prices in a Competitive Power Market" (with James A. Read), *The Virtual Utility: Accounting, Technology & Competitive Aspects of the Emerging Industry*, S. Awerbuch and A. Preston, eds. (Boston: Kluwer Academic Publishers, 1997), pages 175-192.
"Stranded Cost Recovery and Competition on Equal Terms" (with William B. Tye), *Electricity Journal*, Volume 9, Number 10, December 1996.

"Basic and Enhanced Services for Recourse and Negotiated Rates in the Natural Gas Pipeline Industry" (with Paul R. Carpenter, Carlos Lapuerta, and Matthew P. O'Loughlin), filed on behalf

of Columbia Gas Transmission Corporation and Columbia Gulf Transmission Company, in its *Comments on Negotiated Rates and Terms of Service*, FERC Docket No. RM96-7, May 29, 1996.

"Premium Value for Hydro Power in a Deregulated Industry? Technical Opportunities and Market Structure Effects," presented to the *EPRI Hydro Steering Committee Conference*, Chattanooga, Tennessee, April 19, 1996, and to the *EPRI Energy Storage Benefits Workshop*, New Orleans, Louisiana, May 22, 1996.

"Distributed Generation Technology in a Newly Competitive Electric Power Industry" (with Johannes P. Pfeifenberger, Paul R. Ammann, and Gary A. Taylor), presented at the *American Power Conference*, Illinois Institute of Technology, April 10, 1996.

"A Framework for Operations in the Competitive Open Access Environment" (with Marija D. Ilić, Lester H. Fink, Albert M. DiCaprio), *Electricity Journal*, Volume 9, Number 3, April 1996.

"Prices and Procedures of an ISO in Supporting a Competitive Power Market" (with Marija Ilić), presented at the *Restructuring Electric Transmission Conference*, Denver, Colorado, September 27, 1995.

"Potential Impacts of Electric Restructuring on Fuel Use," EPRI *Fuel Insights*, Issue 2, September 1995.

"Optimal Use of Ancillary Generation Under Open Access and its Possible Implementation" (with Maria Ilić), *M.I.T. Laboratory for Electromagnetic and Electronic Systems Technical Report*, LEES TR-95-006, August 1995.

"Estimating the Social Costs of PUHCA Regulation" (with Paul R. Carpenter), submitted to the Security and Exchange Commission's *Request for Comments on Modernization of the Regulation of Public Utility Holding Companies*, SEC File No. S7-32-93, February 6, 1995.

*A Primer on Electric Power Flow for Economists and Utility Planners*, TR-104604, The Electric Power Research Institute, EPRI Project RP2123-19, January 1995.

"Impacts of Electric Industry Restructuring on Distributed Utility Technology," presented to the Electric Power Research Institute/National Renewable Energy Laboratory/Florida Power Corporation *Conference on Distributed Generation*, Orlando, Florida, August 24, 1994.

Pricing Transmission and Power in the Era of Retail Competition" (with Johannes P. Pfeifenberger), presented at the Electric Utility Consultants' *Retail Wheeling Conference*, Beaver Creek, Colorado, June 21, 1994.

"Pricing of Electricity Network Services to Preserve Network Security and Quality of Frequency Under Transmission Access" (with Dr. Marija Ilić, Paul R. Carpenter, and Assef Zobian),

Response and Reply comments to the Federal Energy Regulatory Commission in is *Notice of Technical Conference on Transmission Pricing*, Docket No. RM-93-19-000, November 1993 and January 1994.

"Evaluating and Using CAAA Compliance Cost Forecasts," presented at the *EPRI Workshop on Clean Air Response*, St. Louis, Missouri, November 17 and Arlington, Virginia, November 19, 1992.

"Beyond Valuation—Organizational and Strategic Considerations in Capital Budgeting for Electric Utilities," presented at *EPRI Capital Budgeting Notebook Workshop*, New Orleans, Louisiana, April 9-10, 1992.

"Unbundling, Pricing, and Comparability of Service on Natural Gas Pipeline Networks" (with Paul R. Carpenter), as appendix to Comments on FERC Order 636 filed by Interstate Natural Gas Association of America, November 1991.

"Estimating the Cost of Switching Rights on Natural Gas Pipelines" (with James A. Read, Jr. and Paul R. Carpenter), presented at the M.I.T. Center for Energy Policy Research, "Workshop on New Methods for Project and Contract Evaluation," March 2-4, 1988; and in *The Energy Journal*, Volume 10, Number 4, October 1989.

"Demand-Charge GICs Differ from Deficiency-Charge GICs" (with Paul R. Carpenter), *Natural Gas*, August 1989.

"What Price Unbundling?" (with P.R. Carpenter), *Natural Gas*, June 1989.

"Price-Demand Feedback," presented at *EPRI Capital Budgeting Seminar*, San Diego, California, March 2-3, 1989.

"Applications of Finance to Electric Power Planning," presented at the World Bank, *Seminar on Risk and Uncertainty in Power System Planning*, October 13, 1988.

"Planning for Electric Utilities: The Value of Service" (with James A. Read, Jr.), in *Moving Toward Integrated Value-Based Planning*, Electric Power Research Institute, 1988.

"Valuation of Standby Charges for Natural Gas Pipelines" (with James A. Read, Jr. and Paul R. Carpenter), presented to M.I.T. Center for Energy Policy Research, October, 1987.

**Appendix 3**
**Disclosure of Deposition and Testimony**
**of Frank Graves During the Past Four Years**

1. Direct testimony before the Illinois Commerce Commission on behalf of Midwest Generation EME, LLC, Docket No. 05-0159, June 8, 2005, regarding the appropriate load caps for a POLR auction.

2. Affidavit to the Federal Energy Regulatory Commission on behalf of Dominion Energy, Inc., Docket No. EC05-43-000, April 11, 2005, regarding unmitigated market power concerns arising from the Exelon – PSEG Merger.

3. Expert and rebuttal reports and oral testimonies before the American Arbitration Association on behalf of Liberty Electric Power, LLC, Case No. 70 198 4 00228 04, December 2004, regarding damages under termination of a long-term tolling contract.

4. Oral direct and rebuttal testimony before the United States Court of Federal Claims on behalf of Connecticut Yankee Atomic Power Company, Docket No. 98-154 C, July 2004 (direct) and August 2004 (rebuttal), regarding non-performance of the U.S. Department of Energy in accepting spent nuclear fuel under the terms of its contract.

5. Direct, supplemental and rebuttal testimony before the Public Service Commission of Wisconsin, on behalf of Wisconsin Public Service Corporation and Wisconsin Power and Light Company, Docket No. 05-EI-136, February 27, 2004 (direct), May 4, 2004 (supplemental) and May 28, 2004 (rebuttal) in regard to the benefits of the proposed sale of the Kewaunee nuclear power plant.

6. Direct and rebuttal testimony before the Public Utility Commission of Texas on behalf of CenterPoint Energy Houston Electric LLC, Reliant Energy Retail Services LLC, and Texas Genco LP, Docket No. 29526, March 2004 (direct) and June 2004 (rebuttal), in regard to the effect of Genco separation agreements and financial practices on stranded costs and on value of control premiums implicit in Texas Genco Stock price.

7. Rebuttal and additional testimony before the Illinois Commerce Commission, on behalf of Peoples Gas Light and Coke Company, Docket No. 01-0707, November 2003 (rebuttal) and January 2005 (additional rebuttal), in regard to prudence of gas contracting and hedging practices.

8. Rebuttal testimony before the State Office of Administrative Hearings on behalf of Texas Genco and CenterPoint Energy, Docket No. 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, October 23, 2003, regarding proposed exclusion of part of CenterPoint's purchased power costs on grounds of including "imputed capacity" payments in price.

9. Rebuttal testimony before the Federal Energy Regulatory Commission (FERC) on behalf of Ameren Energy Generating Company and Union Electric Company, Docket No. EC03-53-000, October 6, 2003, in regard to evaluation of transmission limitations and generator responsiveness in generation procurement.

10. Rebuttal testimony before the New Jersey Board of Public Utilities on behalf of Jersey Central Power & Light Company, Docket No. ER02080507, March 5, 2003, regarding the prudence of JCP&L's power purchasing strategy to cover its provider-of-last-resort obligation.

11. Oral testimony (February 17, 2003) and expert report (April 1, 2002) before the United States District Court, Southern District of Ohio, Eastern Division on behalf of Ohio Edison Company and Pennsylvania Power Company, Civil Action No. C2-99-1181, regarding coal plant maintenance projects alleged to trigger New Source Review.

12. Expert Report before the United States District Court on behalf of Duke Energy Corporation, Docket No. 1:00CV1262, September 16, 2002, regarding forecasting changes in air pollutant emissions following coal plant maintenance projects.

13. Direct testimony before the Public Utility Commission of Texas on behalf of Reliant Energy, Inc., Docket No. 26195, July 2002, regarding the appropriateness of Reliant HL&P's gas contracting, purchasing and risk management practices, and standards for assessing HL&P's gas purchases.

14. Direct and rebuttal testimonies before the Public Utilities Commission of the State of California on behalf of Southern California Edison, Application No. R. 01-10-024, May 1, 2002, and June 5, 2002, regarding Edison's proposed power procurement and risk management strategy, and the regulatory guidelines for reviewing its procurement purchases.

15. Rebuttal testimony before the Texas Public Utility Commission on behalf of Reliant Resources, Inc., Docket No. 24190, October 10, 2001, regarding the good-cause exception to the substantive rules that Reliant Resources, Inc. and the staff of the Public Utility Commission sought in their Provider of Last Resort settlement agreement.

16. Direct testimony before the Federal Energy Regulatory Commission (FERC) on behalf of Northeast Utilities Service Company, Docket No. ER01-2584-000, July 13, 2001, in regard to competitive impacts of a proposed merchant transmission line from Connecticut to Long Island.

17. Direct testimony before the Vermont Public Service Board on behalf of Vermont Gas Systems, Inc., Docket No. 6495, April 13, 2001, regarding Vermont Gas System's proposed risk management program and deferred cost recovery account for gas purchases.

18. Affidavit on behalf of Public Service Company of New Mexico, before the Federal Energy Regulatory Commission (FERC), Docket No. *ER96-1551-000, March 26, 2001,* to provide an updated application for market based rates.

**Appendix 4**
**Disclosure of Publications of Frank Graves During the Past Ten Years**

1. "Disincentives to Utility Investment in the Current World of Competitive Regulation," (with August Baker), prepared for the Edison Electric Institute (EEI), October, 2004.

2. "Resource Planning and Procurement in Evolving Electricity Markets," (with James A. Read and Joseph B. Wharton), white paper for Edison Electric Institute (EEI), January 31, 2004.

3. "Analysis of Alternative Standards for Reactive Power and Voltage Support Services for Colombia" (with Martin L. Baughman and W. Mack Grady), in *IEEE Transactions on Power Systems.*

4. "Transmission Management in the Deregulated Electric Industry – A Case Study on Reactive Power" (with Judy W. Chang and Dean M. Murphy), *The Electricity Journal,* Volume 16, Issue 8, October, 2003.

5. "Flaws in the Proposed IRS Rule to Reinstate Amortization of Deferred Tax Balances Associated with Generation Assets Reorganized in Industry Restructuring," (with Michael J. Vilbert), white paper for Edison Electric Institute (EEI) to the IRS, July 25, 2003.

6. "New Directions for Safety Net Service – Pricing and Service Options" (with Joseph B. Wharton), white paper for Edison Electric Institute (EEI), May 2003.

7. "Volatile Markets Demand Change in State Regulatory Evaluation Policies," (with Steven H. Levine), chapter 20 of *Electric & Natural Gas Business: Understanding It!,* edited by Robert E. Willett, Financial Communications Company, Houston, TX, February 2003, pp. 377-405.

8. "New York Power Authority Hydroelectric Project Production Rates," report prepared for NYPA (New York Power Authority) on the embedded costs of production of ancillary services at the Niagara and St. Lawrence hydroelectric projects, 2001-2006, January 22, 2003.

9. "Regulatory Policy Should Encourage Hedging Programs" (with Steven H. Levine), *Natural Gas,* Volume 19, Number 4, November 2002.

10. "Provider of Last Resort Service Hindering Retail Market Development" (with Joseph B. Wharton), *Natural Gas,* Volume 18, Number 3, October 2001.

11. "PBR Designs for Transcos: Toward a Competitive Framework" (with Steven Stoft), *The Electricity Journal,* Volume 13, Number 7, August/September 2000.

12. "Opportunities for Electricity Storage in Deregulating Markets" (with Thomas Jenkin and Dean Murphy), *The Electricity Journal*, October 1999.

13. *How Competitive Market Dynamics Affect Coal, Nuclear and Gas Generation and Fuel Use – A 10 Year Look Ahead* (with L. Borucki, R. Broehm, S. Thumb, and M. Schaal), Final Report, May 1999, TR-111506 (Palo Alto, CA: Electric Power Research Institute, 1999).

14. "Price Caps for Standard Offer Service: A Hidden Stranded Cost" (with Paul Liu), *The Electricity Journal*, Volume 11, Number 10, December 1998.

15. *Mechanisms for Evaluating the Role of Hydroelectric Generation in Ancillary Service Markets* (with R.P. Broehm, R.L. Earle, T.J. Jenkin, and D.M. Murphy), Final Report, November 1998, TR-111707 (Palo Alto, CA: Electric Power Research Institute, 1998).

16. "PJM Market Competition Evaluation White Paper," (with Philip Hanser), prepared for PJM, L.L.C., October, 1998.

17. *Energy Market Impacts of Electric Industry Restructuring: Understanding Wholesale Power Transmission and Trading* (with S.L. Thumb, A.M. Schaal, L.S. Borucki, and R. Broehm), Final Report, March 1998, EPRI TR-108999, GRI-97/0289 (Palo Alto, CA: Electric Power Research Institute, 1998).

18. "One-Part Markets for Electric Power: Ensuring the Benefits of Competition" (with E. Grant Read, Philip Q Hanser, and Robert L. Earle), Chapter 7 in *Power Systems Restructuring: Engineering and Economics*, M. Ilić, F. Galiana, and L. Fink, eds. (Boston: Kluwer Academic Publishers, 1998, reprint 2000), pp. 243-280.

19. "Railroad and Telecommunications Provide Prior Experience in 'Negotiated Rates'" (with Carlos Lapuerta), *Natural Gas*, July 1997.

20. "The Economics of Negative Barriers to Entry: How to Recover Stranded Costs and Achieve Competition on Equal Terms in the Electric Utility Industry" (with William B. Tye), Electric Industry Restructuring, *Natural Resources Journal*, Volume 37, No. 1,Winter 1997.

21. "Capacity Prices in a Competitive Power Market" (with James A. Read), *The Virtual Utility: Accounting, Technology & Competitive Aspects of the Emerging Industry*, S. Awerbuch and A. Preston, eds. (Boston: Kluwer Academic Publishers, 1997), pages 175-192.

22. "Stranded Cost Recovery and Competition on Equal Terms" (with William B. Tye), *Electricity Journal*, Volume 9, Number 10, December 1996.

23. "A Framework for Operations in the Competitive Open Access Environment" (with Marija D. Ilić, Lester H. Fink, Albert M. DiCaprio), *Electricity Journal*, Volume 9,

Number 3, April 1996.

24. "Potential Impacts of Electric Restructuring on Fuel Use," EPRI *Fuel Insights*, Issue 2, September 1995.

25. "Optimal Use of Ancillary Generation Under Open Access and its Possible Implementation" (with Maria Ilić), *M.I.T. Laboratory for Electromagnetic and Electronic Systems Technical Report*, LEES TR-95-006, August 1995.

26. *A Primer on Electric Power Flow for Economists and Utility Planners*, TR-104604, The Electric Power Research Institute, EPRI Project RP2123-19, January 1995.

# CFMS Document Label

| | |
|---|---|
| Fax: | |
| Doc Date: | 11/10/2005 |
| Title: | Expert Witness Report Of Graves, Frank C |
| Under Seal: | |
| To: | |
| From: | |
| CC: | |
| Organization: | |
| Issue: | EXPERTS |
| Has Parent!: | |
| With Attachment: | |
| Prepared By: | mjenkins |
| Preparation Date: | Mon Nov 14 12:54:40 2005 |
| Case Name: | PG&E (Diablo Canyon), PG&E (Humbolt Bay) |
| Document Type: | Witness - Plaintiff's Expert |
| Distribution List: | Todd Cochran, Scott Damelin, Joshua Gardner, Harv Lester, Alan Lo Re, John L. Lucca, Sharon Snyder, Jane K. Taylor |
| Comments: | Distribution/ Navigant: Yushchak, Colleen |

SNF0000009144

New Entry Main Menu

**Yankee Atomic v. U.S. No.: 98-126C July 15, 2004**

**Page 794 to Page 1065**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*

Page 858

the economic sequence model, look at transaction costs?

A It does not. As I've modeled it, there's no explicit incorporation of any administrative costs of arranging swaps or finding a counterparty to do it with. And, of course, in fact, there would be some costs of that.

Or because it's a valuable service, if someone got into the mix as an intermediary, they would probably charge a brokerage fee for helping people find counterparties to deal with.

As I mentioned, the costs of doing the analysis to figure out what – how you can help that process are very low They're akin to what I did in order to prepare my report. So the competition to provide that service would be keen. And the amount you can extract as a premium for offering it would be low

So I expect any transaction costs for intermediation would be quite low Certainly very low compared to the huge amounts of money at stake from trying to find an efficient allocation.

So I've assumed those would – those would be even a smaller impact, for instance, than the amount of uncertainty that there is in the O&M costs

Page 859

at each of these plants per year, which, as I just explained, is not influential on my results.

Q Mr. Graves, in looking at your economic sequence model, did you consider the possibility that some utilities might not have participated in the – in the swaps market for one reason or another, even in a nonbreach world?

A I thought about it My belief is, by and large, most utilities would participate for reasons that I sketched a little before. It's not the case that some utilities win and some lose by participating. Everyone wins by participating in this.

You avoid the inconvenience of premature pickups and disruptions at your facility if you don't yet have a must-move situation And you have the opportunity to gain some money by participating in a sale.

Conversely, you obviously benefit if you can move – accelerate your rights and get them to match an early must-move problem.

So this is jointly beneficial. It's not something where winners have to compensate losers.

There's two kinds of winners out of the process. And that's very auspicious for markets to evolve.

Page 860

THE COURT: Wouldn't you have to have confidence, though, that DOE would continue performance?

THE WITNESS: Yes. That is a key factor. You're absolutely right. And that is, in a sense, the core assumption of my analysis; that in the nonbreach world, DOE would have set up a program whose capacity and performance quality was sustainable and expected to be sustainable by participants, so that they wouldn't feel any reticence to participate in improving their economic opportunities.

Now, of course you won't have perfect confidence that those circumstances are going to obtain. But if you thought about people being somewhat nervous, I think rather than them just kind of tucking their heads into their shells like turtles, it would probably cause people to ration their participation. Either they would participate – they would set aside a little bit of early rights that they weren't willing to trade because they wanted to have a little buffer for uncertainty about whether the project would be carried out effectively. But they would not withdraw from participating entirely.

Or they might add a little surcharge to the amount they're willing to participate at. They would

Page 861

say, I don't want to trade unless I'm making a pretty hefty margin of savings. So I might not trade for a 20 percent advantage over my avoidable costs, but I might trade for 100 percent advantage over my avoidable costs.

Well, there are a lot of parties who have no avoidable costs during the early years because they don't yet have must-move circumstances. So they can easily satisfy a large margin requirement and still participate.

So I think that the reticence or hesitancy that might occur in the nonbreach world is of the character of a tax or a little extra cost that might be involved, not a decision not to participate.

So I think it would have transpired essentially the same way.

BY MR. SHAPIRO

Q Suppose as many as half the participants were reticent to participate. Can you think about a possibility as significant as that?

A Yes, I have looked at that. And, again, as I mentioned, there are so many utilities that have early must-move requirements – sorry, early OFF rights, that don't correspond to their must-move requirements. That even if only about half of the

Page 982

buyers, nor sellers They just live with the OFF
rights that they had. And the other parties do the
buying and selling.
And as I described, a market that's half the
size or even, in fact, smaller than that turns out to
be able to basically accomplish the same thing.
Q I think what you said, though, is that, if
you removed half the buyers and half the sellers, then
the market works about the same. But if we're just
talking about removing sellers, I think you
acknowledge, in fact, the market is going to look a
little different.
If you've got the same number of buyers
seeking same number of slots, you remove half the
supply, that's going to affect the market I think we
established that earlier, didn't we?
A We did But I was uncomfortable with your
definition what it means to not participate as a
seller but still want to be a buyer. It's not clear
that would be acceptable with the rest of the market
for a person to be half in the game. If you don't
want to sell, it may be that you were stuck with your
OFF rights, and you were neither a buyer, nor a
seller. You can't be just buying and not reselling
Q Are you aware of the fact that there are

Page 983

statutory constraints on Northern States Power
regarding the storage of spent fuel at the Prairie
Island; that is, Prairie Island reactor?
A No.
Q You don't consider the possibility that
congressional delegations, governors or local
politicians may prefer the removal of spent nuclear
fuel over the trading of earlier allocations, do you?
A It's a variation on the same case we just
discussed. If someone or some region decides they
don't want their local utilities to participate in
trading but, rather, to stick slavishly to their OFF
rights, then they will have to simply observe the rest
of the market trading in and out.
And they will see that they either forgo the
opportunity to make a profit from selling into that
market with no improvement in their own local waste,
or they'll have to not get out as early as they could
if they were willing to buy.
But if you're willing to buy, you have to be
willing to sell If you're not willing to do that,
you're not going to participate.
So if – and, again, I said my sensitivity
shows that it's easy for half of the market,
25 percent – I mean, 50 percent of the states where

Page 984

there's nuclear plants to make a political decision of
that character and there still be enough volume in the
market for essentially the same result that I
simulate.
Q I assume you'd have the same answer if I
threw in citizens groups instead of governors.
A Sure Whoever is the obstacle, the same
effect.
Q Your model doesn't consider the possibility
that utilities might have retained earlier allocations
just to make sure DOE's program is working. In other
words, they may trade later, but they want to see, on
the ground, is this thing going to work You don't
consider that.
A I don't simulate that. That's a possible
friction that could occur where they could either hold
back a portion that's more – that, you know, tests
the early waters or tests the time when they need
must-move; or they charge a premium for the
participation in those more sensitive periods,
whatever they happen to be
But unless lots of parties do that, again,
it won't fundamentally change the pattern.
Q You assume that the sellers of allocations
are price takers, correct?

Page 985

A The price that I impute, yes, is the last
price in the – the – avoided by the buyer who would
like to have rights.
Q And so you don't assume that sellers may try
to act strategically to determine who is going to pay
more for allocations in any particular year?
A Well, there's two possible interpretations
of what you mean by acting strategically. One might
mean that they simply try to pursue a bilateral
negotiation with somebody and get a better deal than
they can get through my market clearing price.
Q That's what I'm talking about.
A Yeah. That could happen, sure.
Q I want to go quickly to demonstrative – I
think it's 23. This is the first – this is the
initial OFF allocation slot, right?
A Yes. Before swaps have occurred
Q Okay. I want to look at plant B. Plant B
has enough in years 1 and 3 to take care of its
problem in years 2 and 3, right?
A Yes.
Q So, technically, they don't need to exchange
any rights in order to deal with their fuel.
A Well, technically, none of them need to in
the sense that they eventually get out by year 5. But

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - -x

PACIFIC GAS & ELECTRIC COMPANY, :

Plaintiff, :No. 04-00743, into

v. :which has been consolidated

THE UNITED STATES, :No. 04-0075C

Defendant. :(Judge Hewitt)

- - - - - - - - - - - - - - - - - -x

Washington, D.C.

Friday, May 19, 2006

Deposition of FRANK C. GRAVES, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Greenberg Traurig, LLP, 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C. 20006, at 9:43 a.m., Friday, May 19, 2006, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 2

APPEARANCES:
On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202)331-3174

On behalf of the Defendant:
JOHN C. EKMAN, ESQ.
JOSHUA GARDNER, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202)353-0897

ALSO PRESENT:
JONATHAN A. NEUBERGER
Senior Vice President
Economists Incorporated

ALLYSON REED
Navigant Consulting

(Continued)

Page 3

ALSO PRESENT: (Continued)
HUGH HILL
Summer Intern
United States Department of Justice

DEAN M. MURPHY, Ph.D.
Principal
The Brattle Group

Page 4

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| FRANK C. GRAVES | PLAINTIFF | DEFENDANT |
| By Mr. Ekman | | 5 |

Afternoon Session - Page 142


EXHIBITS


| GRAVE'S REBUTTAL EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 Rebuttal Report | 6 |


Page 5

PROCEEDINGS

Whereupon,
FRANK C. GRAVES,
was called as a witness by counsel for Defendant, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. EKMAN:

Q. Good morning, Mr. Graves.
A. How are you?
Q. Good. How are you doing today?
A. I'm fine. Thank you.
MR. EKMAN: Just two preliminary matters -- with me today are Dr Jonathan Neuberger, Josh Gardner from my office, Allyson Reed, who's here for Navigant, and Hugh Hill, who is a summer intern with the Department of Justice.
Additionally, in an effort to avoid writing a letter, I did provide to Mr. Shapiro today DX 1476, which is the second exhibit that we've added to our exhibit list that's reflected in our filing yesterday.
This certainly doesn't encompass all of Mr. Shapiro's opinions about that exhibit, but

Page 38

their participation.
I don't know that it would shut down their participation.
For instance, there would be people for whom the, let's say the year five or year six in which this disruption might occur is a critical year in their needs to have fuel moved, so such people might say, you know, if I think any time now there could one of these, in the first few years, something is going to break and this isn't going to work, they sort it out after that, but they might accelerate their requests for acceptance rights. They might be willing to pay more.
So it would affect preferences and timing of decisions, but I don't know that it would kill people's willingness to use what, the program while it was working.
BY MR. EKMAN:
Q. Now your model is, at least the price component of your model is based solely on avoided storage cost, is that right?
A. Yes.
Q. And you do not, your, at least your base case does not price, build a price into your

Page 39

market for uncertainty, for example?
A. Well, let me just clarify one thing. Again, the price is derived from avoided cost, but it's not exclusively dependent on what the avoided costs are.
It's also dependent on what the total amount of acceptance is and how far down the list of or the rank order of people with must move plans can be served a in a given year.
Q. The marginal bidder is also in what determines the overall market price in your model?
A. That's right.
Q. So --
A. So the price depends on more than one thing, and --
Q. I understand that.
A. And in the base case, there's no assumption that there's any disruption or loss of total capacity in the program.
In other scenarios, I look at lower acceptance rates, and those are equivalent to saying what would happen if, you know, this, only a fourth of the program worked, the program worked at a fourth of its designed capacity, for

Page 40

instance.
What would happen then?
Q. In those cases, the price does increase?
A. Yes, it does.
Q. And I want to just ask a real-world example just to put this in the context.
You're not an expert in oil, right? You do energy markets, not oil markets?
A. I know a fair amount about oil markets, but I'm not a, that's not my primary area.
Q. Well, built into the price of oil is not only the price of production, drilling, and R&D and all that, but also there is a risk component that's built into, an uncertainty component that's built into the price of oil, is that a fair statement?
MR. SHAPIRO: Objection -- vague.
THE WITNESS: Well, there's two kinds of risks that you may be talking about.
One is any commodity that can be produced over time always has an inter-temporal trade-off decision that's made by the producers to say should I produce it now or should I produce it later?

Page 41

And for them to want to produce it now, they have to think that today's price is as good as the present value of what they expect the future price to be.
And in making that calculation, there's a risk factor associated with that, so in that sense, the price reflects a belief about the relative certainty of today's price versus future prices.
BY MR. EKMAN:
Q. And that goes to the supply?
A. Primarily, yes. There's some opinion in the trade literature that there's also a so-called terror or disruption premium that may be prevailing in the market as well of a few dollars per barrel, which is just kind of a nervousness factor, maybe more on the buyer side saying, you know, we don't know if the Iraq or Iran situation is going to decompose in a bad direction, and so we're willing to pay more than we normally would.
Q. In fact, conditions in Venezuela currently are also --
A. They could be part of that general anxiety, sure.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Case No. 04-106C (Chief Judge Damich)

copy map

DAIRYLAND POWER COOPERATIVE, )
Plaintiff, )
v. )
UNITED STATES, )
Defendant. )
)

DEPOSITION OF FRANK C. GRAVES

Tuesday, June 19, 2007

Washington, D.C.

Reported by: Mary Ann Payonk, CRR-RDR

Certified Realtime Reporter

Job No. 0706