Deposition of FRANK C. GRAVES held at the offices of:

U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

Pursuant to Notice before Mary Ann Payonk, CRR-RDR, Certified Realtime Reporter and notary public.

***



APPEARANCES

ON BEHALF OF PLAINTIFF:
ROBERT L. SHAPIRO, ESQUIRE
GREENBERG TRAURIG
800 Connecticut Ave., N.W.
Suite 500
Washington, DC 20006
(202) 452-4878

ON BEHALF OF DEFENDANT:
RUSSELL A. SHULTIS, ESQUIRE
PATRICK B. BRYAN, ESQUIRE
Commercial Litigation Branch
US Department of Justice
1100 L Street, N.W.
Washington, DC 20530
(202) 305-7571

ALSO PRESENT:
Mr. Ted Lunsford, Contract Solutions LLC
Mr. Stuart D. Gurrea, Economists Incorporated
Mr. Dean Murphy, The Brattle Group



WITNESSES


| WITNESS | PAGE |
|---|---|
| FRANK C. GRAVES | |
| Examination by Mr. Shultis | 5 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Agenda of meeting of April 16, 1990 | 26 |
| 2 | Appeals brief dated July 12, 1993 | 28 |
| 3 | Discovery document | 42 |
| 4 | Graves expert report | 80 |
| 5 | Work paper memo dated January 23, 2007 | 178 |
| 6 | Workbook assumptions | 194 |
| 7 | Memo dated May 10, 1993 | 231 |
| 8 | Memo dated December 16, 1997 | 235 |
| 9 | Memo dated June 28 | 242 |
| 10 | Letter dated June 4, 1977 | 242 |


***



PROCEEDINGS
FRANK C. GRAVES
was sworn and testified as follows:
EXAMINATION
BY MR. SHULTIS:
Q Could you state your name and home address for the record, please.
**A Yes. My name is Frank C. Graves, G-R-A-V-E-S. I live at 17 Oak Meadow Road, Lincoln, Massachusetts, 01773.**
Q Good morning, Mr. Graves. My name is Russell Shultis. I'm an attorney with the Department of Justice, and I am here with quite a group. Sitting to my left is Ted Lunsford from Contract Solutions. To his left is Dr. Stuart Gurrea from Economists, Incorporated. And to his left is Rob Sweeney from ABZ, Incorporated. Also with me here from the Department of Justice is Patrick Bryan.
**A Brian or Ryan?**
Q Brian, B-R-Y-A-N.
**A Uh-huh.**
Q We are here to take your deposition today. And I know that you have been -- you've given deposition testimony in the past, but I don't think

it'll probably hurt anything to go over the ground rules very quickly.
We're making a transcript of today's proceedings so it's very important for you to answer audibly. Do you understand that, sir?
**A I do.**
Q Okay. I'll try hard to not have my questions run over your answers, but we both need to be conscious of that so that we can get a clear and correct transcript of today's proceedings.
**A Fine.**
Q You need to answer a question unless your attorney, Mr. Shapiro, instructs you not to. So while he might offer objections today, it's still important for you to answer. Do you understand that?
**A I do.**
Q I'd be happy to clarify any questions that -- any of my questions that aren't clear to you or you don't understand, but if you answer, I will assume that you understood the question. Okay?
**A Reasonable.**
Q Okay. And we're going to be -- we're happy to take breaks so you're not -- you're in the imprisoned here just because you're on the hot seat,



but please try not to do so when a question is pending. Do you understand that?
**A Sure.**
Q Okay. Do you have any questions?
**A No. That should be fine.**
Q Okay. Are you taking any medications that would affect your ability to answer any questions today?
**A No.**
Q Okay. You're feeling okay today?
**A Yes, thank you.**
Q Great. Glad to hear it. Then let's get started.
We're here to talk about the opinions that you've offered in the Dairyland Power case. Do you understand that, sir?
**A Yes.**
Q Okay. And, you know, we've received your expert report. And is it fair to say that in your analysis, you assumed that wet pool operations and maintenance costs are $8.7 million annually for shutdown reactors?
MR. SHAPIRO: Objection, vague.
**A That is a number that I use in my calculations in some of the analysis, but I also**



**explore the possibility that those numbers could be considerably different, so I'm not relying on just that estimate.**
Q Could you tell me how you used that $8.7 million figure?
**A Certainly. One of the analyses I conduct is done in what I call the economic sequencing model, and that model establishes an appropriate economic priority for use of the capacity of the program according to the willingness to pay of the parties to mitigate their at-reactor storage costs. One of those costs is wet pool O&M, so in order to determine how much a party with a pool that they're maintaining would be willing to pay, I need to know what it costs them annually.**
Q So the annual cost is -- would you say that that's a driver in your analysis?
MR. SHAPIRO: Objection, vague.
**A It's a factor. As I explain later, in fact, the costs don't vary across facilities nearly as much as the volumes of waste do. So the cost per ton of waste that the parties ought to be willing to pay to avoid their problem is less sensitive to costs than it is to volume. But costs matter.**
Q Okay. Does that figure affect Dairyland's



willingness to pay for allocations, in your analysis?
MR. SHAPIRO: Objection, vague.
**A Yes, in the sense that it factors into the competition for adjusted positions in the queue.**
Q Could you explain that a little bit? Could you tell me how that factors into competition for adjusted positions in the queue?
**A Okay. Dairyland would like to have its waste removed as soon as possible, but in order to do so, it has to be willing to pay as much or more than others who have rights to move their fuel that they may not regard as important to use. So the economic sequencing model determines what the marginal willingness to pay is, and Dairyland is part of that process to decide whether they have costs that are as high or higher per ton than other parties. And it turns out they do, and so they are willing to pay to accelerate their position to 1998 removal so that as a result of whether their costs are -- per ton are higher than other parties.**
Q Okay. So is it fair to say that you assume Dairyland's wet storage O&M costs are 8.7 million?
MR. SHAPIRO: Objection, vague.

Page 10

A I believe in the base case that is the number I use. But, as I mention, I rely on several analyses which vary that cost considerably.
Q Okay. And could you tell me how much that cost varies from the base case?
MR. SHAPIRO. Objection, vague.
A It depends on the scenario. I describe some 22 or so variations on my base case analysis in my testimony or in my report, and about 12 or so of those involve varying the costs -- maybe 10 -- at the -- of the different kinds of at-reactor storage costs that can be borne.
So, for instance, some of them double the cost of each of the factors at the at-reactor -- that you could incur, double the cost of dry O&M, wet O&M, casks and so on. Some of them cut them in half. Some of them do that one factor at a time. Other scenarios randomly mix and match doublings and halvings across the parties, but the basic range I analyze is twice as great or half as great.
Q So the low would be 4.35 million in your scenarios?
A I -- I believe that's correct, yes.
Q Okay. Now, did you actually investigate Dairyland's wet storage O&M costs?

Page 11

MR. SHAPIRO: Objection, vague.
A I know a little bit about it but I don't try to incorporate in the model Dairyland's recent specific experience.
Q Okay.
A I use the average results that I found from my sample.
Q Why not?
MR. SHAPIRO: Objection, vague.
A Well, the main reason is that I'm trying to use equivalent information on all the parties that are competing for participation in the use of these rights and I don't have specific numbers on every power plant in the United -- every pool or every ISFSI in the United States.
I also know from significant exercising of my model in the past that precision in that number is not very determinative of the priority that ultimately results. As I mentioned before, volume matters is an order of magnitude more significant than cost, and we know Dairyland has a very small volume of waste to be removed and so they're willing to pay quite a bit per ton. And that number -- that will be true across a very wide range of costs for them, wider than my 50 percent or plus 100 percent

Page 12

variation. So I don't need to know their number exactly to find out if they are able to get out.
Q How much interaction did you actually have with Dairyland in preparing your report? Did you -- I understand what you just told me was that you did not investigate their specific costs. Is that fair to say?
MR. SHAPIRO: Objection, vague.
A It's fair to say in my model I don't attempt to use any of their specific estimates of their accounting or administrative costs of managing their facility. I did visit their site and spoke to them about some of their managerial concerns but didn't do so for the purpose of validating or performing a detailed study of their costs.
Q Who did you talk to?
A Oh, four or five of their senior managers and a plant engineer.
Q Okay. Who were they?
A I would have to look up their names for you. I remember some first names, but I couldn't tell you for sure all of them. There was a Chuck.
Q Would that be Chuck Sans Crainte?
A I think that's right, yes.
Q Okay.

Page 13

A John Raymer, or Reimer, perhaps.
Q Could it be Bob Brimer?
A There we go. That sounds more like it.
Q Okay.
A Sorry about that. I can't remember all their names. And I think there was a -- the plant engineer may have been named Mike Braslet or Brasel.
Q Mike Brasel?
A Yes.
Q Roger Christians?
A It's certainly possible, but I can't be certain.
Q Okay. And what information did you draw from this trip?
A Well, it was partly contextual, just to see the site, find out what the attitude of the company had been toward the program and towards their attempts to manage the waste over the time. So I learned about some of their earlier attempts to arrange alternative disposals of the waste and how those hadn't worked. As I say, I visited the site, saw what the configuration was like.
Q Did you -- of the fellows that you just referred to, did you rely on information that you received from any of them?

Page 26

**have gotten going, yes, but not -- it's not a necessity that it be 1992. It could have been thereafter a bit. And in the end, I ended up -- I used data from the spent fuel storage report from -- which was published in 1995 based on 1990 -- which I think had data through 1994. So my analysis is as if you were in -- my base case analysis is as if you were in a 1995 condition.**
Q But the cost information that you used is dated 2002 or later, correct?
A **Yes, that's right.**
Q Okay.
(Exhibit No. 1 was marked.)
Q Mr. Graves, you've been handed what has been marked as Defendant's Exhibit Number 1, and this is a document that's -- it's an agenda of a meeting between Dairyland and -- it's a draft agenda of the meeting -- for a meeting between Dairyland and the Department of Energy dated April 16, 1990. Do you see that, sir?
A **I see the date, yes. I don't see a description, but I'll take it for granted.**
Q Okay. Well, please make yourself familiar with that just so that you're comfortable.
Let me ask you this: Would you agree that

Page 27

it appears to be a draft agenda for a meeting between Dairyland and the Department of Energy, and it's -- the draft agenda is dated April 16, 1990?
A **It certainly addresses alternative arrangements with DOE, and it -- those are the dates, so that's very plausible.**
Q Okay. That's what it appears to be, correct?
A **Yes.**
Q I take it you have not seen this document before.
A **I don't recall seeing it.**
Q Okay. And if you go to the first page and you go down underneath Roman numeral II in subsection B1, do you see where it says: SAFSTOR costs 2.5 million each year, and then underneath says 1.3 million of which is directly related to the presence of spent fuel? Do you see that, sir?
A **I do.**
Q Okay. So if Dairyland in 1990 had $1.3 million, were experiencing $1.3 million in wet pool O&M costs, would that have affected their willingness to trade in your model?
MR. SHAPIRO: Objection, vague.
A **As I described earlier, their willingness**

Page 28

**to pay is a function of their annual avoidable costs and the volume of waste involved because it's based on a dollars-per-ton basis per year. So this is one of the factors. The numerator is the avoidable costs. This -- and so whatever that number properly is would affect their willingness to pay.**
**I don't know whether this is, you know, a -- an official and complete estimate of that cost, but if it were, that would be the type of number they would use in their own such analysis.**
Q Okay. Have you seen the 1.3 number in your analyses at all?
A **I don't recall seeing it. I do vaguely recall the 2.5 million from other documents around this time, but I don't recall seeing the 1.3.**
Q Okay.
(Exhibit No. 2 was marked.)
Q I'm going to hand you another document, Exhibit 2. Mr. Graves, you've been handed -- I'm sorry. You said you saw the $2.5 million figure from other documents?
A **Yes.**
Q Did you incorporate that into your analysis?
MR. SHAPIRO: Objection, vague.

Page 29

A **As I mentioned before, I don't incorporate any specific estimates from just Dairyland into my analysis. I use industry-typical values and then vary those across a wide range so that I can get relative willingness to pay calibrated in a consistent fashion. So if I only knew about Dairyland but don't know about specifics about other sites in an equivalent way, then I can't be certain if I'm making a fair comparison.**
Q Okay. I understand that. But Dairyland's actual experience relative to the rest of the industry does affect their willingness to pay for exchanges, is that not correct?
A **That would be correct.**
Q Okay. Can I just ask quickly, what document did you get the $2.5 million figure from? Do you know?
A **There were some internal memos, four or five, that I cite in my Documents Relied On list, which were describing some of Dairyland's history and its experience from around 1993 or 1994 that I read for background. And I'm pretty sure the number 2.5 was in one of those.**
Q Okay. Did you use the $2.5 million figure to determine an industry average? Did you use that

Page 50

Q Okay. And did -- was there a significant change in security costs at utilities after September 11th?
A **I believe there was.**
Q Okay. And so would it be appropriate to compare post-9/11 security costs with those before, given the time frame of the decision to purchase allocations?
A **Depends on the purpose. For -- what you want is data that describes utilities operating under similar circumstances. So if I use data that's post-9/11, and it's post-9/11 for everybody that I'm analyzing, then at least in a relative sense if they all have incremental security costs then I've captured that in everybody's circumstances, and that gives a fair ability to rank their relative willingness to pay to get out.**
**In terms of what it does to the estimated cost of getting out, it makes it higher than it would have been had you estimated it in a pre-9/11 heightened security environment, which just makes the buyout costs be higher, in my analysis.**
Q Okay. So you'd want to compare utilities working -- utilities that were experiencing costs in basically the same time frame, correct?

Page 51

A **Correct.**
Q Okay. And all the utilities with regard to post-9/11 security costs were obviously operating under -- in the same framework before 9/11 with regard to their security costs. Is that fair to say?
MR. SHAPIRO: Objection, vague.
A **Certainly with respect to, yeah, any -- any incremental burdens imposed by 9/11.**
Q And you don't know of any reason that Dairyland at the LACBWR site would have experienced heightened security costs, do you, in 1990 relative to other utilities, do you?
A **No, I'm not aware of any special reasons why they would have had different security costs.**
**(Recess, 10:19 a.m. through 10:29 a.m.)**
Q Mr. Graves, did you consider technical impediments to fuel removal, spent fuel removal, in your model?
MR. SHAPIRO: Objection, vague.
A **No. I have no special adjustments for any circumstances where a particular piece of waste might be difficult to move.**
Q Why is that?
A **Couple of reasons. One is it's my general**

Page 52

**understanding that failed fuel is covered by the contract and has been handled successfully in other settings. So it appeared to be a secondary consideration.**
Q So where did you obtain that understanding? Let me break that down. I'm sorry. You said it was your general understanding first that failed fuel is covered by a contract. Where did you learn that?
A **Well, I believe that's in the contract document itself.**
Q Really? Where?
A **I would have to review the document, but that's my recollection. So, you know, I would need to look at the document to find it.**
Q Did you have any discussions with Mr. Shapiro or his colleagues regarding that?
A **Yes.**
Q Okay. What were those discussions about? I'm sorry, could you describe those discussions?
A **Well, there's kind of two levels of discussion that went on. One is the question of whether it's -- whether it is valid to conclude that the failed fuel would be covered by the obligations of DOE. And second, we discussed whether there was**

Page 53

**failed fuel at Dairyland and any other settings where it had been -- had arisen. And the answer to that is yes, there is failed fuel at Dairyland.**
**And number two, there has been failed fuel at other settings, including at one or more of the Yankee units, which I believe have either been able to handle it or are confident that they can handle it with conventional waste removal.**
Q Okay. I'm not sure, when you say "and they're confident," who is confident that they can handle it?
A **I would have to refresh my memory on that from source documents and prior testimonies in the Yankee case itself, but I believe -- I recall that there were witnesses in that case who said that they could handle the failed fuel and they may have, in fact, handled failed fuel successfully since then. So -- but I can't remember the names of the parties and the representations.**
Q Okay. But that was in the Yankee case, correct?
A **Yes.**
Q Okay. And that dealt with Yankee's failed fuel, correct?
A **Yes.**

Page 54

Q Okay. How does Yankee's failed fuel compare to Dairyland's failed fuel?
MR. SHAPIRO: Objection, vague.
A It's hard to make a comparison. I guess there are -- I don't know how to compare them. They're obviously not the same fuel in the same place but, you know, there may be some loose pellets, some partially damaged rods that have radiation leakage. And I'm not sure whether that's qualitatively the same as prevails at Maine Yankee or at the Yankee units or not.
Q Have you done any investigation into that issue?
A No.
Q Have you asked anybody at Dairyland to help you understand what the characteristics of their fuel are like?
MR. SHAPIRO: Objection, vague.
A Not beyond the description I just gave you, namely, I'm aware that they have some failed fuel and that, you know, it's a small portion of the total fuel.
Q So are you assuming that Dairyland's failed fuel is like the Yankee's failed fuel?
MR. SHAPIRO: Objection, vague.

Page 55

A As I stated, I have not made any engineering comparison of the quality or condition of those fuels. I'm aware that it exists and that it is -- no one indicated to me that it would require special handling other than, you know, care in packing it into the canisters that were otherwise intended for use at Dairyland. So with that limited understanding, I treated it as -- the same as other fuel.
Q Right. But when you said that it had been successfully handled in other places, when you testified to that just a minute ago, were you assuming that the fact that it had been successfully handled in other places would mean that it could be successfully handled at Dairyland as well?
A Well, I'm not relying on a one-for-one mapping between those circumstances and Dairyland's. I mean, I'm relying on the fact that it -- there is anecdotal evidence that it is not a per se barrier to managing the waste in a fashion consistent with the nonfailed fuel and so I've made no adjustment in my model for any special treatment of failed fuel.
Q Right. But when you said that there's anecdotal evidence, where did that anecdotal evidence come from?

Page 56

A Well, I think I just explained. One that I'm aware of, though I can't reconstruct all the details of it, is that at the Yankee units they have had failed fuel and they've been able to store it or are confident they'll be able to store it in their ISFSI.
Q Okay. Which of the Yankee units? There were three of them?
A Yes.
Q There was Yankee Rowe, Maine Yankee, and Connecticut Yankee, right?
A Correct.
Q Okay. Which of those units did you --
A I don't recall which one or ones had failed fuel. I wouldn't be surprised if more than one did, but --
Q You would?
A I would not be surprised if more than one did.
Q And in terms of comparison, does it matter which one?
A No, not -- because again, I'm not relying on a comparison of the engineering process that would be required at one versus the other versus Dairyland. I'm just saying it has proven to not be

Page 57

an insurmountable barrier to normal waste handling.
Q Now, were one of the Yankee units -- were they all pressurize water reactors? Do you know?
A I don't recall.
Q And the reactor at LACBWR is a boiling water reactor?
A It is, right.
Q So does that make a difference?
MR. SHAPIRO: Objection, vague.
A PWR versus BWR?
Q Yes.
A There are differences that arise, but they don't arise at the level of contravening the expectation that the program would handle the waste on a per-ton basis in a similar fashion. So, for instance, the precise, you know, number of assemblies and so on per cask are different for the two different types of reactors, but the basic process of -- is similar.
Q How do you know that?
A Well, there's been testimony in other hearings that the PWR and BWR distinction is not one that would change the ability to schedule or pick up waste under the program.
There are documents that the communication

Page 58

within DOE during the program design that confirm that. I'm aware of the differences in the assembly and cask configurations, you know, generally from just statistical evidence about what they're like.
Q Which documents are you referring to?
A Well, for instance, in my cost studies there are some PWRs and BWRs, and they have different numbers of assemblies and different weights per assembly and so on.
Q Right. But I thought you were talking about DOE documents. Weren't you?
A Well, among -- yes, that was another source of information. There were -- I believe there were communications that were -- that I first became aware of in the Yankee case in which the question of handling a PWR and BWR waste and whether they would be exchangeable, for instance, for each other in the EFF queue was debated. And I recall seeing that that was not deemed to be a constraint, that that was something that could be handled.
Q Okay. But did you decide that with regard to handling failed fuel that handling the failed fuel at the Yankee's, where they have a pressurized water reactor, is analogous to the handling of failed fuel at Dairyland, where you have a boiling

Page 59

water reactor?
A I don't know what you mean by "analogous." I already said I'm not relying on any presumption that the engineering configuration is identical or that the steps and tasks to handle the waste would be the same any more than I'm relying upon the presumption that the exact mechanism for removing the nonfailed fuel would be identical. It obviously is in some sense site-specific at every facility.
I'm relying on the notion that it can be done inside the scope of the program and that that would be the expectation that it would -- that would have been the expectation of the parties at the time that that would occur. It's not an engineering assessment of what it takes to do one site versus the other site.
Q Did you assume that it was going to cost about the same to do it at one site as opposed to the other?
A Yes, I guess implicitly I did in that I don't treat it as a special incremental expense of a smaller order, or greater-than-average cost of waste handling at any site. To the extent it costs a little bit more or a little bit less than other waste, that's easily handled by my sensitivity

Page 60

analyses on the cost of the overall waste handling.
Q How much failed fuel does Dairyland have?
A I don't remember the metric as to how -- what percentage of the fuel was failed.
Q Did you ever consider that?
MR. SHAPIRO: Objection, vague.
A I consider failed fuel to be must-move fuel, and I don't anticipate -- don't reflect in my modeling any belief that it imposes a different avoidable cost on a utility that would affect its willingness to pay to get out. So in terms of both the must-move analysis and the economic sequencing, it doesn't change companies' desires, positions in the queue, the total amount that has to be moved, or the economic motivation they have to get out. It may change the process that's pursued at the site for actually removing the waste, but it doesn't affect the avoidable costs of the utility itself, so I don't consider it a distinct kind of waste from other waste.
Q What if it had an effect on the relative cost of removal at one utility site versus another?
MR. SHAPIRO: Objection, vague.
A Well, it's still an obligation under the contract that it be removed, and there's been

Page 61

funding from the utility industry to create the means for the DOE to do so. Certainly, there are many, many reasons why the costs could be different at one facility from another for removing the waste, but that's not -- that doesn't change their rights to have it removed nor their ability to swap positions to do so.
Q I'm sorry, I don't think you quite understood my question.
What effect does the relative cost of dealing with failed fuel have on your model?
MR. SHAPIRO: Objection, vague.
A I think I did answer that, which is none. It has no effect because it is -- the failed fuel is still part of the fuel that needs to be removed. It imposes -- its retention imposes avoidable costs on the utility. The avoidable costs are not themselves shaped by the failed fuel, they're shaped by having a wet pool, for instance. And so those are the determinants of results in my mind.
The fact that when it comes time to remove it, you'll have to go through a different engineering process of one facility then another is a program complication, but it doesn't change the must-move requirements nor the economic sequence.

Page 94

example, security engineering and maintenance, are essentially fixed, i.e., independent of the quantity of fuel in the pool. Do you see that, sir?
A I do.
Q Is that true at Dairyland? I mean, I know it says -- your sentence says an operating nuclear reactor, and obviously, Dairyland is not operating. But with regard to their actual experience, would you agree that this assumption applies at Dairyland?
A Yes, I think it does.
Q Okay. And so then my question is if they have, say, one assembly that can't be moved and they have to keep it in the pool, essentially their costs of operating the pool are fixed, is that fair to say?
MR. SHAPIRO: Objection, vague.
A Yes, that's the indication of my sentence. That's the kind of analysis I've assumed in my model.
Q Okay, thank you.
MR. SHULTIS: Can we go off the record real quick?
(Recess, 11:46 a.m. through 11:58 a.m.)
Q I'd like to shift gears a little bit, Mr. Graves, because I wanted to ask you about how

Page 95

your report and how your analyses has changed since you submitted your report in the Pacific Gas and Electric case. Okay?
A Okay.
Q So first of all, could you tell me what the differences are between -- maybe I shouldn't say report. Let me say analysis. How has your analysis changed for this case as opposed to the Pacific Gas and Electric case?
MR. SHAPIRO: Objection, vague.
A The mechanics of my analysis are identical to the work that was done in the PG&E case, and many of the deputy inputs are the same. The ones that are explicitly different are the costs of developing and maintaining spent fuel repositories in O&M at the sites. In the PG&E case, I relied on Rod Knight's data. And as we have discussed earlier this morning, in this case I submitted similar data on my own from some 14 facilities that had good public records about their cost structure. And there were some changes in the numbers as a result. The basic character of it was that the ISFSI setup cost went up quite a bit and the O&M costs went down a bit. Cask costs were also slightly less. They're in the ballpark of the ranges that I've seen from

Page 96

Rod Knight and NAC in the Yankee case, but they're somewhat different.
Q And -- go ahead.
A So that's one element, and that's the main difference.
As an analytic matter, in the PG&E case, I described two versions of the economic sequencing model, a kind of a basic model and an enhanced model. In this case, I run all of the analyses through the so-called enhanced model because they're -- and, in fact, it's just a generalized version of the basic model. And when -- it produces exactly the same results as the basic model under similar -- under similar modeling circumstances, so it was set up to handle a modeling of cases where there was very tight, or limited capacity in the program compared to the must-move amounts that were demanded, which the solution to that algorithm can be used in general and get exactly the same results. So I used one model instead of two, but it's the same model.
And then the third difference that I can think of off the top of my head is there's maybe a couple of different sensitivity analyses, but it's fundamentally the same.

Page 97

Q Okay. Thank you for that. So in PG&E, you actually ran two different models?
A I described it as two different models. There was a basic model, which didn't -- ESM, which did not account for the possibility that if you were in a very tight supply market of limited acceptance rates, then conceivably, the price that people would be willing to pay for rights in one year would be lower than it might be in subsequent years. That didn't happen in the scenarios that I used the basic model for, but in some scenarios where the market -- when I was simulating tighter conditions, I switched to a model that adjusted for that. But it turns out the model that adjusts for that can be used in the unconstrained world and get exactly the same results as the basic model. So in this case, I just ran everything with the enhanced model.
Q Okay. What role does Rod Knight and his -- the information you received from him play in your analysis here in Dairyland?
A Virtually none. You know, I -- I compared it to my results from estimating costs from 14 sites to see if they were broadly consistent, but I -- and I found they were. But other than that, I don't use his data in any way.

Page 114

Department of Justice regarding the Department of Energy's standard contract argue the rate that's in the -- actually, it's in the list of -- it's actually in the 1998 total systemwide cycle cost report that the Department of Energy puts together, but it's the same rate that you list under the 2006 CRWMS requirements doc on page 12 of your report.

MR. SHAPIRO: Objection, vague, argumentative.

**A I'm not aware. They may be doing that simply because it's a 1998 document, and that's when the program was ostensibly supposed to be in full performance rather than having done an economic analysis of what the consequences of relying on that rate are versus a faster rate.**

Q You don't -- but does that -- that doesn't give you pause as to the rate that you consider reasonable?

MR. SHAPIRO: Objection, vague, argumentative.

**A The rate that other parties may have indicated they want to base their damages claim against is not necessarily one that's based on an economic analysis of what would have been reasonable. It may be based on their view of what**

Page 115

**has the most legal credibility or is compatible with their proposed solution to the problem.**

**But if they haven't done any kind of analysis to say whether or not that costs less than alternatives and that it's -- or that if it is worth more, that it's worth spending more than it costs, then they haven't answered the same question I have, which is what's economically reasonable for people to have expected.**

Q Did you ever test this analysis of what is reasonable with other utilities in the industry?

MR. SHAPIRO: Objection, vague.

**A No, I didn't discuss it with other utilities. My model, in effect, addressed that for them in the sense that it includes, you know, the effects on the whole industry of alternative rates.**

Q Uh-huh.

**A And most of them to my knowledge haven't performed such an analysis so I don't know that they would have a good way of answering that question.**

Q But you haven't asked that, so you don't know, right?

**A Well, that's true. I don't know the answer to the questions I haven't asked.**

Q With regard to your analysis for this

Page 116

report as compared to your analysis of PG&E, did you do -- and I know what you told us about the cost data, so aside from the cost data, did you obtain any other information to put together your report in this case that you didn't do in PG&E?

**A Nothing comes to mind.**

Q Did you do any additional analysis regarding the Department of Energy and the Department of Energy's program for the acceptance of spent nuclear fuel that you didn't do in Pacific Gas & Electric?

**A Well, in none of those cases do I directly analyze the program activities of the Department of Energy. I don't do it differently one than the other because I don't do it directly in either one.**

Q Okay. Did you do anything new, additional, with regard to the Department of Energy and, you know, the -- that program that you didn't do in PG&E? I understand what you're saying. You're saying you didn't truly -- you didn't directly analyze the programs, but my question is: With regard to the information that you used from the Department of Energy, did you add any information in that you didn't use in PG&E?

MR. SHAPIRO: Objection, vague.

Page 117

**A Aside from the fact that we just talked about using -- running a scenario for the 2006 study, Sierra WMS requirements documents, which of course didn't exist at the time of the PG&E study --**

Q Uh-huh.

**A -- no, I didn't do any other analysis of DOE.**

Q Did you add any -- any information from any other governmental agency that you didn't use in PG&E?

MR. SHAPIRO: Objection, vague.

**A Not that I can recall.**

Q So not the Nuclear Regulatory Commission or anything like that?

**A Well, outside of the context of the cost studies, which are vetted through the NRC, I don't recall any adjustments.**

Q Okay. Did you ever vet with any utility what they would be willing to pay, specifically, what they would have been able -- willing to pay for the acquisition of allocations --

MR. SHAPIRO: Objection.

Q -- in the nonbreach world?

MR. SHAPIRO: Objection, vague.

**A I -- I didn't do any surveying of anybody**

Page 118

to say what -- what would you have thought that world looked like and what would you have been willing to pay in that circumstance, though I have anecdotally or indirectly three pieces of data, one of which -- all of which arise from these testimonies.

We know that in the Yankee case and PG&E and now Dairyland, there's utilities who have seen my representation of what that world would have looked like and they felt they could credibly file a damage claim saying that we would have been willing to pay that and we feel harmed that we didn't get the opportunity to do so, so there's one piece of empiricism of sorts that supports that.

Going more broadly to just go door to door and ask people what they would have thought I guess isn't useful for two reasons. One, they would have needed a very complete spec and probably a model of what the circumstances were that they thought the nonbreach world would have looked like for them to answer the question, and they wouldn't have it, so they would have given piecemeal, vague answers that you couldn't interpret.

And the second thing is that ultimately isn't really the way market dynamics work anyway.

Page 119

You don't create a market by surveying everybody for their willingness to pay. You find out what the marginal willingness to pay is, and if you happen to have a higher willingness to pay than that, then you go ahead and do so, but you don't need to know -- you just need to know whether it's a good deal for you to do a transaction.

And the way I model this, I'm modeling things that are good deals for the people who pursue them. So you sort of don't need to ask somebody if you would take a good deal if you had it. That's what's -- this is a -- I'm modeling a circumstance where everybody's economics can improve from participating in this arrangement, and I only adjust their positions if they, in fact, have opportunity to do so. So a survey wouldn't have told me anything more about that than I already know for the result.

Q Okay. Now, you said that you assumed that Dairyland was okay with your model because they used it as a basis for damages in this case. Is that right?

A It's a factor in their damage calculation, certainly not the whole analysis.

Q Okay. I understand that. But my -- I

Page 120

guess my question is: How does your opinion affect Dairyland's damages claim? How do you expect Judge Damich to use your opinion in this case to assess damages?

MR. SHAPIRO: Objection, vague.

A I don't know for sure how they have framed their damage assessment, but I expect that it includes -- I would expect that it relies on the dates that I suggested they could get out, and that they might have to incur a cost to do so, since they would be proving their position in the queue and that nonetheless, they feel they bear damages from not having had the opportunity to do so, and those are the differences in costs that they incurred without this world of prevailing versus the costs they would have had in that world.

Q So is it fair to say that you would expect that the costs of inquring allocations should be an offset to damages?

MR. SHAPIRO: Objection, vague.

A As an economic matter, if you expect there would be some costs that you would incur in the performance world, such as acquiring rights, you should reflect those in your calculations to compare to the costs you're incurring in the breach world.

Page 121

And, you know, there may be some disagreement about how conservatively to represent those costs or not. But I think in principle, they ought to be part of the calculation.

Q Do you think it's fair to calculate damages by taking the costs in the actual world and subtracting the costs in the but-for world and then you've got damages, right?

MR. SHAPIRO: Objection, vague, argumentative.

A Qualitatively, that's correct. There's some calculational nuances to it, but that's the general idea.

Q Right. And in -- and in your scenarios, you predict an exchanges cost that range from 2 million to 21 million, right?

A Those are possible costs. I don't predict that they will be -- they will span that range. I don't think the $21 million scenario is a very credible scenario. And as I told you, I don't think the scenario 4 with the 2006 Sierra WMS pace is a credible scenario.

Q Right.

A Certainly, the '91 ACR scenarios aren't ones that should have governed expectations.

Q We talked about this a little bit earlier, but did you obtain representative cost data from publicly available records, or did you estimate costs yourself?
MR. SHAPIRO: Objection, vague.
A **Both.**
Q Okay. Could you explain that?
A **Sure. There were 14 or so facilities from which we obtained data that we thought was comprehensive enough and specific enough to identify component costs. They were, of course, reported in somewhat heterogeneous terms. Sometimes they were in 2002 dollars, sometimes they were in mixed dollars, sometimes they were in 2006, depending on when the filing occurred from which we were drawing the data.**
**So we cleaned those up by expressing all of the data in similar terms and grouping costs under like labels so that we knew what was a fixed O&M, what was a variable cost, what was a setup cost and so on. And then we expressed all of the capital costs for building an ISFSI and acquiring its casks in 2007 dollars as a lump sum cost of the facility for the dry storage facilities. We then fitted the value of that total cost to a statistical equation**



**for -- which had components for a fixed cost and a per-ton variable cost, and we used that estimate from the regression to describe our ISFSI setup costs and our variable costs.**
**And then on the others, we estimated for the fixed O&M costs of a wet pool and the fixed O&M costs of an ISFSI, we just used the arithmetic average of the 2007 dollars for those line items.**
Q Did you bring everything to 2007 dollars for purposes of the damages calculation in this litigation? Is that why you chose that year?
A **I don't know that it was quite that single-minded. You know, we needed to put everything in common dollar terms, and that's what year we're in, so -- and it happens to serve that purpose of putting them in 2007 dollars for the damages calculation.**
Q Was there a minimum sample size that you deemed necessary to develop reliable estimates?
MR. SHAPIRO: Objection, vague.
A **No.**
Q How do you determine the appropriate sample size for estimation?
A **I don't think in general in economics or in statistical sampling there is a right amount**



**that's required. Your confidence in results will vary with the size of the sample, but you can do a sample of thousands and have a smaller band of uncertainty surrounding the results, or you can do a sample of ten and have a higher uncertainty, but nonetheless, a -- a -- perhaps as good a sample as is available.**
Q Right. But for the purposes of your opinion in this case, I mean, there are only 60 or so players to begin with, correct?
A **Uh-huh.**
Q Okay. So doesn't that suggest something to you about the number of the sample sizes that you need?
MR. SHAPIRO: Objection, vague, argumentative.
A **The fact that there's 60 players doesn't by itself tell me anything about the sample, I don't think. It tells you in some sense that an upper bound on your sample is getting all 60, but all 60 haven't pursued or reported on, you know, all of the types of costs that I need data on, so that's not going to be feasible. But more is better, I guess.**
Q Well, I guess my question is: How did you decide on the sample that you got?



A **It wasn't based on a sampling theory that 14 is enough.**
Q Right.
A **It's, you know, we need to get at least eight, or some such number. It was based on attempting to get all the available data we could find that had the constituent parts broken out and explained in terms that we could understand so we could know how to use them in pooling them in our analysis.**
Q Okay.
A **So if somebody just said, well, we have a total spent fuel cost per year of $42 million, we don't know how to use that. We don't know whether that constitutes O&M, setup, cask purchases, so we -- it might be out there as a piece of data, but it's not very useful. So we would -- found as much as we could that was useful.**
Q How did you know that what you found was representative of a industry?
A **I guess there's two or three sources of confidence in that. One is, as you just observed, there's only 60 or so players in this business, and we had data on aspects of 14 of them, which is on the order of a fourth. So that's a, you know, a --**

Page 210

would have a high -- I don't know if the T statistic is what measures that or not, but by -- by interjecting an average in these series of numbers, doesn't it by definition sort of --

A **Improve the signal-to-noise ratio?**

Q I guess so.

A **Yeah, sure, a little bit. But again, the numbers are one tenth or one twentieth of the total costs of other numbers that are varying quite a bit by the time you build back the total capital that's involved, so it's not the lion's share of the numbers.**

Q Are the wet pool O&M costs -- those seem to vary quite a bit. Is that a significant variance, did you think?

MR. SHAPIRO: Objection, vague.

A **It's a material variation. There's no statistical test of whether it's a significant variant. I only have three observations for that.**

Q Well, that's what I was asking -- I'm sorry, go ahead.

A **So again, there again what I do for that is the same as I have done in my -- for all of these factors, is take what appears to be the best estimate I've had of a represented value and then**

Page 211

**also stress that in my sensitivity studies by doubling or halving, which more spans the variation in this case.**

**So if the average is 88.7 million for wet O&M for these three, and I double that, I'm up around 17 million. If I cut it in half, I'm around 4.2, which far exceeds the reading of those three, or far exceeds the range of Rod Knight's estimates, which he provided in a previous proceeding, so I'm -- I ask the question in my model about whether I need to know this number more accurately than that to reach the same conclusions about Dairyland. And the answer is no, I don't.**

Q Okay. Just so I'm clear, would you say that the wet pool O&M for each of these different plants, is that a significant cost category as opposed to ISFSI decommissioning?

MR. SHAPIRO: Objection, vague.

A **It turns out to be more material to the model than the ISFSI decommissioning costs because there are -- under the circumstances that I've deemed economically reasonable, no one has to build a new ISFSI so they never, in fact, incur the setup costs of an ISFSI or the decommissioning costs, and the market price is set by other activities like wet**

Page 212

**pool O&M and dry -- dry O&M.**

Q Okay. So it's really -- that is one of the drivers to your analysis, is it not?

MR. SHAPIRO: Objection, vague.

A **In some circumstances. You know, in the end result, it turns out that's true. It wasn't known a priori that that would be the case. In other words, there's nothing -- the model isn't set up for that to come true. It just happens to be the result.**

Q Okay. And in this instance, you -- what you did is you took the annual wet O&M costs at Humboldt Bay and Rancho Saco, and is it Trojan? Those are the three examples that you used to come up with an average annual O&M cost?

A **Correct.**

Q Is that right?

A **Yes.**

Q Okay. And that's how you came up with the $8.7 million average figure, correct?

A **Yes, it is.**

Q Okay. And is there any particular reason why you chose those three?

A **No. Again, it's based on where the data was, not on any preference for those three. They**

Page 213

**happened to report it.**

Q Okay. Suppose you put in -- you added Dairyland and their experience of $1.3 million in annual wet pool O&M. Okay? And then you did the same average. Do you know how much the average wet pool O&M per year comes down to?

A **Not off the top of my head. And there's at least one adjustments you have to make before you did that, which is all of these numbers are supposed to be in 2007 terms. So that 1. 3 estimate would have to be both inflated and adjusted for any other post -- any more recent additions that are imposed on the process. If there's more security costs, etc., those would be in there. I think their more recent estimates are higher than that.**

Q How much are they? Do you know?

A **3 to 4 million, something like that, per year.**

Q Okay. Well, suppose we use the 3- to 4 million, just because I want to get -- understand for the record what direction that brings it. Doesn't that bring down the average wet pool O&M that you would use in your analysis? Wouldn't that bring that down considerably even if you used a 3- or $4 million figure?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Case No. 04-106C (Chief Judge Damich)

DAIRYLAND POWER COOPERATIVE, )
Plaintiff, )
v. )
UNITED STATES, )
Defendant. )
______________________________________ )

DEPOSITION OF FRANK GRAVES

September 6, 2007

Washington, D.C.

Reported by: Mary Ann Payonk, CRR-RDR
Certified Realtime Reporter
Job No. 2007-11

report that had been offered by Dr. Neuberger in his responsive report to mine, and they required clarification.

**Q In your practice or in your experience as an expert witness do you ordinarily submit rebuttal reports?**

A It's pretty common.

**Q In the other spent nuclear fuel cases that you've worked on, did you submit rebuttal reports in those cases?**

A We did in the PG&E case.

**Q Okay.**

A I don't recall one in the Yankee cases.

**Q How much time did you spend on this report?**

A You know, I don't have a very precise memory of that, but I think we had about five weeks' calendar time to respond, and I probably spent about a week of my time on --

**Q Uh-huh.**

A -- the analysis and the report. Of course, I had staff that helped me develop some of the analyses.

**Q There were others at The Brattle Group that participated in drafting this report?**



A Less in -- yes, somewhat, although less in drafting than doing the analytic studies to feed the report.

**Q Whose idea was it to submit this report?**

A I don't recall who was the -- the source. The entire client team felt it was a good idea.

**Q So it wasn't your sole decision to submit a rebuttal report?**

MR. SHAPIRO: Objection, vague.

A I would say that's fair. You know, I -- I don't think I was in a position to insist on a rebuttal report occurring, but it was easy to convince people that it was a good idea.

**Q You mentioned that the whole client team -- I guess, based on your discussions with the client team, you determined that you should write this report. Who are you referring to specifically when you say "the client team"?**

A Well, my contact is with Mr. Shapiro as counsel for Dairyland, but I'm sure that he was in coordination with them to degree that we would proceed with rebuttal.

**Q And when did Mr. Shapiro approach you about writing a rebuttal report?**

A I think we discussed being prepared to do



it well before we saw Dr. Neuberger's report. It's always a possibility that it would be relevant so we were anticipating that a month or so before it occurred.

**Q Why don't we turn to page 13 of your rebuttal report.**

A Okay.

**Q I'd like to direct your attention to the second paragraph on this page. Is it fair to say that in this paragraph, the paragraph beginning, "In deposition, Dr. Neuberger claimed that polling utilities would have been an appropriate method to determine willingness to participate in exchanges in the nonbreach world," is it safe to say that here, you are criticizing Dr. Neuberger's critique of your report to the extent that you should have polled utilities to determine their degree of willingness, if any, to participate in changes in the but-for world?**

MR. SHAPIRO: Objection, vague.

A He opined that in order to understand the plausibility of exchanges, it would be helpful or perhaps even necessary to interview industry participants and ask them for their opinion, so I'm responding to that, which I think is not a credible suggestion.



**Q It's your position that polling utilities would be inherently unreliable, an inherently unreliable method to determine the extent of the utility industry's willingness to engage in exchanges in the but-for world; correct?**

A Yes.

**Q Okay. And your view is that to the extent that utility managers happen to hold beliefs about the so-called nonbreach world, such beliefs would be, to quote you, quote, he'll tainted by breach world experience, unquote. Is that right?**

A Yes, that's -- that's my opinion.

**Q And in your view, if such a utility witness were to testify at trial that they would not engage in exchanges, such testimony would be also tainted by the actual world experience; correct?**

MR. SHAPIRO: Objection, vague.

A Well, it would depend a lot on the way the question was posed in trial. My point here is that the context of what you believe to be the character of the nonbreach world would have a great important bearing on how you would believe you would have behaved in that setting. And it's -- it takes some work to set up a rich enough model of what that would have been like to give credible answers.

It's possible that that could be done at trial. So I wouldn't say that there's per se impossible for someone to answer usefully, but it would depend heavily on the predicates.

**Q You mentioned in your answer -- I'm reading from the LiveNote transcription here -- that it would depend a lot on the question that was posed at trial. Can you explain what you mean by that?**

A Yes. In order to opine on whether you would have traded in the nonbreach world, you'd have to know what the circumstances were that you were facing. And part of the problem, the reason there's a need for this hearing and the testimony of myself and Dr. Neuberger, is because there isn't an overt agreed-on model of what that world would have been like. So it takes some analysis of the kind I've done to look at the supply and demand conditions and what might have been feasible in that setting to decide if you would participate.

So those are the -- depending on how questions were posed about the circumstances that prevailed and, of course, the way the question is worded itself, you could get very different answers. It would be difficult to make them reliable.

**Q Is it your position that it is per se**



**impossible to draft questions for polling utilities that produce credible results?**

MR. SHAPIRO: Objection, vague.

A Not in general. I mean, there certainly is polling that can be done of some topics. As I say here, the -- the trick would be to get an agreed-upon set of predicates before you started the questioning, and that would itself be a source of controversy in the polling process because you would have to do something like say if the world that Mr. Graves believes should have prevailed had prevailed, what would have been your experience? You would have had to lay down quite a bit of explanation of what that would have been like, and that's not what normally goes on in polling processes.

**Q You mentioned that the trick would be to get an agreed-upon set of predicates. What might some of those predicates be?**

A What the acceptance rates would have been, what kinds of timing and schedules would have been promulgated, and when. You know, an entire framework for what the but-for world would have looked like. And that's what I've laid out in my direct testimony.

**Q If utility witnesses were to testify at trial or deposition that they would have engaged in**



**exchanges in the but-for world, would that testimony be tainted by the actual world experience?**

MR. SHAPIRO: Objection, vague.

A I think it would again depend a little on the question the question is worded and the way the predicates are set up in the question. The actual world experience is one of not having well-defined property rights and schedules and opportunities to trade, or even an understanding yet of what the program ultimate performance might be. So that may well have bred a perception that this is a risky and difficult place to do business. If, notwithstanding that experience, they said they would be willing to trade, I would give that more credence than them saying that they weren't willing to trade, because they would be saying even in the face of the breach world nonperformance, I would still be interested, then they could only be more interested in the -- in the nonbreach world.

**Q Can you develop a question that you believe would produce a reliable answer?**

MR. SHAPIRO: Objection, vague.

A For what context? For polling? For a hearing? What? What are we talking about?

**Q Let's start with for polling.**



MR. SHAPIRO: Objection, vague.

A I think I could do some that would be credible from the point -- from my point of view in the sense that I have studied the question of what I think the nonbreach world should have looked like. But the problem is that if I were to ask a question that said let's suppose the nonbreach world looked like as has been described in my direct report, would you be willing to trade, we might -- you -- you would be only getting conditional answers that would be conditional on whether or not you, in fact, agreed with that characterization of the nonbreach world. And those -- since that is in dispute, having answers that were conditional on a fact that's in dispute I don't think would resolve the courts -- help the courts resolve the question of whether or not those answers tell you what would have happened.

The predicate largely determines the -- in some ways determines the answer. If you're told that it's a poorly designed, half-speed, convoluted process, you might be giving a different answer. And the issue is not if -- how would you answer, it's what is -- what would have been reasonable to expect.

**Q You did not endeavor to present to utilities a set of predicates to assess their**

**attitudes towards trading in a nonbreach world. True?**
A No. And it's also my perception that that is rarely done to the level that would be required in polling processes. People don't like to participate in polls where they say let's spend an hour discussing the predicates of the questions I'd like to ask you and then we will go through them. It's usually a pretty perfunctory process with, you know, people not making those kinds of investments in understanding the question -- the -- the foundations of your questions.
**Q What's the basis for your testimony? I'm sorry, strike that.**
**What was the basis for your position you just articulated about polling and utilities not wanting to waste time or spend the time in responding to a poll?**
MR. SHAPIRO: Objection, vague.
A Well, I have been contacted by pollers from time to time so I have some experience being asked questions of this kind. I've worked in occasional conjunction with market research firms where I've used market research data in my work so I know a little bit about how this is compiled. I'm not offering my opinion as an expert market researcher, but I'm offering my skepticism that it would be -- it



would be easy to get people to participate in a sufficiently sophisticated poll.
**Q Can you elaborate in specific detail your specific experience with regard to polling?**
A Sure. In the early 2000s or late '90s and early 2000s there was quite a bit of concern about how much utility customers might be willing to use alternative suppliers as we created competition for retail electric service. And part of the inputs to the analyses of what the financial implications of such behavior might be were studies on customer tastes and performances. And I've reviewed these kinds of studies in helping utilities make plans for dealing with retail choice, so I'm aware of that -- that kind of polling.
**Q And in those polls that you were involved in in the late 1990s, early 2000 period, you experienced or you -- it was your observation that utilities were reluctant to respond to polls?**
A No. These weren't polling the utilities, these were polling utilities customers. You were asking me what experience I'd had in polling, and that's -- those are among the types of polls that I've seen done and I've used in my own analysis.
I don't have a specific experience of



reluctance of a utility to participate in a poll. I'm talking about the general problem of laying the foundations for asking the questions that would be required in this poll.
**Q Could we rely on what a utility witness believed the but-for world would have looked like?**
MR. SHAPIRO: Objection, vague.
MR. BRYAN: I can rephrase.
**Q Can we rely on testimony offered by a utility witness insofar as that witness is testifying about his or her beliefs as to what the nonbreach world would have looked like?**
MR. SHAPIRO: Objection, vague.
A Well, I'm not sure what it means to rely on the testimony. It could be given various amounts of weight that would depend on the apparent amount of experience the person had with dealing with the question at the time and their awareness of what the institutional alternatives were. There's a variety of factors that would go into deciding if they're reliable and useful or not. I don't think there's a per se yes-or-no kind of answer to that.
**Q Well, assume a very, you know, senior level manager at a utility. Can we rely on that person's testimony --**



MR. SHAPIRO: Objection, vague.
**Q -- as to what -- as to what the but-for world would look like?**
MR. SHAPIRO: Objection, vague.
A I don't think just being senior by itself makes them necessarily a source of information. They could be a chief financial officer and never have thought about the question at all. As I say, it really has to do with what their level of involvement with the issue was at the time and whether it relates to whether they've done any work to formalize their thinking about it.
**Q Let's assume that this utility manager was heavily involved in the particular issue in, you know, managing spent nuclear fuel, let's say. Could we rely or find credible that witness's testimony concerning what the but-for world would have looked like had DOE performed?**
MR. SHAPIRO: Objection, vague.
A Well, I would say you could certainly rely on their representations of their expectations. Whether those were reasonable expectations or not is another matter. That doesn't depend on whether they expected it or not, that depends on whether those expectations describe a efficient, credible process.

What I'm offering it as is a reasonable representation of what the purchasers in this contract could have expected, and I guess would have expected as well. But I don't know whether it would have actually -- whether there's a world in some sense in which it would have occurred.

**Q Your --**

A It describes their credible economic beliefs that you could have had in going into the contracts and in managing your business.

**Q Your exchanges model was an industry-wide model; correct?**

A Yes.

**Q You contend that your model depicts an extremely efficient economic outcome for the spent fuel program; correct?**

MR. SHAPIRO: Objection, vague.

A I certainly don't use the word "extremely." I contend it depicts a reasonable outcome, which is pretty efficient. It's not perhaps as -- it's not conceivably as efficient as some alternatives might be, but it's efficient enough to reasonably well take care of the at-reactor storage costs in a manner that I think is compatible with system management as well, with program management.



So I think it's efficient, but not extremely efficient.

**Q Have you asked any utility representatives about their reasonable economic beliefs with respect to the but-for world?**

MR. SHAPIRO: Objection, vague.

A We're back to polling, I guess. The answer is no, I haven't done any surveys of what people held as beliefs. I think as a -- both as a public matter of public policy and normal business commerce, people would expect a program of this kind to be intentionally run with a goal of being efficient and with being responsive to reducing the costs -- the costs of the parties that are paying for it, which was the purchasers. So those general principles of expectation I would -- I don't think require surveying to understand.

And if you believe those apply, then you can begin to model what that implies about the performance of the -- of the program. That's what I've done.

**Q So I take that that's a yes to my question. You haven't talked to any utility executives --**

A That's what I said.



**Q -- reasonable beliefs --**

A That's what I said.

MR. SHAPIRO: Objection, vague.

**Q A couple questions back, you testified that your model is not an extremely efficient economic outcome, that there might be more efficient but-for worlds. What would -- what would those look like?**

MR. SHAPIRO: Objection, vague.

A Well, for instance, there are -- there's a five-year ramp-up that I assume would prevail to a 3,000-ton-per-year steady state removal rate. And my suspicion is that that's slower than need be. And it's not clear that there's any economic benefit to having it proceed at that pace. So it's plausible that it could have occurred -- that the ramping process could have occurred sooner or faster, and that would have conceivably been operationally and economically more efficient.

**Q Well, if that's true then, why did you -- why do you include a ramp-up period in your recommended rate for your model?**

MR. SHAPIRO: Objection, vague.

A Many, many of the program planning studies that were conducted in the mid '80s and subsequently included a ramp-up period of a few years, sometimes



more, sometimes less. And because that was a recurring part of the way the program appeared to be described at the time, in studies that were conducted before the program failed, they -- I believe they probably would have been part of the expectation set of the purchasers, whether or not it was as efficient as it could be.

**Q Can you name a single DOE document that doesn't presume a ramp-up?**

MR. SHAPIRO: Objection, vague.

A Not off the top of my head. I don't recall any.

**Q Is there an engineering benefit to a ramp-up?**

MR. SHAPIRO: Objection, vague.

A Well, it's conceivable that there is a benefit. The -- but to my knowledge or recollection, none of these studies with a ramp-up discuss the engineering underpinnings of what was going to be accomplished during the ramp-up period. It was a simple -- simply offered as the way things were likely to happen, in my recollection. So I don't know what the engineering motivations would have been

There is -- even if there were interesting engineering benefits to ramping up, it's not clear

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE | : | |
| | : | |
| Plaintiff , | : | |
| vs. | : | Civil Action No. |
| | : | 04-106C |
| UNITED STATES OF AMERICA | : | |
| | : | |
| Defendant . | : | |

Washington, D.C.

Wednesday, August 8, 2007

Deposition of:

JONATHAN A. NEUBERGER, PhD

called for oral examination by counsel for Dairyland, pursuant to notice, at Greenberg, Traurig, 800 Connecticut Avenue, N.W., Washington, D.c., before Ronald E. Bennett, of Capital Reporting Company, a Notary Public in and for the District of Columbia, beginning at 9:12 a.m., when were present on behalf of the respective parties:


©2007

APPEARANCES

ROBERT L. SHAPIRO, ESQUIRE
KEVIN E. STERN, ESQUIRE
GREENBERG, TRAURIG, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
202-452-4878
Fax: 202-261-0107
E.mail: shapiror@gtlaw.com

PATRICK B. BRYAN, ESQUIRE
JOSHUA E. GARDNER, ESQUIRE
U.S.Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
202-616-8299
Fax: 202-305-1571

Also Present: Dean M. Murphy, Ph.D



CONTENTS

EXAMINATION BY: PAGE

Mr. Shapiro 5
Mr. Bryan 223

NEUBERGER DEPOSITION EXHIBITS: *

1 Expert Report 6

2 Contract 121



PROCEEDINGS

WHEREUPON:

JONATHAN A. NEUBERGER, Ph.D.,

called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

Q. Dr. Neuberger, if you would state your name for the record, please.

A. Jonathan A. Neuberger.

Q. Dr. Neuberger, I would like to start talking briefly about the record of your prior testimony experience. Is the record of testimony in your CV complete?

A. I believe it is. Yes.

Q. And I'll show it to you in a moment. The earliest case it looks like that is listed as having you testifying at trial is the McDonnell-Douglas case in 2001. Is that in fact your first trial testimony experience?

A. Yes, that is correct.

Q. And am I correct that all of your experience is a trial testifying experience, I think



with one exception, has been in cases where you are working for the U.S. Department of Justice?

A. At trial that is correct. There is one instance in which I testified in the Federal District Court for the Northern District of California. But the other, I believe six times, I've testified at trial have all been in the Court of Claims testifying on behalf of DOJ.

Q. Working with the National Court Section of DOJ?

A. I believe that's what it's called, civil division. I'm not sure all of the categories.

(Neuberger Exhibit Number 1 was marked for identification.)

Q. Actually let me show you your expert witness report for this next question. Handing you what's been marked as Exhibit 1 to your deposition. Do you recognize it?

A. Yes, it appears to be a complete copy of the report I issued in this case.

Q. In paragraph 12 of your report you'll note amongst your trial testimony experience is testimony




©2007

Page 10

percentage of your work has been for the Department of Justice?

A. Probably a little less than that. Probably about 60 or 65 percent. It varies year to year. I would say in that neighborhood.

Q. Is your compensation greater when you had the opportunity to work as a testifying expert as opposed to working on cases at Economist Incorporated where others will do the testifying expert?

A. There is an additional percentage that I would earn on a case that I do earn on a case where I'm a testifier. There have been instances where I worked on cases where one of my colleagues was testifying. And the percentage that I earned on those cases was somewhat lower, yes.

Q. Could you explain for me, how does that work in the scheme which you previously explained that there is simply a straight percentage of the $425 per hour that you receive and after certain amount it goes up from 65 to 75. What is the extra kicker, if I can use that term, that applies since

Page 11

you're testifying?

MR. BRYAN: Objection. Vague.

THE WITNESS: I believe the answer to your question is, if I'm working on a case that one of my colleagues is the testifier, I receive 50 percent of my billings and none of the billings of other people who are working on that case. That extra percentage would go to the individual who is the testifier.

Q. Let's change subjects for the time being. I would like to ask a few questions about the Economist Incorporated work on the Dairyland case. Who is supporting you in your work on the Dairyland case?

A. My primary support person is named Stuart Gurrea.

Q. You mentioned him as the primary support. Who else is working on the case?

A. We have a couple of research associates in our California office. And I believe one or two of those research associates have provided some support to Dr. Gurrea. I don't know specifically what they have been doing. But Dr. Gurrea has been

Page 12

essentially the case manager under my supervision. And he has, I know, gotten some help from some of the research associates.

Q. What is Mr. Gurrea doing at case manager?

A. Just organizing the documents. He reads the reports along with me. He's a PhD economist. We are in offices next to one another. So we talk constantly --

So Dr. Gurrea and I work very closely together. We have worked together on several of these spent fuel cases. As I said, he reads the reports, reviews documents, just as I do. We talk several times a day about issues related to the case.

When it comes to writing the reports, I do that. But he certainly reviews what I write, and we talk about it. And I would consider him to be a crucial part of the team.

Q. What have you done personally in the Dairyland case?

A. I have reviewed documents. I have looked extensively at the spreadsheets that the Brattle

Page 13

Group and Mr. Graves have provided in this case. I have developed an understanding of how those spreadsheets work. I write the report. I perform the analysis. I work closely together with Dr. Gurrea.

And in some ways I suppose there is some overlap, quite a bit of overlap between what he does and what I do. But the report is my own. And represents my opinions. And Dr. Gurrea has been a key team player, team member of who helps support me in that effort.

Q. You say that you did the analysis. Have you done any quantitative analysis in your work in the Dairyland Power Cooperative case?

A. I have looked and reviewed and analyzed extensively Mr. Graves's allocation rights moderate, the economic sequence model and the must move model. I consider that quantitative, because it requires understanding the workings of the model. And the formulas that go, that drive that model.

I also performed what I would consider to be quantitative analysis in reviewing



 ©2007

Page 14

the cost estimates that are key inputs to the economic sequence model. So I would consider all of that quantitative in nature.
Q. Other than reviewing Mr. Graves's work, have you done any other quantitative analysis in the Dairyland Power Cooperative case?
A. If the question is, did I create my own model and crunch numbers through it, no. But certainly in terms of developing an understanding of Mr. Graves's model, I consider that to be quantitative analysis.
Q. You received Mr. Graves's model in electronic form, didn't you?
A. I did.
Q. Did you use that to run any additional sensitivities?
A. No, I did not.
Q. Did you test Mr. Graves's model by putting in different inputs to see if that would alter the results?
A. No, I did not.
Q. Why not?

Page 15

A. I didn't think it was necessary for the opinions that I express in my report.
Q. Are you aware of any quantitative analyses other than reviewing Mr. Graves's work that Dr. Gurrea or anyone else at Economist Incorporated has performed in the Dairyland Power Coop case?
A. I'm not specifically aware of any alternative scenarios or sensitivity analyses that Dr. Gurrea may have performed. I know he spent a lot of time with those spreadsheets open looking at them, running them.
I know at one point Dr. Gurrea found a bug in one of the algorithms that supported that program that ran that program. And he may have performed some analysis or some programming or some alternative quantitative runs to locate that bug. But I'm just aware of that through conversations with him. I'm not specifically aware of what he did to investigate that.
Q. Did you ask Dr. Gurrea to perform any quantitative analyses in the Dairyland Power Coop case beyond reviewing Mr. Graves's work?

Page 16

A. Not to my recollection, no.
Q. Did you instruct Dr. Gurrea not to conduct any quantitative analyses in the Dairyland Power Coop case beyond reviewing Mr. Graves's work?
A. No.
Q. What instructions did you receive from the Department of Justice about your work in the Dairyland Power Coop case?
A. I would say it was very general. Please review Mr. Graves's report. You are, you being myself, are familiar with that work from the PG&E case. So my assignment was a very vague one. Just please review Mr. Graves's analysis and provide us a report describing your analysis.
Q. Did you receive any sort of instruction from the Department of Justice discouraging you from conducting any quantitative analyses of Mr. Graves's work other than reviewing it?
A. No.
Q. How many hours have you personally spent on the Dairyland case?
A. I haven't summed up all those hours. I

Page 17

would say it's in excess of 200 house. I haven't gone back to check. I could do that, if you like. I haven't specifically checked.
Q. You testified that you personally drafted the text of your report. Is that correct?
A. Every word.
Q. How many drafts did you go through in preparing your report?
A. It's hard to say just because of the way I write a report. It's a constant process of writing, editing, rewriting, adding. I probably took two weeks to write the entire report. And during that process, I mean, if every time I saved a draft that was a separate draft, there could have been dozens.
Q. When was that two week period when you actually drafted the report?
A. Just prior to the date the report was due.
Q. When did you first send a draft to the Department of Justice?
A. Probably three days before the report was due.
Q. What comments did you receive back from

Page 18

the Department of Justice?
A. Very minor. I would say mostly stylistic points. I don't think there was anything substantive that came back in terms of, oh, you said this. This is wrong. Or we want you to say this. That is just not typically the nature of the instructions that I get from DOJ.
Generally it's, oh, this sentence is a little bit vague. You could type it up a little bit or use this word instead of that word. It's really more wordsmithing and stylistic than substantive.
Q. Which individual or individuals in the Department of Justice did you communicate with?
A. I would say primarily, I don't know who all saw it over there, but I know I spoke to Mr. Bryan, and I also spoke to Mr. Sholtice.
Q. Do you recall any specific comments that you received from the Department of Justice about your draft report?
A. Not specifically, no.
Q. In paragraph 16 of your report you say

Page 19

that you reserve the right to change your opinions. Have your opinions changed at all since you signed your report in June?
A. Not to date. No.
Q. Do you anticipate altering your opinions at all?
A. I understand Mr. Graves may be providing a rebuttal report. So to the extent that I'm asked to respond to that rebuttal report, it may involve some further refinement of opinions or some new opinions.
Q. As I think we noted earlier, you have done a fair amount of testifying in other spent fuel cases before the Court of Federal Claims, correct?
A. Yes.
Q. Can we rely on your testimony in those other spent fuel cases?
MR. BRYAN: Objection. Vague.
THE WITNESS: I guess it depends on what you mean by rely. I stand by my testimony, if that's what you mean.
BY MR. SHAPIRO:
Q. Let me ask another more perhaps specific

Page 20

question. Is there anything that you have testified to in other spent fuel cases that in hindsight you now believe is not fully correct?
MR. BRYAN: Same objection.
THE WITNESS: No.
BY MR. SHAPIRO:
Q. Dr. Neuberger, let me turn your attention to paragraph 13 of your report. The first sentence of that paragraph you say that Mr. Graves's model, the demand for Doe acceptance rights does not assist the court in determining issues relevant to Dairyland's damages.
What expertise are you applying in making that assertion? Is that legal expertise?
A. I'm relying on my expertise as an economist. Strictly as an economist.
Q. What methodology did you apply to reach that conclusion?
A. I used my knowledge, training and experience as an economist to conduct a critical review of Mr. Graves's model, including the assumptions, the methodology and the predictions of

Page 21

that model.
That methodology is a well-established methodology among trained economists. I would say every economist who enters a graduate program in economics is trained in that methodology beginning right from the start of the program.
A key element of developing an economics expertise in economic training is to perform critical reviews of models, articles, analyses performed by other economists. And that is the methodology that I used in this case and I've used in several other cases as well.
Q. So the term that you would use to describe the methodology you used in the Dairyland Power Coop case is critical review methodology?
A. I would say the application of fundamental economic principles to perform critical analysis of a model and the analysis performed by another economist.
Q. How can your methodology be tested by other economists?




©2007

Page 22

A. I think it's infinitely testable. I think if you took this model, Mr. Graves's report, and gave it to 10 other economists, there would be tremendous overlap in the criticism that each of those economists would present in terms of a review, critical review of Mr. Graves's work.

Q. How do you know that?

A. The issues that I've identified and the economic principles that I've applied to my work in this case are the same techniques and same economic principles that economists in graduate programs all over the country learn.

So I believe that it's a well-established methodology that is taught to every graduate student in economics and is part and parcel of every graduate program in the training of every PhD level economist.

Q. What are the elements of this methodology that you say is part of the training of all PhD economists?

A. One element is to, when looking at someone else's work or looking at a particular model, is to

Page 23

consider in light of economic principles the assumptions that go into the models. Every modeling framework requires some assumptions. And I think one aspect of a critical economic methodology is to question those assumptions to see if they make economic sense. Are they supported by the economic behavior that we, as an economist, are trained to expect.

A second aspect of that methodology is to look at the underlying methodology in the model that has been presented. Is that methodology consistent with economic principles and economic theory.

A third aspect is to look at the predictions of the modeling framework that's being considered, and do those predictions make economic sense. Do they lead to predictions that do not make economic sense. And, again, I think every economist is trained to consider all of these different aspects of any economic analysis as part and parcel of the tool kit that economists get from their training. And in developing ones own research one

Page 24

needs to develop these kinds of analytical tools in order to write a dissertation, for example, or to conduct a research project.

So I think it's pretty typical that first semester graduate school you begin as a graduate student in economics to read the foundational articles in economics. And then the next set of articles are often those that criticize those foundational articles.

And economic research evolves in a way that tweaks some of the inputs to those models. Or, as new analytical techniques become available, something that may have simply been assumed in an earlier generation of an economic model, may be flushed out more completely and may be able to be solve computationally or may be able to be tested using new statistical techniques. So economic theory and economic models evolve as a result of this economic methodology that I describe.

Q. So even the basic fundamental text of economics are subject of this kind of critical review methodology that you are describing?

Page 25

A. They are.

Q. Would it be accurate to describe this process of review and improvement in a way to sum up, there is always a way to build a better economic mousetrap?

A. I think that is probably a fair characterization. I don't know that the perfect economic model exists for any phaenomenon.

Q. And the three basic elements of the review process that you described for us are review of the assumptions, review of the methodology and review of the predictions resulting from the model?

A. I think those are certainly three key components to an analytical assessment of a economic modeling framework.

Q. Are there any other key components that you left out of your earlier description?

A. Each of those may involve very different types of analytical techniques. Some economic models are very complex and require advanced training in mathematics and dynamic programming.

So to talk about looking at the



 ©2007

Page 26

methodology, that could be something fairly simply or something quite complex. But I think those are the three general areas where a critical review of an economic model would typically focus.

Q. I'm not sure I understand the third category, review of predictions. If you have a model, and you have analyzed appropriately the inputs and you have analyzed appropriately the methodology, aren't the predictions, don't they simply flow naturally from those first two elements?

A. They may very well. It may be that fairly reasonable assumptions went into the model that the methodology such as it is fairly sound. But when looking at the predictions of the model, do they lead to some impractical or unlikely results.

So I think each phase or each step in that analysis is a relevant one and is a useful one. Just because a model makes mathematical sense or is solvable mathematically, doesn't mean it produces sensible results.

So I think each of those components needs to be assessed, and typically is assessed, in

Page 27

an economic assessment of an analytical model.

Q. I'm still not sure I understand. Wouldn't it be the case that, if the predictions in your opinion are not sound, wouldn't that indicate that somehow either the inputs or the methodology of the model are erroneous in some manner?

A. They could, yes. I think a nonsensical result would lead an analyst to go back and look again at the inputs in the methodology. But it isn't always obvious from those first two phases that you are going to get a nonsensical result. So I think it's important to look at all three of those.

There are any number of models in macroeconomics which have a particular structure, but which may lead to nonsensical results. So oftentimes there's an effort made at that third stage to calibrate a model so that it mimics actual behavior that we see in the real world.

Of course, at that point you go back an you look at the methodology, you look at the assumptions. Do those support the calibrated

Page 28

results that you imposed on the model. So I think all three phases are important. And yes, they will lead to additional work if any one of them proves to be inappropriate or proves to be weak.

Q. You testified a few minutes ago that your methodology is infinitely testable by other economists. How would another economist go about testing your methodology?

A. As I said, if you gave Mr. Graves's report to another economist, every economist has some of their own biases and they have each gone to different programs in economics and may have received different aspects to their training.

But I believe, if you handed Mr. Graves's model to another economist, you would find results, you would find criticisms that are very similar and largely overlap with those that I've identified.

Q. But other than your prediction that the criticisms might be similar, how do we know that, how is that hypothesis of yours tested?

A. I don't see how you could have a more

Page 29

profound test than having someone else conduct a similar analysis, that is to say an economic critique of the model's assumptions, methodology and predictions. If you came up with virtually identical results, it seems to me it's the ultimate test.

Q. I understand that's your prediction as to what would happen. How do we know that's what would happen, as opposed to giving your opinion to 10 other economists and getting a dozen different opinions out of those economists?

MR. BRYAN: Objection. Asked and answered.

THE WITNESS: Again, I think that's the ultimate test. If we bring in another economist, I think they would follow many of the same arguments that I make. I think they would reach largely identical conclusions and identify the same weaknesses that I've identified.

I don't know what to say about --

Q. In your opinion, do economists agree all the time?




©2007

Page 30

A. As I said, everyone has got slightly different approach in terms of what they think is important, in terms of the specifics of their training.

But, again, I think this economic, this critical economic methodology is sufficiently well-established that any other economist would reach largely identical conclusion.

Q. What is the objective of critical economic methodology?

MR. BRYAN: Objection. Vague.

A. Depends a little on the context on which it's performed. If an economist is seeking to publish an article, then the nature of that critique may be to find weaknesses in someone else's article that lead to improvements in either assumptions or methodology or predictions for that matter.

In litigation it's to find the weaknesses in an analytical approach that may produce a set of predictions relevant for damages, that may be questionable from an economic standpoint. If it's at a conference, it may be to

Page 31

spur discussion about the methodology or the assumptions that are used in the model. It really is, I think, fairly context specific.

Q. Would it be accurate to describe in a general sense the objective of critical economic methodology, as you described it, to identify weaknesses in a model?

A. Yes.

Q. And, as you testified to earlier, there's almost no model that isn't subject to some area of improvement, correct?

MR. BRYAN: Objection to the extent it mischaracterizes his testimony.

THE WITNESS: I would say most, if not all, economic models can be improved.

BY MR. SHAPIRO:

Q. But how does critical economic methodology enable you to determine if a model is sufficiently accurate for the purpose for which it's constructed?

A. Again, this gets back to looking at the different aspects of the model. If, in order to get the model to work, fairly extreme assumptions have

Page 32

to be made regarding participants behavior, for example. And based on the reviewer's expertise or experience, those assumptions really aren't consistent with the way economic actors behave. Then that process can be used to impose more reasonable behavior, less extreme assumptions on the behavior of the model. And the resulting predictions.

So generally we identify weaknesses in order to highlight areas that can be improved. And can lead to more sustainable supportable economically sensible predictions.

Q. I don't mean to be -- I think you know where I'm heading or what I'm trying to get at on this issue. Your opinion in the Dairyland case is not merely pointing out areas where perhaps there are weaknesses in Mr. Graves's model, correct?

A. I think that is exactly what I do. I point out weaknesses. And by pointing out those weaknesses, indicate areas that I think could be improved.

Q. Don't you also go a further step and

Page 33

assert, argue, however you want to phrase it, that not only are there weaknesses, but the weaknesses are so significant that the model is not usable for its intended purpose?

MR. BRYAN: Objection. Vague.

BY MR. SHAPIRO:

Q. Isn't that part of your opinion?

A. As it currently stands, I believe the model is not adequate for the purpose for which it is offered.

Q. If the weaknesses were fixed, would that alter your answer to whether or not the model is usable for its intended purpose?

MR. BRYAN: Objection, vague.

THE WITNESS: Depends on the nature of the fixes. But yes, that is potentially an avenue or a direction that I think the model could go.

Q. What methodology are you applying in reaching your judgment that the weaknesses in the Graves's model are sufficiently significant to prevent that model from being usable for its intended purpose?



 ©2007

Page 34

A. The same methodology that I've described in which I reviewed it, analyzed it, critiqued it.
Q. Is that methodology, the part of it that determines whether or not a model is good enough for its intended purpose, is that also in your opinion widely recognized in economics?
A. I believe it is. Again, I think it's fairly context specific. For an academic paper, it might be sufficient to use this model to make certain predictions. For purposes of damages, it is my view that this model is not adequate in terms of providing sufficiently robust and reasonable and reliable results that it really doesn't assist the court in quantifying damages in this case.
Now, if the model were improved and some of the deficiencies that I've identified are addressed in an economically sound way, then the model may become more reliable and more reasonable in terms of its predictions for use in a damages context.
Q. How could another economist test your conclusion that Mr. Graves's model is not good

Page 35

enough for use in assisting the court in determining Dairyland's damages?
A. I think exactly the way I have, reviewing the model, reviewing the results, looking at the predictions and seeing if those predictions are sufficiently reliable and sufficiently robust to provide a reasonable basis for quantifying damages. I think another economist would go through exactly the process that I've gone through.
Q. But as you testified earlier, you didn't conduct any quantitative analysis other than merely reviewing Mr. Graves's work in order to reach your sufficiently unreliable or sufficiently non-robust conclusions, did you?
A. Actually I think all of the work that I did in this case was quantitative in nature.
Q. You didn't run any quantitative analysis yourself, did you?
A. I did not separately simulate Mr. Graves's model and I didn't build my own model.
Q. You didn't run any quantitative analysis where you could quantify the extent of the

Page 36

reliability or robustness in terms that you used, regarding Mr. Graves's model, correct?
A. I think the results that Mr. Graves has provided serve that purpose. I think there are a range of results which in my view as economist are sufficiently non-robust and sufficiently varied that they do not form a reliable basis for damages.
Q. When you say it's not sufficiently reliable for damages, aren't you stepping into the judge's role as opposed to an economist role?
A. Not intentionally. My role and my expertise is as an economist. I understand that the judge will ultimately determine what kind of a weight to give to Mr. Graves's analysis and what kind of weight to give to my testimony. And that he will be the ultimate arbiter of a quantification of damages for Dairyland.
All I can do is provide my opinions as economist. And my review of Mr. Graves's work is strictly as economist, not as a lawyer or a judge or anything other than as an economist.
Q. You testified a few minutes ago that Mr.

Page 37

Graves's model might be good enough for an academic paper, even though you don't think it's good enough to assist the court in determining damages. Why would there be different standards between what is useful for an academic paper and the assessment of damages?
A. I have never said that Mr. Graves's analysis is without any merit. I think it raises some interesting issues. I believe I mentioned this to Dr. Murphy last time we were in this room. I think it's a start in assessing an issue. And for that purpose it may be sufficient to initiate an academic discussion about what factors would affect a potential market for DOE acceptance rights.
For purposes of damages, however, I think predictions of a model need to be sufficiently robust and sufficiently reliable that a court can rely on them to quantify damages where someone is paying someone else money.
So I think the standard is different. In an academic setting it may be this is a good place to begin a discussion. And papers get

Page 38

published all the time on that basis. They also frequently end up getting reviewed and critiqued by subsequent authors. And that's the way the academic discussion develops. I think in this setting we are in litigation. And the standard is different.

Q. How would you describe the standard in litigation?

A. Again, I think it goes to a question of robustness and reliability. Is there a sufficient economic basis to rely on the structure and predictions of the models in order to inform a court about what someone should pay someone else.

Q. But robustness and reliability are relative terms. My question for you is, how do you know for litigation purposes how much robustness and how much reliability are enough?

A. That will ultimately be a determination of a judge. I can offer my opinion as economist, which is exactly what I've done. In my opinion, as an economist, I don't believe this model is sufficiently reliable to provide a good basis for damages. But ultimately the court will decide that.

Page 39

Q. But other than simply providing your conclusion that for you it's not robust enough, do economists have some better description, some fuller description of robustness or reliability that we could say, if we reach that level of robustness, that's enough for damages examination purposes?

MR. BRYAN: Objection. Vague.

A. I don't believe there is that clear bright line that anyone can draw.

Q. Is there any line at all in terms of the adequacy of the reliability and robustness for damages purposes, other than the personal opinion of the economist making that judgment?

MR. BRYAN: Same objection.

THE WITNESS: I think it goes beyond the personal opinion. When I see results related to the cost of exchanging, for example, varying under different scenarios by a factor of 10, that leads me to believe that there is not a lot of confidence, either by the author and certainly not by me, that those cost numbers are sufficiently reliable for the court to draw on.

Page 40

If that variation was only two times instead of 10 times, I would certainly feel more comfortable relying on that. I don't know if it would be sufficiently robust or not. It would depend upon other factors as well.

But I see a lot of variation in this model from relatively small changes in parameters. I think as a result, those results are not what I would call robust. And I think most economist, if not all of them, would agree with me, that a model whose results change quite significantly as a result of small perturbations in parameters in that model is not a robust model, and is one that should not be relied on a by a court.

Q. There is no recognized standard among economists for how much variation and results is too much for a model to be reliable for damages estimation purposes, correct?

A. Not to my knowledge.

(Brief Recess.)

BY MR. SHAPIRO:

Q. Before we took the break, Dr. Neuberger,

Page 41

we were talking about when a model is robust and reliable enough to be used for damages. Don't economists have ways of quantifying robustness or reliability of a model?

MR. BRYAN: Objection. Vague.

THE WITNESS: There are certainly quantification methods that could be used to look at a series of predictions to see what their variability might be, for example, or whether they are relatively stable to changes in parameters.

BY MR. SHAPIRO:

Q. You haven't employed any of those techniques in the Dairyland case to test the robustness of Mr. Graves's work, have you?

A. I have not specifically. It's consistent with my testimony that they aren't bright line rules about what makes something robust or not, at least in terms of what should be considered reliable for damages purposes.

Q. You say there are not bright line rules for when a model is robust enough for damage purposes. Can you put any sort of quantitative



 ©2007

Page 46

THE WITNESS: Again, I would have to say that the court has to look at the totality of my testimony and determine whether to give it weight, whether the criticisms that I raise with respect to Mr. Graves's assumptions, his methodology and his predictions, whether they make economic sense, whether they are compelling in terms of their logic, whether the weaknesses that I have found in the omissions that I believe exist in Mr. Graves's analysis are important.

I think they are. Mr. Graves apparently doesn't think they are. So I think it's up to the court to look at all of my testimony and all of Mr. Graves's testimony and determine which should be given more weight, and whether this framework really informs the court on issues relevant to damages.

I happen to think it does not. Mr. Graves obviously thinks otherwise. How the court goes about making that determination I guess will depend upon the complete nature of my testimony and that of Mr. Graves.

Q. You've testified that you are relying on

Page 47

your opinion that there's too much variability in the results of Mr. Graves's model on the various cases run by Mr. Graves and the degree of variability shown amongst those cases.

Is it your opinion then that all of those cases run by Mr. Graves are equally plausible?

A. Well, I think that mischaracterizes the nature of my critique. My critique is, there are some extreme assumptions that feed the model. There are some methodological issues in the model. There are some data issues in the model.

And, even if all those problems, should the court decide, you know, all of those factors really are not important enough to discard this model altogether, even with all of those weaknesses, just looking at Mr. Graves's sensitivity analyses there's a tremendous amount of variability, at least with respect to the costs to Dairyland to accelerate its spent fuel acceptance.

So I think there's more than one aspect to my critique. It isn't just looking at the variability of the results. As I mentioned, I

Page 48

looked at assumptions, I looked at methodology, I looked at data inputs, I looked at the predictions.

Just with respect to the predictions, even with all of the weaknesses and deficiencies in this modeling framework that I believe exist, there's tremendous variability.

And so it's really different pieces of a puzzle. I don't put any more weight on certain of Mr. Graves's simulations or scenarios than others. I think they are done in a piecemeal fashion. I believe they isolate issues that I have raised with respect to assumptions and methodologies. They don't combine those concerns. And I think if they did, the model would be even less stable than it is.

Mr. Graves, as I understand it, puts his stock in his base case. And I believe many of the sensitivities are in response to criticisms that I raised in the PG&E case. So I don't know what probability he attaches to his different scenarios. I think some of them do in some limited way address some of the concerns that I raised. But I don't

Page 49

know that any one of those scenarios is any more likely than any other.

I think that answers your question. I think that was the question that you asked. Did I believe that certain scenarios were somehow better or more probable and more likely than others. And I don't have a response for that. I don't know the answer.

Q. If only some of the cases run by Mr. Graves are plausible, and the variability amongst those cases is much less than the variability amongst all the cases, you simply focused on that smaller number of plausible cases, that could alter your opinion as to whether or not Mr. Graves's model is robust enough for use in estimating damages, correct?

MR. BRYAN: Objection. Vague.

THE WITNESS: That was a tough one. Could I have it back.

(The reporter read back as requested.)

MR. BRYAN: I reiterate the vagueness objection I had. Compound as well.

Page 50

THE WITNESS: I think that is not the nature of the beast. I think that's not the nature of an economic critique. If a model is considered to be deficient in let's say the fundamental assumptions underlying the model's behavior, if you tweak that model, you are still ignoring the deficiency. You still have the deficiency in there.

Are some of Mr. Graves's simulations more meaningful than certain others? Perhaps. But I still think, if you have got a model that is deficient, simulating that model under various circumstances doesn't make it suddenly not deficient anymore.

So that is the primary reason I didn't run my own scenarios of this model. Because I believe the fundamental structure is deficient. The output is going to be informed by those deficiencies. So just focusing on a subset of the scenarios doesn't overcome those deficiencies.

Yes, there is variability in the results using this model. But the model in every one of its variations in those scenarios still has the

Page 51

fundamental deficiencies that I identify in my report.

Q. But, as I believe you testified to earlier this morning, there's almost no model that you can't say doesn't have some deficiency. How do you know when a model is so deficient that it shouldn't be used for estimating damages?

MR. BRYAN: Objection. Vague.

THE WITNESS: Based on my understanding of the economics, it is my belief that the omissions and deficiencies in this model are sufficiently important that if they were considered in the context of the model, the model would produce very, very different results.

Other than relying on my understanding of economics, my experience in developing economic models, I can't give you a bright line that says this model is too deficient, this model is not deficient enough.

I have reviewed this model in great detail. I think that the factors that are omitted from this model or the assumptions that are used to

Page 52

make this model solvable are so extreme that it really doesn't comport with the likely reality, with a likely sequence of events in a non-breach world.

So simulating that model under different scenarios I don't think is particularly informative. I think some of those scenarios address some of my concerns in part. I don't think any of those scenarios address all of my concerns.

It is my belief, based on my training and experience, that this model has omitted many things that would have been relevant in a but for world. And that the assumptions that drive this model are sufficiently extreme that they would not be observed in actual real world behavior under a but for world.

So like I said, I cannot draw you a bright line that says this is not too deficient, this is too deficient.

Q. In fact, not only can't you draw that line, there's not a generally recognized line amongst economists as to when a model is too deficient to be used for estimating damages, correct?

Page 53

MR. BRYAN: Objection. Vague. Argumentative.

THE WITNESS: Again, there is not a quantitative bright line that allows you to draw that distinction, at least that I'm aware.

BY MR. SHAPIRO:

Q. You testified in your last answer that, if the deficiencies in Mr. Graves's model were corrected, the model would produce very, very different results?

A. Yes.

Q. Wouldn't your opinion be much more compelling, if you had actually run those numbers to show just how different the results would have been. Why didn't you do that?

MR. BRYAN: Objection. Vague. Compound. Argumentative.

THE WITNESS: It was not the scope of my assignment in this case to fix the deficiencies in Mr. Graves's models. What you're describing is a fairly extensive effort that would require remodeling most, if not all of this, of this model.



 ©2007

Page 54

It was simply not my assignment. My assignment was to provide a critical economic review of Mr. Graves's analysis and his conclusions.
Under different circumstances, if in the next case you want to hire me, I'll go about the process a little bit differently. And I would certainly inform my analysis based on my understanding of the deficiencies of this framework.
But that wasn't my assignment in this case. I think I can still draw my conclusions, the conclusions that I draw and describe in my report very effectively with the analysis that I have performed.
Q. You testified earlier that your instructions from the Department of Justice were pretty vague and pretty limited. How is it that you interpreted those instructions as precluding you from building enough of your own model to actually quantifiably demonstrate the deficiencies you've otherwise described in Mr. Graves's work?
MR. BRYAN: Objection to the extent it mischaracterizes the witness's testimony.

Page 55

THE WITNESS: I did testify that I received very vague instructions from DOJ counsel. At no time did I expect or understand that my assignment was to fix the deficiencies in Mr. Graves's model. I imagine at some point during the process, if that had been intended, I would have been asked to do that. But I was not.
Q. You say it's your sense, if the deficiencies had been corrected, the results would be very, very different. How much difference are you talking about in numbers that meets your otherwise informal reference to very, very different?
A. There are two or three elements that come out of Mr. Graves's model that are relevant to damages. One is the date that -- one is whether or not Dairyland is successful in accelerating its spent fuel acceptance. Two is the dates at which that fuel is accepted. And three is the price that Dairyland has to pay to accelerate its acceptance.
All three of those elements would differ, if some of the deficiencies in the Graves

Page 56

model were changed or some of the deficiencies were fixed. That is sufficiently different to me, if we get a completely set of predictions about prices, costs and dates -- costs, timing and whether or not Dairyland was successful, that tells me that the results are different. And --
Q. Are you saying that it's your opinion that the results would change or merely that they might change?
A. I feel strongly that they would change.
Q. How do you know that, if you haven't run the numbers?
A. I've worked on certainty based models throughout my career in the last 25 years. I've built them myself. I've computed them, I've tested them. If you incorporated the uncertainty risk aversion and other factors that I believe would have affected this market, you're going to end up with different results. My experience as an economist working with these kind of models tells me that you're going to get a different set of results.
Q. Well, how different do you think the

Page 57

results would have been?
A. Well, with respect to damages, one year's difference in the date that Dairyland is successful in accelerating its acceptance could be 8 to $10 million worth of damages. I think that's very different and very relevant.
If the cost to accelerate is ten times more than under Mr. Graves's base case, that to me is directly relevant to damages and is a big number -- 20 million versus 2 million. All of these factors, I believe, would be affected, if the deficiencies in the Graves model were repaired.
Q. Let's focus on just one of those issues -- the timing issue. In what year would Dairyland spent fuel having picked up absent the breach, if Mr. Graves's model, if the deficiencies were fixed, what's your sense as to what year, a better model would have shown as the year which Dairyland spent fuel would have been picked up?
MR. BRYAN: Objection. Vague. Compound.
THE WITNESS: I don't have an exact number. I don't know exactly when they would have



 ©2007

Page 62

executive expressed their willingness to decelerate. So, if there are no decelerators, there's no counter parties. If there's no counter parties, there is no exchanges.

I'm not saying that would never happen. I'm not saying in every instance no exchanges would take place. I certainly acknowledge that there's an exchanges provision in the contract and some exchanges may have taken place. But there are many fundamental issues with respect to the creation of an exchanges market that I don't think have been sufficiently addressed.

Q. Is it your opinion that absent the breach the results of exchanges would have looked more like the results of Mr. Graves's models or more like an oldest fuel first scenario in which there were no exchanges?

MR. BRYAN: Objection. Beyond the scope of Dr. Neuberger's expert report.

THE WITNESS: I don't have an expert opinion about what the but for world, whether the but for world would have been closer to an OFF

Page 63

allocation or Mr. Graves's allocations.

I think it would only be a fortuitous consequence of events that would have caused the but for world to look like what Mr. Graves has modeled. I think it's much more likely that we would end up or would have ended up in something resembling OFF.

Q. You testified a moment ago that you haven't seen much evidence of utilities willing to swap away early slots. In your opinion are utilities rational economic actors?

MR. BRYAN: Objection. Beyond scope.

THE WITNESS: I think utilities, like every company, have a number of objectives that they must fulfill. Most nuclear utilities are regulated entities. And the regulations can restrict their ability to strictly pursue profit maximization, for example.

I do think utilities executives attempt to act in ways that are consistent with rational economic behavior. I think there are far more objectives and far more constraints than just maximizing profits or minimizing costs.

Page 64

I think once some of those other constraints are considered, the behavior that would result, though still economically rational, would be different than if the only criterion is cost minimization.

Q. What professional experience do you have, other than your work in the spent fuel cases for the Department of Justice, involving electric utilities with commercial nuclear power plants?

A. None.

Q. What professional experience do you have, other than your work with spent fuel cases with the Department of Justice, working for electric utilities that don't have nuclear power plants?

A. None.

Q. Have you made any effort in your work in spent fuel cases to determine the extent of willingness of utilities to exchange away early acceptance rights?

A. I've not specifically studied or investigated utilities willingness to exchange away early allocation rights. What I have heard is an

Page 65

absence of that willingness. I haven't heard anyone say in any of the spent fuel cases in which I have been involved that this was an area they were actively pursuing as a way to make a little bit of extra money.

I do recall some testimony, and I can't tell you who it was, from a prior spent fuel case. I believe it was NSP, but I can't seem to identify the actual testimony, where a utility executive investigated the possibility of other utilities selling them early rights. And was told in no uncertain terms that they were uninterested. They were not interested in selling any earlier rights.

I think that testimony was to that effect was also provided in the Yankee case, that though they asked, these utilities were unable to find anyone willing to trade away their early rights. So that is consistent with my expectations and it's consistent with my critique of the Graves models.

Q. What is your understanding as to when




©2007

Page 82

opinions in any case in which I've testified.
Q. If you didn't have an understanding that looking at an economically appropriate acceptance rate was something that the Department of Justice did not want you to look at, and that was in fact one of the parts of Mr. Graves's analysis, why didn't you study that part of Mr. Graves's analysis?
MR. BRYAN: Objection. Beyond the scope.
A. I certainly have reviewed the must move model. I understand what goes in to it. I understand how it's done. I've looked in great detail at the spreadsheets that describe the must move analysis. But it is not my role or assignment in this case to say this is an appropriate rate of acceptance, this isn't an appropriate rate of acceptance.
In order for Mr. Graves to reach the conclusions that he reaches about acceptance rates, he adopts a particular criterion for evaluating economic efficiency. If you use that criterion, then you can draw certain conclusions. And Mr. Graves does that. Certain 3,000 ramp ups, ramp ups

Page 83

to 3,000 he says are more efficient than others based on that criteria.
I don't really have an expert opinion to offer. If you adopt his criterion, then the one he identifies seems to present the lowest costs. But I don't know all of the criteria that would have been required for evaluating a particular acceptance rate trajectory. It may go beyond Mr. Graves's simple just look at at reactor storage cost.
So within the context, if you accept all of his assumptions, then, yeah, you can say one rate is better than another. But I'm not willing to either adopt that sole criterion or to draw that conclusion. I know a lot of issues went in to determining acceptance rates. Mr. Graves has an opinion. I'm not offering one.
Q. Nor are you disagreeing with the criterion used by Mr. Graves, are you, in his evaluation of an economically appropriate acceptance rate and ramp up?
MR. BRYAN: Objection. Beyond the scope. Lack of foundation.

Page 84

A. Within the confines of what Mr. Graves has done, that determination of economic efficiency, basically lowest cost, appears to be appropriately done. Whether that's the appropriate criterion to evaluate acceptance rates, I don't know.
Q. Let me turn your attention, Dr. Neuberger, to paragraph 28 in your report?
A. Yes.
Q. You say in this paragraph, I think it's the third sentence, that Mr. Graves assumes that all exchanges that improve efficiency relative to the OFF allocations occur readily. Is my understanding of what you are saying, correct?
A. Yes.
Q. Where does Mr. Graves state his assumption you are attributing to him that all exchanges that would improve efficiency would in fact have taken place in a non-breach world?
A. It's never stated. That's my conclusion. There are some must move situations that don't get addressed in the early years of the program in Mr. Graves's model. That's a result of the relative

Page 85

sacristy of allocation rights and the fact that some utilities have a willingness to pay that is below the market clearing price.
But exchanges for those utilities who have a willingness to pay above the market clearing price all get done. They just are assumed to happen. And that's my reading of Mr. Graves's analysis. He never states that assumption explicitly.
Q. What is the basis of your assessment of that particular assessment of Mr. Graves's analysis given that he doesn't state that?
A. There are many things that go unstated in Mr. Graves's model and in his report. The only way to get at those, those unstated assumptions is to analyze the model. Which is exactly what I've done.
Q. Doesn't Mr. Graves in fact state explicitly that he studied the possibility that utilities would in fact refuse to participate in exchanges and include at least one scenario that looked at that issue?
MR. BRYAN: Objection. Vague. Compound.

Page 94

BY MR. SHAPIRO:
Q. Dr. Neuberger, how many utilities with early acceptance allocations would have to opt out of the exchanges market to delay Dairyland's fuel outtake from 1998?
A. I don't recall specifically. Actually, in the Graves models there is no specific identification of who is an accelerator and who is a decelerator. The economic sequence models just identifies who are demanders of rights. As I describe in my report, different demanders are in different situations relative to their OFF allocations. Some will enter the exchanges market, some already have enough allocations.
On the selling side I think I looked at this. I'm trying to think, there may have been 10 to 15 utilities who offered in the Graves model rights for exchanges in 1998. So if any of them withdraws from the exchanges market, that's going to affect the price, the availability of those rights. If many of them opt out, then there may not, and Dairyland may not have high enough willingness to

Page 95

pay, to be able to get out. So I don't know the exact number. I don't think it's a very large number though.
Q. Do you know how many metric tons of uranium, if we put it in that context, as opposed to number of utilities, how many metric tons of uranium of early acceptance would have been withdrawn from the market in order to change the fuel outdate result of Dairyland.
A. I don't recall specifically. It will obviously depend upon the aggregate acceptance rate in 1998 for whatever ramp up is ultimately used and where Dairyland is in the cue in terms of its willingness to pay.
I know there are other utilities that are higher in the cue than they are in terms of willingness to pay. But I don't know how far down that list you have to go in order to prevent Dairyland from getting out in 1998.
Q. You testified earlier that it's important to understand for economic purposes why a utility might opt out of the exchanges market. What's your

Page 96

understanding as to the different reasons why a utility might have opted out of the exchanges market?
A. As I indicate in my report, I think some heterogeneity with respect to risk aversion might lead some utilities to choose not to participate, that the exchanges market adds sufficiently complex level of uncertainty that some utilities that some utilities that were particularly risk averse just wouldn't want to undergo that uncertainty. And that they would keep their OFF rights.
Q. What sort of risk are you saying they are averse to?
A. I'm not saying specifically what risks there would be.
Q. Aren't you really referring to the risk that the Department of Energy, even in an unbreached world might have performed in a timely basis?
A. Not necessarily. There's other elements of risk.
Q. What other risk are you referring to?
A. Even in the presence of performance by DOE

Page 97

there's some uncertainty about when specifically within a particular year DOE is going to arrive. There is uncertainty unassociated with unexpected disruption in the acceptance program that would not be a breach. Maybe the program gets started and something happens or some technical difficulty arises. Just because you're in a non-breach world doesn't mean all uncertainty disappears with respect to spent fuel storage. I don't think that's the case.
So even within the context of performance, I think there could be uncertainty. There could be uncertainty about DOE approval of the exchanges. There could be uncertainty about the treatment of failed fuel. There could be uncertainty about any number of aspects.
Companies of all sorts, but utilities in particular, are making long-term strategic decisions. And, if you are adding layers of uncertainty to an already uncertain environment, some utilities may just decide, you know, this additional uncertainty inhibits our strategic



 ©2007

Page 98

planning. We don't want to play. We are going to stick with our OFF rights.

Q. I want to look at the areas of, causes of uncertainty that you identified and see if I can understand better why it is you think areas would have posed greater uncertainty in an exchanges environment as opposed to having utility simply follow its oldest fuel first rights.

For example, you mentioned failed fuel. If utilities are concerned about the Department of Energy's acceptance of its failed fuel, why would that make a difference to the utility if its exchanging or using oldest fuel first? The fuel is still failed.

MR. BRYAN: Objection. Vague and compound.

A. The fuel is failed. But there is the possibility I think raised in the standard contract, and I believe testified to by Mr. Sabranski, that failed fuel may require a separate schedule. So if you're an exchanger of allocation rights, and you have to get the fuel out of pool in 1998 facing a

Page 99

must move situation, let's say, and you engage in the exchange, and DOE says, sorry, we are not going to be able to deal with that fuel on the same basis, that could effect your ability to exchange, your ability to do address your must move situation.

And your OFF allocations may, it may just be easier to use your OFF allocations in that context than to go through the process of trying to exchange. To the extent that failed fuel gets treated separately, that's just an element of uncertainty. Again, DOE has to approve these exchanges.

Q. I'm trying to figure out why the exchanges makes a difference. If a utility thought, we'll be good enough if we rely on oldest fuel first, wouldn't that utility face a problem if it turns out that oldest fuel first isn't as fast as we thought, because they are not taking the failed fuel from when we thought, which we would have exchanged to have some earlier allocations of other stuff. Now we face an issue?

MR. BRYAN: Counsel, I ask you to please

Page 100

let the witness finish answering before asking your questions. Objection. Vague. Compound.

A. I think the uncertainty would exist in both situations. Whether an exchanges market would have had to deal with that issue I think is just another layer of complexity.

Q. Another area of uncertainty mentioned is unexpected disruption in the DOE acceptance program. Wouldn't that particular concern be present whether utility exchanged or not?

A. It could. I think, if you are making spent fuel storage decisions based on your ability to exchange, you are exposing yourself to an additional layer of uncertainty with respect to the actual date of acceptance.

So, for example, suppose under oldest fuel first you decide, I have got to build an ISFSI. The ISFSI is there and available to be used in the event of a disruption in the DOE program. But let's say you look at the opportunity to exchange and say I'm not going to build my ISFSI, because I think I can use the exchanges market to accelerate my

Page 101

acceptance a year or two or whatever it might be.

Then the program begins, as expected, and there is an unexpected delay. All of a sudden you have made a decision, a long-term strategic decision to forgo an alternative storage option. You don't have any options now at this point. Because construction of an ISFSI takes time.

If you had stuck with your OFF rights, maybe you would have built that ISFSI anyway and been able to deal with the uncertainties. Now you've made the decision, and are faced with the possibility of shutting your plant down, because you relied on an uncertain exchanges market to handle the situation.

Q. If you are assuming the possibility of a disruption sufficient to delay acceptance of spent fuel enough to make a material impact on utilities, aren't you assuming simply another form of breach by the Department of Energy?

A. That's a legal determination. I don't know what would constitute a breach. I know Mr. Graves has testified that anything other than the





©2007

Page 106

utilities, correct?
A. Yes.
Q. Where does Mr. Graves say that he assumes perfect foresight of storage cost by utilities?
A. He doesn't state it. It's another one of these unstated assumptions that underlie the model.
Q. You say that without this assumption of perfect foresight of storage costs that the results would be different?
A. Yes.
Q. How different would the results be?
A. Having not run that I don't know.
Q. You didn't make any effort to quantify how different results would be if less than perfect foresight were assumed, correct?
A. The equilibrium in the model in any year requires knowledge of your own costs and in the current year and every future year. The spreadsheet in the model that determines your net cost to exchanging basically requires you to solve every single year. In that solution you are assuming perfect foresight with respect to your own costs.

Page 107

There is no uncertainty about the predictions of your own costs.
Mr. Graves requires every utility to act in what is called a time consistent manner. If you think the cost of exchanges is going down, you wait until you absolutely need. Nobody bids early in the base case. I know there's those two scenarios where there's advance bidding.
One of the features of the model, and this is true of the basic model under Mr. Graves's acceptance rate, and the enhanced model under any acceptance rate, is that the price of exchanges falls in every year. And that price falling is again based on the simultaneous solutions of every year and this concept of perfect foresight that everybody projects their cost with perfect certainty.
How much the predictions of the model would change if you had a range of possibility predictions is certainly going to affect your willingness to pay, your willingness to participate in year-to-year and will result, will produce

Page 108

different results.
Q. Dr. Neuberger, we are going to have difficulties, as you just did, as we go on in the afternoon, if you answer as you just did, which did not answer my question.
I'm going to get insistent about you answering my questions. And that was an interesting answer somewhat on the general topic we were discussing but it didn't answer my question.
My question is, you did not make any effort to quantify how the results would be different, if less than perfect foresight were assumed.
A. I don't recall that as the question. But no, I did not.
Q. Thank you. You have the expertise to have analyzed how Mr. Graves's results would have differed, if less than perfect foresight were assumed, don't you?
A. I could have made fundamental changes to Mr. Graves's models and estimated the impact of uncertainty about future prices, yes. I have that

Page 109

expertise.
Q. You simply didn't employ that expertise here?
A. I did not feel it was necessary.
Q. Let me turn your attention, Dr. Neuberger, to paragraph 41 of your report. You say it's your opinion as economist that utilities will not behave as Mr. Graves assumes, correct?
A. Yes.
Q. Do you mean that it's your opinion that you don't believe that utilities will pay up to their avoidable costs for exchanges and that utilities would offer unneeded allocations into the exchanges market?
MR. BRYAN: Objection. Compound.
A. Two parts to that. I don't believe utilities would have behaved as Mr. Graves has predicted. I think the decision whether or not to exchange allocation rights is far more complex and has many factors that affect that decision that are not in Mr. Graves's model.
I also don't think every utility

Page 110

would offer 100 percent of its non-used rights into the market for exchanges.
Q. Do you believe that utilities would have paid up to their avoidable cost for exchanges in the non-breach world?
A. That statement requires an assumption which I disagree with, that the only thing that matters to the decision is the potentially avoidable at reactor storage cost that Mr. Graves identifies in his model. I believe that other factors would affect that decision.
So the ultimate price that's paid would be more complicated than just the avoidable at reactor storage cost. I think there are other costs that would have been taken into account based on uncertainty, risk aversion, other factors that Mr. Graves's models does not address. So I don't believe that the metric is correct. It is one metric. It is one factor. I don't think it's the only one.
Q. Do you think it's possible that utilities might in the non-breach world pay more than their

Page 111

avoidable spent fuel storage cost for early acceptance allocations and exchanges?
A. I would have to model that to know. But I think just a narrow look at avoidable at reactor storage cost is not sufficient to answer the question, to answer the question what would they have paid.
Q. In reaching your opinion as an economist that utilities would not have behaved as Mr. Graves assumes, you did not do any quantitative analysis to reach that conclusion, correct?
A. I did not run, by quantitative analysis you mean create my own model or run alternative simulations of Mr. Graves's models, I did not.
Q. What methodology did you employ to reach your conclusion?
A. My knowledge of the economics of uncertainty and risk aversion. Decision making in the presence of those factors.
Q. How could other economists test your conclusion that utilities would not have behaved as Mr. Graves assumes?

Page 112

A. I think conceptually they would largely reach the same conclusion. I think to test it you might have to create your own model and quantify that effect. It wasn't my job to figure out what utilities would pay for exchanges. I believe Mr. Graves has not adequately categorized an exchanges market. Therefore, misses factors that would affect that decision.
Q. So other economists couldn't test your conclusion that utilities wouldn't have behaved as Mr. Graves assumes without in fact performing quantifications that you didn't perform?
MR. BRYAN: Objection. Mischaracterizes testimony. Compound.
THE WITNESS: I don't think that's true. I think you could draw a qualitative conclusions. I think if you wanted to quantify those conclusions, you might need some kind of a modeling framework to do it.
BY MR. SHAPIRO:
Q. You understand that Mr. Graves asserts that the results of his economic sequence model are

Page 113

more efficient than an oldest fuel first acceptance scenario, true?
A. I know that he says that. Yes.
Q. You don't disagree with Mr. Graves in that regard, do you?
A. If the only measure of efficiency is at reactor storage costs, I don't necessarily disagree with him.
Q. What other measure of efficiency would you look to beyond spent fuel storage costs?
A. That is my point. There are other costs. There is costs of uncertainty, cost of risk aversion. Costs associated with decision making in the presence of uncertainty and risk aversion. None of those costs factor into Mr. Graves's model.
Q. Aren't you talking about uncertainty and risk aversion with respect to possibilities of impact on spent fuel storage costs?
A. Obviously we are dealing with spent fuel storage here. Uncertainty in risk aversion can affect those costs. There also might be system wide or system costs, program costs that Mr. Graves has

Page 114

not accounted for. He assumes that the only goal of the program is to minimize the costs of those utilities for storing fuel at their sites. I don't know that that's the criterion by which the program should be judged. It's the criterion he uses. But I don't think it's the only one.

Q. Are you aware of any measure of efficiency under which an oldest fuel first acceptance scenario is more efficient than the exchanges result put forward by Mr. Graves?

MR. BRYAN: Objection. Beyond the scope.

A. I've not analyzed that.

Q. I'm going to turn your attention now, Dr. Neuberger, to paragraph 45. In this paragraph you state that the market for acceptance rates differs from the market for exchanges. True?

A. Yes.

Q. What are the different factors that you believe separate these two markets?

A. Well, other than the fact that utilities effectively have to participate in a market for DOE acceptance rights and they don't have to participate

Page 115

in an exchanges market. That decision is voluntary in the latter case but not in the former case.

All utilities sign contracts to have DOE accept their fuel based on the OFF rights with the option to exchange. There is a lot of other clauses in the contract. Nobody is required by contract or otherwise to participate in an exchanges market. That is a voluntary decision that each utility will make.

The reasons why you might participate in an exchanges market are different than they are for why you have to participate in the acceptance right market. For certain utilities OFF perfectly serves their needs. I can think of Diablo Canyon from the PG&E case where Mr. Graves determined that OFF perfectly met their needs. So they don't need, for purposes of Diablo, to enter an exchanges market. So those are just a couple of reasons why the two are separate.

Q. What is it you are characterizing as the market for acceptances rights?

A. Mr. Graves's model.

Page 116

Q. Isn't he using his model to model the results of exchanges?

A. That's a consequence of the model. It's not directly modeled.

Q. I understand that. What is it that you are characterizing as the market for acceptance rights that's apart from the market for exchanges?

A. As I said, Mr. Graves's model is a model of market for acceptance rights. You can't look at his model and know who exchanges. You have to overlay additional information onto that market to figure out who doesn't have enough OFF rights, who has more rights than they need. And, therefore, there's not an explicit modeling of an exchanges market. It's a separate step that is not explicitly acknowledged in Mr. Graves's model.

Q. I understand that. I'm talking about something else that may be, an example would be helpful, PG&E Diablo Canyon. You note that company for that facility might not have needed exchanges. So how would it have participated in the market for acceptance rights at all?

Page 117

A. By taking its OFF rights, having DOE accept its fuel on the schedule identified by OFF and dealing with its spent fuel storage issues.

Q. In your description of these two different markets, that's what you mean by the market for acceptance rights under, relying on your OFF right?

MR. BRYAN: Objection. Vague.

THE WITNESS: It is a little vague. I am referring to -- I've never seen anyone but Mr. Graves develop a model of the market for acceptance rights. That's what his model is. It's not a models of exchanges.

It determines, based on so-called representative cost estimates of what each must move situation is worth and how much fuel each facility has to move to deal with that must move situation.

It doesn't explicitly address exchanges. Exchange is just behind the scene happen. Some of the price data that comes out of Mr. Graves's acceptance rights model purportedly inform exchanges market and determine the price that exchanges would incur. But there is no explicit models in the

Page 126

not is not made until later in the process, then DOE wouldn't have that information before it when it is deciding whether or not to approve an exchange, right?

MR. BRYAN: Same objection.

A. I honestly don't know.

Q. Isn't it possible that, if failed fuel was taken more explicitly into account in Mr. Graves's model that the results might have changed to have actually produced a more advantageous result for Dairyland?

MR. BRYAN: Objection. Vague.

THE WITNESS: I don't understand how Dairyland could have gotten out any earlier than 1998. So I don't understand how it could arrange for something more advantageous than what Mr. Graves has identified.

BY MR. SHAPIRO:

Q. Maybe at lower costs?

A. I suppose it's conceivable. I can't think of how that would work.

Q. Isn't it possible that, if failed fuel

Page 127

were taken into account, maybe that would have encouraged utilities with failed fuel to have swapped away some early slots and thereby helping Dairyland obtain those slots at lower cost?

MR. BRYAN: Objection. Vague. Compound.

THE WITNESS: I suppose anything is possible. It's not an issue that Mr. Graves has analyzed. And I haven't either.

BY MR. SHAPIRO:

Q. Let me turn your attention back to Exhibit 1 of your deposition, your report. Turn your attention to paragraph 49.

A. Yes, I'm there.

Q. You state that Mr. Graves assumes that in the non-breached world utilities without must move fuel don't value earlier acceptance allocations more than later allocations. True?

A. As long as they don't bump up against a must move situation, yes.

Q. Do you believe that utilities without must move fuel would have valued early allocations more?

A. Yes.

Page 128

Q. What is the basis of that belief?

A. I think Mr. Graves actually attempts to incorporate that into his model in case scenarios 21 and 22 where a utility bids in advance of its actual must move need because of uncertainty or risk aversion.

Q. I understand Mr. Graves recorded those two scenarios in his report. Not necessarily meaning that Mr. Graves thinks that's the most plausible view of the non-breach world. I'm asking about your belief and the basis for it.

You just said that you believe that utilities without must move fuel would have valued early allocations more. I'm asking what the basis is for your belief?

A. Again, I think it's consistent with Mr. Graves's description of these two scenarios that as you approach a must move situation you, the utility, don't want to wait until the last minute to resolve that situation. So as you approach a must move situation, you want to act earlier rather than later because of concerns about risk or uncertainty. And,

Page 129

therefore, you would value rights before they were absolutely needed on a deadline versus beginning to address your spent fuel storage issues earlier. I think there's real value in doing that.

Q. But you didn't analyze how much more you believe utilities would have valued early acceptance allocations more than later ones?

A. I have not done that, correct.

Q. Have you done any analysis of how much earlier in time utilities would value acceptance than later acceptance?

A. Not specifically, no.

Q. Can you put any parameters on what timeframe would be more preferable to a later timeframe?

A. I would say in general earlier is better. But I've not specifically parameterized that issue.

Q. Do you believe that Mr. Graves's scenario 21 reasonably models the possibility that utilities would value earlier acceptance allocations more than later ones, even if they didn't need such acceptance?



 ©2007

Page 130

A. I think Mr. Graves two advanced bid scenarios address one aspect of why earlier rights would be valuable rather than later rights. That is specifically with respect to the demand for rights.

I also think that implicit evaluation would affect the participation decision in the exchanges market. Mr. Graves does not analyze that. So I think he's identified one aspect of it but not another. Both would be important in my view.

Q. Let me turn your attention, Dr. Neuberger, to paragraph 51 of your report. In this paragraph you assert that Mr. Graves should have more explicitly modeled uncertainty regarding the DOE program. Correct?

A. In effect. Yes.

Q. But you didn't attempt to model this uncertainty, did you?

A. I did not.

Q. So you can't say that, if this uncertainty were modeled more explicitly, that it would have a material affect on the results of Mr. Graves's model, can you?

Page 131

MR. BRYAN: Objection. Mischaracterizes his testimony. Vague.

A. I believe very strongly that it would. I have not explicitly modeled it.

Q. How is it that you have an opinion, strong opinion that it would affect the results, if you didn't bother to actually do the quantitative analysis?

A. Again, I would fall back on my experience working with uncertainty based models that introducing uncertainty introduces the possibility that your best guess is not realized. And anything other than your best guess may impose on you some costs. And that any rational economic decision maker is going to take into account the probability weighted cost of being wrong.

And, therefore, would reach different decisions. It would certainly bid differently in terms of participating in the exchanges market. But I believe that, if uncertainty were explicitly incorporated in this model, it would produce different results.

Page 132

Q. You have the expertise to have modeled uncertainty more explicitly, don't you?

A. Yes.

Q. But you decided not to apply that expertise here, correct?

A. I did not explicitly model uncertainty here.

Q. You understand that Mr. Graves looked at uncertainty in some of his sensitivities analysis that we discussed, correct?

A. Every iteration of Mr. Graves's model is a certainty based iteration. There is no explicitly uncertainty in Mr. Graves's model regardless of the scenario. There is some randomized -- there are some scenarios using randomized costs. But, again, the decision making, the decision criteria are all made in a certainty environment. There is no uncertainty explicit in this model.

I understand Mr. Graves says that some of his scenarios address elements of uncertainty. And I think some of those scenarios do. But this is not an uncertainty based model.

Page 133

There is no uncertainty in this model.

Q. Which of the scenarios is it that you believe do address uncertainty, which of Mr. Graves's scenarios?

A. As we just discussed, cases 21 and 22, where the motivation for advanced bidding is according to Mr. Graves, uncertainty or risk aversion. Those are the only two cases I can think of off the top of my head.

MR. BRYAN: Counsel, it's 12:30.

(Whereupon, the deposition adjourned for lunch.)

Afternoon Session

BY MR. SHAPIRO:

Q. Dr. Neuberger, before we took our lunch break we were talking about your understanding of how Mr. Graves dealt with uncertainty. And we discussed that Mr. Graves deals with uncertainty in part by looking at certain sensitivity analysis, correct?

A. Yes.

Q. Is it your understanding or is it your opinion that Mr. Graves' way of dealing with uncertainty is wrong?

A. I think scenario analysis is a useful tool. With respect to the kinds of uncertainty that would affect in my view this market, it's not clear to me that that's the best way to characterize uncertainty.

Based on my knowledge of uncertainty models they do typically produce different results. There is different criteria, additional criteria that get taken into account in presence of



uncertainty versus in the absence of uncertainty.

So I think scenario analysis can be useful. But I don't think it's a replacement and certainly I would say it's not a preferable tool for addressing uncertainty whether in this model or really most models.

Q. You say that use of sensitivities by Mr. Graves is not the best method for looking at uncertainty. Is it an acceptable method?

A. As I said, I think it can be useful tool. I think there are some questions that Mr. Graves is capable of asking through a sensitivity analyses. I don't think that's the same thing as building a model with uncertainty in it and then simulating that. So I think it is a useful tool. It can give you some insights. I don't think it's a replacement for an explicit modeling of uncertainty.

Q. I believe it's paragraph 54 of your report you say that, along the same lines, that you don't believe the use of sensitivities is the most appropriate means of looking at uncertainty, right?

A. Yes.



Q. What do you believe would have been the most appropriate means of looking at uncertainty?

A. Explicit modeling of uncertainty. Incorporating elements of uncertainty directly into the model and then solving the model in the presence of that uncertainty.

Q. How specifically would you have modeled uncertainty in the model, how would you have incorporated uncertainty explicitly in the model?

A. I would have acknowledged that uncertainty exists in many dimensions affecting this model. So, for example, the exact contours of DOE performance I would have introduced uncertainty about what those contours would have been.

I would have introduced uncertainty about projected costs. And simulating the impact of that. I would have introduced the concept of risk aversion, and recognizing that some degree of risk aversion would have required me to perhaps induce a counter party to offer early rights by perhaps paying them more money.

I would have acknowledged that risk



aversion and uncertainty might lead some nuclear utilities not to participate in an exchanges market. I would have introduced other interests and potential costs that they could impose on my decision making as a utility, in particular sociopolitical factors that Mr. Graves dismisses as being unimportant.

I think those are several dimensions that I think this model could benefit by adding a range of possibilities, some degree of uncertainty, a randomization, following some kind of a distribution that I think is appropriate for that element of uncertainty into the solution of the model. That's not what has happened.

Q. Let me focus just on one of those areas, uncertainty about the extent that DOE's performance. How would you have incorporated that into a model?

A. I can't tell you specifically exactly what the equation is that I would write because I haven't done that. But I would acknowledge that, that uncertainty didn't simply go away because DOE was on the road to performance or even began performance.

Page 138

The whole idea of uncertainty is things don't always work out exactly as you've expected. So an outcome that could be relevant to your decision making, like the aggregate rate of acceptance, like the timing of acceptance, like an interruption in acceptance all could affect my decision making. If I'm making decisions now based on what I expect to happen, that doesn't mean that I exclude the possibility that what I expect doesn't come about. Those outcomes impose costs.

Q. I'm asking even if you can't write for us the specific equation, what economic tool would you have put into a model to, that would have explicitly modeled the uncertainty of DOE performance?

A. I would have added parameters to this model to account for the dimensions of uncertainty that I've described. And I would have simulated the model a thousand times, ten thousand times, 100,000 times using different realizations of those random variables that I'm introducing into the model into the acquaintance that I think are relevant based on what I just described. And I would see the results

Page 139

of that model.

And you don't just do it once. You don't just do it twice, five times. The nature of this kind of simulation analysis, which is one way you asked me off the top of my heed how I do it, I would investigate the issue. And I might end up doing it slightly differently. One way would be to perform a kind of Monte Carlo analysis that allows for the introduction of randomness in certain dimensions and simulate what the model says.

Q. Isn't that simply doing -- isn't that the same thing as sensitivity? Just a lot more of them.

MR. BRYAN: Objection. Vague.

A. What I would characterize as real sensitivity analysis or real Monte Carlo analysis is not the nature of the scenarios that Mr. Graves has introduced or has presented.

I will say the five randomized cost simulations are a start in that direction. It assumes some randomization of costs across utilities. But the other scenarios that Mr. Graves has presented as part of his scenario analysis is

Page 140

not what I'm talking about. He's just changing certain parameters in certain ways, not necessarily in a randomized fashion, not necessarily allowing for uncertainty.

So yes, it's scenario analysis. But it's a lot more of them. So that you can begin to understand what the distribution of possible outcomes is. And I would introduce that randomness in many more dimensions than Mr. Graves has done.

Q. Is it your opinion, Dr. Neuberger, that the most appropriate means of modeling uncertainty would have been in this context, the Monte Carlo analysis?

A. Not necessarily. You asked me off the top of my head how I would introduce uncertainty. I described for you one well-accepted methodology for doing so. If I were given the assignment, I would want to investigate various aspects of the markets that I thought I was modeling. And if a Monte Carlo simulation analysis was determined to be the best available methodology, I would use that. If there were alternatives, I would do that as well.

Page 141

Q. You certainly have the expertise to have drawn a Monte Carlo type analysis of the exchanges market, correct?

A. Yes.

Q. You just chose not to do so?

A. I chose not to do so because I didn't have model that I felt was sufficiently rich and robust to be able to do that. Mr. Graves analysis is a certainty based analysis. So no number of simulations in that certainty based analysis is going to replace an explicit modeling of uncertainty.

Q. If you run sensitivity analysis someone with fairly extremely assumptions to put parameters on the range of possible results, and you're still comfortable that that range is not too broad for the purposes that you are modeling for, why is it necessary to do further analysis of the uncertainty within that range?

A. Certainty by its nature is probabilistic. There is some likelihood that some event will occur that will cause you to change your decision. So you

Page 158

people to buy its bond as opposed to a government bond? That's what we are talking about.
A. You might be able to glean some information from that. But I don't know offhand. I don't know if they are comparable. I don't know exactly which units you would put it in. Ultimately you would have to convert it to dollars in order to translate that effect into damages. But I don't know what the order of magnitude is. I really don't.
I do know, any increased cost like that is going to diminish the benefits of trading exchanging, and they could potentially be, those costs could be high enough to wipe all the benefits of exchanging. So there is that possibility.
Q. Since you haven't run the numbers, you don't know whether the possibility is greater than, the difference may be high enough to wipe out the cost of exchanges or so low as to be negligible, do you?
MR. BRYAN: Objection. Vague. Compound. Argumentative.

Page 159

A. That is correct.
Q. Another area of uncertainty you discussed, Dr. Neuberger, is the fact that exchanges require DOE approval of approved delivery commitment schedules, correct?
A. Yes.
Q. You note, referring to paragraph 62 of your report, that the extent of DOE's approval of delivery commitment schedules and exchanges cannot be predicted with absolute certainty, right?
A. Yes.
Q. Is it your opinion that every aspect of an economic model has to be capable of prediction with absolute certainty to be useful?
A. Absolutely not. It does suggest there is some uncertainty in this dimension. And so a more complete model would acknowledge the possibility that every single exchange might not be approved and that might throw a wrench into the workings of an exchanges market.
Q. Is it your opinion that DOE would not have readily approved exchanges?

Page 160

A. No.
Q. Have you attempted to model the extent to which exchanges that would have been agreed to amongst utilities would not have been approved by DOE?
A. No.
Q. Do you have any understanding as to why DOE would not have approved in an non-breach world exchanges that would say have been agreed to and proposed by utilities?
A. I can envision situations in which the logistics of a particular exchange just may not be workable for DOE. They are the ones who got to bring these trains around the country and get this stuff moving. It is possible that some exchanges just would not be physically or logistically possible.
Q. Why is it that an exchange that would have been thought of advantageous amongst utilities, that's why they agreed to it, would have been logistically more difficult to DOE than sticking with the oldest fuel first order with spent fuel

Page 161

pick up?
A. It's not necessarily any relationship there. You could have exchanges between utilities in different parts of the country. DOE had been planning, for example, a southeast campaign, and all of a sudden you have got utilities in the upper midwest who are exchanging for rights. And logistically it may not be possible for DOE to perform under those conditions.
And so, DOE's objectives, the constraints faced by DOE are not identical to the constraints faced by individual utilities. And, as a result, DOE has the right to disapprove an exchange, if for whatever reason, logistical, political, it just can't do that.
Q. You refer to the possibility, and I understand it was off-the-cuff, that maybe DOE would have been planning for a southeast campaign. To the extent that DOE was planning and had the capability to accept spent fuel on an oldest fuel first basis, that DOE had to have robust acceptance capability because there wouldn't have been any campaigning

Page 166

to make a decision. Is that an important point. Is it not an pointer point. I think this model ignores too many important points. I think it focuses on one criterion, one decision criterion and that is it.

I think the decision, the ability of Dairyland or anybody else to exchange would have been impacted by a number of factors that are not in Mr. Graves's models. And it is my belief, as an economist, that a model that includes those factors would yield different results than Mr. Graves's model, which does not address those concerns.

Q. We discussed one method, maybe the only method we have discussed for getting your arms around uncertainty through Monte Carlo analysis by randomizing a uncertain variable. Would you randomize every variable as uncertain?

MR. BRYAN: Objection. Vague. Objection. Mischaracterizes his testimony.

A. Not necessarily.

Q. How would you decide which to conduct that kind of analysis on and which not to?

Page 167

A. Some of it might be informed by some of the simulation analysis. I think you, as any economist, has to make a decision, is uncertainty sufficiently prevalent to require some consideration. And, if it is, how do you operationalize that.

And that's exactly what I'm talking about here. There are many different dimensions in which uncertainty would affect this market. None of them are addressed by Mr. Graves.

It is conceivable that you could make the problem so difficult that it was incapable of being solved. Obviously that doesn't help you either. But I think something richer and more robust than what Mr. Graves has put forward would be appropriate and would be doable.

I think you have to make some decisions. Every economist has to make decisions when building models. What is important here. And Mr. Graves's model, I believe, is overly simplistic. It looks at one point, one issue, one measure and ignores everything else that could affect this

Page 168

market.

(Discussion off the record.)

BY MR. SHAPIRO:

Q. Dr. Neuberger, you've testified that you wouldn't necessarily randomize every -- you acknowledge you don't want to make the problem too difficult to solve. You've listed many potentially uncertain variables from which utilities are more risk averse to DOE approval of delivery commitment schedules.

Have you made any effort to determine which of the these uncertain variables you believe would have warranted studying with a Monte Carlo or similar analysis?

A. No, I've not.

Q. Would you agree, Dr. Neuberger, that it probably would not have been appropriate for Mr. Graves to have done Monte Carlo analysis in all the uncertain variables that could have existed in the exchanges market because it would have made the model too complicated to run, correct?

MR. BRYAN: Objection. Vague. Compound.

Page 169

A. The implication of that sentence seems to be either you ignore uncertainty altogether or you include every possible dimension of uncertainty. There's a whole continuum of approaches that could have been taken somewhere in between. It's a false choice. Either you ignore uncertainty or you only do uncertainty in every possible dimension. That doesn't make sense.

Q. You haven't tried to determine which areas ultimately you believe Mr. Graves should have explored in terms of uncertainty in greater detail?

A. I have described any number of elements of uncertainty in my report that I think are important and that should have been addressed. On the outside, on the outcome maybe some of those factors wouldn't be important and you could simplify the model by just excluding it.

Some of the factors that I've discussed could be modeled together that they might all work in one direction and have one particular impact. You could just summarize three or four different dimensions of uncertainty with one random

Page 174

fuel. Now maybe that's not directly related to exchanges. But it is certainly an example where PG&E's behavior was constrained.

Q. Do you know why PG&E entered into the agreement you are referring to not to move Humboldt Bay spent fuel to the Diablo Canyon site?

A. I think it was to get approval for the ISFSI Diablo. I believe that is the case.

Q. Was it in fact the case that PG&E got something out of that agreement? It wasn't simply an imposition by the citizens of California. There was a quid pro quo, wasn't there?

MR. BRYAN: Objection. Vague. Assumes facts not in evidence.

A. As in any agreement, I think each side got something.

Q. You also referred to testimony in the Dairyland case about sociopolitical factors. What testimony are you referring to in this case?

A. I think it was Mr. Parkin's deposition when he said they had, they being Dairyland, had investigate the possibility of moving their fuel

Page 175

from LaCrosse up to WEPCO's facility. And there was substantial opposition by the citizens of Wisconsin for doing that.

Q. You are not a political scientist, are you?

A. I certainly studied political science over the years. Certainly I don't believe so.

Q. You are not claiming to be an expert in the sociopolitical factors influencing utilities, do you?

A. No.

Q. You say, I'm referring to paragraph 63 of your report, that utilities have to address non-economic interests in the operational decisions of their nuclear plants. Correct?

A. Yes.

Q. What is the basis of that assertion, please?

A. My experience.

Q. What experience are you referring to?

A. Specifically in PG&E. I recall PG&E had a document that was produced pretty much

Page 176

contemporaneous with the lawsuit in which they described the complex series of interests in stakeholders that they attempt to satisfy when they make their operational decisions. I've seen similar documents, similar testimony. It's not simply a matter of profit maximization without any constraints or any other interests.

A utility is trying to balance multiple interests. Sure, it wants to maximize its profits. Most corporations do. There are constraints on that profit maximization. Certainly PG&E acknowledged it. I think Dairyland has as well.

Q. If I understand what you have just testified to, you agree that utilities do attempt to maximize their profits, but there are limits to which they can implement that goal and individual decisions based upon constraints that might be imposed by various stakeholders that they have to deal with?

A. I think that's fair.

Q. Presumably one of those interest of the

Page 177

stakeholders is lower electric rates?

A. Certainly to the extent that utilities are regulated, public utilities and public service commissions generally prefer to see lower rates rather than higher rates.

Q. But the sort of non-economic concerns that you are referring to that might influence utilities are merely fear from the local population of keeping spent fuel at the site of the nuclear reactor?

A. I think anytime you are dealing with a nuclear facility and spent nuclear fuel there are a whole range of interests and concerns that are not specifically economic in nature. I haven't studied all of those concerns. I don't know exactly how all of those socio and political forces would interact.

But certainly this is a, pardon the pun, a hot button topic, and many different groups have different interests. I think in making decisions relevant to spent fuel storage and transportation it's not simply a matter of cost minimization of profit maximization. I think there are many different interests and many different



 ©2007

Page 178

concerns that get raised both within the company and without.
Q. What factor other than fear or opposition to nuclear power are you referring to that might influence a utility, non-economic factor that would influence a utility as caused by other stakeholders --
A. Certainly fear of having the spent fuel on site. That's certainly one of them.
Q. Anything else?
A. Transportation of fuel.
Q. Any others?
A. I'm sure there are many others. That's what I can think of.
Q. The transportation of spent fuel, once it's out of site that's going to have to be dealt with regardless of the timing of the removal of that spent fuel, right?
A. Sure.
Q. So why would you expect that particular fear to have any influence on a utility's engagement in exchanges?

Page 179

A. So a utility who is a seller of early allocation rights has to explain to the local populous why there's 800 metric tons of uranium on site instead of 700 metric tons of uranium on site. And it's going to stay there for an extra five years or ten years.
I think the PG&E example that I describe in my report is directly on point here. There is spent nuclear fuel on site. But the residents around Diablo Canyon didn't want more. They didn't want Humboldt Bay's fuel in that location.
So Mr. Graves says that these sociopolitical concerns will align closely with economic interests. I don't have any reason to believe that's the case. I don't think he has any evidence to support that view.
Q. Is it your opinion that concerns such as those in the San Luis Obispo area removing Humboldt Bay spent fuel to that area, that those concerns would have been as prevalent in the non-breached world as in the breached world?

Page 180

A. I don't have any a priori reason to believe there would be any different in a breached world versus a non-breached world.
Q. You don't think there's a greater concern in the breached world that spent fuel is not moving from its current location because the government is not taking that would have been the case in the non-breached world, if the government were actually in the process of removing spent fuel from a utility site?
A. I don't know how interest groups would have been affected by DOE performance or not.
(Brief Recess.)
BY MR. SHAPIRO:
Q. Dr. Neuberger, we were discussing sociopolitical factors that might influence the exchanges market. You haven't attempted to model the impact of taking into account sociopolitical factors on the exchanges market, have you?
A. That's correct. I have not.
Q. How would you have done so?
A. I think I would have acknowledged somehow,

Page 181

and I don't know exactly off the top of my head, that there were constraints on any individual utility's ability to simply act in a profit maximizing way or a cost minimizing way. That there are other interests -- again, I can't tell you off the top of my head exactly how I would have done it, but I would have attempted to introduce some friction into a potential exchanges market, acknowledging the fact that there are other interests and sometimes utilities cost minimizing behavior is constraint by those interests. I don't know exactly how I would have gone about doing it.
Q. We have discussed earlier today some of the other factors that you feel should have been explicitly in Mr. Graves's model. I have a sense one way or the other you could have come up with a means of doing that. Because those were economic concerns.
This sociopolitical factor issue almost by definition is non-economic concern. It's less clear to me how you could go about incorporating into an economic model such



 ©2007

Page 182

non-economic concerns or is it simply a non-starter?
A. I don't think it's a non-starter at all. I am familiar with a branch of political science, for example, that essentially applied economic analysis to political decisions based on some ordinal ranking of outcomes that night affect a particular interest group.
Those techniques use statistical and econometric techniques to estimate the impact on systems of equations just like any economic model would be. So you need a key translator. And the translator is to translate the impact of sociopolitical interests into either the cost of exchanging or the possibility of exchanges.
So I think it would be possible. And there are plenty of precedents in the quantitative political science arena that could give, I think, some insights into how you might go about doing that.
Q. Ultimately your sense is, you would take into account sociopolitical factors by introducing some additional friction in the exchanges market?

Page 183

A. I think that's correct, just off the top of my head, as I sit here today, I think that's the direction I would initially go. And much like other elements of economic research I would want to read articles that I felt were on point and see how other people addressed similar issues. And then figure out how I might translate into an exchanges market model.
Q. Do you know if those frictions would actually have favored utilities of engaging in more exchanges rather than less?
A. I don't know off the top of my head. I know Mr. Graves asserts that's the way it would work, that sociopolitical forces would align themselves with economic interests. But I don't have any strong a priori beliefs that it would go one way or the other. I would want to investigate that.
Q. You don't have an opinion that the frictions that you would introduce to study sociopolitical factors more would tend to discourage exchanges?

Page 184

A. I do not without doing work.
Q. Let me turn your attention to paragraph 65 of your report. In this paragraph you assert that most parties would support an acceleration of spent fuel acceptance, but that the same support would not be forthcoming for utilities to decelerate acceptance, correct?
A. Yes.
Q. What is the basis for this assertion?
A. I don't have any empirical or quantitive basis. This is my impression. And, again, I think it gets to this point that participation in this exchanges market isn't going to be or may not be viewed symmetrically between those who accelerate and those who decelerate.
I think there could indeed be pressure on a utility board not to decelerate. That is consistent with evidence that I've seen in this and other cases where almost everybody seems to think that aceleration is a good idea. I haven't seen anybody who is actually willing to decelerate.
So certainly my perspective is

Page 185

informed by the cases that I've worked in where this exchanges mechanism has been talked about. To date I've not heard testimony or seen any documents from any utility in any of the cases I've worked in or from any other utilities for that matter that specifically identifies a willingness or desire to decelerate.
Q. Can you point to an example of a utility with a desire to accelerate that didn't have a must move fuel need to do so?
A. I know NSP in some of its testimony, some of the testimony by its executives had indicated a willingness or desire to accelerate before they actually hit a must move situation. So in advance of a must move there was interest in accelerating. But I think it's not unreasonable to expect that a must move situation would be a primary motivator for accelerating or wanting to accelerate.
Q. In paragraph 65, which you reference parties would tend to favor acceleration more than deceleration. What parties are you referring to?
A. I think any stakeholder, whether it's a



 ©2007

Page 186

rate payer, resident who lives near a nuclear power plant, the executives of the utility themselves. So I think a fairly broad range of potential stakeholders would have an interest potentially anyway in accelerating.

Q. I think we have touched on in this morning. By deceleration you are simply referring to removal of some spent fuel from an operating utility at a later time, not the delay of removal of the last of the spent fuel of that utility site, correct?

A. I'm only hesitating because I don't know that the second part of that necessarily doesn't follow from the first. But I would certainly agree that it's generally in the context that I'm talking about is in the context of an operating reactor, not necessarily a shutdown looking at its eventual end date or out date.

Q. Why would any stakeholder care if a utility has a little more or a little less spent fuel on the site at a particular time, if the end date, as you referred to it earlier, for the

Page 187

ultimate removal of all the spent fuel is not delayed?

A. Just a general sense that less is better. Having less fuel around is somehow better.

Q. What expertise are you applying to reach that conclusion?

A. Common sense.

Q. Why does common sense tell you that less spent fuel as opposed to a little more is better, if you are not changing the time for the removal of the last of the spent fuel?

A. Why would the residents around Diablo Canyon not want any of Humboldt Bay's fuel. Obviously something is going on there. Where a little bit more fuel is seen as a bad thing. The converse I think is true, a little less fuel is probably seen as a good thing.

Q. You are not applying your economic expertise in this instance. You are merely applying common sense to conclude that, as you put, a little less spent fuel is preferable to a little more?

A. There is no specific economic expertise.

Page 188

I think to the extent that a presumption that sociopolitical interests would automatically align with economic interests, I think that does draw on my expertise as an economist. But I don't have any particular economic expertise on the sociopolitical side to say how that interest would align or how it would play out.

Q. Switch gears a little bit to another facet of your opinions. Choice of market mechanism. You assert that different exchange mechanisms can produce different results, correct?

A. Yes.

Q. You are not offering opinion as to what exchanges mechanism you feel would most likely have transpired in the non-breached world, are you?

A. I am not.

Q. You are not offering an opinion there could have been only one exchange mechanism in the non-breached world, are you?

A. I'm not suggesting that. No.

Q. In fact, it's entirely possible there might have been in the non-breached world multiple

Page 189

kind of exchange mechanisms that could have been used to facilitate exchanges at the same time?

A. It's possible. Outcomes of the exchange mechanisms would have been different and certainly different than Mr. Graves has predicted.

Q. But you haven't attempted to quantify how use of different exchange mechanisms would have altered the results of Mr. Graves's exchange model?

A. I'm not making a prediction in that dimension.

Q. So you can't say that the effect of using different exchange mechanisms would have been material, can you?

A. I think it would have. Mr. Graves has assumed one particular exchange mechanism. I think if you look at the alternatives, the results under those alternatives, with very high probability, would have been different than what Mr. Graves has predicted.

Q. How different?

A. If this market was characterized by bilateral traits where the sellers were able to



 ©2007

Page 190

perfectly segment the market, then the prices would not have been, prices for exchanges would not have been at the marginal price that cleared the market, but would have been whatever utilities were able to negotiate.

And, if in fact the sellers had a little more power in that arrangement than the buyers, then the sellers would have been able to obtain significantly higher prices, especially from those utilities that had a high willingness to pay, offer somebody a dollar below their willingness to pay, and effectively the buyers have eliminated all the benefits of exchanges. They don't get any benefits to exchanges.

Q. How likely is it that sellers could have perfectly segmented the market for exchanges in the non-breached world?

A. Under Mr. Graves's assumptions, pretty darn possible.

Q. I'm asking your opinion.

A. He says that all this data about individual utilities willingness to pay was readily

Page 191

available. And in that environment sellers could simply pick off those with the highest willingness to pay and offer to pay them a dollar less than their willingness to pay. Therefore, eliminate virtue all the benefits to exchanges.

I believe that a market like this would be quite amenable to bilateral trading, in which case every single transaction is transacted under different terms, different prices. None of them or maybe one of them being at the marginal price.

Q. If a seller of allocations tried to get that kind of price from a potential buyer like Dairyland, couldn't Dairyland go to a different utility with early acceptance rights?

A. Considering the relatively small number of sellers in the early years of program, there's limits to how far you can go there.

Q. To assume perfect segmentation, you have to assume a certain degree of collusion among sellers to produce that result?

A. Not necessarily. Markets have been

Page 192

segmented without collusion.

Q. Perfectly?

A. I don't know if perfectly or not. You asked me for another mechanism, what it would produce. There's an example. Mr. Graves has assumed a particular, whether explicit or not, it's actually implicit, he doesn't really say, but in his model inclusion is a particular exchange mechanism. Yet that exchange mechanism isn't specified, so you can't identify who the seller is. And he acknowledges that alternative exchange mechanisms could have worked and would have produced different prices and perhaps different outcomes than his model.

So all I'm acknowledging is that possibility. And I think this issue needs some more work before you can really say with any reasonable degree of certainty that this is how the market worked.

Q. You've testified that you think that some market segmentation would have been possible, but absent collusion maybe not perfect segmentation.

Page 193

Have you done any analysis to determine how much segmentation you think would have been possible in the non-breached world?

A. No.

Q. Do you have the expertise to have performed such an analysis?

A. Yes.

Q. How would you have gone about doing that?

A. I would model different exchange mechanisms. I would explicitly identify the exchange mechanism. And seen what kind of results it produced. I would have looked at different exchange mechanisms and seen what kind of results they produced.

Any kind of mechanism like that requires some assumptions. I would have made those assumptions, compared the results. I would have attempted to understand how this market would have worked, how the participates expected the market to work.

Mr. Graves has not done that. He's made a particular assumption basically saying this



 ©2007

Page 194

was a perfectly competitive market, it would have cleared at this Welrasian auctioneer's price. But even he acknowledges other exchange mechanisms are possible. And the results under those alternative mechanisms would be different.

Q. How specifically would you have analyzed how much segmentation would have been possible in a market characterized by bilateral exchanges?

A. I don't know off the top of my head. I obviously have to think about it. Again, we are dealing with a relatively small market here. There aren't that many participates in this market. Under Mr. Graves's acceptance rate OFF does a pretty darn good job after the first couple of years. So the volume of exchanges may not have been all that high after the first couple years of the program.

Again, I would have made some guesses. Done some research. Tried to put some parameters around that. Estimated what the effect is and done that multiple times.

Q. You noted that Mr. Graves assumes that generally good information about buyers costs would

Page 195

have been prevalent in non-breached world. Do you agree?

A. He does make that assertion.

Q. Do you disagree?

A. His model doesn't incorporate that information. It incorporates these industry, so-called industry average representative costs. In fact, I would assume, it's my expectation and my experience that utilities guard their cost information quite closely and would not have been eager to have that information readily available to the market.

But I think there would be individuals like Mr. Graves who would be out there as potential brokers, who would argue, okay, here I know all these guys' costs, here's what they are willing to pay. Do you want to sell your rights. I'm not saying the market wouldn't develop. I don't have any reason to believe it would develop the way Mr. Graves says it would.

Q. Does better information about different utilities cost make it easier for utilities with

Page 196

early acceptance rights to exercise market power?

A. A lot of factors that go into that. Generally I would say yes. It just depends on a lot of things -- market structure. Depends upon other factors. Depends on risk aversion. Degree of uncertainty. So hard to know. I think that is something you would want to investigate.

So I just don't know the extent to which this market would be characterized by market power or how eager buyers would be and how reluctant sellers would be.

So I think to the extent this market developed, it would really depend upon a lot of information and a lot of decisions that get made at the time. Bilateral trades. How do you know who is stronger in a bilateral negotiation? If a buyer is more eager to complete a transaction than a seller, buyer is going to have to pay for that.

Mr. Graves has assumed a particular mechanism that allocates the benefits of exchanges in a particular way. I think those benefits could be allocated in very different ways, depending upon

Page 197

the actual mechanism that's used.

Q. If I understand what you are saying, it's also possible that with good information on cost that it might be the potential buyers of exchange allocations that might have the power in the market, correct?

A. It's possible. I don't think particularly likely, but it's possible.

Q. Because you haven't run the analysis, you don't really know which is more likely, whether buyers or sellers would be able to exercise market power in an exchanges market, correct?

A. I think just from an economic logic standpoint it seems to me that buyers are going to be a lot more eager to complete a transaction than seller. The dollars we are talking about for the sellers with respect to, relative to the profitability of a nuclear power plant are not so great that every potential seller would be out there knocking on doors and lowering their prices.

So just a priori my belief would be that the balance of power in that market would be