No. 04-0106C
(Chief Judge Damich)

Electronically Filed: May 15, 2008

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# OPPOSITION TO MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF IVAN F. STUART

---

JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, N.W.
Suite 1000
Washington, DC 20037
(202) 331-3100 (Telephone)
(202) 261-4751 (Facsimile)
Counsel for Plaintiff
DAIRYLAND POWER COOPERATIVE

Of Counsel:

Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

TABLE OF CONTENTS

I. MR. STUART'S OPINIONS ARE RELEVANT ....................6

II. MR. STUART'S NON-SCIENTIFIC OPINIONS ARE BASED ON A SUFFICIENT METHODOLOGY ....................7

III. MR. STUART'S OPINIONS REST ON REAL-WORLD EVIDENCE, WHICH IS COMPELLING ....................14

IV. THE DOCUMENTS THE GOVERNMENT CITES AS "CONTRADICTING" MR. STUART'S OPINIONS DO NOT ADDRESS THE SUBJECT OF HIS OPINIONS ....................19

V. MR. STUART IS QUALIFIED TO GIVE OPINIONS ON THE FEASIBILITY OF EXCHANGES ....................22

CONCLUSION ....................23

# TABLE OF AUTHORITIES

Cases | Page


*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) .......................................4

*Consumers Energy Co. v. United States*, 65 Fed. Cl. 364 (2005) .......................................4

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......................................5

*Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336 (2005) .......................................4

*Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538 (D.Del 2003) .......................................7

*In re Methyl Tertiary Butyl Ether Products Liability Litigation*,
2008 WL 1971538 (S.D.N.Y. May 7, 2008) ....................................... 6-7

*Indiana Michigan Power Co. v. DOE*, 88 F.3d 1272 (D.C. Cir. 1996) .......................................18

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ....................................... 5-6, 11

*Lynch v. United States*, 292 U.S. 571 (1934) .......................................14

*Northern States Power Co. v. DOE*, 88 F.3d 1272 (D.C. Cir. 1997) .......................................18

*Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006) .......................................3

*Perry v. United States*, 294 U.S. 330 (1935) .......................................14

*Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495 (2005) .......................................4

*Sacramento Municipal Utility District v. United States*, 70 F ed. Cl. 332 (2006) ....................................... 2-3

*Southern Nuclear Operating Co. v. United States*, 79 Fed. Cl. 135 (2007) .......................................4

*Suter v. General Accident Ins. Co. of America*, 424 F. Supp. 2d 781 (D.N.J. 2006) .......................................7

*Sys. Fuels, Inc. v. United States*, 66 Fed. Cl. 722 (2005) .......................................4

*United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) .......................................6, 7

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) .......................................14

*Yankee Atomic Power Co. v . United States*, 73 Fed. Cl. 249 (2006) ....................................... 2-3, 17

*Yankee Atomic Power Co. v. United States*, 2004 WL 1535686 ..............................................8

*Zenith Elec. Corp. v. WH-TV Broadcorp.*, 395 F.3d 416 (7th Cir. 2005).......................5, 10, 11

Other Authorities

Rest. 2d Contracts § 204 ..........................................................................................................4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | No. 04-0106C |
| v. | ) | (Chief Judge Damich) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

OPPOSITION TO MOTION IN LIMINE TO
<u>EXCLUDE THE TESTIMONY OF IVAN F. STUART</u>

Dairyland intends to present at trial both fact and expert testimony of Ivan Stuart. As reflected on his resume, which is Exhibit 4 to his expert report attached to the government's motion in limine, Mr. Stuart has vast experience in the nuclear industry during a varied career spanning more than 40 years, including ten years as senior vice president of a company (NAC International, Inc. or "NAC") that designed, developed and manufactured spent fuel transportation and storage casks, including doing so under contract for the Department of Energy ("DOE"). At NAC, Mr. Stuart had overall responsibility for design, development, licensing and fabrication of the company's spent fuel storage and transportation casks. NAC, and Mr. Stuart, also transported spent fuel both domestically and internationally, including under contract for DOE. Based on his extensive first-hand experience with spent fuel transportation and storage matters, experience that also included broad contemporaneous knowledge of the DOE spent fuel program as it developed and familiarity with best practices in the spent fuel cask and transportation industry, Mr. Stuart provides opinions that demonstrate 1) that there are no technical impediments to DOE operating its spent fuel program at an acceptance rate of 3000

MTU with a reasonable ramp-up beginning in 1998, 2) that sufficient casks and rail and other transportation equipment could have been available to DOE to accommodate concentrated acceptance "campaigns" of spent fuel from utilities, and 3) that there are no site-specific conditions at Dairyland's LACBWR nuclear plant site that would have prevented DOE from using acceptance campaigns to transport spent fuel from that site.

The government argues that Mr. Stuart's expert opinions, which it summarizes more fully at p. 2 of its motion, should be excluded from trial for five basic reasons: 1) they are "wholly irrelevant to the issues before the Court," Mot. at 2; *see id.* at 8-10 (addressing relevance); and they are unreliable because 2) Mr. Stuart "failed to employ any testable methodology or to perform any analysis in support of his conclusions," *id.* at 3; *see id.* at 6-7, 18 (addressing this issue), and because his opinions 3) "lack sufficient support," *id.* at 2; *see id.* at 10-13 (addressing purported lack of support), 4) they "fail to take into account a myriad of contradictory information," *id.* at 2; *see id.* at 13-18 (addressing purported contradictions), and 5) Mr. Stuart is "not qualified to opine on the subject of exchanges," *id*. at 18; *see id*. at 18-20.

None of these reasons is a proper basis for excluding Mr. Stuart's opinions, and many of them are not even true. At best, a number of the government's objections are subjects for cross-examination, but many of the objections are not even suitable for that purpose because they do not address any subject up on which Mr. Stuart opines. To a remarkable degree, the government's motion makes arguments that are entirely beside any point addressed by Mr. Stuart's opinions. The government's motion should be denied, and Mr. Stuart should be allowed to provide essentially the same expert testimony in this case that he has given in every other spent fuel case in which he has been offered – and accepted – as an expert, specifically *Yankee Atomic Power Co. v United States*, 73 Fed. Cl. 249 (2006); *Sacramento Municipal Utility*

*District ("SMUD") v. United States*, 70 Fed. Cl. 332 (2006); and *Pacific Gas & Elec. Co. v United States*, 73 Fed. Cl. 333 (2006). In those cases, the government appropriately did not even move to exclude the opinions Mr. Stuart seeks to offer here.[1]

Significantly, the government makes no argument that Mr. Stuart's opinions about site-specific conditions at Dairyland's "LACBWR" nuclear plant site are unreliable. As explained below, *see* pp. 3-4, the government's relevance argument is in applicable to all of Mr. Stuart's opinions. Thus, the government offers no ground for excluding Mr. Stuart's opinions about site-specific conditions at LACBWR.

## I. MR. STUART'S OPINIONS ARE RELEVANT.

The government's contention that "Mr. Stuart's testimony concerning DOE's *ability* to perform at a given rate under the Standard Contract is not relevant," Mot. at 8, first posits that the "important question" in this case is "at what rate was the Government *obligated* to accept SNF from nuclear utilities." *Id*. The government then argues that DOE's ability to perform is not relevant to the issue of DOE's contract obligation. *Id*. at 8-10 (emphasis in original). That may be true under the contractual theory the government advances here, namely that DOE's 1991 ACR and APR "form the only basis for evaluating the Government's contract liability." *Id.* But Dairyland's contractual theory is different, and Dairyland is entitled to present evidence consistent with its theory. Moreover, the government's theory, and closely similar theories the government has previously advanced, have been rejected in virtually every case in which this Court has addressed the theories. *See*, *e.g.*, *Yankee*, 73 Fed. Cl. at 274-75; *Consumers Energy*

[1] In *SMUD*, the government did belatedly object orally at trial to one narrow opinion concerning exchanges that it said Mr. Stuart was giving there, which is not among the opinions set out in his report here (though that opinion was similar to the opinion the government says Mr. Stuart is giving here, and that matter is addressed below at pp.19-20). The Court in *SMUD* did not preclude any of Mr. Stuart's testimony but did give the government a standing objection on the one narrow issue.

*Co. v. United States*, 65 Fed. Cl. 364, 369-71 (2005); *Sys. Fuels, Inc. v. United States*, 66 Fed. Cl. 722, 730-32 (2005) ("as a matter of law, the date of the government's breach is not determined by the annual capacity report or delivery commitment schedules"); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 343 n.8 (2005) (finding government's claim that the acceptance rate was defined by the Delivery Commitment Schedules ("DCSs") "dubious"); *Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495, 503-05 (2005) (holding that ACRs were for planning purposes and DCSs were not binding); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 666 (2003) (noting that "[d]efendant eventually conceded at oral argument that the ACRs were for planning purposes" and that "[t]he parties could not have expected that planning documents would create binding contractual obligations.").

Under Dairyland's contractual theory, because the rate of acceptance is an "open term" under the DOE spent fuel contract, DOE was obligated to perform at a "reasonable" rate. *See, e.g.*, Dairyland's Memorandum of Fact and Law at 7-8; Rest. 2d Contracts, §204; *Southern Nuclear Operating Co. v. United States*, 79 Fed. Cl. 135, 137-143 ( 2007) (court determined a "reasonable annual removal rate"). The lack of technical impediments to DOE's performance at a 3000 MTU rate – *i.e.*, DOE's *ability* to perform – supports the reasonableness of that rate. Mr. Stuart's testimony on that subject is therefore relevant. *See* Federal Rule of Evidence 401. The government's argument that Mr. Stuart's opinions are not relevant merely because they are not consistent with the government's contractual theory is meritless.

## II. MR. STUART'S NON-SCIENTIFIC OPINIONS ARE BASED ON A SUFFICIENT METHODOLOGY.

Regarding Mr. Stuart's "methodology," *see* Mot. at 3, the government acknowledges that "[i]n some instances, reliability depends upon the opinion's scientific foundations, while in

others the relevant indicia of reliability are focused upon personal knowledge or experience." Mot. at 6. The government could hardly deny the latter point, because as the Supreme Court has observed, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 156 (1999). As the Federal Rules Advisory Committee also explains, with respect to the 2000 amendments to Federal Rule of Evidence 702 that incorporated into the Rule the teachings of *Daubert v. Merrill Dow Pharmaceuticals*, Inc., 509 U.S. 579 (1993) and *Kumho Tire*:

> Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

FRE 702, Advisory Committee Note to 2000 Amendments.

The government's particular complaint here is that "an expert may not simply rely upon his or her 'expertise' or 'industry experience' without offering an acceptable methodology. . . . To do so would amount to reliance on mere intuition, which the courts may not do." Mot. at 7, citing *Zenith Elec. Corp. v. WH-TV Broadcorp*., 395 F.3d 416, 418 (7th Cir. 2005). Although the government never actually says so in its motion, the suggestion is that Mr. Stuart's opinions are not based on an acceptable methodology.

The government is wrong on the methodology point because of the very distinction it already acknowledged between scientific expert opinions and expert opinions based on experience. Factors that demonstrate the reliability of a scientific methodology, such as "peer review and publication" or "the theory's known or potential error rate" or "whether the theory has been generally accepted in the scientific community," *see* Mot. at 6, citing *Daubert,* 509 U.S. at 593-94, may not be necessary, or even relevant, to experience-based expert opinions. *See*

*Kumho Tire,* 526 U.S. at 150 ("[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony.") (citation omitted); *id.* at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). Thus, the reliability inquiry is necessarily "a flexible one," based on the uniqueness of the circumstances present. *See Kumho Tire*, 526 at 150 (1999); FRE 702, Advisory Committee Note ("Some types of expert testimony will not rely on anything like a scientific method. . . .").

Applying these principles, the caselaw recognizes a clear distinction, insofar as determining reliability is concerned, between expert testimony that is "scientific" and that which is "non-scientific," like Mr. Stuart's here. The distinction was cogently explained in *United States v. Jones*, 107 F.3d 1147, 1158 (6th Cir. 1997) (citation omitted):

> The distinction between scientific and nonscientific testimony is a critical one. By way of illustration, if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.
>
> On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

Simply stated, in a case like the present one involving experience-based opinions, "the 'method' is the application of experience to facts." *See In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008). The Rule 702 Advisory Committee Note gives the example of a law enforcement agent who testifies

regarding the use of code words in drug transactions, explaining that the "method used by the agent is the application of extensive experience to analyze the meaning of the conversations." Similarly, in *In re MTBE Products Liability Litigation*, *supra*, the court refused to exclude experience-based expert testimony because the expert "properly ground[ed] his conclusions in substantive facts" and "applie[d] his experience to these facts in a reasoned manner." 2008 WL 1971538, at *7-8. The court explained that "defendants' argument that [the expert's] failure to use a social science methodology renders his opinions unreliable is misplaced. [The expert] may properly rely on his experience to testify about all matters within his experience. . . . The only requirement is that he do so with the same degree of intellectual rigor as a professional in his field." *Id.* at *8. The Advisory Committee Note to Rule 702 describes the requirement this way:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.

FRE 702, Advisory Committee Note to 2000 Amendments. *See also Suter v. General Accident Ins. Co. of America,* 424 F. Supp. 2d 781, 789 (D.N.J. 2006) ("the Court is satisfied that Dr. Gilchrist's experience reasonably supports his opinion and reliably applies to the facts of this case;" motion to exclude experience-based expert testimony denied); *Galentine v. Estate of Stekervetz,* 273 F.Supp. 2d 538, 543 (D.Del. 2003) ("Given Mr. Gaworski's electrical experience and his inspection of the vessel on the morning of the fire, the Court concludes that this proferred testimony [regarding the condition of electrical wiring on the vessel that burned] is reliable and will assist the trier of fact;" motion to exclude denied); *see also Jones,* 107 F.3d at 1160 ("Given Sperry's various training experiences, his job responsibilities, his years of practical experience,

and the detailed nature of his testimony in this case," no abuse of discretion in allowing expert opinions").

Under any formulation of the "methodology" test applicable here, Mr. Stuart's opinions pass muster. All of the opinions outlined in his expert witness report rest squarely on the application of his own personal experience with spent fuel transportation and handling to facts either known or appropriately estimated about the "reasonable" non-breach world that Dairyland asserts and will establish at trial. Indeed, the government does not even argue that any of Mr. Stuart's particular opinions offered here is *not* properly based upon and supported by his experience. The government devotes the bulk of its motion to criticizing Mr. Stuart's opinions on other grounds, not because he lacks sufficient experience to render and explain the basis for the opinions. That omission is telling.[2]

Furthermore, Mr. Stuart's opinions do not rest only on his own experience. Mr. Stuart also supports many of his opinions by relying on his own first-hand experience with DOE planning documents, nuclear industry publications or other relevant facts. For example, as Mr. Stuart testified in the *Yankee* cases, among "the most convincing evidence" that there would have been no technical impediment to DOE's operation of its spent fuel program at an acceptance rate of 3000 MTU with a reasonable ramp-up

---

[2] The government does note that Mr. Stuart "has no experience with the subject of exchanges." Mot. at 19. That is not strictly true, because there are other examples of exchanges in the nuclear utility industry with which Mr. Stuart is familiar. *See Yankee Atomic*, 73 Fed.Cl. at 304-05 (discussing exchanges of contract rights for uranium enrichment services). More importantly, as discussed below at pp. 19-20, Mr. Stuart is not providing any opinion about how exchanges under the DOE contract would work. Moreover, no one has any actual experience with exchanges under the DOE spent fuel contracts since there has never been any DOE performance to exchange. Mot. at 18; *see Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 1535686, at *7 (Fed. Cl. June 28, 2004) ("There is no market data because the government's breach thwarted this possibility").

beginning in 1998 is that nuclear utilities in Europe, during each year since 1980, have actually had 2000-3000 MTU of their spent fuel transported to the reprocessing facilities still used there. *See* 07/19/04 Yankee Trial Tr. at 1382:23-1383:5 (A2-A3)[3]. Exhibit 2 to Mr. Stuart's expert report contains the underlying data and a chart showing these European shipments. Moreover, Mr. Stuart has his own European experience since casks used there include storage as well as transport casks manufactured by NAC, as well as other casks and hardware whose characteristics are well known to Mr. Stuart from his work in the spent fuel cask business.[4] As discussed below, *see* p. 13, the government's effort to discredit the "convincing" European experience has no merit. Moreover, the European spent fuel transportation experience is but one of many examples showing that Mr. Stuart's own vast experience with spent fuel transportation and management intersects with many of the facts he relies upon to support his opinions. Another example is Mr. Stuart's own experience heading up project teams that actually transported spent fuel under contract with DOE.

The government also argues that that "another person must be able to replicate the expert's results. . . . Mot. at 7. That assertion improperly seeks to impose a requirement

---

[3] "A" refers to the appendix accompanying this opposition.

[4] Mr. Stuart has testified to the compelling similarities between the European experience and what the Department of Energy would have to do in this country:

> [T]here are a great many similarities . . . . [T]he plants [in Europe] are very similar. In fact, many of the plants are US designed. The casks used . . . are large rail casks, so there's a similarity. The fuel itself is very similar. . . And again, much of the fuel was designed and built in the Untied States. The fact that they use multimodes [sic] for transportation is similar to what we would see here, that is rail, truck, and boat or barge.

Yankee Trial Tr. 1385:5:18 (A5).

applicable to scientific expert testimony; replicability is not required in the case of experience-based, non-scientific opinions such as Mr. Stuart offers here. Nevertheless, Mr. Stuart's conclusions can be replicated by others with comparable experience. In fact, Mr. Stuart's conclusions actually have been replicated in studies conducted by DOE's own contractors. The "Abstract" of one of those studies reports the following:

> Operational experience associated with spent fuel or irradiated hardware shipments to or from the General Electric Morris facility is presented. . . . The lessons learned from these experiences indicate that spent fuel shipments are best conducted in dedicated 'campaigns' that concentrate as much consecutive shipping activity as possible into one continuous time frame.

"Significance of Campaigned Spent Fuel Shipments," Dairyland's Exh. 272 (A7). Significantly, that study addresses spent fuel shipments to and from the GE spent fuel storage facility in Morris, Illinois, and Mr. Stuart was the executive at GE who ran that facility at the time and oversaw the very spent fuel shipments discussed and relied upon in this study.

All of Mr. Stuart's opinions are similarly based reliably on his experience. That is all FRE 702 requires for the type of opinion Mr. Stuart offers. The opinions in the only case the government cites to criticize Mr. Stuart's methodology, *Zenith,* 395 F.3d 416, were of a completely different nature. Unlike Mr. Stuart's opinions, the proffered opinions in *Zenith* were of the scientific variety – they were amenable to statistical analysis, yet the expert neither employed such analysis nor explained why he did not. The court described the opinions as scientific, and its analysis confirmed that characterization. *See, e.g.*, 395 F.3d at 419 ("[S]ocial science has tools to isolate the effects of multiple variables and determine how they influence one dependent variable – here sales of [the disputed] service. Perhaps the leading tool is the multivariate regression, which is used extensively by all social sciences"); *id.* (Shapiro's method,

'expert intuition,' is neither normal among social scientists nor testable."); *id.* ([E]ven a lawyer knows enough to insist that experts follow scientific approaches normal to their disciplines").[5]

By their nature, Mr. Stuart's opinions are not subject to any scientific methodology like regression analysis, nor are they "testable," *see* Mot. at 7, quoting *Zenith*, 395 F.3d at 418, nor ordinarily subject to replication – although as noted above, others with comparable experience, or even less experience, can be expected to reach the same conclusions based on that experience. Ultimately, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 141. Given the nature and extent of Mr. Stuart's experience, and the fact that the opinions he offers are derived directly from that experience, which also allows Mr. Stuart to cogently explain the basis for his opinions, there can be little question that the opinions are reliable and the Court should exercise its discretion to find them reliable under FRE 702.

Finally, to the extent there may exist any doubt (and there should not be) whether Mr. Stuart's expert opinions are properly based on his experience, the matter can only be addressed upon hearing his testimony at trial – where he will articulate his experience, as well as the opinions based on that experience – not on a motion in limine.

## III. MR. STUART'S OPINIONS REST ON REAL-WORLD EVIDENCE, WHICH IS COMPELLING.

The government's next complaint, that Mr. Stuart's opinions are "unsupported," *see* Govt. Mot. at 10, rests on three alleged deficiencies in Mr. Stuart's analysis. First, that Mr. Stuart "never spoke with anyone at DOE" and therefore "does not know what DOE's planning and preparations actually entailed." Mot. at 11. The answer to this is that Mr. Stuart knows,

[5] It is worthwhile to observe here that like the rejected expert in *Zenith*, one of the experts proffered by the government, Dr. Neuberger, conceded at his deposition that although the opinions he offers criticizing Dairyland's expert Mr. Graves are subject to quantification, Dr. Neuberger did not quantify them. *See* 8/8/07 Neuberger Depo. Tr. at 42:19-44:13 (A14-A16).

like everyone else with any interest in the DOE spent fuel program, that DOE's planning documents for the program number in the hundreds, if not thousands. From early drafts in 1983 and 1984 of the Mission Plan required by the NWPA, to the final Mission Plan in 1985, to periodic program requirement documents, Annual Capacity Reports and the like, DOE's own plans for the program are fully laid out in an extensive public record. Thus, it has not been necessary for Mr. Stuart to speak with anyone at DOE to be familiar with DOE's planning. Instead, as a major industry participant interested in selling spent fuel casks as well as transportation and other services to DOE (and actually making such sales to DOE, through NAC), Mr. Stuart followed and read many of DOE's planning documents as they were released. Significantly, the great majority of those planning documents show that DOE intended to operate its spent fuel program using a 3000 MTU annual acceptance rate. That fact alone demonstrates rather clearly that DOE itself did not believe there were any technical impediments to operating at such a rate. In essence, Mr. Stuart's vast experience simply confirms DOE's own plans.

Second, the government claims Mr. Stuart's opinions are unsupported because "he relied exclusively upon a handful of personal industry experiences that were markedly different from the program contemplated and governed by the Standard Contract." Govt. Mot. at 12. But none of the purported "differences" the government cites have any bearing whatsoever on the issue of "technical impediments" to DOE's performance. Instead, the government cites such things as i) the "Standard Contract's peculiar constraints [presumably referring to the DCS process, etc.] do not apply in Europe," *id.*, ii) "Mr. Stuart performed no analysis of the political issues . . . in European countries," *id.*, iii) the U.S. Navy's extensive and successful transportation of its spent fuel over many decades involved "smaller and lighter" fuel, *id.* at 13, and iv) the European example Mr. Stuart cites did not transport 3000 MTU of spent fuel "for 24 years," which

according to the government does not support Mr. Stuart's "assessment that DOE could have accepted 3000 MTU per year from this nation's reactors within five years of 1998," *id.* at 12. At best, some of these are issues for cross-examination, not reasons to exclude Mr. Stuart's expert opinions.

Initially, the latter point is a red herring. As the government knows from Mr. Stuart's testimony in previous cases, nuclear utilities in Europe had no need for annual transportation of 3000 MTU until many years after the first nuclear plants were built there, and as the number of plants grew, the ability to transport *all* available spent fuel to the European reprocessing facilities grew commensurately. The European transportation program always met the need of utilities there for spent fuel transportation. This is shown by the chart attached hereto at A17, which derives from publicly available data reprinted in the December 2006 issue of Nuclear News magazine. And none of the other "differences" the government cites have any bearing on technical impediments to DOE's performance either. Finally, the government's complaint that Mr. Stuart did not analyze the "political issues" in Europe is curious, because whatever those issues were, they did not prevent the transportation throughout Europe of 2000-3000 MTU of spent fuel in every year since 1980.[6]

Third, the government labels Mr. Stuart's opinions an "oversimplified assessment of DOE's ability to perform" because "he neglects to account for the many substantial impediments

[6] Notably, the government does not mention the one "significant dissimilarity" that Mr. Stuart has testified about between spent fuel transportation in Europe and the United States, namely that because the European fuel is going to be reprocessed, the plants there do not store it for very long, and "the fuel is picked up when it's as young as only about 6 months out of the reactor. So it's very much hotter than we would see here in the United States, using the five year cooling criterion [of the DOE contracts]. . . approximately five or six times . . . [h]otter." Yankee Trial Tr. 1384:24-1386:23 (A4-A6); *see also* 1386:3 (A6) ("And the radiation is significantly higher"). The government does not mention this difference because as Mr. Stuart explains, the far cooler spent fuel in the United States is that much *easier* to transport than the hot European fuel.

to performance faced by DOE beyond mere issues of technical feasibility," citing, for example, "shifting legislative and administrative directives" and "lack of funding." Mot. at 13. This criticism explicitly has nothing to do with Mr. Stuart's opinions, which address *technical* feasibility, not the other issues the government cites. Moreover, for the most part, those other issues are within the government's control, and the government therefore is precluded from relying on them by *Winstar* and its progeny, *see United States v. Winstar Corp.*, 518 U.S. 839 (1996) (and the precedents *Winstar* relied upon, *see, e.g., Lynch v. United States*, 292 U.S. 571 (1934); *Perry v. United States*, 294 U.S. 330 (1935)). Oddly, the government specifically objects that Mr. Stuart "focused exclusively on issues relating to technical feasibility." Mot. at 11. But that is the subject on which he opines, and the other matters the government mentions are, therefore, not pertinent to the admissibility of Mr. Stuart's opinions.

The government mentions, as another "impediment" Mr. Stuart failed to consider, "scientific obstacles," without specifying what they are. Mot. at 13. To the extent the government is referring to matters that delayed Yucca Mountain, those also are irrelevant to the non-breach world that Mr. Stuart assumes, where DOE would have a place to store or dispose of spent fuel as its contract with Dairyland requires.[7] To the extent the government is referring to "scientific obstacles" that may impede the robust *operation* of the spent fuel program that Mr. Stuart opines is technically feasible, that is a matter for cross examination at trial. In Mr. Stuart's opinion, there are no such obstacles. Since the government cites nothing specific in its motion, there is no reason – or opportunity – to even consider this issue in addressing its motion.

[7] Surely the government is not attempting to argue that scientific obstacles have precluded DOE from having a place to store spent fuel. The DOE contract permits DOE to utilize any facility to meet its spent fuel acceptance obligations. Arts. I.10. and IV.B.1. And as evidenced by the many ISFISs constructed by utilities in light of the DOE breach, scientific obstacles have not blocked the development of such facilities.

In sum, the government's claim that the factors it cites "do not support" Mr. Stuart's opinions is largely correct. That is because those factors are simply irrelevant to his "technical feasibility" opinions. For the same reason, the factors the government cites do not detract from Mr. Stuart's opinions either. The government's argument on this point is actually rather strange, because it has not made any serious claim in other spent fuel cases that a DOE spent fuel program operating at 3000 MTU is *not* technically feasible. The government instead has relied primarily on its niggardly view of DOE's contract obligations. Indeed, DOE for the past many years has spent hundreds of millions of dollars each year to continue to develop its program, which according to the latest ACR/APR in 2004, Dairyland Ex. 588, DOE plans to operate at 3000 MTU/year. If the government wants to argue now that there are technical obstacles to the performance it has spent billions attempting to achieve, it must do so through evidence, not by attempting to preclude Mr. Stuart's testimony on the basis of arguments having nothing to do with technical feasibility.

Finally, in the lack-of-support section of its brief, the government suggests in vague language that Mr. Stuart "conceded" at his deposition that his opinion that DOE could "have accomplished the tasks necessary to commence acceptance of . . . SNF beginning in 1998" was "not subject to "a great deal of certainty.'" Mot. at 12 (citing 05/24/07 Stuart Dep. Tr. at 112:8-9). Of course, Mr. Stuart said nothing of the kind.[8] Indeed, Mr. Stuart's opinions are directly

---

[8] The deposition exchange was as follows, referring to the various preparatory steps that DOE would have to take to be ready by 1998:

> Q. Okay. What is the longest lead *item* for that, for the planning?
>
> A. I don't think you can say with a great deal of certainty what is the long lead item.

05/24/07 Stuart Dep. Tr. at 112:6-9 (A19) (emphasis added).

contrary to the government's assertion, and the government knows it because they quote the opinions in their motion. *See* Mot. at 2 ("Mr. Stuart intends to offer the following opinions at trial: (1) the acceptance of 3,000 MTU per year by DOE with a reasonable ramp-up beginning in 1998 would have been readily achievable if appropriate planning and preparations had started sufficiently in advance of the January 31, 1998 deadline set for in the Standard Contract[s]. . . . (2) sufficient advance work was clearly possible in view of the large body of experience in the transportation of spent fuel gathered by and/or available to DOE prior to and subsequent to 1983.").

In addition to rejecting the government's misdirected arguments as a basis for excluding Mr. Stuart, the Court should view with skepticism its misleading ones.

## IV. THE DOCUMENTS THE GOVERNMENT CITES AS "CONTRADICTING" MR. STUART'S OPINIONS DO NOT ADDRESS THE SUBJECT OF HIS OPINIONS.

The government next contends that Mr. Stuart's opinions are contradicted by pertinent documentary materials. Addressing those materials in reverse order of the government's presentation, it claims (second) that Mr. Stuart's opinions regarding "the viability of 'acceptance campaigns' to facilitate removal of Dairyland's SNF . . . are fatally undermined by the Standard Contract, which *prescribes* an entirely different and mutually exclusive method of acceptance." Mot. at 16 (emphasis). This claim is premised on the assertion that the DOE spent fuel contracts "obligate[] DOE to accept the nuclear utilities' SNF, including Dairyland's, on an OFF basis" – meaning oldest fuel first. Mot. at 17. In addition to the fact that the contract text says no such thing – it merely provides that "[t]he oldest fuel or waste will have the highest priority for acceptance, " *see* Pl. Ex. 62, Dairyland Contract, Art. IV. B. 5.(a) – the government's assertion is nonsense because the contract also expressly contemplates exchanges of acceptance priorities,

which by definition would *alter* the OFF ranking. And the contract also contains other express exceptions or departures form OFF, such as the provision allowing priority for shutdown plants and for emergency acceptances. *See Yankee,* 73 Fed. Cl. at 305 ("Having heard the evidence over a seven-week trial, and upon due consideration, the court concludes that exchanges would have occurred in the nonbreach world. DOE's partial breach(es) thwarted the market. . . . Exchanges in conjunction with campaigning would lessen the number of trips DOE would make to a particular utility, thus fostering efficiency and lessening environmental and other hazards. Certainly defendant is not advocating that DOE would implement the program inefficiently and at higher cost.").

But regardless of the parties' particular differences over construction of the DOE contracts, here again the government cannot simply assert its own contract construction as a basis for precluding Mr. Stuart's testimony. The sequence of acceptance in the non-breach world may be a disputed issue, but in offering his "technical feasibility" opinions, Mr. Stuart is entitled to rely on Dairyland's position that exchanges would occur. That is not even a legitimate basis for cross-examination of Mr. Stuart, and certainly no basis for excluding his opinions.

The government also says that certain "documents considered by Mr. Stuart in forming his opinions," in this case "contradict" his "assessment that, with better planning and preparation, DOE could have achieved performance at the 3,000 MTU rate . . . beginning in 1998." Mot. at 13. In support, the government states that "these materials demonstrate that numerous obstacles well beyond DOE's control contributed to its failure to begin accepting SNF in 1998."

This government argument, like the last one, is entirely beside the point because the "obstacles" mentioned in the documents it cites have nothing to do with the technical feasibility of DOE operating a robust program. All of the obstacles mentioned in those documents concern

impediments to the siting, development, licensing or funding of either Yucca Mountain or an MRS. *See* Mot. at 13-16. The government can no more rely on the absence of a spent fuel disposal or storage site in attacking Mr. Stuart than it can in defending against liability or damages in these cases. As a matter of law, DOE's contract obligations are "without qualification or condition," and DOE therefore cannot advance arguments that condition its performance on the absence of a disposal site. The D.C Circuit so held, twice, more than ten years ago. *Indiana Michigan Power Co. v. DOE*, 88 F.3d 1272 (D.C. Cir. 1996); *Northern States Power Co. v. DOE*, 88 F.3d 1272 (D.C. Cir. 1997). *See also* note 7, *supra*.

Moreover, these "obstacles" to the availability of a spent fuel disposal or storage site are not "technical" obstacles. As a technical matter the government could, if it wanted to, move commercial spent fuel to any one of a number of federal facilities in reasonably short order. The government has not done so mainly because it has focused all of its energy and attention on Yucca Mountain, for reasons of its own that the government itself could change tomorrow by legislation directing DOE to transport the spent fuel to any one of a large number of federal facilities. *Cf. Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 432 n.81 (2006) (referring to PG&E's dry storage facility, which is similar to an MRS: "The United States, with its vast resources of the most powerful nation on Earth, has failed, after nearly a quarter century, to accomplish a task that plaintiff, with limited resources, has accomplished in less than a decade.") The government's self-serving assertion that such matters are "beyond the control of DOE" is dubious at best, but even if they are, the funding and similar obstacles it cites are within the control of the government as a whole, and therefore any effort to rely on them is, here again, foreclosed by *Winstar* principles.

More to the point, the obstacles the government cites have nothing to do with Mr. Stuart's technical feasibility opinions – which concern DOE program *operations*, not *destinations* – and are no reason to preclude his testimony. Mr. Stuart properly assumes that in the non-breach world DOE would have a place to take Dairyland's and other utilities' spent fuel.

## V. MR. STUART IS QUALIFIED TO GIVE OPINIONS ON THE TECHNICAL FEASIBILITY OF EXCHANGES.

The government's final objection, that Mr. Stuart "is not qualified to opine on the subject of exchanges," Mot. at 18, is also entirely beside the point because, as the government notes in its motion, Mr. Stuart is not offering an opinion as to how exchanges would have worked if DOE had begun performance in 1998. *See* Mot. at 19. Mr. Stuart's opinions concern the technical feasibility of acceptance campaigns. The government knows this also, because it also quotes these opinions in its motion. *See* Mot. at 2 (Reporting, among opinions "Mr. Stuart intends to offer:" . . . (4) [available casks and nationwide rail and truck transportation] network could have been used for the acceptance of SNF in 'campaigns,' and it would have been flexible enough to accommodate exchanges of acceptance allocations amongst contracting utilities; and (5) there are no site-specific conditions that would have prevented DOE from utilizing acceptance campaigns to transport spent fuel from [Dairyland's reactor site,] LACBWR."

Mr. Stuart certainly believes exchanges of acceptance allocations would have occurred in the non-breach world, and has testified to that effect, but his opinions are addressed to the "technical feasibility" of exchanges and their necessary corollary, concentrated acceptance "campaigns." The government argues in various ways that Mr. Stuart is not qualified to testify about exchanges, but does not even suggest – much less assert – that he is not qualified to testify about the technical feasibility of spent fuel acceptance and transportation campaigns. His is qualified to testify on that subject, based on his own extensive experience transporting spent fuel

in concentrated campaigns, including doing so *at DOE's request* under a contract NAC had with the Department.

## CONCLUSION

For the reasons set forth above, the government's motion in limine to exclude Mr. Stuart's expert testimony should be denied, and he should be allowed to testify as an expert as well as a fact witness.

Respectfully submitted,

May 15, 2008

/s/ Jerry Stouck

JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3173 (Telephone)
(202) 261-4751 (Facsimile)

*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

*WDC 371,623,914v1 5/15/2008*

01323

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
V. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday, July 19, 2004

VOLUME 6

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

01382

moving 3,000 metric tons a year. As you can see from this chart, these two companies, one in each of these countries, have moved close to 3,000 and more than 3,000-tons many, many years, just starting '83 through '97.

In fact, France alone in 1996 almost achieved the 3,000 tons.

Now, both of these companies operate a fleet of large rail transportation casks. They're not quite as large as we've been talking about here in the United States, but they are large. And they operate about 40 casks each in their business.

And as I mentioned, they transport fuel from all over the world, except for the communist countries, former communist countries.

Q And except for the United States.

A And except for the United States.

Q Where does the data for this chart come from?

A This data comes from the NAC Fuel-Trac system that I believe has been discussed previously in testimony.

Q Okay. And I believe you said this, but just to make sure we've got it on the record, does this experience inform your opinions that a 3,000 MTU per

01383

year annual receipt rate would have been technically feasible if DOE had begun a program in 1998?

A Absolutely. I think this is probably the most convincing evidence that exists that that can be done.

THE COURT: The 100-ton cask that's being shipped, how many tons of that is the actual fuel?

THE WITNESS: In the case that of the Navy that I showed?

THE COURT: Let's do the Navy.

THE WITNESS: The Navy number, unfortunately, is still classified, but my guess is it's in the neighborhood of about 5 tons of fuel. The STC cask that I was pointing to is 10-tons. And the casks that these folks in Europe use is in the neighborhood of about 5 to 7 tons. That is per cask.

BY MR. STOUCK:

Q And perhaps on that score, just for clarification, if I may follow up the Court's question, there are different -- there are two principal designs for nuclear power reactors in this country; is that right?

A That's correct. In fact, around the world even. There is the boiling water reactor design that General Electric produced almost exclusively. And

01384
then the pressurized water reactor design which was produced by three different companies in this country, Westinghouse, Combustion Engineering, and Babcock & Wilcox.

Q And the fuel assemblies are different size; is that right?

A Yes. They are different sizes.

Q Just with respect to this 10-ton -- what I understood you to say the 10-ton capacity of the STC cask, for example, how many assemblies for each type of plant would that involve?

A For the pressurized water reactor type, say, for example, like Yankee Rowe, which is an older plant, older designs, that can handle, like, 36 of those assemblies.

The more modern design PWR, such as Connecticut Yankee would be 24, 26, depending on whether or not it's a canister mode or a bare fuel.

In the boiling water reactor case, the STC cask is not designed for boiling water fuel. But typical accommodation, say, for the UMS design is 57 BWR assemblies. The quantity of fuel in tons is about the same, 10 tons.

Q All right. Now, are there -- we're back to the European experience that's depicted on the chart

up here. Are there similarities between the logistics of what these European companies do with respect to the transportation of spent nuclear fuel and what the Department of Energy would have to do in this country?

A Yes, there is a great many similarities, and there is also a significant dissimilarity. Let me begin by saying the similarities, the plants are very similar. In fact, many of the plants are US designed. The casks that are used, of course, as I said, are large rail casks, so there's a similarity.

The fuel itself is very similar. It's generally referred to around the world as light water reactor fuel, boiling water or pressurized water type. And, again, much of the fuel was designed and built here in the United States.

The fact that they use multimodes for transportation is similar to what we would see here, that is rail, truck, and by boat or barge.

There is a -- so those are the similarities.

The dissimilarity is that because this fuel is going to be reprocessed, the power plants in Europe do not anticipate storing the fuel for any great length of time. And, in fact, the fuel is picked up when it's as young as only about 6 months out of the reactor.

01386

So it's very much hotter than we would see here in the United States, using the 5-year cooling criterion. And the radiation is significantly higher. All of which contributes to why they transport slightly less fuel in a large rail cask than we would plan to do.

Q Okay. When you say hotter, you're talking thermal heat?

A Yes. Thermal heat.

Q And can you give the Court some further understanding of the difference in thermal heat between 6-month cooled fuel, which you mentioned is transported in Europe, and say 5-year cooled fuel.

A The variation changes extremely rapidly after it leaves the reactor, so I don't have an exact number in my mind as I try to visualize the decay. But it's approximately five or six times.

Q Hotter?

A Hotter, yes. It comes down very rapidly and then it -- that is the amount of heat in the fuel when it's taken out of the reactor comes down very rapidly, and then it stays very constant for a very, very long time.

Q Now, do -- I think you mentioned the Sellafield and LaHague plants.

# SIGNIFICANCE OF CAMPAIGNED SPENT FUEL SHIPMENTS

J.W. Doman
WESTON/Rogers & Associates
955 L'Enfant Plaza
Washington, D.C. 20024
(202) 646-6751

T.E. Tehan
Pacific Nuclear
7555 E. Collins Rd.
Morris, IL 60450
(815) 942-4700

## ABSTRACT

Operational experience associated with spent fuel or irradiated hardware shipments to or from the General Electric Morris Facility is presented. The following specific areas are addressed: problems and difficulties associated with meeting security and safeguard requirements of 10 CFR Part 73; problems associated with routing via railroad; problems associated with scheduling and impact on affected parties when a shipment is delayed or cancelled; and impact on training when shipments spread over many years. The lessons learned from these experiences indicate that spent fuel shipments are best conducted in dedicated "campaigns" that concentrate as much consecutive shipping activity as possible into one continuous time frame.

## INTRODUCTION

The General Electric (GE) Morris Facility in Morris, IL is the only independent spent fuel storage installation licensed by the US Nuclear Regulatory Commission (NRC) that has received spent fuel from several different reactors. GE holds the first 10 CFR Part 72 license issued by the NRC and, prior to 1987, owned and operated a fleet of four spent fuel shipping casks (the IF-300 series).

Starting in 1972, GE has shipped 3455 assemblies to or from this facility. GE has conducted seven major campaigns and provided training and support services to the participating utilities on use of the IF-300 cask. GE's extensive experience provides a source of information that could be of significant benefit to the Department of Energy (DOE) when spent fuel shipments are initiated in early 1998. This paper provides, in narrative format, examples of how a "campaign," as opposed to small grouped shipments based on the Annual Capacity Report (ACR), enhances operations for both the DOE and the utility.

## THE STARTING POINT

Initiation of spent fuel shipments from reactors to a storage facility, such as the GE Morris Facility, is a very labor and time consuming task. Thousands of details must be addressed before the first assembly can be shipped. Foremost among these is the availability of the reactor and reactor site personnel. For all the GE campaigns, early and continual interaction with site personnel was essential to initiating and carrying out a successful campaign. All GE shipments were scheduled according to reactor site availability: that is, shipments were only made between refueling outages and the shipments were interrupted or postponed if an event occurred that required diversion of manpower away from the shipping campaign.

GE participated in seven shipping campaigns. These were: Haddam Neck (1972-1987), San Onofre (1972-1980), Point Beach (1975-1977 and 1983-1984), La Crosse (1979 and 1981), Dresden (1975-1977), Cooper (1984-1989), and Monticello (1884-1987). The early shipments (i.e., those prior to enactment of the NRC safeguards and security regulations in 10 CFR Part 73 in 1980) were considered outside the scope of this paper as they were completed under greatly simplified conditions. An interesting note, however, is that none of these early shipments, which accounted for 1220 assemblies in 505 separate shipments, experienced any sabotage, accident, misrouting, or civil event that could have jeopardized the shipment. Scheduling and routing were performed by private entities, in a completely unencumbered and interactive process that accommodated cancelled or delayed shipments.

## THE BEST LAID PLANS OF MICE AND MEN

The following sections of this paper provide "stories" that describe events that occurred in conjunction with spent fuel or irradiated waste shipments in which GE played a role, either as shipper or recipient. The narratives are considered "stories" in that they are based upon the best available information. The best source of information was the historical files still maintained at the GE Morris Facility. One source was the Campaign Plan that was written prior to initiation of spent fuel shipments. Another excellent source were the Campaign Reports that were written upon completion of each shipping campaign. In addition to these resources, several current and former GE employees were contacted and their recollections of events were taken into account.



PLAINTIFF'S EXHIBIT 272 04-106

PA-222512

## STORIES ABOUT SECURITY

The 10 CFR Part 73.37 safeguard requirements for spent fuel shipments are the primary reason for having dedicated train shipments. The logistics of providing security personnel and arranging for their return to their home base after completion of the spent fuel shipment requires as much time to complete as the determination of the specific route to be taken. All shipments made to and from the GE Morris Facility after the promulgation of safeguards and security regulations were made by dedicated train or truck. Truck shipments are, by their very nature, dedicated since the shipping cask is the only package in the shipment.

The Cooper shipments, initiated in late 1984, were the first large scale train shipments of commercial spent fuel that required armed escorts. Requirements dictate the escorts must have continual visual observation of the rail casks. It was obvious from the beginning of planning that allowing the shipments to go "general freight" under a published tariff would incur large time delays as the railroads could take as long as five days to deliver a railcar from Cooper to Morris. This perception was true as the average return time for empty casks to Cooper as "general freight" was five days. Expedited service was essential to avoid having the armed escorts sit in the caboose for observation of the railcars while waiting for pickup and continuation of the trip. The Cooper shipments were made under a negotiated contract for a dedicated train, wherein the shipment consisted of two IF-300 casks, with buffer cars separating the casks from the locomotive and the cabooses. The train was limited to 35 mph, had to traverse only Class A track, and received expedited interchange with other rail carriers.

The Cooper shipments, traversing a distance of 560 miles, took approximately 28 hours to reach Morris via dedicated train. Security was provided by two armed escorts traveling in a caboose behind the rail casks. Nebraska Public Power District (NPPD), the owner and operator of Cooper Nuclear Power Station (NPS), chose to use a chase vehicle to follow the rail shipment for observation and first response in case of sabotage or emergency situation. No emergency response training was provided to local law enforcement agencies along the rail route.

A pre-arranged shift change occurred about half way through the trip to Morris. Two new armed escorts and two new personnel for the chase vehicle were flown via corporate plane to the pre-arranged meeting point in Iowa. The off-going armed escorts and the off-going chase vehicle crew were then flown back to Nebraska by the corporate plane. The replacement armed escorts and chase vehicle crew accompanied the rail shipment to Morris, stayed overnight in the area and then returned to Nebraska the following day. The return trip, which was made in the chase vehicle, took over 10 hours in good weather. In addition to the armed escorts and chase vehicle personnel, shipments were also accompanied by a health physicist who rode in the caboose for the entire trip.

Coordination of security took tremendous effort to establish. Once the initial trips were over, and people became familiar with what was required and how it affected their lives (necessity to be absent from home for up to three days) things ran smoothly. The lesson to be learned: security logistics affect personnel and must be planned and explained well. This takes time.

## STORIES ABOUT ROUTING

One would think that routing a spent fuel shipment would be relatively easy. After all, there are only so many ways to get to point A from point B, and for spent fuel shipments, that means the interstate highway system for truck shipments and the most direct rail route available.

The events associated with the shipment of irradiated hardware from the Duane Arnold Energy Center (DAEC), Iowa Electric Light and Power Company (IE), to the US Ecology waste disposal site at Hanford, WA provides an example of how a routing exercise can go array[1]. While this shipment was not a spent fuel shipment, and consequently not under safeguards requirements of 10 CFR 73.37, it was, however, a "waste" shipment, as defined in 10 CFR 71.97, and required notification to states seven days prior to commencement of shipment.

The planned shipping route was as follows: Iowa Northern Railway to Cedar Rapid, IA; interchange to the Chicago Central & Pacific to Omaha, NE; interchange to Burlington Northern (BN) to Pasco, WA; and interchange to Washington Central for final delivery to Hanford, WA. The shipment left DAEC on 12/12/86. On 12/15/86 it was traced to Willmar, MN, which was not on the planned route and Minnesota had not received prior notification. When the NRC was notified of the misrouted railcar, they requested that it be immediately stopped and turned around. Re-routing a railcar is more difficult than re-routing a truck shipment; as the train has to taken to the nearest yard, the cask railcar separated from the train and reassembled into a train going in the right direction. However, as requested by the NRC the railcar was turned around and rerouted to Omaha, NE. It then proceeded to Hanford without any further difficulties.

The misrouting was traced to miscommunication between BN marketing personnel and BN operations. While BN marketing personnel understood GE's obligation to control the route and to provide advance notification to states along the route, marketing personnel failed to pass this requirement on to operations personnel. The Bill of Lading details only the interchange points, and the yard master did not know of any reason not to move the railcar on the first available train. Why the railcar was routed east and north, rather than west to Lincoln, NE, is not known. The lesson to be learned: expect surprises, especially with the first shipment. Had additional shipments been made from DEAC, personnel would have known the correct routing and such an error likely would not be repeated.

STORIES ABOUT SCHEDULING

10 CFR Part 73.37 requires a seven day advance notification to states concerning spent fuel shipments through or into a state. This is for emergency response awareness. While this sounds like a simple requirement, practicing advance notification can be a challenging exercise.

In 1984 GE initiated spent fuel shipments from Morris to the Wisconsin Electric Power Company (WEPCO) Point Beach nuclear power station in Two Rivers, WI[2]. These shipments were made by truck, with Tri-State Motor Transit (TSMT) providing the carriage as a contract carrier. The shipments were scheduled in conjunction with WEPCO to coincide with reactor activities and availability of site personnel. Since spent fuel was also going to Point Beach from West Valley, NY at the same time the GE shipments were to occur, WEPCO wanted to avoid simultaneous arrival of two casks from different shippers.

Many meetings were held prior (six months in advance) to the first shipment to work out the details. Participants in the meetings were: GE, WEPCO, the Grundy County Sheriff's Police, the Emergency Services and Disaster Agency (ESDA), the Illinois State Police, Wisconsin Department of Health and Environmental Control, Nuclear Assurance Corporation (NAC) the provider of the truck cask, Tri-State Motor Transit, Illinois Department of Nuclear Safety (IDNS) and the NRC (both Headquarters and regional office personnel).

GE used a single notification letter to schedule up to ten individual shipments at a time. There were 109 shipments to Point Beach and twelve separate letters were issued. The notification letters were sent to NRC Headquarters, NRC Region III in Glen Ellyn, IL, the State of Illinois, the State of Wisconsin, Point Beach NPS, Tri-State Motor Transit, and the contract security firm of Burns International. All scheduling and time departure information is safeguards information and must be protected against public disclosure until 10 days after completion of the shipment.

Once a notification letter was sent, the schedule was not changed. If a shipment could not be made within a six hour time frame the shipment was cancelled. For any delay in shipment of more than two hours, GE provided notification to the affected parties. While this delay notification was not required by 10 CFR Part 73, the extra communication helped all parties to keep abreast of potential changes in the schedule. This helped with any subsequent reallocation of personnel if a shipment was cancelled. Notifying all parties about schedule changes due to late or cancelled shipments was difficult, as all phone conversations had to be performed in code. For example, a cancelled shipment would be identified as item #6 on the letter to the Governor dated December 20, 1984. Repetition and patience proved the best way for all parties to understand what was happening.

There were 37 shipment cancellations due to a variety of reasons. The most common reason for failure to make a shipment was failure of transport equipment. Of these, two shipments were cancelled due to unexpected activation of the vehicle disabling device, which did in fact work very well. There were five cancellations for weather; i.e., ice, snow, fog or bitter cold. The lesson to be learned: shipments never go as planned, and schedules have to be changed. It takes time for people to become familiar with application of safeguards requirements, and communication improves as time goes by.

Side Note #1 about Scheduling - Public Awareness

Initial discussions with the States of Illinois and Wisconsin were held six months prior to initiation of the WEPCO shipments. The most direct route to Wisconsin took the shipment on the Tri-State Tollway (I-94). Because of high traffic on the Tollway during normal rush hours, the Tollway Commission requested that all shipments be scheduled to occur at low traffic times; namely sometime between 1 AM and 4 AM. While there was no specific requirement to alter shipments for such a request, it was in the best interest of all parties. Therefore, GE and WEPCO agreed to arrange the shipments accordingly.

Side Note #2 about Scheduling - Public Awareness

When the spent fuel shipments were to begin between the Northern States Power (NSP), Monticello Nuclear Power Station outside Minneapolis, MN, and the GE Morris Facility, the route selection process was relatively simple. The Burlington Northern (BN) railroad served the Monticello reactor site, and only one interchange - with the Elgin Joliet and Eastern (EJ&E) - was required to get to the Morris Facility. However, as soon as the local media found that radioactive waste shipments were to be transported through the state, and by necessity through downtown St. Paul, MN, a wave of local concern was expressed by grass-roots groups along the proposed route. In an effort to address the concerns of local communities and to be responsive to all individuals, GE, NSP, and the BN embarked on a public meeting program to provide information to these groups. During the six months prior to the actual initiation of the spent fuel shipments, over a dozen meetings were held. GE brought in their health physicist public relations speaker from California to assist the speaking talent available at Morris. Both NSP and BN provided excellent support. Since all parties involved in the shipments were working for a common goal, and since they were of the same general consensus that the shipments would be completely safe and conducted entirely within the realm of all applicable regulations, the three parties worked very well together and provided a uniform message to the public. Consequently, all Monticello shipments were scheduled to leave the reactor site such that they would pass through St. Paul between 1 AM and 3 AM. Even at those times, the initial shipments had media coverage and protestors present. Only after extended passage of time, and the onset of bitter cold weather, did the protestors

cease and the media lose interest in the non-newsworthy spent nuclear fuel shipments. The lesson to be learned: once a campaign is underway, and news coverage has died down, keep the campaign going for as long as possible. If shipments are terminated and restarted at a later date, it will only serve to reopen perceived safety issues.

Side Note #3 about Scheduling - Safeguards Information

Even though GE, NPS, and the BN followed safeguard and security requirements to the letter of the law, safeguards information was readily leaked from unknown sources within the multitude of agencies that had to be notified. Many of the incidents occurred simply because the final user of the safeguards information (shipping schedule) was not informed by the initial recipient of the safeguards information that disclosure was prohibited. For example, the first notification letter sent to the State of Wisconsin for the WEPCO shipments was inadvertently given to the news media. To compensate for a possible reduction in security, additional measures were taken, as agreed upon with the NRC, for the remainder of shipments that were identified in the disclosed notification letter.

STORIES ABOUT TRAINING

Initial training for the Cooper shipments occurred in December 1982, with the anticipation that shipments would be initiated in early 1983. Training of approximately ten NPPD individuals was completed in a two-week period. Two GE individuals, knowledgeable in operation of the IF-300 cask, were provided for training. In addition to site training, this program was also the "dry-run" of the IF-300 cask through the facility. Prior to the training, the generic IF-300 cask handling procedure was rewritten into a site specific procedure, cask interface problems were identified and modifications to plant structures and procedures completed and a training and certification program developed by NPPD. The dry-run revealed that several changes were necessary. A cask lead-in adapter, identified earlier as necessary for cask handling operations, was found to provide an interference fit and could not be used. The dry-run demonstrated the ability of site personnel to place the cask in the pool set-down area by visual manipulation; no small task as only 1/2" clearance existed between the cask and the set-down area's curb.

As it turned out, the Cooper shipments were not made until late in 1984. Postponement occurred for a variety of reasons: it took longer than anticipated to complete the shipping contract with BN; fuel ownership and financial liability questions between GE and NPPD took longer to complete then anticipated; several months were lost due to a piping replacement project at the reactor that necessitated immediate and concentrated effort of all site personnel; and finally, when all was ready to ship, the Missouri River overflowed its banks, producing a "100 year" flood that covered large sections of the rail track leading to the site. Only after the waters receded could the damage be assessed and repairs made.

When it was clear that all issues were resolved and shipping was imminent, a retraining of Cooper personnel was required since they had to be certified on an annual basis. When GE returned to Cooper to perform the training, it was observed that only about half of the class had received the earlier training. The loss of personnel previously trained in cask handling necessitated a complete repeat of the two week program.

The Cooper campaign was conducted in four segments due to refueling priorities at the site. The loss of personnel previously trained in cask handling was found to occur after each outage, though not to the extent observed during the initial delay of shipments. Efficiency of each crew was reduced until the new members were trained and had participated in a cask turnaround. The lesson to be learned: once people are trained and working crews become familiar with cask turnarounds and personnel know their individual role and responsibilities, it is better not to disrupt the flow of casks. Keep the campaign going for as long as possible.

WHAT MAKES SENSE

The very thought of modifying the Standard Contract to allow grouping of spent fuel shipments into campaigns brings fear to the brave of heart. There are many equity issues that would need to be addressed and reopening the Standard Contract could bring in a flood of unwanted and unnecessary changes. However, it has to be realized that there are more cost effective methods for transfer of spent fuel to the Federal Government than reliance on an artificial annual allocation of "metric tonnes uranium" (MTU) to the purchasers under the Standard Contract. Adherence to the "oldest fuel first" has merit and was the basis of the Standard Contract; however, strict application of the delivery allocations listed in the Annual Capacity Report (ACR) could lead to poor deployment of valuable resources. For example, consider the annual allocations given to NPPD for the first ten years of operation of the Federal system, as listed in Table 1.

This schedule shows NPPD delivering 23.5 MTU and 13.4 MTU in years 4 and 5 respectively. Year four's allocation of 23.5 MTU is equivalent to approximately three BR-100 cask payloads, or one train shipment consisting of three casks. Year five's allocation of 13.8 MTU is equivalent to approximately two BR-100 cask payloads, or one train shipment of two casks. There is no reason to spread these shipments over two years as Cooper can easily handle five cask loads between fuel outages within one year.

A similar analysis made for the remaining Cooper shipments, shown in Table 1, indicates that years 7, 8 and 9 could be more efficiently combined to reduce the unnecessary starting and stopping of fuel shipments. The MTU allocations for these three years could be combined into one year in which 11 cask loads of spent fuel would be shipped.

PA-222515

TABLE 1 - NPPD (Cooper) ALLOCATION (ACR and Modified)

| ACR Allocation Schedule | | Modified Schedule | |
|---|---|---|---|
| Delivery Year | MTU | MTU | BR-100 |
| Year 1 (1998) | --- | --- | |
| Year 2 (1999) | --- | --- | |
| Year 3 (2000) | --- | --- | |
| Year 4 (2001) | 23.5 | --- | |
| Year 5 (2002) | 13.8 | 37.2 | 5 casks |
| Year 6 (2003) | --- | --- | |
| Year 7 (2004) | 31.2 | --- | |
| Year 8 (2005) | 28.7 | 81.8 | 11 casks |
| Year 9 (2006) | 21.0 | --- | |
| Year 10 (2007) | --- | | |
| Total | 118.2 | 119.0 | |

Extension of this philosophy, namely grouping of annual allocations designated in the ACR into shipping campaigns, could be accomplished for all purchasers under the Standard Contract. This would not significantly alter the "long-term" net effect of using the oldest fuel first criteria (as the designated 10 year total could still be maintained), though, in the short-term the annual allocations would be altered. To make this concept viable, all purchasers under the Standard Contract must be willing to alter their annual allocations for the good of the overall system. The net result is a tremendous savings of time and labor not only for the DOE but for each individual purchaser.

This conclusion is not in conflict with the minimum campaign size study[3] conducted in 1992 for the DOE by Oak Ridge National Laboratory, Transportation Operations Project Office. This study evaluated six attributes (cask utilization, number of sites visited annually, number of new sites visited annually, campaign size, delivery rights, and pool storage) that were identified as providing quantitative measures of the effectiveness of establishing minimum campaign sizes. The study indicated that application of "minimum campaign sizes" does not produce significant benefits or drawbacks to the transportation system. The study also noted that it did not address benefits to individual shippers that would occur because of enhanced operational efficiency. This paper has severed to identify those areas where non-quantifiable benefits can be achieved.

Any study to quantify the operational benefits of campaigned spent fuel shipments would be complex and many assumptions would have to be made as to what constitutes the "baseline" system to which the "campaign-based" system is compared. Such analyses are highly subject to the assumptions that are made. Instead, justification for the campaign-based shipments is predicated on the overall desire of individuals to simplify the shipping process. The narratives presented in this report were to illustrate that spent fuel shipments are very complex. Anything one can do to take advantage of the "learning curve," through redundant and consecutive operations should be done. The savings will come as a result of following this philosophy.

Side Note #1 about Cooper - Cask Interface

While the GE spent fuel shipments from Cooper were made with the IF-300 rail cask, additional rail shipments from Cooper may not be feasible. The BN has filed for abandonment of the rail line from Brownville, NE to the Cooper site and the rail bed is not being maintained. The draft Site Modal Summary[4] has identified the Cooper site as not having rail access. The analysis of Cooper shipments presented in Table 1 assumes that rail access is maintained and that the capacity of the BR-100 cask is 21 PWR and 40 BWR assemblies. Lesson to be learned: site conditions change. Interface capabilities identified in the DOE transportation planning documents, such as the Site Modal Summary, will be different when the time comes to actually ship fuel. Shippers will make modifications that are cost effective and enhance their ability to ship.

CONCLUSION

The one item that became apparent in the preparation of this paper, though difficult to quantify, is the need to minimize changes and uncertainties associated with spent nuclear fuel shipments. Spent nuclear fuel shipment efficiency can be maximized through effective training and repetition of tasks, best achieved by continuation of shipping campaigns for as long as possible.

It is suggested that the Annual Capacity Report (ACR) could be modified to allow grouping of annualized allocations into a few shipping campaigns. This would minimize disruptions of normal reactor site operations. The long-term effect (over 10 year period) of this reallocation would be consistent with the "oldest fuel first" criteria upon which the ACR is based.

REFERENCES

1. Internal GE memo, S.P. Schmid to T.E. Ingels, "Misrouting of Railcar GEX 50,000," (December 1986).

2. Internal GE report, S.P. Schmid, "Fuel Returns from Morris Operation to Point Beach Generating Station - Final Report - Campaign 83-18," (January 1985).

3. Draft document, "Effects of Imposing Minimum Campaign Sizes on Spent Nuclear Fuel Shipments to the Civilian Radioactive Waste Management System," Oak Ridge National Laboratory, Martin Marietta Energy Systems, Inc., Science Applications International Corporation, (July 1992).

4. Draft document "Site Modal Summary," Oak Ridge National Laboratory, Martin Marietta Energy Systems, Inc., Science Applications International Corporation, (June 1991).

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------:
DAIRYLAND POWER COOPERATIVE :
:
Plaintiff , :
vs. : Civil Action No.
: 04-106C
UNITED STATES OF AMERICA :
:
Defendant . :
--------------------------------:

Washington, D.C.

Wednesday, August 8, 2007

Deposition of:

JONATHAN A. NEUBERGER, PhD

called for oral examination by counsel for Dairyland, pursuant to notice, at Greenberg, Traurig, 800 Connecticut Avenue, N.W., Washington, D.c., before Ronald E. Bennett, of Capital Reporting Company, a Notary Public in and for the District of Columbia, beginning at 9:12 a.m., when were present on behalf of the respective parties:

 ©2007



1eac65e9-97d1-46c2-83f0-6e9652e239fe

parameters on even a range of robustness that is generally recognized by economists as good enough or not good enough?

MR. BRYAN: Objection. Vague.

THE WITNESS: Again, I think imposing rules like that really isn't consistent with what would be appropriate in the legal setting. I can certainly, and I talk in my report about some of the variations in, for example, the costs to Dairyland to accelerate its spent fuel acceptance.

And I note the extent of variability in some of those predictions. But I haven't specifically put a boundary around the range of those predictions to say that, if the numbers were within this range, it would be reliable. If they fall outside this range, they are not reliable. I'm not aware of any such boundaries or rules that would inform the court.

Q. I want to go back actually to the previous question and answer when I asked whether you would employ techniques for testing robustness, and you said you hadn't. Why didn't you employ techniques

that are available to economists to quantify robustness of a model? Why don't you think that would have been helpful to the court?

MR. BRYAN: Objection. Vague. Compound.

THE WITNESS: As an economist, I can present the range of results that Mr. Graves gets in some of his sensitivity analyses. And I do that. I described some of those rages certainly with respect to the costs to Dairyland to accelerate its acceptance.

The problem there, the issue there, as I see it, is translating that range into a rule of some sort that the court could then say, okay, this violates that rule, therefore, it's not reliable.

All I can do, I believe, is to indicate to the court what the weaknesses are in this modeling framework and why I believe the results are not robust. It's then up to the court to say this is sufficiently non-robust for me to exclude it as unreliable. That's a determination I believe that the court can make.

Yes, there are quantitative measures of

that variability. And it would not be difficult for me to talk about that. In my report I don't, however. I simply present the results and my conclusion that these results are sufficiently variable that they should not be considered reliable by the court. But the court makes that ultimate determination.

So, sure, the quantitative measures are there. I could have used them. Instead I chose to describe the results. And to draw my conclusion. And then allow the court to draw its own as well, based on whatever weight it gives my testimony and whatever weight it gives Mr. Graves's testimony.

Q. Did you not use the quantitative measure of variability because of your concern, if you had run those, they might actually bolster Mr. Graves's opinion that his model is robust enough?

A. Absolutely not.

Q. And since you didn't run any of your own sensitivities on Mr. Graves's model, to the extent you're looking at the variability of the results of Mr. Graves's model, you really are just looking at


Nuclear Plants Generating SNF for European Transport Program
Number of Plants
0
50
100
150
200
250
Years from 1960-1989
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Case No. 04-106C (Chief Judge Damich)

DAIRYLAND POWER COOPERATIVE, )
Plaintiff, )
v. )
UNITED STATES, )
Defendant. )
_________________________________________)

DEPOSITION OF IVAN STUART

Thursday, May 24, 2007

Washington, D.C.

Reported by: Mary Ann Payonk, CRR-RDR
Certified Realtime Reporter
Job No. 0705

seven years before you expect to start the program, definition being "start the program" is the first cask heads out to a site, somewhere in that neighborhood is a reasonable amount of time for the planning.

Q Okay. What is the longest lead item for that, for that planning?

A I don't think you can say with a great deal of certainty what is the long lead item. The reason I say that is, for example, the ability to hire people kind of fluctuates from time to time. But I -- I tend to think that actually, the procurement of the casks, the cask fleet, might well turn out to be the pacing item, so to speak, the long lead item. That's how I would characterize it.

Q Okay. Is the period that it takes a function of resources?

MR. SHAPIRO: Objection, vague.

A That's what I meant when I said hiring people is resources. In terms of the casks, obviously, the department wouldn't build them itself. It would go to manufacturers or cask suppliers and so they are resources.

Q Uh-huh.

A So, yeah, it's quite dependent on