No. 04-106C
Chief Judge Damich

(Filed Electronically, May 15, 2008)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

# DAIRYLAND'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE ADMISSION AT TRIAL OF DOCUMENTS PREPARED BY GOVERNMENT CONTRACTORS

JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3173 phone
(202) 261-4751 fax
*Counsel for Plaintiff*
Dairyland Power Cooperative

Of Counsel:
ROBERT L. SHAPIRO
KEVIN E. STERN
Greenberg Traurig, LLP

TABLE OF CONTENTS

Page

I. DOE FULFILLS ITS MISSION THROUGH CONTRACTORS ........ 3

II. THE DOCUMENTS ARE ADMISSIBLE AS STATEMENTS OF AGENTS OR SERVANTS ........ 7

III. THE DOCUMENTS ARE PUBLIC RECORDS ........ 10

IV. THE DOCUMENTS ARE ADMISSIBLE AS AUTHORIZED STATEMENTS. ........ 16

V. THE DOCUMENTS ARE NOT HEARSAY WHERE THE GOVERNMENT HAS "MANIFESTED AN ADOPTION OR BELIEF" IN THEIR TRUTH ........ 19

VI. SOME OF THE DOCUMENTS ARE ALSO ADMISSIBLE AS A PARTY'S OWN STATEMENTS ........ 21

VII. THE DOCUMENTS FALL WITHIN OTHER EXCEPTIONS TO THE RULE AGAINST HEARSAY ........ 21

A. The Documents Are "Business Records" Admissible Under FRE 803(6) ........ 21

B. Certain Documents Are Ancient And Therefore Admissible Pursuant To FRE 803(16) ........ 21

VIII. THE GOVERNMENT'S OBJECTIONS THAT SOME OF THE DOCUMENTS ARE DRAFTS GOES TO WEIGHT AND NOT ADMISSIBILITY ........ 22

IX. CONCLUSION. ........ 22

# APPENDIX INDEX


| | |
|---|---|
| Deposition Transcript Excerpt - Thomas Pollog, 5/22/2005 | 1-3 |
| Deposition Transcript Excerpt - Darrell Newman, 4/17/2002 | 4-6 |
| Deposition Transcript Excerpt - David Zabransky, 4/18/2002 | 7-9 |
| DOE News Press Release 9/16/1998 | 10 |
| Pacific Northwest National Laboratory, About the Lab | 11 |
| Yankee Atomic v. United State Trial Transcript Excerpt | 12-13 |
| Dairyland Exhibit No. 175 (excerpt) | 14-15 |
| Dairyland Exhibit No. 184 (excerpt) | 16-17 |
| Dairyland Exhibit No. 134 (excerpt) | 18 |
| Dairyland Exhibit No. 136 (excerpt) | 19-20 |
| Dairyland Exhibit No. 158 (excerpt) | 21 |
| Dairyland Exhibit No. 166 (excerpt) | 22 |
| Dairyland Exhibit No. 189 (excerpt) | 23 |
| Dairyland Exhibit No. 219 (excerpt) | 24-25 |
| Dairyland Exhibit No. 255 (excerpt) | 26 |
| Dairyland Exhibit No. 405 (excerpt) | 27 |
| Dairyland Exhibit No. 91 (excerpt) | 28 |
| Dairyland Exhibit No. 162 (excerpt) | 29 |
| Dairyland Exhibit No. 329 (excerpt) | 30-31 |
| Dairyland Exhibit No. 275 (excerpt) | 32 |
| Deposition Transcript Excerpt - Nancy Slater, 4/21/1999 | 33-34 |
| Dairyland Exhibit No. 134 (excerpt) | 35-36 |
| Deposition Transcript Excerpt - Nancy Slater, 4/21/1999 | 37-38 |

TABLE OF AUTHORITIES

Cases

*Becton v. Starbucks Corp.*, 491 F.Supp.2d 737(S.D. Ohio 2007) ..................................................... 8

*Bradford Trust Co. v. Merrill Lynch*, 805 F.2d 49 (2d Cir. 1986)........................................... 10, 11

*Brubaker Amusement Co. v. United States*, 304 F.3d 1349 (Fed. Cir. 2002) ................................ 7

*Butler v. Southern Pacific Co.*, 431 F.2d 77 (5th Cir. 1970) ...................................................... 11

*Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F. 3d 742 (7th Cir. 1998)................................... 8

*Columbia First Bank v. United States*, 58 Fed. Cl. 333 (2003) ................................................... 21

*United States v. Hopkins*, 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976) ......................... 13

*Erickson v. Baxter Healthcare, Inc.*, 151 F.Supp.2d 952 (N.D. Ill. 2001) .................................. 14

*Glendale Federal Bank, FSB v. United States*, 39 Fed. Cl. 422 (1997) ...................................... 18

*Horvath v. Rimtec*, 102 F. Supp. 2d 219 (D.N.J. 2000)............................................................. 19

*Lockheed Martin Corp. v. United States*, 50 Fed. Cl. 550 (2001) .............................................. 12

*Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.*,
951 F.2d 613 (4th Cir. 1991) ............................................................................................ 16, 18

*Pappas v. Middle Earth Condominium Ass'n.*, 963 F.2d 534 (2d Cir. 1992) ................................ 8

*Paul v. Federal Mine Safety & Health Review Comm'n*, 812 F.2d 717 (D.C. Cir. 1987 ............... 8

*Pacific Gas & Electric Co. v. United States,* 73 Fed. Cl. 333 (2006)................................ 2, 17, 18

*Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292 (9th Cir. 1983) .......................... 18

*Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246 (Fed. Cir. 2000)....................................... 8

*Smith v. Isuzu Motors Ltd.*, 137 F. 3d 859 (5th Cir. 1998),
*cert. denied*, 525 U.S. 1142 (1999)......................................................................................... 14

*United States v. Frazier*, 53 F.3d 1105 (10th Cir. 1995) ............................................................ 21

*United States v. Lykes Bros S.S. Co.*, 432 F.2d 1076 (5th Cir. 1970).......................................... 13

*United States v. Nordic Village*, 503 U.S. 30 (1992)................................................................. 11

*United States v. Rollins*, 862 F.2d 1282 (7th Cir. 1988) ........ 20

*Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544 (2003) ........ 20, 22

*Westinghouse Elec. Corp. v. United States*, 1997 WL 108204 (Fed. Cl. June 4, 1997) ........ 4

*Yankee Atomic Electric Co. v. United States*, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) ........ passim

Statutes

42 U.S.C. § 10222(d) ........ 3

42 U.S.C.10222(d) ........ 3

48 C.F.R. § 17.604 ........ 5

48 C.F.R. §17.601 ........ 4

Rules

FRE 803(6) ........ 21

FRE 801(d)(2)(A) ........ 15, 21

FRE 801(d)(2)(B) ........ 19, 20, 21

FRE 801(d)(2)(C) ........ passim

FRE 801(d)(2)(D) ........ 7, 10

FRE 803(8)(A) ........ passim

Regulations

48 C.F.R. § 17.60 ........ 4, 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 04-106C<br>(Chief Judge Damich) |

DAIRYLAND'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE ADMISSION AT TRIAL OF DOCUMENTS PREPARED BY GOVERNMENT CONTRACTORS

The government moves to preclude from trial the admission of nearly 140 documents prepared by Department of Energy ("DOE") (or parts of DOE that the government inexplicably seeks to disavow), which generally speak to DOE's research and planning relating to the disposal of commercial spent nuclear fuel. The government's basis for the exclusion of these otherwise relevant and probative documents is that they were prepared by DOE contractors. This is at least the fifth spent fuel case in which the government has made these arguments. This Court has not thus far been persuaded by the government's arguments. The Court denied the government's challenges to the admission of contractor documents in both *Yankee Atomic Electric Company v. United States*, No. 98-126C ("*Yankee Atomic*"), and *Pacific Gas & Electric Co. v. United States,* Nos. 04-74C, 04-75C ("*PG&E*"), and soundly rejecting the merits of the government's contentions. In *Yankee Atomic* Judge Merow held, in part, that such contractor documents are admissible as public records under Federal Rule of Evidence ("FRE") 803(8)(A) as "records, reports, [etc.] of public offices or agencies setting forth the activities of the office or agency." *Yankee Atomic*, 2004 WL 2450874, at *7 (Fed. Cl. Sept. 17, 2004). In *PG&E*, Judge Hewitt

"agreed with the *Yankee Atomic* court's findings and adopted its reasoning in full with respect to [FRE] 803(8)(A)," but also held the contractor documents admissible "as admissions of a party-opponent under [FRE] 801(d)(2)(C)." *PG&E*, 73 Fed. Cl. 333, 439 (2006).[1] Judge Lettow denied as moot the government's motion *in limine* to exclude from trial exhibits prepared by government contractors in *System Fuels, Inc. v. United States*, No. 03-2623C (Oct. 12, 2007), and in *Wisconsin Elec. Power Corp. v. United States*, No. 00-697C (Aug. 16, 2007), Judge Merow explained that the admissibility of the contractor documents was "best evaluated at trial after appropriate foundations have been laid," and correspondingly "denied [the government's motion] without prejudice to renewal during, or after, trial to the extent a contractor document is proposed for admission, or cited as support for a proposed actual finding." The government's present motion is only slightly modified from its motion *in limine* in *PG&E*, and offers no new substantive arguments against the admission of the contractor documents.

The government's principal argument, that DOE's contractors do not create departmental policy for DOE and that their statements "do not represent DOE positions," *see* Govt. Mot. at 2-6, and are "not the agency's adopted positions" *id.* at 19, has no bearing on whether such statements are admissible under the applicable Federal Rules of Evidence, including FRE 803(8)(A) and 801(d)(2)(C). *See Yankee Atomic*, 2004 WL 2450874 at *11 (allowing as admissions statements "by a person authorized by the party to make a statement concerning the subject matter"); *PG&E*, 73 Fed. Cl. at 440 (allowing as admissions, statements in contractor documents under FRE 801(d)(2)(C) as "the question of the admissibility of the contractor documents was not whether DOE contractors' views were the same as those of the government . .

[1] Because the Court in *PG&E* agreed with the *Yankee Atomic* findings and "adopted its reasoning in full with respect to [FRE] 803(8)(A)," *PG&E*, 73 Fed. Cl. at 439, unless otherwise specifically noted references to the *Yankee Atomic* decision herein should also be considered to include the *PG&E* decision.

..”). Moreover, these contractor documents are admissible if they satisfy any one of the rules allowing admissions or providing for exceptions to hearsay. There simply is nothing in the rules to support the government’s argument that these documents must clear multiple admission or hearsay hurdles before they can be deemed admissible.

Perhaps the oddest government argument is its insistence that Pacific Northwest National Laboratory (“PNNL”) and other National Laboratories are government contractors. The deposition testimony proffered by the government says more about the credibility of the deponents that it does about the status of the entities. Although PNNL is managed by a contractor (Battelle), there can be no question that PNNL and the other National Laboratories are part of DOE. *See Yankee Atomic*, 2004 WL 2450874 at *2-*4 (documenting that these laboratories are part of the government); *see also* App. at 11.

## I. DOE FULFILLS ITS MISSION THROUGH CONTRACTORS

As Judge Merow explained in *Yankee Atomic*, “[t]o a significant, if not exclusive extent, DOE’s activities, duties and responsibilities under the NWPA, have been and are conducted through its national laboratories and management and operation (“M&O”) contractors.” *Yankee Atomic*, 2004 WL 2450874 at *3. Indeed, the standard contract between Dairyland and DOE (the “Contract”) expressly provides that “DOE may fulfill any of its obligations, or take any action, under this contract either directly or *through contractors*.” Contract, Art. IV.B.3 (emphasis added). Consistent with the Contract, and consistent with the statutory authority granted to DOE, *see, e.g.*, 42 U.S.C. § 10222(d) (authorizing expenditure of funds for non-generic research, development and demonstration activities under the NWPA), DOE has engaged a number of contractors to provide services to it in connection with the Contract and the management of its spent nuclear fuel program in general.

These contractors have included a number of entities that have been engaged by DOE under M&O contracts, which have been described as follows:

> DOE normally uses M&O contractors to manage and operate its Government-owned facilities. The DOE M&O contract is unique. Unlike a typical Government contract through which the Government obtains products and services to assist it in carrying out its mission, *DOE uses the M&O contract to conduct its mission.*

*Westinghouse Elec. Corp. v. United States*, 1997 WL 108204, at *2 (Fed. Cl. June 4, 1997) (emphasis added). In *Yankee Atomic*, Judge Merow similarly stated:

> These contractors were retained under unique circumstances to perform DOE's function, provided critical and essential data and input to DOE, and operate and manage the national laboratories for and on behalf of DOE. *In a very real sense, these contactors performed DOE's statutory mission*, or at a minimum provided the technical input to perform the same.

2004 WL 2450874 at *11.[2]

Additionally, under the Federal Acquisition Regulations ("FAR"), an M&O contractor is defined as acting on behalf of the government:

> Management and operating contract means an agreement under which the Government contracts for the operation, maintenance, or support, *on its behalf*, of a Government-owned or -controlled research, development, special production, or testing establishment, wholly or principally devoted to one or more major programs of the contracting Federal agency.

48 C.F.R. § 17.601 (emphasis added). The FAR further provides that:

---

[2] M & O contractors involved in the DOE spent fuel program include Battelle Memorial Institute (Pacific Northwest National Laboratories), Martin Marietta Energy Systems, Inc (Oak Ridge National Laboratory), Science Applications International Corporation and TRW Environmental Systems, Inc. (Civilian Radioactive Waste Management System), and Lockheed Martin Idaho Technologies, Inc. (Idaho National Engineering and Environmental Laboratory). *See* App. at 1-3 (Pollog 5/22/02 Dep. Tr. at 594(25) – 595(6) (Martin Marietta Energy Systems, Inc.)); App. at 4-6 (Newman 4/17/02 Dep. Tr. at 7(23) – 8(8) (Battelle Memorial Institute)); App. at 7-9 (Zabransky 4/18/02 Dep. Tr. at 258(16) – 259(1) (TRW Environmental and Safety Systems)); App. at 10 (DOE News Release 8/16/98 at http://newsdesk.inel.gov/press_releases/1998/prrecompete2.html (Lockheed Martin Idaho Technologies Co.)); App. at 11 (stating that Battelle Memorial Institute operates PNNL, but that PNNL is "managed by DOE's Office of Science")*; Yankee Atomic,* 2004 WL 2450874 at *2-*6.

> A management and operating contract is characterized both by its purpose (see 17.601) and by the special relationship it creates between Government and contractor. The following criteria can generally be applied in identifying management and operating contracts:…
>
> (b) Because of the nature of the work, or because it is to be performed in Government facilities, *the Government must maintain a special, close relationship with the contractor and the contractor's personnel* in various important areas (e.g., safety, security, cost control, site conditions).
>
> (c) The conduct of the work is wholly or at least substantially separate from the contractor's other business, if any.
>
> (d) *The work is closely related to the agency's mission and is of a long term or continuing nature,* and there is a need (1) to ensure its continuity and (2) special protection covering the orderly transition of personnel and work in the event of a change in contractors.

48 C.F.R. § 17.604 (emphasis added).

Indeed, Congress has decreed that employees of M&O contracts be deemed employees of the DOE for some purposes:

> *An officer or employee of a management and operating contractor of the Department of Energy*, when serving a member of a group reviewing or advising on matters related to one or more management and operating contracts of the Department, *shall be treated as an officer or employee of the Department* for purposes of determining whether the group is an advisory committee within the meaning of section 3 of the Federal Advisory Committee Act (5 U.S.C. App.).

Pub.L. 108-136, Sec. 3112, November 24, 2003, 117 Stat. 1743 (emphasis added); *see also Yankee Atomic*, 2004 WL 2450874 at *7 ("The documents indicate that the contractor personnel who operate DOE facilities are functionally indistinguishable from the DOE employees who request and use their research or drafting input. They are more akin to contract employees of DOE.").

This symbiotic relationship between DOE and its M&O contractors was also explicitly recognized by Dr. John Bartlett, the former Director of OCRWM. When asked during the *Yankee Atomic* trial about the role of the OCRWM M&O contractor (then TRW Systems), Dr. Bartlett explained that:

> [a]ll of the work is done by the - by the support contractors. That's what they're there for. . . . OCRWM itself has about 65 employees. The program has about 5,000 employees. . . . The work is done by [the contractors]. And the job of the DOE people is to oversight that, do the program planning, give them guidance and direction for what their activities should be.

*Yankee Atomic* 7/14/04 Trial Tr. 615(24)-616(22) (App. at 12-13). Dr. Bartlett was also asked about the extent to which the M&O contractor was "authorized by the Department to make statements concerning the subjects addressed in studies . . ." *Id.* at 616(23)-617(1) (App. at 13). Further reinforcing the identity of functions performed by OCRWM and M&O contractors, Dr. Bartlett explained that "[t]hey have *full authority* to accomplish and report this work." *Id.* at 617(2)-(3) (App. at 13) (emphasis added). In light of this symbiotic relationship, DOE contractors working on the spent fuel program should be deemed part of DOE in this context.

In this case, DOE engaged its contractors to investigate and report on a number of subjects specifically relating the fulfillments of DOE's obligations under the Contract, including the following:

- the program strategy (PX75)
- the proper and most economical rate of acceptance of SNF (PX196, 219, 241, 242, 246, 811)
- allocation of acceptance rights (PX108, 174)
- trading of acceptance rights by utilities (PX108, 131, 134, 136, 141, 255, 310, 315)
- delivery commitment schedules (PX149)
- acceptance scenarios and priorities for shutdown reactors (PX158, 162, 163, 166)
- development of the annual capacity report (PX164, 410)
- alternatives for acceptance and storage (PX184)
- cost estimates (PX189)
- design and construction (PX405)
- the role of transportation (PX91)
- reactor-specific spent fuel discharge projections (PX143)

Contractors also prepared, at DOE's request, positions to be taken by the government on issues relating to the spent fuel program. *See, e.g.*, PX258, 262, and 461.[3]

## II. THE DOCUMENTS ARE ADMISSIBLE AS STATEMENTS OF AGENTS OR SERVANTS

In the circumstances of this case, the DOE contractors were agents or servants of DOE and statements made within the scope of their agency or employment are admissible under FRE 801(d)(2)(D), which provides that statements offered against a party are not hearsay if made "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." This Rule requires only that the statement concern a matter within the scope of the agency or employment; it does not require DOE to have ratified or even agreed with the statement.

An agency relationship "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." *Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1360 (Fed. Cir. 2002). For M&O contractors, that consent and level of control is defined and set forth above in the nature of

[3] In *Yankee Atomic*, Judge Merow described the contractor documents before him (many of which were again challenged by the government in *PG&E* and are now under challenge in this case) as follows:

> For the most part they are documents of national laboratories and other contractors to the Department of Energy ("DOE") and include analysis of priority for shutdown reactors and other acceptance scenarios, fuel shipment strategies, consideration of failed fuel and delivery commitment schedules, allocations between nuclear utilities, program costs, treatment of greater-than-class C waste ("GTCC"), trading of acceptance rights, and the effects of trading of acceptance rights on transportation-all part of the development of DOE's spent nuclear fuel program.

2004 WL 2450874 at *1.

the relationship between the M&O contractor and the government. As Judge Merow reasoned in *Yankee Atomic*,

> As "servants," direct employees of DOE could make binding admissions as to matters within their employment duties, and there may be no good reason to not afford the same evidentiary treatment to the contractors here. Any distinction between a nuclear physicist preparing tonnage estimates for DOE under a direct employment contract versus the M & O contracts here is questionable, and at best a matter of degree.

*Yankee Atomic*, 2004 WL 2450874 at *11; *see also Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1256 (Fed. Cir. 2000) ("'[A]n agency relationship *can* be created by contract . . . .'" (emphasis added) (quoting *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F. 3d 742, 745 (7th Cir. 1998)).[4] Moreover, the fundamental prerequisite for establishing an agency relationship are not onerous. *See, e.g., Pappas v. Middle Earth Condominium Ass'n.*, 963 F.2d 534, 538 (2d Cir. 1992) (fundamental prerequisite may be established with circumstantial evidence); *Becton v. Starbucks Corp.*, 491 F.Supp.2d 737, 741 (S.D. Ohio 2007).

As described above, the symbiotic relationship between DOE and its contractors is more than sufficient to create an agency relationship. Indeed, the D.C. Circuit has specifically described an M&O contractor as the agent of the agency for which it works. *See Paul v. Federal Mine Safety & Health Review Comm'n*, 812 F.2d 717, 718 (D.C. Cir. 1987) (describing Battelle

---

[4] The government's claim that *Rotec* holds "that a contract *must* contain language creating an agency relationship for that rule to apply" is just plain wrong. Govt. Mot. at 29 (emphasis added).

Memorial Institute, which prepared, as the M&O contractor and operator of PNNL.[5] Battelle is responsible for over twenty of the challenged documents.[6]

The government cannot dispute either that the documents were created by parties who had contracted with the government and that the documents were created in fulfillment of the contractor's duties to the government under their contracts. Thomas Wood, a 20-plus year employee of PNNL was questioned during his deposition about a draft report prepared by PNNL entitled "At-Reactor Spent Fuel Storage Requirements With and Without Acceptance Rights Trading" PX134 (excerpt) (App. 20-21). Mr. Wood is noted in the acknowledgements to this draft report as "originally recogniz[ing] the need for this study and instigated its initiation . . ." Mr. Wood testified that he was "involved in the scoping or formulation of the problem that led to this report" (Wood 5/8/02 Dep. Tr. 71:16-20, App. at 43), and that it was not a study that PNNL undertook on its own but instead was commissioned by the Department of Energy.[7] *Id.* at 72(4)-(9) (App. at 44). Thus, it is undisputed that the statements by the contractors both concerned a matter within the scope of the contractor's work and was made during the existence of the relationship.

---

[5] Battelle has operated PNNL for DOE (and its predecessors) for over 40 years, since its inception in 1965. *See* Pacific Northwest National Laboratory, About PNNL Overview, History, http://www.pnl.gov/about/history.asp (last visited May 14, 2008); *see also* App. 11. PNNL is one of four national laboratories managed and operated by Battelle. *See* Battelle, Laboratory Management, http://www.battelle.org/labmanagement/index.aspx (last visited May 14, 2008).

[6] The documents created by PNNL/Battelle include: PX19, 68, 75, 79, 91, 108, 110, 130, 131, 134, 136, 139, 141, 143, 149, 158, 162, 163, 164, 166, 184, 189, 196, 219, 809, and 810.

[7] Mr. Wood is listed as the author on several challenged documents, including PX108, 110, 130, and 131 and describes "[t]he purpose of [PNNL's] work" as directed by DOE as "includ[ing] setting reasonable design and requirements for the system . . . ." Wood 5/8/02 Dep. Tr. 70:3-14, App. at 42.

Accordingly, those contractors are agents or servants of DOE and their statements are admissible pursuant to Fed. R. Evid. 801(d)(2)(D).

III. THE DOCUMENTS ARE PUBLIC RECORDS

The Federal Rules of Evidence exempt from the hearsay bar the records of public offices or agencies setting forth the activities of the office or agency. FRE 803(8)(A). Here, in light of the special relationship between DOE and its contractors, the contractors should be deemed public offices or agencies for purposes of this rule, as Judge Merow held in *Yankee* and Judge Hewitt agreed in *PG&E*. Many of the documents at issue were collected from the government's own files, contractor's files at the national laboratories, not the files of contractors.[8] Moreover, the government's objection to the admission of these documents into evidence fails to recognize the M&O contractors' indispensable and integral role in executing DOE's mission to dispose of the nation's spent fuel. As explained by Dr. Bartlett in his testimony in the *Yankee Atomic* trial, s*ee Yankee Atomic* 7/14/04 Trial Tr. 617(2)-(3) (App. at 13), "[a]ll of the work is done by the – by the support contractors." "They have full authority to accomplish and report this work."

Fundamentally, acceptance of the contractor documents as public records is fully in accord with the justification for this hearsay exception. The justification for the public records exception assuming "that a public official will perform his duty properly. . . .," *see Zeus Enters.*, 190 F.3d at 241, "is [also] premised on the assumption that [the duties are performed] without motive or interest other than to submit accurate and fair reports." *Bradford Trust Co. v. Merrill Lynch*, 805 F.2d 49, 54 (2d Cir. 1986). If the contractor is acting for an agency, there is no reason to treat statements (or reports and records) of a contracting official any differently from an agency official. For instance, PNNL is currently operated by Battelle, a DOE M&O contractor.

[8] For example, the documents with a Bates prefix of "PNL" were collected from the files at PNNL, and those with Bates prefix "HQR" were collected from DOE headquarters.

Battelle has operated the national laboratory for DOE since PNNL was established in January 1965. *See* Pacific Northwest National Laboratory, About PNNL Overview, History, http://www.pnl.gov/about/history.asp (last visited May 14, 2008). No reasonable analysis could conclude that Battelle, after over forty years of operating PNNL for DOE and nearly 25 years involvement in the nuclear waste disposal program, has been doing anything other than performing its duty properly or that its has any motivation or interest other than to "submit accurate and fair reports." *See Bradford Trust Co.,* 805 F.2d at 54.

The government argues that DOE's contractors at issue here do not meet tests for being deemed agencies under the Contracts Disputes Act ("CDA"), the Federal Tort Claims Act or the Tucker Act. *See* Govt. Mot. at 7-9. This argument is beside the point. The government is referring to jurisdictional statutes that must be construed very narrowly. *See United States v. Nordic Village,* 503 U.S. 30, 33-34 (1992) ("We have on occasion narrowly construed exceptions to waivers of sovereign immunity . . ., as in the context of the 'sweeping language' of the Federal Tort Claims Act . . .." (citations omitted)). Conversely, the rules of evidence are appropriately construed broadly to further the admission of all probative evidence. *See Butler v. Southern Pacific Co.,* 431 F.2d 77, 79 (5th Cir. 1970) ("We begin consideration of the question of admissibility with the proposition that 'the Federal Rules and practice favor admission of evidence rather than exclusion if the proffered evidence has any probative value at all.'" (citations omitted)). Moreover, this Court has already rejected the government's reliance on *Blue Water* and *Orleans,* explaining "[q]uestions of whether a contractor is a federal agency under the Tucker Act or the Federal Tort Claims Act are not the same as the court's evidentiary inquiry here." *Yankee Atomic,* 2004 WL 2450874 at *6. The government's citation to *Lockheed Martin Corp. v. United States,* 50 Fed. Cl. 550 (2001), Gov. Mot. at 7, is also inapposite. That case

considered whether a subcontractor could sue the government directly under the CDA. In holding that it could not, the Court examined exceptions to the general rule, including the narrow "purchasing agent exception." *Id.* at 562. The criteria cited by the government are those examined to see if a prime contractor is a mere purchasing agent, thus allowing a direct suit against the government. *Id.* They say nothing about whether a contractor should be deemed a government agency for purposes of FRE 803(8)(A).

The government also mischaracterizes Dairyland's argument and the requirements for admission of these documents pursuant to FRE 803(8)(A) where it contends that Dairyland argues that contractor statements represent the views of the agency. *See* Govt. Mot. at 8. Dairyland's argument is not that contractor statements necessarily represent the views of DOE, but, rather, that as M&O contractors operating federal facilities pursuant to an express grant of authority from DOE, they operate functionally as DOE and the documents at issue here reveal and demonstrate the activities of DOE in fulfilling its obligations under the NWPA. That is all that is required for admission of these documents under FRE 803(8)(A).

The government also argues against the admission of the contractor documents pursuant to FRE 803(8)(A) contending that Dairyland cannot show that the documents are agency documents, have an appropriate indicia of trustworthiness, and are in fact public records. *See* Gov't. Mot. at 12-13. These claims are meritless. As this Court correctly held in *Yankee Atomic*, these contractor documents – which in reality are DOE documents for all intents and purposes – are fully admissible under FRE 803(8)(A). As Judge Merow explained:

> Since the assurance of accuracy is generally greater for public records than for private business records, the proponent is usually not required to establish their admissibility through foundation testimony. Rule 803 documents are non-hearsay and admissible regardless of the availability of the declarant. . . . Admissibility is presumed and the burden of proof is on the party opposing introduction.

*Yankee Atomic*, 2004 WL 2450874 at *4 (citations and footnote omitted); *accord Zeus Enters,* 190 F.3d at 241 ("The party opposing admission has the burden to establish unreliability."). It is noteworthy that the government does not contend that any of the challenged documents are untrustworthy.

Judge Merow went on to explain that "public agency" is construed broadly for the purposes of FRE 803(8)(A). *See Yankee Atomic,* 2004 WL 2450874 at *4. Specifically:

> In this case, the records, reports, statements or other data compilations, in any form, to the extent they are the activities of the DOE, are construed broadly to include those activities done by national laboratories at the behest of DOE and within the parameters thereof. . . . DOE cannot bifurcate its responsibilities for SNF and/or high level waste ("HLW") disposal by utilizing its M&O contractors to develop DOE's spent nuclear fuel program. *Contracting statutory and regulatory responsibility does not eliminate the public nature of these documents.*

*Id.* at *6 (emphasis added). *See also United States v. Lykes Bros S.S. Co.*, 432 F.2d 1076, 1079-80 (5th Cir. 1970) ("[T]he duty to prepare a report can be delegated, under government regulations, to an independent agency or to a foreign government without the report losing its character … as a report of a 'department or agency of the United States.'").

Judge Merow specifically rejected the government's argument, set forth on pages ten and eleven of its motion in this case, that Dairyland's argument creates a "ridiculous result."

> Defendant argues that allowing contractor documents to be admissible as public documents would create a "ridiculous" result because, under plaintiffs' theory, all documents generated by a construction contractor under contract to build a federal courthouse would become "public records" and a contractor could potentially generate documents that could be used against the government in litigation. The "contractors" involved in the instant document issues are in no way analogous to a contractor who bids for and obtains a contract to construct a building. *The documents indicate that the contractor personnel who operate DOE facilities are functionally indistinguishable from the DOE employees who request and use their research or drafting input. They are more akin to contract employees of DOE. See United States v. Hopkins*, 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976). There is no way courthouse construction contractor employees would be performing court work in an equivalent manner.

*Yankee Atomic*, 2004 WL 2450874 at *7 (emphasis added). Judge Merow further noted that the documents came from DOE files:

> Data compilations, records, reports or statements "of" public offices or agencies "setting forth" the activities of that agency are within the scope of the hearsay exception. The qualifier "of" does not mean that data compilations, records, reports and statements must in all situations have been authored by the public office or agency-just that they must have emanated therefrom. These are "... documents generated or collected by the national government in the course of its public functions." *In re Oil Spill by the Amoco Cadiz*, 954 F.2d at 1309.

*Id.* (emphasis added).

The government also argues that some contractor documents do not fall within the hearsay exception of FRE 803(8)(A) "because of their preliminary or interim nature." *See* Govt. Mot. at 18, citing *Smith v. Isuzu Motors Ltd.*, 137 F. 3d 859 (5th Cir. 1998), *cert. denied*, 525 U.S. 1142 (1999). The government does not identify any particular document or group of documents that would fall into this category. In any event, *Smith v. Isuzu* was wrongly decided, is irreconcilable with this Court's decisions in *Yankee Atomic* and *PG&E*, and it should not be followed here. The court in *Smith* concludes, without analysis, that a staff memoranda cannot set forth the activities of the agency. That conclusion is contrary to the plain language of the Rule and the requirement that the Rule be interpreted broadly. The *Smith* court also reasoned that admitting a staff memorandum under FRE 803(8)(A) would swallow up 803(8)(C), which exempts factual findings resulting from an investigation made pursuant to authority granted by law. This analysis is wrong. There may be a variety of contexts where an agency's files contain reports resulting from investigations made pursuant to authority granted by law that do not reflect the activity of the agency in whose files the report is located. *See Erickson v. Baxter Healthcare, Inc.*, 151 F.Supp.2d 952, 966-67 (N.D. Ill. 2001) (cited in Govt. Mot. at 15). Additionally, Judge Merow addressed *Smith* in his analysis of those cases cited by the government in which it found

its reliance unavailing. *See Yankee Atomic*, 2004 WL 2450874 at *5-6. Judge Hewitt agreed in *PG&E* by adopting Judge Merow's opinion.

The government has offered Dairyland Exhibit No. 75 as an example of a contractor document that it claims should be excluded from evidence as hearsay. *See* Govt. Mot. at 9-10. But this document demonstrates that admission into evidence is appropriate. The memorandum to which the government is referring was produced from DOE files (as shown by the "PNL" Bates-number prefix), is written on PNNL letterhead (which also lists Battelle), and notes, as the government indicates, that "[h]eadquarters would like our review and comments on this strategy." *See* Govt. App. at 30. Moreover, there is nothing in the memorandum to indicate, as the government claims, that "Battelle was asked to provide *contractor services* to DOE …." Govt. Mot at 10. Indeed, the plain language of the author, Mr. Ron Liikala, indicates that "[h]eadquarters" asked for "our review and comments on this strategy." Govt. App.[9] at 30. Although Mr. Liikala may technically have been a Battelle employee rather than an employee of DOE, it is clear that such "contractors," who work in a DOE laboratory, and refer to DOE as "headquarters," operate as if they were a part of DOE. The government also neglects to acknowledge that the "draft waste management program strategy" attached to the memorandum shows that it was prepared by RW-30, which is the Program Management and Integration Office of OCRWM, itself an office of DOE. Additionally, this document is separately admissible under the ancient documents exception pursuant to FRE 803(16). It is also an admission under FRE 801(d)(2)(A), discussed below.

[9] "Govt. App." refers to the Appendix attached to the government's motion.

## IV. THE DOCUMENTS ARE ADMISSIBLE AS AUTHORIZED STATEMENTS.

The challenged exhibits are also admissible under FRE 801(d)(2)(C), which exempts from hearsay statements offered against a party made "by a person authorized by the party to make a statement concerning the subject . . .." By its plain language, the rule requires merely that the declarant be "authorized" to speak on the "subject." *See Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 619 (4th Cir. 1991) ("authority in the context of 801(d)(2)(C) means 'authority to speak' on a particular subject on behalf of someone else"). The statement then becomes an admission by operation of the rule: "a statement by a person *authorized* by the party *to make a statement* concerning the subject" is admissible. FRE 801(d)(2)(C) (emphasis added). No specific authorization *to make admissions* explicitly is required. If the contractor is authorized to speak, the statement becomes an admission.

Here, the contractors here were actually hired to *write* the reports in question, so clearly the statements made in the reports – like the analysis and other work underlying the reports – were "authorized" by DOE. Indeed, many of the documents state explicitly on their inside cover that "[t]his report was prepared as an account of work sponsored by an agency of the United States Government." *See, e.g.*, PX175 (excerpt) and PX184 (App. at 16-19). That is the same, in substance, as saying "this report is authorized by the United States Government." On others, on the face of the document, it is readily apparent that DOE authorized the contractors to produce the study or document – *i.e.*, "authorized [the contractor] to make a statement [the study] concerning the subject." *Glendale*, 39 Fed. Cl. at 424. *See, e.g.*, relevant excerpts of exhibits PX134, App. 20 ("Prepared for the U.S. Department of Energy under Contract DE-AC06-76RLO 1830"); PX136, App. 22-23 (same); PX158, App. 24 (same); PX166, App. 25 (same); PX189, App. 26 (same); PX219, App. 27-28 (same); PX255, App. 29 ("Prepared for: The U.S. Department of Energy"); PX405, App. 30 ("Prepared for: The U.S. Department of Energy");

PX91, App. 31 ("Work supported by the U.S. Department of Energy under Contract DE-AC06-76RLO 1830"); PX162, App. 32 ("Prepared for the U.S. Department of Energy under Contract DE-AC06-76RLO 1830"); PX329, App. 33-35 ("Prepared for the U.S. Department of Energy … Under Contract DE-AC01-91RW00134"). Even absent such explicit statements, it is simply not credible to assume that these studies, reports, and papers were prepared and published *sua sponte*, without the DOE's authorization.

The government argues that "Dairyland has not identified any testimony or documents to establish that the DOE contractors were 'authorized' to speak for the Government under FRE 801(d)(2)(C)." Govt. Mot. at 23. Similarly, the government contends, "Dairyland and the other SNF plaintiffs have not identified any basis for finding DOE's contractors 'authorized' to make admissions upon DOE's behalf." *Id.* at 24. To the contrary, Dr. John Bartlett testified about the agency relationship between OCRWM and M&O contractors, stating quite plainly that the M&O contractors "have full authority to accomplish and report this work." *Yankee Atomic* Trial Tr., 617(2)-(3) (App. at 12-13). The government also fails to acknowledge that its argument is contrary to this Court's published opinion in *PG&E*, which held "that statements by contractors in the contractor documents could be admitted as non-hearsay under [FRE] 801(d)(2)(C)." *PG&E*, 73 Fed. Cl. at 440. In so holding, the Court rejected the government's "argument that the contractors' views were not those of DOE or that the contractors were not 'authorized to make admissions [ ] on behalf of the Government,'" and found that the government's arguments "were based on a misapplication of [FRE] 801(d)(2)." *Id.* at 439-40. Instead, the proper inquiry "was whether (a) statements made by DOE contractors were beneficial to, and offered by, plaintiff, and (b) such statements were 'authorized' by DOE to be made." *Id.* at 440. In answering both of these questions in the affirmative, the *PG&E* Court explained that "plaintiff would be offering

(presumably beneficial) statements made by contractors in the contractor documents, and the contractors were 'authorized' – even contracted – by DOE to make such statements." *Id.* (citing *Yankee Atomic*, 2004 WL 2450874 at *8). Indeed, Judge Hewitt even saw fit to clarify that the question of admissibility of an authorized statement was not "whether DOE contractors were authorized to make 'admissions' on behalf of the government." *PG&E*, 73 Fed. Cl. at 441.

Despite the plain language of FRE 801(d)(2)(C), making all of the authorized statements of DOE contractors admissible as non-hearsay admissions, the government would like to impose the additional requirement that the party making the statement first be shown to be an agent of the party against who the statement is being offered. *See* Govt. Mot. at 24. The government's argument is wrong for at least two reasons. First, this Court has recognized that the person "authorized to speak" need not qualify as an "agent" under this provision of the Rule. *See Glendale Federal Bank, FSB v. United States*, 39 Fed. Cl. 422, 424 (1997) (stating that "FRE 801(d)(2)(C) applies to a person who is not an agent but is 'authorized' to speak"); *accord Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1306-07 (9th Cir. 1983) (allowing into evidence report prepared by non-employee of defendant on the basis that it was "authorized" by defendant). *See also Precision Piping.*, 951 F.2d at 619 (explaining that "authority" as it is used in FRE 801(d)(2)(C) "should be distinguished from it use . . . in applying Rule 801(d)(2)(D) governing statements by agents and servants). In the former, a statement is not hearsay if it is offered against a party and is 'a statement by a person *authorized* by the party to make a statement concerning the subject." (emphasis added)). As explained in *Glendale*, the plain language of "FRE 801(d)(2)(C) makes no mention of 'agent' or event 'servant' in the Rule itself. By comparison, Rule 801(d)(2)(D) states clearly that it applies to a 'statement by the party's

*agent* or servant concerning a matter within the *scope of the agency* or employment, made during the existence of the relationship." *Glendale*, 39 Fed. Cl. at 424.

Plaintiff's exhibit 275 (excerpt at App. 32) is an example of a document plainly admissible under FRE 801(d)(2)(C). Nancy Slater, listed as one of the authors of this paper and a DOE employee describes the document as "a general summary of the ACR issue resolution process, the nature and scope of the issues that require interpretation . . .." Slater 4/21/1999 Dep. Tr. 122(13)-123(2) (App. at 33-34). She insists, however, that it was "authored on behalf of E.R. Johnson Associates for presentation at a conference" and "not . . . at the request of DOE." *Id.* at 123(19)-124(3) (App. at 34). So, while DOE attempts to disavow that this document (among others) was authored at the request of DOE, Ms. Slater explains that "in general we have a DOE author on papers like this. We then have the right to review." *Id.* at 123(24)-124(3) (App. at 34). So, regardless of whether these documents have a DOE author or were prepared by a contractor at the direction and authorization of DOE, these documents clearly have DOE's "stamp of approval" before being publicly released. Accordingly, such documents are admissible pursuant to FRE 801(d)(2)(C) and 801(d)(2)(B) (a statement adopted as true by an agency addressed below).

## V. THE DOCUMENTS ARE NOT HEARSAY WHERE THE GOVERNMENT HAS "MANIFESTED AN ADOPTION OR BELIEF" IN THEIR TRUTH

Pursuant to FRE 801(d)(2)(B), "a court can allow into evidence adoptive admissions as non-hearsay if '[t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth." *Horvath v. Rimtec*, 102 F. Supp. 2d 219, 223 (D.N.J. 2000). No talismanic adoption language is required. There need be only a manifestation of either an intent to adopt another's statement, or belief in the statements of another. *See*

*United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988); *see also Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. at 544, 565 (2003).

Many of the challenged exhibits have been made publicly available by the government. *E.g.*, PX175 (excerpt), App. 14-15 (“Available to the public from the National Technical Information Service….”); PX219 (excerpt), App. 24-25 (same).[10] The documents noted in this section are all documents that DOE has allowed (or not prevented) to be published or are otherwise publicly available, or they have been prepared and presented at industry conferences. When the government makes the documents available to the general public, presents them itself, or allows its agents to present them at industry conferences, it manifests an adoption or belief in the truth of such documents. It is not necessary that the government expressly adopt the contractor’s findings, or even verbalize its confidence in the veracity of such reports and studies. *See Horvath,* 102 F. Supp. at 233 (“adoptions can be manifested by any appropriate means, such as language, conduct, or [even] silence ….”). DOE’s permissive release of these documents clearly demonstrates a manifestation of it intent to adopt these documents and the statements therein, or at a minimum reflects DOE’s belief in the truth and veracity of the statements. For the foregoing reasons, these documents are admissions pursuant to FRE 801(d)(2)(B).

The government argues, “absent a showing that DOE had an agency relationship with these contractors or otherwise adopted the contractors’ statement …,” the contractor documents are not admissible under FRE 801(d)(2)(B). *See* Govt. Mot. at 31, (citing *Westfed Holdings,* 55 Fed. Cl. at 565) (“[a]bsent a showing of either an agency relationship *or* adoption, the statements made by these individuals and entities were not admitted as party admissions.”) (emphasis

---

[10] Documents that have been published and are publicly available include PX143, 166, 168, 175, 219, 405 and 811; documents that have been published and prepared or presented for presentation at industry conferences include PX91, 164, 196, 246, 272 and 275.

added). The government ignores the "or" in this Court's holding. Adoption is all that is required under FRE 801(d)(2)(B).

## VI. SOME OF THE DOCUMENTS ARE ALSO ADMISSIBLE AS A PARTY'S OWN STATEMENTS.

FRE 801(d)(2)(A) provides for the admission of a "party's own statement, in either an individual or a representative capacity." The list of documents admissible as a party's statement include, but are not limited to the PNNL documents listed in footnote 12.

## VII. THE DOCUMENTS FALL WITHIN OTHER EXCEPTIONS TO THE RULE AGAINST HEARSAY.

### A. The Documents Are "Business Records" Admissible Under FRE 803(6)

Alternatively, the Court may elect to admit these documents into evidence as "business records" pursuant to FRE 803(6). *See, e.g., United States v. Frazier*, 53 F.3d 1105, 1110 (10th Cir. 1995) (admitting report prepared by independent contractor at direction of Department of Labor into evidence pursuant to FRE 803(6)).

### B. Certain Documents Are Ancient And Therefore Admissible Pursuant To FRE 803(16)

In addition to the bases for admissibility set forth above, fourteen of the challenged documents are independently admissible pursuant to the ancient documents rule. FRE 803(16). That rule allows into evidence "[s]tatements in a document in existence twenty years or more the authenticity of which is established." The twenty-year period is measured back from the date that the exhibit is offered into evidence. *See Columbia First Bank v. United States*, 58 Fed. Cl. 333 at 336 (2003) (rejecting argument that period be measured "from the creation of the document to the date the controversy arises"). Accordingly, PX19 (created 12/1/1982), PX68 (created 9/15/1983), PX75 (created 3/12/1984), PX79 (created 4/27/1984), PX91 (created 3/00/1985, PX108 (created 4/00/1986), PX110 (created 8/6/1986), PX130 (created 6/17/1987),

PX131 (created 6/17/1987), PX134 (created 8/00/1987), PX136 (created 9/8/1987), PX139 (created 10/6/1987), PX141(created 12/31/1987) and PX143 (created 3/00/1988), are admissible as ancient documents under FRE 803(16).

## VIII. THE GOVERNMENT'S OBJECTIONS THAT SOME OF THE DOCUMENTS ARE DRAFTS GOES TO WEIGHT AND NOT ADMISSIBILITY

The government objects that a number of documents are drafts. However, such an argument goes only to the weight of the evidence and not its admissibility. *Westfed Holdings*, 55 Fed. Cl. at 567. An objection that a document is a draft is not an independent basis for excluding a document otherwise admissible. *Id.*

## IX. CONCLUSION.

For the foregoing reasons, the government's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors should be denied, and the Court should admit the challenged documents into evidence. The facts and law noted above supporting the admission into evidence of the documents challenged by the government are clear, already established and unassailable. And as reflected in the prior decisions of this Court in *Yankee Atomic* and *PG&E*, this Court has agreed with that position.

In no event is the government's motion an appropriate vehicle for a conclusive determination of the inadmissibility of the challenged documents. The government has not established in its motion (and by the nature of the issue, could not) that there is no way in which Dairyland can establish the admissibility of these documents. To the extent the Court has any doubt regarding the admissibility of these documents (and it should not have any doubt), the appropriate course is to address the admissibility at trial.

Dated: May 15, 2008

Respectfully submitted,

s/ Jerry Stock
JERRY STOUCK
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3173
(202) 261-4751 fax
Counsel for Plaintiff
Dairyland Power Cooperative

Of Counsel:
ROBERT L. SHAPIRO
KEVIN E. STERN
Greenberg Traurig, LLP

00506

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.) :

Plaintiffs, :

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.

Wednesday, May 22, 2002

Continued deposition of THOMAS POLLOG, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness having been previously duly, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 9:40 a.m., Wednesday, May 22, 2002, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

00594

MR. SKALABAN:

Q. Do you have any general understanding of what happened with these criteria?

MR. CRAWFORD: Objection, asked and answered; objection to the extent it calls for speculation.

THE WITNESS: I don't have any specific recollection of what we did with this. However, I mean I could imagine what we may have done with reports like this that we typically received from contractors.

BY MR. SKALABAN:

Q. Which is what?

A. Probably we would review it in-house, possibly send it out to other interested parts of the RW organization for review, possibly solicit comments, possibly meet with the author to discuss it, get comments.

Q. Do you remember meeting with anyone at Oak Ridge or Martin Marietta regarding this report at all?

A. I know -- I can recall of no specific meeting with anyone from Oak Ridge or Martin Marietta about this report.

Q. And for the record would you explain what

00595
the relationship of Oak Ridge or Martin Marietta was to the program at this time?

A. Yes, they were one of our contractors.

Q. And Martin Marietta was a contractor who operated Oak Ridge National Laboratory?

A. I believe that's correct.

Q. And Oak Ridge is a DOE laboratory?

A. Yes.

Q. It says, if you look at Bates page 1030, that's HQR 034-1030, it says prepared by E.R. Johnson. It also indicates it's prepared by Oak Ridge National Labs.

MR. CRAWFORD: Well, it says it's prepared for Oak Ridge which is also described in the forward.

BY MR. SKALABAN:

Q. Okay. What was E.R. Johnson's relationship to the program?

MR. CRAWFORD: Objection, asked and answered.

THE WITNESS: He had several. He was a direct contractor to the waste acceptance team at that point in time. And he was also a subcontractor to at least shown by here Oak Ridge National Lab, Martin Marietta, and he may have been to other organizations, but I am not aware of that at any

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,
Plaintiff,
vs. No. 98-126C, 98-145C, 98-474C
UNITED STATES OF AMERICA,
Defendant.
______________________________

DEPOSITION OF DARRELL NEWMAN

Taken on behalf of the Plaintiff

April 17, 2002

\- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Darrell Newman was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 17, 2002, commencing at the hour of 10:20 a.m., the proceedings being reported at the Hampton Inn, 486 Bradley Boulevard, Richland, Washington.

00007

A. I was second lieutenant in the ordinance corps at Aberdeen Proving Grounds, Maryland.
Q. How long were you there, sir?
A. I was there for about six months, before I was transferred to Fort Riley, Kansas.
Q. And what did you do at Fort Riley?
A. Fort Riley I was a company commander of an ordinance company in the first infantry division.
Q. And after that what did you do?
A. I was discharged from the army in the summer of 1965, and I returned to Hanford, to the Hanford laboratories which then came under the operation of Battelle.
Q. Do you have an understanding of why the transfer from GE to Battelle?
A. GE lost the contract for the Hanford laboratories under the Atomic Energy Commission's prime contract, but the labs were put up for bid, and Battelle won the bid to operate the laboratory for the Atomic Energy Commission at that time.
Q. And what does Battelle do at the Hanford labs generally?
A. Battelle operates the Pacific Northwest

00008

Laboratory. It's now the Pacific Northwest National Laboratory. But at the time, it didn't have the national designation. But they -- the laboratory performed research and development for now the Department of Energy and it's predecessors, which were the Energy Research and Development Administration and the Atomic Energy Commission.

Q. So when you returned in the summer of '95 to Hanford --

A. '65.

Q. Oh, I'm sorry. Thank you for correcting me. In the summer of 1965 to Hanford, you were working for Battelle?

A. I was working for Battelle.

Q. And what was your position at Battelle?

A. I was an engineer at the plutonium critical mass laboratory.

Q. What did you do at that laboratory, sir?

A. I did experiments with plutonium in various forms to determine how much mass it took to make it critical assembly.

Q. And how long did you work on that project?

A. I worked on that for a couple of years,

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

- - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY

Washington, D.C.

Thursday, April 18, 2002

9:44 a.m.

Job No.: 112597-2

Pages 227 through 459, Volume 2

Reported by: Diane Gomez, RPR

00258

A I don't recall the specific use of all those words that way.

Q Any of them?

A I think there was a -- it's fair to say that a discussion of the contract was one that required interpretation and review. You had to look at it; you had to understand it. But it wasn't a simple contract. It also -- but it was no more complicated than many other nuclear fuel contracts.

Q Were you ever in the presence of DOE officials when anybody discussed the contract and the gist of the conversation was, Gee, we read the contract, and we can't tell exactly what happens?

A I don't recall that conversation -- a conversation like that.

Q Okay. Who was DOE's M&O contractor in December 31 of 1991, do you know?

A I believe that would have been what was TRW Environmental and Safety Systems, TESS.

Q Okay. What does an M&O contractor do with respect to the spent nuclear fuel program?

A They provide technical and management

00259

support.

Q Do you think that the standard contract has any omissions that needed to be filled in through the ACR issues resolution process?

A I'm not sure I would find any omissions. It has a lot of -- for both parties, a lot of clauses that give discretion to each party on different issues, and it would be nice to know how parties intended to use discretion, and that's an omission.

Q How about inconsistencies?

A The only term that I would classify from memory as an inconsistency could be or would be the provision that allows a trading of a DCS I believe up to six months prior to delivery as opposed to someone with an FDS or exchange provision of the contract.

Q Could you explain? And I feel like you were trying to start and wanted to look at the contract, which is fine, but could you explain to me how that's inconsistent?

A I said it appears to be an inconsistency. Purchaser shall have the right to determine -- Article 5.E of the contract. I won't read it, but it gives

# DOE NEWS

FOR IMMEDIATE RELEASE

September 16, 1998

## DOE ANNOUNCES COMPETITION FOR IDAHO CONTRACT

The Department of Energy (DOE) announced today that it will seek competitive offers for the management and operations contract at the Idaho National Engineering and Environmental Laboratory (INEEL). The department's contract with Lockheed Martin Idaho Technologies Co. (LMITCO), the current contractor, expires on Sept. 30, 1999.

"Competition allows us to test the market place and get the best value for the taxpayers. We are interested in receiving proposals from as many qualified bidders as possible, to help us meet the current and future challenges at the INEEL. We anticipate a spirited competition among a number of qualified firms and we invite any and all qualified applicants to bid," said John Wilcynski, manager of DOE's Idaho Operations Office.

When the department originally awarded the INEEL contract to LMITCO in 1994, DOE sought to consolidate and integrate site-wide operations, which were then run by five different contractors. "LMITCO has been successful in some areas, but there are other areas where improvement and greater initiative are necessary," said Wilcynski.

The current contractor employs about 5,800 people at the INEEL. Key missions include basic and applied research in a wide range of areas as well as nuclear reactor operation, environmental restoration and waste management, and national security programs.

Wilcynski emphasized that the department expects a speedy competition as well as a smooth transition. DOE will retain the same single contractor business model for the acquisition and plans to maintain the workforce and mission stability. "Our highest priorities are to maintain and enhance the department's long term commitment to this lab, to meet the cleanup agreements and to assure safety of the workforce," added Wilcynski.

The department expects to issue a request for proposals for the INEEL contract within 60 days, and it will be announced in the Commerce Business Daily. The department also expects to have the procurement completed by the end of July, 1999. The contract will be for five years, with an option for five more.

--DOE-ID--

Media contact: Brad Bugger, (208) 526-0833, buggerbp@inel.gov

98-70

** U.S. Department of Energy * Idaho Operations Office * 785 DOE Place * Idaho Falls, ID 83401-1562 **

Pacific Northwest National Laboratory
Operated by Battelle for the U.S. Department of Energy




# About PNNL

Welcome to the Pacific Northwest National Laboratory, located in Richland, on the sunny eastern side of Washington state. PNNL is one of the U.S. Department of Energy's (DOE's) ten national laboratories, managed by DOE's Office of Science. PNNL also performs research for other DOE offices as well as government agencies, universities, and industry to deliver breakthrough science and technology to meet today's key national needs. Our Laboratory

- provides the facilities, unique scientific equipment, and world-renowned scientists/engineers to strengthen U.S. scientific foundations for fundamental research and innovation
- prevents and counters acts of terrorism through applied research in information analysis, cyber security, and the non-proliferation of weapons of mass destruction
- increases U.S. energy capacity and reduces dependence on imported oil through research of hydrogen and biomass-based fuels
- reduces the effects of energy generation and use on the environment.

PNNL currently has approximately 4,000 staff members and a business volume of $760 million. The William R. Wiley Environmental Molecular Sciences Laboratory, a DOE Office of Science national scientific user facility, is located on PNNL's Richland campus. PNNL operates a marine research facility in Sequim, and has satellite offices in Seattle and Tacoma, Washington; Portland, Oregon; and Washington, D.C.

Battelle has operated PNNL for DOE and its predecessors since 1965. A unique feature of Battelle's contract with DOE allows our staff to work for private industry. To learn more about PNNL, see our Delivering Science and Solutions [PDF, 560 KB] brochure.

Thank you for visiting the PNNL web site, and if you have questions or comments, please contact us.

**Last Updated:** May 2008
Pacific Northwest National Laboratory
Operated by Battelle for the U.S. Department of Energy
Security & Privacy | Site Index | Contact Us

00574

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
V. )
THE UNITED STATES, ) Consolidated
Defendant. )

Courtroom Number 7

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Wednesday, July 14, 2004

VOLUME 3

The parties met, pursuant to the notice of the Judge, at 10:01 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

00615

Q I'm sorry to interrupt, Dr. Bartlett. If you could tell us first where you're reading from.

A I'm reading from page IX in the document, where it says Conclusions.

Q Okay. I'm sorry to interrupt. If you would like to continue.

A Under Conclusions, it says: Based on the foregoing considerations, the preferred range of throughput rates is from 3,000 MTU per year to 4,000 MTU per year.

Q What is your understanding of that conclusion, Dr. Bartlett?

A My understanding is that is an appropriate assessment based on the look at alternatives that was part of this effort, that this is the appropriate rate at which the system should be operated at steady state.

Q When you say appropriate, what do you mean by appropriate?

A That it is the most effective, most cost effective, in particular, with respect to costs incurred to do the operations and costs imposed on the utilities.

Q Dr. Bartlett, as I mentioned when I described the cover of this document, it was prepared

00616

by the management and operations contractor at that time. When you were director, to what extent did you and OCRWM rely upon studies prepared by the management and operations contractor such as this one?

A All of the work is done by the -- by the support contractors. That's what they're there for. The Department of Energy has -- OCRWM itself has about 65 employees. The program has about 5,000 employees, if you look at it this way. These are contractor people.

The M&O organizes all of them, but it includes activities within Sandia National Laboratories, Los Alamos National Laboratory, Livermore National Laboratory, the US Geological Survey.

And a lot of the engineering is done by, at our time, the TRW Systems, M&O contractor, management and operations contractor.

The work is done by those folks. And the job of the DOE people is to oversight that, do the program planning, give them guidance and direction for what their activities should be.

Q And when you were director, Dr. Bartlett, to what extent was the M&O authorized by the Department to make statements concerning the subjects addressed

00617

in studies such as Plaintiffs' Exhibit 175?

A They have full authority to accomplish and report this work.

Q Dr. Bartlett, when you were director of OCRWM, did you consider a 3,000 metric ton acceptance rate to be reasonable in light of the program's objectives?

A Yes, I did.

Q Did you consider when you were director, Dr. Bartlett, whether any other rates of acceptance might be reasonable in addition to 3,000 metric tons?

A Well, if you go much above 3,000, then essentially what you've done is established excess capacity that doesn't get used. It's like leaving an airplane sitting at the dock rather than having it flying. And so you don't need to make the expense or have excessive capability.

On the other hand, if you don't have enough, if you don't have the 3,000, then you're not doing your job with respect to taking this spent fuel from the reactors at an appropriate rate to avoid their occurring costs for additional storage.

Q If I could ask you just to explain a little bit more the first of those instances. If you have excess capacity, what do you mean by excess capacity?

ornl

ORNL/Sub/86-SA094/5
JAI-325

OAK RIDGE
NATIONAL
LABORATORY

MARTIN MARIETTA

# Acceptance of Failed SNF Assemblies by the Federal Waste Management System

PLAINTIFF'S
EXHIBIT
175
04-106

OPERATED BY
MARTIN MARIETTA ENERGY SYSTEMS, INC.
FOR THE UNITED STATES
DEPARTMENT OF ENERGY

HQR-034-1028

This report has been reproduced directly from the best available copy.

Available to DOE and DOE contractors from the Office of Scientific and Technical Information, P.O. Box 62, Oak Ridge, TN 37831; prices available from (615) 576-8401, FTS 626-8401.

Available to the public from the National Technical Information Service, U.S. Department of Commerce, 5285 Port Royal Rd., Springfield, VA 22161.
NTIS price codes—Printed Copy: A07 Microfiche A01

This report was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor any of their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise, does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.

# SOME ALTERNATIVES FOR DOE ACCEPTANCE AND STORAGE OF SPENT FUEL IN 1998 AND 1999

T. W. Wood
R. I. Smith
E. R. Johnson[a]
N. B. McLeod[a]

September 1990

Pacific Northwest Laboratory
Richland, Washington 99352

(a) E. R. Johnson Associates, Inc.
Oakton, Virginia.

PLAINTIFF'S
EXHIBIT
184
04-106

**DISCLAIMER**

This report was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor Battelle Memorial Institute, nor any of their employees, makes **any warranty, expressed or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights.** Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof, or Battelle Memorial Institute. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.

PACIFIC NORTHWEST LABORATORY
*operated by*
BATTELLE MEMORIAL INSTITUTE
*for the*
UNITED STATES DEPARTMENT OF ENERGY
*under Contract DE-AC06-76RLO 1830*

DRAFT

# AT-REACTOR SPENT FUEL STORAGE REQUIREMENTS WITH AND WITHOUT ACCEPTANCE RIGHTS TRADING

R. W. McKee
J. S. Pomykala
J. J. Tawil
A. F. Rosenfeld
M. E. Schutz

August 1987

Prepared for
the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Richland, Washington 99352

PLAINTIFF'S
EXHIBIT
134
04-106

5
EXHIBIT
[illegible]

## ACKNOWLEDGMENTS

The authors would like to express their appreciation and thanks to several individuals who made significant contributions to this report including: T. W. Wood who originally recognized the need for this study and instigated its initiation; to J. M. Reilly, (now with the U.S. Department of Agriculture) who was responsible for some of the early study efforts; to N. B. McLeod, E. R. Johnson Associates, who provided us with an analysis of reactor pool reracking costs; to L. G. Wattenburger, Boeing Computer Services Richland, and his graphic arts team for their excellent graphics work; and to M. M. Hale and her word processing team for their excellent support and forebearance through the numerous revisions and rewrites of sections of this report.

| Name | Approved | Date |
|---|---|---|
| AJ Boegel | AJ Boegel | 8 Sept 87 |
| JL Braitman | JLB | 9/11/87 |
| | | |
| | | |

Battelle
Pacific Northwest Laboratories
P.O. Box 999
Richland, Washington U.S.A. 99352
Telephone (509)
Telex 15-2874

September 8, 1987

Mr. Michael S. Karol, Director
Storage and Transportation Division
U.S. Department of Energy
Richland Operations Office
Richland, WA 99352

bcc: ME Schutz, JS Pomykala, JJ Tawil, AF Rosenfeld, JL Braitman, AJ Boegel, LL Clark, BM Cole, JM Creer, GM Holter, RA Libby, File/LB, RW McKee, GW McNair, TP Sovers, MR Shay, TW Wood, MK White, RI Smith, FP Roberts

Dear Mr. Karol:

SUBMITTAL OF DRAFT REPORT ON ACCEPTANCE RIGHTS ALLOCATION

Enclosed are six copies of a draft report titled "At-Reactor Spent Fuel Storage Requirements With and Without Acceptance Rights Trading."

The Standard Contract (10 CFR 961) between DOE and the nuclear utilities includes a provision allowing reactor sites to trade spent fuel acceptance rights subject to DOE approval. A site needing early storage relief might be able to trade (exchange) some of its later acceptance rights with another site having early acceptance rights and excess storage capacity. This report presents results of an analysis of reactor storage requirements for spent fuel and the effects and possible benefits of trading spent-fuel acceptance rights among reactor sites. The scope of the analysis considers reactor storage requirements both with and without acceptance rights trading and the selection of storage options and costs to meet these requirements as influenced by cost uncertainties.

This report concludes that the potential savings from trading at individual sites appears to be sufficient to attract significant interest from the utilities once acceptance schedules are firmly established. Most sites that can benefit from trading can save at lest $1 million and several sites could save over $10 million in avoided storage facility costs.

This report completes the only deliverables for the Acceptance Rights Allocation Project for FY-87. If it meets with your approval, please transmit four copies to Jack Hale at DOE-HQ. We can supply additional copies if needed.

If you need additional information, please feel free to contact me or the Project Manager, R. W. McKee (376-1309).

Very truly yours,

Gordon H. Beeman

Gordon H. Beeman, Manager
Systems Integration Program

GHB:RWM:ief

Enclosures
cc: DE Kenyon, DOE-RL w/enc
DL Sours, DOE-RL w/o enc

PLAINTIFF'S EXHIBIT 136 04-106

PNL-144-1715

DRAFT

# AT-REACTOR SPENT FUEL STORAGE REQUIREMENTS WITH AND WITHOUT ACCEPTANCE RIGHTS TRADING

R. W. McKee
J. S. Pomykala
J. J. Tawil
A. F. Rosenfeld
M. E. Schutz

August 1987

Prepared for
the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Richland, Washington 99352

SAN 5/13/89

4E-069

Jeff Williams
Bill Dornsough
Western Representative
Dave Dippold

DRAFT

# Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors - A Preliminary Analysis

T.W. Wood
* D.G. Dippold
S.M. Short

* Office of Transportation Systems Planning
Nuclear Systems Group
Battelle Memorial Institute

May 1989

Prepared for the U.S. Department of Energy
Under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Operated for the U.S. Department of Energy
by Battelle Memorial Institute

PLAINTIFF'S EXHIBIT 158 04-106

CTR0002662

Return to Jeff Williams

PNL-7143
UC-812

# Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis

T. W. Wood
A. M. Plummer
D. G. Dippold
S. M. Short

October 1989

Prepared for the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Operated for the U.S. Department of Energy
by Battelle Memorial Institute

PNL-7143

HQ0013950

PLAINTIFF'S EXHIBIT 166 04-106

HQR-007-0817

DRAFT

PNL-xxxx
UC-xxx

# Cost Estimates of Operating On-Site Spent Fuel Pools after Final Reactor Shutdown

S. R. Rod

November, 1990

Prepared for the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Operated for the U.S. Department of Energy
by Battelle Memorial Institute

DRAFT

PNL-7778
UC-812

# Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown

S. R. Rod

August 1991

Prepared for the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Operated for the U.S. Department of Energy
by Battelle Memorial Institute

Battelle

PNL-7778

PLAINTIFF'S
EXHIBIT
219
04-106

CTR006 0514

## DISCLAIMER

This report was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor Battelle Memorial Institute, nor any of their employees, makes any warranty, expressed or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof, or Battelle Memorial Institute. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.

PACIFIC NORTHWEST LABORATORY
*operated by*
BATTELLE MEMORIAL INSTITUTE
*for the*
UNITED STATES DEPARTMENT OF ENERGY
*under Contract DE-AC06-76RLO 1830*

Printed in the United States of America

Available to DOE and DOE contractors from the
Office of Scientific and Technical Information, P.O. Box 62, Oak Ridge, TN 37831;
prices available from (615) 576-8401. FTS 626-8401.

Available to the public from the National Technical Information Service,
U.S. Department of Commerce, 5285 Port Royal Rd., Springfield, VA 22161.

White Paper
August 1992

# EFFECTS OF EXCHANGES OF DELIVERY COMMITMENT SCHEDULES ON THE CRWMS TRANSPORTATION SYSTEM

Prepared for:
The U.S. Department of Energy
Office of Civilian Radioactive Waste Management
by the Transportation Operations Project Office
Oak Ridge National Laboratory

Martin Marietta Energy Systems, Inc.
P.O. Box 2008
Oak Ridge, Tennessee 37831

Science Applications International Corporation
P.O. Box 2501
Oak Ridge, Tennessee 37831

TO05D.91

A00000000-01717-5700-00022 Rev 02
WBS 9.2.1.2
QA: N/A

**Civilian Radioactive Waste Management System**
**Management & Operating Contractor**

# CRWMS Modular Design/Construction and Operation Options Report

**Revision 02**

**December 18, 1998**

Prepared for:

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
1000 Independence Avenue, S.W.
Washington, DC 20585

Prepared by:

TRW Environmental Safety Systems Inc.
2650 Park Tower Drive
Suite 800
Vienna, Virginia 22180

Under Contract Number
DE-AC08-91RW00134

PLAINTIFF'S
EXHIBIT
405
04-106

HQ0013792

PNL-SA-12955

# ROLE OF TRANSPORTATION IN THE UTILITIES' MANAGEMENT OF SPENT FUEL STORAGE

Darrell F. Newman

For presentation at
Fuel Cycle Conference '85
March 12-15, 1985
New Orleans, Louisiana

Work supported by
the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Richland, Washington 99352
Operated by Battelle Memorial Institute

PLAINTIFF'S
EXHIBIT
91
04-106

PNL-XXXX
UC-85

Note to Editor -

Dave, this is a little rougher than I expected, and I have asked Max & Bob to hold up on review until the next version is available. Also note that the final two figures were not included, and apparently still need to go to graphics.

Thanks, Tom

# SPENT FUEL ACCEPTANCE SCENARIOS DEVOTED TO SHUTDOWN REACTORS: A PRELIMINARY ANALYSIS

PS I have also made some editorial as based on GHB's review of this draft & will try to expedite his sign-off.

T. W. Wood
A. R. Plummer[a]
D. G. Dippold[a]
S. M. Short

July 1989

Prepared for
the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Richland, Washington 99352

(a) Office of Transportation Systems Planning
Nuclear Systems Group
Battelle Memorial Institute

PLAINTIFF'S EXHIBIT
162
04-106

TRW

TRW Environmental
Safety Systems Inc.

2650 Park Tower Drive, Suite 800
Vienna, VA 22180
703.204.8500

SN 76000

QA: N/A

February 10, 1995
VA.WA.DAW.2/95.027

Mr. Samuel Rousso
Director, Waste Acceptance, Storage and Transportation, RW-40
Office of Civilian Radioactive Waste Management
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington, DC 20585

Dear Mr. Rousso:

Subject: DE-AC01-91RW-00134; Waste Acceptance Support: *Preliminary Draft DCS Exchange Evaluation Criteria Development Report* (WAD-95-03-00, WBS 3.3.1.1.2, Activity No. 335308)

The enclosed subject report combines the four chapters previously prepared into a single document and incorporates all comments received to date from each system element. This draft is in response to a DOE/RW request for FY 1995 Waste Acceptance Support, WBS 3.3.1.1.2 - Pre-Acceptance Operations.

A key activity in development of the DCS Exchange Evaluation Criteria is consideration of the impacts of exchanges on all elements of the CRWMS. The enclosed report is being given a wide distribution to alert other elements of Waste Acceptance activities.

If you have any questions or require further information, please contact Douglas Williamson at 703.204.8918.

Sincerely,

James B. Blandford
Deputy Assistant General Manager,
Office of Waste Acceptance, Storage and Transportation

JBB:DAW:as

Enclosure: (1)

PLAINTIFF'S
EXHIBIT
329
04-106

cc: A. B. Brownstein, DOE/RW-44
H. A. Benton, TES3/504
S. Benesole, TES1/3200W
J. R. Clark, TES1/2532
T. R. Crump, NV/BOAC/M&O/1105
L. J. Desell, DOE/RW-45
V. Dulock, NV/BOAC/M&O/9444
T. C. Geer, TES3/9256
R. W. Godman, TES1/8584
P. Gottleib, TES3/526
S. E. Houston, NV/BOAC/M&O/512CC
E. R. Johnson, JAI
R. F. Kelly, TES1/2574
J. L. King, TES1/3500M
A. S. Kubo, TES1/8582
J. J. Miller, TES1/3591
R. D. Memory, NV/BOAC/M&O/9260
R. G. Morgan, TES1/3229
R. M. Sandifer, TES3/500
A. M. Segrest, TES3/500
M. Sellers, NV/BOAC/M&O/9400F
N. Slater, DOE/RW-44
L. S. Smith, TES2/695
H. T. Snead, TES1/2576
J. B. Stringer, TES1/2555
R. D. Tagg, TES1/8351
B. R. Teer, TES1/2589
J. R. Williams, DOE/RW-46
L. Wimmer, TES1/2500AA
D. Zabransky, DOE/RW-44
Chron File
Records Processing Center
WA Staff

CTR-003-2213

QA: N/A

# Evaluation of Delivery Commitment Schedules (DCS) Exchange Requests

**Preliminary Draft**

February 10, 1995

Prepared for:

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
1000 Independence Avenue, S.W.
Washington, D.C. 20585

Prepared by:

TRW Environmental Safety Systems Inc.
2650 Park Tower Drive
Suite 800
Vienna, Virginia 22180

Under Contract Number
DE-AC01-91RW00134

CTR-003-2214

# Standard Contract Issue Resolution Process

## An Overview and Status

David C. Jones
E. R. Johnson Assoc., Inc.

Nancy S. Montgomery
U.S. Department of Energy

Billy M. Cole
E . R. Johnson Assoc., Inc.

April 29, 1993
1993 International High-Level Radioactive
Waste Management Conference
Las Vegas, Nevada

PLAINTIFF'S
EXHIBIT
275
04-106

CTR-003-0001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

00122

Q. But they were pretty much on an ad hoc basis?

A. Yes.

Q. Just to clarify what I mean by ad hoc, you didn't have quarterly meetings?

A. Once a month or once a week, no.

Q. Just when an issue came up that was ripe for being addressed?

A. It was addressed.

(Slater Exhibit No. 6 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've just been handed what we've had marked as Slater Exhibit 6. Do you recognize this document?

A. Vaguely.

Q. Can you tell us what it is?

A. Can you give me a moment to refresh my memory.

Q. Sure.

A. Okay. Without reading through the entire paper, yes, this is a general summary of the ACR issue resolution process, the nature and scope of the issues that require interpretation, clarification, resolution, and a brief address on

00123

certain of those issues of what that is likely to be.

Q. Did you draft this document?

A. No, I did not.

Q. Do you recall who did?

A. Yes, Dave Jones did.

Q. You would have reviewed this document?

A. Yes.

Q. And there are three names at the top of the first page of Exhibit 6. Mr. Jones, you, and Mr. Cole?

A. Billy Cole, yes.

Q. What was Mr. Jones' and Mr. Cole's roles?

A. They were consultants to the -- I guess it was logistics to our branch or our division depending on whether or not we had been renamed at that point. But yes.

Q. Exhibit 6 was a document written by Mr. Jones, the contractor, on behalf of your division?

A. No. It was a document that was authored on behalf of E.R. Johnson Associates for presentation at a conference. And in general we have a DOE author on papers like this. We then

00124

have the right to review. And so that's the way this works. No, this was not authored at the request of DOE.

Q. Do you recall what the purpose of the conference was or the nature of the paper?

A. No, I do not.

Q. So you would have reviewed this document, Exhibit 6, as the DOE author to check for accuracy from DOE's perspective?

A. Yes.

Q. Do you see I guess at the bottom of the first page, there looks to be a page number, 757?

A. Yes.

Q. Which suggests this might have been part of a larger compilation?

A. The proceedings from the meeting perhaps.

Q. That was the question I was going to ask, do you know what this might be from a compilation of?

A. I would speculate that it is from a compilation. Which compilation I couldn't say.

Q. In your role as the reviewing author for DOE, is that a fair characterization of your role with respect to this document?

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :

COMPANY, et al., :

Plaintiffs, :

v. : Case No.

THE UNITED STATES, : 98-126C-987 4C

Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.

Wednesday, May 8, 2002

Deposition of THOMAS WOOD, a witness herein, called for examination by counsel for Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee, in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:00 p.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

00070

THE WITNESS: Yes.

BY MR. KRNCEVIC:

Q. Did you receive any direction from the Department of Energy that there was a different purpose other than performing pursuant to the standard contract?

A. The purpose of our work included setting reasonable design and requirements for the system, that includes cases in which the standard contract is interpreted in a lot of different ways, or conceivably departed from in some measure. And so that motivation transcends the specific focus on the contract if I understand the question. Does that answer the question?

Q. Well, what other motivations would there be in the spent fuel system?

MR. LESTER: Objection, vague. Asked and answered.

THE WITNESS: Just to conduct the disposal mission. Maybe I'm making a distinction you're not making. The overall conduct of the disposal mission is laid out in the Nuclear Waste Policy Act.

(Exhibit No. 5 was marked for identification.)

BY MR. KRNCEVIC:

00071

Q. I know this is a big document. To assist you I can limit the areas I'm going to ask you questions about. They'll all be in section 2 and 3.

A. Okay.

Q. Okay. I actually lied. I just wanted to point out that under the acknowledgments they recognize, this is Exhibit number 5, recognizes, T.W. Wood who originally recognized the need for this study and instigated its initiation.

Are you familiar with this report at all?

A. Yes.

Q. Could you just read the title of Exhibit 5?

A. At-Reactor Spent Fuel Storage Requirements With and Without Acceptance Rights Trading.

Q. Were you involved at all in the preparation of this report?

A. Not in the preparation. I was involved in the scoping or formulation of the problem that led to this report.

Q. When you say scoping and formulation of the problem, what specifically does that entail?

A. The issues raised in summary fashion in the earlier documents we discussed really were analyzed in more depth here. I was consulted about

00072

the motivation for the study and the essential features of the problem when this study was being put together.

Q. Is this a study that PNNL undertook on its own?

A. No.

Q. Was it commissioned by the Department of Energy?

A. Yes.

Q. To what extent did you offer consultation on this?

A. I don't remember the details of the process. I know that I was aware of the conduct of the study and generally had access to the authors.

Q. Do you know what the motivation of this study was?

MR. LESTER: Objection, foundation.

THE WITNESS: I guess I had better since it was my idea. The motivation was to understand more thoroughly and more precisely how a market in spent fuel acceptance rights would affect the economics and logistics of the spent fuel management problem at reactors and at DOE.

BY MR. KRNCEVIC:

Q. Would it be fair to say that the