**No. 04-106C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**DAIRYLAND POWER COOPERATIVE,**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

---

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

**OF COUNSEL:**

**JANE K. TAYLOR**
**Office of General Counsel**
**U.S. Department of Energy**
**Office of General Counsel**
**1000 Independence Ave., S.W.**
**Washington, D.C. 20585**

**ALAN J. LO RE**
**Senior Trial Attorney**

**PATRICK B. BRYAN**
**JOSHUA E. GARDNER**
**ANTHONY W. MOSES**
**SONIA M. ORFIELD**
**SCOTT SLATER**
**Trial Attorneys**
**Commercial Litigation Branch**

**GREGORY G. KATSAS**
**Acting Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**RUSSELL A. SHULTIS**
**Commercial Litigation Branch**
**U.S. Department of Justice**
**Attn: Classification Unit,**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 305-7571**
**Fax: (202) 307-2503**

**June 9, 2008**

**Attorneys for Defendant**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES. . . . . . . . . . v

SUMMARY OF ARGUMENT. . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . 6

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT. . . . . . . . . . 6

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER.. . . . . . . . . . 7

A. The Proposed Rule.. . . . . . . . . . 7

B. Public Comments.. . . . . . . . . . 8

C. The Final Rule. . . . . . . . . . 9

III. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT. . . . . . . . . . 12

IV. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT. . . . . . . . . . 13

V. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS. . . . . . . . . . 14

A. The 1987 Through 1990 Annual Capacity Reports. . . . . . . . . . 14

B. The 1991 Annual Capacity Report.. . . . . . . . . . 15

VI. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES. . . . . . . . . . 17

TABLE OF CONTENTS (Cont.)

PAGE

STATEMENT OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I. DAIRYLAND BEARS THE BURDEN OF ESTABLISHING CAUSATION, FORESEEABILITY, AND REASONABLENESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. Dairyland Bears The Burden Of Establishing That Its Costs Are Attributable To DOE's Delay. . . . . . . . . . . . . . . . . . . 18

B. Dairyland Should Be Required To Paint A Reasonable "But For" World Against Which Its Damages Can Be Measured . . . . . . . . . . . 22

C. Regardless Of Whether The Court Employs A "But For" Or "Substantial Causal Factor" Analysis, Dairyland Must Show That Its Costs Would Not Have Been Incurred Absent The Alleged Breach.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

D. Dairyland Bears The Burden Of Proving The Foreseeability Of Its Claimed Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

E. Dairyland Bears The Burden Of Proving Its Claimed Damages With Reasonable Certainty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

II. DAIRYLAND CANNOT PROVE THAT DOE'S DELAY IN PERFORMANCE CAUSED IT TO INCUR THE DAMAGES IT SEEKS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A. The Rate Of Acceptance Is Critical For The Determination Of Dairyland's Alleged Damages In This Case . . . . . . . . . . . . . . . . . . . . . . . 27

B. Dairyland Has Improperly Defined DOE's Obligations Under The Standard Contract And, Thus, Has Failed To Provide A Basis For Comparison To The Actual World. . . . . . . . . . . . . . . . . . . . . 29

1. The NWPA Does Not Mandate A Rate Of Acceptance. . . . . . . . 29

2. The Standard Contract Contains No Language Imposing, And Is Inconsistent With, The Rate Requirement That Dairyland Proposes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

TABLE OF CONTENTS (Cont.)

PAGE


3. The Court Should Not Impose Dairyland's "Reasonable" Rate Of Acceptance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

4. The Rate Of Acceptance Should Be Determined In Accordance With The APR/ACR Process Mandated By The Standard Contract, In Which Dairyland Willingly Participated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

5. Mr. Graves' Opinions Concerning "Economic Efficiencies" Gained Through The Implementation Of An Acceptance Rate Of 3,000 MTU Are Irrelevant And Unsupported. . . . . . . . . 38

C. Dairyland Cannot Establish The Necessary Causal Link Between Certain Of Its Claimed Storage Costs And DOE's Delay. . . . . . . . . . . . . 39

1. Dairyland Cannot Meet Its Burden Of Establishing Exchanges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

2. Dairyland's Damages Claim Fails To Account For Failed Fuel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

3. Dairyland's Cannot Prove That Its Claimed Costs For Its Reactor Pressure Vessel Removal Project Were Caused By DOE's Delay, Or That Its Claimed Costs Are Reasonably Certain. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

4. Dairyland Cannot Establish Causation For Certain Costs It Allegedly Incurred For Internal Labor And "Overheads". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

a. Certain of Dairyland's Claimed Internal Labor Is Not Incremental To DOE's Breach. . . . . . . . . . . . . . . . . 44

b. Dairyland's General & Administrative Overhead And Overhead Represent Fixed Costs That Would Have Been Incurred Regardless Of DOE's Delay. . . . . . . . . . . 45

5. Dairyland's Claim Should Be Adjusted To Account For Costs That It Would Have Incurred In The "But For" World .. . . . . . . . 45

TABLE OF CONTENTS (Cont.)

PAGE

III. DAIRYLAND CANNOT RECOVER DAMAGES RELATED TO PFS, AS SUCH COSTS WERE INCURRED BY A THIRD PARTY THAT IS NOT IN PRIVITY OF CONTRACT WITH THE GOVERNMENT AND ARE OTHERWISE PRECLUDED BY THE FEDERAL CIRCUIT'S DECISION IN *INDIANA MICHIGAN* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

TABLE OF AUTHORITIES

CASES PAGE(S)

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004). .......... 19

Am. Capital Corp. v. FDIC,
472 F.3d 859 (Fed. Cir. 2006).......... 48

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991).......... 36

Barrow Utils. & Elec. Co-op, Inc. v. United States,
20 Ct. Cl. 113 (1990). .......... 26

Bluebonnet Savs Bank. F.S.B. v. United States,
67 Fed. Cl. 231 (2005),
vacated on other grounds, 339 F.3d 1341 (Fed. Cir. 2003). .......... 23

Bluebonnet Savs. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003).......... passim

Boeing Co., ASBCA ,
No. 18,916,74-2 B.C.A. (1974). .......... 32

Bohac v. Department of Agric.,
239 F.3d 1334 (Fed. Cir. 2001).......... 25

City of Tacoma, Dep't of Public Utilities v. United States,
31 F.3d 1130 (Fed. Cir. 1994).......... 36

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000),
rev'd on other grounds, 309 F.3d 1353 (Fed. Cir.2002),
vacated, 320 F.3d 1338 (Fed. Cir. 2003). .......... 23

Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n,
745 F.2d 281 (4th Cir. 1984). .......... 33

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998).......... 36

David Nassif Assocs. v. United States,
557 F.2d 249 (Ct. Cl. 1977). .......... 34

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

David Nassif Assocs. v. United States,
644 F.2d 4 (Ct. Cl. 1981). .......... 34

Department of Energy v. Westland,
565 F.2d 685 (CCPA 1977). .......... 30

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001).......... 22, 23

Granite Mgt. Corp. v. United States,
74 Fed. Cl. 155 (2006). .......... 23

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005). .......... passim

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983),
cert. denied, 464 U.S. 814 (1983). .......... 38

LTV Aerospace Corp.
ASBCA No. 17,131,76-1 B.C.A.(1976).......... 32

Landmark Land Co. v. Federal Deposit Insur. Corp.,
256 F.3d 1365 (Fed. Cir. 2001).......... 26

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994). .......... 35

Myerle v. United States,
33 Ct. Cl. 1 (1897). .......... 48, 49

Nebraska Public Power District v. United States,
73 Fed. Cl. 650 (2006). .......... 2

Nebraska Public Power District v. United States,
74 Fed. Cl. 762 (2006). .......... 2

Nebraska Public Power District v. United States,
Misc. Docket No. 843, 2007 WL 779291 (Fed. Cir. Mar. 1, 2007).......... 2

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

Northern Helex Co. v. United States,
207 Ct. Cl. 862 (1975). .......... 25

Northern States Power Co. v. United States,
78 Fed. Cl. 449 (2007). .......... 49

Northern States Power Co. v. United States,
128 F.3d 754 (D.C. Cir. 1997). .......... 2

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006).......... 25, 50

PSEG Nuclear, L.L.C. v. United States,
465 F.3d 1343 (Fed. Cir. 2006).......... 22

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006)
appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007).......... passim

Prudential Ins. Co. v. United States,
801 F.2d 1295 (Fed. Cir. 1986).......... 25

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992).......... 26

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003).......... 27

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006). .......... 25, 41

San Carlos Irr. & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997).......... 21, 41

Selman v. United States,
204 Ct. Cl. 675 (1974). .......... 30

Southern Nuclear Operating Company v. United States,
77 Fed. Cl. 396 (2007). .......... 48, 49, 50

TABLE OF AUTHORITIES (Cont'd)

CASES PAGE(S)

TEG-Paradigm Environmental, Inc. v. United States,
465 F.3d 1329 (Fed. Cir. 2006)........ 31

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006). ........ 44.

United States Steel Corp. v. United States,
618 F. Supp. 496 (CIT 1985). ........ 30

Wells Fargo Bank v. United States,
88 F.3d 1012 (Fed. Cir. 1996)........ 26

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002)........ 19

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360 (1961). ........ 21

STATUTES

10 C.F.R. § 72.22. ........ 50

10 C.F.R. § 961.11. ........ passim

42 U.S.C. § 10131(b). ........ 6

42 U.S.C. § 10132. ........ 6

42 U.S.C. § 10134. ........ 6

42 U.S.C. § 10135. ........ 6, 14

42 U.S.C. § 10139. ........ 2

42 U.S.C. §§ 10101-10270 (1982). ........ 6

42 U.S.C. § 10161 (1982). ........ 7, 13

42 U.S.C. § 10162(b). ........ 14

42 U.S.C. § 10168(d). ........ 14, 37

TABLE OF AUTHORITIES (Cont'd)

STATUTES PAGE(S)

42 U.S.C. § 10172(a). .......... 14

42 U.S.C. § 10221 (1982). .......... 12

42 U.S.C. § 10222(a) (1982). .......... 7

42 U.S.C. § 10242(a). .......... 14

42 U.S.C. § 10243(a). .......... 14

42 U.S.C. § 10250. .......... 14

MISCELLANEOUS

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). .......... 10

48 Fed. Reg. 5458 (Feb. 4, 1983). .......... 7, 8, 9

S. Rep. No. 100-152 (Sept. 1, 1987). .......... 13, 14

11 Corbin on Contracts § 53.3 (rev. ed. 2005). .......... 23

Restatement (Second) of Contracts § 347. .......... 18

Restatement (Second) of Contracts, § 351, cmt. a. .......... 26

Restatement (Second) of Contracts § 352 cmt. a. .......... 26

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 04-106C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to this Court's February 21, 2008 trial preparation order, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law.

SUMMARY OF ARGUMENT

This case involves a damages claim by plaintiff, Dairyland Power Cooperative ("Dairyland"), for $54.4 million in costs that it allegedly has incurred at its La Crosse Boiling Water Reactor ("LACWR") nuclear power plant associated with the storage of spent nuclear fuel ("SNF"). Dairyland's claim includes costs for, among other things, wet pool storage operations at Dairyland, the alleged incremental cost associated with the dismantlement of its reactor pressure vessel ("RPV"), and approximately $11 million for its investment in its for-profit subsidiary, Genoa FuelTech, Inc., ("GFT"), which, in turn invested in the yet-to-be constructed Private Fuel Storage ("LLC") business venture. Dairyland wrongly contends that the Government is liable for all of these costs because the need for SNF storage was caused by the Government's failure to begin accepting SNF from commercial nuclear reactors on January 31, 1998, pursuant to the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level

Radioactive Waste" ("Standard Contract") between the Department of Energy ("DOE") and Dairyland.[1]

Dairyland bears the burden of proving that its damages were caused by DOE's partial breach, were foreseeable, and are reasonable. Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005). As part of that legal obligation, Dairyland must establish that it properly has accounted for costs that would have been incurred had DOE performed beginning in 1998. Thus, Dairyland must do more at trial than simply identify costs that it has incurred in

[1] The Government has been specifically enjoined, via a writ of mandamus issued by the United States Court of Appeals for the District of Columbia, from relying upon the "Unavoidable Delays" clause of the Standard Contract to excuse its delayed performance. See Northern States Power Co. v. United States Dept. of Energy, 128 F.3d 754, 760 (D.C. Cir. 1997). That provision states that "[n]either the Government nor Purchaser shall be liable under this contract for damages caused by failure to perform its obligation hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform." 10 C.F.R. § 961.11, Art. IX.A (emphasis added).

The D.C. Circuit has eliminated one of the central provisions of the Standard Contract that governs the parties' liability in the event of delays in SNF acceptance. With this clause, DOE would have had the ability to present an absolute defense to liability in this case. Without it, DOE now faces billions of dollars in damages claims. The writ of mandamus wholly changes the nature of the Standard Contract, essentially and inappropriately creating a contract (one without an "Unavoidable Delays" clause) between the parties to which DOE never agreed. We have consistently argued that the D.C. Circuit overstepped its jurisdiction and authority in issuing this writ of mandamus (given that the judicial review provision of the NWPA, 42 U.S.C. § 10139, does not permit the D.C. Circuit to review contract administration matters). Recently, in Nebraska Public Power District v. United States, 73 Fed. Cl. 650, 673 (2006) (Allegra, J.), this Court determined that the writ of mandamus was void because, in issuing the writ, the D.C. Circuit "operated in excess of its jurisdiction and, specifically, without an appropriate waiver of sovereign immunity." This Court subsequently certified its decision for interlocutory appeal to the United States Court of Appeals for the Federal Circuit, Nebraska Public Power District v. United States, 74 Fed. Cl. 762 (2006), and, on March 1, 2007, the Federal Circuit issued an order granting Nebraska Public Power's petition for permission to appeal. Nebraska Public Power District v. United States, Misc. Docket No. 843, 2007 WL 779291 (Fed. Cir. Mar. 1, 2007). The appeal has been fully briefed, and oral argument took place on December 3, 2007. The Government reserves the right to challenge any determination of liability with respect to the Standard Contract if the writ of mandamus is lifted or otherwise deemed inapplicable.

connection with the storage of SNF to meet that burden. Dairyland must establish what DOE was required to do pursuant to the Standard Contract - the "but for" world -and Dairyland must show how DOE's failure to perform has given rise to Dairyland's damages.

Dairyland has failed to satisfy this burden. Dairyland asserts that all of LACBWR's SNF would have been removed by DOE in 1998, the first year of industry-wide acceptance in the but for world. Consequently, Dairyland has claimed as damages all costs associated with the storage of LACBWR's SNF beginning in 1999. Yet, this "fuel out date" is premised upon the erroneous contention that the Standard Contract obligated DOE to accept SNF at a rate that would exceed the industry-wide generation rate and work off the backlog of SNF stored at commercial nuclear reactors. See, e.g., Pl. Br. 7. Consequently, determining the rate and schedule of acceptance to which the Government was contractually obligated is the lynchpin to the determination of damages in this case.

During contract formation, DOE expressly rejected language requested by utilities and industry advocates that would have tied the acceptance rate to the annual generation rate and to a reduction of the backlog. Based upon the myriad uncertainties associated with the development of a first-of-a-kind program and performance under a contract 15 years removed from its execution, the Standard Contract does not contain a defined acceptance rate. Instead, the Standard Contract contains a mechanism for the development of an acceptance rate in the early 1990s – a point in time when DOE would have a clearer picture both as to its expected available facility and the capacity of the system in 1998.

At trial, we will show that the proper rate of acceptance for the Court to apply is that which was developed pursuant to the terms of the Standard Contract and in accordance with the

constraints upon DOE's acceptance of SNF imposed by Congress. As required by the Standard Contract, this rate was first set forth in the 1991 Annual Capacity Report. Based upon Dairyland's allocations pursuant to this rate and the oldest-fuel-first acceptance queue established by the Standard Contract, Dairyland would have been required to store its SNF at LACBWR until at least 2012 and, consequently, would have been obligated to pay for all wet storage costs at LACWBR through 2012, not 1998, as asserted in its claim.

Further, Dairyland's assertion of a 1998 fuel out date at LACBWR requires both the implementation of its acceptance rate and that the Court find that a perfect market for the exchange of approved DOE acceptance allocations would have developed among the utilities in the years leading up to the commencement of acceptance of SNF by DOE allowing Dairyland to acquire enough allocations such that DOE would have accepted all of Dairyland's SNF in 1998, the first year of acceptance. The Government will demonstrate that this theoretical exchange market, as envisioned by Dairyland's expert, Frank Graves, is inherently speculative and unreliable, is factually unsupported, is inconsistent with other "representative" markets, ignores critical economic considerations such as financial and political risk, and relies upon fundamentally flawed financial inputs relating to industry SNF storage costs, not Dairyland's storage costs. Mr. Graves also ignores the effect that Dairyland's failed fuel might have upon the acceptance schedule and Dairyland's ability to engage in exchanges. Upon analysis, Mr. Graves' opinion should not form the basis for any causation determination regarding Dairyland's acceptance rights.

Additionally, Dairyland's claim is flawed because it fails to account for certain activities that were avoided as a result of the partial breach as well as costs that would have been incurred

regardless of the partial breach. These adjustments include the costs associated with loading SNF to DOE that Dairyland avoided, the payment of Nuclear Regulatory fees, the cost of certain decommissioning-related activities, and certain internal labor and overhead costs.

Further, Dairyland's attempt to recover amounts paid in connection with the private, for-profit PFS facility in Utah is inherently speculative, was not foreseeable to the parties (and to the Government, in particular) at the time of contract formation in 1983, and otherwise is not recoverable. First, Dairyland cannot recover PFS costs in this case for the simple reason that Dairyland is not a member of PFS and, as a consequence, did not invest in PFS. Rather, Dairyland invested in a separate, for-profit subsidiary company – GFT – which, in turn, acting in its own corporate interest, decided to invest in PFS. Dairyland cannot now disregard the corporate form for its own benefit to recover the value of its interest in GFT. Second, regardless of whether Dairyland has the standing to recover costs associated with PFS, neither Dairyland nor any other utility may claim as "mitigation" damages the costs related with the PFS business enterprise. The issue of the recoverability of amount paid to PFS was squarely addressed in Indiana Michigan Power Co. v. United States, 422 F.3d at 1369 (Fed. Cir. 2005), in which the Federal Circuit found that the Government could not have foreseen at the time of contract formation that a utility would incur such "speculative" investment costs. Because foreseeability is measured from the perspective of the defendant at the time of contract formation, and in light of the fact that the Standard Contract in Indiana Michigan is identical to contract at issue in this case, Indiana Michigan is dispositive and should be followed here.

Dairyland's brief is characterized by its attempt to evade any responsibility to establish the "but for" world where the characteristics of that world would serve to decrease its damages.

Where a causation theory underlying the "but for" world works to increase Dairyland's damages – such as Dairyland's exchanges theory and the various contentions of its experts as to how DOE would have performed in a manner that works to Dairyland's benefit – the "but for" world is all but certain. Dairyland cannot have it both ways. If Dairyland cannot meet its burden of proof – and, upon many elements of its claim it cannot – its damages claim fails.

## STATEMENT OF FACTS

### I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and high level radioactive waste ("HLW"); establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing a Nuclear Waste Fund, financed by the utilities, to pay for the costs of the DOE program. Id. § 10131(b).

The NWPA defines a specific process by which the Secretary of Energy, the President of the United States, and the United States Congress would determine a site for a repository for the permanent deep geologic disposal of SNF. See 42 U.S.C. §§ 10132, 10134, 10135. Congress also included in the NWPA provisions allowing the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage

of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982).[2]

In addition, the NWPA authorized the Secretary to enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations under the NWPA, published a notice of proposed rulemaking in the Federal Register, proposing terms for the Standard Contract. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed Standard Contract provided a mechanism for determining the order in which, and the rate at which, the contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age. Id. at 5464 (Art. VI.B.3). Although the proposed Standard Contract did not

[2] By June 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1).

identify a specific rate by which DOE would accept the contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. Id. at 5463 (Art. V.B.5 & Art. V.B.6). The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission, and DOE's approval, of delivery commitment schedules ("DCSs"). Id. at 5462. The term "DOE facility" in the proposed Standard Contract referred to a facility for disposal, in a permanent repository, of the SNF and/or HLW. Id. at 5462 (Art. I.11). The proposed rule provided for written comments to be submitted by March 7, 1983. Id. at 5458.

B. Public Comments

DOE received numerous comments in response to the proposed rule.[3] A number of the comments recognized that the Standard Contract did not establish a specific rate at which DOE must accept SNF, and sought to have such a rate included. The Edison Electric Institute ("EEI"), an association of the nuclear power industry, requested as follows:

> The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit

[3] Contrary to the assertion in Dairyland's brief that the industry was largely uninvolved in the formulation of the Standard Contract, Pl. Br. 6-7, the evidence will show that utilities and their representatives had significant involvement with and input in the NWPA and the Standard Contract and affirmatively requested – and received – certain terms for inclusion in the final Standard Contract, including the term concerning exchanges of approved DCSs.

> DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs.

DX 2.034, Attachment A at 2 (ARC0010334).

EEI also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX. 2.034, Attachment A at 4 (ARC0010336). EEI stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." Id. at 5 (ARC0010337). See also DX 2.014 (ARC0010180) (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 2.069 (ARC0010625) ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

C. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made certain modifications to the Standard Contract as proposed. Although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. at 5463, that "disposal" was defined as emplacement in a permanent repository, Id. at 5463, and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of

"facility" operations. 10 C.F.R. § 961.11, Art. II. The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository. 10 C.F.R. § 961.11, Art. I.10. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). DOE did not adopt the suggestion that the contract incorporate a requirement that DOE accept SNF at a rate equal to the annual generation rate plus some additional amount to reduce the accumulated backlog. Instead, the contract provided that the acceptance rate would be developed later through the promulgation of the 1991 ACR.

The utilities acknowledged that DOE rejected their requests regarding the inclusion of a qualitative description of the acceptance rate in both internal memoranda and correspondence with DOE.[4] For example, TVA noted that its request regarding the acceptance rate term had been rejected:

---

[4] Dairyland asserts that the utilities shared the same understanding concerning DOE's obligation to accept SNF at a rate that would accommodate discharges after 1998 and work off the backlog. Pl. Br. 6-7. Dairyland is mistaken. In fact, utilities in have taken different positions concerning DOE's obligations. Southern Nuclear Operating Company, Georgia Power Company, and Alabama Power Company asserted a DOE contractual obligation that was tied to "no additional at-reactor storage" and timely decommissioning (defined by the Southern Nuclear plaintiffs as decommissioning within five years of shutdown) – an obligation that cannot be met with a 3,000 MTU rate. In contrast, Tennessee Valley Authority accepted the rate set forth in the 1991 ACR and argued that the rate in 2008 would ramp-up immediately from 900 MTU to 3,000 MTU.

> DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole.

DX 41, Attachment 2 at 3 (TV1471) (TVA memorandum, dated May 24, 1983). Similarly, in a letter to Robert Morgan of DOE, EEI complained that the Standard Contract as promulgated lacked "standards or milestones for DOE's performance . . . ." DX 46, Attachment 1 at 3 (SN011049-50).[5] The Standard Contract also contains an integration clause which provides that:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.[6]

On June 15, 1983, Dairyland executed the Standard Contract with DOE. DX 1. The Standard Contract covered the SNF generated at LACBWR and contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983.[7] DX 1.

---

[5] DOE likewise did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan . . . ." DX 2.043, attachment 1 at 1 (ARC00010439).

[6] The Standard Contract also included a "Disputes" clause which provided a mandatory administrative mechanism for the resolution of disputes arising under the contract. 10 C.F.R. § 961.11, Art. XVI.A.

[7] On March 22, 1985, Dairyland submitted a claim to DOE pursuant to the Standard Contract seeking relief from that amount of the one-time fee that was for SNF generated during the period before LACBWR was purchased by Dairyland. DX62 (PLAC0145594-96). On June 27, 1985, Dairyland settled its claim with DOE, agreeing to pay $725,236.24 pursuant to Article

## III. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT

In June 1985, DOE issued the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982). In the 1985 Mission Plan, DOE projected for informational purposes that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 64 at 25-26 (HQR0031129-30). The schedules contained in the Mission Plan projected annual SNF generation rates from utilities nationwide of approximately 3,000 MTU in 1998 and increasing by 2007 to over 4,000 MTU per year. Id.[8] The Mission Plan noted that these schedules were "only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses." DX 64 at 29 (HQR0031133). The Mission Plan further advised:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

Id.

---

VIII.B.2 of the Standard Contract. DX65 (PDPC0014806).

[8] Today, utilities discharge approximately 2,000 MTU of SNF per year.

In the 1987 Mission Plan Amendment, submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023. The Mission Plan Amendment reflected DOE's recognition that acceptance beginning in 1998 could not begin at a permanent repository. DOE explained that its recommendation was based upon experience gained in the program, a budget decrease for fiscal year 1987, and budget uncertainty for fiscal year 1988. However, DOE noted that it could nonetheless begin waste acceptance in 1998 at an MRS facility.[9] DX 74 at 6 (HQR0031634). The 1987 Mission Plan Amendment acknowledged the importance of the Annual Capacity Report that would be issued in 1991; namely, that it would be used in the DCS process. DX 74 at 60 (HQR0031687).

## IV. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT

On December 22, 1987, after DOE submitted the 1987 Mission Plan Amendment, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious," and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to

---

[9] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition . . . ." Id.

The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 10135(d)." 42 U.S.C. § 10168(d)(3). Finally, it also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Chapter first accepts [SNF]." Id. § 10168(d)(3).[10]

## V. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

### A. The 1987 Through 1990 Annual Capacity Reports

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." As each of these ACRs expressly stated,

---

[10] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a). The authorization for that office expired in 1994, id. § 10250, without any agreements with any states or Indian tribes.

"[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 73 at 2 (HQR0012713), DX 84 at 1 (HQR0012617), PX 192 at 2 (HQR0012494) ("projections in this initial report are based on current plans and best available information; they are not contractually binding"). Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 73 at 9 (HQR0012713), DX 84 at 2 (HQR0012618), DX 162 at 2 (HQR0012494).

B. The 1991 Annual Capacity Report

In December 1991, DOE issued its "Annual Capacity Report" for that year, DOE-RW-331P. DX 187 at 1-2 (HQR0012362-HQR0012363). The 1991 ACR was significant because it was the last ACR that would be issued prior to the contract holders' submission of DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 118 at 2 (HQR0020798). It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." Id. at 2, 7 (HQR0020798-0802).

As dictated by the Standard Contract, the 1991 ACR specified the aggregate rate of acceptance for the first 10 years of the DOE program, beginning in 1998, starting with 400 Metric Tons Uranium ("MTUs") in 1998, 600 MTUs in 1999, and 900 MTUs from 2000 - 2008. This rate was created with the knowledge that no permanent repository would be available by January 31, 1998. Id. at 4 (HQR0020800). Instead, "the waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility." Id. In particular, the rates were "consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." Id. DOE noted, however, that the schedule assumed that the schedule linkages between the MRS construction and repository construction authorization would be broken. Id.

A December 20, 1991 memorandum to John Bartlett, Director, Office of Civilian Radioactive Waste Management, stated as follows:

> The 1991 ACR assumes that FWMS [Federal Waste Management System] operations commence in 1998 and the system configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a Monitored Retrievable Storage facility with a 10,000 MTU storage limit prior to repository operations.
>
> The 1991 ACR differs from previously published ACRs for two reasons. First, while the information in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules (DCS) by the Contract holders. These DCSs, which will provide planning information for waste acceptance activities, may be submitted to the Department as early as January 1, 1992.

DX 122 (EDB0011764-765).

The utility industry recognized the importance of the 1991 ACR in the determination of delivery commitments for performance beginning in 1998. See, e.g., DX 75 at 8 (YDK038298) (UNWMG memorandum describing the 1991 ACR as "contractually binding.")

VI. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES

By letter dated March 4, 1992, the DOE contracting officer issued a letter to Dairyland and other utilities, along with the instructions for the submission of DCSs. DX 126. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." Id. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." Id. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. The instructions also required that the utilities list upon the DCSs the method of delivery to DOE (truck, barge, or rail) and fuel handling crane capacities.

The DCS instructions were developed with the full participation of the nuclear industry. See e.g. DX 96 (SN1685) (Minutes of High-Level Waste/Spent Fuel Storage Working Group Meeting stating that "[b]y 1/1/92, each utility is required to submit a DCS to DOE" and that the

task force would be "following this closely."). After DOE issued the instructions, utilities met with DOE again to discuss the instructions. DX 127 (SN17206).

Dairyland submitted DCSs to DOE for the years in which they were provided fuel acceptance allocations upon the basis of the allocations contained in the 1991 ACR and the 1991 APR. On September 17, 1992, Dairyland submitted DCSs requesting the following allocations: (1) 0.72 MTUs, or 6 assemblies in 1998; (2) 5.99 MTUs, or 51 assemblies, in 1999; (3) 3.00 MTUs, or 27 assemblies, in 2000; (4) 3.86 MTUs, or 35 assemblies, in 2001; (5) 3.37 MTUs, or 31 assemblies, in 2003; (6) 1.45 MTUs, or 13 assemblies, in 2006; and (7) 3.29 MTUs, or 30 assemblies, in 2007. DX132 and PX156. DOE's contracting officer approved Dairyland's DCSs on December 22, 1992. DX137 and PX263. Thus, Dairyland received approved DCSs for 193 of its 333 fuel assemblies.

## STATEMENT OF LAW

## I. DAIRYLAND BEARS THE BURDEN OF ESTABLISHING CAUSATION, FORESEEABILITY, AND REASONABLENESS

### A. Dairyland Bears The Burden Of Establishing That Its Costs Are Attributable To DOE's Delay

Dairyland seeks to recover damages based upon its "expectation interest" in the Standard Contracts. See Pl. Br. at 19 (citing Restatement (Second) of Contracts § 347)). That is to say, Dairyland seeks to recover expenses that it claims would not have been incurred had the Government begun removing fuel from its reactor sites beginning sometime after January 31, 1998. As Dairyland acknowledges, the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), provides the proper framework for evaluating such damages in an SNF case. See Pl. Br. at 19.

As described by the Federal Circuit in that case, the fundamental goal in awarding expectation damages is to "place the injured party in as a good a position as it would have been had the breaching party fully performed." Indiana Michigan, 422 F.3d at 1373. Conversely, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet Savs. Bank, F.S.B. v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)) ("[T]he non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'"); Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 385 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) (same).

Although Dairyland appears to acknowledge these fundamental precepts of contract law in its brief (see Pl. Br. 19-20), it simultaneously disregards its own burden of proof. As the party seeking to recover damages for breach of contract, Dairyland bears the burden of establishing by a preponderance of the evidence that the Government's breach "caused" it to incur each of the costs that it seeks, and that those costs were foreseeable and have been calculated to a reasonable certainty. Indiana Michigan, 422 F.3d at 1376; Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 414 (2004). Yet, in discussing what it perceives to be the appropriate standard for meeting its burden, Dairyland disclaims any responsibility for showing that the damages it seeks to recover from the Government reflect costs it would not have incurred absent DOE's breach. Specifically, Dairyland contends that "when LACBWR's spent fuel pool would have been empty absent the breach need only support a fair and reasonable approximation of damages." Pl. Br. at 27. According to Dairyland, because the damages it seeks are what it terms "mitigation damages," it need not show that the damages were actually "caused" by DOE's breach, but,

rather, must only show that it incurred the expenses claimed. Id. at 30. Toward that end, Dairyland states that, "[w]hat matter to causation of Dairyland's mitigation costs in this case is *that* DOE would have removed Dairyland's spent fuel in a reasonable time starting January 1998, not precisely *when* DOE would have done so." Id. at 30. The conclusion that Dairyland seeks to draw wholly eliminates its obligation to prove causation.

More specific to the spent nuclear fuel context, Dairyland's efforts to shift responsibility for establishing that its damages were, in fact, caused by DOE's delay in performance should be rejected as contrary to the standard established by the Federal Circuit in Indiana Michigan. In Indiana Michigan, the Federal Circuit defined the scope of a spent nuclear fuel plaintiff's burden with respect to damages. In that case, as in this one, the plaintiff sought damages for its efforts to expand its storage capabilities and, specifically, the costs that it incurred for a rerack and expansion of its spent nuclear fuel pool. 422 F.3d at 1372. In addressing these costs, which Dairyland characterized as "mitigation damages," the Federal Circuit explained that "[t]he presence of a duty to mitigate does not perforce make the pre-breach costs incurred by Indiana Michigan to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness." Id. at 1376. Critically, in Indiana Michigan, the Federal Circuit upheld the trial court's decision not to award any damages, based in part upon its finding that the utility could not show that its actions were caused by DOE's breach and that these actions would have taken place even in the absence of a partial breach. Id. at 1376.

The Federal Circuit's holding in Indiana Michigan dictates the appropriate framework for the resolution of the issues presented in this case. For this reason, the question is not, simply whether the decision to continue to maintain its SNF in its wet pool was a "reasonable" business

judgment made in an effort to limit their damages. Indeed, characterizing the costs that it incurred as "mitigation damages" puts the cart before the horse. As a threshold matter, Dairyland must prove, as a means of demonstrating that the costs that it incurred were "caused" by the partial breach, that it would not have incurred these so-called mitigation costs absent any delay. See San Carlos Irr. & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("A plaintiff must show that but for the breach, the damages alleged would not have been suffered."); Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822, 831 (1961) ("[T]he measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract. Were this not true, the doctrine of mitigation of damages would lose much of its significance.").

Only after Dairyland has established that its expenses are directly attributable to DOE's breach does the burden shift to the Government to show that Dairyland's mitigation efforts were not reasonable. Although Dairyland spends pages of its pre-trial brief discussing legal standards for mitigation, this discussion is irrelevant until it has met its burden with respect to causation (and would only be relevant if, after Dairyland met its burden, we actually challenged the reasonableness of Dairyland's actions). In short, we simply argue that many of those costs for which Dairyland seeks compensation are ones that Dairyland would have needed to incur even if DOE commenced accepting fuel in 1998 at the rate established by the mechanism in the Standard Contract and are, therefore, not appropriately claimed as damages. Even the most eminently reasonable expenditure is not recoverable in a breach of contract action if it was not caused by the defendant's breach.

B. Dairyland Should Be Required To Paint A Reasonable "But For" World Against Which Its Damages Can Be Measured

Requiring Dairyland to depict an accurate "but for" world is crucial to the Court's ability to evaluate whether certain items claimed as damages are costs that would have been incurred even if DOE had begun accepting spent fuel in 1998. This Court's decision in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007), recognizes the general principle that, when seeking expectancy damages, a plaintiff must establish a plausible "but for" world against which to measure causation. Specifically, the Court stated that "[p]laintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract." Id. at 386 (quoting Glendale Fed. Bank, FSB v. United States 239 F.3d 1374, 1380 (Fed. Cir. 2001)); see id. at 413 ("[t]o derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach" (quoting Bluebonnet, 339 F.3d at 1345)). The Court further clarified that PG&E's alleged expectancy damages could only be measured by reference to a world where DOE performed and that, without reference to the performance world, the measure of plaintiff's damages would be "irrelevant." Id. at 375 n.38; see PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343, 1351 (Fed. Cir. 2006) ("Any issues related to the types of damages permitted under the contract, if any, and the extent of those damages can be resolved by solely resolving the DOE's contractual obligations." (emphasis added)).

The principle upon which the Court relied in PG&E is not unique to SNF cases or to cases involving the so-called "mitigation costs" that Dairyland seeks here. As a matter of well-

established contract law, the failure of a plaintiff to prove that certain costs would not have been incurred in the "but for" world precludes a finding that the incurrence of costs was "caused" by the breach. See, e.g., Granite Mgt. Corp. v. United States, 74 Fed. Cl. 155, 169 (2006) (plaintiffs bear burden of propounding realistic "but for" scenario); Bluebonnet Savs Bank. F.S.B. v. United States, 67 Fed. Cl. 231, 237-38 (2005), vacated on other grounds, 339 F.3d 1341 (Fed. Cir. 2003); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000), rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002), vacated, 320 F.3d 1338 (Fed. Cir. 2003); see also Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been"). Requiring a plaintiff to demonstrate a "but for" world is simply another way of stating that a party cannot recover as damages from the Government any costs that it would have incurred in the absence of a breach. See Bluebonnet Savs. Bank, 339 F.3d at 1345; see also Indiana Michigan, 422 F.3d at 1376. Without establishing a "but for" world in which no partial breach occurred, Dairyland leaves the Court with no mechanism by which to determine whether its claimed costs were incremental to the delay in fuel acceptance, or whether they would have been incurred regardless of any delay.

The truth is that courts routinely must resolve what would have happened had a breaching party performed: "[t]he position that one would have occupied if history had been different is purely hypothetical. And yet that is the problem that the trial court . . . [is] required to solve . . . The working rules of law by which court[s] are directed are never capable of exact and perfect application." 11 A. Corbin, Corbin on Contracts § 53.3 (rev. ed. 2005) (emphasis added). cited in PG&E, 73 Fed. Cl. at 386, 397. Simply put, although it is true that the "but for" world has never occurred, that is true in all breach of contract cases. Yet, absent consideration of such a

world, Dairyland will be placed in a better position than had the contract been performed. See PG&E, 73 Fed. Cl. at 397.

C. Regardless Of Whether The Court Employs A "But For" Or "Substantial Casual Factor" Analysis, Dairyland Must Show That Its Costs Would Not Have Been Incurred Absent The Alleged Breach

Dairyland asserts that the Court should employ a "substantial causal factor" test in this case. Pl. Br. at 24. Although Dairyland does not elaborate upon what it perceives to be required by that test, implicit in Dairyland's arguments is the notion that, somehow, the "substantial causal factor" standard sets a lower threshold for them to meet and that this test obviates the need to paint a plausible picture of the actions that it would and would not have undertaken had DOE timely commenced accepting SNF. This argument does not accurately reflect Dairyland's burden.

In Indiana Michigan, the Federal Circuit, in discussing the standard for proving damages, identified the requirement that the plaintiff utility show that "the breach is a substantial causal factor in the damages." However, it did not relieve the plaintiff from its obligation to show that its costs were ones directly attributable to DOE's partial breach, as opposed to an independent "business judgment." Indiana Michigan, 422 F.3d at 1373, 1376. In fact, the Federal Circuit affirmed the trial court's finding that the utility had failed to meet its burden of proof because the utility would have made the same business judgment to rerack its spent fuel pool even had DOE timely commenced performance. As Indiana Michigan illustrates, merely labeling the inquiry as the "substantial causal factor" test does not mean that a plaintiff can recover as damages costs that it would have incurred in the absence of a breach.

Accordingly, the label attached to the standard of causation does not change what the Federal Circuit held in Indiana Michigan – a case that, it bears noting, involves the same type of damage claims that are at issue in this case, for breach of the same contract that is at issue in this case. To establish causation in this context, Indiana Michigan requires plaintiffs to show that, at a minimum, had DOE begun accepting fuel in 1998, plaintiffs would not have incurred the costs they now seek as damages. Imposition of this requirement is necessary to ensure that Dairyland is restored to the position it would have occupied in the absence of DOE's delay in performance, and are not reimbursed for costs that it otherwise would have been required to incur.

D. Dairyland Bears The Burden Of Proving The Foreseeability Of Its Claimed Damages

Dairyland also must also establish that its damages were foreseeable. Indiana Michigan, 422 F.3d at 1376. Foreseeability is determined at the time the contract was executed. See Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 714 (1975); Bohac v. Department of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001); Prudential Ins. Co. v. United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986). Additionally, Dairyland must establish that any damages were foreseeable by the Government when the Standard Contract was executed. Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 360 (2006) appeal pending, No. 2007-5052 (Fed. Cir. docketed Feb. 6, 2007). See Old Stone Corp. v. United States, 450 F.3d 1360, 1375 (Fed. Cir. 2006). As part of the foreseeability determination, Dairyland must demonstrate that both the magnitude and type of damages were foreseeable at the time of contract formation. See Landmark Land Co. v. Federal Deposit Insur. Corp., 256 F.3d 1365, 1378 (Fed. Cir. 2001); Wells Fargo Bank v. United States, 88 F.3d 1012, 1024-25 (Fed. Cir. 1996). "The

mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts, § 351, cmt. a (cited in Landmark Land, 256 F.3d at 1378).

E. Dairyland Bears The Burden Of Proving Its Claimed Damages With Reasonable Certainty

Dairyland also has the burden to establish "reasonable certainty" as to each item within its damages claims. Wells Fargo, 88 F.3d at 1023; see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). To support its claim, Dairyland must provide appropriate documentary or other support from its records to establish its damages claims. Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992) (plaintiff must provide adequate support for claimed costs). A contractor's failure to present any documentary support for its assertions that it incurred costs, precluding the Government from verifying that the costs were incurred and the reasons for their incurrence, precludes any recovery of those costs. Barrow Utils. & Elec. Co-Op, Inc. v. United States, 20 Cl. Ct. 113, 121 (1990). Without proper records, Dairyland cannot meet its burden of establishing causation or reasonable certainty.

## II. DAIRYLAND CANNOT PROVE THAT DOE'S DELAY IN PERFORMANCE CAUSED IT TO INCUR THE DAMAGES IT SEEKS

### A. The Rate Of Acceptance Is Critical For The Determination Of Dairyland's Alleged Damages In This Case

"Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1336 (Fed. Cir. 2003) (brackets in original); see PG&E, 73 Fed. Cl. at 375 n.38 (damages can be determined "[o]nly by determining the scope of plaintiff's performance obligation").

At trial, Dairyland cannot meet its burden of establishing that all of its damages were caused by DOE's partial breach of contract. To determine causation, this Court must measure Dairyland's actions in the "but for" world against the actions undertaken in the actual world. Dairyland has the burden to demonstrate the incremental difference between these two worlds. For example, the rate of acceptance that DOE was contractually obligated to meet beginning in 1998 is a primary causal link. This Court's determination of rate dictates the date upon which responsibility for wet storage costs at LACBWR potentially transfer from Dairyland to DOE's breach. The rate also determines whether the costs associated with certain activities in which Dairyland engaged concerning SNF storage are the responsibility of Dairyland or whether DOE may be found responsible for those costs as a damage. Dairyland's exchanges theory likewise goes to causation: that is, Dairyland's responsibility for SNF storage costs after 1998 is determined, in part, by the Court's determination of whether the exchanges market advanced here by Dairyland would have occurred. Likewise, issues concerning failed fuel, as well as

adjustments needed to account for activities that Dairyland would have undertaken in the "but for" world, also go directly to the issue of causation.

In its pretrial brief, Dairyland attempts to shift the burden of proof concerning causation to the Government in two ways. First, Dairyland asserts that the rate of acceptance goes to mitigation, not causation, and it argues that the Government bears the burden of establishing the rate. Pl. Br. 29-31. Yet, the rate of acceptance, which defines when responsibility for particular SNF assemblies transfers from Dairyland to DOE in the "but for" world, is at the heart of causation. Indeed, the rate of acceptance is the baseline upon which damages in this case must be measured, as it represents how DOE would have been contractually obligated to perform in the "but for" world. It is only by determining DOE's minimum performance required by the Standard Contract and the costs that Dairyland would have incurred in that "but for" world that the Court may determine what damages, if any, Dairyland suffered as a result of DOE's delay in accepting SNF. An examination of different rate scenarios clearly demonstrates the nexus between the contractual rate of acceptance and damages. If DOE would not have removed all of LACBWR's SNF until after 2007, costs incurred by Dairyland before that date were not caused by DOE's partial breach and are not damages. Consequently, the burden to prove the rate in the "but for" world squarely falls upon Dairyland. Indeed, without establishing the rate in the "but for" world, Dairyland cannot establish any harm arising from DOE's partial breach.

Dairyland must also establish at trial that its damages properly are offset by costs that it otherwise would have incurred had DOE performed beginning in 1998. Instead of embracing that burden, Dairyland impermissibly seeks to shift that burden to the Government. See Pl. Br. 18. However, this is wrong as a matter of law, as well as logic.

B. Dairyland Has Improperly Defined DOE's Obligations Under The Standard Contract And, Thus, Has Failed To Provide A Basis For Comparison To The Actual World

1. The NWPA Does Not Mandate A Rate Of Acceptance

Although Dairyland contends that the NWPA and the Standard Contract required DOE to accept SNF at a rate that would eliminate the need for additional expenditures upon SNF storage after 1998 and therefore asks the Court to identify a "reasonable" rate that would accommodate discharges from commercial reactors and work off the backlog of previously discharged spent fuel, there is no basis in either the NWPA or the Standard Contract for such a test. Pl. Br. 7-8. In fact, the 3,000 MTU rate that plaintiff has identified, and upon which it has based its damages claim, does not even satisfy this test. By arguing that DOE was obligated to perform at the rate that it deems to be reasonable, plaintiff is asking the Court to rewrite a contract using terms to which the parties not only never agreed, but that were expressly rejected during the course of the parties' negotiations. Such terms are neither a part of the parties' contract nor, under the circumstances, "reasonable."[11]

Dairyland goes to great length to argue that the "objectives" of the NWPA support imposition of the rate of acceptance that it advocates. Pl. Br. 20. However, it fails to point to a single provision in that legislation setting forth such a requirement. The reason for this omission

---

[11] As described in the next section, the parties' dispute over the rate of acceptance required by the Standard Contract is more than theoretical. Many of the expenditures for which recovery is sought in this lawsuit are recoverable only if Dairyland can establish that DOE was obligated to accept fuel at the rate it advocates. These expenditures would have been necessary even if DOE had begun accepting fuel in 1998 at the rate established pursuant to the mechanism in the Standard Contract and, therefore, are not incremental to DOE's delay in performance.

is simple: the NWPA is devoid of any requirement that DOE begin acceptance at any particular level. Indeed, as the Court concluded in PG&E,

> Plaintiff fails to cite, and the court has not discovered, any provision in the NWPA, or any statement in the legislative history of the NWPA (if the court could consider it – which plaintiff does not address), that indicates that Congress intended to obligate DOE to collect spent fuel at a rate sufficient to prevent utilities from having to incur any additional costs after January 31, 1998 for at-reactor storage. Rather, the plain language of the NWPA clearly states the Act's "purposes," none of which is to eliminate the need for additional at-reactor storage at utilities after January 31, 1998.

PG&E, 73 Fed. Cl. at 389 (citing 42 U.S.C. § 10131(b)). The Court's conclusion in PG&E should apply with equal force in this case.

Dairyland apparently intends to designate at trial the prior testimony of various DOE witnesses concerning their understanding of the scope of the NWPA. Pl. Br. 21. Reliance upon these statements is inappropriate because even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974); accord Department of Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (CIT 1985). The opinions of DOE personnel are similarly inadmissible. PG& E, 73 Fed. Cl. at 390 ("The court therefore declines to afford any weight to 'after-the-fact' statements made by DOE officials about the intent of Congress in passing the NWPA.").

2. The Standard Contract Contains No Language Imposing, And Is Inconsistent With, The Rate Requirement That Dairyland Proposes

In its pre-trial brief, Dairyland never cites to any language in the Standard Contract that requires DOE to accept SNF at a rate designed to preclude utility at-reactor storage after 1998. The reason for this glaring omission, of course, is that the Standard Contract does not impose such an obligation. Standing alone, this fact should foreclose any argument that such a requirement – which would impose billions of dollars upon the United States without even the faintest glimmer of textual support – is consistent with the parties' intent.

Although analysis of the unambiguous terms of the contract should end the inquiry, Dairyland's arguments fail for other reasons as well. The Standard Contract has an integration clause specifically providing that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party [and that] [n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." 10 C.F.R. § 961.1, Art. XXII. Thus, "[t]he existence of the integration clause in the Standard Contract . . . militates strongly against modifying or supplementing it by adding a specific acceptance rate term." PG&E, 73 Fed. Cl. at 385.

The rate that Dairyland has asked the Court to incorporate, though perhaps "reasonable" in the eyes of the utilities that requested such a term, is wholly inconsistent with the intentional rejection from the Standard Contract by DOE of any qualitative rate standard and the history of the parties' negotiations. In construing the terms of a contract, it is appropriate to consider evidence that the parties understood its plain language. See, e.g., TEG-Paradigm Environmental, Inc. v. United States, 465 F.3d 1329 (Fed. Cir. 2006). In fact, because the Standard Contract was

promulgated through notice-and-comment rulemaking in which Dairyland participated, there is a substantial administrative record containing industry comments and requests regarding the originally proposed contract terms that can assist in interpreting the Standard Contract. See, e.g., LTV Aerospace Corp., ASBCA No. 17,131, 76-1 BCA ¶ 11,840 (1976); Boeing Co., ASBCA No. 18,916, 74-2 BCA ¶ 10.976 (1974). This record conclusively demonstrates that DOE unequivocally rejected a rate that was equivalent to, or more restrictive than, the rate that plaintiff now seeks to import and confirms that plaintiff fully understood the clear implications of this rejection.

As described above, in response to DOE's February 4, 1983 proposed rule, which contained no rate of acceptance, utility groups, of which plaintiffs were members, specifically requested that DOE add a two-part minimum acceptance rate obligation in the Standard Contract that would contractually obligate DOE to accept SNF at a rate "[1] commensurate with the amount of [SNF] then being generated together with [2] the accumulated backlog of [SNF]." DX 25.34 at ARC 001 0334. The evidence will show, that despite this request – and others – to include specific obligations in the Standard Contract, DOE elected not to obligate itself to satisfy any particular rate of acceptance or qualitative test in the contract. See PG&E, 73 Fed. Cl. at 348 (acknowledging that "DOE did not adopt the suggestion of EEI and many of the utilities . . . to incorporate into the Standard Contract a firm commitment from DOE regarding the rate of DOE's acceptance of SNF from utilities"). As Robert Morgan, at the time the director of DOE's Office of Civilian Radioactive Waste Management, is expected to testify (and has repeatedly testified), uncertainties surrounding the waste acceptance program that was to commence 15 years in the future would have made it "unconscionable" for DOE to commit to any particular

rate of acceptance.[12] Instead of including a rate of acceptance or qualitative test in the contract, DOE included a provision that obligated DOE to begin issuing an APR and ACR as the date for commencement drew closer. Dairyland thus understood "that the ACR/APR and DCS/FDS scheme was the process under the express terms of the Standard Contract by which a firm acceptance rate and delivery schedule [] would be determined." PG&E, 73 Fed. Cl. at 399.

Moreover, the evidence will show that, even after the promulgation and execution of the Standard Contract, representatives of EEI and UNWMG continued to request that DOE add to the Standard Contract an obligation concerning the rate of acceptance and that DOE did not accept any industry request for a minimum receiving rate for SNF. Despite the repeated rejection of its request for inclusion of a rate into the Standard Contract, EEI continued to press the matter. Even as late as December 1992, EEI continued to advocate that contract holders request the inclusion of a rate of acceptance in the Standard Contract These repeated requests, and DOE's rejection of the requests, is unequivocal evidence that the terms were not included in the contract. Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n, 745 F.2d 281, 289 (4th Cir. 1984) (unilateral statements of position before an integrated contract is entered do not become part of contract when party arguing for their inclusion was unable to secure adoption of statements in contract).

[12] The parties recognized as much in the body of the Standard Contract, and specifically agreed that its terms "has been developed in the light of uncertainties necessarily attendant upon long-term contracts." 10 C.F.R. § 961.11, Art. XV.

3. The Court Should Not Impose Dairyland's "Reasonable" Rate Of Acceptance

Despite the unrefuted evidence that DOE specifically considered – and rejected – the requests of various interested parties, including plaintiff, that DOE obligate itself contractually to satisfy qualitative acceptance rate standards, plaintiff contends that the Court should determine a "reasonable" acceptance rate based upon those proposed standards because the acceptance rate is an "omitted" term. This argument is misguided.

Dairyland's reliance upon the Court of Claims' decision in David Nassif Assocs. v. United States, 557 F.2d 249 (Ct. Cl. 1977), is misplaced. In David Nassif, a construction contract failed to specify the size of a contractually-required cafeteria, or even the manner in which the size would be determined. See David Nassif Assocs. v. United States, 644 F.2d 4, 5 (Ct. Cl. 1981). During contract negotiations, "the parties never discussed the matter of the cafeteria's size" and, "[e]ven more than that, it was quite literally an issue to which neither party ever gave any thought." David Nassif, 557 F.2d at 258 n.5 (emphasis in original). The Court observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." Id. at 258. That, however, was because, "by mutual oversight, the matter of the cafeteria size was never focused upon, either in the negotiations or in the subsequent lease agreement itself." David Nassif, 644 F.2d at 5. Accordingly, the Court assumed the task of determining the size of the cafeteria "that the parties would have agreed upon at the time of their initial lease negotiations . . . ." Id. at 7.

Nassif is distinguishable because, in that case, the parties never considered the contract term that the Court was ultimately required to insert. By contrast, and as the Court explained in

PG&E, in this case, "DOE specifically chose not to obligate itself to a firm acceptance rate, and [] all parties to the Standard Contract recognized that choice, even if they had hoped a rate would be specifically provided for." PG&E, 73 Fed. Cl. at 382. Based upon the request of the utilities, DOE placed into the final version of the Standard Contract the contractual mechanism by which acceptance allocations would be determined – namely, the 1991 ACR/APR. It simply cannot be said that the parties, through "oversight," did not think about the rate during contract formation. To the contrary, the Court's imposition of its own rate term would create a contract that the parties did not create themselves.

To the extent that Dairyland truly believes that the Court should abandon the only contractual mechanism for determining acceptance rate obligations and simply impose its own rate based upon its own selected standards, its arguments would empower the Court to create the central term of the parties' contract. The enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with the our demonstration that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of a reasonable schedule term. A rejection of our position would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . But essential contract terms may not be supplied by a court. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted;

applying Mississippi law)); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[13]

4. The Rate Of Acceptance Should Be Determined In Accordance With The APR/ACR Process Mandated By The Standard Contract, In Which Dairyland Willingly Participated

Although Dairyland asks the Court to impose into the Standard Contract an obligation for DOE to accept 3,000 MTUs of SNF every year soon after 1998, to do so, the Court would have to ignore the actual language of the Standard Contract, which permits DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). If the Court disregards these provisions and the actions of the parties in accordance with these provisions, the Court is left with no method by which to assess damages arising from DOE's delay. See PG&E, 73 Fed. Cl. at 387 (Court's post hoc insertion of a rate of acceptance into the contract would render the ACR provision of the contract "inexplicable, inoperative . . . , insignificant, meaningless, [or] superfluous.")

Consistent with the testimony we will adduce at trial, the Standard Contract recognizes the uncertainties inherent in the development of the waste management program and, accordingly, creates a contractual mechanism for the development of a specific acceptance

[13] It is true that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

schedule that establishes, in essence, a two-phase process. First, the mechanism calls for DOE to issue, beginning not later than July 1, 1987, "an annual capacity report for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b), and for DOE beginning on April 1, 1991, to issue "an annual acceptance priority ranking" for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, under the terms of the Standard Contract, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added), and begin the process of establishing contractual obligations on the part of DOE and utilities regarding specific acceptance.

As we will establish at trial, the rates of SNF acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTUs of SNF for storage at an MRS prior to the operation of a Federal repository. 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010. We will further establish that numerous utilities, including Dairyland, submitted DCSs that were

based upon the rates contained in the 1991 ACR, which were, in turn, approved by DOE. In full compliance with this procedure, Dairyland timely submitted DCSs for DOE approval, never once objecting to the amount or order of allocations that it received.[14]

5. Mr. Graves' Opinions Concerning "Economic Efficiencies" Gained Through The Implementation Of An Acceptance Rate Of 3,000 MTU Are Irrelevant And Unsupported

Even if Dairyland could establish the existence of the two-part qualitative test, which it cannot, Dairyland cannot prove that an annual steady-state rate of 3,000 MTU is necessary to satisfy that purported requirement. At trial, Dairyland will offer the testimony of Frank Graves concerning the "economic efficiencies" under the 3,000 MTU rate of acceptance.[15] First, the issue in this case is not what is "economically efficient" or, even, "economically reasonable." The issue is to what rate did DOE contractually obligate itself. Second, Mr. Graves has had no involvement in the Standard Contract or DOE's SNF acceptance program and, therefore, no basis to comment upon the capacities of that program in either the "but for" or actual worlds. Indeed, the Court in PG&E excluded Mr. Graves' testimony at trial for precisely these reasons. Third, the Government will demonstrate that far lower rates of acceptance would meet the alleged two-part requirement. Indeed, intrinsic to Mr. Graves' analysis are fundamental assumptions which, when changed to reflect certain realities, work to dramatically alter the conclusions concerning

---

[14] The fact that Dairyland had an open line of communication with DOE and, unlike Dairyland's response regarding the assessment of its one-time fee, did not object to the rates promulgated during the ACR/APR process is proof positive that the rate contained in the 1991 ACR was well within the parameters of plaintiff's understanding of DOE's obligations under the Standard Contract. See Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). For this reason, Dairyland's attempt to impose a higher rate should be rejected.

[15] The Government has moved to exclude Mr. Graves' opinions and testimony.

the "economically reasonable" rate of acceptance. Mr. Graves' testimony concerning the rate of acceptance should not form the basis for any conclusion that DOE contractually obligated itself to the rate of acceptance advocated by Dairyland in this litigation.

C. Dairyland Cannot Establish The Necessary Causal Link Between Certain Of Its Claimed Storage Costs And DOE's Delay

1. Dairyland Cannot Meet Its Burden Of Establishing Exchanges

In its pretrial brief, Dairyland contends that the costs incurred for wet pool operations at LACBWR from 1999-2006, as well as a variety of other alleged SNF-related activities, are the result of DOE's failure to begin timely performance upon its Standard Contracts. Pl. Br. 12-13. However, as discussed above, this contention is based upon the unsupportable claim that DOE was obligated to perform at a 3,000 MTU annual acceptance rate after an aggressive five-year ramp-up period and the Court's acceptance of Dairyland's unsupported exchanges theory. If the Court properly finds that the Government was only obligated to accept the amounts of SNF set forth in the 1991 ACR against which the utilities submitted DCSs, Dairyland's claim for the costs of wet storage from 1999-2006, including insurance costs, are eliminated.

At trial, Dairyland will offer the highly speculative and factually unsupported model prepared by Mr. Graves which asserts that a perfect market for the exchange of acceptance allocations would have developed prior to the acceptance of any SNF by DOE that would have resulted in LACBWR's SNF being removed more quickly than under the OFF acceptance queue established by the Standard Contract. Pl. Br. 8-10. The Government will demonstrate at trial, through the testimony of its economics expert, Dr. Jonathan Neuberger, and through the cross-

examination of Mr. Graves, that his theory fails as a matter of fact, economic theory, and law.[16] Upon examination, Mr. Graves' model is based upon pure speculation and, in fact, is often based upon assumed facts that conflict with reality. For example, while Dairyland contends that "many other utilities would have engaged in exchanges" (Pl. Br. 9), Mr. Graves conducted no empirical study to determine whether any utility would be willing to engage in exchanges with Dairyland. Moreover, Mr. Graves ignores material considerations relating to financial and political risk, as well as basic issues effecting market performance. Indeed, Mr. Graves' demand-side market completely ignores the important supply side of that market to reach his conclusions. His alleged market finds no theoretical support in "similar" markets which exhibited significantly less participation than Mr. Graves models here. Finally, the efficiencies gained from Mr. Graves' model are over-stated and rely upon assumptions that, if altered, fundamentally effect his conclusions.

Further, Dairyland's assertion of a 1998 fuel out date at LACBWR requires both the implementation of its acceptance rate and that the Court find that a perfect, hypothetical market for the exchange of approved DOE acceptance allocations would have developed among the utilities in the early 1990s that would have allowed Dairyland to acquire enough allocations such that DOE would have accepted <u>all</u> of Dairyland's SNF in 1998 – the very first year of SNF acceptance under the Standard Contract. Mr. Graves' exchanges model has never been adopted by this Court, although he has presented it in two prior SNF cases, and this Court has specifically

[16] Any contention that Dairyland would have been granted priority over other utilities as a shutdown facility is factually unsupported and belied by the evidence that will be offered at trial. In fact, DOE consistently rejected priority for shutdown reactors based upon strong industry opposition to the granting of priority.

held that a plaintiff cannot recover damages against the United States based upon an "exchanges" theory.[17] See Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332, 375 (2006) ("To accept [plaintiff's] position [regarding exchanges], the court would need to speculate about whether [plaintiff] would have been successful in trading [plaintiff's] acceptance priority with another utility or convincing DOE to accept [plaintiff's] SNF early. The law does not permit the court to do so."). Indeed, the Government will demonstrate that this theoretical exchanges market, as envisioned by Dairyland's expert, Mr. Frank Graves, is fundamentally speculative, lacks factual support, is inconsistent with other "representative" markets, and otherwise ignores critical economic conditions (such as financial and political risk). For example, although Mr. Graves' exchanges model is driven by the principle that utilities will act in their own economic self interest, Mr. Graves does not incorporate into his model any actual spent fuel cost data from Dairyland to determine whether Dairyland had, in fact, any financial incentive to engage in the exchanges market that he depicts in his model.[18] In this regard, Mr. Graves' exchanges theory is

---

[17] According to the Standard Contract, utilities may exchange approved DCSs, subject to DOE's right, "in its sole discretion," to approve or disapprove any proposed exchange. 10 C.F.R. 961.11, Art. V.E. Among many other reasons, the mere fact that DOE has the discretion to disapprove exchange requests renders Dairyland's exchanges theory speculative as a matter of law. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (a plaintiff's potential contractual benefit, that rests upon the "discretion" of the Government, is too speculative to form the basis of a damages theory). Because Mr. Graves assumes in his exchanges model that DOE approves all exchange transactions, his model is inherently speculative and unreliable pursuant to San Carlos and should not be credited.

[18] Nor does Mr. Graves' model consider the effect that Dairyland's significant supply of non-standard, or "failed fuel," might have upon the willingness of DOE to approve of any exchange transaction involving Dairyland. As we will demonstrate at trial, the presence of failed fuel at LACBWR may constitute a reason why DOE may want to invoke its discretion, pursuant to Article V.E. of the Standard Contract, to disapprove of any exchange transaction involving Dairyland. See 10 C.F.R. 961.11, Art. V.E.

virtually identical to the one that he presented in another SNF case before this Court, Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 436 (2006), appeal pending No. 07-5046 (Fed. Cir.), in which the Court found that his model was inherently unreliable as a matter of law. Similarly, Mr. Graves' opinion in this case should not form the basis for any causation determination regarding the timing of Dairyland's removal of spent fuel by DOE.

2. Dairyland's Damages Claim Fails To Account For Failed Fuel

Dairyland's damages claim fails to account for the presence of failed fuel at LACBWR – some of it grossly failed. Dairyland cannot meet its burden that its failed fuel would have been accepted upon the standard OFF queue. To the extent that failed fuel would not have been accepted upon the OFF queue, Dairyland cannot establish that costs it would have incurred in connection with the storage of its failed fuel properly are recoverable here as damages.

The Standard Contract provides three broad classifications of fuel: (1) Standard Fuel; (2) Nonstandard Fuel; and (3) Failed Fuel. See DX 1, App. E, ¶ A. Although DOE is required to accept and dispose of failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel. Instead, DOE is entitled effectively to remove other than standard fuel (including failed fuel) from the "oldest fuel first" priority ranking for acceptance of SNF and, at its discretion, to delay its acceptance. Id. Art. VI.A.2(b).

Dairyland concedes that it possesses failed fuel at LACBWR, and it is not disputed that Dairyland itself believes these assemblies require "special handling." Indeed, once DOE determines that a utility's failed fuel requires special handling, its acceptance by DOE may be delayed, as permitted by the Standard Contract. Thus, "but for" DOE's delay in beginning SNF

acceptance, Dairyland could still have been required to store failed fuel for an indefinite period of time at its LACBWR facility and, therefore, cannot recover costs resulting from its storage of failed fuel.

3. Dairyland's Cannot Prove That Its Claimed Costs For Its Reactor Pressure Vessel Removal Project Were Caused By DOE's Delay, Or That Its Claimed Costs Are Reasonably Certain

Dairyland is seeking $7.4 million for the cost increase that it allegedly incurred for removing its Reactor Pressure Vessel ("RPV") from its nuclear power plant. Pl. Br. 13-14. Assuming that all of Dairyland's SNF would have been removed by 2006 if DOE had performed pursuant to the Standard Contract, Dairyland claims that it would have elected to remove the RPV through an opening cut in the top of the reactor building, rather than through the side of the reactor building as has actually occurred.

The suggestion that Dairyland would have saved money if it had removed its RPV through the top of the reactor building is, at best, speculative. Removing the RPV through the top of the reactor building at LACBWR would have been a challenging task. Further, Dairyland argues that it would have saved money doing so even though there is no engineering analysis for this removal method. Further, Dairyland's claim is based upon an estimate performed by its expert, Mr. Todd Smith. However, as we will explain through our expert, Warren Brewer, at trial, many of the cost savings cite by Mr. Smith arise from activities that take place regardless of the removal method chosen. Because the assumptions made lack support and Mr. Smith's estimate is flawed and unreliable, the Court should reject Dairyland's claim arising from the RPV removal at LACBWR.

4. Dairyland Cannot Establish Causation For Costs It Allegedly Incurred For Internal Labor And "Overheads" Nor Can It Establish Its Internal Labor Costs With Reasonable Certainty

a. Certain of Dairyland's Claimed Internal Labor Is Not Incremental To DOE's Breach And Is Not Reasonably Certain

Dairyland's claim includes approximately $16.8 million in internal labor charges, which represents primarily labor associated with operations and maintenance activities related to the LACBWR wet pool. To the extent that Dairyland can otherwise establish causation for its post-1998 wet pool storage costs, the Court should deny recovery of approximately $1.8 million charged to the "Baseline" cost center, because these costs are not incremental to the Government's partial breach. Indeed, the "Baseline" cost center appears to be a general billing code that is used when employees do not charge their time to specific activities, and Dairyland has failed to provide any specific description of work charged to this cost center which would permit determination of these damages with reasonable certainty. Tennessee Valley Authority v. United States, 69 Fed. Cl. 515, 540 (2006). Compensating Dairyland for the cost of these hours, which total $1,805,834, would pay them for labor costs that would have been incurred in the absence of any breach by DOE, and would place them in a better position than they would have occupied even had DOE commenced performance in 1998.[19]

[19] In addition, Dairyland has included as a claimed damage certain dry fuel storage studies, including the labor associated with these studies. Because the same individuals who worked on the dry fuel storage studies would also have been working on wet pool storage-related activities, the Court's resolution of Dairyland's "out-date" will determine the extent to which the labor costs associated with these dry fuel storage studies are appropriately allowed as damages.

b. Dairyland's General & Administrative Overhead And Overhead Represent Fixed Costs That Would Have Been Incurred Regardless Of DOE's Delay

Dairyland's damages claim also includes two components of overheads – $3.02 million in "indirect overheads," and $3.15 million in "general and administrative overhead" costs, which are not necessarily related to any particular Dairyland business unit, but whose costs are spread over all Dairyland business units, including LACBWR. We do not dispute, and our accounting expert, Larry Johnson, will not challenge, the legitimacy of these allocations from an accounting perspective. However, Dairyland has provided and will provide absolutely no evidence that the pools from which these overhead charges were calculated in any way was affected by DOE's delay in performance. Rather, the evidence will show that, imagined as a pie, the size of the pools from which the overhead charges were calculated stayed essentially the same. The only effect that Dairyland's performance of breach-related activities had upon these pies was to change the size of each of the slices – that is, the amount of the overhead pool allocated to each individual project with a separate code in Dairyland's accounting system. Seen from this perspective, it becomes clear that there is no evidence that Dairyland suffered any measurable damages, let alone the staggering amounts of costs that it includes in its claim, in the form of increased overheads. At a minimum, the amounts of any increases in overhead costs attributable to the breach cannot be proven with reasonable certainty. For these reasons, the overhead charges Dairyland has included in its claim are not recoverable.

5. Dairyland's Claim Should Be Adjusted To Account For Costs That It Would Have Incurred In The "But For" World

Dairyland should not be placed in a better position than it would have been in had DOE performed under the Standard Contract. As a result, costs that Dairyland would incurred

regardless of DOE's delay or costs that it has avoided as a direct result of DOE's delay must be offset from damages.

For example, Dairyland has included in its damages claim costs that are unrelated to DOE's partial breach, such as costs associated with certain technical studies performed by the Waste Policy Institute ("WPI"), which total $75,167. Mr. Brewer, the Government's technical expert, and Mr. Johnson, the Government's accounting expert, will explain at trial that these studies by WPI would have been necessary even had DOE performed under the Standard Contract, and are unrelated to DOE's partial breach.

Further, Dairyland's damages claim fails to consider the costs it would have incurred to load SNF to DOE casks in the "but for" world, but which it has avoided in the actual world as a direct result of DOE's delay. As Mr. Brewer will explain at trial, based upon the physical limitations at Dairyland's LACBWR facility in the "but for" world, had DOE performed in 1998, Dairyland would either have to have (1) loaded small truck casks; or (2) modified its facilities to enable it to handle large casks. It is undisputed that each of these options have a cost, and that Dairyland would have had to have selected one of these options in the "but for" world.

Dairyland has failed to adjust its claim for other costs that it would have incurred had DOE performed. Before Dairyland could have transferred its SNF to DOE, Dairyland had to classify its fuel. Again, there is no question that a significant cost would have been associated with this effort, but Dairyland has not adjusted its claim accordingly.

As discussed above, Dairyland has the burden of demonstrating what the "but for" world have look like and that the costs it incurred in the actual world are incremental to DOE's delay in acceptance. Pacific Gas & Electric, 73 Fed. Cl. At 386. Ignoring this burden altogether,

Dairyland instead contends in its pretrial brief that, because DOE has only partially breached the Standard Contract, and Dairyland continues to expect performance by DOE, Dairyland has only deferred its loading costs, suggesting that it will load its SNF when DOE provides a transportation cask, even though such costs potentially could be completely avoided in the future.

At trial, we will present the testimony of Warren Brewer, a nuclear engineer with over 20 years of experience in estimating the costs associated with the handling and storage of SNF. Mr. Brewer will explain the activities and various site modifications necessary to handle a variety of casks at LACBWR. Indeed, despite the fact that determining the type of cask that LACBWR could and would have used had DOE performed is capable of estimation, Dairyland has failed to account for costs it would have incurred in the "but for" world.

## III. DAIRYLAND CANNOT RECOVER DAMAGES RELATED TO PFS, AS SUCH COSTS WERE INCURRED BY A THIRD PARTY THAT IS NOT IN PRIVITY OF CONTRACT WITH THE GOVERNMENT AND ARE OTHERWISE PRECLUDED BY THE FEDERAL CIRCUIT'S DECISION IN *INDIANA MICHIGAN*

In its pre-trial brief, Dairyland asserts that it has incurred $10,936,901 million in costs associated with the PFS business venture that it should recover from the United States. However, as we established in our August 3, 2007 motion for partial summary judgment, Dairyland has not made expenditures to PFS, is not a member of PFS, and otherwise has not made any direct investments in the PFS enterprise. Rather, to provide itself with an "extra layer of legal protection" to avoid any "potential liabilities of PFS and to ensure that its participation in PFS would not endanger its tax exemption," Pl. Br. at 16, Dairyland chose to invest in a separate, for-profit subsidiary company – GFT – which, in turn, acting in its own corporate interest, decided to invest in PFS. Dairyland cannot now disregard the corporate form for its own benefit

to recover the value of its interest in GFT. See, e. g., Am. Capital Corp. v. FDIC, 472 F.3d 859, 866 (Fed. Cir. 2006) (the subsidiary's injuries that "resulted in its losses . . . are properly its own, and therefore its . . . claims against the government for those injuries must be brought in its name").[20]

Additionally, as established in our summary judgment motion, Dairyland's claims for recovery of its investment in GFT also fail because PFS-related expenditures constitute speculative and unreasonable attempts at mitigation. See Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005). Specifically, the Indiana Michigan court decided that a power company's investment in PFS was a speculative venture and that its high costs were unforeseeable. Id. at 1376. As we discussed in prior briefing, this Court has since followed the Federal Circuit's reasoning and denied recovery for PFS-related costs nearly identical to the costs claimed here in two other spent nuclear fuel cases. See Southern Nuclear, 77 Fed. Cl. at 445 (". . . concerns of speculativeness and foreseeability are no less present in this case than they were in Indiana Michigan."); PG&E., 73 Fed. Cl. at 429-30 ("[P]laintiff's entry into these ventures was highly speculative and uncertain . . . The court finds that the costs associated with such speculative ventures were not foreseeable by the government . . .").[21] In both of these cases, this

[20] In addition, as we discuss in support of our August 3, 2007 motion for partial summary judgment, Dairyland's attempts at so-called "mitigation" through GFT's investments in PFS, as a matter of law, constitute collateral and independent undertakings that are not the direct result of DOE's delay in SNF performance. It is beyond dispute that Dairyland's investments in GFT, and GFT's subsequent funding of PFS, did not directly result from DOE's delay in acceptance. See, Myerle v. United States, 33 Ct. Cl. 1, 27 (1897).

[21] In a similar vein, as we previously discussed in the briefing in support of our August 3, 2007 partial summary judgment motion, this Court already found in a related SNF case that a utility's attempt to "mitigate" the effects of DOE's delay in SNF performance through investments in PFS paid by a third-party agent does not constitute recoverable mitigation. In

Court also noted that the power company's participation in PFS was a business venture involving anticipated profits, suggesting that the investment was caused by factors other than the Government's delay. See id.[22] Likewise, in this case, Dairyland's efforts to invest in PFS also had a profit-making potential, as reflected in Dairyland's decision to invest in PFS through a subsidiary entity. See Pl. Br. at 16 (noting potential for Dairyland to lose its tax-exempt status should PFS generate "receipts" absent GFT's involvement as a pass-through entity).[23] Because

---

Southern Nuclear Operating Co., v. United States, 77 Fed. Cl. 396 (2007), this Court followed decisions in PG&E and Indiana Michigan Power Co. v. United States and denied recovery of the plaintiffs' claimed PFS-related expenses. In Southern Nuclear, the agent for two utilities invested in PFS, and, pursuant to an operating agreement, the two utilities allegedly reimbursed the agent for a proportion of the investment. The Court denied recovery of the utilities' claimed PFS damages and noted that mitigation does not extend to "contractual proportional reimbursement of investments of a third party." Id. at 446. Accordingly, precedent in the SNF context before this Court supports the denial of Dairyland's attempt to recover the investments by GFT in PFS, as such costs do not directly result from DOE's delay in acceptance. See, e.g., Myerle, 33 Ct. Cl. at 27.

[22] Notwithstanding the Federal Circuit's holding in Indiana Michigan and the Court's prior rulings in PG&E and Southern Nuclear, Dairyland argues that the Court's decision in Northern States Power Co. v. United States, 78 Fed. Cl. 449 (2007), should be followed here. For the reasons that we articulated in our briefing in support of our August 3, 2007 motion for summary judgment, however, the Court's award of PFS damages in Northern States was manifest error for several reasons, and we are appealing the Court's decision. For instance, in Indiana Michigan, the Federal Circuit ruled that the expenditure of costs associated with PFS was not foreseeable to the Government in 1983 at the time of contracting. Nevertheless, the Court in Northern States determined that the costs associated with the PFS venture were foreseeable to the Government, based upon a DOE report authored in 2001 summarizing for Congress the storage options available to the plaintiff. Northern States, 77 Fed. Cl. at 445; see Pl. Br. at 31. Although DOE indicated in this 2001 report that PFS represented a potential means for utilities to store SNF, the report simply is not probative of the foreseeability of PFS 18 years earlier when the parties entered into the Standard Contract. Similarly, Dairyland's argument that the Government's consideration of a Monitored Retrievable Storage facility in the 1990s constitutes proof of foreseeability, Pl. Br. at 24, should not be credited, as the Government's consideration of such a project occurred well after the execution of the Standard Contract in 1983.

[23] Indeed, Dairyland continues to view the PFS business venture as "potentially viable." Pl. Br. at 31. Nevertheless, assuming payment by the Government to Dairyland of the PFS-

foreseeability is measured from the perspective of the defendant at the time of contract formation, see Old Stone Corp. v. United States, 450 F.3d 1360, 1375 (Fed. Cir. 2006), and in light of the fact that the Standard Contract in Indiana Michigan is identical to contract at issue in this case, Indiana Michigan is dispositive and this Court should deny Dairyland's attempts to recover PFS-related damages here against the Government. See Southern Nuclear, 77 Fed. Cl. at 445 ("concerns of speculativeness and foreseeability are no less present in this case than they were in Indiana Michigan"); PG&E, 73 Fed. Cl. at 429-30 ("[p]laintiff's entry into these ventures was highly speculative and uncertain . . . The court finds that the costs associated with such speculative ventures were not foreseeable by the government . . .").

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court enter judgment in the Government's favor.

---

related costs that it seeks, Dairyland (through GFT) would be in possession not only of the amount that it invested in PFS, but also of GFT's membership interest in a limited liability company that, as we discussed in our motion for partial summary judgment in this case, had the financial wherewithal to persuade the August 3, 2007 Nuclear Regulatory Commission that it could operate a dry storage facility pursuant to 10 C.F.R. § 72.22. If Dairyland were to be "made whole" for its investment in PFS as a result of a judgement in its favor by this Court, then Dairyland should have to transfer GFT's interest in PFS to the Government, and the potential profit that this interest might generate in the future. Dairyland has never offered to transfer its shares in GFT to the Government or otherwise demonstrated that the investment in PFS has a zero value. In the absence of such a showing, any award of PFS-related costs to Dairyland would overcompensate the company for its own investment decision

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell A. Shutlis
RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Attorney

PATRICK B. BRYAN
JOSHUA E. GARDNER
ANTHONY W. MOSES
SONIA M. ORFIELD
SCOTT SLATER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

June 9, 2008

CERTIFICATE OF FILING

I hereby certify that on this 9th day of June, 2008, a copy of foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Russell A. Shultis