# In the United States Court of Federal Claims

No. 04-106 C
(Filed: June 20, 2008)

***************************************

**DAIRYLAND POWER COOPERATIVE,**

Plaintiff,

v.

**THE UNITED STATES,**

Defendant.

***************************************

## ORDER

Pursuant to the Trial Preparation Order of February 21, 2008, Plaintiff, Dairyland Power Cooperative ("Dairyland") and Defendant, the United States ("the Government") filed their motions *in limine* on April 29, 2008. The parties filed their responses on May 15, 2008, and a hearing was held on May 29, 2008. Based on the arguments of the parties in the pleadings and at the hearing, below is the Court's decision on each of the outstanding motions.

## I. Defendant's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors

The Government, as it has in other spent nuclear fuel ("SNF") cases, seeks to exclude all documents that were prepared by Department of Energy ("DOE") contractors. The Government gives a number of reasons to exclude these documents; however, none of these reasons is persuasive to the Court. For the reasons set forth below, the Government's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors ("Def.'s Mot. to Exclude Contractor Documents") is DENIED.

### A. Admissibility of the Documents under Fed. R. Evid. 803(8)(A)

#### 1. Background

There are approximately 140 documents[1] at issue which were prepared by contractors for

[1] According to the Government there are 137 documents that fall into this category. Def.'s Mot. to Exclude Contractor Documents at 1. According to Dairyland, there are "nearly 140."

DOE regarding research and planning relating to the disposal of SNF. Def.'s Mot. to Exclude Contractor Documents, App.1-11; Pl.'s Resp. at 1; Tr. 8:18-21.[2]

The Government does not contend that the documents are not relevant, rather, the Government argued that the contractor documents are not admissible because they are not covered by any of the exceptions to the hearsay rule under Fed. R. Evid. 803 and that they are not admissions under Fed. R. Evid. 801(d). Def.'s Mot. to Exclude Contractor Documents at 6-14; Tr. 8:24-17:19. Dairyland responded that the documents are admissible under a number of theories including, the public records exception to the hearsay exclusion under Fed. R. Evid. 803(8)(A) or as non-hearsay under Fed. R. Evid. 801(d)(2)(C) or (D). Plaintiff's Response to Defendant's Motion In Limine to Exclude the Admission at Trial of Document's Prepared by Government Contractors ("Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents ") at 7-15; Tr. 18:23-22:23.

**2. Applicable Law**

At this time the primary issue before the Court is the admissibility of the contractor documents. *PR Contractors, Inc. v. United States*, 69 Fed. Cl. 468, 469 (2006) ("A motion *in limine* is a preliminary motion that serves a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly would be inadmissible for any purpose.") If the documents are found to be admissible, the question of whether the statements contained within the contractor documents can be attributed to DOE is a subsidiary question which can be addressed during trial. Tr. 7:4-25. To determine the admissibility of the contractor documents the Court looks to Fed. R. Evid. 803(8)(A) which provides that "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency" are not excluded by the hearsay rule "unless the sources of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A).

The contractor documents were not created by DOE; however, this Court holds that, while DOE contractor documents may not have been directly created by DOE, the exception in Fed. R. Evid. 803(8)(A) allows for admission of the documents. While the Government attempts to argue that DOE contractors have a limited amount of responsibility, this Court finds that "[t]o a significant, if not exclusive extent, DOE's activities, duties, and responsibilities under the NWPA [Nuclear Waste Policy Act], have been conducted through its national laboratories and management and operations ("M&O") contractors." *Yankee Atomic Elec. Co. v. United States* ("*Yankee*"), No. 98-126C, 2004 U.S. Claims LEXIS 363, at *8 (Fed. Cl. Sept. 17, 2004) (citing

---

Dairyland's Response to Defendant's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors. ("Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents ") at 1.

[2] Tr. (page #:paragraph #) refers to the transcript from the oral argument on the parties' motions *in limine* held on May 29, 2008.

*Westinghouse Electric Co. v. United States*, 1997 WL 1068204 at *2 (Fed. Cl. 1997)).[3] Fed. R. Evid. 803(8)(A) is to be construed broadly to include

> those activities done by national laboratories at the behest of DOE and within the parameters thereof. The court is mindful of defendant's point that some of the documents contain a disclaimer that the views are those of the contractor/author, not of any government agency, a position that is . . . not dispositive o[f] their admissibility as public records.

*Pacific Gas & Elec. Co. v. United States* ("*PG&E*"), 73 Fed. Cl. 333, 438 (2006) (citing *Yankee,* 2004 U.S. Claims LEXIS 363, at *22-23). The Government advanced the same position in the instant matter as it did in *Yankee* and *PG&E*, that the documents do not contain the views of any government agency. The Government argued at the hearing on May 29, 2008, that the reports prepared by contractors do not set forth the activities of DOE, rather the documents contain suggestions, recommendations, and advice of contractors hired to provide this information. Tr. 10:15-22. The Government also contended, *inter alia*, that the contractors are not public officials because they are not employees or agents of DOE. Def.'s Mot. to Exclude Contractor Documents at 6-10; Tr. 9:20-25. And while the Government makes a number of arguments regarding whether or not the statements contained in the documents should be attributed to DOE, it has not persuaded the Court that these documents are inadmissible hearsay.

**3. Conclusion**

The Government's position that the documents are not admissible under Fed. R. Evid. 803(8)(A) is unavailing. The contractors in this matter have a significant amount of responsibility under the NWPA for activities related to the disposal of SNF. The Court concludes that these documents constitute "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency." Fed. R. Evid. 803(8)(A). There has been no contention that "the sources of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A). Therefore, the contractor documents are admissible.

This Court agrees with and adopts the reasoning set forth in *Yankee* and *PG&E*. The documents are admissible under Fed. R. Evid. 803(8)(A). However, in making the determination

---

[3] Dairyland excerpted for the Court the testimony of Dr. John Bartlett, the former Director of the Office of Civilian Radioactive Waste Management ("OCRWM"). Dr. Bartlett was asked during the *Yankee* trial, "[w]hen you were director, to what extent did you and OCRWM rely upon studies prepared by the management and operations contractor such as this one?" Dr Bartlett responded, "[a]ll of the work is done by the - by the support of contractors. That's what they're there for. The Department of Energy has - OCRWM itself has about 65 employees. The program has about 5,000 employees if you look at it this way. These are contractor people." Pl.'s Resp. Def.'s Mot. to Exclude Contractor Documents at 6; *see also Yankee,* 2004 U.S. Claims LEXIS 363, at * n.5.

that the documents are admissible, the Court has not determined that the contractor's "[r]ecords, reports, statements, or data compilations" reflect or establish DOE policy. Fed. R. Evid. 803(8)(A); *see also Yankee,* 2004 U.S. Claims LEXIS 363, at *29. This determination shall be made if the issue arises at trial.

### B. Admissibility of the Documents under Fed. R. Evid. 801(d)(2)(C) or (D)

#### 1. Background

Dairyland also seeks the admission of the documents as admissions of a party opponent under Fed. R. Evid. 801(d)(2)(C) or (D). Tr. 21:8-12. The Government contended that the contractors were not "authorized" to make statements on behalf of DOE. Def.'s Mot. to Exclude Contractor Documents at 23. The Government relied on the principle that "[c]ourts have historically applied agency law to determine whether the declarant was authorized by the party to make the statement at issue." *Id.* at 24 (citing 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 801.32[1], at 801-69-70 (2d ed. 2008); Tr. 15:16-17:16.

Dairyland argued that, "[i]n most if not all cases, the contractors were actually hired to *write* the reports in question, so clearly the statements made in the reports–like the analysis and other work underlying the reports–were 'authorized' by DOE." Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents at 16. Moreover, some documents contain the express statement that "this report was prepared as an account of work sponsored by an agency of the United States Government." *Id.* at 16. Additionally, Dairyland again cited to the *Yankee* trial testimony of Dr. John Bartlett, a former director of OCRWM. Tr. 21:13-19. When asked to what extent the M&O contractors were "authorized by the Department to make statements concerning the subjects addressed in studies," Dr. Bartlett responded that "they have full authority to accomplish and report this work." Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents at 17.

#### 2. Applicable Law

According to Fed. R. Evid. 801(d) Statements which are not hearsay:

> A statement is not hearsay if (2) Admission by a party-opponent. The statement is offered against a party and is . . . (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

Fed. R. Evid. 801(d)(2)(C), (D).

In the instant matter it is clear that these Government contractors are authorized by DOE to make the statements contained in the documents at issue. DOE fulfills its mission through the use of Government contractors. The Government cannot now disavow a relationship that was created contractually simply because it would be beneficial to the pending litigation. Additionally, the Court finds that the management and operations ("M&O") contractors at issue here are akin to employees that

carried out DOE's contractual responsibilities under the Nuclear Waste Policy Act [NWPA] and the Standard Contract. *Yankee Atomic Elec. Co.*, 2004 U.S. Claims LEXIS 363, at *8. Therefore, the Court agrees with Dairyland, as well as *Yankee* and *PG&E*, that the documents are admissible as admissions by a party-opponent under Fed. R. Evid. 801(d)(2)(C) and (D). Fed. R. Evid. 801(d)(2) "expressly acknowledges that an admission by a party-opponent is not hearsay if the statement is offered against the party and was actually made by him in either his individual or representative capacity." *Mayor of City of Philadelphia v. Educational Equality League*, 94 S.Ct. 1323, 1345-1346 (1974). Further, "under Fed. R. Evid. 801(d)(2)(C), all that is required for such an 'admission' to be admissible at trial is that it is made by 'a person authorized by the party to make a statement concerning the subject.'" *PG&E*, 73 Fed. Cl. at 440.

### 3. Conclusion

The Court finds that the DOE contractors were authorized, in fact contracted, to make statements for DOE concerning the transportation and disposal of SNF pursuant to the Standard Contract. Additionally, as stated above, the Court finds that the DOE contractors are akin to employees that worked for DOE and carried out its duties under the NWPA and the Standard Contract. The Court, therefore, holds that the documents are admissible under Fed. R. Evid. 801(d)(2) (C) and (D). Whether or not the document reflects or establishes DOE policy shall be determined at trial should the issue arise.

## II. Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance – i.e., Its Breach of Contract

Dairyland seeks to exclude any evidence that the Government might offer regarding the reason for DOE's breach. According to Dairyland, in recent spent nuclear fuel trials the Government has attempted to introduce evidence concerning the reason for DOE's breach which delayed and confused the proceedings. For the reasons set forth below Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance – i.e., Its Breach of Contract is GRANTED.

### A. Background

Despite the broad title of Dairyland's motion it does not seek to exclude all evidence of the reasons for DOE's delay in performance, rather Dairyland seeks to exclude evidence that advances the Government's position regarding "unavoidable delay." Specifically, Dairyland seeks to exclude testimony by Mr. Christopher Kouts, a senior official at DOE, regarding the reasons for the delay of the Yucca Mountain project, such as budgetary issues, because they are not relevant to the damages issue presented in this case. Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance ("Pl.'s Mot. to Exclude Evidence of Delay") at 1. According to Dairyland, *inter alia*, the Government is barred from raising the issue of "unavoidable delay" by the mandamus order issued by the D.C. Circuit. Pl.'s Mot. to Exclude Evidence of Delay at 2; Tr. 24:23-25; 25:1-4; *see Northern States Power Co. v. Department of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997). Dairyland also alleges that the Government has waived its ability to argue unavoidable delay by failing to plead the matter as an affirmative defense. Pl.'s Mot. to Exclude Evidence of Delay at 7; Tr, 25:19-26:5.

At oral argument the Government agreed that based on the D.C. Circuit's ruling at this time it is

"unable to make the argument with respect to unavoidable delays." Defendant's Response to Plaintiff's Motion to Exclude Evidence of the Reasons for the Department of Energy's Delay in Performance ("Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay") at 2; Tr. 26:23-27:4. However, the Government argued that it should be able to put forth evidence regarding "DOE's progress towards developing an MRS, monitored retrievable storage system." Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay at n1; Tr. 27:17-28:7. And if Dairyland challenges the 1991 ACR [Annual Capacity Report] the Government seeks to be permitted to describe the circumstances surrounding its creation and any allegations of "bad faith" surrounding the creation of the 1991 ACR that may arise. Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay at 3-4; Tr. 29:2-30:7.

**B. Applicable Law**

The Court holds, that despite the fact that the D.C. Circuit mandamus order is now on appeal in the U.S. Court of Appeals for the Federal Circuit, while the appeal is pending the mandamus order is still in effect. *See Nebraska Public Power District v. United States*, 73 Fed. Cl. 650, 673 (holding that the subject mandamus was void because the D.C. Circuit "operated in excess of its jurisdiction and, specifically, without an appropriate waiver of sovereign immunity."); Tr. 24:13-14. Specifically, the D.C. Circuit's writ of mandamus states:

> We preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim. This necessarily means, of course, that DOE not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of "acts of Government in either its sovereign or contractual capacity." 10 C.F.R. § 961.11, Art. IX.A.

*Northern States Power Co. v. Department of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997).

**C. Conclusion**

The Court shall not permit any evidence submitted by the Government, including any testimony by Mr. Kouts, that seeks to advance the position that "its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." *Northern States Power Co.*, 128 F.3d at 760. Any testimony by Mr. Kouts that does not concern an "interpretation of the Standard Contract that excuses its failure to perform on the grounds of 'acts of Government in either its sovereign or contractual capacity'" shall be allowed. *Id.*

## III. Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers

Dairyland seeks to preclude the Government from introducing evidence that it claims is inconsistent with the Government's answers to contention interrogatories. Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers ("Pl.'s Mot. to Exclude Evid. Inconsistent Interrog.") at 1. According to Dairyland, the Government made several concessions in its answers to interrogatories and, therefore,

many issues are no longer in dispute. *Id.*; Tr. 35:15-24. For the reasons set forth below Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers is GRANTED IN PART AND DENIED IN PART.

**A. Background**

Dairyland seeks to exclude evidence that is inconsistent with the Government's answers to five contention interrogatories: numbers 9, 13, 15, 16 and 17. Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 1. According to Dairyland, based on the Government's answers to the contention interrogatories, the Government has conceded that it is not going to dispute the reasonableness of Dairyland's mitigation efforts. *Id.* at 8; Tr. 35:15-24. Additionally, Dairyland argues that the Government admitted it is not taking a position on the timing of DOE's acceptance of failed fuel. *Id.*

The Government contended that Dairyland seeks to shift its burden of establishing the "but for," *i.e.* non-breach, world to the Government through its contention interrogatories. Defendant's Response to Plaintiff's Motion to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers ("Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog.") at 7; Tr. 38:6-13. According to the Government, it "cannot state whether, absent DOE's delay, Dairyland's failed fuel would have been accepted on the same schedule as Dairyland's standard fuel." Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 8; Tr. 40:17-20, 41:3-9. Furthermore, based on its answers to interrogatories, the Government is not precluded from responding to any evidence regarding failed fuel adduced by Dairyland at trial. Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 8. Additionally, the Government conceded that it "does not currently plan to challenge the reasonableness of the actions that Dairyland took regarding its storage decisions at LACBWR [LaCrosse Boiling Water Reactor]." *Id.* at 10; Tr. 44:8-13. The Government further argued that this does not relieve Dairyland of establishing the reasonableness of its actions and that DOE's delay caused Dairyland to incur the costs. Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 10; Tr. 44:1-7, 14-20.

**B. Applicable Law**

Dairyland seeks to limit the Government's introduction of evidence based on its answers to contention interrogatories. According to Dairyland the Government should be limited at trial to presenting evidence that is consistent with its answers to contention interrogatories. Dairyland argues that evidence "contradicting the government's contentions is irrelevant and inadmissible under Fed. R. Evid. 401 and 402." Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 1. The relevance of this information is not the real issue, rather the issue before the Court is whether a party is bound by its answers to contention interrogatories. According to the United States Court of Appeals for the Federal Circuit:

> [D]iscovery allows the plaintiff to develop facts to support the theory of the complaint and allows the defendant to develop facts to support its defenses. (internal citation omitted). Second, discovery is designed to allow the defendant to pin down the plaintiff's theories of liability and to allow the plaintiff to pin down the defendant's theories of defense, thus confining discovery and trial preparation to information that is pertinent to the theories of the case.

*O2 Micro International. Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006). Therefore, the Government in answering Dairyland's contention interrogatories has addressed its "theories of defense." Trial preparation for both parties has proceeded based on the information provided during discovery in this matter.

### C. Conclusion

Upon review of the Government's answers to contention interrogatories, the pleadings of the parties, and the arguments made on May 29, 2008, the Court holds the following with respect to each interrogatory:

**Interrogatory 9**–Dairyland asked the Government if it contends that it is was unreasonable for Dairyland to study, analyze, investigate and/or implement dry storage subsequent to DOE's partial breach. Defendant's Response to Plaintiff's First Set of Interrogatories as Amended in Response to the Court's February 5, 2007 Order and Supplemented Following the Close of Fact Discovery ("Def.'s Resp. to Interrogs.") at 24. The Government responded that only through an expert report will it argue that it was unreasonable for Dairyland to study, investigate and/or implement dry storage. *Id.*; Tr. 44:8-13. Additionally, in answering the interrogatory the Government specifically stated that it does not concede that the study, investigation and/or implementation of dry storage were caused by DOE's partial breach. Def.'s Resp. to Interrogs. at 24-25.

The Government shall be allowed to put forth evidence that the damages claimed in studying, analyzing, investigating and/or implementing dry storage was not due to DOE's breach whether or not it is in an expert report. But, the Government shall only be allowed to argue that it was unreasonable for Dairyland to study, analyze, investigate and/or implement dry storage through expert reports.

**Interrogatory 13**–Dairyland asked the Government if it would have picked up Dairyland's failed fuel later than the rest of its SNF, if it began acceptance starting not later than January 31, 1998. Def.'s Resp. to Interrogs. at 33. The Government stated that David Zabransky, an employee of the Office of Civilian Radioactive Waste Management, explained the issues that might arise relating to the acceptance of failed fuel in *Yankee*. *Id.* at 34. According to the Government "although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel . . . ." *Id.*; Tr. 40:5-9. The Government then supplemented its answer concluding that what the Government "would have" done is irrelevant to the case, but rather the only question that needs to be considered is what the Government was required to do under the Standard Contract. Defendant's Supplemental Response to Plaintiff's Interrogatory Number 13 Pursuant to the Court's December 21, 2007 Order ("Def.'s Supp. Resp.") at 5. The Government affirmatively stated that in a "'but for' world Dairyland's failed fuel would not have been accepted pursuant to the terms of the Standard Contact on the same schedule as standard SNF until and unless Dairyland had established that the failed fuel could have been safely handled and transported to a federal facility . . . ." *Id.* at 6. Also, the Government contended that according to the Standard Contract, Dairyland is required to obtain confirmation from DOE as to the "technical feasibility" of accepting such fuel pursuant to the "currently agreed to schedule." *Id.*; Tr. 40:5-9, 42:5-18. Further, because Dairyland has never inventoried all of its failed fuel they do not have sufficient information to allow for a determination of when the failed fuel would have been picked up. Def.'s Supp. Resp. at 6-7; Tr. 40:17-

24. According to the Government, Dairyland cannot meet its burden of establishing that DOE would have accepted the failed fuel on the same schedule as standard SNF. Def.'s Supp. Resp. at 7.

Based on the Government's answers to Dairyland's contention interrogatories, it shall be allowed to put forth evidence regarding the acceptance of failed fuel pursuant to the Standard Contract. However, because the Government specifically stated in its answers to contention interrogatories that what it "would have" done regarding the acceptance of failed fuel is irrelevant, the Government shall not put forth any evidence regarding when it would have accepted failed fuel. This includes any evidence to support the position that it would have picked up Dairyland's failed fuel later than the rest of its SNF. The Government shall be limited to what it was required to do pursuant to the Standard Contract.

**Interrogatory 15**–Dairyland asked the Government if they contend it was unreasonable for Dairyland to store SNF in the wet fuel storage pool after the partial breach. Def.'s Resp. to Interrogs. at 35. The Government's response indicated that it would not contest the reasonableness of Dairyland's storage of SNF in its wet pools except as argued in the Government's expert reports. *Id.* at 36. Additionally, the answer to the contention interrogatory specifically stated that the Government does not concede that Dairyland's maintenance of its wet fuel storage pool was due to DOE's partial breach of the Standard Contract. *Id.*

Based on the Government answers to contention interrogatories, it shall be allowed to put forth any evidence that the maintenance of the wet fuel storage pools was not due to DOE's partial breach of the Standard Contract. But, the Government shall only be allowed to argue the "reasonableness" of Dairyland's storage of SNF in the wet fuel storage pool through expert reports.

**Interrogatory 16**–Dairyland asked the Government to describe all options Dairyland should have explored for the storage of SNF after the partial breach. *Id.* The Government responded that it is not required to determine alternatives for the storage of SNF. *Id.* at 37. Further, the Government stated that it does not plan to argue that Dairyland should have explored or implemented any particular strategy for storage of SNF except as identified in expert reports. *Id.* The Government also indicated that it does not concede that DOE's partial breach was the cause of any particular method chosen by Dairyland. *Id.*

The Court acknowledges that the Government does not concede that DOE's partial breach was the cause of any particular method chosen by Dairyland. Additionally, based on the Government's answer it shall be allowed to present evidence from expert reports regarding alternative storage methods. However, since the Government specifically stated that it does not plan to argue that Dairyland should have explored or implemented any particular strategy for storage of SNF, it will not be allowed to present evidence regarding a particular strategy Dairyland should have explored for the storage of SNF after the partial breach, unless it was identified in an expert report.

**Interrogatory 17**–Dairyland asked the Government to describe all options Dairyland should have explored for the storage of its failed fuel. *Id.* According to the Government's response, it is not required to determine alternatives for the storage of failed fuel. *Id.* at 38. Further, the Government stated that it does not plan to argue that Dairyland should have explored and/or implemented a particular method of storage for failed fuel except as identified in expert reports. *Id.* The Government also stated that while it was required to accept failed fuel under the Standard Contract it was not required to accept failed fuel

under the same schedule as standard SNF. *Id.*

The Government shall be allowed to present evidence from expert reports regarding storage methods for failed fuel. The Government shall also be allowed to present evidence regarding the contention that they were not obligated to accept failed fuel on the same schedule as standard SNF. However, since the Government specifically stated that it does not plan to argue that Dairyland should have explored any particular strategy for storage of failed fuel, it shall not be allowed to present evidence regarding a particular strategy Dairyland should have explored for the storage of failed fuel after the partial breach, unless it was identified in an expert report.

## IV. Motions *In Limine* to Exclude the Testimony of Expert Witnesses

### A. Background

On April 29, 2008, Dairyland filed motions to exclude the testimony of the following Government experts: Warren K. Brewer, R. Larry Johnson, and Jonathan A. Neuberger. The Government filed responses on May 15, 2008. On April 29, 2008, the Government filed motions to exclude the testimony of the following Dairyland experts: Ivan F. Stuart, Charles Wilkins and Frank C. Graves. Dairyland filed responses on May 15, 2008. Each motion *in limine* was addressed at the hearing on May 29, 2008. Because the applicable law is the same for the all the experts, it will be recited only once and then applied to each expert who is the subject of a motion *in limine*.

For the reasons set forth below Dairyland's Motion *in Limine* to Exclude Warren K. Brewer's Testimony is DENIED; Dairyland's Motion to Exclude R. Larry Johnson's Testimony is GRANTED IN PART AND DENIED IN PART; Dairyland's Motion to Exclude Jonathan A. Neuberger is DENIED; the Government's Motion to Exclude Expert Testimony [Charles L. Wilkins] Regarding Overhead Costs is DENIED; the Government's Motion to Exclude the Testimony of Ivan F. Stuart is DENIED; and the Government's Motion to Exclude Frank C. Graves is DENIED.

### B. Applicable Law

Testimony by experts is governed by Fed. R. Evid.702, as amended in 2000. Fed. R. Evid. 702. Testimony by Experts states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the fact of the case.

Fed. R. Evid. 702.

#### 1. The proposed expert witness must be qualified

A witness must be qualified as an expert based on their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This standard is disjunctive; therefore, an expert may be qualified based on any one of the five criteria found in the rule. *Waldorf v. Shuta*, 142 F.3d 601, 626 (3d Cir. 1998) (error

to exclude expert testimony based on practical experience, as "otherwise qualified witness is not disqualified merely because of a lack of academic training."); *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) (an expert can testify based on training even if they possess no experience; however, testimony regarding the application of training principles requires a basis in experience). An expert need only be qualified and need not be the best and the brightest for the testimony to be admissible. *See* Matthew Bender & Co., Inc., *Federal Rules of Evidence Manual* § 702.02 [3] (citing G. Joseph & S. Saltzburg, *Evidence in America* § 51.3 ("trial judges are not to demand that the proffered expert possess the highest possible credentials or skills, or be the most qualified of all conceivable experts."))

**2. Under *Daubert* and Fed. R. Evid. 702, the Court must act as a gatekeeper**

Even after the Court has determined that an expert is qualified, it continues to act as a gatekeeper as required by Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("*Daubert*"), 509 U.S. 579, 597 (1993) ("the Rules of Evidence–especially Rule 702–do assign to the trial judge the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand.").

**a. The expert's testimony must be reliable**

The Court must make a determination that the evidence is reliable. This requires an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. To this end, *Daubert* set forth a five factor, nondispositive, "flexible" test to aid the court. *Id.* at 594; Matthew Bender & Co., Inc., *Federal Rules of Evidence Manual* § 702.02 [5].[4] These factors are:

1) whether the theory or technique can be or has been tested;
2) whether the theory or technique has been subjected to peer review and publication;
3) the known or potential rate of error;
4) the existence and maintenance of standards controlling the technique's operations; and
5) the degree of general acceptance.

*Daubert*, 509 U.S. at 593-94.

On remand the Ninth Circuit, "undertook[] 'the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand.'" *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1313 (1995)(internal citation omitted). According to the Ninth Circuit after the issuance of the Supreme Court's decision in *Daubert* it is the court's "responsibility to determine whether those experts' proposed testimony amounts to scientific knowledge, constitutes good science, and was derived by the scientific method." *Daubert*, 43 F.3d at 1316 (internal citations omitted).

**b. The expert's testimony must be relevant**

As with all evidence, any expert's testimony must be relevant. According to Fed. R. Evid. 702, testimony by an expert must "assist the trier of fact to understand the evidence or to determine a fact in

[4]Many cases cite a four factor, nondispositive, "flexible" test. Factor number four, "the existence and maintenance of standards controlling the technique's operations" is often not cited, although it is present in *Daubert*.

issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591; *see also* Fed. R. Evid. 401 (defining relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") and Fed. R. Evid. 402 (regarding generally the admissibility of evidence, "[a]ll relevant evidence is admissible . . . . [e]vidence which is not relevant is not admissible."). Another aspect of relevance is whether the expert testimony is sufficiently tied to the facts of the case such that it will aid in resolving the factual dispute. *Daubert*, 509 U.S. at 591 (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d. Cir. 1985)). This inquiry can be described "as one of fit." *Daubert*, 509 U.S. at 591.

### 3. Discretion, appellate standard of review and the burden of proof

The proponent of the evidence has the burden of proving the admissibility of the expert testimony by a preponderance of the evidence. Fed. R. Evid. 702, Advisory Committee Notes (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)). The admission of expert testimony is in the discretion of the trial court. *Acoustical Design, Inc. v. Control Elect. Co.*, 932 F.2d 939, 942 (Fed. Cir. 1991) (citing *Salem v. United States Lines Co.*, 370 U.S. 31 (1962)). And expert rulings are reviewed according to the abuse of discretion standard. *General Electric Co. v. Joiner* ("*Joiner*"), 522 U.S. 136, 139 (1997). *Joiner* concluded that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. However, the Supreme Court in *Daubert* noted that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### 4. *Daubert* applies even if the testimony is not "scientific" testimony

The Supreme Court has also held that the gatekeeper function found in *Daubert* applies to the testimony of experts who do not testify based on scientific principles, but based on "technical, or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). There is no reason to attempt to make a distinction between scientific, technical or other specialized knowledge when deciding the question of the admissibility of the expert's testimony. *Id.* at 148 ("Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'"(citations omitted)). The trial judge must ensure that the expert testimony is both reliable and relevant, even if it is not based on scientific principles. *Id.* at 149.

However, the "factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150 (internal citations omitted). The Supreme Court further concluded that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. The court has the same type "of latitude in determining *how* to test an expert's reliability . . . as it enjoys when it decides *whether* that expert's relevant testimony is reliable." *Id.* (emphasis in original).

## C. Pending Motions

### 1. Dairyland's Motion to Exclude Warren K. Brewer's Testimony

Mr. Brewer has worked in the nuclear industry for over 30 years and is one of the owners of ABZ,

Inc., an engineering consulting company performing work for the commercial nuclear power industry. Defendant's Response to Dairyland's Motion to Exclude Warren K. Brewer's Testimony ("Def.'s Resp. to Pl.'s Mot. to Exclude Brewer") App. at 4, 27-42. He attended the Bettis Reactor Engineering School and received an M.S. in Nuclear Engineering from MIT. *Id.*

**a. Dairyland's Position**

According to Dairyland, Mr. Brewer's expert report critiques the opinions of Dairyland's expert Todd Smith regarding the increased cost of removing the reactor pressure vessel (RPV) from Dairyland's plant due to the presence of SNF.[5] Dairyland's Motion to Exclude Warren K. Brewer's Testimony ("Pl.'s Mot. to Exclude Brewer") at 1; Tr. 48:7-13. The RPV, an internal component at LACBWR, was removed between 2005 and 2007. This increased cost is one category of Dairyland's damages. Dairyland claims that the cost of RPV removal would have been significantly lower had DOE timely performed the Standard Contract. Dairyland proffered Mr. Smith's report in an attempt to justify this conclusion that the cost would have been lower in the non-breach world. Pl.'s Mot. to Exclude Brewer at 1. Dairyland contended that Mr. Brewer merely reviews the documents relied upon by Mr. Smith, as well as other evidence, and then offers his opinion of the evidence without completing any independent analysis. *Id*. at 2; Tr. 50:24-52:16. Dairyland seeks to exclude Mr. Brewer's opinion because it is not based on reliable principles or methods and is an intrusion on the role of the judge as the ultimate arbiter of fact and law. *Id*; Tr. 49:25 - 50:7.

Dairyland asserted that Mr. Brewer's testimony is nothing more than his own, subjective belief that certain non-breach world costs calculated by Dairyland's expert Mr. Smith are not supported. Pl.'s Mot. to Exclude Brewer at 5. Because Mr. Brewer did not perform any calculations of his own, Dairyland alleged that the opinion is nothing more than *ipse dixit*, and is not admissible. *Id.* at 6-8, 19; Tr. 50:24-52:16.

Dairyland also contended that Mr. Brewer is to testify that cask loading cost should be deducted from damages. Pl.'s Mot. to Exclude Brewer at 21. Cask loading costs include the cost of loading the SNF into a cask to be picked up and transferred to DOE. Def.'s Resp. to Pl.'s Mot. to Exclude Brewer App. at 25. According to Dairyland this has repeatedly been rejected by other SNF judges based on the rationale that the cask loading costs are not avoided but are merely deferred until a later time when DOE performs. *Id.* at 23. Non-breach costs need only be deducted when they entirely avoided; here the cost will be incurred in the future. *Id.*

**b. The Government's Position**

According to the Government, Dairyland's primary criticism is that, while Mr. Brewer offers a critique of the deficiencies in Todd Smith's report regarding RPV removal in the "but for" world, Mr. Brewer failed to complete his own model calculating his proposed cost for this removal. Defendant's Response to Plaintiff's Motion to Exclude Warren K. Brewer's Testimony ("Def.'s Resp. to Mot. to Exclude Brewer") at 1; Tr. 52:18-53:6. The Government contended that Mr. Brewer used established and reliable engineering principles to provide a useful basis for understanding the deficiencies in Mr. Smith's report. Def.'s Resp. to Mot. to Exclude Brewer at 2; Tr. 53:12-23. According to the Government, Mr. Brewer is an expert in the field of nuclear engineering with experience in nuclear reactor design,

[5]The Government did not file a motion to exclude the testimony of Todd Smith.

construction, testing and operation. Def.'s Resp. to Mot. to Exclude Brewer at 4; Tr. 54:1-10. Mr. Brewer has repeatedly been qualified as an expert in other SNF cases. Def.'s Resp. to Mot. to Exclude Brewer at 4. The Government argued that Mr. Brewer also offers the opinion that two studies performed by a Dairyland contractor would have been required regardless of when DOE accepted Dairyland's SNF, that operations and maintenance costs claims by Dairyland do not depend on the amount of SNF stored in the spent fuel pool, and finally that in the "but for" world Dairyland would have incurred costs to transfer its SNF to DOE, therefore, these costs are not recoverable by Dairyland. *Id.* at 8.

**c. Conclusion**

Based on the pleadings filed herein and the arguments of counsel, the Court holds that Mr. Brewer's testimony is both reliable and relevant. *Daubert,* 509 U.S. at 597 ("the Rules of Evidence–especially Rule 702–do assign to the trial judge the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand."). Mr. Brewer shall be allowed to testify at trial. The Court holds that any argument regarding Mr. Brewer's lack of independent analysis goes to the weight of his testimony rather than the admissibility.

**2. Dairyland's Motion to Exclude R. Larry Johnson's Testimony**

Mr. Johnson is a partner emeritus of Johnson Lambert & Co. and the Chairman/CEO of Veris Consulting, LLC, a litigation consulting service. Dairyland's Motion to Exclude R. Larry Johnson's Testimony ("Pl.'s Mot. to Exclude Johnson"), App. at 27-32. As a partner with Ernst & Young and later a managing partner with Johnson Lambert & Co., he oversaw the firms' accounting and auditing practices. *Id.* Mr. Johnson received a B.S. from the University of Maryland and has completed M.B.A. course work at George Washington University. *Id.*

**a. Dairyland's Position**

Dairyland seeks to exclude the testimony of Larry Johnson which critiques the expert opinions of two Dairyland experts, Charles Wilkins and Todd Smith. Pl.'s Mot. to Exclude Johnson at 1; Tr. 60:3-10, 71:20-24. Mr. Johnson concluded, based on a review of the Wilkins and Smith reports, that 1) Dairyland's asserted damages include costs that are not "incremental" and should be subtracted from the damages claim;[6] 2) Dairyland's asserted damages include costs that are not "reasonable" and should be subtracted; and 3) PFS damages and lobbying should be deducted based on instruction from counsel. Pl.'s Mot. to Exclude Johnson at 1; Tr. 57:19-58:14-23.

According to Dairyland, the "but for" standard used by Mr. Johnson in determining incremental costs is incorrect as a matter of law. *Id.* at 7; Tr. 55:13-24, 56:12- 57:14, 73:1-15. Dairyland asserts that the governing standard for causation, which should be used in determining incremental damages, is whether the breach is a substantial causal factor in the damages. Pl.'s Mot. to Exclude Johnson at 7 (citing *Indiana Michigan Power v. United States*, 422 F.3d 1369, 1371 (Fed. Cir. 2005)) Dairyland states that it must show that: 1) the damages were reasonably foreseeable by the breaching party at the time of

[6] Mr. Johnson explains "costs includable as an element of damages must be incremental to the partial breach in order to be characterized as damages. As such, those costs must be directly related and necessary to the activities caused by the breach and reflect expenditures that would not have been made but for the breach." Pl.'s Mot. to Exclude Johnson, App. at 8.

contracting; 2) the breach is a substantial causal factor in the damages; and 3) the damages are shown with reasonable certainty. Pl.'s Mot. to Exclude Johnson at 7 (citing *Indiana Michigan v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)). Therefore, according to Dairyland, Mr. Johnson's determination of incremental costs is not reliable or relevant because it is based on an incorrect legal premise; that is, it uses the "but for" standard rather than the substantial causal factor standard. *Id.* at 8; Tr. 56:12-22. Dairyland thus seeks to exclude Mr. Johnson's analysis regarding overhead costs. Pl.'s Mot. to Exclude Johnson at 8. Dairyland also contends that Mr. Johnson does not offer any expert testimony when he opines that certain costs are not "reasonable" and should be excluded. *Id.* at 9.

**b. The Government's Position**

The Government contended that Mr. Johnson offers valuable testimony regarding accounting and damages matters and that Mr. Johnson performed valuable analysis that Dairyland failed to perform. Defendant's Response to Dairyland's Motion to Exclude R. Larry Johnson's Testimony ("Def.'s Resp. to Pl.'s Mot. to Exclude Johnson") at 1-2. Mr. Johnson offers a comprehensive framework for evaluating the validity and basis of Dairyland's damages claim. *Id.* at 2; Tr. 61:6-20. According to the Government, Mr. Johnson properly offers the opinion that certain costs claims by Dairyland are not incremental to the Government's partial breach because Dairyland would have incurred the same costs even if DOE had performed. Def.'s Resp. to Pl.'s Mot. to Exclude Johnson at 7; Tr. 68:1- 70:12. Mr. Johnson's opinion regarding incremental costs critique Dairyland's claims regarding: 1) overhead and general and administrative costs; 2) labor costs charges to the "Baseline" activity code; and 3) miscellaneous costs such as activities performed by Dairyland contractors' charges related to the decommissioning of the plant, and Nuclear Regulatory annual fees. Def.'s Resp. to Pl.'s Mot. to Exclude Johnson at 7-8.

The Government claimed that Mr. Johnson's testimony regarding reasonable costs is from the cost and accounting perspective, not a legal one. *Id.* at 14. Additionally, Mr. Johnson performed valuable modeling of two SNF acceptance scenarios, one with a "fuel-out" date in 2005 and one with a "fuel-out" date after 2008. *Id.* at 11-12.

**c. Conclusion**

The Court concludes that Mr. Johnson's testimony is both reliable and relevant. Mr. Johnson's testimony, "reasoning [and] [] methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Mr. Johnson's testimony is also relevant, as it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591.

The Court understands Dairyland's concern that Mr. Johnson's incremental cost analysis uses the 'but for' standard rather than the substantial causal factor test found in *Indiana Michigan*, 422 F.3d at 1373. Pl.'s Mot. to Exclude Johnson at 7. However, according to the Federal Circuit, "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007). Therefore, it is arguable that either test could be appropriate. As recently as May 19, 2008, Judge Wheeler in *Carolina Power* stated "[f]or each of the disputed damages items here, the Court will apply the but-for test or the substantial causal factor test as appropriate." *See Carolina Power v. United States*, No. 04-37C, 2008 WL 2154103 *20 (Fed. Cl. May 19, 2008). Any issues regarding Mr. Johnson's testimony regarding incremental cost are open for Dairyland on cross-examination. *Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Mr. Johnson shall also be allowed to testify regarding his two different models for SNF acceptance scenarios, as they provide an alternative to Dairyland's acceptance theory. Mr. Johnson shall be allowed to testify regarding overhead costs.

Mr. Johnson shall not be allowed to testify regarding his opinion as to whether PFS and lobbying costs incurred by Dairyland are properly attributable to DOE's breach. *Sparton Corp. v. United States*, 77 Fed. Cl. 1, 9 (2007) ("Expert testimony is an improper mechanism for offering a legal opinion to the Court."). A conclusory statement by Mr. Johnson, based on the advice of the Government's counsel, that these specific costs cannot be attributed to the breach, followed by the subtraction of these costs from Dairyland's claimed damages, does not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591.

### 3. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony

Mr. Neuberger is a principal in the economics consulting firm Economists Incorporated. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony, App. ("Pl.'s Mot. to Exclude Neuberger, App.") at 5, 46. He received a Master's Degree and Ph.D in Economics from Johns Hopkins University. *Id.*

#### a. Dairyland's Position

Dairyland asserted that the opinions of Dr. Neuberger are merely criticisms of the testimony of Mr. Graves and that Dr. Neuberger failed to create a competing model to contradict the model created by Mr. Graves. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony ("Pl.'s Mot. to Exclude Neuberger") at 1; Tr. 127:19-128:18. According to Dairyland, Mr. Neuberger's opinions are speculative and impressionistic. Pl.'s Mot. to Exclude Neuberger at 2. And the testimony is unreliable, irrelevant, confusing and a waste of the court's time. *Id.*; Tr. 127:5-9, 128:11-18.

#### b. The Government's Position

The Government takes the position that if the testimony of Mr. Graves is excluded, then the Government will not seek to introduce the testimony of Dr. Neuberger. Defendant's Response to Plaintiff's Motion to Exclude the Testimony of Jonathan A. Neuberger ("Def.'s Resp. to Pl.'s Mot. to Exclude Neuberger") at 1-2, Fn. 1; Tr. 126:19-22. The Government argued that Dr. Neuberger applied well-established and reliable economic principles and provides the Court with a useful basis for understanding the significant deficiencies contained within Mr. Graves' hypothetical exchanges model. Def.'s Resp. to Pl.'s Mot. to Exclude Neuberger at 1, 2. Dr. Neuberger has analyzed the models used by Mr. Graves and has offered an economic critique of Mr. Graves' model and resulting conclusions. *Id.* at 8.

#### c. Conclusion

The Court holds that the testimony of Dr. Neuberger shall be allowed. The Government offers Dr. Neuberger to explore its disputes with the modeling presented by Mr. Graves. *See infra* ¶ 6. Because the Court will allow the testimony of Mr. Graves, the Court finds that the testimony of Dr. Neuberger will "assist the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. In this case the fact at issue is the disputed acceptance rate for SNF and the potential for exchanges as allowed by

the Standard Contract. Dr. Neuberger's opinion is a reliable and relevant critique of the modeling used by Mr. Graves concerning both the acceptance rate and possible exchanges. *Daubert*, 509 U.S. at 587 ("[t]he Rules basic standard of relevance is thus a liberal one.").

**4. The Government's Motion to Exclude Expert Testimony (of Charles Wilkins) Regarding Overhead Costs**

Mr. Wilkins is a Certified Public Accountant with more than 35 years of dispute resolution experience in matters in which the U.S. Government was a party. Dairyland's Response to Defendant's Motion *In Limine* to Exclude Expert Testimony Regarding Overhead Costs, App. ("Pl.'s Resp. to Def.'s Mot. to Exclude Overhead Costs") at 2. He is now a Senior Managing Director in the Forensic Litigation Consulting practice of FTI Consulting, Inc. *Id.* Mr. Wilkins holds B.A.'s from California State University and LaSalle University along with an M.B.A. from the University of California. *Id.*

**a. The Government's Position**

The Government requests exclusion of the expert testimony of Charles Wilkins, who will testify regarding Dairyland's overhead cost allocation to breach-related projects. Defendant's Motion *In Limine* to Exclude Expert Testimony Regarding Overhead Costs ("Def. Mot. to Exclude Overhead Costs") at 1; Tr, 74:21-24. The Government insists that this testimony is not relevant because overhead costs are not attributable to the breach. Def. Mot. to Exclude Overhead Costs at 4. Recovery of overhead costs, which the Government contends Dairyland would have incurred regardless of breach, would put Dairyland "in a significantly better position in the breach world," contrary to the fundamental principles of contract damages. *Id.* The Government contends that Dairyland offers no evidence that it would actually have been able to allocate the resources to non-breach related projects, thus incurring "opportunity costs." *Id.* at 11; Tr. 75:18-24, 81:3-8. Alternatively, the Government requests that Mr. Wilkins' testimony be limited to matters specifically addressed in his report. *Id.* at 12-13.

**b. Dairyland's Position**

According to Dairyland, Mr. Wilkins' "work demonstrates that, but for the government's breach, Dairyland would not have incurred its claimed overhead and G&A costs in connection with its breach related activities." Pl.'s Resp. to Def.'s Mot. to Exclude Overhead at 1-2. Dairyland alleged that it need not prove that the cost would not have been incurred absent the breach, but rather all that they must prove is that if the costs "are properly allocated to breach-related activities, then the resources represented by those costs would have been efficiently devoted to other uses or reduced absent the breach." *Id.* at 2; Tr. 81:15-6, 83:16-9. The claimed overhead cost consists of "incurred service center and operations costs that were required to support LACBWR activities, including activities associated with the government's breach." Pl.'s Resp. to Def.'s Mot. to Exclude Overhead at 2. The Government's contention that it is necessary for Mr. Wilkins to "analyze exactly how Dairyland's overhead and G&A resources would have been used absent the breach" is without merit. *Id.* at 5. According to Dairyland, the argument that Dairyland must demonstrate precisely how the overhead and G&A resources would have been used absent the breach has consistently been raised in other SNF cases and has been "almost universally rejected." *Id.*; Tr. 81:23-83:15.

**c. Conclusion**

The Court holds that Mr. Wilkins shall be allowed to testify regarding Dairyland's overhead costs.

Any argument that the Government makes regarding the fact that Dairyland offers no evidence as to how it would have allocated the overhead and G&A resources in a non-breach world–an argument that has been rejected by other judges on this court–goes to the legal standard by which overhead costs could be awarded by this Court. It does not effect the admissibility of Mr. Wilkins' testimony.

The issue of overhead costs has been present in many SNF cases. For example, in *Carolina Power*, Judge Wheeler allowed Plaintiff's claim for overhead costs, reasoning that "[o]verhead, by definition, is a cost of doing business, and for some period of time, part of Progress Energy's "business" was mitigating DOE's partial breach. Overhead recovery is necessary to compensate Plaintiff's fully." *See Carolina Power v. United States*, No. 04-37C, 2008 WL 2154103 *28 (Fed. Cl. May 19, 2008); (citing *Sys. Fuels, Inc. v. United States*, 78 Fed. Cl. 769, 799-800 (2007) (rejecting Governments principle that all "loader costs" [overhead] would have been incurred absent DOE's breach)). Overhead costs were awarded in *Pacific Gas & Electric v. United States*, 73 Fed. Cl. 333 (2006), but were ultimately rejected in *Sacramento Mun. Util. Dist v. United States*, 70 Fed. Cl. 332, 376-77 (2006) (holding that plaintiff failed to meet the burden of demonstrating that such costs, in fact, were incremental) and *System Fuels, Inc. v. United States*, 78 Fed. Cl. 796, 798-800 (2007) (holding that plaintiff failed to meet burden of demonstrating that these costs would not have been incurred in the absence of DOE's delay).

Finally, while the Government urges the Court to limit Mr. Wilkins' testimony to matters found in his expert report this Court holds that it is unnecessary to limit Mr. Wilkins' testimony in advance of trial.

### 5. The Government's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart

Mr. Stuart has over 40 years of experience in the nuclear industry, including in the field of spent fuel transportation and storage. Defendant's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart, App. at 2, 24-26. He is a registered professional nuclear engineer and President of I. Stuart & Co., Inc., an international nuclear consulting firm. *Id.* Mr. Stuart received a B.S. in Mechanical Engineering from the Newark College of Engineering and a graduate degree from the New York University/ U.S. Air Force Meteorological Program. *Id.*

#### a. The Government's Position

The Government seeks to exclude Mr. Stuart's testimony that 1) the acceptance rate of 3,000 MTU per year by DOE would have been readily achievable by DOE; 2) sufficient advanced work by DOE was possible in view of the large body of experience in the transportation of spent fuel gathered by and/or available to DOE prior and subsequent to 1983; 3) adequate planning and preparations would have ensured the availability of a sufficient number of casks; 4) exchanges of acceptance allocations among contracting utilities would have been accommodated; and 5) there are no site-specific conditions that would have prevented DOE from utilizing acceptance campaigns to transport SNF from Dairyland. Defendant's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart ("Def.'s Mot. to Exclude Stuart") at 2; Tr. 87:9-16. According to the Government, these opinions are wholly irrelevant, they lack sufficient support and fail to take into account contradictory information. Def.'s Mot. to Exclude Stuart at 2; Tr. 87:20-4; 93:23-94:6. The Government contended that Mr. Stuart's testimony is after the fact testimony about what DOE should have done. Def.'s Mot. to Exclude Stuart at 8-10. Furthermore, Mr. Stuart's opinions are irrelevant and unreliable because they offer an opinion as to what DOE could have achieved, as opposed to what it was required to achieve. *Id.*; Tr. 88:5-18. Finally, the Government complained that Mr. Stuart performed no analysis to reach his conclusion. Def.'s Mot. to Exclude Stuart

at 10; Tr. 90:12- 91:19, 94:7-11.

**b. Dairyland's Position**

According to Dairyland, Mr. Stuart has 40 years of experience in the nuclear industry, including ten years as senior vice president of NAC International, Inc., "that designed, developed and manufactured spent fuel transportation and storage casks." Opposition to Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart ("Pl.'s Opp. to Def.'s Mot. to Exclude Stuart") at 1. Mr. Stuart will testify: "1) that there are no technical impediments to DOE operating its SNF program at a rate of 3000 MTU with a reasonable ramp-up beginning in 1998; 2) that sufficient casks and rail and other transportation equipment could have been available to DOE to accommodate concentrated acceptance 'campaigns' of spent fuel from utilities; and 3) that there are no site-specific conditions at Dairyland's LACBWR nuclear plant site that would have prevented DOE from using acceptance campaigns to transport SNF from the site." Pl.'s Opp. to Def.'s Mot. to Exclude Stuart 1-2. Mr. Stuart has testified in *Yankee*, *Sacramento Municipal Utility District (SMUD)*, and *PG&E*. Dairyland opines that the Government did not seek to exclude Mr. Stuart's testimony in the other SNF trials where it was offered (the Government did object at trial to one narrow issue regarding Mr. Stuart's testimony in *SMUD*). *Id.* at 3-4. Dairyland contends that it is entitled to present evidence consistent with its theory regarding acceptance rate and that the lack of technical impediments show DOE's ability to perform and support the "reasonableness" of Dairyland's proposed rate. *Id.* at 3; Tr. 96:24-97:4.

**c. Conclusion**

Mr. Stuart shall be allowed to testify. The Court is satisfied that Mr. Stuart's testimony is both reliable and relevant. Additionally, Mr. Stuart's report adequately describes how his experience in the nuclear industry led to the conclusions reached. Fed. R. Evid. 702, Advisory Committee Notes ("If a witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

**6. The Government's Motion *In Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves**

Mr. Graves is a principal with the Brattle Group, a firm that provides consulting and expert testimony in economics, finance and regulation to corporations, law firms and governments. Brattle Group Home Page, http://www.brattle.com (follow the "About Brattle" hyperlink). He has over 25 years of experience assisting utilities in the design and implementation of long-range planning, investment and operating policies. Dairyland's Opposition to Defendant's Motion *In Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves ("Pl.'s Opp. to Mot. to Exclude Graves"), App. at 15. Mr. Graves received a B.A. in mathematics from Indiana University and an M.S. with a concentration in finance from the M.I.T. Sloan School of Management. Brattle Group Home Page, http://www.brattle.com (follow the "Consultants" hyperlink, then browse by the "G" hyperlink, then the "Graves, Frank C." hyperlink) (last visited June 10, 2008).

**a. The Government's Position**

According to the Government, Mr. Graves will offer his opinion on two issues. First, Mr. Graves will offer testimony regarding an economially reasonable acceptance rate of SNF. Defendant's Motion *In*

*Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves ("Def.'s Mot. to Exclude Graves") at 1; Tr. 105:3-6. The Government contended that Mr. Graves "does not possess any knowledge, skill, experience, training, or education in the areas implicated by an opinion concerning the rate at which DOE would have accepted SNF from the industry beginning in 1998." Def.'s Mot. to Exclude Graves at 17; Tr. 107:22-109:12. Secondly, Mr. Graves will offer testimony regarding the acceleration of Dairyland's place in the Standard Contract's "oldest-fuel-first" acceptance queue. Def.'s Mot. to Exclude Graves at 1-2; Tr. 104:19-105:2. According to the Government, Mr. Graves' hypothetical exchanges market is based on speculative and overly-simplistic economic theory and is not properly grounded upon underlying facts. Def.'s Mot. to Exclude Graves at 20; Tr. 105:7-9. The Government argued that this hypothetical exchanges market is speculative because it assumes that a market for exchanges of SNF acceptance allocations in the queue would have been "analogous to a perfectly competitive market." Def.'s Mot. to Exclude Graves at 25; Tr. 106:2-6. Additionally, the Government claimed that Mr. Graves' model is speculative because it assumes that DOE would "approve[] all exchanges, even though utilities are required to submit their exchange requests to DOE, which has, 'in its sole discretion,' the right to approve or disapprove those requests." Def.'s Mot. to Exclude Graves at 8; Tr. 105:22-23.

The Government urged this Court to accept the reasoning found in *PG&E* and exclude the testimony of Mr. Graves. Tr. 105:18-21. According to the Government, the court in *PG&E* found that Mr. Graves' hypothetical exchanges model is premised upon factually-unsupported and speculative assumptions. Def.'s Mot. to Exclude Graves at 34; Tr. 105:18-106:17. And, this Court should also find that Mr. Graves' model is "too speculative to be helpful to the court in its resolution of this case." *Id.* at 35 (citing *PG&E*, 73 Fed. Cl. at 436).

**b. Dairyland's Position**

According to Dairyland, this Court should reject the Government's argument for the same reason Judge Merow rejected it in *Yankee*. Tr. 111:5-10, 17-23. Dairyland asserted that Mr. Graves is an economist who provides an economic analysis of a reasonable rate of acceptance based on the economic need for the removal of SNF. Plaintiff's Response to Defendant's Motion to Exclude Graves ("Pl.'s Resp. to Mot. to Exclude Graves") at 3. Mr. Graves is not an expert on DOE's programs; however, he is the "*only* witness who will present evidence regarding the reasonable rate of acceptance based on utilities' economic needs for spent fuel removal." *Id.* Dairyland contended that Mr. Graves' opinion regarding acceptance rate is relevant, since this is an open term in the Standard Contract and DOE is obligated to perform at a reasonable rate. *Id.* at 3-4; Tr.112:12-22. Further, Mr. Graves' focus is on what would be considered a reasonable rate from an economic perspective. Pl.'s Resp. to Mot. to Exclude Graves at 4.

Dairyland also contended that the Government's objection to Mr. Graves' hypothetical exchanges model is without merit. *Id.* at 8. According to Dairyland, Mr. Graves' accepts that under the Standard Contract the pick-up queue is initially based on when the fuel was discharged from the reactor, *i.e.* oldest fuel receiving the first allocations. *Id.* However, subject to DOE approval utilities could exchange their slot in the queue. *Id.* Dairyland asserted that Mr. Graves' report "provides a robust estimate, based on established economic principles, of how an exchange process would have influenced the timing and sequence of DOE's acceptance of Dairyland's spent fuel." *Id.* at 9. Dairyland contended that the difficulty in modeling is due to the breach (there is no real world data) and "[t]he defendant who has wrongfully broken a contract should not be permitted to reap advantage for his own wrong by insisting on proof which by reason of his breach is unobtainable." *Id.* at 12 (citing *Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960).

**c. Conclusion**

The Court concludes that Mr. Graves shall be allowed to testify. The Court holds that Mr. Graves' testimony regarding an economically reasonable rate of SNF acceptance, which is based on his analysis of available documents, is reliable and relevant to this matter. In every SNF case that is before the Court of Federal Claims the acceptance rate of SNF has been at issue. For example, in *PG&E*, 73 Fed. Cl. 333 and *Yankee Atomic Electic Co v. United States*, 73 Fed. Cl. 249 (2006) two different rates were held to be appropriate. Both cases have been appealed and the rate of acceptance is a central issue in the appeal. Mr. Graves has analyzed a number of different acceptance rates, even using the rate found in the 1991 Annual Capacity Report (900 MTU), which is advanced by the Government and was determined to be a reasonable rate in *PG&E*. Def.'s Mot. to Exclude Graves, App. at 63D-63F; *PG&E*, 73 Fed. Cl. at 400. To the extent that the Government disagrees with the rate of acceptance that Mr. Graves determined to be appropriate, there will be ample opportunity for cross-examination. *Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Additionally, the Court holds that the Government's arguments regarding Mr. Graves' economically reasonable rate of SNF acceptance goes to the weight of his testimony, not to its admissibility. *Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686 *6 (Fed. Cl. June 28, 2004).

The Court also holds that Mr. Graves' testimony regarding his hypothetical exchanges model is reliable and relevant to this matter. In *Energy Capital Corp*., this Court awarded lost profit damages based on an economic model that contained an estimation of a number of eligible and energy viable properties that would have participated in the Affordable Housing Energy Loan Program ("AHELP").[7] *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1334 (Fed. Cir. 2002) (*aff'g in part, rev'g in part* 47 Fed. Cl. 382 (Damich, C.J.)). The Government argued that this Court "erred as a matter of law by engaging in 'rampant' and 'unsupported' speculation in arriving at its determination that Energy Capital would have realized profits from the AHELP venture." *Id*. at 1328. The Government specifically attacked the sufficiency of the evidence regarding participation in AHELP because it depended upon the consent of both the property owners and the first mortgagees.[8] *Id*. at 1329. The Court is struck by the similarities

---

[7]The AHELP was an agreement between Energy Capital and the Department of Housing and Urban Development ("HUD") that eliminated "the regulatory barriers to financing energy improvements in HUD properties." *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1327 (Fed. Cir. 2002). Under the agreement Energy Capital could originate loans to HUD property owners and in exchange HUD agreed to provide Energy Capital security on the loan. *Id*. Shortly after entering into the AHELP agreement it was terminated by HUD. *Id*. at 1319. This termination occurred before Energy Capital had completed any loans. *Id*. Energy Capital filed suit in the Court of Federal Claims seeking to recover lost profit damages as a result of HUD's breach of contract. *Id*.

[8]The Government urged the appellate court to find the evidence upon which the damages award was based speculative for several reasons, *inter alia*, Energy Capital did not provide testimony from the first mortgagees and Fannie Mae never consented to any AHELP loans in its capacity as first mortgagee. *Energy Capital Corp.,* 302 F.3d at 1329. The Government urges that this Court exclude Mr. Graves under a similar premise. According to the Government under the Standard Contract DOE must approve all exchanges; however, DOE has not approved any exchanges, nor have they been asked to do so. Def's Mot. at 8. The Court declines to exclude

between the Government's arguments in *Energy Capital Corp*. and the instant action. *See Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686 (Fed. Cl. June 28, 2004). In *Energy Capital Corp*., the Federal Circuit held that the Government's "argument seems to be an indirect attack on the sufficiency of the evidence . . . . In any event, we conclude that the Court of Federal Claims drew reasonable inferences based on all of the evidence . . . to arrive at its findings . . . ." *Id*. In *Energy Capital Corp*., this Court based its lost profit damages award on evidence the Government argued was too speculative. At the present time only admissibility, not a determination of damages, is at issue. And, the admission of Mr. Graves' testimony is solely in the discretion of the trial court. *See Acoustical Design, Inc.*, 932 F.2d at 942 (Fed. Cir. 1991).

Despite the Government's urging to the contrary, the Court concludes that Mr. Graves' testimony is based on sufficient facts and evidence to allow for admissibility. The Court agrees with *Yankee* that "[b]y partially breaching the contract, defendant cannot exclude Graves' opinion on the grounds that there is no market data. There is no market data because the government's breach thwarted this possibility." *Yankee*, No. 98-126C, No. 98-126C, 2004 WL 1535686 *4 (Fed. Cl. June 28, 2004).

## V. Procedures Regarding Sequestration

### A. Background

On April 29, 2008, both Dairyland and the Government filed proposed procedures regarding sequestration as required by the Trial Preparation Order of February 21, 2008. The Government has decided to invoke sequestration under Fed. R. Evid. 615; therefore, the parties agreed to the following procedures:

1. Witnesses who have testified should not be permitted to discuss their testimony with witnesses who have not yet testified.

2. An attorney should not be permitted to relate, in any form, the substance of previous testimony to witnesses who have not yet testified.

However, the parties cannot agree regarding whether an attorney should be permitted to counsel a witness during breaks in the witness's testimony.

### B. Applicable Law

Fed. R. Evid. 615 Exclusion of Witness states:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize the exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.

---

Mr. Graves' testimony based on the Government's argument regarding DOE approval.

Fed. R. Evid. 615 does not specifically preclude attorneys from consulting with witnesses during breaks in testimony, however, the Court retains discretion to limit attorney consultation, even where the witness is a party, in order to "maintain the status quo during a brief recess in which there is virtual certainty that any conversation between the witness and his lawyer would relate exclusively to his ongoing testimony." *Perry v. Leeke*, 488 U.S. 272, 273, 284 (1989) (holding that trial court order directing defendant not to consult with his attorney during 15-minute breaks in testimony did not violate Sixth Amendment right to assistance of counsel). *Reynolds v. Alabama Department of Transportation* applied *Perry* and extended that ruling to a civil matter, holding that a prohibition on consultation with witnesses is appropriate "subject to exceptions permitting attorneys to consult with those witnesses testifying on different occasions on different topics, to consult with witnesses about non-testimonial matters during evenings and weekends and, upon approval of the court, to consult with witnesses even about their testimony." *Reynolds v. Alabama Department of Transportation,* 4 F. Supp.2d 1055, 1064-65 (1998).

During oral arguments Dairyland urged the Court to allow counsel to be able to confer with witnesses during breaks in testimony with a limitation that counsel not relate prior testimony to the witness. Tr. 129:20-25. According to the Government in order to have unfettered testimony a bright-line rule that prohibits an attorney from counseling a witness during breaks would be appropriate. Tr. 131:2-24.

**C. Conclusion**

The Court is cognizant of the Government's concern in this instance. However, the Court sees no reason to so limit the role of counsel during trial that there can be no consultation with witnesses. This issue can be resolved with a limiting instruction by the Court. Therefore, counsel shall be allowed to consult with witnesses during breaks in testimony, however, they may not discuss the testimony of any other witness that has appeared before the Court. This limiting instruction provides for a "clear line . . . to prevent witnesses from hearing about the testimony of other witnesses." Defendant's Notice of Proposed Procedures for Sequestration at 2.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge