# ARTHUR, JOHN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------:
PACIFIC GAS & ELECTRIC COMPANY, :
:
Plaintiff, :
:
vs. : No. 04-074C into
: which has been
UNITED STATES OF AMERICA, : consolidated No.
: 04-075C
Defendant. :
-----------------------------------:

Washington, D.C.

Thursday, September 22, 2005

Deposition of:

W. JOHN ARTHUR, III

called for oral examination by counsel for Plaintiff, pursuant to notice, at Greenberg, Traurig, L.L.P., 800 Connecticut Avenue, Northwest, Suite 500, Washington, D.C., before Shari R. Broussard, a Notary Public in and for the District of Columbia, beginning at 9:41 a.m., when were present on behalf of the respective parties:

Page 2

On behalf of Plaintiff
JERRY STOUCK, ESQUIRE
ROBERT L ELAM, ESQUIRE
Greenberg, Traurig, L L P
800 Connecticut Avenue, Northwest
Suite 500
Washington, D C 20006
(202) 331-3173
On behalf of Defendant
HEIDE L HERRMANN, ESQUIRE
ALAN J LO RE, ESQUIRE
U S Department of Justice
Civil Division
1100 L Street, Northwest
Washington, D C 20530
(202) 305-3315
ALSO PRESENT
Jane Taylor, Esquire, Department of Energy
Larry Warner, Esquire, Department of Energy
Judge Hewitt (Via telephone)

Page 3

C O N T E N T S


| EXAMINATION BY | PAGE |
|---|---|
| Counsel for Plaintiff | 5, 323 |
| Counsel for Defendant | 318 |

| ARTHUR DEPOSITION EXHIBITS * | PAGE |
|---|---|
| 1 OCRWM Organizational Chart, 6/27/05 | 20 |
| 2 U S Nuclear Waste Technical Review Board, Winter Board Meeting, 2/9/05 | 68 |
| 3 "Project Operational Thermal Management Strategy," 2/9/05 | 88 |
| 4 Spent Nuclear Fuel Verification Plan, Revision 0, 3/97 | 106 |
| 5 Commercial Spent Nuclear Fuel Handling In Air Study, 3/05 | 123 |
| 6 "OCRWM's Transportation Planning Update, 1/21/04 | 167 |
| 7 "Yucca on DOE Christmas List," 5/14/04 | 183 |
| 8 U S Nuclear Waste Technical Review Board, Winter 2003 Board Meeting, 1/28/03 | 187 |
| 9 "Alternative Canister Scenarios" | 215 |
| 10 "The Potential of Using Commercial Dual Purpose Canisters for Direct Disposal" | 216 |


Page 4


| ARTHUR DEPOSITION EXHIBITS: * | PAGE |
|---|---|
| 11 U S Nuclear Waste Technical Review Board, Repository Design Update Panel on the Engineered System, 1/20/04 | 229 |
| 12 Afternoon Session, Bates NRC0040160 to 190 | 260 |
| 13 Memo from Huizenga to Distribution, 12/29/99 | 269, 275 |
| 14 "Yucca Mountain Project - Design and Operations in 2010" | 286 |
| 15 Partial Transcript, Yankee Atomic Electric vs. U S , Pages 7825 to 7844 | 309 |


(*Exhibits attached to transcript )

Page 5

WHEREUPON,

W JOHN ARTHUR, III

called as a witness, and having been first duly sworn, was examined and testified as follows

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR STOUCK.

Q Good morning, Mr Arthur
A Good morning
Q First could we just have an identification of everyone here for the record, your name, and then we'll go around the table?
A I'm John Arthur with the Department of Energy, Office of Repository Development, Las Vegas, Nevada
MS HERRMANN Heide Herrmann with DOJ
MR LO RE Alan Lo Re, Department of Justice, representing the Department of Energy
MS TAYLOR Jane Taylor, trial attorney, Department of Energy
MR WARNER Larry Warner, attorney, Department of Energy, Office of Repository Development

Page 78

Q The facility is being designed to accommodate the different casks that may be involved, is that correct?
MS HERRMANN Objection Vague
BY MR STOUCK
Q I'm not asking about his testimony Again, this is just sort of a predicate I'm not asking what he said, I'm asking what you think I just want to be clear about that I'm really not asking you what he said
A I'm going to answer again I think I've tried to answer that before In the materials that are received in the repository, and that's what we're covering under the license application, that's my area of responsibility, as received at the repository by train or truck, I'm dealing in these various facilities we can talk about to be able to handle the various spent nuclear fuel, DOE materials, and Naval reactors materials
Q Commercial spent nuclear fuel in your last answer?
A Correct

Page 79

Q Let me just ask a more specific question again without regard to this transcript
A Uh-huh
Q Do you understand what a dual-purpose cask is, a dual-purpose container for spent nuclear fuel in a commercial reactor?
A Somewhat I've heard the terminology used quite a bit
Q What is a dual-purpose container?
A As I understand in interpretations I've heard, it means for storage as well as transportation
Q Do you understand the distinction or do you have an understanding -- I'm not asking you to be an expert on this Do you have an understanding of the difference, with respect to a dual-purpose container, between a canister and a cask?
A I'm not an expert in that particular area
Q Do you have any understanding of that difference?
A Define cask

Page 80

Q Well, cask, transportation cask or storage cask My understanding is that the canister is the internal basket that holds the assembly
A Right
Q That's your understanding?
A That's correct
Q Certainly I realize you're not an expert And then there could be a storage overpack which would be called a cask --
A Right
Q -- or a transportation --
A Transportation cask
Q Let's go with that terminology recognizing you're not an expert
Do you know whether the surface facilities at the repository are being designed to accommodate all of the different canisters in use that might come from different commercial nuclear reactors around the country?
MS HERRMANN Objection Vague
THE WITNESS Again, now, within the

Page 81

areas of planning our license application, now that's the area -- basis I'm speaking to you today, on our design supporting that, our current plans are for the materials in canisters and the various fuels received at the repository to have varying facilities to deal with that through a number of three different nuclear facilities I'll talk about
BY MR STOUCK
Q So the design objective is to accommodate all of the different canisters that are in use at commercial nuclear reactors, is that correct?
MS HERRMANN Objection. Vague, asked and answered
THE WITNESS I'm going to redefine that for the requirements that I have in our OCRWM requirements document, that's the area I'm dealing with in the license application I do not deal in standard contracts and other key areas, so I'm talking from as received at the repository
BY MR STOUCK
Q And the answer is yes from that perspective?

but I'm just asking you if you have any understanding of whether that's going on

MS HERRMANN Objection Foundation, vague

THE WITNESS The understanding I have is, as I said earlier, my responsibility is not in the interface, you know, on waste acceptance and dealing with the standard contract with the utilities That occurs under Chris Kouts' office

I do understand that we have various databases on materials that are available and that's about my extent of knowledge on it

Again, mostly, I want to reaffirm, I've said several times today, my dealings come with what we have in the license application and what will be received at the repository

BY MR STOUCK

Q Right So I just want to understand that a little more I know you've said that several times

What you're telling me with respect to the received at the repository part is that you



have no responsibility for what is going to be received at the repository or, for example, the schedule? I mean that's, you know, it's obvious that's an issue You know, who's coming first, who's coming second or any other aspect of how it's going to get there you don't have responsibility for; your job is when it gets there, what are we going to do with it?

A That's correct, and the only additional statement I make on that, we will be required in our license application to document types of materials and do the necessary safety analysis, but I do not deal on that front end of waste acceptance

Q Right, I understand that and I don't intend to ask you about things that -- well, you know, there's a difference between being responsible for something or having any understanding of it

A Right

Q So I guess does the license application -- let me just put it that way, you've



emphasized that as one of the focuses of your attention -- does the license application deal with this question at all of what's inside canisters that may show up at the facility?

MS HERRMANN Objection Vague

THE WITNESS It is true I mean our license application, we have to -- we're going to deal with a large number of bare fuel assemblies, so in our safety analysis we have to have various knowledge of the characteristics in order to do the safety analysis and proper facility design

BY MR STOUCK

Q Some of these canisters are welded shut, do you know that, what I'm talking about?

A I'm aware of that

Q Is it your understanding that whatever knowledge OCRWM needs or wants of the content of those sealed canisters, welded canisters, in terms of how many assemblies, characteristics of the assemblies, whatever knowledge OCRWM needs or wants about the content of those sealed canisters is available or will be available to OCRWM through



this database or some database that you referenced before? Is that a general understanding that you have?

MS HERRMANN Objection Foundation, speculation

THE WITNESS From my particular perspective right now I do have the necessary information I need on the contents of that because we are performing our preclosure safety analysis, so I have the adequate information I'm not aware of the particular source where it comes from.

BY MR STOUCK.

Q Okay That was my next question.

What about internally? How do you know you have the information you need, just to be clear, about the content of sealed canisters that may be coming into the facility? You say you have the knowledge you need about that

A Our preclosure safety analysis, and I don't think I earlier said today what that is

Q Okay That might be helpful

A That is for the operating life of the

earlier, it would be in our office of either systems analysis or you might go back to the author, to Ronald I'm just not engaged in that level of detail today

BY MR STOUCK

Q That's fine I appreciate it

And, again, just also if you recall, I previously asked you whether you were aware of any efforts that OCRWM was taking to -- please read I don't mean to interrupt you Let me know when you're ready for another question

A That's fine

Q Remember I asked you prior to looking at this document whether you knew whether OCRWM is doing anything today to give guidance to the utilities about how they should document or whether they should document the content, in other words, the characteristics, identity of assemblies that they put inside sealed canisters? Do you remember that question or those questions?

A Yes, I do

Q Well, now let me ask you having looked at



this, does this refresh any recollection or bring to your mind any awareness at all of similar activity that may be going on today to encourage utilities or ask them to do something with respect to documentation of the content of their dry storage canisters?

MS HERRMANN Objection Foundation, speculation

THE WITNESS And the document you gave me I've read about a page or a paragraph thus far, so having not read the rest, I mean the only area I want to clarify is, as I mentioned earlier today about failed fuel and bare fuel having the right facilities to deal with various areas

Right now we have a keen interest on any failed fuel or damaged fuel to make sure we have the right facilities to deal with that at Yucca Mountain, so we are trying to determine certain information on that But how that's being gathered I don't know I just want to clarify that

BY MR STOUCK

Q With respect to intact fuel, for example,



or other waste?

A Right

Q No, that's good I appreciate that and that's actually a good segue into what may be, I hope probably will be but no guarantees, the last exhibit before lunch So let's see if we can make that happen Let's try to keep this in order

I'm going to show you a document that relates to failed fuel So as a predicate to that, Mr Arthur, can you tell me generally why it is that at the present time there is this interest in failed fuel?

A First of all, our interest right now on the failed fuel has to deal with, and in my definition I mean the failed fuel would be fuel that the cladding is damaged, where also, as we've been made aware over the last year, there could be small pinhole leaks that actually get oxidized under higher temperatures And most of the interest there, as I talked about earlier, are in that particular area right now and so that's where we have a lot of interest, because we have recent



reports that have been brought to our attention that show at higher temperatures various pinhole leaks get oxidized and that could be issues for us in a hot cell, especially when we're dealing with large volumes of fuel assemblies So we're working that right now That's one of the areas I talked about our design where we're making some modifications

Q Can you be more specific about the identity of one or more reports that speak to this issue, you know, who prepared it, dates?

A Couple areas and I have to follow-up on specifics, but these are reports I believe we've made public and in the program There was one that was done by our contractor, Bechtel SAIC, back in the March 2005 time frame that actually took some earlier reports -- you need to go over that to get the references on them

Q Yeah

A It will give you a chain of documents -- that actually showed this to be an issue and so that's what's causing some of the design

Page 118

modifications and evaluations that we're currently doing

Q Was there any study, you know, subsequent to, you know, additional analysis of the issue or the problem subsequent to the March '05 Bechtel SAIC study?

A There's been a lot of evaluation after that study, I mean internal reviews to make sure that we're knowledgable that our facilities can accommodate the various bare fuel assemblies we're going to have to deal with

Q Is it true that one of the things that came to light in connection with that study was that there may be pinhole leaks that are present in fuel arriving at the repository that cannot or have not been detected in advance? Is that one of the issues?

A That is one of the possible issues We still don't have the full knowledge of whether that's correct or not, but we're trying to get the necessary information

Q But the study you referenced suggested

Page 119

that may be the case?

A That is correct

Q And prompted further analysis of the issue?

A That's correct And I might add on that that it's a very small amount of the overall If you look at our life-cycle projections of the repository, we're talking about 225,000 assemblies that could be handled in bare fuel We're talking probably less than 5,000 that could have this particular condition

Q Assume it turns out to be true, this pinhole leak issue, what kinds of modifications to the facility might then, you know, what are you looking at to sort of deal with it?

A The first of our goal is to know ahead of time versus opening one and having that issue So as much knowledge as we have on the front end prior to receipt, that's important to us and we want to be able to deal with that particular fuel, be it 4,000 assemblies, 2,000 or 5,000 in what I call an off-normal condition, so we would have a regular

Page 120

routine operation that most of those facilities deal with

In these particular areas it may require us to inert with a particular gas like nitrogen the particular hot cell we're actually going to deal with these in order to prevent that oxidation So that's why it's very important for us to have that kind of knowledge

Q Are those design modifications going to be made before the license application is submitted?

A We're currently -- the contractor, Bechtel SAIC, has recently provided a proposal of new information to me My staff is currently addressing that We have started some efforts to be ready to deal with that particular issue

Q So your current plan is to try to work this into the license application?

A That is correct

Q Also in your prior answer, you can look at it if you want, but, you know, modern technology, the reporter here is taking down, as

Page 121

you know, everything that's being said and we've got this gizmo that puts it right up on my screen and so I can see what at least she thinks you said Your answer was "The first of our goal is to know ahead of time versus opening one and having that issue, so as much knowledge as we have on the front end prior to" -- opening one I took you to be referring to one of these sealed canisters that I've mentioned, is that right?

A When we open a canister, that's correct, that we want to have as much knowledge on the beginning and the basis I go back with is the good knowledge of what's going on over in Cogema in LaHague, France They've dealt with about, and this is referenced in some reports, about a third or 25 percent of what our repository will deal with on their fuel capability They have very good knowledge of what that material is if it's damaged and it's handled in a particular manner, so they know when they receive it at LaHague, and we're trying to follow a similar process here, to know ahead of time so we don't open one or remove a fuel

assembly and have an issue in our hot cell That's why we're trying to apply the necessary safety mitigations

Q Open one, again, I think that's great and I'm glad you're doing it, but open one meaning open a canister?

A A bare fuel assembly, a canister be opened, that's correct

Q Either one?

A That's the only way you're going to get the bare fuel, is to open the canister

Q And so, again, at kind of a high level, is it generally the intent of the current surface design to deal with the fuel, aside from Navy fuel, to deal with commercial and DOE fuel there in some fashion?

A I've answered this earlier Let me go back and make sure we're clear on this It's not our intent to open Navy canisters They come in and are used as is

Q Okay Got it

A The Department of Energy, the high-level



waste, we believe those canisters will be placed in a waste package For the spent nuclear fuel our current technical basis -- baseline shows it will actually remove that material from the canister and actually place it into the waste package, so because of that is why our knowledge of that -- any damaged fuel is very important

Q I appreciate that and, again, when you say "spent nuclear fuel" in your last answer, you mean commercial spent nuclear fuel, is that correct?

A That's correct

Q Let's try one more exhibit

(Arthur Exhibit Number 5 was marked for identification )

BY MR STOUCK

Q Mr Arthur, you've been handed what has been marked as Exhibit Number 5 to this deposition It is an almost three-quarter inch sheet of papers with the title "Commercial Spent Nuclear Fuel Handling in Air Study" dated March 2005, prepared for U S Department of Energy, Office of Civilian



Radioactive Waste Management by Bechtel SAIC Company, L L C Do you see that?

A Yes, I do

Q That's what you have?

A Yes

Q Is this the study that you're referring to?

A It is

Q I mean assuming it's a complete copy?

A (Nodding )

Q No tricks in this deposition

This study was authorized by the Department of Energy, is that correct?

A It is correct I issued what we call a technical direction letter to Bechtel SAIC I believe it was October 29th of 2004 to look at this kind of issue

Q You yourself did that?

A Yes, I did I believe I signed it It's either me or my contracting officer

Q And it was at your direction?

A Based on I or my staff's evaluation,



Department of Energy's direction

Q And is there something or some set of things that prompted your staff and your office and you to believe that this study should be commissioned and undertaken?

A What drove us to issue that letter in October, and I think there's a series of events even before that, was knowledge that in high temperature conditions there were certain evidence out there and information that various pinhole -- very small holes through the cladding could create oxidation at high temperature, so that's what drove us to direct Bechtel SAIC to do an evaluation

Q Do you know how or where or when that information came in? Was this something that came from Cogema, for example, or do you know?

A I'm not aware of the source, but we do have a trail of documents that are available to look at that It's been underway I mean this discussion has occurred for a little over a year now

Q This trail of documents that you just

stamp on and take the stamp off?

A She does have the authority She's a derivative classifier for our office, so she has the capability to do that

Q Does she need any approval from a higher level to do that?

A I'm not aware that she does

Q So you would expect that she probably did both of these things on her own, maybe she consulted with some people, but she was the one who took this off?

MS HERRMANN Objection Foundation, speculation

THE WITNESS Again, that's her signature there, so --

BY MR STOUCK

Q So yes?

A Yes

Q Have you read this report?

A I have read it one time I'm not a technical expert at all on this I have a list of people who prepared it that are, but I am aware of



this report

Q Well, I promise you I won't ask you about a lot of things, but one thing I promise I won't ask you about is the mathematical formulas that are throughout this thing that apparently have something to do with -- I don't know what they have to do with, physics, but I do have some questions for you

You read it and there are people in your organization that if you had a question about something in here, you -- who would you go to? I mean if you really wanted to understand some of the details of this, you know, who would you rely on?

A For the specifics on this report I'd go back actually to my senior staff, Rick Craun or Paul Harrington, or more specifically the individuals that prepared it that are listed on page -- I guess it's not a page number but the signatures on file page there, page three

Q Right, and those are Bechtel people or are they?

A I'm looking down You have -- most all



of them are Bechtel people as I understand except for the D Equilbec, I'll give you the spelling on, who's with Cogema He's one of the subcontractors I mentioned earlier

Q Okay I think it's obvious to me from this study, but let me just ask, I mean the existence of this study makes clear that some amount of the spent nuclear fuel that arrives at the Yucca Mountain repository will be failed fuel or damaged fuel, as defined in here, is that right?

A That's correct, as listed in the first paragraph of the executive summary

Q The first paragraph says about 4 percent, something like that It doesn't say it quite that way, but it says it in a backwards way, is that right?

MS HERRMANN Objection to the characterization of the document

THE WITNESS Let's clarify what the report says

BY MR STOUCK

Q Sure



A It says that 96 percent, again I'm just reading what's written here, it's estimated that 96 percent of the commercial fuel assemblies will have intact cladding and should not experience fuel oxidation The balance of the assemblies would have varying amounts of damage

Q Okay

A Which a small percent could have about four-tenths of a percent and that's where I derived the number, as I said earlier, about 4 to 5,000 out of 225,000

Q And that number, though, those assemblies that you just referred to, are those the ones with the, I'll call them, see if you understand this, the invisible pinhole leaks, the pinhole leaks that can't be detected? Is that that category?

A That's in this report that we're talking about That small percentage are the ones that potentially have an issue that could cause that oxidation that I discussed earlier

Q And that issue is kind of the focus or at least one of the principal focuses of this study?

Page 138

A That was the focus of this study
Q That was the focus of the study
Turn to page, if you would, please, and I do apologize about the heat in here Now that I've realized it, it's really quite warm
Turn to page 3-10, please There's a table there that's labeled Table 3-4 titled "Characterization of Fuel Assemblies as Received at YMP " Do you see that?
A Yes, Table 3-4
Q Right And this category, this little set of assemblies that we were just talking about, you were just talking about, the 4 percent or whatever was mentioned in the executive summary, is that the unknown leaker category? Do you know?
A I'm not aware I'm just looking at -- I mean I haven't read this report recently, so I'm trying to look at this table in its context here, but it goes back basically to what I said earlier about that, you know, 96 percent roughly, which are the unfailed, and it breaks other -- tries to project other ranges of potentially damaged fuel

Page 139

Q Right, in different subcategories?
A Correct
Q That's all So my question is, I think that's right, I'm not going to ask you about the details of those subcategories, but again let me just ask you whether it is true or not that the current design objective of the repository contemplates dealing with all of the failed or damaged fuel that's shown on this chart, is that correct?
A I want to just --
Q All of the types of failed or damaged fuel that's shown on this chart, is that correct?
A As I mentioned earlier, that's what we're trying to look at right now for those pinhole or other damaged fuel, to make sure we have the necessary facilities at Yucca Mountain to deal with that in an off-normal condition
Q What does that mean?
A Off-normal means it's failed or has pinhole damages potentially, so we can deal with it in a proper facility

Page 140

Q With the exception of the 3, 4 percent unknown leakers that is a focal point of this study, which you're currently investigatng, and I guess one outcome is there's no way to deal with that, but putting that possibility aside, the current design objective of the repository is to accommodate all of the types of failed or damaged fuel that is listed in this table; is that correct?
A That's correct, all the materials that are received at the repository.
Q Would you also agree, I think you told me this before, that with respect to that small 3, 4 unknown leaker category, it is a current objective to resolve that problem in time to deal with it in the license application, is that correct?
A That is correct
MR STOUCK Off the record
(Discussion off the record)
(Whereupon, at 12 07 p m , a luncheon recess was taken.)
* * * * *

Page 141

A F T E R N O O N S E S S I O N
(1 25 p m.)
Whereupon,
W JOHN ARTHUR, III
was called for continued examination, and having been previously duly sworn was examined and testified further as follows
(Whereupon, Ms Taylor adjourned the proceedings )
RESUMED EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR STOUCK
Q Good afternoon, Mr Arthur
A Good afternoon
Q You know of course you're still under oath?
A That's correct, I do.
Q Can you estimate for me, if you have any estimate to be able to tell me about, or can you estimate for me when the Licensing Support Network was certified?
MS. HERRMANN Objection Speculation

Page 238

the larger facility will, the dry transfer facility

Q Let's talk about the first facility in terms of capability to handle the bare -- I'm talking only about commercial spent nuclear fuel, bare versus canister, would have equal capability or be able to handle, you know, as in 50/50 or is it contemplated that it would have the capability to handle more canistered fuel or more bare fuel, that first facility?

A It will have the capability to handle both as received and as I push it through the operations I'm really not at a point today to say how that goes It's how we receive it at the repository

Q But overall both canistered and bare would be relatively small?

A That's correct

Q And that's what you meant by "minimal" here?

A Right

Q I see Thank you

Page 239

Now let's talk about the same thing about the second facility will handle with respect to commercial spent nuclear fuel, will be able to handle both canistered and bare fuel or the second facility is only a canister handling facility?

A The second facility, I think that's what Mr Harrington is referring to on line 10, is the canister handling facility, which will be essentially when you bring in a canister and put it right into the waste package or if it's a canister that has to be put out onto the aging pad, it then will be handled, but most of that will be Navy and Department of Energy materials coming through the canister handling facility

Q That's the second facility?

A That's the second

Q Canisters that can go directly into a waste package without opening?

A That's correct, or if it had to be actually placed out into an aging, you know, storage pad, capability that can handle about any canister

Page 240

Q Including commercial?

A That's correct

Q Just going back to the first facility that's contemplated under the current plans, it would, although the overall capacity is relatively small, within whatever capacity that first facility has, it would have the capability to receive canistered commercial spent fuel, open the canisters and deal with it, is that correct?

A It currently has a capability to handle and hold it, but not -- it doesn't have a cutting capability

Q And how long has that been part of the, you know, design, planning design of the surface facility?

A I don't know the specific time, but I mean the fuel handling facility, as I mentioned a little bit earlier today, is one of the facilities we're right now trying to modify to the old -- small amount of failed fuel, so that's where I actually look at the -- we have a hot cell as part of it That's where actual bare fuel, that

Page 241

capability will occur If I mention nitrogen purging had to occur, it will occur in the fuel handling facility But we don't currently have cutting capabilities in the operation

Q So the first of these three facilities that would be capable of receiving commercial canistered spent nuclear fuel would be the third one, that's welded, that's welded?

A Welded

Q Welded canistered commercial spent nuclear fuel?

A Currently I believe that's correct, yes

Q Approximately how long after the inception of the repository operations would it be between the operation of the time that the first facility in this phased approach starts operating and the time that the third facility starts operating?

MS HERRMANN Objection Speculation

THE WITNESS And a lot of that depends on the budgets Right now most of our priorities are into the first two facilities for design and

Page 242

engineering and, you know, we are going to do a parallel construction and operations as part of our licensing aspects, but our goal would be to get that dry transfer facility on as soon as possible and I -- I don't have any range of dates right now It depends on what our budget outlays are It's a very large facility

BY MR STOUCK

Q The dry transfer facility is the third facility?

A It's the third current facility planned, nuclear facility I mean there's going to be other support facilities

Q Receiving facility, waste receiving facility?

A Right

Q I mean we're talking about a year, two years, five years, ten years, or just all you can say is it's, you know, as rapidly as we can do it?

MS HERRMANN Objection Speculation

BY MR STOUCK

Q Or can you even say that? I mean would

Page 243

you agree it would be as soon as we can get it done, trying to get this done?

A I mean our goal is to try to get done as soon as possible, but for constructability the manpower and workforce and the dollars that we know will be realistically available, it's just -- it's going to be highly improbable to be able to construct all three of those at one time, so we're going with a phased approach

Q Right That's why you went to the phased approach?

A The phased approach was to build our concept on the first facility learned and move ahead and apply those lessons learned in a later facility but also to do something reasonable from the budget outlays, to have flexibility in the facilities and be able to construct and operate at the same time

Q And when was this phased approach, you know, sort of implemented?

A It was early '04, and that was a transition I was talking about earlier One time

Page 244

we were looking at one large facility and then we decided to go with a phased approach It was in the late '03 or early '04 time frame That's why in this talk we were talking about a transition essentially

Q But, again, you can't give me any estimate or characterization of the time period between the opening of the first facility and the third as far as your current planning goes?

MS HERRMANN Objection Speculation, asked and answered

THE WITNESS No, but I can tell you that in the license application we will be required to show the various plans for construction, you know, schedules and areas associated with the construction, authorization license and we're still working through that

BY MR STOUCK

Q There will be a schedule in the license application for the timing or chronology of construction of all three of these facilities that we've been talking about?

Page 245

A Based on our licensing approach we're required to have on out-year construction schedule to show the regulator what our current plans will be for construction and that's what we're currently looking at right now

Q And an out-year construction schedule, just to make clear, that would be something, if I looked at it, there would be some dates on there, at least target dates for when the first facility opens, when the second facility opens, and when the third facility opens?

A There will be plan dates when the license application goes in, that's correct

Q So the current draft of the license application has, whatever the current thinking is for what those dates should be I guess, there's some draft somewhere that has that chronology in there?

A That's primarily one of the last sections we're actually developing I mean we're actually right now trying to work through this fuel in air issue to make any modifications We're still doing

bit of redirect I will take about five minutes to review my notes

MR STOUCK Okay

(Brief recess)

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS HERRMANN

Q I just have a few questions for you, Mr Arthur

First of all, let me ask you this Is it part of your job to know what the standard contract requires?

A No

Q Do you know whether DOE is required under the standard contract to accept dual-purpose canisters at the utility sites?

A No

Q You talked a little bit during your deposition today about DOE's technical baseline Do you recall that?

A That's correct, I do recall that

Q And you talked about DOE's plan to cut open canisters with fuel, do you recall that?



A Yes

Q Do you know whether DOE is required under the standard contract, as it's currently written, to accept spent nuclear fuel in canisters from utilities?

A Again, I'm not involved in the standard contract

Q If DOE does cut open canisters at the disposal facility, do you know who will pay for it?

A No

Q Do you know whose responsibility the empty canisters would be once the spent fuel is taken out?

A No

Q Do you have any idea what would happen to the canisters, the empty canisters once the fuel is removed?

A I believe in our current license application that would have to be dealt with as low-level waste

Q Do you know who would pay to dispose of that?



A No, I don't

Q Do you have any idea at what rate DOE is obligated to accept spent nuclear fuel from the utilities?

A No

MR STOUCK That's beyond the scope of the direct, but I won't object

MS HERRMANN Well, actually I want to just respond to that only because you argued to the judge today that the reason you were talking about future events is because it had an impact on rates, so I don't think it is

MR STOUCK It had an impact on the reasonableness of the schedules, but, fine, hey, you know what? Ask him whatever you want

BY MS HERRMANN

Q Mr Arthur, is acceptance from utilities at utility sites part of your job?

A No

Q I want to ask you a little bit about failed fuel because you've talked about it today Do you have any reason to know whether failed fuel



is to be accepted under the same schedule as standard fuel by DOE?

A No, I'm not into that particular aspect As I mentioned earlier today, I'm involved as far as the planning and dealing with materials at the repository

Q Mr Stouck also talked to you about greater than Class C waste, GTCC Do you know whether GTCC is covered by the standard contract?

A No

Q Do you know whether the NRC has determined by rule that GTCC requires permanent isolation?

A I'm not aware of that

Q And just a couple questions about Pacific Gas & Electric

A Say that again

Q Sure

A Ask your question Let me just pick up with the written transcript here

Q Sure I asked you whether you knew if the NRC had determined by rule that GTCC requires

# BARRETT, LAKE

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
----------------x
YANKEE ATOMIC ELECTRIC COMPANY, Case Nos 98-126C.
CONNECTICUT YANKEE ATOMIC POWER 98-154C, 98-474C,
COMPANY, MAINE YANKEE ATOMIC 98-483C, 98-484C.
POWER COMPANY, FLORIDA POWER & 98-485C, 98-486C.
LIGHT COMPANY, NORTHERN STATES 98-488C, 98-614C.
POWER COMPANY, DUKE POWER, a . 98-621C, 99-447C.
Division of DUKE ENERGY CORP, 00-440C. 00-695C.
INDIANA MICHIGAN POWER COMPANY, 00-703C, 01-115C.
SACRAMENTO MUNICIPAL UTILITY 01-116C. 01-249C
----------------X
(Caption continued on the next page)

Deposition of LAKE H BARRETT
Washington, D C
Monday. April 22, 2002
9 31 a m

Job No 11792-4
Pages 1 through 272, Volume 1
Reported by Diane Gomez, RPR

2

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
----------------X

3

Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

4

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT
DEVON E HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT
JEFFREY L HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D C 20004-1206
(202) 942-5000

APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT
TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:
DONALD R. CASSLING, ESQUIRE
JENNER & BLOCK, L L C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:
DONALD J. CARNEY, ESQUIRE (a.m. session)
SUZETTE W. DERREVERE, ESQUIRE (p.m. session)
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D. C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:
KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D. C. 20530
(202) 307-1011



APPEARANCES CONTINUED

ON BEHALF OF DEFENDANT UNITED STATES:
HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D. C. 20530
(202) 307-0290

ON BEHALF OF THE UNITED STATES DEPARTMENT OF ENERGY:
JANE K. TAYLOR, ESQUIRE
U.S. DEPARTMENT OF ENERGY
1000 Independence Avenue, Southwest
Washington, D. C. 20585
(202) 586-7530



CONTENTS


| EXAMINATION OF LAKE H. BARRETT | PAGE |
|---|---|
| By Mr. Cayne | 10 |


EXHIBITS

(Retained by counsel.)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 1 Mission Plan for Civil Radioactive Waste Management Program | 95 |
| 2 Excerpt of Volume 2 of Records of Responses to Public Comments on Draft Mission Plan for the Civilian Radioactive Waste Management Program | 165 |
| 3 Letter dated 9/7/84 D. Hodel to J. Bennett Johnston dated 9/7/84 | 165 |
| 4 Draft of the Civilian Radioactive Waste Management Program Mission Plan as of 12/20/83 | 181 |
| 5 Annual Capacity Report Briefing for OCRWM Executive Committee, November 1996 | 194 |

13

Q Did you review any documents in preparation for today's deposition?
MR. CRAWFORD: Objection.
A **No.**
Q Not a single document?
A **No. We just talked.**
Q What other activities did you engage in in preparation for today's deposition?
A **None.**
Q Can you describe for me your educational background?
A **B.S. degree in mechanical engineering, University of Connecticut, '67; M.S., mechanical engineering/nuclear, '72. Did business courses '72, '73, '74.**
Q In connection with your preparation for today's deposition did you read the transcripts of any other depositions taken in any of the other spent nuclear fuel cases?
A **No.**
Q Are you familiar with the testimony of any witness in any other of the spent nuclear fuel cases?

14

A **No.**
Q Have you spoken with any of the witnesses in any of the spent nuclear fuel cases concerning their testimony?
A **Meaning deposition stuff?**
Q Yes.
A **All I know is what they have done it on, days, but of content, no. Or of questions, no.**
Q I'm sorry, I didn't understand your answer, all I know is that they have done it on, days?
A **They have been here certain days, you know, Zabransky and others. I know their schedules, but I don't know the content of their discussions nor the questions nor their answers.**
Q So you never had a conversation, for example, with Mr. Zabransky concerning any aspect of his testimony in the spent nuclear fuel cases?
MR. CRAWFORD: Objection. Asked and answered.
Q Correct?
A **No. Just, I know when he's done it. That's all I know. I don't know the substance.**

15

Q And would the same -- the same would go for any other person within the Department of Energy who's been deposed in the spent nuclear fuel cases, correct?
A **Correct.**
Q And the same would go for any outside contractor to the Department of Energy who has been deposed in the spent nuclear fuel cases, correct?
A **I have not talked to any of them.**
Q I assume you're aware, Mr. Barrett, that the United States Court of Appeals for the District of Columbia has issued a Writ of Mandamus against the Department of Energy in connection with the spent nuclear fuel cases?
MR. CRAWFORD: Objection.
A **I know they've issued court papers regarding this.**
Q Are you aware that a Writ of Mandamus had been issued?
MR. CRAWFORD: Objection, form.
A **If it's called a Writ of Mandamus or court form I don't know. I know the courts have spoken.**
Q And are you familiar with the contents of

16

the orders issued by the court?
MR. CRAWFORD: Objection. Foundation.
A **In a very general sense.**
Q Can you explain to me your general understanding of the order?
A **The D.C. Circuit Court of Appeals said we have an obligation --**
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A **And there's things in Court of Claims, which is what this is. That's pretty much the general sense I have.**
Q Do you know what obligation the D.C. Circuit said the Department of Energy has?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A **Not really. Because that's a confusing thing to me.**
Q What's confusing to you, sir?
A **When the court stated, you know, obligation and some of the wording in those court orders, I do not personally understand them.**

Q Correct?
MR. CRAWFORD: Objection, asked and answered. Objection, argumentative.
**A That's true.**
Q And, similarly, it was not your opinion in 1986, that a repository could not be operational by 1998, correct?
MR. CRAWFORD: Objection, form. Objection, vague.
**A You're asking what I thought --**
MR. CRAWFORD: Objection, foundation, too. Go ahead.
**A Are you asking what I thought in 1986, or are you asking what I think looking back over history?**
Q I'm asking that you put yourself in the shoes of Lake Barrett in 1986.
MR. CRAWFORD: Objection, foundation.
**A Okay. We went to '86. Before we were -- your line of questioning was going to mid-'84. You want to go to '86 now?**
Q Yes, sir.
**A In '86 I was working for the Department of**



**Energy, okay, so I had different knowledge. So the question is in 1986 did I think something. Now tell me what that something was again.**
Q In 1986 was it your opinion that a repository could not be operational -- a repository for the disposal and storage of spent nuclear fuel could not be operational by 1998?
**A I don't recall what I thought in 1986. Because in 1986 I was at the Department of Energy in a systems job probably, and the colleagues down the hall were working the repository. I did not. I don't recall what the repository schedule was in 19 -- what I personally thought in 1986.**
Q When did you join the Department of Energy?
**A Summer of '85 or spring of '85.**
Q What was your position between the summer of '84 and the spring of '85?
**A I was the branch chief of the engineering branch in the office -- the Division of Waste Management in the Office of Nuclear Materials Safety and Safeguards of the Nuclear Regulatory Commission.**
Q Please describe for me your



responsibilities in that position.
**A I was responsible for engineering for uranium mill tailings, low-level waste disposal sites and high-level waste disposal sites for the Nuclear Regulatory Commission is what my duties were.**
Q Did you work with issues relating to the disposal of spent nuclear fuel in that position?
**A Yes.**
Q And can you describe for me your work on those issues?
**A It was the engineering aspects of repository reviews for all media, including the development of branch technical positions and regulatory guidance and the regulations for high-level waste is what you asked about.**
Q I asked about spent nuclear fuel.
**A Well, okay, spent nuclear fuel and high-level waste.**
Q Using the term "spent nuclear fuel" to cover both?
**A Right.**
Q Did you work with officials at the



Department of Energy in this position?
**A Yes.**
Q And which offices did you work?
**A With the office that I'm presently in.**
Q Do you recall which individuals at the Department of Energy you worked with during this period?
**A Specific names, Ben Rusche is the only name that comes to mind, who was the director who I worked for years ago in the seventies.**
Q When did you work for him in the seventies?
**A Mid-seventies is the best I can recall.**
Q Was that Electric Boat?
**A No, at the Nuclear Regulatory Commission. So it would have been like '75, '76. He was the director of the Office of Reactor Regulation in the mid-seventies in the Nuclear Regulatory Commission, and he was the first confirmed director of the Office of Civilian Radioactive Waste Management. So he was one I know I talked to, but I did not talk much to the DOE people when I served at NMSS between -- that short period from mid-'84 to mid-'85.**

Q How long did you work for Mr. Rusche? Was it approximately a year?
A **At the Nuclear Regulatory Commission?**
Q Yes.
A **I don't remember, a couple of years.**
Q And did you report directly to him?
A **No. He was twice removed. He was my boss's boss. Maybe my boss's boss's boss. I can't remember the structure.**
Q Did you ever meet with him or work with him directly during the period '75, '76?
A **Repeat the question.**
Q Did you ever work directly with him during that period?
A **Directly with him. I was in contact with him on various issues that we mutually worked upon. I mean, I did not report to him. I mean, he was my boss's boss or something.**
Q Did you believe that he was competent in his field of expertise?
A **Very.**
Q Why do you say very?



A **Because he was a very knowledgeable individual in my opinion.**
Q In what field was he knowledgeable?
A **In nuclear matters.**
Q Such as?
A **Regulatory safety, which is what we did.**
Q Did you ever speak with him in the period following the period during which you worked with him and the summer of 1984?
A **Yes. In spring of '79 we worked together. I didn't work for him at Three Mile Island. He was brought in as a temporary manager for Metropolitan Edison, and I worked for the Nuclear Regulatory Commission. So we were -- we worked on the stabilization of Three Mile Island Unit 2 for several months.**
Q So he was in private industry at that point?
A **Correct.**
Q Did you continue during that period to find him competent in nuclear matters?
A **Yes.**



Q Did you continue to describe him as very competent?
A **Yes.**
Q When did you next deal with him?
A **Pardon?**
Q When did you next deal with Mr. -- how do you say his name?
A **Rusche.**
Q Rusche.
A **Well, he became my -- when I came to the Department of Energy in the spring of '85 he was my boss's boss.**
Q How did it come to be that you left the NRC and went to the Department of Energy in 1985?
A **Somebody told me that a fellow named Roger Hilley who worked for Ben Rusche wanted someone like myself there, and we had a phone call and asked me to come down and talk and one thing led to another and I transferred.**
Q Do you recall who had that initial communication with you?
A **No.**



Q Did you speak with Mr. Rusche before you took your position?
A **I don't remember. Probably did but I just don't remember.**
Q What was your initial position at the Department of Energy?
A **Division director, systems and transportation or something to that effect.**
Q And what did that position involve?
A **I was responsible for the development of the transportation systems to move spent fuel and high-level waste to the DOE facilities from their current locations was the primary job, and also for the systems engineering for the entire program.**
Q Entire program you're referring to what?
A **The civilian and all the different sites that we were looking at, the systems engineering requirements documents and the systems engineering structure for all of the civilian radioactive waste management program.**
Q To whom did you report when you held this position?

A **Roger Hilley.**
Q And he reported to Mr. Rusche?
A **Correct.**
Q Are you familiar with the acronym MRS?
A **Yes.**
Q What does that stand for?
A **Monitored retrievable storage facility.**
Q Were you involved with monitored retrievable storage facilities during this period?
A **Secondarily, yes. Insofar as in the -- that was the facility that the transportation --**
MR. CRAWFORD: Objection. Let me object here and -- the objection is to vagueness. What period are you referring to?
MR. CAYNE: First I'm going to object for the record to counsel continuing to cut off the witness while he's in the process of answering a question. And I believe the witness has answered my question.
MR. CRAWFORD: Then I didn't cut him off.
Q For how long did you hold this position?
A **I don't recall.**



Q Two or three years?
A **Probably.**
Q Were you involved in issues relating to the siting and development of a repository during this period?
A **In a general sense. I did not have direct line responsibility for repository development. That was another group.**
Q But you said in a general sense. What did you mean?
A **I would hear in staff meetings in various work we did together the general state of where the repository programs were, but I had no direct, you know, responsibility in that area.**
Q You were a division director, correct?
A **Correct. In the storage and something, whatever Hilley's organization title was. Which was not the repository. That was a completely different office did the repository. We were storage and transportation systems I think was the name of our office.**
Q Were you involved in issues relating to the



rate at which spent nuclear fuel would be accepted for disposal during your time as director of this division?
A **Probably. I don't -- probably.**
Q You don't recall?
A **I don't recall detailed discussions regarding the acceptance rates. I know that we had acceptance rates in various documents for the repository and for the proposed MRS, which was not authorized at that time, for planning purposes.**
Q Were you an advocate of the MRS during this period?
MR. CRAWFORD: Objection, vague.
A **Advocate. I would say that I thought an MRS was -- we were proposing an MRS to Congress, and, yes, I was an advocate. I thought that would have made a much better system if we had it.**
Q Why were you of that view?
A **Because -- one of the reasons was we were striving to meet the '98 removal date to the best of our ability, and an MRS circa early -- let's see in the late eighties the MRS we proposed to do it because**



**the repository date was post -- somewhere in that period it was post-1998. So, yeah, it was post-1998 in the mid-eighties. So the MRS was our primary means to remove fuel by 1998.**
Q You referred to the '98 removal date a moment ago. Do you recall that?
A **Yes.**
Q What were you referring to when you referred to the '98 removal date?
A **The statute said that -- had a January 1998 target date in it for removal of the fuel. We were trying to meet that to the best of our ability.**
Q And what was it that you were trying to accomplish by January 1998?
A **To accept fuel into the federal disposal system, which we were proposing to include an MRS in that mid -- I'm trying to get the years straight. Yeah, mid-eighties. '86 we made a proposal.**
Q How much fuel were you attempting to accept at that point?
A **I don't recall the numbers, but I would have to go back and look in the records. I don't**

49

**recall specific receipt rates.**
Q Were you attempting to accept more than a single spent nuclear fuel assembly?
A **Yes.**
Q Was it ever the intent of your office to be able to accept a single spent fuel assembly by January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection to the extent it might call for a legal conclusion.
A **From a systems perspective it was our intention to build a system that would take more than one fuel assembly.**
Q From a systems perspective was it ever your intention to build a system that would take only -- be able to take only a single fuel assembly by January 31st, 1998?
A **That was never our intention, to do just one fuel assembly.**
Q Was it ever the intention of your office at any time subsequent to the period in which you held the position -- was it director of --
A **Division director.**

50

Q Was it ever the position of your office subsequent to that time that the goal would be to be in a position to accept a single spent fuel assembly by January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection, foundation, and objection to the extent it calls for a legal conclusion.
A **It was never our plans to take one fuel assembly to my recollection.**
Q Do you recall ever having any discussions internally whether the acceptance of a single fuel assembly would satisfy the department's obligations under the contract, the standard contract?
A **I never recall any discussions from a systems perspective about the contract, so, no, I don't recall ever having a discussion.**
Q What do you mean from a systems perspective?
A **We were -- our job was to develop the systems to receive the material, and we never, to my recollection, we never discussed about a system that would receive one fuel assembly. Okay. We always**

51

**talked about more.**
Q From a systems perspective was it ever your intention to design a system that could only accept 900 MTUs of spent nuclear fuel per year?
MR. CRAWFORD: Objection, vague. Objection, foundation. Objection to the extent it calls for a legal conclusion.
A **Repeat the question.**
Q From a systems perspective was it ever your intention to design a system that could only accept 900 MTUs of spent nuclear fuel per year?
A **There's different things happened as a function of time, okay. What time are you referring to?**
Q In 1986.
A **In '86, no.**
Q In 1986 how many MTUs per year did you attempt to design a system to accept?
A **I don't recall a specific number, but it was -- I don't recall a specific number. It's in the records.**
Q Would 3,000 refresh your recollection?

52

A **That's probably about right.**
Q And how did you come to the 3,000 number?
MR. CRAWFORD: Objection, foundation.
A **I'd have to go back and look at records, which I have not done. It is the evolution of the design receipt rates for the first repository, second repository, the MRS in the system. My recollection is the MRS was to receive 3,000 tons a year circa that time prior to the amendments act, which was in excess of the generation rate of around 2,000.**
Q That was important, wasn't it, that it be in excess of the generation rate?
MR. CRAWFORD: Objection, vague.
A **Well, important? Yes, in my opinion it was significant that you design a system to remove the backlog of materials that were accumulating under the intent of the act.**
Q And why was that significant in your view?
A **Because the concept of a Nuclear Waste Policy Act was to -- for the federal government to take the materials from the high-level waste and spent fuel sites into federal custody.**

65

**was in QA, so I personally, the QA office was, very little impact. I had no personal involvement in the linkages then.**
Q But in your position you did attend, did you not, staff meetings in which the linkages were discussed, correct?
A **Probably did. I just don't recall the specifics. But I'm sure there was general discussion about many things that happened in the amendments act.**
Q Well, based on your general recollection of the discussions in which you personally participated, Mr. Barrett, how did the linkages imposed by the '87 act affect the administration of the program?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
A **Given that the MRS was basically linked and disapproved as we had proposed it and we had only one site, there was a lot of discussion about how we could best design the program to be successful, and which success included doing all we could do to meet the '98 date.**
Q And, again, when you say meet the '98 date,

66

you're referring to what?
A **To be able to move fuel into the federal system with a target of January '98.**
Q And in your view did the '87 act have the effect of reducing the take rate?
MR. CRAWFORD: Objection, foundation.
A **Yes, it did. Because the only way at the time for '98 would have been -- to receive the material in '98 was with an MRS, and the MRS could only be achieved in 1998 through a volunteer site, through congressional approval of a volunteer site. And that there were linkages in the statute, and that's when the discussion started about the change to the 900, which was caused by the statutory linkages.**
Q So is it your testimony that it was the statutory linkages imposed by the '87 legislation that reduced the annual acceptance rate from 3,000 MTUs to 900 MTUs?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, foundation.
A **The linkages imposed by law complicated the receipt rates and work was done, and the specifics of**

67

**it I don't recall, regarding how we could best operate the program with those congressionally mandated linkages.**
Q But I'm not sure if you answered my question. Did those linkages have the effect of reducing the take rate, which I understand you to have testified was 3,000 prior to the '87 amendments, to the 900 level that subsequently followed?
MR. CRAWFORD: Objection to the foundation. Objection to the extent it mischaracterizes prior testimony. Objection to the extent it calls for a legal conclusion.
A **We still -- my recollection is we still kept the 3,000 ton receipt design, but we had to reconcile the fact that we would hit the limits, and it was -- my recollection is I just don't remember what we did and how we did balance those.**
Q What did you mean, Mr. Barrett, when you just referred to the 3,000 MTU receipt design?
A **You would have to look at the document -- the systems documents circa '87, '88. I believe they still had 3,000 ton receipt for a volunteer MRS but**

68

**acknowledge the fact that that would have to be addressed as related to linkages.**
Q So if I understand correctly based on your -- well, let me step back a second.
The word "design," what are you referring to when you say receipt design. What design are you referring to?
A **The MRS, which would be the first ability to receive materials, was the receipt rate design was 3,000 tons per year is my recollection. I would have to check that. I haven't gone over any old documents. Was 3,000. So the designing of the transportation system, the design of the hot cells and receiving facilities was a nominal 3,000 ton capability per year.**
Q When you use the word "nominal," what do you mean?
A **That the normal operational rate of receipt was designed 3,000 tons per year of the MRS.**
Q A few moments ago you answered a question and you stated we had to reconcile the fact that we would hit the limits. Do you recall that?

A **Uh-huh.**
Q What did you mean when you stated "we would hit the limits"?
A **The linkages in the amendments act were such that you could not operate at 3,000 tons per year very long before you hit the statutory limits, and we had to look at -- my recollection is that we had to look at how that all would work. For example, you would not want the system to operate at a high rate and then stop to reconcile that.**
Q Why is it that you could not operate at the 3,000 ton per year very long before you hit the statutory limits?
A **The statute had linkages that said you could not receive more than certain tonnages for certain events. I don't recall the details of what they were, but there was a 10,000 ton limit and there was something else that you couldn't do. And that was tied to the repository.**
Q How many years would it take after licensing of the repository for the repository to be built?



MR. CRAWFORD: Objection to foundation. Objection to the extent it calls for speculation.
A **Repeat the question again, please.**
Q Based on your projections, after licensing of a repository how many years do you project that it would take the repository to become operational?
MR. CRAWFORD: Same objection.
A **When you say after licensing, you mean upon receipt of a construction authorization?**
Q Yes.
A **Depends on the design of the facility.**
Q With respect to the facility that you had under design in the 1987 time frame, how many years after receiving construction authorization would the repository become operational?
MR. CRAWFORD: Objection, vague. Objection, foundation.
A **I don't recall the repository construction schedule circa '88/'89. I just don't recall it.**
Q Would five years be a good approximation?
MR. CRAWFORD: Objection to the vagueness of it and objection to the foundation. Objection to



the extent it calls for speculation.
A **Five years probably was what was in the records then.**
Q And with respect to the repository under design today, how many years do you project that it will take for that repository to become operational after receipt of the necessary construction authorization?
MR. CRAWFORD: Objection to the foundation.
A **It depends upon what the design configuration is of the repository, and also the degree of preparatory work that we're allowed to do prior to the construction authorization.**
Q Do you have current projections with respect to the repository under consideration by the department today?
MR. CRAWFORD: Objection, vague.
A **Today's proposal and plan is if we see budgets and if things go according to -- as we would wish them to, if we change to a modular construction approach, it is possible to be receiving material in basically a two to three-year period.**



Q After receiving construction authorization?
A **Correct.**
Q And your best recollection of that period from the 1987 time frame would have been five years back then, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony.
A **As it related to the plans of a repository at that time, five years was probably right.**
Q Had the MRS that you proposed to Congress in 1987 been approved, how long would the construction of that facility have taken from start to receipt of spent nuclear fuel?
MR. CRAWFORD: Objection, vague.
A **I don't recall that.**
Q I'm trying to refresh your recollection. Would two years be a good estimate of that time frame?
MR. CRAWFORD: Objection, vague.
A **I'd have to go -- MRS schedules are 15 years old in my brain. I don't remember what the MRS schedules were at all.**
Q The MRS would have taken less time than the

MR. CRAWFORD: Objection to the foundation. Objection, assumes facts not in evidence.
**A Please restate that question.**
Q As a matter of design and systems engineering, would it have been possible for a repository to accept spent nuclear fuel at a beginning rate in excess of 400 MTUs?
**A Yes.**
Q And as a matter of design and system engineering would it have been possible for a repository to begin the acceptance of spent nuclear fuel at an annual MTU rate of 1,800?
MR. CRAWFORD: Objection, vague.
**A When you use the word "possible" versus practicable there's a difference. You ask possible, the answer is yes. With time and money you can do almost anything.**
Q Do you believe it would not have been practicable?
**A It would have been hard to go from zero to 1800 in my opinion. Possible, yes.**
Q Well, the ramp-up rate you referred to was



five years, correct?
MR. CRAWFORD: Objection, vague.
**A Yes, but not starting at 1800 the first year.**
Q Would it have been practicable for the ramp-up rate to occur in a period of less than five years?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A You could.**
Q For example, would it be practicable for the ramp-up rate to take place within a period of three years?
MR. CRAWFORD: Objection, vague. Objection to the foundation. Objection to the extent it calls for speculation.
**A These are all degrees of more difficult and less difficult practicalities.**
Q You used the word "practicable" and that's simply what I'm asking you. Would it have been practicable for the ramp-up rate to have occurred within a three-year period, the ramp-up to have



occurred within a three-year period?
MR. CRAWFORD: Objection. Same objections.
**A It's possible. These are different degrees of practicality on how quickly you ramp up under what circumstances. I don't remember -- I don't recall what the rates were circa '87. Given the national mood and concerns about things nuclear, it's not very practicable today I believe to ramp up in less than three years to 3,000. Not to say it could not be done.**
Q Putting aside issues of national mood and concerns, as a matter of systems engineering and design would it have been practicable to have the ramp-up occur within a three-year period?
MR. CRAWFORD: Objection, vague. Objection to the foundation. Objection to the extent it calls for speculation.
**A I don't know. I would have to look at all the economics, the cash flow, the preparations for institutional aspects of transportation. You know, I don't know if it would be practicable or not.**
Q So sitting here today you can only state,



am I correct, that it might have been practicable for the ramp-up to have occurred within three years, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony. Objection, asked and answered. Objection, vague. Objection, foundation. Objection, to the extent it assumes facts not in evidence.
**A It's possible.**
Q Are you aware, Mr. Barrett, whether the fees that the utilities were required to pay under the standard contract were developed or determined based on a particular acceptance rate and ramp-up schedule?
MR. CRAWFORD: Objection, lack of foundation. Objection to the extent it calls for speculation.
**A It's my understanding the monies paid by the utilities were a function of the kilowatt hours of nuclear energy delivered, not on the system design that we're doing.**
Q You don't believe the fees had any relation to the system design?

81

A **Not to my recollection.**
Q For how long did you hold your position in quality assurance?
A **I don't know, a year or so.**
Q What position did you next take on?
A **I don't remember my official titles. I became responsible for programmatic aspects of the repository. I became responsible for programmatic aspects of the MRS facility. And I was responsible for business development contracts for awhile.**
Q And when did you take on those responsibilities?
MR. CRAWFORD: Objection. Asked and answered.
A **I don't know, '88, '89, until I was sent by Admiral Watkins to defense programs in the spring of '90.**
Q And what were your duties when you were responsible for the programmatic aspects of the repository?
A **Project manager of Yucca Mountain project at the time reported to me.**

82

Q Were you required to appear before Congress during this period?
A **Not that I recall. I might have but I don't remember it.**
Q Were you involved in the development of acceptance rates during this period?
A **Not to the degree that I remember. I might have been.**
Q Wouldn't you have been if you were responsible for the programmatic aspects of the repository?
MR. CRAWFORD: Objection, argumentative.
A **I don't -- you know, I was responsible for the programmatic aspects. If we ever did anything regarding acceptance rates at that time, I don't recall doing anything.**
Q Do you recall if you were involved in the establishment or analysis of acceptance rates prior to your next position in 1990?
A **I don't recall anything. I might have.**
Q We'll go through some documents later to refresh your recollection, but I just -- a lot of

83

documents actually.
A **Whatever.**
Q I just want to know what you recall.
MR. CRAWFORD: Objection. Form.
A **14 years ago. I don't remember specific documents at this time.**
Q What was the position you took in 1990?
MR. CRAWFORD: Objection, form. Objection, vague.
A **I was detailed initially and then transferred to the Office of Defense Programs. I was the -- what was my title? I don't know. I was director of the Rocky Flats program office.**
Q And what responsibilities did that position involve?
A **It was the restart of the Rocky Flats nuclear weapons production plant after the FBI raid.**
Q Did you have continuing responsibilities for or involvement with the spent nuclear fuel program during this period?
A **None whatsoever.**
Q For how long did you hold this position?

84

A **Until January of '93.**
Q And in January 1993 what position did you take?
A **Admiral Watkins made me acting director of RW.**
Q And RW stands for?
A **Offices of Civilian Radioactive Waste Management.**
Q And what were your duties in that position?
MR. CRAWFORD: Objection, vague. Objection, lack of foundation.
A **The duties of the director of the Office of Radioactive Waste Management.**
Q You ran the program at that point, correct?
A **That's correct.**
Q And have you basically held that position either as acting director, director, or deputy director through today?
MR. CRAWFORD: Objection, vague.
A **I was never the director. I was either the acting director or the deputy director.**
Q And today you are the deputy director,

113

A **Probably.**
Q And in 1987 did you personally read the amendments to the Nuclear Waste Policy Act?
A **I'm sure -- well, did I sit down and actually read it? I mean, I dealt with it a lot, but yes, I'm sure I read most of it at one time or another.**
Q In 1985 when you took on your position at DOE did you read the standard contract?
A **No, actually I didn't.**
Q Have you ever read the standard contract subsequently?
A **Cover to cover, no.**
Q Have you read portions of it?
A **Yes.**
Q What portions have you read?
MR. CRAWFORD: Objection, vague.
A **I don't know. I would have to go -- you know -- the '98 date, the section. I mean I -- I don't know. I would have to look.**
Q Do you think you read at least three-quarters of the contract?

114

MR. CRAWFORD: Objection. Asked and answered. Objection, vague.
A **I doubt I've read --**
MR. CRAWFORD: Objection, foundation.
A **I doubt I've read three quarters of that contract.**
Q Do you think you read at least half of that contract?
MR. CRAWFORD: Objection, asked and answered. Objection, vague. Objection, burdensome.
A **I don't know.**
Q Is it possible you did?
MR. CRAWFORD: Objection, asked and answered. Objection, vague, burdensome.
A **I just don't know how much of it I read.**
Q So it is possible that you have not read half of the provisions of the standard contract, correct, sir?
MR. CRAWFORD: Objection, argumentative. Objection, asked and answered. Objection, vague, burdensome.
A **Possible.**

115

Q Is it possible that you've read less than a quarter of the provisions, sir?
MR. CRAWFORD: Objection, argumentative, burdensome. Objection, asked and answered.
A **I don't know.**
Q So it is possible that you, in your years at the Department of Energy or before, have read personally less than 25 percent of the provisions of the standard contract, correct?
MR. CRAWFORD: Objection, argumentative. Objection, foundation. Objection, asked and answered.
A **I probably read more than a quarter of it.**
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
A **No, I'm not certain.**
Q I would like to return to paragraph three on the top of page seven. Have you had a chance to read that?
A **Yes.**
Q Can you explain that objective to me?

116

A **That was an objective, okay, to receive waste in 1998 and along with the acceptance schedule it's -- in accordance with the acceptance schedule provided in the standard contract, okay. So that was the goal.**
Q And you're comfortable with that goal?
MR. CRAWFORD: Objection.
A **It wasn't mine. It wasn't my goal.**
Q But you understand that was a goal of the program?
A **Yeah.**
Q In 1985, correct?
A **That's correct.**
Q And what acceptance schedule did the standard disposal contract provide for?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A **I think the contract references other documents that references things, and I don't specifically know.**
Q So is it your testimony that it provided for a schedule but you don't sitting here today know

117

what that schedule is?
MR. CRAWFORD: Objection. Argumentative.
A **The receipt rate of January -- excuse me, the receipt date of January 31, 1998, clearly was always a goal. Okay. Regarding the acceptance rate of so many tons year one, year two, year three, okay, you know, that has changed over time. My focus has always been to create a siting process that got us a site to allow us to have the -- a reasonable receipt rate going toward the steady state 3,000 tons per year, and that's where my focus has always been, not on contract details. Okay. I am not a lawyer, I'm an engineer, okay, so I have not gone into the contract in any great detail at all.**
**Okay, now regarding your question here about the acceptance schedule in the contract, actually I don't recall seeing a metric ton per year in the contract.**
Q Let me step back a second, Mr. Barrett. You just referred to a reasonable receipt rate going toward the steady state 3,000 tons per year.
A **Right.**

118

Q "That's where my focus has always been." Do you recall that testimony?
A **That's what I just said I think.**
Q Does that continue to be your focus to this very day, sir?
A **Yes.**
Q And does that continue to be the focus of the Department of Energy's spent nuclear fuel program?
MR. CRAWFORD: Objection to the form. Objection to the foundation. Objection, vague.
A **We are still trying to perform under the Nuclear Waste Policy Act to receive the waste into the federal system as soon as we can under the constraints of the law. So, yes, that remains my goal and the organization's goal.**
Q Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony. Objection, foundation. Objection, vague.

119

A **That has been our goal to do that.**
Q And it continues to be your goal today, correct?
A **Correct.**
Q And it was your goal in 1985, correct?
A **Correct.**
Q And it was the goal of the department in 1982 when the standard contracts were signed, correct?
MR. CRAWFORD: Objection, vague. Objection, calls for speculation. Objection to the extent it mischaracterizes his prior testimony.
A **I wasn't there in '82 so I don't know about '82, but in '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate.**
Q And the reasonable rate is the rate that would ramp up -- is a rate that would ramp up towards 3,000 MTUs per year, correct?
MR. CRAWFORD: Objection, vague. And foundation.
Q I believe your counsel cut you off. What was your answer, sir?

120

A **That has been our intent.**
Q Let's go back to paragraph three, page seven. You referred to January 31st, 1998, as being a goal. Was it something more, wasn't it a contractual commitment and a statutory command?
MR. CRAWFORD: Objection, argumentative. Objection, best evidence. Objection to the extent it calls for a legal conclusion.
A **As an engineer, okay, and as a program administrator, okay, and dependent on what the contract said or what courts said, we were always trying to achieve that goal.**
Q And why did you establish that goal for yourself?
A **Because --**
Q And your department?
A **It was set in the law, okay, that our goal was to try to create a facility and to create a system that would meet that goal of January 31st, 1998, to start to receive fuel. And it has always been an important objective and goal.**
Q To start to receive fuel on January 31st,

1998, at a ramp-up level that would -- in a reasonable amount of time and at a 3,000 per year MTU acceptance rate, correct?

MR. CRAWFORD: Objection to the form. Objection to the mischaracterization of prior testimony. Objection to the extent it assumes facts not in evidence.

A **It was a systems goal to receive the material at a reasonable rate, okay, of which the 3,000, ramp up to 3,000 tons was a reasonable rate. It was never a -- in my opinion it was never a legal requirement to do 3,000 tons per year.**

Q You base the goal on the statute, correct? That's what you've testified to, correct?

A **Yes.**

Q Back to paragraph three --

A **Excuse me. Let me go back to that. When you say the statute does not say 3,000, okay, that was a judgment part. It is the receipt in January 31, 1998, is in the statute. The rate to my knowledge is not in the statute.**

Q So why did you set the 3,000 MTU goal?



A **That was a --**

MR. CRAWFORD: Objection to the fact that that question assumes facts not in evidence.

A **That was in our judgment a reasonable rate, steady state rate to move up to under the circumstances we were in.**

Q Paragraph three. I'm not certain I understand your testimony. I'm still unclear what you're referring to with respect to the acceptance schedule. You see that language, acceptance schedule in paragraph three?

A **You asked me to interpret this paragraph three which I never wrote.**

MR. CRAWFORD: He's asking you whether you see that.

A **Do I see it? I see that line.**

Q And what do you understand that to be referring to? What acceptance schedule did the standard disposal contract provide for?

MR. CRAWFORD: Objection to the foundation of the question and objection, best evidence.

A **I don't know because I do not recall an**



**acceptance schedule in the contract itself. So I would have -- I don't know what this means.**

MR. CAYNE: It's 12:30. Let's break for a one-hour lunch.

(A luncheon recess is taken.)



AFTERNOON SESSION

BY MR. CAYNE:

Q Good afternoon, Mr. Barrett. Who are the individuals that report directly to you in your position as deputy director?

A **Now?**

Q Yes.

A **Dr. Russell Dyer, project manager Yucca Mountain project; Sandra Waisley who is the acting director of the U.S.A. subprogram administration; and Mr. Jeffrey Williams who is the acting director of office of waste acceptance and transportation international or technology -- technology and QA director. Mr. Ron Murthey, and Mr. Ronald Milner who is the chief operating officer.**

Q Do you work with Mr. David Zabransky?

A **Yes.**

Q And what position does he hold?

A **I think he is now the acting director of transportation and waste acceptance.**

Q And in that capacity to whom does he report?

A Did they for what? Were they consistent with which?
Q The system requirement documents that you just described.
A Consistent with -- what would they not be consistent with?
Q That's what I'm asking you, sir.
A I don't know of anything they would not be consistent with. I mean, there's -- I won't speculate.
Q Were the acceptance rates that the department was planning to use consistent with the ACRs?
MR. CRAWFORD: Objection to the form of the question. Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony. Objection, foundation.
A I don't know.
Q You have no idea?
A I just don't know in the sequence of what you're referring to were they consistent, what they are. I would have to look and see what documents



you're referring to at the time.
Q Well, various points in time your office issued ACRs, correct?
A I believe so. I didn't follow, quote, the ACR, DCSs and those sort of things. I didn't follow those very closely. They should have been consistent.
Q So you didn't follow them very closely, correct?
A No. That's correct.
Q When you were acting director and deputy director of your office, did you not have ultimate responsibility for those documents?
A I did.
Q And did you delegate that responsibility to someone else?
A You can delegate authority; you retain responsibility.
Q And although you retained your responsibility for them, you did not familiarize yourself with them?
MR. CRAWFORD: Objection, argumentative.
A Oh, I think I was familiar with them, but I



didn't get into details of the -- of that process.
Q What process are you referring to?
A The -- when various ACRs were issued, when DCSs were issued or consummated or whatever administrative processes happened with those, I was focused on the policy and the direction of the program. The authorities were delegated to the appropriate organizations. Responsibilities were mine.
Q To your knowledge were the acceptance rates established by your office fairly consistent with your office's spent nuclear fuel program plans?
MR. CRAWFORD: Objection, vague.
A The requirements, system requirements and the program plans should, to my knowledge were consistent. There may be some time issues where if one thing changed, one of those might have changed fast within the other because they had administrative processes to follow, but in general they were consistent.
Q Who is Mr. Alan Brownstein?
A He's an employee.



Q What is his position?
A Right now his official position is director of regulatory coordination division.
Q Do you consider him a competent employee?
A Yes, I do.
Q Do you work with him personally?
A Yes.
Q Do you rely on his judgment?
A I do.
MR. CRAWFORD: Objection, vague.
Q What is his field of expertise?
A I believe his formal education is an economist, though he's been in the nuclear industry decades and is very knowledgeable.
Q Have you ever been critical of his professional judgment?
A Never.
Q I return your attention to page 17 of Exhibit 1.
A Okay.
Q Are you familiar with the plan referred to on page 17 denominated as the improved performance

141

plan?
A I don't recall those words here. If you want me to scan it, I'll --
Q Please scan it and tell me if you are familiar with this plan.
A This was to -- my understanding of the improve performance plan was an addition of MRS, an integrated MRS to the waste management system as the improved performance plan is my understanding. I am generally familiar with that concept.
Q You were a proponent of that plan, correct?
A Uh-huh. I agreed with that plan.
Q You were actually a strong proponent, correct?
A I was a proponent of that plan.
Q Why were you a proponent of that plan?
A I believe that an MRS added to the system, waste management system, was an enhancement to the system. A major reason being that it could allow us to receive waste to the system earlier than waiting for the repository to be developed.
In this time period it was -- the

142

repository would not be coming on line in '98. It was 2003 or later. And that this would be -- it would be advantageous to have an MRS in the system.
Q Are the items listed on page 17 over to page 18, one through five, are they various advantages that your office saw in the implementation of that system?
A Yes, they are.
Q Can you explain number three to me on page 18?
MR. CRAWFORD: Objection. Asked and answered.
A Well, as I said earlier, the MRS, the congressional approval of an MRS and the insertion of it into the system would allow us to receive waste as early as 1996, thereby meeting the 1998 schedule that's in the act.
Q On number four what are the added costs -- what added costs are referred to in number four?
A Let's see.
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.

143

A That receiving waste earlier into the system and at larger rates, which you could do with a storage -- an integrated store of a facility, had advantages of reducing the costs at reactor storage over a non -- over a situation where there was no MRS and you had to wait for the repository to be built.
Q What costs would have been reduced?
A The at-reactor storage cost.
Q Any other costs?
A Not that I know.
Q Did you attempt to or did your office attempt to quantify the at-reactor storage costs that would have been saved?
MR. CRAWFORD: Vague. Objection. Objection to the lack of foundation.
A To my recollection the only time we ever did that were in those studies I talked about in the late eighties where we looked at cases with MRSs, without MRSs and what some of the societal cost analyses were.
Q You remember this morning we referred to the 1987 amendments enacted by Congress?

144

A Yes.
Q Was it those amendments in your view that prevented the implementation of what is referred to in this document as the improved performance plan?
MR. CRAWFORD: Objection. Asked and answered.
A It didn't absolutely prevent it. It certainly made it much more difficult by the replacement of the linkages and by the creation of the -- you had to have a volunteer site. So it made it less likely to happen. But it was still possible to happen.
Q What would have been required -- you said it could still have happened, correct?
A Yes.
Q What events would have had to have occurred for the improved performance plan to be implemented after the enactment of the '87 legislation?
MR. CRAWFORD: Objection. Vague. Objection, foundation.
A Pre-'87 the proposal rested with Congress from the Department of Energy to create an MRS at Oak

**Ridge, Tennessee. If that had been the nation's will, there would have been a certain chance of success of meeting the 1998 date. When it was the will of Congress to have a different course and reject that and it was actually rejected in the statute where that new course depended upon finding of a volunteer site and subsequent approval by Congress by statute made it a much more onerous and difficult task to achieve. So it was possible but it was more difficult than if there had been a simple congressional approval of the MRS proposal as the Department of Energy submitted it.**

Q But it wasn't impossible, correct?

A **It was not impossible.**

Q If you had a volunteer site and Congress, assuming there was a volunteer site and Congress passed the necessary legislation, what else would have been required to have happened for your office to have proceeded with the improved performance plan?

A **I don't believe we called it an improved performance plan in the post-'87 time period, but you would have had to have -- to succeed in the '98 date we would have had to maintain the progress on the**



**repository so the linkages permitted. You would have had to had sufficient funding from the Congress, which hindsight has shown that was very -- been very difficult to do. As well as the actual new legislation to consummate the volunteer site.**

Q Would you turn your attention to page 24 of Exhibit 1.

MR. CRAWFORD: I'm sorry, what page?

MR. CAYNE: 24.

Q Do you see on the bottom half of the page on Roman III there are certain assumptions about an MRS facility.

A **Uh-huh.**

Q Are you familiar with these assumptions?

A **No, but I --**

MR. CRAWFORD: Objection. Foundation.

A **No, but I can look at them.**

Q Please.

A **Okay, I'm familiar with them.**

Q Were you familiar with them at the time?

A **In a general sense, yes.**

Q What was the basis of your office's



proposal that the capacity of the MRS be established at 15.000 MTU?

MR. CRAWFORD: Objection, foundation. Objection, vague.

A **From a policy matter my recollection on this was that if you made the MRS capacity too large it would not be acceptable from a congressional perspective because it would appear to be a replacement for the geologic repository. On the other side, if you made it too small, you then would not have the performance of removing the waste that we would like to have had. 15,000 metric tons appeared to be a reasonable capacity that seemed to be not too large that it would be a replacement, nor too small that it didn't have any benefit, and that's why we proposed it in the 15,000 ton range. That is my recollection, but documents would say that.**

Q Was it important to your office that the MRS not be perceived as a replacement for the repository?

MR. CRAWFORD: Objection, foundation.

A **My understanding is the congressional**



**debate in the formulation of the '82 act was there was discussions between what was known at the time as away-from-reactor storage concept versus a geologic repository concept, and the after the debate was over the decision was not to authorize an away-from-reactor storage facility, which the new name became a monitored retrievable storage facility, because the opponents of that felt it would detract from the geologic repository and the DOE was to submit a proposal for an MRS, but it was not approved. It took an act of Congress to approve it and authorize it. That was the forces that were at play from a policy perspective on this.**

Q In 1982?

A **In 1982. And those existed right through '87. Some people vehemently opposed the MRS; some people wished -- were proponents of the MRS.**

Q So then am I correct that in 1985 it was important to your office that the MRS as then proposed not be perceived as a replacement for the permanent repository?

A **That's correct.**

MR. CRAWFORD: Objection. Lack of foundation.
Q You see B, the waste receipt rate?
**A Uh-huh.**
Q Are you familiar with the basis for the 3,000 MTU per year receipt rate in 1985?
MR. CRAWFORD: Objection, asked and answered. Objection, foundation.
**A I'm familiar with it. It was established before my arrival or personal participation in establishing that number. It seemed like a reasonable number to me then as it does today.**
Q Has there ever been a time since you've been at the Department of Energy that a 3,000 MTU per year rate did not seem reasonable?
MR. CRAWFORD: Objection, vague. Objection, asked and answered. Objection, lack of foundation.
**A As this is used in this case, as an assumption for an operating facility rate and capacity, it was a reasonable number.**
Q In C, do I understand this correctly that



after two years the MRS would have been operating at full -- at the full acceptance rate?
MR. CRAWFORD: Objection, vague.
**A That's what it says. I never thought it was that fast, but that's what it says.**
Q Do you have any basis to disagree with the statement in C?
**A I think going from zero to 3,000 in a two-year period is extremely challenging and questionable to go that fast.**
Q Do you believe that the individuals in the Office of Civilian Radioactive Waste Management program were careless in establishing this two-year ramp-up period?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
**A I don't believe they were careless at all. I believe that's overaggressive in my judgment based on what history has shown us how difficult nuclear facility creation implementation is.**
Q Would you believe it to be overly aggressive in 1985?



MR. CRAWFORD: Objection, foundation.
**A I don't think I ever really tuned in on it.**
Q Did you ever have discussions with anyone in your office concerning the reasonableness of the two-year ramp-up period?
**A Not that I recall.**
Q Who would have made the final decision in your office to authorize the two-year ramp-up period?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A That would have been Roger Hilley who is responsible for that office.**
Q Do you believe he was a competent individual?
**A Yes, I do.**
Q Do you believe he had good professional judgment?
MR. CRAWFORD: Objection, foundation.
**A As a senior manager, yes.**
Q Did you find him to be overly aggressive in his administration of the program?
MR. CRAWFORD: Objection, foundation.



Objection, vague.
**A No.**
Q Can you turn your attention to page 26. You see page 26 consists of a chart. Would you take a moment to refresh your recollection concerning its contents.
**A Okay.**
Q Are you familiar with this chart?
**A Vaguely.**
Q Have you seen the column labeled Spent Fuel, the fourth column to the right?
**A There's four, four, four, four, nine, 18?**
Q Right.
**A Yeah.**
Q Are you familiar with the basis for the projection that the ramp-up would go from 400 to 900 at the third year?
**A I'm sorry, repeat the question.**
Q Are you familiar with the basis, technical or otherwise, for the determination that the acceptance rate would ramp up from 400 to 900 between the third and the fourth year of the acceptance of the

177

answered.
A **I have no idea how many meetings.**
Q A handful?
MR. CRAWFORD: Objection. Asked and answered. Objection, foundation.
A **Don't know.**
Q Could it have been as many as five?
MR. CRAWFORD: Objection, asked and answered. Argumentative. Foundation.
A **Don't know.**
Q You don't know whether it was as many as five?
A **Could have been.**
MR. CRAWFORD: Objection, argumentative.
Q Over what period of time did these meetings occur?
MR. CRAWFORD: Objection, argumentative. Objection, foundation and asked and answered.
A **In the post-'94 budget decision when the MRS volunteer was unlikely to go forward.**
Q Do you know whether there were any contacts made by any member of your office to Secretary Hodel

178

in 1994 concerning the contents of Secretary Hodel's letter of September 7th, 1984?
A **I don't know of any.**
Q Do you recall whether during any of the meetings you attended in which Exhibit 3 was discussed whether any member of your office, the Office of Civilian Radioactive Waste Management Program, whether any member of your office expressed the view that there were misstatements of fact or law in Secretary Hodel's letter?
MR. CRAWFORD: Objection. Asked and answered. Objection, foundation.
A **Repeat how you phrased that.**
Q Do you recall whether during any of the meetings you attended in 1994 in which Exhibit 3 was discussed, whether any member of your office took the position that there were -- that the letter of Secretary Hodel dated September 7th, 1984, contained any misstatements of fact or law?
MR. CRAWFORD: Same objection.
A **Don't know.**
Q No recollection?

179

A **Don't recall.**
Q Page 97, Exhibit 2, the same paragraph we've been referencing. Can you tell me what the reference is in the fourth line to a firm schedule?
A **Fourth line of which paragraph? Oh, I see. Okay.**
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A **I don't know what more to say than what it says here. I don't know what they were talking about.**
Q What is your understanding of the term "firm schedule" as it is used in this document?
A **Firm or just the word "schedule" beginning in '98, which is repeating back what the statute says. So adding the word "firm" in front of "schedule" is meaningless to me, but maybe it meant something to the writer.**
Q Do you recall whether that term was discussed by any members of your staff in the 1994 time period?
A **I have no recollection of the word "firm" being used in front of any schedule in this program**

180

**ever.**
Q Would you turn to page 99 of Exhibit 2. Take a look at the third full paragraph on page 99 that starts, "the owners and generators." Do you see that?
A **Uh-huh.**
Q Take a moment to read that.
A **Okay.**
Q Are you familiar with the position stated there?
A **Yes.**
Q What is your familiarity with that position?
A **That the act requires the utilities to store the waste until January 31, 1998.**
Q And after January 31, 1998, whose obligation is waste storage?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the foundation.
A **My interpretation is it's silent about that.**

181

Q Is this consistent with your understanding?
MR. CRAWFORD: Objection, asked and answered.
**A I go back to the act. The act says that the utilities are responsible for storage until the department takes the waste, and it gave a date of January 31, 1998, to start. It was always the tenant that, even when we started, if we started as advertised -- I mean, there would be some storage going on afterwards anyway. So the utility is responsible for safe storage of the waste.**
Q You refer to some storage. What storage were you referring to?
**A Some utilities are still going to have to do storage of the waste while we were operating. It may not have had allocations. There are many different things.**
**(Deposition Exhibit Barrett 4 was marked for identification and was retained by counsel.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 4. Do you have that in front of you?

182

**A Yes, I do.**
Q And this document is a draft of the Civilian Radioactive Waste Management Program Mission Plan as of December 20th, 1983. Do you see that?
**A Yes.**
Q I would like to refer your attention to the third paragraph under Introduction.
MR. CRAWFORD: What page are we on?
MR. CAYNE: Page 1-1.
**A Okay.**
Q Please let me know after you've read that.
**A Okay. I read it.**
Q Do you agree with the statement made in Exhibit 4 that the waste acceptance schedule will initially preclude the need for additional at-reactor storage after January 31st, 1998, and ultimately remove from at-reactor storage all waste that is more than five years old?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A I don't know. I would have look in here and see what it did.**

183

Q Well, would the mission plan as it stood in 1985, based on your knowledge of it, preclude the need -- had it been implemented as it stood in 1985, would that have precluded the need for additional at-reactor storage after January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A Not necessarily.**
Q Might it have?
**A Might have; might not have, too.**
Q How would you make that determination?
MR. CRAWFORD: Objection, vague. Objection, foundation. Objection to the extent it calls for speculation.
**A You would have to look to see what utilities could go when under the oldest-fuel-first allocation and all that. So it becomes very complicated to figure out if someone would have to do additional storage or not.**
Q Did anyone in your office ever make, attempt to make that determination on a utility-by-utility basis?

184

MR. CRAWFORD: Objection, foundation. Objection, vague.
**A Not to my knowledge.**
Q You made a reference to oldest-fuel-first allocation. To what were you referring?
**A It's my understanding that under the framework of the act that the allocations for service are provided to the contract holders on an oldest-fuel-first basis.**
Q Were there also certain exceptions to that under the act or contract?
MR. CRAWFORD: Objection, compound.
**A What do you mean by exemptions?**
Q Exceptions --
**A What do you mean by that?**
Q For example, for shut-down reactors.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, compound.
**A The framework -- now, I don't know if it's in the statute or if it's in the contract -- is we have the ability to approve, I'll use the words hardship cases to allow people to have an earlier or**

less than 2.5 years for its licensing review." Do you see that statement?
A Yes, I do.
Q Are you familiar with the basis for that conclusion, that it would require less than 2.5 years to complete that process?
A In this document, no.
Q Are you familiar outside of this document with the amount of time it would have taken the NRC to complete this process?
MR. CRAWFORD: Objection, vague.
A I'm familiar with the NRC processes to approve and, you know -- facility under 10 CFR Part 72 which is what this is.
Q And do you believe that a projection of that process would take less than 2.5 years to be an appropriate projection?
A It's around two and a half years, 30 some months I've testified to, which is about two and a half years. Two and a half to three years.
Q You've testified to today? Is that what you're referring to?



A In the last five years.
Q Before Congress? Have you testified anywhere in the last five years other than before Congress?
A What do you mean by testify?
Q You just referred to testimony you gave in the last five years, correct?
A Oh, Congress. Yes, I've testified before Congress regarding storage approval times in the last five years.
Q And you testified that the period in which -- the period that it would take to license an MRS facility would approximate 2.5 years, correct?
A It could be done that fast.
Q You testified to Congress that that was an appropriate projection of the required time, correct?
A I believe so. I would have to go back and look.
(Deposition Exhibit Barrett 5 was marked for identification and was retained by counsel.)
Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 5.



The first page states Annual Capacity Report Briefing for OCRWM Executive Committee, November, there's no date, 1986. Do you have that before you?
A Yes, I do.
Q Were you a member in November 1986 of the OCRWM executive committee?
A I don't think so.
Q In November 1986 you were a division director, correct?
A Correct.
Q And you don't believe that in that capacity you would have been a member of the executive committee?
A No, I was not then.
Q Have you taken a moment to leaf through this document?
A Okay.
Q I would like to turn your attention, on the left-hand side it says HQ 0002904.
A 290 --
MR. CRAWFORD: Wait a minute. Oh, I got you.



A Positions by decision group, current status?
Q Yes. You see under Decisions Group it has aggregate acceptance, the first entry, system study on technical basis under review confirms 3,000 MTU per year?
A I see it.
Q That's consistent with your testimony today, correct, that --
MR. CRAWFORD: Objection.
MR. CAYNE: Could I finish, counsel.
MR. CRAWFORD: Sorry.
Q That's consistent with your testimony today that in 1986 your office was projecting a 3,000 MTU per year acceptance rate, correct?
MR. CRAWFORD: Objection, vague.
A Seems consistent.
Q Do you know what the, or are you familiar with the system study that is being referred to in this entry?
A Not the specific one.
Q Do you have a general understanding of the

system study being referred to here?
MR. CRAWFORD: Objection. Asked and answered.
**A There were various studies done in the eighties and also in the very early nineties on system performance rate, you know, what the costs were, schedules were, plausibility of them.**
Q And these system studies looked at system issues, correct?
**A Yes.**
Q And am I correct that each one of these studies to which you've just referred confirmed an acceptance rate, an aggregate acceptance rate of 3,000 MTU per year?
MR. CRAWFORD: Well, objection, vague.
**A I think it's overstated to say it confirmed it. It showed that, you know, at 2,000 it does this, at 3,000 it does that, 4,000 it does something different. I don't know if they actually reached an absolute confirmation that 3,000 was the exact number, but generally they supported the system rate of 3,000 was a reasonable rate.**



Q So it's your understanding or your knowledge that each of the various system studies to which you just referred that were undertaken in the -- from the mid-1980s to I think you said the mid-1990s, supported an acceptance rate of 3,000 MTU per year, correct?
MR. CRAWFORD: Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony.
**A Yes.**
Q I'll ask you to turn to page HQ 0002909 of this same exhibit.
**A Okay.**
Q Do you see under the second entry, allocation of acceptance under consequences of decisions, it says "allocation required to plan maximum storage at some sites." Do you see that statement?
**A I see it.**
Q Do you understand that statement?
**A No.**
Q Do you understand that statement to refer



to the need of the utilities to have significant advanced knowledge of the allocation rankings in order to store the fuel in the most efficient manner?
MR. CRAWFORD: Objection, speculation. Objection to the extent it assumes facts not in evidence. Objection to the foundation.
**A Could be. I don't know.**
Q Do you have any knowledge of the considerations that utilities undertake in attempting to maximize their storage capacity, their existing storage capacity?
**A Yes.**
Q And what considerations are necessary to be undertaken by a utility to do that?
**A Safety considerations, economic considerations, future site use and decommissioning schedules, all sorts of issues a utility needs to consider to make decisions about how best to store the fuel.**
Q And is one of the issues they need knowledge about the priority queue?
**A The likely --**



MR. CRAWFORD: Objection, foundation.
**A The likely removal time for the Department of Energy is an important part of that consideration.**
Q So the failure to provide the utility with that information could cost the utility to store fuel in a less than optimal manner, correct?
MR. CRAWFORD: Objection, speculation. Objection, foundation. Objection to the extent it assumes facts not in evidence.
**A The removal date would be the important thing to the utility planner regarding where you are in your allocation as a subset. The most important part is the when will the federal facility be capable to receive material. So the allocation to me is a secondary issue compared to the rate of development of receiving facility, which is the primary consideration.**
Q You said the most important part. The most important part to what?
**A For a utility deciding what they should do with their storage. The most important -- one of the more important aspects of a utility decision will be**

**but certainly site designation was a key matter.**
Q Look at page two of this document, two in Arabic at the bottom.
A **Okay.**
Q You see the statement, "As specified in the contracts, the ACR is for planning purposes only"?
MR. CRAWFORD: Where are you?
MR. CAYNE: I'm at the last sentence of the carryover paragraph -- next to the last sentence of the carryover paragraph on the top of page two.
A **I've read it.**
Q You see that?
A **Yes.**
Q To your knowledge does the contract actually make that statement, the standard contract?
A **Don't know.**
Q Have you ever been advised by anyone of the statement on this page two that the ACR is for planning purposes only?
A **I've heard that statement.**
Q Have you ever made that statement?
A **Don't recall. Might have.**



Q Is that your position?
A **Yes.**
MR. CRAWFORD: Objection, foundation.
A **Yes.**
Q And what is the basis for that position?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A **My staff has advised me that's the proper thing to say when asked.**
Q What members of your staff?
A **Mr. Brownstein, Mr. Zabransky and the people who are responsible in that area.**
Q When did they give you that advice?
A **Numerous times over many years.**
Q Starting when?
A **Probably when I came back, '93 on I would guess.**
Q Did they give you that advice in the context of discussions relating to the issue of whether operations would start at the repository by January 31st, 1998?
MR. CRAWFORD: Objection, vague.



Objection, foundation.
A **It was always in the context of the entire program because in the early times the MRS was an important part and then later days it was not.**
Q This is referring to the ACR. Why did you just refer to the MRS?
A **Because the ACR has to do with obligation in other legal matters, and as we got closer to the '98 date this became more and more of a sensitive matter.**
Q Why did it become more and more of a sensitive matter?
A **Because of all the --**
MR. CRAWFORD: Objection, vague.
A **All of the legal, either in the rulemaking proposals that went out in the early nineties -- in the mid-nineties and then the litigations.**
Q What rulemaking proposals are you referring to?
A **There was a proceeding that we had circa '95ish about the department does or doesn't have an obligation.**



Q And were you involved in that proceeding?
A **Very peripherally. I was the acting director at the time or the DOE deputy, so I didn't personally get involved in it much but I knew it went on.**
Q Did you make the decision to initiate that proceeding?
A **I don't remember.**
Q Are you referring to the notice of inquiry?
A **That's probably what it was.**
MR. CRAWFORD: Well...
A **I don't know. I was referring -- I don't know if that's the official name of it. But it was a formal thing we did. We sent out in the notice -- I guess it was a notice, yeah, of -- that's probably it but I don't know.**
Q Who in your office was responsible for the handling of the notice of inquiry?
MR. CRAWFORD: Objection to the foundation. Objection, assumes facts not in evidence.
A **Brownstein. Brownstein was responsible.**
Q Was it his idea to issue a notice of

241

**Energy recommended it, but go ahead.**
Q And it was this linkage that caused the ultimate failure of the MRS proposal, correct?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.
**A No.**
Q It hindered the continuation of the MRS proposal, correct?
MR. CRAWFORD: Objection. Same objections.
**A No. I don't think so. Let me rephrase it. I don't think so.**
Q I thought you testified this morning that the congressional enactment in 1987 was a large reason why the MRS proposal never was implemented. Is that not correct?
**A That is correct.**
Q And you indicated that this is similar to one of the linkages Congress enacted, this being the linkage referred to on page 58 of Exhibit 8?
**A No.**
Q I'm sorry. No, you did not say --
**A I'm answering your question no.**

242

Q Okay. I misheard you then. I thought you testified that this linkage was similar to what Congress enacted?
**A Yes.**
Q You did testify to that?
**A Yes.**
Q And did this linkage have an effect on the ability to proceed with the MRS proposal?
**A In a minor way.**
Q And what was that?
**A It limited the usefulness, but it was almost immaterial in the change in '94.**
Q Was there another linkage that had a more adverse effect on the program?
**A Not a linkage.**
Q What resulted in the failure to proceed with the MRS program?
**A Failure to --**
MR. CRAWFORD: Objection, asked and answered.
**A Failure to give the grants to the Indian tribes who wanted to pursue a proposal.**

243

Q Had Congress enacted the grants that you just referred to in 1984, when would an MRS facility have been able to commence operations?
MR. CRAWFORD: Objection to the extent it calls for speculation.
**A There were no grants in '84.**
Q In '94?
**A Now rephrase your question.**
Q With respect to the grants that you referenced a few moments ago that Congress failed to enact in 1994, I'm asking you to assume that those grants had in fact been authorized. Had those grants been authorized in 1994, when could an MRS have commenced operations?
MR. CRAWFORD: Objection to the extent it calls for speculation.
**A It was still possible to do it in '98, and that was my testimony in the spring of '93.**
Q Your testimony to Congress?
**A Yes.**
Q And did that testimony give consideration to the linkages in the 1987 legislation?

244

**A I believe it did.**
Q And taking into account the linkages imposed by the '87 legislation, it's your testimony that if Congress had enacted -- authorized the grants in 1994 the MRS would have, could have commenced operations by January 31st, 1998, correct?
MR. CRAWFORD: Objection to the foundation.
**A I go back here on these things. I think what had to happen was I think they had to change the linkages in the proposal, which is what the plan was with the Mescaleros and the Goshoots, was that they would propose the change to the linkages. So I think the linkages had to be modified for performance in '98. The plan was to do that in the proposal to Congress because it would take Congress to act on it. So the linkages may have had to change. I would have to go back and look at what the linkages were which I don't recall now.**
Q So your best recollection is that the 1994 proposal to which you referred would have required two things, that certain grants be authorized and that the linkages enacted in 1987 be amended or repealed?

245

A Yes. And that was the -- that was the plan. In calendar '93, in the FY '94 budget proposal, that the Indian nations would present a proposal that would change the linkages and be able to operate in 1998. And the denial of Congress to develop those proposals led to -- and there was no chance of modifying the linkages nor getting the site in any practical sense was -- led to the inability or the unlikelihood of meeting the '98 date.
Q But it was your view, am I correct, in 1993 that had Congress acted differently, had Congress authorized the grants, had Congress repealed the linkages, then the MRS facility could have commenced operations on or before January 31st, 1998, correct?
A Correct. That's my recollection.
MR. CRAWFORD: Let's take a break.
MR. CAYNE: Sure.
(There is a recess from the record.)
(Deposition Exhibit Barrett 9 was marked for identification and was retained by counsel.)
Q Mr. Barrett, going back to our previous line of discussion, do you recall that you testified

246

that the linkages to which we were referring would have had very little effect on the ultimate failure of the MRS proposal? Do you recall that?
A Yes.
MR. CRAWFORD: Objection.
Q To the extent you've refreshed your recollection on that proposal and the implications of the linkages, would you want to amend in any way that answer?
A Refresh me on the two linkages.
Q Well, the linkage that I was referring to was the linkage that was proposed in the DOE report.
A I never knew DOE ever proposed a linkage, but the linkage -- the linkages in my mind are the ones in Congress. There's two of them.
Q I will hand them to you, sir.
A And then we'll come back and clear this -- well, we'll come back to this since your question is on those linkages, though.
(Deposition Exhibits Barrett 10 and Barrett 11 were marked for identification and were retained by counsel.)

247

Q Mr. Barrett, you've been handed two additional exhibits marked for identification as Exhibit 10, which is a copy of Section 10165 of Title 42 and Exhibit 11, which is a copy of Section 10168 also Title 42. Do you have those two before you?
A Yes.
Q And I understand you're reviewing these copies of the statutes now to refresh your recollection on the linkages about which you've testified?
A Correct.
MR. CRAWFORD: It might help if you would direct him to some part of it.
A On ten?
Q Yes.
A The linkage is B, the secretary may not select the site under subsection A until the secretary recommends a repository.
Q Okay.
A That in a -- and the reason I said that the failure of the grants was the primary reason why we would not do it was the proposal to Congress would be

248

the Indian nation in that case proposing to be the site, volunteering to be the site which would negate the secretary selecting a site. So the lack of a volunteer, you know, agreed to by Congress was more important than this limitation B.
Q Could I also ask you to look at section little d of Exhibit 11.
A Yeah, I was doing ten and then we'll do -- so that's ten.
And the concept in the proposal would be to modify this linkage as well. If the --
Q This linkage being sub (d)?
A Sub (d), correct.
Q Of 11?
A D of 11, would be to modify these as well, at least -- (d)(1) would be that they would propose to change the one that they could start construction prior to construction authorization for the repository but (d)(2) would remain.
Q What about (d)(3)?
A (D)(3) would remain.
Q With the 10.000 limit?

249

A Right. And (d)(4) would remain. And they were not limiting as to starting in '98. But (d)(1) of Exhibit 11 would be modified by the proposal as would B of Exhibit 10. This was in a proposal to Congress by the Native American nations that would volunteer. But there was never any indication to my recollection that they would change the mass limits of Exhibit 11 (d)(2), (3) and (4). That was the premise that we were working on circa '93 for the proposal.

So I answered the primary reason for the ability to meet the '98 date in early '93 was a proposal to modify those two linkages. So in my mind in my original answer was the lack of -- the congressional refusal to go forward with those proposals was the primary reason that the MRS was not available in 1998. Not the linkages per se. Because if we had a volunteer, in my judgment, those linkages would have been modified by Congress if it was acceptable to the volunteer host.

Q But without modifying linkages that you've identified, the proposal could not have gone forward, correct?

250

A Without -- these linkages prevent us from going forward without a volunteer to change the linkage.

Q And linkage (d)(1) in Exhibit 11 is similar, is it not, to the linkage proposed by the Department of Energy in the last Exhibit 9 that we were referring to a few moments ago?

MR. CRAWFORD: Objection, vague. Objection, foundation, and objection to assumes facts not in evidence.

A The proposal from the Department of Energy that's in one of these things here which I guess would have been 9. You tell me where it was because that's where we started.

Q I'm sorry. Exhibit 8.

MR. CRAWFORD: The last paragraph or last section.

A 58?

Q Yes.

A I was unaware, and I don't know if this is really true or not, that he did this, although it says it here, that the Department of Energy proposed that.

251

The working hypothesis that I had in '93, because I was not intimately involved in the policy aspects in the eighties, was that this was imposed by Congress, which it was.

Q This being?

A The linkage that you could not -- that the MRS could not start receiving fuel. This was congressionally imposed. There's no number of volumes in here in the DOE -- I didn't know DOE had proposed anything to Congress regarding linkages. I was aware that they had dialogues about a concern that the MRS be -- appear to be a replacement for the repository and that there needed to be ties. I did not know the department went so far as to make a congressional recommendation.

Q You believe that they made that recommendation to make it even clearer that the MRS was not a replacement for the repository?

MR. CRAWFORD: Objection to the foundation. Objection to speculation.

A I don't know. I don't know what those who did this at that time did or didn't do. I was not in

252

a policy role in the 1980s.

Q So prior to today you were not aware, Mr. Barrett, that the Department of Energy had made any proposals to Congress with respect to the linkages we have been discussing, correct?

A That's correct.

Q And sitting here today you do not know why the Department of Energy made the proposal with respect to the linkage, the proposed linkage referenced on page 58 of Exhibit 8, correct?

A I do not know.

Q So my question is correct, yes?

MR. CRAWFORD: Objection. Asked and answered.

A State your question again.

Q I just want the record to be clear, sir.

A Well, state your question again. Let's see if I can try to give a yes or no.

Q And sitting here today you do not know why the Department of Energy made the proposal with reference to the linkage, the proposed linkage referenced on page 58 of Exhibit 8, correct?