A Correct.
Q Thank you.
Mr. Barrett, you have before you a document marked for identification as Exhibit 9, which is the annual capacity report issued by the Office of Civilian Radioactive Waste Management in June 1988. Do you have that document, sir?
A I do.
Q Did you play any role in connection with the preparation or issuance of this annual capacity report?
MR. CRAWFORD: Objection, compound.
A Not that I recall.
Q Did you at any time review this annual capacity report prior to its issuance?
A Not that I recall.
Q Have you ever reviewed this annual capacity report prior to today or any portions of it?
A Not I recall.
Q Turn your attention to page four of this exhibit.
A Yes.



Q And specifically Section 2.1, which is on page four and continues on to page five. I ask that you take a moment to read that section and let me know when you're complete, sir.
A Starting from the beginning or just that paragraph?
Q Starting right under "waste acceptance schedule."
A Okay.
Q Turn your attention to page five, and there's a statement that "The projected waste acceptance rate has been increased because it is assumed that the MRS facility and the repository will commence operations simultaneously." Do you see that?
A Yes.
Q Prior to this time it was projected that the MRS would commence operations in 1998, five years prior to the repository, correct?
A I'm not sure the sequence between, you know, the time line, but that sounds reasonable.
Q The last document we looked at was from 1987, the mission plan amendment. Do you recall that?



A I'll go back and see what it was, but -- what's the question?
Q My question is what was the basis for the determination by your office that the MRS facility would commence operations simultaneously with the repository?
MR. CRAWFORD: Objection, vague. Objection, foundation.
A I don't know. I'd have to look and review. I had no personal knowledge or recollection of what was or wasn't in the office plans back in the middle of '88, or early '88.
Q Well, based on -- according to the document that you're now reviewing, the office of waste management was not -- was projecting that the MRS would not commence operations until 2003, correct?
A I thought this was the MRS would start in '98 and the repository was in '03.
Q Do you think that's what the first full sentence at the top of page five says?
A Okay. Let's look at this again. Maybe I'm assuming something I shouldn't. This apparently is



the MRS is going to start in '03. I said I never reviewed this document, so that's what it says. So I have no knowledge about any of the whys or wherefores of what they assume here. Ask your question again.
Q Let me ask you this question. You testified a few moments ago that as late as 1993 you believed that an MRS facility could be up and running by January 31st, 1998, correct?
A The volunteer site, yes.
Q Does this projection in Exhibit 9 that the MRS would not be operational until 2003 affect that conclusion, your conclusion in '93 that the facility could be operational by '98?
A No, because I don't know what the basis for this was. On the face this looks like the department was saying that the first waste acceptance wouldn't be until '03, and that was not my understanding as the department's position at that time.
Q Well, you indicated earlier that you were involved in the -- were you involved in the preparation of the 1988 mission plan amendment?
A Not that I recall. I believe I was doing

257

**quality assurance at that time.**
Q But you were involved in the preparation of the '87 mission plan amendment, correct?
A **Probably. Only peripherally. I was not a major -- I would have provided the transportation work and I probably had seen it for review, but I -- but the '88 -- this '88 ACR I did not personally, was not personally involved in nor was I a reviewer nor did I know it said that.**
Q When you testified that "it was not my understanding that that was the department's position at that time," specifically what position are you referring to?
A **That this section you had me read implies that the department would not accept any waste until the year 2003.**
Q And prior to today you were never aware that the department took that position in 1988, correct?
MR. CRAWFORD: Objection, vague. Objection, mischaracterizes his prior testimony.
A **I was not aware of that. Because it was**

258

**always our intention to work with a volunteer to allow us to be able to receive materials in 1998.**
Q So do I take it that if you had reviewed this document, Exhibit 9, in June 1988, you likely would have objected to the contents of page five that we are now reviewing?
MR. CRAWFORD: Objection, assumes facts not in evidence. Objection to foundation.
A **I would not have objected. I would have made my opinion known to Ed Kay.**
Q And you would have said to Mr. Kay what?
A **I was saying --**
MR. CRAWFORD: Objection. Calls for speculation.
A **I would have said, are you -- you know, this is strong. I would still have tried to put more emphasis on the volunteer to achieve a '98 date, but, again, my responsibility at that time was quality assurance, not this.**
Q Did you say something this is strong? I didn't hear you.
A **I said I would have given him my opinion**

259

**that this was not strong enough that in our intention to try to work with a volunteer. Maybe it's somewhere else on another page that we haven't looked at. Reading the selective page here on five gives the impression that we were not trying to achieve a '98 date. And I think we were.**
Q But you agree that the document, the portion of the document you're looking at is contrary to that view, correct?
A **That portion --**
MR. CRAWFORD: Objection, best evidence.
A **-- appears to be.**
Q Turn your attention to page six, the impacts of nuclear waste policy amendments of 1987. Do you see that?
A **Yes.**
Q The first sentence is, "The amendments act of 1987 could affect both the purchasers and the DOE in implementing the contract." Do you see that?
A **Yes.**
Q I take it the purchasers is referring to the nuclear utilities that entered into contracts with

260

the Department of Energy, correct?
MR. CRAWFORD: Objection to the foundation.
A **That's my understanding.**
Q How in your knowledge or in your view could the amendments act of '87 have affected the purchasers?
MR. CRAWFORD: Objection to the foundation. Objection, calls for speculation.
A **By making it more difficult for the department to achieve a 1998 date.**
Q And how would that have affected the purchasers.
A **If we could not select a place by law we couldn't move the fuel, therefore the fuel would remain there longer.**
Q And that would have what impact on the purchasers?
MR. CRAWFORD: Objection as to speculation. Objection to the foundation.
A **Primarily one of cost, that they would have to store the fuel.**
Q Additional cost?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, MAINE YANKEE ATOMIC POWER COMPANY, FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, a Division of DUKE ENERGY CORP., INDIANA MICHIGAN POWER COMPANY, SACRAMENTO MUNICIPAL UTILITY

Case Nos 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-695C, 00-703C 01-115C, 01-116C, 01-249C
-----------------X
(Caption continued on next page)

Continued Deposition of LAKE H BARRETT
Washington, D C
Tuesday, April 23, 2002
9 36 a m

Job No 11792-5
Pages 273 through 526, Volume 2
Reported by Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X



Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT
DEVON E HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 893-0527

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT
JEFFREY L HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D C 20004-1206
(202) 942-5000

APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:

DONALD R. CASSLING, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

SUZETTE W. DERREVERE, ESQUIRE
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D. C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:

KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D. C. 20530
(202) 307-1011



APPEARANCES CONTINUED

ON BEHALF OF DEFENDANT UNITED STATES:

HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D. C. 20530
(202) 307-0290



CONTENTS

EXAMINATION OF LAKE H. BARRETT PAGE
By Mr. Cayne 282

EXHIBITS

(Retained by counsel.)

BARRETT DEPOSITION EXHIBIT PAGE
13 Memorandum dated 1/28/88, subject: Assumptions for 1988 TSLCC 286
14 June 1983 Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High Level Radioactive Waste 315
15 Routing Slip with attached memo re: Document Change Proposal to Baseline, the Proposed Waste Acceptance Schedule 350
16 Document dated 11/30/82 signed by Lake Barrett 379
17 Document entitled Nuclear Waste PA-172230 through PA-172270 425

THE WITNESS: Can we take a break?
MR. CAYNE: Certainly.
THE WITNESS: About 60 seconds.
(There is a recess from the record.)
**A Before we start with the next question, I would like to revisit something.**
Q Mr. Barrett, before you speak, let me ask you, since we broke a few moments ago, have you spoken with your counsel concerning your testimony that you just provided?
MR. CRAWFORD: Yeah.
**A Yes.**
Q Please proceed.
**A Okay. My concern here, I'll give you -- you asked a question; I'll give you an answer. You will restate the questions -- my answers, excuse me, slightly differently. You will introduce words that I did not use. And then you ask me to say yes or no to that. Okay. I don't like your recharacterizing my answer differently than I did. And it puts me in a position I don't want to say yes to something that's slightly different. Now, you may be close but they're**



**different. They're yours, not mine. I did not use the word "danger" in that previous series; you did. Okay. But you're recasting them all slightly different, and I think, that's my perception, setting up a record and putting words in this that I don't necessarily agree to. It's going to take a long time if we're going to go on every single phrase that you recast them because you don't like the way I answered it. That's a problem. All right? So I don't know how to work it out but...**
Q I appreciate the lecture, Mr. Barrett. Let me explain to you this is the process of examination in a judicial proceeding. I ask you the questions. The issue is not whether you like or enjoy the question. Your job here today is to provide the best, most honest, most direct answer. If you think I misstated something, you point it out to me. If you don't like the terms I use, you make that clear in your answer. Okay, sir? I am attempting to determine factual issues to be used in the trial of this proceeding, and I have to ask the questions the way I deem best. You have to give me your most direct and



honest questions. Do you understand the process, sir?
**A I understand the process.**
Q Thank you, sir.
I would like to turn your attention to page two of the same exhibit.
**A Page two or page two of the attachment?**
Q Page two of the attachment. Can you take a look at the first paragraph on the top of page two.
**A Yes.**
Q Take a moment to read it.
MR. CAYNE: Let me state that Steve Cohn, C-o-h-n, counsel for Sacramento Municipal Utility District has entered the deposition room.
**A So you want me to read the paragraph on top of page two?**
Q Yes. Have you had a chance to read it?
**A Yes.**
Q Do you agree with the statement contained in that paragraph?
MR. CRAWFORD: Objection, vague.
**A The points one, two, and three?**
Q Let's go through it. It states that "the



commission recognized the perceived concern that an unlinked MRS facility might be recorded as a de facto repository." Do you see that?
**A I see that.**
Q Did you share that concern at the time of this memorandum?
**A I had no opinion. That was a statement from the commission.**
Q But did you as an individual, sir, as the director or acting director of RW have a concern that an MRS unlinked to a permanent repository might in fact be regarded as a de facto repository?
**A I wasn't the director or the acting director.**
Q In the capacity that you held at this time did you have that concern?
**A I knew that was -- it was a policy issue in the United States Congress.**
Q Did you have a view on that issue of any type?
MR. CRAWFORD: Objection. Asked and answered.

401

**A There was an issue that I knew existed. It was immaterial what I personally felt one way or the other.**
Q Fine. But my question, Mr. Barrett, is whether you personally had a view on that question, not whether or not your view was material to anything.
**A I wished that Congress didn't have such a strong view about it, but that's what they had and that's the way it was.**
Q Why did you wish that Congress did not have such a strong view about it?
**A Because it really restricted our ability to take material into federal responsibility.**
Q You're referring to the linkages imposed by the 1987 amendments to the Nuclear Waste Policy Act of 1982, correct?
**A Correct. That's what this says.**
Q And that was your view?
**A Yes.**
Q Do you understand the statement "and notwithstanding their finding that there is no technical basis for the linkages between the MRS and

402

the repository," do you know what that statement means?
**A I don't know what it means.**
Q You have no idea whatsoever?
**A I can surmise what it means.**
Q Well, what is your professional surmise, sir?
MR. CRAWFORD: Well, objection to the form.
Q Please answer the question, Mr. Barrett.
**A All right. There is no technical reason for linkage other than the perception of the host of the storage facility that it is unfair for it to be there because it will stay for a long time and it may stay there forever, therefore they wanted, from a policy matter, a statutory linkage that prevented it from happening.**
Q Does that mean that there was no technical basis for the provisions of the 1987 amendments to the Nuclear Waste Policy Act that imposed the linkages between the construction and operation of a permanent repository and the construction and operation of an MRS facility?

403

**A Yes.**
MR. CRAWFORD: Objection. Foundation.
Q What is the term "technical basis," what do you understand that term to refer to?
**A That there's no scientific nor -- there's no technical or scientific reason that there needs to be a linkage.**
Q So to be blunt, the linkages involve pure politics. Is that what you're saying?
MR. CRAWFORD: Objection. That's not what he's saying.
**A Pure policy.**
Q Pure policy?
**A Policy.**
MR. CAYNE: And I object to counsel for the government advising the witness as to what he has said or hasn't said or how he should testify. That is totally improper.
MR. CRAWFORD: It's proper for me to say when you're mischaracterizing what he said.
MR. CAYNE: It's totally improper, counsel.
MR. CRAWFORD: No, it's not.

404

Q I would like to direct your attention to the next section on page two, "DOE generally agrees with the commission's conclusions." Do you see that?
**A Yes.**
Q The paragraph has a statement, "The commission found that while no single factor could favor an MRS over the no-MRS option, cumulatively" --
**A Excuse me. Are you reading here?**
Q Under "DOE generally agrees with the commission's conclusions" on page two of the exhibit.
**A Halfway down or --**
Q Oh, about five lines down. Do you see that?
**A Right. Start again.**
Q "The commission found that while no single factor would favor an MRS over the no-MRS option, cumulatively the advantages of an MRS would justify the building of an MRS if, one, there were no linkages of between the MRS and the repository." Do you see that?
**A Yes.**
Q Do you agree with that statement?

409

**wasn't scheduled until after 1998, which would preclude a '98 fuel receipt.**

Q The repository operation wasn't scheduled in 1989 to commence until the year 2010, correct?

**A It says construction authorization.**

Q Well, I just asked you about operation.

**A That's correct.**

Q The operations of the repository were not intended to commence until 2010, correct?

**A That's correct.**

Q And as it was then planned with a 2010 operation date, when was it anticipated that the repository -- the construction of the repository would be authorized?

**A I don't recall, but I think it was something like 2005.**

Q Somewhere between 2005 or somewhere between 2005 and 2007?

**A Somewhere in there. I don't -- 2005 plus or minus a couple of years.**

Q So based on the testimony you just provided, sir, am I correct that, returning your

410

attention to Exhibit 16, that the MRS facility referenced in the bottom of page two of the attachment to that exhibit, the MRS facility that is referred to there under the law that was in existence at that time could not begin operations until, at the earliest, sometime between the period 2005 and 2007, correct?

MR. CRAWFORD: Objection to the form of the question.

Q Correct, Mr. Barrett?

**A Without any changes to the law, that is correct.**

Q It is correct that the repository -- that the MRS facility could not become operational until sometime in the time frame 2005 and 2007?

**A Under the statute currently in place, without a change.**

Q And the statute currently in place was existing federal law, correct?

**A The statute also provided for a volunteer process that could change the linkages.**

Q And the volunteer process itself would require the enactment of additional federal

411

legislation, correct, Mr. Barrett?

**A Correct.**

Q And what is the nature of the additional federal legislation that would have been necessary in order to authorize a volunteer -- the siting of an MRS facility at a location owned by a volunteer?

**A It would require proposal from the volunteer to the Congress with their proposal that could change the linkages.**

Q And it would take federal law, an act of the United States Congress to both approve the linkages and to authorize the construction and operation of a facility on the location owned by the volunteer, correct?

**A Basically, yes.**

Q Let me rephrase my last question. And it would take federal law, an act of the United States Congress to either modify or eliminate -- to both modify or eliminate the linkages and to authorize the construction, operation of a facility on the location owned by the volunteer, correct?

**A Close.**

412

Q What is -- why only close, sir? And let's try to get it right.

**A It's my recollection the facility was authorized by the amendment, so it didn't need to be reauthorized. So it was -- the MRS was already authorized by Congress. It didn't need to be reauthorized. There's something else in your statement that was close but not quite.**

Q The Congress would have been required to either modify, substantially modify or eliminate the linkages, correct?

**A And you used "or." The last time you used an "and."**

Q Okay. Or?

**A If you say it with "or" and "authorize," I agree.**

Q And the volunteer would have to be approved, the siting of the facility at the location of the volunteer, and by volunteer you're referring to a volunteer state or Indian tribe, correct?

**A Correct.**

Q And the location of the volunteer state or

Indian tribe would also specifically have to be approved by affirmative federal legislation, correct?

**A I don't know if the actual site had to. They had to change the linkages. They had to change the linkages. I'm not sure they actually had to approve the site.**

Q You used the term "authorize." What did you mean by authorize?

**A If you read the -- my recollection is if you read the amendments act of '87, they specifically authorize the construction of an MRS that did not exist in the '82 act. But then they put a limitation in the linkages that basically prevented us from ever building. But actually the construction was authorized in the amendments act. You can read it as a matter of record I believe.**

Q Now, I believe you testified that an MRS would have been authorized or was authorized under the '87 legislation provided that the statutorily mandated links were satisfied, correct?

**A That's my understanding.**

Q And I'm referring to the links to the



repository, you understand that?

**A Yes.**

Q But did the '87 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendments to the Nuclear Waste Policy Act of 1982?

MR. CRAWFORD: Objection, best evidence.

**A I think the way you phrased that the answer is no.**

Q Did you not understand the question?

**A Your phraseology had a double negative in it, so I think the answer was no.**

Q Let me try to ask the question again, because we want the record clear. Did the 1987 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendment to the NWPA?

**A No.**

MR. CRAWFORD: Objection. Best evidence.

Q So you agree with me that such an MRS was



not lawful in 1989, correct?

MR. CRAWFORD: Objection. Asked and answered.

**A The answer is yes.**

Q And in fact --

**A I do.**

Q And, in fact, such an MRS never became lawful under the laws of the United States, correct?

**A Yes.**

Q Turn your attention to page four of Exhibit 16, please. The second full paragraph, Mr. Barrett. Are you there?

**A Yes.**

MR. CRAWFORD: What page?

MR. CAYNE: Page four of the attachment to Exhibit 16.

MR. CRAWFORD: Which paragraph are we on?

MR CAYNE: The second full paragraph.

Q It starts, in conclusion number four, "The commission found that an MRS link as provided in the current law would not be justified, especially in light of uncertainties in completion time for the



repository." Do you agree with that statement or did you agree with that statement in 1989?

MR. CRAWFORD: Objection. Relevance.

**A I don't recall what I felt in '89, but I basically agree with that.**

Q And then it proceeds, "As a result of that conclusion the commission does not recommend a linked MRS as required by the current law." Do you now or did you then agree with that recommendation?

**A Basically, yes.**

Q Turn your attention to page five of the same document, the final paragraph. Towards the middle of the paragraph. And you can take your time again to read any part of this page or any part of this entire document that will assist you in responding to my inquiry. The part of the paragraph I'd like to focus your attention on is towards the middle. It states, "The capacity limit would be reached within a few short years, assuming any sort of reasonable acceptance rate for the waste management system." Do you see that statement?

**A Yes.**

425

**consternation about what constitutes an emergency. So neither of those in my recollection did I consider practical. And we didn't pursue them.**
Q What did you mean by the last statement. "The MRS review commission recommendations are viewed as an interim solution to a problem that requires long-range planning and thought"?
A **That their recommendations didn't make any sense but we were being nice about it.**
**(Deposition Exhibit Barrett 17 was marked for identification and was retained by counsel.)**
Q The court reporter has handed you, Mr. Barrett, a document marked for identification as Exhibit 17, which is encaptioned Nuclear Waste. Is there a need for federal interim storage by the U.S. monitored retrievable storage review commission? November '89, bearing Bates numbers PA-172230 through PA-172270. Do you have that document before you?
A **Yes.**
Q And let me tell you that this document is an excerpt from the entire -- of the entire report issued by the U.S. monitored retrievable storage

426

review commission.
Did you ever have an opportunity to review this document in the course of the performance of your duties as an official at the Department of Energy?
A **I believe so.**
Q Let me turn your attention to page bearing Bates number PA-172244.
A **Okay.**
Q I'd like to ask you to read the passage, the paragraph that begins at the very bottom of the left-hand column of that page starting, "However, the schedule linkage." Do you see that?
A **Yes.**
Q Could you read that paragraph up to including number five.
A **I've read that.**
Q Okay. Let me ask you to focus your attention to the first statement of that section, specifically, "However, the schedule linkage presently in the NWPAA (MRS construction may not begin until the Nuclear Regulatory Commission issues a license with a construction of a repository) would make it impossible

427

for an MRS to be operational more than three years before the repository." Do you see that statement?
A **Yes.**
Q Do you agree with that statement?
MR. CRAWFORD: Objection. Asked and answered.
A **In general, yes.**
Q Do you agree with it as stated here to be accurate and correct?
A **It's a judgment call.**
MR. CRAWFORD: Same objection.
A **I don't disagree with it -- I don't disagree with that statement.**
**(Deposition Exhibit Barrett 18 was marked for identification and was retained by counsel.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 18. Do you have that before you?
A **Yes.**
Q This document is the report to Congress on reassessment of the civilian radioactive waste management program dated November 1989 issued by the

428

U.S. Department of Energy, Office of Civilian Radioactive Waste Management bearing Bates numbers PA-163156 through PA-163188. Did you have any role in the preparation of this report?
A **I think so.**
Q What was your role, Mr. Barrett?
A **I don't specifically remember the details. I remember we did this. This was part of Admiral Watkins', you know, review of this. So I know I was involved in it. I don't remember what my title was then. I was one of the acting office directors. Not the entire program office but one of them.**
Q Do you know whether you would have been a drafter or a reviewer of this document?
A **I did not draft it. I was a reviewer. I was a participant in its generation and development.**
Q In your position would you have been required to approve of or sign off on this document prior to its final issuance?
A **I don't remember if I signed this or not.**
Q You might have?
A **I might have. I wasn't the final, because**

**I was not -- November '89. I was still there but I was not the act -- Sam Ruosso would have been the director, so Sam would have signed this.**
Q But would it be a fair statement that it is likely that you would have been the person who would have had to sign off on this document prior to its final issuance?
MR. CRAWFORD: Objection to foundation.
A **Sam ran things administratively loser than I do. I don't know if I would have signed this or not. I mean, under my regime I would have to sign it. I don't know if I signed it, but I was a participant in it.**
Q You might have signed it?
A **I might have signed it. But I might not have.**
Q I would like to turn your attention to page -- you see page ten?
A **Yes.**
Q In connection with your participation in the preparation of this report, would you have reviewed and analyzed the content of this referenced



schedule for restructure program, Figure 1?
A **I would have been involved in it. So, yeah, I would have reviewed it probably, yes.**
Q And would you have been in agreement with its contents before this report was issued?
A **Organizationally I would have been. I'm not sure what my personal opinion was versus the organization's. I just don't recall. I don't recall I had a big disagreement or anything with it.**
Q So you believe that as an organizational matter you would have signed off on the contents of Figure 1, correct?
A **I would have supported it, yes.**
Q Let's just walk through -- first, can you explain to me what this Figure 1 represents?
A **In '89 we reviewed the program, where it was in light of the amendments act, in light of the MRS commission report, and basically restructured the program to a degree around the new repository date which now went to 2010 whereas before it had been 2003. We reviewed that and this was the new, the new revised adjusted program based on those events.**



**That's my recollection of what it was.**
Q How did the MRS commission report that we just reviewed affect your analysis with respect to your review of Figure 1 on page ten?
MR. CRAWFORD: Well, let me just -- I'll object to the foundation of that and to the form of the question about the statement made by counsel that we just reviewed the MRS commission report. I mean, you certainly asked the witness questions about it.
MR. CAYNE: I object to counsel's testimony and speaking objections. They're improper.
Q Could you please respond to the question, Mr. Barrett.
MR. CRAWFORD: I was speaking to you.
A **Repeat the question, please.**
Q Certainly. How did the report issued by the MRS commission affect your analysis of what appears in Exhibit 18 as Figure 1?
MR. CRAWFORD: Objection, foundation. Objection, vague.
A **What the primary premise in this Figure 1 is is a volunteer MRS that would have a proposal to**



**Congress which would change the linkages which would allow us to receive waste in 1998. It does not have in it the user-funded facility. It does not have in it the emergency facility that they recommended.**
Q You said it would have a proposal to Congress.
A **Right.**
Q A proposal to Congress would not be sufficient to allow the overall process referenced in Figure 1 to go forward, correct?
A **A proposal from a volunteer site where the proposer agreed to the linkages, where the linkages were invented to protect the MRS site would surely have been approved by Congress in my opinion. So if we had a volunteer site, I thought it would be very easy -- Congress would readily approve the change in the linkages if it was satisfactory to the volunteer.**
Q So you are confident that federal legislation would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting of an MRS facility on its property?

433

**A Did I use the word "confident"?**
Q That's my question, sir.
**A No, I'm asking you, did I use the word "confident"?**
Q I don't recall. My question is are you confident that federal legislation in fact would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting and operation of an MRS facility on its property?
**A I would say --**
MR. CRAWFORD: Objection, vague.
**A -- high probability of success. I would not use the word "confident."**
Q What do you base your conclusion that there would be a high probability of success? Let me ask this, have you ever participated in the legislative process?
**A Yes.**
Q By providing testimony to Congress?
**A Yes.**
Q And in 1987 did you -- you are aware in

434

1987 that there was an effort to obtain legislation that failed, correct? An effort to obtain legislation by the Department of Energy that failed when Congress imposed linkages that the Department of Energy did not like, correct?
**A Correct.**
Q But, nevertheless, you sitting here today are confident that if you went back to Congress for legislation to approve a volunteer that came along that was willing to allow the siting of an MRS repository, that Congress would enact and the President would sign into law legislation that would authorize that siting and operation in a form that you would find satisfactory?
MR. CRAWFORD: Objection. Vague.
**A I believe that would have a reasonably high chance of success, because the difference being between the two cases is the MRS was proposed to be in Tennessee, which was vigorously opposed by the State of Tennessee and its elected officials, whereas if we had a volunteer site, the premise is that they would not be opposing it because they wouldn't have**

435

**volunteered. So there would be a very different legislative outcome of the two cases.**
Q What states -- an Indian tribe could have been a volunteer, correct?
**A Correct.**
Q And would it have been just Indian tribes located in certain states?
**A No. It could be an Indian tribe federally recognized.**
Q Are you aware that there are Indian tribes today located in the State of Connecticut?
**A Yes.**
Q And are you aware that the Indian tribes in the State of Connecticut run gambling casinos?
MR. CRAWFORD: Objection. Relevance.
Q Are you aware of that?
**A Yes, I am.**
Q Well, let me ask you to assume that the Indian tribe in the State of Connecticut receives investment advice from its Wall Street bankers that you guys can make more money siting an MRS facility than competing with Donald Trump in Atlantic City. Do

436

you understand the situation I'm posing to you?
**A Yes.**
MR. CRAWFORD: I object to that.
Q And let me assume the Indian tribe came into your office and said, Mr. Barrett, we're here to volunteer. Let's get moving. We want to set up an MRS facility in our tribe location, which is within spitting distance of Stamford, Westport and Greenwich, Connecticut. But it's our land, our property and we think we would be doing good for the United States of America so we're ready to move. If you had a proposal like that, that would be the type of volunteer you're talking about, correct? The tribe would be volunteering to enter into an agreement with the United States to site and operate an MRS facility on its sovereign land in the State of Connecticut. That would constitute a volunteer under your hypothetical, correct?
**A No. You invented some totally hypothetical, incredible situation and I wouldn't consider that credible.**
Q I'm asking you if a tribe from the State of

calls for speculation.
A I believe they could have and would have.
Q And do you believe then that the political establishment, using your phraseology, of the State of New York, would also support the siting and operation of an MRS facility in the Adirondack Mountains in New York State?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A They may not have vigorously opposed it.
Q And on what do you base that testimony?
A Since you're asking me to speculate on these line of questions, it's my opinion based on working with organizations and political establishment.
Q Do you know who the senators were of the State of New York at the time of the proposals referenced in Exhibit 18?
A I don't know specifically, but it was Senator Moynihan I think and I forget the other one. I think a republican.
Q And do you believe that Senator Moynihan,



Senator D'Amato would have supported the establishment and operation of an MRS facility in the Adirondacks in 1989 or after?
MR. CRAWFORD: Objection. Speculation.
A I didn't use the word "support." I said not vigorously oppose. I don't think they would support it.
Q Do you think they would not vigorously oppose it?
A I think it would have been more difficult for them to oppose a sovereign Indian nation who volunteered to do a national service arrangement. I think it would have been a better situation certainly than was in Tennessee.
Q And why would it be better than Tennessee?
A Because you would have a sovereign Indian nation standing up and saying I would go along with this.
Q Have there been any sovereign Indian nations in Nevada or elsewhere that have offered or expressed interest in the siting of an MRS facility or a permanent repository?



A Yes.
Q And where did that occur?
A New Mexico, Oregon and Utah.
Q And were those -- have those proposals been advanced -- are those proposals still under consideration?
A No.
Q And why not?
A Because Congress didn't provide the funding in FY '94 to go forward and develop it.
Q And did the local politicians of each one of those states that you just referenced, New Mexico, Oregon and Utah, oppose the siting of an MRS or repository within their state borders?
A Not to my knowledge.
Q You don't think the state officials challenged it?
MR. CRAWFORD: Objection. Asked and answered.
A I don't recall them.
Q Why did Congress not provide funding?
A The -- I don't know who started it, but



clearly the Senate and House of Representatives canceled the funding before it got going.
Q What was the proposal before the Congress in 1994 that was not funded?
A The proposal was to provide grants to those three -- the tribes to develop proposals to Congress, and Congress did not provide that funding for us to be able to do that.
Q When did the process begin that led to the consideration of those proposals? Was it in '92 or '93?
A It started in, you know, earlier than that. Probably '89, '90. '89 I think.
Q Was there ever a time between '89 and '94 when Congress failed to provide the funding that you believed that those three proposals or one of those three proposals would likely be approved by the United States Congress?
A Say that again.
Q Did you ever believe that any of the three proposals involving the States of New Mexico, was it Utah, and Oregon would be approved by Congress?

A **If the process was allowed to proceed, yes, I had -- I believed it could happen.**
Q You believe what?
A **I believed it could happen, it could be approved.**
Q And you believed that firmly enough to invest a lot of personal energy and energy of your department and office in pursuing those possibilities, correct?
MR. CRAWFORD: Objection to the form of the question. Objection to the foundation.
Q Correct?
A **Yes. Yes, that was the only alternative I had under the act to be able to meet the '98 date, so I pursued it with all the energy I could.**
Q And you thought you had a reasonable possibility of success, correct?
A **Yes.**
Q And you thought wrong, didn't you?
A **History turned out that that wasn't the way it's going to be.**
Q It's not easy to get fair legislation, is



it?
MR. CRAWFORD: Objection to the vagueness of that.
A **That particular issue never even got to be considered. I think you're surmising that if the proposal had been laid before Congress what was going to happen and you're speculating on that. But I wouldn't speculate like you are.**
Q But what you saw is sometimes you can't even get your proposal before Congress?
A **That's correct. That was cut off before the proposal was ever given to them.**
Q Not only do you have to get Congress to approve your proposal, you have to get Congress to look at it. right?
A **Say that again.**
Q Let me ask you, on page ten of Exhibit 18, you see on the top column under program element, it goes out to 2010.
A **Yes.**
Q Does it go out to 2010 because that was the projected date of repository -- the first date of --



the projected date of repository operations?
A **Yes.**
Q What was the process that led to the extension of that date. the delay of that date out to 2010?
A **I don't remember the details as to what happened with the schedules, but it's my recollection that when you put together the site characterization plan implementation and the processes spelled under the act, and that it was going to take until 2010 to emplace fuel.**
Q Was there a formal process within the Department of Energy that was undertaken that led to the determination that this projection should be delayed to 2010?
A **There was a review done by the staff in the program that came up with the schedule you see on Figure 1.**
Q And who would have been involved. what offices would have been involved in that review?
A **Pretty much all the offices in the program.**
Q Who would have signed off on that



determination to delay the projected start date of the permanent repository?
A **You know, Mr. Ruosso, who I think was the acting director at the time; Mr. Peters, who was the deputy director. I was involved. I might have signed off on it. Then there were dozens of other staff people involved.**
Q Let me ask you to look, it's towards the middle of this document. 1997 it states "start construction 1/1/97." Do you see that?
A **Yes.**
Q You see that that refers, does it not. to the start -- what type of construction is that referring to? Construction of what?
A **That's the MRS facility.**
Q And how long does this Figure 1 indicate it would take for the completion of that facility from start to finish?
A **Construction?**
Q Yes. Construction and to be placed in a position that it would be ready to receive spent nuclear fuel.

461

Q And the premise that I put on it you understand to be that the law remained as it stood on February 5th -- federal law remained as it stood on February 5th, 1990, correct?
MR. CRAWFORD: Objection. Vague.
A **Under that premise what you say is true.**
Q What I say is that under that premise the MRS could not begin to accept spent nuclear fuel until approximately October 2006 according to your calculations, correct?
MR. CRAWFORD: Objection. Asked and answered.
A **With your assumptions, yes.**
Q The only -- when you say your assumptions, what are you referring to? Are you simply referring to the fact that -- strike that. What assumption are you referring to?
A **You make the statement there would be no change in the linkages. The premise that we had for January '98 was that there would be a change in the linkage which could accompany any year with the appropriations process, and it could be changed. In**

462

**that time period, in the 1990s and eighties it was very -- relatively simple to change statute regarding this program, because Bennett Johnston ran both authorized and appropriations committee and that's how he made the amendment in '87. And he could have done it like that.**
Q You're confident of that?
A **Confident? I believe that that was a very plausible scenario, and that's why we adopted that as an approach for the program.**
Q Was Senator Johnston able to push through the legislation desired by the Department of Energy in 1987?
A **No.**
Q He was unsuccessful that time around?
A **Correct. Because it wasn't done in appropriations.**
Q You believe that the congressmen, senators should have followed different legislative procedures in order to accomplish the goals of the Department of Energy at that time, correct?
A **No. There's a lot of flexibility for the**

463

**legislative branch to do what they wish to do.**
Q Let me ask you, back to Exhibit 19. You indicated that this projection was based on the premise that federal law would be amended, correct?
A **Correct.**
Q And specifically the linkages would be repealed or modified, correct?
A **Correct.**
Q If that assumption was being made, why was there not also a proposal to increase the statutory MTU limit of 10,000 to a higher figure such as 15,000 or greater?
A **I don't recall exactly why the program at the time chose to deal with the linkage and not with the mass limits.**
Q You have no knowledge of that issue?
A **Say your question again.**
Q I'm asking why -- let me step back. The projections and proposals referenced on Exhibit 19 assume the enactment of federal legislation, correct?
A **Correct.**
Q In light of the fact that your office was

464

assuming that the law was changed, why wasn't your office also assuming that that change in law would increase the MTU limit that I believe that the Department of Energy had initially opposed in 1987?
A **My -- I don't know if it's speculation, but my belief, okay, when this was discussed was that there had to be a balance in the eyes of the volunteer that they had some protections. We did not make it an issue to remove all elements like the metric tonnage limits as well as the time linkages, because the thing that was most important to us was that we start moving materials of reasonable quantity, of which 10,000 tons was a reasonable quantity, as soon as we could with '98. So we did not -- my recollection is we did not try to remove everything because it would have been harder to ever get a volunteer or to get it through the political process, that we chose to leave the linkages and not make the linkages a statutory initiative like we did the time linkages, because it was secondary and would have detracted our ability to ever get it approved by Congress as you asked earlier.**
**So in my mind, as I recall this, was we**

**chose not to try to force the tonnage, as we chose to really address the time linkage. Because it was a secondary -- of secondary importance relative to the time. So that is why we left the metric tonnage there. Although we initially never wanted the metric ton limits, they were a fact and they were law at that time, period. So we were trying to make the best of a bad statutory situation we found ourself in with the '87 amendment.**

Q Did the Department of Energy have a congressional lobbyist in 1990?

A **We don't have lobbyists.**

Q Do you have officials whose primary duty is dealing with the federal legislature?

A **We have an Office of Congressional Affairs.**

Q And who was that office run by in 1990?

A **I don't recall.**

Q Do you frequently deal with that office?

A **No.**

Q Did you deal with that office in 1990?

A **Probably.**

Q But maybe not?



A **I don't remember.**

Q Do you recall whether in 1990 you sought advice from that office on the likelihood of federal legislation being enacted to modify or amend the statutory linkages?

A **I don't remember the Office of Congressional Affairs really ever being in tune with much of this at all. This was done primarily with Secretary Watkins' office.**

Q But the Office of Congressional Affairs did deal with congressmen, senators on a daily basis, correct?

A **I don't know what they did.**

Q You don't know the function?

A **I know -- no, I don't.**

Q And I take it you never involved that office in discussions relating to efforts to cause Congress to consider the repeal or amendment of the linkages, correct?

MR. CRAWFORD: Objection. Foundation.

A **There were probably some congressional affairs staffers around at meetings.**



Q But you're not sure?

A **I'm not sure.**

Q And you don't recall ever having a conversation with the head of that office or any staffer relating to the likelihood of congressional legislation -- the likelihood that congressional legislation would be enacted to modify or repeal the statutory linkages, correct?

MR. CRAWFORD: Objection to the foundation. Objection to the form of the question.

Q Correct?

A **I don't recall any ones that I did. Sam Ruosso or Frank Peters, who were my superiors, might well but I didn't. That I recall. I know there were staffers around. I never recall having a meaningful discussion with somebody from that office who really knew anything.**

Q And don't recall ever having such a conversation in 1990 or any other time, correct?

MR. CRAWFORD: Objection to the form of the question. Objection to the foundation.

A **You're talking about 1990.**



Q Did you ever have a conversation with anyone from that office concerning the issue of congressional legislation to amend or repeal the linkages at any time, 1990 or at any time prior to or subsequent to 1990?

MR. CRAWFORD: Objection to the form and foundation.

A **Probably did in '93ish. But not in 1990. I don't recall any in 1990, '89 or 1990.**

Q Can you recall a specific discussion in '93ish?

MR. CRAWFORD: Objection to the form. Objection to the foundation.

Q Or do you just think you might have had such conversations?

A **No, I know in '93, '93 was different because I was now -- a change of time. I was acting director in '93. So I can't remember who it was but there was -- and I did have discussions with that office regarding all my testimony and dealing with stuff with Secretary O'Leary, so, yeah, I worked with that office but I don't remember like who was in**

469

charge or whatever.
Q In Exhibit 19 why was it planned that the MRS facility would be developed in two phases?
**A To --**
MR. CRAWFORD: Objection. Asked and answered.
**A To allow us to receive fuel as close to 1998 as we could.**
Q And how would the implementation of the MRS facility in two phases facilitate that goal?
**A By having a smaller --**
MR. CRAWFORD: Objection. Asked and answered.
**A The smaller the facility, the faster you could construct it.**
Q So specifically how was the two-phase supposed to work?
MR. CRAWFORD: Objection. Asked and answered.
**A You build the first phase that has a capacity of X and then you continue building through the next module, the next phases which has a capacity**

470

**of more than X, so that you ramp up in receipt rate.**
**(Deposition Exhibit Barrett 20 was marked for identification and was retained by counsel.)**
Q The court reporter has handed you, Mr. Barrett, a document marked for identification as Exhibit 20. It's a multipage document. At the very top the number appears 0001111 through 0001123. On the third page of this document, at the very bottom, there's a caption Memorandum to Jim Carlson from Tom Cotton, subject: Additional analysis related to the MRS. Do you have that document before you?
**A Yes.**
Q Do you know who Mr. Jim Carlson is?
**A Yes.**
Q Who is Jim Carlson?
**A He was the man in charge of the MRS organization.**
Q He did not report to you, did he? Or did he?
**A Sometimes he did; sometimes he didn't. I don't know if in '89 he reported to me or not.**
Q He might have?

471

**A He might have.**
Q Who is Mr. Tom Cotton?
**A He was a contractor that supported the program.**
Q Did you ever meet with or speak with Mr. Cotton concerning matters relating to the program?
**A At various times, yes.**
Q Let me ask you to look at page -- the third page of this document. At the top the number is 00001113. Do you see that?
**A Yes.**
Q Can you take a look, please read the eighth paragraph on this page.
**A Number eight?**
Q Yes.
**A Okay. I've read it.**
Q Would you have in 1989 agreed with the statement contained in paragraph eight?
MR. CRAWFORD: Objection, vague.
**A I don't know what an EDF scenario is, so I don't know.**
Q Do you understand the last sentence of

472

paragraph eight?
**A In a general sense.**
Q Can you give me, please, your general understanding of that statement.
**A Is the higher the receipt rate, the less the burden on the reactors for on-site storage. The lower the receipt rate, the higher the burden for reactors for on-site storage.**
Q Do you agree with the statement contained in the last sentence of paragraph eight?
**A Which statement?**
Q The entire, the entire statement. I'll read the statement in the record. I'm asking if you agree with the following statement: "The point is that unless the peak annual unloading rate in this scenario is very high (which would have interesting transportation and cost implications), there will be a substantial cost for the continued on-site storage after shutdown for many reactors."
**A No, I really don't.**
Q What don't you agree with?
**A I think it overstates the situation.**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, MAINE YANKEE ATOMIC POWER COMPANY, FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, a Division of DUKE ENERGY CORP, INDIANA MICHIGAN POWER COMPANY, SACRAMENTO MUNICIPAL UTILITY

Case Nos 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-695C, 00-703C, 01-115C, 01-116C, 01-249C

-----------------X

(Caption continued on the next page)

Continued Deposition of LAKE H BARRETT
Washington, D C
Friday, April 26, 2002
8 10 a m

Job No 11792-8
Pages 527 through 825, Volume 3
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X



Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC , POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT.

DEVON E HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT

HOWARD CAYNE, ESQUIRE
JEFFREY L HANDWERKER, ESQUIRE
RONALD A SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D C 20004-1206
(202) 942-5000

APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:
CHRISTOPHER P. TOMPKINS, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF DEFENDANT UNITED STATES:
KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D. C. 20530
(202) 307-1011



APPEARANCES CONTINUED

ON BEHALF OF DEFENDANT UNITED STATES:
HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D. C. 20530
(202) 307-0290



CONTENTS

| EXAMINATION OF LAKE H. BARRETT | PAGE |
|---|---|
| By Mr. Cayne | 535 |

EXHIBITS

(Attached to the Transcript)

| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 25 Memorandum dated 2/23/01 from L. Barrett to E. Fygi | 539 |
| 26 Handwritten diagram | 593 |
| 27 Statement of L. Barrett dated 4/25/02 | 599 |
| 28 Memorandum dated 1/25/93 from L. Barrett to the Secretary | 616 |
| 29 OCRWM planning for a no-MRS contingency | 628 |
| 30 Memorandum dated 4/6/93 to L. Barrett | 634 |
| 31 Letter dated 5/13/93 from L. Barrett to J. Cantlon | 678 |
| 32 DOE Office of Civilian Waste Management document | 679 |



EXHIBITS CONTINUED

(Attached to the Transcript)

| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 33 DOE instructions for completing Appendix C DCS | 697 |
| 34 Federal Register entry dated 5/25/94 re: Waste Acceptance Issues | 708 |
| 35 Predecisional Draft, Vol. 3, Waste Acceptance Storage and Transportation Project | 718 |
| 36 Civilian Radioactive Waste Management Program Plan, Vol. 1 | 736 |
| 37 Memorandum from R. Milner | 744 |
| 38 Draft 1994 Acceptance Priority Ranking and Annual Capacity Report | 753 |
| 39 Acceptance Priority Ranking and Annual Capacity Report issued 3/95 | 763 |
| 40 1992 Annual Capacity Report | 771 |
| 41 Congressional Act S 1287 | 815 |

**either diverge in the case of 3,000 or it would remain parallel in the case of 900.**
Q Was it the concern of your office that if the lines remained parallel your office would -- or the United States would become liable for all the utilities' future storage costs into the indefinite future?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
**A Please repeat that question.**
**(The record is read.)**
MR. CRAWFORD: Let me object to the foundation, too, but the other objection as well.
**A I didn't use the word "liability" and I don't know what that word means, but it was -- our concern was that this was an issue that was going to go through complicated national process in the courts and maybe other places, that it was dangerous ground and just don't go there. Regarding -- I never used the word "liability" that I recall or terms like that, which have potential legal meanings to them.**
Q Was it your concern that if the lines



remained parallel a court could enter or court would enter a damages judgment requiring the United States to reimburse the utilities for all future storage costs?
MR. CRAWFORD: Objection to the extent that that calls for a legal conclusion.
**A You're going into legal space where I didn't go and didn't go then and am not going now.**
Q I'm not asking for a legal judgment. You indicated to the senate staff that they were on dangerous ground, correct?
**A Right.**
Q And I simply want to know was the danger that you were concerned about the possibility that by the enactment of the statute which would result in the parallel lines that you have drawn might lead to a court judgment requiring the United States to reimburse utilities for their future storage costs?
MR. CRAWFORD: Objection only to the vagueness.
**A What's the question again in there?**
MR. CRAWFORD: And to the extent it calls



for speculation.
(Deposition Exhibit Barrett 26 was marked for identification and was retained by counsel.)
Q My question is when you used the term "dangerous ground" -- and I think you may have used different variations of that term in the context of this discussion -- did you use that term to alert the senate staffers to the possibility that the parallel lines reflected on your Exhibit 26 might lead a court to compel the United States to reimburse the utilities for their future storage costs?
MR. CRAWFORD: Objection, mischaracterization of prior testimony and vague.
**A That's far more specific than anything I would have said or thought.**
Q What would you have said or thought?
MR. CRAWFORD: Objection, asked and answered.
**A That there was very complex litigation under way or shortly to become under way and that where they were going with things in the statute could have -- could have possibly major considerations in**



**those things, and that they ought to have some understanding about how things like this may get used and interpretations of it and complicated settings and that they ought to be aware and careful about what they did.**
Q Well, you were concerned about what you referred to as the parallel lines, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony; and objection, foundation and vague.
**A Much more than parallel lines. It's the whole -- use that to illustrate to them only as an illustration that one needed to be careful about stating things that I think they called obligation rates could have repercussions far beyond what they ever thought, and that they ought to be very careful about statutes in this area.**
Q How did the parallel lines illustrate that?
**A The parallel -- the parallel lines, that one could make an argue -- one could argue in a complicated court setting under complicated contract laws that none of us in the room knew and understood,**

**at least I don't anyway, they may have -- that one could make arguments that if you never caught up with what you were supposed to do, that there might be substantial sums from some unknown source at risk, and a complicated legal world was there and they ought to just be careful. So the parallel lines were illustrative of be careful about what you do.**
Q Did you or your office ever have any conversations or communications with the Office of the President or any other office of the executive branch of the United States relating to acceptance schedules for spent nuclear fuel?
MR. CRAWFORD: Objection, asked and answered.
A **Not that I recall.**
Q At any time?
A **At any time.**
Q Was the senate staff concerned, in connection with the discussions on the Fitzgerald Amendment, did the senate staff express a concern that the amendment was necessary because the contract did not provide for a particular acceptance rate?



A **Not that I recall.**
Q Was there any discussion whatsoever concerning whether the contract included -- and during the discussions with senate staff, was there any discussion whether the contract provided for acceptance rates -- acceptance schedules?
A **Not that I recall.**
Q Was there any discussion of the contract in connection with the meetings with the senate staff relating to the Fitzgerald Amendment?
A **My recollection is only that there is a contract, it's being -- this is a matter of litigation. It's very complicated, substantial sums will be litigated, and be careful about what you do here as it relates to bills or statute that has to do with rates and such. So only to that degree do I recall the contract discussed.**
Q Do you know why the bill was introduced?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A **No.**
MR. CRAWFORD: Objection, vague and



foundation.
Q Did any member of the senate staff make any statement relating to the reason why the bill was introduced?
A **I don't recall.**
Q Were there ever any letters sent between you or any member of your staff and the senate staff relating to the Fitzgerald Amendment?
A **I don't recall any.**
Q How did you find out about the Fitzgerald Amendment?
A **I don't remember. I think somebody showed it to me. There were lots of amendments. Somebody showed me an amendment and someone said, Hey, we have a meeting on the Hill people want to know about. Does this mean anything? Do we have any opinion on it? We saw -- I remember seeing, you know, it went into, you know, this area that was a very sensitive area, and we ended up having a meeting to explain to them --**
MR CRAWFORD. Objection to the extent that you're going to -- if any of these meetings occurred in the presence of counsel or at the instruction of



counsel, I instruct you not to testify about the communication.
A **That's my answer.**
Q Who set up the meeting with the senate staff?
A **I think they did. I don't recall. I don't know who set up the meeting. This is two, three years ago.**
Q Do you think it was somebody on your staff?
A **I don't know.**
Q How long did the meeting last?
A **Don't know.**
Q Have you ever had any meetings, conversations, communications with any Senate or House staffers relating to the Upton Bill, U-p-t-o-n?
A **I don't know what the Upton -- what you mean by the Upton Bill.**
Q You never heard that term?
A **There's multiple Upton -- there are multiple bills that Congressman Upton was involved in, and I don't know which one you mean because I...**
Q Do you know whether there are any bills

615

Q What were you referring to when you used that term?
MR. CRAWFORD: Objection, vague.
**A I don't know how much flexibility the Department of Energy has under its authorized or not authorized and all those kind of issues, so I guess I don't know. I probably shouldn't have used it. I don't know what it means.**
Q What did you mean when you said it a couple of moment ago?
MR. CRAWFORD: Objection. Asked and answered.
**A I don't know. It's inappropriate. I shouldn't have said it.**
Q We can save time if you can reflect back or else we'll go back in the transcript and I can read it to you and maybe that will refresh your recollection, but you meant something when you used the phrase.
**A Can I go back?**
**(The record is read.)**
**A I spoke in error in that. What I meant is that if it is designated, you know, material that**

616

**would be considered authorized under the Nuclear Waste Policy Act, there are a lot of policy issues that would have to be worked out regarding contracts, payments, etc., etc., etc. Those are the policy matters that are complicated in the subject of greater than Class C.**
MR. CAYNE: Let's take a short break.
(There is a recess from the record.)
(Deposition Exhibit Barrett 28 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 28. It's a memorandum dated January 25th, 1993, from Lake Barrett to the Secretary. It begins at Bates HQR-064-3925 and extends through HQR-064-3930. Do you have the document before you?
**A I do.**
Q For what purpose did you prepare this memorandum for the Secretary of the Department of Energy?
MR. CRAWFORD: Objection, best evidence.
**A I don't think I ever did. I don't recall**

617

**ever doing it.**
Q Did a member of your staff prepare this document?
**A Probably.**
Q Do you believe you would have at some point read this document?
**A If it ever was to go out I would have. It says "Preliminary draft." I don't recall ever being a final one of these. There may have been, but I don't know.**
Q I'll represent to you, sir, and we'll get to it later --
**A Okay.**
Q -- if it refreshes your recollection, but the document did go out in final.
**A So I signed it?**
Q This is a preliminary draft.
**A Did I sign a successor to this?**
Q Yes. It has your name on it. I don't recall if it has your signature.
**A Okay, that's helpful. This one, though, doesn't have my signature on it.**

618

Q Right. This one says "draft."
**A So this is a forerunner of what we're going to get to?**
Q Yes, sir.
**A Okay. Go ahead. I don't remember this one but go ahead.**
Q For what purpose -- next to "transmittal" it states "implementation plan for acceptance of civilian spent nuclear fuel by the federal government." Do you see that?
**A Yes.**
Q What does that refer to, the implementation plan?
**A On January -- I was appointed the director two weeks before this or three weeks before this. We had an incoming new secretary. It was the Clinton administration's first weeks. President Clinton was sworn in five days before the date on this. I was preparing a summary for incoming Secretary O'Leary and her staff as to what my intentions were and what my plans were to implement the program.**
Q Do you see in the first paragraph next to

Discussion it states that "The department is committed to providing timely and adequate waste acceptance of spent nuclear fuel into the civilian radioactive waste management system"? Do you see that?
A Yes.
Q What was the meaning of the term or what did you mean by the term "timely and adequate"?
**A We were committed to implement the act to the best of our ability to start receiving fuel in January 1998, and this was a description of the actions that we were taking to do exactly that.**
Q The next couple of sentences refer to a letter to Senator Bennett Johnston. Do you see that?
**A Yes.**
Q Do you recall if that was the letter we discussed at the conclusion of Tuesday's session of this deposition?
MR. CRAWFORD: Objection, vague.
**A I believe so.**
Q And you can refer to the exhibits to refresh your recollection.
**A There were two Watkins letters. I assume**



**this is it. I don't know.**
Q When you say there were "two Watkins letters," another Watkins letter that we did not discuss in the deposition?
**A I think there was two, but I don't know which one we did here. One was on a repository -- my recollection is one was on a repository and one was on storage. Is this the one, if I dig back in the pile, I'll find --**
Q Take a look and see.
MR. HANDWERKER: I think it's 24.
**A What is it, 24? Yes. December 17th, yes.**
Q So Exhibit 28 refers to Exhibit 24, correct?
**A Yes.**
Q What did you mean by the term "delink" in the next paragraph, last line?
**A First of all, I didn't mean anything by this because I didn't write this. I didn't sign this. If you want to talk about what I signed, we can do that.**
Q Do you understand the meaning of the term



"delink"?
**A Well, that we can do, but you asked what I meant when I wrote this, and I didn't write this. What's the question?**
Q What's the meaning of the term "delink"?
**A Delink would be to change the linkage that required the -- you couldn't start construction until the repository construction authorization is to change that linkage, not to change other linkages such as the 10,000 tons, etc. That was a premise or an assumption that we were operating on, that we could delink the timing part, but we would probably not be successful legislatively to eliminate all the linkages. So that's what was meant -- that's what I believe the author here was saying when they would delink the schedule constraints, not to delink the capacity.**
Q Turn to the second page of this exhibit. Are you there?
MR. CRAWFORD: Give him a second now.
**A I'm there.**
Q Under Problem, the first sentence refers to "the possibility of failing to begin." Do you see



that?
**A Yes.**
Q At this point in 1993 how likely did the department consider it that it would be unable to begin acceptance of spent fuel in 1998?
**A For myself at this time I looked on this as what we were going to do and try to do, not dwell on what we couldn't do. So it was our goal to achieve this, and we worked as hard as we possibly could within the law to achieve this goal.**
Q But you knew there were substantial difficulties at this time, correct?
**A Yes, we did.**
Q And you didn't minimize those difficulties, did you?
MR. CRAWFORD: Objection, vague. Objection, leading.
**A I don't believe we minimized them, no.**
Q This paragraph further states "Thus, if the negotiator cannot site the monitored retrievable storage facility, the department cannot build such a facility and, consequently, it is not liable to accept

631

things were in dialogue with public utility commissions about escrowing the fee, which is I would say comparable to "terminating the waste fee." I've never seen the words "terminate the waste fee." I've seen discussions of escrow, which is probably close.
Q With what public utility commissions did you discuss waste fee issues?
A They would have been meetings before -- they were not formal public utility commission proceedings. They were meetings with the national -- committees of the NARUC, national association of regulatory something or other commissioners. I know the State of Virginia had a proceeding. I think one of them in the Midwest had a proceeding. And somebody else probably had a proceeding of which they had wishy-washy conclusions that didn't say anything. They never did it. So there were discussions in various NARUC meetings of which I was in attendance regarding that. That was in the mid-nineties.
Q You did attend the meetings?
MR. CRAWFORD: Objection. Relevance.
A Yes.

632

Q Did you make any statements in the meetings?
A Probably.
MR. CRAWFORD: Objection. relevance. Move along to something that's relevant.
Q What would you have testified to in those meetings?
A You won't have to decide what you're going to do regarding escrowing the fees. They would always ask me, How does the federal budgeting system work? I explained to them, you know, treasury receives and the Congress disburses, and tried to explain to them the big picture and said, you know, we took -- I took no position one way or the other if they should or shouldn't escrow the fees. What they always were asking -- what their intention was was performance, and so we always talked about performance and how we were trying to do the best we could do to perform to do this job. And there would be dialogue about would escrowing help or hurt. And, you know, those kind of discussions.
Q Could you please turn to page six. Under

633

Rationale, the first entry is "There is no simple compelling case for the need for an MRS." Do you see that statement?
A Yes.
Q Do you agree with the statement of rationale set forth on page six?
MR. CRAWFORD: Objection to the foundation. Objection. vague. Objection -- that's it.
A You're asking do I agree with this statement, the sentence, right, just read that sentence, not in context with this document, this sentence?
Q Do you agree that there was no simple compelling case for the need for an MRS?
A Yes. Not in the context of anything on this page, but that statement I agree with.
Q And why do you agree with that statement?
A Because --
MR. CRAWFORD: Objection, overbroad.
A We proposed an MRS to Congress in 1986 or whenever it was. There was a great debate. It was rejected at that -- the linkages were established --

634

it was authorized, but linkages were established which effectively negated the authorization. There was an MRS commission that was established. It gave a report that didn't conclude much of anything. So clearly in the early -- as a national policy matter there was never a clear-cut, simple, compelling case why this nation needed an MRS. We always pushed to try to do the MRS because it was important to implement the act, but the Congress and the nation didn't see it that way.
(Deposition Exhibit Barrett 30 was marked for identification and was retained by counsel.)
Q The court reporter has handed you a document marked for identification as Exhibit 30. It's a memorandum to Lake H. Barrett dated April 6, 1993. subject: Guidance for site characterization plan at Yucca Mountain. bearing Bates HQR-036-1161 through 1163.
Do you have this document before you?
A Yes.
Q Do you recall this document? And take a moment to review it.

683

acceptance schedules with the board?
A **Not that I recall. That's not an issue with the board very often.**
Q Is it possible that you ever discussed acceptance issues with the board?
A **It's possible.**
Q Does the board take certain action based on your presentation?
MR. CRAWFORD: Objection, vague. Objection, foundation.
A **They write reports to Congress and the Secretary at least once a year based on all that they review.**
Q Will you turn to page Bates number on the bottom right corner 1812. Are you there?
A **Yes.**
Q Under Program Goal the first entry is "Objectives of the Nuclear Waste Policy Act of 1982 have not been achieved as authors envisioned." By the way, let me ask you, when you use this document, Exhibit 32, in your presentation, is it your practice to use it as a handout or did you use it through

684

overhead projection?
A **Both.**
Q Both. And was it used to guide your discussion? You would shoot up the picture of program goals and you would go down through them and cover each program goal?
A **Generally.**
Q When you made this presentation on November 1st and 2nd, 1993, and shot up the picture of program goals and with a first entry "Objectives have not been achieved," what would you have said in your discussion concerning that topic?
MR. CRAWFORD: Objection, vague.
A **I don't remember from 12 years ago. They have a transcript. You can go read it. There was a transcript. You can read it.**
Q Do you know whether that transcript has been produced in the discovery in this case?
A **I have no idea. It's a technical review board document, it's not mine. It's not the department's.**
Q When you give presentations such as this,

685

do you use speaker's notes?
A **No. I personally do not.**
Q You just speak from memory?
A **Yes.**
Q Let's go back to the time period of 1993. What objectives in November 1993 had not been met that the authors of the act had envisioned that you might have pointed out to the board at that time?
A **I don't remember.**
Q You can't think of a single objective of the Nuclear Waste Policy Act that had not yet been met in November 1993?
MR. CRAWFORD: Objection. Mischaracterizes prior testimony.
A **There were many things in the act, the environmental assessments in the eighties, the three sites to five -- you know the '87 amendment. A whole lot of things have changed, so I don't know what ones I would have referred to here.**
Q Let's go through each of the objectives that in 1993 -- that you can't recall which ones you mentioned. Let's go through each one that would not

686

have been achieved as of November 1993. Why don't we go through them one at a time.
A **I don't remember them.**
Q You can't remember --
A **No.**
Q -- any topics?
A **I don't remember from 1993 what I orally said that went with that bullet.**
Q But I'm asking in 1993, whether or not you made a presentation on this point, what objectives had not been met?
A **I don't remember what they were that I said back in 1993.**
Q Putting aside this document, as you sit here today to the best of your recollection what program goals had not been achieved as of November 1993?
A **Things were behind schedule. The environmental assessments took longer. All of those issues, the site characterization plan took a whole lot longer because drafts were issued and the final was issued. The '87 amendments act totally changed.**

687

**The balance between the first repository and second repository. The MRS was, you know, had the linkages established. Those are things I might have said.**
Q What other things?
A **I don't know what else. I don't know if I said anything about the negotiator or not. Could have been at that time. I don't know if the '94 budget had been -- if this presentation was before or after a congressional decision to not grant the volunteer proposal.**
Q If it was after, what would you have said?
MR. CRAWFORD: Let me object to the overbroad scope of this inquiry. I mean, it seems unfair of you to -- he said he can't recall what he did or what he said, and he's mentioned some things, and I'll object.
Q If that occurred afterwards, what would you have said?
A **What's the time frame you're asking?**
Q November 1993.
A **No, what -- please restate the question.**
**(The record is read.)**

688

A **I would have probably been very circumspect if it had been right after as to what the MRS schedule would be. I would have probably avoided any reference to the '98 date. Maybe I did. I don't know. Without looking back through here, what's in the following pages, I don't know.**
Q Why would you have been circumspect?
A **Because it was a surprise to me that the Congress, you know, in conference committee revoked our ability to provide for the grants for the Indian proposals for an MRS. So this may have been -- I may not, since we hadn't sorted that out, I may not have -- I would have tried to avoid any dialogue on the '98 date if I could have.**
Q The next program goal listed on this page is "Little satisfaction with process." Do you see that?
A **Yes.**
Q To what would you have been referring with that statement?
A **Most of the parties, be it the State of Nevada, be it the antinuclear people, be it the**

689

**nuclear utilities, were happy with the program.**
Q Was your office happy with the program?
A **We were struggling to do the best we could under extremely difficult constraints.**
Q And who imposed those extremely difficult constraints?
A **Congress of the United States basically.**
Q Let's turn to the next page, Bates 1813, Program Priorities. Do you see that?
A **Yes.**
Q The third entry, "Eliminate program support activities." Do you see that?
A **Yes.**
Q To what does that refer?
A **I don't remember.**
Q No idea at all?
A **I can speculate that it probably was we're going to try to reduce costs in nonline activities and focus available resources on to determine if the mountain was suitable and develop the MPCs, which were the two primary program goals, as you see above it.**
Q What do you mean by "nonline activities"?

690

A **Administrative overhead functions.**
Q The last entry, "Support Secretary's goal to stakeholder involvement." What does that refer to?
A **Secretary's direction to involve stakeholders, external parties, more in the program.**
Q And would those be parties including the what you referred to this morning as the Greens and the antinuclear forces?
MR. CRAWFORD: Objection, asked and answered.
A **As well as the states and the counties and the public utility commissions and the utilities and everybody else.**
Q I refer your attention to the next page, Bates 1814. The first entry is "System point of view is key to priorities, strategies, and decisions." What does that statement mean?
A **You need to look at the whole program from a systematic point of view that -- everything together to evaluate the priorities and the best strategies and try to make the best national decisions.**
Q Well, in the time period 1993 how would you

need to find out if you have an understanding of what's in this document, sir.
This morning you testified that DCS stood for delivery commitment schedule. Do you recall that?
A **Yes.**
Q What, without looking at the document, are you able to tell me is the purpose of a DCS?
A **I believe they were something to do with the planning for the receipt of material into our system in the future, ten years or something in the future. And it related to the contract.**
Q Why did you view it as administrivia?
A **Because I did not consider it pertinent to the primary business, which was to determine if the repository site was suitable so we can get on to build the facility to be able to receive it.**
Q What consideration did you personally give to the data produced by a DCS?
A **What?**
Q What consideration did you give to the data produced on a DCS?
MR. CRAWFORD: Objection, vague.



Objection, foundation.
Q Did you give any?
A **What consideration -- repeat the question again.**
Q A DCS form contains certain data, correct?
A **I really don't know if it has data in it or not.**
Q Let me ask you to look at item number two on the first page, "Who should submit." Do you see that item?
A **Yes.**
Q Why does that item provide that the DCS should be submitted by all purchasers with allocations in the '91 annual capacity report?
MR. CRAWFORD: Objection, foundation, vague.
A **I don't know.**
Q Do you know why the '91 annual capacity report was a report that was chosen?
MR. CRAWFORD: Objection, foundation.
A **No.**
Q Could a nuclear utility that submits a DCS



or submitted a DCS request an allocation amount that was different than the amount specified in the 1991 annual capacity report?
MR. CRAWFORD: Objection, assumes facts not in evidence. Objection, foundation.
A **I don't know.**
Q Let's turn to page two. Can you read, take a look at entry 7C.
A **Okay. I've read it.**
Q Now, you see that it states that the DCS -- do you know what FWMS stands for? Is that federal waste management system?
A **I think so.**
MR. CRAWFORD: Objection, best evidence.
Q You see the statement that "The process described herein assumes that the federal waste management system will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the ACR"?
A **I see that.**
Q Based on your testimony earlier today, as of what date in your opinion would that have been an



unreasonable assumption that spent fuel acceptance would be beginning in 1998? Did you indicate earlier today that that projection became unreasonable sometime in mid to late 1993?
MR. CRAWFORD: Objection. Mischaracterizes his prior testimony.
A **In late '93 it became, you know, in my mind unlikely to happen.**
Q Do you know why this instruction form for completing DCSs contains that assumption?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A **No.**
Q Do you know what the relevance of that assumption was in connection with the DCS process?
MR. CRAWFORD: Objection, foundation, vague, and objection to the extent it calls for any kind of a legal conclusion.
Q Let me strike that question and ask you to -- subparagraph C, it says "In the event that such circumstances change" -- referring to the assumption that you and I just discussed, Mr. Barrett. Do you

715

**the contract holders for some equitable arrangement regarding our inability to have a facility capable to move the fuel. So that offer to work out some sort of arrangement was there for many years.**
Q Turn to page six. Under Interim Storage Issues, do you see that?
A **Yes.**
Q There's an entry "What role, if any, should the department play in the development of private interim storage facilities." Can you describe for me the department's deliberations on that point?
A **I don't remember deliberations about that question in this thing.**
Q Was there any consideration of that proposal after this release went out for comment?
A **Not that I recall. We must have said something about it in the final.**
Q But you don't recall any internal discussions about that point?
A **No.**
Q Why is there the reference to, further down, "should the department pursue" -- why was the

716

suggestion that the department should pursue with Congress the elimination of existing restrictions on MRS site construction and operations? Had you not already pursued that with Congress at this point?
MR. CRAWFORD: Objection, vague.
A **I don't remember why that's there.**
Q This is basically what Congress had already shot down, correct? When the grants were denied.
A **Well, they stopped the volunteer process for purposes of putting grants in. Doesn't mean you still couldn't try to do it, and at this time -- this is circa '94 -- I think they were starting -- there was discussions starting about interim storage.**
Q Well, at the time on May 25th, 1994, when this notice of intent went out, was there any question in your mind, Mr. Barrett, that for all practical purposes the MRS proposal was dead?
MR. CRAWFORD: Objection, mischaracterizes prior testimony.
A **No, I wouldn't say it was dead. I didn't use that word, "dead." I said it was unlikely. It wasn't dead.**

717

Q Was part of your program plan waste management system at that time an MRS facility?
A **I'm not sure of the timing, but we basically shifted from site-specific MRS to generic, and so we submitted a topical report to the Nuclear Regulatory Commission so that if a site could be developed through some process, you could expedite the licensing much faster and ran on line as quickly as possible close to 1998. And that's why we did that, spent money on that topical report. So hopefully there could have been maybe a breakthrough with a volunteer who didn't need grant money or some other arrangement through some other designating process that I don't know what it would have been, but could have been.**
Q But at this point you did not expect it to happen, correct?
A **It was less likely than it was likely.**
MR. CRAWFORD: Objection.
Q Excuse me?
A **It was less likely than it was likely.**
Q It was a lot less likely than it was likely

718

at this point, wasn't it, Mr. Barrett?
MR. CRAWFORD: Objection, asked and answered.
A **I don't know what "a lot" is, but I said it was unlikely.**
Q We're saying it was unlikely that an MRS facility would be operational, be pursued and made operational, correct?
MR. CRAWFORD: Objection, vague. Objection --
A **It was unlikely is what I said.**
Q Was it part of your program plan waste management system at this time in mid-1994?
MR. CRAWFORD: Objection to form.
A **I think the MRS was still there. We didn't take it out.**
**(Deposition Exhibit Barrett 35 was marked for identification and was retained by counsel.)**
Q The court reporter has handed you a document marked for identification as Exhibit 35. It is a predecisional draft, Volume 3 of the Waste Acceptance Storage and Transportation Project

739

**readiness for earlier transportation should a site for federal interim storage become available sooner than a repository." I believe that's the only part in here on the MRS.**
Q You believe that's the only reference in this document to an MRS?
**A My quick scan here, my recollection was I don't remember anything else. Somebody else may have read it closely.**
Q Turn your attention to page one, Bates 174286.
**A I'm sorry, page one?**
Q Page one on the bottom, paragraph one.
**A Okay.**
Q On the end of the introduction section it states that "By 1993 it became clear that continuation of the program in accordance with the then-current approach was no longer a viable option." Do you see that?
**A Yes.**
MR. CRAWFORD: Where is that?
MR. CAYNE: Last sentence of the

740

introduction.
**A Yes, I see it.**
Q What was the then-current approach that's being referred to in that statement?
**A That was the volunteer MRS that would -- had a reasonable chance of success for 1998. That was no longer a viable option.**
Q So that was no longer a viable option?
**A I would have used the word "unlikely," but it's certainly not the central premise for waste acceptance anymore.**
Q The department used the word "viable," correct?
**A That's what it says.**
Q And you would have seen this document before it was issued, correct?
**A Yes.**
Q And I assume you were in the chain of command that had to approve this document?
**A I was responsible, I'm sure. I don't know if I ever signed it off or not.**
Q You would have been satisfied with the

741

language of this document, correct, before it became final?
**A Yes.**
MR. CRAWFORD: Objection, asked and answered. Argumentative.
**A I would have accepted those words there.**
Q The words being "no longer a viable option," correct?
MR. CRAWFORD: Objection, asked and answered. Argumentative.
Q Correct?
MR. CRAWFORD: Objection, asked and answered, argumentative.
**A Correct.**
Q Page four, please, bottom of page four. The first sentence. "When the Nuclear Waste Policy Act was enacted, it was envisioned that the department would have had a facility available in 1998 to accept waste for disposal, and the department entered into contracts with utilities on that basis." Do you see that?
**A Yes.**

742

Q What does that mean, that the department entered into contracts with utilities on the basis that it would have a facility available in '98 to accept waste for disposal?
MR. CRAWFORD: Objection to the extent it calls for speculation.
**A Just what it says.**
Q Do you understand what that means?
**A The act says we should have a contract within the time frame, and they put those contracts together under the limited time there in '83, '84. The base operating premise was it would have a facility ready to accept in 1998.**
Q The time the contract was signed or contracts were signed in 1983, that is what the government and the nuclear utilities intended?
MR. CRAWFORD: Objection --
Q Correct?
MR. CRAWFORD: -- to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.
**A I wasn't there. I wasn't involved in a**

743

program then, so I don't know what they envisioned.
Q But is that your understanding?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.
A Yes.
Q Page nine, please. Under Waste Acceptance Storage and Transportation Approach, towards the bottom of the page it says, The main aspects of the approach for waste acceptance storage and transportation are to" -- and it gives then six separate entries on pages nine and ten. Do you see that?
A Yes.
Q And specifically on the top of page ten, the first line it says "Because more detailed work would not be useful until a specific site has been selected, no development work is included in the current plan." Do you see that?
A Yes.
Q Is that referring to an MRS facility?
A Site-specific MRS facility is what that

744

refers to.
Q And again by "site-specific MRS facility," specifically what are you referring to?
A The actual siting of a facility. If we did generic work was the previous sentence. We did generic work for a generic facility. It could be sited anywhere. So if a site develops through some political process, we would be able to quickly build such a facility to receive fuel as quickly as possible.
Q And at this time the department did not think that to be a viable option, correct?
MR. CRAWFORD: Objection. Best evidence.
A There was a low probability.
Q Low probability did you say?
A Yes.
Q And, in fact, such a specific site never did become available through today?
A Correct.
(Deposition Exhibit Barrett 37 was marked for identification and was retained by counsel.)
Q Exhibit 36, under Fiscal -- on page 14,

745

under Fiscal Year 2000 it states that "The site recommendation will be submitted in a report to the President in 2000." Correct?
MR. CRAWFORD: Objection, vague.
A Yes, it says that.
Q And the page before to which that refers, the caption of that page is Major Milestones for Program Success. Do you see that, page 13?
A I see the chart.
Q So according to this chart, the recommendation, the site recommendation to the President was one of the major milestones for program success, correct?
A Yes.
Q And that milestone, in fact, has occurred two years later than planned for in the radioactive management program plan set forth in Exhibit 36, correct?
A Close.
Q What's close? It occurred two years after the date, correct?
A Including FY '02, but depending on when in

746

the year, a little less than two years.
Q Is it fair to say that as of now the program is at least a little less than two years behind schedule, as reflected by the major milestones for program success?
A As defined back in '94, yes.
Q The court reporter has handed you a document marked for identification as Exhibit 37. It is a memorandum, Subject: Total life cycle cost 1995 assumptions package from Ronald A. Milner, Director, Office of Program Management and Integration, bearing Bates HQR-057-1493 through HQR-057-1569. Do you have that document before you?
A Yes.
Q Could you please turn to page Bates number 14 -- oh, this is -- it says RW-30 in the top left corner. Do you see that?
A Yes.
Q Could you please refer to Bates 057-1498. First, what would your involvement in this, in the preparation or review of this document have been?
A I would have signed off on a final total

**A What's the question again?**
Q What was the status of a volunteer MRS facility that would have required the enactment of affirmative congressional legislation modifying certain linkages, what was the status of such a facility in 1995?
MR. CRAWFORD: Same objection.
**A Unlikely.**
Q And weren't there answers that you even gave stronger than unlikely? Do you recall that, sir?
**A Unlikely or --**
MR. CRAWFORD: Objection, argumentative.
Q Unlikely or what?
**A Unlikely is what I said.**
Q Okay. What did the department say in the plan that we looked at before? Did it use the words "not viable"?
**A It did.**
MR. CRAWFORD: Objection.
Q And you said you would have approved that document, didn't you?
MR. CRAWFORD: Objection --



Q Didn't you?
MR. CRAWFORD: -- argumentative.
**A I said I might have. I would not have objected to those words.**
Q But you were comfortable with them, right?
MR. CRAWFORD: Objection, argumentative.
**A I could support those words.**
Q Okay. So by early 1995 an MRS facility was either not likely or, in the words of the department, not viable, correct?
**A Correct.**
Q If an MRS facility is not viable in early 1995, tell me, based on your understanding of the capacity limits, which I know you understand, what is the relevance of capacity limits as set forth in the first sentence of page four of Exhibit 39?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
Q And take as much time as you need, sir, to study the document.
**A Just rephrase it. Now I'm in 39. What sentence?**



Q The first sentence I'll read into the record. "The project nominal acceptance rates also reflect the capacity limit imposed by the act in such a storage facility prior to repository operations."
**A That sentence is consistent with the table there, Table 1, and it describes what Table 1 is.**
Q Thank you. What is the relevance of Table 1 in early 1995 when the department has publicly taken the position in a document that Lake Barrett has signed off on that states an MRS facility is not viable?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
**A I didn't say I signed that document, by the way.**
Q But you were comfortable with it. Do you recall that, sir?
**A I would support that.**
MR. CRAWFORD: Objection, argumentative.
Q Thank you, sir.
What is the relevance of the table on page four of Exhibit 39?



**A I don't know what the relevance of that is.**
Q Does it have any relevance to projected acceptance rates as of early 1995 when the MRS no longer is viable, according to the Department of Energy, in official agency promulgations and publications?
MR. CRAWFORD: Objection, vague. Objection to the extent it calls for a legal conclusion.
**A I don't have an opinion nor a feeling nor -- I just don't have any position regarding what this would be in a thing called an ACR or DCS that were very low priority. This was administrational activities regarding, you know, this, and I did not personally get involved in that. So the appropriateness or inappropriateness one would have of a table of a list that wasn't central to what the highest priority items were, I personally did not get involved in. So I really don't know if it is or isn't or -- your question, try it again.**
Q For your purposes did you consider the projected nominal waste acceptance rates set forth in Table 1 on page four to be relevant?

783

MR. CRAWFORD: Objection, best evidence. Objection to the extent it calls for a legal conclusion. Objection, asked and answered.

**A This is relative to -- relevant to what? They were relevant to the -- they were created, and their genesis was with the MRS limitations. They were relevant to that. When the system changed and the MRS became unlikely, I have no opinion nor idea about the relevance of these tables in any of these subsidiary documents. I never got involved in them, and I don't have an opinion one way or the other.**

Q But sitting here now looking at this document with everything you know as a director and deputy director of the Office of Civilian Waste Management over the last decade, can you perceive any relevance of the acceptance rate set forth in Table 1?

MR. CRAWFORD: Objection, vague. Same objections.

**A I have no opinion nor ideas regarding the relevance or irrelevance of this in any of these documents at all. Because they are not central to the primary focus that I've had and still have of trying**

784

**to perform and build a facility.**

Q Let me ask it this way: What relevance, if any -- and let's go outside the context of this exhibit, this ACR. What relevance, if any, do projected nominal waste acceptance rates as reflected in Table 1 have in an environment where the department has concluded that an MRS facility such as the volunteer facility we have discussed is not viable?

MR. CRAWFORD: Same objections as before. It's the same question.

**A None of these projected nominal waste acceptance rates in any of these subsidiary documents have any relevance at all on anything as far as I'm concerned, because my focus is on building a facility that can receive the material, and we want to have that facility perform as best as it reasonably can, and we're focused on doing exactly that. These -- such things as this, relevance or nonrelevance of this or that is not on my radar screen. It's not a priority for me.**

Q Do you recall we spoke this morning about meetings you had with senate staffers concerning the

785

Fitzgerald Amendment?

**A Yes.**

Q Did you use the projected nominal waste acceptance rates set forth in Table 1 during those meetings?

MR. CRAWFORD: Objection. Asked and answered.

**A Yes.**

Q For what purpose?

**A That these to show -- the question was -- from them was does this make any difference if we put in numbers or not regarding this obligation rate. And we used that as an example to show them, yes, it does make a difference because for exactly the things we're doing here today, that this will become important if litigation and all of this continues on like it is. People argue over this, and be careful if you go there.**

Q But the projections in Table 1 you testified related to an environment where there would be a volunteer MRS facility, correct?

**A That's how they were originally generated.**

786

Q In 1999 or 2000 when you had the meeting with the senate staffers, there no longer was a viable hope of a volunteer MRS facility, correct?

**A Correct.**

Q So why did you use these projected nominal waste acceptance rates from the MRS environment at least five or six years after the department determined that the MRS alternative and the volunteer MRS alternative was not viable?

MR. CRAWFORD: Objection. Asked and answered. Objection, vague. Objection to the extent it calls for a legal conclusion.

**A As illustrative that when they used the words "obligation rates" or "obligations" in statute, this was a complex matter for American society to work out. That's exactly what happened. It was used to caution them, if you go doing this be careful what you do. Okay, because it will be -- it will -- potentially could be involved in defining contracts and contract issues, which is exactly what it is.**

Q But you did not believe at that time that the projections reflected in Table 1 any longer

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY, Case Nos 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY, MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY, FLORIDA POWER & . 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES · 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a . 98-621C, 99-447C,
Division of DUKE ENERGY CORP , . 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4
Washington, D C.
Wednesday, May 8, 2002
9 31 a m

Job No . 11792-10
Pages 826 through 1103
Reported by Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X



Deposition of LAKE H. BARRETT, VOLUME 4, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC , POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT·
ALEX D TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT·
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C 20004-1206
(202) 942-5000

830

APPEARANCES CONTINUED
ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL
UTILITY DISTRICT.
TIMOTHY R MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING
COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER
COMPANY:
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D C 20004-1206
(202) 942-5000

831

APPEARANCES CONTINUED
ON BEHALF OF PLAINTIFF COMMONWEALTH
EDISON COMPANY:
CHRISTOPHER P. TOMPKINS, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF DEFENDANT UNITED STATES:
HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 307-0290

ALSO PRESENT:
Kimberly Longford, Arnold & Porter

832

CONTENTS

EXAMINATION OF LAKE H. BARRETT PAGE
By Mr. Cayne 834

EXHIBITS
(Retained by Counsel)

BARRETT DEPOSITION EXHIBIT PAGE
42 "Civilian Radioactive Waste Management System Alternatives to the Office of Management and Budget" dated 12/22/97 836
43 "Civilian Radioactive Waste Management System Approach to the Office of Management and Budget" dated 3/19/98 856
44 "Parametrics Analysis for Future Program Costs Scenarios" dated 9/16/99 900
45 "Analysis of Total System Life Cycle Cost of Civilian Radioactive Waste Management Program" dated 9/95 955

833

EXHIBITS CONTINUED
(Retained by Counsel)

BARRETT DEPOSITION EXHIBIT PAGE
46 Federal Register release dated 5/3/95 1005
47 "DOE Acceptance of SNF in Dual-Purpose Canisters" dated 9/2/93 1014
48 Letter dated 9/2/93 from L. Barrett to J. Shetler 1015
49 Letter dated 10/4/93 from L. Barrett to N. Dix 1015
50 Letter dated 4/26/95 from T. Glauthier and C. Curtis 1045
51 Letter dated 3/1/96 from A. Rivlin to F. Murkowski 1065
52 1995 Acceptance Priority Ranking and Annual Capacity Report 1077
53 E-mail messages 1083
54 Letter dated 3/13/97 from B. Tomasoni to R. Cocherell 1095

938

executive branch, and we followed that.
Q So the position advanced by your office was consistent with the administration policy that you just stated, correct?
MS. HERRMANN: Same objections.
A We accepted that, and we followed that as a member of the administration.
MR. CAYNE: We're going to the next document. It's 11:55. Why don't we break for an hour lunch now, and we'll return at one.
(There is a discussion off the record.)
(A luncheon recess is taken.)

939

AFTERNOON SESSION
Q Mr. Barrett, between the time of the last session of this deposition and today did you discuss your testimony with any person?
A No.
Q Did you review any documents in preparation for today's session of the deposition?
A No.
Q Did you have any conversations with counsel following the completion of the last session and the beginning of today's session?
A Just to set up the date for today.
Q Do you recall, Mr. Barrett, that you testified today that the obligation rate is not equal to the system operating capacity?
A Yes.
Q What is the basis for that testimony?
A In designing any system, from an engineering point of view you design the system to meet or exceed the system requirements. In this case -- not case. In this situation designing the system -- I don't want to confuse this with legal

940

cases. We want to design the system to operate at a rate that exceeds the requirements. The requirements that we have are a combination of many factors, which one of them is in the contract, as I understand, relates to the ACR which is the four, six, 900 number. We want to exceed that by a substantial margin. Which the design rate of -- our present reference rate of four, six, 12, 2,000, 3,000, does that.
Q Your testimony on that point is inconsistent with the position taken by the Department of Energy in 1987, isn't it?
MS. HERRMANN: Objection. Foundation.
A Not that I know of.
Q Your testimony that the obligation rate would not equal the system operating capacity, isn't that inconsistent with the position taken by the department in 1987?
MS. HERRMANN: Objection. Foundation.
A Not that I know of.
Q Let me turn your attention to Exhibit 6 of this deposition, page ten, which bears Bates --
A Hold on now. Six? Do you want me to find

941

it?
Q Yes.
MR. CAYNE: I'll just state for the record that I'm turning the witness' attention to PA-103165.
A What page number should I be at?
Q Page ten. Bates 103165.
A Okay.
Q Under Section 3.2 there is the following statement: "The waste acceptance schedule presented in this ACR represents the projected WMS capacity available for allocation to the purchasers. The projected WMS capacity equals the system operating capacity," and then you see it continues.
A I see it.
Q That statement is inconsistent with the testimony you just gave, is it not?
MS. HERRMANN: Objection. Asked and answered.
A Yes, I think so.
Q Who was responsible for issuing this annual capacity report? Was it your predecessor?
A I don't think it was me. Yeah, Ben Rusche,

942

**yes.**
Q Who was it?
A **Ben Rusche I see. He signed it.**
Q And is he someone you work with?
A **Once upon a time.**
Q Did you consider him competent?
A **Yes, I did.**
Q Did you ever discuss with him your disagreement on this point?
A **No.**
Q But you concede that your testimony is inconsistent with -- the testimony you just gave is inconsistent with this statement, correct?
A **Well, I don't know what they meant by "waste acceptance schedule," "waste management system capacity" and those sorts of -- so I don't know what they meant by this.**
Q But your testimony is you don't agree with this statement, correct?
MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony.
A **Well, since I don't quite know what they**

943

**meant by this, I'm not saying I agree or disagree with this. My statement stands the way I believe it.**
Q According to this, the waste management system capacity equals the system operating capacity. Do you see that?
A **I see those words.**
Q Would you agree with that statement, that you have designed the waste management system capacity to equal the system capacity?
MS. HERRMANN: Objection. Foundation.
A **I don't use those terms, so I don't know what that means.**
Q Can you turn to page seven of this exhibit. See Table 2.1?
A **I see it.**
Q There's a waste acceptance schedule?
A **Yes.**
Q And under that there's a system receipt rate?
A **Yes.**
Q Does that help put in context for you the statement that I've referenced you to?

944

MS. HERRMANN: Objection. Vague.
A **Not to me.**
Q You understand the system receipt rate, correct?
A **I'll tell you what I believe system receipt rate would be, but I don't know what they meant when they wrote it here.**
Q What do you believe it to be?
A **If someone says to me the words "system receipt rate" I would say, Are you talking about the design rate or are you talking about a requirement rate. I don't know what they meant by this. I believe they have them set the same, but I don't know what they have set here.**
Q You believe they have them set the same you said?
A **Sounds like the same numbers.**
Q What is the same number, the system receipt rate and the -- can you just clarify that?
A **I guess -- the answer is I don't understand it so I can't clarify it.**
Q Well, let's work at it. The system receipt

945

rate. What is your understanding of that term?
A **I don't know what the authors meant.**
Q What do you mean by that term?
A **I'd have to put it in context. Is it design receipt rate? Or is it a receipt rate that you are obligated to meet?**
Q Have you ever used the term "system receipt rate"?
A **Not that I know. I might have but -- I generally would avoid using it. I would have to have it in context. I've used the word "receipt rate" many times.**
Q What was the purpose of the ACR?
A **It had something to do with the contract.**
Q You don't know what the purpose of the ACR was?
MS. HERRMANN: Objection. Calls for a legal conclusion.
Q Beyond that it had something to do with the contract?
A **It had something to do with the contract, and it was a planning document for -- with the**

950

Q What lower receipt rate studies were you just referring to?
**A Oh, I don't know. Some of those ones you had back here.**
Q Could you go through the exhibits and please identify for me which ones you were referring to.
**A Which one is that OMB one that had the -- all the 2007, 2010, 2000 whatevers? Not this one.**
Q You mean Exhibit 42?
**A 43 I think.**
Q 43?
**A I think 43 had some lower receipt rates in it.**
Q And those lower receipt rates in Exhibit 43 were based upon what?
**A Funding constraints.**
Q Funding constraints imposed by Congress?
**A Yes.**
Q Did Congress impose such funding constraints?
**A They certainly have.**

951

Q When were those funding constraints imposed?
MS. HERRMANN: Can we just give him a minute to get what he's looking at.
**A About every year. For the last five years. We've been funding-constrained by Congress for the last five years.**
Q Those funding constraints had an ability (sic) on your office's capability to begin the acceptance of spent nuclear fuel on a timely basis?
MS. HERRMANN: Objection. Calls for a legal conclusion.
**A They've slowed us down.**
Q Substantially?
**A Months.**
Q Years?
**A If you add them all up, probably a year or so.**
Q Getting back to the ACR, what is the relevance of an ACR with an acceptance rate of 400, 600, 900 MTUs per year in today's environment where there is a stand-alone repository?

952

MS. HERRMANN: Objection. Vague, calls for a legal conclusion.
**A I don't know.**
Q Is there any?
MS. HERRMANN: Same objections.
**A Only as it relates to the legalities of contracts.**
Q The 400, 600, 900 MTUs standard was pertinent in the context where an MRS would have gone into effect in 1998 and have been in operation for ten to 12 years prior to repository, correct?
**A That's my understanding.**
Q And that's the only circumstance in which a 400, 600, 900 MTU take-rate had any relevance, correct?
**A That was the basis at that time.**
Q At that time, you're referring to what time?
**A Back in the eighties when that was -- late eighties, early nineties when that was established, that's correct.**
Q So in the late eighties, early nineties

953

when the 400, 600, 900 MTU take-rate was established, the only relevance that take-rate had was in the context where an MRS would commence operations in 1998 and would operate by itself for ten to 12 years prior to the time that a repository, a permanent repository, began operations, correct?
**A Correct.**
Q Back to Exhibit 6. WMS stands for waste management system, correct, on page ten of Exhibit 6?
**A I think so.**
Q And what is the waste management system?
MS. HERRMANN: Objection. Foundation.
Q You've used that term, haven't you?
**A I generally don't.**
Q Have you ever heard it used?
**A Yes.**
Q Do you have an understanding what it means?
**A I think that was the overall -- yes. I think I do. I think it was the overall system as they described it back at that time.**
Q And the overall system as described back at that time involved what?

954

A A repository, a transportation, an MRS.
Q What is system operating capacity?
A I don't know how they used it in this document.
Q How do you use it?
A I use it as that's what you really expect to operate at.
Q Okay. Using the term "system operating capacity" as you just defined it --
A Okay.
Q -- and the term "WMS" as you just defined it also, do you agree with this statement on page ten?
MS. HERRMANN: Which statement?
Q That the projected WMS capacity equals the system operating capacity?
A What was the question, do I agree with it?
Q Yes.
A No.
Q Why don't you agree with that?
A Because I believe that the system operating capacity should exceed the system operating requirement. It would appear to me in this, back in

955

'87 they were setting the system operating capacity exactly equal to the requirement, which I think is the wrong way to design a system.
Q But that is what the Department of Energy did in 1987?
A I don't know what they did in '87. I wasn't involved in this.
Q Did you ever discuss this issue with your predecessor?
A The issue of what?
Q The issue of setting the operating capacity exactly equal to the requirement.
A No. Not that I recall. Let me phrase it that way.
(Deposition Exhibit Barrett 45 was marked for identification and retained by Counsel.)

Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 45, bearing HQR-025-5075 --
MS. HERRMANN: Can I get one of those?
Q -- through 5139.

956

A 50?
Q 5075.
A Down the bottom here?
Q Yeah, bottom right.
A I got 176202.
MS. HERRMANN: We're not looking at the same document.
Q The Bates numbers I just read into the record are wrong. The correct Bates numbers are PA-176202 through PA-176266. The document is called Analysis of Total System Life Cycle Cost of Civilian Radioactive Waste Management Program dated September 1995. Do you have that document before you?
A I do.
Q Would you turn to page five. What was the purpose of this document?
MS. HERRMANN: Objection. Foundation.
A This is the total life-cycle cost analysis that we do periodically to determine -- to estimate the total cost of the system so we can do a fee adequacy report as to the adequacy of the charge to the utilities.

957

Q Now, in 1995, in September 1995 your office in performing the total system life-cycle cost analyses assumed that there would not be a monitored retrievable storage facility, correct?
A I have to check what the time is. September '95 we probably did not assume there was an MRS. I don't know what this document says.
Q Well, I refer your attention to page five, the third-to-the-last paragraph on page five.
A Okay. Does not.
Q Could you turn to page eight.
A Yes.
Q What does Table 1-2 represent?
MS. HERRMANN: Objection. Foundation.
A It says "monitored geologic disposal system receipt/emplacement rates."
Q What were the rates reflected on Table -- how were the rates reflected on Table 1-2 determined?
MS. HERRMANN: Objection. Foundation.
A I don't know.
Q You have no idea?
A No.

about the nuclear waste negotiator, correct?
A Yes.
Q And am I correct that the activities of the nuclear waste negotiator were terminated in 1995?
A **I don't know the exact date, but somewhere in the mid-nineties.**
Q Were they terminated at that point?
MS. HERRMANN: Objection. Foundation.
A **I believe the term of office of Mr. Stallings, the last negotiator, expired by statute.**
Q Do you know why his mandate was not renewed?
MS. HERRMANN: Objection. Foundation, speculation, calls for a legal conclusion.
A **No.**
Q What effect did the termination of the Office of Nuclear Waste Negotiator have on the planning activities of your office?
MS. HERRMANN: Objection. Foundation.
A **Not appreciable that I recall.**
Q Did it have any effect on your



consideration, for example, of the viability of an MRS facility?
A **No, because -- not to my recollection, because the viability of an MRS facility was, you know, negative based on the budget enactment of FY '94.**
Q So would you agree that the MRS facility was effectively dead prior to the time that the Office of the Nuclear Waste Negotiator terminated?
A **I don't know when the term -- the office actually terminated. So I don't know. You said '95. I don't know when the negotiator officially terminated.**
Q Take a look at page 33 of Exhibit 45. I refer you to paragraph 4.7.
A **Uh-huh.**
Q Does that indicate that the negotiator's activities terminated in 1995?
A **It looks like it.**
Q But based on that would you agree that the viability -- that an MRS facility was nonviable significantly before the time the Nuclear Waste



Negotiator's Office terminated?
A **Well, in my opinion the MRS siting was not viable once the Congress act on the FY '94 appropriations prohibiting me from providing grants to the Indian tribes. That's in my mind when it became not viable. Exactly when a negotiator terminated I don't remember.**
Q Do you remember we discussed the 1995 ACR in the last session of the deposition?
A **Not really.**
Q Do you recall discussing it at all?
A **We had -- there were multiple ACRs of different dates. So that much I remember we talked about, but the '95 one versus other dates I don't recall.**
Q You're referring to Exhibit 39?
A **39. I have it.**
Q Take a moment to look through it and see if it refreshes your recollection that we discussed it during the last session of this deposition.
A **What's the question? I see an ACR.**
Q Do you recall that we discussed this ACR?



A **Yes.**
Q What was the purpose of the 1995 ACR?
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.
A **Something that relates to the contract.**
Q Do you have any more knowledge about the purpose of the 1995 ACR?
A **No.**
Q Did your office use the 1995 ACR for any purpose?
MS. HERRMANN: Objection. Asked and answered.
A **I'm sure people in the office used it, okay.**
Q For what purpose?
A **For whatever they used it for. I don't know.**
Q You didn't use it for any purpose?
A **Does this have the table in it that I do use?**
Q Which table are you referring to?
A **The only thing I'm familiar with in this is**

page six, Table 2. That's the only thing I ever personally used out of this document.
Q The only thing you ever used is the summary of the purchaser's annual allocations?
A Right.
Q And for what purpose did you use that chart?
A I used that to have an understanding of which utilities had what allocations in the year one, year two, year three, year four. For policy reasons is why I wanted to know.
Q What policy reasons?
A Just if I ever have to talk to various executors from various companies where they stood in the queue.
Q Look at page four, please.
A Yes.
Q Did you use the table on page four for any purpose?
A No.
Q None at all?
A No.



Q What was your position in March 1995?
A I think I was the deputy director.
Q Who prepared the table on page four?
MS. HERRMANN: Objection. Foundation.
A I don't know. Some people in the waste acceptance area.
Q People who worked for you?
A Yes.
Q For what purpose?
MS. HERRMANN: Objection. Foundation.
A Part of what they consider the business of the office, which I agreed with.
Q You agreed with what?
A Them doing what they felt they needed to do.
Q In March 1995 you did not expect to be picking up spent nuclear fuel at the rates referenced in Table 1, correct?
MS. HERRMANN: Objection. Vague.
A Repeat the question again.
Q In March 1995 you did not expect that the Department of Energy would be picking up spent nuclear



fuel at the rates reflected on Table 1?
MS. HERRMANN: Same objection.
A It was my desire and intention that we would pick up in year two, three, four a rate higher than this.
Q But there was no, in 1995 there was no expectation in the Office of Civilian Radioactive Waste Management that spent fuel would, in fact, be picked up at the rates reflected at Table 1, correct?
MS. HERRMANN: Objection. Foundation.
A Did you say no expectation?
Q Right. In March 1995, at which time, as you've testified, the MRS was not viable, your office did not expect that spent fuel would be picked up at the rates reflected on Table 1, correct?
MS. HERRMANN: Same objection.
A I ask you to clarify the word "expect." I didn't know what to expect. It was our intention and desire with all our energies to pick it up at a rate that we desired to pick it up, which was a higher rate than this.
Q That was the rate that moved up to 3,000



MTUs per year, correct?
A That was our desire, that was our goal, and we strived to do that. What actually would happen we did not know. So my expectation was very uncertain. So you asked to say what I expect. The expectation, I have to say that I don't know what to expect. We were trying to run it as high as we could run it.
Q But you had various -- your office, the Office of Civilian Radioactive Waste Management Control, had various plans that it followed pursuant to which your activities were conducted, correct? You had various plans?
A We had plans and goals in trying to achieve the intent of the act.
Q Right. And in 1995, March of 1995, there was not a plan in effect that would have called for the acceptance of spent fuel at the rates reflected in Table 1, correct?
A Correct.
Q In fact, the plan that was in place in 1995 called for the acceptance of spent fuel at a rate that

1042

**decommission their spent-fuel pools in the auxiliary buildings which would be expensive operating systems, and they wouldn't be required to have those pools. So that was the concept of why it was valuable to have dual-purpose systems, be they canisters or be they casks, to facilitate the utility costs and decommissioning.**
Q So a utility such as Sacramento Municipal Utility District could use a dual-purpose canister or cask system in order to accelerate the closure of the spent-fuel pool, correct?
A **Yes.**
Q Now, just to clarify, the NRC has not to date licensed or certified any canisters or casks for disposal, correct?
A **Correct.**
Q On the last entry on page 2145 of Exhibit 47 you see the entry "possible use for at-reactor storage by 1998"?
A **Yes.**
Q Am I correct that dual-purpose canisters or casks would be equally amenable for use for at-reactor

1043

storage? Correct?
A **Yes.**
Q And that could have been done by 1998 had the department proceeded with a program for the development of multipurpose canisters or dual-purpose canisters, correct?
MS. HERRMANN: Objection. Speculation.
A **Yes, for dual-purpose canister -- for multipurpose canister. When you added the dual-purpose the answer is no because that was never the department's policy.**
Q The department's policy was to obtain a license or certification for all three purposes; storage, transport, and disposal, correct?
A **That was our desire, yes.**
Q Does the Department of Energy play any role in the approval process of casks or canisters for disposal?
A **Please repeat that.**
Q Does the Department of Energy play any role in the approval of casks or canisters for disposal?
MS. HERRMANN: Objection. Vague.

1044

A **A support role.**
Q And please describe that support role.
A **We've done technological issues with the Nuclear Regulatory Commission to facilitate and support vendors getting certifications. An example of would be burn-up credit. We've submitted topical reports to the NRC which all vendors can use. So we play a support role to certifications.**
Q The actual approval or certification comes from the NRC alone, correct?
A **For health and safety purposes, yes.**
Q What do you mean by "for health and safety purposes"?
A **The NRC evaluates and approves based upon public health and safety. They do not on economics or interchange issues or other things like that. An example would be under the contract on the DOE accepting this as an acceptable waste form, there are issues such as size, loads, and things like that need to be worked out, which we have not done. So we have approval, DOE has approval for receipt as well as the NRC for health and safety.**

1045

**(Deposition Exhibit Barrett 50 was marked for identification and retained by Counsel.)**

Q Mr. Barrett, the court reporter has handed you Exhibit 50, which bears Bates CTR-040-0568 through 0583. It's dated April 26, 1995, and it's from T.J. Glauthier, G-l-a-u-t-h-i-e-r, Associate Director, Natural Resources, Energy, and Science; and Charles Curtis, Undersecretary, Department of Energy. Do you have that document before you?
A **I do.**
Q And do you see on the second page the distribution includes a copy going to Daniel Dreyfus?
A **Yes.**
Q Now, on April 26, 1995, you reported to Mr. Dreyfus, did you not?
A **Correct.**
Q Do you recall earlier today you I believe indicated that on, I don't know if you used the term "frequent," but perhaps regularly you deal, in your capacity as deputy director, with the Office of Management and Budget?