A **Yes.**
Q And --
A **Well, excuse me. Primarily as the acting director.**
Q Primarily as the acting director?
A **Yeah. Sometimes I do.**
Q And would you have dealt with the Office of Management and Budget in 1995 in connection with the issues addressed in Exhibit 50?
A **In a nonpolicy sense.**
Q So you would have dealt with the Office of Management and Budget in connection with these issues, correct?
A **In a nonpolicy sense.**
Q Now, the memorandum, it's on the letterhead of the Executive Office of the President, Office of Management and Budget. Do you see that?
A **I see that.**
Q Who is T.J. Glauthier, if that's how you state it?
A **Yeah, T.J. Glauthier.**
Q Who was he?



A **At that time he was the associate director of natural resources and energy and science within the OMB.**
Q And Mr. Charles Curtis, who the memorandum is also from, was an official with the Department of Energy, correct?
A **He was the Undersecretary at that time.**
Q Do you know why Mr. Curtis issued a memorandum on April 26th, 1995, on letterhead of the Office of Management and Budget?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Would that have been unusual based on your experience in the office?
A **Not unusual. I'm not sure this is a final. I don't see any initials on it. I'm not sure this is issued.**
Q Have you ever seen another memorandum in which Undersecretary of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?
A **What?**



Q Are you familiar with any other situation in which an official of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?
A **You used the word "issued." I'm not sure this is issued. Usually I'm used to seeing a little curlicue, a signature, something with it. This may be issued.**
Q But assuming it was issued, are you aware of any other instance in which an official of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?
A **I don't know of any, but it's -- I would think it's not uncommon.**
Q Well, assuming this memorandum was, in fact, issued, why do you believe that Mr. Curtis would have issued a memorandum on the letterhead of the Office of Management and Budget?
MS. HERRMANN: Objection. Speculation.
A **The first name on there is T.J.'s, not Charlie's. So this was a joint activity. So whose letterhead it is, it's going to be one or the other.**



**T.J. is first. That's probably why it's on his letterhead, but I'm speculating because I don't know.**
Q Can you turn to page two, Bates number 0571.
A **I'm sorry, 05 -- mine's cut off. So it's the second page?**
Q Second page, yes.
A **Okay. I'm there.**
MR. MACDONALD: Fourth page of the document.
THE WITNESS: Says page two on the bottom?
MR. MACDONALD: Yes.
Q Under Issues in the first paragraph, will you take a moment to read that.
A **Yes.**
Q Have you read the first paragraph?
A **Yes.**
Q Is the first paragraph consistent with your understanding?
A **When you said the first -- I haven't read -- you says issues. The first paragraph, not down to "expectation for waste"?**

1050

Q No. My question is with respect to this statement: When the nuclear waste policy was enacted, policy act was enacted, it was envisioned that the department would have a repository available for permanent waste disposal in 1998, and the department entered into contracts with the utility to begin accepting waste in 1998 on that basis. Is that statement consistent with your understanding?
A **Yes.**
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.
A **Yes.**
Q On page three could you please turn to the first paragraph on the top of the page. Do you see that?
A **Yes.**
Q Why would continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?
MS. HERRMANN: Objection. Foundation.
You can take time to read it if you need to.

1051

THE WITNESS: Yeah.
A **You're referring to a phrase in this paragraph?**
Q I'm looking at the last sentence of the first full paragraph on page three. Do you see that?
A **The last sentence. I see the last sentence.**
Q And my question is how or why would the continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?
MS. HERRMANN: Objection. Foundation.
A **The example of this would be the Prairie Island situation.**
Q And please explain to me that example.
A **Where due to local state -- state law they had difficulty getting storage and may have to shut the reactor down.**
Q Are there any other situations that you're familiar with which at-reactor storage could threaten the orderly operation of nuclear reactors?
A **No specific ones.**

1052

Q Do you believe that to be generally a concern?
A **Yes.**
Q Do you recall I asked you about an Upton Bill, U-p-t-o-n, the last session of this deposition?
A **Vaguely.**
Q Could you please turn to what's marked as page one, Bates number 0579 of this exhibit.
MS. HERRMANN: The next page in our copy, right, counsel?
A **Policy options, option one?**
Q Yes, that's the page.
A **I see it.**
Q It's Option 4. I'm sorry.
A **Option 4?**
Q Yes. The bottom of the page is Bates number 0579.
MS. HERRMANN: Our Bates numbers are cut off so we're going to need a better reference.
MR. CAYNE: It's Option 4.
A **Yes, I see the page.**
MS. HERRMANN: For the record, a good

1053

number of these pages are numbered page number one and page number two, so that's not going to help.
A **Just so you know, ten minutes from now I need to go.**
Q It's 3:45.
A **Oh, I'm a whole hour off. Sorry about that.**
MS. HERRMANN: Wishful thinking.
Q I'd like to turn your attention to towards the bottom of the page there's a paragraph that begins "start of waste acceptance." Do you see that?
A **Yeah, I see the paragraph.**
Q Would you please read that.
A **Okay.**
Q Have you read that passage?
A **Yes.**
Q Now, the reference to the storage facility here is to an interim storage facility, correct?
MS. HERRMANN: Objection. Foundation.
A **That's my understanding.**
Q And just for the record, let me just read the statement so it's clear what we're talking about.

1054

The paragraph reads "Start of waste acceptance: The Upton/Towns Bill mandates a storage facility in 1998, but this appears infeasible. More realistic estimates are that a storage facility could be available in five to seven years after legislation is passed, depending on the degree of procedural streamlining included in the law. Assuming passage of legislation 1995, therefore acceptance could begin from 1999 to 2003." Do you see that? That's the statement you're referring to, correct?

A **Yes.**

Q Earlier on your office believed that an interim storage facility could be up and running within three-and-a-half years of the start of construction, correct?

MS. HERRMANN: Objection. Speculation.

A **I don't recall three-and-a-half years.**

Q You do not recall testifying in this deposition that at an earlier point in time you believed that it would take less than five to seven years to get an interim storage facility up and running?

1055

A **All depends on the infrastructure and degree of streamlining, etc. The shortest I think I've ever said was four under some -- some circumstances which I don't remember the details. But generally -- I've never said less than four. You can do it in three and a half. That's the licensing phase or something, to put it in context. But go ahead. I mean, what's the -- what's the question? If you're saying three and a half, I don't think you can do it in three and a half.**

Q My question is do you agree with the statement at page Bates 0579 that a realistic estimate of the amount of time that it would take to get an interim storage facility up and running would be from five to seven years after the enactment of authorizing legislation?

MS. HERRMANN: Objection. Speculation.

A **Could be four, could be five, could be seven. All depends on a lot of things.**

Q Would an MRS facility be an interim storage facility within the meaning of this paragraph on 0579?

MS. HERRMANN: Objection. Foundation.

1056

A **It would be very similar.**

Q Is that what was in mind?

MS. HERRMANN: Objection. Foundation. Speculation.

A **The Upton/Towns Bill was straight storage. An MRS was more than straight storage. It was an integral part of the system.**

Q Turn to page -- it's a section that on the top of the page it states "supporting initiatives for policy options."

A **We're going back in the document or forward?**

Q It's --

MR. MACDONALD: Third-to-the-last page.

Q -- third-to-the-last page.

A **I see that page.**

Q And can you take a moment to read this portion of the memorandum. And to put it into context for you, I'm going to specifically ask you about, on the following page, the section on policy considerations. Why don't you read this memorandum, this portion of the memorandum so that you can respond

1057

to the questions I have on that section.

A **Am I supposed to read B or A?**

Q I'm focusing on Subsection B.

A **Oh, I'm sorry, I'm doing A. I've read B.**

Q Okay. Now, under page 0581.

A **Tell me which one.**

Q That's the first page with "supporting initiatives for policy actions." Do you see that?

A **Yes.**

Q In 1995, in April 1995 was the multipurpose canister program still in force, or had you terminated it already?

A **It's my recollection it was still there in early '95.**

Q And as you discussed earlier, the multipurpose canister program would have been intended to mitigate at least some of the harm suffered by utilities as a result of the delay in acceptance of spent nuclear fuel, correct?

A **Correct.**

Q Well, why, as reflected in this Exhibit 50,

was it also believed that -- by the department and the Office of Management and Budget that additional payments would be required to be made to the utilities to supplement the provision of multipurpose canisters?

MS. HERRMANN: Objection. Foundation.

**A It doesn't say that. It says it could be. You know, if this option were adopted you could do that to additionally compensate them for the delays.**

Q Because I thought when you explained the multipurpose canister program, that would have been a stand-alone proposal, to compensate the utilities?

**A That was a -- that was a stand-alone proposal, but what this is referring to, I believe, is this would be in addition to the multipurpose canisters. It says right there, These payments would supplement the multipurpose canisters.**

Q You indicated that the multipurpose canister program was intended to mitigate the harm suffered by the utilities, correct, as a result of the acceptance delays?

**A Yes.**

Q Why was the department in 1995 considering



the possibility of supplementing the provision of multipurpose canisters to utilities with additional payments reflected in the proposal on page 0581 and 0582 of Exhibit 50?

MS. HERRMANN: Objection. Foundation. Speculation.

**A It would be my understanding that many utilities were not particularly satisfied that the multipurpose canisters being supplied were sufficient to cover the delays and wanted more. And this was our -- an option that we were looking at that we could provide more. An example is one you said earlier, we talked about earlier was that the multipurpose canisters did not cover the construction costs that on-site reactors would have to do.**

Q And would the payments reflected in the proposal set forth at page 581 have covered such construction costs?

**A Could have been used for that.**

Q That would have been one of the purposes, correct?

**A Could have been, yes.**



Q For what other purposes would the payments reflected at page 051 have been used?

MS. HERRMANN: Objection. Foundation.

**A I don't know.**

Q Well, rather than giving me all the purposes, what other purposes can you think of? Can you think of any other purposes?

MS. HERRMANN: Same objection.

Q Other than construction?

**A Well, if it was a payment in terms of cash, utilities could do with it what they wished to do in conjunction with the PUCs.**

Q In conjunction with the?

**A Public utility commissions.**

Q How would the amount of the payments have been determined?

MS. HERRMANN: Objection. Foundation, speculation.

**A That's a complexity that's there and one of the reasons why we never did it.**

Q On the next page, page 0582.

MS. HERRMANN: Can we get a title on the



top, please?

MR. CAYNE: The first entry is Legislative Implications.

MR. MACDONALD: The second-to-the-last page.

**A The next-to-the-last page?**

Q Yes. You said a moment ago the payments weren't made because of the complexity of determining the amount. Do you recall that statement?

**A Yeah, I recall the statement. I shouldn't have made it.**

Q You didn't mean to indicate that the department didn't make the payments because it didn't believe that it had an obligation to mitigate or rectify the harm sustained by the utilities as the result of the delay in acceptance, did you?

MS. HERRMANN: Objection. Foundation, calls for a legal conclusion. Objection to the extent it mischaracterizes prior testimony.

**A Cash payments are extremely complicated, and this was not pursued beyond the preconceptual discussion that you see here.**

1062

Q But it was not pursued, if I understand your testimony, because of the difficulty in determining the amount of the cash payments as opposed to a determination by the department that it didn't have an obligation to rectify the harm suffered by the utilities as a result of the acceptance delays, correct?

MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.

Q Correct?

MS. HERRMANN: Same objections.

**A I don't know how to answer that question, because you had so many things mixed in it. I don't know how to answer that question.**

Q If I understand your testimony, the department basically threw up its hands and said, It's too complicated for to us figure out how much we should pay each utility, so we're not going to pursue this proposal. Would that be a correct statement?

MS. HERRMANN: Objection. Mischaracterizes prior testimony.

**A No, it would not be, because the amount**

1063

**that one would pay is probably one of the more easy things to do, and that is very complicated in itself. So there are many issues involving direct payments, of which determining what amounts to whom and when is a very complicated one, but that is probably less complicated than the source of funds and the other things discussed in this statement.**

**So I did say that, but that's a lesser item. Although that is a major item. I have nothing to do -- in my statement on that, my remark had nothing to do regarding obligations or anything else that revolved through contractual matters.**

Q Do you see under Policy Consideration it says "mitigates the perceived problems of utilities 'having to pay twice for storage'"? Do you see that?

**A I see that.**

Q What is that?

MS. HERRMANN: Objection. Foundation, speculation.

**A I believe what the authors were trying to do here was find a way to provide resources back to the utilities that were having to spend resources due**

1064

**to the fact that we didn't pick the fuel up, through storage or whatever, while they were -- operating utilities, not shut down ones -- were still paying money into the waste fund. The ones who were operating claimed they were paying twice; once to pay the waste fund and once to do with storage. So we were trying to figure a way to cover some of the storage costs that would alleviate the utilities to have to, quote, pay twice.**

Q Under the statute the utilities were supposed to pay into the waste fund, and at that point it became the obligation of the Department of Energy to store and dispose of the spent fuel, correct?

MS. HERRMANN: Objection. Calls for a legal conclusion.

Q Correct?

MS. HERRMANN: Same objection.

**A Repeat the question again.**

Q The problem of the utilities having to pay twice for storage arose because under the Nuclear Waste Policy Act it was the intention of Congress that the utilities pay once into the nuclear waste fund,

1065

and the payments into the nuclear waste fund would be used to pay for the storage and disposal of spent fuel and the utilities would not have to pay again directly out of their own pockets to provide for such storage and disposal during the period that the department failed to comply with its statutory contractual obligations to pick up the fuel, correct?

MS. HERRMANN: Objection. Calls for a legal conclusion, compound.

**A Yes.**

Q My statement is correct?

**A I believe so.**

**(Deposition Exhibit Barrett 51 was marked for identification and retained by Counsel.)**

Q The court reporter has handed you a document marked for identification as Exhibit 51. Do you have that before you?

**A I do.**

Q And this document bears Bates numbers HQR-038-0202 through 0204. It's a letter dated March 1st, 1996, from the director of the Office of

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
----------------- x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY, NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; · 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY · 01-116C, 01-249C
----------------- X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D C.
Friday, May 10, 2002
8.06 a m

Job No : 11792-11
Pages 1104 to 1437, Volume 5
Reported by· Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
----------------- X



Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC , POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT.
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D C. 20004-1206
(202) 942-5000

1108

APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT
TIMOTHY R MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER COMPANY.
RONALD A SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D C. 20004-1206
(202) 942-5000

1109

APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:
CHRISTOPHER P. TOMPKINS, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF DEFENDANT UNITED STATES:
HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D. C. 20530
(202) 307-0290

ALSO PRESENT:
Thomas Harding, Arnold & Porter

1110

CONTENTS

EXAMINATION OF LAKE H. BARRETT PAGE
By Mr. Cayne 1114
By Ms. Hewitt 1327
By Mr. Schechter 1376
By Mr. Tompkins 1428

EXHIBITS
(Attached to the Transcript)

BARRETT DEPOSITION EXHIBIT PAGE
55 "Preferred Repository Receipt Rates Based on Waste Management System Cost Risks and Logistic Impacts" 1133
56 Letter dated 5/5/87 from N. McLeod to H. Steinberg 1139
57 "Determination of Cost-Effective Waste Management Receipt Rates" 1148
58 Parametrics Analysis for Future Program Costs Scenarios dated 11/5/99 1166
59 Letter dated 11/5/86 from J. Braitman to R. Izatt 1206

1111

EXHIBITS CONTINUED
(Attached to the Transcript)

BARRETT DEPOSITION EXHIBIT PAGE
60 "Disposal Contract and Annual Capacity Report, Briefing for OCRWM Executive Committee, November 1986" 1218
61 Document "Edison Electric Institute Utility Nuclear Waste Management Group" dated 12/8/87 1222
62 Statement of L. Barrett before the Subcommittee on Energy and Power, 4/29/87 1231
63 Program History Briefing to Secretary Pena by L. Barrett 1243
64 DOE News Release dated 1/30/98 1257
65 "Analysis of the Total Time Life-Cycle Cost of the Civilian Radioactive Waste Management Program, December 1998" 1267
66 Draft RFP 1287
67 Draft Environmental Impact Statement dated 8/12/99 1294

1148

because of short-cooled fuel"?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Do you understand the term "derate"?
A **I understand the term as I use it. How the author is using it I don't know.**
Q How would you use it?
A **It is to reduce the design capacity or reduce the output.**
Q And do you understand the term "short-cooled fuel"?
A **Yes.**
Q What does that mean?
A **Lower megawatt days per metric ton on the fuel.**
Q Based on the understanding of those two terms you just expressed, if the author of that sentence used those two terms in the way you just explained them, do you understand this sentence?
MS. HERRMANN: Objection. Speculation.
A **No.**
**(Deposition Exhibit Barrett 57 was marked**

1149

**for identification and was attached to the transcript.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 57. It is captioned Determination of Cost-effective Waste Management Receipt Rates. It is by R.W. McKee, M-c-K-e-e. It starts at Bates PA-221971. And it continues through PA-221980. Do you have that document before you?
A **I believe so. I can't read the Bates number at the bottom, but go ahead. Yes.**
Q And you'll see that the first two pages of this consecutively-Bates-numbered document appear to be the same other than the fact that the first page looks as if a buck slip covered over a portion of the left-hand column, correct?
A **Correct.**
Q Do you know a person named R.W. McKee?
A **No.**
Q Have you ever heard of that person?
A **I've heard the name.**
Q Are you familiar with Pacific Northwest

1150

Laboratory?
A **Yes.**
Q What is Pacific Northwest Laboratory?
A **It's a contractor in Richland, Washington.**
Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
MS. HERRMANN: Objection. Vague.
A **We use them as advisors and analysts for the waste management system.**
Q Do you continue to so use them through today?
A **No.**
Q Through when did you use them?
A **Through the late eighties.**
Q There's also another name at the top of the first page, H.D. Huber, H-u-b-e-r. Do you know that individual?
A **No.**
Q Did you ever rely on the work of Pacific Northwest Laboratory?

1151

MS. HERRMANN: Objection. Vague.
A **I used it as input.**
Q For what purposes?
A **For advice on systems analysis.**
Q Did you ever personally assign work out to be performed by Pacific Northwest Laboratory?
A **I don't remember me personally, but my staff did.**
Q Did you authorize your staff to assign work out to Pacific Northwest Laboratory?
A **Yes.**
Q I take it then you considered the work of Pacific Northwest Laboratory to be competent?
A **Yes.**
Q I turn your attention to page Bates number PA-221972. It's the second page of the document. Actually, returning to the first page, do you see the buck slip on the first page? It says, '91 HLRWM conference papers, volume two, "high priority."
A **I see it.**
Q Is that your writing?
A **No.**

Q Are you familiar with the HLRWM conference?
A **It's one of many conferences that were held regarding high-level waste management. Exactly this one, I don't know what it is.**
Q So does HLRWM stand for high-level radioactive waste management?
A **I think so.**
Q Do you know why there's a statement on this buck slip, "high priority"?
MS. HERRMANN: Objection. Speculation.
A **Not at all.**
Q With respect to the statement "papers volume two," did your office maintain a library of papers such as the paper represented by Exhibit 57?
A **No.**
Q So you don't know what the volume two is referring to here on the buck slip?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Why was Pacific Northwest Laboratories assigned the task of conducting a determination of cost-effective waste management system receipt rates?



MS. HERRMANN: Objection. Speculation.
A **I'm not sure they were.**
Q Do you believe that this paper was unauthorized by your department?
MS. HERRMANN: Same objection.
A **I don't know.**
Q Do you believe it likely someone in your department, an employee of yours, would have requested that Pacific Northwest Laboratory prepare the paper reflected by Exhibit 57?
MS. HERRMANN: Same objection.
A **I don't know.**
Q How would this paper have been used by your office?
MS. HERRMANN: Objection. Speculation.
A **Paper, not at all.**
Q Excuse me?
A **The paper, not at all.**
Q How would the analysis set forth in Exhibit 57 have been used by your office?
A **The paper is a summary of a report. The report was submitted to the department, I would**



**assume. The report is what we would use. The paper given at the conference is just a paper given at a conference.**
Q Fine. Let's go back to that series of questions now that I understand what you're doing.
Would your office have authorized the report summarized in the paper, specifically Exhibit 57?
MS. HERRMANN: Objection. Speculation.
A **I don't know for sure, but probably so.**
Q For what purpose would your office have authorized that report?
MS. HERRMANN: Same objection.
A **For input to the Department of Energy regarding the overall design of the system.**
Q And you see that according to the abstract, the abstract states, does it not, that a comprehensive logistics and cost analysis has been carried out to determine if there are potential benefits to the high-level waste management system for receipt rates other than the current 3,000 MTU per year design basis receipt rate. You see that?



A **I see it, yes. I'm trying to figure out what the question was.**
Q Simply whether you see it.
A **I see it.**
Q Not a hard question.
How would your office have gone about authorizing payment for this report? What would the process have been?
A **Generally we request -- first we decide what we wanted done. In the case of a report like this one we would have asked them to analyze logistics and cost analyses for the system for a range of scenarios. To find that scope of work agreed to on a contractual basis, either person hours or dollar value, the contractor would execute the report, submit the report. The report would be reviewed by the Department of Energy, and then payment would be made if it was a satisfactory report.**
Q Would a number of individuals have to, in the chain of command, authorize such a report?
A **Generally.**
Q And I take it there would be documentation

1332

reference to a variety of DOE documents. My question is do you have an understanding of the term "steady-state rate"?
A **I believe so.**
Q What's your understanding of that term?
A **Basically constant over time.**
Q I believe you testified that there is a relationship between the 3,000 MTU annual steady-state rate and either the discharge rate or generation rate. Is that correct?
A **There's a difference.**
Q Is there a relationship between the two?
A **Discharge rate is what it is. Utilities control that. The receipt rate, which is what you call 3,000, is something that is variable, but depending upon the system we design to build, we can vary that. So there's no direct relationship between the two.**
Q My understanding from your testimony -- and please correct me if I'm wrong -- was that the 3,000 MTU steady-state rate or receipt rate as you just used that term, was chosen in part because it exceeded the

1333

discharge rate or the generation rate by utilities. Is that right?
A **Correct.**
Q What other factors went into choosing a 3,000 MTU receipt rate?
A **The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have -- you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.**
Q Do you know if there were any studies that talked about the 3,000 rate being a reasonable number to use?
A **I don't know of any that were done back then, but I'm told there were some done. I never had reason to ever look. There were some -- we went**

1334

**through some of them here that were done in the middle eighties and some done in the early nineties that would say that you can run them at a higher rate. And you can run them at a higher rate and there are puts and takes on costs and performance.**
Q And am I right in understanding that the 3,000 steady-state rate has been used as the steady-state rate in the majority of design documents for the facility that DOE will eventually use to take and emplacement spent nuclear fuel?
A **Yes, it's around 3,000.**
Q And am I also right in understanding that the 3,000 steady-state rate has been the rate that is used in the majority of documents issued by DOE with regard to total system life-cycle costs?
A **Correct.**
Q With regard to those documents, the documents issued in connection with estimating total system life-cycle costs, what is that document supposed to reflect, the TSLCC document?
A **Our best estimates of what the costs would be, you know, year by year for the program. And to**

1335

**determine those you would have some assumption as to what the receipt rate would be, and we used 3,000.**
Q And is the receipt rate of 3,000 used because that's what your intention at the time you issued that TSLCC report, is that the intention at that time, to use that rate for whatever facility you would have running when you begin to accept spent nuclear fuel?
MS. HERRMANN: Objection. Foundation.
A **At steady state, yes.**
Q Do you have an understanding of what the term "waste management system" is?
A **Yes.**
Q What's your understanding of that term?
A **That would be the transportation system to remove it from the reactors. It would be an MRS if there were to be an MRS, and it would be the repository, or repositories if we have more than one.**
Q With regard to the transportation system, other than the RFP that we've discussed just a couple of hours ago, were there any other documents that talked about the acceptance rate or the physical

1340

answered.
A **It was, you know, a relatively small amount. We had also gotten information -- we also put the transportation RFP which had the higher rates in it, and we thought we could get that extra out of the system. So we have always strived to perform at this high-as-possible, high-as-practicable rate we could operate at, so that's why.**
Q Is it your testimony that the highest practicable rate that you could perform at for year 2011 would be 600 MTUs on an annual basis?
A **We didn't really look hard to try to raise -- to see if we could raise that or the 1200 to 1300. I felt that was a lower priority item and didn't try to push it much. Didn't push it at all.**
Q Do you know whether the acceptance rates that are included in this document are the same acceptance rates that are included in the 1995 TSLCC report?
MS. HERRMANN: Objection. Best evidence.
A **I thought we just described it a little bit. The 300 to 400. Other than that, I think**

1341

**they're the same.**
Q If you would take a look at Barrett Exhibit 45, which is the 1995 TSLCC document. And in particular I direct your attention to page eight.
A **Yes.**
Q And I think you're absolutely right that these rates are almost exactly the rates in the 1998 TSLCC but for the 2010 where you accurately noticed that it's 300 MTUs in the 1995 TSLCC.
When this document was issued in 1995, was this DOE's intention with regard to the acceptance rate it would implement when it began to take spent nuclear fuel from utilities in 2010?
MS. HERRMANN: Objection. Foundation. Mr. Barrett is not a 30(b)(6) witness.
A **Restate that question again, please.**
MS. HEWITT: Can you read it back.
(The record is read.)
MS. HERRMANN: Same objection.
A **This was a cost report. The primary focus was, you know, to do a cost estimate for total life-cycle cost. This was not primarily a waste**

1342

**acceptance operating-type document. It should reflect what the system was at that time.**
**Regarding when we reviewed this document, when I reviewed the document, I was not paying much attention to if it was 300, 400, 600, or whatever. This should reflect what the repository design numbers were, and I just don't know what they were at the time. So the only reason I'm going through this is you asked this was the primary DOE document for acceptance rates. It really wasn't. It should have been the systems requirements documents for the repository of whatever were in place in 1995. If there was 100 percent alignment between those documents I honestly don't know.**
Q Table 1-2 that we're talking about is entitled MGDS Receipt/Emplacement Rates. What does the acronym MGDS stand for, do you know?
A **Mine geologic disposal system I believe.**
Q Do you know whether or not the rates that are included in this document are different from the rates that were included in the 1995 APR ACR that was published around the same time?

1343

MS. HERRMANN: Objection. Best evidence.
A **I think that the '95 ACR has the four-six-nine constant in it.**
Q I think you're right, but if you would like to look at it, that's Exhibit 39.
A **Well, that's different than these.**
Q It is different?
A **Yes.**
Q Why was there a difference in rates published in two separate documents that were published around the same time?
A **This is a performance document on what we thought we could perform at. That has something to do with the contract.**
Q So is it your testimony that DOE could perform at a rate that's different than what it was supposed to perform under the contract?
MS. HERRMANN: Objection. Relevance.
A **Yes.**
Q Why don't you take a look at Exhibit 39, which is the 1995 APR ACR.
A **Okay.**

1344

Q I'm going to refer your attention to Table 1 on page four.
**A Yes.**
Q The table is entitled Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel. My first question is -- and you've used this term quite a bit as well -- what does the term "nominal" mean when the DOE uses it in its documents?
**A Not an exact number. To me the word "nominal" -- I don't know what the authors of this document meant. When I hear the word "nominal" or when I use the word "nominal" it's sort of an average number. It might be more; it might be less, but it's in that order of magnitude.**
Q Now, this table sets forth projected waste acceptance rates for a period of ten years, correct?
**A It appears to.**
Q Do you know why it only sets forth projected acceptance rates for ten years?
**A No.**
MS. HERRMANN: Objection. Speculation.
Q Do you know what the acceptance rate would

1345

have been in year 11?
MS. HERRMANN: Objection. Speculation.
**A No.**
Q Do you have any understanding of whether or not this ACR APR indicates that DOE will take spent nuclear fuel from utilities at a steady-state rate of 900 MTUs per year for the life of the program?
MS. HERRMANN: Objection. Best evidence. Speculation.
**A Repeat the question, please.**
**(The record is read.)**
**A I don't know a relationship between this table and what we'll actually perform at.**
Q Well, do you know what the purpose of issuing this table was?
MS. HERRMANN: Objection. Speculation.
**A No.**
Q Would an annual acceptance rate of 900 MTUs, if implemented by DOE, preclude the need of utilities to make arrangements for additional on-site storage after 1998?
MS. HERRMANN: Objection. Speculation.

1346

**A I don't know.**
Q How would you figure that out?
**A You would need to -- to calculate that you would need to project what the pool overflow rates would be, would know performance. You would need to then figure out how would the 900, or whatever rate we were going to perform at, how that would be allocated under the contract relationships. And then you could determine who had pool overflows and who did not.**
Q Does DOE have information on what you call pool overflow rates?
**A We have data reported by utilities in their 859 reports that you could derive that from.**
Q Do you know whether or not that consideration, pool overflow, quote/unquote, was a factor in arriving at acceptance rates in this document?
**A I don't know. I don't think so.**
Q Do you know whether pool overflow was a consideration in developing any acceptance rate in any of the acceptance capacity reports issued by DOE?
**A Not that I know of.**

1347

Q Were pool overflow rates a consideration in developing the 3,000 steady-state rate used for the design of the repository?
MS. HERRMANN: Objection. Speculation.
**A Not specifically, but in a gross national sense, yes.**
Q And how in a gross national sense?
**A By setting the performance rate of nominally 3,000 being higher than the production rate of 2,000, that would give a thousand tons per year working off the backlog which should re-present if there was appropriate distribution amongst the contract holders' pool over -- anymore pool overflows.**
Q Do you have an understanding of whether DOE ever established a minimum acceptance rate that would accomplish the need for eliminating pool overflow by utilities after 1998?
**A Not specifically. The only reason I'm pausing, as I recall somewhere having a discussion with staff that the pool overflow rate in the teens, you know, post-2010, was something in the neighborhood of 500 tons per year if there was no -- if we did not**

**perform at all.**
Q And do you recall at all what that figure of 500 tons was based on?
**A Based on somebody's guesstimate of what they realistically thought the pool overflows would be in the 2010 to 2015 time frame.**
Q And was the pool overflow figure that was cited to you, 500 metric tons per year, did that reflect an aggregate number based on all the utilities, do you know?
**A My recollection was that was a national number. You couldn't really do it on a -- we didn't have the data to do it on a utility-by-utility number very clearly.**
Q Well, did the utilities report individually with respect to them this data on their RW 859 documents that they submitted to DOE?
**A I don't know exactly what's on an 859. I think that's being derived from the 859s.**
Q We spoke a little earlier today about the viability assessment. Do you recall that conversation?



**A Vaguely.**
Q And the conversation centered around a reference case for a repository that would be available in 2010 that was actually described in the viability assessment that was published I think by DOE in 1998. Is that correct?
**A I believe so.**
Q And if I remember correctly, the reference case is a repository that is -- I think you described as a nonmodular system. Is that right?
**A Correct.**
Q What are the major milestones that are left between now, May 2002, and 2010 that have to be accomplished before the repository and nonmodular repository can take spent nuclear fuel?
MS. HERRMANN: Objection. Foundation.
**A Have to prepare the license application, go through the licensing process of the NRC, receive a construction authorization, construct it, receive an operating license, build the transportation system, both the hardware aspects of it and the institutional aspects of the transportation system, and then be**



**ready to operate in 2010.**
Q What is a reasonable estimate of time that it would take to construct a nonmodular repository?
MS. HERRMANN: Objection. Speculation.
**A Under normal circumstances a building like that would be approximately five years.**
Q And what's a reasonable time or a reasonable estimate of time that it would take to get your license approved to build such a facility?
MS. HERRMANN: Same objection.
**A The statute says three years.**
Q Do you consider that reasonable?
**A It could be tight.**
Q Why?
**A Well, I think the hearings will be difficult for the NRC to complete within that time period, but it's doable.**
Q And I believe you said in addition to the licensing and the construction there are concerns about building a transportation system as well and getting an operating license. Is that correct? Those are two additional milestones?



**A Two additional milestones. I didn't use the word "concerns."**
Q But they are two additional milestones?
**A They are milestones, yes.**
Q And is the time to get an operating license the same as the time to get your -- for a licensing procedure, is that the same milestone or are those two separate actions?
**A What I refer to in a general sense as the operating license is actually an amendment to our license that we would receive when we get the construction authorization. So it's a license amendment, which should take less time than the original licensing proceeding itself.**
Q And how long would that licensing amendment take?
MS. HERRMANN: Speculation.
**A It will take a couple of years. The actual operating license proceeding will probably start just about when the construction authorization is given.**
Q From what you said it does not appear likely that DOE will accomplish all these milestones

1368

**A The higher the rate of performance the better.**
Q That doesn't answer the question of whether or not the rate --
**A I couldn't understand the question. Repeat the question.**
Q At least you told me that.
**A All right. I thought that was your question, but try again.**
Q My understanding is that one of the goals of the Civilian Radioactive Waste Management Program was to design a system that could take spent nuclear fuel at a rate that would eliminate the need for utilities to provide for additional on-site storage after January 31st, 1998. Is that correct?
**A No.**
Q What is not correct about that statement?
**A I never considered the design of the system to solely try to avoid spent-fuel pool overflows. I tried to design the system to be as large as you could reasonably make it to avoid not only spent-fuel overflows but pool rerackings to allow shut-down**

1369

**reactors to empty their sites. For all those other reasons in addition to. So the way you phrased it I don't think is correct.**
Q Thank you for clarifying. It actually did clarify a misimpression I had, so I'm glad I asked the question.
And is it your testimony that prior to you actually coming to the Office of Civilian Radioactive Waste Management DOE had established that a steady-state rate of 3,000 MTUs on an annual basis would achieve all those objectives that you just specified in your prior answer?
MS. HERRMANN: Objection. Foundation.
**A In a general sense, yes.**
Q At any point during your tenure at OCRWM did you have a reason to disagree with that rate that was selected, the 3,000 MTU steady-state rate on an annual basis?
**A Never paid much attention to it. Because all my energies were focused on trying to get a system that could run as soon as practicable.**
Q But in your tenure at the program did you

1370

ever see any evidence that would indicate that that 3,000 MTU rate was not sufficient to address all of those needs as you specified a couple of answers ago?
**A I saw no reason nor saw no reports that said 3,000 was a bad choice. There were some studies done in the late eighties, also in the early nineties that, you know, it didn't say there was an obvious better number. That 2,000 was better or 4,000 was better. And 3,000 appeared to be okay. So I didn't pay much attention. So I was satisfied. It wasn't conscious per se. I saw no reason why I should change it. Let's phrase it that way.**
Q And I'll take it a step further. Do you believe that the 3,000 annual steady-state rate is a reasonable rate for DOE to plan to use in terms of taking spent nuclear fuel from utilities?
**A I think it's a reasonable rate. There may be better rates that if we -- if the nation gets a little clearer that we're going to really perform I think we will refine that number and we may, based on events of September 11th, maybe it will be raised.**
Q And would you agree that the 3,000 annual

1371

steady-state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?
**A Generally so, yes.**
Q In your opinion would a steady-state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?
**A I would think that's low.**
Q Why?
**A Because that's about what the generation rate is, and if we start with that, matching the generation rate at 2010 -- if we steady state at 2010, all the fuel that's in dry storage and a lot of the shut-down reactors, it will be difficult to avoid new storages or prolong decommissionings.**
Q And what would your opinion be if an annual steady-state rate was chosen that was around 1,000 MTUs per year?
MS. HERRMANN: Objection. Speculation.
**A For performance aspect it would be better, you know, better than none, but not as good as 2,000 and not as good as 3,000.**
Q Would you believe that a steady-state

acceptance rate on an annual basis of 1,000 MTU is consistent with the program's goals of avoiding pool overflow and addressing the backlog and providing for some other concerns that you mentioned earlier?
**A I don't know if it is or isn't.**
Q Well, you testified just a minute ago that you thought 2,000 was pretty low with regard to that.
**A Yeah.**
Q But you have no opinion with regard to 1,000?
**A I said -- I thought I said earlier 1,000 was not as good as 2,000.**
Q Would 1,000 achieve any of those objectives?
MS. HERRMANN: Objection. Speculation.
**A It might.**
Q Which objectives would it achieve?
**A If it was allocated right, it would probably avoid a lot of pool overflows. Maybe all pool overflows if it was allocated correctly.**
Q But it's true that DOE didn't have absolute flexibility in that regard because it had to allocate,



at least in one regard, oldest fuel first, correct?
MS. HERRMANN: Objection. Calls for a legal conclusion.
**A Correct. DOE does not -- it would be difficult for DOE to just automatically allocate to the greatest-need ones.**
MS. HEWITT: Just give me a second and I might be done.
Q Mr. Barrett, did you participate ever in the development of any acceptance rates that were included in any DOE document?
**A Rephrase the question.**
Q Did you personally participate in the development of any acceptance rates that were included in any DOE published document?
**A What do you mean by acceptance rates?**
Q Well, let me first ask you the question that acceptance rates is used, as that term is used, "acceptance rate," not design receipt rate, not pool overflow rate. When it's called acceptance rate by DOE, did you ever participate in the development of that rate?



MS. HERRMANN: Objection. Vague.
**A You mean APR?**
Q Yes.
**A In this thing?**
Q Yes.
**A Not directly.**
Q Indirectly?
**A Yes.**
Q And in which APR ACR would you have participated in developing the acceptance rates designated therein?
**A Back in the eighties, the group that I was responsible for provided input to ACRs in the late eighties. So I'm not -- so I probably indirectly participated in meetings or something. I just don't remember any details of it.**
Q In your role as either acting director of OCRWM or deputy director of OCRWM did you ever personally participate in the development of any acceptance rate in any annual capacity or priority report?
**A The '95 one I was the deputy, so I might**



**have been involved in. I just don't remember because I didn't work much on that. I was trying to build a tunnel in '95 so I didn't pay much attention to it. But I might have participated in a meeting or something. I just don't remember.**
Q Mr. Barrett, do you believe the utilities have a legitimate claim for damages in this case?
MS. HERRMANN: Objection. Calls for a legal conclusion, irrelevant.
**A I have no opinion on that at all.**
Q Do you believe that DOE had an obligation to take the spent nuclear fuel in '98?
MS. HERRMANN: Objection. Calls for a legal conclusion, and relevance.
**A I don't know what obligation means as it relates to court rulings and such.**
Q Well, what was your understanding of DOE's legal obligation with regard to taking spent nuclear fuel by January 31st, 1998?
MS. HERRMANN: Same objections.
**A I have no opinion on legal obligations.**
Q My question was what was your

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY, : Case No. 98-126C,
Plaintiff, : 98-154C, 98-474C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : Volume I

\- - - - - - - - - - - - - - - x

Washington, D.C.
Tuesday, May 14, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:30 a.m., Tuesday, May 14, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

APPEARANCES:

On behalf of the Plaintiff:
JERRY STOUCH, ESQUIRE
PETER J. SKALABAN, ESQUIRE
Spriggs & Hollingsworth
1350 Eye Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
HEIDE L. HERRMANN, ESQUIRE
KEVIN B. CRAWFORD, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Room 7002
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| LAKE H. BARRETT | PLAINTIFFS |
| By Mr. Stouck | 5 |
| Afternoon Session - Page 87 | |


EXHIBITS


| BARRETT EXHIBIT NO. | | PAGE NO |
|---|---|---|
| 78 | Defendant's Witness List | 6 |
| 79 | Excerpt from United States Code Title 42, Section 10222 | 41 |
| 80 | 9-29-87 letter, Cole to Karol, with attachments | 44 |
| 81 | 1-86 Transportation Business Plan | 91 |
| 82 | 3-14-02 Nuclear Waste News | 145 |
| 83 | Other Wastes/Nuclear Materials: A General Overview | 152 |
| 84 | 7-21-94 Meeting notes | 162 |
| 85 | 12-98 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program | 182 |
| 86 | 9-15-83 memo, Williamson to Distribution List | 187 |





| BARRETT EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 87 | 5-3-00 Letter, Itkin to King | 196 |
| 88 | Transportation Under the Nuclear Waste Policy Act | |
| 89 | Litigation Chronology | 213 |
| 90 | 1-8-98 memo, Carlson to Barrett | 216 |
| 91 | 9-24-96 letter, Grube to Barrett | 234 |
| 92 | 4-30-96 Memorandum of Agreement | 238 |




PROCEEDINGS

- - - - - - -

WHEREUPON --

LAKE H. BARRETT,

a Witness called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. STOUCK:

Q. Good morning --

A. Good morning.

Q. -- Mr. Barrett. I'm Jerry Stouck. I represent three utilities in this litigation, Yankee Atomic Electric Company, Connecticut Yankee Power Company, and Maine Yankee Atomic Power Company, and we are here this morning -- in a sense this is a continuation of the deposition you have been giving over the last previous four or five days, and in a sense there is some new matters in the discovery situation with the three Yankees is a little bit different than the discovery situation than the other utilities, so it is kind of a separation and kind of a continuation.

For example, I have all of the

Page 66

amplify a little bit by what you mean by bite size campaigns?
A. Bite size meaning how much tonnage of fuel are you going to take in a campaign over a certain period of time.
Q. Okay. Is that determination something that is going to be substantially left to the regional contractors under the RFP that we were discussing earlier?
MS. HERRMANN: Objection. Speculation.
A. It is my opinion regarding the efficiency of the system that the RSC would work with the contract holders in their region or nationally to work out the best mutual arrangement for the contract holders and the government for the most efficient system that could be devised.
Q. As to schedule; is that what you are talking about? It may be other things, but including scheduling matters?
A. Including scheduling, recognizing the fact that there are contractual legal matters that will also have to be addressed, and that I would hope that the RSC, the regional services contractor or agent could facilitate and arrange

Page 67

for an acceptable arrangement for both the contract holders and the Department of Energy, to present that for mutual approvals.
Q. Well, for mutual approvals. What are the contractual matters that you are referring to?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. Given that the contract -- contracts exist under the statute and that there are implementing documents under the contract, I would -- it is our goal that there is an acceptable arrangement for all the parties how to work the allocations into actual shipping campaigns.
Q. And when you referred a moment or two ago to working out the most efficient system for scheduling that could be arranged -- do you recall that reference?
A. Yes.
Q. Okay. What are your expectations in the context of working out the most efficient system or an efficient system for scheduling? What are your expectations about the extent to which exchanges of allocations between or among utilities will occur?

Page 68

MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
A. I don't -- I'm hopeful, but I don't know what the actual utility contract holders will do.
Q. Why are you hopeful?
A. From a macroscopic perspective it has always been my hope that utilities that have a lesser need earlier would exchange the appropriate remuneration or compensation with others that might have a greater need to work out the most effective national utilization of whatever capacity you were able to bring on line.
Q. And that's your hope because that would promote the most effective national utilization of the capacity? Is that why it is your hope, because it would be the most effective utilization of the capacity of a system?
A. It would be more effective than a layout like this on this table. You say the most -- it would be better.
Q. Okay, but that's a goal that the program has, is to promote effective utilization of the capacity of the system?
MS HERRMANN: Objection. Foundation

Page 69

A. I'm not sure the program has taken a programmatic position or programmatic document on that when it is my opinion.
Q. Wouldn't it be more economically efficient? Isn't that what we are talking about, the economic efficiency -- the economic efficiency of effective system utilization?
Or let me ask that question. Do you believe that a schedule that more effectively utilizes system capacity would be more economically efficient?
A. Most of the time, but there may be some particular situations where it may not be effective for somebody.
Q. Well, as a general matter would be more economically efficient?
MS. HERRMANN: Objection. Vague.
A. It should be, but there may be many cases it is not.
Q. Give an example of a case or a situation in which more effective utilization of system capacity will not be more economically efficient for a particular utility
A. It would depend upon the details, you know, such as interface issues, transportation

Page 70

issues possibly. Possibly one utility has got pool overflow issues, another has a decommissioning issue. Another has maybe a policy or political issue about moving fuel. So those, all those issues would have to be dealt with, and they may -- it may not be to everyone's advantage to do something like that. We just don't know that.
Q. And what is the "something like that"?
A. To have exchanges or allocations recommended by the RSC.
Q. Okay. Well, let's see if you agree with this: Those matters that you just referred to might pose impediments to an optimal, in other words most efficient utilization of capacity, but that's not inconsistent with utilization of a system capacity being made as a goal more efficient than what would result if the schedule were to follow the sequence that is shown on Page 8 of Exhibit 40, right?
THE WITNESS: Can I have that question again?
MR. STOUCK: Would you read it back, please?
(The record was read as requested.)

Page 71

A. Yes.
BY MR. STOUCK:
Q. Okay.
Do you think there is any possibility that when the spent fuel acceptance program commences operations in 2010, or at some other time, that the actual sequence of pickup of spent nuclear fuel will be the sequence -- putting aside the minor variations that we referred to previously -- do you think there is any possibility that the actual sequence will be the sequence that is shown on this OFF array on Page 40?
MS. HERRMANN: Objection. Speculation.
A. Yes.
Q. You do?
A. Yes.
Q. Okay. Can you quantify the possibility?
MS. HERRMANN: Objection. Speculation.
A. No.
Q. If that sequence were to be followed in actuality, do you believe that the costs would

Page 72

be greater or less than the costs of a system that includes some -- included some amount of campaign pickups?
MS. HERRMANN: Objection. Speculation.
A. Greater.
Q. Okay.
So it would be in the utility's interests to avoid that greater cost through some kind of rearrangement of the sequence; would you agree with that?
MS. HERRMANN: Objection. Foundation.
A. From a cost perspective, yes.
Q. Okay, and it would be in DOE's interest from a cost perspective to promote some rearrangement of the sequencing to be more cost-effective, right?
A. Within the extent of the law, yes.
Q. And is the reason that you believe it is possible that the actual sequence for pickup would be the sequence that is shown on Page 8 of Exhibit 40 is -- the reason that you believe that is a possibility, that contractual matters and issues and disputes on the utility side would require that that schedule be maintained if those

Page 73

issues and disputes could not be worked out; do you think that's a possibility?
MS. HERRMANN: Objection.
Can I have that question back?
(The record was read as requested.)
MS. HERRMANN: Objection. Foundation. Vague. Calls for a legal conclusion. Speculation.
A. Yes.
BY MR. STOUCK:
Q. Any other reason other than the inability of the utilities with or without the Department's help to work out those issues, is there any other reason that you think it's possible that the schedule that is shown on Page 8 of Exhibit 40 would be the actual sequence for pickup?
MS. HERRMANN: Objection Speculation.
A That's the main reason.
Q Okay. That's the only reason you can think of right now?
A. That's the only one I can think of right now.
Q. Okay.

Page 70

issues possibly. Possibly one utility has got pool overflow issues, another has a decommissioning issue. Another has maybe a policy or political issue about moving fuel. So those, all those issues would have to be dealt with, and they may -- it may not be to everyone's advantage to do something like that. We just don't know that.
Q. And what is the "something like that"?
A. To have exchanges or allocations recommended by the RSC.
Q. Okay. Well, let's see if you agree with this: Those matters that you just referred to might pose impediments to an optimal, in other words most efficient utilization of capacity, but that's not inconsistent with utilization of a system capacity being made as a goal more efficient than what would result if the schedule were to follow the sequence that is shown on Page 8 of Exhibit 40, right?
THE WITNESS: Can I have that question again?
MR. STOUCK: Would you read it back, please?
(The record was read as requested.)

Page 71

A. Yes.
BY MR. STOUCK:
Q. Okay.
Do you think there is any possibility that when the spent fuel acceptance program commences operations in 2010, or at some other time, that the actual sequence of pickup of spent nuclear fuel will be the sequence -- putting aside the minor variations that we referred to previously -- do you think there is any possibility that the actual sequence will be the sequence that is shown on this OFF array on Page 40?
MS. HERRMANN: Objection. Speculation.
A. Yes.
Q. You do?
A. Yes.
Q. Okay. Can you quantify the possibility?
MS. HERRMANN: Objection. Speculation.
A. No.
Q. If that sequence were to be followed in actuality, do you believe that the costs would

Page 72

be greater or less than the costs of a system that includes some -- included some amount of campaign pickups?
MS. HERRMANN: Objection. Speculation.
A. Greater.
Q. Okay.
So it would be in the utility's interests to avoid that greater cost through some kind of rearrangement of the sequence; would you agree with that?
MS. HERRMANN: Objection. Foundation.
A. From a cost perspective, yes.
Q. Okay, and it would be in DOE's interest from a cost perspective to promote some rearrangement of the sequencing to be more cost-effective, right?
A. Within the extent of the law, yes.
Q. And is the reason that you believe it is possible that the actual sequence for pickup would be the sequence that is shown on Page 8 of Exhibit 40 is -- the reason that you believe that is a possibility, that contractual matters and issues and disputes on the utility side would require that that schedule be maintained if those

Page 73

issues and disputes could not be worked out; do you think that's a possibility?
MS. HERRMANN: Objection.
Can I have that question back?
(The record was read as requested.)
MS. HERRMANN: Objection. Foundation. Vague. Calls for a legal conclusion. Speculation.
A. Yes.
BY MR. STOUCK:
Q. Any other reason other than the inability of the utilities with or without the Department's help to work out those issues, is there any other reason that you think it's possible that the schedule that is shown on Page 8 of Exhibit 40 would be the actual sequence for pickup?
MS. HERRMANN: Objection Speculation.
A That's the main reason.
Q Okay. That's the only reason you can think of right now?
A. That's the only one I can think of right now.
Q. Okay.

Page 74

You, Mr. Barrett, testified previously in your deposition about -- you used the term obligation rate to refer to the rate of spent fuel acceptance that I believe is shown in the '91 and '95 ACRs. It is the so-called 4-6-9 rate You refer to that as the obligation rate.

Do you recall that testimony or that concept?

A. I do.

Q. And I think you also said that -- but according to what you told me here this morning, and the reference to obligation rate was -- that was -- is it your understanding that that at least in some people's minds is what defines DOE's obligation under the Standard Contract as to the rate of pickup? Is that what the term means, obligation rate?

MS. HERRMANN: Objection. Speculation as to what is in people's minds. Calls for a legal conclusion.

A. Some people use it that way.

Q. Okay. But you don't know whether that is true or not according to what you told me this morning. You don't know whether that is actually DOE's obligation or not, you yourself?

Page 75

A. Correct.

Q. And I believe you testified when you were talking about this obligation rate that you had heard -- well, that phrase originated sometime in the early '90s; is that correct?

A. I don't recall.

Q. You don't know where it originated or when it originated?

A. No.

Q. You don't recall when you first heard it?

A. No.

Q. Okay. Well, do you know whether this term obligation rate was in use prior to the first of the ACRs that specified that 4-6-9 rate?

A. I don't know when it came into use.

Q. Okay. Might have been before, might have been after, you don't know what relationship it might have had to the first ACR that specified that rate?

A. No, I don't know.

Q. But you've heard it used for at least a number of years, the term obligation rate?

A. I only recall in the last five years or so.

Page 76

Q. The last five years or so. Okay. But it may have been around before that, you just don't know?

MS. HERRMANN: Objection. Speculation.

A. I don't know.

Q. Well, do you think it was around before approximately five years ago?

MS. HERRMANN: Objection. Speculation.

A. I don't know. I don't recall hearing it. I don't recall ever using it.

Q. But in any event, you don't know if that is an accurate statement of what the Department's obligation is?

A. Correct.

MS. HERRMANN: Objection. Calls for a legal conclusion.

Q. Okay.

Do you know what failed fuel is?

MS. HERRMANN: Objection. Calls for a legal conclusion.

A. In a general engineering sense, yes.

Q. Okay, what is your general engineering sense of the term?

Page 77

A. Fuel that has more than hairline cracks and pinhole leaks I think is the term that NRC uses. Pinhole leaks is the NRC term.

Q What are the current program plans for dealing with the acceptance of failed fuel in general, if you know?

MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion. Vague and overbroad.

A. I don't recall.

Q. Do you know whether -- okay. You don't recall what the current program is?

A. No.

Q. Do you know whether there are any technical impediments to the acceptance of failed fuel, you yourself?

A. Yes.

Q. Are there?

A. Yes.

Q. What are they?

A. They can require the special handling at the receiving facilities.

Q. Okay Do the current program plans include plans for the special, necessary special, appropriate special handling of failed fuel?

Page 78

MS. HERRMANN: Objection. Foundation.
A. At steady state they do. Initial startup is another matter.
Q. Do they for initial startup?
MS. HERRMANN: Objection. Foundation.
A. We are evaluating the design, the modular construction type design. To advance receipt to as early a practical date may require failed fuel to be deferred until a later date.
Q. Okay. To a steady state date, if I understood your prior testimony?
A. Steady state or later.
Q. Okay, and that would be because -- that would be a tradeoff, would you agree -- if I understand your testimony, that would be a tradeoff in return for the earlier receipt of standard fuel?
A. And also costs.
Q. Okay, costs, meaning that the Department might decide not to incur the cost of whatever special handling procedures were necessary for failed fuel at the earlier years of startup?
A. Correct.
Q. Okay. But that would be also part of

Page 79

the tradeoff for making operational earlier the program and the acceptance of standard fuel, I guess?
MS. HERRMANN: Objection. Mischaracterizes the testimony.
A. There are all sorts of tradoffs, and those would be the tradoffs that you would look at.
Q. But there is no doubt that the Department at some point in time will put in place whatever special handling procedures are necessary in order to accept failed fuel, right?
MS. HERRMANN: Objection. Foundation.
A. That is our plan to do so.
Q. Okay.
Do you know how utilities, for example my three clients that I mentioned at the outset, Yankee Atomic, Maine Yankee and Connecticut Yankee, are currently dealing with any failed fuel that they may have at their sites?
MS. HERRMANN: Objection. Foundation, speculation, compound.
A. No, I don't know specifically how those utilities do it.
Q. Do you know what those utilities are

Page 80

currently doing with their standard fuel?
MS. HERRMANN: Same objections.
A. Storing it in approved storage methods.
Q. Dry canisters?
MS. HERRMANN: Same objections.
A. And pools.
Q. And pools. Okay.
Well, do you know that these three utilities being shut down -- you know, having shutdown plants are in the process, some stage of the process of transferring their spent fuel from pools to dry casks; are you aware of that?
MS. HERRMANN: Same objections.
A. Yes.
Q. And do you know whether or not the failed fuel at these sites also is going to be transferred from pools to dry storage containers?
MS. HERRMANN: Same objections.
A. I believe that is their plans to do so.
Q. Who in your organization at RW, I guess, is responsible for analyzing issues relating to the acceptance and disposal of failed fuel?

Page 81

MS. HERRMANN: Objection. Vague.
A. Mr. Zabranski.
Q. Anyone else?
A. And staff that works with him, and his management, Mr. Williams.
Q. Anyone at the Yucca Mountain program office responsible for those matters?
A. There are designers in Yucca Mountain project office and also at the contractors that have design responsibilities that interface with Mr. Zabranski.
Q. When you point to Mr. Zabranski, who you say is primarily responsible?
A. Yes.
Q. Does that suggest that this is primarily a cost issue --
MS. HERRMANN: Objection.
Q. -- as opposed to a technical issue?
MS. HERRMANN: Objection. Mischaracterization.
A. No.
Q. No?
A. No.
Q. Mr. Zabranski is also dealing with whatever technical issues that concern acceptance

Page 82

of failed fuel?
A. Yes.
Q. Okay. Can you give me an example? A technical issue would be the special handling that you referred to?
A. Yes.
Q. Anything else besides special handling?
A. Transportation.
Q. Okay.
A. And then there are the contractual matters, waste acceptance contractual matters.
Q. Do you know specifically what the waste acceptance contractual matters are that pertain to failed fuel?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. It is one of many of the issues that needs to be resolved between the Department and the contract holders prior to implementing the system.
Q. Do you know specifically what the issue is pertaining to failed fuel?
MS. HERRMANN: Objection. Calls for a legal conclusion.

Page 83

Q. You told me it is one of the issues that need to be resolved. Do you know what the issue is?
A. I understand some of the subissues. With respect to failed issue I don't know what the issue is.
Q. With respect to failed fuel?
A. Correct.
Q. But in any event, with special handling procedures, failed fuel can be accepted at the repository or at another receiving facility as long as appropriate special handling procedures are in place?
A. And disposal procedures, yes.
Q. And disposal procedures, okay.
At an earlier point, at some previous time in this litigation, Mr. Barrett, were you asked to gather documents ultimately in response to the requests that one or more utilities had made to the government for documents relevant to this litigation?
A. Yes.
Q. Okay. Do you recall when that was?
A. No.
Q. Was it more than a year ago?

Page 84

A. I think so.
Q. Okay, and in what form did the request come to you that relevant documents be searched for? Was it E-mail, letter, memo, personal visit to your office?
A. The lawyers told me on some piece of paper. I don't know if it was an E-mail or --
MS. HERRMANN: Hold on. To the extent that you have to disclose communications between you and counsel, don't answer.
Q. Don't tell me the communications between you and counsel. I just want to know the form.
A. Piece of paper, E-mail.
Q. Did you yourself undertake the task of searching your own personal files for whatever documents were being called for in this communication, or did you have someone else do it?
A. Someone else do it.
Q. Who was that?
A. I don't know.
Q. You don't know who did it?
A. No, I don't.
Q. Well, who did you ask to do it?
A. I don't remember.

Page 85

Q. Okay, but were your personal files searched?
A. Yes.
Q. By someone?
A. Yes.
Q. But you don't know exactly who?
A. Correct.
Q. How do you know they were searched?
A. Somebody asked me do I have whatever it was, and I said anything I have that relates to that is in that bookcase and over there on the window sill, and I said go and look and do whatever you want to do, and I know people did because I was, like, missing things, and somebody brought back a box full of stuff many months later and said this is what we took.
Q. Those were your copies of what was taken or those were copies of what was forwarded on?
A. No. I just said do it and they just returned the originals, I think.
Q. Returned the originals?
A. I think.
Q. And somebody got the lucky task of being able to fill in all those holes on your

Page 86

bookshelves from where the documents had been taken?
A. Threw most of it out.
Q. And this was in your office at the Department of Energy?
A. Yes. These were things that I personally had.
Q. In your possession?
A. Yes.
Q. Do you ever send things to be filed outside of your own personal office?
MS. HERRMANN: I'm going to object if you are going to go a lot further, because this was all addressed at the previous deposition, this whole area.
MR. STOUCK: Can we go off the record for a second?
(Discussion off the record.)
(Whereupon, at 11:45 a.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:30 p.m., this same day.)

Page 87

AFTERNOON SESSION
(1:30 p m.)
Whereupon,
LAKE H BARRETT,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS (RESUMED)
BY MR. STOUCK:
Q Good afternoon, Mr Barrett.
A Good afternoon
Q Welcome back You are still under oath, you understand that?
A. Yes, I do
Q. We spoke a little earlier this morning about -- I think I referred you to a couple passages in the mission plan about DOE's ability to develop a transportation system suitable to support the Spent Fuel Acceptance Program.
Do you recall that?
A. Yes.
Q And it is true, is it not, and I think you told me this morning, but whether or not you did, it is true that, in the period from 1983 to 1988, DOE had the ability to develop a

Page 88

transportation program that would have been suitable for supporting the implementation of the Spent Fuel Acceptance Program beginning in 1998; is that right?
MS. HERRMANN: Objection. Vague.
A. You said '83 --
Q. Well, to develop a transportation program that would have been suitable for supporting implementation of the acceptance program beginning in January 1998. There was enough time to develop a suitable transportation program?
MS. HERRMANN: Objection, vague.
A. From '83 on, yes.
Q. It could have been done?
MS. HERRMANN: Objection.
A. Yes.
Q. And, in the course of developing that program, whatever special handling procedures may be necessary in order to accept failed fuel, those special handling procedures also could have been developed by DOE in that time frame as well, correct?
MS. HERRMANN: Objection. Vague.
A. Didn't say that.

Page 89

Q. Well, I'm asking you that now.
A. Okay. What is the question?
Q. The question is whether beginning -- whether DOE had adequate time, from the time that the spent fuel program was enacted in 1983 until the planned commencement date of January 1998, to develop and implement whatever special handling procedures are necessary or may be necessary in order to accept failed fuel at a time commensurate with the acceptance of standard fuel, beginning in 1998?
MS. HERRMANN: Objection, vague.
Q. Could those special handling procedures have been developed in that time period, between '83 and '98?
MS. HERRMANN: Same objection.
A. Maybe.
Q. Okay, depending on what? Given adequate funding could they have been developed?
A. Could have. I'm not sure would have.
Q. Well, impediments might have existed that would have led those special handling procedures not to have been developed in that time period?
A. Well, failed fuel is special. That was

Page 90

with the MRS concept at the time. You know, I just don't know.
Q. So your testimony is DOE did not have the capability during the 15-year period between 1983 and 1998 of developing whatever special handling procedures for failed fuel may have been necessary to commence operations and acceptance of failed fuel commencing in January 1998; is that what you're telling me?
MS. HERRMANN: Objection. That's a mischaracterization of his prior testimony.
A. I don't know what the plans were. I don't know what the intentions were because that wasn't the -- failed fuel was not standard fuel, and I don't know what the plans were.
Q. Okay. I'm not asking about plans. I'm just asking about -- plans are included in my question. Plans could have been developed to address the problem, study the problem, or if it was a problem study the issue of failed fuel and how to accept it. And whatever special handling procedures may have been or may be necessary in order to accept spent fuel, the DOE had the capability, the technical expertise of developing those special handling procedures and implementing

Page 91

them by January 1998 when the acceptance of spent fuel was supposed to begin, correct?
MS. HERRMANN: Objection. Vague. Speculation.
A. In a 15-year time period, if there is a will and finances, et cetera, from the technological point of view you can develop a system to accept failed fuel in a 15-year period.
Q. I'm going to hand you what the reporter is about to mark as Exhibit 81.
(Barrett Deposition Exhibit No. 81 was marked for identification.)
BY MR. STOUCK:
Q. Let me identify this for the record. It is entitled, Transportation Business Plan, January 1986, Bates number HQR-037-0258 through 0311.
Is that the document that you have?
A. It is.
Q. Have you seen this before?
A. Yes.
Q. What is it?
A. It is Transportation Business Plan from long ago, January '86.

Page 92

Q. Okay. And I notice that the transmittal letter at the front of the document is signed by you, correct?
A. Correct.
Q. What was your role in developing this Transportation Business Plan?
A. This was done by the transportation group which was under my responsibility, so I was the director of this organization.
Q. Did you review this and approve it before it was issued?
A. Yes.
Q. And you agreed with its contents when it was issued?
A. Yes.
Q. And what was the purpose of this document at that time in January of 1986?
A. It was to lay out our general plan, business plan for transporting fuel to the facilities in, you know, '96/'98.
Q. And you say your general plan. This was the plan at that time, right? Was there some other plan?
A. There was also an institutional plan that was contemporary to this, that may have come

Page 93

afterwards.
Q. Okay, and what did the institutional plan do that this did not do, or what was the relationship between the two?
A. This addressed the business aspects of the program. The institutional plan addressed routing, state interfaces, inspections, and those types of issues.
Q. Okay. What would you -- what do you mean by the business aspects of the plan? Can you just specify a little further what parts of the plan that is?
A. Developing the hardware, the casks. That primarily was the main item that was addressed here.
Q. Okay. Thank you.
Now, take a look at -- do you need some or want some time to review this?
A. Not unless there is some particular place you want to go. I haven't seen it in 15 years.
Q. Okay. Well, take a look at Page 3. You will see the third paragraph there refers to a Phase I. Do you see that in the first sentence?
A. Yes.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiffs, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : VOLUME II

- - - - - - - - - - - - - - - -X

Washington, D.C.
Wednesday, May 15, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:05 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

APPEARANCES:

On behalf of the Plaintiff:
JERRY STOUCK, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
HEIDI L. HERRMANN, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR DEFENDANT |
|---|---|
| LAKE H. BARRETT | |
| By Mr. Stouck | 246 |


EXHIBITS


| BARRETT EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 93 | Memo, Barrett to Wade | 246 |
| 94 | Notes written by PNL re '96 meeting | 253 |
| 95 | Document entitled Civilian Radioactive Waste Management System, June '97 | 278 |
| 96 | Notes of telephone conversation with Mr. Barrett | 283 |
| 97 | Condensed transcript of Mr. Barrett's previous testimony, 4/22/01 (selected pages) | 289 |
| 98 | Memo, Tomasoni to Buchheit | 303 |
| 99 | Informal Memorandum, 7/8/93 | 309 |
| 100 | Condensed transcript of Mr. Barrett's previous testimony (selected pages) | 317 |





| BARRETT EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 101 | Memo, Milner to Barrett and attached concurrence sheet | 322 |
| 102 | Collection of documents | 340 |
| 103 | Excerpt of Proceedings, 1983 Civilian Radioactive Waste Management Information Meeting | 386 |




PROCEEDINGS

\- - - - - -

Whereupon,

LAKE H. BARRETT,

was recalled as a Witness by counsel for the Plaintiff, and having been previously duly sworn by the Notary Public, was examined and testified further as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS (RESUMED)

BY MR. STOUCK:

Q Good morning, Mr. Barrett.

A Good morning.

Q. You understand that you are still under oath?

A I do.

Q. Good.

MR. STOUCK: Can you mark this with the next number, please?

(Barrett Deposition Exhibit No. 93 was marked for identification.)

BY MR. STOUCK:

Q. You have been handed a document that has been marked Exhibit Number 93 to this deposition, Mr. Barrett. It is a memorandum on

A. I don't recall. I have lots of meetings with Yankee -- there were quite a few people included with the Yankees, and I don't remember.

Q. Do you recall telling anyone at Yankee Atomic, you know, shortly, sometime not long after this denial letter, that you were receptive to suggestions on a process for allocation of priority under the contract which DOE could follow?

MS. HERRMANN: Objection. Vague.

A. I might have.

Q. Okay.

Do you think -- were you sympathetic to Yankee's predicament at the time? In other words, to its desire to move this spent fuel off of its site so that it could complete the decommissioning activities which had been initiated?

MS. HERRMANN: Objection. Vague.

A. Yes.

Q. Why?

A. I felt that it was in the nation's interests to support utilities like Yankee who were trying to clean up their sites and return that real estate to useful societal purpose in



that we should try to move the fuel off as quickly as we practically could, consistent with sound national policies.

Q. Good. That's what you thought, you know, in your working life at RW?

A. Yes.

Q. Okay. But because of these other factors we have discussed previously, either the time wasn't right or whatever to actually grant the priority at that time?

MS. HERRMANN: Objection as to the characterization.

Q. Even though you were sympathetic to their predicament?

A. I was sympathetic to their predicament. Sympathy did not drive the decision to grant it.

Q. Because of the other factors that we discussed previously, is that what led you to deny it?

A. Correct.

Q. Okay.

MR. STOUCK: Would you mark this as Number 101 (sic), please.

(Barrett Deposition Exhibit No. 102 was marked for



identification.)

MS. HERRMANN: Exhibit 102.

BY MR. STOUCK:

Q. Actually, Mr. Barrett, this one I will tell you is a collection of documents. I believe -- yes, they are consecutively numbered, out of Yankee Atomic's files. But there is at least a couple of documents here, so let me just identify them for the record as follows.

The cover page is a letter from Mr. Grube to you dated October 7, 1993. Then there looks like a two-page document, "suggestions of How DOE Should Implement the Granting of Priority Acceptance of Spent Fuel from Permanently Shutdown Plants," and then the fifth and sixth page is a memorandum dated October 1993, a memo from Mr. Grube to Dr. Kadek, and the Bates numbers are YOF006635-6640 -- excuse me, then there is a last page which is all part of the same collection, October 19, 1993, a letter from you to Mr. Grube. Okay?

Would you please -- could we just take a short break here while you are reviewing this document? I will come back and ask you a couple of questions about it.



(Recess taken -- 11:45 a.m.)

(After recess -- 11:55 a.m.)

BY MR. STOUCK:

Q. Have you had a chance to review this collection of documents?

A. I have.

Q. Let's start with the letter to you dated October 7. It's the first page of the exhibit --

MR. STOUCK: What is the number on this exhibit again?

THE REPORTER: 102.

Q. This is letter from Mr. Grube thanking you for spending time at a meeting on September 20th, right?

A. Yes.

Q. Do you recall the meeting now?

A. No.

Q. Do you know if the meeting happened?

A. Probably.

Q. Okay. Well, did you review this entire exhibit?

A. Yes.

Q. Okay. Well, the last page is a letter from you, right, signed by you, right?

Is that a fair characterization?
A. Yes.
Q. Okay. Number 1, "Granting priority can be shown to be lest costly to DOE's waste management system."
Do you believe that a shutdown utility could make that showing?
MS. HERRMANN: Objection. Speculation.
A. Possibly.
Q. Okay. Well, I mean the question is not whether this would always be true, but whether -- the question included possibly. Is it possible that a shutdown utility could make that showing? I'm not sure that "possibly" is a fair answer to that.
MS. HERRMANN: Objection. Speculation. Asked and answered.
A. What was the question?
Q. The question is could a shutdown reactor, is it possible that a shutdown reactor could show that granting priority acceptance to it would be less costly to DOE's -- would reduce the cost of the waste management system?
A. Yes.
Q. And is it possible that granting



priority acceptance -- this is Number 2 -- to a shutdown utility -- I'm paraphrasing -- could be shown to involve small enough quantities of fuel compared to the overall DOE acceptance rate so as not to jeopardize the timely removal of spent fuel from other sites. Is it possible that they could make that showing?
MS. HERRMANN: Objection. Speculation.
A. You use the word timely in an absolute sense. The answer is no.
Q. Okay. So it is your opinion that granting priority acceptance to a shutdown reactor would necessarily involve a schedule impact to some other utility or utilities? In other words, there is no play in the system. If you got priority for one, somebody else would necessarily have to move; is that your understanding?
A. Yes.
Q. And I take it you would agree that granting priority -- this is a different question -- not whether the showing could be made, but I take it you would agree that granting priority to a shutdown reactor can be shown, at least in some circumstances, to avoid the establishment of



otherwise unneeded reactor site storage facilities?
A. Yes.
MS. HERRMANN: Objection. Speculation.
Q. And Number 4, "Granting priority can be shown to be clearly cost-effective for consumers from the standpoint of timely decommissioning."
I take it you agree with that? We talked about that earlier.
MS. HERRMANN: Objection. Speculation.
A. Yes.
Q. All right. And Number 5 is an overall policy issue which I think we have also talked about. Okay.
I think we have exhausted that one, and I just have a couple more questions for you about your prior testimony and I hope we can wrap this up. So all my remaining questions, I believe, are going to concern either Exhibit Number 100 or Exhibit Number 97, which are the first two days of your testimony in this deposition, so you might want to have those handy.
Before we turn to those I do have one other question. Yesterday we talked about something, and I believe, Mr. Barrett, it concerned



the draft RFP which is on your web site for regional services. And it had to do with risks -- the general subject matter was risks that the prospective contractors might face in the startup phase of the program, that DOE has apparently given or is giving some consideration to offsetting those costs or risks with either financial subsidies or contractual arrangements. Do you recall that subject?
A. Yes.
Q. And I think you told me that, in connection with that subject, that these added risks or added costs in the startup phase would be reduced over time as the performance of the acceptance program and the overall system -- you didn't use these words but I will use them -- built up a track record, that there would be more confidence in the system such that these risks or costs at the startup that DOE is giving special consideration would in some sense dissipate over time and be less of a factor once there is confidence through a track record that the system could and would work.
Do you recall that?
A. Yes.

# BROWNSTEIN, ALAN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J )
WISCONSIN ELECTRIC POWER COMPANY
(00-697C)(Merow, S J )
POWER AUTHORITY OF THE STATE OF NEW YORK
(00-703C)(Damich, J )
OMAHA PUBLIC POWER DISTRICT
(01-115C)(Bush J )
NEBRASKA PUBLIC POWER DISTRICT
(01-116C)(Sypolt, J )
TENNESSEE VALLEY AUTHORITY
(01-249C)(Bruggink J )
Plaintiffs,
v Discovery
THE UNITED STATES, Judge
Defendant (Judge
--------------------xSypolt)
McLean, Virginia
Tuesday, April 9, 2002
Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 9 30 a m , Tuesday, April 9, 2002, and the proceedings being taken down by Stenotype by CATHERINE S BOYD and transcribed under her direction

Page 4

APPEARANCES

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District
ALEX D TOMASZCZUK, ESQ
DANIEL S HERZFELD, ESQ
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District
DAVID S NESLIN, ESQ
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 5

APPEARANCES (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company
JEFFREY L HANDWERKER, ESQ
Arnold & Porter
555 Twelfth Street, N W
Washington, D C 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company
DONALD J CARNEY, ESQ
Perkins Coie, LLP
607 Fourteenth Street, N W
Washington, D C 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company
NORMAN M HIRSCH, ESQ
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 14

Q What did you do when you worked at GPU from 1978 to 1980?
A I was a, I worked on the corporate planning division
Q Can you describe for me briefly your duties at that time?
A Generally we worked on, on planning future resources for the company, generation of resources for the company, doing economic evaluations of power plants, load capacity forecasts
In general, that was it
Q And you said you left GPU in 1980?
A Yes
Q Why did you leave?
A Opportunities from Washington
Q It was at that time that you accepted a position at GAO?
A Yes
Q Okay And you said you worked at GAO for five years?
A Yes
Q What were your, what was your title at GAO?
A I was a, I think they called it a

Page 15

senior evaluator
I was a electricity specialist they hired me in as
I don't recall the exact title, but I worked in doing studies involving various electricity policy issues
Q To whom did you report at GAO?
A The top gentleman, first level or --
Q Who was your immediate supervisor? Why don't we start there?
A I believe Billy Oakers
Q Could you spell the last name for me?
A Actually I don't remember
Q Were you within a, an office at GAO, or a division of GAO?
A I was, and it was called the energy division I believe
Oh, actually excuse me -- Energy and Minerals Division
Q And why did you leave GAO in 1985?
A Opportunities at the Energy Department working on this program
Q And when you say working on this program, what do you mean by this program?
A The Office of Civilian Radioactive

Page 16

Waste Management
Q What I referred to earlier as OCRWM?
A That's correct
Q So if I use that acronym, we'll both understand what I'm talking about?
A OCRWM or RW, yes
Q And you have been with OCRWM or RW since 1985?
A Correct
Q To the present day, correct?
A Correct
Q Did you have any involvement or participation in discussions relating to the enactment of the Nuclear Waste Policy Act of 1982?
A I did not
Q Now you were a GAO employee at the time that bill was enacted, right?
A That's correct
Q At GAO, did you have any involvement in the discussions relating to the enactment of that statute?
A None whatsoever
Q Were you aware while you were at GAO that the statute was enacted?

Page 17

A No
Q Your first awareness of the statute occurred in 1985 when you became a DOE employee?
A Correct, when I was considering employment at DOE
Q While you were at GAO, did you work on spent nuclear fuel issues?
A No
Q Did you work on nuclear issues?
A Tangentially to the extent that they involved electricity policy issues
Q Is it fair to say that your first real involvement with spent nuclear fuel occurred in 1985 when you assumed the job at DOE?
A Correct
Q What caused you to take the job at DOE in 1985?
A The, really the mission of the program, opportunities, it was a professional promotion at the time, and I was intrigued by the mission of the office and my, potentially my role in that
Q What GS position did you assume when you joined DOE in 1985?
A Fourteen



Alderson Reporting Company, Inc
1111 14th Street, N W Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 54

Q What were the responsibilities of the department with respect to the disposal of spent nuclear fuel?
A We were responsible --
MR BANES Objection -- I'm sorry Objection Calls for a legal conclusion
Go ahead
THE WITNESS Okay Ultimately we were responsible for accepting that fuel for permanent disposal
BY MR TOMASZCZUK
Q Was there a date by which the department was to undertake that effort?
MR BANES Objection Calls for a legal conclusion
Go ahead
THE WITNESS I believe and the department believed that we had to begin accepting that fuel upon commencement of the facility operations
BY MR TOMASZCZUK
Q Not by a particular date?
A There was a date, but that date was conditional
We believed that the January 31st,

Page 55

1998 date was clear as we responded to written questions from the Hill and others, that that date was conditional based on the commencement of facility operations
Q Did the department have the responsibility to take title to the spent nuclear fuel or high-level waste involved as expeditiously as practicable?
MR BANES Objection Calls for a legal conclusion
THE WITNESS Yes, but, and the but is based upon commencement of facility operations
BY MR TOMASZCZUK
Q Is it your understanding, Mr Brownstein, that if the facility never opens, then DOE never has an obligation under the contract?
MR BANES Objection Calls for a legal conclusion, and vague
THE WITNESS Yes
BY MR TOMASZCZUK
Q Did you have any understanding at or about the time you became a DOE employee with respect to the spent nuclear fuel acceptance rate that DOE was using with respect to the

planned geologic repository?
MR BANES Objection -- vague and irrelevant, but go ahead
THE WITNESS The acceptance rate as I understood it was the one -- you said at the time I became employed -- was the one issued in the mission plan
BY MR TOMASZCZUK
Q Does the standard contract specify a spent nuclear fuel acceptance rate?
A No
MR BANES Objection Calls for a legal conclusion
THE WITNESS It does not
BY MR TOMASZCZUK
Q Did you discuss the fact that the contract did not have an acceptance rate with Mr Brandt at or about the time you became an employee?
A I do not recall that
Q Did you discuss it with anyone else at or about the time you became an employee?
A I don't recall
(There was a pause in the proceedings )

Page 57

MR TOMASZCZUK Ms Reporter, I'm going to hand you and ask you to mark as Brownstein Exhibit 2 an excerpt of a June 1985 document entitled, "Mission Plan for the Civilian Radioactive Waste Management Program," and I think I can represent it reflects the Table of Contents and the, I believe the first 28 pages of that mission plan
(Brownstein Exhibit No 2 was marked for identification )
BY MR TOMASZCZUK
Q Do you recall that document, Brownstein Exhibit 2?
A Yes
Q And it is an excerpt of the June 1985 mission plan, is that correct?
A To the best of my recollection, it is
Q All right And you're familiar with this document, are you not?
A I'm aware of it I have read pieces of it
Q You didn't prepare it, did you?
A That's correct
Q Do you know who did?

Page 58

A I do not recall This is, the date is June '85 It was before my time
Q I appreciate that Do you recall whether you read this document at or about the time you became a DOE employee or shortly thereafter?
A I believe I read excerpts from it
Q Did you use the document to implement the terms of the standard contract?
A I used -- yes, in part
Q And what parts did you use?
A I used the waste acceptance rates Hesitation in the response is whether I used the '85 or the subsequent mission plan
I don't recall which, but I certainly used the mission plan or its predecessor documents for the waste acceptance rates
Q Do you know whether there was an earlier version of this mission plan?
A I don't believe there was
Q The reason I ask, sir, is because I believe you used the term this document or its predecessor I was trying to --
A Subsequent documents, it's amended documents after I'm sorry

Page 59

Q Let me hand you, Mr Brownstein, I'm going to have this marked as Brownstein Exhibit 3, what appears to be Volume 1 of a draft mission plan dated December 20, 1983
(Brownstein Exhibit No 3 was marked for identification )
BY MR TOMASZCZUK
Q Have you ever seen that document before?
A I cannot recall ever seeing this document
Q Can I direct your attention to page 2-1 under the heading II, program strategy?
I would direct your attention to the first paragraph under that heading, program strategy
(The witness reviewed the document )
THE WITNESS Okay
BY MR TOMASZCZUK
Q Do you see the last two sentences of that paragraph?
A Yes
Q It states, "The waste materials will be accepted in accordance with a Waste

Page 60

Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998 Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year "
That's what is stated there, correct?
A Correct
Q Was that DOE's policy at the time you became an employee?
A I've never seen this document
MR BANES Objection -- vague
THE WITNESS And I do not believe it reflects the policy
BY MR TOMASZCZUK
Q It does not reflect the policy?
A I do not believe it does
Q It was not DOE's policy under the contract to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?
MR BANES Objection -- asked and answered

Page 61

THE WITNESS It may have been a goal I mean I was not with the program and had not seen this document
May have been a goal, but in terms of the policy with respect to the contract, I don't believe that reflects that
BY MR TOMASZCZUK
Q And it's your testimony that you haven't seen this document before today as best you can recall?
A As best I recall, I have not seen this document
(There was a pause in the proceedings )
BY MR TOMASZCZUK
Q Let's go back to Brownstein Exhibit 2, which was the June 1985 mission plan
And I believe you testified if I understood it, Mr Brownstein, that you used the waste acceptance schedules in the mission plan to implement the terms of the contract?
A And --
MR BANES Objection Go ahead
BY MR TOMASZCZUK
Q I understood that to be your

Page 62

testimony?
A In the mission plan or the mission plan amendments
Q Okay And how did you go about doing that?
Explain to me what you mean by that
A My responsibilities did not include developing a waste acceptance rate that was done by other parts of the program, and in order to complete the things that I was responsible for, we needed a waste acceptance rate, and I used documents available elsewhere in the program
Q Who was responsible for developing the waste acceptance rates reflected on page 26 of Exhibit 2?
A I don't recall As I testified, this document came out before I was an employee, so I don't know who, who was responsible for that
I don't recall who was responsible for that
Q What office within DOE was responsible for preparing this data, do you know?
A OCRWM
Q Was there a division or branch within OCRWM that was responsible for preparing the

Page 63

waste acceptance schedule at page 26 of Brownstein 2?
A There probably was, but I just don't recall
Q Do you see the first sentence of this section under the heading 2 7, waste-acceptance schedules, on page 25?
(The witness reviewed the document )
THE WITNESS Yes
BY MR TOMASZCZUK
Q It says, "The DOE is committed to accept waste from the signatories of the standard disposal contracts on a firm schedule that begins no later than January 31, 1998"?
A Yes
Q Is that an accurate statement?
MR BANES Objection Calls for a legal conclusion
It's vague
BY MR TOMASZCZUK
Q I'm not asking for your understanding as a, as an attorney
A The statement is what it is You read it correctly
Q Is it an accurate statement? Do you

Page 64

understand my question?
A I don't
MR BANES Same objection
BY MR TOMASZCZK
Q Well, is it true that DOE under the contract is committed to accept waste from the signatories of standard disposal contracts on a firm schedule that begins no later than January 31, 1998?
MR BANES Objection Calls for a legal conclusion
Go ahead
THE WITNESS I don't believe that I believe that this is a, a goal
I don't believe that it accurately represents what the contract calls for
BY MR TOMASZCZUK
Q Did you ever discuss that view with anyone?
A I'm sure that I must have, but I don't recall specifically who or circumstances
Q You would at least agree the first sentence doesn't talk about goals, does it?
MR BANES Objection -- vague, argumentative

Page 65

THE WITNESS The word goal is not used in the first sentence
BY MR TOMASZCZUK
Q Do you know to whom this mission plan was disseminated?
A The document was public It was all -- it was public, all interested parties, all interested people
I don't know the mailing list
Q Do you know why it was prepared?
A I believe, I believe it was required under the NWPA
(There was a pause in the proceedings )
BY MR TOMASZCZUK
Q There are two tables which appear near the end of this excerpt on pages 26 and 27
(The witness reviewed the document )
THE WITNESS Okay
BY MR TOMASZCZUK
Q And are you familiar with these two tables?
A I have seen them before, generally familiar with them
Q Do you know what they purport to

Page 86

Q For the first repository, sitting here today, do you recall what, if anything, changed between the original mission plan in 1985 and this mission plan amendment in June 1987 which caused the data on these tables to change a little bit?
MR BANES Objection -- lack of foundation
Go ahead
THE WITNESS Section F 2 talks about the key changes between the rates in the two documents you talk about, so there is a list of --
BY MR TOMASZCZUK
Q All right
A Causal factors if you will
Q Did you prepare any of this, any of the items on this list at F 2 that you just alluded to?
A I'm going to review the list
Q Absolutely
A One more time
Q Please, take your time
(The witness reviewed the document )
THE WITNESS I, I do not believe that

Page 87

I wrote any of these
BY MR TOMASZCZUK
Q Okay Did someone tell you to use the data in these tables in the preparation of the ACR?
A When you say tell you, you mean like nobody ordered me to do it
I discussed what I was going to do with, with my superiors and peers, so I think, you know, discussing it is the better acronym
Nobody told me
Q Okay And with whom did you discuss that subject?
A In '87, I certainly would have discussed it with Mr Brandt
I certainly would have discussed it with Mr Milner
I'm sure I discussed it with the then director, who I believe was Rusche at the time, and there was a reporting chain above me, so you know, those people that I knew that were going to have to concur in the document, you know, I coordinated with them beforehand, so I spoke to a number of people about that
Q Was it your decision to use the data

Page 88

in the mission plan amendment in the first ACR, or was it someone else's within DOE?
A I believe it was my recommendation that others concurred on
Q And why did you use the data in Table F-1 to prepare the first ACR?
A I have not looked at the ACR in a long time, so I'm assuming based on your statement that, that I did
I mean I need to review it to make sure
Q That's fair And I base my statement on what I understood your testimony to be
A Okay
MR BANES Objection -- lack of foundation
THE WITNESS In implementing the terms of the contract, the, I didn't view -- there are many factors that go into the waste acceptance rate that are not contractual
There are logistical There are engineering There are other concerns that, responsibilities of other parts of the office, not mine
I needed a waste acceptance rate in

Page 89

order to carry out my responsibilities in the contract
It was not my responsibility to, to do, to put that together, so I took information that the department was publishing at the time and used that
It was, it was more simple as opposed to more complicated in terms of the decision
BY MR TOMASZCZUK
Q In or about June of 1987, Mr Brandt was your immediate supervisor?
A Yes
Q Okay And where was Mr Milner in the supervisory chain?
A To the best of my recollection, in June of '87, he was not in my supervisory chain
He was, he was I believe a division director in another division within one of the offices within RW, so he was someone that I regularly consulted with on a number of issues associated with the contract
Q Okay, but you, just so I understand your testimony, you didn't report to him directly at that time?
A At that time, I did not

Page 110

responsible for it under my direction
Q Okay
(There was a pause in the proceedings )
MR BANES The draft has been produced It was produced in the initial production
MR TOMASZCZUK Do you know under what identification?
MR BANES Just for the record, I don't have the Bates stamp with me, but it's in there
BY MR TOMASZCZUK
Q Did any entities provide comments to you on the ACR after it was published?
A I believe we did get some letters from some of the utilities
Q And do you recall the contents of those letters?
A No, I don't
(There was a pause in the proceedings )
BY MR TOMASZCZUK
Q Did you ever have any occasion to meet with utility representatives concerning the

Page 111

acceptance rate schedule referenced in the ACR?
MR BANES Objection -- vague In this ACR?
MR TOMASZCZUK Yes
MR BANES Okay All right
THE WITNESS No
BY MR TOMASZCZUK
Q Do you recall when the first draft of the ACR was prepared?
A No
Q Were drafts of the ACR prepared?
A Yes
MR TOMASZCZUK Let me ask the reporter to mark another document as Brownstein Exhibit No 7, and it is, appears to be a letter dated April 28, 1987, to Mr Christopher Jedrey, and the letter is signed by S Kraft on behalf of an organization I believe is UNWMG
(Brownstein Exhibit No 7 was marked for identification )
THE WITNESS Okay
BY MR TOMASZCZUK
Q Do you recall seeing this letter before today?

Page 112

A Yes
Q And in what context had you seen it before?
A In my review of carrying out my program responsibilities
Q Mr Jedrey at the time was the contracting officer responsible at DOE for the standard contract?
A Yes He was part of procurement He was the contracting officer
Q And did you have occasion to work with him at this time?
A I did
Q Okay So presumably he gave a copy to you at or about the time you received it?
A I'm sure he did
Q Okay And did you do anything about the issues identified in this letter?
MR BANES Objection -- compound and vague
BY MR TOMASZCZUK
Q What did you do with this letter after you got a copy of it, if anything?
A I can't recall whether we responded to it or not, to be frank with you

Page 113

I mean I know we worked on and analyzed it I know it was discussed
I can't tell you what we did with it I don't recall
Do you have the letter we can see?
Q Did you ever have occasion to discuss the subjects in the letter with the author, Mr Kraft?
A I, I spoke to, to Kraft on a relatively regular basis, so I'm sure we discussed at least parts of this at some point, yeah
Q Do you recall anything specific with respect to your discussions with Mr Kraft?
A That was a long time ago I don't recall the specific conversations
I'm sure that I had them with him, but I just don't recall the specifics
It was a long time ago I can't even recall what we, as a department, how we responded to it
Q Directing your attention to page 2 of the letter?
A Okay
Q The heading A, which is underlined at

Page 114

the top of the page, there is a reference in that underlined language to performance standards?

A Yes

Q Do you recall that issue being discussed at this time?

A Generally, I do

Q And what do you recall about that subject, if anything?

A To the best of my recollection, I believe we didn't think that was necessary and was something that the department was not willing to agree to

We thought the law and the contract were sufficient clarity, so we weren't, as I recall, we weren't amenable to do that, and I'm sure the conversations reflected that

Q The DOE was not amenable to the inclusion of performance standards in the contract?

A Right We thought they were unnecessary

(There was a pause in the proceedings )

BY MR TOMASZCZUK

Page 115

Q When you got this letter and saw the reference to performance standards, did you understand that to be milestones in meeting the January 31, 1998 date, or did you have a different understanding of that term?

MR BANES Objection -- vague and lack of foundation

I think the words are additional performance standards

MR TOMASZCZUK I appreciate that That's fair

THE WITNESS Okay Could you restate the question?

BY MR TOMASZCZUK

Q When you got this copy of this letter from Mr Kraft, what did you understand the term additional performance standards to mean in your mind?

A In my mind, they, they wanted us to be clearer in terms of what we were going to do and when we were going to do it than was included in either the NWPA or the contract itself

We felt both documents were sufficiently clear

Q And did you understand the term

Page 116

additional performance standards to mean milestones for meeting the January 31, 1998 date, or did you understand it to mean something other than that?

MR BANES Objection -- compound, vague

THE WITNESS In my mind, the January 31st, 1998 date, as I have stated previously, was always a conditional requirement, and it was conditioned clearly both on the law and the contract, on the commencement of the facility operations, and so while we, as I indicated to you earlier today, we had, I think you used the word goals or objectives of accepting fuel as early as possible, that is separate and apart from the contractual, conditional contractual commitment which predicated the acceptance on commencement of facility operations

That's how I used it

BY MR TOMASZCZUK

Q Did you understand when you saw the term additional performance standards that the utilities were asking DOE to adopt a minimum acceptance rate for the facility?

A One of the things that was implied in

Page 117

the letter that Mr Kraft was concerned about was in his mind, the department could potentially meet its obligation again in my mind, following commencement of facility operations by accepting a single fuel assembly from a utility, and, and they were concerned about that

Q Did you have a view about that issue?

A We viewed the contract and the law, you know, contain sufficient performance standards

It was clear that in return for payment, ultimately and conditionally, we would be required to take their waste, and that's the ultimate performance standard

Everything else were intermediate milestones or goals as opposed to contractual commitments

Q Do you know whether the federal Courts of Appeal have adopted your view as to the conditional nature of DOE's performance that you just articulated?

A They have not, but that is how we, that is what we believed, and that's how we acted really at all times prior to that decision

Page 118

you referred to
Q And what decision did you understand me to be referring to?
A Whether we had an obligation on January 31st, 1998, whether in fact that was conditional or not
Q And you understand now that the courts have concluded that that obligation was not conditional, is that correct?
A That's correct
MR BANES Calls for a legal conclusion
THE WITNESS Sorry That's correct
BY MR TOMASZCZUK
Q Do you think the courts were wrong about that?
A Can I answer that?
MR BANES Yeah
THE WITNESS My --
MR BANES Objection -- irrelevant, but you can answer that
THE WITNESS I, my personal opinion is I absolutely believed my interpretation was correct
And the reason for that is there are

Page 119

words in the law and there are words in the contract in order for me to agree with that ruling I have to ignore, so yes, I believe I was correct, and I believe I still am
That's my personal opinion
(There was a pause in the proceedings )
MR TOMASZCZUK Let's have another document marked as Brownstein Exhibit 8
It appears to be a, it appears to be a memorandum to file dated June 29, 1987, and it has Mr Brownstein's name on it
(Brownstein Exhibit No 8 was marked for identification )
THE WITNESS Okay
BY MR TOMASZCZUK
Q Do you recall this document?
A Vaguely
Q Did you prepare it?
A Yes
Q That's your signature on the document?
A It is, and my initials at the bottom
Q All right And in the first paragraph, the document reflects that on June

Page 120

26, 1987, you met with Mr Kraft, right?
A It does
Q For purposes of discussing his previous letter?
A Um-hm
Q Brownstein Exhibit No 7?
A Right
Q All right Why did you meet with Mr Kraft to discuss his letter to Mr Jedrey?
A I don't recall Before you showed me this letter, I didn't even recall this memo, so as I testified previously, I knew I had talked with him, but I met on many occasions with Mr Kraft on a host of contract-related issues
I don't recall this specific meeting or how we --
Q And what, why is it that you were meeting with Mr Kraft on contract issues?
A He, he represented, he was the director of the Utility Nuclear Waste Management Group, and he represented a large number of utilities who had interests in the contract
I told you my responsibilities, and that's what -- we had regular interactions over

Page 121

various contract issues
Q Okay Do you recall who was present at the meeting with Mr Kraft on June 26, 1987?
A No
Q Do you recall where the meeting took place?
A No
Q Do you recall how long it lasted?
A No
Q Do you recall discussing with Mr Kraft two issues where DOE could be responsive, namely, issues C and E as reflected on his earlier letter?
A As I testified before you showed me this letter, I knew I had regular interactions with Mr Kraft
I knew I had discussed a lot of issues
I knew I discussed this at some point in general terms
I did not even recall this meeting I did not recall preparing this until you showed it to me
I don't recall any of the details of that conversation