Page 126

impression that you had that they were positioning themselves for quote, unquote, future action, right?
A Yes
Q What about the conversation left you with that impression?
A I testified before I didn't, don't recall
This is the best reflection of what I believed at the time, and I have no reason to either add to it or take away from it
I mean that's what I wrote, and that's what I believed at the time
I don't recall anything else
(There was a pause in the proceedings )
BY MR TOMASZCZUK
Q Was it your common or regular practice to prepare memos to file like this?
A I did it on occasion It was not common, and it was not regular
Q Do you recall other occasions where you prepared such memoranda?
A In terms of memos to the files?
Q Yes, like this

Page 127

A Irregardless of the subject?
Q Well, I guess yes is the answer to my question?
A Yes, on occasion
Q And do you recall the topics with which they dealt?
A I recall several that dealt with personnel-related matters
Q Do you recall any dealing with spent nuclear fuel disposal or acceptance?
A I do not I do not even recall this one
Q Do you know whether you prepared a memo to file after each of your meetings with Mr Kraft or not?
A I am, I am sure that I did not This was a rare -- I can't, I cannot testify it was the only, but it was rare
I met with Steve Kraft regularly
Q And sitting here today, you don't recall why you prepared this memo after this meeting and follow-up discussion?
A My conjecture is that this was a formal letter he sent into the contracting officer, and that since it was, it was

Page 128

dealing with something a little informally submitted that I wanted to be careful since it dealt with legal issues as well as contractual and policy issues that I memorialized that conversation, so it was different than other conversations that I had with him
Q Correct me if I'm wrong, but did you not always deal with him on legal and contractual and policy matters?
What else would you have dealt with him on?
A Well, the distinguishing point of that list was that he had sent in, you know, formal letter to the contracting officer, so because of that distinguishing feature, I'm guessing now that that's why I decided to treat that conversation differently
MR TOMASZCZUK All right Ms Reporter, would you mark as Brownstein Exhibit No 9, that's a copy of a letter from Mr Jedrey to Mr Kraft dated October 2, 1987?
(Brownstein Exhibit No 9 was marked for identification )
THE WITNESS I'm anxious to read it

Page 129

MR TOMASZCZUK I'm sure all the warm and fuzzy feelings are coming back!
THE WITNESS Yes, sir
(The witness reviewed the document )
THE WITNESS Okay Before we get into this, I'm going to ask for a five-minute break
MR TOMASZCZUK Absolutely
THE WITNESS And then I'll read it
MR TOMASZCZUK That's fine Any time you want a break, just speak up
THE WITNESS Okay Thank you
(A recess was taken )
MR TOMASZCZUK Back on the record
BY MR TOMASZCZUK
Q Mr Brownstein, I actually want you to go back and look at Exhibit No 7 for just a moment
That's the April 28, 1987 letter from Mr Kraft to Mr Jedrey
A Um-hm
Q You should have that handy
A Yes
Q And directing your attention to page 2, under the heading rationale, there is a

Page 130

sentence slightly more than halfway through that paragraph which states this language, referring to previous language from Article 2 of the contract, could conceivably be read to permit DOE to accept single fuel assembly in 1998 and no more until decades later

Do you see that?

A Yes, I do

Q Do you agree with that statement?

A No, I don't

Q And why not?

A We believe that's, that was not the department's intent, and that's a radical view of the contract

Q And it wasn't your view?

A It was not It was no one's view at the department

Q Going back to Brownstein Exhibit No 9, and I think we took a break just as I was going to start asking you some questions about this one, do you recall this document?

A It's, it's been 15 years I didn't when you asked me before, but I certainly do now

Thank you for jogging my memory

Page 131

Q And this document appears to be the DOE contracting officer's response to Mr Kraft's earlier letter, right?

A It is

Q Okay Did you help prepare this response?

A Yes, I did

Q Did you draft it?

A Large parts of it, not the entire thing

Q Can you identify sitting here today what parts you drafted?

A How about if I do it the other way, the parts that I know that I did not?

Q Okay That's fair I'll take it that way

A I know that I was not the primary author on No 4 beginning on page 3, nor on No 5

Q So it would be fair to assume then that you had a significant hand in drafting responses delineated 1, 2 and 3?

A I just -- I want to be clear on one thing

Q Of course, take your time

Page 132

(The witness reviewed the document )

THE WITNESS Not solely, but, but had a large hand in the others, yes

BY MR TOMASZCZUK

Q Okay And the first paragraph, the last sentence states, "The Department shares your desire to ensure that the Contract is fair and equitable and that it accurately reflects the intent of the contracting parties "

Do you see that on page 1, first paragraph

A Oh, yes

Q Last sentence?

A Yes I'm sorry Yes

Q And does that accurately reflect a desire of the department at that time?

A Yes

Q What was the intent of the parties at that time concerning the spent nuclear fuel acceptance rate?

MR BANES Objection Calls for a legal conclusion

THE WITNESS Well, in, I believe as I testified behalf before, in the broadest of terms, the utilities were responsible for

Page 133

funding the system, and that we were responsible ultimately to accept their fuel

BY MR TOMASZCZUK

Q Directing your attention to page 2 of the document --

A Um-hm

Q Under the heading No 1, additional performance standards?

A Yes

Q Do you see that? Would you look at the second paragraph under this heading?

(The witness reviewed the document )

THE WITNESS Yes

BY MR TOMASZCZUK

Q Do you recall sitting here today whether you drafted this language in this paragraph?

A I am sure I played a major role in it

Q And Mr Jedrey is telling Mr Kraft here in the first sentence of the second paragraph under subheading or under heading one, additional performance standards, quote, " I can assure you that the Department intends to honor both the letter and spirit of the NWPA and the contract, rather than seek opportunities to

Page 134

circumvent its obligations"?
A Yes
Q What did you understand by that language, seek opportunities to circumvent its obligations, to mean?
MR BANES Objection Calls for a legal conclusion
THE WITNESS I believed what it meant was responding to Mr Kraft's concern about the possibility of us, of the department accepting a single assembly and walking away
That to me is a trick, and I think the contracting officer was trying to indicate that was, that type of gamesmanship is not what the department was all about
BY MR TOMASZCZUK
Q And that would constitute circumventing its obligations under the contract?
MR BANES Objection Calls for a legal conclusion
THE WITNESS That's how I interpret it, that sentence
We're responding to his specific concern

Page 135

BY MR TOMASZCZUK
Q Could you look at the last sentence of this same paragraph under the heading additional performance standards?
A Yes
Q Last phrase in pertinent part says they provide clear evidence that DOE does not intend to meet its contractual obligation by accepting a single assembly?
A Yes
Q Do you see that?
A Yes
Q Is that a true statement?
MR BANES Objection Calls for speculation
BY MR TOMASZCZUK
Q You can disagree
A I do not disagree I agree with that sentence
Q In the intervening language in this paragraph, there's a discussion about schedules illustrating a planned acceptance rate of 1200 MTU for each of the first five years and then an acceleration to 2,650 metric tons thereafter
Do you see that?

Page 136

A I do
Q And if my recollection is right, I believe those are the figures that were used in the first ACR which had been published a couple of months prior to this October 1987 letter?
A They are
Q All right What was your intention or what was the Department of Energy's intention in giving Mr Kraft that information?
What was he supposed to do with that?
A This, this was, this entire paragraph is trying to reflect that the department was not only not trying to game the system by accepting a single assembly and walking away, but by demonstrating that the evidence of what our plans were through these other documents clearly showed that we were intending to do something other than take a single assembly
Q Was it your intention that the utilities would use or rely on, in any way on that information in preparing their own plans for dealing with their spent nuclear fuel?
A I believe we addressed that issue in the Annual Capacity Report, and in fact I think it was addressed in the contract itself

Page 137

The contract said to provide this information for planning purposes recognizing that it would change over time, and so if we went back to the ACR, I think you would see relevant language that addressed what we intended that information to be and not to be
Q We saw language that says it's for planning purposes, right?
A Yes
Q And I guess my question to you, Mr Brownstein, is as a practical matter, what does that mean to a utility that gets it?
What are they supposed to do with it?
MR BANES Objection Calls for speculation
THE WITNESS Since the contract was, you know, evolved between two parties, we didn't just write the contract
The utilities signed it It was a two-party contract The utilities wanted information, and they wanted it -- the contract, that's a two-party agreement The utilities wanted the information to understand, you know, down the road, what our plans were so they can begin their thinking process

Page 138

They asked for it for planning purposes, not for binding purposes

That's what we stated in the contract, and that's what we tried do

We tried to keep them updated on what our plans, recognizing and as we stated in all the documents that those plans would change as laws changed, as situations changed, as the system evolved in developing a very complex system

(There was a pause in the proceedings )

BY MR TOMASZCZUK

Q Can I direct your attention to the next page of this response?

A Sure

Q At the top of page 3 in particular, if you would just focus on that paragraph?

(The witness reviewed the document )

THE WITNESS Okay

BY MR TOMASZCZUK

Q Okay There is a sentence in the middle of the paragraph at the top of page 3 that says that, quote, "The Department will continue to give Purchasers' views due

Page 139

consideration, and utilities will continue to have access to such program documents as the ACR, Mission Plan, Annual Report, System Requirements Documents, Fee Adequacy Report, Congressional budget submittals, and testimony before the Congress "

A Yes

Q What process existed for the department to give purchasers' views due consideration as that phrase is used here in the language I just quoted?

A I think that comes in many forms In terms of the contract, we met on a regular basis with utilities to discuss their concerns, and tried to address them

We reported that in the, in subsequent issues of the ACR

They would testify before Congress We would, you know, look at their statements

There were regular meetings with other parts of RW other than mine, and they, you know, as an example, they would regularly go out to Nevada and -- to look at the Yucca Mountain project

They met with project people They

Page 140

made their views known, and I believe there was a, an effort on everybody's part to understand, you know, what their concerns were, what their points were, and try to address them

I believe we ran this whole program, I think we did, and I think we do today, run this as an open and transparent program, and ignore no one's views, and that's how I interpret due consideration

Q Was there any advantage or benefit to be gained by the utilities in having access to program documents and in particular the program documents that are referenced here?

A I don't understand

Q Okay What was the purpose of giving the utilities access to the program documents such as the ACR, mission plan, annual report, system requirements document?

A I see

MR BANES Objection Calls for a legal conclusion in part

THE WITNESS I think all those documents describe different aspects of what the program was doing

In other words, this program was

Page 141

spending the utilities' money, and the utilities, this was a way to impart, make sure the utilities knew how their money was being spent

(There was a pause in the proceedings )

BY MR TOMASZCZUK

Q In the previous page, there is a, this reference to letter and spirit of the NWPA and the contract

What was the letter and spirit of the NWPA and the contract?

MR BANES Objection Calls for a legal conclusion, and calls for speculation

THE WITNESS I believe I have already answered the question actually

BY MR TOMASZCZUK

Q That it was, that it was to, simply to take one spent fuel rod?

That was the answer that you're referring to?

MR BANES Objection Calls for a legal conclusion

MR TOMASZCZUK I'm trying to clarify what his answer was

Page 142

What about that calls for a legal conclusion?
MR BANES You're asking him what the letter and the spirit of the NWPA is?
MR TOMASZCZUK I was asking him to clarify his previous answer
MR BANES You're asking for a legal conclusion about what the NWPA means
BY MR TOMASZCZUK
Q Mr Brownstein, did you understand my last question?
A I'll respond to you the way I believe I responded to you before
Q Okay
A In the broadest of terms, the way I understand it is the utilities had the responsibility for paying for the waste management system, and we had an ultimately responsibility to accept the waste
That's how I answered you before
That's, that's how I understood your question
Q All right So the letter and spirit of the NWPA in the contract was to ultimately dispose of the spent nuclear fuel?
A Yes

Page 143

MR BANES Objection Calls for a legal conclusion
BY MR TOMASZCZUK
Q What did you mean when you, as I understand your testimony, wrote this phrase the letter and spirit of the NWPA in the contract?
MR BANES Objection -- asked and answered
THE WITNESS I believe I have responded to you twice already on that
BY MR TOMASZUZUK
Q Well, could you try it for me one more time?
MR BANES I don't think he will I think he's answered
MR TOMASZUZUK Are you directing him not to answer?
MR BANES Yes
MR TOMASZUZUK Okay We'll mark that one
BY MR TOMASZUZUK
Q Do you recall the 1987 mission plan and the spent nuclear fuel rates identified in the mission plan?
A Yes

Page 144

Q Were those rates consistent with the letter and spirit of the NWPA and the contract?
MR BANES Objection Calls for a legal conclusion, and vague
THE WITNESS The letter and spirit you're referring to in that paragraph was responding to Mr Kraft's concern of his letter
His concern was that the department would fulfill whatever its obligations were through accepting a single assembly
We tried to address that concern in this paragraph in those words, so --
BY MR TOMASZCZUK
Q And as I understand it, acceptance of one spent fuel rod would not be consistent with the letter and spirit of the NWPA in the contract in your mind?
A I would agree with that statement
Q All right A little further down on this same page, in paragraph, page 2, there is a reference and a sentence that reads as required by the contract, these schedules will serve as the basis for developing contractually binding Delivery Commitment Schedules in 1991?
A Yes

Page 145

Q Do you know whether you drafted that sentence or not?
A I probably did
Q What schedules were you referring to in that sentence?
A Schedules were the ACR schedules, the schedules in the Annual Capacity Report
Q You were referring in particular to the schedule at page 7 of the Annual Capacity Report that's been previously marked as Brownstein Exhibit 6?
A Yes, but, and the but is that we recognized in this Annual Capacity Report that there would be subsequent Annual Capacity Reports
We recognized that this was an illustrative schedule That schedule could change, and so what I, what was intended by that is the one, the latest one that we were relying on when we got to that point for the Delivery Commitment Schedules, not necessarily this one from page 7 for this ACR
Q But at least as of this point in time, this was the only schedule in any ACR, isn't that true?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

FLORIDA POWER & LIGHT COMPANY :

(98-483C)(Wilson, J.) :

NORTHERN STATES POWER COMPANY :

(98-484C)(Wiese,J.) :

DUKE POWER, A Division of :

DUKE ENERGY CORP. :

(98-485C)(Sypolt,J.) :

INDIANA MICHIGAN POWER COMPANY :

(98-486C)(Hodges, J.) :

SACRAMENTO MUNICIPAL UTILITY DISTRICT :

(98-488C)(Yock, S.J.) :

SOUTHERN NUCLEAR OPERATING COMPANY, :

et al. :

(98-488C)(Yock, S.J.) :

COMMONWEALTH EDISON COMPANY :

(98-621C)(Hewitt, J.) :

BOSTON EDISON COMPANY :

(99-447C)(Allegra, J.) :

GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J )
WISCONSIN ELECTRIC POWER COMPANY
(00-697C)(Merow, S J )
POWER AUTHORITY OF THE STATE OF NEW YORK
(00-703C)(Damich, J )
OMAHA PUBLIC POWER DISTRICT
(01-115C)(Bush, J )
NEBRASKA PUBLIC POWER DISTRICT
(01-116C)(Sypolt, J )
TENNESSEE VALLEY AUTHORITY
(01-249C)(Bruggink, J )
Plaintiffs,
v Discovery
THE UNITED STATES, Judge
Defendant (Judge
--------------------xSypolt)

McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,



LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9 26 a.m , Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S BOYD and transcribed under her direction



APPEARANCES

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District
ALEX D TOMASZCZUK, ESQ
DANIEL S HERZFELD, ESQ
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District
DAVID S NESLIN, ESQ
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company
JEFFREY L HANDWERKER, ESQ
Arnold & Porter
555 Twelfth Street, N W
Washington, D C 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company
DONALD J CARNEY, ESQ
Perkins Coie, LLP
607 Fourteenth Street, N W
Washington, D C 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company
NORMAN M HIRSCH, ESQ
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 275

10135(d) of this title?
A Right And you know, in my mind, I was also referring to (3) and (4), not really (2)
Q Okay All right And (3) refers to a 10,000 metric ton limitation for the MRS?
A Correct
Q And then (4) refers to a total limitation of 15,000 metric tons for the MRS, right?
A Right The 10,000 as stated here is linked to the acceptance of fuel at the repository itself, and 15,000 is irregardless of that, the overall limit
Q Right And just stated in sort of layman's terms, what is your understanding of the limitation that you just referred to in (d)(1)?
A That we could not proceed within an MRS, and MRS -- I'll just use the acronym -- until we had gotten a license from the Nuclear Regulatory Commission
Q A license for what?
A For construction of a repository
Q Okay So in Brownstein Exhibit 20, at

Page 276

page 4, your understanding is when that term linking is used, that that's a catchall term to encompass at least these three conditions or linkages that you just testified about?
A That's what I was referring to, yes
Q Okay Do you know whether those linkages were repealed or still exist today?
MR BANES Objection Calls for legal conclusion
Go ahead, sir
THE WITNESS They have never been repealed
The MRS was never successful The Office of Negotiators that was established by the Amendments Act never successfully identified an MRS, and so we, the idea, that facility came to an end
BY MR TOMASZCZUK
Q And was, when was that?
A I don't recall
Q You don't, you have no approximate understanding of when that occurred?
A There were two, there were two negotiators appointed to implement the Amendments Act

Page 277

Both served terms Both ended their terms unsuccessfully
I don't recall the dates of those terms
Q Would it have been between 1990 and 1995?
A It would have been
Q So somewhere in that timeframe?
A Yes That's a guess
Q That's fair I just ask for your best recollection
(There was a pause in the proceedings )
BY MR TOMASZCZUK
Q If I said that decision was made in or about December of 1992, would that sound roughly accurate to you?
MR BANES Object It calls for speculation
THE WITNESS I would rather stand by my last answer
BY MR TOMASZCZUK
Q Okay Let me ask you another question, Mr Brownstein, about this document
Could you turn to page 7?

Page 278

A Okay
Q Do you know whose handwriting that is on this document?
A No I can't even distinguish a word
Q Okay Can you tell whether it's your handwriting or not?
A I can tell that it is not my handwriting
Q All right
(There was a pause in the proceedings )
MR TOMASZCZUK Ms Reporter, I would like to have marked as Brownstein No 24 -- I got it right -- the Annual Capacity Report issued in December of 1990
(Brownstein Exhibit No 24 was marked for identification )
BY MR TOMASZCZUK
Q Have you seen this document before today?
A Yes
Q You had a hand in its preparation?
A I did
Q Is this one of the documents you

Page 279

looked at to prepare for your deposition?
A I looked at excerpts from an ACR and never read the whole ACR, and I cannot testify that it was in 1990, the ACR
I have reviewed excerpts of an ACR
Q Okay By the way, did you review any documents last night between the time we adjourned and when we recommenced this morning?
A No You wore me out I did not
Q If I could direct your attention to the summary page, Roman Numeral Five, do you recall whether you prepared the summary?
A I prepared the summary in this document consistent with how I testified yesterday and how all the ACRs were prepared
Q Okay The first paragraph, second sentence states, "This report is currently scheduled to be the last in the series of ACRs to be published by DOE " Okay?
A Yes
Q Do you know why this was scheduled to be the last in the series of ACRs to be published by DOE?
A Well, they go on to explain in the next sentence consistent at that time with my

Page 280

understanding of the contract, the ACR was then going to be replaced by the annual Acceptance Priority Ranking report.
Q So with replacement of the ACR by the APR, there would be no more need for an ACR?
A Correct
Q Okay
A That's how I interpreted the contract
Q Okay And the next paragraph appears to reflect what we saw in the draft with respect to an upper and lower bounded waste acceptance schedule, right?
A Correct
Q And those upper and lower bounded schedules are reflected at page 7?
A They are
Q There is no source identified for the lower bounding case in Table 2 2, is there?
A That's correct
Q And do you know what the source of this, of the data on this table was?
A I don't
MR BANES You are not limited to that page in order to answer that question
BY MR TOMASZCZUK

Page 281

Q And I imposed no such limitation in my question
A Okay Let me refresh my memory
(The witness reviewed the document )
THE WITNESS I honestly don't recall I'm referring back to page 5 in the middle paragraph where we talk about the source for the upper bounding case, and identified that, and have the sentence the lower bounding case requires early MRS siting, but complies with the current 10,000 MTU storage limit part of the repository operation
That is referring to the linkages that we just talked about, so I do not recall how we were consistent with the 10,000 MTU, but came up with these exact numbers
I just don't recall that
BY MR TOMASZCZUK
Q Is it your best recollection that you did not develop the data on this Table 2 2?
(The witness reviewed the document )
THE WITNESS I'm hesitating because I'm deeply trying to think about, about how that was developed
(There was a pause in the

Page 282

proceedings )
THE WITNESS I'm sorry I just don't recall
BY MR TOMASZCZUK
Q Okay In any event It is true, is it not, that the conditions for the lower bounding case reflected in Table 2 2 never materialized, right?
MR BANES Objection Calls for a legal conclusion
THE WITNESS Could you clarify what you mean?
BY MR TOMASZCZUK
Q Sure There was no MRS?
A That's correct
Q Right And the language that you referred to on page 5, it indicates, does it not, that the lower bounding case requires MRS siting, and then refers to the 10,000 MTU storage limitation?
A That's correct That process never, never materialized
Q So there would be no reason to use the data in Table 2 2 for any purpose now, would there?

Page 291

based could have caused perturbations really to the utilities, some to us
That's an example
Q Since you raised the subject, exchanges are mentioned here as the fourth issue to be addressed in the APR?
A Right
Q And the first sentence under the issue says purchasers have the right to exchange approved DCSs subject to DOE approval?
A Correct
Q Did you agree with that statement?
A Yes, I did
MR BANES Objection Calls for a legal conclusion
THE WITNESS Sorry Yes, I do
BY MR TOMASZCZUK
Q Going back to the first page, the draft briefing paper goes on to state this option, and I presume that's the option of delaying the APR and DCS process, was rejected because of the purchasers' perceived need not to support any action that could be viewed as acquiescing on the 1998 date?
A Correct

Page 292

Q And is that statement consistent with your understanding of the rejection of this option?
A Yes, it is
Q The purchasers were concerned that they not take any action that could be viewed as extending the 1998 date in the contract?
A Yes
Q Do you know why?
MR BANES Objection -- lack of foundation
Calls for speculation
BY MR TOMASZCZUK
Q Let me go back Did you have any discussions with utility representatives concerning this issue?
A I did
Q And you understood the utility representatives to advise you that they were not willing to take actions that could be perceived as acquiescing on an extension of the January 31, 1998 date?
A We referred to the ACR issue resolution process yesterday, and these were basically staff-to-staff technical discussions

Page 293

We discussed many issues associated with the contract, some of which are listed in this paper
When we had those discussions with the technical people, as I recall it, they understood, you know, a host of implementation problems, and as I recall it, were sympathetic to the need to try to resolve those, you know, before we moved on
They went back, as I understand it, after our meetings to their respective management and to their legal counsel, and came back and said something to the order of while we understand, we have been advised not to proceed down that course
This is many years ago, but that's how I recall the, the events
Q And did any of those utility personnel explain that to you or tell you anything further about that?
A My only recollection is for whatever the reason that I remember, they came back and said there was a group or an individual, I don't recall, that Jay Silberg, they had reviewed the issue with Jay Silberg, and he had advised them

Page 294

in part because of, you know, legal concerns, not to do that, again, to the best of my recollection
Q Okay
(There was a pause in the proceedings )
BY MR TOMASZCZUK
Q There is a reference here at the bottom of page 1 to an option for dealing with the waste acceptance rate issue as I understand it?
A Correct
Q And it refers to the need or desire to allow the purchasers to cooperatively avoid out-of-pool storage requirements based on RW-859 data?
A Correct
Q Do you see that?
A Yes, I do
Q Was it DOE's intention at the time to structure the program such that purchasers would avoid out-of-pool storage requirements based on RW-859 data?
MR BANES Objection -- vague
THE WITNESS In my mind, there's a

Page 295

fundamental difference between goals and objectives and policy and contractual commitments
There was no contractual commitment to do any such thing
Was there a goal to try to avoid additional storage? Sure, but that's separate and apart from contractual commitment
BY MR TOMASZCZUK
Q So at least in that context, you understood a distinction between contractual commitments and other things?
MR BANES Objection Mischaracterizes prior testimony
THE WITNESS Every time I use, whether today or yesterday, every time I use the word goal or objectives, to me, that's separate, distinct and apart from a contractual commitment
MR TOMASZCZUK All right Ms Reporter, would you mark as Brownstein Exhibit 26 a memorandum dated April 15th, 1991?
And the subject is approval for issuance of a comment draft of the annual Acceptance Priority Ranking

Page 296

It has on it the Bates numbers HQR-001-1538 through 1539
(Brownstein Exhibit No 26 was marked for identification )
THE WITNESS Okay
BY MR TOMASZCZUK
Q Have you seen the document before today?
A I have
Q Did you draft it?
A To the best of my recollection, I did, or played a major role in doing so
Q All right Your name appears in handwriting in the upper right-hand corner?
A That's my name, not my handwriting, but yes
Q And this was a memorandum sent through the deputy director of OCRWM to the director, correct?
A Correct
Q And at that time, Mr Milner was acting as the deputy director?
A I don't believe that's accurate, no
Q But Mr Milner signed the memo on the

Page 297

second page of it?
A Yes, that's correct
Q And he sent it through RW-2, the deputy director's office?
A That's correct
Q And who would that have been at the time, do you know?
A We can clearly go back to the charts if I had to
Q Can you tell from that initial there next to RW-2 who that might be?
(The witness reviewed the document )
THE WITNESS I really can't
BY MR TOMASZCZUK
Q Okay Can you tell who approved the action?
A Yes
Q As set forth in the memorandum?
A Yes, I can
Q And who is that?
A That signature there is J B , stands for John Bartlett, and a guess, that, that mark may have been Frank Peters
Q Okay And the subject of the memo is the front office approval if you will for

Page 298

issuance of a draft of the APR?
A Well, for a comment draft of the Acceptance Priority Ranking report, yes
Q Do you see in the second paragraph under the heading discussion?
A Yes
Q Can you read the first sentence for me?
A The publication?
Q Um-hm
MR BANES You're not limited to that
THE WITNESS "The publication of the APR begins the contractually binding waste acceptance process "
BY MR TOMASZCZUK
Q Did you write that?
A I did, or am responsible for it, yes
Q Is it a true statement?
MR BANES Objection -- vague, and calls for a legal conclusion
THE WITNESS It is, it is accurate in the context that I have testified earlier today and yesterday of how I interpret contractually binding

Page 299

BY MR TOMASZCZUK
Q I'm not sure I understand what you mean
How did you interpret contractually binding as you used the words in this memo?
MR BANES Objection -- asked and answered three times
THE WITNESS I agree with counsel I don't know what I'm allowed to do here
I go back to how I answered you just before and yesterday
I tried to distinguish between the ACR and the APR
BY MR TOMASZCZUK
Q The publication of the ACR was to be contractually binding on whom?
MR BANES Objection Mischaracterizes the document
THE WITNESS No one, the ACR was going to be contractually binding on no one
BY MR TOMASZCZUK
Q I said the APR
A Oh, the APR?
Q At least I meant to say the APR The publication of the APR was to be contractually

Page 300

binding on whom?
MR BANES Objection
Mischaracterizes the document
THE WITNESS The parties to the contract, and consistent with how I used those terms and how I have testified to the use of those terms
BY MR TOMASZCZUK
Q Once the APR was published, was it going to be subject to contractual modification?
MR BANES Objection Calls for a legal conclusion
THE WITNESS I would have to ask you to clarify the meaning of that
BY MR TOMASZCZUK
Q Okay Let's look at the next paragraph and read the first sentence
MR BANES You're not limited to that You can read the entire document
BY MR TOMASZCZUK
Q Absolutely That's been true of every question I have asked you about any document
A Okay Do you want me to read it aloud?
Q Please

Page 301

A "Since the APR will become the basis for allocating waste acceptance capacity as well as for approving DCSs and exchanges, it is of utmost importance that the information on which the APR is based is accurate and not subject to continual modification "
And that's the sentence, and I believe I have tried to explain why that was important, and actually, this memo reinforces in my mind in a very powerful way what this memo is asking the director to do is to take a, a first-of-a-kind document, and before we issue it, to actually issue it to the utilities, to comment on before it's officially issued to make sure that the information is accurate, and this is, it shows to me the import of the document to both sides
Q Do you know whether comment draft of the APR was issued?
A To the best of my recollection, we did either issue a comment draft, or we issued or we put out the table with the data showing how the allocations would be based on the information that we had
I forget which we did, but we did one of those, to the best of my recollection

Page 302

Q Did any utilities comment on the draft APR?
A I honestly can't recall I have a general impression that we did receive comments, but I'm hard pressed to tell you from who or how many
I just can't recall
(There was a pause in the proceedings )
BY MR TOMASZCZUK
Q And was the, was an APR issued?
A Yes
MR TOMASZCZUK Ms Reporter, can you mark as Brownstein No 27 a document dated December 1991 entitled, "1991 Acceptance Priority Ranking"?
(Brownstein Exhibit No 27 was marked for identification )
THE WITNESS Okay
BY MR TOMASZCZUK
Q Have you seen this document before today?
A I have
Q Did you help prepare it?

Page 319

going to be here a long time if you continue to make objections which I consider to be ill-advised and not consistent with the rules of the court

I would encourage you to make your objection Fine, go ahead make it

MR BANES Are you just telling me that I just did something inconsistent with the rules of the court?

All I did was ask you to set a foundation for this document

He doesn't remember it He didn't write it, and he has testified that he doesn't know what it means other than just reading what it says

That's a valid objection If you want to ask him what something means, you need to lay a foundation for it first

BY MR TOMASZCZUK

Q At or about the time you received this document in August 14th, 1991, did you understand this to be a draft document?

A This was a, this was, clearly was a contractor document

Contractors prepare studies all the

Page 320

time at DOE's direction

That automatically means to me that it was, it was a, it was something that DOE had not signed off on

Now whether this was the first draft or the last draft, who knows? But it was a contractor document

The contractor documents are regularly prepared They regularly go through extensive review and modification before they're, if they're ever accepted as a DOE document

Q After you received the document, did you do anything other than read it?

A I cannot specifically recall My normal operation would be to, to read it

If I had comments, I would make those comments either verbally or in writing I use both

Q And do you recall sitting here today whether you made any comments on this particular document?

A I honestly cannot recall

Q All right

(There was a pause in the proceedings )

Page 321

MR TOMASZCZUK Mr Brownstein, let's mark as, and Ms Reporter, as Brownstein Exhibit 30 the Annual Capacity Report dated December 1991

It has on it the Bates stamp numbers HQR-001-2357 through 2373

(Brownstein Exhibit No 30 was marked for identification )

THE WITNESS Okay

BY MR TOMASZCZUK

Q And have you seen the document before today?

A Yes

Q And were you responsible for preparing it?

A Consistent with how I have testified about those documents, yes

Q All right At Roman Numeral Five of the summary, there is a reference to, in the second paragraph, to statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act, Nuclear Waste Policy of 1982 -- it looks like the word act is missing -- as amended will be modified

Page 322

Are those, or when you wrote the term linkages there, were you referring to the linkages that I asked you about in your testimony this morning?

A Yes

Q This paragraph goes on to state that during the first ten years following commencement, projected commencement of federal waste management system operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU

And my question to you, Mr Brownstein, is do you know what the source of that statement is or was

(The witness reviewed the document )

THE WITNESS I don't specifically recall

(There was a pause in the proceedings )

BY MR TOMASZCZUK

Q Mr Brownstein, are you comparing this ACR to the previous ACR?

A I am

Q And that would be, you would be comparing it to Brownstein Exhibit 24, the



Alderson Reporting Company, Inc
1111 14th Street, N W Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 343

goal of trying to get a repository approved and built at Yucca Mountain?
A Completing the mission of the program
Q Right In your view, how likely is it that the repository will be designed and constructed to accept 900 metric tons a year?
MR BANES Objection Calls for speculation, lack of foundation
THE WITNESS The question is confusing to me
Whatever the acceptance, whatever the long term if you will acceptance rate is, whatever that number would be, you would expect a several year ramp-up period
MR TOMASZCZUK Can you read my question back?
THE REPORTER Question "In your view, how likely is it that the repository will be designed and constructed to accept 900 metric tons a year?"
MR BANES Objection Calls for speculation, lack of foundation
THE WITNESS As a steady state? Is that what your question implies?
BY MR TOMASZCZUK

Page 344

Q As a steady state, I'll take that answer That's fine if you want to put that clarification on it to help you answer
A I believe we would, I believe that would be a low figure
I mean every document that you have shown me shows a higher figure than that for steady-state operation
(There was a pause in the proceedings )
BY MR TOMASZCZUK
Q Mr Brownstein, going back to the ACR, this 1991 ACR, still on page 4, third paragraph on this page, and there is a reference in the first sentence to Table 2 1 ?
I think I have asked you some questions about that
A Yes
Q And then the sentence appears this table, that is, the Table 2 1, provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility?

Page 345

A Right
Q All right Now do I understand that at this point in time, the APR had been issued, is that right?
A The dates are the same month I cannot recall if one preceded another by a number of days
Q Can I get you to turn back to the summary in the ACR?
A Okay
Q At the end of the first paragraph, do you see the sentence that reads the 1991 ACR applies the waste acceptance rates in Table 2 1 to the 1991 APR?
A Yes
Q Resulting in individual purchaser allocations?
A Um-hm
Q That suggests to me that the APR was out before the ACR since the ACR appears to refer to it?
A I'm indicating to you that looking at both documents, they both have the same month and year on it, and I cannot recall what day within each month each was released

Page 346

That's all I'm trying to say
Q So you think it's possible that the ACR was actually out before the APR?
MR BANES Objection Calls for speculation
THE WITNESS I've answered as truthfully as I can
BY MR TOMASZCZUK
Q Is it true that the Table 2 1 was subject to change as is suggested by the language at --
A Yes
Q Page 4?
(There was a pause in the proceedings )
MR TOMASZCZUK Ms Reporter, can you mark as Brownstein Exhibit 31 what appears to be a memorandum with the action item referenced approval for publication of the 1992 Acceptance Priority Ranking and the 1992 Annual Capacity Report?
It has on it the Bates Numbers EDB-001-1924
(Brownstein Exhibit No 31 was marked for

Energy's plans for nuclear waste at Yucca Mountain?
A What time period are you referring to?
Q March 14th of this year
A No
Q Did you ever discuss that testimony with Mr Barrett?
A Not that I recall
Q Do you know whether Mr Barrett testified on the Hill on March 14th?
A I believe he did
Q And what do you know about that subject?
A I wasn't involved in the preparation of that testimony, and I don't believe I actually reviewed, reviewed that testimony
I wasn't involved in that one at all
(There was a pause in the proceedings )
BY MR TOMASZCZUK
Q Give me just a second, okay?
A Sure
(There was a pause in the proceedings )
MR TOMASZCZUK Mr. Brownstein, at



this time, I don't have any further questions for you.
I would like to thank you for your time and your cooperation I very much appreciate it
I know it has been a long day and a half, and I need to adjourn the deposition because there are some documents which we believe still have not been produced that may bear upon your testimony, so I reserve the right to call you back if and when those documents are produced, and that includes but are not limited to documents on a privilege log that the government has provided to us, but at this time, I have no further questions, and I adjourn subject to those conditions
THE WITNESS Okay
MR BANES We reserve the right to, we reserve the right to object to reopening, so with that, I'm going to ask a few questions
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR BANES
Q So Mr Brownstein, let's see here if you could just get out Exhibit 1
It's the contract It's in there



somewhere
(There was a pause in the proceedings )
THE WITNESS Okay
BY MR BANES
Q Let's see Turn to page, there is a Bates stamp number the bottom It says ADM-001, and then I'm going to use that last four digits if you could turn to page 660 for a moment in Exhibit 1?
A Okay
Q Mr Tomaszczuk was asking you several questions about the Delivery Commitment Schedules and how they related to the contract
Do you remember that testimony?
A Yes
Q Turn to paragraph or Article V B that's located down there on this page 660
A Okay
Q Was this the paragraph you were talking about earlier that was the basis for Delivery Commitment Schedule instructions?
A Yes
Q Now turning to where it says beginning January 1st, 1992, purchaser shall submit to DOE



the Delivery Commitment Schedules or schedule which shall identify all SNF or HLW the purchaser wishes to deliver beginning 63 months thereafter.
Now can you tell me, could you just explain for me how you interpreted that paragraph and how it translated into the Delivery Commitment Schedule instructions?
MR TOMASZCZUK Objection It's compound, calls for a legal conclusion
(The witness reviewed the document )
THE WITNESS I combined that paragraph with Appendix C of the contract
BY MR BANES
Q Okay And did you believe that the delivery -- let's take a look at the Delivery Commitment Schedule Pull that out for a minute That was Exhibit 34
A Yes
Q Did you believe that those, Exhibit 34 was consistent with the provisions of the contract regarding Delivery Commitment Schedules?
A We used the Appendix C as a basis for that, yes

Page 391

Q Okay Now with respect to when a purchaser would submit a Delivery Commitment Schedule, let's say a purchaser wanted to, pursuant to this paragraph B on the contract, Article V B , if a purchaser wanted to deliver SNF beginning in say 1998, when would they have to submit a Delivery Commitment Schedule?
A It's clear in our mind you would have to subtract 63 months from that date
Q Okay Now if they didn't want to, if a purchaser did not want to deliver any SNF in 1998, would they have to submit a DCS 63 months prior to that?
A No It states that purchaser shall identify all SNF and/or HLW the purchaser wishes, emphasize wishes, to deliver to DOE beginning 63 months thereafter
Q So but was this, was the submission of a DCS a prerequisite, pursuant to the contract in your opinion, was submission of a DCS a prerequisite to acceptance of a purchaser's spent nuclear fuel?
A In my mind, it was
Q And was that pursuant to this, was it a prerequisite 63 months prior to the date they

Page 392

wished delivery to occur?
MR. TOMASZCZUK Objection to the form
I don't know what "this" is
BY MR BANES
Q Was it, was such a, was such acceptance of spent nuclear fuel a prerequisite, or was submission of a DCS 63 months prior, in your opinion, a prerequisite to DOE's acceptance pursuant to the contract to such spent nuclear fuel?
A Yes
Q All right Now if a, if a utility decided not to submit a DCS -- well, strike that
If a utility -- let's see Prior to, I think you testified earlier prior to acceptance of spent nuclear fuel, who in your opinion was responsible for this, for storage of the spent nuclear fuel?
A I think it is in my mind, and based on several documents, it is clear that the utilities remained responsible until DOE accepted it
Q In the documents you prepared, did you

Page 393

convey that to the purchasers?
A I did
Q All right Now let's take a look at --
(There was a pause in the proceedings )
BY MR BANES
Q Okay With respect to, with respect to the rates, acceptance rates contained in each of these documents we have looked at, I think that you testified earlier that they were subject to a whole host of assumptions, is that correct?
A Yes
Q Now so let's take a look at Exhibit 6 and go to Table 2 dash 1 or 2 1 on page 7
(There was a pause in the proceedings )
THE WITNESS Okay
BY MR BANES
Q Now on page 7 of this document, there is a, there is what purports to be called illustrative waste acceptance schedule And then at the top there, it says the waste acceptance schedule, or excuse me -- this

Page 394

schedule is only an approximation, approximation of how the system may operate and is subject to uncertainties that are recognized in the mission plan
Why did you include that language in this Annual Capacity Report?
A We knew that there were, you know, at different times in the program, you know, whether there were legal restrictions, we certainly knew that there were challenges, and we wanted to make it clear to the utilities and everyone understood that we were at the early stages, and these were our best projections at the time, and we tried to be clear over the years of why, and, and that they were subject to change
Q In your opinion, with respect to Table 2 dash 1, would it be appropriate to read 2 1 in this 1987 Annual Capacity Report without reading the entire document?
A Well, I believe it's always inappropriate to pull out any excerpt from a document
A document's prepared All words have meaning, and should be read in the context of

Page 395

the document
Q And is that because in other portions of the document, the assumptions upon which the rates on page 7 are based are described?
MR TOMASZCZUK Objection -- leading
THE WITNESS In each of the ACRs, and we reviewed several of them here, there were a number of caveats concerning the waste acceptance schedule
They were in different places in different, different documents as the document evolved, but they were there
We didn't put them in the same place in the same time
They were always there somewhere
BY MR BANES
Q Let's see Mr Tomaszczuk showed you Exhibit 2, which was the 1985 mission plan
Before we get to that, let me ask you a couple of questions
Did the, in your opinion, did the Nuclear Waste Policy Act require the Department of Energy to accept spent nuclear fuel at any particular rate from the purchasers?
MR TOMASZCZUK Objection -- lack of

Page 396

foundation
THE WITNESS There was no rate in the Nuclear Waste Policy Act
BY MR. BANES
Q Okay And with respect to the standard contract, which is located at Exhibit 1 --
A Yes, I have that
Q Did the standard contract require the Department of Energy to accept spent nuclear fuel from the purchasers at any particular rate of acceptance?
A There was no rate in the standard disposal contract
Q Now going back to the mission plan, which is Exhibit 2, to your knowledge, was the mission plan or any portion thereof ever incorporated into the contract?
A No
Q All right Now Mr Brownstein, Mr Tomaszczuk was asking you about the 1991 APR, which is Exhibit 30 He was referring to page --
A Wait a second
Q I'm sorry Did you find it?

Page 397

A No -- Number 30?
Q Exhibit 30
MR HANDWERTER The ACR
BY MR BANES
Q Was that the ACR? Excuse me The ACR is the one I want to talk to you about
A I'm sorry I don't have these things in order
Okay
Q Page 4 for a second of the document under 2 0, waste acceptance projections?
A Yes
Q Mr Tomaszczuk was asking you whether the rates reflected in Table 2 dash one or 2 1 -- excuse me -- assumed the existence of an MRS facility or a DOE facility
Do you recall that question?
MR TOMASZCZUK Object to the form
THE WITNESS Yes
BY MR BANES
Q All right. And do you recall that you responded to that yes, it did assume the existence of a DOE facility for acceptance of spent nuclear fuel?
A Yes, an MRS facility, yes

Page 398

Q Now with respect to every, in every document that you, that contained a rate that you worked on, did, did all of those projected rates assume the existence of some type of repository, either repository or MRS, prior to the acceptance of spent nuclear fuel?
MR TOMASZCZUK I'm going to object to the form of the question
I don't understand it
THE WITNESS I can still answer?
BY MR BANES
Q Sure, if you understand it, you can
A I made the statement in all the documents, as I have testified -- I'm looking at page 4 -- that assumed the commencement of facility operations
Q Okay
A And I defined facility as either an MRS or a geologic repository
Q So in any document in which you would have incorporated a rate, is it fair to say that you would have assumed the, an operational facility being either an MRS or a repository?
A Yes
(There was a pause in the

Page 399

proceedings )
MR BANES Okay, sir Just a second here
(There was a pause in the proceedings )
BY MR BANES
Q Okay Turn to Exhibit 26 for a minute, sir?
A I really need to organize this If these are going to be the subjects of questions, I have to get them in some order
Twenty-six, I've got it
Q Okay Okay All right Turn to Exhibit 26
Let's go back to that paragraph you were discussing with Mr Tomaszczuk It starts the publication of the ACR, APR
If you would just read that entire paragraph for me?
You don't have to read it outloud You can read it to yourself
A Thank you
(The witness reviewed the document )
THE WITNESS Okay
BY MR BANES

Page 400

Q All right Now in the statement there, I think Mr Tomaszczuk asked you what you meant by the publication of the APR begins the contractually binding waste acceptance process
Does the remainder of that paragraph refresh your recollection what, why that word begins is there?
A Well, in my mind, the contract laid out a process, as I have testified, beginning with the ACR, ACR following with the APR, to be followed by the DCS to be followed by the FDS
That's what I was referring to
Q Okay And all right So as far as this contractually binding waste acceptance process, were you referring to all of that process, or just the APR?
A No Begin the process, the APR was the sort of the second step, well, the first step in the process leading to the FDSs, which is the last step leading to the, to the actual acceptance
Q And with respect to the process, while it hasn't been marked as an exhibit, Mr Tomaszczuk showed you the what has been kind of referred to as the Starship Enterprise chart?

Page 401

A Yes
Q Did that, did that chart lay out what this process, this process was supposed to be from the beginning of the contract all the way to acceptance and delivery?
A That was, that was its intent
Q And looking at this, we just I guess won't mark it, but --
MR TOMASZCZUK I'm going to come around
THE WITNESS If we're going to do it, could we move it closer?
This is not the easiest thing in the world to read
Can you see it from here?
(A discussion was held off the record )
BY MR BANES
Q All right Now I wanted to ask a little bit about the mechanics of the chart?
A You understand I haven't seen this in, I haven't looked at this in years
Q Can you tell where the Annual Priority Ranking first appears, or that let's start with the Annual Capacity Report

Page 402

Where is that?
A That's right there
Q Let the record reflect that the witness is pointing to a box that has the number 060 in the upper left-hand corner
And on the far left of the chart, towards the far left of the chart, now there is a dark line here
A Right
Q What is that dark, what is that dark line supposed to represent? Annual Capacity Report and Annual Priority Ranking?
A The dark line under the legend indicates the optimum path
The whole chart is divided basically into two parts which is, which is the first part is if everything went right, this is, this is how the process would go
And then there were, there were other possibilities, other things that could go, other things that could happen, and what I had asked the contractor to do was to lay out all those other things that could happen and contingencies, and that's what they tried to do here

Page 403

Q Okay Now --
A So this was, this was the optimum path In other words, these were things that had to be done
Q Okay So in order -- now at the end of the chart on the far right is acceptance and delivery, right?
A Yes The last box, 059, is spent nuclear fuel received at DOE, yes
Q And these dark lines are connected to boxes, consistent with your testimony I assume, that these dark lines are connected to boxes that pursuant to the contract have to occur prior to acceptance occurring?
A Yes
Q Is that correct?
A Yes
Q So Annual Priority Ranking, that would be the first step after the Annual Capacity Report?
A Yes
Q And then there would have to be a DCS to DOE from the purchaser
A Yes
Q And then the DCS would have to be

Page 404

reviewed and approved by reviewed by DOE?
A Yes We were required to review it and either approve it or disapprove it
Q Over here is the approval, or if it's approved or disapproved, what happens?
A Let's -- that's the approval
Q Okay
A I'm just trying to look disapproval Oh, I see
Yes, this is for its approval This is where we -- this is the submittal This is where we review it This is where we approve it This is what we would hope to have happened
If it got disapproved, then we get down below the dotted line into the contingency There is disapproval
Q Okay Now down, further down the path here, there is some, or never mind I'll reserve those questions, but the, the bottom line is for this, that, and does this, does this chart, to the best of your recollection, reflect the process that we're talking about in this Exhibit 26, the second paragraph?
A It does

Page 405

Q Okay
A It's a document I used internally to explain that to people
Q Okay Have a seat, sir I'm done with that
(There was a pause in the proceedings )
BY MR BANES
Q Okay Sir, did you consider the spent nuclear fuel acceptance rates contained in the mission plan to be contractually binding upon the Department of Energy?
A No
MR TOMASZCZUK Objection -- leading
BY MR BANES
Q Did you consider the SNF or high-level waste acceptance rates contained in any of the ACRs to be contractually binding upon DOE?
MR TOMASZCZUK Objection -- leading
THE WITNESS No
MR BANES Okay
(There was a pause in the proceedings )
BY MR BANES
Q Oh, Mr Brownstein, if you would turn,

Page 406

flip over Exhibit 26 for a second?
A Okay
Q You testified earlier that Mr Bartlett approved this document?
A Yes
Q During your tenure as the, in your role during the ten-year period when you're implementing the provisions of the standard contract, did you have occasion to discuss any contractual issues with Mr Bartlett?
A Probably, he and I talked relatively regularly
Q Okay
(There was a pause in the proceedings )
MR BANES Okay That's all I have Thank you, sir
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK,

COMMONWEALTH EDISON COMPANY
BY MR HIRSCH
Q Good afternoon, Mr Brownsteın My name ıs Norm Hırsch
I'm an attorney for Commonwealth Edıson Company, one of the plaıntıffs ın this lıtıgatıon
I'm goıng to be askıng you a series of questions
Just lıke Mr Tomaszczuk saıd, ıf you don't understand a question I'll be askıng, please feel free to ask for clarıfıcatıon
A Okay Thank you
Q I want to ask you about a couple of questions that Mr Banes asked you a lıttle while ago
I belıeve that you testıfıed ın response to a question that ıt was your understandıng that prior to acceptance by the DOE, utılıtıes were responsıble for storage of SNF?
Do you recall that?
A Yes
Q And I think we got into this a little yesterday, but it's your understanding I take ıt



that the D C Circuit has now held that the DOE was required to begin SNF acceptance in 1998?
A I have never read the decision, but that's my understanding of it
Q And I believe we also had some testımony from you that ıt was DOE's objectıve or goal to elımınate the need for utılıtıes to provıde on-sıte storage after the DOE began acceptance, ıs that correct?
MR BANES Objectıon -- vague
THE WITNESS It's correct, and I used the term and testıfıed to such to dıstınguısh between ıntent and goal and objectıves as opposed to a contractual commıtment
BY MR HIRSCH
Q All rıght, but the DOE goal or objectıve was to elımınate the need for utılıtıes to provıde on-sıte storage after the DOE began acceptance of spent nuclear fuel, ıs that correct?
A That was a goal
Q Now Mr Banes also asked you a question about whether the mission plans were ıncorporated ın the contract
Do you recall that?



A Yes
Q Was ıt your understandıng that the mıssıon plans were requıred to be ıssued by the Nuclear Waste Polıcy Act?
A It ıs my understandıng
Q And dıd you ever have any dıscussıons with ındıvıduals at DOE as to what the purpose of that requırement was?
A The mıssıon plan?
Q Yes, or the requırement to ıssue a mıssıon plan ın the Nuclear Waste Polıcy Act
A No
Q What was your understandıng of the purpose of the mıssıon plans?
A Really very elementary understandıng, that, that the law requıred that we ıssue a mıssıon plan
The purpose of the mıssıon plan was to descrıbe what our goals and objectıves were, and descrıbe the program ın general terms
Q And I take it that at least while you were at the DOE, the DOE made an effort to be as accurate as possible in the mission plans in terms of describing what its current plans and objectives were?



A I believe that's true for all the RW documents
Since the beginning, I think we've tried as a goal if you will to be an open and transparent program, and to, to try to put as much information out ın the public as we could, and make that as accurate as we could
Q Okay So ıt would be correct to say that the DOE made an effort ın the mıssıon plans to be as accurate and ınformatıve as possıble, ıs that correct?
A Yes
MR HIRSCH We're on 37, ıs that correct?
(Brownsteın Exhıbıt No 37 was marked for ıdentıfıcatıon )
BY MR HIRSCH
Q Mr Brownsteın, I have handed you what has been marked as Brownsteın Deposıtıon Exhıbıt 37, which ıs a two-page document tıtled, "Questions from Representatıve Hastert," and then ıt appears to have answer on ıt
It has Bates labels HQR-010-1635 through 1636

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 468

(00-440C)(Bush J )
WISCONSIN ELECTRIC POWER COMPANY
(00-697C)(Merow S J )
POWER AUTHORITY OF THE STATE OF NEW YORK
(00-703C)(Damich J )
OMAHA PUBLIC POWER DISTRICT
(01-115C)(Bush J )
NEBRASKA PUBLIC POWER DISTRICT
(01-116C)(Sypolt J )
TENNESSEE VALLEY AUTHORITY
(01-249C)(Bruggink J )
Plaintiffs,
v - Discovery
THE UNITED STATES, Judge
Defendant (Judge
---------------------xSypolt)
McLean, Virginia
Thursday, April 11, 2002
Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

Page 469

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9 38 a m , Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S BOYD and transcribed under her direction

Page 470

APPEARANCES

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District
ALEX D TOMASZCZUK, ESQ
DANIEL S HERZFELD, ESQ
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District
DAVID S NESLIN, ESQ
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 471

APPEARANCES (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power
JEFFREY L HANDWERKER, ESQ
Arnold & Porter
555 Twelfth Street, N W
Washington, D C 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company
DONALD J CARNEY, ESQ
Perkins Coie, LLP
607 Fourteenth Street, N W
Washington, D C 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company
NORMAN M HIRSCH, ESQ
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 548

proceedings )
BY MR BANES
Q Okay Let's see here Turning back to Exhibit 43, Mr Brownstein --
MR HIRSCH Which one is 43?
MR BANES I think that's one of the, one of these vugraphs
MR HIRSCH Off the record
(There was a pause in the proceedings )
BY MR BANES
Q Okay Now let's see if you could open to Exhibit 43, page 262 -- I just asked him to hold Exhibit 42, page 43 exhibit, or page 262 open for a moment
And then let's see I have got now Brownstein Exhibit 36
Now yesterday we were talking about the, with Mr Tomaszczuk, we were talking about at what point we are in, the DOE and the purchasers are in the process of the standard contract for setting a rate?
A Right
Q Do you recall that testimony now?
A Yes, I do

Page 549

Q And I think you testified that the, that the point of the process that we're in is in the, in the DCS?
We're still in the DCS process, is that correct
A Yes
Q Now the utilities and the utilities and the -- to, to your recollection, have you, the utilities and DOE ever agreed upon a mutually acceptable schedule?
MR HIRSCH Objection -- vague Calls for a legal conclusion
THE WITNESS Some utilities have submitted the DCSs, and we have approved them
BY MR BANES
Q Okay And for those that you haven't approved, what's the process for after disapproval occurs?
MR HIRSCH Objection -- vague, no foundation
Calls for a legal conclusion
THE WITNESS I don't know how to identify these boxes
This exhibit shows the path If -- once we have completed our review, which is

Page 550

indicated in the box
BY MR BANES
Q The number in the upper left-hand corner?
A 005, if we disapprove it and it goes to box 025, then it lays out a series of steps
We, we disapprove it We notice the utility of that disapproval, and then the utility is supposed to revise their DCS and submit it to us
We then go through another review process, and again, we then have two options
We can approve the DCS, or we can disapprove it
If we disapprove it again, there is, appears to be two links
We notify purchaser, and the purchaser -- or we can then propose a DCS to the purchaser That's a little different than the first one, and I believe that's consistent with the contract
Do you want me to continue on with the steps?
Q Sure
MR HIRSCH I'm going to make the

Page 551

same objection I made to the previous question
THE WITNESS There is another review process
Once again, you can end up with an, with approved DCS or, or we could then disapprove what the purchaser proposed, which leads into negotiations between DOE and the purchasers
BY MR BANES
Q Okay Now let's go to, let's go to the contract for a minute, Exhibit 1
A Okay
Q All right And turn to page 660 of the Exhibit 1
A Okay
Q And is the process you have just described located, contained somewhere in the contract here?
MR HIRSCH Objection -- vague Calls for a legal conclusion
THE WITNESS Yes
BY MR BANES
Q And where is that?
MR HIRSCH Same objection
THE WITNESS Under Article V B 1 and

2 is the process that I just tried to describe off that
BY MR BANES
Q At the end of that process, you describe the process where parties would seek or there would be some type of scheduling negotiation, is that correct?
MR HIRSCH Objection -- vague Misstates the testimony
Calls for a legal conclusion
THE WITNESS Under Article V B 2, it says, quote, if these are not acceptable to the purchaser, the parties shall promptly seek to negotiate mutually acceptable schedules
BY MR BANES
Q Would it be accurate to say that that's the point in the process that the parties are now?
MR HIRSCH Objection -- leading Misstates the testimony
Calls for a legal conclusion
THE WITNESS For those utilities that have not, not gotten approved DCSs, yes
BY MR BANES
Q Okay So have the parties, for those



DCSs that have been disapproved, have the parties been able to agree on or negotiate a mutually acceptable schedule to your, in your knowledge?
MR HIRSCH Objection -- vague, no foundation
THE WITNESS To the best of my knowledge, no
BY MR BANES
Q Do you have an opinion as to why that is?
MR HIRSCH Objection -- no foundation
Misstates facts
BY MR BANES
Q Do you have an opinion as to why that is?
MR HIRSCH Same objection
MR BANES Misstates facts?
MR HIRSCH Your antecedent or precedent for this or basis for this question I believe misstates facts, but he can try and answer
I'm just stating an objection, counsel



MR BANES All right Okay
THE WITNESS I have not, I have not been involved in those
To the best of my recollection, I was only involved in one set of negotiations between the utilities and the contracting officer over this, and it's just -- since '95, I have not been party to that
MR BANES Okay
(There was a pause in the proceedings )
BY MR BANES
Q All right Now with respect to, with respect to the process as laid out on the chart here, I'm referring to Exhibit 36, in your opinion, does DOE have any, have any requirement to provide casks or transportation until the schedule is established?
MR HIRSCH Objection -- no foundation
Calls for a legal conclusion
THE WITNESS Well, the casks, we're responsible for providing the casks when, when we pick up the fuel
BY MR BANES



Q Okay Now are the -- you talked about the TSLCCs with Mr Hirsch
Do you recall that testimony, sir?
A Yes
Q Are the TSLCCs, were the TSLCCs referenced in the contract at all?
A No
Q Were they in any way incorporated into the contract, what you believe?
A No
MR HIRSCH Objection Calls for a legal conclusion
BY MR BANES
Q And in your opinion, is anything contained in them contractually binding?
MR HIRSCH Objection Calls for a legal conclusion, no foundation
THE WITNESS In the TSLCCs?
BY MR BANES
Q Yes
A No
Q With respect to the issue of whether the -- I think you testified earlier the contract did not contain a particular rate of spent nuclear fuel and acceptance beyond January

Page 560

me -- so I have nothing further at this time

(Whereupon, at 12 05 o'clock, p m , the deposition was recessed, to reconvene at 1 00 p m the same day )

Page 561

AFTERNOON SESSION

(1 02 p m )

Whereupon,

ALAN BROWNSTEIN,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows ^

EXAMINATION BY COUNSEL FOR PLAINTIFF

SACRAMENTO MUNICIPAL UTILITY DISTRICT

BY MR NESLIN

Q Mr Brownstein my name is Dave Neslin

I'm an attorney representing Sacramento Municipal Utility District, also known an SMUD which is another of the plaintiffs in these cases

I'll be asking you questions, and I would like to follow the same ground rules that Mr Tomaszczuk set up with you

If you don't understand my question please tell me and I'll try to rephrase it

Okay?

And if you want to take a break at any point in time just let me know and we ll stop

A Okay

Page 562

(Brownstein Exhibit No 50 was marked for identification ) ^

BY MR NESLIN

Q Mr Brownstein, you're being handed what's been marked as Exhibit 50 to your deposition

It's an August 30, 1988 letter from Mr B M Cole to Joseph Sutey with an attachment titled, "Delivery Commitment Schedule Processing, Approval, and Management Control System" stamped as Bates Numbers PNL-098-1106 through 1126

Are you familiar with these documents?

(The witness reviewed the document )

THE WITNESS I vaguely recall seeing this

BY MR NESLIN

Q Was this work undertaken at your direction?

A As I testified previously, PNL did, did a number of pieces of work, some at my direction, and some that they pursued on their own consistent with work tasks that we gave them

Page 563

This was probably done at my direction

Q The upper right of the attached document, there is a date August 30, 1988, and then Rev 4

Would that to your mind refer to Revision 4?

A Yes

Q Did you typically comment on different drafts and revisions?

A It could have gone one of two ways

It could have been because I commented on it and went through it, or because they went through their internal reviews before it was presented to DOE and went through revs

It could have been either way

Q What was your practice as they were preparing work that you requested them to do, going through different drafts?

Was it your practice to provide input to them to review drafts?

A It depended on time associated with a particular product

If there was some time urgency, I would review an early draft



Alderson Reporting Company, Inc
1111 14th Street, N W Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 564

If there wasn't, it would go through the normal course of internal reviews

That's how I recollect it

Q Would others at DOE have reviewed drafts PNL prepared as well?

A As I testified yesterday, you know, my office evolved from sort of a one-man place to, to a branch and then a division

I have to go back and think about whether in 1988, I was still a one man, or I had staff

If I had staff at that time, they would review it, yes

Q Do you recall reviewing this attached document?

A I don't have a specific recollection of that

Q If I could ask you to turn to page 6 of the attachment, and would you review lines 24 through 31?

(The witness reviewed the document )

THE WITNESS Okay

BY MR NESLIN

Q Mr Brownstein, 24 through 32 state exchange requests should be approved if, and ,

Page 565

then they set forth in bullets five criteria

Would you agree that an exchange should be approved if it meets these criteria?

MR BANES Objection Calls for a legal conclusion

THE WITNESS Those were important criteria

There may be other things that we would want to have considered, and I don't recall those now, but, but these, these criteria were appropriate

I agree with them

BY MR NESLIN

Q Let me ask again if an exchange request meets these four criteria, should it be approved?

MR BANES Objection -- asked and answered

THE WITNESS I think I did answer that, and the reason for the hesitation is upon review of this, and upon discussion with others in the department ranging from the contracting officer, my peers, my superiors, we may have -- it's conceivable that this, these contractor-proposed criteria may have evolved,

Page 566

been modified, added to, deleted

BY MR NESLIN

Q Do you recall discussing these criteria with anyone else at the department, these criteria set forth on page 6?

A I don't have a specific recollection of that

Q Do you recall discussing them with the contractor PNL?

A The only way I can answer you is I don't specifically recall, but that's not saying that I did not

Q Do you recall discussing these criteria with anyone at the utility, at the utility?

A I can't recall whether in the ACR initial resolution process, which was subsequent to this date, whether we discussed, you know, that issue or not

I don't specifically recall, but again, I don't want to testify that I absolutely never did

Q Let me direct you to lines 28 through 29

That sets forth as one of the criteria

Page 567

that the transportation system and receiving facilities have the capacity to meet the revised commitments?

A Yes

Q What does that mean to you?

A Okay

MR BANES Objection Calls for speculation, and lack of foundation

Go ahead

THE WITNESS Okay When the DCSs were approved, I believe we -- we can go back to it, but I believe one of the pieces of information that we requested from the utilities was that the type of transportation cask that would be required

One of the concerns we had in this criteria as I recall, is -- let's take an example

If we had approved, you know, let's say we had approved 90 percent of our DCSs for a, they would accommodate PWR rail casks

If somebody wanted to do, you know, exchanges at the last minute, we may have gone through the procurement process to procure the type of casks to be available for who we thought

Page 568

we were going to serve, and we, and that could have affected our ability

If somebody wanted a BWR truck cask, and we had ordered, you know, too many of the other kind based on the information provided in the DCS, because the utilities were acting on the DCS, so were we, so that was the intent

BY MR NESLIN

Q So if, if sufficient casks were available to accommodate the exchange, would this criteria be met, to your mind?

A No I used that as an example To says receiving facilities, there may have been other characteristics that, that could have influenced that

Q Okay What, can you think of what those characteristics would be?

A Well, beyond just the casks, you had to have the, the infrastructure to serve that

Some utilities may only be able to accommodate a truck operation as opposed to a rail, and so, you know, that's an example

Q Let me ask this then If you had sufficient casks and if the utilities involved in the exchange and the facility had sufficient

Page 569

infrastructure to accommodate the exchange, would this criteria be satisfied?

A Could I extend your analysis one step in answering?

Q Certainly

A If the information on a DCS of the two DCSs between two utilities that were approved by us came to us and they were identical, then it would be met Then that criteria would be met

Q By information, what information are you referring to?

A Can we go back to the DCS, please?

Q Yes

MR HANDWERKER The instructions

MR NESLIN The instructions

THE WITNESS Yes That's the form I'm thinking of

MR HANDWERKER Thirty-four

THE WITNESS You can see on the form under 2 0 -- I'm looking at the actual form itself -- it asks things like number of assemblies and type PWR BWR, proposed shipping mode type cask required including maximum loading lifting weight

Those, those are the types of things

Page 570

that I'm referring to

There are others? There are two The date of discharge potentially could be important

BY MR NESLIN

Q Mr Brownstein, would they have to be identical, or would the transportation system and receiving facilities simply have to have the capacity to accommodate the exchanged spent nuclear fuel?

A We were talking about this one

MR BANES Go ahead

THE WITNESS This one criteria, no, I used identical as an example, as an extreme

No, they would not have to be identical

BY MR NESLIN

Q So they could involve different number of fuel assemblies?

MR BANES Objection Calls for speculation

THE WITNESS I really, it really does call for speculation because we had never gotten that, that far, that detailed, to my recollection

Page 571

We were never faced with a DCS exchange process, and I would be speculating about the answer, you know, specific intricacies

BY MR NESLIN

Q Mr Brownstein, would it be your testimony that you don't recall DOE considering the specific details of how these criteria might apply to a given exchange?

A No What I'm saying is you're asking if, if, if there was a one-assembly difference, would that affect it?

That's getting down to a gradation that we never got to

We did consider a number of things, but that's a fine gradation

Q Let me ask it a different way Would the fact that there is a different --

A Okay

Q Number of fuel assemblies automatically lead an exchange request not to be approved?

A If that was the only difference, that would not be an automatic disapproval in my mind

Page 572

Q The fact that a, if requested, exchange might involve a different size or type of fuel assembly wouldn't automatically lead it to be disapproved to your mind?
A Well, that could because that could affect the cask, the availability of the cask
Other certain, certain facilities have, you know, for example, very long fuel, and that could affect it
Q Would the fact that a proposed exchange might involve DCSs which involve different modes of shipment, would that necessarily lead to, a requested exchange to be denied?
A It could, but not necessarily
Q I would like to direct you to lines 30 and 31
A I just want to clarify all these questions you're asking me were all hypotheticals?
Q I'm asking you a series of hypothetical questions, sir
I'm asking for your opinion on how they would apply
A Right

Page 573

Q Lines 30 and 31 state that the exchange, another criteria in the exchange will not impact WMS performance in a way that would delay acceptance of waste from other purchasers
What does that mean to you?
MR BANES Objection -- lack of foundation
Calls for speculation Go ahead
THE WITNESS The best way I can try to explain it is by example, if that's okay with you
If a utility were to give us failed fuel, that might influence the decision
BY MR NESLIN
Q And why would that influence the decision?
A Again, hypothetically, there would probably be a preference in the early stages of system operation to, to try to use standard fuel to minimize the opportunity for, for us having to employ some contingencies
In other words, failed fuel, we might have to do some repackaging that we would have rather not have done on the opening day
Q Would, would that necessarily delay

Page 574

the acceptance of waste from other purchasers?
A It could, but not necessarily It was a concern
There may have been other concerns associated with that criteria that at this moment, I can't recall
Q Do you recall the basis of these criteria?
A Well, the basis of the criteria was that PNL was, was tasked to think about this and develop suggestions to the department
It was a normal course of business, and so I viewed this as contractor input to the department that, you know, certainly the department did not take a position
One, as I said, hadn't gone through to my knowledge, you know, the necessary concurrence and evaluation by a range of people within RW that would need to have, you know, evaluated it
Q Evaluated it for what purpose?
A Of whether that was appropriate or acceptable to the department, in other words, this is not departmental policy
Q You're saying that for something to be

Page 575

adopted as department policy, additional people would have to review it and approve it?
A What I'm saying is that a contractor product is not departmental policy
Q How would a contractor product become departmental policy?
A One way it would become that would be for it to be issued under DOE letterhead
Q By issue, what do you mean?
A Number of ways -- issued could be instructions or it could be a report
It could be a letter by a program official or, or contracting officer
Those are three ways
Q So if it were incorporated into a DOE document or a DOE letter, then it could become departmental position departmental position?
A Sure
Q How was this information, this report used, do you recall, by the department, used by the department?
A I don't recall
Q Do you recall whether you did anything in response to this report?
A That's a good question There are 14

Page 576

years between the report and now, and I just don't recall
(There was a pause in the proceedings )
MR NESLIN Can we go off the record for a second?
(A discussion was held off the record )
MR NESLIN Mark that as 51
(Brownstein Exhibit No 51 was marked for identification )
BY MR NESLIN
Q You've been handed what's been marked as Exhibit 51 to your exhibit -- to your deposition
This is a document entitled, "Guidebook for Standard Contract for Disposal," stamped preliminary draft
MR BANES Do you have several copies of that?
MR NESLIN Yeah Sorry, counsel
MR BANES No problem Is this 51?
MR NESLIN Fifty-one
BY MR NESLIN

Page 577

Q Mr Brownstein, are you familiar with this document?
A You have to give me a chance at least to glance at it
(The witness reviewed the document )
THE WITNESS I don't recall, I do not recall ever seeing this before
BY MR NESLIN
Q Do you recall any discussion at OCRWM about preparing a guidebook for the standard contract?
A Guidebook does not ring any bells I have no recollection of that
Q This includes information, turning to the Table of Contents, this includes information on the ACR issue resolution process?
A Yes
Q On the Delivery Commitment Schedule process, on the delivery commitment, on the Delivery Commitment Schedule exchanges?
A Um-hm
Q Do you recall any discussion at OCRWM about providing written guidance on those issues collectively in a document of this sort, whether it was called guidebook or not?

Page 578

A As I testified, we had something called this ACR resolution process with the utilities, and there were a number of issues that were identified, and those would be subject to, you know, discussions at meetings
I would normally have requested a contractor to prepare such things as suggested -- well, analysis of the issue, and potentially suggested positions for DOE recommendations, so these issues are familiar to me
Responding to your question, I never saw it in this form or this guidebook, but as I have testified previously, contractors may have worked on this as a way to present this to me, but I don't recall the document
Q Mr Brownstein, I've just looked at several pages, for example
A Sure
Q Pages 1 and 2, 3, have numbering along the left side of the text?
A The left? You're talking about these?
Q Yes
A Yeah Yes
Q But by these, you're pointing to the

Page 579

numbers along the left side of the page?
A Yes
Q Does that begin --
MR BANES Page, on page 2017
BY MR NESLIN
Q Does that indicate anything to you about the, who might have prepared this document?
A As I have testified before, this was a characteristic normally employed by PNL
Q If I could ask you to turn to page 37? This would be Bates Number CTR-001-2050 in the lower right-hand corner
A Okay
Q I would ask you to review lines 13 through 20 on the page
(The witness reviewed the document )
THE WITNESS Okay I'm sorry You said to 30?
BY MR NESLIN
Q Thirteen through 20
A I have read that, yes, 1 through 28, I didn't
MR BANES Just note for the record line 21 and 22 don't seem to be readable

Page 580

THE WITNESS That's true
BY MR NESLIN
Q This is the best version that we had available
The top of page bears the date of August 14th, 1991, and the first sentence states that the importance of the exchange process is becoming more apparent as the projected early receipt rates result in insufficient annual capacity allocations to avoid additional at-reactor storage by some purchasers
Mr Brownstein, what does that mean to you?
MR BANES Objection -- lack of foundation
Calls for speculation
THE WITNESS Okay See if we can pull out an APR, any one It doesn't matter to me
Twenty-seven is the first one I picked up
MR HANDWERKER Twenty-seven and 33
BY MR NESLIN
Q Do you have 27?
A Wait a second I want to use a

Page 581

different table
MR BANES Exhibit 32
MR NESLIN Thirty-two
THE WITNESS Yeah This is an example
I would like to go to Table 3 1 to try to respond to your question Okay?
BY MR NESLIN
Q 3 1?
A Yes Yes I'm just picking, picking that one, 3 1 That's on page 8
Q Yes
A What, what this sentence tells me is, is that there is a recognition that on any particular year of when acceptance would begin, around Year One, that the, those utilities that have an allocation may not match exactly what those utilities that have or are projected to have storage difficulties
Q And was that a potential problem with the oldest fuel first priority system to your mind?
MR BANES Objection -- vague
THE WITNESS The oldest fuel first was a condition, was a term laid out in the

Page 582

contract
That's how the parties, that was a, a key criterion that the parties negotiated in '83 to allocate acceptance capacity
As a result of that mutual negotiation, did that result in a difference between those that were, had the allocations and those that had storage problems, recognizing that, you know, until DOE accepted storage problems with responsibility of the utility, in my mind, that's an equity issue, you know, among utilities
BY MR NESLIN
Q Well, Mr Brownstein, didn't you testify previously that one of the OSM or one of DOE's objectives with this system was to avoid the need for utilities to have to add additional on-site storage after 1998?
MR BANES Objection -- vague
THE WITNESS I did, and I put the caveat on that their goals and objectives, apart from contractual commitments, I viewed the oldest fuel forecasts as a contractual commitment
I viewed the, I viewed as a goal as

Page 583

opposed to contractual commitment to avoid additional on-site storage
BY MR NESLIN
Q As a goal, wouldn't the mismatch between those utilities which had allocations and those utilities that needed additional storage, running into storage problems, would not that mismatch frustrate that goal?
Do you understand my question?
A I do
MR BANES Objection Calls for speculation
THE WITNESS A contractual commitment in my mind is a higher priority than a goal
BY MR NESLIN
Q My question was simply would the goal that you had identified, and understanding that it is a goal and that's the form in which you're speaking to it, wouldn't that be frustrated by the mismatch between those utilities which have allocations, annual allocations and those utilities which need additional storage?
A It certainly could
Q Okay And wouldn't that problem be addressed by exchanges?

Page 584

A That was --

MR BANES Calls for speculation Go ahead

THE WITNESS That was certainly something we were aware of, and it certainly could be

BY MR NESLIN

Q To your mind, wasn't that part of the reason for exchanges?

MR BANES Can we take a break for a second?

(There was a pause in the proceedings )

MR BANES I'm sorry, Dave

THE WITNESS I'm sorry Just to make sure I accurately answer your question, can you repeat that?

MR NESLIN Do you want to restate that question?

THE REPORTER Question "To your mind, wasn't that part of the reason for exchanges?"

THE WITNESS Need to go back to an additional -- that was half a question

THE REPORTER Question "My question

Page 585

was simply would the goal that you had identified, and understanding that it is a goal and that's the form in which you're speaking to it, wouldn't that be frustrated by the mismatch between those utilities which have allocations, annual allocations and those utilities which need additional storage?"

MR BANES Objection -- lack of foundation

THE WITNESS My opinion is yes, and the only caveat I have to that is that when those terms of the contract -- you know, I wasn't with the department, you know, originally, but in my mind, that was -- that's right

BY MR NESLIN

Q Could exchanges, would exchanges be beneficial to the operation of the waste management system?

MR BANES Object Calls for speculation

THE WITNESS It could be

BY MR NESLIN

Q Insofar as exchanges addressed this mismatch between those utilities which had

Page 586

allocations and those utilities which faced storage problems, exchange which addressed that mismatch would be beneficial to the operation of the waste management system, wouldn't it?

MR BANES Same objection

THE WITNESS It could be, and I can think of cases where it wouldn't for other reasons that we have talked about before, but in terms of that, that narrow issue that you're raising, yes

BY MR NESLIN

Q The other reasons you're referring to being infrastructural problems?

A As an example, like I testified before about mismatch in terms of cask availability, as an example

Q Well, I'll accept that as an additional clarification of my hypothetical

A Okay

Q That the exchange would not create such a mismatch would create infrastructural capacity problems for the system?

A Okay

Q Assuming that, would an exchange of the sort that I previously described be

Page 587

beneficial to the operation of the waste management system?

MR BANES Objection Calls for speculation

THE WITNESS Are you saying -- waste management system, you're talking about the federal site?

BY MR NESLIN

Q Yes

A And I have answered you it could

Q Why wouldn't it be?

MR BANES Objection Calls for speculation

BY MR NESLIN

Q If it does not, if it fits within the capacity of the system, and if it addresses this mismatch between allocations and storage needs, why wouldn't that be beneficial?

A Well, I'm answering when you talk to me about beneficial to the federal waste management system, I'm viewing it from a technical perspective

For instance, if the exchange were between, you know, exactly alike, everything was alike between the utilities, would this be a

Page 588

benefit to, to the federal waste management
system?
Well, you know, we might have to
travel a few miles less or a few miles more,
that that's not really much of a benefit to me
It's a wash The benefit falls to the
utilities
If you're meaning beyond the
technical, and that's how I was answering you,
that's a different question
Q And let me clarify I was meaning
beyond the technical
I was meaning in terms of, I was
talking in terms of the addressing your
objectives for the system, which included, as I
understand it, avoiding the need for additional
at-reactor storage after 1998?
A Right That's a policy objective, and
I agree with the policy objective
I was trying to answer you in the
technical, how I was interpreting the question
Q You would agree that an exchange would
help to meet that policy objective?
A Yes
(Brownstein Exhibit No 52

Page 589

was marked for
identification ) ^
BY MR NESLIN
Q Mr Brownstein, you've been handed
what's been marked as Exhibit 52 to your
deposition
This is a memorandum from Pat McDuffie
to a D C Langstaff and you dated May 16th,
1990
Here is a Bates stamp of HQ0006755
through 6761, and it attaches or attached to the
first page is a document entitled, "The DCS
Exchange Process "
Could you take a minute and review
this?
(The witness reviewed the document )
BY MR NESLIN
Q Mr Brownstein, my first question is
going to be, my first question will be just
whether you're familiar with this document
A I would like to throw in your first
instruction, which is to review it
(The witness reviewed the document )
Is
THE WITNESS Okay I'm quickly

Page 590

scanning the document, and I think I can answer
that I have seen this document before
BY MR NESLIN
Q Is this work done at your request or
at your direction?
A Consistent with how I previously
testified, yes
Q If I could ask you to turn to page 3
of the attachment?
A Okay
Q Lines 15 through 26, if you could
review that paragraph?
(The witness reviewed the document )
THE WITNESS Okay
BY MR NESLIN
Q Beginning with the second line, "Since
approved DCSs define the annual transportation
system's and receiving facility's requirements
in terms of DOE's commitment to accept SNF, an
Exchange may impact the timing of the need for a
particular cask mix The lifetime cask mix will
not be changed, since all Purchasers must
eventually be serviced This implies that
adequate planning and anticipation of potential
Exchanges on the part of DOE can minimize this

Page 591

impact "
And then discusses the fact that by
addressing the potential impact of exchanges
now, the department could minimize cask lead to
receiving facility requirements in a way that
would maximize its ability to accommodate
exchanges?
A Um-hm
Q Do you recall reviewing or considering
this question or this issue at or about May 16
1990?
A I reviewed, I recall reading this
paper, so I'm familiar with it
Q Do you recall this part of the paper
that talks about the ability of DOE to
accommodate exchanges by planning and
anticipating them in setting the parameters for,
for cask fleets and receiving facility
requirements?
A Before you handed me the paper, I
didn't recall it
I have read the paragraph I recall
it
Q Well, did, did the department, did the
department, to your knowledge, do anything to

Page 592

accommodate the need for further, the need for exchanges -- excuse me Strike that

Did the department take any action to accommodate the potential need for exchanges in setting and addressing cask or transportation or facility needs?

A Well, understand that what this paragraph is suggesting is that we look at the potential mismatches and predict or guess what exchanges will take place

Exchanges, initiation of exchanges was all at the discretion of the utilities, so what this paper was doing is saying look at the allocations It's telling me look at the allocations Look at the mismatches with storage, and why don't you guess on what exchanges may be offered by the utilities and use that to influence transportation cask procurement decisions

That's what it says to me We have never entered in at this point in time, to the transportation procurement decisions, so I can't say We just haven't done that as a department

Was this in my mind and was this important? Sure

Page 593

Q This was, this was important, would have been considered important at that time?

A Well, if --

MR BANES Objection -- mischaracterizes

Go ahead

THE WITNESS No If -- let me restate

If we were at the time procuring casks, I believe this would have been a concern that should have been taken into account

BY MR NESLIN

Q But you were not in fact procuring casks at that time?

A Correct

Q And have you subsequently begun the process of procuring casks?

A No

Q So you haven't had a reason to address this as part of a cask procurement process?

A No I recognize this is a, a legitimate point

(Brownstein Exhibit No 53 was marked for identification ) ^

Page 594

BY MR NESLIN

Q Mr Brownstein, I've handed you what's been marked as Exhibit 53 to your deposition

This is a letter from James B Blandford to Ronald A Milner dated June 28, 1994, with an attachment titled, "Recommended DCS Exchange Processing and Approval System Development Plan "

It bears Bates Number CTR-001-1328 through 1334

Could you please review this document, tell me whether, whether you're familiar with it?

(The witness reviewed the document )

THE WITNESS I'm aware of its -- I, I am not familiar with it

I have been aware of its existence, yes

BY MR NESLIN

Q How did you become aware of its existence?

A I believe by this time, Nancy Slater was serving as or was working for me serving as my deputy, and I recall that she, she and I had discussed both tasking TRW with this, and I

Page 595

recall her telling me as I was looking through this that she had received it and was, you know, had some concerns with it, but this was a, an early contractor deliverable to a request that my staff had made

Q Did you have any input in its development?

Did you provide any direction to TRW regarding this project?

MR BANES Objection -- compound

THE WITNESS The answer is both yes and no

As division director, I was responsible for, I did discuss it with my staff before the, before the task was made, and I know I discussed with her her views and comments on this paper when it was turned in, so I hope that's responsive

BY MR NESLIN

Q Will you turn to page 2 of the attachment, page 2 of the attached report?

A Oh, okay

Q Under heading 2, second paragraph, the first -- excuse me -- the first paragraph, under heading 2, if you can review that?

A Okay
(The witness reviewed the document )
BY MR NESLIN
Q This states that DOE has determined that a DCS exchange PAS capable of analyzing, tracking DCS exchanges needs to be put in place, and I'll represent to you that on the preceding page, PAS is defined as a processing approval system
Is this statement accurate that DOE had determined that such a system capable of analyzing and tracking DCS exchanges needed to be put in place?
A As I recall, our contractor support suggested that such a system was necessary, and we said, you know, why don't you flush it out?
The words DOE has determined, again, as I testified before, the contractor often made a lot of statements
This isn't, the department never determined that, that this system was necessary
We made the request to, you know, explore it, flush it out
They write words, but because the contractor writes words does not mean it's



departmental policy
Q Was such a system in fact developed?
A I don't recall how far they went in it and how much it was used, frankly
If you have got some documents, that might jog my memory, but I don't recall how far we went with that
MR NESLIN Let's take a break for about five minutes here
MR BANES Okay
MR NESLIN I'll come back with such a document I hope
(A recess was taken )
BY MR NESLIN
Q Mr Brownstein, before the break, we were discussing Exhibit 53 and the proposal to develop an exchange processing approval system, and I think your testimony was that you do not know sitting here today whether such a system was in fact ever developed?
A I did not recall how far the contractor or we took that
Q Do you recall any additional steps towards such a system that were taken?
MR BANES Objection -- vague



THE WITNESS I guess I stand by my answer
I don't recall if or how far it went
BY MR NESLIN
Q Do you recall anything else being done regarding the development of such a system beyond this report?
A If I did I would have to speculate
Q You have no recollection today?
A Right
Q And the system that we're talking about, that would have been a computerized tracking system?
A I believe that's what they were referring to it as
Q Do you have any independent recollection sitting here today how the system would have worked or operated?
A What I'm testifying to is so many years have passed, I just don't recall
If you had something to jog my memory, I might, but I don't right now
(Brownstein Exhibit No 54 was marked for identification )



BY MR NESLIN
Q Mr Brownstein, Exhibit 54 is a document captioned preliminary draft that appears to be a preliminary draft of a Federal Register notice Bears Bates Number CTR-024-0043 through 4
(The witness reviewed the document )
THE WITNESS Okay
BY MR NESLIN
Q Do you recall this document?
A Yeah I think I have seen it before
Q Did you ask that it be prepared?
A To the best of my recollection I testified that there were -- contractors did work for us primarily one of two ways
We would give them a work task to do something specific, and there would also be a general task order and where they would, you know, develop ideas and present them to us, you know, on related but, but matters specifically asked for
I think, my recollection is this fell in the latter category
I don't recall specifically asking for it

Page 600

I believe they had an idea and they did it
That's my recollection
Q Do you recall reviewing it at some point in the past?
A Well, I testified that I think I have seen this before, so if I saw it before, then I would have read it
Q By contractor, are you referring to PNL?
A Yes by the distinguishing marks on the left-hand side
I also don't know what year this is
Q Do you recall doing anything in response to this document?
A The department never, to my recollection, never moved forward with the Federal Register notice
I think it was an idea, but I don't believe we moved forward
Q Do you recall who decided not to move on that?
Would that have been your decision?
A Well, one of things that would help is for me to understand the year of the document

Page 601

Q It does not bear a date
A So I would speculate it probably was me, but it could have been, you know, who knows? Timing reasons, whatever, I don't specifically recall
(There was a pause in the proceedings )
BY MR NESLIN
Q Do you recall the idea of developing an information clearinghouse to facilitate exchanges?
A No The way I recall it is that I testified I believed this was an idea that the contractor thought up and, and proposed it, and for whatever specific reason, I don't recall
I did not move further on it
Q Do you recall the department taking any action to develop an information clearinghouse for this purpose?
MR BANES Objection -- asked and answered
THE WITNESS I believe I did answer that question
No
(Brownstein Exhibit No 55

Page 602

was marked for identification ) ^
BY MR NESLIN
Q Mr Brownstein, Exhibit 55 is a memorandum from D Williamson to D Jones dated July 25th, 1994, on the subject of review of hypothetical DCS exchanges
It bears Bates Number CTR-004-0035 through 42
Are you familiar with this document?
(The witness reviewed the document )
THE WITNESS I believe I have seen this document before, yes
BY MR NESLIN
Q Who was D Williamson?
A To the best of my recollection, it was Doug Williamson
Q And was he an employee of TRW?
A Yes
Q And who is D Jones?
A That's Dave Jones
Q And is he an employee of DOE?
A No No
Q Where would he have been employed at that time?

Page 603

A TRW
Q Do you recall why -- well, this discusses a, a review of hypothetical exchanges that was performed
Do you recall why such a review was prepared?
A At either our initiative or TRW's initiative, they developed some hypothetical cases to understand how things could work, as I recall, and problems, you know, could be encountered, you know, to make sure that, you know, we were, we were prepared if and when exchange requests came in, so it was that type of activity
Q And what was your role?
A As I recall it, Williamson and Jones I believe reported to Cole, although I do not see his name on the cc's, which surprises me, and you know, they were our M&O contractors
Q By Cole, you're referring to Billy Cole?
A Yes
Q And what was, what was your role in this review process?
A In essence, I was the client To the

Page 620

have answered that
(Brownstein Exhibit No 61
was marked for
identification ) ^
BY MR NESLIN
Q Exhibit 61 is a letter from Ronald Milner to William Manion dated October 30th of 1990, Bates Number CTR-006-0505
(The witness reviewed the document )
THE WITNESS Okay
BY MR NESLIN
Q Did you prepare this letter?
A I believe I did
Q The second -- excuse me -- the third paragraph of the first page, the second sentence reads, "The Department has not determined whether or not priority will be accorded shutdown reactors, or if priority is granted, under what specific circumstances "
Was that a true statement?
A Yes
Q Does it remain true today, to your knowledge?
A To my best of my knowledge, yes
Q Was it the department's position that

Page 621

it would make any determination on a request for priority by a shutdown reactor on a case-by-case basis?
MR BANES Objection -- lack of foundation, vague as to time
THE WITNESS You know, the sentence as I recall writing it as I'm reading it today, you know, was true then
We hadn't determined what we were going to do, and I think we tried to, you know, accurately portray that in that sentence
The only caveat I have, you know, I haven't been responsible in the area for seven years, but up until '95, that sentence remained accurate, and I think it remains accurate today, but that's speculation
(Brownstein Exhibit No 62
was marked for
identification ) ^
BY MR NESLIN
Q Exhibit 62 is a memorandum from P N McDuffie and S A Vance to D C Langstaff and you dated June 28th of 1991
(The witness reviewed the document )
THE WITNESS Okay

Page 622

BY MR NESLIN
Q Do you recall this document?
A I do I do recall it
Q This was prepared as part of the ACR issue resolution process that we have, you have testified about previously?
A Well yes We my contracting support was, was trying to help us out on the issues that we identified, so this was prepared probably at my direction to try to help us think through the resolution of different issues
Q The first page, the second sentence states that "In this draft, we have indicated a 'Phase 1' and a 'Phase 2' position, where Phase 1 refers to the earlier years of system operation and Phase 2 refers to the years after the system is in steady-state operations "
Do you see that?
A Yes
Q Do you know why that distinction is -- was that distinction important to the resolution of certain issues?
A My recollection is that it was If I went through the issues and looked at, if you want me to read the paper, to read the

Page 623

differences between the Phase 1 and Phase 2, I can probably give you a more complete and accurate recollection
Q Let's turn to page 5
A Okay
Q Lines 1 through 17
(The witness reviewed the document )
THE WITNESS That's a pretty good example
BY MR NESLIN
Q This is discussing priority, the issue of priority for shutdown reactors?
A Yes
Q And under -- and it distinguishes between Phase 1 and Phase 2, correct?
A Yes
Q Phase 1 being the ramp-up period for the facility and Phase 2 being steady-state operations?
A Right
Q Phase 1 says that during Phase 1, this indicates that the issue is primarily an equity issue among the purchasers
What does that mean to you?
A To me, that means an issue that

Page 624

irregardless how it would be resolved would not affect the technical operations of the federal waste management system, but would impact the individual utilities more or exclusively, not the federal system
Q And was that your opinion?
A Yes, it was
Q And it goes on to state DOE concurs with the purchasers' consensus view that no priority shall be afforded to shutdown reactors during the start-up phase of the waste management system?
A Correct
Q At least during Phase 1, what does consensus mean in this context?
A As part of the ACR issue resolution process, that group, we would discuss issues, and they would attempt to reach consensus if you will on individual issues
In some way, shape or fashion that I really don't recall, in other words, whether it was orally or in writing or in a particular meeting, the utilities came to that view, as I stated, that no priority should be given to shutdown reactors during that phase

Page 625

Q Do you recall discussing that issue with the utility representatives?
A Yes, I do
Q And were all the utility representatives in agreement on that issue?
A I believe consensus, consensus implies to me not in unanimity
Q Do you have any recollection of what portion of the utilities agreed with that view?
A No When they would discuss the issues, they would have their own private meetings and present to us things like a consensus view
What their internal conversations were, you know, I have no idea
Q This states DOE concurred with that view
Was that accurate?
A No As I have testified before, this is a this is a contractor document, and they are proposing that DOE concur with that, but because, as I testified because, it says so in a contractor document doesn't make it so
It makes it so what DOE, a DOE official puts in a letterhead, you know,

Page 626

official correspondence or an official report or in testimony, something like that, not, a DOE policy is not made through a contractor document
Q And to your knowledge, DOE did not formally adopt a policy on this issue?
A To the best of my recollection, the sentence that you pointed out in the Manion letter, the previous one, was the department's policy
Q Just for purposes of clarity, that was the sentence that read the department has not determined whether or not priority will be accorded shutdown reactors or if priority is granted, under what specific circumstances?
A Yeah That was the, that was the official line
Again, we were trying to reach closure on these issues, but I have answered your question
Q With respect to Phase 2, the document states that when the waste management system receipt rate exceeds the aggregate purchasers' annual discharge rates, and all purchasers can be assured that they will not need additional

Page 627

at-reactor storage, it suggests that DOE may elect to allocate acceptance prior to shutdown reactors?
A Right
Q What does that mean to you?
A Is there a specific question, or the whole --
Q What is the significance of reaching steady-state operations for the issue of whether shutdown reactors should be granted priority?
A There will be a time during steady-state operations where we receive more spent nuclear fuel than generated, and therefore, the backlog will no longer be increasing, will be decreasing, and as it is decreasing, this issue will have a different impact on the utilities
And the suggestion here is that, that during that phase, we, we may want, the contractor is suggesting we consider altering the policy
Q What was your view on that issue?
A My personal view on this?
Q Yes
A My personal view on this is that the

Page 696

MR BANES Objection
Mischaracterized prior testimony
Go ahead, asked and answered
THE WITNESS The design of the federal waste management system, you know, is an engineering feat, has many elements Has financial Has contractual Has engineering Has regulatory and many -- a policy decision affecting, you know, technical aspects of the program in a real world should be influenced by the technical feasibility of implementing that and I think that was I recall in the documents that we reviewed, several of them like the mission plan talked about the complexity of the system and the early stage that we're in and the challenges that we faced, many of those from, from engineering, and that was an important way and important component to develop acceptance rate
It is not a question of somebody sitting back and saying I would like to have 20,000 MTU a year accepted
I think it's more than that
BY MR HANDWERKER
Q So to summarize your testimony, would

Page 697

it be fair then that one element of determining what the appropriate annual aggregate acceptance rate should be would be engineering considerations?
MR BANES Objection Calls for a legal conclusion
THE WITNESS Engineering is a part
BY MR HANDWERKER
Q And financial issues as well?
MR BANES Same objection
THE WITNESS If you build a system, the extreme response to your answer to make my point is it is highly unlikely in my view, probably others', that Congress would fund, provide enough funding for you to develop an entire system to take all the utilities' fuel in one day
BY MR HANDWERKER
Q So to answer my question then, financial considerations were also an element in determining what the appropriate annual aggregate acceptance rate should be?
MR BANES Same objection
THE WITNESS To the extent I used it in the example, as an example, there are many

Page 698

aspects
BY MR HANDWERKER
Q And the utilities also fund the waste acceptance program, don't they?
MR BANES Objection -- misleading
THE WITNESS The utilities contribute to the nuclear waste fund consistent with the statutory and contractual requirements
BY MR HANDWERKER
Q Turn if you would to PNL-102-1183, which is entitled at the top "Alternative Approaches or Concepts for ACR "
And Mr Brownstein, this page has three columns on it
The first column on the left is entitled concept, and then the middle column is entitled philosophy, and then the third column is entitled content
And underneath, going back to concept, the first concept listed is minimum contractual, and the philosophy from minimum contractual is include only absolutely necessary information, avoid taking preliminary positions, and the content is aggregate acceptance rate from mission plan -- fuel age rankings for existing

Page 699

inventory
Do you see that?
A Yes, I do
Q Was the content column referring to the content to include in the Annual Capacity Report?
A Yes
Q And if I'm reading this correctly, what was the, what was the concept column --
A Oh --
Q Depicting?
A It's a, it's a tag-on It's how you, it's a subjective way to tag or describe both philosophy and the content
Q So if I'm reading this correctly, then the minimum contractual description would contemplate that the aggregate acceptance rate from the mission plan be included in the Annual Capacity Report, is that right?
MR BANES Objection -- vague
Objection as to form, calls for a legal conclusion
THE WITNESS Yes
BY MR HANDWERKER
Q And is that what you told the OCRWM

Page 728

Interim Storage? U S Monitored Retrievable Storage Review Commission Washington D C ," November 1989

Bates number, starting Bates number is PA-172230, and I will represent for counsel and the witness that in the interests of saving my strength, I have only printed out the first 26 pages of the document, which consists of the summary of the conclusions and recommendations

If you need to look at the entire document, which is lengthy, I'll be happy to provide you with a copy of that Okay

(Brownstein Exhibit No 69 was marked for identification ) ^

BY MR HANDWERKER

Q And I will tell you in advance, Mr Brownstein, you can look at whatever amount of this document you need to refresh your recollection, but I'm going to focus all of my questions on, on the conclusions that are in the front

(The witness reviewed the document )

THE WITNESS I believe that I, I did read this document back then

Page 729

BY MR HANDWERKER

Q Okay Take a look if you would at the page marked with the letters xvi at the bottom

It's Bates number PA-172244

A Okay

Q And at the bottom of the first column, under conclusion No 4, do you see the statement that the schedule linkage presently in the Nuclear Waste Policy Act -- strike that

The Nuclear Waste policy Amendments Act, open paren, MRS construction may not begin until the Nuclear Regulatory Commission issues a license for the construction of a repository, close paren, would make it impossible for an MRS to be operational more than three years before the repository

Do you see that?

A Yes

Q Do you agree with that conclusion?

MR BANES Objection -- lack of foundation

THE WITNESS I'm not, my responsibilities, you know, within RW did not include working on the MRS in terms of technically how you would construct one or how

Page 730

it would work, so I have no independent basis on which to say I agree or I disagree

BY MR HANDWERKER

Q That's fair enough Did you discuss that conclusion with anyone within the Department of Energy that you can recall?

A To get clarity of this was an accurate statement or not?

Q Yes Yes

A No I wouldn't have a basis to challenge the commission

Q At this time, in November 1989, is that around the time that the DOE Secretary issued the report, the 60-day report reassessing the nuclear waste program?

A My recollection is that that 60-day report was issued in '89

I don't recall when in '89

Q And that report, the 60-day report, delayed the opening of the repository from 2003 until 2010, is that correct?

A I believe that's correct

Q And three years prior to 2010 is 2007 obviously, right?

A That's the way the math works

Page 731

Q Is that the -- you're right

A Sorry

Q It's pretty obvious Is that the basis for the inclusion of the 2007 date in the subsequent ACRs that we looked at earlier for the date on which facility operations could begin if the scheduling linkages were not modified or repealed?

MR BANES Objection -- lack of foundation

THE WITNESS Please show me the statement you're referring to in the ACR

I'm trying to answer your questions

BY MR HANDWERKER

Q Take a look at the 1991 ACR, which is Exhibit 30, and in particular, in Brownstein Exhibit 30, could you take a look at page 4, which is Bates Number HQR-001-2365?

A Okay

Q And in the second paragraph, the last sentence which reads, we discussed earlier, if the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and

Page 732

initial acceptance of SNF by the Department of Energy could not start until at least 2007?
A Yeah That's my recollection That's consistent, so I agree
Q Okay So if the siting linkages between MRS facility construction and repository construction authorization are maintained, then facility operations and initial acceptance of spent nuclear fuel by DOE cannot start more than three years before repository, repository operations start, is that correct?
MR BANES Calls for a legal conclusion
Go ahead
THE WITNESS My understanding is the law would have to change on this
We were following statute
(There was a pause in the proceedings )
MR HANDWERKER I would like to have marked as Brownstein Exhibit No 70 a document entitled, "Civilian Radioactive Waste Management Program Plan Volume 1" dated I think December 19th, 1994 Yes
That is as referenced on the second

Page 733

page
It's got the U S Department of Energy seal on it, and the first Bates number is SN174276(D) and the final Bates number is SN174362, and I will represent for counsel and for the witness that I have provided to you Volume 1, which is the program overview
There are two additional volumes
(Brownstein Exhibit No 70 was marked for identification) ^
BY MR HANDWERKER
Q Take as much time as you need to familiarize yourself with the program plan, which could take years, right?
Let me ask you as a starting point to help you out do you recognize this document as the December 19th, 1994 program plan?
A Yes
Q And did you review this document at or about the time it was released?
A I reviewed parts of the document
Q Okay The parts of the document that you reviewed, were they interspersed throughout the program plan, or were they focused on any

Page 734

particular part?
A As I recall, they were in a number of different sections, not in one location
Q Okay Did you play any role in preparing any parts of the program plan?
A I believe that I did
Q Which parts did you play a role in preparing?
A In order to answer that question, I would need to go and look through it
Q Okay Maybe -- go ahead
A Those, those sections that describe activities then under my responsibility at the time, which I would have to then look through and show, and that's for preparing, and then I reviewed, you know, other sections as well
Q Okay Maybe when I asked my questions about particular parts, that might help focus on those parts of the program plan that you did prepare
Okay?
A I would rather do it that way
Q That's fine Take a look if you would at page X -- I'm sorry Strike that -- ix -- my Roman Numerals are terrible -- which is Bates

Page 735

number SN174284
And there is a statement there by Daniel Dreyfus
He was the director of OCRWM at that time?
A Correct
Q Is that correct? And who, to whom was the program plan circulated when it was issued?
Was it sent to Congress?
(The witness reviewed the document )
THE WITNESS My recollection is that it was
I probably would have to read this but my recollection is that it was
BY MR HANDWERKER
Q Okay Was this the first program plan of this type that the Department of Energy issued with respect to the waste management program, to your knowledge?
A I believe it was
Q What was the purpose of publishing this program plan in December of 1994?
(The witness reviewed the document )
THE WITNESS The, as I have previously testified the department RW has