IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
\- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiffs:
JERRY R. STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
RUSSELL A. SHULTIS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS |
| --- | --- |
| ALAN BROWNSTEIN | |
| By Mr. Stouck | 4 |

Afternoon Session - Page 143


EXHIBITS


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
| --- | --- |
| 77 - Condensed testimony of Alan Brownstein, pages 1 through 781 | 6 |
| 78 - Memo dated 7/23/84 with attachments | 37 |
| 79 - Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983 | 42 |
| 80 - Memo dated 4/8/83 with attachments | 55 |
| 81 - Proposed Rules, Nuclear Regulatory Commission, 10 CFR Part 61, Disposal of Radioactive Wastes, 5/18/88 | 81 |
| 82 - U.S. Department of Energy, Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste | 157 |




PROCEEDINGS

Whereupon,

ALAN BROWNSTEIN,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFFS

BY MR. STOUCK:

Q. Good morning, Mr. Brownstein. I'm Jerry Stouck, we met briefly before the deposition started. I represent three utility companies in this litigation, Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company.

And I know you have some familiarity with the litigation because you were deposed for three days I think in the so-called common proceedings. I want to start by asking you some questions about your prior testimony just for clarification.

A. Sure.

Q. And maybe some supplementation. So I'm going to hand you and I think we'll mark as -- well, hold on. We're going to start numbering the exhibits with the next number in the common deposition just so



we don't get confused and we may use some of those prior exhibits today.

I believe the last number according to the transcript I have is No. 76. So let's go ahead and mark this 77. And furthermore I've got a copy for you guys. We'll do what we did with Mr. Barrett when we went through a similar exercise.

I've got the entire transcript from the three days. I'm not going to ask you about every page. What I would like to do is, when I do ask a question, I would like you to put a checkmark on that page and then the official exhibit will consist of only those pages that were actually asked about.

Is that okay with you guys? I mean I'll introduce the whole transcript.

MR. CRAWFORD: No, I definitely want to avoid introducing the whole transcript.

MR. STOUCK: Because you just get into circularity. And we'll have an agreement that, if for some reason on reviewing the transcript we realize that we didn't mistakenly disassemble the transcript, we'll just put in as Exhibit 77 the pages that he was actually asked about. But we'll try to do that is we sit here so we don't have to fix it later.

Page 22

ask the judge to have you answer it. I'm not asking you -- well, let me ask you this, you're not qualified to make legal interpretations about a contract; is that right?
A. That's correct.
Q. I'm not asking about that right now. I'm asking about your understanding. Did you have an understanding that the contracts obligated DOE to have a facility operating by 1998?
MR. CRAWFORD: Objection, asked and answered; objection to the extent it calls for a legal conclusion.
THE WITNESS: I'm not sure I know how to expand on the answers that I already gave.
BY MR. STOUCK:
Q. Well, it's a yes or no. You had no such understanding or did you have that understanding? I don't mean to confine you, you can give me any explanation you want. But you worked on this program in this area for ten years.
A. Uh-huh.
Q. You have testified unhesitatingly about your understanding that the obligation was conditional on the '98 date?
A. Right.

Page 23

Q. I'm just asking whether or not you had this other understanding about whether the contracts obligated DOE to have that facility by 1998?
MR. CRAWFORD: Same objection.
THE WITNESS: The same answer. I really don't know how to expand on it. I don't believe its's -- if it's a yes or no, that's a legal conclusion.
BY MR. STOUCK:
Q. Your understanding is not a legal conclusion because you already told me you can't give me legal conclusions?
A. Right.
Q. Your understanding, Alan Brownstein, ten years in the program, was it your understanding that the contracts obligated DOE to have or did you not -- if you didn't have that understanding, just tell me that.
A. I'll try it this way --
MR. CRAWFORD: Wait a minute. Same objections.
Go ahead.
THE WITNESS: Why don't you help me out with your definition of obligated.
BY MR. STOUCK:

Page 24

Q. It's the same obligated by the contracts. I mean you answered a question about obligations on line 20 of page 55.
A. To me the obligation of the department was ultimately to accept all the waste. And we had a goal to do that as quickly as we could. It was a goal set by Congress of 1998. And we worked to try with all the things we faced, budgetary and other matters, to meet that. So, from a policy perspective, it was a goal.
Q. Right. Did the contracts obligate DOE to have a facility in place by 1998, do you know?
MR. CRAWFORD: Same objections as before.
THE WITNESS: I really can't go beyond that answer. I think I've given you an answer, my understanding of the contract.
BY MR. STOUCK:
Q. You haven't given me an answer to my question and I'd like to get one. I'm going to get one, that's a promise.
A. Okay.
Q. Okay. It stands. It hasn't been answered. If you didn't have any understanding about that subject, just tell me that.
A. Well, I had an understanding of the

Page 25

subject. I think I tried to answer that.
MR. CRAWFORD: Same objections.
BY MR. STOUCK:
Q. Was it your understanding that the contracts obligated DOE or not to have a facility operational in 1998?
MR. CRAWFORD: Same objections.
THE WITNESS: I guess I've never thought about it that way. You know --
MR. CRAWFORD: Jerry.
MR. STOUCK: He is not done with his answer.
MR. CRAWFORD: I know. I have a suggestion.
MR. STOUCK: Let's wait and see if he's got anything else to say.
MR. CRAWFORD: Okay. Fair enough.
THE WITNESS: My understanding was that the law set a goal. It set a lot of goals in the Nuclear Waste Policy Act. And it established a goal of January 31st, 1998.
And we proceeded to try to meet that goal. And we had an obligation to try to meet the date that was in the law. And I think we did everything we could to try to meet that. Is that responsive to



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 26

your question?
BY MR. STOUCK:
Q. That is responsive if you would agree with me that -- I would take that as a no answer, because there's a difference between try to meet and meet. You testified that your understanding was there was an obligation to try to meet. And my question was whether it was your understanding that there was an obligation to have a facility operating, not try, to have it operating by '98.
So I understand the substance of your answer to be no, it was not your understanding that the contracts obligated DOE to have a facility operational by '98. But I don't want to mischaracterize your testimony. I'm just asking if that is accurate?
MR. CRAWFORD: Well, objection, asked and answered; objection to the extent it calls for a legal conclusion; let me object to the foundation of it. Those are my objections.
BY MR. STOUCK:
Q. Do you understand the pending question?
A. It's the same question.
Q. I take it as a no answer. But you have testified that your understanding was the obligation

Page 27

was to try to meet the date. My question was whether you had an understanding that there was an obligation, in some sense absolute obligation to have the facility operating by '98.
And I think what you told me is you did not have an understanding that the contracts obligated DOE to actually have it, a facility, your understanding is the contracts only obligated DOE to try to have it. Is that a fair characterization? I'm just trying to get your understanding of these matters which are important to this dispute.
MR. CRAWFORD: Objection, asked and answered; to the extent it calls for a legal conclusion; objection to the foundation; and objection to the extent it may have mischaracterized prior testimony.
You may answer.
THE WITNESS: I think your restatement of it is probably close. There are a lot of things that have to happen in order for that date to be met that are independent of us. There are NRC licensing actions, there are budgetary considerations that are determined by Congress.
So there are a number of things that are outside of our control. So I viewed it at the time

Page 28

as a goal. I never thought about it as, you know, anything other than, you know, the conditional obligation I talked about, in terms of fulfilling my responsibilities in the waste acceptance process as conditional.
I guess I never thought about that question, you know, in its absolute sense. So I think your characterization is probably closer to my views.
BY MR. STOUCK:
Q. At the time you were working on this?
A. Yes.
Q. Now, I want to ask about your understanding now about what obligations DOE had under the contracts, if any, prior to the commencement of facility operations.
A. Okay.
Q. Did you understand that there were any obligations prior to the commencement of facility operations? I guess you have already told me that one obligation was to try to get the facility operating.
A. No, no.
MR. CRAWFORD: No.
BY MR. STOUCK:

Page 29

Q. Why don't you just answer the question.
A. I think there were other obligations.
MR. CRAWFORD: Wait a minute, wait a minute. Now I'm confused on which question he's answering.
BY MR. STOUCK:
Q. Let me restate it.
I want to know what understanding, what your understanding was when you were working on this, Mr. Brownstein, of what obligations DOE had under the contracts prior to the commencement of facility operations?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion; objection to the foundation since we don't have the contract.
THE WITNESS: I believe we did have obligations when we started down that path. I think the contract required us -- I think the first thing that we needed to do under the contract was it required us to issue what was called an annual capacity report. I believe it required us to do that beginning in 1987.
I believe it required us to issue an acceptance priority ranking report. I believe it, you know, required us to begin the delivery

Page 30

commitment schedule process. Those were obligations that I believed we had under the contract and we fulfilled those.

BY MR. STOUCK:

Q. Okay. No obligation, though, to actually accept any spent fuel until facility operations commenced?

A. That's correct.

MR. CRAWFORD: Wait a minute. Objection to the extent it calls for a legal conclusion. I may need a running objection on that just for any obligation under the contract question. But at any rate go forward.

BY MR. STOUCK:

Q. Let me just say, it's hard for both of us sometimes to avoid talking over one another. But it's certainly fine by me if you pause to give your counsel time to object.

Any others? Those ACR, APR delivery commitment schedules that you referred to, would you agree that those documents and DOE's obligations with respect to those documents were aimed at developing a schedule for spent fuel acceptance?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

Page 31

THE WITNESS: The contract laid out a waste acceptance process. Those were key parts of that process.

BY MR. STOUCK:

Q. Waste acceptance scheduling process? Is there some difference? Is that what you mean when you say waste acceptance process?

MR. CRAWFORD: Let me object to the mischaracterization of his prior testimony; objection, asked and answered; and objection to the extent it calls for a legal conclusion.

THE WITNESS: Well, it was -- it was schedule, it was -- you know, there are a number of factors of how the parties were going to get together actually to make the exchange. The contract laid out that process in some detail. And we followed that process.

BY MR. STOUCK:

Q. Okay. Aside from obligations that DOE had with respect to that process that you just described, is it your understanding that DOE had any other obligations under the contract prior to the commencement of facility operations?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion; objection, vague and

Page 32

overbroad.

THE WITNESS: I need to look at the contract again, it's been awhile. We have financial obligations, obviously we had to collect the fees and we had to do some activities with respect to the fee collection. But that's what I recall now.

BY MR. STOUCK:

Q. Okay. Now, are you aware that the court system has rejected your understanding about the conditional nature of the '98 date as a matter of law; that is, the courts have held that the 1998 date for commencement of spent fuel acceptance is not conditional on commencement of facility operations? Are you aware of that?

MR. CRAWFORD: Objection, asked and answered; objection to the extent it calls for a legal conclusion.

THE WITNESS: I did answer that actually several times in the last deposition. I am aware of that.

BY MR. STOUCK:

Q. Right. And is your understanding of those court rulings the same as I just outlined, that the obligation to accept fuel, commence acceptance of fuel on the '98 date is not conditional on facility

Page 33

operations; is that your understanding?

MR. CRAWFORD: Same objection.

THE WITNESS: That is my understanding.

BY MR. STOUCK:

Q. Okay. Now, in light of those court rulings, as we sit here today, I take it your understanding is that DOE was obligated to commence spent fuel acceptance in 1998; is that right?

MR. CRAWFORD: Objection, asked and answered; objection to the extent it mischaracterizes prior testimony; objection to the extent it calls for a legal conclusion.

THE WITNESS: I understand that the -- my interpretation and I believe the department's interpretation of that was not considered accurate by the courts.

BY MR. STOUCK:

Q. Okay. And I do realize that a lot of similar questions were asked previously and I'm trying to avoid duplication, but to some extent I've just got to get you back to the same subjects and I apologize.

And one of those questions is coming. You were asked something similar, but I just want to get back to the subject about whether or not it was the

intent of the Nuclear Waste Policy Act that no power reactor would require additional spent fuel storage capacity on-site after January 31, 1998.

I believe you testified previously that it was not your understanding that it was the intent of the act that no utility would have a need for additional storage capacity after the '98 date; is that right?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion; objection, asked and answered; objection, vague.

THE WITNESS: As I testified before, we clearly had a goal. But, in terms of was that required by the contract, no, that's not what the parties agreed to in the contract, that's my understanding.

BY MR. STOUCK:

Q. The current question is about the intent of the act. Your understanding was that it was the intent of the act that no utility would have a need for additional on-site storage, spent fuel storage capacity after the '98 date?

MR. CRAWFORD: Objection, foundation, and to the extent it calls for a legal conclusion.

THE WITNESS: I don't recall that from the



act.

BY MR. STOUCK:

Q. Okay. So when you say recall, it was not your understanding during the time you were working on these matters, from the mid-eighties to mid-nineties, that the act intended that?

MR. CRAWFORD: Objection, same objection as before.

THE WITNESS: That's correct, nor did the contract.

BY MR. STOUCK:

Q. Okay. And that's an understanding that you would have gotten after you started working at DOE, that understanding about the intent of the act that we just talked about, it was not the intent of the act about the additional storage capacity and whatnot, that was an understanding that you would have gotten after you started working at DOE during these first few years you testified, when you were working on Congressional testimony and questions from utilities, and you were performing other functions; is that right?

A. I had no understanding of the Nuclear Waste Policy Act before I learned about this job. So that's true.



Q. Okay. Well, do you know whether DOE officials, DOE officials had an understanding different from yours prior to your arrival about whether it was the intent of the act that no power reactor would require additional storage after the '98 date?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: Not that I'm aware of.

BY MR. STOUCK:

Q. Okay. Does that mean that you believe that the understanding that DOE officials had about the intent of the act prior to your arrival was consistent with your understanding that you have testified about?

MR. CRAWFORD: Same objection.

THE WITNESS: Yes, there is nothing that happened subsequently to change that view. I never recall a conversation where someone indicated that, you know, the views that we had were ever different.

BY MR. STOUCK:

Q. Were ever different prior to your arrival?

A. Prior to my arrival.

Q. You don't recall any discussion that there were any views different prior to your arrival?



MR. CRAWFORD: Same objection.

THE WITNESS: Not that I recall.

BY MR. STOUCK:

Q. But I think the original question, and let me rephrase it or restate it, was do you know whether there was a different understanding prior to your arrival?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: No.

BY MR. STOUCK:

Q. You don't know?

A. I do not know.

Q. But you don't recall any conversations during the time you were there that there was a different understanding?

A. That's --

MR. CRAWFORD: Same objection.

THE WITNESS: That's correct.

MR. STOUCK: Why don't we go ahead and mark this as Exhibit 78.

(Brownstein Exhibit No. 78 was marked for identification.)

BY MR. STOUCK:

Q. Mr. Brownstein, you have been handed a

Page 98

utilities.
And, since they were allowed to trade subject to DOE's approval, if we did not reach consensus on some of these 34, 36 implementation issues, the department would have to be, you know, making decisions, you know, on those. And we thought it would be better to try to do that as best we could together.
Q. So, in other words, if I'm understanding -- I see now. Are you saying that, as a predicate or sort kind of prerequisite for the DCS exchange process, it would have been helpful to have some or all of the open 34 issues resolved prior to the development of a market for DCS exchanges because some of those issues involved technical matters that would be better to have nailed down before the exchanges started taking place; is that what you're saying?
MR. CRAWFORD: Objection, vague.
THE WITNESS: Certainly not all of those issues but a subset of those, yes.
BY MR. STOUCK:
Q. You wanted to nail those down first so as to make the -- so as to promote a better function of the DCS exchange market?

Page 99

MR. CRAWFORD: Objection, vague.
THE WITNESS: In order to carry out those phases of the contract, referring to the APR and the DCS, we would have had to make some decisions; for example, you know, instructions. Okay. And, you know, there were real questions as I recall now, you know, back on the table.
And, if we had not reached some sort of consensus agreement in order to go forward, the department would have had to make some judgments about that and move forward.
BY MR. STOUCK:
Q. Judgments about?
A. Whatever, we would have to go through the questions.
Q. Let's stick with these exchanges. Are you saying here -- this is the example you gave at the last deposition. Are you saying that it would be more difficult for the DCS exchange market to develop and work smoothly --
A. No.
Q. -- if the issues were not resolved before that market happened, is that what you were saying? You say that's not what you're saying?
A. No.

Page 100

Q. Then what are you saying here?
A. I'm saying that, if there were questions on the table that both sides recognized there were real questions, if we did not together reach some consensus and move forward, if the process wasn't delayed, clearly we would -- the department would have to, you know, reach whatever decisions it was going to reach in implementing that. And that's what I was referring to.
Q. Well, how does that relate to the DCS exchange process? That's what I'm not understanding. And it may relate to other things and that's fine.
A. For instance, I'm going back to your exhibit. And I haven't read the thing through. But No. 3 is changes in the allocation. If we did not -- and there's an issue here and there are options.
If we together with utilities did not select an option in order to carry out the process, we would have picked one, the department would have picked one. The allocation queue is, you know, a prerequisite to getting to a DCS.
Q. Which in turn is a prerequisite to an exchange?
A. To an exchange.
Q. What about the criteria the department

Page 101

would use for approving or disapproving exchanges?
A. That would be something that, you know, the utilities I think would want to understand and work with us on. Without that we were prepared as we did move ahead. We were just trying to do it in a more cooperative fashion. That's my best recollection.
Q. Okay. Well, look at this testimony at the bottom of page 290. You know, maybe I'm misinterpreting, but I thought what you were saying there was that, if you went -- it says, if you went through the entire process, it's conceivable a market could have developed of which DCSs had some value amongst the utilities and those trades occur and subsequent to that a or several utilities change the data on which allocations were based could have caused perturbations really to the utilities, some to us. That's an example. Do you see that?
A. Yes, I do.
Q. So I took that to mean that your expressing the view that, in order to either eliminate or minimize the prospect that the data on which -- I really took that to mean, and maybe this is -- this is what I'm asking about, to mean if the data on which the exchanges were based might change

both were possible, you know, reach a consensus, it's not that the department could not act. The department could act. It would have made its decisions.

BY MR. STOUCK:

Q. Here's the thing, I'm not trying to be critical, I'm jut trying to find out what did happen. And the approval criteria, exchange approval criteria were never finalized, right? I mean I think that's what you testified to. Tell me. I see you pausing.

A. You're talking about the ACR issue resolution process. Issues were never finalized? That would be a correct statement.

Q. Now I'm talking about criteria for approval of exchanges of DCSs. There was an effort underway at some point in all these documents to develop specific -- and I could show it to you, if it becomes important, to develop criteria to guide DOE in determining whether or not to approve exchanges?

A. Right.

Q. And it's my understanding, my recollection from the testimony that I have heard that those criteria were never finalized?

A. I think that's correct.

Q. Okay. And I thought you agreed with me



that that was an example of the kind of thing that, despite your efforts and your motives to as I understood the testimony remove impediments from the marketplace, to promote the smooth functioning with this market, this failure to, you know, failure, again I'm not being critical, but the fact that those exchange criteria were never finalized is an example of something I thought you agreed, that, you know, I used word impediment, that if those criteria had been finalized or those exchange approval criteria, that would have furthered the smooth functioning of this marketplace in DCSs that we're talking about.

You do you agree with that and the fact that it, therefore, was something that could have been done to make it even better than the things that you were able to accomplish?

MR. CRAWFORD: Objection, compound.

THE WITNESS: That's a long question. As I recall we evaluated different alternatives, different criteria. There was no -- let me make it clear for the record. No one ever gave us a DCS -- an approved DCS for an exchange.

So we had in our desk drawer something that we were prepared to use. Now, whether it was finalized, well, no one ever had to sign off it



because it never became --

BY MR. STOUCK:

Q. I see. Now I understand. That's fine. Do you know why there were never any exchanges of DCSs submitted for approval?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: No. I mean because that was something that the utilities had the right to do on their own to submit to us. And why they never did I don't know.

BY MR. STOUCK:

Q. Do you have an opinion about it?

A. No.

Q. No understanding of why it has happened, but there have not apparently been any exchanges submitted for approval?

MR. CRAWFORD: Objection, asked and answered.

THE WITNESS: I don't know. All I know is they had the right. And we needed -- it was my responsibility to be prepared for that should it occur.

BY MR. STOUCK:

Q. And you could not testify about the



reasons why utilities had not submitted exchanges for approval; is that right?

MR. CRAWFORD: Objection, argumentative; objection, asked and answered.

THE WITNESS: No, I testified why I think a market could develop just a few minutes ago. Why it didn't I have no idea. I don't know, I just flat out don't know.

BY MR. STOUCK:

Q. Okay. Now, in this same testimony I have directed your attention to from the prior deposition, I think we moved on to 293 now, you said you thought there were advantages to delaying, but the utilities didn't want to delay; is that right? I mean is that a brief summary of for whatever this is on page 293, line 21, my only recollection is for whatever reason they came back and said -- well --

A. Let me just review that for a second.

Q. Okay. It's actually on 292 I guess, line 5.

A. Yes.

Q. You thought there were advantages to delay, but the purchasers for whatever reason did not want a delay according to this question and answer, it says they were concerned that they not take any

Page 150

Q. Okay. Can I ask, do you know an answer to my question without telling me the answer?
MR. CRAWFORD: He's asking you if you know an answer to his question.
THE WITNESS: I'm going to ask it to be repeated so I can answer you accurately.
MR. STOUCK: Let's have it read back.
THE REPORTER: "Question: Have you reviewed, Mr. Brownstein, any briefs or legal filings by the government in this litigation?"
MR. CRAWFORD: The pending question is different than that.
BY MR. STOUCK:
Q. Right. Your counsel has instructed you not to answer that question. I'm just asking in your mind, without telling me the answer, do you know an answer to that question?
A. Yes.
Q. Do you know the position that the Department of Justice has taken in these cases, I'm talking now about the Yankee cases, about the significance under the standard contract of delivery commitment schedules? Do you know the Department of Justice's position?
MR. CRAWFORD: Objection, vague,

Page 151

overbroad, and to the extent it calls for a legal conclusion.
THE WITNESS: I think I do.
BY MR. STOUCK:
Q. Okay. What is your understanding of the Department of Justice's position with respect to the significance under the standard contract of delivery commitment schedules?
MR. CRAWFORD: Same objection or objections. And let me add one, foundation.
THE WITNESS: I think Justice believes that the extent of damages or breach is determined by approved DCSs.
BY MR. STOUCK:
Q. Okay. Is that the same thing as saying that -- is it your understanding that the Department of Justice has taken the position in this litigation that the Department of Energy has no obligation to accept any spent fuel that is not described in an approved delivery commitment schedule? Do you know whether the Department of Justice has taken that position?
MR. CRAWFORD: I'm going to object, vague, foundation, to the extent it calls for speculation, to the extent it calls for a legal conclusion, and

Page 152

overbroad.
THE WITNESS: I really don't know.
BY MR. STOUCK:
Q. You don't know one way or the other?
A. No.
Q. Okay. Well, do you believe that the Department of Energy -- or do you know whether the Department of -- let me ask it this way, without regard to whatever position the Department of Justice has taken, do you know whether the Department of Energy has an obligation under the standard contracts to accept spent fuel that is not described in an approved delivery commitment schedule?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and foundation since he's not a 30(b)(6) witness.
THE WITNESS: That's an issue in question. I always viewed that both parties had to do the steps required in the contract. The DCSs are -- there's another step in the process which is the final delivery commitment schedules.
So you're asking about DCSs. Where I'm going to ask you for clarification is you're asking me about what happens if there's an approved DCS but there never is an approved FDS.

Page 153

BY MR. STOUCK:
Q. I believe you testified that is the situation we're in, correct?
A. Yes.
Q. There are no approved final delivery commitment schedules that I'm aware of. Are you aware of any?
A. There are not to my knowledge.
Q. Okay. So do you know whether -- well, I don't know if that clarifies the question. But my question is, with respect to spent fuel, commercial spent fuel, utility spent fuel that's out in the world somewhere in the United States that is not described in a delivery commitment schedule that has been submitted by a utility and approved by the Department of Energy, okay, you agree there is such spent fuel out there?
A. Yes.
Q. Okay. With respect to that spent fuel that's not described in a delivery commitment schedule that has been submitted to the Department of Energy and approved by the Department of Energy, do you know whether or not DOE is obligated under the standard contract to accept that spent fuel for disposal at some point in time? The question does

Page 154

not involve a time frame of when they are obligated to accept it, just whether they are obligated to accept it?
MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.
THE WITNESS: I'm going to try to ask a clarification.
BY MR. STOUCK:
Q. Sure.
A. Are you saying -- let me try this again. Are you saying, if there is an approved DCS, irrespective of anything else, do we have an obligation, does the department have an obligation to accept that fuel? Is that what you're asking me?
Q. Actually the question I just asked was about all of the fuel that's not described and approved.
A. Okay.
Q. The fuel that's not described in an approved DCS, do you have an obligation under the contract as DOE to accept that spent fuel for disposal?
MR. CRAWFORD: Same objections.
THE WITNESS: I really don't know because

Page 155

that's a situation that we never looked at. You know, the expectation is that both sides would complete the contractual requirements for both the delivery commitment schedules and then final delivery schedules, you know, as we did the dance to the waste acceptance -- you know, to actual waste acceptance. I don't recall ever addressing the question of what happens if, you know, a utility did not do that. So the answer is I don't know.
BY MR. STOUCK:
Q. So would it be fair based on that answer to say that, during your tenure at RW, when you had responsibility for these waste acceptance matters which as we've said or I have said many times I think is from 1985 to March of '95, during that time you did not have any understanding one way or the other about whether or not DOE was obligated under the standard contract to accept spent fuel that was not described in an approved delivery commitment schedule; is that right? I thought you said you never thought about it.
A. Yeah. As I recall my assumption was that both sides would do it. What happens if somebody did not do it? I don't -- I don't believe we ever really had that discussion.

Page 156

Q. So you had no understanding one way or the other about that subject during the time you were responsible for these matters; is that a fair statement?
A. I just want to take time and think about the question.
Q. Okay. I did not mean to rush you.
MR. CRAWFORD: Same objections as to the original question.
THE WITNESS: We never -- if we had a discussion about that, we never took that to its logical conclusion. In other words, we always said, you know, we needed to do this, whether it's publishing the ACR, APR, and the DCSs, and the utilities had these responsibilities in order to do it.
And we may have made some statements in these documents indicating that the utilities, you know, needed to do it or are required to do it, I don't know the exact words. But I don't recall a discussion where we said, well, if a utility did not do this, how would you balance them not meeting a specific term of that contract with the ultimate responsibility, irregardless of time, if they paid their fees, that we would have to accept their waste.

Page 157

You know, that's a much broader question. Does that help?
BY MR. STOUCK:
Q. That does help. I think what that means is you did not have any understanding one way or the other on this question during the time you were working on these matters; is that right?
MR. CRAWFORD: Objection.
THE WITNESS: I think, if you boil it all down, that would be fair. I mean that's a complex situation.
MR. STOUCK: Can we go off the record.
(Discussion off the record.)
MR. STOUCK: Can you mark this?
(Brownstein Exhibit No. 82 was marked for identification.)
BY MR. STOUCK:
Q. Mr. Brownstein, I must ask you, while you were off the record you had a conversation with your counsel?
A. Yes.
Q. Anything else you want to tell me about our recent exchange?
A. No.
Q. Okay. Do you know what this is?

Page 162

BY MR. STOUCK:
Q. Now, back to this question about whether there are obligations before or after DCSs. Looking at this paragraph, it does use the word all SNF generated by the specified reactor. So let me ask, you know, a similar question but see whether, at the time you were working on waste acceptance issues at RW, you had any understanding one way or the other whether DOE's responsibilities specified in this paragraph extended to spent fuel prior to the time that that spent fuel was described on a delivery commitment schedule that had been approved by DOE?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: My response to that is DOE had a number of responsibilities under the contract as did the purchasers. And you're taking out one DOE responsibility and saying, well, if the purchasers did not do something, does DOE still have the responsibility.
BY MR. STOUCK:
Q. Yes.
A. My only answer to you is, you know, that ultimately is a legal call. The contract said what both parties, you know, as I testified before were

Page 163

supposed to do. If something didn't happen, you know, ultimately, you know, General Counsel would have to opine on that.
Q. I'm not asking for a legal call, certainly at least not until we discuss it privately first. But I'm asking about your understanding --
MR. CRAWFORD: Same objection.
BY MR. STOUCK:
Q. -- while you were working on these matters. And I just thought that this paragraph might help because it does use the word all. And I'm just asking whether you had any understanding one way or the other about whether DOE did have obligations to accept spent fuel that was not described in an approved delivery commitment schedule?
A. This does not help my answer.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and to the vagueness.
BY MR. STOUCK:
Q. It does not help the answer you gave me before you looked at this paragraph?
A. No. Can I just review one of the prior answers here.
(Discussion off the record.)
BY MR. STOUCK:

Page 164

Q. Okay. Now, let's talk about the spent fuel, commercial spent fuel in the United States. There are approved delivery commitment schedules, right?
A. Yes.
Q. Some have been approved?
A. Yes.
Q. Okay. Now, I want to direct your mind's eye to the spent fuel, commercial spent fuel that is described in a delivery commitment schedule that has been submitted by a utility and approved by DOE. Okay?
A. Okay.
Q. As to that spent fuel, do you know whether or not DOE has a binding obligation under the contract to accept that spent fuel at some point in time?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion; objection, asked and answered.
THE WITNESS: A clarification. Are you asking me at the time, you know, at that time?
BY MR. STOUCK:
Q. Well, that was going to be the next question. I'm asking you today whether you know.

Page 165

And then I'm going to follow that up with a question about what you knew at the time.
A. Well, today, I mean to me that's a legal call, you know, in light of the court decision which, you know, occurred after my responsibilities. So that's a legal question. At the time --
Q. Let me ask the question just so we have a clear record. At the time you were working on waste acceptance matters at RW from '85 to '95, did you have an understanding with respect to the spent fuel that is described in an approved delivery commitment schedule whether or not DOE had a binding obligation to accept that spent fuel pursuant to the standard contracts?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: First of all at the time I and I believe the department viewed the obligation as a conditional obligation. Now, putting that aside, the contract required other steps. The final delivery commitment schedule, because the specific fuel was often not described, you know, in the approved delivery commitment schedules which was fine under the instructions.
So, with those two caveats, no, if we



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 166

didn't have a facility, with respect to the first caveat: with respect to the second, what would happen if they had an approved DCS but took no action to submit an FDS, we never really addressed that, I never really addressed that.

You know, every stage -- you know, whether it was the APR or the DCSs, I know in correspondence we urged -- we told the utilities this was consistent with the contract, but we never said -- well, we never did the what-if questions.

BY MR. STOUCK:

Q. So you didn't have any understanding one way or the other about my question which is you have the DCS, but you don't have anything subsequent, you just never thought about it, never focused on it; is that fair?

MR. CRAWFORD: Same objections.

THE WITNESS: I did not think we had a binding obligation with respect to my first caveat which is because the commencement of facility operations. We never really addressed the second caveat situation, where we had that and it stopped.

BY MR. STOUCK:

Q. You never formed that understanding?

A. No.

Page 167

Q. You agree with my statement, never formed an understanding?

A. Yes.

Q. And you expected that utilities, you expected them in the course of the processes discussed in the standard contract, that at some point in time utilities would submit final delivery schedules, that's the way you thought about it?

A. I had every reason to expect that utilities, you know, participated, if you will, in both the ACR, in the development of the APR, and in responding to our instructions on the DCS.

Q. Okay. So you did expect that there would be FDSs for all spent fuel described in a DCS?

A. I did.

Q. And do you know whether it would be possible for DOE to accept spent fuel from a utility if that utility had submitted a DCS to DOE, proper DCS, completely filled out, but had not submitted an FDS? And, just to amplify my question, is there enough information specified in the DCS to allow DOE to accept spent fuel for disposal even if DOE does not subsequently get the additional information specified in the FDS?

MR. CRAWFORD: Objection, compound, vague,

Page 168

and to the foundation and to the extent it calls for a legal conclusion.

THE WITNESS: Not necessarily. Let me try to give you an example. And frankly I would have to go back and review, it's been a long time, whether it's a real example or not. But let's say a utility owned a couple reactors and say one -- a couple examples, one was a PWR and one was a BWR or one facility could accommodate rail and one facility can only do truck.

In the DCS they may put a range of fuel down that encompassed both situations. Under that situation we would not necessarily have enough information whether to show up with the right type of cask, whether it be a BWR, PWR, or a rail or a truck cask. So that's not -- that's why I said not necessarily.

BY MR. STOUCK:

Q. Okay. So there are circumstances such as the examples you just gave me where, in the absence of the additional information set forth in the FDS, DOE would not be in a position to accept spent fuel just on the basis of the information set forth in a DCS with respect to the same fuel?

MR. CRAWFORD: Objection, asked and

Page 169

answered.

THE WITNESS: If that was the only information we have, that could be a problem.

BY MR. STOUCK:

Q. Well, would it be a problem in at least some circumstances, maybe not all, but at least some?

MR. CRAWFORD: Same objection.

THE WITNESS: I would expect it would be a problem especially in the initial years, whenever those initial years were, as we were -- we would be -- we would be ordering casks, for example, we would understand -- the vision was that we would understand what casks of what type we would need and what year.

And we would begin to order that, you know, in an efficient manner from the manufacturers. It wouldn't be a -- we viewed it not as a prudent use of nuclear waste fund dollars to take a look at what we would need over ten years and order that on day one.

So, in the initial years, we may have a limited number of truck and rail casks and those orders would, in fact, be based in part on information that was exchanged in both the DCS and the FDS. That's the basis for how I'm giving you the

Page 226

Q. Now, I'd like to turn now to almost the end, pages 714 and 715 and 716. There's a question about the -- and I'll get the document also as we have been doing here. I believe this is -- oh, gosh, exhibit -- I think it's Exhibit 12. Let's see. I'm interested in this question that starts on page 24 of 714 and I'll show you the document in a second. Here. This has been previously marked as Exhibit No. 12 to your deposition, it's the 1988 annual capacity report. And the exchange ends on line 13 of 716, at least the one I'm interested in.

A. Okay.

Q. On this question there's the sentence in the report, and you can certainly look at that on page 10, if you want to. I mean I think it's accurately quoted in the transcript, about resolution of the issues, analysis and resolution so that the waste management system can achieve maximum efficiency while attempting to assure equity among the parties. And you testified you had in mind in that sentence the federal waste management system, the federal side, right?

A. Yes.

Q. Okay. And then you were asked were you concerned whether the utilities could operate in an

Page 227

efficient manner, and you said that was not my responsibility. But then the follow-up was do you believe -- you see it here on line 7 of 716, did you believe that one of the purposes of the waste acceptance schedule that is incorporated into the ACRs was to enable the utilities to obtain maximum efficiency in terms of their storage needs.

MR. CRAWFORD: Objection, vague.

BY MR. STOUCK:

Q. And the answer that you gave there is not entirely responsive. You said you believed that it was to help them in their planning efforts. But let me ask you this question again and see if we can -- because I don't think that -- did you, this is the question, did you believe that one of the purposes of the waste acceptance schedule that was incorporated into the ACRs was to enable the utilities to obtain maximum efficiency in terms of their storage needs?

MR. CRAWFORD: Objection, vague; objection to the extent it calls for speculation; objection to the foundation.

THE WITNESS: As I testified previously, not today, but in the previous deposition, and as we indicated in documents and we can find them, you know, until we accepted the waste, it was the

Page 228

utilities' responsibility, it was their responsibility.

So the answer that I gave here, you know, I think was accurate. I mean I think the information was helpful or, you know, hopefully was helpful to them in their planning efforts. But to obtain maximum efficiency in terms of their storage needs, to obtain maximum efficiency in terms of their storage needs, that was the question, that was the utilities' responsibility, not ours.

BY MR. STOUCK:

Q. So you do not agree that that was one of the purposes of the waste acceptance schedules incorporated into the ACRs?

A. Not those words, no.

Q. Was one of the purposes of the waste acceptance schedule that is incorporated into the ACRs to enable the utilities to obtain greater efficiencies in terms of their storage needs? Strike the word maximum, just to be able to more efficiently store fuel on-site when the program started operating?

MR. CRAWFORD: Objection, asked and answered; objection, argumentative.

THE WITNESS: Let me try a different way.

Page 229

That was their responsibility, it was not our responsibility to assist them in the -- to maximize or help in their efficiencies. I think we did have a responsibility and I think it was enumerated in the contract, you know, to provide them information for planning purposes.

How they used that planning -- how they used that information for planning purposes, could it have contributed to that goal, sure. But I would rather answer it in terms of it was planning information.

BY MR. STOUCK:

Q. That's fair enough. Does that mean that it was your understanding when you had responsibility for waste acceptance matters, from about '85 to '95, that RW was not concerned in issuing these planning documents meaning ACRs, APRs, DCSs, et cetera, was not concerned in issuing those documents about the cost implications for utilities' on-site storage of spent fuel, is that what you're saying?

MR. CRAWFORD: Objection, vague; objection, compound; objection to the extent it calls for speculation, to the foundation, and asked and answered.

THE WITNESS: No, that's not what I'm

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

\- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, June 14, 2002

Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 247

APPEARANCES:

On behalf of the Plaintiffs:
JERRY R. STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
RUSSELL A. SHULTIS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640

Page 248

CONTENTS

| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| ALAN BROWNSTEIN | PLAINTIFFS |
| By Mr. Stouck | 250 |
| | DEFENDANT |
| By Mr. Crawford | 437 |

Afternoon Session - Page 377

EXHIBITS

| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 83 - Defendant's Witness List | 251 |
| 84 - Withdrawn by counsel | 259 |
| 84 - Preliminary Draft, DCS Review Process, 10/13/92 | 261 |
| 85 - Letter dated 12/22/92 with attachments | 272 |
| 86 - Letter dated 3/13/97 | 290 |
| 87 - Letter dated 9/25/92 with attachments | 294 |
| 88 - Letter dated 12/1/92 with attachments | 298 |
| 89 - Attachment | 304 |
| 90 - Letter dated 1/7/93 with attachments | 307 |
| 91 - Letter dated 4/8/93 with attachments | 308 |
| 92 - Informal Memorandum | 321 |
| 93 - Letter dated 4/28/93 | 328 |
| 94 - Agenda for Conference Call with DOE on Delivery Commitment Schedules, 5/12/93 | 333 |
| 95 - Memo undated | 334 |

Page 249

EXHIBITS (Continued)

| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 96 - Memo undated | 334 |
| 97 - Memo dated 6/14/93 | 340 |
| 98 - Letter dated 6/10/93 | 366 |
| 99 - Letter dated 7/15/93 | 368 |
| 100 - Memo dated 7/8/93 | 370 |
| 101 - Letter dated 7/26/93 with attachment | 372 |
| 102 - Letter dated 2/4/92 | 377 |
| 103 - Letter dated 4/6/92 | 380 |
| 104 - Letter dated 4/25/94 with attachment | 382 |
| 105 - Letter dated 9/28/95 | 383 |
| 106 - Memo dated 3/28/91 with attachments | 408 |
| 107 - Questions for Senator Mathews | 410 |
| 108 - Letter dated 10/19/90 with attachment | 413 |
| 109 - Letter dated 8/22/91 with attachment | 419 |

Page 250

PROCEEDINGS

Whereupon,

ALAN BROWNSTEIN,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS (RESUMED)

BY MR. STOUCK:

Q. Good morning, Mr. Brownstein.
A. Good morning.
Q. Welcome back. Thanks for coming back. As I mentioned very briefly before we started here, I have some more questions for you obviously. And, because your deposition has been a little bit fragmented in time, no fault of yours, with your first few days and then May 23rd and then today and because I've been busy with other depositions, I have tried hard to limit the amount of duplication there may be today; but we may have a little.
If we get into an area that we've covered before, I apologize and I will certainly try to keep that to a minimum. I realized last night when I was getting ready for today that there may be a little more of that than is ideal, but it's not because I

Page 251

want to ask you the same questions.
Would you mark this as the next exhibit, please.
MR. CRAWFORD: For the record you may always remind Mr. Stouck if he begins to duplicate and he'll take note of that I'm sure.
MR. STOUCK: Absolutely.
(Brownstein Exhibit No. 83 was marked for identification.)
BY MR. STOUCK:
Q. Mr. Brownstein, you've been handed a document that's been marked Exhibit No. 83. This is a document entitled Defendant'S Witness List which has been prepared by the Department of Justice under a court order in the -- well, this one is in the Yankee Atomic case, but we've got something similar in the Connecticut Yankee and Maine Yankee cases.
This is a list of folks the government may call as witnesses at the trial of this action. If you turn to page 2, you'll see your name.
A. Yes.
Q. Did you know prior to right now that you might be called as a witness at the trial of this action?
A. Yes.

Page 252

Q. You discussed that with counsel?
MR. CRAWFORD: Well, I'll object to that and I'll instruct him not to answer that.
BY MR. STOUCK:
Q. The question then is how do you know that, who told you that?
A. Discussions with the Department of Justice attorneys.
Q. And for how long have you known that?
A. I think -- in one of our conversations, from one of the depositions, I think I asked the question about the next steps.
Q. This is a brief description as you'll see under your name of the topics that the government has told you they may call you to give testimony about. And would you just take a look at it. I want to ask you a couple questions about the subjects.
A. Okay.
Q. Remind me when you started working on waste acceptance at the Department of Justice?
A. September 1985.
Q. Now --
A. Department of Energy.
Q. Department of Energy, thank you. I take it that prior to September of 1985 you would have no

Page 253

personal knowledge about any of these subjects, implementation of standard contract, priority for shutdown reactors, how the Department of Justice was handling that?
A. That's correct.
Q. And when did you stop working on waste acceptance matters?
A. March of 1995.
Q. Subsequent to that time, you would have had no personal knowledge of these topics; is that right?
A. Hallway conversations with people, but I didn't stay very much connected with it.
Q. You would not be able to testify about what the Department of Energy was doing in these areas subsequent to the time you stopped working on them; is that right?
A. I think that's fair.
Q. The exchange approval process which is the last mentioned subtopic, if you will, here, I thought you told me previously that -- I showed you some documents or I asked you some questions about exchange approval criteria.
And I thought the testimony from you was that those kinds of documents and that thinking about

Page 254

exchange approval, this is delivery commitment exchanges, thinking about criteria under which those would be approved, it was clearly done by the contractor and their documents reflecting that.
But, when it got to your desk, you never really acted on the pursuit of the development of these exchange approval criteria; is that a fair recollection of what you told me?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: I'm not sure what you mean by acted on.
BY MR. STOUCK:
Q. They were never implemented, they were never finalized?
A. That's true.
Q. Was there ever an exchange approval process at the Department of Energy while you were working on waste acceptance matters that was anything other than proposals for how the process would work?
MR. CRAWFORD: Objection.
BY MR. STOUCK:
Q. In other words, was the process of exchange approvals ever implemented?
MR. CRAWFORD: Objection, vague.

THE WITNESS: We never received an exchange request.
BY MR. STOUCK:
Q. Was there a process in place at the Department of Energy during your tenure in working on waste acceptance matters for approval of exchange requests that might be submitted?
MR. CRAWFORD: Objection, vague.
THE WITNESS: There was not one approved by my management.
BY MR. STOUCK:
Q. And lastly, just the only other question I have about this description of what you might testify about, there's a reference there to schedule negotiations. And the context is it says Mr. Brownstein will provide testimony concerning the government's implementation of the standard contract including acceptance rates, priority for shutdown reactors, and a number of other things and also including according to this statement schedule negotiations. Do you see that?
A. I see it.
Q. Do you know what that means?
MR. CRAWFORD: Objection to the extent it calls for speculation.



THE WITNESS: Well, I don't know who wrote that so I would have to be guessing, speculating on what it could mean.
BY MR. STOUCK:
Q. Were there during your tenure in this period we just blocked, from September '85 to March of '95, were there schedule negotiations that took place between the Department of Energy and any one or more utility purchasers?
MR. CRAWFORD: Objection, vague.
THE WITNESS: I'm really not sure what schedule negotiations means here. I don't recall negotiations between us and utilities on schedules.
BY MR. STOUCK:
Q. Is there a reason why -- well, you understand the word schedule in this context, schedule for acceptance?
A. Well, I'm not sure that I do. I mean I can interpret it different ways.
Q. What other interpretation would there be in the context of this then schedule for acceptance?
A. Schedule negotiations could -- someone could interpret that to mean the actual DCS or FDS process. You negotiate, if you will, as outlined in the contract. For example, in the FDS, where you



were a year beforehand, you start scheduling real dates.
One could interpret that as negotiations within the context of the contract. That's why I'm not sure who wrote this and what was meant by that. But that's an interpretation.
Q. But there were not such negotiations that occurred because my understanding is there were no such negotiations that took place?
A. Correct.
Q. Okay. Outside the context of -- well, can you think of any other meanings that this might have? I mean would there be negotiations that could take place in the context of delivery commitment schedules?
MR. CRAWFORD: Objection, overbroad.
THE WITNESS: There was again broad interpretation. One utility, perhaps one you represent, had objected to -- we had disapproved their DCS. And, at one point in time, they had come and had discussions with us and the contracting officer. One could interpret that to mean negotiations.
BY MR. STOUCK:
Q. That was Yankee Atomic?



A. Yeah.
Q. On the subject of priority for shutdowns, general shutdowns?
A. Well, that was one of the subjects, yes.
Q. What were the others, can you think of others?
A. Well, it was -- we had disapproved their delivery commitment schedule. And certainly shutdowns were a part of that.
Q. And so that's an example of something that could be embraced within in term that somebody else wrote on Exhibit 83 of schedule negotiations?
A. Yeah, that's -- I mean it can be interpreted many ways. I have given you two or three examples.
Q. And, listen, my situation is this, they hand me that piece of paper and they say you're going to testify about this. I'm trying to find out what it is.
A. That's how I interpret it.
Q. All right. Let me look at it first.
In the course of your work on waste acceptance matters at the Department of Energy, Mr. Brownstein, have you been involved in studies or analyses of the -- well, have you been involved in

Page 279

person to sign was based on the Department of Energy's desire to have a proper certification from the utility, that that utility, quote, has the legal right to deliver such SNF. Is that why DOE was interested in getting the right person, because it wanted to have a proper certification?
MR. CRAWFORD: Objection, asked and answered and objection to the lack of foundation. He has answered your question.
You can give another answer if you like.
THE WITNESS: Well, I don't know any other answer to give other than the one I've given.
BY MR. STOUCK:
Q. Which is?
MR. CRAWFORD: Well, objection asked and answered. He's given you that answer. He stated it might be something required by the contractor by procurement. That's what he said.
THE WITNESS: I don't know what to say to you beyond that.
BY MR. STOUCK:
Q. You don't know or you don't recall whether that was why --
A. Well, I don't recall.
Q. But that seems to be what these words seem

Page 280

to indicate on these instructions, that that was at least a reason why the Department of Energy wanted to have the proper person?
MR. CRAWFORD: And I didn't interject a bunch of objections about best evidence because he and you both have that section right in front of you. And that seems to be what it says to me.
And I certainly wasn't involved in the process, but I mean it says what it says, Jerry. You know, he's told you that he doesn't recall anything beyond that, why that section was put in like that. I think our record is clear on that now.
MR. STOUCK: Okay. If that's what it seems to mean to you, I guess I'll take that.
MR. CRAWFORD: Well, what I've got to say about it doesn't mean anything other than from an objection standpoint. And I mean the man has given you his answer to your question several times. And that's all I'm saying. And the document simply says what it says.
BY MR. STOUCK:
Q. Let's go back to the cask issue that you pointed out on the first page.
A. Okay.
Q. Actually let me ask one more question

Page 281

about this other thing. Do you know why DOE was interested in whether or not the purchaser had the legal right to deliver SNF?
MR. CRAWFORD: Objection to the lack of foundation and objection to the vagueness of that.
You may answer.
THE WITNESS: I do not know how to answer beyond what I've already answered you. I've given you --
BY MR. STOUCK:
Q. Well, you just basically don't recall, is that what you're telling me?
A. No. What I said was I don't recall whether that language arose because that was part of the contract, there was some language in the contract, or it was part of -- or it was some contracting officer, therefore, procurement regulation, guidance, rule, you know, I don't know. I keep telling you that's all I know about that section, that's all I recall about that section.
Q. Back to the cask issue. Do you know whether what is referred to in this letter as an apparent inconsistency would have been a basis for disapproving the DCSs or this DCS?
And I'll just note for the record, as

Page 282

you'll see this paragraph does not indicate that it was being disapproved on that basis. So that's obvious from the document. But do you know whether this kind of inconsistency would be a basis for disapproval?
A. I do recall that they would not be a basis for disapproval.
Q. Do you recall why that was so, why this kind of inconsistency would not be a basis for disapproval?
A. The way I recall it now is these go back to the broader issue of the DCSs. These were all for planning purposes. And planning purposes as I have testified before had, you know, some use to the utilities, they had some use to us; for us in the early stages of trying to put together a system and whether to early plan for what type of cask we would need, whether it would be a BWR or a PWR or a rail or a truck cask. And we -- this was another piece of the puzzle.
When the FICA, the facility interface capability assessment -- we had a large database that provided a lot of information, some all being old, on each utility site. And we thought we understood what the capabilities and flexibilities of those sites

Page 283

were. You now have a situation where a utility is now providing you further information.

And it was our responsibility to check. Now, if there was something -- they said they could handle one type of cask and that wasn't consistent with our information, they could submit whatever they wanted to DCS. It wouldn't be a basis for a disapproval.

But it would be a basis for us to understand for our planning purposes why, did they make a mistake here, for approval or disapproval, was work done on the FICA inappropriate, were there more generic things that would cause us to reevaluate -- we needed to understand why there was that difference again based on our early planning efforts.

Q. And so, as this letter reflects, it says DOE would appreciate an explanation of this apparent inconsistency. So it had an opportunity to correct the inconsistency or correct the capabilities at the site?

A. We needed to understand why, whether they had mischaracterized it, whether we had mischaracterized it in the FICA, whether we mischaracterized the information that we had, just trying to get the record.

Page 284

Q. And there would be ongoing communication about that between DOE and the utilities or the --

A. I don't know about ongoing. There would usually be a phone call or a letter to try and -- I mean this was not a point -- I do not recall any of these being points of contention.

They were points of information and clarification. And the communication would have been either written or oral, I don't specifically recall.

Q. Well, was this a common occurrence; in other words, you know, do you recall that there were, you know, numerous instances in which the information about either casks required or other information similar to that were discrepant between the information that DOE had and what was shown on the DCSs?

MR. CRAWFORD: Objection, vague; objection, best evidence.

THE WITNESS: I really don't recall. I can tell that you I don't recall that this was unique; in other words, that this was the only time. And I don't believe that they were numerous, that there were a lot of others put out. So, to the best of my recollection, there were a few.

BY MR. STOUCK:

Page 285

Q. Okay. Actually we did find on the database the second page of this letter, a different copy. Let me just note for the record, I'm not going to re-mark the exhibit or anything. But this is HQ 0011135 and 36. And the second page reads in toto as follows, should you have any questions concerning this action, please contact Nick Graham of my staff, and there's a phone number, or Nancy Montgomery of the department's Office of Civilian Radioactive Waste Management, again with the phone number, signed, Linda Strand, contracting officer, cc: Jay McKissick.

A. Okay. Thank you.

Q. Who was Nick Graham by the way?

MR. CRAWFORD: Objection, lack of foundation, to the extent it calls for speculation.

THE WITNESS: I think he worked for the contracting officer. There were so many people that went through that office. I recall the name, I think he was with the contracting office.

BY MR. STOUCK:

Q. Do you know if he was a lawyer?

A. I don't think so.

Q. You don't think so?

A. I don't think so.

Page 286

Q. Now, I think I understand this issue about the apparent inconsistency on the casks. But I don't still understand why that inconsistency was not a basis for disapproval, whereas the wrong signature was a basis for disapproval. And so I would like to ask you if you can just define for me where the dividing line was between problems or mistakes or inconsistencies that would lead to disapproval and problems or mistakes or inconsistencies that would not lead to disapproval.

MR. CRAWFORD: I'll object to the foundation for that, to the extent it calls for speculation, and to the vagueness.

THE WITNESS: I mean you want me to use this example or a general example?

BY MR. STOUCK:

Q. It's a good example because we've got one issue that did lead to disapproval and one issue that didn't lead to disapproval. If that's helpful to your answer, fine.

MR. CRAWFORD: Well, probably not, because you really don't have what's being talked about here in front of him. So I'll object to the foundation, again to the extent it calls for speculation, and to the vagueness of it.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 287

THE WITNESS: Well, here they're telling us their site is -- the lifting capacity, they could only handle a -- let's go back.

The DCS indicates that Haddam Neck can accommodate a cask with a maximum lifting weight of less than 100 tons, while the FICA and the RW-859 data indicate the site capability is five tons.

They could -- it was not a basis for disapproval because we just had to know what equipment -- again this was part of the planning process, the DCS preceding the, you know, 12 months before expected delivery of the FDS. We're trying to understand what equipment we ought to have there.

They're not required, the utilities weren't required to be able to accommodate a certain cask. I mean we had responsibility under the contract to have the right cask there. So there would be no basis for us to disapprove it, it's just trying to understand what they could and couldn't handle.

BY MR. STOUCK:

Q. So the things that would be a basis for disapproval were -- I mean I know some examples. One example would be if they asked for acceptance of more than their allocation, right?

Page 288

A. Correct.

Q. Here is another example, the wrong signature, right, in this letter?

A. There were, you know, technical reasons and administrative reasons.

Q. Can you just characterize for me why some things would lead to disapproval. I'll tell you, what Mr. Williamson told me was that he went through this checklist. And, if everything on the checklist was there, then he recommended approval.

I mean is there some dividing line that you had in your office between issues that would lead to disapproval and would not lead to disapproval, I mean how did you make that determination?

MR. CRAWFORD: Objection, vague and overbroad.

THE WITNESS: Well, I thought I provided you that answer. If the contract requires specific things for procurement reasons or for, you know, language in the contract, if a certain person had to be authorized to sign it and -- you know, that was a basis for disapproval. I mean that was -- again I have testified, whether the requirement came from the contract or procurement rules, you know, I'm not sure.

Page 289

Other information was for planning purposes. And whether they could accommodate a 100 ton cask or not wouldn't be a basis for us to say, well, we're not going to approve it. We're just trying to make sure we had the right equipment.

You could take those two examples and expand it out, if it was required by the contract, if it was required by some procurement rule versus information leads.

BY MR. STOUCK:

Q. Okay. Thank you. Do you know whether there were any final delivery schedules submitted to DOE during the period in which you were working on waste acceptance matters which I guess ended in March of '95?

A. I think I testified before, to the best of my recollection, no.

Q. And were there instructions for preparation of final delivery commitment schedules that were prepared, do you know?

A. To the best of my recollection -- we certainly did not issue any. I don't recall whether there were drafts floating around. But it would have been pretty early.

MR. STOUCK: Can we mark this as whatever

Page 290

the next number is.

(Brownstein Exhibit No. 86 was marked for identification.)

BY MR. STOUCK:

Q. This is a letter from Beth Tomasoni, contracting officer, to Mr. Lee Hill at Northeast Utilities, March 13, 1997. I appreciate that this is after the period when you stopped working directly on waste acceptance matters. But the first sentence here says, the Department of Energy has received your delivery commitment schedules submitted pursuant to Article V.B of the standard contract. And then it says, the department at this time is not able to approve your DCS submittal. Do you see that?

A. Yes.

Q. Do you know why the department was not able at that time to approve the DCS submittal?

MR. CRAWFORD: Objection to the lack of foundation and to the extent it calls for speculation.

THE WITNESS: I wouldn't have a basis to answer the question. I don't know.

BY MR. STOUCK:

Q. Do you know whether a decision was made within RW to across the board respond to DCS

Page 295

utilities put me on the cc, sometimes I would get it from the contracting officer.
Q. Could I see that. So a copy came directly to you of RW-432?
A. Right, in this case.
Q. Do you recall whether prior to -- and the substance of this is that they're submitting delivery commitment schedules. It says, quote, please note that because the Yankee Nuclear Power Station is permanently shutdown and to facilitate decommissioning, we are requesting that DOE accept all of the spent nuclear fuel in storage at the station over a three year period starting in 1998 as indicated on the DCSs, close quote. Have I read that correctly?
A. Yes.
Q. Okay. Do you recall whether prior to receipt of this correspondence there were discussions between Yankee and DOE about priority acceptance for its spent fuel?
A. I don't recall.
Q. One way or the other?
A. Right. I mean there were discussions. But, in terms of whether it was before this date or after this date, I don't recall that.

Page 296

Q. Okay. What did you do when you got a copy of this correspondence? And I'm trying to find out, there were discussions, there's a lot of correspondence, we're going to look at that. But I'll trying get a very detailed understanding of exactly how you, Alan Brownstein, responded to or reacted to this letter. What did you do?
A. Are you asking how I reacted or how I responded?
Q. Well, if there's a difference, tell me both.
A. Well, how I responded, I have to go back to whether there are notes that I took. I mean I kept and turned in -- you know, when I had discussions with utilities, I generally wrote them down. And that's part of the record somewhere. And how I specifically responded I don't recall.
How I reacted, I mean I recall that which is clearly they were requesting approval of a DCS that went beyond their allocation. And that was a cause of concern.
Q. Okay.
A. And I don't recall now whether, you know, the flow of paperwork from, you know, the review from TRW, whatever, I mean I knew this was a problem as

Page 297

soon as I saw the letter.
Q. Problem in the sense that it very well could be a basis for disapproval?
A. Yes.
Q. Okay. Well, had a decision been made prior to this time that it would be a basis for disapproval? In other words, I believe the instructions and other documents that we've looked at indicate that the DCSs were to be filled out in such a manner that they matched the allocations in the ACR.
So I mean, at the time this letter came in, was it fairly clear that it was going to be a basis for disapproval or rather was it something that, you know, might well be disapproval, was open to consideration, and let's review this issue?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: In my mind, and again I do recall that there were, you know, a lot of correspondence again which I have not reviewed. But no, I knew that this was going to be -- you know, when I reviewed it, it was going to be a basis for disapproval.
BY MR. STOUCK:
Q. Because a decision had been made prior to

Page 298

this time that the DCSs had to match the allocations?
A. Yes. And I think we were clear -- or as I recall we were clear in that whether in the general or specific instructions. I mean it certainly would not have been a surprise to anyone.
MR. STOUCK: Let's mark this as No. 88, please.
(Brownstein Exhibit No. 88 was marked for identification.)
BY MR. STOUCK:
Q. Okay. Here is a letter that has been marked as Exhibit No. 88, Mr. Brownstein. This is from Linda Strand, contracting officer, to Mr. J. M. Buchheit, Yankee Atomic Electric Company. And it looks like it's dated December 1, 1992, with a received stamp a couple of days or a few days later.
Anyway this is the response to Exhibit No. 87, right? It looks like that?
A. Yes. I just want to a chance to read it. Okay.
Q. This is a response to the prior exhibit; is that right?
A. Yes.
Q. What involvement did you, Alan Brownstein, have in the preparation of this letter?

**Wisconsin Electric Power Company v. U.S No. 00-697C October 9, 2007**

**Heritage Reporting Corporation**

**Page 4902 to Page 5168**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 4902

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

WISCONSIN ELECTRIC POWER COMPANY,
Plaintiffs
vs NO 00-697C
THE UNITED STATES
Defendant

-------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D C

Tuesday October 9, 2007
Volume 21

The parties met pursuant to the notice of the Judge at 10 05 a m

BEFORE THE HONORABLE JAMES MEROW

Page 4903

APPEARANCES

ON BEHALF OF PLAINTIFFS
RICHARD OEHLER ESQ
[illegible] GRIFFITHS ESQ
Perkins Coie LLP
[illegible] Third Avenue Suite 4800
Seattle Washington 98101
[illegible] 359-8000
and
EMILY POULIN ESQ
DONALD CARNEY ESQ
MARY ROSE HUGHES ESQ
Perkins Coie LLP
[illegible] Fourteenth Street N W
Washington D C 20005
[illegible] 628-6600

Page 4904

APPEARANCES CONTINUED

ON BEHALF OF THE DEFENDANT
ALAN J LO RE, ESQ
SHARON SNYDER, ESQ.
RUSSELL SHULTIS, ESQ
STEPHEN FINN ESQ
SONIA ORFIELD ESQ
U S Department of Justice
1100 L Street, N W
Washington, D C 20036

(Index appears at end of transcript)

Page 4905

P R O C E E D I N G S

(10 05 a m )

THE COURT Who's up first today?

MS SNYDER Your Honor I think the government is going to make its 52(c) motion

THE COURT Okay Very good

MR OEHLER· That's fine, Your Honor Just a couple of housekeeping issues

THE COURT Yes.

MR OEHLER. A reminder from last week Wisconsin Electric still has some exhibit issues we'd like to raise with the Court, and one thing I was thinking, I believe that the government also has some exhibit issues that it wants to raise with the Court, we might do all that in one joint session if that makes sense to the government

MS SNYDER Your Honor that's fine. We wanted to take a look at the list that we had provided to the Court in a motion earlier in the trial and winnow that down to see what's been admitted and what is no longer an issue, and so once we do that in the next couple of days we'll have a list ready

THE COURT Okay Fair enough

Page 5030

contract. Certainly, he was instrumental with me in developing the ACR.

Q. And I want to zero in now, if I could, on the 1990 through 1991 timeframe.

A. Okay

Q Were you working with Mr. Cole in that timeframe?

A. I was.

Q. Did you work with an individual named Scott Vance?

A. Through Billy, yes.

Q. And who was Mr. Vance?

A. Mr Vance was one of Billy's assistants.

Q. And what was your understanding as to Mr. Vance's position at PNL?

A. Actually, he was a junior member to a number of other Billy's staff at the time at PNL, there were a number of people that were senior to him when he came aboard.

Q And you may have answered this a moment ago, did you say that you had dealings with Mr Vance through Mr. Cole, is that right?

A. Yes, Mr. Cole was my key contact.

Q Did Mr. Cole have other people other

Page 5031

than Mr Vance he dealt with?

A He did, yes

Q Now, I want to talk specifically about the 1990 timeframe As of 1990, what did you understand the status of the waste acceptance program to be regarding the MRS and the repository?

A Out of the Nuclear Waste Policy Act amendments, there was a linkage, there was a schedule linkage between the MRS and the repository that we could not begin construction of the MRS until we got a construction authorization for the repository from the Nuclear Regulatory Commission, and then there was also a capacity linkage – excuse me, a capacity limit on the MRS

Q. Do you know the reasons behind those limitations?

A There was a concern that without the, certainly, without the capacity limit, that the MRS could turn into a de facto repository.

Q Now, as of this timeframe, that is the 1990 timeframe, what was your understanding as to when DOE expected that it could receive a construction authorization?

Page 5032

A. I believe, at that time, the schedule for operation of the repository was 2010, so a construction authorization would have been at 2007.

Q. Now, let's look at the document, Mr. Brownstein.

MR LO RE: I'm sorry, Counsel, this is DX-558.

BY MR. LO RE:

Q. Mr. Brownstein, I've handed you an exhibit that's been marked as DX-558, this is a document entitled annual capacity report dated 1990.

MR. LO RE: And, Your Honor, for the record, I understand that this document, which is also cross-referenced as PX-211, and I think also PX-214, has been admitted into evidence.

THE COURT: Yes, it has.

BY MR. LO RE.

Q. This is an annual capacity report, Mr Brownstein, dated 1990. Are you familiar with this document?

A. I am.

Q. What is it, sir?

A The annual capacity report was the

Page 5033

first document called for under the standard disposal contract

Q. Did you have any involvement in the preparation of this document?

A I did, I was responsible for the document.

Q. Now, let's look at page three of this document, there's several Bates numbers in this document, we'll go with the top one, it's the Bates number ending 2494, and under the heading, "1.3, submittal of comments on the annual capacity report," do you see that, sir?

A I do.

Q. And there's a paragraph there, and then below it, it says, "Comments on this ACR should be addressed to Mr. Alan Brownstein," and it has an address at the Department of Energy, Office of Civilian Radioactive Waste Management. Is that you that's referred to there?

A It is.

Q. And do you know why you were the person, the point of contact for comments on the annual capacity report?

A. I was, my responsibility is I was a

key link between the utilities and the Department on contract issues, and I had developed it, and everyone knew I was the focal point

THE COURT: Is RW-432 your address or your personal number?

THE WITNESS: Neither now. There are – let me do it this way. There are codes, like RW-1 would be the director, and then RW-10 is another office, and then within 10, there would be a three digit, these are all old. They don't exist anymore, but they're just classifications of different offices. That was, I believe, at the time, 432, I think, was a branch, 43 might have been a division, I think that's how it was broken down at that time.

BY MR. LO RE

Q. Now, Mr. Brownstein, if you could turn to V of this document, which is also the Bates number ending in 2490, there's a paragraph that starts with, under the heading, "Summary," just that top paragraph, please? Middle of that paragraph, it says, "The standard disposal contract states that, beginning in April 1991,



DOE will publish the first annual acceptance priority ranking report, which will formally set forth the acceptance queue in which purchaser's will receive priority for allocation of the waste management system (WMS) acceptance capacity "

A. Will receive priority, not reserve.

Q Thank you And what was your understanding of that sentence?

A The contract called for a number of documents, the first one, as I indicated, was the annual capacity report, and the second document called for in the contract was the issuance of an acceptance priority ranking, so another contract deliverable

Q What was the significance, if any, in your mind, to that April 1991 date?

A The contract very clearly stated, with respect to the annual capacity report, that it was for planning purposes only When it discussed the next report, the acceptance priority ranking, it did not use those terms, so from my point of view, there was a distinction between a planning document and one that was contractually binding.



Q. What was your understanding as to what was to happen from the contractor's perspective upon issuance of the 1991 APR?

A. The 1991 APR set the allocations for the utilities, and that was an important step under the contract process to get to the delivery commitment schedules, which was the next step in the contract, contractual waste acceptance process.

Q. Now, I'd like to turn your attention to page four of this document, which is the Bates ending in 2495, and there's a paragraph there under the heading, "2.0, waste acceptance projections." And you'll see there's a reference to two bounding cases, one is the upper bounding case, and then there's one below, that's the lower bounding case, I want to focus on the upper bounding case for one moment.

You'll see in the paragraph or the sentence that's been highlighted, several sentences that's been highlighted, it says, "With respect to the upper bounding case, this case is also not restricted by the MRS site selection and construction schedule linkages



with the repository as imposed by the Amendments Act." Do you see that sentence sir?

A. I do.

Q And what was your understanding as to the assumption that was going into this sentence that I just read?

A. While the capacity limits would be maintained, it was the Department's position that we would obtain a site and not have the linkages with the construction of the repository. In other words, we'd be able to build the MRS sooner.

Q. And with respect to, there's a reference here to not restricted by the – I'm sorry, I'll back up. It says, "The upper bounding case is representative of receipt rate of the WMS that is not restricted by the MRS storage capacity limits of 10,000 MTUs," then it goes on. What was the assumption that was being made there?

A There, it was not only – the first thing you pointed to was the schedule linkages. This particular sentence refers to the capacity limits, and we assume the capacity limits went away.

Page 5038

Q. So, to wrap it up, with respect to the upper bounding, what were the assumptions that you understood as to the tonnage limitation and the construction authorization linkage?

A There would be no schedule linkage, and there would be no tonnage, no capacity linkage limit.

Q Thank you Now, I want to go on in that paragraph, there's a reference to the lower bounding case, and there, it says. middle of the paragraph, "The lower bounding case represents a receipt rate that would be in compliance with the Amendments Act restrictions on storage limits at an MRS before a repository starts operation However, this case assumes removal of the schedule linkages with the repository imposed by the Amendments Act."

A Correct

Q And my question, Mr Brownstein, is, what was your understanding as to the assumptions being made there with respect to the lower bounding rate?

A There that, from a timing aspect, we would not, that the schedule linkages would be gone, but the capacity limits of 10,000 MTU

Page 5039

would be maintained

Q Now, Mr. Brownstein, as of this point in time, that being December 1990, what was your understanding as to the chances of DOE beginning performance at an MRS in 1998?

A The challenge for the MRS, in our minds, was one of siting the MRS. In terms of construction and operation, it was not a complex undertaking like a repository It would be using technology that the utilities used to store fuel So if we could get a site, the construction and operation of the MRS was really not that large a problem

Q. Did you consider the prospects of getting a site as of December 1990 to be insurmountable?

A. No

Q Why do you say that?

A. The Amendments Act had appointed a Negotiator, and so there was a Presidential appointee that was trying to work with different entities to obtain a site, as was the Department, and in fact, we had discussions with different, principally, tribes and entered into discussions, as did the Negotiator, to get

Page 5040

a site. So there was a lot of activity and a lot of work done We believed that that was going to work.

Q. Mr. Brownstein, at this point in time, December 1990, did you believe that it was obvious at DOE that the Department would be unable to meet its 1998 performance date?

A No.

Q. Now, I'd like to turn your attention to the table 2 1, which is page seven of this document, and it's got those upper and lower bounding cases we talked about. If we could just look at the whole thing, please? I want to focus first on that upper bounding case. Mr. Brownstein, do you believe that if DOE had begun performing at that upper bounding rate that's depicted there as of January 31st, 1998 at an MRS, that DOE would have been meeting its obligations under the NWPA and the standard contract?

A. I do.

Q. Now, I want to turn to the lower bounding rate. With respect, now focusing on that lower bounding rate, same question, do you believe, if the DOE had started performing at

Page 5041

the lower bounding rate at an MRS as of January 31st, 1998, that DOE would have been meeting its obligations under the NWPA and the standard contract?

A Yes.

Q Now, focusing on that lower bounding rate for a moment, again, prior to the issuance of this document the, December 1990 ACR, did anyone indicate to you that you should not publish the lower bounding rate because DOE had already concluded it would not perform beginning in 1998 and this was a way to limit DOE's liability?

A Absolutely not.

Q Did anyone, to your recollection, ever advise you against publishing the lower bounding rate depicted here for any reason?

A No

Q Now, I want to look at a different document, 564. Mr. Brownstein, I've just handed you a document that is marked as DX-564 This is a document entitled, "Draft Mission Plan Amendment," dated September 1991 Mr Brownstein, are you familiar with this document?

Page 5042

A. Yes.
Q. What is it?
A. This was a document that was required by the Nuclear Waste Policy Act to report to the Congress and others on the status and progress of our program.
Q. And did you review this document as part of your work on the ACR?
A I reviewed pieces of it that were relevant to the ACR.
MR LO RE Your Honor, I understand this document has been admitted into evidence.
THE COURT. Yes
MR. LO RE Thank you.
BY MR. LO RE
Q. Now, I want to turn your attention, Mr. Brownstein, to the page marked as 5001, which is also page 18 of the document, and there's a heading there that says, "strategy for the MRS facility," do you see that?
A I do
Q. And I want to zero in on that paragraph right under that heading, and I wonder if you could read that paragraph into the record, please?

Page 5043

A "To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998 To make this possible, the President's legislative package for the national energy strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy Amendments Act of 1987 (Amendments Act) This could also be achieved by Congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator "
Q Now, Mr. Brownstein, how did the statement that you just read, how did that statement comport with the lower bounding rate that you talked about a moment ago in the 1990 ACR?
A The lower bound rate assumed, while we would maintain the capacity limits established in the Nuclear Waste Policy Amendments Act, that the schedule linkages would go away, and that's consistent with this statement
Q Now, at this time, there's no reference here to the tonnage limitation that we talked about?

Page 5044

A. That's correct.
Q Do you know why that is?
A. As I answered a previous question, there was a concern that, if those would be removed, that the MRS could eventually turn, de facto, into a repository. In other words, there would be more effort placed on the MRS than a repository, there was concern about that.
Q. And how did, if you know, how did not breaking that tonnage limitation affect that concern or address that concern for you?
A. Sure That would, with a capacity or a tonnage limit in place of 10,000 MTU, in order to accept all the utilities' fuel at some point in time, you would need another facility, and the main facility was the repository. The MRS was just an interim link to that So by keeping that capacity limit in, we could continue to focus our efforts on the siting and eventual construction and operation of the repository.
Q. Now, I'd like to look at another document Let's take a look at DX-566.
MR LO RE· Your Honor, I understand

Page 5045

this document has also been marked as PX-237 and has been admitted into evidence.
THE COURT: Yes, that's correct
MR LO RE: Thank you.
BY MR. LO RE:
Q Mr. Brownstein, this document is a document entitled, "Annual Capacity Report," dated December 1991. And what is this document, sir?
A This is a continuation of the documents required by the standard disposal contract.
Q And did you have any involvement in the development of this document?
A I did, I was responsible for its preparation
Q. And if you turn to page three of this document, which is also marked as Bates number ending in 3596, you'll see a reference to you again.
A That's correct.
Q And is it fair to assume, at this point, that you were still the point of contact for the utilities?
A Absolutely, yes

Page 5046

Q. Now, if you could turn to page, if you could turn to page V of this document, which is entitled, "Summary," under the heading there, that first paragraph, it says, second sentence in, "In December 1991, the Department published the 1991 acceptance priority ranking (APR) that established the order in which the Department will allocate acceptance capacity." Do you see that?

A. I do

Q. What was the significance of that, sir?

A. Again, we're going through the documents called for in the standard disposal contract The acceptance priority ranking was a key document in order to support the next document in the contract, which was the delivery commitment schedule, so this set the allocations for the utility allocations that would be important or absolutely vital to complete a delivery commitment schedule

Q Now, you'll see a little farther down in that paragraph, the second-to-last sentence says, "The 1991 ACR applies to the waste acceptance rates in table 2 1 to the 1991 APR,

Page 5047

resulting in individual purchaser allocations "

Do you see that?

A I do

Q Now, what was the significance, contractually, of that statement?

A Well in order to complete delivery commitment schedule, in order for a utility to submit that to the Department, it needed two pieces of information, it needed where it was in the queue which was supplied by the acceptance priority ranking report, and it needed a waste acceptance schedule, it had to have those two pieces of information to follow the next piece of the standard disposal contract

Q And just so the Court is clear, in the ACR, we can look at the – I'm going to go back to that Let's look at one other thing before we do that Could you turn to page number one of this document, which is also the Bates number ending in 3594? And there's a heading there that says, "1.1, Purpose of the Annual Capacity Report " Do you see that, sir?

A. Yes

Q Halfway through there is a sentence

Page 5048

starting with "although," do you see that?

A. I do.

Q. Could you read that sentence into the record, please?

A. Sure. "Although the 1990 ACR indicated that it would be the last ACR published, DOE has elected to continue publication of the ACR after discussions with the purchasers."

Q. Mr. Brownstein, were you involved in that?

A I was.

Q. And why did DOE make that decision?

A. If we go back to the standard disposal contract, when it talked about, when the contract identified the acceptance capacity report, it identified that it would be published from, through 1990, and then in '91, it would be followed by the acceptance priority ranking report.

There was an issue of the utilities, as I said, needed two pieces of information where they were in the queue and also what waste acceptance rate to apply, so they could complete a DCS, which was the next step. And

Page 5049

so there was some options about how utilities, how the Department would provide that rate to them

We had, through this whole process, had been in discussions with the utilities, and I discussed some of those options with the utilities, and there was, as I recall, there was general consensus, yes, even though the contract said to publish the ACR through 1990, let's go ahead and continue to publish that, and I did to provide another piece of information the utilities needed.

Q. Mr Brownstein, in your opinion, did you publish that 1991 ACR in any way to attempt to limit DOE's liability to standard contract holders?

A. No

Q. Why do you say that?

A We published it because we were, in following the terms of the contract, again, the next step in the contract was for the utilities to send it to us, delivery commitment schedules, for our approval. If we did not publish the ACR and we published the acceptance priority ranking, the APR, there was a missing

Page 5074

changed over the period of time?

MR LO RE: The realities of the program changed, Your Honor, I think we brought that out on direct examination.

THE COURT: Perhaps you could qualify it by time.

BY MS. HUGHES.

Q. And DOE's intent in implementing the standard contract in the mid-to-late 1980s was to implement the standard contract in such a way as to work off the backlog of spent nuclear fuel at a reasonable rate, correct?

A. I was responsible for implementing the contract. I was not responsible for developing waste acceptance rates. In implementing the terms of the contract under my responsibilities, that didn't fall under my responsibilities, so you're asking a broader question beyond, you know, my role in the Department.

Q. Mr. Brownstein, you recall you were deposed, correct?

A Uh-huh

Q And you said you have reviewed your deposition testimony?

Page 5075

A Right

MS HUGHES. May I have a moment, Your Honor

THE COURT Sure

BY MS HUGHES:

Q Mr Brownstein, if you could turn to your April 9th, 2002 deposition testimony? Which you should have with you, and I would direct your attention to page 70, beginning at line 17 to line 24 And here, sir, you were being questioned about the 1985 mission plan

A Okay.

Q "QUESTION Wouldn't it be fair to read this document as a reflection of DOE's intent to reduce the spent fuel backlog?

"THE WITNESS. " – that would be you – "that was the DOE's intent, yes "

A Yes, but your question asks me in terms of implementing the terms of the standard disposal contract, that's not how I responded to that question

Q A part of your job when you started at DOE in September of 1985 was to implement the standard contract, correct?

A Correct.

Page 5076

Q. And part of that job was to develop the documents that were required by the standard contract, correct?

A. Correct.

Q. And one of the documents required by the standard contract was the annual capacity report, correct?

A. Yes.

Q. And DOE had published some documents prior to your arrival to the program, correct?

A. Yes.

Q And some of those documents included the draft mission plans and the 1985 mission plan, correct?

A Yes.

Q You're familiar with the 1987 final mission plan amendment released in June of '87, aren't you?

A Generally.

Q Well, why don't you take a look at Plaintiff's Exhibit 124? Which is in volume eight, and it should be on the shelf right there behind you.

A. The June '87 mission plan amendment?

Q Yes, let me know when you have it.

Page 5077

A. I have it.

Q And you were involved in producing this mission plan amendment, correct?

A No

Q You had no involvement in this?

A I may have reviewed portions of it that affected my responsibility, but in terms of the preparation of it, I did not.

Q. And you reviewed it in connection with your responsibilities to produce the ACR, is that right?

A. Documents often go through for concurrence or coordination, and I may have, I reviewed a number of documents, I can't recall specifically, but I know I did not – I was not responsible for its preparation

Q But you are familiar with this document?

A In general, I know that it exists, I'm not familiar with every word

Q. Well, here, the Department of Energy announced that the only way it was going to start accepting spent nuclear fuel by January 31st, 1998 was if it had an MRS operating by January 31st, 1998, correct?

Page 5078

A. I have not read this document in 20 years Would you like to give me a chance to read it? Or you want to –
Q. And would you take a look at the highlighted language, Mr. Brownstein, and see if this refreshes your recollection as to the contents of this document?
A. Okay
Q Okay And you had an understanding, didn't you, working on the program in 1987, that the only way DOE was going to be able to meet a January 31st, 1998 pickup date was if it had an operating MRS by January 31st, 1998?
A Yes.
Q That was your understanding, correct?
A It needed an MRS.
Q. Now, you're familiar with the Nuclear Waste Policy Act amendments, correct?
A Yes
Q And I believe you also testified in your direct testimony that you're familiar with the conditions that the amendments put on construction of an MRS, correct?
A With respect to the schedule and the capacity numbers, yes

Page 5079

Q And those conditions are sometimes referred to as linkages?
A Yes
Q One condition prohibited DOE from selecting an MRS site until the Secretary of Energy had recommended to the President the approval of a site for the development of a repository, correct?
A I believe that's the case
Q. Another condition, which I believe you testified to, prohibited construction of the MRS until the NRC issued a construction license for the repository, correct?
A A construction authorization, yes
Q Another condition limited the amount of spent nuclear fuel that the MRS could accept to 10,000 MTU until a repository began accepting spent nuclear fuel, correct?
A Correct
Q That was a capacity limitation, correct?
A Yes
Q And there was still an additional capacity limitation, correct?
A Of 15,000 MTU, yes.

Page 5080

Q. That limited the amount of spent nuclear fuel at the MRS to 15,000 MTUs after the repository began acceptance, correct?
A. Correct.
Q. Now, at the time the Amendments Act was passed in 1987 with these conditions or linkages, you understood that if DOE did not pick up fuel beginning no later than January 31st, 1998, the utilities would incur additional at-reactor storage costs, correct?
A. Yes.
Q. Now, returning to the 1987 mission plan amendment, which is Plaintiff's Exhibit 124, you should still have it there, if I could refer you to the table at page 61 and specifically to the first four columns from the left on that table?
A. Okay.
Q These highlighted columns show how the Department of Energy planned on performing with an MRS as of June 1987, correct?
A. Yes, they're illustrative waste acceptance schedules
Q. Now, would you turn to volume nine, Exhibit 137?

Page 5081

A Okay.
Q. Okay This is the same letter you talked about earlier in your direct testimony, correct?
A. Yes
Q I would like to direct your attention to the second page, second full paragraph, and highlighted language and ask if you could read that.
A You want me to read that out loud?
Q. Please.
A. "The ACR details the annual aggregate and individual acceptance rates for the first 10 years following commencement of WMS facility operations based on current projections These schedules illustrate a planned annual aggregate acceptance rate of 1200 MTU for each of the first five years, which will accelerate to an annual rate of 2650 MTU thereafter."
Q. Thank you. And you testified that you drafted this language, correct?
A. Yes.
Q And the ACR that you're referencing there is the 1987 ACR, correct?
A I don't recall. I assume that's

Page 5082

correct. I don't know. I haven't looked at
the '87 ACR.
Q Well, this letter, this correspondence
is dated October 2nd, 1987, correct?
A. Yes. Okay
Q Was there an ACR prior to –
A Yes.
Q. – the 1987 ACR?
A. No, but this letter indicates on the
first page that DOE in fact issued the first
ACR, that's right.
Q. So –
A Didn't recall
Q The ACR to which you are referring in
the second full paragraph on page two is the
DOE's 1987 ACR, correct?
A Yes.
Q. Can you turn to Exhibit 123 in volume
eight, please? And let me know when you have
this exhibit
A I'm there
Q This is the 1987 ACR, correct?
A Yes, it is
Q And it's the acceptance rates in this
ACR to which you were referring in the letter

Page 5083

to Mr Kraft, correct?
A. That's correct.
Q And turn to the table two on page
seven
A Okay
Q Just so we're clear, do you see those
acceptance rates?
A I do
Q. These are the acceptance rates to
which you were referring Mr Kraft to, correct?
A That's correct
Q Now, these acceptance rates in the
1987 ACR are the same as those in the 1987
mission plan amendment, correct?
A Yes
Q. And these rates, that is, the rates in
the 1987 ACR and the 1987 mission plan indicate
how DOE planned on performing the standard
contract at this point in time, correct?
A. Yes
Q Now, DOE published a draft mission
plan amendment in 1988, correct?
A I believe so
Q Okay. You might want to turn to
Plaintiff's Exhibit 150, which is in volume 10

Page 5084

A. Okay.
Q. Now, the draft '88 mission plan
amendment recognized the linkages imposed by
Amendments Act, didn't it?
A. I would assume it did I'm only
saying that because I wasn't responsible for
its preparation, haven't looked at it in a long
time, I assume it did.
Q At the time, you were familiar with
the provisions of the draft 1988 mission plan
amendment, weren't you?
A. Yes, that's a good assumption.
Q. Let's turn to page 18 and 19 and see
if this refreshes your recollection. Just let
me know when you're there.
A. I'm there, I'm reading over 2.4,
unless you'd like me to –
Q. Are you at the bottom of page 18,
continuing on to page 19?
A. I'm just starting to read that now.
Q Just let me know when you're finished
A. Okay.
Q. Okay.
A. Yes.
Q. The draft '88 mission plan amendment

Page 5085

said that, "Under current conditions, spent
nuclear fuel receipt cannot begin at a waste
management facility in 1998," correct?
A Under current conditions, that's
correct.
Q. And the draft 1988 mission plan
amendment also stated that the delay in the
repository and the linkages between the
schedule and key milestones in the siting and
construction of the MRS facility made it
unlikely that DOE will start accepting waste
significantly before 2003, correct?
A With the schedule linkages, that's
true
Q Now, the draft 1988 mission plan
amendments waste acceptance schedule shows
waste acceptance beginning in 2003 at both a
repository and an MRS, correct?
A That's, yes, table 2.2.
Q Now, the draft mission plan amendment
assumed the linkages, correct?
A Yes.
Q. And you understood, at this time, that
with the linkages in place, DOE would not begin
accepting spent nuclear fuel on January 31st

Page 5118

A I'm continuing to read, in this ACR, that's true, it recognized it would take action, you know, Congressional action. Now, you're comparing this to the '91?
Q. I am. And you're welcome to look at the '91 ACR again.
A It's been so long, I guess I'd rather do that.
Q. That's fine. Take your time.
A Okay.
Q. Now, in terms of the statutory linkages regarding performance with an MRS, nothing changed between the publication of the 1988 ACR and the publications of the 1991 ACR, correct?
A I think that's accurate
Q The statutory constraints on the MRS remained in effect, correct?
A That's correct.
Q DOE through its own efforts had not located a site for the MRS, correct?
A That's correct
Q The Nuclear Waste Negotiator had not located a site for the MRS, correct?
A That's correct

Page 5119

Q And the Secretary of Energy had not yet recommended to the President a site for the repository, correct?
A Correct
Q When did the Secretary of Energy recommend to the President a site for the repository?
A I believe it was in 2001 or 2002.
Q And obviously, in '91, the NRC had not issued a construction authorization for the repository, correct?
A Correct.
Q And in those three years between the publication of the 1988 ACR and the publication of the 1991 ACR, the date for the anticipated opening of the repository had slipped seven years, correct?
A Correct
Q So it had slipped from 2003 to 2010, right?
A Correct
Q. And you understood and the Department of Energy understood in 1991 that, with the linkages in place and the repository start now slipped to 2010, the earliest that an MRS could

Page 5120

be operational was 2007, correct?
A. No, I disagree.
Q Isn't that what the 1991 ACR says, Mr. Brownstein, that with the linkages in place –
A. With the linkages in place, but on page four of the 1991 ACR, in the first paragraph under 2.0, it says, "DOE recognizes that waste acceptance at a DOE facility can begin in 1998, only if the following things occur," and it states what those things were, including the Office of the Waste Negotiator obtaining a site or the federal government, possibly for agreement for a site, so it recognized that in this document
Q. I think you may have misunderstood my question, Mr. Brownstein, my question was, DOE understood in 1991 that, with the linkages in place and the repository start now slipped to 2010, the earliest that an MRS could be operational was 2007, correct?
A. With the linkages in place, that's correct.
MS. HUGHES: Thank you very much Your Honor, if I may have a few minutes, I

Page 5121

believe I'm just about done.
THE COURT: Sure. Why don't we take a break and come back at 10 minutes of, come back at 20 of?
(Whereupon, a short recess was taken )
THE COURT: Ms. Hughes, do you have any more questions?
MS. HUGHES: Just a few, Your Honor, thank you.
BY MS HUGHES.
Q Mr. Brownstein, what was your title in 1990?
A In 1990, I was, it was a staff position, I was a nuclear industry specialist, that was the title of the position
Q That was the title of your position?
A A nuclear industry specialist, right.
Q And how about in 1991?
A I became branch chief for logistics and utility interface, I believe.
Q And was that a division or –
A That was a branch.
Q. Okay.
A. It became a division in 1994.
Q And in 1991, you reported to

Page 5122

Mr. Milner, correct?
A. At some point, I certainly did. I, to be honest, I can't recall what year I reported to who. I'd have to look back at the org charts I certainly worked with Mr. Milner over the years.
Q. Who were your immediate superiors in 1991?
A It may have been, again, I have to look at the org charts, it may have been I reported through Jim Carlson, and then – I may have reported to Jim Carlson, and Mr. Carlson then reported to Mr. Milner I believe, in '91, that was the way it is
Q And in 1991, Mr. Tom Pollog reported to you, correct?
A Yes.
MS HUGHES: I have no further questions, Your Honor
THE COURT Any redirect?
MR LO RE Just a bit, Your Honor.
REDIRECT EXAMINATION
BY MR LO RE:
Q Mr. Brownstein, on cross-examination, counsel for Plaintiff asked you some questions

Page 5123

about your understanding of the intent or goals of the NWPA, do you remember that?
A Yes
Q When you were preparing the ACRs for publication, did you understand that the intent of the NWPA created an obligation on the part of DOE to perform at any particular rate of acceptance?
A No I was aware that both the Nuclear Waste Policy Act and the contract did not discuss rates, and in fact, the law of the Nuclear Waste Policy Act said, until DOE begins its acceptance, it was utilities that were responsible for the storage
Q You also talked on cross-examination, Mr Brownstein, about certain goals that the Department had When you were preparing the ACRs as part of your duties, did you consider the goals of the Department, stated goals, to be contractual obligations vis-a-vis the rate of acceptance?
A No.
Q. Why is that?
A Two different things, certainly, the Department would like to have taken fuel as

Page 5124

much and as fast as possible, but that's a goal. The, you know, the ultimate mission of the Nuclear Waste Policy Act gives responsibility, ultimately, to the Department for taking that fuel, so it was a goal to take it and as much and as fast as we can, but that's far different than, you know, in our view, in terms of a contractual obligation
Q. I would like to take you through a few documents we looked at on cross-examination The first document is the document PX-123. This is the annual capacity report from 1987 If you could turn to V on this document, under, "Summary," and there's a paragraph that starts, "with the system configuration"?
A. Yes, I see it.
Q. Now, if you look at the sentence right in the middle, maybe two-thirds of the way down, it says, "by starting"?
A I see that sentence.
Q. And could you read that into the record, please?
A. Sure. "By starting the WMS operations in 1998, the MRS facility could accept 6,000 MTU of spent fuel by the time repository

Page 5125

operations are projected to begin in 2003 "
Q Now, what, if you recall, were the assumptions that the Department was making about the repository operations and the MRS operations in terms of time at this date as of the issuance of the June '87 ACR?
A Well, that there was no limitation, there's no schedule linkages, there's no limitations, but you're asking me about the waste acceptance rate that was in the –
Q No, actually, what I'm asking about is just with respect to the repository opening in connection with or in conjunction with the MRS What assumptions, if you know, was the Department making about when a repository would be available?
A. I think, at that time, it was 2003
Q. Was it your understanding that that performance beginning at a repository in 2003, did that have any effect on the amount of spent fuel that the MRS could accept?
A Not at that time.
Q. Do you know whether the repository opening in 2003 would allow the MRS to accept more fuel in the beginning and thus not hit its

Page 5126

10,000 MTU limit?
A I'm sorry, can you state, can you state that again?
Q Sure Did you understand, as of June 1987, that by opening a repository in 2003, that that would have an effect on when or the rate of acceptance at an MRS early in the program?
A This was before the Amendments Act.
Q. Okay
A So it didn't
Q. Now, I'd like to turn your attention to that same paragraph that refers to, first sentence, "The system configuration used as the basis for this report"?
A Yes
Q And then it goes on, it says, in the second paragraph, it says, "The illustrative waste acceptance schedule for this configuration reflects the amended first repository schedule and the proposed schedule for the MRS facility " I think you referred to this several times on cross-examination What was your understanding of that term "illustrative waste acceptance schedule"?

Page 5127

A We had used that in several documents To us, we were trying to convey that, based on where we were now, this is an example of how it may work We used that in the mission plan. We used it in all our documents It's a word we use time and time again. We were forthright in all the documents to show that, given what we knew, this was how it may have gone, so we used words like "illustrative," and we also identified what conditions were associated with it We were very up-front with all the documents we put together, at least I believe we were
Q Now, I'd like to look at one more document Would you look at PX-150? And this document, we looked at on the cross-examination This is the document entitled, "Draft 1988 Mission Plan Amendment," dated June 1988
A Okay.
Q. And if you would turn to page 18, which I believe you testified to on direct examination, you'll see, there's a reference to that last sentence, "the DOE recognizes that under current conditions" –

Page 5128

A. Yes.
Q. "– waste acceptance at a waste management facility cannot begin in 1998," and it goes on and talks about the linkages that are talked about. Did those programmatic assumptions ever change about what DOE would do vis-a-vis those linkages?
A No, we always supported the capacity limits for the reason I discussed, and we always supported breaking the schedule linkages.
Q. So with respect to the next chart that goes, "performance beginning," this is table 2-2, the next page?
A Yes.
Q. This beginning in 2003, what assumptions, if any, do you know, do you know what assumptions, if any, this chart makes with respect to the construction authorization linkage?
A. Yes Well, it appears that there is no schedule linkage because we have the repository and the MRS beginning at the same time
Q. Now, after this, at this time, do you

Page 5129

recall whether there was any change in the assumption as to when the repository would be open?
A Yes. There was another assessment done by the Secretary of Energy, as I recall, and the date moved out from 2003, out to 2010.
Q And then, as a result of that reassessment, do you know whether DOE made any representations about how it would handle the construction authorization linkages?
A In terms of the MRS?
Q Yes.
A No, we still supported, you know, if we could get a site, we felt that we could modify those schedule linkages.
Q. And if you modify the schedule linkage, would that allow the MRS to open earlier than 2003 or 2010?
A Sure, the conditions without the schedule linkage and with the site, again, the MRS is a relatively simple facility, certainly next to a repository, it uses technology that is used every day by the utilities, and we thought we could do that.
MR. LO RE: Thank you. One moment,

# BURGOYNE, ROBERT

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------- x
SACRAMENTO MUNICIPAL :
UTILITY DISTRICT, :
Plaintiff : No. 98-488C
v. : (Judge Braden)
THE UNITED STATES OF AMERICA, :
Defendant :
----------------- X

Deposition of ROBERT M. BURGOYNE
Washington, D.C.
Thursday, July 8, 2004
9:42 a.m.

Job No.: 1-38205
Pages: 1 through 178
Reported by: Diane Gomez, RPR

2

Deposition of ROBERT M. BURGOYNE, held at the offices of:

ARNOLD & PORTER ,LLP.
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:
TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER, LLP.
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF DEFENDANT:
VICTORIA L. STROHMEYER, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20005
(202) 305-7573

4

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANT:
SCOTT DAMELIN, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest, Room 12020
Washington, D.C. 20530
(202) 305-2312

waste is covered by the standard contract under the definition of high-level waste --

MS. STROHMEYER: Objection.

Q -- in the contract?

MS. STROHMEYER: Calls for a legal conclusion. Foundation.

A **No, I don't.**

Q Do you have an understanding of the definition of the term "failed fuel" as used in the standard contract?

MS. STROHMEYER: Objection. Calls for a legal conclusion.

A **I don't think it's defined, as far as I know.**

Q As far as you know, failed fuel is not defined in the standard contract?

A **Well, I mean, failed fuel is identified, but I don't know that the specifics are defined as to what constitutes failed fuel.**

Q In your view from a transportation standpoint if fuel does not require any special handling, is there any reason for DOE to delay



acceptance of such fuel?

MS. STROHMEYER: Objection. Foundation.

A **Can you repeat that again? It doesn't require special handling?**

**(The record is read.)**

A **Well, to my knowledge if it doesn't require special handling I don't know that there would be any reason it couldn't be accepted. If it's -- meets the standard contract dimensions and other clauses and so forth described. I think the NRC has an opinion, but.**

Q Have you been involved in modifying the DCS process that would more easily facilitate campaigns by using a three-year service window?

A **When you say modify the DCS, I have been involved in studies looking at different campaign windows and allocations and projection alternatives and so forth to see how we could best increase our campaign sizes and, hence, the efficiency of the overall acceptance. So, I mean, we've looked at different alternatives and ways to do that, but, again, they've all been just simply scenario studies that nothing definitive has ever came out of any of**



**that that I'm aware of.**

Q Who from the DOE side has been involved in that process you just described?

A **You mean, you want a name?**

Q Yeah, if possible.

A **Dave Zabransky, who would be basically my waste acceptance client that I deal with on a day-to-day basis.**

Q Dave Zabransky is the person at RW that you deal with on a day-to-day basis, for the most part?

A **Yes. Well, in waste acceptance.**

Q In the waste acceptance division of RW?

A **Well, it's in the -- they don't really call it waste acceptance. They call it something else, but that's in essence what it is. My primary interface is with transportation.**

Q Who's --

A **The Office of Transportation. Now, I mean, basically our customer is Mr. Zabransky. If you look at us as FedEx, he's our client.**

Q You're FedEx because you are responsible for --



A **Moving it.**

Q -- moving the fuel --

A **Providing the infrastructure to move the fuel from A to B, yeah.**

**(There is a recess from the record.)**

**(Deposition Exhibit Burgoyne 4 was marked for identification and was attached to the transcript.)**

Q Mr. Burgoyne, I've handed to you what's been marked as Exhibit 4. It's a document titled Transportation Meeting. It's dated June 8, 2001. First Bates page is YMP-012-1826, and it references a meeting that a number of DOE employees attended, and you're listed as attending as well. And I just ask first if you could review the document and let me know if you think you've seen it before.

A **Okay.**

Q Do you believe --

A **I don't recall the meeting specifically, but some of the topics that I glanced through here I recall.**

Q Do you recall whether you've ever seen

# COLE, BILLY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Tuesday, March 12, 2002

Deposition of BILLY M. COLE, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Tuesday, March 12, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 4

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

Page 5

APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011