IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY, :
(98-154C) (Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY, :
(98-474C) (Merow, S. J.) :
Plaintiffs, : Discovery
: Judge
v. : (Judge
: Sypolt)
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - -x

VOLUME I

Pages 1 - 228

Deposition of BILLY M. COLE, held at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Ninth Floor, Washington, D.C., commencing at 10:30 a.m., Tuesday, June 4, 2002, before Heidi L. Jeffreys, RDR, CRR, Notary Public.

APPEARANCES OF COUNSEL:

ON BEHALF OF PLAINTIFFS:

FOR YANKEE ATOMIC ELECTRIC POWER COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, AND MAINE YANKEE ATOMIC POWER COMPANY:

SPRIGGS & HOLLINGSWORTH
BY: JERRY STOUCK, ESQUIRE
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5389

ON BEHALF OF THE DEFENDANTS:

FOR THE UNITED STATES:

U.S. DEPARTMENT OF JUSTICE
BY: HEIDE L. HERRMANN, ESQUIRE
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290



INDEX

WITNESS


| ON BEHALF OF THE PLAINTIFFS: | Examination by: | Page |
|---|---|---|
| B. M. Cole | Mr. Stouck | 5 |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| 8 | Defendant's witness list | 20 |
| 9 | Deposition transcript | 24 |
| 10 | Memo (Coles to McKee and Wegeng) | 37 |
| 11 | Letter dated 4-11-83 | 112 |
| 12 | CSFM program document | 116 |
| 13 | Article | 118 |
| 14 | Article | 126 |
| 15 | Letter dated 12-15-86 | 129 |
| 16 | Contract | 136 |
| 17 | Letter dated 12-30-86 | 140 |
| 18 | Letter dated 2-8-87 | 151 |
| 19 | Letter dated 3-5-87 | 151 |
| 20 | Memo dated 6-5-87 | 157 |
| 21 | Letter dated 12-22-87 | 169 |
| 22 | Memo dated 10-5-90 | 174 |
| 23 | '89 ACR draft | 174 |
| 24 | Memo dated 8-14-91 | 182 |
| 25 | Letter dated 3-13-97 | 195 |




EXHIBITS (Continuing)


| No. | Description | Page |
|---|---|---|
| 26 | Memo dated 4-22-91 | 200 |
| 27 | Memo dated 6-28-91 | 200 |
| 28 | Memo dated 6-18-92 | 202 |
| 29 | Memo dated 6-29-92 | 205 |
| 30 | Letter dated 12-29-92 | 216 |




BILLY M. COLE, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. STOUCK:

Q. Good morning, Mr. Cole. We've met briefly before we went on the record. I'm Jerry Stouck. I'm a lawyer. I represent three utility companies in this litigation, Yankee Atomic Electric, Connecticut Atomic Power Company, and Maine Yankee Atomic Power Company.
I'm aware that you were previously deposed for several days in another phase of this litigation, and I'm familiar with that testimony, and I will ask you some questions, just some follow-up questions, about some of the things you said then.
My first question, though, is have you done anything subsequent to the last deposition to prepare for today's deposition?
A. Nothing.
Q. Okay. Prior to the last deposition did you do anything different to prepare for today's deposition? For instance, today's deposition is in the three cases I mentioned.
A. I didn't do anything to prepare for either, because I didn't really know what to prepare. This is,

10

published in the annual capacity report after the 1200-ton rate was another rate of like, I think, 300, 700, something like that, and that was based on what the transportation function could claim they could do. They could not transport any more than that. But they really didn't have a basis for it at that time.

Along came around 1990, 1991, and I was asked could I come up with a basis, a real acceptance rate and a basis for it, based on what we knew at that time, and I developed the 400, 600 and 900 at that time.

Q. Right, which you testified about previously.

A. Right. And that's -- you know, that's -- their position has always been, well, that's it. Because they sent out notices prior to publishing that to all the utilities explaining how they were going to do things, why they were going to do it this way; speak now or forever hold your peace. They were given a three-month comment period. Nobody had any objections to it that I remember.

Q. Right.

A. Most of the utilities' positions at that time was, I don't care if it's 1200, 400, just do something; you know, start taking fuel. That's what they were concerned about. They didn't care if it went

11

in a hole or where it went; they only wanted to get rid of it so they could continue operating. The main thing was keeping on generating power. That was the big concern.

Q. Okay. Are you done?

A. Yeah.

Q. Okay. But you have no specific -- is this right? You have no specific understanding -- well, let me ask it this way:

Have you reviewed any of the court filings the government has made in this litigation?

A. No.

Q. So, you have no specific knowledge of what position they're taking in this --

A. Not with specificity, no.

Q. What you just told me is your understanding from working on the program?

A. That's absolutely true.

Q. Okay. Now, tell me -- you mentioned in your prior testimony that Mr. Vance, Scott Vance, had started working -- the date that sticks in my mind is 1986, from your testimony. Does that sound right?

A. I think that was about when he started working on the program.

Q. And, first of all, do you know what he did

12

prior to that?

A. Yeah. He was in school. I hired him out of MIT.

Q. Okay. And can you tell me -- why did you hire him?

A. Why did I hire him?

Q. Yeah.

A. Well, I was short-handed, for one thing, and I was at that time on the Department of Energy's program for -- it was a scholarship/fellowship program where six of us in the United States were chosen to review the scholarship and/or fellowship request, stipends they could get from the government to work on various things.

I was one of the people on that committee to decide who got what, and we gave out, from funding out of this, out of the spent fuel program, seven or eight stipends every year.

When the program first got started, Mr. Vance was one of the early applicants on the program. That was my first encounter, was seeing his application, and when he -- he -- you know, I followed his career path through school and stuff, and he was one of the best candidates I had ever seen. I said, I'd like to have him, partly because he got his Master's

13

degree in nuclear engineering, but it was what we called fuzzy nuclear engineering. He understood the nuclear aspects, but he understood what really ran the program. It was more policy. His thesis was basically the economic impact on the utilities by delaying the repository. So, he understood what the real problems were. They weren't technical.

Q. That was his master's thesis at MIT?

A. Uh-huh.

Q. And what was his role -- first of all, he started in about '86?

A. It was around '86, if I remember right.

Q. And do you remember when he left?

A. Well, I left before he did.

Q. Okay.

A. He was working for me up until I left in -- I think I left in December of '88, and then I still worked on the program after I left through JAI, and, so, I still had contacts with him.

He left probably -- I'm guessing 1990, sometime in that time frame.

Q. 1990?

A. Sometime in that time frame, '89, '90.

Q. Okay. And what did he do while he was there? He worked for you?



Alderson Reporting Company, Inc.
1111 14th Street, N.W. [redacted]-FOR-DEPO Washington, DC 20005

A. He worked for me, and then after I left he worked for my successor.
Q. In relation to, for example, Pat McDuffy what was --
A. They both worked for me.
Q. Okay. Did they have similar rolls?
A. Yes and no. Pat was more senior, and Scott supported him a lot. Scott had his own projects that he was responsible for, also, but he supported Pat quite a bit.
Q. Okay.
A. You know, he left and went to work for CH2M Hill, I think, out in Boise, out in that area. And I kept trying to hire him to come back out here, and he wanted to live in Boise. And then he decided he wasn't going anywhere in his career if he stayed in Boise and if he was going to work in his area of education he needed to get back here. So we hired him again, and he worked out of his house there for a while until he made the decision to move the family back here.
Q. Now, did he work with you on developing the '91 ACR?
A. At that time I was not -- it's kind of a complicated relationship.
In '91 I was not responsible for the ACR,



although I was -- I shouldn't say I wasn't responsible for it. I was responsible for it but not -- well, Pacific Northwest Laboratories had the contract to do the job. DOE gave it to them. I no longer worked for them, but I was under subcontract to them --
Q. Okay.
A. -- to support them on this as more or less a consultant. I developed all this stuff, gave it to Pat McDuffy and all that stuff and published the report.
Q. What did Scott Vance do?
A. He was working with Pat. He was aware of it. He was not party to the development of that rate. I developed that rate, along with Mr. Brownstein of DOE, sitting in the Forrestal Building.
Q. Was Mr. McDuffy involved in the development of the rate?
A. I can't remember. I know he was involved at least to the point of I had to get his approval because I was under subcontract to him at that time and explain everything to him and get his okay. I don't remember how much physical involvement. I'm sure I bounced all this off of him before I did anything with it to get his approval, since he signed the contract.
Q. Do you know who Ivan Stewart is?
A. Ivan Stewart? Yes, I do. He worked for



NUS Corporation for many years. I don't know where he is now.
Q. Okay. Did you ever work with him?
A. No, not really. You know, we've known each other because we've been in the business for years, but I never really worked with him.
Q. What about Ed Davis?
A. I know Ed Davis.
Q. Who is Ed Davis?
A. He was president and CEO of NUS for quite a few years. I don't know where he is now.
Q. Do you know what he was doing at the time of the Nuclear Waste Policy Act?
A. Huh-uh.
Q. Okay.
A. I don't remember if he took over NUS before or after the Act.
Q. Okay. And what about E. R. Johnson?
A. Oh, yeah.
Q. You know him?
A. I know him. He's my boss -- well, he likes to think he's my boss.
Q. Right.
A. He's not really.
Q. What was he doing at the time of the



Nuclear Waste Policy Act?
A. What was Ed Johnson doing?
Q. Yeah.
A. President of E. R. Johnson Associates. He had several jobs working for the Department of Energy through various laboratories. I think at that time he had a lot of funding through Oak Ridge, at the time it was passed.
Q. The program was ongoing at the time of the Nuclear Waste Policy Act?
A. Uh-huh.
Q. Was Ed Johnson working --
A. He probably was. I didn't know him at that time. I met him after the Act got passed. He became one of my subcontractors when he was at PNL.
Q. Okay. What about Tom LaGuardia?
A. Tom LaGuardia? Never heard of him.
Q. What about Micky Buchheit?
A. I've heard the name. I think he was with one of the utilities, wasn't he?
Q. Yeah, he worked for Yankee Atomic.
Let me ask about the companies. Did you in your work in relation to this program that we're talking about ever have a direct relation with Yankee Atomic?
A. I don't know how you qualify "direct."

# KLEIN, KEITH

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF KEITH A. KLEIN

May 22, 2002
Richland, Washington

APPEARANCES

For the Plaintiffs Yankee Atomic Electric, Connecticut Yankee Atomic Power Company, Maine Yankee Atomic Power Company:

Robert L. Shapiro
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5879
(202) 682-1639 Fax

For the Defendant

Erin Powell
R. Alan Miller
United States
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-0523
(202) 514-8624 Fax



EXAMINATION INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Shapiro | 7 |


EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | 20-page Federal Register Part II Department of Energy Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste DC-107922 - DC-107941. | 49 |
| 2 | 7-page memorandum to distribution from Richard H. Williamson dated September 15, 1983 PNL 173-1282 - PNL 173-1288. | 95 |
| 3 | 21-page Civilian Radioactive Waste Management Program Mission Plan Volume I Overview and Current Program Plans December 20, 1983 Draft CTR042-1065 - CTR042-1085. | 103 |




EXHIBIT INDEX


| EXHIBIT NO | DESCRIPTION | PAGE NO. |
|---|---|---|
| 4 | 121-page Mission Plan for the Civilian Radioactive Waste Management Program Volume I Overview and Current Program Plans April 1984 RA-109881 - RA-110001. | 105 |
| 5 | 46-page excerpt from Mission Plan for the Civilian Radioactive Waste Management Program Volume I June 1985 DB-105274 - DB-105678. | 113 |
| 6 | 3-page letter to Keith A. Klein from P.A. Craig dated January 4, 1984 DER006-3244 - DER006-3246. | 130 |
| 7 | 10-page Program Strategy Draft 2/29/84 PNL 150-0158 - PNL 150-0167. | 131 |




EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 8 | 3-page Informal Note PNL 001-1324 - PNL 001-1326. | 134 |
| 9 | 6-page RPH Evaluation Study DER004-0273 - DER004-0278. | 143 |
| 10 | 87-page Annual Capacity Report June 1987 HQ0002704 - HQ0002791. | 150 |
| 11 | 19-page memorandum to Lake Barrett from Ronald Milner dated Sep 9, 1987 PNL 102-0359 - PNL 102-0377. | 153 |
| 12 | 25-page memorandum to various from Samuel Rousso dated January 28, 1988 PNL 108-0507 - PNL 108-0531. | 155 |

Article V, there is a sentence that says a paragraph has been deleted and it is now covered by the new provision on Exchanges.
A Uh-huh. (Witness answers affirmatively.)
Q. Do you recall consideration of -- of addition of this exchanges provision to the standard contract?
MS. POWELL: Objection. Vague.
THE WITNESS: I'm reading it to see if it jogs my memory. I don't have an immediate recollection of -- of this.
Q. (By Mr. Shapiro) Let me also direct your attention to the actual exchanges language in the standard contract.
Have you had enough time to read that discussion of exchanges in the --
A. Yeah, I -- I think I have a general recollection now of --
Q. And the language in the contract itself, it's on 16601, the third column at the bottom of that column, Subsection E?
A. Uh-huh. (Witness answers affirmatively.) Okay, I have some recollection now.
Q. What do you recall about consideration of the exchanges provision?
MS. POWELL: Objection to the extent it



calls for a legal conclusion.
THE WITNESS: That a strict interpretation of "oldest fuel first" would mean that, you know, assemblies are discharged one at a time from a reactor. And so you could have an assembly that was -- the very first one that was discharged that might be put in location X in this pool. The next one may be put in a position removed from X. Third one might be put somewhere else.
These things may get shuffled over a period of years to -- to just control heat loads. And then as pools were reracked, and/or -- and storage outside of the reactor pools, that eventually you could have a storage cask that might have a very old assembly in it, to a more recently discharged assembly, and so forth, such that a -- a strict taking of the oldest fuel first from reactors would be very difficult to implement.
And so we needed to have some flexibility in the system to allow common sense to be used in terms of -- of what specific assemblies; a serial number, we took from which utilities and -- and when. So that "oldest fuel first" was -- made sense in terms of allocating tons of fuel from



which reactors and -- in a general sense. But when it came down to specifically which assemblies we took from where, when, it didn't necessarily make -- make sense. That was one component of -- I believe it was this exchange provision.
Another component may have been -- may, as I don't specifically recall -- to allow utilities to -- to trade amongst themselves, as in -- as in credits, where -- whereby if a -- a utility had made provisions through storage outside the pool, like dry storage casks, that -- that I was responsible for developing, and were able to accommodate essentially their lifetime discharge of fuel, they could be entitled to ship.
But they might have a -- there might be another utility that was much more anxious to ship, for whatever reason, and be able -- you know, would be able, then, through this exchange provision -- this may not have been the provision. I just recall having some discussion that -- from a DOE standpoint on what we accepted, it didn't really matter to us. If utilities wanted to work these things out in a way that helped ratepayers, there is a win/win for utilities, for utilities to exchange these things. As long as it didn't



impact us or increase costs overall -- it wouldn't make sense that we'd have to, you know, pick up fuel here necessarily and go to this other utility down South.
So that you could see how, you know, it would deoptimize the transportation system or costs or otherwise deoptimize or increase costs for the disposal system. As long as it didn't impact that, that -- that we were open to utilities exchanging rights to ship.
Q. Do you recall whether you had any expectation that if utilities would exchange their -- their acceptance allocations, that -- that such exchanges would increase transportation or other costs?
A. At least when I was at RW, I was much more focused on trying to provide a capacity to accept. And these were, in my mind, nuances to be dealt with later. But first we had to provide a -- a capacity to -- to receive significant quantities; I mean, robust capacity to -- to begin receiving fuel.
Q. What do you mean by "significant quantities"?
A. I mean, being faithful with the intent of the -- the Nuclear Waste Policy Act as we understood it,

and that was to implement a system for receiving fuel from -- from the utilities.
Q. Do you ever recall anyone saying if -- RW at the time that the contract was passed or even some later time, that DOE could meet its obligations to utilities under the contracts if it took one fuel element in -- in 1998 --
MS POWELL: Objection to the extent it calls for --
Q. (By Mr. Shapiro) -- and then waited for a long time before it took any more spent fuel?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
You can answer.
THE WITNESS: I vaguely recall some people suggesting that -- that that could be done. I don't recall it having -- that idea having any credibility within the management circles, that that would be consistent with the intent of the Waste Policy Act.
Q (By Mr. Shapiro) Going back to the exchanges provision, I think I -- I asked whether or not there was a concern that the exchanges provision might increase transportation costs. Do you recall, was there -- was there a countervailing



consideration that exchanges might actually result in transportation costs going down because the -- it might actually improve the -- the -- the order or the places to which Department of Energy would have to go to get spent fuel?
A. Yes.
Q. What -- what do you recall about that consideration?
A That depending on the mode of transport and the receipt capabilities of -- of the system. And I would say the system would include potentially a monitored retrievable storage facility in addition to a geologic repository facilities; that the overall costs of the system would be affected by how much fuel we took from utilities, where and in what sequence.
And -- and I guess just -- just common sense would say, for example, if we were to ship by unit trains -- are you familiar with that -- what a unit train is as opposed to shipping in general commerce?
Q. I'll ask you to clarify, at least for the record. I might have a general sense, but I want to make sure that -- that we have it on the record what you're saying.



A. It's just to illustrate that it -- there are a number of variables that affect the overall cost of the system. And to -- to minimize the overall cost, if you were to have a -- a train that was dedicated just to shipping -- taking fuel, you wouldn't want that train to just pick up one cask at this reactor, drive -- you know, go down to Florida, you know, pick up one there, go off to the North -- Pacific Northwest, pick up something there and then come back and -- you would want to take as much as you could while you're at one location, and maybe if there are other stops along the way between there and a repository or MRS, it might make sense to pick up that fuel, if it's on the way, as opposed to taking a little bit from here or a little bit from there and so forth.
On the other hand, if you're shipping by truck, it may not make nearly as much difference in -- in terms of how much you take from where when; that as far as an MRS or a repository is concerned, it doesn't know where the -- in terms of just quantities, where the fuel came from. It just -- how much, how hot is it, does it meet acceptance criteria. And since it's coming by truck, it doesn't matter if it came from 1,000



miles away or 50 miles away. And if it's driven by truck it's going to cost the same no matter what. So it's a -- it's a whole different equation than if it's by rail.
Then by rail, it depends on whether unit trains or special trains or general commerce. It has a big bearing on the cost of transport and -- and it would be influenced by, you know, what -- by these trades.
Q. Was it RW's expectation that the trades, as you've termed them, make exchanges of approved delivery commitment schedules by utilities, would make it more likely that DOE would be able to use larger train-based shipments that would be less costly than -- than if the oldest fuel first system was strictly followed?
A. My recollection, just in general, was it was intended to allow us to optimize the system, to allow common sense to prevail, and -- and minimize the overall cost to the utilities and ratepayers.
Q. And the expectation was that -- was that that exchange provision would work, that utilities that -- that needed or wanted, for whatever reason, the earlier acceptance slots would be able to exchange with others to get them?

Page 62

A I'm sorry. Your question is --
Q. Was it, you know, RW's expectation, as you recall it, that the exchange provision would work and actually enable utilities to optimize their deliveries to -- to RW?
A. I mean, the converse would be, would we put out something that we didn't think would work?
Q. Well, I'm asking you the question. Was -- was it your recollection that you thought it would work?
A. I didn't personally put it out. I have to assume that -- that the people that I work with who put it out would not have put it out if they didn't think it would work.
Q. Do you have any recollection as to what your expectation was about the utility of the exchanges provision?
A. My only recollection was, providing flexibility was -- was good. A strict interpretation of oldest fuel first would create -- would increase costs unnecessarily for the system.
Q. And --
A. I say a strict interpretation going back to my previous explanation, that if you literally went out and sought the oldest fuel discharged in the system, that's got to be number one. And then

Page 63

number two into the MRS or -- had to be this other assembly over in -- you know, other part of the country and we had to take that next, that that would be a -- would increase the cost to the overall system.
Q. That strict interpretation of oldest fuel first would increase costs for both the waste management system and utilities?
A. Following the principle of full cost recovery, yes.
Q. Let me move on to a different topic, to something called emergency deliveries. Let me see if I can jog your recollection by directing you first to the comment section of the Final Rule. This is on Page 16592 of that.
And emergency deliveries are discussed at the bottom, the second column, that last paragraph there that carries over to the next column. The paragraph notes complaints that some utilities wanted a definition of emergency delivery, which the Department of Energy decided not to put in, but then it gives one example of a possible situation that would be deemed an emergency delivery. One of --
Do you recall that consideration of that

Page 64

issue of emergency deliveries?
A. Not specifically, but reading the language, it's -- I think the example is clear.
Q. Let me ask you actually about the example. The example which the language in the -- in the text says, "which a delivery is needed to permit licensed reactor operations to continue."
In your mind, does -- does that include a -- a reactor whose spent fuel pool is -- is filling up or would be full if it didn't otherwise have an opportunity to deliver spent fuel to the Department of Energy?
A. Recognizing that pools can be reracked and so it could be full, but still not necessarily -- it doesn't mean that the capacity can't be expanded and/or storage capacity added outside the pool. But that there are conditions where if there is physically no place to discharge fuel from the reactor, then the -- the fuel -- they can't generate any more fuel. In which case, they cannot operate because that -- of course, operation generates fuel.
So for any given reactor, there could -- could come a point at which they could no longer operate because they would have no place to

Page 65

discharge the fuel to.
Q. Let me ask you about another provision that's mentioned in the comment section on the same page. In the first column, the next-to-the-last paragraph in that column, it notes that "at the request of a number of commenters, a new provision has been added" referring to "an annual report for planning purposes setting forth the projected annual receiving capacity for the DOE facility."
Do you recall consideration of adding that provision to the standard contract?
A. Do I recall --
Q. Do you recall consideration -- first of all, let me -- let me ask: Do you recall consideration of the issue whether or not to add that language to the standard contract?
A. I don't recall the arguments as to whether or not we should add that language or not.
Q. Do you have a recollection of what the purpose of that -- that provision was?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
You may answer.
THE WITNESS: I would only surmise, based on what I'm reading here, what the intention

Page 66

was. I don't have any specific recollection of -- at the time of -- of that, but I'll be glad to, if you'd like me to, to tell you what I think it was a -- why it was done.
Q. (By Mr. Shapiro) What do you think?
A. It was for planning purposes, recognizing that as we -- we can project how much we'll be able to take, when. The closer -- you can do it ten years in advance of when a repository or MRS is open. And that would clearly be a -- an estimate; that a lot of things can happen in ten years. The closer you get to when you can actually open, the better an estimate we would be able to provide. After it is -- it is open, you'd be able to learn from experience, just how much you could receive when, under what circumstances, and be able to further refine an estimate.
So my, I guess, conjecture or understanding of -- of this would be this reflects the realities of -- of a planning process; that there's benefits to -- to the utilities, benefits to -- to DOE, to set up a regime that -- whereby we are refining our -- you know, our estimates of receiving capacity on some periodic basis, to the help utilities with their planning, for their planning

Page 67

purposes, and that would in turn help the -- you know, optimize the -- minimize the costs of the overall system.
Q. Do you recall a term called "annual capacity report"?
A. Vaguely.
Q. What do you recall about annual capacity reports?
A. Pretty much the same as what's discussed in this -- in this particular paragraph, that -- that that was intended to forecast how much we could take in any given year. It's based on the best planning estimates that we could provide at any point in time.
Q. Did you have a role in developing any of the annual capacity reports?
A. I suspect so. I just -- I don't recall specifically to what extent or how, even.
Q. Do you recall whether there was ever consideration that annual capacity reports would create a -- a binding obligation on the part of the Department of Energy to take that much spent fuel from utilities in -- in the noted years?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
But you can answer.

Page 68

THE WITNESS: I don't recall how the -- the numbers in that report were to be used --
Q. (By Mr. Shapiro) Do you --
A. -- if it was strictly for planning or if it was for some -- for some other purpose.
Q. Do you -- do you ever recall consideration within RW that annual capacity reports could be used to control and, in fact, limit RW's obligation to take spent fuel from utilities?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
You may answer.
THE WITNESS: I don't recall.
Q. (By Mr. Shapiro) Mr. Klein, I want to direct your attention to another part of the comment section of the Final Rule publication with respect to another term. This one is on Page 16593. It's the next page, first column of that page. The first new paragraph of that column refers to a section, "gives priority to spent fuel high-level waste from permanently shutdown reactors."
Do you recall consideration of that issue?
A. Vaguely.
Q. What do you recall about consideration of that issue?

Page 69

A. I recall what this paragraph says as being a -- a general issue, where there was some disagreement as to whether or not we should give priority to -- or how fast we should be obligated to take fuel from reactors that are shut down.
Q. Do you recall the consideration within the Department of Energy to -- to decide to -- to keep that priority for -- shutdown reactor provision in the standard contract?
A. No, I don't recall.
Q. Let me direct your attention to the specific language in the contract about that priority provision. It's on Page 16602. It's near the bottom of the first column there, the column right above the Subsection 2. I want to focus your attention on the word "may" where it says "priority may be accorded" to removal of spent fuel high-level wastes from a permanently shutdown reactor.
Do you recall any consideration of how RW would -- would implement that "may" term, under what circumstances it would accord such priority?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
You can answer.

And to curtail the buildup at any one time, you have to receive as -- as much as was being discharged To reduce the buildup, the legacy, you'd have to receive at a rate faster than what is being generated.
And so as -- as engineers trying to design the system, it would seem reasonable that we want to at least take fuel at the rate of -- of discharge.
Q. It sounds reasonable. Do you have any recollection as to why that -- that suggestion wasn't put into place in the contract?
A. I don't recall.
Q. Do you recall whether the -- the decision was made to not be that specific and just stick with the as fast as possible or as soon as practicable language that we talked about earlier?
A. I only -- I vaguely recall discussions. It comes back to the -- to the practicality. You know, recognizing that in putting in place a system like that, you have a ramp-up curve. You don't just at day zero start taking at some -- at some rate. And in particular, with the geologic repository and other things, there's some uncertainty in people's minds regarding practicality, at what



rate did it make sense to -- to receive, over what periods of time. And that even at the time of receiving, maybe the generation rate is -- is down like (indicating). And so that, you know, that might be satisfying to some, but it wouldn't do much to -- to alleviate the legacy of -- of the huge buildup.
So you get into what makes sense to put into contracts is binding commitments versus, you know, practicality of trying to design a system -- there are just a lot of considerations. And I just have no recollection of ultimately who decided what to put into the contracts and on what basis Whether it was legal considerations or technical or political or whatever.
Q. Let me just clear up one thing for the -- for the written record. In your last answer, at one point you referred to the thought that by the time Department of Energy was actually taking spent fuel, that discharges from utilities could be down to -- I think you said, "like this." And for the record, to reflect that you were putting your fingers close together to mean that the discharge would be small?
A. Small, yeah.



Q. Let's go back to something else you said in that answer about the consideration of ramp-up. The understanding was that on day one of Department of Energy's acceptance, that they'd be -- that Department of Energy would be accepting spent fuel that -- at a somehow lower or slower rate than it ultimately would get to. Is that correct?
A. Correct.
Q. What do you recall as to the -- as to the consideration of how long it would take between the start of facility operations and when Department of Energy would get to full performance level?
A. From the standpoint of what the utilities saw, it would depend on whether there was monitored retrievable storage capacity in the system or how much storage capacity would be at a geologic repository. Given that, you know, the -- the emplacement rate at the repository was -- I guess a number of considerations to -- to -- to be thought out that hadn't yet been thought out, that would govern at what rate we could emplace things in the repository.
Q. So the expectation was that the ramp-up would be faster if a monitored retrievable storage system



was used as opposed to -- to only a repository?
A. Correct. I guess -- I mean, I'm trying to distinguish in my mind what would be in my mind versus what was in the rest of RW's mind, and I'm just -- you know, I'm just recalling kind of engineering thought process of designing an acceptance rate for a system that is -- involves technology that is much more demonstrated than a technology like deep geologic emplacement that is -- for which we have little experience, so I could design an acceptance rate with more confidence for a monitored retrievable storage, ramp-up rate.
And so -- and you could design that to be as -- as robust or aggressive as -- as what was desired; whereas, I think there were more limitations when -- when you come to designing an emplacement rate for deep geologic repository.
Q. Do you recall, was there ever consideration what could be deemed, I suppose, as an in-between idea of having something called buffer storage at the repository, receiving spent fuel but that doesn't necessarily go into the --
A. Right.
Q. -- into the mountain that fast?

Page 78

A. That's what I referred to: A storage capacity at the repository would be that buffer storage.
Q. Do you recall, was there consideration that by providing that storage capacity, that you could have a repository-only system and still ramp-up and take the spent fuel as fast as you could if you had an integrated MRS in the system?
A. I recall at least thinking out different options there and the -- with an interest towards minimizing cost to the ratepayers and -- and utilities, that depending on how one was to provide that -- that storage capacity, it could be reasonably efficient or inefficient.
For example, if we were to deploy a system of transportable storage casks that could be transported -- store fuel at the reactor sites, at any point in time come pick it up, transport it by truck or rail, and that same system is just used to store it at the repository, then that it would not require a -- a large capital investment in buffer storage capacity at the repository. That overall system could end up being more expensive than some centralized large storage capacity that would involve some capital investment, but under the considerations of biasing a repository, a

Page 79

siting decision, if you were to try to say we're going to store a lot of fuel there before we actually open the repository.
So there are just a lot of considerations that -- that went into trying to determine how much capacity should be at a repository and in what form over what time frames.
Q. Is it fair to say that there is a general intent within RW to -- to ramp-up at whatever facilities, whether it's MRS or repository without MRS, as -- as fast as technically possible?
MS. POWELL: Objection Vague
You can answer.
THE WITNESS: I would say there was certainly an intention to comply with the -- with the letter and spirit of the law while minimizing costs to the -- to the ratepayers and utilities.
Q. (By Mr. Shapiro) When you say "the spirit of the law," what are you referring to?
A. The spirit of the law being deploying a system starting in 1998 that was -- that would be -- that would start taking significant quantities of -- of -- of spent fuel.
Specifically, it -- I think we're beating around the bush. Maybe I should consult with the

Page 80

lawyers But I think what you're getting at --
Q What do you think I'm getting at?
A. I think you're -- you're asking me did someone think we could be meeting the spirit of the law just by taking one spent fuel assembly or pin and say, Ha, we did what we were supposed to do.
Q. I think we discussed that previously, before. But you're saying your recollection is no?
A. Correct, that I don't recall anyone thinking that that would be a very satisfying, even though some -- a lawyer might And I don't recall anyone doing so. A lawyer might argue that that met the letter of the law. I think the -- everyone that I was worked with, associated with, did not think such an arrangement would meet the spirit of the law.
Q. Are you aware that that's one of the arguments that the -- that the Federal Government is making in -- in our case -- in the cases that -- that are the subject of this deposition now?
A I don't know what arguments the Federal Government is making, no. Honest.
Q Let me switch topics a little bit again to something called "failed fuel." Do you recall the term "failed fuel"?

Page 81

A. Yeah.
Q. Do you recall that the -- that the term "failed fuel" is used in the standard contract?
A. You'd have to refresh me.
Q. Let me turn your attention to Page 16606.
A. (Witness complies.)
Q. The second column there, starts Appendix E, which has General Specifications and -- and actually failed fuel was discussed in more detail on the third column, Subsection 6, which refers to particular types of failed fuel.
A. Okay.
Q. Do you recall the development of the -- of the definitions of failed fuel in the standard contract?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
THE WITNESS: I vaguely recall discussions on it, but I don't recall why.
Q. (By Mr. Shapiro) What's your understanding of what failed fuel is?
A. We'd call them leakers. Defect or something -- a leak in the cladding such that the cladding no longer provided containment of the fission product -- fission product gases.

Page 82

Q. Do you recall, was there -- was there ever consideration that -- that Department of Energy might take failed fuel at some different time or at some different schedule than -- than other spent nuclear fuel?
A. Again, I don't recall specific discussions with anyone, but I can -- I have to believe that my current understanding or recollection of failed fuel and considerations of it derive from my involvement in it back then. So I can tell you what I now think of failed fuel and I guess reasonably assume that it's based on whatever I was involved in back then.
Q. Well, what -- what do you now think or -- again, understanding the difficulty of -- of trying to pinpoint the timing of a recollection of -- of -- but you also did other work at RW -- what the expectation was with respect to the timing of when failed fuel would be taken from utilities?
A. Failed fuel would typically be treated differently than -- than other fuel. It would have to get packaged differently in a utility basin to prevent, you know, leakage from contamination of the pool and so forth. So my -- I would think that it -- since that involves additional

Page 83

packaging, and since we wanted to take as much fuel as we could, as fast as we could, you'd want to ship large density of fuel first.
So, you know, to the extent failed fuel would represent a lot more packaging per unit of fuel, that would be a low-density type And so, you know, as -- as a system designer, you'd say, you know, it's -- as long as it's being stored somewhere and it's okay, that would not be our highest priority in terms of -- of what we would accept into the system.
Q Do you --
A. Again, that's just based upon -- I don't recall any going back then.
Q. Do you have an understanding as to what percentage of nuclear plants have failed fuel? Is this something that everybody has?
A. I'd say most have some failed fuel. You have thousands of these individual fuel rods going through the reactors, and some percentage of them would be expected to have some defects; you know, hot spots or whatever would cause them. And so I guess, depending on the, you know, white-water reactor or boiling-water reactor or how hard they push the fuel and -- and things like that would --

Page 84

would determine how much failed fuel they would have. But I would -- it would not surprise me that -- if -- if every utility had some.
Q. I think you said before -- and I don't want to mischaracterize -- that taking failed fuel wouldn't be the highest priority if it's otherwise okay stored where it -- where it is. What about in the -- in the instance of a permanently shutdown reactor that wants to -- to decommission its facilities? Do you have any recollection whether RW would have intended to have left that failed fuel only to be taken at some later time?
A. I -- I don't recall.
Q. Would leaving that failed fuel at a permanently decommissioned reactor, would that be consistent with your recollection of the -- the decision to leave the process in the standard contract, providing for priority shipments of spent fuel from permanently shutdown reactors?
MS. POWELL: Objection Vague.
THE WITNESS: If it's permanently shut down, I would -- I would think that a utility would want us to take it all, as fast as we could And whether left it -- and whether it's failed fuel before the other fuel, I'm not -- I'm not --

Page 85

it's not clear to me why it would make a difference.
Q. (By Mr. Shapiro) Well, I'll represent to you that I think you're right about the utility wanting the Department of Energy to take it all.
Do you have -- would it be consistent with the Department of Energy's intent to take it all --
MS. POWELL: Object to the --
Q. (By Mr. Shapiro) -- from a permanently shutdown reactor?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Yeah, I don't think I understand your question.
Q. (By Mr. Shapiro) You recall that we talked earlier about the provision in the standard contract for priority shipments for permanently shutdown reactors?
A. Right.
Q. Would it make sense to have a provision that says you go to the permanently shutdown reactor, get priority, and take their nonfailed fuel, but otherwise leave some small quantity of failed fuel there and still delay decommissioning that

Page 86

reactor?
A. That wouldn't make sense to me.
Q. Do you think that would make sense to anybody at RW to do that?
A. I don't know. I don't recall any discussions of that.
Q. Would it be your expectation in the future, when RW eventually does start taking spent fuel from utilities, that it will ultimately take failed fuel from shutdown reactors expeditiously to enable such reactors to shut down?
MS. POWELL: Objection to the extent it calls for speculation.
But you can answer it.
THE WITNESS: I would think so.
Q. (By Mr Shapiro) And that's because it would make sense to do that?
A Well, the -- I would infer from legislation or the -- or the words that you showed me, that giving preference to decommissioned reactors, that the intent was to allow them to fully decommission and disposition the reactors. And to the extent that there is fuel remaining, whether it's failed or unfailed, that would constrain the -- the decommissioning process; hence, it would make

Page 87

sense to take it all so the utility could get on with the decommissioning.
Q. And if a utility had placed its failed fuel in containers licensed by the NRC for transport, can you think of any technical difficulty that RW would have in taking that spent fuel from a utility?
MS. POWELL: Objection. Speculation.
But you can answer.
THE WITNESS: Yes, I could think of -- of reasons why they would not want to take that early.
Q. (By Mr. Shapiro) Why would that be?
A Because it could require special treatment and handling that would either interfere or take away from taking larger quantities of fuel from other -- other places. So in general, just it could slow down the rate of bulk -- or the average receipt rate of fuel from the -- from the system in general.
Does that make sense?
Q. The concern with special handling, would that be at the utility or at the Department of Energy receiving facility? Again, assuming that the spent fuel is -- is in an NRC licensed --

Page 88

A. I was answering from the standpoint of Department of Energy receiving and -- and either further packaging or whatever it needed to do with -- with failed fuel.
Q. Maybe I don't understand how -- how spent fuel is -- is transported. If it's -- if it's in a -- if it's in a container, does it matter whether -- does it matter particularly what's in the container, as to how you carry the container away?
A. No. If it's in a container that's certified to transport it, I don't see where that would be a problem. But the problem would be what do you do after you receive it? Are you just going to continue storing it in that container? That probably would not be a problem unless you're limited to how many containers you can have stored.
If you're to dispose of it and if space is a premium at the repository or heat-loading considerations are a consideration, such that you either need to have a minimum amount of -- of kilowatts per package to -- to maintain a dryness, are you going to have less than a -- you know, whatever. That it would just be a -- could have to be handled differently than unfailed fuel.

Page 89

Could have to be packaged differently. But it would just require potentially some special consideration that, again, could detract from the -- you know, the -- the overall system's operation or receipt rate.
Q. Let me ask next about another subject that's of particular interest to permanently shut down reactors. And we touched on this briefly before: Greater than class C waste.
You understand that in the -- in the decommissioning of a commercial nuclear reactor, that one of the -- the results is a -- is a small amount of greater than class C wastes?
A I'm not personally familiar with how much, if any, would be generated in the decommissioning of commercial reactors, no.
Q. Do you understand that at least some greater than class C waste is created?
A. I understand that some could be.
Q. And you understand that a -- a reactor can't completely decommission its facilities until it finds a means of -- of getting rid of the greater than class C wastes?
A. I understand there's limits on how far a utility can go in decommissioning a -- a reactor without

Page 134

you know, I would not venture into what a legally binding commitment is.
Q. (By Mr. Shapiro) That wasn't an issue that -- that you recall focusing on at all when you were at RW?
A. No. What we were focused on, again, was -- was a spirit of wanting to -- to deliver. It wasn't driven by lawyers or legal considerations or, you know, that -- it wasn't contracts. It was driven by, you know, professionalism and -- and just wanting to -- to do our job, I guess.
MR. SHAPIRO: Is now a good time to take a break?
MS. POWELL: This is a good time.
(Recess 2:21 - 2:33 p.m.)
(Exhibit No. 8 marked for identification.)

EXAMINATION (Continuing)
BY MR SHAPIRO:
Q Mr. Klein, I'm going to turn to a new document. It's been marked as Exhibit 8 It's titled "Informal Note." It appears to have your signature on the third page.
If you could take a look at this exhibit and

Page 135

tell me if you recognize or recall this -- this note at all.
A. (Examination of documents.) All right.
Q. Do you recall this note?
A. Only vaguely.
Q I'd asked you about some individuals previously. One person who I don't think was on that prior list that's on the To list on this note is R. Gale. Do you recall who R. Gale was?
A. Roger Gale.
Q. Do you recall what Roger Gale's role in RW was?
A. He was there for a -- say, a brief stint -- it might have been a year or so -- I think in kind of a planning, integration, intergovernmental-type role. I don't recall specifically. He didn't seem to be a major factor. He was -- he was there for a while and then gone.
Q. This informal note -- it's the middle of the first page -- it says, "The purpose of this paper is to stimulate thought on alternative commitments that may be more responsive to our contractual obligations, the 'spirit' of the law and the 'letter' of the law."
Do you have any recollection as to why -- why you were trying to stimulate thought on those

Page 136

issues? Why that would have been under your responsibility at RW?
A. I think I was advancing the idea of a monitored retrievable storage in addition to -- to just a repository. That, I was convinced, would add significantly more confidence to our ability to deliver on our commitments.
Q. Now, above the paragraph that I was reading from, about the purpose of the paper you have written there that what -- up to that point, what -- what RW's commitments have been envisioned as. And the first bullet note there is, accepting waste starting in 1998. And it notes acceptance rate 400 MTU, increasing to 900 later, and some other provisions of the other bullets.
Do the provisions in -- of the commitments as they are referred to in this memorandum, is that consistent with your recollections?
A. Up to that point, that's what we were working to do, is minimum commitments, if you will.
Q. The fourth bullet down, it says provisions would be made to give shutdown reactors some priority. Do you have any further recollection as to what was meant by "some priority"?
A. My thinking would have been that oldest fuel first

Page 137

and completely, you know, eliminating the inventory. Shutdown reactors could be competing priorities. And something like an MRS that you might not have to get into that -- into that trade-off that -- that you could deinventory shutdown reactors without it necessarily being at the expense of other reactors that were having pain.
Q. When you say "other reactors that were having pain," you're referring to reactors that would otherwise have to incur some additional expense to deal with spent fuel like reraking or dry cask storage?
A. Correct. That, in my understanding or sense of the law, was this is to be a -- a solution to minimize, you know, the cost to the utilities and -- and ratepayers, and, you know, we're working to deliver on that.
Q. And part of the reason for your writing this paper is you -- you were advocating what you -- you saw as an even better way to deliver or a fuller way to deliver on those principles to the utilities?
A. We have certain minimum commitments, but the potential to -- to do better.
Q. Minimum commitments are those listed above the

Page 138

Purpose paragraph and the opportunity to do better
is what's discussed below?
A. Minimum would include those, which is -- I suspect
I'm paraphrasing and not necessarily, you know,
comprehensively, but for some reason I singled
those out.
Q. Do you have any recollection of what happened to
-- to the ideas in this informal note?
MS. POWELL: Objection. Vague.
But you can answer.
THE WITNESS: My recollection is that as
we got to further trying to optimize the system,
that these things were considered.
Q. (By Mr. Shapiro) Do you have any recollection,
were you encountering resistance to these ideas?
Were you trying to build a case for something
internally as compared to those that were opposing
these ideas? Or was this just more a study piece?
A. More of a study piece. You know, just trying
to -- to project, think out, what it would be
like, and just my thought as to just additional
things that -- that we should think about.
Q. On Page 2 at the top, there's a reference to
"central questions." And the third one down says,
"Should fuel be shipped in campaigns from a given

Page 139

reactor, and if so how large a campaign?"
Is this what you were referring to before
the -- before the lunch break, when you were
talking about different costs for -- for following
oldest fuel first versus given priorities?
A. Exactly. If you're picking up fuel from a -- from
a reactor and under some scenarios it made sense
to take as much as you could while you're there
rather than to have to come back later,
particularly if you're talking train/rail
shipments.
Q. And that would make sense both for the utilities
as well as the program because of the -- just
potential disruptions to the site of having to
deal with a pickup of spent fuel?
A. Well, it would make sense certainly for that
particular utility. They would want to get rid of
as much as they could, as fast as they could. But
that could be at the expense of another utility.
And, you know, we were -- we were not at a level
of thinking at this point of how that would work
yet.
So there were just a lot of issues on the
table, then, that things to -- that we needed to
think out. And at that, we didn't know if we were

Page 140

shipping by rail or truck. In fact, things like
this could go to consideration as to which way we
should be pushing. So... (Pause.)
Q. Do you recall, would this informal note, would
this have been part of the development of the --
of the Mission Plan or would this just have
been -- or not necessarily connected to the
Mission Plan, just independently part of the work
in developing strategies for -- for getting the
job done?
A. Yeah, I would have -- I think this would just be a
normal evolution of our -- of our thinking as
we -- as we are further proceeding with the design
of this -- of this system.
Q. Do you recall what happened to the idea of having
an integrated MRS as part of the waste management
system?
A. My recollection is that it -- it was supported by
-- by management, that we pursued siting of an
MRS. In the end, a decision was made to focus on
Oak Ridge, but that ran into, in the end, a change
in governors and other things happened. And
politically it was -- it just didn't -- wasn't
able to gain sufficient support, considering the
opposition of the Governor of Tennessee.

Page 141

Q. Do you recall the -- the impact to the
consideration of monitored retrievable storage of
the amendments to the NWPA in 1987?
MS. POWELL: Objection to the extent it
calls for a legal conclusion.
But you can answer.
THE WITNESS: I don't recall offhand.
Q. (By Mr. Shapiro) Do you recall generally the
amendments to the Nuclear Waste Policy Act of
1987?
MS. POWELL: Same objection.
THE WITNESS: Not offhand.
Q. (By Mr. Shapiro) Do you recall that the
amendments linked the Department's ability to move
forward with an MRS to achieving certain
milestones with the repository --
MS. POWELL: Same --
Q. (By Mr. Shapiro) -- and also said that -- that
the MRS couldn't be in the same location as the
repository?
MS. POWELL: Same objection.
THE WITNESS: I remember not being in
the same location. I don't remember the other one
you just --
Q. (By Mr. Shapiro) There was another provision



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

# KLEIN, SUSAN

# Susan Klein

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : I
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 274

Page 2

THE UNITED STATES, :
Defendant. :
-----------------------------------------X

Deposition of Susan Klein
Washington, DC
Wednesday, April 24, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144539

Page 3

April 24, 2002
9:37 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

# Susan Klein

Page 53

MR. HIRSCH: All right. Well, let me just say that a letter from a separate governmental agency to the Secretary of Energy I don't think is subject of a privileged communication or is a privileged communication or certainly covered under the work product privilege.

MS. POWELL: Again, our position is that it's covered or our understanding of that arises from her work product, her position as counsel at the time, and it is way beyond the scope of what Ms. Klein is here to testify to today. So she's ready to answer your 30(b)(6) questions.

BY MR. HIRSCH:

Q. Ms. Klein, you have an understanding as to what the purpose of the utilities submitting DCS forms is?

MS. POWELL: I'm going to object to beyond the scope, but you can answer as to your personal knowledge.

THE WITNESS: I think that's what you just asked me. Yes, I have an understanding.

BY MR. HIRSCH:

Page 54

Q. And what's your understanding of the purpose of the utilities submitting DCS forms?

MS. POWELL: And, again, just for the record, we offer Mr. Pollog on this topic, but you can answer as to your personal knowledge.

THE WITNESS: I think --

MR. HIRSCH: Wait. Hold on a second.

MS. POWELL: Topic number 2 was the role and purpose of the DCSs, and we offered Mr. Pollog as our 30(b)(6) witness. Ms. Klein can certainly testify to her personal knowledge. I'm not going to instruct her not to answer.

MR. HIRSCH: All right; that's fine.

MS. POWELL: Okay.

THE WITNESS: Should I answer it?

BY MR. HIRSCH:

Q. Yes, you can answer it.

A. It was the process by which we established the utilities placed in the cue.

Q. What do you mean, established the utilities placed in the cue?

MS. POWELL: Same objection. You can

Page 55

answer.

THE WITNESS: Well, it was the method by which the department committed to accept the utilities' spent fuel. It's a delivery commitment schedule.

BY MR. HIRSCH:

Q. And did you have an understanding of what the Department of Energy was going to or was supposed to do with the delivery commitment schedules that were submitted by the utilities?

A. Yes.

Q. And what is that?

A. We were supposed to approve or disapprove them within three months.

Q. All right. Beyond the question of whether you approved or disapproved them, did you have an understanding or do you have an understanding what the DOE does with the forms it gets from the utilities in terms of what function they serve?

A. Yes.

Q. And what is that?

A. Well, they look it over for general accuracy to see that the addresses and signatures are correct.

Page 56

They look to see that the allocation is consistent with the current APR and ACR. They look to see that the fuel is standard. And then as appropriate they respond to the utility.

Q. Okay. I guess I'm getting in a different issue, Ms. Klein.

A. Okay.

Q. After all that occurs and the DOE has approved or disapproved the DCS forms, and let's assume that they've approved the DCS forms in this instance.

A. Uh-huh.

Q. Do you know what purpose the DCS forms as filled out serve for the Department of Energy?

MS. POWELL: I'll, again, object to beyond the scope, but you can answer to your personal knowledge.

THE WITNESS: I think this is our legal obligation of what we're supposed to pick up from the utility. That's the -- and then they're supposed to submit a final DCS 12 months before the final pickup.

BY MR. HIRSCH:

Q. Well, do you have any understanding about what

# Susan Klein

Page 57

role the DCS forms that are filled out by the utilities play in terms of the Radioactive Waste Management Program?

MS. POWELL: The same objection, beyond the scope, but you can answer.

THE WITNESS: Could you repeat that. Sounds like the same question, but I know there's a different word in there.

BY MR. HIRSCH:

Q. I guess what I'm just getting at, Ms. Klein, is: After the forms are submitted and they're approved, what does the DOE do with the forms? What function do they serve? That's what I'm getting at.

A. They become the legally binding commitment of the department.

Q. Do they have any role in DOE's planning of the spent nuclear fuel program?

MS. POWELL: Same objection, beyond the scope, but you can answer to your personal knowledge.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. And what role is this?

Page 58

MS. POWELL: Same objection. You can answer.

THE WITNESS: I'm thinking, actually. I'm thinking because we have -- we're planning for a greater acceptance rate once we begin operation, but those were the planning rates based on an MRS, which was limited by statute to 10,000 metric tons.

BY MR. HIRSCH:

Q. So, is it my understanding that the DOE is now currently planning for a higher acceptance rate than the acceptance rate upon which the DCS forms were originally submitted; is that correct?

A. We're planning for that, but it's for planning purposes, yes.

Q. All right. We're getting into one of the other topics, but what is the rate that the DOE is currently planning on accepting spent nuclear fuel?

A. 400 the first year of operation of a repository. 600 -- just to be sure -- the next year. 1200 the year thereafter. 2,000 the year thereafter. 3,000 the following year and then a steady state 3,000 for 10-year period. I mean, that whole thing covers

Page 59

10 years.

Q. Will you look back at Klein Deposition Exhibit 2.

A. Uh-huh.

Q. You see on the first page of the general instructions?

A. Uh-huh.

Q. It says on the When to Submit part, and I'm reading the last I think sentence. "For each allocation listed in the 1991 ACR or subsequent ACRs as appropriate, a purchaser must submit at least one DCS for the allocation of at least 63 months prior to the date that the allocation occurs (e.g., if a purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)."

Is it correct that utilities were supposed to submit a DCS form at least 63 months before the utility had an allocation in the latest ACR report from the DOE?

A. Yes.

MS. POWELL: Beyond the scope, but you can answer.

Page 60

THE WITNESS: Oh.

MS. POWELL: No, you can answer.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. And I think that you've said earlier that the 1990 -- or strike that.

You recall that the 1991 ACR had an acceptance rate that was based on a ramp-up up to 900 metric tons for the first 10 years?

MS. POWELL: Objection, beyond the scope.

THE WITNESS: I don't know that.

MS. POWELL: But you can answer.

THE WITNESS: I don't know whether it was in 1991. I know -- I don't know what was in 1991.

BY MR. HIRSCH:

Q. Do you know what the 1995 ACR --

A. Yes.

Q. -- had in terms of acceptance rates?

MS. POWELL: Let me -- I'm going to object as to beyond the scope. Just give me a moment.

THE WITNESS: I will be --

MS. POWELL: It's beyond the scope, but

Page 61

you can answer to your personal knowledge.
BY MR. HIRSCH:
Q. And what was the acceptance rate in the 1995 ACR report from the DOE?
MS. POWELL: Same objection. You can answer.
THE WITNESS: Okay. 400 the first year, 600 the second year, 900 the third year, and then steady state 900, and that was just through the first 10 years of operation.
BY MR. HIRSCH:
Q. So when the utilities started submitting DCS forms, they were relying on whether they had an allocation in what was then I guess the 1991 ACR; is that correct?
MS. POWELL: Objection, beyond the scope. You can answer.
THE WITNESS: Yes, I think. Yeah.
BY MR. HIRSCH:
Q. And I take it from your -- strike that?
Referring to the 1995 ACR rates that you just recited, I take it from your earlier testimony that the

Page 62

D OE is not planning on using those rates in terms of when it starts accepting spent nuclear fuel?
A. No. Well, once there's an operational repository, we are planning to use the larger rates that were -- that I have mentioned. I don't know if we'll be accepting it outside of a repository. That's yet to be. It depends upon your definition of accept I guess.
Q. Do you know when the last time the DOE used the acceptance rates in the 1995 ACR for planning purposes?
MS. POWELL: Object to beyond the scope. You can answer to your personal knowledge.
THE WITNESS: No, I don't.
BY MR. HIRSCH:
Q. I --
A. I don't know.
Q. Let me say, I don't think this one is beyond the scope because I think it relate to the acceptance rate question.
Well, I take it from your answer that the DOE is not currently planning on using the acceptance rates

Page 63

stated in the 1995 ACR; is that correct?
A. We are planning to use the larger rates for an operational repository. If for some other reason we would accept it in a different way, we view the 4, 6, 9 as the binding legal obligation.
Q. And why is the 400, 600, 900 considered to be a binding legal obligation?
MS. POWELL: Object again, beyond the scope. You can answer.
THE WITNESS: Those are the rates in the 1995 ACR upon which the current DCSs are based and the department views the DCSs as the binding legal obligation of the department.
BY MR. HIRSCH:
Q. You mean the approved DCS is binding?
A. Approved. Yes, thank you. Approved.
Q. Will you look at page 2 of the general instructions, Ms. Klein.
A. Yes.
Q. And in particular, I'd like you to look at paragraph 7(b) of the instructions.
A. Uh-huh.

Page 64

Q. You see where it says: "Once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against that allocation. The DCS does not restrict the purchaser to deliver the specified SNF that was the basis for the allocation."
Do those instructions reflect that once a utility had a place in the ACR cue by virtue of the age of its spent nuclear fuel, it could supply any spent nuclear fuel from any reactor as long as it met the basic contract requirements?
MS. POWELL: Objection to beyond the scope. You can answer.
THE WITNESS: Yes, any of their own reactors.
BY MR. HIRSCH:
Q. Their. You mean the utilities' own reactors?
A. I mean that utility's reactor, yeah.
Q. All right. Now, is it also correct that in terms of the DCS instructions that utilities did not have to identify specific fuel assemblies in responding to the DCS instructions?
MS. POWELL: Same objection, but you can

# Susan Klein

Page 121

Q. All right. And there was a question: "Does this document anywhere inform the reader about when year 1 is?" Answer: "I have not found such a statement in the document as to what year 1 is."

And I believe that based on your testimony, you haven't identified what year year 1 would be either based on this document; is that correct?

MS. POWELL: Again, I'll object to beyond the scope.

THE WITNESS: I haven't read the whole document in a long time. So I don't know, but I don't -- I don't know what it says as to -- but this table does not tell you.

BY MR. HIRSCH:

Q. Right.

A. This particular table does not.

Q. All right. And we looked at another table on page 4, which is Projected Nominal Acceptance Rates in Exhibit 5, and that doesn't have any years either; is that correct?

A. That's correct.

MS. POWELL: Same objection.

Page 122

BY MR. HIRSCH:

Q. All right. You see Mr. Zabransky's next or the next question and the answer. Question: "Would it be possible for a utility using that document -- the 1995 ACR -- to determine when its delivery commitment schedule was due?" Answer: "I don't believe so."

A. I see that.

Q. Do you agree with Mr. Zabransky's position on this issue?

MS. POWELL: Again, it's beyond the scope, but you can answer to your personal opinion.

THE WITNESS: I think the utilities all know that 2010 has been our projected date. So, but -- and I have not read this whole document recently. So, but based on those two tables, if you're just looking at those two tables and don't know that our projected date is 2010. But --

BY MR. HIRSCH:

Q. All right.

A. -- we have been quite vocal on 2010.

Q. All right. Well, we'll get to the vocal part in a minute, Ms. Klein, but if the DOE's position

Page 123

currently is that it's going to start in 2010, would the DCS submissions from the utility be due 63 months before that date?

A. Yes.

MS. POWELL: I'm going to object to beyond the scope. To the extent it calls for legal conclusion, but you can answer that.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. Why don't we take a lunch break.

A. That's a good idea.

(Recess, 12:08 to 1:07 p.m.)

AFTERNOON SESSION

(Thereupon, the reporter marked for identification Deposition Exhibit No. 7.)

(Thereupon, the reporter marked for identification Deposition Exhibit No. 8.)

(Recess, 1:07 to 1:16 p.m.)

BY MR. HIRSCH:

Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 7, which is a letter from Ken Petersen, Kenneth Petersen at ComEd to Beth

Page 124

Tomasoni at the Department of Energy dated September 25, 1996, and then attached to the letter are a series of DCS forms and the Bates labels for this document is COF 02165 through 2172.

Ms. Klein, do you recognize Klein Deposition Exhibit 7 to be the DCS forms ComEd submitted for proposed delivery year 2002?

A. I'm just looking for the proposed delivery.

Q. That's line 2.3.

A. Yes. I recognize it.

Q. Do you recall seeing Klein Deposition Exhibit 7 at or about the time it was sent?

A. I don't recall seeing it, but...

Q. All right. I'd like you to look at Klein Deposition Exhibit 8, which you should have in front of you. Klein Deposition Exhibit 8 is the DCS forms submitted by Commonwealth Edison company for year 2002 and these don't have a Bates label. They have the page numbers where we got them, which was from the government appendix to the Summary Judgment Motion in this case, and those appendix pages are 284 through 290.

should have said something.
BY MR. HIRSCH:
Q. Ms. Klein, was there a period in 1995 when the DOE was basically holding DCS forms to decide what to do with them?
A. There was a period, and I don't remember the exact time, but when we did hold them to figure out what to do with them. But as I say, I don't remember the exact time frame. I thought it was '96, but maybe it was. I don't --
Q. You're not sure when that time frame was?
A. No.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 11.)
BY MR. HIRSCH:
Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 11, which is a letter dated September 26, 1997 from Kenneth Petersen at ComEd to Beth Tomasoni, Department of Energy, and attached to that is a DCS form for proposed delivery year 2003.
Ms. Klein, do you recall seeing this document, Exhibit 11, at or about the time it was sent?



A. I don't recall seeing this particular document. I didn't see these documents when they came in. I only saw the DOE responses to them and that would be the time at which this would be in the incoming folder.
Q. All right.
A. In the package.
Q. And when you say these documents, you mean the incoming DCS forms from the utilities?
A. Right. There would be the letter and the attached form in the incoming, and then there would be a proposed response.
Q. And so they wouldn't -- the DCS forms wouldn't cross your desk until there was a proposed response?
A. That's correct.
Q. Is that correct?
A. That's correct.
Q. Ms. Klein, again I'm going to represent to you that Commonwealth Edison Company had not received a response one way or the other to the DCS form that was submitted as part of Klein Deposition Exhibit 11. Do you have an understanding why that's the case?



A. No, I don't have -- I do not understand why that's the case. You have not received a letter that says we cannot -- we are not able to approve?
Q. Not that we're aware of, Ms. Klein.
A. Oh, okay.
Q. Maybe the government has got it somewhere.
Will you look back at the DCS instructions. That's Klein Deposition Exhibit 2.
A. Okay.
Q. And what I'd like you to look at in particular is paragraph 7(c) on page 2. And I'm going to ask you to focus on a second couple of sentences, which read as follows: "The process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. In the event that such circumstances change, all DCSs previously approved by the DOE may need to be reevaluated by DOE and the purchasers."
Ms. Klein, is it fair to say that the circumstances have changed since this initial submission of DCS forms?



A. Since 1992?
Q. Yeah.
A. Today have the circumstances changed since then?
Q. Yes.
A. Yes.
Q. And for one thing, the DOE is not going to accept purchasers' SNF beginning in 1998, correct?
A. Physically accept it? No.
Q. Well, since we're in 2002, it's correct that the DOE hasn't accepted --
A. Right.
Q. -- any SNF since 1998 to the present; is that correct?
A. Yes. I was just trying to think about the PECO agreement, but no. Yes, we have not accepted.
Q. Well, let me rephrase it to address it.
A. No. I think the answer is that's true; we have not accepted.
Q. Is it correct that the DOE has not removed any SNF from any utility site from 1998 to the present?
A. From 1998 to the present?

# Susan Klein

Page 245

A. My --

MS. POWELL: Well --

THE WITNESS: You don't have to say anything. I'm just waiting for you to have the opportunity.

My understanding is that at the time we came up with that figure, that was approximately the utility discharge rate and that we took 70,000 metric tons and divided it by 25. Both those reasons gave us the 3,000 and then we had 4, 6, 12, too, as a ramp-up period, less transportation and all that.

BY MR. HIRSCH:

Q. Let's talk about the first reason for a minute. The utility discharge -- strike that.

The DOE had looked at the utility discharge rate?

A. That's what I was informed of. I didn't personally do that.

Q. And is it correct generally that the 3,000 metric ton rate would equal the discharge rate plus some amount to get rid of the backlog of spent nuclear fuel?

Page 246

MS. POWELL: I'm just going to note for the record that we offered Mr. Pollog on I think -- I think that you're talking about this topic, but you can answer.

THE WITNESS: I don't remember. I wasn't told about the backlog. I was informed that it was based on 3,000 was at the time the average utility discharge rate. So...

BY MR. HIRSCH:

Q. It was your understanding that the --

A. I don't know about the backlog issue at all.

Q. All right.

A. About that that accounted for a backlog.

Q. Is it your understanding that the 3,000 rate would keep up with the utility discharge rate?

A. Yes.

Q. Is that correct?

A. Uh-huh.

Q. And then I guess you mentioned the other reason or rationale. I'm sorry. What was the second rationale?

A. 70,000 metric tons, which is how much we're

Page 247

authorized to put in the first repository, divided by the life of the repository, which is 25 years.

Q. Gives you about 3,000 metric tons a year?

A. Uh-huh.

Q. Given both of those reasons, are you aware of any reason why the DOE would run the repository at Yucca Mountain at a rate less than 3,000 metric tons?

MS. POWELL: Object to beyond the scope, but you can answer.

THE WITNESS: I understand there are lots of ramp-up issues. There's transportation issues. There's utility interface issues. Casks. I mean, that could affect it, but that was our planning and what we'd like to do is be able to do that at 3,000. But I know there's lots of things that need to be worked out.

BY MR. HIRSCH:

Q. Well, assuming that all the ramp-up issues are resolved including transportation?

A. Uh-huh.

Q. Are you aware of any reason why the DOE wouldn't operate the facility at a 3,000 metric ton

Page 248

rate --

A. No, I'm not.

Q. -- over the life of the facility?

A. No, I'm not aware of any reason we would not do that.

Q. All right. You got or we saw this maybe a little earlier. In order to open by 2010, does the DOE need to essentially build a rail line from the existing rail line in Nevada to the repository?

MS. POWELL: Objection, beyond the scope, but you can answer.

THE WITNESS: That's one of the possibilities is building a rail line. The other is to have -- I know one of the counties wanted to have some sort of system through there. I think it's Lincoln County, Nevada. To have a transportation truck centrally located site. So we haven't made the decision yet. Mostly rail is our preferred alternative, but we haven't decided the routes and the methods.

BY MR. HIRSCH:

Q. So, well, is there -- is it correct that

# Susan Klein (vol 2)

Page 275

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : II
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :275 - 533

Page 276

THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Susan Klein
Washington, DC
Thursday, April 25, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144540

Page 277

April 25, 2002
9:54 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 278

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

# Susan Klein (vol 2)

Page 339

doesn't have very much knowledge about that facility or how it operate or how it's projected to operate.

And so I think on issues like that that related to the specifics of how the DOE would be in a position to start performing in 2010, I think it's our position that she's not -- on some of those issues she's not really knowledgeable about those issues.

MS. SULLIVAN: Anything else?

MR. HIRSCH: I think that was the principal concern that we had about that. Specifics of how the DOE would be in position to start performing in 2010, particularly in light of the testimony that Ms. Klein gave that the DOE isn't likely to get a license application granted to build a facility until the end of '97 or '98.

MR. TOMASZCZUK: 2007.

MR. HIRSCH: I'm sorry. 2007, 2008.

MS. SULLIVAN: Okay. We have nothing that we need to clarify.

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS NORTHERN STATES POWER COMPANY, ET AL.

BY MR. TOMASZCZUK:

Page 340

Q. Ms. Klein, my name is Alex Tomaszczuk. I'm counsel for various utility plaintiffs which have pending cases at Court of Federal Claims.

I have a few follow-up questions to ask you based on the testimony that I've heard so far. I'll compliment Mr. Hirsch. He was very thorough. I wouldn't say this in his presence, but since he stepped out, he was very thorough and I think I have only a relatively few number of questions for you.

The same ground rules apply that Mr. Hirsch expressed to you at the outset of your deposition. If for some reason you don't understand my question, please let me know that I'll try and rephrase it so that there's common ground and so that we understand your testimony, okay?

A. Yes.

Q. I would like you if you can to identify for me all the assumptions on which your testify that DOE will begin performance in 2010.

A. The assumptions?

Q. Yes.

A. The assumption is that we would have a

Page 341

designation by Congress of the site. That we will have a construction authorization from the Commission, and that we will have a license to receive by -- to receive nuclear material by 2010. All those things have to be accomplished.

Q. If I understood your answer, there were three basic assumptions on which DOE's ability to meet 2010 is based. The first was the designation of the site; is that correct?

A. Uh-huh. Yes.

Q. And the second assumption was the obtaining of an authorization for construction?

A. Yes.

Q. And the third was receiving a license to operate?

A. Yes.

Q. Okay.

A. Those are the three major assumptions.

Q. Are there any other assumptions on which DOE's ability to meet the 2010 date is based?

A. Well, we do need to get funding. We need to -- there can be no injunctions against us by a court.

Page 342

I mean, I could go on about, you know, how the assumptions one has, how they got to work. I think by court, right.

Q. What I'm asking you to do is identify them to the best of your ability.

A. Every one of them? I don't think I'm capable of identifying every one of them. There are big differences between what we plan and hope to happen and what we assume, but I mean we would like to have an alternative means of financing and managing the program, but I don't know that that's a required amended order for us to meet the 2010 date. But that would certainly ease our burden if we could get government cooperation and have our funding mechanism changed. That is a high priority for the program in order to succeed. I think those are the assumptions that I can think of, I mean. Those are the assumptions.

Q. All right. The two that you identified in your -- in the continuation of your answer was first funding and second no injunctions as I understood your testimony?

# Susan Klein (vol 2)



MR. TOMASZCZUK: I believe that's the page that's in front of the witness.
MS. SULLIVAN: That's what she's looking at. I want to make sure.
THE WITNESS: Personal knowledge at the time. We have discussed this. I have some knowledge because I just discussed it with my counsel, but I was not involved with it. I don't remember. I might have been involved. I just do not remember what happened here. I'm sorry.
BY MR. TOMASZCZUK:
Q. You have no knowledge independent of that which you just obtained from discussion with your counsel?
A. And a discussion with counsel last, yeah.
MS. SULLIVAN: Don't --
THE WITNESS: Yeah, just instruction with counsel.
MS. SULLIVAN: I instruct you.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. All right. I'm going to move on and reserve



the right to seek testimony from an appropriate Rule 30(b)(6) witness on those issues.
Ms. Klein, can I ask you to get in front of you Klein Exhibit Number 5.
A. Yes.
Q. And this document is the APR and ACR for March of 1995; is that right?
A. That's right.
Q. And as I understood your testimony, this was the last APR/ACR issued by the government; is that correct?
A. Yes.
Q. And this was the APR/ACR on which the utilities were to or which the utilities were to use in submitting the DCS forms submitted after it was published in March of 1995?
A. Yes.
Q. Could I direct your attention to page 1 of this document.
A. Got it. Introduction.
Q. You're welcome to read the whole page.
A. Yes.



Q. I'm going to ask you some questions about the text which appears at the bottom.
A. Okay.
Q. All right. And the last sentence states: "As specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers." Is that right?
A. That's what it says here, yes.
Q. All right. And is that to the best of your knowledge a true statement?
MS. SULLIVAN: Objection, beyond the scope. You can answer the question.
THE WITNESS: Well, once it was sent out with the CO's instructions and made a requirement of the contract, the department believes it is a requirement of the contract. Once it was sent out by the contracting officer to each individual purchaser, it became a commitment.
BY MR. TOMASZCZUK:
Q. I'm sorry. What became a commitment?
A. The allocation for each particular -- well, it



became a commitment if -- the conditioned upon the allocation for each purchaser became a commitment between the department and that purchaser if they submitted a DCS and it was approved. It became a commitment.
Q. But it was a commitment that was based on underlying data which was not contractually binding; is that fair?
MS. SULLIVAN: Objection, beyond the scope. You may answer.
THE WITNESS: It was -- I don't see what relevance it has. There was a commitment that we made based on information. Most commitments are based on information that are not contractually binding, I mean. I guess I don't understand the question.
BY MR. TOMASZCZUK:
Q. Well, I guess I don't understand your testimony.
A. Yeah.
Q. In all candor.
A. Uh-huh.
Q. Is it your testimony that the ACR is now a

Page 379

contractually binding document?
MS. SULLIVAN: Objection, beyond the scope. You may answer.
THE WITNESS: What I am testifying is that the allocation once it's -- not until the DCS based on this allocation is submitted to the department and the department approves it. Then it becomes a contractually binding commitment. Then there is a legal obligation. And whether or not the background that got us to that amount was legally binding or contractually binding I don't think is relevant to the fact that the DCS becomes a legally binding commitment between the department and the purchaser.
BY MR. TOMASZCZUK:
Q. Do you know in what document, if any, the utilities were so advised?
MS. SULLIVAN: Objection, vague.
THE WITNESS: It was the 1991 -- it's in here somewhere. Letter that the contracting officer sent with instructions.
BY MR. TOMASZCZUK:
Q. Okay. Let's look at that.

Page 380

A. Do you know what exhibit number that is? I think it was 30. Exhibit 2. Actually, this is not the whole letter. I don't think we have it in the exhibits. Attached to it are the instructions. I think there's actually more information in the 1991 letter from the contracting officer to the utilities. But this will do.
Q. All right. And where in this document, Klein Exhibit 2, were utilities advised that once their DCSs based on the then-current ACR were submitted and approved that that represented a binding commitment of the parties?
MS. SULLIVAN: Objection, beyond the scope. Objection, the document speaks for itself.
THE WITNESS: The allocations in the --
BY MR. TOMASZCZUK:
Q. I'm sorry. I just was asking where are you reading, please?
A. I'm sorry. Right now I'm reading the beginning of the second paragraph. "The allocations in the 1991 Annual Capacity Reports should be the basis for the DCS submittals. Once purchaser has an

Page 381

allocation, an equivalent quantity of spent fuel owned by the purchaser can be designated for delivery within the limits of that allocation." There's also a provision -- I'm not sure where it is here -- where this becomes a basis for exchanges is the DCS. That's the basis for exchanges with other utilities.
"Once a purchaser has an allocation" --
Q. I'm sorry. Where are you reading?
A. I'm sorry. Page 27-B. "Once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against that allocation." That's not the exchange provision, but that's consistent with what I read in the beginning.
Q. Does any of the language you just referred to advise the utilities that the DCS based on the then-current APR once submitted and approved represents a binding commitment of the parties?
MS. SULLIVAN: Objection, beyond the scope. Objection, the document speaks for itself.
THE WITNESS: Does not use those exact words, but that appears to me to be a commitment. It's a delivery commitment schedule.

Page 382

BY MR. TOMASZCZUK:
Q. Are you still --
A. I think I'm done. I just couldn't find it, but exchange provision in there somewhere.
Q. Just so the record is clear. Do you believe that somewhere in that exhibit the utilities were advised that once their DCS had been submitted and approved, it represented a binding commitment on both the government and the utility?
MS. SULLIVAN: Objection, beyond the scope. Objection, the document speaks for itself. Objection to the extent it calls for a legal conclusion, and asked and answered.
THE WITNESS: And what?
MS. SULLIVAN: Asked and answered, but you can answer again.
THE WITNESS: Okay. It does not have those exact words binding commitment, but it does have the word commitment and it does say this is your allocation once approved. And I believe that is and the department believes that is a binding legal commitment of the department.

# Susan Klein (vol 2)

Page 515

A. Yes.
Q. No DOE contractors?
A. No. Fortunately, this was one topic I didn't need to talk to anybody else about.
Q. I believe you testified earlier today that DOE's current position with respect to priority for shutdown is that DOE would not grant priority because it would not be fair to other utilities in the cue. Do you remember that testimony?
A. Yes.
Q. And --
A. At this time.
Q. And at this time. I wanted to explore that for a minute. At this time DOE is not accepting fuel from anyone; is that correct?
A. We're not. We're not accepting it, yes; that's true.
Q. And hasn't been accepting fuel during the time from 1982 -- I'm sorry, strike that.
From 1983 when the utilities signed the contract to the present, DOE has not accepted spent nuclear fuel from utilities, correct?

Page 516

A. Under the standard contract; that's correct.
Q. Under the standard contract. And so DOE's consideration of granting priority at this time is -- would you describe it as being premature?
A. I guess it's just that we reserve the right to do it if we had a huge repository and we could meet everybody's need and it might seem to be a reasonable thing to do. So, I mean, we may determine once we're operational.
Q. You haven't prejudged and foreclosed the possibility; is that fair to say?
A. That's fair to say.
Q. If the repository were operating at such a rate that granting priority would not harm operating utilities, DOE would consider granting a priority to a shutdown reactor. Is that also fair to say?
A. I think that's fair to say, yes.
MR. MACDONALD: 48.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 48.)
BY MR. MACDONALD:
Q. Ms. Klein, I've handed you a document marked

Page 517

as Exhibit 48, which is entitled "Priority Acceptance for Shutdown Reactors" and it appears to be a memorandum prepared by Dave Zabransky dated 6/27/95. Do you have that before you?
A. Yes, I do.
Q. And it is a memo addressing the question: "Can the department provide priority for the removal of spent fuel from permanently shutdown reactor sites?" Do you see that?
A. Yes, I do.
Q. The middle of the paragraph states that: "In assessing whether or not we would be in a position to provide for priority removal of spent fuel from permanently shutdown reactor sites, we would have to consider the following questions." And then it lists four questions.
"Does the department have the capability to provide for the interim storage or disposal of the spent nuclear fuel? Where is the interim storage or disposal capability located? What is the capacity of the interim storage facility or disposal storage, and a what annual rate can the department accept spent fuel

Page 518

from the utilities? What expectations may have been created by the department regarding the allocation of spent fuel removal capacity through the publication of the annual capacity report?"
You see those four --
A. Yes, I do.
Q. -- considerations or questions?
Are these the considerations that DOE would use in deciding whether or not to grant priority to shutdown reactors?
A. I mean, they seem reasonable to me, but there could certainly be other ones. There could be others. I don't -- this was something Dave put together. I don't know if anybody else had a view on this. So I don't know. This is a department position, but...
Q. The final sentence at the bottom of this document states: "If the department had the unconstrained capability to provide for the storage or disposal of spent nuclear fuel and if the rate of spent fuel acceptance exceeds the acceptance rates published in the annual capacity report, the department would have the flexibility to address the issue of priority

# KOUTS, CHRISTOPHER

Christopher A. Kouts June 4, 1999

*Page 1 to Page 219*

CONDENSED TRANSCRIPT AND CONCORDANCE
*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC 20005*
*Phone: 1-800-FOR-DEPO*
*FAX: 1-800-367-3310*

**Page 1**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
---------------X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
---------------X
Washington, D.C.
Friday, June 4, 1999

Deposition of CHRISTOPHER A. KOUTS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:00 a.m., Friday, June 4, 1999, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

**Page 2**

APPEARANCES:

On behalf of the Plaintiff:
GLENN S. GREENE, ESQ.
ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
TERRY M. PETRIE, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W., Room 10150
Washington, D.C. 20530
(202) 307-6289
and
JANE TAYLOR, ESQ.
U.S. Department of Energy
1000 Independence Avenue, N.W.
Washington, D.C. 20585
(202) 586-7530

**Page 3**

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| CHRISTOPHER A. KOUTS | |
| By Mr. Greene | 5 |

Afternoon Session - Page 77


EXHIBITS


| KOUTS EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 1 | Letter 3/1/99 | 7 |
| 2 | OCRWM Organization Chart | 48 |
| 3 | Annual Capacity Report March 1995 | 70 |
| 4 | Revision 01 Total System Descrip. | 80 |
| 5 | Determ. Cost-effect. Receipt Rates | 94 |
| 6 | Prelim. Anal. Spent Fuel Scenarios | 99 |
| 7 | Annual Capacity Report June 1988 | 103 |
| 8 | Requirements Document Revision 05 | 107 |
| 9 | Throughput Rate Analysis 8/17/93 | 115 |
| 10 | Rev. 02 Contingency Study 12/18/98 | 120 |
| 11 | Rev. 00 Contingency Study 9/24/98 | 130 |
| 12 | Contract DE-CR01-83NE44428 | 141 |
| 13 | Waste Acceptance Schedules | 150 |
| 14 | Facility Inter. Capab. Assessment | 158 |
| 15 | Memo 3/29/91 HQ0003944-46 | 164 |
| 16 | Draft Instr. For compl. Appendix | 165 |


**Page 4**

EXHIBITS


| KOUTS EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 17 | Memo, Meeting Notes 7/21/87 | 169 |
| 18 | Memo, attachments HQ0013354-71 | 174 |
| 19 | Memo, 10/13/98 Meeting Minutes | 180 |
| 20 | Meeting Minutes, attendance list | 183 |
| 21 | OCRWM Transportation Program | 189 |
| 22 | Meeting Agenda 10/3/90 | 192 |
| 23 | Two memos HQ0014780-83 | 195 |
| 24 | Letter, Briefing document diagram | 199 |

Page 53

requirements documents, et cetera, and production of systems studies. International, we have a small international program which also resides in that division.

Q. And what residual transportation activities do you have?

A. Not much. My understanding is it's just related to very few staff with minimal contractor support. The expectation of the program is that we will not be shipping until 2010, so our transportation capability and the need for a large transportation capability is no longer evident.

Q. Was this staff reduced recently or relatively recently?

A. It's been over a series of years. Since I headed the program back in the late '80s, early '90s, it's gotten smaller and smaller.

Q. What aspects of the standard contracts do the Waste Acceptance and Transportation Division handle?

A. Having never worked in that area, I couldn't really tell you.

Q. When will the Department of Energy begin to pick up spent nuclear fuel and

Page 54

high-level waste in accordance with the standard contracts that were signed with nuclear utilities?

A. Our present plans project that we would begin to receive spent fuel in the year 2010.

Q. Is that a firm number?

A. That's our planning basis at this point.

Q. And what is the basis for that number?

A. Planning documents that we've issued publicly, our program plans. We've held that same date since the late 1980s.

Q. How was that date developed?

A. It was developed -- it was first, I believe, announced as a result of a study that was done for the Secretary of Energy at that time, Secretary Watkins. It was the Secretary's reassessment report of the program. And in that report, I believe we set the 2010 date as our waste acceptance date.

Q. Do you recall the date of that report?

A. I believe it was issued in 1989.

Q. That was the first presentation of the 2010 date?

A. To the best of my recollection, that

Page 55

was the first.

Q. Do you know where that date came from, how that date came to be included in the presentation?

A. I was not directly involved in the development of that report, so I couldn't say.

Q. Do you know who was involved?

A. I believe the staff person at the time was Vic Trevules, that's T-r-e-v-u-l-e-s.

Q. Does he currently work for DOE?

A. Yes, he works for the Yucca Mountain project.

Q. Do you have any understanding at all of where the 2010 number came from, how it was derived, what the basis for that number is?

A. It was developed through working with the repository program, which was an area of the program I wasn't working with at the time, so I don't have any direct knowledge as to how that date was developed.

Q. Do you have any indirect knowledge?

A. No.

Q. When do you believe that spent nuclear fuel will start to be picked up from nuclear utilities?

Page 56

A. I believe, assuming we get the resources, that it can be done by 2010.

Q. Do you believe it will be done by 2010?

A. I can't really say.

Q. Any particular reason why you can't say?

A. It's predicated upon preceeding budgets, it's predicated upon many, many different variables. I think our schedules are reasonably based, but there are many variables associated with it.

Q. What do you expect to happen? Do you expect that you will get the budgetary -- all these variables will fall into the place and that the 2010 date will be met?

A. I don't know. I couldn't say.

Q. What will be the initial rate of acceptance for spent nuclear fuel when the program begins accepting the utility's spent nuclear fuel?

A. My sense is it would be the same acceptance rate that's outlined in the annual capacity reports that we've issued over the years.

Q. You said reports plural. Did you say

Page 85

which is called Waste Receipt Rates at the First Repository, have you seen these numbers before?
A. I've seen similar numbers before that are similar to this, yes.
Q. When have you seen these?
A. When we were developing the interim storage facility design that I mentioned earlier, we looked at receipt rates that were similar to these that were called out in various pieces of proposed legislation that had been introduced in Congress over the past four or five years.
Q. Did DOE play any role in developing those receipt rates that were part of different legislation?
A. Not to my knowledge, no.
Q. Do these numbers represent the current thinking on the rates at which waste will be accepted at the repository?
A. Unless there is some later document, this is fairly current. This is within the last six months or so. So it represents fairly good current thinking on this.
Q. Did you have any role in developing these numbers?
A. These numbers, no, I did not.

Page 86

Q. Do you have any understanding of how the numbers were derived, what the basis for the numbers is?
A. No, I don't.
Q. Is there any particular reason for the progression where it starts at 400 units in year 2010 and then moves up to 600 in 2011, then in the year 2012, it's 1,200; in 2013, it's 2,000; and in 2014, it moves up to 3,000? Do you know if there is any reason for that progression?
A. It would just be speculation on my part as to what that progression is.
Q. What would your speculation be?
A. That it has to do with, to some extent, with ramping up a transportation system.
Q. How would you define ramping up?
A. How would I define ramping up of the transportation systems?
Q. Right.
A. Having additional capability in succeeding years from the initial year of waste receipt.
Q. Do you know of any reason why the system would not be able to accept spent fuel at the 3,000 unit rate in year 2010 as opposed to

Page 87

starting out at 400?
A. When I was in the transportation program, our view of being able to start a shipping campaign was that it would be very difficult to start one at a very, very high level; that you would start at more moderate rates and build up to gain experience with the casks that you were using and gain experience with the facilities that you would be operating.
And also, depending on what your resources were, usually we didn't anticipate that we would have the capital available to buy all the casks that we needed and all those casks would be available on day 1. We take years to have all the casks constructed that we would need. So we looked at using available casks, ones that might be available in use by industry initially and whatever new casks we had brought on line and then, as new casks were designed and developed, we would have additional capability. It all had to do with the lead time that we had to develop it and also the resources available to implement the transportation system.
Q. Well, if you were given or if the system were given enough money to buy enough

Page 88

casks to accomplish the task, would there be any other reason why the system couldn't begin accepting fuel at a 3,000 unit rate in the year 2010, the first year of operations?
A. Is your question if we had infinite resources available and infinite staff and infinite capability, could we do it? Under those conditions, yes. In the conditions in which this condition has historically operated, infinite resources are not available.
Q. Well, you would agree, wouldn't you, that there would be some level of staffing and resources short of infinite that you could achieve that 3,000 unit rate with?
A. My sense is, if you wanted to start on day 1 with 3,000 tons, probably there isn't enough manufacturing capability in the world to develop the amount of casks that you would need on that one date, given the lead times that we've had in this program. Plus it is unclear that we would have gotten resources in order to buy all those casks on day 1. So my sense is that trying to as a step function from zero to 3,000 tons per year, which is more than has ever been shipped in one year in this country before, it's unlikely

**Page 89**

that we would be able to accommodate that without
an incredible amount of resources.
Q. What's the maximum that's ever been
shipped in one year in this country before?
A. I would think somewhere in a couple
hundred tons per year at most.
Q. Would this be commercial spent fuel?
A. Commercial spent fuel, yes.
Q. You mentioned that there was -- you
characterized a particular level as being a high
level. What's the criteria for deciding whether
a level is considered to be high in terms of
shipping spent fuel? What rate is considered to
be high, what rate would be considered to be
moderate?
A. The best way to answer that question is
I think even attempting to move 400 tons of spent
fuel in one year would be a tremendous challenge,
given the amount of fuel that's been moved in the
past in this country and the amount of fuel that
this program has moved, which has been very, very
few, very, very few assemblies. We moved some
from a research standpoint years ago to Idaho,
but you're talking about starting from a standing
start to try to do something that's greater than

**Page 90**

probably this country has done in any one year,
and that's a big, big chunk, over 400 tons a
year. That would be challenging.
And it depends on, again, what reactors
you're shipping at, whether or not that 400 tons
is made up of truck reactors, which would mean
that -- assuming one ton per reactor or one ton
per shipment, that's 400 shipments. You only
have 365 days in one year, you've got weather
problems and so forth. Some of that may be rail,
but still in all, to start out at that level
would probably be challenging.
Q. You mentioned the term lead time in
connection with these shipping campaigns. What
do you anticipate the lead time will be in order
to meet this 2010 date?
A. The lead time before we could -- you
probably want to start six or seven years before
shipment to make sure that you were getting all
the planning done and procuring all the available
equipment that you would need and doing all the
studies that you would need to do in order to
know what your shipping environment is at the
sites that you would be servicing initially.
Q. Would six or seven years be enough time

**Page 91**

to procure or provide for the procurement of
enough casks to ship 3,000 metric tons of spent
fuel in a year?
A. To procure how much?
Q. Procure enough casks, shipping casks.
A. For 400 a year?
Q. No, to ship 3,000 metric tons per
year.
A. No. You would have to start before
then.
Q. When would you have to start?
A. I would be guessing. You would
probably have to start at least 10 years ahead of
time. I would have to say before 10. You would
have to almost -- to have enough capability for
3,000 tons on day 1, you would probably have to
be building those casks right now.
Q. Is DOE currently building
transportation casks?
A. Not to my knowledge.
Q. Turning your attention back to Exhibit
3, which is the 1995 ACR, and Table 1 of that
which is on page 4, the acceptance rates in these
two documents are different, at least after the
third year, starting the third year of shipping.

**Page 92**

Which one of these receipt rates is going to be
binding on the utilities or which one of these
receipt rates can utilities count on once the
Department begins accepting spent fuel for
disposal?
A. I don't know that I'm the one to answer
that question. I really don't know. I couldn't
tell you.
Q. Who would be the one to answer that?
A. My sense is it would be related to
whatever contractual obligations we have and
through the standard contract in terms of what
agreements we have with utilities. That's not an
area of my expertise.
Q. Did you have any responsibility in
terms of fulfilling the Department's obligations,
Department of Energy's obligations, under the
standard contract? Actually, I'll withdraw
that. That's probably way too broad of a
question.
Do you have an understanding of which
one of these rates will be used by DOE, either
the rate that's reflected in the total system
description or the rates that are reflected in
the 1995 ACR?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

INDIANA MICHIGAN POWER )
COMPANY, )
Plaintiff, )
v. ) No. 98-486C
THE UNITED STATES, )
Defendant. )
COMMONWEALTH EDISON COMPANY, )
Plaintiff, )
v. ) No. 98-621C
THE UNITED STATES, )
Defendant. )

- - - - - - - - - - -

DEPOSITION OF CHRISTOPHER ALEXANDER KOUTS

VOLUME I

The deposition of CHRISTOPHER ALEXANDER KOUTS was convened on Friday, January 30, 2004, commencing at 10:21 AM, at the offices of SHAW PITTMAN LLP, 2300 N Street, N.W., Washington, D.C., before Cheryl A. Lord, RPR, CRR, and Notary Public for the District of Columbia.

APPEARANCES

For Plaintiff Indiana Michigan Power Company:
Devon E. Hewitt, Esquire
Jay E. Silberg, Esquire
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-485
(703) 770-7962

For Plaintiff Commonwealth Edison Company:
Christopher Tompkins, Esquire
JENNER & BLOCK LLC
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350





APPEARANCES CONTINUED

For Defendant:
R. Alan Miller, Esquire
Stephen Finn, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
1100 L Street, N.W., Room 12000
Washington, D.C. 20530
(202) 616-0383

Also present:
Eileen Supko





CONTENTS


| EXAMINATION BY | PAGE |
|---|---|
| Ms. Hewitt | 5 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Nuclear Waste, Nos. GAO-02-765T, 14 pages | 114 |
| 2 | Yucca Mountain Project Status - Exhibits | 123 |
| 3 | Nuclear Waste Disposal, FY 2004 Congressional Budget, pages 565-580 | 131 |
| 4 | Testimony Before Congress, 4-7-03 | 213 |






PROCEEDINGS
(--------)
CHRISTOPHER ALEXANDER KOUTS,
a witness called for examination, having been first duly sworn, was examined and testified as follows:
(--------)
EXAMINATION BY COUNSEL FOR PLAINTIFF
INDIANA MICHIGAN POWER COMPANY
BY MS. HEWITT:
Q. Good morning, Mr. Kouts.
My name is Devon Hewitt, and I represent Indiana Michigan Power Company in this case. I'm a partner at Shaw Pittman, and I'm going to be taking your deposition here today.
Have you ever been deposed before?
A. Yes, I have.
Q. You might, then, know the rules of depositions, but in any event, I'm going to repeat some instructions just so we understand how this might work today.
I'm going to ask you a series of

A. That's fine.
Q. And what were your functions as part of the MRS team?
A. Initially, it was to develop the needs and feasibility analysis that was a major component of the department's proposal to the Congress on monitored retrievable storage.
Q. And did your tasks or responsibilities change over time?
A. They evolved to where I was heading the team for a period of time while my direct supervisor was off on other duties.
Q. And who was that?
A. That was James Carlson.
Q. How long did you participate in the MRS team?
A. Approximately 3 years.
Q. Would it be correct to say that you were on this team from 1985 to 1988, approximately?
A. Approximately, yes.
Q. Did you change positions or





responsibilities in 1988, approximately?
A. Yes, I did.
Q. And what happened at that time?
A. The office was reorganized, and I was reorganized into a systems integration group.
Q. What does, systems integration, mean?
A. Within the context of the program, it's the group that looks across all 3 major functional areas of the program, waste acceptance, transportation, and disposal, or in that case, there was another function, which was storage, and does cross-cutting analyses to look at efficiencies and effective ways to implement the program.
Q. You mentioned at that time there was a fourth storage.
Is there no longer a fourth component to the waste management system?
A. With the passage of the 1987 amendments act, which null and voided the department's siting proposal of the MRS facility,





that had a major impact on future storage-related activities.
However, they remained at a relatively low level up until the time of the development of various facility designs to support legislation that was being considered in Congress on interim storage.
Q. And what about currently?
Is there still a storage element or sector within the program?
A. No, there is not.
Q. When you refer to a waste acceptance portion of the program, and in fact, I don't want to put words in your mouth, what is the term that DOE or OCRWM uses when it talks about the 3 parts, sectors, divisions?
What do they call it within the program?
MR. MILLER: Objection, vague.
But go ahead if you understand.
BY MS. HEWITT:
Q. I don't know what you said when you





said that within the program there are 3 -- or 3, used to be 4, and I didn't know whether you said parts or divisions or sectors or -- I don't know what the term is.
I'd like to use the correct term.
A. There are several ways that -- several interpretations. I think that the -- we refer to it primarily as functions, the acceptance function, the transportation function, and the disposal function.
BY MS. HEWITT:
Q. Thank you very much.
I always like to be correct.
If you could briefly describe for me what OCRWM views as the waste acceptance function under the program.
A. Briefly, it's interaction with utilities and management of the standard contract with utilities.
Q. And currently, is there a person that is responsible or a leader or supervisor of the waste acceptance function?

A. Yes, there is.
Q. And who is that?
A. It's myself.
Q. Oh.
Could you describe what OCRWM regards as the transportation function within the program?
A. Currently, the definition of the transportation function encompasses the development of equipment and capability to move high-level waste materials from the standard contract holders and DOE sites.
In addition to that, that program is also -- that function is also responsible for the development of infrastructure within the state of Nevada, specifically a rail spur to the Yucca Mountain site.
Q. You mentioned, to move high-level waste.
Is that function also responsible for moving spent nuclear fuel?
A. Yes.





Q. And who was in charge of that function?
A. Director of the office of national transportation is Mr. Gary Lanthrum, L-A-N-T-H-R-U-M.
Q. And if you'd be kind enough to describe what the disposal function covers within the program.
A. Simplistically, the disposal function is responsible for receiving spent fuel and high-level waste materials from the transportation function at the disposal site preparing it for disposal and emplacing it for disposal, and eventually closing the site.
Q. And who at DOE is in charge of that function?
A. The deputy director of the -- I can't remember the specific title -- the deputy director responsible for the Yucca Mountain project, deputy director of OCRWM, is John Arthur.
Q. Now, is there a separate individual





or office that is in charge of ensuring that these 3 functions work together well as a system?
A. Yes, there is.
Q. And what is that office or person?
A. That person manages the office of systems analysis and strategy development.
Q. And is that office also within OCRWM?
A. Yes, it is.
Q. And who is in charge of that office?
A. I am.
Q. Okay. Back to 1988.
When you started in the systems integration group, was the systems integration group similar to the systems analysis and strategy development office that you're currently heading right now?
A. It was a more narrowly defined office. It wasn't an office. It was a branch.
Q. M-hm.
A. So it had similar responsibilities, fewer staff, lesser resources.





Q. How long did you work for the systems integration group?
A. About 3 months.
Q. Oh.
What did you do for those 3 months?
A. We initiated an effort to do a programwide system study that addressed a variety of issues that were being raised by the monitored retrievable storage commission that had been appointed by Congress.
Q. What happened after 3 months?
A. After 3 months I was promoted to take over the transportation function of the program.
Q. So this still would have been in 1988?
A. Approximately.
Q. Approximately.
And how long were you working on the transportation function of the program?
A. Approximately 3 years.
Q. So until approximately 1991?