Q. How long were you in this position?
A. Roughly about a year and a half to 2 years.
Q. So around 1998, approximately, you took on another position; is that correct?
A. Correct.
Q. And what was that?
A. I was -- well, the office was reorganized, as I remember. The division which I was heading was abolished, and I was transferred to the office -- well, I was -- I became a liaison with the Yucca Mountain project residing in Washington, D.C. My direct supervisor was the project manager of the Yucca Mountain project.
Q. And who was that at the time?
A. At that time, it was Dr. Russ Dyer, D-Y-E-R.
Q. And how long did you function as a liaison with Yucca Mountain?
A. Up until October of 2002.
Q. Oh. A healthy 4 years almost.
So what did you do as liaison?





A. I was responsible for making sure that major products that were produced by the Yucca Mountain project were coordinated and approved through DOE headquarters.
Q. You used the term products.
A. Correct.
Q. What do you mean, products?
What do you mean by the term products?
A. By, products, major documents.
I was also responsible for management of a variety of technical issues from a policy level for the project.
Q. Can you give me some examples on some of the major products that Yucca Mountain produced and that you had responsibility to oversee or review during that time?
A. Yes.
Q. Oh, good.
Thank you.
Would you go ahead and do so, please.





A. Certainly.
First of which was the viability assessment that was directed by Congress to be submitted in 1998. The other major products were managing the revisions -- or I should say, managing the regulatory process that ended in the issuance of 10 CFR, part 963, which were the site suitability guidelines that were finalized in late 2001.
In addition to that, I was also responsible for making sure that all site recommendation documents that were a part of the secretary's recommendation to the president were acceptable to senior policymakers within the department.
Q. That's quite impressive.
Anything else?
A. There's a lot more, but the question is, how much do you want me to go into detail?
Q. I obviously don't want minutiae. I confess that I am not familiar with everything that was produced and certainly not familiar with





these documents.
In your mind, are those the major things that you addressed during those 4 years?
A. Those are the highlights.
Q. What happened in October 2002?
A. In October 2002, the current director of the office, Dr. Margaret Chu, reorganized, and I assumed on an acting basis the -- being the director of the office of systems analysis and strategy development.
Q. And I take it that you have assumed that position since 2002 until today?
A. It was on an acting basis until approximately August of last year when I was then made permanent in that position.
Q. Congratulations.
A. Thank you.
Q. I think.
And in this position, to whom do you directly report?
A. To the deputy director of the office of program development -- strategy and program

**Sacramento Municipal v. U.S No. 98-488C March 29, 2005**

**Heritage Reporting Corporation**

**Page 1826 to Page 2214**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone. 202-628-4888*
*FAX. 202-371-0935*

Page 1826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

SACRAMENTO MUNICIPAL UTILITY DISTRICT,

NO 98-488C

Plaintiff

vs

UNITED STATES,

Defendant

--------------------------------

Courtroom 5
National Courts Building
715 Madison Place
Washington, D C

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a m

BEFORE THE HONORABLE SUSAN G BRADEN

Page 1827

APPEARANCES

ON BEHALF OF PLAINTIFF
DAVID S NESLIN, ESQ
TIMOTHY R MACDONALD, ESQ
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N CAYNE ESQ
Arnold & Porter LLP
555 Twelfth Street, N W
Washington, D C 20004-1206
(202) 942-5656

Page 1828

APPEARANCES (Continued )

ON BEHALF OF THE DEFENDANT
ALAN J LO RE, ESQ
JOSHUA E GARDNER ESQ
TODD J COCHRAN, ESQ
SCOTT DAMELIN, ESQ
RUSSELL SHULTIS ESQ
ELIZABETH THOMAS, ESQ
U S Department of Justice
1100 L Street, N W
Washington, D C 20036

ALSO PRESENT
STEVEN M COHN, ESQ
STEVE J REDEKER
THOMAS POLLOG

***Index appears at end of transcript***

Page 1829

P R O C E E D I N G S

- - - - - -

THE COURT Let's go

Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MR CAYNE

Q Good morning, Mr Zabransky

A Good morning

Q I'd like to turn your attention to Plaintiff's Exhibit 121 I believe that will be in the first binder, one out of three Do you have that document before you, sir?

A Yes I see it

Q And is this document a memorandum from you to -- was this a memorandum from you, sir?

A It's an e-mail from me to Mr -- I believe it's Auke Piersma

Q And who is that person?

A Mr Piersma used to be with a group called Public Citizen

Q And there's also a CC?

A Yes

Page 2118

would be decommissioned and go back to its original state, where the repository –

THE COURT· What was the time period?

THE WITNESS I think we had it operating for 20, 25 years That would allow the repository to be filled to the statutory limit, which was 70,000 metric tons and still is today

BY MR DAMELIN

Q Now, you had just mentioned three repository sites at the time of this submission Were the three repository sites still under consideration or being reviewed by Department of Energy?

A. They were still – we had three active projects. We had the salt site, which was – that was in Texas. It was a bedded salt deposit. We had a basalt site, that's b-a-s-a-l-t site, in Hanford, and we had the Yucca Mountain tuff repository, tuff, that's in Nevada

Q. Now, the 15,000 metric ton storage capacity limit you just mentioned, where does that come from?

A That was what we felt was the maximum that we needed, and when we got the facility operational for surge issues, and if we wanted, and if for some reason the repository couldn't take materials, we

Page 2119

could have a surge capacity of the MRS and continue to accept fuel, even if the repository was not operational

Q Now, you just referenced the objections of Tennessee about the proposal Did the MRS proposal that's submitted in March of 1987 refer to any particular sites?

A Yes, it did We focused on three sites within the state of Tennessee, the former Clinch River Breeder Reactor site, which was the primary site; the Oak Ridge Reservation, which was right next to the Clinch River Breeder Reactor site; and also, there was the shutdown – not the shutdown, but the Hartsville Nuclear Station, which was never built by the Tennessee Valley Authority.

Q And you might have just answered this. Was one of the sites the primary site in this submission?

A And that was the Clinch River, the primary site was the Clinch River Breeder Reactor site, which was never built That was our, that was a facility that Congress withdrew funding from

Q And was that the same as –

THE COURT. What was to be built there exactly?

THE WITNESS. It's a breeder reactor,

Page 2120

essentially a reactor that can develop its own fuel in its own, in its own process, so that gets into somewhat of a technical area, but it was a state of the art nuclear facility, generating facility that Congress was interested in and then stopped funding, and since that site was fairly well-understood and excavated, we felt that would be a good site in order to build an MRS facility.

BY MR DAMELIN

Q Is that site part of or related to the Oak Ridge facility?

A It's right next to the Oak Ridge facility, Oak Ridge Reservation, in Oak Ridge, Tennessee

Q Now, what type of facility did DOE propose to build in this MRS submission?

A. That's what I more or less went through It was a central packaging facility that would take the fuel and then ship it to the repository site in a disposal-ready container.

Q Now, when this proposal was submitted to Congress in March 1987, what type of schedule did DOE propose for when the MRS was to become operational as part of the waste management system?

A. Well, our expectation was that the facility, if it was approved by Congress in an

Page 2121

expeditious manner, would be operating and available in the 1998 time frame

Q Now, once this proposal was actually submitted to Congress in March of 1987, what happened in response to the submission?

A Not very much. To my recollection, there were no Congressional hearings held on it The proposal was submitted to Congress, and then Congress essentially directed the Department, through the 1987 Amendments Act, as to what to do next with MRS.

Q So the 1987 Amendments Act followed the submission of this proposal?

A That's correct.

Q And what was the impact of the 1987 amendment to the Nuclear Waste Policy Act on DOE's, I guess, plan for an MRS facility?

A Well, the good news was that Congress authorized the facility. The not so good news was that they nullified the site and essentially put restrictions on how the facility would be deployed in the future, and those restrictions are that it could not be sited until we had a site for a repository, it could not be built until we had a construction authorization for a repository, and it also could not have more than 10,000 metric tons until the

Page 2122

repository was operational, and 15,000 metric tons in total
Q. And so when you say, "nullified," nullified this proposal, Plaintiff's Exhibit 113?
A Right And it also directed that the, that an MRS could not be in the same state as the repository, or within 50 miles of the repository.
Q. And did the, did the 1987 amendment address the procedures for potentially siting an MRS that was authorized by the amendments?
A Yes, it allowed the Department to, if it chose, to undertake a survey of sites, based on its own criteria, and then essentially follow the same process that a repository would be sited, where there would be a recommendation of the site, there was an opportunity for a notice of disapproval by the governor of the state, and then potential for a Congressional override with a majority vote in both houses, similar to what happened with the siting of Yucca Mountain, the Yucca Mountain repository in 2002.
Q. Did the 1987 amendment address any other options for siting of either MRS or a repository?
A Yes, it did, it created the office of the Nuclear Waste Negotiator, which was a separate entity

Page 2123

in the executive branch whose duty was to go out and try to find willing hosts It may be a state or an Indian tribe that would be, that either an MRS or a repository would be acceptable to, so it gave two approaches to the siting of these facilities One on a voluntary basis; the other on the survey basis that the Department would conduct, as I mentioned earlier.
Q. Now, the office of Nuclear Waste Negotiator, you also mentioned there was a DOE, I guess, procedure or potential siting of an MRS Did DOE express a preference for either one of these options?
A Basically, and this came down from the Secretary at the time, Secretary Watkins, given our success in the state of Tennessee, I think his view was that it would best – that the Department would put our efforts behind the Nuclear Waste Negotiator and support his efforts to the greatest extent possible, in the hope that he could find a willing host for the facility
Q And how, finding a host, can you explain how the amendments addressed that type of process that the Nuclear Waste Negotiator could potentially undertake to site a facility?
A The Negotiator was empowered to negotiate

Page 2124

an agreement with the host entity, the host state, or Indian tribe, and then that agreement would have to come to Congress for approval, and assuming that Congress approved that agreement, there would also be a siting declaration in that, in that approval by Congress
Q If I can direct your attention to, it should be the final exhibit in that binder, marked as PX-169
A Yes
Q. Do you see that document, sir?
A. Yes, I do
Q. And what is the document marked PX-169?
A. This was the reassessment report that Secretary Watkins, James Watkins, directed the program to develop under his guidance, in terms of how we were going to proceed with the program, based on his analysis of it.
Q. Now, if I can refer you, and there are some numbered pages in small letters, and then it goes to the numbered pages, and it's going to be numbered page 14 at the bottom, the Bates number is DB0001465, and it's going to be the second full paragraph from the top.
A Okay

Page 2125

Q. It reads, "When the Nuclear Waste Negotiator is appointed, the DOE is prepared to support initiatives developed by the Negotiator that could expedite issuance of the environmental permits necessary to gain access to the Yucca Mountain candidate site The Negotiator is to seek to enter into negotiations on behalf of the United States with the governor of any state in which a potential site is located or the governing body of any Indian tribe on whose reservation a potential site is located "
A couple questions, Mr Kouts, you had referenced earlier that there were three sites prior to the 1987 amendments that were being considered for repositories What does this paragraph mean in reference to the "Yucca Mountain candidate site"? Had anything changed?
A No, it had not I think this was just another opportunity, if you will, if we could find a willing host for a repository, that that would be something that the Department would consider, but the Department was focusing its repository efforts on Yucca Mountain
Q Let me ask this question, did the 1987 amendments affect the sites that DOE could consider for a repository?

Page 2126

A It more or less nullified the siting in Tennessee, so it effectively removed that from the table Other than that, it didn't give any further direction on where an MRS would be located In the expectation that the Negotiator could find a state, it could be any other state except Tennessee and Nevada

Q Let me – I might have asked an imprecise question You had mentioned a couple other sites, I think, including a salt site?

A. Right, those were repository sites

Q Okay. What, what effect, if any –

A Oh

Q – did the 1987 amendments have on the repository sites that were being considered in addition to Yucca Mountain?

A It effectively directed the Department to terminate the site characterization efforts in the state of Washington and the state of Texas, and also, we had a second repository effort underway at that time, it also terminated those programs and told the Department effectively to focus on Yucca Mountain. Now, in relation to the second repository, it did direct us to submit a report to Congress in the 2007, 2010 time frame on the need for a second repository

Page 2127

THE COURT: I'm sure everybody here knows this but me, but who owns Yucca Mountain?

THE WITNESS: It's effectively owned by the federal government. There are three different types of land that it sits on. Part of the site is owned by the Bureau of Land Management, BLM Part of it's owned by the Nevada Test Site. And the other part of the site is owned by the Department of the Air Force It's the Nellis bombing range So it's all federally owned, but it's under different jurisdictions

THE COURT: It's remote?

THE WITNESS: Yes, it's about 100 miles northwest of Las Vegas and extremely remote and very arid.

BY MR. DAMELIN

Q. If I can turn your attention to page 17 of this document, Mr Kouts?

A Sure.

Q In the middle of the page, there is a section marked 4 3, titled, "DOE's Position on the MRS Facility " Now, I neglected to actually ask you, this document, the report to Congress on a reassessment of the OCRWM program, who is submitting this to Congress back in November 1989?

A I believe this was the Secretary's

Page 2128

document We – it was by the Secretary of Energy, as indicated, it's dated November 29th, 1989 It was his report to Congress.

Q Now, in this section, the last sentence of the first paragraph reads, "The DOE also expressed preference for an MRS facility sited through the efforts of the Negotiator, especially if these siting negotiations lead to modified linkages " What does that sentence mean to you, Mr. Kouts?

A Well, obviously, the preference to have a negotiated site with a volunteer state is kind of obvious "Modified linkages" refers to the restrictions in the Act that I mentioned earlier, on how we could deploy the facility I think that the Department's view then and now is that the value of such a facility is very limited with those restrictions in place. So that, basically, we were hopeful that if the Negotiator was going to negotiate a deal, that part of that deal would be that these linkages would be removed, and that we could deploy the facility as quickly as possible.

Q Now, was there any type of – let me ask this, at the time of this report, had there been a Nuclear Waste Negotiator actually appointed?

Page 2129

A I believe it was, it was a few years after the Amendments Act, but the first Negotiator, Mr. Leroy, was appointed, it might have been after this point that he was eventually appointed.

Q. And was there any type of relationship following the 1987 Amendments Act, and I guess the appointment of a Negotiator, between the DOE and the office of Nuclear Waste Negotiator?

A As I mentioned earlier, it was an independent entity from the Department and was his own – he had his own office in the executive branch of government with that specific role, so the Department and the Negotiator were definitely separate. We did, however, support his efforts through administering a grant program for him and also providing technical staff and, whenever he needed it, to go out and talk to people to explain what the Department's concept of an MRS was and to explain, for instance, issues that might be of interest to, to local governments about how much employment was going to be there, how much the facility was going to cost, et cetera, those kinds of issues

Q Now, you had referenced – I'm not sure if

Page 2130

you used the word "grants" or "money " Can you
describe what DOE did in reference to either funding
or providing financial support to the Negotiator?
A Well, as I mentioned earlier, we
administered a grant process for him. The grants
were to be issued in phases. A Phase I grant was
essentially $100,000 to a local community to study
the issue, the feasibility of the issue Phase II,
Phase II was cut into two different pieces, a Phase
IIA and a Phase IIB
Phase IIA was further feasibility, that was
a couple of hundred thousand dollars. And then Phase
IIB was a 2 8 million dollar grant, which was to be
given to a party that was serious about negotiating,
in the expectation that we would have a negotiated
agreement with those expenditures of funds
Q Were any of the grants you described
actually provided to parties that were engaged with
the Nuclear Waste Negotiator?
A. As I remember There were about 14 or 15
requests for Phase I grants, about six of those were
issued. Phase IIA grants, which were the $200,000
grants, I think there were eight applications, and we
issued five grants along those lines, and there were
two applications for the big grants, the 2.8 million

Page 2131

dollars grants, by two Indian tribes, the Goshutes
and the Mescalero Apaches. The Goshutes are in
Utah –
THE COURT. We've learned a little bit
about that
THE WITNESS If you're familiar with the
private fuel storage facility, which is a private
facility funded by utilities, the Goshutes are the
tribe that were interested in that, they were also
involved back in the MRS days And the Mescalero
Apaches in New Mexico were also interested in having
an MRS, and they applied for a grant, but Congress
essentially withdrew all funding for these grants
prior to the time that they were issued.
BY MR. DAMELIN
Q. And do you, do you know the time period,
when you're referencing these grants, approximately
what period of time we're talking about?
A It was the '93 to '94 time frame, as I
remember, that the grants were issued
Q And you had just mentioned that, I guess,
Congress had discontinued or cut off funding for the
later grants Was that in that same time frame?
A Yes, and this gets into the political
world, but one of the tribes was in a state of a very

Page 2132

influential Senator who was not happy with the
concept.
THE COURT· This is Bingaman?
THE WITNESS It might have been Bingaman
or Senator Domenici at the time, from the state of
New Mexico
BY MR DAMELIN:
Q Now. The office of Nuclear Waste
Negotiator – let me ask this question, what was the
outcome of the Nuclear Waste Negotiator's efforts to
negotiate a site for a MRS facility?
A He was not successful.
Q. And when did that office or the
Negotiator's efforts end?
A The Act Amendments basically formed the
office for a period of seven years, and after those
seven years were up, basically, the office was
terminated.
Q. Now, during the 1990s, and in addition to
the MRS we've spoken about, were there, were there
any other efforts to provide interim storage for
commercial spent nuclear fuel, apart from the
permanent repository?
A What you'll find in the mid-'90 time frame
is moving away from the words and the acronym MRS

Page 2133

because that seemed to carry a lot of bad baggage,
and what you seem to see is the emergence of the term
"interim storage " So in Congress, there were a
variety of bills that were introduced, and at some
point, they had hearings on them, where Congress was
interested in trying to identify a site and basically
authorize the Department to undertake the building of
an interim storage facility, which is essentially
just a storage facility a little different than the
integrated MRS we were looking at back in the
mid-'80s
But a storage facility in the sense of
trying to get a facility available in the near term,
to take materials away from utility sites
Q. And during, if we can just be specific as
to the time frame, when you had referenced these
interim storage facilities were being considered or
bounced around in Congress, when was that?
A They started in – I don't remember exactly
because there were various bills on the House and the
Senate side I believe in the '93, '94 time frame,
there were various pieces of legislation that were
introduced, and they carried up through a bill that
was eventually actually passed in the '99 to 2000
time frame, which was then vetoed by then President

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER )
COMPANY )
Plaintiffs, ) No. 98-614C
v. )
THE UNITED STATES, )
Defendant. )

--------------------------------x

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

SOUTH CAROLINA ELECTRIC & GAS )
COMPANY and SOUTH CAROLINA )
PUBLIC SERVICE AUTHORITY, )
Plaintiffs, ) No. 04-0101C
v. )
THE UNITED STATES OF AMERICA, )
Defendant. )

--------------------------------x

2

Deposition of CHRISTOPHER A. KOUTS
Washington, D.C.
Monday, April 11, 2005
9:26 a.m.

Job No.: 1-53961
Pages 1 - 155
Reported By: Joan V. Cain

Deposition of CHRISTOPHER A. KOUTS, held at the law offices of:

ARNOLD & PORTER
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Pursuant to Notice, before Joan V. Cain, Certified Court Reporter and Notary Public in and for the District of Columbia.

3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY:

M. STANFORD BLANTON, ESQUIRE
K.C. HAIRSTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 226-3417

ON BEHALF OF PLAINTIFFS SOUTH CAROLINA ELECTRIC & GAS COMPANY and SOUTH CAROLINA PUBLIC SERVICE AUTHORITY:

CHRISTOPHER TOMPKINS, ESQUIRE
JENNER & BLOCK LLP
One IBM Plaza
Chicago, Illinois 60611-7603
Telephone: (312) 222-9350

4

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT:

HEIDE L. HERRMANN, ESQUIRE
STEPHEN FINN, ESQUIRE
JOSHUA E. GARDNER, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, Northwest
Washington, D.C. 20530
Telephone: (202) 305-3315

CONTENTS


EXAMINATION OF CHRISTOPHER A. KOUTS PAGE
By Mr. Blanton 7, 147
By Mr. Tompkins 112
By Ms. Herrmann 150


EXHIBITS

(Attached to the Transcript.)


KOUTS DEPOSITION EXHIBITS PAGE
1 Protective Order, 4/8/05 10
2 DOE Report, July 2004 14
3 Letter from Mr. Zabransky to Mr. Cocherell, 7/28/04 31
4 Civilian Radioactive Waste Management System Requirements Document Rev 06 45
5 Letter from Mr. Zabransky to Mr. Cocherell, 12/1/04 50
6 Dr. Chu's Presentation 2/7/05 75
7 Summary of Mr. Garrish's Statement, 3/10/05 82
8 Mr. Garrish's Statement, 3/10/05 105




EXHIBITS CONTINUED

(Attached to the Transcript.)


KOUTS DEPOSITION EXHIBITS PAGE
9 30(b)(6) Notice of Deposition 112
10 Letter from Mr. Zabransky to Mr. Carden, 11/3/04 130
11 Letter from Mr. Detmer to Mr. Johnson with Attachment, 3/4/92 134
12 DOE's Supplemental Privilege Log, December 2004 137
13 Copy of Protective Order, 2/14/05 150




PROCEEDINGS

CHRISTOPHER A. KOUTS

having been sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY

BY MR. BLANTON:

Q Mr. Kouts, good morning. My name is Stan Blanton. I'm one of the lawyers representing Southern Nuclear Operating Company in the case of Southern Nuclear Operating Company, Alabama Power Company & Georgia Power Company versus United States of America.

You're here today, as I understand it, pursuant to a Rule 30(b)(6) deposition notice and a personal deposition notice we've served in that case; is that correct?

MS. HERRMANN: Let me just say, just for the record, Mr. Kouts is here today pursuant to a 30(b)(6) deposition notice. We have received an order from the court, dated April 8, 2005, regarding the government's Motion for Protective Order on the



deposition notice that Southern Nuclear served on Mr. Kouts in his individual capacity.

MR. BLANTON: Right.

MS. HERRMANN: And our understanding is that the court has granted the government's Motion for Protective Order, except to the extent that he has decided to allow questioning regarding the -- let me put this right --

MR. BLANTON: Why don't you mark that as Deposition Exhibit 1 to the deposition. We've got a copy of the order. We can make it an exhibit.

MS. HERRMANN: Great. The court talked about the start date for the repository, and so it's our understanding that the date that the Department of Energy now plans to commence SNF disposal given the time frame for the damages to be determined in this litigation keyed to 2010. We understand that to be a proper area for cross-examination in this deposition. We do not understand that Mr. Kouts is here to address any other topics in his personal capacity.

MR. BLANTON: Well, what the court's order

13

anything you've testified to in any of those cases where your position has changed, where you would change anything you've said?
A No.
Q Other than the 2010 start date, has there been -- is there any issue about which you've testified in any of those previous either depositions or trials where the Department of Energy's position has changed, to your knowledge?
A No.
Q Now, as I understand it, you've been designated as the government's designated witness for the purpose of testifying about the 2004 Annual Priority Ranking & Annual Capacity Report document.
MR. BLANTON: Is that correct, Ms. Herrmann?
MS. HERRMANN: That is correct.
BY MR. BLANTON:
Q Okay. Mr. Kouts, do you understand that you've been designated the government's representative to testify about that subject?
A Yes.

14

MR. BLANTON: Let's get a copy of that, K.C.
Let's mark that as Kouts' 2.
(Kouts' Deposition Exhibit 2 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q And she'll give you the original, Mr. Kouts.
MS. HERRMANN: Can I get a copy of Kouts' 1?
MR. BLANTON: Yeah.
BY MR. BLANTON:
Q Mr. Kouts, when you've had a chance to familiarize yourself with Kouts 2 in front of you, let me know.
A I'm familiar with it.
Q Could you identify that document, please, sir?
A It's the Acceptance Priority Ranking & Annual Capacity Report that was issued by the Department in July 2004.

15

Q Who was responsible at the Department of Energy for this document?
MS. HERRMANN: Objection, vague.
BY MR. BLANTON:
Q Can you answer the question?
A The Department of Energy was responsible for it.
Q Well, what individual within the Department of Energy was responsible for this -- for producing this document?
A It was developed by my staff with contractor assistance.
Q Is your title the same as it was when you testified in the Yankee trial?
A Yes, it is.
Q Is your reporting relationship the same?
A Yes, it was -- yes, it is.
Q So you report to Ted Garrish?
A That's correct.
Q Has there been any change in the reporting relationship since -- I don't know if it's doctor or Ms. Chu -- decided to leave the Department of

16

Energy?
A No, there has not been.
Q So Mr. Garrish is now acting director. Is that his correct title?
A No, it is not.
Q What is his correct title at this point in time?
A It remains what it was before.
Q Which is?
A Deputy director for strategy and program development.
Q So there's no -- is there an acting director?
A No, there is not.
Q Who on your staff worked on the Annual Capacity -- or the Acceptance Priority Ranking & Annual Capacity Report?
A Dave Zabransky and Tom Pollog.
Q What was the purpose of issuing this report in July of '04?
A The purpose was to -- this report was to accompany a letter and was accompanied by a letter

17

**to contract holders to initiate the planning process under the standard contract in anticipation of receiving shipments in 2010.**
Q When you refer to the planning process under the standard contract, explain to me what you mean by that.
A **Essentially, the Department asked contract holders to submit delivery commitment schedules based on the information provided in the Acceptance Priority Ranking & Annual Capacity Report.**
Q When is the last time DOE had issued an Acceptance Priority Ranking & Annual Capacity Report before the July '04 report, if you're aware?
A **We issued several. I don't remember exactly the last one. I was not involved at the time in managing that area when they were issued.**
Q On page 1 of the document, the first paragraph -- the first sentence of the second paragraph -- strike all that. We're going to start over.
The first sentence of the second paragraph says, "The Standard Contract requires the Department

18

to issue an annual," and that annual is in a small case, "Acceptance Priority Ranking report and an Annual Capacity Report (ACR)." How often does the standard contract require the Department to issue a document such as has been marked as your Deposition Exhibit 2?
MS. HERRMANN: Objection, calls for a legal conclusion.
BY MR. BLANTON:
Q What's your understanding of the contractual requirement?
A **My understanding of the contractual requirement is that if the Department was requesting DCSs, that it would be issued on an annual basis.**
Q Why only if the Department was asking for DCSs?
A **My own personal view is that the -- there'd be no need for it.**
Q Why is that?
A **Because the Department would not -- essentially, would be signaling that we were not accepting fuel 63 months prior to the date of -- of**

19

**acceptance.**
Q I'm sorry. What would signal the Department didn't intend to accept fuel within 63 months?
A **The fact that we were not issuing -- or requesting DCSs.**
Q So do I understand your testimony correctly then to be that the impetus for the issuance of the Acceptance Priority Ranking & Annual Capacity Report is the Department of Energy's intent to request DCSs?
A **That's my understanding.**
Q And by DCSs, we mean delivery commitment schedules; is that correct?
A **That's correct.**
Q And delivery commitment schedules are also addressed in the standard contract; is that correct?
A **Yes.**
Q Do I also understand from your testimony that it's the Department's position that they will -- that the Department will only request DCSs to be submitted by contract holders when the

20

Department has an intention to accept fuel within 63 months?
A **That's correct. I believe it's 63 months from the year we're going to.**
Q Right.
A **63 months from -- prior to the year we're going to accept fuel, not 63 months prior to the point in time that we're going to be accepting fuel.**
Q So to help this make sense on the record, as I understand, the standard contract provides that within 63 months of the year in which fuel is to be accepted, the contract holder is to submit a Delivery Commitment Schedule; is that correct?
A **The Department will request it. It's up to the contract holder as to whether or not they're going to submit it.**
Q Right. And it's the Department of Energy's position that it will only request these delivery commitment schedules within 63 months of the date when the Department of Energy has determined it will accept -- of the year in which the Department of Energy has determined it will accept fuel?

69

**A You can submit a license application any time you want; however, before the NRC will docket the license application, there must be at least six months prior to the time of docket that the Licensing Support Network has been certified.**
Q So if the recertification happens in June of '05, then the earliest the NRC would docket an application for a construction authorization for repository would be six months after that? I don't know whether that means December or January but --
**A That's correct.**
Q Is there any way right now to determine what impact on the license application schedule -- strike all that.
Is there any way to determine right now what the impact of any revised health and safety standard EPA may issue this summer will have on the schedule for the preparation and submission of a license application for repository?
**A No.**
Q The second paragraph of the December 1, 2004, letter concludes with the sentence that

70

says, "After the Department has determined a revised date, the initial operation of the Yucca Mountain repository, it will resume the DCS process in accordance with the provisions in the standard contract." Do you see that sentence?
**A Yes.**
Q Has the Department determined a revised date for the initial operation of the repository as we sit here today?
**A No.**
Q I asked you earlier, and I think you said you did recall in the Commonwealth Edison case you were deposed regarding a milestone schedule that led to the commencement of operations of the repository and maybe even closure of the repository. Do you recall that testimony?
**A Yes.**
Q I think that document's called a milestone dictionary. Is that the right terminology for it?
**A No.**
Q What is the right terminology for that document?

71

**A Disposal Decision Plan.**
Q Okay. Has a -- has the Department of Energy revised the disposal decision plan since December 1 of '04?
**A No.**
Q How about since July 28th of '04?
**A No.**
Q Has the Department revised any milestone schedule that it uses to determine when it will either submit a license application or commence repository operations?
**A Yes.**
Q What's the name of the document that you're referring to?
**A The document I'm referring to is testimony given by Mr. Garrish before Congress in terms of when the Department's plans are to submit a license application.**
Q Okay. I'm referring -- let me -- I'm going to ask you about that in a minute.
What I'm asking about right now is, is there any DOE document that has a critical path

72

schedule with milestones indicated that includes as a milestone either the submission of the license application or the commencement of operations of the repository that's been revised since this December 1, '04, letter?
**A The best way for me to answer that is there may be some documents that look at that but in draft form; however, the secretary has indicated that we have no schedule for the program at this time. Until the secretary approves the schedule, we don't have a schedule for the program.**
Q Okay. So there's nothing official -- no official revised schedule?
**A That's correct.**
Q Is there a concern within the Department that DOE's schedules for repository program lack credibility with contract holders?
MS. HERRMANN: Objection, foundation. Speculation.
BY MR. BLANTON:
Q Well, let me rephrase it then. Are you, in your position, concerned that DOE's schedules lack

credibility with contract holders?
MS. HERRMANN: Objection, relevance.
**A I think there is general concern within the Department that the schedules for the program need to be credible.**
**BY MR. BLANTON:**
Q Is that it?
**A Yeah.**
Q In your position, are you concerned that the resumption of the DCS process and then the suspension some five months later of that same process creates some doubt about the credibility of DOE's schedules among the contract holders?
**A The Department made the decision that it made based on the information it had at the time and felt that that was a reasonable decision to make. Subsequent events indicated that the schedule was not attainable, and the Department informed contract holders to that extent.**
Q And my question is, as an official of the program, were you concerned that that change in position over that short period of time creates a



lack of credibility in DOE scheduling? Let me rephrase the question and call it reliability as opposed to credibility.
Are you concerned that there's a sense that DOE schedules are not reliable on the part of contract holders?
**A I guess I can only answer that in the context that the Department tries to make the best decisions that it has based on the information that it has, and to the extent that that creates concern among the contract holders, that's essentially their own concern. The Department's trying to do the best that it can under the conditions that it's implementing the program.**
Q But you would not advise a contract holder to base significant economic decisions on a DOE schedule such as was issued in the 2004 ACR/APR, would you?
MS. HERRMANN: Objection, foundation. Speculation. Relevance.
**A Utilities and contract holders have to make their own decisions based on the information that**



**the Department provides.**
**BY MR. BLANTON:**
Q And if they rely on the information the Department provides, and that information happens to be wrong, it's the utilities hard luck; is that it?
MS. HERRMANN: Same objections. Calls for a legal conclusion.
**A It's their decision.**
MR. BLANTON: Let's get this out. Let's do '06 budget roll-out. It's your tab either six or seven. I don't know which.
We're marking that as Kouts' 6 please, ma'am.
(Kouts' Deposition Exhibit 6 was marked for identification and was attached to the deposition transcript.)
MR. BLANTON: And while we're on the record, we may need to use some of these same documents tomorrow. Is it acceptable to everybody just to leave the originals with the court reporter and have her bring them back tomorrow, and if we need one of these for Mr. Zabransky, we'd use it,



the same one?
MS. HERRMANN: We have no objection as long as that's okay with the reporter.
BY MR. BLANTON:
Q Mr. Kouts, at the time the FY '05 budget request was made, had DOE projected the funding it would require to open the repository in 2010 for the years subsequent to '05 as well?
**A Yes.**
Q So that -- just to make the record clear, that '05 request was part of a series of projected appropriation requests that the Department felt was necessary in order to meet the 2010 schedule; is that right?
**A Yes.**
Q Do you recall when the fiscal year '05 request was made, what the fiscal year '06 projection was?
**A I believe it was slightly over a billion dollars.**
Q Now, we've marked as Kouts' Exhibit 6 a document which is before you. Do you recognize that

questions earlier regarding this document, more specifically, Appendix A, and you testified that the methodology for Appendix A is the same as it has been in annual capacity reports and annual priority rankings?
A **That's correct.**
Q Okay. And that this Appendix A merely lists SNF discharges ranked in order by date of permanent discharge?
A **That's correct.**
Q Okay. This particular version of Appendix A, do you know what the source of this information was?
A **The source of this information comes from the RWA 59 forms that were sent out to contract holders over the years.**
Q Okay. Do you know when -- do you know when the Department most recently requested submission of RWA 59 forms?
A **Last year.**
Q Does this particular version of Appendix A cover information submitted through the RWA 59 forms



submitted last year?
A **Yes, it does.**
Q Okay. Do you know what the date of the last discharge that would have been reported on those forms?
A **No, I do not.**
Q Do you know how we would determine that?
A **The last date of discharge for who?**
Q Well, actually, I was a little imprecise in my question. I should -- I'm actually asking, what is the last -- what is the end date of that reporting period on that last set of RWA 59 forms?
A **I believe that this report responds to discharges up through December 31, 2002.**
Q Okay. If you'd turn to Table 2 of this document, please --
MS. HERRMANN: What's the page on that?
MR. TOMPKINS: Page 3 of the document.
BY MR. TOMPKINS:
Q And this is a table entitled "Summary of Purchasers' Annual Allocations." Could you explain how the information in Appendix A is taken and



transferred into this Summary of Allocations?
A **Basically, you look at the first year, count up 400 tons and allocate it to the individuals who have allocations in the first year.**
Q Okay. And so the first column for 2010, assuming as this ACR does that DOE was planning on accepting 400 metric tons, the allocations which are reflected in the first column would represent the first 400 metric tons in Appendix A?
A **That's correct.**
Q Okay. If the Department was to use a different rate, would it use a similar methodology to calculate Table 2, but just alter how far down Appendix A goes to determine that?
A **That's correct.**
Q Okay. And if -- if the start date for the program was altered, would you undertake the same effort with respect to whatever the start date was? For example, if your start date was 2015 instead of 2010, you would just use the first year's acceptance rate and go down Appendix A, whatever the amount of that first year's acceptance rate was?



A **That's correct.**
Q And, conversely, if you wanted to determine what allocations would have been in 1998 if DOE had used this particular acceptance rate, you could do a similar thing in reverse and replace 2010 with 1998?
A **No, you could not.**
Q Why not?
A **Because the capabilities of the facilities were different at that time.**
Q Okay. Assuming that the capabilities were the same and DOE was accepting SNF at a 400 metric ton rate in 1998 and that was the start of the program, would the allocations represented in this 2010 column be the same for 1998?
MS. HERRMANN: Objection, assumes facts not in evidence. Speculation.
A **I don't know.**
BY MR. TOMPKINS:
Q Why don't you know?
A **Because I don't know how we would -- how you can possibly project back into time, based on what we're doing in 2010 back to where we were in**

**Tennessee Valley Authority v. U.S No. 01-249C July 11, 2005**

**Heritage Reporting Corporation**

**Page 1264 to Page 1560**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1264

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, )
Plaintiff ) Case No 01-249C
v )
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D C.

Monday, July 11, 2005
Volume 7

The parties met pursuant to the notice of the Judge, at 9 32 a m

BEFORE: THE HONORABLE CHARLES F LETTOW

Page 1265

APPEARANCES
ON BEHALF OF THE PLAINTIFF
PETER K SHEA ESQ
EDWIN W. SMALL, ESQ
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J LO RE, ESQ.
SONIA ORFIELD ESQ
SHARON A SNYDER, ESQ
KEVIN CRAWFORD, ESQ
U S Department of Justice
1100 L Street, Northwest
Washington, D C. 20530
(202) 305-7562

***Index appears at end of transcript***

Page 1266

P R O C E E D I N G S
- - - - -
THE CLERK All rise The Court of Federal Claims is now in session the Honorable Charles Lettow presiding
THE COURT. Good morning. We've all arrived in Washington, and we appear to be ready to go People have documents in hand Preliminarily Mr Shea, is there anything that you would care to address?
MR SHEA No, Your Honor I'll leave that, I've spoken with Mr Lo Re, and we're in agreement We had the joint exhibits that we discussed in Chattanooga, and we've put them together, and we have Joint Exhibit 2 and 3, copies with us and we will introduce those in due course. And I don't believe there's anything else from TVA's point of view, Your Honor. I understand Mr Lo Re has an item or two of administrative procedure
THE COURT All right. Mr. Lo Re?
MR. LO RE: Good morning, Your Honor, just a couple of housekeeping notes. As Mr Shea said we have received Joint Exhibit 3 which is the site plan from the Sequoyah plant that we visited back in June. We wanted to make that an exhibit introduce that

Page 1267

into evidence and we have experts who will be talking about the site plan, and in addition, we have the site plan for the Browns Ferry plant, which has already been marked as an exhibit
THE COURT As the Court recalls, we had Joint Exhibit 1 already in evidence Joint Exhibits 2 and 3 were in effect presented during our site visit to the Sequoyah plant so they are, as far as the Court's concerned, already admitted
MR LO RE. That's fine Your Honor
(Joint Exhibit Numbers 2-3 were received in evidence )
THE COURT All right
MR LO RE With respect to two other matters, one there were two witnesses the Court may recall who have been former DOE employees who have long since retired One is Robert Morgan The other is Michael Lawrence We will be presenting testimony of both of those individuals later in the week but we did want to make the Court aware that we had spoken with Mr Morgan and because he is on the other side of the country, I believe he's in New Mexico, we were inquiring into the possibility of presenting his testimony through video conferencing.
We have spoken about this with TVA counsel.

Page 1448

in any affirmative defense in an answer. It's simply not in this case.

THE COURT: I'm thinking of the opinions by the Federal Circuit earlier this decade, written by Judge Freedman. Those opinions are binding on this Court. If we get an argument that is a delay based argument that is different from those, then it's beyond the power of this Court to act on, but I certainly acknowledge that the government is entitled to put forward its case in the effort of perhaps to get the Court of Appeals to change its mind or to get the Supreme Court to address the matter. I don't recall this being put forward as an affirmative defense, but that's not to say that the government has actually asked that it be put forward as an affirmative defense here. I'm going to allow people to preserve the record though. There's no doubt about that And I take it that's what both you, Mr. Lo Re, are doing, and that's what you, Mr Small, are doing.

MR. SMALL: Yes, Your Honor, we do want to preserve the record on the point, and of course, I would ask for a continuing objection throughout the trial to that particular line of questions I do not wish to delay the trial or obstruct it when it comes

Page 1449

to objections, but I did want to make the point clear to the Court as we receive evidence, and of course, there may be particular times when I will renew that objection as to some particular matter. If I can't concede that, it might be relevant to "telling the story" if you will.

THE COURT: All right. Thank you, Mr. Small, and you do have a continuing objection in that respect.

MR. LO RE: Thank you, Your Honor, and that's fine, and I believe the opinion the Court may have been referring to is Judge Freedman's decision in the Yankee Atomic case.

THE COURT: Yes.

MR. LO RE: I believe that was maybe –

THE COURT: What did I say it was?

MR LO RE: You didn't say. You said earlier in the decade, and I believe it may be the Yankee case. Thank you.

THE COURT: All right. I was trying to remember. It was one of the Yankee cases, and I couldn't precisely remember the style.

MR. LO RE: Ms Court Reporter, could you read back the last question, please?

(The reporter read the record as

Page 1450

requested.)

THE WITNESS: Simplistically, Congress in the Amendments Act indicated that the Department could not site an MRS until the repository was sited. It could not construct an MRS until the repository construction authorization was received from the Nuclear Regulatory Commission. It could not – the MRS under those conditions could not receive more than 10,000 tons until the repository was operational and no more than 15,000 tons overall while the repository was in operation.

BY MR. LO RE:

Q. Now, with respect to the limits on the operation, what, if any, effect did that have upon the rate of acceptance at which DOE could begin to accept the spent nuclear fuel from facilities?

A. Well, depending on when you were deploying the MRS in relation to the repository, you were now reduced from 15,000 tons to 10,000 tons until the repository was operational, so that limited even further the ability of waste acceptance in that small window of time that they allowed you from the timing.

Q. Now, Mr Kouts, could you please turn to Exhibit DX-292? And this is a document entitled, "Preliminary Estimate of the Total System Cost For

Page 1451

the Restructured Program: An Addendum to the May 1989 Analysis of the Total System Life Cycle Cost For the Civilian Radioactive Waste Management Program," and the document is dated December 1990. Mr. Kouts, are you familiar with this document?

A. Yes, I am.

Q. What is it, sir?

A. It's another total cost projection of the program, based on new assumptions, based on the Secretary's reassessment of the program, Secretary Watkins' reassessment of the program in 1989.

Q. And what was that reassessment of the program, Mr. Kouts?

A. Again, simplistically, that had the repository, the first repository operation no longer in 2003, but operational in 2010.

Q. Now, did you use this document in the course of your work with the document?

A. I was aware of it

Q. And, again, I notice in the upper left-hand corner, there is a stamp, DOE/RW-0295. What does that number indicate to you?

A. It's, again, a departmental document issued under departmental letterhead.

MR. LO RE: Your Honor, at this time, the

Page 1452

government would move for the admission of DX-292 into evidence.

THE COURT: Denied; it was already admitted on the 27th of June.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. Now, Mr. Kouts, could you turn to page – before we go there, the cover, it says, "An Addendum to the May 1989 Analysis." What is, why was an addendum required?

A. I quite honestly don't remember the specifics of why it was. It was probably that the, the earlier version, and this is speculation on my part, but the earlier version which was issued earlier in the year of 1990 did not reflect the latest direction from the Secretary, so this probably was an addendum to reflect the latest programmatic assumptions at that time

Q Now, Mr. Kouts, if you could turn to Roman Numeral III of this document, does not have Bates numbers, Roman Numeral III, under the heading, "Abstract"?

A Yes

Q And do you know what is meant by the term "abstract" in this document?

Page 1453

A. It's a synopsis of what's inside the document, essentially

Q. Now, it says, after the underlined portion, a third of the way down this paragraph, it says, starting with, "The major elements"?

A. Yes

Q. It says, "The major elements of the restructured program announced in this report which pertain to the program's life cycle costs are: A prioritization of scientific investigations program at the Yucca Mountain candidate site to focus on identification of potentially adverse conditions, a delay in the start of repository operations until 2010, the start of limited waste acceptance at the monitored retrievable storage facility in 1998, and the start of waste acceptance at the full-capability MRS in 2000."

I'd like to focus on the last part of that sentence there, and that is starting with the assumption regarding a delay in the start of the repository operations until 2010. What is that referring to?

A In our discussion earlier, basically, we had seen that the planning of the Department was to have the repository operational in 2003. This now

Page 1454

delayed the first repository to 2010, but it still had the MRS facility, or a more limited MRS facility operational in 1998.

Q. And the next clause says, "the start of limited waste acceptance in a monitored retrievable storage in 1998." Again, what is that referring to?

A. This, again, indicates that at, in the time frame, without authorization, we probably couldn't build the entire facility that we had in our proposal in 1987 by 1998, but we could build a smaller facility that could just receive materials and store them, and then the larger facility, the integrated facility would come later, and that's what this reflects.

Q. Now, with respect to the commencement of an MRS in 1998, I believe you testified that there were linkages in the amendment that would preclude that?

A. That's correct.

Q And so why was the, why was the DOE making an assumption with respect to MRS operation in 1998, notwithstanding those linkages?

A. Okay. The Secretary's redirection report basically informed the program that we weren't going to go and try to site MRSes anymore since we were somewhat unsuccessful in trying to site one in

Page 1455

Tennessee, so we were going to rely on the good office of the Nuclear Waste Negotiator to assist us in doing that, and the planning assumption that was built into this was that once the negotiator identified a host site, that a benefits package would be agreed to by the negotiator and the host community and the host state

That would have to be approved by Congress, and part of that act of Congress would be to address the linkages, such that we could begin accepting materials at an MRS in 1998, and it effectively would adjust the linkages that were put in, in 1987. So that was the assumption at this point, that we would be successful in siting this with a negotiator, then the negotiator's package would be approved by Congress, with the understanding that those linkages would be removed, and we would be able to deploy the facility in 1998.

Q. And, again, what was the significance of deploying the facility in 1998?

A Again, to meet the Department's contractual obligation

Q. Mr. Kouts, could you please turn to page 10 of this document, under the heading, "Waste Logistics," and can you describe for the Court what

Page 1460

A. Only one.
Q Okay. Let's take a look at A-1, please.
A. Okay.
Q. Now, what does this chart depict, sir, with respect to acceptance rates?
A. Well, as I said earlier, it has the MRS operational in 1998 and it basically accepting it at 400 metric tons for the first two years and then ramping, going up to a 900 ton rate and up to the point of repository operation and then bumping up from there with the repository in operational to an 1,800 ton rate and then eventually a 3,000 ton rate.
Q. Now, if you look at first 10 years, going through 2007, can you – after 2007, the rate remains steady at 900 in 2008 and then 900, again, in 2009. Why is that?
A. Well, that's to make sure that you don't exceed the 10,000 metric ton limit in the linkages that Congress had in the Nuclear Waste Policy Act amendments of 1987
Q. And can you tell the Court why that rate does not jump up to 3,000 in 2008?
A In 2008, it's essentially because you would exceed the 10,000 metric ton limit, the statutory limit imposed on the facility

Page 1461

Q. Now, I see from this document, A-1, that the repository comes online in 2010, is that right?
A. That's correct.
Q And the acceptance there at the repository is 400, is that right?
A That's correct.
Q So that would mean that the cumulative acceptance between the MRS and the repository for that year, 2010, is how much?
A. Well, actually, the cumulative acceptance is 1,800 because the 400 that's at the repository, that goes to the repository comes directly from the MRS, so the total acceptance into the system in 2010 is 1,800. 400 metric tons, however, would be shipped from the MRS to the repository.
Q. Now, why doesn't the rate jump up from 900 in 2009 to 3,000 in 2010 when the repository comes online?
A. Well, essentially, the repository is ramping up here, as we see, it's just beginning operations, where you do see a bump up in 2010 of capability at an MRS because we are shipping away from the repository, but essentially, the – shipping to the repository. Essentially, what you're seeing here is, again, a start-up of a nuclear facility,

Page 1462

which you want to start fairly slowly.
Q. Now, when does the rate, at what point does the rate actually hit 3,000 MTU on this chart?
A. Five years after the start of operation of the repository.
Q. Do you know why that is, sir?
A That's essentially because that's the, that's kind of the five-year ramp-up that we've used in, ever since, in terms of trying to develop a capability at the repository to ramp-up and have more capability to receive materials.
Q. Now, Mr Kouts, the rates that are depicted here in this chart, which is A-1 of DX-292, how did those rates comport with the rates set forth in the documents we've been looking at to-date; that is, the documents that DOE issued prior to the December 1990 PETSC?
A. Well, the ones prior did not have this limitation in terms of the 10,000 metric tons.
Q And specifically, can you describe to the Court what that limitation is?
A. Well, again, with the restriction that Congress put on the facility, we could not receive more than 10,000 tons until the repository was operational, so therefore, this waste acceptance rate

Page 1463

essentially limits and tries to get to a steady state amount quickly, so that we could take a measured amount on a year that would be integrated across the 10 years of operation, if you will, 10 to 12 years of operation, we would be operating the MRS in advance of the repository.
Q. And how does that comport with the assumptions in previous documents we looked at?
A. Well, it's a lesser acceptance rate.
THE COURT. Mr. Lo Re, before we leave this page?
MR. LO RE: Yes, Your Honor.
THE COURT: Are you about ready to leave it?
MR. LO RE: I am, certainly.
THE COURT: Mr Small, with apologies, I have a couple of questions here, just because I don't understand – well, I think I don't understand the method of presentation, and while it's fresh in my mind, I want to try to sort it out You may obviously object to any question I ask.
Mr. Kouts, you said for 2010 that the 4,000 – or 400 MTUs that are shown on table A-1 came from the repository, is that correct?
THE WITNESS· No, sir, they came from the

Page 1476

THE WITNESS: Part 63.
THE COURT. 63, sorry.
THE WITNESS· Right, right
THE COURT: It was 71, 72, and 63.
THE WITNESS: Right.
MR. LO RE: Just to throw you off
THE COURT: Actually, it was 72, 71, and 63, in the order that Mr. Kouts addressed them. But in any event, the reference you made to the disposal, it's not cask exactly, but the package –
THE WITNESS: Right.
THE COURT· – with the inclusion of gallium is specified in the regulations?
THE WITNESS: No, that's, again, that's the Department's proposal in order to demonstrate long-term criticality control in the underground there. You peel off the layers of the onion here. It's a little bit more complicated than that. The Department will also propose getting burnup credit, which is a basically credit for the burned portions of the fuel, so a criticality event cannot happen. And that's something, again, the NRC would have to agree to, and that's something that's never been issued by the NRC either for transport or for storage, so we're kind of breaking new ground in

Page 1477

that, and it's a very analytical exercise. So, I mean, what I gave you was kind of a summary of the requirements for it. There are, once you get below the first layer, there are others that kind of crop up as you try to meet the requirements of the storage, transport, and disposal components.
THE COURT All right
THE WITNESS But I would like to emphasize that there is no storage device or storage transport device because there are certain devices that the utilities use that have been certified under 71 and 72, but none of those would still meet the requirements of what we need in the underground, and therefore, they're not disposable.
And when we receive those, if we receive those at some future time and we have an amendment to a contract or an adjustment to the contract to do that, we would have to repackage the fuel in those and put them into a waste disposal package because those packages could not be disposed of.
THE COURT: That's what I was really driving at, that is the – Yucca Mountain facility contemplated a repackaging at the facility?
THE WITNESS That's correct.
BY MR. LO RE:

Page 1478

Q. Now, Mr. Kouts, could you please turn to DX-76?
A. Okay.
Q. And this is a document entitled, "Annual Capacity Report," dated December 1991 Mr. Kouts, are you familiar with this document?
A. Yes, I'm familiar with it.
Q What is it, sir?
A. It's an annual capacity report issued by the Department. You can see from the upper left-hand corner, it has a DOE/RW number, which means it was issued, and it, again, identifies what the annual capacity of the system is expected to be as of December 1991.
Q. And did you use this document – or how did you use this document in your tenure?
A. I was certainly aware of it. I don't know that I used it on a daily basis, but I was aware of its contents, yes.
MR. LO RE: Your Honor, the government moves for the admission of DX-76 into evidence.
MR. SMALL· No objection, Your Honor.
THE COURT: Admitted.
(Defendant's Exhibit Number 76 was received in evidence.)

Page 1479

BY MR. LO RE.
Q. And can you explain the purpose of the annual capacity report, Mr. Kouts?
A It's to provide a view of the Department's perspective in terms of its planning for the capacity in the system as it projects into the future.
Q And why are you making those projections?
A More or less to just inform people what our current planning base is.
Q. Now, if you could turn to page HQ2360, please? And this is under the heading of, "Summary."
A. Yes.
Q. It says, starting in the second paragraph here, it says, "The projected waste acceptance rates for SNF presented in table 2.1 assume: A site for a monitored retrievable storage (MRS) facility will be obtained, and the facility will initiate operations in 1998." Let's just stop right there. What does that mean?
A. That the assumptions in this table have an MRS operational in 1998, and there is an authorized MRS in the system
Q Then it says, "and the statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act of 1982 as

Page 1480

amended (NWPA) will be modified."
A That's correct.
Q Could you describe what that means?
A. This is, again, the same assumption that we're operating under, that the Nuclear Waste Negotiator would find a host site for the MRS. That is part of the approval of the benefits package for that host site, that Congress would revisit the linkages in the 1987 amendments for the MRS, and we would be allowed at that point to deploy an MRS in 1998.
Q. And then it goes on and completes the following two sentences, "During the first 10 years following projected commencement of Federal Waste Management System (FWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU. This is consistent with the annual capacity licensing conditions imposed on an MRS facility by the NWPA." What does that mean?
A It's consistent with the storage capacity of the, as identified in the Amendments Act, which was not to exceed 10,000 metric tons until the repository was operational.
Q. Okay Let's take a look at table 2.1, which is page 2365, and this is a table entitled,

Page 1481

"Projected Waste Acceptance Rates For Spent Nuclear Fuel," dates starting in '98 going through 2007 First, Mr. Kouts, why did the projections stop after 2007?
A. Essentially because it's the first 10 years into the system, and typically, an annual capacity report only looks at the first 10 years.
Q. And now, how do these rates that are reflected here between 1998 and 2007 comport with the rates of acceptance that we looked at in DX-292, which is the 1990 PETSC?
A. They're consistent. There's a slight change in terms of the second year. You've gone up to 600 metric tons, but it's essentially the same concept. The steady state rate is 900 metric tons, and you operate at a steady state basis until the repository is operational, and of course, you're conscious of the fact that the repository is not going to be there until 2010. So you don't want to exceed the 10,000 metric ton requirement as, or statutory limitation in the Amendments Act
Q. Mr. Kouts, could you turn to DX-84, please? And this is the 1992 annual capacity report, revision one, dated May 1993 Are you familiar with this

Page 1482

document, sir?
A. Yes, I am.
Q. And how are you familiar with it?
A. I'm familiar with the fact that I probably reviewed it before it went out, and it was a document issued in 1992 that essentially had the updated, any updated information that we had for beyond the 1991 report.
Q. And, again, there's an RW number on that document. What does that indicate to you?
A. That indicates it's, again, a DOE document. It was issued by the Department. In other words, it's not a contractor report, and it represents DOE policy.
MR. LO RE: Your Honor, we move for the admission of DX-84.
THE COURT: Mr. Small?
MR. SMALL: No objection, Your Honor.
THE COURT Admitted.
(Defendant's Exhibit Number 84 was received in evidence.)
BY MR. LO RE:
Q Now, Mr. Kouts, before we go on past the cover page of this document, I notice that the document says, "1992 Annual Capacity Report," yet the

Page 1483

date on the document is May 1993. Do you know why that is?
A. It's essentially because they used data from projections for spent fuel through 1992 and that's why they – but the report was issued later in 1993.
Q. Now, if you could turn, Mr. Kouts, to the page marked HQ2322 of this document? And this is under the heading, "2.0, Waste Acceptance Projections."
A Yes.
Q. The second paragraph starts with the sentence, "The acceptance rates in table 2.1 are nominal and do not reflect the MRS facility schedule linkages and the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." What does that mean?
A. Essentially, that the document does not reflect the fact of the existing linkages to the effect that the MRS is, could not be deployed until the repository – or could not be constructed until the repository was being constructed. The assumption here is that, again, the negotiator is successful,

THE WITNESS: That sits and is invested by the Department in Treasury securities, as required by the Act. So whatever is not – in other words, the excess over whether the receipts come in – let's talk about receipts. Right now, the receipts coming into the fund are roughly 750 million dollars a year. If Congress does not appropriate that 750 million dollars, the rest of that supposedly goes to the Treasury, and the Department is allowed to invest it in Treasury securities

Now, there have been, there's, last year, this administration, and in certain previous years in other administrations, there has been legislation that has been proposed to allow direct access to the receipts coming into the Fund, but that's something that Congress has not acted on as of yet

THE COURT: When you say 750 million dollars approximately comes into the fund, roughly contemporaneously, does that include the interest that's paid on the funds by the Treasury?

THE WITNESS: No, those are simply receipts for this entire year that have come in. The past funding that was not expended, that is invested and interest is borne on that, if you will, from Treasury securities, and then we keep a tally of what's



existing in the fund from a year-to-year basis, and there's roughly about 16 billion dollars that sits in the fund at this point in time

THE COURT: At this point?

THE WITNESS: At this point in time, yes

THE COURT: Thank you Mr Lo Re, anything further?

MR. LO RE: Nothing further, Your Honor

THE COURT. Now, Mr. Small, cross-examination, please.

MR. SMALL: I'll be glad to start, Your Honor.

THE COURT. Well, you have just a start.

MR. SMALL: Your Honor, I want to pick up with the last topic and cross-examine on it, again, specifically reserving the objection. I feel like I must cross-examine on the topic because the questions and testimony that came in about the topic of the budget.

THE COURT: Certainly

CROSS-EXAMINATION

BY MR. SMALL:

Q. Mr. Kouts, did I understand your last answer to be that there's about 16 billion in funds right now saved in the Nuclear Waste Fund?



A. That's correct.

Q. Does that include both the payments by the utilities and the interest that's accumulated on the funds?

A. That's correct.

Q. Has the Fund ever been judged inadequate?

A. No, it has not

Q The money that's in the Fund and not being used to construct the facilities and other things necessary for the program to proceed to pick up spent nuclear fuel, is that in effect used to help reduce the deficit?

A. That's one view.

Q. Is there another view?

A. Another view is that it sits there in the Treasury waiting for Congress to appropriate the funds as appropriate

Q. But on the books of the government, it in effect reduces the deficit, doesn't it?

A. That's one interpretation, yes.

Q. With regard to taking title to spent nuclear fuel at utility sites, couldn't DOE take title to spent nuclear fuel at utility sites and store it at those sites?

A Physically, could the Department do that?



Q Yes, sir.

A. It would require that the Department – my sense is the Department would have to become the licensee for those materials, which would mean the Department would have to demonstrate all the capabilities of the licensee, that it had control of the land, that it had, you know, access to the materials, that it was capable of doing all those things, and that would be a substantial effort for the Department to undertake.

Q. Couldn't the Department contract with the licensee of the site?

A. It could contract, but ultimately, the liability of those materials and anything that happened to those would then fall on the federal government.

Q. But nevertheless, DOE could contract with the utility at the site to handle the storage of the material until DOE could take it away, correct?

A. It depends on what you refer to as contract. Are you talking about operations in the pool itself? Are you talking about spent fuel that sits outside a reactor in an independent spent fuel storage installation? I mean, you'd have to be more specific in terms of – if you were talking about

Page 1544

taking title to what's actually in the reactor pool, I think that would be very difficult for the Department to do, considering the fact that the licensee who's operating the reactor needs access to that pool to move materials in and out. The Department would not be the sole operator of the pool. I think that would be a very confusing situation for the Department and the operator of the facility.

If you're talking specifically about the independent spent fuel storage installation that exists, I think there would still be issues there essentially because there would still be requirements for the licensee to move more materials into that site, and the handoff as to who's responsible and liability of those operations would be very complicated issue that would have to be worked through.

If you're asking whether these things are physically possible, I would say, yes, but I think they would be very confusing in their implementation and something that would be very challenging to do, especially when you're talking about doing this at a variety of different sites around the country with different site requirements and different site

Page 1545

issues, and it would not ultimately resolve the issue, which is to get these materials off the site, so that these facilities eventually could be decommissioned, and therefore, that these materials would not rest there.

I think taking title, from a policy standpoint, at the reactor sites doesn't do what the intent of the Act was, which was to get these materials away from the reactor sites and basically to get them into control of the federal government at a specific site separate from where the utilities currently have them.

Q. Well, wasn't the first step in that process for DOE to take title of the nuclear fuel, the spent nuclear fuel?

A. I think that's, again, I think the best way for the Department to handle that is to take title to the fuel at the reactor gate, as it's accepting those materials into the Federal Waste Management System and moving those materials to a federal site.

Q. Yes, sir, but given that the Department is not doing that, wouldn't an alternative the Department should consider be taking title at the sites and contracting with the site operators to store it for the Department?

Page 1546

MR. LO RE: Your Honor, I'm going to object on the grounds of that calls for speculation.

THE COURT: Just a moment. Overruled.

THE WITNESS: I think the best way for me to answer that is the Department of Energy has very specific statutory directions for the Nuclear Waste Policy Act. If that was considered to be the new policy of the nation and Congress passed an act which was, and that was enacted by the Congress, and that legislation was enacted and signed by the President, or he vetoed it, overruled it, then the Department would have to consider it.

At this point in time, the Department's only considering implementing a Yucca Mountain repository, as directed by the Nuclear Waste Policy Act.

BY MR. SMALL:

Q. You touched on somewhat about budget considerations and budget impacts on the DOE spent nuclear fuel program. And certainly, an implication of your testimony, if not a direct statement, was that lower appropriations than requested impacted the program. Would that be a fair statement?

A. That's correct.

Q. If Congress had appropriated the requested

Page 1547

amounts, would DOE have been able to perform starting in 1998?

A. That's difficult to say I think it would have certainly helped the Department conduct more activities and would have perhaps provided us the ability to do something sooner than what we're capable of doing now.

Q. Does that mean it's difficult to say whether or not appropriations would have changed the fact that DOE did not begin spent nuclear fuel acceptance in 1998?

A. I think appropriations and Congressional action certainly had an impact. I think, had the Congress approved the MRS proposal in 1987, I think we would have had spent fuel acceptance in 1998 Part of that would have also been providing the funding in order to deploy the facility in a meaningful time frame so we could have that.

So my sense is, without Congressional action on what the Department provided as a meaningful mechanism to receive materials by 1998 and providing the appropriations for that, had Congress done all that, I think we would have potentially had a facility available in the 1998 time frame.

Q. When you were talking about an MRS at one

**Tennessee Valley Authority v. U.S No. 01-249C July 12, 2005**

**Heritage Reporting Corporation**

**Page 1561 to Page 1810**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, July 12, 2005
Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW



APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S
\- - - - - -

THE COURT: Good morning. I congratulate our reporter on solving her technical difficulties so promptly. Good job. Do we have any preliminary matters before we continue with the cross-examination of Mr. Kouts?

MR. LO RE: Your Honor, we did have one preliminary matter, and the Court's indulgence, we would like to have a sidebar. Is that possible?

THE COURT: I suppose what we might do -- well, yes, we can always excuse Mr. Kouts temporarily.

MR. LO RE: This is actually something I would prefer is just discussed off --

THE COURT: Let us do this right down by the reporter.

(Discussion off the record.)

THE COURT: The Court thanks counsel and thanks them for their cooperation one with another. With that, Mr. Small, are you ready to continue with your cross-examination?

MR. SMALL: Yes, Your Honor.

Whereupon--

CHRISTOPHER KOUTS



a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MR. SMALL:

Q. Good morning, Mr. Kouts.

A. Kouts. Good morning

Q. I'd like to return first to something you talked about yesterday under the heading M&O contractors. Did I have that right?

A. Yes.

Q. Okay. And what is an M&O contractor again?

A. The M&O designation stands for management and operating contractor.

Q. And I believe you talked about documents that were produced by M&O contractors and how there would be some indication that the Department had approved those documents, is that right?

A. I believe my testimony was to the effect that the contractor document was not accepted by the Department unless it was published under the Department's letterhead with the Department's seal and with the Department's document designation.

Q. Okay. And so a document that did not meet the criteria that you've just testified to would simply be a contractor document, as opposed to a DOE

Page 1589

ask Congress for any of those funds, correct?
A. Well, my understanding, if Congress passes a law and says we can use the Nuclear Waste Fund for that purpose, then of course, the Department would do that, but the Courts have already ruled the Department can't use the Nuclear Waste Fund, so I don't know how the Department could request money in contrary to a court ruling.
Q. Well, of course, sir, what the net effect of the ruling is, is that you can't use the funds that are supposed to be used for particular purposes, for Nuclear Waste Fund purposes, but you could use other funds if you acquired them from some other place, correct?
A. Some other place could only be the Congress.
Q. Yes, sir. That's where DOE obtains other funds, isn't it?
A. It only obtains, for this program, funds from a Nuclear Waste Fund and from a defense account.
Q. Yes, sir. Did DOE ever attempt to obtain funds from Congress, other than those two accounts?
A. I'm unaware of any budget requests that requested that.
Q. So I want to return once more to this

Page 1590

sentence, sir, and say, what else did DOE do to meet the commitment that it made in this sentence?
A. I'd say those are the two examples that come to mind at this point.
MR. SMALL: May I have one moment, Your Honor?
THE COURT: Yes, certainly.
MR. SMALL: That's all I have, Your Honor.
THE COURT: Thank you, Mr. Small. Mr. Lo Re?
MR. LO RE: Thank you, Your Honor.
REDIRECT EXAMINATION
BY MR. LO RE:
Q. Good morning, Mr. Kouts.
A. Good morning.
Q. Mr. Kouts, during your cross-examination, Mr. Small asked you about a steady state rate of acceptance. Do you recall that?
A. Yes.
Q. When you were talking about a steady state rate of acceptance after a five-year period, what system were you contemplating in mind?
A. In virtually all the systems that Mr. Small went through, they were repository only systems.
Q. Mr. Kouts, the -- strike that.

Page 1591

The MRS proposal that was submitted to Congress in 1987 by DOE, what system did that contemplate performance begin with?
A. An MRS facility.
Q. And at the time of the proposal, when was the repository to come online?
A. At the time of the proposal, it was in the year 2003.
Q. After that proposal, did the estimated time for the repository to come online change?
A. Yes, it did.
Q. And what did it change to?
A. In 1989, in Secretary Watkins' reassessment report, the schedule for the repository was moved back to 2010.
Q. Now, you referred to the scenarios that Mr. Small went through with you this morning, and I believe you've answered this, but just so the record is clear, what is your understanding of, in those scenarios, that is the document that he went through, in those scenarios, how did performance begin?
A. In virtually every case, I believe it was with a repository.
Q. How does that comport with -- or strike that.

Page 1592

How do the acceptance rates that were set forth in those scenarios comport with the acceptance rates that DOE was considering after the proposal of the MRS to Congress?
A. Well, if you remember my testimony yesterday, we went through at some length that there, the Department proposed a 15,000 metric ton limit in its proposal, so during the operation of the MRS, you would always have to keep under that storage limit. In addition, post the Amendments Act, Congress placed additional restrictions on the operation of the monitored retrievable storage facility, and that's that we could take no more than 10,000 tons until the repository was operational and no more than 15,000 tons total while both, while the repository was in operation. So the amount of material that the Department could take was limited from the start of MRS operations, up until the point of repository operations, to 10,000 metric tons.
Q. And as a result of that limit, how did the rates that were reflected pursuant to those constraints compare to the rates you looked at today with Mr. Small?
A. Well, the repository rates were

Page 1593

unconstrained. Basically, you could ramp-up and maintain a higher steady state with the MRS rates. Basically, you ramp-up to, if I remember the acceptance schedules correctly, about a 900 metric ton rate in order to stay under the 10,000 ton limit until the repository was operational. So basically, you operate for a period of about 10 to 11 years at the 400 – at the 400, 400, and 900, I believe, in order to stay under the 10,000 tons prior to the time the repository was operational.

Q. Now, Mr. Kouts, Mr. Small asked you some questions about whether the Department had ever published rates, certain rates that he went through with you. Do you recall that testimony?

A. Yes.

Q. Mr. Kouts, has the Department, to your knowledge, ever published a rate of acceptance contemplating performance commencing with an MRS that jumped up to a 3,000 rate after year 10 of the MRS performance?

A. No, essentially because you would still be operating under the constraint, you'd be waiting for the repository to open, and you would bust the cap, if you will, on the 10,000 metric ton storage limit that Congress had placed on the facility.

Page 1594

Q. To your knowledge, Mr. Kouts, has DOE ever published a rate whereby there was no ramp-up to 3,000 at the repository level; in other words, where the repository was simply opening its doors at a rate of 3,000?

A. On day one?

Q. On day one.

A. No.

Q. Mr. Small asked you some questions about Congress' response to the MRS proposal. Do you recall that?

A. Yes.

Q. Now, and I think you testified to this at length yesterday, the proposal was not adopted by Congress, is that right?

A. That's correct.

Q. After Congress chose not to adopt the proposal as written by Congress, are you aware of whether TVA filed an action against the DOE for breach of contract of the standard contract?

A. I don't believe any of those suits were filed until much later, but I, you know, I don't know for sure.

Q. Do you recall TVA, representatives from TVA ever indicating to you or anyone in your office that

Page 1595

the refusal by Congress to fully adopt the MRS proposal constituted a breach of contract, of the standard contract?

A. I was never approached from anyone from TVA with that statement.

Q. How about anybody from the utilities in general?

A. Not that I'm aware of, no.

MR. LO RE: Your Honor, I have nothing further.

THE COURT: Mr. Small?

MR. LO RE: Your Honor, if I may, there was one issue that I neglected to mark on my notes.

THE COURT: Yes.

MR. LO RE: Do you mind if I – thank you.

THE COURT: Mr. Small?

MR. LO RE: Mr. Small, I did have just two more questions. Thank you, thank you for your indulgence.

BY MR. LO RE:

Q. Mr. Kouts, Mr. Small asked you about MPCs. Do you recall that testimony?

A. Yes.

Q. And how does the Department of Energy define an MPC?

Page 1596

A. As we envisioned it in the mid-'90s, it was a canistered system that could be used for both storage, transport, and disposal.

Q. The system that TVA uses, is that licensed for storage, transport, and disposal?

A. No, it is not.

Q. Are you aware of any system that any utility is currently using that is licensed for storage, transport, and disposal?

A. No.

Q. We used the term "MESC" yesterday. How do you characterize a MESC with respect to how it can be, how it can handle spent nuclear fuel?

A. Depending on its configuration, it can be used for storage on-site, or it could potentially be transported from a site to another site, essentially.

Q. In order for MPCs, as you defined them, to be used at Yucca Mountain, what would have to happen?

A. Essentially, we would have to get a license to construct the facility from the Nuclear Regulatory Commission, which would be an endorsement of our approach to the disposal of the materials, and part of that, part of that construction authorization would be, if you will, a ratification of our design or whatever changes they feel are appropriate to our

**Southern Nuclear Operating Co. v. U.S. No. 98-614C October 26, 2005**

**Heritage Reporting Corporation**

**Page 1731 to Page 1933**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1731

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING )
COMPANY ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO 98-614C
COMPANY )
Plaintiffs )
v )
THE UNITED STATES )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington D C

Wednesday, October 26 2005

VOLUME 8

The parties met pursuant to the notice of the Judge at 10 00 a m

BEFORE THE HONORABLE JAMES F MEROW

Page 1732

APPEARANCES
ON BEHALF OF THE PLAINTIFFS
M STANFORD BLANTON ESQ
K C HAIRSTON ESQ
S ALLEN BAKER JR ESQ
Balch & Bingham
1710 Sixth Avenue North
Birmingham Alabama 35203
(205) 226-3417
and
RONALD A SCHECHTER ESQ
Arnold & Porter
555 12th Street Northwest
Washington DC 20004
ON BEHALF OF THE DEFENDANT
JOHN EKMAN ESQ
HEIDE HERRMANN ESQ
MARIAN SULLIVAN ESQ
JOSHUA E GARDNER ESQ
ALAN LO RE ESQ
STEPHEN FINN ESQ
U S Department of Justice
1100 L Street Northwest
Washington DC 20530
** Index appears at end of transcript **

Page 1733

P R O C E E D I N G S

JUDGE MEROW Please be seated Mr Ekman do you have a witness today or --

MR EKMAN We do We have a couple witnesses. Your Honor, but before we begin our case, or actually before we call our witnesses at the start of our case there are a few administrative items to take care of

First of all there's still the issue of the government exhibits to which there are no objections I have a list here which I provided the Plaintiffs last week With the exception of DX329 which is still on this list but I've crossed off the list which we're withdrawing, I would ask that to the extent these exhibits have not already been admitted -- and some of them have been For instance there's some administrative record documents in here that were admitted -- that the government's exhibits to which there are no objections by Plaintiffs be admitted

JUDGE MEROW Yes

MR BLANTON. No objection from us on that, Your Honor

JUDGE MEROW Okay the exhibits where

Page 1734

there are no objections are admitted in evidence and as according to the list provided by the -- Mr Ekman

(DX Exhibits were received in evidence and the list filed electronically.)

MR EKMAN Should I provide this list to the court reporter? Or to Ms Strandell?

JUDGE MEROW Yes they should -- we should get it for the record So we don't have a list of those, do we?

MR EKMAN No Did I -- I don't know if I provided these to Ms. Strandell or not.

JUDGE MEROW. We probably ought to file it

MR EKMAN Okay Do you want to file it electronically?

JUDGE MEROW Yeah you could just file the list That would be fine

MR EKMAN Sure, we can do that Absolutely

THE CLERK Judge, do you want to have Southern's list electronically filed? Because I have a hard copy of Plaintiff's prior list

JUDGE MEROW If --

MR BLANTON I'm assuming we could file that electronically, Your Honor

Page 1775

Plaintiff's Exhibit 23 – 823 No, sorry. Yeah, 823. I skipped ahead Can you identify this document for the record?

A Yes. This is an acceptance priority ranking and annual capacity report that was issued by the department in March of 1995.

Q Can I direct your attention to page 4 of this document?

A Yes.

Q Bring up that table there in the middle of the page. Mr. Kouts, what is the basis for the rates set forth on that table?

A They were essentially – the assumption was we would begin operation at an MRS facility. At this time we're kind of hedging our bets it might not be in 1998 As a result, you're seeing year one, year two, year three, but we're still holding on to the 10,000-ton maximum limitation that an MRS would have.

Q Can we go back to page 3 and the paragraph that ends on that page and continues to the next page? Could you read the portion of that paragraph that's been highlighted?

A Okay "In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a monitored

Page 1776

retrievable storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years."

Q Thank you. Why were the years – going back to the table there on page 4, why were the years not identified in this table?

A Again, because the department was, as indicated in that previous paragraph I read, was uncertain as to when we could deploy the facility. We were not encountering great success with interest in Congress for reducing the linkages or for identifying a site.

Q And what was the uncertainty with regard to the program performance at that time?

A That the time that we had to implement an MRS and have it available, the time period had shrunk to such a small amount that it was not feasible for us to anticipate that it could be operational in 1998

Q Mr Kouts, I've handed you, I believe, an excerpt of Plaintiff's Exhibit 23 Can we put that up on the screen? Could you identify this document for the record?

Page 1777

A This is an analysis of the total system life cycle cost of the Civilian Radioactive Waste Management Program. We also refer to the acronym as TSLCC. It was issued in September of 1995

Q Can I direct your attention to page 2 of this document? And can I ask you to read that paragraph into the record, please?

A "Our national strategy maintains a clear focus on the long-term objective of waste disposal in a geologic repository. The immediate challenge is to provide for the timely acceptance and safe interim storage of spent nuclear fuel from the nation's commercial reactors. In order to accomplish these objectives, the program was restructured in 1994. The program is organized with two," quote-unquote, "business centers, the Yucca Mountain site characterization project and the waste acceptance, storage and transportation, WAST, project, along with a management center that provides integration and management support to the director of OCRWM and the projects.

"Program and project activities were reviewed and focused on near-term interim milestones leading to planned acceptance and in placement of SNF in a geologic repository beginning in 2010. The

Page 1778

program approach is described in detail in the Civilian Radioactive Waste Management plan, values 1 through 3, published on December 19, 1994. Reference is 1-3."

Q Mr. Kouts, at the time this document was issued in September of 1995, what were DOE's plans for performance?

A Primarily, to develop a geologic repository.

Q And when was the repository projected to begin operation?

A In 2010.

Q And can I direct your attention to page 8, table 1-2 on that page? What does this table indicate as to DOE's plans for performance?

A That we were – that our initial waste acceptance would begin in 2010 with the operation of the first repository.

Q Okay. Mr. Kouts, in your current position, do you have responsibility for preparing total system life cycle cost reports and fee adequacy studies?

A Yes, I do.

Q What is a TSLCC?

A It's essentially an analysis of the total

Page 1779

system costs of the program, the system life cycle costs of the program That's done to support what we call a fee adequacy assessment, which is required by the Nuclear Waste Policy Act In the act, the secretary is asked to review the adequacy of the fee that's provided by utilities into the Nuclear Waste Fund As established by the act, that's 1 mill per kilowatt hour of energy produced and sold

Essentially, what the TSLCC analysis does is in the year of dollars that it's developed, in this case it would be probably 1994 dollars, you look at the course of the program and the spending of the program up to its completion. Then the fee adequacy analysis takes that spending stream, if you will, and looks at the corpus of the Nuclear Waste Fund, the expected revenues, projections of economic growth in the future in terms of how the fund would grow with interest and makes an assessment as to whether or not the mill per kilowatt hour is still adequate, is more than adequate or less than adequate to meet the needs of the program

By law, by the statute, the secretary is responsible for reporting to Congress if the need for the – there needs to be a change in the fee either up or down

Page 1780

Q And do these reports contain assumptions regarding DOE's plans for performance?

A Yes, they do

Q And why is that?

A Essentially, we have to be able to project how the program is going to be deployed, so we essentially look at the program baseline, whatever it is in that one year, and cost out the program based on the anticipated baseline that we have in place.

Q And what is the basis for the assumptions in any given TSLCC?

A Again, it's essentially the technical baseline that exists at the time that that analysis is undertaken

Q Are there assumptions made regarding the acceptance rate in the TSLCC and fee adequacy studies?

A Yes, they are.

Q Why are those assumptions made?

A In order again, as I mentioned earlier, to look at how the program would spend its money over the years, so it's – and in order to lay that out, you have to understand what the program is accepting and how much waste the program is processing, etc , etc , into the future And taking this out to the end of the program, whatever monitoring period we have for the repository, we have to have enough money to make sure that we can pay for that monitoring period, etc., so that the analysis basically has to look at the entire life of the program from its expenditures in the past through where we are at the present when we deploy facilities, when we operate and when we actually shut the repository down at some time in the future.

Page 1781

And this is for both – I hasten to add this is for all the waste that's – that comes into the system, not just for the first repository. So however we would process all the projected waste materials, that also has to be taken into account in the total system life cycle cost analysis

Q And the acceptance rates that are assumed in a TSLCC, how were those chosen?

A They are essentially taken from the program technical baseline in that specific year

Q Plaintiff's Exhibit 17. Mr. Kouts, I've handed you an excerpt of Plaintiff's Exhibit 17. Can you identify this document for the record?

A Yes. This is an analysis of the total system life cycle cost for the program that was published in April 1985.

Q Could I direct your attention to page 2-3 of that document. And, Dawn, would you bring up paragraphs number 4 through number 6? Actually, through 7 Sorry. No, all the way.

Page 1782

Mr. Kouts, what were the program assumptions at the time this document was prepared in 1985?

A Well, from the highlighted area of that page, you can see that we have two repositories that – the first repository would have 70,000 metric tons, the second, 60,300, which matches up with the projected amount of spent fuel that was being projected at that time.

Item number 6 is the receipt rate at the first repository and the second repository under that and the startup dates for both facilities, which was in 1998 for the first repository and 2006 for the second repository

Q And what acceptance rates were assumed for the purposes of this cost analysis?

A From number 6, the first repository receives 400 metric tons per year for the first three year, 900 metric tons per year for the fourth year, 1800 metric tons for the fifth year and 3,000 metric tons every year thereafter to closure.

And the second repository starts at 1800

Page 1783

metric tons per year for the first five years and then proceeds at a rate of 3,000 metric tons per year thereafter to closure.
Q Direct your attention to page –
JUDGE MEROW: Is this a program based on the assumption that it's just going to apply to the existing reactors at that period of time? In other words, do you stop generating electrical power after this waste is stored or what?
THE WITNESS I'd have to go back and look specifically at this report, but at that period in time, we were still projecting that new reactors would be built and basically, we would use what we called Energy Information Administration range of nuclear growth, if you will Then we would base our spent fuel projections on whether or not – on how many new reactors would be built.
At this point in time, we weren't looking at reactor life extensions. We were still thinking, at least the EIA, Energy Information Administration, was thinking there would be new reactors that would still be built, which of course hasn't happened up to the present day So we've adjusted our estimates, if you will, of spent fuel generation but – from no new starts, but then we had to look – presently, we look

Page 1784

at how many reactors actually have extended operation, and many of them have gone in for that, so they want to operate their reactors for another 20 years or so.
JUDGE MEROW: If new reactors are now built in the future, would they be under the same program or –
THE WITNESS: Yes, they would, and depending on the company, we would have contracts with those individuals also. They would probably be built by the existing firm, so we'd have to look, but they'd probably be covered by the same standard contract that we have now with some adjustments.
BY MS SULLIVAN:
Q Mr Kouts, may I direct your attention to page 1-6 of this document, the table on that page. What were the estimated total costs of the program at the time this TSLCC was prepared?
A You know, at the time that this program was being prepared, it had – it ranged from roughly 24 or 23 8 to 29 7, so roughly between 24 and $30 billion in 1984 dollars
Q And that's the last number entered in the far lower right-hand corner of that table?
A Correct
Q Mr. Kouts, I've handed you an excerpt of

Page 1785

Defendant's Exhibit 330. Put that up on the screen. Can you identify this document for the record, please?
A Yes This is a preliminary estimate of the total system cost of a restructured program This was a – an addendum that was provided to external parties that basically showed how the program changed based on the redirection of the Secretary of Energy in the redirection report that we talked about earlier
Q Let me direct your attention to table A-1, page A-1 of this document.
A Okay
Q Mr. Kouts, what were the program assumptions or the DOE's planning assumptions at the time this document was prepared?
A For this, for a single repository system, number one, it indicates that since we didn't have a second repository, we were focusing on one repository that would essentially take all the fuel
And it basically has an MRS facility available in 1998 and adheres to the statutory restrictions laid out in the Nuclear Waste Policy Act amendment so that it does not exceed 10,000 metric tons, capacity of MRS does not exceed 10,000 metric tons until the repository is operational in 2010.
Q And what acceptance rates were assumed in

Page 1786

the preparation of this document?
A This would have been the current baseline of the program, and again, it would accept spent fuel at 1998 at 400 metric tons for two years, 900 metric tons up until the year 2010
Q And I direct your attention to page 4 of this document Bring that table forward. And what were the estimated total costs of the program at the time this document was prepared in 1990?
A Okay. This – there are three cases given in this table The first case, the first column indicates that we have a single repository that disposes of the entire quantity of waste and in that case, the total system cost is roughly about 25 and a half billion dollars.
For a two-repository case with no new orders, again, previous case was no new orders, no new reactor orders, we'd have a total of about $34 billion
And in an upper reference case, which has some growth in the nuclear power industry with two repositories, you'd have basically about a 34-and-a-half-billion-dollar cost of the program.
Q I'd like to go back now to Plaintiff's Exhibit 23, which we've talked about already, but I'd

Page 1787

like to direct your attention to page 8 And the table on page 8, what does that show with regard to DOE's plan for performance at the time this document was issued?

A At the time that document was issued, we had essentially made the assumption that we were not going to have an MRS facility and that our first receipt would be in the 2010 time frame at a repository

Q Okay And what were the acceptance rate assumptions at the time this document was prepared?

A In 2010, 300 metric tons; 2011, 600; 2012, 1200; 2013 and 2014 until near closure, roughly 3,000 metric tons.

Q Can we go to page 3 of this document, please, table 1-1 Mr. Kouts, what were the estimated total costs of the program at the time this document was prepared?

A According to this chart, it was $33 billion

Q I'd like to ask Dawn to put up the three cost tables from the three documents that we just reviewed from Plaintiff's Exhibit 13, Defendant's Exhibit 330 and Plaintiff's Exhibit 23

MS SULLIVAN: Your Honor, while she puts

Page 1788

this together, could we take a ten-minute break?

JUDGE MEROW Sure.

MS. SULLIVAN: I don't have many more questions, but rather than us sit here and watch her put these tables together, can we take a break?

JUDGE MEROW. Return at half past.

MS SULLIVAN: Very good. Thank you

(A recess was taken from 11:30 AM through 11.30 AM)

JUDGE MEROW Ms. Sullivan.

MS. SULLIVAN: Thank you, Your Honor. I believe we've now worked or magic with the electronic documents.

BY MS SULLIVAN.

Q Mr Kouts, I've had put on the screen together the three cost tables that we had just looked at in those three documents, Plaintiff's Exhibit 17, table 1-1; Defendant's Exhibit 330, table 1-1, and Plaintiff's Exhibit 23, table 1-1

Mr Kouts, could you explain to the Court whether the costs of the program changed between these documents based upon the different program assumptions that we have seen?

A Well, yes. The – if you look back at the January 1998 analysis, you see you're in a range

Page 1789

between 24 and $30 billion. And that's basically dependent on where the repository is from the lower cost to the upper cost repository

One of the difficulties in comparing these charts, as you can tell with the dollars, that they're done in different year dollars. 1984 dollars, you've got 1988 dollars and 1994 dollars, so the costs of the program are going to go up as you go into the future when you rewicker the dollars to whatever year you're doing the analysis, because the assumption of the analysis is that all the money is spent in that year, so all the costing is done based on that, the costs of the program, if you expended it all in that year.

So between these estimates, you're not seeing a wide variation in the overall cost of the program, given the different scenarios being run and given the variability in the dollars that are being considered

Q And based upon the different cost tables that we have here, what is the effect of different acceptance rate assumptions on the cost of the program?

A They have a fairly minor effect. I didn't program these analyses or they weren't done under my direction, but certainly the ones that we do now,

Page 1790

roughly two-thirds of the cost of program are fixed costs and roughly a third are operational costs.

And when you look at an analysis of when the dollars are spent and so forth, it's actually, from an adequacy of the funds standpoint, it's better to spend dollars in the future than it is to spend dollars in the present because future dollars are worth less than present dollars.

So to the extent that you operate slower and push your operations off into the future, the costs – the adequacy of the fund is actually better and you have more confidence in the adequacy of the fund.

When you spend dollars sooner and faster, basically, the adequacy of the fund is lesser. So what these tables indicate to me, basically, is that the costs of the program haven't migrated very much depending on the assumptions, and the variability of acceptance rates really has a relatively minor effect on the overall cost of the program.

Q And, Mr. Kouts, did the fee that utilities have paid change as a result of these analyses over time?

A No, it did not

Q Mr Kouts, I'd like to go – let's go back

Page 1791

to Plaintiff's Exhibit 23. Dawn? And could we go to
page 8 of that document?
Now, Mr Kouts, at the time this document
was issued in September 1995, DOE assumed operation of
repository in 2010, as you previously testified But
are you familiar with other efforts that would have
still allowed DOE to perform in 1998?
A Yes There were still a variety of bills
that were being considered in Congress that would have
given the department interim storage authority and
would have removed the linkages that existed between
the MRS and the repository
In fact, as I mentioned when I went
through my history in the program, around this time
frame, I was actually working on a topical safety
analysis report that would have expedited the
licensing of an interim storage facility, if you will,
should Congress have given us the technical direction
in order to proceed. So we were still expending
resources on developing technical information that
would have allowed us to implement new legislative
direction from Congress if it was received
Q Can I direct you back to Plaintiff's
Exhibit 823? And pages 3 and 4 of that document, that
paragraph that we highlighted.

Page 1792

A Yes.
Q At the time this document was issued,
Plaintiff's Exhibit 823 in March of 1995, what was the
status of DOE's program?
A Status of the program at that time is that
we were still hopeful, I believe, that we would get
some kind of legislative relief and get the
opportunity to deploy a storage facility earlier
Our – as this indicates, our perspective
of our ability to do it by 1998 was such that there
was more uncertainty being added to it, but as
indicated here, we were still hopeful that it was
going to happen in the near future.
If I could also correct something that I
might have said earlier, if I remember, the
negotiator – the negotiator's office went out of
business in the 1994 time frame, so – and I think
where I got confused was essentially that David Leroy,
who was the initial negotiator, left at the beginning
of the Clinton administration and then there was
another gentleman that was appointed at that time, and
he carried out until the end of the office, which I
believe ended in 1994.
So just prior to this, I believe was
toward the end of 1994, the negotiator had just gone

Page 1793

out of business There was still some hope that there
were some Indian tribes that were interested, and
there were some discussions about whether or not an
interim storage site could be identified in one of
those sites that was still interested or Congress
could pick another site
So there was still possibilities and the
department was still hopeful, although we admit here,
I think, that there are uncertainties and 1998 was
going to be a challenge, so therefore, we were putting
the acceptance schedule in terms of year one, year
two.
Q Thank you.
I'd like to change topics Can we go to
Defendant's Exhibit 332, please? Mr. Kouts, could you
identify the chart that is Defendant's Exhibit 332,
please?
A Yes. This is a summary history of the
appropriations history, requested funds for the
program versus appropriated funds for the program
since its inception in 1983 continuing through this
last fiscal year.
Q Did you direct that this chart be
prepared?
A Yes, I did.

Page 1794

Q And what information does this chart
convey regarding DOE's funding since the inception of
the program?
A Well, first of all, it indicates that we
did not always receive what we had requested of
Congress, and there were certain years that had
substantial impact on the program.
If you look back at 1987, basically,
Congress took away a lot of our funds because they
redirected the program in the sense of only having one
repository site to characterize instead of three.
Another area that – and every year
virtually you see we get less than we typically ask
for. Probably one of the biggest dislocations was in
1996 where, although it shows we received
$400 million, we actually received $315 million
because 85 million of the appropriated 400 million was
withheld and was not to be provided to the department
unless interim storage legislation was passed by the
Congress
So this was another indication as late as
1996 that Congress was still indicating an interest in
trying to pass interim storage legislation and we
could not use those funds, nor were they ever released
because that legislation was never passed

Page 1831

that the record's clear, table 2.1, the upper bounding case assumes all of the linkages and limitations on an MRS are eliminated that Congress had imposed

A That's correct

Q Okay Now, table 2.2 just assumes that the schedule linkages are eliminated but the capacity limitations are maintained, correct?

A That's correct

Q Okay And it starts in 1998 at 300 and goes to 2007, ramps up to 875 and ends at 2007, correct?

A That's correct

Q But as the sentence we just read notes, DOE could not perform that schedule as long as the schedule linkages are in place, correct?

A That's correct

Q Now let's look at Plaintiff's Exhibit 823, which is the 1995 annual capacity report. Got it?

A Yes, I do

Q All right, sir All right Now, you weren't actually involved in the production of the 1995 annual capacity report, were you?

A No, I was not.

Q That wasn't part of your job back then?

A No, it was not I was a reviewer for the

Page 1832

document, but I did not prepare it

Q You weren't involved in managing the area that published the ACR?

A That's correct.

Q Now, did I understand your testimony correctly that by March of 1995, the Office of Nuclear Waste Negotiator had been eliminated?

A That's correct. I believe it went out of existence or that office went out of existence in late 1994.

Q And the purpose, as I understand it, of the Office of Nuclear Waste Negotiator was to go out and negotiate with different states to try to get somebody to host a monitored retrievable storage facility. Is that correct?

A That was one of his duties He was also charged with trying to find a willing host for a repository.

Q Okay. Another thankless job, I'm sure.

At any rate, by March of 1995, the Nuclear Waste Negotiator is history?

A That's correct

Q He doesn't exist anymore?

A That's correct.

Q DOE had not selected a site for the MRS,

Page 1833

correct?

A That's correct. Nor could we under the current construct of the act, since we could not site it until after the repository was sited.

Q Excellent point.

You hadn't selected a site for the repository by 1995 either –

A That's correct.

Q – correct? So the prospect of an MRS facility anytime close to 1998 was fairly dim by March of 1995, wouldn't you agree with me about that?

A Well, certainly the negotiator went out of existence. There were several bills that were still being actively considered in Congress that would have given the department authority to implement interim storage. Those bills were still in play at the time that this report was written.

Q Glad you mentioned that. Let me ask you about that. There were several pieces of legislation that were calling for interim storage facilities that percolated through the mid to late '90s, correct?

A That's correct.

Q And at that time, President Clinton was in office, correct?

A Yes, he was.

Page 1834

Q And therefore, he appointed the Secretary of Energy, correct?

A He did.

Q Are you aware that the Clinton administration vetoed legislation calling for centralized interim storage when it was passed by both houses of Congress?

A Yes, I am That was in the year – I believe it was in 2000 that that occurred.

Q I believe it was too.

All right, so we're back to the ACR, to the Plaintiff's Exhibit 823, and, Your Honor, I've got just a couple of questions about this and then we can maybe take a break.

JUDGE MEROW: Sure.

BY MR. BLANTON

Q Now, let's look at page 4, the famous year one, year two acceptance rate schedule. Your testimony is not the first time we have talked about this, Mr Kouts. Don't feel rained on.

A I don't.

Q Now, at this point, DOE is telling the utilities that there's – there's no – there's probably not going to be an MRS in 1998, correct?

A Well, I wouldn't want to go beyond what

Page 1835

the document said. I believe in the previous page it said due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual capacity rates are presented by years of operations rather than specific years, so I would refer to the statements in the document which indicates that there is uncertainty regarding 1998 But that's why we provided the schedule as a year one, year two basis.

Q You certainly didn't think you were going to have an MRS by 1998 back in March of '95, did you, Mr. Kouts?

A Quite honestly, I – I think I was on the spectrum since I was, I believe, at that time working to develop a topical safety analysis report in anticipation of legislation, I was somewhat optimistic because we were hopeful that that topical safety analysis report would be approved and we would have a path to getting a facility very quickly So I was monitoring that carefully, and I was hopeful that Congress would do something

I would also submit to you that besides President Clinton's statements, need to go back to the Secretary of Energy's statements at that time, Secretary O'Leary, where she said in front of Congress

Page 1836

untie my hands. She came from the utility industry She was pushing very hard for authority in order to get acceptance of spent fuel earlier than the repository.

So under that auspices and under that general direction of the secretary and general viewpoint of the secretary, we were still actively hopeful that we would get some direction from Congress in order to implement that

Q Now, by this time – and we can go – this is not a memory game I can find the document, but I've got a lot of documents, I just can't put my hands on it.

By this time, Secretary O'Leary had issued the notice of inquiry on waste acceptance issues, had she not?

A I believe so. I'm not totally familiar with that. I don't know the date, but I believe she had

Q I'll get it after lunch.

But you're aware that by this time, DOE had announced to the industry we're not coming to get your fuel in 1998 and tell us what you think about it, correct?

A I really can't testify one way or the

Page 1837

other. I don't have the information in front of me.

Q We'll get that document for you after lunch.

A Okay.

Q Now, notwithstanding the difficulties in siting and getting an MRS facility established, this document continues to impose the capacity limitations but not the schedule linkages on the acceptance rate that's contained in the 1995 ACR, correct?

A That's correct.

MR BLANTON: Your Honor, I'm only two minutes late, but I think this is a great time to take a break.

JUDGE MEROW. Okay. Why don't we take a break and return at 5 past 2

MR. BLANTON: Thank you, sir.

(Luncheon recess taken from 1.01 PM through 2:06 PM)

Page 1838

- AFTERNOON SESSION -

BY MR BLANTON.

Q Mr. Kouts, see if you can find Plaintiff's Exhibit 23 I think Ms Sullivan asked you about that before lunch.

And, Kristin, if I could get it on the viewer

Now, this, Mr Kouts, is the analysis of the total system life cycle cost of the Civilian Radioactive Waste Management program as of September '95, is that correct?

A That's correct.

Q Now, I think right before lunch we were talking about the 1995 annual capacity report, which was published in March of '95, and whether or not an MRS was a faint hope at that point in time

A Uh-huh.

Q My question is: By the time September '95 rolled around and the total system life cycle cost analysis came out in September 1995, the MRS facility was not included as part of the cost of the program, is that correct?

A The – I have to go back and check the assumptions for this. Certainly, the historical costs would have been included since that has to, but I –

Page 1843

years here. It's a design goal for them to achieve that.

Q It's sort of the specifications for the rest of the system to operate by, is that a fair way to characterize it?

A That's correct.

Q Okay Now, it's true, isn't it, sir, that the rates shown there on page 10 of the system requirements document, Plaintiff's 167, are considered reasonable rates, reasonable acceptance rates for the program to operate under?

A I would agree with that, yes.

Q Okay And this particular rate that ramps up to 3,000 metric tons and stays at a steady state was determined to be reasonable based on a series of analyses over many years of the program?

A I believe the -- I can't speak to the analyses that indicated this I think this was a design target for the system. It's been in existence, as you can see, at a steady-state rate since the early days of the program. There have been -- I'm not directly familiar with any specific analyses that were associated with this.

Q But you were aware there were some You were aware this is based on an analysis?

Page 1844

A I was aware that basically when the requirement was set, people looked at analyses to see how the requirement could be met

Q Okay

A But if you're talking about anticipatory analyses, it was a study done that helped set the rate I'm unaware of any specific analysis that helped set a rate

Q Maybe I'm confused again. Isn't it true, sir, that there have been a series of analyses over many years that have been done to indicate that the rate shown on that document is a reasonable maximum rate for the system to operate under?

A When you say "reasonable maximum rate for the system to operate under," there have been studies that have looked at higher rates, there have been studies that have looked at lower rates I mean, I don't know -- it all depends on what your characterization of what reasonable is I'm not trying to be difficult, it's simply that this -- this has been something that's been within the program for a long time. It's almost accepted as a target for our acceptance.

As I indicated earlier, I don't remember any specific study that said that, you know, looking

Page 1845

at a variety of different rates, this was the right one, as far as I can recollect from my involvement in the program.

MR BLANTON· I'm going to show him page 27 of his April 11, '05 deposition Actually, I'll probably start at the bottom of page 26.

MS SULLIVAN Okay

BY MR BLANTON.

Q Mr Kouts, I'm going to hand you -- this is a travel copy of the deposition, so it has four pages to a page Don't read it out loud, just refresh your memory from the bottom of page 26 down through the bottom of page 27.

A Okay, I see it

Q All right. Now, my question is, as I understand your testimony, somebody decided that the system should operate at a 3,000 metric ton rate, and the system requirements document says we're going to design a facility and a transportation system around that number

A That's correct.

Q So the number comes first and it drives the design?

A That's correct.

Q All right. And my question is simply

Page 1846

Isn't it true that the 3,000 metric ton rate that's reflected on that page is a product of analysis within the Department of Energy over many years?

A Well, it -- it may be. I -- I can't remember one specific analysis that said 3,000 metric tons is the right reasonable maximum rate. As I indicated, it actually -- it predated the existence of -- the 3,000 metric ton rate predated my involvement with the program. It was actually being considered before -- in the development of the plan even before that, so maybe in that time frame someone came up with it in relationship to how the repositories would work.

Over the years, it's been more or less accepted. We have looked at greater amounts, lesser amounts over the years, but the requirement hasn't changed. That's probably the best way I can answer that.

Q You keep bouncing around and coming back to 3,000 metric tons, is that right?

A Because we don't have a strong basis, I'd say, for saying it should be higher or should be lower I have done analyses that indicate that, for instance, a 6,000-ton rate, which means you'd need a lot more capability at the repository, a lot more

**Pacific Gas & Electric Company v. U.S No. 04-74C June 14, 2006**

**Heritage Reporting Corporation**

**Page 2633 to Page 2985**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2633

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------x
PACIFIC GAS & ELECTRIC :
COMPANY, No. 04-74C
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant :
-----------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D C.

Wednesday, June 14, 2006

VOLUME 8

The parties met, pursuant to the notice of the Judge at 9:00 a m.

BEFORE THE HONORABLE EMILY C. HEWITT

Page 2634

APPEARANCES.
ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D C 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ
ALAN LO RE, ESQ
HEIDE HERRMANN, ESQ
SCOTT R. DAMELIN ESQ
SHARON A SNYDER, ESQ
JOSHUA E GARDNER, ESQ.
MARIAN SULLIVAN ESQ
U S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000

Page 2635

APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***

Page 2636

PROCEEDINGS
-----
THE COURT: We are on the record to continue hearing evidence in the Defendant's case-in-chief. Our witness is Mr. Kouts. The witness continues under oath. Good morning, sir.
THE WITNESS: Good morning.
THE COURT: Mr. Lo Re to continue direct examination.
MR. LO RE: Good morning, Your Honor.
THE COURT: Good morning.
Whereupon--
CHRISTOPHER KOUTS
a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
DIRECT EXAMINATION(continued)
BY MR. LO RE:
Q. Mr. Kouts, when we broke yesterday, we were looking at DX-114.
MR. LO RE: Which is admitted as PX-97, Your Honor.
BY MR. LO RE:
Q. Mr. Kouts, do you have that document

Page 2805

Department proposed to Congress in February of, this is my recollection, in 1987.

Q. Well, maybe my question is imprecise. It's comparable though because you mention storage only, but it says the facility would store spent fuel as necessary and stage spent fuel shipments to the repository for final disposal. That at least was part of the plan at this point in time, correct?

A. Again, I'm not trying to be evasive, but the amount of operations were substantially limited in the new vision of the MRS as presented to the MRS review commission than what was initially proposed in the Department. Yes, we would receive fuel. Yes, we would provide those shipments to the repository. However, we would not do any of the packaging of the repository that had originally been contemplated.

Q. And you mentioned the Amendments Act in your answer, the reason that the MRS at this time in 1989 had – I think your phrase was "substantially limited capability," was the '87 Amendments Act, correct?

A. The –

Page 2806

Q. It's really a yes or no question, for starters.

A. Yes, if you'd like me to explain, I will.

Q. And a part of the reason that the '87 Amendments Act led to substantially limited capability for the MRS was the linkages, correct?

A. No.

Q. Okay. The linkages did not limit the capability of the MRS, is that your testimony?

A. The linkages were consistent with what the Department proposed to Congress for the facility, so to the extent that they were consistent with the Department's vision of the MRS, which is the limited capacity and so forth, it did not limit the capability of the facility. That's the context in which I'm answering your question.

Q. It may be another imprecise question. The linkages limited the ability of the Department to implement an MRS in 1998, correct?

A. Yes.

Q. And just to be clear, the linkages

Page 2807

you're talking about are the ones you testified about, those are the ones that DOE proposed to Congress?

A. Congress went beyond the linkages that the Department proposed to it in implementing the Nuclear Waste Policy Act.

Q. With respect to capacity?

A. Not with respect to capacity, but with respect to other issues.

Q. What other issues?

A. The limitation of 10,000 metric tons until the repository was operational. The site of the facility could not be located within the state of Nevada. The linkage of the construction of the MRS to the construction authorization of the repository, those were all additional linkages that Congress imposed that the Department did not initially propose to Congress, to my recollection, in the 1987 Act.

Q. Which linkages did DOE propose?

A. The Department proposed that the operation of the MRS facility would be linked to the receipt of a construction authorization of the repository by the Nuclear Regulatory Commission.

Page 2808

Q. And excuse me one second, how does that differ from what Congress ultimately enacted?

A. Congress essentially indicated that we could not construct the MRS facility until we received a construction authorization from the repository, for the repository.

Q. If you would take a look at, I think Defendant's 107, Mr. Kouts, is the monitored retrievable storage submission to Congress, and on page 22 here, and, again, if you turn to page 22 – wait a minute. 22, is that what it is? 27, excuse me, 27 of this document, Mr. Kouts, just want to make sure I understand this distinction to be drawn on this one narrow point, and then I'll move to something else. On the second paragraph, it says, "To dispel doubts about the resolve to develop a repository, the DOE proposes a direct linkage of MRS ooerations to the development of a repository. Specifically, the DOE proposes that waste acceptance at the MRS facility be precluded until a construction authorization for the first repository is received." That was what was proposed?