Page 2829

using those simple and proven technologies and methods, there's no reason, other than the linkages, why DOE could not have implemented a larger capacity MRS than the one that was reflected in the '91 ACR, would you agree with that?

A. No.

Q. Okay.

A. Would you like me to explain?

Q. Not at this time. Why don't we take a look though, just to be clear about this, about the simple technologies. I just want to make sure that is reflected in this plan.
Are you aware of that, on page 14, it says in the second paragraph, "The MRS facility on the other hand will be a limited lifetime plant whose safety is based on engineering using simple and proven technologies and methods." Do you see that?

A. Yes.

Q. And I guess, I mean, why don't you tell us why, what reason other than the linkages, what reason other than the linkages would have precluded DOE from using that simple and proven technology to develop a larger

Page 2830

capacity MRS than the 10,000-ton MRS that was reflected in the '91 ACR?

A. First of all, the Department believed in the linkages, which was one reason, but that's besides the point. The ability of the Department to receive fuel in any one year, again, is based on the walk, don't run concept, so we would start slow and build up.
So even with simple technologies, we would still want to start at a relatively lower level and then build up to that as we gained experience and as our people gained experience.
Yes, there is industry experience to implement this.
However, the Department as a first-of-a-kind licensee in this area and so forth would, again, slowly ramp up the capability and not try to be at full capability on day one or try to go near a 3,000-ton acceptance rate because it just didn't make good engineering sense.

Q. Yeah. Well, but I thought the MRS and the mission plan got to 3,000 in the third year, right, so that was before the linkages, right?

Page 2831

A. That was before the linkages, and in the mission plan, that was prior to the time that the Department had really fleshed out all the different intricacies of the kind of facility that it was, wanted to build for the integrated MRS, so I think they were estimates back in 1985.
And as we see, the evolution of the understanding of the Department in terms of the complexity of that facility basically tempered its judgment in succeeding years in terms of what its capability could be on day one.

Q. Well, in '87, the MRS in the '87 ACR started right up at 1,200 the first year?

A. Yes, I understand that.

Q. So –

A. That's not 3,000 metric tons a year though.

Q. Agreed. Was there something other than the linkages that you can point to specifically that precluded DOE at the '87 Amendments Act to not use this simple and proven MRS technology that we see in the draft mission plan to implement an MRS with a higher capacity than 10,000 MTU?

Page 2832

MR. LO RE: Your Honor, I'm going to object on the grounds that this question has been asked and answered several times now.

THE COURT: Sustained.

BY MR. STOUCK:

Q. Would you turn, please, to Plaintiff's Exhibit 187, Mr. Kouts, which is the '91 ACR? It was introduced as DX-187, DX-187.

THE COURT: Are you hoping to find us looking at the annual capacity report for December 1991, Mr. Stouck?

MR. STOUCK: Yes, Your Honor. Thank you.

BY MR. STOUCK:

Q. Do you have that, Mr. Kouts?

A. I don't have the paper copy, but I do have the screen.

Q. Well, would you like that?

A. Sure.

MR. LO RE: And, I'm sorry, I'm trying to clarify, not to make this more complicated, but our records show that this exhibit, Your Honor, was admitted as PX-158.

THE COURT: We'll check.

MR. LO RE: Thank you.

Page 2881

delivery commitment schedules, took us right to page seven, got my note on it, not on this paragraph. I'll agree with that, but this is the adjacent paragraph. It seems to me pretty close.

MR. LO RE: Thank you, Your Honor.

THE COURT: Thank you.

(The reporter read the record as requested.)

BY MR. STOUCK:

Q. And just one more question about this and then a general question. If you could just take a look at the executive summary to this, Mr. Kouts? It's a couple of pages in. Oh, it has a number one on it at the bottom. I see that. Do you see that?

THE COURT: You're referring to PX-145?

MR. STOUCK: Yes, PX-145, thank you, Your Honor, page one.

THE WITNESS: Yeah.

BY MR. STOUCK:

Q. This is the executive summary, correct?

A. Yes.

Page 2882

Q. And at the bottom, it says, "This information," referring to the executive summary and, I guess, the report, "should provide guidance on what allocation rules can be established that will mutually benefit both the FWMS transportation system and the utilities." Do you see that?

A. Yes.

Q. And to your knowledge, was this concept of expanded allocations ever implemented?

A. No.

Q. But I guess, to your knowledge, it was further studied, is that your testimony?

A. Potentially, yes. Again, I can't answer that. I left this part of the program, and there may be other studies in the program that exists.

Q. Studies were done in the late '80s. Studies have been done over the course of time by OCRWM about waste acceptance issues such as this, correct?

A. Yes.

MR. STOUCK: I'm done, Your Honor, thank you. No further questions.

Page 2883

THE COURT: That concludes cross-examination. Are there any questions on redirect?

MR. LO RE: Yes, Your Honor.

THE COURT: Redirect will be within the scope of cross.

MR. STOUCK: May I move the admission of PX-145, Your Honor?

THE COURT: From your sitting position, you may.

MR. STOUCK: Thank you, Your Honor.

THE COURT: PX-145 is admitted.

(Plaintiff Exhibit Number 145 was received in evidence.)

REDIRECT EXAMINATION

BY MR. LO RE:

Q. We're in the homestretch here, Mr. Kouts?

A. That's good news.

Q. Mr. Kouts, on cross-examination, Mr. Stouck asked you about your understanding of DOE's contractual obligations under the standard contract, do you remember that?

A. Yes.

Q. Mr. Kouts, when did it become your

Page 2884

understanding that – when did you gain your understanding as to what DOE's contractual obligation was with respect to the commencement of the acceptance of spent nuclear fuel under the standard contract?

A. When I ascended to this position within the program, it started in an acting basis on October 2002 timeframe.

Q. When did you become aware of DOE's commitment to begin accepting fuel in 1998?

A. I was well aware of that when I first joined the program in 1985.

Q. Mr. Stouck asked you some questions about the Nuclear Waste Policy Act amendments of 1987 that rendered the MRS proposal that you discussed about today, I believe you used the term "null and void." Do you remember that?

A. Yeah.

Q. And I thought that you indicated that you wanted to explain what you meant by that. Could you do so?

A. Yes. The Congressional direction was that the siting was null and void. In other words, the site that the Department proposed in Oak Ridge, Tennessee or near Oak Ridge,

Page 2885

Tennessee was unacceptable to Congress. Therefore, the Department was not to pursue that site. In addition, Congress was unclear, or let's say unpersuaded by the Department's proposal on the integrated MRS concept and therefore set up an MRS review commission which, again, held hearings and provided its own perspective on the type of MRS, what the linkages should be and implementation should be in the waste management system.

Q. After the amendments were passed, what was your understanding of DOE's understanding of the likelihood of meeting the contractual obligation to begin accepting spent nuclear fuel as of January 31, 1998?

A. Well, the only mechanism that the Department potentially had was through an MRS, and in that regard, the MRS linkages had to be modified legislatively in order for the Department to meet its commitment by January 31, 1998, since the repository had moved forward and the schedule for the repository had, was no longer, not in the 1998 timeframe.

Q. And I know you testified about this,

Page 2886

did the Department take any actions to make those linkages, to have those linkages removed?

A. Yes. As identified in the reassessment reports that was submitted to Congress in 1989 under Secretary Watkins' tenure as Secretary of Energy, the Department took an approach to legislatively address the linkages in legislative initiative and also to pursue them through changes in the nuclear waste negotiators, under the auspices of that office, should it be successful in developing or identifying a site. And as part of the approval of that agreement with that site and that state supposedly to have legislation that would be passed, that would modify those linkages.

Q. Now, the linkages that came out of the amendments, can you describe what they did with respect to the capacity limit for the MRS?

A. Yes. I'll just go back in history. The proposal of the Department with the MRS proposal was to limit the capacity of the MRS to 15,000 metric tons and to link the operation, the initial operation of the MRS facility to the acceptance, or to the receipt

Page 2887

of a construction authorization for the repository. Congress modified those linkages by indicating that we could not build the MRS until the repository construction authorization was received. We could receive no more than 10,000 tons until the repository was operational and no more than 15,000 tons in total.

Q. Now, I'm going to show you just a few documents, which I'm sure you're thrilled about. Can we look at PX-187, please? This is the, I believe it's the throughput rate analysis. This is the Office of Civilian Radioactive Waste Management throughput analysis, I believe you testified on cross-examination, do you recall that?

A. Yes, I did.

Q. And this is dated August 17th, 1983?

A. Yes.

Q. Who prepared this analysis?

A. TRW, our M&O contractor at the time.

Q. Now, Mr. Kouts, yesterday on direct examination, we talked about the review of M&O contractor work and the acceptance of that work

Page 2888

by DOE. Looking at this document, does it reflect such a review of acceptances occurred?

A. We may have accepted it as a deliverable from the contractor in fulfillment of the need to perform a study, but it does not have an RW symbol or a DOE stamp on it, which indicates this is the contractor's view and not necessarily the Department of Energy's view.

Q. Thank you. You also looked at the 1987 ACR, and I believe that's PX-96. Could we take a look at that, please? Now, if you turn to page two of this document and I believe you testified about the rates as set forth in this document, do you recall that?

A. Yes.

Q. And there is a paragraph, second paragraph down, starting with, "beginning"?

A. Yes.

Q. Would you please read the first sentence of that paragraph into the record?

A. "Beginning in 1991, the ACR acceptance ranking will be converted into an annual priority ranking for the receipt of SNF/HLW."

Q. If you could go on and read the next sentence, please?

Page 2889

A. "In 1992, based on this priority ranking, the purchasers will submit to DOE for approval delivery commitment schedules identifying the SNF/HLW that purchasers propose to deliver to the DOE waste management system."
Q. Now, what is your understanding of those two sentences in conjunction with the rate of acceptance that's set forth in this document that you looked at on cross-examination?
A. That beginning in 1991, the Department was going to initiate the planning process within the contract, issue the APR/ACR, if you will, and then receive delivery commitment schedules from which it would then potentially approve those, which would be the Department's commitment to accept those materials into the waste management system in the year of operation of the facility that we'd have available at that time.
Q. And does that have any impact on your understanding of the nature of the schedule, the actual acceptance schedule that you looked at with Mr. Stouck on direct examination set forth in this document?

Page 2890

A. Yes, essentially, that we would be approving delivery commitment schedules based on the amount of fuel that we had in that document that we issued in 1991.
Q. Now, just before Mr. Stouck completed cross-examination, he showed you Exhibit PX-145, and this is the study that you discussed, do you remember that?
A. Yes.
Q. Now, there is a reference in this document, we don't need to go through it, to changing the fuel acceptance cycle from one year to three years, do you remember your testimony about that?
A. Yes.
Q. Mr. Kouts, is it your understanding that DOE was contractually obligated to make such a change?
A. No.
Q. What is your understanding as to what DOE's obligation was or is under the standard contract with respect to acceptance intervals?
A. It's what the Department approves in terms of delivery commitment schedules from the utilities for that specific year of operation.

Page 2891

Q. And specifically, what I mean – it wasn't a good question.
What is your understanding as to the Department's obligations under the standard contract as to how often it is to visit a particular site?
A. As many times as it's necessary in order to implement, you know, in terms of implement that specific contractual allocation for that year.
Q. And with respect to the one or three-year interval?
A. Right now, it's a one-year planning interval.
Q. Can we look at PX-238, please? This is a document that you looked at with Mr. Stouck relating to GTCC, and just looking at the cover page, this says, "Greater-Than-Class-C Low-Level Waste Program Management Plan." Do you see that?
A. Yes, I do.
Q. What is your understanding as to the material that the Nuclear Waste Policy Act requires DOE to accept under the standard contract?

Page 2892

A. As I testified earlier, it's high-level waste or commercial spent fuel.
Q. How does that relate to the GTCC low-level waste that's discussed here?
A. It doesn't relate to it.
Q. Now, you talked about, I believe you used the term that the government, with respect to the linkages between the MRS and the repository and the capacity limit, you said that the DOE believed in those linkages, do you remember that testimony?
A. Yes.
Q. What did you mean by that?
A. Essentially that, as I testified earlier, in order to assure that the facility would not become a de facto repository or the only facility, if you will, that would accept these materials, a capacity limit was essential in order to assure the host of the MRS or the storage facility, if you will, that it would not be the recipient of all the material for the repository, the 70,000 metric tons that was identified for the first repository.
Q. Now, you looked with Mr. Stouck on cross-examination at PX-97, which is the

Page 2893

document that I asked you about earlier. It's the mission plan amendment from June of 1997. And you looked at –

THE COURT: 1987?

MR. LO RE: I'm sorry. Thank you, Your Honor, 1987.

BY MR. LO RE:

Q. And you looked specifically at page 411. Could we look at that, please? Thank you. And these were the EEI comments. Do you remember that testimony that you provided on cross-examination?

A. Yes.

Q. I'd like to turn, if I may, to another page of this document, and just so we're clear, if you see up on the upper right-hand corner, you see the numbers 044, do you see that? The first page of the document, first page of page 411?

A. 411, sorry.

Q. Which is the EEI comment, excuse me.

A. Yes.

Q. See that 044?

A. Yes.

Q. Okay. I'd like you to turn, if you

Page 2894

would, to page 110 of this document, and if you look at that first bullet there, and I believe this is under the heading of the – if you can go down, further down, from 4.2 down to 4.3, please. Thank you. And I believe this is in a section of the draft mission plan that is, draft mission plan amendment, that is the responses to the comments?

A. Yes.

Q. Do you remember, I think we may have talked about that a little bit?

A. Yes.

Q. I'd like to turn your attention to the first paragraph that says, "Synopsis of Comments." Do you see that?

A. Yes.

Q. And could you just read that first paragraph into the record, starting with, "the Edison Electric Institute"?

A. Yes. "The Edison Electric Institute (44-23) and the Florida Power & Light Company (27-4) had reservations about specific portions of the waste acceptance, the schedule. Edison urged that the acceptance rates in the draft amendment be increased to match the rates given

Page 2895

in the 1985 mission plan, while Florida Power & Light recommended increasing the proposed spent fuel acceptance rate to 6,000 metric tons of uranium per year, beginning in the year 2000."

Q. Now, I'd like to focus just on the Edison Electric Institute, and first, you see there's that 44-23. Do you see that?

A. Yes.

Q. Do you know what that indicates?

A. Yes, I do

Q. And what does it indicate, sir?

A. It refers to the number of the comment response, the comment letter that was provided, which would be in this case number 44, which would be the Edison Electric Institute letter, and 23 would be the 23rd identified comment within that specific letter.

Q. Now, with respect to the Edison Electric Institute comments and the interpretation of those comments, how does that, those sentences that you just read, how do they comport with your testimony earlier about EEI's comments on the rate of acceptance?

A. I believe when what I testified earlier was that they liked the acceptance

Page 2896

schedules in the original mission plan better than they liked it in the mission plan amendment.

Q. How does that comport with what you just read?

A. I think that what I said was just consistent with what their general comment was.

Q. Now, you see below that, it says, "response." Do you see that?

A. Yes.

Q. And then the second paragraph says, "the DOE is planning to start issuing beginning in 1987."

A. Yes.

Q. "Beginning in July 1987 an annual capacity report for planning purposes, as required by Article IV.B.5(b) of the contract of the utilities. The report will inform utilities of the projected annual receiving capacity and the annual acceptance rankings based on accepting the oldest fuel first the DOE intends to use beginning in 1998."

A. Yes.

Q. Why is that sentence in there?

A. To indicate that, again, in compliance

Page 2897

with the standard contract, we would begin issuing annual capacity reports for the utilities to use as planning purposes.

Q. And what was the significance of that?

A. It was a document to inform utilities about what the current plans of the Department were in terms of targets for waste acceptance beginning in 1998.

Q. Now, I'd like to direct your attention to PX-82, and I believe this is volume I of the mission plan.

MR. LO RE: And I must confess, Your Honor, at this point, I am not positive if DX-82 or DX-81 – I'm sorry, PX-82 or PX-81 is in.

MR. STOUCK: It's 82.

MR. LO RE: It's 82. Thank you. I believe this document is in evidence, Your Honor.

BY MR. LO RE:

Q. Now, on cross-examination, Mr. Stouck showed you page 596 of this document, which I believe is in volume III.

MR. STOUCK: Yeah, that's in volume III.

Page 2898

THE COURT: Same document, separate volume.

MR. LO RE: Thank you.

THE COURT: It was handed over the counter several times.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q Mr. Kouts, this is a document within PX-82 that you looked at with Mr. Stouck, and first, I'd like to draw your attention to the stamp in the upper right-hand corner. Do you see where it says 091?

A. Yes.

Q. Do you know what that means?

A. Yes, that's the number given to this comment letter from Pacific Gas & Electric, which is numbered 91, if you will, out of – I don't know how many comments that the Department – or comment letters that the Department received in response to the issuance of the draft mission plan.

Q. Just so we're clear, we're looking at PX-82. Is that the actual mission plan, the 1985 mission plan?

A. Yes, because I believe this is dated

Page 2899

July 24th, 1984, so it's a response to the draft mission plan that was issued prior to the final mission plan in 1985.

Q. So it's the 1985 draft mission plan that the comments related to?

A. 1984 draft mission plan.

Q. Thank you. Now, I'd like to draw your attention to the bottom paragraph here, starting with "notwithstanding." It says, "Notwithstanding the significant progress achieved to-date by DOE, we see an even greater challenge ahead. Of greatest concern to us is the apparent slippage in the schedule set by Congress for an operational storage facility by 1998.

Many utilities, including PG&E, have been counting on the availability of the repository in 1998 as mandated by Congress. It is for this commitment that the electric utilities are," and then it goes to the next page, "currently making payments to DOE of the 1 mil per kilowatt hour. If the repository is not available at that time, DOE will have to make alternate plans, since DOE is obligated to accept spent fuel after 1998." Do you see

Page 2900

that?

A. Yes.

Q. Mr. Kouts, what is your understanding, looking at this document, as to what PG&E was telling the Department of Energy that its contractual obligation was under the standard contract and the NWPA?

A. That the Department was, in PG&E's mind, obligated to accept spent fuel in 1998.

Q. At any particular rate?

A. I don't see a rate mentioned here.

Q. Mr. Kouts, I'd like to turn in that same document, if we could look at page 97?

MR. STOUCK: On volume III?

MR. LO RE: I'm sorry, it's volume II now. This is volume II of PX-82, page 97.

BY MR. LO RE:

Q. Are you with me, Mr. Kouts?

A. Yes, I am.

Q. Okay. I'd like to just focus on that first paragraph there, under synopsis of comments, it's 3.3.1, obligation. That's it, thank you. It says, 3.3.1, "Obligation to accept waste by 1998," and then under that, it says, "Synopsis, comments." It says,

Page 2901

"Approximately 20 percent of the comments about the repository schedule (see chapter 4) concerned the DOE's commitment to begin waste acceptance by 1998 as mandated by the Act." Then there's another sentence, then it says, "Those advocating that the DOE accept waste by 1998 included electric utility companies in 11 different states," then there's an open paren and a series of numbers with dashes. One of those is, the very last is 91-1, do you see that?

A. Yes, I do.

Q. Now, having looked at page 596 of volume III from PX-82, the comments from PG&E on this draft mission plan, do you have any understanding as to what 91-1 relates to?

A. Yes, it was referring to the first identified comment in that comment letter, which referred to the first comment, again, on that first page of the PG&E letter and comments in the draft mission plan.

Q. Is that the comment we looked at a moment ago?

A. Yes

Q. Now, Mr. Kouts, these two sentences

Page 2902

that I just read into the record, how does that comport with your understanding of what you just testified to as what your understanding was that PG&E was telling DOE about its statutory and contractual obligations as of April – July 1984?

A. That DOE had a commitment to begin to accept fuel from utilities by January 31, 1998.

Q. At any particular rate?

A. Doesn't indicate a rate, no.

MR. LO RE: Thank you. Your Honor, I have no further questions.

THE COURT: Are there any questions on recross?

MR. STOUCK: I have one question, Your Honor, it's just about the same document that's open. It might morph into two questions, but it's just one point.

RECROSS-EXAMINATION

BY MR. STOUCK:

Q. If you would look, Mr. Kouts, at – do you have the same letter here that you're looking at, which is part of volume II of Plaintiff's 82? It's on the screen. That's fine. Can we just see the whole page? This is

Page 2903

page 97 of volume II of PX-82 that you were just looking at, right? And then the response is shown at the bottom of the page, do you see that?

A. Yes.

Q. And it says in the first sentence, under response, "DOE is committed to accept waste from the signatories of the standard contract and so on, on a firm schedule beginning no later than January 31, 1998."

A. Yes.

Q. And then at the bottom of that page, there's a paragraph that starts, "in order to meet these objectives." Do you see that?

A. Yes.

Q. "The DOE is investigating several different arrangements of the waste management system and their optimization through an integrated systems approach," do you see that?

A. Yes.

Q. Now, let's turn to the next page, and it results in skipping a sentence, but the first new sentence on page 98, do you see that, "the DOE"?

A. Yes.

Page 2904

Q. "The DOE considers that its obligation to accept spent fuel in 1998 can be met if certain elements of the total integrated waste management system that would allow it to accept waste in 1998 are in place." Do you see that?

A. Yes.

Q. "In addition to the repositories, the integrated system would consist of a transportation network and facilities for monitored retrievable storage if the latter are authorized by Congress." Do you see that?

A. Yes.

Q. And doesn't that mean that DOE considered that its obligations could be met if elements of the program were put into place, including the monitored retrievable storage component, isn't that your understanding of what's being conveyed there?

A. I believe it says, in addition to the repository, so this, in addition to the repositories, these other facilities would also – well, certainly, the transportation network would be needed and an MRS is something that also the Department would want to have in the system also, if it's authorized by

**Northern States Power Company v. U.S No. 98-484C November 13, 2006**

**Heritage Reporting Corporation**

**Page 2942 to Page 3281**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone 202-628-4888*
*FAX 202-371-0935*

Page 2942

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY )
Plaintiff ) Case No
vs. ) 98-484C
THE UNITED STATES )
Defendant )

Courtroom 6
National Courts Building
717 Madison Place NW
Washington D.C

Monday, November 13, 2006

VOLUME 10

The parties met, pursuant to the notice of the Judge, at 10 04 a m
BEFORE THE HONORABLE JOHN P WIESE

Page 2943

APPEARANCES

ON BEHALF OF THE PLAINTIFF.
ALEX D. TOMASZCZUK ESQ.
DANIEL S HERZFELD ESQ
Pillsbury Winthrop Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean Virginia 22102-4859
(703) 770-7900
and
JAY E. SILBERG ESQ
Pillsbury Winthrop Shaw Pittman, LLP
2300 N Street N W
Washington D C. 20037-1122
(202) 663-8063

Page 2944

APPEARANCES CONTINUED

ON BEHALF OF THE DEFENDANT
ALAN J LO RE, ESQ
HEIDE HERRMANN, ESQ
JOSHUA GARDNER ESQ
STEPHEN FINN ESQ
ANDREW P AVERBACH, ESQ
JOHN EKMAN ESQ.
U S Department of Justice
1100 L Street N.W
Washington, D C. 20530
(202) 305-7562

(Index appears at end of transcript)

Page 2945

P R O C E E D I N G S
\- - - - - - -

THE COURT Good morning We are again in the proceedings the 13th of November to continue the trial in Northern States Utilities versus the United States. And that is docketed as Case Number 98-484C
Mr Tomaszczuk, have you any preliminary matters?
MR TOMASZCZUK Not for the plaintiff, Your Honor
THE COURT Very good. Ms Herrmann?
MS HERRMANN None from the defense Your Honor
THE COURT· We're off to a great start Your first witness
MR TOMASZCZUK We would like to call Mr Kenneth P Metcalfe
THE COURT· Come forth. By now you know the witness stand is to the left of the bench
Whereupon
KENNETH P. METCALFE
was called as a witness and, having first been duly sworn was examined and testified as follows
THE COURT: I would like you to state

Page 3158

Q It says: The DOE's proposal is ready for submittal to the Congress in February of 1986, but litigation has delayed the submittal for more than a year. Do you see that?

A Yes, I do.

Q And can you describe for the Court what that delay was caused by.

A Yes. The State of Tennessee basically sued the Department not to submit the proposal that it had planned to submit, essentially with the primary site at the former Clinch River breeder reactor site. And the backup sites were also within the State of Tennessee. The State of Tennessee was not pleased with the Department's siting. So essentially they sued in district court. A local district court judge issued a temporary restraining order on the Department. And it took approximately a year for the Department to appeal that injunction, if you will. It later turned into an injunction through the circuit courts. And the State of Tennessee then appealed the overturn of the circuit court to the Supreme Court. And the Supreme Court denied cert in early 1987.

Page 3159

Q And what was the effect, if any, on DOE's submittal of the proposal of that litigation?

A It delayed it essentially a year. And some believe that had it been reviewed by the Congress, and had that extra year of review, that there might have been a greater chance of it potentially being approved.

Q Now there's a reference here right after the quote that we just read. It says: Since the planned submittal date, the DOE's Civilian Radioactive Waste Management Program, CRWM, has progressed and undergone several changes. I want to talk a little bit about those changes. I would like to pick up a little further down on this paragraph. It says – maybe 40 percent down, it says the programmatic change. Do you see that, sir?

A Yes, I do.

Q If you could read that through to where it says – through the – where it says the first quarter of 1998. Do you see that? In other words, there's one more sentence to highlight and I think we've got it Could you read that passage into the record, please?

Page 3160

A Yes. The programmatic change that most affects the DOE's planning for the MRS facility is an extension of the date for the start of operations at the first repository, this date is extended from January 31, 1998, to 2003, to allow time to carry out necessary technical program activities and to provide additional opportunity for consultation and cooperation with affected states and Indian Tribes. The revised schedule shows that the DOE expects to receive from the Nuclear Regulatory Commission a construction authorization for the repository by the first quarter of 1998.

Q Now, Mr. Kouts, how did this programmatic change that's described here, how did that affect your understanding of the role that the MRS was to play in the overall waste management system?

A Well, this was essentially signaling the Congress and contract holders and anyone else who followed the program that the repository was not going to be available in 1998 as a waste acceptance facility. And that, therefore, the only way that we would be able to accept fuel from utilities would be at an MRS facility.

Page 3161

Q And the last sentence of that paragraph says: Thus, the MRS facility would be critical to the DOE's ability to accept waste for disposal in 1998. Do you see that?

A Yes.

Q And what is the significance of that sentence?

A The significance of that is, without an MRS, we would not have an ability to accept waste for disposal in 1998.

Q Now, if you would turn two pages forward to the Bates number ending in 315, which I believe is also page 5 of this document, there's a paragraph a third of the way down starting with some potential adverse. Do you see that?

A Yes.

Q And then the middle of that paragraph it says: To allay such concerns. Do you see that?

A Yes, I do.

Q Could you read that passage from what I just read, to allay such concerns, to the end of the paragraph.

A Okay. To allay such concerns and to reinforce this country's unwavering commitment to the geologic repository program, the DOE proposes

Page 3162

that the Congress link the start-up of the MRS facility to the schedule of the repository: No waste may be accepted at the MRS facility until a construction authorization for the first repository is received from the Nuclear Regulatory Commission. Furthermore, the DOE proposes that the Congress limit the MRS storage capacity to 15,000 MTU.

Q Mr. Kouts, I would like to break those concepts up if I may. The first clause says no waste may be accepted at the MRS facility until a construction authorization for the first repository is received from the Nuclear Regulatory Commission.
What was the purpose of that, sir?

A That was to link the MRS facility directly – the schedule for the MRS facility and the operation of it, if you will, to the – to progress in the repository schedule.
Essentially, this meant the linkage that the Department submitted to Congress for its consideration meant that we would not operate the MRS facility until the NRC, or the Nuclear Regulatory Commission, had gone through an evaluation of the Department's license application

Page 3163

for the repository, and had given the Department authorization to begin to construct the repository.

Q And do you recall why DOE was making that proposal to Congress?

A Certainly in the development of the proposal on MRS, the Department, including myself, met with officials in and around the sites. One of their biggest concerns was that if they accepted this facility, that they did not want the waste to stay at the MRS And they wanted some linkage, if you will, with the operation of the MRS to the – to the development of the repository.
So, after various discussions we, or the Department made a decision to link the MRS facility to the construction authorization to the repository. This would have meant that the MRS would begin operation only after we had been given the authorization to begin to construct the repository.

Q Now, how did this relate, if you know, sir, to DOE's obligation to begin accepting fuel as of January 1998?

A Well, as I read earlier from the

Page 3164

document, the intent here and the expectation was that the Department would receive the construction authorization for the repository in 1998, early 1998. So we would essentially have the MRS built and ready to operate as soon as we received that authorization from the NRC.

Q Now there's a second clause here. It says – second sentence, I guess. Furthermore, the DOE proposes that the Congress limit the MRS storage capacity to 15,000 MTU. Do you see that?

A Yes, I do.

Q Now, what was the reason behind that proposal?

A Again, it was further linkage to the repository, to make sure that all the materials didn't somehow end up at the MRS facility and did not go – and eventually didn't go to the repository.
So the idea was to limit the capacity of the MRS, again, to make it more acceptable to those who were going to accept the facility nearby.

MR. LO RE: Your Honor, at this point, the government would move for the admission of DX-49 into evidence.

Page 3165

MR. SILBERG: No objection.

THE COURT: Madam Reporter, we will receive Defendant's Exhibit 49 into evidence.

(Exhibit Number DX-49 was received into evidence.)

THE COURT: And, Mr. Lo Re, the mission plan that we addressed earlier through this witness, that is already in evidence?

MR. LO RE: Yes, Your Honor.

BY MR. LO RE:

Q Mr. Kouts, what happened after the submission of the MRS proposal to Congress with respect to the MRS program?

A The MRS proposal was addressed in the 1987 Amendments Act that Congress passed in relation to the overall Nuclear Waste Policy Act.
And, specifically, Congress authorized the facility, however, nulled and voided the siting of the facility.
In addition to that, the Congress put somewhat different linkages on the MRS than the Department had proposed.
And if you would like, I will go through and try to explain what those were.

Q Sure Before we do that, let me try to

Page 3178

referring to?
A The comment letter on the draft mission plan amendment, that's again responded to in the responsive comments for the final mission plan, which is this document.
Q Now, Mr. Kouts, what is your understanding of the Edison Electric Institute?
A Well, it still exists today. It was a trade organization in this great city that essentially dealt with all nuclear – excuse me, all utilities. This specific area of EEI or Edison Electric Institute had an offshoot which is now called the Nuclear Energy Institute. But it represents the view of member companies who at this point had nuclear power and were following this program very carefully.
Q Now, if you could turn to page 414 of the document, which is also Bates number 6215, there's a heading Roman numeral II, Monitored Retrievable Storage System. Do you see that?
A Yes, I do.
Q And then three-quarters of the way down that first paragraph, it says: Previously, EEI/UNWMG/NTG indicated strong support for the MRS concept for numerous, and still valid, reasons.

Page 3179

Now, the MRS is more important to NWPA implementation, because it is the only feasible way that DOE can meet its 1998 statutory and contractual obligation.
Do you see that, sir?
A Yes, I do.
Q How did you interpret that comment from the Edison Electric Institute?
A I think that the Edison Electric Institute agreed with the Department's view that the MRS was going to be the only mechanism by which we could begin to accept materials from utilities in the 1998 time frame
Q Now, if you could turn to page 417 of this document, which is also Bates number 6218, there's a heading that says Spent Fuel Acceptance Rate Do you see that?
THE COURT: Second full paragraph.
THE WITNESS. Yes
MR LO RE Right. Thank you.
BY MR. LO RE:
Q It says – starts with saying: A significant change between the mission plan and the draft mission plan amendment, or DMPA, occurs in the magnitude, time of, and the rate at which

Page 3180

DOE will accept spent fuel.
Do you see that?
A Yes, I do.
Q If we cut down to the bottom of the page, it says: The much lower acceptance rate now proposed will require greater at-reactor inventories and will adversely impact the ability to dispose of spent fuel from reactors during decommissioning.
It goes on to say, DOE should ensure that the repository and MRS receiving rates are set such that the original mission plan acceptance rate is retained.
Do you see that?
A Yes, I do.
Q Now, what is your understanding as to what the Edison Electric Institute was saying in this passage with respect to the proposed rate of acceptance in the draft mission plan amendment?
A Essentially that they like the rates that we had in the original mission plan better than we had in the mission plan amendment.
Q Did you have any opinion as to whether the phrase that I just read was making any commentary on DOE's obligations under the Standard

Page 3181

Contract?
A Not that I can see.
MR. LO RE Excuse me, Your Honor.
BY MR. LO RE.
Q Now, I think you talked about this a little bit earlier, Mr. Kouts. You talked about those two linkages, the construction linkage and the limit capacity on the MRS that were proposed by DOE to Congress.
Can you once again tell the Court what happened to that proposal.
A The – the proposal was submitted to Congress. And Congress addressed it in the Nuclear Waste Policy Act amendments by essentially authorizing the facility, nulling the siting, in other words, disagreeing with the Department's siting of the facility, and basically gave us no site.
And then the linkages were modified by Congress to the extent that an MRS facility could not be constructed until a construction authorization for the repository was received. It could not receive more than 10,000 metric tons until the repository was operational, and no more than 15,000 tons overall.

Page 3182

Q Now, in light of the linkages that Congress modified, the modified linkages that Congress put forth, what did the Department do?
A Well, the Department – well, I have to go back and explain, also, what the other – other provisions of the Amendments Act were.
Since the siting was nulled and voided by Congress, Congress gave us, if you will, the Office of the Nuclear Waste Negotiator, essentially to assist the Department in finding either an MRS site or a repository site.
That Amendment's Act also directed the Department to characterize only Yucca Mountain as the repository site, and to essentially shut down the other two repository – first repository efforts that we had.
And it also told us to terminate the second repository activities and submit to Congress – a report to Congress between 2007 and 2010 on the need for a second repository.
Given what the Amendments Act brought about, the Department revised its strategy on how to get to an MRS facility in 1998, essentially relying on the efforts of the Nuclear Waste Negotiator.

Page 3183

MR. LO RE: Your Honor, I have one more document on this general topic. I could take a break now or we could just power through for a couple more minutes. Whatever is the –
THE COURT: Let's finish this topic.
MR. LO RE: Okay. That's fine.
BY MR. LO RE:
Q Mr. Kouts, I've just handed you what's been marked as –
MR. LO RE: And, Your Honor, before we go on, I just want to check – yeah. The mission plan amendment we just looked at, DX-53, I understand is already admitted into evidence.
MR HERZFELD. Yes.
MR. LO RE: Thank you.
BY MR. LO RE:
Q Now, Mr. Kouts, I've placed before you or handed you what's been marked DX-76. This is a document entitled Report to Congress on Reassessment of Civilian Radioactive Waste Management Program, dated November 1989.
Do you see this, sir?
A Yes, I do.
Q What is this document?
A This is a report done at the request of

Page 3184

the Secretary of Energy at the time, Admiral James Watkins, reassessing the status of the program and providing strategy and new direction for the program for its implementation.
Q Now, if you would turn to page Roman VII of this document, VII. And it's also Bates number, top Bates number 1448. You'll see again an executive summary.
And then one, two, three – four paragraphs down, there is a paragraph that starts, several months ago. Do you see that?
A Yes.
Q There's a reference to a schedule. Then it says: This schedule shows a significant slip for the expected start of repository operations, from the year 2003 to approximately 2010. In developing the revised schedule, the DOE was mindful that certain activities, such as the issuance of environmental permits by the State of Nevada and the Nuclear Regulatory Commission review of the license application, are outside the DOE's control.
Do you see that?
A Yes, I do.
Q Okay. Now, what is the – what is your

Page 3185

understanding as to what the Department is signaling in these two sentences, sir?
A Well, the repository schedule was being slipped from 2003 – if you remember, it slipped from 1998 to 2003. Now it's being slipped to 2010.
Q And what is the effect, if any, on the MRS project at this point in time?
A Well, at this point in time, our previous plan was the repository being operational in 2003, and would have a construction authorization in 1998. That's no longer the case.
So essentially, the linkage that the – that existed within the act at this time, and that was – would have to be addressed in order for the Department to have a facility available in 1998 to accept spent fuel from utilities.
Q Now, the other part of this paragraph – or second paragraph refers to certain activities.
Do you see that?
A Yes.
Q Why was the Department putting in a reference to activities such as the permits by the State of Nevada and NRC review of DOE's license application?

Page 3230

Q Okay. Mr. Kouts, you have before you DX-108. And this is a document entitled Annual Capacity Report dated 1991.

MR. LO RE: And for the record, Your Honor, this document, as I understand it, is also – has also been previously admitted.

THE COURT: Yes.

BY MR. LO RE:

Q Now, Mr. Kouts, are you familiar with this document?

A Yes, I am.

Q And what is it, sir?

A It's the Annual Capacity Report that was issued in December 1991 by our office.

Q And why was this document issued, if you know?

A As a basis for contract holders to submit delivery-commitment schedules and signaling essentially what capacity the Department was planning to have available in the 1998 time frame.

Q And did you have an opinion as to the relative import of this Annual Capacity Report compared to capacity – Annual Capacity Reports that had been issued prior to this?

A This is the one from which we were

Page 3231

forming the basis for the specific obligations that the Department was going to commit itself to based on the submission of delivery-commitment schedule for contract orders.

Q And when you say that this was the one from which you were forming the basis for specific obligations, from where did that obligation arise that you were to use the 1991 ACR?

A Well, again, going back to the time frame that the contract called for, that delivery-commitment schedules could be submitted no later than, I believe, 63 months from the initial year of shipment. So backing that up and then giving me the contract holder's time to react to this is how we got to this being issued in 1991.

Q Now, if you could turn to Roman numeral V of this document under the heading Summary. And that's the Bates number 3592.

A Yes.

Q It says – on the second paragraph, it says: The projected waste acceptance rates for SNF presented in Table 2.1 assume: A site for a monitored retrievable storage facility will be obtained and the facility will initiate operations

Page 3232

in 1998; and the statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act of 1982, as amended (NWPA) will be modified. Do you see that?

A Yes, I do.

Q Okay. And just for the Court, could you explain for the Court why that language is included in this ACR.

A We were essentially stating the assumptions under which we were issuing the ACR and APR, which was that our expectation was that we were going to have a facility, MRS facility that would initiate operations in 1998. And in order to do that, the statutory schedule linkages would have to be removed or modified.

Q Now, if you would turn to page 4 of this document under the heading Waste-acceptance Projections, which is Bates Number 3597.

A Yes.

Q That second paragraph says: The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity

Page 3233

limit contained in the NWPA for an MRS facility before a repository starts operation. Do you see that?

A Yes, I do.

Q It goes on to say These acceptance rates assume commencement of facility operations in 1998. Mr. Kouts, why was that language included in the Waste-acceptance Projection section of the 1991 APR?

A To provide the basis for the contract holders to understand why the acceptance rates were what they were and why we were projecting it. It was essentially to hold on to the 10,000 metrics of uranium storage capacity until the repository was in operation.

Q And, again, why were you holding on to that 10,000 MTU capacity and seeking to remove the construction linkages?

A Well, the – we were trying to get the facility operational and hold on to the concept that we could begin acceptance in 1998. Yet, we still wanted to hold something out to make the host state understand that this was not going to be a de facto repository. We were going to limit

Page 3234

the capacity of this facility as the current statute allowed us or directed until the repository was in operation.

Q Now, if you could turn to the next page of this document, which is – includes Table 2.1, Projected Waste-acceptance Rates for Spent Nuclear Fuel. Do you see that?

A Yes, I do.

Q What do the rates under the column SNF (MTU), what do those rates reflect?

A Again, for the years 1998 to 2007, a total of 8200 metric tons and for additional 2 years of operation at a steady state of 900 metric tons. That would bring us exactly to 10,000 metric tons at the time the first repository was intended to be operational

Q And, Mr. Kouts, do you consider this rate for the first 10 years of system operation to be a reasonable rate?

A It's reasonably technically – reasonable from a technical perspective. Also, it's consistent with the linkage I mentioned earlier

Q Do you consider this a rate that's depicted here to be based in fact?

Page 3235

A Yes.

Q Do you consider it to be a mythology?

A No. I do not.

Q Why is that?

A Because it had a firm basis as to what we were planning and which was explained in the document and the passages that we've just gone over.

Q Do you consider the rate that's depicted in this document to be an effort – an effort by DOE to minimize its liability under the Standard Contract?

A No I believe my sense is that this acceptance schedule reflects the reality of us trying to implement an MRS facility in a very difficult policy environment.

Q Do you have an opinion, Mr. Kouts, as of this time frame in 1991, December 1991, as to whether there was work being performed by DOE to site and locate – locate and site a constructed MRS?

A Yes. We had a great deal of work under way We were, again, working with the Nuclear Waste Negotiator administering his grant program and going out to the sites and trying to –

Page 3236

prospective sites and briefing local leaders and citizenry on what this facility would look like, how it would be operated and how the Department would – would implement this program.

THE COURT. But, again, you didn't have in place the facilities that would have permitted you to achieve the schedules that you were projecting. Is that not a fact?

THE WITNESS. That's correct. We would have needed a site. And we would have needed to go through the licensing process with the NRC, environmental impact statements and so forth. And that facility could have been done in this time frame assuming we had the proper authorization and we had addressed the schedule linkages or Congress addressed the schedule linkages.

THE COURT· Once again, it's a question of defining your performance under the Standard Contract by reference to what the political will will tolerate; is that correct?

THE WITNESS: It was – as it turned out in response to your question, the – there was no political will over the next several years to implement an MRS facility.

THE COURT· That term is political will?

Page 3237

THE WITNESS: My Department was trying to walk a careful path, if you will, to try to construct a process and a plan that could potentially be acceptable to a local government through the Office of the Nuclear Waste Negotiator and, hopefully, still be palatable to the Congress to allow us to address the linkages and move forward with it.

So, again, it was a tortuous path that we were walking through, trying to come up with a path forward that hopefully would be acceptable to the policy arena and get us a host site.

MR. LO RE: Your Honor, may I have the overhead switched on for the next document?

THE COURT: Of course.

MR. LO RE· Thank you.

THE COURT: Did you move 108 –

MR. LO RE: I believe it was already admitted. Thank you.

EVENING SESSION (6.00 p m )

BY MR LO RE:

Q Now, Mr. Kouts, I would like you to take a look at the chart that I have put on the overhead camera here.

I would like to focus on the column that

**Northern States Power Company v. U.S No. 98-484C November 14, 2006**

**Heritage Reporting Corporation**

**Page 3282 to Page 3598**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3282

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff ) Case No.
vs. ) 98-484C
THE UNITED STATES, )
Defendant )

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D C

Tuesday, November 14, 2006

VOLUME 11

The parties met, pursuant to the notice of the Judge, at 10:02 a.m
BEFORE THE HONORABLE JOHN P WIESE

Page 3283

APPEARANCES.

ON BEHALF OF THE PLAINTIFF·
ALEX D TOMASZCZUK, ESQ
DANIEL S HERZFELD,, ESQ
Pillsbury Winthrop Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
(703) 770-7900
and
JAY E SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
2300 N Street, N.W
Washington, D.C. 20037-1122
(202) 663-8063

Page 3284

APPEARANCES CONTINUED·

ON BEHALF OF THE DEFENDANT
ALAN J LO RE, ESQ
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ
JOHN EKMAN, ESQ
U.S Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

(Index appears at end of transcript)

Page 3285

P R O C E E D I N G S
- - - - - - -

MR LO RE· Just one housekeeping matter I talked to Ms Herrmann about

THE COURT Ms. Herrmann, you've been so silent these days

MS HERRMANN I like to think of myself as the moral support

THE COURT You would rather have Mr Lo Re take the heat

MS HERRMANN· Exactly

THE COURT. I don't blame you one bit.

MR LO RE Good cop, bad cop

THE COURT. But you have some preliminary matters

MS HERRMANN We do Your Honor, we discovered this morning that one of our witnesses, Mr David Zabransky is ill and he's quite ill and is going to need a day or two before he can appear to testify So we wanted to let you know that our witness order is going to be juggled And with the Court's indulgence, we may need to do a little bit of magic tricks, as far as stopping one witness

THE COURT Sure

Page 3358

THE COURT: Slowly.
THE WITNESS: On or before June 1st, 1985, the Secretary shall complete a detailed study of the need for and feasibility of and shall submit to Congress a proposal for the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel.
BY MR. SILBERG:
Q Now, did the 1982 Nuclear Waste Policy Act have any linkages with respect to the MRS?
A No, it did not.
Q Let me call your attention to page 50 of the document I handed you. And I would ask you to look at section 141(g), limitation. That provision does state, does it not, that there can be no MRS in a state approved for site characterization for repository?
A Well, when I was -- I took your word restriction to mean essentially either the linkage to the repository or limitation on capacity. This restriction -- I'm trying to remember whether or not in the '85 time frame we had selected sites for the first repository. So I don't know that we were necessarily limited by

Page 3359

that
So, anyway, but, yes, I agree this is a limitation, but it's not the limitations I thought you were referring to.
Q Okay. And this was put in in the original 1982 act?
A That's correct.
Q This limitation.
Now, it is true, also, that there was no limitation or restriction on the size of an MRS being proposed in this law?
A That's correct.
Q And there was no restriction or limitation or linkage tying the MRS schedule to a repository in the 1982 act?
A That's correct.
Q By the way, it is true, is it not, that Congress provided in this original act that impact assistance would be available to host jurisdictions for an MRS?
MR. LO RE: Your Honor, at this point, I would like to lodge an objection. I believe that when we asked Mr. Kouts about anything before 1985, Mr. Silberg objected on direct examination and now seems to have gone --

Page 3360

THE COURT: I honestly don't remember, Mr. Lo Re.
MR. SILBERG: I was asking about the formation of the Standard Contract. This is a document that Mr. Kouts had to have operated under. He was involved with the MRS program. That was his job when he came to DOE. And it wasn't changed until 1987. So I simply don't understand the objection.
THE COURT: And your concern, Mr. Lo Re, is what?
MR. LO RE: Really, first it's temporal. That is, Mr. Kouts testified that he came on to the program in 1985. Admittedly he understood -- he looked at the program document. I think he talked about the 1985 Mission Plan as the bible, I think he referred to. Now we're asking about the details of a statute that was promulgated years before he started.
THE COURT: Yes. But you know, I think the same issue came up yesterday. And I think the Court questioned the witness about his familiarity of background materials, meaning by background materials relevant to his work that preceded in

Page 3361

origination his appearance at the agency. I allowed that testimony based upon his duties.
MR. LO RE: That's fair enough.
THE COURT: And this follows in line with that.
MR. LO RE: That's fair enough. And excuse me for interrupting. Certainly to the extent Mr. Kouts says he is familiar with the document, I don't object to the examination. However, to jump into the document, have him read it -- I would point -- he does have a hard copy at least. So I would point out I think there should be at least some foundation laid that Mr. Kouts is familiar with this document.
THE COURT: I think that's a fair request.
MR. LO RE. Thank you.
BY MR. SILBERG:
Q Mr. Kouts, are you familiar with the Nuclear Waste Policy Act provisions regarding the MRS in the 1982 act?
A Yes. Except my memory lapsed in terms of the June '85 date, but yes, I am familiar with it

Page 3530

out in its contract that binds it as well as us, that it simply doesn't have the right to ignore the contract.

THE COURT: All right. That's your interpretation of the contract, Mr. Silberg.

MR. SILBERG: Yes.

THE COURT: All I want to get across is this process of variation occurs before the final delivery schedule is set.

MR. SILBERG: I certainly agree.

THE COURT: The purchaser doesn't have the unilateral right to adjust the allocation by 20 percent.

BY MR. SILBERG:

Q Now, Mr. Kouts, is it your view that it makes sense to have a system that is so constrained by its capacity that it has no flexibility to take emergency deliveries or exchanges or plus or minus 20 percents?

A I'm trying to understand the context of your comment.

The capabilities of our facilities essentially is not based on emergencies. It's based on the capabilities that we're trying to design into them.

Page 3531

We're talking about here the early years of operation, especially the first year of operation. And we set a target level of 400 metric tons. And we allocated to purchasers amounts which they provided us in certain instances information about what facilities we would take that from.

My sense is that – that the Department in the development of its facilities would do its best to accommodate the purchasers.

I think what we're talking about here is a – is an anomalous situation where a purchaser wants us to take additional materials for whatever reason, and the Department has to make a decision as to whether or not it can accommodate that based on the capacity it has in that specific year, whether or not it has shipping casks to move that additional material, and all the technical issues associated with that.

So I – the simple answer to your question is that this was a planning process that the Department was trying to implement. There may be variations. But the Department only has limited resources and can only implement essentially what it says it was going to

Page 3532

implement.

To the extent it would accommodate purchasers with additional materials, I'm sure the Department in some future time would be willing to do that.

But right now we're dealing with an unclear future. And, you know, I can't say what capabilities the Department's facilities might have in any one year to deal with an emergency or deal with a purchaser who decided that they needed to provide – or needed us to take an additional 20 percent over their allocation.

Q Is today's future any more clear than was the future in 1991?

A I think it's clearer to me. I think that we have a fairly good understanding of what facilities we're planning on building at the repository. We have an approach that I think has more promise than approaches in the past. I think – but I live in this program and that's my opinion. I'm optimistic and I'm hopeful we'll be able to move forward on our current approach.

Q I hope you're right.

A I hope I'm right, too.

Q Two more questions. Is 3,000 metric

Page 3533

tons per year a reasonable steady-state rate for the DOE spent fuel program?

A Can you define more about the program and the time frame that you're referring to? Are you referring to an MRS? Are you referring to a repository? You're asking about –

Q Let's talk about today.

A Today. I would say today, with the approach the Department is taking, assuming we can ramp up over a five-year period to get to 3,000 metric tons a year, that we are designing our facilities to have the technical capability to accept that amount of spent fuel from the industry.

Q What about 1985, before the '87 amendments?

A 1985 was a different world. We postulated a world where there were two repositories operational, one operational in 1998, one operational in 2006, with ramp-ups to 3,000 metric tons of each of those. That was where the Department was at that point in the program. Was it reasonable? It was the Department's estimate based on what it understood at the time.

Page 3534

Q You don't have a position as to whether
or not it was reasonable?
A It was reasonable in the context of the
time, yes.
Q Is the 3,000 metric ton rate something
that's been in the program as accepted for a long
time and exists today in all of DOE's requirements
documents?
A It certainly exists today in our
requirements documents. And it's been that way
for a good many years, yes.
Q And it's been accepted that way for a
good many years?
A The maximum receipt rate has been in our
requirements documents certainly, I'd say, for the
last 8 or 9 years that I can remember. But that's
the ultimate steady-state acceptance rate with a
ramp-up of about a 5-year period to get to that
3,000 metric tons.
Q One final set of questions. I apologize
if I covered this.
During the period from 1998 to – 1988
to 1991, you were involved in developing
transportation casks?
A That's correct.

Page 3535

Q And the purpose of that was to move
spent fuel from two facilities, two facilities in
the 1998 time frame?
A In the '88 to '89 time frame, I mean it
focused much more on an MRS and providing, if you
will, shipments to an MRS facility as opposed to a
repository.
Q Okay. But it was to a DOE facility in
the 1998 time frame?
A In 1998 time frame.
Q Yes. And only one transportation cask
design was eventually completed out of that
program?
A There was one certified design, that's
correct. But that does not mean that the
Department could not have obtained transportation
capability from existing casks that already
existed – that already were certified and were in
the industry at that time.
Q And how many of those were there in the
industry at that time?
A There were a – there were several
designs. And from a contingency standpoint, the
Department looked at essentially going to those –
owners of those certificates, and assuming that

Page 3536

the facility became a reality, we would have
used – we would have gone to those vendors and
gone with the procurement to have them essentially
build more of those so we could start moving fuel
with those casks.
Q But that process never reached fruition,
I take it?
A No. That was a contingency that the
Department could have embarked upon should the MRS
facility had linkages removed, if you will.
Q And DOE never requested funding to
construct or purchase casks, transportation casks.
A Not to my knowledge, no.
MR. SILBERG: We have no further
questions, Your Honor.
THE COURT: Thank you, Mr. Silberg.
MR. LO RE: If I may, Your Honor, just
one moment to set up.
THE COURT: Mr. Herzfeld, why don't I
start unloading a few of your documents.
MR. HERZFELD: Sure.
THE COURT: That's one. I've got a
whole bunch of them here.
Mr. Lo Re, will we be going back through
some of the documents you used during direct?

Page 3537

MR. LO RE: Possibly, Your Honor. Not
many, not many.
THE COURT: Well, you know that pile is
mighty high.
MR. LO RE: Let's put it this way, Your
Honor, I'm not planning to add to it.
THE COURT: Well, but it's even finding
a document within that file is a formidable task.
Why don't I give these all back to you.
MR. LO RE: That's fine, Your Honor.
THE COURT: And then –
MR. LO RE: And then we'll play it by
ear. That's fine.
I'm ready whenever you are, Your Honor
THE COURT: We are ready, sir.
MR. LO RE: Thank you.
REDIRECT EXAMINATION
BY MR. LO RE:
Q Mr. Kouts, I want to start with the
discussion regarding the budget that you talked
about with me and also with Mr. Silberg. Could we
go to Kouts Demonstrative 1, please – I'm sorry,
2. This is that bar chart that we showed you a
while back.
There was a question, if you recall,

Page 3550

It believed that – the Negotiator was very active. We were developing the grant program. We had a lot of things under way. So was it unlikely? I think the Department was acting on the basis that we were going to be successful in the long run.
This is a judgment by the GAO based on their own – their own rationales.
Q Now, I would like to draw your attention to a sentence that starts with: The Negotiator. It's three quarters of the way down that paragraph. And it goes to the words substitute for the repository.
Do you see that? Could you read that sentence into the record, please.
A Okay. The Negotiator also believes that any prospective host for the facility would require some type of assurance that the MRS facility would not become a permanent substitute for the repository.
Q Now, you talked with Mr. Silberg about the linkages that were placed on the MRS effort.
I would like to look at those linkages in the context of what's said here.
Mr. Kouts, did you consider the cap, the

Page 3551

10,000 MTU cap on the MRS to be associated with the comment that you just read into the record here?
A Well, both the 10,000 and the 15,000 cap from my perspective I believe address the Negotiator's concerns here.
Q And how is that?
A Well, the – the restrictions in the act essentially said that we could receive no more than 10,000 tons until the repository was operational, and no more than 15,000 tons total.
And my sense is that, as I've indicated before, that you needed to hold on to those, as we saw in the Clinch River task force report. Those kinds of capacity limitations were important, not only to Oak Ridge, which was considering a site, but also clearly there were some other concerns raised by people who the Negotiator was talking to.
Q Now, I would like to ask you about the construction linkages that you talked about with Mr. Silberg.
Do you have an opinion as to whether the construction linkages related to the permanency issue with respect to the MRS?

Page 3552

A Well, the construction linkages tie the schedules of the two facilities. And as long as those linkages were in effect, there was no hope of getting an MRS operational in the 1998 time frame.
Q Now, I would like to draw your attention to DX-102. That is the 1991 Mission Plan.
MR. LO RE: Your Honor, this is a document we used on direct examination. I will hand you a copy of it.
MR. SILBERG: I'm sorry, which document?
MR. LO RE: 102.
MR. SILBERG: What is the document?
MR. LO RE: What is the document? It's the 1991 Mission Plan Amendment.
BY MR. LO RE:
Q And I would like to draw your attention to page 5001 of this document, which is also page 18. And there's a paragraph that starts with: To achieve. Do you see that?
A Yes, I do.
Q The second sentence of that paragraph says, I'll read both of them: To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to

Page 3553

start waste acceptance in 1998. To make this possible, the President's legislative package for the National Energy Strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy Act of 1987 (Amendments Act).
Now, you discussed with Mr. Silberg the proposed legislation around this time with respect to the linkages. Do you recall that?
A Yes, I do.
Q Does this passage that I just read refresh your recollection as to what the DOE was proposing to Congress at that time?
A Well, this is a Presidential legislative package. So this would be the administration was including a provision in the National Energy Strategy to repeal the schedule linkage.
Q And do you understand that that Presidential proposal was comporting with the understanding of DOE on this issue?
A Yes.
Q And the reference to the repeal of the schedule linkages, do you know what that refers to?
A Essentially removing the linkage of the siting of the MRS facility and the construction

**System Fuels v. U.S. No. 03-2624C January 16, 2007**

**Heritage Reporting Corporation**

**Page 1726 to Page 2066**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1726

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------x
SYSTEM FUELS INC , on its own behalf
and as agent for SYSTEM ENERGY
RESOURCES, INC , and SOUTH ·No. 03-2624C
MISSISSIPPI ELECTRIC
POWER ASSOCIATION
Plaintiff
vs
THE UNITED STATES
Defendant
-----------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington D C

Tuesday, January 16 2007

VOLUME 6

The parties met, pursuant to the notice of the Judge, at 10 00 a m

BEFORE THE HONORABLE SUSAN G. BRADEN

Page 1727

APPEARANCES·
ON BEHALF OF PLAINTIFF
ALEX D TOMASZCZUK, ESQ
JACK Y CHU, ESQ
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E SILBERG, ESQ
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D C 20037
(202) 663-8000

and
L JAGER SMITH JR , ESQ
Wise Carter Child & Caraway, P A
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

Page 1728

APPEARANCES (Continued.)
ON BEHALF OF THE DEFENDANT
SHARON A SNYDER, ESQ
ALAN J LO RE, ESQ
STEPHEN FINN, ESQ
SCOTT DAMELIN, ESQ
MARIAN SULLIVAN, ESQ
U S Department of Justice
1100 L Street NW
Washington, D C 20036

(Index appears at end of transcript)

Page 1729

P R O C E E D I N G S
- - - - -

THE COURT All right I have a lot of different papers here I am sure I have got everything I need. Let me just tell you a little bit about this week's schedule

I am going to have to break this afternoon about 3.15 for a doctor's appointment at 3 30 It shouldn't -- it is downtown. It shouldn't take me that long. I am hoping I will be back here before 4 30 I'm sorry to do that, but I can work until 7 tonight to make up the time. We will be starting at 9 every other day this week, and I have nothing else during the week that will interfere with our schedule so we can run through I don't think this -- I'm sorry to do this to you, but that's where we are

I am ready to begin, unless there is something I have a lot of different motions, obviously, that have been filed in the last couple of days. I have looked at all of them and I know that we have granted the government's request to put some deposition testimony in I don't know if you got that or

Page 1834

Are you familiar with this document?
A. Yes, I am.
Q Okay. Now, from a programmatic standpoint, what happened between 1991, the issuance of the 1991 ACR and the 1994 ACR, which was issued in 1995, in March of '95?
A Well, after the 1991 ACR/APR was issued, the Department was following the strategy that the Secretary of Energy had laid out in his reassessment of the program in 1989, Secretary Watkins, essentially directing the support the office of negotiator in the siting of an MRS facility.
And in that period of time, there was a great program that was administered by the Department for the office of the negotiator, there were a variety of grants issued to Indian tribes and local governments studying the feasibility of an MRS facility The Department also developed several designs of the facility that potentially could have been implemented depending on the – its acceptance by the locals around the siting area. But after several years of working on that and supporting the actual negotiator, a site was not

Page 1835

forthcoming
In addition, grant funds were cut off by Congress in the 1994 time frame, I believe, so follow-on grants to do more work to try to identify a site and develop an agreement that would have to be approved by Congress was essentially terminated by Congress
So that process effectively ended the Department's support of the office of the negotiator.
Q. Now let's turn to page 4 of this document. I am not sure you have the same Bates numbers as I, so we will refer to it as page 4.
And this has got the projected nominal waste acceptance rates for spent nuclear fuel. And you will see the same rates there, but now instead of the years, specifically years, it is year one, year two, year three. Do you see that?
A. Yes, I do.
Q. What is your understanding of what's being reflected here, sir?
A. Essentially, at this point in time, the Department essentially was communicating in

Page 1836

this document that it was unclear when it might receive authorization for an MRS facility and – not authorization, but I should say a site for an MRS facility. And it was uncertain as to when that deployment might occur.
So this essentially reflects that in the first year of operation, this is the acceptance that we would have, and in succeeding years.
Q. Now, what program – I think you may have just alluded to this, but what is the system that is being contemplated in this, with respect to these waste acceptance rates?
A Well, this is the system that would have both an MRS and a repository in it. We used to call it in the early days the program, the improved performance system.
Q. And what would these ten years set forth here, what would that reflect? What system is being used there?
A. That's – as I testified earlier, that acceptance schedule is attempting to try to keep it under a 10,000 ton limit until the repository is operational.
Q. Okay. So, in other words, I think you

Page 1837

answered the question, what system are you operating here? Is that a repository or an MRS?
A. It is an MRS. It is an MRS operating prior to the time the repository is operational.
Q. Okay. Now, did there ever come a time when DOE changed the assumptions as to how it would begin performance? In other words, whether it began or assumed performance beginning with the repository versus an MRS.
A. It was shortly after this document was issued that I believe there were some changes in some of the programmatic documents indicating that we were going to be pursuing essentially a repository only system, which would have a repository operational in 2010. However, we did have some residual activities underway and, as I testified earlier in my background, after this document, we – since there were still several bills in Congress being considered for storage, I worked with a team of engineers on developing a topical safety analysis report to essentially facilitate the licensing of a storage facility,

Page 1838

should Congress give us authorization and allow us to do that prior to the 2010 time frame

Q. And after DOE began assuming performance not with an MRS, but with a repository, beginning with a repository, did these rates that are depicted at table 1 on page 4 of this document, did those rates change?

A. If I understand your question, if we were looking at a repository only system, would these rates have been different?

Q. Yes

A. Yes, they would have been, since there were no limitations on the terms of a ramp-up schedule or our acceptance rates for the repository, you would see a different acceptance rate, as we have today within the program. It is, I believe, it is 4, 6, 12 400 tons the first year, 600 tons the second, 1200 tons the third, 2,000 tons the fourth, and 3,000 tons, a steady state rate from thereafter So that there are no limitations on the repository In the steady state rate that

Page 1839

we have had for the repository and for the MRS in the earlier days of the program, was about an acceptance rate, after the ramp-up, of five years of 3,000 metric tons per year.

Q Now, in your experience in the program, when did DOE draw the conclusion that it could not perform at a rate that you just referred to, let's refer to it as an unconstrained rate, and also begin performance in 1998?

MR SILBERG. I'm sorry –

THE COURT: Is that what you are calling the unrestrained rate?

MR. LO RE: I will call it a repository rate, that's fine, Your Honor.

MR. SILBERG: I'm sorry. Can you restate the question?

MR. LO RE: Sure, I will restate the question

BY MR. LO RE:

Q In your experience with the program, Mr. Kouts, at what point did DOE conclude that it could not perform at a repository rate beginning in 1998??

A If you are asking, when did we know a

Page 1840

repository would not be available in the –

Q. Yes.

A – in the 1998 time frame, I believe it was the earlier document you referred to It was shortly after – it was 1987, I believe, that we recognized that the, that the repository would not be available in the 2000 – in the 1998 time frame, and it was delayed five years So from that point on, you know, the repository acceptance rates, you know, as you will see in the programs for planning purposes were up to the steady state level of 3,000 metric tons So, again, it was at that point in 1987 where we made the announcement that the repository was delayed five years, that that was the case.

Q And from a programmatic standpoint, Mr. Kouts, would it make any sense to apply a repository rate to an MRS?

A. Well, this gets back to the philosophy, if you will, of the Department in terms of implementing the MRS and the acceptance of such a facility in advance of a

Page 1841

repository There needed to be some limitation on the MRS from a capacity standpoint such that it did not, in the mind of the local people or in the concerns of the local people, become a de facto repository. So what you see over the years is that consistent with what we had in the proposal and what Congress effectively legislated in the Amendments Act of 1987 is a limitation on the MRS until a repository is operational, and then a total limitation.

Q. Now, Mr. Kouts, are you familiar with the term fee adequacy study?

A. I am familiar with fee adequacy, yes.

Q And what is that?

A. There is a requirement in the Act, again, that the Secretary assess the adequacy of the nuclear waste plan fee on an annual basis. And there is an analysis that's performed on an annual basis, based on the total cost of the program over the expenditures the Department anticipates over the years going up to, potentially up to 100 years in the future, looking at the balance in the nuclear waste fund, projecting how that balance would

Page 1842

be utilized with economic conditions up to well into the future, and whether or not over the life of the program, the adequacy – the fee is adequate, whether it is too adequate or less than adequate.

So the Secretary is responsible for either recommending to Congress a reduction or an increase in the fee, based on what his analysis shows.

Q. Now, you referred to the total – I think you referred to the total system cost.

A. Total system life cycle cost, yes.

Q. How does that total system life cycle cost relate to the rate of acceptance?

A. The rate of acceptance, it is built in to the size of the facilities that we operate at, the cost of operating those facilities over a period of time in terms of receiving all the waste that we need to receive.

The adequacy assessment has to take that into account, yes.

Q. And how does the – a change in acceptance over the span of, let's say, these ten years that are set forth here, how does that affect the total system cost or relate to

Page 1843

the total system cost?

A If you are referring to this relatively small amount of waste acceptance, it would be a minor component of the overall fee adequacy analysis.

The ramp-up rates typically don't have a significant impact on fee adequacy at all.

And, in addition – but the 3,000 metric ton rate would have an impact on what kind of facilities you need and what you need to operate them, as well as the transportation system.

Q Why does that ramp-up rate not have an effect in the overall system?

A Typically, it is because the assumption is that the capital cost of building the facilities has sunk in prior to this, so you are looking at an operational, a ramp-up in operations of four or five years.

It is, again, a minor component. It is more the long operation of the system at a 3,000 ton rate for over 20 years or 30 years that is more of a cost driver than the first initial years of operation

MR. LO RE: And, Your Honor, this is

Page 1844

the last question, I think, before we take the lunch break, with the Court's permission.

BY MR. LO RE:

Q. As you understand it, Mr. Kouts, the fee adequacy studies that were performed that contemplated beginning performance at an MRS, did they also contemplate and account for costs associated with a repository?

A. Yes, they did

Q. Thank you.

MR. LO RE: Your Honor, this would be a good time for a break.

THE COURT. All right. We will come back at 20 after 1, try to use our time as best as we can.

(Whereupon, at 12:17 p.m., a lunch recess was taken.)

Page 1845

AFTERNOON SESSION

(1:22 p.m.)

THE COURT: All right, Mr. Lo Re.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. Good afternoon, Mr. Kouts. Mr. Kouts, before the break, we were talking about the fee adequacy determination made by DOE. In your career at DOE, do you know whether the fee that the utilities have ever paid under the standard contract has changed?

A. No, it has not.

Q. Do you know why that is?

A Well, every fee adequacy assessment that's been performed by the program has not indicated either a need to increase or decrease the fee.

Q. Mr. Kouts, I would like to show you what has been marked as PX-264. And, Mr. Kouts, this is a document entitled total system life cycle cost of the Civilian Radioactive Waste Management Program dated September 1995.

And are you familiar with this document, sir?

Page 1894

MR. LO RE: Your Honor, I am going to object on the grounds that the document speaks for itself.

THE COURT: It certainly does. This seems to me as argument in front of the witness The document says what it is. And I think I have already given what my view is. You don't want me to change my view, do you?

BY MR. SILBERG:

Q. Mr. Kouts, is there anything in this document that says that approval of a delivery commitment schedule by the Department of Energy becomes a contractually binding –

THE COURT. Sustained.

MR. LO RE: Thank you, Your Honor.

THE COURT: You are welcome.

BY MR. SILBERG:

Q If you look at page Roman V, which is Bates 3592, in the second paragraph, there is a sentence about two-thirds of the way down that says, "the annual acceptance rates "

Do you see that sentence?

A. Yes, I do. I see it on the screen.

Q And that sentence says, refers to the annual acceptance rates that are provided in

Page 1895

this document. Is that what you had in mind when that document – or what DOE had in mind when they wrote that document?

A. I think that as the history of the program has indicated, you know, our projections in terms of what we could do in any one year are subject to change, and I think that that sentence is consistent with what we said in the past and what we would say today.

Q And if you look at page 3598, which is table 2 1, the title of that is projected waste acceptance rates. Is that correct?

A. That's correct.

Q. And those are the acceptance rates that were subject to change as the program progressed?

A. Yes.

Q Were purchasers obligated to submit DCSs to DOE under this document?

A Were they obligated to? I think that for the purposes of the Department, in order to plan for shipment from individual reactor sites, given the projections we were providing, without that information, the Department would have no way of knowing how a purchaser would

Page 1896

allocate basically their allocation between facilities.

So without information, providing that information, the Department would be left adrift in terms of what it could do in the year of shipment in terms of how it would service that contract order.

Q. Could you look at the top of page 3595, which is page 2 of the document, the first sentence, "beginning in January 1992." Does that indicate that the purchasers were required to submit DCSs or that the purchasers may submit DCSs?

A. It says, "may."

Q. Now, if you look at page 8 of the document, which is Bates 23 – I'm sorry, wrong Bates Number – 3601. And if you look at the first sentence, that says, does it not, that the information contained on approved DCSs will assist DOE in implementing the waste management process? Is that your understanding of what the DCSs would do?

A. The document speaks for itself.

Q. The answer is yes?

A. Yes.

Page 1897

Q. And after DCSs, you would still have to go through the final delivery schedule process; is that correct?

A. That's correct.

Q. And if – strike that.

If we were to look at page 4 of the document, which is Bates 3597, if you look at the bottom of the second paragraph, DOE's position at this time was that with the current linkages as they existed in the Nuclear Waste Policy Act, then and now, that MRS construction and MRS operations could not begin until at least 2007.

A. That's correct.

Q. And today that date would be later because the repository schedule was later?

A. That's correct.

Q. Okay. So that would now be about 2017, based on the 2020 repository schedule?

MR. LO RE: Your Honor, I am going to object on the grounds that this is not relevant to the issues before the Court. I think that –

THE COURT. Well, I have been sitting here thinking that myself. I am not sure

Page 1898

exactly what the witness – what counsel is doing

I mean, if you want to argue off the document, put that in your brief. You don't need to go line by line through the document with this witness.

MR. SILBERG: Well, I am not going line by line, Your Honor, but I want to establish –

THE COURT: What do you want to establish? Let's hear that.

MR. SILBERG: That this document assumed an MRS, which was not authorized by law at the time

THE COURT: And so what?

MR. SILBERG: Was never authorized by law at the time

THE COURT And so what?

MR. SILBERG. Therefore –

THE COURT: How is that relevant to what your damage is?

MR. SILBERG: Not to our damages claims, because we believe that this whole acceptance rate is a red herring, but given the fact that –

Page 1899

THE COURT: So argue that.

MR. SILBERG: Excuse me?

THE COURT: So argue that. What do you need the witness to do here?

MR SILBERG: What I want to establish, and the witness is, in case the Court wants to deal with the acceptance rate issue, that the 1991 ACR does not provide an appropriate basis to establish an acceptance rate because it is based on an MRS which was not authorized by law, which – whose operation in 1998 would have required speculating that Congress would have changed the law, which it never did, and therefore –

THE COURT This witness is not going to say any of that What you are doing is an argument. It is fine, there is nothing wrong with the argument, but, I mean, you don't need this witness doing it. That's my point. What do you want him to do? You have a document.

MR. SILBERG. Well, I want to establish the basis for their assuming that they could get an MRS in 1998, when there was congressional prohibition –

Page 1900

THE COURT: Why did you assume that you could get an MRS in 1998?

THE WITNESS: Well, first of all, I would disagree with learned counsel. The facility wasn't authorized. It was authorized in the 1987 Amendments Act so we did have an authorized facility

And in addition to that –

THE COURT: It was authorized It wasn't appropriated.

THE WITNESS: Correct, but the facility was authorized

The Department's view was, and it had expectations, and was being, shall we say, encouraged by various congressional committees to – at this point in time, to work very closely with the negotiator, to try to find a site and to meet the obligations.

So the Department's view was that we were going to do everything we could and the strategy, which is laid out in the 1989 reassessment, by Secretary Watkins, which I mentioned earlier, was that once the negotiator found a site, and the approval of that siting agreement, in other words, the benefits

Page 1901

agreement to the local government, would also have contained in it a legislation which would have to be approved by Congress, as well as the benefits agreement would also have to be approved, would have in it legislation that would remove the schedule linkages so we could begin operation of the facility in the 1998 time frame.

So my perspective is at this point in time, and having lived it, that the Department was still pursuing very vigorously, with all its resources, trying to have a facility available in the 1998 time frame.

MR. SILBERG: And our point, Your Honor, is that the Department of Energy is trying to establish and the government is trying to establish a contractual obligation based on a facility that is – was then and now remains purely speculative, because, and I can ask the questions as to the status of the negotiator, negotiator's efforts, the status of legislation, and get through that fairly quickly.

And then I think we can put this issue to bed

Page 1922

obligate, and we think it is fair that we vet
that issue with Mr Kouts
THE COURT: Yes, he insisted on going into that.
MR. LO RE: Thank you, Your Honor.
THE COURT: Go on ahead.
THE WITNESS: Would you repeat the question?
BY MR. LO RE:
Q. Sure. If you would, Madam Reporter
THE REPORTER. "Question: Now, what did you mean by assist in implementing the waste acceptance process?"
THE WITNESS. The information contained in the DCSs is essential for the Department to determine where it is going to go in any specific year, what casks that it is going to have to have available, what transportation casks it is going to have to have available in order to service individual reactor sites
So it is, besides just the logistical planning, it is also the Department's firm basis, if you will, in terms of trying to figure out exactly how it is going to implement

Page 1923

the system. Over and above that, in the Department's perspective, it is -- it is an obligation on its part in order to provide those services that are jointly planned, if you will, for the, for both the Department and the utilities.
BY MR. LO RE:
Q. Without the DCSs, do you know how DOE would be able to implement this program?
A. Quite honestly, without establishing an order of, in a specific year, in terms of what facilities we're going to service, and having an interaction of -- a planned and structured interaction with the utilities to provide the information needed for the Department and needed for the utilities to make that fuel available, I don't know how you implement this, this contract.
Q. Without the ACRs, do you know how DOE would implement this program?
A. It would be somewhat of a food fight, because I think the, you know, everyone would be looking about, what is everybody else's date of discharge from reactors. Basically, the queue, if you will, the acceptance priority

Page 1924

ranking is based on information that we received from the utilities and through the RWA 59 process. And what this document does is lay that out so everyone sees exactly where in the queue they are, and in what specific year they are going to be serviced.
Without that kind of unifying information, I don't know how the Department would implement this.
Q. And when you say "this document," you are referring to the '91 ACR that's before you?
A. Yes.
Q. Mr. Kouts, did the utilities, in paying their fees under the standard contract, pay for a 3,000 rate of acceptance in year five?
MR. SILBERG: Objection. That goes beyond cross. I don't know that there is any foundation laid for any of these questions.
THE COURT: Go ahead and ask one or two, Mr. Lo Re It does go beyond the scope, but --
MR. LO RE: Thank you, Your Honor. If I may have the question read back, please.
THE REPORTER: "Question: Mr. Kouts,

Page 1925

did the utilities, in paying their fees under the standard contract, pay for a 3,000 rate of acceptance in year five?"
THE WITNESS: I don't --
MR. SILBERG: Your Honor, excuse me, I would also note that this, in essence, asks the same question about what's the legal obligation, so I think we're beyond fact witnesses.
THE COURT: He can answer. I am not going to, you know, give much credence to his view about what's in the contract or not.
THE WITNESS: Thank you, Your Honor.
Simplistically, the fee essentially pays for the implementation of the overall program. And in terms of the rate at which -- that we receive fuel from the utilities, it is hard to define the fees for that specific rate.
I think that the fee is to pay for the total costs of the program, which essentially is for the Department to receive and accept all the fuel and dispose of it and to transport it and anything else it needs to do with that fuel.
So the assumptions used in total

Page 1926

system life cycle cost estimates make assumptions about acceptance rates and so forth, but in terms of the sensitivity of that analysis to a specific rate, I would say it is not highly sensitive.

If it was a 2,000 ton rate, you would have to evaluate that for fee adequacy. I don't think that would change it very much 3,000, you know, obviously we have analyzed. If you went to 4,000, 5,000, or 6,000, that gets to whether or not you expend more capital for those facilities and what their operating costs are and so forth, which can have an impact on total system cost.

But generally, as I look at it, the acceptance rate is a factor, but it is not the determining factor, if you will, in terms of adequacy of the fee

MR. LO RE. Thank you. Your Honor, I have no further questions.

THE COURT: Counsel?

MR. SILBERG. We have none, Your Honor.

THE COURT: All right Very well.

THE WITNESS. I can get up now? Thank

Page 1927

you

THE COURT: My advice to you is, you know, what is it, what was the guy, Gump, get your shoes on and run as far as you can and as fast as you can

THE WITNESS Thank you, Your Honor.

THE COURT When do you retire?

THE WITNESS: Believe it or not, I am of retirement age now but this is so much fun, I just love coming to work.

THE COURT: This could be, you know, it could be wheeling you in here in a chair.

THE WITNESS I also have two sons in college, which is a determining factor

THE COURT. I see. That's a good investment. So something good is coming from this, we hope. Does the government want to start with its next witness?

MS. SULLIVAN: Yes, Your Honor. We need a few minutes to bring the documents in. We moved a little bit faster than we expected this morning, so if we can have a few minutes.

THE COURT That's quite all right. I was just thinking of the image of this gentleman coming in here, you know, ten years

Page 1928

from now and both of us going to each other, why are we here, you know?

(Discussion off the record.)

MS. SULLIVAN: I have been told that our litigation support contractor doesn't have the materials I need for Mr. Zabransky, although I told them to bring them here at the lunch break. Could I start and get through his background and then – I don't have the documents that I need.

THE COURT: That's fine. That should work fine then.

MS. SULLIVAN: Is that fine?

THE COURT: I am trying to use the time as best as I can. I apologize for being gone for an extra hour this afternoon.

MS. SULLIVAN: Your Honor, the government calls its next witness, Mr. David Zabransky to the stand.

THE COURT: All right. Welcome back.

Whereupon–

DAVID K. ZABRANSKY

a witness, called for examination, having been first duly sworn, was examined and testified as follows:

Page 1929

MR. TOMASZCZUK: Can I just have one second, Your Honor?

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Mr. Zabransky, could you state your full name for the record, please?

A. Yes. It is David K. Zabransky.

Q. Mr. Zabransky, where are you currently employed?

A. U.S. Department of Energy in Washington, D.C.

Q And what are your responsibilities – what position do you hold at the Department of Energy?

A I am in the Office of Civilian Radioactive Waste Management. I am a nuclear utilities specialist within that office.

Q. And what are the responsibilities in – your responsibilities in that position?

A. Among a number of technical activities I do, I also administer or act as contracting officer for the standard contract at this point

**System Fuels, Inc., and Entergy Arkansas, Inc., v. US No. 03-2623C April 12, 2007**

**Heritage Reporting Corporation**

**Page 3339 to Page 3676**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3339

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

SYSTEM FUELS, INC., and ENTERGY :
ARKANSAS, INC.,
Plaintiffs, NO 03-2623C
vs.
THE UNITED STATES, :
Defendant.

-------------------------------------x

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C

Thursday, April 12, 2007

The parties met, pursuant to the notice of the Judge at 9 03 a m.

BEFORE THE HONORABLE CHARLES LETTOW

Page 3340

APPEARANCES
ON BEHALF OF PLAINTIFF·
ALEX D. TOMASZCZUK, ESQ
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, N W
Washington, D C 20037
(202) 663-8000
and
L. JAGER SMITH, JR , ESQ.
Wise Carter Child & Caraway, P.A
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

Page 3341

APPEARANCES (Continued.)
ON BEHALF OF THE DEFENDANT
JOSHUA E GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
ALAN J. LO RÉ, ESQ
SCOTT DAMELIN, ESQ
U.S Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

***Index appears at end of transcript***

Page 3342

P R O C E E D I N G S

- - - - - (9 03 a.m )

THE COURT Welcome back The Court appreciates the organization and care with which the site visit was undertaken and successfully accomplished Is there anything preliminarily this morning before we begin, Mr Gardner?

MR GARDNER: Not from the government, Your Honor

THE COURT. Mr Tomaszczuk?

MR TOMASZCZUK Nor from Plaintiffs.

THE COURT All right. Yes?

MR. GARDNER: And the government would call its next witness, Christopher Kouts

THE COURT: Thank you very much. Mr. Kouts, you're familiar with the process, if you'd approach the bench and stop and raise your right hand to be sworn?

THE WITNESS· Yes, sir.

Whereupon--

CHRISTOPHER KOUTS

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT· Thank you. Please be

Page 3347

2002, I worked on the development and the implementation of the Yucca Mountain site recommendation process, working closely with the Undersecretary's office and the Secretary of Energy's office through his recommendation to the President and supported them through hearings in the 2002 timeframe up until the point that the President assigned the joint resolution of Congress, essentially identifying the Yucca Mountain site as the site for the repository.
After that, I was appointed on an acting basis to the position that generally I'm in right now, and that was in roughly October 2002.
Q. Thank you. What is your educational background?
A I have a Bachelor's and a Master's in mechanical engineering, and I'm a licensed professional engineer.
Q. I'd like to look at our first document, Defendant's Exhibit 49.
MS. SULLIVAN: And it's also, Your Honor, PX-187, and both were admitted for completeness. Your Honor, may I approach?

Page 3348

THE COURT: Yes, certainly.
BY MS. SULLIVAN:
Q. Mr. Kouts, I've handed you just an excerpt of what is a three-volume document. Could you identify the document from which this excerpt is taken for the record?
A. Yes, this is the mission plan for the Civilian Radioactive Waste Management Program. It was a document that was required to be developed by the Nuclear Waste Policy Act
Q. Were you at DOE at the time that this document was issued?
A. I joined DOE in the month that this document was issued.
Q. Did you review this document when you joined the Office of Civilian Radioactive Waste Management?
A. Yes, I did. It was the blueprint for the implementation of the program at that time
Q. And did you use it in the work that you do?
A. Yes, I did.
Q. Could we please go to page 25 of this document, Bates number ending 1129? And there's a table on that page titled,

Page 3349

"Assumptions About Geologic Repositories."
It's also on the screen.
A. Okay.
Q. Mr. Kouts, at the time this document was issued, how many repositories did DOE plan to bring online?
A. At that time in the program, we were planning on developing two repositories.
Q. And why was that?
A Well, essentially, with the 70,000 metric ton limit on the first repository, you needed two repositories in order to essentially dispose of all the anticipated commercial and defense waste that the program has to deal with.
Q. At the time the 1985 mission plan was issued, when was DOE planning to begin operations at each of these repositories?
A. The first repository was to begin operations by January 31, 1998, and the second repository, I believe, was about five years after that.
Q Mr. Kouts, could I direct your attention to the paragraph below this section that we have excerpted on the screen, under

Page 3350

waste acceptance schedules, and there's a paragraph that begins "on the basis"?
A. Yes.
Q. Could you read that paragraph? It continues to page 28, and I'll just have you read through the end of that sentence that continues on page 28
A. Okay "On the basis of the integrated system approach described in the improved performance plan (section 2 3), the DOE has identified many possible waste acceptance schedules depending on the size and the operating characteristics of the system facilities."
Q. Actually, let me have you stop right there. What did this paragraph reflect about DOE's planning at this point in the program?
A. Well, at this point in the program, in 1985, which was essentially three years after the passage of the Act, the heading of the designs, many of the capabilities of the facilities were still in a very preliminary planning stage, so what the Department was indicating by this statement was, essentially, that we were still learning, and we were still

Page 3351

developing the system, and there could be a variety of ways in which the system could be implemented.

Q. Could I turn your attention to the next page, page 26 of the document? There's a schedule set forth on that page. What is this schedule?

A. It is a schedule with essentially a repository only system, a repository only system, what's referred to here as an authorized system, showing the first repository, again, beginning operation in 1998 and the second repository beginning operation in actually 2006, I believe.

Q. At the time the mission plan was issued, had DOE designed its repositories?

A. No, at that point in time, our designs were very conceptual, if you will, and I had personal experience with this essentially because, as part of the MRS team and given our development of the MRS, we had to be cognizant and aware of how the repositories were developing. At this point in time, we had three first repository projects and the designs and the – let's say the development of those

Page 3352

designs were very preconceptual at that time.

Q. Do you have an understanding as to the term "steady state rate"?

A. Yes, I do.

Q. What is your understanding of that term as it is applied in the program?

A. That rate essentially is the rate that we would eventually get to that would, that after we had developed all our service facilities and our capabilities at our sites, that we would operate at over the long-term for the program.

Q. And what is the steady state acceptance rate for commercial spent nuclear fuel set forth in this schedule on page 26?

A. When both repositories were in operation, that would have been a steady state rate of 3000 metric tons each, so it would be a total of 6000 metric tons a year.

Q. And at what point, pursuant to this schedule, would DOE begin to work off the backlog of spent fuel that it accumulated at utility sites?

A. Well, looking at the chart, it would have been when the, on the far right column,

Page 3353

when that backlog began to reduce, which would have been beginning the year when the second repository began operations in 2006.

Q. And what is the significance of the information in the far right-hand column?

A. That essentially shows the amount of fuel that would have existed at utility sites in this concept and when that amount of fuel would be decreasing based on the acceptance rates that were being brought into the program.

Q. And at what point pursuant to the schedule depicted on this page would DOE accept more than the generation rate or more than the fuel that was being generated by utilities?

A. Again, that would be 2006 when the backlog would begin to reduce.

Q. At the time this schedule was prepared, what were the projections for the total waste to be generated?

A The cumulative acceptance would be, for commercial spent fuel, would be about 130,000 tons, and that's in the second-to-last column at the very bottom in the year 2031.

Q. And how long did DOE project that it would take to work off the backlog, according

Page 3354

to the schedule set forth on this page?

A. Again, right at, actually, in the year 2030 would be – 2031, actually, when we took the last of the backlog would be in the year 2031.

Q. If I could turn your attention to the next page, page 27, and there's another schedule on that page titled, "Waste Acceptance Schedule Improved Performance System." What does that schedule depict?

A. This depicts a system with a monitored retrievable storage facility, within it beginning operations essentially in the 1998 timeframe –

Q Was –

A. – with two other repositories. I'm sorry.

Q Was DOE authorized to build an MRS at this point in time?

A. No, it was not.

Q. Could I direct your attention – and this is in the excerpt to page 381 of this document, Bates ending 1478.

MR. SILBERG: Excuse me, this is page 370?

Page 3359

Q. And the understanding that you've just expressed with regard to DOE's ability to take at-reactor storage – take title at reactor sites, did you have that understanding in 1985 when you joined the program?

A. That was not an issue that people, I think, were dealing with at that time. They were very much absorbed with the development of repositories and development of the MRS proposal, so that issue I don't think was first and foremost in people's minds in terms of whoever wrote this section of the mission plan.

Q. I'd like to direct your attention back to page 29 of DX-49, and I'd like to direct your attention to the paragraph, it begins, "it should be emphasized," if you could read that into the record?

A. Sure. "It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses."

Q Why did DOE include this language in the mission plan?

Page 3360

A. Well, again, it's consistent with what I stated earlier, that this was a very early time for the program, that we recognized that there were many uncertainties as to how the system might be implemented, the challenges in implementing a repository, and also, we were unclear at that point whether an MRS facility was also going to be in the system.

Q. Now, I'd like to direct your attention to the following paragraph, and we will highlight the portion of the paragraph that begins, "the waste acceptance schedule," if you could read from that point to the end of the paragraph?

A. "The waste acceptance schedule will serve as the planning basis that will be updated annually in response to the latest forecasts of nuclear power growth. Under the terms of the contract for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish

Page 3361

firm waste acceptance schedules for individual reactors, including shipment allocations."

Q. And just so that the record is clear, I believe you said, "serve as a planning basis," and the text section reads, "planning base."

A. I'm sorry.

Q. Mr. Kouts, why did DOE include that reference to 1991 in this document?

A This goes back to the standard contract and the timeframes associated leading up to 1998, when the Department had an expectation at that time that it would begin receiving materials, so we would begin publishing, in 1991, information – an acceptance priority ranking, if you will, that would show the individual contract holders what their allocation would be in the year 1998 when we would begin shipping.

Q. And what were the firm waste acceptance schedules described in that paragraph?

A. Again, that the annual capacity report that would accompany the acceptance priority ranking would show what capacity we were

Page 3362

planning in the system and how that prioritized ranking would be allocated along with that in a capacity report.

Q I'd like to turn to another document, DX-53

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: Yes, certainly.

BY MS. SULLIVAN:

Q. Mr. Kouts, I've handed you what's been marked as Defendant's Exhibit 53. Would you identify this for the record, please?

A Yes, this is volume one of the monitored retrievable storage submission to Congress, which was essentially a proposal the Department was required to submit. This is, again, volume one. There were two other volumes to it.

Q And were you involved in the preparation of this document?

A. Yes, I helped write it.

MS. SULLIVAN: Your Honor, at this time, we would move for admission of Defendant's Exhibit 53.

THE COURT: It's already admitted. It

Page 3371

anticipation of repository construction and operation.
Q. I'd like to now provide you what's been marked as Defendant's Exhibit 57, again, an excerpt of that document.
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Yes.
BY MS. SULLIVAN:
Q. Mr. Kouts, could you identify Defendant's Exhibit 57 – or the excerpt from which, the document from which this excerpt is taken?
A. Yes, I can. This is the, I think, only finalized program mission plan amendment. If you remember, the mission plan was required by the Act to provide a road map in terms of how we were going to implement the program, and at this point in time, it was felt that since there were some major changes to the program, that we needed to provide an amendment to the mission plan. And this document has essentially that amendment, along with comments on the draft amendment that was issued prior to this and the Department's responses to those

Page 3372

comments.
Q. Were you involved in the preparation of this document?
A. I believe I was involved in reviewing it. I might have been involved in responding to comments related to MRS issues.
Q. And what was your position within the program at the time this document was issued?
A. I was still working as part of the MRS team.
MS. SULLIVAN: Your Honor, at this time, we would move for admission of Defendant's Exhibit 57.
MR SILBERG No objection.
THE COURT: Admitted.
(Defendant Exhibit Number DX-57 was received in evidence.)
BY MS. SULLIVAN.
Q. Could I direct your attention to page six of this document, the paragraph that begins, "as already mentioned," if you could read that paragraph into the record, please?
A. "As already mentioned, several important milestones have been achieved However, the experience gained in achieving

Page 3373

those milestones and advances in the technical planning of the program, coupled with the decrease in the budget for fiscal 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule, see table one. The new schedule shows a five-year extension of the date for waste acceptance at the first repository, from 1998 to 2003. As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility."
Q. What was the state of DOE's planning at the time this document was issued?
A. Essentially, that the MRS was going to be our only vehicle to receive materials in the 1998 timeframe and that that had to be linked to the repository's beginning operation in 2003.
Q. How did DOE's budget appropriations affect this program plan?
MR. SILBERG: Objection, Your Honor, relevance.
THE COURT: Again, the Court will hear

Page 3374

this evidence It is not now relevant, but it may be.
MS SULLIVAN: Your Honor, with count two of Arkansas's complaint, they've made allegations with regard to DOE's budget, budgets and whether or not DOE's failure to act has been the result of inadequate funds. That's, in part, a reason for presenting this evidence.
THE COURT: Is that the good-faith claim?
MR. SILBERG: I don't believe there's any reference to budgets. The good-faith claim doesn't deal with the physical Yucca Mountain program It deals with the waste acceptance and the handling of the ACRs and the DCSes. It does not deal with whether or not Yucca Mountain was constructed, whether they had enough money for Yucca Mountain, whether there were quality assurance problems with Yucca Mountain. Those were not relevant to a good-faith and fair dealing claim, and we've not made any allegations to that.
MS. SULLIVAN: Your Honor, I have

Page 3375

copies of Plaintiff's first amended complaint. Paragraph 28 goes directly to the budget appropriations and whether, and DOE's expenditures.

THE COURT: Will you read it, please.

MS. SULLIVAN: Sure, or let me put it on the Elmo, if we can switch to the Elmo.

THE COURT: Mr. Silberg?

MR. SILBERG: Yes, sir.

MS. SULLIVAN. Your Honor, paragraph 28, "DOE's failure to act has not been the result of inadequate resources. DOE annual expenditures for the Nuclear Waste Fund have consistently been well below the level of annual receipts in the Nuclear Waste Fund. There are receipts in funds available for DOE to comply with its contractual obligations."

MR. SILBERG: Dealing with the contractual obligations, if you look, and I haven't read this in a while, but I think if you look at paragraph 27, the issue is DOE's obligations and the contractual obligations and not the program, the physical attributes of the program itself. And in any event, Congress is part of them.

Page 3376

THE COURT: Congress is part of the United States of America, frankly, so is the executive branch, and so is this Court, but we will hear the evidence.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Kouts, would you like the question again?

A. No, I think I remember it. I think it's essentially addressed in the footnote on the bottom of page six that, in that specific budget year of 1987, the administration had requested 710 million dollars for the program. Congress provided 499 million, but withheld 79 million, pending certification of good-faith efforts in consultation and cooperation with states and affected Indian tribes. So essentially, we were getting a substantially reduced budget in that year, which contributed to the delay, as indicated here.

Q. I'm going to direct your attention to page 60 of the excerpt that I've handed you, the paragraph that begins, "like the schedule in the 1985 mission plan"?

Page 3377

A. Yes.

Q. I'm sorry, the paragraph above that.

MR. SILBERG: I'm sorry, what page?

THE COURT: 60.

MS. SULLIVAN: 60.

THE WITNESS: Would you like me to read the entire paragraph?

BY MS. SULLIVAN.

Q. Yes, the entire paragraph that begins, "the 1985 mission plan."

A. Okay. "The 1985 mission plan presented representative waste acceptance schedules for the authorized system and the improved performance system. Because of the intent to postpone indefinitely site specific activities for the second repository, the rebaseline schedule for the first repository, and the revised estimate of when an MRS facility could begin receiving waste, it was necessary to develop a revised waste acceptance schedule as a reference for planning purposes and for fee adequacy assessments."

Q. Why did DOE include this language in the 1987 mission plan amendment?

A. Again, to indicate what the new

Page 3378

planning basis for the program was and to indicate that, again, that things are changing and we have to rebaseline the program according to events that are transpiring.

Q. And how did DOE want recipients of this document to view this schedule?

A. Again, it was our snapshot in time, if you will, as to how we felt the program was going to be implemented, based on the information we had at that time, and it was certainly subject to change as we went forward in the future.

Q. Could I direct your attention to the third paragraph on that page that begins, "under the terms of the contract," if you'd read that paragraph, please?

A "Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receipt and capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent fuel receipt by the

Page 3387

purposes, recognizing that the MRS Review Commission is to provide an independent assessment of the need for an MRS facility before the DOE can start site surveys and evaluations."

Q. And, Mr. Kouts, were you involved in the work of the MRS Review Commission?

A. I provided information to the commission and the commission staff and essentially was involved in the development of this DOE position on it, but I did not work directly for the commission. I did provide information to them.

Q. Could I direct your attention to the next section on that page titled, "Statutory Conditions on the MRS Facility"? And in the interest of time, I won't have you read that into the record, but I just direct your attention to the first paragraph, paragraph numbered one on that page, there's a reference to, "The MRS Review Commission submits in November of '89 a report." Did the MRS Commission submit its report in November of 1989?

A. Yes, it did.

Page 3388

Q. Did you review that report at the time it was issued?

A. Yes, I did.

Q. And why was that?

A. Well, this was important information, since Congress essentially set up this commission to evaluate the need for the facility, and of course, the Department had a very special interest in an MRS facility since it was the only facility that we felt we could have available in the 1998 timeframe, since the repository program was delayed. So whatever findings that commission came up with and recommendations were of great interest to the Department.

Q. May I have Defendant's Exhibit 321, please?

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: Yes.

BY MS. SULLIVAN:

Q. Mr. Kouts, would you identify Defendant's Exhibit 321?

A. Yes, this is the report of the Monitored Retrievable Storage Commission that I

Page 3389

mentioned earlier.

Q. And this is the document you would have reviewed?

A. Yes.

Q. About the time it was issued?

A. Yes.

MS. SULLIVAN: Your Honor, at this time, we'd move for admission of Defendant's Exhibit 321.

MR. SILBERG: No objection.

THE COURT: Admitted.

(Defendant Exhibit Number DX-321 was received in evidence.)

BY MS. SULLIVAN:

Q. I direct your attention, Mr. Kouts, to the page of the document with the Bates number ending 3994. It appears to be the cover letter transmitting the document.

A. Okay.

Q. And if we could bring up the last paragraph on that page, if you could read that into the record, please?

A. "The Commission notes that the Congress, for many years, has expressed concern that an unlinked MRS might be regarded as a de

Page 3390

facto repository and could reduce the impetus for proceeding with permanent geologic disposal. The Commission recognizes this expression of Congressional will, as well as similar sentiments voiced during the course of its hearings. Although the Commission does not believe there is a technical basis for the linkages, the Commission concludes that some linkages are justified."

Q. Mr. Kouts, did you understand this reference to the linkages to be the limits on the operation of the MRS that we've been discussing?

A. Yes.

Q. If we could turn to page XVI, the executive summary ending in Bates number 4006, if we could look at conclusion four, if we could, if you could read that conclusion four, please, into the record?

A. Okay. Conclusion number four, "An MRS linked, as provided in current law, would not be justified, especially in light of uncertainties in the completion time for the repository. Consequently, the Commission does not recommend a linked MRS as required by

Page 3391

current law and as proposed by DOE. The Commission notes that members of Congress, other public officials, environmental groups, and many private citizens for many years have expressed concern that an unlinked MRS might be regarded as a de facto repository and thereby would reduce the impetus for building the repository as expeditiously as possible. Although the Commission does not believe there is a technical basis for the linkages, the Commission agrees that, in light of Congressional and other concerns about a de facto repository, some linkages are justified. However, the schedule linkages presented in the NWPAA, MRS construction may not begin until the Nuclear Regulatory Commission issues a license for the construction of the repository, would make it impossible for an MRS to be operational for more than three years before the repository. Because of delays already experienced in the repository schedule and continued uncertainty surrounding the repository's location and date of operation, the value of

Page 3392

the MRS would be greatly diminished if its construction were tied to the schedule of the repository. Most of the need for an MRS would have disappeared, and that utilities would have had to make other arrangements for storage.

MR. SILBERG: Excuse me. I think when Mr. Kouts read that, he read, "is impossible for an MRS to be operational for more than three years," and I think the text says, "operational more than three years."

THE WITNESS: I'm sorry.

THE COURT: Thank you, Mr. Silberg. Ms. Sullivan, you may continue

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Kouts, how did DOE view this conclusion by the MRS Commission regarding the linkages proposed by the NWPA amendments?

A. Well, this perspective of the Commission is consistent with the Department's experience in the development of an MRS site in Tennessee and the other sites that we dealt with, so the Department was in agreement with the perspective of the Commission in this regard

Page 3393

Q. Mr. Kouts, I'd now like to show you Defendant's Exhibit 68, another document dated November '89.

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: Yes.

BY MS. SULLIVAN:

Q. Mr. Kouts, would you please identify this document for the record?

A. Yes, this is a report to Congress on the reassessment of the program that was essentially directed by the Secretary of Energy at that time, Admiral James Watkins. When he came into his position as Secretary, he directed that a reassessment of the program be undertaken, and this was eventually provided to Congress after he completed his assessment.

Q. Were you involved in the preparation of this document?

A. No, I was involved in a review of it prior to the time it went out.

Q. And what position did you occupy within the program at the time this document was issued?

A. At this point in time, I was still

Page 3394

head of a transportation program within the program.

MS. SULLIVAN: Your Honor, at this time, I would move for the admission of Defendant's Exhibit 68.

MR. SILBERG: No objection.

THE COURT: Admitted.

(Defendant Exhibit Number DX-68 was received in evidence.)

BY MS. SULLIVAN:

Q. Mr. Kouts, to your knowledge, was this document provided to Congress?

A. Yes, it was.

Q. What were the results of the Secretary's reassessment of the program schedule?

A The major change was a change to the repository schedule and a delay in the first repository even further from 2003 to 2010, and at this point in time, the Secretary was also very mindful of our need to have a facility to meet our contract obligations available in 1998 and directed that, essentially, that we would support the Office of the Nuclear Waste Negotiator in trying to find a site, and we

Page 3399

that the schedule linkages needed to be adjusted in order for the Department to have the facility available in that timeframe in 1998.

Q. Do you know why there's no reference to the capacity limitations in that paragraph?

A. Essentially, because the, as I've discussed and as the MRS Review Commission also indicated, that you need some kind of condition linkage, if you will, to satisfy local concerns that an MRS facility won't be the ultimate permanent facility if we don't end up developing a repository, so therefore, if you put a capacity limitation on the MRS, that would only solve part of the problem, and therefore, that would create continued pressure to implement the repository.

Q. Now, I'd like to go back very quickly to Defendant's Exhibit 57, which was the 1987 mission plan amendment, and I'd like to direct your attention to page 61 of that document, the schedule on that page, the 1987 mission plan amendment.

A. Okay.

Q. I'll let Mr. Silberg get that before

Page 3400

him too. Mr. Kouts, after DOE performed the reassessment -- or the Secretary ordered the reassessment of the program provided to Congress, did DOE plan to perform in accordance with this schedule set forth on page 61?

A. No, it could not, for several reasons. First of all, we didn't have a second repository program. Secondly, the first repository program was delayed until 2010, and the acceptance rates at the MRS facility would have, assuming the schedule linkages would have been removed, the acceptance rates would have far exceeded the 10,000, the 10,000 ton limitation, if you will, on the -- that you could not receive more than 10,000 tons at the MRS until the repository was operational. So this schedule was no longer attainable.

Q. And could DOE, after the Secretary's reassessment in 1989, could DOE have begun operations in a repository in 2003?

A. No, it could not.

Q. And why do you say that?

A. There was just too much work to be done, and the amount of work that had to be

Page 3401

done in order to implement the repository needed additional time, so a repository in 2003 was not attainable.

Q. After 1989, what activities did DOE undertake regarding the siting of an MRS?

A. As directed by the Secretary, we focused our efforts on supporting the Nuclear Waste Negotiator, and that essentially manifested itself in the management of a grants program for him, so it's such that when he went out to talk to interested local governments and Indian tribes, we would provide grant money for that, and there were several stages of those grants that we laid out in a Federal Register notice.

In addition to that, since the timeframe from 1989 to 1988 was a relatively short timeframe in the implementation of a nuclear facility, a storage facility that had to go through NRC licensing, we began looking at simplified designs, storage only designs, if you will, for an MRS facility that could be deployed very quickly. And we went through several phases of looking at those kind of designs.

Page 3402

In addition, we were sensitive to the fact, in working with the Nuclear Waste Negotiator, that perhaps the host area for an MRS might have some perspective on the types of technologies, storage technologies that they would prefer to see. So we were trying to create an array of options of a facility, such that it would be more acceptable to local governments.

And so we followed very carefully the efforts of the Negotiator. Our staff went out and gave presentations to localities that potentially had an interest, and there was a great deal of effort in the program to support that area.

Q. How long was the Office of the Nuclear Waste Negotiator in existence?

A. It was in existence for approximately, for, I believe, seven years, where there was a sunset provision in the Nuclear Waste Policy Act amendments that went out of existence in 1994.

Q. I'd like to provide you another exhibit, Defendant's Exhibit 88.

MS. SULLIVAN: May I approach, Your