Page 3415

that we could still implement it, assuming we got very, very directed legislation. However, as the waste acceptance schedule indicates here, it was more likely that it would potentially be beyond 1998, simply because of the challenges to implement the program.

Q. And what happened to DOE's program planning after this document was issued?

A. Well, I believe later that, this year, we essentially kind of took the MRS off the table and began focusing our efforts totally on the repository, even though, again, as I indicated earlier, there was a small group of us that were still working on the contingency, if you will, that legislation might be passed. The main focus later in this year of the program were primarily on the repository.

Q. And that repository was projected to begin operations when?

A. In 2010.

Q. Mr. Kouts, after the 1989 reassessment by the Secretary of the program, could DOE have sought to break both linkages proposed by the NWPA amendments and projected performance beginning in 1998, ramping up to a 3000 MTU

Page 3416

rate?

A. Yes, it could.

Q. Did it?

A. No, it did not.

Q. Why not?

A. Essentially because we believed that that capacity limitation was still going to be a necessary component of any agreement with a locality to – and a state, to have that facility hosted.

MS. SULLIVAN: Your Honor, I'm going to change topics here. I have two, what I hope to be very brief topics. I just would like to tell the Court that if the Court wanted to break now or wanted to break after I finish?

THE COURT: Your timing is impeccable. We are ready for a morning break. In fact, the Court would suggest that we take our morning break now, we return, and that we take our luncheon break at 12:00 and then reconvene at 1:00, if that helps your plan.

MS. SULLIVAN: Very good. Thank you, Your Honor. We will be finished with Mr. Kouts well before the lunch break.

THE COURT: Well, we have

Page 3417

cross-examination.

MS. SULLIVAN: With the direct, with the direct.

THE COURT: We're in recess for 15 minutes.

(Whereupon, a short recess was taken.)

THE COURT: Ms. Sullivan, you may proceed.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Kouts, in your current position, do you have responsibility for preparing total system life cycle cost reports and fee adequacy studies?

A. Yes, I do.

Q. What is a total system life cycle cost report or TSLCC?

A. We perform total system life cycle cost estimates in support of the Secretary's annual assessment of the nuclear waste fund fee. Essentially, you need to project the costs of the program from its, from 1982 until eventual repository closure which, right now, is somewhere after year 2119. And you basically need to look at the cash flows of the

Page 3418

program over that period of time and make some projections of economic conditions, if you will, in order to do an assessment of the adequacy of the Nuclear Waste Fund. The TSLCC analysis basically provides the cash flow of the program up until the point of the repository closure.

Q. And what is a fee adequacy study?

A. A fee adequacy study, as I mentioned earlier, takes the total system life cycle cost estimates and then applies economic projections into the future about how the Nuclear Waste Fund would essentially accrue over that time period, given the drawdown of the cash flow and what interest would accrue over the time period of the program and looking at whether or not the Fund, if you will, is adequate to support all the activities of the program over its life.

Q. And why does DOE perform these studies?

A. Essentially, there's a statutory requirement, as I mentioned earlier, for the Secretary to annually assess the adequacy of the fee. When the fee is more than adequate or

Page 3419

not adequate and should the Secretary find either of those eventualities, he is duty bound to inform the Congress and provide his recommendation as to what changes should be made in terms of the payments made by the utilities into the Fund on an annual basis.
Q. Does DOE – or does your office make assumptions with regard to acceptance rates in the preparation of the TSLCC?
A. Yes, it does.
Q. And how are those rates chosen?
A. Essentially, the rates are taken from the planning basis for the program at any particular time.
Q. Have the rates assumed in the TSLCCs changed over the course of the program?
A. Yes, they have.
Q. How have they changed?
A. Well, they've changed based on, as we've gone through the documents and explained, the assumptions made about repositories in the program, about the year of acceptance, the ramp-ups and so forth and so on, so basically, as the program has evolved also, the acceptance rates have evolved along with the program.

Page 3420

Q. With these changes in acceptance rates, have the fees that utilities are required to pay changed?
A. No, they have not.
Q. What is the relationship between the rate of acceptance in the first 15 years and the projected total system cost?
A. It's a component, but I wouldn't call it a major component of the overall cost of the program, acceptance rates for the first 15 years in a program, where you're looking at operations that last, you know, over a hundred years, so the first 10 to 15 years are not that significant in the overall perspective of the cost of the program.
Certainly, the acceptance rates in and of themselves are not that significant The major costs are the facilities themselves that you have to construct and the operation of those facilities, if you will, so those are the big costs, and the operation of those facilities over a long time period.
Q. Mr. Kouts, are utilities paying for a specific rate of acceptance?
A It's not my understanding that they

Page 3421

are.
Q. What are utilities paying for with the fees that they pay into the Nuclear Waste Fund?
MR. SILBERG: Objection, lack of foundation.
THE COURT: Well, it's a vague question. If you mean what are they paying for right now, to your personal knowledge, you may answer.
THE WITNESS: My perspective is that the utilities are paying their fees for the disposal of their materials, for the ultimate disposal of those materials, and essentially, those fees are taken and put into the Nuclear Waste Fund for eventual use by the program in the disposal of those materials.
BY MS. SULLIVAN:
Q. Mr. Kouts, could you explain to the Court briefly how the activities of the Office of Civilian Radioactive Waste Management are funded?
A. We are funded through two appropriations. The first and foremost is the Nuclear Waste Fund, which commercial utilities pay 1 mil per kilowatt hour, that's one-tenth

Page 3422

of a cent for each kilowatt hour produced and sold by utilities. Those receipts presently are about 750 million dollars a year, but we don't get access to that. Basically, we have to apply to Congress through the budget process in order to receive Nuclear Waste Fund dollars, as we do for defense fund dollars, which pay for the disposal of defense materials, if you will, DOE spent fuel and DOE high-level waste So there are two components to our program, to our program funding, the Nuclear Waste Fund and the Defense Waste Fund.
THE COURT: The Court has a quick question.
MS. SULLIVAN: Please, Your Honor.
THE COURT: In order to have access to the fees paid by utilities on a regular basis, you need an appropriation from Congress, is that correct?
THE WITNESS: Yes, sir, and there have been, the administration has submitted legislation in the past several years to essentially recategorize the receipts coming into the Nuclear Waste Fund, from the mandatory to the discretionary side of the ledger, which

Page 3423

will make it easier for the budget committees on the Hill and appropriations committees to appropriate up to the amount of the receipts. At this point in time, basically, this program has to compete with funding with other DOE programs under the Department's cap, if you will, that's given by the committees and also by the Office of Management and Budget. What the legislation does is give more free access to that, such that that 750 million dollars that comes in would not be subject to a specific cap, the Department's cap or a committee's cap, in terms of providing appropriations for this program. But the simple answer to your question is we do not have free access to that money without going through the appropriations process at the present time.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Kouts, I'd like to hand you two things, one, a demonstrative that's been marked as Defendant's Exhibit 279, and a binder of materials supporting that demonstrative.

MS. SULLIVAN: May I approach, Your

Page 3424

Honor?

THE COURT: Yes. And for the demonstratives, you have it marked as DX-279. Is that correct?

MS. SULLIVAN: Yes, Your Honor.

THE COURT: I'm going to suggest we put another D in front of it, so it's DDX.

MS. SULLIVAN: Very good, Your Honor.

THE COURT: Is that satisfactory?

MS. SULLIVAN: That's fine, Your Honor.

THE COURT: Thank you.

MS SULLIVAN: We'll make that. Oh, Your Honor, I was actually planning to make a motion pursuant to Rule 1006 for the admission of the document –

THE COURT: Well, that's different.

MS. SULLIVAN: – as a summary. I want to make it clear to the Court this was a demonstrative, that it wasn't a document, that it was prepared as a summary, so that there wasn't any confusion on the Court's part.

THE COURT: So you're proposing that this be admitted for all purposes?

MS. SULLIVAN: Yes, Your Honor –

Page 3425

THE COURT: All right.

MS. SULLIVAN: – as a summary pursuant to Rule 1006. But I need to make my motion and lay my foundation for that.

THE COURT: All right. Now, Mr. Silberg, is that your understanding of the status of DX-279? We'll amend my suggestion and indeed withdraw it.

MR. SILBERG: Yes, that's my understanding, and I will object to the admission of this exhibit.

THE COURT: We'll cover that in due course. You may proceed, Ms. Sullivan.

MS. SULLIVAN: Thank you.

BY MS. SULLIVAN:

Q. Mr. Kouts, what is the binder of materials that I have provided to you?

A. This binder contains essentially the requested appropriations, if you will, for the program and also the actual appropriations provided by Congress based on the administration's request for the funding for the program, for both the Nuclear Waste Fund and Defense Nuclear Waste Fun, for a period of time between 1983 and to 2006, although the

Page 3426

demonstrative that you have here only goes through 1998.

Q. Thank you. And let me ask you to identify the chart for the record, what has been marked for identification purposes right now as DX-279. Can you identify it for the record?

A. Yes, it's essentially a bar chart that reflects the requested appropriations for the program for the period of time between an annual basis, for the period of time between 1983 and 1998, and the actual appropriations provided by Congress based on the administration's request in any given year.

Q. And did you direct that this chart be prepared?

A. Yes, I did.

Q. And what information is depicted on the chart?

A. Essentially that the –

Q. Without getting into the substance, I'm just trying to lay a foundation.

A. Okay. Basically provides for, each year, a comparison of the two levels of requested funding and appropriated funding.

Page 3431

taking voir dire now, but that's your choice Mr. Silberg.

MR. SILBERG: We can defer.

THE COURT: Thank you

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Kouts, what information does this chart convey regarding DOE's funding since the inception of the program?

A. Well, just to summarize, essentially, in the 16 years between 1983 and 1998, there are only three years of that time period where the Department received its entire request, and there was one year where it received a little bit more, which was in 1983, but all the rest of the years, essentially, the Department received less and, in certain years, substantially less than what was requested by the administration at that time.

Q. Was there money appropriated in fiscal year 1996 that DOE was not allowed to spend?

A. Yes, that was funding, as I remember, that was – I don't remember the exact amount, but it was somewhere in the 70 to 80 million dollar range that essentially was not allowed

Page 3432

for the Department to spend, due to its set aside, if you will, in the anticipation of interim storage legislation that might have been passed at that time.

And as I remember, that specific year, I think we actually went through a reduction in force due to the substantial reduction in the amount of funding that the program had.

Q. Have these funding shortfalls affected DOE's ability to perform the standard contract in a timely manner?

A. They've been a contributing factor, yes.

Q. What do you mean by that?

A. Well, essentially, that to the extent that we needed to have the funding in order to accomplish various activities associated with the program, and we did not receive that funding, that meant that those activities had to be deferred to succeeding years. So if you don't get the money, you can't do the work, and you have to push the work off to future years, so it did have an impact on the schedule to the program.

Q. And are there any years that the

Page 3433

funding shortfalls had a particular impact upon DOE's activities?

A. Well, certainly, the year 1987 was a very substantial reduction, 1988, 1989, and '90, those four years were very substantial reductions, in addition to 1996, so that would have had an impact on our ability to perform site characterization activities at the other sites and at Yucca Mountain for that period of time, pushing off our ability to go through the site recommendation process.

MS. SULLIVAN: One moment, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Kouts, from 1985 until 2007, what has DOE done to meet its contractual obligations, pursuant to the standard contract?

A. From 1985 to –

Q. I mean, sorry, yes, 1985, the period of your first employment.

MR. SILBERG: Your Honor, that question is so broad and open-ended, that I'm afraid we could be here either for a minute or for the rest of the week. I think a more focused inquiry would be appropriate.

THE COURT: Let's see what Mr. Kouts

Page 3434

does with it. He might reiterate his entire testimony this morning, but let's find out.

THE WITNESS: I'd prefer not to do that. If I can just summarize, I think that the Department made every effort that it reasonably could in order to try to have a facility available in the 1998 timeframe, as we are trying to have a facility available as quickly as we can right now for a repository site at Yucca Mountain. There's been no lack of desire or effort on the Department from that time period, since I've been involved in the program, that indicated that it, in any way, that we were trying to delay or wanted to delay. If the Department was able to have facilities available, believe me, it would have done everything it could in order to do that, and I believe it made every effort to.

So whether it was an MRS facility or a repository, we have a very dedicated group of people in this program who have suffered through a lot of difficult times, but nonetheless, have tried to persevere to try to bring about the implementation of the Nuclear Waste Policy Act, which was, when it was signed

Page 3435

and/or enacted, if you will, I believe that the drafters of that bill -- I don't believe had a good perspective of some of the challenges that the Department was going to face in its implementation.
But, again, to summarize, I think the Department took every effort that it reasonably could in order to bring about waste acceptance, and unfortunately, it was unable to attain that.
MS. SULLIVAN: No further questions, Your Honor. Thank you.
THE COURT: Thank you, Ms. Sullivan.
Mr. Silberg, cross-examination.
MR. SILBERG: Thank you, Your Honor.
CROSS-EXAMINATION
BY MR. SILBERG:
Q. Mr. Kouts, you said DOE made every effort it reasonably could have to make a facility available in 1998. Did the administration of which DOE is a part make every effort to make a facility available in 1998?
A. That varied on the administration.
Q. Isn't it true that after 1995, when

Page 3436

you were working on the design for the centralized interim storage facility and there was legislation pending, that you discussed that President Clinton said he would veto that legislation?
A. Yes, he did. My comments were -- if I could add, if you would allow me?
Q. Certainly?
A I was referring to the Department, the Department's part of the administration.
However, the President obviously makes his own decisions and makes his own decision on the budget, so when I speak for the Department, certainly, within the program, we were doing everything we could in order to bring it about
Q. When you had on the stand the -- if we could have Elmo? DX-279, you said that there were particularly large differences between the requested and the appropriated funds in '87, '88, '89, and '90?
A. That's correct.
Q. The appropriation, the request in 1987, did that include any money for a second repository program?
A. I would have to go back and look at

Page 3437

the individual budget request. My sense is, for '87, that it probably did, but I have to review the individual budget submission on that.
Q. And do you know how much that was?
A. No, I do not.
Q. Okay. And I believe you also testified that the second repository program at some point was taken off the table either by DOE or by Congress, is that correct?
A. That's correct.
Q. And once that was taken off the table, that money would not have served a useful function had it been appropriate, isn't that right?
A. That's correct.
Q. Now, in the 1987, '88 timeframe, DOE was also characterizing several sites for the first repository, isn't that correct?
A. That's correct.
Q. And was money in the request to characterize all three sites?
A. During that timeframe, yes, it was.
Q. Okay. And Congress took two of those sites off the table, didn't it?

Page 3438

A. Yes, they did.
Q. So it wouldn't have made sense to appropriate money to characterize sites that the DOE could no longer characterize, isn't that correct?
A That's true, except if I could add, when you terminate sites, you also have to pay the costs of terminating those programs which, if you have employees there, you have to pay severance costs, you have to essentially mothball the facilities or do something with the property of those facilities.
So even though those efforts were terminated, there were still residual costs that the program had to incur in order to terminate those facilities, as well as the repository effort, so there were still expenditures that were allocated to those efforts for probably a year or two after that, in order to just close down those programs.
Q. And what's the magnitude of those expenditures?
A. In the case of the salt project, it was fairly significant, since there were a variety of people who had relocated to Texas,

Page 3459

that similar language would exist.
Q. Okay. And that would include the 1991 ACR?
A. Yes.
Q. And the 1995 ACR?
A. Yes.
Q. And even the 2004 APR/ACR?
A. Yes.
Q. And that same language appears in the instructions, the two sets of instructions that DOE issued in 1991 and 2004?
A Yes.
Q. And it's true, is it not, that all of the ACRs state that they are not to be considered contractually binding, isn't that correct?
A. I'd have to go back and look at the individual ACRs and verify that fact, but my perspective is that they probably should not indicate that they are contractually binding.
Q. Well, do they affirmatively indicate they are not contractually binding?
A. Again, I'd have to go and review each of the documents. I'm sure the 2004 did not, and that was the one I was specifically

Page 3460

directed – that I specifically directed the development of.
Q. I'm sorry, that one says it is not contractually binding?
A. That's correct.
Q. Well, let's just look at one or two, and then maybe we can move on. Let's look at the first one, which is 1987, which is Defendant's Exhibit 56. I'm calling your attention to the top of page two, on the fourth line, I guess it's the sixth line, it says, "As specified in the contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the purchasers," is that correct?
A. That's correct.
Q. And you remember that language being in the 1991 ACR?
A. Not specifically, I'll be happy to review it. Actually, I found it for you, Mr. Silberg, it's in the bottom of page one.
Q. Right, so that does appear in the 1991. Do you have any reason to believe that this language doesn't appear in all of them?
A. No.

Page 3461

Q. Is there anything in any of the ACRs that say that the delivery commitment schedule is contractually binding?
A. I don't believe so, but I'd have to review the documents to know for sure, to assure myself of that, but my expectation would be that there would be nothing in those documents to indicate that.
Q. And it's also true, is it not, that all the DCSes say that DOE will further define and specify system operating and waste acceptance parameters as the program progresses, do you remember that language in all of the DCSes?
A. Yes.
THE COURT. Ms. Sullivan.
MS. SULLIVAN: Objection, Your Honor, beyond the scope of the direct. We haven't laid any foundation for Mr. Kouts' testimony about this, and also vague.
THE COURT: Well, overruled. The DCSes are part and parcel of the exercise and the natural outgrowth of the ACRs
MS. SULLIVAN: I don't disagree, Your Honor, and also, my objection is more the

Page 3462

reference to generally all the DCSes, rather than –
THE COURT: Oh, that's true.
MS. SULLIVAN· Than providing specifics.
MR. SILBERG: I can go through the one, I was trying to short-circuit the process.
BY MR. SILBERG:
Q. Is it true, Mr. Kouts, that all the DCSes include a statement to the effect that DOE will further define and specify system operating and waste acceptance parameters as the program progresses?
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Same objection, and I'm not clear, is he actually saying that the DCSes themselves say that?
MR. SILBERG: I'm sorry, the ACRs, if I said DCSes –
THE COURT: Well, now, we're getting confused. I think you might be talking about either the ACRs or the instructions for the DCSes, but not –
MR. SILBERG: In this case, if I said DCS, strike that, I meant to say ACRs. I

Page 3467

So since there was no discussion about when this year might be, it's kind of hard, that might have been implicit with what was intended by the document, but it doesn't specifically state it.

BY MR. SILBERG:

Q. So in 1995, DOE was assuming that this one linkage, the capacity link would remain, but made no assumption as to the schedule linkage, and in fact, because there are no dates, the schedule linkage is irrelevant, is that a good summary?

A. I don't know that I would agree with that characterization. I think it does indicate that, certainly, 1998 is in question, but the only way you're going to have a facility available before 2010 is to somehow have the schedule linkages addressed. So I think, although this doesn't specifically address the schedule linkages, it's implicit in its discussion, my perspective is it's implicit in its discussion

And it's following the same concept that we would implement an MRS, assuming we got authorization for – or a site, if you will,

Page 3468

and specific direction to do that, as well as the schedule linkages were removed, although it doesn't state that, my sense is that that's what the general intent of the document was.

Q. But there's nothing in there that makes that assumption, that assumption went away after the 1991 ACR?

A. I don't think it went away after the 1991 ACR. I think it was still carried within the program. I think this document is just reflecting the uncertainty in 1998 operations, but still an expectation that there was a potential for having the facility available in, you know, several years after 1998, still well in advance of 2010 operations of the repository.

Q. But DOE never undertook any steps since the Negotiator was out of business in 1995, never took, never undertook any steps either to recreate the Negotiator or to undertake its own siting program?

A. We didn't undertake those specific steps, but as I testified earlier, I was involved in my efforts within the program to develop a design for a facility that could be

Page 3469

deployed very quickly, assuming that legislation was passed.

So although the Negotiator went away, and that was unsuccessful, and there was Congressional direction also, as you may remember, that basically directed the Department to no longer issue certain grants for the Negotiator, that was done the previous year, but the Department still, as a contingency, it was also developing that topic of safety in its analysis report, and I had personal knowledge of that since I was one of the people in the program that was doing that.

Q. But you weren't looking for a site?

A. No, we were not looking for a site at that time, that's correct.

Q. In September of 1991, it's correct, is it not, that the General Accounting Office issued a study on the MRS facility, are you familiar with that study?

A. I remember the issuance of the study. I don't remember the specifics of it. I'd be happy to review it, if you have it available.

Q. I do, Plaintiff's Exhibit 198. I've handed you a document, GAO/RCDE, 91-194, U.S.

Page 3470

General Accounting Office report to Congressional requestors, September 1991, entitled, "Nuclear waste operation of monitored retrievable storage facility is unlikely by 1998." Is this the document you're reflecting on?

A. Yes.

Q. And calling your attention to page five of that document –

MS. SULLIVAN: I'm sorry, Mr. Silberg, I'd like to lodge a foundation objection, Your Honor. This is a report by GAO, a different branch. There's been no foundation laid for Mr. Kouts' testimony about this document.

MR. SILBERG: Mr. Kouts said he was aware of the document, and I believe he said that.

THE COURT: He did say that. That's about as far as we've gotten.

BY MR. SILBERG:

Q. Mr. Kouts, you're aware of the General Accounting Office?

A. Yes, I am.

Q. Can you tell us what it is?

A. It's essentially an office that

Page 3471

supports requests for Congressional review and for individual review of different aspects of the government.

Q. Are you aware that DOE regularly receives reports by GAO?

A. Yes, I am.

Q. And are you aware that DOE received this report by GAO?

A. I assumed it received it, yes.

MR. SILBERG: Your Honor, I would ask admission of this document.

MS. SULLIVAN: Your Honor, there's still been no foundation laid that Mr. Kouts is the proper witness to talk about this document, and he's not a 30(b)(6) witness with regard to the Department of Energy's views on this document, and, again, it's a Congressional document He's not the proper witness.

THE COURT: The Court can ask about three questions and solve all this, but I'm reluctant to do so. Mr. Silberg, why don't you ask those three questions? Well, let me start with the first one. Mr. Kouts, what were your responsibilities in September of 1991?

THE WITNESS: In September of 1991, I

Page 3472

was supporting strategic and contingency planning for the program.

THE COURT: Did that include an MRS?

THE WITNESS: Yes, generally looking at, certainly, the contingency of having an MRS available, yes.

THE COURT: Now, Mr. Silberg, I've gotten you started.

BY MR. SILBERG:

Q. And in the context of that, were you aware at that time or thereafter of this report?

A. Yes, I believe I read it when it was issued.

Q. And this report deals with GAO's analysis of the MRS program?

A. My assumption is that its an analysis primarily of the schedule aspects of an MRS, yes.

MR. SILBERG: I repeat the request.

THE COURT: Ms. Sullivan?

MS. SULLIVAN: The only foundation is that Mr. Kouts read the report at the time it was issued, not that he had any involvement in it, contributed to it, we would renew our

Page 3473

foundation objection.

THE COURT: Well, except that this is, the GAO might be an arm of Congress, but it's still part of the government, and as a consequence of that –

MS. SULLIVAN: Your Honor –

THE COURT: I'm sorry, go ahead.

MS. SULLIVAN: I'm not sure the report of GAO can be construed as admissions against the administrative branch.

THE COURT: It can't.

MS. SULLIVAN: Okay.

THE COURT: It can't, I don't think there's any doubt about that. But on the other hand, at least, at least there's not in the Court's mind, I might be wrong, I basically agree with you, but on the other hand, there is a public record and a report.

MS. SULLIVAN: I think that's true, Your Honor, my concern goes to Mr. Kouts being the proper witness to talk about this, and I'll draw a parallel to my direct examination where I asked him about the MRS Commission report, where Mr. Kouts was directly involved in the activities of the MRS Commission from the DOE

Page 3474

side, and I asked him based on that knowledge. I don't think we've established the foundation for the admission of, in his testimony, about this document, in the same vein that I did with that report.

THE COURT: Well, it might be admissible under Federal Rule of Evidence 803(a). That doesn't mean that Mr. Kouts agrees with it or agrees with all the statements or assumptions.

MS. SULLIVAN: Or is the proper witness to talk about it.

THE COURT: Well, it was part of his responsibilities to know about these things at the time, that's why – I'm sorry to help counsel out, but that's why I asked the two questions I did. I find it very hard not to help counsel out, but the objection is actually overruled.

MS. SULLIVAN: Thank you, Your Honor.

THE COURT: Now, you move for admissibility.

MR. SILBERG: I do.

THE COURT: It's admitted under Federal Rule of Evidence 803(a). That's not to

Page 3483

other testimony, included operation up to a 3000 metric ton limit, even though the repository had not yet been licensed?
MS. SULLIVAN: Objection, Your Honor, vague as to those recommendations. I'm not sure if he's talking about DOE's or somebody else's.
MR. SILBERG: We're talking about the Clinch River task force, the local people's recommendations to DOE.
THE COURT: Thank you for clarifying. The objection then is overruled with the qualification.
THE WITNESS: I'm trying to understand your question, Mr. Silberg. Are you referring to a 3000 ton.
BY MR. SILBERG.
Q. I believe it was a 300 ton capacity limit prior to the repository being licensed.
A. That could be true. I'd have to, again, I'd have to review those specific documents. I just don't have a specific recollection. I remember they did have a capacity limit. I don't remember the specifics of it.

Page 3484

Q. Okay. And if we turn for a minute to page 22 of this document, which is Bates 1361, and let me, about halfway down that paragraph, you see the sentence that starts, "the Negotiator told us"?
A. Yes.
Q. Could you just read that into the record, please?
A "The Negotiator told us that, even with a very aggressive effort, it is unlikely that he can negotiate and gain approval of an agreement by late 1992."
Q. And do you disagree with the statement that's attributed to the Negotiator?
A. I have no basis to disagree with it.
Q. So you would agree that it would have been –
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Objection, Your Honor, the question implicates hearsay because the Negotiator said something in the document, and he's being asked about that statement.
THE COURT: Well, there's an objection, but it's based on the fact that the report is reciting what the Negotiator's

Page 3485

position was, and I'm not sure that Mr. Kouts would have personal knowledge of what the Negotiator's position was.
BY MR SILBERG:
Q. Did you have dealings with the Nuclear Waste Negotiator in this timeframe?
A. I did have some interactions with his staff on occasion, but it was not on a regular basis.
Q. Are you aware of what he believed to be the likelihood that he could negotiate an agreement with the host community?
MS. SULLIVAN: Your Honor.
THE COURT: Ms. Sullivan.
MS. SULLIVAN: It's still a hearsay objection, and speculation.
THE COURT: Well, that's not actually – are you aware of what he believed? He could become aware of it through all sorts of means, so it's not a hearsay objection.
MS. SULLIVAN: Thank you, Your Honor.
THE WITNESS: I have no recollection of what the Negotiator was specifically planning on at that point in time. I'm just reflecting what the document here is, and

Page 3486

that's, I have no reason to doubt the GAO's presentation here, but I don't have any confirming information in my memory that that was the case
BY MR. SILBERG:
Q. Did DOE take issue with this statement when it received the GAO report?
A. All I can do is go back to the statement in the document here, which said that this – I believe it's on page, regarding agency comments on page 1344, page five of the document, Bates number 1344, where it basically said that GAO discussed the facts in the report with DOE officials, who generally agreed with their accuracy. But I have no knowledge as to whether or not that was a specific fact that the Department attested to its accuracy.
Q. But you're not aware of DOE taking issue with the statement, are you?
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Well, foundation, I think that's what Mr. Kouts just testified to.
THE COURT: Well, yes, but it's the second time it's been asked. Let's find out.
THE WITNESS: Could you repeat the

Page 3543

MS. SULLIVAN: And, Your Honor, just as a note, we presented the same chart in TVA, and you did present it.
THE COURT: I understand. It's familiar to me.
MS. SULLIVAN: Okay.
MR. SILBERG: As I read these provisions, I don't see anything there that deals with budget requests and nothing that deals with appropriations, and as I said, to the extent that the government wants to avoid getting into this, I have stipulated that our issue on good-faith and fair dealing goes not to the question of whether they had enough money to go forward with the project, but whether the waste acceptance program was being gamed, and I think the evidence is clear, it was.
THE COURT: DX-279 is admitted as a summary.
(Defendant Exhibit Number DX-279 was received in evidence.)
MS. SULLIVAN. Your Honor, I do have some redirect, but I don't know when –
THE COURT: I was just pausing for a

Page 3544

moment to let Mr. Silberg collect his papers.
MS. SULLIVAN: I just didn't know what the Court's preference was for the timing of the afternoon break.
THE COURT: I thought we might go until about 3·00, but it depends, do you have a preference? And Mr. Kouts may have a preference too.
THE WITNESS: I could continue.
MS. SULLIVAN: Your Honor, if we could take our break now, I could shorten what I need to do with Mr. Kouts on redirect.
THE COURT: Mr. Silberg, do you mind if we take a break here?
MR SILBERG: I absolutely do not, Your Honor.
THE COURT: You absolutely do not. Well, if you'd all wait just a moment, as I hadn't anticipated breaking right this minute, just so I can walk out of here. 15-minute recess.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Thank you very much.
(Whereupon, a short recess was taken.)
THE COURT: Ms. Sullivan, you may

Page 3545

proceed.
MS. SULLIVAN: Thank you, Your Honor.
REDIRECT EXAMINATION
BY MS SULLIVAN:
Q. Mr. Kouts, do you remember why President Clinton vetoed the legislation that you were discussing with Mr. Silberg?
MR. SILBERG: Objection, incorrectly characterizes his testimony.
THE COURT· Right. I can help you out, Ms. Sullivan.
MS. SULLIVAN: I'm sorry, I missed that.
THE COURT: It's just that President Clinton said he would veto it if it were passed by Congress. It's not that he actually did it. That was enough.
BY MS. SULLIVAN:
Q. Mr. Kouts, do you recall why President Clinton said he would veto –
MR. SILBERG Objection, lack of foundation, if this witness can't talk about things from a DOE perspective on cross-examination, I'm not sure why he can talk about it on redirect.

Page 3546

THE COURT: Well, President Clinton might have expressed a view, but in any event, we'll see what happens. Overruled.
THE WITNESS: My recollection of the President's objection to the deployment of interim storage was that he believed that – I believe it was related to the fact that the program should focus its efforts on a repository and site a repository prior to the time that an interim storage site was ultimately selected, as I remember the general argument put forth, I believe, by the administration at that time. So he was not supportive of interim storage until there was a repository site identified, and I think there were several other things that were being considered that were part of it, but that's, to the best of my recollection, what the objections were.
BY MS SULLIVAN:
Q. And when was the site for Yucca Mountain finally recommended?
A. It was recommended by Secretary Abraham in February of 2002.
Q. And when, the legislation that you

Page 3547

were discussing with Mr. Silberg that President Clinton said he would veto, when was that legislation being considered?

A. In the mid-'90s, and let me just also, several of the pieces of legislation would have identified Yucca Mountain, and I probably should have, should have clarified my previous comment, would have identified Yucca Mountain as the site where we should move these materials, and that's what was contained in several of the industry bills. And the President was of a view that, before you would move materials there, you had to make sure that was the ultimate repository site, and until that occurred, he would not be supportive of interim storage at Yucca Mountain. That's the best, to my recollection, of his objections to it.

Q. Thank you. Mr. Kouts, you also talked, during cross-examination with Mr. Silberg, about the DOE's, the fact that DOE did not initiate siting efforts, while the Office of the Nuclear Waste Negotiator was also conducting such efforts, do you recall that testimony?

Page 3548

A. Yes.

Q. Would it have made sense for DOE to initiate siting efforts at the same time that the Nuclear Waste Negotiator was looking for a site?

A. My perspective is, no, it would have been confusing, to say the least, to have both the Department and the Negotiator trying to identify sites. In addition to that, if you remember in my testimony on the 1989 reassessment report, essentially, the Secretary felt that the Department's efforts were not, did not meet with success, and it was probably best for a third party to try to implement that area of the program, which was siting at either a repository or developing a siting agreement for a repository or an MRS facility.

Q. Now, Mr. Silberg also discussed with you recent analysis, the recent analysis, TSLCC analysis performed by your office in 2006. Do you recall that testimony?

A. Yes, I do.

Q. And I believe you testified that the assumptions on that, for part of that study, included beginning of repository operations in

Page 3549

the year 2017 and ramping up a repository facility to a 3000 steady state rate, is that correct?

A. That's correct.

Q. Okay. So under the assumptions, the rate of acceptance by the program would be, between 1998 and 2017 would be zero, correct?

A. That's correct.

Q. And has the collection of fees changed between when the program was projecting a system accepting at a steady state rate of 6000 MTU to one where not projecting system acceptance beginning until 2017?

A. No, it has not.

Q. Why not?

A. Essentially, because, as I testified earlier, that acceptance rate is not necessarily a main driver of the overall cost of the program, so whether it's 6000 metric tons or 3000 metric tons, based on the analysis that we did back then and the analysis we're doing now, the fee is still adequate to cover the costs of the program.

Q. Thank you. Mr. Kouts, Mr. Silberg asked you about TSLCC studies that reflected

Page 3550

the 900 MTU rate of acceptance in the MRS prior to 2010. Do you recall that discussion?

A. Yes, I did.

Q. And you recall the document that did contain those assumptions?

A. Not specifically, but I'd be happy for you to refresh my memory.

Q. That's what I want to do.

MS SULLIVAN: Could we look at, Your Honor, what has been admitted already as Plaintiff's Exhibit 173? I am going to show the witness what's been marked as Defendant's 76, but they're the same exhibit And if I may approach?

THE COURT: Certainly.

BY MS SULLIVAN.

Q. Mr. Kouts, could you identify this document for the record?

A. Yes, the title of it is, "Preliminary estimates of the total system cost for the restructured program, an addendum to the May 1989 analysis of the total system life cycle cost for the Civilian Radioactive Waste Management Program," it's dated December 1990.

Q. Could I direct your attention to page

Page 3551

III, Bates number ending 1606? And could we look at the paragraph in the middle of that page that begins, "based on the restructured program"?

A. Yes. Would you like me to read it?

Q. Yes, please.

A. "Based on the restructured program, the total cost for the system with the repository at the candidate site at Yucca Mountain in Nevada, a facility for monitored retrievable storage, MRS, and a transportation system, is estimated at 26 billion dollars, expressed in constant 1988 dollars. In the event that a second" –

Q. Let me, Mr Kouts, let me stop you. I'm sorry, I directed you to the wrong paragraph. Look at the paragraph above that.

A. Okay.

Q. The middle of that paragraph, there's a reference to the Secretary of Energy's report to Congress, issued in November of 1989, do you understand that to be the report that we looked at previously today?

A. Yes.

Q. Okay. And then if you could look at,

Page 3552

read the portion of the paragraph after that, after November 1989?

A. Beginning with, "the major elements"?

Q. Yes.

A. "The major elements of the restructured program announced in this report which pertain to the program's life cycle costs are a prioritization of the scientific investigations program at the Yucca Mountain candidate site to focus on identification of potentially adverse conditions, a delay in the start of repository operations until 2010, the start of limited waste acceptance at the monitored retrievable storage, MRS, facility in 1998, and the start of waste acceptance at the full capability MRS facility in 2000."

Q. Let me stop you there. And so what was the basis of the, what were the assumptions for the preparation of this report in December 1990?

MR. SILBERG: Objection, lack of foundation to this witness' knowledge of the details of the analysis.

THE COURT. Ms. Sullivan.

BY MS. SULLIVAN:

Page 3553

Q. Mr. Kouts, you're currently responsible for preparing TSLCC analyses, correct?

A. Yes, I am.

Q. When you obtained that responsibility, or took on that responsibility, did you familiarize yourself with prior TSLCC analysis that had been done?

A. In general, yes, and I believe that I reviewed this document back in my earlier days with the program, so I was familiar with the assumptions under which this analysis was undertaken.

MS SULLIVAN: Your Honor, may I –

THE COURT: Yes, you may continue.

BY MS. SULLIVAN.

Q. Could we read back the question? Okay. I'm sorry. What were the assumptions on which the study was based?

A. Well, as all total system life cycle cost estimate analyses are, they're based on the assumptions, the operating assumptions of the program at that time, and what this reflects is the fact that, given the issuance of the Secretary's report, the analysis that

Page 3554

was done was updated to reflect the perspective of the Secretary's report and, essentially, the delay in repository operations and the start of an MRS in the 1998 timeframe.

Q. Okay. And can I direct your attention to appendix A or table A1 – it's appendix A of the document, Bates number ending 1666, there's a table there.

A. Okay.

Q. And what does the information set forth on this table convey about the assumptions with regard to the acceptance rate assumed for this report?

A. That the acceptance rate for the program would begin in 1998, ramping up to a 900 steady state rate of the MRS facility, and that the storage of materials, that the MRS would not exceed 10,000 prior to the time that the first repository was in operation in 2010, from which point, we would have acceptance at the repository also.

Q. Thank you. You can put that document aside. Mr. Kouts, do you have the GAO report regarding the MRS that Mr. Silberg asked you about?

Page 3555

A. Yes, I do.
Q. I just wanted to ask you, did you agree, at the time you reviewed this report, with GAO's assessment about the prospects of DOE obtaining an MRS by 1998?
A. I believe the GAO report was somewhat pessimistic, and, however, I did agree that, with some of the recommendations, that Congress needed to relook this and potentially provide a path forward for the program. So I did agree with that, primarily because I think you need to pursue multiple paths, if you will, in terms of trying to make things better within the program.
But the bottom line is the report provided its perspective, as GAO reports do, and some of the things, I agreed with, some of the things, I didn't necessarily agree with.
Q. And why did you believe that GAO's view was pessimistic?
A. Well, I still think that there was hope for the Office of the Negotiator, that something could be done. We were, at that point in time, we still believed that there was a potential for some sites being identified and

Page 3556

working its way through the process, so I think, you know, we took a more optimistic view of the Negotiator, and we're more hopeful than this report reflected.
Q. Mr. Kouts, could you put in front of you, pull out Plaintiff's Exhibit 82, it's one of the last things you discussed with Mr. Silberg, I believe?
A. Yes
Q. Do you have that in front of you?
A. Yes, I do.
THE COURT: Go ahead, I think I remember enough to keep up with you.
MS SULLIVAN: Very good. Thank you, Your Honor.
BY MS. SULLIVAN:
Q. First of all, let me ask you, Mr. Kouts, when did the Office of the Nuclear Waste Negotiator, when did the authority for that office sunset?
A. I believe in 1994.
Q. Okay. And do you remember when in 1994?
A No, I don't specifically.
Q. Did DOE, after this letter was sent by

Page 3557

the Secretary to Senator Johnston, did DOE continue to work with the Nuclear Waste Negotiator?
A. Yes, we did.
Q. Do you know why the Secretary was writing to Senator Johnston with this letter, Plaintiff's Exhibit 82?
A. This was at the end of his tenure in the Department –
MR. SILBERG: Your Honor, again, we're getting into the grounds of speculation as to what was in the mind of Mr. Watkins. I think the government objected, in many cases, to this witness' ability to speak for the Department as a whole, and now, we're not only doing that, but we're speaking to the mind of the Secretary.
THE COURT: Overruled. Mr. Kouts, you may testify, if you know.
THE WITNESS: Okay. This was in response to a letter, first of all, sent by Senator Johnston, and, again, this was toward the end of the tenure of the Secretary. If there was going to be a change in the administrations within the next month, and I

Page 3558

think what he was trying to do was to provide a perspective to try to break the logjam in terms of trying to move the program forward, and what this letter is reflective of is trying to, again, identify an alternative path, other than the Negotiator, to try to site the facility.
And, again, this is consistent with the Department's view all along about trying to pursue every available alternative, and this was an attempt to try to stimulate the Congress at that point in time, to try to assist the Department essentially with new legislation that would have allowed us to do this at DOE sites.
BY MS. SULLIVAN:
Q. And when you say, "pursue every alternative," pursue every alternative to do what?
A. To try to have a facility available in the 1998 timeframe to meet our obligations to begin to accept fuel from utilities by January 31, 1998.
Q. And you said that DOE did continue to work with the Office of Nuclear Waste Negotiator after this letter was sent. What

Page 3559

did DOE do with the Office of the Nuclear Waste Negotiator?

A. We continued our support. We still continued to administer the grants program and, you know, provide personnel support to go out and do presentations, if you will, to local governments, et cetera, to try to assist the Negotiator in just providing information about how we would implement an MRS facility, so we continued those efforts beyond this, certainly this letter into the next administration.

Q. And were any first round grants awarded by DOE through the Office of the Nuclear Waste Negotiator?

A. Yes, there were.

Q. Can you describe those grants?

A. Those were initial feasibility studies, where money was given to the individual locality to hire consultants and to evaluate, if you will, the Department's information that was being provided and the Negotiator's information, and then there were some phase two agreements, I believe, that were issued, that were, again, more intensive feasibility analyses.

Page 3560

And then the final stage, which we never got to, was to provide money for the actual negotiation of agreements, and that, I believe, was terminated essentially by direction of Congressional appropriations and direction of the Department's budget to terminate that process in the next several years.

Q. Okay. Thank you. Mr. Kouts, when the Department issued the 1994 ACR, did the Department believe that it could perform at an MRS?

A. The 1995 or the '94?

Q. '94 ACR issued in March of '95?

A. We did, but, again, we recognized in that, that it would probably not be in 1998. As you remember, the waste acceptance schedule went to a year one, year two, year three, but we still had some hopes, again, that there would be some legislation that would give us authority in order to implement it, so that was what that acceptance schedule was based on, without a start date, if you will, for the facilities, since 1998 seemed highly unlikely.

Q. At the time the 1998 ACR was issued in

Page 3561

March of 1995, if DOE were to accept fuel from the utilities pursuant to the standard contract prior to 2010 at a repository, where would that acceptance have been?

A It would have had to have been at a monitored retrievable storage facility, and essentially, the linkages would have had to be broken, et cetera, et cetera. So that's the only facility that, potentially, we could have had available before 2010.

Q. At the time of the issuance of the 1994 ACR in March of 1995, were, was DOE trying to "game" the waste acceptance system?

MR. SILBERG: Objection, calls for a conclusion that this Court is going to have to make.

THE COURT: Sustained.

MS. SULLIVAN: Your Honor I was trying to answer Mr. Silberg's – one moment.

BY MS. SULLIVAN:

Q. At the time of the issuance of the 1994 ACR in March of 1995, was DOE trying to manipulate the waste acceptance system?

MR. SILBERG: Same objection.

THE COURT. Sustained.

Page 3562

MS. SULLIVAN: Your Honor, I think the Plaintiffs have made this an issue, a factual issue, as to what DOE was trying to do, and Mr. Kouts is in a position to testify as to what he knows.

THE COURT: And there is a prior decision out there that bears on this issue, but, may I, I hate to – I'm going to do this again. It's about the third or fourth time today I've made a suggestion.

MS. SULLIVAN: Please.

THE COURT: There's a better way to ask your question, without getting into words like "game" or "manipulate" or pejorative words.

BY MS. SULLIVAN:

Q. Mr. Kouts, do you have a response to what Mr. Silberg had to say about the issuance of the March – of the 1994 ACR in March of 1995?

MR. SILBERG: Objection, vague.

THE COURT: Sustained. I'm going to make a suggestion.

MS. SULLIVAN: Yes, Your Honor.

THE COURT: Why don't you ask

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------:
DAIRYLAND POWER COOPERATIVE, :
Plaintiff, :
v. : No. 04-106C
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:
ENERGY NORTHWEST, :
Plaintiff, :
v. : No. 04-0010C
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:

Washington, D.C.

Tuesday, May 1, 2007

Volume 1

Deposition of:

CHRISTOPHER KOUTS

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:10 a.m., when were present on behalf of the respective parties:

APPEARANCES

On behalf of Dairyland Power Cooperative:
JERRY STOUCK, ESQUIRE
ROBERT L. SHAPIRO, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3173

On behalf of Energy Northwest:
DAVID JIMENEZ-EKMAN, ESQUIRE
CHRISTOPHER TOMPKINS, ESQUIRE
Jenner & Block, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Defendant:
ALAN J. LO RE, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 12070
Washington, D.C. 20530
(202) 307-0226



CONTENTS


EXAMINATION BY: PAGE
Counsel for Dairyland .................. 6
Counsel for the Defendant .............. 296
Counsel for Dairyland .................. 305

KOUTS DEPOSITION EXHIBITS: * PAGE
1 Summary of employment history at DOE .. 6
2 Excerpt of testimony at PG&E trial .... 28
3 Excerpt of testimony at PG&3 trial .... 40
4 Standard Contract between Dairyland Power Cooperative and the Department of Energy, dated June 15, 1983 ........ 58
5 March 04, 1992 letter from M. Deuner to Mr. J.E. Barrett at PG&E ........... 66
6 Excerpt of testimony at PG&E trial .... 79
7 Delivery-commitment schedule forms .... 91
8 July 28, 2004 letter from Mr. Zabransky to William Berg ...................... 104
9 Letter to Russ Shultis identifying 30(b)(6) topics ...................... 114
10 Letter from Marian Sullivan designating witnesses for 30(b)(6) topics ......... 114




CONTENTS (Continued)


11 Notice of Deposition .................. 114
12 Segment of trial testimony from Yankee Atomic trial .................. 127

KOUTS DEPOSITION EXHIBITS: * PAGE
13 Excerpt from proceedings of 1983 Civilian Radioactive Waste Management information meeting held in December of 1983 ............................ 150
14 June 1987 Annual Capacity Report ...... 166
15 1988 Annual Capacity Report ........... 172
16 December 1991 Annual Capacity Report .. 193
17 1987 Monitored Retrievable Storage submission to Congress ............... 206
18 1995 APR and ACR ..................... 218
19 Excerpt of 1985 Mission Plan .......... 271
20 Excerpt from June 4, 1999 deposition in Yankee Atomic case ................ 275
21 Letter from Michael J. Lawrence to Ben Rusche, dated July 23rd, 1984 ..... 281
22 Memorandum on the Department of Energy memo letterhead stationary dated




CONTENTS (Continued)


December 21, 1992 ..................... 284
23 Letter from Spencer Abraham, Secretary of Energy, to Senator Orrin Hatch, dated July 8, 2002 .................... 288
24 Memorandum on the Department of Energy memo letterhead stationary dated December 20, 1991 ..................... 290


(*Exhibits attached to transcript.)





©2007

917ffa92-9800-4498-95e6-5e4b9a24ccb0

Q Okay. Do you know if in this 2004 time frame or in connection with the 2004 ACR/APR and this new round of potential DCSs, do you know if at that time, DOE reevaluated any of the approved DCSs from the 1990s?

MR. LO RE: Objection. Vague as to the term reevaluated.

THE WITNESS: I don't believe we reevaluated. I believe we asked the purchasers to resubmit.

BY MR. STOUCK:

Q Okay. And can you just tell me your understanding -- okay. Can you tell me your understanding -- well, you don't believe you reevaluated.

Can you tell me why you did not reevaluate at that time? Do you know why DOE did not reevaluate those previously approved DCSs at that time?

MR. LO RE: Objection. No foundation.

THE WITNESS: Essentially because this was a new planning process; that we were



anticipating different acceptance rates than we anticipated in the 1998 time frame. And that the DCSs that were approved and submitted back in the '92 time frame, again, reflected a system that had a far less capacity than the ones that we were planning. Therefore, we felt that -- especially in the first 10 years.

Therefore, we felt it was in the purchaser's best interest and the Department's best interest, for that matter, to address planning to the new, higher rates as opposed to planning to the old, lower rates.

BY MR. STOUCK:

Q Okay. So if you didn't reevaluate the 19 -- the DCSs that had been approved in the 1990s, what then -- how would you describe -- what is your understanding of the relationship between the DCS -- DCSs that were submitted and approved in the '90s and these DCSs that were submitted in -- or any DCSs that were submitted in connection with the 2004 ACR/APR?

MR. LO RE: Objection. No foundation.



THE WITNESS: In terms of the relationship, they were, again, not connected in the manner that -- that the planning -- that the utilities were doing in the '91/'92 time frame, in terms of what spent fuel might be available, et cetera, et cetera, was probably -- and my sense was most assuredly different than what they would plan for in the 2010 time frame.

BY MR. STOUCK:

Q Okay.

A Therefore, from the Department's perspective, it made sense to have the -- the purchaser reconsider, if you will, what fuel might be available in the 2010 time frame since the submissions that the purchasers provided in the '91/'92 time frame were, again, at a different point in time in their spent fuel storage and perspectives and their capabilities that their facilities might have changed.

Q Okay. Thank you. So if approved, would the 2004 DCSs replace the DCSs that have been submitted in the '90s? Is that your understanding?



A That was the Department's desire, yes.

Q Okay. Now, the -- the DCSs that were approved in the 1990s, they were based on acceptance rates, you know, in the '91 ACR and elsewhere that reflected an MRS with a capacity limit of 10,000 MTU. Is that your understanding?

A That's correct.

Q Okay. And that MRS -- well, no MR -- currently, DOE's plans do not include an MRS; is that correct?

A That's correct.

Q Do you know whether or not the DCSs that were submitted in the 1990s and approved by DOE are still binding today?

A You know, that's a legal question. And that's a reason why we're involved in 65 different actions. I think there is a view that -- it's what this litigation is all about.

Q What's your understanding of whether or not those approved DCSs are still binding today?

MR. LO RE: Calls for a legal conclusion.

THE WITNESS: My sense is, yes, they're

Page 134

A Perhaps the best way is to provide an example.
Q Okay.
A The APR/ACRs that went out in the '91/'92 time frame envisioned an MRS operational in the 1998 time frame with the repository operational in the 2010 time frame.
Q Okay.
A Given that 12-year difference in the operations of the facilities, the acceptance rate and the design for the MRS, from an economic and -- and management standpoint, would need to be reduced to be in the -- as the APR/ACR indicated, approximately 900 tons per year.
It would make no sense to develop an MRS with a capability of 3,000 metric tons per year and all the surface facilities and all the transportation equipment that would need to be bought for those for a 3,000-ton acceptance rate, for example, and only operate the facility for 3 and a third years until the repository was operational.
So to the extent that the capacity

Page 135

limitations dictated the acceptance rate and the receipt rate of the facilities, that was a factor in terms of how the Department would design the facilities.
Q Okay. Thank you. Here is Exhibit Number 12.
Mr. Kouts, this is a segment of your trial testimony from the Yankee Atomic trial. Do you remember that one a couple years ago?
A Vaguely.
Q Okay.
A Yes.
Q But it's on the same subject. If you look at page 3450 -- let's see. I'm sorry. 3451, line 5, what is the receipt rate? Okay. And you gave an answer that I think, you know, is not unlike the answer you've given us today.
And then I asked you about acceptance rate. Do you see that?
A Yes.
Q And the answer on acceptance rate that you gave here on line 14 was, quote: The acceptance

Page 136

rate is the contractual rate at which the Department has committed to receive materials from the contract holders, close quote.
Do you see that?
A Yes.
Q Is that right?
A Yes.
Q Then I asked on line 21: Could the receipt rate and the acceptance rate be different?
And you said: Yes, they could.
Do you see that?
A Yes.
Q And I asked you why. And you can read the answer to yourself, but generally it says, I'm paraphrasing, that from a business standpoint, a business judgment, that DOE could determine it does not want to commit to accept materials at the amount of maximum capability.
Do you see that?
A Yes.
Q Okay. And that's -- you know, I don't -- is that -- is that right?

Page 137

A That's totally consistent with what the government just told you a minute ago.
Q Okay. And my question for you is: Why, why would DOE exercise this business judgment that you referred to not to commit to accept materials at the amount of maximum capacity?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: I just explained an example where it would not make economic sense to develop -- to develop facilities with three or -- three times plus the capability of acceptance when there was a statutory limitation on the amount that the Department could have over those 12 years.
Therefore, totally consistent with Mr. Kouts' testimony back in 2004, if you're going to essentially space the operation of the facility over 12 years, from an economic perspective, it would be much wiser and a more appropriate use of waste fund dollars not to build facilities that would only build very large receipt facilities that could only operate for three -- 3 and one-third



917ffa92-9800-4498-95e6-5e4b9a24ccb0

Page 166

year.

I am asking you, in 1987, what was the rate of acceptance that DOE planned to use, if any, under the Standard Contracts?

My question doesn't include 1998. But if that's what DOE was planning to do, I guess, which I think is what's shown in the '87 ACR -- would it be helpful to get a copy of the '87 ACR?

A Okay.

(Discussion off the record.)

(Whereupon, at 1:38 p.m. a recess was taken until 1:40 p.m.)

(Kouts Exhibit No. 14 was marked for identification.)

BY MR. STOUCK:

Q You've been handed what's been marked Exhibit Number 14. It's the June 1987 Annual Capacity Report, correct?

A Yes.

Q If you turn to page 7. Table 2.1, do you see that?

A Yes.

Page 167

Q Now let me just ask you, are these the rates of accept -- in 1987, or as of the time of this document, are these the rates of acceptance that DOE planned to use under the Standard Contracts?

A Yes.

Q Okay. Now I want to ask about receipt rates, okay. In 1985, what receipt rate, if any, was DOE planning to use?

A To the extent that there was design -- conceptual design of facilities, the capabilities of the facilities would have been designed to meet the schedules identified for both the repository and the MRS, as identified in the '85 Mission Plan.

Q Okay. So you're saying that the -- the rates identified in the '85 Mission Plan for both the approved -- well, for both -- let me just ask the question. You're saying the rates identified in the '85 Mission Plan for both the approved design and the improved performance or enhanced performance, those are the receipt rates that DOE, at that time in 1985, was planning to use?

Page 168

A Those were the steady state receipt rates, recognizing that the facilities, as was represented earlier, that the facilities needed to have additional capability over and above the planned receipt rates in order to make sure you could deal with maintenance cycles and anomalous situations in the operation of the system.

Q I thought that the additional capability that you told me about earlier was an additional capability for rates above the acceptance rates. So I -- again, I know --

A The -- the acceptance rates and the receipt rates were very similar in terms of planning rates within the program.

Q Okay.

A But the design engineering rates, in terms of what the physical capacity of the facilities would be, would have to assure themselves that they could deal with the anticipated receipt rates with some margin to deal with anomalies in operation.

Q Okay. I'm going to hand you what I'll

Page 169

represent to you as pages 26 and 27 of the 1985 Mission Plan. I've only got one copy. I'm sorry. We'll get more copies if necessary. This is the Mission Plan.

MR. LO RE: Are you marking this as an exhibit?

MR. STOUCK: No.

BY MR. STOUCK:

Q That is pages 26 and 27 from the 1985 Mission Plan. You can just take my representation on that. Those are the rates we've just been talking about; is that right?

A Yes.

Q Okay. Are those the receipt rates that DOE was planning to use in 1985?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: As I testified earlier or as I provided information earlier, these were the nominal design rates in which the facilities would have -- have to be sized in order to meet this schedule.

Page 170

And to the extent that any design work in the system was ongoing, which was very embryonic, these were the guides to the engineers to understand basically how many receipt bays they would need in any one year in order to meet what's identified here.
BY MR. STOUCK:
Q So you would not say that DOE was planning -- that those are the receipt rates that DOE was planning. It's just too preliminary? Is that the -- is that the tenor of your response? Or was DOE planning to use those receipt rates?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: As the Mission Plan says in numerous places, these schedules are illustrative and can change. So the -- what might have been the planning basis for this, and subsequently into the program those did evolve and change. As we get into other documents, you'll see how they did change.
BY MR. STOUCK:
Q At this time.

Page 171

A At this time, this was more or less -- the best way for me to represent it was the technical baseline for the program in the sense that this -- that the facilities needed to be designed to address this kind of receipt rate into the system.
Q Okay. But you would not say these are receipt rates that DOE was planning to use, which is, again, the language of the topic?
A Again, planning -- again, going back to your question, which was plan to use under the Standard Contracts, I think you have to go back to the Annual Capacity Report. And as we move forward, you'll see that that evolves also as the -- our deployment of the system.
Q Right. Those are acceptance rates?
A Right.
Q Now we're talking about receipt rates.
A Correct.
Q Are the rates on that piece of paper, pages 26 and 27 from the 1985 Mission Plan, are you able to say that those are receipt rates that DOE was planning to use at that time or are you not able

Page 172

to say that, for whatever reason? For example, because the -- you know, there just were not any plans that were sufficiently formed that you're able to testify that DOE was planning to use those rates?
MR. LO RE: Objection. Asked and answered.
BY MR. STOUCK:
Q Or for whatever other reason you're not able to say that DOE was planning to use those rates? That's just --
A I would characterize these as receipt rates and design basis rates for those who were doing design work for the facilities to size those facilities from a design standpoint.
Q Okay. Thank you. Let me have that back.
MR. STOUCK: Now let's mark this, which is number 15, I think.
(Kouts Exhibit No. 15 was marked for identification.)
BY MR. STOUCK:
Q All right. Exhibit 15, Mr. Kouts, is the 1988 ACR. Is that what you have in front of you?

Page 173

A Yes.
Q Okay. Good. And I take it, on page -- is it 5? What page is this on? Yeah. Page 5 -- are you on page 5?
A Yes.
Q In 1988, those were the acceptance rates that DOE was planning to use under the Standard Contract; is that right?
A Yes.
Q Okay. Actually, I'll tell you what, before we get into the '88, let's go back to the '87 for a moment, if we could. And you can certainly consult the ACR if you want to.
Do you know whether the -- well, you do know that DOE, in the 1980s, missed certain deadlines or milestones in the statute for various steps in the repository siting process; is that right? There were statutory milestones that DOE did not scrupulously conform to?
MR. LO RE: Objection. Counsel, can you explain how that relates to this 30(b)(6) notice, Counsel?

very often called Private Fuel Storage, with capital letters.

Do you know whether or not there are other private fuel storage initiatives, you know with a small PFS, other ventures of the same type that either are currently in progress or at some point in time in the past had been operative? Distinct from what we now call private fuel storage which is the one in Utah.

A There were other projects, other sites, typically on Indian reservations that are -- or tribal reservations, if you will, that looked at the potential for having such a facility on their premises.

Q Okay. So let me just start with the basic question, which is: Were -- do you know whether Dairyland has made any -- let's start with the predicate. Do you know whether Dairyland has made any expenditures on private fuel storage initiatives?

A No.

Q You don't know whether or not Dairyland



has?

A No.

Q Oh, okay. Well, then, can you answer -- the first question is, can you answer the question: Were any expenditures that Dairyland may have made on private fuel storage initiatives reasonable or unreasonable? Is that a question you're able to address?

A Yes.

Q Okay. Even though you don't know whether or not in fact there were any such expenditures?

A That's correct.

Q Okay. Well, were -- then let me just ask. Were any expenditures that Dairyland may have made on private fuel storage initiatives at the time -- you know, reasonable or unreasonable at the time such expenditures were made?

A The government's perspective on that is that the -- from an investment standpoint, the government would not be willing to invest in a private venture to obtain an independent spent fuel storage installation, due to the fact of the history



of such projects and the potential success of such a project, history has shown the government, at least, that the best path to pursue is a federal system, a federal facility that has legislative authorization behind it, either for storage or for -- or for the disposal of spent fuel.

So to the extent that, from the government's perspective, that investment in a private venture, without some congressionally -- congressional authorization and congressional forcing function on the implementation of such a facility, that certainly from the government's perspective, that investment is not well advised.

Q Investment by Dairyland?

A Correct.

Q Okay. Even an investment, made, say, just hypothetically in 1995, before some of the factors you mentioned may have been known, would your answer still apply to investments during that time frame?

A Yes.

Q Okay.



A And I think, as history has borne out, if you look at the history of the Goschute experience, where there was no forcing function on licensing of such a facility, it took over twice the period that one might have expected for it to be licensed. In addition, ultimately now it's lost its ability to transport spent fuel to the site based on a federal decision associated with its right-of-way of passage over rails to the facilities.

So, again, the government's perspective is, investing in such a facility without congressional authorization is not a reasonable expense, from the government's perspective.

Q Right. Well, I mean hindsight is pretty good. I'm familiar with what you're talking about. But, you know, I don't invest in bankrupt companies either, but some people do before they go bankrupt.

So I mean your answer that you're giving me about the reasonableness of Dairyland's expenditures, I want to be clear for the record, applies even to expenditures that may have been made, say, for example, in 1995 when the events, I

Page 242

think all of the events or most of the events certainly that you just mentioned, were prospective; is that correct? Your answer still applies to expenditures in that time frame?
A Yes. Based on the Department's experience with the office of the Negotiator and the ability of private ventures to -- and private siting to be efficacious.
Q Okay. And that's the reason -- you've just given me the reason why Dairyland's expenditures on private fuel storage initiatives are unreasonable, in the government's view?
A Yes.
Q Any other reasons that you haven't mentioned?
A That's the primary reason.
Q Okay. Do you know how much, in total, in the aggregate, has been expended on the private fuel storage initiative by the group of --
A No.
Q -- utilities involved?
Can you make any estimate?

Page 243

A No. I used to know at one time. I did follow that. But I didn't review it for the purposes of this deposition. And it really doesn't matter because in -- I knew that there were several utility contributors to the project over a period of time. And -- but ultimately the perspective of the government is the same.
Q Okay. So do you know -- or would you expect that expenditures in total by the group of involved utilities exceeds $5 million on private fuel storage in --
A Potentially it could.
Q Whoa.
A I would have to review the public record to see that.
Q You don't know one way or the other?
A No.
Q You couldn't estimate one way or the other whether it's more or less than 5 million?
A I would assume that it would probably be more but that's my own personal assumption.
Q Okay. I guess your testimony, I take it,

Page 244

is whatever expenditures that were made -- well, strike that.
Do you know how many utilities were involved in the capital PFS, Private Fuel Storage initiative in Utah?
A There were a handful.
Q Okay.
A Plus or minus.
Q Half a dozen plus or minus?
A Yes.
Q Okay. Your testimony is that all of the expenditures made by those utilities on that Private Fuel Storage initiative, at least in Utah, were unreasonable for the reasons you mentioned?
A Yes.
Q Okay. And with respect, going back to Dairyland's expenditures on private fuel storage initiatives, you are telling me that the reasons, the particular reasons that Dairyland decided to make expenditures on private fuel storage are not -- not relevant to your consideration of whether or not those expenditures are reasonable; is that correct?

Page 245

A That's correct.
MR. LO RE: Excuse me. I'm sorry, Counsel. I just wanted to -- I should have done this earlier. I want to put on the record we object to the line of questions with respect to PFS on the grounds that it is -- the issue of recoverability of PFS has been decided as a matter of law by the Federal Circuit.
Go ahead.
MR. STOUCK: You don't believe that, do you?
MR. LO RE: I've said what I said, Counsel.
MR. STOUCK: Do you really believe that? Do you really believe that, AJ?
MR. LO RE: I've said what I said. We can talk about it off line, Jerry.
BY MR. STOUCK:
Q Okay. Back, though, to -- so my last statement is correct, Mr. Kouts, because you don't -- you don't know the reasons why -- any of the reasons why Dairyland decided to make

MR. LO RE: Okay.

MR. STOUCK: My position is that this deposition was where the government was supposed to tell us their position on those topics and you haven't done it and we have to pursue it.

MR. LO RE: Certainly you aren't suggesting that Mr. Kouts was to come in here today and testify about an expert opinion that may be rendered months from now.

MR. STOUCK: I am stating that Mr. Kouts was required by the rules and by court order, I might add, to come in here and testify today about the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 30, 1998, amongst these other topics.

And as far as I'm concerned, the record is that the government, the United States, has no position on that issue.

MR. LO RE: And I understand what you're saying. And I've put on the record what our position is with respect to that. I think that's all we're going to be able to do today.



MR. STOUCK: Yep. I agree. Today.

BY MR. STOUCK:

Q So just some follow ups. I take it that -- and, again, going back to some basics -- you know, I'm sure you're listening to what's going on here. But I'm asking you questions in your capacity as a 30(b)(6) witness here. So let's just be clear about that going forward, especially in light of this colloquy, Mr. Kouts but -- do you understand that?

A Yes.

Q Okay. You -- do you -- does -- can you tell me whether Dairyland's storage of its spent fuel in its spent fuel pool subsequent to January 31, 1998 has been reasonable or unreasonable in any part of that period, you know, as opposed to the whole period which I think the prior answer implied?

A Again, ultimately I'll go back to my previous answer, that's a business decision on the part of Dairyland, that the Department has no information one way or the other if one time period would be more acceptable or more reasonable than any other time period.



Q Okay. And you've prepared no analysis regarding the reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 1998; is that right?

A That's correct.

Q And I take it you also have no position on whether or not the storage of spent fuel by any purchaser in its spent fuel pool during periods -- the period subsequent to January 1998 is reasonable or unreasonable; is that right? You haven't singled Dairyland out for this no position?

A That's correct.

MR. LO RE: Objection. Outside the scope of this 30(b)(6) deposition.

BY MR. STOUCK:

Q Can you tell me -- do you have an understanding of why Dairyland has stored its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998 as opposed to doing something else with it?



A I would assume that it was a decision made that that was the best course -- business course for that individual entity.

Q But other than that assumption, you have no knowledge or no other response to my question --

A No.

Q -- why they have done it?

Okay. Do you know -- is there a storage option for spent fuel that Dairyland could have employed during the period subsequent to January 31, 1998 that would have been more reasonable than continued storage of the spent fuel in the spent fuel pool?

MR. LO RE: Objection. Asked and answered.

BY MR. STOUCK:

Q For example dry storage, off-site storage, or anything else.

A Only to the extent that if Dairyland did undertake dry storage, they would have to consider





917ffa92-9800-4498-95e6-5e4b9a24ccb0

Page 258

issues associated with what kind of dry storage that was, whether or not it was in a manner that would be consistent with the Standard Contract.

And if it was not in a manner consistent with the Standard Contract, then Dairyland would have had to seek a mutually agreeable contract amendment to address that issue.

Other than that, that's essentially a business decision on the part of Dairyland, in terms of what type of storage and what that storage costs in relation to the resources that it has available.

Q Okay. So you cannot testify whether or not there is some storage method for Dairyland's spent fuel other than continued storage in the spent fuel that would have -- in the spent fuel pool that would have been more reasonable than -- than storage in the spent fuel pool during the period subsequent to January 1998; is that right? Or can you testify about that? There are two choices. You can testify about it or you can't testify about whether there would be a more reasonable storage option?

A Not knowing the specifics of -- facing

Page 259

Dairyland, there's no way for DOE to know that.

Q Okay. No way for you to know that?

A Or the Department has no information associated with that.

Q Or you, in your capacity as a 30(b)(6) witness?

A That's correct.

Q Okay. Let's move on to topic number 8 on the list, the reasonableness or unreasonableness of Dairyland's study, analysis, investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998.

Do you see that?

A Yes, I do.

Q Okay. I'm going to try to break this down because that's a big mouthful.

First, let me ask, do you know whether or not -- well, let me break it down first. I'm going to try to separate study, analyze, investigate from implement.

A Okay.

Q All with respect to dry storage. Study,

Page 260

analyze, investigate dry storage on the one hand, and on the other hand, implement dry storage. Okay.

Let's start with implement dry storage. Do you know whether or not Dairyland has incurred any costs for the implementation of dry storage at its reactor site?

A No.

Q Do you know where Dairyland's reactor site is?

A Yes. I believe it's in Wisconsin.

Q Have you been there?

A No, I have not.

Q Okay. Now, let's talk about study, investigate, analyze. Do you know whether or not Dairyland has incurred any expenses for the study, analysis, or investigation of dry storage for its spent fuel?

A My assumption is, if it's studied, analyzed or analyzed it, it must have spent some resources in order to do that. But I do not know the extent to which those resources were expended.

Q Okay. Do you know whether it has studied

Page 261

or analyzed it at all?

A No, I do not.

Q Okay. If it had, you would assume there's a cost associated?

A Yes.

Q But you don't know whether in fact Dairyland has studied or analyzed or investigated?

MR. LO RE: Objection. Asked and answered.

BY MR. STOUCK:

Q Right?

A That's correct.

Q Okay. Well, are you nevertheless, in light of your recent answers to my recent questions, able to testify about the reasonableness or unreasonableness of Dairyland's study, analysis, investigation, and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998?

A To the extent that the Department has no information associated with the analysis or study, the only comment -- and has no position on it, the

only comment that the Department would make is that implementation of such a dry storage initiative would have to take into consideration a mutually agreeable amendment to the Standard Contract to address whether or not the fuel is going to be in a -- in a form which the Department can accept.

Q So other than that, the mutual amendment, and the form of the -- of the fuel being suitable for acceptance, you have no position on the reasonableness or unreasonableness of Dairyland's study, analysis, investigation, on the one hand, or implementation, on the other hand, of dry storage for its spent fuel after January, '98; is that correct?

A That's correct.

MR. LO RE: Just so the record is clear, we take the same position with respect to this question, number 8, that we took with respect to number 7.

MR. STOUCK: Right.

MR. LO RE: Vis-a-vis a challenge at court.



MR. STOUCK: It won't surprise you that we do, too. And I think we're entitled to answers on that question.

MR. LO RE: That's perfectly fine, Jerry. Once again, we're just making a record here.

BY MR. STOUCK:

Q Okay. Your understanding is that bare spent fuel is the only acceptable waste form under the Standard Contract; is that correct?

A Yes.

Q Is that explicit in the Standard Contract; do you know? Are there words that say that, you know, in substance? Or is that an interpretation?

A It's laid out in the appendix in terms of what's an acceptable waste form.

Q Okay. And do you understand the term TAD, T-A-D?

A Yes.

Q What is that?

A That is a device that the Department is in the process of developing that would allow a



canister to be loaded at a utility site and sealed at a utility site with all the -- a canister that would be provided by the Department for the purposes of transport to the repository, that would meet both the transportation requirements, aging requirements at the repository, and disposal requirements at the repository.

Q Are TADs an acceptable waste form under the Standard Contract?

MR. LO RE: Objection calls for a legal conclusion. Calls for speculation.

THE WITNESS: No. They would have to be a mutually agreeable contract amendment by both parties in order to allow the use of TADs.

BY MR. STOUCK:

Q Okay. And is that -- is it your understanding that that would be true for the same reasons that a mutual acceptable contract amendment would be necessary in order to accept a currently available spent fuel -- dry storage containers?

A That's correct.

Q Okay. That's because, under the



appendices to the Standard Contract, it's your understanding that only -- those appendices state that only bare fuel is an acceptable waste form?

A As identified in the appendix, yes.

Q Okay. All right. Now let's go back -- I've just got a few more. Can we go off the record for just one second.

(Discussion off the record.)

BY MR. STOUCK:

Q Actually, this -- before we leave TADs and acceptable waste forms, Mr. Kouts, if you look through the Standard Contract appendices, can you show me -- I don't want you to go searching for it, but could you identify a place in there where you think it's set forth that -- do you have something in mind that you can point to without too much trouble? I appreciate that. It's Exhibit Number 4. It's pretty thick. So it's probably got a clip on it.

MR. LO RE: That's it.

BY MR. STOUCK:

Q And I certainly don't want to put words

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | No. 04-106C |
| ENERGY NORTHWEST, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | No. 04-0010C |

Washington, D.C.
Wednesday, May 2, 2007

Volume 2

Deposition of:

CHRISTOPHER KOUTS

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:45 a.m., when were present on behalf of the respective parties:

Page 312

APPEARANCES

On behalf of Dairyland Power Cooperative:
JERRY STOUCK, ESQUIRE
KEVIN E. STERN, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3173

On behalf of Energy Northwest:
DAVID JIMENEZ-EKMAN, ESQUIRE
CHRISTOPHER TOMPKINS, ESQUIRE
Jenner & Block, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Defendant:
ALAN J. LO RE, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 12070
Washington, D.C. 20530
(202) 307-0226

Page 313

CONTENTS


| EXAMINATION BY: | PAGE |
|---|---|
| Counsel for Energy Northwest ............ | 316 |
| Counsel for the Defendant .............. | 426 |
| Counsel for Energy Northwest ............ | 439 |
| Counsel for the Defendant .............. | 446 |

| KOUTS DEPOSITION EXHIBITS: * | PAGE |
|---|---|
| 25 Document ............................ | 319 |
| 26 Document ............................ | 324 |
| 27 Document ............................ | 338 |
| 28 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program .................. | 350 |
| 29 Preliminary Estimates of the Total System Cost for the Restructured Program, dated December 1990 .......... | 361 |
| 30 Report issued by the GAO, entitled: Operation of Monitored Retrievable Storage Facility Is Unlikely by 1998 .. | 377 |
| 31 Report entitled OCRWM Planning for No MRS Contingency .................. | 393 |


Page 314

CONTENTS (Continued)


| | |
|---|---|
| 32 Letter from James Watkins to Bennet Johnston ...................... | 398 |
| 33 Document ............................ | 417 |
| 34 Interrogatory responses Government provided in Energy Northwest .......... | 420 |


(*Exhibits attached to transcript.)

Page 315

PROCEEDINGS

\- - - - - -

Whereupon,
CHRISTOPHER KOUTS
was called as a witness, and, having first been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. TOMPKINS:
Q Good morning, Mr. Kouts.
A Good morning.
Q Just a couple cleanup questions on your background. I know that yesterday you testified that you joined OCRWM in 1985.
A That's correct.
Q Okay. So you didn't have any development -- prior to '85, you didn't do any work developing the Standard Contract that's at issue in this case?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: That's correct.
BY MR. TOMPKINS:





bf26d080-af37-4c04-b9ae-52505afae60b

the design of the facility differently and the license differently so forth. So there were options in terms of how we might implement the program based on when we identified a site.
BY MR. TOMPKINS:
Q Okay. But as a general target, the end of 1992, early 1993 was the target at this point in time?
A Generally, yes.
Q And, do you have knowledge that that was the target?
A Other than what the Secretary's report said -- this is different from it. Again, as I stated earlier, I have no basis for understanding why the GAO believed that that was the magic date, as opposed to the Secretary's date that was contained in his reassessment report.
Q This report also states that Negotiator also -- this is in the same paragraph. The Negotiator -- excuse me. It's the sentence above.
However, because the Negotiator expects the process to take considerable time, he does not


believe that these activities can be completed by then.
Were you aware at this time, in September of 1991, about the activities of the Negotiator?
A Yes.
Q Okay. And are you aware of whether or not the Negotiator expected his siting process to take considerable time?
MR. LO RE: Objection. Vague. Objection. Document speaks for itself. Objection. Calls for speculation.
THE WITNESS: I don't remember conversations with the Negotiator or the staff where that came up. But the document speaks for itself.
BY MR. TOMPKINS:
Q Okay. Independent of this document, do you recall having any conversations with anyone about what the Negotiator believed about when he would site an MRS facility?
A My perspective and my interactions with members of the Negotiator's office was that they were doing what they could to site a facility as


quickly as they could.
Q Okay.
A I don't remember any hard and fast, that we will have it by a specific date or we'll need more time. I just don't remember any conversations to that effect.
Q Did you have direct interactions with the office of the Negotiator?
A I, on occasion, interacted with members of the Negotiator's staff and with the Negotiator.
Q And was that in your job in the contingency planning or was that in your role in the transportation branch?
A More contingency planning than transportation.
Q Okay. Do you have any reason to believe that the GAO's characterization of the Negotiator's beliefs here is not accurate?
A I have no reason to believe that it's accurate or inaccurate.
Q Mr. Kouts, do you know when the position of the Negotiator was first filled by the President?


A Not specifically, no.
Q Okay. Turn to page 11 of this report. The first full paragraph here indicates that the position of the Negotiator was filled in August of 1990. Do you know if that's true?
A The document speaks for itself.
Q Do you have any knowledge yourself about whether or not that's true?
A I don't have any independent knowledge as to whether or not that's true or untrue.
Q Okay. Mr. Kouts, turning back to the principal findings on page 3, the GAO indicates that it believes that an MRS facility was unlikely by 1998.
At this point in September of 1991, did you believe that an MRS facility was unlikely to be operating by 1998?
MR. LO RE: Objection. Asked and answered. Mr. Kouts has testified repeatedly about his understanding of an MRS. If you want to ask the GAO about their opinion, I suggest that you attempt to ask them.




bf26d080-af37-4c04-b9ae-52505afae60b

Page 384

This is an improper question of this witness who has now sat here for close to 12 hours of deposition and numerous times in trial and has testified about his opinions and understanding of the MRS in this time frame.

Go ahead and answer if you can.

THE WITNESS: My perspective as an employee of the program, was that we were doing everything we could to implement the MRS in 1998. And the Department still had a belief and I had a belief that that was still attainable.

BY MR. TOMPKINS:

Q It was attainable. Was it likely?

MR. LO RE: Objection. Vague.

THE WITNESS: I believe it was -- I -- it's difficult to think back as to how I thought in 1991. My perspective at that point was that we still had a very good chance of being successful and that we were going to do everything we could to have that facility available.

In terms of likely or unlikely, there were lots of variables. My belief was that there

Page 385

was a strong desire to have a facility available to meet our obligations under the contract. And that if the Negotiator found a site, that Congress would approve changes to the conditions under the Act such that we would be able to operate it.

So whether it was likely or unlikely, I believed from my own perspective that it was a very viable approach and that it had -- it had merit to pursue.

BY MR. TOMPKINS:

Q Your last answer, I think, indicates that it was dependent upon a number of other factors; is that true?

MR. LO RE: Objection. Mischaracterizes the testimony.

BY MR. TOMPKINS:

Q And one of those was whether or not the Negotiator identified a site and reached an agreement with the host?

A Yes.

Q Okay. And another contingency was whether or not Congress acted and authorized such a

Page 386

facility?

A Congress had already authorized the facility.

Q Would Congress need to approve any agreement reached by the Negotiator?

MR. LO RE: Objection. Calls for speculation.

THE WITNESS: The plan was that the negotiated agreement with the host site would address the linkages in the Nuclear Waste Policy Act. So in order for the linkages to be removed, Congress had to approve the agreement.

So had those linkages not existed, it's unclear to me whether or not Congress would have had to approve the agreement; other than if the agreement was monetary, that Congress would have had to approve that it was agreeing to the monetary provisions of that agreement.

BY MR. TOMPKINS:

Q But the Department, at this point, needed to change the linkages which were enacted in 1987 to actually begin acceptance in 1998; is that correct?

Page 387

MR. LO RE: Objection. No foundation.

THE WITNESS: The Department could not change the linkages. Congress had to change the linkages.

BY MR. TOMPKINS:

Q Okay. And so one of the contingencies for DOE's plan to begin waste acceptance in 1998 was a change by Congress of the existing linkages?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: I wouldn't characterize it as a contingency. I would characterize it as that was the strategy of the Department in having a facility available in 1998, as presented in the Secretary's reassessment report in 1989.

BY MR. TOMPKINS:

Q And without a change in the linkages, the Department would not be able to have an MRS facility in 1998; is that correct?

MR. LO RE: Objection. Mischaracterizes the testimony.

THE WITNESS: If Congress did not change

**Boston Edison & Entergy Nuclear v. U.S Nos. 99-447C, 03-2626C June 18, 2007**

**Heritage Reporting Corporation**

**Page 3517 to Page 3844**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3517

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------x

BOSTON EDISON COMPANY
Plaintiff,
and :NO. 99-447C
ENTERGY NUCLEAR GENERATION COMPANY :and
Plaintiff :No. 03-2626C
vs
THE UNITED STATES,
Defendant

-----------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D C

Monday June 18 2007

VOLUME 11

The parties met, pursuant to the notice of the Judge at 10 00 a m.

BEFORE THE HONORABLE CHARLES F LETTOW

Page 3518

APPEARANCES

ON BEHALF OF PLAINTIFF ENTERGY:
ALEX D TOMASZCZUK, ESQ
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean Virginia 22102
(703) 770-7674
and
JAY E SILBERG ESQ
Pillsbury Winthrop Shaw Pittman
2300 N Street NW
Washington, D.C 20037
(202) 663-8000

and
L JAGER SMITH JR ESQ
Wise Carter Child & Caraway P A
1340 Echelon Parkway
Jackson Mississippi 39213
(601) 368-5572

Page 3519

APPEARANCES (Continued·)

ON BEHALF OF THE PLAINTIFF BOSTON EDISON
RICHARD J. CONWAY, ESQ.
BRADLEY D. WINE, ESQ.
BERNARD F. SHEEHAN, ESQ
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D C 20006-5403
(202) 420-2235

ON BEHALF OF THE DEFENDANT.
ALAN J. LO RE ESQ
SCOTT DAMELIN, ESQ
JOSHUA E GARDNER, ESQ
SONIA M ORFIELD ESQ.
PATRICK B BRYAN, ESQ.
STEVEN FINN, ESQ.
U S Department of Justice
1100 L Street, NW
Washington D.C. 20036

(Index appears at end of transcript)

Page 3520

P R O C E E D I N G S

(10:00 a.m.)

THE COURT: Good morning Mr. Lo Re

MR. LO RE Good morning, Your Honor

THE COURT. We understand there is a modest change in the proposed schedule.

MR LO RE. Yes, Your Honor, and I was just writing that down The proposed schedule is as follows, Your Honor We will start the testimony with the testimony of Mr Kouts this morning Then after Mr. Kouts has testified Mr Hintz is scheduled to testify

What we would like to do is have Entergy Nuclear present that witness as part of -- at the time of our case-in-chief. We would then examine Mr Hintz, and hopefully complete that examination before the lunch break

After that, Your Honor we have Mr Morgan scheduled to testify via videoconference at 1 p m local time If there is a gap there in other words, from the time Mr Hintz leaves until the time we put Mr Morgan on, we can fill that with -- we can begin the examination of our first expert Mr Brewer In other words rather than leave

Page 3537

A. Yes, these are the instructions that accompany the Annual Capacity Report and Acceptance Priority Ranking of the previous document, of the previous documents. I don't know which one this probably referred to, it is probably the 1992, as I see here from it, it is the 1992 – 1991 ACR, so it would have accompanied that.
Q. And is this a document that is generated by the Department?
A. Yes.
Q. And is this a document that you were aware of, relied upon, and reviewed as part of your work at DOE?
A I have reviewed it in the past, yes.
MR LO RE: Your Honor, at this time, the government would move for the admission of EX-246 into evidence.
Mr SILBERG: No objection, Your Honor
MR CONWAY. With the stipulation that this accompanied the 1991 ACS, we would have no objection.
THE COURT: ACR.
MR. CONWAY. I'm sorry, ACR

Page 3538

THE COURT. Admitted
(Entergy Exhibit Number EX-246 was received into evidence )
BY MR. LO RE:
Q. I would like to skip the next tab and if you can go to the last tab in this binder, which is BX-260. Mr. Kouts, this is a document entitled Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program Mr. Kouts, are you familiar with this document?
A Yes.
Q. And what is it?
A It is a total system life cycle cost analysis of the program that was issued, I believe, in the 1995 time frame. There is no date, but essentially the letter from the director, it does indicate that attached is the document which is dated August 1995. So it would have been a fall document, an August or September issuance of the document. It has a DOE RW number which means it is a departmental document
Q. Is this a document you have reviewed,

Page 3539

relied upon or been aware of in your work at DOE?
A. Yes, I would have reviewed it.
MR. LO RE: Your Honor, at this time, the government would move for the admission of BX-260 into evidence.
Mr. SILBERG: No objection.
MR. CONWAY: No objection, Your Honor.
THE COURT: Admitted.
(Boston Edison Exhibit Number BX-260 was received into evidence.)
BY MR. LO RE:
Q. Okay. One down, one to go. There is a second binder, Mr. Kouts, that should be behind you on the stand. The first document on this, in this binder is marked EX-248. This is a document entitled Recommendations on the Proposed Monitored Retrievable Storage Facility dated October 1985. And it says Roane County/City of Oak Ridge Tennessee. Do you see that document, sir?
A. Yes, I do.
Q. Are you familiar with this document?
A. Yes, I am.
Q. What is it, sir?

Page 3540

A. It is a report of the Clinch River MRS task force that was submitted to the Department, and it provided recommendations from the local governments in and around the site that the Department was intending on proposing to Congress for a monitored retrievable storage facility.
It was given to the Department in, I believe it was referenced in the MRS proposal that was submitted to Congress in March of 1987.
Q. So this document was not generated by the Department; is that right?
A No, it was not.
Q. But it was a document that you received, that the Department received as part of the MRS siting proposal?
A. It was referenced in the MRS proposal It was – the Department had provided funding to local governments to study whether or not they wanted to accept an MRS. And part of that funding was used to develop this report and to provide their recommendations and perspectives on siting a facility at the former Clinch River Breeder Reactor site in Oak Ridge, Tennessee.

Page 3541

Q. And is this a document that you were aware of or reviewed as part of your work with DOE?
A. Yes.
Q. Is this a document that was kept in DOE's files, to your knowledge?
A. I believe so. It was probably in our record system. I see an NWTRB stamp up here, so it looks like it was also in the Nuclear Waste Technical Review Board's library, but yes.
MR. LO RE: Your Honor, at this time, the government moves for the admission of EX-248 into evidence
Mr. SILBERG· No objection, Your Honor.
MR. CONWAY: No objection, Your Honor.
THE COURT: Admitted.
(Entergy Exhibit Number EX-248 was received into evidence.)
BY MR. LO RE:
Q. Now, if you turn to the next tab, Mr. Kouts, you will see a document marked EX-240. This is a document entitled Nuclear Waste Operation of Monitored Retrievable

Page 3542

Storage Facility is Unlikely by 1998. This is a document dated September 1991, issued by the GAO or General Accounting Office
Mr. Kouts, are you familiar with this document?
A Yes.
Q. What is it, sir?
A. It is a report providing the perspective of the GAO on whether or not an MRS facility could be operational in 1998.
Q. And this document was not generated by the Department of Energy?
A. No, it was not.
Q And did you review this document as part of your work at DOE?
A. After it came out, yes.
MR. LO RE: At this time, the government would move for the admission of EX-240 into evidence.
Mr SILBERG No objection, Your Honor.
MR. CONWAY. No objection, Your Honor.
THE COURT: Admitted.
(Entergy Exhibit Number EX-240 was received into evidence.)

Page 3543

BY MR. LO RE:
Q. If we skip the next tab, the following tab is marked EX-251. This is a letter on the Department – from the Secretary of Energy dated December 17th, 1992 from Secretary James D. Watkins to the Honorable J. Bennett Johnston, chairman, Committee on Energy and Natural Resources.
Mr. Kouts, are you familiar with this document?
A. Yes.
Q. And what is it, sir?
A. It is a letter that was signed out by the Secretary to – in response to a letter from Senator Johnston requesting basically perhaps a new approach as to how the Department might have a facility operational in the 1998 time frame.
Q. And to your knowledge, was this a document actually issued by Secretary Watkins?
A. It has his signature on DOE letterhead and a date stamp, so my assumption is that this letter did go out and was received by the senator.
Q. And, Mr. Kouts, is this a document

Page 3544

that you were aware of during your time or aware of, reviewed, or relied upon during your work with the Department?
A. After the fact, I believe – I hadn't – actually I was shown this letter in trial and I didn't remember it, but the more I think about it, I think I did see this after it came out.
And it provided a perspective of the outgoing Secretary as to what – when I say outgoing, this was the end of Admiral Watkins' tour as Secretary, since there was a changeover in the administration, and this was his attempt to try to move the program forward from his perspective as he was leaving, as he was leaving the office.
MR. LO RE: Your Honor, at this time, the government moves for the admission of EX-251.
Mr. SILBERG: No objection, Your Honor.
MR. CONWAY: No objection, Your Honor.
THE COURT: Admitted.
(Entergy Exhibit Number EX-251 was received into evidence.)

**Wisconsin Electric Power Company v. U.S No. 00-697C October 10, 2007**

**Heritage Reporting Corporation**

**Page 5169 to Page 5446**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 5169

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------X

WISCONSIN ELECTRIC POWER COMPANY, Plaintiffs,

vs :NO 00-697C

THE UNITED STATES, Defendant

-------------------------------------X

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, October 10, 2007
Volume 22

The parties met, pursuant to the notice of the Judge at 10.04 a m

BEFORE THE HONORABLE JAMES MEROW

Page 5170

APPEARANCES·

ON BEHALF OF PLAINTIFFS
RICHARD OEHLER, ESQ
JAY GRIFFITHS, ESQ
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101
(206) 359-8000
and
EMILY POULIN, ESQ
DONALD CARNEY, ESQ
MARY ROSE HUGHES, ESQ
Perkins Coie LLP
607 Fourteenth Street, N W
Washington, D C 20005
(202) 628-6600

Page 5171

APPEARANCES CONTINUED·

ON BEHALF OF THE DEFENDANT
ALAN J. LO RE, ESQ
SHARON SNYDER, ESQ
RUSSELL SHULTIS, ESQ.
STEPHEN FINN, ESQ
SONIA ORFIELD, ESQ
U S. Department of Justice
1100 L Street, N.W
Washington, D C 20036

(Index appears at end of transcript)

Page 5172

P R O C E E D I N G S

(10.04 a m )

THE COURT Mr Lo Re

MR LO RE Good morning, Your Honor Your Honor, before I proceed, there is one matter that I would like to clarify that came up yesterday With the Court's indulgence, I'd like to address that.

THE COURT. Sure

MR LO RE This is the matter of the exhibit that was moved into evidence yesterday. This is PX-175

THE COURT Right.

MR LO RE It is the draft annual capacity report or ACR

THE COURT. Right

MR LO RE I wanted to put, for the Court, into context what happened there with respect to the government's movement for the admission of the document Frankly, when I was shown the transcript yesterday, I had forgotten that the government had moved that exhibit into evidence, and I wanted to, if I could, just give the Court a little context --

THE COURT Sure

Page 5217

Department's vision about what an MRS facility could be. We also effectively managed a grants program for the Negotiator.

In other words, if the Negotiator found a willing host, a local government that was interested in having the facility then we would issue grants to that locality in a series of stages that would allow them to study the facility, hire consultants and evaluate whether, further, in more detail, whether or not they wanted to accept it.

So we managed that grants program for the Negotiator throughout the Negotiator's existence.

Q. Did the Department actually issue any grants, to your knowledge?

A. Yes, they did They issued a variety of what we called phase one feasibility grants which were for several hundred thousand dollars, and then there were also phase two agreements, which were more substantial agreements with much more money, to effectively help negotiate the settlement and also accomplish further study on the part of the locality and the state involved

Page 5218

Q Now, I'd like to go to page 205 of this document, which is the Bates number ending in 5176, and this is under the heading, "Waste Acceptance Schedule."

A Okay.

Q. And there's a reference to several tables, which we'll talk about in a moment. It says, "Table B3 presents a preliminary schedule for waste acceptance by the waste management system This schedule shows the MRS facility starting to accept spent fuel in 1998 and is based on the statutory limits on MRS capacity (10,000 MTU before the start of operations at the repository)."

And then it goes on and says, "The first 10 years of the waste acceptance schedule correspond to the lower bound schedule published in the annual capacity report." Do you see that?

A. Yes, I do.

Q. What did that sentence mean?

A. Essentially, that we were reflecting in this waste acceptance schedule the fact that we would not exceed 10,000 metric tons of uranium, if you will, before the start of

Page 5219

operations at the repository which, again, was a capacity linkage that was in the '87 amendments to the Nuclear Waste Policy Act and no more than 15,000 tons thereafter at the MRS, it could not exceed 15,000 metric tons, as long as the repository was operational.

Q. And there is a reference there to the lower bounding schedule in the ACR. Do you know what that refers to?

A. Yes, there were two schedules published in that ACR, I believe, referred to in footnote 11. There was an upper bound and a lower bound. This was reflective of the lower bound schedule, which was consistent with the linkages in the Nuclear Waste Policy Act amendment.

Q. Now, at this point in time, Mr. Kouts, this is the September 1991 timeframe, did you believe that there was a possibility that DOE could begin performing with an MRS in 1998?

A. Yes, I did.

Q. Why is that?

A. Well, we had a very active program supporting the Negotiator. The Negotiator had a variety of localities that he was working

Page 5220

with at the time. We were undertaking some preliminary design work on the facility, which was fairly substantial, and we had a fairly substantial effort within the program to try to make the facility happen.

Q. Now, let's look at an ACR. Can we look at DX-566, please?

MR. LO RE: This document, Your Honor, is DX-566, which is also PX-237, and the document has been admitted

BY MR. LO RE:

Q. Mr. Kouts, this is an annual capacity report dated December 1991. Are you familiar with this document?

A. Yes, I am.

Q. And what is it?

A. Actually, it's a dual report. It has an annual capacity report and also an acceptance priority ranking, which shows the ranking in which fuel was discharged from the various contract holders. That's basically what the document is.

Q. Now, if you turn to page V of this document under, "Summary," second paragraph starts with, "the projected waste acceptance

Page 5221

rates."

A. Yes.

Q. And I think you may have just answered this, but why don't we read into the record that, starting with, "the projected waste acceptance rates," down to the words "will be modified"?

A. "The projected waste acceptance rates for SNF presented in table 2.1 assume: A site for a monitored retrievable storage facility (MRS) facility will be obtained and the facility will initiate operations in 1998, and the statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act of 1982, as amended (NWPA) will be modified."

Q. And what was DOE conveying with that statement you just read?

A. That this waste acceptance schedule was premised on the fact that the schedule linkages contained in the 1987 amendments to the Nuclear Waste Policy Act were effectively repealed by Congress, and it's done essentially through the, either an act of legislation or through approval of a negotiated – an

Page 5222

agreement by the Nuclear Waste Negotiator on a host MRS facility area.

Q. Now, let's go to page five of the document, which is table 2.1. Do you have that, sir?

A. Yes, I do.

Q. And, Mr. Kouts, do you believe that if DOE had begun performing at the rate depicted in this document as of January 31st, 1998 at an MRS, that DOE would have been meeting its obligations under the NWPA in the standard contract?

A. To my understanding, yes.

Q Prior to the issuance of this document, specifically, the table depicted at 2 1, did anyone indicate to you that DOE should not publish this rate because DOE had already concluded it would not perform by 1998?

A. No.

Q Are you aware of anyone advising that this rate not be published for any reason?

A. Not that I'm aware of.

Q Was it your understanding at this time, Mr. Kouts, that is December 1991, that DOE had concluded that it was obvious that it

Page 5223

would be unable to perform in 1998 at an MRS?

A. No.

Q. The rate that is depicted here at table 2.1, do you consider this to be a reasonable rate?

A. Yes, I do, based on the fact that the schedule linkages, excuse me, that the schedule linkages were broken and that the capacity linkage in the Act was still in place, this was a very reasonable rate for the Department to design and operate a facility at.

Q. Now, let's look at another ACR. This is DX-584-A.

MR. LO RE: And I understand, Your Honor, that this document is admitted, and I also understand, having looked at this myself, I think this is identical to 584, although I think the print's just larger in this one, so we wanted the easier to read version.

THE COURT: Both versions are admitted in evidence.

MR. LO RE: Belt and suspenders.

BY MR. LO RE:

Q. Mr. Kouts, what is this exhibit?

A. This is an acceptance priority

Page 5224

ranking/annual capacity report that was issued in March of 1995.

Q. And did you review this document?

A. Yes, I did.

Q. Now, if you turn to page two of this document, the bottom paragraph, there's a reference to the Department, it says, "The Department has decided to issue a consolidated APR/ACR report for 1994 and subsequent years." You mentioned this document was actually issued in March of 1995. Do you know why there's a reference there to 1994?

A. I believe the data is based on '94 data, but the document was not issued until 1995.

Q. Now, if you turn to the next page, there's a heading that says, "1.2"?

A. Yes.

Q And it's basis for the annual capacity report. It says, "in the previous ACR," and do you know which ACR that refers to?

A. I believe it was the '91.

Q. It says, "The projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a monitored

Page 5261

is a reasonable rate of acceptance, isn't it?

A. Yes, it is.

Q. And the program has never considered for life of the program steady state rate of acceptance to be 900 MTUs per year, has it?

A. A life of the program?

Q. Life of the program, yes.

A. To my knowledge, no, the only 900 per year acceptance rate was based on MRS acceptance, which was in compliance with the capacity limitations contained in the Nuclear Waste Policy Act amendments.

Q. And the objective of the Waste Management Program has been, from the beginning, to eliminate the need for additional at-reactor storage after 1998 and to reduce the backlog at a reasonable rate, correct?

A. The objective of the program is stated in the Nuclear Waste Policy Act, and that's to dispose of these materials and take them away from the reactor sites for ultimate disposal.

Q. Can you answer my question?

A. I believe I have. I mean, I would like to have a copy of the Nuclear Waste Policy Act, the purpose of the program is clearly laid

Page 5262

out in that document.

Q. Here's my question, sir, and if you can't answer it, tell me, the objective of the Waste Management Program has, from the beginning, been to eliminate the need for additional at-reactor storage after 1998 and to reduce the backlog, correct?

A. I go back to my original answer, which was the objective of the program is to develop and deploy geologic repositories for the disposal of these materials, that's the ultimate objective of this program.

Q. Do you disagree that an objective of the program is to eliminate the need for additional at-reactor storage after 1998?

A. That's what I would call a sub-objective of the program. The primary objective is to get facilities operational to begin waste acceptance, and to the extent that we can deploy facilities and obviate the need for additional dry storage at reactor sites, that's certainly very beneficial result of that.

Q. Do you agree that an objective of the program from the beginning was to reduce the

Page 5263

backlog of spent nuclear fuel that had been built up at the utilities?

A. An objective of the program.

Q. An objective?

A. As opposed the objective.

Q. An objective?

A. An objective, yes, I would agree with that.

Q. Now, you were involved in the design and attempt to implement the MRS, correct?

A. The design and an attempt to implement an MRS, was that the question?

Q. Yes.

A. I was involved with the development of the MRS proposal, which was directed by Congress under Section 141 of the Nuclear Waste Policy Act. Part of that was to also develop multiple designs for the facility, and to the extent that I had an involvement with that, yes, I would agree with your question.

Q. And at the time that the DOE proposed the MRS to Congress in March of 1987, the MRS was to be an integral part of the Waste Management System, correct?

A. Yes.

Page 5264

Q. And at the time that DOE proposed an MRS to Congress in March of '8,7 the MRS was not proposed as a stand-alone facility that would operate for 10 years within a 10,000 MTU capacity limit, correct?

A. It was proposed as a facility that would not exceed a 15,000 ton capacity limit and one that would operate well beyond 10 years, that's correct.

Q. It was not proposed as a stand-alone facility, was it?

A. I don't understand what your characterization of stand-alone – it certainly would be a stand-alone facility. It was not coupled with any other facility like a repository. It was separate and apart from a repository, so in my way of thinking, it was a stand-alone facility.

Q It was proposed as an integral part of the Waste Management System, correct? I think you've already testified to that.

A. It was an integral part of the system, in the sense that it would also be undertaking packaging for the repository, but in terms of a stand-alone facility, it was absolutely a

Page 5329

THE WITNESS: Well, let me ask you a question this way, there are e-mails in those, in that collection, and I don't know that the Department necessarily paid for the e-mails that were written from a contractor on whatever position or not, but the point I'm trying to get to is that, basically, all information that the Department has developed over the years related to Yucca Mountain including legacy e-mails from 10 to 15 years ago that, in many cases, don't have relevance, but they're still in there because someone put them in there, are going to be in there, and there'll be lots of extraneous material in there.

What I referred to in my response to counsel's question was that the Department, in its license application, will focus on those contractor documents that it will rely on and information in those documents that it will rely on in order to make its case for the repository and will specifically cite those documents as the ones that we'll rely on.

So that's – but it will be under the auspices of a DOE document that specifically points to that reference and says, yes, we use

Page 5330

that reference in order to make this specific point.

MS. HUGHES: Thank you, I have no further questions.

THE COURT: Any redirect?

MR. LO RE: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. LO RE:

Q Mr. Kouts, I have said this to you before and I may say it to you again, the end is near for this particular trial.

A. I'm excited about that.

THE COURT: For this trial, you mean?

MR. LO RE: For this trial, exactly, Your Honor.

BY MR. LO RE:

Q. Mr. Kouts, on cross-examination, you talked with Plaintiff's counsel about objectives of the program, do you remember that testimony?

A. Yes, I do.

Q Did you consider, or do you consider the objectives of the program to be contractual binding commitments on the part of DOE?

A. Yes, I do.

Page 5331

Q. Do you consider, with respect to the objective of accepting spent fuel in 1998, did you consider there to be an obligation on the part of DOE to begin accepting at any particular rate of acceptance?

A. No.

Q. Why is that?

A. Because, number one, the contracts didn't specify our rate, and number two, it depended on what the Department physically could deploy in that timeframe under the constraints and restraints that it was given under the Nuclear Waste Policy Act.

Q. You talked about, on cross-examination, this notion of working off the backlog, do you remember that, of spent fuel?

A. Yes.

Q. Did you consider that DOE had a contractual obligation to begin accepting in such a way so as to begin working off the backlog immediately?

A. Not necessarily, the intent of the Department was to try and deploy a facility that it could, first of all, build and operate

Page 5332

in that timeframe, and to the extent that that provided a reduction in the amount of storage requirements at utility sites, that was an added benefit.

Q. You talked both on direct examination and cross-examination about the rates depicted in the 1991 ACR for the first 10 years of the program. Do you, Mr. Kouts, have an opinion as to whether or not performance beginning for the first 10 years of the program under that rate depicted in the 1991 ACR, whether that rate would have been consistent with the objectives of DOE regarding both the statute and the program?

A. From my perspective, yes.

Q. Why is that?

A. Well, first of all, we would have begun operation in 1998, which was a major requirement of the contracts, and the next is that it would be still within the constraints of the – the capacity constraints of the amendments which, effectively, I agreed with, I personally agreed with because I don't believe you would have had a facility, unless you demonstrated some kind of linkage, if you will,

Page 5345

acceptance, excuse me, under current conditions waste acceptance at a waste management facility would not begin in 1998, do you remember that?

A. Under the current statutory linkages, that's correct.

Q. Now, at that time, 1988, had you concluded that there was no way that DOE could perform, that DOE could meet its obligations under the standard contract and begin accepting waste in 1998?

A. Had the Department concluded that?

Q. Yes.

A. No, it had not.

Q. Why do you say that?

A. Because I think that, in 1988, we were still reacting to the amendments that were passed and trying to determine a course forward for the program so we could still have waste acceptance in 1998. The '88 amendment effectively acknowledged the fact that, under current constraints, we would not have an MRS available in that timeframe.

However, we were developing strategies internally in the program to try to address how we might, and that manifested itself to some

Page 5346

extent in the Secretary's reassessment report that was provided to the Congress in November of 1989.

Q. Let's take a look at that. This is DX-553. And I'd like to take you back to page IX of this document, and it goes on to page X, this is the monitored retrievable storage under the heading monitored retrievable storage, and this was a passage that we looked at on direct examination, and there's a reference here to the linkages and an effort, plans to work with Congress to modify the current linkages, do you see that?

A. Yes.

Q. Now, Mr. Kouts, at this time, November 1998, in your opinion, had DOE –

A. In 1988

Q. In 1988, thank you, had DOE concluded that it was obvious that it would be unable to meet its contractual obligation beginning in 1998?

A. No, it had not.

Q. In your opinion, Mr. Kouts, did DOE issue this document that is the reassessment to Congress of the program or any document after

Page 5347

this date in a way to limit its liability to contract holders in the event that it was unable to perform beginning in 1998?

A. No, it did not.

Q. Why do you say that?

A. Having lived in the program at that time, I think that the perspective of the management of the program and as indicated in this document, the Secretary of Energy, was that it was unacceptable for the Department not to try to proceed down a course, to have some kind of facility available in the 1988 timeframe.

So what this report was indicative of was a strategy to – the Department was going to embark on and put its efforts behind in order to do everything it could to have a facility available in the 1998 timeframe.

Q. Now, on cross-examination, you were asked about a GAO report that was issued in 1992, late 1991, do you remember that, September '91?

A. Yes, I do.

Q. Now, do you recall, in that report GAO indicating that, if DOE did perform in 1998 at

Page 5348

an MRS, that it would have some liability to contract holders?

A. I don't remember any construct in the report related to that.

Q. Do you remember any construct in the report where GAO actually considered what would happen from a liability standpoint or from any standpoint if DOE actually began performing in 1998 at an MRS using the rates depicted in the 1991 ACR?

A. I don't believe the report addressed that issue.

Q. Now, you also talked on direct examination about a letter that the Secretary at the time sent to Capitol Hill to Senator Johnston. Why don't we take a look at that? That is DX – I'm sorry, PX-276. And I think counsel brought you to the second page or page two of the document, behind the cover page, under standardized container system, this is a difficult document to read, and I think you were examined about that last paragraph under standardized canister system, do you see that, is it container maybe, container system?