# MILNER, RONALD

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Wednesday, May 1, 2002
Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 3

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 4

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 5

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 26

MR. SHULTIS: Objection -- vague.
THE WITNESS: I don't know that I could call out any particular area.
BY MR. TOMASZCZUK:
Q. Are there aspects of the Civilian Radioactive Waste Program with which you're not familiar?
MR. SHULTIS: The same objection.
THE WITNESS: Probably.
BY MR. TOMASZCZUK:
Q. Do you know what they are?
A. I would be hard pressed to call it out.
Q. The reason I ask the question, Mr. Milner, is you have been in the office of OCRWM for a long time, and I'm trying to find out areas where you might have particular expertise and knowledge, and if there are some, it would I think speed things along if you could identify those for me.
If you can't, then I will have to assume that all areas are fair game and I'll proceed accordingly.
Are there any areas that you feel you have particular expertise or knowledge in?

Page 27

A. No, I wouldn't say so.
Q. In preparation for your deposition here today, did you review any documents?
A. No, I did not.
Q. Did you speak with anyone concerning your deposition?
A. Very briefly with the two Justice Department attorneys.
Q. Other than counsel for the Department of Justice, did you speak with anyone concerning your deposition?
A. No, not concerning the deposition.
Q. Did you speak with anyone at OCRWM concerning their deposition?
A. No.
Q. Did you speak with anyone at OCRWM concerning any topics or issues on which you thought I might ask you about?
A. No.
MR. SHULTIS: Objection -- asked and answered.
BY MR. TOMASZCZUK:
Q. Are you familiar with the standard contract for disposal that's at issue in these cases, for disposal of spent nuclear fuel and

Page 28

high-level radioactive waste?
A. Yes.
Q. Did you have any role to play in the drafting of this, what I'll refer to as the standard contract?
A. No, I did not.
Q. It had already been executed at the time you became an OCRWM employee?
A. Correct.
Q. At the time you became an OCRWM employee, did you have occasion to read the contract?
A. Yes.
Q. At the time that you became an OCRWM employee, did you read any other documents?
A. I'm not sure I understand that question.
Q. Okay. I understood you became a branch chief at OCRWM in, in or about 1984?
A. Um-hm.
Q. Right. And you have testified you have read the standard contract?
A. Um-hm.
Q. At or about that time, correct?
A. Um-hm.

Page 29

Q. Did you read any other documents relating to OCRWM or its programs at that time?
A. Relating to OCRWM, yes.
Q. Okay. And what were they?
A. The most recent total system life cycle cost report, final draft of the Mission Plan, most recent fee adequacy analysis report.
Q. Why did you read those documents?
A. Those are items under my responsibility.
Q. Do I understand it correctly that at the time you became the branch chief, a total systems life cycle cost report had already been prepared?
A. Yes.
Q. All right. I'm going to refer to that as a TSLCC report.
A. Much easier.
Q. Right -- certainly easier to say. And what was the -- you said, I believe you have testified that you had read the final draft of the Mission Plan.
Had a final Mission Plan been prepared at the time you became the branch chief?
A. No, it had not.

Page 66

(Milner Exhibit No. 4
was marked for
identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. Very vaguely. This would appear, judging by the date, to be an early draft.
Q. Early draft of a Mission Plan?
A. Yes.
Q. And is this a document that you read at or about the time you became an employee of OCRWM?
A. I don't believe I would have reviewed this draft.
Q. You would have reviewed another draft?
A. Subsequent draft.
Q. A later draft do you think? And why do you say that?
A. Only judging by the date; I'm assuming that drafts would have occurred between December '83 and April of '84.
Q. And why do you make that assumption?
A. Typically over that intervening period, the document would have been refined and

Page 67

further drafts produced.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. At the time you became an OCRWM employee, was it a goal of OCRWM to provide an acceptance rate in the first five years such that no utility would have to provide additional storage capacity after January 31, 1998?
A. I don't recall that being a goal.
Q. Could I direct your attention to page 2-1 of the document under the heading program strategy?
A. Oh, 2-1.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Do you see the last two sentences of the first paragraph on page 2-1?
A. Yes.
Q. It states in part the waste materials would be accepted in accordance with the waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?

Page 68

A. Um-hm.
Q. And you disagree that that was an intention of DOE at or about this time?
MR. SHULTIS: Objection. Mischaracterizes the prior testimony.
Calls for calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. I didn't mean to mischaracterize your testimony.
I understood it to be that you did not agree with that statement.
A. I did not recall that that was a goal at that time.
Q. Okay. Having read it, do you now recall that that was a goal?
A. I don't recall whether that language was in the final Mission Plan.
Q. Okay. Even if it wasn't, was that a goal of DOE at or about this time?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: I don't recall it.
BY MR. TOMASZCZUK:
Q. The text of this paragraph goes on to

Page 69

state subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.
At or about this time, did DOE intend that the acceptance rate would be equal to or greater than the actual discharge rate of spent fuel each year?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Also Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I didn't recall that.
BY MR. TOMASZCZUK:
Q. The next page of this document, 2-2, under the heading waste acceptance schedule, and this paragraph states that the department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear waste that the program will accept beginning in 1998.
This schedule is presented in Table 2-1, and then turning to Table 2-1 whenever you're ready --
(The witness reviewed the document.)
BY MR. TOMASZCZUK:

Page 70

Q. Do you recall seeing this Table 2-1 before today?
A. I don't recall it, no.
Q. It shows under the column first repository acceptance, a spent nuclear fuel acceptance rate starting in 1998 of 1800 metric tons?
A. Correct.
Q. And maintaining at that 1800 metric ton rate for five years, correct?
A. Correct.
Q. And then ramping up to 3,000 metric tons?
A. Correct.
Q. And then continuing at a steady-state rate of 3,000 metric tons for roughly 20 years I think?
A. Correct.
Q. And does that column accurately reflect DOE's intentions at this time with respect to spent nuclear fuel acceptance rate commencing in 1998?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Also Mr. Milner is not a 30(b)(6)

Page 71

witness.
MR. TOMASZCZUK: I don't want my silence to be construed as acquiescence in the notion that I can't ask him these questions because he is not a 30(b)(6) witness.
I don't know what --
MR. SHULTIS: You're asking about DOE's intention or position.
Mr. Milner has not been designated as a witness who is qualified to speak to DOE's position.
MR. TOMASZCZUK: Oh, I understand that Mr. Milner has been at OCRWM for 18 years and is the Chief Operating Officer, and if he is not qualified to answer these questions, I don't know who would be, but in any event, your objection is noted for the record.
MR. SHULTIS: The people we designated for those responses is qualified, but you can answer.
THE WITNESS: At the point this draft was prepared, December of 1983, I was not with the program.
I don't know what the department's intent was.

Page 72

BY MR. TOMASZCZUK:
Q. Did you have any understanding about the data reflected on this table at or about the time you read it?
MR. SHULTIS: Same objections.
THE WITNESS: I don't understand the question.
BY MR. TOMASZCZUK:
Q. Did you have any understanding as to what information was being conveyed by the data on this table at or about the time you became an OCRWM employee and looked at this document?
MR. SHULTIS: The same objections -- asked and answered.
The document speaks for itself.
THE WITNESS: I don't recall seeing this specific table.
I can look at it now and see what's on it.
BY MR. TOMASZCZUK:
Q. Okay. This table goes on to, under the column remaining backlog MTU, do you see that?
A. Yes.
Q. In the right-hand side? It shows a

Page 73

pre-1998 backlog of 40,809 metric tons?
A. Yes.
Q. Correct? And that number basically decreases over time, and the table shows a backlog as of 2020 of 23,775 metric tons, right?
A. Correct.
Q. Showing that the backlog is being reduced over time?
A. Correct.
Q. And was that a fair statement of DOE's intentions at or about this time, to work off the backlog of spent nuclear fuel that utilities were storing?
MR. SHULTIS: Objection. Calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, at this specific point in time, I don't know what the department's intent was.
At the point I joined the program, my understanding of the intent was to work off the backlog.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Milner, I'm going

speculation, and compound.
THE WITNESS: I have personal opinions in some regards.
BY MR. TOMASZCZUK:
Q. Okay. And I'm anxious to hear about those.
Would you tell me what your personal opinions in that area are?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Well, one opinion is that in some areas, I do believe it is incomplete.
One example would be that the contract doesn't clearly define how you would deal with non-standard fuel.
It doesn't clearly define how you deal with non-fuel bearing components of the fuel assembly.
BY MR. TOMASZCZUK:
Q. Any other opinions that fall within these four areas?
MS. HERRMANN: Objection -- vague.
THE WITNESS: No.
(There was a pause in the proceedings.)



MR. TOMASZCZUK: Ms. Reporter, would you mark as Milner Exhibit 11 another document entitled briefing for OCRWM Executive Committee dated November 1986, disposal contract and Annual Capacity Report?
(Milner Exhibit No. 11 was marked for identification.)
MS. HERRMANN: Do we get one?
MR. TOMASZCZUK: Oh, I'm sorry -- absolutely.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today, Mr. Milner?
A. Not that I recall, no.
Q. Did you participate in any briefing of the OCRWM Executive Committee in November of 1986 concerning the disposal contract and Annual Capacity Report?
A. Not that I recall.
Q. Can I direct your attention to Bates page number PNL-102-1182?
And this appears to be a listing of bullet points relating to the purpose and background for the Annual Capacity Report?



A. To my understanding, yeah.
Q. Was it your understanding that the ACR was intended to lead to contractually binding waste acceptance commitments starting in 1992?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My recollection is not so much the timeframe, but yes, they would lead to a binding commitment.
BY MR. TOMASZCZUK:
Q. At the time the ACR was issued, was it binding?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My personal opinion was that no, it was not.
As indicated here, it was for planning purposes.
BY MR. TOMASZCZUK:
Q. But the ACR issued for planning purposes in your understanding would lead to a mutually binding commitment on the parties?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That would have been my



understanding.
BY MR. TOMASZCZUK:
Q. And is your understanding today?
A. Yes.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Let's mark as Milner Exhibit 12 the Annual Capacity Report dated June 1987.
(Milner Exhibit No. 12 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Actually, Mr. Milner, before I ask you about that, I had a couple of questions on the OCRWM Executive Committee I forgot to ask you about.
Were there any minutes of the meetings of that committee do you know?
MS. HERRMANN: Objection -- foundation, speculation.
THE WITNESS: None that I can recall.
I simply don't know on that one actually.
BY MR. TOMASZCZUK:
Q. Do you know insofar as the meetings

Page 138

Amendment itself is referred to underneath Table 2.1 here, right?
A. Correct.
Q. And it appears to be a, the June 1987 Mission Plan Amendment?
A. Correct.
Q. And that's a document that you worked on?
A. I believe I did, yes.
Q. And that is the source for the acceptance rates that are reflected on this Table 2.1?
A. Yes. That's what is indicated here.
Q. And this table shows a, an initial rate of 1200 metric tons in 1998?
A. Yes, it does.
Q. And then ramping up in the fifth year or sixth year, correct me, to 2,000 metric tons?
A. Correct.
Q. And then increasing to 2,650 metric tons thereafter?
A. Correct.
Q. Do you know how those rates were derived?
A. No, I don't.

Page 139

Q. Do you know on what they're based?
A. No, I don't.
Q. Who would know?
A. I don't know.
Q. Is there any basis for them?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I don't know what they're based on.
I don't know.
BY MR. TOMASZCZUK:
Q. Do you know what a utility was to do with this information when it received it from DOE in or about June of 1987?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I think the purpose was to provide some information for planning purposes.
BY MR. TOMASZCZUK:
Q. Now the rates were not binding on DOE, is that right?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That would be my understanding.

Page 140

BY MR. TOMASZCZUK:
Q. Were they binding on the purchasers?
MS. HERRMANN: Same objection.
THE WITNESS: I'm not sure I understand that question.
BY MR. TOMASZCZUK:
Q. You understand my question that they were not binding on DOE, but you don't understand my question, which is the same question, as to whether or not they were binding on the purchasers?
A. That's correct.
MS. HERRMANN: Objection -- vague.
BY MR. TOMASZCZUK:
Q. What about it don't you understand?
A. I don't know how a receipt rate would be binding on a utility since this is an aggregate rate.
Q. Would the receipt rate be binding in the aggregate on nuclear utilities?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I don't believe it would.
(There was a pause in the

Page 141

proceedings.)
BY MR. TOMASZCZUK:
Q. Do you know a gentleman by the name of Christopher Jedrey?
A. Yes.
Q. And who is Mr. Jedrey?
A. I believe he was in DOE's procurement office some time ago.
The name is familiar. I don't specifically recall.
Q. Did you ever have occasion to work with him?
A. I believe I did.
Q. On what matters did you work with Mr. Jedrey?
A. The name is familiar. I don't specifically recall what his capacity was, so I don't know matters I worked with him on.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Let's mark as Milner 13 a letter dated April 28, 1987, to Mr. Christopher Jedrey, contracting officer, U.S. Department of Energy, from S.P. Kraft, director of an organization called UNWMG -- Utility

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 198

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK .
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Page 199

Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 200

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 201

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1609

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 230

A. That's correct.
Q. And can you explain to me your understanding of Table A-3?
A. Table A-3 I guess differs from Table A-1 in that it has assumes a two repository system versus a one repository system.
Q. Here again, it appears that the table in the aggregate reflects for the systems referenced on it a ramp-up period getting to 3,000 metric tons and then staying at 3,000 metric tons as a steady-state acceptance rate figure for a number of years, correct?
A. That's correct.
Q. What about Table A-4?
A. I guess same assumptions as Table A-3 except consolidated fuel.
Q. All right. And here again, the table appears to indicate a ramp-up period, then the spent nuclear fuel acceptance rate of 3,000 metric tons per year for a number of years?
A. That's correct.
Q. And then that brings us to Table A-5. Can you explain to me your understanding of this table?
A. Table A-5 I guess is similar to Table

Page 231

A-4 except that it utilizes EIA upper reference case projections for spent fuel discharge.
Q. Okay. And can you explain to me the difference between the upper reference case and the no new orders case?
A. Well, in very general terms, the upper reference case would have assumed that there are new reactors ordered and on line from that point some time in the future, but I don't recall numbers.
Q. And this table also shows a ramp-up to a 3,000 though metric ton, right, and that maintaining at a steady-state figure for a number of years, right?
A. Correct.
Q. Mr. Milner, did you prepare these tables?
A. No, I did not.
Q. Do you know who did?
A. No, I don't.
Q. Do these tables accurately reflect DOE's intentions at the time with respect to spent nuclear fuel waste acceptance schedules?
MR. SHULTIS: Objection. Calls for a legal conclusion.

Page 232

Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, again, given that they are assumptions for different cases, depending on which case was assumed, yes, it would have reflected DOE's goal.
BY MR. TOMASZCZUK:
Q. At or about this point in time, May 1989, are you aware of any documents published by DOE which would have indicated a design rate other than 3,000 metric tons for the steady-state operation?
A. No, not that I can recall.
Q. And would I be fair in assuming that if there were such documents, you would be aware of them?
A. I certainly would have hoped so.
MR. TOMASZCZUK: This could be off the record.
(A discussion was held off the record.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, I would now like you to get in front of you Exhibit 20, which was the last exhibit that we marked yesterday, but we adjourned and I didn't ask you any questions

Page 233

about it.
And this was the November 1989 report to Congress on reassessment of the Civilian Radioactive Waste Management Program.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this report?
A. Yes, I am.
Q. Did you prepare it?
A. I did not.
Q. Did you prepare any portions of it?
A. No, I did not prepare any portions of it.
Q. Okay. Do you know why the report was prepared?
A. I do. Actually it indicated in here the report, well, appropriations for that year I guess.
Appropriations Act for 1990 I believe directed us to submit this report.
Q. The report indicates that Congress asked for this I gather because of its concerns about endemic schedule slips, problems in management structure, and lack of integrated

Page 298

BY MR. TOMASZCZUK:
Q. Is it possible that they would constitute GTCC from a technical standpoint?
A. It's possible.
MS. HERRMANN: Objection. Calls for a legal conclusion, speculation.
BY MR. TOMASZCZUK:
Q. Could I ask you to look at page 2 of your letter?
At the top of this page, there is the phrase as we proceed with final cask design, then you go on to request assistance from Mr. Zabransky in developing and implementing a plan to obtain data.
Was OCRWM at this point in the process of final cask design?
A. Yes, that's correct.
Q. Did that task get completed?
A. In one instance, it did, yes.
Q. And what instance is that?
A. There were essentially three cask designs that were being worked on.
Two of the designs were for a truck cask, and one was for PWR assemblies. One was for BWR assemblies, and at that point in time,

Page 299

another was rail cask.
My recollection was that as a result of these discussions indicated here, we dropped the rail cask design, and I believe, I can't recall for certain whether the department actually completed the final design or whether the contractor completed the design on their own because at some point in time, one of the appropriations acts, the Congress basically directed us to cease cask design work.
Q. Is cask design work ongoing today at OCRWM?
A. No, it's not.
Q. It's being held in abeyance for some reason?
A. It's not being accomplished. Congress directed us to stop cask design activity.
Q. Okay.
A. And we did, have continued to stop it.
Q. Do you know why Congress made that direction?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: I have no idea.
BY MR. TOMASZCZUK:

Page 300

Q. Would these assemblies with channels that you described in your testimony a few moments ago constitute non-fuel components at that time as used in the contract?
A. Yes.
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: They would, in my opinion.
MR. TOMASZCZUK: Let's mark as Milner Exhibit 37 a memorandum dated April 15th, 1991, signed by Mr. Milner concerning approval for issuance of a comment draft of the annual Acceptance Priority Ranking.
(Milner Exhibit No. 37 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recognize this document, Mr. Milner?
A. Offhand, I do not, no.
Q. That's your signature that appears at the second page of it, right?
A. That's correct.
Q. Is that also your handwriting that

Page 301

appears on this second page next to the third paragraph and in the third paragraph?
A. It does not appear to be my handwriting, no.
Q. You understand what I'm asking you about?
A. Yes.
Q. The marginalia there?
A. Yes.
Q. Turning back to the discussion set forth in the memo at the first page, second paragraph starts off by saying publication of the APR begins the contractually binding waste acceptance process system.
Is that a true statement in your view?
A. In my view, yes.
MS. HERRMANN: Objection. Calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. The next sentence says the ACR will be used in conjunction with waste acceptance rates to be published in the 1991 Annual Capacity Report as the basis for purchasers to submit Delivery Commitment Schedules beginning in January 1992 for the department's approval.

Page 302

Do you know who made the decision to use the 1991 ACR as the basis for purchasers to submit Delivery Commitment Schedules?
A. No, I don't.
Q. Did you make that decision?
MS. HERRMANN: Objection -- asked and answered.
BY MR. TOMASZCZUK:
Q. Did I just ask you that question? I'm sorry if I did.
I thought I asked you if you knew who did, but maybe I misspoke.
Do you know who made the decision to use the 1991 ACRs as the basis for purchasers to submit Delivery Commitment Schedules?
A. No, I don't.
Q. Would Mr. Brownstein have made that decision, or would that have been somebody higher up in the chain than him?
MS. HERRMANN: Objection -- asked and answered.
He told you he doesn't know.
MR. TOMASZCZUK: I asked him a different question.
THE WITNESS: I don't know who would

Page 303

have made the decision.
Could have been Mr. Brownstein. Could have been the director of the program. Could have been the deputy director of the program.
BY MR. TOMASZCZUK:
Q. You have absolutely no recollection?
A. I have no recollection.
Q. Could it have been a contractor?
A. No, sir.
MS. HERRMANN: Asked and answered.
BY MR. TOMASZCZUK:
Q. It would have had to have been somebody within DOE?
A. That's correct.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. The last sentence of that paragraph says in turn, purchasers will have the opportunity to exchange approved DCSs also subject to departmental approval.
Was that an accurate statement of the department's position at the time with respect to the exchange of DCSs?
MS. HERRMANN: Objection -- foundation.

Page 304

Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: In my opinion, that was an accurate statement.
BY MR. TOMASZCZUK:
Q. The next paragraph states in part it is of utmost importance that the information on which the APR is based is accurate and not subject to continual modification.
Why was that of the utmost importance?
A. Well, since the APR played a role in the, an important role in the binding waste acceptance process, if the information that, upon which that was based was not accurate, the APR would not be accurate, the process would not be accurate.
MR. TOMASZCZUK: Want to take a break?
MS. HERRMANN: Sure.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, on Exhibit 37, there is a reference in the first page in the second paragraph to a contractually binding waste acceptance process.
Do you see that?

Page 305

A. Yes.
Q. What is your understanding of that term?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My own understanding of it is that begin the process using priority ranking, capacity reporting.
Ultimately utilities would submit and have approved a Delivery Commitment Schedule which would have been the binding agreement.
BY MR. TOMASZCZUK:
Q. Binding on both the government and the utility?
A. Correct.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. And that understanding that you just articulated is based on your review of the contract, or some other source of information?
A. It would have originally stemmed from my review of the contract, yes.
Q. And have you discussed that view with others at OCRWM?
A. I can't specifically recall, but yes,

Page 306

I'm sure I did.
Q. Do you recall the details of any such discussions?
A. No. No, I don't.
MR. TOMASZCZUK: Ms. Reporter, I would like to mark as Exhibit 38 a memorandum from W.A. Lemeshewsky dated August 14th, 1991.
Subject is coordination of system through-put rate study.
And then let's also mark at this time as Milner Exhibit 39, a memorandum dated August 30, 1991, by Ronald A. Milner; subject, comments on scenarios for system through-put rate study.
(Milner Exhibits Nos. 38 & 39 were marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall either of these two documents?
A. No, I don't.
Q. It appears to me that some time between April and August of 1991, you left the position of acting associate director for storage and transportation and became the associate director for storage and

Page 307

transportation?
A. I guess that's true. That sounds like the right timeframe.
Q. All right. At or about this time, were you still working on the MRS team?
A. No.
Q. You had stopped working on the MRS team?
A. That's correct.
Q. As of August 1991?
A. That's correct.
Q. How do you know that?
A. In essence, when, I believe even when I became acting associate director, the MRS team was essentially disbanded, embodied in the storage and transportation group.
Q. Do you know when you became acting director or acting associate director I should say?
A. I don't recall specifically.
Q. All right.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. The second paragraph or second

Page 308

sentence of your memo dated August 30, 1991, says in pertinent part, "In addition, we have a more general concern that some of the scenarios proposed, while potentially interesting to study, are significantly at odds with current program assumptions, and if taken out of context could be interpreted as evidence of changes in program positions."
And my question, Mr. Milner, is what does that mean?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: Well, I don't recall specifically, but reading further, it appears that some of the scenarios they were studying had a repository start date of much later than 2010.
BY MR. TOMASZCZUK:
Q. And that caused you concern because such positions would be at odds with the then current program assumptions?
A. Yes.
Q. The end of this first paragraph, you state scenarios which suggest removal of the statutory limits on MRS or repository capacity

Page 309

should also be approached with caution.
Why did you say that?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: Well, the best of my recollection, I believe at that point in time, we were discussing probably several different entities, possibility of one of them volunteering to host the MRS facility, and things such as the statutory limits, the capacity of an MRS were thrown out as items for negotiation, so I would have felt that that was not appropriate to automatically assume that that capacity would be raised.
BY MR. TOMASZCZUK:
Q. Were you concerned that it might adversely affect sensitive negotiations which were then ongoing?
A. Yes.
Q. The memo then goes on to state we would also suggest a more careful look at the issue of the ramp-up rates to be used at the MRS facility as that is the near-term driver for our system requirements.
What ramp-up rates were you suggesting



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 314

should work off the same assumptions.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 40 a memorandum dated December 20, 1991, authored by Mr. Milner?
And it's an action memorandum approval for publication of the 1991 ACR.
(Milner Exhibit No. 40 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this memorandum, Mr. Milner?
A. I don't specifically, no.
Q. Did you prepare it?
A. It's unlikely that I would have prepared it.
Q. Somebody prepared it for you and you viewed it and approved it?
A. That's correct.
Q. Do you know who prepared it?
A. No, I don't.
Q. As of this point in time, December 20, 1991, did you still believe that a MRS facility

Page 315

could be cited?
A. Yes, I did.
Q. Was the MRS team still working at this time?
A. I don't believe it was, no.
Q. Who was working on siting an MRS at this point?
A. My organization.
Q. And when you say your organization, you mean the Office of Storage and Transportation?
A. That's correct.
Q. I may have misunderstood, but -- and if I did, correct me -- I thought I heard you say yesterday that when the MRS team was disbanded, that that effectively ended DOE's plans to site an MRS.
Did I misunderstand that?
MS. HERRMANN: Objection to the extent that it mischaracterizes prior testimony.
BY MR. TOMASZCZUK:
Q. I don't want to mischaracterize what you said.
I want to understand it correctly.
A. If, if I said or alluded to that, I

Page 316

was in error.
The MRS team was disbanded I guess essentially at the time that I became the acting associate director for storage and transportation.
I don't recall specifically. That may have been incident to organizational change, but nonetheless, the Storage and Transportation Office subsumed the duties of the MRS team, and volunteer MRS siting effort continued at that time.
Q. And that effort was ongoing as of December 20, 1991?
A. I believe it was, yes.
Q. Who in your office was working on that issue?
A. I believe Victor Trebules was, Jeffrey Williams.
Offhand I don't recall the rest of the employees there.
Q. Were you working that issue as well?
A. I was.
Q. How much of your time were you spending on DOE's efforts to site an MRS?
MS. HERRMANN: Objection -- vague.

Page 317

THE WITNESS: I would have to estimate 40 to 30 -- 30 to 40 percent of my time.
BY MR. TOMASZCZUK:
Q. And that level of activity continued until when?
A. Probably some time later, until 1992 perhaps.
I don't recall precisely -- approximately six months after the administration changed.
Q. When you say the administration changed, you're referring to a Presidential election?
A. Correct.
Q. So six months after a November election roughly?
A. Roughly six months after a January swearing in.
Q. Okay.
A. But very approximate.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. In this memo, under the heading discussion, the last sentence of the first

Page 318

paragraph states the ACR applies a waste acceptance rate to the APR resulting in individual allocations to the contract holders of FWMS capacity.

Do you know who made the decision to utilize the ACR, in this instance, the 1991 ACR, to apply a waste acceptance rate to the APR?

A. I don't know that there was an individual that made that decision.

It was the process basically. The ACR was simply an annual capacity of the system's acceptance, an estimate without regard to which utilities were first, second and so forth, and how much was the first utility going to deliver and so forth, so as this indicates, the capacities listed in the ACR were applied to the priority ranking in the APR.

The result was that you had a priority listing by utility and by fuel quantity in the different years what the estimated acceptance rate would be.

Q. The memo goes on to state at the bottom of the page, the last paragraph, the 1991 ACR differs from the previously published ACRs for two reasons. First, while the information

Page 319

in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules by the contract holders.

Do you know who made the decision to use the allocations in the 1991 ACR as the basis for submission of DCSs by the contract holders?

A. No, I don't.

Q. Do you know whether that decision was authorized by or set forth in the standard contract itself?

MS. HERRMANN: Objection. Calls for a legal conclusion.

Standard contract is the best evidence of its contents.

THE WITNESS: I'm fairly certain that the standard contract doesn't specify a 1991 ACR.

BY MR. TOMASZCZUK:

Q. Does it specify using the allocations in any ACR as the basis for submission of DCSs do you know?

MS. HERRMANN: Same objections.

THE WITNESS: Best of my recollection,

Page 320

it does.

BY MR. TOMASZCZUK:

Q. It does?

A. It does.

Q. Could you identify for me where in the contract you find that language or direction?

A. I could try.

Q. Thank you.

MS. HERRMANN: Could you give him an exhibit number?

MR. TOMASZCZUK: I can -- No. 3, Milner deposition Exhibit No. 3.

(The witness reviewed the document.)

MS. HERRMANN: While he's looking, let me just object again it calls for a legal conclusion, and best evidence.

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

Q. If it helps you at all, Mr. Milner, Delivery Commitment Schedules are addressed in Article V. Maybe that's where you're looking, but --

A. Yes, that's where I'm looking.

(The witness reviewed the document.)

THE WITNESS: And I do not see ACRs

Page 321

referenced there.

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

Q. Have you finished your answer, Mr. Milner, or do you want more time?

A. Another minute.

Q. Sure.

(The witness reviewed the document.)

MS. HERRMANN: Could we have the question read back just so that I'm clear?

THE REPORTER: Question: "Could you identify for me where in the contract you find that language or direction?"

MS. HERRMANN: If it speeds things up at all, could I refer him to another section?

MR. TOMASZCZUK: Sure.

MS. HERRMANN: Or are we just hunting? Do you want him to hunt?

MR. TOMASZCZUK: No, I don't want him to hunt.

MS. HERRMANN: Okay -- right before Article V.

THE WITNESS: Yes. Actually I was just reading that paragraph 5.

Yes, it references both the ACR and

Page 322

the APR.
BY MR. TOMASZCZUK:
Q. I'm sorry. Where are you referring to now?
A. Immediately above Article V; it's labeled paragraphs 5A and B.
Q. Um-hm. Has a reference to the APR and the ACR?
A. Correct.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. But no tie-in between the DCS and the ACR, right?
MS. HERRMANN: Same objection.
THE WITNESS: The Article V, paragraph B doesn't specifically reference the ACR.
However, the APR might be very useful since it contains no quantities.
BY MR. TOMASZCZUK:
Q. The last sentence on this page states these DCSs which will provide planning information for waste acceptance activities may be submitted to the department as early as January 1, 1992.
Were the DCSs to be contractually

Page 323

binding, or were they for planning purposes?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I'm not actually certain.
BY MR. TOMASZCZUK:
Q. You don't know?
A. I don't know.
Q. Turning the page to reference at the top of this page to the upper and lower bounding waste acceptance rates that we saw in the 1990 ACR, and then the memo goes on to state, quote, 'although no annual acceptance rate has been baselined, and let me just stop you there, or let me stop myself there.
What do you mean by baselined as that term is used here?
A. Finally approved.
Q. The memo goes on to state the 1991 ACR uses a single acceptance rate that is very similar to the lower bounding rate in the 1990 ACR. While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for at-reactor out-of-pool storage starting in 1998.

Page 324

What did you mean by using the term theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998?
A. One of the goals at that point in time, assuming an MRS began operating in 1998, that we would at least accept waste at a rate sufficient to keep a utility from having to build additional dry storage.
Theoretically it refers to all of that as based on projections of spent fuel discharge.
Q. Does theoretically as used here mean mathematically?
A. My understanding of the way it's used here is that theoretically being based on projections of spent fuel discharge was not an exactly calculated number because it's a projection.
Q. Were you familiar with those projected discharge rates?
A. At the time, I would have been, yes.
Q. But you're not familiar with them now?
A. I can't recall what they were at that time, no.
I can't recall what they are right

Page 325

now.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 41 the 1991 -- give me just a minute. I want the 1991 ACR, but I will need a moment.
THE WITNESS: Okay.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: While we're waiting, why don't we go ahead and use the 1991 and have marked the 1991 APR.
This should be marked as Milner 41.
(Milner Exhibit No. 41 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with what has been marked as Milner deposition Exhibit 41, the 1991 APR?
A. In general terms, yes.
Q. Was your office responsible for preparing and issuing this?
A. I believe it was.
Q. And what was the purpose of this document?

Page 326

MS. HERRMANN: Objection -- vague.
THE WITNESS: It was essentially to inform the utilities, inform the utilities of --
BY MR. TOMASZCZUK:
Q. Thank you.
A. Determination as to who would be first, second, third, what the queue would be.
Q. And the discharge data that you were at one time familiar with is contained in this document?
A. These are the actual discharges, yes.
Q. As opposed to projected discharges?
A. Correct.
Q. And how were the projected discharge, how was the projected discharge information compiled by OCRWM or DOE?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: It was compiled from data provided on a form called RW-859 provided by the utilities, individual utilities.
BY MR. TOMASZCZUK:
Q. And on that form, utilities were asked to project their discharge information into the future?

Page 327

A. Yes. They were requested to project discharges.
They were also requested to provide information, actual discharges.
Q. So when you stated in your memo Milner Exhibit 40 that the rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998, you were referring to a, an assessment of all the projected discharges for 1998?
A. Well, actually the projected discharges from 1998 and beyond.
Q. And it was, was it simply a, a matter of adding the projected discharges for each year based on the RW-859 forms and then seeing what that totaled?
A. Correct.
Q. And do you recall what the projected discharge information for 1998 was?
A. No, I don't.
MR. TOMASZCZUK: I have now the 1991 ACRs. It's amazing.
Can we mark it as Exhibit 42?
(Milner Exhibit No. 42

Page 328

was marked for identification.)
BY MR. TOMASZCZUK:
Q. Can I direct your attention, Mr. Milner, to page 5 of this document?
This table is the single acceptance rate that's referenced in your memo Milner Exhibit 40?
A. I believe it is.
Q. And do you know who compiled this rate?
A. Specifically, I don't know who, no.
Q. Can you explain for me what the number 400 SNF for 1998 represents as regards your statement in the memo that the rates selected was theoretically sufficient to eliminate the need for additional at-reactor out-of-pool storage?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I would assume that the projection of fuel discharges versus what could be stored in the pool versus what would have had to have been put into dry storage, the amount that would have had to go, projected to be placed in dry storage was less than 400 MTUs.

Page 329

MR. TOMASZCZUK: I'm sorry. Could you read that back?
THE REPORTER: Answer: "I would assume that the projection of fuel discharges versus what could be stored in the pool versus what would have had to have been put into dry storage, the amount that would have had to go, projected to be placed in dry storage was less than 400 MTUs."
BY MR. TOMASZCZUK:
Q. I'm not sure I understood your answer, so let me ask some follow-up.
Are you saying that the 400 figure represents the amount, the amount of spent nuclear fuel considering all the nuclear industry that would have had to have been placed in dry storage in fiscal or in Year 1998?
A. The number would have had to have been less than the 400, yes.
Q. 399 or less?
A. Or less, yes.
Q. So this Table 2.1 assumes that utilities would have been placing fuel in their spent fuel pools, correct?
A. That's correct.

Shelor's office that prepared it?

A. I believe so.

Q. Now at some point in time, you came back to that office, that is, the Office of Waste Acceptance, Storage and Transportation, is that right?

A. That's correct.

Q. ..But that would have been after this APR/ACR was published?

A. I believe it was.

Q. Notwithstanding the fact that your office didn't publish this, did you have occasion to review this and sign off on it before it was published?

A. I don't recall specifically, but it's likely that I would have concurred in it.

Q. Can I ask you to look at page 1 of the document? And the second paragraph is what I'm going to ask you a few questions about.

There is a reference to the APR and the ACR?

A. Um-hm.

Q. And then there is a sentence in the middle of the paragraph which states the ACR applies projected nominal acceptance rates for



the system to the priority ranking and the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium.

Do you have an understanding of what is meant by the phrase nominal acceptance rates in that sentence.

A. No. I don't know.

Q. Did you have any discussions with any OCRWM employees concerning what was meant by that phrase nominal acceptance rates?

A. Not that I recall.

Q. The last sentence of this paragraph states as specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers, right?

That's what it says?

A. That's correct.

Q. Did I understand your testimony earlier, Mr. Milner, to be that the DCSs represented a binding commitment of the parties?

A. That was my opinion, yes.

Q. And the DCSs as indicated by this paragraph, are based on the capacity allocations



as listed in the ACR, right?

A. Correct.

Q. Can you explain to me how it is that if the ACRs which form the basis for the DCSs are not binding, that the DCSs are binding?

MR. SHULTIS: Objection. Calls for a legal opinion.

THE WITNESS: The DCSs were submitted by the utilities to the department based upon the information in the ACR, the allocations.

Then the department would either approve or disapprove those, and if approved, then in my opinion, that became a binding agreement.

A utility could certainly choose to submit a DCS which reflected lower amounts than were contained in the ACR.

BY MR. TOMASZCZUK:

Q. Is there any reason of which you're aware why a utility would do that?

A. None that I know of.

Q. Wouldn't it be in the utility's interest to try and put as much fuel as they could in the DCS to get that fuel moved off site?



MR. SHULTIS: Calls for speculation.

THE WITNESS: If I were a utility fuel manager, I would have.

BY MR. TOMASZCZUK:

Q. Can I ask you to look back at the DCS instructions?

We looked at those this afternoon -- 43.

And in particular, I was going to ask you to look at, Mr. Milner, paragraph 7C.

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

Q. And this paragraph reflects in the first sentence that the rates in the ACR provide an approximation and are for planning purposes, right?

A. Correct.

Q. And then the next sentence, there is an assumption stated that the waste management system will begin acceptance of spent nuclear fuel in 1998, correct?

A. Correct.

Q. And then there is this third sentence in the event that such circumstances change, all DCSs previously approved by DOE may need to be

Page 394

re-evaluated by DOE and the purchasers.
What was meant by that?
MR. SHULTIS: Objection. Calls for speculation.
THE WITNESS: Well, the program and the department position had always been that acceptance of spent fuel was conditioned upon having the facility available to accept it, and if those conditions changed, DCSs would have to be re-evaluated in terms of start of acceptance.
BY MR. TOMASZCZUK:
Q. So if circumstances changed, the DCSs wouldn't be binding?
MR. SHULTIS: Objection. Calls for a legal conclusion.
THE WITNESS: If there was no facility available to accept the fuel in 1998, which ultimately there was not, then yes, they would have to be re-evaluated.
BY MR. TOMASZCZUK:
Q. Do you know whether the Delivery Commitment Schedules once approved were subject to adjustment plus or minus 20 percent in final delivery schedules?
A. I don't recall that. I simply don't

Page 395

know.
Q. Does that sound correct or incorrect to you?
A. I have no recollection of a 20 percent.
BY MR. TOMASZCZUK:
Q. Are you looking at the contract?
A. Yes, I am.
Q. If you would direct your attention to Article V.B.2?
A. Okay -- 20 percent.
Q. It seems to indicate that the quantities of spent nuclear fuel and high-level waste can be adjusted plus or minus 20 percent, right?
A. That does say that, yes.
Q. So the DCSs could change if circumstances changed, right?
A. That's correct.
Q. And they, and the amounts of fuel in the DCSs could be adjusted plus or minus 20 percent per the contract?
MR. SHULTIS: Objection. Calls for a legal conclusion unless you're just asking him to read the contract.

Page 396

BY MR. TOMASZCZUK:
Q. I'll delete the reference to the contract in my question.
The DCS spent nuclear fuel information could be adjusted plus or minus 20 percent, right.
A. This is what I read in the contract, that's correct.
Q. Fine. Mr. Milner, were you surprised to see that reference in the contract?
A. That I did not recall it, yes.
Q. Does it change your view about the binding commitment reflected in the DCS?
MR. SHULTIS: Objection. Calls for a legal conclusion.
THE WITNESS: I guess in my interpretation of a commitment, not necessarily.
I think my interpretation of the delivery commitment was that it was a best estimate, good-faith commitment on the quantity and timing, and as I read this, neither the department nor the purchaser -- well, okay -- just the purchaser can adjust it up or down, so it's his option.
I guess I would interpret that to mean

Page 397

it's less binding on the utility than it was on the department.
BY MR. TOMASZCZUK:
Q. There is a discussion, Mr. Milner, at the second page of the '95 APR and ACR which I want to direct your attention to.
And in particular, ask you to look at the paragraph that begins at the bottom of page 2, and it would appear to suggest that there was a delay in issuing the '93 ACR and APR, right?
A. Apparently so.
Q. And were you, do you have any knowledge as to why that '93 ACR and APR was delayed?
A. No, I don't.
Q. But in any event, the text goes on to indicate that that information was, is combined with this '95 APR/ACR, right?
A. That's correct.
Q. And it goes on to state that the department has decided to, in the interests of easing its administrative burdens, it has decided to issue a consolidated APR/ACR report for '94 and subsequent years?
A. Correct.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) :
NORTHERN STATES POWER COMPANY :
(98-484C) :
DUKE POWER, A Division of DUKE :
ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al., (98-614C) :
COMMONWEALTH EDISON COMPANY :
(98-621C) :
BOSTON EDISON COMPANY :
(99-447C) :
GPU NUCLEAR, INCORPORATED :
(00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, :
(00-697C) :
POWER AUTHORITY OF THE STATE OF :
NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) :
Plaintiffs, :
v. :
UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

Page 404

Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9 15 a m , Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Page 405

APPEARANCES:
On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:
PETER SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D. C. 20005-3305
(202) 898-5821

Page 406

APPEARANCES (Continued):

On behalf of the Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D. C. 20005-2011
(202) 434-1690

On behalf of the Plaintiff Southern Nuclear Power:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of the Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 407

APPEARANCES (Continued):

On behalf of the Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C. 20530
(202) 305-7561

Page 416

Q. Again, any questions at all, please let me know. If you don't understand my question, please let me know. Is that fair?
A. That's fair.
Q. And if you disagree with any assumption in my question, please advise me.
A. Okay.
Q. If I could ask you to turn to Exhibit 3 to your deposition, that's the standard contract. Do you have it in front of you now?
A. I do.
Q. If I could ask you to turn to page 16593. If you'd look in the first column, the first full paragraph that begins, Article VI.B.3(b), do you see that?
A. I do.
Q. Could you read that paragraph?
A. Article VI.B --
Q. You don't need to read it out loud. You can just read it to yourself.
A. Okay.
Q. Are you familiar with this language?
A. Vaguely, yes.
Q. Do you think you've reviewed it in the past?

Page 417

A. Not this specific language. I have reviewed it after the contract was final, after the registered notice was final.
Q. You're familiar with the concept of the Department having the right to grant priority to shut down reactors?
MR. SHULTIS: Objection as to characterization.
THE WITNESS: I'm familiar with that, yes.
BY MR. NESLIN:
Q. It states here that, in the second sentence, this type of priority is necessary to prevent reactors from waiting 20 or 30 years to be commissioned -- decommissioned after they've finished generating electricity. Do you understand that DOE had a goal of avoiding reactors from experiencing such delays?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: My recollection was that the Department preferred not to prohibit giving priority to shutdown reactors.
BY MR. NESLIN:
Q. Well, this paragraph states that certain commenters had recommended that a provision allowing

Page 418

for such priority be deleted, that the Department had not accepted that recommendation because again it states that this type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity.
And, again, my question is, was avoiding that kind of delay a goal or objective of the Department?
MR. SHULTIS: Objection, same objection.
THE WITNESS: No, and again, my recollection of the situation is that the Department preferred not to preclude the ability to give some priority to shutdown reactors. But of course we are reading from the preamble to the rule and discussing how comments were addressed.
BY MR. NESLIN:
Q. That's correct. Did the Department have any interest in the timely decommissioning of shutdown reactors?
A. It did.
MR. SHULTIS: Same objection.
BY MR. NESLIN:
Q. That was an interest of the Department's?
A. It was an interest, yes.

Page 419

Q. The Department, would it be fair to say that the Department had an objective of allowing shutdown reactors to decommission in a timely manner?
MR. SHULTIS: Same objection.
THE WITNESS: Well, again, I think it was more a case that the Department preferred not to preclude that ability.
BY MR NESLIN:
Q. What do you mean by not preclude that ability?
A. The Department did not as I recall have an objective to give priority to shutdown reactors, it simply preferred not to preclude that ability in the future.
Q. My question isn't about asking granting priority, my question is simply did the Department have an objective of allowing shutdown reactors to decommission in a timely manner?
MR. SHULTIS: Same objection.
THE WITNESS: It did, yes.
BY MR. NESLIN:
Q. And would that remain an objective of the Department's today?
A. I believe so.
Q. If we could turn to page 16606, do you see

Page 432

submittal timing procedures and approval process.
Is that accurate?
MR. SHULTIS: Objection, go ahead. I'm sorry.
THE WITNESS: Well, I don't recall not having been directly involved in the issue resolution process. But certainly we believed that the clarification was necessary in the exchange process.
BY MR. NESLIN:
Q. And why was that?
A. You know, apparently we believed at the time that there were some areas that needed clarification, some ambiguities.
Q. Is that a recollection that you have or is that your inference from the material on this page?
A. Probably a little of both.
Q. Do you recall were there ambiguities or issues that the Department wished to clarify that are not listed on this page?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I don't recall.
BY MR. NESLIN:
Q. If you could turn to the next page, HQR0060154. I ask you to read lines 2 through 6.

Page 433

Mr. Milner, this indicates that under the contract, DCS's could be exchanged between different utilities?
MR. SHULTIS: Objection as to characterization.
THE WITNESS: In reading this I believe this was a proposed position, a draft position that our M&O had submitted. But my understanding is under the contract certainly utilities could exchange DCS's.
BY MR. NESLIN:
Q. And is it also your understanding that under the contract DSC's could be exchanged or modified within a utility?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I don't recall that in the contract.
BY MR. NESLIN:
Q. If I could ask you to turn back to Exhibit 3. Turn to page 16601, bottom of the third column. Article Roman V, E, Exchanges. The first sentence reads, "Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE."
Would that allow purchasers to exchange within a utility?

Page 434

MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I guess in my opinion I wouldn't view that as an exchange. My view had always been that a utility once it reached its place in the queue could ship whatever fuel it wanted to, not necessarily just the oldest fuel that it had. As long as it was older than five years.
BY MR. NESLIN:
Q. What if a utility has several generating stations and wished to shift the generating station?
MR. SHULTIS: Same objection. Calls for speculation.
THE WITNESS: My recollection was that it wasn't limited to a reactor site, that the utility had a right in the queue when it chose.
BY MR. NESLIN:
Q. If I could take you back to Exhibit 52, still on the same page.
A. Okay.
Q. Lines 29 through 32, there's a sentence that states DOE will evaluate the exchange request in accordance with the projected DOE transportation capabilities and the projected available civilian radioactive waste management systems acceptance

Page 435

capacity for the indicated delivery years.
Is that accurate in your opinion?
A. In my opinion, yes.
Q. The Department would evaluate an exchange request with reference to the systems transportation capabilities?
MR. SHULTIS: Objection, Mr. Milner is not 30(b)(6) witness.
THE WITNESS: In my opinion, yes.
BY MR. NESLIN:
Q. And the system's acceptance capacity for the year in question?
MR. SHULTIS: Same objection.
THE WITNESS: Correct.
BY MR. NESLIN:
Q. Do you recall discussing with others at the Department what criteria that the Department would use in reviewing exchange requests?
A. I don't recall any specific discussions, certainly there were issues that you would have to look at for an exchange request, and I think reading further on in this proposed position statement gives an indication of some of them. If one utility with an approved DCS was intending to ship 20-year-old fuel and an exchange request came through where



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 436

another utility was going to ship five-year-old fuel, that would certainly make a difference in our transportation abilities.
Q. And why is that?
A. Younger fuel, hotter fuel.
Q. So that would be a consideration that DOE would look at?
A. Correct.
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
BY MR. NESLIN:
Q. But the fact that the fuel might involve different ages wouldn't preclude an exchange from being proposed?
MR. SHULTIS: Same objection.
THE WITNESS: Well, in my opinion it wouldn't necessarily preclude it. In the example I gave it could certainly affect the quantity at any one time.
BY MR. NESLIN:
Q. And the fact that -- I didn't wish to cut you off?
A. Using a hypothetical case if the Department had one transport cask available at the time, an unlikely situation, and all of a sudden a

Page 437

change was made from 20-year-old to five-year-old fuel, that cask certainly would have the ability to carry less fuel at five years old than it would at 20.
Q. Let me ask it another way. If an exchange request would be consistent with the Department's transportation capabilities and acceptance capacity for the delivery year, is it your opinion that it should have been approved?
MR. SHULTIS: Objection, calls for speculation. Also Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, since we never did receive any change requests, I can't indicate, but in my opinion that would have been the case, yes, it should have been approved.
BY MR. NESLIN:
Q. If I could turn you to the next page, HQR-006-0155. You see there's a proposed contract revision which is set forth in lines 19 through 30. It's your recollection that the contract was never revised in this matter, was it?
MR. SHULTIS: Objection, calls for a legal opinion.
THE WITNESS: I don't recall that it had

Page 438

been revised, no.
BY MR. NESLIN:
Q. Do you recall the Department ever adopting a position statement on the DCS exchange process?
MR SHULTIS· Objection, Mr. Milner's not a 30(b)(6) witness.
THE WITNESS: I don't recall a position statement, no.
BY MR. NESLIN:
Q Do you recall any further work being done on this proposed position statement?
A. No, I don't recall.
Q Do you recall the Department taking other work on the exchange process?
A. Not that I can recall.
Q. Sitting here today, you can't recall any other analysis or assessment that the Department did of the exchange process under the contract?
MR. SHULTIS. Asked and answered.
THE WITNESS: Not offhand, no.
BY MR. NESLIN:
Q. If I could direct you to page HQR0060162. Mr. Milner, this is another proposed OCWRM position on issues 019, 021, and 024, nonfuel and structural components.

Page 439

Do you recall receiving or reviewing this in the past?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: No, I don't recall.
BY MR. NESLIN:
Q. Do you recall the Department ever taking any work relating to a position statement on nonfuel and structural components?
A. No, I don't.
Q. Do you recall the Department considering any amendments to the contract to address nonfuel or structural components?
MR. SHULTIS: Asked and answered.
THE WITNESS: Other than the indication in this document that it was under consideration, no, I don't recall specifically.
BY MR. NESLIN:
Q. Other than what's set forth in this document?
A. Correct.
Q. You have no recollection?
A. No, I don't.
Q. And reviewing this document doesn't refresh your memory?



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 440

A. No.
(Milner Exhibit No. 53 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, you've been handed what's Exhibit 53 to your deposition. This is a March 31st, 1994 letter from James Blandford to you. And an attachment consisting of a preliminary draft of a document captioned, DCS Exchange Network, Software Recommendation.
Are you familiar with this document?
A. I don't recall it specifically, no.
Q. Cover letter states that the attached report provides a recommendation for software on the DCS Exchange Network which will be a computer-based, menu-driven system providing information on approved Delivery Commitment Schedules for their use in assessing opportunities for DCS exchanges with other purchasers.
Do you recall the DOE or its contractors doing any work on a DCS exchange network?
A. What I recall is in general terms a program considering whether or not it should take an active role in encouraging exchanges or simply react to utility requests. And if it ultimately chose to

Page 441

take an active role, how might that be accomplished.
Q. Who at the Department was involved in that consideration?
A. Well, I guess it would have been myself, members of my staff, the director of the program.
Q. Who on your staff?
A. At this point in time, Alan Brownstein, I see two staff members, one name crossed out and the other one, I can't recall what point in time which one left or which one was there, but one of the two, either Nancy Slater or Mary Payton were staff members.
Q. Anyone else?
A. Not that I can recall offhand.
Q. During what period would the Department have been considering this question?
A. In March 31st, 1994.
Q. Do you, sitting here today do you recall over what period of time that consideration extended?
A. No, I don't.
Q. And did the Department reach a decision as to whether it should take an active role in encouraging exchanges or simply respond to utilities?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.

Page 442

THE WITNESS: I don't recall the Department ever actually taking a position. In essence it became a moot point because we never received a request.
BY MR. NESLIN:
Q. And is it your understanding that you never received a request in part because of the uncertainties that arose in the 1990s as to when a repository would become operational?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I have no such understanding.
BY MR. NESLIN:
Q. Do you believe that, is it your opinion that the uncertainties and delays associated with the start-up date for a repository had no effect on utilities' actions in deciding whether to submit exchange requests?
MR. SHULTIS: Same objection.
THE WITNESS: No, I don't have that opinion. I have no idea why none were submitted.
BY MR. NESLIN:
Q. In considering how the Department might take an active role, what sorts of actions did you

Page 443

consider?
A. I recall maintaining a list of approved DCS's and looking at that list versus utilities which we might be aware were running out of pool space which had a lower priority ranking than another which had sufficient pool space.
And, you know, the potential of in essence brokering something between the two utilities.
Q. And do you recall any consideration of developing a computerized system for providing information among utilities on approved DCSes?
A. I do now reading this.
Q. But you don't have any independent recollection beyond this document?
A. No, I don't.
Q. If I could turn you to the first page of the attached draft report. Do you know whether this report was ever finalized?
A. I don't recall whether it was or not. In any event this is a contractor report which would never relate to a position the Department took, simply input data to it.
Q You say it would never relate to a position?
A. It would never reflect, I'm sorry; not

Page 444

relate, it would never reflect the Department's position, it would simply input data to it.
Q. The Department would have to subsequently take a separate position which might or might not approve or reflect what the contractor recommended?
A. The Department would take a position based on information from a number of sources including its contractor's input.
Q. I see the last sentence of the second paragraph on this page states that, the next to the last sentence, "Based on the preliminary evaluations of the cost, complexity, maintenance requirements, and the accuracy and timeliness of the information provided through these various options, the Department has decided to develop a PC-based electronic bulletin board system, the DCS exchange network."
A. I'm sorry; what paragraph are you reading from?
Q. The second paragraph under introduction, sir.
A. Okay.
Q. The next to the last sentence. You see it states that the Department has decided to develop a PC-based electronic bulletin board system?

Page 445

A. Okay, yes.
Q. Do you know, did the Department ever make such a decision?
A. I don't recall that.
Q. Do you know why the contractor would have included a statement like this?
MR. SHULTIS: Calls for speculation.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. In your opinion, did the Department have an interest in providing this kind of information to purchasers to assist them in assessing exchange opportunities?
A. To the best of my recollection the Department certainly considered providing that information, I don't know I would characterize it as interest.
Q. It's something the Department considered doing?
A. Yes. Oftentimes the Department considered a number of things, and discussed that with industry representatives, and no longer considered it based on their input.
Q. Do you recall receiving any input from the industry indicating they weren't interested in a

Page 446

system of this sort?
A. On that specific issue, I don't recall, no.
MR. SHULTIS: Are we moving on to a different document, Dave?
MR. NESLIN: Yeah.
MR. SHULTIS: Do you think we could take a break, please?
MR. NESLIN: If you'd like to, sure.
(Recess.)
BY MR. NESLIN:
Q. Mr. Milner, before we get to another document, let me ask you just a couple of follow-up questions. You mentioned that you had, in considering the exchange provision, you had maintained a list of approved DCS's and compared those to utilities which might be needing more pool space?
A. We certainly maintained a list of approved DCS's, I don't recall whether we actually ever got into any analysis of looking at utilities that might be potential exchanges, I don't recall that.
Q. You don't recall --
A. No.
Q. -- that comparison?

Page 447

A. No.
Q. I thought that you testified that you also considered the potential for brokering exchanges between utilities?
A. Yeah, as a concept, yes.
Q What do you mean, what do you mean by as a concept?
A. We were -- well, looking at the concept of was it appropriate for the Department to do that sort of thing.
Q. What was your opinion?
A. My personal opinion was that it potentially could serve a useful purpose if the utilities desired such an activity.
Q. And what do you mean by useful purpose, what would that purpose be?
A. Well, certainly one purpose could have been if one utility that was needing to build a dry storage that was farther down in the queue, and another utility that had a higher priority that either didn't at that particular time or perhaps even life of plant storage, which I don't recall anybody was that high in the queue that they had life of plant, but you could preclude the need for constructing dry storage if such an exchange were

Page 448

made.
Q. And that would be beneficial to the utilities?
A. Certainly to the utility that would have had to build the dry storage.
Q. Would it also be beneficial to the program?
A. Not necessarily, no.
Q. When you refer to brokering, what do you mean by that?
A. If we had done comparisons and saw a situation where, as I just described, that occurred, I guess one concept might have been that we would contacted both utilities and inquired as to their interest in exchange and trying to bring it about.
Q. Was this concept memorialized or documented in any way?
A. Not that I recall, no.
Q. Do you recall any documents discussing how this brokering might work?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Not that I recall other than what we just looked at.
BY MR. NESLIN:

Page 449

Q. Do you recall discussing this brokering concept with anyone else at DOE?
A. Not specifically. I probably discussed it with members of my staff.
Q. The same members of your staff that you identified previously?
A. Yes, including them.
(Milner Exhibit No. 54 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, you've been handed Exhibit 54 which is a March 31st, 1994 letter from James Blandford to you and an attachment consisting of a preliminary draft of a document entitled, DCS Exchange Review Criteria, First Set of Time Phased Review Criteria.
Are you familiar with this document?
A. I don't specifically recall it.
Q. Do you recall it generally?
MR. SHULTIS. Asked and answered.
THE WITNESS: No.
BY MR. NESLIN:
Q. Who was Mr. Blandford?
A. My recollection was that he was Mr. Vawter's predecessor in that position at the M&O.

Page 450

Q. So he would have been your primary contact at the M&O?
A. Correct.
Q. You would have communicated with Mr. Blandford?
A. Correct.
Q And do you know what Mr. Blandford's doing now?
A. I have no idea.
Q. Do you know where he is located today?
A. No, not at all.
Q. You see the first sentence of the letter states, The attached draft report presents the first set of time phased DCS exchange review criteria to be used by the Department and its contractors in reviewing DCS exchange requests submitted by purchasers.
Do you know, were such exchange review criteria ever adopted by the Department?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I don't recall them being adopted, no.
BY MR. NESLIN:
Q. Do you recall work being done by the

Page 451

Department on review criteria?
A. Yes.
Q. Why did the Department undertake that work?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness. Calls for speculation.
THE WITNESS: My recollection was that we were planning for the possibility of receiving exchange requests and began looking at criteria and ways of what would be the criteria for approving or disapproving them.
BY MR. NESLIN:
Q. So you wanted to be prepared?
A. Correct.
Q. How many exchange requests did you anticipate receiving?
A. I don't think we ever even focused on the potential number, we had no idea.
Q. And who was involved at the Department in attempting to develop review criteria?
A. Well, I guess it would be the same set of people as far as my recollection, if he was involved in the broad term of being aware of the activity going on, the director of the program, the deputy director of the program, myself, members of my staff.

Page 452

Q. And the members of your staff would have been Mr. Brownstein and Ms. Slater and/or Ms. Payton?
A. Including them, yes.
Q. Others?
A. There were others on the staff, I don't recall at the time which ones they were.
Q. If I could direct you to page CTR-001-1306. Under heading III, Time Phased Review Criteria, I'd like to ask you to review the first paragraph.
You see it states in the second sentence that, "These sets of review criteria will be time phased with the time dependency being linked to when the DCS exchange request is received by the Department." What does that mean to you, time phased?
MR. SHULTIS. Objection, foundation. Calls for speculation.
THE WITNESS: Reading these words at this point in time, my opinion would be that we would be looking at dealing with exchange requests in the order they were received.
BY MR. NESLIN:
Q. Do you recall any consideration by the Department that different criteria might apply

Page 453

depending upon how far along the waste management system planning and procurement had progressed?
MR. SHULTIS: Objection, assumes facts not in evidence. Mr. Milner's not a 30(b)(6) witness.
THE WITNESS: I'm sorry, would you repeat that, I'm not sure I understand that question.
BY MR. NESLIN:
Q. Let me ask it a different way. Do you recall the Department considering using different criteria for reviewing an exchange request depending upon how far along the waste management system planning and procurement had progressed?
MR. SHULTIS: Same objection.
BY MR. NESLIN:
Q. In other words that if an exchange request were made very early in the system before final planning or procurement decisions had been made, the criteria might be in one form, but other criteria might apply if decisions had been made regarding system planning or procurement?
A. No, I don't recall that.
Q. Let me ask you to turn to the next page, page 1307, under heading VI, First Set of Time Phased Review Criteria?
A. Uh-huh.

Page 454

Q. The third from the last sentence states, that in fact since the facility, the waste disposal facility locations and system designs are still being evaluated, it could be argued that there would be no impact to the system of any DCS exchanges at this time. Do you see that language?
MR. SHULTIS: Objection. I don't.
THE WITNESS: I found it here. I'm going to read it in context.
BY MR. NESLIN:
Q. Let me restate my question. This paragraph states that in fact since the facility locations and system designs are still being evaluated, it could be argued that there would be no impact to the system of any DCS exchanges at this time.
Would you agree that there would be no impact to the system of a DCS exchange if as of March 1994 the facility locations and system designs were still being evaluated?
A. I think at that point in time there was no known reason why there would be any impact. For example the designs were early enough along that presumably you could have adjusted designs if there had been any impact. But that can't be said with

Page 455

certainty because you just simply didn't know.
Q. So if the system could be adjusted at that point to address the requirements of an exchange, did that make it more likely that an exchange would be approved by the Department?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness. Calls for speculation.
THE WITNESS: I guess my personal opinion would be if you could adjust the system design at whatever point an exchange request was received and that change in design didn't impact the system adversely in another way, such as cost or schedule, yeah, that probably would have made it more likely.
BY MR. NESLIN:
Q. Under that circumstance, the Department should approve an exchange?
MR. SHULTIS: Same objections.
BY MR. NESLIN:
Q. In your opinion?
A. Well, that would not have been the sole criteria, I don't believe. But that would certainly have been factored in.
(Milner Exhibit No. 55 was marked for identification.)
BY MR. NESLIN:

Page 464

such a review occurring with respect to the development of exchange criteria?
MR. SHULTIS: Same objection.
THE WITNESS: I don't specifically recall. Presumably there were departmental reviews of drafts of criteria.
BY MR. NESLIN:
Q. But sitting here today you don't recall who might have been involved in those reviews?
A. No. Or even if they occurred. But presumably they did.
Q. If I could turn you to page 0010. You see a couple bullets at the bottom of the page, Mr. Milner?
A. Yes.
Q. The sentence preceding the bullet states that, "Consequently, several questions must be answered to determine if an exchange request can be approved. The foremost being do the proposed changes adversely impact the system's ability to meet the commitments made on other DCS's, and have the designs or procurements in any of the CRWMS elements been based on the original DCS's, and if so will approval of the exchange request adversely affect them."
Would you agree that those were the

Page 465

foremost questions that need to be answered by the Department in determining whether to approve an exchange request?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.
THE WITNESS: In my opinion they would be at least two of the more important ones.
BY MR. NESLIN:
Q. Can you think sitting here today of other important considerations?
MR. SHULTIS: Same objection.
THE WITNESS: Not offhand.
BY MR. NESLIN:
Q. So if a proposed exchange wouldn't adversely impact the system's ability to meet the commitments made on other DCS's, and wouldn't adversely affect the designs or procurements of the waste management system elements, is it your opinion it should be approved by the Department?
A. It would be my opinion that it shouldn't be disapproved at that point.
Q. If it weren't disapproved, wouldn't it be approved?
A. No, because there may be other criteria that you would look at.

Page 466

Q. Are there other criteria that you can identify sitting here that would be important to that question?
MR. SHULTIS: Asked and answered.
THE WITNESS: No.
BY MR. NESLIN:
Q. If I could ask you to turn to page 0021. The third paragraph, if I could ask you to review the third paragraph on that page. The second sentence states that, "Whereas the review could be terminated after the first failed review criteria, performing a complete review will provide the purchaser with as much information as possible for preparing a revised exchange request, if desired."
Do you see that language?
A. Yes.
Q. Was it important to the Department to provide purchasers with information on why an exchange request might be disapproved so that they could attempt to correct the problem and resubmit?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.
THE WITNESS: In my personal opinion it would have been important, sure.
BY MR. NESLIN:

Page 467

Q. And in your opinion, would the Department have done so?
MR. SHULTIS: Same objection, calls for speculation.
THE WITNESS: In my opinion it would have, I believe.
BY MR. NESLIN:
Q. The last sentence of, the last two sentences state that the, "Furthermore, the review process will aid DOE in identifying patterns of change in purchaser servicing capabilities or desires. These trends will provide DOE with an early indication of the need to change existing procurements." Do you see that language?
A. Yes, I do.
Q. Would you agree with those statements?
A. Yeah, I would agree.
Q. On the next page, page 16, there's a figure?
A. Which?
Q. Page CTR0010022?
A. 22, yes.
Q. Figure 1. See, this suggests?
A. You switched page references on me, so --
Q. I apologize. Figure 1 indicates that in



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 472

MR. SHULTIS: Objection.
MR NESLIN: Correct?
MR. SHULTIS: Asked and answered.
THE WITNESS: Yes, I do.
BY MR. NESLIN:
Q. Do you recall the Department considering applying review criteria to sample exchanges?
A. Not to sample exchanges, no.
(Milner Exhibit No. 58 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, Exhibit 58 is a letter from you to William Manion, dated October 30th, 1990. You want to take a minute and review it? That's your signature on the second page, sir?
A. It is.
Q. Do you recall this letter?
A. No, I don't.
Q. The first sentence states that Dr. John Bartlett, director of OCWRM, had asked you to respond to apparently a letter from Mr. Manion.
Do you recall why, do you recall whether you were asked to respond to a letter by Mr. Manion?
A. I don't understand that question.
Q. Well, the first sentence of this letter

Page 473

states that "Dr. John Bartlett, Director, Office of Civilian Radioactive Waste Management has asked me to respond to your letter of September 4th, 1990 concerning the Department of Energy's plans for acceptance priority of spent fuel from permanently shutdown reactors." Do you recall being directed or asked by Mr. Bartlett to respond to Mr. Manion?
A. No, I don't.
Q. Would you have prepared a letter of this sort or would someone on your staff have prepared it for you?
A. Someone on my staff would have prepared such a letter.
Q. Would it have likely been Mr. Brownstein since his name is at the end?
A. Likely it would have, yes.
Q. And would a letter like this have been reviewed or approved by superiors at DOE?
A. Likely it would have at this point, yes.
Q. And who would have been involved in that review?
A. If that were the case, certainly my immediate supervisor would have reviewed it. Potentially it could have been reviewed up through the director.

Page 474

Q. If I could direct your attention to the third paragraph on the first page. The second sentence states that the Department has not determined whether or not priority would be accorded shutdown reactors or if priority is granted under what specific circumstances.
Was that accurate, as of 1990?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I suspect it probably was.
BY MR. NESLIN:
Q. That's your recollection sitting here today?
MR SHULTIS: Same objection.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Would that be accurate today?
MR. SHULTIS: Same objection.
THE WITNESS: I think at this point in time today the Department has not decided to give priority to shutdown reactors.
BY MR. NESLIN:
Q. Are you saying that the Department's not decided whether or not it would accord priority to a shutdown reactor or are you saying that the

Page 475

Department has decided that it would not grant priority to any shutdown reactors?
MR. SHULTIS: Same objection.
THE WITNESS: Well, I think that there has been no final decision as to whether or not, although it is not under active discussion.
BY MR. NESLIN:
Q. And the next sentence states that, "The Department recognizes that granting priority to shutdown reactors invites questions of equity among all owners and generators, and is involved in discussions on this and other issues with contract holders through the Annual Capacity Report issue resolution process."
Do you recall what you meant by questions of equity?
A. Yes. My recollection, the standard contract essentially gave priority to the oldest fuel first, and should that change and the Department decide to give priority to shutdown reactors, that would certainly have equity questions with those who were first, second and third in line on an oldest fuel first basis.
Q. So by equity you mean it would affect other utilities who might be ahead of the shutdown

Page 476

reactor in the queue?
A. Correct. And certainly there were discussions at that point in time and at various points in time with industry representatives as to whether there was any desire on the part of the industry in general to give priority to shutdown reactors.
Q. Other than --
A. The Department raised that issue a number of times with the industry and the industry consensus always was no.
Q. By consensus, do you mean it was uniform, everyone in the industry took that position or something else?
A. Well, certainly the majority
Q. Other than the effect on other utilities, were there other reasons that the Department would be unwilling to grant priority to a shutdown reactor?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, my opinion, yeah, there would be several. Well, if approval somehow adversely -- I can't necessarily think of a situation where that would occur, but if somehow approval or doing that would have adversely affected the system,

Page 477

it would have been.
BY MR. NESLIN:
Q. Sitting here today can you think of a way of which approving authority to shut down a reactor would have adversely affected a system?
A. The federal system, I can not, no.
Q. Any other reasons why the Department would be unwilling to grant priority to a shutdown reactor?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness. Calls for speculation.
THE WITNESS: I can't think of any. In my opinion, the chief one would be equity. I can't think of any others.
(Milner Exhibit No. 59 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, Exhibit 59 is a report by S.R. Rod, Pacific Northwest Laboratory, entitled, Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown.
A. Uh-huh.
Q. Now I note on page HQR-025-0904, under the distribution list, you're listed as a recipient of this report. Do you recall this report?
A. No, I don't specifically recall this

Page 478

report.
Q. Do you recall the Department or its contractors looking at the cost of shutdown reactors having to continue to operate on-site spent fuel pools?
A. I do.
Q. What do you recall about that?
A. In very general terms I do recall at least one, probably more of our contractors looking at estimating the cost. I vaguely recall one or two estimates being prepared by a contractor, in essence their own estimate. I seem to recall one or two estimates prepared by the contractor pretty much solely based on input from the utilities.
Q. Do you recall which contractors were involved?
A. Beyond PNL, no offhand I don't.
Q. And this was work done at the direction of the Department?
A. Correct.
Q. Subject to the Department's control and input?
A. Well, subject to the Department's direction.
Q. If we could turn to page HQR0250876?

Page 479

A. Executive summary you're referring to.
Q. Executive summary, yes. And I'm going to ask you with respect to the second paragraph, the last sentence provides an estimate of operating storage only pools after a reactor has been shut down.
Do you see that?
A. No, I don't.
MR. SHULTIS: Did you say active or inactive.
BY MR. NESLIN:
Q. Inactive. And it projects the cost of operating one inactive storage only pool at $3,670,000 annually?
A. Yes.
Q. Do you believe that's an accurate number as of 1991?
A. I have no basis to determine whether it was accurate or not.
Q. Do you have any basis sitting here to disagree with that number?
A. No.
MR. SHULTIS: Objection asked and answered.
BY MR. NESLIN:

Page 484

Q. This letter was submitted to the Department in December of 1992. Do you recall whether this consideration occurred before or after December of 1992?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I don't specifically recall, no.
BY MR. NESLIN:
Q. Do you recall who was involved with the Department in considering this rulemaking?
A. No, not specifically.
Q. Were you involved?
A. I probably was. I don't recall specifically.
Q. Do you recall which issues the Department was considering addressing as part of its rulemaking?
A. There were numerous issues, I don't recall them all. Certainly priority for shutdowns were one. Offhand, I can't recall the others.
Q. Do you recall any of the other issues sitting here today?
A. No. Not at this point.
Q. Do you recall what if any documentation was prepared as part of this consideration?

Page 485

MR. SHULTIS: Objection, asked and answered.
THE WITNESS: No.
BY MR. NESLIN:
Q. Do you recall whether a proposed rule or proposed amendments to rules were prepared by the Department for this purpose?
MR. SHULTIS: Same objection.
THE WITNESS: I don't recall a proposed rule being prepared.
BY MR. NESLIN:
Q. I take it the Department determined not to go through a rulemaking process?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness. Asked and answered.
THE WITNESS: I don't recall a rulemaking process being undertaken, no.
BY MR. NESLIN:
Q. Do you know why the Department decided not to go forward with any rulemaking process?
MR. SHULTIS: Same objection. Calls for speculation. Assumes facts not in evidence.
THE WITNESS: No, I don't recall
BY MR. NESLIN:
Q. If you could turn to page HQR0010111. If

Page 486

you could review lines 1 through 11. Mr. Milner, the second sentence states that the projected CRWMS acceptance capacity is currently anticipated to exceed the industry's annual SNF discharge rate in the year 2010 or when a repository begins operations. Do you see that?
A. Yes, I do.
Q. Was that accurate? Was that accurate as of 1992?
A. That was the projection at that point in time.
Q. And then it goes on to state that at that time the Department would revisit this issue and consider granting acceptance priority to shutdown reactors. Now let me ask, in your opinion would the Department be more likely to grant priority to shutdown reactors once the acceptance rate exceeds the annual spent nuclear fuel discharge rate?
A. I have no idea, no decision had been made on that whatsoever.
Q. Well, if the principal concern in granting priority to a shutdown reactor is equity, meaning the effect on other utilities, that's your view?
A. That's a -- well, I won't call that a principal concern. That's certainly one of the more

Page 487

important concerns.
Q. Wouldn't the effect on other utilities be alleviated at least in part if the receipt rate of spent fuel exceeded the discharge rate?
MR. SHULTIS: Calls for speculation.
THE WITNESS: No, my personal opinion it may be somewhat alleviated but any time you depart from the queue, so to speak, and grant priority to another utility for whatever reason, you are impacting those higher in the queue.
BY MR. NESLIN:
Q. If the receipt rate exceeds the discharge rate, theoretically -- let me restate the question.
Wouldn't the effect be alleviated or diminished, the effect on other utilities, if the acceptance rate exceeds the discharge rate?
A. In my opinion the effect would be diminished.
Q. There would still be an effect?
A. There would still be an effect.
Q. Because the order is changing?
A. Correct.
Q. But theoretically other utilities should not have to add additional storage as a result of granting priority?

Page 492

Rudy and others from Yankee Rowe.
Q. By that issue you mean the issue of?
A. Priority for Yankee Rowe.
Q The second paragraph of the letter in the second sentence states that you, meaning Mr. Barrett, indicated during our discussion that you would be receptive to suggestions on a process for allocation of priority under the contract which DOE could follow with public notice or through a rulemaking.
Do you recall Mr. Barrett encouraging Yankee Atomic to suggest a process for granting priority to shutdown reactors?
A. I don't recall him encouraging it. I recall him being willing to have a discussion of the public rulemaking process.
Q. This is the rulemaking process that you've referred to earlier in your testimony?
A. Yes. Which, as I recall, did not actually take place.
Q. Do you recall having previously received or reviewed the attachment to this letter?
A. No
Q. Let me ask you to turn to the second page of the attachment. Would you review the suggested process language? Do you recall having reviewed

Page 493

these or similar criteria for making decisions on whether to grant priority to shutdown reactors?
A. No, I don't.
Q. Do you have an opinion sitting here today as to whether these criteria would be appropriate for making that decision?
A. Well, I guess in my view sitting here looking at this today some of these don't appear to be criteria so much as statements of opinion.
Q. Do you disagree with certain of these, sir?
A. I do.
Q. Do you disagree with the first item, that granting priority can be shown to be less costly --
A. I do.
Q. -- to the Department's waste management system?
A. I do.
Q. Why do you disagree with that?
A. Because I can't envision how granting the priority would be less costly.
Q. What would the additional cost be for granting priority?
A. Huh?
Q. What would the additional cost be for

Page 494

granting priority?
A. I don't know where there would be additional cost. I can't see where the cost would be reduced.
Q. Well, the cost to the utilities in question, the shutdown utility would certainly be reduced?
A. Yes, it would. I think that's what's being reflected in number 3.
Q. And with respect to number 2, item 2, granting priority can be shown to involve a shipment of small enough quantities of spent fuel compared to the overall DOE acceptance rate so as not to jeopardize the timely removal of spent fuel from other sites, or other compensation should be provided.
Do you disagree with that?
A. I do.
Q. And why do you disagree with that?
A. Any amount of fuel that you accepted from a shutdown by granting priority would certainly impact other utilities in the queue.
Q. But this refers to jeopardizing the timely removal of spent fuel from other sites. Would such an impact necessarily jeopardize the timely removal

Page 495

of spent fuel from other sites?
A. I believe it would. If over some period of time the Department were to -- according to the priority ranking, the ACR of 1995, since that combined both, one utility would expect to have X number of MTUs removed from their reactor within some specified time period. So if a portion of that allocation was given to another reactor, it would not be as timely.
Q. But would a portion of that allocation have to be given to another reactor if in fact the receipt rate exceeded the discharge rate?
A. Certainly.
Q. Why do you say that?
A. Any time there's a finite amount of fuel being accepted, and that finite amount of fuel is allocated amongst the utilities in the queue, whatever that number may be, if you reallocate that, a portion of that, to other utilities farther down in the queue, you're certainly impacting that.
Q. Would you disagree with criterion 3 here that granting priority can be shown to avoid the establishment of an otherwise unneeded reactor site storage facility?
A. I don't completely agree with that.

Page 496

Q. And how do you disagree with it?
A. If a reactor is shutting down, presumably it has all of its spent fuel stored on site either in the pool or dry storage or a combination thereof. That storage exists when the reactor shuts down. Since no more fuel is being generated by the reactor I'm not sure what additional storage would be established.
Q. Would you agree that it would avoid the need to continue an otherwise unneeded reactor site storage facility?
A. I would.
Q. And the next item states that granting priority can be shown to be clearly cost effective for consumers from the standpoint of timely decommissioning?
A. I would agree with that.
Q. And the last item is that granting priority can be shown to support the national policy of efficient operation of the country's waste management system.
A. I can neither agree or disagree with that. I'm not quite sure what that means.
Q. You don't understand --
A. Correct.

Page 497

Q. -- the criteria?
A. Correct.
Q. Do you know whether you or Mr. Barrett responded to this letter by Mr. Grube?
A. I don't recall for certain, I don't believe we did.
Q. Do you know whether the Department has ever adopted any criteria for making decisions on shutdown reactors?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I don't recall. I don't believe.
BY MR. NESLIN:
Q. You're not aware of it?
MR. SHULTIS: Same objection.
THE WITNESS: I'm not aware of it, no.
BY MR. NESLIN:
Q. Do you believe you would have been aware of it if such criteria had been developed?
A. I think I would have.
(Milner Exhibit No. 62 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, Exhibit 62 is a letter from

Page 498

you to Dr. Andrew Kadak dated June 16th, 1994. Are you familiar with this letter?
A. I vaguely remember this letter, yes.
Q. Did you draft this letter?
A. I don't believe I did.
Q. But you would have reviewed and approved it?
A. Certainly.
Q. And the purpose of this letter was to respond to certain questions that Yankee Atomic had raised with the Department?
A. Apparently so, yes.
Q. Is that your recollection?
A. Yes.
Q. In the second paragraph of the first page, the first sentence reads that, "In designing the waste management system, the Department and the nuclear utilities share mutual goals of initiating federal acceptance of spent nuclear fuel as soon as possible and accommodating economic and physical situations confronting utilities such as yours."
What did you mean by mutual goals of initiating federal acceptance of spent nuclear fuel as soon as possible?
A. I think both the Federal Government, the

Page 499

program and the utilities had a goal of taking fuel off the sites as soon as possible, to begin to take fuel off the sites as soon as possible.
Q. And what did you mean by accommodating economic and physical situations confronting utilities such as yours?
A. I think there was a goal to at least mitigate the economic situation relative to cost of storage, but I don't know what physical situation meant.
Q. What was meant by utilities such as yours? Were you referring to shutdown, utilities with shutdown reactors?
A. I don't recall. Likely that would have been the case.
Q. So you've testified that Department had an interest in mitigating the economic situation confronting such utilities. What do you mean by mitigating the economic situation for them?
A. Well, I don't know that -- hypothetically I don't know whether the condition of the economic situation could be totally alleviated, but potentially at least you could mitigate it.
Q. How?
A. Well, I guess one example I might think of

core reserve capacity in the pool, or --
A. I don't know.
Q. We previously marked -- I believe it was Wednesday we previously marked the 1987 mission plan amendment or actually one of the appendixes to it. This is also an excerpt of that same mission plan amendment It's just a portion of the text rather than the appendix we looked at previously.
(Milner Exhibit No. 72 was marked for identification.)
BY MR. TOMPKINS:
Q. I believe you testified yesterday that you had some involvement in preparing this mission plan amendment?
A. I believe I would have, yeah.
Q. Okay. I'd like to call your attention to page 6 of this excerpt. The third full paragraph under extension of the schedule for the first repository, this indicates that at this time the program in OCWRM was projecting a delay in start of repository operations from 1998 to 2003; is that correct?
A. That's what's indicated here, yes.
Q. Okay. It indicates that this five-year extension is necessary for technical planning in the



program?
A. I don't see where it refers to technical planning.
Q. Okay.
A. It seems to indicate that the schedule was certainly due to budget reductions.
Q. Are you aware of any other reasons why the schedule would have slipped at this point?
MR. SHULTIS: Objection, mischaracterizes the document.
THE WITNESS: No, not offhand, I don't recall.
BY MR. TOMPKINS:
Q. Also in this same paragraph this amendment indicates as explained later, the DOE could nonetheless start accepting waste in 1998 in an MRS facility. Was this consistent with DOE planning at the time in 1987?
A. I believe it was.
Q. So they were going to operate an MRS from 1998 until about 2003 when a repository opened?
A. I think the intention was that the MRS would continue operating beyond 2003.
Q. In fact the MRS was intended to be an integral part of the whole waste acceptance system?



A. Yes.
Q. It wasn't intended to operate alone or as a permanent place for storage in disposal?
A. No.
Q. I'd like to talk to you about page 12 now, in particular the last full paragraph or actually the last paragraph which goes on to the next page under the heading MRS facility. It stays that on March 31st, 1987 the DOE submitted to Congress a proposal for construction of an MRS facility. To allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority, DOE asked Congress to limit the MRS storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until a construction authorization for the repository has been received from the Nuclear Regulatory Commission.
Is this an accurate statement that the DOE was the organization that requested the linkages between the repository and the MRS?
MR. SHULTIS: Objection, the document speaks for itself.
THE WITNESS: Certainly the DOE was the entity that requested Congress, my recollection of



the origins of those linkages were at that time, DOE was developing a site specific proposal for an MRS facility, actually at the old Clinch River Breeder reactor site at Oak Ridge, and I believe the local community had requested the Department insert those linkages.
BY MR. TOMPKINS:
Q. The capacity limit of 15,000 metric tons, do you know where the Department would have come up with that number?
A. I believe that was the request or recommendation of the local community at the time.
Q. At the time as we saw in the previous page this was assuming that the MRS would operate for only about five years prior to being able to move additional waste from the MRS and start feeding into the repository?
A It was intended to operate for five years before it began shipping waste and it certainly was going to operate longer than five years.
Q. But over the course of that five years, would this limit on the capacity of 15,000 metric tons have been a significant restraint on the ability of the Department to operate this facility?
A. It certainly would have been a constraint.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY     )
(98-126C)(Merow, S.J.)             )
CONNECTICUT YANKEE ATOMIC POWER    )
COMPANY                            )
(98-154C)(Merow, S.J.)             ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY) Washington, D.C.
(98-474C)(Merow, S.J.)             ) Tuesday
              Plaintiffs,          ) May 7, 2002
              v.                   )
 THE UNITED STATES,                )
              Defendant.           )
- - - - - - - - - - - - - - - - - - -)
```

Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

APPEARANCES:

On behalf of Plaintiffs:
PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority for the State of New York, Omaha Public Power District, Nebraska Public Power District, and PSEG Nuclear L.L.C.:
DANIEL S. HERZFELD, ESQ.
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7612



APPEARANCES CONTINUED:

On behalf of Defendant:
RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561



CONTENTS

WITNESS EXAMINATION PAGE NO.
RONALD A. MILNER
By Mr. Skalaban 5

EXHIBITS
(No exhibits were marked.)



PROCEEDINGS

Whereupon,
RONALD A. MILNER
was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:
Q. Hello, Mr. Milner. My name is Pete Skalaban. I represent Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company in this litigation.
I'd like to apply the same general ground rules that occurred in the common deposition. If you don't understand a question, if you can let me know, and I'll try to clarify it.
A. All right.
Q. And that way, we can have a common understanding for my questions and your answer.
A. Fine.
Q. If you need a break at any time, please let me know. I'll be happy to stop. I just request that the break doesn't occur when a question is pending.
Is that okay?

Page 6

A. Fine by me.
Q. Okay. And also, if I ask you a question and it occurs to you subsequently, perhaps when we're looking at another exhibit or what have you, that the answer was incomplete -- your prior answer was incomplete or inaccurate in some way, can you let me know so that we get a true and accurate record?
A. Certainly.
Q. Thank you.
Mr. Schecter was asking you about a schedule for accepting wastes at the repository. And there was one answer I didn't quite understand, and I wanted to go over it.
I believe you were talking about the facility would have an ability to take a canister out of a transportation overpack and place a canister in a storage overpack and that this might accelerate the ability of the repository to accept fuel.
Did I understand that correctly?
A. Well, what I was speaking of was, some of the fuels certainly will arrive at the repository site in dual-purpose canisters. That canister has the ability to be removed from its transport overpack and placed into a storage overpack.
Certainly there's a relatively -- in

Page 7

relative terms, a simple matter.
Q. All right. And that's something you're planning to do, the department is planning to do with the repository, to accept the canister fuel and put it into storage overpacks?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. My understanding is that we're planning on having the capability to accept canisters, canistered fuel. There will be certainly an ability to store some fuel aboveground for some period of time. I didn't intend to characterize that as the department's plan to do that initially.
BY MR. SKALABAN:
Q. But it's what you expect to happen?
MR. SHULTIS: Objection, calls for speculation.
A. No, I don't expect it to happen or not to happen. It's an ability.
BY MR. SKALABAN:
Q. Okay. But if I understand your answer, you -- the department's plan is to accept canistered fuel and possibly put it in storage overpacks before it goes in the repository?
MR. SHULTIS: Objection, calls for

Page 8

speculation.
A. The characterization is that we expect to receive canistered fuel. We expect to have the ability to store -- I don't think you can infer that the plan is it will go directly to storage and then later to a repository.
BY MR. SKALABAN:
Q. And the fuel in the canisters, would that be from canisters from different dry storage systems that different utilities have been implementing across the country?
A. Well, when I say, dual-purpose canister, it's a canister that's been approved by the NRC for both transport and storage, and then they could be utilized in different storage modes.
Q. And what are some of the canisters that you're aware of that have been licensed for dual storage and transportation?
A. I can't recall the designations now. I believe there's at least one or two that have currently been approved, perhaps more.
Q. Such as the NAC, N-A-C?
A. Yeah, I believe that's one of them.
Q. So the canistered fuel would be fuel that different utilities had put in systems like the NAC

Page 9

multipurpose-canister system or other dry storage vendors?
You have a multipurpose-canister-type system?
A. Correct.
Q. Does the department have any plans to cut those canisters open to dispose of the fuel inside?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness, also calls for speculation, asked and answered.
A. Yeah. It does call for speculation, because that would ultimately be determined as part of the licensing process as to whether those canisters would ever have to be opened up or not.
BY MR. SKALABAN:
Q. Does the department have a current position on how -- whether it thinks it may be cutting them open, cutting the canisters open?
MR. SHULTIS: Same objections.
A. I don't know that they do, no.
BY MR. SKALABAN:
Q. So that just hasn't been decided one way or another, what to do with the canisters that arrive from the utilities at the repository?
A. As I say, ultimately they will be

Page 10

determined by the NRC as to whether they'll require opening of the canisters.
Q. Is there any reason why you think they might do that?
Wouldn't that -- or actually, strike that.
Wouldn't that possibly implicate safety concerns, to actually open up the canisters, because that would create radiation -- potential radiation exposure?
A. I don't know that that would be any different than opening up a transport cask that has bare spent fuel in it. We do that robotically.
Q. But generally it's a goal, to minimize the amount of handling of bare spent fuel assemblies?
A. Certainly.
Q. That's something the department would plan to do?
A. Would prefer to.
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
BY MR. SKALABAN:
Q. Do you know whether the department has looked at procuring or developing a disposal overpack that can fit the different canistered fuel?
A. We're still in various stages of waste

Page 11

package design. I believe some of them would envision a dual-purpose canister, canistered fuel.
Q. In your opinion, would that be sensible to do, given that utilities have been going to dry storage in view of the delay in repository operation?
A. Certainly if there's no licensing issues with the NRC on that, if you receive a canistered fuel, my opinion it would be foolish to open it if you didn't have to.
Q. Yeah. Mr. Milner, you in your -- the prior coordinated discovery deposition, you talked a little bit about the NWPA Amendments Act linkages, and I believe you identified a schedule linkage between the siting of the MRS and the siting of the repository as well as the capacity limitations.
And to make sure that the record is very clear, there's also a construction linkage?
A. That's correct, yes.
Q. And is it fair to say that the construction linkage was perhaps the most significant linkage between the development of an MRS and the development of a repository?
MR. SHULTIS: Objection, calls for a legal conclusion, vague.
A. I don't know that you could view the

Page 12

siting versus the construction start one more significantly than the other. Being somewhat of a near-term horizon type of person, siting has been more of a concern to me.
BY MR. SKALABAN:
Q. Okay. Could you take a look at Milner Exhibit 27, please, and for the record that's the May 1989 analysis of the total system life cycle cost for the Civilian Radioactive Waste Management program.
And if you could turn to page 1, dash, 3 of that exhibit, please.
And for the record, it has a Bates number of PA, dash, 177154. If you could take a look and take a moment to read through the last paragraph in that section.
A. M-hm.
Q. And at that time in this publicly available total system life cycle cost report, the department stated that: The most significant -- or at least does this indicate to you -- the second paragraph -- or the second sentence of this paragraph -- that the most significant linkage from the amendments act was the construction requirements, the construction linkages?
MR. SHULTIS: Objection. The document

Page 13

speaks for itself.
A. This document states that the more significant linkage -- the more significant linkage is the construction
BY MR. SKALABAN:
Q. And is that because the MRS can't begin to be built until the department has received authorization to begin building the repository?
MR. SHULTIS: Same objection
A. Well, certainly that linkage states that, that they cannot begin construction of an MRS until you begin construction of a repository, yes.
BY MR. SKALABAN:
Q. If we can take a moment -- or actually, let me just ask you· Do you have a sense of what the -- from your time that you were at the program after the NWPA Amendments Act was passed, do you have a sense of what the department estimated that when it could build a -- I'm sorry -- when it could start waste acceptance in an MRS -- strike that.
Let me try to ask a better question.
When you started -- I'm sorry.
Following the amendments act, did you have a sense of what the time gap would be between -- given this construction linkage in the statute when