Page 22

again?
MR. SHULTIS: That was just the cover. Right?
MR. SKALABAN: Yep.
A. Okay.
BY MR. SKALABAN:
Q. And here again, sir, on page 5, you see that the beginning paragraph, the last sentence of the beginning paragraph appears to estimate the possibility that the MRS could be ready three years prior to the repository operations.
Is that fair?
A. Correct.
Q. And that would again be the department's best estimate of when it could feasibly get an MRS up and running before a repository?
A. Yes.
MR. SHULTIS: The document speaks for itself.
BY MR. SKALABAN:
Q. And we did look at this document before, and there was the upper and lower bounding case?
A. I believe that's true, yeah.
Q. I just want to call your attention in the first full paragraph on page 4 -- almost in the

Page 23

middle of the paragraph, it refers to the lower bounding case, and it says: The lower bounding case represents a receipt rate that would be in compliance with the amendments act restriction on storage limits at an MRS before a repository starts operations.
Do you see that?
A. Yes.
Q. And then it goes on to say that: However, this case assumes removal of the schedule linkages with the repository imposed by the amendments act.
In view of that passage, it's fair to say that the lower bounding rate in the lower capacity report, which for your reference can be found on page 7, is based on a change -- is based on a change in the law?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Yes, because it removed one of the linkages.
BY MR. SKALABAN:
Q. It would require the removal -- a Congressional -- a law, a change in the law to remove some of the -- the scheduling?
A. That's correct.
Q. If we could turn to Milner 42, which is

Page 24

the December 1991 annual capacity report, on page 4, it has what appears to me a similar estimate on when an MRS facility could be available to start spent fuel acceptance in view of the schedule linkages between an MRS and the operation of a repository.
Do you see that in the middle paragraph?
A. I do.
Q. And here again like in the 1990 annual capacity report the department is estimating that the time -- that it could not start MRS facility operations until at least 2007 in view of the statutory schedule linkage?
A. Correct.
Q. And again, at this point in time, the repository was anticipated to be in operation in 2010, so the department here is figuring that at the earliest -- and I'm focusing on the language, until at least 2007, the earliest that an MRS could be available to accept spent fuel before a repository could be available to accept spent fuel would be three years?
MR. SHULTIS: Objection. The document speaks for itself.
BY MR. SKALABAN:
Q. Is that fair?

Page 25

A. Correct.
Q. Now, sir, on page 5, there are the waste acceptance rates for the 1991 ACR.
Do you see that, sir?
A. Yes.
Q. And this is a waste acceptance schedule that is based on the assumption of again like the 1990 ACR a change in the law?
A. Correct. I think at that point in time, it was envisioned that if the nuclear waste negotiator were successful in finding a volunteer site for an MRS that that volunteer host would certainly support a change in the schedule linkage.
Q. And it would still, however, would still require Congress to change the law, presumably the president to sign the law or --
A. Correct.
Q. -- or an override veto, but it would require a change in law to make the schedule linkages go away?
A. Correct.
Q. Now, this waste acceptance schedule on page 5, which is based on the absence of the schedule linkages in the statute, these were the basis for the DCS submittals; is that correct?



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

that the department will require the purchasers to follow the waste acceptance schedule in page 5 and page 9 of the 1991 ACR?
MR. SHULTIS: Objection. The document speaks for itself, Mr. Milner is not a 30(b)(6) witness, calls for a legal conclusion.
A. In my opinion, that's what it says -- indicating here.
BY MR. SKALABAN:
Q. And is therefore, assuming that purchasers followed the instructions and submitted DCSs on the basis of the 1991 ACR -- the delivery commitment schedules would then be based upon a waste acceptance schedule that was not consistent with the Nuclear Waste Policy Act?
MR. SHULTIS: Objection, calls for a legal conclusion and -- objection, calls for a legal conclusion, and also Mr. Milner is not a 30(b)(6) witness.
MR. SKALABAN:
Q. Specifically to give you further clarification, I mean the Nuclear Waste Policy Act schedule linkages between the MRS and the repository.
MR. SHULTIS: Same objections.
BY MR. SKALABAN:



Q. The DCSs were -- do you understand my question?
A. No, I don't.
Q. I mean, assuming then, that the purchasers followed the instructions and submitted DCSs based on the schedules in the 1991 annual capacity report, then the DCSs would be based upon a waste acceptance schedule that was inconsistent with the statutory linkages in the Nuclear Waste Policy Act?
MR. SHULTIS: Objection. It calls for a legal conclusion.
A. You're talking schedule linkage?
BY MR. SKALABAN:
Q. Yes, sir.
A. Well, I just don't view it as inconsistent in the sense that certainly in my opinion at the time there was a possibility of that schedule linkage being removed.
Q. But it was -- but the schedule linkage was there?
A. Yes.
Q. And so as the law then existed and as it exists now, because I don't believe -- scratch that.
As the law then existed, the DCSs were based on a waste acceptance schedule that was



inconsistent with the Nuclear Waste Policy Act's schedule linkages as they existed at this time?
A. Sitting here today looking at that, that would be my opinion.
Q. And to your knowledge, the schedule linkages have never been changed. There's -- I'm sorry.
Let me ask a more artful question.
There hasn't been a change in the law removing those schedule linkages?
A. No, there has not.
Q. Mr. Milner, if you could just give me a general overview of how -- as the chief operating officer of OCRWM, how you envision the actual overall process of waste acceptance, transportation, disposal unfolding when it begins in approximately -- as you anticipate in 2010, an overview, just kind of a general overview of the process.
How do you envision that working?
MR. SHULTIS: I'm sorry. Which process?
MR. SKALABAN: The process of the -- well, let's say the real logistical process of sort of waste acceptance, transportation, disposal.
BY MR. SKALABAN:
Q. How do you envision that happening in



2010?
MR. SHULTIS: Vague, but if you can answer.
A. I'll give it a shot if I understand.
BY MR. SKALABAN:
Q. Sure.
A. The department would show up at the gates of the first utility in the queue and begin accepting their waste, taking title to their waste at the utility gate. I believe under contract at least if -- probably not in the legislation, but certainly under the contract, the department's responsibility is to show up at the reactor site with transport cask.
The utility is responsible for loading that cask with their spent fuel, in essence, delivering it back to the gate. The department takes title, transports that to the repository. It would undergo whatever packaging was necessary for replacement in the repository.
If for whatever reason that particular fuel were to be determined to go first into storage, it would be placed in a storage container, but eventually placed in the repository.
Q. How do you at this time -- what are the --

Page 38

country, isn't it?
A. I don't know.
Q. Okay. So you have no awareness of failed fuel, for example, being handled and moved to hot cells for studying or anything like that?
MR. SHULTIS: Objection, asked and answered.
A. With the possible exception of TMI 2.
BY MR. SKALABAN:
Q. Are you aware of any reasons why failed fuel cannot be moved at the same schedule as regular standard fuel?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. Well, I think there are certification issues with the NRC. It's my understanding that failed fuel would require some special handling different than nonfailed spent fuel.
BY MR. SKALABAN:
Q. And what kind of special handling are you referring to?
A. I don't know. That would I think ultimately be determined by the NRC.
Q. Would placing failed fuel on a reconfigured fuel assembly be an example of

Page 39

the kind of special handling that a utility might be able to do to get its failed fuel movable?
Actually, let me back up.
Does the term reconfigured fuel assembly mean anything to you?
Does that ring a bell?
A. I'm familiar with the term reconstituted fuel assembly. I'm not familiar with anybody having put a failed fuel rod back in an assembly. I think you'd have a heck of a time getting it out of the old one.
Q. Okay. But do you have any general sense of what the special handling might be?
A. I can make a guess that the NRC potentially could require some sort of special canistering of failed fuel.
Q. Special canister or special envelope or something of that nature?
A. Yes.
Q. Do you have any reason to believe that that's not technically feasible, to develop that kind of technology?
MR. SHULTIS: Objection, calls for

Page 40

speculation.
A. I'm certainly not an expert in that area, but I don't know of any.
BY MR. SKALABAN:
Q. And having worked in the office of storage and transportation in OCRWM and now as its chief operating officer, have you ever heard anyone express the opinion that within OCRWM that failed fuel couldn't be moved or would be technically infeasible to move?
A. No.
Q. Are you aware of any current OCRWM plans to defer the acceptance of failed fuel?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my understanding of the current situation -- and I think that's provided for under the standard contract -- that the failed fuel is back further in the queue.
BY MR. SKALABAN:
Q. Okay. Maybe we can take a look at that. If you could please take out Milner Exhibit 3. And in particular, article six on Milner Exhibit 3, criteria for disposal, page 16602, if you could take a look at article 6 A, 2 B.

Page 41

A. 6 A, 2 B.
Q. It's on the first column.
A. M-hm.
Q. And please take all the time you need to look if you want to look up any other sections.
(Pause.)
BY MR. SKALABAN:
Q. Let me ask you, what is your understanding of this paragraph 6 A, 1 -- I'm sorry -- 6 A, 2 little B?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Okay. In my opinion, at this point reading the paragraph, I would interpret that it means that DOE is, one, saying that it will accept both standard and nonstandard fuel, and nonstandard including failed fuel, that the purchaser will have to obtain delivery and procedural confirmation prior to delivery, and DOE will determine the technical feasibility of disposing of it on essentially the current schedule, which would essentially be the same as standard fuel.
So I would read that to say that we would have to look at each case of nonstandard fuel and determine whether that could be accepted as standard

fuel for purposes of the schedule.

BY MR. SKALABAN:

Q. Whether it would be technically feasible to accept that spent fuel?

A. On the currently agreed-to schedule.

Q. Do you have an understanding of what would happen if the department thought it wasn't technically feasible to do it at that point in time on the currently agreed-to schedule?

MR. SHULTIS: Objection, vague, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.

A. I guess in my opinion if the department determined that it wasn't technically feasible on the schedule and since we've already stated that we would accept it, it would move back in the queue.

BY MR. SKALABAN:

Q. Well, does this read to you more like just a basic operational provision, whereas the department is going to look at the individual case, if it can't accommodate it at that time, it's going to move it back a little bit?

A. That's the way I would read it.

MR. SHULTIS: Asked and answered.



BY MR. SKALABAN:

Q. This doesn't suggest to you that failed fuel is going to be put back years later in the queue, does it?

MR. SHULTIS: Objection, asked and answered, calls for a legal conclusion.

A. I couldn't say on that. It would depend on the nature of the fuel.

BY MR. SKALABAN:

Q. Well, assuming that there was an NRC-licensed container for that failed fuel, would the department then accept it upon the currently agreed schedule?

MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.

A. I guess in my opinion, if for that specific failed fuel, if there were an NRC-certified container, the NRC said, yep, that particular fuel is okay to move in that container, then, yes.

There's all kinds of failed fuel. You can have a fuel rod that goes -- the cladding is slightly unzipped, or it can have it totally failed and a bunch of pellets laying at the bottom of the pool. That's the extreme case, of



course.

BY MR. SKALABAN:

Q. And in the extreme case, do you know whether or not the technology has been developed to put that into a safe, licensed container?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I don't know. That would be a utility operation responsibility in any event.

BY MR. SKALABAN:

Q. But it's possible that that kind of situation would be dealt with?

A. As an engineer, I like to think that most things are technically feasible.

Q. And you have no reason to believe that it wouldn't be technically feasible to develop a safe, NRC-licensed container to handle that extreme situation you posited?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I can't think of any.

MR. SKALABAN: Can we go off the record a



second?

(Whereupon, at 5:08 p.m., the taking of the instant deposition adjourned.)

Ronald A. Milner

Signature of the Witness

SUBSCRIBED AND SWORN to before me this [illegible] day of [illegible], 20[illegible]

[illegible]

Notary Public

My Commission Expires: 5/14/06

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY ) Volume II
(98-154C)(Merow, S.J.) ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C)(Merow, S.J.) ) May 8, 2002
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
\- - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

APPEARANCES:

On behalf of Plaintiffs:
PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Defendant:
RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561



CONTENTS


| WITNESS | EXAMINATION PAGE NO. |
| --- | --- |
| RONALD A. MILNER | |
| By Mr. Skalaban | 51 |
| Afternoon Session | 159 |


EXHIBITS


| MILNER EXHIBIT NO. | PAGE NO. |
| --- | --- |
| 96 1992 Annual Capacity Report, Nos. HQ002314-352 | 61 |
| 97 Letter, 9-25-92, and attachments, Nos. YDK008922-229 | 68 |
| 98 Letter, 4-20-94, No. YDK-005-0417 | 120 |
| 99 Letter, 9-29-92, and attachments, various MOF and MPA numbers | 160 |
| 100 Letter, 9-25-92, and attachments, Nos. CDB006458-6437, and various other numbers | 166 |
| 101 10 CFR 61.55, Waste | |




EXHIBITS CONTINUED


| MILNER EXHIBIT NO. | PAGE NO. |
| --- | --- |
| Classification | 186 |
| 102 Nuclear Waste Technical Review Board Full Board Meeting, 1-11-94, Nos. YDK-013-0001-035 | 216 |
| 103 Memorandum, 3-8-94, and attachments, Nos. HQR-028-2747-762 | 221 |
| 104 Memorandum, Nos. HQR-058-0330-331 | 223 |
| 105 Defendant's Proposed Stipulation of Facts, Case No. 98-126C | 226 |
| 106 Letter, 7-15-98, Nos. HQR-041-0600-601 | 276 |
| 107 Memorandum, Nos. EL-115711-713 | 277 |
| 108 Letter, 7-30-93, and attachments, Nos. HQ0013568-578 | 283 |




PROCEEDINGS

Whereupon,

RONALD A MILNER

was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR SKALABAN

Q Okay Hello, Mr Milner How are you today?

A Morning Fine
How are you?

Q And just before we begin this morning, the same ground rules that we discussed apply
Is that okay?

A Fine with me

Q I wanted to cover something about failed fuel we were talking about at the end of yesterday's session And I asked you if there was an NRC-licensed container for failed fuel with the department then accepted upon the currently agreed schedule, and your answer was, as I understand your answer, in your opinion you thought yes
I mean, do you recall that exchange?

A Yeah My recollection was that

Page 52

certainly -- well, overall, we're going to accept failed fuel, so ultimately there will have to be a certified container to move it in. And then I think you just have to deal on a case-by-case basis, what's the nature of the failure, what's it look like, and what kind of handling will it require, and at what point do you do that.

Q. If I understand your testimony from yesterday, in the failed fuel, if there was an NRC-licensed transportation cask -- I'm sorry -- canister system available for it, it would be taken on the same waste acceptance schedule?

A. Well, again, I think -- at least I intended to characterize that that you almost have to look at it on a case by case, what's the nature of the fuel, how badly is it failed, what does it look like, and what kind of handling will that require at the repository receipt facility.

And I guess just to use a hypothetical example, if you have some very, very badly failed fuel, and out of all the assemblies that we will accept, ultimately, if that's the only one that requires that type of handling, do you stop everything and try to deal with that one assembly or do you put it farther back in the queue.

Page 53

It's hypothetical I don't know. You'd have to know what the situation was to say what you do

Q But if there was an NRC canister system that was fully licensed to transport that failed fuel, you would still anticipate that there be could a problem with accepting the waste on an agreed-upon schedule?

A. I think there's a potential of that, yes, again, depending on the nature of the failure, what it looks like.

Q. And that's based on disposal problems?

A. Well, it's based on the ability to move that fuel from the transport pack -- transport cask to a waste package and then place it You know, for example, if the requirement was that you had to physically put this in a hot cell and deal with it, that's a different matter than unloading a standard fuel assembly

Q. How likely do you think that kind of a situation may arise, that you would have a failed fuel assembly that the NRC has blessed in effect for transportation in a licensed canister that you would be technically unable to dispose of it in a repository?

Page 54

MR. SHULTIS: Objection, calls for speculation.

A. I don't think I said that we were technically unable to dispose of it It was a question of, do you handle that in the normal queue, or do you have to make provision for special handling of it

To me it's not a question of whether you're disposing of it It's just a question of, you have to delay receipt of that until you make special arrangements to handle it.

BY MR. SKALABAN:

Q. Is the department making any plans at the current time to handle failed fuel at the disposal facility?

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness, calls for -- I think it also calls for a legal conclusion.

A. Again, I guess in my opinion, if you had failed fuel that was not badly failed -- not a very good term of art -- but it probably would not require heroic special handling, and if you do, then I think you're going to have to be able to deal with that on a case by case. Certainly it would be sufficient for handling that, but again depending on the nature of

Page 55

the failure, does that bring your receipt line to a stop, for example, to handle that one particular piece of fuel.

So, yes, the repository would be able to handle failed fuel, but what does that do to the receipt system. And I don't know that we have -- we have certainly asked the utilities in -- I believe we asked the utilities in the RW 859 form something about failed fuel.

I don't know that we -- the department -- have a very, very good handle on all the failed fuel, the nature of the failed fuel. I'm not sure even the utilities themselves would know exactly what they have in the way of failed fuel in their pools until they do an in-depth check.

BY MR. SKALABAN:

Q. Who's looking at the failed fuel, the integrating failed fuel into the acceptance and disposal system at DOE?

A. Well, that would be part of the overall design effort that's being done by our M and O contractor.

Q. I mean, is it fair to say that for the -- in general you're envisioning that most failed fuel would be accepted and taken without problems, but

Page 56

there may be a few exceptions that would require an individual careful study?
MR. SHULTIS: Objection, mischaracterizes the prior testimony.
MR. SKALABAN: I'm not trying to mischaracterize. I just want to make sure I understand it.
MR. SHULTIS: Calls for speculation.
A. I mean, I just simply don't know, because I don't feel that I have a handle on how much failed fuel is out there, what are the nature of the failures. If you have a fuel assembly that has one or more pins that have pinhole leaks in them, that's not necessarily a large problem. If you've got very badly unzipped cladding, that could be a problem.
BY MR. SKALABAN:
Q. And how so?
MR. SHULTIS: Objection, asked and answered.
A. Again, you know, this is pure speculation, because I don't know the nature of the failed fuel.
BY MR. SKALABAN:
Q. Sure.
But I guess I'm just trying to explore -- in your mind you're drawing a distinction between

Page 57

different types of failed fuel and unzipped cladding, I guess is something that pops in your head as something that could be a problem, and I'm just trying to understand why that --
A If you have a fuel pin or a fuel rod that the cladding is split wide-open, you know, or are the fuel pellets going to fall out when you try to transfer that, you have to make provision for that
Q Wouldn't that be just in a canister?
A If the canister is also certified for disposal by the NRC, then that's obviously less of a problem
Q. Okay. And now, as a matter of background, I can represent to you that my clients are using a NAC multipurpose-canister, a Connecticut Yankee and Yankee Atomic-type system.
And assuming a system like that is licensed for storage and disposal, and it's licensed to transport failed fuel, would you anticipate that that kind of system couldn't be accommodated on the normal schedule?
A If the NRC ultimately determines that that multipurpose-canister does not have to be opened, that it can be disposed as is, then that is no problem.

Page 58

Q And that's generally -- would that be generally your opinion with -- in terms of kind of multipurpose-canister systems?
A. I'm not aware at this point in time that the NRC has made any statements as to the disposability of those canisters.
Q Is the department looking at that?
A. The department is not looking at that, no
Q Why not?
A. No. Again, that's a decision that would be made by the NRC They will determine as part of the licensing process whether or not that canister can be disposed of without being opened or whether they'll have to pull the fuel out of there and move it into the waste-packing facility
The department's objective when it was working on the MPC, the multipurpose-canister program, whenever it was, in the early '90s, our objective of that effort was to try to spur development of the canister that could be stored, transported, and disposed. I think I testified that we were ultimately directed to cease work on that program, so we have not continued development of an MPC I'm aware that private vendors are trying to do that

Page 59

Q. And I believe you testified earlier that that was -- even though the MPC program had been canceled, that that was a positive that came out of it, is that industry did look and develop this technology?
A In my opinion, that was a positive, yeah.
Q And I mean, if it's not going to be compatible with the waste management system that RW is developing, then that wouldn't be a positive, would it?
A That would be a negative That's right
Q And so I mean as you sit here today, are you aware of any DOE plans to cut off that kind of technology from the system and not integrate it into the system?
MR SHULTIS: Objection, asked and answered
A I think the department is certainly considering that it may have to open those canisters
BY MR SKALABAN:
Q So at this point in time, there's a possibility in your mind that the DOE is not going to integrate multipurpose canisters into its system?
A. I think that's a mischaracterization We're certainly going to be able to integrate and

Page 60

handle multipurpose canisters The decision as to whether or not that canister gets disposed of in the repository is not the department's decision That's the Nuclear Regulatory Commission's decision.
Q I see. Again, I'm not trying to mischaracterize. I'm trying to understand
A Yeah
Q And again -- so if I understand correctly, I mean, it's your understanding, I mean, as COO of OCRWM, that the system is going to accept those kind of canisters.
It's just a matter of whether or not for disposal the NRC will let you dispose of them as is or in an overpack, I guess?
A Correct
Q You're not planning to go just cut that technology off and kind of leave the utilities hanging so to speak?
A No
MR. SKALABAN I'd like to mark as Milner Exhibit 96 the 1992 annual capacity report
BY MR SKALABAN:
Q. And Mr Milner, if you can look at this, and also Milner 51, which is the 1995 annual capacity report, and Milner 42 So the numbers are 42, 51,

Page 61

and 96
(Milner Exhibit No.96 was marked for identification )
BY MR SKALABAN
Q. And Mr Milner, before we start on these documents, I want to ask you a followup about what we just talked about And I understand your testimony to be it's not the department's intent to not accept this kind of multipurpose canister technology that's being implemented by utilities
It plans to accept those kind of waste packages?
A That's correct.
MR SHULTIS: Objection, calls for a legal conclusion.
BY MR SKALABAN:
Q And if you weren't going to do that, that would potentially create some very serious problems for the industry, wouldn't it?
MR SHULTIS. Objection, calls for speculation.
A If we were not going to accept multipurpose canisters, I think it would certainly cause some problems for the utilities. They would

Page 62

have to remove the fuel from those canisters before it could be loaded into a transport cask.
BY MR. SKALABAN:
Q Could it possibly create -- or do you think it could create problems with getting license -- or license extensions for nuclear power plants, or possibly impact the utilities' ability to implement dry storage at all?
MR. SHULTIS. Objection, calls for speculation, asks for a legal conclusion
A. My personal opinion, I don't believe that it would cause a problem in terms of implementing dry storage. Again personal opinion, I don't believe that it would affect the ability to get a license renewal, but that's really an NRC realm there.
BY MR. SKALABAN
Q. And why is that your opinion?
A. Just based on my limited knowledge of the area I can't particularly envision it would cause a problem in terms of a license renewal. And I can't envision why it would cause a problem with dry storage.
Q Well, do you think it would cause some heartburn and potential anger from state Public Utility Commissions?

Page 63

MR. SHULTIS: Objection, calls for speculation.
A. I have no idea.
BY MR. SKALABAN:
Q. Okay Turning to the documents I had just referenced, 42, 96, and 51, we talked about the waste acceptance schedule that appeared on page 5 of the 1991 annual capacity report, Milner Exhibit 42.
And looking at Milner No. 96, which is the 1992 ACR, if you could turn to page 4.
What we see in the 1992 ACR, page 4, table 2.1, this is the same waste acceptance schedule that appears in the 1991 ACR at table 2.1; is that correct?
A. Sorry. You said -- okay. 1992 ACR dated May '93.
Q. Right.
A. Okay. Yes. That's the same schedule.
Q. And for Milner Exhibit 51, which is the 19- -- March 1995 annual capacity report and annual priority ranking, there's a table one that appears on page 4.
A. M-hm.
Q. And that table is the waste acceptance schedule which is the same as the waste acceptance

and the correspondence are between Yankee Atomic and the department of energy.
MR SHULTIS All of these together are 97?
MR SKALABAN Yes.
(Milner Exhibit No 97 was marked for identification )
BY MR. SKALABAN:
Q Mr. Milner, if I could turn your attention to this Exhibit 97 The first document contained here is a letter signed by a Mr. R M Grube to U S Department of Energy, DOE contracting officer, dated September 25th, 1992
I believe at this time you were the director of the office of storage and transport?
A I believe I was
Q Okay And is that --
A Have to double-check, though.
Q Yeah Is that the office that had responsibility for the processing of the DCSs?
A Yes, in conjunction with the office of procurement
Q. Have you ever seen this letter before?
A I don't recall specifically this letter,



no.
Q. And from the text of the letter, what do you understand that Yankee Atomic is asking here?
MR. SHULTIS: Objection, document speaks for itself, calls for speculation.
A. Sitting here today, in my opinion, they're basically asking for priority for reactor since it was shut down.
BY MR. SKALABAN:
Q. Does it also indicate too that they're asking the DOE to accept all of the spent fuel at the station over a three-year period starting in 1998 as indicated by the attached DCSs?
MR. SHULTIS: Objection. The document speaks for itself.
A. Certainly that's what's stated in the document, which in my view is requesting priority.
BY MR. SKALABAN:
Q. And if you turn to the next document in the series, it's dated December 1, 1992.
A. M-hm.
Q. And it's a letter from Linda Strand, the contracting officer, the office of placement and administration. And it's addressed to a Mr. Buchheit.



Does this appear to be the department's response to the September 25, 1992, letter that we just looked at?
A. It appears to be, yes.
Q. Did you have occasion to review this document as the director of the office of storage and transport?
A. I don't specifically recall that one way or the other.
Q. Can you take a moment to read the two paragraphs that begin, as stated, and, as a result, which are the last two paragraphs on the first page.
A. Let me take a moment to read the letter.
Q. Sure.
(Pause.)
A. Okay
BY MR. SKALABAN:
Q. What do you understand the department of energy to be telling Yankee Atomic in these last two paragraphs of the first page of the letter?
MR. SHULTIS: Objection. The document speaks for itself.
A. Sitting here reading this at this point, it would tell me that under the instructions for completing DCRs, contract holders were instructed to



keep their DCSs within the allocation specified in the ACR.
Yankee submitted three DCSs, all three of which exceeded some cases by a factor of about five, some cases more -- one case more those allocations, and therefore, consistent with the instructions in the DCS, they were disapproved, and Yankee was requested to submit revised DCSs.
BY MR. SKALABAN:
Q What was the authority upon which the DOE relied in formulating these instructions restricting the DCSs to the specific allocations in the ACR?
MR. SHULTIS: Objection, calls for a legal conclusion. The document speaks for itself.
A. I guess in my opinion, you trace the authority back to the standard contract, which one indicates an oldest fuel first priority ranking. It also specifies that the department prepared ACRs and APRs to allocate fuel, and the allocations are based on that.
BY MR. SKALABAN:
Q. And at this time it was the department's position that any DCS that did not comply with the instructions -- instruction 2.7 would be disapproved?
A. I believe --

Page 72

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
MR. SKALABAN: Well, he was the director of the office with responsibility at the time.
MR. SHULTIS: I understand, that but he's not a 30(b)(6) witness.
MR. SKALABAN: Your objection is noted.
BY MR. SKALABAN:
Q. Can you answer, Mr. Milner?
A. I'm sorry. Would you repeat the question.
MR. SKALABAN: Could you read it back, please.
(The reporter read the next-to-last question.)
MR. SHULTIS: Same objections.
A. And I believe that was so stated in the instructions from the DCS.
BY MR. SKALABAN:
Q. And so that was the department's position?
A. I believe so.
Q. Do you remember ever talking about that instruction while you were director?
A. Not specifically. I don't know.
Q. And if you do need to refer to the instructions, they are No. 43. The item is 2.7 on

Page 73

page 6.
A. Okay.
Q. Do you have any reason to believe that the department ever talked about deviating from that instruction and the approval and disapproval process?
MR. SHULTIS: Objection, foundation.
A. I'm not aware of any discussions that had taken place that deviate from the instruction, no.
BY MR. SKALABAN:
Q. Do you know if the pos- -- I mean, was it something even open for discussion, is that maybe there would be cases where a purchaser would be allowed to exceed their allocation?
MR. SHULTIS: Asked and answered.
A. I think I had indicated previously that in a number of points throughout the conduct of the program, there had been discussions and considerations as to whether priority should be given to shutdown reactors. I believe in each case, the final outcome in discussing it with the industry as a whole was that we should maintain the ranking, I guess, if you will, that's specified in the contract, that is, oldest fuel first. Priority should be given on oldest fuel first rather than shutdown
BY MR. SKALABAN:

Page 74

Q. Thank you. I appreciate that, but my question is actually a little bit more specific.
Was there any discussions that you are aware of or that you can recall where the department was considering or discussing whether or not it could or should deviate from this instruction 2.7 and approve any DCS that exceeded the 1991 ACR allocation?
MR. SHULTIS: Objection, asked and answered.
A. Yeah. I believe I stated that I wasn't aware of any discussion specific to deviating from the instruction.
BY MR. SKALABAN:
Q. And so then the only -- if I understand correctly the only conversations you recall generally about the topic of deviating from the 1991 ACR allocation would be the possibility of shutdown priority?
MR. SHULTIS: Objection, assumes facts not in evidence, asked and answered.
A I think what I stated was that, yes, there had been discussions about should we maintain a priority based on oldest fuel first, should there be priority for shutdown reactors. I don't recall if

Page 75

there were any other situations other than shutdown reactors that we discussed as to whether or not priority should be given, but certainly.
BY MR. SKALABAN:
Q. Turning back to this letter in Yankee -- this Sept- -- this December 1, 1992, letter in Milner 97, second paragraph says, as a result of these errors, the DCS has been approved --
MR. SHULTIS: Objection.
MR. SKALABAN: I'm sorry Thank you, counsel.
BY MR. SKALABAN.
Q. -- has disapproved -- or, has been disapproved, so as a result of these errors, the DCS numbers specified here have been disapproved.
Was it the department's position at the time that Yankee Atomic had submitted -- had committed errors in submitting its DCSs as it did?
MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion.
A. In my opinion, certainly the department felt that Yankee had deviated from the instructions and submitted DCRs that were far in excess of the allocation.
BY MR. SKALABAN:

Page 76

Q If you look at the next letter in the series, it is a January 7th, 1993, letter to Linda Strand, the contracting officer, from a Mr. J.M Buchheit, and the letter is under Yankee Atomic Electric Company letterhead. If you want to take a moment to review the letter, please feel free.
(Pause.)
BY MR. SKALABAN:
Q. Okay. From your review of this letter, is it fair to say that Yankee Atomic is taking exception to the DCS instruction 2.7?
MR. SHULTIS: Objection. The document speaks for itself, calls for speculation.
A. In my opinion, that's what's characterized here, m-hm.
BY MR SKALABAN:
Q. Did you review this letter when it came in from Yankee Atomic?
A. I don't recall having done that.
Q. Would that be something you would probably review in your ordinary course of business as the director of office of storage and transport?
A. Not necessarily It could have been handled by one of my staff.
Q. Who do you think that would be?

Page 77

A Exhibit 1 doesn't help me, so at this point in time, I can't really recall.
Q Do you remember in early 1993 the subject coming up at all that Yankee Atomic was taking issue with the DCS instructions and not submitting DCSs per that instruction?
A. I generally recall that
Q What do you generally recall was being said within DOE at that time about this?
A I think at that point in time as the best of my recollection, the industry in general had made it pretty clear to the department that they wanted to maintain the oldest fuel first as the basis for priority ranking.
Q You remember anything else about internal DOE discussions about Yankee Atomic's objections?
A Nothing specific within the department. I certainly remember the industry in general raising equity issues if we gave priority to shutdown reactors
Q If you look at page 2 of Mr. Buchheit's letter, in the last paragraph, he says: Storing spent fuel on-site for an extended period after a plant has shut down or could be dismantled is not what Congress had in mind when it passed the waste

Page 78

policy act.
Do you agree with that statement?
MR SHULTIS. Objection, calls for a legal conclusion.
A. I'm sorry. Where are you reading?
MR. SHULTIS· I can help you, I think
A. I can neither agree or disagree. I don't know what Congress had in mind.
BY MR. SKALABAN:
Q Well, when you came to the program in the early years, in 1984 and 1985 and were, if I understand your prior testimony correctly -- I mean, you were doing things to get orientated and learn about the program when you came on board.
At that time in, you know, '84, '85, did you have that -- an understanding similar to what's reflected here?
MR. SHULTIS: Objection, calls for a legal conclusion, also, asked and answered.
A. I guess the best of my recollection, when I first joined the program, oldest fuel first had been in essence the basis for priority ranking.
BY MR. SKALABAN:
Q But when you came on board with DOE in '84 and '85, did you have any understanding about what

Page 79

Congress had in mind or Congress intended when it passed NWPA?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. No, other than what was in the act itself, which is certainly subject to interpretation.
BY MR. SKALABAN:
Q. If we turn to the next letter in the stack, that's an April 8, 1993, letter. And this letter is from Ms. Tomasoni, the contracting officer, to Mr. Buchheit It has a Bates label of YDK 037406.
MR. SHULTIS: I'm sorry?
MR. SKALABAN· The small number.
MR. SHULTIS Oh, okay. Thank you.
Q. If you could just take a moment to review that.
Does this letter appear to be a response to Yankee Atomic's January 7, 1993, letter?
A. Appears to be.
Q And that January 7, 1993, letter was again a resubmittal after the first rejection of the DCSs?
A. I believe that's correct
Q. And so this letter -- this DOE letter of April 8, 1993, is a second rejection, if you will, of Yankee Atomic's DCSs.

Page 88

BY MR. SKALABAN:
Q. Okay. But looking at the sentence in the next paragraph below that, that again reiterates that the request for accelerated acceptance was not in error?
MR. SHULTIS: Same objection, and asked and answered.
A. I believe the third paragraph, I would interpret that that way.
BY MR. SKALABAN:
Q. Now, Mr. Buchheit, on the second page, makes a statement in the second full paragraph: Then if spent fuel shipping campaigns were consolidated rather than spread out over an extended period, comma, it would reduce DOE's cost, which is a goal that should be supported by all DOE's customers and regulatory bodies.
Is that a fair point, that spent nuclear fuel shipping campaigns are consolidated --
A. Oh. I'm having difficulty finding where you're reading.
Q. I'm sorry. The second full paragraph, and it begins, we have enclosed correspondence.
A. Okay. I see it. Yeah.
Q. Okay. Well, looking at that paragraph, it

Page 89

indicates that Yankee Atomic has stated that as a matter of national policy it would be extremely undesirable to have decommissioned sites containing only spent fuel storage casks for over 20 years
Do you agree that it would be undesirable as a matter of national policy to have decommissioned sites containing only spent nuclear fuel casks for over 20 years?
A I don't know that I can agree or disagree.
Q Well, in your opinion, would that be desirable, to have utilities who have completed decommissioning to have to incur operations and maintenance expenses for 20 years to watch over spent nuclear fuel casks on their site?
A I think taken in isolation without other considerations, it would certainly be desirable not to have that occur.
Q And the next sentence in the letter makes a point about spent fuel shipping campaigns being consolidated would revise DOE's cost, which is a goal that should be supported by all.
Do you think that's a fair point about spent fuel shipping campaigns?
MR. SHULTIS: Objection, calls for speculation, vague.

Page 90

A Yeah I'm not sure what is really being referred to here Certainly reducing costs are a goal. but I'm not sure what they're really referring to when they say, consolidating shipping campaigns rather than spread out over a period of time
BY MR SKALABAN:
Q Well, to remove spent fuel from a site, if there were only five shipping campaigns in five years, for example, as opposed to 20 shipping campaigns to the same site spread out over 20 years, wouldn't that likely reduce DOE's cost?
MR SHULTIS Objection, calls for speculation.
A. I guess I'm still having a little trouble understanding if what's being referred to is, is it cheaper to -- just to use arbitrary numbers -- ship 500 MTUs of spent fuel in one year versus 500 MTUs of fuel over five years, a hundred per year, without really having any knowledge of what contractual arrangements might be made with the shipper. basically you're paying by the miles and numbers of shipments And I don't know how that would vary whether you did it all in one year or over five years
BY MR SKALABAN.

Page 91

Q And in the last paragraph, it indicates that there would be a meeting and a conference call
Do you see that in the last paragraph -- between DOE and Yankee Atomic -- a meeting and a conference call?
A Yeah, yeah, I do
Q Do you remember or did you participate in any conference call with Yankee Atomic in or around April of 1993?
A I don't recall that I did
Q Do you remember that such a conference call took place?
A I don't recall, no
Q If you look at the next letter dated June 10, 1993, from Yankee Atomic, this says, this letter is written to document the apparent impasse reached in our June 4, 1993, meeting.
Did you have any participation in a meeting that may have occurred between Yankee Atomic and the department on June 4, 1993?
A I don't recall having done so
Q The letter is copied to Allan Brownstein
Do you know whether he might have been in such a meeting?
A I don't know whether he was or not It's

Page 96

Q. Now, the next letter is a June 15, 1993, letter from the DOE contracting officer to Mr. Buchheit.
Does this letter appear to be a response to the June 10, 1993, letter that we just looked at?
A. The letter states, this is in response to your letter of June 10, so I guess so.
Q. And on page 2 of this letter, it states that -- on the second paragraph beginning June 10, 1993 -- actually if you want to just take a minute to read through that paragraph and the next one.
A. Okay.
(Pause.)
BY MR. SKALABAN:
Q. Okay. Is this letter from the department denying Yankee Atomic's request for priority acceptance at that time?
A. That would be my interpretation, yes.
Q. Does the letter also indicate that after completion of a rule making on shutdown priority Yankee could resubmit its -- resubmit its request, at which time the department will respond in accordance with the terms of the final rule?
MR. SHULTIS: The document speaks for itself, also, lack of foundation.

Page 97

A. What this is saying to me is that if -- once the rule making was completed, if the result of that rule making was to grant priority to shutdown reactors, then certainly Yankee could resubmit its request.
BY MR. SKALABAN:
Q. In that sentence, it says, Yankee Atomic may submit -- resubmit this request, which is in the second paragraph.
What is your understanding of what the department was referring to in the request?
Was it DCSs or another -- a request of another sort?
What was the department intending here --
A. Sitting here --
MR. SHULTIS: Objection. The document speaks for itself, also calls for speculation, lack of foundation.
A. At this point reading this, I would interpret this to mean their request for priority for shutdown reactors.
BY MR. SKALABAN:
Q. Is this indicating that after the rule making, Yankee Atomic could resubmit DCSs?
MR. SHULTIS: Same objection, asked and

Page 98

answered.
A Well, to me it doesn't say that I would infer from that
BY MR. SKALABAN.
Q In the next paragraph, is the department again encouraging Yankee Atomic to swap?
A Appears to be, yes.
Q Do you know what the department intended by the phrase here, quote The department is willing to assist Yankee Atomic in this process --
MR. SHULTIS: Objection, calls --
Q. -- end quote?
MR. SHULTIS: Objection, calls for speculation. The document speaks for itself
A. I don't believe anything was specifically intended by saying that other than if Yankee Atomic felt that in some manner the department could be of assistance in arranging a swap, the department would be willing to do what it could.
BY MR SKALABAN
Q To help Yankee Atomic obtain those swaps?
A. Yes
Q. In the last paragraph, the department is stating that. As we discussed during our negotiations, submittal of an acceptable DCS does not

Page 99

preclude Yankee Atomic's right under the contract should the department subsequent to rule making grant such priority under article -- under the articles of the contract?
A M-hm.
Q. Do you see that part, sir?
A I do
Q Does that indicate that Yankee Atomic would not be bound by acceptable DCSs, that this would be contingent upon future events?
MR SHULTIS Objection, calls for speculation, asks for a legal conclusion, lack of foundation
A. In my personal opinion, I think what's intended here is that if through the rule-making process provisions of the contract were changed, then Yankee could submit a new DCS and not be bound by the previously approved one.
BY MR SKALABAN.
Q. So this is providing some qualification of the DCS process, is it not?
MR SHULTIS: Objection, asked and answered
A No, I don't believe it is I think what this is saying to me is that if the contract were

ultimately changed through the rule-making process, then new DCSs could be submitted, which would be consistent with that new provision of the contract.
BY MR. SKALABAN:
Q Well, the contract at that time already provided the department the ability to grant priority for shutdown plants?
A. The contract did not preclude the department's ability to do that.
Q. Well, it gave them an affirmative grant of authority to do that if they wanted to; isn't that correct?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my recollection of the words is that the department may afford priority.
BY MR. SKALABAN:
Q And so there -- wasn't the issue to be addressed whether rule making wasn't a change to the contract, it was whether or not priority would be available for Yankee?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation, and mischaracterizes the document.
A. In my personal opinion, the contract



provided for priority based on oldest fuel first I think in totality, what this paragraph is saying is that -- it's suggesting that Yankee should submit DCSs based on current allocations, encouraged Yankee to exercise exchange rights, indicated the department would be willing to assist whatever Yankee would like to do, but that ultimately, if the rule making changed a provision of the contract away from oldest fuel first, then Yankee could submit -- well, new DCSs, whatever.
BY MR SKALABAN:
Q I understand your answer
I guess what I'm trying to probe at this point in time is, the contract already provided that the department may grant priority So the issue is not a change in the contract language itself It was the issue of whether the department should or should not exercise that provision and grant authority
Isn't that a more accurate characterization of the issue at that time?
MR SHULTIS. Objection. The document speaks for itself, calls for a legal conclusion, asked and answered.
A No. I don't believe so. I believe the contract provided for oldest fuel first. It did not



preclude some priority for shutdown.
BY MR. SKALABAN:
Q. What would be the effect if the rule making that's being discussed in this letter and the other letters we've seen -- what would be the effect if the department never carried through with that rule making on Yankee Atomic's DCSs?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation, and vague.
THE WITNESS: Yeah.
A. I mean, I don't understand the question.
BY MR. SKALABAN:
Q. I think it's fair to say that in view of the letters we've been seeing, the department has told Yankee Atomic that they're going to carry through a rule making on the priority for shutdown reactor issue?
MR. SHULTIS: Objection.
BY MR. SKALABAN:
Q. Do you agree with that?
A. Appears to be the case, yes.
Q. And there's nothing in your recollection as the director of office of storage and transport which makes you think otherwise?
A. Don't understand.



Q There's nothing to your recollection at this time -- you were the director of office -- director of the office of storage and transport, and during this time, you have no recollection of anything other than the fact that Yankee Atomic was being told there was going to be a rule making to address this?
A. Yeah. I certainly recall -- in fact in one of these letters, I think I saw it that Yankee Atomic preferred not to have a rule-making process, and I can only speculate the reasons, but certainly under a rule-making process, you solicit the views of all interested parties, and you reflect essentially the majority views in that rule making, and I can only assume that Yankee would have felt it was in the minority and not received its intended objective in the rule making, but I do recall Yankee preferring not to go through the rule-making process.
Q. Okay. But my question was about what the department was telling Yankee. And if we look here at the very first part of the very first paragraph, it says: The department has not determined whether priority will be accorded to shutdown reactors. The department intends to address further the issue of priority acceptance for shutdown reactors through the

Page 152

request so much as it's stating that it's available for delivery at that point in time as may be contrasted with another utility all of whose spent fuel would not be available at any given point in time for delivery.
BY MR. SKALABAN:
Q. Well, if we actually look at the final delivery schedule that's attached to the document, this indicates that Yankee Atomic is requesting for the department to pick up 127 metric tons of spent fuel and 21 spent fuel assembly-size containers of GTCC waste.
MR. SHULTIS: The document speaks for itself.
Is that a question?
MR. SKALABAN: Yeah.
BY MR. SKALABAN:
Q. Is that correct, is that what it indicates?
A. Yes, I believe so.
Q. And that it's proposing a delivery estimate for all of that spent fuel and GTCC on October 31, 1998?
MR. SHULTIS: I'm sorry. I think that mischaracterizes the document.

Page 153

Are you looking at the discharge date or the purchaser's delivery estimate?
MR. SKALABAN: Purchaser's delivery estimate.
MR. SHULTIS: And that's --
MR. SKALABAN: I'm sorry. If I said October, I meant to say January 31, 1998. And thank you, counsel, for correcting me.
MR. SHULTIS: The document speaks for itself, thankfully.
A. Yes.
BY MR. SKALABAN:
Q. So this is a final DCS requesting that on January 31, 1998, the department take approximately 127 metric tons of spent fuel and 21 spent fuel assembly-size containers of GTCC waste.
Is that fair?
A. That's what I would read in this, yes.
Q. Do you recall discussing with anyone at the department this final delivery commitment schedule submission by Yankee Atomic?
A. I don't recall having any discussion, no.
Q. And at this time, I believe you would have been office of waste acceptance and transport director?

Page 154

A. I think at that point in time, I was acting deputy director of OCRWM.
Q. Okay. And did that take place in January of '97, that promotion?
A. That -- wouldn't call it promotion so much as an appointment, yes, a temporary appointment.
Q. I'd like to call your attention to the next document. It's dated March 11th, 1997. It's from Beth Tomasoni, and it appears to be addressing Yankee Atomic's final delivery commitment schedule submission.
A. M-hm.
Q. Would that appear to be the document we just -- the final delivery schedule submission would be the document we just looked at dated January 31, 1997?
A. I believe so.
Q. Do you have an understanding of what the department is telling Yankee Atomic at this time about the consideration of Yankee Atomic's final delivery commitment schedule submission?
MR. SHULTIS: Objection. The document speaks for itself.
A. I guess in my opinion it's stating that the department was not approving the final delivery

Page 155

schedule at that point. It did not disapprove it It just did not act on it, did not approve it.
BY MR SKALABAN
Q Was the department intending to convey to purchasers at this time that the DCS and final delivery commitment schedule process had been in effect suspended?
MR SHULTIS Objection The document speaks for itself, calls for a legal conclusion, and Mr Milner is not a 30(b)(6) witness
A Well, I guess in my opinion, the -- when you got to the point of final delivery schedules, you then specified specific dates Since the department didn't have a facility in operation, it felt that it couldn't approve or disapprove final schedules since we didn't know when a facility would be in operation
BY MR. SKALABAN
Q Well, would DCSs in your view be binding if no final delivery schedule had been finalized?
MR. SHULTIS. Objection, calls for a legal conclusion.
A. I guess my understanding of the process of the contract is that, no, if a final delivery schedule had not been approved, then nothing in the DCS binds either party to accept or deliver waste on

Page 172

discussions in the sense of affecting all utilities that given the inability at that point or the highly unlikely ability to meet a '98 date that to approve schedules that were year-specific didn't seem appropriate.
Q Was there anything else about those discussions that you can remember?
MR SHULTIS Objection, asked and answered.
A No.
BY MR SKALABAN.
Q And I used the term suspending.
The processing of DCSs and FDSs, I mean, is that a fair characterization of what was happening at the department?
They were no longer suspending consideration of these DCSs and FDSs?
A That would be how I would characterize it, suspended rather than stopped processing Stopped to me would be more permanent than suspend
Q. So at some point in the future, this process may open up again?
A. Certainly that's my anticipation
Q I'd like to switch gears for a moment and talk about greater than class C waste, and for the

Page 173

record. I may refer to that as GTCC waste, and you're familiar with that term?
A Yes, I am
Q There was a few documents we looked at previously or that have been looked at previously in the coordinated portion of your deposition. I'd like to if you could please pull those out. That's No. 64 and 79
Starting first with Exhibit 64, this describes a meeting that was scheduled for February 8, 1995, and it indicates here in this document that the meeting was scheduled for four hours?
A It indicates that, yes.
Q Is it fair to say the letter is indicating that the meeting is about the coordination between the office of environmental management, GTCC, LLW program, and the 5office of Civilian Radioactive Waste Management repository program?
A. I'm sorry. Would you --
Q. Sure. The document reflects that there was a -- that someone has recognized the need for coordination between the office of environmental management and RW regarding GTCC waste?
A Yeah It states that here
Q Do you remember who it was that kind of

Page 174

came to that recognition, that there was a need for coordination?
A Well, it would infer from this memo it was Mr Plummer
Q. Do you know prior to the time of this memo, dated January 27, 1995, were there any discussions in RW about accepting GTCC waste as part of RW's waste management program?
A. I can't remember -- I can't recall any specific meetings or discussions. I guess I do recall in general terms discussions which essentially focused on the idea that greater than class C was not required to be disposed of in a repository.
Q. And who -- do you recall who those discussions were with?
A. I can only recall just vaguely in general terms having such discussions No, I can't recall who I had them with.
Q. And why were those discussions being held?
Was there a question in people's mind or a doubt in people's mind whether or not GTCC would have to be taken by RW as far as a waste program?
A. Actually, no. The nature of the discussions I recall were basically either in response to a question from somebody within the

Page 175

program or perhaps even somebody from environmental management simply informing them that there was no requirement for RW, DOE -- RW.
Q. Did you make that decision, or did someone else?
A. I did not make that decision. I guess the program held that position stemming from -- I guess language in the NWPA, which indicated that the program would dispose of high-level waste that NRC had determined required disposal in the deep geologic repository, and NRC had not made that determination.
Q. Do you remember anyone in particular on RW who was -- may have studied this question or may have --
A No, no.
Q Now, I don't want to cover the same ground that was covered before, and I recall your answer being -- about this February 8, 1995, meeting being that you communicated to the office of environmental management RW's position that GTCC was not RW's responsibility.
I mean, is that what you recall you testified to?
A. Yes. I recall I guess having a meeting with Mr Plummer and stating that. Whether it was a

Page 204

Q If I could call your attention briefly to Milner 60, in particular the position statement draft on page 3.

The second sentence says: The projected CRWMS acceptance capacity is currently anticipated to exceed the industry annual SNF discharge rate in the year 2010 or when a repository begins operations, period At that time, DOE will revisit this issue and consider granting acceptance priority to shutdown reactors

Now, recognizing that this is a preliminary draft and that it appears to be from a contractor, does that indicate to you that the department at this time would consider more favorably granting acceptance priority to shutdown reactors at a time when the industry's annual discharge rate had exceeded?

A. It does not

Q Why not?

A Well, two things The wording in this draft statement first of all indicates that it would be considered at that time. To me it gives no indication of whether that would be a more favorable consideration or not

But then secondly, this is a preliminary

Page 205

draft of a contractor work product, which would simply be input to the department's decision-making process.

Q. Well, from December 29, 1992, forward, did the department ever take the view that it would consider granting acceptance priority when the discharge rate is exceeded?

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.

A. Well, in my recollection, the department never took the view that it would grant priority to shutdown reactors once a certain rate was reached or exceeded. And I think I had testified earlier that in a number of points throughout the history of the program, the department addressed the issue of priority to shutdown reactors and usually addressed the issue in discussions with industry representatives.

And generally, I think the majority opinion was -- discussions on the part of the utility side was that priority should not be afforded to shutdown reactors.

(Discussion off the record.)

BY MR. SKALABAN:

Q. Well, if it could be shown that granting

Page 206

priority to a shutdown reactor would not adversely impact an operating utility in the sense that that operating utility would not be required -- or no operating utilities would be required to rerack or build dry storage because of some accelerated priority for a shutdown, in that instance, would it make sense for the department to grant priority?

MR. SHULTIS: Objection, assumes facts not in evidence, also calls for speculation.

A. Well, I think that the view held by a large number of utilities were that any priority afforded a shutdown reactor would adversely affect them.

BY MR. SKALABAN:

Q. But if it could be demonstrated that it wouldn't -- that it wouldn't require any excess cost to be incurred for on-site storage to any operating utility, would that be an important consideration in the department's mind as to whether to grant acceptance priority or not?

MR. SHULTIS: Same objection, asked and answered.

A. Again, I think if it could be demonstrated -- in that sense demonstrated to all of the contractor holders as well as the department that

Page 207

there was no adverse effect, and I wouldn't limit that to the need or not need -- or no need for building additional storage, just a general if everybody agreed that, yes, it was demonstrated that there was no adverse effect whatsoever in anyone's mind, then, yeah, that would have made sense.

I don't -- I can recall of nothing that was ever said, demonstrated, whatever, that went along those lines. I think it remains the position of quite a number of utilities to this day that any priority for shutdown reactors would adversely affect a utility.

BY MR. SKALABAN:

Q. Well, wouldn't the answer to the question on whether there would be an adverse impact to other purchasers -- wouldn't that be influenced to a very large extent by how great the acceptance rate is if the -- if, for example, there's a steady state rate of 3,000 MTUs, as opposed to, say, 400 MTUs, there would be a lot less need to build or to allow for additional storage at operating reactor sites?

Do you agree with that?

MR. SHULTIS: Calls for speculation.

A. I would agree with a part of the statement that said, if you -- well, if you up the acceptance



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 208

rate and utilities had no need for additional storage at the lower rate, certainly the higher rate they wouldn't need either.

And perhaps I misunderstood your question, but --

BY MR. SKALABAN:

Q Okay I guess what I'm driving at is, how great the steady state acceptance rate is would have a large impact on whether or not other purchasers would be impacted by a grant of priority if the department's performing in a rate such as 3,000 MTU

It's accepting a lot more spent fuel from purchasers than if it's accepting rate at 400; is that right?

MR. SHULTIS: Asked and answered.

A. Well, I think in my opinion, a number of the contractor holders hold the view that regardless of what the acceptance rate is, any priority to a shutdown reactor would adversely impact them.

And if I can try to think of a hypothetical example.

If utility X had an allocation of a hundred MTUs in a given year and the overall acceptance rate was 500 MTUs for that year, if the department doubled that acceptance rate to a thousand

Page 209

MTUs in that particular year, potentially utility X might expect that their allocation would increase to 200. And therefore, you know, likely their view would be that they were adversely impacted even though the rate were doubled.

BY MR. SKALABAN:

Q. I guess what I'm driving at, there's plenty of room in their spent fuel pool, that utility -- and the overall acceptance rate is, say, 3,000 MTU, and they can see in view of that acceptance rate that they're not going to have to add additional storage under that rate, and they have excess room, they're not going to be adversely affected economically if there's a grant of priority?

MR. SHULTIS: Objection, assumes facts not in evidence, calls for speculation, asked and answered.

A. I mean, we're both sitting here trying to get into the mind of a hypothetical utility, and if a utility's only view of adverse impact was whether or not they had to build additional storage, then I suppose that utility would deem that there was no adverse impact, but I no way can try to believe that I know what every utility's definition of adverse impact is.

Page 210

BY MR. SKALABAN

Q. Well from the department's perspective, if there was no -- if it could be shown that there's no economic impact to other utilities, in other words, because of this grant of priority, the other utilities are not going to have to add some additional storage facilities, they're not going to have to incur those costs, what other adverse impacts would there be that the department would be concerned about?

MR. SHULTIS: Same objections, including asked and answered.

A Well, to characterize adverse impacts that the department would be concerned about, I think our concern more related to the allocation in our view under the contract specified oldest fuel first. To change that really would require I think the agreement on certainly the bulk of the contract holders

BY MR SKALABAN:

Q. But can you think of any other adverse economic -- I mean, any other adverse impacts other than economics?

MR SHULTIS Same objections, asked and answered.

Page 211

A Well, I can only speculate that a utility might be concerned if -- might perhaps be concerned about the reaction of its PUC or its post- -- that there may be a negative reaction for them giving up what might be viewed as a quicker removal of the spent fuel from that site, be it shutdown or operating reactor.

BY MR SKALABAN:

Q Now, while we have the contract still out, we looked and spent some time talking about the DCS instruction 2.7, which required the utility purchasers to follow the allocations in the ACR, is that correct?

We looked at that earlier?

A. Right.

Q. And I believe I asked you about what was the authority that the department based that instruction on, and I believe you referred me to different provisions in the contract, is that right, the ACR?

A Well, I think I referred -- reference in the contract not to specific provisions but the ones that reference the ACR -- APR Excuse me

Q Well, I'd like you to take a look at the contract section -- it's the page of the Federal

Page 212

Register 16601 And in the article five, part B, delivery commitment schedule, it says on the top of column three: The purchaser shall submit to DOE the delivery commitment schedules which shall identify all SNF and/or HLW that the purchaser wishes to deliver to DOE beginning 63 months thereafter.
Do you see that, sir?
A I do, yes.
Q. What was your understanding of that part of this provision of the contract?
MR SHULTIS: Objection, calls for a legal conclusion.
A. I guess my personal interpretation is that they would in fact submit DCSs which were consistent with their allocation
BY MR SKALABAN:
Q If it says that the purchaser shall submit DCSs which shall identify all the SNF and/or HLW the purchaser wishes to deliver -- if the purchaser is required to by the instruction to, say, only submit up to the level of their allocation in MTUs, they can't then provide or can't identify -- they can't -- or more specifically, they're precluded from identifying all of the SNF that they may wish to deliver?

Page 213

MR. SHULTIS: Objection, calls for a legal conclusion.
A. Yeah. In my personal opinion, I would read that -- I don't know that you can read any provision of the contract separate and apart from other provisions of the contract. And I guess I would be reading that in conjunction with the prior article, which talks about DOE issuing an annual acceptance priority ranking and an annual capacity report, which delineates our receiving capacity.
And in reading those two together, in my personal opinion, I think you would not -- I can't see a reason why you would infer that you would submit a DCS which was greater than your allocation.
BY MR. SKALABAN:
Q Well, the language, all SNF and/or HLW that they wish to deliver, that language in that provision is -- it's not tied to an ACR allocation, is it?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. In my opinion, it is. I mean, I guess if I were to read that provision -- you know, hypothetically if I were to read that provision separate and distinct from any other provision in the

Page 214

contract, I could conceivably read that as requiring the utility to deliver that fuel to the repository.
BY MR. SKALABAN:
Q. All the fuel that it wishes to deliver?
A. To the repository.
MR. SHULTIS: Same objections.
BY MR. SKALABAN:
Q. So it can conceivably be read to allow the utility to identify all the fuel that it wishes to deliver, aren't the DCS instructions in effect changing the terms of the contract?
MR. SHULTIS: Objection, calls for a legal conclusion, mischaracterizes prior testimony.
A. Yeah, I think you are mischaracterizing my response.
I was saying a hypothetical that if you read that provision separate and apart from anything else in the contract, you could probably infer any number of things. But I think you read one provision in the contract in conjunction with other provisions. And to me you read that in conjunction with annual capacity report limitations and allocations.
BY MR. SKALABAN:
Q. Well, I guess what -- yeah, I definitely don't want to mischaracterize your prior answers.

Page 215

Thank you for clarifying.
But there's nothing in this provision B 1 that references an annual capacity report. It does talk about a priority ranking, but there's nothing about the annual capacity report in the DCS provision
MR. SHULTIS: Objection The document speaks for itself, asked and answered.
A. Unless I'm totally remembering wrong, I believe the contract does reference annual capacity reports and annual priority rankings.
BY MR. SKALABAN:
Q. I'm just talking about this provision B 1.
MR. SHULTIS: Same objections.
A. I believe I've responded to that already.
BY MR. SKALABAN:
Q Okay. So it's your view that this provision that purchasers shall submit to DOE the delivery commitment schedules which identify all SNF that they wish to deliver is tied to the annual capacity report?
A. That's my view.
Q. And in your view, it's not susceptible to another interpretation?
MR. SHULTIS: Same objection, asked and

Page 216

answered, mischaracterizes prior testimony.
A. In my view, no.
MR. SKALABAN: I'd like to mark as Exhibit I believe it's 102 --
(Milner Exhibit No. 102 was marked for identification.)
MR. SKALABAN: This is a document entitled, U.S. Department of Energy, Office of Civilian Radioactive Waste Management, nuclear waste technical review board, full board meeting, subject, update on the multipurpose canister concept, presenter, Ronald A. Milner, and it's dated July 11th, 1994.
MR. SHULTIS: Actually -- I'm sorry It says, January 11th
MR. SKALABAN: Thank you. January 11th, 1994
BY MR. SKALABAN:
Q Do you remember giving this presentation?
A. Vaguely, I do, yeah.
Q. Can you tell me about what the purpose of the presentation was?
A. No. My recollection, it was just what the subject says, to update the TRB on the multipurpose

Page 217

canister concept at that time.
Q. And who is the nuclear waste technical review board?
A. The nuclear waste technical review board is a body which as I recall was established -- the body in general was established by the Nuclear Waste Policy Amendments Act. They are a body of essentially 11 members which are nominated I believe by the National Academy of Sciences and appointed by the president to oversee the technical aspects of the OCRWM program, and they provide reports to the Congress.
Q. Are you a member of the board?
A. Oh, no They are an independent body independent from the department.
Q. Now, at this presentation, would this be open to the public?
A Yes, I believe virtually all of the board meetings are open to the public.
Q. And what's the purpose of the review board?
I think you just said they report to Congress
A. I don't recall the exact wording from the act -- I believe it was the amendments act -- it

Page 218

essentially created an oversight body over the program, and they are to in essence review and provide recommendations on various technical aspects of the program to the Congress.
Q. I'd like to call your attention to page 19. I'm hoping you can explain for me some of the bullet points that are there. That page is entitled, programmatic risks and contingency analysis.
A. M-hm.
Q And it references contingencies evaluated for the MPC system
Can you tell me what this is about, what contingencies were evaluated for MPC?
A My recollection of that, which is very vague, but looking at some of the different contingencies there, probably related to the numbers of canisters that had to be dealt with, but I don't really recall
Q Do you know what was being referred to here with -- under the, dash, impact of transportation after storage uncertainty, what that contingency was?
A. My recollection of that, that it -- at this point in time, I don't believe NRC had certified any canister for transport subsequent to extended

Page 219

storage. In other words, if a canister was loaded at the reactor site and stored for some period of time, I think at that point, there was no canister that was certified by the NRC that could subsequently be transported.
Q. I see. And that has changed, hasn't it?
A. It has now, yes.
Q. The canisters have been licensed for transportation?
A. Correct.
Q. And so when you're talking about programmatic risk measured as economic impact, there's a bullet point there for MPC not transportable after storage.
That's the concern you were just talking about?
A. Yes.
Q. And on the next page, page 20, in this first bullet point, it lists some concept benefits.
What does that mean, sited as motivation for work?
I don't understand that.
A. Well, at this point in time, I'm not sure I do either, but I would infer that these were reviewed as some potential system benefits which.

Page 220

therefore, would provide some impetus or motivation for the department or others to develop an MPC system.
Q. And so these listed under that bullet point -- these are advantages of an MPC system, whether it's developed by the department or by others?
A. Yes.
Q. And you agree that these are advantages of the system, of an MPC canister system?
A. My personal opinion -- well, I didn't read all of them, but, yeah, I would agree those are advantages.
Q. Are there any major disadvantages of canisters, of using canisters in the program that you're aware of?
A Certainly a disadvantage that it -- I could see would be that if ultimately no canister could be simply placed in a waste package and in the repository, then the department would have to open those canisters and repackage that fuel, which would probably to some degree increase the handling on DOE's part that would be required.
Certainly if there were widespread use of a canister system that ultimately could not be used

Page 221

for disposal, you've created a fairly large secondary waste stream to deal with canisters.
Q. Any other disadvantages that you can think of?
A. Not offhand, no.
Q. And at this point, if I understand -- again I don't want to -- I want to make sure I'm correctly testifying -- or correctly representing your prior testimony -- at least currently the department's plans are to accept canister systems and to dispose of them if possible?
A. Certainly the department plans to accept canister systems. The department certainly hopes to be able to dispose of those. Obviously, we would prefer not to have to open them and create another waste stream.
MR. SKALABAN: Let me go ahead and mark this. I believe we're on Exhibit 102; is that correct?
MR. SHULTIS: 103.
MR. SKALABAN: Thanks.
(Milner Exhibit No. 103 was marked for identification.)
BY MR. SKALABAN:

Page 222

Q. 103 is a memo from Mr. Ronald Milner dated March 8, 1994, to a series of people listed on a distribution list, and it contains an attachment. And the subject of the memo is, modification of the CRWMS program baseline to a multipurpose canister-based system.
Are you familiar with this document, Mr. Milner?
A. I am, yes.
Q. What was the purpose of this document?
A. Essentially, as it's stated here, that this was advising staff within the program that the director of the program had approved a change to the baseline to incorporate multipurpose canisters into the baseline.
Q. And what does that mean, to be incorporated into the baseline?
A. That means that essentially that we expect and would accept canisters into the system. That was part of the operation that we envisioned.
Q. Was the intent of this at this time to actually furnish multipurpose canisters to all of the utilities?
A. To the best of my recollection, time frames are unclear. Certainly at one point, which

Page 223

would be this approximate time frame, the department gave consideration to furnishing multipurpose canisters to utilities as a potential means to mitigate any delays Whether it was actually this exact time frame, I can't recall.
Certainly what this baseline change is dealing with is not the provision of canisters to anyone. It's simply a change in the baseline so that as part of the design process, designers will begin to take into account multipurpose canisters in the design of the system.
Q. And is that baseline still in effect?
A. I believe it is.
MR. SKALABAN: If I could mark now as Exhibit 104.
(Milner Exhibit No. 104 was marked for identification.)
BY MR. SKALABAN:
Q. Can you tell me what this -- and just for the record, 104 is a memo, although I will indicate there's no approval signature on the memo, but it appears to be a memo from Mr. Milner to Daniel Dreyfus, the director of OCRWM.
Do you recall this memo?

Page 228

your understanding, are those canister systems that are an outgrowth of what we've just been talking about, the multipurpose canister program that DOE was looking at?
A. Actually, I'm not familiar with the designation UMS Certainly the NAC MPC is -- my understanding suggests a canister system.
Q Okay So you're -- just with respect to the NAC UMS, you're just not sure if that is a multipurpose canister-type system?
A. Yes.
Q Now, here the assertion is made that it is a multipurpose element sealed canister
Does that suggest to you that it's a canister-type system?
I'm talking about the Maine Yankee part
A Yeah It suggests that certainly I've simply indicated I had not heard the term UMS before.
Q. Now, part 114, can you take a look at that paragraph.
(Pause.)
BY MR SKALABAN:
Q. Do you agree with that?
MR. SHULTIS Objection, calls for a legal conclusion.

Page 229

A. To the best of my recollection, there is no provision in the contract that requires disposal of a canister.
BY MR. SKALABAN:
Q. Is there anything in the contract to your recollection that excludes acceptance of a canister?
MR. SHULTIS: Same objection.
A. In my recollection, nothing excludes it. That's my opinion.
BY MR. SKALABAN:
Q. So is the contract kind of open on the issue of whether or not a canister has to be accepted?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. You know, in my opinion -- well, in fact, when the contract was written and executed, there were no such things as multipurpose canisters, so I would have been surprised if they'd been referenced in the contract in one way or another.
BY MR. SKALABAN:
Q. Can you take a look at proposed finding of fact 145, which is on page 70 of this document.
Mr. Milner, what I'd like to ask you first is, as a general matter, do you think it's an

Page 230

unreasonable decision generally for Yankee Atomic to have put its spent fuel in a multipurpose canister?
MR SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A I don't believe I know the answer to that.
BY MR. SKALABAN:
Q. How about with respect to Connecticut Yankee and Maine Yankee?
Do you think it's unreasonable for them to put their spent fuel into multipurpose canisters?
MR. SHULTIS: Same objections.
A. Likewise.
BY MR. SKALABAN.
Q. And for all three companies, do you have any reason to believe at all that it would be an unreasonable thing to do?
MR. SHULTIS: Same objections, asks for a legal conclusion, calls for speculation.
A. No. Likewise.
BY MR. SKALABAN:
Q So you have no reason to believe that that's an unreasonable thing for them to do?
MR SHULTIS: Same objections, asked and answered.
A I'm saying I don't know all the facts

Page 231

surrounding it to make a judgment in my opinion whether it's reasonable or unreasonable.
BY MR. SKALABAN:
Q. Well, as the chief operating officer of OCRWM, do you agree that Yankee Atomic has indefinitely delayed the acceptance of its spent fuel because it put the spent fuel in a multipurpose canister?
MR SHULTIS: Objection, calls for speculation and also calls for a legal conclusion.
A. I guess I don't know just exactly how they stored it.
Have they commingled failed fuel and spent fuel and GTCC and --
BY MR. SKALABAN:
Q. Well, let's assume that there are many canisters where there's no commingling of any failed fuel or GTCC with the spent fuel.
With that assumption, do you think that Yankee Atomic has indefinitely delayed the acceptance of canisters with SNF without failed fuel or GTCC?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. I don't know
BY MR. SKALABAN:



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 232

Q. If the department is planning to pick up canisters of failed fuel that are licensed for storage and licensed for transport on the same schedule, which I believe is what you had testified to earlier, then they haven't indefinitely delayed the acceptance of that fuel, have they?
MR. SHULTIS: Objection, asked and answered, and calls for a legal opinion, assumes facts not in evidence.
A. I don't know the facts surrounding their storage, so I can't form an opinion on that.
BY MR. SKALABAN:
Q. Well, what information would you need to know?
A. What exactly is in the canister.
Q. And in particular, what would you be looking for?
I mean, what are the variables?
What would you need to know?
A. What's in the canister.
Q. Let's assume we have a canister of standard fuel.
Is that going to be delayed indefinitely, the acceptance of that, because it was put into a multipurpose canister system?

Page 233

MR. SHULTIS: Objection, calls for a legal conclusion, also asks for speculation.
A. In my personal opinion, if the canister contained nothing but standard fuel, I don't see any reason why that canister would be delayed.
BY MR. SKALABAN:
Q. And if it contained some failed fuel but the canister system was licensed to handle that failed fuel and it was licensed to store it and it was licensed to transport that failed fuel, would there be any reason that that canister would be delayed?
MR. SHULTIS: Objection, calls for a legal conclusion and asks for speculation.
A. My personal opinion, if that canister were licensed for storage and transport failed fuel, that could still potentially delay that canister.
BY MR. SKALABAN:
Q. And why would that be?
MR. SHULTIS: Same objections.
A. If that canister were not licensed for disposal, therefore, requiring the department to open that canister, depending on the nature of the failure, that may or may not require special handling.

Page 234

BY MR SKALABAN
Q So that would again depend -- in your view, in your opinion, it would depend on the disposal facility's ability to process that failed fuel?
MR. SHULTIS Same objections
A Yeah. It would depend on the nature of the failure and whatever requirement there may be for special handling.
BY MR. SKALABAN
Q. Do you know a Mr. Ivan Stewart?
A. Yes, I do.
Q Can you tell me who Mr Stewart is?
A. I believe -- he certainly was -- I believe he still is an employee of Nuclear Assurance Corporation.
Q. Let me ask you, have you had occasion to work with Mr. Stewart?
A Yes
Q. What's your professional opinion of him?
MR. SHULTIS: Objection, relevance.
A My personal opinion, I think he's a good engineer. It's been some time since I've seen Mr. Stewart
BY MR. SKALABAN:

Page 235

Q Now, Mr. Tomaszczuk was asking you some questions about when the repository would open, and I believe you testified you thought it would be 2010
When is the department going to work on implementing its transportation system?
A Right now, the department intends to begin implementing its transportation system once it has a repository site approved
Q. And the current estimation for that is calendar year 2007?
A. No. Site approval, current estimation for that is fiscal year 2002
Q Okay So that's calendar year 2003?
A No I believe that is still calendar year 2003
Q Is there a difference between fiscal year and calendar year?
A. Yes. Calendar year 2002 goes through December 31st of this year, whereas fiscal year 2002 ends on September 30th of this year
Q. I see. So in December of 2002, we're in fiscal year 2003?
A. 2003. But site approval is -- if it occurs, is expected to occur in fiscal year 2002
Q. And what kind of preparations for

Page 256

say that it's true today, yes.
Q. It's something that you're -- I guess will be studying probably in the near future?
A. Correct
Q. And do you agree with this statement: It will depend on the availability of technologies that are certified by the NRC prior to the start of CRWMS operations and the needs of the individual purchasers?
A. Correct
Q. And what is your understanding of that clause there, the mix will -- in essence the mix of casks and canisters will depend in part on the needs of the individual purchasers?
A. I think it's -- I believe it's the program's view -- it's certainly my view that individual utilities will make decisions on storage based on their own individual needs and economics studies. And I suppose it's conceivable that if a true multipurpose canister system -- and maybe now is a good time to make a distinction since we've been talking about multipurpose canister systems, but what we've really been talking about in terms of what's in existence are dual-purpose storage systems transport, but if a true multipurpose canister system is

Page 257

developed, that's one that's considered by the NRC for storage, transport, and disposal, were available, it still could be decided by an individual utility not to use that system.
So therefore that would -- individual utility needs would certainly affect the mix. Some utility for whatever its own individual needs -- maybe it's economics. Maybe there are other considerations -- may not utilize all the technologies available.
Q I just want to pick up on something you said
You said we'd been talking about what are dual-purpose canister systems?
A. M-hm
Q. Isn't it possible that the canisters such that are utilized in the NAC SDC (sic), NAC MPC could be licensed for storage -- I mean, licensed for disposal, which would make them a multipurpose canister system?
A It's conceivable that they could, yes I don't know that any of them have submitted an application for certification yet, but I know of no reason why that couldn't ultimately happen.
Q And in this -- going back to this

Page 258

sentence, it will depend on the needs of the individual purchasers, is that indicating RW's intent to accommodate the different dry storage technologies that may be deployed at different reactor sites?
A My understanding is that, yeah, the department's goal is to handle all the technologies
Q Because different utilities may implement different vendors' dry cask storage systems to store their spent fuel?
A. Correct.
Q If I could just take your attention to Milner 84, which I don't believe we've looked at today. I'm on page 5 Excuse me
There's a strategy objective No. 1.
For the record, this is the program plan revision two from July 1988.
You see strategy objective No. 1 says. Dispose of high-level radioactive waste and spent nuclear fuel in accordance with the Nuclear Waste Policy Act of 1992 as amended?
A I see that, yes.
MR. SHULTIS 1982
BY MR SKALABAN.
Q. 1982 as amended
A Yes

Page 259

BY MR. SKALABAN·
Q And I assume as long as you've been at RW, that's been the goal of or the objective of RW is to dispose of high-level waste spent nuclear fuel in accordance with the act?
A Correct
Q And that has been RW's intent throughout the time you've been there?
A Correct
Q. Does the contract implement -- do you understand the contract to be implementing the NWPA?
A I believe it does, yes.
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. SKALABAN.
Q And therefore in your view, is it important that the contract be consistent with the act?
MR. SHULTIS· Same objection
A Yes
BY MR SKALABAN·
Q And that the contract should be implemented in a way that's consistent with the act That's important?
MR. SHULTIS. Same objection

Page 264

little bit less than that, but again I really don't recall.
Q. If I wanted to find out the answer to that question, who would I ask in the department?
A. Well, I believe that the estimates of turnaround times and so forth are embodied somewhere in the TSLCC analysis. Whether it's specifically stated in the published report, I don't recall. The person responsible for the TSLCC analysis is currently the acting director of the -- I forget what we call it now -- acceptance transportation and integration office.
Q. And who is that?
A. That's Jeff Williams.
Q. Does the department anticipate any problems handling higher burnup fuel?
What I mean by that is fuel --
A. I understand the term higher burnup, yeah.
MR. SHULTIS: Objection, vague.
A. I guess I'm vaguely aware that somebody has raised the question as to whether or not there would be any difficulty in handling higher burnup fuel. I don't recall any specifics or any specific concern.
BY MR. SKALABAN:

Page 265

Q. And in general hasn't the industry been moving towards higher burnup fuels in general matter because that reduces the amount of spent fuel generated?
A. It has.
Q. And as you sit here today, do you have any reason to believe that the department would have difficulties handling fuel burned up to say levels of 50,000?
A. The only -- in a general term, I don't know of any reason why the department would not handle higher burnup fuel. I think one potential difficulty that comes to mind is that higher burnup fuel could potentially have the effect of reducing the capacity of a transport cask.
Q. One way of possibly dealing with that would be mixing within a particular transportation cask some higher and some lower burned-up fuel?
A. Yes, that's a potential, sure.
Q. And still reach a full cask?
A. Potentially, yeah. You have to look at the specifics there.
Q. Sure. And if I could call your attention to Milner Exhibit 12.
For the record this is the 1987 annual

Page 266

capacity report
I'd like to call your attention to the -- inside the first page, there's a letter from Ben Rusche, or a statement signed by Mr Rusche.
Do you see that there's a statement there where Mr. Rusche says: Even more importantly, comma, it activates a mechanism through which contract holders can express their views on how the waste management system can achieve maximum efficiency while assuring equity among the parties?
What did Mr. Rusche mean to your knowledge about achieving maximum efficiency?
MR SHULTIS Objection, calls for a legal conclusion, calls for speculation.
A. I don't know what specifically what Mr. Rusche was referring to. I can form an opinion in my own mind at this point in time reading that that the start of issuing this document indicated to the utilities at that time what the capacity in the rankings plans were, and that could be the basis for comment on how efficiencies might be improved
BY MR. SKALABAN
Q. Has it been the objective of OCRWM to operate the waste management system in a way that can achieve maximum efficiency?

Page 267

A. Yes.
Q. And that's been an objective throughout your time in RW?
A. Yeah, I believe it has.
Q. And when you consider efficiency in operating the waste management system, is it also proper in your view to take into account utility costs?
A. My personal opinion, that should be a consideration.
Q. And that would be particularly appropriate given that it is a full-cost recovery contract?
A. Well, I don't know that I would blend those two ideas together. Full-cost recovery only refers to the DOE expenditures. Full-cost recovery doesn't consider utility costs.
Q. Do you think given it is a full-cost recovery contract and program that it puts some kind of responsibility on the department to operate it in a way where practicable to minimize utility costs?
MR. SHULTIS: Objection, mischaracterizes prior testimony, asked and answered.
A. In my personal opinion, I think it -- the department should and in fact I think the department did consider utility costs, and that's factored in

Page 268

many decisions what the impacts would be on utility costs.
BY MR SKALABAN:
Q And that consideration of utility cost has been a constant through your tenure at RW?
MR SHULTIS Objection, asked and answered.
A In my mind, it has.
BY MR SKALABAN.
Q Now. in considering utility exchanges. what was the department's position if you have a utility that has an allocation for example that doesn't perfectly match up?
For example, you have a utility one year that has an allocation of 20 MTUs, another one that has an allocation of ten MTUs in a later year, and they want to swap that ten-MTU allocation The first utility with the allocation of 20 would then be swapping away for example ten MTUs, but still hold a ten-MTU allocation.
Would that sort of partial trade, if you will, not a trade of exactly the same allocations, be permissible in the department's view?
MR. SHULTIS Objection, calls for speculation, Mr. Milner is not a 30(b)(6) witness,

Page 269

asks for a legal conclusion.
A. Well, since no exchange request or swapping request had ever been made, I can't really say how the department would have ultimately dealt with that. My personal opinion was that a partial trade like that would work.
BY MR. SKALABAN:
Q. Because as a practical matter, it would be coincidence or not very likely that any utility would have the exact same allocation in two different years. Right?
MR. SHULTIS: Same objections.
A. I believe that's true. I'd have to look at the allocations there, but I believe that's true.
BY MR. SKALABAN:
Q. I mean, I think that that's a fair characterization, more likely than not, they're not, and so to have a swap -- to be able to have swaps in the system, the partial trades would need to be allowed?
A. In my opinion, yes.
Q. And that wouldn't be a problem, would it, because the utility could just resubmit new DCSs to reflect that change?
MR. SHULTIS: Same objections, calls for a

Page 270

legal conclusion, asks for speculation.
A. Yeah Again, in my personal opinion, because the department had never received a request, in my opinion, that would make sense.
BY MR SKALABAN:
Q And you do not have any reason to believe that that would be a problem for the department?
MR SHULTIS: Same objections
A Other than some slight increase in administrative burden, I have no reason to believe that.
MR. SKALABAN: Let's go off the record for a second.
(Discussion off the record.)
MR. SKALABAN: Back on the record.
BY MR. SKALABAN:
Q. You agree that commercial nuclear power has been used in the United States for a long period of time?
A Yes.
Q. And is there a history of -- history available of shipping consistent quantities of spent fuel from reactor sites to commercial and governments facilities?
A There's certainly been large numbers of

Page 271

nuclear shipments within the country. I don't know that there's been large number of shipments from reactors to government facilities. There certainly has been some small amounts of that that I'm aware of, at least within this country.
Q. And has there been a lot of shipments of foreign fuel?
I mean, are you aware that spent fuel has been shipped in large quantities in foreign countries?
A Yes.
Q In fact, I believe countries such as Britain, France, Japan, and Russia reprocess spent fuel, don't they?
A. France and Britain reprocess spent fuel. Germany, Japan, I believe others ship their fuel to one of those two countries for reprocessing or have in the past at least.
Q. So in view of that, there's been substantial amounts of spent fuel transportation shipments abroad?
A. Yes.
Q Would you have any reason to disagree with an opinion that through 1998 more than 100,000 MTUs of spent fuel has been shipped by road, rail, and sea

Page 276

within a few years thereafter making 3,000 MTU.
A M-hm
Q. Again on that kind of schedule, you wouldn't see a problem on making -- on developing a transportation system to do that?
A. Developing a transportation system? No. Because that's simply -- how many MTU you can handle relates strictly to how many casks trailers and railcars there are
MR SKALABAN. Off the record briefly.
(Discussion off the record.)
MR. SKALABAN. I'd like to mark Exhibit 106.
(Milner Exhibit No 106 was marked for identification )
BY MR SKALABAN:
Q. Mr Milner, I'd like to call your attention -- this is a letter that's actually signed by you for Lake Barrett, and it's dated July 15, 1998.
A I just received it, so if I can take a moment
Q Sure Please.
(Pause )

Page 277

A. Okay.
BY MR. SKALABAN:
Q. I just want to call your attention to the last sentence in this letter dated July 15, 1998, the last sentence in the third full paragraph.
It states that: Due to the delay in opening a disposal facility, the department has been unable to finalize the schedules.
Does that further confirm your recollection that the department was unable to -- or stopped processing -- scratch that.
Does that further confirm your recollection of that the department was unable to finalize schedules because of the delay in opening a disposal facility?
MR. SHULTIS: Objection, vague, calls for a legal conclusion, asked and answered, document speaks for itself.
A. Yes, in my opinion, it does.
MR. SKALABAN: And I believe this will be Exhibit 107.
(Milner Exhibit No. 107 was marked for identification.)
BY MR. SKALABAN:

Page 278

Q. Mr. Milner, can you identify for the record what is Exhibit 107?
A. Appears to be a memo from myself to then acting director Lake Barrett requesting his approval of a letter from the contracting officer to Yankee denying priority acceptance.
Q. Now, in the second paragraph in the background section, it indicates that the director committed to subject this issue, shutdown priority, to rule making to clarify how this provision of the contract should be implemented; is that right?
A. That's what it states, yes.
Q. And in view of that, does that confirm for you that the DOE had told Yankee Atomic that the issue of shutdown priority was going to be addressed by rule making?
A. Yes, I believe so.
Q. In fact it goes on a little bit further here and says that: Secretary O'Leary reaffirmed our intent to clarify this issue through rule making in response to a question from Congressman Gallo.
Do you see that?
A. Yes.
Q. Do you recall that exchange between Secretary O'Leary and Congressman Gallo?

Page 279

A. No, I don't.
Q. It also reflects that in the interim the director encouraged Yankee to exercise a contractual right to exchange allocations with other interested utilities; is that correct?
A. Correct.
Q. And that is in fact what the department did?
A. I believe so, yes.
Q. On the second page, a few bullet points down under the department's position is that, colon, there's a provision -- well, can you tell me what you understand what's being talked about in this first -- the first bullet point under, the department's position is that, and I'm referring to the part that it says the contract provides a priority may be granted?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Well, in my opinion, I believe that that particular bullet is responding to the first bullet under the section that's labeled Yankee's position. Yankee's position was that they believed that priority acceptance was provided for in the contract, and I think this states that the department's

Page 280

position was that it may be granted, that it was not required to be granted, but that to grant priority to shutdowns would adversely impact other utilities

BY MR. SKALABAN:

Q. Here you wrote to the director of the program that the grant of shutdown priority in Yankee would adversely impact other utilities, quote, due to the legal limit on acceptance capacity prior to repository operations, unquote.

Do you see that part?

A. I see that.

Q. What do you mean by that?

A. That particular parenthetical referred to the 10,000 metric-ton capacity limit prior to the start of the repository operation on an MRS.

Q Here you seem to be linking the fact that it would adversely impact other utilities to the statutory capacity limits, but I believe in other testimony you at least indicated or I understood you to indicate that granting shutdown priority would just as a general matter adversely impact other utilities.

A. Well, with the capacity limit, it would certainly impact -- adversely impact other utilities In my personal opinion, is that even without the

Page 281

capacity limits, under almost any acceptance rate, it would adversely impact other utilities.

Q. Well, why add this parenthetical, then, in your letter to the director?

A. I don't specifically recall why it was added there, but it's certainly true, and --

Q. So the situation -- I mean, is it fair to say that if the legal limits on acceptance capacity were not there, there may be opportunities where shutdown priority would not adversely impact other utilities?

MR. SHULTIS: Objection, calls for speculation, document speaks for itself.

A. In my opinion I guess I have to go back to what's each individual utility's definition of an adverse impact, and you and I may determine is or is not an adverse impact might be completely different for another utility if we were utility representatives.

BY MR. SKALABAN:

Q. Okay. And the concurrence chain on the side indicates that this memo was circulated to a wide variety of people and they concurred in it?

MR. SHULTIS: Objection, mischaracterizes the document.

Page 282

MR SKALABAN I'm sorry Am I missing something?

MR SHULTIS Mr Barrett's initials are not there

MR. SKALABAN: Okay Fair enough.

BY MR. SKALABAN.

Q Excluding Mr Barrett, whose initials are not there, everyone else on the chain of concurrence --

MR SKALABAN: Thank you counsel for pointing that out.

BY MR. SKALABAN

Q -- everyone else on the chain had signed off on it?

A Yes. I don't see any indication of nonconcurrence or comment or whatever, although I note that three of the concurees there were members of my staff, and the other three people who -- aside from myself who initialed off on the concurrence were front office staff at the time.

Q. Do you know, did Mr Barrett sign off on this memo ultimately?

A I don't recall.

MR SKALABAN All right I believe this is the last exhibit. This is 108.

Page 283

(Milner Exhibit No 108 was marked for identification.)

(Discussion off the record.)

BY MR. SKALABAN:

Q. Do you recognize this TRW letter?

It's dated July 30, 1993, and it's addressed to you.

A. I don't offhand recall it, no.

Q. It says: The attached report provides the current status of all domestic utility dry storage facilities.

Do you know why you or your office might have requested TRW do a report on this subject?

A. Just to stay abreast of the current status of storage at the utilities.

Q. And it was important to you to do so?

A. Yeah. In my mind it was.

Q. And is that for purposes of -- why was it important to you?

A. Well, for acceptance, I think it was important to know whether we would be picking up spent fuel from a spent fuel pool, from a dry storage facility, what the nature of the dry storage facility was In my opinion, it would potentially affect

**Yankee Atomic Electric v. U.S. Nos.: 98-126C, 98-154C, 98-474C August 11, 2004**

**Heritage Reporting Corporation**

**Page 4614 to Page 4865**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 4614

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC ) Case Nos
COMPANY CONNECTICUT YANKEE ) 98-126C
ATOMIC POWER COMPANY, and MAINE ) 98-154C
YANKEE ATOMIC POWER COMPANY, ) 98-474C
Plaintiffs, )
v )
THE UNITED STATES, )
Defendant )

Courtroom Number 5

National Courts Building
717 Madison Street, Northwest
Washington, D C

Wednesday August 11 2004

VOLUME 21

The parties met pursuant to the notice of the Judge at 10 06 a m

BEFORE THE HONORABLE JAMES F. MEROW

Page 4615

APPEARANCES
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
YANKEE ATOMIC POWER COMPANY
JERRY STOUCK, ESQ.
ROBERT SHAPIRO ESQ
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W
Washington, DC 20005
(202) 898-5800

ON BEHALF OF THE UNITED STATES
HAROLD LESTER, JR ESQ
JOHN EKMAN ESQ
MARIAN E SULLIVAN, ESQ
HEIDE L HERRMANN, ESQ.
U S. Department of Justice
1100 L Street N W
(202) 305-7562

*** Index appears at end of transcript ***

Page 4616

P R O C E E D I N G S

JUDGE MEROW· Ms Herrmann?

MS HERRMANN Ready to continue with Mr Buchheit, Your Honor?

MR. STOUCK. I've got a couple of preliminary points if I could mention it, Your Honor.

JUDGE MEROW Sure.

MR STOUCK One is we do want to get to the exhibits that came up yesterday We do want to get to the exhibits from yesterday I've looked at the transcript and we're certainly ready to deal with those. We're not proposing at this moment because we would like to get finished with Mr Buchheit, but either between witnesses or at the end of the day

JUDGE MEROW· Fine

MR. STOUCK That's number one Number two also I would like today to address the counterclaim, the motion to amend the counterclaim, which we've given some thought to.

Thirdly, one thing I need to take care of right now, on the question of notice and documents, as I was looking back over the transcript thinking about the exhibit issues I noticed that little colloquy and I just didn't want there to be any remaining

Page 4617

misunderstanding We certainly have worked well, you know for six years and don't want to run into a misunderstanding now There's really two rules: one is disclosure and the other is cross-examination.

There certainly may be documents that we want to show the government's witnesses that we don't want to show the government's lawyers the night before and you know, unless we get some different direction, we're not intending to do that and I just don't want to be vilified again if that comes up, because I think it might

JUDGE MEROW Okay

MR LESTER. I think we addressed this several times The issue here is the difference between impeachment documents and documents which the plaintiffs are going to ask be introduced as substantive evidence We did not play this kind of game when we were doing our cross-examination We didn't pull out unidentified exhibits and then just sort of pop them in during the cross-examination, then say please admit this as a substantive exhibit. We didn't do that.

We identified our exhibits and if and when we identified that there's an exhibit on our may-use list that we're going to want to introduce as

Page 4710

memo to which the plaintiffs have referred that Mr. Rusch had – that has Mr. Rusch's name on it in fact somehow goes with the concurrence on the prior page.

With that understanding, we will not object to this series of documents being admitted as a single exhibit.

JUDGE MEROW: Well, okay. Then with that explanation, Plaintiff's Exhibit 1972 is admitted into evidence.

(PX Exhibit 1972 was received in evidence.)

MR. LESTER: I've been told, Your Honor, the prior exhibit the plaintiffs had tried to introduce was Plaintiff's Exhibit 1951, and I understand that that exhibit's being withdrawn and that it will not be admitted here.

MR. SHAPIRO: That's correct, Your Honor. That was subsumed within the larger one.

JUDGE MEROW: Okay. 1951 is considered withdrawn. Does that take up our prelunch – anything else?

MR. STOUCK: Take up the other matters at the end of the day.

JUDGE MEROW: Fair enough. We'll break

Page 4711

for lunch And what time?

MR LESTER I'm told Mr. Milner cannot be here until 2 o'clock, so if we could resume at 2, that would be great

JUDGE MEROW: Okay, we'll resume at 2 o'clock.

(Luncheon recess taken from 12:40 p.m. through 2:06 p.m.)

- AFTERNOON SESSION -

MS. SULLIVAN. Government's ready to call its next witness.

JUDGE MEROW Fine

MS. SULLIVAN We call Ronald Milner to the stand, please.

(The witness was sworn.)

MS. SULLIVAN: Thank you, Your Honor

RONALD MILNER

was sworn and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Good afternoon, Mr. Milner.

A Good afternoon.

Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?

Page 4712

A Yes, I am.

Q What is your current position?

A Chief operating officer.

Q What are your responsibilities as chief operating officer?

A I assist the deputy director for strategy and program development in the day-to-day management of that office.

Q And do you report to the deputy director?

A Yes, I do

Q And who is the department director?

A Ted Gerrish.

Q Does anybody report to you?

A Not directly

Q How long have you served as chief operating officer?

A In total, about four years.

Q When did you first join the Office of Civilian Radioactive Waste Management?

A I believe it was April of '84.

Q What was your first position? And I'm going to refer to it as RW, if that's all right.

A Okay.

Q What was your first position with RW?

A I was the branch chief of the

Page 4713

organization.

Q What were your responsibilities in that position?

A Preparation of total system life cycle cost, adequacy analyses and the first mission plan

Q What position did you next hold in RW?

A I was a division director.

Q And what were your responsibilities in that position?

A Budget, human resources, total system life cycle costs, fee adequacy analyses.

Q And what position did you next hold in RW?

A Next, I was first acting director and then permanent director of the Office of Storage and Transportation.

Q And do you remember when you became acting director of the Office of Storage and Transportation?

A Roughly 1990.

Q And how long did you serve as director of the Office of Storage and Transportation?

A About four years.

Q What were your responsibilities as acting and then director of the Office of Storage and Transportation?

A Management of the MRS monitor to treatable

Page 4714

storage program, transportation program, waste acceptance issues, such as preparation of the annual capacity reports, processing of delivery commitment schedules and so forth.

Q You said that you were responsible for management of the MRS process. What specifically were you doing?

A At that point in time, we were attempting to find a volunteer site to construct an MRS.

Q Do you recall, was Dr Bartlett the director of the program while were you the acting director and director of the Office of Storage and Transportation?

A Yes, he was.

Q Did you report to Dr. Bartlett?

A Yes

Q After serving as the director of office – of storage and transportation, what position did you next hold?

A Director of the Office of Program Management and Integration.

Q And what were your responsibilities in that position?

A The program's budget, human resources, preparation of total system life cycle costs and fee

Page 4715

adequacy analysis.

Q Did you also have responsibility for regulatory interface with the NRC?

A Yes, uh-huh.

Q And then what position did you hold next after you were director of program management and integration?

A After that, I was appointed the acting deputy director of the program.

Q Do you recall approximately when that was?

A I believe that was 1996.

Q And how many times have you served as deputy director of the program?

A I was acting deputy two different times.

Q And what time periods were those?

A It was '96 through '99, roughly, and then 2001 through 2002, roughly.

Q What position did you hold in between these periods that you were data director?

A Chief operating officer.

Q And were your responsibilities as the chief operating officer then substantially the same as they are today?

A Substantially the same, yes

Q And then in 2002, is that when you became

Page 4716

chief operating officer again?

A Yes, uh-huh.

Q Mr. Milner, prior to joining RW, where were you employed?

A With the Department of Energy with the – first with the Strategic Petroleum Reserve and then with the Office of Conservation and Renewable Energy.

Q Prior to becoming a DOE employee, where were you employed?

A Prior to that, I served eight years as a Naval officer.

Q Mr Milner, do you hold a Bachelor's degree?

A Yes, I do.

Q In what?

A Mechanical engineering

Q Where did you obtain that degree?

A University of Mississippi.

Q When?

A 1966.

Q And do you also hold a Master's degree?

A I do.

Q In what subject?

A Also mechanical engineering.

Q When did you obtain that degree?

Page 4717

A 1967.

Q Was that also from the University of Mississippi?

A Yes.

Q Can we have Plaintiff's Exhibit 95, please?

MS SULLIVAN: May I approach?

JUDGE MEROW: Sure.

MS. SULLIVAN: We're going to look at several different pages of this exhibit, so I'd like to provide copies to the Court as well.

JUDGE MEROW: All right.

MS SULLIVAN: Plaintiff's Exhibit 95 is a multivolume set. What I provided to the Court and the witness is simply an excerpt of that document.

BY MS. SULLIVAN:

Q Mr. Milner, do you have water there? Do you want a cup of water?

A Yeah, that would be great.

MS. SULLIVAN: Could I get a cup of water for the witness, Your Honor?

JUDGE MEROW: Of course.

BY MS. SULLIVAN:

Q Mr. Milner, do you recognize the document that I've handed to you and put up on the computer

Page 4722

Q Thank you. Mr Milner, did DOE evaluate possible contingencies in the mission plan?

A Yes, it did.

Q Can we go to page 20 of this document? Can you highlight the text on the page? Mr. Milner, could you read the highlighted sentence?

A Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.

Q Was one of the contingencies that DOE evaluated in the mission plan the possibility that DOE could not construct either an MRS or a repository?

A Yes, it certainly was.

Q Mr Milner, I believe you testified that DOE prepared the mission plan because it was a requirement of the NWPA.

A That's correct.

Q Okay. Do you remember whether there was specific statutory provision that went to the mission plan?

A I believe there was, yes

Q Mr. Milner, I've handed you an excerpt from Title 42 of the US Code, Section 10-221, which is titled mission plan. Do you recognize this provision

Page 4723

to be the provision that sets forth the requirements of the mission plan?

A Yes, I do.

Q Mr Milner, did you have an understanding as to whether this provision contained a requirement for the mission plan to set forth a specific acceptance rate?

A I did not

Q Why did DOE include acceptance rates in the mission plan?

A Well, one of the requirements for the mission plan was to provide an estimation of – of how long the repository would be in operation before it was closed To do that, you had to assume an acceptance rate, so there were acceptance rates assumed in the mission plan as examples of how the – the program might be operated.

Q Thank you.
And that requirement, is that set forth on – as your understanding of that requirement is set forth in paragraph 9, A9 of this provision?

A Yes

Q Thank you.
Could we go back to Plaintiff's Exhibit 95, please? Page 26. Mr. Milner, for some

Page 4724

reason our electronic copy – I checked it against the paper copy. For some reason, it's turned. I don't know why we turned it but it's – same information is there. I think the information just got squeezed. Mr. Milner, do you recognize the schedule that's set forth on page 26 of the mission plan?

A Yes. That was an example of – of how the authorized system might operate.

Q How many repositories did DOE assume would be constructed at the time the mission plan was prepared?

A Two

Q Can we go to page 29? Can you bring up the first full paragraph under the numbered paragraphs?
Mr. Milner, can you read that section, that highlighted material?

A It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.

Q Mr. Milner, does that paragraph accord with your recollection regarding the schedule set forth in the mission plan?

Page 4725

A Yes, it does

Q Could we bring up the last paragraph on this page and, Mr. Milner, would you read the last two sentences that are highlighted there?

A Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991 the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.

Q Mr. Milner, what was your understanding of the term "firm waste acceptance schedules" as that term's used in that paragraph?

A That would be the schedules that DOE was committing to to accept the waste.

Q Did DOE publish, if I recall, waste acceptance schedules in 1991?

A Yes, it did

Q Where were those schedules set forth in the annual capacity report for that year? And what were utilities to do with these schedules set forth in the annual capacity report?

A They were to utilize those to develop

Page 4726

their delivery commitment schedules, DCSs, for submittal to the department.
Q And which office within DOE prepared the 1991 ACR?
A The Office of Civilian Radioactive Waste Management.
Q And which office within RW?
A The Office of Storage and Transportation.
Q That was your office?
A Yes, it was.
Q Mr. Milner, in your various positions within DOE, have you had responsibility for preparing total system life cycle costs?
A Yes, I have.
Q Have you also had responsibility for preparing what are referred to as fee adequacy studies?
A Yes.
Q Could you explain to the Court what a total system life cycle cost is, or a TSLCC?
A It was a – an estimate at any given time of – of the total costs of – of the entire waste management system from identifying sites, characterizing sites through construction operation of the system and – and ultimately decommissioning

Page 4727

Q Decommissioning of what?
A Of the repository facilities.
Q What is a fee adequacy study?
A The fee adequacy studies using the – the cost estimates as a basis attempted to analyze whether or not the fee that was being paid by the utilities was adequate to cover the – the costs.
Q Why is a TSLCC, or total system life cycle cost report, prepared?
A Well, one, it's – it's good to keep track of the estimate of the program costs but principally is – is input to the fee adequacy analysis.
Q And why are fee adequacy studies prepared?
A They're mandated by the act.
Q By the Nuclear –
A Waste Policy Act.
Q Are there assumptions made for the preparation of a TSLCC?
A Yes, there are.
Q What is the basis for those assumptions?
A They were the current program planning bases at the time.
Q Has DOE changed the assumptions that form the basis for TSLCCs over time?
A Yes

Page 4728

Q Can we have Plaintiff's Exhibit 248, please?
Mr Milner, I've handed you what's been marked as Plaintiff's Exhibit 248. Do you recognize this document?
A Yes, I do.
Q Could you tell the Court what the document is?
A Well, it – again, it's – the title basically says preliminary estimate of the restructured program, which was an addendum to a prior – prior TSLCC analysis.
Q Were you involved in the preparation of this document?
A No, I was not.
Q Okay. Are you familiar with this document based upon your work with other TSLCCs?
A Yes.
Q Can we go to page 1, please? Can we bring out the first paragraph on the page and highlight the third sentence?
Mr. Milner, would you read the highlighted portion into the record, please?
A The primary use for the total system life cycle costs, TSLCC, analysis is to provide cost data

Page 4729

necessary for determining whether the fees paid by the waste generators will be sufficient to fully cover the costs of the program, parentheses, the fee adequacy analysis.
Q Okay, thank you. For our court reporter, as you read things, you can take your time. Thank you.
Mr. Milner, the sentence that you read, does – just read, does that sentence accord with your understanding as to the purpose of the TSLCC?
A Yes, it does.
Q Can we go to page 2, please? And in the first full paragraph, bring that out. The first two sentences.
Mr. Milner, would you please read those – the highlighted material into the record?
A It must be recognized that the waste management program is continually evolving. The TSLCC estimates represent snapshots in time which incorporated all available and appropriate information on program activities up to a specific point in – specific point in time in order to develop comprehensive set of cost estimates for the system.
Q Mr. Milner, do you agree with that statement regarding the nature of TSLCCs?

Page 4730

A Yes, I do.
Q Can we go back to page 1 of this document, that first paragraph again? Mr. Milner, in that paragraph there's a reference to report to Congress on reassessment of the Civilian Radioactive Waste Management Program issued by the Secretary of Energy in November of 1989.
A Yes.
Q Do you recall that reassessment?
A Yes, I do.
Q Do you recall what the result of that reassessment was?
A I think principal result of that reassessment was the repository would not be able to be opened until the your 2010.
Q Okay. As a result of that reassessment, was there a date by which the MRS was to be opened?
A 1998.
Q Can we go to pages 4 and 5? Could I ask you to read the highlighted sentences into the record?
A The TSLCC estimates presented in this report are updated estimates from the May 1989 TSLCC analysis which reflect the changes in the system outlined in the secretary's reassessment of the Waste Management Program. As such, these estimates are

Page 4731

derived in the same manner as those presented in May 1989, since the majority of the assumptions and methodologies have remained unchanged, however, a major change in the schedule had a significant impact on the updated estimates. Thus, the difference between the May 1989 estimates and the updated estimates represent the overall cost impact due to the restructured program
Q Mr Milner, were you responsible for the preparation of the 1989 TSLCC?
A I believe I was.
Q It was a long time ago. Could we go to appendix A, page A1?
Mr. Milner, what information is presented in table A1 of this document?
A That's the waste acceptance schedule, which included acceptance rates, amount of material that would be stored at the MRS at any given point in time, cumulative numbers.
Q So is it your understanding that these are the waste acceptance assumptions for the preparation of this TSLCC?
A Yes.
Q This is an addendum to the 1989 TSLCC.
Can we have Plaintiff's Exhibit 976, please?

Page 4732

Mr. Milner, do you recognize what's been marked as Plaintiff's Exhibit 976?
A Yes. It's the 1986 TSLCC estimate.
Q Were you involved in the preparation of this document?
A I believe I was, yes.
Q Can we go to page 2? And can we highlight the first three sentences of the first paragraph?
Mr. Milner, could you read the highlighted portion, please?
A Two important program developments pertinent to the TSLCC analysis have emerged since the previous analysis in January 1985. First, the president has determined that defense high-level waste, parentheses, DHLW, should be emplaced in the civilian geologic repositories. Second, the DOE has announced its plans to seek Congressional approval for a monitored retrievable storage, parentheses MRS, facility that will be fully integrated into the overall waste management system
Q Thank you. Mr. Milner, based upon what you just read, do you recall what the basis for the 1986 TSLCC was?
A Essentially would have been the mission plan.

Page 4733

Q Thank you. Can we have Plaintiff's Exhibit 982, please?
MS SULLIVAN: Your Honor, I should note that on Plaintiff's Exhibit 976, I provided to counsel and to the witness just an excerpt of that document. It also is a multivolume – volume document.
BY MS. SULLIVAN:
Q Mr. Milner, do you recognize Plaintiff's Exhibit 982?
A Yes It's the 1998 TSLCC analysis.
Q Were you responsible for the preparation of this document?
A Not directly, no.
Q Okay Would you have reviewed it prior to its issuance?
A Yes.
Q Can we go to page 1 of this document, please? Paragraph one, second sentence. Mr. Milner, can you read that highlighted material, please?
A This estimate is consistent with the viability assessment of a repository at Yucca Mountain, parentheses, VA, design basis and cost estimate, parentheses, DOE 1998, extended to address total system costs for all waste planned for disposal in a geologic repository for the total system life

Page 4746

as the various TSLCCs progressed over the years, no, certainly the assumptions changed depending on the circumstances.
Q No, not the same – not to be consistent across all the TSLCCs, but at any one time, the department's documents, the – the program plan, the TSLCC, the fee adequacy report, they would all have the same set of assumptions?
A We would hope so
Q And you thought it was important that all of the – the OCRWM entities be using the same assumptions with respect to the acceptance rate for spent nuclear fuel, right?
A Yes, yes
Q In fact, when you reviewed and approved some of these documents that you discussed, one of the purposes for your review was to ensure that the documents accurately reflected what you understood to be the Department of Energy's position at the time with respect to issues such as the acceptance rate, correct?
A Correct.
Q Now, at the time you joined Office of Civilian Radioactive Waste Management, it was your understanding that the intent of the department was to

Page 4747

work off the backlog of spent nuclear fuel stored in utilities True?
A Well, at the time I joined the department, since – again, very early stages of the program, we were in the very early stages of planning the program, trying to identify potential sites and so forth. I don't know that we – we had evolved to talking about working off the backlog at that point. Obviously, at some point in time you would hope that you would work off the backlog.
Q But at the time you joined the program, your understanding was the intent was to work off the backlog?
A Well, the intent was ultimately to accept all spent fuel from the utilities.
Q Do you recall having your deposition taken over a number of days?
A Oh, yes.
Q One of those was back on May 1st of 2002, a little more than two years ago
A Two and a half years ago, roughly, uh-huh
Q I'm sure you endeavored to testify accurately
A Yes.
Q Truthfully.

Page 4748

A Yes.
Q I want to ask you about a question and answer that you gave at that time, reading on May 1st, page 73.
MS. SULLIVAN: Could the witness be provided a copy of the deposition?
MR. SHAPIRO: If he needs one. I'm trying to be quick about it.
THE WITNESS: Given that it was approximately two and a half years ago, I probably wouldn't know the context in which the question and answer were given.
BY MR. SHAPIRO:
Q Would you like to see a copy?
A Yes.
Q Sure enough.
As it turns out, May 1st is the first tab in your binder. Page 73, if you look, there are four pages per page the way it's printed out. Are you on page 73 Mr. Milner?
A Yes, uh-huh.
Q I'm going to start reading at line 10, and my question is, were you not asked the following question and give the following answer?
Question: And was that a fair statement

Page 4749

of DOE's intentions at or about the time to work off the backlog of spent nuclear fuel that utilities were storing?
There was an objection by Mr. Shultis
You answered: Well, at this specific point in time, I don't know what the department's intent was. At the point I joined the program, my understanding of the intent was to work off the backlog
That was your testimony, Mr. Milner?
A Yes, if I could have a moment to look at the – the context.
Q I'm just asking about your testimony. And that was your – your honest testimony?
A Yes.
Q Now, it's true that the Department of Energy's intentions with respect to the repository design receipt rates had stayed constant pretty much to the present day, 3,000 MTU per year?
A I'm sorry, would you repeat that?
Q It's true, is it not, that the Department of Energy's intentions with respect to the repository design receipt rates have stayed constant to the present day, 3,000 MTU per year?
A Yes, uh-huh.

Page 4750

Q And that – that 3,000 MTU steady-state acceptance rate has been used fairly consistently in the OCRWM published documents, correct?
A As far as the steady-state rate, yes.
Q And that's a reasonable rate?
A Yes, I think so.
Q Now, you testified, I believe it was about Defendant's Exhibit 23, the memorandum for approval of the 1991 annual capacity report.
A Uh-huh.
Q And there's one little aspect I wanted to ask you about that. Part of that annual capacity report – we have copies of that available if you need to review that Part of that had a slow acceptance rate because of some of the limitations that were imposed by the alternative set. Do you recall that?
A Correct.
Q But you were asked to read part of that memorandum that said: Nonetheless, that lower rate was theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in – in 1998
A Uh-huh.
Q Could you explain for us how – how that analysis was done, how you reached that conclusion?

Page 4751

A Well, if – if you took each utility, what its – its projected spent fuel discharges were, what its pool capacity was, its remaining pool capacity when it would run out of capacity and – and you did that for each utility, then you took the overflow, if I can call it that, from pool storage, in the aggregate, that would be the amount of – of dry storage that would be needed across the industry and our rate would have in the aggregate prevented the need for additional storage
However, that – that didn't address the fact that – that where the utility that was running out of storage in the queue and at what time their – their waste would be accepted.
Q So that analysis ignored the oldest rule first priority scheme?
A No, it didn't ignore the oldest fuel first.
Q Well, how did it – I thought you just said that it didn't take into account where the utility was in the queue.
A Where the utility that was running out of the storage was in the queue
Q So how would that acceptance rate be sufficient to help that utility that was running out

Page 4752

of space?
A I think I said that in the aggregate, it would prevent additional at-reactor storage but not necessarily for each specific utility and in fact, that was not the case.
Q So there – there would be utilities that would have to add additional at-reactor storage?
A Yes.
Q What about shutdown reactors? Would that lower rate contemplated in the 1991 annual capacity report do anything for shutdown reactors?
MS. SULLIVAN: Objection, vague.
BY MR. SHAPIRO:
Q Do you understand the question, Mr. Milner?
A No, I'm sorry. Repeat the question.
Q Would the lower rate contemplated in the 1991 annual capacity report, would that be sufficient to handle the spent fuel removal needs of shutdown reactors?
A Well, I'm not – I'm not sure in what sense you mean that, because we did base everything on oldest fuel first if – if a shutdown reactor had the oldest fuel, I suppose it could have handled it, but I don't suppose that was the case in all situations.

Page 4753

Q So with the lower acceptance rate in the 1991 annual capacity report, a shutdown reactor might – might still have to store spent fuel for an extended period of time?
A Yes.
Q So that annual – that lower rate in the 1991 annual capacity report would not have been sufficient to handle the needs of shutdown reactors?
A Again, in the aggregate it would have been sufficient. Looking at each utility, no.
Q I'd like to ask you a few questions about monitor retrieval storage. You testified about that a little bit. We discussed also some of these limitations in Department of Energy's ability to accept spent fuel in light of the amendments passed in 1987 that provided linkages between monitored retrievable storage and progress in repository. Are you aware of that?
A Right.
Q It's the Department of Energy that requested those – that those linkages be put into the amendment set, correct?
A Well, no. I believe – as I recall, earlier in the program, the – the department was attempting to develop a – a MRS facility at a site in

Page 4754

Tennessee, the – the former Clinch River breeder reactor site. As I recall, discussions and negotiations with the host community at that time gave rise to those linkages, and Congress simply chose to carry forward those linkages when it authorized an MRS in the amendment side.

Q It wasn't the Department of Energy that requested those linkages?

A I don't recall that to be the case.

Q Let's go back to your – your deposition I want to ask you about May – a statement you made at May 3rd. Do you want to follow along in your binder? Tab 3 If you could turn to page 554, and were you not asked the following question and gave the following answer starting on line 5? It's a little bit long.

I'd like to talk to you about page 12 now, in particular the last full paragraph, or actually the last paragraph which goes on to the next page under the heading MRS facilities. It says that on March 31, 1987, the DOE submitted to Congress the proposal for construction of an MRS facility to allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority. DOE asked Congress to limit the MRS

Page 4755

storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until the construction authorization for the repository has been received from the Nuclear Regulatory Commission

Is this an accurate statement, that the DOE was the organization that requested the linkages between the repository and the MRS?

And there was an objection and you answered Certainly, the DOE was the entity that requested Congress. My recollection of the origins of those linkages were at the time DOE was developing a site-specific proposal for an MRS facility, actually, the old Clinch River breeder reactor site in Oak Ridge, and I believe the local community had requested the department insert those linkages.

MS. SULLIVAN Objection. The statement that's just been read into the record isn't inconsistent with what Mr. Milner testified to.

MR SHAPIRO. That can be brought out in redirect. I certainly believe that he denied that it was the department that asked for those linkages.

THE WITNESS If I could clarify

JUDGE MEROW. Yes.

A I misunderstood your statement because I

Page 4756

thought you asked me if the department had requested those linkages be placed in the legislation We had requested those linkages when we submitted an MRS proposal for the Clinch River breeder reactor site not to be placed in the amendment set.

Q Nevertheless, it was the Department of Energy that requested it.

A In its proposal for the Clinch River site.

JUDGE MEROW: Is that to satisfy community?

THE WITNESS: That was to satisfy community concerns, yes

BY MR. SHAPIRO:

Q We're going back, Mr. Milner, to this 1987 time frame. It was the Department of Energy's plan to start accepting waste at a monitored retrievable storage facility in 1998 and to open a repository in 2003?

A In the '87 time frame, I believe that was correct.

Q And the MRS was intended to be an integral part of the whole waste acceptance system, correct?

A Yes, I believe so.

Q It wasn't intended to be a – a – a standalone system or as a permanent replacement for

Page 4757

storage and disposal?

A Correct.

Q And fast-forward a little bit to June of '88. By that time, the Department of Energy believed that the linkages between the – the schedule and the key milestones in siting the construction of an MRS facility made it unlikely that the department would be able to start accepting waste significantly before 2003, isn't that correct?

A At a – at a repository?

Q At any facility.

A At any facility?

Q Linkages.

A Yes, I believe that was the case.

Q And as of November 1989 – and that was the time that report to Congress on reassessment of the program – it was the Department of Energy's position that a repository would not be available until 2010, correct?

A Correct.

Q It was also the Department of Energy's view at that time that if the statutory linkages remained in place, that the MRS operations would not begin until 2007, correct?

A Correct.

Page 4758

Q And that's because that – that three-year difference between repository and MRS opening, that represented the department's best estimate of how quickly it could get an MRS up and running given the linkages?
A Correct.
Q Now, you believed at the time of that November 1989 report to Congress on the reassessment of the Civilian Radioactive Waste Management Program that if the statutory linkages were modified, that the department could begin to accept waste beginning in 1998?
A Yes
Q And by 1991, you believe that if the linkages between the MRS construction and the repository authorization were maintained so the initial acceptance by DOE could not begin until 2007?
A Correct.
Q And ultimately, the DOE abandoned its effort to site an MRS sometime roughly between 1991 and 1994?
A Yeah, I think it was probably closer to 1994.
Q And even by February of 1994, RW was doing contingency planning for the possibility that an MRS

Page 4759

might not be sited at all. True?
A I don't recall that, but potentially.
Q Well, let me ask you again about your deposition. And this was a short one. Let me ask you if you recall the following question and giving the following answer. Page 359 if counsel wants to follow.
MS. SULLIVAN: Which day?
MR. SHAPIRO: It's May 2.
BY MR. SHAPIRO:
Q Are you on that page, Mr. Milner?
A Yes, sir.
Q Start on line 5. Do you recall being asked the following question and giving the following answer?
Question. So at least as of February of 1994, OCRWM was concerned about the possibility that an MRS might not be sited?
Answer: We were certainly doing contingency planning for that, yes.
That was your testimony, Mr. Milner?
A Yes, it was.
Q And that was accurate testimony?
A Yes, at the time.
Q Do you have a different opinion now,

Page 4760

Mr. Milner?
A Well, that was two and a half years ago. I have different recollections than what I did two and a half years ago, but no, that would be accurate.
Q Now, as of December 1994, that – the end of that year, there was no development work on an interim storage facility, was there, Mr. Milner?
A By that time no, I don't believe so.
Q And DOE has no current plans to site an MRS?
A No.
Q Do you believe that – that an MRS would have offered a better opportunity for the department of meeting the objective of accepting waste by 1998?
A Yes, I do.
Q I'm going to turn to the subject of delivery commitment schedules. You touched on that a little bit during your direct testimony. I'd like to ask you two questions. First, you would agree that if there was no facility to accept fuel in 1998, then the delivery commitment schedules that were entered into between utilities and the department would not be binding and would have to be reevaluated, true?
A Well, I certainly recall discussions as to what would – what would happen in that case and yeah,

Page 4761

I think we would have certainly had to reevaluate what would have occurred.
Q So the delivery commitment schedules could change if circumstances change?
A Potentially, that would have to be evaluated, yes.
Q If circumstances change, the DCSs could change. True?
A I'd have to know what the circumstances were before I knew whether they would change or not.
Q In your opinion, the delivery commitments were really best estimates, good-faith commitments on quantity and timing?
A No, I viewed the DCSs as a binding commitment.
Q Let me go back to your deposition again, once again May 2, the same day that we were at, this time page 396. Have you found that page, Mr. Milner?
A Yes, I have.
Q I'm going to start on line 12. Do you recall being asked the following question and giving the following answer?
Question: Does it change your view about the binding commitment reflected in the DCS? There was an objection from Mr. Shultis.