Page 4778

list of utilities that might be running out-of-pool space and utilities with sufficient pool space and considering brokering something between those utilities?
A Yeah, certainly we maintained a list of the approved DCSs, we knew the status of utilities' pool storage, and there had been some general discussion about brokering exchanges should – should utilities desire that.
Q You believe that brokering exchanges for utilities could serve a useful purpose?
A Yeah, I – I think it could have.
Q And one of those purposes would be potentially precluding the need for – for dry storage?
A Yes, uh-huh.
Q At one point, the department was planning for the possibility of exchange requests and began looking at criteria for approving or disapproving them?
A Yeah, I think again we – we started looking at if – if we got exchange requests, what would be the criteria, how would we handle them, but again, we never – never received any
Q By 1994 you envisioned that swap market

Page 4779

would develop that could accommodate Yankee Atomic's spent fuel?
A I could have envisioned that, yes.
Q In fact, you did envision that, didn't you?
A I seem to have some recollection of that, yes
Q And others at the department held that belief as well, didn't they?
A I think so, I think so.
Q But you have thought that the uncertainty of the department meeting the 1998 acceptance date had the ability to hinder that swap market from ultimately developing?
A Yes.
Q You believed that as a practical matter, it would – I'm sorry, I cut off that question. If I could have a moment, Your Honor?
JUDGE MEROW· Surely.
MR SHAPIRO. Apologize for that delay. We have no further questions.
JUDGE MEROW: Any redirect?
MS. SULLIVAN: Yes, Your Honor May we take a break? I don't think we're going to go very long this afternoon.

Page 4780

JUDGE MEROW. Take a ten-minute break? Is that enough?
MS. SULLIVAN· Yes, thank you.
JUDGE MEROW: Back on the hour then.
MS SULLIVAN. Okay, thank you
(Recess taken from 3·48 p.m. through 4:06 p.m )
MS SULLIVAN: I apologize, Your Honor.
JUDGE MEROW. Oh, no problem. Continue when ready
MS SULLIVAN: Thank you Your Honor, I'd first like to ask a couple questions that have been raised in a pleading that Plaintiff's counsel has filed, I believe, today that I meant to make part of my direct. Certainly, Mr. Shapiro can cross-examine on those questions.
REDIRECT EXAMINATION
BY MS. SULLIVAN:
Q Mr Milner, do you know what the Pacific National Laboratory is?
A It's one of the national laboratories in the DOE system
Q And who runs PNL?
A A contractor, an M and O contractor.
Q And what does an M and O contractor do, to

Page 4781

your understanding?
A In the indication of a lab, they operate the entire lab
Q Has PNL done work for the Office of Civilian Radioactive Waste Management?
A It has, yes, uh-huh
Q Okay. And are the reports that PNL has provided for the Office of Civilian Radioactive Waste Management the statements of DOE?
A No, they – they would be treated like another contractor, any other contractor report
Q And how is that?
A Which is input to – to the department for – for consideration.
Q Thank you Mr. Milner, could – could I direct your attention – do you have the binder of your deposition in front of you?
A Yes
Q Could you go to the first tab and just have one – the first day of your deposition, May 1st, page 73. Okay. Do you have that in front of you?
A Yes, uh-huh.
Q And Mr. Shapiro asked you about a statement that you had made at your deposition

Case 1:04-cv-00106-EJD Document 310-15 Filed 06/23/2008 Page 2 of 40

Page 4782

regarding your understanding of the intent of the program was to work off the backlog. Do you remember that testimony in the cross-examination?
A Yes, yes.
Q When you say intent was to work off the backlog, what do you mean?
A Intent to me would be that that would be a – a program goal or – or one of the planning assumptions
Q Are you referring to a contractual intent when you use the word "intent" in that statement?
A No, not at all
Q Mr Milner, you were also asked about the approval of DCSs being conditioned upon the existence of a facility or the delivery date being conditioned upon the existence of a facility. Do you remember that testimony?
A Yes, uh-huh.
Q Do you recall whether all DCSs were approved with that conditional statement?
A I – I don't recall whether all of them were
Q Okay. Can we look at – and I apologize, I don't have the exhibits for the witness. We'll have to rely on the computer. I am going to look first at

Page 4783

29, I believe. Yeah, 29.003. Can you put that on the computer, please?
Mr. Milner, I apologize, I don't have a paper copy for you Defendant's Exhibit 29.003 has been talked about by other witnesses, is a letter from contracting officer to M.E Thomas of Maine Yankee Do you recall Mr. Thomas at Maine Yankee?
A No, I don't offhand
Q Okay And it – the first sentence of that letter reads: The Department of Energy has reviewed and approved the six delivery commitment schedules by Maine Yankee, and it goes on to provide the numbers. Copies of the accrued DCSs are enclosed for your records
And attached to this document, if we could go to the next page, are a series of DCSs. Do you see that they have been approved?
A Yes, uh-huh.
Q And how do you know that those have been approved?
A I see the approved by DOE signature.
Q Okay And do you – do you see the conditional statement that you testified about earlier regarding the delivery date?
A No, I don't.

Page 4784

Q Okay And could we go to –
JUDGE MEROW Do you recall, Mr Milner, though, before the Court of Appeals for the District of Columbia told us otherwise, that it was DOE's position, which you attempted to establish by rule making, that the obligation of DOE to perform under this contract was subject to the existence of a – of a repository?
THE WITNESS. I do. I recall that had been the department's position until the court decision, sir.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q Could we go to Defendant's Exhibit 30.018? Mr. Milner, this is a letter from Beth Tomasoni dated June 14, 1995 to Mr. Buchheit at Yankee Atomic again forwarding approved delivery commitment schedules. The third sentence in the first paragraph reads: The proposed delivery date is dependent upon existence of an operational repository or an interim storage facility constructed under that – the act. Do you see that language?
A Yes, I do.
Q Okay. Do you recall – does that refresh your recollection as to Department of Energy's

Page 4785

statements to that effect at or about this time?
A Yes.
Q 1995?
A Yes, yes.
Q Okay. If we could go to the next page, and could you enlarge the section 2.0, delivery information, commitment information? And, Mr. Milner, do you see the statement that's been typed in there? The proposed delivery date is dependent upon the existence of an operational repository or interim storage facility constructed under the act.
A I do.
Q Is that the conditional language that you recall?
A Recall, yes.
Q Mr. Milner, do you recall your testimony – one second, Your Honor.
Let's actually go to something else.
Mr. Milner, do you still have Defendant's Exhibit 23 in front of you?
A Yes.
Q Okay. Could we go to the second page of Defendant's Exhibit 23 in that second – that last – second – first paragraph, the last sentence. And

Page 4786

Mr Shapiro asked you about the analysis with regard to that statement that was highlighted.

A Yes, uh-huh.

Q And he asked you specifically whether that – the rate in the 1991 ACR would take care of the needs of shutdown reactors for storage. Do you remember that?

A Yes, uh-huh

Q Mr Milner, do you have an understanding as to whether shutdown reactors have any additional out-of-pool storage needs?

A Certainly once the reactor shuts down, it's no longer generating spent fuel and would, no, have no further need for – beyond what they already had.

Q Okay, thank you

Mr. Shapiro also asked you if the 900 MTU rate would require shutdown reactors to store fuel for an extended period of time Do you recall that?

A Yes, uh-huh.

Q Would a 3,000 MTU rate require shutdown reactors to store fuel for an extended period of time?

A That would also have, yes

Q Mr Shapiro also asked you a couple questions about exchanges

Page 4787

A Uh-huh

Q Did any utilities approach DOE to broke current exchange?

A Certainly none that I was aware of.

Q And did any utility submit exchange requests to the department?

A No, no

Q Mr Milner, I think you also testified that uncertainty about the acceptance date or DOE's ability to meet the acceptance date could hinder the development of the market for exchanges. Do you recall that testimony?

A Yes, uh-huh

Q Are there other factors that might have hindered the development of a market?

A Very definitely, there were other factors. I – I think certainly the public opinion and the locality would have been a major factor. I think pressure from the Public Utility Commission on the utility who was giving up its right in the queue would have been significant, political pressures.

Q Thank you Mr. Milner, could you go in your binder to the deposition, the deposition May – of May 3rd, pages 474?

A Uh-huh.

Page 4788

Q Actually, let's – let's do something else first I'm a little scattered and I apologize.

Mr Milner, do you recall Mr. Shapiro asked you about whether DOE had put the – about the statutory linkages and whether DOE had requested those?

A Yes.

Q Okay And I think you explained to him your deposition testimony. I just have one question. The Clinch River proposals that DOE submitted –

A Yes.

Q – what happened to that?

A Congress voided that.

Q Mr. Milner, could you go to tab 2 of your deposition, the binder containing your deposition testimony, page 391. Do you recall Mr. Shapiro asked you whether or not you believed that DCSs were binding?

A Yes, uh-huh.

Q Could you read your deposition testimony on pages 391 beginning at line 20, going through 392, ending at line 14.

A Question: Did I understand your testimony earlier, Mr. Milner, to be that the DCSs represented a binding commitment of the parties?

Page 4789

Answer: That was my opinion, yes.

Question: And the DCSs as indicated by this paragraph are based on the capacity allocations as listed in the ACR. Right?

Answer: Correct.

Question: Can you explain to me how it is that if the ACRs which form the basis for the DCSs are not binding, that the DCSs are binding?

Mr. Shultis. Objection, calls for a legal opinion.

The witness: The DCSs were submitted by the utilities to the department based upon the information in the ACR. The allocations – then the department would either approve or disapprove those and if approved, then in my opinion, that became a binding commitment – a binding agreement, I'm sorry.

Q Okay. And actually, your answer continues – continues on there, but I don't think we need to – to go there

Mr. Milner, is that your belief at the time you testified on May 2, 2002?

A Yes

Q Does that remain your belief today?

A Yes.

Q Now I'd like to go to page 394 through 397

Page 4790

of that deposition If you could review those pages to yourself, you don't need to read those into the record
A Yes, okay
Q Thank you. Having reviewed those pages, do you now recall whether you could recall at your deposition whether the DCSs could be adjusted up or down by 20 percent?
A Well, from this, apparently at my deposition I did not recall that plus or minus 20 percent adjustment. The attorney pointed that out to me and I recognized that at that time.
Q And the question about the binding nature of the DCSs was in the context of that 20 percent provision, correct?
A The plus or minus 20 percent.
Q Thank you.
Could you go to tab 3 of the deposition binder, page 474?
A Okay
Q Mr. Shapiro read the question and answer that begins on line 23 of page 74.
Could you read the material that's set forth at lines 1 through 21 of that – on that page into – out loud?

Page 4791

A Question: If I could direct your attention to the third paragraph on the first page, the second sentence states that the department has not determined whether or not priority would be accorded shutdown reactors or if priority is granted under what specific circumstances. Was that accurate as of 1990?
Mr. Shultis, objection Mr. Milner's not a 30(b)(6) witness
The witness: I suspect it probably was.
Mr. Neslin: That's your recollection sitting here today?
Mr. Shultis Same objection.
The witness Yes.
By Mr. Neslin: Would that be accurate to the –
Mr. Shultis. Same objection.
The witness: I think at this point in time today, the department has not decided to give priority to shutdown reactors
Q Thank you.
And similarly, Mr. Milner, could you go to page 419 of that same deposition?
A Okay
Q Mr Milner, I believe Mr. Shapiro read the question and answer that begin on page 418, line 18.

Page 4792

Could you read the question and answer that follows that exchange beginning on line 1, page 419 through line 7?
A Question: The department – would it be fair to say that the department had an objective of allowing shutdown reactors to decommission in a timely manner?
Mr. Shultis: Same objection.
The witness: Well, again, I think it was more a case that the department preferred not to preclude that ability.
Q Could you continue to line 14?
A By Mr. Neslin, question: What do you mean by "not preclude that ability"?
Answer: The department did not, as I recall, have an objective to give priority to shutdown reactors, it simply preferred not to preclude that ability in the future.
Q And your use of the word "objective" on line 12 of that deposition, is that – your use of that term then is the same as your – how you define "objective" today?
A Yes, yes.
Q Mr. Milner, you were asked by Mr. Shapiro whether it was DOE's goal to remove spent nuclear fuel

Page 4793

from shutdown reactors to prevent long-term storage.
Do you recall that testimony?
A Yes, uh-huh.
Q Okay. Would that be goal – would that goal be implemented if it came at the expense of operating reactors?
A No, absolutely not.
MS. SULLIVAN: One moment, Your Honor
JUDGE MEROW: Sure.
MS. SULLIVAN: Nothing further, Your Honor
MR. SHAPIRO: We have nothing further, Your Honor.
JUDGE MEROW: Well, Mr. Milner, I don't know if you can answer this, but under the current posture of the VOICE program, is it subject to being shut down by executive branch action at this point or would that require legislation?
THE WITNESS: I believe it would require legislation.
JUDGE MEROW: You're committed to file a license application at this point?
THE WITNESS: Yes, sir. Yes, sir.
JUDGE MEROW: Okay. Any questions?
MS. SULLIVAN: Nothing further, Your

# POLLOG, THOMAS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126c) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER :
COMPANY, (98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) (WILSON, J.) :
NORTHERN STATES POWER COMPANY :
(98-484c (Wiese, J.) :
DUKE POWER, A Division of DUKE :
ENERGY CORP. (98-485C) (Sypolt, J.):
INDIANA MICHIGAN POWER COMPANY :
(98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY :
DISTRICT (98-488c) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY :
et. al. (98-488c) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621c) (Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C) (Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C) (Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF :
NEW YORK (00-703C) (Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) (Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) (Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) (Bruggink, J.) :
Plaintiff, :
:
vs :
:
THE UNITED STATES, :
Defendant. :
\- - - - - - - - - - - - - - - - - - - - -x

McLean, Virginia
Thursday, April 11, 2002

Page 2

Deposition of
THOMAS POLLOG,
the witness, called for examination by counsel for the defendant, pursuant to notice and agreement, commencing at 10.10 a.m., at the offices of Shaw, Pittman, 1650 Tysons Boulevard, McLean, Virginia, before Linda C. Marshall, RPR, a Notary Public in and for the Commonwealth of Virginia, when were present on behalf of the respective parties:
APPEARANCES.
On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District, Nebraska Public Power District.
DEVON E HEWITT, ESQUIRE
JACK CHEW, ESQUIRE
Shaw, Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7962
On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power.
KRISTI L REMINGTON, ESQUIRE
Balch & Bingham, LLP
Tenth Floor,
1275 Pennsylvania Avenue, N W
Washington, D C 20004
202-347-6000

Page 3

APPEARANCES CONT'D

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQUIRE
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 50511-7603
312-222-9350
On behalf of Plaintiff SAcramento Municipal Utility District.
TIMOTHY R. MACDONALD, ESQUIRE
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, CO 80202-1370
On behalf of Plaintiff Wisconsin Electric Power Company
SUZETTE W DERREVERE, ESQUIRE
Perkins Coie, LLP
607 14th Street, N W
Washington, D.C. 20005-2011
202-434-1675
On behalf of the Defendant
MARIAN SULLIVAN, ESQUIRE
ERIN POWELL, ESQUIRE
U S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D C
202-514-7300

Page 4

I-N-D-E-X


| Witness: | Page |
|---|---|
| Thomas Pollog | |
| Examination by Ms. Hewitt | 5 |


E-X-H-I-B-I-T-S


| | Page |
|---|---|
| No. 1 - | 20 |
| No. 2 - | 28 |
| No. 3 - | 44 |
| No. 4 - | 71 |
| No. 5 - | 103 |
| No. 6 - | 112 |
| No. 7 - | 122 |
| No. 9 - | 164 |


Page 5

P-R-O-C-E-E-D-I-N-G-S

(Pollog Deposition Exhibit No. 8 was marked off the record.)

Whereupon,

THOMAS POLLOG,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION ON BEHALF OF THE PLAINTIFF
BY MS. HEWITT:

Q Good morning, Mr. Pollog. My name is Devon Hewitt of the law firm of.
Shaw, Pittman. I represent ten of the utilities that are in litigation with the Department of Energy regarding spent nuclear fuel. And I take it you're familiar with this litigation?
A Yes, I am.
Q I understand you've been deposed before in this litigation. I'll go over some ground rules to make sure they're on the record, but I'm sure you've heard these instructions before. I'll ask you a series of questions and I ask that you answer them truthfully.
If you don't understand something that

Page 14

A I don't think so.
Q And what happened in 1992?
A I took a three-year leave of absence.
Q And I understand you went to Austria; is that right?
A That's correct.
Q That's a wonderful place.
Did you return to DOE then in 1995?
A Yes.
Q And what division or department of DOE did you return to?
A It was still RW. I worked for the engineering division.
Q And who did you report to?
A Jeffrey Williams.
Q And what were your duties in that position?
A We were managing the MPC, Multi Purpose Canister Program and the GA, General Thomas Cast Development Program, were the major responsibilities. There were other minor ones, but they were the two major initiatives I was involved with at that time.
Q And how long did you hold this position?

Page 15

A Until the fall of '96.
Q And did you take on a new position?
A Yes.
Q And what was that?
A I was assigned to the waste acceptance team.
Q And who comprised that team?
A When?
Q When you joined in '96?
A That would have been Mr. Zabransky, who was the team leader, myself, William Floyd and Mary Lee Payton.
Q What were your duties on the team?
A To support Mr. Zabransky in any of the contract issues that were ongoing, other than what Mr. Floyd and Ms. Payton were doing.
Q Did Mr. Floyd have any specific responsibilities?
A Yes.
Q And what were they?
A He was our safeguards expert.
Q Safeguards?
A Yes.
Q What are safeguards?
A Safeguards for nuclear material,

Page 16

preventing theft and diversion for parties we're not favorable to.
Q And Ms. Payton, what were her responsibilities?
A The same. Yet, she was still working on the fee verification issues, collection.
Q How long did you hold this position?
A Until now.
Q And you currently hold that position today?
A Yes.
Q Mr. Pollog, did you have any personal role in drafting the standard contract?
A No.
Q Did you have any personal role in drafting or participating in the ACRs? Are you familiar with the term ACR?
A Which ACRs?
Q Any of them.
A I believe I was involved in production of the 1991 ACRs.
Q Any other ACRs?
A I don't believe so.
Q And what did you do with regard to the 1991 ACRs?

Page 17

A Basically, review the draft we had to received from our contractors.
Q What contractor was that?
A I believe it would have been -- I forget if it was either P&L or TRW at that time.
Q And what was your role in reviewing the document?
A Read it, made suggestions, corrections, anything that I felt was appropriate. Direct my comments to our contractor at the time, resolve my comments.
Q Do you recall whether you made any comment or raised any questions with regard to the acceptance rates in regard to the 1991 ACR?
A I don't recall.
Q You passed your comments back to the contractor? Is that what your testimony was?
A Yes.
Q Did you relay any comments to anybody else at DOE?
A I probably went over it with Mr. Brownstein. I don't recall specifically, but that would have been how I would have done things normally.
Q Did you have any role in drafting any

Page 30

that could fall within this paragraph?
A I would imagine so.
Q Could you identify some of those documents?
A Excuse me.
Q That's all right. Could you identify some of those documents?
A I would say the Mission Plan.
Q And you're referring to the 1995 Mission Plan?
A Well, there have been various mission plans.
Q There were various drafts. I think it's called a 1985 Mission Plan. I understand there were two drafts to that.
A Two drafts after that, and there were amendments thereafter.
Q Right.
A The TSLCC reports, there were, I believe, annual reports to Congress. They are the only ones that come to mind right now that broadly fit into the --
Q If you'd flip the page over and take a look at Sub-section B talking about --
A Did you say B?

Page 31

Q Yes, the first full paragraph on the left hand column addresses the publication of the annual capacity report.
It states in this paragraph that the DOE shall issue an annual capacity report for planning purposes.
Do you know what that term, planning purposes, means used in the standard contract?
MS. SULLIVAN: Objection, calls for legal conclusion.
You can answer, if you know.
THE WITNESS: I would speculate that it meant the utilities could make plans regarding how they want to handle spent nuclear fuel.
BY MS. HEWITT:
Q You have no knowledge about how this provision was interpreted or what it was suppose to mean?
A How we dealt with or how we tried to fulfill our obligation under the contract to meet this would be to produce information contained in the ACR that utilities could use for their plans.
Q And what kind of plans would utilities be making that would need guidance from DOE?
A Spent fuel management decisions.

Page 32

Q Such as?
A How they would want to handle their spent fuel after it was discharged.
Q And would some of those decisions regard how they should store the spent nuclear fuel?
A Yes.
Q And how would the annual capacity report help them in that regard?
A It would inform the purchaser of potential waste acceptance schedules; would inform them where their place might be in the queue, when they might expect service.
Q That paragraph also indicates that DOE would provide that information for ten years following the projected commencement of operation of the initial DOE facility. You see that reference?
A Yes.
Q Why was ten years picked?
MS. SULLIVAN: Objection, calls for a legal conclusion.
You can answer the question, if you know.
THE WITNESS: I don't know.

Page 33

BY MS. HEWITT:
Q Further down in Article 5, there's a section addressing delivery commitment schedules. Are you familiar with that term?
A Yes.
Q What is a delivery commitment schedule?
A That is Appendix C to the standard contract.
Q And can you describe it?
A I can read it for you if you like.
Q Can you describe in your own words what it is?
A Let me look at it first.
Q Certainly.
A Delivery commitment schedule is a commitment on both the purchasers' and DOE's, when they're both signed, part to commit parties to delivering a range of spent fuel in a year from a specific site.
Q When did the delivery commitment schedules have to be submitted to DOE by the purchasers?
A That would depend upon where their allocation is.
Q How would that influence when they

Page 34

needed to submit their delivery commitment schedules?
A Because the delivery commitment schedules are to be submitted 63 months prior to the year of delivery.
Q Why 63 months?
A I don't know.
Q And when you made reference to the term, year of delivery, are you referring to a calendar year of delivery?
A Yes. Not specifically any, you know, year, but a 12-month period corresponds to something from January to December. Not specifically any specific year, but a 12-month period.
Q Let me ask you the question then. They would have to know what the calendar year is in order to be able to back out 63 months, right? It would have to be, for example, year 2000?
A Yes.
Q It would have to be a calendar, a number of years?
A Yes.
Q Because you're aware, obviously, that DOE had at one point published ACRs in calendar

Page 35

years which were not used?
A Yes.
Q Once a delivery commitment schedule was submitted to DOE, what was DOE's role in reviewing them?
A They would be reviewed to see if they had the proper information on them.
Q What do you mean by proper information?
A They identified a location that the purchaser actually owned or had a site at; if the amount of fuel identified in that schedule, the MTU's would correspond to an actual allocation they had. If it was the right type of fuel, for example, BWR or PWR fuel they owned.
Q Anything else?
A Nothing that comes to mind.
Q When you answered that it had to correspond to an allocation that they had, what are you referring to?
A The amount of fuel in the DCS that they were submitting it for had to correspond to an allocation in the ACR. Not just the '88 ACR, but the '91 ACR.
Q Did that requirement come from the contract, the standard contract?

Page 36

MS. SULLIVAN: Objection, vague.
BY MS. HEWITT:
Q Did the requirements that the DCS correspond to an allocation in the ACR come from the standard contract?
A I'd have to read through the standard contract and see.
Q Why don't you take a look at the standard contract.
A I believe so.
Q And what in the standard contract makes you say so?
A Well, the standard contract sets up a process for both parties to follow. And if you follow through the process, the only thing we can use to really compare if the allocation is correct is the process sets up the requirements for us to compare if the allocation is correct from what they submit and what the ACR says.
Q I'm not sure that's responsive to my earlier question. Does the standard contract require offerors to deliver commitment schedules based on the allocations identified in the ACR?
A Okay. Now, I think what you said now may be a little different. I interpret it

Page 37

differently than what you said before.
Q It could be slightly different, so please clarify for me.
A Can you say what you said the second time, one more time. I think there was a slight difference. At least, I interpreted a slight difference.
Q Okay. Does the standard contract require purchasers to base their delivery commitment schedules on the allocations made by the ACR?
A Does it require the purchasers to submit their --
Q Right.
A -- allocations based on what's in the ACR? Yes.
Let's read this again. I got a different interpretation the last time.
Q Can you explain to me your confusion? You are suppose to be prepared to answer these type of questions. So I'm trying to be very clear, but just explain to me your confusion and I'll try to clear it up. I'm not sure how my questions are different.
A Previously we talked about DOE's review

and approval, what's required by DOE. And now you're saying what's required by the purchasers.
Q Okay. We had been talking about a DOE process and you said they had to correspond to the allocations in the ACR. And my question was, was that required by the standard contract?
A Required by who? Required on the purchasers? Were the purchasers required to do that or was the DOE required to do that by the standard contract?
Q Okay. I guess -- I'll ask both questions ultimately.
So the issue is, does the standard contract require purchasers, first of all, to submit DCSs based on allegations in the ACR?
MS. SULLIVAN: Objection, legal conclusion.
You can answer, if you know.
THE WITNESS: You're talking purchasers this time?
BY MS. HEWITT:
Q Yes.
A I believe so.
Q Why?
A Because the purchasers have to start



submitting their DCSs after the publication of the APR, okay. And the APR is used to develop the ACR.
Q But it's different than the ACR; isn't that right?
A Well, they are different documents. They're not doing the same thing.
The APR is used to develop an ACR. One cannot do one without the other. One cannot do the ACR without an APR.
One can do an APR without an ACR, but one cannot do an ACR without an APR.
Q And where in the contract does it say that the delivery commitment schedule has to reflect the ACR?
A It doesn't say that, but it says it has to be done after the APR. And then we take the APR and give them an ACR. So it's like a flow from one to another trying to connect different boxes.
Q My question is, where is the connection between the ACR and DCS process in the contract?
A I would say it comes from the APR.
Q But it does not come from the ACR?
A It says the -- let me read this a



second.
Well, if you -- I read Article 4B, 5D -- excuse me, 5B.
Q Yes.
A That's where the purchasers get their annual acceptance ranking relative to DOE contract for disposal. I would say it comes from there.
Q And the acceptance ranking there, I think you're referring to the acceptance priority ranking there. That's the phrase that's used in that paragraph, fourth line down, fifth line down.
A Excuse me. You say fourth?
Q I mean, you're the one that used the term. And the term that's used here is, acceptance priority ranking. Is that what you're talking about in your prior answer?
A Annual acceptance ranking relative to DOE contracts. I don't believe it's the same as the APR.
Q Where are you reading from, sir?
A Page 525, upper left corner.
Q Yes.
A B, beginning not later than July 1st,



1987.
Q Right, okay. But that's not under the delivery commitment schedule process?
A True.
Q Okay. I guess we'll have to go over this testimony a little bit. You said in delivery commitment schedules, the purchasers would include proper information, which included identified location of the fuels and corresponding to the allocations in the ACR?
A Yes.
Q And you mentioned the right kind of fuel?
A Yes.
Q And you said PWR versus?
A BWR.
Q And that is boiled water reactor versus?
A Pressurized water reactor versus boiling water --
Q And did they also have to include the quantity of fuel they're going to deliver?
A I believe so.
Let's look at the -- they would identify the metric tons of uranium initial and

Page 42

number of assemblies.
Q Why did DOE need this information?
A We would use that information to try and develop a transportation program.
Q And when you said transportation program, what are you referring to specifically?
A A group of hardware essentially; casks, whatever associated with equipment, yokes, lifting equipment, transporters, receipt facilities to transport spent fuel from purchasers to a DOE facility. Whatever is included with that regarding hardware; and also, planning systems.
Q What do you mean by planning systems?
A Well, you have X amount of casks and you try and maximize your fleet. So you don't want to have ten purchasers needing the same cask at the same day. So you prefer to have, you know, the minimum number of casks as possible, so you try to plan most efficiently to use your system.
Q Now, did DOE have the ability to reject DCSs that were submitted by purchasers?
A Yes.
Q And on what basis could they reject

Page 43

them?
A If they believed there's information that was incorrect on them.
Q And how would they determine that?
A Oh, you would compare the allocation that the utilities put down on their DCS to see if it was correct in comparison with what was in the ACR, '91 ACR.
We could see if they put down a facility that they didn't own. If they put down a pressurized water fuel and this utility only owned boiling water reactor fuel.
If they put down a range of discharge dates that don't correspond to any fuel they have range of discharge dates within.
Q What happened after DOE rejected a delivery commitment schedule submitted by a purchaser?
A They would return it to the purchaser.
Q And what is the purchaser supposed to do at that point?
A Re-submit the DCS.
Q With what -- why would they have to re-submit the DCS?
A If they wanted to have it approved,

Page 44

they would have to re-submit it.
Q Was there a point in time in which the DOE and the purchaser would negotiate mutually acceptable delivery commitment schedules?
A Yes.
Q And what time would that occur?
A Let me read the process here to refresh my memory.
That would come after, providing there was a second disapproval.
Q And what would the negotiations entail? How would that work?
A The parties would come together and try and sit down and discuss the issues and reach an agreement.
Q And if they couldn't reach an agreement, what would happen?
A Speculative. I don't know of any case of that happening.
Q I'm going to hand you a copy of the DCS instructions that were distributed by DOE to offerors. We'll make this Exhibit 3 to the deposition.
(Whereupon, Pollog Deposition Exhibit No. 3 was marked for identification.)

Page 45

BY MS. HEWITT:
Q Have you ever seen this document before, Mr. Pollog?
A Yes.
Q Did you have any role in drafting the document?
A Can you explain for me by drafting, you mean actual writing? You mean any part in the eventual development?
Q Why don't we say the latter.
A Yes.
Q What was your role in the development of this document?
A I believe I've seen draft versions submitted by DOE to contractors and provided comments.
Q Do you remember what kind of comments you provided?
A No.
Q Was this document distributed to purchasers in preparation for them submitting their DCSs?
A Yes.
Q And it was distributed by DOE, correct?
A Yes.

Page 58

So all of your questions as to whether or not a delivery commitment schedule, a final delivery schedule would be rejected for certain aspects are beyond his testimony because those criteria haven't been developed.
MS. HEWITT: I also asked him whether or not DOE ever discussed the final delivery commitment schedules in their role or purpose, and he said he doesn't know.
MS. SULLIVAN: Well, he's testified that the criteria hasn't been developed.
MS. HEWITT: That's one question, but you can ask more than one question about the final delivery commitment schedules. He doesn't seem to have any knowledge beyond that one question I asked him.
So we can address that later. But that seems to be a very thin basis on which he's designated as representative on this topic anyway.
So, just for the record, we're very concerned that he's not prepared, at least fully, to speak on this topic.
MS. SULLIVAN: Objection noted.
BY MS. HEWITT:

Page 59

Q Mr. Pollog, I assume you don't know any information about how DOE would address problems in final delivery commitment schedules that were submitted by offerors?
A Correct.
Q Why were --
MS. SULLIVAN: Can we take a break?
MS. HEWITT: Yes.
(Brief recess.)
BY MS. HEWITT:
Q Mr. Pollog, you mentioned that DOE did not develop any criteria for review of the final delivery schedules a few minutes ago. Do you recall giving that testimony?
A Yes.
Q Why did they not develop any criteria in this regard?
A I don't think we were ever at that point problematically where we saw FDSs coming in that we would be processing.
Q You also mentioned earlier that it was DOE's intent that DCSs that were signed by both parties were contractually binding. You used that term?
A Yes.

Page 60

Q What do you mean by contractually binding?
A It's a contractual commitment for DOE to meet obligation under the contract for whatever is in the DCSs. Same way with purchasers.
Q Do you mean by that that DOE could not change what was in the DCS that was signed by both parties?
A DOE couldn't change? Are you asking me --
Q Either the parties could change what was agreed to or what was both signed by both parties?
A Well, I don't think DOE could change what was our obligation. The purchasers did have a right to exchange that DCS with another purchaser provided DOE approved that exchange.
So I guess you could say the purchaser could change in the sense that they could take that DCS and trade it to another purchaser, and then we'd have to pick up at another site.
Whether we could pick up another type of fuel or not would also be part of the approval process, if we go from PWR to BWR fuel.

Page 61

Q But it was your testimony that DOE couldn't change its commitment as expressed in the delivery commitment schedule?
A Yes.
Q We noted on the instruction though that if the year in which DOE would begin the program or begin taking spent nuclear fuel changed, the instructions at least appeared to allow DOE to change the year it would come and get the fuel designated in the delivery commitment schedule; is that right?
A Well, I think it says, In the event that such circumstances change, all DCSs approved by DOE may need to be re-evaluated by DOE and the purchasers.
We would re-evaluate them. That's what we stated we could do.
Q And does that give DOE the opportunity to change the date at which it would come take the spent nuclear fuel from utilities?
A I don't think that's ever been evaluated.
Q You don't think what has ever been evaluated?
A If we evaluated, we could change the

Page 62

date based upon the statement that's here.
Q Is it your testimony that DOE would never consider changing the date?
A My testimony is, I don't know that it's ever been evaluated whether we could change the date in the delivery commitment schedule consistent with the statement here.
Q I'm asking you what DOE's view is, whether they could change the commitment schedule?
A I don't know. I mean, I have not thought about that question before, if we could.
Q You don't know the answer?
A No, I've never thought of that question before. I know of no discussion concerning that.
Q But you don't have an answer as to what DOE's position is in that regard?
A I don't.
Q Why would they re-evaluate them if they weren't going to consider to change the date?
A Can you say it again slower this time?
Q Why would DOE re-evaluate, as they indicated they might do in this instruction, if they weren't going to change something about the delivery commitment schedule, presumably the

Page 63

date?
A There were other things we might seek from purchasers.
Q Such as?
A There were other things on the DCSs, like whether they would ship by truck, rail or barge. I mean, there were certain things that we might find beneficial for the system, such as doing more rail shipment as opposed to more truck shipment.
Q And is it your testimony that DOE would seek to change that term or requirement in the DCS?
A I wouldn't say we would seek to change it. We would seek to negotiate it with the utility or purchaser if we had a wish for something that would be beneficial for the system.
Q But how would that relate to changing the dates from 1998 to some time later?
A I don't think it would relate to that.
Q And of course, what the sentence says is if the circumstances change with regard to 1998, then they would re-evaluate. So it suggests the re-evaluation would be based on

Page 64

changing the date, not on other circumstances.
A Okay. Is that a question?
Q Yes. My question is, you said they would re-evaluate them based on these other issues. But that sentence talks about re-evaluation with regards to the date, which you previously said doesn't relate to these other issues you mentioned.
A Okay. So is there a question there?
Q So, my question is, the re-evaluation that's referenced in this instruction would be based on the changing of the dates, not on transportation issues as you identified?
A Is that a question?
Q Yes, that is a question.
A What's the question?
Q Can you repeat the question?
(Whereupon, the question was read by the court reporter as requested.)
THE WITNESS: Yes.
BY MS. HEWITT:
Q The DCSs were a reflection of allocations awarded purchasers in the ACRs; is that correct?
A I wouldn't use awarded.

Page 65

Q What word would you use?
A Allocated purchasers.
Q Okay. Now, were the ACRs contractually binding?
A No.
Q And why not?
A They were put out as -- for planning purposes.
Q And does that mean that they could change over time?
A Yes.
Q So a purchaser's allocation would change over time?
A Possibly.
Q And if that's the case, then would a delivery commitment schedule change over time?
A No.
Q How would that be if you have a delivery commitment schedule that's supposed to reflect an allocation in ACR, but it changes over time?
A Once they are signed in, those are locked in. Once the DCSs are signed, those allocations were locked in.
Q Of course, they wouldn't be locked in

Page 154

anticipating receiving allocations under this would be eastern reactors.
Q Is it your testimony that the receipt rate that's included in the Table 2.1 of the 1987 ACR does not reflect using an MRS?
A I'd have to read that to make sure, but -- let me read that real fast.
It doesn't reflect with or without an MRS. It just says, this schedule is only an approximation. How a system may operate and subject uncertainties that are recognized in the Mission Plan Amendment.
So, there's no stipulation being made whether an MRS is included or not included. It's just as it states, an approximation of how a system may operate.
Q If you could flip over the table in the Mission Plan Amendment, there's some numbers, paragraphs on the other side on page 62. In the second sentence says, spent fuel acceptance rate for the total system. It's paragraph five on page 62. Take a look at that paragraph.
The second sentence, have you taken a look?
A Yes, I have.

Page 155

Q Second sentence talks about spent fuel acceptance rate for total systems remains at 3,000 MTU per year, but Table F-1, the table we just looked at assumes that 350 MT of spent fuel from nuclear reactors would be received directly by a repository and 2650 would be received as shipped by the MRS facility.
Is that statement consistent with that you were saying about western reactors shipping of fuel directly to the repository?
A Considering western reactors to be reactors nearby, yes.
Q And when the reference to spent fuel acceptance rate for the total system remains at 3,000 MTU? Is it correct that that 3,000 MTU would only be achieved in 2008?
A Yes.
Q This refers to a storage limit of 15,000 MTUs proposed by DOE for the MRS facility. Do you see that reference?
A Yes.
Q Do you know why 15,000 MTU was proposed as the limit for the facility?
A Yes.
Q Why?

Page 156

A When the department was negotiating with the local counties, people located and situated in the area of Clinch River, Tennessee, one of the points that they tried to negotiate was keeping a limit so that it never became a de facto repository.
And it was a negotiating point between the Department of Energy and the local people. The people living in the vicinity of where a potential MRS may go.
Q So why was 15,000 chosen?
A Through negotiation with the local people.
Q Did the acceptance rates projected in the documents preceding MRS proposal factor into that -- what the capacity would be for the MRS?
A Say that again please.
Q Did the acceptance rates that's included in the document preceded, did they factor into the capacity limit proposed for the MRS?
A I don't believe so.
Q I'm going to have you take a look at the 1988 DCR. Are you familiar with this document, Mr. Pollog?

Page 157

A Pardon.
Q Are you familiar with this document?
A Yes, I am.
Q Would you take a look at Table 2.1 on page five. It contains an acceptance rate or something called an illustrative waste acceptance schedule. Are you there?
A Yes.
Q What is the basis for the acceptance rates included in this table?
A 1988 Mission Plan Amendment.
Q And do you know how the numbers were derived to be included in the draft 1998 Mission Plan Amendments?
A I have not reviewed the '88 Mission Plan Amendment.
Q Do you know how this plan derived, this acceptance plan in this table 1988?
A The numbers included came from the '88 Mission Plan Amendment. I didn't look to see how the numbers in the amendment were derived.
Q So you don't know how these numbers were derived by the Department of Energy?
A That's correct.
Q This acceptance rate schedule included

Page 174

Q Were ACRs ever issued for comment to purchasers or utilities?
A I don't believe the ACRs were ever issued for comment.
Q Were purchasers allowed to object or was there a process for them to state their objection for something that was included in the ACR?
A I believe the contract, if it comes out under the contracting officer's signature, the contract allowed purchasers to send a letter to the contracting officer with their objections to something that's sent out under the contracting officer.
Q And what exactly are you referring to in the standard contract that allows them to do that?
A I think there's a dispute clause or some clause like that that allows them to dispute some action taken by the contracting officer. I'm not sure if that's the exact section, but there's some verbiage to that effect in there.
Q Why don't we take a look at the acceptance rates included in the 1992 Annual Capacity Report. I believe they are found on --

Page 175

Page 4, Table 2.1. Do you know what the basis was for the derivation of these numbers included into Table 2.1 on page four?
A It was taken from the prior years' ACR.
Q There's no other input in these numbers other than just physically taking it from a prior ACR?
A As far as I know, it was just copied from the prior years' ACR.
Q And the same considerations that led to including those numbers in the prior year's ACR, would they be the same considerations for including these numbers in this 1993 ACR?
A Yes.
Q I'm actually not going to hand you this, but there's a '92 Annual Capacity Report that was published again as revision dated 9 May, 1993?
A Yes.
Q Do you know why this revision was published?
A I don't recall at this time.
Q All right. I'm going to hand it to you. Have you seen this document before, Mr. Pollog?

Page 176

A Yes, I have.
Q If you look at page four, again, and there's another Table 2.1 which contains the same acceptance rates that were included in the earlier version of this document.
With regards to these numbers, if you take a look at page three, the page before, the first or the second paragraph. And I'm right in the middle of the page. It says, The acceptance rates included in Table 2.1 are nominal and do not reflect the MRS facility linkages with repository developed imposed by MWPA.
First of all, what does the term nominal mean in that sentence?
A I would suggest it means, just for example, illustrative.
Q And it says in the same sentence that they do not reflect the schedule linkages with the repository development. I believe that with regard to these rates and I may be wrong, but please clarify if I am.
You said the rates were chosen here because of the restrictions imposed by the Nuclear Waste Policy Amendments Act of 1987 and that one of those restrictions was the linkages

Page 177

with the operation of the repository or the construction of the repository?
A The operation of the repository.
Q Operation of the repository. And does this sentence on page three indicate otherwise?
A There are linkages in addition to the one I've stated about the 10,000 MTU limit that reflect into when the MRS becomes operational and excepting it. So it does not reflect all of the linkages in the Amendments Act of '87.
Q Which doesn't it -- does it reflect?
A It reflects the 10,000 MTU capacity limit prior to repository operations. In addition to that limit -- in addition to that linkage, there are additional linkages also in the Amendments Act that it does not reflect.
Q Now, going back through -- because I don't think that was clear with regard to some of the other capacity reports. Would that be true of the prior version '92 Annual Capacity Report, which includes the exact same numbers on page 4, Table 2.1?
A Yes, that would be true of the Exhibit 13.
Q Okay. And if we go back then to 1991

Page 206

ground.
Q And it indicates in this paragraph that the receipt rates included in, I guess, prior ACRs were really reflecting in-placement rates; is that correct?
A I don't think any ACRs were developed prior to issuance of this document.
Q Does this document indicate that receipt rates that would be included in ACRs would reflect in-placement rates?
A I don't think this document makes any statements regarding whether the ACR would reflect in-placement rates.
Q Okay. Take a look at page 2.17 under section entitled accelerated acceptance rate. On that first paragraph, I think the third sentence starts, For some reactors, this initial allocation may not provide sufficient acceptance rates to prevent encroachment or pool core reserve. (Storage reserved to allow complete discharge of the core if required.)
What is the term initial allocation referring to?
A I would believe it refers to the initial allocation as identified for a facility,

Page 207

for a purchaser in an ACR.
Q And is that going to be -- I see. And is that going to reflect the acceptance priority ranking?
A The acceptance priority ranking would be used in developing initial allocation.
Q And what does it mean -- although there's an explanation here, but what does it mean or what is the significance of not having sufficient acceptance rate to prevent encroachment on full core reserve. Do you know what that term means?
A Yes I do.
Q What does it mean?
A A reactor's spent fuel pool is so big. It has a certain limited capacity. Generally speaking, not always, but generally utilities like to maintain so many open spaces. It's considered good management and good operating procedures. It's not required by NRC or anyone else.
In event of some situation of the reactor, they would need to offload the full core. They would have sufficient spaces in their whole pool to take every assembly out of the core

Page 208

and transfer it to the pool.
Q And does this sentence indicate then that the initial allocation in an ACR may not allow all utilities to maintain that ability for full core reserve?
A Yes.
Q Then the next sentence says that additional storage capacity or reallocation of acceptance rights would be required for those particular sites; is that right?
A Yes.
Q Okay. Then it goes on to define the term additional storage capacity. And you and I have tried to define that term earlier today.
This definition refers to consolidation of continued storage in a nuclear -- in the reactor pool; transfer to on-site dry storage, transfer to off-site storage to maintain full core reserve capacity in the reactor pool. Do you agree with that definition?
A Yes.
Q So, consolidation for continued storage in the reactor pool, is that the same thing as re-racking?
A No.

Page 209

Q What is the difference?
A Re-racking is physically making the racks or spent fuel assemblies stored in the pool closer together. It's just pushing everything a little bit closer together so you can fit additional storage cells in the pool.
Consolidation entails taking apart the assemblies rod by rod and putting several assemblies of rods into one sell.
It's consolidating -- for example if you have consolidation ratio of five to one, taking five assemblies, putting all the rods together in one canister or something like that and storing all five assemblies worth of rods into one canister which would go into one cell.
Q Okay. The paragraph goes on to say that the standard utility contract and I presume that means the standard contract provides a method of reallocation of acceptance rights through training process is that the exchange process that you referred to earlier?
A Yes.
Q Then it goes on to say that the initial acceptance rate must exceed the utility's needs for additional storage capacity before any

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, A Division of DUKE ENERGY CORP. :
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(98-477C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(98-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - X
Discovery Judge (Judge Sypolt)
McLean, Virginia
Friday, April 12, 2002
VOLUME II

Continued deposition of THOMAS POLLOG, a (30)(B)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been previously sworn, taken at the offices of Shaw

Page 3

Pittman, 1650 Tysons Boulevard, 14th Floor, McLean, Virginia, at 9:00 a.m., Friday, April 2, 2002, and the proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.

APPEARANCES:

On behalf of Plaintiff Northern States Power:
DEVON HEWITT, ESQ.
JACK Y. CHU, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
703-770-7901

On behalf of Plaintiff Commonwealth Edison:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603
312-923-2829

Page 4

APPEARANCES: (Continued)

On behalf of Plaintiff Wisconsin Electric:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
202-434-1609

On behalf of Southern Nuclear Operating Company:
KRISTI L. REMINGTON, ESQ.
Balch & Bingham, LLP
Tenth Floor
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-347-6000

On behalf of Sacramento Municipal Utility District:
TIMOTHY P. MACDONALD, ESQ.,
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303) 863-2334

Page 5

APPEARANCES (Continued)

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
202-514-7300

Page 6

CONTENTS

WITNESS EXAMINATION BY COUNSEL FOR
THOMAS POLLOG NORTHERN STATES POWER
By Ms. Hewitt 8
COMMONWEALTH EDISON
By Mr. Eidukas 18
SACRAMENTO MUNICIPAL UTILITY DISTRICT
By Mr. Macdonald 33
DEFENDANT UNITED STATES
By Ms. Sullivan 160
SOUTHERN NUCLEAR OPERATING CO.
By Ms. Remington 162

Afternoon Session - Page 115

EXHIBITS

| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 19 - 1985 Mission Plan | 10 |
| 20 - 1984 Mission Plan | 32 |
| 21 - Mission Plan Strategy Memo, 9/15/83 | 60 |
| 22 - Excerpt of Government's Brief | 87 |
| 23 - DOE Notice, 5/25/94 | 100 |
| 24 - DOE Notice, 5/3/95 | 105 |
| 25 - 1988 Draft Mission Plan Amendment | 128 |
| 26 - Analysis of TSLCC of CRWMP | 146 |

Page 7

EXHIBITS (Continued)

| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 27 - 1995 APR ACR | 154 |
| 28 - 1996 APR ACR | 157 |
| 29 - Georgia Power Letter to Robert Morgan | 163 |
| 30 - Protest of 1998 Mission Plan & ACR | 168 |
| 31 - Letter, Certified Mail, 9/9/88 | 173 |
| 32 - Handwritten Notes | 173 |

Page 8

PROCEEDINGS

Whereupon,

THOMAS POLLOG,

was called as a witness by counsel for Plaintiff, and having been previously sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF
NORTHERN STATES POWER
BY MS. HEWITT:

Q. Morning, Mr. Pollog. We're going to continue my portion of your questioning. As I mentioned yesterday, I apologize, but we didn't have one of the documents available that was identified on your list, and I do want to ask you about that, but hopefully it won't take very long?

MS. SULLIVAN: Before you do that, Mr. Pollog would like to clarify something from his testimony yesterday. Is that all right?

MS. HEWITT: Okay.

THE WITNESS: Yes. I want to clarify concerning the relationship and the importance and the differences between the DCS and the FDS process. Okay, the DCSs and FDSs are of approximately the same influence in a multi-step process that was looked upon going forward for waste acceptance. The

Page 9

difference between the DCS and FDS, there's only two. The DCS, the purchasers and DOE agreed to delivery on a specific year, a calendar year.

Whereas in the FDS the purchaser would identify a range of dates within that year as wide as they want to, could be days or weeks, and DCS if the Department would agree that they would be committing to a specific range of day. So it would narrow down from a full calendar year to a lesser range of dates within that year will be the one difference.

And the second difference where the DCSs are potential low changeable or exchangeable where other utilities, whereas an FDS is not exchangeable.

BY MS. HEWITT:

Q. Is your testimony otherwise that all the information -- if you didn't exchange your DCS. All the information that you included in the DCS had to be the same information in the FDS?

A. That's not my testimony.

Q. Do you know the answer to that?

A. The answer to that is the Department had never decided if everything in a DCS had to be included in an FDS.

Q. Okay. I'm going to ask you about the 1985

Page 10

mission plan. I'll mark it.
(Pollog Exhibit No. 19 was marked for identification.)
MS. SULLIVAN: Is this an excerpt or volume 1?
MS. HEWITT: No. This is volume 1. And actually it's only chapter -- I guess it's only volume 1. I didn't have everything.
MS. SULLIVAN: That's fine.
MS. HEWITT: Actually, I think it's just chapters 1 and 2.
MS. SULLIVAN: Good.
BY MS. HEWITT:
Q. But what I handed you is pages 1 through 29, so make sure you have 29 pages.
(Witness reviewing document)
A. Actually there seems to be --
Q. There's some on your right there?
A. Yeah. These come at the end. Actually page 14 seems to be missing. Let me check one more time.
Q. Okay.
(Witness reviewing document)
MS. SULLIVAN: Yeah.
MS. HEWITT: Page 14's missing?

Page 11

MS. SULLIVAN: That's fine. We can change that later, just note it right now.
MS. HEWITT: Well, yes, page 14 is missing from mine as well.
MS. SULLIVAN: Did you have questions about it.
MS. HEWITT: No. I don't have questions from page 14, but I don't know why -- it might be in the actual original document. In any event, we don't have any questions about page 14. And I apologize. Here's the stapler. Other than that, we are a very sophisticated law firm. We provide extensive resources for our clients.
BY MS. HEWITT:
Q. Anyway, what I'd like to ask you about is the waste acceptance schedules that are included in this document.
Have you had a chance to look at this document before, Mr. Pollog?
A. Yes, I have.
Q. In particular, I think there's a table at the very end on page 26. Have you found that table? It's Table 2-2.
A. Yes, I have.
Q. Set forth here are acceptance rates for

Page 12

repository, first repository and second repository. In particular, I'd like you to look at the spent fuel column under the first repository.
Do you know the basis for the acceptance rate figures listed therein?
A. Are you referring to the section under first repository, spent fuel starting with No. 400 in 1998.
Q. Yes, I am.
A. Yes, I am.
Q. And what is the basis of those acceptance rates?
A. The basis would be twofold, or two parts. One would be, again, we anticipated two repositories of total amount of spent fuel approximately 130 to 140,000 MTUs with equal amounts in both repositories and that number being approximately 70,000 dividing the operational life of approximately 25 years, you get approximately 3000 per year as a steady state rate with a several-year ramp up rate in the early years. It would be part 1.
The second reason for that would be again to try and keep up with spent fuel discharges and the need for alleviating the need for additional on-site dry storage at the purchaser sites.

Page 13

Q. And these were the same reasons for the acceptance rates that were included in prior drafts of the mission, this mission plan, is that correct?
A. I believe so.
Q. And we may have discussed this yesterday with regard to the drafts, but the ramp-up rates from 400 in the first three years to 900 and then 1800, why were the numbers segregated that way for the ramp-up years?
A. Can you explain for me what you mean by segregated?
Q. Yes. Why was 400 chosen for the first three years and then 900 for the fourth year and then 1800 for the fifth year?
A. Okay. Originally we had suggested an earlier drafted mission plan, 1800 metric tons per year for the ramp-up period. I believe we received public comments, the document mission plan itself, including the schedules and one of the comments or several, I'm not sure how many, stated that they thought that would be an overly ambitious ramp up rate to go from zero to 1800 in your first year and suggested scaling back which way were initial ramp up would be.
In response to those comments, I think the

Page 14

decision was made to reduce the ramp up the numbers in the early years in order to get the system going from basically zero up to the 3000.
Q. Do you know why it was broken down to 400 and then 900 and then 1800? There seems to be a relationship between those numbers but I would rather not guess.
A. I think they were just approximately doubling every -- you do a couple of years at 400 and you double that and get comfortable with that and you double that again until you reach your essential steady state rate.
Q. Okay. If you take a look at the next chart that follows that on page 27, Table 2-3, have you located that chart?
A. Yes.
Q. What is the difference between this chart and the prior chart that we just were discussing?
A. This chart is for improved performance system which includes an MRS in the waste management system.
Q. Okay. And is the idea that the waste would be transferred first to an MRS before going to a repository? Is that what this chart reflects?
A. Let me examine it for a second.

Page 15

(Witness reviewing document)
MS. HEWITT: Can we go off the record for a second?
(Discussion off the record)
THE WITNESS: I believe this chart includes a system where waste would first go in the first, from pre-'98 through 2005, if I'm reading this across correctly. To an MRS and then to the first repository and then starting I believe in 2006, waste would still be going to an MRS to a first repository and some of it would be going straight to a second repository. Some would be going to an MRS and some would be going to a second repository, starting in I believe if I'm reading this chart correctly, 2006. Yeah, I believe 2006.
MS. SULLIVAN: Are --
BY MS. HEWITT:
Q. What is the basis for the acceptance rates that are listed here for the MRS?
A. I believe the basis is the 3000 again comes from the two objectives we had discussed just a few minutes ago, the first one being looking at how much was going to eventually, to the first repository being the 70,000 MTUs, taking that number and looking at the lifetime -- anticipated lifetime for the MRS

Page 16

repository for approximately 25 years dividing 75,000 by 25 and reaching an approximate number of 3000 per year in steady state and the second being the goal to alleviate the additional need for dry storage or out of full storage at a facility, at a purchaser's facility.
Q. How come there's not a ramp up rate for the MRS acceptance?
A. Well, I believe there is. If you look at the pre-'98, it doesn't give specific years. It just says pre-'98. So I believe that includes more than one year, the 2200 number.
Q. I see. And do you know when this assumes the MRS would be operational or able to take spent nuclear fuel?
A. I believe it was based on starting in 1996.
Q. I don't think I have any more questions for you Mr. Pollog. I will turn it over to my colleagues. I will note for the record that you did yesterday not know some basis for some of the rates in the ACRs which was supposed to be part of your responsibility, so I'm not going to end my questioning and just keep it open. And I don't know whether they're going to bring you back to speak on

Page 17

that after you've learned more about it or have another witness for that, but there were a couple of areas that you didn't know any information about. So I just reserve that right on an examination basis for a 30(b)(6) witness, whoever that might be.
MS. SULLIVAN: Well, we would object to that because the topics asked for the basis for the ACR rates and he told you they were found in other published documents up until 1991 and was able to explain from 1991 where those rates came from and he did walk you through the mission plan for 1997, although that was not a document and was able to track that back. So we would object to any -- but let's leave it on record right now and we can ask Judge Sypolt.
BY MS. HEWITT:
Q. Let me just clarify. I'm just talking about the rates that appear on two ACRs based on the 1998 mission plan when he said he did not look at and did not know the basis of those generations?
A. The topics set forth the rates in the ACRs. And as the ACRs say, they were found in the mission plans.
MS. HEWITT: But that's all he could say.
MS. SULLIVAN: Then you did put the 1997

mission plan draft amendment in front of him. He was able to.

MS. HEWITT: But he said he had not reviewed the 1998, so --

MS. SULLIVAN: He said he hadn't reviewed the 1998 mission plan.

MS. HEWITT: He did say he had reviewed that.

MS. SULLIVAN: Not recently.

MS. HEWITT: Well, he had reviewed it. Anyway, I'm going to reserve the right. We can discuss that later.

MS. SULLIVAN: Well, we will object and let Judge Sypolt decide. Can we take a few minutes to see if we have any cross?

MS. HEWITT: Sure.

(Recess)

MS. SULLIVAN: Okay. Who's next?

MR. EIDUKAS: I think I'll go next.

EXAMINATION BY COUNSEL FOR PLAINTIFF COMMONWEALTH EDISON

BY MR. EIDUKAS:

Q. Good morning, Mr. Pollog, my name is Ted Eidukas. I represent Commonwealth Edison.

A. Good morning.



Q. My question is yesterday we had some discussion about plans for spent fuel being sent to the MRS or the repository based on whether they were western reactors or eastern reactors. And I just had a clarifying question.

Was there a specific dividing line as to what was a western reactor and what was an eastern reactor?

A. I know of no dividing line between western and eastern reactors.

Q. So there was no designations made or assignments made as to whether this reactor is an eastern or western?

A. As far as I know, there were no designations made from this reactor is eastern and this reactor is western.

Q. Okay, thank you.

Yesterday you gave some testimony about the 1995 ACR APR and the acceptance schedule present in that document. And I don't remember what exhibit it was, if you want to look at it. But I believe that was the -- and I believe that is an acceptance schedule that uses rather than calendar years, it uses years 1 through 10?

A. Correct.



Q. And just to be -- and I believe you testified that -- and correct me if I'm wrong, but I believe you testified that utilities would be unable to submit DCS based on that schedule because there were no calendar years given but rather years 1 through 10.

A. Yes, I did.

Q. Does the DOE have a position on whether or not after the publication of that ACR, that schedule, does the DOE have a position as to whether purchasers were obligated or required to submit DCSs after that point?

A. We had informed purchasers that at this point in time we weren't going to be further processing schedules starting in 19 -- I believe it was the end of '96. Then after we started, we did not believe it was necessary for purchasers to further submit DCSs.

Q. I'm done with that document. You can put that aside for now. In testifying about the basis for the acceptance schedules found, the acceptance rates found in a lot of these documents, you've testified that there were two objectives or principles that underlied the rate.

One was -- and I'm going to focus on what



I believe you characterized as the first objective being the -- I can have you say that again, but let me see if I understand it.

You believe that each repository would accept up to approximately 70,000 MTU of spent fuel, and then you took the -- you also anticipated that there would be approximately 25-year operational life? And I'm not sure if operational life is the word you've used, and then I'll let you correct me. Operational period or operational life of the facility or the program and by taking and dividing 25 into 70,000, you got approximately a steady rate of 3000.

Is that an accurate paraphrasing of what you've testified or perhaps if you want to --

A. I would say that's close enough.

Q. Close enough, Okay. The 25 years for the anticipated operational life of the facility, could you just clarify again what that 25 years represents?

A. I believe it represents what was anticipated in normal lifetime of the equipment that would be used in one of these facilities such as transportation casks, handling equipment, any type of hardware that was going to need to be purchased to operate the facility was thought to have about an

Page 22

operational life before you would need to basically just get rid of it and buy new stuff of 25 years.
Q. So the 3000, or the rate that was generated by looking at that, the rate was based on the calculation or the estimation that the life of this equipment would be about 25 years, not vice versa? I sense by your expression they were as clear as mud?
A. The vice versa, I wasn't sure.
Q. Sorry. In other words, as I understand it, the DOE in developing this acceptance schedule or this acceptance rate didn't approach it in the manner of we want a rate of 3000 and then let's calculate what the life of this equipment would be.
Rather, they took the 70,000 MTU limit or what they felt would be the limit on the acceptance, what the repository would accept and then looked at the life of the equipment, what they expected the life of the equipment would be and took those numbers and then came up with the 3000, not the other way around.
A. We looked at what the life of the equipment was and not -- and then divided the total anticipated capacity to determine the rate. We didn't look at the rate first. We did not look at

Page 23

the rate first and then back calculate what the life of the equipment would be.
Q. Okay. I think that expressed what I was trying to say. Was there any expectation by the DOE that the program would last longer than this 25 years? In other words, that they would have to go out and buy a new set of this equipment?
A. Well, if you look at the early documents, it actually includes two repositories. So the first one would be operating for approximately 25 years and then the second one coming on line or starting several years, I'm thinking -- it varied at different points of permanence, but I'm going to say approximately 10 years after the first one so that would be 25 years past, so you're talking approximately 35 years or so.
Q. At each repository, was there any expectation that at each of the repository there would be a replacement of the equipment so that each repository would be operating for more than 25 years?
A. I don't believe so. Well, let me just clarify that. When you say operation, you mean you're still going to be done after no more fuels come in after the repository. The acceptance part of files coming into the gate was expected to last 25

Page 24

years.
There are additional requirements such as everything would not necessarily be in place within that 25 year period of time. It would take a little bit longer to work off the backlog, and I believe the nuclear policy act specifies we have to provide a 50-year retreatability, capability at the repository. So there would be certain activities going on to fulfill those statutory requirements. But regarding I think accepting fuels through the front gate and doing what we need to do to get into placement would last 25 years plus a few additional years to work off any lag fuel storage.
Q. I think with that clarification we're still on the same page as far as what I meant by operational life and what you said in your earlier testimony -- just to clarify, when you were talking about operational life of the equipment, you've been referring to the operation life of the acceptance equipment?
A. For the most part, yes.
Q. Briefly look at the 1997 annual capacity report. And again, it should be one of the middle -- or early documents, No. 4.
A. Okay.

Page 25

Q. I'm going to focus on the bottom of page 4 and top of page 5. It's a Section 1.2.3. Submittal of comments on the annual capacity report. Yesterday I believe you were asked that question about whether or not -- and I can't remember the exact question. But I believe it was a question as to whether or not the standard contract required comments or provided for a method for commentary on the annual or draft annual capacity reports.
And I believe you gave some testimony as to whether -- you know, that the standard contract provided a mechanism for comment when something had been delivered to a purchaser by a contracting officer, do you remember giving testimony like that?
A. Yes.
Q. If you could just take a look at Section 1.2.3 on Exhibit 4 there, you'll see it -- I'll read it. It just starts, "Wherein comments are requested, specifically from the purchasers, on the content of this initial ACR."
Do you know whether or not this request for comments was being made pursuant to the standard contract?
MS. SULLIVAN: Objection beyond the scope. You can answer if you know.

Page 34

several people and you said that you had spoke with Vic Trebules and Jim Carlson by telephone?
A. Yes, by telephone.
Q. Was counsel present during either of those telephone calls?
A. Yes, both.
Q. You also talked about meeting with Michael Conroy. I think you described he was walking by and stopped by your office?
A. Correct. I did mention speaking with Michael Conroy.
Q. You said you had talked about a schedule in the 1985 mission plan with him?
A. Yes.
Q. Do you recall what schedule that was? I'm just curious if you can grab that exhibit. If you remember.
A. Exhibit 19?
Q. The June 1985 mission plan.
A. Yeah. I have a version that goes through page 29 with page 14 missing.
Q. Do you know if the schedule that you discussed with Mr. Conroy is in that exhibit you have in front of you?
A. Yes.

Page 35

Q. And what page is it on?
A. It was either schedule -- excuse me. It was either Table 2.2 or 2.3 on page 26 or 27. I don't recall which of the two I talked with him about.
Q. And for the record, that is both tables, Table 2.2 and 2.3 are waste acceptance schedules?
A. Yes. I talked with him only about one table. I don't recall which one it was, Table 2.3 or 2.2.
Q. What was the nature of your conversation? What did you ask him?
A. I said something to the effect, and I'm not quoting verbatim, hey Mike, do you remember this? And he said to me, yes, I do. I think I may have helped put that together.
Q. Did you ask him further where the numbers came from?
A. Yes, I did.
Q. And when I say the numbers, I'll be specific. We're talking about the acceptance rate contained in the table and in Table 2.2 the acceptance rate starts at 400 MTU in 1998 ramping up to 3000 MTU in 2003?
A. Under the first repository group, the

Page 36

table under spent fuel, yes, that column.
Q. And --
A. It's on Table 2.2 now.
Q. And Table 2.3 under first repository -- I guess maybe you can describe the difference to me between Table 2.2 and 2.3?
MS. SULLIVAN: Objection. Asked and answered.
THE WITNESS: Table 2.2 is a system -- two repositories. Table 2.3 is an MRS and a repository.
BY MR. MACDONALD:
Q. And 2.3 has an MRS acceptance of 2200 MTU pre-98?
A. Yes.
Q. 3000 MTU in '98 continuing at 3000 with the MRS acceptance?
A. Yes.
Q. Does looking at these acceptance rates refresh your recollection as to which table you talked to Mr. Conroy about?
A. I'm not a hundred percent, but the more I think about it, I believe stronger, but I'm still not a hundred percent sure. It was probably Table 2.2 because the numbers we looked at was the 4, 6, 9, 9, 18, 3000 continuous. And it just seems more obvious

Page 37

where they are on that table than the second table. But that's, again, I have a stronger belief, but I'm not certain. But that's the column that we looked at.
Q. And what was Mr. Conroy's response when you asked him about the 400, 900, 1800, 3000 rate?
A. His best recollection that he stated to me was, I believe, we looked at 25 years for an operating lifetime of a facility, and we took 70,000 and divided it by 25 and came to approximately 3000.
Q. And this is the principle that you discussed with other counsel as one of the ways you got to the 3000 MTU acceptance rate?
A. Yes.
Q. Was Mr. Conroy the first person that you discussed this principle that the 3000 rate was derived from taking 70,000 MTU, divide it by the 25 year lifetime of the facilities?
A. No.
Q. Who else did you have discussions with about that?
MS. SULLIVAN: Objection. Calls for attorney-client and attorney work product.
MR. MACDONALD: Other than your attorneys.
MS. SULLIVAN: Or in the presence of

Page 38

counsel.
THE WITNESS: I don't recall ever having a discussion outside with anyone else who stated that to me outside the presence of counsel.
BY MR. MACDONALD:
Q. Was it your understanding in 1995 that this is how the 3000 rate was derived?
A. No, it was not.
Q. Was it your understanding -- you gained that understanding sometime after 1995?
A. Yes.
Q. Did you have this understanding, your present understanding, that the 3000 rate was derived from this 25-year lifetime of the facilities prior to the initiation of this litigation in 1998?
A. I did not have that understanding prior to 1998 litigation. Litigation we're all here involved with.
Q. What was your understanding prior to the time of this litigation as to how the 3000 rate was derived?
MS. SULLIVAN: I'm going to object. This is beyond the scope. He's here as a DOE witness, and he was prepared to answer questions on the acceptance rate. You can answer but I do not see the relevance

Page 39

and I think it's beyond the scope of this deposition.
THE WITNESS: I did not have any understanding why those numbers were chosen till I started researching this for this deposition.
BY MR. MACDONALD:
Q. And when you started researching it for the deposition, were there certain documents that led you to conclude that the 3000 rate was derived based on this lifetime operations of the facility?
A. No.
Q. So when you say research, that your research in preparing for this led you to that conclusion, what research are you referring to?
A. Discussions with the individuals who I identified yesterday at the beginning of my deposition who I talked with to prepare for this.
Q. And just to go back, the people you identified yesterday were Mr. Zabransky, Mr. Brownstein, Ms. Taylor, Lake Barrett, Ron Milner, Vic Trebules?
A. (Nods)
Q. Jim Carlson, and Mike Conroy?
A. I believe that's all inclusive.
Q. Who on that list besides Mr. Conroy who you testified shared that opinion with you, who on

Page 40

the list also would have shared that opinion with you?
MS. SULLIVAN: Objection. Calls for attorney product and attorney-client privileged communications. If you have any knowledge outside of your conversations that were retained by counsel, you can answer.
THE WITNESS: Could you repeat that for me, I'm not sure what you're asking.
MR. MACDONALD: Could you read the question back?
THE REPORTER: "Question: Who on that list besides Mr. Conroy who you testified shared that opinion with you, who on the list also would have shared that opinion with you?"
THE WITNESS: Shared what opinion with me?
BY MR. MACDONALD:
Q. The opinion that the 3000 rate was derived from the 70,000 MTU limit divided by a roughly 25-year operating life of the facility.
MS. SULLIVAN: Same objection.
THE WITNESS: I believe Mr. Carlson.
MS. SULLIVAN: Remember my guidances. Outside the presence of counsel.
THE WITNESS: The only person I had

Page 41

conversation with outside of counsel was Mike Conroy.
BY MR. MACDONALD:
Q. So at these discussions that you may have had with certain of the people we just described where this principle was discussed, counsel was present at all those discussions?
A. All discussions except for the one that I had with Mike Conroy.
Q. And to your knowledge, there are no documents that you reviewed that reflect this principle?
A. Correct.
Q. Do you know if there are any documents that DOE produced in this litigation that reflect this principle?
A. I don't know.
Q. When did DOE determine that it would not begin accepting SNF in 1998 at a permanent repository roughly?
A. I believe the first time we published that that we wouldn't be receiving SNF at a permanent repository in 1998 was either -- I believe it was the '87 mission plan amendment but it also could have been the '88 draft amendment. It was either one of those two.

Page 42

Q. So by either 1987 or 1988, DOE had determined that it wouldn't begin accepting SNF at the repository in 1998?

A. Yes.

Q. Prior to that time, were there any DOE studies suggesting an acceptance rate of 900 MTU?

MS. SULLIVAN: Objection. Vague. 1900 MTU, what time period?

MR. MACDONALD: Did you understand the question?

THE WITNESS: Are you saying 1900 MTUs per year?

MR. MACDONALD: I'm sorry. I thought I said 900 MTUs.

THE WITNESS: 900 MTUs on a yearly basis?

MR. MACDONALD: Yes.

THE WITNESS: On a steady state basis not just given any year?

MR. MACDONALD: That's right. With a reasonable ramp-up period.

THE WITNESS: Steady state acceptance rate of 900 MTUs. I don't know of any.

BY MR. MACDONALD:

Q. You don't know of any DOE studies before 1998 in which DOE intended to operate its facilities

Page 43

with a steady state acceptance rate of 900 MTU per year?

A. I'm sorry. Maybe you misspoke or maybe I misheard you. You say before 1998?

Q. I may have said that. If I did, I apologize. I'm trying in my head to refer to 1988.

A. Okay. If you're asking me do I know of any studies that were prior to 1998 that this steady --

Q. 1988.

A. 1988, excuse me, with steady state acceptance rate of 900 MTUs, I do not recall any.

Q. Are you aware of any studies where DOE planned on accepting fuel at a repository at less than a 3000 MTU per year steady state rate?

MS. SULLIVAN: Objection, vague.

MS HEWLITT: Before 1998?

MR. MACDONALD: At any time.

THE WITNESS: I am not aware of any studies that stated that the steady state acceptance rate at a repository would be less than -- other than in the ramp-up period, less than 3000 MTUs per year.

BY MR. MACDONALD:

Q. And the question is sort of convoluted, so I apologize. Another way of putting that is assuming

Page 44

the operation of a repository DOE planned on a 3000 MTU per year steady state rate, is that correct?

MS. SULLIVAN: Objection, vague.

THE WITNESS: No. I would say that's not correct.

BY MR. MACDONALD:

Q. Okay. In what way is it not correct?

A. I think if you look at documents such as the 91 ACR, 95 ACR, we looked at steady state rates of 900.

Q. Were either of those ACRs based on accepting fuel at the repository at the time during the period where the rate was 900 MTU?

MS. SULLIVAN: Objection, vague.

THE WITNESS: Can you restate that for me?

MR. MACDONALD: Could you read the question back?

THE REPORTER: "Question: Were either of those ACRs based on accepting fuel at the repository at the time during the period where the rate was 900 MTU?"

THE WITNESS: I don't believe so.

BY MR. MACDONALD:

Q. Maybe my earlier question was inartful, then. Assuming an operation at a repository, not an

Page 45

MRS, did DOE plan to use a 3000 MTU acceptance rate once it ramped up to a steady state?

A. I believe so.

MS. SULLIVAN: Can I have a --

(Counsel conferring with witness)

BY MR. MACDONALD:

Q. Mr. Pollog, I'd like to ask you a couple of questions about the '83 draft mission plan which you have looked at previously and it should be Exhibit 7. I'd like you to turn to page 2-3.

For the record, this is a table that Ms. Hewett asked you about yesterday entitled Waste Acceptance Schedule, is that right?

A. I believe so.

Q. One of the questions that Ms. Hewett asked you before about -- she asked about this third column discharge from decommisioned reactors, and I believe your testimony was you didn't think this had or was related to the acceptance rate in any way?

A. Correct.

Q. Do you know why this table includes information about the discharge rate from decommissioned reactors?

MS. SULLIVAN: Objection. Asked and answered. You can answer it again if you remember.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 46

THE WITNESS: No, I don't.
BY MR. MACDONALD:
Q. Are you aware of a provision in the standard contract that provides authority to DOE to give shutdown reactors a priority in the acceptance of SNF?
A. I'm aware of a provision that DOE may provide priority for shutdown reactors.
Q. Do you know why that provision was put in the standard contract?
A. No, I do not.
Q. Would you turn to page 2-5?
A. The same document?
Q. Same document. The first full paragraph on page 2-5 begins, "The main plan and primary effort is to have an operating geologic repository in 1998."
Do you see that?
A. Yes.
Q. As of December 20, 1983, the date of this document, was it DOE's main plan and primary effort to have a repository?
MS. SULLIVAN: Objection. Beyond the scope. You can answer if you know.
THE WITNESS: I believe it was the objective of the Department to have a repository

Page 47

operating by 1998.
BY MR. MACDONALD:
Q. Would you turn to page 3-B-12. It's a ways in the back.
A. 3-B-12?
Q. Yes. And in particular, if you would look at the paragraph B entitled Licensing.
A. Yes. I'm there.
Q. I had some questions about this which maybe you will be able to explain. This paragraph states that, "It has been estimated that the Nuclear Regulatory Commission would require two-and-a-half years to review and monitor retrievable storage facility licensing application."
Can you explain to me what would go into that estimate of why it would take two-and-a-half years for the NRC to review an NRS licensing application?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: I must admit I'm not that familiar with NRC licensing regarding a facility, so I can't explain to you why it would take two-and-a-half years to do that.
BY MR. MACDONALD:

Page 48

Q. Is the 2.5 year time period consistent with your current understanding of how long the NRC would take to license an MRS?
MS. SULLIVAN: Same objection.
THE WITNESS: My current understanding is based on work that was done I believe a CISF, centralized interim storage facility submittal we sent to NRC in the late 1990s, and I believe the licensing time approximates that.
BY MR. MACDONALD:
Q. And what was again the CISF proposal that you're talking about?
MS. SULLIVAN: Same.
THE WITNESS: Centralized interim storage facility.
BY MR. MACDONALD:
Q. And you worked on that proposal in what period of time?
A. I did not work on that proposal.
Q. When was that proposal sent in?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe in the late '90s, mid to late '90s.
BY MR. MACDONALD:
Q. If you didn't work on it, how are you

Page 49

aware of the time that the study estimated for NRC approval of an MRS license?
A. I believe I picked a copy up just for some general light reading one afternoon.
Q. You're an engineer at heart. Do you know who did work on that?
MS. SULLIVAN: Same objection.
THE WITNESS: Yes, I do.
BY MR. MACDONALD:
Q. Who was that?
MS. SULLIVAN: Same objection.
THE WITNESS: Dan Kane, K-a-n-e.
BY MR. MACDONALD:
Q. In 1983, did DOE anticipate that utilities would have to build additional on-site storage facilities?
A. I believe so, yes.
Q. Did DOE anticipate the utilities would have to about the additional on-site storage facilities after 1998?
A. I believe so.
Q. Why do you believe so?
A. Because we believe utilities would need to build additional on-site storage facilities by the mid-'90s.

Page 50

Q. Would they -- I think my question may have been poorly worded. DOE anticipated that the utilities would have to build storage in the mid-'90s.
Did DOE anticipate that utilities would have to build storage after January 31, 1998?
MS. SULLIVAN: I'm going to object to this as beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: You're talking about 1983?
MR. MACDONALD: Correct.
THE WITNESS: I think DOE anticipated at that time that it was possible that utilities would need to build additional on-site storage after 1998. If DOE did not start accepting fuel by that date, by that time frame. DOE believed it was also possible but difficult to speculate that far even if we did accept fuel starting in 1998, if utilities would need to build additional on-site storage because we hoped to take rates who reduced the need, but that would be in a perfect world with perfect trading and one could not speculate how an exchange process would work 20 years in the future.
BY MR. MACDONALD:
Q. But the waste acceptance schedule in 1983

Page 51

was designed so that no utility would have to provide additional on-site storage after January 31, 1998?
MS. SULLIVAN: Objection, vague. It was designed as I've testified, two things in mind. One thing was to hopefully reduce or if in a perfect world eliminate the need for additional on-site storage, and it was also designed with the objectives we talked about earlier, and that is a 70,000 MTU limit at a repository divided by 25 years and you come to the number of approximately 3000. It had two objectives I think regarding -- or two reasons why that rate was chosen.
BY MR. MACDONALD:
Q. Would you turn to page 2.1 of the same document, the 1983 draft mission plan?
A. You said 2.1?
Q. Yeah, 2-1. And in the first paragraph, this document states, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998."
So my question is was the waste acceptance schedule "Designed to provide an acceptance rate in

Page 52

the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?"
A. Yes.
Q. Do you know why this document doesn't discuss or mention the second objective that you had talked about, the 25-year life of the operations?
A. No, I do not.
Q. I'd like to talk briefly about the 1984 draft mission plan which should be Exhibit 8. Conveniently, I'd like you to turn also to page 2-1 of this document, the 1984 draft mission plan. And in particular I wanted to ask a few questions about the language that Ms. Hewett identified yesterday for you in the second paragraph. In specific, the first sentence which talks about providing owners and generators of SNF with planning schedules sufficiently early to determine their on-site interim storage needs.
What's your understanding of what "sufficiently early" in that sentence means?
MS. SULLIVAN: Objection. Asked and answered. You can answer again if you recall your answer.
THE WITNESS: I'm having trouble finding

Page 53

sufficiently early. Can you point it out to me?
MR. MACDONALD: It's the second paragraph, the fourth line.
THE WITNESS: Oh, I'm sorry. I'm looking under A. I believe that would mean they would not have to be in a situation where their spent fuel pool was full before they had to make a decision about what they were going to do next.
BY MR. MACDONALD:
Q. And we talked a little bit about this yesterday, but I just want to clarify it. The reason the utilities need advanced notice is because if DOE was not going to pick up fuel starting in 1998, the utilities would need to make arrangements for storage on their own, is that correct?
MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: They would have to make arrangements.
BY MR. MACDONALD:
Q. Would those arrangements potentially entail building additional dry storage facilities?
MS. SULLIVAN: Same objection.
THE WITNESS: It could.
BY MR. MACDONALD:

Page 90

Q. And do you know when generally, what year SMUD would have submitted and had DCSs approved?
A. Yes.
Q. What year generally would that have been?
A. I believe it would have started in 1992.
Q. And would have been approved under the contract shortly after being sent in -- there were time lines set out in the contract for when they had to be approved?
A. There are time lines set into the contract for specific actions regarding approval of DCSs, yes.
Q. So at the time that they were approved, assume that was in 1992 or 1993, it was DOE's position that it was contractually obligated to begin picking up fuel from SMUD on this schedule set out here that we're looking at?
A. It was the DOE's contention that once the DCSs submitted by SMUD and approved by the department, it was obligated to pick up set amounts in those DCSs of fuel.
Q. If you would look at Exhibit 3 to your deposition which should be the DCS instructions. Were the DCS instructions based on allocations in the 1991 ACR?
MS. SULLIVAN: Objection. Vague.

Page 91

THE WITNESS: I don't quite understand what you're asking. I'm sorry.
BY MR. MACDONALD:
Q. Well, the purchasers had to submit DCRs based on some allocation, correct?
A. Yes.
Q. My question is, on what allocation in what DOE document were the purchasers' DCS submissions based?
A. The purchasers were supposed to use for their DCS submittals allocations in the 1991 ACR.
Q. Is there anything in the DCS instructions that would suggest to a utility that DOE believed that the DCSs would be contractually binding?
A. If you allow me several minutes to review this very quickly.
Q. Please take as much time as you need.
(Witness reviewing document)
THE WITNESS: I'm ready. Can you repeat that question for me?
THE REPORTER: "Question: Is there anything in the DCS instructions that would suggest to a utility that DOE believed that the DCSs would be contractually binding?"
THE WITNESS: I think there's something

Page 92

here that suggests it's contractually binding for the purchaser, but not for DOE.
BY MR. MACDONALD:
Q. And when you say for the purchaser not DOE, could you explain what you mean, contractually?
A. Yeah. If you look on page 5 under certifications, it says, "Any individual duly authorized to bind the purchaser must sign DCS certifying the purchaser has a legal right to deliver such SNF to DOE."
Q. And explain to me why that suggests that the DCSs are contractually binding for the purchaser but not DOE.
A. I didn't say they weren't contractually binding for DOE. I just said that the statement here indicates to me it binds the purchaser to DCSs instructions. But there's no statements in here that state that it binds DOE.
Q. And in fact, this statement doesn't state that the DCSs bind the purchaser; it states that a certification that the individual authorized to bind the purchaser must sign the DCS certifying that the purchaser has the legal right to deliver such SNF to DOE.
MS. SULLIVAN: Object. The document

Page 93

speaks for itself. You can answer.
THE WITNESS: It says any individual that we must certifying that the purchaser has legal right to deliver such SNF to DOE.
BY MR. MACDONALD:
Q. So this provision is speaking to whether or not the purchaser has the legal right to deliver the SNF to DOE, correct?
A. I believe so.
Q. Other than that statement, is there anything in these DCS instructions that suggest DOE believed that the DCSs were contractually binding?
A. No.
Q. If I could ask you to turn to page 2, little paragraph C, just take a quick look at that paragraph. Is there anything in these DCS instructions that suggest that the DCSs are not binding commitments on behalf of DOE?
A. No.
Q. The sentence they believe you spoke discussed with Ms. Hewett yesterday that's in little subparagraph C says, "In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers."

Page 98

approve?
MS. SULLIVAN: Same objection.
THE WITNESS: You would have to ask the utility.
BY MR. MACDONALD:
Q. Do you see any reason why they would do that?
MS. SULLIVAN: Same objection.
THE WITNESS: You would have to ask the utility.
BY MR. MACDONALD:
Q. Going back to the chart of approved DCSs from the government's brief, is it fair to say that you could derive DOE's 1998 obligation to pick up spent fuel by adding up all of the allocations that utilities had an approved DCS for?
A. Assuming that this is correct, I would say yes.
Q. So you could come up with a number of X MTUs have been approved in DCSs for 1998 and that would be DOE's contractual obligation to pick up that amount of spent fuel?
A. One could look at all the approved DCSs, add up all the MTUs that are on those approved DCSs, come up with a number, and we would say that would be

Page 99

our obligation for the acceptance was spent fuel in 1998.
Q. And subsequent years, 1999, 2000?
A. Subsequent years until we -- yes.
Q. And I believe you testified that this was DOE's -- this would have been DOE's view in 1994, correct?
A. Yes.
Q. As well as 1995?
A. Yes.
Q. Are you familiar with DOE's notice of inquiry from 1994?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: Vaguely.
MR. MACDONALD: Actually, I disagree that it's beyond the scope. It has to do with the role and purpose of the DCSs.
MS. SULLIVAN: Well, my objection stands.
BY MR. MACDONALD:
Q. And when you say you're vaguely aware of it, tell me what you know about it.
A. I believe DOE published something in the Federal Register concerning whether we had a obligation starting in 1998 to start acceptance of

Page 100

spent fuel absent commencement of facility operations.
Q. Do you know what DOE's preliminary view was with respect to its obligations in 1994?
MS. SULLIVAN: Same objection.
THE WITNESS: Preliminary review of what?
MR. MACDONALD: Its obligations for accepting spent fuel in the absence of an operating repository or an interim storage facility.
THE WITNESS: Say that again for me? I'm sorry.
THE REPORTER: "Question: Do you know what DOE's preliminary view was with respect to its obligations in 1994? Its obligations for accepting spent fuel in the absence of an operating repository or an interim storage facility."
MS. SULLIVAN: Same objection.
THE WITNESS: Can you tell me what you mean by preliminary view?
MR. MACDONALD: I will hand you a document. We're on Exhibit 23.
(Pollog Exhibit No. 23 was marked for identification.)
BY MR. MACDONALD:
Q. Exhibit 23 which I've just handed you is a

Page 101

notice, a copy of a notice from the Department of Energy dated Wednesday, May 25, 1994. The action which it gives is notice of inquiry. This is a copy of the notice of inquiry which we were just discussing. And I would ask you to look at the beginning paragraph entitled Summary?
MS. SULLIVAN: I would ask that the witness be allowed to review the document if he feels the need to do so.
MR. MACDONALD: Please take as much time as you need.
(Witness reviewing document.)
BY MR. MACDONALD:
Q. Have you had a chance to review that?
A. Yes.
Q. The document on page 1 in the summary section states that, "It's the Department's preliminary view that it does not have a statutory obligation to accept spent nuclear fuel in 1998 in the absence of an operational repository or a suitable storage facility constructed under the Nuclear Waste Policy Act of 1982."
My question is whether you're familiar with that preliminary view, to use the language in this document, in 1994.

Page 102

MS. SULLIVAN: Objection. Beyond the scope. Can you answer as to your personal knowledge.
THE WITNESS: This is the first time I've read this document.
BY MR. MACDONALD:
Q. You didn't review this document in preparation for your deposition today?
A. This is the first time I've read this document I believe I just stated.
Q. Besides your counsel, have you ever discussed this document with anyone or the principles outlined in the document?
A. No.
Q. You previously testified that in 1994 it was the DOE's position that DCSs were contractually binding and that they obligated DOE to pick up specific X amount of fuel in 1998, 1999, and 2000.
Does this change your opinion?
A. No.
Q. Why not?
A. It doesn't.
Q. Does this document state that it is DOE's preliminary view that it has no obligation to pick up spent fuel in 1998 in the absence of a repository or interim facility?

Page 103

MS. SULLIVAN: Objection. The document speaks for itself.
THE WITNESS: It states "That it does not have a statutory obligation to accept spent nuclear fuel in 1998 in the absence of an operational repository or a suitable storage facility constructed under the Nuclear Waste Policy Act of 1982 as amended." The document states that.
BY MR. MACDONALD:
Q. Does that statement suggest that DOE believed it was obligated to pick up fuel in 1998 based on the approved DCSs?
A. It doesn't refer at all to DCSs in the document.
Q. I understand that, but my question is you testified that it was DOE's belief that the DCSs represented binding obligations. And I'm asking you does this statement suggest that DOE's belief was it had no obligation if it had no repository or facility?
MS. SULLIVAN: Asked and answered.
THE WITNESS: It states that was a preliminary view of the Department.
BY MR. MACDONALD:
Q. Do you know if that preliminary view was

Page 104

changed?
MS. SULLIVAN: Objection, beyond the scope. You can testify as to your personal knowledge.
THE WITNESS: I could only say that the Department considered DCSs to be a binding obligation.
BY MR. MACDONALD:
Q. My question was, do you know if its preliminary view as set forth in this document changed?
MS. SULLIVAN: Same objection.
THE WITNESS: I said I believe the Department always believed that the -- since I believe I mentioned 1991 it's been our view that the DCSs were a binding commitment on both parties.
BY MR. MACDONALD:
Q. And having fully reviewed this document, is there any language in here that suggests that was DOE's belief as of May 25, 1994?
A. What was DOE's belief?
Q. Is there any language in this document that suggests DOE believed it had binding obligation to pick up spent fuel based on the approved DCSs in 1998?

Page 105

A. There's nothing in this documents that suggests that we had a binding obligation to pick up spent fuel based on approved DCSs. The document does not state used DCSs. So there's nothing in here that suggests that belief.
MR. MACDONALD: I'm going to hand you Exhibit 24.
(Pollog Exhibit No. 24 was marked for identification.)
BY MR. MACDONALD:
Q. Exhibit 24, which I've just handed you is a notice from the Department of Energy or a copy of a notice from the Department of Energy dated Wednesday, May 3, 1995. The action listed in the notice states, "Department of Energy final interpretation of nuclear waste acceptance issues."
You can take as much time as you need to review this.
(Witness reviewing document)
BY MR. MACDONALD:
Q. Have you had an opportunity to fully review that document?
A. Yes.
Q. Does this document appear to be DOE's final interpretation of the preliminary notice that

Page 106

we were just talking about?
A. Yes.
Q. Have you ever reviewed this document before?
A. No.
Q. Have you ever discussed this document or the principles outlined in it with anyone before?
MS. SULLIVAN: Object to these questions, beyond the scope of the deposition. You can answer as to your personal knowledge.
THE WITNESS: No.
BY MR. MACDONALD:
Q. What is DOE's conclusion in this document as of May 3, 1995 with respect to its obligation to pick up spent fuel in 1998?
MS. SULLIVAN: Objection as beyond the scope and also the document speaks for itself. You can speak to your personal knowledge.
THE WITNESS: I can read for you a summary if you like. If you want me to do that, I'd be happy to sit here and read into the record the summary.
BY MR. MACDONALD:
Q. Instead of doing that, would you turn to page 4 of the document? It's actually the third page, but listed as page 4 in the upper right-hand

Page 107

corner. Right above the Roman Numeral or the letter A, the last paragraph states that, "After considering the views of the commenters, the provisions of the act, and its legislative history, and the terms and conditions of the standard contract, DOE has concluded that it does not have a legal obligation under either the act or the standard contract to begin disposal of SNF by January 31, 1998, in the absence of a repository or interim storage facility constructed under the act."
Do you see where it says that?
A. Yes.
Q. Are you aware that as of May 3, 1995, that was DOE's conclusion?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: Am I aware of that now or was I aware of that in 1995? What is your question?
BY MR. MACDONALD:
Q. Were you aware of that in 1995 first?
MS. SULLIVAN: Same objection.
THE WITNESS: No.
BY MR. MACDONALD:
Q. Were you aware of that at any point before this deposition?

Page 108

MS. SULLIVAN: Same objection.
THE WITNESS: I vaguely recall conversations about what we stated in the final rule. When you say aware, I recall conversations to that effect. I don't recall specifics of who they were with or when they were, but I do recall hearing what the final rule stated.
BY MR. MACDONALD:
Q. And what do you recall hearing the final rule state it?
MS. SULLIVAN: Objection. Beyond the scope. Also objection to the extent it calls for attorney-client -- disclosure of attorney-client privileged information. You can answer as to your personal knowledge.
THE WITNESS: I can reread that last paragraph of Section 3 if you like, but that's what I recall.
BY MR. MACDONALD:
Q. Okay. You do recall hearing that DOE had concluded that it does not have a legal obligation under the act or the contract to begin disposal of fuel by '98?
A. Yes.
Q. And you don't remember when you may have

Page 109

heard that conclusion?
A. I recall no specific conversations with any individual at any point in time concerning that conversation.
Q. Roughly what period of time?
A. I would say somewhere in the mid-95 to '96 time frame.
Q. If DOE had concluded that it had no legal obligation to accept fuel in January 1998, how could it have been DOE's belief at that time that DCSs were -- that DCSs legally obligated them to pick up fuel in 1998?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Also objection as argumentative. You can answer the question.
THE WITNESS: Because we still had signed and approved DCSs signed by the purchasers and signed by DOE's contracting officer. Since we had signed and approved DCSs we still had an obligation to fulfill what was in those DCSs, our part of the DCS.
BY MR. MACDONALD:
Q. Is that what this statement suggests?
A. No.
Q. Does this statement suggest the opposite?
A. The statement says nothing about signed

and approved DCSs.
Q. But it states that DOE has no obligation to begin accepting fuel in 1998.
A. Yes. It states that, what you just said.
Q. Looking at the DCS instructions again, which I believe you still have in front of you, again, little paragraph sub C.
A. Are you on page 2?
Q. I am, I'm sorry. The second sentence states that, "The process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate listed in the ACR." We've discussed that previously, correct?
A. Yes.
Q. And in the event that the waste management system can't begin accepting fuel in '98, the DCS will be reevaluated by both DOE and the purchasers, correct?
A. May be reevaluated by both DOE and the purchasers.
Q. And the final interpretation in fact states that there will not be acceptance of SNF in 1998, correct?
MS. SULLIVAN: Objection. I think you're



mischaracterizing the document.
THE WITNESS: I don't believe it states that.
BY MR. MACDONALD:
Q. What do you believe that it states?
A. Were you talking about the May 3 -- were you talking about Exhibit 24?
Q. The May 3, 1995, Department of Energy final interpretation, yes.
A. I believe it states that "DOE has concluded that it does not have unconditional statutory or contractual obligation to accept high-level waste and spent fuel beginning January 31, 1998 in the absence of a repository or interim storage facility constructed under the Nuclear Waste Policy Act of 1982 as amended."
Q. Okay. And my question was, does this final interpretation state that DOE would not be able to begin accepting fuel in 1998?
A. I don't believe it does.
Q. If you turn to page 3 for me, the second page of the document with page 3 at the top, and follow along the paragraph near the top beginning it states "Although the Act originally envisioned that a geologic repository would be in operation, DOE would



be prepared to begin acceptance of SNF by January 31, 1998, it since has become apparent that neither a repository nor an interim storage facility constructed under the Act will be available in 1998."
So my question is does that change your view on whether or not this document and DOE's position at the time was it would not be able to begin accepting fuel in 1998?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: Yes.
BY MR. MACDONALD:
Q. If you would turn to the APR ACR dated March 1985. I believe it's Exhibit 15.
MS. SULLIVAN: How much longer are we going to go? Can we get a break for lunch?
MR. MACDONALD: Yeah. Let me ask some questions about this and then we can break for lunch.
BY MR. MACDONALD:
Q. If you would turn to page 4 of this document, I guess I would ask the same question with respect to this ACR APR, and you can review it if you need to the first four or five pages, but does this document suggest anywhere that DOE believed as of March 1995 that DCSs were contract contractually



binding.
(Witness reviewing document)
A. I don't believe it does.
Q. Does this document suggest that DOE's belief at the time was that it would not begin accepting SNF based on the DCSs -- the approved DCSs in 1998?
MS. SULLIVAN: Objection. Beyond the scope. And also objection, the document speaks for itself. You can answer the question as to your personal knowledge.
THE WITNESS: Can you repeat the question for me or have someone read it?
THE REPORTER: "Question: Does this document suggest that DOE's belief at the time was that it would not begin accepting SNF based on the DCSs -- the approved DCSs in 1998?"
THE WITNESS: I don't believe so.
BY MR. MACDONALD:
Q. Does it suggest that DOE would begin accepting fuel based on the approved DCSs in 1998?
MS. SULLIVAN: Same objections.
THE WITNESS: I do not believe so.
BY MR. MACDONALD:
Q. If you turn to page 4 and look at the last

Page 114

sentence, the document states that, "Until the SNF is accepted by the Department, Section 111(a)(5) of the Act assigns the waste owners and generators the primary responsibility to provide for, and pay for the costs of, interim storage."
If DOE believed this statement at the time, wouldn't it suggest that the it would not begin picking up the fuel base on the approved DCSs?
MS. SULLIVAN: Objection beyond the scope, objection argumentative, objection vague. You can answer as to your personal knowledge.
THE WITNESS: Could you repeat that again?
BY MR. MACDONALD:
Q. Let me rephrase it. The premise of this sentence is that until SNF is accepted, the purchasers will have to pay for and provide the cost of interim storage. Strike that.
MR. MACDONALD: You want to break for lunch?
MS. SULLIVAN: Sure.
(Whereupon, at 1:30 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 2:15 p.m., this same day.)

Page 115

AFTERNOON SESSION
(2:15 p.m.)
Whereupon,
THOMAS POLLOG,
the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:
EXAMINATION BY COUNSEL FOR
PLAINTIFF SACRAMENTO MUNICIPAL (RESUMED)
BY MR. MACDONALD:
Q. Mr. Pollog, when did you form the opinion that DCSs are contractually binding?
A. When did I, Tom Pollog?
Q. Yeah.
A. I believe in -- that DCSs are binding, is that what your question is?
Q. I guess I should preface the question. Do you, Tom Pollog, believe that the DCSs are contractually binding?
A. Yes, I do.
Q. When did you form that belief?
A. I believe I formed that belief in approximately 1991.
Q. And how did you form that belief in 1991?
A. General waste -- no. At that point in

Page 116

time, I was with the utility interface and logistics branch, which was headed up by Mr. Brownstein and at various points during the work period we would discuss just contract issues, work issues, stuff like that, and we would have general discussions just sitting across a desk or table like this, and I don't have any specific recollection of a conversation or any particular time, and when I started working for Mr. Brownstein around 1991, we had a discussion similar to that and during that period I formed my belief.
Q. Did Mr. Brownstein ever express the same opinion that DCSs were contractually binding?
A. I believe Mr. Brownstein expressed similar beliefs.
Q. Did Mr. Brownstein ever -- did you ever have discussions with Mr. Brownstein where he expressed the view that DCSs may not be binding?
A. I believe he stated that DCSs may not be binding if we didn't commence facility operations.
Q. And did DOE commence facility operations?
MS. SULLIVAN: Objection. Beyond the scope. You may answer the question.
THE WITNESS: Not beyond this point in time, today.

Page 117

BY MR. MACDONALD:
Q. Does DOE -- strike that. DOE is currently continuing plans for acceptance of waste developing program plans for acceptance of waste at Yucca Mountain beginning in 2002, is that correct?
MS. SULLIVAN: Objection. Beyond the scope. You can answer the question as to your personal knowledge.
THE WITNESS: Yes, that's correct.
BY MR. MACDONALD:
Q. In developing those plans, is DOE currently planning to use the approved DCSs for the basis of acceptance starting in 2010?
MS. SULLIVAN: Same objection.
THE WITNESS: We have not had discussions as to how we will begin acceptance in 2010, but we've always believed that the commitment -- we did have a commitment to a legal contractually binding commitment to accept the fuel that is designated on the submitted and approved DCSs.
BY MR. MACDONALD:
Q. Have you participated in any planning or conversations in which DOE discussed modifying the entire DCS and FDS process for acceptance for Yucca Mountain?

Page 118

A. Yes.
Q. You have participated in discussions about modifying the DCS and FDS process?
A. Yes.
Q. Tell me generally the nature of those conversations or that plan.
A. The contract as it's written is difficult to implement because we do not get a great deal of information from utilities until the last part of the waste acceptance process starting with DCS, FCS, I believe comes in 60 days prior to delivery.
Information on the appendix F would most likely be needed by us in order to select the most appropriate transportation cask, and we would have a desire to try and get some of that information a little bit earlier than 60 days prior to delivery to allow us to operate maybe a little more efficient transportation program.
Q. Would utilities that had allocations in the first 10 years based on the '91 ACR who do not have approved DCSs, will they have acceptance rates assuming repository operation in 2010?
MS. SULLIVAN: Objection. Calls for speculation. You can answer the question.
THE WITNESS: We did not discuss that

Page 119

issue.
BY MR. MACDONALD:
Q. Have you been involved with presentations, either preparing them or listening to them in which Lake Barrett discussed overhauling the DCS-FDS process?
A. I would not say it in those words, so no.
Q. Well, I apologize, I'm not trying to characterize it. What's a better way to characterize?
MS. SULLIVAN: Objection, vague.
THE WITNESS: We, the waste acceptance team, had discussions with Lake Barrett about what we think we needed for waste acceptance transportation program planning and what was supplied by the current contract. Lake didn't -- I would not say discussed anything but more but listened to what our concerns were.
BY MR. MACDONALD:
Q. Do you know in the current program plan what the rate of acceptance DOE is planning to use for the repository when it opens in 2010?
MS. SULLIVAN: Objection. Beyond the scope. That's covered in another topic, but you can answer as to your personal knowledge.

Page 120

THE WITNESS: This may sound bad, but I don't usually read the program plans.
BY MR. MACDONALD:
Q. Let me ask it a different way. Do you have any knowledge as to the DOE's plan for the rate at which it will accept fuel beginning in 2010?
MS. SULLIVAN: Same objection. You may answer as to your personal knowledge.
THE WITNESS: Yes, I do.
BY MR. MACDONALD:
Q. Okay. And tell me what that rate DOE is planning to use when it begins operation in 2010.
A. I will use what I refer to and is commonly referred to in the RW program as a document called a CRD, which is I believe an acronym for Office of Civilian Radioactive Waste Management System Requirements Document.
Q. SRD then?
A. CRD. It doesn't make sense, but it's called a CRD. Stands for Civilian Requirements Document.
Q. Gotcha.
A. This is the overall systems requirements document. That document I believe specifies a design rate for the repository yucca mountain of 4, 6,

Page 121

12, -- excuse me. 400, 600, 1200, 2000, 3000, starting in 2010 and 2011 being 600, 2012 being 1200, 2013 being -- you understand what I'm saying.
Q. So it's 400, 600, 1200?
A. 2000.
Q. 2000.
A. 3000.
Q. 3000 by the fifth year?
A. Yes.
Q. And then operating at a steady state 3000 going forward after that?
A. Yes.
Q. And what year is the -- what's the most recent CRD document that you're aware of?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
I believe 2001, although it could be 2000.
BY MR. MACDONALD:
Q. And if the program operated with the acceptance rates in the systems requirement document that you're referring to at 400, 600, 1200, 2000, then at 3000 steady state, the DCSs -- the approved DCSs wouldn't fit that schedule, would they?
A. I would say they would fit it very well.
Q. And why would you say that when the DCSs

Page 158

Q. Does this refresh your recollection as to whether you've ever seen this document before?
A. Yes.
Q. Were you involved in the preparation of this document?
A. No.
Q. Do you know why after DOE had decided not to publish the APR ACR dated September 1996 that we just talked about, why DOE prepared an APR ACR the following year?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: Yes, I do.
BY MR. MACDONALD:
Q. Could you explain why?
A. Yeah. I'm actually going to have to correct what I just said earlier about the Exhibit 27.
Q. Okay. Exhibit 27 being the APR ACR dated September 1996?
A. Yes. After I saw both of these, it brought back a better recollection for me.
Q. Great.
A. In this approximate time frame, September of '96 we had a reorganization, where I went from the

Page 159

engineering division back to the waste acceptance group and several people came and went into different organizations. And we got Exhibit 27 even though it says September of '96 a little bit later than that. And we expected the data for the Exhibit 28 to be coming in fairly soon, so we decided not to issue September '96 edition, Exhibit 27, and just go forth with Exhibit 28 because of the lateness in getting this and the expectation to be getting the data from the 859 form in time to be able to turn Exhibit 28 in a timely manner. So this one we just basically decided not to issue because of the timing.
Q. And this one being, sorry, for the court reporter, the ACR APR dated September '96?
A. That's correct. It was a timing issue that we just never got around to doing it. And then by the time we started -- we got this from our contractor --
Q. This being the APR ACR dated September '97?
A. Yes, Exhibit 28. That's when we received the guidance from the Office of General Counsel to stop doing this.
Q. And what contractor would DOE have received that from?

Page 160

A. TRW.
MR. MACDONALD: I have no further questions at this time. Along the same lines with Ms. Hewett's reservation in light of outstanding document issues, we reserve the right to reopen the deposition if necessary and thank you for your time.
THE WITNESS: I look forward to it.
MS. SULLIVAN: I have a couple of questions.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MS. SULLIVAN:
Q. Mr. Pollog, could you define the term emplacement rate for me?
A. Yeah. Emplacement rate would be the rate of fuel taken underground at repository if possible, for fuel to be accepted and moved to repository and not be emplaced within a few weeks or a few days, so it might still be in lag storage for a period of time. The emplacement rate would reflect the actual amount of material going from the surface facility underground.
Q. Is there a difference between a waste acceptance rate and an emplacement rate?
A. There can be.
Q. Could you define the term waste

Page 161

acceptance?
A. Yeah. When title is transferred from the purchaser to the Department of Energy.
Q. I'm sorry, I should have -- waste acceptance within the context of the program that we've been discussing. Is that your definition?
A. Yes. That would be when title was transferred from the purchaser to the Department of Energy for particular SNF, spent nuclear fuel.
Q. Is there a difference between waste acceptance and waste disposal?
A. There can be.
Q. And what is that difference? What can be that difference?
A. The waste acceptance rate can be higher than what the waste emplacement rate is if there is cause for lag storage or storage needed at a disposal facility.
Q. Mr. Pollog, could you look at Exhibit 3, which are the instructions for completing the Appendix C delivered commitment schedule. And could I direct your attention to paragraph 7 C on page 2. And I'm going to read a sentence that you've been read a number of times, the third sentence in that paragraph. "In the event that such circumstances

Page 162

change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers."
Can you describe what circumstances would require reevaluation of DCSs?
MR. MACDONALD: Objection. The document speaks for itself. Calls for a legal conclusion.
BY MS. SULLIVAN:
Q. Would you like to answer?
A. Yes, I would.
Q. Would you please?
A. Yes. An example of this would be where a purchaser indicated that they would like to be served via a truck cask as opposed to a rail or barge. If DOE thought it might be in the best interest of the system to service them via a rail cask which is larger and would reduce the number of casks and shipments, we would seek to negotiate with a purchaser and with both parties agreeing, try and service them with the rail cask.
MS. SULLIVAN: Okay. Nothing further.
MR. MACDONALD: Nothing further from me.
(Recess.)
EXAMINATION BY COUNSEL
FOR SOUTHERN NUCLEAR OPERATING COMPANY
BY MS. REMINGTON:

Page 163

Q. Hello, my name is Kristi Remington and I work for Balch & Bingham and we represent Southern Company. And I just have a few questions that shouldn't take too long. I'm going to go back to the topic of DCSs very quickly. And can you just tell me when you came to learn that DOE's official position was that accepted DCSs would be contractually binding?
A. I would say it would be in the 91-'92 time frame and we were discussing what the ramifications would be of the DOE contracting officer signing off on the DCS. That would be an official -- a real commitment for the Department.
Q. Is it the position of the Department of Energy that an approved DCS would not be contractually binding if there were no operating facility in 1998?
A. I don't believe that's the official position of the Department of Energy.
MS. REMINGTON: I'm going to show you a document that's going to be marked Exhibit 29.
(Pollog Exhibit No. 29 was marked for identification.)
BY MS. REMINGTON:
Q. And that is a DCS submitted by our

Page 164

company, Southern Nuclear Company. If you would take a minute and look at it.
A. (Witness reviewing document.)
Q. I'm actually not going to ask you any questions on the attachments, but you're more than welcome to read them.
A. Okay.
Q. If you'll look on the second page of the letter, the first full paragraph, it states, "The attached meets the notice obligations under the spent fuel disposal services fuel contracts but does not indicate Southern Nuclear's acceptance of the removal rates contained in the current ACR. Southern Nuclear believes that ACR rates are too low and are therefore inadequate."
Have you ever seen this document before today?
A. I don't recall.
Q. Do you know whether DOE would consider that last paragraph that I just read to you a protest of the acceptance rates?
MS. SULLIVAN: Objection. Beyond the scope. You can answer the question as to personal knowledge. Also calls for a legal conclusion.
THE WITNESS: I guess I'm a little puzzled

Page 165

by what you mean by consider.
BY MS. REMINGTON:
Q. Would the contracting officer read this and make a determination that it was a protest of the acceptance rates?
MS. SULLIVAN: Same objection.
THE WITNESS: He might.
BY MS. REMINGTON:
Q. If a purchaser would protest DCS, was it the practice of the Department of Energy through the contracting officer to make a determination that a dispute then existed?
A. It could.
Q. Was there a process that the Department of Energy had for responding to a protest to a DCS? Or I'm sorry, to an acceptance rate?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: To an acceptance rate?
BY MS. REMINGTON:
Q. As listed in the DCS.
A. If you're asking me whether a contract holder in the DCS form itself submitted a allocation that was different than what they were given in the ACR, yes, there was a process.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.), :

Plaintiffs, :

v. :

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - - - - - - - - - - - - X

Discovery Judge (Judge Sypolt)

Washington, D.C.

Wednesday, May 15, 2002

Deposition of THOMAS POLLOG, a (30)(B)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been duly sworn by BRYAN WAYNE, Notary Public for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by BRYAN

Page 2

WAYNE, RPR, and transcribed under his direction.

APPEARANCES:

On behalf of Plaintiffs Yankee Atomic, Connecticut Yankee, and Maine Yankee:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5821

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 12128
Washington, D.C. 20530
202-305-9640

Page 3

CONTENTS

| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS |
|---|---|
| THOMAS POLLOG | |
| By Mr. Skalaban: | 4 |

Afternoon Session - Page 123

EXHIBITS

| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Letter, 3/1/99, Lester to Stock, Shapiro | 8 |
| 2 - Standard Contract | 127 |
| 3 - Government's Witness List | 167 |
| 4 - Copy of 1990 ACR | 169 |
| 5 - 1991 ACR | 171 |
| 6 - Unspecified Doc., Contains APR | 208 |
| 7 - Nancy Montgomery Document, Identifies 35 Issues With Std. Contract Needing Correction | 251 |

* All exhibits retained by counsel.

Page 4

PROCEEDINGS

Whereupon,
THOMAS POLLOG,
was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:
Q. Hello, Mr. Pollog. My name is Pete Skalaban. I represent Yankee Atomic, Maine Yankee, and Connecticut Yankee in the spent fuel litigation. I understand you've been deposed twice in the litigation. Prior to that, have you ever been deposed?
A. Three times, and no, prior to that I have not been deposed.
Q. And the three times was in connection with this spent fuel litigation?
A. Yes.
Q. There was a 30(b)(6) deposition on document issues, is that correct?
A. Yes.
Q. There was a 30(b)(6) deposition on certain other issues, is that correct?
A. Yes.

Page 5

Q. What's the third time?
A. There was another 30(b)(6) yesterday.
Q. I see. And what was that? What did that entail? What were the issues discussed?
A. DCS approval process. It was one of the issues identified by the non-Yankee litigants in their 30(b)(6) witness request.
Q. What's your understanding of what will happen here today?
A. You'll ask me questions, and I'd try and answer them.
Q. Okay. If you don't understand any of my questions, will you let me know so we can have a common ground for my questions and your answers?
A. Yes.
Q. And if you need to take a break at any time will you let me know?
A. Yes.
Q. I just ask that you do that -- you can take a break at any time just so long as a question is not pending, is that fair?
A. Yes.
Q. If I understand correctly, in 1998 you joined DOE as a general engineer for the systems development branch?