Page 158

A. Not to my knowledge.
Q. What would happen if a reconstituted fuel assembly, which was properly placed in a multi-element sealed canister that is licensed for transport and storage by the NRC, how would that impact the treatment of that canister as standard or nonstandard fuel?
MR. CRAWFORD: Objection, vague.
THE WITNESS: That would depend upon how the purchaser identified that specific assembly, whether that specific assembly was standard or whether it was other than standard.
BY MR. SKALABAN:
Q. And when you say how the purchaser identified it, you mean when they actually inserted it into the canister and closed it?
A. And identified it to the Department as this is -- you have this canister, it's got all standard fuel, say it has 20 assemblies in it. It has 20 assemblies and all of these assemblies are standard or 19 of them is standard and one is nonstandard or other than standard.
Q. And if they properly identified it and the canister was licensed to accept that failed fuel and they identified one element of the canister as being

Page 159

failed fuel and the rest being standard fuel, how does your criteria deal with that, or does it at all?
MR. CRAWFORD: Objection, vague.
THE WITNESS: I don't think we could deal with that possibility yet.
BY MR. SKALABAN:
Q. Do you know, in the Department's plan to get canistered fuel under a standard criteria that would allow it to be accepted on the schedule as standard fuel on the schedule proposed by the utility, is there any consideration in that plan for failed fuel being in the canister?
A. There certainly should be. I'm not sure if we have yet, but we certainly should.
Q. And why do you say you should?
A. Because failed fuel will be an issue for the Department. It will be a major handling issue at a receiving facility.
Q. And why do you think that?
A. Well, we would like to limit our occupational exposures as low as we possibly can, and handling failed fuel certainly can have an effect on what occupational exposures workers at our receiving facility would receive.
Q. Wouldn't putting the failed fuel in a

Page 160

multi-element sealed canister help with that issue?
A. Well, are you referring to a multi-element or a multipurpose multi-element?
Q. Let's just talk about a multi-element sealed canister in general.
A. If it's multi-element dual purpose, then it will still have to be reopened at a receiving facility and handled accordingly, taken out and put in some other package.
Q. So your answer differs on whether it's a true multipurpose canister system including disposal versus just a dual purpose system?
A. Correct.
Q. Now, do reconstituted fuel assemblies reduce that, reduce the potential occupational exposure?
A. Potentially. It would depend if the reconstituted were a failed or not. After reconstitution generally I would expect them not to be failed anymore because you reconstitute it with a mind to making it whole again to be to make it a normal standard. If that's the case, I don't think reconstitution would have that great an effect on the system. Now, if somebody else is applying reconstituted in a different way, it may have an

Page 161

effect.
Q. Assuming the failed fuels are put into reconstituted assembly such that it can be handled as any other assembly, then do you see it as a problem of being accepted on the same schedule of other standard fuel?
MR. CRAWFORD: Objection. Mischaracterizes the prior testimony.
THE WITNESS: Most likely not. I don't want see a problem with it. Other factors would have to be looked into, like when it was reconstituted, it was 20 years ago and what the shape is now, but in general I don't see any major concern.
BY MR. SKALABAN:
Q. Now, you said that you've been -- one of the other things you've looked at is failed fuel. Can you tell me about that work?
A. Yes. Standard contract also contains a category of failed fuel. Unfortunately, it doesn't contain criteria for stating whether something is failed or not failed or intact. We would like to be able to give purchasers guidance in that area for making that determination.
Q. So your work in this area is fleshing out the existing provisions on failed fuel?

Page 266

casks to facilitate -- or just having enough casks would not be a problem?
A. Probably not, but it would depend upon how the trade was -- or exchange was requested. If one guy was taking 10 MTUs at one facility and requesting to exchange and the party receiving it was going to use that 10 MTUs, one MTU per facility, then it could be more difficult. Also timing of when it was going to be, because there are utilities that would prefer to ship in the winter, some in the summer, depending upon whether their peaking time was. So there's a regional consideration based upon peaking times for the electricity usage.
Q. I'm not sure if I understand that. I mean, you're going to have to service this particular purchaser a certain amount of MTU any given year anyways, so how does the peak timing issue affect it? Can you explain that for me?
A. Some utilities' peak electricity depend is in winter, that's the northern ones. Some utilities' peak utility demands is in the summer for the southern ones. So if everybody wants to be serviced at the same time, if they're all northern or southern utilities, that could potentially put an enormous demand on cask usage and that could potentially cause

Page 267

problems for the transportation system. As I stated, I think the utilities would prefer to load casks whether they are operating as opposed to shutdown, and you would shut down in your lower -- you would shut down not in your peak usage time.
Q. Well, what was your understanding for an operating utility that's generating electricity, what their average shutdown time would be a year?
A. When? My understanding now, my understanding 10 years ago, 20 years ago?
Q. How about now?
A. Generally I'm going to say one to two months per 18 to 24 months.
Q. Is there anything else about this timing phenomenon that you would think would affect changes? Or to be more specific, DOE's approval of exchanges?
A. Yeah. There were another one or two minor issues. One comes to mind.
Q. What is that?
A. That would get into -- it's a minor issue, but a potential truck versus rail scenario where we would have a large surge of demand for truck-only sites as opposed to spreading it out over a longer period of time.
Q. Is it your understanding that a utility

Page 268

was bound by the delivery date that it would propose in a DCS?
A. Yes.
MR. CRAWFORD: Objection to the extent it calms for a legal conclusion.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. They had no flexibility to adjust that in an FDS?
MR. CRAWFORD: Same objection.
THE WITNESS: Well, the DCS just identified a delivery year, and the FDS recommended a proposed range of delivery dates. So they could adjust it downward.
BY MR. SKALABAN:
Q. So the information on the DCS wouldn't include proposed delivery dates, would it?
A. It included the proposed delivery year.
Q. But you were talking about a timing phenomenon which would influence DOE's decision on whether it would approve an exchange of DCS. And what I'm trying to understand is how does this timing consideration, how does it come into play if all the utilities identified the year of proposed delivery in DCS?

Page 269

A. We would try to anticipate what would be a preferable month for a utility based upon whether they were winter peaking and summer peaking and using also their 859 data where they would project their next five system discharges. They would -- you could predict to some degree of accuracy when they anticipated doing these things, shutting down for refueling or other maintenance activities.
Q. And what documents reflect this analysis that you just described?
A. The RW 859 report is where we would see the projected five cycle discharges.
Q. The RW-- I'm sorry?
A. 859, nuclear fuel data form would give us information about when they were projected to shut down or to discharge. I believe there were transportation planning documents that would try to predict delivery schedules.
Q. And what are those transportation documents?
A. I don't recall.
Q. Is that something you had any involvement in?
A. No.
Q. How do you know they exist?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.), :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, May 16, 2002

Continued deposition of THOMAS POLLOG, a 30(b)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been previously sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Thursday, May 16, 2002, and the proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.

APPEARANCES:
On behalf of Plaintiffs Yankee Atomic, Connecticut Yankee, and Maine Yankee:

PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5821

On behalf of the Defendant:

KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS |
|---|---|
| THOMAS POLLOG | |
| By Mr. Skalaban | 277 |

Afternoon Session - Page 379


EXHIBITS


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 8 Annual Capacity Report | 278 |
| 9 Instruction Sheet | 316 |
| 10 Memorandum w/attachment, 9/29/87 | 336 |
| 11 Letter w/attachment, 9/29/87 | 365 |
| 12 Memo, 6/28/91 | 373 |
| 13 Memo, 5/21/91 | 379 |
| 14 Letter w/attachment, 9/25/92 | 405 |
| 15 Letter w/attachment, 9/29/92 | 405 |
| 16 Letter w/attachment, 9/25/92 | 405 |
| 17 Expert Report of Edward C. Abbott | 444 |




PROCEEDINGS

Whereupon,
THOMAS POLLOG,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:

Q. Mr. Pollog, did you have an understanding of whether or not the ACR issue resolution process which you participated in for approximately a year, year and a half, was that binding?

MR. CRAWFORD: Objection, vague. And objection to the extent it might call for a legal conclusion of some sort.

THE WITNESS: I didn't believe so.

BY MR. SKALABAN:

Q. Do you know if anyone at the Department had the opinion that the exchanges and discussions between the utility representatives and the Department representatives were any conclusions that might have been reached between those two bodies was a binding commitment?

MR. CRAWFORD: Objection, vague. Speculation. Foundation.



THE WITNESS: I don't recall having any conversations with anybody in the Department about whether those conversations were -- or agreements were binding.

BY MR. SKALABAN:

Q. Was it the Department's expectation that any understandings or agreements that may have been reached through that process would ultimately have to be implemented by amendments to the contract?

MR. CRAWFORD: Objection, foundation and to the extent it calls for a legal conclusion.

THE WITNESS: My best memory of that was to implement agreements between the parties would require contractual amendments.

MR. SKALABAN: Mark this as Pollog Exhibit 8.

(Pollog Exhibit No. 8 was marked for identification.)

BY MR. SKALABAN:

Q. Mr. Pollog, can you identify this document for the record?

A. It appears to be a copy of the June 1988 annual capacity report.

Q. If you could turn to page 10 of this document, and there's a section 4.0 regarding the

Page 319

Q. And why do you think that that wasn't discussed?
MR. CRAWFORD: Objection.
BY MR. SKALABAN:
Q. Or why would you think that wouldn't be discussed?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: Because I believe we all had the same opinion regarding how much MTUs a purchaser could put down on their DCS.
BY MR. SKALABAN:
Q. And for the record, what was that opinion?
A. That they are limited to the allocations in the 1991 ACR.
Q. Is it your view that the DCSs if submitted by the purchasers and approved by the Department are binding on both the purchasers and the Department?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. So is the effect of the DCS instructions that the Department has the discretion to establish what are the binding commitments between the

Page 320

purchasers and DOE?
MR. CRAWFORD: Same objection.
THE WITNESS: Can you repeat that for me, please?
THE REPORTER: "Question: So is the effect of the DCS instructions that the Department has the discretion to establish what are the binding commitments between the purchasers and DOE?"
MR. CRAWFORD: Best evidence also.
THE WITNESS: I believe it's the contract and the DCS instructions together that result in the 1991 ACR allocations being used for submittal of DCSs.
BY MR. SKALABAN:
Q. Does the contract in any part say that DOE has the discretion to set the annual aggregate rate which will then be allocated to the purchasers?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Not in those words.
BY MR. SKALABAN:
Q. Do you think the contract has the words that do exist equal to that effect?
MR. CRAWFORD: Objection, vague and objection to the extent it calls for a legal conclusion.

Page 321

THE WITNESS: The contract sets up a waste acceptance process. When you use the waste acceptance process in the contract and the DCS instructions together, I believe that's where the Department gave the guidance or -- or that's how the Department developed the position in 1991 ACC is what is to be used for completing DCSs.
BY MR. SKALABAN:
Q. Now, the DCS instructions don't refer -- I'm sorry. The DCS provisions of the contract don't refer to the ACR, do they? And if you would like to, please feel free to look at the contract.
THE WITNESS: Give me a moment.
MR. CRAWFORD: Yeah. Because my objection would have been best evidence.
(Witness reviewing document.)
THE WITNESS: Can you repeat the question then for me please?
THE REPORTER: "Question: The DCS provisions of the contract don't refer to the ACR, do they?"
MR. CRAWFORD: Let me just insert my objection, best evidence.
THE WITNESS: No. They do not refer to the ACR, but they do refer to the APR.

Page 322

BY MR. SKALABAN:
Q. Now, were the DCS instructions filling in a gap in the contract between the ACR and the DCSs and their relationship?
MR. CRAWFORD: Objection, best evidence and objection to the foundation.
THE WITNESS: I think one could argue that, yes.
BY MR. SKALABAN:
Q. And your understanding of deliver commitment schedule provisions that are provided for in the contract, again, not divorced from the instructions, do they in your view provide for the Department to set in the Department's discretion what the purchaser's allocation must be?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: When viewing contract in total, yes.
BY MR. SKALABAN:
Q. When you say viewing it in total -- okay. Let me back up for a second. So you agree that this provision on delivery commitment schedules standing alone does not provide the Department the discretion to set the allocation of each purchaser?
MR. CRAWFORD: Objection, best evidence.

Page 323

THE WITNESS: Yes.
BY MR. SKALABAN:
Q. You agree with me on that?
A. Yes.
Q. What do you base your on the contract as a whole interpretation? Can you point to me what your view is based upon?
A. If you read the contract at least for the waste acceptance process that it sets up with the Department producing an ACR starting in 1997 and then an APR in 1991 and then purchasers starting to submit DCSs in '92, I think it lays out different activities of points of time. And when you look at these as an entire process, I think that's where we got the impression or view that the 1991 ACR should be used by purchasers to fill out their DCSs, the allocations from the 1991.
Q. Now, you're essentially making an inference from different provisions of the contract. The contract doesn't expressly tie these together, does it?
A. Objection, best evidence.
Q. In your view.
A. The phrase we use is connects the dots.
Q. And can you explain that for me?

Page 324

A. It gives an activity to occur over a period of time and they're not necessarily all connected very clearly. So we're trying to connect the different activities into one complete process.
Q. So from the language of the contract, the connection is not stated clearly between the different activities?
MR. CRAWFORD: Objection, mischaracterizes prior testimony.
THE WITNESS: Not all the time.
BY MR. SKALABAN:
Q. And how about this connection of ACR, APR, DCS, ACR must be the basis for the DCS? Are the lines connecting those different dots expressly stated in the contract in your view?
MR. CRAWFORD: Objection, best evidence. Objection to the -- that's all.
THE WITNESS: That's certainly subject to interpretation. My view is certain areas it's very clear; in other areas it's not quite as clear. For this specific area we're discussing right now, I think it's pretty clear but maybe not explicitly clear.
BY MR. SKALABAN:
Q. Do you think it's something that's subject

Page 325

to debate?
MR. CRAWFORD: Objection, mischaracterizes prior testimony.
BY MR. SKALABAN:
Q. Let me ask a better question. Could reasonable minds differ on your view on this?
A. I don't want to get into a reasonable minds belief.
MR. CRAWFORD: Objection to the vagueness.
THE WITNESS: That's a difficult question, again, because I don't want to start saying people are reasonable, what their minds are. But I think it's pretty clear in my mind what's intended by it. I would not necessarily want to say a person is unreasonable or had an unreasonable mind if they disagreed with me.
MR. SKALABAN: Okay. Let's go off the record.
(Recess.)
BY MR. SKALABAN:
Q. Mr. Pollog, as part of the ACR issue resolution process, do you remember any Yankee utilities agrees with Department's interpretation of all SNF and wishes-to-deliver that we've been talking about this morning?

Page 326

MR. CRAWFORD: Objection, foundation.
THE WITNESS: I have no specific recollection of the Yankee positions in the ACR issues resolution process.
BY MR. SKALABAN:
Q. And that goes for all of the issues?
A. Essentially goes for all of the utilities and all of the issues; I just do not recall what specific utility and what specific position on any of the issues.
Q. And so you have no recollection then of whether or not the Yankee utilities agreed with the Department's interpretation that it could require the utilities to fill out their DCSs in accordance with the 1991 ACR?
A. I have no recollection.
Q. Now, the DCS instructions we've been looking, at I want to call your attention to page 2 of those instructions. In particular, if you could take a moment to please review part 7(c). What was your understanding of this provision of the statement that the 1991 ACR provides an approximation of the federal waste management systems acceptance capacity?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: I think it's

Page 379

AFTERNOON SESSION
(1 30 p m )
Whereupon,
THOMAS POLLOG,
the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows
MR SKALABAN Mr Pollog, we're back after lunch recess Just to remind you, you're still under oath I'd like to mark this as the next exhibit, Pollog No 13
(Pollog Exhibit No. 13 was marked for identification )
EXAMINATION BY COUNSEL FOR PLAINTIFFS (RESUMED)
BY MR SKALABAN
Q Would you take a moment to review that document, Mr Pollog.
A Do I need to review the entire document?
Q No, if you could just familiarize yourself with it briefly Let me ask you, do you recognize this document?
A No.
Q Just for the record, it's a document from P M McDuffie/S A Vance to D C Langstaff/A B Brownstein, date May 21, 1991 On May 21, 1991, you

Page 380

were working in Mr. Brownstein's office at that time?
A. Yes.
Q. Do you remember Mr. Brownstein's office requesting analyses or views from the program's contractor regarding the exchange process?
MR. CRAWFORD: Objection to the foundation. Object, assumes facts not in evidence.
THE WITNESS: Not specifically.
BY MR. SKALABAN:
Q. Do you remember reviewing any analyses or studies prepared by contractors on the exchange process?
A. Not specifically.
Q. If I could turn your attention to page 1. It is actually the second page of the exhibit, but it is marked page 1, some type of exchange request. It has a Bates number of HQ 0006741.
You see in the first paragraph lines 8 and 9, it says the intent was to allow the purchasers greater flexibility in arranging their inventory of SNF in delivery to DOE. Do you agree with that, that that was the intent of the exchange provision?
MR. CRAWFORD: Objection to the foundation. Objection to the extent it calls for speculation.

Page 381

THE WITNESS: I wasn't at the Department at the time the contract was written, so I don't know what the original intent of the exchange provision in the contract was when it was written, signed.
BY MR. SKALABAN:
Q. Is that fair to say with all the provisions of the contract, even though you weren't there during the time of its formation -- you're not familiar with the original intent of the parties to the contract?
A. No.
Q. Okay. Why do you think you are familiar with the parties' original intent on some matters of the contract?
A. I was told by people more knowledgeable than I what the intent of certain provisions were throughout the history of my working with the contract.
Q. And which provisions were those?
A. I don't recall specifically which ones they were and which ones that weren't, but I don't recall ever -- I was involved in discussion regarding the intent of exchange request provisions of the contract.
Q. Well, sitting here today, are there any

Page 382

provisions to the contract that you can identify that you feel that you're sort of qualified by your experience to talk about what the original intent of the parties was to the contract?
MR. CRAWFORD: I'll object to that as vague and object to the foundation and that it mischaracterizes what he previously said.
THE WITNESS: I believe some of the development of the fee provisions.
BY MR. SKALABAN:
Q. And how are you familiar with that?
A. The contract -- there are two fee provisions I'm going to talk about right now, and that's the ongoing fee and the one-time fee, and how the basis for the one-time fee was developed, what that was intended to do as in comparison to the one mill per kilowatt hour fee.
Q. What is your understanding of the parties' original intent as to those two provisions?
A. The one mill fee is based on burn-up of an assembly. That is for all fuel that was generated or in core as of, I believe April 7, 1983, and then the ongoing fee is for all fueling after that date. So there is a fee schedule for the fuel covered by the one-time fee, and I was told, I believe by



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 407

Mr. Brownstein. Do you see that?
A. Yes.
Q. And highlighted here it says, "We are once again filing this DCS under protest." Did you have any involvement in consideration of any DCSs that Yankee Atomic was filing under protest?
A. I don't believe so.
Q. Now this, if I recall correctly, was approximately the time that you came back to DOE?
A. Yes.
Q. But at that time you had no involvement with waste acceptance issues because you were working for Mr. Williams, is that correct?
A. Yes.
Q. Now, a few pages further in the series there's a letter under Department of Energy letterhead from Ms. Beth Tomasoni to Mr. J.M. Buchheit, field engineer Yankee Atomic, and there's a stamp dated March 5, 1996 on it. This one is Bates numbered YDK 023077.
Now, that letter indicates that a copy of the approved DCS is enclosed for your records. If you go to the next Bates numbered document in the series, it is a DCS that is -- does that appear to be a DCS that is signed by the Department of Energy?

Page 408

A. Yes.
Q. And I recognize the handwriting may be a little difficult to read, but do you recognize whose signature that is?
A. Are you talking under section 3 or section 4?
Q. Section 4.
A. I believe I recognize both signatures.
Q. And whose signatures are they?
A. Under technical representative that I believe is David Zabransky, and under contracting officer I believe that's Beth Tomasoni.
Q. Now, on this DCS, there's a notation that the proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the act. Do you know who put that notation on the DCS we're looking at?
A. Are you asking me if I know the specific person who put that on there?
Q. Fair enough. I'm not asking actually who may have typed that on there, but who caused that language to appear on this piece of paper? Under whose direction would this legend have appeared?
MR. CRAWFORD: You're asking him if he

Page 409

knows?
MR. SKALABAN: If he knows.
THE WITNESS: Sort of.
BY MR. SKALABAN:
Q. Okay. Well, tell me what you mean by sort of.
A. To the best of my knowledge it wasn't any one individual who said put this on here; it was a combination of organizations.
Q. And who were the organizations?
A. It would have been the waste acceptance team which I believe was headed by Mr. Zabransky at that time on advice from the Department of Energy's Office of General Counsel.
Q. Do you know whether the waste acceptance team and the Office of General Counsel directed the contracting officer to put that language on the DCS?
A. I'm not certain, but I believe --
MR. CRAWFORD: Let me object to the foundation.
THE WITNESS: I'm not certain, but I believe they did not direct the contracting officer to do that.
BY MR. SKALABAN:
Q. Is it your understanding that the

Page 410

contracting officer -- I think I'm trying to reconcile the testimony you've just given me, the last two answers. So the contracting officer put this legend, or directed this legend to be put on the DCS under her own initiative?
MR. CRAWFORD: Objection, mischaracterizes prior testimony.
THE WITNESS: I don't believe I testified to that.
BY MR. SKALABAN:
Q. Okay. I'm just trying to understand what your testimony is on this. Was it that Mr. Zabransky or the waste acceptance team and the Office of General Counsel requested the contracting officer to put this language on the DCS and the contracting officer caused that language to be placed on the DCS?
A. I don't believe so.
Q. Okay. So can you maybe help me out a little bit and tell me the evolution of how this language got on the DCS as you understand it?
A. My best understanding of it --
MR. CRAWFORD: Wait a minute. I won't object. Go ahead. Let me just object to the form, but go ahead.
THE WITNESS: My best understanding of it

Page 415

Q. And why do you still believe that, in view of the Department's the "proposed delivery date is dependent on the existence of an operational repository or interim storage facility?"
MR. CRAWFORD: Object to the extent it calls for a legal conclusion.
THE WITNESS: The court told us that our belief that we did not have an obligation absent an operating facility in 1998 was incorrect, and we still had an obligation regardless whether there was a facility operating or not. I believe in Indiana-Michigan but I'm not a lawyer so don't quote me, but I believe that's the case. But I'm not sure.
BY MR. SKALABAN:
Q. So the Department's original intent was to create a nonbinding conditional DCS for 2001, is that correct?
MR. CRAWFORD: Objection to the vagueness of that. Objection to the extent it calls for a legal conclusion.
THE WITNESS: When you say original intent, when are you talking about?
BY MR. SKALABAN:
Q. Okay, the date is fuzzy on here, but let's assume it's '96. Let's say in early 1996 when it put

Page 416

this legend on the DCS, by putting this legend saying the delivery date is dependent upon the existence of the facility, the Department's original intent at this time was to create a conditional nonbinding DCS.
MR. CRAWFORD: Objection to the extent it calls for speculation or a legal conclusion, but you can go ahead and answer.
THE WITNESS: I think that the Department's intent was to condition the proposed delivery year at this time.
BY MR. SKALABAN:
Q. And that was the purpose of putting this legend on the DCS?
MR. CRAWFORD: Objection. Asked and answered.
THE WITNESS: It was to put a condition on the proposed delivery year on the existence of an operational repository or an interim storage facility constructed under the act.
BY MR. SKALABAN:
Q. And the condition that we've been talking about and that's reflected here has been realized, so regardless of what the court said, doesn't that make this DCS nonbinding?
MR. CRAWFORD: Objection to the foundation

Page 417

of that and to the vagueness of it and to the extent it calls for a legal conclusion.
THE WITNESS: I don't believe so. I believe what the court said is what we're operating under now.
BY MR. SKALABAN:
Q. So even though the original intent was to rate a conditional approved DCS and that condition has been realized, it's now the Department's position that despite the fact that it intended to create a conditional DCS, that DCS is now still in effect for 2001?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, asked and answered.
THE WITNESS: The court corrected our erroneous thinking.
BY MR. SKALABAN:
Q. Did the court correct -- did the court change the conditional -- or did the court say what was originally intended by the Department to be conditional DCSs are now nonconditional and binding?
MR. CRAWFORD: Objection to the foundation of that, objection to the extent it calls for a legal conclusion, objection to the mischaracterization of

Page 418

prior testimony, objection, asked and answered. I think that's enough.
THE WITNESS: I believe the court stated that our obligation under the contract proceeded regardless of whether there was a facility operating or not.
BY MR. SKALABAN:
Q. But the court said nothing about the DCSs that the Department had originally approved conditioned upon the existence of a facility as far as you know, right?
A. As far as I know, they did not mention the DCSs.
Q. If we look at the next letter in this series, it's a letter dated September 26 from Mr. Buchheit, the senior fuels engineer, and it's addressed to Ms. Beth Tomasoni and it's copied to Mr. David Zabransky. Now, if I understand correctly, at the time of this letter you were at waste acceptance?
A. Yes.
Q. Do you recall receiving this letter from Mr. Buchheit?
A. No.
Q. Do you recall any discussions about Yankee

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

\- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, May 22, 2002

Continued deposition of THOMAS POLLOG, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness having been previously duly, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 9:40 a.m., Wednesday, May 22, 2002, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiffs:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR |
| --- | --- |
| THOMAS POLLOG | PLAINTIFFS |
| By Mr. Skalaban | 509 |
| Afternoon Session - Page 585 | |


EXHIBITS


| POLLOG EXHIBIT NO. | PAGE NO. |
| --- | --- |
| 18 - Spent Fuel, Government Responsive Document Collections, 2/15/02 | 551 |
| 19 - ID. Number: 001 through 034 | 554 |
| 20 - Letter dated 3/26/93 with attachments | 575 |
| 21 - ORNL, Acceptance of Failed SNF Assemblies by the Federal Waste Management System | 585 |
| 22 - Standard Contract Working Group with attachments | 599 |
| 23 - Ivan Itkin, 10/16-10/22/00 Calendar | 607 |
| 24 - Ivan Itkin, 10/23-10/29/00 Calendar | 610 |
| 25 - Memo dated 12/20/91 with attachments | 620 |
| 26 - Letter dated 4/1/91 with attachments | 643 |
| 27 - Memo dated 6/11/91 | 649 |
| 28 - Handwritten note | 651 |
| 29 - Memo dated 9/18/90 | 657 |
| 30 - Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown, 8/91 | 661 |
| 31 - Handwritten notes | 670 |




PROCEEDINGS

MR. SKALABAN: Why don't you swear the witness in since we've had a long break.

Whereupon,

THOMAS POLLOG,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

MR. CRAWFORD: At the at the outset, Pete, let me just state that Mr. Pollog wishes to correct some statements made in his prior deposition transcript or in his prior testimony.

EXAMINATION BY COUNSEL
FOR PLAINTIFFS (RESUMED)

BY MR. SKALABAN:

Q. Would you like to go ahead and do that now?

A. Yes. I believe it was Thursday, I testified concerning several conversations I had, telecons concerning I guess one of the exhibits, I forget the number, but I believe we'll refer to it as the Abbott report. I stated I had conversations with Mr. Abbott concerning draft versions of that. And now I am not sure whether I talked with Mr. Abbott or not concerning that report.



Q. Do you know, was it someone in Mr. Abbott's company or someone who was working on the report for him who was on the phone call?

A. I do not recall specifically who was on the telecon now other Justice Department lawyers.

Q. To the best of your recollection, you're just not sure one way or the other whether Mr. Abbott was a participant in any of these conference calls?

A. That's correct.

(Discussion off the record.)

BY MR. SKALABAN:

Q. Mr. Pollog, is there anything else about those conference calls -- let me start again.

Is there anything else that you would want to change your testimony about with regard to those conference calls other than the fact that you're not sure whether Mr. Abbott was there or not?

A. No.

MR. CRAWFORD: And, Pete, let me just interject on the record. Based on his present recollection, we would probably assert or we will assert that those conversations fall within the attorney-client and work product privilege. And we may want to move to protect or limit their use at some point, but that can be reserved until later.

Page 575

assumes facts not in evidence; objection, foundation.
THE WITNESS: Possibly.
MR. SKALABAN: Mark that as Pollog Exhibit 20.
(Pollog Exhibit No. 20 was marked for identification.)
BY MR. SKALABAN:
Q. The court reporter has handed you Exhibit 20. It's a letter from TRW to Mr. Milner dated March 26, 1993. Have you ever seen this document?
A. I don't believe so.
Q. Assuming that date is correct, you would have been in Austria at the time?
A. Yes.
Q. Now, I want to call your attention to the Bates numbered page in this exhibit, and I'm referring to the CTR Bates number, CTR 0002513. If you would take a moment to read the position portion of this.
A. I have read it.
Q. Okay. Now, this position statement on page 1, line 31 and 32, indicates that any quantity of MTU may be requested in an exchange as long as it is within the quantity provided for by the approved DCSs. Do you see that?

Page 576

A. Yes.
Q. It also says on line 28 and 29, DCSs for any remaining quantities of SNF as covered by the original DCS but not included in the exchange. Do you see that?
A. Yes.
Q. Do you know, did DOE adopt the view that a purchaser could submit exchange requests including an additional DCS for any remaining quantity that was not exchanged?
A. I don't know.
Q. Now, working in waste acceptance today, do you have a view on whether or not purchasers can go ahead and propose an exchange with a remaining quantity of SNF which will then have another DCS issued for it, the remaining quantity?
MR. CRAWFORD: Objection to the extent it calls for speculation.
You can go ahead and answer.
THE WITNESS: Yes, I have a view.
BY MR. SKALABAN:
Q. And what's that?
A. It's my belief, although not again an official position or one we've ever really had to decide upon, that the only thing that could be traded

Page 577

were equal quantity DCSs.
Q. And, if you have a remaining quantity on one side of that equation, you would still go through with the exchange or not?
MR. CRAWFORD: Objection, vague; objection to the extent it calls for speculation.
THE WITNESS: It would depend greatly on all the other factors that are enumerated here or discussed in that paragraph. Possibly, but -- it's not something we discuss actively in the department. So it's speculative. I'm not sure what we would do, it would depend upon the specifics of the exchange. Could it possibly happen? Yes, I don't know for sure.
BY MR. SKALABAN:
Q. It's fair to say from having read this position statement the authors of this document at this time didn't see any problem at all with partial trades?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: I believe what you said accurately reflects what the authors of this documents stated at this time.
BY MR. SKALABAN:
Q. And did you ever hear Mr. Milner,

Page 578

Mr. Brownstein, or Ms. Montgomery indicate a contrary opinion to the opinion that's reflected here by the authors on this issue?
MR. CRAWFORD: Objection, vague and overbroad.
THE WITNESS: My best recollection of this from the '90, '91 period is from discussions with Mr. Brownstein -- discussions that Mr. Brownstein and I may have had. And I believe, although this is very vague, that we had believed you could only trade equal quantities, five for five, ten for ten. Now, I could easily be mischaracterizing Mr. Brownstein's belief, I'm just not sure what we believed back then.
BY MR. SKALABAN:
Q. And you recall addressing if one person had ten, the other person had five, what you would do with that other five?
A. I believe what we talked about was you could only trade five for five. You would have to have an approved two equal quantity DCSs to trade. So, if you had ten and I had five, we couldn't trade. You would have to have a five and I would have to have a five.
Q. And, if I understand what the authors of this paper are laying out here, that's not a barrier

Page 599

A. Similar to mine, I would say we were -- we did not have strong disagreement in what was here. And we had similar beliefs that it could be handled in the same manner as a bare assembly, that it probably could be accepted on the same scheduling basis as standard fuel.

MR. SKALABAN: Would you mark this exhibit as Pollog No. 22.

(Pollog Exhibit No. 22 was marked for identification.)

BY MR. SKALABAN:

Q. Mr. Pollog, this is a document with Bates range CTR 000738 to 777. I'd like to call your attention to Bates page No. 739. There is a conceptual schedule for multiyear delivery commitment schedule. Just so the record is clear, these may originally have been separate documents, but they are part of the same consecutive Bates range. And they were produced to us by the government in discovery.

Are you aware of a concept that was being discussed at DOE or its contractors about a multiyear delivery commitment schedule?

A. Sort of.

Q. And what's your recollection about this concept? And, if you need to take some time to look

Page 600

over this page 739, go ahead.

A. I think page 739 was actually done by industry and they presented this to us. So we sort of were in the reactive mode. They proposed for discussion a concept something like this.

And I believe we -- I'm not sure if I participated in discussions or not, but I believe I have seen this before. And I don't recall the context of this, if it was the industry people or just Mr. Zabransky and myself. But we've discussed this.

Q. What is a multiyear delivery commitment schedule, what's the purpose of that?

A. Something that I think I testified to last week, and that was similar to campaigning the way we define it. Basically rolling up the allocations for several years and coming one time in that multiyear period as opposed to coming consecutive years, that that would be as the allocations would fall.

Q. And the concept of multiyear delivery commitment schedule, that was something that was originally raised by the purchasers to DOE?

A. I don't know who originally proposed it. It could have been purchasers, it could have been DOE. When you talk about originally, campaigning to

Page 601

the best of my recollection goes back to my first interfaces or discussions or early discussions with waste acceptance issues with Mr. Brownstein.

And I don't know who the original person, whoever brought it up to me was, whether it was a purchaser or a federal employee staff or a contractor.

Q. And, in the conversations you and Mr. Brownstein had about it, what would you two discuss about campaigning?

MR. CRAWFORD: Objection, vague.

THE WITNESS: Whether it was appropriate for the government to consider campaigning.

BY MR. SKALABAN:

Q. Campaigning in the sense of, even though there are different allocations in different years, collapsing them into one year, one sustained effort, if you will?

A. Collapsing them into one sustained period, whatever that period is, collapsing essentially all allocations into a two or three or four or whatever year period. And servicing a purchaser once, taking all the allocations during that five-year period. Instead of coming every specific year, they have one during that five-year period.

Page 602

Q. Now, did Mr. Brownstein consider that desirable?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: I don't recall what his response was on that.

BY MR. SKALABAN:

Q. How about yourself, did you consider that to be something that would be desirable if the program could be implemented?

MR. CRAWFORD: Objection, vague.

THE WITNESS: I believe my opinion, when it first was brought up to me, was yes and no. It's not really desirable in the early years when you're trying to get a system started and developed, but it's probably more desirable after you have a steady state system where you're fairly confident of what you can do.

BY MR. SKALABAN:

Q. And would the advantages just be ease and logistical planning and cost savings?

MR. CRAWFORD: Objection, overbroad, vague.

THE WITNESS: Yes, I would agree with that.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INDIANA MICHIGAN POWER COMPANY, Plaintiff, | : | |
| v. | : | No. 98-486C |
| THE UNITED STATES, Defendant. | : | |

Washington, D.C.

Wednesday, December 17, 2003

Deposition of

THOMAS POLLOG

a witness, called for examination by counsel for Plaintiff, pursuant to notice and agreement of counsel, beginning at approximately 10:02 a.m., at the law offices of Shaw Pittman, 2300 N Street, Northwest, Washington, D.C., before Shari R. Broussard of Capital Reporting Company, notary public in and for the District of Columbia, when were present on behalf of the respective parties:



APPEARANCES:

On behalf of Plaintiff:

DEVON E. HEWITT, ESQUIRE
JACK Y. CHU, ESQUIRE
JAY SILBERG, ESQUIRE
Shaw Pittman
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7962

On behalf of Defendant:

R. ALAN MILLER, ESQUIRE
STEPHEN FINN, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, Northwest
Washington, D.C. 20530
(202) 616-0383

* * * * *



C O N T E N T S


| EXAMINATION BY: | PAGE |
|---|---|
| Counsel for Plaintiff | 4 |
| POLLOG DEPOSITION EXHIBITS: | |
| No. 1 - Methodology for the Projection of Spent Nuclear Fuel Discharges | 95 |
| No. 2 - e-mail, Bates YMP-023-0001 - 002 | 107 |
| No. 3 - Memo from Fages to Highberger, 6/15/00 | 115 |
| No. 4 - e-mail, Bates HQR249 0303 - 0307 | 115 |
| No. 5 - e-mail, Bates HQR-029-2321 | 154 |
| No. 6 - Teleconference Call Summary | 174 |


* * * * *



P R O C E E D I N G S

Whereupon,

THOMAS POLLOG

called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MS. HEWITT:

Q Good morning, Mr. Pollog. My name, as you know, is Devon Hewitt. I'm with the law firm of Shaw Pittman and I represent Indiana Michigan Power Company in its lawsuit against the Department of Energy. I know you've been deposed before, but just for the record I'm going to go over some ground rules for the deposition. I'm going to ask you a series of questions today and I ask that you answer them honestly and if you don't understand one of my questions, that you ask for clarification and if you need a break, that you ask for a break and if you can't hear me, that you just ask me to speak up. Is that okay?

A Yes.

Q From time to time your lawyer,

at EM that share Mr. Frei's view?
A I've had several discussions with people at EM; Rob Campbell for one, Dave Huizenga, Charlie Head concerning this topic.
Q Have they ever expressed the "understanding" that GTCC waste will go into the repository at Yucca Mountain?
MR. MILLER: Objection, hearsay, relevance. Go ahead.
THE WITNESS: The only opinion that I recall is Rob Campbell's. I don't recall what the other gentlemen said about the issue.
BY MS. HEWITT:
Q What was Mr. Campbell's opinions?
A Similar to this.
MR. MILLER: Same objection. Go ahead.
BY MS. HEWITT:
Q I'm sorry?
A Similar to this.
Q Has anyone at OCRWM ever expressed an understanding that, as a practical matter, GTCC will go into the repository at Yucca Mountain?



MR. MILLER: Asked and answered. Go ahead.
THE WITNESS: Not to me.
BY MS. HEWITT:
Q Are you familiar with the term "failed fuel"?
A Yes.
Q What does that term mean to you? Would you like some more water?
A No, I'm okay right now. Thanks.
Fuel that is in a condition that essentially the cladding or structure can no longer contain constituent materials in a form that is easily handled, used in the reactor, poured, transported or stored.
Q Are you familiar with the term "nonstandard fuel"?
A Yes.
Q What does that term mean to you?
A Appendix C per the standard contract categorizes fuel as standard or other than standard. One of the categories for other than



standard is not standard. There is a series of criteria which designate it as nonstandard.
Q Is DOE required to take nonstandard or failed fuel under the standard contract?
MR. MILLER: Calls for a legal conclusion, but go ahead if you know.
THE WITNESS: Yes.
BY MS. HEWITT:
Q Is DOE required to take failed fuel or nonstandard fuel under the standard contract at a different rate than it would take standard fuel --
MR. MILLER: Same objection.
BY MS. HEWITT:
Q Under the standard contract?
MR. MILLER: Sorry. Same objection.
THE WITNESS: I wouldn't say it that way. I would say that nonstandard fuel or other than standard fuel, which includes nonstandard fuel, is subject to delayed acceptance.
BY MS. HEWITT:
Q What leads you to that conclusion?
A The standard contract.



Q What in the standard contract leads you to that conclusion?
MR. MILLER: Same objection. Go ahead.
THE WITNESS: If purchasers have fuel that they designate as other than standard, they have to submit to us nonstandard fuel handling procedures for our approval prior to acceptance.
If we aren't -- don't have the technical feasibility of handling that material on a schedule they propose in the DCS and FCS process, we would not approve their nonstandard fuel handling procedures and it would have to be subject to delayed acceptance.
BY MS. HEWITT:
Q Has DOE looked at the type of procedures or equipment or technical competence they would need to possess in order to handle other than standard fuel at the repository?
MR. MILLER: Compound, but go ahead if you can answer.
THE WITNESS: I can't answer that for sure because I don't know all the things going on

**Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, 98-474C August 4, 2004**

**Heritage Reporting Corporation**

**Page 3888 to Page 4106**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Case 1:04-cv-00106-EJD Document 310-16 Filed 06/23/2008 Page 17 of 40



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.·
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY ) 98-154C
Plaintiffs ) 98-474C
)
THE UNITED STATES )
Defendant )

Courtroom 5
National Courts Building
717 Madison Place, N W
Washington D C

Wednesday August 4 2004
Volume 17

The parties met pursuant to the notice of the Judge, at 10 00 a m

BEFORE THE HONORABLE JAMES F MEROW



APPEARANCES·

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY,
JERRY STOUCK ESQ.
ROBERT SHAPIRO ESQ
PETER J SKALABAN JR ESQ
VIVEK K HATTI ESQ
Spriggs & Hollingsworth
1350 I Street, N W
Washington D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY CONNECTICUT YANKEE ATOMIC POWER COMPANY
MERRILL J ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page )



APPEARANCES CONTINUED·

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY
JOSEPH D FAY ESQ
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant
HAROLD LESTER JR . ESQ
JOHN EKMAN ESQ
MARIAN E SULLIVAN ESQ
HEIDE L. HERRMANN, ESQ
R ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street N.W
Washington D C 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - - -

THE COURT. Another witness today?

MR STOUCK Your Honor, I've got a couple of preliminary matters very briefly, if I may Sorry to interrupt but it's really just for the record if I can just stay here Mr. Lester mentioned a couple of days ago that we had filed a list of all of the documents that had been admitted -- exhibits that had been admitted by the Court, either because they were on one or the other exhibit list and not objected to and therefore admitted at the pretrial conference or because they were admitted during the course of our case.

And he said that he thought the list was fine, if I recall correctly, except there were four documents on there that he, I'm not exactly sure what he said my recollection is they may have been on the government's list and so forth but they wanted to withdraw them, and I said I'd take a look at that

And I just want to address that because the I've looked at the documents, a couple of them are contracts one is a contract between Yankee Atomic and Duke Engineering that's Defendant's 261 one is a contract between Maine Yankee and Securitas.

Page 3900

I also thought, this is interesting, there were a lot of worlds in this case, a lot of scenarios, but I guess we have an additional scenario now where the government came, and we were supposed to pay, but we'll deal with it when we see the papers.

THE COURT: I did ask a couple of questions on the fee in terms of the claim because it concerned me at the time as to what to do with the situation. I didn't know whether I would have to do something sua sponte or raise it, so I'm glad someone has raised the thing formally, and we can resolve exactly what the status is.

Obviously, the issue is, if you don't come, is it an item of damage? I mean, could it be a, or the question is really in the circumstances that we have here, is it owed or isn't it, at this point. Is it an item that you offset against the damages, if there are any damages, or is it something that you could claim independently at this point?

MR. LESTER: And I think, in the motion, we'll talk about it.

THE COURT: Yeah.

MR. LESTER: But it's really the idea, you know, a damages award is to place the Plaintiff in a

Page 3901

position it would have been in had performance occurred. If performance had occurred, the Plaintiff would have had to pay the fee. So by retaining the fee and being able to invest it and make money off of it, it's actually in a better position than it would have been if the Court awards damages, and we compensate the Plaintiff monetarily for the delays, and they're keeping the fee, that would actually place them in a better position than they would have been, so that's the theory.

THE COURT: I take it that's only on two of the claims?

MR. LESTER: Only on two, Yankee Atomic has paid a one-time fee, so it's not an issue in that case.

THE COURT: Well, another issue

MR. LESTER: Your Honor, I thought things were getting a little dull, and I just wanted to keep it exciting.

THE COURT: Well, I think it's good to raise the issues because, obviously, notice of appeal has been filed in Indiana Michigan, so that's going to the Circuit, and I assume that whatever we do here will end up in the Circuit, unless people decide to settle, which is always an option.

Page 3902

MR. LESTER: And, Your Honor, we are raising the issues in other cases where the fee has not been paid –

THE COURT: So it's a good idea – right.

MR. LESTER. – so for consistency's sake, I think it's also important to raise it here.

THE COURT: It's a good idea to get as many issues as we can up to the Circuit in that regard. Okay. Thank you for the information.

MS. SULLIVAN: Your Honor, the government calls its next witness, Thomas E Pollog.

Whereupon–

THOMAS E POLLOG

a witness, called for examination, having been duly sworn, was examined and testified as follows.

MS. SULLIVAN Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Good morning, Mr. Pollog.
A Good morning.
Q. Mr. Pollog, are you currently employed at the Department of Energy?
A. Yes, I am.
Q. And to what office within the Department of Energy are you currently assigned?

Page 3903

A I work in the Office of Civilian Radioactive Waste Management, the Office of Systems Analysis and Strategy Development.
Q. What are your current responsibilities?
A. Generally, I'm assigned to implement a standard contract between the Department of Energy and the contract holders.
Q. How long have you been in your current position?
A. Approximately eight years.
Q So when did you join the Office?
A The Office I'm currently in? That Office was formed in October of 2002, but my responsibilities were the same in the prior organization.
Q. And when did you join the prior organization?
A. September of 1996.
Q. Prior to September of 1996, did you serve in the Office that had responsibility for the waste acceptance function at DOE?
A. Yes, I did In 1990, '91 and early '92, I was in the Office that performs the same functions
Q. Mr. Pollog, do you also serve as the contracting officer's technical representative?

Page 3904

A Yes, I do, in an unofficial capacity.
Q. When did you assume the responsibilities of the contracting officer's technical representation?
A When Mr. Zabransky assumed responsibilities of the contracting officer, which I believe was in the summer of 2002, I was unofficially assigned responsibilities of the contracting officer's technical representative.
Q. What are the responsibilities of the contracting officer's technical representative?
A. To provide the contracting officer with any technical expertise or guidance he needs in implementing the standard contract.
Q To whom do you report?
A. I report to Christopher Kouts.
Q. And to whom does Mr. Kouts report?
A. Mr. Kouts reports to Theodore Garrish
Q. To whom does Mr. Garrish report?
A. And Mr. Garrish reports to Dr Margaret Choo, director of our program.
Q. Do you hold a Bachelor's degree?
A. Yes, I do I have a Bachelor of Science in Nuclear Engineering that I received in 1981 from Penn State University.
Q. Do you hold a Master's degree?

Page 3905

A Yes, I do. I received a Master's of Science from Clemson University in Environmental Systems Engineering in 1988.
Q Can you pull up Defendant's Exhibit 24, please?
MS SULLIVAN: Your Honor, may I approach?
THE COURT: Yes, of course
MS. SULLIVAN: And, Your Honor, I know you usually use the computer, but we're going to use this copy a lot, so I'd like to give copies to you and your clerk as well.
MR. STOUCK Thank you very much
BY MS. SULLIVAN:
Q Mr. Pollog, do you recognize what's been marked as Defendant's Exhibit 24?
A. Yes, I do.
Q Could you tell the Court what this document is?
A. This is the 1991 annual capacity report that was developed by the Office of Civilian Radioactive Waste Management.
Q What is the purpose, or was the purpose of the – sorry. And is the annual capacity report commonly referred to as the ACR?
A. Yes, that's how we commonly refer to it.

Page 3906

Q. What was the purpose of the 1991 ACR?
A. It was to provide the contract holders what would be the waste acceptance capacity of the Federal Waste Management System and to provide them also with the allocations that they will need for filling out their delivery commitment schedules.
Q. Were you involved in the preparation of the 1991 ACR?
A. Yes, I was.
Q. And I believe you've already said this, but which office within DOE prepared this document?
A. It was the Office of Civilian Radioactive Waste Management
Q. Thank you. Did the contracting office have any role in the preparation of the 1991 ACR?
A Yes, they had a minor role in the preparation of the document.
Q. And what was their minor role?
A. After we had developed a draft version of it, we sent it around to several organizations for comment, and I believe they submitted some minor comments to us on the document prior to its being finalized.
Q. Was the 1991 ACR sent out by the contracting officer?

Page 3907

A. Yes, it was. It was sent out to all contract holders under the signature of the contracting officer.
Q. Mr. Pollog, could I direct your attention to page five of this document, please? Mr. Pollog, what is the information set forth in table 2.1 on page five of this document?
A. These are the projected waste acceptance rates starting in 1998 and going through 2007.
Q. How were these rates developed?
A They were based primarily on the Nuclear Waste Policy Amendments Act of 1987 and restrictions placed on a monitored retrievable storage system in that Act.
Q. Could we go to Defendant's Exhibit 23? Mr. Pollog, you've been handed what's been marked as Defendant's Exhibit 23. Do you recognize this document?
A. Yes, I do.
Q. Could you explain to the Court what it is?
A. Yeah, it's an action memo from Ronald Milner, who is the associate director for the storage and transportation division at that time, to John Bartlett, seeking his approval for the publication of the 1991 annual capacity report.

Page 3908

Q. I direct your attention to the second page of this document, the last sentence in that top paragraph, that starts, "While not stated." Could you read, we'll let her finish highlighting, could you read that sentence please?
A. Yes "While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out of pool storage starting in 1998."
Q. Mr. Pollog, do you recall analysis of utilities at-reactor storage needs at the time the 1991 ACR was developed?
A Yes.
Q What did this analysis show?
A. This showed that in the aggregate, if the Department accepted spent nuclear fuel on the rate in 1991, it would be sufficient to eliminate the need for out of reactor pool storage at the contract holder sites
Q. And that sentence that you've just read contains the phrase "in the aggregate." Do you have an understanding what that means?
A Yes, I do.
Q What is that?

Page 3909

A That would be on an industry-wide basis. That would be considering all the storage needs of all the facilities and all the pools of all the facilities, what the aggregate need was and the aggregate capacity of the specific facilities.
Q Can we go back to Defendant's Exhibit 24, please? Mr Pollog, at the time the 1991 ACR was prepared, was DOE planning to accept spent nuclear fuel at a 3,000 MTU rate?
A No, we were not
Q. Why not?
A Because the Department believed the only way it could accept spent fuel starting in 1998 would be at a monitored retrievable storage facility, and there were linkages put on that facility that were laid out in the 1987 Nuclear Waste Policy Amendments Act.
Q. Mr Pollog, how did the 1991 ACR differ from the previous ACRs issued by DOE?
A It differed in a couple of ways First would be, generally speaking, the rates were lower than we've seen in prior ACRs, other than the 1990 ACR, which contained a lower bounding rate, which was very similar to this one.
And also, it differed in the sense that the

Page 3910

1991 ACR became the document that purchasers would use for submittal of delivery purchase schedules The prior ones were more for information and planning, but this one was the document that the purchasers would use to submit their delivery commitment schedules.
Q. Could we pull up Plaintiffs' Exhibit 52, please? Mr. Pollog, do you recognize what's been marked as Plaintiffs' Exhibit 52?
A. Yes, I do.
Q. Could you tell the Court what it is, please?
A. It is the 1987 annual capacity report.
Q. Could I direct your attention to page two of the report, that second, the first full paragraph highlighted or brought up. Would you please read the portion that's been excerpted from the document?
A. Yes "Beginning in 1991, the ACR acceptance ranking will be converted into an annual priority ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the purchasers will submit to DOE for approval delivery commitment schedules identifying the SNF/HLW that purchasers propose to deliver to the DOE Waste Management System (WMS)

Page 3911

Once approved, these schedules will become the basis for final delivery schedules to be submitted by the purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility."
Q. Mr. Pollog, does the paragraph you've just read comport with your understanding as to the role of the 1991 ACR?
A Yes, it does
Q. Was the document that's been marked as Plaintiffs' Exhibit 52 provided to standard contract holders?
A. I believe so.
Q. Can we have Defendant's Exhibit 18, please? Mr. Pollog, do you recognize what's been marked as Defendant's Exhibit 18?
A. Yes, I do
Q So could you tell the Court what this document is?
A. This document is the 1990 annual capacity report that was produced by the Office of Civilian Radioactive Waste Management.
Q. Direct your attention to page two of this document. Could you read the portion of the document

Page 3912

that's been highlighted on the computer screen?
A. Yes, I can. "As specified in the contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers The standard contract states that, beginning in April 1991, the ACR is scheduled to be replaced by the annual acceptance priority ranking report for receipt of SNF/HLW. The contract further states that, beginning in January 1992 and based on the acceptance priority ranking, the purchasers shall submit delivery commitment schedules to DOE identifying the range of discharge dates of the SNF/HLW that the purchasers propose to deliver to the Waste Management System."
Q. Thank you. And just so the record's clear, the second sentence that you read actually reads, "the standard disposal contract." Mr. Pollog, the portion of the document that you just read, does that comport with your understanding as to what the role of the 1991 ACR was?
A. Yes, it is.
Q. Was this document provided to standard contract holders?
A. Yes , I believe this document, along with all other ACRs, were provided to standard contract

Page 3913

disposal holders
Q Can I direct your attention to page seven of Defendant's Exhibit 18?
MR. STOUCK: Your Honor, could I just interpose an objection for the record? I'm sorry to interrupt. We'll take this up on cross-examination. Mr. Pollog was asked at deposition, "Do you recall having any work or having any involvement in the preparation of the 1990 ACR that preceded that? "Answer: I don't believe so." So our objection is the testimony should be limited to reading from the documents, but we'll take it up on cross-examination.
THE COURT: Okay. You may continue, Ms Sullivan.
MS SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. Mr Pollog, do you see page seven of the 1990 ACR?
A Yes, I do.
Q. I believe you testified as to a difference in rates between the 1990 ACR and the 1991 ACR. Were these the rates that you were discussing earlier?
A. Yes, they are.
Q. And I believe you talked about the lower

Page 3914

bounded case. Could you, which table is that?
A. That would be table 2.2.
Q. Thank you. Could we go back to Defendant's Exhibit 24? Mr. Pollog, in preparing, in your work helping to prepare Defendant's Exhibit 24, the 1991 annual capacity report, did you review previous ACRs?
A. Yes, I did.
Q. Thank you. Could we go to page nine of this document? Mr. Pollog, what information – specifically, let me back up a second. Specifically, in your work preparing the 1991 ACR, did you review the 1987 and 1990 ACRs?
A Yes, I read through all of the prior ACRs when I was preparing the 1991 ACRs.
Q. Thank you. Mr Pollog, the table 3.1 set forth on page nine of Defendant's Exhibit 24, what information is conveyed by this chart?
A. This chart is a summary of the purchaser's annual allocation. It shows every purchaser and goes through it in years one through 10, and it states by purchaser what your annual allocation would be.
Q. How is this chart compiled?
A. We would take the information in the APR, the acceptance priority ranking, and we would apply the rate at the very bottom, and the total row, where

Page 3915

it says 400, 600 and 900, to that rate and then just sum up what every purchaser's allocation would be in any given year and put them into this table.
Q. Could we highlight the line for Yankee Atomic on the table, please? Mr. Pollog, if we could look at the line for Yankee Atomic Electric Company. Is 9.8 the MTU allocation for Yankee Atomic in year one?
A. Yes, it is.
Q And similarly, is 10.1 the MTU allocation for Yankee Atomic in year 2?
A. Yes, it is.
Q. Mr. Pollog, how are utilities supposed to use the information in table 3.1?
A. They would use that information for filling out and submitting their delivery commitment schedules.
Q. Let me back up a second to the highlighted for Yankee Atomic. If there's no entry, if there's no numerical entry in a given year for, say, Yankee Atomic, at the fifth entry over, there's two dashed lines, what is meant by that?
A. That means they would have no allocation in that given year.
Q. Thank you. And specifically, how were

Page 3916

utilities told to use the allocations in this chart to submit their DCSes?

A. They were told to use allocations as the basis for submitting their delivery commitment schedules in any given year. The total sum of the MTUs you would ask for in your DCS should equal what you were given that year in this table of the ACR.

Q. Can we have's Exhibit 30.001? Mr. Pollog, do you recognize what's been marked as Defendant's Exhibit 30.001?

A Yes, I do

Q. Could you tell the Court what this is?

A This is a letter from Michael Detmer transmitting the DCS instructions to Mr Buchheit, who was manager of fuel procurement for New Hampshire Yankee division of the public service of New Hampshire

Q And what was the purpose of these instructions?

A This was to provide the contract holders instructions on how to complete their delivery commitment schedules.

Q Could we go back to Defendant's Exhibit 24 Table 3.1, page nine? Mr Pollog, how come this chart presents information for 10 years?

Page 3917

A The contract tells the Department to prepare an annual capacity report that states 10 years, the first 10 years' worth of receiving allocation, or allocations for each purchaser.

Q There's an entry on table 3.1 marked U S. DOE. What spent nuclear fuel is covered by this entry?

A That is spent nuclear fuel currently owned by the Department of Energy that was formerly commercial nuclear fuel held by a commercial reactor and was transferred to the Department for some reason.

Q. Could we go to 8 1, the first page, I'm sorry, Appendix 8 1. Could you highlight the entry for U.S DOE?

MR STOUCK. What page? I'm sorry.

MS. SULLIVAN. It's page 8.2 at the bottom, the Bates number on the document ends in 2375.

MR. STOUCK: Thank you very much.

BY MS. SULLIVAN:

Q. Mr Pollog, does Appendix A identify the source of the U.S DOE fuel for any given year?

A Yes, it does

Q. So what does the highlighted or the excerpted portion of this page tell you?

Page 3918

A. That for the U.S. DOE allocation in year one, that is based on fuel the Department had received from Big Rock Point, the Ginna Facility and Point Beach Unit One.

Q. Where is the fuel that's identified as U.S. DOE fuel currently stored?

A. It's either at one of three of Department of Energy sites, DOE's Idaho Scythe, Hanford or Savannah River.

Q. Are there other materials destined for the repository storage on those sites?

A. Yes, many, many more materials that are at those sites are destined for the repository.

Q. Is this DOE owned fuel different, or the U S. DOE fuel, different from the defense waste generated at DOE's weapon sites?

A. Yes, it's significantly different.

Q. And the defense wastes that are generated at DOE's weapons sites, will those also be going to the repository?

A. The intention is for those to go to the repository right now.

Q. Mr. Pollog, did DOE publish substantially similar ACRs to that of the 1991 ACR in 1992, '93, and 1995?

Page 3919

A. Yes, we did.

Q Were there any differences between the ACRs?

A. There were probably minor differences based upon some utilities would have a practice or habit of reinserting some discharged assemblies. At one point, they would have told us they were permanently discharged, but every now and then, they would get into a habit, for whatever reason, they would reinsert them into the core. And once they were removed, they would be taken out of the permanent discharge ranking and be eventually put in with their new date of permanent discharge.

Q. And was there a difference in the 1995 ACR with regard to the acceptance rates?

A. The rates were the same, but the '95 ACR, instead of saying 1998, 1999 through 2007, said year one, year two, year three, through year 10.

Q. Mr. Pollog, could you explain to the Court what the Oldest Fuel First or OFF queue is?

A Yes, that's how the Department ranks fuel for allocating acceptance capacity. Purchasers earn acceptance capacity based on date of discharge of their fuel. The earlier you discharge the fuel, the earlier you'll get an allocation, so it ranks it from

Page 3920

first to last, with the earliest discharges getting the earliest allocations in the acceptance queue.
Q. But just to be clear, the Oldest Fuel First earns the allocation. Do the utilities have to deliver the Oldest Fuel First against those allocations?
A No, they do not. The purchasers can use that allocation for any fuel that they, you know, they want to use it for submitting to the Department.
Q. Is there cooling time requirement in the contract that you understand?
A. Well, there is a description of standard fuel in the contract. In order to be standard fuel, it would have to be greater than five years old or have to be discharged from a reactor core more than five years in order to be designated as standard
Q Mr. Pollog, could I direct your attention to Appendix B of Defendant's Exhibit 24, specifically page B2, which is Bates-numbered 2403? Mr Pollog, does this table present the OFF queue, information on the OFF queue?
A. Yes, it does.
Q What is this table?
A This table is a subset of the acceptance priority ranking that was established in that time

Page 3921

period.
Q. Mr. Pollog, do you recognize Plaintiffs' Exhibit 92?
A. Yes, I do. It's the 1991 acceptance priority ranking report produced by the Office of Civilian Radioactive Waste Management.
MS. SULLIVAN: Your Honor, we don't have computer copies We don't have these loaded in the computer, so I would like to provide them to the Court.
BY MS. SULLIVAN:
Q. Mr. Pollog, were you involved in the preparation of the 1991 acceptance priority ranking?
A. Yes, I was.
Q And is the acceptance priority ranking commonly referred to as the APR?
A. Yes, it is.
Q And what specifically is the APR?
A It is, simply speaking, a ranking from earliest to latest of all discharges of commercial spent fuel from utilities and some other nonutility contract holders It ranks it basically starting with the earliest or first discharge coming first and the last discharge at the end of the queue.
Q. Was 1991 the first time DOE issued the APR?

Page 3922

A. Officially, yes.
Q. And what is the source of information, what is the source of the information that's set forth in the 1991 APR?
A That would be what we call the RW-859 data form.
Q. And what is the RW-859 data form?
A. It is a data form the Department uses to collect information from utilities. It provides historical discharge information, characteristics of the discharges, especially with spent fuels, characteristics such as burnup, enrichment. It also provides information where the utilities will project what their next five cycle discharges will be.
Q. Can we go back to Defendant's Exhibit 24, Appendix B? And could we highlight the entry for Yankee Atomic on that page? Mr Pollog, could you explain the information that's set forth for Yankee Atomic on that line?
A. Yes. In the first column, you'll see it has who the purchaser is for that specific discharge, and in this case, it is Yankee Atomic Electric Company. And in the next column, where it says, "fuel originator," it'll say it is the Yankee Rowe unit one facility, then it has in the next column

Page 3923

storage location, and it's also Yankee Rowe 1. The next column will tell you the type of fuel, and it says, "PWR," which is pressurized water reactor fuel. The next column has the discharge date, and in this case, it would be February 12th of 1972. The next column will tell you the number of assemblies in that discharge, and that was 36. The next column will tell you the total MTU or metric tons of uranium of that discharge, and that is, 36 assemblies contained 9.837 metric tons of uranium. And then the next column is the cumulative total metric tons of uranium that have been discharged, including this one. So it is the sum of all the discharges above this one and includes this one, and that is 173.24 metric tons of uranium.
Q And if we could go back to table 3.1, which is page nine of this document? Does the discharge amount that we just saw on the first page of Appendix B match Yankee Atomic's allocation in the first year?
A. Yes, it does.
Q. Why is that?
A. Because the Yankee discharge is in the first 400 metric tons of cumulative discharge, and because of that, it would go into year one, and it would appear in table 3.1 of this document.

Page 3924

Q. Mr. Pollog, does DOE maintain the information it collects on the RW-859 forms in a database?

A. Yes, we do.

Q. Is this database used to project future discharges from reactors?

A. Yes, it is

Q. How are these projections made?

A Well, as I stated, utilities project for us in the RW-859 form what their next five cycle discharges will be. Then we take that information, and we tie it in with the long-term nuclear energy generation forecast by the Department of Energy's Office of – it's the Energy Information Administration. I'll refer to it as EIA, it's a lot easier for me

So they project for us what the long-term energy nuclear power needs or generation is going to be for the country And we take those two pieces of information, and we tie them together, and we project what all of the discharges will be for the future history of nuclear power. So it's energy-based and also uses the projections given to us by the contract holders

Q. Is this database used to project the total

Page 3925

amount of spent nuclear fuel expected to be discharged from all commercial reactors?

A. Yes, the database does have the capability of making that calculation

Q Does DOE use the projections generated from this database in its system planning?

A Yes, we use it for several purposes, including for system planning

Q What are the other purposes that you use it for?

A. Well, we use it for what we call the TSLCC, which is a total system life cycle cost report that we do. We use it for a design basis waste stream. We use it for providing any type of responses to inquiries from the public or from Congress or from the administration regarding how much spent fuel we expect to be generated at any given point in the future.

Q And I believe you referred to the design basis waste stream, what is that?

A That is a document used by our designers for trying to predict what the waste stream will be in the future years of – once the system gets operating.

Q. And are the projections from this database

Page 3926

also used with regard to the total amount that will be sent to the repository?

A Yes. Another thing it's used for by our designers is they try and determine if the total amount of spent nuclear fuel that might be generated in the history of nuclear power, whether Yucca Mountain has sufficient capacity to handle that total amount of material.

Q. Have the projections of the total amount of spent nuclear fuel to be accepted by DOE changed over time?

A Yes, they've changed significantly over the last 20 years.

Q How have they changed?

A In the early 1980s, I believe the amount of material that was projected was approximately 140 metric tons of uranium, and that number basically declined to the mid to late '90s, where it bottomed out at a number around 80, 83,000 metric tons of uranium.

And since then, the number has increased rather significantly, again, to about 130,000 metric tons of uranium, what we expect to be generating now in the total future of nuclear power.

Q. Do you have an understanding as to what

Page 3927

accounted for the projections of the late '90s of approximately 80,000 MTU?

A. Yes, in the early '80s, there were scenarios forecast where nuclear power would continue to grow and more plants would be built. And there was no new licenses being sought by the early to mid-'90s. As a matter of fact, we start seeing a pattern of facilities shutting down prior to the expiration of their operating license

And I believe it was thought by people who did the projections that there might be other facilities, for economic reasons, who decide not to continue operating through the end of their operating license.

Q. And do you have an understanding as to what accounts for the increase, that backup to about 130,000 MTUs that you just testified to?

A Yes, the trend where facilities were starting to shut down prior to the end of their operating license seemed to end. And more importantly, reactors that had operating license started seeking license renewals or extensions of their operating licenses.

Q. And just so the record's clear, I believe you testified that in the early '80s the projection

Page 3928

was 140. Did you mean 140,000 MTU?
A. Yes, I did, 140,000 metric tons of uranium.
Q Okay. And I believe you said the people who do the projections saw some utilities shutting down and then expected that other utilities might shut down Who are you referring to?
A. This would be at the Department of Energy's Office – their Energy Information Administration.
Q. And do you work with the Energy Information Administration, or EIA, in the work that you do?
A. Yes, I do.
Q. And do you work with them specifically with these projections?
A Yes, I do.
Q Can we have Defendant's Exhibit 544, please? Mr. Pollog, you've been handed what's been marked as Defendant's Exhibit 544. Do you recognize this document?
A. Yes, I do.
Q Could you explain what Defendant's Exhibit 544 is?
A. Yes. It is a series of spreadsheets conveying allocations that Connecticut Yankee, Maine Yankee and Yankee Atomic Electric would have received under several acceptance scenarios, starting in 1998

Page 3929

in the first one.
MR STOUCK: Your Honor, I'm going to object to this until we find out what it is It seems to me it's been created for litigation, and I don't think Mr. Pollog was disclosed as an expert witness, and I'm just concerned that we're getting into some things here that may be beyond the work that he does at the Department of Energy. I don't know what this is. I'd like to find out.
MS. SULLIVAN: Let me clear that up, Your Honor.
THE COURT. Okay, thank you.
BY MS. SULLIVAN:
Q. Mr. Pollog, did you direct that the pages of Defendant's Exhibit 544 be prepared?
A. Yes, I did.
Q. And do you know where they were prepared from or what they were based upon?
A. Yes, I do.
Q. What were they based upon?
A. They were based upon the latest information we had for, the RW-859 information
Q. And were they generated from the DOE database that we've been discussing?
A Yes, they were.

Page 3930

MR. STOUCK: But why, Your Honor, for what purpose? For this litigation. These are not Department of Energy business records or anything else.
MS. SULLIVAN: Your Honor, these were provided, these are the scenarios, the basis for the scenarios that were then put forth in Mr. Abbott's report. They were generated from this DOE database or DOE model that we referred to in other cases, Indiana Michigan, Commonwealth Edison. We've actually turned the DOE model over to our experts to let them run the scenarios.
Because this is all data that doesn't have any of the future projections element to it, we just asked Mr. Pollog to run the database based upon these acceptance rates. It's something he does. He works with the database every day, and he directed that this work be prepared. I'm providing the basis for Mr. Abbott's testimony about those, these were inputs to Mr. Abbott's work.
MR. STOUCK: Mr. Abbott disavowed any knowledge about this, Your Honor, and I'll show you the deposition transcript. Furthermore, this testimony was not disclosed from Mr. Pollog. And I mean, this is not a technicality. This comes as a

Page 3931

complete surprise to me.
I had no idea that Mr Pollog was going to testify about this I expected the APRs, I expected the DCSes. But I'm looking at the witness list now to confirm, because I have reviewed it recently, disclosure. These documents were prepared for litigation, as Ms. Sullivan just said, to give to Mr Abbott
And I don't believe that Mr. Pollog is entitled to testify about them without some advance notice. I can tell you for sure he wasn't deposed about these.
MS. SULLIVAN: Your Honor, in the description of Mr Pollog's testimony, the last sentence reads, "Mr. Pollog will also testify about the DOE database built upon the RW-859 data submitted by the utilities and used to develop fuel acceptance allocations." This document is generated from that database, and that's what he was testifying about.
MR. STOUCK: That's fine, Your Honor. That was disclosed. And that's what's set forth in these official documents that Ms. Sullivan just walked Mr. Pollog through. These pieces of paper, which were prepared for this litigation, are not something the Department of Energy does in its work.

Page 3932

I think that's admitted – well, Mr Pollog can deny that if he wants to. These were created solely for this litigation They're brand new to me today. I mean, they're on the exhibit list objected to by us. I honestly did not know what these were, and I don't think this witness can testify about creating scenarios In fact, if my memory serves me, Mr. Abbott testified that the Department of justice created these scenarios.

And if you want to take a short break, I can find that deposition testimony. I object to this very vehemently. And, you know, I know the Court's practice is to let things in and deal with it later, but this goes way beyond anything we were prepared for today with Mr. Pollog. It was not disclosed And Mr. Abbott testified that the Department of Justice provided him with the scenarios.

MS. SULLIVAN Your Honor, we asked Mr Pollog to have these tables generated. We provided them to Mr. Abbott. They merely provide, based on DOE's database, a copy of which was provided to counsel and this specific, these specific pages were provided to Plaintiffs' counsel as part of Mr Abbott's work papers and materials produced with his most recent report.

Page 3933

They were generated from the DOE model, and like I said, it's been used in the Indiana Michigan and the other cases I know that Mr Pollog's deposition has been taken upon the DOE database and the DOE model in Commonwealth Edison I'm sure that Plaintiffs' counsel had access to that, to the information as to how these things are generated

MR STOUCK: That's not good enough, Your Honor I asked Mr Abbott where he got – he couldn't testify about these. He didn't know anything about them, except the Department Of Justice gave them to him That's all he knew. And as far as Commonwealth Edison, I really, I do know some things that's going on in that case, and I've looked at the deposition

I don't know what these are, and I would object to any testimony about them from Mr. Pollog that has not been disclosed

THE COURT: What are they again, this is designed to show?

MS. SULLIVAN: Your Honor, this is designed to show, based upon the database that DOE maintains of the utility discharge data, if DOE had started in 1998 for 2010, and you apply , we've applied three different acceptance rates – well, two different

Page 3934

acceptance rates, assuming performance in 1998 and one assuming start in 2010, when the last of each of the Yankees' fuel would be removed from their pools. It's a similar analysis that Mr. Graves did with his model, and actually, let me provide the Court with paper copies because, on the computer, you don't have the complete exhibit. Your Honor, and, Your Honor, I would note, the information at least for the – I mean, you can tell what these are based on if you look at the 900 MTU starting in 1998. The allocations will match what you've seen in the ACR. It just goes out further than it did in the ACR. Similarly, in 1998, if you assume a 3,000 MTU rate, I think there's a difference in the ramp-up rate that Mr. Graves used and the one that Mr. Pollog assumed for his analysis, but the allocations are the same, and I believe that the fuel outdates, if not the same years, are just a year off.

THE COURT. Did you actually need a database to do this, or could you use the APR and just take the quantity and run down the APR and assign it?

MS. SULLIVAN: I believe you could use – maybe we could have the witness testify to that.

MR. STOUCK: Your Honor, just move on,

Page 3935

subject to my objection Let's have the Court hear the testimony, but I put it on the record. I don't mean to be obstructive I just was surprised by it.

THE COURT Okay. Well, we'll go forward and reserve your –

MR. STOUCK: And certainly, the objection to the exhibit remains also

THE COURT: Right, okay

BY MS. SULLIVAN:

Q. Actually, Mr. Pollog, could you answer the Court's question as to –

A. Yes, Your Honor, you can actually do that. You just go through all the fuel that's been discharged, and that's in the APR ranking, and see where every discharge fall when the Yankees come and if you know your rate, you can easily pull it right out of that information.

Q And Mr. Pollog, the ACR and the APR that we've been looking at, were earlier versions of the DOE database used to generate those documents?

A. Yes, they were

Q. So I'd like to walk through these pages, please. Could we pull up the 1998 900 MTU? Mr. Pollog, based upon a 900 MTU acceptance rate beginning in 1998, when does DOE's database project

Page 3936

that DOE would have accepted the last of Yankee Atomic's spent fuel?
A. Yankee Atomic's last spent fuel acceptance would have come in 2024.
Q. Similarly, based on a 900 MTU beginning in 1998, when does DOE's database project that DOE would have accepted the last of Connecticut Yankee's spent nuclear fuel?
A. We would have accepted the last of Connecticut Yankee's spent nuclear fuel in 2032
Q. And finally, based upon a 900 MTU acceptance rate beginning in 1998, when does DOE's database project that DOE would have accepted the last of Maine Yankee's spent nuclear fuel?
A Maine Yankee's spent nuclear fuel, their last acceptance would have also been in 2032.
Q. Can we go to the next pages, the pages which are – Mr Pollog, for the projections based upon a 3,000 MTU rate, what ramp-up rate was assumed?
A Well, based on a 3,000 steady state rate, the ramp-up would have been 400, 600, 1,200, 2,000, 3,000, and then 3,000 continuous after that.
Q. And where is that ramp-up rate set forth?
A. Right now, it's set forth in our CRD or our overall top-level civilian, Office of Civilian

Page 3937

Radioactive Waste Management requirements document
Q. Mr. Pollog, based upon a 3,000 MTU acceptance rate beginning in 1998, when does DOE's database project that DOE would have accepted the last of the Yankee Atomic spent nuclear fuel?
A Can you say that again for me? Because I'm not sure if the figure on the chart is actually matching what you're asking me right now.
Q. You're right, it's not. Can we go to the next excerpt? There we go. Does that look more like –
A. Yeah, actually, I think there was some confusion. The answer to the last series of questions, I don't think, now looking back at this, was right – oh, yes, it was, I'm sorry. Okay. Yes, I think it's correct
Q So based on the 3,000 MTU acceptance rate beginning in 1998, when does DOE's database project that DOE would have accepted the last of Yankee Atomic's spent nuclear fuel?
A. Yankee Atomic's last acceptance year would be 2008
Q. And based upon a 3,000 MTU acceptance rate beginning in 1998, when does DOE's database project that DOE would have accepted the last of Connecticut

Page 3938

Yankee's spent nuclear fuel?
A. Based on that acceptance rate, Connecticut Yankee's last acceptance would occur in 2011.
Q. And the same for Maine Yankee?
A. And for Maine Yankee, the last acceptance would occur in 2012.
Q. Can we go to the last excerpt? Mr. Pollog, based upon a 3,000 MTU acceptance rate beginning in 2010, when does DOE's database project that DOE would have accepted the last of Yankee Atomic's spent nuclear fuel?
A. Based on DOE starting in 2010 and accepting at a ramp-up rate followed by a 3,000 MTU per rate in 2014, Yankee Atomic's last acceptance would occur in 2020.
Q. And when does DOE's, same assumptions, when does DOE's database project that DOE would have accepted the last of Connecticut Yankee's spent nuclear fuel?
A. Based on those same assumptions, Connecticut Yankee's last acceptance would be in 2023.
Q. And finally, based upon a 3,000 MTU acceptance rate beginning in 2010, when does DOE's database project that DOE would accept the last of

Page 3939

Maine Yankee's spent nuclear fuel?
A Maine Yankee's last acceptance would come in 2024.
Q. The allocations for the Yankee Plaintiffs set forth on these pages, are they based on any future projections?
A. No, they're not They're all based on historical projections; that is, fuel that's been discharged to date, so there's no need to make any assessments or judgments of what will happen in the future.
Q. And why is that?
A. Because all of the fuel that needs to be – let me restate that. Their place in the queue falls at a specific point where all of the fuel – all of Yankee's fuel is discharged by the time their last place in the queue comes.
Q. Mr. Pollog, are you aware – let me back up. Are you familiar with a contractor known as NAC?
A. Yes, I am.
Q. Are you aware that NAC maintains a similar database of discharge information?
A. Yes, I've heard something like that.
Q. And how are you aware of that fact?

Page 3940

A. Somebody from NAC calls me on a periodic basis requesting the RW-859 data

Q Mr. Pollog, in your responsibilities at DOE, are you responsible for tracking the fees paid by utilities pursuant to the standard contract?

A Yes, I am.

Q. What do you do to track these fee payments?

A. The comptroller's office for the Department of Energy submits to us – they maintain and they submit to us a quarterly report of all fees that have been collected under the contracts

Q. And do you review those reports?

A Yes, I do. They send it to us every quarter, and we review what's in the document.

Q. Does the Energy Information Administration also have a role in the fee payments made by utilities?

A. Yes, they do. They will review all the quarterly fee payments to determine that the actual fee that was proposed and paid by the utilities is indeed the correct amount.

Q. Does the comptroller also maintain information on which utilities have paid their one-time fees?

A. Yes, it does The same report contains

Page 3941

information about what the current one-time fee is and what the interest is owed on that fee

Q. And could you explain to the Court what your understanding of the one-time fee, what that is?

A Yes For fuel that was, after April 7th, 1983, the contract holders paid a one mill per kilowatt-hour fee on all electricity generated and sold. For fuel that was discharged in-core prior to that date, the contractor has a schedule of payment, and a one-time fee payment is what it's called, instead of the ongoing fee payment. So it was for fuel that was in-core generated prior to April 7th, 1983

Q Could we pull up Defendant's Exhibit 7, please? Mr. Pollog, do you recognize what's been marked as Defendant's Exhibit 7?

A Yes, I do.

Q Could you tell the Court what it is?

A. It is the standard disposal contract for Yankee Atomic

Q. And could I direct your attention to page 19 of this document?

MS. SULLIVAN Your Honor, this is another exhibit where we'll be going for several pages.

BY MS SULLIVAN:

Page 3942

Q Mr. Pollog, do you have an understanding that the utilities had an option as to when they could pay the one-time fee pursuant to the contract?

A. Yes, I understand that there were three options that a purchaser or contract holder could select for payment of their one-time fee

Q. And what do you understand those options to be?

A. Well, option one would be the purchaser can pay over 40 quarters, and that would consist of the fee, plus interest, prior to the beginning of waste acceptance. Option two would be the purchasers can pay, in one lump sum, the fee, plus interest, prior to the beginning of waste acceptance And option three is the purchasers can pay the one-time fee without any interest prior to June 30th, 1985.

Q. Has Yankee Atomic paid its one-time fee?

A. Yes, they have.

Q. Has Connecticut Yankee paid its one-time fee?

A. No, they have not.

Q. When did Connecticut Yankee opt to pay its fee?

A. I believe they selected option two.

Q. Which is?

Page 3943

A. Prior to the beginning of waste acceptance.

Q And how much does Connecticut Yankee currently owe?

A. Connecticut Yankee owes approximately $153 million in fees, plus interest

Q. And that's –

A As of June 30th, 2004.

Q. Does this amount continue to increase?

A. Yes, it does. The interest does accrue.

Q. Has Maine Yankee paid its one-time fee?

A. No, they have not.

Q When did Maine Yankee opt to pay its fee?

A I believe Maine Yankee also selected option two, which would occur prior to the beginning of waste acceptance

Q. How much does Maine Yankee currently owe for its one-time fee?

A. The one-time fee, plus interest, is approximately $159 million, as of June 30th, 2004.

Q. And does this amount continue to increase?

A. Yes, it does continue to accrue interest.

MS. SULLIVAN: One moment, Your Honor. Your Honor, I believe the only two exhibits that we talked about with Mr. Pollog that haven't already been admitted or to which there are no objections are

Page 3944

Defendant's Exhibit 544, which I believe Mr. Stouck maintains his objections, and Plaintiffs' Exhibit 92, which we pulled from the Plaintiffs' may use list. That is the 1990 ACR. Plaintiffs' objections to Defendant's Exhibit 544 were authenticity and hearsay. I believe Mr. Pollog has authenticated the document and provided testimony as to what it constitutes.

MR. STOUCK: Your Honor, our position on that would be that the Court ought to at least reserve a ruling on admissibility until I get to question Mr. Pollog about it, and then it may be as the Court was intimating, that all this is, is a bunch of arithmetic. And if that's the case, perhaps we can get over the difficulty But I would like to have a chance to question him before the ruling.

THE COURT: I'll reserve ruling until cross is over on 544.

MS. SULLIVAN: Okay. Do you have any objection to Plaintiffs' Exhibit 92?

MR. STOUCK: No.

THE COURT: Plaintiffs' Exhibit 92 is admitted in evidence

(Plaintiffs' Exhibit Number PX-92 was received in evidence.)

Page 3945

MS. SULLIVAN Your Honor, thank you, we have no further questions.

MR. STOUCK: Can we take a short break, Your Honor?

THE COURT. Yes

MR. STOUCK: 10 minutes

THE COURT: Okay Half-past, we'll be back at half-past.

(Whereupon, a short recess was taken.)

THE COURT: Mr. Stouck, whenever you're ready.

MR. STOUCK: Thank you, Your Honor. And I guess what I'd like to propose, if I may, Mr. Pollog has been deposed many times in this case and in common proceedings and in other cases, and there's a lot of material out there, and what I'd like to do is, since he's the only witness the government has scheduled for today, is start a little bit of cross-examination, but then take a lunch break probably earlier than usual.

And if I go back, and even if we take a longer break, since the day seems to be a short one for everyone, I think if it's one of those situations where the more time I can spend organizing the balance of my questioning, I can assure you that it's

Page 3946

going to make it more efficient and shorter.

THE COURT: Whatever is best for your purposes is fine.

MR. STOUCK: Thank you, Your Honor

CROSS-EXAMINATION

BY MR. STOUCK:

Q. Good morning, Mr Pollog. It's still morning. The questions about the fees which were near the end of your direct examination, I believe you testified, what did you say was the amount that Connecticut Yankee owes under the contract to DOE?

A. I believe the one-time fee, plus interest, as of June 30th, 2004, is approximately $153 million

Q. You say, "plus interest." Does that figure you're giving include interest or not include interest?

A. It does include the interest.

Q. And interest is included in the other figure you gave for Maine Yankee?

A. That is correct.

Q. And what was that?

A. It was I believe approximately $159 million, including interest.

Q. And how does interest run?

A. I think it's based upon the 13 week T-bill

Page 3947

rate

Q. From what date?

A. I believe from either when the contract was signed or when they started making their first payment

Q. In preparing these ACR documents that you testified about, does the Department of Energy use contractors, you know, do contractors participate in the process of preparing these?

A. Yes.

Q. Is Oak Ridge National Lab a part of DOE?

A. Yes.

Q. All right Just going through your, some of your background here, if I may, if I understood your testimony, in 1990, you were assigned to the utility interface and logistics branch, is that right?

A. Yes, that's correct.

Q. And you reported to Alan Brownstein?

A That is correct.

Q. And I don't think you said this, but I understand that, in 1992, you took a three-year leave of absence and went to Austria?

A. That's correct, also.

Q. And did not work at all on OCRWM matters?

Page 3952

advice of the contracting officer's technical representative, who would ask me many times what I thought something might have meant.

Q. And you were not the contracting officer at that time?

A No, I wasn't.

Q. Now, let's take a look at Defendant's 30.001, this letter to Mr. Buchheit you were asked about that encloses the instructions, the DCS instructions. Do you have that in front of you?

A. Yes, I do.

Q. These are the instructions that were provided to the contract holders, looks like in about March 1992 by the Department, right?

A Yes.

Q. And you were involved in that process?

A. Yes, I was.

Q. And these instructions provide, basically instruct the contract holders that -- well, let's take a look at it, on page two, under paragraph 7A.

A. Are you on the instructions or the letter?

Q I'm on the instructions, page 2, paragraph 7A. Do you have that?

A. Yes, I do.

Q. It says, basically, "The Department of

Page 3953

Energy instructed the utilities that they were required to fill out their DCSes in a manner that conformed to the allocation shown in the '91 ACR."

Isn't that right?

A. Yes

Q. And if they didn't do that, the DOE would not even consider the DCSes for approval?

A. The DCS, if they didn't conform to the allocations, the DCS would have been disapproved.

Q. Would not have even been considered for approval, is I think what the wording here is. Does that ring a bell with you?

A. Not specifically.

Q Let's take a look at it, paragraph 7A, last sentence. Are you there?

A. Yes

Q. It says, "Due to the limited annual acceptance capacity of the FWMS, only DCSes submitted by purchasers with an allocation in the delivery year will be considered for approval " Is that the instruction that was given?

A. That's what the paragraph reads

Q Now, you're also aware, I'm sure, that it's the Department of Energy's position in this litigation that those DCSes that were submitted are

Page 3954

binding?

A. Yes, I'm aware of that.

Q And that's your personal view as well?

A. Yes.

Q. And you've testified about that extensively in some of these depositions that I mentioned?

A. Yes, I have.

Q. And do you know whether that's the Department's official, the Department of Energy's official position?

A. Yes.

Q. It is. Well, my next question for you is, isn't that position something that has been made up entirely for this litigation?

A. Not to my knowledge, it's not there, hasn't been made up for this litigation

Q. Do you know if Mr. Brownstein had that view in 1990 or '91 when you worked for him in connection with this '91 ACR; in other words, that DCSes were binding?

A. I believe Mr. Brownstein's view was the DCS was not binding if a facility hadn't commenced operations in 1998.

Q. That was the position, that's what he told you in 1991 what his position was?

Page 3955

A If I remember correctly, yes. I think he caveated the binding nature of the DCS on a facility commencing operations in 1998.

Q. But you definitely discussed this subject with Mr. Brownstein, of DCSes being binding or not, in the 1990, '91 time period?

A. I believe so.

Q. And you're clear, in your mind, that he had a view about whether or not DCSes were binding or not?

A. I'm not 100 percent clear, but that's my best recollection of a conversation we had some 13, 14 odd years ago.

Q. Well, he was your boss, so presumably, you did talk with him about these things?

A. Yes, we talked about many contract issues 13, 14 years ago, and I have a recollection of some of them better than others.

Q. I'm not asking about specific request conversations. I'm asking you whether it's your testimony that Mr. Brownstein, in 1990 and '91, had a view of his own about whether or not DCSes that had been submitted by the utilities were binding.

A. Yes, and I think I testified that I think Mr. Brownstein's view was there was a caveat on the

Page 3968

A. 426, line 20.
Q. Are you there?
A. Yes.
Q. It says, "Prior to reading that draft and prior to whatever discussions grew out of that draft, you had no understanding of the legal significance, you had no discussions with anyone who would have given you any basis for having an understanding of the legal significance of DCSes, is that right?" And he answered, "That's right. And why I brought that up is because, you know, my reaction was, well, that's interesting, when I read that, it was interesting I never discussed it or thought about it before." Do you see that?
A Yes, I do
Q. And, now, are you sure that you discussed these matters with Mr. Brownstein in 1990 and 1991, the legal significance of the DCSes?
MS SULLIVAN: Objection, asked and answered.
THE COURT: Well, it doesn't hurt to ask him again.
MS. SULLIVAN: I apologize, Your Honor.
THE COURT: You may answer.
THE WITNESS: I don't think I ever

Page 3969

discussed the legal significance of the DCSes. I thought Mr. Brownstein and I talked about what the DCS meant. I'm not qualified to give an opinion on the legal significance of the document. We did discuss the contract and implementing the contract.
BY MR STOUCK:
Q. And the significance of the DCSes in the context of implementing the contract?
A. I would say the significance, but I wouldn't say the legal significance. I can't give a legal opinion on what the document implies or doesn't imply.
THE COURT: In your view, were they tied to the existence of an MRS? If it was not in existence, Mr. Brownstein's view was probably you have to do it over if there was another facility?
THE WITNESS: Your Honor, I never really thought about whether it was tied to the MRS or not.
THE COURT: Well, you testified that the rates were tied –
THE WITNESS: The rates were, yes
THE COURT: So, I mean, if you didn't have an MRS, but you had a repository which could have a greater capacity, I suppose you'd change the rates.
THE WITNESS: Yeah, and I thought, I would

Page 3970

think this would bind the government, but whether the MRS didn't operate or not, I never really thought about that. Once the contracting officer signed it and the, for the Department, and the utilities' representative signed it, that bound both parties, but I wasn't –
THE COURT: What is your view on whether or not DCSes would be tied to the licensing of a particular facility and the capacity of a particular facility's license? Or would you just do a DCS and just with no facility in mind?
THE WITNESS: I've always believed that the DCS bound the government, regardless of the facility. Once the contracting officer for the Department signed something, it commits the government to certain actions.
MR. STOUCK: We'll return to that, Your Honor, that subject of reevaluation, because Mr. Pollog has testified about that in his deposition, so I think we may get some further illumination about his views on that.
BY MR. STOUCK:
Q. But let me stick with this for a moment. The contracting officer, do you think the contracting – was Nancy Slater the contracting

Page 3971

officer at one point?
A No
Q. She wasn't, she was the technical representative?
A. I believe she was the contracting officer technical representative for a period of time.
Q She signed some DCSes, do you know that?
A. I believe that's correct.
Q. What significance would you give her views about the binding nature of DCSes?
A. I'm not sure what you mean by what significance I would give her views, I mean –
Q. Would she know what the significance was?
A I would hope so.
Q. Well, would you be surprised if she testified in her deposition in this case that she did not recall anyone, anyone, either within the Department of Energy or in industry, who thought that the delivery commitment schedules were binding on either party? Would that surprise you?
A. No.
MS. SULLIVAN: Objection, hearsay.
BY MR. STOUCK:
Q Why would that not surprise you?
MS. SULLIVAN: Same objection.

Case 1:04-cv-00106-EJD Document 310-16 Filed 06/23/2008 Page 32 of 40

Page 4000

record, this is the May 16, 2002 deposition transcript. All right.
In fact, though, you do know that the Department of Energy originally held the view that DCSes were not binding because circumstances could change with respect to the 1998 date, correct?
A. I've seen language to that extent.
Q. Seen language?
A. Yeah, I think so.
Q. Well, you testified at your deposition that you knew that was a true statement, that the Department held the view at one time that DCSes submitted by purchasers and approved by the Department of Energy based on these instructions were in fact not binding because circumstances changed with respect to the 1998 date, isn't that –
MS SULLIVAN: Objection, Your Honor, it's unclear whether Mr Stouck is trying to refresh the witness' recollection or trying to impeach the witness or just wants to discuss with the witness the testimony. May I ask that the witness be shown the deposition testimony that he's being asked about?
MR. STOUCK: If he remembers testifying to that effect, Your Honor, I think we can save time by not doing it. That's what I'm trying to accomplish.

Page 4001

If he doesn't recall, then I'm certainly going to show it to him, but I'd like to know if he recalls holding the view that, or knowing that the Department held that view that these DCSes were not binding.
THE WITNESS: As I stated that I think I've seen that language at some point in time.
BY MR STOUCK:
Q. You know that the Department held that view at one time?
A. I think that's appeared in some document that we've published in the past.
Q. So you do know that the Department held the view at one time that these DCSes, even though approved, were not binding?
A. I think I've seen that text published in some documents in the past, yes.
Q. And that was the Department's view?
A. That was the view placed in that document, yes
Q Of the Department?
A Of whatever that document was.
Q So you don't know, as we're sitting here, whether the Department –
A. I would have to see the document to refresh my memory, I guess.

Page 4002

Q. Let's start with your deposition, Mr. Pollog. Again, behind – and then we'll get to the documents. It's behind tab five again, 332, page 332. It may have bled over to 333, but let's take a look around there, bottom of page 332, line 20
"Do you know whether the Department ever held the view that DCSes submitted by purchasers and approved by the Department based on these instructions were in fact not binding because circumstances changed with respect to the 1998 date?"
Do you see that?
A Yes, I do.
Q. And at the top of the next page, you say, yes, you did know, and you went on to explain. But you did know at the time of this deposition that the Department held that view, correct?
A. Yes, and I think I also explained that this was something that came out of the Indiana Michigan case, where we believed that if we had not started commencement of facility operations, we were under no obligation under the contract.
Q. So necessarily, DCS – that was the Indiana Michigan case from the D.C. Circuit, do you know?
A. I believe so.
Q Prior to that decision, the Department had

Page 4003

published the view, its view that it had no obligation under the Nuclear Waste Policy Act or these contracts to the utilities in the absence of a repository, is that your understanding?
A. I believe they published something to that extent. I'm not sure of the exact words, but I think they published, we didn't have an obligation to begin in 1998, absent commencement of facility operations.
Q. And prior to the Indiana Michigan decision, that was the Department's view of its obligations?
A. Yeah, that absent the start of or commencement of facility operations, we didn't have an obligation in 1998.
Q. And so necessarily, DCSes submitted before 1996, before the Indiana Michigan decision that we're talking about now, the Department must have viewed those as also conditional in not creating any binding commitments, isn't that right?
A. I don't think so.
Q. Well, let's take a look at what you told us at the deposition.
A. Okay.
Q. Same page, 334 – I mean, same tab, 334, bottom of page, line 20. Do you see that?
"Necessarily, the DCSes submitted and

Page 4004

approved by the Department pursuant to these instructions, in the Department's view, did not create any binding obligations?" Do you see that question?

A. I'm sorry, can you read that for me?

Q Bottom of page 334, line 20

A. Yes

Q "Necessarily, the DCSes submitted and approved by the Department pursuant to these instructions, in the Department's view, did not create any binding obligations." And then your answer at the top of page 335, "There were, I believe, people who held that view."

A Yes, I see that

MS. SULLIVAN. Your Honor, I'm going to interpose the same objection that's there in the transcript of the deposition, that this really goes to the legal conclusion as to discovery of the Department's obligations starting in 1998.

THE COURT: Okay.

MR STOUCK. That's all I've got there, Your Honor I think the testimony is fairly clear and putting it all together with the Indiana Michigan decision, but let me move on to something else. I'm happy to do that

Page 4005

BY MR. STOUCK:

Q. I guess, just to be clear here, let me just ask the question, prior to that Indiana Michigan decision, was it the Department's view that DCSes that were approved were or were not conditionally binding? Were they binding, or were they only binding on the condition that you eventually have a repository?

A I thought the Department's view was that they were binding.

Q. Can I have Defendant's Exhibit 30.018 and 30.020? Now, Defendant's Exhibit 30.018, if you would look at that one first, do you see that?

A. Which one, please?

Q It's the one, the bottom right, there's a sticker that says 030.018.

A. 18?

Q. It's a letter from Beth Tomasoni, contracting officer, on Department of Energy letterhead, to Mr. J.M. Buchheit at Yankee Atomic, June 14, 1995. Do you see that?

A. Yes, I do.

Q. And it says, in the last sentence of the first paragraph of that letter, the following: "The proposed delivery date is dependent upon the

Page 4006

existence of an operational repository or an interim storage facility constructed under the Act." Do you see that?

A. Yes, I do.

Q. Was that the Department's view at the time?

A. Yes.

Q. Okay. And on the attached, if you look at the DCS, it's actually stamped on there the same language, "The proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the Act."

A. Yes, I see that.

Q. And doesn't that mean that the Department at that time viewed these as conditional, not as binding, but as conditional?

A. I think –

MS. SULLIVAN: Objection, legal conclusion.

MR. STOUCK: I'm asking for his understanding, Your Honor.

THE COURT: Overruled for the understanding, if he has an understanding.

THE WITNESS: I think my understanding was they can view the date as conditional, but not the obligation to take that amount of fuel

BY MR. STOUCK:

Page 4007

Q And if you take a look at 030.020, it's got the same language, and you would say the same thing?

A. Let me read it first, okay?

Q. Sure, I'm sorry I'll show you the language. It's the last sentence of the first paragraph and then the stamped legend on the exhibits.

A Yes, it says the same thing

Q. DOE received a final DCS submittal from Maine Yankee requesting that its fuel be taken in three years, faster than the allocations that were shown in the then current ACRs, isn't that right, do you recall that?

A. No, I don't recall that.

Q. You don't recall that?

A. No, I don't.

Q. Let me have 29.005. We had some testimony about something similar from Yankee Atomic, I think, but this is a letter from Mr. Michael E. Thomas, vice president, on Maine Yankee letterhead, to Ms. Beth Tomasoni, contracting officer, Department of Energy, May 11, 1998. Is that what you have before you?

A Yes, I do.

Q Okay. And if you look sort of at the second half of the first paragraph there, it says,

Page 4016

Q. And you don't know why the Department of Energy did not consider the possibility that Congress might remove the capacity limitation in preparing the '91 ACR?

A No, I do not know why Congress would or would not consider that.

Q. Just one more set of questions about this, if I could have Plaintiff's 54, please? This is the June '88 annual capacity report.

THE COURT Do you know why DOE, in the '91 ACR, set forth a constant rate, rather than say – I take it that the reduction in rates was because of the capacity limitation in the MRS.?

THE WITNESS: That's correct, Your Honor

THE COURT· So why would there be a constantly lowered rate instead of just filling it up quickly and letting it sit there?

THE WITNESS: Because I believe that would just have been probably quite a bit of a waste of resources in the sense that you would move all of this fuel and have to procure all this transportation cask and transportation equipment to move a large amount early on, and then when you'd reached your 10,000 metric ton limit the materials, the casks, the equipment would all just sit idle, including handling

Page 4017

facilities and potentially people at the facility. So instead of buying the lot and using it for a couple years and then letting it sit for whatever period of time it may be, try and spread out the movement of the fuel, the acceptance, over a longer period of time, so it just allows you a better use of your equipment You don't have to buy as much stuff if you're moving a little bit every year, as opposed to a lot earlier and then letting it sit.

THE COURT All right.

BY MR STOUCK

Q. This is Plaintiff's Exhibit 54. But just in further response, or relevant to, I think, the Court's questions, Mr. Pollog, the Department could not, the Department in 1998 could not have picked up 400 tons under the linkages that were then part of the Amendments Act, isn't that right?

A Yes, that is correct. With the, if we maintain, or if Congress maintained the current linkages that were in the Nuclear Waste Policy Amendments Act of 1987, we could not have picked up the 400 tons in 1998.

Q. And probably could not have picked it up until three years before 2010 or thereabouts?

A. Or thereabouts, yes, without any

Page 4018

Congressional relief

Q. Do you recognize this document that's been marked as Plaintiff's 54?

A. Yes, I do. It's the 1988 annual capacity report produced by the Office of Civilian Radioactive Waste Management.

Q. And June '88 is after the enactment of the '87 Amendments Act, right?

A. I believe so.

Q. So those linkages we talked about were in force when this document was issued?

A. Yes, I believe so.

Q Take a look at page five, please. There's a table 2.1, illustrative waste acceptance schedule. Do you see that?

A. Yes, I do.

Q. And it shows 2003, 1,200 MTU; 2004, 1,200 MTU; 2005, 2,000 MTU; 2006, 2,000 MTU; 2007, 2,700 MTU; and 2008, 3,000 MTU. And isn't it correct that this document reflected the Department of Energy's view of how the program was going to be implemented with an MRS and with repository and with the schedule linkages in place?

A. Can I just have a moment to read this?

Q. Sure. Please take all the time you need,

Page 4019

but not to, if you look at the top of the page, it may help you. The first new sentence on page five says this· "Although the draft mission plan amendment projects a five-year delay in WMS operation, the projected waste acceptance rate has been increased because it is assumed that the MRS facility and the repository will commence operation simultaneously." So maybe that's helpful, maybe it's not, but take whatever time you need and let me know when you're ready for a question.

A. Yes, it appears – if you're ready.

Q. Okay. So do you remember the question?

A. I think so. This schedule assumed that both the MRS and the repository would be starting at the same time, is that correct?

Q. This, no, my question was – well, let's have it read back, rather than trying to rephrase it. I think I –

(The reporter read the record as requested.)

THE WITNESS: I believe that's correct, yes.

BY MR. STOUCK:

Q. And so in 1990, you don't know what led the

Page 4020

Department to, in a sense, ignore the linkages and depart downward substantially from these acceptance rate in the 1991 ACR, do you, Mr. Pollog?
A. Well, I think the 1990 ACR –
Q. I'm sorry, '91, I meant to say.
A Oh, I'm sorry.
Q. I apologize. I'm not quite as conversant with these documents as you are. You don't know why the '91 document departed downwards significantly from these projected acceptance rates by ignoring the linkages, isn't that right, you don't know the reason?
A I think the Department used the rates they did in the 1991 ACR, they took the lower bounding case from the 1990 ACR and also tried to maintain the 10,000 MTU statutory limit and hoped that they would receive Congressional relief on the construction linkages.
Q. That's not a reason why they departed Right here in 1988, with the Amendments Act in place, the Department projected a much higher rate of acceptance with the linkages in place. You don't know why the Department of Energy departed from that substantially downward in 1991, do you?
MS. SULLIVAN· Objection, argumentative

Page 4021

THE COURT He either knows, or he doesn't know. So you can answer, if you know.
THE WITNESS. I'm not sure, Your Honor. I think it also has to do with, between 1988 and the 1991 ACR, the repository also got delayed another seven years. I think we're talking about a 2003 start date at the time of this document And in 1991, we already believed that the repository wouldn't start before 2010.
BY MR STOUCK:
Q Okay. But you are aware that, in the Amendments Act, it was very clear that your understanding is that Congress was clear that it did not want the MRS to become a substitute, long-term substitute for a repository, correct?
A. Yes, I believe I had that understanding.
Q. All right And let's move on then to another subject, if we can To your knowledge, Mr. Pollog, there is no group in the Department of Energy that disagrees that the 3,000 MTU rate is the rate that's to be used as a steady state throughput rate in the program, correct?
A Are you asking me within all of Department of Energy or the Office of Civilian Radioactive Waste Management?

Page 4022

Q. There's no group within DOE that disagrees that that is the appropriate way to – there's no group within DOE that disagrees that the 3,000 MTU rate is the appropriate rate to use as the steady state throughput rate, isn't that right?
A Are you talking about today or any point in time throughout the Department of Energy or the Office of Civilian Radioactive Waste Management?
Q Well, let's take them one at a time. Start with today.
A. Today, I'm not aware of any organization within the Department of Energy, or group, I can use group, who disagrees with that.
Q. Would your answer be different if we went to some different time period?
A. Possibly
Q Well, do you know if there was a group that disagreed any time from – can you testify as to whether there was any group within DOE, organizational group, that since the time of the Nuclear Waste Policy Act until today, that disagreed that the 3,000 MTU rate was the appropriate steady state acceptance rate?
A Well, I've only been an employee at DOE since '88, and I can't answer for times prior to

Page 4023

that. And even since then, I haven't interfaced with all the parts of DOE, but I think possibly in the early '90s, people thought the appropriate rate may have been the one stated in the 1991 ACR.
Q As the steady state rate for the program?
A Until a repository was operating, yes.
Q. What about after a repository was operating?
A. After the repository was operating, I would think people would be more inclined to agree with the 3,000 metric ton rate.
Q. Part of your response was, I thought I understood this from your direct part too, you have some responsibilities for following or monitoring or working with the information that the Department of Energy has about discharge rates from utilities, is that right?
A. Not quite.
Q Okay. What's wrong with my statement?
A. Well, the Office of Civilian Radioactive Waste Management basically manages that project, so the data is collected by another group, but we're the one who manage the efforts. I say we are the ones who collect that data and use it.
Q. Okay. So your familiarity with that data

Page 4032

turn to a subject that's different, again, if I may, in a different document, if we need it. You are not aware of any failed fuel that would be technically infeasible for DOE to handle and dispose of when it begins performance of this program, isn't that right?
A Are you asking me if I'm aware of any specific failed fuel or failed fuel in general?
Q. I'm asking about failed fuel in general. You cannot give any reason why it would be technically infeasible for the Department to handle and dispose of failed fuel when it begins performance?
A. Given sufficient time and budget resources, I would probably agree with that statement. It would depend greatly on what the budget is for designing, building, constructing, licensing the facility. If we had essentially unlimited budget, yes, I would agree with that statement.
MS SULLIVAN· Your Honor, I would object to the topic of failed fuel as being beyond the scope of direct
MR. STOUCK: Not in our conception of things, Your Honor.
MS. SULLIVAN I understand Mr. Stouck's metaphysical relationship to the scope of direct, but

Page 4033

I just wanted to make the objection for the record
THE COURT The objection is noted.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT. Overruled, but –
MR. STOUCK. Thank you, Your Honor.
MS. SULLIVAN: That's what I figured.
MR. STOUCK: Excuse me for one second, Mr. Pollog. I will be with you just in one moment, I apologize.
BY MR. STOUCK:
Q. That's not the answer that you gave me, or that you gave us at your May 15, 2002 deposition. Do you recall what answer you gave there?
A Something to the effect that we had to have significant or – we needed to budget in order to do something like that
Q The answer I have is, "No " Let's take a look at it and see if you recall that testimony. It's tab four, 5/15/2002.
A. What was the page again, please?
Q. 165, on line 16 Tell me when you're there, Mr. Pollog
A. I'm there.
Q. "Do you have any reason why it would be technically infeasible for the Department to handle

Page 4034

and dispose of failed fuel when it begins performance presumably in 2010?" Do you see that?
A. Yes, I do.
Q. Mr. Crawford objected, and your answer on line 21 was, "No." And then just for completeness, let's go on and see what else you said. Is that right, that was your testimony then?
A. Yes, it was.
Q. The next question was, "Is it your belief that the engineering and technical basis exists to accept that and dispose of that failed fuel?" Do you see that?
A. No, I don't
Q. It's the next question, line 23 at the bottom of 165.
A. Okay
Q. "Is it your belief that the engineering and technical basis exists to be able to accept that and dispose of that failed fuel?" Do you see it?
A. Yes, I do.
Q. And your answer was, "Most likely." Do you see that?
A. Yes, I do.
Q. And you went on, "I would like to qualify that just because I'm not familiar with every failed

Page 4035

fuel assembly that's out there. There may be something out there that would cause special problems I'm not aware of, but in general, I think you can engineer around most situations, given sufficient resources." Do you see that?
A. Yes, I do.
Q. And that was your testimony?
A. Yes, it was. It's also my testimony in this deposition summary that we needed sufficient budget resources too.
Q. Okay. But there's no technical reason why the Department couldn't begin accepting failed fuel, isn't that right?
A. I think I testified, given sufficient budget resources, we could probably engineer a solution to most failed fuel assemblies.
Q. And you have worked on developing criteria that would apply to spent nuclear fuel that's placed in canisters, so that the canisters can be taken on the same schedule as other spent fuel by DOE, isn't that right, you've worked on that?
MS. SULLIVAN: Objection, again, beyond the scope of direct
THE COURT: We're talking about scheduling, so I guess I'll overrule that as well.

Page 4036

MS. SULLIVAN: Thank you, Your Honor.
THE WITNESS: Yes, that's correct.
BY MR. STOUCK:
Q And your belief is that the NAC multi-purpose canister system – let me broaden that, NAC multi-purpose canister systems meet the criteria that you're developing, isn't that right?
A. I think my belief was, several years ago, when we had an early draft version of this, that NAC multi-purpose system you were describing fit the dimensional envelope that was in that draft table that we had developed, or draft criteria or set of standards
Q. That's not the answer you gave at your deposition in May 2002. When you say, "several years ago," is May 2002 within your several years ago?
A. I think the canister standards table was developed in the 2000, 2001 time frame.
Q Okay.
A. And I think I was asked this in 2002.
Q. Right. And at that time, the NAC multi-purpose canister systems met the criteria that would apply to canister fuel, so it could be taken on the same schedule as other standard fuel, correct?
A. It met the draft standards that we had

Page 4037

developed, yes, that is correct
Q. At that time?
A Yes.
Q And you worked on those standards?
A. Yes, I did.
Q At that time, it was also your view that it was more likely than not that such fuel would be accepted in canisters as a standard fuel form, right?
A Assuming a contract holder would negotiate an amendment to their contract to make canistered fuel or fuel in multi-assembly canisters an acceptable waste form, yes, that is correct
Q. Now, you also agree, don't you, that it was a DOE objective to achieve efficiency in this spent fuel removal program, at least in the 1980s and probably into the – at least early 1990s, don't you agree?
MS. SULLIVAN Objection, vague.
THE WITNESS: I think that was all –
THE COURT: Excuse me, I didn't hear the –
MS SULLIVAN: Objection, vague, Your Honor I don't know what he's talking about with the term "efficiency."
THE COURT: Do you understand?
THE WITNESS: In a very general, broad

Page 4038

sense, but I'm not sure how I can put any specifics on that, but generally speaking, I guess.
THE COURT: Okay.
BY MR. STOUCK:
Q. Do you agree, do you remember the question? Do you want me to rephrase it?
A Yeah, I remember the question. I think it's always been a goal of the Department to operate the system efficiently.
Q. An objective?
A A goal.
Q. Is there a difference?
A. It's always been a goal of the Department to try and operate the system efficiently
Q. How about an objective?
A. A goal of ours.
Q. I'm just curious, "objective" was the word at the deposition, so is there a difference?
A. I don't know. Is there a – to me? Probably not.
Q. And that efficiency would extend beyond just DOE's operations and also would include utility needs, in your view, isn't that right?
MS. SULLIVAN: Objection, vague as to what "that efficiency" means.

Page 4039

THE COURT: You mean the, the utility would have to be efficient as well?
MR. STOUCK. Of course, I'm asking for his understanding, but he testified about this extensively, and I would just like to have the Court hear the benefit of it.
THE WITNESS: Okay. I think I mean both parties, contract holders and the Department, would agree that if we can operate with efficiency for both sides, it's beneficial for everyone.
BY MR. STOUCK:
Q And minimize costs for both sides?
A. If we could do that, yes, that would be beneficial.
Q. Okay. And you agree that, at least at one point in time during the course of this program since the Nuclear Waste Policy Act was enacted, DOE had the objective of minimizing utility reactor storage costs, right?
A. I believe words to that effect were published in mission plans in the 1980s, yes.
Q. And I'm trying to wrap this up, but I've got one question, or a couple questions, I'm looking for them in my notes here.
There was one exhibit – let me get my copy

Page 4064

complete record, it seems to us it might make some sense to have this in.

THE COURT: That's 1952 and 1953?

MR. STOUCK: That is correct

MS. SULLIVAN· Your Honor, we're not sure what relevance those documents have to the acceptance obligations that DOE had in 1998, but we have no objection to their admission I would like Mr. Pollog to flip through our copy, the copies we provided, just make sure that they're complete

MR. STOUCK: Are you planning to introduce those? Because if you are, that's fine with me.

MS. SULLIVAN: No, no, we'll admit your copies. That's fine.

THE COURT Well, Plaintiffs' Exhibit 1952 and 1953 are admitted.

(Plaintiffs' Exhibit Numbers PX-1952 and PX-1953 were received in evidence.)

MR. STOUCK: Thank you, Your Honor. And then there is still the outstanding question, which is the government's exhibit of 544, but I'm sure Ms. Sullivan will get to that, or else we'll otherwise address it.

THE COURT: 554?

MR. STOUCK· Yeah, that was –

Page 4065

THE COURT: 544.

MR. STOUCK: 544. I've been misspeaking here today, and I apologize about that.

THE COURT: Any objections to that?

MR. STOUCK: We do object I adhere to my hearsay objection. The witness didn't prepare it. Someone else prepared it. The numbers are not particularly controversial, and I think anybody might be able to prepare it, but it seems to us not particularly useful to have in the record, or maybe one of the experts can tell us what they used it for, if that's what the government is intending to do.

THE COURT I think the same cases I cited for the admission of the budget, your Plaintiffs' budget, owing to the fact that these are figures that are drawn out of business record-type activity, would support the admission of 544, so I'll overrule the objection, and Defendant's 544 is admitted into evidence.

(Defendant's Exhibit Number DX-544 was received in evidence.)

MS. SULLIVAN· Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. SULLIVAN:

Q I just have a few minutes worth of

Page 4066

questions. Mr. Pollog, Mr. Stouck asked you if the Oak Ridge National Labs was a DOE facility. Do you remember that?

A. Yes, I do.

Q. And I believe you said that it was?

A. Yes, I did.

Q Mr. Stouck didn't ask you any other questions about that, but I would like to. Is the Oak Ridge National Lab run by an M&O contractor?

A. I believe they are, yes.

Q. Do you know who the M&O is?

A. Currently, I do not know. I knew in the past it was Martin Marietta systems, but I don't believe they are M&O there, and I don't recall who the new M&O is there.

Q. What is an M&O contractor?

A. It is a management and operations contractor. They manage the facility and operate the facility for the Department.

Q. Has the M&O at the Oak Ridge National Lab prepared reports for the Office of Civilian Radioactive Waste Management as part of its contract with DOE?

A. It has in the past, yes.

Q Do the M&O's reports and statements

Page 4067

represent the opinions or statements of the Office of Civilian Radioactive Waste Management?

A. No, they do not. They represent their own opinion and not the Office of Civilian Radioactive Waste Management

Q. Do you have an understanding as to under what circumstances an M&O report would become an opinion or a statement of the Office of Civilian Radioactive Waste Management?

A. Yes, I do. They would become an official position of the Office of Civilian Radioactive Waste Management if they were published under the, by us, and would have a DOE/RW number on it, indicating that it was produced for us. It would, if we adopted it in some media via letter, presentation, statement, somehow saying this is our official position.

Q. Could I direct your attention to Plaintiffs' Exhibit 1952, which is the July 2004 annual capacity report?

A. Yes

Q. And on the front page of that document, there's a DOE/RW number 0567. Is that the DOE/RW number, is it a number like that, that you were just referring to?

A Yes, it is. All publications that are done

Page 4068

by the Department of Energy's Office of Civilian Radioactive Waste Management will have a number like that, and it will look like all the ACRs that we've discussed here, and APR, you'll see a similar number or similar logo like that on each document.
Q. Thank you. Mr. Pollog, during cross-examination, you were asked about some draft standards or draft criteria for the acceptance of canistered fuel Do you remember that testimony?
A Yes, I do.
Q Did you develop draft criteria for the acceptance of canistered fuel?
A Yes, I participated in an effort by myself and a couple of contractors to develop those standard canister criteria.
Q Why did you do that?
A. We had been asked by several contract holders about the acceptability of canistered fuel; that is, fuel that's in multi-assembly canisters. And we had already responded that this was not a waste form currently covered by the contract, and a contract holder would need to seek modification to their contract to have this waste form included But we indicated to them that we would initiate the actions necessary to make this an

Page 4069

acceptable waste form. And following on in that commitment that we had made, we start developing these standards
Q. And when did you work on these draft criteria?
A. I believe it was in the 2000, 2001 time frame.
Q Were these criteria ever formalized?
A No, they were not.
Q. Mr. Pollog, Mr. Stouck also discussed with you the fact that efficiency is a goal of the program. Do you remember that testimony?
A. Yes, I do
Q Can the goal of efficiency trump Oldest Fuel First as the method by which RW allocates acceptance capacity?
A I have never been of the belief of that. I've always believed we had to operate under the terms of the contract. The contract states we allocate acceptance capacity via Oldest Fuel First, and I've never seen anything to the contrary suggesting that something otherwise be used.
Q. Mr Pollog, could I ask you to pull out Plaintiffs' Exhibit 7, which Mr. Stouck talked to you about, which is titled, "Preliminary Estimate of the

Page 4070

Charge for Spent Fuel Storage and Disposal Services."
A. Did you say 7?
Q. Yes.
A. Okay.
Q Do you have that in front of you? And just first, on the front cover, the cover bears a date of July 1978. Do you have an understanding that this was, this document was prepared several years before the enactment of the Nuclear Waste Policy Act?
A. Yes, it was prepared before the Nuclear Waste Policy Act was enacted.
Q. Can I direct your attention, please, to Roman Numeral page IV, which is titled at the top, "Forward " Do you have that in front of you?
A. Yes, I do.
Q. Could I ask you to read the third paragraph on that page, please?
A. "The report does not establish new policy, and it does not commit DOE to any specific program, schedule or charge. No scenario or case is to be considered. Most important, no methodology is to be considered definitive, and no charge is to be considered most likely or to represent a proposed charge."
Q. Thank you. And could I direct your

Page 4071

attention to page four of this document, which is Bates number ending in 7416?
A Did you say page four?
Q. Yes, page four
A. Okay
Q. Could you read the first two sentences on that page?
A. "DOE expects to provide NRC licensed interim storage in the form of AFR water basins prior to the availability of a terminal repository Initial storage capacity is expected to be available to receive fuel in 1983."
Q. Thank you, Mr. Pollog. Mr. Pollog, do you know what an AFR water basin is?
A. No, I do not.
Q Could I direct your attention to Plaintiffs' Exhibit 1959, which is entitled, "Department of Energy Report on Fee for Spent Nuclear Fuel Storage and Disposal Services." Do you have that in front of you?
A Yes, I'm there.
Q. Again, I'd like to direct your attention to the date on the front cover, which is October 1980 Do you have an understanding as to whether this was before the NWPA was enacted?

Page 4072

A. Yes, this document was produced prior to the Nuclear Waste Policy Act being enacted.
Q. Could I direct your attention to page eight of this document? On page eight, there seems to be a list there of several different facilities and proposed opening dates. Do you have an understanding as to how many facilities were envisioned when this document was prepared?
A Yes, it appears this document is envisioning six different facilities.
Q. And could I ask you to turn to the next page, page nine, and I believe Mr Stouck read footnote C into the record. Based on what's depicted there on that chart, do you have an understanding as to what this document envisioned as to the number of facilities and the acceptance rate of each of those facilities?
A. Yes, I do. It appears that there are six facilities, and it lays out the acceptance rate by facility in table 2 on page nine
Q Mr. Pollog, could I direct your attention to Plaintiffs' Exhibit 54, which is the 1988 annual capacity report?
A. Yes.
Q Do you have that in front of you?

Page 4073

A. Yes, I do.
Q. Could I ask you to turn to page five, please?
A Yes, I'm at page five.
Q Mr. Pollog, do you have an understanding, based on the section in this document that Mr. Stouck asked you to read, what this document assumed in terms of start date for the MRS and the repository?
A. Yes, it appears that both the MRS and repository will be starting in 2003.
Q. And do you have an understanding as to whether the 10,000 MTU limitation would apply to an MRS facility if the repository were operating?
A. The 10,000 metric ton uranium limitation would no longer apply.
Q. Mr. Pollog, could I direct your attention to Defendant's Exhibit 24, which is the 1991 annual capacity report, page four of that document? And could you highlight the middle paragraph on that page? And, Mr. Pollog, could you read that paragraph, please?
A. Yes "The acceptance rates in table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 metric ton

Page 4074

storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation These acceptance rates assume commencement of facility operations in 1998.
If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007."
Q. Mr. Pollog, does the paragraph you've just read capture your understanding as to the basis for the rates set forth in the 1991 ACR?
A Yes, it does.
THE COURT: I should note for the record that AFR means away from reactor.
MS. SULLIVAN: I appreciate that
BY MS. SULLIVAN:
Q. Do you know, with that clarification from the Court, do you know what that means?
A. I believe, away from reactor, yes, I do think I know what that means.
Q. What is an AFR facility?
A. Well, I think it's a storage facility that's not located at the reactor site

Page 4075

Q. Is that a term that's been used by DOE since you've been with the program?
A. Not to my knowledge, no.
Q. Mr. Pollog, just to clear up a question that I believe His Honor asked you, is your view as to the binding nature of DCSes tied to the existence of a specific facility?
A. No, it is not. It's not.
Q. But the rates in the ACR upon which the DCSes are to be based, is it your understanding that these rates are dependent upon a facility?
A. Yes, they were developed with a facility in the system in mind.
Q. Are the rates in the 1991 ACR and the 2004 ACR different?
A. Yes, they are
Q. Why?
A. The 1991 ACR was based upon having a MRS in the system in the Waste Management System. The 2004 ACR assumes there will be no MRS in the Waste Management System.
Q. And that has an effect on the rates?
A. Yes, it does. The 2004 would assume that the spent fuel was being transported from the reactor right to the repository.