Page 4076

Q And how did the differences in the rates impact the allocations that can be given to any particular utility?

A. Well, in the first two years, they should be similar or the same, very close to the 1995 or 1991 ACR But starting in the third year, they should all increase significantly.

Q. In the 2004 ACR?

A. In the 2004, the rates from year three through 10 should increase significantly.

MS. SULLIVAN: One moment, Your Honor

THE COURT Sure.

MS. SULLIVAN· Nothing further, Your Honor. Thank you.

MR. STOUCK: Just a couple questions, Your Honor, if I may?

THE COURT Okay.

MR. STOUCK: Actually, Your Honor, I do not have any questions. I would like to though, just for the record, on the two old reports that I did ask Mr Pollog, one has been marked as Plaintiffs' Exhibit 7, I have a problem with numbers today. I, in fact, was mistaken when I said this had been admitted into evidence.

Plaintiffs' Exhibit 7 has not been admitted

Page 4077

into evidence It was, I believe, on our may use list. Plaintiffs' Exhibit 1959, which is the 1980 study, as was discussed earlier, was not on either, not on our exhibit list at all It is a DOE document I would especially certainly like to move into evidence Plaintiffs' 7, which was on our may use list.

But it seems to me, just for clarity of the record, each side sort of read different selected portions It may be worthwhile to have both studies entered into evidence, just so that if there's any need for us or the Court to consult them, we'd have something other than snippets that are in our transcript, so I would propose that.

MS. SULLIVAN: Your Honor, these documents are wholly irrelevant. They're both issued before the enactment of the NWPA, the concern consideration of what fee was to be assessed and some program to be developed that eventually became the NWPA. I think, as we established, they described systems that are wholly different from what DOE has been pursuing. They are DOE documents, so we would object to them on relevance grounds.

THE COURT Being consistently skeptical of relevance objections, and if that's the only

Page 4078

objection, I'll admit Plaintiffs' Exhibit 7 and 1959.

MR. STOUCK: Thank you.

(Plaintiffs' Exhibit Numbers PX-7 and PX-1959 were received in evidence.)

MS. SULLIVAN. Thank you, Your Honor.

THE COURT: I just had one question. Well, a couple of questions maybe, but on the M&O contractor situation, I noticed, like the situation with Exhibit 544, how does it work?

I mean, can you just call up someone working for Bechtel and say, Hey, run this study for me? Or do you have to enter into a contract amendment and say, Do this. Or are they treated like employees? What's the relationship?

THE WITNESS It's a little bit of both actually, Your Honor. We have a annual work plan with our M&O contractor under certain deliverables and tasks we assigned them to, and they do those tasks on a normal basis. In addition to that, from time to time, there were specific projects we asked them to undertake that aren't in their annual work plan.

If it's a large involved task, generally, we have to write what we call a TDL, a technical direction letter, and assign task and say funding is

Page 4079

to be used from this portion of your budget. If it's a task that's covered by ongoing activity, generally, I'll just call them up and say, Please do X, Y or Z for me. And they'll perform that task for me and get me the deliverable within a reasonable period of time So it's a combination of ways we assign work to them.

THE COURT: When a deliverable comes in, do you have to sign a voucher or something certifying that you, it's okay, and you're accepting it?

THE WITNESS· Generally –

THE COURT: What happens to say it's okay?

THE WITNESS: Generally, what we'll do, they'll submit to us draft deliverables, and we're commenting along the way. And when a final one comes in, it'll come under signature, and we will accept it. We don't generally submit a letter back saying, This has not been accepted

But if we have some problem with it, we'll say, This document isn't what we wanted, and go back and do it a specific way, or change in this what needs to be changed We don't formal ly accept it via written letter, but there is an iterative process, usually going back and forth between the parties, when they submit us the document, and we

**Sacramento Municipal v. U.S No. 98-488C March 29, 2005**

**Heritage Reporting Corporation**

**Page 1826 to Page 2214**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone. 202-628-4888*
*FAX. 202-371-0935*

Page 1826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
--------------------------------x
SACRAMENTO MUNICIPAL UTILITY
DISTRICT,
NO 98-488C
Plaintiff
vs
UNITED STATES,
Defendant
--------------------------------
Courtroom 5
National Courts Building
715 Madison Place
Washington, D C

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a m

BEFORE THE HONORABLE SUSAN G BRADEN

Page 1827

APPEARANCES
ON BEHALF OF PLAINTIFF
DAVID S NESLIN, ESQ
TIMOTHY R MACDONALD, ESQ
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N CAYNE ESQ
Arnold & Porter LLP
555 Twelfth Street, N W
Washington, D C 20004-1206
(202) 942-5656

Page 1828

APPEARANCES (Continued )

ON BEHALF OF THE DEFENDANT
ALAN J LO RE, ESQ
JOSHUA E GARDNER ESQ
TODD J COCHRAN, ESQ
SCOTT DAMELIN, ESQ
RUSSELL SHULTIS ESQ
ELIZABETH THOMAS, ESQ
U S Department of Justice
1100 L Street, N W
Washington, D C 20036

ALSO PRESENT
STEVEN M COHN, ESQ
STEVE J REDEKER
THOMAS POLLOG

***Index appears at end of transcript***

Page 1829

P R O C E E D I N G S
- - - - -
THE COURT Let's go
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:
CROSS-EXAMINATION (Resumed)
BY MR CAYNE
Q Good morning, Mr Zabransky
A Good morning
Q I'd like to turn your attention to Plaintiff's Exhibit 121 I believe that will be in the first binder, one out of three Do you have that document before you, sir?
A Yes I see it
Q And is this document a memorandum from you to -- was this a memorandum from you, sir?
A It's an e-mail from me to Mr -- I believe it's Auke Piersma
Q And who is that person?
A Mr Piersma used to be with a group called Public Citizen
Q And there's also a CC?
A Yes

Page 1970

Q And what is the purpose of the 1991 annual capacity report?

A. It was –

MR MACDONALD Your Honor?

THE COURT. Yes, I'm sorry

MR MACDONALD I'm just going to object to the extent it's calling for a legal conclusion as to the purpose of the '91 ACR under the standard contract

MR. GARDNER: And, Your Honor, to be clear, I'm not asking for a legal interpretation.

THE COURT: He didn't use the words "standard contract," that I know of He just asked what was the purpose of the report. Go ahead.

THE WITNESS· It was to provide the contract holders with allocations that they could use to submit their delivery commitment schedules.

BY MR. GARDNER:

Q. Were you involved in the preparation of the 1991 ACR?

A. Yes, I was

Q Could you describe the involvement you had in the preparation of the 1991 ACR?

A. Yes, I will The first draft of this document was completed by one of our contractors,

Page 1971

Pacific Northwest Laboratory They would have provided a copy to Mr. Brownstein Well, even before that, Mr. Brownstein would have given them guidance on what to put into the document, what acceptance rates, what issues he wanted covered, what general topics that needed to be addressed, and they would have developed an initial draft.

And after the, internally, PNL was satisfied, they would have transmitted a copy to Mr. Brownstein. And Mr. Brownstein would have, or gave members of his staff copies of this document to review it and prepare comments on it We would have transmitted our comments either to Mr. Brownstein, and we would have resolved them with Mr. Brownstein and then with PNL

They maintained a master copy of it for us that included all the comments that were accepted. After Mr. Brownstein and his staff were satisfied with it, Mr Brownstein assigned me the responsibility of essentially getting this thing approved through the Department of Energy. So I would have, in conjunction with Mr Brownstein, taken this document, we would have prepared a concurrence package and then gone through the effective organizations within the Office of Civilian

Page 1972

Radioactive Waste Management in the Department of Energy, had them review it, addressed their comments, gotten their approval, and then we would have submitted it to our publications group and had it published

Q And to be clear, which office within the Department of Energy actually prepared this document?

A. The Office of Civilian Radioactive Waste Management.

Q. What role, if any, did the contracting officer have in the preparation of the 1991 ACR?

A They had a minor role. One of the organizations that would have reviewed it and commented on it and had their comments addressed would have been the contracting officer's office

Q. And was this 1991 ACR, was this sent out to contract holders?

A. Yes, it was, it was sent out to all contract holders.

Q And whom at the Department of Energy sent this out, sent out the 1991 ACR to the contract holders?

A It would have gone out under the signature of the contracting officer

Q. If I could turn your attention, Mr Pollog,

Page 1973

to page five of the 1991 ACR, and please let me know when you're there?

A. I'm ready

Q Okay What is the information set forth in this table on page five?

A These are the projected waste acceptance rates starting in year 1998, going through year 2007.

Q. How were these rates developed?

A We developed these rates in order to comply with the Nuclear Waste Policy Amendments Act of 1987. There is a 10,000 metric ton limit on the receipt capacity of the MRS prior to operation of a, of the repository operation.

Q I see And at the time the 1991 ACR was prepared, what rate was DOE planning to accept spent fuel at?

MR MACDONALD. Your Honor, I'm going to object to the extent it calls for speculation

THE COURT: Go ahead

BY MR. GARDNER:

Q Okay

A The rates that are shown in table 2.1, 400, 600, 900, through 2007.

Q Now, why wasn't DOE planning on accepting spent fuel at a 3000 rate back in 1991?

Page 1974

A At that point, the only facility that we thought we were going to be capable of opening by 1998 would have been an MRS, and it was subject to the limits, the statutory restrictions or linkages, as we called them, at that time in the Amendments Act of 1987

Q Now, are you aware that DOE published ACRs prior to 1991?

A Yes, I'm aware of that

Q. Okay How, if at all, did the 1991 ACR differ from previous ACRs published by the Department of Energy?

A In a couple of ways, first comes to mind is the 1990 ACR had two acceptance rates, a lower bounding rate and an upper bounding rate This ACR only had one rate, and this rate here shown in the '91 ACR is very similar to the lower bounding rate from the 1990 ACR, and then also, the 1991 ACR was to be the basis for the contract holders to submit their delivery commitment schedules

Q I see And if we could turn for a second to DX-105? And let me know when you're there, Mr. Pollog Mr. Pollog, do you recognize this document?

A Yes, I do, this is the 1987 annual capacity

Page 1975

report

Q. If I could direct your attention to page two of this document, it's actually, it's literally the page number two, it's not the second page of the document For the record, it's, there's two Bates numbers, I'll use the top one, it's HQ0002712 Are you there, sir?

A Yes, I am

Q If you could blow up the first full paragraph beginning, "In 1991"? Mr. Pollog, could you please read that paragraph into the record, please?

A "Beginning in 1991, the ACR acceptance ranking will be converted into an annual priority ranking for receipt of spent nuclear fuel, high-level waste In 1992, based on this priority ranking, the purchasers will submit to DOE, for approval, delivery commitment schedules identifying the spent nuclear fuel high-level waste that purchasers propose to deliver to the DOE waste management system, WMS Once approved, these schedules will become the basis for final delivery schedules to be submitted by purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the spent nuclear fuel, high-level waste and

Page 1976

subsequent transport to a DOE facility "

Q How does this paragraph, Mr Pollog, comport with your understanding as to the role of the 1991 ACR?

A It's exactly what we had planned, or what we – the process that we went through

Q Do you know, was this document provided to contract holders?

A I believe it was

Q If I could draw your attention, Mr Pollog, to DX-218, please? And let me know when you're there, Mr Pollog, are you there?

A Yes.

Q Mr Pollog, do you recognize this document?

A Yes, this is the 1990 annual capacity report

Q Okay And I am going to, again, draw your attention to what is actually numbered page two, it's got a Bates, this one has three Bates numbers, I'm going to go with the top one, it's HQ0002493. Are you done, Mr. Pollog?

A Yes.

Q Excellent And beginning with, it looks like the end of the first line, "As specified," do you see that, sir, "As specified in the contract"?

Page 1977

A Yes

Q Could you please read that into the record, sir?

A The full paragraph after that?

Q Yes, please, just the paragraph.

A "As specified in the contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers The standard disposal contract states that, beginning in 1991, the ACR is scheduled to be replaced by the acceptance priority ranking report for receipt of spent nuclear fuel and high-level waste.
The contract further specifies that, beginning in January 1992, and based on the acceptance priority ranking, the purchasers shall submit delivery commitment schedules to DOE identifying the range of discharge dates of spent nuclear fuel and high-level waste that the purchasers propose to deliver to the waste management system, WMS
The contract provides that the approved DCSes will become the bases for the final delivery schedules, which are to be submitted by the purchasers not less than 12 months before the

Page 2026

you can go through the same exercise Do you see
what I'm saying?
MR MACDONALD Very well, Your Honor
THE COURT But, you know, if you want to emphasize some points to me from the document, or you can do it during argument later on or in a brief, you don't need him for the document, is what I'm saying
BY MR MACDONALD:
Q. Mr. Pollog, to your knowledge, there is no group within DOE today that disagrees that a 3000-ton rate is the appropriate rate to use as a steady state acceptance rate, isn't that correct?
THE COURT. I'm going to sustain the objection which is coming, I am sure, unless the bureaucracy has changed, that there are people on every floor of every department, someplace, that disagree with something that's been done. It doesn't make any difference what a group of people within the bureaucracy think The issue is, what is the official Department position?
MR MACDONALD: Well, Your Honor –
THE COURT Or those in the position of authority to bind the Department
MR. MACDONALD· I understand that, Your Honor, I think the question includes those within

Page 2027

Mr. Pollog's knowledge He has testified on this, this very topic previously
THE COURT Do you know whether, do you know if there are people within the Department that disagree with the Department's official position?
THE WITNESS: Well, I can't speak for everybody, but I don't know of anyone who raised objections to that.
THE COURT: All right.
BY MR MACDONALD·
Q Who disagrees with the 3000-ton rate as the appropriate steady state rate?
A Just, are you talking about right now or throughout the history of the program?
Q Let's start with right now, sir.
A. Okay. Right now, I know of no one who disagrees with that rate.
Q And do you know of anyone throughout the life of the program, sir?
A Nothing comes to mind, but I am sure at some point in time, someone disagreed with that. For example, when we put together the '91 ACR, we used a lower rate because we thought it was more appropriate for acceptance at a MRS I guess the question sort of brings to mind, are you talking about a

Page 2028

repository-based system or an MRS-based system, or some combination thereof?
It's a very broad question, and without more information, I can't really refine my answer very well for you
Q Sir, when you prepared the 1991, when you were involved in the preparation of the 1991 ACR, was it DOE's plan to operate its facilities on a 900-ton steady state basis?
A It was DOE's plans for the year 1998 through 2010 – or, excuse me, 2007, to operate at a 4, 6, 9 continuous rate, yes
Q Let's take a look at the 1991 ACR, sir Mr Gardner asked you a series of questions about it. It's Defendant's Exhibit 290 in your original binder.
A You said in the Defendant's binder?
Q. The binder that Mr. Gardner provided to you.
A. It's not in yours?
Q. That's correct And let me clean one answer, one thing up, Mr. Pollog, in your last answer, you specified that it was DOE 's plan to operate at the 4, 6, 9 number through 2007. What was DOE's plan at the time, in your view, as to how it would operate after 2007, sir?

Page 2029

A. I don't recall many specific discussions about that, but I, my best memory is I thought we would operate at 900 in 2008 and 900 in 2009 After that, I just don't recall what we were planning It could have been increased because of a repository coming online, but I don't have a good recollection right now of what we planned in 1991 for repository acceptance rates for 2010 and beyond
Q Do you have any reason to disagree that it was a 3000-ton rate, sir?
MR GARDNER: Your Honor, objection, he just said he didn't recall
THE COURT. Just a minute I missed that. He did say, I do not recall, yeah, he said he's got three, "I don't recalls," and don't have a good recollection within the answer. So you asked him, however, you didn't use the 3000-ton rate first, he was talking about 900 What's the basis for your objection?
MR GARDNER: He – Mr Pollog just testified that he didn't recall, with any sort of specificity, after 1997, what the projected rates were going to be. Then Mr Macdonald said, do you have any reason to disagree that it's a 3000-ton rate? Mr Pollog testified he doesn't recall what

Page 2046

5, 50.9 metric tons of uranium, year 6, 30.1 metric tons of uranium, and in year 9, 82 metric tons of uranium

Q That's a total MTU of approximately 228 tons?

A Yes, that's correct

Q I'd ask you to turn back one page, Mr Pollog, page 10, under 3 3, "Alternative Allocation Methodologies," and the second sentence states, "DOE is currently examining how expanding the allocation period, e g , to 18-36 months, would affect WMS operating efficiency." Do you see that, sir?

A. Yes, I do.

Q Could you describe for me what that sentence, what concept that sentence is referring to?

A. I have no recollection of what this sentence was referring to at that point in time I could tell you what I think it means now, but at that point in time, I have no recollection of any examination being done in this area.

Q. Did you have any involvement in the preparation of the December 1990 ACR, sir?

A I think I did.

Q But you don't recall anyone at DOE in that

Page 2047

time frame examining the expansion of allocation periods, for example, the 18 to 36 months?

A I don't recall.

Q. Have you, sir, in the past five years, been looking at the concept of transportation campaigns in your work at Department of Energy?

A Yes, I have

Q You think those would be a good idea when Department of Energy actually picks up fuel, correct?

A Possibly

Q. It's something that the Department of Energy would like to see, correct?

A Possibly

Q. And you say, "possibly," sir. Is it something that you think would be an efficient method of accepting fuel from utilities?

A Again, possibly

Q Sir, if you'd look at the top of page 10, the second sentence, could you read the second sentence into the record?

A Starting with, "The capacity"?

Q Correct

A. "The capacity available for allocation to the purchasers will be equal to the WMS operating capacity, unless part of that operating capacity is

Page 2048

reserved to accommodate contingencies (e g , emergencies) "

Q Mr Pollog, do you – what do you recall about the concept embodied in that sentence?

A Simply, that the contract doesn't give DOE or allow DOE to accommodate emergency situations.

Q. And at this time, DOE was planning to allocate the entire capacity of the WMS system to the purchasers, is that correct?

A. Yes, that's correct.

THE COURT At this time, you mean in 1983?

MR MACDONALD This document, Your Honor, is –

THE WITNESS: I take it 1990, when the document was written, Your Honor

THE COURT 1990?

THE WITNESS: That's what my answer referred to, just so the Court is clear.

THE COURT: Okay

THE WITNESS: And that's what you were intending, Counselor, correct, 1990?

BY MR. MACDONALD:

Q That's correct And it's true today, isn't it, that DOE plans to allocate its entire capacity to the purchasers, correct?

Page 2049

A. Yes

Q Whatever that capacity is?

A Correct

Q And I believe you testified about this earlier, but let me be clear, your current plans are to have a capacity of 3000 tons acceptance, is that right, per year?

A I believe the repository is being designed for a steady state acceptance rate of 3000 metric tons per year, yes.

Q. Sir, that's not going to be a precise amount every year, right at 3000, is it?

A I don't know, I mean, I don't know the answer to that, probably not, but close

Q. Likely, it could be 3100, one year, 2950, another year, sir?

MR GARDNER Your Honor, I'm just going to object –

THE COURT Sustained.

MR GARDNER: Thank you

BY MR MACDONALD:

Q. Mr Pollog, I'd like to direct your attention to Plaintiff's Exhibit 3 –

THE COURT Just to clarify, I mean, he didn't choose those numbers, you chose the numbers

**Tennessee Valley Authority v. U.S No. 01-249C July 12, 2005**

**Heritage Reporting Corporation**

**Page 1561 to Page 1810**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1561

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, ) Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, ) Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, July 12, 2005
Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

Page 1562

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

Page 1563

P R O C E E D I N G S

THE COURT: Good morning. I congratulate our reporter on solving her technical difficulties so promptly. Good job. Do we have any preliminary matters before we continue with the cross-examination of Mr. Kouts?

MR. LO RE: Your Honor, we did have one preliminary matter, and the Court's indulgence, we would like to have a sidebar. Is that possible?

THE COURT: I suppose what we might do -- well, yes, we can always excuse Mr. Kouts temporarily.

MR. LO RE: This is actually something I would prefer is just discussed off --

THE COURT: Let us do this right down by the reporter.

(Discussion off the record.)

THE COURT: The Court thanks counsel and thanks them for their cooperation one with another. With that, Mr. Small, are you ready to continue with your cross-examination?

MR. SMALL: Yes, Your Honor.

Whereupon--

CHRISTOPHER KOUTS

Page 1564

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MR. SMALL:

Q. Good morning, Mr. Kouts.

A. Kouts. Good morning

Q. I'd like to return first to something you talked about yesterday under the heading M&O contractors. Did I have that right?

A. Yes.

Q. Okay. And what is an M&O contractor again?

A. The M&O designation stands for management and operating contractor.

Q. And I believe you talked about documents that were produced by M&O contractors and how there would be some indication that the Department had approved those documents, is that right?

A. I believe my testimony was to the effect that the contractor document was not accepted by the Department unless it was published under the Department's letterhead with the Department's seal and with the Department's document designation.

Q. Okay. And so a document that did not meet the criteria that you've just testified to would simply be a contractor document, as opposed to a DOE

Page 1609

restriction, so if the acceptance rate stated in this document would allow the Department to begin operation and accept waste at an MRS and still be in compliance with the '87 Amendments Act.

Q. Turn to page four, please, paragraph one, and would you please highlight all but the last sentence of that paragraph, please? Would you read that highlighted section into the record please, Mr. Pollog?

A. Yes. "The waste acceptance projections used in this ACR are representative of a FWMS configuration authorized by the NWPA, which included a monitored retrievable storage facility. Article II of the standard contract specifies that, 'The services to be provided by DOE under this contract shall begin, after the commencement of facility operations, not later than January 31st, 1998.' DOE recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998, only if the federal government is able to consummate a timely agreement, which is enacted into federal law with a host state or Indian tribe for the siting of an MRS facility."

Q. Go ahead and read the last sentence there, please.

Page 1610

A. "The Office of the Nuclear Waste Negotiator, the head of which is a representative of the federal government appointed by the President, is actively seeking a state or Indian tribe willing to host an MRS facility or a geological repository."

Q. And does that paragraph comport with DOE's assumptions regarding an MRS facility?

A. Yes, it does.

Q. Do you recall analysis of the utilities' at-reactor storage in 1991 when the 1991 ACR was developed?

A. Vaguely, yes.

Q. And what did that analysis show?

A. It showed that the rate in the 1991, if it was achieved, would, in the aggregate, prevent the need for additional at-reactor storage at the utility sites.

Q. Would you turn to DX-78, please? Mr. Pollog, are you there?

A. Yes.

Q. Thank you. Do you recognize this document?

A. Yes, I do.

Q. Could you describe it for the record, please?

A. Yes, this is an action memo sent from

Page 1611

Mr. Ronald Milner, who was Mr. Brownstein's boss at the time, to Mr. John Bartlett, requesting his approval for publishing the 1991 annual capacity report.

Q. And did you assist in preparing this document?

A. Yes, I did.

Q. And was the document maintained in DOE files in the ordinary course of business?

A. Yes, it would have been.

MS. SNYDER: Your Honor, I would move for the admission of DX-78 into evidence.

MR. SMALL: No objection, Your Honor.

THE COURT: Admitted.

MS. SNYDER: Thank you, Your Honor.

(Defendant's Exhibit Number 78 was received in evidence.)

BY MS. SNYDER:

Q. Mr. Pollog, take a look at page one, the second paragraph under the discussion section. Would you read that paragraph into the record, please?

A. "The 1991 ACR assumes that FWMS operations commence in 1998 and the system configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a monitored retrievable storage

Page 1612

facility with a 10,000 MTU storage limit, prior to repository operations."

Q. Thank you. And does that comport with your understanding of the basis for the 1991 ACR?

A. Yes, it does.

Q. At the time the 1991 ACR was prepared, at what rate was DOE planning to accept spent nuclear fuel?

A. At the rate in the 1991 ACR, which was 4, 6, 900 for the next 8 years.

Q. And that was the rate that we just looked at in the previous document, DX-76, the actual 1991 ACR, is that right?

A. That is correct.

Q. Thank you. And, Mr. Pollog, why wasn't DOE planning on accepting spent nuclear fuel at a 3,000 MTU rate in 1991?

A. We were planning to accept it at an MRS, a monitored retrievable storage facility, and that had a 10,000 to metric ton limit, so the 900 limit -- or 900 MTU rate, if you would go through 2007, was 8,200 MTUs, and then add 900 more for 2008 and 900 more for 2009, that would take you to 10,000 metric tons.

Q. How did the 1991 ACR, which we just reviewed, differ from previous ACRs issued by DOE?

A. Several ways; most importantly, the 1991 ACR, what we said at the time was for real because this was the document that was actually really starting the waste acceptance process. The contract holders would be using allocations stated for them in the 1991 ACR to fill out their delivery commitment schedules. That was the one major difference. The second one, the prior 1990 ACR had two acceptance rates, an upper bound and a lower bound encased, whereas this one just had one rate in it.

Q. Now, you mentioned delivery commitment schedules in your answer. Can you explain what a delivery commitment schedule or a DCS is, please?

A. Yes, it's Appendix C to this contract actually. That is a document the purchasers must fill out, at a minimum, 63 months prior to the year of requested delivery for acceptance of some of their fuel. They would actually start the process by identifying the material that they would want us to pick up under a specific allocation that was stated in the 1991 ACR.

Q. Turn to DX-50, please, Mr. Pollog. And do you recognize this document?

A. Yes, I do.

Q. Can you explain briefly what this document



is, please?

A. Yes, this is a 1987 annual capacity report or ACR.

Q. And did you review the 1987 ACR in preparing the 1991 ACR?

A. Yes, I did.

Q. Go to page two of the document, please, and would you highlight the first full paragraph beginning in? Thank you. Would you please read the highlighted paragraph into the record, please?

A. "Beginning in 1991, the ACR acceptance ranking will be converted into an annual priority ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the purchasers will submit to DOE for approval the delivery commitment schedules identifying the SNF/HLW that purchasers propose to deliver to the DOE Waste Management System, WMS. Once approved, these schedules will become the basis for final delivery schedules to be submitted by the purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility."

Q. And does that paragraph comport with your understanding as to the role of the 1991 ACR?



A. Yes.

Q. And was DX-50 produced, provided to standard contract holders?

A. I believe it was.

Q. Now, if you'll turn back to DX-76, which is the 1991 annual capacity report, please, Mr. Pollog, and go to page nine of that document. And do you see table 3.1 on page nine?

A. Yes, I do.

Q. Would you please explain to the Court what information is contained in table 3.1?

A. Yes, this table is a summary of the purchaser's annual allocations. It's given by year. If you go down the different columns, you'll see in the first column, it identifies specific purchaser, and it goes through the first 10 years of system operation, and the last column is the total. The total sums up all the allocations between year 1 through 10, and at the very last row, it says, "Total," and you'll see 4, 6, 900. That is the waste acceptance rate in any given year.

Q. And does that rate match the rate that we looked at earlier in your testimony?

A. Yes, that's the same rate that I believe was in table 2.1.



Q. And how was this chart compiled?

A. You would go to a document, this also was produced in that year, called the APR, acceptance priority ranking. That is a compilation of all discharges of all the utilities, discharges of their spent fuel, and you would basically break that into blocks with the oldest fuel coming first or the earliest discharges coming first, then you would go down to the first 400 metric tons. Everyone who had a discharge in the first year would appear, an allocation would appear for them. So for the second year, you would go from the cumulative point of 400 to 1,000, which would cover 600 metric tons, and everyone who had a discharge in that block would receive a corresponding allocation in year two, and you would do et cetera for the following year. You would go 900, 900, 900, every contract holder having a discharge would receive a corresponding allocation in this chart.

Q. And if we turned to the line that shows Tennessee Valley Authority, TVA's allocations there, according to the chart, what is TVA's allocation in year one?

A. Zero.

Case 1:04-cv-00106-EJD Document 310-17 Filed 06/23/2008 Page 12 of 40

Page 1657

THE WITNESS: Yes, Your Honor, that's fine with me.
THE COURT: All right. Thank you very much. We're in recess for one hour.
(Whereupon, at 12:32 p.m., a lunch recess was taken.)

Page 1658

AFTERNOON SESSION
(1:32 p.m.)
THE COURT: Mr. Small, I believe when we took our luncheon break, you were about ready to cross-examine Mr. Pollog.
MR. SMALL: That's correct, Your Honor.
THE COURT: You may proceed.
CROSS-EXAMINATION
BY MR. SMALL:
Q. Mr. Pollog, the first thing I would just like to ask a couple questions about would be the rates that appear in the 1991 annual capacity report, which was DX-76. Do you recall that document, sir?
A. Yes, I do.
Q. Okay. And the acceptance rates in that document were 400 for the first year, 600 for the second year, and then 900 for the remaining years of the first 10 years, is that correct?
A. Yes, that's correct.
Q. Now, if I understand things correctly, in your testimony, there was the '87 amendments to the Nuclear Waste Policy Act that led to those 1991 ACR rates, is that correct?
A. They led to the 1991 ACR rates, yes.
Q. Now, in 1995, DOE published a combined

Page 1659

acceptance priority ranking and annual capacity report, is that correct?
A. Yes.
Q. And the rates in that report were the same as the rates in the 1991 annual capacity report, correct?
A. Yes.
Q. Okay. And I believe, if I recall correctly, I made a note, your testimony was that there was no reason to change the rates?
A. I believe I said no reason or no basis to change the rates.
Q. Okay. But now, the 1991 ACR rates contemplated a system beginning with an MRS, didn't it?
A. Yes.
Q. Okay. But by 1995, hadn't the MRS concept been discarded?
THE COURT: Ms. Snyder?
MS. SNYDER: I'm sorry. Objection, foundation, assumes facts not in evidence. I'm sorry.
THE COURT: Overruled. You may answer.
THE WITNESS: Okay. Not fully, partially, but not fully.

Page 1660

BY MR. SMALL:
Q. There was no MRS included in the 1995 TSLCC, was there?
A. I don't know.
Q. Now, in the 1995 APR/ACR, there was some discussion about updating that document, wasn't there?
A. I believe so.
Q. I believe you read some of that discussion in your direct testimony, didn't you?
A. Yes.
Q. About how it was going to be kept updated annually through a loose-leaf publication system?
A. Yes.
Q. Was it kept updated annually through a loose-leaf publication system?
A. Annually, no.
Q. Was it ever updated at all prior to 2004?
A. We never completed another ACR in the period between '95 and 2004.
Q. And that's because your understanding that the office of general counsel probably would not approve publication of an ACR?
MS. SNYDER: Objection, Your Honor, speculation.

Page 1661

THE COURT: The objection is overruled, to the extent, Mr. Pollog, you can answer the question of your own personal knowledge.
THE WITNESS: That is consistent with my personal knowledge, yes.
BY MR. SMALL:
Q. That is consistent with your personal knowledge?
A. Yes.
Q. Okay. And in fact, your boss told you, your boss, Mr. Zabransky, told you that the Department of Energy would not publish an ACR in 1997 because it probably would never be approved by the general counsel, is that correct?
THE COURT: Ms. Snyder?
MS. SNYDER: Objection, assumes facts not in evidence.
THE COURT: Well, I think that's exactly the point of the question, to get some facts in evidence.
MR. SMALL: Your Honor.
THE COURT: Yes, Mr. Small, the problem is the way you framed the question. I'm not having any difficulty with Ms. Snyder's objection. I'm having difficulty with another ground for objection to the

Page 1662

question that is not yet stated. I hate to –
Ms. Snyder?
MS. SNYDER: Your Honor, it calls for hearsay.
THE COURT: Yes, it does. Sustained on that ground.
BY MR. SMALL:
Q. Mr. Pollog, I'd like to call your attention to an exhibit that was marked during your direct examination, Defendant's Exhibit 78. Do you have that, sir?
A. Yes, I do.
Q. Defendant's Exhibit 78 is a December 20, 1991 memorandum recommending approval for publication of the 1991 ACR?
A. Yes.
Q. Okay. And did you work on this document, Defendant's Exhibit 78?
A. I was involved in its preparation. I'm not sure exactly what I did, but I was most likely involved somehow in it or may have given an initial draft, may have reviewed an initial draft. I somehow saw this document in the preparation process.
Q. Are you familiar with it?
A. Yes.

Page 1663

Q. I'd like to draw your attention to page two of the document, the last sentence in the first paragraph there, the sentence reads, "While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998." Do you see that sentence, sir?
A. Yes, I do.
Q. Are you familiar with it?
A. Yes, I am.
Q. The reference to the rate being theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage, that's a reference to an important goal of the program, wasn't it?
A. At times, it was stated as one of the goals of the program. I'm not sure, at this point in time, it was one of the important goals of the program, but historically, if you look at all the documents the program produced and all the goals we had at periods of time, I think that was stated at certain points in time to be a goal of the program.
In 1991, when this was written, I wouldn't call it an important goal. It was something that

Page 1664

would have been good to do, but it wasn't something that we actively sought to do.
Q. Okay. Nevertheless, the memorandum though states that that rate was selected because of that purpose, isn't that correct?
A. That's what the words say, yes.
Q. Well, do you have any reason to believe that that's inaccurate?
A. No, but I believe what I testified to earlier, the primary rate the goals were selected were in compliance with the 1987 Amendments Act, and in addition to meeting the 10,000 metric ton limit, it also achieved this, the primary reason for selection was compliance with the Amendments Act of 1987.
Q. Okay. Now, this goal of eliminating additional at-reactor, out-of-pool storage starting in '98, how would that be achieved at the rates stated in the '91 ACR?
A. I'm not sure what you're asking me. Can you help me a little bit?
Q. Okay. How would that be achieved by the utilities, the meeting of that goal, no additional at-reactor out-of-pool storage beginning in '98, given the rate that was stated in the '91 ACR?

**Southern Nuclear Operating Co. v. U.S. No. 98-614C October 26, 2005**

**Heritage Reporting Corporation**

**Page 1731 to Page 1933**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1731

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING )
COMPANY ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO 98-614C
COMPANY )
Plaintiffs )
v )
THE UNITED STATES )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington D C

Wednesday, October 26 2005

VOLUME 8

The parties met pursuant to the notice of the Judge at 10 00 a m

BEFORE THE HONORABLE JAMES F MEROW

Page 1732

APPEARANCES
ON BEHALF OF THE PLAINTIFFS
M STANFORD BLANTON ESQ
K C HAIRSTON ESQ
S ALLEN BAKER JR ESQ
Balch & Bingham
1710 Sixth Avenue North
Birmingham Alabama 35203
(205) 226-3417
and
RONALD A SCHECHTER ESQ
Arnold & Porter
555 12th Street Northwest
Washington DC 20004
ON BEHALF OF THE DEFENDANT
JOHN EKMAN ESQ
HEIDE HERRMANN ESQ
MARIAN SULLIVAN ESQ
JOSHUA E GARDNER ESQ
ALAN LO RE ESQ
STEPHEN FINN ESQ
U S Department of Justice
1100 L Street Northwest
Washington DC 20530
** Index appears at end of transcript **

Page 1733

P R O C E E D I N G S

JUDGE MEROW Please be seated Mr Ekman do you have a witness today or --

MR EKMAN We do We have a couple witnesses, Your Honor, but before we begin our case, or actually before we call our witnesses at the start of our case there are a few administrative items to take care of

First of all there's still the issue of the government exhibits to which there are no objections I have a list here which I provided the Plaintiffs last week With the exception of DX329 which is still on this list but I've crossed off the list which we're withdrawing, I would ask that to the extent these exhibits have not already been admitted -- and some of them have been For instance there's some administrative record documents in here that were admitted -- that the government's exhibits to which there are no objections by Plaintiffs be admitted

JUDGE MEROW Yes

MR BLANTON. No objection from us on that, Your Honor

JUDGE MEROW Okay the exhibits where

Page 1734

there are no objections are admitted in evidence and as according to the list provided by the -- Mr Ekman

(DX Exhibits were received in evidence and the list filed electronically.)

MR EKMAN Should I provide this list to the court reporter? Or to Ms Strandell?

JUDGE MEROW Yes they should -- we should get it for the record So we don't have a list of those, do we?

MR EKMAN No Did I -- I don't know if I provided these to Ms. Strandell or not.

JUDGE MEROW. We probably ought to file it

MR EKMAN Okay Do you want to file it electronically?

JUDGE MEROW Yeah you could just file the list That would be fine

MR EKMAN Sure, we can do that Absolutely

THE CLERK Judge, do you want to have Southern's list electronically filed? Because I have a hard copy of Plaintiff's prior list

JUDGE MEROW If --

MR BLANTON I'm assuming we could file that electronically, Your Honor

Page 1863

first one to two years I worked in the systems development group working on developing dry storage technologies After that, I went into the systems integration group, which was responsible for developing the technical baseline for the Office of Civilian Radioactive Waste Management program After that, I took a three-year leave of absence, and when I came back from my leave of absence, I went back to the Office of Civilian Radioactive Waste Management and I was in the engineering division, responsible for developing transportation and storage technologies And starting in the fall of 1996, I'd been working in the waste acceptance area until present

Q I think you just mentioned a three-year leave of absence What were you doing during that time period?

A I took an assignment with the International Atomic Energy Agency in Vienna, Austria

Q Could you please tell the Court your educational background?

A Yes I have a Bachelor's of Science in nuclear engineering from Pennsylvania State University, I have a Master of Science in environmental engineering from Clemson University

Page 1864

Q And when did you receive those degrees, sir?

A I received my bachelor's in 1981, and I received my master's in 1988

MR GARDNER. Dawn, could you please put up DX97, please? Your Honor, may I approach the witness?

JUDGE MEROW Yes You have permanent approaching rights

MR. GARDNER: Yes.

BY MR. GARDNER:

Q It's also on the screen for your convenience, if you'd prefer to look at that. Could you identify this document for the record?

A Yes This is the 1991 annual capacity report.

Q Were you involved in the preparation of the 1991 ACR, or annual capacity report?

A Yes, I was

Q What involvement did you have?

A I had direct organizational responsibility for the production, concurrence, approval, publication of this document.

Q What was the purpose of the 1991 ACR?

A It was to provide to purchasers the

Page 1865

allocations they will need to fill out the delivery commitment schedules.

Q Dawn, could you please turn to page 5. Mr Pollog, we put up on the screen table 2.1 on page 5 of the 1991 ACR. What's the information set forth on this table?

A These are the projected waste acceptance rates for spent fuel starting in 1998 going through 2007

Q And what were the rates in the 1991 ACR represented here in table 2.1, what were they based upon?

A They were based upon receipt at a MRS-monitored refuelable storage facility, and in compliance with the 1987 Nuclear Waste Policy Amendments Act, there was a 10,000 metric ton statutory limit on the capacity prior to, I think, construction authorization. It was to comply with that 10,000 metric ton statutory limitation.

Q Dawn, could you please put up DX98? Mr. Pollog, I just handed you Defendant's Exhibit 98 Do you recognize this document?

A Yes, I do.

Q And what is this document?

A This is an action memo seeking the

Page 1866

approval of the director of the Office of Civilian Radioactive Waste Management, seeking his approval for publication of the 1991 annual capacity report.

Q I'd like to turn your attention to the second page of the document, please. And, Dawn, if we could blow up the second full paragraph. I'm sorry, the first full paragraph. I apologize. And if you could highlight the last sentence. Mr Pollog, could you please read that highlighted sentence into the record?

A "While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998 "

Q How does that statement comport with your understanding of the rate contained in the 1991 ACR?

A It is consistent with my understanding

Q Now, this says "in the aggregate." Do you know what that term means in this context?

A Yes, I do.

Q Could you tell me what your understanding is of that term?

A Yeah. It was meant to be on an industrywide basis. If you summed all of the discharges and all of the pool capacities of all of

Page 1903

Q All right And they are subject to being approved by the Department of Energy?
A Yes, that's correct
Q In other words, if a DCS is sent in by a utility that perhaps exceeds their allocation, then it could be subject to being rejected?
A That's correct
Q And the DCSs are reevaluated by the Department of Energy and the utility companies from time to time, are they not?
A I am unaware of any approved DCSs that were ever reevaluated by a purchaser or by the Department of Energy I can't say they haven't been, but I am not aware of that ever happening
Q Okay
A I wasn't involved in this all the time, as we talked about earlier. I took a three-year leave of absence when some of this stuff was going on, so I can't speak for the total history of it, but I'm unaware of this happening.
Q Yeah, well, I'll just – let me pull up, if you would, Plaintiff's 74 I'm sorry, I don't have a copy And this may be just about the time you were –
MR BAKER May I approach, Your Honor?

Page 1904

JUDGE MEROW Yes
BY MR BAKER
Q This may be just about the time you took off for your sabbatical, but I'll show you what's been marked as Plaintiff's 74 Do you recognize that, please, sir?
A Yes, I do
Q Is that a document you're familiar with?
A Yes, it is
Q And I'll show you – and I'm going to take it back from you and we'll put it up on the screen, okay? Let me take that, sir. Sir, this is a cover letter from Mr Detmer, contracting officer of placement administration Do you recognize his name on page 2? Do you know who that is?
A Yes, I do
Q And this was a – go back to page 1, if we could. He was writing to, in this case, our Mr Ron Cocherell of Southern Nuclear, who testified earlier in this trial about – is this a standard cover letter that went out to all the purchasers about how to fill out or that they are receiving in the letter the instructions for the DCS process? Do you understand that?

Page 1905

A Yes, it was a standard letter that was sent to all purchasers
Q All right It went to everybody?
A That's correct
Q All right. And the enclosure had instructions on how to go about filling out the DCS for submittal back to the Department of Energy?
A That's correct.
Q All right. We were talking about the ability, the – when circumstances changed that a DCS could be reevaluated – and I would like to turn to page 2, paragraph 7C. And if you would – all right, sir. If you would, just read that, please, sir.
A Sure "The annual acceptance rates in the 1991 ACR provide an approximation of the federal FWMS," that's federal waste management system, "acceptance capacity and are for planning purposes The process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rates reflected in the 1991 ACR In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers."
Q All right, sir. So from that, reasonable interpretation would be that the DCSs actually were

Page 1906

subject to change depending on how circumstances changed.
A This was intended to be a bilateral modification to the DCS that both parties would attempt to agree to a change, yes.
Q All right, sir And they – in other words, the DCS that is authorized by the Nuclear Waste Policy Act was never intended to be a firm contract number that the DOE was bound by as well as the purchaser?
A Well, I've always believed that an approved DCS was a firm commitment on both parties for a certain action That's always been my belief
Q All right Sir, it's true, though, that that view is not shared by everybody within the Department of Energy Isn't that a fair statement?
A I guess it depends on what time frame you're asking about
Q Well, let's talk about in the early '90s
A I think that's probably true, then. It wasn't shared by everybody in the department.
Q Okay. It just happens to be your personal belief that it is?
A That's correct.
Q The – is it also your belief that the

**Northern States Power Company v. U.S No. 98-484C November 15, 2006**

**Heritage Reporting Corporation**

**Page 3599 to Page 3771**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3599

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff ) Case No
vs ) 98-484C
THE UNITED STATES, )
Defendant )

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D C

Wednesday, November 15, 2006

VOLUME 12

The parties met, pursuant to the notice of the Judge, at 10:01 a m.
BEFORE THE HONORABLE JOHN P WIESE

Page 3600

APPEARANCES

ON BEHALF OF THE PLAINTIFF
ALEX D TOMASZCZUK, ESQ
DANIEL S HERZFELD,, ESQ
Pillsbury Winthrop Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
(703) 770-7900
and
JAY E SILBERG, ESQ
Pillsbury Winthrop Shaw Pittman, LLP
2300 N Street, N W
Washington, D C 20037-1122
(202) 663-8063

Page 3601

APPEARANCES CONTINUED·

ON BEHALF OF THE DEFENDANT
ALAN J. LO RE, ESQ
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ
U S Department of Justice
1100 L Street, N W.
Washington, D C. 20530
(202) 305-7562

(Index appears at end of transcript)

Page 3602

P R O C E E D I N G S

THE COURT We can go on the record Any preliminary matters? Mr. Tomaszczuk
MR TOMASZCZUK None from the plaintiff, Your Honor Good morning
THE COURT Ms Herrmann, good morning
MS HERRMANN Good morning, Your Honor None from the Government
THE COURT Very well Then we will move on with the Government's next witness Is that right?
MS SULLIVAN Yes. Good morning, Your Honor
THE COURT Good morning
MS SULLIVAN We'd like to call Mr Thomas Pollog to the stand
THE COURT Mr Pollog Will you take the stand for us please And the reporter needs to know that the questioning will be by Ms Sullivan
MS SULLIVAN Thank you, Your Honor
Whereupon,
THOMAS E POLLOG

Page 3719

BY MR. HERZFELD:

Q So is it your view that, by stopping the approval of DCSs, your understanding is that the Department of Energy could unilaterally cut off its obligations to all purchasers; is that correct?

A No. I don't think that's what I said. I'm trying to specify – we've cut off our obligation to perform waste acceptance in a certain time period. All material still covered by that contract is the material we will eventually be obligated to take.

Q That's not the question I'm asking. I'm asking for the time period between now and 2025. Could you unilaterally cut off your obligations by cutting off the approval of the DCSs?

MS. SULLIVAN: Your Honor, I'm troubled by Mr. Herzfeld's question. It seems to be introducing an element of bad faith into what DOE – what Mr. Pollog has explained why DOE did what it did with regard to the suspension of the DCS process.

THE COURT: Ms. Sullivan, I think what we're doing here is probing the legal significance of the delivery-commitment schedule process. And

Page 3720

what we're examining is this witness' understanding of how the fulfillment of its contract responsibilities can exist side by side with the suspension of the delivery-commitment schedule process.

MS. SULLIVAN: Understood, Your Honor. Thank you.

THE COURT. So that's where we are.

MS. SULLIVAN: That's fine, Your Honor.

MR. HERZFELD. Okay. Now I am going to hopefully introduce this into evidence because –

THE COURT: I'm not sure that we got the last question answered.

MR. HERZFELD: He did not answer. Well, then I guess I would – if I could ask you to answer the last question. If you could read it back.

(The reporter read the record as requested )

THE WITNESS: Well, that's what we believe we did, so yes.

BY MR. HERZFELD:

Q So the answer is, yes, that you could unilaterally cut off your obligations by no longer approving DCSs?

Page 3721

A That's what we try to do, yes.

Q Thank you.

THE COURT: What do you mean by obligation? What do you understand the term obligation to mean in the context of counsel's question to you?

THE WITNESS: I'm referring to a specific obligation to take a specific amount of material in a specific period. This has to be taken, these 10 metric tons of uranium in 2003 or 2007. A specific commitment to accept a specific amount of material by a specific time period. That's what I believe he's asking me.

BY MR. HERZFELD:

Q So if I understand your answer correctly, the DCS just commits you to the amount of fuel. It doesn't actually commit to the time period.
So, for example, if DOE didn't begin performing until 2025, it would have no obligation – no contractual obligation?

A The DCS –

MS. SULLIVAN: One moment, Your Honor. Your Honor, we'll just let the question go. Thank you.

Page 3722

THE WITNESS: The DCS does contain a time period. It has a year on it. So it has a year and an amount.

BY MR. HERZFELD:

Q Okay. And I must have misunderstood your answer. Because I thought you said it was a definite commitment to the amount but not the year?

A No. I said year and amount because they're both clearly on the DCS form.

Q So let me shift gears just slightly and ask you, is your understanding of the purpose of DOE stopping the approval of DCSs was to limit DOE's liability?

MS. SULLIVAN: Objection to the extent it calls for legal conclusion. The question could be his understanding as to the effect or something. Your Honor, limiting liability, that's a province for the general counsel's office.

THE COURT: All right. With that modification –

MR. HERZFELD: I don't think – I think I said, is it your understanding that the purpose of stopping the approval of DCSs was to limit DOE's liability?

Page 3735

THE COURT: By all means, proceed.
REDIRECT EXAMINATION
BY MS. SULLIVAN:
Q Mr. Pollog, could I ask you to look at the exhibit that we were just looking at, PX-1019. And could I direct your attention to page 3 of that document, ending Bates Number 1829.
THE COURT: Madam Reporter, you may be correcting this, but I said "by all means, please proceed."
THE COURT REPORTER: Yes. That's what I have.
THE COURT: Okay.
BY MS. SULLIVAN:
Q Mr. Pollog, are you on that page?
A Yes.
Q May I ask you to please read paragraph -- the second paragraph under the conference report language that begins "in identifying."
A In identifying the potential alternatives available to NSP for addressing Prairie Island spent fuel management, Department has not attempted to interpret any laws enacted by the state of Minnesota that may govern decisions

Page 3736

regarding implementation of any alternative. Furthermore, the Department takes no position on the degree to which any of these alternatives may be or have been applied at Prairie Island, nor the degree to which they may be effective, alone or in combination, in extending the duration of the operation of the Prairie Island Units 1 and 2.
Q Thank you. Mr. Pollog, if you had been asked to perform a similar analysis for another plant owned by another utility, would your list of options have been different?
A Possibly, yes.
Q Could it have been the same list of options?
MR. HERZFELD: Objection. Asked and answered. And leading.
THE COURT: I sustain that objection.
BY MS. SULLIVAN:
Q Mr. Pollog, did you discuss the situation at NSP with anyone at NSP prior to the preparation of this report?
A No, we did not.
Q Okay. What is the status of PFS today?
MR. HERZFELD: Objection. Calls for speculation. And relevance.

Page 3737

THE COURT: I'm assuming, since the witness exhibited knowledge of the existence of a private full storage facility at the time that report was authored in '01, I'm assuming that he is able to answer the question today regarding that facility status.
MS. SULLIVAN: Your Honor, I can lay a foundation for the question and then ask it.
THE COURT: This witness has put out in his report as among the alternatives that Northern States may rely upon the availability of a private storage facility. That exhibits his knowledge of that facility and, thus, the relevance and permissibility of the question asked.
MR. HERZFELD: We withdraw our objection.
BY MS. SULLIVAN:
Q Mr. Pollog, what is the status of PFS today?
A As far as I know, it's dead right now.
THE COURT: As far as I know, it is what, Mr. Pollog?
THE WITNESS: Dead.
THE COURT: Okay.
MR. HERZFELD: Thank you. I didn't hear

Page 3738

him either, Your Honor.
BY MS. SULLIVAN:
Q Mr. Pollog, do you recall you testified on cross --
THE COURT: Excuse me. May I interrupt?
MS. SULLIVAN: Yes.
THE COURT: How did you learn about the private fuel storage facility in the first instance?
THE WITNESS: The initiative was in nuclear periodicals.
THE COURT: I see.
THE WITNESS: Journals. There was discussions of it in different conferences, seminars throughout the nuclear industry, seminars, symposiums, conferences concerning spent fuel management in the nuclear industry.
THE COURT: I see.
BY MS. SULLIVAN:
Q Is this the same source for your current understanding is the current status of PFS?
A Yes.
Q Mr. Pollog, during questioning by Mr. Herzfeld, there was an exchange with regard to DOE's -- whether Department of Energy was

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------- X

DAIRYLAND POWER COOPERATIVE, )

Plaintiff, )

vs. ) No.

UNITED STATES OF AMERICA, ) 04-106C

Defendant. )

------------------------------- X

Washington, D.C.

Friday, May 4, 2007

Deposition of:

THOMAS POLLOG,

called for oral examination by counsel for Plaintiff, pursuant to notice, at the Law Offices of Greenberg Traurig, LLP, 800 Connecticut Avenue, Suite 500, Washington, D.C., before Kathy Savich, Registered Professional Reporter, of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:24 a.m., when were present on behalf of the respective parties:



©2007

APPEARANCES

On Behalf of the Plaintiff DAIRYLAND POWER COOPERATIVE
Greenberg Traurig, LLP
800 Connecticut Avenue
Suite 500
Washington, D.C. 20006
(202) 452-4878
sternk@gtlaw.com
caplenr@gtlaw.com
stouckj@gtlaw.com
BY. KEVIN E STERN, ESQUIRE
ROBERT A. CAPLEN, ESQUIRE
JERRY STOUCK, ESQUIRE

On Behalf of Defendant UNITED STATES OF AMERICA
U.S Department of Justice - Civil Division
1100 L Street, N.W.
Room 10150
Washington, D C 20005
(202) 307-6288
marian.sullivan@usdoj.gov
patrick bryan@usdoj.gov
BY. MARIAN E. SULLIVAN, ESQUIRE
PATRICK B. BRYAN, ESQUIRE



CONTENTS

EXAMINATION BY: PAGE
Mr. Stern 5
Ms. Sullivan 212
Mr. Stern 216

POLLOG DEPOSITION EXHIBITS: PAGE
1 Email string from 7/26/01 32
2 Email with attachment from Barton to Pollog and Zabransky dated 5/20/02 37
3 Notice of deposition 41
4 Annual capacity report dated 12/9151
5 GAO report titled, "Nuclear Waste: Operation of Monitored Retrievable Storage Facility is Unlikely by 1998" dated 9/91 59
6 Memo from Milner dated 12/20/91 81
7 Annual capacity report dated 6/88 86
8 Acceptance priority ranking and annual capacity report dated 3/95 97
(Exhibits continued on the next page.)



POLLOG DEPOSITION EXHIBITS: PAGE
9 Acceptance priority ranking and annual capacity report dated 7-04 109
10 DOE instructions for completing Appendix C of the DCS 119
11 Letter with attachments from Strand to Berg dated 12/22/92 142
12 Letter with attachment from Zabransky to Berg dated 7/28/04 146
13 Memo from Chris to Margaret and Ted dated 11/15/04 157
14 Letter from Zabransky to Berg dated 12/1/04 160
15 Dairyland's standard contract 168
16 FICA project cask handling assessment for LACBWR dated 10/90 185
17 Spreadsheet Bates stamped CTR-013-2788 through 2793 202
(Exhibits attached to transcript)



PROCEEDINGS

Whereupon,

THOMAS POLLOG,

called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. STERN:

Q. Good morning, Mr. Pollog.
A. Good morning.
Q. Hi. I'm Kevin Stern, and I represent, along with my colleague here, Mr. Caplen, Dairyland Power Cooperative in its suit against the United States regarding the removal of spent fuel from its LACBWR facility, Lacrosse boiling water reactor facility. Are you familiar with Dairyland?
A. Yes.
Q. How are you familiar with Dairyland?
A. I know they had a nuclear reactor there. I'm familiar with the nuclear




©2007

Page 30

THE WITNESS: Not to my knowledge.
BY MR. STERN:
Q. Did you have any involvement in the development of the criteria for the MPC system, canister system?
MS. SULLIVAN: Same objections.
THE WITNESS: I had no involvement in the development of the criteria for the MPC.
BY MR. STERN:
Q. Are you aware that in this case the government has indicated that it believes that it would have taken Dairyland's failed fuel on a different schedule than it would accept its other spent fuel?
MS. SULLIVAN: Objection. Legal conclusion. Foundation. Vague. Assumes facts not in evidence.
THE WITNESS: I'm not familiar with DOE's position regarding Dairyland's specific spent fuel regarding this issue right now.
BY MR. STERN:

Page 31

Q. And you've had no discussions with anyone other than counsel regarding this issue in this case?
MS. SULLIVAN: Same objections. And I direct the witness not to answer as to the substance of any conversations with counsel with regard to this issue.
MR. STERN: My question said other than with counsel.
MS. SULLIVAN: I'm just making my objection, Counsel.
THE WITNESS: I have had no discussions regarding Dairyland's spent fuel -- acceptability or delayed acceptance of Dairyland's spent fuel, specifically.
THE REPORTER: I'm sorry. Can you say that again?
THE WITNESS: I have had no specific discussions regarding the acceptability of Dairyland's failed fuel or any delayed acceptance of Dairyland's failed fuel.

Page 32

(Deposition Exhibit No. 1 was marked for identification.)
BY MR. STERN:
Q. Mr. Pollog, you have been handed what has been marked Exhibit 1 to your deposition. And Exhibit 1, does it appear to be an email thread dated July 26, 2001?
A. Yes.
MR. STERN: I should state for the record that there appears to be, on the last page of this document, an email from November 5th, 1999, which I think was mistakenly --
MS. SULLIVAN: And it's not consecutively Bates numbered. I don't think it's part of the exhibit.
MR. STERN: I would agree with that, so you can pull that page off.
THE WITNESS: The last page?
MR. STERN: Yes, that's fine.
BY MR. STERN:
Q. And I'm turning to the second page

Page 33

of this document which has the last three digits of the Bates numbers 421. Do you see that?
A. Yes. You said 421?
Q. 421, yes. And is this an email from you to Bill Teer?
MS. SULLIVAN: Objection. Best evidence.
THE WITNESS: Yes.
BY MR. STERN:
Q. And who is Bill Teer?
A. He was a gentleman who worked for our M&L contractor.
Q. Could you tell me what this email is concerning?
MS. SULLIVAN: Objection. Vague. Best evidence. And relevance.
THE WITNESS: It appears to be an email from myself to Bill Teer requesting transportation infrastructure capability for six different sites that have shut down and I believe reactors that are undergoing

Page 46

THE WITNESS: It ranks the fuel that has been discharged by the purchasers by date of discharge. It forms the basis of developing the waste acceptance schedule.

BY MR. STERN:

Q. Is there any other purpose and role for the ACR annual acceptance priority rankings?

MS. SULLIVAN: Objection. Vague. Legal conclusion. Best evidence.

THE WITNESS: Not that I can think of.

BY MR. STERN:

Q. Is it the government's contention that annual capacity reports are binding upon the parties?

MS. SULLIVAN: Objection. Legal conclusion. Vague.

THE WITNESS: I don't know whether they're legally binding. That would be something that would have to be determined by a court or by way of recommendations from our

Page 47

counsel. We produce it because it's called out for by the contract. We fulfill our obligation by doing that.

BY MR. STERN:

Q. So you cannot say -- you are testifying on the government's behalf in this case. You cannot tell me whether or not it's the government's contention that ACRs are legally binding upon the parties?

MS. SULLIVAN: Objection. Legal conclusion. Vague. Mischaracterizes the witness' prior testimony. And asked and answered.

THE WITNESS: The ACRs are called out for by the contract. We produced them consistent with the contract. They're for planning purposes. Whether they're legally binding, I'm not sure. I don't know. It's not something I've ever considered.

BY MR. STERN:

Q. You personally have never considered that question?

Page 48

MS. SULLIVAN: Objection. Legal conclusion. Vague. Relevance.

THE WITNESS: Yes.

BY MR. STERN:

Q. Well, you've -- in preparation for this deposition, you read several ACRs; is that right?

A. Yes.

Q. And isn't it a fact that all -- each one of these ACRs that you reference that you read, the '87, '88, '90 and '91 ACRs, they all contain a statement that says that these are not legally binding on the parties?

MS. SULLIVAN: Objection. The documents are the best evidence of their content. Vague.

THE WITNESS: I don't know. I don't recall that statement.

BY MR. STERN:

Q. One way or the other?

A. One way or the other.

(Deposition Exhibit No. 4 was

Page 49

marked for identification.)

BY MR. STERN:

Q. Mr. Pollog, you've been handed what has been marked Exhibit 4 to your deposition. Let me direct your attention to paragraph 1.1 entitled, "Purpose of the Annual Capacity Report."

Do you see that?

A. Yes.

Q. And if I could direct your attention to the last sentence in that paragraph on that page. It states, "As specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or purchasers."

Do you have any basis to disagree with that statement?

MS. SULLIVAN: Objection. Best evidence. Legal conclusion.

THE WITNESS: No.

BY MR. STERN:



 ©2007

with?
MS. SULLIVAN: Objection. Vague
THE WITNESS: Dave Zabransky.
BY MR. STERN:
Q. And what did Mr. Zabransky tell you?
MS. SULLIVAN: Objection. Vague Hearsay.
THE WITNESS: The reason the rates that are in this document are here are they just took the ones from the prior one.
BY MR. STERN:
Q. From the previous ACR?
MS. SULLIVAN: Objection. Vague Best evidence.
THE WITNESS: Yes.
BY MR. STERN:
Q. Any other reason besides -- is there any other reason besides just taking the rates from the previous ACR that this acceptance rate schedule is set forth in this '95 ACR?



MS. SULLIVAN: Objection. Vague Compound.
THE WITNESS: That was the only reason that was given to me.
BY MR. STERN:
Q. And you're not aware of any other reason?
MS. SULLIVAN: Objection. Vague
THE WITNESS: No.
BY MR. STERN:
Q. At the time that the -- this ACR, the '95 ACR, was issued, what was the status of whether an MRS facility was going to be opened up to accept spent fuel?
MS. SULLIVAN: Objection. Foundation. Beyond the scope. Vague.
THE WITNESS: It was unknown.
BY MR. STERN:
Q. Well -- so you don't know whether it was -- you don't recall whether it was likely or unlikely at the time?
MS. SULLIVAN: Objection.



Foundation. Beyond the scope. Vague.
THE WITNESS: At this point in time and the years after that, the status, I would say, was probably -- it kept changing. There were several pieces of legislation introduced. We had produced a topical safety analysis report on a centralized interim storage facility submitted to the NRC. So it was -- I mean, it was unknown. We were ready to go forth with it if Congressional action was completed.
There was no, I think, definitive answer. It was unknown. We were prepared to go forward with it. Legislation had been introduced several times in several different years, so it was unknown. That's the best answer I can give you.
BY MR. STERN:
Q. At what point did DOE amend the MRS concept?
MS. SULLIVAN: Objection. Beyond the scope. Foundation. Vague.



THE WITNESS: Probably in the late '90s.
BY MR. STERN:
Q. 1999?
MS. SULLIVAN: Objection. Foundation. Beyond the scope. Vague.
THE WITNESS: I don't know the last time legislation was proposed regarding MRS. It may have been '99. It may have been '98. It may have been even '97. I just don't recall. We went through an almost yearly process where a new bill was introduced in Congress regarding siting an MRS or having an MRS as part of our system.
And I just don't recall the last time that legislation was brought up or introduced. I don't recall specifically what year we submitted our topical safety analysis report for a centralized interim storage facility to the NRC somewhere around the '96, '97, '98 time frame. Somewhere around there. I just don't know specifically when.



 ©2007

Page 126

extent it mischaracterizes the document. Best evidence.
You can answer.
THE WITNESS: Yes.
BY MR. STERN:
Q. Did these instructions provide any mechanism for a party to protest -- or a purchaser to protest or challenge the acceptance rates for allocations that are set forth in the '91 ACR?
MS. SULLIVAN: Objection. Best evidence.
THE WITNESS: No.
MS. SULLIVAN: And to the extent it calls for a legal conclusion.
THE WITNESS: No.
BY MR. STERN:
Q. Now, is it DOE's position that an approved DCS that was submitted pursuant to these '91 instructions, that those are legally binding upon DOE and the utilities -- purchasers?

Page 127

MS. SULLIVAN: Objection. Legal conclusion. Beyond the scope of the rule 30(b)(6) notice, specifically covered by another 30(b)(6) notice of Mr. Zabransky. Foundation. Vague.
THE WITNESS: Yes.
BY MR. STERN:
Q. So that's DOE's position?
MS. SULLIVAN: Same objections.
THE WITNESS: Yes.
BY MR. STERN:
Q. And what is the basis for DOE's position that the approved DCS is legally binding upon the parties?
MS. SULLIVAN: Objection. Beyond the scope. Foundation. Mr. Pollog is not here as a rule 30(b)(6) witness on this topic. Vague.
You can answer.
THE WITNESS: They're signed out by -- the approved DCS is signed by a DOE contracting officer. They have the authority

Page 128

to legally bind the government to a commitment to what was in the DCS.
The purchaser also certified that an individual duly authorized to bind the purchaser signed the DCS, certifying that the purchaser has the legal right to deliver such estimate to DOE.
So when -- the DOE contracting officer signs it and binds the government, and the purchaser, an individual duly authorized to bind the purchaser, signs the DCS -- so both parties have individuals signing documents that have legal authority to -- have authority to bind the party.
BY MR. STERN:
Q. And you're reading from the instructions?
A. Yes.
Q. What part are you reading from?
A. Page 7, certifications.
Q. So a certification, according to these instructions, is signed by the purchaser

Page 129

that he's -- by signing it, it's "certifying that the purchaser has the legal right to deliver SNF to DOE."
Is that right?
MS. SULLIVAN: Objection. The document is the best evidence of its content. Objection to the extent it calls for a legal conclusion.
BY MR. STERN:
Q. Isn't that what it says?
MS. SULLIVAN: Same objection.
THE WITNESS: It says, "An individual duly authorized to bind the purchaser must sign the DCS."
BY MR. STERN:
Q. Does it say bind the purchaser to the terms of the DCS? Is that what it says?
MS. SULLIVAN: Objection. The document speaks for itself. Objection to the extent it calls for a legal conclusion.
THE WITNESS: It says, "An individual duly authorized to bind the



 ©2007

Page 130

purchaser must sign the DCS, certifying that the purchaser has the legal right to deliver such SNF to DOE."
That's what it says.
BY MR. STERN:
Q. So it's your interpretation that that statement there, the signature on the DCS -- by doing that, that binds the purchaser to the delivery of that spent fuel set forth in that DCS; is that right?
A. Yes.
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. STERN:
Q. Other than this statement here, is there any other basis for DOE's position that you're aware of that the DCSs are legally binding upon the parties?
MS. SULLIVAN: Objection. Beyond the scope of Mr. Pollog's rule 30(b)(6) deposition. Foundation. Vague. And to the

Page 131

extent it calls for a legal conclusion.
THE WITNESS: And also that when the DOE contracting officer signs the document, that they have authority to bind the government on -- the contracting officer was signing, approved. That was binding the government, DOE, to that commitment.
BY MR. STERN:
Q. If a utility does not have an approved DCS, or any approved DCSs, does that mean that it is DOE's position that DOE has no obligation to pick up any of its spent fuel?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Beyond the scope of Mr. Pollog's 30(b)(6) notice. Foundation. Vague.
THE WITNESS: No.
BY MR. STERN:
Q. So DOE still has -- believes that even though a utility doesn't have any signed DCSs or approved DCSs, that it still has a legal obligation to pick up a utility's spent

Page 132

fuel; is that right?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Beyond the scope of Mr. Pollog's 30(b)(6) notice. Foundation.
THE WITNESS: Yes.
BY MR. STERN:
Q. Do you know when DOE first took a position that approved DCSs are legally binding upon the parties?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Beyond the scope of Mr. Pollog's 30(b)(6) notice. Foundation.
THE WITNESS: No.
MS. SULLIVAN: Can we take a break for two seconds? I need talk to Mr. Pollog in the hall.
(Discussion off the record.)
BY MR. STERN:
Q. Didn't DOE at one point have a position that DCSs were not legally binding

Page 133

unless there was an operating waste acceptance facility?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Beyond the scope of Mr. Pollog's 30(b)(6) deposition notice. Foundation.
THE WITNESS: I believe so.
BY MR. STERN:
Q. So at one point DOE didn't -- at one point there were approved DCSs back in '91 -- or pursuant to the 1991 DCS instruction, DOE approved DCSs submitted by utilities, right?
MS. SULLIVAN: Objection. Beyond the scope of Mr. Pollog's 30(b)(6) notice. Foundation.
THE WITNESS: Yes.
BY MR. STERN:
Q. And at this time those DCSs were approved, there was no operating waste acceptance facility, correct?
MS. SULLIVAN: Objection. Beyond

Page 170

for a legal conclusion. Beyond the scope of the 30(b)(6) deposition. Foundation.

THE WITNESS: Yes, that would be the initial thing they would do if they disagreed with what was in the annual capacity report.

BY MR. STERN:

Q. And, similarly, if a -- if a utility or purchaser did not like -- did not agree with the acceptance rates that were published in the ACR, they could also raise a dispute pursuant to this?

MS. SULLIVAN: Same objections.

THE WITNESS: I would imagine they could have, yes.

BY MR. STERN:

Q. And how would that -- how would that get resolved if one utility says, "I don't like these acceptances rates; they're too low, and as a result I'm going to have to incur a lot of extra costs for my spent fuel," do you have any idea how that could possibly

Page 171

get resolved under a dispute clause like this?

MS. SULLIVAN: Objection. Speculation. Beyond the scope of the 30(b)(6) notice. Foundation. And calls for a legal conclusion. And vague.

THE WITNESS: Well, we have never gotten there, so I don't know for sure how it would go because nobody has ever disputed it in regard to the acceptance rates or the allocations. But, again, it goes to the D.C. -- or DOE board of contract appeals, is what it says in this clause.

BY MR. STERN:

Q. So if all the utilities raise that issue, they would have to take it up with the DOE contract appeals board?

MS. SULLIVAN: Objection. Speculation. Calls for a legal conclusion.

BY MR. STERN:

Q. That was the remedy?

MS. SULLIVAN: Objection. Compound. Speculation. Legal conclusion.

Page 172

Beyond the scope of the 30(b)(6) notice. Foundation. Relevance.

THE WITNESS: We would follow what the contract says, and that is what is written in article 16.

BY MR. STERN:

Q. Okay. But other than the disputes clause that we've been talking about here, was there any other event -- is it DOE's position that it could -- strike that.

Do you believe that the 900 MTU acceptance rate set forth in the '91 ACR is consistent with the intent of the parties under the standard contract?

MS. SULLIVAN: Objection. Calls for a legal conclusion. Beyond the scope of rule 30(b)(6) notice. Foundation. Vague.

(The reporter read the record as requested.)

MS. SULLIVAN: Same objection.

THE WITNESS: I wasn't around when the contract was written, so I don't know what

Page 173

they intended in 1983, '84. I don't know.

BY MR. STERN:

Q. If DOE decided that the acceptance rate would be 10 MTU per year, do you believe that it would be consistent with its obligations under the standard contract?

MS. SULLIVAN: Objection. Calls for a legal conclusion. Beyond the scope of the 30(b)(6) deposition notice. Foundation. And speculation.

THE WITNESS: It's not something I've ever pondered.

BY MR. STERN:

Q. So you don't have a position one way or another on that?

MS. SULLIVAN: Same objection. Asked and answered.

THE WITNESS: It's not a scenario that I've ever thought about or ever even brought up to me, so I don't have an opinion.

BY MR. STERN:

Q. Well, do you believe that a 900 MTU

acceptance rate is DOE fulfilling its obligations under the spent fuel contract?

MS. SULLIVAN: Objection. Calls for a legal conclusion. Beyond the scope of 30(b)(6) deposition notice. Foundation. Asked and answered.

THE WITNESS: Yes, I believe if we would have began waste acceptance in '98 at the rate specified in 1991, considering the limitations on the program brought upon us by the Nuclear Waste Policy Amendments Act of 1987, that we would have fulfilled our obligation.

BY MR. STERN:

Q. So based upon the circumstances that existed at the time, you believe that DOE would have been performing its obligations if it had a 900 MTU acceptance rate?

MS. SULLIVAN: Objection. Mischaracterizes the witness' prior testimony. Calls for a legal conclusion. Beyond the scope of the 30(b)(6) deposition notice.



Foundation.

THE WITNESS: Based upon the situation in 1991 when we published the ACR, considering the legal limitations on the program placed on us by the Nuclear Waste Policy Amendments Act of '87, yes, I thought that would have fulfilled our obligations.

BY MR. STERN:

Q. And those limitations did not exist at the time the parties entered into the standard contract, right?

MS. SULLIVAN: Objection. Calls for a legal conclusion. Beyond the scope of the 30(b)(6) deposition notice. Foundation.

THE WITNESS: Since the amendments act was enacted in 1987, it wasn't in place in '83 or '84.

BY MR. STERN:

Q. Let's move on to the last 30(b)(6) topic, and that's all efforts undertaken by or on behalf [sic] to examine the manner or process by which DOE would remove spent fuel



from the Dairyland site.

My first question is, what efforts have been undertaken by or on behalf of DOE to examine the manner or process by which DOE would remove spent fuel from the Dairyland site?

MS. SULLIVAN: Objection. Overbroad. Vague.

THE WITNESS: There was the FICA analysis, FICA report that has been done -- FICA being facility interface capability assessment. There was NSTI activity -- which is near site transportation infrastructure program. There was the SPD program, which is the service planning document effort. There was the FIDS efforts, which is facility interface data sheet.

And that's all I can think of right now.

BY MR. STERN:

Q. And what is the facility interface capability assessment report, I guess, FICA?



A. The FICA initiative was to evaluate the on-site capability of facilities for transportation. It looked at all the capabilities of a facility inside the gate to the reactor.

Q. And what about the NSTI study or report?

A. That looked at the off-site capabilities within the facility and the nearest major transportation infrastructure point, such as interstate highways, railroad, barges -- waterways for barge shipping. So the FICA went inside the gate, from the facility to the gate; the NSTI ran from the gate to the nearest major transportation interface.

Q. And when were these assessments conducted by DOE?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: They started in the mid to late '80s, probably the late '80s, and went to approximately 1990, '91, '92 time





©2007

**Carolina Power & Light & FL Power v US No. 04-37C November 9, 2007**

**Heritage Reporting Corporation**

**Page 1163 to Page 1380**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1163

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------------x
CAROLINA POWER & LIGHT COMPANY and :
FLORIDA POWER CORPORATION, :
Plaintiffs, :No. 04-37C
vs. :
THE UNITED STATES, :
Defendant. :
------------------------------------x

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Friday, November 9, 2007
Volume 5

The parties met, pursuant to the notice of the Judge at 9:31 a.m.

BEFORE THE HONORABLE THOMAS C. WHEELER

Page 1164

APPEARANCES:
ON BEHALF OF PLAINTIFFS:
Arnold Bradley Fagg, ESQUIRE
Paul Bessette, ESQUIRE
Linda Eaton, ESQUIRE
David Kerr, ESQUIRE
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5191

ON BEHALF OF THE DEFENDANT:
Andrew P. Averbach, ESQUIRE
Christopher J. Carney, ESQUIRE
Marian Sullivan, ESQUIRE
Lisa Donahue, ESQUIRE
U. S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
12th Floor
Washington, D.C. 20530
(202) 353-0527

(Index appears at end of transcript)

Page 1165

P R O C E E D I N G S
(9:31 a.m.)
THE COURT: So let's see, Mr. Lehmann. Please come forward, sir. Good morning, you understand you're still under oath in these proceedings?
THE WITNESS: Yes, Your Honor.
Whereupon--
THOMAS LEHMANN
a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
THE COURT: Very well, you may go ahead, Mr. Averbach.
MR. AVERBACH: Thank you, Your Honor. Before I begin, there are actually two new faces in the courtroom I wanted to make sure the Court was aware of. First is my colleague Alan Lo Re, from the Department of Justice.
THE COURT: Yes, good morning, Mr. Lo Re.
MR. LO RE: Good morning, Your Honor.
THE COURT: Nice to see you.
MR. AVERBACH: The second is not really a new face, who has been here from the

Page 1166

beginning, but who's operating the AV equipment. Charles Jackson has been here assisting us, and I didn't introduce him previously.
THE COURT: All right, thank you.
CROSS-EXAMINATION (Resumed)
BY MR. AVERBACH:
Q. Mr. Lehmann, when we left off yesterday, we were discussing some of the options that had been set forth before project approval, and we had been through the first two options, and I had begun asking you about reverse osmosis, and I believe right before the break, I'd asked you a question concerning what would happen, what the ramifications of performing reverse osmosis might be on the rate of Boraflex degradation, so let me go back to that particular issue.
Now, Mr. Lehmann, removing silica could potentially have the effect of increasing the rate of Boraflex degradation, correct?
A. Not necessarily, not necessarily true.
Q. Could it have the effect of increasing the rate of Boraflex degradation?
A. Again, as I spoke yesterday, the two

Page 1263

Q. You testified about DCSes a lot?
A. Yes.
Q. Okay. It's your belief that when a utility filled out a DCS and the DOE approved it, that that was binding, is that a fair statement?
A. Yes.
Q. Let's explore that a little bit, Mr. Pollog. You'd acknowledge that the view wasn't shared unanimously in the Department of Energy, correct?
A. Yes.
Q. Prior to the Indiana Michigan decision in the D.C. circuit, do you know the case I'm talking about?
A. Vaguely.
Q. In any event, there was a period of time when the Department of Energy took the position that it did not have a commitment to utilities, unless there was an operating repository, is that a true statement?
A. I believe so. Again, I wasn't involved in the waste acceptance program at that point in time. I wasn't even in the country for a large part of that time?

Page 1264

Q. You're the Department of Energy's representative in this proceeding, right, Mr. Pollog?
A. Yes, I am.
Q. The Department of Energy issued a Federal Register notice, didn't it, saying that the Department of Energy has no obligation, absent the commencement of operations at a repository?
A. I believe so.
Q. So the Department of Energy officially took the position that, unless there was an operating repository, it had no obligations to utilities to commence acceptance of spent nuclear fuel?
MR. LO RE: Objection, asked and answered, objection, best evidence. Mr. Fagg has referred to the Federal Register notice, that's the best evidence he's driving at, and the question was already answered.
THE COURT: Overruled. I'll take the answer.
MR. FAGG: Need the question back, Mr. Pollog?
(The reporter read the record as requested.)

Page 1265

THE WITNESS: I think that's what the Federal Register notice said, and I'm not sure I ever read the entire thing.
BY MR. FAGG:
Q. Let's just talk about -- fair enough. Let's just talk about what you know, Mr. Pollog. You know that the Department of Energy took the position that, if there was no repository, no obligation by DOE, right, I mean, are we quibbling about something here?
A. I believe, again, I believe that's correct. I wasn't working in this area at the time, and I wasn't at DOE at the time, and I wasn't even in the country at the time.
Q. Okay. But no reason to dispute me on that, that's a true statement?
MR. LO RE: Your Honor, I'm going to object on the grounds of asked and answered, and also, I'm going to object on relevance. And if I may be heard on that, on the relevance issue?
THE COURT: Sure.
MR. LO RE: This case is about the so-called but-for world, in other words, if DOE

Page 1266

had performed the contract, what were its minimum obligations of performance under the standard contract? And this question, several of the questions previously are designed to -- I won't put words into counsel's mouth, but the questions appear to be talking about, at the point that DOE recognizes it is not going to meet its commitment, that, in our opinion, Your Honor is not relevant to the inquiry before the Court which is, again, if DOE had met its obligations, what would that performance have looked like?
THE COURT: Well, it's important to the Court to understand basically everything that's happened along the way, and I consider this testimony to be part of that puzzle, so I will take the testimony.
MR. LO RE: Thank you, Your Honor.
BY MR. FAGG:
Q. I confess, I forgot the immediately pending question, but I think I know sort of where we were. Let's start again, Mr. Pollog. Again, DOE has taken a position, no repository, no obligation, right?
A. Again, I believe that's correct. I

Page 1283

A. We issued a draft APR in '91, I'm not positive, but I thought the draft one came out in, it was either April or May, and then a final one was issued in December of 1991.
Q. Okay. And were APRs issued after that date?
A. I think they were issued, they were included in the ACRs or issued separately, yes.
Q. Up until 1995?
A. Yes.
Q. But then not from 1995 to 2004, correct?
A. Correct.
Q. Let's move to the next clause of the contract, it says, "Beginning not later than July 1st, 1987, DOE shall issue an annual capacity report for planning purposes," see that?
A. Yes, I do.
Q. Okay. And let's read the rest of this, and let's do read this into the record, "This report shall set forth the projected annual receiving capacity for the DOE facilities and the annual acceptance ranking relating to DOE contracts for the disposal of

Page 1284

SNF and/or HLW, including to the extent available capacity information for 10 years following the projected commencement of operation of the initial DOE facility." Did I mostly read that correctly?
A. I believe you got it mostly correct.
Q. Okay. There's no reference in this part of the contract, is there, to delivery commitment schedules, Mr. Pollog?
A. No, there is not.
Q. Mr. Pollog, you believe that if DOE quit approving delivery commitment schedules until 2025, DOE could unilaterally cut off its obligation until then, correct?
MR. LO RE: Objection, calls for legal conclusion.
THE COURT: Overruled, I'll take his answer.
THE WITNESS: Can you say that again for me, please?
BY MR. FAGG:
Q. You believe, do you not, that if DOE quit approving DCSes and didn't approve another one until 2025, DOE could unilaterally cut off its obligation until then?

Page 1285

A. I believe the delivery commitment schedules were a binding commitment on the government. What would have happened to the other allocations or other fuel that purchasers had would have been determined by the Court.
Q. If there were no approved DCSes, in your view, there's no fixed time or amount of a DOE commitment, correct?
A. There is a commitment that the Department still is obligated to accepting that material, but how that would occur would be subject to how the Court was going to interpret it.
Q. Or when it would occur?
A. Yes.
Q. Or how much would be taken?
A. Yes.
Q. And your understanding of the effect of stopping the DCS approvals, when DOE did in fact stop those DCS approvals was to limit DOE's liability, correct?
MR. LO RE: Objection, calls for a legal conclusion, Your Honor.
THE COURT: Overruled, I'll take his understanding.

Page 1286

THE WITNESS: I wasn't involved at all in the process to stop approving the DCSes. At that point in time, late '96, early '97, the '98 date was not going to be met, so we stopped approving DCSes because it just didn't make sense for us to continue obligating ourself to some commitment that we couldn't meet.
BY MR. FAGG:
Q. Do you still have the November transcript in front of you, Mr. Pollog?
A. Yes, I do.
Q. Can I ask you to read a couple of pages, beginning at 3720 and 3721? Do you have a chance to read those passages, Mr. Pollog?
A. Not yet.
Q. Sorry. And please feel free to look at as much of that transcript as you want. Let me re-ask the question to focus this, if that's helpful. Do you believe you could unilaterally cut off your obligations by no longer approving DCSes, Mr. Pollog?
A. I believe what would happen regarding fuel that purchasers had that weren't covered by DCSes was going to be determined by the Court.

Page 1303

see a footnote that refers to the Energy Information Administration, do you see that?

A. Yes, I do.

Q. What is the Energy Information Administration?

A. They're a part of the Department of Energy, an office that collects energy information.

Q. And do you know – and that's also known as EIA, is that right?

A. That's right.

Q. And did EIA provide the projected discharge rates for this chart?

A. I believe so, yes.

Q. And do you know where EIA got the information that it used to make predictions for discharge rates?

A. I believe they did several analyses at that point in time, considering various scenarios for the nuclear power industry, the data from those analyses would have been used to put together this chart.

Q. Do you know whether they consulted with the utilities?

A. I believe they probably did, but I

Page 1304

don't know for sure.

Q. Now, I want to go back to another document – oh, oh, before we go, before we move off that chart, at the time that this chart was issued, Mr. Pollog, were there any – had any ACRs been issued?

A. No.

Q. Had any DCSes been submitted?

A. No, there were not.

Q. Now, if we can go to PX-17, which is the draft mission plan 1983 mission plan, and if you could turn to the Bates ending in 173? Under waste acceptance schedule, and this is the page before the chart that Mr. Fagg asked you about, do you see that, sir?

A. Yes, I do.

Q. Now, under the heading, "waste acceptance schedule," if you go three paragraphs down, there's a sentence, second sentence of that paragraph says, "In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations." Do you see that?

A. Yes, I do.

Page 1305

Q. Now, why was DOE including that language in the draft mission plan?

A. Because the schedule that would be used to develop the allocations for the utilities to submit their delivery commitment schedules was going to be coming out of the – would be done in accordance with the contract.

Q. And what was your understanding, having worked with the 1991 schedules, what was your understanding as to the importance of those schedules vis-a-vis the contract and the contract holders?

A. When you say, "those schedules," which ones do you mean.

Q. The schedules that were issued in 1991.

A. They were the basis for the whole waste acceptance process to move forward.

Q. And in your opinion, how did the importance of the '91 schedule compare to the importance of earlier schedules?

A. It was much more important, that was the basis for the whole program moving forward regarding waste acceptance, everything else prior to that, the documents, I guess, was for

Page 1306

illustrative purposes, when we wanted to start the process for real, the document that we were going to use was the annual capacity report in 1991.

Q. Now, let's take a look at PX-22, which is another document that Mr. Fagg showed you, and this is the mission plan, volumes, it's an excerpt of volume one in April 1984. And under, at the page 1150, or II-1 of this document, that's the page just before the chart that Mr. Fagg showed you. There's a heading that says, "program strategy," do you see that?

A. Yes, I do.

Q. And just for the record, this is a draft 1984 mission plan. And you'll see under the second – I'm sorry, it's third paragraph, under the heading, "waste acceptance schedule," starting with, "the disposal"?

A. Yes.

Q. It says, first sentence says, "The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level waste. In 1991, the Department will begin publishing firm individual acceptance schedules in accordance

Page 1311

Q. – "DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facilities and the annual acceptance ranking relating to contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for 10 years following the projected commencement of operation of the initial facility." Now, do you see that.
A. Yes, I do.
Q. And were you involved in the implementation of that paragraph?
A. Yes.
Q. I can ask a better question. Were you involved in the development of those ACRs that – as a result of that paragraph, the July 1 paragraph?
A. Yes.
Q. Now, if you go up – now, let's go up. Now, let's look at 5.A. "Beginning on April 1st, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," and it goes on. Were you involved in taking action in response to

Page 1312

DOE's obligations under that paragraph?
A. Yes, I was.
Q. Now, first question, Mr. Pollog, how, if in any way, did these two paragraphs work together?
A. Well, they do work together. The first one, the APR, that sets the order basically, the queue based upon oldest fuel first, with information we received from the utilities, the RW-859, we take that ranking, and we use the acceptance rates that are given in the annual capacity report to basically draw the line in that ranking in determining where a utility comes in an order, how much allocation they get in any given year. So you take the rates in the ACR, and you apply them to the ranking in the APR, and you basically then determine the allocations for a contract holder for the first 10 years of the waste acceptance program.
Q. Now, if you turn to the next page, which you also addressed with Mr. Fagg, page 11 of this document, you'll see a paragraph referencing the delivery commitment schedule. And it says, "The delivery commitment schedule

Page 1313

or schedules in the form set forth in appendix C annexed hereto and made part hereof for delivery of SNF and/or HLW shall be furnished by the purchasers." Now, can you explain perhaps, again, how that delivery commitment schedule clause of the contract worked with the two prior clauses we've been discussing?
A. The APR priority ranking will – if you list the queue of utility discharges, do it chronologically, and you take the rates that are in the ACR, the annual capacity report, and you apply them to that document, that's basically where you draw the line across that ranking. Basically, you sum all the discharges for any utility in that block, and that becomes their allocation, they go in that year, and the total sum of their discharges become the basis for their allocations for that year, the amount, so it basically gives you the year and the amount. And the year and amount given in the allocation table in the ACR becomes the basis for your delivery commitment schedule submittals.

Page 1314

Q. And there's a reference there to 63 months, right in the middle of the paragraph. It says, "which shall identify all SNF and/or HLW for purchasers for delivery to DOE beginning 63 months thereafter," what's the significance in your mind for that 63 months?
A. They had to submit the delivery commitment schedule at least 63 months prior to the year of delivery, so for a 1998 schedule pickup or allocation, they would have had to submit that DCS by September of 1992.
Q. And Mr. Fagg asked you about utilities asking for more allocations in their DCS than they were given in the APR/ACR, do you remember that?
A. Yes.
Q. If the utilities are asking for more allocations than they are provided for, how would DOE administer the contract?
A. It would be very difficult to do that then because we have a fixed receiving capacity, we have a fixed amount of transportation casks, fixed receiving capabilities, and if every utility was asking for an unknown amount, it would be virtually

# ROSSELLI, ROBERT

# CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,

Plaintiffs,

vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
98-621C, 99-447C, 00-440C
UNITED STATES, 00-697C, 00-703C, 01-115C
01-116C, 01-249C

DEFENDANT.

---

VOLUME I
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 15, 2002
\- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

NAEGELI REPORTING CORPORATION

Portland, OR (503) 227-1544
Spokane, WA (509) 838-6000
Seattle, WA (206) 622-3376
Coeur d'Alene, ID (208) 667-1163

National: (800) 528-3335
www.naegelireporting.com
Fax: (503) 227-7123

Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,
Plaintiffs,
vs Case Nos 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
98-621C, 99-447C, 00-440C
UNITED STATES, 00-697C, 00-703C, 01-115C
01-116C, 01-249C
DEFENDANT

VOLUME I
DEPOSITION OF ROBERT M ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 15, 2002
* * *

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9 34 a m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington

Page 1

APPEARANCES
ARNOLD & PORTER
BY: DAVID S. NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail: David_Neslin@aporter.com
Appearing on behalf of Sacramento Municipal Utility
.
SHAW PITTMAN
BY: DANIEL S. HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail: daniel.herzfeld@shawpittman.com
Appearing on behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the state of New York, Omaha Public Power District, and Nebraska Public Power District
.
BALCH & BINGHAM

Page 2

BY. K. C. HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail: kchairston@balch.com
Appearing on behalf of Alabama Power, Georgia Power, and Southern Nuclear
.
JENNER & BLOCK
BY: DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail dcassling@jenner.com
Appearing on behalf of Commonwealth Edison Company
.
U.S. Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and ALAN MILLER
1100 L. Street, N.W.
Washington, D.C. 20530
202-307-6288
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov

Page 3

Also Present·
Peter J. Skalaban

Page 4

folks from within the department where we needed help And we started interacting with utility representatives.
Q Did the three of you work on the entire contract, or did you divide up the contract and each focus on a different portion or issue?
A. To the best of my recollection, we worked on the total -- totality of the contract. Although, saying that, clearly, Jay Cavanaugh had a focus on the terms and conditions of government contract and sales instruments, because that's where his expertise was.
Elliott Winneck had, you know, the broad band, you know, the legal aspects and how consistent were we with the legislative history and the statute
And my focus was more, sort of, the bringing in the technical aspects and the programmatic aspects.
Q. You mentioned that you got input from various people within the department as part of this effort Do you recall who?
A. No, I don't
Q If we go back to Exhibit 1, we could look at the chart showing the office of

Page 45

management. Do you recall getting input from Mr. Yanoksi, or Mr. Head, or Mr. Brandt?
A. To the degree that I can recall, we certainly had interactions with Mr. Head and got input from his particular group.
Q. If we could turn back to the first page showing the organization of the office. Did you receive input from Mr. Bennett?
A. I don't recall specifically whether we got input from Mr Bennett.
Q Do you recall specifically whether you received any input from Mr. Bauer?
A. I don't recall specifically that either.
Q. Do you recall whether you received input from Mr. McElvey?
A. I do not recall that either.
Q. Mr. Lawrence?
A. You know, Mr. Morgan and Mr. Lawrence were my supervisors, you know. So certainly, it was probably discussions with them about the form and substance of the contract. Specifically, things we talked about, I could not recall.
Q. But you would have discussed the contract with them?
A. Yes. That would be fair to assume

Page 46

that, yes
Q. On numerous occasions? Would that be fair?
A. I cannot recall that.
Q. Sitting here today, can you recall anyone else within the department who was part of this process?
A. No, I can't.
Q. Now, you testified earlier that you recall beginning work on the contract after the act passed. And I'll represent to you that that occurred on January 7th, 1983. I'll also represent to you that the proposed contract was published for public comment in the federal register on February 4th of 1983.
Would that indicate to you that your group spent something less than a month in developing the initial draft of the contract that was published for public comment?
A. I don't recall.
Q. Sitting here today, do you recall spending more than a month on the initial draft?
A. I think it is fair to say that we spent more than a month in developing the standardized contract draft.

Page 47

Q. The initial draft that was published?
A. Yes.
Q Do you recall how much time was spent on that?
A. No, I don't.
Q Can you describe the contract development process for me? How did you go about developing the first draft of the contract?
A. What I remember and the best of my recollection, there was an iterative process that occurred between the government and the utility industry and then -- and with them within the department, the team. So we would have iterations with the industry, and we'd come back and have iterations, you know, among ourselves. And that was the principal method that was used to development the contract.
Q What was the basis for the first draft of the contract that was developed?
MR LESTER: Objection, vague.
BY MR. NESLIN:
Q. Do you understand my question, sir?
A. No
Q. In developing the first draft of the contract, did your group use anything as a

Page 48