MR. LESTER: Objection, leading.
THE WITNESS: Some, yes.
BY MR. NESLIN:
Q. Mr. Rosselli, what was the process that you followed in attempting to develop a final contract after the publication of Exhibit 3?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, the process was, we received comments on the draft contract. We evaluated those comments. And we framed our final rule.
BY MR. NESLIN:
Q. Who evaluated the comments?
A. The team that I referred to before had the principal responsibility to review the comments.
Q. And that would be you, Mr. Cavanaugh, and Mr Winneck?
A. Yes, sir.
Q. If I could direct you back to Exhibit 3 for a moment, Mr. Rosselli. You see on the bottom of the first page with a heading for further information contact. First page, sir. The very bottom of the page.
A. Yes.



Q. It references you at the office of terminal waste disposal and remedial action. Is that where you were working at this point in time?
A. No.
Q. Do you know why it would provide that as a reference point for you?
A. I imagine it's just an error.
Q. You were working at OCRWM at that point?
A. Yes, I was.
Q. Let's go back. And you, Mr. Cavanaugh, and Mr. Winneck had reviewed the comments that had been submitted. Correct?
A. Yes.
MR. LESTER: Objection, leading
BY MR. NESLIN:
Q. You modified the contract in some respects in response to comments?
MR. LESTER: Objection, leading.
THE WITNESS: Yes, we did.
BY MR. NESLIN:
Q. Did you continue to meet or confer with representatives of the utility industry following the public comment period?
A. Yes, we did. To the best of my



recollection.
Q. Were you meeting with the same representatives that you identified previously?
A. Point of clarity, I didn't identify anybody specifically earlier.
Q. You mentioned that you met with or conferred with EEI. I believe one or two other entities on behalf of --
A. Okay APA and the rules, et cetera?
Q. Yes.
A. To the best of my recollection, yes.
Q. And you continued to meet with them, because you continued to seek to work with them to come up with a final standard contract that would be mutually acceptable to both sides?
MR. LESTER: Objection, leading
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Do you recall any issues where you and Mr. Cavanaugh or Mr. Winneck disagreed over how an issue should be resolved?
A. No, I don't.
Q. Your recollection is that you three were in agreement on the resolution of all of the issues raised during the public comment period?



MR. LESTER. Objection, leading. Misstates his prior testimony.
THE WITNESS: When we published the final rule, we were in agreement, yes.
(Whereupon, a document entitled U. S. Department of Energy memorandum was marked Exhibit-4.)
BY MR. NESLIN:
Q. Mr Rosselli, you've been handed what's been marked as Exhibit 4 to your deposition. It's a Department of Energy memorandum entitled, Action Memorandum on Final Rule Making on Standard Contract for Nuclear Waste Disposal dated April 8th of 1983. Are you familiar with this document?
A. Yes.
Q. Did you help to prepare this document?
A. The best of my knowledge, in all probability, yes.
Q. What do you mean by that?
A. I think I did have a hand in preparing this document.
Q. Do you recall who else participated in preparing this document?
A. Not specifically, no.

Q. Would Mr Cavanaugh or Mr. Winneck have participated in this?
A. To the best of my knowledge, they probably did
Q. If I could direct your attention to the first page Bates number ZAB-001-0893, under the heading Discussion, the last sentence states, "Eight general policy issues arose from the comments, and we appropriately resolved these issues." Do you know what's meant be, "general policy issues?"
MR. LESTER: Objection. Calls for speculation.
THE WITNESS: Generally, yes.
BY MR. NESLIN:
Q. What's meant by the term, "general policy issues," in this document?
A. It had to do with positions the Department would take with respect to its interactions with the utility community on the contract
Q. Were these the most important issues?
A. Yes.
Q And you included this in the briefing memorandum to the secretary so that the secretary

Page 69

would be familiar with these issues?
A. Yes.
Q. If I could ask you to turn to page ZAB-001-0899 through 0902. So those would be the last four pages of the document. Are these the general policy issues, to your recollection?
A. To the best of my recollection, they are.
Q. Now, I don't see any reference in these issues to the receipt rate at which the Department would receive spent nuclear fuel from the utilities. Do you know why that's the case?
A. To the best of my knowledge, I don't recall that being an issue from the Government's standpoint.
Q It was not an issue from the Government's standpoint?
A. Yes
Q Do you recall it being an issue from the industry standpoint?
A. To my knowledge, no, I don't recall.
Q. You don't recall the issue coming up?
A. Yes. There were -- I mean, I do recall it coming up from the utility standpoint.

Page 70

Q. You say it wasn't an issue from the Government's standpoint Why was it not an issue from the Government's standpoint?
A. Because at the point in time of drafting this particular document, the Government wasn't in position to contemplate or set any type of receipt or acceptance rate.
Q Why do you say that?
A. At this particular point in time, there wasn't a repository site that was selected. The facilities, you know, that would be needed to support the repository, you know, weren't designed or built. It was just too early. There were a lot of technical issues, you know, still on the table that had to be resolved and worked through.
Q. Did the Government have any criteria in mind for the rate at which it would receive spent nuclear fuel at this point in time?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, I do not recall
BY MR. LESTER:
Q. So would it be your testimony, then, that the Government at this point in time did

Page 71

not have a view as to the rate it would receive spent nuclear fuel from the utilities?
MR. LESTER· Objection Vague as to the term -- not defining the word, the Government.
BY MR. NESLIN:
Q Can you answer my question, sir?
A. Yes, we did not have a view
Q. If you did not have a view, then, you did not have a position on the rate at which spent nuclear fuel would be received by the Government either Is that correct?
MR. LESTER· Objection, leading.
THE WITNESS. To the best of my knowledge, that is correct
BY MR. NESLIN:
Q Now, one of these issues -- enumerated as issue number seven on page 0901, 0902 refers to utilities' rights to audit the waste disposal fund Do you want to review that paragraph, sir? Mr. Rosselli, by audit is this issue referring to a financial audit of the fund?
A. It's broader than a financial audit.
Q. What else was encompassed by this issue?
A It was a management audit

Page 72

Q. What do you mean by a management audit?
A. Efficiency and effectiveness of the total operations of the waste program.
Q. And this was denied, because the utilities would be able to get that kind of information from other sources without doing a management audit. Is that your recollection?
MR. LESTER: Objection, form.
THE WITNESS: To my recollection, there were two reasons. One, it wasn't precedent setting, in effect, to have a private sector look at the federal Government. And two, the information was available in other venues.
BY MR. NESLIN:
Q. Another issue here. Issue number 1 on page 0899 was exchange rights. Mr. Rosselli, what do you recall about this issue?
MR LESTER: Objection, vague.
THE WITNESS: What I recall is that there may be circumstances arising where a utility would have to change their commitment schedule, things happening outside of their control, for example. And that this provision provided the opportunity for them to do that,



subject to the review and concurrence of the Government.
BY MR. NESLIN:
Q. Would this also allow two different utilities to exchange their allocations?
A. I'm actually -- to be honest, I don't recall, you know, the specifics of the exchange rights provision.
Q Well, this paragraph states that, "After consideration aside from some complex record keeping, this poses no great problem to us. Consequently, we've accepted this suggest." Is it your recollection that the inclusion of an exchange provision was made in response to the industry?
MR. LESTER: Objection.
THE WITNESS: To the best of my knowledge, I don't remember specifically where it came from.
BY MR. NESLIN:
Q. Do you recall what was meant by the language, "that this would pose no great problem," to DOE?
A. What I remember, to the best of my knowledge on this one, was that it just



entailed, I'm going to call it bookkeeping, and that we could handle that bookkeeping.
Q. What do you mean by bookkeeping?
A. Well, it would change if someone has a schedule, and you would exchange with someone else, so we would have to change the records in terms of when something would be delivered.
Q. And that was something that DOE could handle?
MR. LESTER. Objection, leading
THE WITNESS. To my recollection, yes
BY MR. NESLIN:
Q. In the last sentence it states that, "This will require our approval, and we intend to be reasonable " What did that mean?
MR. LESTER: Objection. Calls for speculation.
THE WITNESS: Well, clearly, we would say yes or no in terms of whether we would allow an exchange and that we would consider all the facts and not just be pure critically bound in terms of our determination on this.
BY MR. NESLIN:



Q. Does that mean the Department would look favorably upon exchanges?
MR. LESTER: Objection, leading. Calls for speculation.
THE WITNESS: Yeah I'm speculating. I can't answer that.
BY MR. NESLIN:
Q You have no recollection?
A. I have no recollection in terms of what parameters we would use, nor did it come up while I was associated with the program. So I don't know.
Q. If I could ask you to go pack to 0896.
MR LESTER: Before we do that, can we take a break? I have to call my office in response to that phone call that just came in a few minutes ago
MR. NESLIN: Do you want to break for lunch?
MR LESTER That's fine with me If that's what people want to do, I don't care.
(Noon recess.)
MR. MILLER: During the lunch break, Mr. Rosselli, after having looked a some

and said we had to be ready.
Q. If we look down at the next to the last sentence, it states that, "1998 date is called for in the Act, and we believe it to be a realistic date." What's meant by "realistic date?"
MR. MILLER: Objection. Calls for speculation and a legal conclusion. Go ahead.
MR. NESLIN: You may answer.
THE WITNESS: That it's doable.
BY MR. NESLIN:
Q Did you answer the 1998 date to be doable at that time?
A. Yes.
Q. Did DOE consider the 1998 date to be doable at that time?
A. To the best of my recollection, yes.
Q. What was meant by the statement that, "Our performance will be judged by meeting this date?"
MR. MILLER: Same objections.
THE WITNESS: Whether we would have a repository ready to receive high-level waste or spent nuclear fuel by January 31st



1998.
BY MR. NESLIN:
Q. And that would be the standard for determining whether DOE was complying with the contract?
MR. MILLER: Objection. Calls for speculation and a legal conclusion.
BY MR. NESLIN:
Q. In your opinion, sir?
A. Yes.
Q. And so to comply -- in your opinion to comply with the contract, DOE would have to be receiving spent nuclear fuel under the contract by the 1998 date?
MR. MILLER: Same objections.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Mr. Rosselli, what in your opinion was the purpose of the contract?
A. The purpose of the contract was to document the provisions of the statute, and basically, it was for the return for the utilities providing one mill per kilowatt hour. The Department would have a repository in place ready to receive spent nuclear fuel or high-level



waste by January 31st, 1998.
Q. And why was that important?
A. A question for clarity, why the date was important or the instrument?
Q. Why was the date important? Well, let me back up. Why was the receipt of spent nuclear fuel by the Department important?
MR. MILLER: Objection, vague.
THE WITNESS: First of all, it was a statutory date that we had to comply with.
Second of all, there was a growing concern within the utility community that they were running out or soon would be running out of space for on-site storage.
And thirdly, that could very well impact the continued utilization of nuclear energy.
BY MR. NESLIN:
Q. So would it be fair to say that one of the purposes of the contract was to prevent utilities from having to shut down?
MR. MILLER: Objection. Mischaracterizes his previous testimony and calls for a legal conclusion.



THE WITNESS: No.
BY MR. NESLIN:
Q. No. Well, you earlier testified that there was a growing concern that utilities were accumulating spent nuclear waste. Was there a concern that this may cause individual utilities to have to shut down because of the accumulation of waste?
A. No. There were other avenues available to the utilities to grow with their increased inventory of spent nuclear fuel, re-racking being an example of a potential option.
Q Or on-site storage?
A. Or dry storage. On site would be another example.
Q. What's your understanding as to why congress decided to adopt this arrangement in which the utilities would provide delivery of the waste to the Department, and the Department would assess a fee in return for that?
MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I wasn't a party to what was addressed, so I can't answer that
BY MR. NESLIN:

Q. Let me back up then. What was the importance of the 1998 date for you as you understood it?
MR. MILLER: Objection, vague. And I believe asked and answered. Go ahead.
THE WITNESS: That was the date specified in the statute that the Government would have a repository available to accept spent nuclear fuel or high-level waste.
BY MR. NESLIN:
Q. Did that date enable utilities to plan for the disposal of their spent nuclear fuel?
MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I don't know.
MR. LESTER: Lacks foundation.
THE WITNESS: I don't know the answer to that from a utility perspective.
BY MR. NESLIN:
Q. You don't know whether having a specific date by which the Department would begin accepting spent nuclear fuel would allow utilities to make plans regarding the disposal of their fuel?
MR. MILLER: Same objections.



THE WITNESS: Having a repository available on January 1st, 1998 was only one step having to do with delivery of it. You had to have a rank ordering. You had to, you know, develop a delivery commitment schedule. All things that would occur after or just before. I guess, there was a timetable when they would first do it, so much better planning would come subsequent, you know, to this contract signing
BY MR. NESLIN:
Q. There would be additional planning?
A. Right.
Q. But was it still intended in developing this contract, did you anticipate that the Department would begin receiving spent nuclear fuel from the utilities in January of 1998?
MR LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
MR. NESLIN: You may answer.
THE WITNESS: Yes
BY MR. NESLIN:
Q. And isn't that, in fact, what the utilities were receiving in return for the fees



they were paying to the Department?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And they were paying hundreds of millions of dollars to the Department. Correct?
A. Yes.
Q. And in return, the Department was to begin picking up their spent nuclear fuel January of 1998. Correct?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
(Whereupon, a document entitled Department of Energy and signed by Rovert M. Rosselli was marked Exhibit-7.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's marked as Exhibit 7 to your deposition. It's a cover letter from you, and attached to it is a report on financing the disposal of commercial spent nuclear fuel and processed high-level radioactive waste. Do you recall this document?
A. Yes.



Q Was this document prepared as part of the fee-adequacy assessment?
A. I don't recall
Q Do you recall why it was prepared?
A Yes.
Q. Why was it prepared?
A. To evaluate the income that would be received into the fund from the utilities for the amount of spent nuclear fuel or high-level waste that was generated based on the amount of electricity that was produced against the estimated programmatic cost to characterize, design and build the repository associated facilities, waste forms, et cetera
Q. How did that differ from the fee-adequacy assessment process?
A. I don't recall if there was much difference. I really don't.
Q. If I could direct your attention to Bates numbered page PNL02802022. Do you generally recall the process that was followed in this document in estimating the cost of operating the waste management system programmatically?
A. Do I recall?
Q. Generally, the process that was followed?



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

THE WITNESS: I don't remember.
BY MR. NESLIN:
Q. Do you recall what the process was for developing the initial draft of the Mission Plan?
A. No, I don't.
Q. Who might have such knowledge?
A. At this point, I don't know.
Q. You don't know who at DOE might have knowledge as to who was involved in preparing the Mission Plan, the initial draft of the Mission Plan?
A. Back then?
Q. Correct.
A. Mr. Head maybe, but that's all.
Q. Sitting here today, can you think of -- are there any documents that you can recall that might provide direction on that issue?
A. On the Mission Plan development?
Q. On who at DOE was involved in developing the initial draft of the Mission Plan.
A. The best I could do is from Exhibit 1 that you gave me and the fact that that was under the responsibility of Mr. Head. That's the best I can do from my memory.
Q. Was Mr. Head responsible for preparing



the first draft of the Mission Plan?
A. To my recollection he was, yes.
Q. And then he reported to you?
A. Yes.
Q. And you would have reported to the director of OCRWM?
A. Yes
Q And do you know, would that have been Mr Morgan, at that point in time?
MR. MILLER: Objection, vague.
THE WITNESS: Again, based upon my recollection, Mr. Morgan's life span in that job was, like from -- I don't know, four to six months. And then Mr. Rusche, I think, came in. And so my speculation would be that Mr. Rusche was the director at that time.
BY MR. NESLIN:
Q. What was the purpose of the Mission Plan, as you understand it?
A. Well, the Mission Plan was to describe the mission of the office and to outline the goals that they we would be pursuing.
Q. Was the Mission Plan intended to implement the intention behind the contract?
A. The Mission Plan, to my recollection,



was broader than that. It was to talk about the total function of the office of OCRWM. And that would include the work that was going on in terms of repository development, monitored retrieval storage, transportation, as well as fund and fund management.
Q. Do you recall the Mission Plan being contrary to the purposes of the contract?
A. I don't recall that, no.
Q. Do you recall any inconsistency, to your mind, between the Mission Plan and the contract?
A. No, I don't. What I mean by that, I don't recall.
Q. Did you believe that the Mission Plan was consistent with the contract?
A. I don't remember that.
Q Well, you were responsible for the preparation of the Mission Plan. Correct?
A. Yes, that's right.
Q. And the Mission Plan was intended to implement the contract, wasn't it?
MR. MILLER: Objection. Mischaracterizes his previous testimony.
THE WITNESS: Yeah. The Mission Plan was a plan in terms of how we were



going to accomplish the objectives of the Act, which was to develop a repository by 1998. If in the interim you needed a monitored retrieval storage, how that fit into the program. What did we do about waste form and transportation activities? How would we assure the adequacy and maintain the adequacy of the fund? The totality of the program?
BY MR NESLIN:
Q. I understand that it was broader than the contract. But in so far as it dealt with the same matters that were dealt with in the contract, you considered it to be consistent with the contract, didn't you?
A. To the degree there was applicability, yes.
Q. You were in charge of preparation of the contract?
A. Yes.
Q. And you were in charge of the Mission Plan. Correct?
A. Yes.
Q. And you considered the two to be consistent to the extent that they overlapped, didn't you?

MR. MILLER: Objection. Mischaracterizes his previous testimony.
THE WITNESS. Yeah. Not so much as to the degree there was applicability from one to the other, but there would be consistency
(Whereupon, a document entitled U S Department of Energy Memorandum dated September 15, 1983, was marked Exhibit-12.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed Exhibit 12, which is a memorandum by Richard Williamson regarding Mission Plan strategy, dated September 15th, 1983. Who is Mr Williamson?
A. If memory serves me correctly, he was deputy director of the office of planning and analysis, which was a department, sort of corporate planning office
Q Did he work under Mr. Head?
A. No.
Q. Was it a separate branch?
A. Separate organization entity, yes.
Q. Was Mr. Williamson involved in developing the Mission Plan?
A. I honestly don't remember. I mean, I



don't remember
Q. Can I direct you to page PNL-173-1283. This is captioned Nuclear Waste Strategy: An overview proposal And I'd ask you to read the first paragraph and the first four bullets under that paragraph.
A. Okay
Q Mr Rosselli, first sentence in that paragraph states, "Central focus of waste management strategy: DOE will begin accepting spent fuel in significant quantities in 1998." Was that your understanding of the central focus of the Department's waste management strategy at that time?
A. Yes
Q. What quantity of waste did you expect the Department to begin accepting in 1998?
A. I don't recall.
Q. Sitting here today, you have no recollection?
A. No
Q. Well, Exhibit 7 and 10 they use a figure of 1,800 MTU. Do you recall any figure other than 1,800 MTU being used for that purpose?



A. To clarify, I mean, I don't recall any number. But given the exhibits and the assumption in the exhibits, I would have to accept those as the planning basis for what our acceptance rate would be.
Q. Those you're referring to table 3.3 in the exhibits?
A. Right. In both those 7 and 10 exhibits.
Q. If we could skip down in this page below waste acceptance schedule The second bullet states that, "The central criteria for the schedule is," and there are two sub-bullets. The first one states that, "An acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998."
The second states that, "An acceptance rate after the first 5 years equivalent to the actual rate of utility discharge of spent fuel each year." Do you see that language?
A. Yes
Q. Was that, in fact, DOE's criteria for a waste acceptance schedule, as of the date of



this memorandum?
A. I don't recall
Q. Do you recall information regarding utility discharge rates after 1998?
A. No, I don't.
Q. Do you recall reviewing information on utility storage needs as of 1998?
A. What I do recall is that there were -- some utilities would run out of basin storage, and they would have to re-rack or look at other mechanisms. In terms of what utility and when, I don't remember.
Q. Did DOE wish to avoid the needs for those utilities to have to re-rack or add on-site storage?
A. What I remember was that it was a foregone conclusion that some utilities would have to do some re-racking before we would be in a position to start accepting spent nuclear fuel.
Q. And is that assuming that you began accepting spent nuclear fuel in 1998?
A. To my memory, that is correct.
Q But was it the Department's intention that following January of '98, utilities would

not have to add additional on-site storage?
A. That I don't recall.
Q. If I could ask you to look at the next bullet.
A. Okay.
Q. Mr Rosselli, this bullet indicates that certain utilities which might have an allocation for spent nuclear fuel under the oldest fuel first criteria, might not face an immediate need for additional storage. And that other utilities that may face a need for additional storage may not have an allocation in that particular year, and that those utilities could exchange their rights. Does that refresh your recollections about the intended purpose of the exchange provision in the final contract?
A. No, I don't recall why that was done.
Q. You don't recall any consideration of the possible benefits either to the program or to the utilities from exchanges?
MR. LESTER: Asked and answered.
THE WITNESS: I don't recall.
BY MR. NESLIN.
Q. If I could ask you to turn to PNL-173-1284. Well, strike that. I'd like to



return to page 1282. Mr. Rosselli, the second paragraph in this cover memo from Mr. William states that, "If this overview strategy meets with your approval, it will be used to guide the authors of the different volumes of the Mission Plan in the completion of the next draft." Do you see that?
A. Yes.
Q. Do you know whether, in fact, this overview strategy met with the approval of the Department officials who received it?
A. I don't remember.
Q. And you, yourself, don't recall reviewing this document?
A. No, I don't.
Q. Locking at the distribution list on this page, does that refresh your recollection of who might have been involved in preparing the Mission Plan?
A. I believe, you know, when we talked about this before, I mean, there was -- we were the coordination office, and there was input from all the organizational components that you outlined in Exhibit 1.
And so when you look at, you



know, Bill Bennet and Ralph Stein, that was the deputy and deputy director of the office of repository. You know, Bauer and Keith Klein were the responsible parties for monitored retrievable storage at that particular time. So this is just reaffirming the point that the Mission Plan was an organizational planning document. And contribution came, you know, from all the parties in the organization.
Q. From throughout the organization?
A. Yes.
Q. To your recollection, did Mr. Head and his team actually author the plan, or did they assemble input received from different parties?
A. To my recollection, it is more the latter They assembled and edited for uniformity inconsistency.
Q. And your recollection that it was a composite document? In other words, parts coming from different origins? From different branches of the Department?
MR. MILLER: Asked and answered.
THE WITNESS: To the best of my knowledge, yes.
BY MR. NESLIN:



Q What was your responsibilities, then, with respect to that process?
MR. MILLER. Asked and answered
BY MR. NESLIN.
Q. Were you responsible for insuring that all of the input was incorporated into the draft plan?
A. I was responsible to assure that the Mission Plan appropriately characterized the work that was ongoing, our mission and our plans for the whole office.
MR. NESLIN: Shall we take a short break?
MR. MILLER: How long?
MR NESLIN: Five or ten minutes.
(Recess.)
BY MR. NESLIN
Q. Mr. Rosselli, could I ask you to turn back to Exhibit 7 to your deposition?
A. Can I say no?
Q. You can, but it will do you no good. The cover letter is addressed to gentlemen, and then the second sentence of the first paragraph states, "This report is forwarded to you in



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

keeping with the Department of Energy's continuing commitment to inform public utility companies and other interested parties of all aspects of DOE's civilian radioactive waste management program."
Was this letter and the attached report, in fact, forwarded to utility companies?
A. To the best of my knowledge, it was.
Q. And was it sent for the purpose of informing them of all aspects of DOE civilian radioactive waste management programs?
MR. MILLER: Objection -- withdrawn
THE WITNESS: That was the stated intent, yes.
BY MR. NESLIN:
Q. Is that your recollection?
A. That was my recollection, yes.
Q. If we could go back to Exhibit 12, the cover memo from Mr. Williamson The first sentence states that, "Attached is a revised Mission Plan strategy overview based on the discussions in our last planning session."
Do you recall whether you and others in the Department had planning sessions to

Page 133

work on the Mission Plan or the Mission Plan strategy?
A. I do not recall
Q. Do you recall meeting with the individuals listed, under distribution on this memo, with respect to the Mission Plan strategy?
A I do not recall
Q. Assuming that planning sessions were held regarding the Mission Plan strategy, would it have been your practice or the Department's practice to prepare minutes of those planning sessions?
A. Based on my personal experience, you know, normally, you don't have minutes of meetings that you hold, no
Q Would there have been any documentation prepared regarding such meetings?
A. I don't recall.
(Whereupon, a document entitled Civilian Radioactive Waste Management Program Mission Plan was marked Exhibit-13.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed Exhibit 13 to your deposition. It's a document entitled, Civilian Radioactive Waste Management

Page 134

Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983. And it includes in large type "draft." You were still at OCWRM in December of 1983. Correct?
A. Yes, I was.
Q. Do you recall a draft of the Mission Plan being produced on or about December 20th of 1983?
A. No, I don't.
Q. Do you recall when the first draft of the Mission Plan was prepared?
A. No, I don't.
Q. Can you think, is there any documentation that might refresh your recollection as to when the first draft of the Mission Plan was prepared?
A. Only this Exhibit 13.
Q. If you would turn to page 1-1 of the exhibit, under introduction, the third paragraph. Could you review that paragraph to yourself?
Mr. Rosselli, the first sentence states that, "Every activity specified in the Mission Plan is targeted toward one fundamental objective. to accept commercial high-level radioactive waste for safe management,

Page 135

storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."
Was it your understanding that that was OCRWM's fundamental objective?
A. Yes.
Q What do you mean by firm schedule?
MR MILLER: Objection. Calls for speculation and a legal interpretation and legal conclusion.
MR. NESLIN: You may answer.
THE WITNESS: Oh --
MR. MILLER: Oh, I'm sorry, yes Please. Remember you can answer, except when I tell you don't answer that.
THE WITNESS: Okay. Firm schedule, based upon my recollection, would be the delivery commitment schedules.
BY MR. NESLIN:
Q. So your recollection that the reference to "firm schedule" refers to the delivery commitment schedules?
A. That's correct.
Q The next sentence states that, "The waste acceptance schedule will initially preclude

Page 136

the need for additional at-reactor storage after January 31, 1998, and ultimately, removed from at-reactor storage all waste that is more than five years old."
Do you recall, was that one of the intended objectives of the waste acceptance schedule included in the draft Mission Plan that is, "To preclude the need for additional at-reactor storage after January 31, 1998?"
A. I don't recall.
Q. Do you recall why this language was included in the draft Mission Plan?
A. No, I don't.
Q. You were responsible for preparing the draft Mission Plan. Is that correct?
A Yes.
Q. It was prepared under your supervision?
A. Yes.
Q. Would you have reviewed this draft of the Mission Plan?
A. Yes.
Q. Would you have approved its circulation in this form?
A. To the best of my recollection, yes.
Q. So would you have agreed with the

Page 137

statement in that sentence that, "The waste acceptance schedule will initially preclude the at-reactor storage after January 31, 1998?"
A. As a planning basis, yes.
Q. What do you mean, "as a planning basis?"
A. The Mission Plan was the plan relative to how we would respond to the requirements of the Act.
Q. And what is a plan? What's the significance of describing it as a plan, sir?
A. It's a road map in terms of how you anticipate getting from point A to point B and what are assumptions you have built into that to make that plan possible.
Q. But that road map did reflect DOE's intention for how it would get from point A to point B at that point in time, didn't it?
A. That's correct.
Q. This was accurate to the best of your understanding at that point in time?
A. That is correct.
Q You considered it to be reasonable?
A. I considered it to be accurate at that point in time, yes.
Q. If you could go to page 2-1 Program

Page 138

Strategy, the next to the last sentence in the first paragraph, sir, states, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first 5 years, such that no utility will or have to provide additional storage capacity after January 31, 1998." You would have reviewed that language, wouldn't you?
A. Presumably so, yes.
Q. You would have approved that at that point in time for purposes of circulation, wouldn't you?
A. Yes.
Q. You would have consider that to be accurate at that point in time?
A. Yes.
Q The next sentence states that, "Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year " And again, you would have considered that to be accurate at that point in time?
A. Yes.
Q. The last sentence on this page, page 2-1, "Until 1998, each utility will be

Page 139

responsible for providing its own additional on-site interim storage, unless the utility applies for and is certified for the federal interim storage program." Do you see that?
A. Yes.
Q. Was it your understanding that after 1998, the Department of Energy would become responsible for providing or eliminating the need for additional on-site storage?
A. Yes.
Q. If I could direct you to page 2-2, the last paragraph on this page which carries over to the top of page 2-4. Could you review that paragraph, sir? You've reviewed that paragraph, Mr. Rosselli?
A. Yes, I have.
Q. Does this paragraph refresh your recollection, at all, about the purpose or perceived benefits of the exchange provision in the contract?
A. Yes.
Q. How does that refresh your recollection?
A. To the point that after 1998, the utilities would not have to build on-site storage. They could rely upon the Government to

Page 140

MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I don't know the answer to your question.
BY MR. NESLIN:
Q. Do you recall there being multiple drafts of the Mission Plan in December of 1983?
A. I don't recall.
Q Well, does this letter indicate that the Department circulated a draft of the Mission Plan on or about December 20th to Edison Electric Institute?
A. From the context of this letter, it appears that that is true.
Q. Would you have been involved in that process, sir?
A. I don't remember.
Q. And does this letter indicate that the Department would have requested comment from the Edison Electric Institute on the then current draft of the Mission Plan?
A. Based upon the last paragraph, that is correct.
Q. Does this letter also indicate that the Department would have similarly sought comment

Page 153

from other federal agencies, congress, state government, Indian tribes, utilities and nuclear industries?
MR. MILLER. Document speaks for itself.
THE WITNESS: Based on the first paragraph, yes, it does.
(Whereupon, a statement of Michael J. Lawrence, acting director, Office of Civilian Radioactive Waste Management, Department of Energy, was marked Exhibit-16.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 16 is a statement of Michael J. Lawrence, acting director, Office of Civilian Radioactive Waste Management, Department of Energy, before the Subcommittee on Energy Conservation and Power, of the House Committee on Energy and Commerce, dated February 22, 1984.
Do you recall acting director, Lawrence, appearing before such a subcommittee on or about February 22 of 1984?
A. I don't recall, no.
Q. If you could glance at the document and tell me whether you recall reviewing this

Page 154

document at any time in the past. Do you recall reviewing this testimony?
A. No, I don't.
Q. Mr. Rosselli, do you recall participating in the preparation of testimony for Mr. Lawrence at any time?
A. No, I don't.
Q. Do you recall participating in the preparation of other congressional testimony during the time that you were at OCWRM?
MR. MILLER: Objection, vague.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. If you could look at page PNL-173-0226. The first paragraph of the -- let me back up This page is captioned, Summary of Statement by Michael J. Lawrence. First paragraph discusses the budgeting process for OCRWM. Do you see that?
A. Yes.
Q. And if you skip down to the third paragraph, it talks about various accomplishments that have occurred since the passage of the NWPA. And these include establishing a fee collection system. Do you see that, the second

Page 155

bullet?
A. Yes.
Q. And contracting with the nuclear utilities is the third bullet. Do you see that?
A. Yes
Q And this testimony was given on February 22nd, 1984. That would have been the period at which you were still at OCRWM Is that correct?
A Yes
Q. Given the fact that Mr. Lawrence was discussing the budgeting process and the fee collection process and the contracting process, do you believe that you would have reviewed this testimony before it was given?
MR MILLER. Objection. Asked and answered
MR. NESLIN: You may answer if you can.
THE WITNESS. Yes
BY MR. NESLIN:
Q. Because he was discussing various facets of the program that you were in charge of?
A. Yes.

Page 156

Q. If we could turn to page PNL-173-0228. If I could ask you to review the last -- point you to the last paragraph of the text of this page which states that, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule" -- well, let me back up. The preceeding sentence states that, "The programs activities are fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982, which is: to accept high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."

The next sentence goes on to say, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and ultimately, remove all eligible waste from at-reactor storage." Do you see that language?

A. Yes.

Q Would you agree with that language?

A. Yes.



Q. Did that language state the Department of Energy's position in February of 1984, to your knowledge?

A. Yes.

Q. Would it be fair to say that as of February 1994, the Department believed that an appropriate waste acceptance schedule would preclude the need for additional at-reactor storage after January of 1998?

A. Yes.

Q And would it be fair to say that the Department believed that such a schedule would reflect the intent behind the Act?

MR. MILLER: Objection. Calls for a legal conclusion, speculation.

THE WITNESS: What do you mean by the word "intent?"

BY MR. NESLIN:

Q. The intent of congress. Well, let me -- the intent of congress in enacting the Act?

MR. LESTER: Same objection.

THE WITNESS: The intent of congress was what?

BY MR. NESLIN:

Q In enacting the Act?



A. Was what?

Q. To provide that the utilities would not need to store additional waste at reactors after January 1998? In other words, that the Department would be responsible for addressing the waste generation following January of 1998?

MR. MILLER. Same objection, vague.

THE WITNESS: I need to clarify a point on this. And maybe it extends back to some of the previous discussions we had on the Mission Plan. I think it's important to recognize it was the intent of the Mission Plan, okay? In terms of how we -- and the Mission Plan was to define how we would carry out the provisions of the Nuclear Waste Policy Act. So it was the intent of the plan that described how we were going to accommodate the needs of the utilities.

In no way, shape, or form was it a contractual intent that we would make all the things happen that was in the Mission Plan.

BY MR. NESLIN

Q. But it reflected the Department's intent at that point in time?



MR MILLER· Objection. Same --

BY MR NESLIN

Q. In administering the program?

MR. MILLER. Same objection.

THE WITNESS· Again, I have to go back, and in your definition, it was an intent of the Mission Plan, not a contractual intent And I think we have to go back to previous questions that you asked me on this. I think the distinction is extremely important here.

BY MR. NESLIN.

Q. Let me back up That intent reflected, whether you call it a plan or contract, it reflected what the Department intended to do as of that point in time Do you understand my question?

MR. MILLER: Same objections.

THE WITNESS: The intent of the plan in terms of how we would carry out the Nuclear Waste Policy Act, was to have a repository in place in 1998 and begin receiving spent nuclear fuel from reactors on a schedule that would preclude -- that would match their



NAEGELI REPORTING CORPORATION
Portland, OR (503) 227-1544
Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000
Coeur d'Alene, ID (208) 667-1163
Phone: (800) 528-3335 www.naegelireporting.com Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

generation rate and, you know, which would then
preclude them from having to build additional
on-site storage capacity. That's different from
contractual intent.
BY MR. NESLIN:
Q. What do you mean by contractual intent?
A. What do I mean by contractual intent?
Q Yes, sir.
A. Contractual intent was, I guess, the
quid pro quo between, you know, two parties that
in exchange for the utilities paying us one mill
per kilowatt hour, we would provide a disposal
facility to receive and dispose of their spent
nuclear fuel.
Q And what's the basis of that
understanding? Where does that understanding
come from, sir?
A. That understanding came out of the
Department and negotiation of the contract.
Q So what was, in your mind, the
contractual intent? Do you recall that issue?
MR. MILLER: Objection. Asked
and answered. Calls for a legal conclusion.
BY MR NESLIN:
Q. What were the utilities receiving in

Page 161

return for paying the one mill? Making the one
mill payment?
MR. MILLER: Objection. Asked
and answered.
THE WITNESS. Disposal services.
BY MR. NESLIN.
Q. Disposal services beginning in January of
1998?
MR. MILLER: Objection. Asked
and answered. Calls for a legal conclusion.
BY MR. NESLIN:
Q Is that correct?
A. Yes
Q. And disposal of substantial amounts of
spent nuclear fuel?
MR. LESTER: Same objections.
THE WITNESS: That doesn't talk
about the amounts at all.
BY MR. NESLIN:
Q. Well, sir, you -- if we go back to
Exhibit 14, second column.
A. Page?
Q. Page SNO69599. Mr. Morgan's testifying
or a portion of Mr. Morgan's presentation in
which he talks about the fact that he did not

Page 162

believe that accepting one spent fuel element
would meet the intent of the Act. Do you see
that language?
A. Yes.
Q. And you would agree with that. Correct?
A. Based upon the plan I would agree with
that
Q. Mr. Rosselli, did you discuss any of
your prior testimony with your counsel during the
last break?
MR. MILLER: Don't answer that
Objection. Calls for privileged communication.
MR. NESLIN: I'm not asking
what was said I'm simply asking whether he
discussed his prior testimony.
MR. MILLER: The substance of
our discussions with Mr. Rosselli are subject to
attorney/client privilege, and don't answer that.
MR. NESLIN: You're instructing
the witness not to answer?
MR. MILLER: That's correct.
(Whereupon, a document entitled
Battelle, Human Affairs Research Centers was
marked Exhibit-17.)
BY MR. NESLIN:

Page 163

Q Mr. Morgan, Exhibit 17 is a memorandum
from Thomas Overcast and Susan Carney at Battelle
to Emmett Moore?
MR. LESTER. I think it's Mr
Rosselli
MR. MILLER: Yeah, you misspoke
and said Mr. Morgan.
MR. NESLIN: Mr. Rosselli.
Excuse me. I'd like to direct you to page 2
of that document. PNL-117-3152 under heading
3.0, DOE Considers Temporary At-reactor Storage.
Would you read those two paragraphs please?
BY MR. NESLIN:
Q. Mr Rosselli, in the first paragraph, it
refers to you speaking at, "An Atomic Industrial
Forum Conference in Atlanta." Do you see that?
A. Yes.
Q. Do you remember participating in such a
conference?
A. No, I don't.
Q. Do you recall during the time that you
were at OCRWM making any presentations to outside
groups on the waste management program?
A. Yes, I do. I remember being in the
same forum as the conference that Mr. Morgan

Page 164

spoke at, I believe in Washington, D.C.
Q. That was the proceedings of the 1983 Civilian Radioactive Waste Management information meeting?
A. I believe so.
Q In December of 1983?
A. I think so, yes.
Q. Do you recall what the subject of your participation was?
A. I vaguely remember it had to do with the Waste Fund and the operation of the Waste Fund
Q. Did you prepare a written paper that you submitted?
A. Oh, what I remember, yes.
Q. And did you appear and actually present the paper and give a speech?
A. I gave a speech.
Q. Did you retain a copy of that paper?
A. No
Q. Your remarks?
A. No.
Q. Do you know who might have a copy of those remarks?
A. No.



Q You say that it addressed the Waste Fund. What aspect of the waste fund did you address?
A. I don't remember the specifics at this point.
Q What do you remember about it?
A. Very little outside of the fact that I was on the docket to speak.
Q. Do you recall making any other presentations regarding the waste management system during the period that you were at OCRWM?
A. To the last public forum, no, I don't.
Q. And in paragraph 3.0 on page PNL-117-3152 in the second paragraph the last sentence states or attributes to you the statement that, "DOE plans to provide the capability to accept waste at the reactor site in accordance with the waste acceptance schedule so that utilities will not be required to continue adding additional storage capacity beyond 1998." Do you see that?
A. Yes.
Q. Does that refresh your recollection at all?
A. I don't remember the speech. I do



remember internal discussions in the Department to be consistent with the Mission Plan that said, utilities would not have to, at their own cost, build additional on-site storage. That we were looking at options, should a repository be delayed beyond 1998. And these were some of the, you know, options that were under consideration.
Q. And internal discussions among who?
A. DOE, OCRWM staff. Specifically, I couldn't remember and tell you.
Q. Would it have been senior staff at your level?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes
BY MR. NESLIN:
Q And did you agree with that view that DOE should be accepting waste -- or that DOE planned to accept waste at a rate such that utilities would not be required to add storage after 1998?
A. That was consistent with, you know, the Mission Plan that we were putting together and the intent of that plan.



Q You agree with that?
A. Yes
Q. You say that DOE was looking at certain options Are you referring to the options discussed in the preceeding sentences of this document?
A. Yes
Q That's at-reactor cask storage and a monitored retrievable storage system?
A. Yes.
Q. Were there other options that DOE was considering?
A. I honestly don't remember that.
Q. DOE would pay for the implementation of those options?
A. Yes. Let me -- yes, we would Because we were going to build a monitor retrievable storage out of the -- yes So whether it was casks at reactor sites or shipment to an interim storage facility, yes.
Q. And the effect of that would be that individual utilities would not have to add storage after 1998?
A. Yes
Q Or incur any costs associated with

# CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,

Plaintiffs,

vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
98-621C, 99-447C, 00-440C
00-697C, 00-703C, 01-115C
01-116C, 01-249C

UNITED STATES,

DEFENDANT.

---

VOLUME II
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 16, 2002
- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 9:07 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.


## NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000

Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

National: (800) 528-3335
www.naegelireporting.com
Fax: (503) 227-7123

Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

*IN THE UNITED STATES COURT OF FEDERAL CLAIMS*

YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,
Plaintiffs,
vs Case Nos 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
UNITED STATES, 98-621C, 99-447C, 00-440C
00-697C, 00-703C, 01-115C
01-116C, 01-249C
DEFENDANT

---

VOLUME II
DEPOSITION OF ROBERT M ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 16, 2002
---

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M Rosselli was taken before Marta M Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 9 07 a m, the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington

Page 186

APPEARANCES

ARNOLD & PORTER
BY DAVID S NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail. David_Neslin@aporter com
Appearing on behalf of Sacramento Municipal Utility

SHAW PITTMAN
BY; DANIEL S HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail Daniel.herzfeld@shawpittman com
Appearing on behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the state of New York, Omaha Public Power District, and Nebraska Public Power District

BALCH & BINGHAM

Page 187

BY K C HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail Kchairston@balch com
Appearing on behalf of Alabama Power, Georgia Power, and Southern Nuclear

JENNER & BLOCK
BY DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail Dcassling@jenner com
Appearing on behalf of Commonwealth Edison Company
.
U S Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D LESTER, JR. and R. ALAN MILLER
1100 L Street, N.W
Washington, D.C 20530
202-307-6288
E-mail harv lester@usdoj gov
alan miller@usdoj gov

Page 188

Also Present
Peter J Skalaban, Jr

Page 189

RICHLAND, WASHINGTON,
APRIL 16, 2002,
9 07 a.m.
EXAMINATION
BY-MR.NESLIN
Q Mr Rosselli, I remind you that you're still under oath from yesterday Do you understand?
A Yes
Q And we'll follow the same ground rules that we discussed in the beginning of your deposition yesterday, okay Do you recall?
A Yes
Q Have you discussed your deposition with anyone since the time that we broke yesterday and this morning?
A. No
Q I'd like to clarify one point that we discussed yesterday afternoon with respect to Exhibit 13, the December 20, 1983 draft of the Mission Plan Mr Rosselli, am I correct that this draft does reflect the intent of the Department, as you understood it at the time it was issued?
A The intent of the Department as it



relates to its plans to fulfill the requirements of the statute, yes
Q It reflects how the Department expected to fulfill it's requirements under the statute?
A Yes
(Whereupon, a document entitled Mission Plan for the Civilian Radioactive Waste Management Program, dated April of 1984 was marked Exhibit-24 )
BY MR NESLIN
Q Mr. Rosselli, you've been handed what's been marked Exhibit 24 to your deposition This document is entitled Mission Plan for the Civilian Radioactive Waste Management Program dated April of 1984 Would you have been responsible for the preparation of this document, sir? And let me clarify that this is not the entire document It's simply, I believe, the first two chapters of a much lengthier document
A Given the fact that the Mission Plan was under my responsibility, I would conclude, yes
Q And you were still at OCRWM as of April 1984?
A Yes, I was
Q. Would you have reviewed this before it



was published in this form?
A I don't recall
Q Sir, as you've testified that you would have been responsible for the preparation of the Mission Plan, apparently a Mission Plan, this April draft, was prepared, was published Pages 1 and 2 indicate that it was circulated to various parties by the Department Based upon that, would you believe that you would have reviewed it before it was circulated?
A The transmittal letter on this thing is dated May 2nd, '84 And I do not recall when I started to actually disengage If memory serves me correctly, I was here in Richland in the first part of May And so I don't recall the extent and degree of my actual review of this before it went out
Q. Do you recall reviewing drafts of the Mission Plan subsequent to December 20th of 1983?
A Yes, I did I have reviewed those documents Those are per all your documents
Q And I'm talking about drafts after, that were prepared after Exhibit 13?
A No, I don't recall that I just don't recall



Q Do you recall the process that the Department followed in going from the December 20th, 1983 draft to the April 1984 draft?
A Specifically, no, I don't recall the exact process
Q Do you recall anything about the process?
A No, I don't
Q Do you recall who was involved in attempting to revise the plan?
A Specifically, no
Q I believe you testified yesterday that the Mission Plan work was coordinated by Mr Head in the operations division?
A That's correct
Q Would Mr Head have been involved in the preparation of the April 1984 draft?
A Yes I can only assume, you know, at this point in time, given the functional responsibilities of that organization and the fact that it fell under my responsibility that, you know, there was a process, and those players were involved from the initial draft to the second draft to the final
Q If I could direct you to page 2-1 of

the April 1984 draft If you could look under heading A, Waste Acceptance Schedule If you could review that portion of the document. Do you see the table 2-1, Mr. Rosselli?
A. Yes.
Q. Do you recall reviewing this table?
A No, I don't
Q At or about March or April of 1984?
A. I don't recall it specifically, no.
Q. Do you know whether this table reflected the Department's intended rate for receiving spent nuclear fuel as of April 1984?
MR LESTER. Objection Calls for speculation and a legal conclusion
MR. NESLIN You may answer if you can
THE WITNESS Yes I believe that in the earlier version, it showed 1800 as the initial acceptance rate for the first five years And I believe in further thought and discussion, the department felt that they couldn't start at that higher rate, so they made some adjustments to it and they, sort of, prepped for operation and full scale on a different schedule And that's what I remember



as the terms of why there are changes in the numbers from the previous Mission Plan.
BY MR NESLIN
Q. This table reflects the receipt rate of 400 metric tons beginning in 1998, increasing to 900 metric tons in 2001, 1800 metric tons in 2002, and then 3000 metric tons thereafter for the first repository. Correct?
A Yes.
Q And a second repository beginning in, I believe, 2005 at 1800 metric tons receipt rate, increasing to 3000 metric ton receipt rate in the year 2010. Correct?
A Yes.
Q Did that reflect the Department's expectation as of April 1984, as you recall?
A. Yes.
Q. Mr Rosselli, was the change to a 400 metric ton receipt rate in 1998, was that because returns repository development was slipping?
A. No. It was much more associated with start-up of a new operation and what was doable relative to the start-up.
Q Concerns that you could not immediately



begin performing at 1800 MTU?
A. Right
Q Even if the facility were operating in 1998?
A. Right. It was as they were starting to look at it, you know, the feeling was that starting at 1800 was too big a number for an initial acceptance rate. And they had to start on a smaller scale and work through the procedures that were in place and get comfortable with them before they got to a steady state operation of 3000. It would take them some time to get there, which is a normal start-up situation, by the way, in anything
Q Who at the department was involved in making that change? Do you recall?
A I don't recall that
Q Do you recall who at the department had concerns about the Department's ability to begin receiving waste at the rate of 1800 MTU in 1998?
A I don't recall that
Q Do you recall -- if I could direct you back to Exhibit 1 Do you recall whether that reflected input from the geologic repository



deployment section?
MR LESTER Objection Asked and answered
THE WITNESS I don't recall
BY MR. NESLIN
Q Do you recall whether it reflected input from the storage and systems development?
MR LESTER Same objection.
THE WITNESS I don't recall
BY MR NESLIN
Q Is there anything that you can think of that you might look at that would refresh your recollection on this issue?
A Not off the top, no
Q Can you think of who else would be knowledgeable about this issue?
MR LESTER Objection Asked and answered.
THE WITNESS Specifically, no.
(Whereupon, pages of a document from the Justice Department to Mr Rosselli were marked Exhibit-25 )
BY MR NESLIN:
Q Mr. Rosselli, Exhibit 25 is a series of pages, the first page of which bears the

CONDENSED TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff,

vs. No. 98-126C, 98-145C, 98-474C

UNITED STATES OF AMERICA,

Defendant.

VOLUME III
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of the Plaintiff
April 16, 2002

- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 10:30 a.m., the proceedings being reported at the Hampton Inn, 486 Bradley Boulevard, Richland, Washington.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff,

vs No 98-126C, 98-145C, 98-474C

UNITED STATES OF AMERICA,

Defendant.

---

VOLUME III
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of the Plaintiff
April 16, 2002

- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 10.30 a m., the proceedings being reported at the Hampton Inn, 486 Bradley Boulevard, Richland, Washington

Page 227

APPEARANCES
SPRIGGS & HOLLINGSWORTH
BY. PETER J. SKALABAN, JR.
1350 I Street, N W.
Washington, D C. 20005-3305
202-898-5821
E-mail pskalaban@spriggs com
Appearing on behalf of Yankee Atomic Company

U S DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY HAROLD D LESTER, JR and R. ALAN MILLER
1100 L Street, N W
Washington, D C 20530
202-616-0383
E-mail harv lester@usdoj.gov
alan miller@usdoj gov
Appearing on behalf of the United States

Page 228

RICHLAND, WASHINGTON,
APRIL 16, 2002,
10.30 a m
ROBERT M. ROSSELLI,
having been first duly sworn, was examined and testified as follows·
EXAMINATION
BY-MR SKALABAN
Q. Hello, Mr. Rosselli My name is Peter Skalaban I represent Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company. This deposition has been noticed in Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Main Yankee Atomic Power Company versus the United States under the numbers 98-126C, 98-153C and 98-474C Could you state your full name for the record?
A Robert Michael Rosselli
Q Procedurally, how this deposition will work is, I'll be asking you a series of questions, and you will be expected to answer the questions The court reporter is taking everything down, and we will get a written transcript of everything that's said today. Do

Page 229

you understand that?
A Yes, I do
Q Please respond verbally, so that the court reporter can get your answers So if possible, please avoid shaking of the head Is that okay?
A Yes, it is
Q If I ask you a question and you don't understand one of my questions, or you're not sure what I'm asking, will you let me know, so I can rephrase it?
A I will
Q And if I ask you a question and provide an answer and later on in the deposition you realize that answer is incorrect or incomplete, will you let me know, so that we can correct or complete your answer?
A Yes, I will.
Q. Thank you Sir, where were you born?
A Youngstown, Ohio
Q And when were you born?
A May 8, 1944
Q Did you grow up in Youngstown, Ohio?
A No I grew up, basically, in Murray, Ohio which is a southwest suburb of Cleveland

Page 230

Object to the form. Object because it calls for speculation
THE WITNESS: I have no basis to respond to that question
BY MR. SKALABAN
Q Is it reasonable to expect that some utilities under an OFF schedule would not have enough of an allocation to meet their storage needs?
MR LESTER Objection, vague Objection, doesn't define the time period. Objection, calls for speculation And I object to the form
THE WITNESS I have no basis to respond to that question
BY MR. SKALABAN
Q When you say you have no basis to respond to my last two questions, you just don't have an understanding of the issue?
A I don't know what would happen in 1998 It's total speculation So I have no basis to comment upon that
Q Well, when you were involved in drafting the contract in 1983, did you have any expectations of how that would work in the



future?
A No
Q In terms of OFF and exchanges?
A No We were setting up a mechanism that would provide for the disposal of spent nuclear fuel based on oldest first
Q And that's how you expected it would work in practice?
A Yes. And there was the exchange provision to address, if for some reason a deviation surfaced.
Q And that reason would not be to reallocate the acceptance allocations to each utilities in an efficient way?
MR LESTER: Objection Asked and answered both in this deposition and in the last one Calls for a legal conclusion I object to the form as well
THE WITNESS I do not recall.
BY MR. SKALABAN
Q In your mind if exchanges would allow for the reallocation of spent fuel acceptance allocations in a manner that was efficient and saved utilities money, would that be a desirable outcome?



MR. LESTER: Objection, vague Calls for speculation
THE WITNESS. I don't recall
BY MR. SKALABAN.
Q But even sitting here today, would that be a desirable outcome to increase under efficiency?
MR. LESTER Same objections.
THE WITNESS I don't recall.
BY MR SKALABAN
Q. Again, Mr Rosselli, I'm not asking for your recollection. I'm just asking you for your opinion If exchanges would allow for utilities to realize cost savings by reallocating among themselves, acceptance allocations, would that be desirable?
MR LESTER Objection, vague Calls for speculation
THE WITNESS. You're asking me to comment on something that I don't recall was a consideration at the time of the formation of the contract
BY MR SKALABAN·
Q But sitting here today, you have no opinion on whether that would be desirable or



not?
A No, I don't
Q I'd like to call your attention to paragraph 112 on page 24 of this document That paragraph states, "Under the Yankee Atomic Contract, DOE is required to undertake all reasonable steps necessary for the development, licensing and construction of all transportation casks necessary for use in the spent fuel/HLW program established by the NWPA "
Do you agree with that paragraph, Mr. Rosselli?
MR LESTER Objection, vague Doesn't define the term reasonable Calls for a legal conclusion The standard contract is the best evidence of its contents
THE WITNESS I don't recall
BY MR SKALABAN
Q Do you have any recollection of any discussions, at all, from the January 1983 time period through June of 1983 regarding DOE's provision of the transportation casks necessary for use in the spent fuel program?
MR. LESTER: Objection, vague.
THE WITNESS· I don't recall

MR. LESTER. Objection, vague, compound Calls for speculation
THE WITNESS I have no basis to respond to that
BY MR. SKALABAN:
Q And in the next paragraph it states that, "The movement of spent fuel from a spent fuel pool at an operating plant can be disruptive of the normal electricity generation activities at the plant " Do you see that, sir?
A. Yes, I do
Q Do you have any reason to disagree with that statement?
MR LESTER Objection, calls for speculation
THE WITNESS I have no basis to respond
BY MR. SKALABAN:
Q I'd like to call your attention to Rosselli Exhibit 3 which is the standard contract If you could please take a moment to read -- I'll give you the Bates number of the page It's HQ0016689
A Okay



Q If you could take a moment to read Article B
A. Excuse me what article?
Q I'm sorry Article 5, paragraph B, entitled Delivery Commitment schedule and paragraph C, entitled Final Delivery Schedule
A Okay
Q During the time of contract formation, what was your understanding of how Article 5, subparagraph b, Delivery Commitment Schedule would work in operation?
MR LESTER Objection Calls for a legal conclusion and asked and answered in the prior coordinated discovery depositions.
THE WITNESS. In the development of the contract, we were preparing a process, was an enabling process I don't recall giving much thought in terms of how it would actually work, because it was so far out into the future
BY MR SKALABAN
Q. So at the time of contract formation, you hadn't thought through all the details of how the process would work and operation --
MR LESTER. Objection, form.



BY MR. SKALABAN.
Q -- down the line?
MR. LESTER. Objection, form. Mischaracterizes his testimony.
THE WITNESS Yes And at the time of, you know, formulation, I mean, there were still a lot of technical and financial questions that had to be resolved So we were putting together based on the contract, on the legislation, the instrument that would define the process in terms of how this would all work when all these things got resolved
MR SKALABAN I'm sorry Could you read back the last answer
(Record read )
BY MR. SKALABAN
Q. Now, I'm sorry, what did you mean by the instrument of the process? I'm not sure if I followed your answer to that?
MR LESTER. Objection, vague
BY MR. SKALABAN:
Q Could you clarify that for me a little bit?
A The contract was the instrument and that contract outlined the process that would be used



once all the issues were resolved, and we were starting to implement the contract
Q And so what did you understand that process to be?
MR LESTER Objection, vague
THE WITNESS As outlined right here in the article, that utilities would propose The Department would either accept or reject their proposals If they were rejected, they were given an opportunity to re-propose or revise.
BY MR SKALABAN
Q Now, what did you understand the criteria to be on whether a DCS was acceptable or not?
MR LESTER Objection. Calls for a legal conclusion Asked and answered in the last deposition
THE WITNESS I don't remember
BY MR SKALABAN
Q And did you anticipate that the exact operation of this provision and this process would be flushed out in the future?
MR. LESTER. Objection. Calls for a legal conclusion

THE WITNESS I don't recall
BY MR. SKALABAN
Q. Do you have any understanding of what the provision that says, "Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus 20 percent and the delivery schedule up to two months until the submission of the final delivery schedule." Do you have an understanding of what that provision was intended to do?
MR. LESTER Objection. Calls for a legal conclusion
THE WITNESS: I don't recall.
BY MR SKALABAN:
Q Do you have an understanding of what the effect would be if the delivery commitment schedule process was halted or suspended?
MR LESTER. Objection Calls for a legal conclusion
THE WITNESS I have no basis to respond to that
BY MR SKALABAN
Q So at the time of contract formation, you hadn't thought of the possible effects of that? Of a halting or suspense in the process?

Page 299

MR LESTER Objection, form. Mischaracterizes his testimony
THE WITNESS I don't recall.
BY MR SKALABAN.
Q Do you have any understanding of what the effect of final delivery commitment schedule was intended to be? A final delivery schedule, what the intent -- I'm sorry. Let me rephrase that, maybe, to be a little clearer.
Article 5, paragraph C, refers to final delivery schedule. Do you have any recollection of what DOE's intent was regarding how that provision would operate?
MR LESTER: Objection. Calls are a legal conclusion. Vague.
THE WITNESS: This was the instrument that the utilities could propose what they finally would be giving the Department according to their acceptance ranking And it would be the basis upon which future plans would be, you know, made to receive and ultimately dispose of their spent fuel.
MR SKALABAN: I'd actually like to take to break, Mr. Lester, if that's acceptable to you, because I don't think I have

Page 300

that much longer to go And if I can organize things then --
MR. LESTER. Sure.
(Recess)
MR. SKALABAN: I'd like to mark as Rosselli Exhibit 6 the May 7, 1983 EEI comments
(Whereupon, a document entitled Edison Electric Institute dated March 7, 1983 was marked Exhibit-6)
MR. LESTER I'm sorry. You mean to say March rather than May?
MR. SKALABAN March 7, 1983 EEI comments
BY MR SKALABAN
Q Mr. Rosselli, if you can look at page 7 of these comments. First of all, do you recognize these comments?
A Specific form, I mean, I don't But I do recognize that we got comments from EEI
Q Does this --
MR. LESTER Maybe we could stop the deposition until taping stops
MR SKALABAN. Yeah, off the record

Page 301

(Off the record)
BY MR SKALABAN
Q Does this appear, Mr Rosselli, to be the comments that you would have received from EEI?
MR LESTER Objection Calls for speculation
THE WITNESS To the best of my recollection, yes
BY MR. SKALABAN.
Q I'd like to call your attention to page 7 in the letter It's YDK-026-103882.
A Got it
Q Do you see in the first full paragraph beginning, "To remedy these shortcomings?"
A Yes
Q EEI states, "We also urge the purchasers be allowed to exchange delivery commitments This will allow the marketplace to deal with particular utility needs." Do you see that, sir?
A. No. "To remedy these shortcomings?"
Q Yeah, it's in that paragraph If you could take a moment, please.
A. Okay.

Page 302

# SLATER-THOMPSON, NANCY

Nancy H. Slater April 21, 1999

*Page 1 to Page 205*

CONDENSED TRANSCRIPT AND CONCORDANCE

*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC 20005*
*Phone: 1-800-FOR-DEPO*
*FAX: 1-800-367-3310*

**Page 1**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
--------------- X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No 98-126C
v Senior Judge
Merow
THE UNITED STATES,
Defendant
--------------- X
Washington, D C.
Wednesday, April 21, 1999

Deposition of NANCY H SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N W , Washington, D.C , at 10.10 a m , Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A WILLIAMS, RPR, and transcribed under her direction

**Page 2**

APPEARANCES

On behalf of the Plaintiff
ROBERT L SHAPIRO, ESQ
JERRY STOUCK, ESQ
PETER J SKALABAN, JR , ESQ
Spriggs & Hollingsworth
1350 I Street, N W
Washington, D C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E SULLIVAN, ESQ
Trial Attorney
Commercial Litigation Branch
U S Department of Justice
1100 L Street, N W
Room 10150
Washington, D C. 20530
(202) 307-6289

**Page 3**

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| NANCY H. SLATER | PLAINTIFF |
| By Mr. Shapiro | 4 |
| Afternoon session - 94 | |


EXHIBITS


| SLATER EXHIBIT NO | PAGE NO |
|---|---|
| 1 - Letter dated 3/1/99 | 50 |
| 2 - Letter dated 4/28/87 | 82 |
| 3 - Memo dated 6/29/87 | 95 |
| 4 - Letter dated 10/2/87 | 97 |
| 5 - Letter dated 11/10/87 | 99 |
| 6 - Standard Contract Issue Resolution Process | 122 |
| 7 - Preliminary Draft dated 12/19/92 | 152 |
| 8 - Handwritten documents dated 8/29/91 | 161 |
| 9 - Memo dated 6/18/92 | 171 |
| 10 - Preliminary Draft dated 12/22/92 | 175 |
| 11 - Preliminary Draft dated 12/19/92 | 177 |
| 12 - Fax dated 9/1/93 | 181 |
| 13 - Spent Fuel Acceptance Scenarios devoted to Shutdown Reactors dated 10/89 | 185 |
| 14 - Letter dated 1/26/93 | 191 |
| 15 - Fax dated 6/2/94 | 194 |
| 16 - Memo dated 7/25/94 | 199 |


**Page 4**

PROCEEDINGS

Whereupon,

NANCY H SLATER,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows

EXAMINATION BY COUNSEL
FOR PLAINTIFF
BY MR SHAPIRO:

Q. Would you state your name for the record, please.

A Nancy H. Slater.

Q. Ms Slater, my name is Robert Shapiro, we're here for your deposition. Have you ever had your deposition taken before?

A No

Q Do you have some understanding of what's going to happen today?

A Yes

Q. What do you understand is going to happen today?

A I understand that I'm going to be a factual deponent and that you're interested in asking me questions about my knowledge of the waste acceptance area during the time I was in

**Page 29**

instance, DOE's obligations under the contracts?

A. Actually I can give you an example of what I would have looked at that might clarify this a little, and that is utilities are entitled to deliver five-year-old fuel If the requirements document were to say ten-year-old fuel, I would have to call that out as something that needed to be corrected. So that's the kind of thing that you would have looked for, the inconsistencies between the contract and the requirements documents

Q Let me go back to that again Suppose your contracts required you ultimately to take 100,000 MTU and you see that the system is only calling for 70,000 Wouldn't that be an inconsistency?

A I don't believe that it would be. You understand that the 70,000 MTU is legislatively mandated. So, therefore, you understand that there is no flexibility to change the capacity of the repository willy-nilly

But, if you've read the legislation, I'm sure you also understand that at one point a second repository was contemplated So no, I could not do anything about 100,000 MTU limit

**Page 30**

because I cannot change legislation.

Q Again so I understand the difference is that you were really looking at things for which there might be some flexibility to change, those were the kinds of things that you were examining, to see if those items were consistent with the contract?

A Right, or there were some items that might have been inflexible and someone made an error and transposed a number. So we were looking at a lot of things, again with the ultimate goal of assuring that the contract was consistent with program documents, no new requirements imposed indirectly

Q But, if there was a legislative limit such as the 70,000 K limit, you weren't going to look at that to see how that would fit in with the contracts?

A No. And I don't believe that the 70,000 limit is discussed in the contract.

Q When you were looking at these kinds of requirements, did you ever look at the time frame called for in the contract for starting waste acceptance and how that fit in with the system requirements?

**Page 31**

A I'm not sure I understand the specific point you're trying to get at with that question.

Q. Well, you understand the contract called for --

A. January 31, 1998, right

Q. Called for waste acceptance that began on that date?

A. Right.

Q Did you ever look at whether or not any of the system requirements called for waste acceptance to start at a later point in time, would you have looked at that kind of issue?

A. I would have looked at that kind of issue. And my recollection at the time I was there is that the documents were consistent with the contract

Q The system requirements documents called for waste acceptance to begin by January 31, 1998?

A I believe so

Q Do you recall how the system planned to start taking spent fuel in '98?

A No, I don't

Q The system requirements documents, when

**Page 32**

you looked at them, in the '91 to '95 period, they didn't call for taking spent fuel by 1998 in a repository, did they?

A I think the subject of acceptance, transportation, storage, and disposal was in the main addressed independent of date The same activities have to be performed no matter the date you start them.

Q. Do you recall looking at any discussions in the system requirements documents of taking spent fuel at a location other than the one repository?

A. No

Q So the system as we've been talking about, as you've been referring to it, was the system for the one repository?

A Yes

Q And earlier you had mentioned that there was some discussion that the system might include two repositories?

A. No. There was legislation that discussed the second repository.

Q. Let me go back to your background. Prior to 1991, when you joined DOE, what was your prior position?

**Page 33**

A I worked for the Edison Electric Institute in two positions Lastly in the fossil power area, managing two committees, prime movers and chemistry But prior to that, when I joined the institute, I was program manager for the Utility Nuclear Waste Management Group

Q What was your job title when you were working in the fossil fuel area?

A Program manager.

Q And how long were you in the fossil fuel area?

A My recollection is perhaps a little over two years

Q How come you left EEI to go to the government?

A. Oh, this will sound like one of those idealistic answers, but truthfully I grew up in the generation that was taught that you do not solve problems from the outside, you solve them from the inside, you have to be part of the solution And I was on a "mission from God"

Q What do you mean you were on a "mission from God"?

A It's a line from the Blues Brothers I was very committed to the whole concept of

**Page 34**

disposal.

Q When you say the issue of disposal, you mean spent fuel disposal?

A. Yes, nuclear waste disposal, whether it's spent fuel or high level waste.

Q And we've covered the period when you were with the fossil fuel group When did you start with the nuclear waste group?

A. That would have been in 1991, April -- no, actually sorry about that, April of '86, because I was with EEI for roughly five and a half years

Q So roughly '86 to '89 you were in the nuclear waste of EEI and then '89 to '91 the fossil fuel area?

A. Right

Q How come you moved in '89 from the nuclear area to the fossil fuel area?

A Truthfully because I had a manager who was the most obnoxious person I have ever worked for And it is just as important to me who I work for as what I do

Q You had an obnoxious manager in the nuclear area?

A Nuclear area

**Page 35**

Q Who would that have been?

A Steven Kraft.

Q What was Mr. Kraft's position?

A He would have been the director.

Q Director of the Utility Nuclear Waste Management Group?

A Right There were two program managers, one handled low level waste and I handled spent fuel and high level waste.

Q I'm not sure how EEI was organized. What was the level above Mr Kraft?

A It would have been a vice president

Q And who was that?

A Loring Mills

Q During the two years you were with the fossil fuel group, did you have any residual involvement at all in the nuclear side of things?

A None. I was asked to come back and I refused

Q Who asked you to come back?

A Steve Kraft

Q What sort of issues did you work on with the Utility Nuclear Waste Management Group from '86 to '89?

A As I recall we were routinely involved

**Page 36**

in assessing the adequacy, both financial and technical, of DOE's program. We would visit the sites I remember at that time there were three

We would meet with department personnel to discuss issues that were of interest to us And we were also involved in an effort that related to the standard contract And involved identifying issues that might require clarification.

Q. Did this group have any involvement in legislation?

A. Not directly, no

Q What about indirectly?

A Indirectly as you know EEI is a trade association and dealt with -- I'm not sure what it stands for, ANEC which would have been the lobbying arm And so that's how any legislative connection would have been made But I have no personal knowledge of that.

Q Now, if I understand correctly, did this part of EEI, the Utility Nuclear Waste Management Group, what happened to that group?

A Well, let's see. Ultimately I believe they were absorbed by NEI, but I can't tell you

**Page 65**

contract that could use some clarification
Which part of the contract were you trying to clarify when you were looking at the priority for shutdown plants issue?
A. I don't recall the specific provision, but I believe the language runs something like may provide priority for shutdown reactors.
Q. So you were trying to put some greater meaning on what was meant by may provide?
A Actually I believe we were trying to find a way to meet the needs of both groups
Q Did anyone have a proposal, how were you going to meet the needs of both groups?
A Actually there was a proposal And that was to request an exchange in -- two utilities, it assumed two utilities were swapping, one that was shutdown and one that was operating
The shutdown reactor would request an exchange in positions in the queue for lack of a better word That would have been a deal that was worked out as we understood it in the utilities -- in the group between the two utilities
Q In fact, there was a provision in the

**Page 66**

contract that called for exchanges of slots in the queue?
A That would permit exchanges
Q When you say permit exchanges, what do you mean by permit?
A It is possible for one utility to exchange its position in the queue with another utility If, for example, utility one has a ten MTU allocation and utility two has a ten MTU allocation, they would exchange like in kind.
Q Did the utility group in this '86, '87 time frame, did it ever reach closure on the priority for shutdown plants issue?
A Not in the '86, '87 time frame.
Q What happened in the '86, '87 time frame with that issue?
A The discussion continued And, as you might well imagine, it was rather rancorous at times
Q The way you've described it, it sounds like a zero sum game, there was no way to work it out, was there?
A That depends on how willing the two parties are to work together.
Q As one of the staff people, did you try

**Page 67**

to come up with compromises?
A. We were not engaged in exchanges at the time, simply developing the process, suggesting the process. There were no exchanges going on at the time. One would have to submit a DCS before you could do that. And they would not have been submitted.
Q DCS?
A Delivery commitment schedule
Q Let me ask a different question What was your role as staff person for the group with all these rancorous discussions going on?
A Listening to both sides, serving as a mediator on occasion because the viewpoints were rather strong given that they were financially motivated; and, as a utility group, trying to help the group reach some consensus
Q. What did you do as a mediator?
A Sometimes people don't hear what the other person is saying, they're not hearing it accurately They're reading into it, they're filtering it And you defilter and you stop the reading into Just more clear communication, because I do not have a vested interest in the outcome of the situation.

**Page 68**

Q Let me make sure I understand So you would try to go to each side in this dispute and tell them as objectively as you could what the other side was really talking about?
A Uh-huh, yes
Q Do you recall, were there any particular areas of misunderstanding, where in your sort of objective presentation you would try to make a distinction?
A I do recall that there was concern among the shutdowns or potentially shutdown reactors that this would not be a simple exchange but might involve the exchange of some remuneration as well
Q. Was that, in fact, the view of the utilities that were proposing exchanges instead of priority, that there would be money as well as exchanges in kind?
A No, I don't recall that
Q The utilities in this '86, '87 time frame were simply talking about exchanging the slots themselves?
A. Right.
Q. On this priority for shutdown plants issue in the '86 or 87 time frame, was there any

Page 69

interaction between your group and the Department
of Energy on this issue?
A Yes
Q What was the nature of that
interaction?
A. Informal technical exchanges with the
logistics and utility interface branch on a
variety of issues including that issue.
Q Were you involved in those informal
exchanges personally?
A Yes
Q. Who would you have talked to at DOE?
A. Alan Brownstein.
Q When you say you had informal technical
exchanges with Mr. Brownstein, what do you mean
by a technical exchange?
A Not debating legislative history, not
debating organizational policy, strictly
addressing the technical merits of the issue, the
mechanistic aspects of the issue.
Q. What do you recall Mr. Brownstein
saying on this issue in that time frame?
A I recall that Mr Brownstein expressed
his opinion that this was very much an industry
driven issue, that, if the industry decided as an

Page 70

industry that shutdown reactors should have
priority, given the statement in the contract may
grant, the department would be willing to
consider that.
Q. Mr Brownstein reviewed the language
saying that DOE may give priorities as giving DOE
complete discretion to do it or not?
A. I don't believe I would characterize it
that way. I would characterize it as the
flexibility to grant priority, if the industry
achieved consensus, that that was what the
industry wanted, because it was an industry
equity issue
Q Mr. Brownstein understood the priority
for shutdown plants issue to be an industry
equity issue also?
A Yes
Q Other than your discussions with
Mr Brownstein, did you discuss the priority for
shutdown plants issue with anyone else at DOE in
the '86 to '87 time frame?
A I don't recall that I did
Q What would you have been telling
Mr Brownstein during these discussions?
A What I did tell Mr. Brownstein is that

Page 71

we were finding it very difficult as a group to
achieve consensus on the issue, that the obvious
split was occurring because of the equity
involved And that I was not sure we would be
able to achieve consensus on that issue
Q Did you discuss the possible exchanges
of slots in the queue with Mr Brownstein?
A. Yes, we did as a group. And
Mr Brownstein believed that, by affording the
utilities the opportunity to exchange positions
in the queue, they were -- the contract was
affording the utilities the opportunity to
rearrange their location in the queue
Q You said you had these discussions with
Mr. Brownstein as a group. Who was in the group?
A This would have been the high level
waste working group. There was a low level waste
working group This is all part of the Utility
Nuclear Waste Management Group
Q. Who was in the high level waste working
group?
A Oh, I don't remember all the names
But --
Q Just tell me who you remember
A Let's see, Jerry Rhode, Rudy Grube,

Page 72

Andy Kadak, Greg Snipes, Tony Furrier, Marvin
Smith, Brian Wakeman, Dave Zabransky
Q Anybody else?
A That would be stretching it I can see
faces and not remember names right now.
Q. That's a pretty good list. Each of
these individuals was affiliated with a
particular utility, a particular utility that had
one of the standard contracts?
A Yes
Q This would be a more difficult
question, but can you link the people with the
companies?
A. Gerry Rhode I believe was Niagara
Mohawk. Tony Furrier I believe was Rochester Gas
& Electric. Greg Snipes was Duke Power. Marvin
Smith and Brian Wakeman were Virginia Power
Dave Zabransky was Wisconsin Electric Power
Q Mr Grube?
A Rudy was -- was he Maine, Maine
Yankee?
Q Was he Yankee Atomic?
A I believe he was Yankee Atomic
Q Mr Kadak, who was he with?
A. Maine Yankee.

**Page 81**

A Mr. Kraft rarely attended the working group meetings and tended to focus his efforts more on what was going on in the legislative front And the day-to-day operations for the group were left to me

Q You said there was a long list of issues that the utilities looked at that they thought might need some benefit or need some clarification that are in this standard contract Do you recall any others besides these three?

A Let's see The term domestic origin, for example, I do recall that one.

Q What was the nature of that issue?

A What does -- what is fuel domestic origin, is it fuel that's mined in this country or is it fuel that's burned in this country And as you know utilities buy their fuel from a variety of places And so one of the things that needed to be interpreted and clarified was that it means fuel burned in a reactor in this country

Q Did the group reach closure on that issue?

A Oh, yes, they did. And subsequently,

**Page 82**

when I came to DOE, I wrote the letter that answered the question yet again for one of the utilities

Q Which way did you answer the question?

A Burned in a U S reactor

Q Just to rephrase, DOE agreed that, as long as the fuel is burned in a U S reactor, it was considered fuel of domestic origin?

A Domestic origin, right, right

Q. Do you recall the utility working group looking at the issue of the rate at which DOE would accept spent fuel?

A Not really And only in the sense that whatever DOE came up with the utilities obviously wanted more

(Slater Exhibit No 2 was marked for identification.)

BY MR. SHAPIRO

Q. Ms Slater, if you would take a look at a document that we've had marked, Slater Exhibit 2 Do you recognize this document?

A Let me look through it. Yes, I do

Q Can you tell us what the document is?

A You'll remember that I said that there

**Page 83**

were issues that were identified based on review that both DOE and the utility group believed needed to be resolved Some of the issues were coincident, some were not

And this represented the utility group's effort to not only request a clarification but influence the outcome of the clarification because only the contracting officer had the ability to opine on the standard contract

Q Now, you'll see in the last page of this document that it's signed by Mr Kraft Do you recall, would you have written this document for him?

A No, I would not.

Q Were you involved in the creation of this document?

MS SULLIVAN Do you need to take time to review the document before you answer any further questions?

THE WITNESS: Yes, I was involved

BY MR. SHAPIRO:

Q. What was the nature of your involvement?

A Explaining issues to the individuals

**Page 84**

who would have been responsible for drafting this response, this request

Q Who would have drafted this letter?

A To the best of my knowledge, it would have been individuals like Jay Silberg at Shaw, Pittman, Potts & Trowbridge and Mike Bauser at Newman, Holtzinger

Q So it would have been drafted by outside counsel for the Utility Nuclear Waste Management Group?

A. With some support from perhaps technical contractors if it dealt with technical issues

Q. I see you looking through the document. Do you want some more time to look through it?

A No.

Q. Just a moment ago, you said something, and I didn't understand what you said. You had said that utilities had looked at issues and DOE had looked at issues that might need clarification, you said some were coincident and some were not I guess I'm not sure what you mean

A DOE, for example, might not have

**Page 105**

DOE didn't have any viewpoint?
A Priority for shutdown reactors was a classic
Q Any others?
A I don't recall specifically I remember that one in particular because it was so contentious within the industry
Q What about issues on which DOE did have a viewpoint, which of those do you recall being worked on?
A I know we had a viewpoint as DOE on final delivery schedules and what information those FDS's should include And I know that DOE based that on operational considerations, similar to the safeguards and security operational considerations I explained to you earlier this morning
Q Let me make sure I've got the right time frame in mind We're still talking about the time when you were working for the Utility Nuclear Waste Management Group?
A Yes
Q And during that period do you recall any other issues coming up where DOE was proposing a clarification?

**Page 106**

A Not specifically
Q What about when you actually started working with Mr. Brownstein over at DOE, this process was still ongoing?
A It was still ongoing
Q And then you sort of reversed roles in some respects and you started working on that process from the DOE side?
A Yes
Q What did you do in this process on the DOE side?
A For example, on -- I continued to work on developing positions on issues where DOE felt it had an interest, communicating with the utility group
Q Which issues do you recall working on once you joined DOE?
A Delivery commitment schedules, delivery commitment schedule exchanges, final delivery schedules, standardized canisters, oldest fuel first I don't remember whether domestic origin was one of those issues or not There were a significant number of issues
Q You mentioned delivery commitment schedules What was the nature of the issue with

**Page 107**

respect to delivery commitment schedules?
A Delivery commitment schedule had to be -- the instructions for completing the DCS had to be developed, the DCS itself had to be approved by is it OMB or -- OMB The DCS's had to be transmitted, actual forms had to be transmitted to the utilities.
Q. What was the issue as part of the ACR resolution process that was trying to be resolved with respect to delivery commitment schedules?
A. One of the issues that I recall, and this was from the utility side, the DCS asks for the discharge date on the fuel Now, the department would have liked to have had a very specific discharge date because it tells them a lot about the characteristics of the fuel It lets them plan very accurately
The utilities didn't want to do that. The utilities wanted to give them a range of discharge dates that might have been for ten years, because they wanted -- they believed they needed to preserve their flexibility to reach into that pool of fuel, pull it out, and give them anything they felt like giving them. And that was the issue. DOE wanted specific

**Page 108**

discharge date, they wanted broad discharge dates
Q Do you recall how that issue got resolved, did it get resolved?
A By default it did because the DCS's were submitted with a range of discharge dates. And on my side on DOE I recognized that, in the final delivery schedule, I would get the specific discharge dates So, in fact, it ceased to be an issue
Q Do you remember any other issues coming up in this ACR resolution process with respect to delivery commitment schedules?
A. Not that I recall
Q What about delivery commitment schedule exchanges, what was the issue there?
A Do you wish me to address that from the utility side or from the DOE side?
Q. Well, let's start with the utility side.
A From the utility side, the issue there centered around let's assume that two utilities wanted to make an exchange Could a utility that had BWR, boiling water reactor, fuel exchange with a utility that had pressurized water reactor

**Page 161**

address one issue, that you would go to rulemaking to address the entire suite of issues, some of which could take longer to resolve than others So a timing issue

Q The timing issue being that DOE wanted to wait before going further on this issue until other issues were more ripe?

A Until we completed the effort, the ACR issue resolution process, and been able to go to rulemaking with a more complete set of changes.

(Slater Exhibit No. 8 was marked for identification.)

BY MR SHAPIRO

Q Ms Slater, you've been handed what we've had marked as Slater Exhibit 8 Do you recognize this document?

A No, I don't recall this This is my handwriting And these appear to be the meeting minutes from a standard contract task force that would have been a utility group task force in August 29, 1991, five days after I joined DOE

And it looks like it focuses on completing DCS's And I believe you will note in item 3 that we discussed that range of discharge dates which was one of the issues that was

**Page 162**

unclear

Q You said that Slater Exhibit 8 that you're looking at looks to be minutes of a meeting of utilities Why would you have attended the meeting if you were already at DOE at that point?

A You recall that we discussed instructions for completing the DCS form Prior to formalizing the instructions for completing the DCS form, we would have met with the standard contract task force, the utilities, because we had provided them with a copy of the instructions and asked them to review it, asked them if they had any questions, and agreed to discuss the form with them so that we were not imposing something that was unclear and would not work

And this meeting appears to have done just that, because, if I am reviewing this correctly, starting at item 4, page 3, paragraph 1, page 3 paragraph 3, page 4 at the top, these are all what appear to be pages of the procedure

Q Let me also confirm something that I think you said earlier, that Slater Exhibit 8, the first page of it looks to be a sign-in sheet for a meeting?

**Page 163**

A Yes.

Q And the subsequent pages appear to be your own minutes or notes of that meeting?

A My notes for suggested changes, because, in fact, if you look, it says page 4 at the top, article VB, spell it out And what does approval mean, it has to be signed So this is exactly what this one is. This was to receive the comments that the utilities had on the DCS procedure and the form itself and go back and review them and then incorporate them.

Q. When you say the DCS procedure, you mean the instructions given to --

A Instructions.

Q Given to utilities on how to complete the DCS?

A Right

Q On the second page of Slater Exhibit 8, you have it looks like certain items or issues 1, 2, 3, 4 Could you tell me what the second one is talking about?

A Let me read it for a moment

Okay. Submission of the first DCS's was timed, it's explicitly mandated in the contract, 63 months prior to the delivery year,

**Page 164**

and assumes that delivery would commence in 1998, January 31, '98

If 1998 were not the year when delivery commenced, utilities would have submitted DCS's for 1998 The question was do they get to go back now and revise their DCS's or are they just overcome by events, are they calendar year specific or year one, is it 1998 or year one.

Q Year one of what?

A Of any range of dates. So, if it were year one, no one would have to revise anything. If it's 1998, do I make them go back and revise all their DCS's, do I -- if they have to go back and revise their DCS's, can I revise a DCS or would I have to treat it as an exchange in a given year So there were procedural questions about that, and that's what this issue is discussing

Q You say year one, you mean year one of DOE's acceptance of spent fuel under the waste acceptance system?

A Yes

Q The instructions for the delivery commitment schedules, did they require utilities to not request delivery of more spent fuel than

## Page 165

was provided for in their allocation in the published annual priority report?

A Yes, that would have been the basis for rejection of the DCS

Q Was there any discussion of that instruction at this meeting?

A I don't specifically recall that.

Q You don't specifically recall that instruction being discussed at any such meetings?

A No, because I know that, when I was on the utility side, we clearly understand that you weren't supposed to go ask for more than you were entitled to

Q What was the point then of the delivery commitment scheduling process if everyone was entitled to a certain amount and everyone knew what that amount was and you couldn't ask for more than that amount? Couldn't DOE have just written -- they knew what the delivery commitment schedules were going to be requesting, didn't they? What was the point of the process?

A. Again, because it's not as clear as you think it is, if there were no DCS exchange process, you might perhaps be correct. But, assuming that people could exchange positions in

## Page 166

the queue, could exchange BWR fuel for PWR fuel, could exchange ten-year-old fuel for five-year-old fuel, it could make a very great difference to how you manage your acceptance process

The DCS was supposed to be a heads-up from the utilities about the type of fuel they would be delivering to us The utilities didn't want to do that They did not want to commit themselves to a specific discharge date because they were concerned that, if they did that, they would lock themselves in and there would be no opportunity to deliver anything else

So in the end it wasn't much of a heads-up because they had tremendous ranges. In fact, there was a discussion that they would like to include in that range of discharge dates fuel that had not even been discharged at the time the form was submitted because obviously five years later, if it were four-year-old fuel, now it would be nine-year-old fuel

So again, you know, the heads-up that it was supposed to be in the end turned out to be not much of a heads-up at all. But by completing the DCS -- you had to have a signed DCS in order

## Page 167

to exchange So, by completing and filing the DCS, you were providing yourself with a future instrument to adjust your position in the queue

Q But, other than actually coming up with a formalized signed piece of paper, pretty much anyone looking at the process could have predicted what any given utility's DCS was going to look like?

A I would say that I could predict looking at the APR who was going to deliver -- this is absent an exchange process Who was going to deliver and how much they were going to deliver I couldn't predict what they were going to deliver, the age of it, that was just not possible

Q. As far as the age, what you're saying is most of the utilities were fairly vague as to indicating how old the fuel was that they intended to deliver anyway?

A They provided a tremendous range so that they would have the flexibility to pick what they wanted when it came time to deliver And for us, you know, we wanted to know because there are limits There's the certificate of compliance for each cask and there are I believe

## Page 168

thermal load limits, radiation level limits And that is dependent on the age and burnup of the fuel

So, if you're trying to schedule acceptance of fuel, you to a certain extent arrive at the number of casks you need to deliver by the type of fuel you're going to pick up So we had thought we would get a heads-up on what we would be picking up and that would permit the department to plan out its transportation program It didn't quite work out that way

Q. The DCS process would also I guess have allowed a utility to request delivery of less fuel than their allocation?

A. Yes. Let's assume that someone -- I don't believe this was the case But let's suppose someone was permitted to discharge -- to deliver one fuel assembly in year one Remember. every time you deliver fuel, you disrupt your operations in order to do that So the utility would likely ask themselves is it worth it to me to deliver one assembly.

Q Do you recall, did any utility submit proposed delivery commitment schedules requesting delivery of less than their full allocation?

**Page 173**

and there

Q And the bottom paragraph talks about a marathon session and mentions comments from others, you are mentioned and then the next entity is PNL Is that Pacific Northwest Labs?

A Yes

Q. What would the nature of their involvement have been?

A. PNL was involved in -- as a contractor in originally drafting -- helping to draft the standard contract Now, precisely what their involvement was I don't know And in this capacity they may have been consulting for Billy Cole

Q So PNL would have been a subcontractor of TRW?

A I think, I'm not sure.

Q And then the next entity referred to is M&O Transportation?

A That's TRW, that's management and operating, their transportation group. And the next organization would be the M&O MRS, monitored retrievable storage design group

Q What would the nature of those two organizations have been in the process of

**Page 174**

finalizing those issues?

A. If there were any design considerations for which we were unaware, because, remember, we were focusing on contractually based issues. If there were design considerations that we needed to consider or that we had overlooked, it would be their opportunity to inform us

Q At the top of the memo, there's a cc list with a number of people These people were all individuals involved in DOE's resolution of these issues?

A Some directly, some indirectly. Alan Brownstein, of course, was my boss. Jim Clark was M&O, the supervisory level, I don't know how directly he was involved. E.R. Johnson is the managing officer of JAI, and I don't know how directly he would have been involved

M C. Klose I don't recall Ernie Leonard, a staffer to the M&O. Nora McDonald, M&O, data manipulation Doug Williamson, M&O, nuclear engineering background And Glen Vawter, I don't have the vaguest idea of why he's on this distribution list, he's M&O

Q What do you recall Mr. Vawter's position being with the M&O group?

**Page 175**

A I don't recall his position with the M&O

(Slater Exhibit No 10 was marked for identification )

BY MR SHAPIRO.

Q Ms Slater, you've been given what we've had marked as Slater Exhibit 10 Do you recognize it?

A Yes I would like to look it over, but it is another OCRWM position on one of the 35 issues, this one dealing with the identity of the amount of waste to be identified on the DCS

Yes This is a simple issue, simple The language at the time in the contract implied that ad infinitum, when it became time to submit on that first opportunity of DCS, that you would have to tell us everything you were ever going to deliver

So the confusion was do I need to submit ten DCS's, 50 DCS's, do I put it all on one DCS, and what is the amount I'm supposed to submit This was a simple issue in the sense that what we told them was that the DCS is year specific It's not to include more than one year

**Page 176**

You have a DCS for every year And the amount you put in the DCS for one year is the amount that you're allocated for that year So there was confusion about how many DCS's did they have to submit for all ten years, could they submit for all ten years if they wanted to

The questions from the industry were all over the map Some people thought they didn't have to, some people thought they did It was just confusion.

Q Was part of this issue also the notion that the delivery commitment schedules called for the utility not to request more than their allocation, the utilities' statement of how much spent fuel they would like to deliver, if they had complete flexibility, it was constrained by their allocation?

A. Right, absolutely That was an implicit assumption. And, when I was in the utility side of the business, it was always understood that the DCS's were not to be completed for more than what you had as an allocation

Q And DOE shared that understanding?

A And DOE shared that understanding

Page 193

A Yes
Q Again there are a bunch of cc's at the bottom of this page Is this a listing of people involved in the delivery commitment review procedure process?
A In some cases, yes, but in most cases this looks like the standard distribution chain for just about anything The library is listed here, local records center, Bill Teer was a transportation type, Lois Smith was an environmental type.
I have no idea what Alden Segrest did. Robbie Robertson ended up in the TRW organization. And I can assure you he was absolutely not involved in developing or reviewing these procedures. So it's really a little bit of everything
The people involved in setting up these procedures would most directly be Billy Cole, Ron MacDonald, these are JAI people, possibly Bill Teer because the exchange could have had transportation impacts.
Q. I don't know that I understand the acronyms Does TES mean that he was with TRW?
A Yes TES is their -- I don't know what

Page 194

it stands for But that's the acronym they gave, the part of TRW that supports --
Q TRW Environmental Systems?
A Systems
Q Do you have a recollection generally what was JAI's general role for TRW, is there a way to characterize that?
A JAI in general were the people most experienced and knowledgeable about the nuclear industry. They would have been most familiar with power plant operations, with fuel characteristics, and with transportation, because I do believe, although I can't recall precisely who, that some of them worked for companies that transport By and large the rest of TRW built defense systems.
(Slater Exhibit No 15 was marked for identification.)
BY MR SHAPIRO.
Q Ms Slater, you've just been handed what we've had marked as Slater Exhibit 15 Do you recognize this document?
A I'll need a moment to look it over Yes
Q Can you tell us what this document is?

Page 195

A As a matter of fact, with my consultants I don't like leaving things open-ended. And so I want a game plan in place for precisely how we're going to do this, how long it's going to take, what's anticipated, so it's a work scope And then theoretically the contractor lives to whatever is in this work scope, schedule, budget, deliverables, content
Q So this is a work scope for what?
A It's a task management plan which is a work scope for developing the internal review criteria; in other words, for developing the mechanism by which we would review DCS -- proposed DCS exchanges and to determine whether or not they were to be approved.
Q. If you turn to the first page of what's called the preliminary draft and the second paragraph, if you would read that, does that paragraph represent DOE's position as to the general criteria it would use as to whether or not it would approve the proposed exchange?
A. Can you give me a moment to read it, please.
Q. Sure
A That is my understanding, yes.

Page 196

Q How did DOE come up with that criteria? Basically the focus is on the transportation system capabilities and projected available acceptance capacity?
A Again, when someone -- if you were to go to the APR and you were to draw a line, if your capacity for the first year is 300 MTU, you know precisely theoretically the type fuel you're looking at, where it is, where you have to go to look at it, you can make a guess at how many casks you're going to have to get to accept the fuel
If you start changing the type of fuel, you change -- that's the two-to-one ratio, PWR, BWR, you change the number of casks that may be required If you're not planning on that, you can't be there all dressed up with your party dress on to accept twice the amount of fuel.
If you have licensed a cask for a particular heat load, everything that is delivered to us must be in compliance with what's called a certificate of compliance It's got to meet the licensing conditions of the NRC. You would want to look at what they were proposing to deliver and determine whether or not that cask

Page 197

could accept that type of fuel
Let's see In terms of the other items that are here, location, let's assume for the sake of discussion that your first year's deliveries were heavily weighted in the Southeast and then all of a sudden somebody exchanged in the Northeast and you had planned on an intense transportation campaign in the Southeast. You now have to make arrangements.
It's not as simple as when a utility in South Carolina finishes and it goes to North Carolina and there's an economy there of cask movement Now he's up the East Coast someplace else and there's transit time, time for loading
And so you may have lost the opportunity to load more fuel given that the number of casks will likely be limited So I would say that the largest number of impacts would be transportation related
Q Who at DOE came up with these criteria, the transportation and the other one being listed as available acceptance capacity for the overall waste management system, was that something that you came up with?
A Available acceptance capacity would

Page 198

have been something that was discussed in waste acceptance and was again something that was understood by both utilities and DOE. The capacity doesn't exist, you can't allocate it
Transportation impacts would have been developed by the transportation division within DOE and its transportation support at the M&O.
And the way this would work is that waste acceptance -- DOE would talk to transportation and say we're contemplating doing this. The contractors would then discuss the same things and then would feed back to the person requesting the work which would have been waste acceptance But this is integration.
Q Do you recall at this point how the terms of this particular paragraph got put together, I mean who told the M&O contractor that these are the kinds of criteria that you should put in your statement of work?
A I don't believe that anyone told the M&O contractor that these are the types of terms you should put in your work I believe that what is more likely to have happened is the contractor was asked what are the types of operations that could be impacted by varying the type of fuel,

Page 199

the quantity of fuel, delivery dates, delivery locations, okay
And I think that's why this is a preliminary draft, because the contractor would have come back and said this is our first impression, do you think it's complete, have we left anything out, should we put something in that really is moot So I think that's more likely.
(Discussion off the record )
(Slater Exhibit No 16 was marked for identification )
THE WITNESS Okay Let me have a moment to review this
BY MR SHAPIRO
Q Ms , Slater you've just been handed what's been marked as Slater Exhibit 16 After you've had a chance to review it, if you could tell us if you recognize it
A Yes, I do
Q Can you tell us what it is?
A. Well, once you have a proposed process in place, you're going to run some test cases to see how the process drives And what we did was to construct a number of sample exchanges And

Page 200

we ran them through the process.
And we looked at whether or not, given the parameters that we varied, we would approve the exchange or not, because, in determining under what circumstances you would disapprove, you then have the ability to help the utilities construct an exchange that works from the very beginning, or, if you disapprove it, to provide them with some recommendations about how they might alter the exchange so that it will work So my recollection is that that's what this is
Q Now, on Slater Exhibit 16, it looks like there were five or six sample exchanges Only one of them was recommended, only one of the samples was recommended for disapproval And it says on the second page that one of the proposed exchanges was an attempt to game, in quotation marks, the system Do you have any recollection of what that was talking about?
A None. And, in fact, I see here that it references summaries of the reviews and results are attached for each exchange It would be more helpful for me if I could see that attachment and then I might have some indication of what it is. But it would be a shot in the dark right now

Nancy H. Slater April 22, 1999

*Page 206 to Page 312*

CONDENSED TRANSCRIPT AND CONCORDANCE
*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC 20005*
*Phone: 1-800-FOR-DEPO*
*FAX: 1-800-367-3310*

Page 206

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
--------------- X
YANKEE ATOMIC ELECTRIC
COMPANY,
Plaintiff, Case No. 98-126C
v Senior Judge
Merow
THE UNITED STATES,
Defendant
--------------- X
Washington. D C
Thursday, April 22, 1999

Continued deposition of NANCY H SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W , Washington, D C , at 2:10 p m , Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A WILLIAMS, RPR, and transcribed under her direction

Page 207

APPEARANCES

On behalf of the Plaintiff
ROBERT L SHAPIRO, ESQ
SUSAN SACHS, ESQ
Spriggs & Hollingsworth
1350 I Street N W
Washington, D C 20005-3305
(202) 898-5854

On behalf of the Defendant
MARIAN E SULLIVAN, ESQ
Trial Attorney
Commercial Litigation Branch
U S Department of Justice
1100 L Street, N W
Room 10150
Washington, D C 20530
(202) 307-6289

Page 208

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr Shapiro | 209 |


E X H I B I T S


| SLATER EXHIBIT NO. | PAGE NO |
|---|---|
| 17 - Memo dated 8/5/94 | 209 |
| 18 - Memo dated 5/16/90 with attachments | 215 |
| 19 - Letter dated 2/10/95 with attachments | 221 |
| 20 - Memo dated 6/24/93 | 233 |
| 21 - Letter dated 6/24/93 | 249 |
| 22 - Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste dated 6/22/83 | 254 |
| 23 - Acceptance Priority Ranking & Annual Capacity Report dated March 1995 | 275 |
| 24 - Complaint | 306 |


Page 209

P R O C E E D I N G S

Whereupon,
NANCY H. SLATER,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF - RESUMED
BY MR SHAPIRO

Q. Ms Slater, we're here for the continuation of your deposition. You understand you're still under oath?
A Yes
Q. Do you understand that?
A Yes, I do
Q You may recall at the end of yesterday we were talking about exchanges of approved delivery commitment schedules?
A Yes
Q I want to just have a few more questions on that subject Let me have another document marked and show it to you
(Slater Exhibit No 17 was marked for identification )
BY MR. SHAPIRO

Page 210

Q Ms. Slater, you've been given what's been marked as Slater Exhibit 17 Take a look at that document and tell us if you recognize it?

A Without reviewing it in detail, yes

Q Can you tell us what Slater Exhibit 17 is?

A. The program had envisioned that there would need to be some idea of what actual operations for the entire system would look like That included waste acceptance, transportation, perhaps storage at some point, and then the repository

The transportation division was focusing on a transportation concept of operations And we were focusing on a waste acceptance concept of operations

The M&O had drafted a document that described what that concept would involve And I had asked that Scott Vance who works for JAI review that draft generated by the M&O and provide me with his comments on topics that were particularly relevant to the waste acceptance process and the standard contract, because again this was an opportunity to make sure that no requirements were to be imposed on utilities that

Page 211

were not entirely consistent with the standard contract

Q Let me make sure I understand Mr Vance was looking at two things separate or in combination, he was looking at concept of operations draft for the acceptance and transportation plan and then he was also looking at the exchange process Was he looking at those two things together?

A He needed to look at the exchange process to assure that the concept of operations did not contradict anything that was in the exchange process document So the focus of the review was the concept of operations And you would use as the basis for your review the standard contract and then documents that supported the contract

Q So Mr Vance worked for JAI Was he an engineer or what sort of role does he play?

A Yes, he is, I believe he's a nuclear engineer that graduated from MIT

Q And he was one of the consultants that you would occasionally go to to ask for advice such as this?

A Yes

Page 212

Q. Let me point you to a particular page of the document, page 3 The top paragraph on that page, in the middle of that paragraph, there's a sentence that begins approved DCS's are the basis for the establishment of the transportation system performance requirements Do you see that?

A Yes

Q And then he says, once this baseline system is established, the ability to approve/disapprove an exchange request should be very straightforward and involves answer to the simple question can we accomplish this new proposed delivery using the system that we designed for the original delivery?

A. Yes

Q Does that statement in Mr Vance's memorandum, Slater Exhibit 17, is that consistent with your understanding of how RW was intending the exchange process to work?

A I'm not going to speak for everyone in RW, but I will speak for myself And it is consistent with my understanding of how that process would work

As we discussed yesterday, it is

Page 213

possible, if two utilities exchange slots in the queue, one owning a PWR one owning a BWR, that twice as much fuel could be delivered That would obviously affect transportation because you could conceivably need twice as many casks

And you might have to procure additional casks There's a lead time on procurements And so it would conceivably be possible, if enough exchanges were submitted, to entirely disrupt the transportation operation You might not have sufficient resources allocated to perform the actual acceptance and transportation

Q You said you were speaking for yourself, not necessarily all of RW

A Yes

Q Are you aware of anyone in RW who had a different view of how the exchange process would work?

A Not specifically

Q Generally are you aware?

A Not generally either

Q To the best of your understanding, is the view that you have with respect to this concept of the exchange process, is it consistent