## Page 214

with what was generally held at least within the utility interface branch where you worked?

A At the time this was done, I think I would have been it in that sense So, when you're asking if it was consistent with the branch's or the division's perspective, it would have been my perspective, and yes, it is consistent with my perspective. So this is not something that I recall anyone having specific decision-making involvement other than me

Q Why was the baseline as it was called here the basis system that was being used based upon the delivery commitment schedules as opposed to an expectation of what expected exchange requests would look like?

A Let me see if I understand the question At the time this was generated, we had received delivery commitment schedules. Those were absolute quantitative and easily analyzed

The other involves prediction And your guess would be equally as valid as my guess as to what exchanges would occur between which utilities You cannot in my opinion procure, plan for, and operate a system based on that type of projection, particularly when you have in your

## Page 215

hands approved DCS's

MR SHAPIRO: Let me show you another document

(Slater Exhibit No 18 was marked for identification )

BY MR SHAPIRO

Q Ms Slater, you've been handed what we've had marked as Slater Exhibit 18 Do you recognize this document?

A Not offhand And I note that the date on it is approximately a year and a quarter before I came to DOE Would you mind if I took a moment to look at it?

Q Definitely take a look

A Okay

Q Now that you've had a chance to review it, do you recognize the document better?

A Not specifically no But I recognize the topics discussed in the document

Q Let me ask then at least about the people mentioned in the cover. It says it's a memo from Pat McDuffie Do you know who Pat McDuffie is?

A Pat McDuffie was a consultant at PNL, now retired as I understand it

## Page 216

Q Do you know what her role would have been around May 16, 1990, the date on Slater Exhibit 18?

A His role

Q. His role

A. No, I don't, because I was not there at the time. I have no idea what his particular role was.

Q What was his role when you were working in that office?

A. An advisor on various standard contract issues, primarily to Alan Brownstein.

Q And then it says on Slater Exhibit 18 that the memo was written to A B Brownstein. I assume that's Alan Brownstein?

A That's Alan Brownstein

Q And D C Langstaff Do you know who that is?

A That's Dave Langstaff And I cannot recall what his affiliation is

Q Maybe this is purely as a matter of curiosity, but it seems to have a header on it that says don't say it, write it Did someone in particular tend to put that on their memoranda?

A No I've seen that before, but I don't

## Page 217

recall who would have done that

(Discussion off the record )

BY MR SHAPIRO·

Q Ms Slater, the first page of Slater Exhibit 18 is sort of a cover memo and then there's a document entitled The DCS Exchange Process And I'd like to point your attention to the second page of that document

A Okay

Q. On this page the lines are numbered. And, if you look at line 5, the sentence that begins at the end of line 5, it says, "If the Purchasers who find themselves at the limit of their pool storage capacity are not those who can anticipate timely delivery of SNF to the WMS, they will have to develop alternative storage capacity "

And then it says, "This shortcoming of the OFF allocation method was recognized when the Contract was written In an effort to minimize this shortcoming, and at the request of the Purchasers, DOE included in the Contract a provision for the exchange of approved DCSs among Purchasers " Do you see that?

A Yes

Page 218

Q And then, if you could turn to the next page, page 3 of this document, and then the paragraph that begins at line 15, I don't have to read all that into the record, but if you would take a moment to read that paragraph
A Okay
Q Now, this paragraph on page 3 of Slater Exhibit 18 is talking about this concept that you just talked about, that requests for exchanges of delivery commitment schedules might impact the transportation system?
A Correct
Q Now, this memorandum, however, is talking about the ability to anticipate those changes and having the transportation plan plan for that in advance Do you see that?
A This as I read it says that this implies that adequate planning and anticipation of potential It doesn't say that it is possible, it says it's implied
Q Do you recall, while you were working in the waste acceptance office or utility interface office, any discussion on this issue, trying to anticipate exchange requests and to have the transportation system, acceptance

Page 219

system, to the extent possible, to be able to accommodate those requests?
A I do recall that there were discussions within the transportation division I do not know specifically what those discussions involved. There was a distinct split between responsibilities for transportation and waste acceptance
Q Do you recall who specifically would have had those discussions?
A I believe Bill Teer at the M&O was involved and I'm trying to recall who was involved at DOE I don't recall specifically who at DOE There were several rearrangements of the deck chairs
Q What branch or division or office would have been in charge of the transportation issue?
A The transportation division
Q The transportation division of which office?
A Of the Office of Waste Acceptance Storage and Transportation
Q Do you have any explanation of what happened to the concept of trying to accommodate anticipated exchanges discussed in Slater Exhibit

Page 220

18 that doesn't seem to be part of the discussion in Slater Exhibit 17?
A No, I don't have any specific recollection
Q Do you have any general recollection?
A No
Q What is your view, do you disagree with the notion expressed in Slater Exhibit 18 that implies that adequate planning in anticipation of potential exchanges on the part of DOE can minimize the impact of exchanges on the transportation system?
A My personal opinion is that I don't believe that it would be entirely possible to do that
Q What you say not entirely possible, what do you mean, it might --
A You could speculate that at the time any reactor that was shut down would want to exchange But you could not predict whether the reactors that actually had allocations would be willing to exchange
So perhaps you could bound what you thought might be the lower bound but I don't think you could bound the upper bound You would

Page 221

also have to look at plants with pool constraints and see when they might be running out of fuel and when they might want an exchange
Q And that would also impact which plants would be willing to exchange If they were going to themselves get into a pool constraint situation, such a plant wouldn't want to exchange?
A That's correct I do recall discussions among the utilities at the time that, if delivery commitment schedule exchanges were to be accomplished, that, in fact, the exchanges might involve some exchange of money which conceivably could more than pay for a utility's away-from-reactor storage if they were one of the utilities running out of pool space
MR SHAPIRO We've got one more document
(Slater Exhibit No 19 was marked for identification )
BY MR SHAPIRO
Q Ms Slater, you've been handed what's been marked as Slater Exhibit 19 If you would take a look and tell us if you recognize this document?

Page 222

A Yes, I do May I have a moment to look
through it?
Q Definitely
A Okay
Q Can you tell us what Slater Exhibit 19
is?
A In our parlance it appears to be a preliminary draft of a process by which we would evaluate delivery commitment schedule exchanges for their impacts on the total system And that would include waste acceptance, transportation, storage and disposal to the extent that those portions of the system were sufficiently developed to be able to evaluate those impacts
Q You said this document is titled a preliminary draft Do you have a recollection or a sense from looking at this document and its transmittal letter how far along in the process this draft was?
A I do not recall But it would be my belief that we were perhaps three-quarters of the way through the process Generally speaking a document that's submitted formally like this is being submitted for a formal review, if you will So you're close

Page 223

Q Would the individual components to do an acceptance transportation and whatever other appropriate components, would they have already seen parts of the document or are they seeing it for the first time?
A I couldn't speak to that, I don't know For example, I can speak for waste acceptance We would have likely seen the waste acceptance portion
Q If you could turn to page 20 of Slater Exhibit 19 I would point your attention to the last paragraph on page 20, the first sentence of that paragraph that says, based on approved delivery commitment schedules, transportation would have developed a cask procurement strategy which will result in a cask fleet of the required size and for each planning horizon
Is this then that same concept we've been discussing, that, when looking at whether or not to approve a proposed exchange of delivery commitment schedules, that you would first look at a transportation plan based upon trying to service the original delivery commitment schedules, not anticipating exchanges?
A You would look at whether or not you

Page 224

could accommodate a change. You would first look at whether or not the DCS exchange itself met the conditions set out in the DCS exchange procedure in terms of no more MTU being requested than being allocated.
And then you would assess various impacts on various parts of the system with an eye towards accommodating, if possible, and I know that we wrote this in at least one document, perhaps recommending alternative ways to accomplish what the utility wished to accomplish
Q If you could explain that, the idea would be that, if DOE had to reject a particular exchange, DOE would take it upon itself to offer up an alternative?
A Not in the sense of a precise alternative but in the sense that, for example, if the MTU allocation, if they had -- let's see, this will get into another topic
We've talked about the plus or minus 20 percent and the theory that you want a full cask, not a half full cask. If they actually submitted for less than the allocation because they believed that they could not submit at the

Page 225

allocation because it would be rounded down, we would tell them submit the full allocation because it will likely be rounded up So we would send it back to them and say you're really entitled to more, resubmit your DCS exchange.
Q When you say rounded up or rounded down, you mean rounded up to the next full cask?
A Full cask, right If they had -- if they were one assembly short in a full cask, then, at the time of acceptance, it was understood that we would permit them to include the additional assembly and debit their next year's allocation for that amount
Q We might have covered this yesterday But, just to make clear, the reason for allowing rounding to a full cask is that it was just more efficient to use full casks rather than partial casks?
A System efficiencies, yes
Q And the reason for that is you have to move the cask anyway so you might as well move it full, it's the same amount of trouble to move it full or half full?
A Yes
Q Let me go back to Slater Exhibit 19,

Page 226

that page on the transportation issue Perhaps if you could take a look at that whole page and let me try to rephrase my question. What I'm trying to get at is, by the time this issue got to this level of draft, was the plan still to base the decision on whether or not to approve a proposed exchange of delivery commitment schedules on the transportation plan that would have been created based on the queue as opposed to a transportation plan based on anticipated exchanges?

A Yes, it would have been based on approved delivery commitment schedules

Q Do you recall any discussions or considerations at this stage of the process on transportation plan or acceptance plan or any other plan for that matter being based upon anticipated exchanges as opposed to approved delivery commitment schedules?

A I don't recall myself having any significant thoughts about that, because my intention was that it be based on approved DCS's I cannot speak for the transportation people

Q You just don't know what was going on

Page 227

with them?

A Right

Q And, other than Bill Teer who you mentioned earlier, you can't tell us anyone else we might talk to who might be able to give us more information on that issue, on what was being done in the transportation area?

A I seem to recall that Jim Carlson at DOE might have been involved

Q Anyone else?

A I can't recall

Q Now, is your recollection that ultimately a final draft was developed of this document, evaluation of delivery commitment schedule exchange requests?

A I believe it was

Q Do you have a sense of when that final document was prepared?

A No, I really don't

Q This draft says it was prepared by TRW It would have been your expectation that the final would also been prepared by TRW?

A Yes

Q And the transmittal letter for that draft is from a James Blandford at TRW Do you

Page 228

recall Mr. Blandford?

A Yes, I do

Q Was he directly involved in that project?

A Not directly He would probably have been the equivalent of Sam Rousso who was our office director So there were probably -- there was at least one, if not two levels of supervision below Mr Blandford

Q Who at TRW would have been most directly involved in putting together the final document?

A I believe it would have been Bill Teer and Jim Clark.

Q Let's turn to a different subject We touched on this a little bit yesterday You said that utilities beginning 63 months prior to January 31, 1998, had to submit their initial proposed delivery commitment schedules?

A Yes

Q Do you recall that amongst those was Yankee Atomic?

A I vaguely recall that I don't really -- I couldn't give you the details

Q Do you recall that Yankee Atomic,

Page 229

that's Yankee Atomic Electric Company, requested to deliver more spent fuel in the first few years of the program starting after January 31, 1998, than was provided for in their allocation in the annual priority report?

A Yes, I do

Q And do you recall there was a number of pieces of correspondence back and forth between DOE and Yankee Atomic on that issue?

A Yes

Q What was your role in that process?

A I was responsible at the time for performing an initial review, higher level review of the DCS's when they came in I would have been responsible for communicating to the utility, drafting the letter that would go back to the utility that would explain why their DCS was being rejected A specific basis for that rejection would have been provided

Those letters would have been reviewed by the contracting officer And I don't recall who signed the letters

Q Who else would have been involved in that process?

A Our M&O would have been involved in

Page 230

that process And, because of the changes in hats and the time frames we're talking about, I can't recall who specifically But our M&O would have also reviewed the DCS's according to the procedure that was drafted and approved and discussed with the utilities In addition to the contracting officer, Alan Brownstein.

Q What would Mr Brownstein's role have been?

A Consistent with my role to perform the review, I would have made a recommendation and supported it to Mr Brownstein And he would have evaluated whether or not he thought my determination was accurate and reasonable

Q Anyone else involved?

A Not that I recall

Q Now, you described your initial review of the submitted delivery commitment schedule, if I heard correctly, as a higher level review?

A Right

Q What do you mean by higher level review?

A To be precise, if you did not have an allocation in the year in which you submitted a DCS, that was a showstopper, if you exceeded your

Page 231

allocation for that particular year, that was a showstopper, no additional review required because it was a fundamental flaw in the DCS that was submitted

Q What else would be involved in your review?

A Making sure that the appropriate people who could bind the utility did, in fact, sign the DCS because, remember, it's a contract, and that basically the form was complete If we asked for discharge date, you recall we had the discussion about specific discharge date versus range of discharge dates, at least some discharge date was included in that blank So a very top level review

Q You said the M&O would also do a review What would be involved in their review that would have been different than the review that you were doing?

A I don't recall I believe that, if we went back to the procedure, we could determine that precisely

Q When you say the procedure, you're referring to the --

A DCS review

Page 232

Q. And that's different than the -- because we also talked about the instructions for utilities to complete the delivery commitment schedule?

A. Yes

Q. So there was instructions for the utilities to complete the delivery commitment schedule?

A Yes.

Q And then there was separate document procedures for DOE and its M&O contractor to review those delivery commitment schedules once they were submitted?

A Yes And, because there are contractually mandated time frames for accomplishing the review and any required revisions, there was a procedure to make sure that none of us missed those dates

Q Did DOE always make those dates?

A To the best of my recollection, yes

Q Do you recall ever missing any of those dates?

A I don't recall

Q Do you recall any discussion on any difficulties making any of the required response

Page 233

dates?

A I don't recall any of those discussions either.

(Slater Exhibit No 20 was marked for identification.)

BY MR SHAPIRO

Q Ms Slater you've been handed what we've had marked as Slater Exhibit 20 If you'll take a look at it and tell us if you recognize it?

A I see I was the originator as well as my concurrence initials that I would have drafted this memo Could I have a moment to review it?

Q Sure

A I remember it well.

Q First let me ask you something that you mentioned about the document You said that you were the originator What on the document tells that you you're the originator?

A If you turn to the very last page, you will see at the bottom left hand the designator RW-432 which would have been the branch number, colon, N Slater That indicates that I'm the originator of the document

The DE would indicate the secretary

## Page 242

have an allocation in this year or, B, you've exceeded the allocation to which you're entitled, you need to provide me with a DCS that is consistent with the terms and conditions of the standard contract, and we understand those to mean

Yankee resubmitted and submitted identical DCS's So this is discussing that second letter, because that would -- from the department The second letter from Yankee submitting the same DCS's would have kicked us into let's sit down and talk about this and try to understand why we don't seem to be able to come to closure on this issue

So this was at the end of that process There is a formal response required And it is a final decision, if you will

Q Now, I want to point your attention to the second page of this memorandum, one of the points in the middle, where it says submitting acceptable DCS's would not preclude their rights under the contract should the department subsequent to rulemaking grant such priorities Do you see that?

A Yes

## Page 243

Q What was meant there?

A Oh, I recall that precisely Yankee's concern as expressed to us was that, well, suppose I submit a DCS to you, suppose I have a ten MTU allocation in the first year, I don't recall what it was precisely I really want to empty my site in five years

And that would mean that I need to submit a DCS to you for 100 MTU If I go ahead and submit a ten MTU DCS to you now, does that mean after rulemaking, if everyone could agree that priority should be afforded to shutdown reactors, that I could still only deliver ten MTU

And our response to them was no Submitting an accurate DCS now does not preclude you from availing yourselves of the opportunity to ship additional fuel, more than ten MTU, were the decision made that priority should be afforded to shutdown reactors

And the reason for doing this in rulemaking is again, as I have stated over and over again, this is a utility equity issue And both, while I was at the utilities and at the DOE, I was personally involved and personally

## Page 244

aware that the utility industry did not support priority for shutdown reactors In fact, their stated consensus position was that priority should not be afforded to shutdown reactors

Q So it was not intended that the delivery commitment schedule process be a gotcha process?

A A static process

Q Right, that, gee, you only requested five and now, even though we can accommodate 20, you've wanted all along to do 20, we're not going to let you because you only asked for five, that was not the intention?

A That's correct, it was not our intention to do that

Q And we might have covered this yesterday, but let me just make sure it's clear, that the delivery commitment schedule was intended to indicate how much spent fuel the utility wanted to deliver up to the limit of their allocation?

A In part, because recall that the discharge date of the fuel earned you a slot in the acceptance priority ranking, but the fuel you could actually deliver did not have to be the

## Page 245

fuel that earned you the slot

So simply going to the APR and drawing a line at 300 MTU wasn't a good way of predicting what you were likely to get, because people who had older plants might decide to put their older plant's fuel in dry storage and might want to empty the pools at some of the younger plants

So the DCS was intended to provide us with an indication of the age of the fuel, the location of the fuel Multiplant utilities could deliver from any site as long as they met the conditions established in the standard contract

So it wasn't as clear as looking at the APR The DCS was intended to provide a little bit more sound information for planning purposes

Q Focusing just on quantity then, the DCS was not intended to indicate what quantity the utility really wanted to deliver, it was limited to the allocation provided in the APR?

A Right Now, theoretically they could have delivered -- they could have said, jeez, I don't want to disrupt my operations and I'm not going to deliver at all But they could not ask for -- they could not have more than what they

Page 246

were allocated because of the equity issue. There's only so much system capacity If I accept more from someone else, I accept less from someone else

Q And then briefly I want to point your attention to the next sentence on page 2 of Slater Exhibit 20 that says they have the contractual right to exchange allocations with other interested utilities, what was that referring to?

A. That's the DCS exchanges. They have the contractual right to exchange their slot in the queue with someone else in the queue and conceivably either obtain the ability to deliver in a year in which they weren't originally scheduled to deliver or obtain the ability to deliver more than they were scheduled to deliver

Q And so the availability of the right to exchange was being offered to the director of the program as another justification as to why it was appropriate to deny the priority request that Yankee Atomic was making, because they had the right to accomplish what they wanted through the exchange process?

A Yes

Page 247

Q Perhaps if you could turn to page 3 of Slater Exhibit 20 And, on the right-hand side, it has that long list of concurrences Could you run down that and tell me what was the role of the various people in that concurrence chain

A You know my role, I'm the originator, the technical lead, if you will Alan Brownstein would have been the branch chief Jim Carlson would have been the -- I think we called them divisions then, division director

Q It says RW-43, that was his division, Mr Carlson's division?

A Forty-three, right

Q What division would that have been?

A I don't recall the name specifically We've shifted names so many times

Q But approximately what --

A Waste acceptance and transportation perhaps Ron Milner would have been the office director

Q And that RW-40 is the designation for that office?

A For that office Dick Nelson and Jerry Saltzman would have been in what we called the front office as support directly to the director

Page 248

of the program

Q. And their office is indicated as RW-2?

A Yes. And Lake Barrett as RW-1, and I cannot make out the last one, I can't make the last one out. I believe it's Charlie Smith And again that would have been front office support, support directly to the director of the program.

Q So the director is the only one with RW-1?

A. Yes.

Q. And his support people are RW-2?

A. Yes. The deputy director of the program, for example, would be an RW-2 and there are usually two or three others who are support directly to the director

Q And you had pointed out previously an indication noting that you were the originator of the document And there's a line below that, Correspondence Reviewer What's the role of the correspondence reviewer?

A. I don't recall

Q And the concurrence line, there's no indication of a review by the contracting officer Why would that have been?

A That depends on the version of this

Page 249

that you pulled from the files In fact, I have right now unrelated to this case a version of a document to review I have a concurrence sheet and I will be concurring for myself and for the division director. It will be an attachment to a separate records package that, when put together with this, will form a complete picture.

Q So there may have been another version of this memo with a concurrence by the contracting officer?

A It would have been the same version of this memo that would have gone over separately for concurrence in another office because that would speed the process

(Slater Exhibit No 21 was marked for identification )

BY MR SHAPIRO

Q Ms Slater, you've been handed what's been marked as Slater Exhibit 21 If you could take a look and tell us if you recognize this document?

A Okay I believe this is the letter that would ultimately have been sent to Yankee, to Mr Buchheit, that would have been the result of the director's approval to communicate with

**Page 250**

Yankee that we could not accept
Q So, after the director would have proved Slater Exhibit 20, then Slater Exhibit 21 would have gotten drafted?
A Actually does this have a date on it? I cannot determine whether this is the letter that would have gone with the original DCS's that were incorrect or subsequent to the negotiations If I were to do a cold reading of this --
Q You asked about the date. Let me point your attention to the last page on the left, where there's that indication of you as originator that you pointed out in the previous document It appears to be a date 6/24/93
A This would have been the final letter I've read enough in the letter to know that it's the final letter
Q And, in fact, it appears that Slater Exhibit 20 and Slater Exhibit 21 were at least originated by you on the same day?
A Actually not necessarily originated on the same day But it was standard practice, when you submitted a memo like this to the director, to provide him with the opportunity to see the

**Page 251**

letter itself so he knew what he was likely to be recommending be signed by the contracting officer And that's what this would have been So the total concurrence package would have contained both
Q So there would be no disconnect between the approval memo and the actual product that went out of the office?
A Yes And I cannot determine whose comments these would be on here
Q That was going to be one of my questions There's some handwriting on the second page of Slater Exhibit 21 And you don't recognize that handwriting?
A No, I don't
Q It's not your handwriting?
A Certainly not mine Mine would have been an absolutely clean copy And actually --
Q Can you tell from the concurrences, does that give you any clue as to whose writing it would have been?
A No
Q Let me point your attention to the last paragraph of this draft letter, the second sentence in that paragraph that says, if an

**Page 252**

acceptable year one DCS is not received within 30 days, the contracting officer will issue a decision regarding the status of YAEC's year one allocation. What was meant by that sentence?
A You would have to question the contracting officer particularly concerning that My recollection is that, if a utility does not submit an acceptable DCS, one of the concerns I do know, I do recall from the utility days is, if they decided not to submit an acceptable DCS, did that mean that then they were relinquishing their right to an allocation in that year
And the utility's understanding at the time I was in the industry was that that's precisely what it meant And this letter stopped short of saying, guys, the contract has requirements, you signed the contract You need to behave consistent with the contract
So I don't know precisely what the contracting officer envisioned as the ultimate consequence of not submitting an appropriate DCS But I recall from the utility days that that's one of the things utilities were concerned about
Q So it would have been a fair

**Page 253**

interpretation on Yankee Atomic's part on receiving that letter that this is saying submit the delivery commitment schedule we want or we're not going to give you any allocation at all?
A No It would be a fair interpretation to say submit the delivery commitment schedule that you were contractually obligated to submit, not the one we want, contractually obligated to submit, or we will have to make a further determination about where we go from here
Q Who would have drafted this particular language, would that have been you?
A It could have been me, it could have been Alan Brownstein, it could have been Beth Tomasoni, it could have been Nick Graham
Q Who was Nick Graham?
A I do not particularly remember drafting that paragraph Nick Graham supported Beth Tomasoni He would have been my equivalent, if you will, in terms of I reported to Alan, Nick reported to Beth
Q Now, you said the intent of that sentence that we just discussed was to tell Yankee Atomic to submit a delivery commitment schedule consistent with their obligations under

**Page 254**

the contract Can you tell us what part of the contract you were referring to?
A. I can't recall the specific article number But, if you go to the standard contract, you will find a section that is labeled delivery commitment schedules
And under that section you will find that there are certain steps that must be executed by both the department and the purchaser And there are timetables associated with each of those steps And that's in there
(Slater Exhibit No 22 was marked for identification )
BY MR SHAPIRO
Q Ms. Slater, you've been handed what's been marked as Slater Exhibit 22 Would you take a look and tell us if you recognize this document?
A I recognize this generally to be the contract executed by Yankee with the Department of Energy consistent with the standard contract Knowing that these contracts were subject to individual modifications, for example, payment of fees the schedule in which fees might be paid, I can't tell you what the particulars are

**Page 255**

Q But generally the terms of the contracts were largely the same?
A Standard
Q Can you point us to the language of the contract you were just referring to as far as Yankee Atomic's obligation with respect to the delivery commitment schedule?
A Yes, if you turn to page 11, it's Article V B 2 , DOE shall approve or disapprove -- actually let's go to B 1 , DOE shall approve or disapprove such schedules within three months after receipt This is the initial submittal In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval, which we discussed, and request a revised schedule from the purchaser to be submitted to DOE within 30 days after receipt of DOE's notice of disapproval
DOE shall approve or disapprove such revised scheduled within 60 days after receipt In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule If these are not acceptable to the purchaser, the parties shall promptly seek to

**Page 256**

negotiate mutually acceptable schedules
The terms and conditions for this process, this iterative process are very clear. And, in fact, you know, we did engage in the negotiations In fact, another letter came back that said no
Q But what in the contract says that after the parties try to come up with a mutually agreeable result, it says that if they can't come up with something that both agree on, that the contracting officer gets to decide the issue?
MS SULLIVAN Objection You're asking her for an interpretation of the contract And Ms. Slater is not a lawyer. If you would like to ask her a question about her opinion or whether she finds guidance to that effect, that's fine But her interpretation of the contract, she's not the contracting officer or an attorney
BY MR SHAPIRO
Q Answer the question
A That's why I stated earlier that I have no personal knowledge of how the last paragraph of Exhibit 21 which was the letter to Mr Buchheit at Yankee Atomic was drafted,

**Page 257**

because it appears to me that that portion of the letter would have been drafted by the contracting officer or their staff And I have no knowledge of what led them to those statements
Q So you can't point to a clause of the contract from your knowledge and experience working with it that says that the contracting officer gets to resolve those disputes that the parties can't agree upon, that the contracting officer gets to resolve that herself?
A. No, I can't point to anything in the contract that tells me where we go once the utility has repeatedly refused to honor the terms and conditions of the contract
Q You said when a utility refuses to honor the terms and conditions of the contract What term and condition of the contract are you saying that Yankee Atomic wasn't honoring?
A Submit an acceptable delivery commitment schedule
MS SULLIVAN. Give me a chance to object before you answer the question
BY MR SHAPIRO
Q What part of the contract tells you that Yankee Atomic's delivery commitment

**Page 258**

schedules weren't acceptable?
MS SULLIVAN Same objection She can answer as to her opinion
THE WITNESS In my opinion I cannot give you a specific section because I haven't looked at this contract in years I can refer you to the procedures, instructions that were provided to the utilities that were reviewed with the utilities that specifically state that an acceptable DCS is one which does not exceed the individual utility's allocation in a given year
BY MR. SHAPIRO.
Q Can you take a look now at the contract and tell me where that would be.
MS SULLIVAN Same objection to the extent you're asking for a legal interpretation of the contract
You can answer the question.
THE WITNESS You recall that we discussed the identification as part of the ACR issue resolution process, the issue of delivery commitment schedules Do you recall that? If we need to discuss that again to refresh your memory, I'll be happy to
One of those issues was delivery

**Page 259**

commitment schedules And primarily the issue there was the need for the department to issue instructions on how to complete the form
One of the issues associated with completing the instructions to complete the form was what is an acceptable DCS Those instructions as I believe -- I'm not sure, I believe it was exhibit -- maybe it was seven yesterday It was my handwritten meeting minutes from the standard contract task force
I attended the meeting, Dave Zabransky I believe chaired that task force, at which we discussed with the utilities the contents of those instructions So it was recognized by both the industry and DOE that clarification was required and an effort was embarked upon jointly to develop the instructions for completing the form
Those instructions were formally issued to the utilities And I base my definition of an acceptable DCS on that entire package which is not just the original contract, it is the supporting documents that are official including the instructions for completing those forms
BY MR SHAPIRO

**Page 260**

Q And I certainly understand that and I understand your counsel's objection that you were never the contracting officer. But, if I understand correctly, I mean you just took a little while to look at Yankee Atomic's contract And looking at it you can't point to a particular clause or combination of clauses that you would have relied upon to say that Yankee Atomic's submitted delivery schedule were not acceptable?
MS SULLIVAN Same objection
THE WITNESS I believe that the discussion contained in the contract on the acceptance priority ranking and the annual capacity report, when viewed together and in the context of a theoretical acceptance capacity and repository, fairly clearly indicate what the amount of the allocation is for a utility in any given year
BY MR SHAPIRO
Q But you can't point to a clause in the contract that sets that out?
A That sets what out?
Q That sets out that Yankee Atomic's proposed delivery commitment schedules

**Page 261**

were not acceptable?
MS SULLIVAN Same objection
THE WITNESS. No, I can't, because I'm not the contractual expert
BY MR SHAPIRO
Q Beth Tomasoni who was the contracting officer at the time of final denial of Yankee Atomic's proposed delivery commitment schedule, she might be able to tell us more specifically what clause of the contract was being relied upon?
A She might be able to give you the basis for her approval of this letter
Q Who else might be able to tell us more specifically what contract provision was being relied upon?
A That would be someone in the contracting officer's office, perhaps herself or himself at the time, herself and her staff
Q How large was the contracting officer's staff?
A I really do not know
Q You didn't work closely with those people?
A I worked closely with a couple of

Page 262

individuals. But, as you may know, that doesn't necessarily tell you how large the organization is

Q Do you have a sense of who the key individuals likely would have been on this particular issue for the contracting officer?

A My recollection is Nick Graham

Q Anyone else?

A Not that I can recall

MR SHAPIRO: Why don't we take a break

(Recess )

BY MR SHAPIRO:

Q. I just have a couple final points on this issue of Yankee's proposed delivery commitment schedule I think we covered one clause with respect to the propriety or the acceptability of Yankee's proposed delivery commitment schedules

I think I had asked you another question, I'm not sure that I got a full answer You also can't point to a specific clause of Yankee's contract, Slater Exhibit 22, that says, if the utility and the contracting officer can't agree on the resolution of a proper delivery

Page 263

commitment schedule, that it's the contracting officer as opposed to the utility that ultimately gets to decide that issue

MS SULLIVAN Same objection.

THE WITNESS No, I can't

BY MR SHAPIRO

Q I wanted to go back to Slater Exhibit 20, the memorandum from Mr Milner to Mr. Barrett You had said, if I recall correctly, that there is a certain process for the dates by which the various responses have to happen and that there wasn't a problem with them

If you look at the first page of that, down at the bottom, where it gives the dates for some of the back-and-forth of the correspondence, it says that on January 7 Yankee resubmitted its identical delivery commitment schedule Do you see that?

A Yes

Q And then DOE responded on April 8?

A Yes

Q And that's roughly three months?

A Yes

Q And then you had said previously, if

Page 264

you go back now to the contract, Slater Exhibit 22, to page 11, where there is I guess it's Article V B 2. that you've referred to, that says DOE shall approve or disapprove such revised schedules within 60 days after receipt?

A Yes

Q So it would appear that DOE didn't make that 60-day deadline in that particular instance?

A Yes And I recall saying that I didn't recall any specific --

Q Does this refresh your recollection?

A Looking at this memo which is Exhibit 20?

Q Looking at any of this discussion, does that refresh your recollection?

A I can read and subtract the dates in the letter, but I still don't recall that specific time frame

Q And you don't recall any discussion within DOE of concern that DOE wasn't meeting a deadline for a response provided in the contract?

A. No, I have no recollection

Q So there was no concern on DOE's part that, because it didn't respond by the deadline in the contract, that it would have forfeited its

Page 265

opportunity to disapprove the resubmitted schedule?

A I don't recall.

Q. And then the last point I wanted to ask about on Yankee Atomic's proposed delivery commitment schedule, again on Slater Exhibit 20, where we had talked about the alternative of Yankee Atomic exchanging allocations with other utilities, you had stated that, when you had a face-to-face meeting with Yankee Atomic, that one of your points to them was, if you can come up with two people who are willing not to have a delivery at the first of the year, then we can talk more about Yankee Atomic getting priority Do you recall that?

A I recall telling them that I thought they should engage in their contractually provided-for DCS exchange process I recall asking them if they had made an attempt to do so I recall them telling me no, they had not

And I recall asking them who again they would like to bump out of the queue in order to have their slot And I recall them making the statement that shutdown priority was good for the industry

Page 266

And I asked them, since it was good for the industry, which utilities they were considering knocking out of the queue. And I said give me two utilities that you would have removed from the queue.

Q If I recall correctly, you said that there was laughter at some point in this discussion?

A. Yes

Q Laughter because everyone understood that Yankee Atomic wasn't going to be able to find two utilities willing to engage in such an exchange?

A. No Laughter at some point because I think everyone realized two things One, that Yankee was completely intransigent about the process and that they were not receptive at all to the idea of DCS exchanges This is my personal recollection.

So you had a utility sitting across the table who has an option that they prefer not to execute, that they prefer not to even attempt to execute, and that became absurd at some point.

And so, after we had had this exchange back and forth about shutdown priority, DCS

Page 267

exchanges, shutdown priority, DCS exchanges, it became absurd and people started laughing And I believe there was also at least on my part a recognition that finding an exchange would be difficult.

Q What was the basis of your expectation that it would have been difficult for Yankee Atomic to have found a willing exchange partner?

A. In general the utilities that have allocations in the first year are the oldest utilities who were sitting on the most spent fuel and would have likely been running out of pool storage space before others and would have likely been faced with the decision to provide for away-from-reactor storage And I base it on that

Q Was this concern also exacerbated by the recognition in 1993 that it was unlikely that DOE was going to begin accepting spent fuel in 1998?

A I can't speak for what their concern was based on

Q I'm talking about your recognition that it was going to be difficult for Yankee Atomic to find an exchange partner?

Page 268

A. I don't believe my concern was based on the '98 date I think it was based more on what -- no matter what the date, that people with allocations at the front of the queue would be likely to want to exercise their ability to deliver on that schedule

Q But, if it had been clear in 1993 that DOE was going to start accepting spent fuel in 1998 at the expected rates, that it might have been easier for Yankee Atomic to have found a willing exchange partner?

A No, I can't make that statement, because I do personally still believe that those utilities who were in the first year would have still wanted to deliver their waste That's why I say, I think it's year independent I still believe that

Q And the reason for that is that all of those utilities with first year allocations were likely facing pool constraint problems?

A I believe so

Q Finally, we covered the fact that it appeared that you did the initial draft of the letter that was signed by the contracting officer that went to Yankee Atomic on the final denial of

Page 269

their proposed delivery commitment schedule?

A Yes

Q Can you tell us generally what determined whether or not you would draft a letter that went out to a utility as opposed to the contracting officer him or herself?

A At least from my perspective, for the issues I was responsible for, technical issues would have been drafted initially by our branch at that time, our division But I think we were well aware of when we were not able to make legal and contractual interpretations

And the contracting officer would have been responsible for doing that And I cannot recall a time when the contracting officer was not included even on technical issues in the review process simply because this is all a contract

Q And again what would be characterized as a technical issue?

A DCS's, allocation of capacity, the acceptance priority ranking, things of that nature

Q And the legal issue would be what?

A Dispute resolution

**Page 286**

show up the second year and take my first year, my second year, and maybe my third year.
So that was discussed when I was in the industry And I don't know where that went after that So I have a recollection that the precise schedule laid out in here, alterations to that schedule were discussed by the utilities
Q And the campaign was premised in part I think as you said on the notion that it would be more efficient for utilities to have pickups done in larger amounts than in a series of smaller amounts?
A In fewer years actually, in fewer years, so that you weren't showing up every year with the consequent interruption of operation
Q And it was --
A I think it was DOE's understanding that it would result in -- might result in efficiencies for the DOE transportation system as well So my recollection is that there were discussions on both sides about efficiencies for both sides by campaign But I'm not the expert on campaigning and you would have to talk to the transportation folks about that
Q Let me ask a couple questions on that

**Page 287**

just so I make sure I understood what you were saying The efficiency from DOE's perspective to campaigning would be, once you got the transportation campaign going, it was more efficient to keep it going at one time than to stop it and start it five different times or a number of different times, it doesn't have to be five?
A I don't recall the details I do recall that some of the efficiencies included not having to retrain personnel on the specifics of that site three years in a row because you might not have the same personnel at the same site again
So there were efficiencies to be obtained from that And that's the one that really sticks in my mind I'm sure there were others, but again I'm not the transportation expert
Q Do you recall discussions of this notion of campaigning after you got to DOE?
A I am aware that the issue was evaluated, but I was not part of those evaluations So I have no knowledge of what was involved in the evaluation inputs, outputs,

**Page 288**

anything like that.
MR. SHAPIRO: Can we go off the record
(Recess.)
MR SHAPIRO· Back on the record
BY MR SHAPIRO
Q. So, once you got to DOE, you weren't personally involved in any discussions on campaigning?
A No, because that was deemed to be a transportation related issue as opposed to a waste acceptance issue Now, had transportation wanted to pursue campaigning, they would have come back to waste acceptance and, as the contact point for the utilities, it would have been waste acceptance responsibility to discuss it with the utilities as part of the ACR issue resolution process That's essentially how it would have worked.
Q Do you recall whether or not there were, in fact, discussions on campaigning even if you weren't personally involved?
A No, I don't
Q Who would have been involved in such discussions if they were, in fact, going on for

**Page 289**

such consideration of campaigning?
A I don't recall who specifically was in the transportation group at that time In fact, I'm having a tough time recalling who the transportation division director was I really don't know
Q Going back to this table 2 in Slater Exhibit 23, other than the notion of campaigning, do you recall any other ways in which DOE or utilities for that matter might have expected that actual acceptances of spent fuel might occur in an order different than what is depicted on this table?
A Plus or minus 20 percent rounding, campaigning, DCS exchanges, because, if exchanges occurred, although the amount wouldn't change, the individual utility that would be serviced in that year would So that would have represented a departure from what's published in here
Q And it was generally anticipated that there would be some amount of DCS exchanges?
A. Yes, I did anticipate that there would be some amount of DCS exchanges
Q You said that was your expectation To what extent did you understand that that

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - X

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC | : |
| COMPANY, MAINE YANKEE ATOMIC | : |
| POWER CO., and CONNECTICUT | : |
| YANKEE ATOMIC POWER CO., | : Case No. 98-126C |
| Plaintiffs | : 98-474C, 98-154C |
| -v- | : (Senior Judge |
| | : Merrow) |
| UNITED STATES OF AMERICA, | : |
| Defendant | : |

\- - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

Page 2

APPEARANCES:

On behalf of the Plaintiffs:
ROBERT L. SHAPIRO, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594

Page 3

CONTENTS


| WITNESS | EXAMINATION |
|---|---|
| NANCY SLATER THOMPSON | |
| By Mr. Shapiro | 4 |
| By Ms. Sullivan | 149 |
| By Mr. Shapiro | 153 |

Afternoon Session - Page 67


EXHIBITS


| Ex.No. | Description | Page |
|---|---|---|
| 1 | December, 1990 ACR | 17 |
| 2 | 6-22-83 contract | 25 |
| 3 | March, 1995 APR and ACR | 32 |
| 4 | June, 1987 ACR | 47 |
| 5 | June, 1988 ACR | 67 |
| 6 | December, 1991 ACR | 69 |
| 7 | May, 1993 ACR | 84 |
| 8 | March, 1993 ACR | 86 |
| 9 | 9-28-95 letter, Dreyfus to Kadak | 113 |
| 10 | Instructions for Completing the Appendix C - Delivery Commitment Schedule | 127 |
| 11 | Review Record | 139 |


Page 4

PROCEEDINGS

- - - - -

Whereupon,
NANCY SLATER THOMPSON,
was called as a witness by counsel for Plaintiff, and having been duly sworn, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF:
BY MR. SHAPIRO:
Q. Would you state your name for the record, please?
A. Nancy Slater Thompson.
Q. Ms. Slater Thompson, my name is Robert Shapiro. As you recall I deposed you, gee --
A. Some time ago.
Q. -- a couple years ago now in these cases, and they are still going on. I won't have to go back over the procedures, I have your deposition, and I think you understand what we are doing today. It also saves -- I mean, we are not going to cover the same material the same way again, either. I just have a couple, I guess, catch-up items to make sure I understand what's happened with your background in the last couple years, and I have some additional topics I want to

Page 5

cover with you today.
What is your current position?
A. I am the acting division director of the regulatory coordination division.
Q. How long have you been in that position?
A. I have been in that position since January of 2001.
Q. What was your position before that one?
A. Team leader in the regulatory coordination division.
Q. How did your duties change when you moved from the team leader position to the acting director position?
A. In the main, I believe that most of the technical and policy-related duties that I had been performing didn't change, but I have now assumed responsibility for personnel actions.
Q. Are there any other teams in that division other than the one in which you were team leader?
A. No, there are not.
Q. How many people are in that division?
A. There are, including details, four in

Page 42

the 1995 ACR was not intended to reflect an expectation that the 900 MTU acceptance rate would continue for years 11 and 12 prior to a repository becoming operational in 2010?
A. My recollection and my opinion are that to the extent utilities did not round up 20 percent and there were no emergencies, that in fact that additional capacity could have been used in subsequent years.
Q. I understand what you are saying that it could have been, but I am not sure that that answers my question. Maybe I am not phrasing it as well as I could.
I am trying to focus on how table 1 was developed, your recollection of that, and maybe you don't have a recollection of that, but was the projection in table 1 made with an expectation that the 900 MTU acceptance rate would be applied for two more years? Is that why the total in table 1 is 8200 MTU per year?
MS. SULLIVAN: Objection. Asked and answered.
A. I have no recollection of that.
Q. Turning back to the 1990 ACR, page 7 there, table 2.2, the lower bounding case, do you

Page 43

have any recollection of how the projections in table 2.2 in the 1990 ACR ultimately got changed to the numbers that are reflected in the 1995 ACR?
A. No, I do not.
Q. You understand it, and I think you testified but I don't want to put words into your mouth, I just will ask a new question, but your understanding is that both the projection of waste acceptance in the 1995 ACR and the lower bounding case in the 1990 ACR both reflect the 10,000 MTU limit on the size of an MRS?
A. Yes, that is my recollection.
Q. Obviously the two ACRs handled that limit a little bit differently, but you just don't recall what the nature of the difference is that the two waste acceptance projections are meant to reflect?
A. No.
MS. SULLIVAN: Objection. The document speaks for itself.
Q. Are you familiar with the term ramp up?
A. Vaguely.
Q. I will tell you what, so I can ask the question, I will explain what I understand ramp up

Page 44

to mean, the notion that an acceptance rate would not be achieved in the very first year of a facility's operation and that the facility would ramp up to its full performance level.
Does that explanation ring true to your understanding of that term?
MS. SULLIVAN: Objection. Vague.
A. My recollection of ramp up was that it implied an increasing rate of acceptance based on successful experience, demonstrated successful performance, at whatever the starting acceptance rate is.
Q. Looking first at the 1995 ACR, do you have any recollection as to what accounts for the progression of an acceptance rate to 400, 600, 900?
A. I don't recall.
Q. You don't recall why 400 and 600 were picked as opposed to 300 and 700 for that matter?
MS. SULLIVAN: Objection. Argumentative.
You can answer.
A. No, I don't.
Q. And turning back to the 1990 ACR, you don't recall how the progressions from 300 to

Page 45

400 to 550 to 875 MTU was developed, do you?
A. As I previously indicated, I wasn't in the department at the time and would not have had any insight or involvement in developing those rates, so I have no recollection.
Could I impose on you to take a break?
MR. SHAPIRO: Absolutely.
(A recess was taken from 11:00 a.m. to 11:15 a.m.)
BY MR. SHAPIRO:
Q. I want to go back to, I guess, a little bit of something we covered when you were deposed last so I understand the context in which you might have seen or worked with these ACRs, the ones before you got to DOE.
What was your position prior to moving to the Department of Energy?
A. I worked at the Edison Electric Institute. I think I started at EEI in roughly April of '86 and left the institute roughly August of '91, so it was a five-year period there. The first -- I'm not sure how long it was -- two to two and a half years was spent with the utility nuclear waste management group working on the issues that we are discussing today.

Page 86

of why we have a revision one and why you have not presented me with Rev. 0.
Q. I'll show you what I have got as the other version. Maybe you can offer a further explanation.
(Thompson Deposition Exhibit No. 8 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater Thompson, I have handed to you what's been marked as Exhibit 8 which has on its title a 1992 ACR with a date of March, 1993. Do you recall this document?
A. Not explicitly, no.
Q. Does this help clear up for you at all the revision one issue that I just asked you about about Exhibit 7?
A. Not at all. In fact, what you have handed me, I can't determine whether or not this is a final or not.
Q. I take it then you don't recall issuing one draft of the 1992 Annual Capacity Report in March and then another one two months later?
A. No.
May I take a moment to read through

Page 87

this?
Q. Sure.
A. Thanks.
(Discussion off the record.)
BY MR. SHAPIRO:
Q. Did you say that you thought that Exhibit 8, the one dated March, 1993, might be a draft? It doesn't have the fancy cover that the other versions had.
A. Right. That's what confused me because this doesn't look like the finals that we have, even the one with the fancier artwork for '95.
No clue; it will remain one of life's mysteries.
Q. Turning to Exhibit 7, the May, 1993 version of the 1992 Annual Capacity Report, again I want to ask you about the acceptance waste projections that are on page 4 of this exhibit.
Do you recall how the acceptance waste -- acceptance rate -- waste projections in Exhibit 7 were developed?
A. No.
Q. I want to go back to the most recent ACR, the 1995 one, for a moment.

Page 88

I believe you testified that those acceptance rates were based in part upon the 10,000 MTU limit on the size of MRS. If that was the concern, why wouldn't it have been appropriate for DOE to accept waste at a faster rate and then have stopped at 10,000 MTU so as to provide more assistance to the utilities who needed waste accepted sooner?
MS. SULLIVAN: Objection, argumentative. Objection, vague. Objection, foundation.
A. My personal opinion, and as we have discussed before, there are numerous factors that would affect the rate at which you would work off delivery of spent fuel from reactor sites, and one of the most important being do you have enough casks in the transportation cask fleet to accept more even if you assumed for a moment that you had a facility that could accept more.
So I'm not entirely sure that you would have had the ability from a transportation cask standpoint to have accepted 10,000 MTU in the first year, for example. What would have prevented you from accepting 10,000 MTU in the first year? Logistically, I don't believe you

Page 89

could have done it. You didn't have the transportation capacity. That makes a lot of assumptions, again, that we had facility, that we had a license to receive and possess, but ...
Q. To what extent were the waste acceptance projections in the 1995 ACR reflective of a desire by the department to limit its commitments to utilities?
MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion. Objection, foundation.
A. I have no knowledge of anything like that.
Q. You don't recall anybody discussing a desire to have relatively low acceptance projections in the ACR so as to limit the department's commitments to the utilities?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, foundation.
A. No, I do not.
Q. Let's switch subjects to talk about the delivery commitment schedule process. Why don't we turn first to that provision in the contract, which is Exhibit 2. The part that I

Page 90

want to ask you about first is on page 11.
Section B1 there, I guess it's the second sentence, it says: After DOE has issued its proposed Acceptance Priority Ranking as described in paragraph B5 of Article IV hereof, beginning January 1, 1992 the purchaser shall submit to DOE the delivery commitment schedule which shall identify all SNF and/or high-level waste the purchaser wishes to deliver.
The part of that phrase that I really would like to ask you to focus on is the part that says all SNF or HLW the purchaser wishes to deliver. What is your understanding of what that phrase is referring to?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
You can answer the question.
A. I would like to take us back to the ACR resolution process and actually to the time when I sat on the industry side of the table.
As I mentioned before, there were some roughly three dozen issues that the utilities and the department believed it would be worthy to conduct technical information exchanges on in an effort to see if we could clarify some of the

Page 91

statements like that one in the contract that could be interpreted in a number of ways.
There was a concern on the part of the utilities that, for example, this might in fact be a request to identify absolutely all the fuel they would ever intend to deliver under the contract over the life of the time when they would deliver fuel. Another interpretation was that no, actually what this is asking for is for you to identify as a utility to the department the fuel that you intend to deliver in a given calendar year.
One of the other issues that I recall being associated with this was do we specify a range of discharge dates, do we specify a specific discharge date, how valuable is the information, if what I do is provide you with ten years of discharge dates so that you have no clue what I am really delivering when the year comes to deliver fuel.
One of the other issues that was tied up with this that I recall is whether or not you could project the discharge date. For example, if I am submitting a DCS 63 months in advance theoretically of the calendar year in which the

Page 92

department arrives to accept it, by the time they arrive to accept it I have generated more fuel theoretically that could have been included in that range of discharge dates. Am I permitted to extend the upper bound on that discharge date range to include the fuel that will be discharged between now and acceptance.
There were a lot of issues that were associated with this that the utilities and the department in fact discussed, and my recollection is what we had all mutually reached consensus on in terms of our understanding was that it was okay to specify a range of discharge dates, that this was not intended to impose on the utilities a requirement to disclose absolutely every single assembly that they would deliver over the life of the plan, that in fact it was for a particular acceptance year.
Q. Was it your understanding that the utility in their proposed delivery commitment schedule could specify or should specify all of the spent fuel that utility wished to deliver in a particular year?
MS. SULLIVAN: Objection. Calls for a legal conclusion.

Page 93

You may answer.
A. These discussions are perhaps more fruitful when we use an example to illustrate what we are talking about.
Let's assume that you have 10 MTU that you wish to deliver to me in year 1. You are not required to submit DCSs to me if you choose not to. If you do choose to submit DCSs, I would assume that you would submit for the entire 10 MTU. You may either do it in one DCS and specify a specific discharge date or a range of discharge dates. You may choose to submit 10 DCSs for one MTU each and do the same thing. I don't have an expectation or a requirement in terms of how you do it in the context of one, many or none. I do have an expectation that when you do it, the total, when you total all the DCSs up in terms of the allocation, it will not exceed the allocation to which you are entitled and which is provided in the NCR.
Q. Where is that limitation on the total amount of spent fuel a purchaser may note on their delivery commitment schedule or schedules for a particular year provided for in the contract?
MS. SULLIVAN: Objection to the extent

Page 114

Does that statement comport with your understanding of how the exchange provision was supposed to work?
MS. SULLIVAN: Objection. Foundation.
A. Yes, it is. It's consistent with my understanding that the exchange process would permit the utilities to alter their slot in the cue. And in the case of Yankee, who had requested priority for shutdown reactor acceptance, the exchange provision which they were encouraged to use would permit them to alter their slot in the cue.
Q. It was the department's belief at least in 1995 that the exchange provision would have worked and actually have enabled a utility like Yankee Atomic to alter their space in the cue?
MS. SULLIVAN: Objection, vague. Objection, compound.
A. Conceptually, yes, the exchange process could result in a utility's ability to alter their slot in the cue.
Q. What about practically?
MS. SULLIVAN: Objection. Vague.
Q. I asked that because you used the word

Page 115

conceptually. Were you using the word conceptually to distinguish from practically?
A. This will take us back to my utilities' side of the table.
From a practical standpoint, I believe most of the older utilities in my opinion would have been unlikely to engage in exchanges. I believe it would have been possible for Yankee to exchange with some of the younger utilities, but I do seem to recall when asked by me directly whether or not they had attempted to in fact conduct an exchange, the answer was no.
Q. Do you think the Yankee Atomic would have been able to have exchanged with younger utilities because the younger utilities would have had less need for early acceptance of their spent fuel?
MS. SULLIVAN: Objection, vague. Objection, calls for speculation.
A. My opinion, it would be more likely that they could effect a trade with a utility that had made provisions for additional storage or that had no particular need for additional storage.
Q. If Yankee Atomic had actually sought out such exchanges, do you think that they would

Page 116

have been successful in getting utilities without need for immediate spent fuel acceptance to exchange with them?
MS. SULLIVAN: Objection, calls for speculation. Objection, vague.
A. I think that's so predictive that I couldn't possibly predict the outcome of those conversations. It's within the realm of possibilities.
Q. Did the department have any view as to the likelihood of the success that Yankee Atomic might experience in seeking out exchanges in 1995?
A. I'm not aware of any.
Q. Would it have made sense for the department to tell Yankee Atomic that it could use the exchange provision to optimize their spent fuel acceptance schedule if in fact the department thought that Yankee Atomic wouldn't be successful in attempting to use the exchange provision in that manner?
MS. SULLIVAN: Objection, argumentative. Objection, calls for speculation.
A. I think the letter speaks for itself, it encourages them to avail themselves of contractually mandated privilege, the outcome of

Page 117

which could not be predicted until the effort had been made.
Q. I will recommend to you, Ms. Slater Thompson, that a few years after this letter was sent Yankee Atomic did make an effort to find exchange partners and that that effort proved unsuccessful, nobody offered to exchange with them. Why do you think Yankee Atomic was unsuccessful in finding exchange partners in -- I believe it was roughly the 1998 time frame.
MS. SULLIVAN: Objection, calls for speculation. Objection to your characterization of the facts as incomplete.
A. I really don't know.
Q. Can you speculate as to why you think that would have been?
A. Without knowing the complete context of the exchange conversations that went on, no.
Q. I will represent to you there really weren't conversations, there was a written request for proposals, and Yankee Atomic didn't get responses back.
MS. SULLIVAN: Is there a question?
Q. You said you wanted to know the context of the discussion; that's the extent of

Page 118

it. Does that enable you to even speculate as to
why no one would have responded to Yankee Atomic?
MS. SULLIVAN: Objection, calls for
speculation.
A. Again from my time sitting on the
utilities' side of the table, I recall there was a
discussion at one point among the utilities that
in fact these allocations might have a monetary
worth. There was a significant amount of
discussion among the utilities about how much
something like that would be worth. Again,
without knowing what was offered, what was asked,
it's very hard for me to answer something like
that.
Q. So your recollection based upon the
time when you were on the utility side of things
was that if the utility was offered the right
terms, they would have agreed to have swapped an
earlier exchange -- an earlier acceptance
allocation?
A. I recall the discussions did include
the fact that for some type of remuneration,
whatever that might be, that utilities might
consider exchanging positions in the cue. I
distinctly recall that one of those considerations

Page 119

was perhaps if sufficient financial advantage was
gained that it would perhaps result in a profit
and an offset in operating costs.
Q. Do you recall, was there ever
discussion amongst utilities or within DOE that
the exchange provision might not be successful if
utilities were sufficiently uncertain as to when
DOE will come and start accepting spent fuel from
utilities because with such uncertainty utilities
cannot make an adequate determination of what
their profits or losses would be from such
exchanges? Do you recall any consideration of
that issue?
MS. SULLIVAN: Objection, compound.
Objection, vague.
A. No, not explicitly. No, not
deliberately. I don't recall. Nothing like that.
Q. Do you recall the Department of Energy
actually working to facilitate exchanges of
approved delivery commitment schedules by
utilities?
MS. SULLIVAN: Objection, foundation.
Objection, vague.
A. Could you define facilitate for me?
Q. In the context, I mean trying to make

Page 120

it easier for utilities to exchange proposed
delivery commitment schedules.
MS. SULLIVAN: Objection, vague.
A. Easier? I am not sure -- easier,
again, is a contextual question. Easier relative
to --
Q. Jump over a couple things.
Did the department view there being
advantages to the department from having utilities
utilize the exchange provision of the Standard
Contract?
MS. SULLIVAN: Objection, vague.
A. I don't recall the department had a
view. My personal experience, I don't really view
the exchange process as something as particularly
advantageous to the department.
Q. Did the department ever consider
whether the result of exchanges of approved
delivery commitment schedules would more likely
lead to campaign shipments of spent fuel?
MS. SULLIVAN: Objection, foundation.
Objection, vague.
A. I'm not sure how to answer your
question because it tends to imply that we might
have had some level of control over directing

Page 121

exchanges, and I'm not sure how you would arrive
at a campaign through the randomness of exchange
processes.
Q. I think you testified that you didn't
expect that the changes would be random, that they
would only occur if the two utilities exchanging
each saw an economic benefit to the exchange.
Isn't that right?
A. It might, but I can't predict for you
which utility in which area of the country would
choose to exchange with another utility. That's
what I mean by random. I don't have the ability,
for example, to pick up the Annual Capacity Report
and tell you over that ten-year period which
utilities will exchange with which other
utilities. There is no predictiveness to that
process.
Q. Couldn't you look at the utilities'
exchanges and compare that to information as to
when utilities are likely to run out of space for
storing spent fuel and see which utilities would
be wanting more spent fuel acceptance and which
utilities wouldn't need more spent fuel
acceptance?
MS. SULLIVAN: Objection, calls for

Page 122

speculation. Objection, compound. Objection, foundation.
A. I am not sure I really understand your question, to be honest.
Q. Did you understand before what I meant by campaign shipments of spent fuel?
A. Yes.
Q. To make sure we are on the same page, what's your understanding of what a campaign shipment of spent fuel is?
A. At the time that I was in the industry as well as during the time when I was at DOE, my understanding of the term campaign was at one point, for example, you might wish to -- for example, you have a list of utilities you have in your one, it may be all over the map in terms of where they are in the country. You might wish to define campaign in terms of during that calendar year of acceptance I will go to the southeast and pick all the southeastern reactor fuel up first which people have an allocation in that year and then I will move to the northeast, but the nature of the campaign would tend to argue against I go from Georgia to Illinois to Texas to New York to California and that kind of thing, so campaigning

Page 123

is an efficiency consideration.
Q. A considering being that it is less efficient to pick up small amounts of spent fuel, relatively small amounts of spent fuel, from the utility multiple times as opposed to picking up a relatively larger amount of spent fuel from a utility a fewer number of times?
MS. SULLIVAN: Objection, vague. Objection, asked and answered to the extent we went into this in the previous deposition.
You can answer.
A. I think in the context I just discussed it with you actually, it would be in the context, for example, of weather-related concerns. Campaign, I might not want to go pick things up in Illinois and New York in the middle of the winter and I might want to pick fuel up during the middle of the winter in the south, and so again a matter of efficiency. I know at one point there was consideration, and I believe we have discussed this before, that you might in fact wish on a 3-year rolling front to pick up the first year's fuel, you might have room for the second year's fuel, you would debit additional allocations against that, and theoretically in year 2 you

Page 124

wouldn't come back to that utility. So there are aspects of campaigning that deal with many factors, and actually that again is not my area of expertise. This is kind of like the acceptance rates and the utility of those.
Frankly, the group that would find the information most useful would be in transportation, which is not my responsibility, and I think that extends, for example, to the DCSs. That's why when you asked the question do I have any knowledge of what the department would use it for, not really, not my area. Campaigning is really not my area, either.
Q. Focusing back on exchanges, proposed exchanges of approved delivery commitment schedules, I believe you did testify that when you were at the department you did work on consideration of how the department would go about evaluating proposed exchanges.
A. That's correct.
Q. It was the department's intent to approve proposed exchanges to the extent practicable?
MS. SULLIVAN: Objection, vague. Objection, foundation.

Page 125

A. Practicable is a very broad word, but if, for example, a utility wanted to exchange with another utility with exactly the same age fuel, the same type fuel, reasonably close locations, the same number of MTU, I would say that would be practicable. I don't think it was the department's intention, nor mine, to hinder that process.
Q. Would it be reasonable to say that the department intended to minimize the number of proposed exchanges that it would have to disapprove?
MS. SULLIVAN: Objection, vague.
A. I don't think we had a specific intention to minimize or maximize. I think it was our intention to accommodate, to the extent practicable, all reasonable requests to exchange.
Q. Let's switch subjects to failed fuel, something that I think you mentioned briefly before. I believe that you mentioned before that you had at least a vague recollection of an understanding that acceptance by the department of failed fuel might be delayed. Am I remembering that correctly?
A. Correct.

Page 126

Q. Why would acceptance of failed fuel be delayed?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
You may answer.
A. I believe, again I am absolutely not sure about this, but I believe there were operational issues in terms of the ability to handle canisters that contained failed fuel at the repository. I believe there were issues about defining how failed failed is before it's failed. There were transportation issues. The industry had questions, as did we, and I don't recall many specifics about that issue, honestly.
Q. That was going to be one of my next questions. What was the nature of your work at DOE in failed fuel?
MS. SULLIVAN: Objection, vague.
A. The only involvement I can recall on failed fuel was in the context of whether or not failed fuel had been adequately defined and whether or not the definition was clear. Other than that, I don't recall doing much on failed fuel.

Page 127

(Thompson Deposition Exhibit No. 10 was marked for identification.)
BY MR. SHAPIRO:
Q. We have had handed to you what's been marked as Exhibit 10 which is a copy of the September 10, 1993 revised version of the instructions for completing the Appendix C delivery commitment schedule. I want to turn your attention to a particular provision on page 3, section 7H. Why don't you take a moment to read that paragraph.
I have a question as to how the acceptance timing for failed fuel was intended to work. The subsection that I pointed you to covers fuel, and it notes that if a purchaser intends to deliver other than standard fuel.
Let me ask you this: The phrase other than standard fuel, did you understand that to include failed fuel?
A. My recollection is yes.
Q. The provision in the instructions says that if the purchaser intends to deliver other than standard fuel the purchaser must submit proposed procedures to DOE, and particularly I want to focus on the part at the bottom that says

Page 128

that if other than standard fuel cannot be accommodated, the purchaser has an option to deliver standard fuel or to exchange the approved DCS with another purchaser.
My question is: Suppose the purchaser with the nonstandard fuel can't find anybody to exchange with and doesn't have any more standard fuel left, what happens? Does the purchaser lose that allocation?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, calls for speculation.
A. I don't ever remember having contemplated that particular issue. I don't believe I have a factual bases on which to speculate on it. I think that's one of those issues that would have to be addressed by the contracting officer and legally.
Q. Let me focus on shutdown reactors and failed fuel for a moment. Do you understand that a shutdown reactor incurs some cost to store its spent fuel until they can get rid of all of its spent fuel?
A. I do.
Q. And you understand that it's possible

Page 129

that a utility will continue to incur some costs, perhaps even significant costs, even if it has a very small amount of spent fuel left that it doesn't have removed from its site?
MS. SULLIVAN: Objection, foundation. Objection, vague.
A. I do.
Q. When you were working at the waste acceptance division at DOE, was there an understanding of the need to remove all spent fuel from a shutdown reactor reasonably promptly after the shutdown of a reactor?
MS. SULLIVAN: Objection. Vague.
A. I think if you revisit my prior deposition, it's fairly clear in there that the department perceived, as did the utility industry, the issue of priority acceptance for shutdown reactors to be an industry equity issue, an equity issue in the sense that there are lots of utilities that at the time had been paying into the waste fund for a lot of years, and that although the contract said we may grant priority, the industry in fact itself determined that priority shouldn't be granted for shutdown reactors because of the equity issue, because to

Page 130

insert a shutdown reactor into the cue is to simply conceivably drive up the cost of other utilities who now don't have a slot in the cue and themselves have to pay for additional storage.
Q. I did not mean to revisit that particular discussion because I do recall that from last time. I'm focusing again more on the failed fuel issue which I don't believe was discussed, at least not at this level of detail before.
Suppose Yankee Atomic, a shutdown reactor, was able to use the exchange provision and purchase early acceptance slots for all of its standard fuel, and then in the next year Yankee Atomic had enough of an allocation to cover its fuel that happened to have been failed.
When you were working in the waste acceptance division, was it understood that there would be an urgency to enable a shutdown reactor like Yankee Atomic to in fact deliver its failed fuel at that time and not to have to wait longer to deliver its failed fuel?
MS. SULLIVAN: Objection, vague. Objection, compound. Objection, calls for speculation.

Page 131

A. I don't remember considering that at all. I don't remember considering the issue at all. The issue never came up.
Q. The issue of not delaying the acceptance of failed fuel from shutdown reactors didn't come up?
MS. SULLIVAN: Objection. Vague.
A. The issue in the context in which I understand you are going to put it, which is that all a utility has left to deliver is failed fuel, I don't remember ever contemplating that issue.
Q. Was it generally understood when you were in the waste acceptance division that a utility would be delivering failed fuel roughly contemporaneously with other spent fuel then?
MS. SULLIVAN: Objection, vague.
A. I believe it was my understanding that failed fuel was subject to delayed acceptance, and therefore it would have been unlikely that they would have been delivering standard fuel at the same time they were delivering failed fuel.
Q. Was it your understanding that the utility would complete delivery of standard fuel and then have some amount of delay before it delivered its failed fuel?

Page 132

MS. SULLIVAN: Objection. Vague.
A. There's not my understanding that -- if I understood your question correctly -- that there could or would be a gap in the delivery process. I don't remember contemplating that or considering it. I believe that the discussions on failed fuel were in the context of acceptance could be delayed.
Q. Do you have any understanding of how long the acceptance of failed fuel could be delayed under the contract?
MS. SULLIVAN: Objection. Calls for a legal conclusion.
You may answer.
A. No.
Q. Would it be reasonable to delay acceptance of failed fuel for 20 years after the acceptance of a utility's standard fuel?
MS. SULLIVAN: Objection, calls for speculation. Objection, vague. Objection to the extent it calls for a legal conclusion.
A. I have absolutely no basis on which to make that type of speculation.
Q. Let's switch to another subject.
MS. SULLIVAN: Can you -- do you need

Page 133

a break?
THE WITNESS: I'm okay.
(Discussion off the record.)
BY MR. SHAPIRO:
Q. The next subject I want to talk about is the containers in which spent fuel might have been delivered to the department. When you were working in the waste acceptance division, was there any consideration of the kinds of containers that would be used to transport spent fuel to a DOE facility?
MS. SULLIVAN: Objection. Vague.
A. You are going to have to give me a little better definition of container.
Q. Do you recall when you were working in the waste acceptance division that some utilities were storing spent fuel in dry casks?
MS. SULLIVAN: Objection. Foundation.
A. Yes.
Q. Do you recall utilities intending to transport spent fuel to DOE in transport casks?
A. Yes.
MS. SULLIVAN: Objection, foundation. Objection, vague.
Q. Do you recall utilities intending to

Page 138

fuel I'm coming to get given it will not exceed the allocation that the particular utility has gained for that year.
Q. I'm assuming something, and let me just make sure it's true. When you were in the waste acceptance division at DOE, no one actually submitted a proposed final delivery commitment schedule to you during that time, did they?
A. No.
Q. Theoretically, I guess, they could have, but they weren't due during that time?
A. They were not due.
Q. I think one of the things that you just said was that the amount of spent fuel on the final delivery commitment schedule couldn't be greater than the utility's allocation as set out, I suppose, in the Annual Capacity Report and reflected in the delivery commitment schedule. Where is that limitation contained in the contract?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A. Again, I cannot give you a specific citation in the contract.
Q. It's just your general recollection

Page 139

that that's how the process was supposed to work?
A. That's my knowledge of the process.
MR. SHAPIRO: Why don't we go off the record for a minute.
(Discussion off the record.)
(A recess was taken from 3:35 p.m. to 3:45 p.m.)
MR. SHAPIRO: One more.
(Thompson Deposition Exhibit No. 11 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater Thompson, we have handed you what's been marked as Exhibit 11, it's titled a Review Record, and it has a date of February 9 of 2000.
Do you recognize this document?
MS. SULLIVAN: I think the witness needs a moment to look at it.
MR. SHAPIRO: Sure.
MS. SULLIVAN: The document appears to be excerpts of a larger document because the Bates numbers are not in order to the last portion of the document, and I recognize the title of the document as being a much larger document.
MR. SHAPIRO: What I will represent to

Page 140

you -- what I think is going on is that the front part of this is a review with Ms. Slater's comments on parts of something called the waste acceptance system requirements document, and then the part with which there are excerpts are the excerpts on the parts that she is commenting. I believe that is what is contended.
MS. SULLIVAN: But you have put together what you believe to be the excerpts on which she is commenting. I mean, this is not a complete copy of the WASRD.
MR. SHAPIRO: I didn't do this myself, but given the size of it, you are right. It is --
MS. SULLIVAN: Okay. This is the form in which it was produced, yes. That's the only thing I want to put on the record.
BY MR. SHAPIRO:
Q. Let's just focus first, Ms. Slater Thompson, on the review record. Do you recognize the review record?
A. Yes, I do.
Q. Can you explain to me what is the review record representing here?
A. The review record here is, this version of it, represents my comments on this

Page 141

particular revision of the waste acceptance system requirements document, more affectionately called the WASRD. We pronounce every acronym; we find a way.
Q. Why were you commenting on the WASRD in February of 2000?
A. There are requirements contained in the WASRD that apply not only to the interfaces that we have with the commercial industry but with the Navy and with our other DOE brethren for the acceptance of DOE spent nuclear fuel and DOE high-level waste.
One of my primary responsibilities in my group is for safeguards and security post-911 operations security as witnessed by the fact that if you look at the bulk of the comments here, they are focused on safeguards and security. That safeguards and security, for example, might translate to a requirement that an identifier on an assembly be clearly visible, because one of the ways we will account for all the material we receive is to demonstrate that what you gave us that has a number on it matches what we have that has the same number on it.
There are a couple of other comments

Page 146

fuel in any NRC licensed container, licensed by the NRC for transport?
MS. SULLIVAN: Objection to your characterization of the department's current plans. Objection, vague. Objection, foundation.
You can answer.
A. No, I am not focusing on anything related to transportation.
Q. The regulatory division that you are acting director of doesn't address transportation regulatory issues at all?
A. No, it does not. There is a separate transportation group that does that.
Q. The regulatory issues that your division is involved in are limited to those of the repository?
A. The repository, and I would say those in part two issues, that would be license and process issues.
Q. Has the issue of greater than class C waste come up in your role in the regulatory division?
A. No.
Q. Do you recall any discussion of whether or not to include greater than Class C

Page 147

waste in the EIS for Yucca Mountain?
MS. SULLIVAN: Objection. Vague.
A. No, I don't.
Q. Has the issue of high-level waste come up in your role in the regulatory division?
MS. SULLIVAN: Objection, vague. Objection, foundation.
A. I'm not sure I understand what you are driving at here. I mean people know generically that we are accepting high-level waste.
Q. Have you ever had -- has the issue ever come up in the regulatory division in any way? Just to give you a couple examples, you know, how we are going to do it, which high-level waste, what form, how are we going to put it in containers. Have you had to actually focus on any issue concerning high-level waste in the regulatory division?
MS. SULLIVAN: Objection. Vague.
A. I am aware of those discussions. My personal involvement at this point is limited, for example, to issues like safeguards and security, which I explained to you before, and whether or not, for example, I need to tamper indicate canisters of high-level waste that are of low

Page 148

strategic significance.
Q. A government argument that I have heard made at times, and I will ask if you've heard this before, not necessarily from government counsel, have you ever heard an interpretation of the contract that would say that the government would meet its obligation by accepting one fuel element from one utility by January 31, 1998?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A. I have never heard that.
Q. Has such an interpretation ever played a role in your work in the waste acceptance division?
MS. SULLIVAN: Objection, foundation. Objection, vague.
A. I have never heard it, and I don't recall even considering that.
MR. SHAPIRO: That's all the questions I have for you at this time, Ms. Slater Thompson. I appreciate your help.
I should note that there's a small chance that we may seek to talk to you yet again, there is an issue concerning some documents that we may or may not get which may or may not address

Page 149

issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.
A. I understand. Thank you.
MS. SULLIVAN: I have a couple questions.
EXAMINATION
BY MS. SULLIVAN:
Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?
A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.
Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?
A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.
Q. Do you have or have you ever had responsibility for transportation planning for the program?

Page 150

A. No.
Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?
A. Yes.
Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?
A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.
Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?
A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.
Q. I believe Mr. Shapiro has asked you

Page 151

previously today about the provision of the Standard Contract or whether there was a provision of the Standard Contract that told purchasers that they were limited in their DCSs to the allocation set forth in the ACR.
Other than in the Standard Contract, is there another place that purchasers were informed that they were limited to the amount set forth in the ACR when submitting their DCSs?
A. I am positive it's in the DCS instructions.
Q. Could you turn to Exhibit 10, please, to your deposition.
Are these the DCS instructions to which you are referring?
A. Yes.
Q. Could you point to me where in these instructions purchasers were informed that they were limited to the amounts set forth in the ACR?
A. Give me a minute.
Q. Sure.
A. Page 2, number 7E, the last sentence.
Q. Could you read that for me, please?
A. Exceeding the allocation will result in disapproval of the DCS.

Page 152

Q. Thank you.
While you were in the waste acceptance division at DOE, what was your understanding of the effect of the DCSs with regard to DOE's performance in 1998, if DOE had begun performance in 1998?
MR. SHAPIRO: Objection. Vague.
Q. Do you want me to clarify the question?
A. Please.
Q. I believe you testified that in your opinion the DCSs were for planning purposes only. While you were in waste acceptance, did you ever have an understanding as to the role of the DCSs if DOE had started performance in 1998?
MR. SHAPIRO: Objection. Vague.
A. My understanding of the role of the DCSs, if we had begun to accept in 1998, is that those individuals who had submitted DCSs and had them approved for year 1, which the question you are posing would be 1998, those would be the utilities that I would expect to receive FDSs from, and they would be the utilities that would deliver in that year.
Q. I am not sure whether Mr. Shapiro

Page 153

asked you this specific question. Is it your understanding that the final delivery schedules submitted by purchasers and approved by DOE would be binding on the parties?
A. Are you asking me for my personal opinion?
Q. Yes.
A. My personal opinion is that given that the FDSs are submitted a year before actual acceptance is to start that they are supposed to include the actual reactor, the actual age, discharge date of the fuel, and that that's the basis on which we actually begin to mobilize the system to come get it, yes.
Q. And one final question with regard to multi-element sealed canisters, or MESCs, that we discussed. Do you have an understanding as to whether, while you were in the waste acceptance division, those were considered a standard waste form?
A. My recollection is that they were not.
MS. SULLIVAN: Thank you.
MR. SHAPIRO: I just have a couple follow-up questions for you.
EXAMINATION

Page 158

intention.
Q. Can you point me to a part of the contract for the DCS instructions that leads to that result?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A. No, I can't at this time.
Q. Ms. Sullivan also asked you about the delivery commitment schedule instructions. Can you point me to a provision in the contract that calls for or even permits DOE to issue instructions to utilities as to how to complete the delivery commitment schedule form?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A. No, at this point I can't point you to a provision in the contract.
Q. Do you have any understanding of the basis on which the delivery commitment schedule form instructions were issued?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A. Actually, from sitting on the utilities side of the table, the utilities had asked if we would work with them to provide them

Page 159

with a better understanding of how to complete the form. This was a cooperative effort, mutually agreed to by both sides. That's why we took the time once we had drafted instructions to go back over and discuss the instructions with them and get comments.
Q. Did you view the DCS instructions as guidance to utilities as to how to fill out their delivery commitment schedule forms or did you view the instructions more directly as requirements for how the forms must be filled out by utilities?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
You may answer.
A. I view the DCS instructions as my expectations for what it would take in completing these forms in order for me to approve a DCS. For example, if I told them, which I did on page 2, section 7, section E, that if they exceeded their allocation I would disapprove the DCS, I view that as an instruction.
Actually, that point is also made clear on page 5, item number 2.5, that says: The total quantity of SNF designated for delivery must not exceed the allocation in the ACR.

Page 160

Exceeding the allocation will result in disapproval of the DCS (S).
This is Exhibit 10.
Q. Do you recall whether you ever disapproved a proposed delivery commitment schedule for any reason other than the proposed schedule exceeding a utility's allocation of spent fuel acceptance?
A. No, I don't.
Q. I am not sure that -- maybe I didn't ask the question quite clearly enough.
You don't recall whether you did or you recall that you didn't disapprove any for any other reason?
A. I do not recall whether I disapproved additional DCSs for reasons other than having exceeded the acceptance allocation.
Q. We have been talking about you approving or disapproving delivery commitment schedule forms submitted by utilities. Technically, wasn't it the contracting officer who was doing the approval or disapproval?
A. Yes, but as the contracting officer's technical representative, it was my responsibility by virtue of my signature to make a

Page 161

recommendation.
Q. And as a practical matter, you were in fact the person who was approving or disapproving; wouldn't that be a fair statement?
A. Well, I can't make that statement. That's to imply that the contracting officer had no role whatsoever and did no review.
Q. Did the contracting officer ever disagree with one of your recommendations concerning the approval or disapproval of a proposed delivery commitment schedule?
A. Not that I recall.
Q. Did the contracting officer ever question one of your recommendations to approve or disapprove a proposed delivery commitment schedule?
A. Not that I recall.
Q. Did the contracting officer ever question any of your recommendations that you made in your role as COTR?
MS. SULLIVAN: Objection. Vague.
A. That's a lot of history and a lot of time. Unless you can be more specific, I am not sure I can answer that question.
Q. I am just asking for your

Page 162

recollection. Do you recall any instance when the contracting officer questioned a recommendation?
MS. SULLIVAN: Objection. Vague.
A. I recall instances where the contracting officer and I discussed issues related to implementation of the Standard Contract including, for example, the DCS instructions. I don't recall specifically that the contracting officer ever took serious objection, significant -- ever had a significant objection to my recommendations.
Q. What was the nature of your discussion with the contracting officer concerning the delivery commitment schedule instructions?
A. We would have -- I don't recall the specific nature of the discussions, but I recall having discussed the fact that collaboratively the industry -- and we believed that there was a greater chance of the industry completing their DCSs accurately and having them approved on the first try if they clearly understood our expectations for what it took to successfully complete a DCS. I remember being told that that was a good idea.
I remember transmitting the DCS

Page 163

instructions to the contracting officer for his review, or her review, I can't remember who the CO was now at that point, and we would have gotten comments back from them, incorporated those, held additional discussions if we needed to, and the contracting officer -- these are not things we would have done unilaterally. Absolutely not.
Q. You mean the delivery commitment schedule instructions were not something that the waste acceptance division would have sent out without at least consultation with the contracting officer?
A. And his approval or her approval.
Q. Was there anyone in the contracting office besides Beth Tomasoni who you dealt with on issues concerning the Standard Contract?
A. I'm searching my memory for names.
What was Liotta's first name?
Q. Richard?
A. Rich Liotta, and I always want to say Ray Liotta because of the actor. Rich Liotta, Nick Graham, who I believe worked with Beth. That's all that springs to mind at this point.
MR. SHAPIRO: That's all the questions I have.

Page 164

THE REPORTER: Reading and signing?
MS. SULLIVAN: Yes, reading and signing.
Off the record.
(Thereupon, at 4:35 p.m., the taking of the instant deposition was ceased.)
\- - - - - -

Signature of the Witness

SUBSCRIBED AND SWORN to before me this day of , 20 .

NOTARY PUBLIC

My Commission Expires:

Page 165

UNITED STATES OF AMERICA)
STATE OF MARYLAND)
I, DEBORAH K. WILKINS, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition is a true record of the testimony given by said witness.
I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

Deborah K. Wilkins, RPR

My Commission expires June 1, 2003

# TREBULES, VICTOR

# Victor W. Trebules, Jr.

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : I
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 241

Page 2

THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144458

Page 3

April 17, 2002
9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

# Victor W. Trebules, Jr.



(202) 942-5160
BY: Ronald A. Schechter, Esq.

Arnold & Porter
For the Plaintiff SACRAMENTO MUNICIPAL UTILITY DISTRICT
370 Seventeenth Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2301
BY: David S. Neslin, Esq.

Perkins Coie LLP
For the Plaintiff WISCONSIN ELECTRIC
607 Fourteenth Street, NW
Washington, DC 20005-2011
(202) 434-1609
BY: Suzette W. Derrevere, Esq.

Spriggs & Hollingsworth
For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE YANKEE ATOMIC POWER COMPANY
1350 I Street, NW



Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch
Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

I N D E X


EXAMINATION OF VICTOR W. TREBULES, JR. PAGE
BY MR. EIDUKAS 8

TREBULES DEPOSITION EXHIBITS: PAGE
No. 1 Federal Register on Standard Contract. 22





2 Interim Spent Fuel Storage Policy. CTR-044-0180 through 0201. 37
3 Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting. SN 069588 D, SN 069599 through 600. 48
4 December 20, 1983 Draft Mission Plan. CTR-042-1065 through 1190. 78
5 A Mission Plan for the Radioactive Waste Management Program, Volumes 1 and 2.Draft. 84
6 June 1985 Volume I Mission Plan. CE 14791 through 15200. 143
7 January 1987 Draft Mission Plan Amendment. DER-002-3157 through 3217. 197
8 June 1987 OCRWM Mission Plan Amendment. PA-142069 through PA-142139. 211
9 Report to Congress. YMP-002-0181 to 0215. 218
10 Radioactive Waste Review Committee. HQR-077-1119 through HQR-077-1143. 230


**Exhibits are attached.



Thereupon,

VICTOR W. TREBULES, JR.

Was called for examination, and, after having been duly sworn or affirmed, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF COMMONWEALTH EDISON

BY MR. EIDUKAS:

Q. Good morning, Mr. Trebules. My name is Ted Eidukas and I represent one of the plaintiffs in this case, Commonwealth Edison.

A. Okay.

Q. And why don't you go ahead and just spell your full name for the court reporter for the record.

A. Okay. My name is Victor, V-i-c-t-o-r, Trebules, T-r-e-b-u-l-e-s.

Q. Mr. Trebules, have you ever been deposed before?

A. No, I have not.

Q. Well, let me just go over some of the, you know, kind of ground rules they call it. You know, basically I'll ask you a question and please try to

# Victor W. Trebules, Jr.

Page 13

Q. Mr. Trebules, if you can specify a date that you were working on the planning for the disposal of radioactive waste and spent nuclear fuel while at the Office of Nuclear Energy Programs, that would be helpful.

A. Let me try to clarify what I think you asked. I don't remember exactly when ERDA switched over to the Department of Energy. My guess, that was sometime in the 1980s. But in 1977, I joined the Office of Nuclear Energy Programs, which may have been part of ERDA or, you know, Atomic Energy Commission or ERDA or Department of Energy. It was 1977 and at that time I was involved in the planning activities for nuclear energy programs, which included breeder reactor development like the Clinch River breeder reactor, and I was responsible for preparing what was called the Fish and Energy Program Plan for the Department of Energy, which included some at that time it was called fuel cycle activities, which included handling of radioactive waste.

Q. Did that planning for the handling of nuclear radioactive waste that you just described, did that

Page 14

involve planning for the disposal of those wastes in a deep geologic repository?

MR. SHULTIS: Objection, relevance.

BY MR. EIDUKAS:

Q. Generally, when your lawyer objects --

MR. SHULTIS: You still have to answer.

BY MR. EIDUKAS:

Q. You still have to answer unless he instructs you not to, if you're able to.

A. As best as I could remember, we did in the Fish and Energy Program document talk about reactor development and waste activities, and it did include I believe reprocessing at that time. This was prior to the ban on reprocessing and ultimate disposal of radioactive waste.

Q. Did those plans that you worked on go so far as to discuss the design of a repository? Did it get that specific?

MR. SHULTIS: Objection, relevance.

THE WITNESS: As best as I could remember, I don't believe we got involved in the -- at least I didn't get involved in the design of repositories for

Page 15

the disposal of waste. My primary area of emphasis at that time was on reactor development. As I said, the Clinch River breeder reactor and, for example, Whitewater breeder reactor.

BY MR. EIDUKAS:

Q. At some point did your position at either ERDA or the Department of Energy change?

MR. SHULTIS: Objection, vague.

THE WITNESS: I had a number of activities during my career. As I mentioned, I stayed in the Office of Nuclear Energy Programs for a while and then soon after the passage of the Nuclear Waste Policy Act, about a year or two after the act was passed, then I joined the Office of Civilian Radioactive Waste Management.

BY MR. EIDUKAS:

Q. When you joined the Office of Civilian Radioactive Waste Management, you say a year or two after the act was passed, so we're talking somewhere in the 1983-1984 time frame?

A. That's correct.

Q. What was your first position at the Office of

Page 16

Radioactive Waste Management?

A. I don't remember the title of my first position. It was probably program analyst or something like that, but I'm not exactly sure.

Q. What did that position entail? What were your responsibilities in that position?

A. First major assignment I could remember was coordinating the preparation of the mission plan for the Civilian Radioactive Waste Management Program.

Q. Was there anything else that your role entailed in that position?

MR. SHULTIS: Objection, vague.

THE WITNESS: That preparation of the mission plan was pretty much a full-time activity for a number of years. So there might have been other minor assignments I was given, but, you know, overall it was primarily the mission plan.

BY MR. EIDUKAS:

Q. Okay. Did there come a time when your position at the Office of Civilian Radioactive Waste Management changed from program analyst working on the mission plan?

Page 17

MR. SHULTIS: Objection, vague.

THE WITNESS: I had a number of different assignments in the Office of Civilian Radioactive Waste Management over the nearly 20 years that I've worked in that program.

BY MR. EIDUKAS:

Q. I guess what I'm trying to get at is I'd like to have just a brief chronology of the different positions you've been in with dates, if possible.

So you started out as a program analyst in the Office of Civilian Radioactive Waste Management in the approximately 1983-1984 time frame. What I'd like you to do is going forward to the present with dates, if possible, just state the various positions you've held in the OCRWM.

A. Okay. Around the 1984-'85 time frame, as I said, I believe I was a program analyst. I think in 1985 or '86 I became the senior technical adviser and technical assistant to the Director of Office of Civilian Radioactive Waste Management. I don't remember the exact time frame, but when Admiral Watkins became Secretary of Energy, I was detailed to his

Page 18

office for I think little over half a year as an adviser to the Secretary.

I then came back into the Office of Civilian Radioactive Waste Management I think in 1990 or 1991, and I was the Acting Director of what was called the M&O Management Division with responsibility to bring on board the M&O contractor for the program. I think that was 1991. About the a year or two after that, I became the Director of the Storage Division. The primary responsibility was to work on a proposed monitored retrievable storage facility.

A few years after that, I became the Director of the Program Management Division. And let's see. About four years ago I transferred out to Las Vegas to the Yucca Mountain site characterization office, and I'm currently the Director of the Office of Project Control.

Q. Did you have any involvement in the drafting of the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, asks for legal conclusion.

BY MR. EIDUKAS:

Page 19

Q. My question was whether or not you had any involvement in actually writing or preparing the text of the Act.

A. Not that I could remember.

Q. At the time that the Act was being -- and when I say the Act, I'm referring to the Nuclear Waste Policy Act of 1982. At the time that Act was being drafted, did you have discussions with people who were involved in drafting that Act?

MR. SHULTIS: Objection, vague.

THE WITNESS: I don't believe so. I obviously talked to people in the department, you know, who were talking to people, you know, involved in nuclear energy activities, but I don't know that I've ever had any conversations with anyone that was actually involved in drafting the Nuclear Waste Policy Act.

BY MR. EIDUKAS:

Q. Okay. Do you have an understanding as to what the intent of the Nuclear Waste Policy Act is?

MR. SHULTIS: Objection, asks for legal conclusion.

Page 20

THE WITNESS: I'm not sure what you mean by intent of the Nuclear Waste Policy Act. Obviously I was familiar with some of the provisions and some of the requirements. As I said, my main job when I was in the Office of Civilian Radioactive Waste Management was to prepare the mission plan. That was clearly required by the Nuclear Waste Policy Act.

BY MR. EIDUKAS:

Q. I'll try to clarify what I mean. Do you have an understanding of what the primary purpose of the Nuclear Waste Policy Act is?

MR. SHULTIS: Objection, asks for legal conclusion.

THE WITNESS: My understanding of the Nuclear Waste Policy Act is that it laid out a blueprint for this country to follow to provide for the management and disposal of spent nuclear fuel and high level radioactive waste with a number of specific provisions.

BY MR. EIDUKAS:

Q. Are you familiar with the term standard contract?

just re-ask the question. Do you know whether it is the Department of Energy's position that it entered into contracts with utilities to begin accepting waste in 1998 on the basis that it would have a repository available for permanent waste disposal in 1998?
MR. SHULTIS: Same objections.
THE WITNESS: As I understand your question, the Department of Energy did enter into contracts and the date I believe you indicated was correct, 1983, on the basis that it planned to have a repository or it was planning to have a repository in operation by 1998.
BY MR. EIDUKAS:
Q. I'm done with that document. If you want to put that aside. You just want to turn it over. That way.
MR. SHULTIS: Keep in order.
BY MR. EIDUKAS:
Q. Keep in order if you have to refer back to something in the future.
Do you know what the parties to the standard contract intended with respect to how fast spent



nuclear fuel would be taken by the Department of Energy?
MR. SHULTIS: Objection. It asks for a legal conclusion, vague, asks for speculation.
THE WITNESS: Yeah. I do not know what the parties had intended in terms of the rate of waste acceptance. If you're referring to the utilities, I do not know that.
BY MR. EIDUKAS:
Q. Okay. Do you know what the DOE intended with respect to the rate of waste acceptance?
MR. SHULTIS: Objection, asks for a legal conclusion, speculative.
THE WITNESS: I would have to answer that as follows. I know what the plans were that the Department of Energy was working on to develop the facilities because I was primarily responsible for developing those plans. We had planned or our objective was to try to have the facilities, primarily the repository, online in operation by 1998. But, again, those were plans.
BY MR. EIDUKAS:



Q. And I'm sorry, were you done with your answer?
A. Yes.
Q. Okay. When you're referring to working on those plans in that answer, what time frame are you talking about?
A. The early schedules that we prepared indicated that we had hoped to have the repository in operation by 1998, but we clearly I guess the word would be identified caveats or issues or uncertainties associated with that because we, again, as I had indicated before, we recognized the schedules were optimistic and success oriented was the phrase we used to describe them. And we had also identified, as I think I indicated before, schedules for the MRS facility, if that were to eventually be authorized by Congress, that showed that that could go into operation at least by 1998, perhaps a year or two earlier.
Q. Okay. I think -- well, I think I may have misphrased my question. What I was trying to get at was: What was the time frame that you were working on the plans you had referred to? Are you referring to the mission plan, or is this something earlier than



that?
A. It was the mission plan again. We worked on that in 1984, and I think we published it after a round of public review and comment. I think we published it in June of 1985.
Q. Okay. And I think you said that you personally at least were primarily involved in the planning for the designing of the facility. Did I understand you correctly?
A. No, not the design. I was responsible for developing the overall plan, which included design, included some of the siting issues, some of the permitting issues, some of the institutional issues that we had to deal with, as well as the bulk of the activity at that time, though, was the scientific programs that we had to conduct.
Q. Okay. Do you have knowledge as to he what rate of acceptance of spent fuel the repository was designed to operate at this time?
MR. SHULTIS: Objection, asks for legal conclusion.
THE WITNESS: Again, going back to the

# Victor W. Trebules, Jr.

Page 45

mission plan of some 17 years ago, we had put in the mission plan what were called waste acceptance schedules, which were again planning targets of what we thought the system could do if it were developed, you know, in total as we had laid it out. Starting in 1998 with one repository operating. We had laid out what we thought were practical waste acceptance rates.

What I mean by that is it allowed for a ramp-up. I think the number that we started with was for the first repository, for example, 400 metric tons and then it increased. I don't remember the other numbers, but it increased 400 to 600 up to a rate of about 3,000 metric tons per year for a single repository, but at that time we also had authorization to pursue a second repository. That was a provision in the Nuclear Waste Policy Act that we laid out waste acceptance schedules for that two-repository system.

BY MR. EIDUKAS:

Q. Do you have any knowledge about whether there were waste acceptance schedules prepared or proposed prior to the mission plan?

MR. SHULTIS: Objection, asks for

Page 46

speculation.

THE WITNESS: No, I have no knowledge of any waste acceptance schedules proposed prior to the mission plan.

BY MR. EIDUKAS:

Q. Just so I'm clear on the scope of your knowledge or your involvement, is it correct to say that your first involvement or encounter with waste acceptance schedules was when you began working on the mission plan in about 1984?

MR. SHULTIS: Objection, mischaracterizes witness's testimony.

THE WITNESS: Could you repeat the question, please.

BY MR. EIDUKAS:

Q. Sure. I'll rephrase it. I'm trying to make sure I understand whether or not your first involvement with waste acceptance schedules in connection with the Nuclear Waste Policy Act and the standard contract was when you began working on the mission plan in, I believe you said, 1984?

A. I don't remember the exact date, but I think I

Page 47

joined the Civilian Radioactive Waste Management Program in 1984. And my first assignment was working on the mission plan and in that mission plan we did include proposed waste acceptance schedules.

Q. But you personally didn't work on waste acceptance schedules prior to that time? This is what I'm asking.

A. I do not remember working on any waste acceptance schedules prior to that time.

Q. When you joined the Office of Civilian Radioactive Waste Management and you said you were assigned to work on the mission plan, at that time had there already -- had work already been done on preparing the mission plan?

MR. SHULTIS: Objection, asks for speculation.

BY MR. EIDUKAS:

Q. If you know.

A. I honestly don't remember. I know it was a provision of the Nuclear Waste Policy Act, which I believe was passed by the Congress in December of '82, signed by the President in January '83. As I said, I

Page 48

joined the program in '84. I don't remember if people had worked on that before I did, but I know that when I joined the program, that was the first assignment I was given.

MR. EIDUKAS: I'm going to go ahead and mark this as Number 3 and for the record I'm having marked Bates MS 069588 --

MR. STOUCK: 528?

MR. EIDUKAS: I'm sorry.

MR. STOUCK: I didn't hear.

MR. EIDUKAS: I'm sorry. I'll repeat. It's actually three pages. The first page is Bates number SN 069588D and then it skips some Bates numbers and then you have SN 069599 through 600. It's a document entitled "Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting," December 12th through 15th, 1983 in Washington, DC and the date of the actual document is February 1984.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 3.)

BY MR. EIDUKAS:

Q. Mr. Trebules, as you can see, this is three

pages from what appears to be a larger document. But if you can just take a moment to take a look at these and let me know if you're familiar with this.

A. (Pause). I note that from the two pages you gave me, it's only page 11 and 12. So I assume it was from a larger document.

Q. That's correct.

A. That's not included here.

Q. That's correct.

A. All right. I've looked over these two pages.

Q. Okay. Do you recall, have you seen these pages before?

A. I don't ever remember seeing these two pages.

Q. Okay. These refer to -- purport to refer to apparently a meeting or a conference that was held in mid-December 1983, during which Robert Morgan at the time appears to have been the Acting Director of Civilian Radioactive Waste Management gave this presentation or talk about the mission plan.

A. Right.

Q. Were you present for such a conference or meeting, whatever you want to call it?



A. I don't remember being at this meeting. I'm not even sure that I was working in the program at this time.

Q. Right.

A. This was in 1983.

Q. At the top of the middle page, page 11, on the right-hand side, the first full paragraph there says: "We have just received a preliminary draft of Volume I of the mission plan and we hope to have this available to interested parties, the states and others by Christmas."

Does that refresh your recollection as to whether or not work had been performed in preparing a mission plan prior to your arrival at the Office of Civilian Radioactive Waste Management?

A. I honestly don't remember that. I could only speculate that when he said we have just received a preliminary draft, it might have been a draft prepared by the support service contractor at the time, but I honestly don't remember that.

Q. Okay. I want to move down to that same column. It's the largest paragraph there on the



right-hand side.

A. Uh-huh.

Q. The paragraph starts out "I would like to talk a little bit about." You see that?

A. Yes.

Q. What I want to refer you to is about midway through that paragraph. There's a sentence that starts, "The basic strategy which we've outlined."

A. Yes.

Q. Okay. I just refer from there on to the end of the paragraph that says: "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at any -- I'm sorry -- or at another location." You see where it says that there?

A. Yes, I see that.

Q. Okay. Do you know whether that was -- or strike that.



Do you know was that the intent of the DOE at the time?

MR. SHULTIS: Objection, asks for legal conclusion. Mr. Trebules is not a 30(b)(6) witness, asks for speculation.

THE WITNESS: Again, as I understand your question, did I understand that to be the intent of DOE at the time. I don't believe I worked in the program at that time.

BY MR. EIDUKAS:

Q. When you worked in the program, do you know whether or not it was the intent of DOE to receive fuel at a rate beginning in 1998 that no utility would have to add any further storage facilities?

MR. SHULTIS: Same objections and relevance.

THE WITNESS: When I started working in the program on the mission plan, I remember that we discussed the objective of reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage. That was our objective or planning target.

Page 53

I believe what happened early on was that when we sent the draft mission plan out for public review and comment, we got a number of comments that said our schedules were too optimistic and we, I believe, revised those schedules in the actual document that went out in June of 1985 to the point where it didn't quite meet the intent of the words described here.

We started out as best as I could remember with a number like 400 metric tons in 1998, and we incorporated a ramp-up period that after four or five years or so we would eventually get up to about 3,000 metric tons a year, which we believed was the accepted spent fuel generation rate of the nuclear power plants at that time.

And it was over that ramp-up period that we hoped to get to the point where we would preclude the utilities from having to provide additional on-site storage. And then when the second repository came into operation, then we could, when that one reached full capacity, be able to reduce the backlog.

So, again, I'm speculating that when this

Page 54

was written that was the intent, but that was changed after we got comments on those early draft versions of the mission plan. We adjusted those waste acceptance schedules a bit.

BY MR. EIDUKAS:

Q. Okay. Do you know whether or not it was the intent of the parties to the standard contract when they entered those contracts back in 1983 that fuel would be received at the repository at a rate that no utility would have to add any further storage facilities either on-site or at another location?

MR. SHULTIS: Objection, asks for a legal conclusion, calls for speculation.

THE WITNESS: As I think I heard your question, did I know the intent of the parties to the contract. Again, if you're referring to the utilities, I do not.

BY MR. EIDUKAS:

Q. Okay. Do you know whether or not the DOE had an intent -- had this intent when they entered into the standard contracts with the utilities?

MR. SHULTIS: Objection, asks for a legal

Page 55

conclusion. Mr. Trebules is not a 30(b)(6) witness. Calls for speculation.

THE WITNESS: Could you help me? Could you clarify what you mean by the word intent?

BY MR. EIDUKAS:

Q. Sure.

A. Because I know we had planning targets or objectives or goals that we were trying to meet, but I know there was concern about the characterization of those and we put in, as I said before, caveats as this document indicates, you know, that represented some of the difficulties. And as I say on page 11 where it says, at the end of the second full paragraph. "Our intent is to fully comply with the act in process and in technical mandates. However, if we must slip a date in the schedule to accomplish the requirements and intent of consultation, we will do so." Again, can you clarify your question by what you mean by intent?

Q. Sure. I mean, I think we're talking about DOE here because you said you don't know what the utilities intended. What I mean by intent is what the DOE expected to do when -- and I was talking and my

Page 56

question was referring to the time that the standard contracts were entered into back in 1983. You may not know the answer to that, but that was my question.

MR. SHULTIS: Same objections as before. Legal conclusion, 30(b)(6) witness, calls for speculation.

THE WITNESS: Again, I would have to characterize my answer by saying that our planning targets or our objectives or our strategies were such that, you know, we tried to have the facilities in operation to take the field by 1998. You know, with the caveats that I previously indicated. If that's what you mean by intent, that's how I would answer that question.

BY MR. EIDUKAS:

Q. Look quickly at the section of this paragraph right above where we've been looking. Starting with the sentence "I think most of you know." Do you see where I'm referring to? It's the second sentence of that paragraph. "I think most of you know."

A. I see that.

Q. Okay. Great. "I think most of you know that

Page 57

the Act requires that we receive waste from the utilities by January 1, 1998."

First of all, is that your understanding that the Act requires that DOE start receiving waste from utilities on January 1, 1998?

MR. SHULTIS: Objection, calls for a legal conclusion. Calls for speculation.

THE WITNESS: Again, my recollection -- I don't remember the exact wording in the Act -- is that there was a qualifier that, you know, once we had the facilities available to do that, specifically the repository and the MRS that we already talked about. But other than that, that's my understanding.

BY MR. EIDUKAS:

Q. Okay. The sentence and this paragraph goes on to say, "Technically, the act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."

Do you recall having any discussions back when

Page 58

you were working on the mission plan as to regarding whether or not accepting one spent fuel element in 1998 would be in accordance with the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, calls for speculation. Asking for a legal conclusion.

THE WITNESS: As I understood your question, do I recall having discussions, the answer is yes. I was involved in many discussions or speculation as about what that meant and would accepting only one fuel assembly satisfy the intent of the act. And as best as I can remember, I don't know that we ever got a clear determination, you know, from those involved that that was the case.

BY MR. EIDUKAS:

Q. Did you personally draw any conclusions regarding that?

MR. SHULTIS: Objection, relevance. Calls for a legal conclusion.

THE WITNESS: Again, would you repeat the question. Did I?

BY MR. EIDUKAS:

Page 59

Q. I'm sorry. You had said that you recall there being discussions regarding whether or not accepting one spent fuel element in 1998 would comply with the Nuclear Waste Policy Act.

My question was whether or not you personally reached a conclusion as to whether or not accepting only one spent fuel element in 1998 would comply with the act?

MR. SHULTIS: Same objection.

THE WITNESS: I'm not quite sure how to answer that because at the time I was, you know, a fairly low level staff person. I was given an assignment. So I'm not sure if my conclusion would have mattered much. I mean, I'm not trying to be frivolous, but I don't know that I consciously thought of the implications of that at the time. I mean --

BY MR. EIDUKAS:

Q. Have you -- I'm sorry. I was going to ask you whether or not you have since come to such a conclusion or thought about the implications.

MR. SHULTIS: Same objections and relevance.

Page 60

THE WITNESS: I think I would personally feel that one could argue since the Act was not specific, if we only accepted one fuel assembly, you know, we met the intent of the words. However, I also would be sympathetic to the additional phrase in here that where it says, "However, we did not believe that that meets the intent of the Act."

I believe the intent of the Act was for the government to develop the facilities to solve the nuclear waste problem, which isn't accepting just one assembly, and we were to develop the facilities. And we were trying to do that as expeditiously as we could, you know, to really deal with the overall problem of the accumulation of spent fuel.

BY MR. EIDUKAS:

Q. Okay. And was there ever a schedule or plan developed that called for only receiving one spent fuel element in 1998?

MR. SHULTIS: Objection, calls for speculation. It's vague.

THE WITNESS: I don't ever remember developing a schedule that only called for one assembly

# Victor W. Trebules, Jr.

Page 73

remember. His name was Tom Longo, who wrote a lot of the geology and hydrology sections of the mission plan, and then we had a support service contractor and I think at that time their name was Weston.

BY MR. EIDUKAS:

Q. And do you recall what Weston worked on for the mission plan?

A. Well, they were, again, support service contractors under DOE direction. They were drafting up various sections of the plan, you know, for DOE review. DOE had final approval and authority over the content of the mission plan, and I was responsible for a lot of the individual sections myself.

Q. I'm sorry. When you say responsible, do you mean to review what Weston had drafted?

A. Yes.

Q. Who else was responsible for reviewing sections of the mission plan drafted by the contractor?

A. Well, it was always DOE individuals within the organization that had to review and give final approval of anything that went out as part of the mission plan. Again, I don't remember the names of many of the

Page 74

people, other than perhaps Tom Longo or Charlie Head or Bob Rosselli that were involved in the review.

And I believe during the time we issued the draft to when we issued the final in June, we actually went through an organizational change. And I think when the June '85 version was issued, I actually ended up working in a different group and that was probably called the office of -- Office of Policy and Institutional something or other, and people there that were involved were people like Tom Isaacs, Roger Gale and Ben Easterling.

Q. Do you recall what their involvement was?

A. Ben Easterling was my immediate supervisor at that time in June of '85 I believe and Tom Isaacs was the director of that office, and I think Roger Gale was the deputy.

Q. I'm going to go back to -- so when you first started, you said your first supervisor was Charlie Head and then when this reorganization occurred, it became Ben Easterling.

Was there anyone in between those two people to whom you reported to?

Page 75

A. Not that I can remember.

Q. Did you have final say over approving the sections of the mission plan that you were responsible for, or did you have to take that to your supervisor for them to have your decision approved?

MR. SHULTIS: Objection, compound.

THE WITNESS: Yeah. Did I have final say. I would say no. I had to get approval of several layers of my management at the time, starting with Ben Easterling, Roger Gale, Tom Isaacs, and ultimately the director of the program had to approve release of the document.

BY MR. EIDUKAS:

Q. So Ben Easterling -- after this reorganization occurred, is that when Ben Easterling became your supervisor?

A. I don't remember the exact time, but I think when we issued the document in June of '85, he was my immediate supervisor.

Q. Okay. And to whom did he report?

A. To Roger Gale and Tom Isaacs.

Q. Did Mr. Gale report to Mr. Isaacs or vice

Page 76

versa, or were they kind of at the same level of management?

A. I'm trying to recollect. I believe Roger Gale was the Deputy of the Office of Policy and Institutional, whatever it was called, and Tom Isaacs was the director. So, in a sense I believe Roger Gale reported to Tom Isaacs.

Q. Okay. And then did Tom Isaacs report to the director of the program?

A. Yes, I believe so, and I think that was Ben Rusche at the time.

Q. You had said I think that you had drafted some of the sections of the mission plan. Is that correct or am I --

A. Yes, I wrote or drafted some of the sections of the mission plan.

Q. Could you just briefly list or describe which of the sections you were responsible for drafting?

A. The one in particular was I think what was called Chapter 1, which was an introduction, which I remember clearly we discussed the kinds of radioactive waste that we intended to deal with, and we put in a

# Victor W. Trebules, Jr.

Page 77

picture of a person standing next to a fuel assembly before it got inserted into a reactor. I essentially wrote that first chapter.

I was heavily involved in the second chapter, which was sort of the strategy, which we talked about before, laid out the authorized system and the improved performance system. Although I remember Tom Isaacs provided a lot of the direction as to how that chapter should be structured and what it should say.

I compiled the table of assumptions that went into that second chapter. Sort of give people an understanding of the magnitude of the issue that we were dealing with. It talked about the quantities of spent fuel, the modes of transportation, the number of repositories, you know, some of the parameters. The waste acceptance schedule, that was also included in Chapter 2.

And then I wrote a lot of the response to comments in the comment response document that we prepared, and again all these had to be reviewed by my management, and ultimately the director of the program before it got published.

Page 78

MR. EIDUKAS: Mark this as 4.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 4.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I have marked as Exhibit 4 -- this version doesn't have Bates stamps on it. This is a December 20, 1983 marked as "Draft, Civilian Radioactive Waste Management Program Mission Plan, Volume 1, Overview and Current Program Plans." This appears to be a December 20, 1983 draft of the mission plan. Are you familiar with this document?

A. Could I have a few minutes to look at it?

Q. Sure, sure.

A. (Pause).

MR. SHULTIS: Ted, ours has Bates numbers.

MR. EIDUKAS: Let me read it into the record. For the record, the Bates stamp of the exhibit is CTR-042-1065 through 1190. Thank you.

(Counsel and witness conferring).

MR. EIDUKAS: There's a question pending. If you want to ask questions of the witness, you can ask them on the record, but I prefer you don't have

Page 79

these consultations while there's a question pending.

MR. SHULTIS: What is the question pending?

MR. EIDUKAS: Are you familiar with this document, and you'll have a turn to ask questions of the witness when I'm done.

THE WITNESS: I'm ready to answer.

BY MR. EIDUKAS:

Q. Sure. I believe the question was: Are you familiar with this document?

A. To be honest with you, I don't remember specifically seeing this document before. I believe this was probably prepared before I joined the Civilian Radioactive Waste Management Program. However, I'm very familiar with some of the material in here and the reasons why we changed it in the eventual mission plan that got published in June of 1985.

Q. Okay. Would you describe what was changed --

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. -- that you're referring to in your earlier answer.

Page 80

A. Just very briefly, in looking at Chapter 1, for example, just skimming through it, this only has, for example, two pages and I believe in the version that I was responsible for, the one that got issued in June of '85, we had a much more extensive discussion in Chapter 1 on, as I indicated before, the types of wastes. We had a picture of the fuel assembly, you know, as to what it looks like, you know, before going into a reactor. We talked about other kinds of waste that we might have to deal with. The high level waste that came from the DOE operations.

Chapter 2, for example, looks like an early, early version of the strategy, which I think bears no resemblance to the one that ultimately got published in June of '85 where we talked about the authorized system and the improved performance system. This does have an early version of a waste acceptance schedule, but it's got numbers that were changed significantly from the one that got published in June of '85.

So, again, I mean, it's obviously an early version of the mission plan. I can't say for certain whether this is the one that was issued for public