# Victor W. Trebules, Jr.

Page 81

review and comment. I would think not, but it's significantly different than the one that got published in June of '85.

Q. I can't recall if you answered this or not. Do you know whether or not -- do you know who prepared this version, this draft of the mission plan?

A. No.

MR. SHULTIS: Objection.

THE WITNESS: I do not know specifically who prepared this.

BY MR. EIDUKAS:

Q. Okay. And I think this follows from what you testified, but do you know whether or not this draft of the mission plan was used in any way in preparing the later drafts and the final mission plan?

A. I don't know. I don't remember how it was used. I mean, normally the process is, you know, drafts evolve, you know, through successive iterations. I'd only be guessing, but I'd assume that is what happened with this one.

Q. When you referred to Chapter 2, you said this was an early version of the strategy and didn't include

Page 82

the authorized plan and the approved performance plan, but the final version of the mission plan did. Do you know why that was changed?

MR. SHULTIS: Objection, calls for speculation. Asked and answered.

THE WITNESS: I believe, as I indicated, Tom Isaacs was the primary author or inventor of the approach in that strategy chapter where we felt we had to clarify, as the names imply, what the department currently had authorization to execute. At the time that was the first repository in the transportation system, and we included discussion in the improved performance plan as to how that system could operate if we proposed and Congress accepted our recommendation on incorporating a monitored retrievable storage facility.

So we wanted to expand on and clarify that discussion, which I don't see in this document that you've provided me, the one dated December of '83.

BY MR. EIDUKAS:

Q. And you referred to a waste acceptance schedule. Is that the -- were you referring to the table that appears on page 2-3?

Page 83

A. Yes.

Q. Okay.

MR. SHULTIS: You want to identify the Bates number?

THE WITNESS: CTR-042-1072.

BY MR. EIDUKAS:

Q. Is that the schedule that you were referring to?

A. Yes.

Q. Okay. And you said that this was changed in the eventual mission plan that was published?

A. Yes. This table doesn't look familiar to me, and I think the one that got published in the version of the mission plan in June of '85 was -- is different.

Q. So I take it you don't know the source of this waste acceptance schedule on page 2-3?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: I don't remember the source. I don't know.

BY MR. EIDUKAS:

Q. And I think you said you don't recall seeing

Page 84

this schedule before?

MR. SHULTIS: Go ahead.

THE WITNESS: I don't specifically recall it. I may have, but I don't -- I mean, I don't recollect it at all.

BY MR. EIDUKAS:

Q. Why don't we put this one aside for now. I may come back to this one later.

A. Okay.

MR. EIDUKAS: Would you mark this as Exhibit 5.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 5.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I've had marked as Exhibit 5 a document titled "A Mission Plan for the Radioactive Waste Management Program, Volumes 1 and 2 of Two Volumes, Overview and Current Program Plans." This appears to be -- and it's dated April 1984 up in the right-hand corner. It says that it's a draft that was reprinted in July of 1984. Feel free to take a look at this.

# Victor W. Trebules, Jr.

Page 85

My first question is going to be: Are you familiar with this document? I can also say for reference that this was the same document that was marked as Exhibit Number 11 of Mr. Robert Morgan's deposition.

MR. STOUCK: Can you give us Bates numbers?

MR. EIDUKAS: There are no Bates numbers on the document.

THE WITNESS: (Pause). All right.

BY MR. EIDUKAS:

Q. Are you familiar with this document?

A. Yes, I am.

Q. Is this a draft of the mission plan that you worked on?

A. Yes, it is.

Q. Okay. Turn to page Section I-Introduction. It has in the upper right-hand corner page 1-1. Is this a section that you drafted?

A. That I don't remember.

Q. I guess I'll back up a second. On this particular draft that is marked as Exhibit Number 5,

Page 86

what specifically was your role in preparing this document?

A. Well, that's tough to answer. Again, when I got there, the mission plan work was underway. I don't remember exactly when or where I picked up because, you know, this is like 16, 17 years ago. I do remember, I believe this is the document that went out for public review and comment. As the cover letter indicates, signed by Mike Lawrence. As I indicated, the comments were due back to Charlie Head, who was my supervisor at the time.

Once we -- and I remember, you know, after this document much clearer that when the comments came back in, we revised some of these chapters and I did write the next version of this Chapter 1, for example, which was much more extensive with the pictures in it and the waste sites. To be honest, I may have been involved in structuring some of these words back then, but this is just about the time when I was, you know, coming into the program to work on it.

We made a lot of changes in response to those comments such as Chapter 1. We changed the strategy

Page 87

chapter significantly, and I remember very clearly working on, you know, writing sections of the document after this version. To be honest with you, I don't remember exactly what I did with this document because this was the one that had been under work and went for public review and comment.

Q. Okay. Do you know who drafted this Section I of this draft?

MR. SHULTIS: Objection, asked and answered. Calls for speculation.

THE WITNESS: No, I don't remember specifically who might have drafted this.

BY MR. EIDUKAS:

Q. If you look down that second paragraph, page 1-1, the last sentence says, "The program developed by the department to fulfill the requirements of the Act is described in this mission plan."

A. I see that.

Q. Okay. Do you agree that the mission plan describes the program developed to fulfill the requirements of the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, asks for legal

Page 88

conclusion.

THE WITNESS: I believe that's the case, but I would point out, though, that this was a draft document that went out for public review and comment and does not reflect the final version of the mission plan, which was the June '85 version of the plan.

BY MR. EIDUKAS:

Q. Okay. The sentence in that paragraph says, "Specifically, the following program objectives have been identified to implement the Act," and then it lists five numbered program objectives.

Is it your understanding that these program objectives would fulfill or would implement and fulfill the requirements of the Act?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Give me a second to review them, please.

BY MR. EIDUKAS:

Q. Sure.

A. As I recollect, these are the objectives that the department identified, which they thought would

# Victor W. Trebules, Jr.

Page 93

THE WITNESS: Again, I'm not familiar with the provisions of the contract that, as these words indicate, that included the development of a waste acceptance schedule. I was involved in the subsequent development of the waste acceptance schedules that we used for planning purposes, which we put in the following version of the mission plan that got published in June of '85.

BY MR. EIDUKAS:

Q. Okay.

A. But I'm not clear at all as to the relationship of that to the contract, to the provisions of the contract.

Q. Okay. So if you'll just turn to the back side of that page you're looking at, there is a Table 2-1 Waste Acceptance Schedule.

A. Right.

Q. Did you have any involvement in preparing this particular schedule?

A. As best as I could recollect, I believe I did and, as I indicated, this is -- if I could refer back to the previous --

Page 94

Q. Sure.

A. -- version that you gave me. The previous document.

Q. You're looking at page 2-3 is the table in that?

A. Yeah. I noted very quickly some changes. For example, in the previous exhibit, okay, if you note that this one began with acceptance rates for the first repository starting at 1800 metric tons, okay, for five years. Then it ramped up to 3,000 metric tons. Again, as best as I could recollect, upon reflection of this ramp-up rate, it was determined that was probably optimistic and unrealistic.

So, in Exhibit 5 that you just gave me, if you note the difference in the first repository acceptance rates, it started out at 400 metric tons, a much lower rate, a gradual ramp-up to 3,000 metric tons. And as I think I've previously indicated in some of my earlier answers, you know, my recollection of the first waste acceptance schedule we published started at 400 metric tons. So I am familiar with the ones in Exhibit 5, but I wasn't familiar with the ones in Exhibit 4.

Page 95

Q. Okay. Talking about the schedule in exhibit -- strike that.

I think you said that the ramp-up period was revised downward in the schedule in exhibit -- between the schedule in Exhibit 4 and the schedule in Exhibit 5. You said it started at 400 rather than the 1800 metric tons that's set forth in Exhibit 4, and I think you characterized it in order to make it more realistic or probable.

My question is whether or not it's your opinion that the schedule set forth in Exhibit 5 is a realistic schedule?

MR. SHULTIS: Objection, calls for characterization. Legal conclusion.

THE WITNESS: Let me try to correct one thing you said. You said the ramp-up period was revised downward. It's the ramp-up rate that was revised downward.

BY MR. EIDUKAS:

Q. Thank you. That's correct.

A. I think I recollect discussions, you know, back again some 16, 17 years ago where people looked at

Page 96

bringing a nuclear facility online like the waste receiving facilities of a repository and recognizing that it needs a gradual ramp-up rate before it reaches its full capacity steady state operations. And when we compared the numbers in Exhibit 4 to Exhibit 5, as we just discussed, you know, the ramp-up rate in Exhibit 5 is more gradual and I think in many people's minds, particularly the engineers that were working on it at the time, probably more realistic.

Q. Okay. Who did you have those discussions with, if you can recall?

A. Again, the only names I remember at the time the people I was talking to were people like Charlie Head, who was my immediate supervisor, who is the name indicated in this cover letter to provide comments to. He was, you know, back then he was the one that I talked to most of the time about the work on the mission plan.

Q. Referring to the acceptance schedule in Exhibit 5 that you have in front of you, how was that prepared?

MR. SHULTIS: Objection, vague.

Page 97

BY MR. EIDUKAS:
Q. And what I mean by how was it prepared, I don't mean how was it typed. I mean, how were these numbers decided upon? How was this schedule developed?
MR. SHULTIS: Objection, vague. Asks for a legal conclusion.
THE WITNESS: As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or zero.
As Table II-1 in Exhibit 5 shows, in the second column, the annual spent fuel generation rate, these were numbers that we got from the Department of Energy's Energy Information Administration. Based on their analysis of the nuclear power plants in operation and the expected amount of spent fuel that they'd be generating, and as you can see in this table, the numbers start at in 1998 at 2,700 metric tons. They go up a little bit. They approach 3,000 metric tons.

Page 98

So, for the first 10 years of operation, our target was sort of to reach an acceptance rate of about 3,000 metric tons, which would more than the generation rate from all the nuclear plants.
We did recognize, though, at that time we still had a backlog, which is shown in column 4, you know, of over 40,000 metric tons that already was in storage. So, again, our two objectives or goals were to try to begin, as you know, as soon as possible, you know, 1998 or as soon as possible thereafter. And as we indicated before, those were what we characterize as optimistic schedules and reach an acceptance rate of 3,000 metric tons, which would preclude the utilities from having to provide any additional on-site storage.
Then when we got a second repository in operation, again, this is shown in Table 2.1 in column 6, a second repository would come into operation about a half a dozen years after the first, and we expected that to ramp-up faster because we would have experience from operating the first repository. And when those two repositories were then operating in tandem, at that point then we'd be able to start reducing the backlog,

Page 99

which is indicated in the column on the far right.
You know, eventually to the point where we'd between the two repositories accommodate all the expected spent fuel, which at that time was still judged to be 140,000 metric tons.
BY MR. EIDUKAS:
Q. Okay. So, just looking at the -- let's take the first repository acceptance rate that starts at 400 and ramps up to 3,000 and then stays at 3,000 until it looks like 2025 or 2026 where it goes to has 100 and then stops.
I guess, how were those numbers actually -- how did you actually come up with those numbers? Was there a source or a basis for the actual numbers you have here in this for that schedule?
MR. SHULTIS: Objection, vague.
BY MR. EIDUKAS:
Q. I mean, do you understand what I'm asking? I mean, in other words, is this representing a physical limitation that was projected or recognized? Were these numbers picked out and then the idea was to design repository around them? I guess what I'm

Page 100

trying to get at what, I guess, first the source for these numbers?
A. Okay.
MR. SHULTIS: Objection, compound.
THE WITNESS: It's a compound answer. It's somewhat complicated, but again my recollection is that going back to the Nuclear Waste Policy Act, which indicated that the country planned on developing two repositories, and there were various reasons for that, but the plan was to develop two repositories. And based on the projections at the time, again, the source that I'm familiar with is the Department of Energy's Energy Information Administration, which projected we'd have a total of about 140,000 metric tons of spent nuclear fuel to accommodate or dispose of.
There was a provision in the law that said the first repository could not emplace more than 70,000 metric tons until the second repository goes into operation, and I think there were various reasons for that. But that was sort of a guideline that we used that said the first repository should be designed, if the geology permits, to accommodate 70,000 metric tons

and then the other 70,000 metric tons would go in a second repository.

It was that in combination with what I indicated earlier that the objective was to get an acceptance rate of about 3,000 metric tons, which at that time was the anticipated annual spent fuel generation rate from the nuclear power plants in operation. So if you just do the math, you have a capacity for repository of 70,000 metric tons divided by 3,000 metric tons per year. That would indicate that that repository would operate for about 25 years as this table shows.

And then the second repository would be in operation. Again, a capacity of about 70,000 metric tons, at about 3,000 metric tons per year. That one would operate for about 25 years, and the sum of those two would accommodate all the anticipated spent fuel to be generated by the nuclear power plants in operation at that time.

BY MR. EIDUKAS:

Q. Okay. Referring to -- I think other witnesses have called it the steady state rate or the



maximum rate. The 3,000 that's carried out for the most of the years on this schedule for the repository. Does that represent a limitation on how fast the repository was designed to accept waste?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: I'm not quite sure how to answer your question. You said does it. You could design the repository to operate in a number of different ways, and if money or schedule or no object, you could increase its capacity. Although you complicate the operations.

I believe we again established various goals or objectives and operating parameters which we thought were reasonable based on the experience to date because you also had to consider, for example, the transportation requirements to service these repositories. And in 3,000 metric tons per year, that equates to a large number of truck shipments or, you know, somewhat lesser number of train shipments. And, again, you're looking for the reasonable accommodation of all these interrelated factors.



But I think my earlier answer is still pertinent that the overriding objectives were, again, to develop two repositories. The first with the capacity suggested by the Nuclear Policy Act of 70,000 metric tons with an acceptance rate that would accommodate the expected spent fuel generation rate from nuclear power plants in operation. So when you balance all those design factors, you know, for the engineering solution, you get something I think that was represented at the time by the parameters in this Table 2.1 in Exhibit 5.

Let me point out, though, that this is not our current approach because there have been subsequent actions by Congress which essentially have postponed any work on the second repository. So we knew at the time when we published the mission plan back in the '84-'85 time frame that there were a lot of things beyond our control and, again, this was just a plan. These were just objectives we were trying to meet, and we knew we'd have to accommodate a lot of, you know, prohibitions and hiccups as we began to execute the program.



BY MR. EIDUKAS:

Q. Okay. You had set forth the two objectives and the second was that you wanted the rate to reach -- to basically reach -- you wanted to basically reach a rate that would equal the waste generation rate. So that the need for additional reactor storage would be either minimal or zero.

My question is: What was the source of that objective? Why was that an objective you had?

A. Okay. Could you give me a minute --

Q. Sure.

A. -- to review some of these previous documents. Because I think there were words in one of those that I remember being presented to me when I joined the program. Let me just... Is it Bob Morgan?

Q. It's Number 3.

A. Yes. Let me quote from Exhibit 3, page 11, column 2, the large paragraph in that column about halfway through the paragraph. There's a sentence that begins "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage

any discussion. To my recollection, at that time I'm sure the answer was yes, but I don't remember any of the details of the discussions. I mean, again, I was fairly new to the program back in 1984. My primary involvement was on developing the numbers that went in the waste acceptance schedule that seemed to make sense, you know, from an operational standpoint.

Again, meeting the two criteria talked about before. You know, beginning in 1998 trying to get up to an acceptance rate that would preclude the utilities from having to add additional on-site storage. In looking at the combination of the two repositories, that would eventually reduce the backlog and accommodate all the waste. I'm sure there were discussions, but if there were discussions, I don't remember the details of them, you know, at this time.

BY MR. EIDUKAS:

Q. And when you were working, to the extent you were working on developing these waste acceptance schedules, did you view yourself as trying to meet a requirement that waste be taken as expeditiously as practicable as set forth as an obligation in the



contract? Did you have that in your mind when you were developing these schedules?

MR. SHULTIS: Objection, asks for a legal conclusion. Asks for speculation.

THE WITNESS: I'm trying to remember, you know, again, what was in my mind back at that time. I honestly don't remember if we in the planning group, you know, looked upon that as a, as you say, as a requirement. We're trying to establish what we thought were possible schedules, you know, based on assumptions, strategies, objectives that we thought we could meet. Again, they were -- we were concerned about those becoming fixed dates. We were concerned about that. We put caveats in there.

Some of this documentation shows, you know, we said the schedules may change, you know, as other developments occur. I remember fairly clearly the concern of some people -- and I'd have a hard time remembering exactly who the people were, but the answer that I came up with to address that was incorporating key words in our explanation of the waste acceptance schedules as illustrative. You know, they were



examples. They were ways the system could be operated.

You know, we put in words like that to sort of caveat, you know, being overly committal on what we thought we could do. And as you saw the words in some of these other documents, it said that the schedules may change, you know, and if they change, you know, we will have to change.

So, back to your original question, did I consider it as a requirement we were trying to meet? I don't believe so. It was a planning objective more than anything, and I think -- even as this cover letter that transmitted Exhibit 5 and I think I was involved in writing this. The one that starts off "Dear Recipient."

BY MR. EIDUKAS:

Q. Okay. I see that.

A. Signed by Mike Lawrence.

Q. Yes.

A. It states right in the first paragraph that: "The purpose of this report is to provide an informational basis sufficient to permit informed



decisions to be made in carrying out the repository program and the research development demonstration programs required under the Act." Again, it was an informational basis sufficient for decision making. So we didn't want to, you know, overly commit or prescribe to anything.

You know, we knew there were a lot of issues that we would deal with. And, in fact, I think as we discussed before, if you compare Exhibit 4 to Exhibit 5, there were significant changes just from that early draft to this May 1984 draft. I mean, we were making changes, you know, in response to comments, you know, and the development of the planning activities at that time.

Q. Okay. In referring to that letter, when you talked about the document being provided as an informational basis that would allow use of people to rely or make decisions upon it, who are you referring to as making those decisions?

A. It would have primarily been the decision-makers in the Department of Energy, you know, who are charged by Congress with responsibility for

of those objects being that it would ramp up to equal, at least equal the waste generation rate. So that it would either eliminate or, you know, reduce to either minimal or zero the need for utilities to build additional on-site storage after 1998?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, as best as I can remember, we had two overriding objectives. One was to begin acceptance in 1998 and the other one was to ramp up, you know, as fast as realistically possible, you know, with all the engineering constraints to preclude the need for utilities to add additional on-site storage. But we did anticipate that the schedules would change and, in fact, in Exhibit 5 on page 2-1, just quickly looking at the section that's entitled "(A) Waste Acceptance Schedule."

BY MR. EIDUKAS:

Q. Yes.

A. The second paragraph begins by saying that: "This waste acceptance schedule will eventually be further developed to show not only the aggregate



acceptance schedule, but also an acceptance program ranking by utility and fuel element." So we anticipated that these waste acceptance schedules would continue to evolve, you know, would change based on, you know, new or updated information.

The next sentence goes on to read: "The schedule will serve as a planning base, which will be updated annually, with responsible latest projections." So, again, we anticipated that they would be updated.

Q. To stop you there, that sentence that you referred to is that "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections of nuclear power growth." Is that connected to the objective you stated that the schedule was intended to ramp up and then to meet the generation rate?

MR. SHULTIS: Objection, looking for a legal conclusion.

THE WITNESS: My recollection is that the main reason we said "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections," the projections



that we were monitoring closely were the EIA projections, the Energy Information Administration projections. And I believe at the time the Nuclear Waste Policy Act was passed, those projections indicated there were would be 140,000 metric tons of spent fuel generated. And if I can look back quickly to Exhibit 4 here.

BY MR. EIDUKAS:

Q. Sure.

A. Again, when the Act was passed in the end of 1982, the number was 140,000 metric tons, which divided by two was the basis for the 70,000 metric ton limit. By the time this draft of the mission plan was published in December of '83, those projections had already fallen to 133,000 metric tons, and one of the factors obviously was Three Mile Island in 1977 I think. You know, that the number of power plants under construction was dropping. Some were being canceled.

And let me just look here. Well, this one still says 133,000 metric tons. But, you know, we thought that the total amount of spent fuel to be generated might continue to decrease. You know, so we



wanted to make sure we could accommodate that.

Q. Okay. To your knowledge, was the objective of having a rate that would meet the generation rate, did that objective ever change over time?

MR. SHULTIS: Objection, asks for a legal conclusion.

THE WITNESS: I think we tried to maintain that as an objective and that sort of became institutionalized with this 3,000 metric tons per year, you know, acceptance capability for one repository, and again when the second one would come online with an additional 3,000 metric tons, then we'd be able to reduce the backlog. That remained a planning objective or assumption for a number of years but got seriously set back when Congress I believe in 1987 pretty much put the second repository program on hold. So, at that time we sort of had to regroup and figure out what we were going to do.

BY MR. EIDUKAS:

Q. Looking again at the schedule in Exhibit 5, it provides for schedules for the first and second repository, but there's no acceptance schedule in this

# Victor W. Trebules, Jr.

Page 141

meetings cannot possibly call for speculation. The question is whether or not they recall something.

I would just ask please if counsel for the government would listen to the questions and attempt to interpose only objections that are proper and actually meet the substance of my questions so as not to unnecessarily delay the length of this deposition.

MR. SHULTIS: The objections I'm making are based on the questions being asked. If you don't want me to make objections, don't ask objectionable questions. I'm sorry that you feel that I am not listening to your questions. I'm listening. I'm sorry that you think that Mr. Trebules is not having a clear memory of something that happened 16 or 18 years ago is speculative, but if he's already answered that he doesn't remember, then asking another question is speculative. But your objection is noted.

MR. EIDUKAS: Okay. This is not the proper place to debate this. I would only -- my objections to your objections has been stated.

BY MR. EIDUKAS:

Q. But my question still stands, Mr. Trebules, is

Page 142

if you can recall who at these meetings discussed this issue, I would please like to know the names of those persons.

MR. SHULTIS: Objection, asked and answered.

MR. EIDUKAS: It's been asked but not answered.

THE WITNESS: Okay. Again, at this time back in 1984-'85 I don't remember specific meetings or the names of specific individuals that were at those meetings, other than the people I normally talked to, you know, in the normal course of events with the names I've already given like Charlie Head and Bob Rosselli and Tom Isaacs and Roger Gale. But I couldn't relate that to a specific meetings or specific topics but, you know, just in general we talked about issues like this. So that's the best I could do.

BY MR. EIDUKAS:

Q. Okay. I think I'm done with this particular document at the moment. Although, again, you may want to refer back to it in later course of this deposition.

MR. EIDUKAS: Mark that as the next

Page 143

exhibit, please.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 6.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I've had the court reporter mark and hand to you Exhibit 6, which is a copy of the June 1985 Volume I of the June 1985 mission plan and I'll represent to you that it contains Volume I through Chapter 10. It goes from -- it goes through the end of Chapter 10, which is page 403/404 of the documents. The Bates range that I've handed you is CE 14791 through CE 15200.

I have remaining portions of this available if you would like to look at it. I will not have any questions beyond that involve the section that is not attached here. But if you need to look at it at any time, let me know and I will provide it for you.

Take a look at this and take all the time you want, but my question is: Is this a copy, at least the sections that are present, a copy of that final mission plan that you worked on that you have testified was published in June of 1985?

Page 144

A. (Pause). (Conferring with counsel).

MR. SHULTIS: Is there a pending question?

MR. EIDUKAS: Yes, there is.

MR. SHULTIS: Would you read it back.

MR. EIDUKAS: I'll rephrase it. I was asking whether or not this was for the portions that are here a copy of the mission plan that Mr. Trebules had testified he worked on and that was published in June of 1985. Off the record.

(Discussion off the record.)

(Recess, 2:15 to 2:26 p.m.)

BY MR. EIDUKAS:

Q. The exhibit marked as Exhibit 6, we've had some discussion off the record and have determined that it had some discrepancies in the copying of the original document and in particular what we noticed was that page 13 of this document was absent. So we have located another copy of page 13 and inserted it into Exhibit 6. We believe that page 14 was blank and that's why there's no page 14 present. Also, the page part 2 is out of place?

A. Oh, the section in part 2 Chapter 11 was not

# Victor W. Trebules, Jr.

Page 145

included and doesn't include Volumes II and III of the entire mission plan.

Q. I also was going to refer there was a page out of order. There was like a cover page for part 2 of Volume I.

A. Oh, it's the one that was in place at page 13 in the front section.

Q. Right. So the page that's Bates numbered CE 14820 is out of place. It should go later in the document and then, in addition to that, I've also represented and the witness has confirmed I believe that Chapter 11 of this volume, Volume I, is not present and Volume II and Volume III of the mission plan are also not present and part of this exhibit.

Is that an accurate statement of what --

MR. SHULTIS: That's consistent with my understanding. Mr. Trebules found the discrepancy. So...

THE WITNESS: I think that covers it.

MR. SHULTIS: Okay.

BY MR. EIDUKAS:

Q. Okay. With all of those caveats and

Page 146

clarification as to what is present in Exhibit 6 for this deposition, is what is present here, those portions here, are they from the June 1985 mission plan that you worked on?

A. I believe so, yes.

Q. If you could turn to page 3. It's titled Chapter 1 Introduction and that section appears to go through page 13 that we added to this document. Is this the chapter that you testified to earlier as being the author of?

A. Yes.

Q. If you could turn to pages 6 and 7, and in particular on page 7 there's a section that starts: "The following specific program objectives have been established to implement the provisions of the Act. They evolve from the previously mentioned policy goals."

And then the third objective listed here says, "To insure the acceptance of waste for disposal by January 31, 1998 in accordance with the acceptance schedule provided for in the DOE standard disposal contracts and in conformance with the Act."

Page 147

My question is: When you wrote this section, what did you mean by "the acceptance schedule provided for in the DOE standard disposal contracts"?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: This is on page 7 with the introductory sentence that says, again, "The following specific program objectives have been established." So, again, this was an objective for the program. It was a goal or a target. And we identified the five objectives. One of our objectives was to insure the acceptance of waste. It says for disposal by January 1998. Again, this is one of our objectives.

"In accordance with the acceptance schedule provided in DOE standard disposal contract." My understanding was that the contracts that the government entered into with the utilities at some point in the future would have more detailed schedule information, and I believe that was to be provided after, you know, later. It was to come after this mission plan and when those specific schedules were developed, that's what we would -- that's what the

Page 148

government would target to meet.

BY MR. EIDUKAS:

Q. The language you used here does say that "the acceptance schedule provided for in the DOE standard disposal contracts" and I would just, if you could tell me, what it is, what are you referring to in the contracts in this passage?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, I was not the person that worked directly on the standard disposal contracts. My understanding was that they were to -- I'm trying to think of the terms. There were going to be documents issued later in the late 1980s or early 1990s and I think they were related to -- and these are documents I'm not familiar with -- the annual capacity report, annual priority rankings that were to be -- I think they were going to be negotiated with utilities and those would become the specific schedules that the government would try to meet in terms of accepting spent fuel.

BY MR. EIDUKAS:

Page 173

waste, in addition to spent nuclear fuel.
Q. Do you know why was that added? Why was that added in the final mission -- in this schedule that appears in the final mission plan, if you know?
A. I need a second to check one thing before I answer.
Q. Sure.
A. Has to do with Section 8. Okay. Between the time that the April 1984 draft of the mission plan was issued and the publication of the June 1985 version, we completed an evaluation under Section 8 of the Nuclear Waste Policy Act, which basically said unless there are compelling reasons, which basically required us to look at whether or not a separate repository needed to be constructed for the disposal of high level waste from the defense activities in the Department of Energy from the weapons activities.
We completed that evaluation and we made a recommendation to the President that we did not need to construct a separate repository. That it could be combined with the repository for spent nuclear fuel, and the President completed his evaluation and he then

Page 174

directed the Secretary to proceed for the combined repository option in conformance with the Act.
So, based on that study, we then started incorporating in our waste acceptance schedules provisions for high level waste disposal, in addition to spent nuclear fuel. So you'll see in Table 2.2 of the June '85, Exhibit 6 version, high level waste acceptance beginning around 2003 I guess. So we then combined the total metric tons on an equivalent basis of the spent fuel and the high level waste for the total acceptance at the repository. Up to that same limit of 70,000 metric tons, which meant that there's less spent fuel going in the first repository. Okay?
Also, by this time another key difference in these waste acceptance schedules between Exhibit 5 and Exhibit 6 is that the cumulative amount of spent fuel that we expected to have to deal with in 1984 was still 140,000 metric tons. By 1985, that number was down to 130,000 metric tons. There are a few other differences, but they're relatively minor compared to those. For example, the annual spent fuel generation rate numbers are different in the two versions. The

Page 175

early one starting out at 2,700 metric tons in 1998. The later one showing 2,900 metric tons in 1998.
Q. But with those changes that you've identified or those differences between the acceptance schedule on page 26 of the 1985 mission plan and the acceptance schedule in Exhibit 5, which was the 1984 draft of the mission plan, just looking at the rate, the ramp-up rate for the acceptance of spent fuel, there does not appear to be a change between those two documents; is that correct? It's 400, 400, 400, 900, 1800, 3,000 for spent fuel in both documents?
A. Right, the early ramp-up rates are the same.
Q. And the steady state rate of 3,000, looking at the first repository, is also the same?
A. I don't believe so.
Q. Well, in terms of maybe not the duration, the number of years at which fuel is accepted at that rate, but it's the same maximum or steady state? The rate itself 3,000 is the same?
A. That's true, but I think the duration is different.
Q. Right. Is that a function of both the

Page 176

difference in spent fuel generation projections and the acceptance of high level waste?
MR. SHULTIS: Objection, compound.
THE WITNESS: It's primarily a function of the 70,000 metric ton capacity, and now that you're adding high level waste to the spent fuel, you reach that 70,000 metric ton capacity with a combination of the two, which means there's less spent fuel in the first repository.
BY MR. EIDUKAS:
Q. With the determination that there would also begin to be acceptance of high level waste beginning in 2003 at a rate of 400 metric tons per year, in addition to the steady state rate of 3,000 metric tons of spent fuel per year at the repository, did there need to be a change in the design of the repository because of that additional, the additional acceptance of high level waste?
MR. SHULTIS: Objection, vague.
THE WITNESS: I'm not the best person to ask that question of. My intuition says yes, but I can't give you any specifics.

BY MR. EIDUKAS:
Q. Okay.
A. There's obviously a different heat load that the repository has to accommodate and the size of -- which is why we put the pictures in the document. The size of the waste forms we're dealing with are significantly different. If you look at the spent fuel picture on page 9, okay? We would design waste packages to accommodate multiple fuel assemblies, you know, from reactors. The spent fuel assemblies.
The high level waste is in the form of the picture on page 11, you know, which is a different geometry. So, I mean, to me it's obvious. There's got to be some differences in the design now that you're going to accommodate a different waste geometry, waste form, waste heat load, but I can't give you any of the specifics of what those design changes would be.
Q. Okay. But the decision was made apparently that there might be a design change, but there was not going to be a difference in what the steady state rate of accepted spent fuel range was going to be?
MR. SHULTIS: Objection, vague, assumes



facts not in evidence.
THE WITNESS: As best as I could remember, again our objectives were to try to reach a steady state rate, you know, along the lines that we talked about to preclude for need for utilities to add storage, which, you know, was still estimated to be around 3,000 metric tons per year. And that's still supported by the spent fuel generation column on both waste acceptance schedules. There's still around 3,000 metric tons per year in the early years of repository operation.
BY MR. EIDUKAS:
Q. So, even after it was determined that you were going to start accepting the high level waste in addition to spent nuclear fuel, the objective to continue accepting at the 3,000 rate or because of the objective you've identified, you didn't decrease the 3,000 steady state rate in order to accommodate the additional need to accept high level waste. Is that a fair statement?
A. I believe that's a fair statement.
Q. Okay. Turning to the -- you're looking at



the next. Do you need a break? We've been going for a while.
A. I'm okay.
Q. Going to the next page, waste acceptance schedule on page 27. This is for the improved performance system or plan that we've discussed today, correct?
A. Right.
Q. Okay. Did you work on developing this acceptance schedule?
A. Yes.
Q. And is this the first acceptance schedule involving an integral MRS facility that the DOE published?
A. To the best of my recollection it is.
Q. So, because we didn't see an acceptance schedule like this involving an MRS in the earlier drafts of the mission plan, right?
A. The reason I'm hesitating is I don't know if there were any presentations like that one meeting you referred to. You had the handout from that one meeting. I don't know if there were any others at the



time where DOE might have, you know, released some preliminary numbers. This is the one first one I'm aware of.
Q. Okay.
A. I can answer it that way. This is the first one I'm aware of.
Q. So one of the additions, changes here is that there's a column for MRS acceptance, which is the third column. What's the basis or how was this rate for the MRS facility determined?
A. The best answer I could give you is that we, again, had as -- it can sound repetitive, but we again had as our objective to accept spent fuel to preclude the need for additional at-reactor storage, which again was 3,000 metric tons per year at that time. That was our projection. In 1984-'85 we were trying to anticipate what the spent field generation rate would be, you know, some 13, 14 years into the future. So, again, based on the EIA projections, it looked like it would be about 3,000 metric tons per year based on the number of nuclear power plants online. So that was our design target for the MRS. Okay.

Q. So, before you go on, so, is it fair to say that that objective, which you've stated several times now, that objective was the basis for the design rate of the MRS you were anticipating at the time of this document?

A. That's correct. If you look at the column on page 27, column 4, MRS Acceptance, you'll see that it starts out at 2200 metric tons first year, 3,000 metric tons the second year and stays at 3,000 metric tons. Again, remember, that was our design target, our design objective. You could have probably designed a smaller MRS, you could have designed a bigger MRS, but this was our designed target.

Inventory at MRS is the next column, column 5, which increases the first couple of years but then in 1998 starts to discharge to the repository. So it continues to increase until its rate of receipt equals its rate of discharge where then it stays constant, you know, until the MRS ceases operation and then the MRS eventually unloads into the repository. Okay?

Let me caution you one thing about this Table 2.3. The first year was 2200 metric tons does not



necessarily mean that in 1998 we would have accepted 2200 metric tons. That column is entitled, if you look over on the far left, Pre-1998 and, again, it looked like there was a chance we could get the MRS into operation in 1996. So it would be '96, '97, '98, the total of those three years that would have gotten us up to 2200 metric tons. Again, we thought we needed a ramp-up during that period before we reached a steady state rate of 3,000 metric tons.

Q. Okay. And would that ramp-up rate be similar to what would be the ramp-up rate that was proposed for the repository in the other schedule; the 400, 400, 400, 900, 1800?

A. I don't remember what the exact numbers are.

Q. Okay.

A. I mean, the only thing I could refer you to was the number in the table where it says pre-1998, you know, 2200.

Q. And as this proposed system would work, would there be -- would the MRS -- would any of the spent fuel accepted at the MRS be accepted or moved to the second repository, or was it planned that waste would



be received directly at the second repository from the utilities?

A. I need a second because I believe we talked about that as an option, but I don't remember where. (Pause). All right. Let me refer you to page 25. The bottom paragraph, the one starts: "On the basis of the integrated system approach described in the approved performance plan, the DOE has identified many possible waste acceptance schedules."

Again, one of the caveats, this is only an illustrative schedule that we're talking about. There were many others, you know, with all the questions and uncertainties. Depending on the size and operating characteristics of the system facilities. That's MRS and the repository. One such waste acceptance schedule that illustrates -- and again illustrates was the word we coined to try to, again, sort of serve as caveat.

That illustrates the quantity of waste that we feel we could accept beginning in 1996 with the completion of the integral MRS facilities presented in Table 2-3. The schedule assumes that one MRS facility



services the first repository. Other scenarios are possible, such as a larger MRS facility servicing part or all of both repositories or two MRS facilities serving two repositories.

Again, a lot of different ways you could design and operate the system. The schedules we presented were illustrative only for those two concepts. But we indicated that, again, there were lots of different ways to do the job.

Q. Even though that -- so, if these are illustrative schedules and as this section indicates that the DOE has in effect many possible ways to do acceptance schedules, to your knowledge, were all those schedules, though, consistent with the objective you've identified of ramping up to a steady state rate that would act to eliminate the need for additional at-reactor storage?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: There are a couple of places in this chapter. If I had more time I could probably find better words, but let me just show you a few that

Page 185

I think get to your question. On page 24 under Section 3. Assumptions about an MRS facility.
BY MR. EIDUKAS:
Q. Okay.
A. If you look down to B, waste receipt rate. "The waste acceptance rate will be approximately 3,000 metric tons per year of spent fuel or equivalent high level waste." Again, the 3,000 was based on the EIA projection of the amount of spent fuel we thought would be generated in that time frame. So, again, that was sort of like our target. That was a design objective.
If you also look on page 28, for example. These are just some I can find relatively quickly. Down at the bottom of the page, it's got numbers 1 and 2.
Q. Yes.
A. Number 1 says, if you look at the sentence: "The rate at which an integral MRS facility would accept spent fuel is based on two major considerations. The need to relieve the utilities of on-site fuel storage pressures that could result in the disruption of orderly nuclear reactor operations after January

Page 186

1998." Again, the need to relieve utilities of on-site fuel storage pressures. Those were some of our considerations, our planning objectives. Our targets that, you know, we incorporated into the plan.
Jumping ahead, the unfortunate thing about all these references to the MRS facility is that when we proposed it to Congress, they didn't accept it.
Q. Or didn't they accept it with certain linkages that made it possible to --
A. We proposed a specific site and a design for the MRS. We proposed the Clinch River breeder reactor site down in Tennessee with a number of different design concepts. Congress said, if I remember right, we accept the concept of an MRS, but don't build it at Clinch River. You know, go find another site. And then they put linkages on it, too, like it couldn't begin until a repository goes into operation or it passes a certain licensing phase, which made it impractical. I mean, the real one is you got to have a site to build it, okay, and that's a whole other story with the nuclear waste negotiator, the volunteer siting process and all that other stuff.

Page 187

MR. EIDUKAS: Okay. Why don't we take off record.
(Recess, 3:30 to 3:43 p.m.)
BY MR. EIDUKAS:
Q. Mr. Trebules, we've looked at Chapters 1 and 2 of the section of the '85 mission plan that's contained in Exhibit 6. What other, if any, portions of what's in Exhibit 6 here did you have involvement in preparing yourself? You know, if it would be easier, if you want to look at the table of contents, if that would help.
A. Yeah, I think so. For example, at page 55, the small section on sub-seabed disposal, I was involved in probably writing or getting the information from the other office in DOE that was in charge of that activity to put it in the plan.
I think the easiest way to answer this was my job was to coordinate the preparation of the mission plan, which meant I had to write individual sections if there was no one else in the program that was the recognized expert, or I had to make sure that we had people assigned to these other areas to draft up the

Page 188

material. In most cases, I would review and comment on their input to make sure it was consistent in content and style and level of detail with other parts of the plan.
There were probably some other individual sections that I wrote, but I'd have to go through sort of page by page to try to remember which those are. But, for example, Chapter 9 and 10 of Volume II, the waste generation rates, requirements for disposal of past or repository schedules, I believe I wrote or compiled, you know, much of that information directly.
Chapter 10, cost of managing the program. I played a substantial part in that. Chapter 11, which is not even in this exhibit, I contributed to that. Probably the list of acronyms and abbreviations, which, you know, is a very important. I probably put that together. And the other two volumes that aren't in here, the responses to comments, you know, I wrote many of those sections individually. In general, that was my responsibility with this document at that time.
Q. Turning to -- you said you did some work on Chapter 9. I just want to direct your attention. We

# Victor W. Trebules, Jr.

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------------X

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY | :VOLUME |
| (98-126C)(Merow, S.J.) | : I |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | :Discovery |
| (98-154C)(Merow, S.J.) | :Judge: |
| MAINE YANKEE ATOMIC POWER COMPANY | :(Judge |
| (98-474C)(Merow, S.J.) | :Sypolt) |
| Plaintiffs, | : |
| v. | : |
| THE UNITED STATES, | :PAGES |
| Defendant. | :1 - 160 |

-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144559

Page 2

April 18, 2002
2:15 P.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Spriggs & Hollingsworth
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 3

APPEARANCES:

Spriggs & Hollingsworth
For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE YANKEE ATOMIC POWER COMPANY
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch

Page 4

Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

I N D E X


| EXAMINATION OF VICTOR W. TREBULES, JR. | PAGE |
|---|---|
| BY MR. STOUCK | 5 |

| TREBULES DEPOSITION EXHIBITS: | | PAGE |
|---|---|---|
| No. 14 | Defendant's Witness List. | 51 |
| 15 | Documents CTR 006-1645, 1648 to 53, 1657 to 58, 1661 to 65. | 71 |
| 16 | Documents DB-110060 to 70. | 71 |
| 17 | Letter of April 19. HQR 064-2234 to 2253. | 71 |
| 18 | Memo of 6-21-93. HQR 064-6684 to 85. | 71 |
| 19 | Memo of 7-28-93. DE-108508 to 8515. | 71 |
| 20 | NCAI Briefing. HQR 064-5423 to 5435. | 71 |
| 21 | Privilege Log Excerpts. | 145 |


**Exhibits are attached.

Page 5

Thereupon,

VICTOR W. TREBULES, JR.

Was called for examination, and, after having been duly sworn or affirmed, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY

BY MR. STOUCK:

Q. Good afternoon, Mr. Trebules.

A. Right.

Q. Okay. We've all been together for a couple of days for your deposition in the so-called common proceedings here and now we've resumed with a small group, and I would just like to say, as I've discussed with government counsel off the record, that there has been a dispute between the parties about how depositions in the three Yankee utility cases should be conducted.

Our position, the Yankee's position, is that we can ask whatever questions we want to ask of

Page 6

whatever witnesses we want to call for deposition under Judge Merow's orders, and as really kind of accommodation to the government and those witnesses who are being deposed in the common proceedings, we have participated in the common depositions, as I was at your deposition in the last couple days. And those depositions are captioned with the Yankee cases.

And now we are here at this deposition, and our position is that in some sense this is a continuation of the common deposition. I'm going to ask some follow-up questions of some things you've been asked over the last couple of days, but we are also going to get into some areas that may not have been appropriate for questioning in the common depositions.

I think the government's position has been, as I understand it, that insofar as questions about so-called schedule issues are concerned, the Yankee utilities may only ask those schedule issue questions in the common deposition and may not ask schedule issue questions in the separate Yankee utilities deposition.

And to whatever extent that dispute still exists after the conference call we had with Judge

Page 7

Merow yesterday, my view would be that essentially he resolved it, but to whatever extent that dispute exists, it's going to exist after today and we've gone on the record, at least my understanding, of what the respective positions are.

Since both sides agreed I can ask whatever questions I want in one deposition or the other, we can argue somewhere else about which deposition it is. I guess, if necessary, Judge Merow will further clarify that for us.

MR. SHULTIS: Fair enough. I mean, it's our position that this is coordinated discovery. This is all part of the same process and Mr. Trebules continues. It's not new. Although we've changed offices for the convenience of the plaintiffs.

BY MR. STOUCK:

Q. Okay. With that said, Mr. Trebules, just you know the routine. Several lawyers have already and you've been through the deposition. So I won't repeat that, but, of course, you are under oath and if you don't understand one of my questions, please ask and I'll try to clarify it. If you need a break and so

Page 8

forth. All the same instructions pertain.

And I take it that -- well, let me ask you. If I were to ask the questions that you gave, you know, the answers that you've given over the last day and a half in your deposition, I take it if I were to ask you those same questions, you'd give the same answers; is that correct?

A. Yes. I would try as best as I can to give the same answers.

(Mr. Eidukas entered.)

Q. What do you know about Yankee Atomic Electric Company just briefly? Or do you know anything about Yankee Atomic?

A. Very little. I believe they have nuclear plants that produce electricity, and as a result they've entered into contracts with the government. I believe I've heard part of their concern is in regard to some one or more shutdown nuclear plants, but other than that I know -- I really know very little about the utility company.

Q. Okay. Let me take half a step back because we've met off the record, but I'm Jerry Stouck and I

but who would have been working from the Department of Energy side of things on contract matters at that time?

MR. SHULTIS: Same objection.

THE WITNESS: As best as I can remember, it would have been Robert Rosselli, and I'm not so sure about Charlie Head because he was my direct supervisor when we worked on the mission plan, but I don't remember if he had a significant role in the contracts. I believe Robert Rosselli did, though.

BY MR. STOUCK:

Q. Okay. But you did not?

A. No, I did not.

Q. Do you know whether Mr. Rusche had any involvement in contract matters at that time?

MR. SHULTIS: Asked and answered.

THE WITNESS: I don't know specifically his degree of involvement, but as head of the program, I'm sure he would have, you know, he would have had some degree of knowledge of the status and progress of the contracts, but I don't know exactly what that was.

BY MR. STOUCK:

Q. What do you mean by status and progress of the



contracts?

A. Just, you know, again, I'm not sure when they were signed, but I knew there was a target date to have them signed and, you know, I believe there was a large number of contracts. I mean on the order of, you know, 60 or 70. So it was just the overall status of all of those contracts. I'm sure somebody must have been a report to Mr. Rusche, but, again, I don't know the specifics of that at that time.

Q. Okay. I believe you testified and, you know, I'm sure you'll correct me or your counsel will if I'm not characterizing this correctly, but you testified I think at various points previously that OCRWM had a goal of solving problems, solving the spent fuel problem. That was an objective. In a general sense an objective was to solve the spent fuel problem for the utility industry.

Is that fair or is that too broad, or do you want to rephrase it? I just want to get you back to that subject so I can ask you some questions about it.

A. I think that's a fair characterization.

Q. Okay. Now, is it your understanding that the



Department of Energy had an obligation to solve the spent fuel problem in the sense that you've testified about solving that problem?

MR. SHULTIS: Objection, calls for a legal conclusion. Also, Mr. Trebules is not a 30(b)(6) witness.

THE WITNESS: In the sense that the Nuclear Waste Policy Act identified by name the Secretary of Energy and established the Office of Civilian Radioactive Waste Management and the position of director to deal with the spent fuel situation in the United States, I would say that we had an obligation to, you know, to execute the provisions of the Nuclear Waste Policy Act, you know, to, as you say, solve the spent fuel problem.

BY MR. STOUCK:

Q. Okay. And again referring back to some of your previous testimony, I believe you testified that the program had -- and, again, please rephrase or this is my understanding of what you said I believe a couple of times previously in your testimony. That there were two overriding goals or objectives.



One was to begin in 1998 and the other was to reach a rate, an acceptance rate that at which or for which amounts of additional at-reactor storage would be minimal or zero after 1998. Is that a fair characterization of what you told us here?

MR. SHULTIS: Objection as to characterization of his testimony, especially regarding overriding goals.

BY MR. STOUCK:

Q. Okay. Well, if it's not, please tell me, but I'm trying to -- again, I want to ask you some follow-up questions. I just want to get back to those two goals. Recharacterize them for me if you don't like my characterization.

A. I think that's close. I think that's reasonably accurate.

Q. Okay. Now, is it your understanding that the Department of Energy had an obligation to achieve those goals?

MR. SHULTIS: Objection, calls for a legal conclusion and Mr. Trebules is not 30(b)(6) witness.

THE WITNESS: My understanding -- do you

mean by back -- let me ask a clarifying question. Do you mean in the early days back in 1984-'85 or any time after that during my tenure with the program?

BY MR. STOUCK:

Q. Let's start 1984-'85 and then see where that takes us.

MR. SHULTIS: Same objections.

THE WITNESS: Again, primarily my work on the mission plan back in '84 and '85, I don't remember forming an opinion one way or the other about whether the department had an obligation. I think if you mean that in a legal sense. Again, what I do remember was that we were developing plans, as the name implies, the mission plan, which had schedules in it which we characterized as goals or objectives that we would try to meet, but we indicated that those schedules were subject to change.

That we would do our best to try to meet them but, you know, I believe we -- there was concern, you know. We wanted to give the department some flexibility, and I think as we previously discussed when we went through the exhibits, we showed even in



those early days that some of those schedules changed for various reasons.

BY MR. STOUCK:

Q. Okay. Excuse me. Are you finished?

A. Yeah.

Q. So, what you just told me is your understanding as of around '84-'85?

A. Right.

Q. That's the question you're answering?

A. Right.

Q. Okay. And you said you hadn't formed an opinion. Is that the same thing as saying at that time you did not know if the department had an obligation to achieve these two objectives?

MR. SHULTIS: Same objections.

BY MR. STOUCK:

Q. I mean, is that the gist of it? You didn't know and you say you hadn't formed an opinion? I just --

MR. SHULTIS: Same objections.

THE WITNESS: Yes, I think that's fair. I did not know for sure.



BY MR. STOUCK:

Q. Okay. Did there come a point later in time subsequent to that time when you did know or did come to have a better understanding of whether or not the Department of Energy had an obligation to achieve the two objectives that were testified about?

MR. SHULTIS: Objection, calls for a legal opinion.

THE WITNESS: I obviously heard a lot of discussion about the department's position that we were relying on the specific words in the Nuclear Waste Policy Act, which said we would target to begin waste acceptance in 1998 after we had a facility in operation. I think that became the department's position.

BY MR. STOUCK:

Q. Okay. Do you have a view today about whether or not the Department of Energy has an obligation to achieve the two objectives that you've testified about and discussed?

MR. SHULTIS: Objection, relevance.

THE WITNESS: My understanding of the



current position is obviously we can't meet the 1998 date. We've already -- in fact, we've already missed that and we have laid out our plans or best-effort plans to try to have the repository in line -- since we're no longer working on an MRS facility -- to try to have the repository on online by 2010. And I think we also discussed earlier that, you know, as in regards to the second objective or goal still to try to reach an acceptance rate of about -- the nominal acceptance rate of about 3,000 metric tons.

BY MR. STOUCK:

Q. Okay. Now, still with reference to these two objectives that you had testified about previously, can you tell me what -- let's go back to the '84-'85 time frame. Put yourself in that time frame for purposes of this question.

What is your understanding of why it is that the Department of Energy was pursuing those two objectives at that time?

MR. SHULTIS: Objection, relevance.

BY MR. STOUCK:

Q. Why was, if that's the proper diction?

Page 125

A reference, which I think is where the data is from. If we were to look at current estimates, you don't know whether or not they'd be similar, more, less, the same?
A. No, I don't.
Q. Okay. But I believe you also testified that the current plans today, in your job today, the current plans -- it's not written down anywhere, but the thinking is that if and when the repository begins operation, the annual acceptance rates will, at least at the steady state, the ultimate steady state rate, will be approximately 3,000 tons a year; is that right?
A. I think that's one of our design objectives still, yes, that's right.
Q. And is that also related in some way to an objective of being able to accommodate all of the aggregate industry wide annual generation of spent fuel?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I'm hesitant because when we prepared these schedules back in 1985, we were considering the two-repository system and, remember,

Page 126

our objective was to try to reach 3,000 metric tons with the first repository. And then when the second repository came online with its added capacity, we would begin to reduce the backlog. Because of the evolution of the program, the fact that Congress told us to delay work on the second repository, you know, our current design objectives are for a single repository. Again, I think at about the 3,000 metric ton rate, which has impacts on future generation.
BY MR. STOUCK:
Q. Okay. I didn't understand the last part. Why does it have impacts on the future generation?
A. Well, again, as I just mentioned, I don't know what the current projections are, but if you look at Table 2-2.
Q. Yes.
A. Spent fuel generation, okay? Around 1998-2000, the spent fuel generation rate was about 3,000 metric ton per year, which the one repository system could accommodate, but this shows that the numbers continued to grow, okay, to, you know, in the 4,000 range, you know, or higher and obviously the one

Page 127

repository system wouldn't be able to accommodate that.
Q. Okay. And so --
A. I thought your question had to do with, you know, if our current plans enough to accommodate --
Q. Right.
A. -- the current spent fuel generation rates.
Q. Okay. What you're saying, you don't know?
A. Yeah, I don't know.
Q. But if they're the same generation rates, --
A. Right.
Q. -- then it would not be able to accommodate because the number is smaller than these numbers here?
A. Exactly.
Q. Okay. I see. And so that suggests to me that I think it just follows that the three -- well, what is the 3,000 ton? So it seems to follow that the 3,000 ton a year acceptance rate that is in the current planning, current as of today planning, thinking for this program when it starts operating, it sound like is not based on a consideration of the actual annual discharge rates in the future and an ability to accommodate them. Would you agree with that?

Page 128

MR. SHULTIS: Objection, mischaracterizes --
BY MR. STOUCK:
Q. At least to your knowledge it's not based?
MR. SHULTIS: -- prior testimony.
THE WITNESS: Again, I haven't kept up on the current generation rates. I do believe, though, that the total amount of spent fuel that was expected to be generated has continued to shrink substantially. We're no longer considering 130,000 metric tons as the '85 mission plan did. I think the number in total is down to around 90,000 metric tons.
BY MR. STOUCK:
Q. Okay.
A. Of spent fuel generated.
Q. Okay.
A. So there are significant changes, you know, that would have to be looked at to update this table, and I'm just not familiar with all the current numbers.
Q. That's fine. All I'm saying is, you are familiar with what the current planning and thinking is about the annual acceptance rates once the repository

Page 242

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : II
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :242 - 396

Page 243

THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144459

Page 244

April 18, 2002
9:30 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 245

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

Page 246

(202) 942-5160
BY: Ronald A. Schechter, Esq.

Arnold & Porter
For the Plaintiff SACRAMENTO MUNICIPAL UTILITY DISTRICT
370 Seventeenth Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2301
BY: David S. Neslin, Esq.

Perkins Coie LLP
For the Plaintiff WISCONSIN ELECTRIC
607 Fourteenth Street, NW
Washington, DC 20005-2011
(202) 434-1609
BY: Suzette W. Derrevere, Esq.

Spriggs & Hollingsworth
For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE YANKEE ATOMIC POWER COMPANY
1350 I Street, NW

Page 247

Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch
Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

Page 248

I N D E X


| EXAMINATION OF VICTOR W. TREBULES, JR. | PAGE |
|---|---|
| BY MS. HEWITT | 250, 310 |
| BY MR. SHULTIS | 309 |
| BY MR. SCHECHTER | 311 |
| BY MR. NESLIN | 372 |

| TREBULES DEPOSITION EXHIBITS: | PAGE |
|---|---|
| No. 11 Environmental Assessment. DER-003-1257 to 1765. | 279 |
| 12 Statement by Ben C. Rusche. PA-141922 to 141950. | 314 |
| 13 Letter of December 17, 1992. HQR-010-1623 to 1626. | 322 |


**Exhibits are attached.

Page 249

Thereupon,
VICTOR W. TREBULES, JR.
was called for examination, and, after having been previously sworn or affirmed, was examined and testified further as follows:

MR. EIDUKAS: Good morning, Mr. Trebules.

THE WITNESS: Good morning.

MR. EIDUKAS: At this point I am going to -- I'm finished with my questions for you in this deposition. But at this time I also want to state for the record that we're reserving my client's right to recall you to the extent that there are outstanding document and privilege issues that weren't resolved that might take a further session of this deposition, but at this time I have no further questions.

MR. SHULTIS: Okay. In response to that reservation we object. We object. This is coordinated discovery and we think this is complete.

MR. EIDUKAS: Well, as you might know, there are pending issues regarding documents listed on your privilege log that there's a dispute about. So while your objection is noted, I reserve my right to

Page 266

1200 metric tons. It would operate through about 2028. It would reach a maximum capacity of 14,700 metric tons until it off-loaded the spent fuel into the repository. So, according to that schedule, it looks like it operates for about 30 years.
Q. And according to this Table F-1 and to clarify it's on page 61; is that correct?
A. Yes.
Q. Of Exhibit I think you said 6?
A. 8.
Q. 8. I'm sorry. That's okay. It seems to indicate that in the MRS facility in year 2004, the acceptance rate for spent fuel would be 2650; is that correct?
MR. SHULTIS: Object.
THE WITNESS: That's correct.
BY MS. HEWITT:
Q. Why was that figure chosen, 2650?
MR. SHULTIS: Objection, asked and answered. Calls for speculation.
THE WITNESS: Yeah. I don't remember why that specific number was selected at that time.

Page 267

BY MS. HEWITT:
Q. Do you recall what the components of the MRS submission to Congress included?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Could you please repeat the question.
BY MS. HEWITT:
Q. Do you recall what the MRS submission to Congress included in terms of the components of the proposal?
MR. SHULTIS: Same objection and vague.
THE WITNESS: Only generally that we had to identify a site and design options for the MRS facility.
BY MS. HEWITT:
Q. Do you recall whether it included an environmental assessment?
MR. SHULTIS: Same objection. Asked and answered.
THE WITNESS: I believe I -- I'm not sure but I believe it did. I believe I remember seeing the

Page 268

document. Although I never read through it or contributed to the development of it.
BY MS. HEWITT:
Q. Do you have an understanding of the term emplacement rate?
MR. SHULTIS: Objection, vague.
THE WITNESS: My understanding of the term emplacement rate would be the rate at which we would emplace spent nuclear fuel in the underground portion of the geologic repository.
BY MS. HEWITT:
Q. Do you have an understanding of the term design receipt rate?
MR. SHULTIS: Same objection.
THE WITNESS: Again, my understanding of the term design receipt rate is the rate at which spent fuel would be received at the repository at primarily the surface handling buildings, which would come in either by rail or truck.
BY MS. HEWITT:
Q. Is the design receipt rate the same thing as the design acceptance rate?

Page 269

MR. SHULTIS: Same objection.
THE WITNESS: I think under certain conditions it can be. Under other conditions it doesn't have to be. For example, the -- I'm sorry. Could you give me that question again, the two terms?
BY MS. HEWITT:
Q. Design receipt rate and acceptance rate.
A. Okay. The acceptance rate could be dependent on the facilities that the system may have. For example, you could be receiving at an MRS facility and at a repository. Okay. The design receipt rate could apply to either one of those facilities, particularly the repository, and the emplacement rate is obviously the emplacement rate only at the repository.
Q. Is the emplacement rate the same thing as the design receipt rate?
MR. SHULTIS: Objection. Asked and answered.
THE WITNESS: Again, it could be, but it doesn't have to be. You can receive rate at a certain -- you could receive spent fuel at a certain rate with the surface facilities of the repository.

Page 270

You could put spent fuel in storage above ground. You could emplace underground at a different rate. Obviously then you'd have an accumulation of spent fuel at the storage facilities above the repository or you could be reducing the backlog. They don't have to be the same. They could be independent. Although if you reach steady state operation, ideally they're very close, if not identical.

BY MS. HEWITT:

Q. When I use the term OCRWM, do you have an understanding of what that term is?

A. Yes, I do.

Q. Were you ever involved in OCRWM's efforts to design a repository?

MR. SHULTIS: Objection, vague.

THE WITNESS: I think I would have to answer yes.

BY MS. HEWITT:

Q. What was the extent of your involvement?

A. Again, my primary role over the past 10 years or so has been in the planning, budgeting and scheduling part of the program of the OCRWM program,

Page 271

the Office of Civilian Radioactive Waste Management, and I'm primarily responsible for the cost and schedule baselines for the program. But obviously the cost and schedule baselines have to relate to the technical baseline, which includes as a subset the design solution for the system. So I had to have some familiarity of the design or the evolving parameters of the design to be able to fully integrate the cost and schedule activities.

Q. What is the present design receipt rate for the repository?

MR. SHULTIS: Objection, assumes -- well, calls for speculation. Assumes facts not in evidence, vague.

THE WITNESS: I cannot say for certain what the present receipt rate is. We typically talk about the current design as the design in our site recommendation documents that have been submitted to Congress. I do not know the exact numbers. I believe they are, though, close to the 3,000 metric tons once it reaches a steady state. Although we are looking at a variety of design options or modifications

Page 272

to that conceptual design.

BY MS. HEWITT:

Q. Are those designs or possible modifications going to affect the design receipt rate?

MR. SHULTIS: Same objection.

THE WITNESS: Yeah, that would be speculation on my part. That's not my major area of focus and I really would be speculating at that point.

BY MS. HEWITT:

Q. During your tenure at OCRWM, has the design receipt rate at a steady state been different than 3,000 MTUs on an annual basis?

MR. SHULTIS: Objection, vague.

BY MS. HEWITT:

Q. Do you understand my question?

A. Yes, and as we discussed in some detail yesterday, the receipt rate changed significantly through the various documents we went through yesterday. In the early versions of the draft mission plan and in the subsequent versions of the amendment, it changed because of the facilities involved.

Q. Understand.

Page 273

A. Obviously when we had a two-repository system, the receipt rate for the system in total was higher than a single repository system or in, again, referring to Exhibit 8, I believe the waste acceptance schedule we were just talking about, this shows a significant delay in the operation of the second repository. So yesterday in the earlier documents, the earlier exhibits and mission plan documents, we had a combination of the two repositories which had a receipt rate much greater than what this latest version would show.

Q. You're absolutely correct. My question was a little bit unclear. It wasn't very specific. I'm going to further narrow it.

At any time during your tenure at the DOE program, was the design receipt rate for the single repository other than 3,000 MTU on an annual basis?

A. You said at any time during my? I believe basically the nominal design receipt rate target -- again, this was a target; this was an objective -- on an annual basis was 3,000 metric tons.

Q. And that's also what you refer to as the

steady state rate?

A. That's correct.

Q. When you use the term nominal, what do you mean by nominal?

A. Nominal in my jargon typically means like an average or a design number that you try to meet. You know, it usually implies a certain degree of precision. You know, you could say 3,000 plus or minus 20 metric tons, you know, but nominal, when you say nominally 3,000 metric tons, it could vary. In some years it could, depending on the truck and train shipments, it could be 2,980. Next year it could be 3,022, but we sort of average that out over the operation of the facility and say the nominal rate of 3,000 metric tons.

Q. And I believe you testified earlier that the 3,000 annual MTU steady state rate corresponded to the discharge rate by utilities; is that correct?

MR. SHULTIS: Objection, calls for -- mischaracterizes prior testimony.

THE WITNESS: Yeah. I believe I said yesterday that we had two overriding design objectives, you know, two goals. One was to initiate operations



in 1998. The other was to design a system to try to meet the EIA projection that we were using at the time of the spent fuel discharge rate from the utilities, which at that time I think was nominally, again, nominally about 3,000 metric tons a year. Although it varied, you know, year by year.

BY MS. HEWITT:

Q. I believe yesterday also you testified regarding that -- regarding the 3,000 MTU annual rate and said that it was at some point designed to ensure that utilities did not "have to engage in additional storage, on-site storage after 1998." Is that a correct fair reading of your testimony yesterday?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Again, without looking at the transcript, I think that was close to what I said. I guess I would also want to refer to a paper that was worked on I think before I joined the program. This is Exhibit 3. This is the proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting. Again, this was developed before I got to



the program, but this became sort of my understanding of the design objective that we were trying to meet.

It's on page 11. There's only two pages in this exhibit, but on page 11, the second column, the largest paragraph near the end. This says, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location."

Again, I think I referred to that as sort of one of our design objectives, you know, with the proper caveats.

BY MS. HEWITT:

Q. When you use the term design objective, do you mean the design objective for the facility that DOE ultimately would build?

A. Facility or facilities; that's correct.

Q. And so that the term design objective would apply equally to MRS or a repository?

A. I think that's a fair statement.

Q. And then I'd like to explore the meaning of the term on-site storage. Do you have an



understanding of what consists of on-site storage?

A. I have an understanding of what I think that term means, yes.

Q. What's your understanding?

A. The spent fuel discharged from nuclear power plants, first of all, has to be aged a certain amount of time, and it goes into storage at the reactor sites or on the site of the reactor power plants. Typically it goes into storage pools, or I believe if it meets certain conditions, it could go into dry storage on the sites of the nuclear power plants.

Q. And when the term additional on-site storage is used, for example, in that document, does that refer to storage in the spent fuel -- spent nuclear fuel pools as well?

A. I'm sorry. Can you repeat the question again, please.

Q. When the term is used -- and you've used it and other witnesses have used it -- saying that the MTU rate is designed at some point to preclude the need for "on-site storage," does that include storage in the spent nuclear fuel pools that are on site?

adequacy reports that DOE issues; is that correct?
A. Input into the fee adequacy report.
Q. And what kind of input do you provide to the fee adequacy report?
A. I work on the Yucca Mountain cost and schedule and plans. So I'm right now responsible for coordinating the input of the Yucca Mountain part of the fee adequacy report in the total system life cycle cost.
Q. Are you familiar with the actual fee adequacy reports that DOE issues?
A. Yes.
Q. Do acceptance rates factor into that report?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I believe the answer is yes. It's a fairly complicated analysis that needs to be prepared, but I believe acceptance rates are one of the parameters that needs to be evaluated.
BY MS. HEWITT:
Q. And how do the acceptance rates affect the fee adequacy analysis?



MR. SHULTIS: Objection, vague.
THE WITNESS: This may be a rather long, complicated answer. But basically the fee adequacy analysis, which is required by the Nuclear Waste Policy Act, is analysis that the Secretary of the department has to conduct to evaluate whether the one mill per kilowatt hour fee is judged to be sufficient to cover the total cost of the program.
(Mr. Stouck entered.)
To do that, we prepare what's called a total system life cycle cost analysis, which looks at the cost of basically the facilities we have to build to accept fuel. That would include the surface facilities of the repository, the underground facilities of the repository, the waste package that the waste would be disposed in, the transportation system, equipment needed to move the waste, and we have to estimate the cost of that and balance that against the incoming money from the one mill per kilowatt hour.
And you have to relate the timing of those facilities and when they need to be online to be able to accept the waste. And since there's a time related



cost of money depending upon when you build and construct and have facilities in operation, in that sense it relates to the waste acceptance rates.
BY MS. HEWITT:
Q. You mentioned that the total system life cycle cost analysis -- and is that also called the TSLCC analysis?
A. That's the common acronym to describe it; that's correct.
Q. You testified that that analysis comprises cost of the system, which include the facilities; is that right?
A. That's correct.
Q. And when you use the term facilities, are you referring to facilities that would store or dispose of the waste? What do you mean by facilities when you used that term in your prior answer?
A. Generally it's meant to include the waste handling surface facilities at the repository location, the underground area of the repository in which the waste will be placed, and another major component which may or may not fall under the term facilities is the



waste package that the spent fuel elements will be placed in for disposal underground. That's a major cost contributor.
Q. So, is it fair to say that when you use the term facilities, you are not including possibility of an MRS in that term?
MR. SHULTIS: Objection, mischaracterizes prior testimony.
THE WITNESS: At one time in the program's evolution, we did include I believe the cost of an MRS facility, but over the past 10 years or so when Congress never acted or we were never able to get an MRS facility authorized, we haven't included it in our TSLCC estimates.
BY MS. HEWITT:
Q. So, the acceptance rates that are used in the TSLCC estimates reflect an acceptance rate of a repository; is that correct?
A. That's correct.
MR. SHULTIS: Object.
THE WITNESS: That's correct.
BY MS. HEWITT:

Page 306

Q. And has that been the case since you've been working on TSLCC reports?
A. I think, as I just said, I've been working on the program for quite a while, and at one point we did include estimates that had an MRS, but over the past 10 years or so we have not included that. It's just been focused on repository facilities.
Q. And what is the purpose of the TSLCC and fee adequacy reports?
A. The fee adequacy report -- fee adequacy assessment is required by the Nuclear Waste Policy Act to determine on a periodic basis whether or not the one mill per kilowatt fee is still judged to be sufficient to cover the cost of the program.
Q. And are these reports submitted to Congress?
A. Yes.
Could we take a break?
Q. Yes, absolutely.
(Recess, 10:48 to 10:56 a.m.)
BY MS. HEWITT:
Q. I just have a couple of more questions, Mr. Trebules.

Page 307

A. Okay.
Q. Are you aware that DOE has announced that it will not be able to take spent nuclear fuel until the year 2010 at the earliest?
A. I would say that DOE has issued -- the part that I'm familiar with, DOE has recently issued new schedules to have a repository begin operations in 2010.
Q. Do you believe that DOE will have a repository in operation in 2010?
MR. SHULTIS: Objection, relevance.
THE WITNESS: Do I believe? Again, I'm speculating, forecasting. I would still characterize our schedules as success oriented and optimistic, but there's a lot of things beyond our control like future appropriations, which has been a problem historically through the program that we don't control. There's a chance if everything goes right we could have facilities in operation by 2010. But the schedules are success oriented and optimistic.
BY MS. HEWITT:
Q. Do you think that 2010 is a realistic date?

Page 308

MR. SHULTIS: The same objection. Asked and answered.
THE WITNESS: I would, you know, I would answer the question the same way. Again, the schedules that we are currently working to are success oriented and optimistic.
BY MS. HEWITT:
Q. Are you aware of any slippages in the schedule for getting a repository online by 2010?
MR. SHULTIS: Objection, vague. Asked and answered.
THE WITNESS: Could you clarify what time frame? Because as we saw yesterday going through these various documents, in the early days of the program we issued schedules to show 1998. Then we went through some documents that showed that slipped to 2003. Then we went from 2003 to 2010.
BY MS. HEWITT:
Q. I'm talking about now are you aware of any schedule slippages that would affect the 2010 deadline?
MR. SHULTIS: Objection, vague.
THE WITNESS: The current schedules we're

Page 309

working to today still show that we hope to have a repository in operation by 2010.
MS. HEWITT: Okay. I don't have any more questions.
MR. SHULTIS: I just have one question in follow-up.
EXAMINATION BY COUNSEL FOR THE DEFENDANT
BY MR. SHULTIS:
Q. Vic, when you were discussing the schedules and the mission plan and it showed rates, and we're talking about acceptance rates, you're talking about rates that could be accommodated in the facilities being designed, correct?
A. That's correct. My area of specialization or primary focus has to do with, as I indicated before, the schedules and the costs for the program, and we're developing schedules to try to meet a number of competing interests; and we focused on the design of the facilities to try to balance these interests as those waste acceptance schedules showed. That's my primary area that I've been working in.
Q. So, was it limited -- it wasn't limited to

# Victor Trebules

In the U.S. Court of Federal Claims

--------------------------------x

Yankee Atomic Electric Co., :

et al :

: NO. 98-126C

v. : 98-154C

: 98-474C

United States of America :

--------------------------------x

April 19, 2002

DEPOSITION OF:

Victor W. Trebules, Jr.

a witness, called by counsel pursuant to notice, commencing at 9:00 a.m., which was taken at Spriggs and Hollingsworth, 1350 I St., NW, Washington, DC



Appearances

Jerry Stouck, Esq.
Spriggs and Hollingsworth
1350 I Street, NW
Washington, DC 20005-3305
for Yankee

Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.
U.S. Dept. of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20530
for the government

Richard Johnson, Esq.
Jenner and Block
for Commonwealth Edison



INDEX OF EXAMINATIONS


| WITNESS | D | C | RD | RC |
|---|---|---|---|---|
| Victor W. Trebules, Jr.. | 4 | | | |


Index of Exhibits

(Exhibits maintained by counsel)


| Description | Page |
|---|---|
| exhibit number 22.. . . . . . . . . . . . | 39 |




(Morning Session)

Stipulations

(It is stipulated and agreed by and between counsel for the respective parties that the reading and signing of this transcript by the witness are not waived.

It is further stipulated and agreed that the filing of this transcript with the clerk of the court be and the same is hereby waived.)

* * * * *

Whereupon,

Victor W. Trebules, Jr.

was called for examination by counsel and, having been previously sworn, was recalled and testified as follows:

DIRECT EXAMINATION:

BY MR. STOUCK:

Q. Good morning, Mr. Trebules. Would you

Page 5

agree that at the time that you were working on the plan in 1984 and 1985 it was an objective of the spent fuel program that that program be operated in an economically efficient manner?

MR. SHULTIS: Objection as to "economically efficient." It's vague.

A. I believe we said words to that effect in the mission plan, that's correct.

Q. Why was that an objective?

A. To the best of my recollection, I think we used phrases like fiduciary responsibility. People working in the program felt that they had an obligation to try to execute the program efficiently and effectively.

Q. Why was that an objective?

A. We knew the program was going to cost a lot of money over its lifetime.

I guess it's my opinion that the people felt they ought to try to be efficient in carrying out that program.

Q. Let's pull out the mission plan which I think is exhibit six, if you would, please.

Page 6

A. Okay.

Q. Take a look at page six, please, which is Bates CE14813. It's a listing of goals and objectives. We discussed this earlier.

Number four, do you see that? "The program must be conducted in a cost effective manner with full cost recovery."

Do you see that?

A. Yes.

Q. What does "full cost recovery" mean?

MR. SHULTIS: Objection to the extent it's calling for a legal conclusion.

A. It was my understanding that the Nuclear Waste Policy Act had a provision that the owners and generators of the spent nuclear fuel and the radioactive waste would pay for the cost of the program. It would not be funded by taxpayer money. It would be funded by the owners and generators of the waste.

The Act initially established a rate of one mill per kilowatt hour for the nuclear utilities which would go into a nuclear waste fund

Page 7

and the government would draw on that money plus any other monies, for example monies for the disposal of defense high level waste, and that would cover the cost of the program.

Q. Is that concept of full cost recovery related to the objective of economic efficiency?

MR. SHULTIS: Same objection.

A. To the best of my understanding, it is.

Q. What's the relationship, if you would just explain that?

MR. SHULTIS: The same objection.

A. Not being an economist, I guess I would explain it in more or less layman's terms.

The people working in the program knew they had a source of funds, that was the nuclear waste fund, and any appropriations to cover the disposal of defense high level waste.

They wanted to conduct the activities, the scientific characterization, the design and the engineering aspects essentially at minimum cost, do the necessary, minimum necessary, but sufficient work to develop the facilities, the geologic

Page 8

depository and the transportation system to manage and dispose of the radioactive waste.

Q. Is it your understanding at the time of this mission plan, at the time this mission plan was written, these words we've been looking at, is it your understanding that this objective of economic efficiency was a requirement for the program?

MR. SHULTIS: Objection to the degree it's calling for a legal conclusion.

A. I don't ever remember back then some 16, 17, 18 years ago it being described as a requirement.

My recollection is, as exhibit six states, it was a policy goal that guided DOE's implementation of that program.

I don't ever remember the terms requirement when it came to conducting the program in a cost effective manner.

Q. Let's turn to page 37. Under mission 3.1.4, mission and objectives, do you see that?

A. Yes.

# ZABRANSKY, DAVID

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER . 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC · 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & . 98-485C, 98-486C,
LIGHT COMPANY, NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; . 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Deposition of DAVID ZABRANSKY
Washington, D.C.
Wednesday, April 17, 2002
9:38 a.m

Job No.: 12597-1
Pages 1 through 226, Volume 1
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X



Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT.

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

5

APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT.

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER COMPANY

M. STANFORD BLANTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 251-8100

6

APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:

NORMAN M. HIRSCH, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

RICHARD W. OEHLER, ESQUIRE
PERKINS COIE LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419

7

APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY

DONALD J. CARNEY, ESQUIRE
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D.C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:

KEVIN B CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D.C. 20530
(202) 307-1011

8

APPEARANCES CONTINUED

ON BEHALF OF DEFENDANT UNITED STATES:

WILLIAM L. OLSEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #7002
Washington, D.C. 20530
(202) 305-7594

CONTENTS

EXAMINATION OF DAVE ZABRANSKY PAGE
By Mr. Blanton 13

EXHIBITS
(Attached to the Transcript)

ZABRANSKY DEPOSITION EXHIBIT PAGE
1 Federal Register Notice dated 4/18/83, "Standard Contract for Disposal of Spent Nuclear Fuel" 28
2 Letter dated 9/30/96 from R. Cocherell 34
3 Letter from B Tomasoni to R. Cocherell 39
4 Instructions for Completing Appendix C Delivery Commitment Schedule 43
5 1995 Acceptance Priority Ranking and Annual Capacity Report 44
6 Federal Register Notice dated 2/4/83 65
7 Final Interpretation of DOE's Nuclear Waste Acceptance Issues 67



EXHIBITS CONTINUED
(Attached to the Transcript)

ZABRANSKY DEPOSITION EXHIBIT PAGE
8 1984 Civilian Radioactive Waste Program Mission Plan 83
9 1985 Civilian Radioactive Waste Program Mission Plan 98
10 Excerpts from 1985 Mission Plan 114
11 "FWMS Cases Requested by the DOE HQ" 123
12 Proposed Contract Changes, Revision O, 4/13/92 124
13 "Index to Tables of Issues Related to the Standard Contract" 127
14 Document, "Disposal Contract Modifications" dated 10/22/84 130
15 Document from files of D. Zabransky 138
16 Document with Subject: Potential Modifications to the Standard Disposal Contract 139
17 Meeting Notes dated 3/25/87 142
18 Letter from J. Kearney to B. Rusche 150



EXHIBITS CONTINUED
(Attached to the Transcript)

ZABRANSKY DEPOSITION EXHIBIT PAGE
19 Letter dated 4/28/87 from S. Kraft to C. Jedrey 164
20 Letter dated 10/2/87 from C. Jedrey to S. Kraft 166
21 Statement of Sol Burstein dated 3/19/87 171
22 Documents from the Wisconsin Production 173
23 Letter dated 8/29/88 from J. Kearney to C. Kay 179
24 UWASTE Presentation dated 5/16/89 189
25 UWASTE Report dated 2/16/90 193
26 Preliminary Projection of Spent Fuel Acceptance Rate 197
27 Letter dated 2/16/94 from S. Parker to D. Dums 199
28 Document dated 3/31/92, "ACR Response Team Meeting" 214



PROCEEDINGS

DAVID ZABRANSKY

having been duly sworn, testified as follows:

MR. BLANTON: Before I start asking Mr. Zabransky questions, I want to put on the record an understanding we have with the government's counsel that Mr. Zabransky's deposition has been noticed both as a fact witness and he's been designated by the government, as I understand it, as the government's 30(b)(6) representative as to certain topics. Somebody want to tell me --

MR. OLSEN: I believe topics eight and ten.

MR. BLANTON: Eight and ten of the plaintiff's deposition notice under Rule 30(b)(6).

What we have agreed to do is essentially conduct Mr. Zabransky's fact deposition first and all the lawyers will have their chance to ask Mr. Zabransky questions regarding his fact deposition, and then we will take his deposition on the topics as to which he's been designated the government's representative under Rule 30(b)(6)

MR. CRAWFORD· That sounds exactly like

that's it.
Q So without a DCS is it your testimony that without a DCS process there can be no rate under the contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion, and asked and answered.
**A It's my belief that an approved DCS is required to establish a rate and date for acceptance.**
Q All right, sir. Are you aware of any plans that the Department of Energy has to recommence the process of reviewing and processing delivery commitment schedules?
**A I am not.**
Q And as long as that condition exists, do I understand your testimony to be that the Department of Energy has no obligation with respect to the rate of spent fuel acceptance?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
**A No further obligation than that already established in approved DCSs.**
Q All right. Which means that utilities who



don't have spent fuel in that first ten years could never have had an obligation with respect to rate. Is that right?
MR. CRAWFORD: Objection. Mischaracterizes prior testimony. Objection to the extent it calls for a legal conclusion. Asked and answered.
**A To the extent they don't have an approved DCS, that would be the case.**
Q Okay. What reasons would purchasers have for wanting to reevaluate DCSs based on the failure to begin acceptance in 1998, to your knowledge?
**A I'd have to speculate as to what they would consider if they wanted to --**
Q Well, based on your experience at WEPCO what would the considerations be?
MR. CRAWFORD: Well, objection to the extent it calls for speculation or assumes facts not in evidence.
Q Well, you said that you were at WEPCO when WEPCO submitted delivery commitment schedules, weren't you?
**A Yes, I was.**



Q And those were approved, weren't they?
**A Yes, they were.**
Q Based on what you know about the submittal of those DCSs, what purpose would a utility have for wanting to reevaluate a DCS?
MR. CRAWFORD: Same objection.
**A I can't speak for WEPCO, but DCSs in general contain fuel ranges that would be proffered for delivery by the utility to the Department of Energy. It could be the case -- again we're speculating -- that the fuel range on the original DCS that was submitted and approved would no longer be the fuel they wished to deliver because something else had been done to it, like we put in dry storage. And then, therefore, it would not be in that utility's best interest perhaps to take that fuel and offer it to the delivery but instead to offer different fuel. So it may wish to evaluate that DCS.**
Q Was the primary purpose of the DCS process to identify which fuel of a given allocation the utility wanted to deliver to DOE?
MR. CRAWFORD: Objection. Vague.



Q Do you understand my question?
**A There are many purposes for the DCS process. One of them was to identify the range of fuels the utility may wish to deliver.**
Q I don't understand what you mean by "range of fuels." Could you explain that?
**A Yes, I could.**
Q Will you?
**A Yes, I will. Fuel from a given reactor -- one of the purposes is to identify the range of fuels. Fuels from a given reactor require different shipping equipment, shipping casks, depending upon when it was discharged, how highly it was enriched, how highly it was burned, how long it's been postreactor basically. So fuel of a certain class wouldn't necessarily be fungible from a technical standpoint with fuel of a different class. So one of the purposes of the DCS was to establish for DOE's planning to fulfill the need to supply a cask suitable for the utility's use was to identify what fuel the utility wished to have moved. And the fuel that would be moved ultimately would be a subset of the fuel specified on the DCS.**

Q Okay. As implemented by DOE, was the purpose ever to determine the quantity of spent nuclear fuel?

A Yes.

Q How so?

**A By taking the MTUs and also by asking them to provide the number of assemblies that could be contained in those MTUs.**

Q The way the process was implemented by DOE, did the utility have any discretion about how many MTUs to put in the DCS?

**A No.**

Q So that was dictated by the Department of Energy.

**A The MTUs was as per the instructions from the ACR. The number of assemblies contained was to some extent the utility's discretion.**

Q Okay. Let me get you to look back at Exhibit 1 to your deposition and specifically Article 5.B of the standard contract.

Does Article 5.B deal with a delivery commitment schedule process?



**A Yes, it does.**

Q Where in Article 5.B does the contract limit the quantity of spent nuclear fuel the utility can put on a DCS to the amount in the ACR?

**A It doesn't.**

Q Where did that requirement come from?

**A That requirement came from the contracting officer when the contracting officer transmitted the instructions for completing DCSs to the utilities.**

Q Under the process as you understand it, during the period of time when DOE processed delivery commitment schedules, if a DCS came to the Department of Energy or submitted to the Department of Energy and had a quantity of spent fuel that was greater than that shown in the ACR, what happened?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to foundation.

**A When DOE was processing DCSs, if the DCS contained a quantity of SNF -- MTUs greater than that in the current ACR, it was more than likely rejected by DOE, sent back by the contracting officer as**



**disapproved.**

Q Now, I have referred you to Article 5.B of the standard contract and asked you about any relationship between the DCS and the ACR in there. But I want to be fair. Is there anyplace else in the standard contract that authorizes the rejection of a DCS because it does not match the quantity of spent nuclear fuel in an ACR?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

**A The process for filling out DCSs was transmitted with the contract instructions, I believe. I am not aware of other provisions in the contract that deal with the ACR and the DCS process.**

Q All right. When did DCS forms first begin to be submitted, if you know?

**A I don't have an exact date.**

Q Early nineties?

That's a question.

**A It would have been the early nineties. My recollection would have been -- from my experience at WEPCO it would have been 63 months -- no later than 63**



**months prior to January 31st, 1998, or January 1st, 1998.**

Q Okay.

**A Sometime in September of '92.**

Q Okay. At that point in time was there a general understanding in the utility industry and the department -- well, strike utility industry. In the Department of Energy as far as you know about whether a repository was going to be available in 1998?

**A I wasn't at the Department of Energy in '92 so I don't know what the general understanding was at the Department of Energy.**

Q What was the general understanding in the utility industry?

MR. CRAWFORD: Objection to the extent it calls for speculation.

**A I don't know.**

Q What did you think?

MR. CRAWFORD: Objection to the foundation.

Q What did you think in 1992 about whether or not there was going to be a repository in 1998, Mr. Zabransky?

**A Mr. Zabransky thought in 1992 that there was still a possibility for a monitored retrievable storage facility by 1998.**
Q But not a repository?
**A But not a repository.**
Q Okay. What had to happen in order for a monitored retrievable storage facility to be available by 1998 as of 1992?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection, foundation.
**A I don't know the exact steps that would have been required.**
Q Okay. Now, as I understand your testimony, you were not involved in any standard contract issues at the time the standard contract was promulgated. Is that correct?
**A That is correct.**
Q Let me back up from my line of questioning. I just started to ask the question that just got passed to me.
Do you recall when you concluded that there would be no spent fuel acceptance in 1998?



MR. CRAWFORD: What was your question again? Hang on, I just --
Q I assume you concluded at some point that there would be no spent fuel acceptance in 1998. Is that right?
**A Yeah. Obviously at some point I concluded that wasn't going to happen.**
Q When did you conclude that, do you recall?
**A No, I don't recall exactly when that was.**
Q Were you involved in any way in any of the activity that led up to the passage of the Nuclear Waste Policy Act of 1982?
**A No, I was not.**
Q Were you involved in the process that led to the promulgation of the standard contract in 1983?
**A No, I was not.**
Q Did you review the standard contract for either Wisconsin Electric or any utility industry group during the period between the time it was proposed and the time it became final?
**A No, I did not.**
Q Were you privy to any conversations between



the Department of Energy and utilities about the standard contract during that period of time?
**A During -- before it became final?**
Q Between the February to June '83 time frame.
**A No, I was not.**
MR. CRAWFORD: Stan, is this an appropriate time to take a break?
MR. BLANTON: It's a fine time to take a break.
(There is a recess from the record.)
Q Mr. Zabransky, I got another couple of questions I need to ask you about Exhibit 5, which is the annual capacity report for 1995.
**A Okay.**
Q The last sentence of page one of the document says "As specified in the standard contract the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers."
And then if I could refer you over to page four. And referring to Table 1, the projected nominal



acceptance rates for spent nuclear fuel, the second sentence after Table 1 says "This table provides only an approximation of system throughput rates and is subject to change depending on congressional action regarding the conditions for site and construction, operation of an interim storage facility, if any, the repository, and the system design and configuration."
Do you see where I've read from?
**A Yes, I do.**
Q What would happen to the DCS if DOE changed the waste acceptance rates set forth in the ACR upon which the DCS was based?
MR. CRAWFORD: Objection. Vague. Objection to the extent it calls for a legal conclusion.
Q Do you understand my question?
**A Which DCS?**
Q The ones that have been approved.
**A The ones that have been approved by the contracting officer are binding.**
Q Whether or not the ACR changes?
**A That's correct.**

letter was sent?
A That was my position at the time the letter was sent, and that was the company's position, that the program should commit to whatever it needed to do to cause this to happen.
Q What's the basis for the 3,000 MTU per year? That's M as in man, T as in ton, and U as in uranium. Also M as in metric.
A Again, that's I believe as I talked to earlier, I spoke to earlier, is the -- my understanding, and I think it was the general understanding at the time that 3,000 tons a year would be a sufficient rate to work off the backlog and the discharges in a reasonable time frame.
Q Now, at this point in time were you participating in any industry groups that you mentioned earlier?
A I may have just started. I mean, I would have been a neophyte in this end of the business at that point in time, having just come over from being a civil engineer to the wonderful world of nuclear fuel.
Q Do you see in the first paragraph where it



says "Wisconsin Electric has reviewed the draft mission plan issued by DOE and it has participated in the formulation of comments prepared by Edison Electric Institute, Utility Nuclear Waste Management Group, and the Electric Utility Companies Nuclear Transportation Group"?
A I see that.
Q Do you know whether you were the WEPCO representative for that participation?
A I know I definitely wasn't for the EUCNTG, and I'm not sure whether I was or wasn't for the UNWMG.
Q Who would have been if you not?
A Howard Shimon.
Q Could you spell his last name, please.
A S-h-i-m-o-n.
MR. HANDWERKER: Volume 3, page 32, which is Bates PA 141086.
Q That should be a July 9, 1984, letter to Charles Head?
A Uh-huh.
Q From Mr. John J. Kearney, vice president of



Edison Electric Institute. Are we looking at the same document?
A I believe we are.
Q Having had a chance to review that document, do you recall whether you've seen this letter before?
A Having looked at the front page and gone no further, I've seen it in preparation for litigation over the last several years, and I don't recall whether or not I saw it in 1984. I could have seen it in 1984.
Q Does this appear to be the same letter referenced in Wisconsin Electric's letter of July 6 where they say, We endorse the comments of all these groups?
A Hold on.
It appears to be the same letter referred to in the July 6th, '94 -- 1984 letter. Yes.
Q Look at enclosure one to the EEI letter, which has a page number 36 on the bottom on mine?
A Enclosure one?
Q Enclosure one should be titled Waste



Acceptance Schedule Interim Storage and Waste Generation Rate?
A I see that.
Q Take a second and look at it, if you would.
A Any particular portion or the entire --
Q That's about a page and a quarter. I ask if you would --
A That's fine.
Okay. I've read enclosure one.
Q Do you recall participating in conversations in industry groups where the issues discussed in enclosure one were discussed?
A I don't believe I would have done it at the time enclosure one was developed. I think I would have been too new on that job to have done that as a participation in industry groups.
Q Do you recall this essentially being the position of the industry at the time you became involved with respect to waste acceptance?
A Reading now that it was, I'm not sure I recall specifically, but, yes, this is consistent with whatever partial memories I had that enclosure one was

the industry's position.
Q All right. Do you recall having any interaction with DOE during the first months of your job as a contract administrator regarding waste acceptance issues raised in enclosure one?
A I don't recall that, no.
Q How about any group discussions with DOE officials?
A In the early -- in the mid-July '84 time frame, I don't recall any.
Q Do you recall ever hearing any official of DOE expressing disagreement with the idea that waste material should be accepted in accordance with the schedule in the first five years such that no utility would have to provide additional storage capacity after January 31, 1998?
A Can you restate the question.
(The record is read.)
A I don't recall any DOE official ever making that statement to my knowledge in my presence.
Q Do you recall a statement that that was not the case?



A I recall nothing about that statement either way.
Q Do you recall any discussions in connection with your work on industry groups about the acceptance rate in the 1984 mission plan raising serious concerns among utility members as to the value being received for the considerable monies being provided to DOE?
A I did not participate to my recollection in any discussions with groups of that issue.
Q All right. Was it the position of Wisconsin Electric that the waste acceptance schedule was a significant part of what Wisconsin was paying waste fees for?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for a legal conclusion.
A Please repeat the question again.
Q Was Wisconsin Electric paying waste fees under the contract?
A Yes.
Q Several million dollars a year in waste fees?



A More than that, yes.
Q What did Wisconsin Electric expect in exchange for those waste fees?
MR. CRAWFORD: Objection. Foundation.
A That -- Wisconsin Electric expected that its waste would be removed.
Q And Wisconsin Electric adopted these comments of EEI to suggest that it should be removed on some sort of schedule. Is that right?
A I believe that's the case. Yes. They've adopted these comments.
Q Do you recall Wisconsin Electric being concerned that the '84 draft mission plan was not as aggressive in terms of waste acceptance as the '83 draft of the mission plan had indicated?
A I don't recall that other than the fact that I've read it in this enclosure one and they've adopted these comments.
Q You mentioned a minute ago Mr. Shimon?
A Yes.
Q What was his position at Wisconsin Electric?



A He might have at that time -- I think the title was -- he was probably the project engineer for nuclear fuel.
Q Do you know who had been the contract administrator before you?
A Howard was. Howard Shimon.
Q Okay. Was it whoever the contract administrator at the time was who would have worked on these comments?
A I believe that's the case.
Q Okay. So if we went and looked to see when you became contract administrator, that would tell us whether or not you worked on these comments or not?
A Not exactly. Again, Howard had been involved with this for awhile. I eventually took this over as a function, but the transition, which was sometime during '84, how much I took on immediately was -- I don't recollect. I was more worried, quite frankly, about uranium contracts, enrichment contracts, and fabrication contracts than I was about this at this point in time. So when the transition took place I don't recollect exactly.

**and the industry that became known as the ACR issue resolution process. I don't know when it began exactly. My recollection is sometime in the '86ish time frame, '87ish time frame. But I don't have knowledge as to when it started.**
Q Would the ACR issue resolution process have dealt with changes to the contract?
**A It would have dealt with issues that the utilities as a group and DOE thought required discussion for clarification. It could have resulted in changes to the contract.**
Q Okay. Do you recall what those issues were?
**A Specifically, no. There were 30-something-odd issues I believe, but I don't recall offhand what they were.**
Q Do you recall ever any discussion -- and I'm looking at the first page of Exhibit 12 to your deposition where in the whereas clause it has "Whereas the DOE has responsibility following the commencement of operation of a repository," and has a change indicated and has "delete the word 'repository' and



insert the phrase 'DOE facility.'" do you remember that ever being a subject of the ACR issues task force?
**A It was not.**
Q Or, excuse me, ACR issue resolution process?
**A I don't -- I don't recall it as one of the issues, no.**
Q Do you recall in any other context a question regarding changing the word "repository" to "DOE facility" in that clause?
**A I do not recall that.**
Q Even since you've been at DOE?
**A No, do not recall.**
MR. CRAWFORD: Can we take a break?
MR. BLANTON: Yeah, we sure can.
(There is a recess from the record.)
Q Mr. Zabransky, Exhibit 13 to your deposition is a document entitled Index to Tables of Issues Related to the Standard Contract and has a Bates number CTR 0060139 at the bottom. And goes from 0139 to 0174 on the Bates numbers.



(Deposition Exhibit Zabransky 13 was marked for identification and was attached to the transcript.)
Q Do you recognize this document?
**A I don't recognize this specific document, no.**
Q Do you recognize any of the issues as issues that the ACR issues resolution process addressed?
**A This appears to be some of the issues, if not all the issues -- some of the issues that were developed as part of the ACR issue resolution team meeting the DOE process, whatever you want to call it.**
Q Can you tell, based on your experience at DOE, what the function of this particular document is? Is this a particular type of document that gets generated in the course of processing changes to a contract at DOE?
**A No, I don't know what the function of this document is.**
Q Let me get you to look for a second at -- it's going to be -- the Bates number at the bottom of



the page is going to be CTR -- excuse me. That's not right either. CTR 0060158. This is talking generally about the purchaser's right to adjust the quantities of SNF and HLW plus or minus 20 percent from its delivery commitment schedule.
**A Yes.**
Q Do you remember that being an issue in the ACR issues resolution process?
**A That was an issue that was identified.**
Q Could you describe what the issue was?
**A Well, the issue that was identified by DOE was that -- and again, I was not at the DOE at the time, but as DOE identified the issue for our discussion was that how was that going to work and what did that mean. And how would that be -- how would that affect transportation cask planning and procurement. So it was a scheduling and procurement and cask availability issue that they wanted to discuss.**
Q And the "that" being the option of the purchaser to adjust the quantities listed in the DCS by 20 percent? When you say "that," is that what

you're referring to?
A **To adjust the DCS number in the FDS plus or minus 20 percent.**
Q How does DOE take that into account, that right into account in connection with the limit on the quantity of fuel that can go on a DCS?
A **It doesn't. I don't -- I believe the adjustment goes to the FDS.**
Q Okay. What happens if everybody increases their quantities on their DCS by 20 percent and it ends up being the total quantity would be more than the acceptance rate in the ACR?
A **That was the issue DOE identified that they needed to work through.**
Q Do you recall how that was resolved?
A **It wasn't resolved.**
Q Has it ever been resolved?
A **Not to my knowledge.**
Q Does that issue reflect an inconsistency between the contract and the practice of DOE of limiting the quantities in DCSs to the allocations in the ACR?



A **I would have to go review the contract.**
Q Okay.
(Deposition Exhibit Zabransky 14 was marked for identification and was attached to the transcript.)
A **The contract states that the purchaser shall have the right to adjust the quantities of SNF and/or high-level waste plus or minus 20 percent and the delivery schedule up to two months until the submission of the final delivery schedule.**
Q Is the 20 percent 20 percent of the amount shown on its approved DCS?
A **I believe the answer is yes.**
Q Okay.
A **The amount on the approved DCS.**
Q I think you testified earlier that if a DCS was submitted that had a quantity different than the allocation in the most recent ACR, that that DCS would most likely not be approved?
A **That's what I --**
Q Am I following you?
A **That's correct.**



Q So my question is, is the limit on the DCS to the ACR quantities inconsistent with that provision that allows the purchaser a 20 percent increase over the DCS amounts?
A **My understanding in my reading of this provision is that they could adjust the amount of the approved DCS.**
Q Without respect to what was in the ACR?
A **They could adjust the amount as the contract says in the approved DCS plus or minus 20 percent.**
Q So is it correct then that the amount in the approved DCS was not binding on the customer, on the utility, to the extent it could adjust it under the term of the contract?
A **Plus or minus 20 percent, that's correct.**
MR. CRAWFORD: Let me object to that to the extent it sought a legal conclusion.
Q Has DOE had the occasion to process any request to increase the quantities on approved DCSs?
A **To my knowledge, not subject to this provision, no.**



Q Well, in any other way, has anybody asked to increase the quantity in a DCS that's already been approved?
A **No. Not to my recollection.**
Q Is there any limit until the submission of the final delivery schedule on when the quantities can be adjusted?
A **As the contract says, it states in the last sentence of Article 5.B.2 "Until the submission of the final delivery schedule."**
Q So is it correct that DOE could approve the DCS on day one, and on day two the utility could change the quantity in the DCS by 20 percent?
A **Or decrease it by -- yes, plus or minus 20 percent.**
Q And could do that at any time up until the final delivery commitment schedules are issued?
A **That's what the contract says.**
Q But had a utility submitted a delivery commitment schedule in the first instance that was in excess of the ACR quantities, DOE would reject it?
A **That is my understanding.**

based on this meeting?
A That's what it says.
Q Am I reading that correctly?
A That's what it appears to say.
Q Do you have any idea what you meant by using the term "significant quantities" in 1998 --
MR. CRAWFORD: Objection.
Q -- as used in the minutes marked Zabransky Exhibit 17?
MR. CRAWFORD: Objection. Assumes facts not in evidence.
A I wouldn't know the specific number that I meant at that point in time, but it would have been, from my perspective at that point in time, enough so that I wouldn't have had trouble at my plant. That was my concern.
Q And trouble, define how --
A Having to do with spent fuel that I didn't need to deal with. That was my position, the company's position in 1987.
Q Having to add storage space outside your pool?



A That was the industry position, yes.
Q And you agreed with it?
A Sure. Yes.
(Deposition Exhibit Zabransky 18 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I'm going to hand you what's been marked as Zabransky Exhibit 18 which is page 411 through -- what? I can't tell.
A 417, 18, 19?
Q I can't tell. It's a letter, the signature sign is John J. Kearney, Senior Vice President, Edison Electric Institute, a letter to Ben C. Rusche on the draft mission plan amendment. Take a second and review that if you want to.
A In its entirety?
MR. CRAWFORD: Let's get on the record just kind of where this thing was pulled out of.
MR. HANDWERKER: It's from the 1987 mission plan, June '87 mission plan amendment. It's 411 through 418 of the comments.
Q If it helps you, I'm not going to ask you



anything after page four -- well, wait a minute. Maybe I will.
MR. CRAWFORD: Don't tie yourself down.
MR. BLANTON: As a matter of fact, I think I will.
(There is a recess from the record.)
Q Have you had a chance to review number 18, Exhibit 18 to your deposition, Mr. Zabransky?
A Yes, sir.
Q Is this letter the letter that resulted from the meeting that we just talked about that was Exhibit 17 to your deposition? It refers to comments that were transmitted to DOE on April 3, 1987?
A It appears to be.
Q Do you know if you, in connection with your work with the UNWMG, participated in drafting these comments?
A I did not participate in drafting these comments.
Q Did you review and comment on the comments before they went in?
A I would have, yes.



Q Okay. Do you recall whether you disagreed with any of these comments?
A I did not, to my knowledge, disagree with any comments as far as I'm aware.
Q On page 417 of the comments they say "A significant change between the mission plan DMPA" -- which I assume refers to the draft mission plan amendment -- "occurs in the magnitude, time of, and rate at which DOE will accept spent fuel." Do you see that?
A Uh-huh.
Q Do you recall any discussions about the content of that particular paragraph among the UNWMG members?
A Not specifically about that particular paragraph, no.
Q Are you aware of whether what is expressed in this paragraph is generally the same subject matter as what you discussed in the meeting on March 25th, 1987, as chairman of the Program Strategy and Schedule Task Force?
A I have no reason to believe it isn't a

**draft letter that was discussed.**
Q Okay. Well, and what I'm talking about are the problems with the draft mission plan this identifies. Would that have been part of your discussion on the --
**A I have no specific recollection of that.**
Q Okay. Do you have any reason to think it would not have been?
**A I have no reason to think it would not have been.**
Q On page 412, the second page of the letter, the comments address a five-year slippage in the first repository operations day Do you see that?
**A What's the side bar number there?**
Q Two and three over there in the brackets.
**A I see, yes.**
Q Okay. The middle of that paragraph the comments say "This change can be acceptable to the electric utilities if and only if DOE makes a more substantial and achievable commitment to begin taking spent fuel in January 1998 as required under the NWPA and the standard contract."



**A Yes.**
Q Do you recall at that time what you believed the DOE contractual commitment to be other than --
MR. CRAWFORD: Objection.
Go ahead.
MR. BLANTON: Go ahead.
MR. CRAWFORD: Well, no. You finish the question.
Q -- other than to accept fuel in January 1998?
MR. CRAWFORD: Well, objection. Assumes facts not in evidence, foundation, relevance. It's vague.
**A Specifically with the contractual commitment, no, I don't recall beyond the fact that I believe we believed we were advised by counsel that there was a contractual commitment to begin accepting in 1998.**
Q Was the issue of the quantity of fuel that they would accept part of that commitment, in your judgment?



**A The reason for the sternly worded letter was our concern that there appeared to be no commitment to the quantity of fuel and that we were upset and wanted them to commit to a large quantity of fuel but we saw no such commitment.**
Q In the draft mission plan amendment?
**A Anywhere.**
Q Would a commitment to accept spent fuel in 1998, without some commitment to accept a sufficient quantity to relieve the utilities of its storage problems as you referred to a second ago, have been of any real use to the utilities?
**A Yes.**
Q In what way?
**A Ultimately even with respect to -- without regard to the amount of storage required, they need to dispose of the spent fuel.**
Q But that implies, doesn't it, that they're going to pick up all of it?
**A Eventually, yes. That's a necessity. That's of value to the utilities, as you asked me.**
Q Is there some period of time in your



judgment beyond which that process becomes unreasonable?
MR. CRAWFORD: Objection. Speculation.
Q How long is it supposed to take to pick up the spent fuel?
MR. CRAWFORD: Objection. Vague.
**A I don't have an answer. I don't know.**
Q In your judgment would 80 years to clear out spent fuel from a reactor site be consistent with DOE's commitment and obligation under the contract?
MR. CRAWFORD: Objection. Argumentative. Lack of foundation, speculative, vague.
**A I don't believe the contract contains a commitment with respect to rate.**
Q So is the answer to my question no, it's not unreasonable for DOE to extend the period of performance under the contract for 80 years?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and all the other objections to the first question.
**A If that's how long it takes to remove the spent fuel, that's how long it takes to remove the**