**spent fuel.**
Q Look at page 414 of the document. Talking about monitored retrievable storage facility.
**A Uh-huh.**
Q The last sentence of that paragraph says "Now the MRS is more important to NWPA implementation because it is the only feasible way that DOE can meet its 1998 statutory and contractual obligation."
Why was the MRS important to the DOE's ability to meet its contractual obligation?
MR. CRAWFORD: Objection. Foundation.
**A Why did the industry say this -- why was that the industry position? Is that what you're asking me?**
Q Well, do you think that's not correct now? Do you think the position you took in 1987 is not correct?
**A But this -- okay. Why did the industry believe in 1998 or at that point in time why the only way to meet the contractual and statutory obligation was to have an MRS?**
Q Did you believe that then?



**A Yes, I did.**
Q Why?
**A Because there was no way they could have built a repository by 1998 at this point in time.**
Q Would it have made any sense to have a repository or an MRS and accept fuel at such a small rate that it took decades to remove it from the plant sites?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence.
**A It wouldn't have made sense to the industry, no.**
Q Would it have made sense to anyone? Would it have made sense to DOE?
**A No.**
Q Doesn't the longer you take to remove the fuel the more it costs?
**A I can't make that conclusion.**
Q Certainly the longer you operate a repository and MRS the more it costs to operate. Is that a fair statement?
**A That could be a fair statement, but there's**



**a lot of facts that need to be considered.**
Q All other things being equal, it costs less to run one for 40 years than to run one for 90?
MR. CRAWFORD: Objection to the extent it calls for speculation.
**A Speculating that all other things are being equal, that would be a true statement. But all other things are never equal.**
Q Was there anything that caused you to agree with the comments in the draft mission plan or in these EEI comments other than the fact that you happen to work in the electric utility industry?
**A I'm not sure what you're asking me. Is there anything that caused me --**
Q I'm asking did you come to the conclusion that these comments were correct based on your own judgment or just based on the fact that that's what your employer thought?
**A Given the information I had available to me, I believed these comments. I still do believe these comments given the information I had available to me.**



Q Are you aware of any information that you have now that you didn't have then that calls these comments into question?
MR. CRAWFORD: Objection. Vague.
**A My personal opinion is that these comments were valid then, and as customer of DOE, as a member of the industry, this was my industry position as to what they should be doing pursuant to our relationship.**
Q I guess my question is, Mr. Zabransky, don't take this the wrong way, but were you posturing or did you really believe what was in here?
**A I believe these things, sure.**
Q And do you believe them now?
**A Do I believe specifically which comments now?**
Q Do you believe at the time these were written that all the -- do you believe now that at the time these were written they were all valid comments?
MR. CRAWFORD: Objection. Vague.
**A I believe now that at the time these were written these were all valid comments.**

161

Q Do you know how long the repository receiving facilities at Yucca Mountain are designed to operate?

**A At this time we haven't finalized a design. There are design requirements that appear in the systems requirements documents that give the designers guidance as to how long they must have the facility operational. Those are -- it's also predicated on the fact that the contracts run as long as the nuclear plants run, if not longer. So as soon as we know how long you're going to run nuclear plants, we can then have an idea how long the facilities have to operate.**

Q Well, is there any assumption in the system requirements regarding how long after the last plant shuts down the repository is scheduled to operate?

**A There are assumptions in the systems requirements documents for planning bases that postulate the length of operation assuming a beginning of acceptance of a repository in 2010. I do not know specifically what those numbers are.**

Q Okay. I don't remember whether you told me or not. Are you aware of anything that -- any facts

162

now that makes these comments on April 3, 1987, inaccurate?

MR. CRAWFORD: Objection. Vague. Objection, relevance.

**A Facts now that are in existence that weren't in existence at this point in time where that there is an MRS linkage. MRS couldn't be constructed as these comments suggested.**

Q Okay. And you're referring to -- okay, anything else before I ask follow-up on that?

**A Other comments in here, if you want to go specifically one by one, with respect to quantities and things like that are no longer valid. But --**

Q Why are they no longer valid?

**A Because the industry no longer projects it's going to generate 79,000 tons of spent fuel.**

Q They project less now?

**A More now.**

Q More?

**A So, I mean, this document is 15 years old. It was valid then. Certain assumptions that went into its preparation are no longer valid.**

163

Q Okay. The linkages that you're referring to that would have prevented the MRS development in the way it's suggested in Zabransky 18, are you referring to the linkages in the Nuclear Waste Policy Act amendments of 1987?

**A That's correct.**

Q Other than the Nuclear Waste Policy Act amendments of 1987, is there any other reason why an MRS could not be developed the way it's envisioned to have been -- it should be developed in Zabransky 18?

**A By 1998 as envisioned here, all -- were there no linkages, there still would be the issue of siting and development of a facility, just as there is with a repository.**

Q Okay. But I thought I understood you to say that it could not be developed because of the linkages.

**A And again this presumed -- this called for an MRS by '98. Even without linkages there's no assurance one could have been developed by '98.**

Q No assurance, but as I understand your testimony the linkages made development of an MRS as

164

envisioned in Zabransky 18 impossible?

**A That's correct.**

Q Okay. Is there anything else other than the linkages that make it impossible, to your knowledge?

**A Not that I'm aware of, no.**

Q And again the linkages we're talking about are the ones contained in the 1987 amendments to the Nuclear Waste Policy Act?

**A Correct.**

MR. CRAWFORD: Are you going to move on to another exhibit at this point?

MR. BLANTON: Let me see.

Yeah.

MR. CRAWFORD: Okay.

MR. BLANTON: Kind of the same general subject but another exhibit.

MR. CRAWFORD: Let's give Dave a break.

(There is a recess from the record.)

(Deposition Exhibit Zabransky 19 was marked for identification and was attached to the transcript.)

197

to make at this time for his kids.
MR. BLANTON: Sure.
(There is a recess from the record.)
(Deposition Exhibit Zabransky 26 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I've marked as Exhibit 26 to your deposition a document entitled Preliminary Projection of Spent Fuel Acceptance Rate Point Beach Nuclear Plant. Do you see that?
**A Yes, I see that.**
Q Do you need a second to review it?
**A Yes, I do.**
**Okay.**
Q Do you recognize that document?
**A I recognize the document.**
Q Did you prepare it?
**A I prepared the transmittal memo, yes.**
Q How about the attachment?
**A No. That was prepared by Energy Resources International.**
Q Okay. Is the fact that it was prepared by

198

ERI reflected on it? Right here, okay.
What was the purpose of preparing this acceptance schedule?
**A It was to, as it says in the document, respond to information requests from Tsien-Lit Poon, who was Public Service Commissioner of Wisconsin staff.**
Q Can you explain a note that -- there is a footnote that says "After 2015 projected spent-fuel acceptance rates are based on a projection of total spent-fuel discharges and projected OFF priority ranking." But could you explain, as I understand it, at the point in time when the 1991 ACR was issued, the ACR contained projections of spent fuel acceptance through 2008. Is that right?
**A Through 2007.**
Q 2007?
**A Yes.**
Q How were the projections after 2007 done for this table?
**A From 2007 to 2009, 2008 and '9 specifically, it continued the rate at the 900 tons a**

199

**year consistent with the 10,000 ton statutory limitation. Beyond that the assumption was the repository was in operation at -- in 2010 and, therefore, the rates were now unconstrained. The 1800 to 3,000 per year rate were provided by Energy Resources International as their best estimate as to what the DOE rate would be.**
Q Do you know what that was based on?
**A No, I do not. That was why we paid them to do this.**
Q During this time frame was the Wisconsin Citizens Utility Board asking questions frequently regarding the standard contract and what your expectations were for performance of the standard contract by DOE?
**A Wisconsin CUB was asking questions all the time about all kinds of things, so I don't know specifically -- I have no recollection of what they were asking at this point but, yes, they were asking all kinds of questions about Point Beach.**
**(Deposition Exhibit Zabransky 27 was marked for identification and was attached to the**

200

**transcript.)**
Q I marked as Exhibit 27 to your deposition, Mr. Zabransky, a letter dated February 16, 1994, to a Mr. Dennis Dums, which is an unfortunate name for a regulator.
**A He wasn't a regulator.**
Q Well, whatever he was.
**A He was a nuclear intervenor.**
Q From Stephen Parker at Wisconsin Electric Power Company, and attached is, it appears, some questions. I think we've got a document in the file that reflects this, but to save time, do you recall whether you were responsible for answering these particular questions on behalf of Wisconsin Electric?
MR. CRAWFORD: You're referring now to the second page?
MR. BLANTON: Yes, sir.
Q And specifically 3A and 3B.
**A I presume I was involved with this. It would have been something I was doing. I don't recall the specific exercise, but it was the time frame and my name is on here, so I'm sure I worked on this.**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; · Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES · 98-488C, 98-614C,
POWER COMPANY, DUKE POWER, a · 98-621C, 99-447C,
Division of DUKE ENERGY CORP., · 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; . 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D.C.
Thursday, April 18, 2002
9 44 a m

Job No 112597-2
Pages 227 through 458, Volume 2
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT
ALEX D TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT
JEFFREY L HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D C 20004-1206
(202) 942-5000

231

APPEARANCES CONTINUED
ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT
TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER COMPANY:
M STANFORD BLANTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 251-8100

APPEARANCES CONTINUED
ON BEHALF OF PLAINTIFF

232

COMMONWEALTH EDISON COMPANY:
NORMAN M. HIRSCH, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:
RICHARD W. OEHLER, ESQUIRE
PERKINS COIE LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419

233

APPEARANCES CONTINUED
ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:
DONALD J. CARNEY, ESQUIRE
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D.C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:
KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D.C. 20530
(202) 307-1011

234

APPEARANCES CONTINUED
ON BEHALF OF DEFENDANT UNITED STATES:
WILLIAM L. OLSEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #7002
Washington, D.C. 20530
(202) 305-7594

239

Q Do you have any military experience or anything like that?
A **No.**
Q I'm going to show you what's been marked as Zabransky Number 29.
(Deposition Exhibit Zabransky 29 was marked for identification and was attached to the transcript.)
Q Which purports to be a letter dated February 2, 1994, from you to the Energy Information Administration titled Transmittal of EIA Nuclear Fuel Data Form.
Do you recognize that letter?
A **I don't remember this letter, but I'm reading it now. Yes, I'm sure I wrote it and signed it.**
Q Was it part of your responsibility to submit the RW 859 forms to the EIA --
A **Yes.**
Q -- at Wisconsin Electric?
A **Yes, under my -- it was under my area of responsibility, yes.**

240

Q Somebody else prepared the form and gave it to you, and you put a cover letter on it and sent it?
A **Correct.**
Q The middle paragraph of that letter, would you read that to yourself, please.
A **That's correct.**
**Okay. I've read it.**
Q Was it a regular practice of Wisconsin Electric when it was transmitting information either to the EIA or to the Department of Energy to remind the Department of Energy of its obligations under the terms of the contract for disposal of spent nuclear fuel to begin acceptance of Wisconsin spent fuel no later than January 31, 1998?
A **I think it had become at that point in time.**
Q At what point did it become the regular practice?
A **I don't recollect which point it became.**
Q Okay. Now, at this point in time Wisconsin Electric had approved delivery commitment schedules. Is that right?

241

A **Yes, it did.**
**(Deposition Exhibit Zabransky 30 was marked for identification and was attached to the transcript.)**
Q I've handed you Zabransky Exhibit Number 30.
MR. BLANTON: And I'm one copy short on that one, guys. Sorry.
Q Which purports to be a document dated September 21, 1992, to the U.S. Department of Energy contracting officer, signed by Bob Link, officer of placement and administration -- or, excuse me, DOE contracting officer in the office of placement administration. Do you recognize that document? And it has several pages of documents attached to it. It goes from page 0469 to page 0486.
A **I've seen this document.**
Q What is that document?
A **Well, the cover letter is a transmittal letter from Bob Link sending in DCSs for approval to Point Beach --**
Q Okay.

242

A **-- for the ten years of allocations beginning in 1998.**
Q Did you participate in the process of generating these DCS submittals?
A **One of my staff did it, but, yes, I was involved with it.**
Q Would the submittals have gone through you to Mr. Link?
A **Yes, they would have.**
Q I want to ask you about a notation that appears on each of the DCS documents.
A **Okay.**
Q On line 2.7 there's a line for metric tons of uranium, and then in parenthesis, initial, and it has 43.0.
MR. OLSEN: Which one are you --
MR. BLANTON: I'm sorry. Look at page 0745.
MR. OLSEN: Okay.
A **Okay.**
Q See where it has metric tons, uranium 43?
A **Yes.**

Q And underneath that, under 2.8 it has, Number of assemblies, 119?
**A Yes.**
Q Then it has an asterisk that says, Maximum number of assemblies deliverable per instruction 2.8.
**A Yes.**
Q Now, do you recall where Wisconsin Electric got the 43 number to put in line 2.7?
**A That came out of the 1991 ACR.**
Q Okay. And where did Wisconsin Electric get the 119 number?
**A That came out of the lightest assemblies we have in inventory, that we anticipated having in inventory in its date range to maximize the number of assemblies that fit within that ACR MTU limit.**
Q Was that the typical practice, you tried to get as many assemblies as you possibly could into a given weight limit?
MR. OLSEN: Objection. Vague.
Q At Wisconsin Electric was that what you guys tried to do?
**A I think at this point in time what we tried**



**to do was inform DOE for planning purposes that the 43-ton allocation could be as many as that assemblies so they could plan accordingly for the number of casks they would need.**
Q What does the notation "Maximum number of assemblies deliverable per instruction 2.8" mean?
**A I would have to refer to instruction 2.8.**
Q I think the instructions are Exhibit 4 to your deposition.
Well, I don't see instruction 2.8 in these instructions.
**A I think it means instruction 2.6. Don sometimes made mistakes.**
Q What's the date of this form? You sent this in in --
**A '92.**
Q '92.
**A It came right after the instructions.**
Q And these are the revised '93 instructions, so is it possible there was a 2.8 in the instructions that you had?
**A Oh, I don't know.**



Q Okay. But there is an instruction on the number of assemblies, BWR, PWR, and other, right?
**A Uh-huh.**
Q When I said that I was referring to Exhibit 4.
**A Yes, instruction 2.6 in Exhibit 4, which appears to be what 2.8 refers to in this document.**
Q Can you tell me how the instruction limits the number of -- or does the instruction limit the number of assemblies deliverable?
**A Well, it says, Enter the number of assemblies corresponding to the metric tons indicated in item 2.6. If the SNF designated -- and I skipped over some words. If the SNF in the designated range of designated -- If the SNF in the designated range of discharge dates encompasses assemblies in a wide range of MTUs per assembly, state the maximum number of assemblies that may be delivered. That's what we did.**
Q I'm just slow. I'm sorry. Can you explain to me in lay terms how the instruction limits the number of assemblies? Is it the metric tons that limit the number of assemblies?



**A Yes. Each assembly has a certain number of metric tons in it, and generally for a given class of fuel designs they're all the same. Wisconsin had used -- Wisconsin Electric had used several classes of fuel designs, and the assemblies ranged anywhere from .36 metric tons to .42 metric tons.**
Q Okay.
**A So to tell DOE as to what we were planning on doing or to give them the maximum amount of assemblies that could be moved within that MTU allocation, we provided this information.**
Q Why do you think it was necessary to tell DOE that was the maximum number of assemblies deliverable?
MR. OLSEN: Objection. Vague.
**A Well, I don't know why -- again, from my perspective I felt it was reasonable to tell DOE this so they could plan on the number of casks they would need to move the fuel.**
Q Did Wisconsin Electric object to the limit on the metric tons of uranium DOE had limited it to in submitting the DCS?

MR. OLSEN: Objection, vague, and objection to the extent it calls for a legal conclusion.
Q I'm not asking for a legal conclusion.
A **Not to my knowledge.**
Q Mr. Zabransky, what is failed fuel?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
Q Are you responsible for determining what failed fuel is for the Department of Energy?
A **In the context of the contract, failed fuel is described in Appendix E.**
Q Well, you skipped over a question. Is part of your responsibility providing technical input to the contracting officer about what constitutes failed fuel?
A **Yes, it would be.**
Q Okay. Can you describe what failed fuel is?
MR. OLSEN: Again, objection to the extent it calls for a legal conclusion.
Q That's fine. Your technical understanding of what failed fuel is. As described in the contract.



A **As described in the contract, it's any assembly that, once inspected, exhibits deformity, damage to cladding or spacers or other physical characteristics that may require special handling.**
Q What does "special handling" mean?
A **Cannot be handled with normal fuel-handling equipment in the way you would normally handle a fuel assembly at a reactor site for normal cores or loading casks for storage or transport.**
Q Do you know whether any of the spent fuel included in the delivery commitment schedule submitted with Mr. Link's letter of September 21, 1992, Exhibit 30 to your deposition, contained failed fuel under the definition you just gave?
A **Don't know. I'm sure some of it was, but, again, what WEPCO did in submitting its DCSs was to include all the fuel in its inventories at that point in time, as a date range.**
**If you notice on 2.6, the date range of discharge on document 475, you want to look at that one, is 9/30/72 to 10/31/93. That covers every assembly ever generated by Point Beach between the**



**date of operation and five years prior to 1998.**
Q Right.
A **So any of your assemblies at that point in time would have been covered by this DCS. We didn't specify which fuel would be covered by this DCS.**
Q Okay. You only specified a quantity of tons and a number of assemblies but not which assemblies?
A **It's not required, and we felt it was in our best interest to keep it as broad as possible since an FDS, which is the next submittal, is a subset of a DCS.**
Q In order to come up with the 119 assemblies did WEPCO internally have to identify to itself which assemblies those were?
A **No. We just took the lowest one we had in inventory and said this was the lowest weight we had and divided that into the number of tons and got the maximum number of assemblies it could possibly be.**
Q Did you have 119 assemblies of the lightest weight assemblies?
A **Not necessarily. But that was the maximum**



**number of assemblies. It wasn't -- it couldn't be more than that. That's how we interpreted this.**
Q Okay So whether or not you actually had 119 assemblies of whatever the lightest weight was was not something you looked at?
A **No, we did not.**
Q So from Wisconsin Electric's standpoint this DCS on page 475 covered an unspecified 119 fuel assemblies of Wisconsin Electric? Am I following you?
A **Up to 119 assemblies.**
Q Okay.
A **The most or the most -- let's see. And I would also say that the discharge no later than 12/31/93.**
Q Did you say that a final delivery schedule is a subset of the delivery commitment schedule?
A **That was my understanding when we did this form.**
Q Can you explain what that means? I don't follow you.
A **Am I speaking from my Wisconsin Electric perspective as to what it meant?**

Q Just what you know right now, how you know it.

A **Well, the FDS process which occurs one year prior to the delivery specifies the date one wants it delivered, and you go to the contract and see what else it specifies. The number of assemblies per cask, the metric tons of uranium, the range of discharge dates, and it gets down to be more specific from the number of assemblies because it's nearer to the time a cask must be provided a planning document. This is a five-years-out planning document. This is a one-year-out planning document. We are now actually getting down to discharging or dispatching casks to go pick up specific fuel.**

**So the understanding that I had then and understanding I have now is that once one submitted a DCS that blocked out a certain amount of fuel, the FDS needed to be a subset of the DCS, that one couldn't now say, Okay, I said this range over here, but now that I'm submitting my FDS I want to submit hotter fuel, different fuel, etc., because DOE's planning would have been on a different basis.**



Q So is what you're saying that the FDS is a much more specific document and identifies more closely which fuel out of the universe of fuel contained on the DCS?

A **That's --**

MR. OLSEN. Objection to the extent it calls for a legal conclusion.

A **That was my understanding of how the documents were worked and how the process would work, and that's still my understanding. And as a result of that understanding for Wisconsin Electric we kept the DCS as broad as possible.**

Q Okay Given that, what value is that to DOE? What did DOE do with the DCS?

MR. OLSEN. Objection, vague. Objection, foundation.

A **Given that information, DOE now knows Wisconsin Electric intends to have fuel picked up from Point Beach in that year and it's in the date range. For Wisconsin Electric, that's the value to DOE. It knows that, Wisconsin Electric. For other utilities with other reactors it would know which reactor and**



**which type of fuel they wanted to have picked up, if they had multiple reactors with multiple types of fuels. And they would plan accordingly.**

Q I don't understand, though, and help me. What does the DCS, the way Wisconsin Electric filled it out, what the DCS tell DOE about the kind of fuel that will actually be delivered to DOE on the day DOE shows up with the truck?

A **Well, from my perspective at that point in time it put them on notice that it's going to be anything like this, and it was their obligation to keep it open and service my needs.**

Q Sort of anything and everything?

A **That's right. I was allowed to do it, and that's what I did.**

Q Okay. So from my standpoint, the way you filled out the DCS does not narrow it down much for DOE in terms of what it's actually going to get?

A **That's correct.**

Q I think I know the answer to this question, but I'll ask it anyway. Has DOE approved any final delivery schedules for anybody?



MR. OLSEN. Objection to the extent it calls for a legal conclusion.

A **No.**

Q Has DOE received submission of a final delivery schedule from anybody?

A **I believe so.**

Q Oh, you do. From who?

A **I don't recollect exactly.**

Q Okay. These DCSs were all approved by DOE. Is that right?

A **Correct. Wisconsin Electric was of the opinion that the DCS was a binding commitment and took the opportunity to send it all ten years at once just on the chance that DOE may stop approving them in the future.**

Q Did you have any indication that that was going to happen at the time?

A **No indication, but counsel advised us that that would be a prudent thing to do.**

MR. OEHLER: I'm going to object. I'm the counsel for Wisconsin Electric, and Wisconsin Electric has not waived the attorney/client privilege, and

263

Q What was the industry's position about that?
A **The industry -- the industry's position was that, no, it should be -- it should accrue to the purchaser to proffer any fuel they wanted to move forth on.**
Q What was the DOE's position?
MR. OLSEN: Objection. Foundation.
Q Did DOE express a position during the process?
A **I guess reading the instructions and the DCS instructions they wound up coming up with the same position.**
Q So we have one resolved, bingo.
A **I guess that's true. Yeah. In retrospect, yes.**
Q How about number 003, "Adds new purchasers to the acceptance ranking queue." What does that mean?
A **I don't recollect what that one was.**
Q Do you know what is meant by "new purchaser" in that line?

264

A **I don't know. At this point it's been so many years I'm not sure what that one referred to. Which number is that?**
Q We're looking for Exhibit Number 13, I think, which is the --
A **Oh, here it is.**
Q Do the numbers correspond?
A **No. No, because these numbers are different, I think. It's a cross-reference. There was some of these issues that early on dropped off everybody's radar screen because nobody eventually cared about them. So I don't know what these lists are here or how they differ.**
Q All right. Well, if somebody figures out where we can find a description of that they'll let us know and we can move on.
A **Okay.**
Q What is issue number five, do you recall what that was about?
A **I think someone -- again, keep in mind these issues were brought up in the mid-eighties which the fact that an issue was identified meant that some**

265

**utility member thought it was important. This one to the best of my recollection would have been someone who was worried about if he reprocessed his spent fuel he wanted to deliver high-level waste, how would the metric ton equivalents be calculated.**
Q Do you recall what the industry position was on that?
A **I don't recall that we ever developed a position on this one.**
Q How about number six?
A **I don't recall the exact issue. It says we developed a position paper and transmitted to DOE. I don't recall what it was on this one.**
Q Do you recall whether that particular issue, issue number six, was resolved by the instruction that said you only put the amount of metric tons on the delivery commitment schedule that is allocated to you in the ACR?
A **I don't know what this issue was. I can't draw that conclusion.**
Q Have you got Exhibit 13 in front of you?
A **Yes, I do.**

266

Q Look on page 157, Bates number 157.
A **Okay.**
Q Does that refresh your recollection about what this issue was and how it was -- or what the status of it was at least?
A **No. Again, this document looking at it is '87. I'm not sure how it evolved by this '91 document or where it wound up. I really don't know where that one went.**
Q Well, do you recall there ever being a question about whether the contract really meant what it said when it said that the purchaser was to identify all the SNF it wishes to deliver on its DCS?
A **My interpretation of that was when we fill out our DCS at Wisconsin it was to put the broadest range down we wished to deliver.**
Q Including the quantities, all the quantities it wished to deliver?
A **No. All the fuel, the types of fuel, the fuel ranges, heat loads, weights, enrichments.**
Q Does the contract clearly identify in any way how much fuel was to be put on the DCS, what

267

quantity of fuel?
MR. OLSEN Objection to the extent it calls for a legal conclusion.
A **The contract doesn't give that guidance. The contracting officer's directions gave the guidance of how to complete the DCS form.**
Q Did the contract anywhere say the contracting officer will decide how much fuel goes on the DCS?
MR. OLSEN: I'm sorry, could you repeat?
Q Did the contract say anywhere that the contracting officer was authorized to decide how much fuel the purchaser could put on the DCS?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
A **The contract doesn't say that specifically, but the contract gives DOE the right to approve or disapprove the DCSs, and the contracting officer provided the basis for the approval or disapproval in the instructions.**
Q Number 33 is legal status of contracts not in compliance with 10 CFR 961. Do you remember what

268

that was about?
A **If I recollect, and this is one that I think was never worked on or thought about again, either, were some of the contracts that were developed and signed weren't exactly the same as the standard contract that was published in the Federal Register.**
Q Do you remember why?
A **Well --**
Q Excuse me. Do you remember how they were different than what was in 10 CFR Part 961?
A **Some -- again, there are some contracts that were signed that have different provisions because they're different circumstances in the department and the purchaser agreed to sign a slightly different contract pursuant to I guess the deviations provision of the contract.**
Q Okay. Have any of the contracts executed by the Department of Energy and the utilities been amended without going through a rulemaking process?
Do you understand what I mean when I say "rulemaking process"?
A **(The witness nods.)**

269

Q She can't take down a nod.
A **I'm thinking. I'm not answering yet.**
**There were contracts that were changed before they were signed that were different from the standard contract that was published in the Federal Register. I'm trying to recollect if there are any since then that were modified without having published something in the Federal Register. And the only thing that might approach that or might be in that class would be the settlement agreement signed with PECO Energy.**
Q Okay. And that was the one I was thinking about, too. And the question is did DOE go through any notice and comment rulemaking process prior to entering into that amendment?
A **No.**
Q Do you know why it didn't?
MR. OLSEN: Objection to the extent it's going to cause you to reveal attorney/client privileged information and information related to a settlement agreement.
Q I'm just asking you in terms of

270

administrative procedure why you amended that contract without following the rulemaking process?
A **Advised by counsel it wasn't necessary.**
Q Okay. Is issue 24 the same issue that we talked about yesterday in terms of nonfuel parts of an assembly that aren't connected to an assembly, or is that something different?
A **It's a portion of that same discussion, yes.**
Q Okay. Does the discussion yesterday apply to that, or is it different in some fashion?
A **This issue I think primarily dealt with that what would be the basis for putting these materials that were no longer part of the assembly in the queue. How would they be picked up? How would they be allocated space? It hadn't been determined.**
Q What was the industry's position on that?
A **I don't recollect. I think -- I don't recollect. I would have to go back and review whatever documents were provided to DOE.**
Q As I recall, yesterday you said you felt like the material that had once been a part of an

291

A That to me would be a system that would have one purpose being storage, one purpose being transport, and would be comprised of the inner canister as we just talked about, the overpack for storage, whether it's horizontal or vertical, and an additional overpack for transport.
Q The overpack for storage being the concrete cylinder you described a minute ago?
A Concrete cylinder or a mausoleum, whatever.
Q Okay. And is there an additional overpack or a different overpack for transportation with the dual-purpose cask?
A For that kind of system it's a different overpack. There's also dual-purpose casks that don't have canisters, that are just transportable and storable.
Q Okay. From a technical standpoint does the type of -- and I'm limiting myself to standard fuel right now. From a technical standpoint does the type of dry storage system being used by a utility have any impact on DOE in terms of receiving that utility's spent fuel?

292

MR. OLSEN: Objection. Vague.
A The type of storage should have no impact on the integrity or quality of the spent fuel that, when removed from the cask, DOE would receive.
Q Okay. Is it DOE's current plan to remove fuel from the casks rather than to use the casks, assuming they're licensed for transport?
A It's DOE current plan to accept spent fuel, not to accept the containers that they're stored in.
Q Okay. Does that mean that DOE will need to procure a transport system for the spent fuel?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
Q Technically. I'm trying to understand how the process work?
A The answer is yes, and let me amplify the last question. The department has had discussions with utilities and has corresponded with utilities and expressed its programmatic intent to discuss including in a contract amendment dual-purpose systems licensed for storage and transport as acceptable waste forms, and the department intends to do that. In a contract

293

amendment.
So those casks, when the contract is amended, it's our intent to have -- the program has expressed that intent and to then include those as acceptable waste forms under the contract.
Q Okay. What difference does it make to the utility whether or not DOE accepts those systems, the storage systems in use by the utility as a waste form or not?
A The difference it makes to the utility is the same difference it makes to the department is that if the department doesn't take them the utility will have to unload that material and dispose of that cask.
Q Okay.
A If the department takes them we will have to unload that material and dispose of that cask.
Q Okay. Is that because the casks at the current time are not licensed for disposal?
A They're not licensed for disposal.
Q What is the status of the contract amendment process by which the contract would be amended to specify that the storage systems would be

294

accepted as spent fuel?
A We've never had -- at this point we've never had discussions with the utilities on that issue.
Q I'm sorry, I must have misunderstood your earlier testimony. I thought you said that you had decided to amend the contract?
A We offered to enter into discussions to amend the contract.
Q Has any decision been made by DOE with respect to amending the contract to accept the dry storage systems?
A We've offered to enter into discussions to amend the contract, but we haven't done it yet.
Q And the reason for my question, you said you offered to discuss it but not offered to amend it. Do you see the distinction in my question?
A I think I would have to read the letter that was sent out in 1993. It's available to everybody. It says offer to begin -- offer to initiate the contract modification to include this. But, again, we need to look at that. We haven't

spec'd out what we need. Some of these canisters will have an impact on the system. Some, should we go down this path and enter into an amendment, may be standard; some may be nonstandard. Haven't yet determined what those criteria would be.

(Deposition Exhibit Zabransky 33 was marked for identification and was attached to the transcript.)

Q Mr. Zabransky, we've marked Exhibit 33 to your deposition, a 1987 annual capacity report. Did you have any responsibilities either at Wisconsin Electric or for the UNWMG for reviewing or commenting on this document?

A I don't recollect.

Q Do you recall having seen the document before?

A I've seen the document before.

Q Do you recall having seen it at or about the time it was issued?

A I'm sure -- I'm sure I saw it when it was issued.

Q In the time you've been at the Department



of Energy have you had any occasion to use this document in the course of your duties?

A This document? No.

Q On the first page of the document under Summary.

A Okay.

Q The second paragraph says "The system configuration used as the basis for this report is defined in the plan amendment. It includes a monitored retrievable storage facility as an integral system component." Do you know how the waste-management system as described in this ACR in June of 1987 was designed?

A What do you mean "designed?"

Q From an operational standpoint. And in what way was an MRS facility an integral system component, for instance?

A I don't recollect the details of what DOE had planned for that design, no.

Q Well, when I say "design" I'm not talking about technical design. I'm talking about what function was the MRS supposed to serve.



A I don't recollect.

Q Okay. At the point in time of this document, were there any linkages between MRS development, any statutory linkages between MRS development and repository development?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A I don't recollect.

Q On page two of the document, the last sentence in the first paragraph that actually begins on page one says "As specified in the contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers." As a person involved with the utility nuclear waste management group, what significance did you place on the ACR?

A The significance I placed on it at that point in time was that it gave me an indication under what the planning basis was here as to what fuel -- which fuel I could expect to be removed from my plant as a planning basis. So it gave me, gave Wisconsin Electric, an indication of what this system meant for



Wisconsin Electric, how many assemblies would leave Point Beach in what year as a planning basis.

Q What did you take it to mean that the ACR was not contractually binding on DOE?

A That I couldn't rely upon them to do this.

Q What did you take it to mean that it was not contractually binding on the purchaser?

A That they couldn't make me do this, provide that fuel.

Q Anything else?

A That's it.

Q Did you take it to mean that the purchasers weren't bound to the acceptance rates in the document?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A I didn't draw that conclusion.

Q Did you draw the opposite conclusion, that the purchasers were bound to the acceptance rates in the document?

A Didn't draw that conclusion.

MR. OLSEN: Again, the same objection, that it calls for a legal conclusion.

**progressive storage because I couldn't determine exactly how much storage I needed.**
Q Did you conclude that you couldn't depend on this document for purposes of your own internal planning?
MR. OLSEN: Objection, vague.
A **I concluded that I couldn't rely upon the rates in this document for continued operation of my plant.**
Q I think that's a different answer than the question I asked, though. Did you, for the purposes of determining how much spent fuel storage capacity you needed to install at Wisconsin Electric, what weight did you give the acceptance rates contained in this document and the commencement date contained in this document?
A **It was a consideration. I don't know exactly what weight was given since we needed storage prior to the date that the service was to commence anyway.**
Q Did you say it was or was not?
A **It was a consideration, but since we needed**



**storage prior to 1998, it was one of the factors that was considered, that DOE could show up and remove spent fuel. But, then again, maybe they weren't going to. It needed to be factored in accordingly.**
Q See the middle -- and I'm looking at page Arabic numeral 4 under 2.0, Waste Acceptance Projections of the document. Paragraph begins with Acceptance Rates and ends with 2007.
A **Uh-huh.**
Q First of all, do you know why the Department of Energy eliminated the upper bounding case where both schedule restrictions and capacity restrictions on the MRS that was contained in the 1990 ACR was eliminated from the 1991 ACR?
MR. OLSEN: Objection, foundation.
A **I don't know why they did that.**
Q Do you know why in this document the DOE assumed away the schedule linkages but not the capacity limit?
MR. OLSEN: Objection.
Q For MRS?
MR. OLSEN: Foundation.



A **I do not know why they assumed away the schedule and not the capacity.**
Q Do you know how the Department of Energy concluded that if the linkages, the schedule linkages were not eliminated that the initial acceptance of SNF by DOE could not start until at least 2007?
MR. OLSEN: Objection. Foundation.
A **No, I do not know how they concluded that.**
Q Have you done any such analysis in your work at the Department of Energy?
A **No, I do not do that.**
Q What was Wisconsin Electric's reaction to the December 1991 annual capacity report? You mentioned that they didn't like the lower rate in the 1990.
A **I think the general attitude was that this was not what we wanted to see. Obviously we liked the higher rates better. We wanted DOE to perform faster.**
Q Did you express that in any way to DOE?
A **I don't recall. We talked yesterday, you've seen other letters that came out from Wisconsin Electric. I don't know if there was one for this**



**specific exercise or for other exercises.**
Q Okay. Do you know whether the EEI responded to -- or any other nuclear industry group responded to the ACR in a formal way?
A **I don't know.**
**(Deposition Exhibit Zabransky 37 was marked for identification and was attached to the transcript.)**
Q Mr. Zabransky, we've marked as Zabransky Exhibit 37 a document titled 1994 Acceptance Priority Ranking and Annual Capacity Report, and it's dated March 1995. And it has a Bates number of EDB-001-0136. Do you recognize that document?
A **I don't recognize this version of the document. I believe it's -- I don't really recognize it, but yes.**
Q Does it appear to be a draft?
A **It appears to be a draft.**
Q And have you ever seen the draft?
A **I'm sure I've seen a draft. I'm not sure I've ever seen this copy of a draft.**
Q Do you recognize any of the handwritten

notes, who those are the notes of, in the margins of the document?
A No, I don't.
Q Did you participate in the drafting of the 1995 annual -- or acceptance priority ranking and annual capacity report?
A Yes, I did.
Q What was your role in drafting that document?
A Well, at that point in time the contractor delivered a draft document. I put it in the review process. Comments were received back to the contractor and they incorporated the comments, and I prepared the document.
Q Who was the M&O contractor at that time?
A That was TRW.
Q Was there a particular person at TRW that was most involved in that?
A I don't know who specifically it was at the time. Could have been either Billy Cole, Bill Teer. One of them perhaps.
Q Okay. Was there ever a discussion within



the Department of Energy regarding whether or not an annual capacity report should be issued in 1995 given the uncertainty in the commencement date of the program at that point?
MR. OLSEN: Objection, foundation.
A I don't recall discussion of that type.
Q Do you recall any suggestion by anybody that, We don't know when we're going to be able to perform so we shouldn't be putting out an annual capacity report?
A I don't recall discussion of that, no.
Q Look on page one of this document that's marked Zabransky 37. And the last sentence says "As specified in the standard contract the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers." It appears someone has lined that out and someone else has written in "STET" in the margin next to it.
A Or the same person. I don't know who did either or.
Q Do you recall any discussion about whether or not that sentence should be in the '95 ACR?



A Can I speak to my counsel for a second?
Q Sure.
(The witness and Mr. Olsen confer.)
MR. OLSEN: I've just had a conversation with Mr. Zabransky, and I'm going to direct him not to answer that question because it will require him to reveal attorney/client information.
MR BLANTON: About whether or not there was a discussion? I haven't asked him yet what the contents of the discussion are, but all I'm asking is whether there was a discussion.
MR. OLSEN: He can answer the question whether there was a discussion.
A I believe there was a discussion on that sentence.
Q Was that discussion with counsel?
A I believe it was.
Q Who was the counsel you discussed it with?
MR. OLSEN: I'm going to direct him not to answer that question.
MR. BLANTON: The identity of his counsel is not privileged.



MR. OLSEN: Which of his lawyers told him to do that is privileged.
MR. BLANTON: Told him to do what?
MR. OLSEN: His counsel is the Department of Energy's general counsel's office and the Department of Justice. The identity of the counsel who told him this is privileged.
MR. BLANTON. I don't think that's right. I don't think that's a correct statement of what the law is.
Q Mr. Zabransky, are you going to refuse to answer that question based on your counsel's advice?
A I guess so.
Q Okay. Did you discuss with anybody outside the presence of your counsel whether or not that sentence should be in the 1995 ACR?
A I don't recall.
Q Who else was involved on the part of DOE in the drafting of the 1995 ACR other than the people you've mentioned at TRW, you, and Department of Energy counsel?
A I believe Nancy Slater could have been

**involved, and Alan Brownstein may have been involved in this as well.**
Q Do you recall whether you discussed this with Mr. Brownstein or Ms. Slater?
**A Not outside of the discussions that we had with counsel.**
Q You see the margin notes below the STET on the right-hand corner? They have a big X through them
**A I see them. Okay.**
Q Appears to me to say, "This is not stated in contract and is a conclusion we have not yet reached or resolved."
**A That's what it appears to say.**
Q Do you recognize that handwriting?
**A Not really, no.**
Q Do you know what that refers to?
**A It's pointing to that sentence. I presume it's pointing to that sentence. I don't know if it is or isn't.**
Q Do you know what that means?
**A No. I could speculate it means as to the**



**deletion of that sentence or not, but I don't know.**
Q Is there a statement in the standard contract about whether or not the ACRs are contractually binding?
**A I believe there is under Article --**
Q 4.B.5, is that it?
**A 4.B.5 -- I don't see it there. I guess not. I don't see that statement in that provision at this time.**
Q Okay. Do you know what the origin of that statement in the earlier ACRs was, where that came from?
**A No. It was in there from the first ACR.**
Q Okay. Did you ever have a conversation with the contracting officer about that statement?
**A No, I didn't, not with Ms. Tomasoni.**
Q How about with any of the previous contracting officers?
**A I didn't work with any previous contracting officers.**
Q How about any contracting officer since then?



**A Never come up.**
Q The statement was eventually in the '95 ACR, correct?
**A I would have to look, but I believe it is.**
Q It's marked as Exhibit 5, and you might as well get it out because that's the next one on the list.
**A It's in there, yes.**
Q Look on page four of the document that's marked Exhibit 37.
**A That's this one. Okay.**
Q Do you recall why the -- or was the passage relating to the civilian radioactive waste management program plan deleted from the final document?
**A I would have to look.**
**It appears to have, yeah.**
Q It was deleted?
**A Yes, it was.**
Q Do you know why?
**A No.**
Q There's a statement at the end of that passage that says "Although the program plan does not



include a monitored retrievable storage facility, the existing storage capacity restriction imposed by the act is still in effect." Do you see where I'm reading?
**A I see the cross-out.**
Q Yeah. It's crossed out. Did that come out of the '95 ACR?
**A Did that --**
Q Was that statement in the '95 ACR?
MR. OLSEN: I just want to note for the record an objection that the 1995 ACR speaks for itself as to whether or not somewhere in this entire document this paragraph appears.
Q Well, do you know why you took all this stuff out?
MR. OLSEN: Objection. Assumes facts not in evidence.
**A I don't know what version this was, who prepared it, who reviewed it. So the fact that it exists, I don't know whose document it was or at what state of play this was. This could have been a contractor-developed internal document that we never**

**saw.**
Q Do you know whether the '95 ACR that the Department of Energy issued assumed that the existing storage capacity restrictions imposed by the Nuclear Waste Policy Act of 1987 were still in effect even though the program plan did not include a monitored retrievable storage facility?
**A It assumed that the limitations were still in effect. I don't know for a fact that the program did not include a monitored retrievable storage facility.**
Q How did you pick the rates that went into the '95 ACR?
MR. OLSEN: Objection, foundation.
**A They were the same rates that were in the previous ACR.**
Q Okay. Was there any analysis done of whether the rates should change or stay the same from the previous ACR?
**A I don't believe so.**
Q Was there any discussion about whether the rates should go up or down?



**A I don't recollect that there was.**
Q Just cut and paste? Is that how you did the '95?
**A '95 was pretty much a reissue of the previous document from the ACR perspective. The APR changed.**
Q There's a sentence circled on this page that says "Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years." Do you see that?
**A I see that.**
Q And somebody has written out to the margin "move to page three." Do you see that?
**A Okay.**
Q And if you look at page three of the document it looks like there's an arrow for an insert, that says "insert page four." Do you see that?
**A I see that.**
Q What were the uncertainties associated with



the date of commencement of the operation of the waste management system at this point in time?
**A At that point in time in 1994 I believe the negotiator's office had been terminated. There was no active program looking for a voluntary MRS, and it became less certain that there was -- there was great uncertainty with respect to the '98 date.**
Q More certain that there would not be an MRS by 1998?
**A That's a fair statement.**
Q Is that a fair statement?
**A That's a fair statement.**
Q Do you recall any discussions within the Department of Energy about whether or not dates should be eliminated from the acceptance allocations in the '95 ACR?
**A Yes, I recall that discussion.**
Q Who was that with?
**A With Mr. Brownstein and Ms. Slater.**
Q And yourself?
**A And myself.**
Q Can you tell me who said what?



**A I believe there was -- Ms. Slater advocated removing dates, to my recollection, going back to how the ACRs used to be.**
Q Had there ever been one without dates on the years of allocations?
**A I believe so. Let me check. Like this one here which says, Year one, Year two, Year three.**
Q Let me see.
MR. OLSEN: Let the record reflect that Mr. Zabransky has pointed to exhibit number --
MR. BLANTON: Zabransky 36, which is the December 1991 ACR.
**A And the 1990 ACR also has year one, year two, year three.**
Q Look at page five of Zabransky 36.
**A Okay.**
Q There's a table there that has the rates for each year starting in 1998. Is that correct?
**A There is, yes.**
Q And we can go through this process, but do you remember that all the other ACRs have a similar table?

A **I'll look, but let me verify.**
**Yes, other ones do.**
Q And is there any such table in the '95 ACR?
A **No, there isn't.**
Q So that's a change from previous ACRs?
A **The change was to remove the years from Table 1 of this document, yes.**
Q And why was that done?
A **Discussion centered around the uncertainty with when year one would be.**
Q And the uncertainty regarding when year one would be resulted from what?
A **When a facility would be in operations.**
Q You say you and Mr. Brownstein and Ms. Slater discussed this issue. Is that right?
A **Yes.**
Q Did anybody take the opposite view that the years should stay in the ACR?
A **I'm sure it was a discussion that had other viewpoints. I don't know who took what view, but eventually the dates came out.**
Q What was the issue? Why would not they



have come out?
A **Why would not they have come out?**
Q Why would they not have come out of the ACR given that you didn't know when you would start?
A **I can't recollect all the details of the conversation. One view was to leave it in the way it was. Another view was to take it out, change it. And Ms. Slater prevailed. I believe that's how that happened.**
Q Okay.
A **That's my recollection of the situation.**
Q I refer to Exhibit 5 of your deposition, which is the '95 ACR. You got it right in front of you.
A **Okay.**
Q Does that document anywhere inform the reader about when year one is?
MR. OLSEN: Objection. The document speaks for itself.
A **I have not found such a statement in the document as to what year year one is.**
Q Would it be possible for a utility using



that document to determine when its delivery commitment schedule was due?
MR. OLSEN: Objection, foundation.
A **I don't believe so.**
Q Are the rates contained in the 1995 ACR the rates DOE currently plans to use when and if it commences spent fuel acceptance?
A **The rates contained in the ACR, '95 ACR, were predicated upon some elimination or some restriction on performance. DOE's current plans assume a repository and assume no restrictions on performance and, no, these are not the same rates that we currently plan after the operation of the repository.**
Q So the restrictions on -- or the amount of the rate is dependent on the restrictions on performance?
MR. OLSEN: Objection. Calls for a legal conclusion.
MR. BLANTON: I'm just making sure I understood his last answer.
A **As the document states, and let me find it**



**here -- well, it's based upon 8200 tons. That number the first ten years was predicated on some restriction in capacity.**
Q Are there no capacity restrictions now because no MRS is assumed?
MR. OLSEN: Objection, calls for a legal conclusion.
A **The planning basis right now is for a repository, so there would be no statutory restrictions on annual capacity. There still is a statutory limit on total capacity of 70,000 metric tons.**
Q Well, and when you say the planning is based on a repository, you mean a repository with no MRS, correct?
A **Currently the planning basis for the program does not include a monitored retrievable storage facility.**
Q Okay. When did the planning basis convert from one including a monitored retrievable storage facility to one including only a repository?
A **Don't know exactly. That would have been**

**sometime in the mid-nineties.**
MR. OLSEN: Stan, I think Dave needs a short little break. Would this be a good time?
MR. BLANTON: Sure.
(There is a recess from the record.)
Q If you would look back at page four of Exhibit 37. Do you have that in front of you?
**A Yes, I do.**
Q Do you recognize whose handwriting that is at the bottom of the page that's marked out, has a sentence that says "the waste management system" and then I can't -- I'm not sure what the rest -- envisions --
**A I don't.**
Q Any idea who wrote that?
**A No, I don't. It's like the rest of the -- appears to be the same writing as whoever wrote the rest of it, and I don't know who that is or where this document came from.**
Q Okay. Referring back to -- it's easier for us to both have the same language -- Exhibit 5, do the uncertainties associated with the date of commencement



of operation of the waste management system have anything to do with DOE's decision to stop processing DCS submittals?
MR. OLSEN: Objection. Vague.
**A I don't think that this statement here and this discussion here had anything to do with that decision.**
Q Okay. So the fact that you don't know when you could start to accept waste had anything to do with the DCS process being suspended?
**A I think the decision to suspend the process had to do with the determination that there was a commitment and that there was an uncertainty as to date, but it's not tied to this document at this time.**
Q I'm not asking if it's tied to the document. I'm asking if just the uncertainties associated with when a facility will be available is the reason you determined to suspend the DCS process?
MR. OLSEN: Objection. Vague.
**A Again, as I answered yesterday, there was a discussion; we were advised to suspend the DCS process for a number of reasons by counsel.**



Q Well, as -- did I interrupt your answer?
**A No.**
Q And as I understand it, you're taking the position that your liability to the utilities is limited by the suspension of the DCS process. Isn't it a fact?
MR. OLSEN: Objection, assumes facts not in evidence, and objection to the extent it calls for a legal conclusion.
**A I'm not -- I don't know what position you're referring to.**
Q You told me yesterday the first hour of your deposition that unless a utility has an approved DCS that the department has no obligation to that utility.
**A I did say that, yes.**
Q Because of the suspension of the DCS process it's impossible for a utility to have a DCS approved, correct?
**A That's correct.**
Q Why has the department suspended the DCS process?



MR. OLSEN: Objection. I believe this was asked and answered.
MR. BLANTON: No, he said on advice of counsel, and I think we're entitled to know why the DCS process has been suspended.
**A I'll answer the question. I think the belief was that approving DCSs committed the department to that obligation, and the decision was to suspend that commitment.**
Q What was the problem with committing the department to that obligation?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
**A Again, counsel advised us it would be appropriate, it would be the correct move to stop processing the DCSs.**
Q So you wouldn't have that obligation?
MR. OLSEN: I want to direct the witness not to answer to the extent that you're going to have to reveal attorney/client privileged conversations. Also calls for speculation.
MR. BLANTON: I think you put whatever the

motivation was behind suspending the DCS process I think is right in issue, and I think we're entitled to know that. I mean, your filings in all the cases suggest that nobody has -- that DOE doesn't have an obligation to anybody that doesn't have an approved DCS. The witness has testified to that. He also testified that the DCS process has been suspended. I think we're entitled to know why, even if it is on advice of counsel. I think we're entitled to know what the advice was. I'm asking the question.

MR. OLSEN: And I'm instructing him if he has to reveal the specific advice from a lawyer that I'm directing him not to answer the question.

Q Mr. Zabransky, are you refusing to answer that question on the advice of your lawyer?

THE WITNESS: Can I speak to my lawyer for a second?

Q Well, I would like to have an answer to that question. Are you going to tell me whether you're going to refuse or not after you talk to him?

**A I would like to talk to him first, if that's okay with you.**



Q Okay.

MR. OLSEN: Would you like to step outside?

THE WITNESS: Yes.

MR. OLSEN: Please go off the record while we step outside.

(The witness and Mr. Olsen and Mr. Crawford confer outside the room.)

**A I'm not going to answer the question.**

Q Okay. At some point in order for the system to operate will the DCS process have to be recommenced?

**A At some point the DCS process will have to be recommenced in order for the system to operate, yes.**

Q Will that have to be at least 63 months before the repository is scheduled to commence operations?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

**A It would be my understanding that that would be the appropriate time.**

Q Will that be your technical advice to the



contracting officer?

**A That would be my technical advice.**

Q Do you understand that the DCS process will be suspended until 63 months before the commencement of repository operations?

MR. OLSEN: Objection. Calls for speculation.

**A I don't have that understanding. I don't think anybody's made that decision at this point.**

Q What was the MPC program?

**A The MPC program was a multipurpose canister program and it was an effort the department had, I believe beginning in -- I don't know if it was '92, '91, that time frame, to develop a -- I would say a system that would be suitable for storage, transport, and disposal.**

Q How would that work?

MR. OLSEN: Objection, vague.

Q Do you understand my question?

**A You're asking me how technically it would work?**

Q Well, what would the process be? Assuming



an MPC were developed, how would the department use it?

**A The MPC program was developed while I was still at Wisconsin Electric. My understanding as to how the department was thinking at that time was that it would develop a canister-based system that would be suitable, as I said, for storage, transport, and disposal and would allow them to be deployed at utility sites for storage prior to pickup and ultimately to place them directly in the repository.**

Q Was the MPC system envisioned to be an alternative to a monitored retrievable storage facility?

**A It was my belief and my understanding that it was viewed as a way of -- their way at that time of trying to meet the '98 date by deploying canisters as opposed to removing fuel.**

Q Okay. But if the fuel is going to be stored on the utility site, there wouldn't be any need for an MRS. Is that correct?

**A That's true.**

Q Was that the thinking at the time?

A I think the thinking at that time was that the MRS was not going anyplace.
Q And that was still back when you were at Wisconsin Electric?
A Yes.
Q Was that also the thinking when you prepared the 1995 annual capacity report, that the MRS process wasn't going anywhere?
A I believe by that point in time the MRS process had ceased.
Q Okay. And why in the 1995 annual capacity report did you continue to impose the MRS capacity limitations on the acceptance rate?
A There was no discussion of changing the rates that were in the ACRs from the previous years, so I don't recall why -- there was no specific why -- it was not a discussion to change them.
Q Well, if an MRS was not in the plans, then those capacity limitations would not apply, would they?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.



A The capacity limitations were on the MRS. If the MRS was not -- not in the system, there would be no constraints, but there also would be no facility to which to move fuel.
Q Okay. On page four of Exhibit 5 to your deposition, at the top of the page it says "The projected nominal acceptance rate also reflects the capacity limit imposed by the act on such a storage facility prior to repository operations." Why is that sentence in the document if the MRS was not part of the department's plan at that particular time?
A Because they did -- they do reflect that.
Q Well, I guess the better question is why were the limits imposed if the MRS wasn't a part of the plan?
MR. OLSEN: Objection, asked and answered.
MR. BLANTON: Well, asked.
A This rate was left in the document from the previous version. No one discussed changing the rates.
Q What does nominal acceptance rate mean? What does the word "nominal" mean there?



A Nominal historically in all these documents is used to reflect the fact that in any given year, if you look at the detail tables, it's not exactly any of the numbers, it's somewhere around the numbers. It's either 402 or 607 or 898. So there's not -- there's a rounding, so it's a nominal number of about 400 or about 900.
Q Refer to the 1991 annual capacity report. I'm not sure what --
MR. OLSEN: I think it's 36.
Q Turn to page five.
A I'm on page five.
Q Table 2.1. The table is entitled Projected Waste Acceptance Rates for Spent Nuclear Fuel, and in Exhibit 5 on Table 1 it's "projected nominal waste acceptance rates for spent nuclear fuel." Do you know why you inserted the word "nominal" from '91 into the '95 document?
A To clarify the point that in any given year it wasn't exactly that number. It was around 900 or around 600, because again the individual allocations in the table don't add up, as you go back in the



document, to exactly those numbers. If I can point you, for instance, to page B.15.
Q Of '91?
A Of Exhibit 5.
Q Okay.
A Which is Table B-6.
Q I don't have it in front of me.
A This one here.
Q Okay.
A Look at the bottom of the page. It will have a number of 901.7 as opposed to exactly 900. So the summary table was annotated to reflect that it was nominally 900.
Q Okay. The statement after that sentence says "The department will continue to process" -- I'm back on page four of Exhibit 5. It says "The department will continue to process DCS submittals on an annual basis." Do you know how long after this document was published that the decision was made to suspend the DCS process?
A I believe it was sometime over a year later.

Q Did the Department of Energy at any point starting with the time this document was published, March 1995, referring to Zabransky Exhibit 5, starting in March 1995 did the Department of Energy ever use the acceptance rates published in that document for its own planning purposes, for the purposes of planning for the operation of the waste management system?
**A The Department of Energy never used these rates for the planning for the operation of a repository facility.**
Q I'm not asking -- not my question.
**A Okay. Repeat the question.**
Q Did you ever use these rates beginning in March of 1995 for the planning for the federal waste management system?
**A No, we did not.**
Q Let me show you Exhibit 38
(Deposition Exhibit Zabransky 38 was marked for identification and was attached to the transcript.)
Q Which is unsigned, but it has "official



file copy" on the second page and has your name down at the bottom of the second page. Do you know what this document is?
**A This is a draft of a transmittal letter that would have gone from Sam Rousso to the director, who at that time was Dan Dreyfus, recommending approval for the publication of the '95 ACR. I believe that's what it is. The '94 -- '94 ACR, published in March '95.**
Q Is that document the one that's marked Exhibit 5?
**A That's what this document refers to, yes.**
Q And all those initials to the right-hand side indicate various approvals of the document?
**A Right, to that point in time.**
Q Okay. Why did the Department of Energy publish a document to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purpose of planning the system?
**A The department carried over the rates it had in the previous ACR and did not change them.**



Q Was the department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?
**A I believe that that was a consideration.**
Q Were there any other considerations that you can think of for using those rates?
**A There was no other basis to develop any other rates at that point in time.**
**(Deposition Exhibit Zabransky 39 was marked for identification and was attached to the transcript.)**
Q We have marked as Exhibit 39 to your deposition, Mr. Zabransky, a document entitled Analysis of a Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program. Are you familiar with that document?
**A I've seen this document. I'm not familiar with it, but I know what it is.**
Q Did you participate in any way, shape or form in either providing any of the information for the document or helping draft it?



**A No, I don't believe I did.**
Q Do you use it in the course of your duties in the Department of Energy?
**A I don't use this document in the course of my duties, no.**
Q Let me refer you to page eight of Exhibit 39, Mr. Zabransky.
**A Okay.**
Q You found it before I did.
**A I found it.**
Q Do you know where those receipt and placement rates came from?
**A I don't know specifically where they came from, no.**
Q As far as you know, were those the rates that the DOE was using for planning purposes as of September of 1995?
MR. OLSEN: Objection, vague.
Q Do you understand my question, Mr. Zabransky?
**A Those were the rates that were used to cost out a repository and its operations that were used in**

395

**president after Jim. Jim Zach took over for Bob Fay. After Jim left Bob Link took over for Jim. Ed left, I reported to Bob, and eventually a short time after that Gary Krieser came in and I reported to Gary Krieser.**

Q So you reported to Gary Krieser who reported to Bob Link?

A **That's correct.**

Q And as far as the vice president of the nuclear area, it went from Bud Fay to --

A **Jim Zach to Bob Link.**

Q To Bob Link. Was Mr. Link still there when you left WEPCO in 1994?

A **Yes, he was.**

Q You said Mr. Lipke left. Did he leave Wisconsin Electric?

A **Yes, he did.**

Q In your position as manager of nuclear fuel services did you have the authority to bind or commit Wisconsin Electric?

A **At the end I was able to sign commitments for deliveries of materials, yes. In the beginning,**

396

**no.**

Q Approximately what time would you have had that authority?

A **Not until I believe late '93, mid -- yeah, late '93, '94.**

Q And can you describe more specifically for me the precise authority that you had?

A **From my recollection I was able to commit to orders for materials and deliveries of uranium and things like that.**

Q In that position did you, when you had this authority did you represent the position of Wisconsin Electric with regard to the Department of Energy for example?

A **I always represented the position of the company but I never had the authority to bind the company in those areas, and that's the reason, for example, that Bob signed all the DCSs. Bob had the authority to sign the company, and that's how Wisconsin Electric did business and kept the authority at the vice president level.**

Q When you left Wisconsin Electric and joined

397

the Department of Energy, did you take any Wisconsin Electric records or documents with you?

A **Not that I recall.**

Q I would like to ask you to look at Zabransky Exhibit 1.

MR. OLSEN: Is that also the contract?

MR. OEHLER: Yes.

A **Is it the '83 or the --**

MR. CRAWFORD: The final one.

MR. OLSEN: It's the final contract.

A **Okay.**

Q And I'd ask you to look at Article 5, please.

A **Okay.**

Q And I believe that you reviewed with Mr. Blanton Article 5.B regarding delivery commitment schedules. Is that correct?

A **Yes.**

Q And I believe that during that discussion he gave you delivery commitment schedules for Wisconsin Electric which you then reviewed. Is that correct?

398

A **Yes. We looked at the ones that were sent in, yes.**

Q And you indicated that those were approved by the Department of Energy?

A **Yes.**

Q Okay. I would like you to look at subsection C under Article 5. Can you tell me what that is entitled?

A **Final Delivery Schedule.**

Q Am I correct that the final delivery schedule would come after approval of the delivery commitment schedule?

MR. OLSEN: Objection, calls for a legal conclusion.

A **The sequence is the contract calls for that to come after the approval of the delivery commitment schedule.**

Q Okay. And do you know whether Wisconsin Electric submitted final delivery schedules to the U.S. Department of Energy?

A **I don't recollect.**

MR. OEHLER: I'm going to have marked as

that did not include counsel, what do you recall about those discussions?
A We discussed that we needed to discuss with counsel how to deal with this.
Q Do we call that punting?
A We call that having received prior direction.
Q Could you look down at the third paragraph. There's a reference to a letter from GA.
A Yes.
Q Do you know who GA is?
A I believe that would be General Atomics.
Q I want to refer you to the date again of Exhibit 47, January 5th, 1998.
A Uh-huh.
Q Do you remember --
A Okay.
Q January 5th of 1998?
A Yeah.
Q Okay. Do you remember six months later Wisconsin Electric asking DOE to accept certain fuel assemblies from Wisconsin Electric because Wisconsin



Electric was concerned that it had no place to store those assemblies and that it might have to shut down the Point Beach nuclear plant?
A I remember that discussion took place, yes.
Q Okay. My recollection is that DOE did not agree to pick up any fuel assemblies from the Point Beach nuclear plant. Is that correct?
A I think that's my recollection, too.
Q Wisconsin Electric, however, I believe you also testified had approved delivery commitment schedules?
A That's correct.
Q And I believe that you indicated that while you were at Wisconsin Electric one of the reasons why Wisconsin Electric submitted the delivery commitment schedules was they found that to be I believe your term was a binding commitment. Do you recall that discussion?
A That's correct.
Q If DOE approved Wisconsin Electric delivery commitment schedules and they represented, to use your words, a binding commitment, why did DOE refuse to



pick up fuel assemblies from Wisconsin Electric in mid-1998 when Wisconsin Electric asked DOE to do so?
A I think at the time DOE was of the opinion and is of the opinion it has no place to bring that fuel. So that was a discussion that took place with Wisconsin Electric and others, and DOE's position was that it's unable to fulfill that commitment by moving that fuel.
Q When Wisconsin Electric submitted the DCSs, again in the belief that it was a binding commitment, did Wisconsin Electric rely upon that portion of the contract which included the final delivery schedule provision that we just reviewed?
MR. OLSEN: Objection, vague. Objection, foundation.
A I'm not sure what you mean by "rely upon."
Q Okay. Let's go back to what I said.
A Okay.
Q You indicated that Wisconsin Electric submitted delivery commitment schedules for approval because it believed that it was a binding commitment.
A Correct.



Q Okay. And who made that decision at Wisconsin Electric, that they should submit the ten delivery commitment schedules at one time?
A I think that was a discussion that took place between me and Bob Link and, if Gary was involved, Gary at the time depending on the time frame and concluded that there were good and sufficient reasons to do that.
Q And what were those reasons?
A We felt that it would basically cause the Department of Energy to commit to picking up that spent fuel at those dates. And if they didn't, that we would be able to hold them responsible for not meeting that date. And the reasons to do all ten was to get them in before they changed their mind and stopped doing something.
MR. OEHLER: Let me have a moment.
MR. OLSEN: Uh-huh.
MR. OEHLER: I have no further questions of Mr. Zabransky at this time. Similarly to Mr. Blanton, however, I reserve my right to continue this deposition after documents that the Department of

forms. And is it correct that a utility did not have to identify specific assemblies --

A **That's correct.**

Q Let me just finish. -- in the DCS form?

MR. OLSEN: Objection, calls for a legal conclusion. Objection, asked and answered.

A **That's correct.**

Q I would like to go back to the Wisconsin Electric DCS forms.

I've referred you back to Zabransky Deposition Exhibit 30, which I think you previously identified as Wisconsin Electric DCS submissions.

A **Yes.**

Q Do you see that? And do the Wisconsin Electric DCS submissions identify range of discharge dates -- let's look at the one labeled 472. That range of discharge dates is 20 years. Is that right?

A **That's correct.**

Q So according to this form Wisconsin Electric could have submitted any fuel assemblies discharged any time during that 20-year period. Is that correct?



A **Correct.**

Q Will you look at, continuing on in Deposition Exhibit 30, the page labeled 483 at the bottom.

A **Yes.**

Q Does this DCS form reflect that Wisconsin Electric was submitting a range of discharge dates from 1972 to '01, 2001?

A **That's what the form reflects.**

Q All right. And so that would reflect that Wisconsin Electric was going to supply fuel assemblies discharged anywhere during approximately a 29-year period?

MR. OLSEN: Objection. Calls for speculation and objection to the extent it calls for a legal conclusion and also the form speaks for itself. You may answer.

A **That reflects that the range of discharge dates that could be selected for delivery would be in that period of 29 years.**

Q Do you know what the planning value to the DOE would be of getting a DCS form that indicated that



it was going to get some spent fuel assemblies discharged anywhere during a 29-year period?

MR. OLSEN: Objection. Foundation. Objection, calls for speculation.

A **Planning value is they're going to Point Beach and they're picking up fuel from Point Beach.**

Q And apart from the location, there really isn't much planning value associated with this, is there?

MR OLSEN: Objection, vague. And objection, borderline argumentative here, so...

A **The form was filled out in accordance with the instructions.**

Q Could you answer my question, please.

MR. OLSEN: Argumentative, please.

A **There's planning value here to the extent they were required to provide it.**

Q Well, Mr. Zabransky, there's a tremendous range in terms of I guess what you refer to as the heat of the spent fuel in fuel that's been discharged over a 29-year period, isn't there?

A **There could be, yes.**



Q And apart -- well, can you identify what the planning considerations were for getting this DCS information?

MR. OLSEN: Objection, vague. Go ahead.

A **At this point in time, before delivery, it was primarily to get an idea of where people expected us to go and what they expected us to do so we could plan at that level and start deciding what the appropriate equipment would be.**

Q Well, where people expected you to go was what reactor. Is that correct?

A **Correct.**

Q And how would that impact on the DOE's plan?

A **To know what kind of equipment that would need, whether it would be a truck site, a rail site whether it was going to be in Maine or in California.**

Q Well, apart from whether the location would be served by truck or rail or the general geographic area of the country, were there any other planning considerations associated with the location?

A **To the extent it was made available, some**

451

**idea of the fuel that would be provided.**
Q Well, is it correct, Mr. Zabransky, that Wisconsin Electric didn't provide much of an idea of what fuel would be provided? Is that correct?
**A They provided the information they had available, which is they would select later on from that inventory.**
Q And that was the inventory over 29 years?
**A That's correct.**
Q I think you also said where people expected us to go and what they expected us to do. Do you recall that?
**A I think I just said that, yeah.**
Q What do you mean "what they expected us to do"?
**A Approximately how much fuel that we'll pick up. And this at least says the maximum number of assemblies it could be.**
Q Well, when you identified the maximum number of assemblies, did you have a sense of what percentage range that could include?
MR. OLSEN: Objection, vague. And

452

objection, foundation.
**A No. We based it on the directions that say what's the maximum number it could be for assemblies that hadn't yet even been discharged or purchased.**
Q So Wisconsin Electric was submitting DCS forms for fuel that it hadn't purchased yet. Is that correct?
**A It's correct to my knowledge that by 1993 we hadn't purchased the fuel that was in the reactor as of 2001.**
Q How long in advance of putting a fuel in a reactor would the utility purchase the fuel, based on your experience at Wisconsin Electric?
**A Fuel designs are probably set two years ahead of time, three years ahead of time.**
Q So generally you would arrange a purchase of fuel two or three years ahead of time that went into the reactor?
**A That's when you would set the final design, two years or so, three years ahead of time.**
Q Now, I believe this got discussed a little earlier, but is it also correct that under the

453

contract a utility could submit up to 20 percent more fuel in terms of metric tons than the amount that it had identified on a DCS form?
MR. OLSEN: Objection to the extent it calls for a legal conclusion. And objection, it's vague.
**A If you're saying that could a utility when it put forth its FDS used the adjustment of plus or minus 20 percent provided for in the contract, the answer is yes.**
Q And the adjustment of 20 percent up or down is an adjustment by weight. Is that correct?
**A By MTU.**
Q Okay. And MTU is metric tons?
**A Metric tons of uranium, yes.**
MR. OLSEN: Can we go off the record for one second.
(There is a discussion off the record.)
Q Once a utility had submitted a DCS form that had been approved by the DOE for a particular range of fuel at a reactor, could the utility submit, when it came time to submit the final delivery

454

schedule, fuel in a different range or from a different reactor?
MR. OLSEN: Objection to the extent it calls for a legal conclusion. And I believe this question has been asked and answered already.
**A It was DOE's position that the FDS needed to be a subset of the DCS.**
Q And where is that provided in the DCS instructions?
**A It's not provided in the DCS instructions.**
Q Well, where is it provided in the contract?
MR. OLSEN: Objection. The contract speaks for itself.
**A The contracting officer has discretion for the basis of approval or disapproval.**
Q Well, Mr. Zabransky, is it correct that the contract did not specifically address the issue of whether a utility could provide different fuel than fuel identified in a DCS form?
MR. OLSEN: Objection. The contract speaks for itself, and objection to the extent it calls for a legal conclusion.

460

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER . 98-154C, 98-474C,
COMPANY, MAINE YANKEE ATOMIC · 98-483C, 98-484C,
POWER COMPANY, FLORIDA POWER & · 98-485C, 98-486C,
LIGHT COMPANY, NORTHERN STATES . 98-488C, 98-614C,
POWER COMPANY, DUKE POWER, a · 98-621C, 99-447C,
Division of DUKE ENERGY CORP., 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D C
Friday, April 19, 2002
10 03 a.m

Job No. 12597-3
Pages 460 through 722 - Volume 3
Reported by· Diane Gomez, RPR

461

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X

462

Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

463

A P P E A R A N C E S
ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC , POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT
ALEX D TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT
JEFFREY L HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D C 20004-1206
(202) 942-5000

APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT
TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY
NORMAN M. HIRSCH, ESQUIRE
JENNER & BLOCK, L.L.C
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:
RICHARD W. OEHLER, ESQUIRE
PERKINS COIE LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419

ON BEHALF OF DEFENDANT UNITED STATES:
MARIAN E. SULLIVAN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #10150
Washington, D. C. 20530
(202) 307-6288



APPEARANCES CONTINUED

ON BEHALF OF DEFENDANT UNITED STATES:
WILLIAM L. OLSEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #7002
Washington, D. C. 20530
(202) 305-7594



CONTENTS


| EXAMINATION OF DAVID ZABRANSKY | PAGE |
| --- | --- |
| By Mr. Hirsch | 471 |
| By Mr. Tomaszczuk | 565 |
| By Mr. Macdonald | 641 |


EXHIBITS
(Attached to the Transcript)


| ZABRANSKY DEPOSITION EXHIBIT | PAGE |
| --- | --- |
| 51 CTR 0440723 through 0743 | 480 |
| 52 Preliminary Draft OCRWM Position Issue No. 2, Oldest Fuel First v. Waste Selected for Delivery CTR 0131268 through 1273 | 496 |
| 53 E-mail from D. Shelor to J. Carlson dated 9/16/98, CTR 004-0263 | 533 |
| 54 Presentation to APC, EDB 0020584 - 0020602 | 536 |
| 55 Letter to N. Slater from E. Benz EDB 002056 - 618 | 538 |

628

state "The proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the act."
A **Yes.**
Q And do you know the source, Mr. Zabransky, of those notations?
A **Not specifically, no.**
Q Did you place those notations on these DCS forms?
A **I did not.**
Q Did I understand your testimony, Mr. Zabransky, to be that the DCSs represented binding commitments by DOE and the affected utility?
A **That is my belief, yes. Approved DCSs.**
Q And per the instructions those DCSs were to be based on, Zabransky Number 4, the instructions. And I want to direct your attention if I can, Mr. Zabransky, to Exhibit 4, the instructions, and in particular the second paragraph on page one.
MS SULLIVAN: Here Look at the right exhibit.
A **Second paragraph on page one?**

629

Q Yes.
A **Who should submit?**
Q Yes And that says "The DCS should be submitted by all purchasers with allocations in the 1991 ACR or subsequent ACRs as appropriate as specified in Article 5.B of the standard contract."
A **That's what it says, yes.**
Q And do I understand that instruction to be that in completing the DCS forms the utilities were to use the information contained in the 1991 ACR, which is Zabransky Exhibit 36?
MS. SULLIVAN: Objection. The document speaks for itself.
A **That's what it says, yes.**
Q Okay. And could you get Exhibit 36 in front of you, Zabransky 36. It's the 1991 ACR.
A **Okay. Okay.**
Q And in Zabransky Exhibit 36 the allocations that are referred to, as I understand the instructions, is that the Table 3.1 that appears at page nine?
A **That's a summary of the allocations, yes.**

630

**Yes. Table 3.1 on page nine.**
Q Yes.
A **Yes.**
Q All right. And so the utility is to use this table and submit its DCS, and once it's approved it's binding, as I understand your testimony?
A **That's my belief, yes.**
Q Can I direct your attention to page one of this Exhibit 36.
A **Yes.**
Q You see the Section 1.1 there towards the bottom?
A **Yes.**
Q And can you read the last two lines there at the bottom of this page one?
A **Beginning with "although"?**
Q Starting with "as specified."
A **"As specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers."**
Q And my question to you, sir, is given that

631

language, if the ACR is for planning purposes only and the DCS is based on the ACR, how can the DCS be binding?
MS. SULLIVAN. Objection to the extent it calls for a legal conclusion. Answer the question to your knowledge.
A **The contracting officer chose to use the ARC when he gave instructions as to how to approve the DCS and entered into a binding commitment.**
Q Was the data in the ACR subject to change?
MS. SULLIVAN: Objection, vague.
A **I'm not sure what you mean.**
Q Were the allocations in the ACRs as reflected, for example, in Table 3.1 at page nine of Zabransky 36 subject to change?
A **If you're asking me did the allocations in ACRs change between ACRs, the answer to that is yes.**
Q So the commitment reflected at the DCSs was subject to change. Would that be a fair statement?
A **No. That upon signature by the contracting officer became a firm commitment for that quantity, even if DOE changed it.**

Q Mr. Zabransky, in Exhibit 5, can I direct your attention to page six. Given the department's decision to suspend the DCS approval process in or about February or March of 1997, was there any need for any utility to submit DCS approval forms after that date?
MS SULLIVAN: Objection, vague Objection to the extent it calls for a legal conclusion
**A I don't know that the department ever told utilities not to continue to submit. So whether there was need or not was up to the utility from their perspective.**
Q The Department of Energy did tell utilities in or about March 13th, 1997, that they were -- that it, the Department of Energy, was no longer going to act upon DCS forms. Isn't that true?
**A At that time, yes.**
Q And has that direction changed since March 13th, 1997?
MS SULLIVAN: Objection, vague.
**A That position has not changed.**
Q And has the department approved any DCS



forms submitted after March 13th, 1997?
**A Not to my knowledge.**
Q And you would know if they had, would you not?
**A I would hope I would.**
Q Now, I understood your testimony to be that DOE's current intention is to begin contract performance in 2010?
**A That's DOE's current plans.**
Q And if I could direct your attention to page six of Exhibit 5, do you have that?
**A Yes.**
Q So in interpreting this table, is it fair that year one should now be read to mean year 2010?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A That's a way of interpreting this table.**
Q Is there any other way to interpret it?
**A I'm sure there are. I don't know.**
Q Can you tell me what they are?
**A Interpret year one to be any year you want but I don't know how else -- it seems reasonable from**



**your statement that year one was the first year of operations.**
Q And your testimony is, as I understand it, that DOE's current intention is to begin performance in 2010?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion
**A That's DOE's current plans, are repository plans commence in 2010.**
Q And you would agree this the last APR ACR that was published by DOE, correct?
**A Yes, I would agree with that.**
Q Are you aware of any other guidance, instruction, memoranda or other information provided by DOE to the utilities concerning how to utilize this table and the instructions for purposes of determining when to submit a DCS?
**A No, I'm not.**
Q Do you have an understanding of the term "nonbreach world."
MS SULLIVAN: Objection to the extent it calls for a legal conclusion. And it's also beyond



the scope but I'll allow him to answer.
**A I have heard the term used, and I believe I have an understanding of it.**
Q Can you tell me, sir, what your understanding of it is?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer the question.
**A My understanding is what would have happened had DOE not breached its obligation to begin performance in 1998.**
Q And do you have an understanding, sir, as to what rate DOE would use for acceptance of spent nuclear fuel in the nonbreach world?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer the question.
**A Had DOE begun performance in '98 as originally anticipated, at an interim storage facility, it would have been the rates in the ACR.**
Q You understand the term "nonbreach world" to assume an interim storage facility?

640

MS. SULLIVAN Objection to the extent it calls for a legal conclusion.

A **DOE's plans for 1998 performance included, required the use of an interim storage facility.**

Q Did that change at some point in time?

A **Not --**

MS. SULLIVAN. Objection, vague.

A **Not for 1998 performance.**

MR. TOMASZCZUK. I just want to look at my notes.

Q Mr. Zabransky, could you identify for me all of the assumptions on which you relied or do rely in your understanding of the term "nonbreach world."

MS. SULLIVAN· Objection to the extent it calls for a legal conclusion. Objection as to relevance. You can answer the question.

A **In my understanding it would have been that DOE had performed in accordance with the contract at its facility which I believe would have been in interim storage before a repository and would have been in accordance with the DCSs in the contract. That were approved.**

641

Q And those approved DCSs were subject to a 20 percent adjustment, right?

MS. SULLIVAN. Objection to the extent it calls for a legal conclusion. You may answer.

A **The contract allows the purchaser to adjust the DCSs plus or minus 20 percent.**

Q I don't have any further questions at this time, Mr Zabransky. I'm going to reserve the right to call you back based on some instructions not to answer, number one. And second, based on certain documents which have been designated by the government as privileged as to which we have a dispute with the government. And subject to that right, I want to thank you for your time and cooperation, and as Mr Oehler has correctly pointed out, we have just gotten some documents as well that we have not had a chance to review prior to the taking of your deposition. I want thank you for your time. Depositions can be tedious and litigation is a tough business. I appreciate your cooperation.

EXAMINATION BY COUNSEL FOR PLAINTIFF
SACRAMENTO MUNICIPAL UTILITY DISTRICT

642

BY MR. MACDONALD:

Q Mr. Zabransky, good afternoon My name is Tim Macdonald. We met earlier off the record the last couple today of days. I represent Sacramento Municipal Utility District, another one of the plaintiffs in this litigation. I'll refer to them as SMUD as lots of people do. I assume you've heard that acronym before?

A **Yes, I have.**

Q When you were speaking with Mr. Tomaszczuk he was asking you about assumptions for your view of what would happen in the nonbreach world. Do you recall that testimony?

A **I recollect, yes.**

Q And I believe your testimony was that as one of the assumptions performance would have to be consistent with the contract. Is that correct?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A **Yes, I guess that's one of my assumptions.**

Q Is another one of your assumptions that performance would have to be consistent with the

643

statute?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A **I believe we would have to be consistent with the statute from what I know about legal things, but, yeah.**

Q Mr. Tomaszczuk also asked you a series of questions about communications you had with his collection of clients.

A **Yes.**

Q And I would like to ask you the same question with respect to SMUD. So I think the first question was whether you remember having conversations with SMUD employees while you were at WEPCO about matters relating to performance under the standard contract?

A **I don't recollect a conversation with SMUD employees when I was at WEPCO.**

Q The second question then is while you have been an employee of DOE have you had or do you recollect having conversations with SMUD employees regarding issues related to the performance under the

648

contract?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A I don't know that you can presume that the parties would conclude that -- agree to an amendment but we could discuss it.**
Q If you would look at Zabransky Exhibit 32 for a moment. This is your correspondence between you and Mr. Brownstein while you were at Wisconsin Electric. If you will look at page Bates page 1703 for me.
**A Yes.**
Q I'm looking at the big numbers
**A Yes, I see.**
Q And this page discusses the issue of acceptance and handling of multiple-element sealed canisters. Do you see that?
**A Yes.**
Q These are referred to in the industry as M-E-S-Cs?
**A MESCs.**
Q MESCs. And the reference listed here is

649

that a multiple-element sealed canister does not appear to qualify for acceptance as standard fuel at the current time. Do you see that?
**A I see that.**
Q And the position listed in this letter is that DOE should accept licensed multiple-element sealed canisters as standard fuel classification?
**A Yes.**
Q And this was your position at the time when you worked at WEPCO. Is that right?
**A This was the consensus position of the industry.**
Q And did you agree with this as the representative of WEPCO at that time?
**A I think in principle I agreed with it, but there may be details that need to be looked at. But, again, in principle I agreed with this, yes.**
Q Can you think of any details right now that would cause you not to agree with this?
MS. SULLIVAN. Objection, vague.
**A Knowing what I know now from the DOE side, yes, there are issues that would cause me to consider**

650

**this differently for me, from as how this is written, yes.**
Q Let me try to understand that. When this was written you agreed that DOE should accept licensed multiple-element sealed canisters as a standard fuel classification?
**A I agreed -- this position basically says as an industry negotiating point, an industry position, we want you to go here. That was the industry position. We want this. All I'm saying is that now I look at it from the DOE perspective, and the answer is in principle this looks fine but there are other things that need to be considered before a contract amendment can be concluded.**
Q When you say this looks fine, explain to me what you mean by that, if you would.
**A This is a good goal for the parties to move towards, but whether or not all canisters can be standard, or all can be acceptable, with the basic burden being that a contract amendment entered into by the contracting officer has to be deemed to be in the best interest of the government, needs to be worked**

651

**out.**
Q If the canister is licensed for storage and transportation by the NRC, does that in your view make it more likely that it should be accepted as standard fuel?
MS. SULLIVAN· Objection to the extent it calls for a legal conclusion.
**A From a technical basis it would be the minimum for it to be acceptable, but with respect to standard or not, I don't think that has any relevance.**
Q Why does that not have any relevance?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A Because the NRC will license any cask that can be stored -- that meets their requirements for storage and transport. It doesn't mean it will be satisfactory or work into the DOE facilities that will be constructed or are being planned or that it would be reasonable to transport. NRC doesn't do any assessments of reasonableness of use.**
Q Is it possible for a utility right now to plan for the types of casks or containers necessary

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiff, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. :

\- - - - - - - - - - - - - - - - X

Washington, D.C.

Thursday, June 6, 2002

Deposition of DAVE ZABRANSKY, Volume II, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., commencing at 9:32 a.m., Thursday, June 6, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

APPEARANCES:
On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594

On behalf of Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins & Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2911
(202) 434-1675

Reported by: Cappy Hallock, RPR-CRR



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| DAVE ZABRANSKY | |
| By Mr. Shapiro | 212 |
| By Mr. Carney | 387 |
| Afternoon Session - Page 281 | |


EXHIBITS


| ZABRANSKY EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 7 | 4-18-02 Deposition Excerpt | 243 |
| 8 | 7-19-93 letter, Tomasoni to Buchheit | 261 |
| 9 | 9-28-95 letter, Dreyfus to Kadak | 266 |
| 10 | 1-28-00 letter, Zabransky to Thomas | 315 |
| 11 | 9-29-00 letter, Zabransky to Zinke | 318 |
| 12 | Instructions for Completing the Appendix C | 339 |
| 13 | 12-17-96 letter, Tomasoni to Kadak | 368 |
| 14 | 6-3-97 letter, Tomasoni to Buchheit with attachments | 371 |
| 15 | 12-16-97 letter, Fugi to Schiffer | 375 |




P R O C E E D I N G S

\- - - - - - -

WHEREUPON --

DAVE ZABRANSKY,

was called as a witness by counsel for Plaintiff, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF (Continued)

BY MR. SHAPIRO:

Q. Mr. Zabransky, welcome back. You are here for your second day of your deposition in the Yankee cases. Before moving back to where we were in our discussion, looking through my notes yesterday evening there were a few areas that I want to go back to and clean up things that I think I might have missed in our earlier discussion.

If you recall, we talked about some of the people who you work with. I think briefly we mentioned at this point you report to Jeff Williams, and I think I had asked you about your interaction with your prior supervisor, Mr. Carlson, but I had not asked you about your interaction with Mr. Williams and I wanted to go back to that.



First, what is your understanding, what does Mr. Williams do? What is his responsibility?

A. He is the Acting Director of the Office of Acceptance Transportation Integration, and he is the director of the -- no, it is Acceptance Transportation International -- I'm not sure what the I stands for. It's OATI, and he is the director of the Systems Integration and International Division.

Q. What does the director of that office do?

A. The director of the office of OATI --

MR. CRAWFORD: Objection. Vague. Which office?

MR. SHAPIRO: I'm talking about the office, not the division.

A. The office director has the responsibility for the two divisions within the office.

Q. How would you describe Mr. Williams' supervision of you?

MR. CRAWFORD: Objection.

A. I'm not sure how to describe his

Page 229

A. I don't know how to answer that question.
Q. I'm asking what you think.
A. I have no idea what people would do. As many people as there are out there, I don't know what they all think.
Q. What do you think WEPCO would have done?
MR. CRAWFORD: Objection, calls for speculation. Objection, assumes facts not in evidence.
A. I think WEPCO would have done what WEPCO did. They understood the basis for prioritization and acted accordingly. WEPCO didn't like the quantities but WEPCO signed up for the quantities, bought as many as it could as soon as it could.
Q. Didn't WEPCO do that in part because it didn't have confidence that the department was going to be able to accept spent fuel when WEPCO really needed the department to do that?
MR. CRAWFORD: Objection, calls for speculation.
A. I think WEPCO signed up for that for the reason it saw it as a binding commitment, and

Page 230

it was concerned that the department would some day stop approving these documents and wanted them signed before they came to their senses.
Q. I'm asking you to suppose a different world.
A. I can't suppose a different world. I don't know what would have happened and I can't speculate about things I have not thought about.
Q. I'm asking you to think about it right now.
A. I will try.
MR. CRAWFORD: Indulge Mr. Shapiro.
THE WITNESS: I will indulge him to the extent that I can.
Q. If WEPCO had not had a concern that the department would stop approving delivery commitment schedules, if WEPCO didn't have a concern that the department would not be picking up spent fuel at a rate of, let's say, 3,000 metric tons per year from utilities, if it didn't have those concerns, do you think WEPCO would have asked for all of its spent fuel to be picked up as soon as possible?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to

Page 231

the speculation.
A. I don't know what WEPCO would have done. I would not have recommended that WEPCO take such an action.
Q. Take what action?
A. To request that all its spent fuel be picked up immediately.
Q. Why wouldn't you have recommended that?
A. Because it makes no sense either.
Q. Why doesn't it make any sense for a utility to have all of its spent fuel picked up immediately?
A. Assuming our group, and utilities are a group, everybody wanted to go first, and in that idiot fashion no one would go anywhere. It didn't make sense. Everybody had their allocation but it was the world we had to live with. Utilities that didn't buy into that acted differently. We didn't act that way at WEPCO.
Q. I'm not sure you are understanding my hypothetical --
A. That's probably true.
Q. -- So let me try to rephrase and make it simpler.

Page 232

Other than a concern that it will not be able to get the department to pick up its spent fuel at a later time, why would a utility want to have the department come to pick up its spent fuel earlier if the presence of that spent fuel in its pool is not causing that utility any marginal cost?
A. Again, you will have to ask those utilities who did that. I can't speculate what their motivation was. I never could figure out their actions. Ask those utilities. Don't ask me to speculate. I never could figure it out.
Q. So you're saying you don't see a reason why a utility would be anxious to have the Department of Energy pick up its spent fuel early if the utility otherwise had confidence that the department would later come to pick up its spent fuel when the utility needed to have the spent fuel picked up?
MR. CRAWFORD: Objection. Calls for speculation --
Don't speak over me. Wait until I finish. Then you can respond to Mr. Shapiro.
Objection to the extent it calls for speculation.

Page 233

Go ahead.
A. Again, we are sitting here saying why would someone act that way? The way I acted, I signed a deal. The deal says it works this way. We worked that way. It said there was a line, we got in line.
Q. That's where I'm not sure you understand my hypothetical. You got in line because you were concerned that the department was not going to accommodate everyone in line on a timely basis.
MR. CRAWFORED: Objection to the extent it mischaracterizes the prior testimony.
A. I didn't say that. How do you draw that from what I said? What are you trying to say that I said?
Q. Why were you, and I assume you were talking about WEPCO, why was WEPCO anxious to get in line as early as possible?
A. To get in line? We were in line. You're in line from the basis of discharging fuel, so I'm not sure what you are alluding to.
Q. I thought you said that's the way your understanding was that the system was set up and you got in line?

Page 234

A. We were in line. You were in line pursuant to being in the contract. You don't get in line, you are in line. You got in line when you signed the contract.
Q. We will move on.
Another thing we covered yesterday, Mr. Zabransky, was the acceptance rates in the Annual Capacity Report, and if you recall, you distinguished between the acceptance rates in documents such as the program plan versus acceptance rates in an Annual Capacity Report. You said one would be -- the one in a program plan would simply be a plan of what the system might be capable of doing, but it was your opinion that the projections in the Annual Capacity Report should reflect what you referred to as dependable performance.
Do you recall that testimony?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony.
A. I think what I was trying to refer to or trying to state was the fact that when the contracting officer chose a document to bind the government, which I believe they were doing, they should base it on the maximum dependable capacity,

Page 235

not on an engineer's planned capacity, so even though the APR or the ACR was a planning document, when it was utilized for the basis of the DCSs, it became a commitment document, and the contracting officer needed to exercise judgment that that was the right amount to commit to. Apparently they did.
Q. Well, you're aware that earlier Annual Capacity Reports used acceptance rates that were consistent with the planning documents that went right up to 3,000 BTU. Are you saying that was ill-advised?
MR. CRAWFORD: Objection to the lack of foundation. Objection in that it calls for speculation. And objection, it may call for a legal conclusion.
A. I'm saying they were never used by the contracting officer for the submittal or approval of DCSs.
Q. Is it your understanding that the department made a decision to reduce the amounts of spent fuel in its projections in the Annual Capacity Reports once those could be used for the purpose of submitting delivery commitment schedules?

Page 236

MR. CRAWFORD: Objection to the lack of foundation and to the extent it calls for speculation.
A. I was not there. I don't know why they do what they do.
Q. Well, for the 1995 Annual Capacity Report, is it your understanding that a lower acceptance rate was put in that report in order to limit the government's commitments to utilities?
MR. CRAWFORD: Objection, asked and answered. Objection, lack of foundation. Objection, speculation.
A. Again, as I stated yesterday, the numbers in the '95 report were carried over from the previous report, and I'm not aware of any discussion about changing them.
Q. Other than yourself, are you aware of anyone else at DOE that shares your view that the Annual Capacity Report should reflect what you term as dependable performance projections as opposed to projections consistent with the department's current plans for spent fuel receiving facilities?
MR. CRAWFORD: Objection to the extent it mischaracterizes the prior testimony.

Page 237

A. I have never had that discussion at DOE.
Q. Let me turn to something that I don't think we discussed specifically yesterday, but I believe was discussed when you were deposed previously by other spent fuel plaintiffs.
Do you recall testimony to the effect that it was your understanding that the department does not have an obligation to accept spent fuel from a utility unless that utility has an approved acceptance delivery schedule?
MR. CRAWFORD: Objection, vague.
A. I guess I do. I'm not sure -- I haven't reviewed my testimony but that's not inconsistent with my belief.
Q. That's consistent with your understanding, that the department does not have an obligation to pick up spent fuel unless the utility has an approved delivery schedule for that amount of spent fuel?
MR. CRAWFORD: I will object to that. That calls for a legal conclusion.
A. That's my understanding.
Q. How does that understanding comport with Article 4B1 of the Standard Contract?

Page 238

Article 4 talks about the parties' responsibilities, 4B1 the Department of Energy's responsibility. Paragraph 1 says that the DOE shall accept title and dispose of all of the spent fuel that a utility has. Isn't that what that paragraph is referring to?
A. That's correct.
MR. CRAWFORD: Objection to the extent that it calls for a legal conclusion.
Q. How do you reconcile that paragraph with your understanding that DOE doesn't have an obligation unless there is an approved delivery commitment schedule?
A. To the extent that it calls for a legal conclusion, and I guess to clarify the statement, not an obligation on that time frame. An overall obligation, yes, schedule to be determined.
Q. Suppose a utility never gets an approved delivery commitment schedule for its spent fuel? Is it your understanding that the department never has an obligation to pick up that utility's spent fuel?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to

Page 239

the vagueness of it. Objection to the extent it calls for speculation.
A. To the extent they never called for delivery, that's correct. The obligation to pick it up is there, the schedule has never been determined.
Q. Suppose the utility keeps submitting delivery commitment schedules and the department does not like those schedules and keeps denying them?
MR. CRAWFORD: Objection to the street extent it calls for a legal conclusion.
A. It can pursue its remedies under the clause of the contract.
Q. But absent getting relief there, you are saying it is your understanding that the department does not have an obligation to pick up that utility's spent fuel?
A. No.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, it assumes facts not in evidence. Objection, calls for speculation.
A. Again, I said the schedule has not been agreed to.

Page 240

Q. I'm not sure, what does it mean to have an obligation to do something if a party never has to do it?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the extent it assumes facts not in evidence. Objection to the extent it calls for speculation.
A. Both parties have obligations, and the utility has an obligation to submit and get a DCS under the contract, so the DOE's obligation is to get rid of the spent fuel per the schedule as determined by the parties. The process is laid out in the contract.
Q. Suppose the utility submits a proposed delivery commitment schedule, the contracting officer disapproved it. The utility can resubmit it, the contracting officer can disapprove it again.
A. Yes.
Q. The parties will negotiate those are all steps in the delivery commitment schedule process --
MR. CRAWFORD: You all are walking all over each other. I don't know when a question is ending and when the answer is being given. Both

Page 245

time."

Did you mean that the only basis for the rates in the 1995 ACR was to minimize the department's commitments?

MR. CRAWFORD: Objection to the lack of foundation. Objection to the extent it calls for a legal conclusion.

A. No. I think what I'm saying there, it was my belief or my knowledge was I didn't know what other basis they would use for rates at that point in time.

Q. All right.

Mr. Zabransky, I want to turn back to where we had been at the end of the day yesterday. We were talking about delivery commitment schedule cost estimates, and I believe we ended up with a discussion about whether the department has used the information in approved delivery commitment schedules for planning purposes, and I believe we ended up with the understanding that to your knowledge they haven't. Maybe they did at some point prior to your arrival at the Department of Energy, but you don't have any knowledge of the department using that information since you have been there.

Page 246

Looking forward, could the department use the information in the currently approved delivery commitment schedules for planning?

A. Could it? Yes.

Q. What would be the use of the information, the currently approved delivery commitment schedules, given that the department's current plan is for a waste acceptance system with a repository that will have acceptance rates that are significantly different from those that were the basis of the approved delivery commitment schedules?

MR. CRAWFORD: Objection, lack of foundation. Objection to the extent it calls for speculation.

A. I wouldn't see any good use for it. You didn't ask me if they should use it, you asked me if they could use it.

Q. You wouldn't recommend that the department use the information or the currently approved delivery commitment schedules for planning at this time?

A. It's my belief, my personal belief that we need to renegotiate those with the contractholders as was stated would be done when

Page 247

the initial DCS directions were sent out.

Q. Why do you believe the department has to renegotiate those approved delivery commitment schedules?

A. Because one, we said it would, the department said it would; and two, I think the utilities should have the option of deciding if it's -- their plans have changed. Perhaps they want different locations to be serviced.

Q. What about the amount of acceptance? If the department in fact moves forward with the repository in 2010 with acceptance rates consistent with its plans for a repository, should utilities with currently approved delivery commitment schedules be able to renegotiate for larger amounts of acceptance consistent with the capacity of the repository?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the extent it calls for speculation.

A. And again, if the department winds up with a larger facility that actually operates that way, and the contracting officer feels comfortable to committing to quantities for a larger facility, that can be a subject of renegotiation.

Page 248

Q. Would it be in the department's interest to renegotiate the currently approved delivery commitment schedules?

MR. CRAWFORD: Objection to the lack of foundation. Objection to the extent it calls for a legal conclusion.

A. I can't speak for the department. I think I would recommend that it be done.

Q. Why would you recommend that the department renegotiate the currently approved delivery commitment schedules?

A. To give the purchasers the opportunity to revisit decisions they had made as to where they wanted to be serviced and in what years and in what order.

Q. Can you think of any advantages to the government of renegotiating the currently approved delivery commitment schedules?

A. Other than being responsive to the needs of its customers, I don't know that there is a big advantage except that we said we would.

Q. What about from a transportation campaign aspect? I believe you testified that there can be advantages to the program using transportation campaigns.

Page 249

MR. CRAWFORD: Objection to the extent that mischaracterizes the prior testimony. Objection, assumes facts not in evidence. Objection to the vagueness of the question.
A. Again, I believe that I said that transportation campaigning might be advantageous to both parties, but I don't see how that relates to renegotiation of DCSs.
Q. Well, the currently approved delivery commitment schedules would require the department to go to those utilities and pick up relatively small amounts of spent fuel, wouldn't it?
A. Breaks down allocation on an annual basis, but that would stay the same through renegotiation unless the contract were modified. I'm only talking about renegotiating the DCSs.
Q. Wouldn't renegotiated DCSs entail having larger quantities of spent fuel which would permit larger transportation campaigns?
A. Not necessarily.
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to the extent it involves speculation. Objection, calls for a legal conclusion.
A. The answer is the same, I don't see

Page 250

exactly what they are talking about. You can't speculate as to that. You don't know who discharges what in what year so you are assuming something without a basis for assuming it.
Q. How can a utility's allocation be smaller if the overall acceptance rates would be larger in any given year?
A. I didn't say smaller, but you can't say bigger in a given year. It's based on when a utility discharges its fuel and who else discharges that year.
Q. In reality the allocation would be bigger if acceptance rates are larger, wouldn't they?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to the extent it calls for speculation.
A. And average has nothing to do with campaigning when this is an annualized basis. You look at the specific annual years and see what happens.
Q. Let's turn to a slightly different subject. We may come back to that one later.
You recall yesterday we talked about potential purposes of the delivery commitment

Page 251

schedule process. We discussed the planning purpose. You also said another purpose of the delivery commitment schedule process was to bind the parties. How does that binding process work.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A. I mean, I'm not sure what you're asking, how does that process work?
MR. CRAWFORD: Objection, best evidence.
A. The contract says that the utilities will submit the draft DCS. It will be approved or disapproved. That will be the basis for disapproval resolution. How does it bind the parties? I'm not sure what you mean.
Q. Why don't we talk through some of the steps.
It is your understanding that the contracting officer gets to publish the Annual Capacity Report that sets forth the maximum allocations that utilities would be entitled to?
A. I'm not certain --
MR. CRAWFORD: Well, objection to the extent that it mischaracterizes many peoples' testimony, as well as in particular Mr.

Page 252

Zabransky's. Objection to the extent it calls for a legal conclusion. Objection, best evidence.
A. I didn't say that. I said the program published an Annual Capacity Report that is used for planning purposes. The contracting officer decided to use that as the basis for DCS submittals and approvals. He could have chosen something else. He didn't.
Q. The program gets to publish an Annual Capacity Report; that is your understanding?
MR. CRAWFORD: Same objections?
A. It's published, yes.
Q. The contracting officer has the discretion to designate the allocations in the Annual Capacity Report as the maximum allocations that utilities may use in delivery commitment schedule forms?
A. I believe that's the case, yes.
Q. And the contracting officer has the discretion to enforce compliance with those instructions by disapproving the delivery commitment schedules that seek delivery of spent fuel in excess of those allocations?
MR. CRAWFORD: Same objections.
A. I believe he can do that, yes.

Page 281

I guess, and I'm not sure when it ceased.
Q. During your tenure in the waste acceptance team, has your office done work studying exchanges of approved delivery schedules?
A. I think work was done after I came, but it wasn't done for me.
Q. Who would that have been done for?
A. I believe Ms. Slater looked at that.
Q. Did you have any involvement in the work that was done for Ms. Slater?
A. Not to any great degree. I remember on a tangential basis it was going on, but I really didn't get involved in it too much of the time.
Q. You said a moment ago that you believed that DOE would try to facilitate exchanges if the DOE was otherwise accepting waste. Why do you believe that DOE would try to facilitate exchanges?
A. Well, I think it has always been DOE's stated position, and back in the old days, I mean at one point DOE went as far as developing the -- an electronic bulletin board to try to facilitate exchanges so utilities could see who had what approved DCSs.

Page 282

Q. When did DOE develop this electronic bulletin board?
A. That was probably in the '94 time frame. I'm not sure exactly when in that time frame.
Q. And the intent of the bulletin board was to facilitate exchanges by making information available to utilities as to what was available to be exchanged?
A. It was to basically make available the approved DCSs so people would know, you know, what was available to exchange with.
Q. If you believe that DOE would have tried to facilitate exchanges, do you believe that DOE would have approved most of the exchanges that would have been proposed by utilities?
MR. CRAWFORD: Objection, vague. Objection to the extent it calls for speculation.
A. I can't speculate without knowing the circumstances of the specific exchanges.
Q. Do you have an understanding as to what would cause DOE to disapprove a proposed exchange?
MR. CRAWFORD: Objection to the lack of foundation and to the vagueness and to the

Page 283

extent it calls for speculation.
A. I mean, part of the process would be -- first of all, the contracting officer retains sole discretion to approve any exchange, but to the extent there would be a technical implication it would have to consider whether or not the exchange could be accomplished without adversely affecting the operation of the facility or other contractholders.
Q. Well, you mentioned the contracting officer retains sole discretion. What do you see as the significance of the contracting officer's retention of sole discretion to approve or not approve exchanges?
A. I don't know. It is in the contract. We would have to ask the contracting officer.
Q. Why did you preface your last answer with that part of the contract?
A. Because I was quoting from the contract, I believe. I will go back and check.
Q. I think the phrase sole discretion is in there somewhere.
A. Um-hmm.
Q. Is it your understanding that the contracting officer would exercise that discretion

Page 284

to approve proposed delivery commitment schedules to the extent that they would not cause technical problems that would adversely affect the operations of the facility or other contractholders?
MR. CRAWFORD: Objection to the vagueness of that, and to the lack of foundation. Objection to the extent it calls for a legal conclusion.
A. I can't speak to what criteria the contracting officer would use beyond the technical attributes that I would consider.
Q. What technical attributes would you consider?
A. As I just mentioned, whether or not the exchange could physically be accomplished without adversely impacting the operation of the system or other contractholders.
Q. How would an exchange adversely affect the waste acceptance system?
MR. CRAWFORD: Objection to the vagueness and to the lack of foundation.
A. Again, I didn't say all exchanges would. It depends on the specifics of the exchange.