Page 285

Q. Any exchange. What are you thinking of that a potential exchange, why would an exchange adversely affect the waste acceptance system?
A. Speculating as to what could happen, given that an exchange would come in at any time, and the system was, with a certain capacity was expecting to get a certain number of casks the following year, whatever period it might be, and the exchange came in and now it is double that number of casks, that would adversely affect the operations of the system. It may not be able to be accommodated.
Q. How would an exchange result in a need to double the number of casks?
A. We went from ten rail casks to 50 truck casks because the exchange was between a utility that can only ship truck casks and one that can ship rail casks, so without knowing the specifics I can't answer the question.
Q. Well, let me just go through the possibilities. You mentioned a potential cask issue. Can you think of any other technical problems that might be posed by a potential proposed exchange?

Page 286

MR. CRAWFORD: I will objection to the extent it calls for speculation and to foundation.
A. Again, further speculation could be that waste packages had already been procured for the fuels to be delivered under one regime and under the exchange different waste packages were required. I don't know what could happen. Without reviewing the circumstances at the time the exchange was requested, I can't answer as to whether it would be acceptable or not.
Q. You mentioned waste packages and a transportation cask. Can you think of any other potential technical problems that would be imposed by a proposed exchange?
MR. CRAWFORD: Let me object to the overbroadness of that, and to the extent it mischaracterizes what he previously testified to.
A. I mean, I'm giving you speculation as to what items may have to be considered and could be in the way of an exchange. Other things that could happen is the exchange could be between different geographic parts of the country where training has not yet occurred or in sufficient time before the shipment to allow us to transport in accordance with the provisions to transport.

Page 287

Q. Any other potential problems?
MR. CRAWFORD: Again, object to the overbroadness of that, vagueness of it. Objection to the extent it requires -- to the extent it calls for speculation.
A. Because of the different locations of plants, distances, time traveled, there might not be enough casks to service that facility at that time. Another one would be that the casks requested were already committed to service someplace else and could not be available within that time, so most of these are logistic in nature. Until you know what you are dealing with you can't pass judgment on it.
Q. I want to see if I have all the issues that you can think of right now. Not necessarily an exhaustive list but what you can think of right now, what logistical issues that might come up that would cause a technical problem with approving a proposed exchange.
A. And again those -- responding to your question, those are the ones I can think of right now but I also believe it is impossible to think of right now even exhaustively things that could happen over the next 20, 30 years that would be

Page 288

new issues so there is no way to come up with an exhaustive list to cover items in the future.
Q. One of the items you mentioned was how different waste packages might have been procured. I'm not sure what you mean by -- what is a waste package as opposed to a transportation cask?
A. A waste package is what is used for disposal.
Q. DOE's current plan is to use different waste packages for different spent fuel?
A. Different spent fuel has different physical characteristics, and you couldn't use the same waste package.
Q. Ultimately DOE will need the appropriate number of various kinds of waste packages to handle all the waste that is in the stream to come to Yucca Mountain; isn't that true?
A. Ultimately.
Q. But you're saying that to handle some proposed exchanges they might need more of a particular type of waste package sooner than they might have otherwise predicted, and then they might not have the right kind of waste package available?
A. That could be an outcome, yes.

Page 289

Q. Is that the problem that you were referring to when you said there could be a problem with the waste package that might cause a technical problem to accommodate an exchange?
A. Correct.
Q. You mentioned training in the region where the fuel is supposed to come from. What is the potential problem with training? I'm not sure what you're referring to there.
A. The DOE is obligated to provide funding for emergency response training a certain number of years prior to the shipments. If it had not been done, shipments couldn't occur.
Q. Is DOE planning to conduct this required training in different parts of the country at different times?
A. I think DOE is planning on doing the training at the appropriate time, recognizing that training people who aren't going to use it, who will leave those positions is wasted, Since it is mostly volunteer organizations that will get trained and you have turnover rates, so you try to track the training to your need. And there is a requirement for continuing training.
Q. Who is being trained?

Page 290

A. Emergency responders. The Act requires DOE to train, for funds and equipment for emergency responders. The states will also require certain training prior to allowing nuclear fuels to traverse their territories.
Q. You said DOE would plan to do such training at what you termed an appropriate time. DOE has to at least conduct such training prior to the first delivery of spent fuel from a utility in a particular region?
A. And continuing training is to be provided.
Q. So even if there were no exchanges of a utility's spent fuel allocation, DOE would need to do the requisite training to remove fuel from the utility consistent with where that utility is in the oldest fuel first queue to make deliveries to DOE?
A. At some point, yes. But if it is somebody who is in the twentieth year, it makes no sense to do it the fifth year before operations.
Q. But if a utility otherwise has an allocation in the first year, but is merely exchanging to get more allocations in that first year, then that exchange would not necessarily

Page 291

implicate this potential concern that you have raised about regional training?
A. That's why every exchange has to be reviewed on its own individual merits. There are no generalities.
Q. I don't think you quite answered my question, about if a utility had an allocation in the first year, and that if the utility was merely exchanging for a greater allocation in that year, that wouldn't affect DOE's training obligation, at least with respect to that utility with that year one allocation, would it?
A. With that specific utility and with that specific condition, probably not.
Q. Another potential concern you mentioned was transportation of the casks. I'm not sure, what is the nature of the logistical concern there?
MR. CRAWFORD: Objection vague.
A. A certain number of casks will be procured to meet a certain need within certain turnaround times. It takes longer to move the casks from the east coast to Nevada than it does from the west coast to Nevada. To the extent exchanges move it more to the east coast with

Page 292

short notice there may not be sufficient casks to service everybody else after that exchange because the casks have already been committed for the year.
Q. In general you need fewer casks if larger transportation campaigns are used to ship spent fuel?
A. No --
MR. CRAWFORD: Objection. Vague.
A. No. You may need more casks for larger campaigns.
Q. How could that be?
A. Because a utility can only load a certain number of casks a week, and if you are waiting for a campaign you will let them sit there until you fill the last cask, so it may actually require more casks, not less.
Q. Do you have any expectation as to the extent to which you believe that DOE will be able to resolve these logistical concerns -- I'm sorry, I think was the word that you used -- in order to approve proposed exchanges of approved delivery commitment schedules?
MR. CRAWFORD: Objection to the foundation. Objection, assumes facts not in

Page 293

evidence. Objection to the extent it calls for speculation.
A. And I'm not sure, when you say DOE resolved these issues, what do you mean?
Q. The issues that you have raised, since they are capable of being anticipated, aren't they capable of being addressed such that when a proposed exchange is actually put in DOE would be prepared to accommodate the exchange?
MR. CRAWFORD: Objection to the extent it mischaracterized what he said, and objection to the extent it calls for speculation or assumes facts not in evidence.
A. And again depending on when an exchange is requested and what the exchange is, if you're asking me can the department, can anybody buy enough of everything, having it sitting around uselessly until somebody decides at the last minute, sure. Would that be right? No. There are budget constraints. It depends on when the request occurs and what the request is, and I can't envision all the circumstances in the future in order to get it addressed.
Q. Well, you said the department would not want to buy a lot of extra casks and other

Page 294

material in anticipation of exchanges uselessly, particularly if such exchanges don't happen. Wouldn't the department be able to model and predict with some fair amount of reliability what exchanges would likely be proposed?
MR. CRAWFORD: Objection to the foundation. Objection to the extent it calls for speculation.
A. I don't think so. I can't model how utilities will act for their own self-interest.
Q. You could model to determine who likely would want spent fuel at particular times, couldn't you?
A. I can't model individual self-interests. I also need to be accountable to other contractholders who continue to pay for expenditures that are not used.
Q. Let's do it one question at a time. My question is you could model which utilities would want spent fuel removed at particular times, couldn't you?
MR. CRAWFORD: Objection to the extent it calls for speculation. Object to the foundation. Objection to the extent it assumes facts not in evidence.

Page 295

A. No, I can't. I can't model as to what utilities might want to do.
Q. My question is, you could model to determine which utilities would need spent fuel removed in order the avoid otherwise incurring additional costs.
MR. CRAWFORD: Objection. Asked and answered.
A. I can't model -- I can model what utility inventories might be. I can't model as to what the behaviors would be. And again one thing I think you are missing, it is not as simple as a cask for this type or that type. Each fuel may require a different type of cask from the same facility.
Q. A different transportation cask?
A. Yes.
Q. Well, let me go back to the discussion we were just having where you were saying you can't predict self-interest. Are you saying that in such a model it wouldn't be reasonable to presume that utilities would act in their economic self-interest in order to minimize their costs and maximize their profits?
MR. CRAWFORD: Objection to the

Page 296

vagueness of that.
A. For a perception model to work I would not only have to model who needed it early but who would be willing to give it up later, because it has to be a trade, and I can't model the infinite number of variables that would come to that scenario unless I modeled everything possible. I'm not sure what the purpose would be. When a trade is proposed it can be evaluated. The sooner it is proposed, the easier the evaluation.
Q. Well, the Department of Energy, you are aware, has done studies to determine which utilities are likely to run out of pool space at various times.
A. I'm aware of that, yes.
Q. Wouldn't those studies also show which utilities have plenty of pool space at given times?
MR. CRAWFORD: Objection to the facts.
A. Yes.
Q. Wouldn't the utilities with ample pool space be likely sellers of allocations during those time periods when they have plenty of space?
MR. CRAWFORD: Objection to the vagueness. Objection to the extent it calls for

**Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, 98-474C August 5, 2004**

**Heritage Reporting Corporation**

**Page 4107 to Page 4238**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos
COMPANY and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY ) 98-154C
Plaintiffs ) 98-474C
)
THE UNITED STATES )
Defendant )

Courtroom 5
National Courts Building
717 Madison Place N W
Washington D C

Thursday August 5 2004
Volume 18

The parties met. pursuant to the notice of the Judge at 10 00 a m

BEFORE THE HONORABLE JAMES F MEROW



APPEARANCES
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
YANKEE ATOMIC POWER COMPANY
JERRY STOUCK ESQ
ROBERT SHAPIRO ESQ
PETER J SKALABAN JR ESQ
VIVEK K HATTI ESQ
Spriggs & Hollingsworth
1350 I Street N W
Washington D C 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MERRILL J ATKINS ESQ
Assisting General Counsel
19 Midstate Drive
Auburn Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page )



APPEARANCES CONTINUED

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY·
JOSEPH D FAY ESQ
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset Maine 04578
(207) 882-5603

On Behalf of the Defendant
HAROLD LESTER. JR ESQ
JOHN EKMAN ESQ
MARIAN E SULLIVAN. ESQ
HEIDE L HERRMANN ESQ
R ALAN MILLER. ESQ
KEVIN B CRAWFORD ESQ
RUSSELL SHULTIS ESQ
U S Department of Justice
1100 L Street N W
Washington D C 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S
- - - - - -
MS SULLIVAN Good morning Your Honor We're ready to call our next witness unless there s anything we need to handle preliminarily
THE COURT Okay
MS SULLIVAN The government calls David Zabransky
Whereupon--
DAVID ZABRANSKY
a witness called for examination having been duly sworn was examined and testified as follows
DIRECT EXAMINATION
BY MS SULLIVAN
Q Good morning Mr Zabransky Are you currently employed at the Department of Energy?
A Yes I am
Q And to what office within the Department of Energy are you currently assigned?
A I'm in the Office of Civilian Radioactive Waste Management. and I work in the Office of Systems Analysis and Strategy Development within that office
Q What are your current responsibilities?
A I report to Chris Kouts and I work on issues related to the standard contract other

Page 4131

Q And putting the fuel into DOE transportation casks, where is that supposed to happen?
A. At the utility site.
Q. Turning to another subject, Mr. Zabransky, what is failed fuel?
A Failed fuel is generally fuel that requires some kind of special handling There's some issue with it that requires something to be looked at.
Q. Do you have an understanding as to whether DOE is required to accept failed fuel, pursuant to the standard contract?
A. It's my understanding DOE is required to accept all the utilities' fuel, pursuant to the contract, yes.
Q Including failed fuel?
A Including failed fuel.
Q Do you have an understanding as to what the contract requirements are for the scheduling of the delivery of failed fuel to DOE?
A The contract contains provisions that require the utility to notify DOE that it has failed fuel and to seek procedural and schedule a confirmation that that fuel can be accepted on the normal agreed-to schedule, and that's for failed fuel

Page 4132

and other than nonstandard fuels
Q Can I have Defendant's Exhibit 7, please?
Mr Zabransky, you've been handed what's been marked as Defendant's Exhibit 7 Do you recognize this document?
A This document appears to be a copy of the contract between Yankee Atomic Electric and the government for disposal of spent fuel from Yankee Atomic's plant
Q. Thank you Could I direct your attention to pages 13 and 14 of this document, specifically Article VI, (a)(2)?
A Okay
Q Do you have that in front of you?
A Yes, I do
Q. Mr. Zabransky, could you read the portion that's highlighted on the screen?
A "DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel However, for any SNF which has been designated by the purchaser as other than standard fuel, as that term is defined in Appendix E, the purchaser shall obtain delivery and procedural confirmation from DOE prior to delivery. DOE shall advise purchasers within 60 days

Page 4133

after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed-to schedule and any schedule adjustment for such services."
Q. Thank you Mr. Zabransky, in the provision that you've just read, what is your understanding of the phrase "other than standard fuel"?
A That would be fuel as defined in Appendix E of the contract, that Appendix E sets forth criteria for standard fuel and it sets forth criteria for nonstandard and failed fuel, which are also called "other than standard fuel."
Q. Can we go to Appendix E, please?
Mr. Zabransky, are these the categories of other than standard fuel that you were just referring to?
A. Yes, in the contract, we have standard fuel, which is under C1, and the other than standard fuels are in C2 and C3 of that section
Q. Can we go back to the provision on page 14?
Mr. Zabransky, in the highlighted provision, what is your understanding of the phrase "currently agreed-to schedule"?
A. My understanding is that that would refer to the approved DCSes for delivery of fuel
Q. And that phrase also, that provision also

Page 4134

refers to a requirement to obtain delivery and procedure confirmation What is your understanding as to what that will require?
A. Well, that would require that once the failed fuel is identified or nonstandard fuel is identified as to what condition makes it nonstandard, that we'll have to look at, the Department, the receipt facilities that we have and any other equipment that we have, including transportation equipment to verify that there's no issues associated with receiving fuel in that condition.
Q And what is your understanding of the phrase "technical feasibility" in that provision?
A In that provision, "technical feasibility" could entail physical capabilities at the facility. It could entail that the facility has been licensed and analyzed for handling fuels in certain conditions.
It could entail the procedures that are in place to handle fuel in certain conditions So all that has to be done for us to be able to accept that fuel.
Q. Has DOE determined the technical feasibility of handling failed fuel?
A. That's something that's going to have to be

Page 4135

done on a case by case basis, once we know exactly what's failed about a given assembly There's many things that can cause an assembly to be failed, and that will have to get looked at against the requirements that may exist in the license and technical specifications and make sure that the analysis has been done and the license has been granted, such that we can possess fuel in that condition.

Q. And when will that case by case analysis be undertaken?

A. Well, again, it would be after we've been asked to look at a specific type of failed fuel by a utility, and after we have a license that says we can go off and we can compare it against, but we're not in a position right now to do that.

Q And the license that you're referring to, which license is that?

A That's the one to operate the repository because, again, that's where it's going to set forth what technical specifications we might have that limit our ability in the facility.

Q. Mr Zabransky, are you familiar with the exchange provision of the contract?

A Yes, I am.

Page 4136

Q What is your understanding as to what that provision provides?

A. That provision of the contract allows utilities to exchange amongst themselves approved delivery commitment schedules, subject to DOE's approval

Q Do you recall considering exchanges while you were at Wisconsin Electric?

A I recall at Wisconsin Electric that we discussed the concept of exchanges, but we never considered any concrete real exchanges.

Q Do you recall any specific discussions about exchanges?

A. Yes, we talked, in generally, my bosses and myself, was that this was a provision that would be interesting It's something we could look into. We had been doing a number of exchanges in other things in the fuel cycle in the front-end, as far as uranium and converted product, but that this provision, we needed to take into account the political uncertainties, and this is something that probably was going to be very hard to do.

And that if we exchanged a place in line, in essence, we saw it as something where someone would be looking for some of our early allocations,

Page 4137

because we had a number of early allocations, that they'd want us to move back, that we'd have to figure out how to justify that, and that we'd probably have to have some type of premium to justify the pain and political heat that we may take for doing such a thing

Q Were you ever asked on behalf of Wisconsin Electric to exchange allocations with another utility?

A. No, I was not

Q And did you ask on behalf of Wisconsin Electric to exchange allocations with another utility?

A. No, I did not

Q. Since you had been at DOE and served as the contracting officer's technical representative and the contracting officer, has any exchange request been submitted to DOE for approval?

A. No, it hasn't

Q. Has DOE formalized the criteria it would use to evaluate a exchange request should it receive one?

A The criteria would have to be something that would get looked at in light of when the request was received and what the request was for. So other

Page 4138

than the fact that we have to look at all aspects of the system and make sure we could address or accommodate the exchange, there really are no formal criteria

Q. Can we have Plaintiffs' Exhibit 145? Mr Zabransky, do you recognize what's been marked as Plaintiffs' Exhibit 145?

A Yes, this is a letter from Dr. Daniel Dreyfus, who was the director of the program, to Dr Kadak, who was at the time president and CEO of Yankee Atomic.

Q This letter is dated September 28th, 1995 Do you recall seeing it about the time it was prepared?

A. I believe I did. I don't know what my involvement was in creating it, but I believe I was aware it was getting done at the time and sent out.

Q Could we highlight the last sentence of the second paragraph? Mr. Zabransky, can you read the last sentence that's been highlighted there?

A In its entirety?

Q Actually, read the entire thing, although it's not all highlighted

A "We believe the exchange provision will allow industry to optimize the allocation of waste

Page 4139

acceptance capacity to meet individual utility needs, without the overt involvement of the Department."

Q Did you have an understanding as to what that, what was intended by that sentence at the time this letter was prepared?

A My understanding was that Dr. Dreyfus was trying to convey to Dr Kadak that we thought that they could arrange their own exchanges amongst themselves, and that they didn't need us to arrange them on their behalf, and the DOE didn't need to reallocate acceptance capacity. That could be done by utilities amongst themselves, pursuant to the exchange provision

Q I'm sorry, did you have something else?

A. Subject to DOE's approval

Q Did you have an understanding that this language was intended to indicate that DOE would approve all exchanges?

A I don't believe it indicates that, no. It just says that we wouldn't be overtly involved by arranging for the exchanges, but it couldn't imply, didn't imply that DOE would approve every exchange put forth.

Q And do you have a belief as to whether DOE could indicate, at the time this letter was

Page 4140

approved – at the time the letter was prepared, whether DOE could indicate whether it would approve all exchanges?

A I don't think DOE could do that at that time, and I'm not sure DOE could do that today Exchanges would have to be looked at in the context and time frame that they're submitted because, until you see what's actually being done and look at where the system is and what equipment exists and what analysis is done, you really can't put forth a blanket approval for all exchanges

Q You just said, "what equipment exists " What specifically about the equipment has to be looked at?

A. Well, if an exchange was between two utilities, and one utility had a boiling water reactor, BWR, another had a pressurized water reactor, a PWR, depending on when the exchange was put forth, the Department may not have the right cask You need different transportation casks for the two different fuel types We might not have the right waste package in place at Yucca Mountain because you need different waste packages for the different fuel types. So depending upon when all that capability was needed

Page 4141

and how it was changed by the exchange, you'd have to look at that. Those were just a few of the things you'd have to look at.

Q Whether training had been conducted prior to an exchange request being granted, is that something that would have to be looked at?

A. Well, training is another action, and that would be training not only of the personnel at the utility site and the personnel at Yucca Mountain for receiving different fuel types, if it hadn't already been covered, but training for emergency responders along transportation routes. The Department has to provide, under Section 180C, for funding for emergency responders to ensure they're trained to respond to any transportation incidents. And if an exchange took place between a utility in one region of the country where we had already trained people, but was putting forth an exchange in another region where we hadn't done training, it may not be possible to accommodate that on a short time frame.

Q. Does DOE, as this letter indicates, expect utilities to exchange DCSes?

A DOE continues to expect the utilities will exchange DCSes, yes

Page 4142

Q. And does DOE encourage utilities to exchange DCSes?

A. I think DOE has been encouraging the utilities to exchange DCSes under the provisions of the contract since DCSes were created back in the early '90s, yes.

Q As contracting officer, would you have the responsibility for approving exchange requests?

A. Yes, I would, now.

Q And do you expect that DOE will be able to approve all exchange requests?

A. I think DOE would approve exchange requests that we can accommodate without adversely affecting or impacting others that we have an obligation to pick up fuel from. So to the extent we can accommodate them, I think we'd approve them, yes

Q Do you have an understanding as to how an exchange request might adversely affect another purchaser?

A. Well, again, in the example we talked about with the PWR and BWR in transportation casks, if the exchange would cause us to move a resource, a PWR cask, to facilitate the exchange, it may be that that cask now becomes unavailable for the next utility that should have been served with its PWR fuel.

Case 1:04-cv-00106-EJD Document 310-22 Filed 06/23/2008 Page 9 of 40

Page 4143

So we'd have to make sure that we just didn't take from one utility to advance to another one, and then wind up not being able to serve that utility that had already been in line.

Q Mr. Zabransky, does the Office of Civilian Radioactive Waste Management try to manage the waste management program in an efficient and cost-effective manner?

A I think, as federal employees, we always try to do our jobs in an efficient, cost-effective manner It's a goal of the program to operate in an efficient, cost-effective manner, and I think we do things to try to ensure that happens

Q. What types of things does RW do to try to manage the program in an efficient and cost-effective manner?

A Typical things like procurements are done in a competitive fashion, to invest value for government whenever possible. And when we look at planning the system, we try to plan a system that meets the needs we have to take into account from our utility customers, but to be reasonable in doing it, so we don't overbuild systems that don't get utilized

Q. Does this goal of being efficient and

Page 4144

cost-effective translate into a specific acceptance rate?

A No, it doesn't, that I know of

Q Do you understand the term "full cost recovery" as that term is applied to the waste management system?

A Yes, I do

Q What does that term mean to you?

A Well, to me, that term means that the users of the system, those who we have contracts with, pay the full cost of us developing and operating the system, which includes developing the transportation equipment, the facility, Yucca Mountain, and ultimately closing that facility in the future, and those costs are all borne by the users.

MS SULLIVAN. One moment, Your Honor Nothing further at this time, Your Honor. I would move for admission of Plaintiffs' Exhibit 81, which was the letter that Mr. Zabransky sent to Alan Brownstein.

THE WITNESS: Your Honor, if I could take just a two-minute break?

MS. SULLIVAN Hang on just a minute.

THE WITNESS· Sorry

MS SULLIVAN Let's do this.

Page 4145

MR SHAPIRO: Your Honor, we don't have any objection to the admission of Plaintiffs' Exhibit 81, although we would want to check to make sure that there aren't any additional documents that should appropriately be considered along with this one in order to have a complete record of this, but as far as this document goes, we don't have any objection

THE COURT. Plaintiffs' Exhibit 81 is admitted

(Plaintiffs' Exhibit Number PX-81 was received in evidence.)

MS SULLIVAN Thank you, Your Honor

THE COURT. Why don't we take a break, 10 minutes?

MS SULLIVAN: That's fine

(Whereupon, a short recess was taken.)

MR SHAPIRO. Good morning, Your Honor

CROSS-EXAMINATION

BY MR. SHAPIRO:

Q Good morning, Mr. Zabransky.

A Good morning.

Q. I'd like to start with some questions about the delivery commitment schedule process. I believe you testified that starting in the 1997 time frame, the Department of Energy stopped approving or

Page 4146

disapproving delivery commitment schedules proposed by utilities?

A Yes, and I think it was in early '97, we stopped processing the submittals from utilities.

Q And DOE also stopped processing approvals or disapprovals of submittals of final delivery schedules from utilities?

A. We never processed any, so we never started those.

Q And instead, DOE sent letters to utilities responding to those proposed final delivery commitment – final delivery schedules stating they were being neither approved nor disapproved, isn't that correct?

A I believe that's correct, yes

Q. But the contract doesn't contain language that provides DOE that option to be either approving or disapproving, isn't that correct?

A That's correct

Q And it was your opinion at the time, as contracting officer's technical representative, that the contracting provide that option, correct?

A I was a technical representative I didn't make contract interpretations as to what it provided or didn't provide with respect to provisions, but,

Page 4151

for the decision to stop processing was based upon a belief that the DCSes were binding commitments, and we should not enter into binding commitments that we know we couldn't meet at that point in time

Q And in fact, not only did the Department stop approving those delivery commitment schedules and not even start processing final delivery schedules because of its desire not to commit itself, but on the advice of counsel, you actually went back and voided some previously approved delivery commitment schedules, isn't that correct?

A There were a number of documents that were in the process of being approved, but had never been transmitted to the utilities So these were documents that because, again, all correspondence goes through a review and legal review, was part of that review, that were in the system to be processed, that I had signed off on and sent on to the contracting officer, and that the contracting officer, in some cases, had signed off on, but had never been transmitted And prior to the final transmittal to the utilities, the review was, it was concluded that those should not be processed, and they were voided

Q But nevertheless, if I understand what

Page 4152

you've just said correctly, there were indeed some delivery commitment schedules submitted by utilities that reached not only your approval as contracting officer's technical representative, but the final sign-off by the contracting officer, and yours might have been the final sign-off in some occasions, yet nevertheless, those final approvals were voided?

A Well, again, my approval as COTR would have just merely advised the contracting officer the form was ready for her to approve, so it wouldn't have been final in any case if I had signed off on it. There were a few that Beth Tomasoni, I believe was the CO at the time, signed off on, that prior to transmittal, she rescinded.

Q And you would not have taken the action to void those except under the direction of counsel, correct?

A Counsel provided us advice that it would no longer be appropriate to keep signing those documents, yes

Q. And that's why you voided those?

A Yes

Q. And although counsel instructed you to void your signature on some of those approved delivery commitment schedules, isn't it correct that you would

Page 4153

not presume that once you had received an approved document, that it could be voided unilaterally by the Department, isn't that correct?

MS SULLIVAN. Objection, mischaracterizes the witness' previous testimony

THE COURT When you say, when the utility had received it or?

BY MR SHAPIRO.

Q No, I'm talking about simply, once the Department, once Mr. Zabransky and the contracting officer have approved it, that Mr Zabransky's belief that, is that, but for the advice of counsel, that the Department was not free simply to void those unilaterally?

A. But, again, the Department never communicated its approval The documents never left the Department They were, the ones that the CO voided were voided before they were ever transmitted The approval never really took place from that perspective

Q But you would not presume once you had received an approved document that it could be voided unilaterally?

THE COURT I don't get the "received an approved document "

Page 4154

THE WITNESS I'm not sure who's receiving what in your question

THE COURT What do you mean by "received an approved document"?

BY MR SHAPIRO

Q If you get back from the contracting officer an approved document, an approved delivery commitment schedule, you wouldn't think that you could simply void that, would you?

A. I didn't void her signature. She voided her signature

Q Didn't you void some delivery commitment schedules yourself, some approved delivery commitment schedules yourself?

A I only voided my signature, to my knowledge

Q. And did your signature appear on the approved delivery commitment schedule?

A. Yes

Q And you voided that?

A The contracting officer decided not to transmit and execute the final approved DCS, and we voided them, yes

Q And you voided your own signature as well?

A. I did, yes

Page 4155

THE COURT: Does any of this relate to a delivery commitment schedule binding the Plaintiffs, or is this –

MR. SHAPIRO No, it goes, Your Honor, to Mr. Zabransky's testimony that he thinks that the delivery commitment schedules have some significance, that they were binding, he thought, when they were at WEPCO, and they're important at DOE. But it would seem that the Department also feels that they can void them at the Department's whim, and that they're otherwise subject to counsel's direction to the Department not to grant them at all. That's the line of questioning

THE COURT· I just wanted to make sure you weren't talking about Yankee Atomic or Connecticut Yankee or Maine Yankee DCS.

MR. SHAPIRO I don't believe any of those were voided

THE WITNESS: And, again, I think you mischaracterized what I said The Department didn't void any DCSes that were approved and sent out and received by utilities. It recognized that once they received them, they were approved, and they had those approved DCSes It ceased sending them out. It ceased the approval process in

Page 4156

mid-process Transmittal letters transmitting them to the utilities were never signed, and they were never sent out by the contracting officer.

BY MR. SHAPIRO

Q Now, approved delivery commitment schedules are of limited value, aren't they? For example, despite having approved delivery commitment schedules when you were at WEPCO, you didn't rely on those approved delivery commitment schedules as a solution for WEPCO's near term fuel storage needs, did you?

A When I was at WEPCO and we were contemplating needing additional storage in the '92 time frame when those schedules came up, I think it was our belief that there was some uncertainty as to whether the Department would actually come forth and perform in 1998 And as a result, we built into our thinking for storage at Point Beach, that we needed to have reliance to keep the plan operating on our own ability to store the spent fuel. And that the commitments that we have from the Department of Energy, we were glad we happened to sign them, because we thought there might be some recourse someday, but we weren't going to rely on them to put the plant in jeopardy

Page 4157

So, again, we relied on them in the effect they were a contractual commitment, but we also made sure we had the capability to maintain the plant in operation in case the Department didn't follow through or wasn't able to follow through on that commitment.

Q. So the answer to my question is, yes, WEPCO did not rely on its approved delivery commitment schedules to provide for its, a solution for its near term spent fuel storage needs?

A. And I think that sort of mischaracterized what I said, is we went and got off as soon as we could as many commitments as we could, in case they would, for some reason, stop processing them, so we had some recourse, pursuant to the contract But, yes, we also built facilities that made sure that, in case something happened, we weren't putting our facilities in jeopardy.

Q. Well, the reason I'm asking the question more than once is I'm not sure you're answering my question. You're concerned about putting in a caveat that I don't understand, Mr. Zabransky. So the bottom line is that, notwithstanding the fact that WEPCO had approved delivery commitment schedules and maybe had some recourse down the line,

Page 4158

WEPCO didn't rely on those to provide for its near term spent fuel storage needs, correct?

A And I think, like I said, the answer is, yes, it has no – as would anybody else with a valuable asset that needed to make it operate, continue to operate, wouldn't put it in jeopardy solely on something beyond its control

Q And isn't it true that when DOE approved delivery commitment schedules, that it conditioned the approvals on the existence of a repository?

A I think there was a point in time where DOE did that. The original DCSes in the early years, and I don't know when it changed, did not contain that conditioned statement.

Q. Well, what about the ones at WEPCO?

A Those –

Q That was one of the reasons you didn't rely on those is because DOE conditioned those, isn't that correct?

A I don't believe those contained any kind of conditional statement.

Q. But others did contain conditions?

A At some point, that was the Department's policy or was advised a statement saying these were conditioned upon the existence of the facility

Page 4159

constructed under the Act, yes.
Q. Now, for the currently approved delivery commitment schedules, the ones that, before the last week's ACR and new delivery commitment schedule instructions came out, isn't it true that you don't see any good use for the information on those approved delivery commitment schedules because the Department's current plan for its waste management system uses different acceptance rates than those upon which the earlier delivery commitment schedules were based?
A I think your statement is partially correct It's true that our current plans in the ACR that we just put out last week are for greater acceptance rates beginning in 2010 through 2019 then in the first 10 years of the previous ACR, but it's also correct that some of the information provided by the utilities may no longer be valid, and they may have other plans for what they wish to have done beginning in 2010
Q So the bottom line, again, the real crux of my question is that you wouldn't see any good use for the information on the currently approved delivery commitment schedules?
A. Those supported operations beginning in

Page 4160

1998 I don't think they're valid for use supporting operations in 2010
Q And it's your belief that DOE has to renegotiate those delivery commitment schedules, isn't that correct?
MS. SULLIVAN Objection, vague. Which delivery commitment schedules are we talking about?
MR. SHAPIRO The previously approved delivery commitment schedules
THE WITNESS I think the disposition of those needs to be resolved We haven't resolved in the Department how to address that yet, but the DCSes that would be coming in under the APR that we issued last week for 2010 would be for the same fuel that were covered by the DCSes that came in previously. So we'd have to resolve that with the utilities, yes
THE COURT: Before I forget it, do you agree with Mr Pollog that the DCSes, well, the allocation under the capacity report is strictly for an allocation of quantity and that you can, the utility can substitute any fuel, they can list any fuel?
THE WITNESS On the DCS?
THE COURT On the DCS
THE WITNESS Yeah, I believe, I agree with

Page 4161

Tom, and that was a position I held when I was at the utility and which DOE has put forth, that the age of the fuel, the allocation really gives you a place in line, a ticket And when it comes time to proffer your DCS and actually deliver fuel, it's any fuel that meets the criteria under the contract
THE COURT· I guess I was kind of misled On page 15 of Defendant's Exhibit 7, which is the contract, in article, I think it was Article V – no, Article VI
THE WITNESS Article VI, sir?
THE COURT: Article VI, B1(a).
THE WITNESS. B(1)(a)?
THE COURT. B(1)(a), it says, "DOE would first accept from purchaser the oldest SNF and/or HLW for disposal in the view of facilities accepted otherwise provided in paragraph B, D and E "
THE WITNESS Yes
THE COURT: And B, D and E talk about exchanges or things like that, so I assume the contract required the utility to deliver the oldest fuel they had first
THE WITNESS I think this is another case where the contracting officer issued in her directions the guidance that utilities were free to

Page 4162

submit, or free to put forth any spent fuel they had that met the criteria as spent fuel under the contract and, again, explained that the allocation provision really made sense. And that it gave you a place in line, but then let you manage your fuel inventories as you saw appropriate, so that was another clarification that was also, I believe, in the instruction transmittal letters from the DCSes Yes
BY MR SHAPIRO
Q I want to get one more concern with the delivery commitment schedules, Mr Zabransky Under the contract, utilities have the express right to vary the quantities of spent fuel and high-level waste that DOE would pick up by 20 percent from the amounts on those approved delivery commitment schedules at many point before issuance of the final delivery schedule, isn't that correct?
A I believe that's correct, yes
Q But if everybody adjusts their allocation upward by 20 percent, so that the quantity to be accepted is more than the total acceptance rate that the Department has planned for that year, you don't know how the Department would accommodate that contract work, do you?

utilities on the draft mission plan
And what we have here at pages 593 and 594 of volume three of Plaintiffs' Exhibit 95 is a July 6th, 1984 letter from WEPCO to Charles Head. Do you recognize this letter?
A I've seen it in, I think, in prior depositions I'm not sure I recognize it from the time.
Q These are WEPCO's comments –
A. Yes, they are –
Q – to the draft mission plan?
A. They appear to be, yes. They are.
Q Well, let's take a look to see if it confirms your understanding that you had about WEPCO's position at the time. If you look at the bottom of the first page, it says in the indented portion, "DOE must be prepared to accept spent fuel from utilities on a schedule which will obviate the construction or deployment of additional at-reactor storage capacity after January 31, 1998 "
A. I see that, yes
Q And you agreed with that statement?
A Yes, that's what the WEPCO put forth as its position in July of 1984
Q And if you would turn to the second page of



the comments, the comment that's numbered number 2, the top paragraph on the page, it says that, "The DOE repository program should be carried out in a cost-effective manner which protects the interest of those who are required to pay for it. In other words, DOE should not permit itself to give in to expediency in making decisions or taking actions with significant cost schedule implications " You agreed with that statement?
A I agreed with it then, and I think we operate the program that way now.
Q Let's switch subjects, Mr Zabransky. You talked about failed fuel during your direct examination It's your understanding that the Yucca Mountain facility is going to be prepared to handle failed fuel to the extent it handles like an individual fuel assembly with normal handling equipment, isn't that correct?
A That's, again, I don't know what it's actually going to be able to do The goal is to try to handle failed fuel that – restate your question. I'm not sure I caught it Can you repeat the question?
Q. Your understanding is that the Yucca Mountain facility will be prepared to handle failed



fuel to the extent it handles like an individual fuel assembly with normal handling equipment isn't that correct?
A Well, I think I said in my answer, it's more than just handling equipment. It's all the facility capabilities are there so they can handle failed fuel without any additional requirements. So to the extent that failed fuel behaves in all aspects like intact fuel or standard fuel, then there should be no reason it couldn't.
Q And in fact, almost all utilities, nuclear utilities, have some amount of failed fuel, isn't that correct?
A. I think most have it I don't know the exact quantities or characteristics at each utility, no, but, yes, most have it
Q And as far as the delivery commitment schedule process goes, the delivery commitment schedules, they treat failed fuel just like any other fuel, isn't that correct?
A. No, I don't believe it's the case
Q And when a utility proposes a delivery commitment schedule, do they indicate failed fuel differently on that?
A. No, but I think in the instructions that



were provided to the utilities that I've always operated under, the DCSes presume all the fuel is standard. So to the extent DOE's being informed fuel is going to be delivered, it assumes it's going to be standard, unless it's informed otherwise, subject to the approval of DCS
Q. I think that's my question. The delivery commitment schedule paperwork doesn't distinguish between standard fuel and failed fuel?
A. You said, your question to me was, does it treat it the same as, and the answer is, it assumes it's not failed, it assumes it's standard.
Q So the process treats them the same?
A No, it excludes failed fuel. It assumes it's standard fuel
Q How does the delivery commitment schedule, we could pull one out, but where does the delivery commitment schedule exclude failed fuel?
A I believe the instructions that were provided instructed the utility, informed the utility that DOE would assume that everything on that schedule was standard fuel, and that it was the obligation of the utility to inform DOE otherwise.
Q. On the proposed delivery commitment schedule?

Page 4175

A. Subsequent to, at some point in time, yes

Q But not on the proposed delivery commitment schedule?

A That was merely for an acceptance of that amount of standard fuel from that utility

Q. So on the proposed delivery commitment schedule, the utility was not obligated to note whether or not that quantity of fuel was failed or not?

A. Because it had already been told it was going to be assumed by DOE it wasn't failed, it was standard, in the instructions that were provided.

Q If you could just answer the question on the proposed delivery commitment schedule, the utility was not obligated to note whether or not the fuel represented in that schedule was failed?

A No, the complete answer to the question is because DOE had already informed them that the fuel would be assumed to be standard

THE COURT. How would they schedule failed fuel? Would they have to put in a separate DCS?

THE WITNESS Well, the process that was envisioned is that when the facility decided it wanted to deliver failed fuel, or fuel it knew that wasn't standard, it would have to tell DOE, here's

Page 4176

what I want to deliver, and here's exactly what this fuel entails.

DOE has a process within the contract that when a utility informs it that they want to deliver other than standard fuel, the utility puts forth an exact description of the fuel and the issues, we'd have to evaluate that within a 60-day period and inform them whether or not we could accept it on the agreed-to schedule or what adjustments would need to be made to the schedule, so we could accommodate that failed fuel or that nonstandard fuel

THE COURT That notification might include in a statement that, in our approved DCS of such and such a date, the following failed fuel

THE WITNESS· It could, but then DOE might not approve it for normal scheduling at that point in time So that would have been something that would have factored into the approval process, if we knew that's what was happening

But the approach that was taken was it was an assumption that this is just starting the scheduling process, we'll deal with the particulars of the exact fuel assemblies later, and until we know the circumstances of a specific type of failed fuel or nonstandard fuel, we can't give a blanket there's

Page 4177

no issues here

THE COURT· When in the process did the utility have to actually list the specific assemblies?

THE WITNESS We really don't get to that level until I think a year, or 60 days before, when we start tightening up the allocations The DCSes could be for broad ranges of fuels. The FDSes, which comes a year before, can narrow that down, but the specific fuel assemblies, excuse me, aren't due until 60 days before

THE COURT Before actual pickup?

THE WITNESS. Delivery, yes.

THE COURT: Well, they couldn't, at that point, tell you it's failed fuel because you have 60 days or something, and there's notice to respond or something?

THE WITNESS. Right. So by that point in time, we should have worked out all the procedural requirements. It could affect the shipping cask. It could affect the receipt facilities. Those get worked out between the DCS and the final pickup process.

THE COURT I don't know if that helps

MR SHAPIRO I think it does help some,

Page 4178

Your Honor, just to make sure we can confirm Mr. Zabransky's understanding

BY MR. SHAPIRO

Q So the delivery commitment schedule form itself, we can show you one if you need it, that form doesn't even have a place on it to indicate whether or not the fuel is failed, does it?

A. No, it doesn't. Again, Mr. Shapiro, that's because going into it, the Department assumed and put the utilities on notice that it would presume it was all standard. So then to give them a place to check "failed" would be kind of inappropriate, since we've already said it's all standard from an assumption purpose.

Q. Well, do your instructions say that the utility is filling out its form incorrectly if some of that fuel happens to be failed? You're just saying that it makes an assumption?

A. Yes, I am. So going into it, we're committing to pick up that amount of standard fuel

Q Well, let me turn back then to the annual capacity report that provides allocations to utilities.

A Yes

Q. And we can get you a copy of that if you

Page 4179

need it. But you're familiar with the annual capacity report, the one sent out last week?
A I'm familiar with it, yes.
MS SULLIVAN: I would ask that the witness be provided a copy of the report since he's already testified he was going from memory when he answered the previous question If there are specific questions about the document, it's appropriate to hand the witness a copy
MR. SHAPIRO It's Plaintiffs' Exhibit 1952.
BY MR SHAPIRO
Q And why don't we turn to page three in Plaintiffs' Exhibit 1952, the summary of purchaser's annual allocations? Now, this table, the summary of purchaser's annual allocations, this lists the amount of spent fuel that the Department is allocating that each utility, the amount that the Department will pick up in each year?
A That's correct.
Q. And this allocation is not limited, there's nowhere in this document where it says this allocation is limited to fuel that is not failed, does it?
A No, this is a complete allocation to that

Page 4180

utility in a given year
Q And let me turn back to issues about the acceptance of failed fuel Other than technical handling reasons, there were other reasons for not accepting failed fuel on the same schedule as standard fuel, isn't that correct?
A I think that's a simplification, but some of those technical handling reasons can be pretty significant.
Q Well, under the contract's definition of failed fuel, you would interpret the phrase "special handling" to mean fuel that requires handling with equipment other than the fuel handling tool that otherwise accompanies regular fuel assemblies, isn't that correct?
A That's one requirement that may kick in with respect to failed fuel, yes.
Q But isn't that how you would define "ordinary handling"?
A Excuse me, the word what?
Q. Ordinary handling.
A Again, no, I'd go farther than that. For instance, the receipt facility at Yucca Mountain could handle failed fuel in an entirely different location than it would handle intact fuel, so it may

Page 4181

need to be scheduled to entirely different facilities if we knew it was failed ahead of time, and we'd have to address that.
That's special handling It may require totally different procedures if it's failed That's also special handling
Q Do you recall having your deposition taken in the Indiana Michigan case earlier this year?
A I recall many depositions. I think I had 13 days of depositions
Q And you had one earlier this year in the Indiana Michigan case?
A. I think I did, yes.
Q And you took an oath much like you did this morning?
A. Yes.
Q. And you told the truth?
A Yes, I did.
Q. And you testified accurately?
A. Yes, I did.
Q And weren't you asked the following question and give the following answer: "How would you define 'ordinary handling'?" You gave an answer, "Spent fuel is handled with a fuel handling tool Anything more than that

Page 4182

is not ordinary " Isn't that your correct answer?
A And, again, that's one type of ordinary handling
Q Isn't that your correct answer?
A I'd like to see the deposition.
MS. SULLIVAN Objection, I ask that the witness be provided with a copy of the deposition he's being asked about
THE WITNESS I'd like to see it.
MR SHAPIRO Certainly.
MS. SULLIVAN Which deposition is this?
MR. SHAPIRO. This is January 29th.
MS. SULLIVAN· Thank you
BY MR. SHAPIRO.
Q. We're handing out binders. It's tab 10 in the binder. We must have missed a couple days somehow, Mr. Zabransky.
A A couple days.
Q. And I was reading from page 297, down at the bottom
A. 297, oh.
Q. There are four pages on a page, it's near the end, down at line 20. It says, "How would you define 'ordinary handling'?
"ANSWER Spent fuel is handled with a fuel

Page 4183

handling tool Anything more than that is not
ordinary "
That's your truthful testimony, isn't it,
Mr Zabransky?
A Well, again, I think if you read before
that, you'll see how that's I defined it when I was
at Wisconsin Electric
Q. So you changed your definition?
A. Absolutely, I have When I was at
Wisconsin Electric in the '80s and early '90s, that's
what I thought should have been the requirement
Since I've been at DOE and I've been kind of aware of
the issues related to the receipt of spent fuel at
Yucca Mountain, I'm aware of the fact that there's
other issues related to failed fuel that might be
broader than just mere mechanical transfer.
Q If failed fuel requires no special
handling, it must be taken on the same schedule as
standard fuel, isn't that correct?
A. I think the provision you're referring to
in the contract which requires the utilities to
inform DOE of the type of failure and the nature of
the failure says that if there's no technical issue,
if we have no technical reason that we can't take it,
doesn't require special handling, that there be no

Page 4184

reason to delay it, that's a correct statement
Q. So if it doesn't require, if failed fuel
doesn't require special handling, it must be taken on
the same schedule as standard fuel, correct?
A I think that's fine I agree with that,
yes
Q And isn't it possible that, for example, a
fuel assembly could have radioactive leakage and
still not require special handling?
A. It's possible that it could and not
require, it's possible it could and could require
special handling, so you can't say, right now, with
respect to a hypothetical type of failure, what will
happen to it
Q. And you have mentioned concerns about the
handling of failed fuel at Yucca Mountain. But you
don't work on how failed fuel would be handled at
Yucca Mountain, do you?
A I have discussions with the designers at
Yucca Mountain who are working on the design receipt
facilities who have expressed concerns about that,
yes
Q. But that's not something that you worked
on, is it?
A I think, you know, do I design it? No. Do

Page 4185

I interface with the designers in Mr. Kouts'
organization to ensure that we can accommodate their
needs and they understand exactly what they have to
design for? Yes, I do.
Q Let me ask you about another deposition
that you gave, this one a couple years earlier,
January 6th, of 2002. Do you want to look at it in
the binder?
A Sure
Q. This one should be on tab seven
MS. SULLIVAN Mr. Shapiro, I think you
misstated. It's June 6th, not January 6th.
MR. SHAPIRO I'm sorry, if I misspoke,
June 6th, yes
BY MR SHAPIRO.
Q. And if you would look on page 332, line 18,
weren't you asked the following question and give the
following answer:
"QUESTION: I'm asking what the
Department's plans are. Is failed fuel something
that – is planning for how failed fuel would be
handled at the repository something you work on?
"ANSWER: No, it wouldn't be "
That's your truthful answer, isn't it,
Mr Zabransky?

Page 4186

A. It was as of June 6th, 2002.
MS SULLIVAN. Objection. For
completeness, I ask the next question and answer be
read into the record
THE COURT. You can read it in, if you
wish
MS. SULLIVAN: That's fine I'll do that
on redirect. Thank you, Your Honor.
THE COURT· Okay.
BY MR. SHAPIRO
Q. I'd like to turn at this point to a
different subject Mr. Zabransky, you gave some
testimony about multi-element sealed canisters and
containers that could be used to handle spent fuel,
and I want to turn to that subject
A Okay.
Q. Isn't it true that the Department plans to
use different waste packages for different kinds of
fuel at Yucca Mountain?
A. I believe the LA, and this is, again, an
area that I'm aware of only in passing terms,
contains four, five, maybe six different types of
waste packages, correct.
Q. And this is due at least in part because
the Department is planning to accept different waste

Page 4187

with different characteristics from utilities,
correct?
A The Department has, is planning on and part of the requirements are to accept DOE spent fuels, DOE high-level waste and Naval spent fuel, yes
Q And once at Yucca Mountain, the Department's plan is to repackage the waste in whatever container it comes in into a disposal waste package, isn't that correct?
A. Well, again, not for all materials, no
Q For utility materials, for utility spent fuel?
A My understanding is that the waste packages being designed for commercial spent fuels are for bare, not canistered, not multi-canistered, bare PWR and BWR fuel assemblies.
Q That's my point, Mr. Zabransky, so that the department's firm plan is that if the Department receives, as you termed it, bare PWR or BWR spent fuel – first of all, when you say, "bare," the Department isn't receiving a flatbed truck with bare assemblies like the one we have in the courtroom, it's receiving those in a transportation cask, isn't that correct?
A That's correct.

Page 4188

Q And the plan is to take those, as you termed them, bare assemblies out of the transportation cask and put it into a disposal container, isn't that correct?
A. The lid would be taken off the transportation cask, and the assemblies would be taken out and transferred to a disposal package, yes
Q. So the Department is planning to repackage the waste in disposal packages, correct?
A It's planning to unbolt the lid and take the fuel out and repackage it, yes.
Q And I believe you testified in the direct examination, but let me just confirm that the Department's current plans for Yucca Mountain include the capability of accepting canistered spent fuel, or as you've phrased it, spent fuel in MESCs from utilities at Yucca Mountain, isn't that correct?
A. It's my understanding, from my review, sitting in a design review meeting of facilities being planned for Yucca Mountain, that there will be a space where a MESC can be taken and reopened, but not on a routine basis, not a normal throughput activity. So, yes, the contractors are including the capability to do that, but not as a normal course of operations

Page 4189

Q And I believe you testified that the reason that it's not being made part of normal operations is simply because there's a need for a contract amendment, an amendment to the standard contract, is that correct?
MS SULLIVAN. Objection, mischaracterizes the witness' testimony.
THE WITNESS I don't believe I said that
THE COURT· Okay Your question asked whether he did testify, and the witness has answered.
MS SULLIVAN: Thank you, Your Honor.
BY MR SHAPIRO:
Q Isn't the contract amendment what's preventing DOE from accepting spent fuel from utilities in multi-element sealed canisters in these dual purpose containers?
A That's the reason we're not accepting them, but that's not the question you just proffered to me
Q. Well, let me just focus on that. So you're saying that is the reason why you're not planning to accept them?
A. Well, that and the fact that it's a big burden on the system to accept them and repackage them.
Q But in fact, the Department considered

Page 4190

making the modifications to the standard contract in order to accept multi-element sealed containers, the dual purpose containers, isn't that correct?
A. We're willing to talk about that. The Department's position was, yes, we're willing to talk about that, along with other contract modifications that would be to our benefit.
Q. But the Department is not pursuing contract modifications, isn't that correct, Mr Zabransky?
A. I think it's not exactly true We're not doing anything actively right now. We'd be happy to pursue them, but there's no utility that's come forth and said, We agree with you that these aren't covered, let's modify the contract. It takes two to have a modification
Q Isn't it your understanding that the Department decided not to pursue contract modifications further from the input of counsel?
A. I think that we're sitting around, and, again, we're happy to talk to anybody at any time. I don't know that counsel ever directed us to not talk to utilities There were just no work that needed to be done at that point, so I'm not sure what you're referring to.
THE COURT: Could you sort of maybe -- I

Page 4191

assume there's some coordination between DOE and the Nuclear Regulatory Commission, and the Nuclear Regulatory Commission is licensing these dry storage facilities which have sealed containers, generally, I assume, in them, and also decommissioning of the plant, which correct me if I'm wrong, but I assume eliminates the ability to actually reopen the sealed container, at that point, and do anything with them, other than just put them on a truck and send them to the repository

As such, is it your view that the Nuclear Regulatory Commission licensing these facilities is just assuming that DOE would have to accept these containers, assuming there's no alternative?

THE WITNESS Well, again, I think it's an awkward situation to be in, but, yeah, I think NRC has nearly done its technical review. At least technically, their reviews are limited to, does it meet its requirements to be safe during transport and storage. And having done that, they'll license it.

THE COURT And I assume the ceiling is necessary for safety and for storage.

THE WITNESS Right But they require the utilities be able to demonstrate how they would open them, if they needed to remove the contents So,

Page 4192

yes, it's a situation where these things have been approved for storage, but there hasn't been closure on the issue of will they be subsequently accepted by DOE, pursuant to the contract

THE COURT: Do you know of any way that they could be reopened on-site?

THE WITNESS: It would require, you know, just from a general background, there would have to be some type of facility, maybe a modest facility constructed, that would allow them to be cut open and repackaged, much as we're going to have to do when we receive them at Yucca Mountain.

THE COURT So it would be another cost aspect?

THE WITNESS Uh-huh.

THE COURT: Okay.

BY MR. SHAPIRO

Q But your ultimate expectation, Mr. Zabransky, is that DOE is going to be accepting some canistered spent fuel from utilities?

A. I believe that we'll eventually reach an accommodation with a utility or more than one utility to come up with a contract amendment and accept some canisters, yes

THE COURT Is there any ability to alter

Page 4193

the fee under those circumstances?

THE WITNESS: At this point, it doesn't look like it, no We don't charge a given utility for its express individual cost

THE COURT: So what –

THE WITNESS We charge a uniform fee for everybody.

THE COURT: Oh.

BY MR. SHAPIRO

Q. And I just want to confirm something I think we covered a little bit before, but I want to make sure I have your understanding that originally the Department anticipated that spent fuel would arrive at the DOE facility from utilities in a vaulted transportation only cask that DOE was to provide to utilities?

A. When you say, "originally," what do you mean, "originally"?

Q. Well, since the beginning of the, since 1983, has that been your understanding?

A. I don't know what DOE presumed before I got there in '94, but as long as I've been there, it's always been that there would be a transportation cask, and I'm not aware of any transportation casks other than bolted/closed

Page 4194

THE COURT Just in case I forget, is Appendix F to the contract, if you're aware of that, the first requirement for a detailed description of the fuel assemblies?

THE WITNESS Well, let me get a copy of that. I believe that's the first time the utilities have to describe the assemblies they're going to provide.

THE COURT: And also any damage to –

THE WITNESS Right But there's also a provision, and bear with me while I try to find it

THE COURT That's a 60-day before shipping date.

THE WITNESS Right. But under Article VI, 2(b), that we talked about earlier, it basically tells the purchaser there that they need to obtain delivery and procedural confirmation prior to delivery and designate it, describe it to DOE. So the timing of that is sometime before the Appendix F, so at that point in time, you can be sure that fuel can be accommodated

THE COURT As a practical matter?

THE WITNESS Uh-huh.

BY MR. SHAPIRO:

Q. Mr. Zabransky, while we're still on this

Case 1:04-cv-00166-EJD Document 310-22 Filed 06/23/2008 Page 19 of 40

Page 4207

transportation system that you'd have to develop for transportation to Yucca Mountain, might be the exchanges would be crucial to developing an efficient transportation system.

THE WITNESS I think it's fair to say, Your Honor, that without, as laid out in the ACRs and as followed up in the Oldest Fuel First, it doesn't necessarily go to the most efficient transportation system, but it's the system that, in the absence of somebody exchanging with each other, we're going to have to live with

I think the scheduling process that's laid out doesn't always lend itself to the most efficient operation of the system

BY MR. SHAPIRO

Q So if utilities exchanged, Mr Zabransky, that might actually result in a more efficient transportation system that will be actually easier for the Department to accommodate?

A If the circumstances of the exchange were to that effect, it could, yes

Q. You can't think of any reason, can you, Mr. Zabransky, why a utility wouldn't participate in a market for approved delivery commitment schedules if the DOE acceptance system was otherwise up and

Page 4208

operating at a rate consistent with the current plan for Yucca Mountain?

A. I think there could still be reasons. I mean, utilities would have to look at their own individual circumstances There could be in-state political reasons that they don't want to take whatever heat would come from making an announcement which in effect says, I've decided to leave nuclear fuel in my state longer than I had to because I wanted to exchange with utility X for a few dollars. So I don't think you can say there can't be any reason There could be other utilities who may have committed to their in-state regulators or in-state groups that they wouldn't do such a thing. So it's a broad statement to say there aren't any other reasons There could be other reasons I don't know what they are

Q So you don't know what those reasons would be?

A Those are examples of types of reasons There could be political constraints

Q. But ultimately, you believe there's no reason why exchanges shouldn't work on a global basis, isn't that correct?

A. It would be my belief that, like I said, in

Page 4209

a mature situation, where this is no longer a big deal, where trading uranium, trading pollution offset credits becomes a routine thing as it did, that when moving nuclear fuel around the country or leaving it in one state or another state isn't a big deal anymore, this could be a normal exchange process. But that's a long ways off

Q. But there's no reason why exchanges shouldn't work on a global basis, isn't that correct?

MS SULLIVAN Objection, asked and answered.

THE COURT You mean as a matter of economics?

MR SHAPIRO: As Mr. Zabransky's belief, his entire understanding of the program over many years.

THE WITNESS: Again, Mr. Shapiro, it may be that the utility who has the exchange, as a good utility, might be in a profit-making motive, might want so much for its allocation, that the utility that would really like to have it decides it would rather just build a facility itself. That's going to be driven by the individual economics of the situation and individual desires of the utilities involved

Page 4210

BY MR SHAPIRO·

Q. I want to go back to one more part of one of your depositions, June 6th, 2002, back to tab seven It's kind of a series of, starts on page 277, there's a series of questions and answers that I thought ended on this point, Mr Zabransky Let's take a look. Have you found page 277?

A. Yes, I have

Q Let me start on that question that begins on line 21

"Can you think of any reason why a utility wouldn't participate in the market for approved delivery commitment schedules if the DOE acceptance system was otherwise up and operating at a rate consistent with the current program plan for the Yucca Mountain repository?"

Objection by Mr. Crawford

And you said, "And, again, utilities are private companies They have boards. They have management that have done things for reasons that these people find personal I can't speculate as to what reasons people would have for doing things or not doing things

Utilities, over the years, have decided not to buy from certain countries because they didn't

Page 4211

want to. They have decided not to do this or" –

MS. SULLIVAN Objection, Your Honor. I don't believe Mr. Zabransky's statement that's being read into the record is inconsistent with what he said here in court

THE COURT. I think he's getting there

MR SHAPIRO: I'm going to get to it, Ms Sullivan, I don't want to take it unfairly out of the context I wouldn't have thought you would have minded this part of the statement

BY MR. SHAPIRO

Q "They have decided not to do this or not to do that for their own particular reasons. I don't know what those are."

And then came back to a question, "I'm not sure that's quite an answer to my question. Is the answer to my question, no, you can't think of any reasons right now?"

Mr Crawford objected again.

"I guess I don't know how to respond to a question which says, given individual people, what reasons would they have for doing something or not doing something I don't know what reasons they would have It could be they had a bad day and just don't want to do it

Page 4212

I mean, it's a private decision You would have to ask the questions There is no reason it shouldn't work on a global basis. Some utilities decided to go into nuclear power, some didn't They had reasons."

MS. SULLIVAN. Your Honor, same objections, I don't think that's inconsistent with his statement here today

BY MR SHAPIRO·

Q. Wasn't it your testimony, Mr. Zabransky, "There is no reason it shouldn't work on a global basis"?

A And, again, there's no technical reason it shouldn't work, but whether it actually works or not –

Q Didn't you testify, Mr. Zabransky, that there's no reason it shouldn't work on a global basis? You didn't say, in your deposition, "technical reasons," did you, Mr Zabransky?

A Mr. Shapiro, after the two pages you just read there, I said here's all the reasons it may not happen, no reason it shouldn't happen, but it just may not happen.

Q I believe you testified, Mr. Zabransky, but I want to confirm, isn't it true that DOE will work

Page 4213

to facilitate exchanges?

A. I think DOE would do that, if it was asked to do something, it will work to facilitate exchanges. I'm not sure what that means.

Q. If you look at it historically, Mr. Zabransky, didn't DOE at one point have an electronic bulletin board that hosted approved delivery commitment schedules so utilities could see what was available to exchange?

A. Yes, the DOE did that.

Q. And it has been the Department's position that DOE will act reasonably in approving exchanges, isn't that correct?

A. Yes, it has been.

MR SHAPIRO Thank you, Mr. Zabransky

THE WITNESS: Thank you, Mr Shapiro.

THE COURT. Redirect, or you want to break for lunch?

MS. SULLIVAN: Can we take a 10-minute break? And I think I'm going to have a very short redirect, and we truly can have a short day today Is that all right?

THE COURT· Sure Break and come back about five minutes of.

MS. SULLIVAN. Thank you, Your Honor.

Page 4214

(Whereupon, a short recess was taken.)

MR SHAPIRO. Your Honor, I hate to make a habit of it, but we had just one more question

THE COURT. Sure

MR. SHAPIRO· Really more of curiosity.

BY MR. SHAPIRO·

Q But there apparently has been a reorganization, Mr. Zabransky, maybe you can help me out. Right at the beginning of your direct testimony, you explained that you report to Mr Kouts, who reports to Mr. Garrish, who reports to Dr. Choo And I guess my question is, what happened to Mr. Milner? Last time I checked, I thought Mr. Milner was the chief operating officer to Mr. Garrish. What role does he have now?

A. He's the chief operating officer, and I don't think it's a direct line role to Mr. Kouts' organization. It's a staff support function to Mr. Garrish. And I don't know exactly how to explain it to you beyond that

Q. So the staff position is Mr. Milner's position, or are you, is the line, if I understand what you just said, so the line goes direct from Mr. Garrish, to Mr. Kouts and to you, and Mr Milner

Page 4215

is just kind of off as a support person?
A He works on issues related to how to run the program from a departmental perspective for Mr Garrish, as far as budgets and those kind of things
Q. Is he senior to Mr Kouts or same level as Mr. Kouts?
A. I don't know the answer to that question
Q And when you say he works on a departmental level, can you explain that a little bit more?
A He is Mr. Garrish's chief operating officer for operating the program within the requirements of the Department of Energy, but I really don't know his job description personally.
MS. SULLIVAN Your Honor, Mr Milner will be here next week He can certainly be asked about the scope of his responsibilities at that time
MR SHAPIRO. I just thought we'd get an advanced preview
THE COURT Okay
MR. SHAPIRO. Thank you, Mr Zabransky
THE WITNESS. You're welcome
THE COURT Any redirect?
MS SULLIVAN Yes, Your Honor
THE COURT Okay

Page 4216

REDIRECT EXAMINATION
BY MS SULLIVAN.
Q. Mr Zabransky, I believe you testified in response to some questions that Mr Shapiro had for you that you believed that exchanges could occur in a mature situation What do you mean by that statement?
A Well, when I used the word "mature" to talk about exchanges occurring in a mature situation, I'm envisioning a situation where the whole idea of moving spent fuel from utilities to a repository and transporting on the roadways has become routine, that there's no special significance, and nobody's excited about it, so it's a really routine activity. It's gone on for years, maybe five, 10, 15 years, no one is excited. And utilities are generally risk adverse They don't like to be the first to do things, so they tend to want to have some assurance that what they're doing is not going to upset their public, and that's what I say, when you can be sure it's going to work like clockwork, then exchanges become easier to deal with.
Q Does that mean that you don't expect exchanges to occur in the first year of the program?
A I can only speak from my personal

Page 4217

perspective I can't imagine when I was at Wisconsin that we would have thought about doing things in the first year.
Q. And the bulletin board that Mr Shapiro asked you about, was DOE approached with any exchange requests as a result of that bulletin board?
A No. My recollection is that we kept it up for a while, maybe a year or so, and that there was very little activity on it It merely listed all the approved DCSes, and I think utilities could figure that out for themselves, so it didn't have a lot of activity, and we didn't have any exchanges brought to our attention as a result of it
Q Mr Zabransky, did you prepare the 1995 ACR?
A I, yes, I guess at that point I was responsible for getting it published, so I took a document that was in process and brought it to completion.
Q How did you identify the rates that were to be put in that document?
A The rates, by the time I came to that document, the rates were already in there in draft form, and they were not different than the rates in the previous documents.

Page 4218

Q Mr Zabransky, do you have the binder of your deposition transcripts that Mr. Shapiro had prepared for you?
A. I have that binder, yes
Q Could I ask you to turn to page seven – I'm sorry, tab seven, which is your June 6th, 2002 deposition? And could I ask you to go to page 332?
A Yes, ma'am
Q Mr Shapiro asked you about the question and answer on page – lines 18 through 22 on that page Could you read, beginning at line 23 of that page, through your answer that ends on line 9 of page 333?
A. Yes, I can
"QUESTION: How have you become aware of the Department's plans for handling failed fuel at the repository?
"ANSWER: Only from the standpoint to the extent that I have the ability, I make sure they're aware of going to have to deal with some failed fuel, and that they are aware of it. The contract ultimately has to take all of the fuel. The question is some of fuel may require special handling, and until we know what the special handling is, as told to us by the utilities who will handle it first, we

Page 4219

can't plan for it "

Q. Thank you. Mr. Zabransky, do you have an understanding that utility discharges earn a utility, an allocation, an acceptance allocation as set forth in – let me back up

Do you understand that the acceptance priority ranking issued by DOE contains discharges reported by utilities?

A Yes, the APR is a listing of all the discharge reported by utilities to the Department.

Q And do you understand that those discharges earn utilities allocations in the acceptance ranking?

A. The discharges in the APR form is the basis for the allocations in the ACR, that's correct

Q And could those discharges that earn a utility an allocation include failed fuel?

A Yes, I'm sure they do

Q And when will a determination be made as to whether failed fuel needs special handling?

A Well, after the utility requests the Department to review a specific instance of a failed fuel, we have, I think, pursuant to the contract, 60 days to make that determination

Q. Could we pull up Defendant's Exhibit 30 001? Mr. Zabransky, I'll represent to you that

Page 4220

Defendant's Exhibit 30.001 is a transmittal letter to Mr Buchheit from Mr. Detmer, the contracting officer, in March of 1992, forwarding what are referred to as the delivery commitment schedules. Do you see that on the screen? I don't have copies of this document

A Yes, I'm looking at it.

Q. Could we go to the third page of the instructions, which is the fifth page of the document, and could you highlight paragraph H, please? Mr Zabransky, could you read that excerpt from the DCS instructions, please?

A Yes "Since the DCS does not require the identification of specific fuel to be delivered, each DCS is assumed to be for standard fuel, Class S1 or S2 as defined in Appendix E of the standard contract An approved DCS should not be interpreted as a commitment by DOE to accept other than standard fuel. The standard contract makes specific provisions for delivery of other than standard fuel If a purchaser intends to deliver other than standard fuel, the purchaser must submit proposed handling/shipping procedures to DOE for evaluation and confirmation as to the technical feasibility of accepting the delivery on the schedule in the

Page 4221

approved DCS Submittal of these proposed handling/shipping procedures is not required until after the DCS has been approved. If the acceptance of other than standard fuel cannot be accommodated, the purchaser has the option to deliver standard fuel on the schedule in the approved DCS or to exchange the approved DCS with another purchaser, provided contractual time limitations can be met."

Q. Mr Zabransky, is the portion of the DCS instructions that you just read, is that your understanding as to where the contracting officer communicated the assumption that the DCSes would cover standard fuel?

A. That's what I was referring to when I testified earlier, yes

Q. Thank you. And could we pull up Plaintiffs' – excuse me, Defendant's Exhibit 7, which is the Yankee Atomic standard contract? Could we go to page 12 of this document? Do you have that in front of you, Mr. Zabransky?

A I have it on the screen, yes.

Q. Could you highlight the exchanges provision at the bottom there, please? I want to clear up some confusion about the Oldest Fuel First Could you

Page 4222

read the first sentence of that provision under exchanges?

A. Yes. "Exchanges, Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE, provided, however, that the purchaser shall comply with the requirements of this contract."

Q Mr Zabransky, is it your understanding that this sentence is what gives utilities the right to designate specific fuel it wishes to deliver to DOE outside the Oldest Fuel First queue?

A. Yes, this is my – my understanding is this is what was relied upon by the contracting officer when it gave the instructions that utilities could do that.

Q. Could we go to page 11? Mr. Shapiro also asked you about the provision in the standard contract that allows a purchaser to adjust the quantities of spent nuclear fuel and HLW plus or minus 20 percent in the delivery schedule, up to two months. Do you remember that testimony?

A. Yes, I do.

Q And is that provision of the contract paragraph number two here on this page?

A Yes, it's contained in paragraph two.

Q. Do you understand that that adjustment

Page 4223

occurs after the approval of a DCS? Maybe we need to go back

A. Yeah, I need to go back to the previous paragraph It follows the first paragraph, which has the submittal of the DCS and talks about revised schedules And, yes, it would follow that it's after the approval of the DCS

Q So to map out the process, is it your understanding that a utility first submits a DCS?

A That's correct

Q And then DOE will review that DCS and approve or disapprove it?

A Correct

THE COURT. Going back to –

MS SULLIVAN Pardon me

THE COURT I was just going to go back to the exchanges again. If the source of the right to deliver other than Oldest Fuel First is considered an exchange, then I assume it has to be approved by DOE It does say that any – or is it the approval will only apply to purchaser exchanges?

THE WITNESS. Bear with me, I have to go back

THE COURT It's on page 12 of this document

Page 4224

MS SULLIVAN The exchange provision

THE WITNESS The contracting officer's letter that was sent out in '92 and the guidance given, when I was outside, I took that to mean I could do my own fuel management internally for my own purposes

But the next sentence that goes to the approval deals with the exchange of DCSes between purchasers So DOE's guidance was that the first type of exchange of different fuels that are in the allocation wouldn't require approval

THE COURT· Maybe DOE is giving a blanket approval for that type of exchange

THE WITNESS. That's the way I took it, yes.

THE COURT Go ahead.

BY MS SULLIVAN:

Q No, no, is that – let's go back to the previous page, page 11, talking about the 20 percent So let's assume that a purchaser has an approved DCS

A Yes

Q Then pursuant to provision B2 on that, on page 11 of the contract, purchaser can adjust the quantities or the delivery schedule, is that your understanding?

Page 4225

A. Yes, plus or minus 20 percent in the schedule up to two months

Q. Is it then your understanding that the utility is to submit an FDS?

A That would be the next step in the process.

Q Okay. And is the FDS subject to DOE's review and approval?

A. Yes, it would be.

Q To your knowledge, has anyone with an approved DCS notified DOE that it was going to adjust, by two months, its delivery schedule, or by 20 percent, the delivery amount?

A Not that I'm aware of.

Q Have you ever had to address whether DOE has to approve an FDS that has added 20 percent, regardless of DOE's circumstances or capacity?

A No, we have not had to address that

Q Once a utility submits such a request, will DOE's response have to go through a series of reviews within DOE?

A The FDS will have to go through series of reviews in DOE, yes.

Q. Has any such review process ever occurred with regard to the 20 percent adjustment provision?

A. No, it hasn't.

Page 4226

Q Do you know what will be the result of that, what will result from that review?

A. No, I don't

Q Mr Zabransky, you've talked, both in your direct testimony and on cross-examination, about a contract amendment with regard to multi-element sealed canisters Do you foresee a unilateral amendment by DOE?

A When you say, "unilateral," I foresee that would be a modification that the parties would negotiate and agree and enter into through a bilateral contract change.

Q And do you expect that DOE will seek to negotiate terms that it will benefit from, in response to proposed contract amendments?

A It's been my understanding that, yes, DOE would look to other provisions of the contract that it finds to be difficult, such as some of the scheduling provisions, and look for some relief there, in return for the agreement to accept the additional burden of multi-element sealed canisters.

Q I believe you testified that a facility might be built at the repository in which DOE could open sealed canisters. Was that your testimony?

A. I think I testified that I'm aware that the

**Sacramento Municipal v. U.S No. 98-488C March 29, 2005**

**Heritage Reporting Corporation**

**Page 1826 to Page 2214**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone. 202-628-4888*
*FAX. 202-371-0935*

Page 1826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
--------------------------------x
SACRAMENTO MUNICIPAL UTILITY
DISTRICT,
NO 98-488C
Plaintiff
vs
UNITED STATES,
Defendant
--------------------------------
Courtroom 5
National Courts Building
715 Madison Place
Washington, D C

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a m

BEFORE THE HONORABLE SUSAN G BRADEN

Page 1827

APPEARANCES
ON BEHALF OF PLAINTIFF
DAVID S NESLIN, ESQ
TIMOTHY R MACDONALD, ESQ
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N CAYNE ESQ
Arnold & Porter LLP
555 Twelfth Street, N W
Washington, D C 20004-1206
(202) 942-5656

Page 1828

APPEARANCES (Continued )

ON BEHALF OF THE DEFENDANT
ALAN J LO RE, ESQ
JOSHUA E GARDNER ESQ
TODD J COCHRAN, ESQ
SCOTT DAMELIN, ESQ
RUSSELL SHULTIS ESQ
ELIZABETH THOMAS, ESQ
U S Department of Justice
1100 L Street, N W
Washington, D C 20036

ALSO PRESENT
STEVEN M COHN, ESQ
STEVE J REDEKER
THOMAS POLLOG

***Index appears at end of transcript***

Page 1829

P R O C E E D I N G S
- - - - - -
THE COURT Let's go
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:
CROSS-EXAMINATION (Resumed)
BY MR CAYNE
Q Good morning, Mr Zabransky
A Good morning
Q I'd like to turn your attention to Plaintiff's Exhibit 121 I believe that will be in the first binder, one out of three Do you have that document before you, sir?
A Yes I see it
Q And is this document a memorandum from you to -- was this a memorandum from you, sir?
A It's an e-mail from me to Mr -- I believe it's Auke Piersma
Q And who is that person?
A Mr Piersma used to be with a group called Public Citizen
Q And there's also a CC?
A Yes

Page 1910

THE COURT Well, you can do that, but I want to be sure he's careful enough to read the transcript before he gives an answer Do you want to mark this as an exhibit?
MR CAYNE· Yes, Your Honor Do we know what number?
THE COURT. I think you're at 2004
MR. NESLIN 1004, Your Honor
THE COURT· I think
MR. LO RE Your Honor, are we going to mark the entire transcript here?
THE COURT You know, I don't know, it's up to the –
MR. LO RE We would object to –
MR. CAYNE: We would mark the entire transcript, Your Honor
THE COURT Well, I think his objection goes to the fact that the witness is here, unless you think everything he's testified to is a problem and inconsistent.
MR LO RE Yes, Your Honor, in fact, this goes directly to the effort that Plaintiffs made to designate pages and pages of Mr Zabransky's testimony. I would say this is a backdoor way apparently of getting all that testimony into the

Page 1911

record in this case and –
THE COURT. Well, why don't you refresh his recollection first? Then we'll go to the specific area you want to impeach him with, if you have it, and then we'll mark that
MR CAYNE And, Your Honor, we can go through, there are a number of areas in this beyond what we're dealing with right now that I still want to deal with this witness on, and my plan was not to mark the whole thing and go through it basically issue-by-issue, it's just a matter of time, but I'm more than happy to go through it issue-by-issue
THE COURT Okay
BY MR. CAYNE
Q Mr Zabransky, did you appear as a witness in the Yankee Atomic trial this summer, by Yankee Atomic, it's Yankee Atomic Power Company versus United States?
A. I think, yeah, it was in 2004, yes
Q And you were sworn to testify?
A. Yes, I was.
Q And you appeared before Judge Merow?
A Yes, I was
Q And you swore to testify honestly, correct, sir?

Page 1912

A Yes, I did
Q. Okay And could I refresh, and look at any parts of the transcript you would like to, but I specifically am going to ask you about, Mr Zabransky, and take your time to read it, and let me know when you're done, and I won't ask until you're done reading, is I'd like to turn your attention to transcript page 4166 and 4167, could you please read that and anything else you need to put it in context and tell me after you're completed, sir?
A Okay
Q Now, does reading that transcript refresh your recollection whether you have taken in the past a sworn position whether the Department of Energy was trying to minimize its obligations to utilities by using the acceptance rates that were used in the 1995 ACR for which you bore responsibility?
A I think, as it says in the transcript, my opinion was I thought they were trying to, but I've never heard them say that. As of that point in time, they thought they had a conditional obligation, that obligation wasn't really complete, unless there was a repository constructed under the Act So this says my opinion was that, but I don't recall anyone at DOE telling me that that's why they were doing things.

Page 1913

Q Were you, yourself, an official at the Department of Energy at this time?
A I was an eight-month employee at the Department of Energy, so, no, I was not an official at the Department of Energy.
Q What was the basis for your opinion, sir?
A Because I felt they had an obligation before I came to the Department of Energy and I saw this as a way of trying to manage an obligation, if you had an obligation and you had a question about meeting it, you didn't make it bigger than you had to. Now, that's what I would have done, but that was my opinion
Q. What do you mean you thought they had an obligation before? You felt they had what obligation before?
A I think I testified yesterday that when I was at Wisconsin Electric, we thought that there was a obligation on the part of the Department of Energy to begin picking up fuel in 1998
Q. And at that time, did you believe the obligation was at a level of 3000 MTU?
A No, I didn't I believe it was what we signed up to in the DCSes, sir
Q Sir, did you believe, back when you were at

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER )
COMPANY, )
Plaintiffs, ) No. 98-614C
v. )
THE UNITED STATES, )
Defendant. )

--------------------------------x

Deposition of DAVID ZABRANSKY
Washington, D.C.
Tuesday, April 12, 2005
9:33 a.m.

Job No.: 1-53967
Pages 1 - 99
Reported By: Joan V. Cain

2

Deposition of DAVID ZABRANSKY, held at the law offices of:

ARNOLD & PORTER
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Pursuant to Notice, before Joan V. Cain, Certified Court Reporter and Notary Public in and for the District of Columbia.

3

APPEARANCES

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY:
M. STANFORD BLANTON, ESQUIRE
K.C. HAIRSTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 226-3417

ON BEHALF OF DEFENDANT:
HEIDE L. HERRMANN, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, Northwest
Washington, D.C. 20530
Telephone: (202) 305-3315

4

CONTENTS


| EXAMINATION OF DAVID ZABRANSKY | PAGE |
|---|---|
| By Mr. Blanton | 6 |


EXHIBITS
(Attached to the Transcript.)


| ZABRANSKY DEPOSITION EXHIBITS | PAGE |
|---|---|
| 1 Protective Order, 4/8/05 | 11 |
| 2 DOE Report, July 2004 | 12 |
| 3 Letter from Mr. Zabransky to Mr. Cocherell, 7/28/04 | 16 |
| 4 Civilian Radioactive Waste Management System Requirements Document Rev 06 | 49 |
| 5 Letter from Mr. Zabransky to Mr. Cocherell, 12/1/04 | 26 |
| 7 Summary of Mr. Garrish's Statement, 3/10/05 | 31 |
| 10 Letter from Mr. Zabransky to Mr. Carden, 11/3/04 | 23 |
| 13 Copy of Protective Order Filed 2/14/05 | 76 |

5

EXHIBITS CONTINUED
(Attached to the Transcript.)

| ZABRANSKY DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| 14 | Document Titled Casks Suitable for Use, 3/14/03 | 64 |
| 15 | Letter from Mr. Cocherell to Mr. Watkins, 3/29/01 | 69 |
| 16 | Strategic Plan for Transportation of Spent Nuclear Fuel, 11/18/03 | 70 |
| 17 | E-mail to Mr. Kouts with Attachment, 11/14/03 | 77 |
| 18 | E-mail Chain | 90 |

6

PROCEEDINGS
DAVID ZABRANSKY
having been sworn, testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY
BY MR. BLANTON:
Q Mr. Zabransky, good morning. My name's Stan Blanton. I represent Southern Nuclear Operating Company, Alabama Power Company & Georgia Power Company and each of those three companies against the United States of America regarding the spent fuel litigation.
We've met before because I've deposed you before. Welcome back to the witness chair.
**A Nice to see you again.**
Q It's not my intention to replow old ground today. I'm not going to ask you about things I or anybody else have already asked you unless there's something in any of that previous testimony that you'd like to change or take back. Is there anything you want to change or take back?

7

**A Not to my knowledge. I haven't reviewed the previous testimony. I don't know of anything offhand right now.**
Q You know from the times your deposition's been taken before, is I'll ask you questions and you're entitled to have a question that you understand and can answer. So if I ask you a question that you don't understand or you feel I've misstated the facts in some way, will you stop me and ask me to rephrase my question?
**A Yes, I will.**
Q And will you give verbal answers so the court reporter can take down your answers?
**A I will try to, and if I don't, please remind me, and I will clarify.**
Q And you're physically well and able to testify today?
**A I think so. A little tired, but I'm okay.**
Q Okay. We're in the same boat then?
**A Yeah.**
Q What is your current position at -- I assume you're employed by the Department of Energy;

8

is that right?
**A Yes, I am.**
Q What's your current position?
**A I work for Chris Kouts in the Office of Systems Analysis and Strategy Development I think it's called now.**
Q Do you have a title or position description?
**A I am a nuclear industry specialist, and I also act as the contracting officer for the contracts, the standard contracts.**
Q That was my next question, you're still the contracting officer for Southern Nuclear's contract with -- or actually for Alabama Power and Georgia Power's contracts with the federal government for high-level waste in spent nuclear fuel?
**A That's correct.**
Q You mentioned that you had not reviewed your testimony from either the last deposition or any previous trial testimony; is that correct?
**A Not for this deposition, no.**
Q What if anything had you reviewed in

13

we have the same disagreement that we did yesterday, but, you know, hopefully there's not going to be a lot of rehashing, and so we can get through this without arguing about it.
BY MR. BLANTON:
Q Now, have we sufficiently erased any memory of the question from your mind? The question was, what was your role, if any, in the preparation of the APR/ACR for 2004?
**A Mr. Pollog, who works with me, prepared the document, and my role was primarily to take this document and send it out to the contract holders, as the basis for DCSs.**
Q So you were more or less a conduit for Mr. Pollog to the contract holders. You didn't write any of the words or review or revise any of the language in the ACR/APR?
**A I think I may have commented on it, but I don't know specifically what comments I would have had or what exact word changes we would have made. Tom and I worked on this, but he did all the work.**
Q Do you know where the acceptance rates in

14

Table 1 on page 2 of the report came from?
**A Those were provided to us, myself and Tom, by Mr. Kouts.**
Q Do you know what the basis of those rates were?
**A I believe they're the same rates that are in the program planning documents.**
Q Have you yourself done anything to arrive at particular acceptance rates that should be included either in the program planning documents or in the ACR/APR?
**A I have not.**
Q Do you have any role in the planning either for the submission of the license application or in any other aspect of the development of the repository?
**A In assisting Mr. Kouts, I have -- I reviewed documents at times at his request to look at them for technical issues, but, no, not really, no direct role.**
Q Is your primary responsibility interacting with contract holders concerning the administration

15

of a contract?
**A It's one of my responsibilities.**
Q Okay. As I understand your testimony, you don't have a role in preparing the license application?
**A No, I do not.**
Q I also understand, from your testimony, you don't have a role in either the design or causing the construction of the repository to go forward; is that correct?
**A The only role we have in design would be in Mr. Kouts's office, the area of integration to look at how the pieces of the program fit together and to advise the director's office as to other issues that may be arising, if any. But, no, with respect to the design itself or construction, no, I do not.**
Q When you use the word "integration," could you be more specific or maybe elaborate on what you mean by that?
**A That would be how the repository designs are compatible with the transportation designs are compatible with waste forms that may exist or**

16

**materials in spent fuel in general.**
Q I'm going to show you what was marked as Exhibit 3 to Mr. Kouts' deposition yesterday, and we'll mark it as Exhibit 3 to yours as well.
(Zabransky Deposition Exhibit 3 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q Hold on. Let me make sure I get a note on the -- Exhibit 3 to your deposition will be a July 28, 2004, letter to Mr. Ron Cocherell, I think signed by you. Do you recognize that?
**A This specific letter, no, but I recall this was a general letter that was sent out on July 28th to the contract holders transmitting the APR/ACR.**
Q Was your role in preparing and sending that letter similar to the role you had in the issuance of the APR/ACR? Somebody told you to do it and so you sent it out, or did you have -- was your role more substantive in the decision to reinitiate the DCS process?
**A Well, the program schedule called for**

**repository operations to begin in 2010, when this letter was sent out, and as a result of that, after discussion with Mr. Kouts, I was directed that it was time to restart the DCS process for the 2010 acceptance.**

Q And do you have -- at the time you sent out that letter, what was your understanding as to whether the 2010 -- whether DOE was on schedule to meet the 2010 date or not?

MS. HERRMANN: Objection, foundation.

BY MR. BLANTON:

Q Did you have an understanding as to whether DOE was on schedule to meet the 2010 date or not?

**A At the time this letter was sent out, my understanding was that we were.**

Q Okay. How did you get that understanding?

**A Discussions with Mr. Kouts.**

Q In general, are your understandings about the progress toward -- that DOE is making toward the commencement of repository operations generally based on information you've received from Mr. Kouts?

**A Yes.**



Q Had you received any DCSs from a utility between the times DOE suspended the -- last suspended the DCS process in this July 28 letter?

**A I believe so.**

Q Do you recall from who?

**A No, I don't.**

Q What did DOE do with those DCSs?

**A We didn't process them, and sent a letter back to the utilities saying we weren't processing them.**

Q And did you return the documents too, or did you keep the documents?

**A I don't recall where the documents are.**

Q How would it be possible to figure out what utilities sent you those DCSs? Just by looking at your correspondence to see who you wrote back to?

**A That would be a way, I presume, yes.**

Q Does that correspondence still exist, as far as you know?

**A I presume it does. I don't know for sure.**

Q Why did DOE refuse to process those DCSs?

MS. HERRMANN: Objection, foundation.



THE WITNESS: Are you done?

MS. HERRMANN: Mm-hmm.

**A At the time, it became clear that it was no longer appropriate to continue to process those DCSs.**

**BY MR. BLANTON:**

Q Why was it no longer appropriate?

**A At that time, DOE's commitment became clear, and there was discussion within the Department prior to that that the commitment was conditional, and I think in which case -- whatever case it was in the latter part of '96, it became clear it was an unconditional commitment, and given the fact that the schedule didn't call for the repository to be open at the time the DCS was being submitted for, it was no longer appropriate.**

Q And I'm not asking about legal positions, because we've talked about those in your previous depositions, but do I understand what you're telling me is you didn't process those DCSs because you didn't have a scheduled start date for the repository?



**A It wouldn't make sense to sign a DCS for 2007 when there wasn't going to be any operations in 2007.**

Q Do you recall when the DCSs you received requested DOE to pick up the fuel?

**A I don't.**

Q Now, as of July 28 of '04, DOE had scheduled 2010 as the start date for the repository for quite some time; had it not?

**A Yes.**

MS. HERRMANN: Objection, vague.

**A It had been -- 2010 had been scheduled for a couple years, yes, several years.**

**BY MR. BLANTON:**

Q Do you recall when you received these DCSs prior to July 28 of '04 whether -- and after the last time the process was suspended -- we're talking about that interim period between the suspension -- the first suspension of the DCS process on July 28.

Do you recall whether the scheduled date for the repository opening had been set at 2010?

**A I believe it was 2010, during that period**

wanted to use, it would have been okay with you for them to just continue to use that one and not submit a new one?
**A And tell us they wanted the date changed to 2010, that would be fine.**
Q And what was DOE's position as to if they used an old DCS and merely changed the date, did DOE have a position relative to what that did to the contract holder's rights, if any, that arose from that approved DCS?
MS. HERRMANN: Objection, calls for a legal conclusion.
**A I don't know that DOE had a position on that point.**
**BY MR. BLANTON:**
Q Was DOE trying to get contract holders to release their rights, if any, under those approved DCSs by agreeing to the new DCSs?
MS. HERRMANN: Objection, calls for a legal conclusion. Foundation. Speculation.
BY MR. BLANTON:
Q I'm not asking for whether it would work.



I'm sure we wouldn't agree about that, but I'm asking if that was DOE's purpose.
MS. HERRMANN: Same objections.
**A And all I can say is to my knowledge DOE's purpose was just to start the planning process for 2010 operations.**
**BY MR. BLANTON:**
Q And it was not to try to affect anybody's prior existing rights?
**A I'm not aware of any such effort to do that, no.**
Q Did you get a response from Mr. Carden to this letter?
**A I don't recall that I did.**
Q All right. Here's another one that's going to be a little out of order. It was marked as Exhibit 5 to Mr. Kouts' deposition, and we'll mark it as Exhibit 5 to your deposition as well, Mr. Zabransky.
(Zabransky Deposition Exhibit 5 was marked for identification and was attached to the deposition transcript.)



BY MR. BLANTON:
Q It's a letter dated December 1, 2004, to Mr. Ron Cocherell, and, again, I think I'll ask you whether that's your signature at the bottom of the letter.
**A Yes, it is.**
Q What was the occasion for you sending that letter? I assume other contract holders received a similar letter to this one?
**A I believe they did, yes.**
Q As an initial matter, this letter indicates that the Department returned or may have returned DCS forms that Southern Nuclear submitted. Are you aware that Southern Nuclear submitted any DCS forms in response to your July '04 letter?
**A I don't know if they did or didn't.**
Q Would the contract holder have gotten this same letter, whether or not they had submitted any DCS forms?
**A Yes.**
Q What recent developments relating to the fiscal year 2005 budget caused the Department to



conclude that the resumption of the DCS process was premature?
**A It's my belief, and, again, I'm not involved with the budget, but I understand that less money was appropriated than was requested by the program for its FY 2005 budget.**
Q And how did that affect resumption of the DCS process?
**A My understanding was that with the lower amount of funds, it was no longer possible to meet the 2010 date.**
Q Is all of your understanding about that from Mr. Kouts, or did you get understanding from other sources?
**A Primarily from Mr. Kouts, other than what I read in the paper.**
Q Okay. Did you yourself have any responsibility in terms of determining whether or not the Department could meet the 2010 date, based on the 2005 appropriation?
**A No, I did not.**
Q And I assume the answer's the same, that

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PACIFIC GAS & ELECTRIC COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | No. 04-074C into which has been consolidated No. 04-075C |

Washington, D.C.

Tuesday, November 1, 2005

Deposition of:

DAVID ZABRANSKY

called for oral examination by counsel for Plaintiff, pursuant to notice, at Greenberg, Traurig, L.L.P., 800 Connecticut Avenue, Northwest, Suite 500, Washington, D.C., before Shari R. Broussard, a Notary Public in and for the District of Columbia, beginning at 9:29 a.m., when were present on behalf of the respective parties:

On behalf of Plaintiff:
JERRY STOUCK, ESQUIRE
Greenberg, Traurig, L.L.P.
800 Connecticut Avenue, Northwest
Suite 500
Washington, D.C. 20006
(202) 331-3173

On behalf of Defendant:

ALAN J. LO RE, ESQUIRE
SHARON SNYDER, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-3315



C O N T E N T S


| EXAMINATION BY: | PAGE |
|---|---|
| Counsel for Plaintiff | 5, 172 |
| Counsel for Defendant | 167 |

| PG&E Z/P DEPOSITION EXHIBITS: * | PAGE |
|---|---|
| 1 Letter from Barrett to Strand, 8/24/92 | 8 |
| 2 Letter from Tomasoni to Sellers, 5/19/97 | 12 |
| 3 Letter from Tomasoni to Barrett, 5/18/93 | 32 |
| 4 Letter from Groff to Zabransky, 9/30/04 | 42 |
| 5 Letter from Zabransky to Groff, 12/1/04 | 46 |
| 6 Letter from Desell to Barrett, 9/13/95 | 48 |
| 7 Canister Considerations for Commercial Spent Nuclear Fuel, Bates HQR 290 0025 to 290 0031 | 54 |
| 8 Letter from Milner to Clarke, 9/15/93 | 68 |
| 9 Letter from Sullivan to U.S. DOE, Rueter, 6/27/91 | 74 |
| 10 Memo from Pollog to File | 77 |
| 11 Letter from Gisclon to Gibbard, 2/19/92 | 83 |
| 12 Memo Graham to File, 4/8/92 | 87 |
| 13 Letter from Stock to Detmer, 5/18/92 | 90 |
| 14 Letter from Tomasoni to Stock, 5/12/94 | 91 |





| PG&E Z/P DEPOSITION EXHIBITS: * | PAGE |
|---|---|
| 15 Memo from Johnson to Willis, et al., 7/8/99 | 95 |
| 16 Meeting Between Humboldt Bay PP and the Department of Energy, Agenda | 102 |
| 17 DOE Meeting Minutes, November 11, 1999, Draft | 116 |
| 18 DOE Meeting Minutes, November 9, 1999, Draft | 117 |
| 19 e-mail from Moulia to Womack, et al., 1/25/00 | 129 |
| 20 e-mail from Benz to Zabransky, et al., 1/19/98 | 129 |
| 21 DOE Recommends Changes to Yucca Mountain Repository Design | 149 |
| 22 Letter from Carlson to Sellers, 12/4/00 | 157 |
| 23 Letter from Zabransky to Sellers, 3/22/04 | 157 |
| 24 Letter from Zabransky to Sellers, 8/14/02 | 164 |


(*Exhibits attached to transcript.)



WHEREUPON,

DAVID ZABRANSKY

called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. STOUCK:

Q Good morning, Mr. Zabransky. How are you today?

A Fine.

Q Thanks for coming. I know you've been deposed a number of times and testified a number of times in cases similar to this one, and I will endeavor not to repeat things that's been covered in the past in the PG&E matter so we can get you out of here hopefully in a reasonable period of time.

You understand you're here for a deposition in one of the spent fuel damages case that's pending in the Court of Federal Claims?

A Yes, I do.

Q And it's the case that's been brought by Pacific Gas & Electric Company?

Page 134

view is appropriate, but I don't believe those are all benefits that accrue to DOE.

Q Strike the last --

A I said all of these.

Q These are not all the benefits that accrue to DOE; is that what you're saying?

A No, I'm saying all the benefits don't accrue to DOE.

Q Some benefits accrue to the utility?

A Absolutely.

Q Was it DOE's view at that time that this was a preferred course to follow?

A I don't know that we had a preferred view. I think that's a mis -- I don't recall that A or B, one or two was more preferred. I think DOE was -- would be willing to discuss either. I think the other clarification was that, in general, that two referred to was taking allocations that would have appeared over let's say a five-year period once a year and aggregating them into one place but not necessarily at the utility's desire.

Q Aggregating them. What about aggregating

Page 135

them into one year?

A That's right, but it may mean that DOE takes all five fuels in the fifth year and that's what -- that was what the discussion was to be about there.

Q And your view is that would have had benefits over the strict oldest fuel first system?

A That would have had benefits to both parties, to take those and make them campaigns that would have had benefits, yes.

Q You don't recall discussing that specifically at this January 2000 meeting?

A No, I don't recall the meeting specifically.

Q So, therefore, it very well may have been discussed, as these notes reflect?

A It may have been discussed, but I would be surprised that -- again, I don't recall ever discussing in any form -- I've explained how DOE thought about it. How they took it was another issue.

Q I'm not asking you -- I appreciate that

Page 136

you can't speak for these people.

A Right.

Q But you do agree with the DOE that there would have been benefits to concentrated campaign pick-ups, you know, maybe not in the first year, you know, the example you gave, you may be able to move back rather than move up but rather than come every year, you do agree there were benefits to coming once rather than five times, other things being equal?

A If they can work out for both parties, yes.

Q Thank you very much.

Let's try to keep this short here as I can. Fuel heat, page two, would you take a look under number three, Mr. Zabransky, and just in the interest of speeding this up can you read those two paragraphs that are on page 0004 and just tell me if these two paragraphs are consistent with what you told me a few moments ago about this allocation of responsibilities issue? In other words, if the allocation was clear, if I understood your

Page 137

testimony, the allocation of responsibility was clear, but there needs to be a lot more or at least some more detail about exactly what each party is going to do?

A I think this better reflects it. It talks about the fact that it is really getting down to issues such as when are they going to be staffed, so --

Q This better reflects your understanding of this issue?

A Yes, it does.

Q Just one question on the next page, 005, under Appendix E, "Standard Fuel."

A Uh-huh.

Q Are you with me there? The second paragraph where it says "Comments," do you see that?

A Uh-huh.

Q "DOE agreement on the characteristics of canisterized fuel which will qualify it as 'standard' is on the surface a difficult issue for them because of the moving target of Yucca

**Pacific Gas & Electric Company v. U.S. No. 04-74C June 15, 2006**

**Heritage Reporting Corporation**

**Page 2986 to Page 3130**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2986

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------x

PACIFIC GAS & ELECTRIC COMPANY, .No 04-74C

Plaintiff,

vs

THE UNITED STATES,

Defendant.

-----------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C

Thursday, June 15, 2006

VOLUME 9

The parties met, pursuant to the notice of the Judge at 9.03 a.m

BEFORE THE HONORABLE EMILY C. HEWITT

Page 2987

APPEARANCES.

ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L SHAPIRO, ESQ
DAVID CALLET, ESQ.
ERIC ROWE, ESQ
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D.C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT.
JOHN EKMAN, ESQ.
ALAN LO RE, ESQ
HEIDE HERRMANN, ESQ
SCOTT R. DAMELIN, ESQ.
SHARON A SNYDER, ESQ
JOSHUA E. GARDNER, ESQ
MARIAN SULLIVAN ESQ
U S. Department of Justice
1100 L Street Northwest
Washington, D C. 20036
(202) 514-2000

Page 2988

APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***

Page 2989

PROCEEDINGS

-----

THE COURT: Before we call the next witness, are there any housekeeping matters at this time?

MR. STOUCK: Your Honor, I guess this qualifies as housekeeping, just for scheduling, as of now, I don't believe the Plaintiff plans to have, based on what we've heard so far, any rebuttal evidence. However, we've got one more day of the government's trial, and as a precaution, I guess you call it, or as a contingency, we've made arrangements I just told Mr. Ekman we're in the process of making arrangements with the Court's technical folks to have, if the need arises, which I don't know how likely it is, but I think the likelihood is small, but in any event, to have a video feed from the West Coast, rather than to have to fly someone here for a small piece of testimony.

So I just want to let the Court know that that was the way we were thinking, but as of now, we don't.

THE COURT: Would that be expected to

Page 3014

A I recall it generally.
Q. And isn't it true that you and the Department both believe that exchanges that would allow utilities to optimize allocations of waste capacity will still work, correct?
A. I think I just said that. I believe they will eventually.
Q. And it's also your belief that buyers and sellers of exchanges would incur little, if any, brokerage fees for arranging the trades, correct?
A. I think that I've said that early on in the nuclear industry, there were a lot of brokers involved. In the last several years with the internet, I think the brokers are looking for business because it's too easy for utilities to now know with each other what's available, so the secrecy of he has this and you need it isn't there, and I wouldn't go into the brokerage business.
Q. And it has been DOE's position that DOE will act reasonably in approving exchanges, correct?
A. Yes.
Q. And you believe there's no reason why

Page 3015

exchanges shouldn't work on a global basis, correct?
A. As I said, in a mature market, I think they'll work on a global basis.
Q. And in fact, but for the Department's breach and being able to accept fuel and accepting fuel in 1998, you believe that DOE would have worked to facilitate exchanges, correct?
A. I guess I can't answer that yes because I don't believe that the breach has anything to do with what DOE is going to do to facilitate exchanges. We'll facilitate exchanges. If someone proposes one, we'll deal with it. No one's proposed any.
Q. I'm not talking about just dealing with proposed exchanges in terms of deciding whether or not to approve it. You believed the DOE would in fact try to facilitate exchanges, correct?
A. I guess you'll have to define "facilitate" as you're using it.
Q. To help utilities exchange. You believe that utilities would try to facilitate exchanges, correct?

Page 3016

A I think utilities would try to facilitate exchanges, correct.
Q. You believe that DOE would try to facilitate exchanges?
A. I think referring to Dr. Dreyfuss' '95 letter, I think the Department's philosophy is it would occur without the overt involvement of the Department, that our attitude was that we would reasonably review and approve exchanges, but that we were not going to be brokers ourselves.
We would not overtly go out there and call people and say, this guy has this, you should talk to him. That was up to them. So I think that's my belief, Mr. Shapiro.
Q. You recall having your deposition taken multiple times in these cases, don't you, Mr. Zabransky?
A. Many, many times, Mr. Shapiro.
Q. I have a big binder of those, and one of those depositions was on June 6th of 2002, may have been?
A. May have been.
Q. And each of those depositions, you took an oath to tell the truth?

Page 3017

A. Yes.
Q. And you believe you did tell the truth?
A. To the best of my ability at the time.
Q. And at the June 6th, 2002 deposition, weren't you asked the following question and gave the following answer – I'll be reading from page 280, line 3.
MS. SULLIVAN: Objection, Your Honor. I'd ask that the witness be provided a copy of the deposition he's being asked about.
THE COURT: Do you have a copy?
MR. SHAPIRO. We have, Your Honor
MS. SULLIVAN: Thank you, Your Honor.
BY MR. SHAPIRO:
Q. Page 280, if you want to follow along, Mr. Zabransky?
THE COURT: At what line?
MR. SHAPIRO: Line 3.
THE COURT And the date is June?
MR. SHAPIRO: June 6th, Your Honor.
BY MR SHAPIRO:
Q. I'm going to start on line 3.
"QUESTION: Mr Zabransky, before we took our lunch break, we were talking about

**Northern States Power Company v. U.S No. 98-484C November 20, 2006**

**Heritage Reporting Corporation**

**Page 4385 to Page 4690**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 4385

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff,) Case No.
v. ) 98-484C
THE UNITED STATES, )
Defendant.)

National Courts Building
717 Madison Place NW
Washington, D.C.

Monday, November 20, 2006
Volume 15

The parties met, pursuant to the notice of the Judge, at 10:29 a m.

BEFORE· THE HONORABLE JOHN P WIESE

Page 4386

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
ALEX D TOMASZCZUK, ESQ.
DANIEL S HERZFELD, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
14th Floor
McLean, Virginia 22102
(703) 770-7940
and
JAY E. SILBERG, ESQ
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, Northwest
Washington, DC 20037-1122
(202) 663-8063

Page 4387

APPEARANCES CONTINUED

ON BEHALF OF THE DEFENDANT:
ALAN J LO RE, ESQ
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U S. Department of Justice
1100 L Street, Northwest
Washington, D.C 20530
(202) 305-7562

(Index appears at end of transcript)

Page 4388

P R O C E E D I N G S
\- - - - - -
THE COURT. Let us go on the record. We convene proceedings this morning for the continuation of the trial in Northern States Power v United States, and the case number is 98-484C Mr Tomaszczuk, are there any preliminary matters?
MR TOMASZCZUK· No, Your Honor, good morning None from Plaintiff.
THE COURT. Good morning, thank you. Ms Herrmann?
MS HERRMANN Good morning, Your Honor
THE COURT Good morning
MS HERRMANN. No preliminaries for the government
THE COURT. Excellent Mr Lo Re, good morning
MR. LO RE. Good morning, Your Honor
THE COURT Good morning, Mr Zabransky.
THE WITNESS: Good morning, Your Honor
THE COURT: You did go home over the

Page 4473

applicable regulatory requirements, and be accompanied by pertinent information including, but not limited to the following," I'm going to spare you and the Court the burden of having me read the rest of that paragraph.
But it would be fair to say, Mr. Zabransky, that DOE has not arranged for and provided a cask and all necessary transportation of the spent nuclear fuel from Prairie Island's facility?
A. No, at this point, DOE hasn't scheduled any deliveries from Prairie Island's facility, so is DOE planning to do this? Absolutely. Has it done it yet? No.
Q. And the earliest it expects to accommodate this obligation is 2017?
A. That's my understanding as to the current schedule, yes.
Q. And then the next paragraph three says, "DOE can fulfill its obligation under the contract either directly or through contractors," right?
A. Yes.
Q. And then skip to the next obligation, fourth, on the next page, it says, "DOE shall

Page 4474

annually provide to the purchaser pertinent information," correct?
A. That's what it says, correct.
Q. And then let's look at V.A and V.B, V.A states, "Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository." Correct, that's what that says, sir, I read it correctly?
A. That's what it says, correct.
Q. And DOE, at least since 2004, has not met this obligation, correct?
A. DOE hasn't done this since 2004 because, you're right, because there's no purpose in doing this right now.
Q. And it also didn't meet this obligation between March of 1995 and the summer of 2004, correct?
A. DOE suspended that publication until there was a basis for a new document, that's correct.
Q. And then let's, at subparagraph B, it states, "Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes." I read that correctly?

Page 4475

A. That's what that says.
Q. And at least since the summer of 2004, DOE has not met this obligation either, is that correct?
A. We've not issued a new ACR at this point until we're ready to do one when we have a firm date for the repository.
Q. And the earliest that DOE expects to meet that obligation now is 2017?
A. That's the current date for the repository, so we would issue the ACR sufficiently in advance to begin the process we were planning.
MR. TOMASZCZUK: Can I have just a minute, Your Honor?
THE COURT: Yes.
MR. TOMASZCZUK: No further questions, Mr. Zabransky. Thanks for your time.
THE COURT: Thank you, Mr. Tomaszczuk. Mr. Lo Re?
MR. LO RE: Thank you, Your Honor.
REDIRECT EXAMINATION
BY MR. LO RE:
Q. Mr. Zabransky, during your cross-examination, Mr. Tomaszczuk asked you

Page 4476

about your tenure at Wisconsin Electric, do you remember that?
A. Yes.
Q. And he asked you about your belief, and I believe you said on cross-examination that you believed it was a good goal of the program to accept fuel at an aggregate rate of discharge, plus some amount of backlog, do you remember that testimony?
A. Yes.
Q. Mr. Zabransky, did you consider that to be a contractual obligation under the standard contract?
MR. TOMASZCZUK: Objection, to the extent it calls for a legal conclusion.
MR. LO RE: And I can ask a better question.
MR. TOMASZCZUK: And also leading.
BY MR. LO RE:
Q. Did you consider that DOE had a contractual obligation to begin accepting spent nuclear fuel at such a rate, so as to meet that obligation within the first 10 years of the program?
MR. TOMASZCZUK: Same objections.