Page 4477

THE COURT: Let me rule on the objection. It's an appropriate question to ask this witness. You've elicited all sorts of answer to this witness' understanding of what the delivery commitment schedule implicates and means, and as he was responsible for responding to the DCSes while at Wisconsin Electric, his understanding of what he was doing was certainly a relevant question. So let's have the question, once again, for the witness' clarification.

(The reporter read the record as requested.)

THE WITNESS: I think that's a we were hopeful they would, but I think, ultimately, when it came time to do the DCSes, they weren't for that larger amount, they were restricted to the MRS capacity. So earlier on, we had lobbied very extensively for higher acceptance rates, and when they changed the acceptance rates to reflect the limitation of the MRS from the earlier documents to the final ACR that we used in '91, there was consternation because the utilities weren't happy. Ultimately, that's what DOE was able

Page 4478

to do, and I think we understood the limitations on DOE, and we signed up to it, so it became the limitations that were put upon DOE by the MRS restrictions that formed the basis for our contractual commitments.

BY MR. LO RE:

Q. And then as a follow up to that, Mr. Zabransky, we showed that chart earlier, I think both myself and Mr. Tomaszczuk used, when WEPCO received its approved DCSes for the 10 years that it submitted those DCSes, how did you understand that vis-a-vis DOE's obligation?

A. We understood that that was what they were now obligated to do because they sent back the signed documents to us and we put them in our files.

Q. Mr. Tomaszczuk asked you some questions about the MRS, and I believe that the Judge followed up with some questions about the MRS, and I believe you said, at one point, that you weren't the best person to talk to about the MRS?

A I was, as far as me being at DOE during that timeframe, having arrived in July of '94, it took me months to find the bathrooms

Page 4479

and figure out what was going on there, so, no, I did not work on the MRS action at that point in time and didn't work on it much before then either, so I knew of it peripherally from my involvement in industry groups.

At DOE, I was focused on learning what I was supposed to do there within the waste acceptance organization and getting some documents published that needed to get published and trying to figure out how to do that.

Q And you referred, I think, to Mr. Kouts. Why did you refer to Mr. Kouts as someone to talk about the MRS?

A. It was my recollection that Mr. Kouts worked on the MRS proposal and followed the MRS program, so he would have been in a much better position, plus he had been there a couple decades at that point in time also.

Q. I'd like to look at the contract, it's one of the last documents Mr. Tomaszczuk showed you PX-56, and if you could turn – I believe it's page nine, Mr. Tomaszczuk asked you some questions about this. He was asking you about casks?

Page 4480

A. Yes.

Q. And if you could look at paragraph two, please? It says, right after the number two, there's a paragraph starting with, "DOE shall arrange for," and then I think it's the third sentence down, it says, "Such casks shall be suitable for use at the purchaser's site." Do you see that?

A. Yes.

Q Now, I'd like you to – keeping that in mind, let's look at DX-139, please. This is a document that I showed you this morning, and I believe Mr. Tomaszczuk followed up with. The second page of this document, it's table 2

A. Yes.

Q. And under 2.1, it says, "Type of cask required, maximum loaded lifting weight in tons," do you see that?

A. Yes.

Q. Now, having looked at that provision of the contract that we just looked at a moment ago, what is your understanding here as to what NSP is asking for with respect to the size of the cask?

A. My understanding of what it says in

Page 4481

2.1 is that they can handle up to a 125-ton cask, so it's informing DOE that, as you go off and look at what's available cask wise, this facility can handle up to 125 tons, there's also 70-ton casks it can handle. There's also hundred-ton casks it can handle. There's also truck casks it can handle. It just has the capability for large casks.

Q. And I want to probe a little bit, when you say this facility can handle a cask up to 125 tons, what is your understanding when you say this facility can handle, if you could just elaborate on that a bit?

A. Well, that, at this point in time, and, again, this is an early step in the planning process, that if DOE were to go off and procure or plan for 125-ton cask, that it's based upon NSP telling DOE that it could handle that cask if it showed up there.

Q. And if DOE were to show up at the Prairie Island facility with 125-ton casks, what is your understanding as to the physical ability of the plant and the apparatus in the plant?

A. Without knowing the details of the

Page 4482

plant, you have to, A, have a large crane with at least 125-ton capacity, and that it would have to have large openings, doorways and stuff, to handle a cask that large. A cask that big is going to be 20 feet long and 10 feet in diameter. It's going to be a fairly large item

THE COURT: This is information that DOE is providing to the utility?

THE WITNESS: No, this is the utility.

THE COURT: I see. All right.

BY MR. LO RE:

Q. And just to make that clear, what is the actual, what does the utility receive in this chart, 2.0, what does it look like physically?

A. It could be a blank document.

Q. So focusing on 2.1, who fills in that 125 there?

A. That was filled in by the utility.

Q In this case, NSP, correct?

A. Correct

THE COURT: But where 2.1 says, "type cask required," required of whom, Mr. Zabransky?

Page 4483

THE WITNESS: Required, in other words, required of DOE to provide, in other words, so it could provide up to 125-ton cask. When I was at Wisconsin, we used to put the same number down because we had 125-ton crane, but we didn't check rail because we didn't have rail access, which let the Department know that, while we could handle a large cask in the plant, we had no way of getting it to the plant, and that was something they had to look into.

BY MR. LO RE:

Q. And to close that, Mr. Zabransky, on 2.3, when you see rail as checked off there, what do you understand that to mean with respect to the capability of the Prairie Island Plant?

A. Well, that's an indication to the logistics people, transportation people, that the utility is saying that there's a way of getting rail casks directly to that point, that the rail line goes to the plant.

THE COURT: What do we mean by the line item that says, "range of discharge dates"?

Page 4484

THE WITNESS: That's telling us in this case that the fuel they intend to deliver is going to come out of the reactor sometime between 2/18/92 and 12/3/93, so given the fact that this was for a 1999 pick-up, that that fuel would have been six to seven years old when DOE came to pick it up, that tells the technical people that they can expect the fuel to be certain hot, certain heat loads come off of certain radiation loads, which means this is going to be hotter fuel, as opposed to a utility saying, I'm going to give you 25-year-old fuel

Hotter fuel may mean the cask has to have a lower capacity because it needs more shielding, so it's just an indication of what their intents are when they put the fuel forth as to what we might have to provide to give in a cask.

BY MR. LO RE:

Q. Now, Mr. Zabransky, Mr. Tomaszczuk asked you – he showed you the contract and asked you about the fact that DOE did not issue ACRs for a period of time, do you remember that?

Page 4485

A. Yes, he did.
Q. Why didn't DOE issue ACRs during that period that was referenced in your cross-examination?
A. During that period, the Department had no plans, other than the 2010 date to begin operations, so issuing an ACR every year for the sake of issuing an ACR when it really had no use at that point from the standpoint of planning future deliveries, there was no reason to do that, so we didn't do it.
Q. Did anyone from NSP ever ask you to issue an ACR during that period?
A. I don't believe anybody did, I mean, it's a small document, it still probably cost a couple hundred thousand dollars to go through that process. It just didn't make sense to spend the money on things like that every year for the sake of spending the money.
Q. And you talked about the cost, was there a cost with respect to human resources, as well as dollars?
A. There was human resources and contractor labor and the publishing process. Again, there's human, there's personnel time

Page 4486

and contractor labor.
MR. LO RE: Thank you. No further questions, Your Honor.
THE COURT: Mr. Tomaszczuk, anything further of this witness?
MR. TOMASZCZUK: Just a couple, Your Honor.
THE COURT: Okay, please.
RECROSS-EXAMINATION
BY MR. TOMASZCZUK:
Q. Defendant's Exhibit 139, back on that one again, if we can get to page two, and this section 2.0, delivery commitment information, I'd already asked you, I believe, Mr. Zabransky, about the metric tons uranium and the differences between the 2004 allocations versus the 1991 allocations. Do you recall that line of questions?
A. Yes, I recall that line of questions.
Q. But isn't it true, in addition to the metric tonnage, that given that DOE is not going to commence performance until 2017 at the earliest, that other sections or subsections of 2.0 could well change between now and 2017?
A. And I guess I agree, and that's why

Page 4487

DOE offered the opportunity, when it was a 2010 date, to refresh these by submitting revised ones or new ones, and that's why it doesn't make the sense to start the process now for 2017.
Q. For example, a utility might now have rail access capacity, which it didn't have back in 1993, by way of example, correct?
A. Exactly.
Q. And all of that augers for the need to replace the old DCSes with new ones?
A. That gives us a reason to say, submit new ones, if you need to change something. If nothing is changed, for instance, I don't believe anything has changed at Point Beach since the 1992 DCSes.
Q. But you don't know about the circumstances of the other 60-some odd utilities that are listed in Zabransky Demonstrative 1, correct?
A. No. And, again, that's why we restarted the planning process, to give them the opportunity to refresh the process.
Q. Can I get you to look at the contract again, tab 56, or Exhibit 56 of binder six? I

Page 4488

want to ask you about that page, KRG NSP 07980.
A. Uh-huh.
Q. And scroll down a little bit. Now, this paragraph, as I understand it, basically says that DOE has to arrange for and provide a cask and necessary transportation of the spent nuclear fuel at each utility site, correct?
A. That's DOE's responsibility, to provide a cask for transportation, correct.
Q. And the cask has to be usable for use at the purchaser's site, correct?
A. Has to be suitable.
Q. I'm sorry, if I didn't say, "suitable," that's what I meant. Maybe we can scroll up and see that part of the text. Such casks shall be suitable for use at the purchaser's site, correct?
A Correct.
Q. All right. And then there's a category of items that DOE has to provide along with that, correct?
A. Correct.
Q. Among other things, DOE has to provide written procedures for cask handling and loading, correct?

**System Fuels, Inc., and Entergy AR, Inc., v. US No. 03-2623C April 13, 2007**

**Heritage Reporting Corporation**

**Page 3677 to Page 3986**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3677

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------x
SYSTEM FUELS, INC., and ENTERGY
ARKANSAS, INC.,
Plaintiffs, .NO 03-2623C
vs
THE UNITED STATES,
Defendant.
-----------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D C

Friday, April 13 2007

The parties met, pursuant to the notice of the Judge at 9.02 a m

BEFORE THE HONORABLE CHARLES LETTOW

Page 3678

APPEARANCES
ON BEHALF OF PLAINTIFF
ALEX D TOMASZCZUK ESQ
JACK Y CHU ESQ
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean Virginia 22102
(703) 770-7674
and
JAY E SILBERG ESQ
Pillsbury Winthrop Shaw Pittman
2300 N Street N.W
Washington, D C 20037
(202) 663-8000
and
L JAGER SMITH JR . ESQ
Wise Carter Child & Caraway P.A
600 Heritage Building
401 East Capitol Street
Jackson Mississippi 39201
(601) 968-5500

Page 3679

APPEARANCES (Continued:)
ON BEHALF OF THE DEFENDANT
JOSHUA E. GARDNER, ESQ.
ALAN J. LO RE, ESQ
SCOTT DAMELIN, ESQ
MARIAN SULLIVAN, ESQ
U.S Department of Justice
1100 L Street, N W
Washington, D.C 20036

(Index appears at end of transcript)

Page 3680

PROCEEDINGS
(9 02 a m )

THE COURT Do we have anything preliminarily this morning?

MR TOMASZCZUK. Good morning, Your Honor Not from Plaintiffs

MR GARDNER Nothing from the government, Your Honor

THE COURT Thank you very much. Ms Sullivan and Mr Zabransky, you may proceed

MS SULLIVAN Thank you, Your Honor Good morning

THE WITNESS· Good morning

THE COURT· Welcome back

THE WITNESS Thank you sir

Whereupon--

DAVID ZABRANSKY

a witness called for examination, having been previously duly sworn, was examined and testified further as follows.

DIRECT EXAMINATION (Resumed)

BY MS SULLIVAN

Q Mr Zabransky when we ended yesterday, we were talking about Plaintiff's

Page 3813

came out, yes.
Q. And shared it with your senior management at Wisconsin Electric, correct?
A. Yes, I did.
Q. I'd like to direct your attention to the third sentence of this first paragraph. Could you read that for us?
A. The second item of interest?
Q. No, the first paragraph under the heading, "Status of Standard Contract's Task Force."
A. The second item of interest?
Q. And that reference to, "Dave began by pointing out."
A. Am I looking at the first sentence or the third sentence?
Q. And I think I asked you to address the third sentence, I think I meant the fourth.
A. Oh
Q. Would you read that for us?
A "An ACR is due every year, and the last one was issued in 1987."
Q. Was that a true statement?
A. That's what the notes say.
Q And that was your position at the

Page 3814

time, an ACR is due every year?
A. That's what the group thought, yes.
Q. And that's what you thought, correct?
A. That's what the group thought.
Q. No, that's not my question. That's what you thought?
A. Again, whether I thought that or not, I was reporting on behalf of the group.
Q. So you're saying that that was not your view at the time?
MS. SULLIVAN: Objection, Your Honor, asked and answered.
THE COURT: Overruled.
THE WITNESS I think I said earlier that, again, it was something I really didn't focus on a lot at that point in time. The '87 came out, I was doing other things, I really didn't focus on this until later
BY MR. TOMASZCZUK:
Q. Well, these minutes are dated March of 1990, correct?
A. Yes.
Q. So this was a point in time when you were looking to the 1991 ACR, were you not?
A Yes.

Page 3815

Q. And this wasn't significant to you, the fact that the ACR was due every year?
A. No, what was significant was the fact we were looking for the 1991.
Q. Well, as reflected in this document, the statement, "an ACR is due every year," you would not agree with that, sitting here today, correct?
A. I wouldn't, no.
Q. Was that view, the consensus view of the task force, that an ACR was due every year?
A. I don't recall it reached that level of discussion. I'm sure that was the view of part of the group, and the discussion went that way.
Q. And there's no minority opinion or view reflected in these minutes, right?
A. It wasn't something one would vote on.
Q. Were you hopeful that an ACR would be issued in 1990?
A. This says we were. I'm not sure I personally was, the group was.
Q. That was not of particular significance to you, the issuance of an ACR in 1990?

Page 3816

A. No.
Q. Let's talk about the contract for a minute. Do you have DX-1 handy there?
A. Certainly, absolutely.
Q. And I was going to ask you, Mr. Zabransky, about the DOE responsibilities which are at page nine of the contract. Counsel for the government asked you some questions about that yesterday?
A. Okay.
Q. And in particular, section B.2 of the, of this clause of the contract, which is clause – or article IV, right, "DOE responsibilities," and you talked about this yesterday with counsel for the government, the DOE's obligation to arrange for and provide a cask, do you recall that?
A. Yes.
Q. And I wrote down that you understood the term "suitable for use." Do you see that in the fifth line of this subsection of the contract?
A Yes, I do.
Q. You can correct me if I'm wrong, but I wrote down yesterday that that term "suitable

Page 3817

for use" did not mean that DOE had to be efficient in what it brought to the site, did I understand you to say that?

MS. SULLIVAN: Objection, mischaracterizes witness' testimony.

BY MR. TOMASZCZUK:

Q. I don't want to mischaracterize it. Mr. Zabransky, I wrote down that term, and if I'm incorrect, please correct me?

THE COURT: Under the circumstances, the Court will overrule the objection.

THE WITNESS: Again, I'm not sure if I use that word, I think I might have Basically, what I said was the casks had to work at their site, it didn't have to be the most efficient cask to use at the site, it had to be usable, suitable for use at that site. It couldn't be too big, it didn't mean it couldn't be smaller than they could handle, but it couldn't be too big.

BY MR. TOMASZCZUK:

Q Well, could, by way of example, just so I understand your view of this, could DOE provide a one ton cask, even if the utility could handle a hundred ton cask, even though

Page 3818

that might be inefficient?

A. If such a thing existed, it could, but it says, "suitable for use." It doesn't say, "optimal for use."

Q. And you don't understand the concept of efficiency to inform the parties understanding of the term "suitable for use"?

A It says, "suitable for use," Mr. Tomaszczuk

Q. So the answer to my question is no?

A The answer is it has to be suitable for use.

Q. You also talked yesterday about the purchaser's request, the term I wrote down, to adjust the quantities of spent nuclear fuel specified in delivery commitment schedules. Do you recall that?

A. Yes.

Q. Let's look at page 11 of the contract, same exhibit, article V, paragraph B. And can you read the last sentence of article V, paragraph B, section 2, which is on the screen?

A Sure. "Purchaser shall have the right to adjust the quantities of SNF and/or high-level waste plus or minus 20 percent and

Page 3819

delivery schedule up to two months until submission of the final delivery schedule."

Q. Now, you would agree, would you not, Mr. Zabransky, that this doesn't talk about utilities could or may make a request, it says they shall have the right to adjust the quantities plus or minus 20 percent, correct?

A. That's correct, that's what it says.

Q. And there's nothing in that language which suggests that DOE can disapprove that or limit that right, is there?

MS. SULLIVAN: Objection, Your Honor, legal conclusion.

THE COURT: Overruled.

THE WITNESS: Well, in the language that you presented, no, but we continue on, the DCS is the basis for the final delivery schedule. That's where the actual delivery date is set and specific fuel is set. DOE has the right to approve or disapprove that submittal, and that submittal will reflect that adjustment, so the utility had upped their adjustment to the point where a department couldn't accommodate it because of others in the queue, it wouldn't approve the FDS.

Page 3820

BY MR. TOMASZCZUK:

Q. And just so we're clear, no one has ever had an FDS approved, right?

A. No one has ever had an FDS approved, no one has ever asked for a 20 percent increase.

Q Let me ask you next, Mr. Zabransky, to look at Plaintiff's Exhibit 236, and this is where we were right before we broke for lunch. I can hand you a copy, I'm not sure, you may or may not have one up there.

MR. TOMASZCZUK: If I can approach, Your Honor?

THE COURT: Yes, certainly.

BY MR. TOMASZCZUK:

Q And, Mr. Zabransky, this is a letter you sent to Mr Rives in or about December of 2004?

A. Yeah, appears to be an unsigned copy of that letter

Q. I can't explain the fact that it's unsigned.

A. I can't either. I sign all the letters.

Q But you don't have any reason to

Page 3821

dispute that you sent this letter in or about December of 2004 to Mr. Rives at Entergy?

A. I do not.

Q. And in this letter, you were suspending the process which had only resumed in July of 2004, correct?

A. That's correct.

Q And you did that because of "recent developments relating to the fiscal year 2005 budget, along with other issues," that's what you stated in the letter, correct?

THE COURT: Ms. Sullivan.

MS. SULLIVAN: Objection, Your Honor, relevance, we're going far afield from what.

THE COURT: We had that discussion just before the luncheon recess Overruled.

THE WITNESS. And can you repeat the question?

BY MR. TOMASZCZUK:

Q. Basically, you were suspending the process, as reflected in the letter you sent to Mr. Rives, due to "recent developments relating to the FY 2005 budget, along with other issues"?

A. That's what it says.

Page 3822

Q. And indeed, that is the state of play today, right, the DCS process remains suspended?

A. That's correct

Q. And as long as the DCS process remains suspended, based on your view that DCSes, approved DCSes constitute binding commitments, DOE effectively avoids incurring any additional liability to the utilities, right?

MS. SULLIVAN. Objection, Your Honor, legal conclusion.

THE COURT: Sustained

BY MR. TOMASZCZUK.

Q. Mr. Zabransky, DOE has an interest in keeping the process suspended, correct?

MS. SULLIVAN· Objection, Your Honor, foundation, speaking on behalf of DOE, argumentative, and calls for legal conclusion.

THE COURT: There is a way, there are several ways in which that question is acceptable, the Court will take that interpretation of the question. Overruled.

THE WITNESS: Again, I can't speak for DOE, but I've, from people I know, which isn't all of DOE, nobody would like anything more

Page 3823

than to be ready to start this process again and have a repository ready to go.

BY MR. TOMASZCZUK:

Q. If, as you've articulated, the DCS is a binding commitment, that is your view, correct?

A. Yes.

Q. Isn't it true, if that's the case, that if DOE had the right to disapprove a final delivery schedule, then the DCS itself is not binding?

THE COURT: Ms. Sullivan.

MS. SULLIVAN: Objection, Your Honor, calls for a legal conclusion, calls for speculation.

THE COURT: Well, let's just put it this way, the Court had two questions that it was going to pose to Mr. Zabransky after Mr. Tomaszczuk had finished his examination and this was one of them. Overruled

THE WITNESS: Well, again –

MR. TOMASZCZUK: Well, I'm right 50 percent of the time.

MS. SULLIVAN: Your Honor, with all due respect, we still we maintain our

Page 3824

objection.

THE COURT I understand.

MS. SULLIVAN: Thank you.

THE WITNESS: And, again, DOE has the right to disapprove an FDS, as it does, but if you wait for it to process, then DOE must propose an alternate schedule, the purchaser can accept DOE's proposed alternate schedule, and if the two parties can't reach agreement as to what the revised date should be or the revised time should be, then there will be a dispute that needs to be resolved. But it doesn't change the process, it's a scheduling process, and DOE has the right to say, I can't come on June 5th. I'm proposing July 12th, instead.

Q So doesn't that mean that the DCS is not binding?

MS. SULLIVAN. Objection, Your Honor, asked and answered.

THE COURT: Overruled.

THE WITNESS: I don't believe it does.

BY MR. TOMASZCZUK:

Q. It's binding, but it's subject to DOE's right to approve it and adjust it?

Page 3825

A. And the --
MS. SULLIVAN: Objection, Your Honor, asked and answered
THE COURT: Overruled again.
THE WITNESS: And the purchaser has a right to disagree with that and pursue a dispute.
MR. TOMASZCZUK: Can I have just a moment, Your Honor?
THE COURT: Yes.
MR. TOMASZCZUK: Mr. Zabransky, thank you for your time. No further questions right now.
THE WITNESS: Thank you.
THE COURT: You have subsumed the Court's questions in your last couple of questions, so I have no questions for you, Mr. Zabransky.
THE WITNESS: Thank you, sir.
THE COURT. Ms. Sullivan.
MS SULLIVAN: Yes, hopefully very briefly, Your Honor
THE COURT Redirect
MS. SULLIVAN: Thank you, Your Honor.
REDIRECT EXAMINATION

Page 3826

BY MS SULLIVAN:
Q Mr Zabransky, I believe you testified -- well, let me just ask you, why was the issuance of an ACR in 1990 not of significance to you?
A Well, because the DCSes for 1998 weren't going to be started until the next, until 1992, so the 1990 ACR would have come and gone and would have been supplanted by a 1991 ACR, which would have informed the DCS process.
Q. Mr. Zabransky, Mr. Tomaszczuk asked you some questions about your views as to a reasonable rate and what your views were while you were at Wisconsin Electric, and I believe you offered some testimony with regard to an unconstrained world. What did you mean by an unconstrained world?
A The unconstrained world is the world where you don't have legislative limitations on what you can do, and in the MRS world, there were constraints. DOE had to live within those constraints I was referring to a world where you could do what you needed to do.
Q. Did you consider the MRS rate to be reasonable, given the constraints that you just

Page 3827

discussed?
A. Given the constraint of 10,000 ton limitation and given the 12-year delay that was anticipated between the MRS and the repository, working it off in a fairly even rate seemed reasonable.
Q. And did you, was it your understanding that in, if DOE had performed in accordance with the rates in either the 1991 ACR or the 1994 ACR, that DOE never planned to reach a 3000 rate?
MR. TOMASZCZUK: Objection, calls for speculation.
THE COURT: Just a moment. Overruled.
THE WITNESS: Can I have the question repeated? I think there were a couple of double negatives or something.
THE COURT: That's right. You have to really work at this one to understand it. Ms. Sullivan, you posed an intellectual puzzle.
MS. SULLIVAN: Let me try again, Your Honor.
BY MS. SULLIVAN:
Q. At the time that you were reviewing the 1991 ACR while you were at Wisconsin

Page 3828

Electric, with the rates with the 900 MTU rate through 2007, did you have an understanding that DOE did not plan to reach a 3000 rate, eventually?
A. My understanding was they did plan to reach that rate eventually.
Q. And when would that be?
A. After the repository was operational.
THE COURT: Cope with double negatives in there
MS. SULLIVAN: I apologize, Your Honor.
BY MS. SULLIVAN:
Q Can we go to Plaintiff's Exhibit 130 which is the exhibit marked Defendant's Exhibit 131, Mr. Zabransky, which is the delivery commitment schedule for Arkansas? Mr. Zabransky, I'd like to direct your attention the section 2, the typewritten note, did DOE add that notation on the DCS after it approved the DCS or before it approved the DCS?
A. That was added before the contracting officer approved it.
Q. Now, Mr. Zabransky, I'm going to direct your attention, could you pull out --

Page 3829

let me just ask you, did DOE – you also
discussed with opposing counsel several DCSes
which you had voided your signature. Did DOE
ever send an approved DCS to a utility that DOE
subsequently voided?
A. No.
THE COURT: May I ask a quick question
now, a single question?
MS. SULLIVAN. Please.
THE COURT: Obviously, you may object,
and Mr Tomaszczuk may. What's the, going back
to PX-130, which is DX-131, what's the status
of that DCS today?
THE WITNESS. The status of that DCS
is it was never approved Which one are you
talking about? I'm sorry, I'm sorry, I looked
at the wrong one The Arkansas Power & Light
DCS?
THE COURT That's right
THE WITNESS It's a DCS that we've
approved, and we're committed to perform on,
we're delayed
THE COURT: Thank you.
MR TOMASZCZUK I'm sorry, could we
have that answer read back? Just because I'm

Page 3830

not sure I heard it all
(The reporter read the record as
requested )
THE COURT. Do you have something
else?
THE WITNESS That's correct. We're
just delayed.
BY MS SULLIVAN
Q Mr. Zabransky, did litigation
concerning the standard contract inform DOE's
preparation of the 1994 ACR that was issued in
1995?
A I don't believe so
Q. And prior to the U.S Court of Appeals
decision in Indiana Michigan, which we've
discussed here today, what was your
understanding of DOE's view regarding DOE's
obligation in the absence of a DOE facility?
A My understanding of their view, DOE's
view, which was that it was their belief that,
in the absence of a facility constructed under
the Act, that the obligation was contingent
upon that.
Q And why did DOE not approve DCSes in
the 1997 timeframe?

Page 3831

A. Because of the Court ruling that told
DOE its belief was incorrect and they were not
conditioned by the existence of the facility.
Q. And as of 1997, did DOE believe that
it could perform beginning in 1998?
A. As of 1997, it did not believe it
could perform in 1998.
Q. And to your knowledge, does the
standard contract require DOE to approve DCSes
that it knows it cannot meet?
A. I don't know that it does or doesn't
but it doesn't seem to make sense that you'd
approve commitments that you can't meet.
Q. And what is the status of DCSes
approved before the suspension of the DCS
process?
A. Those, like the one we saw from
Arkansas, remain in effect, and DOE is delayed
in performance.
Q. Mr. Zabransky, could you pull out
DX-1, which is the standard contract with
Arkansas?
A. Yes.
Q. I direct your attention to page 11.
A. Yes.

Page 3832

Q. And could we bring out that first
paragraph under delivery commitment schedule?
Mr. Zabransky, I'll read the second sentence
that begins, "After DOE has issued its proposed
acceptance priority ranking as described in
paragraph B.5 of article IV hereof, beginning
January 1st, 1992, the purchaser shall submit
to DOE the delivery commitment schedules which
shall identify all SNF and/or HLW the purchaser
wishes to deliver to DOE beginning 63 months
thereafter."
What is the significance of the
reference there to paragraph B.5 of article IV,
to your understanding?
A. Repeat the question.
Q. That sentence that I just read?
A. Yes.
Q. References paragraph B.5 of article
IV, to your understanding, what's the
significance of that reference?
A. Well, again, that ties that back to
the APR in April 1st of 1991.
Q. And, Mr. Zabransky, you discussed with
Mr. Tomaszczuk the instruction contained in the
DCS instructions to utilities to use the

Page 3833

allocations in the ACR as the basis for their delivery commitment schedules, do you remember that testimony?
A. Yes.
Q. Did the 2004 DCS instructions contain a similar instruction?
A. I believe they did, yes.
Q And why was that?
A. Because they should have used the allocations in the 2004 ACR as a basis for their delivery commitment schedules.
Q Why did you issue instructions containing that direction?
A Because at that time, that was what DOE believed it would be able to fulfill, as far as picking up spent fuel beginning in 2010.
Q. And what is your understanding if a utility, going back to when you were at Wisconsin Electric, what was your understanding that if a utility did not submit a DCS for the allocation it had in the appropriate ACR, what would be the result?
MR TOMASZCZUK: Objection, speculation, also lack of foundation.
THE COURT: We had a snippet of

Page 3834

testimony on this previously, but only a snippet. Overruled. That is, if you know
THE WITNESS: Well, again, when I was at Wisconsin Electric and I had a contract that said I was supposed to give notice that I wanted delivery by a certain date, in other contracts, I had, if I didn't do that, I had the potential of losing my right to claim my uranium or something else, so I took it to mean that you did it by that date or there might be a consequence
I don't think the consequence was known to me at the time, but I figured there could be a consequence, so I tried to make sure I didn't miss the date.
BY MS SULLIVAN
Q. And going now to your experience at DOE and what your understanding is as a contracting officer, if a utility did not submit a DCS to claim an allocation in an ACR, what would be the result?
MR. TOMASZCZUK: Same objection
THE COURT. Same caveat to your response, Mr. Zabransky.
THE WITNESS Again, the situation has

Page 3835

not – well, theoretically, or perhaps the utility could wind up forfeiting the allocation, and it could be given to someone else who claimed plus 20 percent.
BY MS. SULLIVAN:
Q. Now, Mr. Tomaszczuk asked you about a series of assumptions that underlie the issuance of the 1994 ACR in 1995 regarding the development of an MRS. If DOE had been assuming a repository would open in 1998, would the siting for a repository have had to have been done by a particular date?
A It would have had to have been done well before 1994.
Q. And would DOE have had to have submitted a license application to the NRC?
MR. TOMASZCZUK: Objection, lack of foundation, also calls for speculation, we've had absolutely no discussion about NRC license applications or any testimony by this witness that he's knowledgeable about that process.
THE COURT: Well, we did with Mr. Kouts, Ms. Sullivan.
MS. SULLIVAN: Yes, Your Honor, I'm merely trying to draw a parallel,

Page 3836

Mr. Tomaszczuk asked Mr. Zabransky a series of questions of what would have to happen to get an MRS running in 1998. I'm asking the same questions of Mr. Zabransky for a repository.
THE COURT. I think you know the answer, but in any event, overruled.
THE WITNESS: Okay. And since the Act allows the NRC three years, plus a year to license a repository, you'd have to have a licensing at least four years before you could even begin construction.
BY MS. SULLIVAN:
Q. And would DOE have had to undertake the necessary development of casks prior to that 1998 date for a repository?
A. Well, again, my answer to that is the same one I gave to Mr. Tomaszczuk, that DOE would have to purchase casks, their casks, some casks are available, DOE would have to buy more, so procurement would have to start three or four years ahead of time, but casks would have been available to dos ome shipping.
Q. And would DOE have had to successfully navigate legal challenges with regard to the repository?

Page 3837

A. I'd presume there'd be many.
Q. I'm sorry?
A. There would be many legal challenges, yes.
MS. SULLIVAN: One moment, Your Honor.
THE COURT: Yes, certainly.
MS. SULLIVAN: Nothing further, Your Honor, thank you.
THE COURT: Thank you, Ms. Sullivan Mr. Tomaszczuk, recross.
RECROSS-EXAMINATION
BY MR TOMASZCZUK:
Q. Mr. Zabransky, with respect to the approved Arkansas Power & Light DCS –
A. Uh-huh
Q. – that Ms. Sullivan just asked you about, and you testified that because that DCS was approved, DOE is now "permitted to perform or delay," is that what you said?
MS. SULLIVAN: Objection mischaracterizes the witness' testimony.
THE COURT: Well, that is a possible construction of Mr. Zabransky's testimony. It's not a necessary one, but nonetheless, the objection is overruled

Page 3838

THE WITNESS: I don't think I said that
MR TOMASZCZUK: Well, I'm going to ask the court reporter because that's what I wrote down, after having heard her read it back. Could you read that answer back to the question Mr. Zabransky answered about the effect of DOE's approval of the Arkansas Power & Light DCS?
THE COURT: There are two prior responses, one is about on pages 141 and 2, and there's another that's about 147 or 8 in today's transcript
(The reporter read the record as requested.)
BY MR. TOMASZCZUK:
Q And this DCS –
MS. SULLIVAN: Is there a question pending?
THE COURT: No, I think Mr. Tomaszczuk is just getting the Elmo set up, at least that's my understanding of what's happened
MR. TOMASZCZUK: Yes, absolutely I was about to ask a question.
BY MR TOMASZCZUK:

Page 3839

Q. And this DCS which DOE approved was for delivery in 2001, correct?
A. That's correct.
Q. And the 23.3 metric tons of spent nuclear fuel specified in this DCS remains on-site at Arkansas Power & Light Company or now Entergy Arkansas?
MS. SULLIVAN: Objection, foundation, I don't know that Mr. Tomaszczuk – I mean Mr. Zabransky knows that.
THE COURT: Oh, he knows. Overruled
THE WITNESS: I presume it's there.
THE COURT: I don't know where else it would be. If it's someplace else, we're in real trouble.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. And when you say, "we are delayed," you mean DOE is delayed in its performance of this obligation, correct?
A. That's what I mean.
Q. And the earliest that DOE now expects to perform is 2017, correct?
MS. SULLIVAN: Objection, Your Honor, relevance

Page 3840

THE WITNESS: That's my understanding –
THE COURT: Just a moment. Overruled
THE WITNESS: That's my understanding, based upon Mr. Sproat's announcement.
MR. TOMASZCZUK: Mr. Zabransky, that's all I have. Thank you.
THE WITNESS. Thank you.
THE COURT: Thank you, Mr. Tomaszczuk. Ms Sullivan?
MS. SULLIVAN: Nothing further, Your Honor, thank you.
THE COURT: Mr. Zabransky, I believe I might excuse you as a witness, but before I do that, you've got to listen for just a moment The parties have requested, as they are entitled to do under Federal Rule of Evidence 615 and as you know from prior occasions, that fact witnesses are to be excluded from the courtroom during the testimony of other witnesses, so that each fact witness can give his or her testimony fresh, without being distracted by or influenced by the testimony of others
My order to you is that, until this

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------:
DAIRYLAND POWER COOPERATIVE, :
Plaintiff, :
v. : No. 04-106C
UNITED STATES OF AMERICA, :
Defendants. :
---------------------------------:

COPY

Washington, D.C.
Thursday, May 3, 2007

Deposition of:

DAVID K. ZABRANSKY

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:14 a.m., when were present on behalf of the respective parties:

 ©2007

Page 2

On behalf of Plaintiff:
ROBERT L. SHAPIRO, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3174

On behalf of Defendant:

MARIAN E. SULLIVAN, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 10150
Washington, D.C. 20005
(202) 307-6288

Page 3

CONTENTS


EXAMINATION BY: PAGE
Counsel for Plaintiff 5
Counsel for Defendant 203


Page 4

ZABRANSKY DEPOSITION EXHIBITS: * PAGE

| | | |
|---|---|---|
| 1 | Bates number HQR501 0029 | 65 |
| 2 | Bates numbers HQR401 0027 through HQR401 0028 | 71 |
| 3 | Bates number PLAC 0079761 | 78 |
| 4 | Bates numbers PLAC 0079752 through PLAC 0079760 | 79 |
| 5 | Bates numbers PLAC 0110411 through PLAC 0110416 | 97 |
| 6 | Bates numbers PLAC 0097730 through PLAC 0097732 | 111 |
| 7 | Bates number PLAC 0138340 | 112 |

(*Exhibits attached to transcript.)

Page 5

PROCEEDINGS

\- - - - - -

Whereupon,

DAVID K. ZABRANSKY

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SHAPIRO:

Q Good morning, Mr. Zabransky. I'm Robert Shapiro. I know we've sat opposite one another several times before for your deposition. And we'll start -- this is a new deposition because this is in the Dairyland Power Cooperative case. But I do want to ask a couple questions at the outset about your prior testimony. And obviously these are prefaced to the extent you can recall your prior testimony, either at trial or deposition, either in cases where I've been an attorney for the plaintiff or in other spent fuel cases.

And my question is is there anything you would like to change in any of your prior deposition or trial testimony in the spent fuel cases?





©2007

Page 54

foundation, assumes facts not in evidence.
THE WITNESS: And I have no knowledge of the work or of the costs they're incurring. So I can't give a basis as to whether it could have been done for more or less.
BY MR. SHAPIRO:
Q Do you understand that Dairyland is claiming that it could have removed its reactor pressure vessel at a lower cost if its spent nuclear fuel were not in its spent fuel pool?
MS. SULLIVAN: Objection. Vague, foundation. Foundation. Yeah. Go ahead.
THE WITNESS: And no, I have no understanding of that.
BY MR. SHAPIRO:
Q I'll represent to you, Mr. Zabransky, that that's the case, that Dairyland is claiming it could have removed its reactor pressure vessel at a lower cost if its spent nuclear fuel were not still present in its spent fuel pool.
You don't have any knowledge that would be inconsistent with Dairyland's contention in that

Page 55

regard, do you?
MS. SULLIVAN: Objection. Vague, legal conclusion.
THE WITNESS: I don't have any knowledge that either supports their contention or refutes it.
BY MR. SHAPIRO:
Q Next topic, Mr. Zabransky, I would like to talk about is the anticipated timing of the Department's performance in terms of accepting spent nuclear fuel. And we're still -- and you noted this earlier, we are still talking to you at this point just in your individual deposition as opposed to a 30(b)(6) designation. I don't think you -- you are the designee on this issue for the Department.
But as an individual, when do you expect the Department to start accepting spent nuclear fuel from utilities?
MS. SULLIVAN: Objection. Vague, relevance.
THE WITNESS: And can you repeat the question.
BY MR. SHAPIRO:

Page 56

Q When do you expect the Department of Energy to start accepting spent nuclear fuel from utilities?
MS. SULLIVAN: And foundation. Same objections. Foundation and speculation.
THE WITNESS: Basically all I can tell you is that the program has Mr. -- Mr. Sproat has announced or said on a number of occasions that the best achievable date is 2017.
BY MR. SHAPIRO:
Q I'm certainly familiar with Mr. Sproat's statements. Do you have any estimate yourself, Mr. Zabransky, of when you expect, based upon all of your work on these issues over the years, when you expect the Department to start accepting spent nuclear fuel?
MS. SULLIVAN: Objection. Vague, relevance, foundation.
THE WITNESS: I have no basis to disagree with Mr. Sproat's assessment.
BY MR. SHAPIRO:
Q You're aware that Mr. Sproat has stated

Page 57

publicly that he believes that 2020 is actually a more likely date of when the Department will actually start expecting -- accepting utilities' spent fuel because the 2017 best achievable date doesn't take into account litigation, true?
MS. SULLIVAN: Objection. Assumes facts not in evidence, vague, foundation.
THE WITNESS: And, again, I'm aware of Mr. Sproat has made statements that the 2017 best achievable date was conditioned upon certain things. I believe that may have been one of them. I'm not sure that's a totally accurate quote. But those are things he said in the press.
BY MR. SHAPIRO:
Q You don't have any basis for disagreeing with Mr. Sproat's assessment, do you?
MS. SULLIVAN: Objection. Asked and answered, relevance, vague, foundation.
THE WITNESS: No, I don't.
BY MR. SHAPIRO:
Q Do you agree with Mr. Sproat that 2020 is a more likely date for when the Department will

Page 102

Q And if there's no schedule, then there's no obligation on the part of the Department of Energy to pick up that utility's spent nuclear fuel?

MS. SULLIVAN: Objection. Legal conclusion, vague. Objection to the extent it mischaracterizes the witness' prior testimony.

THE WITNESS: And I think the obligation is a different question than schedule. There's no schedule. So it's not necessarily delayed. There's an obligation to pick up the spent fuel. The schedule hasn't been established.

BY MR. SHAPIRO:

Q And it's the Department's view that if the schedule hasn't been established, then the Department of Energy can't be in breach of its obligation yet to pick up that spent nuclear fuel?

MS. SULLIVAN: Objection. Legal conclusion, foundation, vague.

THE WITNESS: And I can't offer an opinion on that legal issue.

BY MR. SHAPIRO:

Q You're aware, Mr. Zabransky, that the

Page 103

Department of Energy has not approved delivery commitment schedules for all of Dairyland Power Cooperative's spent nuclear fuel, correct?

A I don't know what number had been approved. I know some have been approved for the allocations that existed. I'm not sure if that covered the entire quantity or not.

Q I'll represent to you that the amount of spent nuclear fuel that is covered in Dairyland's approved delivery commitment schedules is not all of Dairyland's spent nuclear fuel.

When is the Department of Energy obligated to remove the amount of spent nuclear fuel -- Dairyland's spent nuclear fuel that's not set out on any of its approved delivery commitment schedule forms?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: I'm not sure the contract has a date that requires the Department to finish by any point in time.

BY MR. SHAPIRO:

Page 104

Q So the Department of Energy has no obligation to ever complete the removal of spent nuclear fuel from Dairyland?

MS. SULLIVAN: Objection. Legal conclusion, vague, mischaracterizes the witness' prior testimony.

THE WITNESS: And you keep using the word obligation. I'm using the word schedule. No schedule has been established for the removal of all of Dairyland's spent fuel. The Department has an obligation to remove all the spent fuel. But no schedule has been established that I'm aware of.

BY MR. SHAPIRO:

Q Well, I'm using the term obligation in the context of the approved delivery commitment schedule forms because I thought it was your understanding -- is the government's understanding that the delivery commitment schedule forms do create a binding obligation on the part of utilities and the Department? Isn't that right?

MS. SULLIVAN: Objection. Legal conclusion, vague. I'm not sure there's a question.

Page 105

Mischaracterizes -- objection to the extent it mischaracterizes the prior testimony.

THE WITNESS: I mean my testimony was that the approved delivery schedules create a schedule and a commitment to move fuel on that schedule.

BY MR. SHAPIRO:

Q And absent such a form, there can be no commitment by the Department of Energy to complete removal of the utility's spent nuclear fuel -- Dairyland's spent nuclear fuel?

MS. SULLIVAN: Objection. Legal conclusion, vague, to the extent it mischaracterizes the witness' prior testimony, and asked and answered.

THE WITNESS: Absent an approved DCS for the fuel, there's been no schedule established by which it will be removed or should be removed, no.

BY MR. SHAPIRO:

Q What is the purpose of the final delivery commitment schedules under the Standard Contract?

MS. SULLIVAN: Objection to the extent it

Page 138

far as entering into the standard contract was other than simply referring to a database?

MS. SULLIVAN: Objection. Mischaracterizes the witness' prior testimony.

THE WITNESS: That administrative record represents the Department's understanding. It's best viewed as the record.

BY MR. SHAPIRO:

Q You're not in any position as a 30(b)(6) designee to have reviewed that material and provide for us the Department's view as to the essence of what it's view is as to what the utilities intended by entering into the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion, compound, vague, mischaracterizes the witness' prior testimony.

THE WITNESS: And, no, I'm not prepared to provide the essence of what's in there.

BY MR. SHAPIRO:

Q So the Department has no view of utilities' intent for entering into the Standard Contract other than the submittals that utilities

Page 139

made to the Department as part of the administrative rule-making process through which DOE drafted the Standard Contract?

MS. SULLIVAN: Objection. Legal conclusion.

THE WITNESS: And based upon my preparation for this deposition, no.

BY MR. SHAPIRO:

Q Didn't DOE understand that utilities intended that the Standard Contract would solve the problem of spent fuel accumulation at utility reactor sites?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: And I don't have any information that would say DOE understood that.

BY MR. SHAPIRO:

MR. SHAPIRO: All right. Would this be a good time for a lunch break?

MS. SULLIVAN: Uh-huh.

(Whereupon, at 12:38 p.m., the deposition was recessed, to be reconvened at 1:40 p.m. this same

Page 140

day.)

Page 141

AFTERNOON SESSION (1:47 p.m.)

Whereupon,

DAVID K. ZABRANSKY

having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued)

BY MR. SHAPIRO:

Q Mr. Zabransky, I think we're ready to turn to the next 30(b)(6) topic. This one concerns the purpose and role of exchanges under the Standard Contract.

What is the government's understanding of the purpose of the exchanges provision of the contract?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: The purpose of the exchange provision under the contract is to allow utilities to exchange approved delivery commitment schedules, subject to the Department's approval, to reallocate amongst themselves their place in line of waste acceptance allocations.

Page 142

BY MR. SHAPIRO:
Q The government has expected that the exchanges provision would enable utilities to optimizing the timing of DOE's acceptance of spent fuel from individual utilities, true?
MS. SULLIVAN: Objection. Vague, legal conclusion.
THE WITNESS: I'm not sure what you mean by the word optimizing.
BY MR. SHAPIRO:
Q In this sense I mean optimizing in the sense of providing the most efficient schedule for utilities. The optimal schedule from a utility's standpoint?
MS. SULLIVAN: Objection. Vague, legal conclusion.
THE WITNESS: And, again, I'm not sure that, necessarily, whether it's optimal or not, if two utilities agree to exchange for whatever reason, the provision allows them to do that subject to DOE's approval.
BY MR. SHAPIRO:

Page 143

Q You've stated earlier that the purpose of the exchanges provision is, well, basically to perform exchanges. What's your understanding as to why the contract has an exchanges provision?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: Again, to allow utilities to make adjustments in their schedule for acceptance, that would facilitate whatever condition they wanted to address, whether it was to -- you know, again, I don't know the reasons they would do it, but it allows them to adjust their place in line by exchanging with another utility an approved DCS, to go at another different point in time, later or earlier. Of course the exchange is subject to DOE's approval.
BY MR. SHAPIRO:
Q Why did DOE find it desirable to put that provision into the Standard Contract?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: And, again, I think that to review that you need to go back to DOE's

Page 144

administrative record as to why it put that provision in the contract. I believe it was put in to address utility concerns or utility desires to have some flexibility in adjusting those schedules.
BY MR. SHAPIRO:
Q And that intended purpose of the exchanges provision assumes that DOE would exercise its discretion or disapprove -- its discretion to approve or disapprove exchanges in a reasonable manner, true?
MS. SULLIVAN: Objection. Vague, legal conclusion.
THE WITNESS: And I think that the answer to the question is would DOE approve or disapprove exchanges in a reasonable fashion, the answer is I believe they would, yes.
BY MR. SHAPIRO:
Q We may come back to that topic. Let me move on for the moment to the next topic. The purpose and role of the provision in the Standard Contract providing for priority acceptance of spent fuel from permanently shut down reactors.

Page 145

What is the purpose and role of that provision of the Standard Contract, Mr. Zabransky?
MS. SULLIVAN: Objection. Legal conclusion, vague.
THE WITNESS: The provision under the Standard Contract that allows DOE at its discretion to grant priority acceptance of shut down reactors was put in the contract for exactly that purpose, for DOE to have that ability at its discretion to grant that acceptance, to facilitate removal of fuel from reactors that are permanently shut down, potentially to avoid them having fuel for many, many years.
BY MR. SHAPIRO:
Q Why did DOE find it desirable to have a provision that would help ensure that permanently shut down reactors would not otherwise be potentially storing spent fuel for many years?
MS. SULLIVAN: Objection. Vague. Objection to the extent it mischaracterizes the witness' prior testimony.
THE WITNESS: Again, I'm not sure the

provision ensures anything. It allows discretion to grant priority to shut down reactors in the case that DOE thought that that was appropriate for whatever reason.

BY MR. SHAPIRO:

Q Why did DOE think it appropriate to have that provision in the Standard Contract?

MS. SULLIVAN: Objection. Asked and answered, vague.

THE WITNESS: DOE felt it was appropriate to have the provision that allowed it that discretion in the contract. And there's nothing beyond that that I can add to that discussion.

BY MR. SHAPIRO:

Q Since DOE has entered into Standard Contracts with utilities, what role has that provision providing for priority for -- acceptance of spent fuel from shut down reactors, what role has that provision played in the program?

MS. SULLIVAN: Objection. Vague, compound.

THE WITNESS: I'm not sure -- how do you



mean played in the program? I don't understand what that means.

BY MR. SHAPIRO:

Q How has that provision affected operation of the program?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: I don't --

MS. SULLIVAN: Assumes facts not in evidence.

THE WITNESS: And, again, I don't understand what operation of the program means. I don't think it's affected the operation of the program at all.

BY MR. SHAPIRO:

Q You're aware that the Department of Energy has not agreed to accord priority for acceptance of spent fuel from permanently shut down reactors, true?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: I'm aware that in response to requests the Department has chosen not to exercise its discretion and grant that -- grant the



priority acceptance, correct.

BY MR. SHAPIRO:

Q Why has the Department not granted that priority acceptance to permanently shut down reactors?

MS. SULLIVAN: Objection. Vague.

THE WITNESS: The Department's position is that that issue, which is related to the removal of spent fuel from shut down reactors, is best addressed through the exchange provision of the contract between the utility as opposed to the Department unilaterally reallocating a finite capacity to one utility over another.

BY MR. SHAPIRO:

Q So it has been the Department's expectation that the exchanges provision will operate sufficiently to obviate the need for according priority acceptance to spent fuel at permanently shut down reactors?

MS. SULLIVAN: Objection. Vague, compound, and mischaracterizes the witness' prior testimony.



THE WITNESS: I'm not sure that the latter part -- I mean, my statement was that the Department's position is that the exchange provision is the best way that utilities can, amongst themselves, reallocate that capacity for acceptance in a way that best addresses the need to remove fuel from shut down reactors.

BY MR. SHAPIRO:

Q Well, the Department has expected that, once it actually starts accepting spent fuel, that the exchanges provision will operate as originally intended, to enable utilities to optimize their acceptance -- the timing of their acceptance of spent fuel, correct?

MS. SULLIVAN: Objection. Vague, compound, assumes facts not in evidence.

THE WITNESS: The Department anticipates that the exchange provision will operate in a way that will allow utilities to exchange amongst themselves to advance, or to tailor their spent fuel acceptance schedules to their needs.

BY MR. SHAPIRO:



 ©2007

Page 150

Q Let's move on to the next topic, which is the purpose and role of the provision of the Standard Contract governing acceptance of failed fuel and DOE's plans and scheduling of the acceptance of failed fuel.

Let me first ask, Mr. Zabransky, what's your understanding of how the Standard Contract addresses the timing of the acceptance of failed fuel?

MS. SULLIVAN: Objection. Legal conclusion, vague.

THE WITNESS: I mean, under the provisions of the contract, the purchaser, the contract holder would have to apprise the Department of its failed fuel and the circumstances of its failed fuel, and seek a confirmation that it can be delivered on the normal schedule.

To the extent that there are technical feasibility issues associated with the picking up of that failed fuel, the Department may need to adjust the schedule of pickup.

BY MR. SHAPIRO:

Page 151

Q So this provision of the contract provides a contingency in the event that something is happening in the course of the operating DOE program, true?

MS. SULLIVAN: Objection. Vague, to the extent it mischaracterizes the witness' testimony.

THE WITNESS: Again, I'm not -- can you repeat your question.

BY MR. SHAPIRO:

Q This provision concerning -- this provision in the Standard Contract concerning the timing of acceptance of failed fuel provides a contingency to address something that might happen in the course of an operating DOE program, true?

MS. SULLIVAN: Objection. Vague, mischaracterizes the witness' prior testimony, assumes facts not in evidence.

THE WITNESS: I mean, you would have to clarify what you mean by an operating DOE program.

BY MR. SHAPIRO:

Q A program in which DOE is actually accepting spent fuel from utilities?

Page 152

A I think --

MS. SULLIVAN: Same objections.

THE WITNESS: I think it would have an implication there. It has an implication in the licensing process also.

BY MR. SHAPIRO:

Q Explain for me what is the implication in the licensing process for the provision of the Standard Contract addressing the timing of the acceptance of failed fuel from utilities.

MS. SULLIVAN: Objection. Legal conclusion.

THE WITNESS: I guess let me clarify. The parameters of failed fuel would have an impact on the license process. But to clarify, the focus of the contract provision is in the operational mode.

BY MR. SHAPIRO:

Q I want to make sure that we're on the same page, Mr. Zabransky, as to, again, those provisions for the -- in the contract for the timing of the acceptance of failed fuel, how they -- how it

Page 153

actually works. And I can certainly pull out a copy of the contract.

But for purposes -- let me start with delivery commitment schedules. For purposes of delivery commitment schedule submittals and approvals, there's no differentiation, is there, between failed fuel and fuel that is not failed, is there?

MS. SULLIVAN: Objection. Legal conclusion, vague, compound.

THE WITNESS: There's an assumption on DOE's part -- presumption on the DOE's part that all fuel on the DCS, delivery commitment schedule, is not failed.

BY MR. SHAPIRO:

Q Where is that presumption evidenced?

A I believe it's in the instructions provided with the DCS form.

Q That was part of Exhibit 4. Take a look and point that out to me, please.

A That would be on page 3. Subparagraph h.

Q Subparagraph h on page 3 of the

**Wisconsin Electric Power Company v. U.S No. 00-697C September 12, 2007**

**Heritage Reporting Corporation**

**Page 553 to Page 798**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 553

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------x

WISCONSIN ELECTRIC POWER COMPANY, Plaintiffs,

vs :NO. 00-697C

THE UNITED STATES, Defendant.

-----------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington D C.

Wednesday, September 12, 2007
Volume 3

The parties met, pursuant to the notice of the Judge at 10:00 a m

BEFORE THE HONORABLE JAMES MEROW

Page 554

APPEARANCES

ON BEHALF OF PLAINTIFFS
RICHARD OEHLER, ESQ
JAY GRIFFITHS ESQ
Perkins Coie LLP
1201 Third Avenue Suite 4800
Seattle Washington 98101
(206) 359-8000
and
EMILY POULIN ESQ
DONALD CARNEY, ESQ.
MARY ROSE HUGHES, ESQ
Perkins Coie LLP
607 Fourteenth Street, N.W
Washington D C 20005
(202) 628-6600

Page 555

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SHARON SNYDER, ESQ.
RUSSELL SHULTIS, ESQ.
STEPHEN FINN, ESQ.
SONIA ORFIELD, ESQ.
U.S. Department of Justice
1100 L Street, N.W
Washington, D C. 20036

(Index appears at end of transcript)

Page 556

P R O C E E D I N G S

(10·00 a.m.)

THE COURT Mr Oehler, are you in charge today?

MR OEHLER· I don't know about in charge, I think the Court's in charge, but I did have a few administrative matters. As the Court knows, we're going to be calling Mr David Zabransky today. And I just wanted to confirm my understanding that he's going to be appearing twice in the case. First, we're calling him as a witness, and then the government is calling him as a witness.

MS. SNYDER· That's right, Your Honor. And I think that our understanding is, is that we will take testimony from Mr. Zabransky at the close of this portion of the trial, specifically on his WEPCO employment, and then in our case-in-chief, we will put Mr. Zabransky on for his DOE employment and Plaintiff's counsel can cross him at that point. So they'll also have an opportunity to examine him twice

MR. OEHLER Well, I guess I do have a little bit of a question That was something

Page 585

Q. And did you sign delivery commitment schedules?

A. Those were only done once, and Mr. Link signed those.

MR OEHLER: One moment, Your Honor.

BY MR. OEHLER:

Q. And did you have a next position with Wisconsin Electric?

A. Beyond manager of nuclear fuel services?

Q. Correct.

A. No, I left the company in – excuse me, in 1994, when I was manager of nuclear fuel services.

Q. And do you recall when in 1994?

A. I believe July 8th.

Q. And have you testified in prior spent fuel cases in the U.S. Court of Federal Claims on behalf of the Department of Energy?

A. I have.

Q. And do you recall what trials those were?

A. Let's see. I'm going to miss some of these, but I didn't testify in the Indiana Michigan trial. I've testified in all the

Page 586

other trials.

Q. So did you testify in the Yankee trials?

A Yes

Q. In the SMUD trial?

A. Yes.

Q. TVA?

A. Yes.

Q. Southern Nuclear?

A. Yes.

Q. PG&E?

A. Yes.

Q. Northern States?

A. Yes.

Q. Entergy Arkansas?

A. Yes.

Q. Any others that you recall?

A. I guess that's it I'm not sure.

Q. And do you recall how many times you've been deposed on behalf of DOE in the nuclear utility cases pending at this court?

A. I don't know the exact number of days. It seems like 30. I don't know.

Q. And are you the government's party representative at this trial?

Page 587

A. I am, yes.

Q. Let's turn back to your working with Wisconsin Electric. When you worked at Wisconsin Electric, were you familiar with acceptance rate issues with regard to the standard contract?

A. Could you be more specific?

Q. Were you familiar with the rate at which DOE would accept spent nuclear fuel under the standard contract?

A. Well, again, I worked there many years. If you're asking me, at some point in time, when I was in that area, was I familiar with that? The answer is yes.

Q. And when you worked at Wisconsin Electric, did you believe that a reasonable and appropriate acceptance rate was one that would exceed the then current industry aggregate spent fuel discharge rate and would begin to work off the accumulated spent fuel at a reasonable rate?

A. Yes, I did.

Q. And what was the basis of that belief?

A. My basis of my belief was that seemed like a reasonable thing to do.

Page 588

Q. Was it based on any government programmatic documents?

A. Well, there were programmatic documents that came up with rates which normalized out at about 3000 tons a year, which either coincidentally or on purpose were a rate that would keep up with the pace of discharge and work off the backlog at a reasonable rate, but I think, independently, the industry and myself had come up with that, the determination that would be a good number.

Q. And even after you moved to the Department of Energy, isn't it correct that you continued in that belief?

A. I believe that, today, it's a reasonable rate, yes.

Q. Turning back to your employment with Wisconsin Electric, when you worked with Wisconsin Electric, what was the company's position regarding the acceptance rate at which DOE should accept spent fuel under the standard contract?

A. I think that's a topic that may have changed over time, and I'm not sure exactly how to answer that without you being more specific.

Page 713

A. All those and then, finally, a promotion to manager of nuclear fuel services in 1992 sometime.
Q. And you held that position until you left, is that right?
A. Yes, '92 through '94.
Q. And did you leave Wisconsin Electric voluntarily?
A. Yes, I did.
Q. And I believe you testified that was in July, July 8th of 1994, is that right?
A. It was July 8th of 1994, I believe.
Q. And were you contacted by Wisconsin Electric after you left your employment in July of 1994?
A. I was contacted by Wisconsin Electric, yes.
Q. And who contacted you?
A. I believe I received a letter from Mr. Link.
Q. And what was it that Mr. Link was requesting? Or what did he ask in the letter?
A. He asked me to see if I could be available to come back and help prepare for the dry storage hearings.

Page 714

Q And was that related to the 1991 PSC application that you had helped prepare?
A. Yes, it was.
Q And when were those hearings scheduled to begin, if you recall?
A. It was later that year, in '94.
Q And were you able to go back and assist Mr. Link in the hearings?
A. No, the DOE counsel, I guess, ethics counsel decided that would be inappropriate, so I couldn't do that.
Q. And you mentioned that, at some points during your employment with WEPCO, that you reported to Mr. Shimon?
A. I did.
Q. And what years did you report to Mr. Shimon?
A. From when I moved over to nuclear fuels group in '84 – I want to say '94, but it's '84 – until the time Howard was moved out of that area and went over to planning and budgets, he no longer had responsibility for nuclear fuel.
Q. And do you know approximately when Mr. Shimon shifted to planning and budgets?

Page 715

A. I'm having a hard time with the dates, but sometime in the '89, '90 timeframe.
Q. And was that a shift for him from the nuclear fuels group?
A Yes, I think it was.
Q. Did he have continuing responsibility for spent nuclear fuel once he left the nuclear fuels group?
A. No, he didn't.
Q. Mr. Zabransky, you testified this morning about the standard contract, I wanted to ask you a couple of follow-up questions about the standard contract. You testified that you believed that 3000 was a reasonable rate, do you recall that?
A. Yes, I do.
Q. Could you explain what you meant by that?
A. Well, I think, in the context of the way the question was asked this morning and the way I've answered it previously, is that looking at the fact that the nuclear plants in this country, the 104-odd plants that currently run, and there used to be more, but generate nominally about 2000 tons a year of spent fuel,

Page 716

that to pick up that spent fuel that's being generated and to work off the backlog at some rate, about 3000 tons a year is a number that lets you work that off in a reasonable fashion. If you go much beyond that, and, again, this is based upon – last time I looked at this was several years ago. If you go to much higher rates, you wind up reaching the point where you've caught up, and you don't have any more fuel to pick up, yet you develop a lot of capability to pick up the fuel. So you've created casks and trucks and trains and facilities to receive more, yet once you work off the backlog, you're still down to the 2000 tons a year that can be shipped, as it ages enough to be shipped.
Q. While you were employed with WEPCO, did WEPCO ever ask the DOE to pick up fuel at any particular rate?
A. And, again, I think "ask" is – I'm not sure how to interpret the word "ask." I think, if you look at some of the correspondence we saw this morning, the company expressed its view that DOE should pick up fuel at certain rates, that if that's "ask," as you

**Wisconsin Electric Power Company v. U.S No. 00-697C October 12, 2007**

**Heritage Reporting Corporation**

**Page 5718 to Page 6015**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 5718

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

WISCONSIN ELECTRIC POWER COMPANY,
Plaintiffs,
vs NO. 00-697C
THE UNITED STATES,
Defendant

-------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D C

Friday, October 12, 2007
Volume 24

The parties met, pursuant to the notice of the Judge at 9 32 a.m

BEFORE THE HONORABLE JAMES MEROW

Page 5719

APPEARANCES

ON BEHALF OF PLAINTIFFS
RICHARD OEHLER, ESQ
JAY GRIFFITHS, ESQ.
Perkins Coie LLP
1201 Third Avenue Suite 4800
Seattle Washington 98101
(206) 359-8000
and
EMILY POULIN ESQ
DONALD CARNEY, ESQ
MARY ROSE HUGHES ESQ
Perkins Coie LLP
607 Fourteenth Street N W
Washington D C 20005
(202) 628-6600

Page 5720

APPEARANCES CONTINUED

ON BEHALF OF THE DEFENDANT
ALAN J LO RE, ESQ.
SHARON SNYDER, ESQ
RUSSELL SHULTIS, ESQ
STEPHEN FINN, ESQ
SONIA ORFIELD, ESQ
U S. Department of Justice
1100 L Street, N.W.
Washington, D C 20036

(Index appears at end of transcript)

Page 5721

P R O C E E D I N G S

(9.32 a.m )

MR OEHLER Good morning, Your Honor
THE COURT Good morning, Mr Oehler
MR OEHLER May I begin?
THE COURT· I guess you're on tap today
MR. OEHLER Yes, Your Honor
Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows.

CROSS-EXAMINATION (Continued)

BY MR OEHLER
Q Good morning, Mr Zabransky
A Good morning
Q Do you recall discussing delivery commitment schedules with government counsel yesterday?
A I guess so, yes
Q But you're familiar with delivery commitment schedules, obviously?
A Yes
Q When you joined DOE in July 1994, did

Page 5738

rephrase that. Has DOE ever voided a DCS that it has previously approved?

THE COURT: And communicated, you mean?

MR. OEHLER: I'm trying to draw a distinction between DCSes that are submitted by a utility, but not yet acted on by the contracting officer, and those which have actually been approved by DOE

THE WITNESS: And, again, I just said, Mr. Oehler, there were some that Ms Tomasini, before she finished the process of sending them back, was advised of this situation, and she decided to not send those back and voided those

BY MR. OEHLER

Q And that was based on the advice of counsel, correct?

A That's part of the process to complete the approval process and send them back out, is to review it with counsel, yes

Q. I'm sorry, I don't believe that was responsive. Was that based on the advice of counsel?

A Yes

Page 5739

Q And doesn't the voiding of the DCS reflect DOE unilaterally changing a signed and submitted DCS?

MS SNYDER Your Honor, I'm going to object now I don't understand, I just don't get what we're doing here There's no question that there's been a breach. There's no mystery here That's accepted. DOE did not come. They did not come, they did not pick up fuel, according to DCSes. What's important is what happened in the but-for world, and it has been established and Mr. Zabransky testified previously and he testified now that in fact Wisconsin Electric did believe that the DCSes were binding commitments. You know, what is, what are all of these questions? Why are they relevant to what we're doing here today with Wisconsin Electric's damages claim?

MR OEHLER Your Honor, I strongly disagree with the speech. This was just an oral argument on our position. First of all, Wisconsin Electric has never believed that the DCSes represented a binding commitment. That's the singular opinion of Mr. Zabransky, so I

Page 5740

don't agree with that. Secondly, it's the government's position that these DCSes have importance. Again, Wisconsin Electric doesn't believe they're important. The government does. He's the contracting officer. Frankly, I'm shocked that she's objecting to these questions. They're very reasonable.

THE COURT: Well, does the government intend to argue that the liability is limited to the approved DCSes, the breach of the delivery of the approved DCSes.

MS. SNYDER Your Honor, the approved DCSes show the process that the utilities were operating under in the but-for world. What happened – I mean, it's just part of the process. We agree the DCS process has stopped, as Mr. Zabransky said, because the DOE is not performing There is no point in processing DCSes right now. It's self evident.

THE COURT: I think it more relates to the liability argument about the extent of liability, whether it's limited to approved DCSes and the resulting but-for or whether it isn't, whether the thing is wide open in regard

Page 5741

to performance, so there is some, there is relevance to the issue. I'm not saying Mr. Zabransky's the witness to – although he's the technical representative to the contracting officer and is presently the contracting officer, he certainly has, you know, knowledge and background information, so I think we're dealing with sufficient relevance to ask the questions

MS SNYDER: Thank you, Your Honor.

MR. OEHLER: I don't believe we got an answer to my existing question.

THE COURT: Which was?

MR OEHLER: Could I have the reporter read it back, please?

(The reporter read the record as requested.)

THE WITNESS: And my answer was that DOE didn't consider that to be the case because it had never completed the DCS approval process

BY MR. OEHLER:

Q. When DOE voided DCSes, did you notify the utility of that or just indicate that you

Page 5742

were not approving DCSes?
A Since we considered them not to be approved at that point in time, we let them know that we were not approving them, Mr. Oehler
Q. The way the DCS approval process was implemented by DOE, did the utilities have any discretion regarding how many MTUs to insert in the relevant DCS?
A. They had discretion, yes
Q There was a limit that they could not exceed, correct?
A They could have, certain people did
Q And those were rejected, weren't they?
A. Yes
Q. Let me ask you to turn to the standard contract, please It's Plaintiff's Exhibit 41, and within PX-41, can you go to Bates number 2128? And if you see the provision B delivery commitment schedule?
A Yes
Q Can you show me where in this section of the standard contract it limits the quantity of spent nuclear fuel that the utility can place in a DCS?

Page 5743

A It's not in this section, that was done at the contracting officer's directions that were provided with the DCSes in 1991
Q Let's turn our attention to B1, and let's blow up that section. Let's blow up just the bottom half and start there. Do you see the sentence that says, "DOE shall approve or disapprove such schedules within three months after receipt"?
A I do.
Q So that then sounds that DOE shall approve or disapprove submitted DCSes within three months after receipt, correct?
A That is correct.
Q And let's turn to B2, and I'd like to ask you to read that paragraph for the Court, please.
A. Sure "DOE shall approve or disapprove such revised schedules within 60 days after receipt. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval and shall submit its proposed schedules If these are not acceptable to the purchaser, the parties shall promptly seek to negotiate

Page 5744

mutually acceptable schedules." Continue?
Q. Yes.
A. "Purchaser shall have the right to adjust the quantities of SNF and/or high-level waste plus or minus 20 percent and the delivery schedule up to two months until the submission of the final delivery schedule."
Q. So let me make sure I understand your understanding of this provision Does this provision provide, if the utility submits the schedule that DOE disapproves, that DOE shall then advise the purchaser as the reasons for that disapproval and submit its own proposed schedule?
A. That's what it says, yes.
Q And does it further provide, if the utility then disagrees with DOE's proposed schedule, that DOE and the utility shall negotiate a mutually acceptable schedule?
A. That's what it says, yes.
Q. And it doesn't say that DOE has the unilateral right to impose the schedule, correct?
A. No, it doesn't.
Q. Now, you've referred several times to

Page 5745

the DCS instructions, do you remember that?
A. Yes.
Q. There's nothing in the contract regarding the issuance of DCS instructions, correct?
A. There's nothing in the contract about any guidance from the contracting officer, no, but that's what that was, guidance.
Q In a sense, it's more than guidance, isn't it, because if a utility asks for an allocation larger than those that were spelled out in the relevant APR/ACR, the contracting officer would reject that DCS, correct?
A Yes, and then they could have followed through and protested that rejection.
Q. Let me ask you to turn now to the DCS instructions, Plaintiff's Exhibit 246, and let me know when you're there.
A. I'm there.
Q. And let me ask you to turn to – there's actually two Bates numbers, let me use the most bottom one, 2046, the larger font.
A Okay.
Q And let me ask you to read for the Court section 7(c).

Page 5750

A. Okay
Q. And I talked about part of this, but I wanted to talk about the latter part of B2 Could we now enlarge that, please? Now, Mr. Zabransky, let me direct your attention to the last sentence in paragraph B2 in the standard contract, which we've highlighted and that begins, "purchaser shall have the right." Do you see that provision?
A. I see that, yes.
Q. Now, does that provide that, after a DCS has been submitted, a utility may request a change in its allocation plus or minus 20 percent?
A. That's what it provides for, correct.
Q And the 20 percent referred to here would be 20 percent of the amount shown on an approved DCS, is that correct?
A I believe that's what it refers to, yes
Q Now, I believe you just testified that if a DCS was submitted that had a quantity larger than the allocation contained in the relevant ACR, then that DCS would most likely not be approved, correct?

Page 5751

A. That's the practice that was in effect, yes
Q. Is the limit in the DCS instructions regarding the quantities then inconsistent with this standard contract provision that allows utility to increase its allocation by 20 percent over the DCS amounts?
A I don't believe so
Q Is it your reading that the utilities could adjust the amount of the approved DCS, notwithstanding the DCS instructions?
A. Well, they could adjust the amount on the approved DCS prior to submittal of the FDS, and when the FDS was submitted with the adjusted quantities, it would get reviewed and approved or – then acted upon
Q Would an FDS that had a higher quantity than the DCS be approved by DOE?
A That depends.
Q Depends on what?
A. The circumstances of the time
Q What factors might be relevant in that determination?
A. When the FDS was communicated, whether the casks were available, whether the equipment

Page 5752

was available, et cetera, so without knowing the specifics, you can't give an answer as to whether it would have been approved or disapproved.
Q. So those factors though, those all seem to be DOE performance factors that you've articulated, is that a fair summary?
A. They appear to be logistics issues of what equipment was available, so if it's not available, DOE couldn't perform.
Q. Just to make sure, I want to understand then, that you agree then that the amount in the approved DCS was not binding on the utility to the extent that it could adjust the amount under the 20 percent provision they've just referenced in the standard contract, correct?
A. Yes, and that would have been subject to DOE's approval or disapproval at the FDS stage
Q. Let me ask you to turn to Plaintiff's Exhibit 378. Let me ask you to turn to page four in the document, which has Bates number of 142.
A. Okay.

Page 5753

Q And below the table, do you see the last paragraph?
A. Yes.
Q. And let me ask you to read for the Court the second sentence in that paragraph.
A. Okay. "This table provides only an approximation of the system throughput rates and is subject to change, depending on Congressional action regarding the conditions for the siting, construction, and operation of an interim storage facility, if any, the repository and the system design and configuration "
Q. And what does that provision mean?
A. Beyond what it says there, I can't interpret it any further.
Q. I'm sorry, you're the contracting officer, you can't interpret that for me any further?
A No, I can't.
Q Let me ask you this, what would happen to an approved DCS if DOE changed the waste acceptance rates set in the ACR upon which the DCS was based?
A Well, I think the holder of DCS and

Page 5806

Q The next indented paragraph, please?
A "The performance standard should be based on DOE's rate of receiving spent fuel. Requirements of article IV, section B, paragraph 1, should be interpreted, clarified or amended to include the following: Commencing no later than January 31st, 1998, DOE shall accept SNF at an annual rate not less than the annual rate at which SNF is being discharged from civilian nuclear power reactors, subject to this and other such contracts with DOE By no later than January 31st, 2008, DOE shall have accepted all SNF which has been discharged from such reactors and has been stored for at least five years."
Q And why was UNWMG making this request to DOE?
A I think that's, if you look at the bottom paragraph on the page, that's the concern the group had, was while the contract was clear in establishing the purchaser's obligation to make payments, it does not explicitly recite the standards for DOE's performance in accepting spent fuel from the

Page 5807

purchasers
Q Okay. Was there a response from the Department of Energy to this letter?
A I believe there was from Mr. Jedrey, yes.
Q. And do you recall what that response was?
A I believe that the Department – the contracting officer did not think it was possible for him to do this at this time.
Q "To do this," what do you mean by, "this"?
A. To incorporate these rates or this requirement in the contract.
Q. Now, I just wanted to check some previous testimony. Now, Mr. Oehler asked you a question about whether or not, when you were at Wisconsin Electric, your belief was that DOE had an obligation under the standard contract to accept fuel in significant quantities, and your response was, yes, more than one assembly quantities that were appreciable, do you recall that?
A. Yes
Q. Did you believe, when you were at

Page 5808

Wisconsin Electric, that the rates that were identified in the 1991 ACR were appreciable?
A. Yes.
Q Now, you testified yesterday and in your first testimony that you believed that 3000 MTUs per year with a short ramp-up was a reasonable rate, do you recall that?
A. Yes.
Q. What are the programmatic assumptions that you are considering when you make that statement?
A. Well, I'm considering that there's nothing that restricts the Department, either by regulation or statute or license, from accepting fuel that fast, so that you can move fuel that fast unencumbered by some restriction.
Q. And what are you assuming in terms of the facility?
A. Okay. In that case, the assumption with that would be with a repository.
Q. Now, Mr. Oehler asked you some questions about the standard contract, and he pointed you to the DCS section of the standard contract, where it provided for the parties to

Page 5809

seek and negotiate a mutually acceptable schedule if there was some disagreement, do you recall that?
A. Yes
Q. Did WEPCO ever inform DOE that its allocation was not acceptable?
A. No.
Q. Did DOE ever seek a meeting with the DOE where it would negotiate a mutually acceptable schedule?
A Could you clarify the question? I'm confused by the question.
Q. Sure. I'm referring to the standard contract again and that provision in the standard contract where the parties could meet and seek a mutually acceptable schedule.
A. Okay.
Q. And my question is, when you were at Wisconsin Electric, did Wisconsin Electric ever use that provision of the contract in order to meet with the DOE regarding its allocation rights?
A No.
Q. Did Wisconsin Electric submit its final delivery schedules with an allocation

**Carolina Power & Light Company & FL Power v US No. 04-37C November 13, 2007**

**Heritage Reporting Corporation**

**Page 1381 to Page 1642**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1381

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------x

CAROLINA POWER & LIGHT COMPANY and :
FLORIDA POWER CORPORATION, :
Plaintiffs, :No. 04-37C
vs. :
THE UNITED STATES, :
Defendant. :

----------------------------------x

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, November 13, 2007
Volume 6

The parties met, pursuant to the notice of the Judge at 9:31 a.m.

BEFORE THE HONORABLE THOMAS C. WHEELER

Page 1382

APPEARANCES:

ON BEHALF OF PLAINTIFFS:
Arnold Bradley Fagg, ESQUIRE
Paul Bessette, ESQUIRE
Linda Eaton, ESQUIRE
David Kerr, ESQUIRE
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5191

ON BEHALF OF THE DEFENDANT:
Andrew P. Averbach, ESQUIRE
Christopher J. Carney, ESQUIRE
Marian Sullivan, ESQUIRE
Lisa Donahue, ESQUIRE
U. S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
12th Floor
Washington, D.C. 20530
(202) 353-0527

(Index appears at end of transcript)

Page 1383

P R O C E E D I N G S

(9:31 a.m.)

THE COURT: We're on the record this morning for day number 6 in the trial of Carolina Power, et al. versus United States. Mr. Fagg, who's up next this morning?

MR. FAGG: We have no preliminaries and we would call to the stand, Your Honor, Robert Morgan.

THE COURT: All right. Please come forward, sir.

Whereupon--

ROBERT L. MORGAN

a witness, called for examination, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FAGG:

Q. Good morning, Mr. Morgan.
A. Good morning.
Q. Can you see and hear me okay?
A. Yes.
Q. Mr. Morgan, you and I had never met before about 15 minutes ago; is that correct?
A. Correct.
Q. I'd like you to introduce yourself, if

Page 1384

you could, to the Court. Could you spell your name for the record?
A. Robert L. Morgan, R-O-B-E-R-T, L, M-O-R-G-A-N.
Q. And are you currently employed, Mr. Morgan?
A. No.
Q. Could you -- retired?
A. Yes.
Q. Could you briefly walk through your professional career, if you could, starting after college?
A. I graduated from the Military Academy in 1952. Entered the Army Corps of Engineers. First assignment was in Fort Lewis. Then in Korea. Came back to the 82nd Airborne Division after Korea. I resigned my commission in 1965 and joined Atomic Energy Commission, started there in Savannah River operations office as a division director for the heavy water organic cooled reactor program.

Transferred to Southern California at the liquid metal engineering center in 1966, stayed there until 1973. 1973, I was selected as deputy manager of Savannah River operations

Page 1529

A. I guess so.
Q. And you developed some of your own personal opinions about what a reasonable and appropriate acceptance rate would be, haven't you?
A. Yes.
MS. SULLIVAN: Objection, vague.
THE COURT: Can you put a time on this, Counsel?
BY MR. FAGG:
Q. Sure. During the time when you thought there was going to be an operating repository, Mr. Zabransky, you viewed a rate that would have reflected the aggregate rate of discharges by utilities, plus some amount of working off the backlog as a reasonable rate, correct?
MS. SULLIVAN: Objection, Your Honor, vague as to the term reasonable.
THE COURT: Overruled.
THE WITNESS: And again, I think given what you've stated, that if it was a repository system, that a reasonable rate would – as you said – keep pace with discharges and work off the backlog. That seems reasonable.

Page 1530

BY MR. FAGG:
Q. And stated slightly differently, your own opinion is that a rate that would have kept pace with the industry discharges and removed some amount of backlog would have been an appropriate rate, correct?
A. In a case without constraints, I agree, yes.
Q. Reasonable and appropriate, correct?
A. As I said, in an unconstrained case, that would be fine.
Q. Industry discharges at a rate of about 2000 MTUs per year; is that correct?
A. That's correct.
Q. And acceptance rate of 3000 MTUs per year does what we've just talked about, in a general sense, doesn't it? It keeps up with the industry discharges and starts working off the backlog, correct?
A. Yes.
Q. Thank you. No further questions.
THE COURT: All right. Ms. Sullivan, cross-examination.
MS. SULLIVAN: Yes, Your Honor.

Page 1531

BY MS. SULLIVAN:
Q. Mr. Zabransky.
A. Ms. Sullivan.
Q. Following up on counsel's last question first, does a rate of 2100, an acceptance rate of 2100 MTU also meet the generation rate plus begin to work off the backlog?
A. It does.
Q. And I believe that your – in response to questions from counsel about the 3000 rate, you reference in an unconstrained system, what do you mean by unconstrained?
A. Well, again, I think the caveat was that a repository, a repository doesn't have any limitations as to capacity or annual capacity limits. It's basically an engineering function. In the MRS world, the DOE was operating under there was a constraint placed on the capacity of the MRS.
Q. Talking a little bit more about your experience in industry, Mr. Zabransky, at the time that you were at Wisconsin Electric, were you responsible for completing delivery commitment schedules on behalf of Wisconsin

Page 1532

Electric?
A. I was responsible for having them prepared and they were signed off by a vice president.
Q. And did, in fact, Wisconsin Electric submit DCSes while you were there?
A. Yes, they did.
Q. How many did they submit?
A. I believe for every allocation we have, which I think was 10 years worth.
Q. And were those DCSes approved by the Department of Energy?
A. Yes, they were.
Q. And why did you submit or have prepared delivery commitment schedules for the first 10 years for Wisconsin Electric while you were there?
A. Again, from a company perspective, we saw them as commitments on the part of the government. We wanted to get as many of those as we could as soon as possible.
Q. And what did you understand to be the function of a delivery commitment schedule?
A. Well, besides allowing utility to claim its allocation, it also starts the

Page 1557

A. Could you repeat the question, please?
THE REPORTER: "Question: Mr. Zabransky, what did you understand to be the significance of the current status of the WMS in determining the acceptance rate?"
THE WITNESS: Well I think, you know, as Mr. Jedrey said, right now, or at that point in time, there were many uncertainties with respect to what the system was going to look like, and that because of that, DOE could not set a minimum rate at that time.
BY MS. SULLIVAN:
Q. Mr. Zabransky, I'd like to direct your attention to the second paragraph under additional performance standards, bring out that paragraph that reads in part, "however, with respect to your concern that DOE could, in theory, meet its contractual obligation to begin the waste acceptance process by accepting a single assembly in 1998 and no more until decades later, I can assure you that the Department intends to honor both the letter and the spirit of the NWPA and the contract, rather than seek opportunities to circumvent its obligations. The ACR details the annual

Page 1558

aggregate and individual acceptance rates for the first 10 years following commencement."
THE COURT: Counsel, is it necessary to read all of this, can we just identify it?
MS. SULLIVAN: No, Your Honor. Let me direct his attention then to the sentence, "as required by the contract, these schedules will serve as the basis for developing contractually binding delivery commitment schedules in 1991." Mr. Zabransky, what did you understand, based on this letter, as to how the schedules would be established by the Department of Energy.
A. It was my understanding that the schedules would be established based upon the development and execution of the DCSes. The delivery commitment schedules.
MS. SULLIVAN: Your Honor, I would move for the admission of Defendant's Exhibit 56 as the letter to which Plaintiffs' Exhibit 41 is responding to, so we have a complete record.
THE COURT: Which is the other exhibit?
MS. SULLIVAN: Defendant's Exhibit 56.

Page 1559

THE COURT: Is that the one we were just referencing?
MS. SULLIVAN: I was just asking him about Plaintiffs' Exhibit 41, which I understand the Court admitted. My motion is for the admission of Defendant's Exhibit 56, which is the letter that prompted the DOE response.
THE COURT: Any objection, Mr. Fagg?
MR. FAGG: Yes, Your Honor, we previously stated our objections and would stand on those. You know, the Plaintiffs' Exhibit 41 is admissible as an admission against DOE. But for all the reasons I previously indicated, we do not agree and would stand on our prior objections to Defendant's Exhibit 56. I'm sorry, yes.
THE COURT: I will admit Defendant's Exhibit 56.
(Defendant's Exhibit Number DX-56 was received in evidence.)
BY MS. SULLIVAN:
Q. Thank you, Your Honor. Mr. Zabransky, let's turn now to your experience at the Department of Energy. Since you've been at the

Page 1560

Department of Energy, you've been responsible for the issuance of annual capacity reports?
A. That's correct.
Q. And which ACRs have you been responsible for?
A. The publication of the '94 ACR, which was published in March of '95, and the 2004 ACR, which I think was published in July of 2004.
Q. And if you could pull out Plaintiffs' Exhibit 60, which I believe we discussed with Mr. Fagg. Mr. Zabransky, Plaintiffs' Exhibit 60 is the 1994 ACR APR that was issued in March of 1995, correct?
A. Yes.
Q. Okay. When did you begin preparing this ACR?
A. I arrived at DOE in July of '94, this was already being prepared or at some state of completion. I was given this probably sometime in September or October of '94, and told to get it published.
Q. And could I direct your attention to page 4 of the document, Bates number ending 511. Mr. Zabransky, the rates that are set

Page 1561

forth on that page, what was the basis for those rates?

A. I mean, it says right above that table 1, the rates reflected capacity limits imposed by the Act on a storage facility prior to the operation of a repository.

Q. And what's the storage facility that's referenced there?

A. That would have been the MRS that was being considered.

Q. And if DOE had been able to perform in 1998, what facility would DOE have performed at?

A. The only way it could have performed in '98 would have been an MRS.

Q. Now, I believe in response to some of Mr. Fagg's questions, you noted that this table of rates differs from the same table in previous ACRs, is that correct?

A. I think that's correct, yes.

Q. How does this table differ?

A. I believe in previous documents, the year column would have had calendar years '98, '99, et cetera, versus year 1, year 2, year 3.

Q. And why was this change made to the

Page 1562

table of rates?

A. I think that's been talked about on the previous page on the bottom that there was greater uncertainty associated with the data commencement at this point in time. So DOE felt it appropriate to put this caveat that it was years versus dates.

Q. Could you tell us exactly what the statement is that you're referring to?

A. Sure. It's on the bottom of page 3, "due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year of operation of the system rather than a specific calendar year."

Q. And what was the uncertainty that is mentioned in that paragraph?

A. The uncertainty was with the ability to have their MRS on line by 1998.

Q. Let's turn now to delivery commitment schedules and your understanding – actually, before I get there, Mr. Zabransky, I think also in response to Mr. Fagg's questions, you mentioned that industry was making efforts to

Page 1563

help DOE to site an MRS. What were those efforts that you were referring to?

A. Well, again, the trade association, with UNWMG and UWASTE, we actually brought personnel on board specifically to facilitate that voluntary MRS siting process. And the utilities were volunteering to give tours of their sites to different potential host candidate sites to try to do everything they could to facilitate that voluntary process.

Q. Turning now to delivery commitment schedules, while you were at DOE, I believe Mr. Fagg asked you whether the government's obligations were defined by an approved DCS, do you recall that discussion?

A. Yes.

Q. How did DCSes relate to the Department's general obligation to accept waste pursuant to the standard contract?

A. Well, the obligation is for all the spent fuel, the DCSes put a timeframe on that obligation.

Q. If performance had begun in 1998, how would the DCS process have worked?

A. It would have continued, I presume.

Page 1564

It would have – the DCSes would have continued to be submitted, and DOE would have continued to issue additional allocations for years that were not covered by the first ACR.

Q. If you don't have a DCS process or you don't utilize a DCS process, how does DOE administer the standard contract?

A. That's really the only process by which we could schedule and plan for deliveries from the utilities, because without that, we wouldn't know which utility, for instance, where the utility wanted their fuel picked up, what fuel they wanted picked up, et cetera, so it is the only process by which you can schedule those deliveries.

Q. You have had responsibility for reviewing and approving – have you had responsibility for reviewing and approving DCSes submitted by utilities?

A. Yes.

Q. When would you recommend approval of the DCS?

A. Again, the process that I was involved with was when I was a COTR, and that was to advise the contracting officer that when the

Page 1565

DCSes were completed appropriately, filled out
and all the information made sense, that we
recommended that she or he would approve the
DCS.
    Q.    And if a utility doesn't have an
approved DCS, does a utility know how much fuel
to deliver to DOE?
    A.    I don't think there's any
understanding between the parties as to how
much fuel would be delivered in that case. I
don't know if the DOE knows how much the
utility expects it to deliver or how much the
utility expects DOE to pick up.
    Q.    Can we have Defendant's Exhibit 170.
And also 172.
    MS. SULLIVAN:    May I approach, Your
Honor?
    THE COURT:    Yes.
    BY MS. SULLIVAN:
    Q.    Mr. Zabransky, could you identify
Defendant's Exhibit 170 for the record, please?
    A.    Excuse me, yes, this appears to be
DCSes submitted by Florida Power Corp. to Beth
Tomasoni.
    Q.    And would you have received a copy of

Page 1566

this document on or about the time it was
submitted by Florida Power Corporation?
    A.    Yes, I would have.
    Q.    Okay.
    MS. SULLIVAN:    Your Honor, we would
move for the admission of Defendant's Exhibit
170?
    MR. FAGG:    No objection.
    THE COURT:    Defendant's Exhibit 170 is
admitted.
    (Defendant's Exhibit Number DX-170 was
received in evidence.)
    BY MS. SULLIVAN:
    Q.    Mr. Zabransky, could I direct your
attention to the second and third page of
these, of Defendant's Exhibit 170?
    A.    Yes.
    Q.    For what year are these delivery
commitment schedules requesting fuel to be
accepted?
    A.    2002 and 2004.
    Q.    Can I direct your attention to section
2, delivery commitment information, what
information is requested in section 2 of a DCS?
    A.    Well, it's information that would

Page 1567

assist DOE in procuring, designing if necessary
the right equipment to pick up and transport
the spent fuel. So it's information on cask
type, shipping capabilities and fuel, general
fuel information.
    Q.    Why does DOE seek information with
regard to the type of cask required?
    A.    Well, again, it gives DOE an idea of,
for instance, in this case, it says 120 ton, so
that would be that – an indication that this
could be a large cask, a fairly large cask
which would be typically a rail cask.
DOE needs that information because it
needs to start the process of budgeting and
procuring capital equipment. Casks are fairly
expensive, they're 3 to 5 million dollars each
probably. So that's got to go in the long-term
budgeting process as to what types of casks or
how many cask we might need.
    Q.    And the information with regard to
proposed shipping mode, why does DOE need that
information?
    A.    That informs the transportation group,
now the logistics management office, as to what
types of shipping it might be making, and what

Page 1568

type of equipment it might need also.
    Q.    If we look at – if we compare the
proposed shipping mode between pages 2 and 3,
one is marked, appears to be marked truck and
one appears to be marked rail, do you see that?
    A.    Yes.
    Q.    Okay. And is that an inconsistency
between these DCSes?
    A.    Yes, again, 120 ton cask couldn't be
shipped by truck, so I think the inconsistency
internal on the first one would have resulted
probably in a question by DOE. And the
inconsistency in the document would have
resulted in a question, but when DOE was
processing DCSes, this type of information and
inconsistencies was the subject of a dialogue
between DOE and utilities to make sure DOE
understood what the utility was really saying.
    Q.    And the information with regard to the
range of discharge dates, how is that
information used by DOE?
    A.    Again, it's a very – it's an early
step in the planning process, but here it
indicates a very broad range of discharge dates
from '78 to '94. And it basically just says to

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 23rd day of June, 2008, a copy of the foregoing "DEFENDANT'S CROSS-DESIGNATIONS OF DEPOSITION AND PRIOR TRIAL TESTIMONY TRANSCRIPTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Anthony W. Moses