# In the United States Court of Federal Claims

No. 04-106 C
Filed:  April 27, 2012;
Released for publication: May 2, 2012[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| **DAIRYLAND POWER COOPERATIVE,** | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| **THE UNITED STATES OF AMERICA,** | * |
| | * |
| Defendant. | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Robert L. Shapiro*, Hughes Hubbard & Reed LLP, Washington, DC, counsel of record for Plaintiff; of counsel was *Daniel T. Lloyd*, Hughes Hubbard & Reed LLP, Washington, DC.

*Scott Slater*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, counsel of record for Defendant, with whom were *Harold D. Lester*, Assistant Director, *Jeanne E. Davidson*, Director, and *Tony West*, Assistant Attorney General; of counsel were *Jane K. Taylor*, Office of General Counsel, United States Department of Energy, Washington, DC, *Marian E. Sullivan*, Senior Trial Counsel, and *Luke A. Pazicky*, Trial Attorney, United States Department of Justice, Civil Division.

———————————

## OPINION

———————————

**DAMICH**, Judge:

This spent nuclear fuel case comes to the Court on remand.  The Court previously awarded mitigation damages to Dairyland Power Cooperative ("Dairyland") for costs related to Private Fuel Storage, LLC ("PFS").  The Federal Circuit vacated that portion of the damages

---

[1]  Court issued this opinion under seal on April 27, 2012, allowing the parties the opportunity to propose the redaction of competition-sensitive, proprietary, confidential, or otherwise protected information.  The parties have advised the Court that no redactions are proposed.

award and remanded for this Court to determine whether to offset the award to account for

profit-oriented speculation.  For the reasons set forth below, the Court finds that all of

Dairyland's PFS expenses were properly in mitigation and not unrecoverable due to speculation.

Accordingly, the Court reinstates its earlier award for PFS damages.

## I.      Background

The Court's trial opinion, *Dairyland Power Coop. v. United States*, 90 Fed. Cl. 615 (Fed.

Cl. 2009) ("*Dairyland I*"), sets forth the full factual background of this case; the gist of the case

is as follows.  Between 1967 and 1987, Dairyland operated a nuclear power plant in Genoa,

Wisconsin called the La Crosse Boiling Water Reactor ("LACBWR").  *Id.* at 622.  Although the

reactor is no longer active, Dairyland maintains 38 metric tons of spent uranium in a wet storage

pool (at least as of the conclusion of trial).  *Id.*  The on-site nuclear waste prevents Dairyland

from permanently decommissioning the site.  *Id.* at 650.  Under the "Standard Contract," the

Department of Energy ("DOE") was obligated to accept and dispose of Dairyland's spent nuclear

fuel ("SNF") beginning no later than January 31, 1998.  *Id.* at 619.  Though Dairyland has paid

all required fees under the agreement, DOE has, to date, not accepted any SNF from Dairyland.

*Dairyland I*, 90 Fed. Cl. at 621.  In 2004, Dairyland filed suit against the government for partial

breach of the Standard Contract.  *Id.* at 617.  Damages were limited to costs incurred through

December 31, 2006.  *Id.*  This Court awarded summary judgment on the issue of contractual

liability, and the case went to trial for a damages determination.  *Id.*

After trial, this Court awarded Dairyland $37,658,902 in damages, including

$11,999,125 for its investment in Private Fuel Storage, LLC ("PFS").[2]  *Id.* at 652.  PFS is a

private consortium of utilities whose goal is to locate, license, and operate a SNF storage facility.

---

[2] Dairyland's PFS damages included $10,936,901 in direct costs, $487,393 in overhead, and $574,831 in general and administrative expenses.

*Id.* at 647.  This Court found that Dairyland invested in PFS in order to mitigate the cost of the government's breach.  *Id.* at 622.  The driving consideration behind Dairyland's investment was its perceived need for off-site storage to allow it to decommission the shut-down LACBWR plant.  *Id.* at 647, 651.  At the time, the small LACBWR site posed geographical constraints for constructing another storage facility.  *Id.* at 647, 651.  On the other hand, PFS would have allowed Dairyland to share the high cost of constructing an interim, off-site storage facility.[3]  *Id.*

On appeal, the Federal Circuit upheld all aspects of this Court's damages award except Dairyland's costs for PFS.  *Dairyland Power Coop. v. United States*, 645 F.3d 1363, 1377 (Fed. Cir. 2011) ("*Dairyland II*").  It found that this Court's causation analysis was lacking in detail because the Court did not address whether Dairyland had overinvested in PFS beyond what was necessary for mitigation, as the government had argued.  *Id.* at 1376.  The Federal Circuit held that the government had "raised the specter of a bounty accruing to Dairyland from its PFS investment, [and, therefore,] Dairyland had the burden to prove how much, if any, of its PFS investment was speculative as opposed to mitigation-oriented."  *Id.*  Accordingly, the Federal Circuit vacated the award of PFS costs, and remanded for this Court to determine "the amount to offset Dairyland's award of its PFS investment to account for speculation (if indeed there was speculation)."[4]  *Id.*

On remand, the Court ordered briefing on the mitigation-speculation issue.  The Court denied the government's request to reopen the record.[5]  *Dairyland Power Coop. v. United States*,

---

[3]  To date, PFS has not been able to find a site to construct its facility, and it may well be a failed venture.

[4]  The Federal Circuit's vacatur included, in addition to direct costs, the associated overhead and G&A expenses in PFS awarded to Dairyland.  To the extent this Court were to find that an offset to PFS damages is proper, it is directed to reduce the overhead and G&A expenses accordingly.  645 F.3d at 1376 n.6.

[5]  The Court found, *inter alia*, that the remanded issue was sufficiently before the Court at trial, that the relevant legal standards had not changed on appeal, and that the government had not provided a compelling reason for failing to offer its additional evidence earlier.

2012 WL 691620 (Fed. Cl. Mar. 2, 2012).  Oral argument was held on March 28, 2012.  The

government contended that, in addition to determining whether to offset for speculation, the

Federal Circuit's remand requires this Court to re-examine the reasons behind Dairyland's

investment in PFS and to perform an accounting of the residual value of the PFS stock.  For the

reasons that follow, the Court finds that all of Dairyland's PFS damages were in mitigation and

that the additional issues raised by the government are not properly before the Court.

## II.      Standards for Review

 "The remedy for breach of contract is damages sufficient to place the injured party in as

good a position as it would have been had the breaching party fully performed." *Ind. Mich.*

*Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).  A party has an affirmative

duty to mitigate its damages in the face of an anticipated breach of contract. *Id.* at 1375.  Its

mitigation efforts must be fair and reasonable under the circumstances. *First Heights Bank v.*

*United States*, 422 F.3d 1311, 1316 (Fed. Cir. 2005).  However, the burden is on the breaching

party to show that reasonable alternatives for mitigation existed and were ignored. *Franconia*

*Assocs. v. United States*, 61 Fed. Cl. 718, 741 (Fed. Cl. 2004).

Mitigation damages are recoverable in partial breach cases. *Ind. Mich.*, 422 F.3d at 1375.

Such damages "are intended to reimburse a non-breaching party to a contract for the expenses it

incurred in attempting to rectify the injury the breach caused it." *Citizens Fed. Bank v. United*

*States*, 474 F.3d 1314, 1320 (Fed. Cir. 2007).  The non-breaching party bears the burden of

proving its damages. *See Ind. Mich*, 422 F.3d at 1376.  Proof of mitigation damages is made by

establishing the three elements of foreseeability, causation, and reasonable certainty. *Id.*

Only causation is at issue in this remand. *Dairyland II*, 645 F.3d at 1376.  The Court

previously adopted the "but for" test for measuring causation in this case. *Dairyland I*, 90 Fed.

Cl. at 624.  In the "but for" test, "a plaintiff may recover only for those losses that would not have occurred but for the breach." *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1366 (Fed. Cir. 2010).  The breach need not be the "sole factor or sole cause" of the loss, as "other factors operating in confluence with the breach will not necessarily preclude recovery." *Id.* However, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003).  Thus, "expectation damages are available [only] to compensate a plaintiff for the cost of actions taken in mitigation, and not for speculative ventures." *Dairyland II*, 645 F.3d at 1376.

## III.   Causation of Dairyland's PFS Expenses

Dairyland has the burden to prove causation. *Dairyland II*, 645 F.3d at 1376 ("Dairyland had the burden to prove how much, if any, of its PFS investment was speculative as opposed to mitigation-oriented.").  Accordingly, Dairyland must convince the Court by a preponderance of the evidence that the government's breach actually caused its mitigation damages.  However, once Dairyland has proven up its damages, the Court cannot require Dairyland to produce evidence against itself.  As a practical matter, the government then has the burden of production with regard to evidence suggesting that Dairyland's PFS damages should be offset.  Ultimately, Dairyland must overcome any such evidence to establish causation.  "Dairyland [has] the burden to prove how much, if any, of its PFS investment was speculative as opposed to mitigation-oriented.  The government, of course, [is] entitled to contest that proof, and the trial court to determine which party the evidence best favor[s]." *Id.*; c*f. Sys. Fuels v. United States*, 666 F.3d 1306, 1312 (Fed. Cir. 2012) ("[The] defendant must move forward by pointing out the costs it

believes the plaintiff avoided because of its breach, but with respect to both claimed costs and avoided costs, plaintiffs bear the burden of persuasion." (citation omitted)).

The discussion below first addresses Dairyland's proof of causation and then the government's arguments to the contrary in support of offsetting that award. The Court finds that Dairyland established its damages by a preponderance of the evidence and that the government's arguments to the contrary are unpersuasive.

## A. Dairyland's Proof of Causation

Causation begins with Dairyland's duty to mitigate. When Dairyland first became aware that the government was not going to perform, it had an obligation to mitigate its damages. *Ind. Mich.*, 422 F.3d at 1375. Dairyland's contractual damages were based on its expectation that, if the government had performed, Dairyland would have participated in exchanges to eliminate all of its SNF from the LACBWR site by the close of 1998.[6] *Dairyland I*, 90 Fed. Cl. at 627-36. The benefit of the bargain to Dairyland included not only relief from SNF maintenance costs, but also the value of being able to decommission, a process requiring full removal of all SNF from the LACBWR. *Id.* at 649-50. For the following reasons, the Court credited the testimony of Mr. John Parkyn, Dairyland's manager of special projects, that Dairyland viewed participation in PFS as its only means to mitigate the impending partial breach of the Standard Contract. 90 Fed. Cl. at 649.

Dairyland needed away-from-reactor dry storage. This necessity flowed from the fact that Dairyland could not achieve the decommissioning of the LACBWR with fuel remaining in

---

[6] The Federal Circuit affirmed this Court's finding that Dairyland would have participated in exchanges with other utilities to eliminate its SNF at an earlier date than would have resulted according to the oldest-fuel-first schedule under the Standard Contract. *Dairyland I*, 645 F.3d 1370.

its wet pool.[7]  In addition, it was not apparent to Dairyland in the 1990s that away-from-reactor

dry storage would be possible elsewhere on the LACBWR site.[8]  The small site posed

geographical constraints for constructing another storage facility.  While Dairyland is currently

constructing an on-site dry storage facility on an "ash pond" on its premises (again, as of trial),

Dairyland did not recognize this as an option in the 1990s because, at the time, it thought the ash

pond to be incapable of supporting a storage facility.  As a result, Dairyland reasonably pursued

off-site dry storage.

Dairyland was also aware that, during the 1990s, the cost for other utilities to build their

own dry storage facilities was on the order of $50-100 million.  Tr. 1881-82 (Sans Crainte).

Such a cost would have been prohibitively expensive for Dairyland.  Expenses on that order were

beyond Dairyland's cash reserves, and Dairyland would not have been able to obtain a loan from

its usual capital lender.  *Id.*  Therefore, Dairyland reasonably looked for ways to decrease the

cost of constructing a dry-storage facility.

PFS not only would have allowed Dairyland to store its SNF off-site, but it also would

have permitted Dairyland to share the high cost of constructing an interim storage facility.

*Dairyland I*, 90 Fed. Cl. at 649.  PFS promised a much lower per-utility storage cost, and it was

the most practical alternative for off-site storage.  Tr. 1750:14-1752:5 (Stubbendick).  PFS also

would have been the first of its kind, as there were no private storage facilities in existence for

SNF.  Because off-site, private storage was the most effective mitigation solution for Dairyland,

---

[7] "The major [reason] is we were unable to decommission.  And, of course, now we're in a step where we had a nonoperating unit.  It certainly cost us a lot each year, but it also kept an NRC license open, kept a contaminated facility on our site next to our fossili[z]ed power plant.  So Dairyland was now in a position age of fuel wise where if we could remove it we could complete decommissioning and decontamination of our site and we could have terminated our license with the U.S. Nuclear Regulatory Commission, in a sense, exited the nuclear business."  Trial Transcript ("TR") 1298: 6-17 (Parkyn).

[8] *Dairyland I*, 90 Fed. Cl. at 651.

the utility opted to help the PFS venture get off the ground by participating as an equity member and employing one of its officers as the venture's CEO.  Tr. 1299-1304 (Parkyn).

Although PFS had the potential to earn a return for its equity members, Dairyland was not motivated by profit-seeking.  *Dairyland I*, 90 Fed. Cl. at 651.  Indeed, Dairyland is a non-profit organization.  Tr. 1378-79 (Parkyn).  Moreover, Dairyland understood it could not carry PFS independently, so it "metered" its contributions in accordance with the actions of other members.  Tr. 1890 (Sans Crainte).  The evidence presented by Dairyland belies any notion that Dairyland overinvested in the company, particularly for the purpose of profit speculation.  Dairyland contributed what it believed was necessary to make private storage a reality.

Therefore, the Court is convinced that Dairyland has borne its initial burden of proving up its damages.  The Court now turns to the government's arguments for offsetting the damages.

**B.  The Government's Theories for Offsetting PFS Damages**

The government raises two principal arguments on remand as to how this Court might offset Dairyland's PFS expenses to account for profit-oriented speculation.  First, the government argues, as it did to the Federal Circuit, that Dairyland's equity share in PFS far outstrips its actual storage needs, and that the extra investment above those needs amounts to profit-driven speculation.  Def.'s Resp. at 27.  Next, the government contends that any money contributed to PFS after the point in time when Dairyland ultimately returned to the pursuit of on-site storage is similarly speculative.  *Id.* at 28.  As discussed below, the Court rejects these arguments.

**a.  Dairyland's Storage Needs**

The government argues that Dairyland's equity ownership in PFS is significantly larger than necessary for Dairyland's storage needs.  Def.'s Resp. Br. 27.  Dairyland has approximately

13.5% equity ownership in the PFS venture,[9] and the PFS facility was contemplated to

accommodate approximately 4000 SNF storage casks.  *Id.*  The government calculates that

Dairyland's investment equates to approximately 540 casks (13.5% of 4000 casks).  *Id.*  This

amount of storage, the government points out, is nearly 100 times Dairyland's actual needs –

Dairyland needs only 6 casks to store its 38 MTU (metric tons of uranium) of SNF.  Tr. 1383

(Parkyn).  Consequently, the government implies that the other 536 casks' worth of space

constitutes improper profit-oriented speculation over and above the amount necessary for

mitigation of Dairyland's actual storage needs, and, therefore, not caused by the government's

breach.  *See id.*

     The issue of the number of storage casks was clearly of concern to the Federal Circuit

panel.  The panel found that the government, through this argument, had "raised the specter of a

bounty accruing to Dairyland from its PFS investment."  *Dairyland II*, 645 F.3d at 1376.  It went

on to warn that "the facts of this case urge caution" because "expectation damages are available

to compensate a plaintiff [only] for the cost of actions taken in mitigation, and not for speculative

ventures."  *Id.*  The Federal Circuit explained that Dairyland had the burden to overcome the

specter raised by the government.  *Id.*  As a result of this storage argument, the Federal Circuit

vacated the damages awarded for PFS and instructed this Court to determine whether to offset

Dairyland's damages to account for speculation.  *Id.*

     Given the Federal Circuit's concern, this Court considers the government's argument

cautiously.   Nevertheless, as a preliminary matter, the Court rejects as inapt the government's

comparison of equity ownership to storage space in PFS.  Dairyland's investment in PFS was not

the purchase of a specific amount of storage space.  As Mr. Parkyn explained at trial, "First,

Dairyland doesn't have casks left over.  You're talking about the proportionate ownership of the

---

[9]  See Tr. 1965:11 – 1966:8 (Sans Crainte).

facility, not the casks." Tr. 1400 (Parkyn).  The equity only entitled Dairyland to a right of first

refusal to lease cask space sufficient to meet its own needs (although, even at that, Dairyland

would still be required to pay rent as a customer).

> A. So what you're saying is what would we do with our rights to
>
> put fuel in that much?"
>
> Q. Yes.
>
> A. Those rights are returned to PFS, offered first to the remaining
>
> members if they have a greater need in the year through an
>
> exchange or swap, then their allocation would authorize and then
>
> offer to the industry, the nonPFS members.

Tr. 1400-1401 (Parkyn); *see also* Tr. 1304:5-10 (Parkyn).

All other cask space would remain the property of PFS to lease to other customers.  If the

business ever became successful, Dairyland would have received a share of the profits of the

entire PFS venture, but it would not have been profit fairly characterized as that derived from

alleged excess storage space specifically attributable to Dairyland per se.

> Q. And then ultimately GFT would be entitled to whatever profit
>
> could be gotten from those six minus 500 casks?
>
> A.      No, sir.  No.  We would be able to get whatever profit the
>
> Private Fuel Storage collective got, but in proportion to your
>
> ownership.

*Id*. 1401 (Parkyn).

Because Dairyland was still required to pay for storage, the more apt measure to compare

would have been Dairyland's anticipated on-site construction costs.  In the 1990s, Dairyland

believed an on-site facility would be prohibitively expensive based on its knowledge that other utilities were incurring costs on the order of $50-100 million for similar projects.  Tr. 1881-82 (Sans Crainte).  Comparatively, the Court finds that Dairyland's approximately $12 million investment in PFS to get the collaborative facility up and running was objectively reasonable.  Here, the parties dispute whether, had PFS advanced to the construction phase, Dairyland would have incurred further expenses that might increase or dilute its equity stake.  Pl.'s Initial Br. 12-13; Def.'s Resp. Br. 33-34.  However, the Court need not speculate on what Dairyland might have contributed to equity if the PFS venture had reached the point of construction.  The amount it spent to date to pursue private off-site dry storage was both caused by the breach and its calculation is reasonably certain.

It was necessary for Dairyland to spend the amount that it did in the manner that it did.  Dairyland could not, as the government suggests, simply have been a customer of PFS.  Def.'s Resp. 8.  In the 1990s, there was no PFS of which to be a customer.

> Q. So the money that Dairyland invested in PFS, conceivably it
> could have invested zero and still had a right to storage at PFS;
> correct?
> A. Except that that is not how it started.  You know, the concept of
> being available to everyone at a surcharge developed several years
> into the project as we had to put together a business plan
> preparatory to getting a license.

Tr. 1402-03 (Parkyn).

In order for a PFS to be possible, some utilities had to initiate, organize, and pursue the venture.  *See* Tr. 1318:3 – 1319:15 (Parkyn).  It was reasonable for Dairyland, in light of its off-

site storage needs, to attempt to share the cost of off-site dry storage with other utilities in an

amount less than the price of going it alone.

### b.  Dairyland's On-Site Project

At oral argument, rather than focus on the storage-space analysis, the government chiefly

urged this Court to draw the line between mitigation and profit-speculation by using a time-line

analysis.  The government pointed out that Dairyland is now committed to on-site dry storage.

*See* Tr. 1463:19-22 (Christians).  It contended that at some point in time, Dairyland's pursuit of

on-site storage for mitigation inherently meant that subsequent investments in PFS were profit-

driven and no longer mitigatory.  The government sets forth two dates at which this Court could

draw the line.

First, the government argues that the Court draw the line in 2001 when, it alleges,

Dairyland first began expending money for on-site storage.[10]  The government cites no authority

for the proposition that only one form of mitigation can be pursued at a time.  Here, Dairyland

remained under an obligation to mitigate damages.  As the PFS venture became increasingly

unlikely to be successful, Dairyland necessarily had to seek alternatives for mitigation.   *See,*

*e.g., Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 443 (2007) (noting

utility's decision to cease contributions to PFS only after completion and successful operation of

on-site dry storage), aff'd in part, vacated in part, remanded (all on other grounds), 637 F.3d

1297 (Fed. Cir. 2011).

Alternatively, the government argues that the Court draw the line in 2005 because that is

when Dairyland committed to on-site storage.  To the contrary, trial testimony indicated only that

---

[10] At oral argument on remand, Dairyland disputed that the record demonstrated any expenditures for on-site dry
storage prior to 2005.  The Court finds the evidentiary record unclear on this point, but the date by which Dairyland
began its pursuit of on-site dry storage does not change the Court's finding that its PFS expenses were nonetheless
mitigation costs caused by the government's breach.

Dairyland *began* seriously considering on-site dry storage in 2005. Tr. 1460:16-24 (Christians); Tr. 1609:17-22 (Brasel). Again, the Court finds that it was reasonable, under the circumstances exigent in 2005, for Dairyland to keep its PFS option open at least while it pursued the viability of on-site dry storage in mitigation of Defendant's breach.[11]

### C. The Court's Findings Regarding Causation

Based on the preponderance of the credible evidence, the Court finds that but for the government's breach, Dairyland would not have incurred its mitigation damages in PFS. Dairyland's PFS costs were entirely in mitigation and not speculation.

## IV. Other Issues Raised by the Government

The government raises two additional issues on remand. First, the government disputes this Court's prior findings regarding the reasons for Dairyland's investment in PFS, which the government argues must be re-evaluated as part of the "causal link" between the DOE's breach and Dairyland's PFS investment. Def.'s Resp. Br. 13-25. Second, the government urges this Court to perform an accounting of the residual value of Dairyland's stock in PFS, and to offset the damages award by that amount. For the following reasons, neither issue is before the Court in this remand.

### A. Reasons for Investment

The government asks that this Court revisit its prior findings regarding Dairyland's reasons for investing in PFS. It contends that the Federal Circuit's mandate requires that this Court reexamine the "causal link" between the DOE's breach and Dairyland's PFS investment. The government goes on to argue the factors found by this Court after trial – high storage costs,

---

[11] Dairyland made no capital contribution to PFS in 2006, but did incur $209,623 in direct costs to Genoa Fuel Tech in that year. The period for recovery of damages in this suit extended through December 31, 2006. *See* PX 703.

limited financial resources, the LACBWR geography, and the desire to decommission – are unsupported by the evidence.[12]

The Court disagrees with the government's conclusion that the Federal Circuit directed this Court to reconsider these findings.  The Federal Circuit did not, as the government suggests, throw open the doors to the entire causation analysis.  *See* Def.'s Resp. 15.  Rather, it was concerned with what it termed a "size" issue.  *Dairyland II*, 645 F.3d at 1374, 1375.  The Federal Circuit limited its analysis as follows:

> The government does not contend that it was unreasonable or unforeseeable that Dairyland would seek interim off-site storage for its SNF.  Nor does it argue that Dairyland was not entitled to collaborate with other nuclear utilities to aggregate the costs of such storage.  The problem with the trial court awarding Dairyland the full cost of its participation in PFS, according to the government, concerns the size . . . of that participation.

*Id.* at 1374.  Accordingly, its mandate to this Court was very limited: "It is [this Court's] role . . . to determine in the first instance the amount to offset Dairyland's award of its PFS investment to account for speculation (if indeed there was speculation)."  *Id.* at 1376.  Thus, the Federal Circuit asked this Court to apply a more "detailed inquiry" to its causation analysis, with a focus on drawing a line between expenses attributable to mitigation and non-mitigation expenses attributable to profit-driven speculation.  *Id.*

The government's arguments amount to a claim that "Dairyland was not entitled to collaborate with other nuclear utilities to aggregate the costs of [off-site] storage."  *Id.*; *see, e.g.*, Def.'s Resp. Br. 20 ("Dairyland cannot show that PFS could ever have been considered the lower cost option for its storage needs.").  This is precisely what the Federal Circuit stated was not at issue.  Moreover, to the extent the government suggests that Dairyland could have pursued alternatives to PFS, its arguments are rejected as implicating the reasonableness of how it

---

[12] Additionally, the government disputes with some persuasive force this Court's finding that the unavailability of dual purpose casks was a factor in Dairyland's decision.  This opinion does not rely on that earlier finding.

pursued its duty to mitigate, which is an inquiry distinct from causation and not at issue here. "The government does not contend that it was unreasonable or unforeseeable that Dairyland would seek interim off-site storage for its SNF." *Dairyland II*, 645 F.3d at 1374.

Even considering the government's arguments, there is no basis for this Court to alter its earlier findings. The government argues that high construction costs, Dairyland's finances, and LACBWR geography could not have influenced Dairyland's decision to invest in PFS because Dairyland is currently building an on-site storage facility. The government's comparison suffers from hindsight bias. As Dairyland explained, it did not realize until recently that on-site dry storage was possible. Tr. 1463 (Christians). Additionally, Dairyland's ability to pay for its current dry storage project does not demonstrate that it had the ability to pay for such storage in the 1990s. The government's other arguments rely on unadmitted evidence that the Court rejected in denying the government's motion to reopen.

## B. Residual Value

The government argues that this Court is tasked with performing an accounting of the residual value of Dairyland's PFS stock and offsetting the damages accordingly. The Court is not persuaded that residual value is a remanded issue. The Court's duty on remand is to determine "the amount to offset Dairyland's award of its PFS investment to account for speculation." *Dairyland II*, 645 F.3d at 1376. The Court finds that the inquiry into the remaining value, if any, of Dairyland's PFS equity is distinct from the inquiry into whether any portion of Dairyland's PFS investment was non-mitigatory speculation.

The Court notes that even if it were to decide this issue, it would still find against the government. The government merely alluded to residual value in its pre-trial brief, Def.'s Mem. of Fact and Law 50, and did not mention it in its post-trial brief. Def.'s Post-Trial Br. 50 n. 23

(asking only for the equitable remedy of the transfer to the government of Dairyland's interest in

PFS).  During trial, the only evidence on point was Mr. Sans Crainte's testimony on cross-

examination that he believed Dairyland's PFS stock was worth more than nothing, but that he

could not put a number on it.  Tr. 1963-64 (Sans Crainte).  The government presented no other

evidence that the PFS equity has current value or that there was even a market for the stock.

Based on this sparse record, even if the Court were required to reach this issue, it would find that

the government did not meet its burden of production.

## V.   Conclusion

Based on the foregoing discussion, the Court reinstates its award of $11,999,125 to

Plaintiff for PFS damages.

The Clerk of Court is hereby directed to enter judgment accordingly.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge